# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT NO. 3511-2003M17200012

December 12, 2002

**PREPARED FOR:** Contracting Officer, Thomas Benero
Department of the Army
Chief, Contracting Division
Galveston District, Corps of Engineers
2000 Fort Point Road
Galveston, TX 77550

**PREPARED BY:** Dallas Branch Office
6321 E. Campus Circle Drive
Irving, TX 75063-2742
Telephone No. (972) 753-2580
FAX No. (972) 518-1550
E-mail Address dcaa-fao3511@dcaa.mil

**SUBJECT:** Report on Audit of Price Adjustment Claim for Differing Site Condition – Lost Lake Levees Related to Dredging Work in the Upper Bayou Houston-Galveston Navigation Channel, Texas

**REFERENCES:** Contract No. DACW64-99-C-0001
Relevant Dates: See Page 6
Chron. No.: 027

**CONTRACTOR:** Renda Marine, Inc.
522 Benson Lane
Roanoke, TX 76262

**REPORT RELEASE RESTRICTIONS:** See Page 7

**CONTENTS:**


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 1 |
| Results of Audit | 2 |
| Contractor Organization and Systems | 5 |
| DCAA Personnel and Report Authorization | 6 |
| Audit Report Distribution and Restrictions | 7 |
| Appendixes | 8 |

## SUBJECT OF AUDIT

As you requested on April 29, 2002, we performed an examination of Renda Marine, Inc.'s (RMI) $6,258,853 price adjustment claim for differing site conditions, to determine if the claimed amount is acceptable as a basis for settlement. The claim was submitted pursuant to the Contract Disputes Act of 1978, 41 U.S.C. 601-613. RMI submitted its certified claim, dated October 16, 2002, under firm-fixed-price Contract No. DACW64-99-C-0001, due to Differing Site Condition – Lost Lake Levees related to dredging work in the Upper Bayou Houston-Galveston Navigation Channel, Texas.

The price adjustment claim and related cost or pricing data are the responsibility of the contractor. Our responsibility is to express an opinion on the claim based on our examination.

## EXECUTIVE SUMMARY

Our examination of the $6.3 million price adjustment claim disclosed $6.3 million questioned in its entirety. We questioned the entire claimed amount, due to RMI not providing adequate support for its claim related to Differing Site Condition-Lost Lake Levees.

The significant issues described below should be considered in any update to the price adjustment claim.

SIGNIFICANT ISSUES

The contractor's claimed cost could not be supported or identified by specific elements. We believe this claim contains indirect cost allocations and profits that are duplicated in the additional claims filed by RMI and may not be applicable to the amount previously paid to RMI under the contract.

Significant findings that are contested by the contractor are discussed in the Results of Audit. We are available to provide you with assistance in resolving the reported findings.

## SCOPE OF AUDIT

Except for the qualifications discussed below, we conducted our examination in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the examination to obtain reasonable assurance that the price adjustment claim is free of material misstatement. An examination includes:

- evaluating the contractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on the control risk assessment;
- examining, on a test basis, evidence supporting the amounts and disclosures in the price adjustment claim;

- assessing the accounting principles used and significant estimates made by the contractor;
- evaluating the overall price adjustment claim presentation; and
- determining the need for technical specialist assistance.

We evaluated the claimed costs using the applicable requirements contained in the:

- Federal Acquisition Regulation (FAR);
- Defense FAR Supplement (DFARS);
- Army Corps of Engineers FAR Supplement (EFARS); and
- Contract Provisions.

The award of Contract DACW64-99-C-0001 resulted from a sealed bid and is therefore exempt from all Cost Accounting Standards (CAS), in accordance with 48 CFR 9903.201-1, CAS applicability. As a result, the contractor's price adjustment claim is exempt from CAS.

The scope of our examination reflects our assessment of control risk and includes tests of compliance with applicable laws and regulations that we believe provide a reasonable basis for our opinion. Our assessment of control risk reflects that we have not specifically examined RMI's accounting system and its related internal controls.

QUALIFICATIONS

Our audit did not address the issue of actual or legal entitlement. We have audited the claimed amount and offer conclusions regarding its existence, magnitude, and reasonableness. Any reference in this report to adjusted amounts per DCAA audit should be taken in this context.

The results of audit are based on the Contracting Officer's determination that the contractor's price adjustment claim request under its firm-fixed-price Contract DACW64-99-C-0001 complies with the CDA requirements. If this determination should change, please notify us, so that the impact of such a change on the results of audit can be assessed.

## RESULTS OF AUDIT

In our opinion, the cost or pricing data submitted by the contractor are not adequate (See Note 1, page 3). The claim was not prepared in all respects in accordance with appropriate provisions of the FAR and the DFAR Supplement. Our opinion is qualified as noted above. Because the cost or pricing data inadequacies are considered significant, we do not believe the claim is an acceptable basis for settlement of the price adjustment claim request, as discussed with Mr. Thomas Benero and confirmed in our teleconference with your office on May 7, 2002. FAR 15.403-4 requires the submission of cost or pricing data applicable to the modification of any sealed bid contract. To make the cost or pricing data adequate, the contractor must prepare its claim in the format of FAR 15.408, Table 15-2. Table 15-2 Section II-Cost Elements, requires that the contractor provide breakdowns for the basic cost elements claimed. At your request, we have nevertheless, evaluated the claim to the extent possible in the circumstances.

Significant findings that are contested by the contractor are discussed below. We are available to provide you with assistance in resolving the reported findings. We discussed the results of our examination with Mr. Oscar Renda, President and Chief Executive Officer, Mr. Rudy Renda, Vice President and Mr. Barry Smith, Principal, Pathfinder Construction Consulting, Inc., in an exit conference held on May 14, 2002. We did not provide the dollar impact of our findings. Their comments are shown in the explanatory notes and their written response is attached as an appendix to this report.

**EXHIBIT**

**RENDA MARINE, INC.**
**ROANOKE, TEXAS**

CONTRACTOR'S CLAIMED COST AND RESULTS OF AUDIT

| Description | Claimed & Questioned | Note |
|---|---|---|
| Lost Lake Levees: | | |
| Total Amount | $30,827,513 | |
| Less: Claimed & Paid To Date | 24,568,660 | |
| Questioned | $6,258,853 | 1 |

EXPLANATORY NOTE

1. Differing Site Conditions-Lost Lake

a. Summary of Conclusions:

We question $6,258,853 in its entirety. The price adjustment claim was not prepared in accordance with FAR 15 as required to provide the specific elements.

b. Basis of Contractor's Cost:

Mr. Barry Smith, consultant for RMI, prepared the price adjustment claim based on a total modified cost approach. The amount claimed of $6,258,853 is the difference between the calculated total amount, including indirect on-site and corporate office allocations and profit ($30,827,513), less the sum of the amount paid to RMI ($16,582,665) and the total of additional claims filed to date ($7,985,995).

c. Audit Evaluation:

In our attempts to verify these claimed costs, we noted that the contractor did not provide cost breakouts of the cost elements necessary to support its claimed cost for the realignment

effort. FAR Table 15-2 requires that certified cost or pricing data representations be supported by breakdowns for the basic cost elements claimed. As a result we were not able to audit the above costs claimed because they were not in an auditable format.

To make the cost or pricing data adequate, the contractor must prepare its claim in the format of FAR 15.408(m) Table 15-2. Table 15-2 Section II-Cost Elements requires that the contractor provide breakdowns for the basic cost elements claimed. The contractor did not break out its labor, equipment and other direct costs or present them in a format that was auditable and traceable to the accounting books and records.

Although not prepared in accordance with FAR 15.408, we noted that the contractor applied indirect cost allocations from on-site and corporate office and profit to the total amount of $24,663,589. This total amount was not identified to specific elements and we were unable to verify the $24,663,589 to RMI's accounting books and records. We believe that the total amount includes amounts previously paid to RMI under the contract and amounts in the total of additional claims filed to date. We also believe the application of the indirect cost allocations and profit may effect a duplication of costs and profit, when in fact, it was considered in the additional claims filed to date and may not be applicable to the amount previously paid to RMI under the contract.

In this claim, RMI is seeking the following amounts:

| Element | Amount |
|---|---|
| On-site Allocation | $1,233,179 |
| Corporate Office Allocation | 1,627,797 |
| Profit | 3,302,948 |
| Unidentified amount | 94,929 |
| Total | $6,258,853 |

d. Contractor's Reaction:

The contractor indicates that it will, at a later date, prepare and break out the claimed costs and provide them for either settlement or an appeal through the agency board of contract appeals or the U.S. Court of Federal Claims.

e. Auditor Response:

Claimed costs must be submitted in the format of FAR 15.408, Table 15-2. The claimed amount should not be derived in a matter that contains duplicate indirect cost allocations and profit.

## CONTRACTOR ORGANIZATION AND SYSTEMS

1. ORGANIZATION

Renda Marine, Inc. is located in Roanoke, Texas and was formed May 8, 1998. The company is engaged in the dredging of lakes and offshore waterways. The company provides marine equipment and personnel required to perform the dredging and the transportation and disposition of the by-product. The company performs most if its work on lakes in the state of Texas and the open waterways of the Gulf Coast region. As of April 2002, RMI had 46 employees. This is a decrease from the 106 employees that it had in April 2000, when it was performing on the contract.

For the Fiscal Year Ended October 31, 2000, RMI had sales of $11,319,415 and a net loss of $4,936,282. For the Fiscal Year Ended October 31, 2001, RMI had sales of $6,664,231 and a net loss of $62,696. In accordance with Statement of Auditing Standard 59, "Entity's Ability to Continue as a Going Concern," the CPA stated:

> The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. . . . the Company has suffered recurring losses from operations and has a net capital deficiency that raises substantial doubt about its ability to continue as a going concern. . . . The financials statements do not include any adjustments that might result from the outcome of this uncertainty.

RMI is related to two other companies, Oscar Renda Construction, Inc. (ORC) and Renda Environmental Services, Inc. (RESI). ORC was formed on September 9, 1974. RESI began operating on July 30, 1992.

2. ACCOUNTING SYSTEM

We have not audited the contractor's accounting system.

The company maintains accounting records and files federal income tax returns using the percentage-of-completion method, whereby income is recognized on the basis of engineering estimates of the percentage-of-completion of the contract, based on work performed and job costs incurred. Costs and estimated earnings on incomplete contracts in excess of related billings are recognized as current liabilities. Estimated contract losses, if any, are provided on a current basis.

## DCAA PERSONNEL

| | Telephone No. |
|---|---|
| Primary contacts regarding this audit: | |
| Gene Seiler, Senior Auditor | (972) 753-2583 |
| Darrell Shobert, Senior Auditor | (972) 753-2584 |
| Charles Wylie, Supervisory Auditor | (972) 753-4547 |
| Other contact regarding this audit report: | |
| William F. Daneke, Branch Manager | (972) 753-2580 |
| | FAX No. |
| | (972) 518-1550 |
| | E-mail Address |
| | dcaa-fao3511@dcaa.mil |

General information on audit matters is available at http://www.dcaa.mil.

## RELEVANT DATES

Request for Audit: dated April 29, 2002; received May 1, 2002

**AUDIT REPORT AUTHORIZED BY:**

/Signed/
William F. Daneke
Branch Manager
Dallas Branch Office

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

DISTRIBUTION

Contracting Officer
Department of the Army
Chief, Contracting Division
Galveston District, Corps of Engineers
2000 Fort Point Road
Galveston, TX 77550

E-mail Address
Thomas.benero@swg02.usace.army.mil
Telephone
(409) 766-3850

RESTRICTIONS

1. Information contained in this audit report may be proprietary. It is not practical to identify during the conduct of the audit those elements of the data which are proprietary. Make proprietary determinations in the event of an external request for access. Consider the restrictions of 18 U.S.C. 1905 before releasing this information to the public.

2. Under the provisions of Title 32, Code of Federal Regulations, Part 290.7(b), DCAA will refer any Freedom of Information Act requests for audit reports received to the cognizant contracting agency for determination as to releasability and a direct response to the requestor.

3. The Defense Contract Audit Agency has no objection to release of this report, at the discretion of the contracting agency, to authorized representatives of RMI.

4. Do not use the information contained in this audit report for purposes other than action on the subject of this audit without first discussing its applicability with the auditor.

APPENDIX 1

## CHRONOLOGY OF SIGNIFICANT EVENTS

| Description or Reference to Pertinent Government or Contractor Action | Date |
|---|---|
| Performance started on contract | November 29, 1998 |
| Obstruction hit, dredge damaged, delay period began | December 4, 2000 |
| Delay period ended | January 14, 2001 |
| Request for Equitable Adjustment proposal filed | June 11, 2001 |
| Claim Certified | October 16, 2001 |
| Performance ended on contract, Change Order No. 11, deleting remaining work | September 18, 2001 |
| Corps of Engineers completes technical analysis | February 4, 2002 |
| Corps of Engineers requests audit | February 4, 2002 |

**APPENDIX 2**

**RENDA MARINE, INC.**
**ROANOKE, TEXAS**

CONTRACTOR'S RESPONSE

See separate file titled: 3511-APPENDIX DACW64-99-C-0001

# RENDA MARINE DRAFT RESPONSE TO DCAA AUDIT

**VIA EMAIL**

February 16, 2002

Darrell D. Shobert, CPA
Defense Contract Audit Agency
Central Region
Dallas Branch Office
6321 East Campus Circle Drive
Irving, TX 75063-2742

Re: U.S. Army Corps of Engineers – Galveston District
Houston Ship Channel - Dredging Upper Bayou Project
Government Contract No. DACW64-99-C-0001

Re: Defense Contract Audit Agency – Contract Audit
DCAA Assignment No. 3521-2002V17200001
Contractor Comments from Completed DCAA Audit

Dear Mr. Shobert:

In accordance with DCAA Contract Audit Manual (CAM) DCAAM 7640.1, paragraph 10-212.2.b, Release of Audit Reports to the Contractor, Renda Marine, Inc. (RMI) requests that this written document be attached to the DCAA Final Report to the U.S. Army Corps of Engineers, Galveston District (COE).

On March 13, 2001, RMI initially requested, in writing to the COE Contracting Officer, Tom Benero, that an audit be performed. The audit was requested by RMI to validate indirect overhead rates following Government negotiations with RMI for the Flare Area Request for Equitable Adjustment. The COE requested a DCAA audit from the Houston Branch Office on February 4, 2002. However, the COE failed to take into account that RMI's cost and financial records were located in its Corporate Headquarters in Roanoke, TX. Hence, sometime during the latter half of March 2002, the COE request was transferred to the DCAA Dallas Branch Office. On April 1, 2002, Gene Seiler, Senior Auditor (DCAA Dallas Branch Office) contacted RMI's representative to schedule an Entrance Conference for the DCAA Audit Team. The Audit Entrance Conference was conducted at the Oscar Renda Contracting office on Friday, April 5, 2002, with Oscar Renda, President and Rudy Renda, Vice President in attendance. At the Entrance Conference, the DCAA Audit Team was introduced as follows:

- Charles Wylie Supervisor
- Larry James Technical Specialist
- Gene Seiler Auditor
- Darrell Shobert Auditor
- Sam Cotosman Auditor
- Jude Obaseki Auditor

The onsite audit was started Monday, April 15, 2002 and was completed the week ending May 10, 2002. DCAA personnel provided two separate Exit Conferences. Gene Seiler, Senior Auditor conducted an informal Exit Conference telephonically on Thursday, May 9, 2002 with Barry Smith, Pathfinder Construction Consulting, Inc. Darrell Shobert, Senior Auditor conducted the formal Exit Conference with RMI personnel, including Oscar Renda and Rudy Renda in attendance, on Tuesday, May 14, 2002.

Gene Seiler explained verbally for the informal Exit Conference that both the dredge and booster barge rates must be based on 25-years depreciation in accordance with the EP 1110 Manual, but he recognized that the acquisition price of the equipment did not incorporate RMI and other labor to complete construction of the equipment. The spud barge rates were satisfactory, but rates for the piping joints were questioned. The auditor stated that he had spoken with Kim Callan from the Cost Engineering Branch, U.S. Army Corps of Engineers, Walla Walla District, Washington. Based upon direction from the DCAA customer, COE Galveston, the Linkbelt trackhoe, Caterpillar dozer, lighting set, gator, Komatsu dozer and marsh buggy were removed from the "dredging" claims since it was deemed levee equipment. Regarding the Lower Bay Project, Eric Russek, COE Galveston questioned the charging of equipment by RMI (anchor barge, work barge, excavator) at both the Lower Bay and Upper Bayou Projects. These costs remained in question.

Darrell Shobert explained at the Exit Conference that indirect rates appeared to be satisfactory when compared to what was claimed. Bond and profit costs were also satisfactory. Professional fees related to claims were unallowable. Claims 1, 2 and 7 (Flare Area, South Ferry Landing, Section 7 Clay, respectively) were dredging-related claims calculated using the concept of the Measured Mile. The Measured Mile used the concept of anticipated cost versus total costs incurred, the difference being the amount of the claim. These auditors tested the costs. DCAA felt that technical issues remained whether or not to accept the timeframe or criteria of the particular Measured Mile, but they had no problems with the theory. The audit noted that labor to construct the levees was included in some of the claims. The audit noted equipment rate differences for the dredge and booster barge when considering the use of 25-years versus 7 or 10-year depreciation of the equipment. Claims 3, 4, 5 (HL&P Tower, Obstruction No. 1, Obstruction No. 2, respectively) were dredging-related, simple delay cost/repair damage claims. Claims 6 and 8 (West Levee Realignment, Hydraulic Levee, respectively) were levee claims. Claims 1 through 5 and 7 were supported with cost and pricing data, while Claims 6 and 8 were not supported with cost and pricing data in accordance with FAR 15-408, Table 15-2. The auditor advised RMI that the Contractor's accounting system is required to track the cost of claims separately from the normal costs of the Project. Further, sales is not an acceptable base for calculation of indirect costs. A cost base would be better to meet Government standards.

DCAA personnel performed exit Conference(s), but no written report(s) was provided to RMI. Therefore, RMI is responding to auditor questions and issues raised during the onsite audit and/or items discussed in very general terms at the Exit Conference(s). RMI makes the following comments:

- At the Entrance Conference on April 5, 2002, the Audit Team presented RMI with a 12-page packet of information titled, "Questions Presented To Contractor During April 5, 2002." RMI expressed its intent to provide the information necessary to respond to the questions. We have attached a copy of the packet to this letter.

- The auditors pre-numbered the RMI claims as follows:
  - Claim No. 1 Flare Area Clay
  - Claim No. 2 South Ferry Landing
  - Claim No. 3 HL&P Transmission Tower
  - Claim No. 4 Obstruction No. 1
  - Claim No. 5 Obstruction No. 2
  - Claim No. 6 West Levee Realignment
  - Claim No. 7 Section 7 Clay
  - Claim No. 8 Lost Lake Hydraulic Levees

- RMI expressed its intent to willingly cooperate with the onsite auditors, making available all Project records, claims and corporate financial records for review. In fact, all information requested by the auditors was freely provided, including printouts of electronic records in a format to make the audit easier.

- RMI had their consultant, Barry Smith, Pathfinder Construction Consulting, Inc. available 100% of the time the onsite auditors were present at the Roanoke office, at no cost to the Government. Barry Smith was available for liaison between the Government and RMI and provided assistance to the auditors for questions related to the claims. Further, RMI's outside CPA firm of Milbern and Ray, represented by Kent Ray, was also available to respond to financial questions. Kent Ray responded to both, questions regarding calculation of overhead costs and accounting procedures and to questions regarding RMI's Project cost controls from 1998 through 2001. RMI updated its cost accounting system in early 2001, and the current RMI Controller, Eric Buechler, was not employed by RMI until the spring of 2001. Therefore, Kent Ray was available to discuss the accounting system used by RMI during 1998, 1999 and 2000.

- The DCAA failed to explain at the Entrance Conference that no written report would be issued to RMI at the conclusion of the audit. During the audit, the auditors revealed that a written report would be issued to COE Galveston but not to RMI. At this time, we do not know if the audit was conducted in support of litigation or support of investigation. We have not been informed if the COE Galveston intends to invoke attorney-client privilege for the audit or if the audit was conducted simply as an investigation support tool to enhance the negotiating position of the COE Galveston. The DCAA failed to make clear the use of the report by its customer, COE Galveston.

- RMI explained to the auditors that Oscar Renda, President of RMI was forced to liquidate his banks and commit significant personal assets to the company to avoid bankruptcy of RMI and other corporate holdings, due solely to the changes and additional costs related to this Project.

- RMI's senior management has received no executive compensation for the past 2-1/2 years.

- RMI had expected to receive an objective audit of its financial records, including the overhead rates. While the onsite auditors appeared to follow accepted accounting guidelines for auditing procedures of financial records, it quickly became obvious that the auditors had also been assigned the additional task of subjective evaluation of equipment usage by RMI and evaluation of technical issues related to dredging means and methods. The auditors were neither knowledgeable nor experienced in construction procedures related to technical means and methods of the dredging industry and construction of levees, either mechanical or hydraulic.

- RMI strenuously objects to the COE Galveston providing written technical criteria for evaluation of the claims by the auditors, forcing the auditors to adhere to principles or guidelines, which are questions in fact, currently subject to a lawsuit filed with the Federal Court of Claims.

- As the acknowledged "customer" of DCAA, RMI objects to the COE Galveston using that customer influence to "force feed" or stipulate that their ideas are more correct than RMI's regarding review of the claimed costs, equipment usage, etc.

- The auditors were not familiar with the administrative and/or technical requirements of the Contract Documents.

- While the auditors are obviously competent in the accounting field, RMI questions the level of experience of some of the auditors regarding construction contracts, the standard of "reasonableness" for the construction industry, construction cost controls and general means and methods for construction related to this Contract.

- RMI explained to the auditors that the COE Galveston's directive to the auditors to segregate the levee costs from the dredging costs was not an acceptable practice, nor was it acceptable for the auditors to arbitrarily decide which equipment was levee related and would be removed from specific claims.

- RMI objects to the arbitrary and capricious manner in which the COE Galveston dictated that levee-related costs were to be removed by the auditors from specific claims, without any recourse or discussion allowed by RMI. The levee-related costs associated with dredging delay claims are not mutually exclusive. During negotiations for the Flare Area Request for Equitable Adjustment, the COE Galveston requested that all levee equipment costs be segregated for later evaluation. RMI agreed to remove equipment costs related to levee work only for settlement purposes. RMI never stipulated that levee costs were

not part of the dredging claims, since dredging and levee building are concurrent activities. One cannot proceed without the other in this Contract.

- RMI explained to the auditors that all of the dredge related claim costs (acknowledging certain errors in the transfer of equipment rates between claims) were based upon theories negotiated between RMI and the COE Fort Worth District representative (Will Sanford, COE) assigned the task by COE Galveston to negotiate the Flare Area Request for Equitable Adjustment in February 2001. All equipment means and methods, equipment hours, labor costs, vendor costs and rental equipment costs were negotiated with COE Fort Worth, and the format set for resolution of future issues.

- RMI strenuously disagrees with Gene Seiler's notification and intent to remove the Linkbelt trackhoe, Caterpillar dozer, lighting set, gator, Komatsu dozer and marsh buggy from the "dredging" claims since they were deemed by unknown or unstated criteria to be levee equipment. At the request of COE Galveston, RMI previously segregated all levee-related equipment from the dredging claims. RMI believes that the equipment noted above was supporting dredging operations, not necessarily the construction of levees. It is obvious that COE Galveston directed the auditor to remove this equipment from the claims, which necessarily skews RMI's claimed costs. At one point during the audit, Gene Seiler made the determination that, with the exception of the dredge and equipment on the dredge, all other equipment was levee related. Despite explanations to the contrary from Barry Smith, Gene Seiler explained that this was his interpretation of written instructions from COE Galveston. Gene Seiler recommended that Barry Smith discuss these instructions with Mike Rauls, COE Galveston, but Barry Smith declined noting that Mike Rauls was not one of the personnel assigned to this Contract. Barry Smith contacted the Audit Supervisor, Charles Wylie about RMI's concerns. Several days later but still during the audit, Gene Seiler reversed his position after discussions with COE Galveston. The ability of COE Galveston personnel to influence the auditor's decisions at will, calls into question the objectivity of the review.

- During the audit, Barry Smith recognized that four repair cost items for the dredge had been claimed twice, once in Claim No. 2 (South Ferry Landing) and also in Claim No. 4 (Obstruction No. 1). Barry Smith notified Gene Seiler that these "double-dip" costs would be removed from Claim No. 4.

- Regarding the allegations from COE Galveston that pieces of equipment located at the Lower Bay Project were claimed costs at the Upper Bayou Project, Barry Smith offered Gene Seiler the opportunity to review all correspondence/records transmitted to Will Sanford at the time of the allegations. Barry Smith explained that extensive research had been conducted in response to allegations from the Non-Federal Sponsor, but RMI had never received any response from the COE Galveston to its analysis. Gene Seiler declined to review the files regarding this issue stating that the issue was technical and remained in question. RMI believes its responses to Will Sanford accurately address the concerns, and the issue should be concluded.

- RMI has determined hourly rates for its equipment using the U.S. Army Corps of Engineers Engineering Pamphlet (EP) 1110-1-8 (June 1999) Construction Ownership and

Operating Expense Schedule (EP 1110 Manual). The EP 1110 Manual explains how the contractor can calculate hourly rates using actual costs (CHECKRATE spreadsheet). In addition, the use of the EP 1110 Manual is "required by contractors for pricing contractor-owned equipment in negotiated procurements when: (2) Cost or pricing data is required and the actual cost data to support either ownership or operating costs for equipment or equipment groups of similar model and series is not available." Since RMI's actual equipment costs are generally unavailable, i.e. the equipment accounting system does not accurately track actual costs for individual pieces of equipment, RMI has determined hourly rates based upon the factors provided in Tables 2-1, 2-2, 3-1 and 3-2 of the EP 1110 Manual. During the audit, Gene Seiler arbitrarily declared that hourly rates **for every piece of equipment as a whole** must be determined using actual costs or using the EP 1110 Manual factors. Thus, it was the auditor's position that if RMI used EP 1110 Manual factors to determine the hourly rate for one piece of equipment, then the hourly rate for every piece of equipment must also be calculated from the pre-determined factors. This position is neither substantiated in the EP 1110 Manual nor supportable according to telephone discussions with the authors of the manual, Cost Engineering Branch, COE Walla Walla District.

- The issue regarding the dredge hourly rates, as well as hourly rates for the booster barge, piping, pipe joints, pipe floats, etc. were discussed in detail during the audit. Following discussions with Kim Callan, Chief Cost Engineer, COE Walla Walla, RMI agreed with the auditors that if rates were calculated from the "Dredge Plant Ownership and Operating Rate Worksheet" provided in the EP 1110 Manual, using pre-determined factors from Table 4-1, then actual costs could not be incorporated into the hourly rate calculation. Thus, RMI would not be able to calculate hourly rates mixing actual depreciation costs claimed over a 10-year period and Table 4-1 factors for operating costs. RMI and the auditors reviewed the dredge and booster barge acquisition costs currently capitalized on RMI's Book Asset Detail sheets to validate the "price" of both pieces of equipment for hourly rate evaluation per the EP 1110 Manual. Using the Table 4-1 factors from the EP 1110 Manual and validated acquisition costs for the equipment, new hourly rates were developed using the COE worksheet. However, RMI also pointed out to the auditors that substantial labor costs associated with plant startup were not currently capitalized. Gene Seiler acknowledged that these additional costs should be part of the acquisition price and would therefore change the hourly rate again when compiled. The actual acquisition price of the dredge will be re-calculated incorporating all material and labor costs prior to startup and including all major material and/or labor costs one year following startup, as stipulated in the EP 1110 Manual. Due to the magnitude of the claimed costs associated with this equipment, since the dredge is the prime piece of equipment for the Project, RMI stated that they would attempt to determine revised hourly rates also using actual costs for determination of Ownership and Operating Costs. Barry Smith explained that actual costs for the dredge and booster barge could likely be determined identifying the Ownership and Operating Costs. The actual Ownership Costs can be calculated knowing the yearly depreciation claimed by RMI to the Internal Revenue Service (allowable per FAR 31.205-11 – Depreciation) and the Facilities Cost of Money promulgated by the Government bi-annually. Actual Operating Costs will be more difficult to determine. Because of the uniqueness of the equipment and the easily identifiable, specialty vendors supplying parts/services for the

equipment, actual repair costs and fuel costs may also be identified by vendor invoice for the yearly periods of 2000 and 2001. RMI will still be required to utilize some of the pre-determined formula from the EP 1110 Manual primarily to calculate other cost factors for hourly rates such as Water, Lube, Supplies, etc. These calculations are not skewed by COE-developed formula, which base the hourly rate over the life of the equipment.

- RMI vigorously disagrees with the auditor's attempt to lower RMI's claimed hourly rates for equipment by revising the Conditions from "Severe" to "Difficult" or "Average." Barry Smith provided Gene Seiler with information directly from the EP 1110 Manual, Section 2-4, Average, Difficult, or Severe Conditions, which states:

  > "Operating conditions may be average, difficult, or severe. Rates for both average and severe operating conditions are determined in accordance with APPENDIX C, Guide for Selecting Operating Conditions. Rates for the difficult condition are the arithmetic mean of the average and the severe rates."

  For virtually all categories of equipment, Appendix C of the EP 1110 Manual states that criteria for "Severe" Operating Conditions, is a "salt water environment." RMI believes that the land-based equipment operating for extended timeframes in harsh, constantly wet, saturated muddy conditions aggravated by salty water, reasonably constitutes "Severe" operating conditions for this Contract.

- During the audit, Gene Seiler noted that COE Galveston had requested that **ALL** equipment rates be audited. Gene Seiler certainly believed the COE Galveston request exceeded the bounds of "sampling" costs since only the hourly rates for pipeline (24"), pipeline joints, pipeline pontoons, workboat "Marilyn K. McFarland", workboat "Crista Dian", Skagit crane mounted on anchor barge, Lafco workboat, Monark workboat and American crane mounted on work barge (Equipment Item Nos. 5, 6, 7, 8, 9, 11, 15, 16 and 24, respectively) were analyzed by the auditor. It was Gene Seiler's opinion that the audited equipment represented 80% of the claimed equipment costs. Although RMI acknowledges the Government's right to review every bit of information available, we question the value of an extensive review of equipment rates while only sampling or auditing the remainder of the claimed costs. Further, we question whether or not a reasonable audit/review was performed by DCAA for RMI and Corporate financial records.

- 

Sincerely,

Oscar Renda
President
Renda Marine, Inc.

DEPARTMENT OF THE ARMY
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO ATTENTION OF

APR 29 2002

Contracting Division

Defense Contract Audit Agency
Attn: Mr. Charles Wylie
Dallas Branch Office
6321 E. Campus Circle Drive East
Irving, Texas 75063

SUBJECT: Audit of Contract No. DACW64-99-C-0001 for Houston-Galveston Navigation Channels, Texas, Dredging Upper Bayou (45-Foot Project) in Harris and Galveston Counties.

Dear Mr.Wylie:

It is requested that you provide an audit to assist in negotiating the following claims: ( Hydraulic Levees at Lost Lake, Section 7 clay, HL&P Transmission Tower, Flare Area, Obstruction No. 1 (Between Sections 4 & 8) and Obstruction No. 2, (Section 9), West Levee Realignment and South Ferry Landing) for the subject contract.

Enclosed is a copy of the Military Interdepartmental Purchase Request (MIPR), DD Form 448 (Encl. 1), Equipment List (Encl. 2), Disk 4 (Encl. 3) and Upper Bayou-South Ferry Landing Estimate for "Measured Mile", Daily logs for Dredging & Levee Productions, and Charts (Encl. 4).

If you have any questions in reference to this request, please contact Mr. Mike Rawls at (409) 766-3976 or Mr. Eric Russek at (409) 766-3007 or via e-mail at Michael.B.Rawls@usace.army.mil or Eric.G.Russek@usace.army.mil.

Sincerely,

Thomas Benero
Chief, Contracting Division

Enclosures:

RM-DCAA-1600208



12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF JOHN E. KOSLOSKE

I, JOHN E. KOSLOSKE, declare as follows:

1. I am an attorney in the Commercial Litigation Branch of the Department of Justice and counsel of record for the United States in the above captioned action.

2. The above captioned action involves claims governed by the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13), arising under or relating to a contract between Renda and the United States, acting through the Army Corps of Engineers, Galveston, Texas District, to dredge part of the Galveston-Houston Ship Channel and to construct levees at the Lost Lake Placement Area for dredged material. This contract is referred to in the complaint and other documents as the "Upper Bayou Project." The complaint seeks damages, in the aggregate, of approximately $14.25 million, plus interest, based upon numerous alleged differing site conditions encountered by Renda during the course of contract performance, including the Lost Lake Levees Claim for $6,258,853.

3. On November 25, 2004, I caused plaintiff, Renda Marine, Inc. (Renda), to be served with "Defendant's Second Set of Interrogatories and Fourth Request for Production of Documents." On December 26, 2003, I received by facsimile transmission Renda's responses to those

discovery requests. On December 31, 2003, I attempted to contact Renda's counsel, Brian W. Erikson, to discuss Renda's responses to Interrogatories Nos. 4 and 5, but he was not available. I left a voice mail message for Renda's counsel. To date, he has not returned my telephone call.

4. On December 12, 2003, the Defense Contract Audit Agency (DCAA) issued Audit Report No. 3511-2003M17200012, which concerns Renda's Lost Lake Levees Claim. I have reviewed the DCAA work papers relating to that audit report, which the Government produced for Renda and which are numbered RM-DCAA-1600001 through RM-DCAA-1600227. Those work papers do not contain any document(s) provided by Renda to DCAA that identify each category or component of cost (e.g., labor, equipment, materials, vendor costs, shop cost allocation) contained in the $24,663,589 figure in the chart "Hydraulic Levee Construction Project Claim Accounting Modified Total Cost Approach" appended to Renda's certified claim, that identify the documents upon which each such category or component of cost is based, or that provide a step-by-step statement of the calculation or computation of the $24,663,589 figure.

5. The audit by DCAA of Renda's claims in this case was undertaken in April 2002 at the request of Thomas Benero, an employee of the Army Corps of Engineers and the Contracting Officer for the Upper Bayou Project. The DCAA audit of Renda's claims was not undertaken at my request or at the request of any other representative of the Department of Justice. The onsite part of DCAA's audit of Renda's claims was completed in May 2002. I did not become aware of the DCAA audit until after May 2002.

6. The early meeting of counsel in this case required by Appendix A ¶ 3 of the Rules of the Court of Federal Claims took place telephonically between Renda's counsel and me on August 29, 2002.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 7, 2004, at Washington, D.C.

John Kosloske

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W., Room 12052
Washington, D.C. 20005
Tele: (202) 307-0282