- Charles Wylie — Supervisor
- Larry James — Technical Specialist
- Gene Seiler — Auditor
- Darrell Shobert — Auditor
- Sam Cotosman — Auditor
- Jude Obaseki — Auditor

The onsite audit was started Monday, April 15, 2002 and was completed the week ending May 10, 2002. DCAA personnel provided two separate Exit Conferences. Gene Seiler, Senior Auditor conducted an informal Exit Conference telephonically on Thursday, May 9, 2002 with Barry Smith, Pathfinder Construction Consulting, Inc. Darrell Shobert, Senior Auditor conducted the formal Exit Conference with RMI personnel, including Oscar Renda and Rudy Renda in attendance, on Tuesday, May 14, 2002.

Gene Seiler explained verbally for the informal Exit Conference that both the dredge and booster barge rates must be based on 25-years depreciation in accordance with the EP 1110 Manual, but he recognized that the acquisition price of the equipment did not incorporate RMI and other labor to complete construction of the equipment. The spud barge rates were satisfactory, but rates for the piping joints were questioned. The auditor stated that he had spoken with Kim Callan from the Cost Engineering Branch, U.S. Army Corps of Engineers, Walla Walla District, Washington. Based upon direction from the DCAA customer, COE Galveston, the Linkbelt trackhoe, Caterpillar dozer, lighting set, gator, Komatsu dozer and marsh buggy were removed from the "dredging" claims since it was deemed levee equipment. Regarding the Lower Bay Project, Eric Russek, COE Galveston questioned the charging of equipment by RMI (anchor barge, work barge, excavator) at both the Lower Bay and Upper Bayou Projects. These costs remained in question.

Darrell Shobert explained at the Exit Conference that indirect rates appeared to be satisfactory when compared to what was claimed. Bond and profit costs were also satisfactory. Professional fees related to claims were unallowable. Claims 1, 2 and 7 (Flare Area, South Ferry Landing, Section 7 Clay, respectively) were dredging-related claims calculated using the concept of the Measured Mile. The Measured Mile used the concept of anticipated cost versus total costs incurred, the difference being the amount of the claim. These auditors tested the costs. DCAA felt that technical issues remained whether or not to accept the timeframe or criteria of the particular Measured Mile, but they had no problems with the theory. The audit noted that labor to construct the levees was included in some of the claims. The audit noted equipment rate differences for the dredge and booster barge when considering the use of 25-years versus 7 or 10-year depreciation of the equipment. Claims 3, 4, 5 (HL&P Tower, Obstruction No. 1, Obstruction No. 2, respectively) were dredging-related, simple delay cost/repair damage claims. Claims 6 and 8 (West Levee Realignment, Hydraulic Levee, respectively) were levee claims. Claims 1 through 5 and 7 were supported with cost and pricing data, while Claims 6 and 8 were not supported with cost and pricing data in accordance with FAR 15-408, Table 15-2. The auditor advised RMI that the Contractor's accounting system is required to track the cost of claims separately from the normal costs of the Project. Further, sales is not an acceptable base for calculation of indirect costs. A cost base would be better to meet Government standards.

DCAA personnel performed exit Conference(s), but no written report(s) was provided to RMI. Therefore, RMI is responding to auditor questions and issues raised during the onsite audit and/or items discussed in very general terms at the Exit Conference(s). RMI makes the following comments:

- At the Entrance Conference on April 5, 2002, the Audit Team presented RMI with a 12-page packet of information titled, "Questions Presented To Contractor During April 5, 2002." RMI expressed its intent to provide the information necessary to respond to the questions. We have attached a copy of the packet to this letter.

- The auditors pre-numbered the RMI claims as follows:
  - Claim No. 1 Flare Area Clay
  - Claim No. 2 South Ferry Landing
  - Claim No. 3 HL&P Transmission Tower
  - Claim No. 4 Obstruction No. 1
  - Claim No. 5 Obstruction No. 2
  - Claim No. 6 West Levee Realignment
  - Claim No. 7 Section 7 Clay
  - Claim No. 8 Lost Lake Hydraulic Levees

- RMI expressed its intent to willingly cooperate with the onsite auditors, making available all Project records, claims and corporate financial records for review. In fact, all information requested by the auditors was freely provided, including printouts of electronic records in a format to make the audit easier.

- RMI had their consultant, Barry Smith, Pathfinder Construction Consulting, Inc. available 100% of the time the onsite auditors were present at the Roanoke office, at no cost to the Government. Barry Smith was available for liaison between the Government and RMI and provided assistance to the auditors for questions related to the claims. Further, RMI's outside CPA firm of Milbern and Ray, represented by Kent Ray, was also available to respond to financial questions. Kent Ray responded to both, questions regarding calculation of overhead costs and accounting procedures and to questions regarding RMI's Project cost controls from 1998 through 2001. RMI updated its cost accounting system in early 2001, and the current RMI Controller, Eric Buechler, was not employed by RMI until the spring of 2001. Therefore, Kent Ray was available to discuss the accounting system used by RMI during 1998, 1999 and 2000.

- The DCAA failed to explain at the Entrance Conference that no written report would be issued to RMI at the conclusion of the audit. During the audit, the auditors revealed that a written report would be issued to COE Galveston but not to RMI. At this time, we do not know if the audit was conducted in support of litigation or support of investigation. We have not been informed if the COE Galveston intends to invoke attorney-client privilege for the audit or if the audit was conducted simply as an investigation support tool to enhance the negotiating position of the COE Galveston. The DCAA failed to make clear the use of the report by its customer, COE Galveston.

- RMI explained to the auditors that Oscar Renda, President of RMI was forced to liquidate his banks and commit significant personal assets to the company to avoid bankruptcy of RMI and other corporate holdings, due solely to the changes and additional costs related to this Project.

- RMI's senior management has received no executive compensation for the past 2-1/2 years.

- RMI had expected to receive an objective audit of its financial records, including the overhead rates. While the onsite auditors appeared to follow accepted accounting guidelines for auditing procedures of financial records, it quickly became obvious that the auditors had also been assigned the additional task of subjective evaluation of equipment usage by RMI and evaluation of technical issues related to dredging means and methods. The auditors were neither knowledgeable nor experienced in construction procedures related to technical means and methods of the dredging industry and construction of levees, either mechanical or hydraulic.

- RMI strenuously objects to the COE Galveston providing written technical criteria for evaluation of the claims by the auditors, forcing the auditors to adhere to principles or guidelines, which are questions in fact, currently subject to a lawsuit filed with the Federal Court of Claims.

- As the acknowledged "customer" of DCAA, RMI objects to the COE Galveston using that customer influence to "force feed" or stipulate that their ideas are more correct than RMI's regarding review of the claimed costs, equipment usage, etc.

- The auditors were not familiar with the administrative and/or technical requirements of the Contract Documents.

- While the auditors are obviously competent in the accounting field, RMI questions the level of experience of some of the auditors regarding construction contracts, the standard of "reasonableness" for the construction industry, construction cost controls and general means and methods for construction related to this Contract.

- RMI explained to the auditors that the COE Galveston's directive to the auditors to segregate the levee costs from the dredging costs was not an acceptable practice, nor was it acceptable for the auditors to arbitrarily decide which equipment was levee related and would be removed from specific claims.

- RMI objects to the arbitrary and capricious manner in which the COE Galveston dictated that levee-related costs were to be removed by the auditors from specific claims, without any recourse or discussion allowed by RMI. The levee-related costs associated with dredging delay claims are not mutually exclusive. During negotiations for the Flare Area Request for Equitable Adjustment, the COE Galveston requested that all levee equipment costs be segregated for later evaluation. RMI agreed to remove equipment costs related to levee work only for settlement purposes. RMI never stipulated that levee costs were

not part of the dredging claims, since dredging and levee building are concurrent activities. One cannot proceed without the other in this Contract.

- RMI explained to the auditors that all of the dredge related claim costs (acknowledging certain errors in the transfer of equipment rates between claims) were based upon theories negotiated between RMI and the COE Fort Worth District representative (Will Sanford, COE) assigned the task by COE Galveston to negotiate the Flare Area Request for Equitable Adjustment in February 2001. All equipment means and methods, equipment hours, labor costs, vendor costs and rental equipment costs were negotiated with COE Fort Worth, and the format set for resolution of future issues.

- RMI strenuously disagrees with Gene Seiler's notification and intent to remove the Linkbelt trackhoe, Caterpillar dozer, lighting set, gator, Komatsu dozer and marsh buggy from the "dredging" claims since they were deemed by unknown or unstated criteria to be levee equipment. At the request of COE Galveston, RMI previously segregated all levee-related equipment from the dredging claims. RMI believes that the equipment noted above was supporting dredging operations, not necessarily the construction of levees. It is obvious that COE Galveston directed the auditor to remove this equipment from the claims, which necessarily skews RMI's claimed costs. At one point during the audit, Gene Seiler made the determination that, with the exception of the dredge and equipment on the dredge, all other equipment was levee related. Despite explanations to the contrary from Barry Smith, Gene Seiler explained that this was his interpretation of written instructions from COE Galveston. Gene Seiler recommended that Barry Smith discuss these instructions with Mike Rauls, COE Galveston, but Barry Smith declined noting that Mike Rauls was not one of the personnel assigned to this Contract. Barry Smith contacted the Audit Supervisor, Charles Wylie about RMI's concerns. Several days later but still during the audit, Gene Seiler reversed his position after discussions with COE Galveston. The ability of COE Galveston personnel to influence the auditor's decisions at will, calls into question the objectivity of the review.

- During the audit, Barry Smith recognized that four repair cost items for the dredge had been claimed twice, once in Claim No. 2 (South Ferry Landing) and also in Claim No. 4 (Obstruction No. 1). Barry Smith notified Gene Seiler that these "double-dip" costs would be removed from Claim No. 4.

- Regarding the allegations from COE Galveston that pieces of equipment located at the Lower Bay Project were claimed costs at the Upper Bayou Project, Barry Smith offered Gene Seiler the opportunity to review all correspondence/records transmitted to Will Sanford at the time of the allegations. Barry Smith explained that extensive research had been conducted in response to allegations from the Non-Federal Sponsor, but RMI had never received any response from the COE Galveston to its analysis. Gene Seiler declined to review the files regarding this issue stating that the issue was technical and remained in question. RMI believes its responses to Will Sanford accurately address the concerns, and the issue should be concluded.

- RMI has determined hourly rates for its equipment using the U.S. Army Corps of Engineers Engineering Pamphlet (EP) 1110-1-8 (June 1999) Construction Ownership and

Operating Expense Schedule (EP 1110 Manual). The EP 1110 Manual explains how the contractor can calculate hourly rates using actual costs (CHECKRATE spreadsheet). In addition, the use of the EP 1110 Manual is "required by contractors for pricing contractor-owned equipment in negotiated procurements when: (2) Cost or pricing data is required and the actual cost data to support either ownership or operating costs for equipment or equipment groups of similar model and series is not available." Since RMI's actual equipment costs are generally unavailable, i.e. the equipment accounting system does not accurately track actual costs for individual pieces of equipment, RMI has determined hourly rates based upon the factors provided in Tables 2-1, 2-2, 3-1 and 3-2 of the EP 1110 Manual. During the audit, Gene Seiler arbitrarily declared that hourly rates **<u>for every piece of equipment as a whole</u>** must be determined using actual costs or using the EP 1110 Manual factors. Thus, it was the auditor's position that if RMI used EP 1110 Manual factors to determine the hourly rate for one piece of equipment, then the hourly rate for every piece of equipment must also be calculated from the pre-determined factors. This position is neither substantiated in the EP 1110 Manual nor supportable according to telephone discussions with the authors of the manual, Cost Engineering Branch, COE Walla Walla District.

- The issue regarding the dredge hourly rates, as well as hourly rates for the booster barge, piping, pipe joints, pipe floats, etc. were discussed in detail during the audit. Following discussions with Kim Callan, Chief Cost Engineer, COE Walla Walla, RMI agreed with the auditors that if rates were calculated from the "Dredge Plant Ownership and Operating Rate Worksheet" provided in the EP 1110 Manual, using pre-determined factors from Table 4-1, then actual costs could not be incorporated into the hourly rate calculation. Thus, RMI would not be able to calculate hourly rates mixing actual depreciation costs claimed over a 10-year period and Table 4-1 factors for operating costs. RMI and the auditors reviewed the dredge and booster barge acquisition costs currently capitalized on RMI's Book Asset Detail sheets to validate the "price" of both pieces of equipment for hourly rate evaluation per the EP 1110 Manual. Using the Table 4-1 factors from the EP 1110 Manual and validated acquisition costs for the equipment, new hourly rates were developed using the COE worksheet. However, RMI also pointed out to the auditors that substantial labor costs associated with plant startup were not currently capitalized. Gene Seiler acknowledged that these additional costs should be part of the acquisition price and would therefore change the hourly rate again when compiled. The actual acquisition price of the dredge will be re-calculated incorporating all material and labor costs prior to startup and including all major material and/or labor costs one year following startup, as stipulated in the EP 1110 Manual. Due to the magnitude of the claimed costs associated with this equipment, since the dredge is the prime piece of equipment for the Project, RMI stated that they would attempt to determine revised hourly rates also using actual costs for determination of Ownership and Operating Costs. Barry Smith explained that actual costs for the dredge and booster barge could likely be determined identifying the Ownership and Operating Costs. The actual Ownership Costs can be calculated knowing the yearly depreciation claimed by RMI to the Internal Revenue Service (allowable per FAR 31.205-11 – Depreciation) and the Facilities Cost of Money promulgated by the Government bi-annually. Actual Operating Costs will be more difficult to determine. Because of the uniqueness of the equipment and the easily identifiable, specialty vendors supplying parts/services for the

equipment, actual repair costs and fuel costs may also be identified by vendor invoice for the yearly periods of 2000 and 2001. RMI will still be required to utilize some of the predetermined formula from the EP 1110 Manual primarily to calculate other cost factors for hourly rates such as Water, Lube, Supplies, etc. These calculations are not skewed by COE-developed formula, which base the hourly rate over the life of the equipment.

- RMI vigorously disagrees with the auditor's attempt to lower RMI's claimed hourly rates for equipment by revising the Conditions from "Severe" to "Difficult" or "Average." Barry Smith provided Gene Seiler with information directly from the EP 1110 Manual, Section 2-4, Average, Difficult, or Severe Conditions, which states:

  > "Operating conditions may be average, difficult, or severe. Rates for both average and severe operating conditions are determined in accordance with APPENDIX C, Guide for Selecting Operating Conditions. Rates for the difficult condition are the arithmetic mean of the average and the severe rates."

  For virtually all categories of equipment, Appendix C of the EP 1110 Manual states that criteria for "Severe" Operating Conditions, is a "salt water environment." RMI believes that the land-based equipment operating for extended timeframes in harsh, constantly wet, saturated muddy conditions aggravated by salty water, reasonably constitutes "Severe" operating conditions for this Contract.

- During the audit, Gene Seiler noted that COE Galveston had requested that **ALL** equipment rates be audited. Gene Seiler certainly believed the COE Galveston request exceeded the bounds of "sampling" costs since only the hourly rates for pipeline (24"), pipeline joints, pipeline pontoons, workboat "Marilyn K. McFarland", workboat "Crista Dian", Skagit crane mounted on anchor barge, Lafco workboat, Monark workboat and American crane mounted on work barge (Equipment Item Nos. 5, 6, 7, 8, 9, 11, 15, 16 and 24, respectively) were analyzed by the auditor. It was Gene Seiler's opinion that the audited equipment represented 80% of the claimed equipment costs. Although RMI acknowledges the Government's right to review every bit of information available, we question the value of an extensive review of equipment rates while only sampling or auditing the remainder of the claimed costs. Further, we question whether or not a reasonable audit/review was performed by DCAA for RMI and Corporate financial records.

-

Sincerely,

Oscar Renda
President
Renda Marine, Inc.

**U.S. Department of Justice**

Civil Division

JKosloske
DJ # 154-02-306

Telephone: (202) 307-0282
Telecopy: (202) 514-8624

*Washington, D.C. 20530*

By Telecopy and First Class Mail

February 9, 2004

Brian W. Erikson, Esq.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201
(Telecopy: (214) 871-2111)

Re: Renda Marine, Inc. v. United States,
No. 02-306C (Fed. Cl.)

Dear Mr. Erikson:

This refers to the "accounting backup for Renda Marine's claims" that you provided us on January 15, 2004. We have arranged for an audit of that accounting information by Darrell Shobert of the Defense Contract Audit Agency, in particular the job cost schedule and related documents that reflect $24,793,035.90 of job cost for the Upper Bayou Project. Mr. Shobert has inquired who he should contact for purposes of the audit. Please advise as soon as possible so that the audit may get underway.

Very truly yours,

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch

QSCL
QUILLING · SELANDER · CUMMISKEY · LOWNDS

BRIAN W. ERIKSON
Direct: 214.880.1844

E-mail: berikson@qsclpc.com

February 16, 2004

VIA FACSIMILE

John E. Kosloske, Esq.
Senior Trial Counsel, Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street, N.W., Room 12052
Washington, D.C. 20005

Re: Case No. 02-306C; *Renda Marine, Inc. v. United States Army Corps of Engineers*; United States Court of Federal Claims; DACW64-99-C-0001, Dredging Upper Bayou

Dear Mr. Kosloske:

In response to yours of February 9, 2004, which requests an audit of Renda Marine's job costs, I note the following:

You have previously advised that discovery has been cut off. You have refused to provide answers and responses to Renda Marine's Second Set of Interrogatories and Third Request for Production of Documents on that basis. If the Government will respond to Renda's discovery, Renda Marine would be happy to accommodate your request for additional auditing.

Sincerely yours,

Brian W. Erikson

BWE/ja

S:\Construction\Renda Marine\Upper Bayou 565.09\Kosloske 049.wpd

cc: Oscar Renda