IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

Defendant, the United States, objects to the "Second Set of Interrogatories by Plaintiff, Renda Marine, Inc. to Defendant, United States Army Corps of Engineers" upon the grounds that the discovery request is not timely and that it exceeds the limitation upon the number of interrogatories allowed by RCFC 33(a).[1]

The Court's Order filed on September 10, 2003, provides that "[a]ll fact discovery . . . shall conclude on or before . . . January 14, 2004." Plaintiff's second set of interrogatories third request for production of documents was served upon defendant's counsel on January 15, 2004. To have been timely, that discovery request should have served upon defendant no later than 30 days before the date by which the Court's September 10, 2003 Order mandates that fact discovery is to have been completed. See Thomas v. Pacificorp, 324 F.3d 11761179 (10th Cir. 2003); Gavenda v. Orleans County, 182 F.R.D. 17, 20 (W.D.N.Y. 1997); Smith v. Principal Casualty Insurance Co., 131 F.R.D. 104, 105 (S.D. Miss. 1990); Beller v. Credit Alliance Corp., 106 F.R.D. 557, 559-560 (N.D. Ga. 1985).

---

[1] Should the Court require defendant to respond to this discovery request notwithstanding that it is untimely and exceeds the number of interrogatories allowed by RCFC 33(a), defendant reserves the right to raise at the time of its response to the discovery requests any other objections to the discovery requests permitted by the Court's discovery rules.

Blumberg No. 5118
EXHIBIT
I

Rule 33(a) provides that, "[w]ithout leave of court or stipulation, any party may serve upon any other party written interrogatories, not exceeding 25 in number including all discrete subparts . . . ." Plaintiff's first set of interrogatories in this case met or exceeded this numerical limitation upon interrogatories.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

JANUARY 23, 2004

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 23rd day of JANUARY, 2004, I caused to be sent by facsimile transmission and by United States Mail (postage prepaid) "DEFENDANT'S OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES" addressed as follows:

BRIAN W. ERIKSON, ESQ.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201

[signature]

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OBJECTION TO PLAINTIFF'S
THIRD REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant, the United States, objects to the "Third Request for Production of Documents by Plaintiff, Renda Marine, Inc. to Defendant, United States Army Corps of Engineers" upon the ground that the discovery request is not timely.[1] The Court's Order filed on September 10, 2003, provides that "[a]ll fact discovery . . . shall conclude on or before . . . January 14, 2004." Plaintiff's third request for production of documents was served upon defendant's counsel on January 15, 2004. To have been timely, that discovery request should have served upon defendant no later than 30 days before the date by which the Court's September 10, 2003 Order mandates that fact discovery is to have been completed. See Thomas v. Pacificorp, 324 F.3d 11761179 (10th Cir. 2003); Gavenda v. Orleans County, 182 F.R.D. 17, 20 (W.D.N.Y. 1997); Smith v. Principal Casualty Insurance Co., 131 F.R.D. 104, 105 (S.D. Miss. 1990); Beller v. Credit Alliance Corp., 106 F.R.D. 557, 559-560 (N.D. Ga. 1985).

---

[1] Should the Court require defendant to respond to this discovery request notwithstanding that it is untimely, defendant reserves the right to raise at the time of its response to the discovery request any other objections to the discovery request permitted by the Court's discovery rules.

Blumberg No. 5118 EXHIBIT J

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

JANUARY 23, 2004

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 23rd day of JANUARY, 2004, I caused to be sent by facsimile transmission and United States mail (postage prepaid) "DEFENDANT'S OBJECTION TO PLAINTIFF'S THIRD REQUEST FOR PRODUCTION OF DOCUMENTS" addressed as follows:

BRIAN W. ERIKSON, ESQ.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201

John Toscola
______________________________

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
Defendant. )

ORAL DEPOSITION
LUIS SAENZ
January 9, 2004

ORAL DEPOSITION OF LUIS SAENZ, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 9th day of January, 2004, from 9:08 a.m. to 11:24 a.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of the United States Corps of Engineers, 2000 Fort Point Road, 2nd Floor, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



EXHIBIT
K

levee, that's no secret that that may cause problems for the levee, right?
A. Yes. But we had no -- we did not have that much control over the Port and it was their property.
Q. I understand. When did you first learn that creating a borrow area next to a levee might cause problems with the levee?
A. Well, if the borrow area is that deep, it would cause problems. If the borrow area is kept to a nominal depth, it does not normally create problems. And when you're doing borrow for excavation, that's normally the way we do it. Normally we keep those borrow pits down to -- in our specs I think we have a range of 3 to 5 feet in depth. We don't have 10, 15, 20 feet right next to the levee. That's not allowed.
Q. All right. So, if it's a nominal depth of 3 to 5 feet, that shouldn't present a problem?
A. It shouldn't present a big problem.
Q. If it's deeper than that, it might present a problem?
A. Yeah.
Q. And the closer it gets to the levee, the more problem it might cause, right?
A. Yeah.
Q. You've got the drawings there. Let me get you to open the drawings to Page C-14, which is about halfway

through. You've seen this sheet before, right?
A. A long time ago, yeah.
Q. And you recognize that these are the levees for the Lost Lake placement area Upper Bayou project, right?
A. Yes.
Q. Okay. Now, at the Lost Lake placement area there was borrowing of material off and on through the years to renew and enhance the perimeter levees, right?
A. Yes.
Q. Do you remember when that last occurred?
A. '92.
Q. Tell me about that project.
A. It's the same one that I had with Spillman. It was part of Morgans to Carpenters maintenance job and I had Spillman, Alexander, and Lost Lake, the rehab.
Q. Okay. When did the borrowing of material near the levees occur at Lost Lake? Was it 1992?
A. It was before 1992. We had actually done the borrowing of material, I think, a year before that or six months before that, somewhere around there. And the material was placed on the slopes so that it could be used for levee construction later so it would dry.
Q. Okay. If the material is too wet, it doesn't make good levee building material, right?
A. Unless you add straw like the Jewish people did in

the Bible.

Q. So, sort of create bricks. Okay. Now, what was the name of that project? The renewal of the Lost Lake levees project, what was the name of that one?

A. I believe we just did a single contract to do ditching, dewatering and -- the ditching and dewatering, place the material in the -- on the slopes. I don't recall exactly if it was an individual contract or one attached to a dredging contract. Keep in mind, we did quite a few contracts a year. So, some of them kind of blur into each other.

Q. I understand. Were there any projects -- you may not have been involved with them. But were there any projects after 1992 that may have renewed or increased the height of Lost Lake?

A. No. As a matter of fact, like I said, that particular -- there might have been some miscalculation but we tried raising the levees to where they were at least halfway contained at least up to some of the new work. There might have been some differences in the new work quantities. But I tried to at least get all the maintenance cycles up to the new work and incorporate it in there plus some of the new work material for the levee.

Q. You said you tried to do it. Were you successful?

A. Well, I don't -- you know, after a while, I don't recall if the numbers that I used to do the levee raising

matched those that were used in the final specs. They were just guesses back then, wild guesses.

Q. Tell me about guesses and wild guesses. Guesses and wild guesses about what?

A. As far as what would be the approximate material, new work material that would come out. There wasn't any drawings or any alignment or anything. It was just some guess as to what we might have for -- you know, for new work material.

Q. Okay. So, when you were talking new work material, you were talking there's a dredge some place dredging and you don't know how much virgin clay it's going to acquire?

A. I'm just talking about what template would be the final template here and what material would need to be excavated from the planned view of the channel. That wasn't set. That was just -- that was still in the planning stages. Okay?

Q. I'm sorry. Are you talking about acquiring virgin clay from the Houston Ship Channel some place or --

A. That and also it was my estimate of how much maintenance material would be between -- you know, between 1992 and the time that we got the work. And time slipped, you know. I mean, we didn't get the -- we didn't get this stuff started until 1998 or '99.

Q. Okay. When you're talking about "this stuff,"

you're talking about the Upper Bayou project?
A. Any of the new work. It kind of just didn't quite get off when it was supposed to but at least from what they were talking in 1991 and '92.
Q. Okay. Now, back to the project you were talking about in 1992 or so for Lost Lake where you were trying to collect materials and put them on the levees. You would go in and adjacent to the existing perimeter levee you would have draglines, borrow material, and then put it on the side of the levee?
A. Right.
Q. And you would put it on the side of the levee to dry it out?
A. Drain it and consolidate the foundation, yes.
Q. And when you say "consolidate the foundation," you would expect that additional weight would cause the levee to sink some?
A. It would cause the interior to compress a bit and lose moisture content.
Q. Okay. So, it's making the levee more solid?
A. Yeah.
Q. But it's also reducing in height?
A. Temporarily until we get to the levee raising project, right.
Q. Right. And that's one of the reasons why you're

doing that levee raising project is to make the levee higher?

A. The levee itself doesn't go down. The interior goes down. The levee itself stays pretty constant. It's not going to go down unless there's actual displacement due to foundation problems. It will stay pretty much constant unless you raise it again or there's erosion.

Q. Now, when you were talking about the new work before, were you talking about the Houston-Galveston widening and deepening projects?

A. I was trying to -- yes, trying to build capacity -- at least trying to build enough capacity so it wouldn't be such a hassle to get up to that point for cycles -- for dredging maintenance cycles and for the new work.

Q. Okay. Now, when you were doing the work in 1992 or so at Lost Lake, how tall were the levees then, the perimeter levees?

A. I don't recall. I don't recall the elevation. It could have been 15 feet. It could have been 20. I don't know.

Q. How high were you trying to raise the levees?

A. Probably between 5 to 7 feet.

Q. And you were going to raise the levees using materials borrowed from inside Lost Lake?

A. Right.

Q. And the way that the material was collected was

using draglines on mats immediately adjacent to the existing levee?

A. Yes.

Q. Who was the contractor using the draglines?

A. Affolter.

Q. Do you remember if it was Kenny Affolter or one of the other --

A. It was Kenny that was the project manager for that particular project.

Q. Do you remember any better what the name of that project was?

A. It was Morgans to Carpenters. It was Contract 49.

Q. Contract 49. It was called what? Morgan to Carpenter?

A. Morgans to Carpenters. Dredging Morgans to Carpenters.

Q. Now, what's Morgans?

A. Morgans Point.

Q. Okay. And what's Carpenters?

A. Carpenters Bayou.

Q. And Contract 49, what year was that?

A. I don't remember. It was around '90, '91, somewhere around there.

Q. Okay.

A. I know it was 49 because the last digits were 49 on

it.

Q. Now, prior to that project, the Morgans Point to Carpenters Bayou dredging project, was there any previous efforts to raise the height of the levees at Lost Lake?

A. Yeah. I'm sure there was.

Q. Do you recall any, sir?

A. I don't recall any specific efforts. But I'm sure Johnny or Herbie do because they were there or Hopkins. He was the project engineer for Houston.

Q. Now, how often is the Lost Lake disposal site used?

A. I think the cycle there was ranging from two to three years. Two years was probably more closely related to the cycle. Every two years you have to have a contract there for dredging.

Q. For maintenance dredging?

A. Yes.

Q. So, the maintenance dredging would occur to pick up maintenance material in the Houston Ship Channel?

A. Right.

Q. And then through pipelines, the material would be deposited in the interior of the Lost Lake placement center?

A. Correct.

Q. Now, in the Morgans Point to Carpenters Bayou dredging project, the one where you were talking about Affolter was using draglines?

A. Uh-huh.

Q. Was that --

A. He also -- he also hauled in Spillman. He did haul in Spillman. But for Lost Lake he used draglines.

Q. Okay. And I'm interested right now in Lost Lake. Was that the kind of project where the dragline moved on mats along the interior perimeter of the levee?

A. Yes.

Q. And so, the dragline would work borrowing material from the interior and then placing it on the levee and then move forward?

A. Right.

Q. Were there any records kept on either how much material was borrowed or where that material was borrowed?

A. No. The contract was based on lineal feet for the ditching. You're talking about the ditching that was placed up on the levees, right?

Q. Yes, sir.

A. That was based on lineal feet. I mean, we made an estimate on how much volume but that wasn't the way it was bid. It was bid by lineal feet.

Q. Okay. So, it was bid by lineal feet and what were the parameters of the ditch that was supposed to be dug?

A. We had -- I don't remember but I know that the perimeter ditch was bigger and wider than the lateral ditches.

I don't recall the exact configuration.

Q. Now, the perimeter ditch would have been immediately inside the perimeter levees?

A. The one that is adjacent to the perimeter levee, the containing levee.

Q. But it would have been on the inside of the levee, right?

A. Yeah. Sure.

Q. As opposed to the Houston Ship Channel side of the levee?

A. Yeah.

Q. And then there were some lateral levees that would just run through the middle of the placement site?

A. Right. Just an attempt to get to the interior of the placement area to dry it out, to drain the water out of it.

Q. Okay.

A. Those you normally have marsh buggies with those rotating ditching machines in the back.

Q. Okay. Now, back to the ditch. The equipment that was used was draglines?

A. For the perimeter, yes.

Q. The way that a dragline works is it reaches out as far as it can go and then with a bucket it pulls material and then scoops it up, right?

A. I don't know. I mean, they could be -- there's two types and I don't know exactly which ones are which.

Q. (BY MR. ERIKSON) But somebody within the Corps would have a file of whatever these permits were, right?

A. Regulatory would.

Q. Regulatory. Okay. Now, did you testify previously that you had reviewed the plans and specifications for the Upper Bayou project before it was bid?

A. I looked at them but I think I told you that I had not provided any -- I don't recall providing any formal comment.

Q. Did you look at them enough to form an opinion as to whether or not the design was suitable or you just didn't look at them enough or what?

A. Well, as far as, you know, the way the levees were done, I did have an opinion. And I think -- I know what some of the arguments are. But, you know, one of the things that was -- I recall vividly being brought one of these things and I think it was the cross-sections. And, you know, the fact that we were going to build over the old borrow pits, which was fine if you were going to incorporate hydraulically placed material, which is what we asked for. If it was mechanical, then it could present a problem because you would have bridging of the material. But that's what I was asked to look at and see, well, what do you notice about this?

I said well, everything is over the old borrow pit, which is fine. It's nothing unusual. I mean, we've done it many times before. It's just that you have to incorporate certain construction methods to build over the borrow pit if you're going to build that much.

Q. Now, one of the reasons that the foundations -- and you notice that on the drawing it indicates that the foundations are soft to very soft, right? There's a note?

A. Yeah. I mean, I don't recall what the note said.

Q. You can read the note. It talks about the foundations being soft to very soft. Do you see that particular note?

A. Note 8?

MR. SMITH: Note 10.

A. Note 10? Okay. So, it tells you that.

Q. (BY MR. ERIKSON) Now, you expected that the foundations would be soft to very soft?

A. Yes. Especially in the north face.

Q. And the north face would be the area where you would have the lightest of the materials, mostly the silt, right?

A. Correct. Because that's where your old spill box was at. That's where all your fines would collect.

Q. Now, one of the reasons that the foundations would be soft to very soft is that it was in an area where the old borrow pits were, right?

A. Right. It was over some of the old borrow pits, right.

Q. Did the Corps do any sort of analysis on how wide or deep the old borrow pits were before this project?

A. No. I don't know. They had old surveys and I think we provided all the surveys that we had at the time. It would show where the borrow pits are.

Q. When you are talking about surveys, you're talking about borings?

A. No. Land surveys that show where the pits were in relationship to the levee.

Q. Okay. What do these surveys look like?

A. They look pretty much like that right there except it's mostly natural ground but they look -- it's a cross-section like this.

Q. Okay. And you're looking at page what?

A. C-15. This is the design template here but we would show like this dash line but the interior would show where the depression was.

Q. All right. Let me swing over to your side and see what you're talking about.

A. Do you see this right here? That's a cross-section of the existing ground. And on the interior, wherever that may wind up being over here, we would show a depression over here where the old pit was.

Q. Okay. You are looking at Page C-15?

A. I'm just showing you that this is something we would have -- if somebody asked us for surveys of what we had, this is what we would have given them.

Q. You are looking at Page C-15 of Rozsypal Exhibit No. 2 and the first thing you pointed to was the cross-section that's referenced Station 39+00?

A. It's just an example. I'm not saying that cross-section or anything -- that has anything specific about it. I'm just saying that this would have been a typical outline of what the ground looked like and if we would have -- if we were able to go in far enough, it would have shown a depression where the ditch was.

Q. Okay. Now, take a look at these cross-sections and see if they show the borrow area on the interior of the perimeter levees at Lost Lake.

A. These do not but I have seen others -- I'm pretty sure I saw others that did. The -- that's what I was telling you earlier is that, you know, we were shown where some of these things were and we had cross-sections and I'm not sure if those are all the ones that are shown there. Are these all the ones that are on there?

Q. This is what was given to the bidders in the bid solicitation package for the Upper Bayou project. But take your time and look through the plans and tell me if --

A. They may have been filled in. I mean, that's not to say that -- you know, remember we had several dredging cycles that went in there. And the borrow pit is covered already by maintenance material. We have two dredging cycles that went in there after I did that.

Q. Okay.

A. So, these surveys -- does it have a date on it? We need to find out what date these surveys are but if they're after 1997 or '98, then it's after the King Fisher job and that means there were two dredging cycles put into Lost Lake.

Q. All right. So, you would expect that after the dredging cycles occurred at Lost Lake, that whatever borrow areas existed after your project in about 1992 would be filled in with maintenance material?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And so, then, if somebody were looking at the site or taking a cross-section of the site, it would show -- the borrow area would be covered up in --

A. The borrow area would be covered up. I'm sure it would. We pretty much covered it up in the dredging that we did for the dredging to Morgans to Carpenters. I told you that what was left was swales, just a little depressions that were evident of the ditching. But we had a lot of material

for that job.

Q. Now, in the Morgans to Carpenters dredging project, was that new work or maintenance?

A. I'm sorry. Would you repeat the question?

Q. The Morgans to Carpenters dredging project, was that new work or was it maintenance?

A. No. It was maintenance.

Q. And so, you would expect mostly what would come from one would be silts, right?

A. Silts and sands. Lost Lake had some sands. The reaches that we would get out of there would normally be between the ferry and Carpenters.

Q. Okay. So, I assume that you didn't use those kinds of materials to raise the levees at Lost Lake because those are not your favorite materials?

A. I did use those materials. I did not have a choice. I used those in 1991 in the ditching job to put on the levee and I said I double handled those things. I put them up to the levee. They dried and then I used them in the dredging job, you know, in '92, whatever year it was.

Q. Okay. Now, any other projects that you recall other than the Upper Bayou project --

A. Uh-huh.

Q. -- that occurred out at Lost Lake?

A. Well, I mean, there were all the maintenance

STATE OF TEXAS
COUNTY OF HARRIS

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF LUIS SAENZ
January 9, 2004

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 27th day of January, 2004.

Stacey Whitley

Stacey Whitley, CSR
Texas CSR 3999
Expiration: 12/31/2005
ESQUIRE DEPOSITION SERVICES
Firm Registration No.: 03
3401 Louisiana, Suite 300
Houston, Texas 77002
713-524-4600



1
2
3
INDEX