No. 02-306C
(Judge Hewitt)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL COMPLIANCE WITH RULE 26(a)(2)(B), TO COMPEL PRODUCTION OF DOCUMENTS, TO PERMIT DEFENDANT TO PERFORM AN AUDIT OF PLAINTIFF'S JOB COST SCHEDULES, AND FOR A MODIFICATION OF THE PRETRIAL AND TRIAL SCHEDULE**

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

MARCH 12, 2004

## TABLE OF CONTENTS

Page

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL COMPLIANCE WITH RULE 26(a)(2)(B), TO COMPEL PRODUCTION OF DOCUMENTS, TO PERMIT DEFENDANT TO PERFORM AN AUDIT OF PLAINTIFF'S JOB COST SCHEDULES, AND FOR A MODIFICATION OF THE PRETRIAL AND TRIAL SCHEDULE .................... 1

PRELIMINARY STATEMENT .................... 2

ARGUMENT .................... 2

I. Renda's Trial Experts Barry Smith And Kent Ray Should Be Required To Produce Written Reports That Conform To Rule 26(a)(2)(B) .................... 2

A. Barry Smith .................... 2

B. Kent Ray .................... 9

II. The March 3, 2004 Report Of Robert McCullough .................... 10

III. Renda Should Be Required To Produce All Documents Prepared By Its Experts That Are Responsive To Document Production Request No. 2 Contained In The Government's Document Production Request Regarding Renda's Experts .................... 12

IV. The Government Should Be Permitted To Perform An Audit Of The Job Cost Schedules For The Upper Bayou Project Recently Produced By Renda .... 15

V. The Government Also Should Be Permitted To Audit The Reformulated Lost Lake Levees Claim That Is The Subject Of The March 3, 2004 Report Of Renda's Trial Expert Robert McCullough .................... 18

VI. The Pretrial And Trial Schedule Should Be Modified .................... 18

CONCLUSION .................... 21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ager v. Jane C. Stormont Hospital and Training School for Nurses*, 622 F.2d 496 (10th Cir. 1980) ..... 3

*Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1 (1st Cir. 1996) ..... 17

*Akeva L.L.C. v. Mizuno Corp.,* 212 F.Supp. 2d 306 (M.D.N.C. 2002) ..... 19

*Brown v. Best Foods*, 169 F.R.D. 385 (N.D. Ala. 1996) ..... 4

*City and County of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 219 (N.D. Cal. 2003) ..... 20

*Hi-Shear Technology Corp. v. United States*, 356 F.3d 1372 (Fed. Cir. 2004) ..... 18

*Jayne H. Lee, Inc. v. Flagstaff Industries Corp.*, 173 F.R.D. 651 (D. Md. 1997) ..... 16

*Keener v. United States*, 181 F.R.D. 639 (D. Mont. 1998) ..... 19

*Nguyen v. IBP, Inc.*, 162 F.R.D. 675 (D. Kan. 1995) ..... 8,10

*Plano Builders Corp. v. United States*, 40 Fed. Cl. 635 (1998) ..... 7

*Propellex Corp. v. Brownlee*, 342 F.3d 1335 (Fed. Cir. 2003) ..... 18

*Raytheon Co. v. White*, 305 F.3d 1354 (Fed. Cir. 2002) ..... 11

*Salas v. United States*, 165 F.R.D. 31(W.D.N.Y. 1995) ..... 4

*Shapardon v. West Beach Estates*, 172 F.R.D. 415 (D. Hawaii 1997) ..... 4,6

*Smith v. State Farm Fire and Casualty Co.*, 164 F.R.D. 49 (S.D. W.Va. 1995) ..... 3,4,8,16

*Sprague v. Liberty Mutual Insurance Co.*, 177 F.R.D. 78 (D.N.H. 1998) ..... 4,5

*Sullivan v. Glock, Inc.*, 175 F.R.D. 497 (D. Md.1997) ..... 5

*United States v. Modena*, 302 F.3d 626 (6th Cir. 2002) ..... 17

*Wreath v. United States*, 161 F.R.D. 448 (D. Kan. 1995) ..... 4

## TABLE OF AUTHORITIES (CONT'D)

## FEDERAL STATUTES

United States Code:

28 U.S.C. § 1821 .......... 3

Public Laws:

Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13) .......... 7

## MISCELLANEOUS

Rules of the Court of Federal Claims:

Rule 26(a)(2)(B) .......... passim

Rule 26(b)(4)(A) .......... 19

Appendix A, ¶ 13(a) .......... 17

Federal Rules of Civil Procedure:

Rule 26(a)(2)(B) .......... passim

Rule 26(b)(4)(A) .......... 19

Federal Rules of Evidence:

Rule 702 .......... 4

Rule 1006 .......... 17

# INDEX TO DEFENDANT'S SUPPLEMENTAL APPENDIX


| **Document** | **Page** |
|---|---|
| "Renda Marine, Inc.'s Third Supplemental Answers to Defendant's First Set of Interrogatories" | 1 |
| Excerpts from transcript of deposition of Steve Bowman on January 12, 2004 | 13 |
| "Declaration of John E. Kosloske" dated March 12, 2004 | 18 |
| Selected pages from "file materials" of Barry Smith | 20 |
| Order filed on October 18, 2002 | 39 |
| Subpoena *duces tecum* to Milbern Ray & Company dated November 5, 2003 | 42 |
| Financial Statements for Renda Marine, Inc. for October 31, 2001 and 2000 | 46 |
| Excerpts from transcript of deposition of Kent Ray on December 8, 2003 | 71 |
| "Initial Disclosures by Plaintiff, Renda Marine, Inc." | 80 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT’S REPLY TO PLAINTIFF'S RESPONSE
TO DEFENDANT'S MOTION TO COMPEL COMPLIANCE WITH RULE 26(a)(2)(B),
TO COMPEL PRODUCTION OF DOCUMENTS, TO PERMIT DEFENDANT
TO PERFORM AN AUDIT OF PLAINTIFF'S JOB COST SCHEDULES,
AND FOR A MODIFICATION OF THE PRETRIAL AND TRIAL SCHEDULE

## PRELIMINARY STATEMENT

In response to the Government's motions to compel compliance with RCFC 26(a)(2)(B), to compel production of documents, to permit an audit of plaintiff's job cost schedules for the Upper Bayou Project, and for a modification of the pretrial and trial schedule, plaintiff, Renda Marine, Inc. (Renda), argues that it is not required to comply with Rule 26(a)(2)(B) in the case of two of its experts, produces a report from a third expert that contains a hitherto undisclosed and unaudited method of calculating damages for two of Renda's claims totaling $7 million, states that Renda will agree to an audit by the Government of plaintiff's job cost schedules only if defendant agrees to respond to Renda's out-of-time discovery requests, and opposes a modification of the current pretrial and trial schedules unless defendant agrees to pay Renda part of the amounts claimed by Renda in this case.[1] For the reasons stated below, Renda's arguments are

[1] In this reply, "Pl. Opp. ____" refers to the referenced page(s) of the "Response by Plaintiff, Renda Marine, Inc., to Defendant's Motion to Compel Compliance with Rule 26(a)(2)(B), to Compel Production of Documents, to Permit Defendant to Perform an Audit of Plaintiff's Job Cost Schedules, and for a Modification of the Pretrial and Trial Schedule and Contingent Motion for Leave to Require Defendant to Answer Renda's Discovery" filed on or about March 3, 2004;

without merit and the Government's motions should be granted.

## ARGUMENT

### I. Renda's Trial Experts Barry Smith And Kent Ray Should Be Required To Produce Written Reports That Conform To Rule 26(a)(2)(B).

#### A. Barry Smith

Renda argues that Barry Smith is a "hybrid witness" to whom Rule 26(a)(2)(B) does not apply and that Renda provided the Government with an abbreviated report from Mr. Smith not as a matter of obligation but "in the spirit of cooperation." Pl. Opp. 3. Alternatively, Renda asserts that the abbreviated report of Mr. Smith conforms to Rule 26(a)(2)(B) because it incorporates by reference "writings that the expert prepared earlier," i.e., Renda's certified claims in this case. Pl. Opp. 3-4. We disagree.

The contention that Barry Smith is a "hybrid witness" to whom Rule 26(a)(2)(B) does not apply is inconsistent with a prior statement by Renda's counsel concerning this issue and without legal merit. In his February 11, 2004 correspondence to defendant's counsel, Renda's counsel did not intimate that Rule 26(a)(2)(B) does not apply to Mr. Smith. He asserted, rather, that the claims prepared by Mr. Smith were the functional equivalent of a written report: "Barry Smith's opinions and reports have been the various claims that he prepared and which were submitted to the Galveston District Corps of Engineers." Def. App. 66.[2]

---

"Def. App. ____" refers to the referenced page(s) of the appendix to "Defendant's Motion to Compel Compliance with Rule 26(a)(2)(B), to Compel Production of Documents, to Permit Defendant to Perform an Audit of Plaintiff's Job Cost Schedules, and for a Modification of the Pretrial and Trial Schedule" dated February 18, 2004; and "Def. Supp. App. ____" refers to the referenced page(s) of the appendix to this reply brief.

[2] Renda has since supplemented its response to the Government's interrogatory regarding expert witnesses in a manner that is inconsistent with its argument that a Rule 26(a)(2)(B) report

In any event, Rule 26(a)(2)(B) applies to Mr. Smith because, contrary to Renda's claim, he has been "retained or specially employed" to provide expert testimony in this case within the meaning of Rule 26(a)(2)(B), which provides that, "[e]xcept as otherwise stipulated or directed by the court," the disclosure of expert testimony by a party "shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness." In Smith v. State Farm Fire and Casualty Co., 164 F.R.D. 49, 56 (S.D. W.Va. 1995), the court held that, for purposes of Rule 26(a)(2)(B), "a witness who will testify pursuant to Rule 702 of the Federal Rules of Evidence, and who will receive consideration different than the [witness fees and allowances provided by 28 U.S.C. § 1821], is an expert witness 'retained or specially employed to provide expert testimony."[3]

The "only exception" to the Rule 26(a)(2)(B) requirement that such witnesses prepare and sign reports is found in the Advisory Committee Notes to that rule, which exempt "treating

---

is not required of Mr. Smith. The supplementation contains a statement addressed to publications authored by Mr. Smith in the past ten years and deposition and trial testimony during the last four years and the compensation paid by Renda to Mr. Smith for "labor" through February 2004, which aggregates $305,570. See Renda's "Third Supplemental Answers to Defendant's First Set of Interrogatories," at 1-2, Def. Supp. App. 1-2. While that supplementation is consistent with what is mandated by Rule 26(a)(2)(B), but it was not required by the expert witness interrogatory, which requests (a) "the subject matter upon which [the expert] is expected to testify," (b) "the substance of the facts to which [the expert] is expected to testify," and (c) "the substance of the opinions to which [the expert] is expected to testify and the ground(s) for each such opinion." See Def. App. 11.

[3] The Smith court noted that "[t]he terms 'retained' and 'specially employed' encompass a wide range of compensation agreements not limited to payment of an expert fee at an hourly rate." 164 F.R.D. at 56 (citing Ager v. Jane C. Stormont Hospital and Training School for Nurses, 622 F.2d 496, 498 (10th Cir. 1980)).

physicians" and other medical providers. Smith, 164 F.R.D. at 56.[4] A Rule 26(a)(2)(B) report is not a prerequisite to opinion testimony by a physician with respect to causation, diagnosis, prognosis, or extent of disability, if any, caused by the condition or injury *if* such opinions are based upon the physician's treatment or examination of the patient. See, e.g., Sprague v. Liberty Mutual Insurance Co., 177 F.R.D. 78, 81 (D.N.H. 1998); Shapardon v. West Beach Estates, 172 F.R.D. 415, 416-17 (D. Hawaii 1997) Brown v. Best Foods, 169 F.R.D. 385, 388 (N.D. Ala. 1996). But "when the doctor's opinion testimony extends beyond the facts disclosed during care and treatment of the patient and the doctor is specially retained to develop opinion testimony, he or she is subject to the provisions of Rule 26(a)(2)(B)." Salas v. United States, 165 F.R.D. 31, 33 (W.D.N.Y. 1995); accord Shapardon, 172 F.R.D. at 417; Brown, 169 F.R.D. at 389. For example, "a treating physician requested to review medical records of another health care provider in order to render opinion testimony concerning the appropriateness of the care and treatment of the provider would be specifically retained notwithstanding that he also happens to be the treating physician." Wreath v. United States, 161 F.R.D. 448, 450 (D. Kan. 1995).

Mr. Smith has been retained or specially employed to provide expert testimony in this case. He is President of Pathfinder Construction Consulting, Inc., a "hired gun" according to Steve Bowman, the former Vice-President of Renda who signed and certified the claims allegedly prepared by Mr. Smith in this case. Bowman Depo. Tr. 67(18-21), Def. Supp. App. 15.

---

[4] The Advisory Committee Notes to the 1993 amendments to Rule 26(a)(2)(B) provide, in relevant part: "The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide [opinion testimony under Fed.R.Evid. 702] in the case or whose duties as an employee of a party regularly involve the giving of such testimony. A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."

According to Renda, "Mr. Smith is charging $100.00/hour for his continued work on this project," which exceeds the statutory allowance for witness fees and expenses. See Renda's "Third Supplemental Answers to Defendant's First Set of Interrogatories," at 2, Def. Supp. App. 2.

Renda contends that Mr. Smith is not retained or specially employed to provide expert testimony because he "acquired [his] knowledge about [the Upper Bayou Project] while it was ongoing" and "developed opinions based on such knowledge." Pl. Opp. 3.[5] There are several problems with those assertions. *First*, Renda has not identified any legal precedent concerning "hybrid witnesses" that deals with anything besides treating physicians or other health care providers set forth in the Advisory Committee Notes to the 1993 amendments to Rule 26(a)(2)(B). The two cases relied upon by Renda – Sullivan v. Glock, Inc., 175 F.R.D. 497 (D. Md.1997), and Sprague – both involved the applicability of Rule 26(a)(2)(B) to expert testimony of treating physicians.

*Second*, even assuming that the "treating physician" example referred to in the Advisory Committee Notes signals a broader category of experts excepted from the requirements of Rule 26(a)(2)(B), the exception would not apply to Mr. Smith. Unlike the treating physician, whose opinions are based upon personal treatment and examination of the patient, Mr. Smith's opinions are based in large part upon matters about which he does not have first-hand knowledge. In his "report," Mr. Smith states that he was he was "onsite" at the Upper Bayou Project from "August 2000 through completion." Def. App. 92. The contract for the Upper Bayou Project, however,

---

[5] Renda makes the same argument with respect to its experts Kent Ray and Benton Goodloe. Our response concerning Mr. Ray is set forth below. As for Mr. Goodloe, the Rule 26(a)(2)(B) requirement for a written report does not apply to him because he appears to be an employee of Renda whose duties do not regularly involve giving expert testimony. For that reason, we do not seek to have Mr. Goodloe comply with the requirement of Rule 26(a)(2)(B) for a written report.

was awarded in October *1998*, see Compl. ¶ 10, and some or all of the alleged operative facts concerning several of Renda's claims upon which Mr. Smith opines occurred *before* Mr. Smith's involvement in the Upper Bayou Project, including the South Ferry Landing claim (October 1999-May 2000, see Compl. ¶¶ 20-29), the Flare Area claim (January-July 2000, see Compl. ¶¶ 53-61), the HL&P Tower claim (July and October 2000, see Compl. ¶¶ 75, 77), the West Levee Realignment claim (July-November 2000, see Compl. ¶¶ 91-93), and the Lost Lake Levees claim (December 1998-July 2001, see Compl. ¶¶ 160, 166-168, 170, 186-194).

Moreover, in a recent supplementation by Renda of its response to the Government's interrogatory regarding expert witnesses, Renda lists numerous documents reviewed by Mr. Smith provided to him in this litigation by Renda or Renda's counsel, including materials produced in this litigation by the Government, such as Corps of Engineers documents relating to the Upper Bayou Project, the DCAA audit reports upon Renda's claims and associated DCAA audit work papers, the reports of the Government's expert witnesses, and computer disks produced by the Government with aerial and ground surveys of the Lost Lake Placement Area. See Renda's "Third Supplemental Answers to Defendant's First Set of Interrogatories," at 2, Def. Supp. App. 2. An opinion by Mr. Smith that is based upon any of that materials triggers the report requirement of Rule 26(a)(2)(B).[6] Cf. Shapardon, 172 F.R.D. at 417 ("[T]he parties indicated that at least one of Plaintiff's experts may have obtained an independent medical examination report from Plaintiff's counsel. An opinion based on any information in that report or any other infor-

---

[6] In his "report," Mr. Smith states that, "[b]ased upon comments made by DCAA during its 2002 audit, I am reviewing the claims and updating or responding to information presented" and that, "[w]here appropriate, I am revising the claim components or base costs, which will revise the claim amounts." Def. App. 92.

mation outside the scope of his or her examination or treatment of Plaintiff is of a consulting nature. Thus, that physician must be considered a consulting expert who is subject to the to the report requirement of Rule 26(a)(2)(B).").

*Third*, Renda erroneously implies that Mr. Smith's opinions were "pre-litigation" or that they were not formed in anticipation of litigation. The Contract Disputes Act (CDA) describes a three-step procedure for the disposition of claims filed by government contractors prosecution of a CDA claim, which consists of: (1) the contractor's submission of a claim to the contracting officer; (2) the contractor's securing of a final decision by the contracting officer upon the claim; and (3) an appeal to a board of contract appeals or a judicial action seeking to a reversal of the contracting officer's decision. Plano Builders Corp. v. United States, 40 Fed. Cl. 635, 638 (1998). Because these three steps "are part of a single integrated process for resolution of a CDA claim, . . . each step properly is considered part of the prosecution of that claim." Id. Mr. Smith's opinions, thus, should be considered to have been developed by him in connection with the prosecution of a claim against the Government rather than in a context divorced from litigation.

Renda's alternative argument that, in any event, Mr. Smith's abbreviated "report" satisfies the requirements of Rule 26(a)(2)(B) also is without merit. Rule 26(a)(2)(B) requires a "complete statement" of "all opinions to be expressed and the basis and reasons therefor." Mr. Smith's four-page report does not contain a complete statement of his opinions and the reasons and basis for the opinions. The opinions are set forth in vague and imprecise terms. The report is also incomplete in that it does not contain the results of Mr. Smith's continuing "review" of the DCAA audit reports upon Renda's claims produced by the Government in December 2002, including "updating or responding to information presented" in the DCAA audit reports or potential

revisions of "claim components or base costs, which will revise the claim amounts." See Def. App. 92.

The attempt by Mr. Smith to overcome these failings in his report by the indiscriminate, wholesale incorporation by reference of "Renda's requests for equitable adjustment and certified claims" must also fail. Incorporation by reference in an expert's report of material not prepared or signed by the expert is improper. See Smith, 164 F.R.D. at 54 (disapproving attempt by party's experts to incorporate in their reports answers to interrogatories). Mr. Smith did not sign any of the requests for equitable adjustment or certified claims and, insofar as preparation of those materials in concerned, Mr. Smith merely states in his report that he was "instrumental" in their preparation. See Def. App. 92.[7]

Mr. Smith, therefore, should be required to provide the written report required by Rule 26(a)(2)(B), including, among other things, a complete and detailed statement of all opinions to be expressed by Mr. Smith and the basis and reasons for those opinions as well as any exhibits to be used as a summary of or support for Mr. Smith's opinions. The requirements of Rule 26(a)(2)(B) are mandatory as to as to any expert retained to testify. Nguyen v. IBP, Inc., 162 F.R.D. 675, 681 (D. Kan. 1995). "If the expert is unable or unwilling to make the disclosures he should be excluded as a possibility for retention as an expert witness in the case." Id.

---

[7] Renda's response to the Government's pending motions states that "Mr. Smith prepared the claims in this case." Pl. Opp. 3. If, by this statement, Renda means to say that Mr. Smith's involvement with the preparation of Renda's claims was different or more comprehensive than Mr. Smith's ambiguous description of his role in their preparation, then the statement should be ignored because it is unsworn and not in any way adopted by Mr. Smith. See Ngyuen, 162 F.R.D. at 680 (court disregarded counsel's unsworn statements of fact concerning deficiencies in expert's report that were not adopted by expert witness).

B. Kent Ray

In the case of Kent Ray, Renda does not suggest that the "report" provided the Government satisfies the requirements of Rule 26(a)(2)(B). It argues that a written report is not required of Mr. Ray because he allegedly acquired his knowledge about the Upper Bayou Project "while it was ongoing" and "developed opinions based on such knowledge." Pl. Opp. 3. Again, we do not agree.

Renda's assertion that Rule 26(a)(2)(B) does not apply to Mr. Ray is inconsistent with a prior statement by Renda's counsel concerning this issue and without legal merit. In his February 11, 2004 correspondence to defendant's counsel, Renda's counsel does not suggest that Rule 26(a)(2)(B) is inapplicable to Mr. Ray. He states, simply: "Mr. Kent Ray's *report* is attached. It was inadvertently omitted from a previous mailing to you." Def. App. 66 (emphasis added).

At any rate, Mr. Ray is subject to the Rule 26(a)(2)(B) requirement for a written report because he has been "retained or specially employed to provide expert testimony in the case." Renda states that Mr. Ray is compensated for his services at the rate of $160 per hour, which exceeds the statutory allowance for witness fees and expenses. See Renda's "Third Supplemental Answers to Defendant's First Set of Interrogatories," at 5, Def. Supp. App. 5. Moreover, the job cost schedules for the Upper Bayou Project that are the subject of Mr. Ray's testimony were prepared by Mr. Ray at the request of Renda's counsel for the present litigation. In a letter to Renda's counsel transmitting those cost schedules, Mr. Ray states: "Per your request we have prepared schedules of job costs [for the Upper Bayou Project]." Def. App. 79. Mr. Ray, thus, has been "retained" or "specially employed" by Renda to provide expert testimony in this case.

Mr. Ray, therefore, should be required to provide the written report required by Rule 26(a)(2)(B), including, among other things, a complete and detailed statement of all opinions to be expressed by Mr. Ray and the basis and reasons for those opinions. The requirements of Rule 26(a)(2)(B) are mandatory as to as to any expert retained to testify. Nguyen, 162 F.R.D. at 681. "If the expert is unable or unwilling to make the disclosures he should be excluded as a possibility for retention as an expert witness in the case." Id.

II. The March 3, 2004 Report Of Robert McCullough

On January 26, 2004, Renda provided the Government with a report dated January 23, 2004, prepared by "McCullough & Associates" that was inadequate. See Def. App. 38-56. The report itself stated that it was preliminary in nature and it did not contain the data or other information considered by Robert McCullough in forming the opinions or any exhibits to be used as a summary of or support for the opinions.

Renda has now produced a second report from "McCullough & Associates" dated March 3, 2004, that contains opinions which are a dramatic, pointed variation from Mr. McCullough's January 2004 expert testimony disclosure.[8] Renda characterizes this second report as a "supplemental report," adding that it "should resolve any questions about Mr. McCullough." Pl. Opp. 4.

The January 2004 McCullough report concluded that Renda's claims are "valid and compensable" in the amount of $14,406,646" (exclusive of interest). Def. App. 56. That report contains opinions that essentially rubber-stamp Renda's claims in this case, including Renda's West Levee Realignment Claim for $789,000 and the Lost Lake Levees Claim for $6,258,853, which

[8] The March 2004 McCullough report is appended to Renda's March 3, 2004 response to the Government's pending motion to compel compliance with Rule 26(a)(2)(B). See Exhibit D to Renda's March 3, 2004 response to the Government's pending motions.

is based upon a total cost damages methodology.[9]

The March 2004 McCullough report, by contrast, concludes that Renda's claims in this case are "valid and compensable" in the amount of $13,379,367" (exclusive of interest). Id. at 25. The most striking feature of the March 2004 Report, however, is its treatment of the West Levee Realignment and Lost Lake Levees Claims. Whereas Renda's certified claims present the Lost Lake Levees Claim as one claim for a lump sum of $6,258,853 calculated based upon the total cost damages method, the March 2004 McCullough report redefines the claim by breaking it out into six distinct claim items, totaling $7,055,037, calculated based upon a different damages methodology than the total cost method employed by Renda in the certified claims. See March 2004 McCullough report, at 18-24. Also, in contrast to Renda's certified claims and the January 2004 McCullough report, the March 2004 report does not treat the West Levee Realignment Claim as a separate claim, but "combines" it with the Lost Lake Levees Claim. See March 2004 McCullough report, at 15. The six claim items are:

| | | Direct Costs |
|---|---|---|
| A. | "Additional levee equipment and labor required to construct levees above and beyond what could have been reasonably anticipated from the contract documents" .......................................... | $1,549,759 |
| B. | "Mechanical Levee Construction – East, North, and West Levees (approximately 4/17/2000 to 12/31/2000)"[10] ..................................... | $1,281,581 |
| C. | "Additional dredge plant equipment and labor due to relocation of the dredge discharge line (primarily removing and replacing pipe segments) while reconstructing levees that had subsided" ................. | $ 352,347 |

[9] "Under the total cost method, the measure of damages is the difference between the actual cost of the contract and the contractor's bid." Raytheon Co. v. White, 305 F.3d 1354, 1365 (Fed. Cir. 2002).

[10] The West Levee Realignment Claim is folded into this item of the reformulated Lost Lake Levees Claim. See March 2004 McCullough report, at 22.

D. "Dredge plant time while waiting for displaced material to settle and while pumping water (non-productive time) to flush displacement material" .......... $1,184,162

E. "Additional booster pump equipment required to pump dredge material longer distances due to additional material requirements to construct the levees" .......... $ 211,035

F. "Extended non-effective time for dredge and dredge plant while awaiting official Corps of Engineers release from the project" .......... $ 725,191

Total Direct Cost: $5,304,075

When indirect expenses (overhead), profit, bond, and "professional fees and report preparation" are added to direct costs, the Lost Lake Levees Claim, as recalculated by the March 2004 report, comes to $7,055,037. See March 2004 McCullough report, at 24 ("Damage Summary").

The March 2004 McCullough report is not a "supplemental" report, but an out-of-time disclosure of expert testimony[11] that, as discussed below, warrants a modification of the pretrial and trial schedule to afford the Government a full and fair opportunity for additional discovery, including an audit of the reformulated Lost Lake Levees claim, depositions (Mr. McCullough and others, if necessary), and rebuttal reports by Government experts.

III. Renda Should Be Required To Produce All Documents Prepared By Its Experts That Are Responsive To Document Production Request No. 2 Contained In The Government's Document Production Request Regarding Renda's Experts.

The Government's Document Request No. 2 with respect to Renda's experts requests production of "[a]ll reports, affidavits, declarations, memoranda, papers, notes, studies, graphs, charts, tabulations, analyses, summaries, data sheets, statistical or informational accumulations,

[11] Under the pretrial schedule presently in effect, expert reports were due by February 4, 2004, and depositions of experts were to have been concluded by February 18, 2004. Def. App. 1-2.

and computer generated documents, including drafts or preliminary revisions of any of the above, prepared in connection with this litigation by or under the direction or supervision of any individual that Renda expects to call as an expert witness at trial." See "Defendant's First Set of Interrogatories and Second Request for Production of Documents" dated January 23, 2003, Def. App. 14. Renda does not suggest that this request is improper. Renda's response to the Government's pending motion to compel does not even respond to the motion.

In its March 3, 2004 "Third Supplemental Answers to Defendant's First Set of Interrogatories," however, Renda states that Barry Smith's "file materials were previously furnished to the Government bearing Bates numbers REM 40000-REM 41052," id. at 2-3, Def. Supp. App. 2-3, that Christopher Mathewson "plans to produce additional materials aside from his report" and that, "[u]pon receipt, these materials will be furnished to defendant," id. at 4, Def. Supp. App. 4, and that "Renda will produce under separate cover copies of documents that Mr. Ray and/or his firm have produced or reviewed concerning Renda and the equipment listing and costs for the Upper Bayou Project." Id. at 5, Def. Supp. App. 5. Renda further states that, during the course of the Upper Bayou Project, Ben Goodloe "reviewed the dredging logs for the Project, and the documents that Renda prepared or received concerning its dredging operations," but he "did not prepare any other documents reflecting his opinions." Id.

Renda produced materials prepared by Kent Ray, C.P.A., on March 12, 2004. The Government has not received any materials prepared by Renda's experts Christopher Mathewson or Robert McCullough that are responsive to Document Request No. 2 (other than a report by Dr. Mathewson and an invoice for his services and Mr. McCullough's January 2004 and March 2004

reports. Kosloske Declaration, ¶ 3, Def. Supp. App. 18-19.[12]

As for Mr. Smith, we have not received any materials that he prepared, except his abbreviated "report" (and, of course, Renda's certified claims as to which Mr. Smith states he was "instrumental" in preparing). We have reviewed the "file materials" of Mr. Smith produced by Renda and they do not appear to contain any documents *prepared* by Mr. Smith, such as drafts of claims, memoranda, papers, notes, studies, graphs, charts, tabulations, analyses, summaries, data sheets, statistical or informational accumulations, and computer generated documents, including all drafts or preliminary revisions of any of the above, relating to the opinions that are the subject of his expert testimony. Kosloske Declaration, at ¶ 4, Def. Supp. App. 19.

The "file" documents produced by Renda referred to its March 3, 2004 "Third Supplemental Answers to Defendant's First Set of Interrogatories," contain periodic "Vendor" cost reports relating to the Upper Bayou Project for the period September 1998 to May 2001, which would not have been prepared by Mr. Smith (REM 40004-REM 40187) (e.g., Def. Supp. App. 20-21, "presentation materials" (a kind of slide show) from a meeting between Renda and the Corps of Engineers on January 17, 2002 (REM 40190-REM 40250) (e.g., Def. Supp. App. 22-24), contract documents and correspondence relating to the Upper Bayou Project (REM 40251-REM 40752) (e.g., Def. Supp. App. 25-31), and another file that contains contract documents, project correspondence, and other materials (REM 40753-REM 41052) (e.g., Def. Supp. App. 32-38), most of which predate Mr. Smith's involvement in the Upper Bayou Project.

---

[12] One can tell from the March 2004 report of Mr. McCullough that such materials were prepared by him. The computer-generated document at Tab #8 to the report indicates in the lower, right-hand portion of each page that it is a document which was "Revised: 3/3/2004 3:14 AM." Earlier version(s) of that document have not been produced.

The "file materials" of Mr. Smith previously produced in this case, thus, do not contain documents *prepared* by Mr. Smith responsive to Document Request No. 2, such as, for example, earlier drafts of claims, computer-generated analyses of claims or components of claimed damages, and the development of the so-called "measured mile" used by him to calculate damages for claims, including Renda's $4.6 million Flare Area Claim, all of which are potentially important materials for cross-examination of Mr. Smith. Renda, therefore, should be required to produce for inspection and/or copying by the Government documents prepared by its experts sought by Document Request No. 2 contained in "Defendant's First Set of Interrogatories and Second Request for Production of Documents."

IV. The Government Should Be Permitted To Perform An Audit Of The Job Cost Schedules For The Upper Bayou Project Recently Produced By Renda.

In response to the Government's application for an order that would allow us to perform – through the Defense Contract Audit Agency (DCAA) – an audit of the job cost schedules relating to the Upper Bayou Project prepared by Kent Ray, one of Renda's trial experts, Renda asserts that the Court's October 18, 2002, Order for this case required that the Government complete its audit of Renda by December 16, 2002, and that the Government did not protest that it could not complete the audit by that date. Pl. Opp. 4. We disagree. While the Court's Order required the Government to have "completed" by December 16, 2002, "the audit it has begun at plaintiff's facility," id. at ¶ 1.A, Def. Supp. App. 39, the Order does not foreclose subsequent audits by the Government in this case should the occasion or need for additional audit work arise, as it has because of the supplementation and reformulation by Renda of its claims after the DCAA audit reports were issued in December 2002. To read the provision of the Court's Order concerning

DCAA audits as Renda apparently does would permit Renda to present one damages claim or set of financial or accounting data to DCAA for audit and then offer a substantially different claim or set of data at trial which the Government would not be given the opportunity to audit, a manifestly unfair result that could not be contemplated by the Court's Order.

Renda waited until January 15, 2004, the day after the deadline for the completion of fact discovery in this case, to produce for the Government a breakout of the claimed job costs for the Upper Bayou Project. It produced the job cost schedules only after the Government filed a motion to compel Renda to respond to our November 25, 2003 discovery request for that information and shortly before a scheduled telephonic status conference between the Court and counsel for the parties regarding that motion.[13/]

Renda's attempt to condition compliance with the Government's discovery request upon the Government's agreement to respond to out-of-time discovery requests by Renda is not appropriate. The "existence of a discovery dispute as to one matter is not a ground to delay or withhold the taking of other discovery." Jayne H. Lee, Inc. v. Flagstaff Industries Corp., 173 F.R.D. 651, 657 (D. Md. 1997); see also Smith, 164 F.R.D. at 54 ("The Court will not excuse non-

---

[13] Renda states that the Government "waited until" December 1, 2003, to issue a subpoena to Kent Ray and that the Government took the deposition of Mr. Ray on December 8, 2003. Pl. Opp. 4-5. This is irrelevant to the Government's request to audit the job cost schedules for the Upper Bayou Project prepared by Mr. Ray, inasmuch as Renda did not produce that information until mid-January 2004. The Government's subpoena to Milbern Ray & Company and our deposition of Mr. Ray concerned an "actual" cost figure for the Upper Bayou Project of $19.5 million appearing in a "Schedule of Completed Jobs for the Year Ended October 31, 2001" appended to annual financial statements prepared by Mr. Ray for the years ended October 31, 2000, and October 31, 2001. That job cost figure was not broken out into constituent cost components. See Def. Supp. App. 69. At his deposition, Mr. Ray testified that the $19.5 million job cost figure does not include equipment depreciation expense or "any type of self equipment rentals" for the Upper Bayou Project. See Ray Depo. Tr. 100 (15-20), Def. Supp. App. 76.

compliance with Rule 26 by one party for the reason that the other party may not have fully complied.").

At any rate, as discussed in our pending motion, the Government has an absolute right independent of the discovery rules to audit the job cost schedules prepared by Mr. Ray. These job cost schedules are a summary of voluminous data that, under Federal Rule of Evidence 1006, may not be received in evidence unless the underlying records have been made available to the Government for examination and or copying at a reasonable time or place. See, e.g., Air Safety, Inc. v. Roman Catholic Archbishop of Boston, 94 F.3d 1, 8 (1st Cir. 1996) (contractor's damages summaries not admitted into evidence where materials underlying the summaries were not made available to opposing parties).[14/] The Court's rules underscore and bolster this requirement:

> In the case of exhibits to be offered as summaries under Fed.R.Evid. 1006, the offering party shall provide opposing counsel with a statement with respect to each summary exhibit describing the source(s) for the items or figures listed (e.g., ledgers, journals, payrolls, invoices, checks, time cards, etc.), location(s) of the source(s), the time when the source(s) may be examined or audited by the opposing party, the name and address of the person(s) who prepared each summary and who will be made available to the opposing party during any examination or audit of the source material to provide information and explanations necessary for verification of information in the summary.

Appendix A, ¶ 13(a), Rules of the Court of Federal Claims.

The Government, therefore, should be permitted to examine or copy the materials that

[14] A party's right under Fed.R.Evid. 1006 to examine or copy records underlying a summary offered by the opposing party may not be conditioned upon that party's consent to discovery by the opposing party, as Renda has attempted to do here. See United States v. Modena, 302 F.3d 626, 633 (6th Cir. 2002) (Government's attempt to condition production of materials underlying summary upon opposing party's agreement to allow Government to inspect documents opposing party planned to introduce at trial was improper).

underlie the job cost schedules for the Upper Bayou Project prepared by Mr. Ray as part of an audit by DCAA of those schedules.

V. The Government Also Should Be Permitted To Audit The Reformulated Lost Lake Levees Claim That Is The Subject Of The March 3, 2004 Report Of Renda's Trial Expert Robert McCullough.

Evidently, Renda has had second thoughts about proceeding with the Lost Lake Levees Claim based solely upon a total cost damages method. As discussed above, the March 3, 2004 report of Robert McCullough unveils a new damages methodology for that claim not previously disclosed by Renda to the Government. This new theory of damages breaks out the Lost Lake Levees Claim into six distinct claim items for which damages are calculated separately.[15/]

The Government has not had the opportunity to audit the new damages calculation contained in Mr. McCullough's March 2004 report. We should be permitted to do so now, in conjunction with an audit of the job costs schedules for the Upper Bayou Project prepared by Renda's expert Kent Ray.

VI. The Pretrial And Trial Schedule Should Be Modified.

The need for a modification of the pretrial and, consequently, the trial schedule in this case has arisen because of Renda's conduct in this case, not the Government's behavior. *First*,

[15] Now that Renda has developed a second method of calculating damages for the Lost Lake Levees Claim, it is by no means clear that the total cost method of computing such damages can survive. "The total cost method of recovery is not favored and will not be used if . . . there is another, more reliable method available by which to establish the contractor's damages." Hi-Shear Technology Corp. v. United States, 356 F.3d 1372, 1383 (Fed. Cir. 2004). In any event, before a contractor can obtain the benefit of the total cost method, it must prove, among other things, "the impracticability of proving its actual losses directly." Propellex Corp. v. Brownlee, 342 F.3d 1335, 1339 (Fed. Cir. 2003). If, as it would appear, Renda has come up with a method of proving its alleged losses under the Lost Lake Levees Claim directly, establishing the impracticability of doing so would seem to be an impossible feat.

under the current pretrial schedule, expert discovery – including the production of expert reports – was to have been completed by February 4, 2004, and depositions of experts were to have been concluded by February 18, 2004. Renda, however, has not produced the required reports for its experts Barry Smith and Kent Ray and it did not produce the required report for Robert McCullough until March 3, 2004.[16] Nor has Renda complied with the Government's document production request for *all* materials *prepared* by Renda's experts in connection with this litigation. The Government should not be put in the position of having to depose an expert without benefit of the required written report or other materials prepared by the expert. Rule 26(b)(4)(A), in fact, precludes taking the deposition of an expert until after the report has been provided.

*Second*, under the present pretrial schedule, fact discovery was to have been completed by January 14, 2004. Renda, however, did not produce a break out of its job costs for the Upper Bayou Project – a critical part of its total cost damages calculation for the Lost Lake Levees Claim – until January 15, 2004, the day after the fact discovery deadline. And Renda continues

---

[16] RCFC 26(e)(1) provides that "[a] party is under a duty to supplement at appropriate intervals its disclosures under [Rule 26(a)] if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." "Supplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." Keener v. United States, 181 F.R.D. 639, 640 (D. Mont. 1998). It "does not cover failures of omission because the expert did an inadequate or incomplete preparation." Akeva L.L.C. v. Mizuno Corp., 212 F.Supp.2d 306, 310 (M.D. N.C. 2002). The opinions contained in the March 2004 McCullough report constitute a dramatic, pointed variation of Mr. McCullough's January 2004 expert testimony disclosure – not to mention a substantial overhaul of Renda's West Levee Realignment and Lost Lake Levee Claims – that hardly can be described as a "supplemental" report, at least for purposes of Rule 26(e)(1). The March 2004 report, rather, is an out-of-time disclosure of expert testimony.

to balk at the prospect of an audit by the Government of those job cost schedules.[17]

Moreover, Renda delayed until March 3, 2004, to provide the Government with a new method of calculating damages for the Lost lake Levees Claim that, as discussed above, is radically different from the total cost method of calculating such damages set forth in Renda's certified claim. Because this new damages methodology was not disclosed prior to the close of fact discovery, the Government was deprived of the opportunity to fashion a discovery plan for that reformulation of the Lost Lake Levees Claim, including an audit of the new damages claim by DCAA. We also have been deprived of the opportunity, in depositions of fact witnesses by the Government in this case, of examining those witnesses about factual assumptions that underlie the reformulated Lost Levees Lake Claim appearing in the March 2004 McCullough report.

The current pretrial and trial schedule, therefore, is no longer practical and it should be modified as follows:

1. to set a deadline by which Renda must provide the Government with the reports required by Rule 26(a)(2)(B) of Renda's experts Barry Smith and Kent Ray and to produce for inspection and/or copying materials respon-

[17] RCFC 26(a)(1)(C) mandates that Renda provide the Government, "without awaiting a discovery request," with "a computation of any category of damages claimed by [it], making available for inspection and copying as under RCFC 34 the documents or other evidentiary material . . . on which such computation is based . . . ." Rule 26(e)(1) "also imposes a continuing obligaion to supplement the initial disclosures whenever the parties find that the initial disclosures were 'incomplete or incorrect,' making the operation of Rule 26 the 'functional equivalent of a Standing Request for Production under Rule 34.'" City and County of San Francisco v. Tutor-Saliba Corp., 218 F.R.D. 219, 220 (N.D. Cal. 2003) (citing Rule 26(e) and Advisory Committee Notes to 1993 amendments to Rule 26(a), 146 F.R.D. 401, 631-32 (1993)). Renda's initial damages computation disclosure did not break out the $24,663,589 figure used by Renda to arrive at the amount Renda seeks to recover for the Lost Lake Levees Claim. The initial disclosure merely listed the amount sought for each of the eight claims and referred the Government to Renda's certified claims for further detail. See Def. Supp. App. 81. Inexplicably, Renda waited until January 2004 to finally produce for the Government the Upper Bayou Project job cost schedules that should have been made available to DCAA for audit in the spring of 2002.

sive to Document Request No. 2 contained in "Defendant's First Set of Interrogatories and Second Request for Production of Documents" dated January 23, 2003;

2. to permit the Government to perform an audit (through DCAA) of the job cost schedules for the Upper Bayou Project prepared by Renda's expert Kent Ray, produced by Renda on January 15, 2004, and the new damages calculation for Renda's Lost Lake Levees Claim contained in the March 3, 2004 report of Renda's expert Robert McCullough, and to set a deadline by which those audits must be completed and audit reports provided to Renda;

3. to set a deadline for rebuttal reports by Government experts to the report to be provided by Renda's expert Barry Smith;

4. to set a deadline for rebuttal reports by Government experts to the report to be provided by Renda's expert Kent Ray that is *after* the completion of the Government's audit of Renda's job cost schedules for the Upper Bayou Project prepared by Mr. Ray;

5. to set a deadline for rebuttal reports by Government experts to the March 3, 2004 report of Robert McCullough that is *after* the completion of the Government's audit of the new damages calculation for Renda's Lost Lake Levees Claim contained in the Mr. McCullough's March 3, 2004 report;

6. to set a new deadline for the completion of depositions of expert witnesses that is *after* the new deadline set by the Court for experts' rebuttal reports;

7. to set new deadlines for the pretrial activities that are the subject of paragraphs 4 through 7 of the Court's September 10, 2003 Order; and

8. to reschedule the trial in this case for a minimum of three weeks.

## CONCLUSION

For the foregoing reasons, defendant's pending motions filed on February 18, 2004, should be granted and the Court should: (a) order that plaintiff comply with Rule 26(a)(2)(B); (b) order that plaintiff produce for inspection and/or copying by defendant materials responsive to Document Request No. 2 contained in "Defendant's First Set of Interrogatories and Second

Request for Production of Documents" dated January 23, 2003; (c) permit defendant to audit (through DCAA) the job cost schedules for the Upper Bayou Project prepared by plaintiff's expert Kent Ray and the new damages calculation for Renda's Lost Lake Levees Claim contained in the March 3, 2004 report of plaintiff's expert Robert McCullough; and (d) modify the pretrial and trial schedules in the manner set forth above.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

MARCH 12, 2004

United States Court of Federal Claims

| | | |
|---|---|---|
| Renda Marine, Inc., plaintiff, | § § § | Case No. 02-306C |
| v. | § § | (Judge Hewitt) |
| United States, DEFENDANT. | § § | |

**RENDA MARINE, INC.'S THIRD SUPPLEMENTAL ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

TO: United States Army Corps of Engineers, through its attorney of record, John E. Kosloske, Department of Justice, 1100 L Street, N.W., Room 8012, Washington, D.C. 20530.

Renda Marine, Inc. ("Renda"), supplements its answers to the First Set of Interrogatories of the United States Army Corps of Engineers ("Corps"), as follows.

**FIRST SET OF INTERROGATORIES**

INTERROGATORY NO. 1:

Identify each individual that plaintiff expects to call as an expert witness at trial and, with respect to each such individual, state:

(a) the subject matter upon which he or she is expected to testify;

(b) the substance of the facts to which he or she is expected to testify; and

(c) the substance of the opinions to which he or she is expected to testify and the ground(s) for each such opinion.

ANSWER:

Barry Smith

Mr. Smith has authored no publications in the last ten years. Mr. Smith has not testified in deposition or at trial in the last four years.

Mr. Smith was a consultant for Renda during the Upper Bayou Project. He undertook project administration work as well as claims preparation and consulting work. He was paid the following amounts by Renda:

| | |
|---|---|
| Fiscal Year 2000 | |
| Labor @ $90.00/hour | $2,610.00 |
| Labor @ $3,000/week | $27,000.00 |
| Expenses | $5,293.44 |
| Fiscal Year 2001 | |
| Labor @ $100.00/hour | $12,800.00 |
| Labor @ $3,000/week | $144,000.00 |
| Expenses | $37,891.59 |
| Fiscal Year 2002 | |
| Labor @ $100.00/hour | $1,210.00 |
| Clerical | $225.00 |
| Labor @ $3,000/week | $52,850.00 |
| Expenses | $5,461.48 |
| Fiscal Year 2003 | |
| Labor @ $100/hour | Approx. $47,600.00 |
| Expenses | $4,150.78 |
| Fiscal Year 2004 | |
| Labor (through Feb. 2004) | Approx. $17,500.00 |

Mr. Smith is charging $100.00/hour for his continued work on this project.

Mr. Smith has been provided all of the CD-Roms containing the documents produced in this case. Mr. Smith has reviewed many of the documents on those CD-Roms. He has also reviewed first hand Renda's project files at the project office. Additionally, Smith was also furnished with a set of the DCAA Audit Papers, CDs of documents produced by Government in case; CDs of documents produced by Renda in case; Defendants' experts witnesses reports, two CDs provided by Government with aerial and ground surveys of Lost Lake Placement Area, 13 CDs provided by Renda with photos and report (REM39201-46781), supplemental reports by Government. Smith's

file materials were previously furnished to the Government bearing Bates numbers REM 40000-REM 41052, not in electronic form, and not part of the database.

Mr. Smith also reviewed the following materials on the internet:

1) Federal Acquisition Regulations - http://www.arnet.gov/far/

2) DCAAP 7641.90 (Jan2002) - Information for Contractors, DOD, DCAA Manual - http://www.dcaa.mil/info.htm

3) DCAAM 7640.1 - DCAA Contract Audit Manual (CAM), DCAA - http://www.dcaa.mil/cam.htm

4) FAR Cost Principles Guide - http://www.dcaa.mil/far_cost.pdf

5) Small Business Administration Guidelines - http://www.sba.gov/

6) Bert Visser's Directory of Dredgers - http://www.dredgers.nl/Welcome.html

7) Dredging News - http://www.sandandgravel.com/news/welcome.html

8) Port of Houston Website - http://www.portofhouston.com/

9) Contract Disputes Act of 1978 - http://www4.law.cornell.edu/uscode/41/ch9.html

10) NOAA Weather Data - http://www.srh.noaa.gov/ , http://www.srh.noaa.gov/hgx/marine.htm

11) EFARS - http://www.hq.usace.army.mil/cepr/asp/library/efar.asp?strCat=8&strSubCat=6

12) DFARS - http://www.acq.osd.mil/dp/dars/dfars.html

13) EP 1110-1-8 (1999 & 2001) - Construction Equipment Ownership and Operating Expense Schedule, USACE - http://www.nww.usace.army.mil/cost/ep.asp

14) Prompt Payment Act - http://www.publicdebt.treas.gov/opd/opdprmt2.htm

15) DCAA Manuals - http://www.dcaa.mil/site_index.htm

16) USACE Publications (obtained online) - http://www.usace.army.mil/inet/usace-docs/

17) Department of Defense, Defense Procurement and Acquisition Policy, Guidelines - http://www.acq.osd.mil/dpap/

Rob McCullough

Mr. McCullough's resume lists the publications he has authored, and his trial and deposition testimony. Mr. McCullough's resume is incorporated by reference, and has previously been furnished to Defendant. Mr. McCullough has been furnished with a set of the DCAA Audit Papers, Defendants' expert witnesses reports, two CDs provided by Government with aerial and ground surveys of Lost Lake Placement Area, 13 CDs provided by Renda with photos and reports (REM39201-46781), and the supplemental reports by Government. Mr. McCullough has also been furnished with Renda's claims against the Corps of Engineers, the plans and project manual for the Project, and the deposition exhibits for Thomas Benero. See Attachment 1 for additional items Mr. McCullough has reviewed. Mr. McCullough has discussed this Project at length with Barry Smith, Steve Bowman, and Ben Gooloe. Mr. McCullough's supplemental report is being produced under separate cover.

Christopher Mathewson

Dr. Mathewson's publications are listed in his resume.

Dr. Mathewson has been provided copies of Renda's claims for the Flare Area, South Ferry Landing, Section 7 Clay and Lost Lake Levees. Dr. Mathewson has also been provided Defendant's experts' reports, the plans and project manual for the Project, soil boring by HJV Associates in May 2000, and the deposition exhibits for Thomas Benero. Dr. Mathewson plans to produce additional materials aside from his report. Upon receipt, these materials will be furnished to Defendant.

Kent Ray

Mr. Ray has authored no publications and has testified at no trial or depositions as an expert. He has testified as an accountant for financial statements reviewed or audited by his firm. He and his accounting firm have performed audits of Renda's financial statements and bookkeeping for

Renda. He has reviewed job schedules and audit work papers for Renda. He and his firm are compensated as follows: Kent Ray (CPA) - $160/hour; James Willa (CPA) - $95/hour; Stephanie James (CPA) - $115/hour; and Renee Hale (assistant) - $67.50/hour.

Mr. Ray is a fact witness to whom Renda expects to submit questions which may be expert in nature. Mr. Ray is a certified public accountant, and, as such, qualifies as an expert based on his education, experience and training.

Renda will produce under separate cover copies of documents that Mr. Ray and/or his firm have produced or reviewed concerning Renda and the equipment listing and costs for the Upper Bayou Project.

Benton Goodloe

Mr. Goodloe is a fact witness who is or has been on Renda's payroll. Mr. Goodloe qualifies as an expert based on his years in the marine dredging industry.

Mr. Goodloe is not charging Renda separately for his time for this case.

Mr. Goodloe did not review any documents to prepare his report. He is well familiar with the facts of the Project, as he experienced them first hand. During the course of the Project, he reviewed the dredging logs for the Project, and the documents that Renda prepared or received concerning its dredging operations.

Other than his report, Mr. Goodloe did not prepare any other documents reflecting his opinions.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: ______________________________
Brian W. Erikson, TX Bar No. 06643800

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of March, 2004, a true and correct copy of Plaintiff, Renda Marine, Inc.'s Supplemental Answers to Defendant's Interrogatories, was served via facsimile and certified mail, return receipt requested to counsel for Defendant, John E. Kosloske, Esq.

______________________________
Brian W. Erikson

# ATTACHMENT A

Documents Reviewed by McCullough & Associates

Certified Claim (Revised) for Differing Site Conditions South Ferry Landing Area, Binder 1 of 1 (Bates #RMI 05749 – 06423)

Documents Bates #RMI 06424 – 06782

Certified Claim for Differing Site Conditions South Ferry Landing Area, Binder 1 of 1 (Bates #RMI 06783 – 06841)

Documents Bates #RMI 06842 – 07471

Documents Bates #RMI 10788 – 10933

Documents Bates #RMI 10675 – 10787

Audit Report No. 3521-99M17200005 dated 8/27/99 (on CD)

RMI's 2/13/01 Certified Claim for Differing Site Conditions Flare Area (on CD)

RMI's 10/16/01 Certified Claim for Equitable Adjustment of the Contract Price for Differing Site Conditions & Changed Conditions for Hydraulic Levees at the Lost Lake Placement Area (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 2)

RMI's 6/11/01 Request for Equitable Adjustment (Revision No. 1) for Differing Site Conditions Damages and Delays Related to Obstructions in Channel (Station Nos. 570+00 thru 630+00) (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 3)

RMI's 5/16/01 Request for Equitable Adjustment (Revision No. 1) for Changed Conditions H.L.&P. Transmission Tower Delays (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 3)

RMI's 6/14/01 Request for Equitable Adjustment for Differing Site Conditions Damages and Delays Related to Obstructions No. 2 in Channel (Section 9) (Station Nos. 660+00 thru 685+00) (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 3)

RMI Quality Control Reports dated 12/3/98 – 4/15/01 (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 3))

Quality Control Correspondence (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 4)

Quality Control Submittals (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 4)

General Correspondence (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 5)

Insurance & Permit Correspondence (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 5)

RMI Pay Estimates (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 5)

Safety Reports/Meetings (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 5)

Certified Payroll Reports (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 5)

Pre-Award/Bid Documents (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 6)

Contract Modifications (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 6)

Bid Protest Correspondence (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 6)

Spreadsheets regarding Dredge Quantity Calculations (on CD received from Brian Erikson identified as DACW 64-99-C-0001 DCAA Work Papers Disk 7)

RMI Binder #1 containing payroll information (from RMI's office)

RMI Binder #2 containing payroll information (from RMI's office)

RMI Binder #3 containing certified payroll for Nov. 1999 – Aug. 2000 (from RMI's office)

RMI Binder #4 containing certified payroll for Sept. 2000 – April 2001 Book II (from RMI's office)

RMI Binder #38 containing CQC Reports for Nov. thru Dec. 1999 (from RMI's office)

RMI Binder #39 containing CQC Reports for Jan. thru June 2000 (from RMI's office)

RMI Binder #40 containing CQC Reports for July thru Dec. 2000 (from RMI's office)

RMI Binder #41 containing CQC Reports for Jan. thru April 2001 (from RMI's office)

RMI Binder #61 identified as Binder 2 of 4 Plus Drawings of RMI's 10/16/01 Certified Claim for Equitable Adjustment of the Contract Price for Differing Site Conditions & Changed Conditions for Hydraulic Levees at the Lost Lake Placement Area (from RMI's office)

RMI Binder #62 identified as Binder 3 of 4 Plus Drawings of RMI's 10/16/01 Certified Claim for Equitable Adjustment of the Contract Price for Differing Site Conditions & Changed Conditions for Hydraulic Levees at the Lost Lake Placement Area (from RMI's office)

RMI Binder #63 identified as Binder 4 of 4 Plus Drawings of RMI's 10/16/01 Certified Claim for Equitable Adjustment of the Contract Price for Differing Site Conditions & Changed Conditions for Hydraulic Levees at the Lost Lake Placement Area (from RMI's office)

CD labeled Dec. 19, 2002 Lost Lake Placement Area DNG Files & Report Preliminary (from Brian Erikson's office)

CD labeled Dec. 19, 2002 Lost Lake Placement Area Aerial Photos Preliminary (from Brian Erikson's office)

Audit Report #3511-2003M17200005 documentation (RM-DCAA-0900001 – 0900528; also CD from Brian Erikson's office identified as DACW 64-99-C-0001 DCAA Work Papers Disk 1)

Audit Report #3511-2003M17200006 documentation (RM-DCAA-1000001 – 1001660)

Audit Report #3511-2003M17200007 documentation (RM-DCAA-1100001 – 1100435)

Audit Report #3511-2003M17200008 documentation (RM-DCAA-1200001 – 1200769)

Audit Report #3511-2003M17200009 documentation (RM-DCAA-1300001 – 1300312)

Audit Report #3511-2003M17200010 documentation (RMI 06439 - 06711; RMI 10744 – 10787; RM-DCAA-1400001 – 1400178)

Audit Report #3511-2003M17200011 documentation (RM-DCAA-1500001 – 1500334; RMI 10789 – 10933; RMI 06427 – 06428; RMI 06465; RMI 06506 – 06513; RMI 06574 – 06576; RMI 06615 – 06622)

Audit Report #3511-2003M17200012 documentation (RM-DCAA-1600001 – 1600227)

June 1998 Plans (from Barry Smith/Pathfinder)

FAR, Section 15.408

FAR 31

COE Construction Equipment Ownership and Operating Expense Schedule – Region VI, EP 1110-1-8, Volume 6 June 1999

McCullough & Associates Report and Exhibits thereto

Photograph CD's 1 – 13 (REM 39201 – REM 46781)

Handwritten diaries (from RMI's office)

Affolter Contracting correspondence

RMI Chronology/History for Claims at Upper Bayou Project

Spreadsheet titled "List of Equipment – Impacted Period (Revised 2/12/04)

Spreadsheet titled "Equipment Rate Schedule Summary (Revised 2/12/04")

Spreadsheet titled "Dredge 'Millenium' – Associated List of Equipment (Revised 2/22/04)"

Spreadsheet titled "List of Equipment (Average Hours of Operation Per Week/Month for Hourly Rate Calculation)"

Spreadsheet titled "Claim 12 – Lost Lake Levees Chronology-Summary"

Spreadsheets pertaining to Dredge Standby Rate Calculations, Dredge Operating Rate Calculations, Dredge Hourly Rate Calculations, Hydraulic Levees – Labor & Equipment Damage Calculations, Mechanical Levees – Equipment, Booster Equipment & Labor Calculations, Repair Invoice Duplication, Payroll Rate Calculation, Claim 12 Damage Calculations

Chart titled "Dredging Production – Daily and Cumulative"

Spreadsheet re Dredge CY and Levee LF "Based on Daily Dredging Reports Submitted by Renda Marine"

Spreadsheet re Levee LF "Based on Contractor Quality Control Reports Submitted by Renda Marine"

Chart titled "Remaining Dredge Material (CY)"

Chart titled "Dredged Material Cum CY"

Chart titled "Dredged Material Production Rates"

Spreadsheet re Flare Area Claim – "Dredge CY – Modified"

Chart titled "Upper Bayou Project – Dredging Production Week Ending Data"

Spreadsheet titled "Mechanical Levee Labor and Equipment – Proposed Deductions"

Spreadsheet titled "Original Estimate"

Charts/work sheets and spreadsheets titled "Modified Total Cost Approach"

2/27/04 e-mail correspondence from Barry Smith to John Coakley and documents referred to therein

File labeled "RMI Accounting Records" consisting of spreadsheet titled "Renda Marine, Inc. Job Cost Schedule With Equipment Cost Job 1100 – Corp. of Engineers – Upper Bayou From Start Date of 9/1/98 to 10/31/02; Schedule of Equipment Cost 9/15/01; Equipment List 1999 – 2001; Equipment List 1999; Equipment List 2001; Equipment List 2000

Spreadsheet re costs charged by Pathfinder Construction Consulting in performance of Contract Administration, REA/Modification Development and Certified Claims Development.

2/23/04 report of William F. Connole, P.E.

Transmittals per 2/3/04 Pathfinder Construction Consulting letter to Rob McCullough of half size drawings and RMI's Submittal No. 3 for Hydraulic Levees with comments from the Corps of Engineers

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RENDA MARINE, INC. )
)
Plaintiff ) CASE NO. 02-306C
)
V. )
)
THE UNITED STATES )
)
Defendant )

* * * * * * * * * * * * * * * *

STEVE BOWMAN

* * * * * * * * * * * * * * * *

COPY

January 12, 2004 Dallas, Texas

Monica S. Faulk

IN THE DIST ·CT COURT OF THE UNITED STATES
FOR THE ORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RENDA MARINE, INC. | ) | |
| Plaintiff | ) | CASE NO. 02-306C |
| V. | ) | |
| THE UNITED STATES | ) | |
| Defendant | ) | |

* * * * * * * * * * * * * * * *

STEVE BOWMAN

* * * * * * * * * * * * * * * *

January 12, 2004 Dallas, Texas

Monica S. Faulk



IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RENDA MARINE, INC. | ) | |
| Plaintiff | ) | CASE NO. 02-306C |
| V. | ) | |
| THE UNITED STATES | ) | |
| Defendant | ) | |

* * * * * * * * * * * * * * * *

STEVE BOWMAN

* * * * * * * * * * * * * * * *

ANSWERS AND ORAL DEPOSITION OF STEVE BOWMAN, produced as a witness at the instance of the Defendant, taken in the above-styled and -numbered cause on the 12th day of January, 2002, at 9:15 a.m., before Monica S. Faulk, a Certified Shorthand Reporter in and for the State of Texas, in the conference room of QUILLING, SELANDER, CUMMISKEY & LOWNDS, 2001 Bryan Street, Suite 1800, City of Dallas, County of Dallas and State of Texas, in accordance with the Federal Rules of Civil Procedure and the agreement hereinafter set forth:



A P P E A R A N C E S

UNITED STATES DEPARTMENT OF JUSTICE
1100 L Street, N.W., Room 12052
Washington, DC 20005
By: Mr. John Kosloske

APPEARING ON BEHALF OF THE UNITED STATES

QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
By: Mr. Brian Erikson

APPEARING ON BEHALF OF RENDA MARINE, INC.

Also Present:

George Strickler



I N D E X

ORAL DEPOSITION OF STEVE BOWMAN
Taken on January 12, 2004

PAGE

Appearances....................................3

Exhibit Index..................................5

STEVE BOWMAN

DIRECT EXAMINATION
BY: Mr. Kosloske.......................6

Signature and Corrigendum.........................203

Reporter's Certificate...........................204

with the construction of levees at dredged dispo..al sites?
A. I had -- clay is clay. Dirt is dirt. It works the same way whether it comes beneath of the dredge or out of the end of the back hole bucket. Now, you can refute that if you want. The basic chemistry and the molecular structure of this material is the same. You get it to a certain stage, you get it to a certain dryness and a certain amount of compacted effort, you'll end up with a certain product. I over the years have built lots and lots of levees and earth fills and have worked with extremely wet clays and materials.
If you're asking me if I had ever constructed a levee by use of discharge from a dredge line, no.
Q. Okay. So prior to your preparation of the bid estimate for the Upper Bayou project, you had not had any experience with the construction of levees by the use of hydraulic placement material?
A. Structural levees like this, no, I had not.
Q. What if any experience had you had with the construction of levees at dredge disposal areas such as, for example, Lost Lake placement area?
A. For the specific use of dredge soil? Like I



said, I got involved in some at Eby back in the early '80s in Mississippi. We had built a number of lagoons for biosolids applications that are of similar technology and similar function. I've built a number of levees for a containment of wet soils at -- in various construction projects.
You know, again, dredging is a -- hydraulic dredging or dredging is a very general term too. The fact is it's pumping mud out of a shaft into a containment at the same time area. You essentially dredge material out of the hole into a containment at the same time area. On this scope and scale, no, I hadn't done one.
Q. You hadn't constructed a levee using the hydraulic placement method on the scope and scale of the levees that were to be constructed hydraulically at the Lost Lake placement area?
A. I'd argue there's very few people in the world that have.
Q. But I'm just asking you.
A. Yes, I'm giving you an answer. No.
Q. Who is Barry Smith?
A. He's a -- a construction consultant from St. Louis.
Q. When did you first become acquainted with



Barry Smith?
A. Probably -- I'm guessing I actually physically met Barry May of 2000.
Q. And how did you come to meet Barry Smith in May of 2000?
A. He was in our Freeport office putting together some information on a subcontract that we had with Great Lakes, and he had been involved -- Eddie Fisher had called me indicating he needed -- in fact, I asked Eddie Fisher to find somebody to help support him with some of the issues that we had outstanding on a few of the projects down there, and he had known Barry Smith from doing some work with Barry Smith back when Barry worked for somebody else back in the mid-'90s. And we acquired Barry's services to help Eddie get caught up on some things he was working on.
Q. Is Barry Smith a claims consultant?
A. No. I don't think that he solely wears that hat. I think Barry Smith -- he will do -- you know, he's a consultant. So he's a hired gun. But Barry gets involved in all aspects of construction issues.
Q. To what extent did Barry Smith advise Renda Marine on how to proceed with different issues, matters during the Upper Bayou project?





A. I didn't get involved other than in some meetings that we had had about the direction that our administrative work was going on. I was asked by Oscar in May or June of 2000 to -- I had been going to the project site -- the Upper Bayou site essentially the entire year of 2000 from time to time to look at things, and I was involved with specific issues out on the site; and I had talked to Barry some at that point. I took over the entire management responsibility of the -- all of the projects that Renda Marine had in South Texas around July 1st of 2000 when Eddie Fisher resigned.
Q. I think Mr. Fisher resigned the last -- the last Sunday of July of 2000?
A. Four o'clock, Sunday afternoon, 2000. Yes, he did.
Q. And then the following Monday or -- you took over the responsibility for the day-to-day operations of the company?
A. I was involved in the field operations. Eddie pretty much was the home body at the office. I went back down -- we had a meeting here on Monday, and I came down Monday night and actually took over the operation at that point in total.
Q. Was Barry Smith the -- was he retained by

break, we would be happy to have Mr. Bowman forward them to our office and send them to you.

MR. KOSLOSKE: Could we agree on a date that could be accomplished because we are very close to the end of the fact discovery period, and I would like to try to --

THE WITNESS: Do you want me to look at it and see if I can find any of the worksheets that are in there because I don't recall seeing any of that? You know, you've got the estimate sheets. What you're curious about is the worksheets, correct?

MR. KOSLOSKE: Well, anything that you have that relates to the bid you can keep, but anything that you have that relates to the Upper Bayou project I'd like to take a look at it.

THE WITNESS: I can --

MR. ERIKSON: Actually, what he wants is if you've got a file of the project, just bring it in and make it available to him.

THE WITNESS: Okay.

MR. ERIKSON: You don't have to look at it in advance. Just be sure what project it relates to.

THE WITNESS: Okay. That's fine.

MR. KOSLOSKE: Can we agree upon a date



of when you can get that to Mr. Erikson.

THE WITNESS: I'll attempt it to get it next week some time. I don't know if I can. It appears I'm going to be out of town the rest of this week. Maybe Friday.

MR. ERIKSON: Do you want this on the record?

MR. KOSLOSKE: Do you think you could get the information to Mr. Erikson in two weeks? Today is the 12th. That will be by the 26th of January.

THE WITNESS: I'll certainly try. I'll have Brian give me reminders about halfway through.

MR. KOSLOSKE: And Mr. Erikson will give me notice, and we will make arrangements to get down here and look at the material, and I may get a copy and have you send it to us.

MR. ERIKSON: That's fine.

MR. KOSLOSKE: I have no further questions.

MR. ERIKSON: We will reserve our questions until time of trial.

(End of Deposition)



C O R R I G E N D U M

| Page | Line | Correction/Change | Reason |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

I, STEVE BOWMAN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except to the aforementioned _____ (number) of changes/corrections.

_____________________________
STEVE BOWMAN

STATE OF TEXAS )
)
COUNTY OF DALLAS )

BEFORE ME, ___________________________, on this day personally appeared STEVE BOWMAN, know to me (or proved to me under oath through ___________________________) (description of identity care or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _____ day of ___________________, 2004.

_____________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS





C E R T I F I C A T E

I, MONICA S. FAULK, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement hereinabove set forth, there came before me on the 12th day of January, 2004, at the offices of QUILLING, SELANDER, CUMMISKEY & LOWNDS, 2001 Bryan Street, Suite 1800, in the City of Dallas, County of Dallas and State of Texas, the following named person, to-wit: STEVE BOWMAN, who was by me duly sworn to tell the truth, the whole truth, and nothing but the truth of their knowledge touching and concerning the matters in controversy in this cause; and that the witness was thereupon carefully examined upon their oath and their examination reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness. Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, the witness X did _____ did not request review and sign the original transcript prior to the conclusion of the deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney nor counsel employed by the parties hereto, or financially interest in the action.

In witness whereof, I have hereunto set my hand and

affixed my seal this 27th day of January, 2004.

MONICA S. FAULK, CSR
National Court Reporters
500 S. Ervay, Suite 120-A
Dallas, Texas 75201
Phone No. 214-651-8393
CERTIFICATION NO. 7317
CERTIFICATION EXPIRES: 12/31/03

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF JOHN E. KOSLOSKE

I, JOHN E. KOSLOSKE, declare as follows:

1. I am an attorney in the Commercial Litigation Branch of the Department of Justice and counsel of record for the United States in the above captioned action.

2. The above captioned action involves claims governed by the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13), arising under or relating to a contract between plaintiff, Renda Marine, Inc. (Renda), and the United States, acting through the Army Corps of Engineers, Galveston, Texas District, to dredge part of the Galveston-Houston Ship Channel and to construct levees at the Lost Lake Placement Area for dredged material. This contract is referred to in the complaint and other documents as the "Upper Bayou Project."

3. Renda produced materials prepared by Kent Ray, C.P.A., on March 12, 2004. The Government has not received any materials prepared by Renda's experts Christopher Mathewson or Robert McCullough that are responsive to Document Request No. 2 contained in "Defendant's First Set of Interrogatories and Second Request for production of Documents" dated January 23, 2003. The Government has not received any materials prepared by Renda's experts Christopher Mathewson or Robert McCullough that are responsive to Document Request No. 2 (other than a

report by Dr. Mathewson and an invoice for his services and Mr. McCullough's January 2004 and March 2004 reports).

4. As for Renda's expert Barry Smith, we have not received any materials prepared by him, except his abbreviated "report" (and, of course, Renda's certified claims as to which Mr. Smith states he was "instrumental" in preparing). We have reviewed the "file materials" of Mr. Smith produced by Renda and Bates numbered REM 40004 through REM 41052. Those materials do not appear to contain any documents that were prepared by Mr. Smith, such as drafts of claims, memoranda, papers, notes, studies, graphs, charts, tabulations, analyses, summaries, data sheets, statistical or informational accumulations, and computer generated documents, including all drafts or preliminary revisions of any of the above, relating to the opinions that are the subject of his expert testimony.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 12, 2004, at Washington, D.C.

John Kosloske

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W., Room 12052
Washington, D.C. 20005
Tele: (202) 307-0282

| Upper Bay<br>Job # R1100<br>Vendor | Sep-98<br>Vendor<br>Total | Previous<br>Vendor<br>Total | Vendor<br>Total<br>To Date |
|---|---|---|---|
| Air Liquide | 229.33 | | 229.33 |
| Caple-Shaw | 91.84 | | 91.84 |
| Deringer | 271.50 | | 271.50 |
| Duratrode | 1,461.97 | | 1,461.97 |
| Federal Express | 18.75 | | 18.75 |
| Frank P. Duke | 1,576.50 | | 1,576.50 |
| Gary Gibbs | 1,672.39 | | 1,672.39 |
| Gator Supply | 3,478.06 | | 3,478.06 |
| Marine & Industrial Specialties | 156.74 | | 156.74 |
| Michael H. Calpestri | 3,551.00 | | 3,551.00 |
| Prime Equipment | 97.41 | | 97.41 |
| Quilling Selander & Cummiskey | 8,366.00 | | 8,366.00 |
| R & M Telephone | 1,630.79 | | 1,630.79 |
| Sherwin Williams | 102.34 | | 102.34 |
| Specialized Transportation Services | 3,403.40 | | 3,403.40 |
| Specialties Company | 646.18 | | 646.18 |
| The Facts | 220.00 | | 220.00 |
| US Goverment Bookstore | 186.00 | | 186.00 |
| Wellman Welding | 4,336.88 | | 4,336.88 |
| Vendor Total | 31,497.08 | | 31,497.08 |
| Less: Capitalization | 0.00 | | 0.00 |
| Labor | 2,019.24 | | 2,019.24 |
| Burden | 0.00 | | 0.00 |
| RMI Equipment | 0.00 | | 0.00 |
| Shop Allocation | 0.00 | | 0.00 |
| Total Costs | 33,516.32 | | 33,516.32 |
| Billings | 0.00 | | 0.00 |
| Net Profit or Loss | (33,516.32) | 0.00 | (33,516.32) |

Renda Marine, Inc
May 2001

| DATE | VENDOR | BATCH NUMBER | PHASE | JOB NUMBER | COST CODE | J/C AMOUNT | |
|---|---|---|---|---|---|---|---|
| 05/01/2001 | Lease Payment | 3L0501 | May 2001 | 1000 | 100.001 | 707.50 | |
| 05/01/2001 | Lexcom | 6L0501 | May 2001 | 1100 | 100.030 | 106.85 | |
| 05/01/2001 | Lexcom | 6L0501 | May 2001 | 1000 | 100.030 | 106.85 | |
| 05/01/2001 | Lon Star | RC Batch 2 | May 2001 | 1000 | 100.001 | 40.69 | |
| 05/12/2001 | Lone Star Overnight | ORC Batch | May 2001 | 1000 | 100.001 | 94.90 | |
| 05/12/2001 | Lone Star Overnight | ORC Batch | May 2001 | 1000 | 100.001 | 134.51 | |
| 05/12/2001 | Lone Star Overnight | ORC Batch | May 2001 | 1000 | 100.001 | 21.71 | |
| 05/15/2001 | Lone Star Overnight | 6L0501 | May 2001 | 1000 | 100.001 | 38.37 | |
| 05/23/2001 | Lynn Douglas | 6L0501 | May 2001 | 1000 | 100.001 | 834.49 | |
| 05/01/2001 | Mastercard | | | 1100 | 187.600 | 475.19 | |
| 05/01/2001 | Mastercard | | | 1100 | 100.001 | 7.50 | |
| 05/01/2001 | Mastercard | | | 1100 | 187.400 | 701.44 | |
| 05/01/2001 | Mastercard | | | 1000 | 100.001 | 553.24 | |
| 05/01/2001 | Mastercard | | | 1000 | 100.016 | 749.89 | |
| 05/01/2001 | Mastercard | | | 1000 | 100.040 | 346.85 | |
| 05/01/2001 | Mastercard | | | 1000 | 100.060 | 34.63 | 13,265.55 |
| 05/01/2001 | Mastercard | | | 1100 | 100.040 | 484.28 | |
| 05/01/2001 | Mastercard | | | 1000 | 187.400 | 1,553.35 | |
| 05/01/2001 | Mastercard | | | 1000 | 187.600 | 1,361.10 | |
| 05/01/2001 | Mastercard | | | 1100 | 100.001 | 1,848.29 | |
| 05/01/2001 | Mastercard | | | 1100 | 187.400 | 1,619.37 | |
| 05/01/2001 | Mastercard | | | 1000 | 187.400 | 674.74 | |
| 05/01/2001 | Mastercard | | | 1100 | 100.015 | 7.43 | |
| 05/01/2001 | Mastercard | | | 1100 | 100.040 | 51.96 | |
| 05/01/2001 | Mastercard | | | 1000 | 100.001 | 1,692.04 | |
| 05/01/2001 | Mastercard | | | 1000 | 100.001 | 953.89 | |
| 05/01/2001 | Mastercard | | | 1100 | 100.001 | 57.13 | |
| 05/01/2001 | Mastercard | | | 1000 | 187.400 | 93.23 | |
| 05/14/2001 | NetWork Solutions | 6L0501 | May 2001 | 1000 | 100.001 | 70.00 | |
| 05/01/2001 | Office Max | | | 1000 | 100.040 | 481.65 | |
| 05/01/2001 | Ozarka | 1L0501 | May 2001 | 1000 | 100.001 | 92.20 | |
| 05/01/2001 | Piking Shipping | | | 1000 | 187.400 | 5,016.33 | |
| 05/07/2001 | Ramada Limited | 3L0501 | May 2001 | 1100 | 100.001 | 121.77 | 2841.35 |
| 05/01/2001 | Ramada Limited | 1L0501 | May 2001 | 1100 | 100.001 | 2,719.58 | |
| 05/01/2001 | Southwestern Bell | 3L0501 | May 2001 | 1000 | 100.001 | 72.94 | 139.37 |
| 05/01/2001 | Soutwestern Bell | 1L0501 | May 2001 | 1000 | 100.001 | 66.43 | |
| 05/07/2001 | Swinscoe's Welding | 2L0501 | May 2001 | 1000 | 187.400 | 420.39 | |
| 05/01/2001 | Top Coat | 2L0501 | May 2001 | 1000 | 100.001 | 11,046.30 | |
| 05/01/2001 | Verizon | 6L0501 | May 2001 | 1000 | 100.030 | 15.84 | |
| 05/01/2001 | Verizon | ORC Batch | May 2001 | 1000 | 100.030 | 665.42 | |
| 05/01/2001 | Verizon | | | 1100 | 100.030 | 424.77 | 1562.92 |
| 05/01/2001 | Verzion | 4L0501 | May 2001 | 1000 | 100.030 | 15.84 | |
| 05/01/2001 | Verzion | 4L0501 | May 2001 | 1000 | 100.030 | 425.07 | |
| 05/01/2001 | Verzion | 4L0501 | May 2001 | 1000 | 100.030 | 15.98 | |
| 05/01/2001 | Webb Crane | 2L0501 | May 2001 | 1100 | 100.001 | 2,735.52 | |
| 05/01/2001 | World Dredging | 4L0501 | May 2001 | 1000 | 100.001 | 40.00 | |

RENDA MARINE

# UPPER BAYOU PROJECT

GALVESTON DISTRICT

REM 40190

# MEETING GOALS

( Thursday, January 17, 2002 )

1. Describe and review RMI's Certified Claims

2. Where do we go from here?

# RMI CLAIM POSITION ( ADDITIONAL )

- RMI forced to settle with outside Government agency at Chocolate Bayou for pre-existing conditions

- MOC Project bid as "maintenance material", yet virgin cuts were necessary

✓ Tortious interference of business practices

✓ Reports and allegations of gratuities to COE employees

DEPARTMENT OF THE ARMY
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO
ATTENTION OF
Northern Area Office

October 20, 1999

Mr. Eddie Fisher
Vice President and Construction Manager
Renda Marine, Inc.
P. O. Box 1036
Freeport, Texas 77542

Dear Mr. Fisher:

This is in reference to the meeting of October 18, 1999 between representatives of Renda Marine, Inc., and the Corps of Engineers. The purpose of the meeting was to clarify your dredging activities at they relate to your three active Government Dredging contracts, including Contract No. DACW64-99-C-0001, Dredging Upper Bayou on the Houston-Galveston Navigation Channels, Contract No. DACW64-98-C-0028, Dredging Boggy Bayou to Colorado River and Mouth of Colorado (MOC) on the Gulf Intracoastal Waterway (GIWW), and Contract No. DACW64-99-C-0021, Dredging Chocolate Bayou.

This letter concerns only the latter two projects, which are administered by the Northern Area Office.(NAO). On the afternoon of October 18, 1999, the date of the meeting, you were called on your mobile phone by myself and other representatives of the NAO. At that time you were put on notice that this office would issue you an "Interim Unsatisfactory" rating evaluation after 30 days, should you fail to perform to the level you indicated in the joint meeting earlier in the day.

Specifically, you stated at the joint meeting, that, barring any excusable delays, you would complete the dredging portion of both NAO projects by December 31, 1999. For the MOC project, you indicated that you would complete dredging Stations 35+000 to 36+000 by the end of November, and then complete Stations 36+000 to 37+000 by the end of December. For the Chocolate Bayou project, you indicated that you would complete Sections 1 through 5 by the end of October, and that you would complete Sections 6 through 8 during November 1999, and finally, that you would complete Sections 9 through 11 by the end of December, 1999.

The purpose of this letter is to inform you that your performance on both NAO projects (Boggy to Colorado River/MOC and Chocolate Bayou) will be evaluated on November 17, 1999. Upon the conclusion of our evaluation, should either contract warrant an "Interim Unsatisfactory" rating, then that rating will be issued for that specific contract. If an "Interim

**REM 40253**

F 10/21/99 D

Unsatisfactory" rating is not warranted at that time, your overall performance will continue to be monitored and, as a minimum, will be rated at the completion of the contract work. Please note that if an "Interim Unsatisfactory" rating is not issued, that does not preclude the possibility of a final "Unsatisfactory Performance Rating" being issued.

This letter shall not be construed to be any directive to accelerate or expedite your work. Should you have questions regarding this letter, please contact me at 409-766-6313.

Sincerely,

William J. Hopkins, P.E.
Area Engineer

OFFER (Must be fully completed by offeror)

| | |
|---|---|
| 14. NAME AND ADDRESS OF OFFEROR (Include ZIP Code)<br>Renda Marine, Inc.<br>P.O. Box 181436<br>Dallas, TX 75218 | 15. TELEPHONE NO. (Include area code)<br>(214) 321-8522<br>16. REMITTANCE ADDRESS (Include only if different than Item 14)<br>522 Benson Lane<br>Roanoke, TX 76262 |
| CODE FACILITY CODE | |

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepted by the Government in writing within ______ calendar days after the date offers are due. *(Insert any number equal to or greater than the minimum requirement stated in Item 13D. Failure to insert any number means the offeror accepts the minimum in Item 13D.*

AMOUNTS ▶ SEE SCHEDULE

18. The offeror agrees to furnish any required performance and payment bonds.

19. ACKNOWLEDGEMENT OF AMENDMENTS

*(The offeror acknowledges receipt of amendments to the solicitation - give number and date of each)*

| AMENDMENT NO. | 0001 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DATE | 7/7/98 | | | | | | | | |

| 20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER *(Type or print)* | 20B. SIGNATURE | 20C. OFFER DATE |
|---|---|---|
| Eddie R. Fisher, Vice President | [signature] | 7/17/98 |

AWARD *(To be completed by Government)*

21. ITEMS ACCEPTED:

0001 THRU 0010 (TOTAL SCHEDULE NO. 1) DUE TO A MISTAKE IN DECIMAL POINT PLACEMENT, UNIT PRICE FOR ITEM NO. 0006 IS CHANGED TO $100.00 (SEE MISTAKE IN BID DOCUMENTATION)

| | |
|---|---|
| 22. AMOUNT<br>$12,526,100 (Estimated) | 23. ACCOUNTING AND APPROPRIATION DATA<br>001WQS CONTINUING CONTRACT $500,000.00 AVAIL |
| 24. SUBMIT INVOICES TO ADDRESS SHOWN IN *(4 copies unless otherwise specified)* ▶ ITEM 27 | 25. OTHER THAN FULL AND OPEN COMPETITION PURSUANT TO<br>☐ 10 U.S.C. 2304(c) ( ) ☐ 41 U.S.C. 253(c) ( ) |
| 26. ADMINISTERED BY CODE<br>U. S. ARMY CORPS OF ENGINEERS<br>GALVESTON DISTRICT OFFICE<br>P. O. BOX 1229<br>GALVESTON, TEXAS 77553-1229 | 27. PAYMENT WILL BE MADE BY<br>USAED, FINANCE CENTER<br>MAIL STOP 322<br>7800 THIRD AVENUE<br>MILLINGTON, TENNESSEE 38054-5005 |

*CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE*

☐ 28. NEGOTIATED AGREEMENT *Contractor is required to sign this document and return ______ copies to issuing office.)* Contractor agrees to furnish and deliver all items or perform all work requirements identified on this form and any continuation sheets for the consideration stated in this contract. The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications incorporated by reference in or attached to this contract.

☒ 29. AWARD *Contractor is not required to sign this document.)* Your offer on this solicitation is hereby accepted as to the items listed. This award consummates the contract, which consists of (a) the Government solicitation and your offer, and (b) this contract award. No further contractual document is necessary.

REM 40438

| | |
|---|---|
| 30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN *(Type or print)* | 31A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*<br>THOMAS BENERO, CONTRACTING OFFICER |
| 30B. SIGNATURE [signature] / 30C. DATE | 31B. UNITED STATES OF AMERICA BY Thomas Benero / 31C. AWARD DATE 26 Oct 9 |

00010-2 STANDARD FORM 1442 BACK (REV. 4-85)

# SOLICITATION, OFFER, AND AWARD
*(Construction, Alteration, or Repair)*

| | | | | |
|---|---|---|---|---|
| 1. SOLICITATION NO. | 2. TYPE OF SOLICITATION | | 3. DATE ISSUED | PAGE OF PAGES |
| DACW64-98-B-0004 | [X] SEALED BID *(IFB)* | [ ] NEGOTIATED *(RFP)* | 06/16/98 | 1 of 2 |

IMPORTANT - The "offer" section on the reverse must be fully completed by offeror.

| 4. CONTRACT NO. | 5. REQUISITION/PURCHASE REQUEST NO. | 6. PROJECT NO. |
|---|---|---|
| DACW64-99-C-0001 | W45VAK-8021-4346 | 076185 |

| 7. ISSUED BY CODE DACW64 | 8. ADDRESS OFFER TO |
|---|---|
| U. S. ARMY CORPS OF ENGINEERS<br>2000 FORT POINT ROAD, CONTRACTING DIVISION<br>P. O. BOX 1229<br>GALVESTON, TX 77553-1229 | U. S. ARMY CORPS OF ENGINEERS<br>2000 FORT POINT ROAD, CONTRACTING DIVISION<br>P. O. BOX 1229<br>GALVESTON, TX 77553-1229 |

| 9. FOR INFORMATION CALL: | A. NAME | B. TELEPHONE NO. *(Include area code)* *(NO COLLECT CALLS)* |
|---|---|---|
| | Carolyn Hilliard | (409) 766-3848 |

## SOLICITATION

NOTE: In sealed bid solicitations "offer and "offeror" mean "bid" and "bidder".

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS *(Title, identifying no., date)*:

HOUSTON-GALVESTON NAVIGATION CHANNELS, TEXAS, DREDGING UPPER BAYOU (45-FOOT PROJECT) IN HARRIS AND GALVESTON COUNTIES.

**REM 40439**

11. The Contractor shall begin performance within * calendar days and complete it within * calendar days after receiving [ ] award, [X] notice to proceed. This performance period is [X] mandatory, [ ] negotiable. (See *Section 00820).

| 12A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? *(If "YES," indicate within how may calendar days after award in Item 12B.)* | 12B. CALENDAR DAYS |
|---|---|
| [X] YES [ ] NO | Ten (10) |

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 0 copies to performed the work required are due at the place specified in Item 8 by 14:00 (hour) local time 07/17/98 *(date)*. If this is a sealed bid solicitation, offers will be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number and the date and time offers are due. Bids will be opened in Room 175.

B. An offer guarantee [X] is, [ ] is not required.
(SEE CAUTION TO BIDDERS FOR BID GUARANTEE AMOUNT)

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

D. Offers providing less than 60 calendar days for Government acceptance after the date offers are due will not be considered and will be rejected.



NSN 7540-01-155-3212

STANDARD FORM 1442 (REV. 4-85)
Prescribed by GSA
FAR (48CFR) 53.236-1(c)

## SECTION 03310 - CONCRETE

### PART 1 - GENERAL

**1.1 REFERENCES.** The publications listed below form a part of this specification to the extent referenced. The publications are referred to in the text by the basic designation only.

American Society for Testing and Materials (ASTM) Publications.

| | |
|---|---|
| A 615-96 | Deformed and Plain Billet-Steel Bars for Concrete Reinforcement |
| C 94-96 | Ready-Mixed Concrete. |

American Concrete Institute (ACI) Standards.

| | |
|---|---|
| 305R-91 | Hot Weather Concreting |
| 318R-95 | Building Code Requirements for Reinforced Concrete |
| SP-66-94 | ACI Detailing Manual. |

**1.2 PAYMENT** for the concrete work will be included in the contract lump sum price for "Drop-Outlet Structure (New)," which payment will include full compensation for material, labor, and inspection necessary to complete the work.

### PART 2 - PRODUCTS

**2.1 CONCRETE** shall be composed of portland cement, fine aggregate, coarse aggregate, and water so proportioned and mixed as to produce a plastic workable mixture. The concrete mix shall be designed to secure a minimum compressive strength of 3,000 psi in 28 days and shall conform to ASTM C 94.

**2.2 REINFORCEMENT** shall conform to ASTM A 615, Grade 60, size as shown. Reinforcement detailing and placement shall conform to ACI SP-66 and ACI 318R.

**2.3 WATER** used in mixing and curing concrete shall be fresh, clean, and free from injurious amounts of oil, acid, alkali, salt, or organic matter.

## PART 3 - EXECUTION

**3.1 CONCRETE WORK** shall conform to ACI 318R, "Construction Requirements" and ACI 305R. In general, the consistency of a mix shall be that required to produce a slump between 3 and 4 inches. Entrained air content of exterior concrete shall be between 5 and 7 percent by volume. Concrete shall be placed on clean, damp surfaces free from water, ice, frost, mud, or debris. Unless otherwise approved, concrete shall be mixed and placed only when the temperature is at least 35 degrees F and rising. The concrete shall be spread, tamped, and screeded to a true plane. Concrete slabs shall have a wood float finish. Concrete surfaces not covered by forms shall be protected against moisture loss for not less than 7 days by covering with burlap, cotton, or other approved fabric mats or sand, and kept continually wet by covering surfaces with waterproof paper with edges and ends lapped and sealed or by membrane-forming curing compound. Where formed surfaces are cured in the forms, the forms shall be kept continually wet. If forms are removed before the end of the curing period, curing shall be continued as on unformed surfaces using suitable materials.

**3.2 FORMWORK** shall be provided so that the concrete conforms accurately to the indicated shapes, lines, dimensions, and with surfaces free of offset, waviness, or bulges. Where surfaces are to be exposed or painted, panels shall be manufacturer's stock size material, using smaller panels cut to required dimensions only where required by openings. Exposed corners shall be chamfered, beveled, or rounded by moldings placed in the forms. Surfaces shall be thoroughly cleaned and coated with form oil or form release agent before each use. Forms shall be removed at a time and in a manner that will not injure the concrete.

--oOo--

EXHIBIT B

**Affolter**
**CONTRACTING CO., INC.**

July 29, 1998

Renda Marine, Inc
P.O. Box 181436
Dallas, TX 75218
Attn: Eddie Fisher

Re: DACW64-98-B-0004
Houston-Galveston Channels, Texas
Dredging Upper Bayou

Dear Mr. Fisher:

We are pleased to quote the following on the above referenced project.

| Item No. | Description | Est. Qty. | Unit | Unit Price | Est. Amt. |
|---|---|---|---|---|---|
| Item 0001 | Stripping | 1 | Job | Sum | $ 95,000.00 |
| Item 0002 | Mechanically Constructed Levees | 381,300 | CY | $4.33 | $1,651,029.00 |
| Item 0003 | Drop Outlet Structure Existing | 1 | Job | Sum | $ 45,000.00 |
| Item 0004 | Drop Outlet Structure New | 1 | Job | Sum | $ 172,000.00 |
| Item 0005 | Seeding & Fertilizing | 1 | Job | Sum | $ 80,000.00 |
| Item 0007 | Mob & Demob | 1 | Job | Sum | $ 80,000.00 |
| Total | | | | | $2,123,029.00 |

REM 40752

Billy and Tammi Lockhart
P.O. Box 420154
Laredo, Texas 78042
956/728-9160

QUICK FAX™ OfficeMax

| | | | |
|---|---|---|---|
| Date: 10/20 | # Of Pages 6 | | |
| To: Rudy/Oscar | | From: Steve | |
| Co./Dept. | | Co./Dept. | |
| Fax: | | Fax: | |
| Phone: for your information | | Phone: | |
| Note: | | E-Mail: | |

# FAX

**TO: RENDA MARINE** **FROM: Billy and Tammi Lockhart**

**FAX: 979/ 230-9966** **DATE: 10/19/2000**

**PHONE : 979/230-9911** **PAGES: 6**

**RE: RENEWAL OF LEASE** **ATTN: RUDY**

**CC: EDDIE FISHER**

**Send payment to:**

**Billy and Tammi Lockhart**
**P.O. BOX 420154**
**Laredo, Texas 78042**

**MESSAGE:**

**If Renda Marine intends to remain leasing property the amount is $3,000.00 a month, however the property may be sold in the next 30-45 days. Please call and leave message as to a decision on leasing.**

6

REM 40754

AND AWARD
(Construction, Alteration, or Repair)

DACW64-98-B-0004

[X] SEALED BID (IFB)
[ ] NEGOTIATED (RFP)

06/16/98

1 of 2

IMPORTANT - The "offer" section on the reverse must be fully completed by offeror.

4. CONTRACT NO. DACW64-99-C-0001

5. REQUISITION/PURCHASE REQUEST NO. W45VAK-8021-4346

6. PROJECT NO. 076185

7. ISSUED BY CODE DACW64

U. S. ARMY CORPS OF ENGINEERS
2000 FORT POINT ROAD, CONTRACTING DIVISION
P. O. BOX 1229
GALVESTON, TX 77553-1229

8. ADDRESS OFFER TO

U. S. ARMY CORPS OF ENGINEERS
2000 FORT POINT ROAD, CONTRACTING DIVISION
P. O. BOX 1229
GALVESTON, TX 77553-1229

9. FOR INFORMATION CALL: A. NAME Carolyn Hilliard

B. TELEPHONE NO. (Include area code) (NO COLLECT CALLS) (409) 766-3848

SOLICITATION

NOTE: In sealed bid solicitations "offer and "offeror" mean "bid" and "bidder".

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS (Title, identifying no., date):

HOUSTON-GALVESTON NAVIGATION CHANNELS, TEXAS, DREDGING UPPER BAYOU (45-FOOT PROJECT) IN HARRIS AND GALVESTON COUNTIES.

11. The Contractor shall begin performance within * calendar days and complete it within * calendar days after receiving [ ] award, [X] notice to proceed. This performance period is [X] mandatory, [ ] negotiable. (See *Section 00820 ).

12A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? (If "YES," indicate within how many calendar days after award in Item 12B.)

[X] YES [ ] NO

12B. CALENDAR DAYS

Ten (10)

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 0 copies to performed the work required are due at the place specified in Item 8 by 14:00 (hour) local time 07/17/98 (date). If this is a sealed bid solicitation, offers will be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number and the date and time offers are due. Bids will be opened in Room 175 .

B. An offer guarantee [X] is, [ ] is not required.
(SEE CAUTION TO BIDDERS FOR BID GUARANTEE AMOUNT)

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

D. Offers providing less than 60 calendar days for Government acceptance after the date offers are due will not be considered and will be rejected.

NSN 7540-01-155-3212

1442-102

00010-1

STANDARD FORM 1442 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.236-1(e)

DEPARTMENT OF THE ARMY
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO ATTENTION OF

May 10, 2000

Bay Area Office

Renda Marine, Inc.
Box 1036
Freeport, Texas 77542

Gentlemen:

Enclosed is your copy of Pay Estimate - Contract Performance No. 16 for work performed by you under Contract No. DACW64-99-C-0001 for the period 21 Mar 2000 thru 20 Apr 2000.

This copy is for your file and does not require your signature.

Sincerely,

C.M. McClenan

C.M. McClenan, P.E.
Area Engineer

Enclosure

REM 40804

RECEIVED

# PAYMENT ESTIMATE - CONTRACT PERFORMANCE

For use of this form, see ER 37-2-10 and ER 37-345-10.

1. INVOICE RECEIVE DATE: 02 May 00

SHEET 1 of 3

2. CONTRACTOR AND ADDRESS: Renda Marine, Inc. P.O. Box 1036, Freeport, TX 77542

3. CONTRACT NO.: DACW64-99-C-0001

4. DISTRICT: CESWG

5. DESCRIPTION OF WORK: H-GNC, Dredging Upper Bayou

6. APPROPRIATION AND PROJECT: 001WQS CONTINUING CONTRACT

7. REQUIRED COMPLETION DATE: 21 Mar 00

8. LOCATION: Houston-Galveston Channels

9. PERIOD COVERED BY THIS ESTIMATE: FROM 21 Mar 00 THRU 20 Apr 00

10. JOB ORDER NO.:

11. ESTIMATE NO.: 16

| ITEM NO. a | DESCRIPTION b | CONTRACT: QUANTITY AND UNIT c | CONTRACT: UNIT PRICE d | CONTRACT: AMOUNT e | TOTAL TO DATE: QUANTITY AND UNIT f | TOTAL TO DATE: AMOUNT g |
|---|---|---|---|---|---|---|
| | BASIC CONTRACT | | | 12,526,100.00 | | |
| | MODIFICATIONS Thru P00008 | | | 801,056.90 | | |
| | QUANTITY VARIATIONS | | | 864,126.56 | | |

ACTUAL PERCENT: 62 % LESS STORED MATERIALS: 62 % TOTAL CONTRACT → $ 14,191,283.46 TOTAL EARNINGS TO DATE → $ 8,799,651.06

REMARKS

3122 - Federal (72.3%) $160,155.92
8862 - Non-Federal (27.7%) $ 61,359.87
3123 - O&M $110,224.21

12. PRESENTED FOR PAYMENT

PAYEE: Renda Marine, Inc.

PER:

DATE:

TITLE:

REM 40805

13. APPROVED FOR PAYMENT

I CERTIFY that I have checked the quantities covered by this bill or estimate; that the work was actually performed; that the quantities are correct and consistent with all previous computations as actually checked; that the quantities and amounts are wholly consistent with the requirements of the contract or other instrument involved.

| SIGNATURE | TITLE | DATE |
|---|---|---|
| Eric G. Russek (signature) | Project Engineer | 5/4/00 |
| CONTRACTING OFFICER APPROVAL (Signature) C.M. McClellan ACO (signature) | | 5/9/00 |

| 14. | | |
|---|---|---|
| A. PREVIOUS DEDUCTIONS OTHER THAN RETAINED PERCENTAGE | 0.00 | |
| B. PREVIOUS RETAINED PERCENTAGE | 59,684.10 | |
| C. PREVIOUS PAYMENTS | 8,371,366.96 | |
| D. PREVIOUS EARNINGS (A+B+C) | | 8,431,051.06 |
| E. EARNINGS THIS PERIOD (TOTAL EARNINGS TO DATE MINUS D) | | 368,600.00 |
| F. LESS RETAINED PERCENTAGE | 36,860.00 | |
| G. LESS DEDUCTION OTHER THAN RETAINED PERCENTAGE FOR | 0.00 | |
| H. TOTAL DEDUCTIONS THIS PERIOD (F+G) | | 36,860.00 |
| I. RETAINAGE REFUNDED | 0.00 | |
| J. OTHER REFUNDS | 0.00 | |
| K. TOTAL REFUNDS THIS PERIOD | | 0.00 |
| L. AMOUNT DUE CONTRACTOR (E-H+K) | | 331,740.00 |

15. RECAPITULATION

TOTAL RETAINED PCTG. (B+F-I) $ 96,544.10 TOTAL PAID (C+L) $ 8,703,106.96

ENG FORM 93 1 MAR 78 PREVIOUS EDITION OF THIS FORM IS OBSOLETE

* * (USE REVERSE SIDE FOR DETAILED EXPLANATION AND/OR REMARKS)

# PAYMENT ESTIMATE - CONTRACT PERFORMANCE (Continuation)

PAYMENT ESTIMATE ITEMS DETAIL

2. CONTRACT NO. DACW64-99-C-0001

SHEET 2 of 3

3. CONTRACTOR AND ADDRESS Renda Marine, Inc.
P.O. Box 1036, Freeport, TX 77542

4. PERIOD COVERED BY THIS ESTIMATE
FROM 21 Mar 00 THRU 20 Apr 00

| ITEM NO. a | MOD. NO. b | DESCRIPTION c | CONTRACT QUANTITY AND UNIT d | CONTRACT UNIT PRICE e | CONTRACT AMOUNT f | TOTAL TO DATE QUANTITY AND UNIT g | TOTAL TO DATE AMOUNT h |
|---|---|---|---|---|---|---|---|
| 000001 | | Stripping | 1.00 JOB | | 150,000.00 | | |
| 000001 | P00006 | QUANTITY OVERRUN | 0.00 JOB | | 0.00 | | |
| 000001 | | Revised Quantity | 1.00 JOB | 150,000.00 | 150,000.00 | 1.00 JOB | 150,000.00 |
| 000002 | | Mechanically Constructed Levees | 381,300.00 CY | | 1,753,980.00 | | |
| 000002 | P00006 | QUANTITY OVERRUN | 187,853.60 CY | | 864,126.56 | | |
| 000002 | | Revised Quantity | 569,153.60 CY | 4.60 | 2,618,106.56 | 488,053.60 CY | 2,245,046.56 |
| 000003 | | Drop-outlet Structure (Existing) | 1.00 JOB | 66,350.00 | 66,350.00 | 1.00 JOB | 66,350.00 |
| 000004 | | Drop-outlet Structure (New) | 1.00 JOB | 240,000.00 | 240,000.00 | 1.00 JOB | 240,000.00 |
| 000005 | | Seeding & Fertilizing | 1.00 JOB | 80,000.00 | 80,000.00 | 1.00 JOB | 80,000.00 |
| 000006 | | Hydraulically Constructed Levees | 13,700.00 LF | 100.00 | 1,370,000.00 | 4,400.00 LF | 440,000.00 |
| 000007 | | Mobilization & Demobilization | 1.00 JOB | 800,000.00 | 800,000.00 | 0.69 JOB | 552,000.00 |
| 000008 | | Dredging | 3,483,700.00 CY | 2.10 | 7,315,770.00 | 1,654,856.00 CY | 3,475,197.60 |
| 000009 | | Pipelines | 1.00 JOB | 650,000.00 | 650,000.00 | 1.00 JOB | 650,000.00 |
| 000010 | | Bond Costs | 1.00 JOB | 100,000.00 | 100,000.00 | 1.00 JOB | 100,000.00 |
| 1CO-1 | P00003 | Re-locate south training levee | 4,100.00 CY | 4.70 | 19,270.00 | 4,100.00 CY | 19,270.00 |
| 2CO-1 | P00003 | Extend new drop-outlet structure walkway | 1.00 Job | 55,685.87 | 55,685.87 | 1.00 Job | 55,685.87 |
| 3CO-1 | P00003 | Extend north training levee | 22,500.00 CY | 4.70 | 105,750.00 | 22,500.00 CY | 105,750.00 |
| 4CO-1 | P00003 | Realign perimeter levee @ new d-o struc | 9,100.00 CY | 4.70 | 42,770.00 | 9,100.00 CY | 42,770.00 |
| 5CO-1 | P00003 | Construct 50'wide berms on training leve | 45,400.00 CY | 4.70 | 213,380.00 | 45,400.00 CY | 213,380.00 |
| P00007 | P00007 | Funding Mod - $8,416,350 | 1.00 Job | 0.00 | 0.00 | 0.00 Job | 0.00 |
| P00008 | P00008 | Triple-handle material at PA | 1.00 Job | 364,201.03 | 364,201.03 | 1.00 Job | 364,201.03 |
| | | TOTALS THIS PAGE | | | 14,191,283.46 | | 8,799,651.06 |

REM 40806

36

ENG FORM 93a 1 MAR 78 PREVIOUS EDITION OF THIS FORM IS OBSOLETE

PAYMENT ESTIMATE - CONTRACT PERFORMANCE (Continuation)
APPROPRIATIONS ACCOUNT SUMMARY

2. CONTRACT NO. DACW64-99-C-0001

SHEET 3 of 3

3. CONTRACTOR AND ADDRESS Renda Marine, Inc.
P.O. Box 1036, Freeport, TX 77542

4. PERIOD COVERED BY THIS ESTIMATE
FROM 21 Mar 00 THRU 20 Apr 00

| SEQ. NO. a | DESCRIPTION b | CONTRACT AMOUNT c | PREVIOUS EARNINGS d | EARNINGS TO DATE e | EARNINGS THIS PERIOD f | PERCENT COMPLETE g |
|---|---|---|---|---|---|---|
| 0001 | 001WQS CONTINUING CONTRACT | 14,191,283.46 | 8,431,051.06 | 8,799,651.06 | 368,600.00 | 62.01 |
| | TOTALS THIS PAGE | 14,191,283.46 | 8,431,051.06 | 8,799,651.06 | 368,600.00 | 62 % |

REM 40807

ENG FORM 1 MAR 78 93a PREVIOUS EDITION OF THIS FORM IS OBSOLETE

DEPARTMENT OF THE ARMY
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO ATTENTION OF:

August 5, 1999

Contracting Division

Subject: Consent of Surety and Increase of Penalty for Contract No. DACW64-99-C-0001

Mr. Eddie Fisher
Vice President
Renda Marine, Inc.
PO Box 1036
Freeport, Texas 77542

Dear Mr. Fisher:

Enclosed is an approved copy of Modification No. P00008 for Houston-Galveston Navigation Channels, Texas, Dredging Upper Bayou (45-Foot Project).

In accordance with Federal Acquisition Regulation 28.106-5 – Consent of Surety, please provide this office Consent of Surety and Increase of Penalty. Enclosed is Standard Form 1415, which is provided for necessary action.

This action is due within 10 days from receipt of this letter. If assistance is needed in this matter, contact the undersigned at (409) 766-3852.

Sincerely,

Carol A. Devany
Contracting Officer

Enclosures

Kowloske, J

# In the United States Court of Federal Claims

RECEIVED
2002 OCT 21 A 7:55
CASE PROCESSING UNIT
CIVIL DIVISION/OM

No. 02-306 C

(Filed: October 18, 2002)

FILED
OCT 18 2002
U.S. COURT OF
FEDERAL CLAIMS

RENDA MARINE, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

ORDER

Pursuant to United States Court of Federal Claims Rule (RCFC) 16(b), the court held a telephonic status conference on the record with the parties on October17, 2002 to set a schedule for discovery, pretrial and trial and to address any outstanding issues with the parties. Further to the conference and by agreement of the parties, the court schedules the following:

1. Fact Discovery. All fact discovery, including all depositions, shall conclude on or before Wednesday, November 5, 2003. In order to achieve this deadline, the parties shall make witnesses available at reasonably convenient locations and times. The parties are reminded that the rules of the court contemplate the use of depositions at trial for testimonial purposes in certain circumstances "as though the witness were then present and testifying . . . ." See RCFC 32(a). As requested by the parties in their Joint Preliminary Status Report, the parties may conduct up to 30 depositions, up to 10 to be scheduled by plaintiff and up to 20 to be scheduled by defendant.

A. DCAA Audit. No later than December 16, 2002, DCAA shall have completed the audit it has begun at plaintiff's facility and a copy of the audit shall be delivered to plaintiff. Defendant shall promptly advise DCAA of the terms of this Order.

2. Expert Discovery. All expert discovery, including the exchange of expert reports and excepting only the completion of expert depositions, shall be completed on or before Wednesday, December 3, 2003.

3. Expert Depositions. All depositions of experts shall be completed on or before Wednesday, January 14, 2004.

4. Meeting of Counsel. As set forth in Appendix A ¶ 13, the parties shall meet to satisfy the requirements of this section including the exchange of exhibit and witness lists on or before Wednesday, March 17, 2004.

5. Dispositive Motions. Dispositive motions shall be filed on or before Friday, November 14, 2003.

6. Memorandum of Contentions of Fact and Law. In accordance with Appendix A ¶ 14, plaintiff shall file its Memorandum of Contentions of Fact and Law on or before Thursday, April 8, 2004. Defendant shall file its responsive memorandum on or before Thursday, April 29, 2004. The memoranda shall be accompanied by witness lists and exhibit lists and any motions contemplated by Appendix A ¶¶ 15 and 16. Any objection to a witness or exhibit not made in the Memorandum of Contentions of Fact and Law or a separate motion filed on the same date shall be deemed waived absent a showing of a compelling reason for the failure. The parties shall prepare a joint preliminary trial schedule or, if they cannot agree, separate trial schedules, using the template attached, a copy of which will be, at the request of a party, provided to the party in electronic form by the court.

7. Pretrial Conference. The pretrial conference will be held on Wednesday, May 19, 2004 at the National Courts Building, 717 Madison Place, N.W., Washington, DC 20004. The parties shall bring to the pretrial conference at least three copies of any exhibit as to which an objection remains outstanding.

8. Trial. Trial will be held during the week of June 14, 2004. Trial will begin at 10:00 a.m. on Tuesday, June 15, 2003 and at 9:00 a.m. on successive days. Trial will be held in Houston, TX. The exact location of trial will be determined by further order of the court.

Due to the continuing problems with Washington, DC mail, the parties are directed to fax courtesy copies of any time-sensitive documents to the court and opposing counsel throughout the proceedings.

IT IS SO ORDERED.

Emily Hewitt
EMILY C. HEWITT
Judge

# UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**SUBPOENA DUCES TECUM**

No. 02-306C
(Judge Hewitt)

To: Milbern Ray & Co.
Landmark Bank Centre
150 West Parkway
Suite 100
Bedford, Texas 76040

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | DATE AND TIME |
|---|---|
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): See Attachment

| PLACE | DATE AND TIME |
|---|---|
| Milbern Ray & Co.<br>Landmark Bank Centre<br>150 West Parkway<br>Suite 100<br>Bedford, Texas 76040 | November 26, 2003<br>By close of business. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the dated and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. U.S. Court of Federal Claims rule (RUSCFC) 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (Indicate if Attorney for Plaintiff or Defendant) | DATE |
|---|---|
| [signature: John Kosloske]<br>Attorney for Defendant | November 5, 2003 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

JOHN KOSLOSKE, U.S. Department of Justice, Civil Division, 1100 L. Street, N.W., Suite 12052, Washington, DC 20530 (202) 307-0282

**DEFINITIONS OF TERMS USED IN DESCRIPTION OF DOCUMENTS**
**TO BE PRODUCED BY MILBERN RAY AND COMPANY, L.L.P.**

As used in the description of documents to be produced by Milbern Ray and Company, L.L.P. (Milbern Ray) attached to this subpoena, the following terms have the following meanings:

1. "And" and "or" shall be construed both conjunctively and disjunctively, and each shall include the other whenever such construction will serve to bring within the scope of these requests any items that otherwise would not be brought within their scope.

2. "Communication" means the expression of any statement, question, command, idea, knowledge, information, or other matter, whether by speech, writing, sign, or otherwise.

3. "Document" or "documents" means any written, recorded (by any means), or graphic matter, however produced or reproduced, in the possession, custody, or control of Milbern Ray, whether or not claimed to be privileged or confidential or personal, including, but not limited to, any "document," "tangible thing," or "object," as those terms are used in Rule 34 of the Rules of the United States Court of Federal Claims, and any "writing," "recording," "photograph," "original, or "duplicate," as those terms are defined in Rule 1001 of the Federal Rules of Evidence. "Document" or "documents" includes, but is not limited to: letters; memoranda; reports; agreements; working papers; preliminary, intermediate, and final drafts; communications (including intra- and inter-office communications, inter-company communications); correspondence; electronic mail; reports of telephone or other conversations; electronic data, as defined below; computer runs; view-foils; compilations; summaries of records of personal conversations; diaries; appointment books; desk calendars; financial calculations; forecasts; statistical statements; graphs; charts; plans; drawings; minutes or records of meetings; minutes or records of conferences; expressions or statements of policy; lists of persons attending meetings or conferences; reports of or summaries of interviews; reports of or summaries of investigation opinions or reports of consultants; opinions of counsel; reports of or summaries of either negotiations by Milbern Ray or preparation of such; circulars; books; instruments; accounts; tapes and all other material of any tangible medium of expression and original or preliminary notes. "Document" or "documents" also include copies of documents that are not identical duplicates of the originals and copies of documents the originals of which are not in the possession, custody, or control of Milbern Ray.

4. "Relate to," "relates to," or "relating to" means comprising, mentioning, analyzing, discussing, summarizing, describing, referring to, containing, depicting, embodying, evidencing, constituting, concerning, reporting, or involving an act, occurrence, event, transaction, fact, thing, or course of dealing.

5. "Renda Marine" means Renda Marine, Inc., including, without limitation, any division, group, affiliate, or other entity owned or controlled by Renda Marine, Inc., and all present and past officers, directors, employees, agents, or representatives of Renda Marine, Inc., including, but not limited to, counsel and consultants, who reasonably could be expected to have personal knowledge that would affect the completeness and accuracy of responses made to this request.

6. "ORCI" means Oscar Renda Contracting, Inc., including, without limitation, any division, group, affiliate, or other entity owned or controlled by ORCI and all present and past officers, directors, employees, agents, or representatives of ORCI, including, but not limited to, counsel and consultants, who reasonably could be expected to have personal knowledge that would affect the completeness and accuracy of responses made to this request.

7. "Contract" means Contract No. DACW64-99-C-0001 between Renda Marine and the United States, acting through the Army Corps of Engineers Galveston District, and which also is referred to as the "Upper Bayou Project."

**DESCRIPTION OF DOCUMENTS TO BE PRODUCED**
**BY MILBERN RAY AND COMPANY, L.L.P.**

1. Any and all work papers of Milbern Ray relating to the "Cost" of $19,511,345 for the "Upper Bayou" job appearing in the "Schedule of Completed Jobs for the Year Ended October 31, 2001," contained in the "Supplementary Information" appended to the "Financial Statements, October 31, 2001 and 2000" for Renda Marine, a copy of which is attached to this subpoena *duces tecum*.

2. Any and all documents possessed by Milbern Ray that are the basis of all or any part of the "Cost" of $19,511,345 for the "Upper Bayou" job appearing in the "Schedule of Completed Jobs for the Year Ended October 31, 2001," contained in the "Supplementary Information" appended to the "Financial Statements, October 31, 2001 and 2000" for Renda Marine, a copy of which is attached to this subpoena *duces tecum*.

3. Any and all written communications between Renda Marine and Milbern Ray relating to costs incurred by Renda Marine for the Contract.

4. Any and all written communications between OCRI and Milbern Ray relating to costs incurred by Renda Marine for the Contract.

# RENDA MARINE, INC.

## FINANCIAL STATEMENTS

## OCTOBER 31, 2001 AND 2000



Milbern Ray and Company
L.L.P.
Certified Public Accountants

# CONTENTS

INDEPENDENT AUDITORS' REPORT

FINANCIAL STATEMENTS

Balance Sheets

Statements of Income and Retained Deficit

Statements of Cash Flows

Notes to Financial Statements

SUPPLEMENTARY INFORMATION

Auditors' Report on Supplementary Information

Schedule of Job Revenue and Costs

Schedule of Construction in Progress

Schedule of Completed Jobs

Schedule of Cost of Construction

Schedule of Operating Expenses

Milbern Ray and Company
L.L.P.
Certified Public Accountants

MILBERN D. RAY, C.P.A.
RONALD D. RAY, C.P.A.
KENT A. RAY, C.P.A.

LANDMARK BANK CENTRE
P.O. BOX 849
BEDFORD, TEXAS 76095-0849
(817) 571-7661 • METRO (817) 267-2895
TELECOPIER (817) 571-1391

MEMBER:
AMERICAN INSTITUTE
OF CERTIFIED PUBLIC
ACCOUNTANTS

# INDEPENDENT AUDITORS' REPORT

Board of Directors
Renda Marine, Inc.
Roanoke, Texas

We have audited the accompanying balance sheets of Renda Marine, Inc. as of October 31, 2001 and 2000 and the related statements of income and retained deficit and statement of cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Renda Marine, Inc. as of October 31, 2001 and 2000, and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern.

CPA™

As discussed in Note 7 to the financial statements, the Company has suffered recurring losses from operations and has a net capital deficiency that raises substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 7. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Milburn Ray & Co

November 29, 2001

Euless, Texas

RENDA MARINE, INC.
BALANCE SHEETS
OCTOBER 31, 2001 AND 2000

ASSETS

| | 2001 | 2000 |
|---|---|---|
| CURRENT ASSETS | | |
| Cash | $ 29,655 | $ - |
| Accounts receivable | | |
| Trade | 1,428,715 | 795,029 |
| Retainage | 304,314 | 362,113 |
| Employees | - | 9,505 |
| Inventory, Note 1 | 253,552 | 37,962 |
| Prepaid insurance | 43,465 | - |
| Cost and estimated earnings in excess of billings | - | 3,525,062 |
| Deferred federal income tax benefit, current portion, Note 5 | 745,722 | 704,359 |
| Total current assets | 2,805,423 | 5,434,030 |
| FIXED ASSETS, NOTE 1 | | |
| Automobiles and trucks | 116,498 | 116,498 |
| Machinery and equipment | 1,571,206 | 1,523,796 |
| Dredges | 8,331,003 | 8,034,515 |
| Barges and boats | 1,718,101 | 2,004,739 |
| Leasehold improvements | 75,715 | 46,301 |
| | 11,812,523 | 11,725,849 |
| Less: accumulated depreciation | (3,400,190) | (2,158,571) |
| Total fixed assets | 8,412,333 | 9,567,278 |
| OTHER ASSETS | | |
| Deposits | 10,000 | - |
| Total other assets | 10,000 | - |
| | $ 11,227,756 | $ 15,001,308 |

See accompanying notes and independent auditors' report.



Milbern Ray and Company
L.L.P.
Certified Public Accountants

LIABILITIES AND STOCKHOLDER'S EQUITY

| | | 2001 | | 2000 |
|---|---|---|---|---|
| **CURRENT LIABILITIES** | | | | |
| Bank overdraft | $ | - | $ | 431,590 |
| Accounts payable and accrued liabilites, Note 2 | | 1,457,778 | | 6,782,360 |
| Accrued losses on contracts in progress, Note 3 | | - | | 3,742,611 |
| Billings in excess of costs and estimated earnings | | 866,321 | | - |
| Current portion of long-term debt, Note 4 | | 3,420,060 | | 2,368,910 |
| Total current liabilities | | 5,744,159 | | 13,325,471 |
| **LONG-TERM LIABILITIES** | | | | |
| Long-term debt, Note 4 | | 3,072,864 | | 6,738,885 |
| Notes payable - related party, Note 6 | | 9,426,885 | | 1,926,886 |
| Deferred federal income tax, Note 5 | | 163,553 | | 127,075 |
| Total long-term liabilities | | 12,663,302 | | 8,792,846 |
| **STOCKHOLDER'S EQUITY** | | | | |
| Common stock (no par value, 1,000 shares authorized, 850 and 1,000 issued and outstanding) | | 1,000 | | 1,000 |
| Retained deficit | | (7,180,705) | | (7,118,009) |
| Total stockholder's equity | | (7,179,705) | | (7,117,009) |
| | $ | 11,227,756 | $ | 15,001,308 |

RENDA MARINE, INC.
STATEMENTS OF INCOME AND RETAINED EARNINGS
FOR THE YEARS ENDED OCTOBER 31, 2001 AND 2000

| | 2001 | 2000 |
|---|---|---|
| INCOME | $ 6,664,231 | $ 11,319,415 |
| COST OF CONSTRUCTION | 4,022,699 | 15,780,062 |
| GROSS PROFIT / (LOSS) | 2,641,532 | (4,460,647) |
| OPERATING EXPENSES | 2,033,980 | 1,824,525 |
| OPERATING INCOME / (LOSS) | 607,552 | (6,285,172) |
| OTHER INCOME AND (EXPENSES) | | |
| Interest income | 2,669 | - |
| Interest expense | (706,692) | (1,073,491) |
| Gain on sale of assets | 28,890 | - |
| Joint venture allocation, Note 6 | - | 2,230,323 |
| Total other income and (expenses) | (675,133) | 1,156,832 |
| NET LOSS BEFORE PROVISION FOR FEDERAL INCOME TAX | (67,581) | (5,128,340) |
| PROVISION / (BENEFIT) FOR FEDERAL INCOME TAX, NOTE 5 | (4,885) | (192,058) |
| NET LOSS | (62,696) | (4,936,282) |
| BEGINNING RETAINED DEFICIT | (7,118,009) | (2,181,727) |
| ENDING RETAINED DEFICIT | $ (7,180,705) | $ (7,118,009) |

See accompanying notes and independent auditors' report.



Milbern Ray and Company
L.L.P.
Certified Public Accountants

RENDA MARINE, INC.
STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED OCTOBER 31, 2001 AND 2000

| | 2001 | 2000 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net loss | $ (62,696) | $ (4,936,282) |
| Adjustments to reconcile net income to net cash provided by operating activities | | |
| Depreciation and amortization | 1,241,619 | 1,258,244 |
| (Increase) decrease in: | | |
| Accounts receivable | (566,382) | (412,457) |
| Prepaid expenses, deposits, and inventory | (269,055) | 73,994 |
| Cost and estimated earnings in excess of billings | 3,525,062 | 750,580 |
| Deferred federal income tax benefit | (4,885) | (192,058) |
| Increase (decrease) in: | | |
| Accounts payable and accrued expenses | (9,067,194) | 5,941,250 |
| Billings in excess of costs and estimated earnings | 866,321 | - |
| **Net cash (used by) provided by operating activities** | (4,337,210) | 2,483,271 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of fixed assets | (481,052) | (738,939) |
| Proceeds from sale of assets | 394,378 | - |
| **Net cash used by investing activities** | (86,674) | (738,939) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from long-term borrowing | 7,500,000 | 68,604 |
| Payments on long-term borrowing | (2,614,871) | (1,951,174) |
| **Net cash provided by (used by) financing activities** | 4,885,129 | (1,882,570) |
| **NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS** | 461,245 | (138,238) |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD** | (431,590) | (293,352) |
| **CASH AND CASH EQUIVALENTS AT END OF PERIOD** | $ 29,655 | $ (431,590) |

See accompanying notes and independent auditors' report.

Milborn Ray and Company
L.L.P.
Certified Public Accountants

RENDA MARINE, INC.
NOTES TO FINANCIAL STATEMENTS
OCTOBER 31, 2001 AND 2000

Note 1. NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

This summary of significant accounting policies of Renda Marine, Inc. is presented to assist in understanding the Company's financial statements. The financial statements and notes are representations of the Company's management, who is responsible for their integrity and objectivity. These accounting policies conform to generally accepted accounting principles and have been consistently applied in the preparation of the financial statements.

Business Activities - Renda Marine, Inc. (a corporation) was formed May 8, 1998. The Company is engaged in the dredging of lakes and offshore waterways. The Company provides all of the necessary marine equipment and personnel required to perform the dredging and the following transportation and disposition of the by-product. The Company performs most of their work on lakes in the state of Texas and the open waterways of the gulf coast region.

Depreciation - Depreciation on machinery and equipment is provided by various methods over the estimated useful life of the properties. Maintenance and repairs are expenses as incurred while replacements and improvements are capitalized. In the case of property disposal, cost and related accumulated depreciation are eliminated from the accounts and any resulting gain or loss on a sale or retirement is reflected in the income accounts. The Company uses the accelerated cost recovery system for tax purposes which has recovery periods similar to useful lives used.

A summary of the estimated useful life used is as follows:

| | |
|---|---|
| Auto and trucks | 3 - 5 years |
| Equipment | 5 - 10 years |
| Furniture and fixtures | 3 - 7 years |

Accounting Method - The Company maintains its accounting records and files its federal income tax return using the percentage-of-completion method whereby income is recognized on the basis of engineering estimates of the percentage-of-completion of the contract based on work performed

RENDA MARINE, INC.
NOTES TO FINANCIAL STATEMENTS
OCTOBER 31, 2001 AND 2000

Note 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - (continued)

and job costs incurred. Costs and estimated earnings on incomplete contracts in excess of related billings are recognized as current liabilities. Estimated contract losses, if any, are provided on a current basis.

Use of Estimates - Generally accepted accounting principles require management under certain circumstances to use accounting estimates. Actual results could differ from these estimates.

Cash Flows - For purposes of the statement of cash flows, Renda Marine, Inc. considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents. Cash paid for interest was $692,003 and $1,073,491, respectively, for the years ended October 31, 2001 and 2000. There were no non-cash investing and financing activities for the year. There were no cash equivalents at October 31, 2001 and 2000.

Receivables - Trade and retainage represents earnings estimated on contract jobs in progress and retainages pending completion. An allowance for doubtful accounts is determined by management based on a review of the collectibility of specific trade accounts receivable. At present, all receivables are deemed collectible.

Inventory - Inventory is stated at the lower of cost or market on a first-in, first-out (FIFO) basis.

Compensation Absences - Compensation absences have not been accrued because the amount cannot be reasonably estimated.

RENDA MARINE, INC.
NOTES TO FINANCIAL STATEMENTS
OCTOBER 31, 2001 AND 2000

Note 2. ACCOUNTS PAYABLE AND LIABILITIES

At October 31, 2001 and 2000, accounts payable and accrued liabilities consisted of the following:

| | | 2001 | | 2000 |
|---|---|---|---|---|
| Accounts payable - trade | $ | 618,281 | $ | 1,514,569 |
| Accounts payable - related parties | | 753,011 | | 5,156,515 |
| Payroll taxes payable | | 151 | | 3,129 |
| Accrued wages | | 42,184 | | 78,685 |
| Accrued interest | | 44,151 | | 29,462 |
| | $ | 1,457,778 | $ | 6,782,360 |

Note 3. ACCRUED LOSSES ON CONTRACTS IN PROGRESS

The Company anticipated losses on two contracts in progress at October 31, 2000. The Corp. of Engineers - Boggy Bayou job was projected by management to lose $1,815,021. Of that loss, only $55,000 of estimated job cost remained to be recognized as of October 31, 2000. The Upper Bayou job was projected by management to lose $3,539,168. There were $3,687,611 of estimated job costs remaining to be recognized as of October 31, 2000. The accrued expenses on contracts in progress that will show a loss is as follows:

| | | 2001 | | 2000 |
|---|---|---|---|---|
| Corp. of Engineers - Boggy Bayou | $ | - | $ | 55,000 |
| Chocolate Bayou | | - | | 3,687,611 |
| | $ | - | $ | 3,742,611 |

RENDA MARINE, INC.
NOTES TO FINANCIAL STATEMENTS
OCTOBER 31, 2001 AND 2000

Note 4. NOTES PAYABLE

Notes payable at October 31, 2001 and 2000, consisted of the following:

| | 2001 | 2000 |
|---|---|---|
| Note payable to financing company, due monthly installments of $25,581, including interest at 7.5%, maturing May, 2002, secured by equipment | $ 212,702 | $ 388,157 |
| Note payable to financing company, a related party, due monthly installments of $4,679, including interest at 9.25%, maturing October, 2004, secured by equipment | 180,636 | 180,636 |
| Note payable to financing company, due monthly installments of $8,958, including interest at 7.5%, maturing June, 2002, secured by equipment | 88,119 | 185,586 |
| Note payable to financing company, due monthly installments of $8,157, including interest at 7.5%, maturing June, 2002, secured by equipment | 79,793 | 167,947 |
| Note payable to financing company, due monthly installments of $35,192, including interest at 7.5%, maturing October, 2002, secured by equipment | 390,542 | 636,887 |

RENDA MARINE, INC.
NOTES TO FINANCIAL STATEMENTS
OCTOBER 31, 2001 AND 2000

Note 4. NOTES PAYABLE - (continued)

| | | |
|---|---|---|
| Note payable to company, due monthly installments of $7,026, including interest at 8.0%, maturing March, 2002, secured by vessel | 63,515 | 115,474 |
| Note payable to financing company, due monthly installments of $2,050, including interest at 5.07%, maturing January, 2003, secured by equipment | 29,758 | 52,196 |
| Note payable to financing company, due monthly installments of $120,986, including interest at 7.49%, maturing April, 2004, secured by vessel | 3,300,670 | 3,973,078 |
| Note payable to financing company, due monthly installments of $119,188, including interest at 8.53%, maturing March, 2003, secured by equipment | 1,945,610 | 2,825,535 |
| Note payable to company, due monthly installments of $16,667, including interest at 8.0%, maturing July, 2001, secured by vessel | - | 132,584 |
| Note payable to company, due monthly installments of $9,000, including interest at 10.729%, maturing June, 2003, secured by vessel | - | 242,732 |

RENDA MARINE, INC.
NOTES TO FINANCIAL STATEMENTS
OCTOBER 31, 2001 AND 2000

Note 4. NOTES PAYABLE - (continued)

| | | |
|---|---|---|
| Note payable to company, due monthly installments of $819, including interest at 18.106%, maturing July, 2001, secured by equipment | - | 5,404 |
| Note payable to financing company, a related party, due monthly installments of $4,795, including interest at 9.25%, maturing April, 2004, secured by equipment | 201,579 | 201,579 |
| | 6,492,924 | 9,107,795 |
| Less current portion | (3,420,060) | (2,368,910) |
| | $ 3,072,864 | $ 6,738,885 |

The following is a schedule by year of future payments required under long-term debt obligations.

| Years ended October 31, | |
|---|---|
| 2002 | $ 3,420,060 |
| 2003 | 2,160,964 |
| 2004 | 911,900 |
| 2005 | - |
| 2006 | - |
| | $ 6,492,924 |

RENDA MARINE, INC.
NOTES TO FINANCIAL STATEMENTS
OCTOBER 31, 2001 AND 2000

Note 5. INCOME TAXES

Renda Marine, Inc. uses the percentage of completion accounting for financial statements and federal income tax purposes. Income tax consists of federal income tax currently payable of $-0-, including a net operating loss carryforward available to offset future taxable income in the amount of $9,942,957. This net operating loss will begin to expire in the year 2018.

Following is a reconciliation of pre-tax accounting income to taxable income:

| | 2001 | 2000 |
|---|---|---|
| Net income/(loss) before federal income tax | $ (67,581) | $ (5,128,340) |
| Differences: | | |
| Permanent differences | 76,126 | - |
| Contribution carryover | 100 | - |
| Depreciation | (560,053) | (956,428) |
| Accrued losses on contracts in progress | (3,742,611) | 2,025,901 |
| Taxable income/(loss) | $ (4,294,019) | $ (4,058,867) |

Deferred income taxes arise from timing differences resulting from income and expense items reported for financial, accounting, and tax purposes in different periods. Deferred taxes are classified as current or non-current, depending on the classification of the assets and liabilities to which they relate. Deferred taxes arising from timing differences that are not related to an asset or liability are classified as current or non-current depending on the periods in which the timing differences are expected to reverse. The following are the corporation's temporary differences:

RENDA MARINE, INC.
NOTES TO FINANCIAL STATEMENTS
OCTOBER 31, 2001 AND 2000

Note 5. INCOME TAXES - (continued)

| | 2001 | 2000 |
|---|---|---|
| Basis differences in long-term assets | $ 2,180,698 | $ 1,694,324 |
| Accrued losses on contracts in progress | - | (3,742,611) |
| Less: Taxable net operating loss carryforward | (9,942,957) | (5,648,841) |
| Total temporary differences | (7,762,259) | (7,697,128) |
| Corporation effective tax rate | 15% | 15% |
| Deferred tax/(benefit) before discount | (1,164,339) | (1,154,569) |
| Discount valuation | 50% | 50% |
| Deferred tax/(benefit) | $ (582,169) | $ (577,285) |

Deferred taxes are classified as follows:

| | 2001 | 2000 |
|---|---|---|
| Current deferred tax asset | $ (745,722) | $ (704,359) |
| Long-term deferred tax liability | 163,553 | 127,075 |
| | $ (582,169) | $ (577,284) |

The components of income tax provisions are:

| | 2001 | 2000 |
|---|---|---|
| Currently payable | $ - | $ - |
| Deferred tax (benefit) due to timing differences | (582,169) | (577,284) |
| | $ (582,169) | $ (577,284) |

RENDA MARINE, INC.
NOTES TO FINANCIAL STATEMENTS
OCTOBER 31, 2001 AND 2000

Note 6. RELATED PARTY TRANSACTIONS

The Company has significant transactions and activities with related parties:

The Company's activity with Oscar Renda Contracting, Inc., "ORC", (a related party), consists of start up cost, advances, and 50% of the gross profits on all contracts for the current period that resulted in balances due to "ORC" at year end of the current period of $7,779,437. Of that amount, $7,500,000 was reclassed to long-term debt with no maturity date and the remaining amount of $279,437 is due within the subsequent year. Both amounts are without interest. For subsequent years, "ORC" will provide management and payroll services and advances as needed, no management fees will be charged, and "ORC" will receive 50% of gross profits of all jobs, contracts, and projects of the Company. "ORC" also has co-guaranteed the Company's debt to outside parties. Due to the Company's reorganization of management and change in ownership during the current year, 50% joint venture allocation will be suspended until the Company completes its change in ownership and reorganization of management.

The Company's activity with Austin Insurance Company consists of two promissory notes, with the Company being the borrower, in the total amount of $382,215. These notes require monthly installments of $9,474 which includes interest at 9.25%. These notes are secured by various equipment used in the Company's operation. This transaction has been at arm's length and is comparable to an outside party financing agreement. The Company owes accrued interest on these notes of $44,151 as of October 31, 2001

Two shareholders have notes payable due from the Company. The notes are for $963,443 each, totaling $1,926,886. Both notes are without interest and have no maturity date.

The Company has minor activities with a related party, Agronomic Management Group, Inc., "AMG", consisting only of the usage of common vendors. The accounts payable owed to AMG as of October 31, 2001 was $473,574. The amount is due within the subsequent year.

RENDA MARINE, INC.
NOTES TO FINANCIAL STATEMENTS
OCTOBER 31, 2001 AND 2000

Note 7. GOING CONCERN

The accompanying financial statements have been prepared in conformity with generally accepted accounting principles, which contemplates continuation of the Company as a going concern. However, the Company has sustained substantial operating losses since its inception. In addition, the Company has used substantial amounts of working capital in its operations. Further, at October 31, 2001, current liabilities exceed current assets by $2,938,736, and total liabilities exceed total assets by $7,179,705.

Oscar Renda Contracting, Inc., "ORC", and the shareholders of ORC have co-guaranteed the debt of the Company.

In view of these matters, realization of a major portion of the assets in the accompanying balance sheet is dependent upon continued operation of the Company, which in turn is dependent upon the Company's ability to meet its financing requirements, and the success of its future operations. Management believes that actions presently being taken to revise the Company's operating and financing requirements provide the opportunity for the Company to continue as a going concern.

Note 8. SUBSEQUENT EVENTS

The Company received back 150 shares of common stock from a minority shareholder in November, 2000 at no value. These shares will be retired.

## SUPPLEMENTARY INFORMATION

Milbern Ray and Company
L.L.P.
Certified Public Accountants

MILBERN D. RAY, C.P.A.
RONALD D. RAY, C.P.A.
KENT A. RAY, C.P.A.

LANDMARK BANK CENTRE
P.O. BOX 849
BEDFORD, TEXAS 76095-0849
(817) 571-7661 • METRO (817) 267-2895
TELECOPIER (817) 571-1391

MEMBER:
AMERICAN INSTITUTE
OF CERTIFIED PUBLIC
ACCOUNTANTS

# INDEPENDENT AUDITORS' REPORT

Board of Directors
Renda Marine, Inc.
Roanoke, Texas

Our examinations of the basic financial statements presented in the preceding section of this report were made primarily to form an opinion on such financial statements taken as a whole. The additional information contained in the following pages is not considered essential for the fair presentation of the financial position of Renda Marine, Inc., the results of its operations, or the changes in cash flow in conformity with generally accepted accounting principles. However, the following data was subjected to the audit procedures applied in the examinations of the basic financial statements and, in our opinion, are fairly stated in all material respects in relation to the basic financial statements taken as a whole.

Milbern Ray & Co

November 29, 2001

Euless, Texas

CPA™

# RENDA MARINE, INC.
## SCHEDULE OF JOB REVENUE AND COSTS
## FOR THE YEAR ENDED OCTOBER 31, 2001

| | REVENUE | COST | GROSS PROFIT |
|---|---|---|---|
| Construction in progress | $ 1,310,538 | $ 1,012,398 | $ 298,140 |
| Completed jobs | 5,353,693 | 3,010,301 | 2,343,392 |
| | $ 6,664,231 | $ 4,022,699 | $ 2,641,532 |

See independent auditors' report on supplementary information.



Milbern Ray and Company
L.L.P.
Certified Public Accountants

RENDA MARINE, INC.
SCHEDULE OF CONSTRUCTION IN PROGRESS
FOR THE YEAR ENDED OCTOBER 31, 2001

| CONTRACT | AMENDED CONTRACT PRICE | ORIGINAL ESTIMATED TOTAL COST | COST TO DATE | ESTIMATED COST TO COMPLETE |
|---|---|---|---|---|
| Port of Houston | $ 1,017,439 | $ 724,602 | $ 225,887 | $ 498,715 |
| Sims Bayou | 1,932,421 | 1,530,026 | 786,511 | 743,515 |
| | $ 2,949,860 | $ 2,254,628 | $ 1,012,398 | $ 1,242,230 |

See independent auditors' report on supplementary information.



Milbern Ray and Company
L.L.P.
Certified Public Accountants

| ESTIMATED TOTAL COST | PERCENT COMPLETE | GROSS PROFIT RECOGNIZED IN PRIOR YEAR | GROSS PROFIT RECOGNIZED IN CURRENT YEAR | AMOUNT EARNED TO DATE | BILLINGS TO DATE | COST AND ESTIMATED EARNINGS EXCESS OF BILLINGS | BILLINGS IN EXCESS OF COSTS AND ESTIMATED EARNINGS |
|---|---|---|---|---|---|---|---|
| $ 724,602 | 31.2% | $ - | $ 317,176 | $ 317,176 | $ 669,455 | $ - | $ 352,279 |
| 1,530,026 | 51.4% | - | 993,362 | 993,362 | 1,507,404 | - | 514,042 |
| $ 2,254,628 | | $ - | $ 1,310,538 | $ 1,310,538 | $ 2,176,859 | $ - | $ 866,321 |

RENDA MARINE, INC.
SCHEDULE OF COMPLETED JOBS
FOR THE YEAR ENDED OCTOBER 31, 2001

| | ACTUAL | | |
|---|---|---|---|
| JOB | CONTRACT PRICE | COST | GROSS PROFIT |
| Upper Bayou | $ 16,762,666 | $ 19,511,345 | $ (2,748,679) |
| Boggy Bayou | 7,330,842 | 9,209,010 | (1,878,168) |
| Great Lakes | 5,978,747 | 5,076,905 | 901,842 |
| Jesco | 778,852 | 851,730 | (72,878) |
| Houston Fuel | 1,450,063 | 706,470 | 743,593 |
| Vopak | 208,731 | 147,066 | 61,665 |
| Miscellaneous Jobs | 176,831 | 15,860 | 160,971 |
| | $ 32,686,732 | $ 35,518,386 | $ (2,831,654) |

See independent auditors' report on supplementary information.

| GROSS PROFIT RECOGNIZED IN PRIOR YEARS | GROSS PROFIT RECOGNIZED IN CURRENT YEAR | ORIGINAL ESTIMATES CONTRACT PRICE | COST | GROSS PROFIT |
|---|---|---|---|---|
| $ (3,539,168) | $ 790,489 | $ 12,526,100 | $ 9,809,600 | $ 2,716,500 |
| (1,815,021) | (63,147) | 6,676,920 | 5,116,791 | 1,560,129 |
| 74,561 | 827,281 | 3,785,940 | 3,459,564 | 326,376 |
| 104,582 | (177,460) | 782,534 | 599,800 | 182,734 |
| - | 743,593 | 1,271,409 | 891,700 | 379,709 |
| - | 61,665 | 227,205 | 159,402 | 67,803 |
| - | 160,971 | 176,831 | - | 176,831 |
| $ (5,175,046) | $ 2,343,392 | $ 25,446,939 | $ 20,036,857 | $ 5,410,082 |

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., Plaintiff | ) | |
| VS. | ) | NO. 02-306C |
| THE UNITED STATES, Defendant | ) | |

* * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF KENT RAY

* * * * * * * * * * * * * * * * * * * * * *

ORIGINAL

December 8, 2003 Euless, Texas

Rhonda Mears

A P P E A R A N C E S

UNITED STATES DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Room 12052
Washington, DC 20005
BY: MR. JOHN KOSLOSKE
APPEARING ON BEHALF OF THE UNITED STATES

QUILLING, SELANDER, CUMMISKEY & LOWNDS
Bryan Tower
2001 Bryan Street
Suite 1800
Dallas, Texas 75201
BY: MR. BRIAN ERIKSON
APPEARING ON BEHALF OF RENDA MARINE

# I N D E X

ORAL DEPOSITION OF KENT RAY
Taken on December 8, 2003


| | PAGE |
|---|---|
| Appearances | 3 |
| Exhibit Index | 5 |
| DIRECT EXAMINATION By: Mr. Kosloske | 6 |
| CROSS EXAMINATION By: Mr. Erikson | 134 |
| Corrigendum and Signature | 135 |
| Reporter's Certificate | 136 |

(Deposition commenced at 10:27 a.m.)

KENT RAY,

having being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. KOSLOSKE:

Q Would you state your full name for the record and spell it.

A Kent Alan Ray, K-e-n-t A-l-a-n R-a-y.

Q What is your occupation?

A I'm a CPA.

Q Certified Public Accountant?

A Yes, sir.

Q What is your business address and telephone?

A It is 150 Westpark Way, Suite 100, Euless, Texas 76040, telephone number 817-571-7661.

Q Are you affiliated with Milbern Ray and Company?

A Yes, I am.

Q Mr. Ray, my name is John Kosloske. I am an attorney with the Department of Justice. I represent the United States in litigation, the caption of which is Renda Marine Inc. versus the United States. It's number 02-306C. It's litigation that's in the United States Court of Federal Claims in Washington DC. Are you familiar with the litigation?

A Yes.

Q And how are you familiar with the litigation?

schedule October 31, 2001. Do you recognize this document?

A Yes, sir.

Q What is that?

A It is the job schedule for both jobs in progress and completed jobs for the year 2001 for Renda Marine.

Q And is this a document that was prepared by Milbern Ray?

A Yes.

Q And is this part of the -- Is this a Milbern Ray work paper?

A Yes, sir.

Q Now, directing your attention to the information on Exhibit 12 job schedule that appears for schedule of completed jobs.

A Uh-huh.

Q For job 1100 Upper Bayou under the column revenue earned, the figure of $16,762,666, do you see that?

A Yes, sir.

Q Does that figure include overhead, profit, bond and costs as bid and amended by change orders?

A The 16 million 762?

Q Yes.

A No. That would be total billings to the job.

Q Under cost of revenue is the figure of $19,511,345, do you see that?

A Yes, sir.

Q Are these totals for the job?

A Those would be costs attributed to that job, yes, sir.

Q That is Upper Bayou?

A Yes, sir.

Q Is there anything that has been omitted from cost of revenue that would need to be added to come up with a total cost of revenue?

A Well, you would have to allocate the cost of the company owned equipment to cost to revenue.

Q The depreciation expense?

A If you were doing it outside of financial statement reporting, yes.

Q But does cost of revenue, this 19.5 million figure, does it include indirect expense?

A No. Does not include G and A, depreciation equipment, I'm sorry, depreciation expense of the equipment. Nor does it include any type of self equipment rentals. This is pure cost attributed to that job, outlay of cash.

Q It would include the yard or Renda Marine yard or shop allocation?

A It would include shop allocation, yes.

Q Now, the column gross profit, the figure for Upper Bayou represents the difference between the value given for

C O R R I G E N D U M

| PAGE | LINE | CORRECTION/CHANGE | REASON |
|---|---|---|---|
| 60 | 15 | SHOULD BE A/P AND A/R | |
| 77 | 13 | SHOULD BE U1 AND V1 | |
| 77 | 15 | SHOULD BE U1 AND V1 | |
| 90 | 14 | SHOULD BE 40,650.38 NOT 440,650.38 | |
| 93 | 5 | SHOULD BE 95,930.57 NOT 95.9,000 | |
| 101 | 23, 24, AND 25 | SHOULD SAY - NO. THOSE WOULD BE COST INCURRED FOR THE YEAR LESS COST ALREADY ACRRUED IN PRIOR YEARS. | |
| 105 | 4 | SHOULD BE 15,475.26 NOT 15.4,000 | |
| 114 | 22 | SHOULD BE JAMES WILLS NOT JAMIE WOODS | |
| 116 | 11 | SHOULD SAY - THE ACCRUED EXPENSE NOT THE 19188 | |

KENT RAY

BETTY L. STEPHENS
Notary Public
STATE OF TEXAS
My Comm. Exp. 01/07/2007

STATE OF TEXAS *

COUNTY OF TARRANT *

SUBSCRIBED AND SWORN TO before me by the said witness, KENT RAY, on this the 5TH day of JANUARY, 2004, subject to the aforementioned 9 (number) of corrections/changes.

Notary Public in and for
TARRANT County, Texas

My Commission expires: JANUARY 7, 2007

# C E R T I F I C A T E

I, RHONDA MEARS, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that, pursuant to the agreement hereinabove set forth, there came before me on the 8th day of December, 2003, at the offices of Milbern Ray and Company, 150 Westpark Way, Suite 100, in the City of Euless, County of Tarrant and State of Texas, the following named person, to-wit: KENT RAY, who was by me duly sworn to tell the truth, the whole truth, and nothing but the truth of their knowledge touching and concerning the matters in controversy in this cause; and that the witness was thereupon carefully examined upon their oath and their examination reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness. Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, the witness did request to review and sign the original transcript prior to the conclusion of the deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney nor counsel employed by the parties hereto, or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my seal this 15th day of December, 2003.

Rhonda Mears

RHONDA MEARS, CSR NO. 3665
National Court Reporters
500 S. Ervay, Suite 120-A
Dallas, Texas 75201
(214) 651-8393
Certification Expires: 12-31-04

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC.,<br>PLAINTIFF, | § <br>§ | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| UNITED STATES ARMY CORPS OF ENGINEERS,<br>DEFENDANT. | §<br>§ | |

**INITIAL DISCLOSURES BY PLAINTIFF, RENDA MARINE, INC.**

Plaintiff, Renda Marine, Inc. ("Renda"), makes the following initial disclosures pursuant to RCFC 26(a)(1):

A. Persons with Discoverable Information:

Renda Marine attaches Exhibit A, identifying persons with potentially discoverable information, the address and telephone number if known, and the subject of discoverable information. In addition to those persons listed on the attached Exhibit A, Renda Marine incorporates by reference the list of individuals identified in Defendant's Initial Disclosures, as though it were copied and included herein.

B. Description by Category and Location of Relevant Documents:

Renda has about nine boxes of documents relevant to this case. The boxes include the eight or so claims that Renda has made, including support for such claims. Renda has multiple three-ring binders, and support for those claims. Renda also has project correspondence, daily reports, and similar construction project documentation. The vast majority of this documentation has already been provided to the U.S. Army Corps of Engineers, and been made available to the Defense Contract Audit Agency auditors.

The documents are located in the offices of Renda's counsel at the undersigned address. Renda will make such documents available for inspection and copying at a time mutually convenient.

C. Computation of Damages:

| | | |
|---|---|---|
| South Ferry Landing Claim | | 1,049,173.00 |
| Flare Area Claim | 4,691,688.00 | |
| less payment | (3,083,833.00) | |
| | | 1,607,855.00 |
| HL&P Tower Claim | | 170,863.00 |
| Section 7 Clay Claim | | 1,083,779.00 |
| West Levee Realignment Claim | | 789,600.00 |
| Obstruction #1 Claim | | 2,126,083.00 |
| Obstruction #2 Claim | | 1,158,642.00 |
| Lost Lake Levees Claim | | 6,258,853.00 |
| | | 14,244,848.00 |
| Plus Attorney Fees, Court Costs, and Pre-Judgment and Post-Judgment Interest | | TBA |

The documents supporting such damages are included in Renda's certified claims in this suit, and have already been produced to the U.S. Army Corps of Engineers ("Corps"), and to the Defense Contract Audit Agency ("DCAA"). Renda will make such documents available again.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: ______________________
Brian W. Erikson, TX Bar No. 06643800
Andrew M. Trusevich, TX Bar No. 00785119

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

DATED: October 21, 2002.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of October, 2002, a true and correct copy of the Initial Disclosures of Plaintiff, Renda Marine, Inc., was sent via United States mail, postage prepaid, in an envelope addressed as follows:

John E. Kosloske, Esq.
Senior Trial Counsel, Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street N.W., Room 8012
Washington, DC 20530

Brian W. Erikson