IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFF'S CONTINGENT MOTION FOR LEAVE TO REQUIRE DEFENDANT TO ANSWER PLAINTIFF'S DISCOVERY

PRELIMINARY STATEMENT

Pending before the Court is the "contingent" motion of plaintiff, Renda Marine, Inc. (Renda), for leave to require the Government to answer Renda's Second Set of Interrogatories,[1] Def. App. 20-30,[2] and Third Request for Production of Documents, Def. App. 31-41, which Renda served upon the Government on January 15, 2004, the day after the deadline established by the Court for completion of fact discovery in this case. The Government objected to these discovery requests upon the ground that they are untimely. Def. App. 42-47. For the reasons stated below, the motion should be denied.

BACKGROUND

This case involves claims governed by the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13), arising under or relating to Contract No. DACW64-99-C-0001 between

---

[1] In this opposition, "Pl. Mot. ____" refers to the referenced page(s) of "Response by Plaintiff, Renda Marine, Inc., to Defendant's Motion to Compel Compliance with Rule 26(a)(2)(B), to Compel Production of Documents, to Permit Defendant to Perform an Audit of Plaintiff's Job Cost Schedules, and for a Modification of the Pretrial and Trial Schedule and *Contingent Motion to Require Defendant to Answer Renda's Discovery*" filed on March 3, 2004 (emphasis added).

[2] "Def. App. ____" refers to the referenced page(s) of the appendix to this opposition to plaintiff's motion for leave to require the Government to respond to Renda's discovery requests.

Renda and the United States, acting through the Army Corps of Engineers, Galveston, Texas District, to dredge reach of the Galveston-Houston Ship Channel known as the Upper Bayou and to construct containment levees and other structures at the Lost Lake Placement Area for dredged material. The contract is referred to in the complaint and other documents as the "Upper Bayou Project." The complaint seeks damages, in the aggregate, of approximately $14.25 million, plus interest, based upon numerous alleged differing site conditions encountered by Renda during the course of contract performance.

On September 10, 2003, the Court entered an Order that amended the pretrial and trial schedule in this case. Def. App. 1-2. The Order established a deadline of January 14, 2004, for the completion of "fact discovery." Id. at ¶ 1, Def. App. 1.[3/]

THE DISCOVERY REQUESTS

A. Renda's Second Set Of Interrogatories

Renda propounded three interrogatories. The first interrogatory requests that the Government identify any project(s) at the Lost Lake Placement Area (Lost Lake) during the nine-year period from January 1, 1990, to January 1, 1999, "to maintain or increase the height of levees at that site and, if so, to identify the prime contractor, the contractor "actually working" on the levees, the amount by which the levees were raised, and the source of the material used to raise the levees. Def. App. 29.

---

[3] Renda appears to contend that the Court's deadline for completing fact discovery, including interrogatories and document production requests, is February 4, 2004. See Pl. Mot. 6. That is incorrect. Under the pretrial schedule established by the Court's September 10, 2004 Order, February 4, 2004, is the deadline for completing "expert discovery," except for depositions of experts. Id. at ¶ 2, Def. App. 1.

The second interrogatory requests that the Government state whether, during the 19-year period from January 1, 1980, to January 1, 1999, any "borrow areas" were created or developed adjacent to or near the existing levees at Lost Lake and, if so, to state the date(s) of "any such borrowing" and to identify the "contractor project," the prime contractor, the contractor that "actually undertook the borrowing," and the location of the borrowing "in relationship to the levees." Def. App. 29.

The third interrogatory requests that the Government state whether, during the 19-year period from January 1, 1980, to January 1, 1999, any "surveys or cross sections" were made of any borrow areas at Lost Lake and, if so, to state the date(s) of any such surveys or cross sections and to identify the company undertaking such surveys or cross sections and the location of such surveys or cross sections. Def. App. 29.

B. Renda's Third Request For Production Of Documents

Renda requests that the Government produce for inspection and/or copying "any and all" documents "pertaining to or reflecting"[4/] responsive to 17 categories of materials:

1. Soil or core borings undertaken in the Flare Area of the Upper Bayou Project in May 2000.

2. Soil or core borings undertaken at any time on the Upper Bayou Project after September 2001.

3. Corps of Engineers claims handling or claims administration manual or policy or guidelines in existence at any time during the Upper Bayou Project.

4. Soil or core borings taken for the "Goat Island contract" awarded to Great Lakes Dredge & Dock Company.

---

[4] The phrase "pertaining to or reflecting" is defined broadly by Renda's document production request to mean "concerning, discussing, referring to, pertaining to, reflecting, evidencing, constituting, showing or regarding." See "Definitions and Instructions," at ¶ 25, Def. App. 39.

5. Bid solicitation materials for the "Goat Island contract" awarded to Great Lakes Dredge & Dock Company.

6. "Use" of Lost Lake during the ten-year period from January 1, 1990, to January 1, 2000, including "any depositing of dredging maintenance material."

7. "Work on increasing or maintaining the height of the levees" at Lost Lake during the nine-year period from January 1, 1990, to January 1, 1999.

8. "Creation of or removal of soil material" from "borrow areas" "near or adjacent to" existing levees at Lost Lake.

9. "Surveys or cross sections" of levees or "borrow areas" at Lost Lake performed during the 12-year period from January 1, 1990, to January 1, 2002.

10. Manuals, policies, or guidelines for "the design of levees relevant to the levees at Lost Lake" in existence at any time during the Upper Bayou Project.

11. Revisions or additions to manuals, policies, or guidelines for "the design of levees relevant to the levees at Lost Lake" since July 15, 1998.

12. "Calculations" of liquidated damages for the Upper Bayou Project.

13. "Determination" of the contract amount for liquidated damages listed in the contract for the Upper Bayou Project.

14. The 1993 soil cores and samples referenced at ¶ 1.11, page 02482-4, of the contract specifications for the Upper Bayou Project.

15. "Permits" for the deposit of dredged material at Lost Lake during the eight-year period from January 1, 1990, to January 1, 1998.

16. "Investigation" in response to any of Renda's notices of differing site conditions at any time prior to the commencement of this litigation.

17. The editions or versions of the Corps of Engineers Engineering Pamphlet EP 1110-1-8, "Construction Ownership and Operation Expense Schedule" "applicable" to the contract for the Upper Bayou Project.

ARGUMENT

Although RCFC 33 and 34 do not contain an express limitation upon how late in the proceedings interrogatories or document production requests may be served, when the Court has established a discovery deadline, a party must serve interrogatories or document production requests in sufficient time to permit the responding party the 30-day response time allowed by Rules 33 and 34 (plus the additional time allowed by RCFC 6(e) in the case of service by means other than by hand). Thomas v. Pacificorp, 324 F.3d 1176, 1179 (10th Cir. 2003) (discovery requests served two days after discovery completion deadline not timely); Gavenda v. Orleans County, 182 F.R.D. 17, 20 (W.D.N.Y. 1997) (document production request served two days before discovery cutoff untimely); Smith v. Principal Casualty Insurance Co., 131 F.R.D. 104, 105 (S.D. Miss. 1990) (interrogatories served six days before discovery cutoff untimely); see also 7 Moore's Federal Practice, § 33.41[5] (Matthew Bender 3d ed.), at pages 33-46 and 33-47. When the need to serve interrogatories or document production requests arises less than 30 days prior to a court-ordered discovery completion deadline or after the deadline has passed, a party should file a motion seeking leave of court to serve the discovery requests before serving them. See Beller v. Credit Alliance Corp., 106 F.R.D. 557, 560 (N.D. Ga. 1985) ("If new matters arise during the final thirty days of discovery, it is the responsibility of the party needing additional discovery to petition the court for an extension of time."); accord Contardo v. Merrill Lynch, Pierce, Fenner & Smith, 119 F.R.D. 622, 624-25 (D. Mass. 1988); 7 Moore's Federal Practice, § 34.10[3] (Matthew Bender 3d ed.), at pages 34-26 and 34-27.

Renda's discovery requests are not timely. Under the schedule fixed by the Court's September 10, 2003 Order, "all fact discovery, including all depositions," was to "conclude"

on or before January 14, 2004. Id. at ¶ 1, Def. App. 1. To be timely, Renda's discovery requests had to be served at least 30 days before January 14, 2004, i.e., no later than December 15, 2003. Renda, however, did not serve the discovery requests until January 15, 2004, the day after the deadline for completing fact discovery. Nor did Renda seek (and obtain) leave of the Court to serve the discovery requests before serving them, as it was required to do.

The only excuse offered by Renda for its untimely discovery requests is that "[t]he need for the discovery did not become apparent until Renda deposed the Corps of Engineers' witnesses in mid-January 2004." Pl. Mot. 6. There are several problems with this explanation.

*First*, this excuse does not justify Renda's failure to obtain leave of the Court to serve the discovery requests before doing so or making application to the Court for an order requiring the Government to respond to the discovery requests. As noted above, when a party desires to serve interrogatories or document production requests and there is less than 30 days before the discovery cutoff date or the discovery cutoff date has passed, it should obtain leave of court *before* serving the discovery requests.[5/] Renda's motion to require the Government to "answer" its untimely discovery requests (which, for all practical purposes, is a motion to compel) is therefore improper. See Beller, 106 F.R.D. at 560 ("Since no extension of discovery beyond [the December 31, 1984 discovery cutoff] was sought or granted, Plaintiff's December 14 discovery requests were untimely. A motion to compel with respect to these requests is therefore improper.").

---

[5] A party served with an untimely discovery request under Rule 33 or 34, such as the Government here, should not be put in the position of having to take any steps, such as making inquiries or undertaking investigation to ascertain the burden(s) that responding to the discovery would entail or to identify other potential objections to the discovery, until the Court has determined in the first instance whether to allow the untimely discovery.

*Second*, even assuming for the sake of argument that Renda could not have anticipated the need for the discovery that is the subject of its second set of interrogatories and third document production request until Renda took the depositions of Government employees, that would not by itself justify the untimely discovery requests. Renda did not begin taking depositions in this case until January 5, 2004 – just ten days before the close of the 15-month period allowed by the Court for the completion of fact discovery. In Gavenda, the court rejected a similar excuse for untimely discovery requests: "The depositions, from which plaintiff contends the document demands arose, could have been taken months earlier but for the availability of plaintiff's counsel. The circumstances do not justify the service of a document request, such as the May 8, 1996 document request, two days before the [May 10, 1996] discovery cutoff date." 182 F.R.D. at 20.

*Third*, contrary to its contention, Renda could (and should) have recognized the need for the discovery that is the subject of its second set of interrogatories and third document production request at least as early as April 2002, when the complaint in this case was filed. The interrogatories and Document Requests 2, 4-9, and 15 seek information relative to the location and dimensions of sidecast borrow areas and soils testing at the Lost Lake Placement Area (Lost Lake). See Def. App. 29, 40, 41.[6] These discovery requests relate to Renda's $6.3 million Lost Lake Levees Claim in which Renda asserts that sidecast borrow pits and poor soil foundation conditions at or near the footprint of the new perimeter levees to be constructed at Lost Lake constitute differing site conditions that increased Renda's costs of performance. The allegations at paragraphs 153-

[6] Document requests 4 and 5 seek soil or core borings and bid solicitation materials for the "Goat Island contract" awarded to Great Lakes Dredge & Dock Company. Under this contract, which is known as the "Mid-Bayou Project, " the contractor, among other things, will complete construction of the perimeter levees at Lost Lake that Renda began but did not finish.

158, 178, 180, and 181 of the complaint filed by Renda in this case concern the same matters, including the alleged omission of the contract documents to indicate the "existence, depth, width, and extent of the sidecast borrow areas" at Lost Lake. There is thus no reason why Renda should not have recognized *at the time this litigation was commenced* the need to inquire about the matters that are the subject of its second set of interrogatories and Document Requests 2, 4-9, and 15.

The same is true for the balance of Renda's document production requests, with respect to which Renda does not even attempt to demonstrate how the need for that discovery could not have been anticipated until it began taking depositions of Government employees in mid-January 2004. Document Request 1 seeks production of documents relating to soil or core borings undertaken in the Flare Area of the Upper Bayou Project. Def. App. 39. These soil tests are the subject of paragraphs 60 and 61 of Renda's complaint. Requests 12 and 13 seek production of documents relating to calculations of liquidated damages and determination of the contract amount for liquidated damages for the Upper Bayou Project. Def. App. 41. Liquidated damages are the subject of an allegation at page 28 of Renda's complaint. These are hardly new matters about which Renda could not have anticipated the need for discovery until it began taking depositions of Government employees in January 2004, shortly before the close of the period for completing fact discovery.

Document Request 14 seeks production of documents relating to soil cores and samples explicitly referred to in a specification contained in the contract for the Upper Bayou Project at issue in this litigation and Request 16 seeks documents concerning any investigation by the Government in response to any of Renda's notices of differing site conditions prior to the commencement of this litigation. Def. App. 41. It is difficult to imagine that Renda could not have envi-

sioned the need for that information until it began taking depositions of Government employees in January 2004, shortly before the close of the period for completing fact discovery. Renda does not identify the specific deposition testimony that allegedly gave rise to the need for the documents sought by Requests 14 and 16. The alleged lack of investigation by the Government of putative differing site conditions is a matter raised in Renda's certified claims.

Document Requests 3, 10, 11, and 17 seek production of documents relating to "Corps of Engineers claims handling or claims administration manual or policy or guidelines," "[m]anuals, policies, or guidelines for the "design of levees relevant to the levees at Lost Lake," revisions or additions to any such materials after June 15, 1998, and the Corps's Engineering Pamphlet EP 1110-1-8, "Construction Ownership and Operation Expense Schedule" used by Renda to price several of the certified claims in this case. Def. App. 40, 41. There is no good reason why, as of the time this litigation was instituted, Renda could not have recognized the need for discovery relating to those materials. The dispute between Renda and the Government about the proper application of the "Construction Ownership and Operation Expense Schedule" in the preparation of its claims arose when Government auditors examined Renda's claims in the spring of 2002. Again, Renda does not cite to specific deposition testimony allegedly giving rise to the need for discovery of the broad categories of documents sought by Requests 3, 10, 11, and 17.

Even where a court has not established a discovery deadline, the right to serve interrogatories or document production requests is subject to reasonable limitations, depending upon the facts in the case, complexity of the discovery requests, proximity to trial, hardship to the responding party, and the amount of time that previously was available to conduct discovery. 7 Moore's Federal Practice, § 33.41[5] (Matthew Bender 3d ed.), at page 33-46. Renda's discovery requests

are very broad and would require a substantial amount of time and effort by the Government to address. For example, the interrogatories and Document Requests 6, 7, 9, and 15 would require a search of records of dredging projects involving Lost Lake that occurred during all or part of the 19-year interval between 1980 and 1999. To the extent such records exist, they most likely would have to be retrieved from a Government records storage center, which increases the time needed for response. Renda has not offered a reasonable explanation for why it waited until 22 months after this suit was commenced and just five months before the presently-scheduled trial date to pursue this discovery.

## CONCLUSION

For the foregoing reasons, plaintiff's "contingent" motion to require defendant to respond to its second set of interrogatories and third document production request should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

MARCH 17, 2004

Attorneys for Defendant

**INDEX TO DEFENDANT'S APPENDIX**


| **Document** | **Page** |
|---|---|
| Order filed on September 10, 2003 | 1 |
| Plaintiff's "First Set of Interrogatories" | 3 |
| Plaintiff's "Second Set of Interrogatories" | 20 |
| Plaintiff's "Third Request for Production of Documents" | 31 |
| "Defendant's Objections to Plaintiff's Second Set of Interrogatories" | 42 |
| "Defendant's Objection to Plaintiff's Third Request for Production of Documents" | 45 |

# In the United States Court of Federal Claims

No. 02-306 C

(E-Filed: September 10, 2003)

| | |
|---|---|
| RENDA MARINE, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

ORDER

Upon review of Defendant's Motion for Modification of Pretrial Schedule and further to the telephonic status conference held on the record on September 9, 2003, the court AMENDS its Pretrial Scheduling Order of October 18, 2002 as follows:

1. Fact Discovery. All fact discovery, including all depositions, shall conclude on or before Wednesday, January 14, 2004. In order to achieve this deadline, the parties shall make witnesses available at reasonably convenient times. The parties are reminded that the rules of the court contemplate the use of depositions at trial for testimonial purposes in certain circumstances "as though the witness were then present and testifying . . . ." See RCFC 32(a). As requested by the parties in their Joint Preliminary Status Report, the parties may conduct up to 30 depositions, up to 10 to be scheduled by plaintiff and up to 20 to be scheduled by defendant.

2. Expert Discovery. All expert discovery, including the exchange of expert reports and excepting only the completion of expert depositions, shall be completed on or before February 4, 2004.

3. Expert Depositions. All depositions of experts shall be completed on or before February 18, 2004.

4. Meeting of Counsel. As set forth in Appendix A ¶ 13, the parties shall meet to satisfy the requirements of this section including the exchange of exhibit and witness lists on or before March 24, 2004.

5. Dispositive Motions. Dispositive motions shall be filed on or before January 28, 2004. The motions and all responsive filings shall be filed simultaneously. Responsive briefing shall be filed within the time periods prescribed by the court's rules.

6. Memorandum of Contentions of Fact and Law. In accordance with Appendix A ¶ 14, plaintiff shall file its Memorandum of Contentions of Fact and Law on or before April 14, 2004. Defendant shall file its responsive memorandum on or before May 12, 2004. The memoranda shall be accompanied by witness lists and exhibit lists and any motions contemplated by Appendix A ¶¶ 15 and 16. Any objection to a witness or exhibit not made in the Memorandum of Contentions of Fact and Law or a separate motion filed on the same date shall be deemed waived unless justice shall otherwise require. The parties shall prepare a joint preliminary trial schedule or, if they cannot agree, separate trial schedules, using the template attached. The parties shall confer prior to the pretrial conference for the purpose of resolving as many objections as possible.

7. Pretrial Conference. The pretrial conference will be held on June 2, 2004 at the National Courts Building, 717 Madison Place, N.W., Washington, DC 20004. The parties shall bring to the pretrial conference at least three copies of any exhibit as to which an objection remains outstanding.

8. Trial. Trial will be held during the week of June 14, 2004. Trial will begin at 10:00 a.m. on Tuesday, June 15, 2004 and at 9:00 a.m. on successive days. Trial will be held in Houston, TX. The exact location of trial will be determined by further order of the court. Should additional time be required for trial, the court has set aside the following week of June 21, 2004 as well.

Due to the continuing problems with Washington, DC mail, the parties are directed to fax courtesy copies of any time-sensitive documents to the court and opposing counsel throughout the proceedings.

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC.,<br>PLAINTIFF,<br><br>V.<br><br>UNITED STATES ARMY<br>CORPS OF ENGINEERS,<br>DEFENDANT. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 02-306C<br><br>(JUDGE HEWITT) |

**FIRST SET OF INTERROGATORIES**
**BY PLAINTIFF, RENDA MARINE, INC. TO DEFENDANT,**
**UNITED STATES ARMY CORPS OF ENGINEERS**

TO: United States Army Corps of Engineers, through its attorney of record, John E. Kosloske, Esq., Senior Trial Counsel, Commercial Litigation Branch, Department of Justice, Attn.: Classification Unit, 1100 L Street N.W., Room 8012, Washington, DC 20530.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Rules of the Court of Federal Claims, you are hereby required to (1) answer fully and factually each of the interrogatories hereinafter set forth; (2) furnish all information called for in said interrogatories as is available to you or your agents; (3) sign your response; (4) swear to your response; and (5) serve your answers to the following interrogatories upon the undersigned attorney for Plaintiff, Renda Marine, Inc. ("Renda"), no later than thirty (30) days after service of these interrogatories on your attorney of record.

You are further instructed that:

(a) to the extent possible, answer these interrogatories in the spaces provided after each interrogatory. Answers may be continued on separate sheets of paper attached to these interrogatories; and

(b) you are under a duty to amend your answers to the interrogatories in a timely manner if, between the time answers are served and the time of trial herein, you obtain information upon the basis of which (i) you know the answer was incorrect when made; or

(ii) you know that the answer, though correct when made, is no longer true and the circumstances are such that a failure to amend the answer is, in substance, a knowing concealment.

## DEFINITIONS AND INSTRUCTIONS

1. The term "Plaintiff" or "Renda" refers to Renda Marine, Inc., Plaintiff in this suit.

2. The term "Defendant" or "Corps" refers to the United States Army Corps of Engineers, Defendant in this suit.

3. "Upper Bayou Project" refers to Corps Contract No. DACW64-99-C-0001, for Houston-Galveston Navigation Channels, Texas, Dredging Upper Bayou (45-Foot Project) in Harris and Galveston Counties.

4. "Joint Venture" refers to Turner, Collie & Braden, Inc., Gahagan & Bryant & Associates, Inc., and J. Simmons Group, Inc., collectively.

5. The term "Port of Houston Authority" refers to the Port of Houston Authority of Harris County, Texas.

6. The term "active file" means any electronic data file that can be used by an electronic data processing system in any manner without modification and/or re-construction. An active file is any electronic data file that has not been deleted or otherwise destroyed and/or damaged and which is readily visible to the operating system and/or the software with which it was created.

7. The term "computer" shall include, but is not limited to, microchips, microcomputers (also known as personal computers), laptop computers, portable computers, notebook computers, palmtop computers (also known as personal digital assistants or PDA's), minicomputers and mainframe computers.

8. The term "computer system," when used in reference to any computer, includes, but is not limited to, the following information:

a. Computer type, brand and model;

b. Brand & version of all software, including operating system, private-and custom-developed applications, commercial applications, and/or shareware;

c. Communications capability, including asynchronous and/or synchronous, including, but not limited to, terminal to mainframe emulation, data download and/or upload capability to mainframe, and computer to computer connections via network, modem and/or direct connection.

9. The term "data" is equivalent to the term "electronic data" as defined herein.

10. The term "deleted file" means any electronic data file that has been deleted or deleted from the electronic media on which it resided.

11. The term "document" means the original (or an identical duplicate if the original is not available), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description that are fixed in any form of physical media within your possession, custody, or control, or the control of any agent, employee, representative (including, without limitation, attorneys, consultants and accountants) or other person acting or purporting to act for you or on your behalf. Physical media include, but are not limited to, paper media, phonographic media, photographic film media (including pictures, films slides and microfilm), magnetic media (including but not limited to hard disks, floppy disks, compact disks, and magnetic tapes of any kind), computer memory, optical media, magneto-optical media, and other physical media on which notations or marking of any kind can be affixed. Documents shall include, but not be limited to, contracts, agreements, change orders, change proposals, communications, correspondence, letters, telegrams, memoranda, electronic mail, notes, journals, appointment

calendar, calendar, group scheduler calendar, records, reports, books, summaries, notes, notes or records of telephone conversations, notes or records of personal conversations or interviews, telephone logs, diaries, logs, field notes, inspection reports, daily or periodic reports, notices, deficiency notices, contractor's daily or periodic reports, production reports, quality control reports, batch reports, run reports, shift reports, winding reports, speed memoranda, drawings, shop drawings, sketches, details, plans, specifications, calculations, computations, forecasts, schedules, statistical statements, tests, laboratory tests, assessments, evaluations, work papers, graphs, charts, accounts, analytical records, minutes, minutes or records of meetings or conferences, consultants' reports, appraisals, reports or summaries of negotiations, brochures, marginal notations, bills, invoices, checks, drafts, bills of lading, warehouse receipts, photographs, movies, videotapes, lists, journals, advertisements, magnetic tapes, computer tapes, computer disks, computer cards, computer directory, computer printouts, and every other form of written, printed, stenographic, electronic, recorded, graphic, filmed, or photographic matter, including sound reproductions, however produced or reproduced, and all drafts, revisions, and copies with either markings or alterations of the foregoing.

12. The term "electronic data" means the original (or identical duplicate when the original is not available), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic data includes, by way of example only, computer programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts and/or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files,

charts, graphs and outlines, electronic mail, operating systems, source code of all types, peripheral drivers, PIF files, batch files, ASCII files, and any and all miscellaneous files and/or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists in an active file, deleted file or file fragment. Electronic data includes any and all items stored on computer memories, hard disks, floppy disks, CD-ROMs, removable media such as Zip disks, Jaz cartridges, Bernoulli Boxes and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, PROM, RAM and ROM, on or in any other vehicle for digital data storage and/or transmittal. The term electronic data also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with each original and/or copy.

13. The term "Electronic media" means any magnetic or other storage media device used to record electronic data. Electronic media devices may include, but are not limited to, computer memories, hard disks, floppy disks, CD-ROM, removable media such as Bernoulli Boxes and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, PROM, RAM and ROM, or on or in any other vehicle for digital data storage and/or transmittal.

14. The term "file fragment" refers to any electronic data file that exists as a subset of an original active file. A file fragment may be active or deleted. The cause of fragmentation can include, but is not limited to the execution of ordinary file management routines such as the creation of new files over parts of previously deleted files, the creation of files on disks which do not have enough contiguous blocks to write the file from beginning to end, where the file has been split up between several sections of the disk (each piece a fragment). Other causes include manual intervention, electronic surges, and/or physical defects on electronic media.

15. The term "network" means any hardware and/or software combination that connects two or more computers together and which allows the computers to share and/or transfer data between them. For the purposes of this definition, the connection between or among the microcomputers need not be either physical or direct, i.e., wireless networks, and sharing and/or transferring data via indirect routes utilizing modems and phone company facilities. In addition, there need not be a central file or data server nor a central network operating system in place, i.e., peer-to-peer networks and networks utilizing a mainframe host to facilitate data transfer.

16. The term "rotation" means any plan, policy or scheme that involves the re-use of an electronic media device after it has been used for backup, archival or other electronic data storage purposes, particularly if such re-use results in the alteration and/or destruction of the electronic data residing on the device prior to it's re-use.

17. The term "support" means any help or assistance provided to a user of a computer by another individual, either in an official job capacity or not. Such help or assistance may take the form of, but is not limited to, answering questions, in person or via mechanical means, direct intervention, training, software troubleshooting, hardware troubleshooting, programming, systems consulting, maintenance, repair and and/or user forums. Providers of support may be employees, contractors and/or other third-party providers.

18. A "draft" of any document means and includes any earlier, preliminary, preparatory or tentative version of all or part of a document, whether or not such draft was superseded by a later draft and whether or not the terms of the draft are the same as or different from the terms of the final document; a "copy" of a document means and includes each and every reproduction of a document which is not identical in every respect with the original of such document that is produced, including

photocopies of the original or final document on which any notations or handwritten notes have been added, and copies of documents where the original is not in your possession, custody or control.

19. The term "communications" refers to and includes any form of communication from one person or entity to another person or entity, regardless of whether written or oral, or whether by direct communication, carbon copy, or indirect communication through a third party.

20. The term "person" includes natural persons, firms, general partnerships, limited partnerships, associations, proprietorships, joint ventures, corporations, professional corporations, business trusts, banking institutions, insurance companies of whatever form, unincorporated organizations, governments, governmental agencies, commissions and other formally or loosely organized entities.

21. The plural shall include the singular and the singular shall include the plural.

22. Use of the masculine gender shall also include the feminine or neuter gender where appropriate.

23. The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

24. The words "pertaining to" or "reflecting" are largely synonymous and mean: concerning, discussing, referring to, pertaining to, reflecting, evidencing, constituting, showing or regarding.

25. The terms "claim" or "claims" mean a demand for money or property made by one person upon another.

26. This request shall be deemed continuing so as to require further and supplemental response, pursuant to the requirements of the Federal Rules of Civil Procedure and the Rules of the Court of Federal Claims.

27. The terms "identify" or "identity" as used herein, mean:

a. In the case of a person, to state the person's:

i. Name;

ii. Last known address and telephone number;

iii. Employer or business affiliations; and

iv. Occupation and position held.

b. In the case of a company or other entity, to state:

i. Its name;

ii. Whether a corporation, partnership or other form of business entity;

iii. Its principal place of business and telephone number; and

iv. The identity of persons having knowledge of the matters with respect to which the company is named.

c. In the case of a document, to state:

i. The identity of the person preparing it and the sender;

ii. Te title or a description of a general nature of its subject matter;

iii. The identity of its addressees, if any;

iv. Te date of its preparation;

v. The date and manner of distribution and publication, if any;

vi. The location of copies thereof and the identity of its present custodian; and

vii. Te identity of the person who can identify it.

d. In the case of an act or omission, to state:

i. A detailed description of the act or omission;

ii. The date when it occurred;

iii. The place where it occurred;

iv. The identity of the person or persons performing such acts, or in the case of an omission, the identity of the person or persons failing to act;

v. The identity of all persons who have knowledge of the act or omission;

vi. The date the act or omission first became known to you; and

vii. The circumstances and manner in which you first obtained such knowledge.

e. In the case of any electronic data, to state:

i. the software and/or operating system under which the data was created;

ii. the title and author of the data;

iii. the type of data (example: word processing document, spreadsheet, database, application program, etc.);

iv. all other means of identifying the data with sufficient particularity to meet the requirements for its inclusion in a Request for Production pursuant to the Rules of Civil Procedure; and,

v. the data's present or last known location or custodian, and if any such electronic data was, or no longer is, in the possession or subject to your control, state what disposition was made of it and the reason for such disposition.

28. None of the following interrogatories requesting to identify documents or communications shall be construed as extending to attorney-client communications, the work product of purely consulting experts or the mental impressions, opinions and/or conclusions of your attorney, and/or party communications made in anticipation of litigation.

## INTERROGATORIES

**INTERROGATORY NO. 1:** Please state the identity of all persons with any knowledge concerning the matters at issue in this suit. For each such person listed, please also state the following:

a. such person's last known business;

b. such person's residential addresses;

c. such person's telephone numbers; and

d. what you believe to be the general nature of each such person's knowledge.

**ANSWER:**

**INTERROGATORY NO. 2:** With respect to each person you expect to call as an expert witness at trial, state the following:

a. the name, business address, business phone number, home address, and home phone number of the expert;

b. the expert's qualifications to testify as an expert;

c. the subject matter on which the expert is expected to testify;

d. the substance of the facts and opinions to which the expert is expected to testify; and

e. a summary of the grounds for each opinion.

Your answer to this interrogatory will necessarily include all persons you expect to call as expert witnesses at trial. Renda will object if you attempt to call anyone to testify as an expert witness whose name and requested information is not timely supplied as provided in the Federal Rules of Civil Procedure and the Rules of the Court of Federal Claims.

**ANSWER:**

**INTERROGATORY NO. 3:** With respect to each consulting expert who is not expected to be called as a witness at trial, but whose opinions or impressions have been reviewed by a testifying expert, state the following:

a. the name, business address, business phone number, home address, and home phone number of the expert;

b. the expert's qualifications to consult as an expert;

c. the subject matter on which the expert has been or will be consulted;

d. the substance of the opinions and impressions of the expert which have been reviewed by a testifying expert; and

e. the name and address of each testifying expert who has reviewed the opinions and impressions of this expert.

**ANSWER:**

**INTERROGATORY NO. 4:** Please state the identity of each person who prepared any cost estimate for the Upper Bayou Project, and for each such person, please state the date of any such estimate, the purpose of or aspect covered by any such estimate, and the amount of any such estimate.

**ANSWER:**

**INTERROGATORY NO. 5:** Please state the identity of any persons who have borrowed or excavated material from the area of the Upper Bayou Project at any time in the last 15 years, the date(s) of any such borrowing or excavating, the approximate amount of material borrowed or excavated, the identity of each person with knowledge of any such material borrowed or excavated,

and the identity of any documents pertaining to or reflecting any such material borrowed or excavated.

**ANSWER:**

**INTERROGATORY NO. 6:** Please state the identity of any person who has surveyed, sounded, or otherwise determined or recorded the topography at any time in the area of the Upper Bayou Project, the date(s) of any such determination or recordation, and the name of the project (if any) for such determination or recording.

**ANSWER:**

**INTERROGATORY NO. 7:** Please state whether or not you have any back charges or credits to any of Renda's claims in this suit, and, if so, please state the nature and extent of any such back charge or credit, the factual basis for any such back charge or credit, the amount of any such back charge or credit, the identity of any persons with knowledge of any such back charges or credits, and the identity of any documents pertaining to or reflecting any such back charge or credit.

**ANSWER:**

**INTERROGATORY NO. 8:** Please state the nature and extent of any defenses that you have to Renda's claims in this suit, and for each such defense, please state the factual or legal basis for the defense, and the identity of each person with knowledge of any such defense.

**ANSWER:**

<u>**INTERROGATORY NO. 9**</u>: Please state if you contend that Renda should have in any way mitigated the damages Renda seeks in this suit, and, if so, please state for any particular damages Renda seeks the specific manner in which Renda should have mitigated its damages, the amount by which Renda should have mitigated such damages, the calculations for such amount, the identity of any documents in which Renda was advised how to mitigate its damages, and the identity of any persons with knowledge of how Renda should have mitigated such damages.

<u>**ANSWER**</u>:

<u>**INTERROGATORY NO. 10**</u>: Please state whether you contend that you did not receive timely or adequate notice of any of Renda's claims in this suit, and, if so, please state the particular claim for which you contend you did not receive timely or adequate notice, any and all deficiencies that you allege exist with any such notice, any prejudice you sustained as a result of any such alleged deficiency, and the identity of any persons with knowledge of any such prejudice.

<u>**ANSWER**</u>:

<u>**INTERROGATORY NO. 11**</u>: Please state whether you contend that Renda did not encounter the differing site conditions that Renda alleges in this suit, and, if so, please state which, if any, of the alleged differing site conditions you contend were not differing site conditions or were for some reason not compensable under a differing site condition theory, your legal and/or factual basis for such contention, and the identity of each person with personal knowledge of the basis of any such contention.

<u>**ANSWER**</u>:

**INTERROGATORY NO. 12:** Please state whether or not you contend that Renda in some way caused or contributed to its own damages in ths case, and, if so, please state the nature and extent of damages for any particular claim by Renda that you contend were caused by Renda in whole or in part, the basis for such contention, and the identity of each person with personal knowledge of any such basis.

**ANSWER:**

**INTERROGATORY NO. 13:** Please state whether or not you have ever agreed to entitlement concerning any of Renda's claims in this suit, and, if so, please state the particular claim for which you have agreed to entitlement, the date and manner (e.g., letter, meeting, modification, etc.) of any such agreement, and the identity of the person making or issuing any such agreement.

**ANSWER:**

**INTERROGATORY NO. 14:** Please state whether you agree that Renda is entitled to some amount of compensation for any of its claims in this suit, and, if so, please state the amount to which you contend Renda is entitled for each of Renda's claims in this suit, the basis for such contention, the calculations supporting such basis, and the identity of each person with personal knowledge of such basis.

**ANSWER:**

**INTERROGATORY NO. 15:** For each of the following individuals: Thomas Benero, John Roszypal, Luis Saenz, and Michael McLennan, provide a detailed description of their computer

system(s), including desktop computers, personal digital assistants (PDAs), portable, laptop, and notebook computers. If individuals use home computers for business purposes, please include information concerning these systems.

Please reply as specified below:

a. computer type and brand.

b. brand and version of all software, including operating system, private and custom developed applications, commercial applications and shareware.

c. communications capability, including, but not limited to, terminal to mainframe emulation, data download and/or upload capability to mainframe, and computer to computer connections via network, modem and/or direct connection.

ANSWER:

INTERROGATORY NO. 16: Please provide the following information concerning data backups performed on all computer systems used by the Galveston Office of the United States Army Corps of Engineers:

a. descriptions of any and all procedures and/or devices used to backup the software and/or data, including, but not limited to, name(s) of backup software used, tape rotation schedule, type of tape backup drives including name and version number;

b. are multiple generations of backups maintained? If so, please describe how many and whether the backups are full or incremental;

c. is backup storage media kept off-site? If so, where is such media kept? Describe the process for archiving and retrieving off-site media;

d. is backup storage media kept on-site? If so, where is such media kept? Describe the process for archiving and retrieving on-site media;

e. who conducts the backup;

f. what information is backed up; and,

g. please provide a detailed list of all backup sets, regardless of the magnetic media on which they reside, showing current location, custodian, date of backup and a description backup content.

**ANSWER:**

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: ______________________________
Brian W. Erikson, TX Bar No. 06643800
Andrew M. Trusevich, TX Bar No. 00785119

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of November, 2002, a true and correct copy of the First Set of Interrogatories by Plaintiff, Renda Marine, Inc., to Defendant, United States Army Corps of Engineers, was sent via facsimile and via United States certified mail, in an envelope addressed as follows:

John E. Kosloske, Esq.
Senior Trial Counsel, Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street N.W., Room 8012
Washington, DC 20530

Brian W. Erikson / Andrew M. Trusevich

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC.,<br>PLAINTIFF,<br><br>V.<br><br>UNITED STATES ARMY<br>CORPS OF ENGINEERS,<br>DEFENDANT. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 02-306C<br><br>(JUDGE HEWITT) |

**SECOND SET OF INTERROGATORIES**
**BY PLAINTIFF, RENDA MARINE, INC. TO DEFENDANT,**
**UNITED STATES ARMY CORPS OF ENGINEERS**

TO: United States Army Corps of Engineers, through its attorney of record, John E. Kosloske, Esq., Senior Trial Counsel, Commercial Litigation Branch, Department of Justice, Attn.: Classification Unit, 1100 L Street N.W., Room 8012, Washington, DC 20530.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Rules of the Court of Federal Claims, you are hereby required to (1) answer fully and factually each of the interrogatories hereinafter set forth; (2) furnish all information called for in said interrogatories as is available to you or your agents; (3) sign your response; (4) swear to your response; and (5) serve your answers to the following interrogatories upon the undersigned attorney for Plaintiff, Renda Marine, Inc. ("Renda"), no later than thirty (30) days after service of these interrogatories on your attorney of record.

You are further instructed that:

(a) to the extent possible, answer these interrogatories in the spaces provided after each interrogatory. Answers may be continued on separate sheets of paper attached to these interrogatories; and

(b) you are under a duty to amend your answers to the interrogatories in a timely manner if, between the time answers are served and the time of trial herein, you obtain information upon the basis of which (i) you know the answer was incorrect when made; or

(ii) you know that the answer, though correct when made, is no longer true and the circumstances are such that a failure to amend the answer is, in substance, a knowing concealment.

## DEFINITIONS AND INSTRUCTIONS

1. The term "Plaintiff" or "Renda" refers to Renda Marine, Inc., Plaintiff in this suit.

2. The term "Defendant" or "Corps" refers to the United States Army Corps of Engineers, Defendant in this suit.

3. "Upper Bayou Project" refers to Corps Contract No. DACW64-99-C-0001, for Houston-Galveston Navigation Channels, Texas, Dredging Upper Bayou (45-Foot Project) in Harris and Galveston Counties.

4. "Joint Venture" refers to Turner, Collie & Braden, Inc., Gahagan & Bryant & Associates, Inc., and J. Simmons Group, Inc., collectively.

5. The term "Port of Houston Authority" refers to the Port of Houston Authority of Harris County, Texas.

6. The term "active file" means any electronic data file that can be used by an electronic data processing system in any manner without modification and/or re-construction. An active file is any electronic data file that has not been deleted or otherwise destroyed and/or damaged and which is readily visible to the operating system and/or the software with which it was created.

7. The term "computer" shall include, but is not limited to, microchips, microcomputers (also known as personal computers), laptop computers, portable computers, notebook computers, palmtop computers (also known as personal digital assistants or PDA's), minicomputers and mainframe computers.

8. The term "computer system," when used in reference to any computer, includes, but is not limited to, the following information:

a. Computer type, brand and model;

b. Brand & version of all software, including operating system, private-and custom-developed applications, commercial applications, and/or shareware;

c. Communications capability, including asynchronous and/or synchronous, including, but not limited to, terminal to mainframe emulation, data download and/or upload capability to mainframe, and computer to computer connections via network, modem and/or direct connection.

9. The term "data" is equivalent to the term "electronic data" as defined herein.

10. The term "deleted file" means any electronic data file that has been deleted or deleted from the electronic media on which it resided.

11. The term "document" means the original (or an identical duplicate if the original is not available), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description that are fixed in any form of physical media within your possession, custody, or control, or the control of any agent, employee, representative (including, without limitation, attorneys, consultants and accountants) or other person acting or purporting to act for you or on your behalf. Physical media include, but are not limited to, paper media, phonographic media, photographic film media (including pictures, films slides and microfilm), magnetic media (including but not limited to hard disks, floppy disks, compact disks, and magnetic tapes of any kind), computer memory, optical media, magneto-optical media, and other physical media on which notations or marking of any kind can be affixed. Documents shall include, but not be limited to, contracts, agreements, change orders, change proposals, communications, correspondence, letters, telegrams, memoranda, electronic mail, notes, journals, appointment

calendar, calendar, group scheduler calendar, records, reports, books, summaries, notes, notes or records of telephone conversations, notes or records of personal conversations or interviews, telephone logs, diaries, logs, field notes, inspection reports, daily or periodic reports, notices, deficiency notices, contractor's daily or periodic reports, production reports, quality control reports, batch reports, run reports, shift reports, winding reports, speed memoranda, drawings, shop drawings, sketches, details, plans, specifications, calculations, computations, forecasts, schedules, statistical statements, tests, laboratory tests, assessments, evaluations, work papers, graphs, charts, accounts, analytical records, minutes, minutes or records of meetings or conferences, consultants' reports, appraisals, reports or summaries of negotiations, brochures, marginal notations, bills, invoices, checks, drafts, bills of lading, warehouse receipts, photographs, movies, videotapes, lists, journals, advertisements, magnetic tapes, computer tapes, computer disks, computer cards, computer directory, computer printouts, and every other form of written, printed, stenographic, electronic, recorded, graphic, filmed, or photographic matter, including sound reproductions, however produced or reproduced, and all drafts, revisions, and copies with either markings or alterations of the foregoing.

12. The term "electronic data" means the original (or identical duplicate when the original is not available), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic data includes, by way of example only, computer programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts and/or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files,

charts, graphs and outlines, electronic mail, operating systems, source code of all types, peripheral drivers, PIF files, batch files, ASCII files, and any and all miscellaneous files and/or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists in an active file, deleted file or file fragment. Electronic data includes any and all items stored on computer memories, hard disks, floppy disks, CD-ROMs, removable media such as Zip disks, Jaz cartridges, Bernoulli Boxes and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, PROM, RAM and ROM, on or in any other vehicle for digital data storage and/or transmittal. The term electronic data also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with each original and/or copy.

13. The term "Electronic media" means any magnetic or other storage media device used to record electronic data. Electronic media devices may include, but are not limited to, computer memories, hard disks, floppy disks, CD-ROM, removable media such as Bernoulli Boxes and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, PROM, RAM and ROM, or on or in any other vehicle for digital data storage and/or transmittal.

14. The term "file fragment" refers to any electronic data file that exists as a subset of an original active file. A file fragment may be active or deleted. The cause of fragmentation can include, but is not limited to the execution of ordinary file management routines such as the creation of new files over parts of previously deleted files, the creation of files on disks which do not have enough contiguous blocks to write the file from beginning to end, where the file has been split up between several sections of the disk (each piece a fragment). Other causes include manual intervention, electronic surges, and/or physical defects on electronic media.

15. The term "network" means any hardware and/or software combination that connects two or more computers together and which allows the computers to share and/or transfer data between them. For the purposes of this definition, the connection between or among the microcomputers need not be either physical or direct, i.e., wireless networks, and sharing and/or transferring data via indirect routes utilizing modems and phone company facilities. In addition, there need not be a central file or data server nor a central network operating system in place, i.e., peer-to-peer networks and networks utilizing a mainframe host to facilitate data transfer.

16. The term "rotation" means any plan, policy or scheme that involves the re-use of an electronic media device after it has been used for backup, archival or other electronic data storage purposes, particularly if such re-use results in the alteration and/or destruction of the electronic data residing on the device prior to it's re-use.

17. The term "support" means any help or assistance provided to a user of a computer by another individual, either in an official job capacity or not. Such help or assistance may take the form of, but is not limited to, answering questions, in person or via mechanical means, direct intervention, training, software troubleshooting, hardware troubleshooting, programming, systems consulting, maintenance, repair and and/or user forums. Providers of support may be employees, contractors and/or other third-party providers.

18. A "draft" of any document means and includes any earlier, preliminary, preparatory or tentative version of all or part of a document, whether or not such draft was superseded by a later draft and whether or not the terms of the draft are the same as or different from the terms of the final document; a "copy" of a document means and includes each and every reproduction of a document which is not identical in every respect with the original of such document that is produced, including

photocopies of the original or final document on which any notations or handwritten notes have been added, and copies of documents where the original is not in your possession, custody or control.

19. The term "communications" refers to and includes any form of communication from one person or entity to another person or entity, regardless of whether written or oral, or whether by direct communication, carbon copy, or indirect communication through a third party.

20. The term "person" includes natural persons, firms, general partnerships, limited partnerships, associations, proprietorships, joint ventures, corporations, professional corporations, business trusts, banking institutions, insurance companies of whatever form, unincorporated organizations, governments, governmental agencies, commissions and other formally or loosely organized entities.

21. The plural shall include the singular and the singular shall include the plural.

22. Use of the masculine gender shall also include the feminine or neuter gender where appropriate.

23. The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

24. The words "pertaining to" or "reflecting" are largely synonymous and mean: concerning, discussing, referring to, pertaining to, reflecting, evidencing, constituting, showing or regarding.

25. The terms "claim" or "claims" mean a demand for money or property made by one person upon another.

26. This request shall be deemed continuing so as to require further and supplemental response, pursuant to the requirements of the Federal Rules of Civil Procedure and the Rules of the Court of Federal Claims.

27. The terms "identify" or "identity" as used herein, mean:

a. In the case of a person, to state the person's:

i. Name;

ii. Last known address and telephone number;

iii. Employer or business affiliations; and

iv. Occupation and position held.

b. In the case of a company or other entity, to state:

i. Its name;

ii. Whether a corporation, partnership or other form of business entity;

iii. Its principal place of business and telephone number; and

iv. The identity of persons having knowledge of the matters with respect to which the company is named.

c. In the case of a document, to state:

i. The identity of the person preparing it and the sender;

ii. Te title or a description of a general nature of its subject matter;

iii. The identity of its addressees, if any;

iv. Te date of its preparation;

v. The date and manner of distribution and publication, if any;

vi. The location of copies thereof and the identity of its present custodian; and

vii. Te identity of the person who can identify it.

d. In the case of an act or omission, to state:

i. A detailed description of the act or omission;

ii. The date when it occurred;

iii. The place where it occurred;

iv. The identity of the person or persons performing such acts, or in the case of an omission, the identity of the person or persons failing to act;

v. The identity of all persons who have knowledge of the act or omission;

vi. The date the act or omission first became known to you; and

vii. The circumstances and manner in which you first obtained such knowledge.

e. In the case of any electronic data, to state:

i. the software and/or operating system under which the data was created;

ii. the title and author of the data;

iii. the type of data (example: word processing document, spreadsheet, database, application program, etc.);

iv. all other means of identifying the data with sufficient particularity to meet the requirements for its inclusion in a Request for Production pursuant to the Rules of Civil Procedure; and,

v. the data's present or last known location or custodian, and if any such electronic data was, or no longer is, in the possession or subject to your control, state what disposition was made of it and the reason for such disposition.

28. None of the following interrogatories requesting to identify documents or communications shall be construed as extending to attorney-client communications, the work product of purely consulting experts or the mental impressions, opinions and/or conclusions of your attorney, and/or party communications made in anticipation of litigation.

## INTERROGATORIES

**INTERROGATORY NO. 1:** Please state the names and dates of any project(s) to maintain or increase the height of levees at the Lost Lake Placement Area at any time from January 1, 1990, to January 1, 1999, and for each such project, please also state the identity of the prime contractor, the identity of the contractor actually working on the levees, the amount by which the levees were raised, and the source of the material used to raise the levees.

**ANSWER:**

**INTERROGATORY NO. 2:** Please state whether any borrow areas were created or developed adjacent to or near the existing levees at the Lost Lake Placement Area at any time between January 1, 1980, and January 1, 1999, and, if so, please state the date(s) of any such borrowing, the name of the contractor project, the identity of the prime contractor, the identity of the contractor which actually undertook the borrowing, and the location of the borrowing in relationship to the levees.

**ANSWER:**

**INTERROGATORY NO. 3:** Please state whether any surveys or cross sections were performed of any borrow areas at the Lost Lake Placement Area at any time since January 1, 1980, to January 1, 1999, and if so, please state the date(s) of any such surveys or cross sections, the identity fot he company undertaking any such surveys or cross sections, and the location of such surveys or cross sections.

**ANSWER:**

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: ______________________

Brian W. Erikson, TX Bar No. 06643800
Andrew M. Trusevich, TX Bar No. 00785119

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of January, 2004, a true and correct copy of Plaintiff, Renda Marine, Inc.'s Second Set of Interrogatories to Defendant, United States Army Corps of Engineers, was served via hand delivery by serving John E. Kosloske, Esq. at the offices of Esquire Depositions, 3401 Louisiana Street, Suite 300, Houston, Texas 77002.

______________________
Brian W. Erikson

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., PLAINTIFF, | § | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| UNITED STATES ARMY CORPS OF ENGINEERS, DEFENDANT. | § | |

**THIRD REQUEST FOR PRODUCTION OF DOCUMENTS BY PLAINTIFF, RENDA MARINE, INC. TO DEFENDANT, UNITED STATES**

TO: United States, through its attorney of record, John E. Kosloske, Esq., Senior Trial Counsel, Commercial Litigation Branch, Department of Justice, Attn.: Classification Unit, 1100 L Street N.W., Room 8012, Washington, DC 20530.

Plaintiff, Renda Marine, Inc. ("Renda"), requests that you produce for discovery under the provisions of FED. R. CIV. P. 34 and RCFC 34, the items specified on Exhibit A attached hereto and incorporated herein for all purposes.

The documents listed on Exhibit "A" are to be produced for inspection and copying within thirty (30) days of the date of service of this request on you, in the offices of Quilling, Selander, Cummiskey & Lownds, 2001 Bryan Street, Suite 1800, Dallas, Texas 75201.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: ______________________
Brian W. Erikson, TX Bar No. 06643800
Andrew M. Trusevich, TX Bar No. 00785119

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

**31**

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of January, 2004, a true and correct copy of Plaintiff, Renda Marine, Inc.'s Third Request for Production of Documents to Defendant, United States Army Corps of Engineers, was served via hand delivery by serving John E. Kosloske, Esq. at the offices of Esquire Depositions, 3401 Louisiana Street, Suite 300, Houston, Texas 77002.

Brian W. Erikson

## EXHIBIT A

### DEFINITIONS AND INSTRUCTIONS

1. The term "Plaintiff" or "Renda" refers to Renda Marine, Inc., Plaintiff in this suit.

2. The term "Defendant" or "Corps" refers to the United States Army Corps of Engineers, Defendant in this suit.

3. "Upper Bayou Project" refers to Corps Contract No. DACW64-99-C-0001, for Houston-Galveston Navigation Channels, Texas, Dredging Upper Bayou (45-Foot Project) in Harris and Galveston Counties.

4. "Joint Venture" refers to Turner, Collie & Braden, Inc., Gahagan & Bryant & Associates, Inc., and J. Simmons Group, Inc., collectively.

5. The term "Port of Houston Authority" refers to the Port of Houston Authority of Harris County, Texas.

6. The term "active file" means any electronic data file that can be used by an electronic data processing system in any manner without modification and/or re-construction. An active file is any electronic data file that has not been deleted or otherwise destroyed and/or damaged and which is readily visible to the operating system and/or the software with which it was created.

7. The term "computer" shall include, but is not limited to, microchips, microcomputers (also known as personal computers), laptop computers, portable computers, notebook computers, palmtop computers (also known as personal digital assistants or PDA's), minicomputers and mainframe computers.

8. The term "computer system," when used in reference to any computer, includes, but is not limited to, the following information:

a. Computer type, brand and model;

b. Brand & version of all software, including operating system, private-and custom-developed applications, commercial applications, and/or shareware;

c. Communications capability, including asynchronous and/or synchronous, including, but not limited to, terminal to mainframe emulation, data download and/or upload capability to mainframe, and computer to computer connections via network, modem and/or direct connection.

9. The term "data" is equivalent to the term "electronic data" as defined herein.

10. The term "deleted file" means any electronic data file that has been deleted or deleted from the electronic media on which it resided.

11. The term "document" means the original (or an identical duplicate if the original is not available), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description that are fixed in any form of physical media within your possession, custody, or control, or the control of any agent, employee, representative (including, without limitation, attorneys, consultants and accountants) or other person acting or purporting to act for you or on your behalf. Physical media include, but are not limited to, paper media, phonographic media, photographic film media (including pictures, films slides and microfilm), magnetic media (including but not limited to hard disks, floppy disks, compact disks, and magnetic tapes of any kind), computer memory, optical media, magneto-optical media, and other physical media on which notations or marking of any kind can be affixed. Documents shall include, but not be limited to, contracts, agreements, change orders, change proposals, communications, correspondence, letters, telegrams, memoranda, electronic mail, notes, journals, appointment calendar, calendar, group scheduler calendar, records, reports, books, summaries, notes, notes or

records of telephone conversations, notes or records of personal conversations or interviews, telephone logs, diaries, logs, field notes, inspection reports, daily or periodic reports, notices, deficiency notices, contractor's daily or periodic reports, production reports, quality control reports, batch reports, run reports, shift reports, winding reports, speed memoranda, drawings, shop drawings, sketches, details, plans, specifications, calculations, computations, forecasts, schedules, statistical statements, tests, laboratory tests, assessments, evaluations, work papers, graphs, charts, accounts, analytical records, minutes, minutes or records of meetings or conferences, consultants' reports, appraisals, reports or summaries of negotiations, brochures, marginal notations, bills, invoices, checks, drafts, bills of lading, warehouse receipts, photographs, movies, videotapes, lists, journals, advertisements, magnetic tapes, computer tapes, computer disks, computer cards, computer directory, computer printouts, and every other form of written, printed, stenographic, electronic, recorded, graphic, filmed, or photographic matter, including sound reproductions, however produced or reproduced, and all drafts, revisions, and copies with either markings or alterations of the foregoing.

12. The term "electronic data" means the original (or identical duplicate when the original is not available), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind) of writings of every kind and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic data includes, by way of example only, computer programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts and/or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files,

charts, graphs and outlines, electronic mail, operating systems, source code of all types, peripheral drivers, PIF files, batch files, ASCII files, and any and all miscellaneous files and/or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists in an active file, deleted file or file fragment. Electronic data includes any and all items stored on computer memories, hard disks, floppy disks, CD-ROMs, removable media such as Zip disks, Jaz cartridges, Bernoulli Boxes and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, PROM, RAM and ROM, on or in any other vehicle for digital data storage and/or transmittal. The term electronic data also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with each original and/or copy.

13. The term "Electronic media" means any magnetic or other storage media device used to record electronic data. Electronic media devices may include, but are not limited to, computer memories, hard disks, floppy disks, CD-ROM, removable media such as Bernoulli Boxes and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, PROM, RAM and ROM, or on or in any other vehicle for digital data storage and/or transmittal.

14. The term "file fragment" refers to any electronic data file that exists as a subset of an original active file. A file fragment may be active or deleted. The cause of fragmentation can include, but is not limited to the execution of ordinary file management routines such as the creation of new files over parts of previously deleted files, the creation of files on disks which do not have enough contiguous blocks to write the file from beginning to end, where the file has been split up between

several sections of the disk (each piece a fragment). Other causes include manual intervention, electronic surges, and/or physical defects on electronic media.

15. The term "network" means any hardware and/or software combination that connects two or more computers together and which allows the computers to share and/or transfer data between them. For the purposes of this definition, the connection between or among the microcomputers need not be either physical or direct, i.e., wireless networks, and sharing and/or transferring data via indirect routes utilizing modems and phone company facilities. In addition, there need not be a central file or data server nor a central network operating system in place, i.e., peer-to-peer networks and networks utilizing a mainframe host to facilitate data transfer.

16. The term "rotation" means any plan, policy or scheme that involves the re-use of an electronic media device after it has been used for backup, archival or other electronic data storage purposes, particularly if such re-use results in the alteration and/or destruction of the electronic data residing on the device prior to it's re-use.

17. The term "support" means any help or assistance provided to a user of a computer by another individual, either in an official job capacity or not. Such help or assistance may take the form of, but is not limited to, answering questions, in person or via mechanical means, direct intervention, training, software troubleshooting, hardware troubleshooting, programming, systems consulting, maintenance, repair and/or user forums. Providers of support may be employees, contractors and/or other third-party providers.

18. The term "Identify," when used in reference to any electronic data, means to state the software and/or operating system under which the data was created, title and author, the type of data (example: word processing document, spreadsheet, database, application program, etc.), and all other

means of identifying it with sufficient particularity to meet the requirements for its inclusion in a Request for Production pursuant to the Rules of Civil Procedure, and its present or last known location or custodian. If any such electronic data was, or no longer is, in the possession or subject to your control, state what disposition was made of it and the reason for such disposition.

19. A "draft" of any document means and includes any earlier, preliminary, preparatory or tentative version of all or part of a document, whether or not such draft was superseded by a later draft and whether or not the terms of the draft are the same as or different from the terms of the final document; a "copy" of a document means and includes each and every reproduction of a document which is not identical in every respect with the original of such document that is produced, including photocopies of the original or final document on which any notations or handwritten notes have been added, and copies of documents where the original is not in your possession, custody or control.

20. The term "communications" refers to and includes any form of communication from one person or entity to another person or entity, regardless of whether written or oral, or whether by direct communication, carbon copy, or indirect communication through a third party.

21. The term "person" includes natural persons, firms, general partnerships, limited partnerships, associations, proprietorships, joint ventures, corporations, professional corporations, business trusts, banking institutions, insurance companies of whatever form, unincorporated organizations, governments, governmental agencies, commissions and other formally or loosely organized entities.

22. The plural shall include the singular and the singular shall include the plural.

23. Use of the masculine gender shall also include the feminine or neuter gender where appropriate.

24. The words "and" and "or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

25. The words "pertaining to" or "reflecting" are largely synonymous and mean: concerning, discussing, referring to, pertaining to, reflecting, evidencing, constituting, showing or regarding.

26. The terms "claim" or "claims" mean a demand for money or property made by one person upon another.

27. This request shall be deemed continuing so as to require further and supplemental response, pursuant to the requirements of the Federal Rules of Civil Procedure and the Rules of the Court of Federal Claims.

28. If any documents otherwise responsive to this request are withheld for any reason, including assertions of the attorney-client privilege, the work product doctrine, or any other claim of privilege or immunity, you shall identify the document by stating its date, author, recipients and the reason for withholding.

29. Pursuant to the Federal Rules of Civil Procedure, and the Rules of the Court of Federal Claims, you are instructed to produce the documents as they are kept in the usual course of business, or shall organize and label them to correspond with the categories in this request.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. Any and all documents pertaining to or reflecting any soil or core borings undertaken in the Flare Area of the Project in May 2000.

2. Any and all documents pertaining to or reflecting any soil or core borings undertaken at any time on the Project after September 2001, including, without limitations, any borings undertaken in 2002.

3. Any and all documents pertaining to or reflecting Corps claims handling or claims administration manual or policy or guidelines in existence at any time during the Project.

4. Any and all documents pertaining to or reflecting any soil or core borings taken for the Goat Island contract awarded to Great Lakes Dredge & Dock ("Great Lakes").

5. Any and all documents pertaining to or reflecting the bid solicitation materials for the Goat Island contract subsequently awarded to Great Lakes.

6. Any and all documents pertaining to or reflecting records of use of the Lost Lake Placement Area at any time between January 1, 1990, and January 1, 2000, including without limitation, any depositing of dredging maintenance material.

7. Any and all documents pertaining to or reflecting any work on increasing or maintaining the height of the levees at the Lost Lake Placement Area at any time between January 1, 1990, and January 1, 1999.

8. Any and all documents pertaining to or reflecting any creation of or removal of soil material from borrow areas near or adjacent to the existing levees at the Lost Lake Placement Area.

9. Any and all documents pertaining to or reflecting any surveys or cross sections of the levees or borrow areas at the Lost Lake Placement Area performed at any time between January 1, 1990, and January 1, 2002.

10. Any and all documents pertaining to or reflecting any manuals, policies, or guidelines for the design of levees relevant to the levees at the Lost Lake Placement Area in existence at any time during the Project.

11. Any and all documents pertaining to or reflecting any revisions or additions to manuals, policies, or guidelines for the design of levees relevant to the levees at the Lost Lake Placement Area since July 15, 1998.

12. Any and all documents pertaining to or reflecting any calculations of liquidated damages for the Project.

13. Any and all documents pertaining to or reflecting any determination of the contract amount for the liquidated damages listed in the contract for the Project.

14. The 1993 soil cores and samples referenced in paragraph 1.11 on page 02482-4 of the Project specification book.

15. Any and all documents pertaining to or reflecting any permits for depositing of dredged material in the Lost Lake Placement Area at any time between January 1, 1990, and January 1, 1998.

16. Any and all documents pertaining to or reflecting any investigation in response to any of Renda's notices of differing site conditions at any time prior to Renda's filing of this suit.

17. Any and all documents pertaining to or reflecting the Corps Engineering Pamphlet EP 1110-1-8, "Construction Ownership and Operating Expense Schedule," whichever editions or versions were applicable to the Project.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S OBJECTIONS TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

Defendant, the United States, objects to the "Second Set of Interrogatories by Plaintiff, Renda Marine, Inc. to Defendant, United States Army Corps of Engineers" upon the grounds that the discovery request is not timely and that it exceeds the limitation upon the number of interrogatories allowed by RCFC 33(a).[1]

The Court's Order filed on September 10, 2003, provides that "[a]ll fact discovery . . . shall conclude on or before . . . January 14, 2004." Plaintiff's second set of interrogatories third request for production of documents was served upon defendant's counsel on January 15, 2004. To have been timely, that discovery request should have served upon defendant no later than 30 days before the date by which the Court's September 10, 2003 Order mandates that fact discovery is to have been completed. See Thomas v. Pacificorp, 324 F.3d 11761179 (10th Cir. 2003); Gavenda v. Orleans County, 182 F.R.D. 17, 20 (W.D.N.Y. 1997); Smith v. Principal Casualty Insurance Co., 131 F.R.D. 104, 105 (S.D. Miss. 1990); Beller v. Credit Alliance Corp., 106 F.R.D. 557, 559-560 (N.D. Ga. 1985).

---

[1] Should the Court require defendant to respond to this discovery request notwithstanding that it is untimely and exceeds the number of interrogatories allowed by RCFC 33(a), defendant reserves the right to raise at the time of its response to the discovery requests any other objections to the discovery requests permitted by the Court's discovery rules.

Rule 33(a) provides that, "[w]ithout leave of court or stipulation, any party may serve upon any other party written interrogatories, not exceeding 25 in number including all discrete subparts . . . ." Plaintiff's first set of interrogatories in this case met or exceeded this numerical limitation upon interrogatories.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

JANUARY 23, 2004

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 23rd day of JANUARY, 2004, I caused to be sent by facsimile transmission and by United States Mail (postage prepaid) "DEFENDANT'S OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES" addressed as follows:

BRIAN W. ERIKSON, ESQ.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| Plaintiff, | ) | No. 02-306C |
| v. | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S OBJECTION TO PLAINTIFF'S
THIRD REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant, the United States, objects to the "Third Request for Production of Documents by Plaintiff, Renda Marine, Inc. to Defendant, United States Army Corps of Engineers" upon the ground that the discovery request is not timely.[1] The Court's Order filed on September 10, 2003, provides that "[a]ll fact discovery . . . shall conclude on or before . . . January 14, 2004." Plaintiff's third request for production of documents was served upon defendant's counsel on January 15, 2004. To have been timely, that discovery request should have served upon defendant no later than 30 days before the date by which the Court's September 10, 2003 Order mandates that fact discovery is to have been completed. See Thomas v. Pacificorp, 324 F.3d 11761179 (10th Cir. 2003); Gavenda v. Orleans County, 182 F.R.D. 17, 20 (W.D.N.Y. 1997); Smith v. Principal Casualty Insurance Co., 131 F.R.D. 104, 105 (S.D. Miss. 1990); Beller v. Credit Alliance Corp., 106 F.R.D. 557, 559-560 (N.D. Ga. 1985).

[1] Should the Court require defendant to respond to this discovery request notwithstanding that it is untimely, defendant reserves the right to raise at the time of its response to the discovery request any other objections to the discovery request permitted by the Court's discovery rules.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

JANUARY 23, 2004

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 23rd day of JANUARY, 2004, I caused to be sent by facsimile transmission and United States mail (postage prepaid) "DEFENDANT'S OBJECTION TO PLAINTIFF'S THIRD REQUEST FOR PRODUCTION OF DOCUMENTS" addressed as follows:

BRIAN W. ERIKSON, ESQ.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201