**Claim 7–Differing Site Conditions – Section 7 Clay – $978,271**

During the course of the dredging work in Dredge Section 7, Renda encountered a hard red clay not indicated in the Contract Documents. The hard red clay was suitable for levee construction but substantially slowed dredging production. Renda notified Defendant of the differing site condition. Defendant should have investigated the differing site condition, but did not. As a result of Defendant' lack of investigation, Renda piled a substantial quantity of the hard red clay along the levee. As far as Renda knows, Defendant did not test the hard red clay.

Defendant's Anticipated Factual Response

Defendant is expected to contend that the conditions encountered do not constitute differing site conditions because the clay material encountered was indicated by the borings and Contract drawings. Defendant is also expected to contend that Renda's "means and methods of construction" are the cause of the difficulty that Renda experienced. Finally, Defendant claims that Renda is not entitled to compensation in the amount claimed.

Renda's Reply

While performing its work on the Project, Renda encountered heavy red clay material at the north side of the channel between Station Nos. 561+20 and 609+00. Renda notified Defendant. Defendant denied merit alleging that these materials should have been anticipated. Gray and blue clays might have reasonably been anticipated but not hardpan or red clay that Renda encountered. Renda was delayed 20 calendar days in a 35 day period and incurred additional equipment, labor, and overhead costs.

The DCAA audited this claim. The DCAA's report does not address the technical validity of the claim. The DCAA identifies $256,143 of "questioned costs" in the following

categories – Equipment ($166,564), Indirect Expenses ($37,444) and Professional Fees/Consultants ($25,000). Overall, the DCAA indicates that "because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."

The DCAA questioned two specific items – inclusion of equipment related to levee construction ($207,130) and depreciation periods for the dredge *Millennium* and the booster barge ($114,221). Renda disagrees with all levee-related amounts questioned and contends that these are actual costs that must be recovered. The levee costs are recoverable since they are directly related to the delay to the dredge. The cost of the levee work increased as a direct result of the impact to the dredging work.

For depreciation, Renda calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. EFARS 52.231-5000 allows Renda to use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. It is not mandatory that Renda use Defendant Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts. Renda disagrees with this reduction.

DCAA states that claim preparation costs are unallowable. However, preparation costs incurred prior to this item becoming a claim are allowable.

**Claim 8–Lost Lake Levees – $7,055,037**

As a by-product of the dredging operations, Renda generated clay and other suitable material for use in constructing the hydraulically placed levees of the Lost Lake Placement Area. Renda constructed a pipeline from the Dredge Millennium to the Lost Lake Placement Area to discharge suitable materials for the hydraulically placed levees. Renda also constructed a bypass pipeline for depositing dredged materials which were not suitable for the hydraulically placed levees.

Defendant's Anticipated Factual Response

Defendant is expected to contend that the conditions encountered do not constitute differing site conditions. Defendant is also expected to contend that Renda's "means and methods of construction" are the cause of the difficulty that Renda experienced with hydraulic construction of the Lost Lake levees. Finally, Defendant is expected to contend that Renda is not entitled to compensation in the amount claimed.

Renda's Reply

The Contract Documents do not provide specific directions on how suitable materials are supposed to be placed for the hydraulically constructed levees. Accordingly, Renda was allowed to place suitable dredged material in the area of the hydraulically constructed levees using Renda's own means, methods, and techniques.

The discharge pipe that Renda constructed for the suitable materials dredged from the Houston Ship Channel was placed on top of the area where the hydraulically placed levees were designed to be located. As suitable materials were discharged, Renda had land-based equipment guide and control the materials.

Renda attempted to construct toe dikes or training levees on the interior of the existing perimeter levees to help control the discharge of suitable materials from the pipeline. The foundation soils were so soft that the dikes or retaining levees tended to sink and settle, being of little use in controlling the pipeline discharge. Renda also constructed retaining levees on the exterior of the existing perimeter levees, where the foundations were better and more stable.

As a result of the soft foundations for the new hydraulically placed levees, Renda had difficulty maintaining the new levees at the required height and template. This problem was not Renda's fault, and was outside Renda's control.

The new hydraulic levees were required to be placed on top of what Renda later learned were sidecast borrow areas. The sidecast borrow areas were located along the inside of the perimeter levees. The Corps had used these sidecast borrow areas as recently as the mid-1990's to excavate soil materials to increase the height of the perimeter levees. The excavation of soil opened a trench in the ground near the inside perimeter of the existing levees. Although the Corps surveyed the extent of the sidecast borrow areas, the Corps did not reveal their existence to prospective bidders. After the sidecast borrow areas were created, the Corps allowed maintenance dredging deposits in the Lost Lake Placement Area. These deposits, which were mostly water, filled in the sidecast borrow areas with soft sediments. These soft sediments were not the subject of any soil borings. The most recent soil borings in the sidecast borrow areas were taken in 1993, well before the excavations and redeposits. As a result, the only soil borings for the prospective bidders to examine were out of date, with no notes or disclosure by the Corps in the bid solicitation materials.

As a result of creation of the sidecast borrow areas, and newly deposited maintenance materials, any drying or consolidation of the older materials along the existing levees was lost to the improved levees. Prospective bidders were provided no information on how deep or wide the sidecast borrow areas were.

Although the Corps anticipated that soft or very soft foundation materials would be displaced by the new levee, there was a dearth of information for any one to calculate how much the displacement would be. Without knowing how much the displacement would be, no one could calculate how much material was required to construct the new levees.

The Contract Documents provided specific areas for Renda to dredge to acquire suitable materials for the construction of the hydraulically placed levees. The bid solicitation documents assured bidders that there were sufficient dredged materials to construct the hydraulically placed levees. The Contract Documents provided payment for the hydraulically placed levees only if they achieved design lines and grades. In other words, the levees had to have a height of 30 feet above mean low tide. If Renda did not build a 30 foot high levee with hydraulically placed materials, Renda would not be paid for the levee work.

However, the Corps' internal documents revealed that the designer knew that there were insufficient materials from the designated dredging areas to construct the hydraulically placed levees. The Corps never revealed this problem to prospective bidders.

Simply put, the hydraulically placed levees were not possible to construct. First, there were not enough suitable materials from the designated dredge areas to build the levees. Second, the levees could not achieve and maintain the required 30 foot height due to the very soft foundations. Third, the time period allowed for the Project was 446 days. However, the

mechanically constructed levees were required to be completed before any of the hydraulically placed levees could be started. The contract time simply did not permit the amount of time necessary for the consolidation of the soft foundations to permit the levees to stand.

As a result of the changes at the Lost Lake Placement Area, most or all of the relevant soil borings were of no use to a contractor bidding on the Project. These levees could not be constructed as designed. Renda is entitled to an equitable adjustment of time and money for this design problem.

The DCAA audited this claim. The DCAA's report does not address the technical validity of the claim. The DCAA labels the entire claim amount of $6,258,853 as "questioned costs" due to Renda allegedly not providing adequate support for its claim. More specifically, the DCAA contends that the claim was not prepared in accordance with Federal Acquisition Regulations because Renda did not provide breakdowns for the basic cost elements claimed.

The amount claimed represents the additional costs to attempt to construct and maintain the levees while they were subsiding. These costs are compensable. Renda had previously used the modified total cost method to quantify this REA, which is an allowable method of quantification in this instance. Renda has now revised its claim to reflect actual costs of $7,055,037, including the levee realignment costs. Renda is entitled to an equitable adjustment in contract time and money for the hard red clay.

**Defendant's Purported Final Decision of November 26, 2002**

On November 26, 2002, Defendant issued what it claimed was a "Contracting Officer's Final Decision" regarding alleged Government claims against Renda relating to the Project. As

discussed below, this purported final decision was not preceded by a dispute as required by the Contract Disputes Act, 41 U.S.C. §601 et seq., and thus is a nullity.

Defendant's Anticipated Factual Response

Defendant is expected to contend that it knew that Renda would not accept Defendant's position with respect to Defendant's purported claims against Renda and therefore is relieved of the requirement of presenting the proposed claims against Renda to Renda for possible resolution before issuing a purported contracting officer's final decision.

Renda's Reply

The Contract Disputes Act has been construed as requiring that a contracting officer's demand for payment from a contractor be preceded by a dispute before the demand constitutes a "claim" under the Contract Disputes Act. Failure to satisfy this condition precedent renders the decision a nullity. The claims included in the purported Contracting Officer's Final Decision were not presented to Renda for possible resolution and the purported Contracting Officer's Final Decision is a nullity.

If Defendant contends that the claims included in the purported Contracting Officer's Final Decision were in fact "disputed" because they directly related to the Renda claims discussed above, then the Court, in determining the validity and entitlement of Renda on each of Renda's claims, also has authority to declare the invalidity of the claims included in the purported Contracting Officer's Final Decision.

II.

STATEMENT OF ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

**Claim 1–Flare Area Differing Site Conditions**

Whether the conditions encountered by Renda in the Flare area constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the damages it sustained resulting from differing site conditions in the Flare area.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions in the Flare area.

**Claim 2–South Ferry Landing Differing Site Conditions**

Whether the conditions encountered by Renda in the South Ferry Landing area constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the additional cost and time it suffered relating to the differing site conditions in the South Ferry Landing area.

Whether Renda provided adequate notice to Defendant of the obstructions in the South Ferry Landing area.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions at the South Ferry Landing area.

**Claim 3–HL&P Towers Differing Site Conditions**

Whether the activities of HL&P Renda encountered constitute differing site conditions.

Whether Renda provided adequate notice to Defendant of the activities of HL&P.

Whether Renda took reasonable steps to mitigate the impact of the activities of HL&P.

What are the measure and amount of damages to which Renda is entitled due to the activities of HL&P.

**Claim 4–Differing Site Conditions – Obstructions in Sections 4 to 8, Stations 570+00 to 630+00**

Whether the conditions encountered by Renda in Sections 4 to 8 constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the additional cost and time it incurred relating to the differing site conditions in Sections 4 to 8.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

Whether Renda provided adequate notice to Defendant of the differing site conditions in Sections 4 to 8.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions in Sections 4 to 8.

**Claim 5–Differing Site Conditions – Objections in Section 9, Stations 660+00 to 684+00**

Whether the conditions encountered by Renda in Section 9 constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the additional time and cost it incurred relating to the differing site conditions in Section 9.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions in section 9.

**Claim 6–West Levee Realignment, Lost Lake Placement Area**

Whether Renda is entitled to compensation for the additional time and cost Renda incurred in constructing the West Levee.

Whether Renda's means and methods of construction are the cause of the difficulty that Renda experienced with construction of the West Levee.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

Whether Renda repositioned sections of the West Levee that Defendant agreed Renda did not have to move.

What are the measure and amount of damages to which Renda is entitled due to the difficulty that Renda experienced with construction of the West Levee.

**Claim 7–Differing Site Conditions – Section 7 Clay**

Whether the clay Renda encountered in Section 7 constitutes a differing site condition.

Whether Renda's means and methods of construction are the cause of the difficulty that Renda experienced with the clay in Section 7.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the clay Renda encountered in Section 7.

**Claim 8–Lost Lake Levees**

Whether the materials Renda encountered during hydraulic construction of the Lost Lake levees constitute a differing site condition.

Whether Renda's means and methods of construction are the cause of the difficulty that Renda experienced with the hydraulic construction of the Lost Lake levees.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the difficulty that Renda experienced with the hydraulic construction of the Lost Lake levees.

**Additional Issues**

Whether the differing site conditions Renda encountered entitle Renda to additional time for completing the Project.

Whether Renda is entitled to additional contract time as a result of the Corps' administration or maladministration of the contract for the Project.

Whether Renda is entitled to a remission of the liquidated damages assessed by Defendant.

Whether the Contracting Officer's Final Decision dated November 26, 2002, is a nullity.

III.
A DISCUSSION OF THE LEGAL PRINCIPLES PLAINTIFF CONTENDS ARE APPLICABLE, AND, TO THE EXTENT KNOWN, PLAINTIFF'S RESPONSE TO DEFENDANT'S ANTICIPATED LEGAL POSITION,

A contractor is entitled to recover the extra costs it incurs where "subsurface or latent physical conditions at the site differ materially from those indicated in the contract, *Foster Construction Co. v. United States*, 193 Ct.Cl. 587, 594, 435 F.2d 873, 876 (1970), and . . . these conditions [are] reasonably unforeseeable by the contractor." *J.F. Shea Co., Inc. v. United States*, 4 Cl.Ct. 46, 51 (Cl.Ct., 1983). These types of differing site conditions are known as type I differing site conditions. A contractor is also entitled to recover additional costs incurred due to "unknown and unusual physical conditions at the site, differing materially from those ordinarily encountered and generally recognized as inhering in the work provided for in the contract. " *J.F. Shea Co., Inc. v. United States*, 4 Cl.Ct. 46, 51 (Cl.Ct., 1983). These types of differing site conditions are known as type II differing site conditions. Alternatively, if any of Renda's claims are viewed as involving a situation involving defective plans and specifications, Renda is entitled to recover the additional costs it incurred attempting to comply with defective plans and specifications provided by Defendant. *See e.g. Big Chief Drilling Co. v. United States*, 26 Cl.Ct. 1276 (Cl.Ct., 1992).

A contractor is entitled to recover its additional costs resulting from a type I differing site condition where "1) The contract documents affirmatively indicate the subsurface or latent conditions forming the basis for the claim; 2) The contractor must have acted as a reasonable and prudent contractor in interpreting the contract documents; 3) The contractor must have relied on

the indications of the subsurface or latent conditions in the contract; 4) The subsurface or latent conditions actually encountered at the site must materially differ from the contract indications; 5) The actual conditions encountered must have been reasonably unforseeable; and 6) The costs claimed must be solely attributable to materially different subsurface conditions."
*Appeal of Simpson Const. Co.*, 91-1 BCA P 23,630, VABCA No. 3176 (1990).

A contractor is entitled to recover its additional costs resulting from a type II differing site condition where "it did not know about the physical condition. Second, plaintiff must show that it could not have anticipated the condition from inspection or general experience. Third, plaintiff must show that the condition varied from the norm in similar contracting work." *Lathan Co., Inc. v. United States*, 20 Cl.Ct. 122, 128 (Cl.Ct., 1990).

Where a contractor demonstrates that it suffered a differing site condition, in addition to recovering its extra costs, it is entitled to additional time to perform if the differing site condition delayed the contractor and, if liquidated damages were assessed, a commensurate remission of liquidated damages. *See e.g. Appeal of Praught Const. Corp.*, 93-2 BCA P 25,896, ASBCA No. 39,670 (1993), *et al.*

Renda will demonstrate at trial that each of the elements necessary to recover as either a type I or type II differing site condition are met for each of Renda's Claim's described above. It is anticipated that Defendant will reply that the Contract did not make affirmative representations from which the site differed. However, "[i]t is well settled that 'documents and materials mentioned in the bidding documents' form part of the contract." *W.M. Schlosser, Inc. v. U.S.*, 50 Fed.Cl. 147, 154 (Fed.Cl., 2001). Further, Defendant is expected to argue that it warned of the differing site conditions Renda encountered. However, Defendant cannot insulate itself from

paying for the additional cost caused by differing site conditions by including general warnings in its contract documents that are contradicted by specific site condition information. *See e.g. Appeal of C & G Excavating, Inc.*, 95-1 BCA P 27,289, ENGBCA No. 6063 (1994) ("We agree with C&G that the Differing Site Conditions provision of the contract cannot be 'read out of the contract' by disclaimers, such as the Corps' statement in the IFB that contractors should expect equipment damage and downtime on account of debris."); *see also Appeal of Palmberg Construction Company*, 1959 WL 180, ENGBCA No. 1537 (1959) ("The record of job performance supports the contractor's assertion that quantities of materials in some of these categories,–especially boulders, rock fragments, snags, stumps and pieces of forest wood, were encountered during performance of the job, possibly in quantities exceeding those anticipated. . . It is difficult to reconcile these statements with the specifications which say that the material will 'consist largely of sand, gravel, and some mud or silt' and that 'miscellaneous trash may be encountered' (Underscoring supplied). If considerable debris was expected and was characteristic of such streams why didn't the specifications say so? No other conclusion can be reached but that changed conditions were encountered. The contractor's daily logs and photographs furnished by it show that great amounts of trash, including old tires, cable, iron, boulders, rock fragments and wood fragments were in Section A, B and C. The quantity and character of this trash were subsurface or latent physical conditions at the site differing materially from these indicated in the contract.")

Defendant is expected to argue that Renda did not comply with notice requirements relating to its claims. However, Renda gave timely and complete notice in compliance with all notice provisions in its contract with Defendant. Even assuming, merely for the sake of

argument, that Renda did not, Defendant had actual notice of each of the differing site conditions and thus cannot assert an alleged lack of notice as a defense. See e.g. *Appeal of Bohemia, Inc.*, 84-3 BCA P 17,650, ENGBCA No. 4305 (1984) ("In order to be entitled to an equitable adjustment for a constructive change to a contract, the contractor must give notice thereof to the Government, so that the Government has the opportunity to take remedial action. When the Government has been put on actual notice, the notice requirement is satisfied, irrespective of the medium through which the notice was conveyed," *citing General Casualty Company of America v. Unites States*, 130 Ct. Cl. 520, 175 F. Supp. 805, cert. denied, 349 U.S. 938 (1955)). Further, even a contractor's complete failure to provide "notice will not, per se, preclude recovery for an otherwise proper differing site conditions claim. Failure of notice serves as a defense to such a claim only if the Government can prove that it was prejudiced by the failure of notice," *Appeal of Simpson Const. Co., supra.*

Defendant is also expected to argue that Renda cannot recover on any claim for which it calculated damages using a total cost or modified total cost method of quantification. This is not so. A modified total cost method of recovery is allowable where "(1) the nature of the particular losses make it impossible or highly impractical to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs are reasonable; and (4) it was not responsible for the added expenses." *Delco Electronics Corp. v. U.S.*, 17 Cl.Ct. 302, 327-38 (Cl.Ct., 1989) (Aff'd 909F.2d1495, Fed.Cir., 1990).

Defendant is expected to argue that Renda cannot recover its claim preparation costs. However, claim preparation costs that are part of contract administration of changes are recoverable. *See e.g. In re Appeals of Atherton Const.*, Inc., 00-2 BCA P 30,968, ASBCA No.

48,527 2000) ("However, there are portions of the claim, such as preparation of cost proposals on penetrations, that were undertaken as part of negotiations and which are recoverable.")

The Contract Disputes Act has been construed as requiring that a contracting officer's demand for payment be preceded by a dispute by presentment to the contractor before the demand constitutes a "claim" under the Contract Disputes Act. *See e.g. Keystone Coat & Apron Mfg. Corp. v. United States*, 150 Ct. Cl. 277 (1960); *and Appeal of Instruments & Control Services Company*, 89-3 BCA ¶ 22,237 (1989); *and e.g. Appeals of United Aero, Inc.*, 83-1 BCA ¶ 16,268 (1983). The claims included in the purported Contracting Officer's Final Decision were not presented to Renda for possible resolution and the purported Contracting Officer's Final Decision is a nullity.

If Defendant contends that the claims included in the purported Contracting Officer's Final Decision were in fact "disputed" because they directly related to the claims presented by Renda discussed above, then the Court, in determining the validity and entitlement of Renda on each of Renda's claims, also has authority to declare the invalidity of the claims included in the purported Contracting Officer's Final Decision.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: s/Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of April, 2004, a true and correct copy of Renda Marine, Inc.'s Memorandum of Contentions of Fact & Law was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson