UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | § | |
| PLAINTIFF, | § | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| UNITED STATES ARMY | § | |
| CORPS OF ENGINEERS, | § | |
| DEFENDANT. | § | |

**RENDA MARINE, INC.'S MOTION TO LIMIT TESTIMONY BY DEFENDANT'S EXPERTS**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Renda Marine, Inc. ("Renda"), files this motion to limit the trial testimony of the expert witnesses designated by Defendant, United States, as follows:

Renda took the depositions of Defendant's experts Jack Fowler and William Connole on April 8 and 9, 2004, respectively. Based on the experts' deposition testimony and resumes, the trial testimony of each witness should be limited to their areas of expertise. Renda respectfully reserves the right to supplement this motion upon receipt of the deposition transcripts.

**Jack Fowler**

Mr. Fowler is a geotechnical engineer with a bachelors, masters and doctorate in civil engineering. His resume and report are attached as Exhibits A and B, respectively. While Mr. Fowler certainly has substantial expertise in geotechnical matters, he admitted in his deposition that he has no experience as a dredger and is not a dredging expert. He does not know the differences between the various dredging cutter heads and cannot testify as to production rates. His resume does not show any dredging experience.

Mr. Fowler's testimony should be limited to geotechnical matters. Mr. Fowler should not be permitted to testify about dredging and dredgeability matters.

Besides, Defendant has a dredging expert, Robert Lofgren, and Mr. Fowler's testimony would be cumulative.

**William Connole**

Mr. Connole is a construction claims consultant. He has degrees in Psychology and Civil Engineering. Mr. Connole's resume and Volume I of his report are attached (without exhibits) as Exhibits C and D, respectively. Through most of his career, he has assembled or reviewed construction claims.

In his deposition, Mr. Connole admitted that: (1) he is not a geotechnical expert; (2) he is not a dredging expert; (3) he is not a geotechnical engineer; (4) he is not a geologist; (5) he is not a hydraulic levee designer; and (6) he is not a hydraulic levee constructor. His resume shows no dredging experience or levee design or construction experience.

While Mr. Connole may be an excellent construction claims preparer or evaluator, he lacks sufficient expertise to testify as an expert concerning geotechnical and geological matters. He also lacks sufficient expertise to testify as an expert concerning dredging, dredging expectations, hydraulic levee design, and hydraulic levee construction. He should not be permitted to testify as an expert on these matters.

Besides, Defendant has Mr. Fowler to testify about geotechnical and levee design matters, and Robert Lofgren to testify about dredging issues. Any testimony by Mr. Connole on these matters would be cumulative.

**Robert Lofgren**

Robert Lofgren has substantial dredging experience and has a bachelors and masters degree in civil engineering. Mr. Lofgren's resume and report (without exhibits) are attached as Exhibits E and F, respectively.

He is not a geotechnical engineer, and has not worked as a geologist. He is not a hydraulic levee designer. He is not a claims consultant.

Mr. Lofgren's testimony should be limited to his demonstrated expertise concerning dredging and design of dredges. He should not be permitted to testify as an expert concerning geotechnical matters, hydraulic levee design, and construction claims assembly.

Besides, Defendant has Mr. Fowler to testify concerning geotechnical and levee design matters, and Mr. Connole to testify about construction claims assembly. Any testimony by Mr. Lofgren on these matters would be cumulative.

The admissibility of expert testimony in proceedings in the Court of Federal Claims is governed by the same standards and requirements applicable in federal trial courts, including the requirement that the expert be qualified in the *specific area* in which an opinion is proffered:

> The admissibility of expert testimony is governed by Fed.R.Evid. 702. . .The Supreme Court has held that a trial judge acts as a 'gatekeeper'under Rule 702 to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) *(quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). . . . Defendant stated in its conclusion that the "proposed expert need only possess some specialized 'knowledge, skill, experience, training or education' that will be helpful to the trier of fact in understanding the evidence or determining a fact in issue." Def.'s Hamm Resp. at 44. The court disagrees. In addition to possessing 'knowledge, skill, experience, training, or education,' an expert's testimony must also be both relevant and reliable in order to be admitted into evidence. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786; *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167.

*Westfed Holdings, Inc. v. U.S.*, 55 Fed.Cl. 544, 570-571 (Fed.Cl., 2003). Further, the Court of Federal Claims made clear in "that the issue is not the qualifications of the witness in the abstract or in general but "whether those qualifications provide a foundation for a witness to answer a specific question." *Westfed Holdings, Inc. v. U.S.*, 55 Fed.Cl. at 571, *citing Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994) ("A divorce lawyer is no more qualified to opine on patent law

questions than anyone else, and it is a mistake for a trial judge to declare anyone to be generically an expert.") *and citing Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir.2001) ("Once initial expert qualifications and usefulness to the jury are established, however, a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702, *Kumho Tire*, and related precedents."). *See also* Moore's Federal Practice, Reference Manual on Scientific Evidence 58 (Matthew Bender ed., 1995) ("before the expert is found qualified to offer an opinion about a particular issue, the court must also decide whether the actual qualifications of the expert enable him or her to assist the trier of fact with regard to each controverted issue about which the expert seeks to testify ")

Wherefore, Plaintiff, Renda Marine, Inc., respectfully requests that the Court limit the expert testimony of Defendant's expert witnesses to their areas of respective expertise, and avoid cumulative testimony.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: s/Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)

ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of April, 2004, a true and correct copy of Renda Marine's Motion to Limit Testimony by Defendant's Experts, was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson

# APPENDIX C

Dr. Fowler's Resume

Jack Fowler, Ph.D., P.E.
Geotechnical Consultant
Geotec Associates
5000 Lowery Road
Vicksburg, Mississippi 39180
Telephone: 601-636-5475 FAX: 601-630-9911
E-mail jfowler@geotec.biz and www.geotec.biz

**Education:**

Dr. Fowler received his BS degree in Civil Engineering from the University of Mississippi in 1961, his MS degree in Civil Engineering from Mississippi State University in 1972, and his Ph.D. degree in Civil Engineering from Oklahoma State University in 1979. His major field of study was in Geotechnical Engineering. Dr. Fowler is a Registered Professional Engineer in the State of Mississippi, a member of ASCE, SAME, PIANC, WEDA and Chi Epsilon (Honorary Engineering Fraternity).

**Experience:**

Dr. Fowler worked for the Soil Conservation Service for 1 year while attending the University of Mississippi. After receiving his BS degree in 1961, he was employed by the Corps of Engineers Ballistic Missile Construction Office, Inglewood, California, as a construction inspector at the Jacksonville, Arkansas, Field Office. This work involved construction of 18 Titan II Missile Bases. Dr. Fowler was on Military leave of absence for 3 months in 1962 at Fort Polk, Louisiana, during the Berlin Crisis.

From 1962 to 1994, Dr. Fowler was employed at the US Army Engineer Waterways Experiment Station (WES) as a Research Civil Engineer. From 1962 to 1974 he participated in Geophysical exploration and vibroseismic surveys and design of vibration sensitive structures, dynamic testing of model radar foundations, development of design criteria and subsequent application and verification of design criteria from dynamic measurements from prototype structures. He also participated in the National Aeronautical Space Administration Saturn V Moon Exploration Program by conducting static and dynamic load tests of foundation piles prior to construction and instrumentation of selected foundation piles for static and dynamic measurements during static test firing of the first and second stages in test stands located at Stennis Space Center.

His master's thesis in 1972 consisted of evaluating an existing procedure for determining shear modulus of in situ soils at depth by vibratory techniques. He also participated in studies involving liquefaction phenomena of soils caused by earthquakes or other seismic sources, earthquake resistance of earth and rock fill dams and model studies of concrete arched structures subjected to both controlled and random vibrations.



Blumberg No. 5118 EXHIBIT A

His Ph.D. thesis in 1979 was concerned with design, construction and analysis of the first geotextile fabric reinforced embankment constructed on soft foundations in the United States. He participated in the Dredge Material Research Program as a Senior Project Engineer and principal investigator on numerous projects involving dewatering of dredged materials and design and construction of fabric reinforced containment levees and construction haul roads. He participated in the design of the first geomembrane and soil bentonite slurry wall trenches constructed for under seepage under one of the first successfully designed and constructed welded wire reinforced embankments for flood control protection. He was a principal leader in the preparation of a Technical Manual for Engineering use of Geotextiles for the Department of the Army. He was a principal investigator in the Dredged Research Program responsible for development of a Knowledge Based Expert Systems program for determining dredgeability of sediments for a work unit entitled "Descriptors for Bottom Sediments to be Dredged." He was also a principal assistant to the Chief, Soil Mechanics Branch, and was responsible for planning, executing, and analyzing the results from research and development studies for construction control of earth and rock fill dams and levee design.

Dr. Fowler has served as a consultant with the Construction Productivity Advancement Research Program (CPAR) at WES for "The Development and Demonstration of Dredged Material Containment Systems Using Geotextiles" and "Research, Development and Commercialization of a Ballistic Soil Nailing Systems." He is currently working with several Corps Engineer Districts, Port Authorities, consulting firms and the Navy concerning the containment of contaminated dredged material, municipal fly ash, lime, alum, animal waste and sewage sludge wastes in geotextile containers. He developed a proposed ASTM filtration protocol for geotextile container systems for fine grained sediments. He was responsible for planning and designing the first geotextile tubes and containers for fine-grained contaminated dredged material. Since his retirement in 1994 he has worked in research and consultation involving filling geotextile tubes with concrete and high solids contaminated dredged material using positive displacement pumps. He has prepared documentations for several dredging claims and has served as an expert witness where different site condition claims were involved in dredging projects. He has served as an expert witness involving siltation damage to oyster beds as a result of dredging activities. He also teaches annually in the Texas A&M Dredging Engineering Short Course and an adjunct professor at Mississippi State University.

**Publications:**

Dr. Fowler has authored or coauthored 7 Journal papers, chapters in 5 textbooks, 45 technical publications, 53 papers and holds patents for a telescoping weir and a Geotube Bio-Waste Digester. He was also a technical contributor to 25 technical publications in the fields of geophysics, dynamics, soil mechanics, soil and structural interaction and pile supported foundations, seismic wave phenomena, earthquake engineering, containment and dewatering of dredged materials, vertical plastic strip drains (wicks), geomembrane soil bentonite slurry trenches, and steel wire and fabric reinforced earth structures, geotextile tubes, bags and containers.

# FINAL REPORT

# Expert Witness Evaluation

Prepared by

Geotec Associates – Jack Fowler, Ph. D., P.E.
5000 Lowery Rd
Vicksburg, MS 39180
Contract Number 3W-CIV01-0163

Date: 2 February 2004

Case Name

Renda Marine, Inc. v United States
U. S. Court of Federal Claims No. 02-306C (Fed. C1)

Requesting Office

Department of Justice
National Courts Section
Commercial Litigation Branch
Civil Division

EXHIBIT
B

February 2, 2004

Renda Marine, Inc. v. United States
No. 02-306C (Fed. C1)

Contract No. DACW64-99-C-0001
Houston-Galveston Ship Channel, Texas
Dredging Upper Bayou, (45 foot Project)
Harris and Galveston Counties, Texas

This report was prepared for the U.S. Department of Justice, Civil Division, Commercial Litigation Branch by the undersigned, Dr. Jack Fowler. Included in this report are four tables and five appendices. Appendix A provides a glossary of geotechnical descriptors and includes three tables, A-1 through A-3, Geotechnical Characteristics of Dredge Channel Soils and cohesive and cohesionless material descriptors. Appendix B is a list of cases where I testified as an expert at trial or by deposition. These demonstrate my experience as an expert witness in dredging and differing site condition claims. My resume and experience are included in Appendix C, and a list of publications I have written is in Appendix D. Documents pertaining to this case that were provided by the Galveston District Corps of Engineers, Capital Project Management, Inc., Franvel Corporation, and the U.S. Department of Justice are listed in Appendix E.

In the course of my investigation into this case I visited the Lost Lake Placement Area with Galveston District Corps of Engineer personnel and Gahagan and Bryant, Inc. personnel. I also met with HVJ Associates, Inc., Gahagan and Bryant Associates, Inc., and District personnel concerning volume calculations of different types of dredged materials. I met with District personnel during the hydraulic construction of levees along the Houston-Galveston Ship Channel by Bean Stuyvesant LLC.

I have reviewed the plans and specifications for Contract No. DACW64-99-C-0001, Houston-Galveston Navigation Channels, Texas, Dredging Upper Bayou, (45-Foot Project), Harris and Galveston Counties, Texas, Amendment No. 1, Renda Marine's Certified Claim for Equitable Adjustment of the Contract Price for Differing Site Conditions & Changed Conditions for Hydraulic Levees At Lost Lake Placement Area, October 16, 2001. I have also reviewed the documents listed in Appendix E.

The U.S. Department of Justice is compensating me at a rate of $200 per hour for my professional services in the litigation case regarding Renda Marine, Inc. vs. United States N. 02-306C(Fed.C1.)

The following are answers to questions provided by John E. Kosloske, Senior Trial Counsel, Commercial Litigation Branch, United States Department of Justice in letters dated October 24, 2003 and November 21, 2003.

**Section 7 Clay Claim**

**1-1 Identify each soil boring depicted in the contract documents that is relevant to a prediction about the *character* and *location* of materials *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00.**

Soil borings in Section 7 that are relevant to predicting the character and location of the materials within the maximum pay template are boring logs 3ST-8W, 3ST-9W, 93-64, 3ST-10W, 3ST-11W, 93-65, 3ST-12W, 3ST-13W, 72-106, 3ST-14, 3ST-15, 93-66, 3ST-16, 3ST17, 3ST-18 and 3ST19.

**1-2 What, if anything, do the logs for the borings identified in response to 1-1 above indicate about stiff to very stiff materials *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Table 1 is a summary of the consistency, relative density, and laboratory classification for the remaining depth in the channel for all profiles and boring logs for Sections 1 through 9. Tables 2 and 3 summarize the remaining depth and allowable overdepth for Sections 1 through 9.

The results as shown in Table 2 indicated that the consistency of the cohesive materials (CH, CL and ML) in Section 7 was 30% very soft, 20% soft, 6% medium stiff, 6% stiff, 12% very stiff, and 21% hard of the total volume. The relative density of the cohesionless materials (SC and SM) in Section 7 was 0.5% medium dense, 3% dense and 2% very dense of the total volume.

The results as shown in Table 3 indicated that the laboratory classification of the materials in the remaining depth and allowable overdepth consisted of 53% CH (inorganic clays of high plasticity, fat clays), 41% CL (inorganic clays of low to medium plasticity, gravelly clays, sandy clays, silty clays, lean clays), 1% SC (clayey sands, sand-clay mixtures) and 5% SM (silty sands, sand-silt mixtures) of the total volume in Section 7. Appendix A includes a detail description of the geotechnical properties for cohesive and cohesionless material in tables A-1 and A-3.

The conclusions are that the cohesive clays (CH, CL and ML) make up 94% of the total volume and the cohesionless materials (SC and SM) were 6% of the total volume in Section 7 (Table 3). The medium stiff to hard cohesive materials in Section 7 (Table 2) were 39% of the total volume in this section. The very soft, soft and medium stiff cohesive materials totaled 56% of the total volume in Section 7 (Table 2). The dense to very dense cohesionless materials (SC and SM) were 6% of the total volume in Section 7 (Table 2).

**1-3 What boring logs identified in response to 1-1 above indicate stiff red clays *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Boring log 3ST-16, Station 593+90 indicated very stiff to hard grayish red to red cohesive clay from elevation -44 to -47 MLT. Boring log 3ST-18, Station 603+60 indicated hard red cohesive (CL) materials from elevation -42 to -45 MLT and hard blue to rust material below elevation -45 MLT. Boring log 3ST-19, Station 608+40 indicated hard red cohesive (CH) materials below elevation -40 MLT. All of the soils described by the boring logs and elevations were within the maximum pay template for the area in Section 7.

The basis of color used in describing cohesive soil has been well established in the geotechnical literature. Color observed in field surveys is often helpful in distinguishing between various soils strata. To an engineer or dredger with sufficient preliminary experience with local soils, color may be useful in identifying individual soil types and their consistency and/or their relative density and depth profile which would also indicate their dredgeability. Dredgeability is defined as the difficulty or ease of excavating, removing, transporting and placing of dredged materials.

Cohesive inorganic soils described are generally associated with the brighter colors such as medium and light gray, olive green, brown red yellow, and white. Cohesive and cohesionless materials have a variety of colors and combination of colors ranging from black, gray, brown, yellow, green, blue, white, red or rust (oxidation of ferric or iron minerals). It is concluded that the color of dredge material sediments do not have any relationship as to its dredgeability.

**1-4 What, if anything, do the logs for the borings identified in response to 1-1 above indicate about stiff rust-colored clays *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Boring log 3ST-11W, Station 568+90 indicated hard, rust and grayish colored, cohesive clay from elevation -40 to -47 MLT. Boring log 3ST-12W, Station 574+00 indicated very stiff to hard rust colored cohesive clay from elevation -21 to -47 MLT. Boring log 3ST-13W, Station 579+00 indicated very stiff to hard, rust, blue, and grayish colored, cohesive clay from elevation -38 to -47 MLT. Boring log 3ST-14, Station 583+70 and Boring log 3ST-15, Station 588+20, indicated very stiff, rust and light grayish colored cohesive clay from elevation -45 to -47 MLT. All of the soils described by the boring logs and elevations were within the maximum pay template for the area in Section 7. These materials had laboratory classifications of CL and CH, and the consistency of these cohesive soils varied from very stiff to hard. These rust colored, cohesive clays were generally found in the last few feet of the bottom of the maximum pay template and allowable overdepth.

It is concluded, as in 1-3, that the color of dredge material sediments does not have any relationship to its dredgeability. Based on the boring logs provided in the contract, an experienced and prudent contractor should have expected to encountered stiff, very stiff to hard cohesive clays.

**1-5 What, if any, significance to dredging is there between red, rust, or any other similarly colored stiff to very stiff clay?**

The red, rust or blue color of clay sediments does not have any effect on the consistency or stiffness of the material nor does it have any affect on the excavating or cutting, removal, transport through the dredge pipeline and/or placement in the Confined Disposal Facility (CDF).

**1-6 What, if any, significance to dredging is there between, on the one hand, stiff to very stiff red or rust-colored clays and, on the other hand, stiff to very stiff gray or blue clays?**

There is no significant difference in the dredgeability of different colored stiff to hard clays and it is concluded that the color of dredge material sediments does not have any relationship to its dredgeability. Dredgeability is referred to as the ease or difficulty of excavating, removing, transporting and disposing of dredged material sediments.

**1-7 Define "hardpan."**

Hardpan soils is a term used to describe any hard, over consolidated or cemented impermeable layer that does not soften very easily when wet. This term is also used to describe boulder clay or glacial till which is a very tightly packed deposit from glacial origin ranging from boulders to rock flour. Hardpan can also be a layer of extremely hard impermeable cohesive soil that is difficult to excavate and will not allow water penetration. These soils are over consolidated clays that have been subjected to large overburden loads or to a long period of desiccation drying. During the ice age when the ocean levels dropped, large exposed mud flats dried up resulting in hard impermeable clay layers. Salt or simply water migration through a clay soil can also cause the clay particles to come closer together, consolidate and form a hardpan. This phenomenon is referred to as seepage consolidation.

<u>Hydraulic Levees Claims</u>

**2-1 Regarding the levees at the Lost Lake Placement Area (Lost Lake) to be constructed by the hydraulic placement of dredged material, describe what the contract required Renda Marine to construct (height, base width, crown width, slope, etc.).**

The contract required the contractor to construct 13,650 ft of levees to elevation +30 ft M.L.T with hydraulically placed fill during dredging of Upper Bayou dredge channel. Typical levee cross sections had a 10 ft wide crest and 3 to 1 side slopes. The levee

height varied depending on the existing dike height but the average dike height was about 17 ft at an elevation of +30 ft M.L.T. and the average base width was about 114 ft.

**2-2 Calculate the "neat line" volume per lineal foot of the levees at Lost Lake to be constructed by hydraulic placement of dredged material.**

Table 4 shows the hydraulic levee "neat line" volumes, dimensions and stations. The hydraulic levees at Lost Lake were to be constructed from Station 166+00 to 215+00, 4+00 to 56+00 and 61+50 to 97+00 for a distance of 13,650 ft. The total "neat line" volume required for the hydraulically constructed levees was 522,737 CY and the "neat line" volume per linear ft was 38 CY per linear ft.

**2-3 What do the contract documents indicate about the foundation materials in the levee alignment along the east levee? The west levee? The north levee?**

The contract states on contract Drawing No. C-14 Note: 9: ***"Upon completion of the mechanical constructed levees to the lines and grades specified. The contractor must complete the remainder of the perimeter levee to the minimum template limits shown on the drawings, using hydraulically constructed levees,"*** and Note 10. ***"The foundation of the new levee is very soft to soft dredged material and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material."***

The boring logs in the contract indicate that the foundation conditions along the east levee consisted of 56% very soft to soft and 44% medium stiff to hard cohesive soils near the surface with minor amounts of loose to medium dense cohesionless sandy soils. The foundation conditions along the west levee consisted of 50% very soft to soft and 25% medium stiff to stiff cohesive soils near the surface with 12.5% very loose to 12.5% medium dense cohesionless sandy soils. Boring logs along the north levee indicated that the levee foundation consisted of 57% very soft to soft and 36% medium stiff to hard cohesive materials near the surface with minor amounts of very loose cohesionless soils.

Based on the results of the boring log data, it appears that the east and west levees may have had slightly more foundation bearing capacity than the north levee but not a significant amount. Most of the stiff to hard soils occurred at the surface as a result of dewatering, drainage and consolidation by desiccation drying of surface water. Many areas would have a layer of sandy or desiccated clay crust; but underneath the layer would be very soft to soft cohesive materials. In the past the coarse grained sands, shells and clay balls at the Lost Lake CDF normally settled out at the end of the dredge pipe or dump site near the south perimeter levee providing about 36% very soft to soft and 21% medium to stiff cohesive materials and 43% very loose to medium dense cohesionless materials. These upland dredged material placement areas are commonly referred to by the Corps of Engineers as confined disposal facilities or CDF. Elevation of the dredged materials deposited in the south side of the CDF is higher than the north side: therefore, fine grained sediments and water from dredging or rainfall would collect on the north

side before exiting the site through the weir. Depositions of sediments on the north side of the CDF near the weir site were very fine grained high water content soft cohesive materials. Construction of levees on these types of materials should have the worst foundation conditions in a CDF.

**2-4 Based upon what is contained in the contract documents, would it be reasonable to assume that construction of the north and/or west levees would be more difficult than construction of the east levee? Explain why or why not.**

Based on the results of the boring logs, it does not appear to be much difference in the bearing capacity of the either the east, west or north levee foundation conditions. There should not be any problems constructing hydraulically placed embankments on either the east, west or north embankments. Taking advantage of the desiccated surface materials in a CDF is very important for the support of equipment and dredged material placement without causing a bearing capacity failure.

**2-5 What kind(s) of dredged material would be suitable for the hydraulic construction of levees at a placement or disposal area such as Lost Lake?**

The most suitable dredge materials for building hydraulic levees at Lost Lake would be a combination of shells, sand and clay balls. These materials are readily available in the dredge channel and retention rates of the sand and clay balls are normally 60% of the in situ volume. Very soft to hard cohesive CH material will develop into clay balls that are suitable for the hydraulic construction of levees.

**2-6 What, if anything, do the contract documents indicate about the *character, location,* and/or *quantity* (expressed either in cubic yards or as a percentage of total cubic yards to be dredged) within the maximum pay template of materials suitable for the hydraulic construction of levees at Lost Lake?**

The contract provided the results of the geotechnical exploration which included soil boring logs for the contractor to examine and determine the character, location and quantity of dredged material to be removed. The contractor was expected to examine the site and make his own determination as to the character and quantity of the materials to be dredged. The contract provided a table of remaining quantities on page 02482-9 which stated a total estimated quantity of 3,105,500 CY to be dredged from Sections 1 through 9 and an allowable overdepth quantity of 378,200 CY: but the contract did not express the characteristics of the material in volumes or percentage of the total. The total remaining quantity of dredge material and allowable overdepth was 3,483,700 CY.

Volumes of different materials were determined graphically using the COE channel profiles and boring logs and average end area measurement methods shown for typical channel profiles in Figures 1 and 2 below. The geotechnical characteristics, volumes and percentages that were determined are shown in Tables 2 and 3 for Sections 1 through 9.

1. Determine individual areas and total areas of different classifications, consistency and relative density of material in the Remaining Depth Areas

2. Using these individual areas in the Remaining Depth Areas determine the percent of the total Allowable Overdepth Area

3. Multiply these individual percentages times the Remaining Depth Volumes measured by the COE




**Method for Determining the Percentages and Volumes of the COE Remaining Depth Volumes**

Figure 1

Figure 1. Method for Determining the Percentages and Volumes of the COE Remaining Depth Volumes

1. Determine individual areas and total areas of different classifications, consistency and relative density of material in the Allowable Overdepth Areas

2. Using these individual areas in the Allowable Overdepth Area determine the percent of the total Allowable Overdepth Area

3. Multiply these individual percentages times the Allowable Overdepth Volumes measured by the COE




**Method for Determining the Percentages and Volumes of the COE Allowable Overdepth Volumes**

Figure 2

Figure 2. Method for Determining the Percentages and Volumes of the COE Allowable Overdepth Volumes

Table 2, remaining depth and allowable overdepth materials, shows the consistency of the cohesive soils for the total dredged volume. They were 23% very soft, 25% soft, 8% medium stiff, 5% stiff, 14% very stiff and 11% hard. Table 2 also shows the relative density or compactness of the cohesionless soils for the total dredged volume to be dredged. They were 1% very loose, 1% loose, 3% medium dense, 8% dense and 2% very dense.

The quantity of cohesionless material (SC and SM) suitable for hydraulic levee construction was 15% of the total volume to be dredged or 522,123 CY.

Table 3 shows the geotechnical or laboratory classification for the remaining depth and allowable overdepth cohesive soils. They were 46% CH, 35% CL and 5% ML of the total volume to be dredged. The laboratory classification for the cohesionless materials was 4% SC, 10% SM and 1% OH.

The quantity of cohesive material (CH, CL and ML) suitable for hydraulic levee construction consisted of 8% medium stiff, 5% stiff, 14% very stiff and 11% hard materials for a total of 38% of the total volume to be dredged or 1,355,558 CY. These materials are capable of forming clay balls that trap sand, shell and soft clays in the void space between the clay balls.

The total quantity of cohesionless and cohesive dredged material suitable for hydraulic levee construction was 1,877,681 CY.

**2-7 What capture rate (<u>i.e.,</u> material pumped that is suitable for levee construction vs. material retained that is suitable for levee construction) would be anticipated for a project such as the Upper Bayou Project?**

The retention rate for cohesionless materials (SC & SM) resulting from placement and sedimentation between the training dikes should be about 70% of the in situ dredged volume of 522,123 CY or 365,486 CY. The retention rate of the medium stiff to hard cohesive materials should be about 90% of the in situ dredged volume of 1,355,558 CY or 1,220,002 CY.

The total quantity of cohesionless and cohesive dredged material suitable for hydraulic dike construction was a total of 1,585,488 CY or 44% of the grand total graphical volume 3,584,392 CY shown in Tables 2 and 3.

**2-8 Assuming 60% retention rate, what quantity of suitable dredge material is needed to hydraulically construct the perimeter levees at the Lost Lake CDF.**

If we divide the required "neat line" levee volume 522,737 CY by 0.60, then the required suitable volume of dredged for hydraulic levee construction is 871,228 CY. Based on

this assumption there should be sufficient suitable dredged material to construct the perimeter hydraulic displacement levees at Lost Lake Placement Area.

**2-9 In the context of dredge placement or disposal areas, what is a "side cast borrow area?"**

Side cast borrow areas are formed when dredged material is excavated with a dragline or long stick backhoe from within the CDF adjacent to and parallel to the perimeter containment levee. These borrowed materials are used to raise the levee height and berm to increase the safety and storage capacity of the CDF. When possible the excavator is supported by pontoons or wooden mats and is located on an inside stability berm so the borrow area ditch is not too close to the perimeter retaining dike.

**2-10 Is maintenance upon existing levees at dredge placement or disposal areas ever performed with materials taken from side cast borrow areas? How common is it to maintain existing levees at dredge placement or disposal areas with materials from side cast borrow areas?**

It is very common to excavate perimeter trenches for the purpose of surface water management practices to increase the levee heights. The borrow material excavated from the side cast borrow areas along the inside of the levee is placed on the levee and berm. These trenches promote surface and subsurface water drainage and consolidation of the dredged materials in the CDF increasing the storage capacity and improving the consistency and/or stability of the surface material for incremental levee heights. Once the surface strength is improved to support trenching equipment, continued surface trenching is implemented to increase storage capacity by dewatering, consolidation and desiccation drying.

**2-11 Assume that side cast borrow areas were located within the planned footprint of the alignment of the hydraulic levee to be constructed at Lost Lake. What, if any, impact would that have upon construction of the levee? Would any such impact upon levee construction diminish over time, e.g., if the side cast borrow area had been excavated eight years prior to levee construction vs. three years prior to levee construction?**

If levees are constructed over very soft dredged material filled side cast borrow areas the very heavy clay balls and sand filled levees may cause these soft foundation materials to be displaced. In some COE Districts these side cast borrow areas and all surface water management trenches are normally filled in with dried surface crust prior to dredged material placement in a CDF. These deep side cast borrow areas will not dewater and consolidate at the same rate as the rest of the site; because they are too deep and soft. The material in these areas will be very soft and deep and may not support the levee heights required for dredged material placement for subsequent fillings. The time period of whether it was 3 or 8 years since the borrow areas were excavated is not important. What is important is depth and softness of the material placed in the borrow areas. Also was there a surface water management plan and how aggressive was the surface water

management plan. If Corps of Engineers or Port Authority Houston did not fill in the perimeter trenches or lateral trenches before filling the CDF, they may not have had a plan. If the equipment support berm between the existing levee and the side cast borrow area was 50 ft and the average width of the new levee was 115 ft, then construction and placement of the new levee would most likely displace the soft dredged material in the side cast borrow areas.

**2-12 Assume that maintenance was performed upon the levees at Lost Lake in 1995 and that, thereafter, materials generated from one or more maintenance dredging projects were disposed of at Lost Lake. Would any impact of side cast borrow areas upon levee construction identified in response to 2-11 above be diminished?**

If the borrow areas and surface water drainage trenches were not filled in with dried crust prior to filling the CDF, then construction of the perimeter dikes may have been affected by soft foundation conditions in these areas causing an increase in required levee materials because of potential bearing capacity failure and excessive foundation displacement. Displacement of these materials is acceptable if there are adequate quantities of hydraulic fill material and the displaced sections can be managed properly without catastrophic failure occurring to the inside and/or outside of the perimeter levee.

**2-13 Describe the proper method(s) for constructing hydraulic levees at a placement area such as Lost Lake, including hydraulic placement of dredged material.**

The proper method for constructing hydraulic filled levees placed on very soft, soft to medium stiff foundation conditions with dredged material such as that found at Lost Lake is as follows:

(1) Clear, grub and level the levee foundation alignment and construct two parallel training dikes to either side of the proposed levee base. One of the training dikes may be the crest of the existing levee.

(2) Prior to placement of dredged material the discharge pipe is elevated in a raised position between the training dikes to the required height that is near to the proposed berm height and material quantity necessary to construct the final designed levee cross section.

(3) Dredge material slurry discharged between these training dikes is used to transport fines, sand, shells and clay balls along the longitudinal axis of the proposed levee.

(4) During placement of sand, shells and/or cohesive materials that form clay balls, a low ground pressure dozer or low ground pressure marsh buggy backhoe is required to spread the mounds of dredge material out over the proposed levee base. These materials have a tendency to mound up on steep angles of repose and not spread out over the require levee foundation base width.

The average levee base width for Lost Lake was about 115 ft and the use of a WYE with valves may have been appropriate. Every effort should have been made to advance the discharge pipe along the levee alignment and spread the fill out over the foundation with low ground pressure equipment. Excess discharge water should have been kept within the training dikes and not be allowed to over top and fail the training dikes until sufficient material had been placed. All excess water and unsuitable fine grained material should have been directed into the CDF at the far end of the training dikes.

(5) Additional dredge pipe is added onto the raised platform or fill base as material is being placed along the levee alignment. The dredge pipe is extended out onto previously placed dredged material to form a wide low embankment section or stability berm. The berm is designed to include enough volume to be finally shaped into the required levee cross section without causing a bearing capacity failure. The quantity of material in the berm should include enough material to accommodate shrinkage and subsidence and settlement due to foundation and embankment displacement and consolidation after the levee has been raised to the design height.

(6) After about 30 to 60 days or after pore water pressure dissipation, the embankment is shaped and raised to the required elevation and side slopes. If the levee fails due to bearing capacity failure when it is raised, the berm should be allowed to continue to consolidate and the pore water pressure to dissipate before further attempts are made to raise the levee; or, it may be necessary to widen the levee base width or flatten the slopes to prevent failure.

**2-14 What is a training dyke or levee? Are training dykes or levees used in hydraulic construction of levees at dredge disposal areas such as Lost Lake? If so, for what purpose(s) and how do they function?**

There are two types of training dikes or levees used during construction of a CDF. One type is used during the raising of the perimeter levee and the other type of training dike or levee is used in CDF management. The latter is referred to as a spur dike and is constructed to direct or control the surface water flow and sediments within the CDF for improved sediment management practices. The usefulness and purpose of spur dikes is sometimes debatable because they have been responsible for channelization of fines by increasing the surface water velocity and causing a loss of fines and turbid water over the weir. Spur dikes protrude into the CDF but not across the area and are constructed near the weir to protect the pool of water in front of the weir to minimize turbidity cause by wind and waves causing a loss of water quality passing over the weir.

The other type of training dikes are used to train and direct the hydraulic placement of dredged material fill when constructing perimeter levees. The training dikes are constructed parallel to and at the edge of the proposed levee base. These training dikes serve to channel and trap sediments along the base of the proposed levee and foundation. Sediments are collected between these parallel training dikes to form a wide low berm. The wide berm will contain enough dredge material volume to shape the levee to its required crest elevation and side slopes.

**2-15 What are the consequences of not constructing training dikes during hydraulic levee construction?**

If training dikes are not constructed during hydraulic levee construction and placement of hydraulic fill, then there will be a significant loss of large quantities of cohesionless material, clay and silt slurry and very soft to soft cohesive materials that are normally included as part of the initial levee foundation profile. Once these materials are lost out into the disposal area, it is not economical or practical to recover them mechanically for levee construction.

**2-16 What would be the likely consequences(s) of attempting to construct the north levee at Lost Lake mechanically instead of by hydraulic placement of dredged material? With a mechanical construction method, (a) what would be the maximum lift of material to be placed at one time, (b) what compaction would be required, (c) to what extent would you anticipate that material would "settle" within 24 hours, (d) to what extent would you anticipate that material would "settle" within 48 hours, (e) at what height would you anticipate significant overnight failures?**

Mechanical construction of levees on very soft to soft foundation material similar to that found on the north side of the Lost Lake CDF would result in large foundation bearing capacity failures, displacing and remolding these materials. These low shear strength, high void ratio and high water content fine grained materials are very sensitive to disturbance by remolding activity from trucks or dirt pans. This type of activity would cause these materials to lose up to 80 to 90% of their initial strength during attempts to construct the levee mechanically. Once the foundation materials are remolded they will displace large volumes of the soft sediments and result in requiring twice to three times the "neat line" volumes to complete the levees to the required height. In some cases this loss could be as much as three to five times the neat volume.

(a) The maximum lift thickness would depend on the in situ shear foundation strength or the remolded foundation shear strength. In this case, that value could be two to three times the proposed levee height if the volume loss below the foundation was three to five times the "neat line" volumes.

(b) Potential failure of the levees is not completely dependent on the compaction of the levee, but it does play an important role in levee stability. There are normally no compaction requirements except for track compaction of a dozer or truck wheel loads. Cohesive levee materials placed with a dragline or backhoe without compaction are considered loose compacted. Materials compacted with the dozer tracks or dump truck wheel loads are considered to be semi-compacted. Compacted materials are those materials that are compacted with sheep foot rollers.

(c) To be able to predict whether an embankment is subject to failure, it would be necessary to measure the pore pressure in the foundation and levee materials. If an embankment is constructed during the daylight hours the pore pressure will gradually

increase until the pore pressure reduces the soil shear strength and bearing capacity of the foundation materials may cause a sudden levee failure or subsidence during the night before the next day.

(d) Most failures will occur at night after loading the foundation during the day, but failures have been observed during the day. Monitoring of the pore pressure rise in the foundation levee material will provide an indication of when failure might occur.

(e) When the embankment bearing capacity has been exceeded then the potential for failure is imminent and that height can be determined based on in situ shear strength of the foundation materials. Predicting the time of failure as to whether it will fail 24 to 48 hrs is very difficult to estimate even with good instrumentation such as slope inclinometers and pore pressure monitoring devices. When constructing a displacement levees the foundation has already failed because the bearing capacity has been exceeded. This causes excessive displacement and any other failure mode such as additional bearing capacity failure and displacement, outward or lateral sliding or spreading or embankment rotational slope and/or foundation failure could occur during or after construction. All of the above potential failure modes can be evaluated and analyzed if a thorough geotechnical foundation investigation is conducted. The longer the embankment is allowed to sit undisturbed, the surcharge load of the levee will cause the remolded foundation materials to consolidate and allow pore water pressure to decrease causing an increase in shear strength. However, because these materials have been disturbed the increase in strength will be very slow.

**2-17 Assume that it became necessary to construct the north levee at Lost Lake by a mechanical construction method. Describe the proper means and method to construct the north levee mechanically.**

The proper method to construct a mechanically placed levee on the north levee at Lost Lake CDF would be determined only after a thorough foundation investigation had been conducted to determine available bearing capacity of the foundation soils. Pore pressure measurement using piezometers and vane shear tests would provide the in situ shear strength of the foundation soils and the bearing capacity. From that data the allowable embankment height could then be determined. If the proposed embankment was too high and a bearing capacity failure was imminent then a displacement section might result. Every effort should be made to avoid a bearing capacity failure because, when the foundation materials are remolded, they lose 80 to 90% of their initial shear strength. The embankment will continue to fail until it either rests on higher shear strength materials at a lower depth or the displaced material creates a stability berm to either side due to the brute force displacement caused by levee materials and heavy equipment. Every effort should be made to utilize low ground pressure (2.0 psi to 4.0 psi) construction equipment to construct the levee.

The design use of high strength Geotextile fabric reinforced embankments with wide stability berms could have minimized the uncertainty of the amount of available material required per linear foot for constructing a displacement levee section. A properly

designed fabric reinforced embankment would have had a better chance of not having bearing capacity failures if the contractor was competent in this area of construction. A design using high strength Geotextile fabric and vertical plastic strip drains could have been used with and without surcharge loads.

Whether the contractor used Geotextile fabric or not, the contractor should have used low ground pressure equipment and placed the initial foundation materials in a wide berm from each toe of the levee in two to three foot lifts. The contractor should not allow heavy dump trucks onto the newly placed fill until the fill had been track compacted to a depth of greater than four feet thick beneath the centerline of the embankment. Dump trucks should not have been allowed within 30 ft of the front leading edge or either toe of the embankment.

**2-18 Is management of the pond level in a dredge placement area such as Lost Lake important to *hydraulic* placement operations? If so, describe the function and importance of the pond to *hydraulic* placement operations.**

Management of the pond level of water in the CDF is very critical to the successful hydraulic placement of dredged material for levee construction. High water levels interfere with the construction of training dikes and do not allow drainage of the newly placed dredge material sands and clay balls. High water also interferes with shaping of the newly placed dredged material with low ground pressure equipment and does not allow for hydraulic transport velocities necessary for material transport between the parallel training dikes. Some ponding water is necessary for sedimentation of the solids and clarifications of the dredged material decant water prior to discharge at the weir.

**2-19 What, if any, effect would saturated soils in the foundation area along the alignment of levees to be constructed have upon *hydraulic* placement operations at Lost Lake?**

Most of the foundation materials below the desiccated crust in the proposed levee alignment are already 100% saturated and are very soft to soft cohesive soils that exhibit very low in situ shear strengths. The hydraulic placement operation is not going saturate these cohesive materials beyond 100% saturation and cause a loss in shear strength below the crust. The highly saturated, high void ratio, high moisture content soils are very sensitive to dynamic motion and are subject to liquefaction and loss of shear strength when remolded and/or disturbed. The thin layer of dried crust material will become saturated, which may not affect the local or overall global stability of the levee. However, the dry crust is important in providing bearing capacity for the proposed levee and mobility for construction equipment. Potential embankment failure modes on soft foundation are shown in Figure 3. These types of foundation materials generally lose their in situ shear strength by remolding and disturbance caused by over loading during hydraulic placement and dozer shaping and spreading of the hydraulic fill materials, resulting in bearing capacity failures. Increased pore water pressure in the foundation

soil due to the increase in the fill height will also cause a reduction in the available bearing capacity of foundation materials.




Figure 3. Potential Embankment Failure Modes on Soft Foundations

**2-20 What, if any, effect would saturated soils in the foundation areas along the alignment of levees to be constructed have upon *mechanical* placement operations at Lost Lake, including during *mechanical* placement of the north levee?**

The effect of saturated soft to very soft soils along the alignment of the levees to be constructed would be reduced bearing capacity of the foundation materials during

mechanical placement operations. These high moisture content cohesive soils are very sensitive to any disturbance or additional loading and lose their strength by increased pore pressure and liquefaction.

JACK FOWLER, Ph.D., P.E.

2-2-04
DATE

References

Contract No. DACW64-99-C-0001 "Houston-Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-Foot Project) Harris and Galveston Counties, Texas"

USAEWES (1960). "The Unified Soil Classification System," Technical Memorandum No. 3-357, US Army Engineer Waterways Experiment Station, Vicksburg, MS.

Engineering Manual 1110-2-5027, "Confined Disposal of Dredged Material," 30 September 1987, US Army Corps of Engineers, Washington, D.C.

Spigolon, S.J and Bakeer, R.M. (1993). "Geotechnical factors in the dredgeability of sediments: Report 3, Guidance in the geotechnical evaluation of the dredgeability of sediments using GEODREG," Contract Report DRP-93-3, U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS.

Spigolon, S. Joseph and Bakeer, Reda M. "Instruction Report DRP-94-1, DREDGABL: Geotechnical Factors in Dredgeability, Users Guide," Sept 1994, U.S. Army Engineer Waterways Experiment Station, CE, Vicksburg, MS).

Bowles, Joseph E. "Foundation Analysis and Design," 1968 McGraw-Hill, Inc. pages 125 and 126

**Tables:**

Table 1. Summary of Consistency, Relative Density and Laboratory Classifications for Remaining Overdepth (6 pages)

Table 2. Summary of Consistency and Relative Density for Remaining Depth and Allowable Overdepth

Table 3. Summary of Laboratory Classification for Remaining Depth and Allowable Overdepth

Table 4. Hydraulic and Mechanical Levee "Neat Line" Volumes, Dimensions and Stations

**Table 1. Summary of Consistency, Relative Density, and Laboratory Classification for Remaining Depth**

| | | | Consistency of Cohesive Soil | | | | | | Relative Density of Cohesionless Soils | | | | | | Laboratory Classification | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section No. | Line Station Number | Boring Log Number | Very Soft Vso | Soft So | Medium Stiff Med S | Stiff S | Very Stiff VS | Hard H | Very Loose VL | Loose L | Medium Dense Med D | Dense D | Very Dense VD | Sum of Graphical Measured | Inorganic Clays of High Plasticity, Fat Clays CH | Inorganic Clays Low to medium Plasticity, Lean Clays CL | Inorganic Silts Very Fine Sands, w/ Slight Plasticity ML | Clayey Sands, Sand-Clay Mixtures SC | Silty Sands, Sand-Silt Mixtures SM | Organic Clays of Medium to High Plasticity Organic Silts OH | Sum of Graphical Measured |
| | | | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY |
| 1 | 47000.00C | | | | | | | | | | | | | - | | - | | | | - | - |
| 1 | 47200.00C | 3ST-162* | | 16,706 | | 9,825 | | | | | | | | 26,531 | | 9,825 | | | | 16,706 | 26,531 |
| 1 | 47400.00C | | | 18,471 | | 10,862 | | | | | | | | 29,333 | | 10,862 | | | | 18,471 | 29,333 |
| 1 | 47600.00C | | 842 | | | | 11,048 | | 3,998 | | | | | 15,888 | 11,562 | 328 | | | 3,998 | | 15,888 |
| | spl | | 275 | 7,790 | | 6,841 | | | 953 | | | | | 15,859 | 14,906 | | | | 953 | | 15,859 |
| 1 | 47800.00C | | 508 | 14,428 | | 12,669 | | | 1,765 | | | | | 29,371 | 27,605 | | | | 1,765 | | 29,371 |
| 1 | 48016.77C | 93-60* | 505 | 14,319 | | 12,574 | - | | 1,752 | | | | | 29,149 | 27,397 | | | | 1,752 | | 29,149 |
| 1 | 48200.00C | | 414 | 11,760 | | 10,327 | - | | 1,439 | | | | | 23,941 | 22,502 | | | | 1,439 | | 23,941 |
| 1 | 48400.00C | 93-60 | 1,417 | 8,980 | | 14,407 | - | | 1,889 | | | | | 26,693 | 24,295 | 509 | | | 1,889 | | 26,693 |
| | | 3ST-163* | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | 196,765 |
| | | | 3,961 | 92,454 | | 77,505 | 11,048 | | 11,797 | | | | | 196,765 | 128,267 | 21,524 | | | 11,797 | 35,177 | 196,765 |
| | | | 2% | 47% | | 39% | 6% | | 6% | | | | | 100% | 65% | 11% | | | 6% | 18% | 100% |
| 2 | 48400.00C | 93-60 | - | - | | - | - | | - | | | | | - | - | - | | | - | | - |
| | | 3ST-163* | | | | | | | | | | | | | | | | | | | |
| 2 | 48600.00C | | 676 | 4,596 | | 7,300 | | | 946 | | | | | 13,519 | 12,302 | 270 | | | 946 | | 13,519 |
| | spl | | 1,487 | 5,272 | | | 4,732 | | | | 2,163 | | | 13,654 | 11,491 | | | | 2,163 | | 13,654 |
| 2 | 48800.00C | 93-61 | 2,989 | 10,597 | | | 9,510 | | | | 4,348 | | | 27,444 | 23,096 | | | | 4,348 | | 27,444 |
| 2 | 49000.00C | | 1,605 | 5,692 | | | 5,108 | | | | 2,335 | | | 14,741 | 12,406 | | | | 2,335 | | 14,741 |
| | spl | | 5,254 | 4,670 | | | 4,524 | | | | | | | 14,449 | 11,092 | | | | 3,357 | | 14,449 |
| 2 | 49200.00C | 93-61 | 11,525 | 10,244 | | | 9,924 | | | | | | | 31,694 | 24,331 | | | | 7,363 | | 31,694 |
| 2 | 49400.00C | | 11,935 | 10,609 | | | 10,277 | | | | | | | 32,821 | 25,196 | | | | 7,625 | | 32,821 |
| 2 | 49600.00C | 3ST-164 | | 7,581 | | 11,372 | 3,791 | | | | | 4,332 | | 27,075 | 11,372 | 11,372 | | | 4,332 | | 27,075 |
| | | 93-61 | | | | | | | | | | | | | | | | | | | |
| 2 | 49800.00C | | | 2,840 | | 4,260 | 1,420 | | | | | 1,623 | | 10,142 | 4,260 | 4,260 | | | 1,623 | | 10,142 |
| | spl | | | 4,868 | | | 3,854 | 1,521 | | | | | | 10,243 | 6,389 | 3,854 | | | | | 10,243 |
| 2 | 50000.00C | 3ST-164 | | 8,942 | | | 7,079 | 2,795 | | | | | | 18,816 | 11,737 | 7,079 | | | | | 18,816 |
| | | 72-104 | | | | | | | | | | | | | | | | | | | |
| 2 | 50200.00C | | | 9,006 | | | 7,130 | 2,814 | | | | | | 18,950 | 11,820 | 7,130 | | | | | 18,950 |
| 2 | 50400.00C | 72-104 | | 4,190 | | | 5,524 | 9,333 | | | | | | 19,047 | 9,714 | 9,333 | | | | | 19,047 |
| 2 | 50600.00C | | | 4,508 | | | 5,943 | 10,042 | | | | | | 20,493 | 10,451 | 10,042 | | | | | 20,493 |
| 2 | 50800.00C | | | 3,527 | | | 23,405 | 5,450 | | | | | | 32,382 | 25,328 | 7,053 | | | | | 32,382 |
| 2 | 50933.23T | 72-104 | | 3,209 | | | 21,293 | 4,959 | | | | | | 29,461 | 23,044 | 6,417 | | | | | 29,461 |
| 2 | 51000.00T | | | 1,783 | | | 11,830 | 2,755 | | | | | | 16,368 | 12,803 | 3,565 | | | | | 16,368 |
| | | | 35,472 | 102,136 | - | 22,931 | 135,345 | 39,669 | 946 | | 8,846 | 5,955 | | 351,299 | 246,832 | 70,375 | | | 34,092 | | 351,299 |
| | | | 10% | 29% | | 7% | 39% | 11% | 0.3% | | 3% | 2% | | 100% | 70% | 20% | | | 10% | | 100% |

**Table 1. Summary of Consistency, Relative Density, and Laboratory Classification for Remaining Depth**

| Section No. | Line Station Number | Boring Log Number | Consistency of Cohesive Soil: Very Soft Vso | Soft So | Medium Stiff Med S | Stiff S | Very Stiff VS | Hard H | Relative Density of Cohesionless Soils: Very Loose VL | Loose L | Medium Dense Med D | Dense D | Very Dense VD | Sum of Graphical Measured | Laboratory Classification: Inorganic Clays of High Plasticity, Fat Clays CH | Inorganic Clays Low to medium Plasticity, Lean Clays CL | Inorganic Silts Very Fine Sands, w/ Slight Plasticity ML | Clayey Sands, Sand-Clay Mixtures SC | Silty Sands, Sand-Silt Mixtures SM | Organic Clays of Medium to High Plasticity Organic Silts OH | Sum of Graphical Measured |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY |
| 3 | 51000.00T | | | | | | | | | | | | | | | | | | | | |
| 3 | 51100.00T | | | 2,707 | | | 17,963 | 4,183 | | | | | | 24,853 | 19,440 | 5,414 | | | | | 24,853 |
| 3 | 51200.00T | 3ST-1 | 21,131 | 2,915 | | | | | | | | | | 24,045 | 18,702 | 5,343 | | | | | 24,045 |
| 3 | 51300.00T | | 10,534 | 1,453 | | | | | | | | | | 11,987 | 9,323 | 2,664 | | | | | 11,987 |
| | spl | | 10,776 | 1,332 | | | | | | | | | | 12,108 | 7,749 | 4,359 | | | | | 12,108 |
| 3 | 51400.00T | 3ST-1 | 21,773 | 2,691 | | | | | | | | | | 24,464 | 15,657 | 8,807 | | | | | 24,464 |
| 3 | 51500.00T | | 10,914 | 1,349 | | | | | | | | | | 12,263 | 7,848 | 4,415 | | | | | 12,263 |
| | spl | | 11,159 | 981 | | | | | | | | | | 12,140 | 7,603 | 4,537 | | | | | 12,140 |
| 3 | 51600.00T | | 22,246 | 1,956 | | | | | | | | | | 24,202 | 15,157 | 9,045 | | | | | 24,202 |
| 3 | 51700.00T | | 11,122 | 978 | | | | | | | | | | 12,100 | 7,578 | 4,522 | | | | | 12,100 |
| | spl | | 10,755 | 1,344 | | | | | | | | | | 12,100 | 6,967 | 5,133 | | | | | 12,100 |
| | | | | | | | | | | | | | | | | | | | | | |
| 3 | 51800.00T | | 21,392 | 2,674 | | | | | | | | | | 24,066 | 13,856 | 10,210 | | | | | 24,066 |
| 3 | 51900.00T | | 10,423 | 1,303 | | | | | | | | | | 11,726 | 6,751 | 4,974 | | | | | 11,726 |
| | spl | | 2,843 | 2,487 | 2,013 | | 4,145 | | | | 474 | | | 11,962 | 4,264 | 6,159 | 1,066 | | 474 | | 11,962 |
| 3 | 52000.00T | 3ST-2 | 5,549 | 4,855 | 3,930 | | 8,092 | | | | 925 | | | 23,350 | 8,323 | 12,022 | 2,081 | | 925 | | 23,350 |
| 3 | 52100.00T | | 2,997 | 2,623 | 2,123 | | 4,371 | | | | 500 | | | 12,614 | 4,496 | 6,494 | 1,124 | | 500 | | 12,614 |
| | spl | | 3,872 | 2,498 | 1,499 | | 3,996 | | | | 624 | | | 12,489 | 4,621 | 6,245 | 999 | | 624 | | 12,489 |
| 3 | 52200.00T | 3ST-2 | 9,123 | 5,886 | 3,532 | | 9,418 | | | | 1,472 | | | 29,430 | 10,889 | 14,715 | 2,354 | | 1,472 | | 29,430 |
| | 52300.00T | | 5,291 | 3,414 | 2,048 | | 5,462 | | | | 853 | | | 17,068 | 6,315 | 8,534 | 1,365 | | 853 | | 17,068 |
| | spl | | 6,827 | 2,048 | 1,536 | | 1,707 | 1,365 | | | 3,755 | | | 17,239 | 3,755 | 9,387 | 4,096 | | | | 17,239 |
| 3 | 52400.00T | | 15,798 | 4,739 | 3,554 | | 3,949 | 3,160 | | | 8,689 | | | 39,889 | 8,689 | 21,722 | 9,479 | | | | 39,889 |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | 214,524 | 50,232 | 20,236 | | 59,103 | 8,708 | | | 17,291 | | | 370,094 | 187,981 | 154,701 | 22,565 | | 4,847 | | 370,094 |
| | | | 58% | 14% | 5% | | 16% | 2% | | | 5% | | | 100% | 51% | 42% | 6% | | 1% | | 100% |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| 4 | 52400.00T | 3ST-3 | | | | | | | | | | | | | | | | | | | |
| 4 | 52500.00T | | 17,992 | 5,397 | 4,048 | | 4,498 | 3,598 | | | 9,895 | | | 45,429 | 9,895 | 24,738 | 10,795 | | | | 45,429 |
| 4 | 52600.00T | | 10,115 | 3,034 | 2,276 | | 2,529 | 2,023 | | | 5,563 | | | 25,540 | 5,563 | 13,908 | 6,069 | | | | 25,540 |
| | spl | | 12,896 | 1,770 | 10,368 | | | | | | | | | 25,034 | 14,666 | 7,586 | 2,782 | | | | 25,034 |
| 4 | 52700.00T | | 28,875 | 3,963 | 23,213 | | | | | | | | | 56,052 | 32,838 | 16,985 | 6,228 | | | | 56,052 |
| 4 | 52735.12T | 93-62 | 10,718 | 1,471 | 8,616 | | | | | | | | | 20,805 | 12,189 | 6,305 | 2,312 | | | | 20,805 |
| 4 | 52800.00T | | 19,908 | 2,733 | 16,005 | | | | | | | | | 38,646 | 22,641 | 11,711 | 4,294 | | | | 38,646 |
| 4 | 52900.00T | | 8,972 | 16,150 | | | | 26,319 | | 8,972 | | | | 60,413 | 16,150 | 29,309 | 5,982 | 8,972 | | | 60,413 |
| 4 | 53000.00T | 3ST-4 | 8,849 | 15,928 | | | | 25,956 | | 8,849 | | | | 59,582 | 15,928 | 28,906 | 5,899 | 8,849 | | | 59,582 |
| 4 | 53100.00T | | 8,791 | 15,823 | | | | 25,786 | | 8,791 | | | | 59,191 | 15,823 | 28,716 | 5,861 | 8,791 | | | 59,191 |
| 4 | 53152.17T | | 2,309 | 4,156 | | | | 6,773 | | 2,309 | | | | 15,547 | 4,156 | 7,543 | 1,539 | 2,309 | | | 15,547 |
| | spl | | | 2,463 | 1,539 | | 8,620 | 1,231 | | | 462 | 1,078 | | 15,393 | 4,156 | 9,698 | 924 | 616 | | | 15,393 |
| 4 | 53152.17T | | | | | | | | | | | | | | | | | | | | |
| 4 | 53200.00T | | | 4,502 | 2,814 | | 15,758 | 2,251 | | | 844 | 1,970 | | 28,139 | 7,598 | 17,728 | 1,688 | 1,126 | | | 28,139 |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | 129,425 | 77,391 | 68,879 | | 31,405 | 93,938 | | 28,921 | 16,764 | 3,047 | | 449,770 | 158,646 | 202,336 | 51,760 | 31,271 | 5,757 | | 449,770 |
| | | | 29% | 17% | 15% | | 7% | 21% | | 6% | 4% | 1% | | 100% | 35% | 45% | 12% | 7% | 1% | | 100% |

**Table 1. Summary of Consistency, Relative Density, and Laboratory Classification for Remaining Depth**

| | | | Consistency of Cohesive Soil | | | | | | Relative Density of Cohesionless Soils | | | | | | | Laboratory Classification | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section No. | Line Station Number | Boring Log Number | Very Soft Vso | Soft So | Medium Stiff Med S | Stiff S | Very Stiff VS | Hard H | Very Loose VL | Loose L | Medium Dense Med D | Dense D | Very Dense VD | Sum of Graphical Measured | Inorganic Clays of High Plasticity, Fat Clays | Inorganic Clays Low to medium Plasticity, Lean Clays | Inorganic Silts Very Fine Sands, w/ Slight Plasticity | Clayey Sands, Sand-Clay Mixtures | Silty Sands, Sand-Silt Mixtures | Organic Clays of Medium to High Plasticity Organic Silts | Sum of Graphical Measured |
| | | | | | | | | | | | | | | | CH | CL | ML | SC | SM | OH | |
| | | | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY |
| 5 | 53200.00T | | | | | | | | | | | | | | | | | | | | |
| 5 | 53300.00T | | 514 | 5,295 | 36,223 | | 498 | 6,321 | | | 6,376 | 4,805 | | 60,032 | 12,130 | 36,721 | | 3,242 | 7,939 | | 60,032 |
| 5 | 53400.00T | | 529 | 5,447 | 37,264 | | 512 | 6,503 | | | 6,559 | 4,943 | | 61,757 | 12,479 | 37,776 | | 3,335 | 8,167 | | 61,757 |
| | | 3ST-5 | | | | | | | | | | | | | | | | | | | |
| 5 | 53500.00T | | 535 | 5,514 | 37,719 | | 518 | 6,582 | | | 6,639 | 5,003 | | 62,510 | 12,631 | 38,237 | | 3,375 | 8,267 | | 62,510 |
| 5 | 53600.00T | | 267 | 2,751 | 18,819 | | 259 | 3,284 | | | 3,312 | 2,496 | | 31,188 | 6,302 | 19,077 | | 1,684 | 4,125 | | 31,188 |
| | spl | | | 6,042 | | | 5,531 | 6,923 | 4,628 | | | 8,065 | | 31,188 | 6,042 | 12,453 | 8,065 | 4,628 | | | 31,188 |
| 5 | 53700.00T | | | 12,045 | | | 11,025 | 13,800 | 9,225 | | | 16,077 | | 62,171 | 12,045 | 24,825 | 16,077 | 9,225 | | | 62,171 |
| 5 | 53800.00T | 93-63 | | 11,987 | | | 10,972 | 13,734 | 9,181 | | | 15,999 | | 61,872 | 11,987 | 24,705 | 15,999 | 9,181 | | | 61,872 |
| | | 3ST-6 | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| 5 | 53900.00T | | | 11,855 | | | 10,851 | 13,582 | 9,080 | | | 15,823 | | 61,190 | 11,855 | 24,433 | 15,823 | 9,080 | | | 61,190 |
| 5 | 54000.00T | | 10,284 | 20,061 | | | | | | | | 24,060 | 5,612 | 60,017 | 4,013 | 23,077 | | 5,612 | 27,314 | | 60,017 |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | 12,129 | 80,995 | 130,025 | | 40,164 | 70,729 | 32,113 | | 22,886 | 97,271 | 5,612 | 491,925 | 89,483 | 241,305 | 55,963 | 49,361 | 55,812 | | 491,925 |
| | | | 2% | 16% | 26% | | 8% | 14% | 7% | | 5% | 20% | 1% | 100% | 18% | 49% | 11% | 10% | 11% | | 100% |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| 6 | 54000.00T | | | | | | | | | | | | | | | | | | | | |
| 6 | 54100.00T | | 10,232 | 19,958 | | | | | | | | 23,937 | 5,584 | 59,711 | 4,180 | 22,690 | | 5,374 | 26,870 | | 59,114 |
| 6 | 54200.00T | | 10,314 | 20,119 | | | | | | | | 24,130 | 5,629 | 60,191 | 4,213 | 22,873 | | 5,417 | 27,086 | | 59,589 |
| 6 | 54300.00T | | 10,380 | 20,249 | | | | | | | | 24,285 | 5,665 | 60,579 | 4,241 | 23,020 | | 5,452 | 27,261 | | 59,973 |
| 6 | 54406.55T | 3ST-7 | 10,948 | 21,357 | | | | | | | | 25,615 | 5,975 | 63,895 | 4,473 | 24,280 | | 5,751 | 28,753 | | 63,256 |
| | | 72-105 | | | | | | | | | | | | | | | | | | | |
| 6 | 54500.00T | | 8,540 | 16,660 | | | | | | | | 19,981 | 4,661 | 49,842 | 3,489 | 18,940 | | 4,486 | 22,429 | | 49,344 |
| 6 | 54600.00T | | 7,004 | 13,663 | | | | | | | | 16,387 | 3,822 | 40,877 | 2,861 | 15,533 | | 3,679 | 18,395 | | 40,468 |
| 6 | 54700.00T | | 5,176 | 10,096 | | | | | | | | 12,109 | 2,825 | 30,206 | 2,114 | 11,478 | | 2,719 | 13,593 | | 29,904 |
| 6 | 54800.00T | | 19,642 | 271 | 2,238 | | | | | | 1,490 | | | 23,640 | 13,948 | 9,456 | | | | | 23,404 |
| 6 | 54900.00T | | 15,802 | 218 | 1,800 | | | | | | 1,198 | | | 19,018 | 11,221 | 7,607 | | | | | 18,828 |
| 6 | 55000.00T | | 12,237 | 169 | 1,394 | | | | | | 928 | | | 14,727 | 8,689 | 5,891 | | | | | 14,580 |
| 6 | 55066.00T | | 6,291 | 87 | 717 | | | | | | 477 | | | 7,572 | 4,467 | 3,029 | | | | | 7,496 |
| 6 | 55066.00T | | | | | | | | | | | | | | | | | | | | |
| 6 | 55200.00T | | 10,913 | 150 | 1,243 | | | | | | 828 | | | 13,134 | 7,749 | 5,254 | | | | | 13,003 |
| 6 | 55400.00T | | 13,985 | | | | | | | | | | | 13,985 | 10,908 | 3,077 | | | | | 13,985 |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | 141,465 | 122,996 | 7,391 | | | | | | 4,921 | 146,445 | 34,160 | 457,377 | 100,221 | 151,825 | | 34,160 | 171,171 | | - |
| | | | 31% | 27% | 2% | | | | | | 1% | 32% | 7% | 100% | 22% | 33% | | 7% | 37% | | 100% |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| 7 | 55400.00T | | | | | | | | | | | | | | | | | | | | |
| 7 | 55600.00T | 3ST-8W | 1,218 | | | | | | | | | | | 1,218 | 950 | 268 | | | | | 1,218 |
| | | 3ST-9W | | | | | | | | | | | | | | | | | | | |
| | | 93-64 | | | | | | | | | | | | | | | | | | | |
| 7 | 55800.00T | | 1,260 | | | | | | | | | | | 1,260 | 983 | 277 | | | | | 1,260 |
| 7 | 56000.00T | | 756 | | | | | | | | | | | 756 | | 756 | | | | | 756 |

**Table 1. Summary of Consistency, Relative Density, and Laboratory Classification for Remaining Depth**

| Section No. | Line Station Number | Boring Log Number | Consistency of Cohesive Soil: Very Soft Vso | Soft So | Medium Stiff Med S | Stiff S | Very Stiff VS | Hard H | Relative Density of Cohesionless Soils: Very Loose VL | Loose L | Medium Dense Med D | Dense D | Very Dense VD | Sum of Graphical Measured | Laboratory Classification: Inorganic Clays of High Plasticity, Fat Clays CH | Inorganic Clays Low to medium Plasticity, Lean Clays CL | Inorganic Silts Very Fine Sands, w/ Slight Plasticity ML | Clayey Sands, Sand-Clay Mixtures SC | Silty Sands, Sand-Silt Mixtures SM | Organic Clays of Medium to High Plasticity Organic Silts OH | Sum of Graphical Measured |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY |
| 7 | 56200.00T | 3ST-10W | 2,287 | | | | | | | | | | | 2,287 | | 2,287 | | | | | 2,287 |
| 7 | 56400.00T | | 2,025 | | | | | | | | | | | 2,025 | | 2,025 | | | | | 2,025 |
| | spl | | 1,539 | 486 | | | | | | | | | | 2,025 | 486 | 1,539 | | | | | 2,025 |
| 7 | 56600.00T | 3ST-10W | 2,416 | 763 | | | | | | | | | | 3,179 | 763 | 2,416 | | | | | 3,179 |
| 7 | 56800.00T | | 1,351 | 427 | | | | | | | | | | 1,778 | 427 | 1,351 | | | | | 1,778 |
| | spl | | 1,422 | 231 | | | | 124 | | | | | | 1,778 | 533 | 1,245 | | | | | 1,778 |
| 7 | 57000.00T | 3ST-11W | 6,101 | 991 | | | | 534 | | | | | | 7,626 | 2,288 | 5,338 | | | | | 7,626 |
| | | 93-65 | | | | | | | | | | | | | | | | | | | |
| 7 | 57100.00T | | 4,542 | 738 | | | | 397 | | | | | | 5,678 | 1,703 | 3,975 | | | | | 5,678 |
| 7 | 57200.00T | | 5,678 | 923 | | | | 497 | | | | | | 7,097 | 2,129 | 4,968 | | | | | 7,097 |
| 7 | 57300.00T | | 4,006 | 651 | | | | 351 | | | | | | 5,008 | 1,502 | 3,506 | | | | | 5,008 |
| | spl | | | 1,603 | 200 | 250 | 150 | 2,654 | | | 150 | | | 5,008 | 2,504 | 2,354 | | 150 | | | 5,008 |
| 7 | 57400.00T | | | 4,530 | 566 | 708 | 425 | 7,503 | | | 425 | | | 14,157 | 7,079 | 6,654 | | 425 | | | 14,157 |
| 7 | 57500.00T | | | 5,276 | 660 | 824 | 495 | 8,739 | | | 495 | | | 16,489 | 8,245 | 7,750 | | 495 | | | 16,489 |
| 7 | 57600.00T | 3ST-12W | | 5,116 | 640 | 799 | 480 | 8,474 | | | 480 | | | 15,988 | 7,994 | 7,514 | | 480 | | | 15,988 |
| 7 | 57700.00T | | | 3,953 | 494 | 618 | 371 | 6,547 | | | 371 | | | 12,353 | 6,177 | 5,806 | | 371 | | | 12,353 |
| 7 | 57800.00T | | | 1,470 | 184 | 230 | 138 | 2,434 | | | 138 | | | 4,593 | 2,297 | 2,159 | | 138 | | | 4,593 |
| | spl | | | 1,653 | | | 2,940 | | | | | | | 4,593 | 1,653 | 2,940 | | | | | 4,593 |
| 7 | 57900.00T | | | 3,056 | | | 5,433 | | | | | | | 8,489 | 3,056 | 5,433 | | | | | 8,489 |
| 7 | 58000.00T | 3ST-13W | | 2,778 | | | 4,940 | | | | | | | 7,718 | 2,778 | 4,940 | | | | | 7,718 |
| | | 72-106 | | | | | | | | | | | | | | | | | | | |
| | 58200.00T | | | 5,373 | | | 9,551 | | | | | | | 14,924 | 5,373 | 9,551 | | | | | 14,924 |
| 7 | 58400.00T | | | 6,687 | | | 6,396 | | | | | 1,599 | | 14,682 | 6,687 | 6,396 | | | 1,599 | | 14,682 |
| 7 | 58600.00T | 3ST-14 | | 6,311 | | | 6,037 | | | | | 1,509 | | 13,857 | 6,311 | 6,037 | | | 1,509 | | 13,857 |
| | | 3ST-15 | | | | | | | | | | | | | | | | | | | |
| 7 | 58800.00T | | | 5,937 | | | 5,679 | | | | | 1,420 | | 13,035 | 5,937 | 5,679 | | | 1,420 | | 13,035 |
| 7 | 59000.00T | | 12,621 | | | | | | | | | | | 12,621 | 12,621 | | | | | | 12,621 |
| 7 | 59169.58T | 93-66 | 10,864 | | | | | | | | | | | 10,864 | 10,864 | | | | | | 10,864 |
| | | 3ST-16 | | | | | | | | | | | | | | | | | | | |
| 7 | 59169.58T | | | | | | | | | | | | | | | | | | | | |
| 7 | 59200.00T | | 1,885 | | | | | | | | | | | 1,885 | 1,885 | | | | | | 1,885 |
| | | | | | | | | | | | | | | | | | | | | | |
| 7 | 59400.00T | | 5,639 | | 4,261 | | | | | | | 2,632 | | 12,531 | 5,639 | 4,261 | | | 2,632 | | 12,531 |
| 7 | 59600.00T | 3ST-17 | 6,210 | | 4,692 | | | | | | | 2,898 | | 13,799 | 6,210 | 4,692 | | | 2,898 | | 13,799 |
| 7 | 59800.00T | | 7,128 | | 5,386 | | | | | | | 3,327 | | 15,841 | 7,128 | 5,386 | | | 3,327 | | 15,841 |
| 7 | 60000.00T | | 10,534 | | | 7,321 | | | | | | | | 17,855 | 10,534 | 7,321 | | | | | 17,855 |
| 7 | 60200.00T | 3ST-18 | 11,035 | | | 7,668 | | | | | | | | 18,703 | 11,035 | 7,668 | | | | | 18,703 |
| 7 | 60400.00T | | 10,766 | | | 7,482 | | | | | | | | 18,248 | 10,766 | 7,482 | | | | | 18,248 |
| 7 | 60600.00T | | | 6,784 | | | | 9,915 | | | | | 522 | 17,220 | 16,698 | | | 522 | | | 17,220 |
| 7 | 60800.00T | 3ST-19 | | 6,316 | | | | 9,232 | | | | | 486 | 16,034 | 15,548 | | | | 486 | | 16,034 |
| 7 | 61000.00T | | | 5,698 | | | | 8,328 | | | | | 438 | 14,464 | 14,026 | | | | 438 | | 14,464 |
| 7 | 61200.00T | | | 6,300 | | | | 2,011 | | | | | 5,094 | 13,404 | 6,300 | 2,011 | | | 5,094 | | 13,404 |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | 111,284 | 84,052 | 17,082 | 25,900 | 43,033 | 67,739 | | | 2,058 | 13,384 | 6,540 | 371,071 | 207,109 | 141,981 | | 2,579 | 19,402 | | 371,071 |
| | | | 30% | 23% | 5% | 7% | 12% | 18% | | | 1% | 4% | 2% | 100% | 56% | 38% | | 1% | 5% | | 100% |

# Table 1. Summary of Consistency, Relative Density, and Laboratory Classification for Remaining Depth

| Section No. | Line Station Number | Boring Log Number | Consistency of Cohesive Soil: Very Soft Vso | Soft So | Medium Stiff Med S | Stiff S | Very Stiff VS | Hard H | Relative Density of Cohesionless Soils: Very Loose VL | Loose L | Medium Dense Med D | Dense D | Very Dense VD | Sum of Graphical Measured | Laboratory Classification: Inorganic Clays of High Plasticity, Fat Clays CH | Inorganic Clays Low to medium Plasticity, Lean Clays CL | Inorganic Silts Very Fine Sands, w/ Slight Plasticity ML | Clayey Sands, Sand-Clay Mixtures SC | Silty Sands, Sand-Silt Mixtures SM | Organic Clays of Medium to High Plasticity Organic Silts OH | Sum of Graphical Measured |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY |
| 8 | 61200.00T | | | | | | | | | | | | | | | | | | | | |
| 8 | 61400.00T | 3ST-20 | | 6,351 | | | | 2,027 | | | | | 5,135 | 13,512 | 6,351 | 2,027 | | | 5,135 | | 13,512 |
| 8 | 61600.00T | | | 6,556 | | | | 2,092 | | | | | 5,301 | 13,949 | 6,556 | 2,092 | | | 5,301 | | 13,949 |
| 8 | 61800.00T | | 5,315 | | | | 9,450 | | | | | | | 14,765 | 5,315 | 9,450 | | | | | 14,765 |
| 8 | 62000.00T | 3ST-22 | 5,177 | | | | 9,203 | | | | | | | 14,380 | 5,177 | 9,203 | | | | | |
| | | 3ST-21 | | | | | | | | | | | | | | | | | | | |
| 8 | 62200.00T | | 5,181 | | | | 9,211 | | | | | | | 14,392 | 5,181 | 9,211 | | | | | |
| 8 | 62274.05T | | 981 | | | | 1,743 | | | | | | | 2,724 | 981 | 1,743 | | | | | |
| | spl | | 654 | | | | | 1,090 | | | | 763 | 218 | 2,724 | 654 | 1,090 | | 218 | 763 | | |
| 8 | 62274.05T | | | | | | | | | | | | | | | | | | | | |
| 8 | 62400.00T | | 2,293 | | | | | 3,821 | | | | 2,675 | 764 | 9,553 | 2,293 | 3,821 | | 764 | 2,675 | | |
| 8 | 62600.00T | 3ST-23 | 3,750 | | | | | 6,250 | | | | 4,375 | 1,250 | 15,624 | 3,750 | 6,250 | | 1,250 | 4,375 | | |
| 8 | 62800.00T | | 3,701 | | | | | 6,168 | | | | 4,318 | 1,234 | 15,420 | 3,701 | 6,168 | | 1,234 | 4,318 | | |
| 8 | 63000.00T | | 1,804 | | | | | 3,007 | | | | 2,105 | 601 | 7,517 | 1,804 | 3,007 | | 601 | 2,105 | | |
| | spl | | 7,216 | | | | | | | | 301 | | | 7,517 | 3,232 | | 3,984 | | 301 | | |
| 8 | 63200.00T | | 14,462 | | | | | | | | 603 | | | 15,065 | 6,478 | | 7,984 | | 603 | | |
| 8 | 63347.28T | 3ST-24 | 11,148 | | | | | | | | 465 | | | 11,613 | 4,994 | | 6,155 | | 465 | | 11,613 |
| 8 | 63347.28T | | | | | | | | | | | | | | | | | | | | |
| 8 | 63400.00T | | 4,176 | | | | | | | | 174 | | | 4,350 | 1,871 | | 2,306 | | 174 | | 4,350 |
| 8 | 63500.00T | | 8,779 | | | | | | | | 366 | | | 9,145 | 3,932 | | 4,847 | | 366 | | 9,145 |
| 8 | 63600.00T | | 10,317 | | | | | | | | | | | 10,317 | 10,317 | | | | | | 10,317 |
| 8 | 63700.00T | | 11,455 | | | | | | | | | | | 11,455 | 11,455 | | | | | | 11,455 |
| 8 | 63800.00T | 93-67 | 12,443 | | | | | | | | | | | 12,443 | 12,443 | | | | | | 12,443 |
| | | 3ST-25 | | | | | | | | | | | | | | | | | | | |
| 8 | 63900.00T | | 13,250 | | | | | | | | | | | 13,250 | 13,250 | | | | | | 13,250 |
| 8 | 64000.00T | | 14,225 | | | | | | | | | | | 14,225 | 14,225 | | | | | | 14,225 |
| 8 | 64100.00T | | 7,468 | | | | | | | | | | | 7,468 | 7,468 | | | | | | 7,468 |
| | spl | | | 2,614 | 1,718 | 3,137 | | | | | | | | 7,468 | 1,344 | 3,958 | 2,166 | | | | 7,468 |
| 8 | 64200.00T | | | 5,394 | 3,545 | 6,473 | | | | | | | | 15,411 | 2,774 | 8,168 | 4,469 | | | | 15,411 |
| 8 | 64300.00T | | | 5,170 | 3,398 | 6,204 | | | | | | | | 14,772 | 2,659 | 7,829 | 4,284 | | | | 14,772 |
| 8 | 64400.00T | 3ST-27 | | 4,928 | 3,238 | 5,913 | | | | | | | | 14,079 | 2,534 | 7,462 | 4,083 | | | | 14,079 |
| | | 3ST-26 | | | | | | | | | | | | | | | | | | | |
| 8 | 64500.00T | | | 5,143 | 3,380 | 6,172 | | | | | | | | 14,695 | 2,645 | 7,788 | 4,262 | | | | 14,695 |
| 8 | 64600.00T | | | 4,889 | 3,213 | 5,867 | | | | | | | | 13,968 | 2,514 | 7,403 | 4,051 | | | | 13,968 |
| 8 | 64700.00T | | | 2,287 | 1,503 | 2,744 | | | | | | | | 6,533 | 1,176 | 3,462 | 1,895 | | | | 6,533 |
| | spl | | | 2,744 | | | 3,724 | | | | | | | 6,468 | 2,744 | 3,332 | | 392 | | | 6,468 |
| 8 | 64800.00T | | | 5,654 | | | 7,674 | | | | | | | 13,328 | 5,654 | 6,866 | | 808 | | | 13,328 |
| 8 | 64900.00T | | | 5,918 | | | 8,032 | | | | | | | 13,950 | 5,918 | 7,186 | | 845 | | | 13,950 |
| 8 | 65000.00T | 72-107 | | 6,134 | | | 8,324 | | | | | | | 14,458 | 6,134 | 7,448 | | 876 | | | 14,458 |
| | | 3ST-28 | | | | | | | | | | | | | | | | | | | |
| | | 72-107A | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | 143,795 | 63,781 | 19,993 | 36,509 | 57,361 | 24,454 | | | 1,908 | 14,235 | 14,502 | 376,538 | 167,523 | 124,965 | 50,484 | 6,989 | 26,577 | | 376,538 |
| | | | 38% | 17% | 5% | 10% | 15% | 6% | | | 1% | 4% | 4% | 100% | 44% | 33% | 13% | 2% | 7% | | 100% |

**Table 1. Summary of Consistency, Relative Density, and Laboratory Classification for Remaining Depth**

| | | | Consistency of Cohesive Soil | | | | | | Relative Density of Cohesionless Soils | | | | | | Laboratory Classification | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section No. | Line Station Number | Boring Log Number | Very Soft Vso | Soft So | Medium Stiff Med S | Stiff S | Very Stiff VS | Hard H | Very Loose VL | Loose L | Medium Dense Med D | Dense D | Very Dense VD | Sum of Graphical Measured | Inorganic Clays of High Plasticity, Fat Clays | Inorganic Clays Low to medium Plasticity, Lean Clays | Inorganic Silts Very Fine Sands, w/ Slight Plasticity | Clayey Sands, Sand-Clay Mixtures | Silty Sands, Sand-Silt Mixtures | Organic Clays of Medium to High Plasticity Organic Silts | Sum of Graphical Measured |
| | | | | | | | | | | | | | | | CH | CL | ML | SC | SM | OH | |
| | | | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY |
| 9 | 65800.00T | 3ST-29 | | - | | | - | - | | | | | | - | - | - | | | | | - |
| 9 | 65900.00T | | | 985 | | | 1,609 | 689 | | | | | | 3,283 | 1,674 | 1,609 | | | | | 3,283 |
| 9 | 66000.00T | | | 867 | | | 1,416 | 607 | | | | | | 2,889 | 1,473 | 1,416 | | | | | 2,889 |
| 9 | 66100.00T | | | 549 | | | 897 | 384 | | | | | | 1,830 | 933 | 897 | | | | | 1,830 |
| | spl | | | 1,830 | | | | | | | | | | 1,830 | 1,830 | | | | | | 1,830 |
| 9 | 66200.00T | | | 3,829 | | | | | | | | | | 3,829 | 3,829 | | | | | | 3,829 |
| 9 | 66300.00T | | | 4,307 | | | | | | | | | | 4,307 | 4,307 | | | | | | 4,307 |
| 9 | 66400.00T | 93-68 | | 4,499 | | | | | | | | | | 4,499 | 4,499 | | | | | | 4,499 |
| | | 3ST-30 | | | | | | | | | | | | | | | | | | | |
| 9 | 66500.00T | | | 3,648 | | | | | | | | | | 3,648 | 3,648 | | | | | | 3,648 |
| 9 | 66600.00T | | | 3,167 | | | | | | | | | | 3,167 | 3,167 | | | | | | 3,167 |
| 9 | 66700.00T | | | 4,180 | | | | | | | | | | 4,180 | 4,180 | | | | | | 4,180 |
| 9 | 66800.00T | | | 622 | | | 4,294 | | | | | 735 | | 5,650 | 4,916 | | | | 735 | | 5,650 |
| 9 | 66900.00T | | | 715 | | | 4,942 | | | | | 845 | | 6,503 | 5,658 | | | | 845 | | 6,503 |
| 9 | 67000.00T | | | 838 | | | 5,792 | | | | | 991 | | 7,621 | 6,630 | | | | 991 | | 7,621 |
| 9 | 67100.23T | 3ST-31 | | 844 | | | 5,830 | | | | | 997 | | 7,671 | 6,674 | | | | 997 | | 7,671 |
| 9 | 67200.00T | | | 808 | | | 5,584 | | | | | 955 | | 7,348 | 6,393 | | | | 955 | | 7,348 |
| 9 | 67300.00T | | | 1,031 | | | 7,123 | | | | | 1,218 | | 9,372 | 8,154 | | | | 1,218 | | 9,372 |
| 9 | 67400.00T | | | 12,308 | | | | | | | | | | 12,308 | 12,308 | | | | | | 12,308 |
| 9 | 67500.00T | | | 16,979 | | | | | | | | | | 16,979 | 16,979 | | | | | | 16,979 |
| | 67600.00T | 3ST-32 | | 20,430 | | | | | | | | | | 20,430 | 20,430 | | | | | | 20,430 |
| | | 3ST-33 | | | | | | | | | | | | | | | | | | | |
| 9 | 67700.00T | | | 19,799 | | | | | | | | | | 19,799 | 19799 | | | | | | 19,799 |
| 9 | 67800.00T | | | 18,305 | | | | | | | | | | 18,305 | 18305 | | | | | | 18,305 |
| 9 | 67900.00T | | | 17,412 | | | | | | | | | | 17,412 | 17412 | | | | | | 17,412 |
| 9 | 68000.00T | | | 8,194 | | | | | | | | | | 8,194 | 8194 | | | | | | 8,194 |
| | spl | | | 8,194 | | | | | | | | | | 8,194 | 8,194 | | | | | | 8,194 |
| 9 | 68100.00T | | | 14,761 | | | | | | | | | | 14,761 | 14,761 | | | | | | 14,761 |
| 9 | 68200.00T | | | 12,748 | | | | | | | | | | 12,748 | 12,748 | | | | | | 12,748 |
| 9 | 68300.00T | | | 10,684 | | | | | | | | | | 10,684 | 10,684 | | | | | | 10,684 |
| 9 | 68406.58T | 3ST-34 | | 7,945 | | | | | | | | | | 7,945 | 7,945 | | | | | | 7,945 |
| | | | | | | | | | | | | | | | | | | | | | |
| | | | | 200,478 | | | 37,486 | 1,680 | | | | 5,741 | | 245,386 | 235,724 | 3,921 | | | 5,741 | | 245,386 |
| | | | | 82% | | | 15% | 1% | | | | 2% | | 100% | 96% | 2% | | | 2% | | 100% |

24

**Table 2. Summary of Consistency and Relative Density for Remaining Depth and Allowable Overdepth**

| Section | Consistency of Cohesive Soil | | | | | | Relative Density of Cohesionless Soils | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section | Very Soft | Soft | Medium | Stiff | Very | Hard | Very | Loose | Medium | Dense | Very | Sum of |
| No. | Vso | So | Stiff | S | Stiff | H | Loose | L | Dense | D | Dense | Graphical |
| | | | Med S | | VS | | VL | | Med D | | VD | Measured |
| | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY | CY |
| Sect 1 Remain | 3,961 | 92,454 | - | 77,505 | 11,048 | - | 11,797 | - | - | - | - | 196,765 |
| Allow OD | - | - | - | - | 22,941 | - | - | - | - | | - | 22,941 |
| Total | 3,961 | 92,454 | - | 77,505 | 33,989 | - | 11,797 | | | | | 219,706 |
| % | 2% | 42% | | 35% | 15% | | 5% | | | | | 100% |
| Sect 2 Remain | 35,472 | 102,136 | - | 22,931 | 135,345 | 39,669 | 946 | - | 8,846 | 5,955 | - | 351,299 |
| Allow OD | - | - | - | 4,030 | 16,037 | 12,064 | - | - | - | - | - | 32,131 |
| Total | 35,472 | 102,136 | - | 26,961 | 151,382 | 51,733 | 946 | - | 8,846 | 5,955 | | 383,430 |
| % | 9% | 27% | | 7% | 39% | 13% | 0% | | 2% | 2% | | 100% |
| Sect 3 Remain | 214,524 | 50,232 | 20,236 | - | 59,103 | 8,708 | - | - | 17,291 | - | - | 370,094 |
| Allow OD | - | 12,281 | - | - | 7,197 | - | - | - | - | - | - | 19,479 |
| Total | 214,524 | 62,513 | 20,236 | - | 66,300 | 8,708 | | | 17,291 | | | 389,573 |
| % | 55% | 16% | 5% | | 17% | 2% | | | 4% | | | 100% |
| Sect 4 Remain | 129,797 | 74,266 | 90,793 | - | 7,387 | 95,039 | - | 28,921 | 20,082 | 3,484 | - | 449,770 |
| Allow OD | - | - | - | - | 15,333 | 10,565 | - | - | - | - | - | 25,899 |
| Total | 129,797 | 74,266 | 90,793 | - | 22,721 | 105,605 | - | 28,921 | 20,082 | 3,484 | - | 475,669 |
| % | 27% | 16% | 19% | | 5% | 22% | | 6% | 4% | 1% | | 100% |
| Sect 5 Remain | 12,129 | 80,995 | 130,025 | - | 40,164 | 70,729 | 32,113 | - | 22,886 | 97,271 | 5,612 | 491,925 |
| Allow OD | - | - | - | - | - | 18,950 | - | - | - | - | - | 18,950 |
| Total | 12,129 | 80,995 | 130,025 | - | 40,164 | 89,679 | 32,113 | - | 22,886 | 97,271 | 5,612 | 510,875 |
| % | 2% | 16% | 25% | | 8% | 18% | 6% | | 4% | 19% | 1% | 100% |
| Sect 6 Remain | 141,465 | 122,996 | 7,391 | - | - | - | - | - | 4,921 | 146,445 | 34,160 | 457,377 |
| Allow OD | 1,963 | 978 | - | - | 6,022 | - | - | - | 10,165 | 1,869 | - | 20,997 |
| Total | 143,427 | 123,974 | 7,391 | - | 6,022 | - | - | - | 15,086 | 148,314 | 34,160 | 478,374 |
| % | 30% | 26% | 2% | | 1% | | | | 3% | 31% | 7% | 100% |
| Sect 7 Remain | 111,284 | 84,052 | 17,082 | 25,900 | 43,033 | 67,739 | - | - | 2,058 | 13,384 | 6,540 | 371,071 |
| Allow OD | 17,406 | - | 9,563 | - | 9,133 | 20,667 | - | - | - | - | 2,585 | 59,353 |
| Total | 128,690 | 84,052 | 26,644 | 25,900 | 52,166 | 88,406 | - | - | 2,058 | 13,384 | 9,125 | 430,424 |
| % | 30% | 20% | 6% | 6% | 12% | 21% | | | 0.5% | 3% | 2% | 100% |
| Sect 8 Remain | 143,795 | 63,781 | 19,993 | 36,509 | 57,361 | 24,454 | - | - | 1,908 | 14,235 | 14,502 | 376,538 |
| Allow OD | - | - | - | - | 22,135 | 19,489 | - | - | 2,311 | - | 5,170 | 49,105 |
| Total | 143,795 | 63,781 | 19,993 | 36,509 | 79,496 | 43,943 | - | - | 4,219 | 14,235 | 19,673 | 425,643 |
| % | 34% | 15% | 5% | 9% | 19% | 10% | | | 1% | 3% | 5% | 100% |
| Sect 9 Remain | - | 200,478 | - | - | 37,486 | 1,680 | - | - | - | 5,741 | - | 245,386 |
| Allow OD | 10,267 | - | - | 2,296 | 7,222 | 4,602 | - | - | 185 | 741 | - | 25,313 |
| Total | 10,267 | 200,478 | - | 2,296 | 44,709 | 6,282 | - | - | 185 | 6,482 | - | 270,699 |
| % | 4% | 74% | | 1% | 17% | 2% | | | 0.1% | 2% | | 100% |
| TotalAllow OD | 29,635 | 13,260 | 9,563 | 6,326 | 106,020 | 86,337 | - | - | 12,661 | 2,610 | 7,756 | 274,167 |
| %Total AOD | 11% | 5% | 3% | 2% | 39% | 31% | | | 5% | 1% | 3% | 100% |
| Total Remain | 792,428 | 871,389 | 285,521 | 162,845 | 390,928 | 308,019 | 44,857 | 28,921 | 77,991 | 286,514 | 60,814 | 3,310,225 |
| Grand Total | 822,063 | 884,648 | 295,083 | 169,171 | 496,948 | 394,356 | 44,857 | 28,921 | 90,652 | 289,124 | 68,569 | 3,584,392 |
| % GranTotal | 23% | 25% | 8% | 5% | 14% | 11% | 1% | 1% | 3% | 8% | 2% | 100% |

Table 3. Summary of Laboratory Classification for Remaining Depth and Allowable Overdepth

| Section | Inorganic | Inorganic | Inorganic | Clayey | Silty | Organic | Sum of |
|---|---|---|---|---|---|---|---|
| No. | Clays of | Clays of | Silts & | Sands, | Sands, | Clays of | Graphical |
| | High | Low to | Very Fine | Sand- | Sand- | Medium | Measured |
| | Plasticity, | Medium | Sands, w/ | Clay | Silt | to High | |
| | Fat Clays | Plasticity, | Slight | Mixtures | Mixtures | Plasticity | |
| | | Lean Clays | Plasticity | | | Organic Silts | |
| | CH | CL | ML | SC | SM | OH | |
| | CY | CY | CY | CY | CY | CY | CY |
| Sect 1 Remain | 128,267 | 21,524 | - | - | 11,797 | 35,177 | 196,765 |
| Allow OD | 14,904 | 8,037 | - | - | - | - | 22,941 |
| Total | 143,171 | 29,561 | | | 11,797 | 35,177 | 219,706 |
| % | 65% | 13% | | | 5% | 16% | 100% |
| Sect 2 Remain | 246,832 | 70,375 | - | - | 34,092 | - | 351,299 |
| Allow OD | 9,222 | 22,909 | - | - | - | - | 32,131 |
| Total | 256,054 | 93,284 | | | 34,092 | | 383,430 |
| % | 67% | 24% | | | 9% | | 100% |
| Sect 3 Remain | 187,981 | 154,701 | 22,565 | - | 4,847 | - | 370,094 |
| Allow OD | 5,049 | 14,430 | - | - | - | - | 19,479 |
| Total | 193,030 | 169,131 | 22,565 | | 4,847 | | 389,573 |
| % | 50% | 43% | 6% | | 1% | | 100% |
| Sect 4 Remain | 158,646 | 202,336 | 51,760 | 31,271 | 5,757 | - | 449,770 |
| Allow OD | 12,074 | 13,825 | - | - | - | - | 25,899 |
| Total | 170,720 | 216,160 | 51,760 | 31,271 | 5,757 | - | 475,669 |
| % | 36% | 45% | 11% | 7% | | | 99% |
| Sect 5 Remain | 89,483 | 241,305 | 55,963 | 49,361 | 55,812 | - | 491,925 |
| Allow OD | 18,950 | - | - | - | - | - | 18,950 |
| Total | 108,433 | 241,305 | 55,963 | 49,361 | 55,812 | | 510,875 |
| % | 21% | 47% | 11% | 10% | 11% | | 100% |
| Sect 6 Remain | 100,221 | 151,825 | - | 34,160 | 171,171 | - | 457,377 |
| Allow OD | 7,000 | 1,963 | - | - | 12,034 | - | 20,997 |
| Total | 107,221 | 153,788 | | 34,160 | 183,205 | | 478,374 |
| % | 22% | 32% | | 7% | 38% | | 100% |
| Sect 7 Remain | 207,109 | 141,981 | - | 2,579 | 19,402 | - | 371,071 |
| Allow OD | 21,341 | 35,427 | - | 2,585 | - | - | 59,353 |
| Total | 228,449 | 177,408 | | 5,165 | 19,402 | | 430,424 |
| % | 53% | 41% | | 1% | 5% | | 100% |
| Sect 8 Remain | 167,523 | 124,965 | 50,484 | 6,989 | 26,577 | - | 376,538 |
| Allow OD | 10,569 | 29,826 | 3,541 | 5,170 | - | - | 49,105 |
| Total | 178,092 | 154,790 | 54,025 | 12,159 | 26,577 | | 425,643 |
| % | 42% | 36% | 13% | 3% | 6% | | 100% |
| Sect 9 Remain | 235,724 | 3,921 | - | - | 5,741 | - | 245,386 |
| Allow OD | 24,387 | - | - | - | 926 | - | 25,313 |
| Total | 260,111 | 3,921 | | | 6,667 | | 270,699 |
| % | 96% | 1% | | | 2% | | 100% |
| Total Allow OD | 123,495 | 126,416 | 3,541 | 7,756 | 12,960 | - | 274,167 |
| %Total AOD | 45% | 46% | 1% | 3% | 5% | | 100% |
| Total Remain | 1,521,787 | 1,112,932 | 180,772 | 124,360 | 335,198 | 35,177 | 3,310,225 |
| Grand Total | 1,645,281 | 1,239,348 | 184,312 | 132,115 | 348,158 | 35,177 | 3,584,392 |
| % Grand Total | 46% | 35% | 5% | 4% | 10% | 1% | 100% |

**Table 4. Hydraulic Levee "Neat Line" Volumes and Dimensions and Stations**

| Stations, Crest Width, Height, and Volumes for both Hydraulic and Mechanical Levees | | | | | | | |
|---|---|---|---|---|---|---|---|
| Levee | Crest | Height | Base | Cross | | Distance | Volume |
| Stations | Width | | Width | Section | | Between | |
| | | | | Area | | X-sections | |
| | ft | ft | ft | sf | | ft | CY |
| 400 | 10 | 20 | 142 | 1520 | | | |
| 2000 | 10 | 18.5 | 126 | 1258 | | 1600 | 82,311 |
| 3900 | 10 | 18 | 120 | 1170 | | 1900 | 85,430 |
| 5600 | 10 | 17 | 112 | 1037 | | 1700 | 69,480 |
| | | | | | | | |
| 6150 | 10 | 16.5 | 110 | 990 | | | |
| 8900 | 10 | 13 | 95 | 683 | | 2750 | 85,174 |
| 9700 | 10 | 14 | 94 | 728 | | 800 | 20,896 |
| | | | | | | | |
| 16600 | 10 | 16 | 106 | 928 | | | |
| 17950 | 10 | 15.5 | 106 | 899 | | 1350 | 45,675 |
| 19700 | 10 | 16.5 | 108 | 974 | | 1750 | 60,683 |
| 20900 | 10 | 17 | 112 | 1037 | | 1200 | 44,678 |
| 21500 | 10 | 20 | 142 | 1520 | | 600 | 28,411 |
| | | 202 | 1373 | Total "Neat Line" Perimeter Volume | | | 522,737 |
| | Average | 17 | 114 | "Neat Line" cubic yards per linear ft | | | 38 |
| Hyd Levee Stations | | Dist | | | | | |
| 16600 | 21500 | 4,900 | | | | | |
| 400 | 5600 | 5,200 | | | | | |
| 6150 | 9700 | 3,550 | | | | | |
| Hyd Levee Length | | 13,650 | | | | | |

## APPENDIX A

### Glossary of Geotechnical Descriptors

**Dredgeability.** Dredgeablility is the difficulty or ease of excavating, removable, transportation and placement of dredged materials.

**Relative Density.** Relative density of a cohesionless soil relates to its compactness and density with descriptive terms such as very loose, loose, medium dense, dense and very dense.

**Relative Consistency**. Relative consistency of a cohesive soil relates to its shear strength or unconfined compressive strength with descriptive terms such as very soft, soft, medium stiff, stiff, very stiff and hard.

**Standard Penetration Resistance, N**. Standard penetration test is applied to both cohesive and cohesionless soils. The tests consist of driving the standard penetration split-spoon sampler into the soil and counting the blows, N required driving the sampler the last 12 inches. The blows are imparted by a 140 pound weight falling 30 in. onto the drill rod to which the spoon is attached. The penetration number, referred to as N, is the number of blows to achieve the last 12 inches of penetration. The blow count for the last 12 inches of penetration is specified by ASTM because it is possible that boring disturbance may occur in the first 6 inches of soil at the bottom of the drill hole.

**Table A-1.** Geotechnical Characteristics of Dredge Channel Soils*

<u>Coarse Grained Soils are where more than half of the material is larger than No. 200 sieve size**.</u>

Sand and Sandy Soils

**SM** - Silty sands, sand-silt mixtures

**SC** - Clayey sands, sand-clay mixtures

<u>Fine Grained Soils are where more than half of the material is smaller than No. 200 sieve.</u>

Silts and Clays with LL or Liquid Limit <50

**ML**- Inorganic silts and very fine sands, rock flour, silty or clayey fine sands or clayey silts with slight plasticity

**CL** - Inorganic clays of low to medium plasticity, gravelly clays, sandy clays, silty clays, lean clays

<u>Fine Grained Soils are where more than half of the material is smaller than No. 200 sieve.</u>

Silts and Clays with LL or Liquid Limit >50

**CH**- Inorganic clays of high plasticity, fat clays

**OH**- Organic clays of medium to high plasticity, organic silts

*Technical Memorandum No. 3-357, "The Unified Classification System," August 1982, Geotechnical Laboratory U.S. Army Engineer Waterways Experiment Station, Vicksburg, MS 38180 and ASTM 2487-93 "Classification of Soils for Engineering Purposes (Unified Soils Classification System)"

**The No. 200 sieve size is about the smallest particle visible to the naked eye.

**Table A-2.** Relative Consistency of Cohesive Soils*

| Unconfined Compressive Strength Tons/Sq Ft | Cohesive Consistency Description | N, Standard Penetration Resistance | Approx. Saturated Density pounds per cubic Ft |
|---|---|---|---|
| < 0.25 | Very Soft | 0-2 | 100-120 |
| 0.25-0.50 | Soft | 2-4 | 100-120 |
| 0.50-1.00 | Medium | 4-8 | 110-130 |
| 1.00-2.00 | Stiff | 8-16 | 120-140 |
| 2.00-4.00 | Very Stiff | 16-32 | 120-140 |
| >4.00 | Hard | >32 | |

*Bowles, Joseph E. "Foundation Analysis and Design," 1968 McGraw-Hill, Inc. page 126

**Table A-3.** Relative Density or Compactness of Cohesionless Soils*

| Relative Density or Compactness Description | Relative Density $D_r$ | N, Standard Penetration Resistance | Approx. range of Moist Unit Weight, pounds per cubic Ft | Friction Angle Degrees |
|---|---|---|---|---|
| Very Loose | 0-0.15 | 0-4 | 70-100 | 25-30 |
| Loose | 0.15-0.35 | 4-10 | 90-115 | 27-32 |
| Medium Dense | 0.35-0.65 | 10-30 | 110-130 | 30-35 |
| Dense | 0.65-0.85 | 30-50 | 110-140 | 35-40 |
| Very Dense | 0.85-1.00 | >50 | 130-150 | 38-43 |

*Bowles, Joseph E. "Foundation Analysis and Design," 1968, McGraw-Hill, Inc. page 125

## APPENDIX B

List of Cases where Dr. Fowler testified as an expert at trial or by deposition are shown below:

Nov 2003 Tampa Port Authority vs Gee and Jenson Engineers Architects-Planners, Inc., a Florida corporation, Hendry Corporation, a Florida corporation, and Nicolon Corporation, a foreign corporation.
(Deposition)

Oct 2003 Onyx Industrial Services, Inc. vs St. John's River Water Management District Case no. 01-560-CA-53 (Deposition)

Oct 2002 U.S. Steel vs Geraghty and Miller Inc. (Deposition)

Dec 1999 Skansi Oyster Corporation, Nick L. Skansi and Helen T. Skansi vs The Louisiana Land and Exploration Company, Phillips Petroleum Company and Club Oil & Gas LTD. (Deposition and Trial)

Jan 1997 Oyster Land Leasing, Inc. vs. The Louisiana Land and Exploration Company, Phillips Petroleum Company and Club Oil & Gas LTD.(Deposition and Trial)

April 1990 Weeks Marine Inc. vs. US Army Corps of Engineers Baltimore District, Baltimore, MD (Mediation)

June 1989 C.F. Bean Dredging, Inc. vs. US Army Corps of Engineers Norfolk District, Norfolk, VA (Mediation)

June 1988 T.L. James Inc. vs. US Army Corps of Engineers Baltimore District, Baltimore, MD (Mediation)

April 1987 Great Lakes Dredge and Docks Inc. vs. US Army Corps of Engineers Alaska District, Anchorage, AK (US Court of Appeals-trial Seattle Federal Court)

# Curriculum Vitae

William Frank Connole
4136 East 47th Place
Tulsa, Oklahoma 74135
(918) 747-2654

Registered Professional Engineer in Oklahoma, No. 15149

## Education

1972 Oklahoma State University
1982 University of Oklahoma
1) Bachelor of Arts – 1979 – Psychology
2) Bachelor of Science – 1982 – Civil Engineering

## Employment

| | |
|---|---|
| January 1983 – Present | Franvel Corp. |
| May 1982 – August 1982 | Benham, Blair and Associates |
| May 1981 – August 1981 | Benham, Blair and Associates |
| June 1972 – August 1972 | Franvel Corp. |
| June 1971 – August 1971 | Stan Barber Construction Co. |
| June 1970 – August 1970 | 19th Seed Construction Co. |

## Armed Services

1972 – 1975 U.S. Army, Combat Engineer
Non-Commissioned Officer, Honorable Discharge
Recipient of Army Commendation Medal

## Professional Organizations

Sustaining Member – Society of American Military Engineers
National Society of Professional Engineers
American Society of Civil Engineers
American Concrete Institute
Panel Member for American Arbitration Association
Associate Member – Associated General Contractors of America (AGC)
Past Member – Joint AGC and Corps of Engineers Task Force on the Corps Construction Equipment Ownership and Operating Expense Schedule, EP1110-1-8

## Honors

Member of National Civil Engineering Honor Society, Chi Epsilon

EXHIBIT C

Experience

In the early 1970's, William F. Connole worked as a member of a survey party and bridge foreman. In 1972, William F. Connole began evaluating claims for Franvel Corp.

William F. Connole served in the military for 3 years and performed scheduling activities for barracks rehabilitations and company activities. In 1982, William Connole earned his civil engineering degree and returned to Franvel Corp. In 1987, William Connole became President and CEO of Franvel Corp.

William F. Connole is a licensed professional engineer in Oklahoma. During the past twenty years, he has been a consulting engineer for a variety of clients on highway and heavy construction projects. He has also provided services on wastewater and water treatment plants, industrial plants and commercial buildings both new construction and rehabilitations. His experience includes estimating, scheduling, contract administration, claim analysis, contract negotiations, pricing and calculation of damages. This experience includes Federal, State and Private Projects throughout Southwest and Southeast United States. He serves as a dispute resolution panel member for the American Arbitration Association, and has previously served as an arbitrator for the Arkansas State Highway and Transportation Department and the Oklahoma Department of Transportation.

Attached is a partial list of projects for which Mr. Connole has provided an expert report and/or testimony.

United States Court of Federal Claims,
Case No. 98-695C
Appeal of LaForge and Budd Construction Co., Inc.
Contract No. DACA56-86-C-0074
Transient Munitions Facility
Tinker Air Force Base, Oklahoma

United States District Court for Western District of Tennessee
Case No. 98-2966-MI Bre
Luhr Bros., Inc. vs. Memphis-Shelby County Airport Authority, et al.
Contract No. 9706.30
Hurricane Creek Relocation
Memphis, Tennessee

U.S. Army, Corps of Engineer Board of Contract Appeals
ENG BCA No. 6324
Appeal of Jim Smith Contracting Company, Inc.
Contract No. DACW29-91-C-0028
Welcome-Moonshine Levee Enlargement and Concrete Slope Pavement

U.S. Army, Corps of Engineer Board of Contract Appeals
ENG BCA No. 6261
Appeal of Johnny F. Smith Truck & Dragline Service, Inc.
Contract No. DACW17-93-D-0015
Debris Hauling, Hurricane Andrew
Miami, Florida

Circuit Court for Dyer County, Tennessee at Dyersburg
Cause No. 96-217
Guy Harrison Construction Co., Inc. vs. Dyersburg Housing Authority
Modernization Project CIAP No. TN.021-903
Gardner Heights, Dyersburg, Tennessee

U.S. Army, Corps of Engineer Board of Contract Appeals
ENG BCA No. 5701Q
Appeal of Souter Construction Co., Inc.
Contract No. DACW03-87-C-0014
Rock Excavation and Disposal
Navigation Mile 149 to 151
McClellan-Kerr Arkansas River Navigation System

U.S. Army, Corps of Engineer Board of Contract Appeals
ENG BCA No. 6176
Appeal of Valley Construction Co.
Contract No. DACW63-89-C-0159
Recreation Facilities Part III
Ray Roberts Lake, Texas

U.S. Army, Corps of Engineer Board of Contract Appeals
ENG BCA No. 6228 and No. 6048
Appeal of Circle, Incorporated
Contract No. DACW03-90-C-0071
Channel Improvements, Mill Creek Basin, Mill Creek
Fort Smith, Sebastian County, Arkansas

United States District Court
Northern District of Mississippi, Western Division
Case No. 3:96CV219-D-A
Chancellor & Son, Inc. vs. Three Rivers Solid Waste Management Authority
Contract No. 6, Three Rivers Regional Landfill
Construction of Cell No. 2

Armed Services Board of Contract Appeals
Docket Number ASBCA 48161
Appeal of Four F. Corporation
Contract No. DACA66-89-C-0019
Renovate 6th, J, and 3rd Streets
Defense Depot, Memphis, Tennessee

United States District Court
Northern District of Mississippi, Western Division
Civil Action No. WC91-137-B-D
Hill Brothers Construction Company, Inc. vs. City of Koscuisko and Neel-Schaffer, Inc.
EPA Project No. C280390-02
Wastewater Treatment Facilities
Koscuisko, Mississippi

Interior Board of Contract Appeals
Docket No. IBCA-2108
Appeal of Sardis Contractors
Contract No. 3-CC-5C-00380
Access Road of Boat Ramp
McGee Creek Project, Oklahoma

Claims Commission of the State of Tennessee, Western Division
Claim No. 91-224 Regular Docket
Hill Brothers Construction Company, Inc. vs. State of Tennessee, Tennessee Department of Transportation
Contract No. 4795
Dyersburg Bypass – State Route 20
Dyer County, Tennessee

# Evaluation of Claims
# submitted under

# Renda Marine, Inc. v. United States
# No. 02-306C (Fed. Cl.)

## Volume I of VI

Prepared for:

John Kosloske, Esquire
U.S. Department of Justice

Prepared by:

William F. Connole, P.E.
OK No. 15149
January 30, 2004

Franvel Corp
P.O. Box 4396
Tulsa, Oklahoma 74159

Blumberg No. 5118
EXHIBIT
D

# Table of Contents

1.0 Introduction

2.0 Project Description

3.0 The Work

4.0 The Issues

4.1 South Ferry Landing – Differing Site Condition

4.2 Houston Light and Power (HL&P) Transmission Line Tower – Suspension

4.3 Flare Area – Differing Site Condition

4.4 Obstructions in Channel Sta. 570+00 to Sta. 630+00 – Differing Site Condition

4.5 Section 7 – Differing Site Condition

4.6 Obstructions in Channel Sta. 660+00 to Sta. 685+00 – Differing Site Condition

4.7 West Levee Realignment Lost Lake Placement Area – Changes

4.8 Hydraulic Levees at Lost Lake Placement Area

5.0 Equipment Rates

6.0 Time Summary

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs


| Volume | Tab | Description |
|---|---|---|
| II | 1 | Franvel Corp Database - Inspection Report of Dredging (IRD) |
| II | 2 | Franvel Corp Database - Inspection Report of Dredging (IRD) |
| II | 3 | Franvel Corp Database - Inspection Report of Dredging (IRD) |
| II | 4 | Franvel Corp Database - Inspection Report of Dredging (IRD) |
| II | 5 | Franvel Corp Database - Inspection Report of Dredging (IRD) |
| II | 6 | Franvel Corp Database - Inspection Report of Dredging (IRD) |
| II | 7 | Franvel Corp Database - Contractor Quality Control Report (CQCR) |
| II | 8 | Franvel Corp Database - Contractor Quality Control Report (CQCR) |
| II | 9 | Franvel Corp Database - Contractor Quality Control Report (CQCR) |
| II | 10 | Franvel Corp Database - Contractor Quality Control Report (CQCR) |
| II | 11 | Franvel Corp Database - Government Quality Assurance Report (QAR) |
| II | 12 | Franvel Corp Graphical Plot of Dredging Locations from IRD |
| III | 1 | Dredge Millennium - Franvel Corp Operating and Standby Rate Calculations |
| III | 2 | Renda Built Booster - Franvel Corp Operating and Standby Rate Calculations |
| III | 3 | Duplex High Pressure Pump - Franvel Corp Operating and Standby Rate Calculations |
| III | 4 | Cummins Generator - Franvel Corp Operating and Standby Rate Calculations |
| III | 5 | Pipeline - Franvel Corp Operating and Standby Rate Calculations |
| III | 6 | Pipeline Joints - Franvel Corp Operating and Standby Rate Calculations |
| III | 7 | Pipeline Pontoon - Franvel Corp Operating and Standby Rate Calculations |
| III | 8 | Workboat "Marilyn K. McFarland" - Franvel Corp Operating and Standby Rate Calculations |
| III | 9 | Workboat "Crista Dian" - Franvel Corp Operating and Standby Rate Calculations |
| III | 10 | Anchor Barge - Franvel Corp Operating and Standby Rate Calculations |
| III | 11 | American Crane - Franvel Corp Operating and Standby Rate Calculations |
| III | 12 | Grove Hydraulic Crane - Franvel Corp Operating and Standby Rate Calculations |
| III | 13 | Work Barge No. 1 - Franvel Corp Operating and Standby Rate Calculations |
| III | 14 | Survey Boat - Monark - Franvel Corp Operating and Standby Rate Calculations |
| III | 15 | Work Boat - Lafco - Franvel Corp Operating and Standby Rate Calculations |
| III | 16 | Work Boat - Monark - Franvel Corp Operating and Standby Rate Calculations |
| III | 17 | Work Skiff - Franvel Corp Operating and Standby Rate Calculations |
| III | 18 | Fuel Barge - Franvel Corp Operating and Standby Rate Calculations |
| III | 19 | Fuel Tank - Franvel Corp Operating and Standby Rate Calculations |
| III | 20 | Linkbelt 3800 Excavator - Franvel Corp Operating and Standby Rate Calculations |

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs


| Volume | Tab | Description |
|---|---|---|
| III | 21 | Work Barge No. 2 - Franvel Corp Operating and Standby Rate Calculations |
| III | 22 | Skid Loader - Timberjack 450 - Franvel Corp Operating and Standby Rate Calculations |
| III | 23 | Skid Loader - Timberjack 380B - Franvel Corp Operating and Standby Rate Calculations |
| III | 24 | American Crane 4260 - Franvel Corp Operating and Standby Rate Calculations |
| III | 25 | Linkbelt Crane LS78 - Franvel Corp Operating and Standby Rate Calculations |
| III | 26 | Renda Rates for Marsh Buggy |
| III | 27 | Renda Rates for Marsh Buggy No. 2 |
| III | 28 | Renda Rates for Lincoln Welder |
| III | 29 | Renda Rates for Miller Welder |
| III | 30 | Renda Rates for Caterpillar Dozer D6H |
| III | 31 | Renda Rates for Caterpillar Dozer D6H |
| III | 32 | Renda Rates for Caterpillar Dozer D8L |
| III | 33 | Renda Rates for Caterpillar Dump Truck |
| III | 34 | Renda Rates for Lighting Set |
| III | 35 | Renda Rates for Lighting Set |
| III | 36 | Renda Rates for Utility Trailer |
| III | 37 | Renda Rates for Ford Pickup Truck F250HD |
| III | 38 | Renda Rates for Ford Pickup Truck F250HD |
| III | 39 | Renda Rates for Ford Expedition |
| III | 40 | Renda Rates for Ford Pickup Truck F250HD |
| III | 41 | Renda Rates for Ford Pickup Truck F250HD |
| III | 42 | Renda Rates for Ford Pickup Truck F250HD |
| III | 43 | Renda Rates for Ford Pickup Truck F450 |
| III | 44 | Renda Rates for Ford Pickup Truck F250HD |
| III | 45 | Renda Rates for Ford Pickup Truck F150 |
| III | 46 | Renda Rates for John Deere Gator |
| III | 47 | Tug Boat "Melissa B" - Franvel Corp Operating and Standby Rate Calculations |
| III | 48 | Renda Rates for Combination Building - 18' |
| III | 49 | Renda Rates for Supply Barge MCD212 |
| III | 50 | Renda Rates for Spud Barge KS4001 |
| III | 51 | Renda Rates for Caterpillar LGP - D6M |
| III | 52 | Renda Rates for Komatsu Dozer (SG) |
| III | 53 | Renda Rates for Volvo Articulated Truck A25C |
| III | 54 | Renda Rates for Diesel Welder 400 Amp |
| III | 55 | Renda Rates for Lincoln Welder - 500 Amp |
| III | 56 | Renda Rates for Diesel Welder - 250 Amp |

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

## List of Tabs



| Volume | Tab | Description |
| --- | --- | --- |
| III | 57 | Renda Rates for Diesel Welder - 250 Amp |
| III | 58 | Renda Rates for Air Compressor 185 CFM - P185WJD |
| III | 59 | Renda Rates for Air Compressor + Hose 185 CFM - P185WJD |
| III | 60 | Renda Rates for Air Compressor 185 CFM - P185WJD |
| III | 61 | Renda Rates for Air Compressor 185 CFM - P185WJD |
| III | 62 | Renda Rates for Air Compressor 210 CFM - D210Q6JD |
| III | 63 | Renda Rates for Komatsu Track Excavator - PC300LC-6 |
| III | 64 | Renda Rates for Komatsu Track Excavator - PC200LC-6 |
| III | 65 | Renda Rates for Komatsu Track Excavator - PC200LC-6 |
| III | 66 | Renda Rates for John Deere 550H Dozer - LGP |
| III | 67 | Renda Rates for John Deere 550H Dozer - LGP |
| III | 68 | Renda Rates for Caterpillar D5H Dozer |
| III | 69 | Renda Rates for Ford Explorer (2x2) |
| III | 70 | Renda Rates for Ford Pickup Truck - F250HD (4x4) |
| III | 71 | Renda Rates for Caterpillar Dump Truck - D275B |
| III | 72 | Renda Rates for Komatsu Dozer - D68P |
| III | 73 | Renda Rates for Ford Pickup Truck - F250 |
| III | 74 | Renda Rates for Komatsu Track Excavator - PC200LC-6 |
| III | 75 | Renda Rates for John Deere D850C Dozer - LGP Crawler |
| III | 76 | Renda Rates for John Deere Track Excavator - JD230LC |
| III | 77 | Renda Rates for John Deere Track Excavator - JD450LC |
| III | 78 | Renda Rates for Link-Belt LS4300 Excavator |
| III | 79 | Renda Rates for Bell B25C Articulated Dump Truck |
| III | 80 | Renda Rates for Bell B25C Articulated Dump Truck |
| III | 81 | Renda Rates for Bell B25C Articulated Dump Truck |
| III | 82 | Renda Rates for Bell B25C Articulated Dump Truck |
| III | 83 | Renda Rates for Jeep, Flat-Bed Off Road |
| III | 84 | Renda Rates for Komatsu Dozer D68P, Pyramid D405 |
| III | 85 | Renda Rates for Caterpillar 950E Loader w/Q/A Forks |
| III | 86 | Renda Rates for Caterpillar 120G Motorgrader MG2001 |
| III | 87 | Renda Rates for Komatsu Dozer - D65PX |
| III | 88 | Renda Rates for Komatsu Dozer - D65PX |
| III | 89 | Intentionally left blank |
| III | 90 | Renda Rates for Alco Redi-Prime Pump - 12" |
| III | 91 | Renda Rates for Hendry Booster |
| III | 92 | Renda Rates for Ford Expedition (2x2) |
| III | 93 | Renda Rates for Ford Pickup Truck - F250HD (4x4) |

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs



| Volume | Tab | Description |
|---|---|---|
| III | 94 | Intentionally left blank |
| III | 95 | Renda Rates for Komatsu Dozer - D65PX-12 |
| III | 96 | Renda Marine Book Asset Detail for Fiscal Year Ending October 31, 2000 and 2001 |
| III | 97 | Comparison of Daily Equipment Working Hours Used in Renda Claims |
| III | 98 | Summary of Equipment Rates Used by Renda |
| III | 99 | Calculations for Average Fuel Cost and Facilities Capital Cost of Money Rate |
| III | 100 | Franvel Corp Land-based Equipment Rate Calculations |
| IV | 1 | Pre-solicitation Notice and Commerce Business Daily Announcement for Upper Bayou Project Dated January 26, 1998 |
| IV | 2 | Excerpt of Eddie Fisher Deposition taken on February 1, 2001, page 10-13 |
| IV | 3 | Dredging Supply Company, Inc. Letter dated April 30, 1998 |
| IV | 4 | Amendment No. 1 to Upper Bayou Solicitation dated July 7, 1998 |
| IV | 5 | Abstract of Bids dated July 20, 1998 |
| IV | 6 | Excerpt of Eddie Fisher Deposition taken on February 1, 2001, page 18-21 |
| IV | 7 | Chubb Group Contract Bond Request Form and July 8, 1998, Memorandum from Jim Balzan, WTO-Surety dated July 8, 1998 |
| IV | 8 | Oscar Renda Contracting Inc. Letter dated July 29, 1998 |
| IV | 9 | Renda Marine Letter dated August 12, 1998 |
| IV | 10 | Renda Marine Letter dated July 30, 1998 |
| IV | 11 | Oscar Renda Contracting Inc. Letter dated September 18, 1998 |
| IV | 12 | Government Findings of Fact Concerning the Mistake in Bid by Renda Marine |
| IV | 13 | Renda Marine Letter dated August 3, 1998 |
| IV | 14 | August 10, 1998 Review of Dredging Plan by Allen Dupont and Upper Bayou Pre-award Review by TCB/GBA Joint Venture |
| IV | 15 | Renda Marine Letter dated August 21, 1998 |
| IV | 16 | Renda Marine Worksheet "Stiff Clay Percentages.xls" dated August 15, 1998 |
| IV | 17 | Renda Marine Letter dated June 12, 2000 |
| IV | 18 | Renda Marine Letter dated April 28, 2000 |
| IV | 19 | Topics for Preparatory Meeting dated July 30, 1999 |
| IV | 20 | Renda Marine Letter dated October 18, 2000 |
| IV | 21 | Renda Marine Letter dated October 13, 1999 |
| IV | 22 | Renda Marine Letter dated January 5, 2000 |
| IV | 23 | Eddie Fisher Email dated February 1, 2000 |
| IV | 24 | Renda Marine Letter dated March 30, 2000 |
| IV | 25 | Renda Marine Undated Letter Received on August 5, 1999 |
| IV | 26 | Renda Marine Letter dated October 20, 2000 |
| IV | 27 | Eddie Fisher Email dated September 25, 1999 |

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs


| Volume | Tab | Description |
|---|---|---|
| IV | 28 | Renda Marine Letter dated December 20, 2000 |
| IV | 29 | Renda Marine Letter dated January 31, 2001 |
| IV | 30 | Government Letter dated March 29, 2001 |
| IV | 31 | Renda Marine Letter dated April 14, 2001 |
| IV | 32 | Renda Marine Letter dated April 16, 2001 |
| IV | 33 | Eddie Fisher Email dated February 21, 2000 |
| IV | 34 | Renda Marine Letter dated July 28, 2000 |
| IV | 35 | Modification No. P00026 dated May 4, 2001 |
| IV | 36 | Renda Marine Letter dated August 18, 2000 |
| IV | 37 | Modification No. P00027 dated May 23, 2001 |
| IV | 38 | Defense Contract Audit Agency Report No. 3511-2003M17200012 dated December 12, 2002 and Franvel Corp., Overhead Rate Summary |
| IV | 39 | Preparatory Meeting Agenda and Transmittal for Item No. 3, Retaining Levees |
| IV | 40 | Renda Marine Letter dated July 7, 1999 |
| IV | 41 | Renda Marine Letter dated August 2, 1999 |
| IV | 42 | Government Email dated August 3, 1999 |
| IV | 43 | Renda Email dated August 6, 1999 |
| IV | 44 | Government Letter dated October 12, 1999 |
| IV | 45 | Renda Marine Letter dated October 25, 1999 |
| IV | 46 | Renda Marine Letter dated November 10, 1999 |
| IV | 47 | Gahagan & Bryant Associates Email dated January 28, 2000 |
| IV | 48 | Gahagan & Bryant Associates Email dated March 23, 2000 |
| IV | 49 | Renda Marine Letter dated November 2, 2000 |
| IV | 50 | Government Letter dated May 22, 2001 and Government Letter dated June 1, 2001 |
| V | 1 | Franvel Report of Dredging Quantities |
| V | 2 | Franvel Report of Cubic Yards by Advance |
| V | 3 | Franvel Summary of Contract Payments |
| V | 4 | Franvel Graph and Report of Gross Cubic Yards Dredged vs Pay Quantity |
| V | 5 | Report of Operations for October 8 and 9, 1999 |
| V | 6 | Renda Marine April 11, 2000 facsimile and April 11, 2000 Government Email |
| V | 7 | Renda Marine Email dated February 1, 2000 |
| V | 8 | Renda Marine Daily Report for April 19, 2000 and facsimile dated April 20, 2000 |
| V | 9 | April 21, 2000 Inspection Report of Dredging and Report of Operations |
| V | 10 | April 25, 2000 Renda Marine Daily Report |

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs


| Volume | Tab | Description |
|---|---|---|
| V | 11 | Report of Operations for April 3-May 5, 2000 and May 13, 2000 |
| V | 12 | Renda Marine Daily Report for April 23-May 4, 2000; May 14, 2000; and May 19, 2000 |
| V | 13 | Renda Marine Engine Room Log |
| V | 14 | April 25, 2000 Inspection Report of Dredging |
| V | 15 | Cross Sections for Station 470+00 |
| V | 16 | Cross Sections for Station 472+00 |
| V | 17 | Dredge Millennium Operations Computer Software Manual |
| V | 18 | Cross Sections for Channel Station 470+00, 472+00, 474+00, and 476+00 |
| V | 19 | Franvel Graph of Dredge Locations and South Ferry Landing Work Areas |
| V | 20 | Franvel Report for Renda Marine's Measured Mile at South Ferry Landing |
| V | 21 | Franvel Report for South Ferry Landing |
| V | 22 | Franvel Report of New Measured Mile for South Ferry Landing |
| V | 23 | Facsimile Coversheet dated October 27, 1998 from Mobile Pulley & Machine Works |
| V | 24 | Mobile Pulley & Machine Works - Two Quotations dated May 25, 2000 and Invoice dated September 1, 2000 |
| V | 25 | Renda Internal Memorandum dated March 22, 2000 |
| V | 26 | Franvel Corp Standby Rate for South Ferry Landing |
| V | 27 | Franvel Corp Direct Labor Expenses for South Ferry Landing |
| V | 28 | Franvel Corp Equipment Cost for South Ferry Landing |
| V | 29 | Defense Contract Audit Agency Report No. 3511-2003M17200006 dated December 12, 2002 and Franvel Corp Overhead Rate Summary |
| V | 30 | Franvel Corp Profit Computations for South Ferry Landing |
| V | 31 | Franvel Corp Non-pay Yardage |
| V | 32 | April 17, 2000 Invoice for Melissa B, Inc. and Renda Job Code Report |
| V | 33 | Emails dated May 3, 2000 and May 7, 2001 concerning South Ferry Landing |
| V | 34 | Renda Marine Contractor Quality Control Report dated April 21, 2000 and Franvel Report of Operating Plant |
| V | 35 | Government Letter dated April 13, 1999 |
| V | 36 | Franvel Corp Dredge Production Report |
| V | 37 | Renda Marine Daily Production Report for July 16, 17 and 18, 2000 |
| V | 38 | Barry Smith Email dated June 4, 2000 |
| V | 39 | Report of Operations for October 16, 17 and 18, 2000 |
| V | 40 | Reliant Energy-HL&P Letter dated October 16, 2000 |
| V | 41 | Franvel Corp HL&P Labor Cost Report |
| V | 42 | Franvel Corp Transmission Tower Added Work Report |

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs


| Volume | Tab | Description |
|---|---|---|
| V | 43 | Franvel Corp HL&P Equipment Cost Report |
| V | 44 | Franvel Corp Attendant Plant Report for October 16, 17 and 18, 2000 |
| V | 45 | Defense Contract Audit Agency Report No. 3511-2003M17200007 dated December 12, 2002 and Franvel Corp Overhead Rate Summary |
| V | 46 | Franvel Report Recalculating Renda Stiff Clay Percentages |
| V | 47 | Franvel Report Summarizing Renda Soft Clay Area |
| V | 48 | Weeks Marine, Inc. Letter dated March 23, 2000 |
| V | 49 | Renda Marine Letter dated March 27, 2000 |
| V | 50 | Renda Marine Facsimile dated March 29, 2000 |
| V | 51 | Renda Marine Excerpt from South Ferry Landing Claim, page 14 and 15 |
| V | 52 | HVJ Associates, Inc. Letter dated May 30, 2000 |
| V | 53 | Renda Marine Excerpt for the Measured Mile at the Flare Area and Franvel Report on Production |
| V | 54 | Franvel Report for Flare Area Dredging before March 12, 2000 |
| V | 55 | Franvel Corp Report for Flare Area Dredging after March 11, 2000 |
| V | 56 | Renda Marine Lost Time and Damage Analysis for Flare Area and Franvel Corp Report for Flare Area |
| V | 57 | Franvel Corp Graph and Data for Plugged Discharged Pipelines |
| V | 58 | Renda Marine Memorandum dated March 18, 2000 |
| V | 59 | Franvel Corp Report for Labor Cost at Flare Area |
| V | 60 | Franvel Corp Report for Additional Equipment Cost at Flare Area |
| V | 61 | Franvel Corp Report Comparing Renda Equipment in Renda's Measured Mile and Impact Periods |
| V | 62 | Franvel Corp Report for Renda's Measured Mile in Flare Area |
| V | 63 | Defense Contract Audit Agency Report No. 3511-2003M17200005 dated December 12, 2002 and Franvel Corp Overhead Rate Summary |
| V | 64 | Franvel Corp Report for Profit at Flare Area |
| V | 65 | Turner Collie & Braden Inc/Gahagan & Bryant Associates Inc., JV Letter dated January 24, 2001 |
| V | 66 | Renda Marine Letter dated December 20, 2000 |
| V | 67 | Franvel Corp Report for Section 7, Stations 570+00 through 580+00 |
| V | 68 | Franvel Corp Report for Section 7, Stations 580+00 through 640+00 |
| V | 69 | Franvel Corp Report for Section 7, Stations 570+00 through 640+00 |
| V | 70 | Franvel Corp Report for Sections 1, 2, 3, 4, 5 and 6 |
| V | 71 | Renda Marine Daily Report for December 4, 5, 7, 8, 9, 11, 29, 30, 31, 2000 and January 1-14, 2001 |
| V | 72 | Deposition of Stephen Bowman dated November 22, 2000, page 133-140 |
| V | 73 | Renda Marine Letter dated December 18, 2000 |

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs


| Volume | Tab | Description |
|---|---|---|
| V | 74 | Lufkin Industries, Inc. Letter dated January 8, 2000 |
| V | 75 | Gahagan & Bryant Associates, Inc. Memorandum dated May 11, 2001 |
| VI | 1 | Franvel Report for Obstructions No. 1 Productivity Loss Equipment Cost |
| VI | 2 | Franvel Report for Obstructions No. 1 Impact Equipment Cost |
| VI | 3 | Franvel Report for Obstructions No. 1 Labor Cost |
| VI | 4 | Franvel Report for Obstructions No. 1 Dredge Repair Cost |
| VI | 5 | Quilling, Selander, Cummiskey & Lownds Letter dated April 30, 2001 |
| VI | 6 | Franvel Report Summarizing Report of Operations for Obstructions No. 1 Claim |
| VI | 7 | Renda Marine Daily Production Report for December 4 and 5, 2000 and Cross Sections for Stations 620+00, 622+00, 622+74, 624+00, 628+00, 630+00 |
| VI | 8 | Franvel Corp Report on Section 7 Station 566+35 to Station 609+00 |
| VI | 9 | Franvel Corp Report on Section 7 Station 558+00 to Station 566+35 |
| VI | 10 | Defense Contract Audit Agency Report No. 3511-2003M17200011 dated December 12, 2002 |
| VI | 11 | Renda Marine Daily Production Reports for February 9-19, 2001 |
| VI | 12 | Renda Marine Daily Report February 10-18, 2001 |
| VI | 13 | Franvel Report for Stations 660+00 through 685+00 |
| VI | 14 | Franvel Graph for Forecasting Clear Time in Sections 7, 8 and 9 |
| VI | 15 | Franvel Report Comparing Renda Report Entries between November 30, 2000 and January 31, 2001 and a Dredging Supply Company Letter dated December 12, 2000 |
| VI | 16 | Excerpt from Renda Obstruction No. 2 Claim for Repair Costs and Houston Dynamic Service Inc. Facsimile dated February 8, 2001 |
| VI | 17 | Turner Collie & Braden Inc/Gahagan & Bryant Associates Inc., JV Memo dated May 10, 2001 |
| VI | 18 | Gahagan & Bryant Email dated April 17, 2001 |
| VI | 19 | Krupp Hagler Letter dated May 11, 1999 |
| VI | 20 | Franvel Corp Report for Productivity Loss Equipment Cost for Obstructions No. 2 |
| VI | 21 | Franvel Corp Report for Labor Cost for Obstructions No. 2 |
| VI | 22 | Franvel Corp Report for Impact Equipment Cost for Obstructions No. 2 |
| VI | 23 | Franvel Corp Report on Equipment Repair Cost for Obstructions No. 2 |
| VI | 24 | Defense Contract Audit Agency Report No. 3511-2003M17200009 dated December 12, 2002 and Franvel Corp Overhead Rate Summary |
| VI | 25 | Franvel Corp Report on Quantities at Levee Stations 188+82 to 188+50 |
| VI | 26 | Government Email dated August 3, 2000 |
| VI | 27 | Government Email dated August 8, 2000 |

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs


| Volume | Tab | Description |
|---|---|---|
| VI | 28 | Turner Collie & Braden Inc/Gahagan & Bryant Associates Inc., JV Letter dated September 1, 2000 |
| VI | 29 | Renda Marine Daily Production Report for July 25, 2000 |
| VI | 30 | Oscar Renda Contracting Memorandum dated March 1, 1999 |
| VI | 31 | Government Memorandum dated October 6, 1999 |
| VI | 32 | Gahagan & Bryant Associates Inc. Email dated December 16, 1999 |
| VI | 33 | Excerpt from Renda Hydraulic Levee Claim, page 35 |
| VI | 34 | Franvel Corp Report on Revised Mechanical Levee Lengths |
| VI | 35 | Franvel Corp Report on Lost Lake Boring Logs |
| VI | 36 | Franvel Corp Report on North Levee Hauling between April 15, 2000 and June 28, 2000 |
| VI | 37 | Franvel Corp Report on North Levee Hauling between September 5, 2000 and December 11, 2000 |
| VI | 38 | Franvel Corp Report on Levee Cross Section |
| VI | 39 | Franvel Corp Report on Levee Equipment Arrival and Departure |
| VI | 40 | Franvel Corp Report on Levee Equipment Operating Time |
| VI | 41 | Copy of Renda Complaint against Dredge Supply Co., Inc., Case No. H00-1721 |
| VI | 42 | Renda Marine Financial Statements for the Years Ending October 31, 2001 and 2000 |
| VI | 43 | Franvel Graph and Report of Dredged Material Deposit Locations |
| VI | 44 | Houston Fuel Oil Terminal Company Facsimile dated July 20, 2001 |
| VI | 45 | Franvel Corp Worksheet on Flare Area Boring Logs |
| VI | 46 | Franvel Corp Worksheet on Section 7 Boring Logs |
| VI | 47 | Excerpt of the Deposition of Eddie Fisher taken on February 1, 2001, page 42-45 |
| VI | 48 | Franvel Corp Graph and Report of Material Deposited on Levee by Section |
| VI | 49 | Intentionally left blank |
| VI | 50 | Intentionally left blank |

## 1.0 Introduction

On March 10, 2003, William F. Connole, P.E., President of Franvel Corp., contracted with the United States Department of Justice to provide expert technical evaluation and assessment of the alleged claims including the delay and lost productivity components presented under Renda Marine, Inc. vs United States (No. 02-306C Fed Cl.). The Curriculum Vitae for Mr. Connole is found in Appendix A of this volume.

Renda Maine, Inc. (Renda) asserts that it encountered difficulties during dredging and fill placement for the Upper Bayou Dredging project of the Houston-Galveston Navigation Channel. The objectives of this independent investigation were:

- To summarize the dredging history and levee construction.
- To assess the alleged claims and the associated contract plans and specifications.
- To evaluate the alleged damages and measure actual delay and disruption for each claim.
- To evaluate and compute equipment ownership and operating rates using the U.S. Army, Corps of Engineers Schedule EP1110-1-8 for Region VI dated 1999.
- To provide opinions about the bid estimate, contract interpretation, construction means and methods and contract adjustments in price and time.

The objectives were accomplished by reviewing design, pre-bid and post-bid project documents, depositions, performing a field investigation, interviewing project personnel and conducting an evaluation of the collected information. The documents reviewed in preparation of this report are given in Appendix B of this volume.

This report contains sections on a description of the project; a summary of the dredging and hydraulic fill history, the analysis of the individual issues or difficulties and finally the

summary and conclusion. The report contains six volumes. When a document is referenced, it will be designated as "Volume Roman Numeral, Tab Number, page number" and will generally appear as "Vol __, Tab __, RM-COE - ###". A page number is not always reported.

Volume I is the narrative report.
Volume II is the database compiled from project records.
Volume III is Renda equipment rate calculations used in computing damages.
Volume IV is project correspondence, reports, and other documentation referenced in the report for review.
Volumes V and VI are documents and reports generally referenced in Volume I of the report.

During the past four years, Mr. Connole has provided a deposition (D) and/or testimony (T) as an expert witness in the following cases:

1) American Arbitration Association
Case No. 71 110 00366 02
LCG Company, LLC. v. Tulsa Steel Manufacturing Company, Inc. (D/T)
Air National Guard Composite Support Complex,
Subcontract No. 500051-505,
Tulsa, Oklahoma

2) United States District Court for Western District of Tennessee (D)
Case No. 98-2966-MI Bre
Luhr Bros., Inc. vs. Memphis-Shelby County Airport Authority, et al.
Contract No. 9706.30
Hurricane Creek Relocation
Memphis, Tennessee

3) United States Court of Federal Claims, (D)
Case No. 98-695C
Appeal of LaForge and Budd Construction Co., Inc.
Contract No. DACA56-86-C-0074
Transient Munitions Facility
Tinker Air Force Base, Oklahoma

Mr. Connole is being compensated at the rate of $140.00 per hour plus out-of-pocket expenses. Engineering technicians are billed at $50 per hour, Cadd technicians are billed at $60 per hour and secretarial staff is compensated at $35 per hour.

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 2.0 Project Description

The investigation reported herein is related to Contract No. DACW64-C-99-0001 between the US Army, Corps of Engineers (Government) and Renda Marine, Inc. (Renda) for Dredging Upper Bayou, a 3.9-mile segment of the Houston Ship Channel from Station (Sta.) 470+00 to Sta. 684+06.58[1], in Harris and Galveston Counties, Texas. Figure 2.0.1 shows the location of the project southeast of Houston, Texas.

Figure 2.0.1

Upper Bayou Project Location



[1] Near the upstream limit, between Sta. 650+00 and 658+00, no dredging was permitted.

The dredging had an estimated quantity of 3,483,000 cubic yards and consists of mostly new (virgin) work. The work involves increasing the bottom width and deepening the existing ship channel to a required depth of 47 feet below Mean Low Tide (MLT). The bottom widths and lengths are referred to in Contract Section 02482-Dredging and shown on Drawing Nos. C-2 and C-3[2]. Side and end slopes were to be 3 horizontal to 1 vertical. The amount of material removed from within the specific areas to be dredged is measured by the cubic yard (cy). The measurement is determined from surveys by computing the before-dredging (BD) volume within the required dredging prism[3] and then deducting the computed volume of the after-dredging (AD) survey of the material surface remaining within the dredging prism as soon as practicable after the work has been completed. In addition to the amount of material removed to the required depth of -47 feet MLT, the contract provides for the inherent inaccuracies in the dredging process by measuring and paying for material actually removed up to one foot below the required bottom depth (allowable overdepth). No additional payment was made for material removed outside the required side slopes. Figure 2.0.2 shows conceptually the project dimensions and quantity of material considerations to determine contract payment yardage.

Figure 2.0.2 - Concept Drawing of Project Dimensions




**MAXIMUM PAY YARDAGE = REQUIRED YARDAGE + ALLOWABLE OVERDEPTH YARDAGE**
**NET PAY YARDAGE = MAXIMUM PAY YARDAGE – ALLOWABLE OVERDEPTH NOT DREDGED**
**GROSS YARDAGE = NET PAY YARDAGE + NON-PAY YARDAGE**

---

[2] The contract specifications and drawings have not been attached to this report.
[3] Required dredging prism refers to the trapezoidal design template for dredging consisting of a specified depth, width and side slope within the channel.

Explorations, including core borings, to determine the character of the earth materials to be removed were made by the Government and the results were provided in the solicitation and contract. Cores and samples obtained by the Government with a "93" prefix were available for inspection at the Galveston District Office. For purposes of acceptance, the contract divided the length of the channel into nine sections. Section 1 began at Sta. 470+00 and Section 9 ended at Sta. 684+06.58. The sections are:

| Section No. | From Station | To Station | Length of Section (Feet) | Required Depth (cy) | Allowable Overdepth (cy) | Total Estimated (cy) |
|---|---|---|---|---|---|---|
| 1 | 470+00 | 484+00 | 1,400.00 | 219,000 | 22,600 | 241,600 |
| 2 | 484+00 | 510+00 | 2,600.00 | 394,400 | 42,000 | 436,400 |
| 3 | 510+00 | 524+00 | 1,400.00 | 361,700 | 26,600 | 388,300 |
| 4 | 524+00 | 532+00 | 800.00 | 432,300 | 25,200 | 457,500 |
| 5 | 532+00 | 540+00 | 800.00 | 454,500 | 25,600 | 480.100 |
| 6 | 540+00 | 554+00 | 1,400.00 | 379,500 | 34,700 | 414,200 |
| 7 | 554+00 | 612+00 | 5,800.00 | 320,600 | 84,200 | 404,800 |
| 8 | 612+00 | 650+00 | 3,800.00 | 300,300 | 59,000 | 359,300 |
| 9 | 658+00 | 684+06.58 | 2,606.85 | 243,200 | 58,300 | 301,500 |
| | | | Cumulative Total: | 3,105,500 | 378,200 | 3,483,700 |

Materials removed from the channel were to be transported via pipeline and placed at Lost Lake Placement Area, Contract Drawing C-14. Figure 2.0.3 shows in plan view Lost Lake Placement Area. The Lost Lake Placement Area is an approximate 650 acre island located north of the Houston Ship Channel at approximately Sta. 480+00. Around the approximate four mile perimeter of the Lost Lake Placement Area was an existing levee. The existing levee is represented by the line on the outside perimeter of Lost Lake Placement Area. New levees (interior perimeter line on Figure 2.0.3) were to be constructed at Lost Lake Placement Area by two methods, hydraulically and mechanically.

Figure 2.0.3

Lost Lake Placement Area

(Re: Contract Drawing C-14)




Contract Section 02223 – Retaining Levees contains the scope of work required for mechanically and hydraulically constructed levees. Section 02223, paragraph 1.4.3, Order of Work, required the contractor to complete a new Drop-outlet Structure, modifications to the existing Drop-outlet Structure and the mechanically constructed levees prior to beginning placement of the hydraulically constructed levee. The mechanical levees had an estimated quantity of 381,300 cy. A land-based borrow area was furnished by the government to the contractor for constructing the levees. The mechanically constructed levee was to be constructed along the south perimeter of Lost

Lake (1/4 of the perimeter) and near the drop-outlet structures. Earth fill materials were to be excavated by draglines, backhoes or other suitable equipment and transported to the mechanically constructed levee site.

Mechanically constructed levees required placement of satisfactory materials in 18-inch layers prior to compaction, except in areas having standing water or soft foundations. In areas having standing water or soft foundation conditions, borrow materials were required to be placed in a single lift (layer) as required to support the weight of the hauling and compacting equipment. Fill material used for the mechanically constructed levee was measured and paid by the cubic yard. Measurement of the earth fill materials used to construct the mechanically constructed levee was taken in Borrow Areas No. 1 and No. 2.

Except for the specified mechanically constructed levee locations, hydraulically constructed levees were to be constructed in all other locations.

For hydraulically constructed levees, satisfactory materials (medium to hard clay and sand) were to be obtained from the required dredging. Contract Specification Section 02224, paragraph 3.1.2, states,

> "Satisfactory materials used for Hydraulically Constructed Levees shall be obtained from required dredging. The Contractor shall evenly distribute sufficient hydraulic material at all locations along the levee so that the final new levee section can be constructed to the minimum lines and grades. During the shaping process, the material shall be placed using the same lift thickness and compaction requirements as those required for the Mechanically Constructed Levees. The Contractor shall excavate material from the adjacent existing levee to the limits shown. The "slope to drain" requirements shall apply to the entire placement area perimeter levee."

As quoted above, during dredging, the contractor was required to evenly distribute sufficient hydraulic fill material (a slurry of earth materials and water) at all locations along the levee. The fill material, transported in the pipeline and placed hydraulically, was to be used to build the final new levee cross section to elevation +30 feet MLT. During the shaping process, lifts were to be built under the thickness and compaction requirements of the mechanically placed levee.

Contract Section 02224, paragraph 1.3.1 Construction Plan required the contractor to plan the construction of the levees. The contractor was to phase the mechanical and hydraulic placement work and consider techniques to minimize foundation displacements.

Contract Drawing C-14 also contained thirteen Notes important to the construction of the hydraulically and mechanically constructed levees. Some of the Notes are (exclusion of a Note does not diminish its importance or applicability):

No. 2 Survey date of Lost Lake contours: April 1997, with additional surveys taken Dec. 1997 around borrow area No. 2. Dredging has occurred since the survey date. Interior elev. may differ.

No. 6 Discharge corridors to be used for hydraulic fill placement not associated with levee construction. It is the intent of the plans that hydraulically placed material not used in levee construction be discharged in approximately equal volumes within the discharge corridors. The discharge pipe shall be moved as directed by contracting officer to achieve this.

No. 7 It is the intent of the plans and specifications that the levees be raised to a minimum crest elevation of +30 feet MLT, with crest width of at least 10 feet, and side slopes no steeper than 1V:3H.

No. 9 Upon completion of the mechanically constructed levees to the lines and grades specified, the contractor must complete the remainder of the perimeter levee to the minimum template limits shown on the drawings, using hydraulically constructed levees.

No. 10 The foundation of the new levee is very soft to soft dredged material, and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material.

Also of importance, is Amendment No. 1 (Vol IV, Tab 4) to the solicitation. Amendment No. 1 modified the specifications, including but not limited to, Section 02223 – Retaining Levees and the Bidding Schedule. Amendment No. 1 also provided written responses to questions submitted by prospective bidders.

2.1 – Daily Reports

The contract required, and Renda prepared, two daily reports that were submitted to the Government: the Contractor's Quality Control Report and the Inspection Report of Dredging (IRD). As the name suggests, the Inspection Report of Dredging (IRD) reported the progress of the dredging work in the ship channel. The Contractor Quality Control Report (CQCR) reported levee construction activities and occasionally commented about dredging activities. To assist in organizing the factual information and issues, these daily reports were entered into a database. The database was used as an aid in my evaluation and assessment of Renda's claims. Volume II of this report contains copies of the database: Volume II, Tabs 1 through 6 contain the Inspection Report of Dredging (IRD) data, whereas, Tabs 7 through 10 contain the Contractor Quality Control Report (CQCR) data.

The Inspection Report of Dredging (IRD) and Contractor Quality Control Report (CQCR) databases were used extensively in the preparation of this report. However, other Renda documents, such as the Report of Operations[4] was consulted often since it provided greater detail about daily dredging operations and difficulties.

Additionally, the Government prepared a Quality Assurance Report (QAR). This report has also been entered into a database for use in my evaluation. This data is reproduced in Volume II, Tab 11.

The Inspection Report of Dredging (IRD) is generally consistent with the Report of Operations and reflects the effective time the dredge was producing or pumping material through the pipeline. The non-effective time is time during the dredging operation when the dredge is operational, but no production is taking place. An example of non-effective time would be making changes to the pipeline. Lost time is generally logged when the dredge is not operational due to such things as repairs and lack of crew. Based on a

[4] Not all of the Reports of Operations have been attached to this report. However, certain reports are referred to in the report and are included.

comparison with the Report of Operations, the Inspection Report of Dredging (IRD) does not always properly distinguish between lost time and non-effective time.

The gross quantity reported on the Inspection Report of Dredging (IRD) is intended to represent the total (pay and non-pay) quantity dredged. In general, Renda reports their gross quantity as five percent more than the credited (pay) quantity. Based on a review of the after-dredging (AD) cross sections, the gross quantity is under reported on the Inspection Report of Dredging (IRD) because the non-pay quantity is more than five percent. This over-excavation will be addressed later in the report.

Additionally, the Inspection Report of Dredging (IRD) gross quantity reported is generally inconsistent with the quantities which can be computed based upon the reported advance, width of cut and depth of cut (Vol V, Tab 1). It appears that the dredge quantity within the maximum pay prism for a section or reach was pre-determined by Renda and reported based upon the amount of advance the dredge accomplished per day (Vol V, Tab 2). The quantity reported is not dependent upon productive, effective time of the dredge. However, the Inspection Report of Dredging (IRD) daily gross quantity coincides closely with the monthly payment quantities (Vol V, Tab 4). Therefore, the Inspection Report of Dredging (IRD) gross quantities generally represent the pay quantities removed from the maximum pay prism.

## 3.0 Background

Government Invitation No. DACW64-98-B-0004, for Dredging Upper Bayou, was issued for bid on June 16, 1998, with a subsequent Amendment issued on July 7, 1998.

Renda submitted its bid in response to the Invitation on July 17, 1998 and was notified by the Government that they were the apparent low bidder. However, Renda's bid was not accepted by the Government until October 26, 1998, due to a Renda unit price bid correction and a Bid Protest filed by Great Lakes Dredge & Dock Company. The project was assigned Contract No. DACW64-99-C-0001, and the contract was awarded on October 26, 1998.

The notice to proceed, issued by the Government on November 16, 1998, was received by Renda on November 19, 1998, thereby establishing the contract start date in accordance with Specification Section 00820-Specific Requirements, as follows:

> "(c) complete the work not later than 446 calendar days after the date of receipt.. of Notice to Proceed."

The original contract time, as established by the Contract, is 446 calendar days, which makes the contract completion date February 8, 2000[1].

During the course of the project, Renda received 30 Modifications from the Government, consisting of nineteen (19) Funding Modifications (either increasing or decreasing the Government-obligated Contract funding), and eleven (11) Change Orders. The Modifications which changed the contract are listed as follows:

---

[1] It is Renda's contention that the "As-planned" contract completion date is June 7, 2000 (566-CD), and will be addressed in Section 6.0 of this report.

| Modification No. | Effective Date | Type of Mod. | Amount | | Contract Time (CD) |
|---|---|---|---|---|---|
| P00004 (CO-1) | 3/23/1999 | Unilateral Part 1 | $250,000.00- | NTE | --- |
| P00006 (CO-2) | 6/21/1999 | Bilateral – Settles CO-1-Affolter | $436,855.87- | Add | +20 |
| P00008 (CO-3) | 8/4/1999 | Bilateral-Affolter | $364,201.03- | Add | +22 |
| P00011 (CO-4) | Unknown | Bilateral-Changes Acceptance of Levees | 0.00- | No Change | --- |
| (Government "no cost" modification to Specification Section 02223, Retaining Levees, adding paragraphs 3.3.1, 3.3.1.1 and 3.3.1.2) | | | | | |
| P00009 | 6/21/2000 | Bilateral – Time for Variations in Quantities | 0.00- | No Change | +18 |
| P00019 (CO-5) | 10/27/2000 | Unilateral Part 1- Rubble Removal | $66,000.00- | NTE | +3 |
| P00021 (CO-7) | 11/17/2000 | Unilateral – Settles CO-5 Rubble Removal | $137,000.00- | | +11 |
| P00023 (CO-8) | 3/14/2001 | Unilateral Part 1 – Flare Area | $3,083,833.00- | NTE | +56 |
| P00026 (CO-9) | 5/4/2001 | Bilateral Part 1 – Dredging Suspension | 0.00- | No Change | +60-NTE |
| P00027 (CO-10) | 5/23/2001 | Unilateral – Shifted Cross-Section of Levee | 0.00- | No Change | --- |

## 3.1 The Bid and Award

On January 26, 1998, the pre-solicitation notice (Vol IV, Tab 1) for Solicitation No. DACW64-98-B-0004, Dredging Upper Bayou, was issued by the Galveston District, U.S. Army, Corps of Engineers for the Houston-Galveston Navigation Channels, Texas (45 foot project). Also in early 1998, the principals of Renda Marine, Inc. developed a business plan to enter the maintenance dredging market[2] along the Gulf Coast. The

[2] February 1, 2001, Deposition of Eddie Fisher stated, "What I had discussed with Steve Bowman and Rudy was that I thought, with the widening and deepening of the Houston Ship Channel, that there would be a market for a dredge with a ladder pump to do maintenance dredging once Houston got to be 45 feet, because Corpus Christi was already 49 feet. Freeport was 45 feet, and Houston was a large port. And when it got deep into 45 feet, some of the conventional dredges would have a hard time providing the maintenance work at that depth." (Vol IV, Tab 2)

Dredge Millennium was an off shoot of the business plan, "that there would be a market for a dredge that could effectively provide maintenance dredging at a 45 foot depth and greater because it had a ladder pump" (Vol IV, Tab 2). On or about April 30, 1998, Renda received at least one "ball park" quote for a 24 inch hydraulic cutter dredge from Dredge Supply Company, Inc. (Vol IV, Tab 3). On July 17, 1998, the U.S. Army Corps of Engineers opened bids for the Upper Bayou Dredging solicitation. Bid results (Vol IV, Tab 5) are presented in Table 3.1.1.

Table 3.1.1

Solicitation No. DACW64-98-C-0004
Bid Results of Two Lowest Bidders

| Item No | Description | Qty | UM | Government Estimate | Renda | Great Lakes Dredge Dock Co. |
|---|---|---|---|---|---|---|
| 1 | Stripping | 1 | Job | 55,500 | 150,000 | 55,000 |
| 2 | Mechanically Constructed Levees | 381,300 | cy | 930,372 | 1,753,980 | 1,651,029 |
| 3 | Drop-outlet Structure (existing) | 1 | Job | 22,700 | 66,350 | 35,000 |
| 4 | Drop-outlet Structure (new) | 1 | Job | 229,200 | 240,000 | 150,000 |
| 5 | Seeding & Fertilizing | 1 | Job | 60,700 | 80,000 | 80,000 |
| 6 | Hydraulically Constructed Levees | 13700 | LF | 621,021 | 1,370,000 | 27,400 |
| 7 | Mobilization and Demobilization | 1 | Job | 535,000 | 800,000 | 1,250,000 |
| 8 | Dredging | 3,483,700 | cy | 10,834,307 | 7,315,700 | 11,322,025 |
| 9 | Pipelines | 1 | Job | 187,200 | 650,000 | 50,000 |
| 10 | Bond Cost | 1 | Job | 131,400 | 100,000 | 60,000 |
| Total | | | | 13,607,400 | 12,526,100 | 14,680,454 |

Although Renda had not yet procured a dredge, Renda bid the Upper Bayou Project. Renda's low bid was $12,526,100, but contained a mistake in the bid price for Item No. 6, Hydraulically Constructed Levees. Renda's unit price bid of $1.00 was a mistake and Renda was permitted to correct the mistake to the intended bid price of $100.00 per linear foot (LF). However, Mr. Eddie Fisher, Vice President of Renda Marine, Inc., recognized that the Upper Bayou Project "was a very – a difficult project, and it wasn't something that I had originally had in the business plan" (Vol IV, Tab 6).

Renda submitted bid papers and worksheets in support of its requested bid correction. Mr. Eddie Fisher "took the first stab at preparing the bid estimate for the referenced

project."[3] Eddie Fisher's original estimate (Fisher Original Estimate) was given to Steve Bowman, Vice President of Renda. Mr. Bowman provided his input into the estimate by changing line items, moving line items and deleting line items and making final adjustments to the bid. Mr. Bowman's estimate supports Renda's intended bid (Vol IV, Tab 8). By reviewing the bid sheets and affidavits, the Contracting Officer was satisfied that a mistake had been made and allowed a correction to Renda's unit price on Line Item No. 6 from $1.00 to $100.00 per LF. Additionally, a bid protest was filed by the next low bidder, Great Lakes Dredge and Dock Co. In response to the bid protest, Renda prepared a large pre-award submittal (Vol IV, Tab 13).

In the pre-award submittal dated August 3, 1998, Renda proposed to use the dredge Millennium which was under construction in New Orleans, Louisiana, and represented that it would be ready to commence work on or about January 8, 1999. Renda stated that the dredge was specially designed to work in virgin clays and coastal waters. Renda believed that the dredge which was ordered on July 31, 1998 (Vol IV, Tab 13, RM-COE-05756), would have distinct advantages at Upper Bayou. In particular, it was noted that the cutter diameter was more suited to maintaining the design slopes, avoiding the dangers of overcutting noting that the contract warned bidders to use caution in certain reaches of the channel such as the South Ferry Landing. Renda also provided tentative dredging plan which anticipated completing the hydraulic levees by using the dredged materials from Sections 1, 2, 3, 4, 5 and 6 of the channel (Vol IV, Tab 13, RM-COE-05737).

On August 21, 1998, Renda provided several clarifications to Government questions (Vol IV, Tab 15). Government was concerned that the system, among other things, did not have sufficient horsepower and discharge velocity to prevent plugging of the pipelines. Booster pumps were represented as being readily available and Renda believed the system to be powerful enough to prevent plugs from developing in the pipeline. On August 26, 1998, Renda was awarded the Upper Bayou Dredging Project.

---

[3] September 18, 1998, affidavit of Steve Bowman (Vol IV, Tab 10, RM-COE-23230).

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 4.0 The Issues

In three of Renda's claims, Renda asserts that dredging production was less than anticipated. Renda attempts to support its claim for differing site conditions by use of the measured mile method in the following claims:

1. South Ferry Landing – Concrete rubble
2. Flare Area – Stiff clay
3. Section 7 Area – Heavy, red clay

In two other dredging claims, Renda seeks idle, delay and repair damages for encountering excessive trash and obstructions in the work. These claims are:

4. Obstructions No. 1, from Sta. 570+00 to 630+00
5. Obstructions No. 2, Section 9, Sta. 660+00 to 685+00

Three other claims for delays, changes and differing site conditions are asserted by Renda in connection with the Lost Lake Placement Area. They are:

6. Houston Light and Power Transmission
7. Realignment of the West Levee
8. Total Cost Claim for Hydraulic Levees

As previously mentioned, Renda made a mistake in their bid which was allowed to be corrected. Renda was permitted to correct its unit price for Bid Item No. 6, Hydraulically Constructed Levees. To support the intended bid by Renda, Mr. Bowman and Mr. Fisher, both Vice Presidents of Renda Marine and the individuals who prepared the bids, provided what Mr. Fisher characterized as, "all of the working sheets used to create the bid" (Vol IV, Tab 10, RM-COE-23229). While the bid papers were sufficient to correct the mistake and be awarded the job, the bid papers do not establish reliance on the boring logs or identify any particular anticipated type or consistency of soil material. Two of Renda's claims, the Flare Area and Section 7 Area, concern allegations of different soils being encountered from the soils anticipated at bid. Renda's work papers do not address or analyze the types of materials to be encountered in any area along the channel.

Post-bid, Renda documents carrying the date of August 1998 identify anticipated amounts of stiff clay, which is very good levee building material, being present in different areas of the channel. This document (Vol IV, Tab 16) shows stiff clay through Section 9 and is hereinafter referred to as the August 1998 Stiff Clay Spreadsheet. The August 1998 Stiff Clay Spreadsheet is dated about the same time that Renda submitted its responses to the Government's concerns about Renda's pre-award package.

Renda's Obstructions No. 1 claim and, to some extent, their Obstructions No. 2 claim, seeks adjustments for trash and debris encountered beyond what any reasonable bidder could expect. However, the amount of trash and/or debris expected by Renda cannot be found in its bid papers. Renda also seeks delay time for Houston Lighting & Power decision to construct a new transmission tower on Lost Lake Placement Area. Finally, Renda submits what it characterizes as a modified total cost claim for differing site conditions during construction of the hydraulic levees. The value of these claims totals $14,244,848.

I have evaluated each of Renda's claims and provided conclusions about the additional time and price caused by each claim.

Central to measuring the damages and evaluating cost is the equipment rate(s) component for the dredging plant or construction equipment which is affected by the change or differing site condition. These rates were also evaluated and re-computed.

## 4.1 South Ferry Landing – Differing Site Condition

### 4.1.1. General

In January 2001, Renda submitted a certified claim for $701,753 and 18 additional days due to an alleged Differing Site Condition encountered while performing dredging activities in vicinity of the South Ferry Landing during three separate periods of April 14, April 21 through April 23, and April 30 through May 3, 2000, a total of 8 days. In addition, Renda also seeks as impact ten dredge repair days and other move-in and move-out days. On March 15, 2001, Renda revised its claim by increasing the amount to $1,049,173. The March 15, 2001 revisions to the cost proposal can be recognized by the date of March 6, 2001, in the footer and include increases to the jobsite equipment and labor and indirect overhead rates.

### 4.1.2. Work History

On August 23, 2001, Renda supplemented the March 15, 2001 revised claim by providing a supporting statement of facts and other documentation. Renda asserts that dredging production on the south side of the Houston Ship Channel in the area located approximately between Stations 470+00 and 472+00 was substantially affected by rubble consisting of large rocks or stone and debris consisting of pieces of concrete and steel which delayed completion of the work and caused damage to the dredge Millennium. Renda asserts that it encountered a differing site condition. Renda claims that the conditions it encountered near the South Ferry Landing were of an unusual physical nature which differs materially from those ordinarily encountered and generally recognized in the work of the character provided for in the contract and not discernable at bid.

Section 02482 – Dredging, paragraph 3.5, Overdepth, Side and End Slopes, subparagraph 3.5.2 Side and End Slopes requires the Contractor "... to use caution when cutting the side slopes in the Channel from Station 470+00 to Station 473+00, from Station 514+00 to Station 537+00 and from Station 610+00 to Station 625+00. Excessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel" (underscore added).

Shore protection consisting of riprap and rubble is shown on Contract Drawing C-6 for the North Lynchberg Ferry Landing and also depicts submerged stone structures and piling. The North Lynchberg Ferry Landing is outside the lower (downstream) dredging limits of the channel; however, similar structures along the side of the channel are protecting the South Lynchberg Ferry Landing which is also outside the side slope dredging limits.

As part of its claim, Renda provides a work history for the dredge while performing work in and around the South Lynchberg Ferry Landing. Renda correctly states that the dredge Millennium completed its first pass on the north side of Section 1 on the Houston Ship Channel on October 8, 1999. However, Renda then states that the dredge was relocated "to the South side of the channel at Station 470+00 (near the South Ferry Landing Area) and attempted to start dredging operations late October 8, 1999 (note 2.25 hour charged to 'Changing location of plant on job' on the Inspection Report of Dredging)". This is not consistent with the project records. Renda's internal, handwritten Report of Operations[1] that was contemporaneously completed on the dredge by the leverman does not report dredging on the south side. Rather, after north side dredging had reached Station 470+00, the dredge Millennium stopped work at 9:45 pm (2145) and was moved upstream to Station 488+50. No work occurred on October 8, 1999, on the south side near the Ferry Landing after 9:45 pm. The two hour and fifteen minute travel time accounts for movement of the dredge till midnight.

[1] The Report of Operations accounts for interruptions to the effective operation (pumping time) of the dredge in consecutive five minute increments.

Further, Renda states that on October 9, 1999, the dredge was relocated a second time to Station 488+50 "to allow the Government sufficient time to respond to the problem(s), Renda relocated the dredge (note 3.0 hours charged to 'Changing location of plant on the job' on the Daily Report..." Again, this is inconsistent with job records. A second relocation did not occur. A single continuous relocation of the dredge began at 9:45 pm on October 8, 1999[1] and was completed at 3:00 am on October 9, 1999, when dredging started at Station 488+50. Therefore, the Government could not have been verbally notified of obstructions near the South Ferry Landing on October 8, 1999, since no work was performed at that location.

Approximately six months later, after Government demands for Renda to complete sections of work, on April 7, 2000, the dredge Millennium was returned to Sections 1 and 2. Renda is correct that the dredge began work at Station 478+75 on the south side of the channel and proceeded down station toward Station 470+00.

On April 11, 2000, in a facsimile, Renda described the remaining work along the south and north sides of the channel in Section 1 and did not indicate any previous problems in the area (Vol V, Tab 6). Earlier, in a February 1, 2000, email to the Government (Vol V, Tab 7), Renda commented on the accuracy of the contract boring logs in depicting the character of the soils. These records do not support Renda's assertion that rubble at the South Ferry Landing had been encountered or verbally reported to the Government prior to April 2000.

On April 14, 2000, the dredge progressed 50 feet from station 472+00 to 471+50. Renda states that work was abandoned due to the unknown extent of the rubble (large rocks or stone) and debris (pieces of concrete and steel) being encountered and the dredge relocated due to the unknown extent of the debris. Renda cites the "1.7 hours charged to 'Changing location of plant on job' on the April 14, 2001 Daily Report" as the time used to abandon the work. Contrary to Renda assertions of encountering large rocks or stone and concrete and steel, Renda's records are silent about encountering these types of materials and do not indicate any verbal notice to the Government on April 14, 2000.

---

[1] The Report of Operations for October 8, 1999 and October 9, 1999 are in Vol V, Tab 5 of this report.

The reason for setting the dredge back (changing locations) to Station 492+00 is not stated. However, Renda had not yet coordinated the work around the ferry with the Lynchberg Ferry Operator[3] and continued dredging down station by Renda would have interfered with the Ferry operations. On April 20, 2000, in a facsimile (Vol V, Tab 8, REM31146), Renda's agreements with the ferry operator were reported to the Government.

For the second time, on April 21, 2000, the dredge entered the area between Sta. 472+00 and 471+50 to sweep it clean[4]. Contradicting Renda's own daily report for April 21, 2000, Renda says in its revised claim that "the dredge immediately encountered heavy debris and rubble making 50 feet of headway with no material[5] removed that day" (footnote added). The IRD and the internal Report of Operations[6] for April 21, 2000, do not report encountering concrete debris or stone rubble from Sta. 472+00 to 471+50.

On Saturday, April 22, 2000, under Remarks on the Inspection Report of Dredging (IRD) is the first mention of lost time due to rocks/riprap being encountered at or near the Lynchberg South Ferry Landing. Again on April 23, 2000, rocks and riprap are noted on the IRD between Sta. 471+80 and 471+50. These dates are Renda's third and fourth attempt to dredge the area. No photos were taken or samples collected by Renda to demonstrate the alleged differing materials or volume of materials being encountered. It is of interest to note that Renda fails to mention that excessive dredging outside the side slope was performed in this area, contrary to the warnings in Contract Section 02482. The excessive cutting will be addressed later in this report.

---

[3] According to an internal Renda Marine Daily Report (Vol V, Tab 8, REM 05648), coordination for dredging work across the South Ferry Landing was accomplished on April 19, 2000. The report states, "I talked with Henry L. Jackson Ass. Superintendent of ferries about which time of the night there was the least amount of traffic, so we could dredge across the ferries docks. He told me they would shutdown from 10:30 pm – 6:00 am both Friday, and Saturday nights, then from 10:30 pm – 3:00 am on Sunday night if we need it." (underscore added)

[4] The dredge moved 50 feet while sweeping between Sta. 472+00 and 471+50 on April 21, 2000. Other dredging on April 21, between Sta. 473+00 and 472+00 reported a quantity of 3,000 cy. (Re: IRD for April 21, 2000 at Vol V, Tab 9)

[5] When sweeping, Renda does not report a quantity of material removed.

[6] Internal Report of Operation notes sweeping from Station 472+00-471+50. (Vol V, Tab 9, REM06042)

Further, Renda's assertion that the rocks and riprap were the proximate cause of the decision to move the dredge on April 23, 2000, is contradicted by the previous April 19, 2000 agreement with the ferry operator. At 5:30 am, in accordance with its agreement with the ferry operator, on Easter Sunday, April 23, 2000, Renda stopped dredging, broke the discharge line and moved the dredge to Station 506+00 to avoid interference with the operations of the Lynchberg Ferry which started at 6:00 am. As stated earlier, this was a planned relocation coordinated with the ferry operator which was required by the contract.

On April 25, 2000, internal Renda Daily Report (Vol V, Tab 10, REM05644) notes that the Corps of Engineers was verbally notified about trash at the South Ferry Landing and that a submerged discharge pipeline would be used. It is also reported that Renda worked 12 hours on the submerged line and "would attack the material at the Ferry from the downstream side next time". Use of a submerged discharge line instead of a floating line downstream of the South Ferry Landing would permit continuous operation of the Ferry while dredging operations were being accomplished.

During the period between 11:00 am on April 23 and April 29, 2000, Renda continued sweeping operations upstream away from the North and South Ferry Landings. The locations are:

Table 4.1.1
Sweeping Work Re: Renda Report of Operations (Vol V, Tab 11)

| | From Sta. | To Sta. | Advance (ft) |
|---|---|---|---|
| April 23, 2000 | 506+00 | 510+00 | 400 |
| April 24, 2000 | 513+00 | 524+00 | 1100 |
| April 25, 2000 | 524+00 | 521+00 | 300 |
| April 26, 2000 | 484+80 | 482+50 | 170 |
| April 27, 2000 | down pump engine & main generator water pumps. | | |
| April 28, 2000 | 482+50 | 480+50 | 350 |
| April 29, 2000 | 477+00 | 473+00 | 400 |

In its claim, Renda complains that the sweeping work was not contractually necessary and only served to "test" run the dredge following repairs caused by the rubble encountered. However, no quantity was reported being moved during this period because sweeping was being accomplished. Sweeping is rework necessitated by failing to remove

all the material within the dredge prism when the area was previously dredged. During this period of time, Renda was performing necessary cleaning of the channel and side slopes for acceptance of sections of work as indicated in the April 11, 2000 facsimiles (Vol V, Tab 6) and the Internal Daily Reports (Vol V, Tab 12).

Renda fails to identify the damage caused or the repairs necessitated by encountering rubble or debris near the South Ferry Landing. Table 4.1.2 provides a summary of the repair time reported during the sweeping period from April 23, 2000 to April 30, 2000. Renda does not discuss the individual repairs nor explain how rubble caused the repairs actually performed. The longest period of downtime for pump engine repairs was on April 25, 26 and 27, due to the engine heads having cracks and leaking (Vol V, Tab 12, REM05641 and Vol V, Tab 13).

Table 4.1.2
Comparison of Repair Time
during Renda Impact Period of April 23, 2000 to April 30, 2000.

| Renda Marine Table 1 Data | | | | Renda Marine Report of Operations Data | | | | |
|---|---|---|---|---|---|---|---|---|
| Date (2000) | Station Location(s) | "Pumping Time" (hours) | "Minor Operating Repairs" Time (hrs) | "Pumping Time" (hours) | Repair Time (hours) | Explanation of Repair | Other Non-pumping (hours) | Non-pumping Explanation |
| April 23 | 506+00 to 510+00 | -- | -- | 6.91 | 1.42 | Spud friction (1.42 hrs) | 5.67 | Pass ships (0.25); Pump trash (0.25); add submerged pipeline (5.17) |
| April 24 | 513+00 to 524+00 | 6.9 | 1.75 | 6.91 | 1.75 | Engine Room – fix water – illegible - | 15.33 | Trash (0.83); Anchors (0.08); Swing wire (2.0); Submerged Pipe (12.0); Pass ships (0.42) |
| April 25 | 524+00 to 521+00 | 4.2 | 12.4 | 4.17 | 12 | Engine Room – Booster Engine (12) | 7.84 | Anchors (0.42); Spud pin (0.17); Ships (0.08); Move dredge(6.0);Add pipeline (1.17) |
| April 26 | 484+80 to 482+50 | 10.5 | 10.75 | 10.5 | 10.75 | Booster Engine (Seven times for 10.75 hrs) | 2.74 | Trash Cutter (1.0); Ships (0.83); Anchors (0.58); Trash pump (0.33) |
| April 27 | 482+50 | 0 | 24 | 0 | 24 | Booster EMD (Engine) (Two times for 11.3 hrs); Main Generator Water Pump (12.7) | | |
| April 28 | 482+50 to 480+50 | 8.75 | 10.6 | 8.75 | 10.58 | Engine Room – Engine (Three times for 10.58 hrs) | 4.67 | Ships (1.17); Move dredge (3.5) |
| April 29 | 477+00 to 473+50 | 12.2 | 8.4 | 12.2 | 7.8 | Swing Sheeve (5.67: Spud Friction (1.17) | 3.99 | Ships (1.0); Move dredge (1.5); Suction trash (0.33); Pump trash (0.33); Pump leak (0.58); Pump |
| April 30 | 473+50 to 470+80 | 16.25 | 2.7 | 16.25 | 4.25 | Spud Friction (1.08 hrs); Swing Cable (1.67 hrs); Water pump (1.5 hrs) | 3.5 | Tows (2.0); Ships (0.92); Dump (0.25); Anchor (0.33) |

Following the sweeping period, Renda claims that the dredge Millennium "again began dredging near the South Ferry Landing Area on May 1, 2000... only 50-feet of headway was made and no material was removed." This is not accurate. The dredging which was performed on April 30, 2000 and May 1, 2000, between Station 472+00 and 470+00, was sweeping on the north side of the channel; not the south. Generally, no material is reported being removed while sweeping. On April 11, 2000, Renda advised the Government that material remained to be cleaned (swept) on the north side of Section 1. On April 11, 2000, the Government agreed by email and told Renda to sweep the north side of Sections 1 to 3 (Vol V, Tab 6, REM35012). On April 25, 2000, the IRD (Vol V, Tab 14), reports the dredge being moved to the north side of the channel and proceeded to sweep the north side in a down station direction until May 1, when the dredge reached Sta. 470+00. This is the only time period when north side sweeping work could have been performed. Cross sections at Sta. 470+00, taken on April 28, 2000 (Vol V, Tab 15, REM04105), show material remaining above the required lines and grades on the north side of the channel. The cross section taken at Sta. 470+00 on May 8, 2000, shows the north side material removed from the channel (Vol V, Tab 15). Likewise, cross sections taken for Sta. 472+00 (Vol V, Tab 16) show the north side material removed during this same time period of April 28 and May 8, 2000. Renda fails to account for any north side work and improperly includes the time for the north side sweeping in its claim for the south side.

At 3:45 pm, on May 1, 2000, after completing operations on the north side, the dredge was moved to the south side of the channel. The internal Report of Operations documents the movement from 3:45 pm to 11 pm (Vol V, Tab 11, REM 06032). At 1:00 am on May 2, 2000, the dredge Millennium began as previously stated by Renda to "attack the material at the ferry from the downstream side". On May 2 and 3, 2000, the dredging of the south side of the channel near the South Ferry Landing proceeds as predicted on April 25, 2000, in an upstream direction. Contrary to Renda's claim narrative about "the extensive amount of rubble/debris present" during May 2 and 3, the Report of Operations (Vol V, Tab 11), Inspection Report of Dredging (IRD), and Internal Renda Marine Daily Report (Vol V, Tab 12, REM05634) are silent about encountering

rubble. The IRD reports trash and several pump/cutter clears, but do not indicate rubble was encountered.

Following completion of the dredging work at the South Ferry Landing at 3:35 am on May 4, 2000, the dredge Millennium began to move out of the South Ferry Landing Area to begin sweeping at Sta. 476+00. As part of the delay and impact, Renda claims that while performing sweeping operations, on May 13, 2000, the dredge Millennium began to experience operational problems and was down 17.7 hours for repairs. On May 14, Renda states that the dredge was completely down due to problems with the cutterhead and pump shell. Renda claims that the repair work associated with the rubble at the South Ferry Landing was completed on May 17, 2000, but other repairs which prevented operation of the dredge continued through May 18, 2000. Other documents, such as the Report of Operations are missing for these dates.

As part of its damages, Renda seeks the move-out on May 4, 2000, a contractual move, and the repair days of May 14 through May 17, 2000. Renda also seeks reimbursement for repairs to the pump impeller and shell.

### 4.1.3 South Ferry Landing – Technical Evaluation

At the South Ferry Landing, Renda asserts that its monetary damages consist of reduced production while working in the vicinity of the alleged differing site condition on the south side of the channel from Sta. 470+00 to Sta. 472+00 and delay (movement and repair) time caused by the alleged differing site condition.

Renda applies a measured mile analysis to quantify the damages for the loss of production as a result of encountering unanticipated concrete rubble and/or riprap. The measured mile analysis is generally recognized as the best available method for comparing the contractor's productivity (efficiency) on the work that was affected by a differing site condition or change with productivity actually achieved on similar work that was not affected. The approximations involved in the comparison do not need to be

exact, but the underlying assumptions and facts about the work and production must be accurately identified.

The threshold issue at the South Ferry Landing is whether Renda encountered concrete rubble and/or riprap within the required lines and grades to be dredged? There is no evidence to support that it did.

The dredge Millennium was equipped with GPS for locating the dredge, computerized instruments[7] to visualize the dredging process as it happened and independent winch control for raising the ladder and controlling the swing. With this technology and data, Renda should have been able to trim the required slopes to grade and report coordinates of any piling or riprap encountered. No electronic data has been provided from the dredge instruments or computer based systems.

Contract Drawing C-14, in the lower center of the page, shows the close proximity of the new alignment of the Houston Ship Channel to the shoreline of the South Ferry Landing. The centerline of the channel is depicted with station marks. The parallel dashed lines on each side of the centerline represent the bottom width of the required channel at the toe of the slope. At Sta. 472+00, the horizontal distance between the channel's south toe of the slope at elevation -47 feet MLT and the shoreline (assuming elevation 0 feet MLT) at the South Ferry Landing is approximately 200 feet. However, the cross section for Sta. 472+00 shows the top of the 1 vertical to 3 horizontal (1V to 3H) channel side slope on the south side to terminate at -25 feet MLT. This means that the horizontal distance between the shoreline and the top of the new channel side slope on the south side near the South Ferry Landing is only 134 feet.

Further, the cross section for Sta. 472+00 on Contract Drawing C-13 shows existing ground extending upward on a straight line outside the limits of the work on the south side of the channel from approximate elevation -21 feet MLT to -14 feet MLT. Because it is a straight line, it appears to be a "man-made" slope. If the man-made slope line is projected to elevation 0 MLT, that point measures approximately 200 feet from the

[7] The dredge operations computer software manual is located at Volume V, Tab 17.

channel bottom toe of the slope; the same point as the shoreline depicted on the Contract Drawing C-14.

If the man-made slope is on a 1V to 3H slope and extends from elevation 0 MLT at the shoreline down to elevation -21 MLT, the horizontal distance from the slope toe from the south shoreline is 63 feet. Sixty-three feet deducted from the distance from the shoreline to the top of the channel side slope (134 ft) is 71 feet. Therefore, the contract represents that at Sta. 472+00 Renda had only 71 feet between the toe of the shoreline slope and the top of the channel side slope, about the length of the dredge ladder. The foundation dimensions of the erosion/wave protection are unknown which would reduce the clearance between the shore protection and top of slope.

Further, the docking facilities for the South Ferry Landing extend out into the water from the shoreline. This facility has a chute for docking the ferry constructed out of wood piling driven vertically and on a batter (angle). In the immediate ferry chute area of Sta. 472+00 to 471+50, Renda had less than 71 feet of clearance between the top of the channel slope and the docking facilities. This clearance assumes that Renda did not cut or dredge beyond the required side slope or bottom.

Since the South Ferry Landing facilities were so close to the required side slope on the south side of the channel, it would have been reasonable to locate all the structures prior to dredging the area. Further, when concrete rubble, riprap and/or piling were struck on April 22, 2000, and the contract warned of existing structures in the area, Renda should have discontinued dredging at that location. Instead, on April 23, 2000 Renda strikes the structure(s) again. It is only on April 22 and 23, 2000, that Renda reports encountering concrete debris, the third and fourth time for the dredge to work between Sta. 472+00 and 471+50, the closest alignment of the channel to the South Ferry Landing.

The contract drawings detail other erosion control structures such as the concrete rubble and/or riprap at the North Ferry Landing. Further, although not within Upper Bayou Dredging limits, the Lost Lake Placement Area Drop Outlet Structure also indicates existing riprap structures below the water surface. Other types of shore protection also



Figure 4.1.1 – Photo taken November 12, 2003 from South Ferry Landing looking southwest at the upstream shoreline. Note concrete rubble used as shore protection.



Figure 4.1.2 – Photo taken November 12, 2003 from the south top of bank at approximately Station 470+00 looking up stream along shoreline. Note broken concrete used as shore protection. The South Ferry Landing docking facilities are shown in the upper right corner.

line the ship channel from sheetpile walls, rock filled wire basket gabions, concrete slope paving and riprap. As shown in Figure 4.1.1 and Figure 4.1.2, a pre-bid site visit would have revealed existing concrete rubble shore protection at the South Lynchberg Ferry Landing site[8].

Contrary to the express warning in the contract, dredging outside the south side slope line and grade was performed by Renda from Sta. 470+00 to 472+00. At Sta. 472+00, at least 30 feet of excessive dredging occurred where Renda claims the dredge encountered rubble and piling. This distance reduces the possible clearance and places the dredging on top of the South Ferry Landing facilities. The plotted after-dredging (AD) cross sections show the non-pay dredging performed outside the required slope line and grade on the south side of the channel (Vol V, Tab 15, REM03566 and Vol V, Tab 16, REM03567.

4.1.3.1 Renda's Productivity Loss Period

While in the vicinity of the South Ferry Landing, Renda claims that its productivity was reduced due to the unanticipated rubble encountered on eight days (April 14, 21, 22, 23, 30 and May 1, 2 & 3). Based on a review of the records, Renda's productivity loss is based on inaccurate data at the South Ferry Landing. Renda relied solely on the Inspection Report of Dredging (IRD). Renda disregards information contained in other reports. Renda overstates the hours spent dredging the South Ferry Landing. Renda incorrectly identified 82.6 pumping hours in its claim. This error increases the claimed costs when compared with a measured mile or baseline. The effective or pumping time Renda spent in the claimed area is summarized in Table 4.1.3. As shown in Table 4.1.3, only 46.4 hours were actually spent in dredging operations at the South Ferry Landing.

[8] Concrete rubble protects the shoreline near the South Ferry Landing. November 12, 2003, discussions with the Ferry pilot James Borgue, and Superintendent David Starett, both of whom have been with the Lynchberg Ferry operations for 20 years, stated that the concrete rubble shore protection was placed there before they began working at the ferry. Mr. Borgue remembers Renda dredging inside the ferry chute.

Table 4.1.3
Supported Pumping Hours at South Ferry Landing

| Renda Impacted Dredging Dates | Renda Claim Data (Impacted Period) Dredging Location From Station | To Station | Daily Dredged Amount (c.y.) | Pumping Time (hours) | Daily Advance (feet) | Inspection Report of Dredging Data Dredging Location From Station | To Station | IRD Quantity in Impact Area (c.y.) | Quantity Outside Impact Area (c.y.) | Advance (feet) | Supported Pumping Time Inside Claimed Area | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14-Apr-2000 | 472.00 | 471.50 | 2,400 | 7 | 50 | 472.00 | 471.50 | 2400 | | 50 | 7.00 | Pumping time from Report of Operations |
| | | | | | | | | | | | | |
| 21-Apr-2000 | | | | | | 473.00 | 472.00 | | 3000 | 100 | | 10.60 hrs pumping outside limits of Claim Area |
| 21-Apr-2000 | 472.00 | 471.50 | - | 3.2 | 50 | 472.00 | 471.50 | 0 | | 50 | 5.28 | Pumping time porportioned based on advance |
| **22-Apr-2000** | **472.00** | **471.80** | **400** | **10.7** | **20** | **472.00** | **471.80** | **400** | | **20** | **4.58** | Pumping time from Report of Operations |
| 22-Apr-2000 | | | | | | 481.00 | 488.00 | | 0 | 700 | | |
| **23-Apr-2000** | **471.80** | **471.50** | **750** | **9** | **30** | **471.80** | **471.50** | **750** | | **30** | **1.75** | Pumping time from Report of Operations |
| 23-Apr-2000 | | | | | | 506.00 | 510.00 | | 0 | 400 | | |
| | | | | | | | | | | | | |
| 30-Apr-2000 | 470.80 | 473.50 | - | 16.25 | 270 | 473.50 | 472.00 | | 0 | 150 | 0 | Sweeping North Side in downstream direction |
| 30-Apr-2000 | | | | | | 472.00 | 470.80 | | 0 | 120 | 0 | |
| 1-May-2000 | 470.00 | 470.50 | - | 10 | 50 | 470.50 | 470.00 | | 0 | 50 | 0 | Sweeping North Side (moved at 11:00 pm to south) |
| 2-May-2000 | 470.00 | 470.50 | 2,350 | 11.75 | 50 | 470.00 | 470.50 | 2350 | | 50 | 11.75 | Dredging began at 1:00 am from Report of Operations |
| 3-May-2000 | 470.50 | 471.50 | 4,800 | 14.7 | 100 | 470.50 | 471.50 | 4800 | | 100 | 14.67 | |
| 4-May-2000 | | | | | | | | | | 1 | 1.33 | Report of Operation has work continue till 5:10 am |
| Totals | | | 10,700 | 82.6 | | | | 10,700 | | | 46.36 | |

**Bold Data Indicates when rubble or stone reported on IRD** Average number of pumping hours per day 7.73

With the adjusted pumping hours (46.4) and the gross quantity reported on the IRD (10,700 cy), the actual hourly production rate experienced at the South Ferry Landing is 231 cy per hour; not the 130 cy per hour used in Renda's claim.

4.1.3.2 Renda's Measured Mile – Production Days

Unlike the claimed loss productivity area of 470+00 to 472+00, where Renda excavated all material within the channel down to required line and grade, Renda selected a measured mile that did not include complete removal of the material from the side slope and bottom. Renda's measured mile also includes work in Section 2 which had shorter discharge pipeline lengths.

Figure 4.1.3 in Volume V, Tab 19, graphically shows Renda's measured mile versus the claim area. Renda uses a measured mile (represented in yellow on the graph) that does not consider cutting to grade. Each horizontal bar in Figure 4.1.3 shows the dredging location reported on the Inspection Report of Dredging (IRD). It is noted that Renda only used high production days on the south side in Section 1 and 2 instead of all production days for removal of the soil material down to grade. Additionally, Renda's measured mile primarily includes the removal of only 30 percent clay material (Vol V, Tab 20). The South Ferry Landing claim area contains approximately 50 percent clay soil materials (Vol V, Tab 21).

4.1.3.3 New Measured Mile

Because of the differences between Renda's baseline or measured mile and the claim area, a new measured mile area on the south side of the channel from Sta. 478+00 to Sta. 472+00 was investigated and includes all dredging time and quantities within the same area (see dimpled area on Figure 4.1.3 in Vol V, Tab 19). Part of the new measured mile overlaps and uses a portion of Renda's selected period of time. Results of this investigation find that Sta. 478+00 to 472+00 is a good measured mile because of the similarities in the work. They are:

- Clay content is similar (49 percent) to claim area (Vol V, Tab 22)
- Side slope and channel bottom cut to grade (similar digging depths)
- Discharge line lengths similar

This new measured mile results in consistent, more direct comparison[9] for evaluation of the disruption, if any, in the operating time needed to perform the work near the South Ferry Landing.

The pumping time used in the new measured mile to remove the quantity between Sta. 472+00 and Sta. 478+00 includes all effective time spent in the area. This time is summarized on Table 4.2.3. Table 4.2.3 shows that 121.8 pumping hours were required to remove 42,900 cy of material. This measured mile results in a production rate outside the influence of the South Ferry Landing of 352.2 or 352 cy per hour.

Table 4.2.3
Franvel Corp
Measured Mile for South Ferry Landing
Re: Inspection Report of Dredging

| Date | Station | | Advance | Effective Hours | Gross Cy | Comments about IRD/allocation |
|---|---|---|---|---|---|---|
| | From | To | | | | |
| 4-8-00 | 478+25 | 477+20 | 105 | 13.83 | 5040 | |
| 4-9-00 | 477+70 | 476+90 | 80 | 6.08 | 3840 | |
| 4-10-00 | 476+90 | 475+80 | 110 | 13.92 | 5280 | |
| 4-11-00 | 475+80 | 474+60 | 120 | 13.25 | 5760 | |
| 4-12-00 | 474+60 | 473+20 | 140 | 14.75 | 6720 | |
| 4-13-00 | 473+20 | 472+00 | 120 | 9.42 | 5760 | |
| 4-19-00 | 478+00 | 475+50 | 250 | 15.5 | 3750 | |
| 4-20-00 | 475+50 | 473+00 | 250 | 16.08 | 3750 | |
| 4-21-00 | 473+00 | 472+00 | 100 | 10.55 | 3000 | Two locations hours split based on Advance |
| 5-4-00 | 476+00 | 476+20 | 20 | 1.42 | 0 | |
| 5-5-00 | 476+50 | 478+00 | | 7.04 | 0 | Two locations hours split based on Advance |
| Totals for Area | | | | 121.8 | 42,900 | |
| Production in New Measured Mile Area | | | | 352 | | |

Accurate summaries of the production time and quantities in the alleged impact area and new measured mile areas do identify a slow down in the work while performing dredging at the South Ferry Landing on 6 days; not the claimed 8 days. The loss of productivity is identified as 34.4 percent [(1-231/352)x100]. Renda expended 46.4 pumping hours in the

[9] Differences still exist, such as more night-time operation at the South Ferry Landing.

South Ferry Landing. The additional amount of operating time Renda expended due to the difference in production is 15.96 hours (46.4 hours times 34.4 percent).

4.1.3.4 Renda Requested Impact Days

In addition to the productivity loss requested, Renda asserts entitlement to delay days for additional move-in and move-out and repair days. If Renda is not entitled to an adjustment for a loss in productivity, then Renda is not entitled to any of the eleven requested impact days which are alleged to flow directly from encountering rubble at the South Ferry Landing. However, if Renda is entitled to additional time for allowable repairs, only the actual lost time should be paid at the standby rate. Any operating time should be deducted and the price and time adjusted accordingly.

As previously discussed, Renda seeks full reimbursement for April 24, 25, 26, 27, 28 and 29. Renda was performing required work, sweeping of the areas, during this time period and repairs performed amounted to 80.35 hours or about 56 percent of the total available time. As detailed in Table 4.1.2, repair time (25.2 hours) to the swing sheave, spuds and main generator water pump are not contact items that could be damaged by rubble and are unrelated to a differing site condition at the South Ferry Landing. Further, Renda had problems with the main pump engine becoming overheated. Two of the main pump engine's heads had cracked and other heads were leaking. These engine repairs are not related to rubble at the South Ferry Landing. Because the dredge was performing contract required sweeping and the repairs are unrelated to alleged rubble damage at the South Ferry Landing, no allowance for this period is considered in my evaluation.

Renda also seeks move-out time on the May 4, 2000, which would be the contractual move-out after completing the dredging. As addressed elsewhere, coordination with the Lynchberg Ferry operators required several move-ins/outs and additional time is unwarranted and unsupported. Further, other contract work was performed on May 4, which would reduce the request, if valid.

Ten days after leaving the South Ferry Landing and two hundred and thirty-three days after starting dredging, Renda claims that the rubble encountered at the South Ferry Landing caused extensive repairs to the dredge cutterhead, pump impeller and shell which were performed on May 14, 15, 16 and 17, 2000. May 17, 2000[10], should be excluded from the repair period because on-going repairs to the spud winch prevented operation, not the impeller and pump. In the claim, invoices which Renda used to support the cost of the work are dated months after the repairs were made (outside the claim periods). For instance, the pump shell which was charged to the South Ferry Landing has an order date of May 30, 2000 and a ship date of September 1, 2000. No support is provided for the cost of the repair parts that were installed during the May 14 through 16 period.

By claiming that the South Ferry Landing damaged the cutter teeth, pump impeller and shell, Renda implies that this repair work was unexpected and occurred prematurely. No supporting or historical data was submitted to support this assertion. These parts are wear items on the dredge. Periodically, the pump impeller and shell will require rebuilding or replacing. Cutter teeth will require changing and rebuilding due to wear and may be changed due to dredging conditions.

The cutter teeth on the dredge were reported as being changed on October 8, 1999. The Report of Operations (Vol V, Tab 5) for that date indicates that the teeth were changed in two hours. Additionally, Renda used the dredge Millennium to accomplish work prior to performing the Upper Bayou Project. On at least one of those projects, sand (a very abrasive material for pumps, liners, impellers and pipelines) was the primary material hydraulically excavated and transported by the dredge. The wear from these operations must be considered when replacing the pump shell, liners, wear ring, etc.

Further, Renda management decisions when procuring the dredge contributed to the need to replace the pump shell sooner than expected. When the pump shell was made by

---

10 Repairs for which Renda claims entitlement were complete on May 16, 2000. The Inspection Report of Dredging for May 16, 2000 states, "New pump in (sic) now finished on the dredge. Cutter teeth are now installed on the dredge. Work is in progress on the spud winch drum." (underscore added).

Mobile Pulley and Machine Works (Mobile Pulley), Renda declined to have a hard surface (HS) overlay applied to the interior shell prior to being used (Vol V, Tab 23). When Renda had the pump shell rebuilt[11], the hardening process was applied. If entitled to the pump shell repair, this betterment should be credited to the Government.

Finally, with respect to the claimed unanticipated repairs performed in the May 14 to 16 period, Renda solicited quotes for these precise repairs prior to March 22, 2000, approximately one month before excavating the South Ferry Landing (Vol V, Tab 25). Because of the pre-planning for the repairs in March 2000, the alleged differing site condition is not the proximate cause of the repairs.

Further, the equipment rates used by Renda and specified in the contract have a component for repair parts. An allowance for specific repairs in May 2000 would result in a double recovery of cost.

Renda itself notes that other repairs were performed during the May 14 through 18 period. Repairs to the spuds and spud winch drums are concurrent delays which would prevent operation of the dredge. A concurrent delay would result in time, but no price adjustment. For the reasons stated above, no delay time is warranted for the May impact periods.

Should merit be found for any of the repair days to the dredge during the two delay periods, then the daily standby rate of $10,532 which is computed at Vol V, Tab 26, should be used.

---

[11] May 26, 2000, quote from Mobile Pulley for Pump Shell, 24"A4891 ACS – 3 hs states, "With two passes of hard rod in the inside wear area of the shell" for a price of $43,136. May 30, 2000, order date and invoice included in Renda's claim shows a price of $43,136 for a "Pump Shell, 24" A4891 ACS3 w/HS (Vol V, Tab 24).

4.1.4 Technical Results

On April 22 and 23, 2000, concrete rubble and wood pilings were struck by Renda while dredging between Sta. 471+50 and 472+00. However, a differing site condition at the South Ferry Landing did not occur during the dredging process.

At this location, concrete rubble, riprap and wood pilings should have been expected to be encountered at the structures, ferry dock and shore protection, if dredging outside the required slopes. April 22 and 23, 2000 were Renda's third and fourth day to dredge in the area. The contract specifically warned about encountering structures if cutting or dredging outside the required side slopes. The dredge did cut outside the required side slopes.

Contract Section 800, Special Clauses, paragraph 6, Layout of the Work, requires Renda to lay-out its work and be responsible for all measurements in connection with the layout. Further, paragraph 6 states, in part, "The Contractor shall be responsible for excavating the work to the lines and grades that may be established or indicated by the Contracting Officer." Clearly, dredging beyond the south side slope occurred, structure materials were encountered and Renda is responsible for being outside the dredging limits.

A site visit to the project site prior to bidding by Renda is undocumented. However, if one occurred, the shore protection constructed of broken concrete with imbedded reinforcing steel and angle irons and the ferry dock constructed out of wood piling would have been visible. The close proximity of these facilities to the top of the channel side slopes should have been a warning to Renda to trim the slopes carefully or to locate the structures prior to starting work in the area.

4.1.5 Cost and Time Evaluation

As indicated, a loss of production of 34.4 percent did occur at the South Ferry Landing. Renda claims that the Government is responsible for the inefficiency due to the presence of a differing site condition. A detailed evaluation of the additional cost and time claimed has been performed.

As identified herein, Renda worked 46.4 productive hours performing the dredging at the South Ferry Landing between Sta. 470+00 and 472+00. Therefore, with the actual loss of efficiency factor, Renda performed 15.96 or 16 hours of added work.

An adjustment in price based upon a loss of productivity or overrun of pumping time of 16 hours is calculated.

4.1.5.1 Results of Cost Evaluation

Renda's Claimed Cost and Results of Technical Evaluation

| | Renda Claim | Supported Cost | Note |
|---|---|---|---|
| Direct Costs | | | |
| Additional Labor ($8,053) and Equipment (12,894) | $650,880 | $20,947 | A |
| Equipment Repair Cost | 61,075 | 0 | B |
| Job Site Field Cost | 31,318 | 2,542 | C |
| Total Direct Cost | $743,273 | $23,489 | |
| Overhead: | | | |
| Resident Home Office (4.55%) | 118,032 | 1,069 | D |
| Corporate Office (2.83%) | 49,056 | 665 | D |
| Total Indirect & Direct Cost | $910,361 | $25,223 | |
| Profit (7.15%) | 91,036 | 1,803 | E |
| Bond (0.65%) | 6,509 | 176 | F |
| Total Adjustment | $1,007,906 | $27,202 | |
| Miscellaneous Cost | | | G |
| Professional Fees/Consultant | 40,000 | 0 | |
| Report Preparation Cost | 1,000 | 0 | |
| Bond on Miscellaneous (0.65%) | 267 | 0 | |
| Total Amount | $1,049,173 | $27,202 | |

Explanatory Notes:

A) The additional labor and equipment proposed by Renda include the levee personnel and dredging personnel. As noted in Renda's pre-award submittal (Vol IV, Tab 13, RM-COE-05737), dredging work was anticipated to take 269 days and was continuous from the start of work until complete. The hydraulic levee shaping work was anticipated to take only 172 days and could be performed when the dredge was not actively pumping material. Therefore, the hydraulic levee shaping work is not the controlling activity and is separate from the dredge operation. No allowance is made for levee equipment or personnel performing the shaping operation, which includes hauling equipment.

Renda proposed 19 days of actual cost (8 operating and 11 impacted days) and subtracted 1.75 days of estimated cost from an earlier time period. The actual cost of the disruption is calculated from the six days where production was reduced. No additional time or cost is considered for the impact periods for reasons stated previously.

1) Labor – Renda allocates 100 percent of the direct labor cost for April 14, April 21 thru May 4, and May 14 thru May 17, 2000 to the differing site condition encountered at the South Ferry Landing. Only six days have been identified as being disrupted by the loss of production at the South Ferry Landing Area. Volume V, Tab 27 has the labor calculations for the disruption period.

2) Equipment – Volume V, Tab 28 contains the equipment cost calculation for the loss of production at the South Ferry Landing. The equipment rates used by Renda did not reflect the rates permitted by the Contract. Further discussion about equipment rates can be found in Section 5 of this report.

B) Specific Equipment Repair Parts –No allowance has been made for specific repair parts. Among the numerous reasons cited above, the repair cost factor in the equipment rates compensates for major and minor repairs and maintenance. For the repairs claimed in May, Renda had planned for them prior to performing the South Ferry Landing work.

C) Jobsite Field Costs - This cost component includes cost incurred in the field and generally is for miscellaneous expenses such as freight, communications, and the like. However, many of the elements for supplies included in the monthly field costs appear to be equipment fuel, parts and/or repairs[12] which should be eliminated since the Corps Manual includes an allowance for equipment repairs in the rates. Without the specific invoice, the items in question cannot be confirmed. Therefore, the monthly field cost as presented by Renda is used to calculate a daily rate of $1,815.53 and is considered acceptable at this time. The daily rate is multiplied by the 1.4 days of actual delay.

D) Resident Home Office and Corporate Office Overheads - The DCAA audit (Vol V, Tab 29) found that, for the year 2000, the overhead rates were 16.14 percent for Resident Home Office and 6.60 percent for Corporate Office. However, the audit notes that the Resident Home Office rate and the Corporate Office rate is comprised of two components, office and shop rates. I question the shop rate component of the overhead rates since the Corps Manual, which Renda was required to use, allows for shop expenses in the equipment rate. Only the DCAA-verified overhead office rates[13] for Resident Home Office (4.55%) and Corporate Office (2.83%) are used in this price evaluation. The shop component of the rate is omitted since it is a duplication of cost. The Corps Manual states that an allowance has been made for "Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead."

E) Profit is calculated by using the weighted guidelines method and is 7.15%. Development of the profit rate is in Volume V, Tab 30.

F) Bond is verified by the DCAA audit of the South Ferry Claim.

[12] For example, April 2000 Monthly Vendor Cost for Southwest Wire Rope at $5,953.77, Metal Supply at $9,727.63, Exxon at $1,987.87 and ABB Automation at $5,850.00.
[13] The office overhead rates are included in Volume V, Tab 29 behind the audit.

G) The miscellaneous costs were questioned in their entirety by the DCAA audit. No allowance has been made for these cost items.

4.1.5.2 – Time Evaluation

The slowdown in the work at the South Ferry Landing required 1.4 days to actually perform. Since the performance time is greater than 1, the time has been rounded up to the next whole day. Therefore, the time extension associated with the slowdown is two calendar days.

4.1.5.3 – Over-Excavation Beyond Required/Allowable Pay Prism – Non-Pay Yardage

Renda excavated outside the maximum pay prism in the area of the South Ferry Landing and in my new measured mile area. Therefore, a portion of the productive time expended in each area was wasted while performing non-pay work. The amount of over-excavation (non-pay yardage) in Renda's impacted area from Sta. 470+00 to 472+00 is 15,397 cy or an additional 77 cy/ft of channel length (Vol V, Tab 31). In the measured mile area from Sta. 472+00 to 478+00, the amount of non-pay yardage is 96 cy/ft of channel length. Because the amount of over excavation in the claim area is less than in the measured mile area, the cost and time evaluation above for the South Ferry Landing understates the adjustment by 25 percent to which Renda is entitled, if found that Renda did encounter a differing site condition.

Therefore, Renda's cost and time should be adjusted to account for this non-pay work. The cost increase Renda incurred at the South Ferry Landing is $34,003 ($27,202 times 1.25). The time extension remains at 2 calendar days because 1.4 actual days of delay times 1.25 percent is 1.75 and the time extension has been rounded to 2 calendar days.

### 4.1.6 Conclusion

My evaluation has identified a slow down in the work at the South Ferry Landing. The maximum damages measured by this slow down are $34,003 and required two calendar days to perform. However, no differing site condition was encountered at the South Ferry Landing. The concrete rubble/rip rap and the wood piling were encountered by Renda dredging beyond the required side slopes and bottom.

## 4.2 Houston Lighting and Power (HL&P) Transmission Tower Delay

### 4.2.1 General

On May 16, 2001, Renda submitted its revised claim in the amount of $170,863 for the suspension of dredging work caused by the construction of a new transmission tower by others at Lost Lake Placement Area. Renda claims interruptions during two periods, July 16 and 17, 2000, and October 16, 17, and 18, 2000. Included with its revised claim, Renda provided updates on the damages summary and analyses of labor and equipment.

After contract award to Renda, Houston Lighting and Power Company (HL&P) received permission from the Government to relocate a transmission tower within the existing easements on Lost Lake Placement Area. HL&P's work on Lost Lake interfered with the location of Renda's discharge pipeline. HL&P was to complete its work no later than December 31, 2002 (Vol V, Tab 35). HL&P performed its work in 2000 which conflicted with Renda's construction activities.

### 4.2.2 HL&P Claim Period One – July 16 and 17, 2000

Renda's cover letter for the HL&P transmission tower claim states that work was affected on two days, July 16 and 17, 2000. However, the labor charged to the delay is only for July 16, 2000, and allocated as "50% of Gross Payroll (less Levee Payroll) to Claim". Renda states that July 17, 2000, is "Claimed in Flare Area".

July 16, 2000, is claimed by Renda for 50 percent of the day. The basis for allocating 50 percent of the day is unknown[1]. On July 16, 2000, the Inspection Report of Dredging (IRD) states that Renda was performing contract work on that day and had 8 hours and 45

[1] The Report of Operations for that day is missing which would present a precise accounting of the time.

minutes of effective operating time "sweeping bad stations on the north side of the channel". There is no documentation to allocate the remaining hours to the HL&P tower delay.

However, based upon historical data for the job, the proportion of non-effective time to effective time, Renda would have experienced approximately 1.0 hour of non-effective time for each hour of effective operating time (Vol V, Tab 36). Therefore, on July 16, approximately 17.75 hours (17 hours and 45 minutes) of contract time would be associated with the sweeping in Sections 2 and 3.

On July 16, after sweeping, the Inspection Report of Dredging (IRD) notes that Renda "moved the dredge out of the way to sink submerge(d) crossing." This submerged crossing was laid the following day across the ship channel to perform the work on the south side of the channel in the Flare Area. Movement of the dredge by Renda would have taken additional time and is unrelated to work at the transmission tower. Again, no mention of any delay due to the transmission tower is mentioned on July 16, 2000 in the IRD, or on any other contemporaneous document. No delay or disruption to Renda's dredging operation on July 16, 2000, is documented.

On July 17, other internal Renda documents report laying the submerged pipeline crossing across the Houston Ship Channel, fixing discharge pipe on the dredge and setting up the dredge to resume work in the Flare[2]. All of the above preparations are for beginning work in the Flare Area and unrelated to the transmission tower.

For the July period, in an email dated June 4, 2002, Mr. Barry Smith (Vol V, Tab 38), after consulting with project personnel, advised the DCAA auditor that Renda "was able to rally sufficient forces to basically move/chivy or push the pipeline out of the way with a minimum of difficulty"[3] (underscore added).

[2] See internal Renda Marine Daily Production Reports – Vol V, Tab 37).
[3] Renda did not provide notice of additional work or a conflict with the HL&P transmission tower until October 2000.

However, on July 14, and July 18, 2000, the Inspection Report of Dredging (IRD) reports some additional work caused by the new transmission tower[4]. This work consisted of welding pipe fittings (elbows) onto the metal shore pipe. The Contractor's Quality Control Report (CQCR) does not mention any work caused by the transmission line until July 18, 2000, when it states, "We re-routed shoreline around new tower at disposal area." However, the CQCR did not identify the personnel or time required to "move/chivy the pipeline" which required a minimal amount of time.

4.2.3 HL&P Claim Period Two – Oct 16, 17 and 18, 2000

For claim period two, Renda's claim for equipment states, "Since the actual hours of delay are not specifically defined in the reports hours of operation are JUDGMENTAL". Likewise, for the labor hours, Renda states that the delay costs are judgmental. The hours need not be judgmental. Renda relies on only the IRD in preparing its claim. Renda disregards other internal reports which identify actual hours, specifically the Report of Operations.

Renda claims 67 percent of the weekly dredging payroll (does not include levee payroll) which ends on October 22, 2000. This allocation of labor is inconsistent with the time (48 hours) Renda identified as being delayed. Renda says the transmission line delayed the work as follows:

| | |
|---|---|
| October 16, 2000 | (50% of the day) |
| October 17, 2000 | (100% of the day) |
| October 18, 2000 | (50% of the day) |

The basis for selecting the above percentages is undocumented. However, the claimed 48 hours is only 29 percent of the week; not the 67 percent Renda uses to allocate its weekly labor cost. Additionally, had Renda consulted its internal Report of Operations, the actual delay time for period two would have been easily discerned.

---

[4] The IRD for July 14, 2000, states, in pertinent part, "Welded 45 elbow onto 200' steel pipe to make turn around high line wire." The IRD on July 18, 2000, states, in pertinent part, "Worked on 90 degree elbow to repipe around new tower @ Lost Lake disposal area."

On October 16, 2000, according to the Report of Operations (Vol V, Tab 39), Renda began the pipeline relocation for the transmission tower at 3:45 pm and was delayed 8.25 hours till midnight. On October 17, 2000, Renda was down all day (24 hours). On October 18, 2000, Renda was delayed until 3:50 am due to the relocation of the shore pipe to accommodate the HL&P transmission tower construction. In sum, Renda's critical dredging work was actually idled thirty-six hours.

HL&P had been coordinating their work with Renda since July 2000. Sometime prior to October 16, 2000, unbeknownst to the Government, Renda met with HL&P representatives to resolve the conflict with Renda's pipeline at the new transmission tower (Vol V, Tab 40). Renda agreed to additional shutdown cost with HL&P without notifying the Government of the transmission tower conflict or its negotiations with HL&P. Not until after the additional work was performed did Renda notify the Government on October 18, 2000, of the additional cost to Renda's operation (Vol IV, Tab 20). The Government did not have an opportunity to avoid the additional cost Renda agreed to incur during Renda's undisclosed negotiations with HL&P.

4.2.4 Technical Evaluation

For claim period one, July 16, 2000, delay to Renda's dredging operation by the HL&P transmission tower is undocumented and unsupported. Other Renda work (laying submerged pipeline to Flare Area, and dredge relocation) was non-effective time which is unrelated to the transmission line and not the responsibility of the Government. Renda acknowledges that the work performed for the transmission tower relocation in July was accomplished with a minimum of difficulty. In July 2000, notably the 14th and 18th, Renda did perform some additional work by welding fittings on the discharge pipeline and pushing the pipeline on the shore out of the way with "a minimum of difficulty." The personnel and equipment Renda used to accomplish the added work is not documented. I have estimated the personnel and equipment used during July 2000 to measure the adjustment for Period One.

For HL&P period two, the actual delay time of 36 hours is documented through the Report of Operations. Thirty-six hours of delay time to the critical dredging operation is used to measure the damages. I have made no deduction in time for relocation of the dredge and preparatory work for dredging a different location.

#### 4.2.5 Technical Results

An adjustment in time and price is computed for additional work in July 2000 and delay in October 2000. A detailed evaluation of the additional cost and time claimed has been performed.

##### 4.2.5.1 Results of Cost Evaluation

Renda's Claimed Cost and Results of Technical Evaluation

| | Renda Claim | Supported Cost | Note |
|---|---|---|---|
| Direct Costs | | | |
| Additional Labor | $18,460 | $5,880 | A |
| Additional Equipment | 95,460 | 9,061 | |
| Job Site Field Cost | 4,068 | 2,435 | B |
| Total Direct Cost | $118,208 | $17,376 | |
| Overhead: | | | |
| Resident Home Office (4.55%) | 18,771 | 791 | C |
| Corporate Office (2.83%) | 7,802 | 492 | C |
| Total Indirect & Direct Cost | $144,781 | $18,659 | |
| Profit (0.00%) | 14,478 | 0 | E |
| Bond (0.65%) | 1,035 | 121 | F |
| Total Adjustment | $160,294 | $18,780 | |
| Miscellaneous Cost | | | G |
| Professional Fees/Consultant | 10,000 | 0 | |
| Report Preparation Cost | 500 | 0 | |
| Bond on Miscellaneous (0.65%) | 68 | 0 | |
| Total Amount | $170,863 | $18,780 | |

Explanatory Notes:

A) The additional labor and equipment proposed by Renda for this HL&P claim generally does not include the levee personnel. However, Renda calculated 2.5 days of delay cost. The actual cost of the delay is determined to be 1.5 days where dredging was idled due to the HL&P transmission tower work by others. Additional cost, but no time delay, is considered for the July work for reasons stated previously.

1) Labor – Renda allocates 50 percent of the dredging labor cost for July 16, October 16 and 18 and 100 percent of the dredging labor cost for October 17, 2000 to the HL&P delay. Only portions of three days have been identified as being stopping contract work. Volume V, Tab 41 has the labor cost ($4,529) calculations for the delay period in October and Volume V, Tab 42 has the additional labor cost ($1,351)in July 2000.

2) Equipment – Volume V, Tab 43 contains the equipment cost calculation for the October 2000 delay caused by the HL&P transmission tower construction by others. Volume V, Tab 42 has the estimated equipment cost ($1,545) for the additional work performed in July 2000. The equipment rates used by Renda do not reflect the operating and standby rates permitted by the Contract. Further discussion about equipment rates can be found in Section 5 of this report.

B) Jobsite Field Costs: - This cost component includes cost incurred in the field and generally is for miscellaneous expenses such as freight, communications, and the like. However, many of the elements appear to be costs which would be included in the Resident Office Overhead and duplicated in this cost item. Also, supplies included in the monthly field costs which appear to be equipment fuel, parts and/or repairs[5] that should be eliminated since the Corps Manual includes an allowance for equipment repairs in the rates. Without the specific invoice, the items in question cannot be confirmed. Therefore, the monthly October field cost as presented by Renda is used to calculate a

[5] For example, April 2000 Monthly Vendor Cost for Southwest Wire Rope at $5,953.77, Metal Supply at $9,727.63, Exxon at $1,987.87 and ABB Automation at $5,850.00.

daily rate of $1,623.49 and is considered acceptable at this time. The daily rate is multiplied by the 1.5 days of actual delay.

C) Resident Home Office and Corporate Office Overheads - The DCAA audit (Vol V, Tab 45) found that the actual rates for 2000 were 16.14 percent for Resident Home Office and 6.60 percent for Corporate Office overheads. However, the audit states that the Resident Home Office rate and the Corporate Office rate is comprised of two components, office and shop rates. I question the shop rate component of the overhead rates, since the Corps Manual, which Renda was required to use, allows for shop expenses in the equipment rate. The shop rate component in the Resident Home Office and Corporate Office overheads duplicates the Corps Manual allowance and is omitted. The Corps Manual specifically states that an allowance has been made for "Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead." Without the shop component, the Resident Office Overhead rate is 4.55 percent and the Corporate Office Overhead rate is 2.83 percent.

D) Profit is not allowed on suspensions of work. Since the work was idled or on standby, no profit is allowed.

E) Bond is verified by the DCAA audit of the HL&P transmission tower delay proposal.

F) The miscellaneous costs were questioned in their entirety by the DCAA audit. No allowance has been made for these cost items.

4.2.5.2 Time Evaluation

The dredging work was delayed by 1.5 days. Since the time exceeded one day, by rounding up, a time extension should be granted for 2 calendar days.

4.2.6 Conclusion

Due to the HL&P transmission tower construction, Renda was stopped from performing critical dredging work for 36 hours. If the stoppage is found to have merit, a time extension should be granted for 2 calendar days and increased cost of $18,780.

## 4.3 Flare Area – Differing Site Condition

### 4.3.1 General

The Flare Area is a wide area on one side of the channel that is adjacent to and contiguous with the channel between Sta. 520+00 and 550+65. The channel bottom before entering the Flare Area is 530 feet wide. The transition in the bottom width begins to expand at Sta. 520+00 and ends at Sta. 527+35. At Sta. 527+35 the Flare Area has an additional bottom width of 385 feet on the right side of the channel if looking downstream or down station. This side of the channel is referred to as the south side of the channel. Generally, all earth material in this area is outside the existing channel limits and new or virgin work. At Sta. 544+06, the Flare Area width transitions back to the channel width of 530 feet (265 ft on each side of the centerline). The Flare Area is shown on Contract Drawing C-3 and C-5 and is shown in Figure 4.3.1 below.

Figure 4.3.1
Flare Area (Re: Contract Drawing C-3)



After two months of working in the Flare Area, Renda notified the Government on March 30, 2000, that it had encountered stiff clays at elevations where soft clays had been anticipated. Renda requested a time extension of 100 days. On February 21, 2001, Renda submitted its claim for the Differing Site Conditions in the Flare Area and requested a 76-calendar day time extension and $2,973,227 in additional cost. On March 7, 2001, Renda revised its claim to a request for 76 calendar days and $4,691,688 in additional cost. The difference is based primarily on revised equipment rates and overhead markup.

Renda claims that the Flare production was impacted (disrupted) by stiff clay during two periods. The periods are:

| Renda Impact Period | Date | Station |
|---|---|---|
| Period One | 23-Jan-00 to 11-Mar-00 | 520+00 to 540+00 |
| Period Two | 17-Jul-00 to 29-Sep-00 | 522+60 to 550+50 |

Period One was accomplished without the assistance of a booster pump to transport the earth materials in the discharge pipeline from the channel to the Lost Lake Placement Area. Period Two begins when Renda re-enters the area with a barge-mounted booster pump placed in the discharge pipeline.

4.3.2 Materials to be Encountered

Renda's pre-bid worksheets and bid papers do not identify the types of earth materials (clay, silt, mud, sand) anticipated in the Flare Area. Renda must demonstrate that it relied on, and correctly interpreted, the boring logs to successfully prevail on a differing site condition in the Flare Area. If Renda had no expectations of the material it would encounter at bid, then the soils cannot be materially different and a differing site condition cannot exist.

Two contract boring logs were located on the south bank in the Flare Area, 93-63 and 93-62. Both boring logs are located below water surface elevation close to the existing channel in the toe of the bank of earth material to be excavated. The surface elevation of boring log 93-62 is approximately elevation -33 MLT. The surface elevation for boring log 93-63 is approximately elevation -45 MLT. As shown on the cross sections included in the contract, the surface elevation for the earth materials in the Flare Area slopes upward to approximate elevation -10 MLT. Renda does not explain what documents were relied on to determine that earth materials (approxi-mately 30 feet thick above the top elevations of boring logs 93-62 and 93-63) are soft to very soft clays. There are nine other borings in the general vicinity of the Flare Area, some of which have higher surface elevations, but Renda makes no reference to these. The surface elevation for these logs range from elev. +10 MLT to elev. -41 MLT.

Renda's August 1998 Stiff Clay Spreadsheet (Vol IV, Tab 16) shows Renda's interpretation of the locations and quantities of very stiff to stiff clay anticipated to be encountered while dredging the channel. Renda identified 1,051,871 cy of very stiff to stiff clay to be dredged from the channel. Renda's calculation contains some math errors and artificially narrows the range or location of the very stiff to stiff clays. The Average End Area Method (Vol V, Tab 46) was used to check Renda's math and identification of locations contained in Renda's August 1998 Stiff Clay Spreadsheet. Using the Average End Area Method, Renda should have expected 1,084,512 cy of stiff to very stiff clay on the project. Of particular interest, Renda identifies on its August 1998 Stiff Clay Spreadsheet very stiff to stiff clay in the Flare Area at the following locations:

| Location: Stations | Acceptance Section | Very Stiff to Stiff Clay Quantity (CY) |
|---|---|---|
| 520+00 to 522+00 | 3 | 7,044 |
| 522+00 to 524+00 | 3 | 15,256 |
| 524+00 to 527+35 | 4 | 13,754 |
| 527+35 to 530+00 | 4 | 0 |
| 530+00 to 534+00 | 4/5 | 6,778 |
| 534+00 to 538+00 | 5 | 6,778 |
| 538+00 to 544+00 | 5/6 | 82,147 |
| 544+00 to 550+65 | 6 | 89,331 |
| Total for Flare Area | | 221,088 |

At least in August 1998, Renda expected 221,088 cy of stiff to very stiff clay in the Flare Area. According to Renda, that represents approximately 13 percent of all materials to be removed from within the channel limits, which includes the Flare Area. It is important to note that the bulk of this very stiff to stiff clay quantity in the Flare Area is located at the lower elevations (near or at required grade) and upstream at the upper end of acceptance Section 5 and in Section 6.

Also of interest on Renda's August 1998 Stiff Clay Spreadsheet is an area between Sta. 509+33 and Sta. 520+00 which is identified as containing no stiff clay. This area was anticipated by Renda to contain a total of 384,000 cy and is contiguous with, but downstream of, the Flare Area which begins at Sta. 520+00.

4.3.3 The Work

Dredging work began on September 13, 1999, in Section 2. On October 13, 1999, Renda advised the Government in a letter (Vol IV, Tab 21) that the slow production in Sections 1 and 2 would not continue. Renda stated,

> "As we are now approaching Station 500+00, the material will increase to near 275 cy per lineal foot at Station 510+00 and will consist of very soft clays to –45[ii]. We anticipate productions to increase to more than 20,000 cubic yards per day. After completing the north half of Section 3, we will dredge across to the flare portions of Sections 4, 5 and 6. These areas contain as much as 400 cubic yards per lineal foot[iii] and also consist of very soft clays except for the section beginning in Section 6[iv]."

This Renda statement is consistent with the August 1998 Stiff Clay Spreadsheet where stiff clays are not expected from approximately Sta. 510+00 to 524+00 (end of Section 3) except in the lower elevations and predicts that stiff clays will be more abundant near the beginning of Section 6. Additionally, in the October letter, Renda compares the anticipated very soft clays in the flare portions of Section 4 and 5 to the very soft clays to be dredged beginning at Station 510+00 (Section 3).

Between approximately Sta. 510+00 to Sta. 520+00, Renda had a production rate in the Renda identified very soft clays (hereinafter referred to as "Renda Soft Clay Area") of

about half (9,657 cy/day)[1] of the October 13, 1999 anticipated production of 20,000 cy/day. Analysis of the Inspection Report of Dredging (IRD) reveals that in the Renda Soft Clay Area, production did not reach the anticipated production because the dredge averaged 13.6 running hours per day and had an hourly production rate of 709.5 cy per hour[2].

On January 5, 2000, Renda responded to the Government's concern about the lack of progress on the job (Vol IV, Tab 22). Renda acknowledged that production had not met projections because of the stiff clays encountered. Renda also attributed low production to the late delivery and unsatisfactory condition of the dredge which had delayed the start of work and reduced efficiency of the dredge. However, contrary to Renda's statement in the January 5 letter that stiff clays had been encountered, Renda had already dredged the Renda Soft Clay Area where production was expected to be more than 20,000 cy/day. As noted above in this report, production did not meet with Renda's expectations or predictions in October 1999. The production, however, more closely matched the bid production[3].

In an e-mail to the Government on February 1, 2000 (Vol IV, Tab 23), Renda admits that low productions continued and acknowledges that the low production is due to the limitations of the head[4] available from the dredge and ladder pump while pumping clay. Renda then indicates that it did not expect to be pumping clay without a booster further upstream than Sta. 524+00. Renda states that a booster is scheduled to arrive in February

[1] Actual production is from evaluation of IRD and is contained in Volume V, Tab 47.
[2] Ibid.
[3] Fisher's initial bid did not separate the anticipated production into stations or sections. Fisher's Bid anticipated 8,000 cy per day (Vol IV, Tab 9, RM-COE-23218) and running 13 hours per day (Vol IV, Tab 15, RM-COE-02672 ). Fisher's hourly bid production for the project was 615 cy/hr (8,000 divided by 13). Bowman's bid (Vol IV, Tab 8), the one supporting Renda's bid amounts, did not separate the anticipated production into sections, stations or different types of earth materials. Bowman's bid had a range shown for daily production of 8,500 to 11,000 cy per day. Therefore, the anticipated bid production range was 845 cy/hr to 654 cy/hr. Bowman anticipated average production at bid was 750 cy/hr assuming 13 productive (effective) hrs/day.
[4] Head refers to hydraulics. When a liquid, or in this case a slurry of water and soil, exerts a force against its container, it is called pressure. Pressure in dredging is also referred to as head. The dredge pump(s) creates the positive pressure to move the slurry through the pipeline. Negative losses include discharge head, entrance head and pipeline (friction) head, among others and reduce the velocity of the slurry as it travels through the pipeline. The type of material can also affect the head loss. These types of head losses affect production.

to mid-March 2000. Renda concludes the February 1, 2000 e-mail by stating that the boring logs have been accurate to date showing "locations of muds, sands, soft, medium and stiff clays." As of January 31, after four and a half months of dredging, Renda has not encountered any differing site conditions or been given any change orders for dredging.

Contrary to the February 1, 2000 email that Renda would not dredge clay upstream of Sta. 524+00 without a booster[5], Renda continued to excavate in the Flare up to Sta. 540+50. On March 12, 2000, Renda left the Flare Area of Sections 4 and 5 and returned to Section 1, 2 and 3 to finish the areas for acceptance.

After leaving the Flare Area on March 12, 2000, Renda solicited quotes from other dredging companies for completing the remaining work. On March 23, 2000, Weeks Marine (Weeks) responded to Renda's verbal request for a quote to complete the upstream acceptance sections of 7, 8 and 9 (Vol V, Tab 48). The unit price quoted for performing Section 7, 8 and 9 dredging was $4.95 per cy ($2.85 per cy more than Renda's price to the Government). On March 27, Renda solicited another proposal from Weeks Marine (Vol V, Tab 49) this time requesting an additional price for completing the remainder of the dredging in Sections 5 and 6, as well as, placing the clay in the hydraulic levee on the north side of Lost Lake Placement Area between the existing drop-outlet structure and the new drop-outlet structure. Renda points out that approximately 838,000 cy of primarily clay (levee building material) remains in all of Sections 5 and 6. A response is not documented.

In addition, on March 29, 2000, Renda sought another price from Bean Dredging Corp. (Bean) for completing the dredging in Sections 5 and 6 (Vol V, Tab 50). Renda expressed the "need to have the Meridian[6] work in Sections #5 and #6 pumping clay" (footnote added). Again, for the quote, the clay to be removed from Sections 5 and 6 was to be transported to the backside of the placement area (north levee alignment) to build

---

[5] The Renda booster pump did not arrive on the job until May 2000 and did not work properly until July 2000.

[6] The Meridian is a 30-inch hydraulic dredge.

hydraulic levees; a long discharge pipeline. Renda provided Bean a plan view and a typical cross section of the channel. In the typical cross section provided to Bean, Renda stated that the <u>mud</u> in the area had been dredged off of the remaining stiff clay in Sections 5 and 6 (see Figure 4.3.2 for reproduction of cross section contained in Volume V, Tab 50).

Figure 4.3.2

Reproduction of typical cross section provided in Renda Solicitation to other contractors. (Vol V, Tab 50)




Also in Volume V, Tab 50, REM35088, Renda provided a quantity calculation showing approximately 838,000 cy of clay remaining in all of Sections 5 and 6, including the north bank and Flare Area on the south side of the channel. No documented response has been found in response to this request.

On March 30, 2000, Renda gave notice to the Government of a Differing Site Condition in the "Flare" area. Renda states that stiff clays were encountered at a much higher elevation than the –47 feet MLT as shown on the borings. Renda requested "an additional 100 days for the difference in the production to dredge soft clays versus the time required to dredge stiff clays, and the associated down time caused by plugged lines caused by encountering stiff clays…." (Vol IV, Tab 24).

Renda refers to borings 93-62 and 93-63 as indications of what material to expect in the Flare. However, these borings are located low elevation in the south channel slope toe

and not in the virgin (new) bank material where Renda asserts it encountered differing materials. In particular, boring log 93-62 describes the top ten or fifteen feet as being loose maintenance material contaminated with hydrocarbons. Renda does not mention that boring logs exist in the virgin bank on the north side of the channel. These north bank boring logs show very stiff and hard clay at elevation –35 feet MLT, much higher than where Renda states that stiff clays were anticipated[7].

Renda's reliance on only boring logs 93-62 and 92-63 represent that soil characteristics of the earth materials in the Flare Area is inconsistent with its stated "Character of Dredged Material and Dredging Assumptions" (Vol V, Tab 51) explained in its South Ferry Landing claim. For the South Ferry Landing, which is located at approximately Sta 472+00 on the south side of the channel, Renda states that it relied on Boring 3ST-162 at Sta 473+90 on the north side of the channel approximately 560 feet away on the opposite bank. Additionally, Renda notes that Boring Log Nos. 93-60, 3ST-163, 93-61 and 3ST-164 are equally applicable. Boring Log 3ST-164 is located farthest upstream on the north side of the channel and over 5000 feet away from the South Ferry Landing. In contrast, the Flare Area is directly across the channel and less than 600 feet from Boring Logs 3ST-3, 3ST-4, 3ST-5, 3ST-6, 72-105 and 3ST-7 which are allegedly not used by Renda for determining the character of the material to be dredged. These boring logs describe stiff and hard clays at or above elevation –35 feet MLT. Renda's March 30, 1999, notice letter states, "At the downstream end of the flare, borings showed the stiff clay line to be at approximately –46 mlt. We encountered the clays at near –40 mlt and dredged the area to grade up to Station 534+00."

Renda is correct that boring log 93-62 describes stiff (S), hard (H) and very stiff (VS) clay in the toe of the south slope at approximate elevation –46 MLT. However, for the virgin material above elevation –46 feet MLT, Renda ignores the north side boring logs

---

7 In the South Ferry Landing claim asserted by Renda, Renda states that it uses boring logs on the opposite, north bank to predict characteristics of the soil materials on the south bank (Vol V, Tab 51). That type of assumption is exactly what has been done on Renda's August 1998 Stiff Clay Spreadsheet. For each cross section, the depth of stiff clay has been estimated and multiplied times the entire width of the channel. Material anticipated on one side of the channel is represented to exist across the width of the channel to the other side.

3ST-3 and 3ST-4. These north side boring logs describe stiff (S) clay at –35 feet MLT approximately five feet higher in elevation than where Renda describes encountering stiff clay (at near elevation –40 feet MLT) at the downstream end of the flare. For demonstrative purposes, Figure 4.3.3 shows graphically elevations of the clay materials on boring log 3ST-3 versus the elevations at which Renda states that they anticipated and unexpectedly encountered stiff (S) clay. In the boring logs, the symbols for soft and very soft clay are SO and VSO, respectively.

Figure 4.3.3
Boring 3ST-3 with Elevations noted for Stiff Clay



Renda's notice letter continues, "from Sta 534+00 upstream, the clay level continued to rise reaching as high as –10 mlt on the slopes and –15 mlt in the center of the flare." Boring log 3ST-6, located upstream of Sta 534+00 at Sta 539+00, describes very stiff clay from approximate elevation –5 feet MLT down to elevation –10 feet MLT again where Renda says it encountered stiff clay.

Renda's statement that it anticipated stiff clays in the Flare Area at -47 MLT from its review of the Boring Logs is contradicted by its August 1998 Stiff Clay Spreadsheet. The August 1998 Stiff Clay Spreadsheet anticipates as much as 10 feet of stiff clay (-38 MLT) to be encountered at Sta. 554+06 near the beginning of Section 6 (Sta 540+00 in the Flare). The stiff clay in this Section 6 of the Flare was also anticipated by Renda in its October 13, 1999 letter.

As previously mentioned, when Renda left the flare area on March 13, 2000, Renda was excavating beyond Sta. 524+00 and did not have a booster pump operating at that time. On July 17, 2000, Renda returned to the Flare Area and began to work upstream. This time, Renda was using a booster pump to assist in transporting the material to the placement area, but did not hydraulically place the material on the north side of the placement area. This material was deposited on the west levee in the disposal area, short of the planned placement area discussed with Weeks and Bean.

Renda completed Period Two dredging on September 29, 2000. Additionally, Renda returned to the Stations of Sta. 531+00 to Sta. 550+00 during the period February 26, 2001 through April 3, 2001, and performed 31 days of dredging. This work was on the north side of the channel following removal of unanticipated shore protection (bilateral modification work). However, discharge line lengths averaged 12,871 feet and production with a booster (possibly two at times) averaged 548.72 per day. This final sweeping work would have occurred in the stiff clays that are shown on the north side and that exist at the bottom of the channel, in the allowable overdepth or in the non-pay areas excavated outside the dredge prism.

Following Renda's notice of a differing site condition in the Flare Area on March 30, 2000, the Government investigated the soils which occupied the Flare Area. Three additional boring logs were performed. These borings found that harder clay soils did exist in the bank of soils above the surface elevations which are represented by boring logs 93-62 and 93-63. The Government's new boring logs also confirmed the stiff virgin soils identified by boring logs 93-62 and 93-63 (Vol V, Tab 52).

4.3.4 Renda's Measured Mile

Renda proposes to use the measured mile analysis to measure the loss of production and additional cost due to dredging unanticipated stiff clay versus an anticipated soft clay. Renda also seeks the time and cost associated with plugged lines that resulted from pumping unanticipated stiff clay.

The measured mile method is the preferred method for measuring a loss of productivity due to a change. It eliminates the possible errors or inefficiency included in the bid and considers the contractor's actual capability and capacity. Although comparison of a measured mile (baseline) period with a changed work period does not need to be exact, the work must be similar in nature and scope[8].

Further, Renda's measured mile is based upon eleven non-continuous days dredging between Sta. 522+00 and Sta. 538+15 (Vol V, Tab 53). Renda does not appear to make an analysis of the work or materials to select the eleven measured mile days, except that extraordinary production was reported on those days. Further, Renda's measured mile is during January and February 2000, when plugged discharge pipelines were common-place. However, the days selected by Renda for the measured mile contain no plugged pipelines.

[8] Volume V, Tab 61 shows that the equipment used during the measured mile was less than that used during period two. By using the labor and equipment cost incurred during the measured mile period, Renda seeks reimbursement for 32 additional pieces of equipment that operate in period two only.

Analysis of the soil material types removed by the dredge and transported in the pipeline to the disposal area during Renda's measured mile eleven day period reveals that primarily mud (56 percent) was encountered. Table 4.3.1 shows the material types reported on the Inspection Report of Dredging (IRD).

Table 4.3.1
Material Types during Renda's Measured Mile Period

| IRD Date | Percent | | | |
|---|---|---|---|---|
| | Mud | Silt | Clay | Sand |
| 28 Jan 00 | 50 | 25 | 15 | 10 |
| 29 Jan 00 | 50 | 25 | 15 | 10 |
| 30 Jan 00 | 50 | 25 | 15 | 10 |
| 31 Jan 00 | 50 | 15 | 25 | 0 |
| 1 Feb 00 | 60 | 15 | 25 | 0 |
| 2 Feb 00 | 60 | 15 | 25 | 0 |
| 3 Feb 00 | 50 | 25 | 15 | 10 |
| 15 Feb 00 | 60 | 20 | 10 | 10 |
| 16 Feb 00 | 60 | 20 | 10 | 10 |
| 17 Feb 00 | 60 | 20 | 10 | 10 |
| 18 Feb 00 | 60 | 20 | 10 | 10 |
| Average | 56 | 21 | 16 | 7 |

Renda uses the production achieved while dredging and transporting primarily mud with an average discharge pipeline length of 7,286 feet as the measured mile. Production should be excellent and it was[9]! Renda's measured mile does not represent dredging and transporting soft clay for the use in measuring the differences between soft clays and stiff clays. Renda's claim states that it encountered stiff clays at an elevation where soft clays were anticipated. Because Renda's Measured Mile is based on mud and not soft clay, the measured mile selected by Renda is invalid for use as production in soft clay.

Additionally, production achieved during Renda's Measured Mile is the exception, and not the norm. The eleven days selected by Renda are eleven of the best twenty-four production days reported during the entire contract. Statistically, assuming normal distribution of values, only 2.5% of all values fall above two standard deviations from the average and are not representative of most of the dredging on the project. Renda's

[9] Renda's production for its skewed measured mile was 1,540 cy per effective hour (Vol V, Tab 62). This exceeded Renda's average bid production of 750 cy per effective hour by 791 cy per effective hour.

measured mile should not be used for comparison anywhere on the job. The Renda measured mile production dates are shown on Figure 4.3.4. and Volume V, Tab 53.

Figure 4.3.4




To compute damages in the Flare, Renda improperly projected the daily direct cost of labor and equipment and field overhead incurred during the measured mile period into the impact period. By doing so, Renda over estimates the additional cost of the impacted work. This method does not consider changes in the equipment and allocates all thirty-two of the additional pieces of equipment (e.g. booster and levee equipment) and labor to the Government. To apply the measured mile correctly, the difference in production found from the measured mile should be applied to the equipment and labor and field overhead actually performing the work. In that way, any difference (higher or lower) in equipment, labor and field overhead are properly considered in the adjustment.

4.3.5 Analysis of Production Disruption in Flare Area

As previously mentioned, Renda's claim in the Flare consists of two periods. In Period One Renda does not use a booster pump and the performance period is non-continuous

days from January 23, 2000[10] to March 11, 2000 (Vol V, Tab 54). For Period Two, Renda uses a booster pump, has much longer discharge pipeline and the performance period is a generally continuous from July 17, 2000 to September 30, 2000 (Vol V, Tab 55). Renda combines the two periods and averages the production in both to establish a disrupted production (Vol V, Tab 56).

As shown, Renda's measured mile was for pumping mud. To select a period for comparison with Renda impact Period One, the impact area is analyzed for type of soil materials and pipeline length. Volume V, Tab 54 for Period One and Volume V, Tab 55 for Period Two includes summaries of the daily information contained on Renda's Inspection Report of Dredging (IRD) for the claimed Impact Area. For Renda's impact (disruption) periods, Renda had the following average performance data:

Renda Claim Period

| Claimed Flare Impact Periods | Production | Material Type Mud | Silt | Clay | Sand | Total Line Length |
|---|---|---|---|---|---|---|
| One | 714 cy/hr | 50 | 15 | 28 | 8 | 7103 |
| Two | 361 cy/hr | 17 | 3 | 62 | 13 | 12,208 |
| Combined | 473 cy/hr | 29 | 7 | 50 | 12 | 9,933 |

Claim Periods One and Two are completely different soil materials and line lengths. As previously stated, Period Two also used a booster and was expected post-bid by Renda to have more stiff clay.

4.3.5.1 Disruption Period One in Flare

For Period One, Renda's Soft Clay Area from approximately Sta. 510+00 to Sta. 520+00 was examined as a possible measured mile since this was an area identified in Renda's correspondence and post-bid material analysis as having soft clays similar to the Flare and free of claim. Also Renda's Soft Clay Area is located immediately downstream of

[10] Renda provides no explanation for including January 23, 24, 25, 26 and 27 in the Flare claim when on February 1, 2000, Renda advised the Government that the soils encountered to date were accurately depicted in the boring logs (Vol IV, Tab 23).

Period One area which begins at Sta. 520+00. Vol V, Tab 47 summarizes the performance data on the IRD for work performed between Sta. 510+00 to Sta. 520+00. The results are:

Renda's Soft Clay Area Sta. 510+00 to Sta. 520+00

| Production | Material Type: Mud | Silt | Clay | Sand | Total Discharge Line Length |
|---|---|---|---|---|---|
| 709 cy/hr | 44 | 13 | 32 | 11 | 8662 |

When Renda's Period One Area is compared with Renda's Soft Clay Area, there is no significant difference between the average clay content encountered (28 vs. 32, respecttively) and the production is almost identical, 714 cy/hr and 709 cy/hr, respectively. Renda's Soft Clay Area has a somewhat longer line length, but there is virtually no difference in the actual production between Claim Period One and Renda's Soft Clay Area. Because of Renda's Soft Clay Area is so similar in clay content, recognized by Renda as being a soft clay area and has similar pipeline lengths, it is an excellent measured mile location. For Renda's Claim Period One from January 23, 2000 to March 11, 2000, based on comparison with the new measured mile, no disruption to its dredging operations occurred. It does not appear that stiff clays were encountered or hindered operations. Certainly, the information provided to Weeks and Bean indicates that the mud (easy stuff) has been removed from the Flare and that clay material remains to be dredged in the future.

4.3.5.2 Disruption – Period Two

Renda's Period Two has an actual production rate of 361 cy per hour. This production rate is similar to the production for dredging Renda identified stiff clays in Section 1 and 2 and the measured mile at the South Ferry Landing of 352 cy per hour. Several locations were examined for possible use as the measured mile for claim Period Two. The locations are summarized in Table 4.3.2.

Table 4.3.2
Measured Mile Investigation

| Item | Area | Production | Line Length | Clay Content | Booster |
|---|---|---|---|---|---|
| 1 | Sta. 550+65 to 562+00 (no claims) | 640 cy/hr | 13,081 | 20% | Yes |
| 2 | Channel adjacent to Flare Sta. 520+00 to 550+00 North side (no claims) | 481 cy/hr | 11,182 | 33% | Yes |
| 3 | Renda Soft Clay Area 510+00 to 520+00 | 709 cy/hr | 8,662 | 32% | |
| 4 | Section 1 Renda Stiff Clay | 325 cy/hr | 6,633 | 61% | |
| 5 | Section 2 Renda Stiff Clay | 417 cy/hr | 7,074 | 58% | |
| 6 | Period Three Sta. 531+40 to 549+50 | 549 cy/hr | 12,871 | 30% | Yes |

None of the investigated areas are a direct match for the alleged stiff clays encountered in Flare Area. However, Renda's Soft Clay Area, remains the best choice[11] for a measured mile comparison since Renda has identified the materials as being very soft clay (materials it expected) and it is an area free of claims. Renda's Soft Clay Area has a shorter line length and less clay content than the Period Two Area which means production should be reduced because of longer line length used in Period Two area. However, in the Period Two area, Renda used a booster pump which would tend to keep production up. Therefore, I consider these issues to offset one another and the Renda Soft Clay Area is used as the measured mile to measure the loss of production in the Period Two Claim Area[12].

Renda's loss of production or disruption is applied to the identified 54 days of dredging identified in the claim. Period Two contains 66 total calendar days, 9 are sweeping, one day is lost due to a plugged line and two days the dredge is down. The loss of efficiency for the area is 49.1 percent [1-(361/709) x 100].

During Renda claim Period Two, the dredge operated 890.58 hours. The additional operating hours identified by use of the measured mile is 437.5 or 438 operating hours.

[11] Use of this area may be an overstatement of the production capable of being achieved since the channel excavation for the corresponding stations in Item 2 and Item 6 is less.
[12] Average production for the entire job is 586 cy per hour (Vol V, Tab 36).

Renda operated an average of 13.5 hours per day while in the Period Two area. Therefore, the extended time of the job is 32.4 days. Again, rounding up, the time extension for the alleged slow down in production at the Flare Area is 33 calendar days.

4.3.5.3 Plugged Discharge pipeline

Renda requests reimbursement for plugged pipelines as a result of encountering unanticipated stiff clays in the Flare Area. As indicated above, Renda operated in the Flare Area on two separate occasions.

During Impact Period One, which contains 38 calendar days, Renda experienced plugged lines on eleven of those days for a total lost time of 231 hours. This is equivalent to 9.6 days and is 25.3 percent of the total time available for dredging.

During Impact Period Two in the Flare Area, which contains 66 calendar days, Renda experienced plugged lines on 12 days for a total lost time of 86.66 hours. This is equivalent to 3.6 days and is 5.5 percent of the total time available for dredging.

The differences in Renda's claim periods is significant, and is contrary to the expected outcome if stiff clays caused plugged discharge pipelines. As shown above, production in Period Two in the Flare Area was allegedly reduced by stiff clays. Plugged lines, if caused by stiff clay material, would be expected to increase in the area. However, the opposite is true. Plugged lines decreased in Period Two by almost 80 percent over Period One that did not have disrupted production. However, dredging work in Period Two of the Flare Area was accomplished by using a booster pump to help transport the slurry of water and clay materials to the Placement Area. The booster pump added horsepower (head) and transported the clay material by keeping the velocity up in the pipeline to prevent the materials from setting out before they reached the discharge point.

Additionally, the new measured mile from Sta. 510+00 to Sta. 520+00 (Renda Soft Clay Area) was performed primarily during the months of November and December 1999. As

seen in Figure 4.3.5, Renda was experiencing approximately one hour of plugged line for every 100 feet of pipe Renda had in the system during the months of November 1999, December 1999 and January 2000. Based on that frequency, Renda should have experienced 71 hours of plugged pipelines or the equivalent of 3.0 days in Impact Period One. Renda actually encountered the equivalent of 9.6 days or 6.6 days more than projected based on job history of work in areas with no claims and containing soft clay.

Figure 4.3.5
Plugged Lines and Pipeline Length




For Period One in the Flare Area, which ended on March 11, 2000, plugged lines are approximately 3 times greater than when compared to the Renda Soft Clay Area. This increase in non-effective (lost) time can be traced to a malfunction in the dredging equipment. On March 18, 2000, in a memo (Vol V, Tab 58 ) Mr. Fisher, Vice-President of Renda, advised Superintendent Machack that the flow meter which had been out for "a good while" would be back on line as soon as possible. However, Mr. Fisher noted, in part,

> "Without the flow meter, we are constantly in danger of plugging the line and cannot maximize production."

Indeed, plugging the discharge pipeline had been occurring for some time as noted in Flare Area Period One which ended about the time the memo was issued. It is undocumented when the flow meter ceased to function or when it was repaired.

Period Two in the Flare Area experienced the equivalent of 3.6 days of plugged discharge pipelines or 5.5 percent of the total available time for dredging. Based on Figure 4.3.4, Renda experienced approximately 1 hour of plugged pipeline for each 100 feet of discharge pipeline per month. Using this frequency, Renda should have experienced 244 hours of plugged lines in Period Two of the Flare Area. However, Renda only experienced 86.6 hours of plugged pipelines. The difference is explained by the use of the booster pump which added horsepower and velocity to the transporting pipeline system.

Further, on three days (29.5 hours) that pipeline plugs did occur in Period Two, the booster was not in use. Further emphasizing the importance of a booster pump in preventing pipeline plugs in the discharge line.

4.3.6 Technical Results

As noted earlier, Renda's reliance on only boring logs 93-62 and 93-63 is not consistent with their assertions on the South Ferry claim and is unreasonable.

Further, stated reliance on only boring logs 93-62 and 93-63 contradicts earlier Renda correspondence dated October 13, 1999.

For the South Ferry Landing claim, Renda states that it used five borings on the north side of the channel, one up to 5,000 feet away, to predict or forecast the character of the material to be encountered in the dredging prism on the south side of the channel from Sta 472+00 to 470+00. This dredging assumption is illustrated in Figure 4.3.6.

Figure 4.3.6




In the Flare Area, prior to asserting a claim for the Flare Area, Renda used the boring logs on the north side, as well as the south side of the channel, for determining the character of the materials to be dredged. On October 13, 1999, Renda stated,

> "After completing the north half of Section 3, we will dredge across to the flare portion of Sections 4, 5 and 6. These areas contain as much as 400 cubic yards per lineal foot[iii] and also consist of very soft clays except for the section beginning in Section 6[iv]."

For the Flare Area, Renda interprets the boring logs to contain primarily soft clays. For Sections 4, 5 and 6 of the Flare, Renda uses the boring logs noted in footnote iv to the October 13, 1999, letter (Vol IV, Tab 21) which states,

> "[iv]See Borings No. 93-62, 3ST-4, 3ST-5 and 93-63"

Consistent with Renda's "Bid Assumptions and Character of Dredged Material" boring logs 3ST-4 and 3ST-5 are on the north side of the channel and used to identify the material to be dredged on the south side of the channel.

However, for the Flare Area claim, Renda has not used these same assumptions for the virgin material which exists on the south side of the channel at elevations above the two borings referenced by Renda. As illustrated in Figure 4.3.7, borings 3ST-3, 3ST-4, 3ST-5, 3ST-6, 72-105 and 3ST-7 are in close proximity to the work and should have been used by Renda in determining the "Character of the Dredged Material."

Figure 4.3.7




Using Renda's "Dredging Assumptions", I evaluated the character of the dredged material using the borings on the north side of the channel. On the north side of the channel within the Flare Area, boring log 3ST-3 at Sta 524+10 describes approximately ten feet of very soft clay from elevation –20 feet to –30 feet MLT lying on top of a layer of medium dense sand. Below the medium dense sand starting at elevation –35 feet MLT, boring log 3ST-3 describes 15-foot thick layer of stiff, hard and very stiff clay down to elevation –50 feet MLT. Below elevation –50 feet MLT, the boring log terminates in very stiff clay. These elevations were shown graphically on Figure 4.3.3.

Continuing upstream on the north side of the channel within the limits of the Flare Area at Sta 529+10 is boring log 3ST-4. It too describes hard and very stiff clay starting at elevation –35 feet MLT and extending to the termination depth at approximate elevation –52 feet MLT.

The next boring log upstream is 3ST-5 at Sta 534+50. From approximate elevation –15 MLT down to elevation –25 feet MLT, is a layer of medium and medium dense sand. From –25 feet MLT to –37 feet MLT, the boring logs describe the materials as soft to very soft clay. From elevation –37 to elevation –50 feet MLT, the boring log describes the earth materials as medium, hard and very stiff clay. This boring also terminates in

hard clay. Volume V, Tab 45 shows the elevations of soft and stiff clays that I identified on the boring logs.

The result of my evaluation of the north side boring logs is that if Renda was consistent with its "Dredging Assumptions" stated in the South Ferry Landing claim, Renda should have anticipated hard and stiff clays in the Flare Area beginning at approximate elevation –35 feet MLT instead of –47 feet MLT. Cross section data Renda provided to Bean Dredging and Weeks Marine shows stiff clay being encountered at approximate elevation –30 feet MLT or about 5 feet higher than shown in the boring logs on the north bank. Using the general dimensions of the Flare Area, 3000 feet long and 300 feet wide, there is approximately 166,000 cy of unanticipated stiff clay if the clay layer is 5 feet thicker than shown in the boring logs on the north side of the channel.

Renda seeks compensation for both dredging plant and labor and levee construction equipment and labor. However, dredging is the critical item of work throughout the project until the work is deleted in April/May 2001. At that time, levee work still remained to be performed and became critical. A slowdown in dredging, if any, did not result in a delay to the hydraulic levee construction (Bid Item No. 6) since preparation for hydraulic levee construction and final shaping could be performed.

Further, no segregation of the added expense of mechanically removing and placing the misplaced hydraulic material on the east side of Lost Lake Placement Area has been performed by Renda. As discussed in Section 4.8, Hydraulic Levees, this cost can be segregated and should be eliminated from any dredging claim. My price evaluation does not include the levee equipment and personnel for hauling and shaping.

4.3.6.1 Time Evaluation

As indicated in Section 4.3.5.2 of this report, a loss of production of 49.1 percent occurred while performing dredging work in the Flare Area during Renda's Period Two.

Renda claims that the Government is responsible for the inefficiency due to the unanticipated presence of stiff clay, a differing site condition.

As identified herein, Renda worked 891 hours performing dredging in the Flare Area Period Two (Vol V, Tab 55). Therefore, with the actual loss efficiency factor, all the materials (medium clay and sand) in the Flare including the stiff clay required 437.5 (891 times 50.2 percent) or 438 hours of added work beyond that required for soft clays. During performance of work in Period Two of the Flare Area Renda had an average daily operating (effective) time of 13.49 hours. Therefore, the days required to operate the additional 438 hours is 32.5. Again, rounding up, results in 33 additional days for dredging all materials including the stiff clays in the Flare Area during Period Two (approximately 321,500 cy).

However, not all the quantity is eligible for an adjustment. The portion of the total volume which is represented by the contract to be stiff clay needs to be deducted from this total quantity. Renda's August 1998 Stiff Clay Spreadsheet anticipated 221,088 cy of stiff clay in the Flare Area. Proportioning this total quantity based upon the width of the channel results in 71 percent of the anticipated stiff clay (156,973 cy) to be on the south side of the channel. During Period Two, Renda reports excavating 321,530 cy of stiff clay. Therefore, only 164,557 cy of stiff clay is additional[13]. The additional time due to the unexpected portion of stiff clay in the Flare Area is 51.2 percent (164,557 divided by 321,530) of the added time for dredging stiff clay. Multiplying 51.2 percent times the total 33 days for stiff clay results in 16.9 days additional (or 224 additional hours) for the stiff clays over and above the volume of stiff clays Renda anticipated or should have anticipated.

[13] Gahagan & Bryant Associates, Inc. evaluated the additional stiff clay quantity found in the Flare Area and identified 99,065 cubic yards more than could be identified as being in the south bank from a review of the contract boring logs (Vol V, Tab 75, RM-GBA-00101). Also in Section 4.3.6, I determined that based on the general dimensions of the Flare Area and an unanticipated 5 feet thick layer of stiff clay, that 166,000 cy of additional stiff clay was dredged assuming Renda's depiction of stiff clay remaining in the channel was accurate.

When calculating cost on a daily rate, 16.9 or 17 calendar days are used. If the quantity of additional material is found to be more or less than the unanticipated quantity of stiff clay of 164,557 cy, then an adjustment needs to be made in the time and cost presented herein.

4.3.6.2 Results of Cost Evaluation

As noted above, if the unanticipated quantity of stiff clay is more or less than 164,577 cy than the cost evaluation below should be adjusted. The corresponding hours to perform the identified additional quantity of stiff clays is 224.5 effective hours and 17 calendar days. The cost evaluation below is based on this additional time.

Renda's Claimed Cost and Results of Technical Evaluation

| | Renda Claim | Supported Cost | Note |
|---|---|---|---|
| Direct Costs | $3,311,817 | | |
| Additional Labor | | $106,660 | A |
| Additional Equipment | | 258,105 | A |
| Equipment Repair Cost | 50,000 | 0 | B |
| Job Site Field Cost | 60,180 | 13,461 | C |
| Total Direct Cost | $3,421,998 | $378,226 | |
| Overhead: | | | |
| Resident Home Office (4.55%) | 543,413 | 17,209 | D |
| Corporate Office (2.83%) | 225,852 | 10,704 | D |
| Total Indirect & Direct Cost | $4,191,263 | $406,139 | |
| Profit (8.25%) | 419,126 | 33,506 | E |
| Bond (0.65%) | 29,968 | 2,858 | F |
| Total Adjustment | $4,640,357 | $442,503 | |
| Miscellaneous Cost | | | G |
| Professional Fees/Consultant | 50,000 | 0 | |
| Report Preparation Cost | 1,000 | 0 | |
| Bond on Miscellaneous (0.65%) | 332 | 0 | |
| Total Amount | $4,691,688 | $442,503 | H |

Explanatory Notes:

A) The additional labor and equipment proposed by Renda includes the dredging operations personnel and the levee personnel for hauling fill from the east levee to the north levee. The levee operation was not impacted by a slow down in the dredging and is

not included in the supported cost. Renda calculated 103 days of cost (81 dredging days and 23 lost days for plugged lines and move in/outs) and subtracted 11 days of estimated cost from an earlier time period. The actual cost of the disruption is calculated from Period Two where I determined production was reduced. No additional time or cost is considered for the Period One or for plugged lines for reasons stated previously.

1) Labor – Renda allocates 100 percent of the direct labor cost for Period One and Period Two to the alleged differing site condition encountered at the Flare Area. Seventeen days of additional work have been identified. Volume V, Tab 59 has the labor calculations for the disruption period.

2) Equipment – Volume V, Tab 60 contains the equipment cost calculation for the loss of production at the Flare Area and uses 225 hours of additional effective time to measure the added cost. The equipment rates used by Renda did not reflect the rates permitted by the Contract. Further discussion about equipment rates can be found in Section 5 of this report.

B) Specific Equipment Repair Parts – No allowance has been made for specific repair costs. Among the numerous reasons cited above, the repair cost factor in the Corps Manual equipment rates compensates for major and minor repairs and maintenance. The DCAA audit found that the $50,000 identified was an estimate and unsupported.

C) Jobsite Field Costs - This cost component includes cost incurred in the field and generally is for miscellaneous expenses such as freight, communications, and the like. However, many of the elements for supplies included in the Monthly Field Costs appear to be equipment fuel, parts and/or repairs[14] which should be eliminated since the Corps Manual includes an allowance for equipment repairs in the rates. Without the specific invoice, the items in question can not be confirmed. Therefore, the monthly Field Cost as presented by Renda is used to calculate a daily rate of $791.85 is considered acceptable at

[14] For example, September 2000 Monthly Vendor Cost for Southwest Wire Rope at $1,001.69, Metal Supply at $7,633.88, Exxon at $2,268.34 and Haynes Wire Rope at $2,574.00.

this time. The daily rate is multiplied by the 17 days of actual delay for a total amount of $13,461.36.

D) Resident Home Office and Corporate Office Overheads - The DCAA audit (Vol V, Tab 63) found the combined rate of 16.14 percent for Resident Home Office and 6.60 percent for Corporate Office overheads. However, the audit notes that the Resident Home Office rate and the Corporate Office rate is comprised of two components, office and shop rates. I question the shop rate component of the overhead rates since the Corps Manual, which Renda was required to use, allows for shop expenses in the equipment rate. Only the DCAA-verified overhead office rates[15] for Resident Home Office (4.55%) and Corporate Office (2.83%) are used in this price evaluation. The shop rate component represents a cost duplication. The Corps Manual states that an allowance has been made for "Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead." For the fiscal year 2000, the resident office rate of 4.55 percent is used and 2.83 percent is used for the corporate office.

E) Profit is calculated by using the weighted guidelines method and is 8.25 percent. Development of the profit rate is in Volume V, Tab 64.

F) Bond at 0.65 is verified by the DCAA audit of the Flare Area Claim.

G) The miscellaneous costs were questioned in their entirety by the DCAA audit. No allowance has been made for these cost items.

H) The additional cost of $442,503 is for 164,577 cy of unanticipated stiff clay or $2.69 per cy. If an adjustment (increase or decrease) in the quantity is required then the $2.69 per cy can be used to adjust the amount due. Likewise, time extension for unanticipated very stiff clay in the Flare Area can be adjusted if the quantity is found to be different than the 164,577 cy. One calendar day can be added or subtracted for each 9,680 cy of unanticipated stiff clay found in the Flare Area.

[15] The office overhead rates are included in Volume V, Tab 29 behind the audit.

4.3.6.3 Excessive Dredging Beyond Required/Allowable Pay Prism – (Non-Pay Yardage)

Renda excavated beyond the maximum pay prism in the Flare Area and in Renda Stiff Clay Area used as the measured mile. The productive time expended in each area was wasted while performing non-pay work. The amount of over-excavation or excessive dredging in the Flare Areas is 221,049 cy or 72 cy of excavation per foot of channel (Vol V, Tab 31). In the measured mile area from Sta. 510+00 to 520+00, the quantity of non-pay yardage is 47,485 cy of excavation per foot of channel. Renda wasted more excavation time in the Flare Area than in the measured mile area. Therefore, the cost and time evaluation above overstates the adjustment by 38 percent to which Renda is entitled if a differing site condition is found in the Flare Area.

The adjustment in the time and cost should be made to account for the quantity of non-pay work performed. The cost increase Renda incurred during performance of the Flare Area is $274,352 ($442,503 times 1-.38). The time adjustment is modified to also account for the wasted effort and results in an eleven calendar day extension of time. If an adjustment for the volume of unanticipated stiff clay is found due, that adjustment should be made first prior to adjusting for the disproportionate share of non-dredging work performed in the Flare Area over the measured mile area.

4.3.7 Conclusion

My evaluation has identified a slow down in the work at the Flare Area for 164,577 cy. The price adjustment is determined to be $275,352 and an eleven calendar day time extension.

## 4.4 Obstructions in Channel Sta. 570+00 to Sta. 630+00

### 4.4.1 General

On June 11, 2001, Renda submitted a revised request for an equitable adjustment under the Differing Site Conditions clause for encountering unexpected obstructions while dredging within the Houston Ship Channel. Renda asserts that the obstructions were generally located between Sta. 570+00 and Sta. 640+00 during the time period between October 20, 2000 and December 10, 2000.

Renda reports striking several discrete objects, concrete shore protection between Sta. 620+00 and Sta. 630+00 and a debris field between Sta. 570+00 and 580+00. In addition, Renda asserts that rock and rubble slope protection encountered in the north slope of Sections 5 and 6 between Sta. 530+00 and 554+00 also damaged the dredge.

Renda seeks the idle time and repairs caused by encountering the alleged differing site conditions. Renda claims a 36-calendar day time extension and additional cost in the amount of $2,126,083.

### 4.4.2 Technical Evaluation

A. Excessive Debris between Sta. 570+00 and 580+00

Renda claims that during October and November, while dredging between Sta. 570+00 and 580+00, a significant amount of trash, far in excess of what a reasonable contractor would have assumed from the contract documents, was encountered. Renda acknowledges Contract Specification Section 02482 – Dredging, paragraph 1.11.1, Character of Materials, that states in pertinent part,

> "Other materials such as scrap, rope, wire cable, snags and stumps may be encountered within the specified limits of required dredging and overdepth dredging. No separage (sic) payment will be made for removal and placement of this debris."

However, Renda contends that it could not have reasonably expected such an extensive quantity of trash in a relatively confined area.

Renda's bid papers (Vol IV, Tab 8) do not identify the amount of time or quantity expected during the dredging process in dealing with trash and other debris. However, in the notice letter for the South Ferry Landing dated April 28, 2000 (Vol IV, Tab 18), Renda acknowledges that the debris encountered was normal debris. I do not know if Renda's assessment of debris increased as one progresses upstream.

The extensive nature of the actual debris has not been documented by Renda. Normally, excessive debris is collected and assessed for character and quantity. The volume has not been documented.

Renda explains in its revised claim that in October and November of 2000, it encountered debris fields consisting of "hundreds of feet of steel cable, hundreds of pieces of steel scrap, anchors, anchor chains and cable, old iron large diameter pipe, concrete footings and pieces of concrete rubble, pieces of car bodies, heavy industrial construction demolition material, and thousands of the, ever-present, tires." Renda claims that its production was affected and that the dredging equipment was damaged which required repair in December 2000 and January 2001. However, Renda provided no notice of the large amounts of trash and debris while in the area[1].

For this same area in Section 7, Renda asserts another claim for unanticipated heavy red clay. For the trash interference, Renda does not claim any disruption to the dredging

---

[1] The Government had a side scan sonar and magnetometer survey performed of the area in January 2001. Results of this survey identified 17 targets that may have interfered with dredging operations. Additionally, other larger areas of scattered tires were noted as remaining between Sta. 570+00 and 580+00 (Vol V, Tab 65).

production in this period of time, presumably because impact to productive (effective) time is claimed in the Section 7 clay claim.

However, if the debris was so extensive, then the dredge should be less productive and the non-effective time should increase due to clearing the pump and cutter of trash. In particular, the non-effective time for clearing the pump and cutter are recorded on the Inspection Report of Dredging (IRD). If there is a significant amount of debris at this location over another location, then there should be a corresponding increase in the amount of clear time.

Table 4.4.1 summarizes the production time Renda achieved while performing work in the areas that Renda claims to be disrupted due to trash. Two periods area were evaluated, the narrowly-focused Sta. 570+00 to 580+00 (Vol V, Tab 67) and the entire claim area of Sta. 570+00 to 640+00 (Vol V, Tab 69). The amount of non-effective time for pump and cutter clears are shown as a percent of the total available dredge time.

Table 4.4.1
Pump/Cutter Clean Times for Claim Areas

| Claim Areas | Percent Effective Time | Percent Non-Effective Time | Percent Pump/Cutter Clean Time |
|---|---|---|---|
| Sta. 570+00 to 580+00 | 56.4 | 43.6 | 18.1 |
| Sta. 580+00 to 640+00 | 49.7 | 50.3 | 11.5 |
| Combined Area 570+00 to 640+00 | 52.6 | 47.4 | 12.5 |

As seen above, the amount of pump and cutter clear time is 18.1 percent of the total time available in the concentrated area of Sta. 570+00 to 580+00. This is 6.6% more clearing time than for the remainder of the claimed area Sta. 580+00 to 640+00. For comparison, to evaluate whether the amount of trash and/or pump and cutter clears increased, Sections 1 through 6 (Vol V, Tab 70) were evaluated and summarized. Table 4.4.2 shows these results.

| Table 4.4.2<br>Pump/Cutter Clean Times in Other Areas of Channel | | | |
|---|---|---|---|
| Claim Areas | Percent Effective Time | Percent Non-Effective Time | Percent Pump/Cutter Clean Time |
| Section 1 | 49.1 | 50.9 | 8.6 |
| Section 2 | 51.5 | 48.5 | 10.6 |
| Section 3 | 50.8 | 49.2 | 11.1 |
| Section 4 | 63.7 | 36.3 | 10.3 |
| Section 5 | 57.0 | 43.0 | 11.7 |
| Section 6 | 56.4 | 40.9 | 11.5 |

Comparison of the claim areas with other areas where trash was encountered, but not claimed by Renda as excessive, shows a difference in the amount of time spent clearing the cutter and pump of debris in the limited area of Sta. 570+00 to 580+00 only. The portion of the claimed area between Sta. 580+00 and 640+00 is not effected by excessive trash. If the entire area is considered, then virtually no difference occurred in trash and debris clean time.

The areas used for comparison, Sections 1 through 6, consist primarily of new work areas. However, decades of trash would have built up on the banks outside the existing channel. It is also noted from Table 4.4.2 that the general trend is for trash to be increasing in volume as work progresses upstream to Sections 7, 8 and 9.

B. Shore Protection between Sta. 620+00 and 630+00

Renda also claims that the shore protection encountered on the south bank between Sta. 620+00 and Sta. 630+00 was unexpected. However, Renda claims no direct cost for encountering the alleged unanticipated materials other than it contributed to the idle and repair time (impact) in December 2000. Renda provided notice of encountering this structure on December 20, 2000, after the dredge was shut down.

Renda notes that the rubble shore protection is on the south bank near Oxy Chemical Dock. Renda states that it performed over-cutting to undermine and dislodge the upper riprap materials prior to providing notice to the Government. Again, contract

specification 02482-Dredging, paragraph 3.5.2 warned the Contractor of an existing structure between Sta. 610+00 and 625+00, by stating,

> "The Contractor shall be required to use caution when cutting the side slopes in the Channel from Station 470+00 to Station 473+00, from Station 510 to Station 537+00, and from Station 610+00 to Station 625+00. Excessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel."

Renda encountered shore protection that was identified in the contract and where measures should have been exercised to avoid damage to the existing structure or to the dredge.

Final after dredging surveys, for the most part, locate this shore protection outside of the required dredging prism, except at Sta. 624+00 and at Sta. 624+74. After notice was given, the Government did not require removal of this shore protection. Had Renda notified the Government prior to over-cutting the toe of the slope to undermine the structure, the Government may not have authorized Renda's earlier attempts to dislodge the shore protection.

C. Discrete Objects

Additionally, Renda discusses discrete occurrences where the daily report states that the dredge encountered or struck something in the channel. However, Renda acknowledges in its revised claim that most of these obstructions were not recovered. The noted items were a dredge stern swivel assembly, conex steel box container, and a steel mooring buoy and anchor chain (Section 9 and part of Obstruction No. 2 claim). The added cost of removing the dredge stern swivel has been paid in bilateral Modification No. P00019. The conex box was removed by others.

Renda states that the jarring impacts to the dredge cutterhead were devastating to the equipment, placing undue stresses on the seals and rigid components such as shafts and bolted connections. Renda claims 36 days impact between December 4, 2000 and

January 14, 2001 due to alleged repairs caused by the obstructions. As a result of the jarring effects of striking the unanticipated objects and trash, the dredge is alleged to have required extensive, unscheduled repairs to the cutterhead, the cutter drive and the main pump shaft. However, no historical or supporting information is provided to establish a normal repair cycle for these components of the dredge.

In general, for the alleged 35.5 repair days claimed by Renda, the dredge is being repaired. However, the hours or percent of daily delay Renda attributes to the obstruction damages are overstated based upon the review of the Report of Operations and other internal Renda reports.

Below is a list of differences identified by use of the Report of Operations where Renda claims the obstruction repairs were performed. Details are presented in Volume VI, Tab 6.

| Date | Claim | Supported | Hours Difference |
|---|---|---|---|
| December 5, 2000 | 100% | 94% | 1.5 |
| December 7, 2000 | 50% | 0% | 12.0 |
| December 9, 2000 | 100% | 63% | 8.0 |
| December 29, 2000 | 50% | 0% | 12.0 |
| December 31, 2000 | 30% | 20% | 2.0 |
| January 13, 2001 | 60% | 0% | 14.0 |
| January 14, 2001 | 75% | 0% | 18.0 |
| Total | | | 67.5 |
| | | | 2.8 days |

The alleged obstruction repairs were actually performed on 32.7 days; not the 35.5 days claimed by Renda. From the Report of Operations, other repairs to the spuds, generator and raw water pumps account for the difference.

During the period between December 3 and 6, 2000, repairs to the underwater pump seals are reported. On or about December 3, 2000, the thrust bearing seals on the underwater pump failed. The seals were temporarily patched, repairs were not completed, or they

were not properly repaired by Renda because on December 8 and 9, 2000, the Inspection Report of Dredging reports replacing the seals a second time. On December 4, 2000, the internal Renda Marine Daily Report notes that spare parts were not available to effect repairs (Vol V, Tab 71). Renda Vice-President, Mr. Bowman, who was managing the project at this time, stated in a November 22, 2000, deposition that the Renda "spare part program was woefully deficient" (Vol V, Tab 72, p. 137). Therefore, I question if Renda performed the underwater pump seal repairs in a reasonable amount of time for a well-equipped contractor given the deficient spare parts program. Renda claims four days for this period of time. Only 2 days were required to repair and fix the seals on December 8 and 9, 2000. On December 9 and 10, 2000, the dredge resumed work in the channel.

On December 11, 2000, Renda reports stopping the dredge again asserting that the cutter gear box had been damaged due to obstructions in the channel. These repairs were forecasted by Renda in the IRD to require up to ten days repair.

On December 18, 2000, Renda stops reporting repairs to the cutter gear box on the Inspection Report of Dredging (IRD). The dredge, however, is still idle due to reported work on the "cutter drive systems". Repairs to the cutter drive system were finished on December 29, 2000. The Government's Quality Assurance Report (QAR) details that computer/electronic repairs was the failure causing the repairs to the cutter drive system. Computer and electronic repairs could not be caused by encountering obstruction and this time period from December 18 to December 28 is removed from the obstruction period. On December 29, 2000, the dredge returns to work in the channel.

Two days following repair of the cutterhead and drive assembly, the dredge main pump shaft failed on January 1, 2001.

On January 12, 2001, the shaft was repaired and dredging resumed. However, the main pump engine was used equipment that had been installed on the dredge (Vol VI, Tab 47). Pre-award, at the time when Renda believed the dredge would consist of primarily new components, Renda stated,

> "The fact that an older dredge has been working for years does not preclude it from having serious problems such as corrosion or metal fatigue that could produce a catastrophic failure." (Vol IV, Tab 15, RM-COE-02676).

Renda, by this statement, implies that newer equipment is less susceptible to failures, but that failures do occur. The pump shaft failure may be one of those occurrences.

During the December 2000 shutdown period other repairs unrelated to the obstructions may have been performed which also would have idled the dredge. The performance of these repairs is largely undocumented except for a December 18, 2000 letter from Renda to Lufkin Industries (Vol V, Tab 73) which states,

> "New gear set installed in Renda Marine, Inc Dredge Millennium… Renda Marine had a new gear set manufactured for the main pump gear box… we do have concerns, however, that the improper gear set, missing full contact (by .25 inch) may create a problem under full operating load. Renda's concern is also that making a new pinion only may have an adverse affect on the bull gear because of the distortion of the mating surface."

This gear box for the main pump engine was discovered to be operating in reverse since the dredge was commissioned in May 1999[2]. The effects on the pump drive shaft from this improper installed gear box and the subsequent distortions and vibrations may have accelerated the drive shaft failure.

It is also of interest to note that, in Mr. Bowman's deposition, referred to in the previous footnote, Renda planned to shutdown over Christmas 2000 to complete repairs prior to experiencing the alleged obstruction damage. In fact, the personnel working on the levee were off between December 22, 2000, and January 3, 2001. It is unexplained why the levee personnel were not working, when the dredge resumed work on January 1, 2001.

---

[2] In a letter dated January 8, 2000, Lufkin Industries, Inc reported to Renda that the dredge pump gear box was being run in reverse of its original designed rotation direction (counter clockwise) causing wear on the backside of the gear teeth (Vol V, Tab 74). Almost a year later, in a November 22, 2000 deposition, Mr. Bowman, Renda Vice-President, responded to a question about the booster pump gear box by stating, "That was a gear box that was furnished for the main pump engine that was the wrong rotation. We were going to be involved over Christmas and changing the entire guts of that Lufkin box out" (Vol V, Tab 72, p. 134).

Technical Results

Renda claims no productivity loss from the Obstructions claimed between Sta. 570+00 and 640+00. A loss of productive time has been identified in the limited area of Sta. 570+00 to 580+00. However, a 6.6 percent difference in cutter and pump clears does not appear to be significant when concentrations of debris may be expected.

Renda primarily claims impact, repair and idle time, in December 2000 and January 2001 allegedly attributable to the cumulative effects of the trash, discrete obstructions and shore protection structure encountered from Sta. 620+00 to 630+00 and from 530+00 to 550+00.

A. Loss of Productivity

Within the channel from Sta. 570+00 to 580+00, pump and cutter clears were 18.1 percent of the total time available for dredging. In other claimed areas of the channel, Sta. 580+00 to 640+00, non-effective time for clearing the pump and cutter does not differ than other reaches of the channel. The non-effective time for pump and cutter clears were 11.5 percent of the total available time. Therefore, in the limited area between Sta. 570+00 to 580+00, pump and cutter clears shows an increase of 6.6 percent. Within the area between 570+00 and 580+00, there were 408 total hours available for operating the dredge. A loss of 6.6 percent of this available time is attributable to the additional pump and cutter clears required in this area. Therefore, production loss due to the increased time due to cutter and pump clears is 26.9 hours or 27 hours.

The following summarizes the additional dredging cost Renda incurred due to the loss in production time in the limited area between Sta. 570+00 and 580+00.

Productivity Loss Summary

| | | |
|---|---|---|
| Equipment (Vol VI, Tab 1) | | $29,600 |
| Labor (Vol V, Tab 3) | | 7,665 |
| Jobsite $764 per day x 1.2 days (Renda claims 15,280.94/20 days) | | 917 |
| | Subtotal | 35,776 |
| Resident Office Overhead (8.83%) | | 5,774 |
| Corporate Office Overhead (4.23%) | | 2,261 |
| | Subtotal | 43,911 |
| Profit | | 3,074 |
| | Subtotal | 46,985 |
| Bond | | 305 |
| | | $47,290 |

B. Impact Idle Period

Renda claims that repairs to the underwater pump seals, cutterhead gearbox, cutter drive system and main engine pump shaft were required as a result of striking obstructions in the channel. These repairs were performed on the equivalent of 33 days during the period between December 4, 2000, and January 14, 2001.

All the repairs and associated repair time are not compensable occurrences as alleged by Renda, if the obstructions are found to have caused the damage.

The repair to the underwater pump seals was performed on five days between December 3 and 9, 2000. The two days required on December 8 and 9, 2000, are a reasonable repair time. Therefore, three days are not the responsibility of the Government.

On December 11, 2000, an obstruction is asserted to have caused damage to the cutter gearbox. Repairs to the gearbox were completed on or about December 17, 2000, a period of seven days. However, these repairs did not permit the dredge to resume operations. Repair work continued on the computers and electrical system until December 29, 2000, when the dredge resumed work, a period of eleven days. These eleven days are not the responsibility of the Government. Repairs performed are not relevant to the obstructions.

On or about January 1, 2001, the dredge is allegedly down again due to obstructions. This time the main pump shaft has failed. These twelve days would be compensable if the pump shaft failure is related to the obstruction.

The following cost summary computes the cost for a period of 33 days during the alleged impact period for obstruction repairs. This cost is converted to a daily rate to use if any days are found to be related to obstruction damage.

Cost Summary for 33-day Impact Period

| | | |
|---|---|---|
| Equipment (Vol VI, Tab 2) | | $272,014 |
| Labor (Vol VI, Tab 3) | | 209,715 |
| Jobsite $2,250.14 times 33 days (Renda claims $81,005.08 for 36 days) | | 74,255 |
| Dredge Repair Costs (Vol VI, Tab 4) | | 94,501 |
| | Subtotal | $650,485 |
| Resident Office Overhead (8.63%) | | 56,137 |
| Corporate Office Overhead (4.23%) | | 27,516 |
| | Subtotal | $734,138 |
| Profit Suspension (No profit) | | 0 |
| | Subtotal | $734,138 |
| Bond (0.65%) | | 4,772 |
| Total | | $738,910 |
| Average Daily Cost During Period Without Dredge Repair Parts ($107,346) | | $19,138 |

Conclusions

Although I determined a slow-down in production in the limited area between 570+00 and 580+00, it is not uncommon to encounter pockets of trash. Since the entire section, when averaged, shows no increase in trash clears, an adjustment for this loss of productivity is not warranted.

Renda claims impact for 33 days. I have determined the maximum days the dredge was idled due to the alleged obstructions to be:

a) 2 days for underwater pump seals

b) 7 days for the cutter gear box repairs

c) 5 days for the repairs to the main pump shaft

Further, assuming the alleged obstructions caused the damage, I have determined:

a) An additional price adjustment for pump seals only would be $38,276 plus an allowance for parts of $4,578 for a total of $42,854

b) An additional price adjustment for cutter gearbox repairs would be $133,966 plus an allowance for parts of $46,328 for a total of $180,294

c) An additional price adjustment for the main pump shaft would be $220,087 plus an allowance for parts of $56,440 for a total of $276,527

## 4.5 Section 7 – Heavy Red Clay – Differing Site Condition

### 4.5.1 General

On April 26, 2001, Renda submitted a request for adjustment seeking a three day time extension and an increase in cost of $1,083,779 for encountering hardpan, heavy red clay. In April of 2002, Renda updated its request by providing additional details. Renda's revised cost is $1,123,884 and seeks a 20-day time extension.

### 4.5.2 The Work

Section 7 extends from Sta. 554+00 to Sta. 612+00 along the Ship Channel. Dredging work began in Section 7 on or about July 11, 2000. Dredging work was accomplished within Section 7 on a few days in July and September 2000. On October 1, 2000, dredging work resumed in Section 7 and proceeded essentially uninterrupted until November 23, 2000. Renda returned to Section 7 for three days in January 2001.

Renda's claim is for a portion of the work performed in Section 7. Renda asserts that during the 35 day period between October 2 and November 6, 2000, unanticipated red clay was encountered while performing dredging work between Sta. 558+00 and Sta. 609+00 of Section 7.

On October 20, 2000, Renda notified the Government (Vol IV, Tab 26) that "the dredge encountered hardpan, heavy red clay" between Sta. 565+00 and Sta. 580+00 on the north side of the channel. Renda also noted that the heavy red clay may continue in Section 7 where none was anticipated. Renda's claim for heavy, red clay is for both north and south sides of the channel and extends from Sta. 558+00 to Sta. 609+00. Renda does not

explain why Sta. 558+00 to 565+00 was included in the claim area when work had been performed at that location prior to the notice letter and not included in its notice.

4.5.3 Technical Evaluation

Renda claims that the clays encountered while dredging a portion of Section 7, were unanticipated hardpan, heavy red clay. Renda asserts that, during the period between October 2, and November 6, 2000, an additional twenty days were required to remove 306,184 cy of unanticipated, red clay materials when soft gray clays were anticipated.

Renda does not explain how its description of "heavy" varies from stiff, very stiff, hard, medium or soft clay. Renda's word describing the soils as hardpan is not explained, but hardpan materials, as noted on the Inspection Report of Dredging (IRD), are not reported as being encountered anywhere on the job, much less Section 7.

Section 7 extends from Sta. 554+00 to Sta. 612+00. There are 17 boring logs within the general vicinity of Section 7. Many of these boring logs have soil color descriptions as rust, brown, red, grey and all color combinations in-between. Renda does not explain how color affects the hardness of the clay material. Color is not a reliable measure of the properties of the clay. Red, orange and brown clays had been previously excavated and placed in the disposal area without raising any concern[1].

I reviewed the seventeen boring logs from Sta. 553+90 to 613+80 for a description of the consistency (soft, hard, etc) of the soil materials. Between boring log 3ST-8W (Sta. 553+90) and 3ST-10W (Sta. 563+80), a distance of approximately 1000 feet, the clay consistency is described as generally Soft to Very Soft with some medium clay layers and medium dense sand layers. However, the consistency of clays described approximately 500 feet upstream from 3ST-10W at boring 3ST-11 (Sta. 568+90) is described as generally Very Stiff or Hard with a few medium and soft clay layers. This general

[1] In an email from Mr. Eddie Fisher on September 25, 1999, Mr. Fisher noted, "At the dump there appears to be very little silt, sand or soft clays. The clays are red, gray and orange." (Vol IV, Tab 27)

description of stiffer hard clays continues all the way through the remainder of Section 7 which ends at Sta. 612+00, a distance of 4,310 feet.

In Renda's December 20, 2000, response to the Government's conclusion that the boring logs in Section 7 indicated stiff to very stiff clays and dense sands which Renda should have anticipated, Renda points to boring logs 93+65 at Sta. 569+20, 3ST-13W at Sta. 579+00 and 3ST-14 at Sta. 583+70 and states, "An analysis of the soil borings shows that the majority of the material should have been soft to very soft light grey to gray silty and sandy clays, except small pockets (shown on only one boring) of stiff rusty-blue grey clays near the bottom of the dredging prism." (Vol IV, Tab 28, RM-COE-01637)

An analysis by Renda of the expected materials other than the above description can be found in the August 1998 Stiff Clay Spreadsheet (Vol IV, Tab 16). Although the spreadsheet contains mathematical errors, and generally understates quantities, in this limited area of Section 7, Renda's spreadsheet anticipates encountering 131,889 cy of stiff to very stiff clay; 76 percent of the total anticipated quantity of material to be dredged in that reach of Section 7. Renda's August 1998 spreadsheet was prepared two years prior to performing work in the area and supports the Government's interpretation of the boring logs. The August spreadsheet also contradicts Renda's statement in the December 2000 letter, that a majority of the material should have been soft to very soft clay.

The heavy, red clay that Renda asserts was unanticipated was deposited at approximately Sta. 118+00 on Lost Lake. Renda states in its December 20, 2000 letter that,

> "The Government directed that all clay material recovered from this area of Dredge Section 7 be placed on the new levees… Fortunately, for RMI, the hard red clay material has not been placed on the levee and is available for Government review and analysis… RMI will not relocate this material without a written directive from the Government." (Vol IV, Tab 28, RM-COE-01637).

Whether the red clay was placed in the stockpile or in the levee, it would have been available for review and analysis if Renda would have identified where it was located in the levee.

Even though the material was stockpiled by Renda, no geotechnical tests were provided by Renda to evaluate the properties of the clays encountered. Four and a half months after placement at Sta. 118+00, on March 12, 2001, the Government directed Renda to use the clay material in the levee which was to be hydraulically constructed and considered the clay "Misplaced Excavated Material". Further discussion about the materials placed in the levees which were to be hydraulically constructed can be found in Section 4.8 of this report.

4.5.4 Technical Results

Renda's August 1998 Stiff Clay Spreadsheet does not support the claim that soft soils were anticipated where heavy, red clay materials were found. Multiple colors of red, rust, brown and gray are indicated on the boring logs for this area. Generally, no inference can be drawn from the color about a soil's properties and Renda has not documented any.

Aside from Renda's August 1998 Stiff Clay Spreadsheet, from my review, the soil descriptions in the boring logs do appear to change from soft clays to stiff clays between Sta. 563+80 and Sta. 568+90. Because of this description change, I performed an evaluation of production. Two areas were evaluated that are part of Renda's claim area. Area One contains the soft clays that I identified on the boring logs and extends from Sta. 558+00 (beginning of Renda's claim) to Sta. 566+35, midway between boring logs 3ST-10W and 3ST-11. The second area, Area Two, contains descriptions of primarily stiff clays and extends from Sta. 566+35 to Sta. 609+00, the end of Renda's claim area. Area Two has stiff and hard consistency clays and color descriptions in the boring logs and do not support Renda's claim of a Differing Site Condition. In fact, the boring logs starting at Sta. 568+90 (3ST-11) appear to be the materials described by Renda. Production for

Area Two, in hard and very stiff clay as described in the boring logs was 663 cy per effective hour; some of the best production on the entire project (Vol VI, Tab 8). By contrast, the production in Area One of Section 7 where I determined the boring log to describe soft clays, is 205 cy per hour (Vol VI, Tab 9). These results seem to support Renda's allegations that production was hampered in the limited area from Sta. 558+00 to 566+35. However, somewhat confounding was the production in the stiff clays outside Sta. 558+00 to 566+35, which was three times higher than in the soft clays I identified in Area One.

Further investigation into why production was so poor in Area One reveals that Renda's barge-mounted booster pump was not operating for much of the time. The Government is not responsible for equipment malfunctions that reduce production. Below is a summary of the booster pump use during performance of Area One.

Booster Use
Area One
Renda Section 7 Clay

| IRD Date | Booster Use |
|---|---|
| October 2, 2000 | 12 hours only |
| October 3, 2000 | 0 hours |
| October 4, 2000 | 0 hours |
| October 5, 2000 | 0 hours |
| November 14, 2000 | 3 hours |

In measuring damages caused by the alleged Section 7 Clay, Renda used an estimated measured mile cost developed on eleven days for use in the Flare Area. As stated in 4.3.3, Renda's Measured Mile is flawed and it is not relevant to dredging in Section 7.

As stated above, production in the very stiff and hard clay described by the boring logs of Section 7 was above the job average. No adjustment should be made for this section. Renda states that claimed equipment expense for the Section 7 claim period is $1,097,792. The backup detail for Renda's claimed equipment cost is missing from the record. Renda documents and Government documents do not contain any equipment

details. Therefore, comments about the equipment rates and hours of operation are qualified. However, the Inspection Report of Dredging (IRD) shows what equipment operated during the period.

Renda, if like other claims, may have included mechanical levee construction equipment in the adjustment calculations. This equipment should be eliminated in Section 7. Renda's measured mile has no booster pump or mechanical levee construction equipment where, if like the Flare claim period, the impact period has booster pump equipment and mechanical levee construction equipment. The unanticipated clay, if encountered, did not cause the need for the booster pump or the mechanical levee construction equipment.

Since no adjustment is warranted, the dredging labor is questioned in its entirety.

Conclusion

Renda's claim for Section 7 Area – Heavy Red Clay is without merit based upon a review of the boring logs and corresponding production. Additionally, the Renda August 1998 Stiff Clay Spreadsheet contradicts Renda's assertion that it anticipated soft clays.

## 4.6 Obstructions in Channel Sta. 660+00 to Sta. 685+00 (Obstructions No. 2)

### 4.6.1 General

On August 10, 2001, the Government received a claim from Renda for encountering obstructions and excessive trash while accomplishing the dredging in a portion of Section 9, from Sta. 658+00 to 672+50. The remainder of Section 9 was deleted from the contract.

### 4.6.2 The Work

Renda began dredging in Section 9 at Sta. 660+00, middle cut, on February 9, 2001, after relocating from Section 8. Renda performed dredging in Section 9 for nine consecutive days. On February 19, the dredge is reported down due to the Lufkin gear. After the Lufkin gear box repair, the dredge was relocated to Sections 5 and 6 where it began operations on February 26, 2001.

In the claim, Renda alleges that on February 13 and 15, 2001, two obstructions were struck on each day. The IRD does not mention the obstructions or coordinates. Further, the internal Renda Daily Production Reports (Vol VI, Tab 11) for these dates do not indicate anything out of the ordinary. Another internal Renda Daily Report (Vol VI, Tab 12) is also silent about encountering discrete obstructions during the February 10 through 18, 2001, time period. Renda has been very specific about encountering four obstructions at x,y coordinates, but no supporting documentation can be found, except in the claim correspondence.

The February dredging in Section 9 is rather unremarkable as noted in the internal Renda Daily Production Report, except for equipment repairs. On February 11, 2001, the Renda

Daily Production Report notes "Normal Operations". During the nine day period, the Inspection Report of Dredging (IRD) reports the dredge being stopped for trash clears on the pump and cutterhead for 39.5 hours or 18.3 percent of the time (Vol VI, Tab 13).

In March 2001, armed with the Government's January 2001 magnetometer and side scan survey report[1], Renda lobbied the Government to remove Section 9 from the contract. On March 22, 2001, a meeting was held addressing the work remaining in Section 9. Renda was directed to return to Section 9 to complete dredging. However, the Government did not want Renda to damage the dredge Millennium by attempting to remove excessive debris, trash or obstructions (Vol IV, Tab 30). It was agreed that if the dredge were to encounter excessive debris, trash or obstructions, Renda was to contact the Government for verification. Upon verification of the excessive debris, the Government reserved the right to delete Section 9 or require other changes in the work. Renda returned to Section 9 on April 10, 2001[2].

On April 12, 2001, the Government was called to verify the existence of excessive debris. An on-site visit occurred but the Government did not agree with Renda that the volume or type of trash was excessive or unexpected. On April 14, 2001, Renda complained (Vol IV, Tab 31) to the Government that excessive pump and cutter cleans were required since returning to Section 9. On April 16, 2001, Renda advised that the dredge had struck a mooring buoy and was damaged (Vol IV, Tab 32). After April 16, 2001, the Government determined that it was appropriate to delete the remainder of Section 9.

Repairs were performed to the dredge Millennium during the April 16, 2001, to May 8, 2001, time period. Renda claims reimbursement for eighty percent of the day on April 16, fifty percent of the day on May 8 and all days between.

[1] Renda had a copy of the "Survey Report" on January 31, 2001, when they requested a meeting with the Government for performing future work (Vol IV, Tab 29). The Survey Report is contained in Vol V, Tab 65.

[2] Figure 4

4.6.3 Technical Evaluation

Based on my analysis of cutterhead and pump clears performed in Sections 1 through 6 and projecting those increasing clear times into Section 9 (see figure 4.6.1), Renda should have expected approximately 13 percent of the time to be involved in clearing the pump and cutterhead of trash. In the February 2000 period, Renda spent 18.3 percent of the time (Vol VI, Tab 13) performing pump and cutter clears, a 5.3 percent difference or about 1.3 hours more each day above the forecasted amount.

Figure 4.6.1




During performance of the second period in Section 9, April 10 through 16, 2001, Renda was on the north side of the channel. I evaluated the second period to see if pump and cutter clears varied from that which could be expected from previous work. Pump and cutterhead clears in the second period increased to 24.67 percent of the time (Vol VI, Tab 13), almost double the time that could be forecasted from Renda's experience in Sections 1 through 6 and over six percent more than Renda experienced in the middle cut of Section 9.

Section 9 is the farthest upstream acceptance section of the project. It is separated from Sections 1 through 8 by a "No Dredging" zone, from the end of Section 8 at Sta. 650+00 to the beginning of Section 9 at Sta. 658+00. In the "No Dredging" zone, Contract Drawing C-2 shows several pipeline crossings at elevation -45 ft MLT, above the planned grade.

Renda also lost a large amount of productive time due to channel traffic in Section 9. Renda's bid papers do not document the amount of non-effective time Renda allowed in its bid for traffic moves, pump/cutter clears or other non-productive operations. However, traffic moves and pump/cutter clears were remarkably more (approximately 25 percent each) in Section 9.

4.6.4 Technical Results

Renda is claiming that excessive trash and debris, and particularly one object, a mooring buoy, damaged the dredge and Renda is seeking the repair time and cost from April 16, 2001 to May 8, 2001. Renda makes no claim for the loss in productive time due to excessive trash and debris.

In this report, Renda's damages for the excessive trash and debris are recomputed based on a loss of productive time to the dredging in Section 9, stand-by while the dredge repairs were being performed and some repair parts. However, not all the time requested by Renda is considered during the repair period.

In general, there is an absence of daily reports for the repair period and it is undocumented what repairs, other than the cutterhead gear box assembly, were actually accomplished. From the repair invoices submitted (Vol VI, Tab 23) and other memoranda, the cutterhead gear box was removed from the dredge on April 18, 2001, two days after the alleged damage occurred, and taken into Houston Dynamic Service, Inc.'s (HDS) shop for repair. HDS invoice shows that the cutter box assembly was

completely repaired and sent back to Renda no later than April 27, 2001, a period of nine days.

There is no explanation of what delayed completion of the dredge repairs until May 8, 2001. It is noted that on May 2, 2001, HDS explains in a facsimile to Renda, "This is everything except the new shaft we are still machining." According to the claim documents used to support the shaft's cost, the shaft was ordered by Renda on February 8, 2001, the day before beginning work in Section 9. The delivery date for the spare shaft is undocumented.

Based upon review of the repair invoices, it appears that repairs to the cutterhead gear box were complete in approximately two weeks. This allows Renda two days to remove the gear box, the nine actual days to repair the gear box off-site at HDS, and two days to re-install the gear box. Therefore, the remainder of the repair time after April 30, 2001[3] is determined to be unreasonable.

I also question Renda's choice of cutterheads to use in Section 9. Renda continued to use the Vosta cutterhead with chisel teeth[4] which are best for cutting stiff clays. However, chisel teeth tend to pick up trash which then become stuck in the cutterhead. In Section 9, after receipt of the Government's side scan sonar and magnetometer data indicating the locations of certain obstructions and trash, Renda should have selected to use plain edge adapters to minimize the amount of down time due to trash (Vol VI, Tab 19 and Vol IV, Tab 33).

---

[3] A site visit entry for April 30, 2001, from Mr. Hrvabovsky, a Turner Collie & Braden representative, who were consultants to the Government's cost share partner on the project, writes, "On Monday, April 30th, I made a site visit to Upper Bayou. There were two dozers shaping levee at Lost Lake around Stations 175+00 to 185+00. The dredge was still tied up around Sta. 534+00. The cutter tail shaft and cutter had been installed on the dredge as it appeared to be ready to dredge." (Vol VI, Tab 17).

[4] Photos from April 16, 2001, show that the cutterhead had chisel teeth with trash (tires, chains) stuck on and between the teeth (Vol VI, Tab 18).

4.6.4.1 Time Extension

For the loss in productivity due to the additional time required for pump and cutterhead clears, the February time period had a total available dredge time of 216 hours (Vol VI, Tab 13). Renda's non-effective time (or an equal deductive loss in productive time) was increased 5.3 percent because of the added pump and cutterhead cleans. Therefore, for the February period, Renda had reduced productions for 11.5 hours (216 hours times 5.3 percent).

In the second time period, April, Renda had a total dredge time available of 168 hours (Vol VI, Tab 13). For this time period, Renda experienced an increased loss of productive time of 11.7 percent due to the additional time expended clearing the pump and cutterhead. Therefore, for the April period, Renda had reduced production for 19.7 hours (168 hours times 11.7 percent). Total production loss in Section 9 is 31.2 hours. Renda operated an average of 10.8 hours per day for sixteen days in Section 9. Therefore, 3 days were lost due to the additional pump and cutter clears in Section 9 (31.2 hours divided by 10.8 hours). For additional cost computed on a daily rate, 3 days will be used for the adjustment. For additional dredging equipment cost, the 31.2 hours of lost productive time is used.

The total time extension for the disruption (3 day) and impact (14 days) is 17 calendar days.

4.6.4.2 Additional Cost

A. Loss in Productive Time

Renda did not quantify a loss in productive time for the dredging operation. However, evaluation shows that the dredging work was disrupted by the additional time required to clear the pump and cutterhead in Section 9. The loss in productive time is used to compute the additional labor and equipment cost expended during this period for the

dredge and its attendant plant. The cost calculation for the equipment is contained in Volume VI, Tab 20, and the labor computations are in Volume VI, Tab 21.

Productivity Loss Summary

| | | |
|---|---|---|
| Equipment (Vol VI, Tab 20) | | $48,942 |
| Labor (Vol VI, Tab 21) | | 20,028 |
| Field Cost $1,735 x 3 days | | 5,205 |
| (Renda claims $41,116/31 days) | | |
| | Subtotal | $74,175 |
| Resident Office Overhead (8.63%) | | 6,401 |
| Corporate Office Overhead (4.23%) | | 3,138 |
| | Subtotal | $83,714 |
| Profit @ 7.15% based on S.Ferry Landing | | 5,986 |
| | Subtotal | $89,700 |
| Bond @ 0.65% | | 583 |
| | | $90,283 |

B. Impact Period

Renda has claimed 22.3 days between the dates of April 16 and May 8, 2001, for repairs to the dredge. The idle time caused by the damage to the cutterhead gear box assembly has been found to be fourteen days or 336 hours. The cost incurred for the cutterhead gear box assembly repair has been recomputed and is as follows:

| Direct Costs | Renda Claim | Supported | Notes |
|---|---|---|---|
| Dredging Equipment | $552,664 | $149,466 | A |
| Dredging Labor | 153,751 | 93,460 | B |
| Field Cost (1735 x 14 days) | 38,683 | 24,290 | C |
| Dredge Equipment Repair Cost | 86,058 | 21,432 | D |
| Subtotal | $831,156 | $288,648 | |
| Resident Home Office Overhead 8.63% | 131,988 | 24,910 | E |
| Corporate Home Office Overhead 4.23% | 54,856 | 12,210 | E |
| Subtotal | $1,017,999 | $325,768 | |
| Profit | 122,160 | 0 | F |
| Bond @ 0.65% | 7,411 | 2,118 | G |
| Subtotal | $1,147,570 | $327,886 | |
| Miscellaneous Cost | | | |
| Consultant Services | 10,000 | -- | H |
| Report Preparation Cost | 1,000 | -- | |
| Bond @ 0.65% on Misc Cost | 72 | -- | |
| Total | $1,158,642 | $327,886 | |

A – For equipment calculations, see VI, Tab 22. For explanations of the equipment rates, see Section 5

B – Labor cost for the period is developed in Volume VI, Tab 21

C – Field Cost is considered acceptable at this time. However, some costs appear to be for parts which would be a duplication of equipment rates. Some costs appear to be resident office expense which would also be a duplication. Individual invoices were not available for review.

D – See Volume VI, Tab 23, for discussion of individual repair parts.

E – The DCAA audit (Vol VI, Tab 24) developed overhead rates for Resident Office and Corporate Office. Those rates contained two components, shop and office. The shop component is unallowable since the Corps Manual includes an allowance for shop expense. Rates used are shown at the end of the audit.

F – Suspension of Work. No profit is allowed on suspensions of work.

G – Bond rate verified by DCAA audit, Volume VI, Tab 24

H – Miscellaneous Cost – Cost disallowed by DCAA audit (Vol VI, Tab 24). Consultant Services are litigation expense and the report preparation cost is field office or home office expenses for which an allowance has already been made.

4.6.5 Conclusions

Additional time was performed in clearing the pump and cutterhead of trash and debris in Section 9 when compared to the trash clear time experienced in other areas of the project. Additionally, the mooring buoy obstruction may be the proximate cause of the cutterhead gear box assembly repairs because it is closely related in time. However, the cutterhead gearbox failure is a recurring problem. For seven days in December 2000, Renda claims repairs were necessary. However, with the failure again in April 2001, the repairs allegedly performed in December are suspect. If the cutterhead gear box was not properly repaired in December, that may account for reduced productivity and failure in April 2001.

In measuring the damages incurred during the repair period, Renda makes no adjustment for other repairs which would have prevented the dredge from working or failure to stock spare parts. Also, the equipment rates which Renda developed are improper, particularly for the dredge and booster. A discussion about the equipment rates can be found in Section 5 of this report. Assuming that the trash is found to be excessive in Section 9, the maximum adjustment in price is $99,352 and a time extension of 3 calendar days is warranted.

If the mooring buoy is determined to be a differing site condition, then the cost increase for this occurrence is $380,973 and the time adjusted twenty-four calendar days.

## 4.7 West Levee Realignment Lost Lake Placement Area

### 4.7.1 General

On May 31, 2001, Renda submitted a claim for realigning the West Levee between Sta. 166+00 and 188+50 during the general time period of September to November 2000. Renda is seeking a time extension of 40 calendar days and a cost increase of $789,600. Renda measures its damages by other unit-priced work completed under a bilateral modification executed in 1999 for work that was performed by its subcontractor, Affolter Contracting, Inc.

### 4.7.2 The Work

After preparing the discharge pipeline for almost one month, the hydraulic placement of the West Levee began on March 11, 2000, at Sta.188+82. Renda placed hydraulic fill material at levee Sta. 188+82 for seventeen consecutive days trying to build up the materials to the required elevation of +30 feet MLT. On March 28, 2000, Renda's discharge pipeline broke and, with the permission of the Government, flow was diverted to Borrow Area No. 2 on the south side of Lost Lake at approximate Levee Sta. 118+00 or Sta. 120+00 to permit the continued operation of the dredge. For five days, the discharge (18,320 cy) was placed in Borrow Area No. 2 while repairs to the discharge pipeline were made. On April 3, the levee-building materials were again placed on Sta. 188+82. For another week, except for April 6, 2000, due to another pipeline break, Renda continued to place levee discharge at levee Sta.188+82 or Sta.188+50. Between the period of March 13, 2000, and April 10, 2000, Renda placed 179,225 cy of levee building material at approximate Sta.188+82 (Vol VI, Tab 25).

On April 11, 2000, Renda moved the discharge point to levee Sta. 166+00 and proceeded to place hydraulic fill in a northerly direction along the new alignment. On April 18, 2000, the QAR states that the Government disagreed with the "wide placement of material at the discharge point".

Hydraulic fill placement at levee Sta 170+85 was to +25 feet MLT or higher as noted on the CQCR on May 5, 2000, and the slopes extended into Lost Lake creating a wide placement area.

On July 27, 2000, while on a site visit, the Government was approached by Renda about a mud wave created by the new levee alignment. The hydraulic fill placement, which had started at Sta. 166+00, had reached approximate Sta. 180+33.

On July 28, 2000, Renda confirmed its discussions with the Government about the mud wave and new levee alignment. In its letter (Vol IV, Tab 34), Renda states,

> "The centerline is too far to the East of the existing old levee. The new levee placement <u>will cause the mud to be displaced to the West in a mud wave that will go over the old levee</u> and into the Old River. As per our conversation it would seem that the proper thing to do would be to construct the new levee so that the toe of the new levee would be against the old levee, thus using the old levee as a berm to support the new levee and <u>also keep the mud wave to the inside of the new levee and not push it over the old levee</u>. Please advise me of the possibility of moving the centerline to the West so we can tie in to the old levee." (underscore added)

Renda had been constructing the West Levee for approximately 100 days before the mud wave and new levee alignment became a problem and brought it to the Government's attention.

On August 7, 2000, the Government met on site with Renda to again review the new centerline location with Renda. The Government agreed that the new levee should abut the existing West Levee to prevent trapping mud between the two levees and forcing mud up over the old levee. On August 7, 2000, the Government changed the new alignment. In an August 8, 2000, internal email (Vol VI, Tab 27), the Government agreed that "the increased distance between the new hydraulic fill alignment and the existing levee, near station 180+00 … is more than was intended…" It was also noted that because of the

increasing distance[1] between the two levees "that underlying, very soft, displaced dredged material is trapped, and forced upwards as a mud wave between the two fills". The August 8 email confirms the verbal directions discussed in the field to use the existing levee as a guide for the new levee alignment and place all future hydraulic fill closer to the existing levee.

On August 18, 2000, Renda confirmed the verbal instructions given on August 7, 2000. In that letter (Vol IV, Tab 36), Renda states,

> "Following the specified levee alignment, mud waves were being formed which threatened to top the old levee. RMI personnel met with you, Erik Russek and Tim Few on August 7th at the Placement Area. At this meeting, the Government verbally agreed to realign the levee such that the toe of the new levee would be against the existing, old levee."

On August 16, 2000, the Government conducted a survey of the West Levee from Sta. 166+00 to Sta. 183+67. The survey (Vol VI, Tab 28) identified 132,937 cy of dredged material remaining above the existing ground that had been distributed along the west alignment. This section of the West Levee required only 59,087 cy of fill. Approximately 74,000 cy too much material had been deposited parallel to the levee alignment for use in the shaping and final grading process.

It its claim, Renda states that "after the survey on August 16, 2000, foundation-building materials were deposited between Stations 183+50 and 188+00 to an elevation of approximately +27 MLT extending across at least a 200' base with a 100' top, and a 6:1 slope of repose." Renda continues, stating that "in this area an approximate quantity of 35,000 cy was mechanically relocated to the new levee alignment which abutted the existing levee." However, this second area was placed after receiving instructions to place future dredged materials on the new alignment and after Renda had confirmed the placement instructions on August 8, 2000. Therefore, the Government should not be responsible for relocating this misplaced material.

In February 2001, Renda returned to perform contract-required final grading on the West Levee and place additional material at approximate Sta. 198+00.

---

[1] See Sketch Vol VI, Tab 26

On May 23, 2001, the Government issued Modification CO-10, P00027, to formalize the West Levee alignment change. This change notified Renda that the alignment given on August 7, 2000, incorporated the verbal instruction into the contract and incorporated Sketch, SK-CO10-01. Renda did not agree with the proposed modification as it was issued with no time or cost increase. Eight days later, Renda submitted its claim.

4.7.3 Technical Evaluation

Contract Drawing No. C-14 shows in plan view the Lost Lake Placement Area Plan (Lost Lake). The hydraulically constructed levee on the west side of Lost Lake begins at Sta. 166+00 and proceeds north to approximate Sta. 210+00, where the levee turns to the east. Note No. 10 on Contract Drawing C-14 states that "very soft to soft foundation material will be displaced by the new levee."

Further, Amendment No. 1 to the solicitation (Vol IV, Tab 4) provided, among other things, a response to a prospective bidder's question about "Why is the levee alignment so far from the perimeter where the foundation is crummy?" The Government stated in part that, "the intent of the design is to use the new work material to enhance the long term stability of the levees. For this reason, the designers intend the new work material be used to displace the very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material."

The plan view on Contract Drawing No. C-14 shows the location of the existing west levee centerline to be somewhat parallel to the new west levee centerline. The new west levee is to be constructed to the inside or east of the existing levee. By scaling distances from Drawing No. C-14 at approximately Sta. 166+00, the distance from the existing west levee centerline to the new west levee centerline is approximately 75 feet. At Sta. 179+50, from the plan view on Drawing C-14, the distance between the old centerline and the new west levee centerline has increased to around 125 feet. At approximate Sta. 189+50, the distance between the two levee centerlines remains about the same distance

apart, 125 feet. At Sta. 197+00, the distance between the new levee centerline location and the old existing west levee centerline decreases to approximately 100 feet. Therefore, between Sta. 179+50 and 190+00, the new west levee centerline was the farthest distance away from the existing west levee. The contract anticipated the new west levee centerline to be further to the east of the existing levee for approximately 1,050 feet. This shift of the new west levee to the east of the existing levee can be seen in cross section on Contract Drawing No. 16. On Contract Drawing No. 16 the new levee cross section at Sta. 165+50 shows the new levee toe intersecting the existing levee toe about 45 feet to the left or west. However, on that same drawing, C-16, the cross section at Sta. 179+50, shows the new west levee shifted to the east and the new levee toe terminates on existing ground at about 55 feet to the left and does not intersect the existing levee toe. There is approximately 20 feet between the east toe of the existing west levee and the new west levee. The 20-foot gap would exist for approximately 1,000 feet or more until the new levee alignment shifted back to the east or the existing levee toe extended further to the west.

As noted by Renda's CQCR on July 24, 2000, at approximately Sta. 180+00, Renda began "beefing-up" the potato roll on the levee ahead of the discharge point. This is in the same location as the 20-foot gap between the levees. It is assumed that the need to beef-up the height of the perimeter levee was necessary to contain the mud wave which began to be trapped at approximate Sta. 180+00.

A gap between the levees is contemplated by the contract drawings. However, what was not anticipated or desired by the Government was for displaced foundation/mud trapped between the new and existing levees. A mud wave up against the existing levee was a concern for Renda, as well. The contract required all materials to be retained within Lost Lake.[2] As noted in Renda's July 28 letter to the Government, continued use of the new levee alignment would cause the mud wave to "go over the old levee" and moving the future alignment would "also keep the mud wave to the inside of the new levee".

[2] Contract Section 02223-5, Retaining Levees, paragraph 3.1, Embankment Construction, subparagraph 3.1.3, Misplaced Materials, states, "At no time will material or water be allowed to overflow the existing perimeter levee."

Renda states in their claim that the additional cost for the realignment work took place between early September 2000 and November 2000 due to mechanically relocating significant quantities of material previously placed between Sta. 166+00 and Sta. 188+50. Renda states that "subsequent levee construction after November 2000, up to and including work beyond approximately Sta. 205+00, has been performed in accordance with Sketch SK-C010-01, requiring no additional costs to the Government for work associated with realignment of the levees."

Renda segregated the modification proposal into two parts:

1) Realignment and Relocation of Material between Sta. 166+00 and 183+00 and,
2) Realignment and Relocation of Material between Sta. 183+00 and 188+50.

Renda does not identify any equipment or labor expended in performance of the relocation work during either part of their proposal. Renda does not provide survey data to quantify the materials actually relocated. Renda asserts that the quantity relocated may be double that identified by the Government survey. However, the Government survey does not support the movement of any material[3].

Renda's CQCR report does not support a claim for mechanically relocating significant quantities of previously placed material on the west levee between Sta. 166+00 and 188+50. From September 4, 2000 to November 11, 2000, the CQCR reports Renda mechanically excavating misplaced hydraulic fill material along the inside of the east levee and relocating it by hauling to the north levee where it was placed as mechanical fill instead of the required hydraulic fill.

---

[3] The Government survey performed by Turner Collie & Braden, Inc. on August 16, 2000, quantifies the material existing between the existing ground surface and the top of ground on that date (Vol VI, Tab 28). The CQCR reports no activity between August 7 and the date of the survey. Therefore, material relocated or handled a second time would have occurred after August 16. Another survey has not been taken to quantify the movement of material. Further, at the end of the contract, the material misplaced along the west levee alignment was contemplated by the Government to be relocated but that work was not performed.

The CQCR does identify some additional work on the west levee. After the Government met with Renda on the site on August 7, 2000, and provided direction to shift the centerline of the new levee so that it abutted the existing levee, the CQCR records material being pushed "ahead of the discharge point up against old levee base to force the mud wave towards the inside." This added work of pushing the dredged fill material against the old levee continues being reported on the CQCR through August 21, 2000. The CQCR does not describe or segregate the equipment or personnel performing this west levee added activity (other than listing the total amount of equipment and personnel working each day at Lost Lake). However, on August 22, 2000, the QAR reports,

> "The discharge point on the levee was at about station 188+50 and material was being discharged on the levee at the time of this inspection. There were two bulldozers working the levee at station 175+00. Komatsu D6 walking in cast material. Cat D6 dressing toe area where track hoe excavated moving dike inward. One D-550 dozer working discharge area. One long reach one marsh tractor working inside the levee placing pontoons on line. One idle D-6 and one idle long-reach at station 190+00 of the levee."

The QAR identifies two dozers working behind the discharge, moving the levee inward toward the old levee and compacting cast material[4]. Renda had an excavator available to cast material. However, added work must be distinguished from the contractually required work.

Shaping of the levee to final line and grade was a requirement of the contract. Shaping is performed by obtaining adjacent hydraulic fill material and mechanically placing it to required line and grade. On August 28, 2000, Renda CQCR reports, "Checking C/L to establish toe and shoulder stays to begin final dressing Sta. 167+00 – 189+00." Final dressing of the West Levee up to Sta. 189+50 continued until September 8, 2000; with one additional day reported on September 11, 2000. After that date, the Renda CQCR report is silent about work on the West Levee between Sta. 166+00 and 188+50 until March 5, 2001, when dressing the West Levee is reported again.

---

[4] Cast material is material excavated by a machine, trackhoe or dragline, and then placed at another location by the same machine.

4.7.4 Technical Results

On August 7, 2000, at approximately Sta 180+00, the Government changed the future alignment of the new West Levee. The remainder of the levee from Sta 180+00 to 215+00 was to be constructed in accordance with the verbal instructions. Prior to the change, the West Levee alignment from Sta. 166+00 gradually veered to the east away from the existing levee alignment. At its maximum distance, at approximate Sta. 180+00, a mud wave developed between the existing levee and the new hydraulic levee.

Due to the planned alignment of the new West Levee, a mud wave was generated between the existing levee and the new levee. This mud wave could have overtopped the existing levee. On July 24, 2000, Renda CQCR notes additional work on the potato roll out ahead of the discharge point. The day after the potato roll work began, on July 25, 2000, Renda personnel on the levee asked Renda management if the new levee centerline could be moved over toward the existing levee (Vol VI, Tab 29). The potato roll work (extension of the height of the levee to contain the encroaching material) continues until August 8, 2000, a day after the Government permitted Renda to move the alignment closer to the existing levee.

Due to the proximity in time, the seventeen days of constructing potato roll on top of the existing levee is considered as additional work caused by the mud wave which was a result of the new alignment in this area. This work would have required a hydraulic excavator to perform.

After directions were received from the Government to shift the alignment closer to the old levee, Renda notes additional work on eleven days by pushing material toward the old levee. This work would require dozers to perform. Although the CQCR is silent about personnel and equipment performing this work, the QAR on August 22 and 23, 2000, reports that two dozers and a long reach excavator were working on the spoil area.

No time extension is justified for the work. The dredge continued to excavate, transport and place fill materials for the levee construction while the potato roll and realignment was taking place. Therefore, no stoppage to the critical dredging work was experienced.

Quantities of materials relocated by Renda were not documented. In general, the time is undocumented for the labor and equipment for creating the potato roll and pushing the fill materials after August 17 into the new alignment. For both of these tasks, an estimate of the added work is computed using the days identified from the CQCR and the QAR. No other work is documented for the realignment of the West Levee.

The following computes cost for additional West Levee work caused by the new alignment of the West Levee and associated mud wave.

A. Additional West Levee Potato Roll Work

| | |
|---|---|
| Labor | |
| 1 – Operator 12 hrs/day x 17 days x $15.57/hr | $3,176 |
| (for operator hourly rate, see Vol V, Tab 42) | |
| Plus: | |
| Workman Compensation @ 7.26% | 231 |
| Payroll Tax and Insurance @ 8.2% | 260 |
| Labor Subtotal | $3,667 |
| Equipment | |
| 1 – Trackhoe 12 hrs/day x 17 days x $53.68/hr | $10,951 |
| (for trackhoe rate, see Vol II, Tab 100) | |
| Total Estimated Direct Cost | $14,618 |
| Plus Overhead: | |
| Resident Home Office @ 16.14% | $2,359 |
| Corporate Home Office @ 6.60% | 965 |
| Total Estimated Direct & Indirect Cost | $17,942 |
| Profit @ 7.15% (See South Ferry Landing) | 1,283 |
| Bond @ 0.65% | 125 |
| Total Estimated Adjustment for Potato Roll | $19,350 |

B. Additional West Levee Alignment Work

| | |
|---|---|
| Labor | |
| 2 – Operators 12 hrs/day x 11 days x $15.57/hr | $4,110 |
| (for operator hourly rate, see Vol V, Tab 42) | |
| Plus: | |
| Workman Compensation @ 7.26% | 298 |
| Payroll Tax and Insurance @ 8.2% | 337 |
| Labor Subtotal | $4,745 |
| Equipment | |
| 2 – Dozers 12 hrs/day x 11 days x $46.08/hr | $12,165 |
| (for dozer rate, see Vol II, Tab 100) | |
| Total Estimated Direct Cost | $16,910 |
| Plus Overhead: | |
| Resident Home Office @ 16.14% | $2,729 |
| Corporate Home Office @ 6.60% | 1,116 |
| Total Estimated Direct & Indirect Cost | $20,755 |
| Profit @ 7.15% (See South Ferry Landing) | 1,484 |
| Bond @ 0.65% | 145 |
| Total Estimated Adjustment for New West Levee Alignment | $22,404 |

4.7.5 Conclusion

Due to the planned location of the new levee alignment, some additional work was performed consisting of preventative potato roll work to keep the mud wave from overtopping the existing east levee and shifting work to direct the existing mud wave away from the existing levee. Other levee or dredging operations were not stopped or impacted by performance of the added work. Therefore, no time is considered allowable, but the cost of the added work is $41,754.

## 4.8 Differing Site Condition Encountered During Construction of Hydraulic Levees at Lost Lake Disposal Area

### 4.8.1 General

On October 16, 2001, Renda submitted a certified claim in the amount of $6,258,853 for the alleged differing site condition encountered during construction of the hydraulic levees at Lost Lake Disposal Area. Renda priced this claim on the total cost basis where payments and claims have been subtracted from the alleged total cost. Renda does not make any downward adjustments to the apparent total cost for additional costs that were the sole responsibility of Renda. Similarly, no adjustments were made for errors or inaccuracies in the bid estimate.

The total cost method is not preferred but has been accepted where four criteria are satisfied. They are:

1. The nature of the particular loss must make it impractical to determine the economic loss with a reasonable degree of accuracy;
2. The original estimate or bid must be reasonable and free of error;
3. The actual cost must be reasonable and accurately recorded; and
4. The contractor must show that it was not responsible for any cost overruns.

While a modified total cost calculation more closely represents the additional costs attributable to a claim than a pure total cost submission, it still fails to provide a direct link between the costs and the changes to the work caused by the alleged differing site condition.

On December 12, 2002, the Defense Contract Audit Agency (DCAA) issued its Audit Report No. 3511-2003M172 00012 (Vol IV, Tab 38) for the differing site condition on the hydraulic levees. The auditor did not address the issue of entitlement, but offered

conclusions on the claimed amount, the magnitude and reasonableness. In the results the audit states, in pertinent part,

> "Because the cost or pricing data inadequacies are considered significant, we do not believe the claim is an acceptable basis for settlement of the price adjustment claim request, as discussed with Mr. Thomas Benero and confirmed in our teleconference with your office on May 7, 2002. FAR 15.403-4 requires the submission of cost or pricing data applicable to the modification of any sealed bid contract. To make the cost or pricing data adequate, the contractor must prepare its claim in the format of FAR 15.408, Table 15-2. Table 15-2 Section II-Cost Elements, requires that the contractor provide breakdowns for the basic cost elements claimed."

Almost two years after the exit conference of the audit, an additional breakdown of the alleged total cost has just been received from Renda. A supplemental report will be issued should the data affect any of the conclusions or evaluations contained herein.

### 4.8.2 Contract Requirements for Hydraulic Constructed Levees

Contract Section 02223 – Retaining Levees contains the specification requirements for constructing the mechanically constructed levee, the hydraulically constructed levee and compacted fill and backfill for the new drop-outlet structure work.

Contract Section 02223, paragraph 1.3.1, required a plan for the construction of the mechanically constructed levee and the hydraulically constructed levees. The minimum requirements of the plan were, in part,

(1) The phasing and construction of the Mechanically Constructed Levee, Drop-outlet Structure, and the Hydraulically Constructed Levees, including discharge pipeline placements, with sketches when applicable, and techniques to minimize foundation displacements.

(2) Approximate Houston Ship Channel stations between which the material to be used to construct the Hydraulically Constructed Levees will be dredged.

At the preparatory meeting on December 3, 1998, Renda's plan for constructing the mechanically constructed levee, drop-outlet structure, and the hydraulically constructed levee (Vol IV, Tab 39) was discussed. Figure 4.8.1 shows the Renda sketch which complies with Section 02223, paragraph 1.3.1(2) depicting the location of the planned borrow material and their intended placement sequence in the respective levee section.

Figure 4.8.1

Renda Placement Sketch



No sketch or data similar to Figure 4.8.1 has been located which would show Renda's intentions pre-bid. However, this sketch shows Renda's planned use of the materials prior to the start of work.

From Figure 4.8.1, Renda anticipated the hydraulically constructed levees would be built from satisfactory material obtained from Channel Sections 1, 2, 3, 4 and 5. Section 1 dredged material would be used to construct the levee from Sta. 97+00 to approximately 77+00 on the east side. Section 2 dredged material would be used to construct the remaining east levee and the western third of the north levee from approximately Sta. 77+00 to Sta. 30+00. Section 3 dredged material was anticipated to be pumped to the

north levee and would be used to complete the hydraulic fill from Sta. 30+00 to Sta. 4+00 at the existing drop-outlet structure. Although the color coding is difficult to distinguish, Section 4 and the corresponding Flare Area[1] would be used to complete the north half of the west levee starting at approximately Sta. 185+00 and the eastern third of the north levee that ties into the existing drop-outlet structure. Section 5 of the channel is shown to complete the southern half of the west levee from Sta. 166+00 to approximate Sta. 185+00.

Section 02223, paragraph 1.4, General Provisions, requires the embankments to be constructed to the lines, grades and cross sections shown on the drawings. Government directed field changes in embankment sections would be covered in accordance with the Changes clause of the contract. Under paragraph 1.4.2, Conduct of Work, the contractor was required to maintain and protect the embankment in satisfactory condition at all times until completion and acceptance of the work.

Section 02223, paragraph 1.4.3, Order of Work, required the work be performed in the following order:

(1) The Contractor shall fully complete placement of the Mechanically Constructed Levee between Stations 97+00 and 166+00; and at the areas for the construction of the new Drop-outlet Structure and the modification of the existing Drop-outlet Structure as shown, to the lines and grades specified. The Contractor shall also complete construction of the new Drop-outlet Structure prior to beginning work on placement of the Hydraulically Constructed Levees.

(2) The Contractor shall place Hydraulically Constructed Levees at all levee stations not listed above, until the entire perimeter levee has been completed to Elevation +20 feet Mean Low Tide (MLT).

(3) The Contractor shall not be permitted to grade the area outside the slope of the newly constructed levee until the entire perimeter levee has been completed to Elevation +20 feet MLT.

Section 02223, paragraph 1.4.4, Slides, states that if any part of the levee, during its construction or after its completion, but prior to acceptance, was sliding, the contractor, after written order from the Government, was required to rebuild that portion of the levee.

---

[1] It is of interest to note that in December 1998, Renda anticipated the Flare Area of Section 4 and 5 to contain medium to hard clays and sands suitable to build hydraulic levees. This is not consistent with Renda's claim addressed previously in this report at Section 4.3.

If the contractor caused the slide, the rebuilding operations were to be performed at no cost to the Government.

Section 02223, paragraph 1.4.5, states that the Government could make changes on the levee alignment before completion of the work. If, however, a section of the levee on which work had been done was abandoned, the contractor would be compensated at the contract unit price for that section or location abandoned.

Section 02223, paragraph 1.5, Measurement, subparagraph 1.5.2, Hydraulically Constructed Levees, states that payment for hydraulic levees constructed to the minimum lines and grades shown would be made by the linear foot (LF) of levee completed. Subparagraph 1.5.1, Mechanically Constructed Levee, provided for payment by the cubic yard (cy). A distinction is made between the mechanically and hydraulically constructed levees because payment for the mechanically constructed levee included the cost of excavation, hauling and placement, whereas payment for the hydraulically constructed levee only included mechanically shaping and final grading. Hydraulic fill payment was for dredging and transport and was paid separately under Section 02482 of the contract.

Section 02223, paragraph 2.2.3, Material for Hydraulically Constructed Levees, states,

> "Material for the Hydraulically Constructed Levees shall be medium to hard clays and sands, as described on the Logs of Borings. Material shall be obtained from the required dredging shown. The Contractor will not be required to segregate the soft clays from the suitable construction materials during dredging and construction of the Hydraulic Levees."

The satisfactory fill materials were to be obtained from the required dredging, which measured and for which contractor paid separately under Contract Section 02482 – Dredging. Medium to hard clays and sands and soft clays were acceptable. However, Renda was not required to segregate soft clays from other materials for use in the hydraulically constructed levee.

The performance of the embankment construction is addressed under Section 02223, paragraph 3.1. This paragraph 3.1, Embankment Construction, states, in its entirety,

"3.1.1 Mechanically Constructed Levees. Satisfactory materials used for Mechanically Constructed Levees shall be obtained from the designated borrow areas shown. Material shall be excavated using draglines, backhoes, dozers, or other suitable equipment, transported to the levee site, and placed in layers not exceeding 18 inches in thickness before compaction. In areas having standing water or soft foundation conditions, borrow materials shall be placed in a single lift (layer) as required to support hauling and compacting equipment. Fill materials shall be placed in such a manner to ensure that the soft foundation material will not be trapped in the embankment, but will be displaced laterally as the fill is advanced. The layers so placed shall be spread, distributed, and otherwise manipulated during placement to eliminate voids in the fill. The moisture content of each layer of material shall be suitable to obtain the maximum compaction with the equipment used. In the event the fill material is either too wet or too dry to obtain compaction, the material shall be disked and aerated to dry the material, or moistened and disked to distribute moisture throughout each layer. After placement, each layer shall be compacted by not less that four (4) coverages of a crawler-type tractor conforming to the requirements of the Paragraph: EQUIPMENT above.

"3.1.2 Hydraulically Constructed Levees. Satisfactory materials used for Hydraulically Constructed Levees shall be obtained from required dredging. The Contractor shall evenly distribute sufficient hydraulic material at all locations along the levee so that the final new levee section can be constructed to the minimum lines and grades. During the shaping process, the material shall be placed using the same lift thickness and compaction requirements as those required for the Mechanically Constructed Levees. The Contractor shall excavate material from the adjacent existing levee to the limits shown. The "slope to drain" requirement shall apply to the entire placement area perimeter levee.

"3.1.3 Misplaced materials. At no time will material or water be allowed to overflow the existing perimeter levee. Construction operations shall be so sequenced as to allow fines pumped in with the levee building material time to settle and the water to be discharged through the spillbox. While placing the Hydraulically Constructed Levees the Contractor shall be responsible for maintaining the existing levee height to prevent spillover from the levee construction operations. In the event the dredge material approaches the height of the existing levee, the Contractor shall build a berm of sufficient height to prevent spillover from the levee construction operations. In the event the dredge material approaches the height of the existing levee, the Contractor shall build a berm of sufficient durability to contain the material. The Contractor may be required to remove misplaced material or unauthorized placement of material in accordance with the SECTION entitled DREDGING.

"3.1.4 Mining. Suitable materials obtained from the required dredging shall be used for placement of the Hydraulically Constructed Levees. If, upon completion of required dredging in the Channel reach (or reaches) containing suitable material, sufficient suitable materials are not available to complete the Hydraulically Constructed Levees to the lines and grades specified, the Contractor shall be required to complete the Hydraulically Constructed Levees with suitable materials obtained from mining below the Channel template in the reach of the Channel as shown. Mining will not be paid at the unit price for "Dredging," but will be measured and paid for as specified in the Paragraphs: MEASUREMENT and PAYMENT above.

"3.1.5 Final Grading. The ground outside the new levee shall be graded to drain away from the new levee toe. Satisfactory material removed from the existing levee above the limit of allowable excavation shown, may be used as fill in establishing the new levee cross section. However, material shall not be removed from the existing levee until the new levee crest exceeds Elevation +20 feet Mean Low Tide around the entire Placement Area.

In addition to the specifications issued with the solicitation, Amendment No. 0001 to the contract revised the bidding schedule and, among other things, provided Government

responses to questions by prospective bidders which have been incorporated into the contract. Of interest to the hydraulically constructed levees were the following questions:

> 5. With regard to mining, why was that even put in there? Does the Corps really think there won't be enough clay to build the levees?
>
> Answer: The Corps believes that there will be sufficient material within the dredged template to construct the required levees, provided the contractor carefully manages handling at the discharge pipe. The need to mine is under the contractor's control.
>
> 6. Why is the levee alignment so far from the perimeter where the foundation is crummy? It makes it harder to build on weaker ground. What's the purpose of leaving a hundred feet, or whatever it is, on the outside where the base is the best?
>
> Answer: The intent of the design is to use the new work material to enhance the long term stability of the levees. For this reason, the designers intend the new work material be used to displace the very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material. In addition, there are several locations around the placement area where the levee centerline must be located as shown due to overall slope stability concerns. Finally, in the southeast corner of the site, the levee was located to eliminate crossings under the existing power lines due to clearance concerns for construction equipment.
>
> 5.a. Section 02223, Paragraph 1.5.3: How is mining paid?
>
> Answer: Specifications will be revised to state that there will be no payment for mining. A lot of discussion followed this question regarding how the bidder can estimate how much mining will be required. The designers believe that there is sufficient new work material available to construct the levees hydraulically where indicated, even allowing for the soft foundations, without having to mine. An area for mining was established only in the event that the Contractor chose to place the material in such a way as to exhaust the available pay new work material before levee raising was complete.
>
> 5.b Section 02223, Paragraph 3.1.5: "However, material shall not be removed from the existing levee until the new levee crest exceeds elevation +20 mean low tide around the entire placement area." The key word is "entire." There is a good possibility that the "final grading in the hydraulic levee reach can commence prior to completion of the hydraulic base. In the interest of time on the project this sentence needs to be changed.
>
> Answer: The point is well taken, however we have concerns with the possibility of dredge effluent (water) being able to work its way around the new construction and down the existing embankment sides if the existing levee were allowed to be degraded prior to completion of the new perimeter levee.

Contract Drawing C-14 provides a plan view of Lost Lake Placement Area (Lost Lake). The north, west and east levees were to be hydraulically constructed between Sta. 166+00 and 215+00 and Sta. 4+00 and 97+00[2]. As shown on Drawing C-14, there are eighty-six boring logs scattered throughout Lost Lake which provide information as to the material characteristics and depths of the earth materials. Individual boring logs for Lost Lake are

---

[2] Mechanical fill was to be placed from Sta 61+00 to 56+00 at the new drop-outlet structure.

shown on Contract Drawings F-5, F-6, F-7, F-8 and F-9. On Contract Drawing C-14, Note 10 states,

> "The foundation of the new levee is very soft to soft dredged material, and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material."

On Contract Drawing C-14, Note 2 states,

> "Survey date of Lost Lake contours: April 1997, with additional surveys taken Dec. 1997 around Borrow Area No. 2. Dredging has occurred since the survey date, interior elev. may differ."

In summary, the contract describes the foundation for the new levees (both mechanical and hydraulic) as very soft to soft previously dredged maintenance materials that will be displaced by construction of the new levees (Contract Drawing C-14, Note 10). The natural ground elevation upon which the levee was to be placed was indicated to vary from the contours shown (Drawing C-14, Note 2). Placement of the hydraulically constructed levee was to be planned to include <u>phasing</u>, <u>discharge pipeline placements</u>, and other <u>techniques to minimize foundation displacements</u> (Section 02223, paragraph 1.3.1).

During performance, the contract required phased construction of the hydraulic constructed levee. The contractor was to obtain satisfactory fill materials from the required dredging and evenly distribute sufficient hydraulic fill material at all locations along the levee so that the final new levee section could be constructed to the minimum sections shown (Section 02223, paragraph 3.1.2).

The contractor was to place sufficient hydraulic fill for constructing the hydraulic levees until the entire perimeter levee had been completed to elevation +20 feet MLT (Section 02223, paragraph 1.4.3(2)). During the shaping process to construct the final new levee section, the hydraulically placed fill material was to be excavated and placed using the same lift thickness (18 inches) and compaction requirement (4 passes with a crawler tractor) as those required for the mechanically constructed levees (Section 02223, paragraph 3.1.2). Final grading of the existing levee outside the new levee crest could not be performed until the new levee crest exceeded elevation +20 feet MLT around the

entire Lost Lake Placement Area (Section 02223, paragraph 3.1.5). This final grading process is reinforced under the Order of Work which prohibited the contractor from grading the area outside the slope of the newly constructed levee until the entire perimeter levee has been completed hydraulically to elevation +20 feet MLT.

4.8.3 Technical Evaluation

From Contract Drawing No. C-14, the interior of Lost Lake and the existing perimeter levee foundation for the hydraulically constructed levees tends to slope from south to north. On the south end of Lost Lake previous dredging had deposited two mounds of material. These existing mounds were the borrow source used to obtain fill materials to construct the mechanical levee at Lost Lake. The discharge point for dredge effluent water is the existing drop-outlet structure on the north side of Lost Lake. Therefore, the smallest soil particles would be carried the farthest from the southerly discharge point and deposited along the north and northwest levee. These low lying areas should be the wettest and softest foundation areas for the hydraulically constructed levees.

The construction method for hydraulic fill placement of a levee requires the dredge discharge slurry to be channeled or directed along or parallel with the new levee centerline so that the soil solids and particles fall or settle out of the slowing effluent and build up along the new alignment. Generally small retaining or training dikes on both sides and parallel to the centerline of the alignment, are constructed well in advance of the hydraulic placement to direct and contain the discharge. At Lost Lake, the existing levee served as one of the retaining dikes.

When dredged material is actually being discharged at a location along the levee, one or two pieces of construction equipment (e.g. dozer and excavator) are required, depending on the materials being excavated, to prevent a build up or settling of heavy materials (e.g. gravel or clay balls) at the discharge point (which would block the slurry flow), maintain the directional flow of the slurry, and add pipeline to advance and distribute the hydraulic fill materials along the alignment.

Not all materials are good levee building candidates for hydraulic construction. At Upper Bayou, satisfactory materials for the hydraulically constructed levees were required to be medium to hard clays and sands, as described on the Logs of Borings. Sands, particularly fine sands, require more training dikes than medium to hard clays which are more likely to form clay balls and quickly settle out of the slurry and stack up as they exit the discharge pipe.

Expected unsatisfactory levee materials encountered during the dredging process must be diverted away from placement in the levee by the contractor. This diversion is accomplished by the use of wyes and valves, planning and constant monitoring of dredged material and communication between the dredge and the fill placement area. At Lost Lake, two discharge corridors, one on the east side and one on the west side of the levee alignment, were provided in the contract for use by the contractor in depositing non-levee construction materials. These locations are shown on Contract Drawing C-14.

At Lost Lake Placement Area, the Contractor was cautioned that the levee foundation for the mechanically and hydraulically constructed levees was "very soft to soft dredge material, and sand placed in past dredging maintenance cycles." The contract anticipates that very soft to soft foundation material will be displaced by the new levee material (Contract Drawing C-14, Note 10). Foundation displacements, such as mud waves and subsidence, were to be expected. Section 02223-Retaining Levees, paragraph 1.3.1 Construction Plan Item (1) required the contractor to consider "techniques to minimize" the occurrence of these displacements or levee foundation failures and specifically mentioned planning of hydraulic pipeline placements. Hydraulic placement of fill materials is well suited for construction on very soft foundations where the rate of fill and placement area can be controlled and it is too soft for mechanical placement.

The Upper Bayou contract contemplated a multiple step process for constructing the hydraulic levee. The means and methods for accomplishing the construction of the hydraulically constructed levee was left to the contractor. Contract Specification 02223–

Retaining Levees, Part 3, Excavation, subparagraph 3.1, Embankment Construction, subparagraph 3.1.2, Hydraulically Constructed Levees states,

> 'Satisfactory materials used for Hydraulically Constructed Levees shall be obtained from required dredging. The Contractor shall evenly distribute sufficient hydraulic material at all locations along the levee so that the final new levee section can be constructed to the minimum lines and grades. During the shaping process, the material shall be placed using the same lift thickness and compaction requirements as those required for the Mechanically Constructed Levees. The Contractor shall excavate material from the adjacent existing levee to the limits shown. The "slope to drain" requirements shall apply to the entire placement area perimeter."

The first step in constructing the hydraulic levee was the even placement of sufficient satisfactory materials obtained from required channel dredging <u>at all locations along the levee</u>. During this initial process, the contractor was to take measures to minimize displacement of the very soft levee foundation. Some of these measures could have been placing the hydraulic fill in multiple passes or smaller lifts (layers), at multiple discharge locations, or a combination of both. Further, the width of the hydraulic placement could be controlled by pre-constructing retaining dikes. The contractor was responsible for even distribution of the material and methods for minimizing displacement of the very soft foundation.

As the contractor was evenly distributing sufficient hydraulic fill material at all locations along the levee to elev. +20 feet MLT, the new final levee section could be mechanically constructed to the minimum lines and grades shown on Contract Drawing Nos. C-15 and C-16, Lost Lake Placement Area, Levee Cross Sections.

During this shaping process, the fill material excavated from the recently placed, evenly distributed satisfactory hydraulic material was to be moved by construction equipment and placed using the same lift thickness (18 inches) and compaction requirements (crawler tractors) as those required for the Mechanically Constructed Levees. Contract Bid Item No. 6, Hydraulically Constructed Levees, was provided to pay for this shaping and final grading work.

Once the hydraulically constructed levee crest exceeded elevation +20 MLT around the entire Lost Lake Placement area, the existing levee (outside the new levee) was required to be sloped to drain away from the levee toe. The satisfactory materials obtained from the excavation of the existing levee could be used as new levee fill to shape the hydraulic levee. Contract Section 02223 – Retaining Levees, paragraph 3.1, Embankment Construction, subparagraph 3.1.5, Final Grading states,

> "The ground outside the new levee shall be graded to drain away from the new levee toe. Satisfactory material removed from the existing levee above the limit of allowable excavation shown, may be used as fill in establishing the new levee cross section. However, material shall not be removed from the existing levee until the new levee crest exceeds Elevation +20 feet Mean Low Tide around the entire Placement Area."

This paragraph assures that the entire perimeter levee was to be raised horizontally to the minimum elevation of +20 MLT before final grading was started.

The contractor was to manage the work so that dredging water or materials were contained within the approximate 650 acre Lost Lake Placement Area. The hydraulic construction operations were to be controlled "to allow fines pumped in with the levee building material time to settle and the water discharged through the spillbox."

The Contractor was responsible for spillover and maintaining the existing levee height. In the event discharge water or material approached the height of the existing levee, the Contractor had the option of suspending dredging operations and waiting for the water level inside Lost Lake to subside or building a berm of sufficient durability to contain the material. The expedient berm built to contain material or water is generally called a potato ridge, roll or row.

4.8.4 Hydraulic Fill Placement

The first order of work, the mechanical levees, was complete in early May 1999. On or about July 1, the Government became concerned that Renda would not be able to

complete by the extended completion date of April 1, 2000. In response, on July 7, 1999 (Vol IV, Tab 40), Renda provided a new schedule[3] and a sketch showing the planned initial placement of the hydraulic fill material to elev +32 feet MLT. The sketch is shown in Figure 4.8.1.

The initial hydraulic fill placement sketch does not show the use of interior retaining dikes to control the width of the fill and shows overplacement of materials along the alignment. The plan does contemplate using wyes and valves to build up the levee.

On July 30, 1999, the preparatory meeting for the hydraulically constructed levee was conducted. In a letter (Vol IV, Tab 41) dated August 2, 1999, Renda confirmed the items discussed at the meeting. Renda noted two Government concerns expressed at the meeting with the planned initial placement of the hydraulic levee. First, the Government was concerned about a sufficient quantity of dredged material with initial placement to elev +30 feet MLT and that the slope of the hydraulic fill would be flatter or longer to the interior of the placement area. Renda acknowledged these points but "it was Renda's plan to build the levees as close to grade as the material would allow."

Figure 4.8.1




[3] The July 7, 1999, schedule shows initial hydraulic fill placement complete in 186 days and uses material from Sections 1 to 6. According to the planned quantities, Renda is predicting an average production rate of 13,000 cy per day.

Work on the hydraulically constructed levees began simultaneously with dredging on September 13, 1999. Renda began placement on the east levee at Sta. 97+00 and proceeded northward. However, early placement of hydraulic fill was located on the wrong alignment due to lack of survey control. On October 6, 1999, a site visit was performed by the Government. As noted on an internal memorandum dated October 6, 1999 (Vol VI, Tab 31), the hydraulic fill was placed to elev +32 feet MLT and the interior slope varied between a 1V on 5H to 1V on 15H. Further, the alignment of the levee was noted as being incorrect.

On October 13, 1999, Renda responded (Vol IV, Tab 21) to concerns expressed by the Government. Of particular interest to the hydraulic levee construction was Item 2 in the letter which addressed placement of the levee. Renda acknowledged that the material was misplaced along the early alignment and realized "that some of the material will have to be moved to get into proper alignment". Renda further stated that "We have recently surveyed and marked the levee perimeter so that we are able to provide more accurate daily stations" Renda closed by repeating that they "will build the levees to an elevation of at least +30 feet MLT with enough material within the template cross sections to attain a 10 foot crown and three to one side slopes."

The contract does not prohibit initial placement of hydraulic fill to elevation +30 feet MLT. However, it was under Renda's control to distribute satisfactory dredged material around the perimeter of the site to at least elev. +20 feet MLT so final grading could be performed. By placing the hydraulic fill materials to elevation +30 feet MLT, Renda risked exhaustion of available material. Also by initially placing hydraulic fill to elevation +30 MLT, the slopes of the hydraulic fill would be wider than if placed to elevation +20 feet MLT. The wider slopes contain more dredged fill than needed to shape the levee to final cross section. Further, the initial placement height of hydraulic material to +30 feet MLT would cause more displacement of soft levee foundation materials. Placement to elevation +30 feet MLT caused the weight of the new embankment to be more than if placed to +20 feet MLT which, in turn, would increase

displacement and settlement of the levee foundation requiring the use of more dredged material.

Renda's placement methods of the hydraulic levee fill were of continuing concern to the Government. About two weeks after Renda's response to the Government's October 12 letter, Renda tried to clarify its methods on October 25, 1999. In the October 25, 1999 letter (Vol IV, Tab 45), Renda states that a wider crown width at elev +30 feet MLT was necessary to access the discharge. However, if the material were not placed to elev +30 feet MLT, the crown width would be wider and within template. However, Renda did not want to stop short of the final elevation. Renda continues,

> "We are bring up this point to make you aware of the reason behind the wider crown during construction. In order to prevent time consuming multiple passes with the discharge and/or hauling, it is necessary to slightly overbuild to account for settling and possible subsidence."

Following a Government inspection on November 8, 1999, Renda fired its Captain and Deck Captain "for dereliction of duty". "The condition of the hydraulic levee was not near to the standards it could be." On December 16, 1999, in an internal email (Vol VI, Tab 32), the discharge from the dredge was reported to be at or near Sta 53+00. It was also noted that the distance the dredge was transporting material was at is maximum.

Renda completed placement on the east levee to Sta. 54+44 in late December 1999[4]. However, hydraulic placement did not continue along the north levee alignment. Instead, Renda continued to hydraulically place material along the east levee alignment until March 2000 with some stations, such as Sta. 86+00, receiving over 100,000 cy of additional material. This stockpiled material was later moved mechanically to the north levee.

Hydraulic fill placement was switched to the west levee alignment on March 12, 2000. Placement of hydraulic fill along the west levee alignment prior to completing the north levee hydraulic fill placement was contrary to Renda's initial plan submitted on

[4] The material placed along the east levee was essentially complete as of December 20, 1999. On December 20, 1999, the Government had paid for 3,883 LF of completed east levee (Vol V, Tab 4).

December 3, 1998 (Vol IV, Tab 39, RM-COE-01692). This change is unexplained, except Renda's booster had not arrived and plugged discharge pipelines at long line lengths were a constant problem (Vol V, Tab 57).

On the west levee, hydraulic fill placement began at Sta. 188+82 on March 12, 2000. By April 10, 2000, Renda had placed 179,522 cy of dredged material on Sta. 188+50 to 188+82 (Vol VI, Tab 25). Placement area was wide and only 200 feet long (Vol IV, Tab 48).

On April 11, 2000, Renda began hydraulic placement of dredged material at the southerly limit of west levee at Sta. 166+00 and proceeded northward. Again, placement of dredged material was near elev +30 feet MLT, which resulted in wide placements of hydraulic fill (Vol VI, Tab 28). Hydraulic placement along the west levee continued until fill reached approximate Sta. 198+00 (see West Levee claim for additional discussion Section 4.7).

On the north levee, hydraulically constructed levees were required by the contract. However, Renda placed the material by mechanical methods. The fill material used to place the north levee mechanically was obtained from stockpiled (misplaced) hydraulic material placed along the east levee between the periods of January, February and March 11, 2000.

Placement by mechanical methods on the north levee would cause an increase in the displacement of the very soft to soft foundation soils. The base of the new mechanically placed levee is narrower than if the base was placed by hydraulic methods. In the former case, the weight of the levee is more concentrated, which would cause shear cracks and mud waves. Additionally, the excess hydraulic material recovered along the east levee when initially placed contributed to additional displacement and loss of material along the east levee because it was excess weight that need not have been deposited. However, when Renda re-handles the available excess material a second time, displacement and loss of material occurs again at the new location. For each cubic yard Renda re-handled

by mechanical methods, displacement and loss of material below existing ground occurred twice, once hydraulically and once mechanically. This had the effect of reducing the retention rate of the hydraulically constructed levees and exhausting the hydraulic material available for levee construction.

4.8.5 Renda's Claim for Hydraulic Levee Construction

4.8.5.1 Mechanically Constructed Levee

Renda makes claim for differing site condition encountered during the construction of the hydraulic levees at Lost Lake for the period from September 13, 1999 to September 18, 2001. Renda asserts that a differing site condition was encountered at Lost Lake between the period of December 17, 1998, and September 18, 2001, which substantially affected the ability of Renda and his subcontractor, Affolter Contracting Company, Inc. (Affolter), to construct and complete the mechanical and hydraulic levees at Lost Lake. The asserted delay to the project is 397 calendar days.

As indicated earlier in this report, work did not begin on the project until December 1998 due to a bid correction and bid protest. The first order of work required by the contract was 1) construction of the mechanical levee on the southern side of Lost Lake Placement Area between Sta. 97+00 and Sta. 166+00, 2) construction of a new drop-outlet structure, perimeter levee and training levees located on the east side of Lost Lake between Sta. 56+00 and 61+00, and 3) construction of perimeter and training levees for the existing drop-outlet structure located on the north side of Lost Lake between Sta. 215+00 and 219+66 and Sta. 0+00 and 4+00. Sta. 4+00 is equal to Sta. 219+66 on the closed loop around Lost Lake.

Construction of the mechanical levee occurred between December 1998 and May 19, 1999. Renda's subcontractor, Affolter, performed the mechanical levee construction.

Renda states that the mechanically constructed levees by Affolter are not a direct part of this claim. However, Renda attempts to equate the difficulties Affolter experienced to the difficulties Renda experienced. Therefore, Affolter's mechanically constructed levees are reviewed.

During performance of the mechanical levee construction, Affolter encountered a differing site condition while performing work at the new drop-outlet structure. Change Order No. 1 (P00004) was issued unilaterally as a Notice to Proceed for the added work at the new drop-outlet structure. Change Order No. 1 established five items of work:

1) Redesign the perimeter levee adjacent to the new drop-outlet structure, estimated as 9,100 cy
2) Relocate the south training levee from Sta. 61+00 to 61+50, estimated as 4,100 cy
3) Construct new 50' wide berms on both sides of the two training levees, estimated as 45,400 cy
4) Increase the length of the north training levee to tie-in to the north perimeter levee, estimated as 22,500 cy
5) Extend the new drop-outlet structure walkway, lump sum

Modification P00006, (Change Order-2) finalized the cost of the added work ordered under Modification P00004. For the changes ordered, Renda was paid $436,855.37 in a bilateral modification executed by Renda on June 21, 1999.

Renda's claim points out that its subcontractor experienced levee base failures on the new perimeter mechanically constructed levees on January 11, 1999 from Sta. 112+00 to 114+00. However, no adjustment was made by the Government for these failures because the fill material was "very wet and had spread out beyond base stakes" (Vol II, Tab 8). This is not a foundation failure. The contractor was responsible for drying the fill material if it was too wet for levee construction. These reported failures, including rutting, are due to wet borrow materials being placed in the fill.

Renda's claim also explains that on February 12, 1999, the training levees at the new drop-outlet structure were completed to elev. +19 feet MLT. On February 13 and 14, it

was reported that the north training levee was subsiding (sinking). The CQCR for February 15, 1999 states,

> "Contractor is unable to raise dike above +22 elev. due to subsidence, causing contractor to use more material and equipment in this area." (Vol II, Tab 9)

On February 16, 1999, the Government met with Renda to review their concerns. The result of the site visit was the issuance of Modifications P00004 and P00006 discussed above. As part of Modification P00006, the required height of the new training levees was lowered from +28 feet to +24 feet MLT. Also included in Modification P00006 was a realignment of the hydraulic levee in the northeast corner of Lost Lake. Renda recognized these levee and structure changes and wrote (Vol VI, Tab 30) on March 1, 1999,

> "5. I think that I can safely say that our hydraulic placement quantities will increase significantly due to these changes and that borrow material will run out way before we can finish the mechanical levees."

Renda was correct that hydraulic placement quantities increased at the northeast corner and that the Government-furnished borrow material for the mechanical levees would run out.[5]

The Government issued another modification that added several borrow areas collectively known as Borrow Area No. 3 to the contract as a source for mechanical levee fill material. The new borrow area required multiple handling of borrow material prior to loading it into a truck and being placed into the levee as fill material. Bilateral modification P00008 paid Renda and its subcontractor for this incremental cost increase in obtaining new Government-furnished borrow materials.

The planned mechanical levee construction and additional directed berms constructed by Affolter required additional quantities of fill material to complete. Modification P00006 formalized the payment for an additional 187,853 cy of borrow material to be paid under Bid Item No. 2 for completing the mechanically constructed levee. On May 19, 1999, the

---

[5] Borrow Area No. 1 could not be fully utilized. As noted on the March 17, 1999 CQCR report, "Silt level rising in Borrow Area No. 1, unable to excavate as deep ..." This borrow area shortage also accounts for the need to acquire a third borrow area.

mechanically constructed levees were complete and Renda's subcontractor, Affolter, demobilized.

4.8.5.2 Hydraulically Constructed Levee

Renda's total cost claim for hydraulic levee construction is generally a summary of the daily logs and correspondence with commentary that generally starts on page 35 of the claim document.

The changes claimed by Renda, which begin on page 171 of the claim, are not tied to any particular cause. However, the equipment and labor used to perform the hydraulically and mechanically constructed levees are adequately detailed on Renda's CQCR. The recurring themes of which Renda complains about are:

- Subcontractor encountered differing site condition at northeast corner
- The contract documents do not specify or show in the boring logs "deep, soft foundations, which can be interpreted for use by the contractor" (p. 34 of Hydraulic Levee Claim)
- New Levee Alignment – It is Renda's contention that the (x, y) coordinates for the new levee centerline are incorrect or the location of the original levees is incorrect (p. 95 of Hydraulic Levee Claim)
- Significant change in north levee work – Renda performed mechanically constructed, instead of contract required hydraulically constructed levee (p. 98 of Hydraulic Levee Claim)
- Unknown existence of "side cast borrow area" adjacent to the alignment of the new levees" (p. 108 of Hydraulic Levee Claim)

On page 35 of Renda's October 16, 2001, hydraulic levee claim, Renda provides in Table No. 3, an "Analysis of "As-Planned" vs. "Actual" Material Required per LF of Mechanical Levee (Vol VI, Tab 33). However, Table No. 3 is misleading and does not consider the changes in levee construction by Modification No. P00004 and P00006. As you will note, Table No. 3 maintains the theoretical levee length, 9,586 linear feet (lf) for

both the "As-Planned" and "Actual". Modification P00006 added berms or additional levee length. When considering the berm lengths (Vol VI, Tab 34), the theoretical levee length for the mechanical work was increased to 13,946 lf from the original 9,586 lf. When using the adjusted length, the average material required for mechanical levee (cubic yards per linear foot (lf)) is 40.81 cy/ft. This compares favorably with the "As-Planned" of 38.78 cy/ft per lf. Renda's "Actual" of 59.37 cy/ft per lf overstates the quantity per linear foot.

The differing site condition encountered by Renda's subcontractor resulted in cost increases primarily at the new drop-outlet structure which are identifiable and segregable from the remainder of the mechanical work. The cost and time incurred during the time period when the required mechanically constructed levees were built have been paid through bilateral modifications. There is no cost parallel between the mechanical construction and the hydraulic levee construction.

On page 34 of the hydraulic levees claim, Renda complains that the "Contract Documents do not specify or show in the Boring Logs deep, soft foundations", which can be interpreted for use by the contractor. This is not true. Little interpretation is necessary when the contract states that the levee foundation is very soft to soft material and will displace during placement of the fill. Further, the contract required the contractor to minimize the anticipated foundation displacement.

Ten of sixteen boring logs on the interior perimeter of Lost Lake placement area (Vol VI, Tab 35) show very soft material at the bottom of each boring log. No representation of the material below that terminating depth is provided, but the last indication is very soft material at depths of 15 to 27 feet from top of ground. Four of the other six boring logs show 15 to 25 feet thick layers of very soft to soft foundation materials. Ten of these boring logs show very soft to soft material for the full depth of the boring log hole.

It is disingenuous for Renda to assert that the contract boring logs do not show "deep, soft foundations" for the levee construction. Pre-bid contractor questions added by

Amendment No. 1 (Vol IV, Tab 4) to the contract concerning the new levee alignment inside the existing perimeter levee indicate that all bidders were aware that the foundation is "crummy" and that "it makes it harder to build on weaker ground". If it were true, that the boring logs do not contain information which can be used by the Contractor, then why did not Renda inquire about this ambiguity prior to bid? Other contractors recognized the crummy foundation and the Amendment No. 1 emphasized that point[6].

On page 42 of Renda's claim, Renda provides an alleged "analysis" of twenty-eight soil borings at Lost Lake which Renda claims are directly applicable to the hydraulic levee construction. However, that is where Renda's analysis stops. Renda does not indicate what information the boring logs contain, what they mean to construction or how they were interpreted by Renda at bid, if at all.

Renda asserts that the Contract Drawings are defective that the (x, y) coordinates for the new levee centerline are incorrect or that the location of the original levee is incorrect (p. 95 and p. 57). However, the mechanical levees and drop-outlet structures, which started in December 1998, were laid out by the contractor and constructed without any alignment issues. Once dredging started in September 1999, Renda itself noted in an October 12, 1999, letter that they had "built a large pad to the inside to use as a staging area." It is not until November 9, 1999, that any survey work is reported on the CQCR. No notice by Renda is provided that the alignment was in error on the east levee until the hydraulic levees claim. No documentation has been provided by Renda to demonstrate that the new alignment is in error or that the existing levee is incorrectly located.

From page 95 to approximately 122 of Renda's claim, Renda alleges that the defective Lost Lake drawings caused a radical change in the construction philosophy in late August 2000. The radical change was mechanically constructing the new north levee by excavating and hauling material stockpiled in January, February and March 2000 from the east levee alignment to the north levee. Although, no attempt was ever made by

---

[6] Eddie Fisher, Vice President of Renda, recognized the project "was a very – a difficult project,..." (Vol IV, Tab 6)

Renda to hydraulically construct the north levee, Renda asserts that mechanically relocating the misplaced material from the east alignment to the north alignment was caused by defective drawings (i.e., the proposed new levee centerline did not match the cross sections presented) for which the Government is responsible.

Renda complains that, during the mechanical placement, the foundation for the north levee was found to be "unbelievably poor" that resulted in "catastrophic" failures. The contract advised that the foundation was "crummy" for hydraulic placement. I do not find it surprising that the very soft levee foundation was worse for mechanical placement.

Renda asserts that there was extensive room to place the new levee on either side of the existing north levee and that Renda wanted to build the new mechanical levee on the exterior/outside of the existing levee. Renda also complains that the new mechanical levee could have been used to cap the existing levee raising them to the new levee elevation of +30 feet MLT. Both of these options were proposed by Renda as saving (Renda) considerable time and expense for performing the mechanical haul operation. However, the Government rejected these alternates because of concerns for the stability of the existing levee and environmental concerns. Therefore, Renda chose to construct the new north levee mechanically on its original planned alignment (Vol IV, Tab 49).

On September 10, 2000, Renda again began to haul fill materials to the north levee. Earlier, the north levee was constructed mechanically during the period from May 5, 2000 to June 28, 2000 from approximate levee Sta. 55+44 to 37+00 (Vol II and Vol VI, Tab 36), by excavating misplaced excessive dredged materials from inside east levee and at the northeast corner of Lost Lake. Renda does not explain why in August 2000 hauling to the north levee is considered as a change in the construction philosophy when Renda had been previously hauling to the north levee.

Renda continued to haul excess, misplaced hydraulic fill material from the inside of the east levee alignment until November 11, 2000. By load count, from the Contractor's Quality Control Report (CQCR), Renda moved 173,734 cy of misplaced fill material

during the period from September 10, 2000 to November 11, 2000 (Vol VI, Tab 37). The quantity moved by Renda to the north levee during the May through June 2000 period is undocumented, but the equipment is identifiable from the CQCR. It is no coincidence that on the best haul days for constructing the north levee mechanically, that the worst mud waves are reported. The mechanical construction was more susceptible to generation of mud waves and greater displacements than hydraulic construction.

Additionally, stiff red clay material from Section 7 (see Section 4.5 of this report) which was directed by the Government to be used to construct hydraulic levees was placed improperly in Borrow Area No. 2. On November 13, 2000, Renda began moving the misplaced Section 7 clay to the north levee. On December 11, 2000, Renda stopped work on the north levee and completed hauling of 37,032 cy of Section 7 clay determined by load count from the CQCR (Vol VI, Tab 37).

Renda complains that side cast borrow areas existed adjacent to the alignment of the new levees which were undisclosed to bidders and presumably explains the loss of material along the levee. Side cast borrow areas are commonly used to initially construct and maintain levees, such as those existing around the perimeter of Lost Lake Placement Area. The side cast borrow areas are generally shallow areas away from the toe of the levee where the dryer surface materials have been removed by a dragline and placed on the adjacent levee. As the name suggests, the dragline (similar to a lattice boom crane) swings its bucket out into the borrow area and drops it. Then by dragging the bucket back across the surface, the bucket fills with earth materials. Once the bucket is drawn back and filled with earth materials, it is lifted and the dragline pivots to swing the bucket outward and drop or cast the material onto the desired alignment or location. As the dragline moves (walks) along the alignment of the levee, the process is repeated. Therefore, borrow material opposite and immediately adjacent to the levee are used to raise or maintain the elevation of the levee.

As shown on the contract drawings, the existing levees at Lost Lake Placement Area were constructed to approximate elevation +20 feet MLT. Existing elevations in the

interior of Lost Lake where the new alignment is located ranges from +11 feet MLT to +15 feet MLT. Therefore, the existing levees were small and ranged in height from 5 to 11 feet. Assuming all material used to maintain the levees came from the interior of Lost Lake, the side cast borrow areas would be very shallow. Further, once excavated, these borrow areas would fill with additional maintenance material dredged from the channel, the very material identified in the contract.

The contract advised the bidders that the foundations for the new levee were very soft previously dredged materials. The boring logs indicate the depth of the very soft material to be at least 15 feet thick. The presence of side cast borrow areas, if any, located on the new alignment would have a minimal affect on hydraulically constructed levees.

The presence of "side cast borrow areas" adjacent to the levee alignment may have required additional dredged fill to displace the soft foundation material and to construct the hydraulically constructed levees. However, the contract provided payment for the dredged fill separately under Bid Item No. 8, Dredging.

The location of the side cast borrow areas with respect to the new levee alignment has not been documented. If the side cast borrow areas were significant and existed in close proximity to the new or existing levee alignment, then they should have been identified on a pre-bid site visit or during the performance of the required mechanically constructed levees. The side cast borrow areas issue did not arise until late October 2000, when Renda was constructing the north levee mechanically in violation of the contract which required hydraulically constructed levee at that location.

4.8.6 Technical Results

In Renda's hydraulic levee claim, Renda fails to address the contract requirement to place hydraulic fill around the entire perimeter to elev. +20 feet MLT prior to degrading the existing levee. Renda does not explain why the requirement was not followed or what prevented it.

Renda failed to evenly distribute hydraulic fill at all locations along the levee, so that the final new levee section could be constructed. Some over-placement areas are:

- On the east levee, over-placement occurred between Sta. 97+00 and Sta. 61+50. This over-placement area was later used as a borrow source for mechanically constructing the north levee. Renda placed approximately 620,000 cy in this area.
- On the west levee, over-placement occurred between Sta. 166+00 and Sta. 188+82. Renda overplaced at least 73,850 cy in this segment of the levee.
- In Borrow Area 2, Renda deposited over 300,000 cy of clay material from Section 7 which Renda claims as being excellent levee building stiff clay.

Renda failed to hydraulically construct the required levees at the following locations:

- On the north levee, hydraulic fill was not placed along the levee from approximately Sta. 51+00 to Sta. 4+00 and from approximately Sta. 205+00 to Sta. 215+00.

Figure 4.8.2 shows the locations along the levee alignment where dredged materials were reported to have been deposited.

The contract required Renda to minimize the displacement of the very soft to soft foundation materials. Renda was also required to evenly distribute sufficient dredged fill around the site to elev +20 feet MLT. Renda did not exercise any measures to minimize displacement of the very soft to soft foundation soils. This lack of placement control contributed to the loss of material by displacement and width of placement. Further, Renda's election to initially place the hydraulically constructed levee to "as close to grade as the material would allow" (+30 feet MLT) reduced the amount of hydraulic fill material available for placement at all locations to the interim elevation of +20 feet MLT.

As noted, Renda placed the hydraulic fill to elevation +30 feet MLT or above. This placement technique causes several problems. The geometry of the levee cross section alone, without considering displacement, results in an excess of dredged material

deposited along the levee alignment (see Vol VI, Tab 38 for calculations). An increase in the side slope beyond the required final minimum cross section slope of 1 vertical to 3 horizontal (1V:3H) would contain excess material on the side slope which could be used for shaping or capping the hydraulic placement to grade.

Renda's initial placement method to elev. +30 feet MLT results in large quantities of excess material on the side slopes if the material would not stand on a 1V to 3H slope. If the side slopes had a natural angle of repose after being discharged of 1V:10H then placement to elev. +30 feet MLT (assuming a best case scenario of existing ground at elev. +15 MLT) would result in three times the required volume necessary to complete the final minimum cross section to elevation +30 feet MLT.

As Renda's initial placement slopes became flatter (more than 1V to 3H), the height of the dredge fill could be lowered. Material needed to complete the final levee cross section would exist in the slopes which would be shaped under Bid Item No. 6.

Based on the geometry of the initial hydraulic fill placement cross section, Table 4.8.1 shows the levee elevations at which sufficient material would have been available to shape the new levee to final cross section grade of elev +30 feet MLT. (These calculations do not include the additional quantities available from degrading the existing levee outside the new alignment.)

Table 4.8.1
Maximum Initial Placement Elevation to Produce Sufficient Hydraulic Fill for Shaping to Final Grade

| Existing Ground Elevation | Top Elevation with 1V to 10H Slope | Top Elevation with 1V to 6H Slope |
|---|---|---|
| +11 | 21 | 23 |
| +13 | 22 | 24 |
| +15 | 23 | 25 |

In addition, a neat-line quantity of material, approximately 15 cy per lf, is placed above elev +20 ft MLT in the completed levee. If insufficient material existed in the channel to construct the entire perimeter levee to +20 feet MLT, then Renda unreasonably placed the

available material to final grade. Placing the dredged material to final grade initially would result in a cost saving to Renda for required shaping under Bid Item No. 6, if sufficient material existed in the channel.

On August 2, following the preparatory meeting for the hydraulically constructed levees, Renda confirmed its plan "to build the levees as close to grade as the material would allow." Renda did not waiver from that plan.

As noted by Renda on its "Topics for Preparatory Meeting 1030 7/30/99", Renda recognized that building the hydraulic levees may need special consideration. Possible solutions noted by Renda were:

1) Build bases with best clay even if not to grade
2) Use clay from private jobs if better
3) Let inside slope firm up over time and use this material as cap over solid base with large dragline
4) Mine clays by widening channel on north sides of Sections #1 and #2 where best clays exist

However, other options existed for evenly distributing the satisfactory dredged materials such as Item 1 suggests. Dredged material could be placed in multiple passes, multiple discharge locations along the same alignment, or multiple discharge points along the north, west and east levee simultaneously. However, as stated in an October 25, 1999, letter (Vol IV, Tab 45), Renda was overbuilding the final crown width (elev +30 feet MLT) "to prevent time consuming multiple passes with the discharge and/or hauling". Renda continued,

> "We are using the experience gained during the construction of the mechanical levees to help us determine where more overbuild may be necessary."[7]

However, instead of overbuilding the areas known to be prone to significant subsidence, which would create more displacement, Renda should have limited the build-up of the

[7] The experience which Renda should have gained from construction of the mechanical levees is that when the mechanical levees began to subside, the initial placement height was lowered. In Modification P00008, the Government reduced the required height of the levees in response to subsidence; not increased it.

materials to elev +20 feet MLT and made multiple passes through the area. This would have accomplished two requirements of the contract: efficient distribution of the hydraulic fill and minimization of foundation displacement.

### 4.8.7 Renda Claimed Cost

Renda states that "Due to the extreme difficulty and unreasonable time required to distinguish between damages allocable to the hydraulic levee construction and other claims, the modified total cost method was used. All costs or claims not part of the hydraulic levee work were itemized and deducted from the total cost for the project." This is an inaccurate statement. It is true that all claimed costs and contract payments have been deducted from an unsupported total cost, but none other. To use the total cost method, it must be shown that other more reasonable approaches are not possible.

In this case, levee equipment is easily distinguishable from the dredging equipment and levee equipment can be segregated by operation and time periods. For instance, it is assumed that Renda claims the mechanically constructed north levee as part of the hydraulically constructed levee claim. This would form the bulk of the added cost and most of the equipment was rented. The relocation of misplaced, stockpiled hydraulic fill was performed during three periods, November 16 to December 19, 1999; May 4, 2000, to June 28, 2000, and September 9, 2000, to December 12, 2000. The Contractor's Quality Control Report (CQCR) identifies the equipment used to perform these operations. Other contract costs such as final grading the existing east levee can be segregated. Vol VI, Tab 39 contains a summary of the levee equipment by start date. Vol VI, Tab 40 contains a summary of the average daily work hours for the equipment reported as working on the hydraulic levees. Renda has adequately separated levee labor cost from dredging cost as identified in Sections 4.1, 4.2, 4.3, 4.4 and 4.5 of this report. A more direct approach is certainly available for pricing the additional men and equipment directly related to the hydraulic levee claim.

Further, Renda must show that it was not responsible for other increased costs or that it made an adjustment for those costs. However, during dredging, plugged discharge pipelines contributed to reduced efficiency and operation time of the dredge before adding a booster pump in the discharge line (Vol V, Tab 57). Also, during dredging, Renda performed an excessive amount of non-pay dredging outside the allowable overdepth limits (Vol V, Tab 31). Renda has a final pay quantity for Bid Item No. 8, Dredging of 3,425,642 cubic yards (cy). However, Renda also performed 825,644 cy of non-pay dredging or twenty-four percent more. This means that Renda is responsible for 24 percent of the dredging cost and time which has not been addressed in the total cost claim.

Renda must adjust a total cost claim for the reduced efficiency of the dredge. The dredge did not perform as anticipated when purchased from Dredging Supply Company. Renda sued Dredging Supply Company for failure of the dredge to achieve the anticipated production (Vol VI, Tab 41). On May 24, 2000, the case was filed in the U.S. District Court for the Southern District of Texas, Houston Division, Civil Action No. H-00-1721. In April 2001, the problems were still not worked out with the dredge Millennium (Vol VI, Tab 5).

As for the hydraulically constructed east levee, Renda has not made any adjustment for increased cost at that location.

Renda has not identified any additional cost for being off alignment when dredging began in 1999 when no survey work was performed on Lost Lake. Further, Renda has not credited the Government for mechanically relocating Section 7 clay that was directed to be placed hydraulically.

Renda must show that it did not contribute to the increased cost of placing the hydraulic levees or mechanically placing the north levee when hydraulic placement was required. This is a heavy burden to prove since Renda's initial placement of hydraulic fill to final grade +30 feet MLT results in more quantity than necessary for completion of the levee

because of the geometry of the levee cross section. Also, by stacking the dredged fill material to grade it displaced more material than if it had been initially placed to elevation +20 feet MLT or +25 feet MLT. The added displacement contributes to exhausting the available dredged material prior to distributing it evenly around the perimeter.

To be able to use the total cost method, Renda's bid must be free of material error. In Renda's bid, the dredge crew size is 16 men per shift. As shown by Renda in the South Ferry Landing claim, the dredging crew size was up to 19 for the week ending May 5, 2000 and 20 for the week ending May 21, 2000. Dredging crew sizes continued to increase, and in Section 7 Clay claim, Renda shows 24 men working per shift for the week ending October 22, 2000. Even in the Obstructions Claim in 2001, Renda shows an average of 23 men per shift on the dredge crew for the weeks ending April 29 and May 6, 2001.

Another adjustment that should be made in the bid estimate is for fuel cost. Renda estimated diesel fuel at 80 cents per gallon. As shown in the Equipment Section, actual average fuel cost was approximately 94 cents per gallon, a seventeen percent increase in fuel cost.

As a final note, overhead markups and profit in the bid estimate are approximately a combined 13.6 percent of the total cost of the project. The DCAA has determined that markups are 14.13% for resident office overhead and 6.06% for home office corporate overhead in the year 2000. In the year 2001, these overhead rates increased. The project, if performed as bid, would not cover the actual overhead expense.

Conclusion

The DCAA has determined that the hydraulic levee claim proposed is inadequate as it did not include cost or pricing data. Further, the alleged total actual cost to date of $24,568,660.15 until recently has been unsupported. Renda's audited financial statements

as of October 31, 2001, shows an actual cost of $19,511,345 (Vol VI, Tab 42). Moreover, the total cost method or modified total cost method is not appropriate in this circumstance. The additional work, if any, can be directly identified from the project records and should be used to support a claim for construction of hydraulic levees at Lost Lake.

Renda had control of his placement methods, discharge elevation, location and width. Had Renda discharged the dredged material from the ship channel at elev. +24 feet MLT around the perimeter of Lost Lake, sufficient materials would have been available from the initial hydraulic placement from the slopes and outside existing perimeter levee to complete all the hydraulically constructed levees to the final minimum cross section envisioned by the contract.

Renda did not manage the dredged fill properly. Renda elected to discharge the dredged fill materials at el. +30 feet MLT. When the quality of the materials reduced from very stiff clays to medium clays and sand, the discharge elevation should have been lowered because the material would not "stack up" on a 3H to 1V slope. Renda did not react to the change in dredged materials and displacement, such as mud waves. When displacements developed at placement elevations above +20 feet MLT, the discharge elevations should have been lowered or advanced to another location. These methods were within the sole control of Renda.

As shown in Figure 4.8.2, Renda misplaced 350,000 cy of satisfactory material in Borrow Area 2. Additionally, during the months of January, February and early March, Renda placed 620,000 cy of satisfactory material on the east levee instead of the north. The north levee should have had dredged material placed on it beginning in January 2000, but Renda chose to deposit excess material along the east alignment[8]. Renda chose to mechanically construct the north levee. To construct the north levee, Renda transported approximately 174,000 cy in trucks which was recovered material from the east

[8] Renda acknowledges that the dredge ladder pump and main pump was limited in ability to transport materials without a booster pump (Vol IV, Tab 23).

alignment (only 28 percent of the stockpiled material) and 37,000 cy from Borrow Area 2 (about 10 percent of the misplaced material.)

For these reasons and others stated herein, Renda does not support a total cost claim for hydraulic levee construction or constructing levees mechanically when they should have been built hydraulically.

## 5.0 Equipment Rates

### 5.1 General

For the equipment cost element in Renda's claims, the U.S. Army Corps of Engineers Manual, EP1110-1-8, Construction Equipment Ownership and Operating Expense Schedule (Corps Manual) described in Contract Special Clause Section 800, Paragraph 7 was used. Paragraph 7(b) states

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region VI. Working conditions shall be considered to be average for determining equipment rates using the schedule unless specified otherwise by the contracting officer. For equipment not included in the schedule, rates for comparable pieces of equipment may be used or a rate may be developed using the formula provided in the schedule. For forward pricing, the schedule in effect at the time of negotiations shall apply. For retroactive pricing, the schedule in effect at the time the work was performed shall apply."

Section 800, Paragraph (7) further states for rental equipment that

> "(c) Equipment rental costs are allowable, subject to provisions of FAR 31.105(d)(ii) and FAR 31.205-36. Rates for equipment rented from an organization under common control, lease-purchase arrangements and sale-leaseback arrangements, will be determined using the schedule, except that actual rates will be used for equipment leased from an organization under common control that has an established practice of leasing the same or similar equipment to unaffiliated lessees."

The Corps Manual in effect at the time the work was performed is the June 1999 edition for Region VI. Renda used the correct edition of the Corps Manual, but varied the prescribed factors, formulas, and application.

The Defense Contract Audit Agency (DCAA) has performed an examination of each of Renda's claims. For the equipment, the DCAA "determined that the contractor's accounting system is able to track depreciation expense by asset, but not other expenses." Since both ownership and operating costs cannot be determined for any piece of equipment or similar groups of equipment, the contract required the use of the Corps Manual to determine the equipment rates. However, the DCAA miscalculated rates[1] and did not apply the Corps Manual correctly.

Further, the DCAA did not evaluate whether Renda misapplied the Corps Manual, changed factors or formulas, selected the improper equipment for pricing, or made allowances for costs which are included in overhead rates.

Renda selected a shorter useful and physical life than specified by the Corps Manual for the dredge Millennium and its owned booster pump. Such a variation is improper and affects the operating rate as well as the depreciable life of the equipment as noted by the DCAA. By shortening the useful life of the equipment, Renda more than doubles the recovery of the allowable depreciation expense, and likewise accelerates recovery of operating repairs which are to be recovered over the specified physical life. Renda's invention of rates, such as "non-effective time" and "main generator only" is not allowed or consistent with the Corps Manual. The contractor cannot use one element of the manual and disregard others. The equipment rates that result from use of the formulas contained in the Corps Manual include an allowance for the cost incurred during non-effective operating time. Development and use of a "non-effective time" rate results in a deviation in prescribed methodology and double recovery of cost.

---

[1] From reviewing Renda's equipment rates, the DCAA did identify the following:

- For the dredge Millennium and hydraulic booster pump, Renda developed a "non-effective time" category.
- For the dredge only, Renda developed a "main generator only" category.
- Renda selected a severe operating rate, where a choice was possible.
- Renda used a shorter useful life for the dredge and booster pump instead of the useful life required by the specified schedule.

5.2 The Corps Manual

The Corps Manual provides a method for computing the total hourly ownership and operating rates for construction equipment and dredging plant if actual ownership and operating costs are not available. The method includes formulas and factors to compute both total hourly rates and standby rates for individual pieces of equipment. The methodology assumes "that the equipment furnished to the job is in sound, workable condition. Furthermore, the methodology applies only to equipment which prime contractors or subcontractors either own or control."

The hourly rate is the sum of ownership and operating costs. The standby rate consists of the ownership element of the hourly rate. Ownership cost consists of an allowance for depreciation and facilities capital cost of money (FCCM) which is based on the Cost of Money Rate established by the U.S. Treasury. The operating cost element includes allowances for the following:

- Fuel
- Filters, oil and grease (FOG) and includes servicing
- Repairs, which include maintenance and major overhauls
- Tire wear (replacement), and
- Tire repair

"The hourly rates for operating and owning equipment do not include allowances for the following:

Operating Labor
Mobilization and demobilization
Field Office overhead expenses
Home Office &/or G&A overhead expenses
Investment Tax Credit
Contingency allowance
Profit."

Costs which are allowable and normally included in a contractor's field office or home office rate calculations are license fees, property taxes, storage and insurance. These costs are considered by the Corps Manual to be indirect costs and are not included in the total hourly rate.

Further, of importance to the auditor, because it affects the allowable overhead rates, is the repair costs component of the operating rate. The Repair Cost "is an allowance for equipment repairs, maintenance, and major overhauls (including undercarriage wear) performed in either the field or the shop." Items included in the Repair Cost Factor (p. 2-9 of EP1110-1-8) compensate the contractor for:

1. Mechanic labor including base wages, fringe benefits, supervision and all other costs for labor engaged in the direct repair of equipment.

2. Repair parts and supplies, including those items which are required for all repairs and major overhauls.

3. Service trucks and other equipment used during repair and maintenance work, including tools.

4. Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead.

The DCAA should not include repair facilities and shop overhead in the Resident Office and Home Office Overhead rates. Current DCAA overhead rates include an allowance for shop and duplicate the allowance in the equipment rates.

The Corps Manual provides for calculation and/or adjustment of rates based upon the operating conditions. Operating conditions may be average, difficult or severe. The determination of the operating condition is based on the contract specifications, the site conditions, the basis of any supporting evidence, and Appendix C guidance given in the Corps Manual.

For the majority of the equipment, Renda did not use the step-by-step computation methodology presented in Chapter 2 or 4 to obtain the total hourly rates. Renda used the alternative method in Chapter 3, which uses the equipment rates developed and shown in Table 2-1 and Table 2-2 of the Corps Manual. Use of Chapter 3 is permitted provided that:

a. Cost and pricing data is not available.

b. The Contractor's actual unit of equipment is equivalent in size, capacity, horsepower and value to the unit listed in Table 2-1.

If the Chapter 3 method is used, the Corps Manual requires that the ownership and/or operating portion of the total hourly rates be adjusted. Adjustments are to be made when one or more of the following conditions exist:

Changes in operating conditions
Changes in FCCM rate
Work shifts greater than 40 hours per week.
Changes in Fuel Cost
Equipment of a different age than Table 2-1

For the equipment rates computed by using Chapter 3 methodology, Renda listed adjustments for all the above conditions, except fuel cost. However, not all the adjustment factors were used by Renda, and some were used improperly. In the Table 2 rates, fuel cost for a gallon of diesel (off-road use) is at $0.74 per gallon. During the Renda claim periods from April 2000 thru April 2001, off-road diesel averaged $0.943 per gallon per month (Vol III, Tab 99). The equipment rates re-calculated herein use a fuel adjustment factor for diesel fuel and the rate of $0.943 per gallon. Use of this average fuel rate will result in over-compensation during some periods and in under-recovery for other periods.

5.3 Selection of Operating Conditions

Rates calculated herein make adjustments for operating condition. Contract Section 800–Special Clauses Paragraph 7 states,"Working conditions shall be considered to be average for determining equipment rates using the schedule, unless specified otherwise by the contracting officer". The contracting officer has not determined that working conditions were anything but average.

For the marine equipment, the site working conditions are normal and customary. The dredge, boats and barges are working sheltered, inland service areas of lakes, bays and sounds (See Service in Dredge Millenniums' Survey Report No. 99-4285 (Vol III, Tab 1).

Although the bayou water is subject to tidal influences, the Upper Bayou Project is not an ocean environment subject to the pounding of medium to heavy waves. For the dredging plant, average condition rates are used.

For the land-based construction equipment. Appendix C of the Corps Manual indicates that a salt water environment is a condition for considering the use of severe rates for construction equipment. Since the water is subject to tides and slightly salty, the severe rate was selected and used for the land-based construction equipment when a choice was possible.

## 5.4 Rental Equipment Rates

For the rental equipment, the Corps Manual states that the hourly rates computed do not represent rental rates. However, it is common practice to calculate an operating fuel rate for the rental equipment from the Corps Manual and add the result to the actual rental rate. Rental equipment companies are generally required to perform repairs on their equipment. It is my experience that a 50/50 split of the repair cost shown in the Corp Manual has been a reasonable compromise for the maintenance that the contractor must perform. Therefore, the actual rental equipment cost is used to compute the rental rate plus an operating rate of fuel, FOG, and half of the repair cost, including tire repair.

## 5.5 Dredging Plant

The methodology of Chapter 4 of the Corps Manual is to be used to compute the ownership and operating rates for dredging plant. The dredging plant is more than just the dredge. Dredging plant is all floating equipment engaged in support of the dredging operation including but not limited to, work barges, tugs and tenders, pipelines, pontoons and boats.

Often, Renda uses Chapter 3 methodology incorrectly for calculating the ownership and operating expense rate for the barges and tenders. For smaller boats (e.g. boats with horsepower less than 500) the methodology of Chapters 2 and 3 (non-dredging

equipment) may be used, but those rates must be adjusted for dredge operation hours in accordance with the methodology presented in Chapter 4. This was not done by Renda.

Evaluation of Renda's equipment rates reveals that Chapter 4 Methodology for Dredging Plant was not used on seven pieces of attendant plant. They are:

| Item | |
|---|---|
| 3 | Duplex High Pressure Pump |
| 8 | Workboat 'Marilyn McFarland' |
| 9 | Workboat 'Crista Diari' |
| 10 | Anchor Barge AB102 |
| 13 | Work Barge #1 |
| 18 | Fuel Barge 1 |
| 21 | Work Barge #2 |

Renda also uses the Chapter 3 methodology for small work boats (dredging plant) but does not adjust the shift factor to make those rates consistent with Chapter 4 methodology, as required by Paragraph 4-2 of EP1110-1-8.

Renda's selection of equipment in Chapter 2 comparable to the equipment owned by Renda is questionable. Insufficient equipment descriptions are provided by Renda for its owned equipment (horsepower, value, capacity and size) to determine whether the underlying assumption for selecting a particular unit from Chapter 2 was reasonable. Chapter 3 Methodology (p 3-8, EP1110-1-8) permits the selection of rates from Chapter 2, Table 2-1 if the comparable unit of equipment (horsepower, value, capacity and size) is similar. Some of the more notable discrepancies are:

| Item | Equipment | Remarks |
|---|---|---|
| 3 | Duplex High Pressure Pump | From discussions with Mr. Eric Russek, COE, this pump is a component of the dredge Millennium. Comparable equipment selected M10CP0002 is a stand-alone hydraulic dredge. Improper selection of equipment by Renda. |
| 8 | Workboat 'Marilyn K. McFarland' | Comparable equipment selected M10SM020 is a 600 horsepower (HP) boat; Marine Survey |

| | | |
|---|---|---|
| | | Report for the McFarland shows 390 HP. No adjustment and improper selection by Renda. |
| 9 | Workboat 'Crista Dian' | Comparable equipment selected M10SM021, a tug with 1000 HP valued at $454,208. No marine survey located to compare horsepower. Horsepower listed for Crista Dian on IRD is 400 HP. From Renda's Asset Detail, value of equipment is only $86,600. No adjustment made to ownership – improper selection by Renda. |
| 47 | Tugboat 'Melissa B' | 'Melissa B' is represented to be rental equipment. However, 'Melissa B' is listed in Renda Asset Detail as being owned. Rental rate questioned. |
| 12 | Grove Hydraulic Crane | Renda selects a C75GV005 as comparable equipment. The C75GV005 is an 18-ton hydraulic crane valued at $224,000. Renda's Asset Detail lists a Grove Crane Rough terrain crane 15-ton purchased in 1998 for $30,657. Poor selection and no adjustment for value by Renda. |
| 22 | Skid Loader–Timberjack 450 | Renda selects a Cat L60CA013 as comparable equipment. The L60CA013 is a 160-HP machine valued at $157,000. Renda purchased the skidder in 1998 for $13,200 per Asset Detail. While horsepower and capacity are similar, no value adjustment is made by Renda. |

Other questions and comments concerning the individual pieces of equipment are contained in Volume 5, Equipment. However, as a general note, it was difficult to check the selection of comparable equipment from Table 2-1 and 2-2 when such sketchy information was provided by Renda for most of its owned construction equipment or marine plant. In most cases, the value, size, horsepower and capacity of the Renda owned equipment was not presented for comparison with Table 2. Therefore, most of the equipment rates calculated herein are based on the value, size, horsepower and capacity of comparable equipment selected by Renda.

The equipment rates calculated are adjusted for the actual operating hours. For attendant marine plant (e.g. work skiff) where Chapter 3 methodology was used for calculation of the rate, the shift hours were adjusted to correspond with the operation hours of the dredge. However, most marine plant was recalculated using the methodology of Chapter 4. Each individual calculation by Chapter 4 methodology is present in Volume 5 under the individual tab for the equipment.

The following is a summary of the equipment rates. Following the summary are the calculations for the equipment using the methodology presented in Chapter 3 of the Corps Manual.

EQUIPMENT SUMMARY

| Claim Equip Item No. | Renda Equip ID No. | Type | Total Adjusted Hourly Operating Rate | Adjusted Standby Hourly Rate | Daily Rental Rate | Hourly Rental Operating Rate | Source Document |
|---|---|---|---|---|---|---|---|
| 1 | | Millennium | 468.96 | 70.26 | | | Vol III, Tab 1 |
| 2 | | Renda Built Booster Pump | 190.19 | 16.87 | | | Vol III, Tab 2 |
| 3 | XXX | Duplex High Pressure Pump | | | | | Vol III, Tab 3 |
| 4 | XXX | Cummins Generator | | | | | Vol III, Tab 4 |
| 5 | XXX | Pipeline - (26,000 LF) - per linear foot cost | 0.0013 | 0.0009 | | | Vol III, Tab 5 |
| 6 | XXX | Pipeline Joints - 24" | 13.56 | 6.95 | | | Vol III, Tab 6 |
| 7 | XXX | Pipeline Pontoons | 7.11 | 4.70 | | | Vol III, Tab 7 |
| 8 | B110 | Work Boat "Marilyn K McFarland" | 51.28 | 3.86 | | | Vol III, Tab 8 |
| 9 | B108 | Work Boat "Crista Dian" | 46.28 | 1.46 | | | Vol III, Tab 9 |
| 10 | AB102 | Anchor Barge AB102 | 1.85 | 0.80 | | | Vol III, Tab 10 |
| 11 | XXX | American Crane 4260 | 41.95 | 5.99 | | | Vol III, Tab 100 |
| 12 | CC915 | Grove Hydraulic Crane | 24.25 | 2.54 | | | Vol III, Tab 100 |
| 13 | XXX | Work Barge #1 | 1.29 | 0.64 | | | Vol III, Tab 13 |
| 14 | B102 | Survey Boat - Monark | 41.15 | 1.26 | | | Vol III, Tab 100 |
| 15 | B103 | Work Boat - Lafco | 41.06 | 0.98 | | | Vol III, Tab 100 |
| 16 | B105 | Work Boat - Monark | 41.06 | 0.97 | | | Vol III, Tab 100 |
| 17 | WS102 | Work Skiff | 18.36 | 0.52 | | | Vol III, Tab 100 |
| 18 | XXX | Fuel Barge | 1.29 | 0.63 | | | Vol III, Tab 18 |
| 19 | XXX | Fuel Tank | 4.83 | 0.96 | | | Vol III, Tab 100 |
| 20 | E17 | Linkbelt 3800 Excavator | 38.22 | 6.86 | | | Vol III, Tab 100 |
| 21 | XXX | Work Barge #2 - (4) Flexifloats | 1.74 | 0.85 | | | Vol III, Tab 21 |
| 22 | LS101 | Skid Loader - Timberjack 450 | 38.40 | 5.54 | | | Vol III, Tab 100 |
| 23 | LS103 | Skid Loader - Timberjack 380B | 38.40 | 5.54 | | | Vol III, Tab 100 |
| 24 | CC913 | American Crane 4260 on Barge #1 | 52.83 | 6.32 | | | Vol III, Tab 100 |

EQUIPMENT SUMMARY

| Claim Equip Item No. | Renda Equip ID No. | Type | Total Adjusted Hourly Operating Rate | Adjusted Standby Hourly Rate | Daily Rental Rate | Hourly Rental Operating Rate | Source Document |
|---|---|---|---|---|---|---|---|
| 24 | CC913 | American Crane 4260 on McDonough Barge | 33.61 | 4.37 | | | Vol III, Tab 100 |
| 25 | CC912 | Linkbelt Crane LS78 | 52.83 | 6.31 | | | Vol III, Tab 100 |
| 26 | MB101/ E18 | Marsh Buggy (Wilco) w/Caterpillar Excavator (EL200) | 53.68 | 8.87 | | | Vol III, Tab 100 |
| 27 | MD101 | Marsh Buggy #2 w/Dragline Crane (Little Giant) | 53.68 | 8.87 | | | Vol III, Tab 100 |
| 28 | W2815 | Lincoln Welder - SA300 TMD27 | 4.59 | 0.32 | | | Vol III, Tab 100 |
| 29 | XXX | Miller Welder | 4.59 | 0.32 | | | Vol III, Tab 100 |
| 30 | D412 | Caterpillar Dozer - D6H (LGP) | 46.08 | 4.78 | | | Vol III, Tab 100 |
| 31 | D413 | Caterpillar Dozer - D6H (LGP) | 46.08 | 4.78 | | | Vol III, Tab 100 |
| 32 | D402 | Caterpillar Dozer - D8L | 52.16 | 5.60 | | | Vol III, Tab 100 |
| 33 | DT1305 | Caterpillar Dump Truck - D275B (DJB) | 40.11 | 6.49 | | | Vol III, Tab 100 |
| 34 | GT818 | Lighting Set, Trailer Mounted - Next Generation (BLK64MH) | 4.91 | 0.34 | | | Vol III, Tab 100 |
| 35 | GT821 | Lighting Set, Trailer Mounted - Winco (LSC-411) | 5.27 | 0.68 | | | Vol III, Tab 100 |
| 36 | UT1720 | Utility Trailer - 20' | 1.31 | 0.24 | | | Vol III, Tab 100 |
| 37 | XXX | Ford Pickup Truck - F250HD (4x4) - RRenda | 8.39 | 0.79 | | | Vol III, Tab 100 |
| 38 | PT1028 | Ford Pickup Truck - F250HD (4x4) - Williams | 8.43 | 0.82 | | | Vol III, Tab 100 |
| 39 | PT1055 | Ford Expedition (2x2) - Fisher | 7.98 | 1.35 | | | Vol III, Tab 100 |
| 40 | PT1063 | Ford Pickup Truck - F250HD (4x4) - ARodriguez | 8.39 | 0.79 | | | Vol III, Tab 100 |
| 41 | PT1054 | Ford Pickup Truck - F250HD (2x2) - Goodloe | 7.21 | 0.70 | | | Vol III, Tab 100 |
| 42 | PT1057 | Ford Pickup Truck - F250HD (4x4) - Bowman | 9.89 | 1.66 | | | Vol III, Tab 100 |
| 43 | MT1112 | Ford Pickup Truck - F450 (2x2) - Maintenance | 10.25 | 1.46 | | | Vol III, Tab 100 |
| 44 | PT1059 | Ford Pickup Truck - F250 (2X2) - Machacek | 7.18 | 0.69 | | | Vol III, Tab 100 |
| 45 | PT1062 | Ford Pickup Truck - F150 (2x2) - Safety/QA-QC | 6.75 | 0.64 | | | Vol III, Tab 100 |
| 46 | G101 | John Deere Gator - 6x6 | 5.25 | 1.05 | | | Vol III, Tab 100 |
| 47 | | Rental: Tug Boat "Melissa B" (800 hp) Vendor: Melissa B Inc | 71.31 | 6.15 | | | Vol III, Tab 47 |

EQUIPMENT SUMMARY

| Claim Equip Item No. | Renda Equip ID No. | Type | Total Adjusted Hourly Operating Rate | Adjusted Standby Hourly Rate | Daily Rental Rate | Hourly Rental Operating Rate | Source Document |
|---|---|---|---|---|---|---|---|
| 69 | PT1019 | Ford Explorer (2x2) - BWarren | 8.02 | 1.14 | | | Vol III, Tab 100 |
| 70 | PT1067 | Ford Pickup Truck - F250HD (4x4) - Englen | 8.39 | 0.79 | | | Vol III, Tab 100 |
| 71 | DT1304 | Caterpillar Dump Truck - D275B (DJB) | 40.11 | 6.49 | | | Vol III, Tab 100 |
| 72 | D409 | Komatsu Dozer - D68P | 46.08 | 4.78 | | | Vol III, Tab 100 |
| 73 | PT1061 | Ford Pickup Truck - F250 - BWarren | 7.18 | 0.69 | | | Vol III, Tab 100 |
| 83 | JT101 | Jeep Flatbed Truck, Off-Road | - | - | | | no backup |
| 84 | D405 | Komatsu Dozer - D68P, Pyramid | - | - | | | no backup |
| 85 | RTL220 | Caterpillar 950E Loader w/Q/A Forks | 42.23 | 4.85 | | | Vol III, Tab 100 |
| 86 | MG2001 | Caterpillar 120G Motor Grader | - | - | | | no backup |
| 88 | | Rental: Komatsu Dozer - D65PX<br>Vendor: Waukesha-Pearce Ind Inc | - | - | | | |
| 92 | PT1073 | Ford Expedition (2x2) - Goodloe | 7.95 | 1.33 | | | Vol III, Tab 100 |
| 93 | PT1037 | Ford Pickup Truck-F250HD (4x4)-ECantu | 10.01 | 1.73 | | | Vol III, Tab 100 |
| 95 | D414 | Komatsu Dozer - D65PX-12 | 76.27 | 11.15 | | | Vol III, Tab 100 |
| 48 | | Rental: Combination Building - 18'<br>Vendor: International Quarters LLC | - | | 62.66 | | Vol III, Tab 100 |
| 49 | | Rental: Supply Barge (MCD212)<br>Vendor: McDonough Marine Service | 1.70 | | 83.88 | 0.58 | Vol III, Tab 100 |
| 50 | | Rental: Spud Barge (KS4001)<br>Vendor: McDonough Marine Service | 1.70 | | 111.84 | 0.58 | Vol III, Tab 100 |
| 51 | | Rental: Caterpillar Dozer LGP-D6M<br>Vendor: Nations Rent | 59.35 | | 29.22 | 28.35 | Vol III, Tab 100 |
| 52 | | Rental: Komatsu Dozer (SG)-(D65PX)<br>Vendor: Nations Rent | 75.94 | | 37.25 | 34.51 | Vol III, Tab 100 |
| 53 | | Rental: Volvo Articulated Truck A25C<br>Vendor: Nations Rent | 37.72 | | 316.92 | 13.74 | Vol III, Tab 100 |
| 54 | | Rental: Diesel Welder 400 amp-K1422-1<br>Vendor: Nations Rent | 3.82 | | 12.76 | 2.60 | Vol III, Tab 100 |
| 55 | | Rental: Lincoln Welder-500 amp<br>Vendor: Nations Rent | 3.85 | | 15.95 | 2.61 | Vol III, Tab 100 |
| 56 | | Rental: Diesel Welder 250 amp-K1383-4<br>Vendor: Nations Rent | 2.97 | | 12.82 | 2.45 | Vol III, Tab 100 |
| 57 | | Rental: Diesel Welder 250 amp-SA250<br>Vendor: Nations Rent | 2.97 | | 12.82 | 2.45 | Vol III, Tab 100 |
| 58 | | Rental: Air Compressor 185 cfm-P185WJD<br>Vendor: Nations Rent | 6.18 | | 18.34 | 4.41 | Vol III, Tab 100 |

EQUIPMENT SUMMARY

| Claim Equip Item No. | Renda Equip ID No. | Type | Total Adjusted Hourly Operating Rate | Adjusted Standby Hourly Rate | Daily Rental Rate | Hourly Rental Operating Rate | Source Document |
|---|---|---|---|---|---|---|---|
| 59 | | Rental: Air Compressor+Hose 185 cfm-P185WJD<br>Vendor: Nations Rent | 6.18 | | 18.34 | 4.41 | Vol III, Tab 100 |
| 62 | | Rental: Air Compressor 210 cfm-D210Q6JD<br>Vendor: Nations Rent | 5.66 | | 18.34 | 4.41 | Vol III, Tab 100 |
| 63 | | Rental: Komatsu Track Excavator-PC300LC-6<br>Vendor: Nations Rent | 58.63 | | 231.46 | 26.20 | Vol III, Tab 100 |
| 64 | | Rental: Komatsu Track Excavator-PC200LC-6<br>Vendor: Nations Rent | 37.81 | | 162.55 | 16.87 | Vol III, Tab 100 |
| 65 | | Rental: Komatsu Track Excavator-PC200LC-6<br>Vendor: Nations Rent | 37.81 | | 132.92 | 16.87 | Vol III, Tab 100 |
| 66 | | Rental: John Deere 550H Dozer-LGP<br>Vendor: Nations Rent | 22.21 | | 107.72 | 11.01 | Vol III, Tab 100 |
| 67 | | Rental: John Deere 550H Dozer-LGP<br>Vendor: Nations Rent | 22.21 | | 109.67 | 11.01 | Vol III, Tab 100 |
| 68 | | Rental: Caterpillar D5H Dozer-LGP<br>Vendor: Mustang Rental Services | 26.37 | | 176.26 | 12.89 | Vol III, Tab 100 |
| 74 | | Rental: Komatsu Track Excavator-PC200LC-6<br>Vendor: Nations Rent | 37.81 | | 168.67 | 16.87 | Vol III, Tab 100 |
| 75 | | Rental: John Deere D850C Dozer - LGP Crawler<br>Vendor: Rush Equipment Center | 26.37 | | 260.58 | 12.89 | Vol III, Tab 100 |
| 76 | | Rental: John Deere Track Excavator-JD230LC<br>Vendor: Rush Equipment Center | 32.40 | | 187.23 | 15.48 | Vol III, Tab 100 |
| 77 | | Rental: John Deere Track Excavator-JD450LC<br>Vendor: Rush Equipment Center | 51.10 | | 357.23 | 27.37 | Vol III, Tab 100 |
| 78 | | Rental: Link-Belt LS4300 Excavator<br>Vendor: Con-Equip, Inc. | 48.48 | | 218.10 | 23.33 | Vol III, Tab 100 |
| 79 | | Rental: Bell B25C Articulated Dump Truck<br>Vendor: Con-Equip, Inc. | 37.72 | | 218.10 | 13.74 | Vol III, Tab 100 |
| 80 | | Rental: Bell B25C Articulated Dump Truck<br>Vendor: Con-Equip, Inc. | 37.72 | | 218.10 | 13.74 | Vol III, Tab 100 |
| 81 | | Rental: Bell B25C Articulated Dump Truck<br>Vendor: Con-Equip, Inc. | 37.72 | | 218.10 | 13.74 | Vol III, Tab 100 |
| 82 | | Rental: Bell B25C Articulated Dump Truck<br>Vendor: Con-Equip, Inc. | 37.72 | | 218.10 | 13.74 | Vol III, Tab 100 |
| 87 | | Rental: Komatsu Dozer - D65PX<br>Vendor: Waukesha-Pearce Ind Inc | 75.94 | | 201.00 | 34.51 | Vol III, Tab 100 |
| 88 | moved to owned | Rental: Komatsu Dozer - D65PX<br>Vendor: Waukesha-Pearce Ind Inc | 75.94 | | | 34.51 | Vol III, Tab 100 |
| 90 | | Rental: Alco Redi-Prime Pump-12"<br>Vendor: Service Pump & Compressor Inc | 10.52 | | 85.07 | 8.03 | Vol III, Tab 100 |
| 91 | | Rental: Booster Pump No. 6*<br>Vendor: Hendry Corporation | | 9.19 | 3,169.41 | 179.78 | Vol III, Tab 100 |

*The amounts shown for standby and operating are operation cost only. Total rate would inlcude the daily rent plus the appropriate operating condition.

## Formula Explanations

### For Chapter 3 Methodology

| Column Heading | Formula |
|---|---|
| **OPERATING RATE** | |
| Total Hourly Rate | Depr + FCCM + Fuel + FOG + Tire Wear + Tire Repair + Repair (Table 2-2) |
| FCCM Adjust Factor | 6.865 / 5 (Average FCCM rate for claim periods April 2000 - April 2001 divided by FCCM rate in Corps Manual) |
| Adjusted FCCM Rate | FCCM Adjust Factor * FCCM |
| Adjusted Ownership Rate for Age | (Depr + Adjusted FCCM Rate) * Age Adjust Factor (Age Adjustment Factor from Table 3-1) |
| Shift Adjust Factor | 40 / Average Weekly Hours |
| Adjusted Ownership Rate for Shift | Adjusted Ownership Rate for Age * Shift Adjust Factor |
| Fuel & FOG Adjust Factor | 94.3 / 74 (Average fuel rate during claim period (94.34) divided by the fuel rate in Corps Manual (0.74) |
| Adjusted Fuel Rate | Fuel * Fuel & FOG Adjust Factor |
| Adjusted FOG Rate | FOG * Fuel & FOG Adjust Factor |
| Total Adjusted Hourly Operating Rate | Tire Wear + Tire Repair + Repair + Adjusted Ownership Rate for Shift + Adjusted Fuel Rate + Adjusted FOG Rate |
| **STANDBY RATE** | |
| FCCM Adjusted EP Standby Rate | (Depr / 2) + (FCCM * FCCM Adjust Factor) (based on 40 hours per week, 8 hours per day) |
| Adjusted Standby Hourly Rate | FCCM Adjusted EP Standby Rate * Standby Age Adjust Factor |
| Additional Adjustment | 40 hours / Average Weekly Hours (Additional Adjustment is to conform to hours allocated and Chapter 4 methodology) |
| Conforming Standby Rate | Adjusted Standby Hourly Rate * Additional Adjustment |

1. Additional adjustment made for Chapter 4 methodology of 24 hours standby per day. Standby rate calculated by methodology in Chapter 3 is 40 hours per week. Dredging standby adjustment factor is 0.24 (40 hrs/168 hrs)

2. For construction equipment, an additional adjustment is made to correspond with the standby hours claimed. The adjustment factor is 40 hours divided by Average Weekly Hours.

## 6.0 Time Summary

Renda asserts that the original contract time allowed to complete the project is 566 calendar days.

In the solicitation, Section 00820, Specific Project Requirements, paragraph 1, Commencement, Prosecution and Completion of Work, states,

> "The Contractor will be required to (a) commence work under this contract within 15 calendar days after the date of receipt by him of Notice to Proceed, (b) prosecute the work diligently, and except for turfing, (c) complete Schedule No. 1 of the Bidding Schedule not later than 148 calendar days after the date of receipt by it of Notice to Proceed. An additional time of 418 calendar days after the date of receipt by it of Notice to Proceed for Option No. 1 of the Bidding Schedule will be added to the contract. If the total quantity of material to be paid for actually removed under the contract exceeds the limit established in the CONTRACT CLAUSE entitled VARIATIONS IN ESTIMATED QUANTITIES – DREDGING, additional time will be allowed at the rate of 1 calendar day for each 5,000 cubic yards in excess of the established limit. The time stated for completion shall include final clean-up of the premises."

Included in the solicitation, was a Bidding Schedule, which contained a base bid, Schedule One, for performance of primarily the mechanically constructed levees and an Option 1 which primarily covered the hydraulically constructed levees.

During the bidding process, Amendment No. 1 (Vol IV, Tab 4) was issued which contained a revised bidding schedule comprised of one combined schedule for all the work. Also included in Amendment No. 1 were Government responses to prospective bidders questions. One of the questions involved contract time. The Government responded,

> "Answer: An amendment will reflect performing the entire job as one bid, rather than a base and option. Construction time will be recomputed based on this scenario."

Also questioned was the option portion of the contract and here again the Government response was,

> "Answer: Yes. The option will be combined with the base bid as one single contract."

It was clear that the time and work were to be combined and procured as a single item. Amendment No. 1 modified the bid schedule to one item, Bid Schedule One. Also, paragraph 00820, was modified to read,

> "The Contractor will be required to (a) commence work under this contract within 15 calendar days after the date of receipt by him of Notice to Proceed, (b) prosecute the work diligently, and except for turfing, (c) complete the work not later than 446 calendar days after the date of receipt by it of Notice to Proceed. If the total quantity of material to be paid for actually removed under the contract exceeds the limit established in the CONTRACT CLAUSE entitled VARIATIONS IN ESTIMATED QUANTITIES – DREDGING, additional time will be allowed at the rate of 1 calendar day for each 10,000 cubic yards in excess of the established limit. The time stated for completion shall include final clean-up of the premises."

By amendment, the contract time was modified to 466 calendar days after receipt of the Notice to Proceed. The Notice to Proceed which Renda received on November 19, 1998, established the required completion date of February 8, 2000.

In April 2000, Renda asserted that the required completion date was May 22, 2000, based upon the original solicitation performance period of 566 days (418 plus 148). Renda acknowledges that the contract was awarded with the 446 day performance period, but that Government errors in some of the paperwork (pre-construction minutes and payment estimates) justify using a 566-day performance period.

The solicitation was properly modified by amendment and, in its pre-award submittal, Renda provided a tentative project schedule showing completion of the project within the 446 calendar day period. Renda understood the time provided for completing the work. February 8, 2000, is the original required completion date.

The following would be the new required completion date considering the time extensions determined in this report, assuming that Renda's claims are determined to have merit:

| Description | Days Added | Completion Date |
|---|---|---|
| Original Contract Completion Date | | February 8, 2000 |
| Modification P00006 | +20 days | February 28, 2000 |
| Modification P00008 | +22 days | March 21, 2000 |
| Modification P00009 | +18 days | April 8, 2000 |
| Modification P00023 | +56 days | June 3, 2000 |
| Modification P00026[1] | +29 days | July 2, 2000 |
| South Ferry Landing | + 2 days | July 4, 2000 |
| HLP Delay | +2 days | July 6, 2000 |
| Flare Area[2] | -45 days | May 22, 2000 |
| Obstructions #1 | +14 days | June 5, 2000 |
| Section 7 | 0 | June 5, 2000 |
| Obstructions #2 | +27 days | July 2, 2000 |
| West Levee | 0 | July 2, 2000 |
| Hydraulic Levees Claim | 0 | July 2, 2000 |

If the contract were to be considered complete as of June 1, 2001, the date Modification P00026 was issued to remove the remaining dredging work from Section 9 and accept the channel, then Renda was 335 days, or 11 months, late in completing the work.

Renda's bid was based on a production rate of 750 cy per effective hour[3]. As noted earlier in the report, Renda's average production for the Upper Bayou Project was 586 cy

[1] Modification No. P00026 was issued May 4, 2001, to suspend dredging on Upper Bayou so Renda could perform other private work. On May 22, Renda was directed to remove its submerged pipeline crossing and on June 1, 2001, the remaining dredging work in Section 9 was deleted and the channel work accepted as complete. Therefore, the time was suspended 29 days from May 4, 2001, to June 1, 2001.
[2] The Government issued Modification P00023 unilaterally and granted 56 days for the Flare Area. I have determined only eleven days time extension for work in the Flare Area. The net adjustment for the Flare Area is –45 days.
[3] 750 cy per effective hour is determined from Renda's bid (Vol IV, Tab 8 RM-COE-23212) and pre-award submitted (Vol IV, Tab 15, RM-COE-02672).

per effective hour[4]. Therefore, Renda's bid was too optimistic[5] and anticipated 164 cy more per effective hour than actually achieved. The higher anticipated bid production rate results in Renda underbidding the dredging work by 21.9 percent. Renda anticipated dredging 345 days (Vol IV, Tab 8). A 21.9 percent increase in the anticipated dredging time is 75 calendar days (345 times 21.9 percent) or two and a half months.

Renda performed at least 800,000 cy of non-pay (excessive dredging) work. At the actual average production rate of 586 cy per hour, this would require an additional 1,365 productive hours. Renda operated an average 10.8 effective hours per day[6]. Therefore, the amount of non-pay dredging performed results in 126 days (4.1 months) of additional time.

Renda planned to begin dredging on or about May 1, 1999 (Vol IV, Tab 39). Renda's subcontractor substantially completed the mechanically constructed levees on or about May 1, 1999. The subcontractor completely demobilized on May 19, 1999. Renda should have commenced dredging in early May 1999; however, dredging was started on September 13, 1999, or four months late.

In summary, due to inefficiency of the dredge, the pay quantity work required 2.5 months longer to perform. In addition to the pay quantity, Renda accomplished non-pay dredging. The non-pay dredging required at least 4.1 months to perform. Due to the dredge arriving four months late, the dredging work was delayed a total of 10.6 months.

Therefore, just the three items noted above caused the dredging to be finished 10.6 months late. The above analysis confirms that the 56 calendar days granted under Unilateral Modification P00023 for the additional stiff clay encountered in the Flare Area was 45 days too much and the net adjustment is supported.

---

[4] Volume V, Tab 36, contains a summary of the Inspection Report of Dredging for determining hourly production.
[5] Renda was either too optimistic or the dredge delivered did not have the capability of performing to expectations. Renda had no dredge at bid except a ballpark quote and had a purchase order for the design and construction of a new dredge Millennium for the pre-award submittal. The dredge actually delivered was modified from the pre-award submittal and contained numerous used components.
[6] See Volume V, Tab 36.

Following acceptance of the dredging work of the Upper Bayou Dredging on June 1, Renda agreed to complete as much of the west hydraulic levee with dredged material from other private work procured by Renda. Renda completed the private dredging work no later than July 20, 2001. Renda agreed to perform the levee work constructed from the private dredging for the contract unit price for Bid Item No. 6 of $100.00 per linear foot of completed levee. This agreement was part of bilateral Modification P00026 (Vol IV, Tab 26).

# ROBERT W. LOFGREN

**Senior Dredging Consultant**

## EDUCATION

M.S:, Civil Engineering, University of California at Berkeley
B.S., Civil Engineering, Oregon State University

## PROFESSIONAL EXPERIENCE

Mr. Lofgren has over forty years of experience working with hydraulic and clamshell dredging. Mr. Lofgren started his career in the dredging industry as a field engineer on large hydraulic dredge in 1956. His tasks varied between cost keeping, surveying and management of dredging operations. He advanced to become Vice-President and President of Western Pacific Dredging, a dredging contractor. During these years, Mr. Lofgren was responsible for the design and assembly of five hydraulic dredges. He also was responsible for preparing and managing many multi-million dollar dredging projects throughout the United States and abroad. He is recognized for his ability to construct and coordinate the operation of dredges to meet the unique requirements of site locations. He currently works as a private consultant to various major marine and dredging contractors as well as design and consulting firms.

## REPRESENTATIVE PROJECT EXPERIENCE

*Columbia River Deepening*

This project required the modification of a 650 mm hydraulic dredge with a moveable submerged pipeline for the deepening of the ship channel on the Columbia River from –10 meters to –12 meters. The job involved working in currents as high as 3 meters per second. Careful planning and coordination of the dredging operation allowed vessel and tug traffic to occur without interruption.

*Restoration of Navigation and Flood Control Channels Following the Eruption of Mt. St. Helens*

Bob was responsible for the modifications, mobilization, and operation of six hydraulic dredges to clear the Columbia River Ship Channel and the Cowlitz River Flood Control Channel of sand, silt, and volcanic debris, following the eruption of Mt. St. Helens in 1980. This project required the coordination of all aspects of dredging, including the design of flood control channels and the procurement of disposal sites for much of the material.

Ultimately, over 50 million cubic meters of volcanic material were dredged from these areas. The results of this effort proved fruitful as both rivers were returned to their previous conditions.

EXHIBIT E

Blumberg No. 5118

*Deep Dredging at Itaipu Dam - Brazil*

As part of the construction process of the Itaipu dam, the rock bottom at the site needed to be cleaned and the surface prepared to receive a clay seal. Bob was hired to assess the specific needs of this remote area and coordinate the dredging of over 60 meters of material. Given the deep depth and cleaning requirements, the operation required the design, construction, and assembly of unique equipment. The owners were very satisfied with the work performed by Bob as it allowed the Itaipu dam to be completed ahead of schedule.

*Dredging of a Flood Control Channel - Northern Iraq*

Given the success of the deep dredging operation at the Itaipu Dam in Brazil, Bob was asked to assist a Brazilian contractor with a large flood control project in Iraq. Following a careful evaluation of the site's requirements, the dredge used at the Itaipu Dam was modified to meet the needs of this project location. Seven million cubic meters of clay material were removed from a new flood control channel. The procedure proved to be extremely successful as the work was completed on an accelerated timetable.

*Blair/Sitcum Waterway Dredging – Port of Tacoma, WA*

Bob developed the design plan for the removal of over 2 million cubic yards of contaminated sediments by both clamshell and hydraulic dredging methods. The materials were disposed of in an old waterway as a confined aquatic disposal (CAD) area. This required the construction of an underwater berm to close off the entrance of the waterway prior to the placement of dredged materials. The dredged materials were placed in a controlled manner which resulted in a stable fill. A sand cap was placed over the finer, contaminated material to provide a surface suitable for rocking and paving for industrial use.

*Terminal 2 Capping - Port of Portland, OR*

Bob managed the construction and assisted Beeman and Associates in the design of one the first underwater capping projects in the U.S. He developed a method of filling to allow the capping of soft sediments in the Willamette River prior to filling the area with a 40 foot sand fill. The means and methods that were developed are now used on most marine fill projects.

*Attorney-Client Privileged and Confidential*

# EXPERT REPORT
# UPPER BAYOU PROJECT

**In the matter of**

Renda Marine, Inc.

*versus*

U.S. Government

**Prepared for**

U.S. Department of Justice

Commercial Litigation Branch

Civil Division

1100 L Street, NW, Room 12052

Washington DC 20005

**Prepared by**

Robert W. Lofgren
Lofgren Imagineering & Construction Co.
2320 N.E. 110th Place
Vancouver, Washington 98686

Anchor Environmental, L.L.C
1423 Third Avenue, Suite 300
Seattle, Washington 98101

**January 30, 2004**

Robert W. Lofgren [signature]

EXHIBIT
F

## Table of Contents


1 INTRODUCTION ..... 1

2 BACKGROUND AND EXPERIENCE OF QUALIFYING EXPERTS TO ADDRESS AND OFFER OPINIONS ..... 2

3 INFORMATION AND DATA REVIEWED AND CONSIDERED BY EXPERTS ..... 4

4 STATEMENT OF OPINIONS ..... 7
- 4.1 Pre-Bid Site Investigation ..... 7
- 4.2 South Ferry Landing Claim ..... 10
- 4.3 Flare Area Claim ..... 20
- 4.4 The Obstruction Claims ..... 25
- 4.5 Other Questions ..... 34
- 4.6 Additional South Ferry and Obstruction Claims Questions, October 24, 2003 letter ... 49

5 COMPENSATION ..... 53

6 REFERENCES ..... 54


### List of Tables


Table 1 Flow Velocity versus Material Type

Table 2 Pump Pressure (feet of head) from Pump Curves

Table 3 Estimated Production Rates at Upper Bayou


### List of Figures


Figure 1 Project Location and Vicinity Map

Figure 2 Site Plan

Figure 3 Cross Sections 470+00 and 472+00

Figure 4 Cross Sections 476+00 and 480+00

Figure 5 Cross Section 484+00

Figure 6 Cross Sections 524+00 and 527+35.12

Figure 7 Cross Sections 530+00 and 534+00

Figure 8 Cross Sections 538+00 and 544+06.55

Figure 9 Cross Section 556+00

Figure 10 Slope Dressing Using Box Cutting Techniques

Figure 11 Typical Slope Failure Mode

Figure 12 Production Charts for Various Materials

Figure 13 Production Chart: 24-inch dredge, with and without booster pump

**Table of Contents**

Figure 14 Pipeline Routes to North Levee

**List of Appendices**

Appendix A Resume of Robert W. Lofgren

Appendix B U.S. Department of Justice letters from John Kosloske to Robert Lofgren dated May 9, 2003 and October 24, 2003

Appendix C USACE Payment Estimate – Contract Performance

Appendix D Renda Marine Dredge Disposal Plan

Appendix E Summary of Renda Marine's Report of Operations

Appendix F Renda Marine letter to U.S. Department of the Army, Galveston District Corps of Engineers, dated July 7, 1999

Appendix G Fluid velocity in pipeline as a function of pipe diameter and material characteristics

Appendix H Mobile Pulley and Machine Works Performance Curves

Appendix I Parsons Brinckerhoff Hydraulic Dredge "Pipeline" Model Results

# 1 INTRODUCTION

Anchor Environmental, L.L.C. (Anchor) was contacted by the United States Department of Justice (DOJ) in February 2003 to assist in the matter of Renda Marine, Inc. vs. United States (No. 02-306C [Fed. C1]). Anchor was asked to provide assistance on dredging related issues for three dredging obstructions and differing site conditions claims (the South Ferry Landing, Obstruction #1 and Obstruction #2 Claims), and other dredging related issues per DOJ contract number 3W-CIV01-0164. From Anchor's proposed team, DOJ specifically asked for my support, Bob Lofgren, as an Anchor subconsultant and former president of a large dredging firm, to provide expert testimony on dredging issues pertaining to the above claims. DOJ requested that I also provide expert opinion on an additional claim (i.e., Flare Area Claim).

The Upper Bayou Project was conducted as a Port of Houston sponsored dredging project managed by the United States Army Corps of Engineers (USACE), Galveston District. The project involved widening and deepening the existing Houston Ship Channel to accommodate deeper draft vessel traffic (Figure 1). The project included dredging approximately 3,500,000 cubic yards (CY) of material, some of which was to be used to build levees along Lost Lake Island. The project was advertised on June 16, 1998 with a bid opening on July 17, 1998. The USACE was responsible for preparing the bid documents and managing the construction activities. Renda Marine, Inc. was the apparent low bidder and was awarded the contract.

During construction, Renda Marine made several claims against the USACE, some of which alleged differing site conditions and unanticipated obstructions that caused delays to the dredging operations. This report states my opinions formed after reviewing the available information, and identifies the basis for my opinions. This expert report is organized into six different sections. Section 1 provides a brief introduction of the project and my role as an expert on dredging issues. Section 2 discusses my background and experience. Section 3 presents key information that I reviewed in order to formulate my opinions. Section 4 provides the Statement of Opinions for each of the claims I was asked to review. Section 5 provides the compensation to be paid to Anchor for my study and expert testimony time. Section 6 is the reference section for this report. Figures are attached at the end of this report.

## 2 BACKGROUND AND EXPERIENCE OF QUALIFYING EXPERTS TO ADDRESS AND OFFER OPINIONS

This expert report was prepared based on my experience and expertise with dredging as both a contractor and consultant. Anchor staff provided administrative and technical editing support. My role will be to testify on the issues of dredging, transport of dredged materials, equipment capability, and construction operations during the conduct of the Upper Bayou project. I have not authored a publication within the preceding ten years, and have not testified as an expert at trial or by deposition within the preceding four years.

Anchor technical staff that assisted me in preparation of this document included Mr. Tom Wang, P.E. and Mr. Greg Guannel. They assisted me with preparing figures and report technical editing. Following are biosketches for Mr. Wang, Mr. Guannel, and myself.

**Robert W. Lofgren, M.S.**, a subconsultant to Anchor Environmental, L.L.C., is a nationally recognized expert in the design of hydraulic dredges and management of large hydraulic and mechanical dredging projects. Mr. Lofgren has over forty years of national and international dredging experience with both hydraulic and clamshell dredges.

Mr. Lofgren started his career in the dredging industry as a field engineer on large hydraulic dredges in 1956. His tasks varied between cost keeping, surveying, and management of dredging operations. He advanced to become Vice-President and President of Western Pacific Dredging, a dredging contractor. During these years, Mr. Lofgren was responsible for the design and assembly of five hydraulic dredges. He also managed many major dredging projects such as the deepening of the Columbia River in the mid-1960s and the restoration of navigation and flood control channels following the eruption of Mount St. Helens in 1980. He was responsible for dredging of the foundations for the cofferdams at the Itaipu Dam in Brazil. Mr. Lofgren currently consults with national dredging contractors and dredging consultants nationwide. His resume is attached in Appendix A.

**Thomas S. Wang, P.E.**, a partner with Anchor, is an expert in the design and implementation of dredging and remediation projects. Mr. Wang has over 13 years experience managing numerous dredging and marine projects from the initial planning and permitting stages through design and construction.

Mr. Wang's dredging experience includes domestic and international sites in river, lake and coastal environments, and includes: equipment selection, development of dredge and disposal plans, permitting and regulatory assistance, assessment of environmental impacts from construction activities, sediment characterization, in-water disposal facility evaluation and design, cost estimating, preparation of bid plans and specifications, disposal area management, and construction management.

**Gregory E. Guannel, M.S.**, has two years of experience in the field of dredging. As a staff engineer, he provides engineering assistance in the design of dredge plans, dredging operation oversight, bid plans and specifications preparation, and cost estimating.

# 3 INFORMATION AND DATA REVIEWED AND CONSIDERED BY EXPERTS

In order to understand the project and claims, there were several steps I took in order to form my opinions. First, I reviewed information obtained from the DOJ that is listed below. I then conducted two separate site visits in the summer of 2003 to investigate the dredging and disposal sites, and to meet with individuals who were involved with the project. During my site visit, the key individuals I met with to gain a more comprehensive understanding of local site conditions included: Erik Russek of the USACE, Galveston District, Leon Hrabovsky of Gahagan and Bryant (an engineer working for the Port of Houston), and Wendall Mears of Gahagan and Bryant. I also contacted Ben Goodloe (Renda Marine supervisor) by telephone to discuss the project and site conditions.

As part of my review, I received the following documents from DOJ and reviewed all of them:

- Department of Justice, February 2003. CD-ROM Contract Drawings.
- Renda Marine, February 2003. CD-ROM Volume 1.
- Renda Marine, February 2003. CD-ROM Volume 2.
- Department of Justice, February 2003. CD ROM RM-COE-19888-21559 Job 120380, Box 001.
- Department of Justice, March 2003. CD ROM RM-COE-05958-RM-COE-11138 Job 100483, Boxes 004 to 005.
- Department of Justice, March 2003. CD ROM RM-COE-11139-RM-COE-18552 Job 1004383, Boxes 006 to 008.
- Department of Justice, March 2003. CD ROM RM-COE-18523-RM-COE-19887 Job 100483, Box 009.
- Department of Justice, March 2003. CD ROM RM-COE-00001-RM-COE-05957 Job 100483, Boxes 001 to 003.
- Department of Justice, March 2003. CD ROM RM-COE-21569-RM-COE-22692 Job 020172, Box 001.
- Department of Justice, April 2003. CD ROM RM-PHA-0001-RM-PHA-00871 Job 040087, Box 001.
- Department of Justice, April 2003. CD ROM RM-HVL-00001-RM-HVJ-01747 Job 100483, Boxes 001 to 003.
- Department of Justice, April 2003. CD ROM RM-JSG-0001-RM-JSG-00606 Job 030241, Box 001.

- Department of Justice, April 2003. CD ROM RM-GBA-00001-RM-GBA-00140 Job 030241, Boxes 001 to 008.
- Department of Justice, April 2003. CD ROM RM-TCB-0001-RM-TCB-01735 Job 030241, Boxes 001 to 008.
- Department of Justice, May 2003. CD ROM RM-CHU-00001-001438 Job 050444, Box 001.
- Department of Justice, June 2003. CD ROM RM-COE-22744-2324 Job 050446, Box 001.
- Department of Justice, September 2003. CD ROM-Drawings, Pre- and Post Dredging Cross-Sections, Surveys, Volumes.
- Leefe, Gibbs, Sullivan, April 2003. CD ROM RM-DSC-0001-RM-DSC-05684 Job 030596, Boxes 001 to 008.
- Renda Marine, July 1999. Letter from Renda Marine to Mr. McClenan, Department of the Army, Galveston District Corps of Engineers.

I reviewed the content of each CD, and considered the specific documents (listed below) found on the CDs to be the most relevant in forming my opinions. In order to address some of the questions asked by DOJ in letters from DOJ to Anchor dated May 9, 2003 and October 24, 2003 (Appendix B), I also referenced several industry accepted dredging publications by Tom Turner (listed below) to evaluate pumping and production rate capabilities, and performed some additional analyses of pumping capabilities using both hydraulic head loss equations (as discussed in later sections) and the model "PIPELINE," which is a proprietary hydraulic dredge production rate model developed by Parsons Brinckerhoff. These references and additional information that I used in evaluating the claims are listed below:

- DuPont, A., October 1998. Letter to USACE concerning the evaluation of Dredge *Millennium* production capacity.
- Gahagan and Bryant, November 1999. Letter to USACE concerning the evaluation of Dredge *Millennium* production capacity.
- Mears, W., August 1999. Memorandum from Robert Kite regarding the Upper Bayou Volumes, Station 520+00 to 550+65.99.
- Parsons Brinckerhoff, 2003. "PIPELINE" Model. Proprietary model to calculate production rates for hydraulic dredges.
- Renda Marine Report of Operations
- Renda Marine Daily Reports

- Renda Marine Daily Production Reports
- Renda Marine, 2001. "Request for Equitable Adjustment (Revision No. 1) for Differing Site Conditions Damages and Delays Related to Obstructions in Channel (Station Nos. 570+00 thru 630+00)", Binder No. 1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.
- Renda Marine, 2001. "Certified Claim for Differing Site conditions South Ferry Landing Area, Dredge Station No's. 470+00 to 472+00", Binder No. 1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.
- Renda Marine, 2001. "Request for Equitable Adjustment for Differing Site Conditions Damages and Delays Related to Obstructions No. 2 in Channel (Station No's. 660+00 thru 685+00)", Binder No.1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.
- Renda Marine, July 1999. Letter from Renda Marine to Mr. McClenan, Department of the Army, Galveston District Corps of Engineers.
- Renda Marine, 1999. "Dredge *Millennium* Accepted Proposal", letter to William J. Wetta II, from Eddie R. Fisher from Renda Marine Inc.
- Turner, T.M., 1984. "Fundamentals of Hydraulic Dredging", Cornell Maritime Press.
- Turner, T.M., 1996. "Fundamentals of Hydraulic Dredging", Second Edition, ASCE Press, 258 pp.
- U.S. Army Corps of Engineers (USACE), 1998. "Houston-Galveston Navigation Channels, Texas (45-Foot Project), Specifications for Dredging the Upper Bayou", Department of the Army Galveston District, Corps of Engineers Galveston Texas, Invitation No. DACW64-98-B-004.
- U.S. Army Corps of Engineers (USACE), 1998. Houston-Galveston Navigation Channels, Texas (45-Foot Project), Construction Drawings.
- U.S. Army Corps of Engineers (USACE) Inspection Report of Dredging – Galveston District

# 4 STATEMENT OF OPINIONS

I was asked by the DOJ to provide my expert opinion on the three claims made by Renda Marine, and on various other questions asked in letters from DOJ dated May 9, 2003 and October 24, 2003 (Appendix B). The following sections will present my responses to questions that I was asked to consider. For each claim, I will provide a brief summary of my general understanding of the claim, and then present my general opinions regarding each claim. I will then address the specific questions asked by DOJ.

## 4.1 Pre-Bid Site Investigation

In the May 9, 2003 letter from DOJ to Anchor, I was asked to address the following question:

> *"Would a reasonably prudent dredging contractor have performed a site investigation prior to submitting a bid for the Upper Bayou Project? If so, what should the pre-bid site investigation have entailed insofar as the dredging part of the scope of work is concerned, considering (a) the nature and size of the undertaking, (b) the time available for performing a site investigation prior to submission of a bid, and (c) the Site Investigation clause contained in the contract?"*

Prior to submitting a bid, a contractor has to consider different features that will affect the production of a hydraulic dredging job and that can have an impact on the dredging activity. These features are related to material characteristics as well as site use and conditions. For example, before bidding on a job, a dredge contractor has to pay particular attention to items such as:

1. Characteristics of the material to be dredged including grain size and specific gravity
2. Stiffness of material to be dredged
3. Depth of dredging to grade
4. Depth of dredge cut face
5. Width of dredge cut
6. Length of pipeline
7. Elevation change from the dredge site to the disposal area
8. Current velocity condtions
9. Tidal range
10. Ship or vessel traffic, number of passings
11. Number of stoppages due to debris
12. Existing industry along the shorelines
13. Ferry or other vessel supervisor coordination

Prior to submitting a bid for this dredging project, a reasonably prudent contractor would perform a site investigation in order to familiarize himself with the site and to identify features that affect dredging operation in addition to the information presented in the project specifications. This site visit is an important step in the preparation of the bid package. The range of site conditions and dredge material characteristics will dictate the type of equipment and the power required of the pumps and cutter to achieve the desired rate of dredging. A clear identification of site specificities will help the contractor to determine additional items to consider in selecting his dredge specifications such as:

1. Length of the ladder and ladder angle/max
2. Length of dredge hull
3. Width of dredge cut for a 45° to 45° swing
4. Cutter type, horsepower, and RPM (revolutions per minute)
5. Ladder pump vs. no ladder pump
6. Maximum discharge pressure available
7. Pump horsepower available
8. Power and speed of swing winches
9. Need for a booster pump (located on the hydraulic transport pipeline)
10. Power and speed of spud operations

The job was advertised on June 16, 1998 with an original bid opening date on July 17, 1998. A pre-bid meeting with project personnel from the USACE was held for the contractors on June 23, 1998 for the purpose of answering contractors' questions and/or giving clarification of the specifications. Renda Marine did not sign the attendance list at this meeting and is presumed to have not attended.

The one-month period allowed to contractors to prepare their bid is typical of the USACE contracting practice. Based on my past experience as a dredging contractor, there was sufficient time from advertisement to bid opening for a contractor to perform a thorough site investigation on which to base their bid.

Although primarily concerned with the deepening and widening of the Houston Ship Channel, the contract specifications were also concerned with the construction of disposal area levees on Lost Lake Island. Because of the specified complexities for this type of project

(i.e., dredging, transport to upland placement sites, active navigation channel), it is standard practice for a contractor who intends to bid on a project to visit the dredging project site and dredged material placement locations to determine answers to their logistical questions (e.g., where to change crews, where to install pipelines both floating and submerged, and to determine the vessel traffic pattern for the area), in order to limit their risk and prepare a bid.

A reasonably prudent contractor, during the site investigation in preparation of his bid, should have examined the existing shoreline bank protection and noted the type of shoreline protection materials used, as well as estimating (using best professional judgment or contacting the group responsible for maintaining the shoreline protection, such as County public works) when the shoreline protection material was originally placed and/or maintained, and what equipment was likely used to place the material.

Bank protection material that was placed with floating equipment and floating material barges will likely extend farther into the water than bank protection material placed with land-based equipment. A marine operation is also likely to spill some quantity of shore protection material outside of the required or designed slope protection areas. This spilled quantity may be significant and could affect dredging productions and stoppages for cleaning the pump. A reasonably prudent contractor also needs to determine the tide and currents to be expected in the areas and to generally observe any job features that could impact the cost of performing the work such as exposed riprap close to the channel and vessel traffic.

The presence of vessels within an active navigation channel should always be anticipated, regardless of whether a site investigation is performed. However a site investigation would reveal traffic patterns, frequency of vessels transit within the dredge area, size of vessels and their navigation needs. Please note that contract drawing C-6 required the contractor to *"...coordinate with ferry supervisor to avoid conflicts with ferry operations."*

This project also included a levee building/raising aspect for the disposal area levees on Lost Lake Island. A reasonably prudent contractor would have investigated the Lost Lake area at great length to evaluate several key aspects of this job such as (a) the condition of the

existing disposal area and dikes, and (b) the type of material previously disposed on the area taking note of its stiffness, color, specific gravity, size of any "clay balls" still visible and any other soil characteristics that could hinder or help the construction of the levees. The contractor would also need to identify a location for staging the shore operation (i.e., where the hydraulic pipeline transporting the dredged material comes up on shore) as well as to inspect the areas of the proposed weirs.

In conclusion, a reasonably prudent contractor would have spent considerable time investigating the site to assist in determining the cost of dredging and the construction of the disposal area levees. This site investigation typically would be performed with an experienced person or team, familiar with the job requirements including current methods of constructing levees using hydraulically placed clay materials, and the costs associated with the dredging and construction of levees using the hydraulic dredge method.

### 4.2 South Ferry Landing Claim

This section presents an overview of my opinions regarding the South Ferry Landing Claim, and presents my responses to DOJ questions asked in their May 9, 2003 letter.

<u>General Understanding of Claim</u>

My general understanding of the South Ferry Landing Claim is that Renda Marine claims there was riprap, rubble and other debris encountered within the required excavation prism, and that Renda Marine was not given sufficient information to anticipate the presence of these impediments to dredging.

<u>General Opinion</u>

Upon reviewing the available information, my opinion is that the amount of debris present was not excessive and should have been expected by a reasonably prudent contractor upon conducting a pre-bid site investigation. The basis for my opinion is discussed in more detail in the following response to question sections. It is also important to note that the bid specifications (Section 02482 - Dredging, paragraph 3.4.4.2 Debris) required the contractor to conduct its own pre-construction inspection to determine the presence of debris that may interfere with dredging:

> *"Prior to dredging, the Contractor shall carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the Contractor deems suitable to locate any debris which may interfere with dredging operations..."*

In addition, the post-dredge cross sections taken in the South Ferry Landing area (post-dredge cross sections 470+00, 472+00, 476+00, 480+00 and 484+00 [Figures 2-5]) all indicate that the contractor severely overdredged both the slopes and required dredge elevation, beyond the required design. I conclude that if there were dredging delays caused by riprap, rubble, or other debris, those difficulties were caused by the overdredging of the side slopes, which would cause slope protection materials outside of the required dredging limits to fall into the required excavation prism, resulting in the need to remove those materials. The basis for this opinion is discussed in more detail in the following response to questions sections.

The contractor initially attempted to dredge the South Ferry Landing area using a floating pipeline when working from the east end of the site and proceeding westerly. These initial operations resulted in significant downtime due to having to reposition the dredge and floating pipeline in relation to ferry and ship traffic. It is important to note that a reasonably prudent contractor should have coordinated with the ferry supervisor as required in Contract Drawing C-6 to ascertain the type, frequency and timing of vessels calling at the landing. Based on experience, a reasonably prudent contractor would also have installed a submerged pipeline at the start of the project in that location to avoid excessive downtime from vessel traffic. It is important to also note that Renda Marine did in fact replace the floating pipeline with a submerged pipeline on April 7, 2000 and dredged in the northerly downstream direction, which resulted in fewer delays and increased production.

#### *4.2.1 South Ferry Landing Claim, Question 1, May 9, 2003 letter.*

*"Considering the soundings and depiction of "existing riprap and rubble shore protection" at the North Ferry Landing and the note that the contractor "shall coordinate with ferry supervisor to avoid conflicts with ferry operations" on Drawing C-6, what action(s) would a reasonably prudent dredging contractor take?"*

The specifications (Section 02482 - Dredging, paragraph 3.5.2 Side and End Slopes) state that:

*"The Contractor shall be required to use caution when cutting the side slopes in the Channel from station 470+00 to station 473+00...Excessive cutting outside the side slope lines and grades in theses reaches of the Channel may cause damage to existing structures along Channel. If the Contracting officer determines that excessive cutting of the side slopes in these reaches causes failure of existing structures, the Contractor shall be responsible for restoring the structures to their pre-dredging condition. Therefore, the Contractor may consider shaping the top of the cut in these reaches by using the dredge cutter head or mechanical equipment."*

This warning was meant to alert the contractor for the need to take extra care in excavating the slopes in this area. The contract drawings indicate the presence of slope protection on the north side of the channel. I also noted the presence of that riprap during my site visits. Based on the overall appearance and condition of the slope protection, I observed that this slope protection material had been in place for many years. Also, I observed that slope protection material is placed on the above water part of the upper slope, most likely to prevent erosion from wave forces. Based on my experience, it is unlikely that there would be significant slope protection material found within the channel lines. Wind induced and ship induced waves within a confined navigation channel are typically not large (i.e., less than a few feet in height) therefore, slope protection typically is placed on the upper slope extending to several feet below the waterline to prevent erosion from wave attack, but would not typically extend below water depths of greater than approximately ten feet. This is evidenced on the contract drawings of the north slope (Contract Drawing C-6) where the riprap material ends approximately 70 feet from the toe of slope. During my site inspection, the presence of visible riprap on the south side access road alerted me (and should have alerted the contractor) to the probable presence of riprap on the south side, adjacent to the South Ferry Landing.

A box-cut is simply a series of small cuts down the slope that resemble stair steps because the contractor is attempting to match the required slope grade without excavating excessive material from the slope (Figure 10). Box-cutting of the slope is to be used sparingly and when used, the boxes need to be quite small, less than one cutter diameter, and confined to the outer face of the slope line.

With respect to downtime from vessel traffic, the contract specifications (Section 02482 – Dredging, paragraph 3.4.4.2 Debris) and contract drawings (Drawing C-6 Note 2) were clear that the contractor was responsible for coordinating with the ferry supervisor to avoid conflicts with ferry operations. As previously mentioned, based on experience, a reasonably prudent contractor would have installed submerged pipeline at the start of the project in that location to avoid excessive downtime from vessel traffic. It is important to also note that Renda Marine did in fact replace the floating pipeline with submerged pipeline on April 7, 2000 that resulted in fewer delays and increased production.

#### 4.2.2 South Ferry Landing Claim, Question 2. May 9, 2003 letter.

*"What, if any, assumption(s) would a reasonably prudent dredging contractor make about conditions, including shore protection at the opposite terminal, i.e., the South Ferry Landing?"*

A reasonably prudent contractor would assume that slope protection on the south side would be similar to the slope protection as shown on the north side since it is reasonable to assume that the wave conditions and slope material conditions are similar on both sides of the channel. This erosion protection would typically extend to near the top of the slope and would be subject to sloughing into the required dredge cut if the slopes were overcut.

A. *"Would a pre-bid site investigation by a reasonably prudent contractor have disclosed the presence of riprap and rubble shore protection at the South Ferry Landing?"*

A reasonably prudent contractor conducting a pre-bid site investigation would notice that the approach road leading to the South Ferry Landing was protected with riprap and some broken concrete to protect the road from erosion from waves

generated by the wind and passing vessels. During my site visit in June 2003, I observed, based on the aged condition and disrepair of the slope protection, that the South Ferry Landing area slope protection appeared to be well used and the slope protection probably had been repaired at various times in its past.

B. *"Did the riprap and rubble shore protection at the South Ferry Landing constitute an impediment to dredging operations? If so in what way(s)? If not, why not?"*

The slope protection on the approach road to the ferry landing did not constitute an impediment to the required dredging. The slope protection material on the north side of the channel (as shown on Contract Drawing C-6) did provide a basis for assuming that the slope protection on the south side was similar to the slope protection on the north side as shown on Drawing C-6. The slope protection on the north side extended to within approximately 70 feet of the toe of the cut. A reasonably prudent contractor should have assumed that a similar situation existed on the south side of the channel. A reasonably prudent contractor would have used the visual observation of slope protection material in close proximity to the top of the designed slope as a warning that they needed to take extra care while dredging the slope. A reasonably prudent contractor would not have overcut the slope causing it to slough which could bring slope protection materials into the required dredged cut.

C. *"Would it be reasonable to assume that dredging operations could disturb the riprap and rubble shore protection at the South Ferry Landing?"*

It is not reasonable to assume that dredging operations could disturb the riprap and rubble shore protection at the South Ferry Landing had the contractor stayed within the required limits of dredging. The actual South Ferry Landing is outside of the dredge slope line limits; therefore the slope protection should not have been disturbed, provided the contractor took care not to overdredge the design slope.

Based on reviewing the excessive overcutting of the slopes at the South Ferry Landing area, it is reasonable to assume that the dredging operations disturbed the

riprap and rubble shore protection material and that some of this material sloughed off the slope and down into the required dredging prism. See Figures 2 to 5 for the post-dredge cross sections that indicate the extreme overcutting that occurred.

Based on my experience, a hydraulic dredge could effectively excavate the design slopes specified without causing a failure of the slope outside of the designed slope line (i.e., 1 vertical to 3 horizontal [1:3]), and could excavate the design slopes without significantly overcutting the slopes. Modern positioning equipment such as a Global Positioning System (GPS) or Differential GPS (DGPS) with an on-board monitor will allow a dredge operator to conduct their dredging to within a typical equipment accuracy of ± 3 feet horizontally and ± 0.5 to ± 1 foot vertically of the designed cut lines on slopes and in the channel. Using real time positioning equipment, which is fairly standard within the dredging industry, the dredge operator can actually see the position of the dredge cutterhead in relation to the designed slope on a monitor and avoid over-cutting the slope. It should be noted that it is not sufficient to have this modern equipment on board; it must also be calibrated and working properly and operated by an experienced crew.

A contractor that does not take advantage of the modern positioning equipment is likely to overcut the slopes and excavate considerable quantities of material from outside of the authorized pay-lines. However, based on past experience, the degree to which Renda Marine overcut the slopes and channel areas is extremely excessive. A reasonably prudent and experienced contractor would not have intentionally allowed such excessive overcutting. The post-dredge survey cross sections (Figures 2 to 5) are direct evidence that the contractor either (a) did not have adequate positioning control equipment, (b) did not properly utilize their positioning control equipment, or (c) did not have an experienced dredge operator to ensure that care was taken when dredging the slope area as specified in the USACE bid specifications (Section 02482 – Dredging, paragraph 3.5.2 Side and End Slopes).

i. *"If so, what amount of overcut might be a disturbance to the riprap and rubble shore protection at the South Ferry Landing?"*

Based on my experience, the design slope (1V:3H) selected by the design engineer is based on a static slope stability evaluation to determine a slope that will remain stable under ambient conditions. A 1:3 slope usually represents a stable condition for sandy material. Since the slope area, which included new work areas, likely comprised both consolidated and unconsolidated[1] materials, a temporary construction slope steeper than 1:3 (between 1:1 to 1:2) would occur. Because the design slope was 1:3, the contractor would likely have had to grade the slope, using box-cuts for example, to ensure removing the slope material above a 1:3 grade. Any amount of over excavation at the toe of slope would cause some failure of the slope but this failure would be relatively confined to the area of overcutting when excavating in new work areas. Figure 11 illustrates this point.

The only indication in the specifications of the proximity of the slope protection to the toe of cut in the channel is on Contract Drawing C-6 that shows the approximate location of riprap on the north side of the channel (approximately 70 feet from the toe). It would be reasonable to anticipate that a similar situation exists on the south side of the channel. The specifications (Section 02482 - Dredging, paragraph 3.5.2 Side and End Slopes) warn of excessive cutting of the side slope in this area and caution that, "*...the Contractor may consider shaping the top of the cut [...] by using the dredge cutter head or mechanical equipment.*" It is not unusual in the dredging industry to use a clamshell dredge or other special equipment to excavate areas where there is a possibility of coming across riprap within the dredge prism.

[1] Sediments consolidate over time as additional layers of sediment are deposited, or when external loads (i.e., logs and other debris) are placed at the surface. The weight of the overlying material or external load causes water to be expelled from within the sediment mass thus resulting in a stiffer/harder material (consolidated material). These sediments are generally more difficult to excavate in comparison to softer, more recently deposited sediment (unconsolidated material).

Based on experience with how slopes behave temporarily during construction, it appears likely that Renda Marine box-cut the slope in order to achieve the required grade, but had poor positioning control that resulted in their excavating excessive slope material, including any slope protection material that was present on the overcut slopes. For example, the post-dredge cross section at station 472+00 (Figure 3) shows an overcut of approximately 35 feet horizontally at the top of the dredged slope (approximate elevation of –22 feet MLT [Mean Low Tide]). This overcut likely caused any slope protection material in this area to fall into the required dredge cut that would become a problem for the hydraulic dredge to excavate.

ii. *"What amount of overcut would a reasonably prudent dredge operator allow in the vicinity of the South Ferry Landing?"*

Modern positioning equipment such as GPS or DGPS allows a contractor to position the dredge cutterhead with a horizontal tolerance of ± 3 feet. Modern depth gauges will allow for vertical tolerances of around ± 0.5 feet. Actual vertical accuracy varies depending upon the dredge equipment, but vertical accuracy within ± 1 foot is considered typical and reasonable. The allowable overdepth specified in the design is a standard allowance in dredging contracts to account for equipment accuracy when trying to meet the required dredging depth. Therefore, based on my experience, overcutting in the horizontal direction of less than approximately six feet is considered reasonable, while overcutting in the vertical of less than two feet is considered reasonable with standard hydraulic dredging equipment. These values represent twice the accuracy that typically can be achieved using adequate positioning equipment.

For this project, the post-dredge survey cross sections show an excessive amount of overcutting, both horizontally and vertically. The new (i.e., post-dredge) toe of slope (based on the post-dredge survey) extends horizontally as much as approximately 25 to 30 feet past the design toe of slope (Figures 2 to 5). The new top of slope (based on the post-dredge survey) extends as much as 35 feet past the design slope line. The post-dredge survey cross sections also show that

Renda Marine overdredged up to six feet below the required dredge depth, and consistently overdredged by several feet throughout the South Ferry Landing area. These slope and channel overcuts are consistent on both the south and north sides of the channel, indicating that this problem was due to a lack of adequate positioning control.

iii. *"What factor(s) relating to the operation of the dredge Millennium might contribute or result in a disturbance to the riprap and rubble shore protection at the South Ferry Landing (e.g., equipment not functioning properly, operator inexperience with the dredge)? Did any such factors contribute or result in a disturbance to the riprap and rubble shore protection at the South Ferry Landing?"*

The main factor that likely contributed to sloughing of hard slope protection materials appears to be due to a lack of adequate positioning control on the dredge. A determination could not be made whether this involved a lack of adequate equipment, equipment malfunctions, or inexperienced dredge operators. The Renda Marine Report of Operations (Daily Report of Operations showing locations, delays, volumes, dredges), do not indicate that the dredge operator was utilizing modern navigation equipment in this area. The post-dredge survey cross sections show that the operator did not have adequate horizontal and vertical positioning equipment for performing close tolerance dredging on the slopes or on the bottom of the cut. The pay volume in the USACE payment estimate (Appendix C) indicates that Renda Marine dredged a "Total to Date" dredging pay volume of 3,425,642 CY of material. The CD-Rom obtained from DOJ containing Drawings, Pre- and Post Dredging Cross-Sections, Surveys and Volumes (DOJ September 2003) indicate a Total Excessive Dredging volume of 843,095 CY. This over-dredging amounted to approximately 25 percent of the total project volume. Based on experience, over-dredging typically does not exceed 5 to 10 percent of the total project volume. This large over-dredge volume indicates that the dredge either did not have good positioning equipment that functioned properly, or if such equipment was on board and working properly, the leverman was not paying close attention to the position monitor.

Over-dredging the slope in this area would disturb any slope protection material within the area adjacent to the top of the slope and would cause this material to travel down the slope and encounter the cutter, causing plugs in the pump, cutter, and pipeline.

### 4.3 Flare Area Claim

This section presents an overview of my opinions regarding the Flare Area Claim, and presents the responses to DOJ questions asked in the letter dated May 9, 2003.

**General Understanding of Claim**

My general understanding of the Flare Area Claim is that Renda Marine claims that differing material conditions than those shown on the contract drawings, and as indicated in the contract boring logs (presented in the plans and specifications) within the Flare Area, resulted in decreased production rates. Renda Marine claims that the unanticipated presence of "stiff or dense" clay was substantially different from the softer clays that were indicated in the bid documents, as interpreted by Renda Marine, and that the dredge production was substantially reduced by the presence of these "stiff clays."

**General Opinion**

There are four main parts to my opinion with regards to the Flare Area Claim:

- The boring logs and pre-bid site investigation are considered sufficient information for a reasonably prudent contractor to anticipate that there is clay material throughout the dredge cut, and to determine that the clay material would be likely to form "clay balls" (based on moisture content from the boring logs). The formation of clay balls is the main reason that clay material is difficult to transport in a hydraulic dredged pipeline. The "stiffness" of clay typically refers to the ability of the dredge cutter to excavate the material, rather than describe its difficulty in transporting the material. Once excavated from the in-situ, soft clays or stiff clays are transported in the same manner, and only the presence of "clay balls" results in difficulty in pumping the clay material. A site visit to the levee areas in June 2003 indicated the presence of "clay balls" based on visual observations alone. A pre-bid site investigation of the placement areas, where the USACE specified the clay material to be used for the levee maintenance, would also have indicated the presence of "clay

balls" and "stiff" clay from past dredging activities. A reasonably prudent contractor would have assumed that new work dredging (i.e., Flare Area) would also result in the formation of "clay balls" that are more difficult to transport than finer grained material.

- Renda Marine did not use a booster pump[2] until July of 2000. Until then, they did not provide sufficient pipeline pressure (in feet of head) in the pipeline system to effectively pump the clay material the required distance at the required velocity. The basis for this opinion is discussed in Section 4.5.1.
- The available Renda Marine Report of Operations do not mention the presence of stiff clay in the material description section of their report (reports from January 17 to March 15, 2000) and do not indicate that Renda Marine had difficulty in cutting the material to be dredged (including the alleged "stiff" clay), indicating that the "stiff" clay did not behave significantly differently, as far as "cutting" the material, than other clays that were being dredged. Renda Marine's problem was the inability to maintain an adequate pipeline velocity while pumping "clay balls" over long distances.
- When it became evident that the contractor could not pump the clay material at a reasonable production rate using only the ladder pump and dredge main pump (as evidenced by decreased hourly production rates and by significant plugging within the pipeline), a reasonably prudent contractor would have quickly installed a booster pump in the transport system to increase the velocity of the slurry and to avoid plugging the pipeline.

My interpretation of the boring logs within and adjacent to the Flare Area (boring logs 3ST-4, 3ST-5, 3ST-6, 3ST-7, 93-62, 93-63, 72-105, 3ST-8W [Figures 2, 7, 8 and 9 ]) is that below approximate elevation –30 feet MLT there is a significant amount of clay with moisture contents of less than 20 percent. The -30 feet MLT elevation represents an average approximation using the boring logs. It has been my experience that clays with lower

[2] A booster pump is an additional material handling pump used to increase pipeline pressure. This pressure increase will result in an increase in the velocity of the fluid mixture in the pipeline. The booster pump is usually separate from the dredge, and is not to be confused with the ladder pump and /or the main dredge pump, which are a part of the dredge. The booster pump can be located close to the dredge or could be separated from the dredge by long distances. Most dredge operators prefer to place the booster in a convenient location for crews and supplies and also prefer to place the booster in a location where the hydraulic transport pipeline still has positive pressure when the material enters the booster pump.

moisture content can be expected to form balls (i.e., "clay balls") in the pipeline thus increasing the difficulty to pump the material.

"Clay balls" behave as large sized particles, such as gravel or rock, rather than as fine-grained materials, and require much higher pipeline velocity to keep them in suspension. Once the "clay balls" fall out of suspension (due to low pipeline velocity), they start to clog the pipeline, eventually plugging it unless the dredge operator adjusts their operations to increase flow velocity, or decrease the solids concentration within the pipeline. "Clay balls" are a common occurrence on hydraulic dredging projects where clay is present and a reasonably prudent contractor would have factored the likely formation of "clay balls" in its pipeline in determining whether to use a booster pump in the hydraulic system.

Because the USACE contract specified that the clays present in the required excavation were to be used for the construction of levees, based on my experience as a dredging contractor, it is my opinion that a reasonably prudent contractor should assume for their bid that there were adequate levee building clays in the required excavation and would realize that the primary source of clays was in the widening areas (since those were the new work areas), and mainly within the Flare Area. The dredging within the channel limits would not be expected to have material suitable for levee construction, since the material within the channel limits are infill material, thus predominantly expected to be loose silts, sands, and clays. The widening areas would be expected to contain consolidated material that would be much more suitable for levee construction, and the Flare Area has the widest cuts of new work material thus containing the greatest volume of new work material.

It is my understanding that the contractor used a concept termed the "Measured Mile" (see Flare Area Claim) to negotiate with the USACE additional cost to complete the Flare Area job. The "Measured Mile" concept, as understood, is based on an average production rate that was achieved by dredging maintenance material. The "Measured Mile" was used as the basis for the production rate that should have been achieved within the Flare Area when dredging "stiff" clay.

It is critical to note that the "Measured Mile" production rate was obtained by using the rates achieved by dredging loose, unconsolidated infill material (otherwise known as

maintenance material). The maintenance material was primarily fine-grained material and would easily be dredged and transported long distances without the need for a booster pump, as is common for maintenance material. Figure 12 shows relative differences between the production rates for maintenance material (typically silts), versus larger particle sized material (such as sands, gravels and "clay balls.")

I do not consider Renda Marine's "Measured Mile" example to be valid for negotiating a reasonable price for delay of work at the Flare Area, since there was a significant difference in material type and "pumpability" when dredging maintenance material versus the specified new work material (i.e., Flare Area clays). Based on my experience, the "Measured Mile" production rate is not representative of the production rate achieved when dredging clay material.

### 4.3.1 Flare Area Claim, Question 1, May 9, 2003 letter.

*"How would a reasonably prudent dredging contractor have interpreted the contract plans and specifications insofar as the nature of the materials to be dredged in the Flare Area (approximately station 520+00 to 550+66) is concerned?"*

The Flare Area is a widening of the channel to allow for the passage of vessels or to provide an area for vessels and tows to stop and be out of the way of normal traffic in the ship channel. This Flare Area is a new widening of the channel and contains material that has never been dredged (i.e., new work material) that can be assumed to be native material.

The borings taken directly within the Flare Area (93-63 and 93-64) are more recent borings, taken in the past few years, while the other borings in the adjacent channel (i.e., borings 3ST-1 to 3ST-11) were taken prior to the last deepening of the channel in the 1960s. The newer borings indicated the presence of clay material below the soft top material. The older borings are consistent in taking note that there are clays present throughout the boring but more concentrated below approximate elevation –30 feet MLT.

The older borings represented pre-1960s conditions adjacent to the Flare Area; a reasonably prudent contractor would use both sets of boring data and would assume

that the older borings would likely be representative of the new work condition in the Flare Area. An experienced dredging contractor knows that "clays" are older, sedimentary deposits and are usually deposited in fairly uniform layers. It would be unreasonable to assume that this Flare Area was the only area in the channel that did not contain clays with low moisture content below approximate average elevation of –30 feet MLT.

Based on experience, I conclude that a reasonably prudent contractor would assume that the materials to be dredged in the Flare Area below approximate average elevation of –30 feet MLT would be a clay type material consistent with the older, adjacent borings.

As discussed previously, clays with low moisture content have an increased likelihood of forming "clay balls," which impact the ability of the hydraulic system to transport the material long distances. The Renda Marine Report of Operations dated December 1999 indicates that when Renda Marine started to dredge immediately east of the Flare Area at approximate channel Station 519+00, the shore pipeline had been extended to a placement area that required clay for the construction of levees. This indicates that Renda Marine expected to encounter clay materials in the Flare Widening Area. In addition, Renda submitted to the USACE a dredge material disposal map (Appendix D) that shows that Renda anticipated pumping "clay materials" from this area for the construction of the levees.

The plugged pipelines, commencing on about December 15, 1999, are direct evidence that Renda Marine did not provide sufficient pipeline pressure to provide a pipeline flow velocity to effectively pump "clay balls" for distances in excess of approximately 9,000 feet. This situation resulted in significantly reduced production rates for pipeline lengths between 9,000 feet and 11,000 feet, accompanied by plugged pipelines at distances over 11,000 feet, as shown in a summary of Renda Marine's Report of Operations (Appendix E). As previously noted, a reasonably prudent contractor would have installed a booster pump in the system as soon as they were aware of the reduced production rates or pipeline plugging.

#### 4.3.2 *Flare Area Claim, Question 2, May 9, 2003 letter.*

> *"Do the soil borings 93-62 and 93-63 constitute a reasonable basis upon which to assess or predict the nature of the material in the Flare Area? Would a reasonably prudent dredging contractor consider any other soil borings in assessing or predicting the nature of the material in the Flare Area? If so, which soil boring(s) and why?"*

Boring logs 93-62 and 93-63 are more recent borings and show clay of varying moisture content for almost the entire depth of the borings except for a thin layer of recent infill at the top of the boring (i.e., surface). The elevations noted at the boring locations are approximately –33 feet MLT for boring 93-62 and –46 feet MLT for boring 93-63. Both borings show clay below the surface. There are other borings (i.e., 3ST-1 to 3ST-11) in the adjacent channel that represent pre-dredge conditions before the channel was dredged in the 1960s and that also show the presence of clay.

A reasonably prudent contractor would have used all available borings in the general area to assess the nature of the material to be dredged. For the Flare Area, this would include borings 3ST-1 to 3ST-11 and 93-62 to 93-65. A reasonably prudent contractor would have assumed that the clay materials would be encountered in most of the widening areas below approximate elevation –30 feet MLT. The clay materials in the channel widening and the Flare Area are the clays intended for use in the construction of the new levees. Based on my experience in preparing bids for similar projects, I conclude that the borings provide a reasonable basis for a reasonably prudent contractor to predict the nature of material within the Flare Area.

### 4.4 The Obstruction Claims

This section presents an overview of my opinions regarding the Obstruction Claims, and presents the responses to DOJ questions asked in the letter dated May 9, 2003.

<u>General Understanding of Claims</u>

My general understanding of the obstruction claims is that Renda Marine has claimed that they encountered miscellaneous debris items and trash that caused plugs in the ladder and main pump, as well as causing the need to clean the cutter of wire and other debris. Renda Marine claimed that the debris and trash encountered was not identified in the bid documents and was unusual in nature, and should not have been anticipated. Renda

Marine also claimed that they encountered several "obstructions" which consisted of 1) a Conex steel container box, 2) a sunken steel mooring buoy, anchor, and chain, 3) an old piece of stern swivel from a large dredge, 4) other items such as wire rope, tires, chain, metal trash, and other miscellaneous debris; and that these obstructions caused damage to equipment and delays to the project.

**General Opinion**

Based on my experience working as a dredging contractor, my opinion is that a reasonably prudent contractor would have known that this channel has been in use for approximately 100 years and would have expected to encounter miscellaneous debris and trash as part of dredging (i.e., debris and trash are considered incidental to performing dredging within the ship channel). The Houston Ship Channel has seen all types of marine traffic from large ships to small vessels and miscellaneous marine construction equipment. This marine construction equipment included large suction dredges that had been used to deepen and maintain the ship channel.

The specifications (Section 02482 paragraph 3.4.4.2 Debris) instruct the contractor to *"...carefully inspect the entire area to be dredged, from estimated top of cut to top of cut to locate any debris which may interfere with dredging operations."* An experienced dredging contractor would realize, for example, that sometimes buoys sink and are not found and recovered, or sometimes parts are knocked off a dredge or other vessels and not found. Active navigation channels that are routinely maintained or have constant vessel traffic almost always have debris and trash present, especially in areas used by water dependent industries. In the past, it had been common practice for dredgers and other marine contactors to dispose of used wire rope and miscellaneous steel and debris on the banks of the ship channel. A reasonably prudent contractor would have anticipated that the act of widening this channel would cause the dredge to encounter some of this old discarded debris.

The larger obstructions encountered during dredging (for example, the Conex steel container box and the dredge stern swivel) are not typical of what a reasonably prudent contractor would anticipate as part of the dredging. Upon encountering the large obstructions however, a reasonably prudent contractor would cease dredging operations in

that area, move to another area to continue dredging operations, and notify the USACE construction manager of the obstruction to determine its disposition.

#### 4.4.1 Obstruction Claims, Question 1, May 9, 2003 letter.

*"What allowance for trash in the Houston Ship Channel would a reasonably prudent dredging contractor include in a bid for the Upper Bayou Project?"*

The Houston Ship Channel is similar to other ship channels, with respect to the presence of debris and trash, such as the channels at the Ports of Los Angeles and Long Beach (California) the Columbia River Ship Channel (Oregon), as well as the Sacramento and San Joaquin Ship Channels in California. Ship channels contain many types of trash from the surrounding area and industries that are adjacent to or use the channels.

The Houston Ship Channel has been in use by small vessels as well as large ships for over 100 years. Over the course of time, vessels as well as industries have dumped unwanted materials in the area as a natural disposal area with little thought to its impact on the environment or any future deepening of the channel. The project site has undergone numerous maintenance dredging events in the past and there would be many past opportunities for previous contractors and vessel operators to leave old cables and other miscellaneous debris on the slopes adjacent to the main channel.

The Upper Bayou Project's main objective was to widen and deepen the Houston Ship Channel, which means that much of the area outside of the existing channel lines had never been dredged. Consequently, a reasonably prudent contractor would have assumed that trash and debris from many years would have been deposited and accumulated along the channel. There are also many small industries on the bank of the Houston Ship Channel that contributed to the amount of trash and debris in the area.

A reasonably prudent contractor would have noted the presence and type of industries, old and new, bordering the channel and would have also noted the debris on the slopes. They would have been aware of the multiple use of the channel over time and would have expected to find a considerable amount of trash and debris in some of the areas outside of the established and maintained channel lines. Based on experience with dredging in many ship channels throughout the United States, I consider the Houston

Ship Channel to be typical of other ship channels, and am of the opinion that the debris/trash situation in the Houston Ship Channel dredge area is normal for the age, location, and past use of this channel.

Based on my experience, a reasonably prudent contractor would include in their bid an allowance for approximately 10 to 20 pump/cutter cleanings per day for the portions of this job that border industry, such as the area around Stations 520+00 to 570+00 (Figure 2) and the area around the South Ferry Landing. The remainder of the job could have an average of 5 to 10 pump/cutter cleanings per day. A reasonably prudent contractor would have an easy and quick method for cleaning the pumps and cutter in order to reduce the downtime due to these work stoppages.

### *4.4.2 Obstruction Claims, Question 2, May 9, 2003 letter.*

> *"How would allowance for trash on the Upper Bayou Project be reflected in a bid for that contract? Down time due to trash? Lower production rate due to trash?"*

A reasonably prudent and experienced dredging contractor would consider how the presence of trash and miscellaneous debris would affect the dredging plant proposed for this work. For instance, a 24-inch dredge cannot pass as large an object as a 27 or 30-inch dredge. Additionally, a contractor must also allow for the additional time required for each shut down when dredging with a long discharge line. This is due to the added time required to start material moving again in a long line. An experienced contractor would have a method of cleaning the main pump in approximately five minutes, the ladder pump in ten minutes and also have the proper attendant plant for rapidly clearing wire rope and other debris from the cutter.

An experienced contractor would also realize that it takes a longer time to restart dredging when pumping on a long pipeline such as a 10,000-foot pipeline. Therefore, each shut down for cleaning the pump, cutter or for other reason requires more time than would be required with a short line (e.g., less than 5,000 feet). Additionally, a submerged line requires a slower start up to allow for the air trapped in the line during a pump cleaning to be purged from the line to prevent floating of the submerged pipeline. A combination of all of these items can increase the down time due to cleaning pumps and cutter to 15 to 20 minutes for an average cleaning.

A dredging contractor usually has worked in areas with trash and has a feel as to how many stoppages might be required per shift. An examination of the river and the industries on or near the channel would provide some idea of the area that could be impacted by excessive debris that could cause the dredge to shut down or reduce production. It is not unusual to have pump blockages of 10 to 20 times per day in areas that border industries, new and old, and to have some areas with minimal stoppages when not in the vicinity of industries or mooring areas. The time required to clean the cutter or one of the pumps can vary according to the dredge and methods of cleaning.

Based on my experience, it would be reasonable for a contractor with a 24-inch dredge to experience downtime due to debris and trash and to expect up to 6 hours per day of downtime in areas near new and old industries that contain substantial quantities of trash. The normal anticipated delays in areas not subjected to discarded trash would be in the range of two to three hours of downtime per day. According to the Renda Marine letter to USACE dated July 7, 1999 (Appendix F), it appears that Renda Marine anticipated working approximately 14.5 hours per day, or 9.5 hours of downtime per day. No mention of downtime required to handle debris was mentioned: *"c. We are using a conservative daily effective pumping rate of 14.5 hours per day to take into account, movement of the dredge, pipelines and ship traffic."*

The hourly production rate will decrease in areas with significant debris due to the operator continuing to try to dredge material when a pump or cutter is half plugged. It is a natural tendency for the dredge operator to continue to pump for a period of a few minutes, with a partial plug in the pump or cutter, in the hopes that the plug will clear itself, which it sometimes does. This pumping with a partial plug results in lowered productions until the dredge is shut down and the debris is removed.

Continuing to pump with a partial plug in a pump can also cause substantial damage to the pump bearing and shaft. A rock or piece of debris in the pump causes a vibration that can be severe due to unbalancing the impeller. I have found that continuing to run the pump during a partial plug is one of the main causes of bearing seals and shaft failures on a hydraulic dredge pump pressure and vacuum.

### *4.4.3 Obstruction Claims, Question 3, May 9, 2003 letter.*

*"Did any of the following factors cause or contribute to the damage to the dredge Millennium that Renda Marine attributes to encounters with obstructions and, if so, to what extent did such factor(s) cause or contribute to any such damage?"*

A. *"Faulty operation of the dredge Millennium?"*

Renda Marine's daily Report of Operations did not adequately document standard operational conditions, such as pump pressure and vacuum, and type of debris. Because of this lack of adequate documentation, it was not possible to conclusively determine whether alleged encounters with obstructions caused any damage. I did not have first hand knowledge of the operations of the dredge *Millennium*, but based on review of the dredging records and my own experience, I have identified several key points regarding the operation of the dredge plant that are presented below.

The Renda Marine Report of Operations indicates that early in the job, when working in Section I, the dredge *Millennium* broke a spud on September 29, 1999, and replaced it on December 23, 1999, nearly three months later. This was confirmed by Leon Hrabovsky (personal communication with Leon Hrabovsky in June 2003), who indicated that Renda Marine continued to dredge for a considerable length of time before repairing the spud. This is considered "faulty operation" of a dredge by reducing the consistency of setups or advances of the dredge and reducing the horizontal positioning control of the dredge.

The Renda Marine Report of Operations shows substantially reduced hourly productions and plugged pipelines while pumping clay material from the Flare Area to the Lost Lake levee area. A summary of Renda Marine's Report of Operations is presented in Appendix E. The pipeline lengths approached 11,500 feet and the hourly production was reduced to less than 50 percent of the logged hourly productions for pipeline lengths of 8,000 feet or less. The addition of a booster to the pumping system would have enabled the dredge to maintain substantially higher production with a resultant lower unit cost even after allowing for the cost of the booster.

It is our understanding that part of the damage suffered by the dredge *Millennium* included damage to its pump shaft bearings and shaft. Based on experience, this type of damage to these equipment parts are seldom caused by the presence of debris, but are damaged if the operator continues to run the pump after it is apparent that the pump has debris in the vanes. The practice of continuing to pump with debris in the vanes is one of the main causes of failure of the pump shaft bearings and shaft. It is also standard practice to inspect pump bearings, seals, and oil and grease levels on a regular basis.

B. *"Inadequate maintenance of the dredge Millennium?"*
Based on a discussion with the Port of Houston inspector, Leon Hrabovsky (personal communication with Leon Hrabovsky in June 2003), it appears that at the beginning of the job, the mechanics on the dredge were not aware of the oil requirements for the underwater reduction gear for the cutter. The lack of oil for the gear plus the unprotected coupling between the reduction gear and the shaft would be a significant source of potential problems for the dredge.

Shaft problems with this reduction gear did occur during the job; at the end of the job, much time was lost and costs incurred due to the failure of the cutter reduction gear. The underwater cutter reduction gear had an oil seal that was subject to damage if the seal was not protected from contact by wire rope or other debris becoming entangled with the seals. The cutter gear box as well as the pump shaft and bearing problems could possibly have been prevented with an active maintenance program that would involve periodic shut-downs for maintenance where these items were thoroughly inspected and maintained. It is standard procedure for dredging contractors to try to replace worn or damaged parts prior to total failure of the parts.

I was unable to locate records indicating that Renda Marine had an established maintenance program, which is standard procedure for a dredging contractor. If no maintenance records exist, this would indicate that Renda Marine did not take maintenance of equipment seriously; reasonably prudent contractors keep detailed maintenance logs. The Renda Marine Report of Operations appears to indicate that

Renda Marine only fixed items that had broken and did not have an established preventative maintenance program.

C. *"The use of any "refurbished" equipment on the dredge Millennium?"*
Many dredges use refurbished equipment. This practice is fairly standard in the dredging industry. However, the equipment must be refurbished by qualified people and inspected to see that it was re-assembled and installed correctly. This was not done in the instance of the main swing winch that had to be re-assembled properly after the initial installation (personal communication with Leon Hrabovsky in June 2003).

One of the main drawbacks to older, refurbished equipment is the lack of spare parts at the factory level. Often, the replacement parts have to come off of similar older equipment and be repaired prior to installation on the damaged equipment. This process is time consuming and often more costly than using new parts if available.

The underwater (lower) cutter reduction gear was of Italian design that made the replacement of parts very time consuming. The use of a foreign designed gear such as this was a poor choice from the standpoint of obtaining replacement parts.

#### 4.4.4 *Obstruction Claims, Question 4, May 9, 2003 letter.*

*"Did access to spare parts for the dredge Millennium contribute to the amount of down time required by Renda Marine to repair damage to the dredge Millennium? If so, please answer the following questions:*

A. *Did Renda Marine maintain adequate spare parts for a dredge the size and complexity of the dredge Millennium?*
B. *Did Renda Marine maintain adequate spare parts for the dredge Millennium given the use of refurbished equipment on the dredge?"*

The dredge *Millennium* was mostly constructed of parts and equipment manufactured in the United States, and for the most part could be repaired within a reasonable length of time, based on my experience. The engines were General Motor standard engines with spare parts readily available. The pumps were standard Mobile Pulley pumps with

parts available within a reasonable time, although a reasonably prudent contractor would be expected to have an inventory of spare pump parts with the exception of the pump shaft. The underwater reduction gear was the main item that required a long lead-time for replacement parts and in the end it was the reduction gear that failed and caused a prolonged delay.

Upon discussing the dredge *Millennium* design with Leon Hrabovsky (personal communication with Leon Hrabovsky in June 2003), it was evident that this reduction gear had the potential for problems due to the exposure of the oil seals to damage from wire, trash, and other objects. In the end, it was a costly and time consuming delay that likely could have been prevented by better maintenance of the gear or by selecting a locally manufactured gear such as a Lufkin, Faulk, or Western gear.

### 4.4.5 Obstruction Claims, Question 5, May 9, 2003 letter.

*"What is a reasonable amount of time to make the repairs that Renda Marine alleges were caused by the obstructions?"*

The most time consuming repair, allegedly caused by obstructions, was the repair to the underwater cutter reduction gear as previously mentioned. The main pump and ladder pump also required major repair but spare parts were readily available. For this or any other reduction gear, the time required to remove, repair, and replace the reduction gear would have been a matter of three to four days with a one-week delay at the most. Faulk, Western and Lufkin gears are manufactured in the United States and in my opinion, could have been used as a replacement gear instead of the foreign built gear. If spare parts are not readily available from the gear manufacturer, there are shop drawings readily available so that a machine shop can begin making a new part within a day or so, on an accelerated basis, typically completing a new gear within a few days.

My opinion is that the repair delay would have been much shorter if Renda Marine had replaced the gear with an alternate brand, rather than repair the existing gear. A reasonably prudent contractor would have compared the options of replacement versus repair.

### 4.5 Other Questions

This section presents the response to questions asked under the "Other Questions" section in the DOJ letter dated May 9, 2003. These questions potentially relate to any of the previous claims.

#### *4.5.1 Other Questions, Questions 1 to 3, May 9, 2003 letter*

> *"Was the dredge Millennium capable of discharging materials from dredge section no. 3 to the north levee of the Lost Lake Containment Area without the use of a booster pump?"*

In order to address this question, the concept of how a hydraulic dredge transports dredged material, and what key factors affect transport distance and production rates need to be briefly discussed. This discussion pertains to questions regarding whether the dredge *Millennium* had sufficient power to pump the dredged material the required distances; therefore, this discussion also addresses Other Questions 1 to 3 and 8 to 11.

The production capacity of a hydraulic pipeline dredge is usually expressed in terms of cubic yards per pumping hour. The estimated production rate consists of (a) the total volume of slurry pumped per hour, and (b) the solids content of the slurry (the mixture of material to be dredged and entrained water that form a homogenized mixture that is pumped through the pipeline), usually expressed in terms of "percent solids by weight."

The method of predicting the required flow velocity to prevent the plugging of the pipeline, and the resulting production rate, involves a complex relationship that takes into account the following parameters:

1. The inside diameter of the pipeline
2. The roughness (i.e., friction factor) of the pipeline, joints, and turns that cause loss of pressure (i.e., head loss) over pipeline distance
3. The length of the pipeline
4. The average grain size of the solid particles
5. The specific gravity[3] of the solid particles

[3] Specific gravity represents the ratio of the density of the material to be dredged divided by the density of water.

6. The percentage of solids in the slurry mixture (i.e., mix of water and solids that are intermixed by the process of disturbing and hydraulically transporting the material to be dredged) and the resultant unit weight of the slurry mixture
7. The terminal elevation of the pipeline (i.e., elevation of the discharge end of the pipeline with respect to the elevation of the dredge)

A modern dredge pumping system is typically capable of pumping fine-grained materials such as loose sands and silts for distances in excess of 10,000 feet (when the percent solids of the slurry mixture in the pipeline is low). An increase in the grain size of the material, such as gravels and clay balls, results in an increase in the velocity required to transport the coarser material with a subsequent increase in the required pipeline pressure (or head).

The attached production rate curves (Figure 12) illustrate how relative production rates change as material type varies. These relative production rates were developed by Tom Turner of Ellicott Machine Corporation over many years, and were published in his book, "*Fundamentals of Hydraulic Dredging, 2nd Ed.*" (Turner 1996), and are considered to be reasonable approximations. Another key element for transporting material through a hydraulic pipeline is to make sure that the flow velocity within the pipeline is fast enough to keep the solids suspended. As the particle size increases from silt to clay, to a larger size, such as a quarter-inch gravel particle, so does the required flow velocity to prevent the pipeline from plugging. Table 1, obtained from the charts developed by Turner in the first edition of his book, "*Fundamentals of Hydraulic Dredging*" (Turner, 1984) and presented in Appendix G, shows typical flow velocities required for different material types and percent solids concentration.

**Table 1**
**Flow Velocity versus Material Type**

| Material Type | Pipe Diameter (inches) | Percent Solids Conc. (by weight) | Required Flow Velocity (ft per second) |
|---|---|---|---|
| Fine sand | 24 | 5 | 7.5 |
| | | 10 | 10.5 |
| | | 15 | 11.5 |
| Medium sand | 24 | 5 | 9.0 |
| | | 10 | 10.5 |
| | | 15 | 12.5 |
| Coarse sand | 24 | 5 | 11.0 |
| | | 10 | 13.0 |
| | | 15 | 14.0 |
| Small gravel/clay balls | 24 | 5 | 13.0 |
| | | 10 | 16.0 |
| | | 15 | 17.5 |

These values are approximate but are a guide to the velocity required to maintain a steady flow condition. It is important to have a condition where the materials in the slurry do not begin to settle to the bottom of the pipe, which can result in a fully or partially plugged pipeline. When the velocity in the pipeline is insufficient to maintain the dredged materials in full suspension, the materials tend to become more concentrated in the bottom portion of the pipe and begin to move slowly by sliding on the bottom of the pipe. These materials are moving slower than the average velocity, which causes them to concentrate further. When the material on the bottom of the pipe moves as a combined mass (i.e., bed load) rather than as individual particles, the cross sectional area of the pipe is decreased (i.e., the internal diameter of the pipeline effectively becomes smaller). This effective reduction in pipeline diameter further increases the friction loss per unit length of pipeline (i.e., greater head loss[4]) that causes a further decrease in velocity, eventually leading to the material blocking the pipeline. This is what is meant by the phrase, "plugging the pipeline."

[4] Reduction in pressure and energy over pipeline distance due to the friction and turbulence within the pipeline, pipe turns, bends, joints, etc.

The leverman or dredge operator must have the proper gauges and monitoring equipment to detect any decrease in the pipeline velocity. When the pipeline velocity begins to drop, it is often possible to avoid a plugged pipeline by decreasing the amount of material entering the pipeline (i.e., reducing the percent solids concentration within the pipeline). From an energy point of view, the horsepower required to pump material is a function of the cube power of the flow velocity, as shown in the following equation. All equations presented in this section were taken from Turner (1996), *Chapter 7: Horsepower vs. Line Length.*

The horsepower required to pump material over a certain pipeline length is a function of different variables:

$$HP = Q\rho H$$

where:

$HP$ represents the horsepower required to transport material.

Q represents the volume of slurry mixture that is transported in cubic feet per second.

$\rho$ represents the slurry mixture specific gravity, which is typically between 1.0 and 1.3.

$H$ represents the Head Loss over the length of the pipeline, in feet.

Furthermore, considering that:

$$Q = VA = V\frac{\pi d^2}{4}$$

where:

$V$ represents the slurry velocity in the pipeline, in feet per seconds.

$A$ represents the pipeline cross-sectional area, in square feet.

$d$ represents the pipeline diameter, in feet.

and H, the head loss, can be expressed with the following equation:

$$H = \rho f \frac{l}{d}\frac{V^2}{2g}$$

where:

$f$ represents the pipe friction factor. This friction factor is specific to the pipe and depends on the pipe material, type of joints, turns etc. $f$ is usually between 0.01 and 0.015.

$l$ represents length of the pipeline, in feet.

$g$ represents the gravity force coefficient and is equal to 32.2 feet per second squared.

Thus, it follows that the horsepower can be expressed as:

$$HP = V\frac{\pi d^2}{4} \times \rho \times f\rho \frac{lV^2}{2dg} = f\rho^2 \frac{\pi dl}{8g}V^3$$

The horsepower is a function of the cube of the slurry velocity; doubling the velocity in the pipeline requires an eightfold increase in horsepower. The above discussion conceptually illustrates the factors that affect hydraulic dredging and transport, and the remaining discussion in this section addresses questions 1 through 3.

Dredge section No. 3 starts at approximate station 510+00 and ends at station 524+00 (Figure 2). The distance from the approximate center of dredge section No. 3 to a logical landing point on the Lost Lake main levee is approximately 3,600 feet. The direct distance from the assumed landing point to the north levee is 5,000 feet while the distance via the levee is 9,500 feet, resulting in an assumed pipeline length between 8,600 and 13,100 feet (Figure 14). I determined these approximate distances by using the site map (Contract Drawing C-14) and scaling the distances from the dredging areas to various locations along the new levee alignment.

In order to evaluate the theoretical production capability of the dredge, it was necessary to establish a reasonable range of pressures that the dredge was capable of generating. I

determined the pump pressure by taking typical pump operational characteristics from the dredge specification sheet from the dredge manufacturer (Appendix F) and applying those characteristics to the pump curves for the dredge pump obtained from Mobile Pulley (Appendix H). Since the dredge daily reports from Renda Marine did not identify the pressure or RPM of the engines or electric motors, the dredge specification sheet from the dredge manufacturer was used to provide the operational characteristics of the dredge. The dredge specification sheet indicates that the following horsepower and engine speeds were typical for the dredge *Millennium*.

- Main pump maximum engine horsepower equals 3600 HP at 900 RPM
- Reduction gear ratio, 2.093:1
- The engine RPM recorded on the Renda Marine Report of Operations (800-850 RPM) are converted to pump speed by dividing the engine RPM by the reduction gear ratio (2.093), which results in pump speeds of 380 to 406 RPM
- Ladder pump rated maximum horsepower equals 650 HP

Table 2 identifies the pump pressure estimated from the pump curves; this pump pressure is the initial pressure (in feet of head) at the dredge pump location.

**Table 2**
**Pump Pressure (feet of head) from Pump Curves***

| | Main Pump | Ladder Pump | Combined |
|---|---|---|---|
| Minimum | 260 ft | 80 ft | 340 ft |
| Maximum | 290 ft | 100 ft | 390 ft |

*Pump Curves were obtained from Mobile Pulley and Machine Works, manufacturer of the *Millennium* pumps.

Using a simple relationship of head loss over pipeline length, a contractor can roughly estimate the effective pipeline length a dredge can theoretically pump without a booster using the initial pressure (in feet of head) and subtracting out the change of elevation between the water surface and the elevation of the point of discharge. Assuming a typical head loss of five feet (typical for sand material) for every 100 feet of pipeline (Turner 1996), the distance the dredge *Millennium* theoretically could pump without a booster was between 6,800 and 7,800 feet (based on the assumed 340 and 390 initial feet of head [Table 2]). These distances are less than many of the required pumping distances for the Upper Bayou Project.

Consequently, a reasonably prudent contractor should have anticipated the need for a booster pump given the capability of the dredge, and the type of material to be pumped. Figure 13 (Turner 1996) illustrates the effect of adding a booster pump to production rates for fine-grained sand. The same relative increase in production rates would be expected for pumping clay material.

To provide another method of evaluating the *Millennium*'s production capability, production rates were calculated for the various dredge sections and using different material types. The production rates were generated for operating pressures (feet of head) of 340 feet, 360 feet, and 390 feet to cover the assumed range of values. The production rates were calculated using a hydraulic production rate computer model, "PIPELINE" (Parsons Brinckerhoff 2003), and the modeling results are attached in Appendix I. Table 3 shows that the production rate is greatly reduced when the pipeline length increases, or when the material type changes from fine-grained sediment to larger particle sizes (such as "clay balls"). The model results (summarized in Table 3) demonstrate how different material types affect dredging production rates, and why a reasonably prudent contractor needs to closely monitor the material types being dredged. Table 3 identifies the assumed approximate pipeline lengths for various dredge sections and the estimated maximum carrying capacity of the dredge for each section assuming the dredge main pump was operating near an assumed maximum rated pressure. The representative pipeline lengths on Table 3 are only intended to approximate the distances to the North Levee from each dredge section. Table 3 shows the same relative relationship between decreasing production rates as material grain size increases, as was previously discussed and shown on Figure 12 (Turner 1996).

The estimated maximum production rates in Table 3 are intended to give an approximation of maximum carrying capacity of the system, without taking into consideration factors that could reduce the overall production, such as (1) small dredging face or bank, (2) currents, (3) inability to feed the system due to operator limitations, and (4) inability to feed the system due to difficulty in dredging the materials.

**Table 3**
**Estimated Maximum Production Rates at Upper Bayou**

| Dredge Section | | Representative Distance to Lost Lake [ft] | Representative Distance to N. Levee [ft] | Representative Total Distance [ft] | Ave pressure, 390 ft head Est. Maximum Production/hour (cy/hr) | | |
|---|---|---|---|---|---|---|---|
| | | | | | Fine Sand | Med Sand | Clays |
| 1 & 2 | Min | 2,000 | 5,000 | 7,000 | 2,000 | 850 | 500 |
| | Max | 2,800 | 9,000 | 11,800 | 750 | 350 | 200 |
| | Ave | 2,400 | 7,000 | 9,400 | 1,000 | 450 | 250 |
| 3 | Min | 2,800 | 5,000 | 7,800 | 1,500 | 700 | 350 |
| | Max | 4,400 | 9,000 | 13,400 | 500 | 250 | 200 |
| | Ave | 3,600 | 7,000 | 10,600 | 850 | 400 | 225 |
| 4 | Min | 4,400 | 5,000 | 9,400 | 1,200 | 500 | 250 |
| | Max | 5,200 | 9,00 | 14,200 | 500 | 250 | 200 |
| | Ave | 4,800 | 7,000 | 11,800 | 650 | 300 | 200 |
| 5 | Min | 5,200 | 5,000 | 10,200 | 850 | 400 | 225 |
| | Max | 6,000 | 9,000 | 15,000 | 450 | 225 | 200 |
| | Ave | 5,600 | 7,000 | 12,600 | 600 | 250 | 200 |
| 6 | Min | 6,000 | 5,000 | 11,000 | 800 | 350 | 200 |
| | Max | 7,600 | 9,000 | 16,600 | 500 | 225 | —[1] |
| | Ave | 6,800 | 7,000 | 13,800 | 450 | 225 | —[1] |
| 7 | Min | 7,600 | 5,000 | 12,600 | 600 | 250 | 200 |
| | Max | 14,400 | 9,000 | 23,400 | —[1] | —[1] | —[1] |
| | Ave | 11,000 | 7,000 | 18,000 | —[1] | —[1] | —[1] |
| 8 | Min | 14,400 | 5,000 | 19,400 | —[1,2] | —[1,2] | —[1,2] |
| | Max | 18,400 | 9,000 | 27,400 | —[1,2] | —[1,2] | —[1,2] |
| | Ave | 16,400 | 7,000 | 23,400 | —[1,2] | —[1,2] | —[1,2] |

1Table cells with no results were not calculated, since the results would only show decreasing production rate with increasing pipeline lengths.
2 For this section, it is assumed that the dredge would only be capable of pumping mud, given the pipeline distances, but not coarser material such as sand or "clay balls".

Based on my review of the dredge records, performing a simple head loss calculation, "PIPELINE" model results presented in Table 3 and my experience, my opinion is that the dredge *Millennium* main pump alone was not capable of efficiently pumping clays at distances exceeding about 8,000 feet (assuming an approximate 30-foot lift at the discharge location). Renda Marine's claim that the material was "stiff" was not relevant in determining the production of the dredge in the Flare Area and downstream of that area. "Stiffness" of the material could affect the ability of the dredge to excavate or cut the material from the bottom, but once the material was excavated or cut, the ability to transport the material was not dependent upon the material "stiffness." Renda Marine did not indicate that they had any difficulty in excavating the material from the bottom.

The combined pump discharge pressures were simply not adequate for pumping clay materials for that distance. A reasonably prudent contractor would have added a booster.

### 4.5.2 Other Questions, Question 4, May 9, 2003 letter.

*"Would a reasonably prudent dredging contractor have been aware that the levee maintenance at a containment area such as Lost Lake is typically performed by "borrowing" materials from within the containment area itself?"*

Material for levee maintenance of a disposal area is almost always obtained by borrowing material from the inside of the disposal area. Borrowing materials from the outside weakens the levee and can be the cause of a shear failure on the outside of the levee. The pressure on the levee is from the inside, therefore the outer edges and berms must be maintained and not used as a borrow area.

### 4.5.3 Other Questions, Question 5, May 9, 2003 letter.

*"Would a reasonably prudent dredging contractor have been aware that levee maintenance at a containment area such as Lost Lake is typically performed by "borrowing" materials adjacent to or in the immediate vicinity of existing levees?"*

The material required for levee maintenance must come from material imported from off-site or from material on-hand within the disposal area. Economics usually dictate that the material should come from within the disposal area. The material in the interior of Lost Lake had very high moisture content and the ground would not support normal hauling equipment. The most suitable material for levee maintenance is usually the top layer of dried material fairly close to the inside of the levee. Draglines and dozers usually excavate materials as far away from the existing levee as possible but sometimes this distance is quite small and results in "borrow pits" that are quite close to the inside toe of the existing levee. It is typically intended that these "borrow pits" will be refilled during the next disposal operation.

### 4.5.4 Other Questions, Question 6, May 9, 2003 letter.

*"What, if any, significance would a reasonable prudent dredging contractor place upon the depiction of the designated borrow areas at the Lost Lake Containment Area on Drawing C-14?"*

The designated borrow area on Contract Drawing C-14 depicts two mounds of material designated as borrow material for the raising of the levees around the Lost Lake placement area. The material is to be used for the mechanical construction of levees as specified. The material can be excavated to elevation +12 feet MLT in Borrow Area #1 and to +10 feet MLT in Borrow Area #2, as identified in the specifications. The mounds also provide a visual and physical example of the type of clay materials previously excavated from the channel and similar to the material to be excavated in the "new work" areas of this job.

### 4.5.5 Other Questions, Question 7, May 9, 2003 letter.

*"How would a reasonably prudent dredging contractor interpret note #10 on Drawing C-14."*

Note #10 states:

*"The foundation of the new levee is very soft to soft dredged material and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material."*

This note indicates that the alignment of the new levee is in areas that have not been stabilized and the contractor should expect considerable subsidence in some areas as well as the displacement of some of the softer foundation materials. A reasonably prudent contractor would read this note and treat it as a warning that special filling methods and/or foundation stabilization techniques will be required in some of the areas in order to achieve the desired levee section while minimizing the loss of levee materials outside of the design template. In many instances, this would mean constructing the levee in multiple lifts instead of one lift to full height. Constructing levees in multiple lifts, over soft or unstable foundation materials, is common practice when building levees. This method loads the foundation more slowly and lessens the chances for major foundation failures. These lifts are often as thin as two to five feet and can be repeated as often as required.

#### 4.5.6 *Other Questions, Questions 8 to 11, May 9, 2003 letter.*

These questions are addressed as part of the response to questions 1 to 3. The nature of questions 1 to 3 and 8 to 11 involves the ability of the dredge to pump clay materials.

#### 4.5.7 *Other Questions, Question 12, May 9, 2003 letter.*

*"What in the dredging industry is normal practice with respect to maintenance of a dredge?"*

Most dredging companies and larger dredges have maintenance policies that govern the day-to-day maintenance activities. Most dredges have a man classified as a "chief engineer" who is responsible for the maintenance of the dredging engines and working machinery and in some cases the work on the deck also. Some have a deck captain or captain responsible for the repairs outside of the engine room.

Additionally, the standard of care for dredging companies is that they usually have an established policy for major maintenance of key items such as main engines, gear boxes, pump bearings, etc. These policies ensure that the equipment is thoroughly inspected on a weekly or monthly basis to detect any trends of wear or unusual noise or vibrations. Early detection of wear problems or vibrations can often prevent failure and can serve as a guide as to what parts need to be ordered and when to establish a time for routine maintenance. Maintenance and repair logs are standard practice to help the dredging contractor keep records of maintenance cycles, when to conduct major maintenance events, etc.

The maintenance of the engines and machinery is usually done on a routine basis, either weekly or semi-monthly depending on the dredge and type of machinery. Some dredge companies shut down on Sunday and use this day for maintenance of the engine room, others schedule routine maintenance on a weekly basis where they make repairs to pipeline, pumps, and other equipment, and then start to dredge when the repairs are complete. Oil pressures and temperatures are often checked and recorded on an hourly basis and are reviewed by the chief engineer daily.

It is not unusual for machinery to start to fail long before it actually fails and it is the responsibility the dredge superintendent or operator to have spare repair parts on hand for these items. Dredges usually have spare pump and cutter parts on hand and on the

job site as well as water and oil pumps for the engines. Main pump shafts and reduction gears do not normally need replacement but if there are signs that one of these is showing abnormal wear, replacement parts are usually ordered and on hand prior to the actual failure of the part.

A. *"What is normal practice regarding preventative maintenance?"*

The dredge engine room typically has a checklist of items to be monitored on a regular basis, either hourly or daily. The oil pressures and engine temperatures are two of the more critical items to be checked and monitored. The changing of oil in the engines and the greasing of bearings is done on a regular and routine basis (i.e., daily). These items are the main preventative maintenance work. Additionally, preventive maintenance involves keeping a good record of maintenance and repair work to help schedule major maintenance events, and to understand how the job conditions are affecting the dredge equipment.

B. *"What is normal practice regarding planned or scheduled maintenance?"*

Each dredge and dredging company has its own policies regarding maintenance; however, planned minor maintenance is typically performed on a daily or weekly basis and major maintenance on a monthly or as needed basis. Each dredging job is different and for some, the main pumps must be overhauled on a more regular basis (e.g., weekly) due to extreme wear from sand and gravels. During some jobs where the material to be dredged is less abrasive, such as muds and clays, the main pumps are not a major wear item. As stated previously, monitoring of engine and mechanical items will usually reveal which items are showing signs of failing and it is up to the maintenance supervisor to make repairs when needed or to order replacement parts for these wear items to prevent excessive downtime

C. *"What is normal practice regarding major overhauls?"*

Major overhauls are normally scheduled to cover hull drydocking and maintenance of the main engines, overhaul of the winch bearings, brakes, frictions, reduction gears, shafts and bearings. All parts on dredges do not wear at the same rate, which means that the dredge owner sets their own maintenance schedule. It is not unusual to wait until the end of a job before scheduling major overhauls. The maintenance

and/or replacement of the dredge pumps, cutter, and deck discharge pipes are performed on an as-needed basis and as such are not usually considered as scheduled maintenance, but are treated as job maintenance to be performed on an as-needed basis.

### 4.5.8 Other Questions, Question 13, May 9, 2003 letter.

*"What if any maintenance plan did Renda Marine have for the dredge Millennium and did Renda Marine adhere to that plan during the period of the Upper Bayou Project?"*

I have reviewed the Renda Marine Report of Operations, daily reports, and other available records and did not find documentation of a maintenance program or plan. I would expect that the Renda Marine Report of Operations would make mention of planned maintenance, but there was no mention of maintenance activities in the records kept by Renda Marine.

### 4.5.9 Other Questions, Question 14, May 9, 2003 letter.

*"Were the cutterhead/teeth on the dredge Millennium the most suitable for the Upper Bayou Project? If not, why not? What type of cutterhead/teeth would have been better suited to conditions in the Houston Ship Channel, i.e., more effective, and why?"*

The cutter used on the dredge *Millennium* was a *"Vosta"* cutter, designed and built by a Dutch firm. This cutter is not a well known cutter in the United States but it is considered to be a well designed cutter in the dredging industry and suitable for dredging several types of material.

There are different types of teeth that can be used with this cutter: pick points for rock, wide flare for sands and muds, and various widths of teeth for cutting clays of various stiffness. Based on the capabilities of this cutter and the site conditions, my opinion is that the cutter was suitable for the majority of this job. The Renda Marine Report of Operations does not indicate that the contractor had difficulty in "cutting" or loosening the material to be dredged.

However, the teeth on the cutter have a tendency to gather the wire rope and other long debris items more readily than a smooth edge cutter. This causes a tendency to plug the

cutter more than a smooth edge. The smooth edge, however, is often not always the best edge for clays as it tends to cut the clay into larger "slabs" which sometimes have difficulty in passing the tight clearance in the 4-vane impellers in the pump, and creates larger "clay balls."

As previously discussed, the main problem Renda Marine encountered was the inability to pump the clay the required distance due to the lack of adequate pump pressure. The attached production curves (previously presented) and examples show that the dredge *Millennium* pumping system did not provide adequate pressure to pump the clays from the Flare Area to the required location on the levees except at a greatly reduced rate of production. In my opinion, changing cutters would not have improved the ability of the dredge to pump those required distances.

#### 4.5.10 Other Questions, Question 15, May 9, 2003 letter.

> *"Identify any deficiencies in the electrical and mechanical systems and controls for the dredge Millennium and assess the impact of any such deficiencies upon the productivity of the dredge."*

The records indicate that the electrical control panels were not initially watertight or protected from moisture. The electrical contractor who installed the system made strong recommendations that this be changed and did install heaters to protect the control boards.

Records (personal communications with Leon Hrabovsky in June 2003) also indicate that some of the winches were not properly assembled initially, which resulted in below normal winch speed pull, and production. This condition was discovered and corrected early in the job and there was no further mention of winch problems in the Renda Marine Report of Operations.

Based on a review of the dredge design and my experience, it appears that the main pump on the dredge was not designed to absorb the horsepower available from the main pump engine when the dredge was working on long lines with a low pipeline velocity (see Appendix H). It would have been a better dredge system design for the pump to be inefficient on short pipelines and more efficient on the longer pipelines. The

Renda Marine Report of Operations does not indicate that this was ever corrected with the result that the dredge did not generate adequate pump pressure for pumping clay on long lines (i.e., over 8,000 feet).

### *4.5.11 Other Questions, Question 16, May 9, 2003 letter.*

> *"What, if any, equipment did the dredge Millennium have to monitor the nature of the material it dredged? Was the dredge Millennium equipped with flow and/or density meters or gauges for that purpose? If so, did the flow/density equipment function properly? If not, what effect would that have upon dredge operations?"*

Mr. Ben Goodloe, one of the Renda Marine superintendents on the job, and Mr. Leon Hrabovsky of Gahagan and Bryant, stated that the dredge *Millennium* had both a velocity meter to monitor the discharge velocity and concentration meter for monitoring the specific gravity of the mixture being pumped (personal communications with Ben Goodloe and Leon Hrabovsky in December 2003). This equipment is difficult to calibrate and requires constant maintenance. Unless Renda Marine had a competent person assigned to this task, it likely did not function all the time or accurately.

Furthermore, Mr. Goodloe stated in my conversation with him that he was not sure whether the monitoring equipment was always operational. If the monitoring equipment was not working properly, the dredge operator would not have a good indication of pipeline velocity or solids concentration being pumped which reduces the ability of the dredge operator to optimize dredging production.

This type of monitoring equipment does not tell a dredge operator the nature of the material being pumped. Renda Marine did not have an instrument method to determine the type of material being pumped. Usually, the dredge operators use a radio to talk to the workers at the discharge end of the pipeline. This method for determining the nature of material being pumped is fairly standard and it is important for the dredge operator to be in fairly constant contact with the crew at the discharge end of the pipe and request information regarding the velocity and the type of material being pumped in order to optimize dredging.

### 4.6 Additional South Ferry and Obstruction Claims Questions, October 24, 2003 letter

This section presents the response to questions asked per the DOJ letter dated October 24, 2003 as requested below. These questions relate to the South Ferry Landing Claim and the Obstruction Claims.

> *"Whether any of the things listed below allegedly encountered by Renda Marine in the course of dredging would be considered unusual in nature and materially different from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract in this case, i.e., new work dredging in an urban, commercial marine setting, such as the Houston Ship Channel:"*

The following responses to questions regarding deepening of the Houston Ship Channel are based on information from the contract, the drawings and specifications, the Renda Marine Report of Operations and daily reports, my site visits to the project site, and experience in hydraulic dredging.

1. *Shore protection material (rubble and riprap) in the vicinity of the South Ferry Landing.*
   The drawings indicate riprap and rubble on the north ferry landing and the specifications warn of the presence of slope protection on the south side (Section 02482 Dredging, paragraph 3.5.2 Side and End Slopes). Site visits (June and August 2003) to the South Ferry Landing revealed the presence of slope protection along the road and on the face of the landing. The presence of this material near the top of the dredge slope is not considered unusual.

2. *Rubble and riprap in the vicinity of the Oxy-Chem Docks.*
   A site visit to this area (June and August 2003) revealed the presence of shore protection on the exposed banks. This is an old industrial area and a reasonably prudent contractor would assume that some of the shore protection materials could have migrated into deeper water and might be encountered in the widening and deepening of this area.

3. *A dredge (30") stern swivel assembly*
   This channel has been dredged for deepening and maintenance work for approximately 100 years. Major deepening and maintenance commenced about 50 years ago with ongoing maintenance dredging in this area usually around a 5-year cycle. It is not

considered usual for a contractor to lose a "stern" swivel by accident or to discard a worn out swivel, however, it is understandable. The presence of this swivel should not have presented a major problem to Renda Marine. Most reasonably prudent contractors with larger hydraulic dredges have a floating crane as part of the attendant plant that can be quickly brought to the site to take care of obstructions and larger debris that the hydraulic dredge cannot handle. A prudent dredge operator typically would simply leave the obstacle on the bottom and wait for the floating crane to pick up the obstacle, or immediately notify the construction manager to determine how to dispose of the obstacle(s). The specifications (Section 02482 - Dredging, paragraph 3.4.4.2 Debris) states:

> *"Prior to dredging, the contractor shall carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the contractor deems suitable to locate any debris which may interfere with dredging operations"*

*4. A Conex steel container box*

The presence of a Conex box is considered unusual based on my experience. The presence of a Conex box, however, should not have had a significant impact to the dredging operations. The horsepower on the cutter per the dredge specifications is 650; the nominal horsepower on a new D-8 tractor is approximately 310. The horsepower and the weight of the cutter-ladder assembly should be able to move a Conex box out of the way with little effort without damaging the cutter, reduction gears, and drive train. A reasonably prudent contractor, once encountering the Conex box, would dredge around the obstruction, mark the obstruction for later removal by a floating crane, and notify the USACE construction manager. It is my understanding that this scenario is what occurred in this instance.

*5. A steel mooring buoy and anchor chain.*

A 100-year old navigation channel is likely to have old channel-marker buoys or mooring anchor buoys left behind due to some historical event that caused the buoy to sink. I have encountered sunken buoys on several occasions in my career and am aware of other similar instances. Anchor chain and sunken buoys are not considered unusual to find during dredging operations in active navigation channels. The dredge operator should mark the location of the obstacle and then work around it, leaving the buoy, chain, and anchor to be removed by a floating crane.

*6 and 7. Pieces of steel scrap, iron bars, steel plate scrap*

These miscellaneous metal debris are common along the banks of old navigation channels especially in the vicinity of old industrial facilities. This channel was being widened by approximately 100 feet on both sides of the channel and a reasonably prudent contractor would have assumed that these widened areas would likely contain significant debris. The presence of metal debris is not considered unusual.

*8 and 9. Anchors, anchor chain, and cable*

These items are continuously being lost along navigation channels due to various circumstances. Channel markers that designate the edges of the channel usually mark ship channels. These marker buoys are usually installed by the Coast Guard or other government agency and are sometimes lost without being retrieved. The channel marker buoys are placed on the edges of the channel so that it will not become a hazard to navigation if it sinks. Some areas within a navigation channel have barge-mooring buoys placed outside of the channel that sink or are lost due to various reasons. These items also do not usually present navigation hazards and are often not retrieved. In addition, dredges have performed maintenance dredging on this reach of channel on numerous occasions, and it is not uncommon to lose anchors and chain used to hold the dredge plant or the pipelines in place.

Sunken buoys, lost chain, and anchors would be expected to be within the dredging prism and should be expected by a reasonably prudent contractor. All of this debris material is considered not unusual in nature. Encountering this type of debris is typically not a significant problem as the dredge can locate the object, work around the object for the time being, and then return to complete the missed area after the object has been removed.

*10. Heavy industrial construction demolition materials.*

Significant quantities of heavy industrial construction demolition materials would not be considered common within the dredge prism, with the exception of materials used as slope protection in areas such as the South Ferry Landing and the exposed and shallow shoreline in the area below the Carpenter Bayou. This is an old shipping and barging

channel, however, and a reasonably prudent contractor would be prepared to deal with any type of debris, by having a floating crane to handle larger debris and obstructions.

*11. Tires.*

Tires are a problem on every waterway that I have worked on and are considered common within waterways, and especially waterways that are close to an urban center. Tires do not necessarily end up in a location by falling off a barge or by being thrown from the bank. Tires tend to float and move with the current and tides to eventually sink in unpredictable locations. Some tires are lost from vessels that use them as fendering systems (i.e., tires are tied to the sides of barges, tugs, or other vessels to prevent damage to the vessel and/or berth structure from mooring operations), others float in from tributaries/creeks that flow into the main channel. A large hydraulic dredge usually can handle the tires easily, however time is lost to clean tire debris off of the cutter and out of the pumps. I have worked on projects where as many as 10 tires per shift were encountered. The dredge daily logs did not note an abundance of "tire cleanings." A reasonably prudent contractor would expect to encounter tires occasionally.

## 5 COMPENSATION

The following labor rates represent fully loaded hourly rates for each labor skill classification. My billing rate is at the Principal Engineer rate of $160/hour for study and testifying work.

| | |
|---|---|
| Principal Engr/Plan/Sci | $160 |
| Consulting Engr/Plan/Sci | $145 |
| Sr. Engr/Plan/Sci | $130 |
| Engr/Plan/Sci | $110 |
| Sr. Staff Engr/Plan/Sci | $97 |
| Staff Engr/Plan/Sci | $78 |
| Assistant Engr/Plan/Sci | $65 |
| Sr. Design/GIS/Database | $97 |
| Design/GIS/Database | $78 |
| Project Assistant | $55 |
| Administrative | $55 |

## 6 REFERENCES

Department of Justice, April 2003. CD ROM RM-GBA-00001-RM-GBA-00140 Job: 030241, Boxes: 001 to 008

Department of Justice, April 2003. CD ROM RM-HVL-00001-RM-HVJ-01747 Job: 100483, Boxes: 001 to 003

Department of Justice, April 2003. CD ROM RM-JSG-0001-RM-JSG-00606 Job: 030241, Box: 001

Department of Justice, April 2003. CD ROM RM-PHA-0001-RM-PHA-00871 Job: 040087, Box: 001

Department of Justice, April 2003. CD ROM RM-TCB-0001-RM-TCB-01735 Job: 030241, Boxes: 001 to 008

Department of Justice, February 2003. CD ROM RM-COE-19888-21559 Job: 120380, Box: 001

Department of Justice, February 2003. CD-ROM Contract Drawings.

Department of Justice, June 2003. CD ROM RM-COE-22744-2324 Job: 050446, Box: 001

Department of Justice, March 2003. CD ROM RM-COE-00001-RM-COE-05957 Job: 100483, Boxes: 001 to 003

Department of Justice, March 2003. CD ROM RM-COE-05958-RM-COE-11138 Job: 100483, Boxes: 004 to 005

Department of Justice, March 2003. CD ROM RM-COE-11139-RM-COE-18552 Job: 1004383, Boxes: 006 to 008

Department of Justice, March 2003. CD ROM RM-COE-18523-RM-COE-19887 Job: 100483, Box: 009

Department of Justice, March 2003. CD ROM RM-COE-21569-RM-COE-22692 Job: 020172, Box: 001

Department of Justice, May 2003. CD ROM RM-CHU-00001-001438 Job: 050444, Box: 001

Department of Justice, September 2003. CD ROM-Drawings, Pre- and Post Dredging Cross-Sections, Surveys, Volumes.

DuPont, A., October 1998. Letter to USACE concerning the evaluation of Dredge *Millennium* production capacity

Gahagan and Bryant, November 1999. Letter to USACE concerning the evaluation of Dredge *Millennium* production capacity

Leefe, Gibbs, Sullivan, April 2003. CD ROM RM-DSC-0001-RM-DSC-05684 Job: 030596, Boxes: 001 to 008

Lofgren, December 2003. Personal communication between Bob Lofgren and Leon Hrabovsky.

Lofgren, December 2003. Personal communication between Bob Lofgren and Ben Goodloe.

Lofgren, June 2003. Personal communication between Bob Lofgren and Leon Hrabovsky.

Mears, W., August 1999. Memorandum from to Robert Kite regarding the Upper Bayou Volumes, Station 520+00 to 550+65.99

Parsons Brinckerhoff, 2003. "PIPELINE" model. Proprietary model to calculate production rates for hydraulic dredges.

Renda Marine, 1999. "Dredge *Millennium* Accepted Proposal", letter to William J. Wetta II, from Eddie R. Fisher from Renda Marine Inc.

Renda Marine, 2001. "Certified Claim for Differing Site conditions South Ferry Landing Area, Dredge Station Nos. 470+00 to 472+00", Binder No. 1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.

Renda Marine, 2001. "Request for Equitable Adjustment (Revision No. 1) for Differing Site Conditions Damages and Delays Related to Obstructions in Channel (Station Nos. 570+00 thru 630+00)", Binder N0. 1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.

Renda Marine, 2001. "Request for Equitable Adjustment for Differing Site Conditions Damages and Delays Related to Obstructions No. 2 in Channel (Station Nos. 660+00 thru 685+00)", Binder No.1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.

Renda Marine, February 2003. CD-ROM Volume 1.

Renda Marine, February 2003. CD-ROM Volume 2.

Renda Marine, July 1999. Letter from Renda Marine to Mr. McClenan, Department of the Army, Galveston District Corps of Engineers.

Renda Marine Report of Operations

Renda Marine Daily Reports

Renda Marine Daily Production Reports

Turner, T.M., 1984. "Fundamentals of Hydraulic Dredging", Cornell Maritime Press.

Turner, T.M., 1996. "Fundamentals of Hydraulic Dredging", Second Edition, ASCE Press, 258 pp.

U.S. Army Corps of Engineers (USACE), 1998. "Houston-Galveston Navigation Channels, Texas (45-Foot Project), Specifications for Dredging the Upper Bayou", Department of the Army Galveston District, Corps of Engineers Galveston Texas, Invitation No. DACW64-98-B-004.

U.S. Army Corps of Engineers (USACE), 1998. Houston-Galveston Navigation Channels, Texas (45-Foot Project), Construction Drawings.

U.S. Army Corps of Engineers (USACE) Inspection Report of Dredging – Galveston District

## Figures