# FINAL REPORT

# Expert Witness Evaluation

Prepared by

Geotec Associates – Jack Fowler, Ph. D., P.E.
5000 Lowery Rd
Vicksburg, MS 39180
Contract Number 3W-CIV01-0163

Date: 2 February 2004

Case Name

Renda Marine, Inc. v United States
U. S. Court of Federal Claims No. 02-306C (Fed. C1)

Requesting Office

Department of Justice
National Courts Section
Commercial Litigation Branch
Civil Division

EXHIBIT
B

Blumberg No. 5118

February 2, 2004

Renda Marine, Inc. v. United States
No. 02-306C (Fed. C1)

Contract No. DACW64-99-C-0001
Houston-Galveston Ship Channel, Texas
Dredging Upper Bayou, (45 foot Project)
Harris and Galveston Counties, Texas

This report was prepared for the U.S. Department of Justice, Civil Division, Commercial Litigation Branch by the undersigned, Dr. Jack Fowler. Included in this report are four tables and five appendices. Appendix A provides a glossary of geotechnical descriptors and includes three tables, A-1 through A-3, Geotechnical Characteristics of Dredge Channel Soils and cohesive and cohesionless material descriptors. Appendix B is a list of cases where I testified as an expert at trial or by deposition. These demonstrate my experience as an expert witness in dredging and differing site condition claims. My resume and experience are included in Appendix C, and a list of publications I have written is in Appendix D. Documents pertaining to this case that were provided by the Galveston District Corps of Engineers, Capital Project Management, Inc., Franvel Corporation, and the U.S. Department of Justice are listed in Appendix E.

In the course of my investigation into this case I visited the Lost Lake Placement Area with Galveston District Corps of Engineer personnel and Gahagan and Bryant, Inc. personnel. I also met with HVJ Associates, Inc., Gahagan and Bryant Associates, Inc., and District personnel concerning volume calculations of different types of dredged materials. I met with District personnel during the hydraulic construction of levees along the Houston-Galveston Ship Channel by Bean Stuyvesant LLC.

I have reviewed the plans and specifications for Contract No. DACW64-99-C-0001, Houston-Galveston Navigation Channels, Texas, Dredging Upper Bayou, (45-Foot Project), Harris and Galveston Counties, Texas, Amendment No. 1, Renda Marine's Certified Claim for Equitable Adjustment of the Contract Price for Differing Site Conditions & Changed Conditions for Hydraulic Levees At Lost Lake Placement Area, October 16, 2001. I have also reviewed the documents listed in Appendix E.

The U.S. Department of Justice is compensating me at a rate of $200 per hour for my professional services in the litigation case regarding Renda Marine, Inc. vs. United States N. 02-306C(Fed.C1.)

The following are answers to questions provided by John E. Kosloske, Senior Trial Counsel, Commercial Litigation Branch, United States Department of Justice in letters dated October 24, 2003 and November 21, 2003.

Section 7 Clay Claim

**1-1 Identify each soil boring depicted in the contract documents that is relevant to a prediction about the *character* and *location* of materials *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00.**

Soil borings in Section 7 that are relevant to predicting the character and location of the materials within the maximum pay template are boring logs 3ST-8W, 3ST-9W, 93-64, 3ST-10W, 3ST-11W, 93-65, 3ST-12W, 3ST-13W, 72-106, 3ST-14, 3ST-15, 93-66, 3ST-16, 3ST17, 3ST-18 and 3ST19.

**1-2 What, if anything, do the logs for the borings identified in response to 1-1 above indicate about stiff to very stiff materials *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Table 1 is a summary of the consistency, relative density, and laboratory classification for the remaining depth in the channel for all profiles and boring logs for Sections 1 through 9. Tables 2 and 3 summarize the remaining depth and allowable overdepth for Sections 1 through 9.

The results as shown in Table 2 indicated that the consistency of the cohesive materials (CH, CL and ML) in Section 7 was 30% very soft, 20% soft, 6% medium stiff, 6% stiff, 12% very stiff, and 21% hard of the total volume. The relative density of the cohesionless materials (SC and SM) in Section 7 was 0.5% medium dense, 3% dense and 2% very dense of the total volume.

The results as shown in Table 3 indicated that the laboratory classification of the materials in the remaining depth and allowable overdepth consisted of 53% CH (inorganic clays of high plasticity, fat clays), 41% CL (inorganic clays of low to medium plasticity, gravelly clays, sandy clays, silty clays, lean clays), 1% SC (clayey sands, sand-clay mixtures) and 5% SM (silty sands, sand-silt mixtures) of the total volume in Section 7. Appendix A includes a detail description of the geotechnical properties for cohesive and cohesionless material in tables A-1 and A-3.

The conclusions are that the cohesive clays (CH, CL and ML) make up 94% of the total volume and the cohesionless materials (SC and SM) were 6% of the total volume in Section 7 (Table 3). The medium stiff to hard cohesive materials in Section 7 (Table 2) were 39% of the total volume in this section. The very soft, soft and medium stiff cohesive materials totaled 56% of the total volume in Section 7 (Table 2). The dense to very dense cohesionless materials (SC and SM) were 6% of the total volume in Section 7 (Table 2).

**1-3 What boring logs identified in response to 1-1 above indicate stiff red clays *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Boring log 3ST-16, Station 593+90 indicated very stiff to hard grayish red to red cohesive clay from elevation -44 to -47 MLT. Boring log 3ST-18, Station 603+60 indicated hard red cohesive (CL) materials from elevation -42 to -45 MLT and hard blue to rust material below elevation -45 MLT. Boring log 3ST-19, Station 608+40 indicated hard red cohesive (CH) materials below elevation -40 MLT. All of the soils described by the boring logs and elevations were within the maximum pay template for the area in Section 7.

The basis of color used in describing cohesive soil has been well established in the geotechnical literature. Color observed in field surveys is often helpful in distinguishing between various soils strata. To an engineer or dredger with sufficient preliminary experience with local soils, color may be useful in identifying individual soil types and their consistency and/or their relative density and depth profile which would also indicate their dredgeability. Dredgeability is defined as the difficulty or ease of excavating, removing, transporting and placing of dredged materials.

Cohesive inorganic soils described are generally associated with the brighter colors such as medium and light gray, olive green, brown red yellow, and white. Cohesive and cohesionless materials have a variety of colors and combination of colors ranging from black, gray, brown, yellow, green, blue, white, red or rust (oxidation of ferric or iron minerals). It is concluded that the color of dredge material sediments do not have any relationship as to its dredgeability.

**1-4 What, if anything, do the logs for the borings identified in response to 1-1 above indicate about stiff rust-colored clays *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Boring log 3ST-11W, Station 568+90 indicated hard, rust and grayish colored, cohesive clay from elevation -40 to -47 MLT. Boring log 3ST-12W, Station 574+00 indicated very stiff to hard rust colored cohesive clay from elevation -21 to -47 MLT. Boring log 3ST-13W, Station 579+00 indicated very stiff to hard, rust, blue, and grayish colored, cohesive clay from elevation -38 to -47 MLT. Boring log 3ST-14, Station 583+70 and Boring log 3ST-15, Station 588+20, indicated very stiff, rust and light grayish colored cohesive clay from elevation -45 to -47 MLT. All of the soils described by the boring logs and elevations were within the maximum pay template for the area in Section 7. These materials had laboratory classifications of CL and CH, and the consistency of these cohesive soils varied from very stiff to hard. These rust colored, cohesive clays were generally found in the last few feet of the bottom of the maximum pay template and allowable overdepth.

It is concluded, as in 1-3, that the color of dredge material sediments does not have any relationship to its dredgeability. Based on the boring logs provided in the contract, an experienced and prudent contractor should have expected to encountered stiff, very stiff to hard cohesive clays.

**1-5 What, if any, significance to dredging is there between red, rust, or any other similarly colored stiff to very stiff clay?**

The red, rust or blue color of clay sediments does not have any effect on the consistency or stiffness of the material nor does it have any affect on the excavating or cutting, removal, transport through the dredge pipeline and/or placement in the Confined Disposal Facility (CDF).

**1-6 What, if any, significance to dredging is there between, on the one hand, stiff to very stiff red or rust-colored clays and, on the other hand, stiff to very stiff gray or blue clays?**

There is no significant difference in the dredgeability of different colored stiff to hard clays and it is concluded that the color of dredge material sediments does not have any relationship to its dredgeability. Dredgeability is referred to as the ease or difficulty of excavating, removing, transporting and disposing of dredged material sediments.

**1-7 Define "hardpan."**

Hardpan soils is a term used to describe any hard, over consolidated or cemented impermeable layer that does not soften very easily when wet. This term is also used to describe boulder clay or glacial till which is a very tightly packed deposit from glacial origin ranging from boulders to rock flour. Hardpan can also be a layer of extremely hard impermeable cohesive soil that is difficult to excavate and will not allow water penetration. These soils are over consolidated clays that have been subjected to large overburden loads or to a long period of desiccation drying. During the ice age when the ocean levels dropped, large exposed mud flats dried up resulting in hard impermeable clay layers. Salt or simply water migration through a clay soil can also cause the clay particles to come closer together, consolidate and form a hardpan. This phenomenon is referred to as seepage consolidation.

<u>Hydraulic Levees Claims</u>

**2-1 Regarding the levees at the Lost Lake Placement Area (Lost Lake) to be constructed by the hydraulic placement of dredged material, describe what the contract required Renda Marine to construct (height, base width, crown width, slope, etc.).**

The contract required the contractor to construct 13,650 ft of levees to elevation +30 ft M.L.T with hydraulically placed fill during dredging of Upper Bayou dredge channel. Typical levee cross sections had a 10 ft wide crest and 3 to 1 side slopes. The levee

height varied depending on the existing dike height but the average dike height was about 17 ft at an elevation of +30 ft M.L.T. and the average base width was about 114 ft.

**2-2 Calculate the "neat line" volume per lineal foot of the levees at Lost Lake to be constructed by hydraulic placement of dredged material.**

Table 4 shows the hydraulic levee "neat line" volumes, dimensions and stations. The hydraulic levees at Lost Lake were to be constructed from Station 166+00 to 215+00, 4+00 to 56+00 and 61+50 to 97+00 for a distance of 13,650 ft. The total "neat line" volume required for the hydraulically constructed levees was 522,737 CY and the "neat line" volume per linear ft was 38 CY per linear ft.

**2-3 What do the contract documents indicate about the foundation materials in the levee alignment along the east levee? The west levee? The north levee?**

The contract states on contract Drawing No. C-14 Note: 9: ***"Upon completion of the mechanical constructed levees to the lines and grades specified. The contractor must complete the remainder of the perimeter levee to the minimum template limits shown on the drawings, using hydraulically constructed levees,"*** and Note 10. ***"The foundation of the new levee is very soft to soft dredged material and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material."***

The boring logs in the contract indicate that the foundation conditions along the east levee consisted of 56% very soft to soft and 44% medium stiff to hard cohesive soils near the surface with minor amounts of loose to medium dense cohesionless sandy soils. The foundation conditions along the west levee consisted of 50% very soft to soft and 25% medium stiff to stiff cohesive soils near the surface with 12.5% very loose to 12.5% medium dense cohesionless sandy soils. Boring logs along the north levee indicated that the levee foundation consisted of 57% very soft to soft and 36% medium stiff to hard cohesive materials near the surface with minor amounts of very loose cohesionless soils.

Based on the results of the boring log data, it appears that the east and west levees may have had slightly more foundation bearing capacity than the north levee but not a significant amount. Most of the stiff to hard soils occurred at the surface as a result of dewatering, drainage and consolidation by desiccation drying of surface water. Many areas would have a layer of sandy or desiccated clay crust; but underneath the layer would be very soft to soft cohesive materials. In the past the coarse grained sands, shells and clay balls at the Lost Lake CDF normally settled out at the end of the dredge pipe or dump site near the south perimeter levee providing about 36% very soft to soft and 21% medium to stiff cohesive materials and 43% very loose to medium dense cohesionless materials. These upland dredged material placement areas are commonly referred to by the Corps of Engineers as confined disposal facilities or CDF. Elevation of the dredged materials deposited in the south side of the CDF is higher than the north side: therefore, fine grained sediments and water from dredging or rainfall would collect on the north

side before exiting the site through the weir. Depositions of sediments on the north side of the CDF near the weir site were very fine grained high water content soft cohesive materials. Construction of levees on these types of materials should have the worst foundation conditions in a CDF.

**2-4 Based upon what is contained in the contract documents, would it be reasonable to assume that construction of the north and/or west levees would be more difficult than construction of the east levee? Explain why or why not.**

Based on the results of the boring logs, it does not appear to be much difference in the bearing capacity of the either the east, west or north levee foundation conditions. There should not be any problems constructing hydraulically placed embankments on either the east, west or north embankments. Taking advantage of the desiccated surface materials in a CDF is very important for the support of equipment and dredged material placement without causing a bearing capacity failure.

**2-5 What kind(s) of dredged material would be suitable for the hydraulic construction of levees at a placement or disposal area such as Lost Lake?**

The most suitable dredge materials for building hydraulic levees at Lost Lake would be a combination of shells, sand and clay balls. These materials are readily available in the dredge channel and retention rates of the sand and clay balls are normally 60% of the in situ volume. Very soft to hard cohesive CH material will develop into clay balls that are suitable for the hydraulic construction of levees.

**2-6 What, if anything, do the contract documents indicate about the *character, location,* and/or *quantity* (expressed either in cubic yards or as a percentage of total cubic yards to be dredged) within the maximum pay template of materials suitable for the hydraulic construction of levees at Lost Lake?**

The contract provided the results of the geotechnical exploration which included soil boring logs for the contractor to examine and determine the character, location and quantity of dredged material to be removed. The contractor was expected to examine the site and make his own determination as to the character and quantity of the materials to be dredged. The contract provided a table of remaining quantities on page 02482-9 which stated a total estimated quantity of 3,105,500 CY to be dredged from Sections 1 through 9 and an allowable overdepth quantity of 378,200 CY: but the contract did not express the characteristics of the material in volumes or percentage of the total. The total remaining quantity of dredge material and allowable overdepth was 3,483,700 CY.

Volumes of different materials were determined graphically using the COE channel profiles and boring logs and average end area measurement methods shown for typical channel profiles in Figures 1 and 2 below. The geotechnical characteristics, volumes and percentages that were determined are shown in Tables 2 and 3 for Sections 1 through 9.

1. Determine individual areas and total areas of different classifications, consistency and relative density of material in the Remaining Depth Areas

2. Using these individual areas in the Remaining Depth Areas determine the percent of the total Allowable Overdepth Area

3. Multiply these individual percentages times the Remaining Depth Volumes measured by the COE




**Method for Determining the Percentages and Volumes of the COE Remaining Depth Volumes**

Figure 1

Figure 1. Method for Determining the Percentages and Volumes of the COE Remaining Depth Volumes

1. Determine individual areas and total areas of different classifications, consistency and relative density of material in the Allowable Overdepth Areas

2. Using these individual areas in the Allowable Overdepth Area determine the percent of the total Allowable Overdepth Area

3. Multiply these individual percentages times the Allowable Overdepth Volumes measured by the COE




**Method for Determining the Percentages and Volumes of the COE Allowable Overdepth Volumes**

Figure 2

Figure 2. Method for Determining the Percentages and Volumes of the COE Allowable Overdepth Volumes

Table 2, remaining depth and allowable overdepth materials, shows the consistency of the cohesive soils for the total dredged volume. They were 23% very soft, 25% soft, 8% medium stiff, 5% stiff, 14% very stiff and 11% hard. Table 2 also shows the relative density or compactness of the cohesionless soils for the total dredged volume to be dredged. They were 1% very loose, 1% loose, 3% medium dense, 8% dense and 2% very dense.

The quantity of cohesionless material (SC and SM) suitable for hydraulic levee construction was 15% of the total volume to be dredged or 522,123 CY.

Table 3 shows the geotechnical or laboratory classification for the remaining depth and allowable overdepth cohesive soils. They were 46% CH, 35% CL and 5% ML of the total volume to be dredged. The laboratory classification for the cohesionless materials was 4% SC, 10% SM and 1% OH.

The quantity of cohesive material (CH, CL and ML) suitable for hydraulic levee construction consisted of 8% medium stiff, 5% stiff, 14% very stiff and 11% hard materials for a total of 38% of the total volume to be dredged or 1,355,558 CY. These materials are capable of forming clay balls that trap sand, shell and soft clays in the void space between the clay balls.

The total quantity of cohesionless and cohesive dredged material suitable for hydraulic levee construction was 1,877,681 CY.

**2-7 What capture rate (<u>i.e.,</u> material pumped that is suitable for levee construction vs. material retained that is suitable for levee construction) would be anticipated for a project such as the Upper Bayou Project?**

The retention rate for cohesionless materials (SC & SM) resulting from placement and sedimentation between the training dikes should be about 70% of the in situ dredged volume of 522,123 CY or 365,486 CY. The retention rate of the medium stiff to hard cohesive materials should be about 90% of the in situ dredged volume of 1,355,558 CY or 1,220,002 CY.

The total quantity of cohesionless and cohesive dredged material suitable for hydraulic dike construction was a total of 1,585,488 CY or 44% of the grand total graphical volume 3,584,392 CY shown in Tables 2 and 3.

**2-8 Assuming 60% retention rate, what quantity of suitable dredge material is needed to hydraulically construct the perimeter levees at the Lost Lake CDF.**

If we divide the required "neat line" levee volume 522,737 CY by 0.60, then the required suitable volume of dredged for hydraulic levee construction is 871,228 CY. Based on

this assumption there should be sufficient suitable dredged material to construct the perimeter hydraulic displacement levees at Lost Lake Placement Area.

**2-9 In the context of dredge placement or disposal areas, what is a "side cast borrow area?"**

Side cast borrow areas are formed when dredged material is excavated with a dragline or long stick backhoe from within the CDF adjacent to and parallel to the perimeter containment levee. These borrowed materials are used to raise the levee height and berm to increase the safety and storage capacity of the CDF. When possible the excavator is supported by pontoons or wooden mats and is located on an inside stability berm so the borrow area ditch is not too close to the perimeter retaining dike.

**2-10 Is maintenance upon existing levees at dredge placement or disposal areas ever performed with materials taken from side cast borrow areas? How common is it to maintain existing levees at dredge placement or disposal areas with materials from side cast borrow areas?**

It is very common to excavate perimeter trenches for the purpose of surface water management practices to increase the levee heights. The borrow material excavated from the side cast borrow areas along the inside of the levee is placed on the levee and berm. These trenches promote surface and subsurface water drainage and consolidation of the dredged materials in the CDF increasing the storage capacity and improving the consistency and/or stability of the surface material for incremental levee heights. Once the surface strength is improved to support trenching equipment, continued surface trenching is implemented to increase storage capacity by dewatering, consolidation and desiccation drying.

**2-11 Assume that side cast borrow areas were located within the planned footprint of the alignment of the hydraulic levee to be constructed at Lost Lake. What, if any, impact would that have upon construction of the levee? Would any such impact upon levee construction diminish over time, e.g., if the side cast borrow area had been excavated eight years prior to levee construction vs. three years prior to levee construction?**

If levees are constructed over very soft dredged material filled side cast borrow areas the very heavy clay balls and sand filled levees may cause these soft foundation materials to be displaced. In some COE Districts these side cast borrow areas and all surface water management trenches are normally filled in with dried surface crust prior to dredged material placement in a CDF. These deep side cast borrow areas will not dewater and consolidate at the same rate as the rest of the site; because they are too deep and soft. The material in these areas will be very soft and deep and may not support the levee heights required for dredged material placement for subsequent fillings. The time period of whether it was 3 or 8 years since the borrow areas were excavated is not important. What is important is depth and softness of the material placed in the borrow areas. Also was there a surface water management plan and how aggressive was the surface water

management plan. If Corps of Engineers or Port Authority Houston did not fill in the perimeter trenches or lateral trenches before filling the CDF, they may not have had a plan. If the equipment support berm between the existing levee and the side cast borrow area was 50 ft and the average width of the new levee was 115 ft, then construction and placement of the new levee would most likely displace the soft dredged material in the side cast borrow areas.

**2-12 Assume that maintenance was performed upon the levees at Lost Lake in 1995 and that, thereafter, materials generated from one or more maintenance dredging projects were disposed of at Lost Lake. Would any impact of side cast borrow areas upon levee construction identified in response to 2-11 above be diminished?**

If the borrow areas and surface water drainage trenches were not filled in with dried crust prior to filling the CDF, then construction of the perimeter dikes may have been affected by soft foundation conditions in these areas causing an increase in required levee materials because of potential bearing capacity failure and excessive foundation displacement. Displacement of these materials is acceptable if there are adequate quantities of hydraulic fill material and the displaced sections can be managed properly without catastrophic failure occurring to the inside and/or outside of the perimeter levee.

**2-13 Describe the proper method(s) for constructing hydraulic levees at a placement area such as Lost Lake, including hydraulic placement of dredged material.**

The proper method for constructing hydraulic filled levees placed on very soft, soft to medium stiff foundation conditions with dredged material such as that found at Lost Lake is as follows:

(1) Clear, grub and level the levee foundation alignment and construct two parallel training dikes to either side of the proposed levee base. One of the training dikes may be the crest of the existing levee.

(2) Prior to placement of dredged material the discharge pipe is elevated in a raised position between the training dikes to the required height that is near to the proposed berm height and material quantity necessary to construct the final designed levee cross section.

(3) Dredge material slurry discharged between these training dikes is used to transport fines, sand, shells and clay balls along the longitudinal axis of the proposed levee.

(4) During placement of sand, shells and/or cohesive materials that form clay balls, a low ground pressure dozer or low ground pressure marsh buggy backhoe is required to spread the mounds of dredge material out over the proposed levee base. These materials have a tendency to mound up on steep angles of repose and not spread out over the require levee foundation base width.

The average levee base width for Lost Lake was about 115 ft and the use of a WYE with valves may have been appropriate. Every effort should have been made to advance the discharge pipe along the levee alignment and spread the fill out over the foundation with low ground pressure equipment. Excess discharge water should have been kept within the training dikes and not be allowed to over top and fail the training dikes until sufficient material had been placed. All excess water and unsuitable fine grained material should have been directed into the CDF at the far end of the training dikes.

(5) Additional dredge pipe is added onto the raised platform or fill base as material is being placed along the levee alignment. The dredge pipe is extended out onto previously placed dredged material to form a wide low embankment section or stability berm. The berm is designed to include enough volume to be finally shaped into the required levee cross section without causing a bearing capacity failure. The quantity of material in the berm should include enough material to accommodate shrinkage and subsidence and settlement due to foundation and embankment displacement and consolidation after the levee has been raised to the design height.

(6) After about 30 to 60 days or after pore water pressure dissipation, the embankment is shaped and raised to the required elevation and side slopes. If the levee fails due to bearing capacity failure when it is raised, the berm should be allowed to continue to consolidate and the pore water pressure to dissipate before further attempts are made to raise the levee; or, it may be necessary to widen the levee base width or flatten the slopes to prevent failure.

**2-14 What is a training dyke or levee? Are training dykes or levees used in hydraulic construction of levees at dredge disposal areas such as Lost Lake? If so, for what purpose(s) and how do they function?**

There are two types of training dikes or levees used during construction of a CDF. One type is used during the raising of the perimeter levee and the other type of training dike or levee is used in CDF management. The latter is referred to as a spur dike and is constructed to direct or control the surface water flow and sediments within the CDF for improved sediment management practices. The usefulness and purpose of spur dikes is sometimes debatable because they have been responsible for channelization of fines by increasing the surface water velocity and causing a loss of fines and turbid water over the weir. Spur dikes protrude into the CDF but not across the area and are constructed near the weir to protect the pool of water in front of the weir to minimize turbidity cause by wind and waves causing a loss of water quality passing over the weir.

The other type of training dikes are used to train and direct the hydraulic placement of dredged material fill when constructing perimeter levees. The training dikes are constructed parallel to and at the edge of the proposed levee base. These training dikes serve to channel and trap sediments along the base of the proposed levee and foundation. Sediments are collected between these parallel training dikes to form a wide low berm. The wide berm will contain enough dredge material volume to shape the levee to its required crest elevation and side slopes.

**2-15 What are the consequences of not constructing training dikes during hydraulic levee construction?**

If training dikes are not constructed during hydraulic levee construction and placement of hydraulic fill, then there will be a significant loss of large quantities of cohesionless material, clay and silt slurry and very soft to soft cohesive materials that are normally included as part of the initial levee foundation profile. Once these materials are lost out into the disposal area, it is not economical or practical to recover them mechanically for levee construction.

**2-16 What would be the likely consequences(s) of attempting to construct the north levee at Lost Lake mechanically instead of by hydraulic placement of dredged material? With a mechanical construction method, (a) what would be the maximum lift of material to be placed at one time, (b) what compaction would be required, (c) to what extent would you anticipate that material would "settle" within 24 hours, (d) to what extent would you anticipate that material would "settle" within 48 hours, (e) at what height would you anticipate significant overnight failures?**

Mechanical construction of levees on very soft to soft foundation material similar to that found on the north side of the Lost Lake CDF would result in large foundation bearing capacity failures, displacing and remolding these materials. These low shear strength, high void ratio and high water content fine grained materials are very sensitive to disturbance by remolding activity from trucks or dirt pans. This type of activity would cause these materials to lose up to 80 to 90% of their initial strength during attempts to construct the levee mechanically. Once the foundation materials are remolded they will displace large volumes of the soft sediments and result in requiring twice to three times the "neat line" volumes to complete the levees to the required height. In some cases this loss could be as much as three to five times the neat volume.

(a) The maximum lift thickness would depend on the in situ shear foundation strength or the remolded foundation shear strength. In this case, that value could be two to three times the proposed levee height if the volume loss below the foundation was three to five times the "neat line" volumes.

(b) Potential failure of the levees is not completely dependent on the compaction of the levee, but it does play an important role in levee stability. There are normally no compaction requirements except for track compaction of a dozer or truck wheel loads. Cohesive levee materials placed with a dragline or backhoe without compaction are considered loose compacted. Materials compacted with the dozer tracks or dump truck wheel loads are considered to be semi-compacted. Compacted materials are those materials that are compacted with sheep foot rollers.

(c) To be able to predict whether an embankment is subject to failure, it would be necessary to measure the pore pressure in the foundation and levee materials. If an embankment is constructed during the daylight hours the pore pressure will gradually

increase until the pore pressure reduces the soil shear strength and bearing capacity of the foundation materials may cause a sudden levee failure or subsidence during the night before the next day.

(d) Most failures will occur at night after loading the foundation during the day, but failures have been observed during the day. Monitoring of the pore pressure rise in the foundation levee material will provide an indication of when failure might occur.

(e) When the embankment bearing capacity has been exceeded then the potential for failure is imminent and that height can be determined based on in situ shear strength of the foundation materials. Predicting the time of failure as to whether it will fail 24 to 48 hrs is very difficult to estimate even with good instrumentation such as slope inclinometers and pore pressure monitoring devices. When constructing a displacement levees the foundation has already failed because the bearing capacity has been exceeded. This causes excessive displacement and any other failure mode such as additional bearing capacity failure and displacement, outward or lateral sliding or spreading or embankment rotational slope and/or foundation failure could occur during or after construction. All of the above potential failure modes can be evaluated and analyzed if a thorough geotechnical foundation investigation is conducted. The longer the embankment is allowed to sit undisturbed, the surcharge load of the levee will cause the remolded foundation materials to consolidate and allow pore water pressure to decrease causing an increase in shear strength. However, because these materials have been disturbed the increase in strength will be very slow.

**2-17 Assume that it became necessary to construct the north levee at Lost Lake by a mechanical construction method. Describe the proper means and method to construct the north levee mechanically.**

The proper method to construct a mechanically placed levee on the north levee at Lost Lake CDF would be determined only after a thorough foundation investigation had been conducted to determine available bearing capacity of the foundation soils. Pore pressure measurement using piezometers and vane shear tests would provide the in situ shear strength of the foundation soils and the bearing capacity. From that data the allowable embankment height could then be determined. If the proposed embankment was too high and a bearing capacity failure was imminent then a displacement section might result. Every effort should be made to avoid a bearing capacity failure because, when the foundation materials are remolded, they lose 80 to 90% of their initial shear strength. The embankment will continue to fail until it either rests on higher shear strength materials at a lower depth or the displaced material creates a stability berm to either side due to the brute force displacement caused by levee materials and heavy equipment. Every effort should be made to utilize low ground pressure (2.0 psi to 4.0 psi) construction equipment to construct the levee.

The design use of high strength Geotextile fabric reinforced embankments with wide stability berms could have minimized the uncertainty of the amount of available material required per linear foot for constructing a displacement levee section. A properly

designed fabric reinforced embankment would have had a better chance of not having bearing capacity failures if the contractor was competent in this area of construction. A design using high strength Geotextile fabric and vertical plastic strip drains could have been used with and without surcharge loads.

Whether the contractor used Geotextile fabric or not, the contractor should have used low ground pressure equipment and placed the initial foundation materials in a wide berm from each toe of the levee in two to three foot lifts. The contractor should not allow heavy dump trucks onto the newly placed fill until the fill had been track compacted to a depth of greater than four feet thick beneath the centerline of the embankment. Dump trucks should not have been allowed within 30 ft of the front leading edge or either toe of the embankment.

**2-18 Is management of the pond level in a dredge placement area such as Lost Lake important to *hydraulic* placement operations? If so, describe the function and importance of the pond to *hydraulic* placement operations.**

Management of the pond level of water in the CDF is very critical to the successful hydraulic placement of dredged material for levee construction. High water levels interfere with the construction of training dikes and do not allow drainage of the newly placed dredge material sands and clay balls. High water also interferes with shaping of the newly placed dredged material with low ground pressure equipment and does not allow for hydraulic transport velocities necessary for material transport between the parallel training dikes. Some ponding water is necessary for sedimentation of the solids and clarifications of the dredged material decant water prior to discharge at the weir.

**2-19 What, if any, effect would saturated soils in the foundation area along the alignment of levees to be constructed have upon *hydraulic* placement operations at Lost Lake?**

Most of the foundation materials below the desiccated crust in the proposed levee alignment are already 100% saturated and are very soft to soft cohesive soils that exhibit very low in situ shear strengths. The hydraulic placement operation is not going saturate these cohesive materials beyond 100% saturation and cause a loss in shear strength below the crust. The highly saturated, high void ratio, high moisture content soils are very sensitive to dynamic motion and are subject to liquefaction and loss of shear strength when remolded and/or disturbed. The thin layer of dried crust material will become saturated, which may not affect the local or overall global stability of the levee. However, the dry crust is important in providing bearing capacity for the proposed levee and mobility for construction equipment. Potential embankment failure modes on soft foundation are shown in Figure 3. These types of foundation materials generally lose their in situ shear strength by remolding and disturbance caused by over loading during hydraulic placement and dozer shaping and spreading of the hydraulic fill materials, resulting in bearing capacity failures. Increased pore water pressure in the foundation