## 2.1 – Daily Reports

The contract required, and Renda prepared, two daily reports that were submitted to the Government: the Contractor's Quality Control Report and the Inspection Report of Dredging (IRD). As the name suggests, the Inspection Report of Dredging (IRD) reported the progress of the dredging work in the ship channel. The Contractor Quality Control Report (CQCR) reported levee construction activities and occasionally commented about dredging activities. To assist in organizing the factual information and issues, these daily reports were entered into a database. The database was used as an aid in my evaluation and assessment of Renda's claims. Volume II of this report contains copies of the database: Volume II, Tabs 1 through 6 contain the Inspection Report of Dredging (IRD) data, whereas, Tabs 7 through 10 contain the Contractor Quality Control Report (CQCR) data.

The Inspection Report of Dredging (IRD) and Contractor Quality Control Report (CQCR) databases were used extensively in the preparation of this report. However, other Renda documents, such as the Report of Operations[4] was consulted often since it provided greater detail about daily dredging operations and difficulties.

Additionally, the Government prepared a Quality Assurance Report (QAR). This report has also been entered into a database for use in my evaluation. This data is reproduced in Volume II, Tab 11.

The Inspection Report of Dredging (IRD) is generally consistent with the Report of Operations and reflects the effective time the dredge was producing or pumping material through the pipeline. The non-effective time is time during the dredging operation when the dredge is operational, but no production is taking place. An example of non-effective time would be making changes to the pipeline. Lost time is generally logged when the dredge is not operational due to such things as repairs and lack of crew. Based on a

[4] Not all of the Reports of Operations have been attached to this report. However, certain reports are referred to in the report and are included.

comparison with the Report of Operations, the Inspection Report of Dredging (IRD) does not always properly distinguish between lost time and non-effective time.

The gross quantity reported on the Inspection Report of Dredging (IRD) is intended to represent the total (pay and non-pay) quantity dredged. In general, Renda reports their gross quantity as five percent more than the credited (pay) quantity. Based on a review of the after-dredging (AD) cross sections, the gross quantity is under reported on the Inspection Report of Dredging (IRD) because the non-pay quantity is more than five percent. This over-excavation will be addressed later in the report.

Additionally, the Inspection Report of Dredging (IRD) gross quantity reported is generally inconsistent with the quantities which can be computed based upon the reported advance, width of cut and depth of cut (Vol V, Tab 1). It appears that the dredge quantity within the maximum pay prism for a section or reach was pre-determined by Renda and reported based upon the amount of advance the dredge accomplished per day (Vol V, Tab 2). The quantity reported is not dependent upon productive, effective time of the dredge. However, the Inspection Report of Dredging (IRD) daily gross quantity coincides closely with the monthly payment quantities (Vol V, Tab 4). Therefore, the Inspection Report of Dredging (IRD) gross quantities generally represent the pay quantities removed from the maximum pay prism.

## 3.0 Background

Government Invitation No. DACW64-98-B-0004, for Dredging Upper Bayou, was issued for bid on June 16, 1998, with a subsequent Amendment issued on July 7, 1998.

Renda submitted its bid in response to the Invitation on July 17, 1998 and was notified by the Government that they were the apparent low bidder. However, Renda's bid was not accepted by the Government until October 26, 1998, due to a Renda unit price bid correction and a Bid Protest filed by Great Lakes Dredge & Dock Company. The project was assigned Contract No. DACW64-99-C-0001, and the contract was awarded on October 26, 1998.

The notice to proceed, issued by the Government on November 16, 1998, was received by Renda on November 19, 1998, thereby establishing the contract start date in accordance with Specification Section 00820-Specific Requirements, as follows:

> "(c) complete the work not later than 446 calendar days after the date of receipt.. of Notice to Proceed."

The original contract time, as established by the Contract, is 446 calendar days, which makes the contract completion date February 8, 2000[1].

During the course of the project, Renda received 30 Modifications from the Government, consisting of nineteen (19) Funding Modifications (either increasing or decreasing the Government-obligated Contract funding), and eleven (11) Change Orders. The Modifications which changed the contract are listed as follows:

---

[1] It is Renda's contention that the "As-planned" contract completion date is June 7, 2000 (566-CD), and will be addressed in Section 6.0 of this report.

| Modification No. | Effective Date | Type of Mod. | Amount | | Contract Time (CD) |
|---|---|---|---|---|---|
| P00004 (CO-1) | 3/23/1999 | Unilateral Part 1 | $250,000.00- | NTE | --- |
| P00006 (CO-2) | 6/21/1999 | Bilateral – Settles CO-1-Affolter | $436,855.87- | Add | +20 |
| P00008 (CO-3) | 8/4/1999 | Bilateral-Affolter | $364,201.03- | Add | +22 |
| P00011 (CO-4) | Unknown | Bilateral-Changes Acceptance of Levees | 0.00- | No Change | --- |
| (Government "no cost" modification to Specification Section 02223, Retaining Levees, adding paragraphs 3.3.1, 3.3.1.1 and 3.3.1.2) | | | | | |
| P00009 | 6/21/2000 | Bilateral – Time for Variations in Quantities | 0.00- | No Change | +18 |
| P00019 (CO-5) | 10/27/2000 | Unilateral Part 1-Rubble Removal | $66,000.00- | NTE | +3 |
| P00021 (CO-7) | 11/17/2000 | Unilateral – Settles CO-5 Rubble Removal | $137,000.00- | | +11 |
| P00023 (CO-8) | 3/14/2001 | Unilateral Part 1 – Flare Area | $3,083,833.00- | NTE | +56 |
| P00026 (CO-9) | 5/4/2001 | Bilateral Part 1 – Dredging Suspension | 0.00- | No Change | +60-NTE |
| P00027 (CO-10) | 5/23/2001 | Unilateral – Shifted Cross-Section of Levee | 0.00- | No Change | --- |

## 3.1 The Bid and Award

On January 26, 1998, the pre-solicitation notice (Vol IV, Tab 1) for Solicitation No. DACW64-98-B-0004, Dredging Upper Bayou, was issued by the Galveston District, U.S. Army, Corps of Engineers for the Houston-Galveston Navigation Channels, Texas (45 foot project). Also in early 1998, the principals of Renda Marine, Inc. developed a business plan to enter the maintenance dredging market[2] along the Gulf Coast. The

[2] February 1, 2001, Deposition of Eddie Fisher stated, "What I had discussed with Steve Bowman and Rudy was that I thought, with the widening and deepening of the Houston Ship Channel, that there would be a market for a dredge with a ladder pump to do maintenance dredging once Houston got to be 45 feet, because Corpus Christi was already 49 feet. Freeport was 45 feet, and Houston was a large port. And when it got deep into 45 feet, some of the conventional dredges would have a hard time providing the maintenance work at that depth." (Vol IV, Tab 2)

Dredge Millennium was an off shoot of the business plan, "that there would be a market for a dredge that could effectively provide maintenance dredging at a 45 foot depth and greater because it had a ladder pump" (Vol IV, Tab 2). On or about April 30, 1998, Renda received at least one "ball park" quote for a 24 inch hydraulic cutter dredge from Dredge Supply Company, Inc. (Vol IV, Tab 3). On July 17, 1998, the U.S. Army Corps of Engineers opened bids for the Upper Bayou Dredging solicitation. Bid results (Vol IV, Tab 5) are presented in Table 3.1.1.

Table 3.1.1

Solicitation No. DACW64-98-C-0004
Bid Results of Two Lowest Bidders

| Item No | Description | Qty | UM | Government Estimate | Renda | Great Lakes Dredge Dock Co. |
|---|---|---|---|---|---|---|
| 1 | Stripping | 1 | Job | 55,500 | 150,000 | 55,000 |
| 2 | Mechanically Constructed Levees | 381,300 | cy | 930,372 | 1,753,980 | 1,651,029 |
| 3 | Drop-outlet Structure (existing) | 1 | Job | 22,700 | 66,350 | 35,000 |
| 4 | Drop-outlet Structure (new) | 1 | Job | 229,200 | 240,000 | 150,000 |
| 5 | Seeding & Fertilizing | 1 | Job | 60,700 | 80,000 | 80,000 |
| 6 | Hydraulically Constructed Levees | 13700 | LF | 621,021 | 1,370,000 | 27,400 |
| 7 | Mobilization and Demobilization | 1 | Job | 535,000 | 800,000 | 1,250,000 |
| 8 | Dredging | 3,483,700 | cy | 10,834,307 | 7,315,700 | 11,322,025 |
| 9 | Pipelines | 1 | Job | 187,200 | 650,000 | 50,000 |
| 10 | Bond Cost | 1 | Job | 131,400 | 100,000 | 60,000 |
| Total | | | | 13,607,400 | 12,526,100 | 14,680,454 |

Although Renda had not yet procured a dredge, Renda bid the Upper Bayou Project. Renda's low bid was $12,526,100, but contained a mistake in the bid price for Item No. 6, Hydraulically Constructed Levees. Renda's unit price bid of $1.00 was a mistake and Renda was permitted to correct the mistake to the intended bid price of $100.00 per linear foot (LF). However, Mr. Eddie Fisher, Vice President of Renda Marine, Inc., recognized that the Upper Bayou Project "was a very – a difficult project, and it wasn't something that I had originally had in the business plan" (Vol IV, Tab 6).

Renda submitted bid papers and worksheets in support of its requested bid correction. Mr. Eddie Fisher "took the first stab at preparing the bid estimate for the referenced

project."[3] Eddie Fisher's original estimate (Fisher Original Estimate) was given to Steve Bowman, Vice President of Renda. Mr. Bowman provided his input into the estimate by changing line items, moving line items and deleting line items and making final adjustments to the bid. Mr. Bowman's estimate supports Renda's intended bid (Vol IV, Tab 8). By reviewing the bid sheets and affidavits, the Contracting Officer was satisfied that a mistake had been made and allowed a correction to Renda's unit price on Line Item No. 6 from $1.00 to $100.00 per LF. Additionally, a bid protest was filed by the next low bidder, Great Lakes Dredge and Dock Co. In response to the bid protest, Renda prepared a large pre-award submittal (Vol IV, Tab 13).

In the pre-award submittal dated August 3, 1998, Renda proposed to use the dredge Millennium which was under construction in New Orleans, Louisiana, and represented that it would be ready to commence work on or about January 8, 1999. Renda stated that the dredge was specially designed to work in virgin clays and coastal waters. Renda believed that the dredge which was ordered on July 31, 1998 (Vol IV, Tab 13, RM-COE-05756), would have distinct advantages at Upper Bayou. In particular, it was noted that the cutter diameter was more suited to maintaining the design slopes, avoiding the dangers of overcutting noting that the contract warned bidders to use caution in certain reaches of the channel such as the South Ferry Landing. Renda also provided tentative dredging plan which anticipated completing the hydraulic levees by using the dredged materials from Sections 1, 2, 3, 4, 5 and 6 of the channel (Vol IV, Tab 13, RM-COE-05737).

On August 21, 1998, Renda provided several clarifications to Government questions (Vol IV, Tab 15). Government was concerned that the system, among other things, did not have sufficient horsepower and discharge velocity to prevent plugging of the pipelines. Booster pumps were represented as being readily available and Renda believed the system to be powerful enough to prevent plugs from developing in the pipeline. On August 26, 1998, Renda was awarded the Upper Bayou Dredging Project.

[3] September 18, 1998, affidavit of Steve Bowman (Vol IV, Tab 10, RM-COE-23230).

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

4.0 The Issues

In three of Renda's claims, Renda asserts that dredging production was less than anticipated. Renda attempts to support its claim for differing site conditions by use of the measured mile method in the following claims:

1. South Ferry Landing – Concrete rubble
2. Flare Area – Stiff clay
3. Section 7 Area – Heavy, red clay

In two other dredging claims, Renda seeks idle, delay and repair damages for encountering excessive trash and obstructions in the work. These claims are:

4. Obstructions No. 1, from Sta. 570+00 to 630+00
5. Obstructions No. 2, Section 9, Sta. 660+00 to 685+00

Three other claims for delays, changes and differing site conditions are asserted by Renda in connection with the Lost Lake Placement Area. They are:

6. Houston Light and Power Transmission
7. Realignment of the West Levee
8. Total Cost Claim for Hydraulic Levees

As previously mentioned, Renda made a mistake in their bid which was allowed to be corrected. Renda was permitted to correct its unit price for Bid Item No. 6, Hydraulically Constructed Levees. To support the intended bid by Renda, Mr. Bowman and Mr. Fisher, both Vice Presidents of Renda Marine and the individuals who prepared the bids, provided what Mr. Fisher characterized as, "all of the working sheets used to create the bid" (Vol IV, Tab 10, RM-COE-23229). While the bid papers were sufficient to correct the mistake and be awarded the job, the bid papers do not establish reliance on the boring logs or identify any particular anticipated type or consistency of soil material. Two of Renda's claims, the Flare Area and Section 7 Area, concern allegations of different soils being encountered from the soils anticipated at bid. Renda's work papers do not address or analyze the types of materials to be encountered in any area along the channel.

Post-bid, Renda documents carrying the date of August 1998 identify anticipated amounts of stiff clay, which is very good levee building material, being present in different areas of the channel. This document (Vol IV, Tab 16) shows stiff clay through Section 9 and is hereinafter referred to as the August 1998 Stiff Clay Spreadsheet. The August 1998 Stiff Clay Spreadsheet is dated about the same time that Renda submitted its responses to the Government's concerns about Renda's pre-award package.

Renda's Obstructions No. 1 claim and, to some extent, their Obstructions No. 2 claim, seeks adjustments for trash and debris encountered beyond what any reasonable bidder could expect. However, the amount of trash and/or debris expected by Renda cannot be found in its bid papers. Renda also seeks delay time for Houston Lighting & Power decision to construct a new transmission tower on Lost Lake Placement Area. Finally, Renda submits what it characterizes as a modified total cost claim for differing site conditions during construction of the hydraulic levees. The value of these claims totals $14,244,848.

I have evaluated each of Renda's claims and provided conclusions about the additional time and price caused by each claim.

Central to measuring the damages and evaluating cost is the equipment rate(s) component for the dredging plant or construction equipment which is affected by the change or differing site condition. These rates were also evaluated and re-computed.

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 4.1 South Ferry Landing – Differing Site Condition

### 4.1.1. General

In January 2001, Renda submitted a certified claim for $701,753 and 18 additional days due to an alleged Differing Site Condition encountered while performing dredging activities in vicinity of the South Ferry Landing during three separate periods of April 14, April 21 through April 23, and April 30 through May 3, 2000, a total of 8 days. In addition, Renda also seeks as impact ten dredge repair days and other move-in and move-out days. On March 15, 2001, Renda revised its claim by increasing the amount to $1,049,173. The March 15, 2001 revisions to the cost proposal can be recognized by the date of March 6, 2001, in the footer and include increases to the jobsite equipment and labor and indirect overhead rates.

### 4.1.2. Work History

On August 23, 2001, Renda supplemented the March 15, 2001 revised claim by providing a supporting statement of facts and other documentation. Renda asserts that dredging production on the south side of the Houston Ship Channel in the area located approximately between Stations 470+00 and 472+00 was substantially affected by rubble consisting of large rocks or stone and debris consisting of pieces of concrete and steel which delayed completion of the work and caused damage to the dredge Millennium. Renda asserts that it encountered a differing site condition. Renda claims that the conditions it encountered near the South Ferry Landing were of an unusual physical nature which differs materially from those ordinarily encountered and generally recognized in the work of the character provided for in the contract and not discernable at bid.

Section 02482 – Dredging, paragraph 3.5, Overdepth, Side and End Slopes, subparagraph 3.5.2 Side and End Slopes requires the Contractor "… to use caution when cutting the side slopes in the Channel from Station 470+00 to Station 473+00, from Station 514+00 to Station 537+00 and from Station 610+00 to Station 625+00. Excessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel" (underscore added).

Shore protection consisting of riprap and rubble is shown on Contract Drawing C-6 for the North Lynchberg Ferry Landing and also depicts submerged stone structures and piling. The North Lynchberg Ferry Landing is outside the lower (downstream) dredging limits of the channel; however, similar structures along the side of the channel are protecting the South Lynchberg Ferry Landing which is also outside the side slope dredging limits.

As part of its claim, Renda provides a work history for the dredge while performing work in and around the South Lynchberg Ferry Landing. Renda correctly states that the dredge Millennium completed its first pass on the north side of Section 1 on the Houston Ship Channel on October 8, 1999. However, Renda then states that the dredge was relocated "to the South side of the channel at Station 470+00 (near the South Ferry Landing Area) and attempted to start dredging operations late October 8, 1999 (note 2.25 hour charged to 'Changing location of plant on job' on the Inspection Report of Dredging)". This is not consistent with the project records. Renda's internal, handwritten Report of Operations[1] that was contemporaneously completed on the dredge by the leverman does not report dredging on the south side. Rather, after north side dredging had reached Station 470+00, the dredge Millennium stopped work at 9:45 pm (2145) and was moved upstream to Station 488+50. No work occurred on October 8, 1999, on the south side near the Ferry Landing after 9:45 pm. The two hour and fifteen minute travel time accounts for movement of the dredge till midnight.

[1] The Report of Operations accounts for interruptions to the effective operation (pumping time) of the dredge in consecutive five minute increments.

Further, Renda states that on October 9, 1999, the dredge was relocated a second time to Station 488+50 "to allow the Government sufficient time to respond to the problem(s), Renda relocated the dredge (note 3.0 hours charged to 'Changing location of plant on the job' on the Daily Report..." Again, this is inconsistent with job records. A second relocation did not occur. A single continuous relocation of the dredge began at 9:45 pm on October 8, 1999[1] and was completed at 3:00 am on October 9, 1999, when dredging started at Station 488+50. Therefore, the Government could not have been verbally notified of obstructions near the South Ferry Landing on October 8, 1999, since no work was performed at that location.

Approximately six months later, after Government demands for Renda to complete sections of work, on April 7, 2000, the dredge Millennium was returned to Sections 1 and 2. Renda is correct that the dredge began work at Station 478+75 on the south side of the channel and proceeded down station toward Station 470+00.

On April 11, 2000, in a facsimile, Renda described the remaining work along the south and north sides of the channel in Section 1 and did not indicate any previous problems in the area (Vol V, Tab 6). Earlier, in a February 1, 2000, email to the Government (Vol V, Tab 7), Renda commented on the accuracy of the contract boring logs in depicting the character of the soils. These records do not support Renda's assertion that rubble at the South Ferry Landing had been encountered or verbally reported to the Government prior to April 2000.

On April 14, 2000, the dredge progressed 50 feet from station 472+00 to 471+50. Renda states that work was abandoned due to the unknown extent of the rubble (large rocks or stone) and debris (pieces of concrete and steel) being encountered and the dredge relocated due to the unknown extent of the debris. Renda cites the "1.7 hours charged to 'Changing location of plant on job' on the April 14, 2001 Daily Report" as the time used to abandon the work. Contrary to Renda assertions of encountering large rocks or stone and concrete and steel, Renda's records are silent about encountering these types of materials and do not indicate any verbal notice to the Government on April 14, 2000.

[1] The Report of Operations for October 8, 1999 and October 9, 1999 are in Vol V, Tab 5 of this report.

The reason for setting the dredge back (changing locations) to Station 492+00 is not stated. However, Renda had not yet coordinated the work around the ferry with the Lynchberg Ferry Operator[3] and continued dredging down station by Renda would have interfered with the Ferry operations. On April 20, 2000, in a facsimile (Vol V, Tab 8, REM31146), Renda's agreements with the ferry operator were reported to the Government.

For the second time, on April 21, 2000, the dredge entered the area between Sta. 472+00 and 471+50 to sweep it clean[4]. Contradicting Renda's own daily report for April 21, 2000, Renda says in its revised claim that "the dredge immediately encountered heavy debris and rubble making 50 feet of headway with no material[5] removed that day" (footnote added). The IRD and the internal Report of Operations[6] for April 21, 2000, do not report encountering concrete debris or stone rubble from Sta. 472+00 to 471+50.

On Saturday, April 22, 2000, under Remarks on the Inspection Report of Dredging (IRD) is the first mention of lost time due to rocks/riprap being encountered at or near the Lynchberg South Ferry Landing. Again on April 23, 2000, rocks and riprap are noted on the IRD between Sta. 471+80 and 471+50. These dates are Renda's third and fourth attempt to dredge the area. No photos were taken or samples collected by Renda to demonstrate the alleged differing materials or volume of materials being encountered. It is of interest to note that Renda fails to mention that excessive dredging outside the side slope was performed in this area, contrary to the warnings in Contract Section 02482. The excessive cutting will be addressed later in this report.

---

[3] According to an internal Renda Marine Daily Report (Vol V, Tab 8, REM 05648), coordination for dredging work across the South Ferry Landing was accomplished on April 19, 2000. The report states, "I talked with Henry L. Jackson Ass. Superintendent of ferries about which time of the night there was the least amount of traffic, so we could dredge across the ferries docks. He told me they would shutdown from 10:30 pm – 6:00 am both Friday, and Saturday nights, then from 10:30 pm – 3:00 am on Sunday night if we need it." (underscore added)

[4] The dredge moved 50 feet while sweeping between Sta. 472+00 and 471+50 on April 21, 2000. Other dredging on April 21, between Sta. 473+00 and 472+00 reported a quantity of 3,000 cy. (Re: IRD for April 21, 2000 at Vol V, Tab 9)

[5] When sweeping, Renda does not report a quantity of material removed.

[6] Internal Report of Operation notes sweeping from Station 472+00-471+50. (Vol V, Tab 9, REM06042)

Further, Renda's assertion that the rocks and riprap were the proximate cause of the decision to move the dredge on April 23, 2000, is contradicted by the previous April 19, 2000 agreement with the ferry operator. At 5:30 am, in accordance with its agreement with the ferry operator, on Easter Sunday, April 23, 2000, Renda stopped dredging, broke the discharge line and moved the dredge to Station 506+00 to avoid interference with the operations of the Lynchberg Ferry which started at 6:00 am. As stated earlier, this was a planned relocation coordinated with the ferry operator which was required by the contract.

On April 25, 2000, internal Renda Daily Report (Vol V, Tab 10, REM05644) notes that the Corps of Engineers was verbally notified about trash at the South Ferry Landing and that a submerged discharge pipeline would be used. It is also reported that Renda worked 12 hours on the submerged line and "would attack the material at the Ferry from the downstream side <u>next time</u>". Use of a submerged discharge line instead of a floating line downstream of the South Ferry Landing would permit continuous operation of the Ferry while dredging operations were being accomplished.

During the period between 11:00 am on April 23 and April 29, 2000, Renda continued sweeping operations upstream away from the North and South Ferry Landings. The locations are:

Table 4.1.1
<u>Sweeping Work Re: Renda Report of Operations (Vol V, Tab 11)</u>

| | From Sta. | To Sta. | Advance (ft) |
|---|---|---|---|
| April 23, 2000 | 506+00 | 510+00 | 400 |
| April 24, 2000 | 513+00 | 524+00 | 1100 |
| April 25, 2000 | 524+00 | 521+00 | 300 |
| April 26, 2000 | 484+80 | 482+50 | 170 |
| April 27, 2000 | down pump engine & main generator water pumps. | | |
| April 28, 2000 | 482+50 | 480+50 | 350 |
| April 29, 2000 | 477+00 | 473+00 | 400 |

In its claim, Renda complains that the sweeping work was not contractually necessary and only served to "test" run the dredge following repairs caused by the rubble encountered. However, no quantity was reported being moved during this period because sweeping was being accomplished. Sweeping is rework necessitated by failing to remove

all the material within the dredge prism when the area was previously dredged. During this period of time, Renda was performing necessary cleaning of the channel and side slopes for acceptance of sections of work as indicated in the April 11, 2000 facsimiles (Vol V, Tab 6) and the Internal Daily Reports (Vol V, Tab 12).

Renda fails to identify the damage caused or the repairs necessitated by encountering rubble or debris near the South Ferry Landing. Table 4.1.2 provides a summary of the repair time reported during the sweeping period from April 23, 2000 to April 30, 2000. Renda does not discuss the individual repairs nor explain how rubble caused the repairs actually performed. The longest period of downtime for pump engine repairs was on April 25, 26 and 27, due to the engine heads having cracks and leaking (Vol V, Tab 12, REM05641 and Vol V, Tab 13).

Table 4.1.2
Comparison of Repair Time
during Renda Impact Period of April 23, 2000 to April 30, 2000.

| Renda Marine Table 1 Data | | | | Renda Marine Report of Operations Data | | | | |
|---|---|---|---|---|---|---|---|---|
| Date (2000) | Station Location(s) | "Pumping Time" (hours) | "Minor Operating Repairs" Time (hrs) | "Pumping Time" (hours) | Repair Time (hours) | Explanation of Repair | Other Non-pumping (hours) | Non-pumping Explanation |
| April 23 | 506+00 to 510+00 | -- | -- | 6.91 | 1.42 | Spud friction (1.42 hrs) | 5.67 | Pass ships (0.25); Pump trash (0.25); add submerged pipeline (5.17) |
| April 24 | 513+00 to 524+00 | 6.9 | 1.75 | 6.91 | 1.75 | Engine Room – fix water – illegible - | 15.33 | Trash (0.83); Anchors (0.08); Swing wire (2.0); Submerged Pipe (12.0); Pass ships (0.42) |
| April 25 | 524+00 to 521+00 | 4.2 | 12.4 | 4.17 | 12 | Engine Room – Booster Engine (12) | 7.84 | Anchors (0.42); Spud pin (0.17); Ships (0.08); Move dredge(6.0);Add pipeline (1.17) |
| April 26 | 484+80 to 482+50 | 10.5 | 10.75 | 10.5 | 10.75 | Booster Engine (Seven times for 10.75 hrs) | 2.74 | Trash Cutter (1.0); Ships (0.83); Anchors (0.58); Trash pump (0.33) |
| April 27 | 482+50 | 0 | 24 | 0 | 24 | Booster EMD (Engine) (Two times for 11.3 hrs); Main Generator Water Pump (12.7) | | |
| April 28 | 482+50 to 480+50 | 8.75 | 10.6 | 8.75 | 10.58 | Engine Room – Engine (Three times for 10.58 hrs) | 4.67 | Ships (1.17); Move dredge (3.5) |
| April 29 | 477+00 to 473+50 | 12.2 | 8.4 | 12.2 | 7.8 | Swing Sheeve (5.67: Spud Friction (1.17) | 3.99 | Ships (1.0); Move dredge (1.5); Suction trash (0.33); Pump trash (0.33); Pump leak (0.58); Pump |
| April 30 | 473+50 to 470+80 | 16.25 | 2.7 | 16.25 | 4.25 | Spud Friction (1.08 hrs); Swing Cable (1.67 hrs); Water pump (1.5 hrs) | 3.5 | Tows (2.0); Ships (0.92); Dump (0.25); Anchor (0.33) |

Following the sweeping period, Renda claims that the dredge Millennium "again began dredging near the South Ferry Landing Area on May 1, 2000… only 50-feet of headway was made and no material was removed." This is not accurate. The dredging which was performed on April 30, 2000 and May 1, 2000, between Station 472+00 and 470+00, was sweeping on the north side of the channel; not the south. Generally, no material is reported being removed while sweeping. On April 11, 2000, Renda advised the Government that material remained to be cleaned (swept) on the north side of Section 1. On April 11, 2000, the Government agreed by email and told Renda to sweep the north side of Sections 1 to 3 (Vol V, Tab 6, REM35012). On April 25, 2000, the IRD (Vol V, Tab 14), reports the dredge being moved to the north side of the channel and proceeded to sweep the north side in a down station direction until May 1, when the dredge reached Sta. 470+00. This is the only time period when north side sweeping work could have been performed. Cross sections at Sta. 470+00, taken on April 28, 2000 (Vol V, Tab 15, REM04105), show material remaining above the required lines and grades on the north side of the channel. The cross section taken at Sta. 470+00 on May 8, 2000, shows the north side material removed from the channel (Vol V, Tab 15). Likewise, cross sections taken for Sta. 472+00 (Vol V, Tab 16) show the north side material removed during this same time period of April 28 and May 8, 2000. Renda fails to account for any north side work and improperly includes the time for the north side sweeping in its claim for the south side.

At 3:45 pm, on May 1, 2000, after completing operations on the north side, the dredge was moved to the south side of the channel. The internal Report of Operations documents the movement from 3:45 pm to 11 pm (Vol V, Tab 11, REM 06032). At 1:00 am on May 2, 2000, the dredge Millennium began as previously stated by Renda to "attack the material at the ferry from the downstream side". On May 2 and 3, 2000, the dredging of the south side of the channel near the South Ferry Landing proceeds as predicted on April 25, 2000, in an upstream direction. Contrary to Renda's claim narrative about "the extensive amount of rubble/debris present" during May 2 and 3, the Report of Operations (Vol V, Tab 11), Inspection Report of Dredging (IRD), and Internal Renda Marine Daily Report (Vol V, Tab 12, REM05634) are silent about encountering

rubble. The IRD reports trash and several pump/cutter clears, but do not indicate rubble was encountered.

Following completion of the dredging work at the South Ferry Landing at 3:35 am on May 4, 2000, the dredge Millennium began to move out of the South Ferry Landing Area to begin sweeping at Sta. 476+00. As part of the delay and impact, Renda claims that while performing sweeping operations, on May 13, 2000, the dredge Millennium began to experience operational problems and was down 17.7 hours for repairs. On May 14, Renda states that the dredge was completely down due to problems with the cutterhead and pump shell. Renda claims that the repair work associated with the rubble at the South Ferry Landing was completed on May 17, 2000, but other repairs which prevented operation of the dredge continued through May 18, 2000. Other documents, such as the Report of Operations are missing for these dates.

As part of its damages, Renda seeks the move-out on May 4, 2000, a contractual move, and the repair days of May 14 through May 17, 2000. Renda also seeks reimbursement for repairs to the pump impeller and shell.

### 4.1.3 South Ferry Landing – Technical Evaluation

At the South Ferry Landing, Renda asserts that its monetary damages consist of reduced production while working in the vicinity of the alleged differing site condition on the south side of the channel from Sta. 470+00 to Sta. 472+00 and delay (movement and repair) time caused by the alleged differing site condition.

Renda applies a measured mile analysis to quantify the damages for the loss of production as a result of encountering unanticipated concrete rubble and/or riprap. The measured mile analysis is generally recognized as the best available method for comparing the contractor's productivity (efficiency) on the work that was affected by a differing site condition or change with productivity actually achieved on similar work that was not affected. The approximations involved in the comparison do not need to be

exact, but the underlying assumptions and facts about the work and production must be accurately identified.

The threshold issue at the South Ferry Landing is whether Renda encountered concrete rubble and/or riprap within the required lines and grades to be dredged? There is no evidence to support that it did.

The dredge Millennium was equipped with GPS for locating the dredge, computerized instruments[7] to visualize the dredging process as it happened and independent winch control for raising the ladder and controlling the swing. With this technology and data, Renda should have been able to trim the required slopes to grade and report coordinates of any piling or riprap encountered. No electronic data has been provided from the dredge instruments or computer based systems.

Contract Drawing C-14, in the lower center of the page, shows the close proximity of the new alignment of the Houston Ship Channel to the shoreline of the South Ferry Landing. The centerline of the channel is depicted with station marks. The parallel dashed lines on each side of the centerline represent the bottom width of the required channel at the toe of the slope. At Sta. 472+00, the horizontal distance between the channel's south toe of the slope at elevation -47 feet MLT and the shoreline (assuming elevation 0 feet MLT) at the South Ferry Landing is approximately 200 feet. However, the cross section for Sta. 472+00 shows the top of the 1 vertical to 3 horizontal (1V to 3H) channel side slope on the south side to terminate at -25 feet MLT. This means that the horizontal distance between the shoreline and the top of the new channel side slope on the south side near the South Ferry Landing is only 134 feet.

Further, the cross section for Sta. 472+00 on Contract Drawing C-13 shows existing ground extending upward on a straight line outside the limits of the work on the south side of the channel from approximate elevation -21 feet MLT to -14 feet MLT. Because it is a straight line, it appears to be a "man-made" slope. If the man-made slope line is projected to elevation 0 MLT, that point measures approximately 200 feet from the

[7] The dredge operations computer software manual is located at Volume V, Tab 17.

channel bottom toe of the slope; the same point as the shoreline depicted on the Contract Drawing C-14.

If the man-made slope is on a 1V to 3H slope and extends from elevation 0 MLT at the shoreline down to elevation -21 MLT, the horizontal distance from the slope toe from the south shoreline is 63 feet. Sixty-three feet deducted from the distance from the shoreline to the top of the channel side slope (134 ft) is 71 feet. Therefore, the contract represents that at Sta. 472+00 Renda had only 71 feet between the toe of the shoreline slope and the top of the channel side slope, about the length of the dredge ladder. The foundation dimensions of the erosion/wave protection are unknown which would reduce the clearance between the shore protection and top of slope.

Further, the docking facilities for the South Ferry Landing extend out into the water from the shoreline. This facility has a chute for docking the ferry constructed out of wood piling driven vertically and on a batter (angle). In the immediate ferry chute area of Sta. 472+00 to 471+50, Renda had less than 71 feet of clearance between the top of the channel slope and the docking facilities. This clearance assumes that Renda did not cut or dredge beyond the required side slope or bottom.

Since the South Ferry Landing facilities were so close to the required side slope on the south side of the channel, it would have been reasonable to locate all the structures prior to dredging the area. Further, when concrete rubble, riprap and/or piling were struck on April 22, 2000, and the contract warned of existing structures in the area, Renda should have discontinued dredging at that location. Instead, on April 23, 2000 Renda strikes the structure(s) again. It is only on April 22 and 23, 2000, that Renda reports encountering concrete debris, the third and fourth time for the dredge to work between Sta. 472+00 and 471+50, the closest alignment of the channel to the South Ferry Landing.

The contract drawings detail other erosion control structures such as the concrete rubble and/or riprap at the North Ferry Landing. Further, although not within Upper Bayou Dredging limits, the Lost Lake Placement Area Drop Outlet Structure also indicates existing riprap structures below the water surface. Other types of shore protection also



Figure 4.1.1 – Photo taken November 12, 2003 from South Ferry Landing looking southwest at the upstream shoreline. Note concrete rubble used as shore protection.



Figure 4.1.2 – Photo taken November 12, 2003 from the south top of bank at approximately Station 470+00 looking up stream along shoreline. Note broken concrete used as shore protection. The South Ferry Landing docking facilities are shown in the upper right corner.

line the ship channel from sheetpile walls, rock filled wire basket gabions, concrete slope paving and riprap. As shown in Figure 4.1.1 and Figure 4.1.2, a pre-bid site visit would have revealed existing concrete rubble shore protection at the South Lynchberg Ferry Landing site[8].

Contrary to the express warning in the contract, dredging outside the south side slope line and grade was performed by Renda from Sta. 470+00 to 472+00. At Sta. 472+00, at least 30 feet of excessive dredging occurred where Renda claims the dredge encountered rubble and piling. This distance reduces the possible clearance and places the dredging on top of the South Ferry Landing facilities. The plotted after-dredging (AD) cross sections show the non-pay dredging performed outside the required slope line and grade on the south side of the channel (Vol V, Tab 15, REM03566 and Vol V, Tab 16, REM03567.

4.1.3.1 Renda's Productivity Loss Period

While in the vicinity of the South Ferry Landing, Renda claims that its productivity was reduced due to the unanticipated rubble encountered on eight days (April 14, 21, 22, 23, 30 and May 1, 2 & 3). Based on a review of the records, Renda's productivity loss is based on inaccurate data at the South Ferry Landing. Renda relied solely on the Inspection Report of Dredging (IRD). Renda disregards information contained in other reports. Renda overstates the hours spent dredging the South Ferry Landing. Renda incorrectly identified 82.6 pumping hours in its claim. This error increases the claimed costs when compared with a measured mile or baseline. The effective or pumping time Renda spent in the claimed area is summarized in Table 4.1.3. As shown in Table 4.1.3, only 46.4 hours were actually spent in dredging operations at the South Ferry Landing.

---

[8] Concrete rubble protects the shoreline near the South Ferry Landing. November 12, 2003, discussions with the Ferry pilot James Borgue, and Superintendent David Starett, both of whom have been with the Lynchberg Ferry operations for 20 years, stated that the concrete rubble shore protection was placed there before they began working at the ferry. Mr. Borgue remembers Renda dredging inside the ferry chute.