Table 4.1.3
Supported Pumping Hours at South Ferry Landing

| Renda Impacted Dredging Dates | Renda Claim Data (Impacted Period): Dredging Location From Station | Dredging Location To Station | Daily Dredged Amount (c.y.) | Pumping Time (hours) | Daily Advance (feet) | Inspection Report of Dredging Data: Dredging Location From Station | Dredging Location To Station | IRD Quantity in Impact Area (c.y.) | Quantity Outside Impact Area (c.y.) | Advance (feet) | Supported Pumping Time Inside Claimed Area | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14-Apr-2000 | 472.00 | 471.50 | 2,400 | 7 | 50 | 472.00 | 471.50 | 2400 | | 50 | 7.00 | Pumping time from Report of Operations |
| | | | | | | | | | | | | |
| 21-Apr-2000 | | | | | | 473.00 | 472.00 | | 3000 | 100 | | 10.60 hrs pumping outside limits of Claim Area |
| 21-Apr-2000 | 472.00 | 471.50 | - | 3.2 | 50 | 472.00 | 471.50 | 0 | | 50 | 5.28 | Pumping time porportioned based on advance |
| **22-Apr-2000** | **472.00** | **471.80** | **400** | **10.7** | **20** | **472.00** | **471.80** | **400** | | **20** | **4.58** | Pumping time from Report of Operations |
| 22-Apr-2000 | | | | | | 481.00 | 488.00 | | 0 | 700 | | |
| **23-Apr-2000** | **471.80** | **471.50** | **750** | **9** | **30** | **471.80** | **471.50** | **750** | | **30** | **1.75** | Pumping time from Report of Operations |
| 23-Apr-2000 | | | | | | 506.00 | 510.00 | | 0 | 400 | | |
| | | | | | | | | | | | | |
| 30-Apr-2000 | 470.80 | 473.50 | - | 16.25 | 270 | 473.50 | 472.00 | | 0 | 150 | 0 | Sweeping North Side in downstream direction |
| 30-Apr-2000 | | | | | | 472.00 | 470.80 | | 0 | 120 | 0 | |
| 1-May-2000 | 470.00 | 470.50 | - | 10 | 50 | 470.50 | 470.00 | | 0 | 50 | 0 | Sweeping North Side (moved at 11:00 pm to south) |
| 2-May-2000 | 470.00 | 470.50 | 2,350 | 11.75 | 50 | 470.00 | 470.50 | 2350 | | 50 | 11.75 | Dredging began at 1:00 am from Report of Operations |
| 3-May-2000 | 470.50 | 471.50 | 4,800 | 14.7 | 100 | 470.50 | 471.50 | 4800 | | 100 | 14.67 | |
| 4-May-2000 | | | | | | | | | | 1 | 1.33 | Report of Operation has work continue till 5:10 am |
| Totals | | | 10,700 | 82.6 | | | | 10,700 | | | 46.36 | |

**Bold Data Indicates when rubble or stone reported on IRD**

Average number of pumping hours per day 7.73

With the adjusted pumping hours (46.4) and the gross quantity reported on the IRD (10,700 cy), the actual hourly production rate experienced at the South Ferry Landing is 231 cy per hour; not the 130 cy per hour used in Renda's claim.

4.1.3.2 Renda's Measured Mile – Production Days

Unlike the claimed loss productivity area of 470+00 to 472+00, where Renda excavated all material within the channel down to required line and grade, Renda selected a measured mile that did not include complete removal of the material from the side slope and bottom. Renda's measured mile also includes work in Section 2 which had shorter discharge pipeline lengths.

Figure 4.1.3 in Volume V, Tab 19, graphically shows Renda's measured mile versus the claim area. Renda uses a measured mile (represented in yellow on the graph) that does not consider cutting to grade. Each horizontal bar in Figure 4.1.3 shows the dredging location reported on the Inspection Report of Dredging (IRD). It is noted that Renda only used high production days on the south side in Section 1 and 2 instead of all production days for removal of the soil material down to grade. Additionally, Renda's measured mile primarily includes the removal of only 30 percent clay material (Vol V, Tab 20). The South Ferry Landing claim area contains approximately 50 percent clay soil materials (Vol V, Tab 21).

4.1.3.3 New Measured Mile

Because of the differences between Renda's baseline or measured mile and the claim area, a new measured mile area on the south side of the channel from Sta. 478+00 to Sta. 472+00 was investigated and includes all dredging time and quantities within the same area (see dimpled area on Figure 4.1.3 in Vol V, Tab 19). Part of the new measured mile overlaps and uses a portion of Renda's selected period of time. Results of this investigation find that Sta. 478+00 to 472+00 is a good measured mile because of the similarities in the work. They are:

- Clay content is similar (49 percent) to claim area (Vol V, Tab 22)
- Side slope and channel bottom cut to grade (similar digging depths)
- Discharge line lengths similar

This new measured mile results in consistent, more direct comparison[9] for evaluation of the disruption, if any, in the operating time needed to perform the work near the South Ferry Landing.

The pumping time used in the new measured mile to remove the quantity between Sta. 472+00 and Sta. 478+00 includes all effective time spent in the area. This time is summarized on Table 4.2.3. Table 4.2.3 shows that 121.8 pumping hours were required to remove 42,900 cy of material. This measured mile results in a production rate outside the influence of the South Ferry Landing of 352.2 or 352 cy per hour.

Table 4.2.3
Franvel Corp
Measured Mile for South Ferry Landing
Re: Inspection Report of Dredging

| Date | Station | | Advance | Effective Hours | Gross Cy | Comments about IRD/allocation |
|---|---|---|---|---|---|---|
| | From | To | | | | |
| 4-8-00 | 478+25 | 477+20 | 105 | 13.83 | 5040 | |
| 4-9-00 | 477+70 | 476+90 | 80 | 6.08 | 3840 | |
| 4-10-00 | 476+90 | 475+80 | 110 | 13.92 | 5280 | |
| 4-11-00 | 475+80 | 474+60 | 120 | 13.25 | 5760 | |
| 4-12-00 | 474+60 | 473+20 | 140 | 14.75 | 6720 | |
| 4-13-00 | 473+20 | 472+00 | 120 | 9.42 | 5760 | |
| 4-19-00 | 478+00 | 475+50 | 250 | 15.5 | 3750 | |
| 4-20-00 | 475+50 | 473+00 | 250 | 16.08 | 3750 | |
| 4-21-00 | 473+00 | 472+00 | 100 | 10.55 | 3000 | Two locations hours split based on Advance |
| 5-4-00 | 476+00 | 476+20 | 20 | 1.42 | 0 | |
| 5-5-00 | 476+50 | 478+00 | | 7.04 | 0 | Two locations hours split based on Advance |
| Totals for Area | | | | 121.8 | 42,900 | |
| Production in New Measured Mile Area | | | | 352 | | |

Accurate summaries of the production time and quantities in the alleged impact area and new measured mile areas do identify a slow down in the work while performing dredging at the South Ferry Landing on 6 days; not the claimed 8 days. The loss of productivity is identified as 34.4 percent [(1-231/352)x100]. Renda expended 46.4 pumping hours in the

[9] Differences still exist, such as more night-time operation at the South Ferry Landing.

South Ferry Landing. The additional amount of operating time Renda expended due to the difference in production is 15.96 hours (46.4 hours times 34.4 percent).

4.1.3.4 Renda Requested Impact Days

In addition to the productivity loss requested, Renda asserts entitlement to delay days for additional move-in and move-out and repair days. If Renda is not entitled to an adjustment for a loss in productivity, then Renda is not entitled to any of the eleven requested impact days which are alleged to flow directly from encountering rubble at the South Ferry Landing. However, if Renda is entitled to additional time for allowable repairs, only the actual lost time should be paid at the standby rate. Any operating time should be deducted and the price and time adjusted accordingly.

As previously discussed, Renda seeks full reimbursement for April 24, 25, 26, 27, 28 and 29. Renda was performing required work, sweeping of the areas, during this time period and repairs performed amounted to 80.35 hours or about 56 percent of the total available time. As detailed in Table 4.1.2, repair time (25.2 hours) to the swing sheave, spuds and main generator water pump are not contact items that could be damaged by rubble and are unrelated to a differing site condition at the South Ferry Landing. Further, Renda had problems with the main pump engine becoming overheated. Two of the main pump engine's heads had cracked and other heads were leaking. These engine repairs are not related to rubble at the South Ferry Landing. Because the dredge was performing contract required sweeping and the repairs are unrelated to alleged rubble damage at the South Ferry Landing, no allowance for this period is considered in my evaluation.

Renda also seeks move-out time on the May 4, 2000, which would be the contractual move-out after completing the dredging. As addressed elsewhere, coordination with the Lynchberg Ferry operators required several move-ins/outs and additional time is unwarranted and unsupported. Further, other contract work was performed on May 4, which would reduce the request, if valid.

Ten days after leaving the South Ferry Landing and two hundred and thirty-three days after starting dredging, Renda claims that the rubble encountered at the South Ferry Landing caused extensive repairs to the dredge cutterhead, pump impeller and shell which were performed on May 14, 15, 16 and 17, 2000. May 17, 2000[10], should be excluded from the repair period because on-going repairs to the spud winch prevented operation, not the impeller and pump. In the claim, invoices which Renda used to support the cost of the work are dated months after the repairs were made (outside the claim periods). For instance, the pump shell which was charged to the South Ferry Landing has an order date of May 30, 2000 and a ship date of September 1, 2000. No support is provided for the cost of the repair parts that were installed during the May 14 through 16 period.

By claiming that the South Ferry Landing damaged the cutter teeth, pump impeller and shell, Renda implies that this repair work was unexpected and occurred prematurely. No supporting or historical data was submitted to support this assertion. These parts are wear items on the dredge. Periodically, the pump impeller and shell will require rebuilding or replacing. Cutter teeth will require changing and rebuilding due to wear and may be changed due to dredging conditions.

The cutter teeth on the dredge were reported as being changed on October 8, 1999. The Report of Operations (Vol V, Tab 5) for that date indicates that the teeth were changed in two hours. Additionally, Renda used the dredge Millennium to accomplish work prior to performing the Upper Bayou Project. On at least one of those projects, sand (a very abrasive material for pumps, liners, impellers and pipelines) was the primary material hydraulically excavated and transported by the dredge. The wear from these operations must be considered when replacing the pump shell, liners, wear ring, etc.

Further, Renda management decisions when procuring the dredge contributed to the need to replace the pump shell sooner than expected. When the pump shell was made by

[10] Repairs for which Renda claims entitlement were complete on May 16, 2000. The Inspection Report of Dredging for May 16, 2000 states, "New pump in (sic) now finished on the dredge. Cutter teeth are now installed on the dredge. Work is in progress on the spud winch drum." (underscore added).

Mobile Pulley and Machine Works (Mobile Pulley), Renda declined to have a hard surface (HS) overlay applied to the interior shell prior to being used (Vol V, Tab 23). When Renda had the pump shell rebuilt[11], the hardening process was applied. If entitled to the pump shell repair, this betterment should be credited to the Government.

Finally, with respect to the claimed unanticipated repairs performed in the May 14 to 16 period, Renda solicited quotes for these precise repairs prior to March 22, 2000, approximately one month before excavating the South Ferry Landing (Vol V, Tab 25). Because of the pre-planning for the repairs in March 2000, the alleged differing site condition is not the proximate cause of the repairs.

Further, the equipment rates used by Renda and specified in the contract have a component for repair parts. An allowance for specific repairs in May 2000 would result in a double recovery of cost.

Renda itself notes that other repairs were performed during the May 14 through 18 period. Repairs to the spuds and spud winch drums are concurrent delays which would prevent operation of the dredge. A concurrent delay would result in time, but no price adjustment. For the reasons stated above, no delay time is warranted for the May impact periods.

Should merit be found for any of the repair days to the dredge during the two delay periods, then the daily standby rate of $10,532 which is computed at Vol V, Tab 26, should be used.

---

[11] May 26, 2000, quote from Mobile Pulley for Pump Shell, 24"A4891 ACS – 3 hs states, "With two passes of hard rod in the inside wear area of the shell" for a price of $43,136. May 30, 2000, order date and invoice included in Renda's claim shows a price of $43,136 for a "Pump Shell, 24" A4891 ACS3 w/HS (Vol V, Tab 24).

4.1.4 Technical Results

On April 22 and 23, 2000, concrete rubble and wood pilings were struck by Renda while dredging between Sta. 471+50 and 472+00. However, a differing site condition at the South Ferry Landing did not occur during the dredging process.

At this location, concrete rubble, riprap and wood pilings should have been expected to be encountered at the structures, ferry dock and shore protection, if dredging outside the required slopes. April 22 and 23, 2000 were Renda's third and fourth day to dredge in the area. The contract specifically warned about encountering structures if cutting or dredging outside the required side slopes. The dredge did cut outside the required side slopes.

Contract Section 800, Special Clauses, paragraph 6, Layout of the Work, requires Renda to lay-out its work and be responsible for all measurements in connection with the layout. Further, paragraph 6 states, in part, "The Contractor shall be responsible for excavating the work to the lines and grades that may be established or indicated by the Contracting Officer." Clearly, dredging beyond the south side slope occurred, structure materials were encountered and Renda is responsible for being outside the dredging limits.

A site visit to the project site prior to bidding by Renda is undocumented. However, if one occurred, the shore protection constructed of broken concrete with imbedded reinforcing steel and angle irons and the ferry dock constructed out of wood piling would have been visible. The close proximity of these facilities to the top of the channel side slopes should have been a warning to Renda to trim the slopes carefully or to locate the structures prior to starting work in the area.

4.1.5 Cost and Time Evaluation

As indicated, a loss of production of 34.4 percent did occur at the South Ferry Landing. Renda claims that the Government is responsible for the inefficiency due to the presence of a differing site condition. A detailed evaluation of the additional cost and time claimed has been performed.

As identified herein, Renda worked 46.4 productive hours performing the dredging at the South Ferry Landing between Sta. 470+00 and 472+00. Therefore, with the actual loss of efficiency factor, Renda performed 15.96 or 16 hours of added work.

An adjustment in price based upon a loss of productivity or overrun of pumping time of 16 hours is calculated.

4.1.5.1 Results of Cost Evaluation

Renda's Claimed Cost and Results of Technical Evaluation

| | Renda Claim | Supported Cost | Note |
|---|---|---|---|
| Direct Costs | | | |
| Additional Labor ($8,053) and Equipment (12,894) | $650,880 | $20,947 | A |
| Equipment Repair Cost | 61,075 | 0 | B |
| Job Site Field Cost | 31,318 | 2,542 | C |
| Total Direct Cost | $743,273 | $23,489 | |
| Overhead: | | | |
| Resident Home Office (4.55%) | 118,032 | 1,069 | D |
| Corporate Office (2.83%) | 49,056 | 665 | D |
| Total Indirect & Direct Cost | $910,361 | $25,223 | |
| Profit (7.15%) | 91,036 | 1,803 | E |
| Bond (0.65%) | 6,509 | 176 | F |
| Total Adjustment | $1,007,906 | $27,202 | |
| Miscellaneous Cost | | | G |
| Professional Fees/Consultant | 40,000 | 0 | |
| Report Preparation Cost | 1,000 | 0 | |
| Bond on Miscellaneous (0.65%) | 267 | 0 | |
| Total Amount | $1,049,173 | $27,202 | |

Explanatory Notes:

A) The additional labor and equipment proposed by Renda include the levee personnel and dredging personnel. As noted in Renda's pre-award submittal (Vol IV, Tab 13, RM-COE-05737), dredging work was anticipated to take 269 days and was continuous from the start of work until complete. The hydraulic levee shaping work was anticipated to take only 172 days and could be performed when the dredge was not actively pumping material. Therefore, the hydraulic levee shaping work is not the controlling activity and is separate from the dredge operation. No allowance is made for levee equipment or personnel performing the shaping operation, which includes hauling equipment.

Renda proposed 19 days of actual cost (8 operating and 11 impacted days) and subtracted 1.75 days of estimated cost from an earlier time period. The actual cost of the disruption is calculated from the six days where production was reduced. No additional time or cost is considered for the impact periods for reasons stated previously.

> 1) Labor – Renda allocates 100 percent of the direct labor cost for April 14, April 21 thru May 4, and May 14 thru May 17, 2000 to the differing site condition encountered at the South Ferry Landing. Only six days have been identified as being disrupted by the loss of production at the South Ferry Landing Area. Volume V, Tab 27 has the labor calculations for the disruption period.
>
> 2) Equipment – Volume V, Tab 28 contains the equipment cost calculation for the loss of production at the South Ferry Landing. The equipment rates used by Renda did not reflect the rates permitted by the Contract. Further discussion about equipment rates can be found in Section 5 of this report.

B) Specific Equipment Repair Parts –No allowance has been made for specific repair parts. Among the numerous reasons cited above, the repair cost factor in the equipment rates compensates for major and minor repairs and maintenance. For the repairs claimed in May, Renda had planned for them prior to performing the South Ferry Landing work.

C) Jobsite Field Costs - This cost component includes cost incurred in the field and generally is for miscellaneous expenses such as freight, communications, and the like. However, many of the elements for supplies included in the monthly field costs appear to be equipment fuel, parts and/or repairs[12] which should be eliminated since the Corps Manual includes an allowance for equipment repairs in the rates. Without the specific invoice, the items in question cannot be confirmed. Therefore, the monthly field cost as presented by Renda is used to calculate a daily rate of $1,815.53 and is considered acceptable at this time. The daily rate is multiplied by the 1.4 days of actual delay.

D) Resident Home Office and Corporate Office Overheads - The DCAA audit (Vol V, Tab 29) found that, for the year 2000, the overhead rates were 16.14 percent for Resident Home Office and 6.60 percent for Corporate Office. However, the audit notes that the Resident Home Office rate and the Corporate Office rate is comprised of two components, office and shop rates. I question the shop rate component of the overhead rates since the Corps Manual, which Renda was required to use, allows for shop expenses in the equipment rate. Only the DCAA-verified overhead office rates[13] for Resident Home Office (4.55%) and Corporate Office (2.83%) are used in this price evaluation. The shop component of the rate is omitted since it is a duplication of cost. The Corps Manual states that an allowance has been made for "Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead."

E) Profit is calculated by using the weighted guidelines method and is 7.15%. Development of the profit rate is in Volume V, Tab 30.

F) Bond is verified by the DCAA audit of the South Ferry Claim.

[12] For example, April 2000 Monthly Vendor Cost for Southwest Wire Rope at $5,953.77, Metal Supply at $9,727.63, Exxon at $1,987.87 and ABB Automation at $5,850.00.
[13] The office overhead rates are included in Volume V, Tab 29 behind the audit.

G) The miscellaneous costs were questioned in their entirety by the DCAA audit. No allowance has been made for these cost items.

4.1.5.2 – Time Evaluation

The slowdown in the work at the South Ferry Landing required 1.4 days to actually perform. Since the performance time is greater than 1, the time has been rounded up to the next whole day. Therefore, the time extension associated with the slowdown is two calendar days.

4.1.5.3 – Over-Excavation Beyond Required/Allowable Pay Prism – Non-Pay Yardage

Renda excavated outside the maximum pay prism in the area of the South Ferry Landing and in my new measured mile area. Therefore, a portion of the productive time expended in each area was wasted while performing non-pay work. The amount of over-excavation (non-pay yardage) in Renda's impacted area from Sta. 470+00 to 472+00 is 15,397 cy or an additional 77 cy/ft of channel length (Vol V, Tab 31). In the measured mile area from Sta. 472+00 to 478+00, the amount of non-pay yardage is 96 cy/ft of channel length. Because the amount of over excavation in the claim area is less than in the measured mile area, the cost and time evaluation above for the South Ferry Landing understates the adjustment by 25 percent to which Renda is entitled, if found that Renda did encounter a differing site condition.

Therefore, Renda's cost and time should be adjusted to account for this non-pay work. The cost increase Renda incurred at the South Ferry Landing is $34,003 ($27,202 times 1.25). The time extension remains at 2 calendar days because 1.4 actual days of delay times 1.25 percent is 1.75 and the time extension has been rounded to 2 calendar days.

### 4.1.6 Conclusion

My evaluation has identified a slow down in the work at the South Ferry Landing. The maximum damages measured by this slow down are $34,003 and required two calendar days to perform. However, no differing site condition was encountered at the South Ferry Landing. The concrete rubble/rip rap and the wood piling were encountered by Renda dredging beyond the required side slopes and bottom.

## 4.2 Houston Lighting and Power (HL&P) Transmission Tower Delay

### 4.2.1 General

On May 16, 2001, Renda submitted its revised claim in the amount of $170,863 for the suspension of dredging work caused by the construction of a new transmission tower by others at Lost Lake Placement Area. Renda claims interruptions during two periods, July 16 and 17, 2000, and October 16, 17, and 18, 2000. Included with its revised claim, Renda provided updates on the damages summary and analyses of labor and equipment.

After contract award to Renda, Houston Lighting and Power Company (HL&P) received permission from the Government to relocate a transmission tower within the existing easements on Lost Lake Placement Area. HL&P's work on Lost Lake interfered with the location of Renda's discharge pipeline. HL&P was to complete its work no later than December 31, 2002 (Vol V, Tab 35). HL&P performed its work in 2000 which conflicted with Renda's construction activities.

### 4.2.2 HL&P Claim Period One – July 16 and 17, 2000

Renda's cover letter for the HL&P transmission tower claim states that work was affected on two days, July 16 and 17, 2000. However, the labor charged to the delay is only for July 16, 2000, and allocated as "50% of Gross Payroll (less Levee Payroll) to Claim". Renda states that July 17, 2000, is "Claimed in Flare Area".

July 16, 2000, is claimed by Renda for 50 percent of the day. The basis for allocating 50 percent of the day is unknown[1]. On July 16, 2000, the Inspection Report of Dredging (IRD) states that Renda was performing contract work on that day and had 8 hours and 45

[1] The Report of Operations for that day is missing which would present a precise accounting of the time.

minutes of effective operating time "sweeping bad stations on the north side of the channel". There is no documentation to allocate the remaining hours to the HL&P tower delay.

However, based upon historical data for the job, the proportion of non-effective time to effective time, Renda would have experienced approximately 1.0 hour of non-effective time for each hour of effective operating time (Vol V, Tab 36). Therefore, on July 16, approximately 17.75 hours (17 hours and 45 minutes) of contract time would be associated with the sweeping in Sections 2 and 3.

On July 16, after sweeping, the Inspection Report of Dredging (IRD) notes that Renda "moved the dredge out of the way to sink submerge(d) crossing." This submerged crossing was laid the following day across the ship channel to perform the work on the south side of the channel in the Flare Area. Movement of the dredge by Renda would have taken additional time and is unrelated to work at the transmission tower. Again, no mention of any delay due to the transmission tower is mentioned on July 16, 2000 in the IRD, or on any other contemporaneous document. No delay or disruption to Renda's dredging operation on July 16, 2000, is documented.

On July 17, other internal Renda documents report laying the submerged pipeline crossing across the Houston Ship Channel, fixing discharge pipe on the dredge and setting up the dredge to resume work in the Flare[2]. All of the above preparations are for beginning work in the Flare Area and unrelated to the transmission tower.

For the July period, in an email dated June 4, 2002, Mr. Barry Smith (Vol V, Tab 38), after consulting with project personnel, advised the DCAA auditor that Renda "was able to rally sufficient forces to basically move/chivy or push the pipeline out of the way with a minimum of difficulty"[3] (underscore added).

[2] See internal Renda Marine Daily Production Reports – Vol V, Tab 37).

[3] Renda did not provide notice of additional work or a conflict with the HL&P transmission tower until October 2000.

However, on July 14, and July 18, 2000, the Inspection Report of Dredging (IRD) reports some additional work caused by the new transmission tower[4]. This work consisted of welding pipe fittings (elbows) onto the metal shore pipe. The Contractor's Quality Control Report (CQCR) does not mention any work caused by the transmission line until July 18, 2000, when it states, "We re-routed shoreline around new tower at disposal area." However, the CQCR did not identify the personnel or time required to "move/chivy the pipeline" which required a minimal amount of time.

4.2.3 HL&P Claim Period Two – Oct 16, 17 and 18, 2000

For claim period two, Renda's claim for equipment states, "Since the actual hours of delay are not specifically defined in the reports hours of operation are JUDGMENTAL". Likewise, for the labor hours, Renda states that the delay costs are judgmental. The hours need not be judgmental. Renda relies on only the IRD in preparing its claim. Renda disregards other internal reports which identify actual hours, specifically the Report of Operations.

Renda claims 67 percent of the weekly dredging payroll (does not include levee payroll) which ends on October 22, 2000. This allocation of labor is inconsistent with the time (48 hours) Renda identified as being delayed. Renda says the transmission line delayed the work as follows:

| | |
|---|---|
| October 16, 2000 | (50% of the day) |
| October 17, 2000 | (100% of the day) |
| October 18, 2000 | (50% of the day) |

The basis for selecting the above percentages is undocumented. However, the claimed 48 hours is only 29 percent of the week; not the 67 percent Renda uses to allocate its weekly labor cost. Additionally, had Renda consulted its internal Report of Operations, the actual delay time for period two would have been easily discerned.

[4] The IRD for July 14, 2000, states, in pertinent part, "Welded 45 elbow onto 200' steel pipe to make turn around high line wire." The IRD on July 18, 2000, states, in pertinent part, "Worked on 90 degree elbow to repipe around new tower @ Lost Lake disposal area."

On October 16, 2000, according to the Report of Operations (Vol V, Tab 39), Renda began the pipeline relocation for the transmission tower at 3:45 pm and was delayed 8.25 hours till midnight. On October 17, 2000, Renda was down all day (24 hours). On October 18, 2000, Renda was delayed until 3:50 am due to the relocation of the shore pipe to accommodate the HL&P transmission tower construction. In sum, Renda's critical dredging work was actually idled thirty-six hours.

HL&P had been coordinating their work with Renda since July 2000. Sometime prior to October 16, 2000, unbeknownst to the Government, Renda met with HL&P representatives to resolve the conflict with Renda's pipeline at the new transmission tower (Vol V, Tab 40). Renda agreed to additional shutdown cost with HL&P without notifying the Government of the transmission tower conflict or its negotiations with HL&P. Not until after the additional work was performed did Renda notify the Government on October 18, 2000, of the additional cost to Renda's operation (Vol IV, Tab 20). The Government did not have an opportunity to avoid the additional cost Renda agreed to incur during Renda's undisclosed negotiations with HL&P.

### 4.2.4 Technical Evaluation

For claim period one, July 16, 2000, delay to Renda's dredging operation by the HL&P transmission tower is undocumented and unsupported. Other Renda work (laying submerged pipeline to Flare Area, and dredge relocation) was non-effective time which is unrelated to the transmission line and not the responsibility of the Government. Renda acknowledges that the work performed for the transmission tower relocation in July was accomplished with a minimum of difficulty. In July 2000, notably the 14th and 18th, Renda did perform some additional work by welding fittings on the discharge pipeline and pushing the pipeline on the shore out of the way with "a minimum of difficulty." The personnel and equipment Renda used to accomplish the added work is not documented. I have estimated the personnel and equipment used during July 2000 to measure the adjustment for Period One.

For HL&P period two, the actual delay time of 36 hours is documented through the Report of Operations. Thirty-six hours of delay time to the critical dredging operation is used to measure the damages. I have made no deduction in time for relocation of the dredge and preparatory work for dredging a different location.

4.2.5 Technical Results

An adjustment in time and price is computed for additional work in July 2000 and delay in October 2000. A detailed evaluation of the additional cost and time claimed has been performed.

4.2.5.1 Results of Cost Evaluation

Renda's Claimed Cost and Results of Technical Evaluation

| | Renda Claim | Supported Cost | Note |
|---|---|---|---|
| Direct Costs | | | |
| Additional Labor | $18,460 | $5,880 | A |
| Additional Equipment | 95,460 | 9,061 | |
| Job Site Field Cost | 4,068 | 2,435 | B |
| Total Direct Cost | $118,208 | $17,376 | |
| Overhead: | | | |
| Resident Home Office (4.55%) | 18,771 | 791 | C |
| Corporate Office (2.83%) | 7,802 | 492 | C |
| Total Indirect & Direct Cost | $144,781 | $18,659 | |
| Profit (0.00%) | 14,478 | 0 | E |
| Bond (0.65%) | 1,035 | 121 | F |
| Total Adjustment | $160,294 | $18,780 | |
| Miscellaneous Cost | | | G |
| Professional Fees/Consultant | 10,000 | 0 | |
| Report Preparation Cost | 500 | 0 | |
| Bond on Miscellaneous (0.65%) | 68 | 0 | |
| Total Amount | $170,863 | $18,780 | |

Explanatory Notes:

A) The additional labor and equipment proposed by Renda for this HL&P claim generally does not include the levee personnel. However, Renda calculated 2.5 days of delay cost. The actual cost of the delay is determined to be 1.5 days where dredging was idled due to the HL&P transmission tower work by others. Additional cost, but no time delay, is considered for the July work for reasons stated previously.

1) Labor – Renda allocates 50 percent of the dredging labor cost for July 16, October 16 and 18 and 100 percent of the dredging labor cost for October 17, 2000 to the HL&P delay. Only portions of three days have been identified as being stopping contract work. Volume V, Tab 41 has the labor cost ($4,529) calculations for the delay period in October and Volume V, Tab 42 has the additional labor cost ($1,351)in July 2000.

2) Equipment – Volume V, Tab 43 contains the equipment cost calculation for the October 2000 delay caused by the HL&P transmission tower construction by others. Volume V, Tab 42 has the estimated equipment cost ($1,545) for the additional work performed in July 2000. The equipment rates used by Renda do not reflect the operating and standby rates permitted by the Contract. Further discussion about equipment rates can be found in Section 5 of this report.

B) Jobsite Field Costs: - This cost component includes cost incurred in the field and generally is for miscellaneous expenses such as freight, communications, and the like. However, many of the elements appear to be costs which would be included in the Resident Office Overhead and duplicated in this cost item. Also, supplies included in the monthly field costs which appear to be equipment fuel, parts and/or repairs[5] that should be eliminated since the Corps Manual includes an allowance for equipment repairs in the rates. Without the specific invoice, the items in question cannot be confirmed. Therefore, the monthly October field cost as presented by Renda is used to calculate a

[5] For example, April 2000 Monthly Vendor Cost for Southwest Wire Rope at $5,953.77, Metal Supply at $9,727.63, Exxon at $1,987.87 and ABB Automation at $5,850.00.

daily rate of $1,623.49 and is considered acceptable at this time. The daily rate is multiplied by the 1.5 days of actual delay.

C) Resident Home Office and Corporate Office Overheads - The DCAA audit (Vol V, Tab 45) found that the actual rates for 2000 were 16.14 percent for Resident Home Office and 6.60 percent for Corporate Office overheads. However, the audit states that the Resident Home Office rate and the Corporate Office rate is comprised of two components, office and shop rates. I question the shop rate component of the overhead rates, since the Corps Manual, which Renda was required to use, allows for shop expenses in the equipment rate. The shop rate component in the Resident Home Office and Corporate Office overheads duplicates the Corps Manual allowance and is omitted. The Corps Manual specifically states that an allowance has been made for "Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead." Without the shop component, the Resident Office Overhead rate is 4.55 percent and the Corporate Office Overhead rate is 2.83 percent.

D) Profit is not allowed on suspensions of work. Since the work was idled or on standby, no profit is allowed.

E) Bond is verified by the DCAA audit of the HL&P transmission tower delay proposal.

F) The miscellaneous costs were questioned in their entirety by the DCAA audit. No allowance has been made for these cost items.

4.2.5.2 Time Evaluation

The dredging work was delayed by 1.5 days. Since the time exceeded one day, by rounding up, a time extension should be granted for 2 calendar days.