4.2.6 Conclusion

Due to the HL&P transmission tower construction, Renda was stopped from performing critical dredging work for 36 hours. If the stoppage is found to have merit, a time extension should be granted for 2 calendar days and increased cost of $18,780.

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 4.3 Flare Area – Differing Site Condition

### 4.3.1 General

The Flare Area is a wide area on one side of the channel that is adjacent to and contiguous with the channel between Sta. 520+00 and 550+65. The channel bottom before entering the Flare Area is 530 feet wide. The transition in the bottom width begins to expand at Sta. 520+00 and ends at Sta. 527+35. At Sta. 527+35 the Flare Area has an additional bottom width of 385 feet on the right side of the channel if looking downstream or down station. This side of the channel is referred to as the south side of the channel. Generally, all earth material in this area is outside the existing channel limits and new or virgin work. At Sta. 544+06, the Flare Area width transitions back to the channel width of 530 feet (265 ft on each side of the centerline). The Flare Area is shown on Contract Drawing C-3 and C-5 and is shown in Figure 4.3.1 below.

Figure 4.3.1
Flare Area (Re: Contract Drawing C-3)



After two months of working in the Flare Area, Renda notified the Government on March 30, 2000, that it had encountered stiff clays at elevations where soft clays had been anticipated. Renda requested a time extension of 100 days. On February 21, 2001, Renda submitted its claim for the Differing Site Conditions in the Flare Area and requested a 76-calendar day time extension and $2,973,227 in additional cost. On March 7, 2001, Renda revised its claim to a request for 76 calendar days and $4,691,688 in additional cost. The difference is based primarily on revised equipment rates and overhead markup.

Renda claims that the Flare production was impacted (disrupted) by stiff clay during two periods. The periods are:

| Renda Impact Period | Date | Station |
|---|---|---|
| Period One | 23-Jan-00 to 11-Mar-00 | 520+00 to 540+00 |
| Period Two | 17-Jul-00 to 29-Sep-00 | 522+60 to 550+50 |

Period One was accomplished without the assistance of a booster pump to transport the earth materials in the discharge pipeline from the channel to the Lost Lake Placement Area. Period Two begins when Renda re-enters the area with a barge-mounted booster pump placed in the discharge pipeline.

### 4.3.2 Materials to be Encountered

Renda's pre-bid worksheets and bid papers do not identify the types of earth materials (clay, silt, mud, sand) anticipated in the Flare Area. Renda must demonstrate that it relied on, and correctly interpreted, the boring logs to successfully prevail on a differing site condition in the Flare Area. If Renda had no expectations of the material it would encounter at bid, then the soils cannot be materially different and a differing site condition cannot exist.

Two contract boring logs were located on the south bank in the Flare Area, 93-63 and 93-62. Both boring logs are located below water surface elevation close to the existing channel in the toe of the bank of earth material to be excavated. The surface elevation of boring log 93-62 is approximately elevation -33 MLT. The surface elevation for boring log 93-63 is approximately elevation -45 MLT. As shown on the cross sections included in the contract, the surface elevation for the earth materials in the Flare Area slopes upward to approximate elevation -10 MLT. Renda does not explain what documents were relied on to determine that earth materials (approxi-mately 30 feet thick above the top elevations of boring logs 93-62 and 93-63) are soft to very soft clays. There are nine other borings in the general vicinity of the Flare Area, some of which have higher surface elevations, but Renda makes no reference to these. The surface elevation for these logs range from elev. +10 MLT to elev. -41 MLT.

Renda's August 1998 Stiff Clay Spreadsheet (Vol IV, Tab 16) shows Renda's interpretation of the locations and quantities of very stiff to stiff clay anticipated to be encountered while dredging the channel. Renda identified 1,051,871 cy of very stiff to stiff clay to be dredged from the channel. Renda's calculation contains some math errors and artificially narrows the range or location of the very stiff to stiff clays. The Average End Area Method (Vol V, Tab 46) was used to check Renda's math and identification of locations contained in Renda's August 1998 Stiff Clay Spreadsheet. Using the Average End Area Method, Renda should have expected 1,084,512 cy of stiff to very stiff clay on the project. Of particular interest, Renda identifies on its August 1998 Stiff Clay Spreadsheet very stiff to stiff clay in the Flare Area at the following locations:

| Location: Stations | Acceptance Section | Very Stiff to Stiff Clay Quantity (CY) |
|---|---|---|
| 520+00 to 522+00 | 3 | 7,044 |
| 522+00 to 524+00 | 3 | 15,256 |
| 524+00 to 527+35 | 4 | 13,754 |
| 527+35 to 530+00 | 4 | 0 |
| 530+00 to 534+00 | 4/5 | 6,778 |
| 534+00 to 538+00 | 5 | 6,778 |
| 538+00 to 544+00 | 5/6 | 82,147 |
| 544+00 to 550+65 | 6 | 89,331 |
| Total for Flare Area | | 221,088 |

At least in August 1998, Renda expected 221,088 cy of stiff to very stiff clay in the Flare Area. According to Renda, that represents approximately 13 percent of all materials to be removed from within the channel limits, which includes the Flare Area. It is important to note that the bulk of this very stiff to stiff clay quantity in the Flare Area is located at the lower elevations (near or at required grade) and upstream at the upper end of acceptance Section 5 and in Section 6.

Also of interest on Renda's August 1998 Stiff Clay Spreadsheet is an area between Sta. 509+33 and Sta. 520+00 which is identified as containing no stiff clay. This area was anticipated by Renda to contain a total of 384,000 cy and is contiguous with, but downstream of, the Flare Area which begins at Sta. 520+00.

4.3.3 The Work

Dredging work began on September 13, 1999, in Section 2. On October 13, 1999, Renda advised the Government in a letter (Vol IV, Tab 21) that the slow production in Sections 1 and 2 would not continue. Renda stated,

> "As we are now approaching Station 500+00, the material will increase to near 275 cy per lineal foot at Station 510+00 and will consist of very soft clays to –45[ii]. We anticipate productions to increase to more than 20,000 cubic yards per day. After completing the north half of Section 3, we will dredge across to the flare portions of Sections 4, 5 and 6. These areas contain as much as 400 cubic yards per lineal foot[iii] and also consist of very soft clays except for the section beginning in Section 6[iv]."

This Renda statement is consistent with the August 1998 Stiff Clay Spreadsheet where stiff clays are not expected from approximately Sta. 510+00 to 524+00 (end of Section 3) except in the lower elevations and predicts that stiff clays will be more abundant near the beginning of Section 6. Additionally, in the October letter, Renda compares the anticipated very soft clays in the flare portions of Section 4 and 5 to the very soft clays to be dredged beginning at Station 510+00 (Section 3).

Between approximately Sta. 510+00 to Sta. 520+00, Renda had a production rate in the Renda identified very soft clays (hereinafter referred to as "Renda Soft Clay Area") of

about half (9,657 cy/day)[1] of the October 13, 1999 anticipated production of 20,000 cy/day. Analysis of the Inspection Report of Dredging (IRD) reveals that in the Renda Soft Clay Area, production did not reach the anticipated production because the dredge averaged 13.6 running hours per day and had an hourly production rate of 709.5 cy per hour[2].

On January 5, 2000, Renda responded to the Government's concern about the lack of progress on the job (Vol IV, Tab 22). Renda acknowledged that production had not met projections because of the stiff clays encountered. Renda also attributed low production to the late delivery and unsatisfactory condition of the dredge which had delayed the start of work and reduced efficiency of the dredge. However, contrary to Renda's statement in the January 5 letter that stiff clays had been encountered, Renda had already dredged the Renda Soft Clay Area where production was expected to be more than 20,000 cy/day. As noted above in this report, production did not meet with Renda's expectations or predictions in October 1999. The production, however, more closely matched the bid production[3].

In an e-mail to the Government on February 1, 2000 (Vol IV, Tab 23), Renda admits that low productions continued and acknowledges that the low production is due to the limitations of the head[4] available from the dredge and ladder pump while pumping clay. Renda then indicates that it did not expect to be pumping clay without a booster further upstream than Sta. 524+00. Renda states that a booster is scheduled to arrive in February

[1] Actual production is from evaluation of IRD and is contained in Volume V, Tab 47.
[2] Ibid.
[3] Fisher's initial bid did not separate the anticipated production into stations or sections. Fisher's Bid anticipated 8,000 cy per day (Vol IV, Tab 9, RM-COE-23218) and running 13 hours per day (Vol IV, Tab 15, RM-COE-02672 ). Fisher's hourly bid production for the project was 615 cy/hr (8,000 divided by 13). Bowman's bid (Vol IV, Tab 8), the one supporting Renda's bid amounts, did not separate the anticipated production into sections, stations or different types of earth materials. Bowman's bid had a range shown for daily production of 8,500 to 11,000 cy per day. Therefore, the anticipated bid production range was 845 cy/hr to 654 cy/hr. Bowman anticipated average production at bid was 750 cy/hr assuming 13 productive (effective) hrs/day.
[4] Head refers to hydraulics. When a liquid, or in this case a slurry of water and soil, exerts a force against its container, it is called pressure. Pressure in dredging is also referred to as head. The dredge pump(s) creates the positive pressure to move the slurry through the pipeline. Negative losses include discharge head, entrance head and pipeline (friction) head, among others and reduce the velocity of the slurry as it travels through the pipeline. The type of material can also affect the head loss. These types of head losses affect production.

to mid-March 2000. Renda concludes the February 1, 2000 e-mail by stating that the boring logs have been accurate to date showing "locations of muds, sands, soft, medium and stiff clays." As of January 31, after four and a half months of dredging, Renda has not encountered any differing site conditions or been given any change orders for dredging.

Contrary to the February 1, 2000 email that Renda would not dredge clay upstream of Sta. 524+00 without a booster[5], Renda continued to excavate in the Flare up to Sta. 540+50. On March 12, 2000, Renda left the Flare Area of Sections 4 and 5 and returned to Section 1, 2 and 3 to finish the areas for acceptance.

After leaving the Flare Area on March 12, 2000, Renda solicited quotes from other dredging companies for completing the remaining work. On March 23, 2000, Weeks Marine (Weeks) responded to Renda's verbal request for a quote to complete the upstream acceptance sections of 7, 8 and 9 (Vol V, Tab 48). The unit price quoted for performing Section 7, 8 and 9 dredging was $4.95 per cy ($2.85 per cy more than Renda's price to the Government). On March 27, Renda solicited another proposal from Weeks Marine (Vol V, Tab 49) this time requesting an additional price for completing the remainder of the dredging in Sections 5 and 6, as well as, placing the clay in the hydraulic levee on the north side of Lost Lake Placement Area between the existing drop-outlet structure and the new drop-outlet structure. Renda points out that approximately 838,000 cy of primarily clay (levee building material) remains in all of Sections 5 and 6. A response is not documented.

In addition, on March 29, 2000, Renda sought another price from Bean Dredging Corp. (Bean) for completing the dredging in Sections 5 and 6 (Vol V, Tab 50). Renda expressed the "need to have the Meridian[6] work in Sections #5 and #6 pumping clay" (footnote added). Again, for the quote, the clay to be removed from Sections 5 and 6 was to be transported to the backside of the placement area (north levee alignment) to build

---

[5] The Renda booster pump did not arrive on the job until May 2000 and did not work properly until July 2000.

[6] The Meridian is a 30-inch hydraulic dredge.

hydraulic levees; a long discharge pipeline. Renda provided Bean a plan view and a typical cross section of the channel. In the typical cross section provided to Bean, Renda stated that the mud in the area had been dredged off of the remaining stiff clay in Sections 5 and 6 (see Figure 4.3.2 for reproduction of cross section contained in Volume V, Tab 50).

Figure 4.3.2

Reproduction of typical cross section provided in Renda Solicitation to other contractors. (Vol V, Tab 50)




Also in Volume V, Tab 50, REM35088, Renda provided a quantity calculation showing approximately 838,000 cy of clay remaining in all of Sections 5 and 6, including the north bank and Flare Area on the south side of the channel. No documented response has been found in response to this request.

On March 30, 2000, Renda gave notice to the Government of a Differing Site Condition in the "Flare" area. Renda states that stiff clays were encountered at a much higher elevation than the –47 feet MLT as shown on the borings. Renda requested "an additional 100 days for the difference in the production to dredge soft clays versus the time required to dredge stiff clays, and the associated down time caused by plugged lines caused by encountering stiff clays...." (Vol IV, Tab 24).

Renda refers to borings 93-62 and 93-63 as indications of what material to expect in the Flare. However, these borings are located low elevation in the south channel slope toe

and not in the virgin (new) bank material where Renda asserts it encountered differing materials. In particular, boring log 93-62 describes the top ten or fifteen feet as being loose maintenance material contaminated with hydrocarbons. Renda does not mention that boring logs exist in the virgin bank on the north side of the channel. These north bank boring logs show very stiff and hard clay at elevation –35 feet MLT, much higher than where Renda states that stiff clays were anticipated[7].

Renda's reliance on only boring logs 93-62 and 92-63 represent that soil characteristics of the earth materials in the Flare Area is inconsistent with its stated "Character of Dredged Material and Dredging Assumptions" (Vol V, Tab 51) explained in its South Ferry Landing claim. For the South Ferry Landing, which is located at approximately Sta 472+00 on the south side of the channel, Renda states that it relied on Boring 3ST-162 at Sta 473+90 on the north side of the channel approximately 560 feet away on the opposite bank. Additionally, Renda notes that Boring Log Nos. 93-60, 3ST-163, 93-61 and 3ST-164 are equally applicable. Boring Log 3ST-164 is located farthest upstream on the north side of the channel and over 5000 feet away from the South Ferry Landing. In contrast, the Flare Area is directly across the channel and less than 600 feet from Boring Logs 3ST-3, 3ST-4, 3ST-5, 3ST-6, 72-105 and 3ST-7 which are allegedly not used by Renda for determining the character of the material to be dredged. These boring logs describe stiff and hard clays at or above elevation –35 feet MLT. Renda's March 30, 1999, notice letter states, "At the downstream end of the flare, borings showed the stiff clay line to be at approximately –46 mlt. We encountered the clays at near –40 mlt and dredged the area to grade up to Station 534+00."

Renda is correct that boring log 93-62 describes stiff (S), hard (H) and very stiff (VS) clay in the toe of the south slope at approximate elevation –46 MLT. However, for the virgin material above elevation –46 feet MLT, Renda ignores the north side boring logs

---

7 In the South Ferry Landing claim asserted by Renda, Renda states that it uses boring logs on the opposite, north bank to predict characteristics of the soil materials on the south bank (Vol V, Tab 51). That type of assumption is exactly what has been done on Renda's August 1998 Stiff Clay Spreadsheet. For each cross section, the depth of stiff clay has been estimated and multiplied times the entire width of the channel. Material anticipated on one side of the channel is represented to exist across the width of the channel to the other side.

3ST-3 and 3ST-4. These north side boring logs describe stiff (S) clay at –35 feet MLT approximately five feet higher in elevation than where Renda describes encountering stiff clay (at near elevation –40 feet MLT) at the downstream end of the flare. For demonstrative purposes, Figure 4.3.3 shows graphically elevations of the clay materials on boring log 3ST-3 versus the elevations at which Renda states that they anticipated and unexpectedly encountered stiff (S) clay. In the boring logs, the symbols for soft and very soft clay are SO and VSO, respectively.

Figure 4.3.3
Boring 3ST-3 with Elevations noted for Stiff Clay



Renda's notice letter continues, "from Sta 534+00 upstream, the clay level continued to rise reaching as high as –10 mlt on the slopes and –15 mlt in the center of the flare." Boring log 3ST-6, located upstream of Sta 534+00 at Sta 539+00, describes very stiff clay from approximate elevation –5 feet MLT down to elevation –10 feet MLT again where Renda says it encountered stiff clay.

Renda's statement that it anticipated stiff clays in the Flare Area at -47 MLT from its review of the Boring Logs is contradicted by its August 1998 Stiff Clay Spreadsheet. The August 1998 Stiff Clay Spreadsheet anticipates as much as 10 feet of stiff clay (-38 MLT) to be encountered at Sta. 554+06 near the beginning of Section 6 (Sta 540+00 in the Flare). The stiff clay in this Section 6 of the Flare was also anticipated by Renda in its October 13, 1999 letter.

As previously mentioned, when Renda left the flare area on March 13, 2000, Renda was excavating beyond Sta. 524+00 and did not have a booster pump operating at that time. On July 17, 2000, Renda returned to the Flare Area and began to work upstream. This time, Renda was using a booster pump to assist in transporting the material to the placement area, but did not hydraulically place the material on the north side of the placement area. This material was deposited on the west levee in the disposal area, short of the planned placement area discussed with Weeks and Bean.

Renda completed Period Two dredging on September 29, 2000. Additionally, Renda returned to the Stations of Sta. 531+00 to Sta. 550+00 during the period February 26, 2001 through April 3, 2001, and performed 31 days of dredging. This work was on the north side of the channel following removal of unanticipated shore protection (bilateral modification work). However, discharge line lengths averaged 12,871 feet and production with a booster (possibly two at times) averaged 548.72 per day. This final sweeping work would have occurred in the stiff clays that are shown on the north side and that exist at the bottom of the channel, in the allowable overdepth or in the non-pay areas excavated outside the dredge prism.

Following Renda's notice of a differing site condition in the Flare Area on March 30, 2000, the Government investigated the soils which occupied the Flare Area. Three additional boring logs were performed. These borings found that harder clay soils did exist in the bank of soils above the surface elevations which are represented by boring logs 93-62 and 93-63. The Government's new boring logs also confirmed the stiff virgin soils identified by boring logs 93-62 and 93-63 (Vol V, Tab 52).

4.3.4 Renda's Measured Mile

Renda proposes to use the measured mile analysis to measure the loss of production and additional cost due to dredging unanticipated stiff clay versus an anticipated soft clay. Renda also seeks the time and cost associated with plugged lines that resulted from pumping unanticipated stiff clay.

The measured mile method is the preferred method for measuring a loss of productivity due to a change. It eliminates the possible errors or inefficiency included in the bid and considers the contractor's actual capability and capacity. Although comparison of a measured mile (baseline) period with a changed work period does not need to be exact, the work must be similar in nature and scope[8].

Further, Renda's measured mile is based upon eleven non-continuous days dredging between Sta. 522+00 and Sta. 538+15 (Vol V, Tab 53). Renda does not appear to make an analysis of the work or materials to select the eleven measured mile days, except that extraordinary production was reported on those days. Further, Renda's measured mile is during January and February 2000, when plugged discharge pipelines were commonplace. However, the days selected by Renda for the measured mile contain no plugged pipelines.

---

[8] Volume V, Tab 61 shows that the equipment used during the measured mile was less than that used during period two. By using the labor and equipment cost incurred during the measured mile period, Renda seeks reimbursement for 32 additional pieces of equipment that operate in period two only.

Analysis of the soil material types removed by the dredge and transported in the pipeline to the disposal area during Renda's measured mile eleven day period reveals that primarily mud (56 percent) was encountered. Table 4.3.1 shows the material types reported on the Inspection Report of Dredging (IRD).

Table 4.3.1
Material Types during Renda's Measured Mile Period

| IRD | Percent | | | |
|---|---|---|---|---|
| Date | Mud | Silt | Clay | Sand |
| 28 Jan 00 | 50 | 25 | 15 | 10 |
| 29 Jan 00 | 50 | 25 | 15 | 10 |
| 30 Jan 00 | 50 | 25 | 15 | 10 |
| 31 Jan 00 | 50 | 15 | 25 | 0 |
| 1 Feb 00 | 60 | 15 | 25 | 0 |
| 2 Feb 00 | 60 | 15 | 25 | 0 |
| 3 Feb 00 | 50 | 25 | 15 | 10 |
| 15 Feb 00 | 60 | 20 | 10 | 10 |
| 16 Feb 00 | 60 | 20 | 10 | 10 |
| 17 Feb 00 | 60 | 20 | 10 | 10 |
| 18 Feb 00 | 60 | 20 | 10 | 10 |
| Average | 56 | 21 | 16 | 7 |

Renda uses the production achieved while dredging and transporting primarily mud with an average discharge pipeline length of 7,286 feet as the measured mile. Production should be excellent and it was[9]! Renda's measured mile does not represent dredging and transporting soft clay for the use in measuring the differences between soft clays and stiff clays. Renda's claim states that it encountered stiff clays at an elevation where soft clays were anticipated. Because Renda's Measured Mile is based on mud and not soft clay, the measured mile selected by Renda is invalid for use as production in soft clay.

Additionally, production achieved during Renda's Measured Mile is the exception, and not the norm. The eleven days selected by Renda are eleven of the best twenty-four production days reported during the entire contract. Statistically, assuming normal distribution of values, only 2.5% of all values fall above two standard deviations from the average and are not representative of most of the dredging on the project. Renda's

[9] Renda's production for its skewed measured mile was 1,540 cy per effective hour (Vol V, Tab 62). This exceeded Renda's average bid production of 750 cy per effective hour by 791 cy per effective hour.

measured mile should not be used for comparison anywhere on the job. The Renda measured mile production dates are shown on Figure 4.3.4. and Volume V, Tab 53.

Figure 4.3.4




To compute damages in the Flare, Renda improperly projected the daily direct cost of labor and equipment and field overhead incurred during the measured mile period into the impact period. By doing so, Renda over estimates the additional cost of the impacted work. This method does not consider changes in the equipment and allocates all thirty-two of the additional pieces of equipment (e.g. booster and levee equipment) and labor to the Government. To apply the measured mile correctly, the difference in production found from the measured mile should be applied to the equipment and labor and field overhead actually performing the work. In that way, any difference (higher or lower) in equipment, labor and field overhead are properly considered in the adjustment.

4.3.5 Analysis of Production Disruption in Flare Area

As previously mentioned, Renda's claim in the Flare consists of two periods. In Period One Renda does not use a booster pump and the performance period is non-continuous

days from January 23, 2000[10] to March 11, 2000 (Vol V, Tab 54). For Period Two, Renda uses a booster pump, has much longer discharge pipeline and the performance period is a generally continuous from July 17, 2000 to September 30, 2000 (Vol V, Tab 55). Renda combines the two periods and averages the production in both to establish a disrupted production (Vol V, Tab 56).

As shown, Renda's measured mile was for pumping mud. To select a period for comparison with Renda impact Period One, the impact area is analyzed for type of soil materials and pipeline length. Volume V, Tab 54 for Period One and Volume V, Tab 55 for Period Two includes summaries of the daily information contained on Renda's Inspection Report of Dredging (IRD) for the claimed Impact Area. For Renda's impact (disruption) periods, Renda had the following average performance data:

Renda Claim Period

| Claimed Flare | | Material Type | | | | |
|---|---|---|---|---|---|---|
| Impact Periods | Production | Mud | Silt | Clay | Sand | Total Line Length |
| One | 714 cy/hr | 50 | 15 | 28 | 8 | 7103 |
| Two | 361 cy/hr | 17 | 3 | 62 | 13 | 12,208 |
| Combined | 473 cy/hr | 29 | 7 | 50 | 12 | 9,933 |

Claim Periods One and Two are completely different soil materials and line lengths. As previously stated, Period Two also used a booster and was expected post-bid by Renda to have more stiff clay.

4.3.5.1 Disruption Period One in Flare

For Period One, Renda's Soft Clay Area from approximately Sta. 510+00 to Sta. 520+00 was examined as a possible measured mile since this was an area identified in Renda's correspondence and post-bid material analysis as having soft clays similar to the Flare and free of claim. Also Renda's Soft Clay Area is located immediately downstream of

[10] Renda provides no explanation for including January 23, 24, 25, 26 and 27 in the Flare claim when on February 1, 2000, Renda advised the Government that the soils encountered to date were accurately depicted in the boring logs (Vol IV, Tab 23).

Period One area which begins at Sta. 520+00. Vol V, Tab 47 summarizes the performance data on the IRD for work performed between Sta. 510+00 to Sta. 520+00. The results are:

Renda's Soft Clay Area Sta. 510+00 to Sta. 520+00

| | Material Type | | | | Total Discharge |
|---|---|---|---|---|---|
| Production | Mud | Silt | Clay | Sand | Line Length |
| 709 cy/hr | 44 | 13 | 32 | 11 | 8662 |

When Renda's Period One Area is compared with Renda's Soft Clay Area, there is no significant difference between the average clay content encountered (28 vs. 32, respect-tively) and the production is almost identical, 714 cy/hr and 709 cy/hr, respectively. Renda's Soft Clay Area has a somewhat longer line length, but there is virtually no difference in the actual production between Claim Period One and Renda's Soft Clay Area. Because of Renda's Soft Clay Area is so similar in clay content, recognized by Renda as being a soft clay area and has similar pipeline lengths, it is an excellent measured mile location. For Renda's Claim Period One from January 23, 2000 to March 11, 2000, based on comparison with the new measured mile, no disruption to its dredging operations occurred. It does not appear that stiff clays were encountered or hindered operations. Certainly, the information provided to Weeks and Bean indicates that the mud (easy stuff) has been removed from the Flare and that clay material remains to be dredged in the future.

4.3.5.2 Disruption – Period Two

Renda's Period Two has an actual production rate of 361 cy per hour. This production rate is similar to the production for dredging Renda identified stiff clays in Section 1 and 2 and the measured mile at the South Ferry Landing of 352 cy per hour. Several locations were examined for possible use as the measured mile for claim Period Two. The locations are summarized in Table 4.3.2.

Table 4.3.2
Measured Mile Investigation

| Item | Area | Production | Line Length | Clay Content | Booster |
|---|---|---|---|---|---|
| 1 | Sta. 550+65 to 562+00 (no claims) | 640 cy/hr | 13,081 | 20% | Yes |
| 2 | Channel adjacent to Flare Sta. 520+00 to 550+00 North side (no claims) | 481 cy/hr | 11,182 | 33% | Yes |
| 3 | Renda Soft Clay Area 510+00 to 520+00 | 709 cy/hr | 8,662 | 32% | |
| 4 | Section 1 Renda Stiff Clay | 325 cy/hr | 6,633 | 61% | |
| 5 | Section 2 Renda Stiff Clay | 417 cy/hr | 7,074 | 58% | |
| 6 | Period Three Sta. 531+40 to 549+50 | 549 cy/hr | 12,871 | 30% | Yes |

None of the investigated areas are a direct match for the alleged stiff clays encountered in Flare Area. However, Renda's Soft Clay Area, remains the best choice[11] for a measured mile comparison since Renda has identified the materials as being very soft clay (materials it expected) and it is an area free of claims. Renda's Soft Clay Area has a shorter line length and less clay content than the Period Two Area which means production should be reduced because of longer line length used in Period Two area. However, in the Period Two area, Renda used a booster pump which would tend to keep production up. Therefore, I consider these issues to offset one another and the Renda Soft Clay Area is used as the measured mile to measure the loss of production in the Period Two Claim Area[12].

Renda's loss of production or disruption is applied to the identified 54 days of dredging identified in the claim. Period Two contains 66 total calendar days, 9 are sweeping, one day is lost due to a plugged line and two days the dredge is down. The loss of efficiency for the area is 49.1 percent [1-(361/709) x 100].

During Renda claim Period Two, the dredge operated 890.58 hours. The additional operating hours identified by use of the measured mile is 437.5 or 438 operating hours.

[11] Use of this area may be an overstatement of the production capable of being achieved since the channel excavation for the corresponding stations in Item 2 and Item 6 is less.
[12] Average production for the entire job is 586 cy per hour (Vol V, Tab 36).

Renda operated an average of 13.5 hours per day while in the Period Two area. Therefore, the extended time of the job is 32.4 days. Again, rounding up, the time extension for the alleged slow down in production at the Flare Area is 33 calendar days.

4.3.5.3 Plugged Discharge pipeline

Renda requests reimbursement for plugged pipelines as a result of encountering unanticipated stiff clays in the Flare Area. As indicated above, Renda operated in the Flare Area on two separate occasions.

During Impact Period One, which contains 38 calendar days, Renda experienced plugged lines on eleven of those days for a total lost time of 231 hours. This is equivalent to 9.6 days and is 25.3 percent of the total time available for dredging.

During Impact Period Two in the Flare Area, which contains 66 calendar days, Renda experienced plugged lines on 12 days for a total lost time of 86.66 hours. This is equivalent to 3.6 days and is 5.5 percent of the total time available for dredging.

The differences in Renda's claim periods is significant, and is contrary to the expected outcome if stiff clays caused plugged discharge pipelines. As shown above, production in Period Two in the Flare Area was allegedly reduced by stiff clays. Plugged lines, if caused by stiff clay material, would be expected to increase in the area. However, the opposite is true. Plugged lines decreased in Period Two by almost 80 percent over Period One that did not have disrupted production. However, dredging work in Period Two of the Flare Area was accomplished by using a booster pump to help transport the slurry of water and clay materials to the Placement Area. The booster pump added horsepower (head) and transported the clay material by keeping the velocity up in the pipeline to prevent the materials from setting out before they reached the discharge point.

Additionally, the new measured mile from Sta. 510+00 to Sta. 520+00 (Renda Soft Clay Area) was performed primarily during the months of November and December 1999. As

seen in Figure 4.3.5, Renda was experiencing approximately one hour of plugged line for every 100 feet of pipe Renda had in the system during the months of November 1999, December 1999 and January 2000. Based on that frequency, Renda should have experienced 71 hours of plugged pipelines or the equivalent of 3.0 days in Impact Period One. Renda actually encountered the equivalent of 9.6 days or 6.6 days more than projected based on job history of work in areas with no claims and containing soft clay.

Figure 4.3.5
Plugged Lines and Pipeline Length




For Period One in the Flare Area, which ended on March 11, 2000, plugged lines are approximately 3 times greater than when compared to the Renda Soft Clay Area. This increase in non-effective (lost) time can be traced to a malfunction in the dredging equipment. On March 18, 2000, in a memo (Vol V, Tab 58 ) Mr. Fisher, Vice-President of Renda, advised Superintendent Machack that the flow meter which had been out for "a good while" would be back on line as soon as possible. However, Mr. Fisher noted, in part,

> "Without the flow meter, we are constantly in danger of plugging the line and cannot maximize production."

Indeed, plugging the discharge pipeline had been occurring for some time as noted in Flare Area Period One which ended about the time the memo was issued. It is undocumented when the flow meter ceased to function or when it was repaired.

Period Two in the Flare Area experienced the equivalent of 3.6 days of plugged discharge pipelines or 5.5 percent of the total available time for dredging. Based on Figure 4.3.4, Renda experienced approximately 1 hour of plugged pipeline for each 100 feet of discharge pipeline per month. Using this frequency, Renda should have experienced 244 hours of plugged lines in Period Two of the Flare Area. However, Renda only experienced 86.6 hours of plugged pipelines. The difference is explained by the use of the booster pump which added horsepower and velocity to the transporting pipeline system.

Further, on three days (29.5 hours) that pipeline plugs did occur in Period Two, the booster was not in use. Further emphasizing the importance of a booster pump in preventing pipeline plugs in the discharge line.

4.3.6 Technical Results

As noted earlier, Renda's reliance on only boring logs 93-62 and 93-63 is not consistent with their assertions on the South Ferry claim and is unreasonable.

Further, stated reliance on only boring logs 93-62 and 93-63 contradicts earlier Renda correspondence dated October 13, 1999.

For the South Ferry Landing claim, Renda states that it used five borings on the north side of the channel, one up to 5,000 feet away, to predict or forecast the character of the material to be encountered in the dredging prism on the south side of the channel from Sta 472+00 to 470+00. This dredging assumption is illustrated in Figure 4.3.6.