Figure 4.3.6



In the Flare Area, prior to asserting a claim for the Flare Area, Renda used the boring logs on the north side, as well as the south side of the channel, for determining the character of the materials to be dredged. On October 13, 1999, Renda stated,

> "After completing the north half of Section 3, we will dredge across to the flare portion of Sections 4, 5 and 6. These areas contain as much as 400 cubic yards per lineal foot[iii] and also consist of very soft clays except for the section beginning in Section 6[iv]."

For the Flare Area, Renda interprets the boring logs to contain primarily soft clays. For Sections 4, 5 and 6 of the Flare, Renda uses the boring logs noted in footnote iv to the October 13, 1999, letter (Vol IV, Tab 21) which states,

> "[iv]See Borings No. 93-62, 3ST-4, 3ST-5 and 93-63"

Consistent with Renda's "Bid Assumptions and Character of Dredged Material" boring logs 3ST-4 and 3ST-5 are on the north side of the channel and used to identify the material to be dredged on the south side of the channel.

However, for the Flare Area claim, Renda has not used these same assumptions for the virgin material which exists on the south side of the channel at elevations above the two borings referenced by Renda. As illustrated in Figure 4.3.7, borings 3ST-3, 3ST-4, 3ST-5, 3ST-6, 72-105 and 3ST-7 are in close proximity to the work and should have been used by Renda in determining the "Character of the Dredged Material."

Figure 4.3.7




Using Renda's "Dredging Assumptions", I evaluated the character of the dredged material using the borings on the north side of the channel. On the north side of the channel within the Flare Area, boring log 3ST-3 at Sta 524+10 describes approximately ten feet of very soft clay from elevation –20 feet to –30 feet MLT lying on top of a layer of medium dense sand. Below the medium dense sand starting at elevation –35 feet MLT, boring log 3ST-3 describes 15-foot thick layer of stiff, hard and very stiff clay down to elevation –50 feet MLT. Below elevation –50 feet MLT, the boring log terminates in very stiff clay. These elevations were shown graphically on Figure 4.3.3.

Continuing upstream on the north side of the channel within the limits of the Flare Area at Sta 529+10 is boring log 3ST-4. It too describes hard and very stiff clay starting at elevation –35 feet MLT and extending to the termination depth at approximate elevation –52 feet MLT.

The next boring log upstream is 3ST-5 at Sta 534+50. From approximate elevation –15 MLT down to elevation –25 feet MLT, is a layer of medium and medium dense sand. From –25 feet MLT to –37 feet MLT, the boring logs describe the materials as soft to very soft clay. From elevation –37 to elevation –50 feet MLT, the boring log describes the earth materials as medium, hard and very stiff clay. This boring also terminates in

hard clay. Volume V, Tab 45 shows the elevations of soft and stiff clays that I identified on the boring logs.

The result of my evaluation of the north side boring logs is that if Renda was consistent with its "Dredging Assumptions" stated in the South Ferry Landing claim, Renda should have anticipated hard and stiff clays in the Flare Area beginning at approximate elevation –35 feet MLT instead of –47 feet MLT. Cross section data Renda provided to Bean Dredging and Weeks Marine shows stiff clay being encountered at approximate elevation –30 feet MLT or about 5 feet higher than shown in the boring logs on the north bank. Using the general dimensions of the Flare Area, 3000 feet long and 300 feet wide, there is approximately 166,000 cy of unanticipated stiff clay if the clay layer is 5 feet thicker than shown in the boring logs on the north side of the channel.

Renda seeks compensation for both dredging plant and labor and levee construction equipment and labor. However, dredging is the critical item of work throughout the project until the work is deleted in April/May 2001. At that time, levee work still remained to be performed and became critical. A slowdown in dredging, if any, did not result in a delay to the hydraulic levee construction (Bid Item No. 6) since preparation for hydraulic levee construction and final shaping could be performed.

Further, no segregation of the added expense of mechanically removing and placing the misplaced hydraulic material on the east side of Lost Lake Placement Area has been performed by Renda. As discussed in Section 4.8, Hydraulic Levees, this cost can be segregated and should be eliminated from any dredging claim. My price evaluation does not include the levee equipment and personnel for hauling and shaping.

4.3.6.1 Time Evaluation

As indicated in Section 4.3.5.2 of this report, a loss of production of 49.1 percent occurred while performing dredging work in the Flare Area during Renda's Period Two.

Renda claims that the Government is responsible for the inefficiency due to the unanticipated presence of stiff clay, a differing site condition.

As identified herein, Renda worked 891 hours performing dredging in the Flare Area Period Two (Vol V, Tab 55). Therefore, with the actual loss efficiency factor, all the materials (medium clay and sand) in the Flare including the stiff clay required 437.5 (891 times 50.2 percent) or 438 hours of added work beyond that required for soft clays. During performance of work in Period Two of the Flare Area Renda had an average daily operating (effective) time of 13.49 hours. Therefore, the days required to operate the additional 438 hours is 32.5. Again, rounding up, results in 33 additional days for dredging all materials including the stiff clays in the Flare Area during Period Two (approximately 321,500 cy).

However, not all the quantity is eligible for an adjustment. The portion of the total volume which is represented by the contract to be stiff clay needs to be deducted from this total quantity. Renda's August 1998 Stiff Clay Spreadsheet anticipated 221,088 cy of stiff clay in the Flare Area. Proportioning this total quantity based upon the width of the channel results in 71 percent of the anticipated stiff clay (156,973 cy) to be on the south side of the channel. During Period Two, Renda reports excavating 321,530 cy of stiff clay. Therefore, only 164,557 cy of stiff clay is additional[13]. The additional time due to the unexpected portion of stiff clay in the Flare Area is 51.2 percent (164,557 divided by 321,530) of the added time for dredging stiff clay. Multiplying 51.2 percent times the total 33 days for stiff clay results in 16.9 days additional (or 224 additional hours) for the stiff clays over and above the volume of stiff clays Renda anticipated or should have anticipated.

[13] Gahagan & Bryant Associates, Inc. evaluated the additional stiff clay quantity found in the Flare Area and identified 99,065 cubic yards more than could be identified as being in the south bank from a review of the contract boring logs (Vol V, Tab 75, RM-GBA-00101). Also in Section 4.3.6, I determined that based on the general dimensions of the Flare Area and an unanticipated 5 feet thick layer of stiff clay, that 166,000 cy of additional stiff clay was dredged assuming Renda's depiction of stiff clay remaining in the channel was accurate.

When calculating cost on a daily rate, 16.9 or 17 calendar days are used. If the quantity of additional material is found to be more or less than the unanticipated quantity of stiff clay of 164,557 cy, then an adjustment needs to be made in the time and cost presented herein.

4.3.6.2 Results of Cost Evaluation

As noted above, if the unanticipated quantity of stiff clay is more or less than 164,577 cy than the cost evaluation below should be adjusted. The corresponding hours to perform the identified additional quantity of stiff clays is 224.5 effective hours and 17 calendar days. The cost evaluation below is based on this additional time.

Renda's Claimed Cost and Results of Technical Evaluation

| | Renda Claim | Supported Cost | Note |
|---|---|---|---|
| Direct Costs | $3,311,817 | | |
| Additional Labor | | $106,660 | A |
| Additional Equipment | | 258,105 | A |
| Equipment Repair Cost | 50,000 | 0 | B |
| Job Site Field Cost | 60,180 | 13,461 | C |
| Total Direct Cost | $3,421,998 | $378,226 | |
| Overhead: | | | |
| Resident Home Office (4.55%) | 543,413 | 17,209 | D |
| Corporate Office (2.83%) | 225,852 | 10,704 | D |
| Total Indirect & Direct Cost | $4,191,263 | $406,139 | |
| Profit (8.25%) | 419,126 | 33,506 | E |
| Bond (0.65%) | 29,968 | 2,858 | F |
| Total Adjustment | $4,640,357 | $442,503 | |
| Miscellaneous Cost | | | G |
| Professional Fees/Consultant | 50,000 | 0 | |
| Report Preparation Cost | 1,000 | 0 | |
| Bond on Miscellaneous (0.65%) | 332 | 0 | |
| Total Amount | $4,691,688 | $442,503 | H |

Explanatory Notes:

A) The additional labor and equipment proposed by Renda includes the dredging operations personnel and the levee personnel for hauling fill from the east levee to the north levee. The levee operation was not impacted by a slow down in the dredging and is

not included in the supported cost. Renda calculated 103 days of cost (81 dredging days and 23 lost days for plugged lines and move in/outs) and subtracted 11 days of estimated cost from an earlier time period. The actual cost of the disruption is calculated from Period Two where I determined production was reduced. No additional time or cost is considered for the Period One or for plugged lines for reasons stated previously.

1) Labor – Renda allocates 100 percent of the direct labor cost for Period One and Period Two to the alleged differing site condition encountered at the Flare Area. Seventeen days of additional work have been identified. Volume V, Tab 59 has the labor calculations for the disruption period.

2) Equipment – Volume V, Tab 60 contains the equipment cost calculation for the loss of production at the Flare Area and uses 225 hours of additional effective time to measure the added cost. The equipment rates used by Renda did not reflect the rates permitted by the Contract. Further discussion about equipment rates can be found in Section 5 of this report.

B) Specific Equipment Repair Parts – No allowance has been made for specific repair costs. Among the numerous reasons cited above, the repair cost factor in the Corps Manual equipment rates compensates for major and minor repairs and maintenance. The DCAA audit found that the $50,000 identified was an estimate and unsupported.

C) Jobsite Field Costs - This cost component includes cost incurred in the field and generally is for miscellaneous expenses such as freight, communications, and the like. However, many of the elements for supplies included in the Monthly Field Costs appear to be equipment fuel, parts and/or repairs[14] which should be eliminated since the Corps Manual includes an allowance for equipment repairs in the rates. Without the specific invoice, the items in question can not be confirmed. Therefore, the monthly Field Cost as presented by Renda is used to calculate a daily rate of $791.85 is considered acceptable at

---

[14] For example, September 2000 Monthly Vendor Cost for Southwest Wire Rope at $1,001.69, Metal Supply at $7,633.88, Exxon at $2,268.34 and Haynes Wire Rope at $2,574.00.

this time. The daily rate is multiplied by the 17 days of actual delay for a total amount of $13,461.36.

D) Resident Home Office and Corporate Office Overheads - The DCAA audit (Vol V, Tab 63) found the combined rate of 16.14 percent for Resident Home Office and 6.60 percent for Corporate Office overheads. However, the audit notes that the Resident Home Office rate and the Corporate Office rate is comprised of two components, office and shop rates. I question the shop rate component of the overhead rates since the Corps Manual, which Renda was required to use, allows for shop expenses in the equipment rate. Only the DCAA-verified overhead office rates[15] for Resident Home Office (4.55%) and Corporate Office (2.83%) are used in this price evaluation. The shop rate component represents a cost duplication. The Corps Manual states that an allowance has been made for "Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead." For the fiscal year 2000, the resident office rate of 4.55 percent is used and 2.83 percent is used for the corporate office.

E) Profit is calculated by using the weighted guidelines method and is 8.25 percent. Development of the profit rate is in Volume V, Tab 64.

F) Bond at 0.65 is verified by the DCAA audit of the Flare Area Claim.

G) The miscellaneous costs were questioned in their entirety by the DCAA audit. No allowance has been made for these cost items.

H) The additional cost of $442,503 is for 164,577 cy of unanticipated stiff clay or $2.69 per cy. If an adjustment (increase or decrease) in the quantity is required then the $2.69 per cy can be used to adjust the amount due. Likewise, time extension for unanticipated very stiff clay in the Flare Area can be adjusted if the quantity is found to be different than the 164,577 cy. One calendar day can be added or subtracted for each 9,680 cy of unanticipated stiff clay found in the Flare Area.

---

[15] The office overhead rates are included in Volume V, Tab 29 behind the audit.

4.3.6.3 Excessive Dredging Beyond Required/Allowable Pay Prism – (Non-Pay Yardage)

Renda excavated beyond the maximum pay prism in the Flare Area and in Renda Stiff Clay Area used as the measured mile. The productive time expended in each area was wasted while performing non-pay work. The amount of over-excavation or excessive dredging in the Flare Areas is 221,049 cy or 72 cy of excavation per foot of channel (Vol V, Tab 31). In the measured mile area from Sta. 510+00 to 520+00, the quantity of non-pay yardage is 47,485 cy of excavation per foot of channel. Renda wasted more excavation time in the Flare Area than in the measured mile area. Therefore, the cost and time evaluation above overstates the adjustment by 38 percent to which Renda is entitled if a differing site condition is found in the Flare Area.

The adjustment in the time and cost should be made to account for the quantity of non-pay work performed. The cost increase Renda incurred during performance of the Flare Area is $274,352 ($442,503 times 1-.38). The time adjustment is modified to also account for the wasted effort and results in an eleven calendar day extension of time. If an adjustment for the volume of unanticipated stiff clay is found due, that adjustment should be made first prior to adjusting for the disproportionate share of non-dredging work performed in the Flare Area over the measured mile area.

4.3.7 Conclusion

My evaluation has identified a slow down in the work at the Flare Area for 164,577 cy. The price adjustment is determined to be $275,352 and an eleven calendar day time extension.

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 4.4 Obstructions in Channel Sta. 570+00 to Sta. 630+00

### 4.4.1 General

On June 11, 2001, Renda submitted a revised request for an equitable adjustment under the Differing Site Conditions clause for encountering unexpected obstructions while dredging within the Houston Ship Channel. Renda asserts that the obstructions were generally located between Sta. 570+00 and Sta. 640+00 during the time period between October 20, 2000 and December 10, 2000.

Renda reports striking several discrete objects, concrete shore protection between Sta. 620+00 and Sta. 630+00 and a debris field between Sta. 570+00 and 580+00. In addition, Renda asserts that rock and rubble slope protection encountered in the north slope of Sections 5 and 6 between Sta. 530+00 and 554+00 also damaged the dredge.

Renda seeks the idle time and repairs caused by encountering the alleged differing site conditions. Renda claims a 36-calendar day time extension and additional cost in the amount of $2,126,083.

### 4.4.2 Technical Evaluation

A. Excessive Debris between Sta. 570+00 and 580+00

Renda claims that during October and November, while dredging between Sta. 570+00 and 580+00, a significant amount of trash, far in excess of what a reasonable contractor would have assumed from the contract documents, was encountered. Renda acknowledges Contract Specification Section 02482 – Dredging, paragraph 1.11.1, Character of Materials, that states in pertinent part,

> "Other materials such as scrap, rope, wire cable, snags and stumps may be encountered within the specified limits of required dredging and overdepth dredging. No separage (sic) payment will be made for removal and placement of this debris."

However, Renda contends that it could not have reasonably expected such an extensive quantity of trash in a relatively confined area.

Renda's bid papers (Vol IV, Tab 8) do not identify the amount of time or quantity expected during the dredging process in dealing with trash and other debris. However, in the notice letter for the South Ferry Landing dated April 28, 2000 (Vol IV, Tab 18), Renda acknowledges that the debris encountered was normal debris. I do not know if Renda's assessment of debris increased as one progresses upstream.

The extensive nature of the actual debris has not been documented by Renda. Normally, excessive debris is collected and assessed for character and quantity. The volume has not been documented.

Renda explains in its revised claim that in October and November of 2000, it encountered debris fields consisting of "hundreds of feet of steel cable, hundreds of pieces of steel scrap, anchors, anchor chains and cable, old iron large diameter pipe, concrete footings and pieces of concrete rubble, pieces of car bodies, heavy industrial construction demolition material, and thousands of the, ever-present, tires." Renda claims that its production was affected and that the dredging equipment was damaged which required repair in December 2000 and January 2001. However, Renda provided no notice of the large amounts of trash and debris while in the area[1].

For this same area in Section 7, Renda asserts another claim for unanticipated heavy red clay. For the trash interference, Renda does not claim any disruption to the dredging

---

[1] The Government had a side scan sonar and magnetometer survey performed of the area in January 2001. Results of this survey identified 17 targets that may have interfered with dredging operations. Additionally, other larger areas of scattered tires were noted as remaining between Sta. 570+00 and 580+00 (Vol V, Tab 65).

production in this period of time, presumably because impact to productive (effective) time is claimed in the Section 7 clay claim.

However, if the debris was so extensive, then the dredge should be less productive and the non-effective time should increase due to clearing the pump and cutter of trash. In particular, the non-effective time for clearing the pump and cutter are recorded on the Inspection Report of Dredging (IRD). If there is a significant amount of debris at this location over another location, then there should be a corresponding increase in the amount of clear time.

Table 4.4.1 summarizes the production time Renda achieved while performing work in the areas that Renda claims to be disrupted due to trash. Two periods area were evaluated, the narrowly-focused Sta. 570+00 to 580+00 (Vol V, Tab 67) and the entire claim area of Sta. 570+00 to 640+00 (Vol V, Tab 69). The amount of non-effective time for pump and cutter clears are shown as a percent of the total available dredge time.

Table 4.4.1
Pump/Cutter Clean Times for Claim Areas

| Claim Areas | Percent Effective Time | Percent Non-Effective Time | Percent Pump/Cutter Clean Time |
|---|---|---|---|
| Sta. 570+00 to 580+00 | 56.4 | 43.6 | 18.1 |
| Sta. 580+00 to 640+00 | 49.7 | 50.3 | 11.5 |
| Combined Area 570+00 to 640+00 | 52.6 | 47.4 | 12.5 |

As seen above, the amount of pump and cutter clear time is 18.1 percent of the total time available in the concentrated area of Sta. 570+00 to 580+00. This is 6.6% more clearing time than for the remainder of the claimed area Sta. 580+00 to 640+00. For comparison, to evaluate whether the amount of trash and/or pump and cutter clears increased, Sections 1 through 6 (Vol V, Tab 70) were evaluated and summarized. Table 4.4.2 shows these results.

| Table 4.4.2<br>Pump/Cutter Clean Times in Other Areas of Channel | | | |
|---|---|---|---|
| Claim Areas | Percent Effective Time | Percent Non-Effective Time | Percent Pump/Cutter Clean Time |
| Section 1 | 49.1 | 50.9 | 8.6 |
| Section 2 | 51.5 | 48.5 | 10.6 |
| Section 3 | 50.8 | 49.2 | 11.1 |
| Section 4 | 63.7 | 36.3 | 10.3 |
| Section 5 | 57.0 | 43.0 | 11.7 |
| Section 6 | 56.4 | 40.9 | 11.5 |

Comparison of the claim areas with other areas where trash was encountered, but not claimed by Renda as excessive, shows a difference in the amount of time spent clearing the cutter and pump of debris in the limited area of Sta. 570+00 to 580+00 only. The portion of the claimed area between Sta. 580+00 and 640+00 is not effected by excessive trash. If the entire area is considered, then virtually no difference occurred in trash and debris clean time.

The areas used for comparison, Sections 1 through 6, consist primarily of new work areas. However, decades of trash would have built up on the banks outside the existing channel. It is also noted from Table 4.4.2 that the general trend is for trash to be increasing in volume as work progresses upstream to Sections 7, 8 and 9.

B. Shore Protection between Sta. 620+00 and 630+00

Renda also claims that the shore protection encountered on the south bank between Sta. 620+00 and Sta. 630+00 was unexpected. However, Renda claims no direct cost for encountering the alleged unanticipated materials other than it contributed to the idle and repair time (impact) in December 2000. Renda provided notice of encountering this structure on December 20, 2000, after the dredge was shut down.

Renda notes that the rubble shore protection is on the south bank near Oxy Chemical Dock. Renda states that it performed over-cutting to undermine and dislodge the upper riprap materials prior to providing notice to the Government. Again, contract

specification 02482-Dredging, paragraph 3.5.2 warned the Contractor of an existing structure between Sta. 610+00 and 625+00, by stating,

> "The Contractor shall be required to use caution when cutting the side slopes in the Channel from Station 470+00 to Station 473+00, from Station 510 to Station 537+00, and from Station 610+00 to Station 625+00. Excessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel."

Renda encountered shore protection that was identified in the contract and where measures should have been exercised to avoid damage to the existing structure or to the dredge.

Final after dredging surveys, for the most part, locate this shore protection outside of the required dredging prism, except at Sta. 624+00 and at Sta. 624+74. After notice was given, the Government did not require removal of this shore protection. Had Renda notified the Government prior to over-cutting the toe of the slope to undermine the structure, the Government may not have authorized Renda's earlier attempts to dislodge the shore protection.

C. Discrete Objects

Additionally, Renda discusses discrete occurrences where the daily report states that the dredge encountered or struck something in the channel. However, Renda acknowledges in its revised claim that most of these obstructions were not recovered. The noted items were a dredge stern swivel assembly, conex steel box container, and a steel mooring buoy and anchor chain (Section 9 and part of Obstruction No. 2 claim). The added cost of removing the dredge stern swivel has been paid in bilateral Modification No. P00019. The conex box was removed by others.

Renda states that the jarring impacts to the dredge cutterhead were devastating to the equipment, placing undue stresses on the seals and rigid components such as shafts and bolted connections. Renda claims 36 days impact between December 4, 2000 and

January 14, 2001 due to alleged repairs caused by the obstructions. As a result of the jarring effects of striking the unanticipated objects and trash, the dredge is alleged to have required extensive, unscheduled repairs to the cutterhead, the cutter drive and the main pump shaft. However, no historical or supporting information is provided to establish a normal repair cycle for these components of the dredge.

In general, for the alleged 35.5 repair days claimed by Renda, the dredge is being repaired. However, the hours or percent of daily delay Renda attributes to the obstruction damages are overstated based upon the review of the Report of Operations and other internal Renda reports.

Below is a list of differences identified by use of the Report of Operations where Renda claims the obstruction repairs were performed. Details are presented in Volume VI, Tab 6.

| Date | Claim | Supported | Hours Difference |
|---|---|---|---|
| December 5, 2000 | 100% | 94% | 1.5 |
| December 7, 2000 | 50% | 0% | 12.0 |
| December 9, 2000 | 100% | 63% | 8.0 |
| December 29, 2000 | 50% | 0% | 12.0 |
| December 31, 2000 | 30% | 20% | 2.0 |
| January 13, 2001 | 60% | 0% | 14.0 |
| January 14, 2001 | 75% | 0% | 18.0 |
| Total | | | 67.5 |
| | | | 2.8 days |

The alleged obstruction repairs were actually performed on 32.7 days; not the 35.5 days claimed by Renda. From the Report of Operations, other repairs to the spuds, generator and raw water pumps account for the difference.

During the period between December 3 and 6, 2000, repairs to the underwater pump seals are reported. On or about December 3, 2000, the thrust bearing seals on the underwater pump failed. The seals were temporarily patched, repairs were not completed, or they

were not properly repaired by Renda because on December 8 and 9, 2000, the Inspection Report of Dredging reports replacing the seals a second time. On December 4, 2000, the internal Renda Marine Daily Report notes that spare parts were not available to effect repairs (Vol V, Tab 71). Renda Vice-President, Mr. Bowman, who was managing the project at this time, stated in a November 22, 2000, deposition that the Renda "spare part program was woefully deficient" (Vol V, Tab 72, p. 137). Therefore, I question if Renda performed the underwater pump seal repairs in a reasonable amount of time for a well-equipped contractor given the deficient spare parts program. Renda claims four days for this period of time. Only 2 days were required to repair and fix the seals on December 8 and 9, 2000. On December 9 and 10, 2000, the dredge resumed work in the channel.

On December 11, 2000, Renda reports stopping the dredge again asserting that the cutter gear box had been damaged due to obstructions in the channel. These repairs were forecasted by Renda in the IRD to require up to ten days repair.

On December 18, 2000, Renda stops reporting repairs to the cutter gear box on the Inspection Report of Dredging (IRD). The dredge, however, is still idle due to reported work on the "cutter drive systems". Repairs to the cutter drive system were finished on December 29, 2000. The Government's Quality Assurance Report (QAR) details that computer/electronic repairs was the failure causing the repairs to the cutter drive system. Computer and electronic repairs could not be caused by encountering obstruction and this time period from December 18 to December 28 is removed from the obstruction period. On December 29, 2000, the dredge returns to work in the channel.

Two days following repair of the cutterhead and drive assembly, the dredge main pump shaft failed on January 1, 2001.

On January 12, 2001, the shaft was repaired and dredging resumed. However, the main pump engine was used equipment that had been installed on the dredge (Vol VI, Tab 47). Pre-award, at the time when Renda believed the dredge would consist of primarily new components, Renda stated,

> "The fact that an older dredge has been working for years does not preclude it from having serious problems such as corrosion or metal fatigue that could produce a catastrophic failure." (Vol IV, Tab 15, RM-COE-02676).

Renda, by this statement, implies that newer equipment is less susceptible to failures, but that failures do occur. The pump shaft failure may be one of those occurrences.

During the December 2000 shutdown period other repairs unrelated to the obstructions may have been performed which also would have idled the dredge. The performance of these repairs is largely undocumented except for a December 18, 2000 letter from Renda to Lufkin Industries (Vol V, Tab 73) which states,

> "New gear set installed in Renda Marine, Inc Dredge Millennium... Renda Marine had a new gear set manufactured for the main pump gear box... we do have concerns, however, that the improper gear set, missing full contact (by .25 inch) may create a problem under full operating load. Renda's concern is also that making a new pinion only may have an adverse affect on the bull gear because of the distortion of the mating surface."

This gear box for the main pump engine was discovered to be operating in reverse since the dredge was commissioned in May 1999[2]. The effects on the pump drive shaft from this improper installed gear box and the subsequent distortions and vibrations may have accelerated the drive shaft failure.

It is also of interest to note that, in Mr. Bowman's deposition, referred to in the previous footnote, Renda planned to shutdown over Christmas 2000 to complete repairs prior to experiencing the alleged obstruction damage. In fact, the personnel working on the levee were off between December 22, 2000, and January 3, 2001. It is unexplained why the levee personnel were not working, when the dredge resumed work on January 1, 2001.

---

[2] In a letter dated January 8, 2000, Lufkin Industries, Inc reported to Renda that the dredge pump gear box was being run in reverse of its original designed rotation direction (counter clockwise) causing wear on the backside of the gear teeth (Vol V, Tab 74). Almost a year later, in a November 22, 2000 deposition, Mr. Bowman, Renda Vice-President, responded to a question about the booster pump gear box by stating, "That was a gear box that was furnished for the main pump engine that was the wrong rotation. We were going to be involved over Christmas and changing the entire guts of that Lufkin box out" (Vol V, Tab 72, p. 134).

Technical Results

Renda claims no productivity loss from the Obstructions claimed between Sta. 570+00 and 640+00. A loss of productive time has been identified in the limited area of Sta. 570+00 to 580+00. However, a 6.6 percent difference in cutter and pump clears does not appear to be significant when concentrations of debris may be expected.

Renda primarily claims impact, repair and idle time, in December 2000 and January 2001 allegedly attributable to the cumulative effects of the trash, discrete obstructions and shore protection structure encountered from Sta. 620+00 to 630+00 and from 530+00 to 550+00.

A. Loss of Productivity

Within the channel from Sta. 570+00 to 580+00, pump and cutter clears were 18.1 percent of the total time available for dredging. In other claimed areas of the channel, Sta. 580+00 to 640+00, non-effective time for clearing the pump and cutter does not differ than other reaches of the channel. The non-effective time for pump and cutter clears were 11.5 percent of the total available time. Therefore, in the limited area between Sta. 570+00 to 580+00, pump and cutter clears shows an increase of 6.6 percent. Within the area between 570+00 and 580+00, there were 408 total hours available for operating the dredge. A loss of 6.6 percent of this available time is attributable to the additional pump and cutter clears required in this area. Therefore, production loss due to the increased time due to cutter and pump clears is 26.9 hours or 27 hours.

The following summarizes the additional dredging cost Renda incurred due to the loss in production time in the limited area between Sta. 570+00 and 580+00.

Productivity Loss Summary

| | | |
|---|---|---|
| Equipment (Vol VI, Tab 1) | | $29,600 |
| Labor (Vol V, Tab 3) | | 7,665 |
| Jobsite $764 per day x 1.2 days | | 917 |
| (Renda claims 15,280.94/20 days) | | |
| | Subtotal | 35,776 |
| Resident Office Overhead (8.83%) | | 5,774 |
| Corporate Office Overhead (4.23%) | | 2,261 |
| | Subtotal | 43,911 |
| Profit | | 3,074 |
| | Subtotal | 46,985 |
| Bond | | 305 |
| | | $47,290 |

B. Impact Idle Period

Renda claims that repairs to the underwater pump seals, cutterhead gearbox, cutter drive system and main engine pump shaft were required as a result of striking obstructions in the channel. These repairs were performed on the equivalent of 33 days during the period between December 4, 2000, and January 14, 2001.

All the repairs and associated repair time are not compensable occurrences as alleged by Renda, if the obstructions are found to have caused the damage.

The repair to the underwater pump seals was performed on five days between December 3 and 9, 2000. The two days required on December 8 and 9, 2000, are a reasonable repair time. Therefore, three days are not the responsibility of the Government.

On December 11, 2000, an obstruction is asserted to have caused damage to the cutter gearbox. Repairs to the gearbox were completed on or about December 17, 2000, a period of seven days. However, these repairs did not permit the dredge to resume operations. Repair work continued on the computers and electrical system until December 29, 2000, when the dredge resumed work, a period of eleven days. These eleven days are not the responsibility of the Government. Repairs performed are not relevant to the obstructions.

On or about January 1, 2001, the dredge is allegedly down again due to obstructions. This time the main pump shaft has failed. These twelve days would be compensable if the pump shaft failure is related to the obstruction.

The following cost summary computes the cost for a period of 33 days during the alleged impact period for obstruction repairs. This cost is converted to a daily rate to use if any days are found to be related to obstruction damage.

Cost Summary for 33-day Impact Period

| | | |
|---|---|---|
| Equipment (Vol VI, Tab 2) | | $272,014 |
| Labor (Vol VI, Tab 3) | | 209,715 |
| Jobsite $2,250.14 times 33 days (Renda claims $81,005.08 for 36 days) | | 74,255 |
| Dredge Repair Costs (Vol VI, Tab 4) | | 94,501 |
| | Subtotal | $650,485 |
| Resident Office Overhead (8.63%) | | 56,137 |
| Corporate Office Overhead (4.23%) | | 27,516 |
| | Subtotal | $734,138 |
| Profit Suspension (No profit) | | 0 |
| | Subtotal | $734,138 |
| Bond (0.65%) | | 4,772 |
| Total | | $738,910 |
| Average Daily Cost During Period Without Dredge Repair Parts ($107,346) | | $19,138 |

Conclusions

Although I determined a slow-down in production in the limited area between 570+00 and 580+00, it is not uncommon to encounter pockets of trash. Since the entire section, when averaged, shows no increase in trash clears, an adjustment for this loss of productivity is not warranted.

Renda claims impact for 33 days. I have determined the maximum days the dredge was idled due to the alleged obstructions to be:

a) 2 days for underwater pump seals

b) 7 days for the cutter gear box repairs

c) 5 days for the repairs to the main pump shaft

Further, assuming the alleged obstructions caused the damage, I have determined:

a) An additional price adjustment for pump seals only would be $38,276 plus an allowance for parts of $4,578 for a total of $42,854

b) An additional price adjustment for cutter gearbox repairs would be $133,966 plus an allowance for parts of $46,328 for a total of $180,294

c) An additional price adjustment for the main pump shaft would be $220,087 plus an allowance for parts of $56,440 for a total of $276,527

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 4.5 Section 7 – Heavy Red Clay – Differing Site Condition

### 4.5.1 General

On April 26, 2001, Renda submitted a request for adjustment seeking a three day time extension and an increase in cost of $1,083,779 for encountering hardpan, heavy red clay. In April of 2002, Renda updated its request by providing additional details. Renda's revised cost is $1,123,884 and seeks a 20-day time extension.

### 4.5.2 The Work

Section 7 extends from Sta. 554+00 to Sta. 612+00 along the Ship Channel. Dredging work began in Section 7 on or about July 11, 2000. Dredging work was accomplished within Section 7 on a few days in July and September 2000. On October 1, 2000, dredging work resumed in Section 7 and proceeded essentially uninterrupted until November 23, 2000. Renda returned to Section 7 for three days in January 2001.

Renda's claim is for a portion of the work performed in Section 7. Renda asserts that during the 35 day period between October 2 and November 6, 2000, unanticipated red clay was encountered while performing dredging work between Sta. 558+00 and Sta. 609+00 of Section 7.

On October 20, 2000, Renda notified the Government (Vol IV, Tab 26) that "the dredge encountered hardpan, heavy red clay" between Sta. 565+00 and Sta. 580+00 on the north side of the channel. Renda also noted that the heavy red clay may continue in Section 7 where none was anticipated. Renda's claim for heavy, red clay is for both north and south sides of the channel and extends from Sta. 558+00 to Sta. 609+00. Renda does not