explain why Sta. 558+00 to 565+00 was included in the claim area when work had been performed at that location prior to the notice letter and not included in its notice.

4.5.3 Technical Evaluation

Renda claims that the clays encountered while dredging a portion of Section 7, were unanticipated hardpan, heavy red clay. Renda asserts that, during the period between October 2, and November 6, 2000, an additional twenty days were required to remove 306,184 cy of unanticipated, red clay materials when soft gray clays were anticipated.

Renda does not explain how its description of "heavy" varies from stiff, very stiff, hard, medium or soft clay. Renda's word describing the soils as hardpan is not explained, but hardpan materials, as noted on the Inspection Report of Dredging (IRD), are not reported as being encountered anywhere on the job, much less Section 7.

Section 7 extends from Sta. 554+00 to Sta. 612+00. There are 17 boring logs within the general vicinity of Section 7. Many of these boring logs have soil color descriptions as rust, brown, red, grey and all color combinations in-between. Renda does not explain how color affects the hardness of the clay material. Color is not a reliable measure of the properties of the clay. Red, orange and brown clays had been previously excavated and placed in the disposal area without raising any concern[1].

I reviewed the seventeen boring logs from Sta. 553+90 to 613+80 for a description of the consistency (soft, hard, etc) of the soil materials. Between boring log 3ST-8W (Sta. 553+90) and 3ST-10W (Sta. 563+80), a distance of approximately 1000 feet, the clay consistency is described as generally Soft to Very Soft with some medium clay layers and medium dense sand layers. However, the consistency of clays described approximately 500 feet upstream from 3ST-10W at boring 3ST-11 (Sta. 568+90) is described as generally Very Stiff or Hard with a few medium and soft clay layers. This general

[1] In an email from Mr. Eddie Fisher on September 25, 1999, Mr. Fisher noted, "At the dump there appears to be very little silt, sand or soft clays. The clays are red, gray and orange." (Vol IV, Tab 27)

description of stiffer hard clays continues all the way through the remainder of Section 7 which ends at Sta. 612+00, a distance of 4,310 feet.

In Renda's December 20, 2000, response to the Government's conclusion that the boring logs in Section 7 indicated stiff to very stiff clays and dense sands which Renda should have anticipated, Renda points to boring logs 93+65 at Sta. 569+20, 3ST-13W at Sta. 579+00 and 3ST-14 at Sta. 583+70 and states, "An analysis of the soil borings shows that the majority of the material should have been soft to very soft light grey to gray silty and sandy clays, except small pockets (shown on only one boring) of stiff rusty-blue grey clays near the bottom of the dredging prism." (Vol IV, Tab 28, RM-COE-01637)

An analysis by Renda of the expected materials other than the above description can be found in the August 1998 Stiff Clay Spreadsheet (Vol IV, Tab 16). Although the spreadsheet contains mathematical errors, and generally understates quantities, in this limited area of Section 7, Renda's spreadsheet anticipates encountering 131,889 cy of stiff to very stiff clay; 76 percent of the total anticipated quantity of material to be dredged in that reach of Section 7. Renda's August 1998 spreadsheet was prepared two years prior to performing work in the area and supports the Government's interpretation of the boring logs. The August spreadsheet also contradicts Renda's statement in the December 2000 letter, that a majority of the material should have been soft to very soft clay.

The heavy, red clay that Renda asserts was unanticipated was deposited at approximately Sta. 118+00 on Lost Lake. Renda states in its December 20, 2000 letter that,

> "The Government directed that all clay material recovered from this area of Dredge Section 7 be placed on the new levees… Fortunately, for RMI, the hard red clay material has not been placed on the levee and is available for Government review and analysis… RMI will not relocate this material without a written directive from the Government." (Vol IV, Tab 28, RM-COE-01637).

Whether the red clay was placed in the stockpile or in the levee, it would have been available for review and analysis if Renda would have identified where it was located in the levee.

Even though the material was stockpiled by Renda, no geotechnical tests were provided by Renda to evaluate the properties of the clays encountered. Four and a half months after placement at Sta. 118+00, on March 12, 2001, the Government directed Renda to use the clay material in the levee which was to be hydraulically constructed and considered the clay "Misplaced Excavated Material". Further discussion about the materials placed in the levees which were to be hydraulically constructed can be found in Section 4.8 of this report.

4.5.4 Technical Results

Renda's August 1998 Stiff Clay Spreadsheet does not support the claim that soft soils were anticipated where heavy, red clay materials were found. Multiple colors of red, rust, brown and gray are indicated on the boring logs for this area. Generally, no inference can be drawn from the color about a soil's properties and Renda has not documented any.

Aside from Renda's August 1998 Stiff Clay Spreadsheet, from my review, the soil descriptions in the boring logs do appear to change from soft clays to stiff clays between Sta. 563+80 and Sta. 568+90. Because of this description change, I performed an evaluation of production. Two areas were evaluated that are part of Renda's claim area. Area One contains the soft clays that I identified on the boring logs and extends from Sta. 558+00 (beginning of Renda's claim) to Sta. 566+35, midway between boring logs 3ST-10W and 3ST-11. The second area, Area Two, contains descriptions of primarily stiff clays and extends from Sta. 566+35 to Sta. 609+00, the end of Renda's claim area. Area Two has stiff and hard consistency clays and color descriptions in the boring logs and do not support Renda's claim of a Differing Site Condition. In fact, the boring logs starting at Sta. 568+90 (3ST-11) appear to be the materials described by Renda. Production for

Area Two, in hard and very stiff clay as described in the boring logs was 663 cy per effective hour; some of the best production on the entire project (Vol VI, Tab 8). By contrast, the production in Area One of Section 7 where I determined the boring log to describe soft clays, is 205 cy per hour (Vol VI, Tab 9). These results seem to support Renda's allegations that production was hampered in the limited area from Sta. 558+00 to 566+35. However, somewhat confounding was the production in the stiff clays outside Sta. 558+00 to 566+35, which was three times higher than in the soft clays I identified in Area One.

Further investigation into why production was so poor in Area One reveals that Renda's barge-mounted booster pump was not operating for much of the time. The Government is not responsible for equipment malfunctions that reduce production. Below is a summary of the booster pump use during performance of Area One.

Booster Use
Area One
Renda Section 7 Clay

| IRD Date | Booster Use |
|---|---|
| October 2, 2000 | 12 hours only |
| October 3, 2000 | 0 hours |
| October 4, 2000 | 0 hours |
| October 5, 2000 | 0 hours |
| November 14, 2000 | 3 hours |

In measuring damages caused by the alleged Section 7 Clay, Renda used an estimated measured mile cost developed on eleven days for use in the Flare Area. As stated in 4.3.3, Renda's Measured Mile is flawed and it is not relevant to dredging in Section 7.

As stated above, production in the very stiff and hard clay described by the boring logs of Section 7 was above the job average. No adjustment should be made for this section. Renda states that claimed equipment expense for the Section 7 claim period is $1,097,792. The backup detail for Renda's claimed equipment cost is missing from the record. Renda documents and Government documents do not contain any equipment

details. Therefore, comments about the equipment rates and hours of operation are qualified. However, the Inspection Report of Dredging (IRD) shows what equipment operated during the period.

Renda, if like other claims, may have included mechanical levee construction equipment in the adjustment calculations. This equipment should be eliminated in Section 7. Renda's measured mile has no booster pump or mechanical levee construction equipment where, if like the Flare claim period, the impact period has booster pump equipment and mechanical levee construction equipment. The unanticipated clay, if encountered, did not cause the need for the booster pump or the mechanical levee construction equipment.

Since no adjustment is warranted, the dredging labor is questioned in its entirety.

Conclusion

Renda's claim for Section 7 Area – Heavy Red Clay is without merit based upon a review of the boring logs and corresponding production. Additionally, the Renda August 1998 Stiff Clay Spreadsheet contradicts Renda's assertion that it anticipated soft clays.

## 4.6 Obstructions in Channel Sta. 660+00 to Sta. 685+00 (Obstructions No. 2)

### 4.6.1 General

On August 10, 2001, the Government received a claim from Renda for encountering obstructions and excessive trash while accomplishing the dredging in a portion of Section 9, from Sta. 658+00 to 672+50. The remainder of Section 9 was deleted from the contract.

### 4.6.2 The Work

Renda began dredging in Section 9 at Sta. 660+00, middle cut, on February 9, 2001, after relocating from Section 8. Renda performed dredging in Section 9 for nine consecutive days. On February 19, the dredge is reported down due to the Lufkin gear. After the Lufkin gear box repair, the dredge was relocated to Sections 5 and 6 where it began operations on February 26, 2001.

In the claim, Renda alleges that on February 13 and 15, 2001, two obstructions were struck on each day. The IRD does not mention the obstructions or coordinates. Further, the internal Renda Daily Production Reports (Vol VI, Tab 11) for these dates do not indicate anything out of the ordinary. Another internal Renda Daily Report (Vol VI, Tab 12) is also silent about encountering discrete obstructions during the February 10 through 18, 2001, time period. Renda has been very specific about encountering four obstructions at x,y coordinates, but no supporting documentation can be found, except in the claim correspondence.

The February dredging in Section 9 is rather unremarkable as noted in the internal Renda Daily Production Report, except for equipment repairs. On February 11, 2001, the Renda

Daily Production Report notes "Normal Operations". During the nine day period, the Inspection Report of Dredging (IRD) reports the dredge being stopped for trash clears on the pump and cutterhead for 39.5 hours or 18.3 percent of the time (Vol VI, Tab 13).

In March 2001, armed with the Government's January 2001 magnetometer and side scan survey report[1], Renda lobbied the Government to remove Section 9 from the contract. On March 22, 2001, a meeting was held addressing the work remaining in Section 9. Renda was directed to return to Section 9 to complete dredging. However, the Government did not want Renda to damage the dredge Millennium by attempting to remove excessive debris, trash or obstructions (Vol IV, Tab 30). It was agreed that if the dredge were to encounter excessive debris, trash or obstructions, Renda was to contact the Government for verification. Upon verification of the excessive debris, the Government reserved the right to delete Section 9 or require other changes in the work. Renda returned to Section 9 on April 10, 2001[2].

On April 12, 2001, the Government was called to verify the existence of excessive debris. An on-site visit occurred but the Government did not agree with Renda that the volume or type of trash was excessive or unexpected. On April 14, 2001, Renda complained (Vol IV, Tab 31) to the Government that excessive pump and cutter cleans were required since returning to Section 9. On April 16, 2001, Renda advised that the dredge had struck a mooring buoy and was damaged (Vol IV, Tab 32). After April 16, 2001, the Government determined that it was appropriate to delete the remainder of Section 9.

Repairs were performed to the dredge Millennium during the April 16, 2001, to May 8, 2001, time period. Renda claims reimbursement for eighty percent of the day on April 16, fifty percent of the day on May 8 and all days between.

[1] Renda had a copy of the "Survey Report" on January 31, 2001, when they requested a meeting with the Government for performing future work (Vol IV, Tab 29). The Survey Report is contained in Vol V, Tab 65.

[2] Figure 4

4.6.3 Technical Evaluation

Based on my analysis of cutterhead and pump clears performed in Sections 1 through 6 and projecting those increasing clear times into Section 9 (see figure 4.6.1), Renda should have expected approximately 13 percent of the time to be involved in clearing the pump and cutterhead of trash. In the February 2000 period, Renda spent 18.3 percent of the time (Vol VI, Tab 13) performing pump and cutter clears, a 5.3 percent difference or about 1.3 hours more each day above the forecasted amount.

Figure 4.6.1




During performance of the second period in Section 9, April 10 through 16, 2001, Renda was on the north side of the channel. I evaluated the second period to see if pump and cutter clears varied from that which could be expected from previous work. Pump and cutterhead clears in the second period increased to 24.67 percent of the time (Vol VI, Tab 13), almost double the time that could be forecasted from Renda's experience in Sections 1 through 6 and over six percent more than Renda experienced in the middle cut of Section 9.

Section 9 is the farthest upstream acceptance section of the project. It is separated from Sections 1 through 8 by a "No Dredging" zone, from the end of Section 8 at Sta. 650+00 to the beginning of Section 9 at Sta. 658+00. In the "No Dredging" zone, Contract Drawing C-2 shows several pipeline crossings at elevation -45 ft MLT, above the planned grade.

Renda also lost a large amount of productive time due to channel traffic in Section 9. Renda's bid papers do not document the amount of non-effective time Renda allowed in its bid for traffic moves, pump/cutter clears or other non-productive operations. However, traffic moves and pump/cutter clears were remarkably more (approximately 25 percent each) in Section 9.

4.6.4 Technical Results

Renda is claiming that excessive trash and debris, and particularly one object, a mooring buoy, damaged the dredge and Renda is seeking the repair time and cost from April 16, 2001 to May 8, 2001. Renda makes no claim for the loss in productive time due to excessive trash and debris.

In this report, Renda's damages for the excessive trash and debris are recomputed based on a loss of productive time to the dredging in Section 9, stand-by while the dredge repairs were being performed and some repair parts. However, not all the time requested by Renda is considered during the repair period.

In general, there is an absence of daily reports for the repair period and it is undocumented what repairs, other than the cutterhead gear box assembly, were actually accomplished. From the repair invoices submitted (Vol VI, Tab 23) and other memoranda, the cutterhead gear box was removed from the dredge on April 18, 2001, two days after the alleged damage occurred, and taken into Houston Dynamic Service, Inc.'s (HDS) shop for repair. HDS invoice shows that the cutter box assembly was

completely repaired and sent back to Renda no later than April 27, 2001, a period of nine days.

There is no explanation of what delayed completion of the dredge repairs until May 8, 2001. It is noted that on May 2, 2001, HDS explains in a facsimile to Renda, "This is everything except the new shaft we are still machining." According to the claim documents used to support the shaft's cost, the shaft was ordered by Renda on February 8, 2001, the day before beginning work in Section 9. The delivery date for the spare shaft is undocumented.

Based upon review of the repair invoices, it appears that repairs to the cutterhead gear box were complete in approximately two weeks. This allows Renda two days to remove the gear box, the nine actual days to repair the gear box off-site at HDS, and two days to re-install the gear box. Therefore, the remainder of the repair time after April 30, 2001[3] is determined to be unreasonable.

I also question Renda's choice of cutterheads to use in Section 9. Renda continued to use the Vosta cutterhead with chisel teeth[4] which are best for cutting stiff clays. However, chisel teeth tend to pick up trash which then become stuck in the cutterhead. In Section 9, after receipt of the Government's side scan sonar and magnetometer data indicating the locations of certain obstructions and trash, Renda should have selected to use plain edge adapters to minimize the amount of down time due to trash (Vol VI, Tab 19 and Vol IV, Tab 33).

---

[3] A site visit entry for April 30, 2001, from Mr. Hrvabovsky, a Turner Collie & Braden representative, who were consultants to the Government's cost share partner on the project, writes, "On Monday, April 30th, I made a site visit to Upper Bayou. There were two dozers shaping levee at Lost Lake around Stations 175+00 to 185+00. The dredge was still tied up around Sta. 534+00. The cutter tail shaft and cutter had been installed on the dredge as it appeared to be ready to dredge." (Vol VI, Tab 17).

[4] Photos from April 16, 2001, show that the cutterhead had chisel teeth with trash (tires, chains) stuck on and between the teeth (Vol VI, Tab 18).

4.6.4.1 Time Extension

For the loss in productivity due to the additional time required for pump and cutterhead clears, the February time period had a total available dredge time of 216 hours (Vol VI, Tab 13). Renda's non-effective time (or an equal deductive loss in productive time) was increased 5.3 percent because of the added pump and cutterhead cleans. Therefore, for the February period, Renda had reduced productions for 11.5 hours (216 hours times 5.3 percent).

In the second time period, April, Renda had a total dredge time available of 168 hours (Vol VI, Tab 13). For this time period, Renda experienced an increased loss of productive time of 11.7 percent due to the additional time expended clearing the pump and cutterhead. Therefore, for the April period, Renda had reduced production for 19.7 hours (168 hours times 11.7 percent). Total production loss in Section 9 is 31.2 hours. Renda operated an average of 10.8 hours per day for sixteen days in Section 9. Therefore, 3 days were lost due to the additional pump and cutter clears in Section 9 (31.2 hours divided by 10.8 hours). For additional cost computed on a daily rate, 3 days will be used for the adjustment. For additional dredging equipment cost, the 31.2 hours of lost productive time is used.

The total time extension for the disruption (3 day) and impact (14 days) is 17 calendar days.

4.6.4.2 Additional Cost

A. Loss in Productive Time

Renda did not quantify a loss in productive time for the dredging operation. However, evaluation shows that the dredging work was disrupted by the additional time required to clear the pump and cutterhead in Section 9. The loss in productive time is used to compute the additional labor and equipment cost expended during this period for the

dredge and its attendant plant. The cost calculation for the equipment is contained in Volume VI, Tab 20, and the labor computations are in Volume VI, Tab 21.

Productivity Loss Summary

| | | |
|---|---|---|
| Equipment (Vol VI, Tab 20) | | $48,942 |
| Labor (Vol VI, Tab 21) | | 20,028 |
| Field Cost $1,735 x 3 days (Renda claims $41,116/31 days) | | 5,205 |
| | Subtotal | $74,175 |
| Resident Office Overhead (8.63%) | | 6,401 |
| Corporate Office Overhead (4.23%) | | 3,138 |
| | Subtotal | $83,714 |
| Profit @ 7.15% based on S.Ferry Landing | | 5,986 |
| | Subtotal | $89,700 |
| Bond @ 0.65% | | 583 |
| | | $90,283 |

B. Impact Period

Renda has claimed 22.3 days between the dates of April 16 and May 8, 2001, for repairs to the dredge. The idle time caused by the damage to the cutterhead gear box assembly has been found to be fourteen days or 336 hours. The cost incurred for the cutterhead gear box assembly repair has been recomputed and is as follows:

| Direct Costs | Renda Claim | Supported | Notes |
|---|---|---|---|
| Dredging Equipment | $552,664 | $149,466 | A |
| Dredging Labor | 153,751 | 93,460 | B |
| Field Cost (1735 x 14 days) | 38,683 | 24,290 | C |
| Dredge Equipment Repair Cost | 86,058 | 21,432 | D |
| Subtotal | $831,156 | $288,648 | |
| Resident Home Office Overhead 8.63% | 131,988 | 24,910 | E |
| Corporate Home Office Overhead 4.23% | 54,856 | 12,210 | E |
| Subtotal | $1,017,999 | $325,768 | |
| Profit | 122,160 | 0 | F |
| Bond @ 0.65% | 7,411 | 2,118 | G |
| Subtotal | $1,147,570 | $327,886 | |
| Miscellaneous Cost | | | |
| Consultant Services | 10,000 | -- | H |
| Report Preparation Cost | 1,000 | -- | |
| Bond @ 0.65% on Misc Cost | 72 | -- | |
| Total | $1,158,642 | $327,886 | |

A – For equipment calculations, see VI, Tab 22. For explanations of the equipment rates, see Section 5

B – Labor cost for the period is developed in Volume VI, Tab 21

C – Field Cost is considered acceptable at this time. However, some costs appear to be for parts which would be a duplication of equipment rates. Some costs appear to be resident office expense which would also be a duplication. Individual invoices were not available for review.

D – See Volume VI, Tab 23, for discussion of individual repair parts.

E – The DCAA audit (Vol VI, Tab 24) developed overhead rates for Resident Office and Corporate Office. Those rates contained two components, shop and office. The shop component is unallowable since the Corps Manual includes an allowance for shop expense. Rates used are shown at the end of the audit.

F – Suspension of Work. No profit is allowed on suspensions of work.

G – Bond rate verified by DCAA audit, Volume VI, Tab 24

H – Miscellaneous Cost – Cost disallowed by DCAA audit (Vol VI, Tab 24). Consultant Services are litigation expense and the report preparation cost is field office or home office expenses for which an allowance has already been made.

### 4.6.5 Conclusions

Additional time was performed in clearing the pump and cutterhead of trash and debris in Section 9 when compared to the trash clear time experienced in other areas of the project. Additionally, the mooring buoy obstruction may be the proximate cause of the cutterhead gear box assembly repairs because it is closely related in time. However, the cutterhead gearbox failure is a recurring problem. For seven days in December 2000, Renda claims repairs were necessary. However, with the failure again in April 2001, the repairs allegedly performed in December are suspect. If the cutterhead gear box was not properly repaired in December, that may account for reduced productivity and failure in April 2001.

In measuring the damages incurred during the repair period, Renda makes no adjustment for other repairs which would have prevented the dredge from working or failure to stock spare parts. Also, the equipment rates which Renda developed are improper, particularly for the dredge and booster. A discussion about the equipment rates can be found in Section 5 of this report. Assuming that the trash is found to be excessive in Section 9, the maximum adjustment in price is $99,352 and a time extension of 3 calendar days is warranted.

If the mooring buoy is determined to be a differing site condition, then the cost increase for this occurrence is $380,973 and the time adjusted twenty-four calendar days.

## 4.7 West Levee Realignment Lost Lake Placement Area

### 4.7.1 General

On May 31, 2001, Renda submitted a claim for realigning the West Levee between Sta. 166+00 and 188+50 during the general time period of September to November 2000. Renda is seeking a time extension of 40 calendar days and a cost increase of $789,600. Renda measures its damages by other unit-priced work completed under a bilateral modification executed in 1999 for work that was performed by its subcontractor, Affolter Contracting, Inc.

### 4.7.2 The Work

After preparing the discharge pipeline for almost one month, the hydraulic placement of the West Levee began on March 11, 2000, at Sta.188+82. Renda placed hydraulic fill material at levee Sta. 188+82 for seventeen consecutive days trying to build up the materials to the required elevation of +30 feet MLT. On March 28, 2000, Renda's discharge pipeline broke and, with the permission of the Government, flow was diverted to Borrow Area No. 2 on the south side of Lost Lake at approximate Levee Sta. 118+00 or Sta. 120+00 to permit the continued operation of the dredge. For five days, the discharge (18,320 cy) was placed in Borrow Area No. 2 while repairs to the discharge pipeline were made. On April 3, the levee-building materials were again placed on Sta. 188+82. For another week, except for April 6, 2000, due to another pipeline break, Renda continued to place levee discharge at levee Sta.188+82 or Sta.188+50. Between the period of March 13, 2000, and April 10, 2000, Renda placed 179,225 cy of levee building material at approximate Sta.188+82 (Vol VI, Tab 25).

On April 11, 2000, Renda moved the discharge point to levee Sta. 166+00 and proceeded to place hydraulic fill in a northerly direction along the new alignment. On April 18, 2000, the QAR states that the Government disagreed with the "wide placement of material at the discharge point".

Hydraulic fill placement at levee Sta 170+85 was to +25 feet MLT or higher as noted on the CQCR on May 5, 2000, and the slopes extended into Lost Lake creating a wide placement area.

On July 27, 2000, while on a site visit, the Government was approached by Renda about a mud wave created by the new levee alignment. The hydraulic fill placement, which had started at Sta. 166+00, had reached approximate Sta. 180+33.

On July 28, 2000, Renda confirmed its discussions with the Government about the mud wave and new levee alignment. In its letter (Vol IV, Tab 34), Renda states,

> "The centerline is too far to the East of the existing old levee. The new levee placement will cause the mud to be displaced to the West in a mud wave that will go over the old levee and into the Old River. As per our conversation it would seem that the proper thing to do would be to construct the new levee so that the toe of the new levee would be against the old levee, thus using the old levee as a berm to support the new levee and also keep the mud wave to the inside of the new levee and not push it over the old levee. Please advise me of the possibility of moving the centerline to the West so we can tie in to the old levee." (underscore added)

Renda had been constructing the West Levee for approximately 100 days before the mud wave and new levee alignment became a problem and brought it to the Government's attention.

On August 7, 2000, the Government met on site with Renda to again review the new centerline location with Renda. The Government agreed that the new levee should abut the existing West Levee to prevent trapping mud between the two levees and forcing mud up over the old levee. On August 7, 2000, the Government changed the new alignment. In an August 8, 2000, internal email (Vol VI, Tab 27), the Government agreed that "the increased distance between the new hydraulic fill alignment and the existing levee, near station 180+00 ... is more than was intended..." It was also noted that because of the

increasing distance[1] between the two levees "that underlying, very soft, displaced dredged material is trapped, and forced upwards as a mud wave between the two fills". The August 8 email confirms the verbal directions discussed in the field to use the existing levee as a guide for the new levee alignment and place all future hydraulic fill closer to the existing levee.

On August 18, 2000, Renda confirmed the verbal instructions given on August 7, 2000. In that letter (Vol IV, Tab 36), Renda states,

> "Following the specified levee alignment, mud waves were being formed which threatened to top the old levee. RMI personnel met with you, Erik Russek and Tim Few on August 7th at the Placement Area. At this meeting, the Government verbally agreed to realign the levee such that the toe of the new levee would be against the existing, old levee."

On August 16, 2000, the Government conducted a survey of the West Levee from Sta. 166+00 to Sta. 183+67. The survey (Vol VI, Tab 28) identified 132,937 cy of dredged material remaining above the existing ground that had been distributed along the west alignment. This section of the West Levee required only 59,087 cy of fill. Approximately 74,000 cy too much material had been deposited parallel to the levee alignment for use in the shaping and final grading process.

It its claim, Renda states that "after the survey on August 16, 2000, foundation-building materials were deposited between Stations 183+50 and 188+00 to an elevation of approximately +27 MLT extending across at least a 200' base with a 100' top, and a 6:1 slope of repose." Renda continues, stating that "in this area an approximate quantity of 35,000 cy was mechanically relocated to the new levee alignment which abutted the existing levee." However, this second area was placed after receiving instructions to place future dredged materials on the new alignment and after Renda had confirmed the placement instructions on August 8, 2000. Therefore, the Government should not be responsible for relocating this misplaced material.

In February 2001, Renda returned to perform contract-required final grading on the West Levee and place additional material at approximate Sta. 198+00.

---

[1] See Sketch Vol VI, Tab 26

On May 23, 2001, the Government issued Modification CO-10, P00027, to formalize the West Levee alignment change. This change notified Renda that the alignment given on August 7, 2000, incorporated the verbal instruction into the contract and incorporated Sketch, SK-CO10-01. Renda did not agree with the proposed modification as it was issued with no time or cost increase. Eight days later, Renda submitted its claim.

4.7.3 Technical Evaluation

Contract Drawing No. C-14 shows in plan view the Lost Lake Placement Area Plan (Lost Lake). The hydraulically constructed levee on the west side of Lost Lake begins at Sta. 166+00 and proceeds north to approximate Sta. 210+00, where the levee turns to the east. Note No. 10 on Contract Drawing C-14 states that "very soft to soft foundation material will be displaced by the new levee."

Further, Amendment No. 1 to the solicitation (Vol IV, Tab 4) provided, among other things, a response to a prospective bidder's question about "Why is the levee alignment so far from the perimeter where the foundation is crummy?" The Government stated in part that, "the intent of the design is to use the new work material to enhance the long term stability of the levees. For this reason, the designers intend the new work material be used to displace the very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material."

The plan view on Contract Drawing No. C-14 shows the location of the existing west levee centerline to be somewhat parallel to the new west levee centerline. The new west levee is to be constructed to the inside or east of the existing levee. By scaling distances from Drawing No. C-14 at approximately Sta. 166+00, the distance from the existing west levee centerline to the new west levee centerline is approximately 75 feet. At Sta. 179+50, from the plan view on Drawing C-14, the distance between the old centerline and the new west levee centerline has increased to around 125 feet. At approximate Sta. 189+50, the distance between the two levee centerlines remains about the same distance

apart, 125 feet. At Sta. 197+00, the distance between the new levee centerline location and the old existing west levee centerline decreases to approximately 100 feet. Therefore, between Sta. 179+50 and 190+00, the new west levee centerline was the farthest distance away from the existing west levee. The contract anticipated the new west levee centerline to be further to the east of the existing levee for approximately 1,050 feet. This shift of the new west levee to the east of the existing levee can be seen in cross section on Contract Drawing No. 16. On Contract Drawing No. 16 the new levee cross section at Sta. 165+50 shows the new levee toe intersecting the existing levee toe about 45 feet to the left or west. However, on that same drawing, C-16, the cross section at Sta. 179+50, shows the new west levee shifted to the east and the new levee toe terminates on existing ground at about 55 feet to the left and does not intersect the existing levee toe. There is approximately 20 feet between the east toe of the existing west levee and the new west levee. The 20-foot gap would exist for approximately 1,000 feet or more until the new levee alignment shifted back to the east or the existing levee toe extended further to the west.

As noted by Renda's CQCR on July 24, 2000, at approximately Sta. 180+00, Renda began "beefing-up" the potato roll on the levee ahead of the discharge point. This is in the same location as the 20-foot gap between the levees. It is assumed that the need to beef-up the height of the perimeter levee was necessary to contain the mud wave which began to be trapped at approximate Sta. 180+00.

A gap between the levees is contemplated by the contract drawings. However, what was not anticipated or desired by the Government was for displaced foundation/mud trapped between the new and existing levees. A mud wave up against the existing levee was a concern for Renda, as well. The contract required all materials to be retained within Lost Lake.[2] As noted in Renda's July 28 letter to the Government, continued use of the new levee alignment would cause the mud wave to "go over the old levee" and moving the future alignment would "also keep the mud wave to the inside of the new levee".

[2] Contract Section 02223-5, Retaining Levees, paragraph 3.1, Embankment Construction, subparagraph 3.1.3, Misplaced Materials, states, "At no time will material or water be allowed to overflow the existing perimeter levee."

Renda states in their claim that the additional cost for the realignment work took place between early September 2000 and November 2000 due to mechanically relocating significant quantities of material previously placed between Sta. 166+00 and Sta. 188+50. Renda states that "subsequent levee construction after November 2000, up to and including work beyond approximately Sta. 205+00, has been performed in accordance with Sketch SK-C010-01, requiring no additional costs to the Government for work associated with realignment of the levees."

Renda segregated the modification proposal into two parts:

1) Realignment and Relocation of Material between Sta. 166+00 and 183+00 and,
2) Realignment and Relocation of Material between Sta. 183+00 and 188+50.

Renda does not identify any equipment or labor expended in performance of the relocation work during either part of their proposal. Renda does not provide survey data to quantify the materials actually relocated. Renda asserts that the quantity relocated may be double that identified by the Government survey. However, the Government survey does not support the movement of any material[3].

Renda's CQCR report does not support a claim for mechanically relocating significant quantities of previously placed material on the west levee between Sta. 166+00 and 188+50. From September 4, 2000 to November 11, 2000, the CQCR reports Renda mechanically excavating misplaced hydraulic fill material along the inside of the <u>east</u> levee and relocating it by hauling to the north levee where it was placed as mechanical fill instead of the required hydraulic fill.

---

[3] The Government survey performed by Turner Collie & Braden, Inc. on August 16, 2000, quantifies the material existing between the existing ground surface and the top of ground on that date (Vol VI, Tab 28). The CQCR reports no activity between August 7 and the date of the survey. Therefore, material relocated or handled a second time would have occurred after August 16. Another survey has not been taken to quantify the movement of material. Further, at the end of the contract, the material misplaced along the west levee alignment was contemplated by the Government to be relocated but that work was not performed.

The CQCR does identify some additional work on the west levee. After the Government met with Renda on the site on August 7, 2000, and provided direction to shift the centerline of the new levee so that it abutted the existing levee, the CQCR records material being pushed "ahead of the discharge point up against old levee base to force the mud wave towards the inside." This added work of pushing the dredged fill material against the old levee continues being reported on the CQCR through August 21, 2000. The CQCR does not describe or segregate the equipment or personnel performing this west levee added activity (other than listing the total amount of equipment and personnel working each day at Lost Lake). However, on August 22, 2000, the QAR reports,

> "The discharge point on the levee was at about station 188+50 and material was being discharged on the levee at the time of this inspection. There were two bulldozers working the levee at station 175+00. Komatsu D6 walking in cast material. Cat D6 dressing toe area where track hoe excavated moving dike inward. One D-550 dozer working discharge area. One long reach one marsh tractor working inside the levee placing pontoons on line. One idle D-6 and one idle long-reach at station 190+00 of the levee."

The QAR identifies two dozers working behind the discharge, moving the levee inward toward the old levee and compacting cast material[4]. Renda had an excavator available to cast material. However, added work must be distinguished from the contractually required work.

Shaping of the levee to final line and grade was a requirement of the contract. Shaping is performed by obtaining adjacent hydraulic fill material and mechanically placing it to required line and grade. On August 28, 2000, Renda CQCR reports, "Checking C/L to establish toe and shoulder stays to begin final dressing Sta. 167+00 – 189+00." Final dressing of the West Levee up to Sta. 189+50 continued until September 8, 2000; with one additional day reported on September 11, 2000. After that date, the Renda CQCR report is silent about work on the West Levee between Sta. 166+00 and 188+50 until March 5, 2001, when dressing the West Levee is reported again.

---

[4] Cast material is material excavated by a machine, trackhoe or dragline, and then placed at another location by the same machine.

4.7.4 Technical Results

On August 7, 2000, at approximately Sta 180+00, the Government changed the future alignment of the new West Levee. The remainder of the levee from Sta 180+00 to 215+00 was to be constructed in accordance with the verbal instructions. Prior to the change, the West Levee alignment from Sta. 166+00 gradually veered to the east away from the existing levee alignment. At its maximum distance, at approximate Sta. 180+00, a mud wave developed between the existing levee and the new hydraulic levee.

Due to the planned alignment of the new West Levee, a mud wave was generated between the existing levee and the new levee. This mud wave could have overtopped the existing levee. On July 24, 2000, Renda CQCR notes additional work on the potato roll out ahead of the discharge point. The day after the potato roll work began, on July 25, 2000, Renda personnel on the levee asked Renda management if the new levee centerline could be moved over toward the existing levee (Vol VI, Tab 29). The potato roll work (extension of the height of the levee to contain the encroaching material) continues until August 8, 2000, a day after the Government permitted Renda to move the alignment closer to the existing levee.

Due to the proximity in time, the seventeen days of constructing potato roll on top of the existing levee is considered as additional work caused by the mud wave which was a result of the new alignment in this area. This work would have required a hydraulic excavator to perform.

After directions were received from the Government to shift the alignment closer to the old levee, Renda notes additional work on eleven days by pushing material toward the old levee. This work would require dozers to perform. Although the CQCR is silent about personnel and equipment performing this work, the QAR on August 22 and 23, 2000, reports that two dozers and a long reach excavator were working on the spoil area.