No time extension is justified for the work. The dredge continued to excavate, transport and place fill materials for the levee construction while the potato roll and realignment was taking place. Therefore, no stoppage to the critical dredging work was experienced.

Quantities of materials relocated by Renda were not documented. In general, the time is undocumented for the labor and equipment for creating the potato roll and pushing the fill materials after August 17 into the new alignment. For both of these tasks, an estimate of the added work is computed using the days identified from the CQCR and the QAR. No other work is documented for the realignment of the West Levee.

The following computes cost for additional West Levee work caused by the new alignment of the West Levee and associated mud wave.

A. Additional West Levee Potato Roll Work

| | |
|---|---|
| Labor | |
| 1 – Operator 12 hrs/day x 17 days x $15.57/hr | $3,176 |
| (for operator hourly rate, see Vol V, Tab 42) | |
| Plus: | |
| Workman Compensation @ 7.26% | 231 |
| Payroll Tax and Insurance @ 8.2% | 260 |
| Labor Subtotal | $3,667 |
| Equipment | |
| 1 – Trackhoe 12 hrs/day x 17 days x $53.68/hr | $10,951 |
| (for trackhoe rate, see Vol II, Tab 100) | |
| Total Estimated Direct Cost | $14,618 |
| Plus Overhead: | |
| Resident Home Office @ 16.14% | $2,359 |
| Corporate Home Office @ 6.60% | 965 |
| Total Estimated Direct & Indirect Cost | $17,942 |
| Profit @ 7.15% (See South Ferry Landing) | 1,283 |
| Bond @ 0.65% | 125 |
| Total Estimated Adjustment for Potato Roll | $19,350 |

B. Additional West Levee Alignment Work

| | |
|---|---|
| <u>Labor</u> | |
| 2 – Operators 12 hrs/day x 11 days x $15.57/hr | $4,110 |
| (for operator hourly rate, see Vol V, Tab 42) | |
| Plus: | |
| Workman Compensation @ 7.26% | 298 |
| Payroll Tax and Insurance @ 8.2% | <u>337</u> |
| Labor Subtotal | $4,745 |
| <u>Equipment</u> | |
| 2 – Dozers 12 hrs/day x 11 days x $46.08/hr | $12,165 |
| (for dozer rate, see Vol II, Tab 100) | |
| Total Estimated Direct Cost | $16,910 |
| Plus Overhead: | |
| Resident Home Office @ 16.14% | $2,729 |
| Corporate Home Office @ 6.60% | <u>1,116</u> |
| Total Estimated Direct & Indirect Cost | $20,755 |
| Profit @ 7.15% (See South Ferry Landing) | 1,484 |
| Bond @ 0.65% | <u>145</u> |
| Total Estimated Adjustment for New West Levee Alignment | $22,404 |

<u>4.7.5 Conclusion</u>

Due to the planned location of the new levee alignment, some additional work was performed consisting of preventative potato roll work to keep the mud wave from overtopping the existing east levee and shifting work to direct the existing mud wave away from the existing levee. Other levee or dredging operations were not stopped or impacted by performance of the added work. Therefore, no time is considered allowable, but the cost of the added work is $41,754.

## 4.8 Differing Site Condition Encountered During Construction of Hydraulic Levees at Lost Lake Disposal Area

### 4.8.1 General

On October 16, 2001, Renda submitted a certified claim in the amount of $6,258,853 for the alleged differing site condition encountered during construction of the hydraulic levees at Lost Lake Disposal Area. Renda priced this claim on the total cost basis where payments and claims have been subtracted from the alleged total cost. Renda does not make any downward adjustments to the apparent total cost for additional costs that were the sole responsibility of Renda. Similarly, no adjustments were made for errors or inaccuracies in the bid estimate.

The total cost method is not preferred but has been accepted where four criteria are satisfied. They are:

1. The nature of the particular loss must make it impractical to determine the economic loss with a reasonable degree of accuracy;
2. The original estimate or bid must be reasonable and free of error;
3. The actual cost must be reasonable and accurately recorded; and
4. The contractor must show that it was not responsible for any cost overruns.

While a modified total cost calculation more closely represents the additional costs attributable to a claim than a pure total cost submission, it still fails to provide a direct link between the costs and the changes to the work caused by the alleged differing site condition.

On December 12, 2002, the Defense Contract Audit Agency (DCAA) issued its Audit Report No. 3511-2003M172 00012 (Vol IV, Tab 38) for the differing site condition on the hydraulic levees. The auditor did not address the issue of entitlement, but offered

conclusions on the claimed amount, the magnitude and reasonableness. In the results the audit states, in pertinent part,

> "Because the cost or pricing data inadequacies are considered significant, we do not believe the claim is an acceptable basis for settlement of the price adjustment claim request, as discussed with Mr. Thomas Benero and confirmed in our teleconference with your office on May 7, 2002. FAR 15.403-4 requires the submission of cost or pricing data applicable to the modification of any sealed bid contract. To make the cost or pricing data adequate, the contractor must prepare its claim in the format of FAR 15.408, Table 15-2. Table 15-2 Section II-Cost Elements, requires that the contractor provide breakdowns for the basic cost elements claimed."

Almost two years after the exit conference of the audit, an additional breakdown of the alleged total cost has just been received from Renda. A supplemental report will be issued should the data affect any of the conclusions or evaluations contained herein.

4.8.2 Contract Requirements for Hydraulic Constructed Levees

Contract Section 02223 – Retaining Levees contains the specification requirements for constructing the mechanically constructed levee, the hydraulically constructed levee and compacted fill and backfill for the new drop-outlet structure work.

Contract Section 02223, paragraph 1.3.1, required a plan for the construction of the mechanically constructed levee and the hydraulically constructed levees. The minimum requirements of the plan were, in part,

(1) The phasing and construction of the Mechanically Constructed Levee, Drop-outlet Structure, and the Hydraulically Constructed Levees, including discharge pipeline placements, with sketches when applicable, and techniques to minimize foundation displacements.

(2) Approximate Houston Ship Channel stations between which the material to be used to construct the Hydraulically Constructed Levees will be dredged.

At the preparatory meeting on December 3, 1998, Renda's plan for constructing the mechanically constructed levee, drop-outlet structure, and the hydraulically constructed levee (Vol IV, Tab 39) was discussed. Figure 4.8.1 shows the Renda sketch which complies with Section 02223, paragraph 1.3.1(2) depicting the location of the planned borrow material and their intended placement sequence in the respective levee section.

Figure 4.8.1

Renda Placement Sketch



No sketch or data similar to Figure 4.8.1 has been located which would show Renda's intentions pre-bid. However, this sketch shows Renda's planned use of the materials prior to the start of work.

From Figure 4.8.1, Renda anticipated the hydraulically constructed levees would be built from satisfactory material obtained from Channel Sections 1, 2, 3, 4 and 5. Section 1 dredged material would be used to construct the levee from Sta. 97+00 to approximately 77+00 on the east side. Section 2 dredged material would be used to construct the remaining east levee and the western third of the north levee from approximately Sta. 77+00 to Sta. 30+00. Section 3 dredged material was anticipated to be pumped to the

north levee and would be used to complete the hydraulic fill from Sta. 30+00 to Sta. 4+00 at the existing drop-outlet structure. Although the color coding is difficult to distinguish, Section 4 and the corresponding Flare Area[1] would be used to complete the north half of the west levee starting at approximately Sta. 185+00 and the eastern third of the north levee that ties into the existing drop-outlet structure. Section 5 of the channel is shown to complete the southern half of the west levee from Sta. 166+00 to approximate Sta. 185+00.

Section 02223, paragraph 1.4, General Provisions, requires the embankments to be constructed to the lines, grades and cross sections shown on the drawings. Government directed field changes in embankment sections would be covered in accordance with the Changes clause of the contract. Under paragraph 1.4.2, Conduct of Work, the contractor was required to maintain and protect the embankment in satisfactory condition at all times until completion and acceptance of the work.

Section 02223, paragraph 1.4.3, Order of Work, required the work be performed in the following order:

> (1) The Contractor shall fully complete placement of the Mechanically Constructed Levee between Stations 97+00 and 166+00; and at the areas for the construction of the new Drop-outlet Structure and the modification of the existing Drop-outlet Structure as shown, to the lines and grades specified. The Contractor shall also complete construction of the new Drop-outlet Structure prior to beginning work on placement of the Hydraulically Constructed Levees.
>
> (2) The Contractor shall place Hydraulically Constructed Levees at all levee stations not listed above, until the entire perimeter levee has been completed to Elevation +20 feet Mean Low Tide (MLT).
>
> (3) The Contractor shall not be permitted to grade the area outside the slope of the newly constructed levee until the entire perimeter levee has been completed to Elevation +20 feet MLT.

Section 02223, paragraph 1.4.4, Slides, states that if any part of the levee, during its construction or after its completion, but prior to acceptance, was sliding, the contractor, after written order from the Government, was required to rebuild that portion of the levee.

---

[1] It is of interest to note that in December 1998, Renda anticipated the Flare Area of Section 4 and 5 to contain medium to hard clays and sands suitable to build hydraulic levees. This is not consistent with Renda's claim addressed previously in this report at Section 4.3.

If the contractor caused the slide, the rebuilding operations were to be performed at no cost to the Government.

Section 02223, paragraph 1.4.5, states that the Government could make changes on the levee alignment before completion of the work. If, however, a section of the levee on which work had been done was abandoned, the contractor would be compensated at the contract unit price for that section or location abandoned.

Section 02223, paragraph 1.5, Measurement, subparagraph 1.5.2, Hydraulically Constructed Levees, states that payment for hydraulic levees constructed to the minimum lines and grades shown would be made by the linear foot (LF) of levee completed. Subparagraph 1.5.1, Mechanically Constructed Levee, provided for payment by the cubic yard (cy). A distinction is made between the mechanically and hydraulically constructed levees because payment for the mechanically constructed levee included the cost of excavation, hauling and placement, whereas payment for the hydraulically constructed levee only included mechanically shaping and final grading. Hydraulic fill payment was for dredging and transport and was paid separately under Section 02482 of the contract.

Section 02223, paragraph 2.2.3, Material for Hydraulically Constructed Levees, states,

> "Material for the Hydraulically Constructed Levees shall be medium to hard clays and sands, as described on the Logs of Borings. Material shall be obtained from the required dredging shown. The Contractor will not be required to segregate the soft clays from the suitable construction materials during dredging and construction of the Hydraulic Levees."

The satisfactory fill materials were to be obtained from the required dredging, which measured and for which contractor paid separately under Contract Section 02482 – Dredging. Medium to hard clays and sands and soft clays were acceptable. However, Renda was not required to segregate soft clays from other materials for use in the hydraulically constructed levee.

The performance of the embankment construction is addressed under Section 02223, paragraph 3.1. This paragraph 3.1, Embankment Construction, states, in its entirety,

"3.1.1 Mechanically Constructed Levees. Satisfactory materials used for Mechanically Constructed Levees shall be obtained from the designated borrow areas shown. Material shall be excavated using draglines, backhoes, dozers, or other suitable equipment, transported to the levee site, and placed in layers not exceeding 18 inches in thickness before compaction. In areas having standing water or soft foundation conditions, borrow materials shall be placed in a single lift (layer) as required to support hauling and compacting equipment. Fill materials shall be placed in such a manner to ensure that the soft foundation material will not be trapped in the embankment, but will be displaced laterally as the fill is advanced. The layers so placed shall be spread, distributed, and otherwise manipulated during placement to eliminate voids in the fill. The moisture content of each layer of material shall be suitable to obtain the maximum compaction with the equipment used. In the event the fill material is either too wet or too dry to obtain compaction, the material shall be disked and aerated to dry the material, or moistened and disked to distribute moisture throughout each layer. After placement, each layer shall be compacted by not less that four (4) coverages of a crawler-type tractor conforming to the requirements of the Paragraph: EQUIPMENT above.

"3.1.2 Hydraulically Constructed Levees. Satisfactory materials used for Hydraulically Constructed Levees shall be obtained from required dredging. The Contractor shall evenly distribute sufficient hydraulic material at all locations along the levee so that the final new levee section can be constructed to the minimum lines and grades. During the shaping process, the material shall be placed using the same lift thickness and compaction requirements as those required for the Mechanically Constructed Levees. The Contractor shall excavate material from the adjacent existing levee to the limits shown. The "slope to drain" requirement shall apply to the entire placement area perimeter levee.

"3.1.3 Misplaced materials. At no time will material or water be allowed to overflow the existing perimeter levee. Construction operations shall be so sequenced as to allow fines pumped in with the levee building material time to settle and the water to be discharged through the spillbox. While placing the Hydraulically Constructed Levees the Contractor shall be responsible for maintaining the existing levee height to prevent spillover from the levee construction operations. In the event the dredge material approaches the height of the existing levee, the Contractor shall build a berm of sufficient height to prevent spillover from the levee construction operations. In the event the dredge material approaches the height of the existing levee, the Contractor shall build a berm of sufficient durability to contain the material. The Contractor may be required to remove misplaced material or unauthorized placement of material in accordance with the SECTION entitled DREDGING.

"3.1.4 Mining. Suitable materials obtained from the required dredging shall be used for placement of the Hydraulically Constructed Levees. If, upon completion of required dredging in the Channel reach (or reaches) containing suitable material, sufficient suitable materials are not available to complete the Hydraulically Constructed Levees to the lines and grades specified, the Contractor shall be required to complete the Hydraulically Constructed Levees with suitable materials obtained from mining below the Channel template in the reach of the Channel as shown. Mining will not be paid at the unit price for "Dredging," but will be measured and paid for as specified in the Paragraphs: MEASUREMENT and PAYMENT above.

"3.1.5 Final Grading. The ground outside the new levee shall be graded to drain away from the new levee toe. Satisfactory material removed from the existing levee above the limit of allowable excavation shown, may be used as fill in establishing the new levee cross section. However, material shall not be removed from the existing levee until the new levee crest exceeds Elevation +20 feet Mean Low Tide around the entire Placement Area.

In addition to the specifications issued with the solicitation, Amendment No. 0001 to the contract revised the bidding schedule and, among other things, provided Government

responses to questions by prospective bidders which have been incorporated into the contract. Of interest to the hydraulically constructed levees were the following questions:

5. With regard to mining, why was that even put in there? Does the Corps really think there won't be enough clay to build the levees?

Answer: The Corps believes that there will be sufficient material within the dredged template to construct the required levees, provided the contractor carefully manages handling at the discharge pipe. The need to mine is under the contractor's control.

6. Why is the levee alignment so far from the perimeter where the foundation is crummy? It makes it harder to build on weaker ground. What's the purpose of leaving a hundred feet, or whatever it is, on the outside where the base is the best?

Answer: The intent of the design is to use the new work material to enhance the long term stability of the levees. For this reason, the designers intend the new work material be used to displace the very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material. In addition, there are several locations around the placement area where the levee centerline must be located as shown due to overall slope stability concerns. Finally, in the southeast corner of the site, the levee was located to eliminate crossings under the existing power lines due to clearance concerns for construction equipment.

5.a. Section 02223, Paragraph 1.5.3: How is mining paid?

Answer: Specifications will be revised to state that there will be no payment for mining. A lot of discussion followed this question regarding how the bidder can estimate how much mining will be required. The designers believe that there is sufficient new work material available to construct the levees hydraulically where indicated, even allowing for the soft foundations, without having to mine. An area for mining was established only in the event that the Contractor chose to place the material in such a way as to exhaust the available pay new work material before levee raising was complete.

5.b Section 02223, Paragraph 3.1.5: "However, material shall not be removed from the existing levee until the new levee crest exceeds elevation +20 mean low tide around the entire placement area." The key word is "entire." There is a good possibility that the "final grading in the hydraulic levee reach can commence prior to completion of the hydraulic base. In the interest of time on the project this sentence needs to be changed.

Answer: The point is well taken, however we have concerns with the possibility of dredge effluent (water) being able to work its way around the new construction and down the existing embankment sides if the existing levee were allowed to be degraded prior to completion of the new perimeter levee.

Contract Drawing C-14 provides a plan view of Lost Lake Placement Area (Lost Lake). The north, west and east levees were to be hydraulically constructed between Sta. 166+00 and 215+00 and Sta. 4+00 and 97+00[2]. As shown on Drawing C-14, there are eighty-six boring logs scattered throughout Lost Lake which provide information as to the material characteristics and depths of the earth materials. Individual boring logs for Lost Lake are

---

[2] Mechanical fill was to be placed from Sta 61+00 to 56+00 at the new drop-outlet structure.

shown on Contract Drawings F-5, F-6, F-7, F-8 and F-9. On Contract Drawing C-14, Note 10 states,

> "The foundation of the new levee is very soft to soft dredged material, and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material."

On Contract Drawing C-14, Note 2 states,

> "Survey date of Lost Lake contours: April 1997, with additional surveys taken Dec. 1997 around Borrow Area No. 2. Dredging has occurred since the survey date, interior elev. may differ."

In summary, the contract describes the foundation for the new levees (both mechanical and hydraulic) as very soft to soft previously dredged maintenance materials that will be displaced by construction of the new levees (Contract Drawing C-14, Note 10). The natural ground elevation upon which the levee was to be placed was indicated to vary from the contours shown (Drawing C-14, Note 2). Placement of the hydraulically constructed levee was to be planned to include phasing, discharge pipeline placements, and other techniques to minimize foundation displacements (Section 02223, paragraph 1.3.1).

During performance, the contract required phased construction of the hydraulic constructed levee. The contractor was to obtain satisfactory fill materials from the required dredging and evenly distribute sufficient hydraulic fill material at all locations along the levee so that the final new levee section could be constructed to the minimum sections shown (Section 02223, paragraph 3.1.2).

The contractor was to place sufficient hydraulic fill for constructing the hydraulic levees until the entire perimeter levee had been completed to elevation +20 feet MLT (Section 02223, paragraph 1.4.3(2)). During the shaping process to construct the final new levee section, the hydraulically placed fill material was to be excavated and placed using the same lift thickness (18 inches) and compaction requirement (4 passes with a crawler tractor) as those required for the mechanically constructed levees (Section 02223, paragraph 3.1.2). Final grading of the existing levee outside the new levee crest could not be performed until the new levee crest exceeded elevation +20 feet MLT around the

entire Lost Lake Placement Area (Section 02223, paragraph 3.1.5). This final grading process is reinforced under the Order of Work which prohibited the contractor from grading the area outside the slope of the newly constructed levee until the entire perimeter levee has been completed hydraulically to elevation +20 feet MLT.

4.8.3 Technical Evaluation

From Contract Drawing No. C-14, the interior of Lost Lake and the existing perimeter levee foundation for the hydraulically constructed levees tends to slope from south to north. On the south end of Lost Lake previous dredging had deposited two mounds of material. These existing mounds were the borrow source used to obtain fill materials to construct the mechanical levee at Lost Lake. The discharge point for dredge effluent water is the existing drop-outlet structure on the north side of Lost Lake. Therefore, the smallest soil particles would be carried the farthest from the southerly discharge point and deposited along the north and northwest levee. These low lying areas should be the wettest and softest foundation areas for the hydraulically constructed levees.

The construction method for hydraulic fill placement of a levee requires the dredge discharge slurry to be channeled or directed along or parallel with the new levee centerline so that the soil solids and particles fall or settle out of the slowing effluent and build up along the new alignment. Generally small retaining or training dikes on both sides and parallel to the centerline of the alignment, are constructed well in advance of the hydraulic placement to direct and contain the discharge. At Lost Lake, the existing levee served as one of the retaining dikes.

When dredged material is actually being discharged at a location along the levee, one or two pieces of construction equipment (e.g. dozer and excavator) are required, depending on the materials being excavated, to prevent a build up or settling of heavy materials (e.g. gravel or clay balls) at the discharge point (which would block the slurry flow), maintain the directional flow of the slurry, and add pipeline to advance and distribute the hydraulic fill materials along the alignment.

Not all materials are good levee building candidates for hydraulic construction. At Upper Bayou, satisfactory materials for the hydraulically constructed levees were required to be medium to hard clays and sands, as described on the Logs of Borings. Sands, particularly fine sands, require more training dikes than medium to hard clays which are more likely to form clay balls and quickly settle out of the slurry and stack up as they exit the discharge pipe.

Expected unsatisfactory levee materials encountered during the dredging process must be diverted away from placement in the levee by the contractor. This diversion is accomplished by the use of wyes and valves, planning and constant monitoring of dredged material and communication between the dredge and the fill placement area. At Lost Lake, two discharge corridors, one on the east side and one on the west side of the levee alignment, were provided in the contract for use by the contractor in depositing non-levee construction materials. These locations are shown on Contract Drawing C-14.

At Lost Lake Placement Area, the Contractor was cautioned that the levee foundation for the mechanically and hydraulically constructed levees was "very soft to soft dredge material, and sand placed in past dredging maintenance cycles." The contract anticipates that very soft to soft foundation material will be displaced by the new levee material (Contract Drawing C-14, Note 10). Foundation displacements, such as mud waves and subsidence, were to be expected. Section 02223-Retaining Levees, paragraph 1.3.1 Construction Plan Item (1) required the contractor to consider "techniques to minimize" the occurrence of these displacements or levee foundation failures and specifically mentioned planning of hydraulic pipeline placements. Hydraulic placement of fill materials is well suited for construction on very soft foundations where the rate of fill and placement area can be controlled and it is too soft for mechanical placement.

The Upper Bayou contract contemplated a multiple step process for constructing the hydraulic levee. The means and methods for accomplishing the construction of the hydraulically constructed levee was left to the contractor. Contract Specification 02223–

Retaining Levees, Part 3, Excavation, subparagraph 3.1, Embankment Construction, subparagraph 3.1.2, Hydraulically Constructed Levees states,

> 'Satisfactory materials used for Hydraulically Constructed Levees shall be obtained from required dredging. The Contractor shall evenly distribute sufficient hydraulic material at all locations along the levee so that the final new levee section can be constructed to the minimum lines and grades. During the shaping process, the material shall be placed using the same lift thickness and compaction requirements as those required for the Mechanically Constructed Levees. The Contractor shall excavate material from the adjacent existing levee to the limits shown. The "slope to drain" requirements shall apply to the entire placement area perimeter."

The first step in constructing the hydraulic levee was the even placement of sufficient satisfactory materials obtained from required channel dredging <u>at all locations along the levee</u>. During this initial process, the contractor was to take measures to minimize displacement of the very soft levee foundation. Some of these measures could have been placing the hydraulic fill in multiple passes or smaller lifts (layers), at multiple discharge locations, or a combination of both. Further, the width of the hydraulic placement could be controlled by pre-constructing retaining dikes. The contractor was responsible for even distribution of the material and methods for minimizing displacement of the very soft foundation.

As the contractor was evenly distributing sufficient hydraulic fill material at all locations along the levee to elev. +20 feet MLT, the new final levee section could be mechanically constructed to the minimum lines and grades shown on Contract Drawing Nos. C-15 and C-16, Lost Lake Placement Area, Levee Cross Sections.

During this shaping process, the fill material excavated from the recently placed, evenly distributed satisfactory hydraulic material was to be moved by construction equipment and placed using the same lift thickness (18 inches) and compaction requirements (crawler tractors) as those required for the Mechanically Constructed Levees. Contract Bid Item No. 6, Hydraulically Constructed Levees, was provided to pay for this shaping and final grading work.

Once the hydraulically constructed levee crest exceeded elevation +20 MLT around the entire Lost Lake Placement area, the existing levee (outside the new levee) was required to be sloped to drain away from the levee toe. The satisfactory materials obtained from the excavation of the existing levee could be used as new levee fill to shape the hydraulic levee. Contract Section 02223 – Retaining Levees, paragraph 3.1, Embankment Construction, subparagraph 3.1.5, Final Grading states,

> "The ground outside the new levee shall be graded to drain away from the new levee toe. Satisfactory material removed from the existing levee above the limit of allowable excavation shown, may be used as fill in establishing the new levee cross section. However, material shall not be removed from the existing levee until the new levee crest exceeds Elevation +20 feet Mean Low Tide around the entire Placement Area."

This paragraph assures that the entire perimeter levee was to be raised horizontally to the minimum elevation of +20 MLT before final grading was started.

The contractor was to manage the work so that dredging water or materials were contained within the approximate 650 acre Lost Lake Placement Area. The hydraulic construction operations were to be controlled "to allow fines pumped in with the levee building material time to settle and the water discharged through the spillbox."

The Contractor was responsible for spillover and maintaining the existing levee height. In the event discharge water or material approached the height of the existing levee, the Contractor had the option of suspending dredging operations and waiting for the water level inside Lost Lake to subside or building a berm of sufficient durability to contain the material. The expedient berm built to contain material or water is generally called a potato ridge, roll or row.

4.8.4 Hydraulic Fill Placement

The first order of work, the mechanical levees, was complete in early May 1999. On or about July 1, the Government became concerned that Renda would not be able to

complete by the extended completion date of April 1, 2000. In response, on July 7, 1999 (Vol IV, Tab 40), Renda provided a new schedule[3] and a sketch showing the planned initial placement of the hydraulic fill material to elev +32 feet MLT. The sketch is shown in Figure 4.8.1.

The initial hydraulic fill placement sketch does not show the use of interior retaining dikes to control the width of the fill and shows overplacement of materials along the alignment. The plan does contemplate using wyes and valves to build up the levee.

On July 30, 1999, the preparatory meeting for the hydraulically constructed levee was conducted. In a letter (Vol IV, Tab 41) dated August 2, 1999, Renda confirmed the items discussed at the meeting. Renda noted two Government concerns expressed at the meeting with the planned initial placement of the hydraulic levee. First, the Government was concerned about a sufficient quantity of dredged material with initial placement to elev +30 feet MLT and that the slope of the hydraulic fill would be flatter or longer to the interior of the placement area. Renda acknowledged these points but "it was Renda's plan to build the levees as close to grade as the material would allow."

Figure 4.8.1




[3] The July 7, 1999, schedule shows initial hydraulic fill placement complete in 186 days and uses material from Sections 1 to 6. According to the planned quantities, Renda is predicting an average production rate of 13,000 cy per day.

Work on the hydraulically constructed levees began simultaneously with dredging on September 13, 1999. Renda began placement on the east levee at Sta. 97+00 and proceeded northward. However, early placement of hydraulic fill was located on the wrong alignment due to lack of survey control. On October 6, 1999, a site visit was performed by the Government. As noted on an internal memorandum dated October 6, 1999 (Vol VI, Tab 31), the hydraulic fill was placed to elev +32 feet MLT and the interior slope varied between a 1V on 5H to 1V on 15H. Further, the alignment of the levee was noted as being incorrect.

On October 13, 1999, Renda responded (Vol IV, Tab 21) to concerns expressed by the Government. Of particular interest to the hydraulic levee construction was Item 2 in the letter which addressed placement of the levee. Renda acknowledged that the material was misplaced along the early alignment and realized "that some of the material will have to be moved to get into proper alignment". Renda further stated that "We have recently surveyed and marked the levee perimeter so that we are able to provide more accurate daily stations" Renda closed by repeating that they "will build the levees to an elevation of at least +30 feet MLT with enough material within the template cross sections to attain a 10 foot crown and three to one side slopes."

The contract does not prohibit initial placement of hydraulic fill to elevation +30 feet MLT. However, it was under Renda's control to distribute satisfactory dredged material around the perimeter of the site to at least elev. +20 feet MLT so final grading could be performed. By placing the hydraulic fill materials to elevation +30 feet MLT, Renda risked exhaustion of available material. Also by initially placing hydraulic fill to elevation +30 MLT, the slopes of the hydraulic fill would be wider than if placed to elevation +20 feet MLT. The wider slopes contain more dredged fill than needed to shape the levee to final cross section. Further, the initial placement height of hydraulic material to +30 feet MLT would cause more displacement of soft levee foundation materials. Placement to elevation +30 feet MLT caused the weight of the new embankment to be more than if placed to +20 feet MLT which, in turn, would increase

displacement and settlement of the levee foundation requiring the use of more dredged material.

Renda's placement methods of the hydraulic levee fill were of continuing concern to the Government. About two weeks after Renda's response to the Government's October 12 letter, Renda tried to clarify its methods on October 25, 1999. In the October 25, 1999 letter (Vol IV, Tab 45), Renda states that a wider crown width at elev +30 feet MLT was necessary to access the discharge. However, if the material were not placed to elev +30 feet MLT, the crown width would be wider and within template. However, Renda did not want to stop short of the final elevation. Renda continues,

> "We are bring up this point to make you aware of the reason behind the wider crown during construction. In order to prevent time consuming multiple passes with the discharge and/or hauling, it is necessary to slightly overbuild to account for settling and possible subsidence."

Following a Government inspection on November 8, 1999, Renda fired its Captain and Deck Captain "for dereliction of duty". "The condition of the hydraulic levee was not near to the standards it could be." On December 16, 1999, in an internal email (Vol VI, Tab 32), the discharge from the dredge was reported to be at or near Sta 53+00. It was also noted that the distance the dredge was transporting material was at is maximum.

Renda completed placement on the east levee to Sta. 54+44 in late December 1999[4]. However, hydraulic placement did not continue along the north levee alignment. Instead, Renda continued to hydraulically place material along the east levee alignment until March 2000 with some stations, such as Sta. 86+00, receiving over 100,000 cy of additional material. This stockpiled material was later moved mechanically to the north levee.

Hydraulic fill placement was switched to the west levee alignment on March 12, 2000. Placement of hydraulic fill along the west levee alignment prior to completing the north levee hydraulic fill placement was contrary to Renda's initial plan submitted on

[4] The material placed along the east levee was essentially complete as of December 20, 1999. On December 20, 1999, the Government had paid for 3,883 LF of completed east levee (Vol V, Tab 4).

December 3, 1998 (Vol IV, Tab 39, RM-COE-01692). This change is unexplained, except Renda's booster had not arrived and plugged discharge pipelines at long line lengths were a constant problem (Vol V, Tab 57).

On the west levee, hydraulic fill placement began at Sta. 188+82 on March 12, 2000. By April 10, 2000, Renda had placed 179,522 cy of dredged material on Sta. 188+50 to 188+82 (Vol VI, Tab 25). Placement area was wide and only 200 feet long (Vol IV, Tab 48).

On April 11, 2000, Renda began hydraulic placement of dredged material at the southerly limit of west levee at Sta. 166+00 and proceeded northward. Again, placement of dredged material was near elev +30 feet MLT, which resulted in wide placements of hydraulic fill (Vol VI, Tab 28). Hydraulic placement along the west levee continued until fill reached approximate Sta. 198+00 (see West Levee claim for additional discussion Section 4.7).

On the north levee, hydraulically constructed levees were required by the contract. However, Renda placed the material by mechanical methods. The fill material used to place the north levee mechanically was obtained from stockpiled (misplaced) hydraulic material placed along the east levee between the periods of January, February and March 11, 2000.

Placement by mechanical methods on the north levee would cause an increase in the displacement of the very soft to soft foundation soils. The base of the new mechanically placed levee is narrower than if the base was placed by hydraulic methods. In the former case, the weight of the levee is more concentrated, which would cause shear cracks and mud waves. Additionally, the excess hydraulic material recovered along the east levee when initially placed contributed to additional displacement and loss of material along the east levee because it was excess weight that need not have been deposited. However, when Renda re-handles the available excess material a second time, displacement and loss of material occurs again at the new location. For each cubic yard Renda re-handled

by mechanical methods, displacement and loss of material below existing ground occurred twice, once hydraulically and once mechanically. This had the effect of reducing the retention rate of the hydraulically constructed levees and exhausting the hydraulic material available for levee construction.

4.8.5 Renda's Claim for Hydraulic Levee Construction

4.8.5.1 Mechanically Constructed Levee

Renda makes claim for differing site condition encountered during the construction of the hydraulic levees at Lost Lake for the period from September 13, 1999 to September 18, 2001. Renda asserts that a differing site condition was encountered at Lost Lake between the period of December 17, 1998, and September 18, 2001, which substantially affected the ability of Renda and his subcontractor, Affolter Contracting Company, Inc. (Affolter), to construct and complete the mechanical and hydraulic levees at Lost Lake. The asserted delay to the project is 397 calendar days.

As indicated earlier in this report, work did not begin on the project until December 1998 due to a bid correction and bid protest. The first order of work required by the contract was 1) construction of the mechanical levee on the southern side of Lost Lake Placement Area between Sta. 97+00 and Sta. 166+00, 2) construction of a new drop-outlet structure, perimeter levee and training levees located on the east side of Lost Lake between Sta. 56+00 and 61+00, and 3) construction of perimeter and training levees for the existing drop-outlet structure located on the north side of Lost Lake between Sta. 215+00 and 219+66 and Sta. 0+00 and 4+00. Sta. 4+00 is equal to Sta. 219+66 on the closed loop around Lost Lake.

Construction of the mechanical levee occurred between December 1998 and May 19, 1999. Renda's subcontractor, Affolter, performed the mechanical levee construction.

Renda states that the mechanically constructed levees by Affolter are not a direct part of this claim. However, Renda attempts to equate the difficulties Affolter experienced to the difficulties Renda experienced. Therefore, Affolter's mechanically constructed levees are reviewed.

During performance of the mechanical levee construction, Affolter encountered a differing site condition while performing work at the new drop-outlet structure. Change Order No. 1 (P00004) was issued unilaterally as a Notice to Proceed for the added work at the new drop-outlet structure. Change Order No. 1 established five items of work:

1) Redesign the perimeter levee adjacent to the new drop-outlet structure, estimated as 9,100 cy
2) Relocate the south training levee from Sta. 61+00 to 61+50, estimated as 4,100 cy
3) Construct new 50' wide berms on both sides of the two training levees, estimated as 45,400 cy
4) Increase the length of the north training levee to tie-in to the north perimeter levee, estimated as 22,500 cy
5) Extend the new drop-outlet structure walkway, lump sum

Modification P00006, (Change Order-2) finalized the cost of the added work ordered under Modification P00004. For the changes ordered, Renda was paid $436,855.37 in a bilateral modification executed by Renda on June 21, 1999.

Renda's claim points out that its subcontractor experienced levee base failures on the new perimeter mechanically constructed levees on January 11, 1999 from Sta. 112+00 to 114+00. However, no adjustment was made by the Government for these failures because the fill material was "very wet and had spread out beyond base stakes" (Vol II, Tab 8). This is not a foundation failure. The contractor was responsible for drying the fill material if it was too wet for levee construction. These reported failures, including rutting, are due to wet borrow materials being placed in the fill.

Renda's claim also explains that on February 12, 1999, the training levees at the new drop-outlet structure were completed to elev. +19 feet MLT. On February 13 and 14, it