was reported that the north training levee was subsiding (sinking). The CQCR for February 15, 1999 states,

> "Contractor is unable to raise dike above +22 elev. due to subsidence, causing contractor to use more material and equipment in this area." (Vol II, Tab 9)

On February 16, 1999, the Government met with Renda to review their concerns. The result of the site visit was the issuance of Modifications P00004 and P00006 discussed above. As part of Modification P00006, the required height of the new training levees was lowered from +28 feet to +24 feet MLT. Also included in Modification P00006 was a realignment of the hydraulic levee in the northeast corner of Lost Lake. Renda recognized these levee and structure changes and wrote (Vol VI, Tab 30) on March 1, 1999,

> "5. I think that I can safely say that our hydraulic placement quantities will increase significantly due to these changes and that borrow material will run out way before we can finish the mechanical levees."

Renda was correct that hydraulic placement quantities increased at the northeast corner and that the Government-furnished borrow material for the mechanical levees would run out.[5]

The Government issued another modification that added several borrow areas collectively known as Borrow Area No. 3 to the contract as a source for mechanical levee fill material. The new borrow area required multiple handling of borrow material prior to loading it into a truck and being placed into the levee as fill material. Bilateral modification P00008 paid Renda and its subcontractor for this incremental cost increase in obtaining new Government-furnished borrow materials.

The planned mechanical levee construction and additional directed berms constructed by Affolter required additional quantities of fill material to complete. Modification P00006 formalized the payment for an additional 187,853 cy of borrow material to be paid under Bid Item No. 2 for completing the mechanically constructed levee. On May 19, 1999, the

[5] Borrow Area No. 1 could not be fully utilized. As noted on the March 17, 1999 CQCR report, "Silt level rising in Borrow Area No. 1, unable to excavate as deep ..." This borrow area shortage also accounts for the need to acquire a third borrow area.

mechanically constructed levees were complete and Renda's subcontractor, Affolter, demobilized.

4.8.5.2 Hydraulically Constructed Levee

Renda's total cost claim for hydraulic levee construction is generally a summary of the daily logs and correspondence with commentary that generally starts on page 35 of the claim document.

The changes claimed by Renda, which begin on page 171 of the claim, are not tied to any particular cause. However, the equipment and labor used to perform the hydraulically and mechanically constructed levees are adequately detailed on Renda's CQCR. The recurring themes of which Renda complains about are:

- Subcontractor encountered differing site condition at northeast corner
- The contract documents do not specify or show in the boring logs "deep, soft foundations, which can be interpreted for use by the contractor" (p. 34 of Hydraulic Levee Claim)
- New Levee Alignment – It is Renda's contention that the (x, y) coordinates for the new levee centerline are incorrect or the location of the original levees is incorrect (p. 95 of Hydraulic Levee Claim)
- Significant change in north levee work – Renda performed mechanically constructed, instead of contract required hydraulically constructed levee (p. 98 of Hydraulic Levee Claim)
- Unknown existence of "side cast borrow area" adjacent to the alignment of the new levees" (p. 108 of Hydraulic Levee Claim)

On page 35 of Renda's October 16, 2001, hydraulic levee claim, Renda provides in Table No. 3, an "Analysis of "As-Planned" vs. "Actual" Material Required per LF of Mechanical Levee (Vol VI, Tab 33). However, Table No. 3 is misleading and does not consider the changes in levee construction by Modification No. P00004 and P00006. As you will note, Table No. 3 maintains the theoretical levee length, 9,586 linear feet (lf) for

both the "As-Planned" and "Actual". Modification P00006 added berms or additional levee length. When considering the berm lengths (Vol VI, Tab 34), the theoretical levee length for the mechanical work was increased to 13,946 lf from the original 9,586 lf. When using the adjusted length, the average material required for mechanical levee (cubic yards per linear foot (lf)) is 40.81 cy/ft. This compares favorably with the "As-Planned" of 38.78 cy/ft per lf. Renda's "Actual" of 59.37 cy/ft per lf overstates the quantity per linear foot.

The differing site condition encountered by Renda's subcontractor resulted in cost increases primarily at the new drop-outlet structure which are identifiable and segregable from the remainder of the mechanical work. The cost and time incurred during the time period when the required mechanically constructed levees were built have been paid through bilateral modifications. There is no cost parallel between the mechanical construction and the hydraulic levee construction.

On page 34 of the hydraulic levees claim, Renda complains that the "Contract Documents do not specify or show in the Boring Logs deep, soft foundations", which can be interpreted for use by the contractor. This is not true. Little interpretation is necessary when the contract states that the levee foundation is very soft to soft material and will displace during placement of the fill. Further, the contract required the contractor to minimize the anticipated foundation displacement.

Ten of sixteen boring logs on the interior perimeter of Lost Lake placement area (Vol VI, Tab 35) show very soft material at the bottom of each boring log. No representation of the material below that terminating depth is provided, but the last indication is very soft material at depths of 15 to 27 feet from top of ground. Four of the other six boring logs show 15 to 25 feet thick layers of very soft to soft foundation materials. Ten of these boring logs show very soft to soft material for the full depth of the boring log hole.

It is disingenuous for Renda to assert that the contract boring logs do not show "deep, soft foundations" for the levee construction. Pre-bid contractor questions added by

Amendment No. 1 (Vol IV, Tab 4) to the contract concerning the new levee alignment inside the existing perimeter levee indicate that all bidders were aware that the foundation is "crummy" and that "it makes it harder to build on weaker ground". If it were true, that the boring logs do not contain information which can be used by the Contractor, then why did not Renda inquire about this ambiguity prior to bid? Other contractors recognized the crummy foundation and the Amendment No. 1 emphasized that point[6].

On page 42 of Renda's claim, Renda provides an alleged "analysis" of twenty-eight soil borings at Lost Lake which Renda claims are directly applicable to the hydraulic levee construction. However, that is where Renda's analysis stops. Renda does not indicate what information the boring logs contain, what they mean to construction or how they were interpreted by Renda at bid, if at all.

Renda asserts that the Contract Drawings are defective that the (x, y) coordinates for the new levee centerline are incorrect or that the location of the original levee is incorrect (p. 95 and p. 57). However, the mechanical levees and drop-outlet structures, which started in December 1998, were laid out by the contractor and constructed without any alignment issues. Once dredging started in September 1999, Renda itself noted in an October 12, 1999, letter that they had "built a large pad to the inside to use as a staging area." It is not until November 9, 1999, that any survey work is reported on the CQCR. No notice by Renda is provided that the alignment was in error on the east levee until the hydraulic levees claim. No documentation has been provided by Renda to demonstrate that the new alignment is in error or that the existing levee is incorrectly located.

From page 95 to approximately 122 of Renda's claim, Renda alleges that the defective Lost Lake drawings caused a radical change in the construction philosophy in late August 2000. The radical change was mechanically constructing the new north levee by excavating and hauling material stockpiled in January, February and March 2000 from the east levee alignment to the north levee. Although, no attempt was ever made by

[6] Eddie Fisher, Vice President of Renda, recognized the project "was a very – a difficult project,..." (Vol IV, Tab 6)

Renda to hydraulically construct the north levee, Renda asserts that mechanically relocating the misplaced material from the east alignment to the north alignment was caused by defective drawings (i.e., the proposed new levee centerline did not match the cross sections presented) for which the Government is responsible.

Renda complains that, during the mechanical placement, the foundation for the north levee was found to be "unbelievably poor" that resulted in "catastrophic" failures. The contract advised that the foundation was "crummy" for hydraulic placement. I do not find it surprising that the very soft levee foundation was worse for mechanical placement.

Renda asserts that there was extensive room to place the new levee on either side of the existing north levee and that Renda wanted to build the new mechanical levee on the exterior/outside of the existing levee. Renda also complains that the new mechanical levee could have been used to cap the existing levee raising them to the new levee elevation of +30 feet MLT. Both of these options were proposed by Renda as saving (Renda) considerable time and expense for performing the mechanical haul operation. However, the Government rejected these alternates because of concerns for the stability of the existing levee and environmental concerns. Therefore, Renda chose to construct the new north levee mechanically on its original planned alignment (Vol IV, Tab 49).

On September 10, 2000, Renda again began to haul fill materials to the north levee. Earlier, the north levee was constructed mechanically during the period from May 5, 2000 to June 28, 2000 from approximate levee Sta. 55+44 to 37+00 (Vol II and Vol VI, Tab 36), by excavating misplaced excessive dredged materials from inside east levee and at the northeast corner of Lost Lake. Renda does not explain why in August 2000 hauling to the north levee is considered as a change in the construction philosophy when Renda had been previously hauling to the north levee.

Renda continued to haul excess, misplaced hydraulic fill material from the inside of the east levee alignment until November 11, 2000. By load count, from the Contractor's Quality Control Report (CQCR), Renda moved 173,734 cy of misplaced fill material

during the period from September 10, 2000 to November 11, 2000 (Vol VI, Tab 37). The quantity moved by Renda to the north levee during the May through June 2000 period is undocumented, but the equipment is identifiable from the CQCR. It is no coincidence that on the best haul days for constructing the north levee mechanically, that the worst mud waves are reported. The mechanical construction was more susceptible to generation of mud waves and greater displacements than hydraulic construction.

Additionally, stiff red clay material from Section 7 (see Section 4.5 of this report) which was directed by the Government to be used to construct hydraulic levees was placed improperly in Borrow Area No. 2. On November 13, 2000, Renda began moving the misplaced Section 7 clay to the north levee. On December 11, 2000, Renda stopped work on the north levee and completed hauling of 37,032 cy of Section 7 clay determined by load count from the CQCR (Vol VI, Tab 37).

Renda complains that side cast borrow areas existed adjacent to the alignment of the new levees which were undisclosed to bidders and presumably explains the loss of material along the levee. Side cast borrow areas are commonly used to initially construct and maintain levees, such as those existing around the perimeter of Lost Lake Placement Area. The side cast borrow areas are generally shallow areas away from the toe of the levee where the dryer surface materials have been removed by a dragline and placed on the adjacent levee. As the name suggests, the dragline (similar to a lattice boom crane) swings its bucket out into the borrow area and drops it. Then by dragging the bucket back across the surface, the bucket fills with earth materials. Once the bucket is drawn back and filled with earth materials, it is lifted and the dragline pivots to swing the bucket outward and drop or cast the material onto the desired alignment or location. As the dragline moves (walks) along the alignment of the levee, the process is repeated. Therefore, borrow material opposite and immediately adjacent to the levee are used to raise or maintain the elevation of the levee.

As shown on the contract drawings, the existing levees at Lost Lake Placement Area were constructed to approximate elevation +20 feet MLT. Existing elevations in the

interior of Lost Lake where the new alignment is located ranges from +11 feet MLT to +15 feet MLT. Therefore, the existing levees were small and ranged in height from 5 to 11 feet. Assuming all material used to maintain the levees came from the interior of Lost Lake, the side cast borrow areas would be very shallow. Further, once excavated, these borrow areas would fill with additional maintenance material dredged from the channel, the very material identified in the contract.

The contract advised the bidders that the foundations for the new levee were very soft previously dredged materials. The boring logs indicate the depth of the very soft material to be at least 15 feet thick. The presence of side cast borrow areas, if any, located on the new alignment would have a minimal affect on hydraulically constructed levees.

The presence of "side cast borrow areas" adjacent to the levee alignment may have required additional dredged fill to displace the soft foundation material and to construct the hydraulically constructed levees. However, the contract provided payment for the dredged fill separately under Bid Item No. 8, Dredging.

The location of the side cast borrow areas with respect to the new levee alignment has not been documented. If the side cast borrow areas were significant and existed in close proximity to the new or existing levee alignment, then they should have been identified on a pre-bid site visit or during the performance of the required mechanically constructed levees. The side cast borrow areas issue did not arise until late October 2000, when Renda was constructing the north levee mechanically in violation of the contract which required hydraulically constructed levee at that location.

### 4.8.6 Technical Results

In Renda's hydraulic levee claim, Renda fails to address the contract requirement to place hydraulic fill around the entire perimeter to elev. +20 feet MLT prior to degrading the existing levee. Renda does not explain why the requirement was not followed or what prevented it.

Renda failed to evenly distribute hydraulic fill at all locations along the levee, so that the final new levee section could be constructed. Some over-placement areas are:

- On the east levee, over-placement occurred between Sta. 97+00 and Sta. 61+50. This over-placement area was later used as a borrow source for mechanically constructing the north levee. Renda placed approximately 620,000 cy in this area.
- On the west levee, over-placement occurred between Sta. 166+00 and Sta. 188+82. Renda overplaced at least 73,850 cy in this segment of the levee.
- In Borrow Area 2, Renda deposited over 300,000 cy of clay material from Section 7 which Renda claims as being excellent levee building stiff clay.

Renda failed to hydraulically construct the required levees at the following locations:

- On the north levee, hydraulic fill was not placed along the levee from approximately Sta. 51+00 to Sta. 4+00 and from approximately Sta. 205+00 to Sta. 215+00.

Figure 4.8.2 shows the locations along the levee alignment where dredged materials were reported to have been deposited.

The contract required Renda to minimize the displacement of the very soft to soft foundation materials. Renda was also required to evenly distribute sufficient dredged fill around the site to elev +20 feet MLT. Renda did not exercise any measures to minimize displacement of the very soft to soft foundation soils. This lack of placement control contributed to the loss of material by displacement and width of placement. Further, Renda's election to initially place the hydraulically constructed levee to "as close to grade as the material would allow" (+30 feet MLT) reduced the amount of hydraulic fill material available for placement at all locations to the interim elevation of +20 feet MLT.

As noted, Renda placed the hydraulic fill to elevation +30 feet MLT or above. This placement technique causes several problems. The geometry of the levee cross section alone, without considering displacement, results in an excess of dredged material

deposited along the levee alignment (see Vol VI, Tab 38 for calculations). An increase in the side slope beyond the required final minimum cross section slope of 1 vertical to 3 horizontal (1V:3H) would contain excess material on the side slope which could be used for shaping or capping the hydraulic placement to grade.

Renda's initial placement method to elev. +30 feet MLT results in large quantities of excess material on the side slopes if the material would not stand on a 1V to 3H slope. If the side slopes had a natural angle of repose after being discharged of 1V:10H then placement to elev. +30 feet MLT (assuming a best case scenario of existing ground at elev. +15 MLT) would result in three times the required volume necessary to complete the final minimum cross section to elevation +30 feet MLT.

As Renda's initial placement slopes became flatter (more than 1V to 3H), the height of the dredge fill could be lowered. Material needed to complete the final levee cross section would exist in the slopes which would be shaped under Bid Item No. 6.

Based on the geometry of the initial hydraulic fill placement cross section, Table 4.8.1 shows the levee elevations at which sufficient material would have been available to shape the new levee to final cross section grade of elev +30 feet MLT. (These calculations do not include the additional quantities available from degrading the existing levee outside the new alignment.)

Table 4.8.1
Maximum Initial Placement Elevation to Produce Sufficient Hydraulic Fill for Shaping to Final Grade

| Existing Ground Elevation | Top Elevation with 1V to 10H Slope | Top Elevation with 1V to 6H Slope |
|---|---|---|
| +11 | 21 | 23 |
| +13 | 22 | 24 |
| +15 | 23 | 25 |

In addition, a neat-line quantity of material, approximately 15 cy per lf, is placed above elev +20 ft MLT in the completed levee. If insufficient material existed in the channel to construct the entire perimeter levee to +20 feet MLT, then Renda unreasonably placed the

available material to final grade. Placing the dredged material to final grade initially would result in a cost saving to Renda for required shaping under Bid Item No. 6, if sufficient material existed in the channel.

On August 2, following the preparatory meeting for the hydraulically constructed levees, Renda confirmed its plan "to build the levees as close to grade as the material would allow." Renda did not waiver from that plan.

As noted by Renda on its "Topics for Preparatory Meeting 1030 7/30/99", Renda recognized that building the hydraulic levees may need special consideration. Possible solutions noted by Renda were:

1) Build bases with best clay even if not to grade
2) Use clay from private jobs if better
3) Let inside slope firm up over time and use this material as cap over solid base with large dragline
4) Mine clays by widening channel on north sides of Sections #1 and #2 where best clays exist

However, other options existed for evenly distributing the satisfactory dredged materials such as Item 1 suggests. Dredged material could be placed in multiple passes, multiple discharge locations along the same alignment, or multiple discharge points along the north, west and east levee simultaneously. However, as stated in an October 25, 1999, letter (Vol IV, Tab 45), Renda was overbuilding the final crown width (elev +30 feet MLT) "to prevent time consuming multiple passes with the discharge and/or hauling". Renda continued,

> "We are using the experience gained during the construction of the mechanical levees to help us determine where more overbuild may be necessary."[7]

However, instead of overbuilding the areas known to be prone to significant subsidence, which would create more displacement, Renda should have limited the build-up of the

[7] The experience which Renda should have gained from construction of the mechanical levees is that when the mechanical levees began to subside, the initial placement height was lowered. In Modification P00008, the Government reduced the required height of the levees in response to subsidence; not increased it.

materials to elev +20 feet MLT and made multiple passes through the area. This would have accomplished two requirements of the contract: efficient distribution of the hydraulic fill and minimization of foundation displacement.

4.8.7 Renda Claimed Cost

Renda states that "Due to the extreme difficulty and unreasonable time required to distinguish between damages allocable to the hydraulic levee construction and other claims, the modified total cost method was used. All costs or claims not part of the hydraulic levee work were itemized and deducted from the total cost for the project." This is an inaccurate statement. It is true that all claimed costs and contract payments have been deducted from an unsupported total cost, but none other. To use the total cost method, it must be shown that other more reasonable approaches are not possible.

In this case, levee equipment is easily distinguishable from the dredging equipment and levee equipment can be segregated by operation and time periods. For instance, it is assumed that Renda claims the mechanically constructed north levee as part of the hydraulically constructed levee claim. This would form the bulk of the added cost and most of the equipment was rented. The relocation of misplaced, stockpiled hydraulic fill was performed during three periods, November 16 to December 19, 1999; May 4, 2000, to June 28, 2000, and September 9, 2000, to December 12, 2000. The Contractor's Quality Control Report (CQCR) identifies the equipment used to perform these operations. Other contract costs such as final grading the existing east levee can be segregated. Vol VI, Tab 39 contains a summary of the levee equipment by start date. Vol VI, Tab 40 contains a summary of the average daily work hours for the equipment reported as working on the hydraulic levees. Renda has adequately separated levee labor cost from dredging cost as identified in Sections 4.1, 4.2, 4.3, 4.4 and 4.5 of this report. A more direct approach is certainly available for pricing the additional men and equipment directly related to the hydraulic levee claim.

Further, Renda must show that it was not responsible for other increased costs or that it made an adjustment for those costs. However, during dredging, plugged discharge pipelines contributed to reduced efficiency and operation time of the dredge before adding a booster pump in the discharge line (Vol V, Tab 57). Also, during dredging, Renda performed an excessive amount of non-pay dredging outside the allowable overdepth limits (Vol V, Tab 31). Renda has a final pay quantity for Bid Item No. 8, Dredging of 3,425,642 cubic yards (cy). However, Renda also performed 825,644 cy of non-pay dredging or twenty-four percent more. This means that Renda is responsible for 24 percent of the dredging cost and time which has not been addressed in the total cost claim.

Renda must adjust a total cost claim for the reduced efficiency of the dredge. The dredge did not perform as anticipated when purchased from Dredging Supply Company. Renda sued Dredging Supply Company for failure of the dredge to achieve the anticipated production (Vol VI, Tab 41). On May 24, 2000, the case was filed in the U.S. District Court for the Southern District of Texas, Houston Division, Civil Action No. H-00-1721. In April 2001, the problems were still not worked out with the dredge Millennium (Vol VI, Tab 5).

As for the hydraulically constructed east levee, Renda has not made any adjustment for increased cost at that location.

Renda has not identified any additional cost for being off alignment when dredging began in 1999 when no survey work was performed on Lost Lake. Further, Renda has not credited the Government for mechanically relocating Section 7 clay that was directed to be placed hydraulically.

Renda must show that it did not contribute to the increased cost of placing the hydraulic levees or mechanically placing the north levee when hydraulic placement was required. This is a heavy burden to prove since Renda's initial placement of hydraulic fill to final grade +30 feet MLT results in more quantity than necessary for completion of the levee

because of the geometry of the levee cross section. Also, by stacking the dredged fill material to grade it displaced more material than if it had been initially placed to elevation +20 feet MLT or +25 feet MLT. The added displacement contributes to exhausting the available dredged material prior to distributing it evenly around the perimeter.

To be able to use the total cost method, Renda's bid must be free of material error. In Renda's bid, the dredge crew size is 16 men per shift. As shown by Renda in the South Ferry Landing claim, the dredging crew size was up to 19 for the week ending May 5, 2000 and 20 for the week ending May 21, 2000. Dredging crew sizes continued to increase, and in Section 7 Clay claim, Renda shows 24 men working per shift for the week ending October 22, 2000. Even in the Obstructions Claim in 2001, Renda shows an average of 23 men per shift on the dredge crew for the weeks ending April 29 and May 6, 2001.

Another adjustment that should be made in the bid estimate is for fuel cost. Renda estimated diesel fuel at 80 cents per gallon. As shown in the Equipment Section, actual average fuel cost was approximately 94 cents per gallon, a seventeen percent increase in fuel cost.

As a final note, overhead markups and profit in the bid estimate are approximately a combined 13.6 percent of the total cost of the project. The DCAA has determined that markups are 14.13% for resident office overhead and 6.06% for home office corporate overhead in the year 2000. In the year 2001, these overhead rates increased. The project, if performed as bid, would not cover the actual overhead expense.

Conclusion

The DCAA has determined that the hydraulic levee claim proposed is inadequate as it did not include cost or pricing data. Further, the alleged total actual cost to date of $24,568,660.15 until recently has been unsupported. Renda's audited financial statements

as of October 31, 2001, shows an actual cost of $19,511,345 (Vol VI, Tab 42). Moreover, the total cost method or modified total cost method is not appropriate in this circumstance. The additional work, if any, can be directly identified from the project records and should be used to support a claim for construction of hydraulic levees at Lost Lake.

Renda had control of his placement methods, discharge elevation, location and width. Had Renda discharged the dredged material from the ship channel at elev. +24 feet MLT around the perimeter of Lost Lake, sufficient materials would have been available from the initial hydraulic placement from the slopes and outside existing perimeter levee to complete all the hydraulically constructed levees to the final minimum cross section envisioned by the contract.

Renda did not manage the dredged fill properly. Renda elected to discharge the dredged fill materials at el. +30 feet MLT. When the quality of the materials reduced from very stiff clays to medium clays and sand, the discharge elevation should have been lowered because the material would not "stack up" on a 3H to 1V slope. Renda did not react to the change in dredged materials and displacement, such as mud waves. When displacements developed at placement elevations above +20 feet MLT, the discharge elevations should have been lowered or advanced to another location. These methods were within the sole control of Renda.

As shown in Figure 4.8.2, Renda misplaced 350,000 cy of satisfactory material in Borrow Area 2. Additionally, during the months of January, February and early March, Renda placed 620,000 cy of satisfactory material on the east levee instead of the north. The north levee should have had dredged material placed on it beginning in January 2000, but Renda chose to deposit excess material along the east alignment[8]. Renda chose to mechanically construct the north levee. To construct the north levee, Renda transported approximately 174,000 cy in trucks which was recovered material from the east

---

[8] Renda acknowledges that the dredge ladder pump and main pump was limited in ability to transport materials without a booster pump (Vol IV, Tab 23).

alignment (only 28 percent of the stockpiled material) and 37,000 cy from Borrow Area 2 (about 10 percent of the misplaced material.)

For these reasons and others stated herein, Renda does not support a total cost claim for hydraulic levee construction or constructing levees mechanically when they should have been built hydraulically.

## 5.0 Equipment Rates

### 5.1 General

For the equipment cost element in Renda's claims, the U.S. Army Corps of Engineers Manual, EP1110-1-8, Construction Equipment Ownership and Operating Expense Schedule (Corps Manual) described in Contract Special Clause Section 800, Paragraph 7 was used. Paragraph 7(b) states

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region VI. Working conditions shall be considered to be average for determining equipment rates using the schedule unless specified otherwise by the contracting officer. For equipment not included in the schedule, rates for comparable pieces of equipment may be used or a rate may be developed using the formula provided in the schedule. For forward pricing, the schedule in effect at the time of negotiations shall apply. For retroactive pricing, the schedule in effect at the time the work was performed shall apply."

Section 800, Paragraph (7) further states for rental equipment that

> "(c) Equipment rental costs are allowable, subject to provisions of FAR 31.105(d)(ii) and FAR 31.205-36. Rates for equipment rented from an organization under common control, lease-purchase arrangements and sale-leaseback arrangements, will be determined using the schedule, except that actual rates will be used for equipment leased from an organization under common control that has an established practice of leasing the same or similar equipment to unaffiliated lessees."

The Corps Manual in effect at the time the work was performed is the June 1999 edition for Region VI. Renda used the correct edition of the Corps Manual, but varied the prescribed factors, formulas, and application.

The Defense Contract Audit Agency (DCAA) has performed an examination of each of Renda's claims. For the equipment, the DCAA "determined that the contractor's accounting system is able to track depreciation expense by asset, but not other expenses." Since both ownership and operating costs cannot be determined for any piece of equipment or similar groups of equipment, the contract required the use of the Corps Manual to determine the equipment rates. However, the DCAA miscalculated rates[1] and did not apply the Corps Manual correctly.

Further, the DCAA did not evaluate whether Renda misapplied the Corps Manual, changed factors or formulas, selected the improper equipment for pricing, or made allowances for costs which are included in overhead rates.

Renda selected a shorter useful and physical life than specified by the Corps Manual for the dredge Millennium and its owned booster pump. Such a variation is improper and affects the operating rate as well as the depreciable life of the equipment as noted by the DCAA. By shortening the useful life of the equipment, Renda more than doubles the recovery of the allowable depreciation expense, and likewise accelerates recovery of operating repairs which are to be recovered over the specified physical life. Renda's invention of rates, such as "non-effective time" and "main generator only" is not allowed or consistent with the Corps Manual. The contractor cannot use one element of the manual and disregard others. The equipment rates that result from use of the formulas contained in the Corps Manual include an allowance for the cost incurred during non-effective operating time. Development and use of a "non-effective time" rate results in a deviation in prescribed methodology and double recovery of cost.

---

[1] From reviewing Renda's equipment rates, the DCAA did identify the following:

- For the dredge Millennium and hydraulic booster pump, Renda developed a "non-effective time" category.
- For the dredge only, Renda developed a "main generator only" category.
- Renda selected a severe operating rate, where a choice was possible.
- Renda used a shorter useful life for the dredge and booster pump instead of the useful life required by the specified schedule.

5.2 The Corps Manual

The Corps Manual provides a method for computing the total hourly ownership and operating rates for construction equipment and dredging plant if actual ownership and operating costs are not available. The method includes formulas and factors to compute both total hourly rates and standby rates for individual pieces of equipment. The methodology assumes "that the equipment furnished to the job is in sound, workable condition. Furthermore, the methodology applies only to equipment which prime contractors or subcontractors either own or control."

The hourly rate is the sum of ownership and operating costs. The standby rate consists of the ownership element of the hourly rate. Ownership cost consists of an allowance for depreciation and facilities capital cost of money (FCCM) which is based on the Cost of Money Rate established by the U.S. Treasury. The operating cost element includes allowances for the following:

- Fuel
- Filters, oil and grease (FOG) and includes servicing
- Repairs, which include maintenance and major overhauls
- Tire wear (replacement), and
- Tire repair

"The hourly rates for operating and owning equipment do not include allowances for the following:

Operating Labor
Mobilization and demobilization
Field Office overhead expenses
Home Office &/or G&A overhead expenses
Investment Tax Credit
Contingency allowance
Profit."

Costs which are allowable and normally included in a contractor's field office or home office rate calculations are license fees, property taxes, storage and insurance. These costs are considered by the Corps Manual to be indirect costs and are not included in the total hourly rate.

Further, of importance to the auditor, because it affects the allowable overhead rates, is the repair costs component of the operating rate. The Repair Cost "is an allowance for equipment repairs, maintenance, and major overhauls (including undercarriage wear) performed in either the field or the shop." Items included in the Repair Cost Factor (p. 2-9 of EP1110-1-8) compensate the contractor for:

1. Mechanic labor including base wages, fringe benefits, supervision and all other costs for labor engaged in the direct repair of equipment.

2. Repair parts and supplies, including those items which are required for all repairs and major overhauls.

3. Service trucks and other equipment used during repair and maintenance work, including tools.

4. Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead.

The DCAA should not include repair facilities and shop overhead in the Resident Office and Home Office Overhead rates. Current DCAA overhead rates include an allowance for shop and duplicate the allowance in the equipment rates.

The Corps Manual provides for calculation and/or adjustment of rates based upon the operating conditions. Operating conditions may be average, difficult or severe. The determination of the operating condition is based on the contract specifications, the site conditions, the basis of any supporting evidence, and Appendix C guidance given in the Corps Manual.

For the majority of the equipment, Renda did not use the step-by-step computation methodology presented in Chapter 2 or 4 to obtain the total hourly rates. Renda used the alternative method in Chapter 3, which uses the equipment rates developed and shown in Table 2-1 and Table 2-2 of the Corps Manual. Use of Chapter 3 is permitted provided that:

a. Cost and pricing data is not available.

b. The Contractor's actual unit of equipment is equivalent in size, capacity, horsepower and value to the unit listed in Table 2-1.

If the Chapter 3 method is used, the Corps Manual requires that the ownership and/or operating portion of the total hourly rates be adjusted. Adjustments are to be made when one or more of the following conditions exist:

Changes in operating conditions
Changes in FCCM rate
Work shifts greater than 40 hours per week.
Changes in Fuel Cost
Equipment of a different age than Table 2-1

For the equipment rates computed by using Chapter 3 methodology, Renda listed adjustments for all the above conditions, except fuel cost. However, not all the adjustment factors were used by Renda, and some were used improperly. In the Table 2 rates, fuel cost for a gallon of diesel (off-road use) is at $0.74 per gallon. During the Renda claim periods from April 2000 thru April 2001, off-road diesel averaged $0.943 per gallon per month (Vol III, Tab 99). The equipment rates re-calculated herein use a fuel adjustment factor for diesel fuel and the rate of $0.943 per gallon. Use of this average fuel rate will result in over-compensation during some periods and in under-recovery for other periods.

5.3 Selection of Operating Conditions

Rates calculated herein make adjustments for operating condition. Contract Section 800–Special Clauses Paragraph 7 states,"Working conditions shall be considered to be average for determining equipment rates using the schedule, unless specified otherwise by the contracting officer". The contracting officer has not determined that working conditions were anything but average.

For the marine equipment, the site working conditions are normal and customary. The dredge, boats and barges are working sheltered, inland service areas of lakes, bays and sounds (See Service in Dredge Millenniums' Survey Report No. 99-4285 (Vol III, Tab 1).