Renda Marine overdredged up to six feet below the required dredge depth, and consistently overdredged by several feet throughout the South Ferry Landing area. These slope and channel overcuts are consistent on both the south and north sides of the channel, indicating that this problem was due to a lack of adequate positioning control.

iii. *"What factor(s) relating to the operation of the dredge Millennium might contribute or result in a disturbance to the riprap and rubble shore protection at the South Ferry Landing (e.g., equipment not functioning properly, operator inexperience with the dredge)? Did any such factors contribute or result in a disturbance to the riprap and rubble shore protection at the South Ferry Landing?"*

The main factor that likely contributed to sloughing of hard slope protection materials appears to be due to a lack of adequate positioning control on the dredge. A determination could not be made whether this involved a lack of adequate equipment, equipment malfunctions, or inexperienced dredge operators. The Renda Marine Report of Operations (Daily Report of Operations showing locations, delays, volumes, dredges), do not indicate that the dredge operator was utilizing modern navigation equipment in this area. The post-dredge survey cross sections show that the operator did not have adequate horizontal and vertical positioning equipment for performing close tolerance dredging on the slopes or on the bottom of the cut. The pay volume in the USACE payment estimate (Appendix C) indicates that Renda Marine dredged a "Total to Date" dredging pay volume of 3,425,642 CY of material. The CD-Rom obtained from DOJ containing Drawings, Pre- and Post Dredging Cross-Sections, Surveys and Volumes (DOJ September 2003) indicate a Total Excessive Dredging volume of 843,095 CY. This over-dredging amounted to approximately 25 percent of the total project volume. Based on experience, over-dredging typically does not exceed 5 to 10 percent of the total project volume. This large over-dredge volume indicates that the dredge either did not have good positioning equipment that functioned properly, or if such equipment was on board and working properly, the leverman was not paying close attention to the position monitor.

Over-dredging the slope in this area would disturb any slope protection material within the area adjacent to the top of the slope and would cause this material to travel down the slope and encounter the cutter, causing plugs in the pump, cutter, and pipeline.

### 4.3 Flare Area Claim

This section presents an overview of my opinions regarding the Flare Area Claim, and presents the responses to DOJ questions asked in the letter dated May 9, 2003.

**General Understanding of Claim**

My general understanding of the Flare Area Claim is that Renda Marine claims that differing material conditions than those shown on the contract drawings, and as indicated in the contract boring logs (presented in the plans and specifications) within the Flare Area, resulted in decreased production rates. Renda Marine claims that the unanticipated presence of "stiff or dense" clay was substantially different from the softer clays that were indicated in the bid documents, as interpreted by Renda Marine, and that the dredge production was substantially reduced by the presence of these "stiff clays."

**General Opinion**

There are four main parts to my opinion with regards to the Flare Area Claim:

- The boring logs and pre-bid site investigation are considered sufficient information for a reasonably prudent contractor to anticipate that there is clay material throughout the dredge cut, and to determine that the clay material would be likely to form "clay balls" (based on moisture content from the boring logs). The formation of clay balls is the main reason that clay material is difficult to transport in a hydraulic dredged pipeline. The "stiffness" of clay typically refers to the ability of the dredge cutter to excavate the material, rather than describe its difficulty in transporting the material. Once excavated from the in-situ, soft clays or stiff clays are transported in the same manner, and only the presence of "clay balls" results in difficulty in pumping the clay material. A site visit to the levee areas in June 2003 indicated the presence of "clay balls" based on visual observations alone. A pre-bid site investigation of the placement areas, where the USACE specified the clay material to be used for the levee maintenance, would also have indicated the presence of "clay

balls" and "stiff" clay from past dredging activities. A reasonably prudent contractor would have assumed that new work dredging (i.e., Flare Area) would also result in the formation of "clay balls" that are more difficult to transport than finer grained material.

- Renda Marine did not use a booster pump[2] until July of 2000. Until then, they did not provide sufficient pipeline pressure (in feet of head) in the pipeline system to effectively pump the clay material the required distance at the required velocity. The basis for this opinion is discussed in Section 4.5.1.
- The available Renda Marine Report of Operations do not mention the presence of stiff clay in the material description section of their report (reports from January 17 to March 15, 2000) and do not indicate that Renda Marine had difficulty in cutting the material to be dredged (including the alleged "stiff" clay), indicating that the "stiff" clay did not behave significantly differently, as far as "cutting" the material, than other clays that were being dredged. Renda Marine's problem was the inability to maintain an adequate pipeline velocity while pumping "clay balls" over long distances.
- When it became evident that the contractor could not pump the clay material at a reasonable production rate using only the ladder pump and dredge main pump (as evidenced by decreased hourly production rates and by significant plugging within the pipeline), a reasonably prudent contractor would have quickly installed a booster pump in the transport system to increase the velocity of the slurry and to avoid plugging the pipeline.

My interpretation of the boring logs within and adjacent to the Flare Area (boring logs 3ST-4, 3ST-5, 3ST-6, 3ST-7, 93-62, 93-63, 72-105, 3ST-8W [Figures 2, 7, 8 and 9 ]) is that below approximate elevation –30 feet MLT there is a significant amount of clay with moisture contents of less than 20 percent. The -30 feet MLT elevation represents an average approximation using the boring logs. It has been my experience that clays with lower

[2] A booster pump is an additional material handling pump used to increase pipeline pressure. This pressure increase will result in an increase in the velocity of the fluid mixture in the pipeline. The booster pump is usually separate from the dredge, and is not to be confused with the ladder pump and /or the main dredge pump, which are a part of the dredge. The booster pump can be located close to the dredge or could be separated from the dredge by long distances. Most dredge operators prefer to place the booster in a convenient location for crews and supplies and also prefer to place the booster in a location where the hydraulic transport pipeline still has positive pressure when the material enters the booster pump.

moisture content can be expected to form balls (i.e., "clay balls") in the pipeline thus increasing the difficulty to pump the material.

"Clay balls" behave as large sized particles, such as gravel or rock, rather than as fine-grained materials, and require much higher pipeline velocity to keep them in suspension. Once the "clay balls" fall out of suspension (due to low pipeline velocity), they start to clog the pipeline, eventually plugging it unless the dredge operator adjusts their operations to increase flow velocity, or decrease the solids concentration within the pipeline. "Clay balls" are a common occurrence on hydraulic dredging projects where clay is present and a reasonably prudent contractor would have factored the likely formation of "clay balls" in its pipeline in determining whether to use a booster pump in the hydraulic system.

Because the USACE contract specified that the clays present in the required excavation were to be used for the construction of levees, based on my experience as a dredging contractor, it is my opinion that a reasonably prudent contractor should assume for their bid that there were adequate levee building clays in the required excavation and would realize that the primary source of clays was in the widening areas (since those were the new work areas), and mainly within the Flare Area. The dredging within the channel limits would not be expected to have material suitable for levee construction, since the material within the channel limits are infill material, thus predominantly expected to be loose silts, sands, and clays. The widening areas would be expected to contain consolidated material that would be much more suitable for levee construction, and the Flare Area has the widest cuts of new work material thus containing the greatest volume of new work material.

It is my understanding that the contractor used a concept termed the "Measured Mile" (see Flare Area Claim) to negotiate with the USACE additional cost to complete the Flare Area job. The "Measured Mile" concept, as understood, is based on an average production rate that was achieved by dredging maintenance material. The "Measured Mile" was used as the basis for the production rate that should have been achieved within the Flare Area when dredging "stiff" clay.

It is critical to note that the "Measured Mile" production rate was obtained by using the rates achieved by dredging loose, unconsolidated infill material (otherwise known as

maintenance material). The maintenance material was primarily fine-grained material and would easily be dredged and transported long distances without the need for a booster pump, as is common for maintenance material. Figure 12 shows relative differences between the production rates for maintenance material (typically silts), versus larger particle sized material (such as sands, gravels and "clay balls.")

I do not consider Renda Marine's "Measured Mile" example to be valid for negotiating a reasonable price for delay of work at the Flare Area, since there was a significant difference in material type and "pumpability" when dredging maintenance material versus the specified new work material (i.e., Flare Area clays). Based on my experience, the "Measured Mile" production rate is not representative of the production rate achieved when dredging clay material.

### 4.3.1 Flare Area Claim, Question 1, May 9, 2003 letter.

> *"How would a reasonably prudent dredging contractor have interpreted the contract plans and specifications insofar as the nature of the materials to be dredged in the Flare Area (approximately station 520+00 to 550+66) is concerned?"*

The Flare Area is a widening of the channel to allow for the passage of vessels or to provide an area for vessels and tows to stop and be out of the way of normal traffic in the ship channel. This Flare Area is a new widening of the channel and contains material that has never been dredged (i.e., new work material) that can be assumed to be native material.

The borings taken directly within the Flare Area (93-63 and 93-64) are more recent borings, taken in the past few years, while the other borings in the adjacent channel (i.e., borings 3ST-1 to 3ST-11) were taken prior to the last deepening of the channel in the 1960s. The newer borings indicated the presence of clay material below the soft top material. The older borings are consistent in taking note that there are clays present throughout the boring but more concentrated below approximate elevation –30 feet MLT.

The older borings represented pre-1960s conditions adjacent to the Flare Area; a reasonably prudent contractor would use both sets of boring data and would assume

that the older borings would likely be representative of the new work condition in the Flare Area. An experienced dredging contractor knows that "clays" are older, sedimentary deposits and are usually deposited in fairly uniform layers. It would be unreasonable to assume that this Flare Area was the only area in the channel that did not contain clays with low moisture content below approximate average elevation of –30 feet MLT.

Based on experience, I conclude that a reasonably prudent contractor would assume that the materials to be dredged in the Flare Area below approximate average elevation of –30 feet MLT would be a clay type material consistent with the older, adjacent borings.

As discussed previously, clays with low moisture content have an increased likelihood of forming "clay balls," which impact the ability of the hydraulic system to transport the material long distances. The Renda Marine Report of Operations dated December 1999 indicates that when Renda Marine started to dredge immediately east of the Flare Area at approximate channel Station 519+00, the shore pipeline had been extended to a placement area that required clay for the construction of levees. This indicates that Renda Marine expected to encounter clay materials in the Flare Widening Area. In addition, Renda submitted to the USACE a dredge material disposal map (Appendix D) that shows that Renda anticipated pumping "clay materials" from this area for the construction of the levees.

The plugged pipelines, commencing on about December 15, 1999, are direct evidence that Renda Marine did not provide sufficient pipeline pressure to provide a pipeline flow velocity to effectively pump "clay balls" for distances in excess of approximately 9,000 feet. This situation resulted in significantly reduced production rates for pipeline lengths between 9,000 feet and 11,000 feet, accompanied by plugged pipelines at distances over 11,000 feet, as shown in a summary of Renda Marine's Report of Operations (Appendix E). As previously noted, a reasonably prudent contractor would have installed a booster pump in the system as soon as they were aware of the reduced production rates or pipeline plugging.

#### 4.3.2 *Flare Area Claim, Question 2, May 9, 2003 letter.*

*"Do the soil borings 93-62 and 93-63 constitute a reasonable basis upon which to assess or predict the nature of the material in the Flare Area? Would a reasonably prudent dredging contractor consider any other soil borings in assessing or predicting the nature of the material in the Flare Area? If so, which soil boring(s) and why?"*

Boring logs 93-62 and 93-63 are more recent borings and show clay of varying moisture content for almost the entire depth of the borings except for a thin layer of recent infill at the top of the boring (i.e., surface). The elevations noted at the boring locations are approximately –33 feet MLT for boring 93-62 and –46 feet MLT for boring 93-63. Both borings show clay below the surface. There are other borings (i.e., 3ST-1 to 3ST-11) in the adjacent channel that represent pre-dredge conditions before the channel was dredged in the 1960s and that also show the presence of clay.

A reasonably prudent contractor would have used all available borings in the general area to assess the nature of the material to be dredged. For the Flare Area, this would include borings 3ST-1 to 3ST-11 and 93-62 to 93-65. A reasonably prudent contractor would have assumed that the clay materials would be encountered in most of the widening areas below approximate elevation –30 feet MLT. The clay materials in the channel widening and the Flare Area are the clays intended for use in the construction of the new levees. Based on my experience in preparing bids for similar projects, I conclude that the borings provide a reasonable basis for a reasonably prudent contractor to predict the nature of material within the Flare Area.

### 4.4 The Obstruction Claims

This section presents an overview of my opinions regarding the Obstruction Claims, and presents the responses to DOJ questions asked in the letter dated May 9, 2003.

<u>General Understanding of Claims</u>

My general understanding of the obstruction claims is that Renda Marine has claimed that they encountered miscellaneous debris items and trash that caused plugs in the ladder and main pump, as well as causing the need to clean the cutter of wire and other debris. Renda Marine claimed that the debris and trash encountered was not identified in the bid documents and was unusual in nature, and should not have been anticipated. Renda

Marine also claimed that they encountered several "obstructions" which consisted of 1) a Conex steel container box, 2) a sunken steel mooring buoy, anchor, and chain, 3) an old piece of stern swivel from a large dredge, 4) other items such as wire rope, tires, chain, metal trash, and other miscellaneous debris; and that these obstructions caused damage to equipment and delays to the project.

**General Opinion**

Based on my experience working as a dredging contractor, my opinion is that a reasonably prudent contractor would have known that this channel has been in use for approximately 100 years and would have expected to encounter miscellaneous debris and trash as part of dredging (i.e., debris and trash are considered incidental to performing dredging within the ship channel). The Houston Ship Channel has seen all types of marine traffic from large ships to small vessels and miscellaneous marine construction equipment. This marine construction equipment included large suction dredges that had been used to deepen and maintain the ship channel.

The specifications (Section 02482 paragraph 3.4.4.2 Debris) instruct the contractor to *"...carefully inspect the entire area to be dredged, from estimated top of cut to top of cut to locate any debris which may interfere with dredging operations."* An experienced dredging contractor would realize, for example, that sometimes buoys sink and are not found and recovered, or sometimes parts are knocked off a dredge or other vessels and not found. Active navigation channels that are routinely maintained or have constant vessel traffic almost always have debris and trash present, especially in areas used by water dependent industries. In the past, it had been common practice for dredgers and other marine contactors to dispose of used wire rope and miscellaneous steel and debris on the banks of the ship channel. A reasonably prudent contractor would have anticipated that the act of widening this channel would cause the dredge to encounter some of this old discarded debris.

The larger obstructions encountered during dredging (for example, the Conex steel container box and the dredge stern swivel) are not typical of what a reasonably prudent contractor would anticipate as part of the dredging. Upon encountering the large obstructions however, a reasonably prudent contractor would cease dredging operations in

that area, move to another area to continue dredging operations, and notify the USACE construction manager of the obstruction to determine its disposition.

### 4.4.1 Obstruction Claims, Question 1, May 9, 2003 letter.

*"What allowance for trash in the Houston Ship Channel would a reasonably prudent dredging contractor include in a bid for the Upper Bayou Project?"*

The Houston Ship Channel is similar to other ship channels, with respect to the presence of debris and trash, such as the channels at the Ports of Los Angeles and Long Beach (California) the Columbia River Ship Channel (Oregon), as well as the Sacramento and San Joaquin Ship Channels in California. Ship channels contain many types of trash from the surrounding area and industries that are adjacent to or use the channels.

The Houston Ship Channel has been in use by small vessels as well as large ships for over 100 years. Over the course of time, vessels as well as industries have dumped unwanted materials in the area as a natural disposal area with little thought to its impact on the environment or any future deepening of the channel. The project site has undergone numerous maintenance dredging events in the past and there would be many past opportunities for previous contractors and vessel operators to leave old cables and other miscellaneous debris on the slopes adjacent to the main channel.

The Upper Bayou Project's main objective was to widen and deepen the Houston Ship Channel, which means that much of the area outside of the existing channel lines had never been dredged. Consequently, a reasonably prudent contractor would have assumed that trash and debris from many years would have been deposited and accumulated along the channel. There are also many small industries on the bank of the Houston Ship Channel that contributed to the amount of trash and debris in the area.

A reasonably prudent contractor would have noted the presence and type of industries, old and new, bordering the channel and would have also noted the debris on the slopes. They would have been aware of the multiple use of the channel over time and would have expected to find a considerable amount of trash and debris in some of the areas outside of the established and maintained channel lines. Based on experience with dredging in many ship channels throughout the United States, I consider the Houston

Ship Channel to be typical of other ship channels, and am of the opinion that the debris/trash situation in the Houston Ship Channel dredge area is normal for the age, location, and past use of this channel.

Based on my experience, a reasonably prudent contractor would include in their bid an allowance for approximately 10 to 20 pump/cutter cleanings per day for the portions of this job that border industry, such as the area around Stations 520+00 to 570+00 (Figure 2) and the area around the South Ferry Landing. The remainder of the job could have an average of 5 to 10 pump/cutter cleanings per day. A reasonably prudent contractor would have an easy and quick method for cleaning the pumps and cutter in order to reduce the downtime due to these work stoppages.

#### *4.4.2 Obstruction Claims, Question 2, May 9, 2003 letter.*

> *"How would allowance for trash on the Upper Bayou Project be reflected in a bid for that contract? Down time due to trash? Lower production rate due to trash?"*

A reasonably prudent and experienced dredging contractor would consider how the presence of trash and miscellaneous debris would affect the dredging plant proposed for this work. For instance, a 24-inch dredge cannot pass as large an object as a 27 or 30-inch dredge. Additionally, a contractor must also allow for the additional time required for each shut down when dredging with a long discharge line. This is due to the added time required to start material moving again in a long line. An experienced contractor would have a method of cleaning the main pump in approximately five minutes, the ladder pump in ten minutes and also have the proper attendant plant for rapidly clearing wire rope and other debris from the cutter.

An experienced contractor would also realize that it takes a longer time to restart dredging when pumping on a long pipeline such as a 10,000-foot pipeline. Therefore, each shut down for cleaning the pump, cutter or for other reason requires more time than would be required with a short line (e.g., less than 5,000 feet). Additionally, a submerged line requires a slower start up to allow for the air trapped in the line during a pump cleaning to be purged from the line to prevent floating of the submerged pipeline. A combination of all of these items can increase the down time due to cleaning pumps and cutter to 15 to 20 minutes for an average cleaning.