determined the pump pressure by taking typical pump operational characteristics from the dredge specification sheet from the dredge manufacturer (Appendix F) and applying those characteristics to the pump curves for the dredge pump obtained from Mobile Pulley (Appendix H). Since the dredge daily reports from Renda Marine did not identify the pressure or RPM of the engines or electric motors, the dredge specification sheet from the dredge manufacturer was used to provide the operational characteristics of the dredge. The dredge specification sheet indicates that the following horsepower and engine speeds were typical for the dredge *Millennium*.

- Main pump maximum engine horsepower equals 3600 HP at 900 RPM
- Reduction gear ratio, 2.093:1
- The engine RPM recorded on the Renda Marine Report of Operations (800-850 RPM) are converted to pump speed by dividing the engine RPM by the reduction gear ratio (2.093), which results in pump speeds of 380 to 406 RPM
- Ladder pump rated maximum horsepower equals 650 HP

Table 2 identifies the pump pressure estimated from the pump curves; this pump pressure is the initial pressure (in feet of head) at the dredge pump location.

**Table 2**
**Pump Pressure (feet of head) from Pump Curves***

| | Main Pump | Ladder Pump | Combined |
|---|---|---|---|
| Minimum | 260 ft | 80 ft | 340 ft |
| Maximum | 290 ft | 100 ft | 390 ft |

*Pump Curves were obtained from Mobile Pulley and Machine Works, manufacturer of the *Millennium* pumps.

Using a simple relationship of head loss over pipeline length, a contractor can roughly estimate the effective pipeline length a dredge can theoretically pump without a booster using the initial pressure (in feet of head) and subtracting out the change of elevation between the water surface and the elevation of the point of discharge. Assuming a typical head loss of five feet (typical for sand material) for every 100 feet of pipeline (Turner 1996), the distance the dredge *Millennium* theoretically could pump without a booster was between 6,800 and 7,800 feet (based on the assumed 340 and 390 initial feet of head [Table 2]). These distances are less than many of the required pumping distances for the Upper Bayou Project.

Consequently, a reasonably prudent contractor should have anticipated the need for a booster pump given the capability of the dredge, and the type of material to be pumped. Figure 13 (Turner 1996) illustrates the effect of adding a booster pump to production rates for fine-grained sand. The same relative increase in production rates would be expected for pumping clay material.

To provide another method of evaluating the *Millennium*'s production capability, production rates were calculated for the various dredge sections and using different material types. The production rates were generated for operating pressures (feet of head) of 340 feet, 360 feet, and 390 feet to cover the assumed range of values. The production rates were calculated using a hydraulic production rate computer model, "PIPELINE" (Parsons Brinckerhoff 2003), and the modeling results are attached in Appendix I. Table 3 shows that the production rate is greatly reduced when the pipeline length increases, or when the material type changes from fine-grained sediment to larger particle sizes (such as "clay balls"). The model results (summarized in Table 3) demonstrate how different material types affect dredging production rates, and why a reasonably prudent contractor needs to closely monitor the material types being dredged. Table 3 identifies the assumed approximate pipeline lengths for various dredge sections and the estimated maximum carrying capacity of the dredge for each section assuming the dredge main pump was operating near an assumed maximum rated pressure. The representative pipeline lengths on Table 3 are only intended to approximate the distances to the North Levee from each dredge section. Table 3 shows the same relative relationship between decreasing production rates as material grain size increases, as was previously discussed and shown on Figure 12 (Turner 1996).

The estimated maximum production rates in Table 3 are intended to give an approximation of maximum carrying capacity of the system, without taking into consideration factors that could reduce the overall production, such as (1) small dredging face or bank, (2) currents, (3) inability to feed the system due to operator limitations, and (4) inability to feed the system due to difficulty in dredging the materials.

**Table 3**
**Estimated Maximum Production Rates at Upper Bayou**

| Dredge Section | | Representative Distance to Lost Lake [ft] | Representative Distance to N. Levee [ft] | Representative Total Distance [ft] | Ave pressure, 390 ft head Est. Maximum Production/hour (cy/hr) | | |
|---|---|---|---|---|---|---|---|
| | | | | | Fine Sand | Med Sand | Clays |
| 1 & 2 | Min | 2,000 | 5,000 | 7,000 | 2,000 | 850 | 500 |
| | Max | 2,800 | 9,000 | 11,800 | 750 | 350 | 200 |
| | Ave | 2,400 | 7,000 | 9,400 | 1,000 | 450 | 250 |
| 3 | Min | 2,800 | 5,000 | 7,800 | 1,500 | 700 | 350 |
| | Max | 4,400 | 9,000 | 13,400 | 500 | 250 | 200 |
| | Ave | 3,600 | 7,000 | 10,600 | 850 | 400 | 225 |
| 4 | Min | 4,400 | 5,000 | 9,400 | 1,200 | 500 | 250 |
| | Max | 5,200 | 9,00 | 14,200 | 500 | 250 | 200 |
| | Ave | 4,800 | 7,000 | 11,800 | 650 | 300 | 200 |
| 5 | Min | 5,200 | 5,000 | 10,200 | 850 | 400 | 225 |
| | Max | 6,000 | 9,000 | 15,000 | 450 | 225 | 200 |
| | Ave | 5,600 | 7,000 | 12,600 | 600 | 250 | 200 |
| 6 | Min | 6,000 | 5,000 | 11,000 | 800 | 350 | 200 |
| | Max | 7,600 | 9,000 | 16,600 | 500 | 225 | —[1] |
| | Ave | 6,800 | 7,000 | 13,800 | 450 | 225 | —[1] |
| 7 | Min | 7,600 | 5,000 | 12,600 | 600 | 250 | 200 |
| | Max | 14,400 | 9,000 | 23,400 | —[1] | —[1] | —[1] |
| | Ave | 11,000 | 7,000 | 18,000 | —[1] | —[1] | —[1] |
| 8 | Min | 14,400 | 5,000 | 19,400 | —[1, 2] | —[1, 2] | —[1, 2] |
| | Max | 18,400 | 9,000 | 27,400 | —[1, 2] | —[1, 2] | —[1, 2] |
| | Ave | 16,400 | 7,000 | 23,400 | —[1, 2] | —[1, 2] | —[1, 2] |

1Table cells with no results were not calculated, since the results would only show decreasing production rate with increasing pipeline lengths.
2 For this section, it is assumed that the dredge would only be capable of pumping mud, given the pipeline distances, but not coarser material such as sand or "clay balls".

Based on my review of the dredge records, performing a simple head loss calculation, "PIPELINE" model results presented in Table 3 and my experience, my opinion is that the dredge *Millennium* main pump alone was not capable of efficiently pumping clays at distances exceeding about 8,000 feet (assuming an approximate 30-foot lift at the discharge location). Renda Marine's claim that the material was "stiff" was not relevant in determining the production of the dredge in the Flare Area and downstream of that area. "Stiffness" of the material could affect the ability of the dredge to excavate or cut the material from the bottom, but once the material was excavated or cut, the ability to transport the material was not dependent upon the material "stiffness." Renda Marine did not indicate that they had any difficulty in excavating the material from the bottom.

The combined pump discharge pressures were simply not adequate for pumping clay materials for that distance. A reasonably prudent contractor would have added a booster.

### 4.5.2 Other Questions, Question 4, May 9, 2003 letter.

> *"Would a reasonably prudent dredging contractor have been aware that the levee maintenance at a containment area such as Lost Lake is typically performed by "borrowing" materials from within the containment area itself?"*

Material for levee maintenance of a disposal area is almost always obtained by borrowing material from the inside of the disposal area. Borrowing materials from the outside weakens the levee and can be the cause of a shear failure on the outside of the levee. The pressure on the levee is from the inside, therefore the outer edges and berms must be maintained and not used as a borrow area.

### 4.5.3 Other Questions, Question 5, May 9, 2003 letter.

> *"Would a reasonably prudent dredging contractor have been aware that levee maintenance at a containment area such as Lost Lake is typically performed by "borrowing" materials adjacent to or in the immediate vicinity of existing levees?"*

The material required for levee maintenance must come from material imported from off-site or from material on-hand within the disposal area. Economics usually dictate that the material should come from within the disposal area. The material in the interior of Lost Lake had very high moisture content and the ground would not support normal hauling equipment. The most suitable material for levee maintenance is usually the top layer of dried material fairly close to the inside of the levee. Draglines and dozers usually excavate materials as far away from the existing levee as possible but sometimes this distance is quite small and results in "borrow pits" that are quite close to the inside toe of the existing levee. It is typically intended that these "borrow pits" will be refilled during the next disposal operation.

#### 4.5.4 Other Questions, Question 6, May 9, 2003 letter.

*"What, if any, significance would a reasonable prudent dredging contractor place upon the depiction of the designated borrow areas at the Lost Lake Containment Area on Drawing C-14?"*

The designated borrow area on Contract Drawing C-14 depicts two mounds of material designated as borrow material for the raising of the levees around the Lost Lake placement area. The material is to be used for the mechanical construction of levees as specified. The material can be excavated to elevation +12 feet MLT in Borrow Area #1 and to +10 feet MLT in Borrow Area #2, as identified in the specifications. The mounds also provide a visual and physical example of the type of clay materials previously excavated from the channel and similar to the material to be excavated in the "new work" areas of this job.

#### 4.5.5 Other Questions, Question 7, May 9, 2003 letter.

*"How would a reasonably prudent dredging contractor interpret note #10 on Drawing C-14."*

Note #10 states:

*"The foundation of the new levee is very soft to soft dredged material and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material."*

This note indicates that the alignment of the new levee is in areas that have not been stabilized and the contractor should expect considerable subsidence in some areas as well as the displacement of some of the softer foundation materials. A reasonably prudent contractor would read this note and treat it as a warning that special filling methods and/or foundation stabilization techniques will be required in some of the areas in order to achieve the desired levee section while minimizing the loss of levee materials outside of the design template. In many instances, this would mean constructing the levee in multiple lifts instead of one lift to full height. Constructing levees in multiple lifts, over soft or unstable foundation materials, is common practice when building levees. This method loads the foundation more slowly and lessens the chances for major foundation failures. These lifts are often as thin as two to five feet and can be repeated as often as required.

#### 4.5.6 Other Questions, Questions 8 to 11, May 9, 2003 letter.

These questions are addressed as part of the response to questions 1 to 3. The nature of questions 1 to 3 and 8 to 11 involves the ability of the dredge to pump clay materials.

#### 4.5.7 Other Questions, Question 12, May 9, 2003 letter.

*"What in the dredging industry is normal practice with respect to maintenance of a dredge?"*

Most dredging companies and larger dredges have maintenance policies that govern the day-to-day maintenance activities. Most dredges have a man classified as a "chief engineer" who is responsible for the maintenance of the dredging engines and working machinery and in some cases the work on the deck also. Some have a deck captain or captain responsible for the repairs outside of the engine room.

Additionally, the standard of care for dredging companies is that they usually have an established policy for major maintenance of key items such as main engines, gear boxes, pump bearings, etc. These policies ensure that the equipment is thoroughly inspected on a weekly or monthly basis to detect any trends of wear or unusual noise or vibrations. Early detection of wear problems or vibrations can often prevent failure and can serve as a guide as to what parts need to be ordered and when to establish a time for routine maintenance. Maintenance and repair logs are standard practice to help the dredging contractor keep records of maintenance cycles, when to conduct major maintenance events, etc.

The maintenance of the engines and machinery is usually done on a routine basis, either weekly or semi-monthly depending on the dredge and type of machinery. Some dredge companies shut down on Sunday and use this day for maintenance of the engine room, others schedule routine maintenance on a weekly basis where they make repairs to pipeline, pumps, and other equipment, and then start to dredge when the repairs are complete. Oil pressures and temperatures are often checked and recorded on an hourly basis and are reviewed by the chief engineer daily.

It is not unusual for machinery to start to fail long before it actually fails and it is the responsibility the dredge superintendent or operator to have spare repair parts on hand for these items. Dredges usually have spare pump and cutter parts on hand and on the

job site as well as water and oil pumps for the engines. Main pump shafts and reduction gears do not normally need replacement but if there are signs that one of these is showing abnormal wear, replacement parts are usually ordered and on hand prior to the actual failure of the part.

A. *"What is normal practice regarding preventative maintenance?"*

The dredge engine room typically has a checklist of items to be monitored on a regular basis, either hourly or daily. The oil pressures and engine temperatures are two of the more critical items to be checked and monitored. The changing of oil in the engines and the greasing of bearings is done on a regular and routine basis (i.e., daily). These items are the main preventative maintenance work. Additionally, preventive maintenance involves keeping a good record of maintenance and repair work to help schedule major maintenance events, and to understand how the job conditions are affecting the dredge equipment.

B. *"What is normal practice regarding planned or scheduled maintenance?"*

Each dredge and dredging company has its own policies regarding maintenance; however, planned minor maintenance is typically performed on a daily or weekly basis and major maintenance on a monthly or as needed basis. Each dredging job is different and for some, the main pumps must be overhauled on a more regular basis (e.g., weekly) due to extreme wear from sand and gravels. During some jobs where the material to be dredged is less abrasive, such as muds and clays, the main pumps are not a major wear item. As stated previously, monitoring of engine and mechanical items will usually reveal which items are showing signs of failing and it is up to the maintenance supervisor to make repairs when needed or to order replacement parts for these wear items to prevent excessive downtime

C. *"What is normal practice regarding major overhauls?"*

Major overhauls are normally scheduled to cover hull drydocking and maintenance of the main engines, overhaul of the winch bearings, brakes, frictions, reduction gears, shafts and bearings. All parts on dredges do not wear at the same rate, which means that the dredge owner sets their own maintenance schedule. It is not unusual to wait until the end of a job before scheduling major overhauls. The maintenance

and/or replacement of the dredge pumps, cutter, and deck discharge pipes are performed on an as-needed basis and as such are not usually considered as scheduled maintenance, but are treated as job maintenance to be performed on an as-needed basis.

#### 4.5.8 Other Questions, Question 13, May 9, 2003 letter.

*"What if any maintenance plan did Renda Marine have for the dredge Millennium and did Renda Marine adhere to that plan during the period of the Upper Bayou Project?"*

I have reviewed the Renda Marine Report of Operations, daily reports, and other available records and did not find documentation of a maintenance program or plan. I would expect that the Renda Marine Report of Operations would make mention of planned maintenance, but there was no mention of maintenance activities in the records kept by Renda Marine.

#### 4.5.9 Other Questions, Question 14, May 9, 2003 letter.

*"Were the cutterhead/teeth on the dredge Millennium the most suitable for the Upper Bayou Project? If not, why not? What type of cutterhead/teeth would have been better suited to conditions in the Houston Ship Channel, i.e., more effective, and why?"*

The cutter used on the dredge *Millennium* was a *"Vosta"* cutter, designed and built by a Dutch firm. This cutter is not a well known cutter in the United States but it is considered to be a well designed cutter in the dredging industry and suitable for dredging several types of material.

There are different types of teeth that can be used with this cutter: pick points for rock, wide flare for sands and muds, and various widths of teeth for cutting clays of various stiffness. Based on the capabilities of this cutter and the site conditions, my opinion is that the cutter was suitable for the majority of this job. The Renda Marine Report of Operations does not indicate that the contractor had difficulty in "cutting" or loosening the material to be dredged.

However, the teeth on the cutter have a tendency to gather the wire rope and other long debris items more readily than a smooth edge cutter. This causes a tendency to plug the

cutter more than a smooth edge. The smooth edge, however, is often not always the best edge for clays as it tends to cut the clay into larger "slabs" which sometimes have difficulty in passing the tight clearance in the 4-vane impellers in the pump, and creates larger "clay balls."

As previously discussed, the main problem Renda Marine encountered was the inability to pump the clay the required distance due to the lack of adequate pump pressure. The attached production curves (previously presented) and examples show that the dredge *Millennium* pumping system did not provide adequate pressure to pump the clays from the Flare Area to the required location on the levees except at a greatly reduced rate of production. In my opinion, changing cutters would not have improved the ability of the dredge to pump those required distances.

#### *4.5.10 Other Questions, Question 15, May 9, 2003 letter.*

> *"Identify any deficiencies in the electrical and mechanical systems and controls for the dredge Millennium and assess the impact of any such deficiencies upon the productivity of the dredge."*

The records indicate that the electrical control panels were not initially watertight or protected from moisture. The electrical contractor who installed the system made strong recommendations that this be changed and did install heaters to protect the control boards.

Records (personal communications with Leon Hrabovsky in June 2003) also indicate that some of the winches were not properly assembled initially, which resulted in below normal winch speed pull, and production. This condition was discovered and corrected early in the job and there was no further mention of winch problems in the Renda Marine Report of Operations.

Based on a review of the dredge design and my experience, it appears that the main pump on the dredge was not designed to absorb the horsepower available from the main pump engine when the dredge was working on long lines with a low pipeline velocity (see Appendix H). It would have been a better dredge system design for the pump to be inefficient on short pipelines and more efficient on the longer pipelines. The

Renda Marine Report of Operations does not indicate that this was ever corrected with the result that the dredge did not generate adequate pump pressure for pumping clay on long lines (i.e., over 8,000 feet).

### *4.5.11 Other Questions, Question 16, May 9, 2003 letter.*

> *"What, if any, equipment did the dredge Millennium have to monitor the nature of the material it dredged? Was the dredge Millennium equipped with flow and/or density meters or gauges for that purpose? If so, did the flow/density equipment function properly? If not, what effect would that have upon dredge operations?"*

Mr. Ben Goodloe, one of the Renda Marine superintendents on the job, and Mr. Leon Hrabovsky of Gahagan and Bryant, stated that the dredge *Millennium* had both a velocity meter to monitor the discharge velocity and concentration meter for monitoring the specific gravity of the mixture being pumped (personal communications with Ben Goodloe and Leon Hrabovsky in December 2003). This equipment is difficult to calibrate and requires constant maintenance. Unless Renda Marine had a competent person assigned to this task, it likely did not function all the time or accurately.

Furthermore, Mr. Goodloe stated in my conversation with him that he was not sure whether the monitoring equipment was always operational. If the monitoring equipment was not working properly, the dredge operator would not have a good indication of pipeline velocity or solids concentration being pumped which reduces the ability of the dredge operator to optimize dredging production.

This type of monitoring equipment does not tell a dredge operator the nature of the material being pumped. Renda Marine did not have an instrument method to determine the type of material being pumped. Usually, the dredge operators use a radio to talk to the workers at the discharge end of the pipeline. This method for determining the nature of material being pumped is fairly standard and it is important for the dredge operator to be in fairly constant contact with the crew at the discharge end of the pipe and request information regarding the velocity and the type of material being pumped in order to optimize dredging.

### 4.6 Additional South Ferry and Obstruction Claims Questions, October 24, 2003 letter

This section presents the response to questions asked per the DOJ letter dated October 24, 2003 as requested below. These questions relate to the South Ferry Landing Claim and the Obstruction Claims.

*"Whether any of the things listed below allegedly encountered by Renda Marine in the course of dredging would be considered unusual in nature and materially different from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract in this case, i.e., new work dredging in an urban, commercial marine setting, such as the Houston Ship Channel:"*

The following responses to questions regarding deepening of the Houston Ship Channel are based on information from the contract, the drawings and specifications, the Renda Marine Report of Operations and daily reports, my site visits to the project site, and experience in hydraulic dredging.

1. *Shore protection material (rubble and riprap) in the vicinity of the South Ferry Landing.*
The drawings indicate riprap and rubble on the north ferry landing and the specifications warn of the presence of slope protection on the south side (Section 02482 Dredging, paragraph 3.5.2 Side and End Slopes). Site visits (June and August 2003) to the South Ferry Landing revealed the presence of slope protection along the road and on the face of the landing. The presence of this material near the top of the dredge slope is not considered unusual.

2. *Rubble and riprap in the vicinity of the Oxy-Chem Docks.*
A site visit to this area (June and August 2003) revealed the presence of shore protection on the exposed banks. This is an old industrial area and a reasonably prudent contractor would assume that some of the shore protection materials could have migrated into deeper water and might be encountered in the widening and deepening of this area.

3. *A dredge (30") stern swivel assembly*
This channel has been dredged for deepening and maintenance work for approximately 100 years. Major deepening and maintenance commenced about 50 years ago with ongoing maintenance dredging in this area usually around a 5-year cycle. It is not

considered usual for a contractor to lose a "stern" swivel by accident or to discard a worn out swivel, however, it is understandable. The presence of this swivel should not have presented a major problem to Renda Marine. Most reasonably prudent contractors with larger hydraulic dredges have a floating crane as part of the attendant plant that can be quickly brought to the site to take care of obstructions and larger debris that the hydraulic dredge cannot handle. A prudent dredge operator typically would simply leave the obstacle on the bottom and wait for the floating crane to pick up the obstacle, or immediately notify the construction manager to determine how to dispose of the obstacle(s). The specifications (Section 02482 - Dredging, paragraph 3.4.4.2 Debris) states:

> *"Prior to dredging, the contractor shall carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the contractor deems suitable to locate any debris which may interfere with dredging operations"*

*4. A Conex steel container box*

The presence of a Conex box is considered unusual based on my experience. The presence of a Conex box, however, should not have had a significant impact to the dredging operations. The horsepower on the cutter per the dredge specifications is 650; the nominal horsepower on a new D-8 tractor is approximately 310. The horsepower and the weight of the cutter-ladder assembly should be able to move a Conex box out of the way with little effort without damaging the cutter, reduction gears, and drive train. A reasonably prudent contractor, once encountering the Conex box, would dredge around the obstruction, mark the obstruction for later removal by a floating crane, and notify the USACE construction manager. It is my understanding that this scenario is what occurred in this instance.

*5. A steel mooring buoy and anchor chain.*

A 100-year old navigation channel is likely to have old channel-marker buoys or mooring anchor buoys left behind due to some historical event that caused the buoy to sink. I have encountered sunken buoys on several occasions in my career and am aware of other similar instances. Anchor chain and sunken buoys are not considered unusual to find during dredging operations in active navigation channels. The dredge operator should mark the location of the obstacle and then work around it, leaving the buoy, chain, and anchor to be removed by a floating crane.

*6 and 7. Pieces of steel scrap, iron bars, steel plate scrap*

These miscellaneous metal debris are common along the banks of old navigation channels especially in the vicinity of old industrial facilities. This channel was being widened by approximately 100 feet on both sides of the channel and a reasonably prudent contractor would have assumed that these widened areas would likely contain significant debris. The presence of metal debris is not considered unusual.

*8 and 9. Anchors, anchor chain, and cable*

These items are continuously being lost along navigation channels due to various circumstances. Channel markers that designate the edges of the channel usually mark ship channels. These marker buoys are usually installed by the Coast Guard or other government agency and are sometimes lost without being retrieved. The channel marker buoys are placed on the edges of the channel so that it will not become a hazard to navigation if it sinks. Some areas within a navigation channel have barge-mooring buoys placed outside of the channel that sink or are lost due to various reasons. These items also do not usually present navigation hazards and are often not retrieved. In addition, dredges have performed maintenance dredging on this reach of channel on numerous occasions, and it is not uncommon to lose anchors and chain used to hold the dredge plant or the pipelines in place.

Sunken buoys, lost chain, and anchors would be expected to be within the dredging prism and should be expected by a reasonably prudent contractor. All of this debris material is considered not unusual in nature. Encountering this type of debris is typically not a significant problem as the dredge can locate the object, work around the object for the time being, and then return to complete the missed area after the object has been removed.

*10. Heavy industrial construction demolition materials.*

Significant quantities of heavy industrial construction demolition materials would not be considered common within the dredge prism, with the exception of materials used as slope protection in areas such as the South Ferry Landing and the exposed and shallow shoreline in the area below the Carpenter Bayou. This is an old shipping and barging

channel, however, and a reasonably prudent contractor would be prepared to deal with any type of debris, by having a floating crane to handle larger debris and obstructions.

*11. Tires.*

Tires are a problem on every waterway that I have worked on and are considered common within waterways, and especially waterways that are close to an urban center. Tires do not necessarily end up in a location by falling off a barge or by being thrown from the bank. Tires tend to float and move with the current and tides to eventually sink in unpredictable locations. Some tires are lost from vessels that use them as fendering systems (i.e., tires are tied to the sides of barges, tugs, or other vessels to prevent damage to the vessel and/or berth structure from mooring operations), others float in from tributaries/creeks that flow into the main channel. A large hydraulic dredge usually can handle the tires easily, however time is lost to clean tire debris off of the cutter and out of the pumps. I have worked on projects where as many as 10 tires per shift were encountered. The dredge daily logs did not note an abundance of "tire cleanings." A reasonably prudent contractor would expect to encounter tires occasionally.

## 5 COMPENSATION

The following labor rates represent fully loaded hourly rates for each labor skill classification. My billing rate is at the Principal Engineer rate of $160/hour for study and testifying work.

| | |
|---|---|
| Principal Engr/Plan/Sci | $160 |
| Consulting Engr/Plan/Sci | $145 |
| Sr. Engr/Plan/Sci | $130 |
| Engr/Plan/Sci | $110 |
| Sr. Staff Engr/Plan/Sci | $97 |
| Staff Engr/Plan/Sci | $78 |
| Assistant Engr/Plan/Sci | $65 |
| Sr. Design/GIS/Database | $97 |
| Design/GIS/Database | $78 |
| Project Assistant | $55 |
| Administrative | $55 |

## 6 REFERENCES

Department of Justice, April 2003. CD ROM RM-GBA-00001-RM-GBA-00140 Job: 030241, Boxes: 001 to 008

Department of Justice, April 2003. CD ROM RM-HVL-00001-RM-HVJ-01747 Job: 100483, Boxes: 001 to 003

Department of Justice, April 2003. CD ROM RM-JSG-0001-RM-JSG-00606 Job: 030241, Box: 001

Department of Justice, April 2003. CD ROM RM-PHA-0001-RM-PHA-00871 Job: 040087, Box: 001

Department of Justice, April 2003. CD ROM RM-TCB-0001-RM-TCB-01735 Job: 030241, Boxes: 001 to 008

Department of Justice, February 2003. CD ROM RM-COE-19888-21559 Job: 120380, Box: 001

Department of Justice, February 2003. CD-ROM Contract Drawings.

Department of Justice, June 2003. CD ROM RM-COE-22744-2324 Job: 050446, Box: 001

Department of Justice, March 2003. CD ROM RM-COE-00001-RM-COE-05957 Job: 100483, Boxes: 001 to 003

Department of Justice, March 2003. CD ROM RM-COE-05958-RM-COE-11138 Job: 100483, Boxes: 004 to 005

Department of Justice, March 2003. CD ROM RM-COE-11139-RM-COE-18552 Job: 1004383, Boxes: 006 to 008

Department of Justice, March 2003. CD ROM RM-COE-18523-RM-COE-19887 Job: 100483, Box: 009

Department of Justice, March 2003. CD ROM RM-COE-21569-RM-COE-22692 Job: 020172, Box: 001

Department of Justice, May 2003. CD ROM RM-CHU-00001-001438 Job: 050444, Box: 001

Department of Justice, September 2003. CD ROM-Drawings, Pre- and Post Dredging Cross-Sections, Surveys, Volumes.

DuPont, A., October 1998. Letter to USACE concerning the evaluation of Dredge *Millennium* production capacity

Gahagan and Bryant, November 1999. Letter to USACE concerning the evaluation of Dredge *Millennium* production capacity

Leefe, Gibbs, Sullivan, April 2003. CD ROM RM-DSC-0001-RM-DSC-05684 Job: 030596, Boxes: 001 to 008

Lofgren, December 2003. Personal communication between Bob Lofgren and Leon Hrabovsky.

Lofgren, December 2003. Personal communication between Bob Lofgren and Ben Goodloe.

Lofgren, June 2003. Personal communication between Bob Lofgren and Leon Hrabovsky.

Mears, W., August 1999. Memorandum from to Robert Kite regarding the Upper Bayou Volumes, Station 520+00 to 550+65.99

Parsons Brinckerhoff, 2003. "PIPELINE" model. Proprietary model to calculate production rates for hydraulic dredges.

Renda Marine, 1999. "Dredge *Millennium* Accepted Proposal", letter to William J. Wetta II, from Eddie R. Fisher from Renda Marine Inc.

Renda Marine, 2001. "Certified Claim for Differing Site conditions South Ferry Landing Area, Dredge Station Nos. 470+00 to 472+00", Binder No. 1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.

Renda Marine, 2001. "Request for Equitable Adjustment (Revision No. 1) for Differing Site Conditions Damages and Delays Related to Obstructions in Channel (Station Nos. 570+00 thru 630+00)", Binder N0. 1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.

Renda Marine, 2001. "Request for Equitable Adjustment for Differing Site Conditions Damages and Delays Related to Obstructions No. 2 in Channel (Station Nos. 660+00 thru 685+00)", Binder No.1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.

Renda Marine, February 2003. CD-ROM Volume 1.

Renda Marine, February 2003. CD-ROM Volume 2.

Renda Marine, July 1999. Letter from Renda Marine to Mr. McClenan, Department of the Army, Galveston District Corps of Engineers.

Renda Marine Report of Operations

Renda Marine Daily Reports

Renda Marine Daily Production Reports

Turner, T.M., 1984. "Fundamentals of Hydraulic Dredging", Cornell Maritime Press.

Turner, T.M., 1996. "Fundamentals of Hydraulic Dredging", Second Edition, ASCE Press, 258 pp.

U.S. Army Corps of Engineers (USACE), 1998. "Houston-Galveston Navigation Channels, Texas (45-Foot Project), Specifications for Dredging the Upper Bayou", Department of the Army Galveston District, Corps of Engineers Galveston Texas, Invitation No. DACW64-98-B-004.

U.S. Army Corps of Engineers (USACE), 1998. Houston-Galveston Navigation Channels, Texas (45-Foot Project), Construction Drawings.

U.S. Army Corps of Engineers (USACE) Inspection Report of Dredging – Galveston District

# Figures