IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO LIMIT TESTIMONY BY PLAINTIFF'S EXPERTS

Defendant, the United States, respectfully requests that the Court limit the scope of testimony of the three trial experts designated by plaintiff, Renda Marine, Inc. (Renda) – Christopher C. Mathewson, Ph.D., P.E., Robert McCullough, P.E., and Mr. Benton Goodloe – in the manner and for the reasons stated below.

The Court "acts as a 'gatekeeper to exclude expert testimony that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case." Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1391 (Fed. Cir. 2003). Under Fed.R.Evid. 702,[1] the Court is assigned the task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)). Rule 702 applies not only to scientific testimony but also to expert testimony based on technical or other specialized knowledge. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147-49 (1999).

[1] Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The Court's gatekeeping responsibility is two-fold. First, the Court "must determine whether the proffered testimony rests on a reliable foundation – that is, whether the expert's testimony is 'ground[ed] in the methods and procedures of science' and consists of 'more than subjective belief or unsupported speculation.'" Donnelly v. Ford Motor Co., 80 F.Supp.2d 45, 48 (E.D.N.Y. 1999) (quoting Daubert, 509 U.S. at 590). "Ultimately, it is the role of the trial court as gatekeeper to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Donnelly, 80 F.Supp.2d at 49 (quoting Kumbo Tire, 526 U.S. at 152).

The second part of the Court's gatekeeping responsibility is "to determine whether an expert's testimony is 'relevant to the task at hand,' namely, whether the expert's reasoning or methodology can be properly applied to the facts before the court." Donnelly, 80 F.Supp.2d at 49. In order to determine whether the expert's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702, "the testimony must not only be reliable but must be relevant in that it 'fits' the facts of the case." Donnelly, 80 F.Supp.2d at 49 (quoting Daubert, 509 U.S. at 591).

A. Christopher Mathewson, Ph.D., P.E.

(1) Opinions Re: Legal Matters

The written report of Dr. Mathewson, pursuant to RCFC 26(a)(2)(B), contains opinions regarding four of Renda's Flare Area, South Ferry Landing, Section 7 Clay, and Lost Lake Levees claims. Mathewson Report, at 1-3, Def. App. 1-3.[2] Dr. Mathewson opines that each of those

[2] "Def. App. ___" refers to the referenced page(s) of the appendix to this response.

"sites" "represents a true differing site condition in which the contract documents failed to report the actual natural or man-made condition." Mathewson Report, at 3, Def. App. 3. Whether a condition encountered by a contractor, such as Renda, constitutes a "differing site condition" turns upon whether the conditions indicated in the contract differ materially from those actually encountered during performance. See, e.g., Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002). "The issue of the indications in the contract is one of law for decision by the tribunal, not an issue of fact to be proven by a preponderance of expert testimony . . . ." Foster Construction C.A. & Williams Brothers Co. v. United States, 193 Ct. Cl. 587, 602, 435 F.2d 873, 880 (1970).

Expert testimony upon legal matters is inadmissible. Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003); accord Christiansen v. City of Tulsa, 332 F.3d 1270, 1283 (10th Cir. 2003) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts."); Stearns Co., Ltd. v. United States, 34 Fed. Cl. 264, 268-69 (1995) (expert testimony that reaches legal conclusions admissible only where testimony concerns state law or a technical provision peculiar to the industry). The Court, therefore, should not receive, much less consider, Dr. Mathewson's legal conclusion that Renda's Flare Area, South Ferry Landing, Section 7 Clay, and Lost Lake Levees claims constitute "true differing site condition[s]."

(2) Opinion Re: "Impossible" Construction Condition

The discussion of the Lost Lake Levees claim contained in Dr. Mathewson's report states, in part: "Under the actual conditions at the Lost Lake Placement Area, Renda Marine could not construct the desired levee to +30 ft until the low strength, fluid materials were displaced from

the foundation of the proposed levee and the high strength materials could be placed to form the foundation. The presence of the buried and unreported 'side cast borrow areas' resulted in an impossible condition that was not indicated in the construction documents." Mathewson Report, at 2, Def. App. 2. Dr. Mathewson's opinion that the presence of side-cast borrow areas made it impossible to construct the new perimeter levees at the Lost Lake Placement Area to the specified dimensions and grade does not rest upon a reliable foundation and, thus, the Court should exclude it.

At his deposition, Dr. Mathewson testified that he determined that the side-cast borrow areas resulted in an "impossible condition" for construction of the levees to be built by hydraulic placement of dredged material "[b]ecause of the properties of the . . . soft materials given in the [contract soil boring logs] and the way in which it was loaded and the height at which it was loaded and the speed with which it was loaded and the presence of significant pressure head on . . . the water system." Tr. 159(7-14),[3] Def. App. 17. He also testified that the "impossible condition" resulting from the side-cast borrow areas was that they "created a break in the harder desiccated surface and allowed the shear stresses to escape against an area that had lower shear strength." Tr. 158(8-12), Def. App. 16.

Dr. Mathewson, however, did not perform any calculations or tests in support of those opinions. Tr. 157(20-22); 158(5-7), Def. App. 15, 16. Dr. Mathewson did not perform a side-slope stability, settlement, subsidence, or displacement analysis. Tr. 157(23-25); 158(1-4, 20-23), Def. App. 15, 16. When asked what the dimensions of the side-cast borrow areas were,

---

[3] "Tr. ____(____)" refers to the referenced page(s) and line(s) of the transcript of the expert's deposition.

he replied: "I have no idea." Tr. 164(3-5), Def. App. 20. Dr. Mathewson could not state how deep or wide the side-cast borrow areas were or even whether they ran continuously along the footprint of the hydraulically-constructed levees. Tr. 162(23-25)-163(1-6); 164(7-10), Def. App. 18-19, 20. He does not know what type of equipment was used to excavate the side-cast borrow areas, e.g., a backhoe or a drag line. Tr. 163(9-13), Def. App. 19. Dr. Mathewson testified that some parts of the hydraulically-constructed levees "probably" were stable, but he could not state which parts of the levees were stable and which parts were unstable. He testified: "I have not investigated it that close." Tr. 176(9-17), Def. App. 21.

Dr. Mathewson admits that he has never designed or even participated in the design of a dredged material disposal facility, such as the Lost Lake Placement Area. Tr. 85(3-8), Def. App. 11. He has no experience with the design of levees or dikes for dredged material disposal facilities or the design of structures for soft foundations, including earth structures. Tr. 85(9-14, 21-25)-86(1-4), Def. App. 11-12. Dr. Mathewson, moreover, has never acted as a consultant with respect to the design or construction of a levee or a dike for a dredged material disposal facility or a structure upon a soft foundation. Tr. 89(25)-90(1-3, 11-14), Def. App. 14-14A. When asked whether he has any experience with the construction of dredged material disposal facilities, Dr. Mathewson testified: "Not direct experience that I could identify." Tr. 88(13-15), Def. App. 13. The only experience that Dr. Mathewson appears to have had with the design or construction of levees is the design of "small," three-foot-high surface-water-control diversion "berms" at a sanitary land-fill constructed with mechanical methods upon firm foundations, Tr. 32(14-25)-33(1-6), Def. App. 9-10, and some "small levees" that were part of a project to create a wetland for the treatment of wastewater. Tr. 88(15-25)-89(1-5), Def. App. 13-14.

Although Dr. Mathewson has testified as an expert in judicial or administrative proceedings in the past, he has never been qualified by a court or an administrative entity as an expert with respect to the design of dredged material disposal facilities, such as the Lost Lake Placement Area, the design of levees or dikes for dredged material disposal facilities, the design of levees or dikes in general, or the design of structures for soft foundations. Tr. 86(5-21), Def. App. 12. Dr. Mathewson's opinion that side-cast borrow areas at the Lost Lake Placement Area resulted in an "impossible condition," therefore, is not sufficiently reliable to assist the Court in understanding the evidence and it should be excluded.

B. Robert McCullough, Jr., P.E.

The written report of Robert McCullough, Jr., sets forth opinions with respect to the interpretation and application of two regulations: EFARS 52.231-5000 and FAR 31.205-47(f)(1). See McCullough Report, at 4, 5, 7-10, 12, 14, 15, 17-18, Def. App. 25, 26, 28-31, 33, 35, 36, 38-39. As discussed above, expert testimony upon legal matters is improper. In Rumsfeld v. United Technologies Corp., 315 F.3d 1361(Fed. Cir. 2003), the issue involved the correct interpretation of Cost Accounting Standards CAS), which are Federal regulations. In approaching that task, the Federal Circuit stated: "The views of the self-proclaimed CAS experts, including professors of economics and accounting, a former employee of the CAS Board, and a government contracts accounting consultant, as to the proper interpretation of those regulations is simply irrelevant to our interpretive task; such evidence should not be received, much less considered, by the Board on the interpretive issue. That interpretive issue is to be approached like other legal issues–based on briefing and argument by the affected parties." Id. at 1369 (footnote omitted). Therefore, Mr. McCullough's opinions regarding the correct interpretation of EFARS 52.231-5000 and

FAR 31.205-47(f)(1), as well as their application in the circumstances of this case, should not be received, much less considered.

In addition, Mr. McCullough's report is replete with opinions that Renda's claims are "valid and compensable" by the Government in a certain amount and that Renda is "entitled" to additional compensation of stated amounts. See McCullough Report, at 3, 5, 8, 10, 13, 15, 18, 24, Def. App. 24, 26, 29, 31, 34, 36, 39, 45. Again, these legal opinions should be disregarded, inasmuch as they "state legal conclusions drawn by applying the law to the facts." Christiansen, 332 F.3d at 1283.

C. Benton Goodloe

The report of Benton Goodloe, a Renda employee, states, with respect to Renda's Lost Lake Levees claim: "There was not sufficient clay to be dredged on the [Upper Bayou Project] to construct the Lost Lake Placement Area levees. The foundations for such levees were so soft that the clay and other suitable materials that Renda attempted to place hydraulically displaced so much muck that it was not possible under the circumstances to build the levees to the design template. . . . Renda property [sic] hydraulically placed the clay, but due to causes beyond Renda's control, the levees could not be built as designed." Goodloe Report, at 2, Def. App. 48.

Mr. Goodloe is not qualified to provide opinion testimony as to the sufficiency of the design of the levees at the Lost Lake Placement Area, i.e., "that it was not possible under the circumstances to build the levees to the design template" or that "the levees could not be built as designed." Mr. Goodloe attended a junior college for two years where he studied "engineering." Tr. 38(24-25)-39(1-6), Def. App. 56-57. He does not have a college degree. Id. The only licenses listed in his curriculum vitae are a Coast Guard towing license and "a private pilot license

with instrument rating." Goodloe Report, at 3, Def. App. 49.

Mr. Goodloe has been in the dredging business for about 33 years. Tr. 39(9-11), Def. App. 57. He was employed by Parkhill Goodloe, a family-owned dredging business, from the early 1970s to 1988, Tr. 40(18-22), Def. App. 58, then by Norfolk Dredging Company from 1988 to 1992, Tr. 42(18-20), Def. App. 60, then by Pine Bluff Sand & Gravel for two years, Tr. 43(12-16, 23-25), Def. App. 61, then by T.L. James from 1995 to about 1998, Tr. 44(16-24); 45(7-10), Def. App. 62, 63, and then by Weeks Marine for about two years until 2000 when Mr. Goodloe took a position with Renda. Tr. 44(24-25)-45(1-6), Def. App. 62-63. During that 30-year span of time, Mr. Goodloe's experience with the construction of levees was limited to one project in Kingsbay, Georgia, when he was employed by Parkhill Goodloe, where "you had to construct some levees" and, during the construction of Interstate 95, there were "some projects going on" that had a "little bit of levee work in it" but Mr. Goodloe "wasn't involved with it a lot." Tr. 41(17-25)-42(1-8), Def. App. 59-60. Mr. Goodloe was not involved with construction of levees at dredge disposal sites when employed by Norfolk Dredging Company, Pine Bluff Sand & Gravel, T.L. James, or Weeks Marine. Tr. 43(8-11); 44(11-15); 45(21-24), Def. App. 61, 62, 63.[4/] According to Mr. Goodloe: "There hasn't been a whole lot of levee construction – hydraulic levee construction that I know about going on." Tr. 45(24-25)-46(1), Def. App. 63-64.

Mr. Goodloe, therefore, does not have the education, training, or experience with design or construction of levees – especially hydraulically-constructed levees at dredged material disposal facilities such as the Lost Lake Placement Area – to be qualified as an expert with respect to

[4] At Weeks Marine, where Mr. Goodloe worked immediately prior to his employment with Renda, he managed a Florida beach coast construction project and "some maintenance dredging" on the Mobile River for the Corps of Engineers Mobile District. Tr. 46(18-22), Def. App. 64.

the design or construction of levees. Mr. Goodloe's opinions that "it was not possible under the circumstances to build the [Lost Lake] levees to the design template" and that "the levees could not be built as designed," thus, are not sufficiently reliable to assist the Court in understanding the evidence and they should be excluded.

For the foregoing reasons, defendant's motion to limit the scope of testimony of plaintiff's trial experts Christopher Mathewson, Ph.D., P.E., Robert McCullough, Jr., P.E., and Mr. Benton Goodloe should be granted and the Court should exclude the inappropriate aspects of their opinion testimony discussed above.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

MAY 12, 2004

# DEFENDANT'S APPENDIX

# INDEX TO DEFENDANT'S APPENDIX

**Document** **Page**

Report of Christopher C. Mathewson, Ph.D., P.E. dated January 26, 2004 .................. 1

Excerpts from transcript of deposition
of Christopher C. Mathewson, Ph.D., P.E., on April 14, 2004 ......................... 4

Report of Robert McCullough, Jr., dated March 3, 2004 (without exhibits)................ 22

Report of Benton Goodloe dated January 27, 2004 ..................................................... 47

Excerpts from transcript of deposition of Benton Goodloe on January 13, 2004 ......... 50

# CHRISTOPHER C. MATHEWSON, PhD, PE, REG

**Engineering Geologist**

**1307 Glade Street**

**College Station, TX 77840**

Phone: ......979-845-2488 FAX: ......979-847-9313 E-mail: .......mathewson@geo.tamu.edu


26 January 2004

Brian W. Erikson
Qulling, Selander, Cummiskey & Lownd
2001 Bryan Street, Suite 1800
Dallas, TX 75201

Re: Renda Marine, Inc. *vs.* United States, Case Number 02-306C, United States Court of Federal Claims

Dear Mr. Erikson,

At your request I have evaluated the changed conditions claims filed by Renda Marine related to the dredging of the Houston Ship Channel. The project area includes dredging between Stations 684+06.58 and 470+00, shown as the "Upper Bayou" on the Location Plan (Map C-1), and the construction of a dredged material confinement levee at the Lost Lake Placement Area. You have asked me to limit my evaluation to four specific sites defined in this project. These sites are:

1. Flare Area (STA 520+00 – STA 550+65.99)
2. South Ferry Landing (Section 1, STA 470+00 – STA 480+16.77)
3. Section 7 (Approximately STA 565+00 and 580+00)
4. Lost Lake Placement Area Levees

The professional opinions expressed in this report are based upon a review made on Thursday, 15 January 2004, in Dallas, Texas of the contract documents that were provided to me with further review of these documents made in College Station.

1. The Flare Area: My review and evaluation concurs with the opinions expressed by the Corps of Engineers and Renda Marine in that the subsurface geological and engineering properties were not accurately represented in the boring logs and soil descriptions provided to Renda Marine when they bid the project. As a result, Renda Marine could not predict, anticipate or expect to encounter the "stiff clay" which resulted in reduced dredging productivity and increased operational time to place and handle the dredged materials at the Lost Lake Placement Area.

2. South Ferry Landing: The project drawings do not include any specific information about the bathymetric or submarine conditions of the South Ferry Landing area while they include a detailed map of the North Ferry Landing area (Map C-6). The North landing area is actually outside the limit of the dredging project. The incorporation

of the bathymetric data for the North Lynchburg Landing in the contract documents provides unnecessary and misleading information about the dredging conditions to be anticipated at the South Lynchburg Landing. The complete lack of information or data about the conditions at the South Ferry Landing area, with respect to rubble, shore protection structures, navigational aids or other submarine conditions, strongly suggests that these conditions do not exist in the area. As a result, Renda Marine should not have anticipated the existence of anything other that the naturally occurring Earth materials in this area of the project, except for possible minor amounts of undocumented trash and debris.

3. Section 7: Renda Marine encountered a "very stiff red clay" while dredging in Section 7, approximately between Stations 565+00 and 580+00. The presence of a "red clay" indicates that the dredging operation encountered sediments that are most-likely Pleistocene (Glacial) in age. These sediments, which were exposed to the atmosphere and oxidized during the low stand of sea level, experienced an increased confining pressure through desication, that produced higher strength materials than the Recent marine sediment shown in the contract documents. Because these "red clays" have higher shear strength than the younger marine clays, the dredging effort required to remove these materials is significantly greater than that required to remove Recent marine clays. These "red clays", however would be a superior material for the construction of the foundation for the levees at the Lost Lake Placement Area.

4. Lost Lake Placement Area Levees: The contract documents indicate that the geotechnical characteristics of the materials in the interior perimeter of the Lost Lake Placement Area have low shear strength and that the Atterberg limits of these materials lies between the Liquid Limit (viscous fluid) and the Plastic Limit (plastic material). There are no notes or other information to indicate that the dredged material in the perimeter area was previously "mined" to produce material to rebuild and improve the existing levees around the area. An analysis of the date of sampling indicates that the mining operations occurred recently, after the date of drilling and geotechnical testing, and therefore the geotechnical properties of the foundation materials in the Lost lake Placement Area are significantly weaker than suggested in the contract documents. As a result, Renda Marine experienced significant amounts of "material loss" through the displacement of the low strength dredged material that had refilled the recently mined areas. Hydraulic dredging construction methods, which were specified for much of the levee project, would further decrease the shear strength of the underlying dredged material by increasing the pore-water pressure and decreasing the effective strength of these saturated clays and silts. Under the actual conditions at the Lost Lake Placement Area, Renda Marine could not construct the desired levee to +30 ft until the low strength, fluid materials were displaced from the foundation of the proposed levee and high strength materials could be placed to form the foundation. The presence of the buried and unreported "side cast borrow areas' resulted in an impossible condition that was not indicated in the construction documents.

Thank you for the opportunity to review and evaluate the provided materials and to provide my opinions concerning the differing site conditions at the Flare Area, South Ferry Landing, Section 7 and the Lost Lake Placement Area Levees. It is my opinion that each of these sites represents a true differing site condition in which the contract documents failed to report the actual natural or man-made condition.

Please feel free to contact me should you have any questions or desire a more extensive review and evaluation.

Sincerely yours,

C.C. Mathewson

Christopher C. Mathewson, PhD, PE, REG
Engineering Geologist

encl: Vitae

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., Plaintiff, | ) | |
| | ) | No. 02-306C |
| VS. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, Defendant. | ) | |

---

ORAL DEPOSITION OF

CHRISTOPHER MATHEWSON

April 14, 2004

---

ORAL DEPOSITION OF CHRISTOPHER MATHEWSON, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on April 14, 2004, from 9:04 a.m. to 5:35 p.m., before Gloria Carlin, CSR No. 498 in and for the State of Texas, reported by Stenographic method, at the offices of Quilling, Selander, Cummiskey & Lownds, 2001 Bryan Street, Suite 1800, Dallas, Texas, pursuant to the Rules of the Federal Court of Claims and the provisions stated on the record.

Job No. 040414GJC

CERTIFIED COPY

A P P E A R A N C E S

FOR THE PLAINTIFF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

FOR THE DEFENDANT:

John E. Kosloske, Esq.
CIVIL DIVISION
DEPARTMENT OF JUSTICE
1100 L Street NW, Room 12052
Washington, D.C. 20005

ALSO PRESENT:

Oscar Renda
Barry L. Smith
William Connole, P.E.

## INDEX

Appearances . . . . . . . . . . . . . . . . . . . . 2

Stipulations. . . . . . . . . . . . . . . . . . . . 4

CHRISTOPHER MATHEWSON

Examination by Mr. Kosloske. . . . . . . . . . . 5
Examination by Mr. Erikson . . . . . . . . . . . 214
Re-Examination by Mr. Kosloske . . . . . . . . . 217

Signature and Changes. . . . . . . . . . . . . . . 219
Reporter's Certificate . . . . . . . . . . . . . . 221

## EXHIBITS



| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 1 | Letter 1-26-04 from Christopher Mathewson to Brian Erikson and Curriculum Vitae | 12 | 13 |
| 2 | Subpoena | 93 | 93 |
| 3 | Letter 7-18-03 from Christopher Mathewson to John Kosloske | 93 | 93 |
| 4 | Upper Bayou Dreding Drawings | 96 | 96 |
| 5 | Specifications for Dredging Upper Bayou | 99 | 100 |
| 6 | Amendment of Solicitation | 99 | 100 |
| 7 | Differing Site Conditions Clause | 101 | 101 |
| 8 | Certified Claim (Revised) | 102 | 103 |
| 9 | Letter 3-30-00 from Eddie Fisher to Corps of Engineers | 103 | 103 |
| 10 | Fax 5-15-01 from Barry Smith to Will Sanford | 104 | 104 |
| 11 | Amendment of Solicitation Modification of Contract | 104 | 104 |
| 12 | Fax 3-12-01 from Will Sanford to Tom Benero | 104 | 105 |
| 13 | Letter 4-16-01 from Steven Bowman to Thomas Benero | 105 | 105 |
| 14 | Transmittal 6-2-00 from Alan Jefts to Patrick Kuhne | 106 | 106 |
| 15 | Stiff Clay Percentages | 107 | 107 |
| 16 | Stiff Clay Percentages | 107 | 107 |

INDEX CONTINUED


| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 17 | Memo 7-13-00 from Eddie Fisher to Kenneth Machacek, Steve Bowman | 107 | 108 |
| 18 | Renda Marine's Fourth Supplemental Answers | 115 | 115 |
| 19 | Renda Marine's Second Supplemental Responses | 116 | 116 |
| 20 | Letter 3-25-04 from Christopher Mathewson to Brian Erikson | 119 | 119 |
| 21 | Drawing | 120 | 120 |
| 22 | Upper Bayou Hydraulic Levees | 120 | 122 |
| 23 | Logs of Borings | 123 | 123 |
| 24 | Memo 4-17-00 from Leon Hrabovsky to Al Jefts | 131 | 131 |
| 25 | Letter 10-13-99 from Eddie Fisher to Mike McClenan | 133 | 133 |
| 26 | Drawing | 161 | 161 |
| 27 | Letter 3-16-04 from Cheryl Moseley to John Kosloske | 182 | 182 |
| 28 | Photographs (1 - 98) | 183 | 183 |


REQUESTED DOCUMENTS/INFORMATION

| NO. DESCRIPTION | Page/Line |
|---|---|
| None | |

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| NO. | Page/Line |
|---|---|
| None | |

THE REPORTER: Pursuant to the Federal Rules of Civil Procedure?

MR. KOSLOSKE: The Rules of the Court of Federal Claims.

THE REPORTER: Would you raise your right hand, please?

Do you solemnly swear or affirm to tell the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes, I do.

THE REPORTER: Thank you.

CHRISTOPHER MATHEWSON,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. KOSLOSKE:

Q. Good morning.

A. Good morning.

Q. Dr. Mathewson, would you state your full name for the record and spell it, please?

A. Christopher Colville Mathewson, C-H-R-I-S-T-O-P-H-E-R, C-O-L-V-I-L-L-E, and Mathewson, M-A-T-H-E-W-S-O-N.

Q. And what is your residential address and telephone?

A. 1307 Glade, G-L-A-D-E, Street, College Station, Texas, 77840, and my home phone is (979) 693-5382.

groundwater, there's also road access, availability, cover material, layout of the various trenches, operating schedule, so it's a complete -- is it safe to dig the hole, dig the hole, put the waste in it, bury the material and make sure the waste doesn't escape. Make sure you have wet water -- wet weather access, dry weather operating conditions, so you've got to be concerned about weather, you've got to be concerned about the characteristics of the waste that you're handling, particularly in small rural landfills. You have no idea of how many barrels of arsenic Farmer Brown might want to throw in the landfill. So you're trying to control, at least notify and make the operators aware of what to look for.

Q. Did the design of the sanitary landfill require you to design a levee or a dike?

A. There were surface water control diversions, yes.

Q. Would you describe these structures?

A. They were basically low berms to redirect surface water around the landfill instead of into the site, including also the access roads down the ramp, but you had to be able to divert the surface water running down the ramp and you had to let trucks drive over them.

Q. What were the dimensions of these berms?

A. They were small.

Q. More specific.

A. More specific, maybe half the size of this table, the top. Eight foot wide at the base, three foot high and a flat enough top that they could get a lawn mower over it.

Q. And how were they constructed?

A. They were basically constructed mechanically, dozers.

Q. How would you describe the foundation, the soil foundation on which these berms were built?

A. They're on competent clays.

Q. What do you mean by "competent clays"?

A. The size of the structure built on the subsurface materials, there was no concern about landslides or stability.

Q. You didn't perform a stability analysis?

A. Didn't need to, no, based on the knowledge of the strength of the material.

Q. Who was the client for which you performed this site investigation and design of sanitary landfill?

A. Brazos County was one of them, Brenham was another, and I don't remember how many precincts in Brazos County, but basically we were trying to get the locals from dumping the trash in a ditch or in the creek.

Q. A few items below the item on page three, "Site investigation and design of sanitary landfill," a few items below that there's an item called, "Prediction of settlement

Q. Have you ever been on the dredge Millennium?
A. No.
Q. Have you ever designed a disposal facility for dredged material?
A. No.
Q. Have you ever participated in the design of a disposal facility for dredged material?
A. I don't recall.
Q. Have you ever designed a levee or a dike for a disposal facility for dredged material?
A. To my knowledge, no.
Q. Have you ever participated in the design of a levee or dike or a disposal facility for dredged material?
A. No.
Q. Aside from the small berms you mentioned in connection with the design of the landfill, have you ever designed a levee or dike of any kind?
A. That what, levee or dike that --
Q. Of any kind.
A. Oh, of any kind. Not that I recall.
Q. Have you ever designed a structure for a soft foundation?
A. By structure, you mean --
Q. I'll break it down. Have you ever designed a -- an earth structure for a soft foundation?

A. No.
Q. Have you ever designed a, say, a building that was to go on a soft foundation?
A. No. I'm not a design engineer.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of disposal facilities for dredged material?
A. No. Not that I recall.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of a levee or dike for a disposal facility for dredged material?
A. No.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of levees or dikes in general?
A. No.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of structures for soft foundations?
A. No.
Q. Do you consider yourself to be an expert with respect to the design of disposal facilities for dredged material?
A. No. Just -- I'll have to qualify that, counselor,

to?
A. The capability between the engineer's design and the capability of the landscape to support that design, would be the engineering geology of dredged material, both dredging operations, transporter operations and disposal operations, that's my field of expertise.
Q. Do you consider yourself to be an expert with respect to the design of structures for soft foundations?
A. As a designer, no, as an assessor of the relationship between the structure and the foundation, yes. Again, it's the engineering geology, not how big a footing do I use.
Q. What, if any, experience have you had with the construction of disposal facilities for dredged material?
A. Not direct experience that I could identify. I did while discussing -- remember one other project in which I was -- I acted as a design engineer that involved small levees, and this was the creation of a wetland for wastewater treatment. We had to excavate the ponds.
Q. When was that?
A. That would have been probably mid '90s. That was for TMPA.
Q. I'm sorry. What's TMPA?
A. Texas Municipal Power Agency. We were using a wetland to treat leachate from their -- their fly ash

disposal site, but it was kind of small --

THE REPORTER: From their what?

A. Fly ash disposal site, but it still falls into the small scale type structure. We might have had to levee it, the dam at the downstream end might have been five feet high.

Q. (BY MR. KOSLOSKE) Have you ever been qualified by a court or administrative agency as an expert with respect to the construction of disposal facilities for dredged material?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of a levee or dike or a disposal facility for dredged material?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of levees or dikes in general?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of structures upon soft foundations?

A. No. I believe you went through those questions earlier.

Q. Have you ever acted as a consultant with respect

to the design or construction of a levee or dike for a disposal facility for dredged material?

A. No, I don't believe I have.

Q. Have you ever acted as a consultant with respect to the design or construction of a levee or dike for any purpose?

A. Yes, those would have been the wetland for TMPA, the surface water control structures for the landfills, and some of the debris flow hazard production evaluations for the Wasatch Front in Utah.

Q. Have you ever acted as a consultant with respect to the design or construction of a structure upon soft foundation?

A. Not that I recall.

Q. Have you ever prepared a construction estimate of any kind?

A. Yes.

Q. What kind of estimate was that?

A. Those were for renovation estimates for the Geology Building, Michael T. Halbouty Geoscience Building, I was building property facilities manager, it was minor construction.

Q. Have you ever prepared an estimate for a dredging job?

A. Only with respect to the research on the

14A

A. No.
Q. Is it your opinion that a construction inspector is normally a person who's qualified to perform a vein/shear test?
A. I'm sure there's a qualified person in the Galveston district, so a construction inspector would have picked up a sample and said, "Renda says this stuff is different; is it?"
Q. Turn to the Lost Lake Levee claim, which is item four of your report, the discussion of it appears at the bottom of page two of your report that's marked Exhibit 1. Dr. Mathewson, do you agree that the contract documents for the Upper Bayou Project indicate the soil conditions along the footprint of the new perimeter levee were soft to very soft?
A. Yes.
Q. Now, you didn't visit the Lost Lake Placement Area before issuing your January 26, 2004, report; correct?
A. Right.
Q. Have you performed any calculations in evaluating the Lost Lake Levees claim?
A. No, I have not.
Q. Have you performed any side slope stability analysis?
A. No, I have not.

Q. Have you performed any settlement analysis?
A. No, I have not.
Q. Have you performed any subsidence analysis?
A. No, I have not.
Q. Did you perform or cause to be performed any testing relative to the Lost Lake Levees claim?
A. No, I did not.
Q. What was the impossible condition that resulted from the side-cast borrow areas?
A. The side-cast borrow areas created a break in the harder desiccated surface and allowed then the shear stresses to escape against an area that had lower shear strength.
Q. Is it your understanding of the design for the perimeter levee at the Lost Lake Placement Area of the Upper Bayou project area that the -- the new perimeter levee foundation was to be the existing layer or crust of foundation material at the site?
A. Yes. Was to be placed on top of that and built up from there.
Q. Did you perform a displacement analysis in connection with your evaluation of the Lost Lake Levees claim?
A. No, I did not.
Q. Wasn't the design of the hydraulically constructed levees at the Lost Lake Placement Area, didn't it call for

displacement of the soft to very soft foundation materials that the contract indicated were present along the footprint of the new perimeter levee?

A. I believe it anticipated some displacement of those soft materials. The contractor should expect them, expect displacement.

Q. How did you determine that the side-cast borrow areas resulted in an impossible condition?

A. Because of the properties of the -- of the soft materials given in the boring logs and the way in which it was loaded and the height at which it was loaded and the speed with which it was loaded and the presence of significant pressure head on the groundwater -- the water system.

Q. What is your understanding of the height to which the new perimeter levee at Lost Lake was raised by hydraulic placement of fill?

A. My understanding -- sorry, sir, did you finish the question? My understanding was the contractor was to raise it to 30 feet, plus 30.

Q. Where were the side-cast borrow areas located in relation to new perimeter levee?

A. They were on the outer -- mostly on the outer flange. If you think of the levee, the existing levee provided the buttress against failure into the Buffalo Bayou,

hydraulic levees were to be built?

A. I don't have any knowledge. I would assume that in spots, there are sections of it where they were repairing the levee and there were sections where the side-cast borrow area would not exist or would not have existed -- or may have existed from a long ago previous time.

Q. What is your understanding of Renda Marine's construction sequence to raise the levees to elevation 30 feet above mean low tide?

A. Well, the first phase was a mechanically placed section, and then they went into the hydraulic dredge placement process where they built out, and then proceeded around the side.

Q. My question is addressed to the hydraulic construction, the portion of the new perimeter levee that was to be constructed by hydraulic placement of fill.

A. Okay.

Q. What is your understanding as to the construction sequence used by Renda to build or raise the levees hydraulically to elevation of 30 feet?

A. They would have strung their dredge pipe out and discharged the dredged material about where the crown of the new levee should be, and then you need a piece of machinery that moved the sediment away from the discharge pipe or it plugs everything up, so you're trying to distribute it as

you're going, as technique they used to build it. I don't know what you mean by sequence.

Q. Is it your understanding that the sequence to construct the levees that were to be constructed hydraulically the sequence that was used by Renda or the construction technique, to use your term, was the same for the east levee to west levee and the north levee?

A. I have no data on what they may have changed.

Q. Do you know where the borrow areas, the side-cast borrow areas at Lost Lake Placement Area were excavated with backhoe or dragline?

A. I don't know. Either piece of equipment would have done it.

Q. Do you know where the excavator was positioned?

A. It was positioned on -- near the base of the -- at least from those areas I saw when I was there, it would have been positioned near the base -- inside base of the existing levee.

Q. Would have been -- would the excavator have been positioned on mats?

A. Probably to distribute the load even better so it wouldn't sink out of sight.

Q. Was that on compacted or hard?

A. That would have been on hard, but as soon as you put the mats down you're compacting it, so continued use of

that dragline pad or excavator pad would have compacted the inside part right at the base of the existing levee.

Q. What were the dimensions of the side-cast borrow areas?

A. I have no idea. They were not provided for the contractor.

Q. You don't know how deep they were?

A. No.

Q. You don't know how wide they were?

A. No. They were all buried and never documented, at least never provided.

Q. You state in your report that, "Renda experienced significant 'material loss' through displacement of low strength material that had refilled the side cast borrow areas"; is that correct?

A. That's the beginning of the problem. Then they're displacing -- you've now created a failure plane so you squeeze everything out with it.

Q. How much material loss did Renda experience through displacement of low strength dredged material that had refilled the side-cast borrow areas?

A. Well, not only that, but also it starts the failure of everything underneath, so it's more than just what refilled the borrow area. That was the trigger or the weak spot. I may have -- may have a misstatement in my report in

not calculate whether there's enough dredged material to meet the requirement of the -- the process of displacing the soft sediments.

Q. What is your understanding of the difficulties that Renda experienced in constructing the new perimeter levees at Lost Lake Placement Area?

A. They couldn't get them raised to the design height. They were unstable.

Q. Is it your understanding that was true with respect to the entire reach of the part of the new perimeter levee that was to be constructed hydraulically?

A. No, I don't believe it was the higher reach. I don't assume that it was true. They had a lot of stability problems. There are probably areas that were stable.

Q. Do you know where the stable areas were and where the unstable areas were?

A. I have not investigated it that close.

THE WITNESS: Do you mind if I take two minutes?

MR. KOSLOSKE: No. Let's take a break.

(Recess from 4:09 to 4:17 p.m.)

MR. KOSLOSKE: Back on the record.

Q. (BY MR. KOSLOSKE) Dr. Mathewson, if the Corps of Engineers intended the dredged material to be placed hydraulically at Lost Lake Placement Area, the Corps of

# Evaluation of Claims

Contract No. DACW64-99-C-0001

## Houston-Galveston Navigation Channels, Texas
## Dredging Upper Bayou, (45-Foot Project)
## Harris and Galveston Counties, Texas

**Prepared for:**

Renda Marine, Inc.
Roanoke, Texas

**Prepared by:**

McCullough & Associates
15938 Midway Road
Addison, Texas 75001
(972) 385-3158

March 3, 2004

EXHIBIT D

**Introduction**

McCullough & Associates (M&A) was asked to evaluate the claims made by Renda Marine, Inc. (RMI) to the U.S. Army Corps of Engineers, Galveston District Office (Government or USACE) and to evaluate the USACE response. In performing this analysis, M&A reviewed the Project correspondence, claim documentation prepared by RMI, talked to various employees of RMI, talked to Pathfinder Construction Consulting, Inc. (Pathfinder), reviewed documentation prepared by the USACE in response to RMI's claims, and reviewed the DCAA audit reports. Since discovery in the case is ongoing M&A is continuing to analyze depositions and reports of USACE personnel and experts and reserves the right to revise this report as additional information becomes available.

**Project Summary**

The Project is the Houston Ship Channel, Dredging Upper Bayou, located in Harris County, Texas (Project). The Project was the beginning of a five-year, $508 million program to deepen the navigation channel to 45 feet and widen it by an additional 130 feet to facilitate ships delivering cargo to Houston directly rather than unloading part of their cargo in the Gulf of Mexico. RMI was acknowledged as the low bidder on July 17, 1998, but due to a bid protest initiated by another bidder, RMI's bid was not accepted until October 26, 1998. RMI and the Government entered into Contract No. DACW64-99-C-0001 (Contract) on October 26, 1998. The Notice to Proceed issued by the Government was acknowledged by RMI on November 19, 1998, and work associated with the Project started shortly thereafter.

While performing its work, RMI encountered various differing site conditions and other situations concerning the Project that caused RMI to expend additional funds and/or to incur additional time to perform its work. Because of these situations, RMI submitted various Requests for Equitable Adjustments (REA's) to the Government that subsequently were presented to the Government as Certified Claims.

RMI submitted the following claims:

| Claim* | Description | Claimed Amount |
|---|---|---|
| 5 | Differing Site Condition – Flare Area Stations 520+00 to 550+00 (very stiff clay) | **$1,607,855 |
| 6 | Differing Site Condition – South Ferry Landing Stations 470+00 to 472+00 | 1,049,173 |
| 7 | Changed Conditions – HL&P Transmission Tower Delays | 170,863 |
| 8 | Differing Site Condition – Obstruction in Sections 4 to 8, Stations 570+00 to 685+00 | 2,126,083 |
| 9 | Differing Site Condition – Obstruction in Section 9, Stations 660+00 to 685+00 | 1,158,642 |
| 10 | Changed Conditions – West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 | 789,600 |

| | | |
|---|---|---|
| | (Modification CO-10, P00027) | |
| 11 | Differing Site Condition – Section 7 Clay | 1,123,884 |
| 12 | Differing Site Condition – Lost Lake Levees | 6,258,853 |
| | Total | $14,284,953 |

* Claim numbers refer to the last two digits of the DCAA audit report numbers.

** Original REA amount ($4,691,688) less change order amount paid by USACE ($3,083,833) equals remaining amount of $1,607,855

We have performed an evaluation of these costs and their basis. The results of our evaluation are contained in the narratives that follow and are summarized at the end of the report. In general, we have determined the claimed issues are legitimate and that the claimed costs are compensable costs. We have provided more detail for some of the claim items and made adjustments where appropriate. As a result of our evaluation, M&A believes these RMI claims are valid and compensable by the USACE in the amount of $13,379,367 (see Exhibit A).

**Claim 5 - Differing Site Condition – Flare Area Stations 520+00 to 550+00 (very stiff clay)**

On February 14, 2001, RMI submitted a revised Request for Equitable Adjustment (REA) for differing site conditions pertaining to the Flare Area in the amount of $4,691,688 to the USACE, Galveston, Texas. The "Measured Mile" approach is used to calculate damage dollar amounts and delay days. The measured mile approach is the most widely used method for calculating these types of impact costs in use today. Additional costs were incurred by RMI during the periods between January 23, 2000 through March 11, 2000 and July 17, 2000 through September 29, 2000. The USACE granted merit to the Differing Site Condition on December 13, 2001 in correspondence to RMI. RMI submitted a revised REA and, per various Government regulations, simultaneously, "certified" it as a Certified Claim. RMI submitted its REA for $4,691,688. USACE issued and paid a Change Order for $3,083,833 leaving a balance of $1,607,855 being claimed by RMI. As of the date of this analysis, the balance of RMI's claim has not been resolved.

Audit Report Comments

An audit report for this specific claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $1,306,729 of "questioned costs" in the following categories – Equipment & Labor ($875,784), Equipment Repair Cost ($50,000), Overhead, Profit, and Bond ($329,945), Professional Fees/Consultants ($50,000), and Report Preparation ($1,000). Overall, the DCAA indicates that:

> ***"Because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment & Labor

The DCAA questioned two items – inclusion of labor and equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

RMI disagrees with the levee-related amounts questioned and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and are directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $487,378 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental

Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $542.49 (Non-Effective Time) and $831.83 (Effective Time) per hour rates specified in the RMI claim.

Equipment Repair Cost

DCAA questions the entire $50,000 amount due to RMI "being unable to support the claimed costs." These costs represent estimated rental equipment repair costs and were provided by Pathfinder. These costs are reasonable.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has identified time associated with the preparation of REA's. An adjustment of ($24,298) (includes Bond) was made to the claim amount.

Conclusion

RMI is entitled to $1,096,179 in additional compensation due to this issue.

**Claim 6 - Differing Site Condition – South Ferry Landing Stations 470+00 to 472+00**

On August 23, 2001, RMI submitted to the USACE, Galveston, Texas a revised REA for differing site conditions pertaining to the South Ferry Landing Area in the amount of $1,049,173. The REA was originally submitted to the USACE on January 10, 2001 and revised on March 6, 2001.

This claim involves dredging problems when encountering debris and rubble material (primarily man-made erosion protection stone, concrete and steel) near the South Ferry Landing Area. Between April 7, 2000 and May 17, 2000 while dredging, RMI incurred additional costs due to unanticipated obstructions within the channel between stations 470+00 and 472+00 of the Upper Bayou Project near Houston, Texas. Specification Section 02482 – Dredging, paragraph 1.11.1 states:

> "Other materials such as scrap, rope, wire cable, snags, and stumps may be encountered within the specified limits of required dredging and overdepth

dredging. No separate payment will be made for removal and placement of the debris."

However, RMI believes it encountered significant amounts of man-made materials, not identified in the plans and specifications, above and beyond what a reasonable contractor would expect. As a result, significant time was expended in this area or "lost" (approximately 18 days) and the dredging machinery sustained serious damages. The dredge *Millennium* was also moved to other locations while awaiting responses from the USACE for appropriate action increasing RMI's cost and time. Numerous notifications were made as the extent and scale of the problems were realized.

RMI uses the "measured mile" approach to calculate damages for this claim. The claimed costs are compensable. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $334,881 of "questioned costs" in the following categories – Equipment & Labor ($200,034), Dredge Equipment Repair Cost ($16,489), Overhead, Profit, and Bond ($77,358), Professional Fees/Consultants ($40,000), and Report Preparation Costs ($1,000). Overall, the DCAA indicates that:

> ***"Because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment & Labor

The DCAA questioned two items – inclusion of labor and equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $60,853 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

The primary item within the Equipment category is the depreciation period allowed for the dredge *Millennium* and the booster barge. RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25

year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if other supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $542.49 (Non-Effective Time) and $831.83 (Effective Time) per hour rates specified in the RMI claim.

<u>Dredge Equipment Repair Cost</u>

Several rental equipment repair invoices occurred outside the delay date range. DCAA questioned these costs. These costs were incurred for spare parts which are purchased before they are required and were used to repair damage caused by the encountered debris and rubble. These costs are compensable.

<u>Indirect Expenses</u>

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." Pathfinder has identified time associated with preparation of REA's. An adjustment of ($41,267) was made to the claim amount.

Conclusion

RMI is entitled to $947,054 in additional compensation due to this issue.

**Claim 7 - Changed Conditions – HL&P Transmission Tower Delays**

On May 16, 2001, RMI submitted to the USACE, Galveston, Texas a revised REA for changed conditions pertaining to the Houston Lighting & Power ("HLP") Transmission Tower Delays in the amount of $170,863. The REA was originally submitted to the USACE on April 11, 2001. While performing dredging work on the Upper Bayou near Houston, Texas, RMI was forced to move its discharge line two times because of HLP transmission line and tower work in the immediate area. Additional costs were incurred by RMI during the periods of July 16 and 17, 2000 and October 16, 17, and 18, 2000. To prevent a disruption of the HLP work, RMI had to move the discharge line for the dredge *Millennium* during each of these periods. Moving the discharge line is a substantial operation that cannot be accomplished without significant labor and equipment costs and production delays. The USACE granted "merit" to the claim in its December 13, 2000 correspondence to RMI, acknowledging "HLP failed to coordinate with the government with respect to this tower." RMI submitted the Request for Equitable Adjustment (REA) which was later changed to a Certified Claim on August 9, 2001. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this specific claim was performed by the DCAA and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $45,2320 of "questioned costs" in the following categories – Equipment ($25,563), Overhead, Profit, and Bond ($9,170), Professional and Consultants ($10,000) and Report Preparation Costs ($500). Overall, the DCAA indicates that:

> ***"Because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment

The DCAA questioned two items – inclusion of labor and equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $8,474 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $483.24 (Non-Effective Time) per hour rate specified in the RMI claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with. Therefore, the claimed amounts are compensable.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has identified time associated with preparation of REA's. An adjustment of $5,084 was made to the claim amount.

Conclusion

RMI is entitled to $167,473 in additional compensation due to this issue.

**Claim 8 - Differing Site Condition – Obstructions in Sections 4 to 8, Stations 570+00 to 685+00**

On June 11, 2001, RMI submitted to the USACE, Galveston, Texas a revised REA for differing site conditions related to channel obstructions (Sections 4 through 8) in the amount of $2,126,083. The REA was originally submitted to the USACE on April 16, 2001. While performing dredging work on the Upper Bayou near Houston, Texas between October 20, 2000 and December 20, 2000, RMI incurred additional costs due to higher than normal obstructions within the channel between stations 570+00 and 640+00. Specification Section 02482 – Dredging, paragraph 1.11.1 states:

> "Other materials such as scrap, rope, wire cable, snags, and stumps may be encountered within the specified limits of required dredging and overdepth dredging. No seperage (sic?) payment will be made for removal and placement of the debris."

However, RMI struck numerous buried obstructions and sustained serious damage to dredging machinery as well as significant downtime while repairs were being made. Some of these objects were extremely heavy (one approximately 10 tons) and extremely large (a CONEX sea container). Other obstructions included, but were not limited to old large diameter iron pipe, pieces of cars, heavy industrial construction demolition material and literally thousands of tires. Immediately after each major encounter, notification was provided to the USACE by RMI. In certain cases, the USACE subsequently directed RMI to remove obstructions and specified additional compensation. Other obstructions were either removed by third parties or left in the channel. On December 13, 2000, the USACE, via correspondence, granted "merit" to several notifications as the existence of debris was noted to be in excess of what is considered "normal."

During the period between January 7 and January 11, 2001, an underwater survey of the Upper Bayou channels was performed. Several large objects were located and various scattered debris fields were confirmed to exist and mapped. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this specific claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $351,460 of "questioned costs" in the following categories – Equipment ($171,086), Dredge Equipment Repair Cost ($57,953), Overhead, Profit, and Bond ($87,421), Professional Fees/Consultants ($34,000), and Report Preparation ($1,000).

Overall, the DCAA indicates that

> ***"Because the noncompliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment

The DCAA questioned two items – inclusion of labor and equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $35,513 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their

calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $483.24 (Non-Effective Time) and $772.58 (Effective Time) per hour rates specified in the RMI claim.

Dredge Equipment Repair Cost

Four repair invoices were discovered that occurred prior to the first obstruction in this claim. Per RMI, these items were mistakenly included in this claim as well at the South Ferry Landing claim. Both DCAA and RMI concur that these items are duplicated and should be removed from this differing site condition claim. The total of $78,540 (including Overhead, Profit, and Bond) for duplicated repair invoices has been removed from this claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has

identified time associated with preparation of REA's. An adjustment of ($25,479) was made to the claim amount.

Conclusion

RMI is entitled to $1,986,551 in additional compensation due to this issue.

**Claim 9 - Differing Site Condition – Obstructions in Section 9, Stations 660+00 to 685+00**

On June 14, 2001, RMI submitted to the USACE, Galveston, Texas a Request for Equitable Adjustment (REA) for differing site conditions related to channel obstructions (Section 9) in the amount of $1,158,642. While performing dredging work on the Upper Bayou near Houston, Texas between April 12, 2001 and May 8, 2001, RMI incurred additional costs due to higher than normal obstructions within the channel between stations 658+00 and 680+00. Specification Section 02482 – Dredging, paragraph 1.11.1 states:

> "Other materials such as scrap, rope, wire cable, snags, and stumps may be encountered within the specified limits of required dredging and overdepth dredging. No seperage (sic?) payment will be made for removal and placement of the debris."

However, RMI struck numerous buried obstructions and sustained serious damage to dredging machinery as well as significant downtime while repairs were being made. In addition, the occurrences were made after a sonar survey performed between January 7 and January 11, 2001 indicated the presence of debris fields and other large obstructions within the Section 9 channel. Because of previous difficulties with obstructions in dredging Sections 4 through 8 and the survey results, RMI suggested to the USACE that, before hydraulic dredging proceeds in Section 9, the debris should be removed by clamshell cranes. The USACE directed RMI to proceed with the work regardless of this warning on March 29, 2001 and contact the USACE for verification if excessive debris is encountered. Work proceeded in Section 9 and on April 12, 2001 after encountering several obstructions, RMI contacted the USACE for verification of the conditions and possible solutions. RMI suggested that, if dredging continued, the dredge may be extensively damaged causing delays and dollar damages. After additional encounters with objects and significant damages to the dredge *Millennium*, RMI again sought change or deletion of this section of the contract. On June 1, 2001, the USACE directed RMI to delete the remaining portion of Section 9 in the contract. The claim submitted by RMI on June 14, 2001 relates to damages and additional costs incurred before this contract change. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $131,702 of "questioned costs"

in the following categories – Equipment ($86,645), Overhead, Profit, and Bond ($33,058), Professional Fees/Consultants ($10,000), and Report Preparation ($1,000). Overall, the DCAA indicates that:

> ***"because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. Hydraulic levee amounts are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $474.60 (Non-Effective Time) per hour rate specified in the RMI claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has identified time associated with preparation of REA's. An adjustment of ($9,838) was made to the claim amount.

Conclusion

RMI is entitled to $1,148,804 in additional compensation due to this issue.

**Claim 10 - Changed Conditions – West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 (Modification CO-10, P00027)**

This levee-related claim item has been combined with Claim 12 – Lost Lake Levees. DCAA Audit Report comments and pricing issues are addressed in the claim Item 8 section below.

**Claim 11 - Differing Site Condition – Section 7 Clay**

On April 16, 2001, RMI submitted to the USACE, Galveston, Texas a REA for dredging in clay areas pertaining to the Section 7 Area in the amount of $1,083,779. RMI submitted a certified claim on August 9, 2001 and revised it on April 19, 2002. The total damages are now stated to be $1,123,884 supported by a revised Damages Summary report and audit-related documents. While performing dredging work on the Upper Bayou near Houston, Texas, RMI encountered heavy red clay material at the north side of the channel between Station Nos. 561+20 and 609+00 during the period between October 2, 2000 and November 6, 2000. RMI had notified the USACE on October 20, 2000 in writing that hardpan clay had been encountered. This type of clay, per the REA, is "very difficult to dredge through." The USACE denied "merit" to the issue in correspondence dated December 13, 2000 and indicated:

> "The soils borings shown in the contract drawings pertaining to this area indicate stiff to very stiff clays and medium dense to dense sands. Encountering these materials should be anticipated in various areas during dredging operations."

In the REA, RMI states it anticipated dredging gray and blue clays per the soil borings but not hardpan or red clay as the December 13 USACE correspondence implied. The log borings in the impacted area do not show the conditions actually encountered. The dredge was delayed 20 calendar days in a 35 day period and incurred additional equipment, labor, and overhead costs. RMI uses past historical data, operating information for the dredge, and the "measured mile" approach to calculate damages for this claim. A "Show Cause Notice", dated November 6, 2000, was issued by the USACE indicating the USACE was considering terminating the contract for default. RMI responded to the Show Cause Notice on November 15, 2000. On November 29, 2000, the JV consultants reviewed RMI's response to the Show Cause Notice and were of the belief that there was no differing site condition. More specifically, the JV wrote that RMI "has not provided notice and allowed the Government it's right to investigate" and "heavy clays are depicted in the soil borings and drawings." In a subsequent letter dated June 1, 2001, the JV stated they had further reviewed the boring logs which indicated the presence of hard clays ranging from light gray, blue gray, olive, brown, rust, red, and mixtures thereof. As of the date of this analysis, RMI's claim has not been resolved nor does there appear to be any evidence that the USACE has given "merit" to this issue.

Audit Report Comments

An audit report for this specific claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $256,142 of "questioned costs" in the following categories – Equipment ($166,564), Overhead, Profit, and Bond ($63,578), Professional Fees/Consultants ($25,000), and Report Preparation ($1,000). Overall, the DCAA indicates that:

> ***"Because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment

The DCAA questioned two specific items – inclusion of equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost

of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $129,452 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $483.24 (Non-Effective Time) and $772.58 (Effective Time) per hour rates specified in the RMI claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with. Therefore, the claimed amounts are compensable.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has identified time associated with preparation of REA's. An adjustment of ($16,161) was made to the claim amount.

Conclusion

RMI is entitled to $978,271 in additional compensation due to this issue.

**Claim 12 - Lost Lake Levees**

The Lost Lake Levees claim previously excluded the West Levee Realignment claim – claim, know as Claim 10 in this report. All levee-related issues have been incorporated into Claim 12 – Lost Lake Levees. The DCAA audit reports were provided separately and have been separately addressed below. Following the audit report discussion is a detailed assessment of the entire levee claim along with pricing details.

***West Levee Realignment between Stations 166+00 to 215+00 (formerly Claim 10):***

On May 31, 2001, RMI submitted to the USACE, Galveston, Texas an REA for Levee Realignment between Stations 166+00 to 215+00 in the amount of $789,600. Modification CO-10 had been issued previously but RMI was not in agreement with the cost and time provisions suggested by the USACE. Therefore, RMI submitted the REA to recover its additional costs. In July, 2000, while performing dredging work on the Upper Bayou near Houston, Texas, RMI became aware of a design problem with the levee alignment as described in the contract documents, and on July 28, 2000, notified the USACE. Subsequent discussions and correspondence led to Modification CO-10 issued by the USACE directing RMI to realign the levee per an attached new drawing without any change to the contract cost or completion period. RMI notified the USACE on May 31, 2001 that the cost and time portions of the modification were unacceptable noting that additional costs were incurred and time required to complete the levee realignment. The REA was submitted on the same date to request cost (an additional $789,600) and time (an additional 40 days) adjustments to the contract. RMI further noted that it did not believe that cost and pricing data was required for this REA Proposal as unit prices had been agreed to in earlier modifications CO-1 and CO-2. In its REA, RMI references the Unit Price of $4.70 per Cubic Yard (CY) for realignment and relocation of levees per Modification Pay Item Nos. 1CO-2, 3CO-2, 4CO-2 and 5CO-2 and used that amount to calculate the amount claimed by RMI. RMI mentions that the Unit Price of $4.70/CY was approved by the Government in March 1999. Also related to this claim is a dispute over the amount of material hydraulically placed by RMI. On August 16, 2000, a quality assurance survey was made by Joint Venture (JV) consultants for the USACE. The JV stated "quantity calculations indicate the contractor has pumped 132,937 CY of material versus a required quantity of 59,087 or about 2.5 times the needed quantity." RMI states that material was not wasted, as alleged by the JV but

was used to fill borrow areas and displace unsuitable material. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA labels the entire claim amount of $789,600 as "questioned costs" due to "RMI not providing adequate support for its claim related to Changed Conditions-West Levee Realignment, Lost Lake Placement Area." More specifically, the DCAA stated the claim was not prepared in accordance with Federal Acquisition Regulation (FAR) 15, particularly FAR 15.408, Table 15-2. This FAR requires that the contractor provide breakdowns for the basic cost elements claimed. This FAR provides instructions on the format of cost/price proposals and requires specific cost break outs - for example: Materials and Services, Direct Labor, Indirect Costs, etc.

Response to Audit Report Comments

It should be noted that this position contradicts that which was outlined in the original REA – cost detail is not required due to a previous agreement with the USACE regarding unit costs. The additional costs are compensable. A more detailed evaluation of costs within this claim has been conducted and is provided below.

*Lost Lake Levees:*

On October 16, 2001, RMI submitted to the USACE, Galveston, Texas a REA for differing site conditions and changed conditions related to hydraulic levees at the Lost Lake Placement Area in the amount of $6,258,853. While performing dredging work on the Upper Bayou near Houston, Texas between September 13, 1999 and September 18, 2001, RMI incurred additional costs due to a combination of several Changed Conditions and/or Differing Site Conditions discovered at the Lost Lake Disposal Placement Area. This claim encompasses a wide time-frame and is supported by numerous reports, letters, and other documents. Essentially, it involves extra costs for work and effort incurred to reconstruct levees damaged by subsidence of existing foundation materials, impacts to the dredging operation as a result, and standby time for equipment while awaiting an official release from the USACE to demobilize the project. On December 13, 2000, the USACE via correspondence denied "merit" for the differing site conditions within the claim. The JV also supported this position and indicated that over-dredging, improper levee construction methods, use of unsuitable material, and inexperience are likely causes. RMI disagrees with the USACE and JV positions and believes the USACE did not accurately estimate quantities of suitable materials nor did it provide proper contract specifications and drawings in order to construct the levees as desired and that the foundation materials were unstable causing subsidence of the newly placed levees.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA labels the entire claim amount of $6,258,853 as "questioned costs" due to RMI not providing adequate support for its claim. DCAA indicates the claim was not prepared in accordance with Federal Acquisition Regulation (FAR) 15, particularly FAR 15.408, Table 15-2 and states:

> ***"Because the cost or pricing data inadequacies are considered significant, we do not believe the claim is an acceptable basis for settlement of the price adjustment claim request...".***

Response to Audit Report Comments

The amount claimed represents the additional costs to attempt to construct and maintain the levees while they were subsiding. RMI indicates that the claim was prepared using the Modified Total Cost approach. RMI indicates that at a later date it will prepare and break out the claimed costs. These costs are compensable. A more detailed evaluation of the costs within this claim has been performed and a detailed discussion follows. Claim calculations are included as Exhibit C, Damage Calculations.

***Assessment of Levee Claims (Claims 10 and 12):***

While performing dredging work on the Upper Bayou near Houston, Texas between September 13, 1999 and September 18, 2001, RMI incurred additional costs due to a combination of several Changed Conditions and/or Differing Site Conditions discovered at the Lost Lake Placement Area. Between September 1999 and early April 2001 dredging and levee work was proceeding. In April 2001 the dredge hit obstructions which stopped the dredging operation. In May 2001 the dredge *Millennium* moved to the Houston Fuel Oil project in an attempt to mitigate damages on this project. After the Houston Fuel Oil project was complete the dredge and levee equipment were idle while awaiting an official release from the project. During this time RMI was able to perform the Simm's Bayou project to mitigate some of its damages.

As part of the Dredging Upper Bayou contract, RMI was to construct a total of 20,500 Linear Feet (LF) of levees around the Lost Lake Placement Area. Affolter Construction (La Marque, Texas) was subcontracted by RMI to mechanically construct 6,900 Linear Feet (LF) of the levees using clay material available at existing on-site borrow areas. The remainder, approximately 13,600 LF of levees, was to be hydraulically constructed by RMI using suitable clay materials obtained from the dredging template in the Houston Ship Channel. The balance of the dredged materials were to be placed within disposal areas inside the Lost Lake Placement Area.

The Affolter section of the contract was completed on May 19, 1999. Subsidence issues occurred where Affolter was working on the mechanical levee sections and were attributed to poor existing foundations. RMI submitted change orders and quantity modification requests on Affolter's behalf in excess of $1,600,000 of which over $1,200,000 resulted directly from poor foundations and subsidence found in the Lost Lake Placement Area. The USACE agreed to the

changes with minimal documentation, certain sections were unit-priced, and Affolter was fully compensated.

RMI began their dredging operation on September 13, 1999 and on the same date began constructing hydraulic levees from Station 97+00, near the East end of the recently constructed mechanical levees. Subsidence, displacement, and levee failures began shortly thereafter and are well-documented throughout the entire construction period. In fact, certain areas of the levees continue to fail to this day. RMI estimated 900,000 total CY or 70 Loose Cubic Yards (LCY) per LF would be required to construct the levees to compensate for reasonable, anticipated displacement. This amount represented almost twice the neat cross section quantity and was similar to the USACE estimate of 73 CY per LF. Due to lack of reasonable foundations and the presence of extensive side-cast borrow areas which were not indicated on the contract documents, RMI contends that nearly 2,000,000 CY were required in order to fill the borrow areas and construct the levees. RMI further contends that the clay indicated to be available in dredging Sections 1 through 6 (based on quantities derived from dredging cross sections in the contract documents) should have been adequate to construct the levees.

The existence of undocumented poor foundations caused by side-cast borrow areas from previous levee building activities in the Lost Lake Placement Area caused the levee material requirements and construction time to be significantly higher than originally anticipated. In addition, various mechanical levee operations were added to reconstruct failed levees and construct new levees from clay material that had migrated into side-cast borrow areas. Furthermore, the dredging operation suffered directly related delays and downtime while the dredge discharge pipe was backtracked as levees failed, moved material over greater than anticipated distances, and while pumping water in order to "flush" displaced material away from the levee construction zone. This claim includes all costs related to the above differing site conditions as well as additional time the dredge was held on the project while awaiting an official demobilization release from the USACE.

The following specific items are included in the Lost Lake Placement Area Claim:

A. Additional levee equipment and labor required to construct the levees above and beyond what could have been reasonably anticipated from the contract documents ($1,549,759 total direct costs).

   The original crew anticipated for hydraulic levee construction per the RMI bid estimate was one supervisor and a crew of three operators. The operators were employed for shaping and finishing levees by operating a dozer, backhoe, and marsh equipment as needed. In addition, the operators would rough shape initial clay placement from the dredge and add shore pipe as required. During the actual hydraulic levee operation, massive amounts of displaced material from the side-cast borrow areas accumulated and surrounded the discharge area. This material became known as the "mud wave". RMI never intended to move large amounts of displaced material and the planned crew and equipment spread was not adequate. Because of this differing site condition, RMI was forced to add additional personnel and equipment to continually move the excessive amounts of material from the face of the discharge area and create temporary

containment levees. This extra work was necessary in order to continue to construct the levees as well as preventing the material from breaching the levees and potentially entering the surrounding water channels. Also, the hydraulic levee crew and equipment was extended when the dredge was delayed and the levee operation was forced into a standby mode. This claim item includes additional personnel and equipment required to deal with the excessive displaced material. In addition, the standby time for the entire hydraulic levee operation is included during periods were the dredge was delayed.

B. Mechanical Levee Construction – East, North, and West Levees (approximately 4/17/2000 to 12/31/2000). ($1,281,581 total direct costs).

RMI constructed the East levee section beginning from Station 97+00 during the Fall, 1999. Material from the dredging operation was placed continually at Station 97+00 in an attempt to get the levees to develop out of the existing disposal area. The material continued to flow into the side-cast borrow areas creating a continual problem as displaced mud was forced from the side-cast borrow areas. Attempts to construct the East levee using material discharged from the dredge were made with many failures and this area required numerous reconstruction efforts. RMI then moved the hydraulic discharge line and levee building operation to the West side of the project in the Spring, 2000 in an attempt to construct the West levee. A decision was made at this time and after informing the USACE that additional personnel and equipment would be employed to rebuild the failed levees. RMI brought in additional resources and utilized the clay material that had flowed into the adjacent borrow areas in an attempt to complete the levee. RMI rebuilt the East levees several times from Station 97+00 to Station 104+00 and finally this section was accepted by the USACE around August 4, 2000.

RMI then continued operating several additional crews with mechanical and hauling equipment to mechanically move material that had flowed into the side-cast borrow areas. RMI reclaimed this material and hauled it to the North levee areas in an attempt to construct this section.

In addition, RMI sent crews to the West levee to complete this section and realign a segment per the USACE instructions. The West levee operation also utilized clay material that had filled adjacent side-cast borrow areas. The chronology of the mechanical levee operations are well-documented from June, 2000 forward and supported by a number of USACE directives, instructions, and letters. The mechanical operations would not have been required if the side-cast borrow areas had not been so close to the new levee and had not been so large, and poor foundation conditions were not present in the Lost Lake Placement Area. All mechanical levee claim items have been addressed in this claim item including the previously separated claim entitled "West Levee Realignment Between Stations 166+00 to 215+00" ($789,600 total claim amount).

C. Additional dredge plant equipment and labor due to relocation of the dredge discharge line (primarily removing and replacing pipe segments) while reconstructing levees that had subsided ($352,347 total direct costs).

The dredge *Millennium* lost time as RMI attempted to reconstruct the failed levees, time was lost while the dredge itself had to shutdown while land-based pipe was pulled back to reattempt to construct the levees to planned elevation. This claim item represents non-productive standby costs for the dredge while discharge pipe was back-tracked.

D. Dredge plant time while waiting for displaced material to settle and while pumping water (non-productive time) to flush displacement material ($1,184,162 total direct costs).

The dredge *Millennium* lost time due to the levee operation directing that water be pumped in order to flush displaced material from the levee construction area and while waiting for displaced material to subside. Most of this lost time occurred during the Fall, 1999 and Spring, 2000. RMI was forced to stop pumping clay due to the buildup of displaced mud and sediment from the side-cast borrow areas surrounding the hydraulic levee construction area. RMI then had to request that the dredge operator pump only water in an attempt to flush the corridor so that hydraulic levee construction efforts could resume. In other cases, the dredge would pump water while waiting for displaced material to subside away from the levee construction area. This claim item represents dredge costs while pumping water as well as time waiting for displaced material to settle before additional material could be pumped to the levee construction discharge area.

E. Additional booster pump equipment required to pump dredge material longer distances due to additional material requirements to construct the levees ($211,035 total direct costs).

RMI contends that the hydraulic levees should have been constructed using material from dredging Sections 1 through 6. Should this have occurred as presumed according to the contract documents, RMI planned to place material from Sections 7, 8, and 9 in the West discharge corridor. Because of the additional clay material required to fill the side-cast borrow pits, the clay from Sections 1 through 6 did not complete the levees. The material for the North and East Levees now had to be pumped from Section 7 through 9. RMI determined that an additional booster was necessary to efficiently pump the sediment and clays to the upper levee areas where levee construction had not been completed. If the levee yield would have been as anticipated, the levees would have been completed with material no further than Sections 5 or 6 thus eliminating the need for all hydraulic levee construction equipment thereafter and minimizing the use of dredge boosters. Pumping distances were increased up to an additional 3,000 feet to reach the further quadrants of the Lost Lake Placement Area while dredging within Sections 6 through 9 during the period beginning October, 2000 to April, 2001. This claim item represents actual additional costs of RMI for owned and rented booster equipment.

F. Extended non-effective time for dredge and dredge plant while awaiting official USACE release from the project ($725,191 total direct costs).

In April, 2001, RMI was dredging in Section 9 and encountered obstructions which damaged the dredge. The USACE put the work on hold while it investigated the problem and evaluated removing the balance of the RMI contract. In early May, 2001, the dredge

*Millennium* moved to a Houston Fuel Oil project with permission from the USACE. After completing this project on July 4, 2001, the *Millennium* and associated dredge plant was moved back to the Upper Bayou project area on the Houston Ship Channel. During the next several months, the USACE did not release the dredge and other dredge plant equipment from the Upper Bayou project to await the USCOE's decision. During this period until August 24, 2001, the dredge and its crew were in a standby mode. Thereafter, the dredge and a portion of the associated dredge equipment were moved to the Sims Bayou project. On September 18, 2001, the USACE issued Change Order #11 which officially released the dredge *Millennium* and associated equipment from the Upper Bayou project. This claim item represents dredge standby time from July 5, 2001 to August 24, 2001 and other dredge equipment in standby mode for the period from July 5, 2001 to Sept 18, 2001.

Damage Summary

Total damages for the Lost Lake Placement Area claim are as follows:

| Claim | Description | Total Cost |
|---|---|---|
| 12a. | Hydraulic Levees – Additional Equipment and Labor | $1,549,759 |
| 12b. | Mechanical Levees – East, North, and West Levees | 1,281,581 |
| 12c. | Dredge Delays – Removing and Replacing Pipe Segments | 352,347 |
| 12d. | Dredge Plant Time Due to Displaced Material / Water Flushing | 1,184,162 |
| 12e. | Additional Booster Equipment for Greater Pumping Distances | 211,035 |
| 12f. | Equipment Standby Time While Waiting for USACE Release | 725,191 |
| | **Subtotal** | **$5,304,075** |
| | Add: Resident Overhead | 889,368 |
| | Add: Corporate Overhead | 60,010 |
| | **Subtotal** | **$6,253,452** |
| | Add: Profit – 12% | 750,414 |
| | **Subtotal** | **$7,003,867** |
| | Add: Bond – 0.65% | 45,525 |
| | **Subtotal** | **$7,049,392** |
| | Add: Professional Fees and Report Preparation + Bond – 0.65% | $5,644 |
| | **Total Impact Cost** | **$7,055,037** |

Supporting documentation, damage calculations, and other information are included in Exhibit C.

Conclusion

RMI is entitled to $7,055,037 in additional compensation due to this issue.

**Damage Summary**

M&A believes these RMI claims are valid and compensable by the USACE in the amount of $13,379,367 as shown below (see Exhibit A for adjustments):

| Claim | Description | Claimed Amount |
|---|---|---|
| 5 | Differing Site Condition – Flare Area Stations 520+00 to 550+00 (very stiff clay) | $1,096,179 |
| 6 | Differing Site Condition – South Ferry Landing Stations 470+00 to 472+00 | 947,054 |
| 7 | Changed Conditions – HL&P Transmission Tower Delays | 167,473 |
| 8 | Differing Site Condition – Obstruction in Sections 4 to 8, Stations 570+00 to 685+00 | 1,986,551 |
| 9 | Differing Site Condition – Obstruction in Section 9, Stations 660+00 to 685+00 | 1,148,804 |
| 10 | Changed Conditions – West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 (Modification CO-10, P00027) | Included in Claim 12 |
| 11 | Differing Site Condition – Section 7 Clay | 978,271 |
| 12 | Lost Lake Levees | 7,055,037 |
| | **Total** | **$13,379,367** |

**Benton Goodloe**
Renda Marine, Inc.
#7 Benson Lane
Roanoke, TX 76262
Phone: (817) 430-0998
Fax: (817) 491-4483

January 27, 2004

Brian W. Erikson
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

Re: Renda Marine, Inc. v. United States; Case Number 02-306C;
United States Court of Federal Claims

Dear Mr. Erikson:

As you requested, I have prepared my report on the claims filed by Renda Marine regarding the dredging of the Houston Ship Channel. I also enclose a copy of my curriculum vitae.

During the course of dredging on the Project, the Dredge Millennium encountered numerous obstructions. The Dredge Millennium reasonably handled the obstructions. The waters are too murky to be able to see the obstructions beforehand. The Corps placed great pressure on Renda to achieve production on the Project.

Renda attempted to dredge on the Project, Renda would inevitably hit any obstructions located in the dredge template, unless such obstructions were specifically denoted in the Contract Documents.

Renda was not required to hire a diver to search for obstructions ahead of the dredging operation. Renda was not required to have sonar or magnetometers or sidescan surveying equipment to search for obstructions ahead of the dredging operation. Industry custom is to rely on the contract documents to indicate underwater obstructions. Industry custom is for a dredger not to have divers, or sonar or magnetometers or sidescan surveying equipment to search for obstructions ahead of the dredging operation.

Dredging in stiff clay results in slower production than dredging in soft clay. Slower production means increased cost. Renda had slower dredging production in the Flare Area and Section 7 due to clay stiffer than the materials indicated in the Contract Documents.

Dredging around or through obstacles or obstructions results in slower production than if the obstacles or obstructions were not present. Renda's dredging production was slowed in the South Ferry Landing due to rubble not indicated in the Contract Documents.

Renda's dredging production was slowed in Sections 4 to 8, Stations 570+00 to 630+00 due to underwater obstructions. Renda faced obstructions not shown in the Contract Documents. Renda faced obstructions beyond that reasonably expected. These obstructions were materially different than what was indicated in the Contract Documents. As a result of these obstructions, Renda's dredging progress was slowed, and the costs of dredging were increased.

Renda's dredging production was slowed in Section 9, Stations 660+00 to 685+00 due to underwater obstructions. Renda faced obstructions not shown in the Contract Documents. Renda faced obstructions beyond that reasonably expected. These obstructions were materially different than what was indicated in the Contract Documents. As a result of these obstructions, Renda's dredging progress was slowed, and the costs of dredging were increased.

There was not sufficient clay to be dredged on the Project to construct the Lost Lake Placement Area levees. The foundations for such levees were so soft that the clay and other suitable materials that Renda attempted to place hydraulically displaced so much muck that it was not possible under the circumstances to build the levees to the design template. The Corps has had similar problems on other levee projects. Renda property hydraulically placed the clay, but due to causes beyond Renda's control, the levees could not be built as designed.

Please feel free to contact me if you should have any questions.

Sincerely,

Benton Goodloe

Enclosure

S:\Construction\Renda Marine\Upper Bayou 565.09\Goodloe Report.wpd

**Benton Goodloe, Sr.-**

**Consultant-Involved in all aspects of projects from pre-bid to overseeing of projects.**

He began working for Parkhill-Goodloe Dredging Co. in 1970. Worked in all positions in company beginning as deckhand and working his way up to Project Superintendent and over all Project Managers. Completed project for the U.S. Army Corp of Engineers in the Jacksonville, Charleston, Wilmington, Norfolk, and Mobile Districts. He also completed projects for the TVA, Jacksonville Electric Authority, Jacksonville Port Authority, Estech Chemical Company and Georgia Port Authority. After Parkhill-Goodloe Dredging Co. sold out in 1988 he worked as Project Manager for Norfolk Dredging Co. and T.L. James Dredging Co. completing multi-million dollar projects for the Army Corp of Engineers from New York to Houston, Texas. In 1991 became Vice President for Renda Marine in charge of all dredging projects along the Gulf Coast of the United States. While at Renda Marine, completed a very difficult 17 million dollar project in the Houston Ship Channel. Currently holds a U.S. Coast Guard Towing license as well as a private pilot license with instrument rating.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
Defendant. )

ORAL DEPOSITION
BENTON B. GOODLOE
January 13, 2004

ORAL DEPOSITION OF BENTON B. GOODLOE, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 13th day of January, 2004, from 9:48 a.m. to 4:11 p.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Esquire Deposition Services, 3401 Louisiana, Suite 300, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

50

APPEARANCES

FOR THE PLAINTIFF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 800
Dallas, Texas 75201
Telephone: 214-871-2100 - Fax: 214-871-2111

FOR THE DEFENDANT:

John E. Kosloske, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
1100 L Street, N.W., Room 12052
Washington, D.C. 20005
Telephone: 202-307-0282 - Fax: 202514-8624

ALSO PRESENT:

Stacey Whitley, CSR
George J. Strickler

INDEX


| | PAGE |
|---|---|
| BENTON B. GOODLOE | |
| Examination by Kosloske ........................ | 6 |
| Signature Page ............................. | 168 |
| Court Reporter's Certificate .................. | 170 |


EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Renda Marine daily report dated 12-4-00 | 49 |
| 2 | Inspection Report of Dredging - Galveston District dated 12-10-00 | 68 |
| 3 | Letter to Mr. Erikson from Ben Goodloe | 84 |
| 4 | Renda Marine daily report dated 12-29-00 | 113 |
| 5 | Renda Marine daily report dated 1-12-01 | 113 |
| 6 | Renda Marine daily report dated 2-25-01 | 117 |
| 7 | Renda Marine daily report dated 3-10-01 | 118 |
| 8 | Renda Marine daily report dated 10-22-00 | 122 |
| 9 | Renda Marine daily report dated 10-23-00 | 123 |
| 10 | Renda Marine daily report dated | 124 |

| | | |
|---|---|---|
| 11 | Renda Marine daily report dated 10-31-00 | 125 |
| 12 | Renda Marine daily report dated 11-3-00 | 126 |
| 13 | Renda Marine daily report dated 11-4-00 | 127 |
| 14 | Renda Marine daily report dated 11-9-00 | 130 |
| 15 | Renda Marine daily report dated 11-13-00 | 130 |
| 16 | Renda Marine daily report dated 11-14-00 | 132 |
| 17 | Renda Marine daily report dated 11-17-00 | 134 |
| 18 | Renda Marine daily report dated 11-19-00 | 135 |
| 19 | Renda Marine daily report dated 11-29-00 | 135 |
| 20 | Renda Marine daily report dated 11-30-00 | 137 |
| 21 | Renda Marine daily report dated 2-11-01 | 138 |
| 22 | Renda Marine daily report dated 2-19-01 | 140 |
| 23 | Renda Marine daily report dated 2-20-01 | 140 |
| 24 | Renda Marine daily report dated 2-21-01 | 140 |
| 25 | Renda Marine daily report dated February 22 and 23 | 140 |
| 26 | Renda Marine daily report dated 2-24 | 140 |




Phone #713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

Fax #713.524.4951
1.800.767.9532

| | | |
|---|---|---|
| | 2-25-01 | |
| 28 | Renda Marine daily report dated 2-26-01 | 141 |
| 29 | Renda Marine daily report dated 2-27-01 | 143 |
| 30 | Renda Marine daily report dated 2-28-01 | 144 |
| 31 | Renda Marine daily report dated 3-5-01 | 144 |
| 32 | Renda Marine daily report dated 3-6-01 | 145 |
| 33 | Renda Marine daily report dated 3-7-01 | 145 |
| 34 | Renda Marine daily report dated 3-8-01 | 146 |
| 35 | Renda Marine daily report dated 3-10-01 | 147 |
| 36 | Renda Marine daily report dated 4-4-01 | 147 |
| 37 | Renda Marine daily report dated 4-5-01 | 147 |
| 38 | Renda Marine daily report dated 4-9-01 | 148 |
| 39 | Renda Marine daily production report dated 11-1-00 | 148 |
| 40 | Renda Marine report of operations dated 10-1-00 | 149 |



Phone #713.524.4600
"'01 LOUISIANA, SUITE 300
ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002
Fax #713.524.4951
1.800.767.9532

BENTON B. GOODLOE,

having been first duly sworn, testified as follows:

EXAMINATION

Q. (BY MR. KOSLOSKE) Would you state your full name for the record and spell it, please?

A. Benton, B-E-N-T-O-N, B. Goodloe, G-O-O-D-L-O-E.

Q. And for the record, what is your business address, sir?

A. For Renda Marine, it's 522 Benson Lane, Roanoke, Texas.

Q. And the ZIP code?

A. 7756 --

MR. ERIKSON: If you know.

A. I don't remember. 77562. I'm not sure.

Q. (BY MR. KOSLOSKE) And business telephone?

A. (817)491-2703.

Q. Okay. Are you presently employed by Renda Marine, Inc.?

A. Yes, I am.

Q. For the record, would you state your residential address and telephone?

A. 905 Bunker, B-U-N-K-E-R V-I-E-W Drive, Apollo Beach, Florida 33572.

Q. Mr. Goodloe, my name is John Kosloske. I'm an attorney with the United States Department of Justice. I'm

having with constructing the perimeter levees at Lost Lake placement center; that is, the portion of the levees that were to be constructed by hydraulic placement of fill?

A. I couldn't tell you. I don't recall if Steve did or he didn't. I don't recall. I don't know. Steve -- Steve Bowman and Rudy Renda were, like I say, basically doing the levees before I got there and I don't know if they did or they didn't.

Q. That didn't happen while you were there?

A. Did I -- I didn't consult anybody, no.

MR. ERIKSON: Do you mind if we take a short break?

MR. KOSLOSKE: Sure.

(Recess taken)

Q. (BY MR. KOSLOSKE) Back on the record. Mr. Goodloe, I would like to drop back a moment and ask you some background questions about your education and employment prior to coming to work for Renda Marine.

A. Okay.

Q. Are you a high school graduate?

A. Yes, I am.

Q. And when did you graduate from high school?

A. 1970.

Q. Did you attend college or university?

A. Two years.

Q. Where did you attend college?
A. Jacksonville, Florida, Florida Junior College.
Q. And what did you study at Florida Junior College?
A. Engineering.
Q. Did you receive a degree of any sort?
A. No.
Q. What is your date of birth?
A. 2-19-52.
Q. How long have you been involved in the dredging business?
A. Started in 1970. So, it would be 33 years.
Q. Can you briefly outline for us the positions that you've held with the companies, the dates and the type of work you performed starting with the first position in the Seventies and working up to the time that you went to work for Renda Marine?
A. Okay. After graduating high school in 1970, I went to work at my family-owned business, which was Parkhill Goodloe Company in Jacksonville, Florida working the summertime and part-time when I went to college. And I was a deckhand on dredges, engineer on dredges, and eventually I worked my way up to project superintendent, project manager with the family-owned business. And in 1988, we sold out and I worked for -- probably until '92 with Norfolk Dredging Company as a project manager. Worked in the Philadelphia

district, the Norfolk district, Wilmington district, and Charleston district and Jacksonville district of the Corps of engineers doing various different dredging projects.

For a brief period of time, I worked for Pine Bluff Sand & Gravel out of Arkansas. I was a project manager for them. Worked in the Vicksburg district on some projects for the Corps of Engineers, lock and dam projects. Then went to work for T.L. James as a project manager up until '95 when T.L. James sold out -- sold their assets. I worked dredging projects all over the United States, New York district and all over. Then I was sold to Weeks Marine when T.L. James sold out. I was sold with the equipment and didn't like my position there. So, I didn't work for Weeks very long, a couple years. And then I went to work for Manson Construction out of Seattle, Washington for a couple of years as a project manager on hopper dredges. And I found a job a little closer when I went to work for Renda Marine as project manager.

Q. Okay. So, you worked from the early 1970s until approximately 1988 in the family-owned business?

A. That's correct.

Q. And that was Parker Goodloe?

A. It's Parkhill, P-A-R-K-H-I-L-L.

Q. And you held various positions including deckhand, engineer, and project manager?

A. All different positions on a dredge. I worked

summertimes and --

Q. What kind of dredging projects were you involved with?

A. Hydraulic dredging projects all over the East Coast of the United States from Virginia to Miami.

Q. Were they maintenance projects?

A. Generally speaking. We did some new work projects occasionally.

Q. And what was the size of the dredges?

A. Parkhill Goodloe had three 20-inch dredges and a 12-inch dredge.

Q. Were you ever a captain on a dredge?

A. Yeah. Probably for Parkhill Goodloe on a small dredge I was captain for a while and on a 20-inch dredge, yes.

Q. Did you have any experience as a leverman?

A. I pulled levers very little.

Q. And then during the period of time that you worked for the family business, Parkhill Goodloe, did you have experience constructing perimeter levees at dredge disposal areas?

A. If I recall, we had one project in Kingsbay, Georgia, that you had to construct some levees, which I mentioned earlier, which did not end up being built as designed. It was changed by the Corps of Engineers on the project relatively soon after the project started.

Q. Was that your first experience with building levees?

A. As far as building levees, yes. We did some beach work building beaches where you have to construct toe levees and toe dikes. But as far as building levees, the only other experience I had similar to that was the construction of Interstate 95, we had some projects going on then that had a little bit of levee work in it. But I wasn't involved with a lot.

Q. The project that -- was it Kingsbay, Georgia, did you say?

A. That's correct.

Q. And you said the design was changed in that case?

A. The design was changed in the field, that's correct.

Q. And is the reason the design was changed was there was not sufficient suitable material for building levees hydraulically?

A. That's correct.

Q. And you worked at the Norfolk Dredging Company from roughly 1988 to approximately 1992?

A. I think that's correct, right.

Q. And you were project manager the entire time there?

A. That's correct. They called them project superintendents, but they're the same thing.

Q. And the projects that you managed, were they all contract dredging projects?

A. Yes.

Q. And was that maintenance or new work or both?

A. Both.

Q. And what were the -- what kind of dredges were involved in --

A. Hydraulic cutter dredges. They mostly had 22-inch cutter dredges and they had one 16-inch dredge.

Q. And when you were working for Norfolk Dredging Company, were you involved with the construction of levees at dredge disposal areas?

A. No.

Q. And I believe you testified you then took a position with a firm Pine Bluff Sand & Gravel?

A. That's correct.

Q. Is that a dredging company?

A. Yes, it is.

Q. Where are they located?

A. They're in Arkansas and I can't remember the name of the city they're from. But they have a dredging office in Alexandria, Louisiana, or they did.

MR. ERIKSON: How about Pine Bluff?

A. Yeah. It's Pine Bluff. Pine Bluff, Arkansas.

Q. (BY MR. KOSLOSKE) How long were you employed by Pine Bluff Sand & Gravel?

A. Two years, I believe.

Q. And what was your position with that firm?
A. Project manager, superintendent.
Q. And were the projects that you were involved with all dredging projects?
A. Yes, they were.
Q. Were they maintenance or new work?
A. Both.
Q. And what kind of dredges were involved?
A. They had 24-inch dredges and one 18-inch hydraulic dredge.
Q. And did you have any involvement with construction of levees at dredge disposal sites --
A. No. No.
Q. Not while you were at Pine Bluff Sand & Gravel?
A. No, sir.
Q. Then your next position was at T.L. James. And how long were you employed by T.L. James?
A. Until they sold out in -- I think it was 2000. '99, 2000. I don't recall what year they sold out. I went to Weeks at that time. They sold all their assets to Weeks and Great Lakes.
Q. So, you were with T.L. James from roughly 1995 until 1999?
A. 2000, yeah. And then they sold out and then went -- went to work with Weeks.

Q. How long did you spend with Weeks Marine?
A. Until 2000.
Q. Did you -- I have in my notes here that you worked for Weeks Marine for a couple of years.
A. It was 2000. Probably a year and a half, close to two years.
Q. Okay. Does that mean that you would have left T.L. James in approximately 1998?
A. Somewhere around there. That's correct. I don't remember the exact date.
Q. You were a project manager for T.L. James?
A. Project manager, that's correct.
Q. And where was T.L. James located?
A. Used to be in Kenner, Louisiana.
Q. And you managed dredging projects exclusively?
A. That's correct.
Q. Were they both new work and maintenance projects?
A. Both. A lot of beach work, beach restoration.
Q. And what kind of dredges were involved?
A. 30-inch hydraulic dredges.
Q. And were you involved with the construction of any perimeter levees at dredge disposal sites while you were employed by T.L. James?
A. No, sir. No, sir. There hasn't been a whole lot of levee construction -- hydraulic levee construction that I know

about going on.

Q. And then what was your position at Weeks Marine?

A. Project manager.

Q. And was that dredging projects again?

A. That's correct.

Q. When you were with T.L. James, where were the dredging projects located?

A. We did a project for the Jacksonville district Corps of Engineers which is on the St. John's River. And then we did a job for the Palm Beach County, a beach restoration. And then we went to New York and did a project for the New York district Corps of Engineers, beach restoration on the coast of New Jersey. And then we did beach restoration in Hilton Head, South Carolina. I think that was about it.

Q. And Weeks Marine, where are they located?

A. Weeks took over T.L. James' assets. They had an office in Kenner and they moved it to Mandeville, Louisiana.

Q. Where were the dredging projects located that you managed while you were at Weeks Marine?

A. West coast of Florida beach construction. And then for the Mobile district, we did some maintenance dredging for the Mobile district in the Mobile River.

Q. How long were you employed by the Manson Construction Company?

A. About a year and a half, two years.