# DEFENDANT'S APPENDIX

# INDEX TO DEFENDANT'S APPENDIX


**Document** **Page**

Report of Christopher C. Mathewson, Ph.D., P.E. dated January 26, 2004 .................. 1

Excerpts from transcript of deposition
of Christopher C. Mathewson, Ph.D., P.E., on April 14, 2004 ......................... 4

Report of Robert McCullough, Jr., dated March 3, 2004 (without exhibits)................ 22

Report of Benton Goodloe dated January 27, 2004 ..................................................... 47

Excerpts from transcript of deposition of Benton Goodloe on January 13, 2004 ......... 50

**CHRISTOPHER C. MATHEWSON, PhD, PE, REG**
**Engineering Geologist**
**1307 Glade Street**
**College Station, TX 77840**

Phone: ......979-845-2488 FAX: ......979-847-9313 E-mail: .......mathewson@geo.tamu.edu

26 January 2004

Brian W. Erikson
Qulling, Selander, Cummiskey & Lownd
2001 Bryan Street, Suite 1800
Dallas, TX 75201

Re: Renda Marine, Inc. *vs.* United States, Case Number 02-306C, United States Court of Federal Claims

Dear Mr. Erikson,

At your request I have evaluated the changed conditions claims filed by Renda Marine related to the dredging of the Houston Ship Channel. The project area includes dredging between Stations 684+06.58 and 470+00, shown as the "Upper Bayou" on the Location Plan (Map C-1), and the construction of a dredged material confinement levee at the Lost Lake Placement Area. You have asked me to limit my evaluation to four specific sites defined in this project. These sites are:

1. Flare Area (STA 520+00 – STA 550+65.99)
2. South Ferry Landing (Section 1, STA 470+00 – STA 480+16.77)
3. Section 7 (Approximately STA 565+00 and 580+00)
4. Lost Lake Placement Area Levees

The professional opinions expressed in this report are based upon a review made on Thursday, 15 January 2004, in Dallas, Texas of the contract documents that were provided to me with further review of these documents made in College Station.

1. The Flare Area: My review and evaluation concurs with the opinions expressed by the Corps of Engineers and Renda Marine in that the subsurface geological and engineering properties were not accurately represented in the boring logs and soil descriptions provided to Renda Marine when they bid the project. As a result, Renda Marine could not predict, anticipate or expect to encounter the "stiff clay" which resulted in reduced dredging productivity and increased operational time to place and handle the dredged materials at the Lost Lake Placement Area.

2. South Ferry Landing: The project drawings do not include any specific information about the bathymetric or submarine conditions of the South Ferry Landing area while they include a detailed map of the North Ferry Landing area (Map C-6). The North landing area is actually outside the limit of the dredging project. The incorporation

of the bathymetric data for the North Lynchburg Landing in the contract documents provides unnecessary and misleading information about the dredging conditions to be anticipated at the South Lynchburg Landing. The complete lack of information or data about the conditions at the South Ferry Landing area, with respect to rubble, shore protection structures, navigational aids or other submarine conditions, strongly suggests that these conditions do not exist in the area. As a result, Renda Marine should not have anticipated the existence of anything other that the naturally occurring Earth materials in this area of the project, except for possible minor amounts of undocumented trash and debris.

3. Section 7: Renda Marine encountered a "very stiff red clay" while dredging in Section 7, approximately between Stations 565+00 and 580+00. The presence of a "red clay" indicates that the dredging operation encountered sediments that are most-likely Pleistocene (Glacial) in age. These sediments, which were exposed to the atmosphere and oxidized during the low stand of sea level, experienced an increased confining pressure through desication, that produced higher strength materials than the Recent marine sediment shown in the contract documents. Because these "red clays" have higher shear strength than the younger marine clays, the dredging effort required to remove these materials is significantly greater than that required to remove Recent marine clays. These "red clays", however would be a superior material for the construction of the foundation for the levees at the Lost Lake Placement Area.

4. Lost Lake Placement Area Levees: The contract documents indicate that the geotechnical characteristics of the materials in the interior perimeter of the Lost Lake Placement Area have low shear strength and that the Atterberg limits of these materials lies between the Liquid Limit (viscous fluid) and the Plastic Limit (plastic material). There are no notes or other information to indicate that the dredged material in the perimeter area was previously "mined" to produce material to rebuild and improve the existing levees around the area. An analysis of the date of sampling indicates that the mining operations occurred recently, after the date of drilling and geotechnical testing, and therefore the geotechnical properties of the foundation materials in the Lost lake Placement Area are significantly weaker than suggested in the contract documents. As a result, Renda Marine experienced significant amounts of "material loss" through the displacement of the low strength dredged material that had refilled the recently mined areas. Hydraulic dredging construction methods, which were specified for much of the levee project, would further decrease the shear strength of the underlying dredged material by increasing the pore-water pressure and decreasing the effective strength of these saturated clays and silts. Under the actual conditions at the Lost Lake Placement Area, Renda Marine could not construct the desired levee to +30 ft until the low strength, fluid materials were displaced from the foundation of the proposed levee and high strength materials could be placed to form the foundation. The presence of the buried and unreported "side cast borrow areas' resulted in an impossible condition that was not indicated in the construction documents.

Thank you for the opportunity to review and evaluate the provided materials and to provide my opinions concerning the differing site conditions at the Flare Area, South Ferry Landing, Section 7 and the Lost Lake Placement Area Levees. It is my opinion that each of these sites represents a true differing site condition in which the contract documents failed to report the actual natural or man-made condition.

Please feel free to contact me should you have any questions or desire a more extensive review and evaluation.

Sincerely yours,

CC Mathewson

Christopher C. Mathewson, PhD, PE, REG
Engineering Geologist

encl: Vitae

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., Plaintiff, | ) | |
| | ) | No. 02-306C |
| VS. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, Defendant. | ) | |

---

ORAL DEPOSITION OF

CHRISTOPHER MATHEWSON

April 14, 2004

---

ORAL DEPOSITION OF CHRISTOPHER MATHEWSON, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on April 14, 2004, from 9:04 a.m. to 5:35 p.m., before Gloria Carlin, CSR No. 498 in and for the State of Texas, reported by Stenographic method, at the offices of Quilling, Selander, Cummiskey & Lownds, 2001 Bryan Street, Suite 1800, Dallas, Texas, pursuant to the Rules of the Federal Court of Claims and the provisions stated on the record.

Job No. 040414GJC

CERTIFIED COPY

4

# A P P E A R A N C E S

FOR THE PLAINTIFF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

FOR THE DEFENDANT:

John E. Kosloske, Esq.
CIVIL DIVISION
DEPARTMENT OF JUSTICE
1100 L Street NW, Room 12052
Washington, D.C. 20005

ALSO PRESENT:

Oscar Renda
Barry L. Smith
William Connole, P.E.

INDEX

Appearances . . . . . . . . . . . . . . . . . . . . 2

Stipulations. . . . . . . . . . . . . . . . . . . . 4

CHRISTOPHER MATHEWSON

Examination by Mr. Kosloske. . . . . . . . . . . 5
Examination by Mr. Erikson . . . . . . . . . . . 214
Re-Examination by Mr. Kosloske . . . . . . . . . 217

Signature and Changes. . . . . . . . . . . . . . . 219
Reporter's Certificate . . . . . . . . . . . . . . 221

EXHIBITS

| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 1 | Letter 1-26-04 from Christopher Mathewson to Brian Erikson and Curriculum Vitae | 12 | 13 |
| 2 | Subpoena | 93 | 93 |
| 3 | Letter 7-18-03 from Christopher Mathewson to John Kosloske | 93 | 93 |
| 4 | Upper Bayou Dreding Drawings | 96 | 96 |
| 5 | Specifications for Dredging Upper Bayou | 99 | 100 |
| 6 | Amendment of Solicitation | 99 | 100 |
| 7 | Differing Site Conditions Clause | 101 | 101 |
| 8 | Certified Claim (Revised) | 102 | 103 |
| 9 | Letter 3-30-00 from Eddie Fisher to Corps of Engineers | 103 | 103 |
| 10 | Fax 5-15-01 from Barry Smith to Will Sanford | 104 | 104 |
| 11 | Amendment of Solicitation Modification of Contract | 104 | 104 |
| 12 | Fax 3-12-01 from Will Sanford to Tom Benero | 104 | 105 |
| 13 | Letter 4-16-01 from Steven Bowman to Thomas Benero | 105 | 105 |
| 14 | Transmittal 6-2-00 from Alan Jefts to Patrick Kuhne | 106 | 106 |
| 15 | Stiff Clay Percentages | 107 | 107 |
| 16 | Stiff Clay Percentages | 107 | 107 |

INDEX CONTINUED

| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 17 | Memo 7-13-00 from Eddie Fisher to Kenneth Machacek, Steve Bowman | 107 | 108 |
| 18 | Renda Marine's Fourth Supplemental Answers | 115 | 115 |
| 19 | Renda Marine's Second Supplemental Responses | 116 | 116 |
| 20 | Letter 3-25-04 from Christopher Mathewson to Brian Erikson | 119 | 119 |
| 21 | Drawing | 120 | 120 |
| 22 | Upper Bayou Hydraulic Levees | 120 | 122 |
| 23 | Logs of Borings | 123 | 123 |
| 24 | Memo 4-17-00 from Leon Hrabovsky to Al Jefts | 131 | 131 |
| 25 | Letter 10-13-99 from Eddie Fisher to Mike McClenan | 133 | 133 |
| 26 | Drawing | 161 | 161 |
| 27 | Letter 3-16-04 from Cheryl Moseley to John Kosloske | 182 | 182 |
| 28 | Photographs (1 - 98) | 183 | 183 |

REQUESTED DOCUMENTS/INFORMATION

| NO. DESCRIPTION | Page/Line |
|---|---|
| None | |

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| NO. | Page/Line |
|---|---|
| None | |

THE REPORTER: Pursuant to the Federal Rules of Civil Procedure?

MR. KOSLOSKE: The Rules of the Court of Federal Claims.

THE REPORTER: Would you raise your right hand, please?

Do you solemnly swear or affirm to tell the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes, I do.

THE REPORTER: Thank you.

CHRISTOPHER MATHEWSON,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. KOSLOSKE:

Q. Good morning.

A. Good morning.

Q. Dr. Mathewson, would you state your full name for the record and spell it, please?

A. Christopher Colville Mathewson, C-H-R-I-S-T-O-P-H-E-R, C-O-L-V-I-L-L-E, and Mathewson, M-A-T-H-E-W-S-O-N.

Q. And what is your residential address and telephone?

A. 1307 Glade, G-L-A-D-E, Street, College Station, Texas, 77840, and my home phone is (979) 693-5382.

groundwater, there's also road access, availability, cover material, layout of the various trenches, operating schedule, so it's a complete -- is it safe to dig the hole, dig the hole, put the waste in it, bury the material and make sure the waste doesn't escape. Make sure you have wet water -- wet weather access, dry weather operating conditions, so you've got to be concerned about weather, you've got to be concerned about the characteristics of the waste that you're handling, particularly in small rural landfills. You have no idea of how many barrels of arsenic Farmer Brown might want to throw in the landfill. So you're trying to control, at least notify and make the operators aware of what to look for.

Q. Did the design of the sanitary landfill require you to design a levee or a dike?

A. There were surface water control diversions, yes.

Q. Would you describe these structures?

A. They were basically low berms to redirect surface water around the landfill instead of into the site, including also the access roads down the ramp, but you had to be able to divert the surface water running down the ramp and you had to let trucks drive over them.

Q. What were the dimensions of these berms?

A. They were small.

Q. More specific.

A. More specific, maybe half the size of this table, the top. Eight foot wide at the base, three foot high and a flat enough top that they could get a lawn mower over it.

Q. And how were they constructed?

A. They were basically constructed mechanically, dozers.

Q. How would you describe the foundation, the soil foundation on which these berms were built?

A. They're on competent clays.

Q. What do you mean by "competent clays"?

A. The size of the structure built on the subsurface materials, there was no concern about landslides or stability.

Q. You didn't perform a stability analysis?

A. Didn't need to, no, based on the knowledge of the strength of the material.

Q. Who was the client for which you performed this site investigation and design of sanitary landfill?

A. Brazos County was one of them, Brenham was another, and I don't remember how many precincts in Brazos County, but basically we were trying to get the locals from dumping the trash in a ditch or in the creek.

Q. A few items below the item on page three, "Site investigation and design of sanitary landfill," a few items below that there's an item called, "Prediction of settlement

Q. Have you ever been on the dredge Millennium?
A. No.
Q. Have you ever designed a disposal facility for dredged material?
A. No.
Q. Have you ever participated in the design of a disposal facility for dredged material?
A. I don't recall.
Q. Have you ever designed a levee or a dike for a disposal facility for dredged material?
A. To my knowledge, no.
Q. Have you ever participated in the design of a levee or dike or a disposal facility for dredged material?
A. No.
Q. Aside from the small berms you mentioned in connection with the design of the landfill, have you ever designed a levee or dike of any kind?
A. That what, levee or dike that --
Q. Of any kind.
A. Oh, of any kind. Not that I recall.
Q. Have you ever designed a structure for a soft foundation?
A. By structure, you mean --
Q. I'll break it down. Have you ever designed a -- an earth structure for a soft foundation?

A. No.

Q. Have you ever designed a, say, a building that was to go on a soft foundation?

A. No. I'm not a design engineer.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of disposal facilities for dredged material?

A. No. Not that I recall.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of a levee or dike for a disposal facility for dredged material?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of levees or dikes in general?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of structures for soft foundations?

A. No.

Q. Do you consider yourself to be an expert with respect to the design of disposal facilities for dredged material?

A. No. Just -- I'll have to qualify that, counselor,

to?
A. The capability between the engineer's design and the capability of the landscape to support that design, would be the engineering geology of dredged material, both dredging operations, transporter operations and disposal operations, that's my field of expertise.
Q. Do you consider yourself to be an expert with respect to the design of structures for soft foundations?
A. As a designer, no, as an assessor of the relationship between the structure and the foundation, yes. Again, it's the engineering geology, not how big a footing do I use.
Q. What, if any, experience have you had with the construction of disposal facilities for dredged material?
A. Not direct experience that I could identify. I did while discussing -- remember one other project in which I was -- I acted as a design engineer that involved small levees, and this was the creation of a wetland for wastewater treatment. We had to excavate the ponds.
Q. When was that?
A. That would have been probably mid '90s. That was for TMPA.
Q. I'm sorry. What's TMPA?
A. Texas Municipal Power Agency. We were using a wetland to treat leachate from their -- their fly ash

disposal site, but it was kind of small --

THE REPORTER: From their what?

A. Fly ash disposal site, but it still falls into the small scale type structure. We might have had to levee it, the dam at the downstream end might have been five feet high.

Q. (BY MR. KOSLOSKE) Have you ever been qualified by a court or administrative agency as an expert with respect to the construction of disposal facilities for dredged material?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of a levee or dike or a disposal facility for dredged material?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of levees or dikes in general?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of structures upon soft foundations?

A. No. I believe you went through those questions earlier.

Q. Have you ever acted as a consultant with respect

to the design or construction of a levee or dike for a disposal facility for dredged material?
A. No, I don't believe I have.
Q. Have you ever acted as a consultant with respect to the design or construction of a levee or dike for any purpose?
A. Yes, those would have been the wetland for TMPA, the surface water control structures for the landfills, and some of the debris flow hazard production evaluations for the Wasatch Front in Utah.
Q. Have you ever acted as a consultant with respect to the design or construction of a structure upon soft foundation?
A. Not that I recall.
Q. Have you ever prepared a construction estimate of any kind?
A. Yes.
Q. What kind of estimate was that?
A. Those were for renovation estimates for the Geology Building, Michael T. Halbouty Geoscience Building, I was building property facilities manager, it was minor construction.
Q. Have you ever prepared an estimate for a dredging job?
A. Only with respect to the research on the

14A

A. No.

Q. Is it your opinion that a construction inspector is normally a person who's qualified to perform a vein/shear test?

A. I'm sure there's a qualified person in the Galveston district, so a construction inspector would have picked up a sample and said, "Renda says this stuff is different; is it?"

Q. Turn to the Lost Lake Levee claim, which is item four of your report, the discussion of it appears at the bottom of page two of your report that's marked Exhibit 1. Dr. Mathewson, do you agree that the contract documents for the Upper Bayou Project indicate the soil conditions along the footprint of the new perimeter levee were soft to very soft?

A. Yes.

Q. Now, you didn't visit the Lost Lake Placement Area before issuing your January 26, 2004, report; correct?

A. Right.

Q. Have you performed any calculations in evaluating the Lost Lake Levees claim?

A. No, I have not.

Q. Have you performed any side slope stability analysis?

A. No, I have not.

Q. Have you performed any settlement analysis?
A. No, I have not.
Q. Have you performed any subsidence analysis?
A. No, I have not.
Q. Did you perform or cause to be performed any testing relative to the Lost Lake Levees claim?
A. No, I did not.
Q. What was the impossible condition that resulted from the side-cast borrow areas?
A. The side-cast borrow areas created a break in the harder desiccated surface and allowed then the shear stresses to escape against an area that had lower shear strength.
Q. Is it your understanding of the design for the perimeter levee at the Lost Lake Placement Area of the Upper Bayou project area that the -- the new perimeter levee foundation was to be the existing layer or crust of foundation material at the site?
A. Yes. Was to be placed on top of that and built up from there.
Q. Did you perform a displacement analysis in connection with your evaluation of the Lost Lake Levees claim?
A. No, I did not.
Q. Wasn't the design of the hydraulically constructed levees at the Lost Lake Placement Area, didn't it call for

displacement of the soft to very soft foundation materials that the contract indicated were present along the footprint of the new perimeter levee?

A. I believe it anticipated some displacement of those soft materials. The contractor should expect them, expect displacement.

Q. How did you determine that the side-cast borrow areas resulted in an impossible condition?

A. Because of the properties of the -- of the soft materials given in the boring logs and the way in which it was loaded and the height at which it was loaded and the speed with which it was loaded and the presence of significant pressure head on the groundwater -- the water system.

Q. What is your understanding of the height to which the new perimeter levee at Lost Lake was raised by hydraulic placement of fill?

A. My understanding -- sorry, sir, did you finish the question? My understanding was the contractor was to raise it to 30 feet, plus 30.

Q. Where were the side-cast borrow areas located in relation to new perimeter levee?

A. They were on the outer -- mostly on the outer flange. If you think of the levee, the existing levee provided the buttress against failure into the Buffalo Bayou,

hydraulic levees were to be built?

A. I don't have any knowledge. I would assume that in spots, there are sections of it where they were repairing the levee and there were sections where the side-cast borrow area would not exist or would not have existed -- or may have existed from a long ago previous time.

Q. What is your understanding of Renda Marine's construction sequence to raise the levees to elevation 30 feet above mean low tide?

A. Well, the first phase was a mechanically placed section, and then they went into the hydraulic dredge placement process where they built out, and then proceeded around the side.

Q. My question is addressed to the hydraulic construction, the portion of the new perimeter levee that was to be constructed by hydraulic placement of fill.

A. Okay.

Q. What is your understanding as to the construction sequence used by Renda to build or raise the levees hydraulically to elevation of 30 feet?

A. They would have strung their dredge pipe out and discharged the dredged material about where the crown of the new levee should be, and then you need a piece of machinery that moved the sediment away from the discharge pipe or it plugs everything up, so you're trying to distribute it as

you're going, as technique they used to build it. I don't know what you mean by sequence.

Q. Is it your understanding that the sequence to construct the levees that were to be constructed hydraulically the sequence that was used by Renda or the construction technique, to use your term, was the same for the east levee to west levee and the north levee?

A. I have no data on what they may have changed.

Q. Do you know where the borrow areas, the side-cast borrow areas at Lost Lake Placement Area were excavated with backhoe or dragline?

A. I don't know. Either piece of equipment would have done it.

Q. Do you know where the excavator was positioned?

A. It was positioned on -- near the base of the -- at least from those areas I saw when I was there, it would have been positioned near the base -- inside base of the existing levee.

Q. Would have been -- would the excavator have been positioned on mats?

A. Probably to distribute the load even better so it wouldn't sink out of sight.

Q. Was that on compacted or hard?

A. That would have been on hard, but as soon as you put the mats down you're compacting it, so continued use of