calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $483.24 (Non-Effective Time) and $772.58 (Effective Time) per hour rates specified in the RMI claim.

Dredge Equipment Repair Cost

Four repair invoices were discovered that occurred prior to the first obstruction in this claim. Per RMI, these items were mistakenly included in this claim as well at the South Ferry Landing claim. Both DCAA and RMI concur that these items are duplicated and should be removed from this differing site condition claim. The total of $78,540 (including Overhead, Profit, and Bond) for duplicated repair invoices has been removed from this claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has

identified time associated with preparation of REA's. An adjustment of ($25,479) was made to the claim amount.

Conclusion

RMI is entitled to $1,986,551 in additional compensation due to this issue.

**Claim 9 - Differing Site Condition – Obstructions in Section 9, Stations 660+00 to 685+00**

On June 14, 2001, RMI submitted to the USACE, Galveston, Texas a Request for Equitable Adjustment (REA) for differing site conditions related to channel obstructions (Section 9) in the amount of $1,158,642. While performing dredging work on the Upper Bayou near Houston, Texas between April 12, 2001 and May 8, 2001, RMI incurred additional costs due to higher than normal obstructions within the channel between stations 658+00 and 680+00. Specification Section 02482 – Dredging, paragraph 1.11.1 states:

> "Other materials such as scrap, rope, wire cable, snags, and stumps may be encountered within the specified limits of required dredging and overdepth dredging. No seperage (sic?) payment will be made for removal and placement of the debris."

However, RMI struck numerous buried obstructions and sustained serious damage to dredging machinery as well as significant downtime while repairs were being made. In addition, the occurrences were made after a sonar survey performed between January 7 and January 11, 2001 indicated the presence of debris fields and other large obstructions within the Section 9 channel. Because of previous difficulties with obstructions in dredging Sections 4 through 8 and the survey results, RMI suggested to the USACE that, before hydraulic dredging proceeds in Section 9, the debris should be removed by clamshell cranes. The USACE directed RMI to proceed with the work regardless of this warning on March 29, 2001 and contact the USACE for verification if excessive debris is encountered. Work proceeded in Section 9 and on April 12, 2001 after encountering several obstructions, RMI contacted the USACE for verification of the conditions and possible solutions. RMI suggested that, if dredging continued, the dredge may be extensively damaged causing delays and dollar damages. After additional encounters with objects and significant damages to the dredge *Millennium*, RMI again sought change or deletion of this section of the contract. On June 1, 2001, the USACE directed RMI to delete the remaining portion of Section 9 in the contract. The claim submitted by RMI on June 14, 2001 relates to damages and additional costs incurred before this contract change. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $131,702 of "questioned costs"

in the following categories – Equipment ($86,645), Overhead, Profit, and Bond ($33,058), Professional Fees/Consultants ($10,000), and Report Preparation ($1,000). Overall, the DCAA indicates that:

> ***"because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. Hydraulic levee amounts are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $474.60 (Non-Effective Time) per hour rate specified in the RMI claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has identified time associated with preparation of REA's. An adjustment of ($9,838) was made to the claim amount.

Conclusion

RMI is entitled to $1,148,804 in additional compensation due to this issue.

**Claim 10 - Changed Conditions – West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 (Modification CO-10, P00027)**

This levee-related claim item has been combined with Claim 12 – Lost Lake Levees. DCAA Audit Report comments and pricing issues are addressed in the claim Item 8 section below.

**Claim 11 - Differing Site Condition – Section 7 Clay**

On April 16, 2001, RMI submitted to the USACE, Galveston, Texas a REA for dredging in clay areas pertaining to the Section 7 Area in the amount of $1,083,779. RMI submitted a certified claim on August 9, 2001 and revised it on April 19, 2002. The total damages are now stated to be $1,123,884 supported by a revised Damages Summary report and audit-related documents. While performing dredging work on the Upper Bayou near Houston, Texas, RMI encountered heavy red clay material at the north side of the channel between Station Nos. 561+20 and 609+00 during the period between October 2, 2000 and November 6, 2000. RMI had notified the USACE on October 20, 2000 in writing that hardpan clay had been encountered. This type of clay, per the REA, is "very difficult to dredge through." The USACE denied "merit" to the issue in correspondence dated December 13, 2000 and indicated:

> "The soils borings shown in the contract drawings pertaining to this area indicate stiff to very stiff clays and medium dense to dense sands. Encountering these materials should be anticipated in various areas during dredging operations."

In the REA, RMI states it anticipated dredging gray and blue clays per the soil borings but not hardpan or red clay as the December 13 USACE correspondence implied. The log borings in the impacted area do not show the conditions actually encountered. The dredge was delayed 20 calendar days in a 35 day period and incurred additional equipment, labor, and overhead costs. RMI uses past historical data, operating information for the dredge, and the "measured mile" approach to calculate damages for this claim. A "Show Cause Notice", dated November 6, 2000, was issued by the USACE indicating the USACE was considering terminating the contract for default. RMI responded to the Show Cause Notice on November 15, 2000. On November 29, 2000, the JV consultants reviewed RMI's response to the Show Cause Notice and were of the belief that there was no differing site condition. More specifically, the JV wrote that RMI "has not provided notice and allowed the Government it's right to investigate" and "heavy clays are depicted in the soil borings and drawings." In a subsequent letter dated June 1, 2001, the JV stated they had further reviewed the boring logs which indicated the presence of hard clays ranging from light gray, blue gray, olive, brown, rust, red, and mixtures thereof. As of the date of this analysis, RMI's claim has not been resolved nor does there appear to be any evidence that the USACE has given "merit" to this issue.

<u>Audit Report Comments</u>

An audit report for this specific claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $256,142 of "questioned costs" in the following categories – Equipment ($166,564), Overhead, Profit, and Bond ($63,578), Professional Fees/Consultants ($25,000), and Report Preparation ($1,000). Overall, the DCAA indicates that:

> ***"Because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

<u>Response to Audit Report Comments</u>

<u>Equipment</u>

The DCAA questioned two specific items – inclusion of equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost

of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $129,452 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $483.24 (Non-Effective Time) and $772.58 (Effective Time) per hour rates specified in the RMI claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with. Therefore, the claimed amounts are compensable.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has identified time associated with preparation of REA's. An adjustment of ($16,161) was made to the claim amount.

Conclusion

RMI is entitled to $978,271 in additional compensation due to this issue.

**Claim 12 - Lost Lake Levees**

The Lost Lake Levees claim previously excluded the West Levee Realignment claim – claim, know as Claim 10 in this report. All levee-related issues have been incorporated into Claim 12 – Lost Lake Levees. The DCAA audit reports were provided separately and have been separately addressed below. Following the audit report discussion is a detailed assessment of the entire levee claim along with pricing details.

***West Levee Realignment between Stations 166+00 to 215+00 (formerly Claim 10):***

On May 31, 2001, RMI submitted to the USACE, Galveston, Texas an REA for Levee Realignment between Stations 166+00 to 215+00 in the amount of $789,600. Modification CO-10 had been issued previously but RMI was not in agreement with the cost and time provisions suggested by the USACE. Therefore, RMI submitted the REA to recover its additional costs. In July, 2000, while performing dredging work on the Upper Bayou near Houston, Texas, RMI became aware of a design problem with the levee alignment as described in the contract documents, and on July 28, 2000, notified the USACE. Subsequent discussions and correspondence led to Modification CO-10 issued by the USACE directing RMI to realign the levee per an attached new drawing without any change to the contract cost or completion period. RMI notified the USACE on May 31, 2001 that the cost and time portions of the modification were unacceptable noting that additional costs were incurred and time required to complete the levee realignment. The REA was submitted on the same date to request cost (an additional $789,600) and time (an additional 40 days) adjustments to the contract. RMI further noted that it did not believe that cost and pricing data was required for this REA Proposal as unit prices had been agreed to in earlier modifications CO-1 and CO-2. In its REA, RMI references the Unit Price of $4.70 per Cubic Yard (CY) for realignment and relocation of levees per Modification Pay Item Nos. 1CO-2, 3CO-2, 4CO-2 and 5CO-2 and used that amount to calculate the amount claimed by RMI. RMI mentions that the Unit Price of $4.70/CY was approved by the Government in March 1999. Also related to this claim is a dispute over the amount of material hydraulically placed by RMI. On August 16, 2000, a quality assurance survey was made by Joint Venture (JV) consultants for the USACE. The JV stated "quantity calculations indicate the contractor has pumped 132,937 CY of material versus a required quantity of 59,087 or about 2.5 times the needed quantity." RMI states that material was not wasted, as alleged by the JV but

was used to fill borrow areas and displace unsuitable material. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA labels the entire claim amount of $789,600 as "questioned costs" due to "RMI not providing adequate support for its claim related to Changed Conditions-West Levee Realignment, Lost Lake Placement Area." More specifically, the DCAA stated the claim was not prepared in accordance with Federal Acquisition Regulation (FAR) 15, particularly FAR 15.408, Table 15-2. This FAR requires that the contractor provide breakdowns for the basic cost elements claimed. This FAR provides instructions on the format of cost/price proposals and requires specific cost break outs - for example: Materials and Services, Direct Labor, Indirect Costs, etc.

Response to Audit Report Comments

It should be noted that this position contradicts that which was outlined in the original REA – cost detail is not required due to a previous agreement with the USACE regarding unit costs. The additional costs are compensable. A more detailed evaluation of costs within this claim has been conducted and is provided below.

*Lost Lake Levees:*

On October 16, 2001, RMI submitted to the USACE, Galveston, Texas a REA for differing site conditions and changed conditions related to hydraulic levees at the Lost Lake Placement Area in the amount of $6,258,853. While performing dredging work on the Upper Bayou near Houston, Texas between September 13, 1999 and September 18, 2001, RMI incurred additional costs due to a combination of several Changed Conditions and/or Differing Site Conditions discovered at the Lost Lake Disposal Placement Area. This claim encompasses a wide time-frame and is supported by numerous reports, letters, and other documents. Essentially, it involves extra costs for work and effort incurred to reconstruct levees damaged by subsidence of existing foundation materials, impacts to the dredging operation as a result, and standby time for equipment while awaiting an official release from the USACE to demobilize the project. On December 13, 2000, the USACE via correspondence denied "merit" for the differing site conditions within the claim. The JV also supported this position and indicated that over-dredging, improper levee construction methods, use of unsuitable material, and inexperience are likely causes. RMI disagrees with the USACE and JV positions and believes the USACE did not accurately estimate quantities of suitable materials nor did it provide proper contract specifications and drawings in order to construct the levees as desired and that the foundation materials were unstable causing subsidence of the newly placed levees.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA labels the entire claim amount of $6,258,853 as "questioned costs" due to RMI not providing adequate support for its claim. DCAA indicates the claim was not prepared in accordance with Federal Acquisition Regulation (FAR) 15, particularly FAR 15.408, Table 15-2 and states:

> ***"Because the cost or pricing data inadequacies are considered significant, we do not believe the claim is an acceptable basis for settlement of the price adjustment claim request...".***

Response to Audit Report Comments

The amount claimed represents the additional costs to attempt to construct and maintain the levees while they were subsiding. RMI indicates that the claim was prepared using the Modified Total Cost approach. RMI indicates that at a later date it will prepare and break out the claimed costs. These costs are compensable. A more detailed evaluation of the costs within this claim has been performed and a detailed discussion follows. Claim calculations are included as Exhibit C, Damage Calculations.

***Assessment of Levee Claims (Claims 10 and 12):***

While performing dredging work on the Upper Bayou near Houston, Texas between September 13, 1999 and September 18, 2001, RMI incurred additional costs due to a combination of several Changed Conditions and/or Differing Site Conditions discovered at the Lost Lake Placement Area. Between September 1999 and early April 2001 dredging and levee work was proceeding. In April 2001 the dredge hit obstructions which stopped the dredging operation. In May 2001 the dredge *Millennium* moved to the Houston Fuel Oil project in an attempt to mitigate damages on this project. After the Houston Fuel Oil project was complete the dredge and levee equipment were idle while awaiting an official release from the project. During this time RMI was able to perform the Simm's Bayou project to mitigate some of its damages.

As part of the Dredging Upper Bayou contract, RMI was to construct a total of 20,500 Linear Feet (LF) of levees around the Lost Lake Placement Area. Affolter Construction (La Marque, Texas) was subcontracted by RMI to mechanically construct 6,900 Linear Feet (LF) of the levees using clay material available at existing on-site borrow areas. The remainder, approximately 13,600 LF of levees, was to be hydraulically constructed by RMI using suitable clay materials obtained from the dredging template in the Houston Ship Channel. The balance of the dredged materials were to be placed within disposal areas inside the Lost Lake Placement Area.

The Affolter section of the contract was completed on May 19, 1999. Subsidence issues occurred where Affolter was working on the mechanical levee sections and were attributed to poor existing foundations. RMI submitted change orders and quantity modification requests on Affolter's behalf in excess of $1,600,000 of which over $1,200,000 resulted directly from poor foundations and subsidence found in the Lost Lake Placement Area. The USACE agreed to the

changes with minimal documentation, certain sections were unit-priced, and Affolter was fully compensated.

RMI began their dredging operation on September 13, 1999 and on the same date began constructing hydraulic levees from Station 97+00, near the East end of the recently constructed mechanical levees. Subsidence, displacement, and levee failures began shortly thereafter and are well-documented throughout the entire construction period. In fact, certain areas of the levees continue to fail to this day. RMI estimated 900,000 total CY or 70 Loose Cubic Yards (LCY) per LF would be required to construct the levees to compensate for reasonable, anticipated displacement. This amount represented almost twice the neat cross section quantity and was similar to the USACE estimate of 73 CY per LF. Due to lack of reasonable foundations and the presence of extensive side-cast borrow areas which were not indicated on the contract documents, RMI contends that nearly 2,000,000 CY were required in order to fill the borrow areas and construct the levees. RMI further contends that the clay indicated to be available in dredging Sections 1 through 6 (based on quantities derived from dredging cross sections in the contract documents) should have been adequate to construct the levees.

The existence of undocumented poor foundations caused by side-cast borrow areas from previous levee building activities in the Lost Lake Placement Area caused the levee material requirements and construction time to be significantly higher than originally anticipated. In addition, various mechanical levee operations were added to reconstruct failed levees and construct new levees from clay material that had migrated into side-cast borrow areas. Furthermore, the dredging operation suffered directly related delays and downtime while the dredge discharge pipe was backtracked as levees failed, moved material over greater than anticipated distances, and while pumping water in order to "flush" displaced material away from the levee construction zone. This claim includes all costs related to the above differing site conditions as well as additional time the dredge was held on the project while awaiting an official demobilization release from the USACE.

The following specific items are included in the Lost Lake Placement Area Claim:

A. Additional levee equipment and labor required to construct the levees above and beyond what could have been reasonably anticipated from the contract documents ($1,549,759 total direct costs).

   The original crew anticipated for hydraulic levee construction per the RMI bid estimate was one supervisor and a crew of three operators. The operators were employed for shaping and finishing levees by operating a dozer, backhoe, and marsh equipment as needed. In addition, the operators would rough shape initial clay placement from the dredge and add shore pipe as required. During the actual hydraulic levee operation, massive amounts of displaced material from the side-cast borrow areas accumulated and surrounded the discharge area. This material became known as the "mud wave". RMI never intended to move large amounts of displaced material and the planned crew and equipment spread was not adequate. Because of this differing site condition, RMI was forced to add additional personnel and equipment to continually move the excessive amounts of material from the face of the discharge area and create temporary