UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., PLAINTIFF, | § § | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| UNITED STATES ARMY CORPS OF ENGINEERS, DEFENDANT. | § § § | |

**MOTION BY RENDA MARINE, INC., FOR LEAVE OF COURT TO AMEND COMPLAINT**

Plaintiff, Renda Marine, Inc. ("Renda"), respectfully requests that the Court grant leave for Renda to amend its Complaint to assert issues which arose well after the Complaint was originally filed, as more fully discussed below, and set out in the First Amended Complaint, attached as Exhibit A.

Renda filed this suit on April 11, 2002. On November 26, 2002, the Contracting Officer issued a Contracting Officer's Final Decision concerning alleged counterclaims that the Government purportedly had against Renda. A true copy of the Contracting Officer's Final Decision is attached as Exhibit B.

The Government has never filed counterclaims or sought an offset in this suit.

In Renda's Memorandum of Contentions of Fact & Law (filed on April 14, 2004), Renda raised the issue that the Contracting Officer's Final Decision was a nullity since it was not preceded by a dispute, and was never presented to Renda for comment, as required by the Contract Disputes Act, 41 U.S.C. §§601, et seq. See Renda's Memorandum of Contentions of Fact & Law, pertinent pages of which are attached as Exhibit C.

The Government responded in its Memorandum of Contentions of Fact and Law contending that the Contracting Officer's Final Decision "is not a subject of Renda's complaint in this case and the Government has not sought to place that decision in issue here by way of pleading a set-off or a counterclaim." A true copy of pertinent pages from Defendant's Memorandum of Contentions of Fact and Law is attached as Exhibit D.

The Government correctly points out that Renda's Complaint does not mention the Contracting Officer's Final Decision. At the time that Renda filed its Complaint, there was no Contracting Officer's Final Decision on any of Renda's claims, a fact stressed in paragraphs 17, 48, 73, 83, 90, 100, 120, 147, and 197 of the Complaint. A true copy of Renda's Complaint is attached as Exhibit E.

Renda respectfully requests leave to amend its Complaint to make the Contracting Officer's Final Decision "a subject of Renda's complaint in this case."

Renda has also made other changes to reflect discovery that has occurred in this case. There is no trial date. There is no scheduling order. Defendant will not be prejudiced in any way by Renda's making the Contracting Officer's Final Decision "a subject of Renda's complaint in this case."

Allowing Renda to amend its Complaint now will alleviate surprise to the Government.

Wherefore, Plaintiff, Renda Marine, Inc., respectfully requests that the Court grant Renda leave to file a First Amended Complaint in this case.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: s/Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)

ATTORNEYS FOR RENDA MARINE, INC.

## CERTIFICATE OF CONFERENCE

On June 23, 2004, I placed a telephone call to John Kosloske, counsel for Defendant, concerning whether Defendant had any objection to the Court's granting this motion. I was directed to Mr. Kosloske's voice mail and left a message about Renda Marine's Motion for Leave. I subsequently wrote to Mr. Kosloske and provided a draft copy of Renda's First Amended Complaint. Mr. Kosloske wrote back and indicated that he would not agree to the granting of this motion. As a result, we have not reached an agreement, thereby requiring that this motion be presented to the Court for adjudication.

s/Brian W. Erikson
Brian W. Erikson

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of July, 2004, a true and correct copy of the Motion by Renda Marine, Inc., for Leave of Court to Amend Complaint, was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson

APPENDIX TO MOTION BY RENDA MARINE, INC., FOR
LEAVE OF COURT TO AMEND TO AMEND COMPLAINT

APPENDIX TABLE OF CONTENTS


| Exhibit | Description | Page |
|---|---|---|
| A | Renda Marine, Inc.'s First Amended Complaint | 1-38 |
| B | Contracting Officer's Final Decision | 39-46 |
| C | Renda Marine, Inc.'s Memorandum of Contentions of Law & Fact (pertinent pages) | 47-58 |
| D | Defendant's Memorandum of Contentions of Fact and Law (pertinent pages) | 59-61 |
| E | Renda Marine, Inc.'s Complaint | 62-90 |

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC.,<br>PLAINTIFF,<br><br>V.<br><br>UNITED STATES ARMY<br>CORPS OF ENGINEERS,<br>DEFENDANT. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 02-306C<br><br>(JUDGE HEWITT) |

**FIRST AMENDED COMPLAINT**

Plaintiff, Renda Marine, Inc., complaining of Defendant, United States Army Corps of Engineers, respectfully states the following.

**I.**

**Parties**

Plaintiff, Renda Marine, Inc. ("Renda") is a corporation organized under the laws of Texas, with its principal place of business in Denton County, Texas.

Defendant, United States Army Corps of Engineers ("Corps"), is an agency within the Department of Defense of the United States Government. The Corps has appeared and answered herein and may be served through its attorneys of record..

**II.**

**Jurisdiction**

This Honorable Court has jurisdiction under the Contract Disputes Act, since Renda's claims arise from a United States Government construction contract, which is subject to that act.

**III.**

**Venue for Trial**

Renda respectfully requests that trial occur in Houston, Texas.



EXHIBIT
A

IV.

**Factual Background**

1. Renda is a marine dredging contractor.

2. The Corps is a government agency which awards many millions of dollars in marine dredging projects each year.

3. The Corps awards many contracts in and around the Port of Houston, Texas, in general, and the Houston Ship Channel, in particular. The Port of Houston is a 25-mile long complex, intermixed with public and private facilities. The Port of Houston is among the largest in the United States, and one of the largest in the world.

4. The Corps is charged with maintaining the navigability of the Port of Houston, and the Houston Ship Channel.

5. The Port of Houston Authority is a local sponsor for many of the Corps' projects for the Port of Houston.

6. On about June 16, 1998, the Corps requested proposals for Invitation No. DACW64-98-B-0004, "Houston-Galveston Navigation Channels, Texas (45-Foot Project) - Dredging Upper Bayou" ("Upper Bayou Project" or "Project").

7. The Contract Documents for the Upper Bayou Project made no mention of (1) the Port of Houston Authority, or (2) any agreement that the Corps had signed or may sign with the Port of Houston Authority, or (3) any engineering consultants for the Port of Houston Authority.

8. On about July 17, 1998, Renda submitted a bid to the Corps to construct the Upper Bayou Project. Renda's bid was $12,526,100.00, and was the lowest bid for the Project.

9. Another dredging contractor filed a protest with the Corps to contest an award to Renda of a contract for the Upper Bayou Project. Although Renda ultimately prevailed, the start of the Project was delayed.

10. On about October 26, 1998, the Corps issued Contract No. DACW64-98-C-0001 to Renda for the Upper Bayou Project ("Contract").

11. On about November 19, 1998, Renda acknowledged receipt of the Corps' Notice to Proceed on the Upper Bayou Project. The completion date required by the contract for the Upper Bayou Project was either 446 or 566 calendar days from Renda's receipt of the notice to proceed. During the course of the Project, Renda encountered differing site conditions and other problems which caused extra time and expense for its work on the Project.

12. When confronting a differing site condition, Renda generally first attempted to negotiate amicably with the Corps to lessen the cost input. But, as a general rule, the Corps tended to ignore the problem.

13. As a result, Renda had to submit a more formal request for equitable adjustment to attract the Corps' attention.

14. When the Corps did not negotiate or negotiate in good faith, Renda then had to submit a formal certified claim.

15. The Corps still has ignored most of the claims, and has refused to negotiate them in good faith.

16. One of the Corps' stalling tactics on negotiation and resolution of Renda's claims was the purported need for an audit of Renda's overhead. To resolve this concern, Renda requested an audit by the Defense Contract Audit Agency ("DCAA") of Renda's claims and overhead rates. The Corps delayed requesting an audit for more than a year.

17. The Contracting Officer did not issue any Contracting Officer's final decision on Renda's certified claims, although many more than sixty days have elapsed, before Renda filed this suit.

18. As a result, Renda has had to deem denied the certified claims presented herein, and seek adjudication from this Court.

19. On November 26, 2002, the Contracting Officer issued a Final Decision, which summarily rejected Renda's claims, and asserted numerous counterclaims. The Government has not asserted those counterclaims in this suit, and has not requested an offset or credit for such counterclaims in this suit.

**Count I -**
**South Ferry Landing Differing Site Conditions Claim**

20. The allegations of paragraphs 1 through 19 are hereby incorporated by reference and reaverred as if fully set out herein.

21. On about September 13, 1999, Renda started dredging operations for the Project in the Houston Ship Channel at or near Station 489+60 in Dredge Section 1.

22. On about October 8 and 9, 1999, Renda's dredge (the *Millennium*) hit obstructions on the south side of the Houston Ship Channel while dredging in the vicinity of Station 470+00 (South Ferry Landing). These obstructions were not shown in the Contract Documents.

23. On about October 9, 1999, Renda orally notified the Corps of differing site conditions in the South Ferry Landing area, and relocated the Millennium further upstream in the Houston Ship Channel to avoid the obstructions and to continue dredging.

24. On about March 8, 2000, the Contracting Officer for the Upper Bayou Project issued a cure notice to Renda based in significant part on Renda's not completing dredging in the South

Ferry Landing area. The Corps threatened to terminate Renda for default as a result of delays Renda faced in its efforts to complete the Upper Bayou Project.

25. Under pressure from the Corps, on about April 7, 2000, Renda returned to dredge in the South Ferry Landing area. The Corps well knew of the obstructions, and that it would be expensive and perhaps futile to continue dredging in the area.

26. On about April 14, 2000, Renda's dredge still was unable to clear obstructions from the South Ferry Landing area (stations 470+00 to 472+00). Between April 21, 2000, and April 23, 2000, Renda again attempted to dredge the South Ferry Landing area but had difficulty doing so due to the presence of rubble and other man-made erosion control materials. Renda again notified the Corps of the conditions.

27. As a result of hitting the rubble and rip-rap in the South Ferry Landing area, Renda's dredge was severely damaged. Dredge repairs occurred between about April 24, 2000, and April 30, 2000. Renda again notified the Corps' Contracting Officer and Administrative Contracting Officer about the South Ferry Landing conditions.

28. On about April 25, 2000, the Contracting Officer decided not to terminate the Contract for default. Instead, on about April 26, 2000, the Contracting Officer imposed strict performance requirements on Renda, which, if not met, would result in an immediate termination of the Contract.

29. On about April 28, 2000, Renda confirmed its differing site conditions concerns in a letter to the Corps about the South Ferry Landing area.

30. The Corps did not respond.

31. Fearing termination, Renda redoubled its efforts and completed dredging in the South Ferry Landing area between about May 1, 2000, and May 3, 2000, but at considerable extra expense to Renda.

32. Thereafter, on about May 8, 2000, the Corps conducted a survey of the dredge template for the South Ferry Landing area. (The "dredge template" is the area that Renda was required to clear of the material indicated in the Contract Documents, and as shown on the soil borings.) The Administrative Contracting Officer attended the survey. However, the Corps refused to provide any results of the survey to Renda for several months despite Renda's repeated requests for the results.

33. As a result of completing the dredging in the South Ferry Landing area, Renda's dredge again sustained severe damage, and had to be extensively repaired between about May 13 and 17, 2000.

34. On about August 11, 2000, responding to a Contracting Officer request, Renda revised its construction schedule, noting that the revised schedule did not take into account delays at the South Ferry Landing. Unable to finalize the schedule without a decision by the Corps on the South Ferry Landing, Renda advised the Administrative Contracting Officer that Renda awaited acceptance of Dredge Section 1, including the South Ferry Landing.

35. On about September 22, 2000, the Administrative Contracting officer accepted Dredge Sections 1 through 3, without mentioning any of the South Ferry Landing problems.

36. On September 22, 2000, Renda transmitted a letter to the Corps summarizing the South Ferry Landing differing site condition.

37. On about November 6, 2000, the Corps met with Renda to discuss construction issues, including the South Ferry Landing claim, and most if not all of the claims in this suit.

38. Despite full knowledge of the various differing site conditions that Renda faced (including, without limitation, the South Ferry Landing claim), and the delays and hindrances that such conditions caused to Renda, on about November 6, 2000, the Contracting Officer issued a Show Cause Notice, advising Renda that the Corps was considering terminating the Contract for default due to allegedly insufficient production since the March 8, 2000, cure notice.

39. On December 13, 2000, the Administrative Contracting Officer denied entitlement for the differing site condition at the South Ferry Landing.

40. On about January 10, 2001, Renda submitted a Certified Claim to the Contracting Officer for the extra costs Renda incurred from the South Ferry Landing differing site conditions. Renda sought $701,753.00, and an 18 day extension of contract time, as well as a Contracting Officer's final decision.

41. On about March 9, 2001, the Contracting Officer responded to the Certified Claim stating that a final decision would be issued by June 13, 2001.

42. On about March 13, 2001, Renda requested that the Corps schedule a claims conference for the South Ferry Landing differing site condition claim. Renda also requested a DCAA audit for Renda's overhead rates.

43. On about March 15, 2001, Renda amended the South Ferry Landing differing site conditions claim, and increased the certified claim to $1,049,173.00.

44. A claims conference occurred on about May 2, 2001.

45. On about June 15, 2001, the Contracting Officer informed Renda that his final decision would be delayed until June 25, 2001.

46. On about June 26, 2001, the Contracting Officer requested that Renda submit an amended certified claim to incorporate certain information discussed at the May 2, 2001, claims conference.

47. On about August 23, 2001, Renda submitted an amended certified claim to the Contracting office to reflect the information previously requested. The claim amount remained set at $1,049,173.00.

48. On about October 29, 2001, Renda again inquired as to when the Contracting Officer's final decision would be issued.

49. On about November 6, 2001, the Contracting Officer wrote to Renda to advise that a Contracting Officer's Final Decision would be issued by April 18, 2002.

50. As of the date Renda filed this suit, no final decision had been issued, and none was in sight.

51. The rubble, rip-rap and man-made obstructions that Renda encountered were not shown on any soil boring or anywhere in the Contract Documents for the Upper Bayou Project.

52. Renda had no reason to suspect or expect such obstructions from studying the Contract Documents or from Renda's pre-contract bid site investigation.

53. The Corps benefitted from Renda's work clearing the obstructions. In fact, the Corps ordered Renda to dredge the area knowing not only that the obstructions were there, but also that they would no doubt damage Renda's dredge.

54. Renda is entitled to payment for its extra costs in the South Ferry Landing area which resulted from the differing site conditions. Such entitlement is based either on the differing site condition clause of the contract or on the Corps' termination of dredging work for convenience.

**Count II -**
**Flare Area Claim**

55. The allegations of paragraphs 1 through 54 are hereby incorporated by reference and reaverred as if fully set out herein.

56. On about January 23, 2000, Renda started dredging operations in the Houston Ship Channel at or near Station 520+00 (Dredge Section 3).

57. Renda had anticipated high rates of production in the Flare Area, and had notified the Corps of Renda's expectation on about January 5, 2000.

58. Renda had expected that high production rates in the Flare Area would compensate for delays elsewhere on the Upper Bayou Project.

59. However, Renda encountered a differing site condition which markedly slowed production. Renda encountered stiff clay material not shown in the Contract Documents.

60. Renda removed the material which had been shown in the Contract Documents – silt and very soft clay – with its dredge between about January 23, 2000, and March 11, 2000. Renda timely notified the Corps of the differing site condition.

61. After the Corps issued a Cure Notice on about March 8, 2000, which complained of low production, Renda was forced to relocate the dredge to find an area with better production, while awaiting a response by the Corps to the differing site condition problem.

62. The Corps acknowledged the Flare Area differing site condition in the Contracting Officer's April 25, 2000, decision not to terminate Renda's contract. The Contracting Officer authorized an outside geotechnical firm to obtain soil borings of the material remaining in the area.

63. In about May 2000, the Corps' geotechnical firm obtained three soil borings and issued a report on about May 30, 2000. The Corps withheld the report from Renda. In late August 2000, however, Renda obtained an unofficial copy of the geotechnical investigation report.

64. The Corps' geotechnical report clearly showed the Flare Area stiff clay to be a differing site condition. Nevertheless, the Corps withheld the findings from Renda, and refused to issue a modification to pay for the obvious change in conditions. Instead, the Corps forced dredging to continue on about July 17, 2000.

65. The Corps used the threat of termination against Renda to prod Renda to dredge in changed conditions. The Corps steadfastly refused to acknowledge that the changed conditions warranted an excusable schedule delay.

66. On about August 3, 2000, and again on about August 22, 2000, Renda advised the Corps of the Flare Area differing site condition, reporting delays in the work schedule, and requesting a determination of the claim's merits. The Corps did not acknowledge these letters.

67. On about November 6, 2000, the Corps met with Renda to discuss construction issues, including the Flare Area differing site condition, and most, if not all, of the claims in this suit. The Corps concurrently issued a Show Cause Notice, advising Renda that the Corps was considering terminating the contract for default due to insufficient production since the March 8, 2000, Cure Notice.

68. The Contracting Officer signed the Show Cause Notice knowing full well that the production schedule had been delayed due to the Flare Area differing site condition, and most, if not all, of the claims in this suit.

69. On about December 13, 2000, the Corps issued an opinion which determined that the Flare Area differing site condition (among some of the other claims in this suit) did in fact impact

the Project. The Administrative Contracting Officer granted entitlement for the issue. However, the Corps still refused to issue a modification to pay for the extra work or to extend the contract time.

70. On about February 14, 2001, Renda submitted a request for equitable adjustment to the Corps for the Flare Area differing site condition. Renda requested payment of $3,641,643.00 and a 76 calendar day extension of contract time.

71. Between about March 2 and 8, 2001, the Corps met with Renda to discuss the Flare Area claim. On about March 7, 2001, Renda amended the claim to reflect the actual overhead rates and dredge depreciation rates. As amended, the Flare Area claim sought damages of $4,691,688.00, and a 76 calendar day extension of contract time.

72. To analyze the claim, the Corps prepared an estimate of what the Corps figured as Renda's extra costs. The Corps' estimate was $4,111,778.00. The Corps agreed to pay Renda 75% of the $4,111,778.00 government estimate for the claim, but then suspended further negotiations pending a DCAA audit of Renda's overhead rates.

73. On about March 13, 2001, Renda requested that the Corps schedule a DCAA audit to verify Renda's overhead rates. The Corps failed to do so within any reasonable amount of time.

74. On about March 14, 2001, the Corps issued Contract Modification No. CO-08 (P00023) for $3,083,833.00, with a 56 calender day extension of contract time, to reflect the 75% of the costs that the Corps estimated that Renda had incurred.

75. By about August 9, 2001, it had become clear that the Corps would not allow Renda to complete the Upper Bayou Project, would not request an audit by the DCAA, and would not conclude negotiations on the Flare Area differing site condition. On that date, Renda submitted a certified claim for the Flare Area differing site condition, requesting a Contracting Officer's final decision.

76. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

77. Although the Corps has already conceded entitlement, the Corps has not fully paid to Renda even the money that the Corps has agreed is due and owing.

**Count III -**
**<u>HL&P Tower Claim</u>**

78. The allegations of paragraphs 1 through 77 are hereby incorporated by reference and reaverred as if fully set out herein.

79. On about July 16 and 17, 2000, Renda's dredging operations were disrupted by Houston Lighting and Power ("HL&P") crews who were installing a 138 Kilovolt electrical tower in the vicinity of Lost Lake. To accommodate the HL&P construction, Renda had to break down and relocate its discharge piping.

80. HL&P's work was not shown or indicated in the Contract Documents, and constituted a differing site condition.

81. Between about October 16 and 18, 2000, HL&P caused a second disruption, which required another relocation of the discharge piping in Lost Lake.

82. Renda properly and timely notified the Corps of these changes in site conditions.

83. On about December 13, 2000, the Corps acknowledged in writing that construction of the HL&P Tower impacted the Project. Although the Administrative Contracting Officer granted entitlement, the Corps did not issue a modification to provide for payment of the extra costs Renda incurred.

84. On about April 11, 2001, Renda submitted a request for an equitable adjustment for the HL&P Tower matter, seeking payment of $166,143.00, and a three calendar day extension of contract time.

85. On about May 16, 2001, Renda amended its request, updating the claim to reflect the actual overhead rates and dredge depreciation rates. The amended request for equitable adjustment sought payment of $170,863.00, and a three calendar day extension of contract time.

86. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not negotiate quantum for the HL&P Tower matter, Renda re-submitted its request for an equitable adjustment as a certified claim.

87. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

**Count IV -**
**<u>Section 7 Clay Claim</u>**

88. The allegations of paragraphs 1 through 87 are hereby incorporated by reference and reaverred as if fully set out herein.

89. During dredging operations between about October 2 and November 6, 2000, in Dredge Section 7, Renda encountered stiff clay material between stations 561+00 and 609+00. This type of material was not shown or indicated in the Contract Documents.

90. Renda notified the Corps of the differing site condition on about October 20, 2000.

91. On about December 13, 2000, the Corps issued an opinion in which the Corps concluded that Renda should have anticipated the stiff clay material. The Administrative Contracting Officer denied entitlement, without ever visiting the site. The Corps did not test this

material like it had the stiff clay material in the Flare Area. The Corps' failure to investigate this differing site condition was a breach of contract.

92. As a result, Renda stockpiled the stiff clay material as evidence of the differing site condition, and showed the material to the Corps during an inspection on about February 12, 2001.

93. On about April 16, 2001, Renda submitted to the Corps a request for equitable adjustment seeking payment of $1,083,779.00, plus a 21 calendar day extension of contract time.

94. By about August 9, 2001, it had become clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not acknowledge the existence of the differing site condition. As a result, Renda re-submitted its request for equitable adjustment as a certified claim.

95. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

96. Renda is entitled to compensation for this claim based either on a differing site condition or due to the Corps' termination for convenience of the dredging and levee construction work.

**Count V -**
**West Levee Realignment Claim**

97. The allegations of paragraphs 1 through 96 are hereby incorporated by reference and reaverred as if fully set out herein.

98. While constructing levees during July 2000 at Lost Lake near station 175+00, Renda encountered a problem with the levees. The foundations were extremely soft, and displaced levee foundation material was being forced over the existing levees. On about July 28, 2000, Renda notified the Corps about the problem.

99. On about August 7, 2000, the Corps met with Renda at the site and orally directed Renda that the new levee be realigned so that the new levee was butted up against the existing levee. On about August 18, 2000, Renda confirmed the Corps' levee realignment directive as a change in the contract drawings, which required extra work.

100. Between about September 2000 and November 2000, Renda realigned the levee between stations 166+00 to 183+00 and 183+00 to 188+00. In the course of the realignment work, Renda had to remove and reposition material which had been previously placed.

101. After about November 2000, Renda had repositioned about all of the material which had been previously placed and thereafter followed the Corps' direction for all further levee construction.

102. On about December 13, 2000, the Corps issued an opinion in which the Corps concluded that Renda had created the problem with the West Levee area, and that the Corps had only made suggestions to correct the contractor's errors. The Administrative Contracting Officer denied entitlement for realignment of the West Levees.

103. On about May 23, 2001, the Corps unilaterally issued Contract Modification No. CO-10, concerning the realignment of the west levees. The unilateral modification offered Renda no money.

104. On about May 31, 2001, Renda submitted to the Corps a request for equitable adjustment seeking payment of $789,600.00, plus a 40 calendar day extension of contract time.

105. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Upper Bayou Project, would not request an audit, and would not admit merit to the West Levee Realignment Claim, Renda re-submitted its request for equitable adjustment as a certified claim to the Contracting Officer.

107. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

108. Renda clearly had to perform more work to realign the West Levees. Renda had already placed material in the location contractually required. When the Corps changed the location for the levees, Renda had to move material. Moving the material already placed cost Renda extra time and money.

109. Renda is entitled to compensation for this claim either under the changes provision in the contract or due to the Corps' termination for convenience of the levee construction work.

**Count VI -**
**Obstruction #1 Claim**

110. The allegations of paragraphs 1 through 109 are hereby incorporated by reference and reaverred as if fully set out herein.

111. In or about October and November 2000, Renda was dredging between stations 570+00 and 580+00. Renda's dredge encountered significant and substantial obstructions in the channel. The obstructions encountered by far exceeded the amount reasonably expected. The obstructions constituted differing site conditions.

112. Marine dredges are designed to remove silt, clay, sand, and other soil-like materials. The dredges are not at their best in non-soil removal. The excessive amount of obstructions slowed dredge production. The obstructions caused significant damage to the dredge.

113. Between about October 8 and 18, 2000, Renda's dredge hit three obstructions in Dredge Section 7 of the Houston Ship Channel. On about October 18, 2000, Renda notified the Corps of the obstructions and identified them as differing site conditions. One of the objects appeared to be a CONEX shipping container.

114. On about October 24, 2000, Renda notified the Corps that Renda's dredge had hit another obstruction on about October 23, 2000.

115. On about October 27, 2000, The Corps issued Contract Modification No. CO-05 (P00019) for the removal of rock and rubble, which had been reported in the channel slopes in Dredge Section 5 during May 2000. By way of this modification, the Corps authorized the removal of the previously reported channel obstructions.

116. Between about October 20 and November 15, 2000, Renda's dredge hit two more obstructions, which caused further damage to Renda's equipment. Renda continued to encounter excessive amounts of obstructions in October and November 2000.

117. Between about November 17 and 20, 2000, Renda's subcontractor located and removed an obstruction near station 575+00 with a bucket dredge. The obstruction was an old dredge stern swivel weighing about ten tons, which Renda's dredge had struck on about October 8, 2000. The Contracting Officer has seen and inspected the dredge swivel.

118. Between about November 27, 2000, and December 6, 2000, while dredging in the Houston Ship Channel adjacent to the Oxy-Chem Docks, Renda encountered rubble and rip-rap within the dredge template. The rubble and rip-rap were not indicated in the Contract Documents, and constituted differing site conditions.

119. The conditions Renda encountered were similar to those Renda faced in the South Ferry Landing area. Using its South Ferry Landing experience as a guide, Renda attempted to dredge carefully around the rubble and rip-rap between stations 620+00 and 630+00. The dredging was inefficient, and beset by delays. Unfortunately, the dredge still sustained damage.

120. Between about December 8, 2000, and December 10, 2000, while dredging just past the Oxy-Chem Docks, Renda's dredge hit three more obstructions, which together with the damage from previous obstructions idled the dredge until repairs could be made.

121. On about December 13, 2000, Renda notified the Corps about three more obstructions that Renda hit between December 8 and 10, 2000.

122. Repeated abuse from obstructions, rubble and rip-rap took its toll on Renda's equipment. On about December 20, 2000, Renda again wrote to the Corps about the obstructions, and requested a resolution.

123. As a result of damage caused by obstructions, Renda's dredge was out of operation for repair between about December 11 and 31, 2000, and again between about January 1 and 14, 2001.

124. During the period of about January 7 through 11, 2001, the Corps conducted a survey of the Houston Ship Channel between stations 570+00 and 685+00 (the end of the Project) with a magnetometer and sidescan survey to determine the locations of excessive debris and metal obstructions within the dredge template. Renda received a copy of the report on about January 30, 2001. The report revealed many obstructions and areas full of trash, which it labeled as "debris fields."

125. On about April 16, 2001, Renda submitted to the Contracting Officer a request for equitable adjustment, seeking payment of $1,802,579.00, plus a 35 calendar day extension of contract time.

126. On about June 11, 2001, Renda updated the request for equitable adjustment to seek payment of $2,126,083.00, plus a 36 calendar day extension of contract time.

127. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not acknowledge the merits of this request for equitable adjustment, Renda re-submitted the request as a certified claim to the Contracting Officer.

128. On about August 22, 2001, the Administrative Contracting Officer orally acknowledged entitlement for the Obstruction #1 Claim. On about August 28, 2001, Renda confirmed the acknowledgment of entitlement in writing to both the Contracting Officer and the Administrative Contracting Officer.

129. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

130. Renda is entitled to compensation for this claim either under the differing site conditions clause of the contract, or due to the Corps' termination for convenience of the dredging work on the Project.

**Count VII -**
**<u>Obstruction #2 Claim</u>**

131. The allegations of paragraphs 1 through 130 are hereby incorporated by reference and reaverred as if fully set out herein.

132. On about January 14, 2001, after repairing the damage from obstructions, Renda resumed dredging operations.

133. Between about January 27 and 28, 2001, Renda's dredge struck two more obstructions in Dredge Section 8. Renda notified the Corps on about January 31, 2001, concerning the obstructions, and described them as differing site conditions.

134. On about January 31, 2001, with the Corps' report on underwater obstructions and debris in hand, Renda notified the Corps that the obstructions and debris identified in the survey report were hazards to the dredging operations.

135. On about February 9, 2001, Renda started dredging in Dredge Section 9. On about February 13, 2001, Renda hit two obstructions. On about February 15, 2001, Renda hit two more obstructions.

136. On about March 7, 2001, Renda proposed to the Administrative Contracting Officer that the Corps delete the remainder of Dredge Section 9 from the Contract due to the debris fields and obstructions.

137. On about March 8, 2001, the Corps' Project Engineer admitted that Dredge Section 9 was unsuitable for dredging with a hydraulic cutterhead dredge. (Renda was using a hydraulic cutterhead dredge.) On about March 13, 2001, based on the Corps' survey report and the Project Engineer's admission, Renda wrote to the Contracting Officer and advised that Renda could not proceed with further dredging in Dredge Section 9.

138. On or before March 22, 2001, the Contracting Officer provided assurances to Renda that dredging could safely continue, and insisted that Renda complete dredging in Dredge Section 9. On about March 22, 2001, Renda acquiesced to pressure from the Contracting Officer and agreed to resume dredging in Dredge Section 9.

139. On about April 10, 2001, Renda resumed dredging in Dredge Section 9, and on about April 11, 2001, hit an obstruction.

140. On about April 12, 2001, Renda contacted the Administrative Contracting Officer by telephone and requested that the Corps verify the excessive debris in the area. The Corps visited the

dredge, and instructed the dredge to continue work, without further assistance by the Corps or investigation.

141. On about April 14, 2001, Renda notified the Corps in writing of the unfavorable dredging conditions in Dredge Section 9.

142. On about April 16, 2001, Renda's dredge hit a sunken ship's mooring buoy, which was neither indicated in the Contract Documents or the Corps' underwater obstruction and trash survey report. The dredge hit the mooring buoy with enough force to knock the dredge out of commission, and caused significant damage to the cutterhead drive assembly.

143. Renda notified the Contracting Officer and again requested that the remainder of Dredge Section 9 be deleted from the contract.

144. Repairs to Renda's dredge occurred between about April 16 and May 8, 2001.

145. As acknowledged by Corps personnel and the Corps' own survey report, the obstructions and debris fields constituted differing site conditions for which Renda should be paid.

146. Although the Contracting Officer made specific assurances at the March 22, 2001, meeting with Renda, and promised various things on behalf of the Corps, the Corps seemed unable to make a decision regarding the completion of Dredge Section 9.

147. On about April 24, 2001, Renda requested that the Contracting Officer allow Renda to demobilize its dredge from the Project until the Corps could reach a decision regarding the completion of Dredge Section 9, i.e. (1) whether to delete Dredge Section 9 from the Contract or (2) whether to remove debris with a bucket dredge and then dredge the remainder of Dredge Section 9 with Renda's hydraulic dredge.

148. After Renda began dredging Dredge Section 9 in about February 2001, and encountered four obstructions, it became clear that the debris fields were not only a major dredging hazard, but one that could destroy Renda's equipment.

149. During March 2001, in order to minimize the downtime Renda was experiencing, Renda proposed to the Corps that Renda's dredge be allowed to pursue private dredging work in the immediate vicinity of the Project. Renda's reasons were (1) Renda was pushing for the Corps to delete Dredge Section 9 because of the numerous hazards, (2) the private work included deepening an existing harbor/dock area, which would provide substantially more clay material for construction of the levees at Lost Lake than was anticipated in Dredge Section 9, (3) the private work paid more than the Corps was paying for the Corps work, and (4) during the time it took to complete the private work, the Corps could concentrate on resolving the debris fields and obstruction problems.

150. At first, the Corps declined to allow Renda to perform such private work. Later, on about May 4, 2001, the Corps changed its mind and issued Contract Modification No. CO-09 (P00026), which suspended dredging operations for 30 to 60 days, and instructed Renda to perform private work, and deposit suitable clay materials at Lost Lake for the levees. While seemingly a favor for Renda, in actuality, it was just the opposite.

151. On about May 18, 2001, the Corps directed that Renda's discharge line across Jacintoport be removed, a direct violation of an agreement reached at the March 22, 2001, meeting, where the Corps promised that if Renda would resume dredging, the line would not be removed until Dredge Section 9 was complete.

152. On about June 1, 2001, the Contracting Officer deleted the remainder of the dredging work in Dredge Section 9 from Renda's Contract and accepted all dredging work for the Upper Bayou Project. However, the Corps did not delete the levee construction work from the Contract.

By not releasing Renda from the levee construction work, Renda's equipment was still obligated to the Upper Bayou Project, but could perform no work due to the Suspension Modification.

153. On about June 14, 2001, Renda issued a request for equitable adjustment to the Contracting Officer seeking payment of $1,158,642.00, plus a 36 calendar day extension of contract time. Renda fully expected that the Corps would immediately begin negotiations since, as the Corps had requested, Renda had resumed work in Dredge Section 9.

154. Renda's resumption of work was a gesture of good faith to the Corps, since both parties knew that the dredge faced serious damage from continued dredging in the area.

155. As it turns out, however, the Contracting Officer never intended to pay for any of the damage expected to Renda's dredge. The Contracting Officer was simply bowing to pressure from the Local Sponsor, and promised whatever it took to induce Renda to resume work. Finally, on about July 23, 2001, the Contracting Officer released from the Project Renda's dredge and ancillary equipment.

156. On about August 9, 2001, after it became clear that the Corps would not allow Renda to complete the levee work for the Project, would not request an audit, and would not acknowledge that Obstruction #2 claim resulted from several differing site conditions, Renda resubmitted the request for equitable adjustment as a certified claim.

157. On about August 22, 2001, the Administrative Contracting Officer orally granted entitlement for the Obstruction #2 claim. Renda confirmed the Administrative Contracting Officer's decision in writing on about August 28, 2001, to both the Contracting Officer and Administrative Contracting Officer.

158. The Contracting Officer did not issue a Contracting Officer's final decision on the claim before Renda filed this suit.

159. Renda is entitled to compensation for this claim either under the differing site conditions clause of the contract, or due to the Corps' termination for convenience of the dredging work on the Project.

**Count VIII -**
**Lost Lake Levees Claim**

160. The allegations of paragraphs 1 through 159 are hereby incorporated by reference and reaverred as if fully set out herein.

161. Two types of levees were required on the Project: mechanical levees and hydraulic levees. The Contract Documents set out the sequence for constructing the levees – the mechanical levees had to be completed prior to the start of hydraulic levees.

162. The Contract Documents specified that the unit price for payment for the mechanical levees is measured by the cubic foot of material placed, while that for the hydraulic levees is measured by the linear foot of completed levee (which equates to approximately 35 cubic yards, neat line).

163. The original Contract Documents specified simply that the foundations for the new levees were expected to be very soft to soft dredged material and sand placed during previous dredging cycles.

164. Minutes for the Pre-Bid Meeting held on about June 23, 1998, were issued as a part of Addendum No. 1. These minutes list the contractors' concerns for the vagueness of the specifications regarding levee foundations and the Government's concern for the availability of suitable material to complete the levees.

165. As a result of the vague and general comments regarding the foundations, Renda naturally had to rely heavily on the soil borings, which were part of the Contract Documents.

166. The Contract Documents contained the following soil borings: Hydraulic Levee areas – 2 from 1963, 12 from 1991, 9 from 1993, 4 from 1994, and 1 from 1996, for a total of 28 borings; Mechanical Levee areas – 7 from 1991, 4 from 1993, 3 from 1994, 1 from 1996, and 1 from 1997, for a total of 16 borings. The majority of soil borings in or near the vicinity of the new levee alignment were obtained during 1991 and 1993, with only one soil boring obtained in 1997, one year prior to the actual bid for the work.

167. The Corps, however, knew of the existence of sidecast borrow areas adjacent to the existing levees, whose locations were in the general vicinity of the new levee alignment corresponding to the new levee foundation areas. These "sidecast borrow areas" were areas where soil material had been removed some time prior to the bid solicitation for the Project.

168. The existence, depth, width, and extent of the sidecast borrow areas were not shown in the Contract Documents and were not revealed to the contractors during the bidding cycle.

169. Renda has discovered that the existing levees were "dressed up" sometime in 1995 or 1996, using sidecast borrow areas adjacent to the existing levees. As a result, any soil boring in the vicinity of the new levee alignment obtained prior to about 1996 is probably inaccurate due to the removal of material from the borrow areas.

170. Only three soil borings in the vicinity of the new levee alignment were obtained after 1994. Unbeknownst to the bidders, these three borings provided perhaps the only current information for prospective bidders regarding approximately 24,000 linear feet (approximately 4.5 miles) of new levee.

171. The Corps intentionally failed to perform an up to date survey of the existing levees prior to bidding the work in an effort to minimize the prices bid by prospective contractors. The

Corps knew or should have known that had it revealed the true nature and extent of the sidecast borrow areas, prospective bidders would have increased their prices for the Project.

172. The Corps also knew or should have known that the Contract Documents did not provide offsets from the existing levee, which would have allowed Renda to validate the new levee alignment, during the course of construction.

173. During construction of the mechanical levees between about December 1998 and May 1999, Renda discovered that the levee foundation material was highly unstable and exceedingly soft. The condition of the levee foundation was not what was indicated in the Contract Documents. As a result, the levees had to be realigned in order to construct the Project. Although the Corps directed Renda to realign the mechanical levees so that they were placed on top of the existing levees, this part of the job still required approximately 50% more material than anticipated. The Corps has agreed to pay for the additional material required through a contract modification.

174. Due to the very soft foundations, the extent of which were not definable by either the Corps or Renda, several hundred feet of hydraulic levee were deleted in an attempt to avoid very soft conditions in the northeast corner of Lost Lake.

175. Prior to the start of hydraulic levee construction during July 1999, but after the Contract was awarded to Renda, the Corps modified the specifications. These changes in the specifications concerned the construction monitoring requirements, and incorporated a new design criteria, at considerable extra cost to Renda.

176. To underscore the significance of the change, the Corps has issued a new specification section for subsequent embankment construction contracts, and expanded the construction procedures required to achieve successful completion of the work. The Corps, however, refused to

issue a Contract Modification for the extra work that Renda had to perform, and required Renda to incorporate the new requirements at no cost to the Corps.

177. The Corps had provided assurances during June 1998 that sufficient material was available to complete the hydraulic levees. However, by July 1999, Renda had become increasingly concerned about the validity of the Corps' representation.

178. As part of the Project, Renda was required to install a new outlet box structure, and a 48" diameter discharge pipe within the new levee.

179. In about February 1999, while Renda was constructing mechanical levees and the new outlet box structure in the northeast corner of Lost Lake, Corps inspectors revised the Corps' representation about the foundations in the area to term the disposal area "deep soft dredge material." The Corps inspectors then noted that the Corps' design should have expected pipe sag due to the soft foundation material. These statements underscored concerns that the foundations would not support the newly installed 48" diameter pipe.

180. The soft foundations discovered beneath the mechanical levees affected the stability of not only the new outlet box structure but also the discharge pipe through the levee. To resolve these problems, the Corps issued Contract Modifications CO-01 (P00004), CO-02 (P00006) and CO-03 (P00008), which reimbursed Renda's subcontractor for the additional costs.

181. On about March 23, 1999, the Corps issued Modification CO-01 unilaterally with a Not to Exceed price of $250,000. On about June 21, 1999, the Corps issued Modification CO-02 to adjust the values of CO-01 with a new value of $436,855.87, plus a 20 calendar day extension of contract time. On about August 4, 1999, the Corps issued Modification CO-03 purportedly to complete all of the extras associated with the mechanical levees and new structural requirements at

the outlet box. Modification CO-03 had a value of $364,201.03, plus a contract time extension of 22 calendar days.

182. Additionally, sometime after August 4, 1999, the Corps unilaterally issued Contract Modification VQ011 for a variation in estimated quantities. Modification VQ011 had a value of $0, but awarded a contract time extension of 18 calendar days. With this modification, the Corps set the precedent that additional material required to build the levees would be reimbursed through a modification, and paid by the cubic yard of material placed.

183. When the Corps had to change the hydraulic levee alignment in the northeast corner of Lost Lake due to soft foundation problems at the new outlet box structure, it became clear that the Corps needed more suitable clay material in order to construct the levees. On about March 1, 1999, Renda discussed with the Corps the potential impacts of the increased quantities of material required to complete the work in this area. As it has turned out, the hydraulic levees in the northeast corner would not maintain the required 30' elevation, even after being accepted by the Corps, due to continuing subsidence problems.

184. The Contract Documents require that the hydraulic levees be constructed of suitable materials, which are defined as medium to hard clays and sands. However, the Contract Documents do not require the contractor to segregate soft clays from the suitable materials during dredging and construction of the levees.

185. The Contract Documents assume that sufficient suitable material exists to complete the hydraulic levees. At the June 23, 1998, Pre-Bid Meeting, the Corps stated that sufficient new work material was available to construct the levees even allowing for soft foundations.

186. Despite the Corps' assurances of sufficient material to complete the hydraulic levees, Renda expressed concern in a July 7, 1999, letter to the Corps, and furnished a plan for completion of the work. Renda's plan was designed to minimize the extra cost of resolving the lack of material problem.

187. Renda has discovered that under the circumstances, there was too little acceptable material to construct the levees, a fact that the Corps fully knew prior to the bid opening for the Upper Bayou Project.

188. For example, on about July 26, 1999, prior to the preparatory meeting for the hydraulic levees, the Corps' geotechnical engineer stated that the "Corps had some concerns about there being sufficient quantities available to complete the levees."

189. On about September 13, 1999, hydraulic levee construction started at about station 97+00 in the southeast corner moving downstation towards the already known poor conditions at the northeast corner.

190. The Renda levee crews working on the north levees between stations 48+00 and 51+00 experienced problems with subsidence and soft levee foundations. As a result, the levees could not be raised to or maintained at the required 30' elevation.

191. Renda soon discovered that the levee could not be constructed as designed.

192. Renda discovered that the levee could not be located as shown on the Contract documents.

193. Renda discovered that the levee's foundation was too unstable.

194. Renda discovered that the levee's materials were too soft to allow for proper construction.

195. Renda discovered that there were insufficient materials available to construct the levee.

196. Despite Renda's best efforts, the levee experienced shearing and subsidence, and could not be constructed as per the Contract Documents.

197. Renda notified the Corps of the problems with the levee and of the differing site conditions.

198. As a partial resolution of the differing site conditions and other problems with the levee, the Corps directed Renda to realign the levee.

199. On about August 18, 2000, Renda confirmed in writing the Corps directive to realign the levee, and advised the Corps of differing site conditions and extra costs to perform the work.

200. On about October 23, 2000, the Corps issued a second directive concerning the levee, ordering Renda to change the levee construction again. On about November 1, 2000, Renda confirmed the Corps' second directive.

201. On about November 3, 2000, the Corps sent a letter to Renda changing the method for constructing the levee yet again.

202. At all times material, the Corps knew or should have known that there were insufficient materials available to construct the levees in the manner the Corps directed. The Corps also knew that under the Contract, Renda would only be paid if Renda completed the levee. As a result, since there was no way for Renda to complete the levee, Renda would receive no money for its efforts and work.

203. On or about May 23, 2001, the Corps unilaterally issued Contract Modification No. CO-10, realigning the west levees, but offering no money to Renda for all the extra work involved.

204. On about June 1, 2001, the Contracting Officer deleted the remainder of Dredge Section 9 from the Contract, but did not delete the levee work. As a result, the levee work still remained outstanding.

205. Renda repeatedly attempted to have the Corps resolve the levee work problems. Renda even had a Congresswoman write to prod the Corps into making a decision as to how to resolve the levee work.

207. On about July 23, 2001, the Contracting Officer finally released Renda's dredge from the Project.

208. On about September 18, 2001, the Corps unilaterally issued Contract Modification CO-11 (P00028) deleting the remaining levee work from the Contract. The modification did not expressly provide for additional payment to Renda, and tentatively denoted the costs would be determined.

209. On about October 16, 2001, Renda submitted a certified claim in the amount of $6,258,853.00, plus a 397 calendar day extension of contract time.

210. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

211. It turns out that the Lost Lake hydraulically placed levees were impossible or commercially impracticable to build. First, there was not enough suitable material available from the areas specified for dredging on the Project. The Corps knew that fact before the Project was put out for bids. The Project's designer so advised the Corps before the Project was put out for bids.

212. Second, the foundations for the new hydraulically placed levees were too soft and unstable to allow the levee to be constructed to 30 feet above mean low tide, or to remain at 30 feet above mean low tide.

213. Third, there was not enough time in the contract for the Project to allow for construction of the Lost Lake levees even if there was enough suitable materials due to the softness and instability of the levee foundations. Consolidation of materials placed on the soft and unstable foundations to reach 30 feet above mean low tide would take more time than permitted under the contract for the Project.

214. The Corps had actual knowledge that the Lost Lake levees could not be constructed as designed. Nevertheless, the Corps insisted that Renda perform the impossible or commercially impracticable, under threat of a default termination and a demand that Renda's bonding company complete the Project at Renda's expense.

215. The Corps hoped that by terminating Renda for default, Renda would be put out of business, and Renda's bonding company would not pursue Renda's claims.

216. Eventually, the Corps instructed Renda to construct foundations for the Lost Lake levees. The Corps knew at that time that there was not enough specified dredge material to construct the levees to the contractually required height. The Corps also knew at that time that the foundations for the new levees were so soft and unstable that Renda would not be able to construct the levees to the contractually required height.

217. The Corps required Renda to attempt to construct the Lost Lake levees even though the Corps knew or should have known that it was not possible or commercially practicable to construct the levees.

218. Under the circumstances, Renda is entitled to reimbursement of the costs and expenses Renda incurred in attempting to construct levees that were impossible or were commercially impracticable to construct. Renda's entitlement is based on either the differing site

conditions and changes provisions of the contract or due to the Corps' termination for convenience of the levee construction work.

**Liquidated Damages**

219. The allegations of paragraphs 1 through 218 are hereby incorporated by reference and reaverred as if fully set out herein.

220. Under the circumstances, the Corps should release and/or waive any and all liquidated damages.

221. The Corps directed Renda to perform work that the Corps knew was not possible or commercially practicable. Renda could not complete such work within the contract time and is entitled to an equitable adjustment of contract time sufficient to offset any and all liquidated damages.

222. Alternatively, Renda is entitled to multiple equitable adjustments of contract time for the Corps' delays and disruptions concerning the following non-exclusive list of acts or omissions: (a) Refusal or failure to make a timely decision on releasing the Dredge Millennium from work on the Project; (b) Refusal or failure to make a timely decision on deleting Section 9 from Renda's work on the Project; (c) Refusal or failure to make a timely decision on how to resolve design and construction problems with the Lost Lake levees; (d) Refusal or failure to recognize a lack of suitable dredge materials to construct the Lost Lake levees; (e) Refusal or failure to recognize that the Lost Lake levees could not be constructed to the contractually required height; (f) Refusal or failure to award Renda appropriate extensions of time in connection with other differing site conditions that Renda encountered on the Project; and (g) Refusal or failure to make a timely decision on the release of Renda's construction equipment from the Project.

223. When the Corps terminated Renda's obligation to perform various work on the Project for the Corps' convenience, Renda cannot be assessed liquidated damages in connection with such work.

224. For example, the Corps terminated for convenience Renda's obligation to perform the dredging work remaining on the Project. Renda could not dredge Section 9 due to rip rap and other obstructions. After an undue delay, the Corps decided to delete Section 9 dredging, which was the only dredging work remaining on the Project. As a result, the Corps cannot assess Renda liquidated damages for dredging work.

225. As another example, the Corps terminated for convenience Renda's obligation to perform levee construction work on the Project. As a result, the Corps cannot assess Renda liquidated damages for the levee construction work.

226. With the Corps effectively terminating for convenience any remaining work on the Project, the Corps cannot assess liquidated damages in connection with such work.

**Count IX -**
**<u>Contracting Officer's Final Decision of November 26, 2002</u>**

227. The allegations of paragraphs 1 through 226 are hereby incorporated by reference and reaverred as if fully set out herein.

228. Renda is entitled to a declaration that the Contracting Officer's Final Decision of November 26, 2002, is a nullity or is otherwise invalid.

229. The Contracting Officer did not submit a proposed final decision to Renda for comment. In fact, the Corps had not mentioned any claims against Renda in at least the year preceding the issuance of the Contracting Officer's Final Decision of November 26, 2003. Renda

had no idea that a final decision asserting claims against Renda was being assembled, or that one would be issued.

230. As a matter of federal procurement law, the Contracting Officer's Final Decision of November 26, 2002, is not valid, and has no effect on Renda.

231. Alternatively, the findings of fact purportedly found by the Contracting Officer, which underlay the Contracting Officer's Final Decision, are incorrect, are arbitrary or capricious, or are not supported by the evidence.

232. The Corps did not terminate Renda for default on the Project. The Corps did terminate for convenience the dredging and levee construction work remaining on the Project. With such work being terminated for convenience, the Government cannot now assess damages against Renda for not completing such work.

233. The Corps was well aware during the Project that Dredge Section 9 could not be dredged by a hydraulic cutterhead dredge. The Corps needlessly dallied on deciding what to do with Section 9. The Corps finally decided to delete for its convenience the dredging in Section 9.

234. The Corps cannot now assess against Renda the costs of completing Section 9 after the deletion of the work for the Corps' convenience.

235. The Corps was well aware during the Project that the Lost Lake levees could not be constructed as designed. The Corps needlessly dallied on resolving the design problems. The Corps finally decided to delete the remaining levee construction work for the Corps' convenience.

236. The Corps cannot now assess against Renda the costs of completing levee construction work after deletion of the work for the Corps' convenience.

237. The Corps had an obligation to investigate the Section 7 Clay differing site condition that Renda submitted. The Corps largely ignored the notice, and failed to investigate the differing site condition. Such failure was a breach of contract.

238. The Corps cannot now assess against Renda the costs of moving Section 7 clay material that the Corps refused to investigate. The Corps cannot now assess against Renda the costs of moving Section 7 clay material after the Corps deleted for convenience the remaining levee construction work.

239. The Section 7 clay material was clearly visible to the Corps and the Corps was fully aware of such pile of material at the time of the deletion of levee construction work for convenience.

240. The Government cannot assess liquidated damages for all the reasons set out above.

**Count X -**
**Damages**

241. The allegations of paragraphs 1 through 240 are hereby incorporated by reference and reaverred as if fully set out herein.

242. Renda is entitled to compensation for the extra or changed work that Renda had to perform or was directed to perform on the Project. Renda's entitlement is based on the differing site conditions and changes provisions in the contract or due to the Corps' termination for convenience of the work at issue.

243. A summary of Renda's damages follows. Renda reserves the right to modify such damages as discovery progresses or as Renda refines its numbers and accountings.

| Count | Description | Claimed Amount |
|---|---|---|
| 1 | Differing Site Condition - Flare Area Stations 520+00 to 550+00 (very stiff clay) | $1,096,179 |
| 2 | Differing Site Condition - South Ferry Landing Stations 470+00 to 472+00 | 947,054 |
| 3 | Changed Conditions - HL&P Transmission Tower Delays | 167,473 |
| 4 | Differing Site Condition - Obstruction in Sections 4 to 8, Stations 570+00 to 685+00 | 1,986,551 |
| 5 | Differing Site Condition - Obstruction in Section 9, Stations 660+00 to 685+00 | 1,148,804 |
| 6 | Changed Conditions - West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 (Modification CO-10, P00027) | Included in Count 8 |
| 7 | Differing Site Condition - Section 7 Clay | 978,271 |
| 8 | Lost Lake Levees | 7,055,037 |
| | Total | **$13,379,367** |
| | Plus Attorney Fees, Court Costs, and Pre-Judgment and Post-Judgment Interest | TBA |

WHEREFORE, Plaintiff, Renda Marine, Inc., respectfully prays that: (1) a true copy of this First Amended Complaint be served on the United States of America through its attorneys of record, and that the Government be required to appear and answer same; (2) after due proceedings, there be judgment in favor of Renda and against the Government in accordance with the demands herein; (3) Renda be awarded all costs of this proceeding, together with its reasonable attorney's fees, and pre-judgment and post-judgment interest at the highest rates allowed by law; and (4) Renda receive all such other general and equitable relief as may be appropriate.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY:_______________________________

Brian W. Erikson, TX Bar No. 06643800
Andrew M. Trusevich, TX Bar No. 00785119

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the ___ day of July, 2004, a true and correct copy of the First Amended Complaint, was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson

DEPARTMENT OF THE ARMY
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO
ATTENTION OF

November 26, 2002

Contracting Division

Mr. Oscar Renda
Renda Marine, Inc.
522 Benson Lane
Roanoke , TX 76262

SUBJECT: Contract DACW64-99-C-0001
Houston/Galveston Ship Channel
Dredging Upper Bayou Project

Dear Mr. Renda:

This letter serves as a Contracting Officer counter-claim on Contract DACW64-99-C-0001, Houston/Galveston Ship Channel for items determined to be deficient or incomplete or not in accordance with the contract specifications.

On October 26, 1998, above referenced contract was awarded to Renda Marine, Inc., (RMI) in the amount of $12,526,100.00 to dredge approximately 3,483,700 cubic yards of material. Renda Marine was also responsible for building 381,300 cubic yards of mechanically constructed levees and building 13,700 lineal feet of hydraulically constructed levees. Contract completion was originally set at 18 February 2000 and through several modifications later revised to 28 June 2000. The Notice to Proceed was issued on 16 November 1998.

Each counter-claim is listed below with an explanation and dollar amount associated with each claim:

## FINDINGS OF FACT

I have attached my Findings of Fact and they are incorporated in this document.

## ANALYSIS

**a. Counter Claim No. 1: Dredging Section No. 9**

Modification CO-11, dated 18 September 2001, deleted the remainder of dredging for the project as stated in a Contracting Officer decision dated 01 June 2001.



EXHIBIT
B

The Government deleted the remainder of Section 9 under Modification P00028 dated 18 September 2001 due to your continued and protracted inability to accomplish the work in accordance with contract requirements. Your ineffective and inefficient hydraulic placement of material dredged from the channel resulted in wasting a large quantity of material inside the area instead of such being incorporated into the hydraulic levees. Deletion of the remainder of Section 9 put an end to any further damage to the area by the inefficient operation.

Approximately 135,000 cubic yards of "required dredging" remains to be removed within the channel template in Section 9 and will be removed by another contractor.

Modification P00029 dated 28 September 2001 decreased the total funded amount of the contract by $415,000.00, from $17,052,424.16 to $16,637,424.16. The $415,000.00 deduction is the result of the deletion of Section 9 on this contract.

Our estimate for completing this portion of the work is $2,067,000.00. This amount includes costs for mobilization, pipelines, two boosters and cost to dredge the remaining material from Section 9.

**b. Counter Claim No. 2: Sec. 7 Clay Misplaced Material**

On 20 October 2000, you submitted a letter alleging a differing site condition consisting of "Heavy Red Clay at North Side of Channel, Stations 565+00 to 580+00." The Government never considered this issue to have merit.

You encountered materials commensurate with what was reflected in the borings on the contract drawings, i.e., stiff clays. Hence, that material should have been incorporated into the hydraulic levees around Lost Lake Placement Area (LLPA) but you elected to stockpile such in lieu of what the contract required. The Government decided that it would be more prudent not to incur any further lost time due to inefficient levee construction methods exhibited by you at LLPA. This material is still in this location and will have to be recovered and used to rebuild the incomplete levees by another contractor.

The Government carefully considered your claim in this section, and as stated above, never considered it to have merit. Our estimated cost for excavating the misplaced material, placing it in trucks and hauling to the North Levee is $571,000.00.

**c. Counter Claim No. 3: Incomplete West Levee Realignment (Mechanical Portion Only)**

You failed to complete a significant portion of the west levee to the lines and grades in accordance with the contract specifications during the construction period.

The Government did not recommend that you relocate the completed portion of the levee between approximate levee stations 166+00 and 180+00, but only that work beyond station 180+00. This realignment was to improve the current site conditions and to assist you with your levee construction method. However, you made the decision to relocate this already completed portion of the levee.

In order to bring the levees to lines and grades as specified in the contract documents, the Government estimates it will cost $108,000.00 to complete the work. This work includes mobilization, cutting/hauling and filling material, bonds and contingency.

**d. Counter Claim No. 4: Incomplete, Non-Hydraulic North Levee**

Between approximate levee stations 15+00 to 40+00 you attempted to construct the North Levee mechanically instead of hydraulically displacing the soft foundation with dredged material as required by the construction contract. Consequently, the North Levee was never constructed to the lines and grades as required by the contract documents. You also failed to complete the North Levee to the lines and grades as specified by the contract documents. The contract clearly stipulates that the levees were to be placed hydraulically. This was a requirement so that the soft foundation material would be displaced during the hydraulic operations. Your ability to accomplish an effective and efficient hydraulic fill operation precluded such from occurring. It is apparent that your equipment and management of such were incapable of doing so.

It is noted in this area that you recovered misplaced material from the east side of the levee (one truckload at a time) to attempt to mechanically construct the North Levee. Again, the Government decided that it would be more prudent to delete the work and not incur any further lost time due to inefficient dredging or additional damages at LLPA.

Our estimated cost for another contractor completing the North Levee in accordance with the contract specifications is $3,413,000.00. This estimate includes mobilization of a large dredge capable of excavating new work material, pipelines and associated cost to dredge material from Sections 16-20 in the Mid-Bayou Reach.

**e. Counter Claim No. 5: Recovery of Misplaced/Wasted Material**

Again, due to your inefficiencies in your dredging operations, approximately 1.2 million cubic yards of suitable levee building material was wasted toward the interior of LLPA. A letter from the Bay Area Office, dated November 3, 2000, referenced an October 23, 2000 meeting that recommended continuing to reasonably recover the

misplaced and overplaced satisfactory material along the East Levee. Once again, the Government decided that it would be more prudent to cease any further Renda Marine recovery operations and delete the work and not incur any further lost time or additional damages at LLPA.

Subsequent to the Upper Bayou Contract, the Government contracted with a geotechnical consultant to take numerous soils borings at various locations within LLPA. The borings indicated that suitable levee building material had flowed to the interior approximately 1,000 feet from the levee toe on the east and west sides of LLPA. Also, the borings indicated that the suitable material varied in thickness from about 10 feet near the levee toe to about 1 foot at a distance of about 1,000 feet to the interior. As a result of this, the Government estimates that it will take at least 8 months for another contractor to recover this material and incorporate into the incomplete levees. This work is estimated to cost the Government $5,465,000.00.

**f. Counter Claim No. 6: Liquidated Damages**

At the present time the Government is withholding approximately $259,840.85 in retainage. In addition to this, we are withholding $236,016.00 in liquidated damages calculated by multiplying $528.00 per day multiplied by 447 days the Government estimates is beyond the contract completion date of 28 June 2000.

. To date the Government has refunded $252,000.00 to your company. The amount of $259,840.85 represents the balance remaining in retainage.

Total for all counter claims is summarized below:

| | |
|---|---|
| a. Dredging Section 9: | $2,067,000.00 |
| b. Sec. 7 Clay Misplaced Material: | 571,000.00 |
| c. Incomplete W. Levee Realign. (Mech. Portion Only) | 108,000.00 |
| d. Incomplete, Non-Hydraulic North Levee: | 3,413,000.00 |
| e. Recovery of Misplaced/ Wasted Material: | 5,465,000.00 |
| f. Liquidated Damages: | 236,016.00 |
| Total | $11,860,016.00 |

**FINAL DECISION**

Based upon the above stated facts, I hereby determine that Renda Marine, Inc., is indebted to the Government in the amount of $11,860,000.00 for the additional cost of correction of deficiencies under Contract DACW64-99-C-0001. I hereby direct Renda

Marine to submit a payment in the amount of $11,860,000.00 to me by Certified Check payable to "FAO USAED, Galveston."

Any amount not paid within 30 days from the date of this demand will bear simple interest from the date of this demand at the interest rate established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraph (b) of FAR 52.232-17, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

You may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed. The proposal for deferment should provide the information required in FAR 32.613 and should provide information regarding a proposed bond or other collateral as required.

This is a final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 7th Floor, 5109 Leesburg Pike, Falls Church, Virginia 22041-3204. If you decide to appeal, you must mail or other otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you received this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedures for claims of $50,000.00 or less or its accelerated procedures for claims of $100,000.00 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Thomas Benero

Thomas Benero
Chief, Contracting Division
Contracting Officer

CF: Brian W. Erikson, Attorney at Law
John Kosloske, Dept.of Justice
Mike McClenan, Bay Area Office

**FINDINGS OF FACT**

1. Solicitation (IFB) DACW64-98-B-0004 for Dredging Upper Bayou (45 foot project) in Harris and Galveston Counties was issued 16 June 1998. The solicitation was amended one time

2. Amendment 0001 dated 7 July 1998 incorporated questions from prospective bidders and provided answers by the Galveston District Design Team.

3. Bids were opened on 17 July 1998.

4. Five bids were received, the lowest being $12,526,100.00.

5. The Government estimate was $13,607,400.00 or approximately 9% higher than the Renda Marine, Inc., (RMI) bid.

6. RMI submitted the lowest bid of $12,526,100.00. Award of the contract was made on 26 October 1998. The Notice to Proceed was issued on 16 November 1998.

7. A total of 30 modifications were issued under this contract. Some modifications were issued unilaterally by the Contracting Officer and some bilaterally after mutual agreement by both parties.

8. On 8 March 2000, a Cure Notice was issued to RMI for what the Government considered RMI's failure to demonstrate that they could achieve satisfactory execution of the project within the times required by its terms.

9. On 4 April 2000, RMI responded to the Cure Notice. In their response RMI provided a contract summary to date and a proposed completion date. This response also provided a proposed production rate of dredged material and utilization of a booster pump. Also included in this letter was a dredging plan for completion of the project.

10. On 16 April 2000, the Government and the local sponsor of the project, the Port of Houston Authority (PHA), met with RMI and their surety to discuss progress of work on the Upper Bayou Contract and RMI's response to the Cure Letter issued 8 March 2000.

11. As a result of the 16 April 2000 meeting, on 25 April 2000, RMI was presented a letter outlining 4 conditions they had to meet in order to avoid being Terminated for Default. These were:

a. Maintaining a monthly production rate as stated in the dredging plan for completion of the project must be met for each pay period;
b. Work must be in accordance with the contract drawings and specs;
c. All materials suitable for constructing levees are to be utilized for levee building, and;
d. RMI was to provide an update of quality control personnel and responsibilities for each work area.

12. On 11 July 2000, a letter was issued to RMI stating that the dredging quantity stated in each pay period appeared reasonable and attainable. However, there was still some concern that the quantities of lineal feet of hydraulic levee proposed to be constructed per pay period appeared to be excessive. RMI was asked to review the proposed quantities and revise as appropriate. RMI was also told the 4 conditions in the Government's 25 April 2000 letter still applied.

13. On 6 October 2000, the Government requested RMI to submit a proposal for removing and disposing the debris on the north side of the channel between approximate channel stations 530+00 and 554+00.

14. Modification P00019 dated 27 October 2000, directed RMI to remove and dispose of the debris on the north side of the channel between approximate channel stations 530+00 and 554+00. This mod also increased the contract amount by $66,000.00 and added 4 calendar days to the contract.

15. On 6 November 2000, a Show Cause Notice was issued to RMI for failure to demonstrate they could achieve satisfactory completion of the project within the times required by its terms. This Show Cause Notice reiterated the 4 conditions of the 25 April 2000 letter. However, RMI continued to demonstrate their inability to complete this project by a definite date.

16. On 15 November 2000, RMI responded to the Show Cause Notice. As a result of this, the Government submitted a letter to RMI on 13 December 2000 responding to the 17 issues summarized in their letter. RMI was asked to submit Requests for Equitable Adjustments (REA's) for issues numbered 3, 4, 9 and 10 within 15 calendar days of receipt of our letter. These four issues were the ones the Government considered to have merit.

17. On 21 December 2000, the Government submitted another letter to RMI requesting an REA for a new differing site condition consisting of unknown obstructions on the south side of the channel between stations 634+90 and 635+00 and station 637+57. This was the result of a letter describing a new differing site condition submitted by RMI on 13 December 2000.

18. On 7 March 2001, RMI made an alternative proposal for project delays due to differing site conditions. RMI suggested that they would complete its dredging work at the North Slope of Dredge Section No. 5 and 6 and then move the

discharge line at Jacinto Port. The Government was to remove the remainder of Dredge Section No. 9 from the contract.

19. On 13 March 2000, RMI submitted a letter proposing furnishing approximately 250,000 cubic yards of clay material from a private contract to LLPA for hydraulic levee construction. As a result of this, Modification P00026 was issued adding up to 60 calendar days to the contract.

20. Modification P00023, dated 14 March 2001, established a revised contract completion date of 28 June 2000. It also provided for payment to RMI in the amount of $3,083,833.00 for dredge work completed in the flare area of the Houston/Galveston Navigation Channel.

21. Modification P00026 dated 4 May 2001allowed up to 60 calendar days to complete dredging from private sources and hydraulically placing it into the new levee template at Lost Lake Placement Area (LLPA). The modification provided for additional time allowed of up to 60 calendar days.

22. On 27 August 2001, the Government issued a letter to RMI directing them to remove any remaining pipelines or appurtenant equipment belonging to RMI from the LLPA.

23. Modification P00028 dated 18 September 2001, deleted the remaining unfinished dredging on the north levees between stations 4+00 and 40+00 and the remaining levee construction from the contract.

24. On November 6 and 7, 2001, the Contracting Officer issued 6 letters to RMI acknowledging receipt of various certified claims submitted by RMI between January thru October 2001. Breakdown of claims and dollar amounts are as follows:

| **Claim** | **Dollar Amt.** |
|---|---|
| Dredging S. Ferry Landing | $1,049,173.00 |
| Dredging Flare Area Clay | 4,691,688.00 |
| Delays due to HL&P Trans. Tower | 170,863.00 |
| Dredging Sec. 7 Clay | 1,083,779.00 |
| Realignment of West Levee | 789,600.00 |
| Dredging obstructions No. 1 (Sec. 4-8) | 2,126,083.00 |
| Dredging obstructions No. 2 (Sec. 9) | 1,158,642.00 |
| Delays due to Hydraulic Levees at LLPA | 6,258,853.00 |
| Total | $17,328,892.00 |

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., PLAINTIFF, | § § | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| UNITED STATES ARMY CORPS OF ENGINEERS, DEFENDANT. | § § § | |

# RENDA MARINE, INC.'S MEMORANDUM OF CONTENTIONS OF FACT & LAW

Comes now, Renda Marine, Inc. ("Renda"), and files this, its Memorandum of Contentions of Fact and Law.

## I.
## RENDA'S STATEMENT OF FACTS AND RENDA'S POSITION WITH RESPECT TO FACTS ON WHICH DEFENDANT IS EXPECTED TO RELY

### Project Overview

The project at issue in this litigation was entitled "Houston-Galveston Navigation Channels, Texas, 45-Foot Project, Dredging Upper Bayou" ("Project"). The Project involved dredging the Houston Ship Channel in Harris County, Texas. The Project was the beginning of a 5 year, $508 million program to deepen the navigation channel to 45 feet and widen it by an additional 130 feet to facilitate ships delivering cargo to Houston directly rather than unloading part of their cargo in the Gulf of Mexico. Renda was the low bidder on the Project and, following the resolution of a bid protest, Renda and the United States Army Corps of Engineers ("Corps" or "Defendant") entered into Contract No. DACW64-99-C-0001 (Contract) on October 26, 1998. Renda thereafter began work on the Project.

While performing its work, Renda encountered various differing site conditions or changed conditions that caused Renda to expend substantial additional funds and to invest additional time



Blumberg No. 5118 EXHIBIT C

mechanically constructed levees were required to be completed before any of the hydraulically placed levees could be started. The contract time simply did not permit the amount of time necessary for the consolidation of the soft foundations to permit the levees to stand.

As a result of the changes at the Lost Lake Placement Area, most or all of the relevant soil borings were of no use to a contractor bidding on the Project. These levees could not be constructed as designed. Renda is entitled to an equitable adjustment of time and money for this design problem.

The DCAA audited this claim. The DCAA's report does not address the technical validity of the claim. The DCAA labels the entire claim amount of $6,258,853 as "questioned costs" due to Renda allegedly not providing adequate support for its claim. More specifically, the DCAA contends that the claim was not prepared in accordance with Federal Acquisition Regulations because Renda did not provide breakdowns for the basic cost elements claimed.

The amount claimed represents the additional costs to attempt to construct and maintain the levees while they were subsiding. These costs are compensable. Renda had previously used the modified total cost method to quantify this REA, which is an allowable method of quantification in this instance. Renda has now revised its claim to reflect actual costs of $7,055,037, including the levee realignment costs. Renda is entitled to an equitable adjustment in contract time and money for the hard red clay.

**Defendant's Purported Final Decision of November 26, 2002**

On November 26, 2002, Defendant issued what it claimed was a "Contracting Officer's Final Decision" regarding alleged Government claims against Renda relating to the Project. As

discussed below, this purported final decision was not preceded by a dispute as required by the Contract Disputes Act, 41 U.S.C. §601 et seq., and thus is a nullity.

Defendant's Anticipated Factual Response

Defendant is expected to contend that it knew that Renda would not accept Defendant's position with respect to Defendant's purported claims against Renda and therefore is relieved of the requirement of presenting the proposed claims against Renda to Renda for possible resolution before issuing a purported contracting officer's final decision.

Renda's Reply

The Contract Disputes Act has been construed as requiring that a contracting officer's demand for payment from a contractor be preceded by a dispute before the demand constitutes a "claim" under the Contract Disputes Act. Failure to satisfy this condition precedent renders the decision a nullity. The claims included in the purported Contracting Officer's Final Decision were not presented to Renda for possible resolution and the purported Contracting Officer's Final Decision is a nullity.

If Defendant contends that the claims included in the purported Contracting Officer's Final Decision were in fact "disputed" because they directly related to the Renda claims discussed above, then the Court, in determining the validity and entitlement of Renda on each of Renda's claims, also has authority to declare the invalidity of the claims included in the purported Contracting Officer's Final Decision.

II.

STATEMENT OF ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

**Claim 1–Flare Area Differing Site Conditions**

Whether the conditions encountered by Renda in the Flare area constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the damages it sustained resulting from differing site conditions in the Flare area.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions in the Flare area.

**Claim 2–South Ferry Landing Differing Site Conditions**

Whether the conditions encountered by Renda in the South Ferry Landing area constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the additional cost and time it suffered relating to the differing site conditions in the South Ferry Landing area.

Whether Renda provided adequate notice to Defendant of the obstructions in the South Ferry Landing area.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions at the South Ferry Landing area.

**Claim 3–HL&P Towers Differing Site Conditions**

Whether the activities of HL&P Renda encountered constitute differing site conditions.

Whether Renda provided adequate notice to Defendant of the activities of HL&P.

Whether Renda took reasonable steps to mitigate the impact of the activities of HL&P.

What are the measure and amount of damages to which Renda is entitled due to the activities of HL&P.

**Claim 4–Differing Site Conditions – Obstructions in Sections 4 to 8, Stations 570+00 to 630+00**

Whether the conditions encountered by Renda in Sections 4 to 8 constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the additional cost and time it incurred relating to the differing site conditions in Sections 4 to 8.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

Whether Renda provided adequate notice to Defendant of the differing site conditions in Sections 4 to 8.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions in Sections 4 to 8.

**Claim 5–Differing Site Conditions – Objections in Section 9, Stations 660+00 to 684+00**

Whether the conditions encountered by Renda in Section 9 constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the additional time and cost it incurred relating to the differing site conditions in Section 9.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions in section 9.

**Claim 6–West Levee Realignment, Lost Lake Placement Area**

Whether Renda is entitled to compensation for the additional time and cost Renda incurred in constructing the West Levee.

Whether Renda's means and methods of construction are the cause of the difficulty that Renda experienced with construction of the West Levee.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

Whether Renda repositioned sections of the West Levee that Defendant agreed Renda did not have to move.

What are the measure and amount of damages to which Renda is entitled due to the difficulty that Renda experienced with construction of the West Levee.

**Claim 7–Differing Site Conditions – Section 7 Clay**

Whether the clay Renda encountered in Section 7 constitutes a differing site condition.

Whether Renda's means and methods of construction are the cause of the difficulty that Renda experienced with the clay in Section 7.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the clay Renda encountered in Section 7.

**Claim 8–Lost Lake Levees**

Whether the materials Renda encountered during hydraulic construction of the Lost Lake levees constitute a differing site condition.

Whether Renda's means and methods of construction are the cause of the difficulty that Renda experienced with the hydraulic construction of the Lost Lake levees.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the difficulty that Renda experienced with the hydraulic construction of the Lost Lake levees.

**Additional Issues**

Whether the differing site conditions Renda encountered entitle Renda to additional time for completing the Project.

Whether Renda is entitled to additional contract time as a result of the Corps' administration or maladministration of the contract for the Project.

Whether Renda is entitled to a remission of the liquidated damages assessed by Defendant.

Whether the Contracting Officer's Final Decision dated November 26, 2002, is a nullity.

III.
A DISCUSSION OF THE LEGAL PRINCIPLES PLAINTIFF CONTENDS ARE APPLICABLE, AND, TO THE EXTENT KNOWN, PLAINTIFF'S RESPONSE TO DEFENDANT'S ANTICIPATED LEGAL POSITION,

A contractor is entitled to recover the extra costs it incurs where "subsurface or latent physical conditions at the site differ materially from those indicated in the contract, *Foster Construction Co. v. United States*, 193 Ct.Cl. 587, 594, 435 F.2d 873, 876 (1970), and . . . these conditions [are] reasonably unforeseeable by the contractor." *J.F. Shea Co., Inc. v. United States*, 4 Cl.Ct. 46, 51 (Cl.Ct., 1983). These types of differing site conditions are known as type I differing site conditions. A contractor is also entitled to recover additional costs incurred due to "unknown and unusual physical conditions at the site, differing materially from those ordinarily encountered and generally recognized as inhering in the work provided for in the contract. " *J.F. Shea Co., Inc. v. United States*, 4 Cl.Ct. 46, 51 (Cl.Ct., 1983). These types of differing site conditions are known as type II differing site conditions. Alternatively, if any of Renda's claims are viewed as involving a situation involving defective plans and specifications, Renda is entitled to recover the additional costs it incurred attempting to comply with defective plans and specifications provided by Defendant. *See e.g. Big Chief Drilling Co. v. United States*, 26 Cl.Ct. 1276 (Cl.Ct., 1992).

A contractor is entitled to recover its additional costs resulting from a type I differing site condition where "1) The contract documents affirmatively indicate the subsurface or latent conditions forming the basis for the claim; 2) The contractor must have acted as a reasonable and prudent contractor in interpreting the contract documents; 3) The contractor must have relied on

the indications of the subsurface or latent conditions in the contract; 4) The subsurface or latent conditions actually encountered at the site must materially differ from the contract indications; 5) The actual conditions encountered must have been reasonably unforseeable; and 6) The costs claimed must be solely attributable to materially different subsurface conditions." *Appeal of Simpson Const. Co.*, 91-1 BCA P 23,630, VABCA No. 3176 (1990).

A contractor is entitled to recover its additional costs resulting from a type II differing site condition where "it did not know about the physical condition. Second, plaintiff must show that it could not have anticipated the condition from inspection or general experience. Third, plaintiff must show that the condition varied from the norm in similar contracting work." *Lathan Co., Inc. v. United States*, 20 Cl.Ct. 122, 128 (Cl.Ct., 1990).

Where a contractor demonstrates that it suffered a differing site condition, in addition to recovering its extra costs, it is entitled to additional time to perform if the differing site condition delayed the contractor and, if liquidated damages were assessed, a commensurate remission of liquidated damages. *See e.g. Appeal of Praught Const. Corp.*, 93-2 BCA P 25,896, ASBCA No. 39,670 (1993), *et al.*

Renda will demonstrate at trial that each of the elements necessary to recover as either a type I or type II differing site condition are met for each of Renda's Claim's described above. It is anticipated that Defendant will reply that the Contract did not make affirmative representations from which the site differed. However, "[i]t is well settled that 'documents and materials mentioned in the bidding documents' form part of the contract." *W.M. Schlosser, Inc. v. U.S.*, 50 Fed.Cl. 147, 154 (Fed.Cl., 2001). Further, Defendant is expected to argue that it warned of the differing site conditions Renda encountered. However, Defendant cannot insulate itself from

paying for the additional cost caused by differing site conditions by including general warnings in its contract documents that are contradicted by specific site condition information. *See e.g. Appeal of C & G Excavating, Inc.*, 95-1 BCA P 27,289, ENGBCA No. 6063 (1994) ("We agree with C&G that the Differing Site Conditions provision of the contract cannot be 'read out of the contract' by disclaimers, such as the Corps' statement in the IFB that contractors should expect equipment damage and downtime on account of debris."); *see also Appeal of Palmberg Construction Company*, 1959 WL 180, ENGBCA No. 1537 (1959) ("The record of job performance supports the contractor's assertion that quantities of materials in some of these categories,–especially boulders, rock fragments, snags, stumps and pieces of forest wood, were encountered during performance of the job, possibly in quantities exceeding those anticipated. . . It is difficult to reconcile these statements with the specifications which say that the material will 'consist largely of sand, gravel, and some mud or silt' and that 'miscellaneous trash may be encountered' (Underscoring supplied). If considerable debris was expected and was characteristic of such streams why didn't the specifications say so? No other conclusion can be reached but that changed conditions were encountered. The contractor's daily logs and photographs furnished by it show that great amounts of trash, including old tires, cable, iron, boulders, rock fragments and wood fragments were in Section A, B and C. The quantity and character of this trash were subsurface or latent physical conditions at the site differing materially from these indicated in the contract.")

Defendant is expected to argue that Renda did not comply with notice requirements relating to its claims. However, Renda gave timely and complete notice in compliance with all notice provisions in its contract with Defendant. Even assuming, merely for the sake of

argument, that Renda did not, Defendant had actual notice of each of the differing site conditions and thus cannot assert an alleged lack of notice as a defense. See e.g. *Appeal of Bohemia, Inc.*, 84-3 BCA P 17,650, ENGBCA No. 4305 (1984) ("In order to be entitled to an equitable adjustment for a constructive change to a contract, the contractor must give notice thereof to the Government, so that the Government has the opportunity to take remedial action. When the Government has been put on actual notice, the notice requirement is satisfied, irrespective of the medium through which the notice was conveyed," *citing General Casualty Company of America v. Unites States*, 130 Ct. Cl. 520, 175 F. Supp. 805, cert. denied, 349 U.S. 938 (1955)). Further, even a contractor's complete failure to provide "notice will not, per se, preclude recovery for an otherwise proper differing site conditions claim. Failure of notice serves as a defense to such a claim only if the Government can prove that it was prejudiced by the failure of notice," *Appeal of Simpson Const. Co., supra.*

Defendant is also expected to argue that Renda cannot recover on any claim for which it calculated damages using a total cost or modified total cost method of quantification. This is not so. A modified total cost method of recovery is allowable where "(1) the nature of the particular losses make it impossible or highly impractical to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs are reasonable; and (4) it was not responsible for the added expenses." *Delco Electronics Corp. v. U.S.*, 17 Cl.Ct. 302, 327-38 (Cl.Ct., 1989) (Aff'd 909F.2d1495, Fed.Cir., 1990).

Defendant is expected to argue that Renda cannot recover its claim preparation costs. However, claim preparation costs that are part of contract administration of changes are recoverable. *See e.g. In re Appeals of Atherton Const.*, Inc., 00-2 BCA P 30,968, ASBCA No.

48,527 2000) ("However, there are portions of the claim, such as preparation of cost proposals on penetrations, that were undertaken as part of negotiations and which are recoverable.")

The Contract Disputes Act has been construed as requiring that a contracting officer's demand for payment be preceded by a dispute by presentment to the contractor before the demand constitutes a "claim" under the Contract Disputes Act. *See e.g. Keystone Coat & Apron Mfg. Corp. v. United States*, 150 Ct. Cl. 277 (1960); *and Appeal of Instruments & Control Services Company*, 89-3 BCA ¶ 22,237 (1989); *and e.g. Appeals of United Aero, Inc.*, 83-1 BCA ¶ 16,268 (1983). The claims included in the purported Contracting Officer's Final Decision were not presented to Renda for possible resolution and the purported Contracting Officer's Final Decision is a nullity.

If Defendant contends that the claims included in the purported Contracting Officer's Final Decision were in fact "disputed" because they directly related to the claims presented by Renda discussed above, then the Court, in determining the validity and entitlement of Renda on each of Renda's claims, also has authority to declare the invalidity of the claims included in the purported Contracting Officer's Final Decision.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: s/Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of April, 2004, a true and correct copy of Renda Marine, Inc.'s Memorandum of Contentions of Fact & Law was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson

No. 02-306C
(Judge Hewitt)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

MAY 12, 2004



Blumberg No. 5118
EXHIBIT
D

6. The Schedule's Chapter 4 methodology should be used to compute ownership and operating rates for the dredging plant, which includes, in addition to the dredge, work barges, tugs, and tenders, pipelines, pontoons, boats, and other floating equipment used to support the dredging operation. Renda incorrectly used the Schedule's Chapter 3 methodology to calculate ownership and operating expense rates for the barges and tenders that supported the *Millennium*.

VII. Renda's Challenge To The Contracting Officer's November 2002 Decision Upon Government Claims

On November 26, 2002, seven months after Renda instituted the present litigation, the Contracting Officer issued a decision upon *Government* claims under or relating to the Upper Bayou Project Contract. Renda did not appeal that decision either to the Court of Federal Claims or the Armed Services Board of Contract Appeals. Renda takes the position that the decision is a "nullity" and now apparently asks this Court to ratify Renda's position by declaring the decision null and void.

The validity of the Contracting Officer's November 2002 decision, however, is not a subject of Renda's complaint in this case and the Government has not sought to place that decision in issue here by way of pleading a set-off or a counterclaim. Moreover, it is not necessary for the Court to decide that question in order to resolve any of Renda's claims. A decision by the Court upon the validity of the Contracting Officer's November 2000 decision regarding *Government* claims, therefore, would be tantamount to an advisory opinion.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

MAY 12, 2004

RECEIVED
APR 11 2002
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., PLAINTIFF, | § | |
| | § | CASE NO. 2-306 |
| V. | § | |
| | § | |
| UNITED STATES ARMY CORPS OF ENGINEERS, DEFENDANT. | § | COMPLAINT |

# COMPLAINT

Plaintiff, Renda Marine, Inc., complaining of Defendant, United States Army Corps of Engineers, respectfully states the following.

## I.

## Parties

Plaintiff, Renda Marine, Inc. ("Renda") is a corporation organized under the laws of Texas, with its principal place of business in Houston, Texas.

Defendant, United States Army Corps of Engineers ("Corps"), is an agency within the Department of Defense of the United States Government. The Corps may be served through the Attorney General for the United States of America.

## II.

## Jurisdiction

This Honorable Court has jurisdiction under the Contract Disputes Act, since Renda's claims arise from a United States Government construction contract, which is subject to that act.

## III.

## Venue for Trial

Renda respectfully requests that trial occur in Houston, Texas.

## IV.

## Factual Background

1. Renda is a marine dredging contractor.

2. The Corps is a government agency which awards many millions of dollars in marine dredging projects each year.

3. The Corps awards many contracts in and around the Port of Houston, Texas, in general, and the Houston Ship Channel, in particular. The Port of Houston is a 25-mile long complex, intermixed with public and private facilities. The Port of Houston is among the largest in the United States, and one of the largest in the world.

4. The Corps is charged with maintaining the navigability of the Port of Houston, and the Houston Ship Channel.

5. The Port of Houston Authority is a local sponsor for many of the Corps' projects for the Port of Houston.

6. On about June 16, 1998, the Corps requested proposals for Invitation No. DACW64-98-B-0004, "Houston-Galveston Navigation Channels, Texas (45-Foot Project) - Dredging Upper Bayou" ("Upper Bayou Project" or "Project").

7. The Contract Documents for the Upper Bayou Project made no mention of (1) the Port of Houston Authority, or (2) any agreement that the Corps had signed or may sign with the Port of Houston Authority, or (3) any engineering consultants for the Port of Houston Authority.

8. On about July 17, 1998, Renda submitted a bid to the Corps to construct the Upper Bayou Project. Renda's bid was $12,526,100.00, and was the lowest bid for the Project.

9. Another dredging contractor filed a protest with the Corps to contest an award to Renda of a contract for the Upper Bayou Project. Although Renda ultimately prevailed, the start of the Project was delayed.

10. On about October 26, 1998, the Corps issued Contract No. DACW64-98-C-0001 to Renda for the Upper Bayou Project ("Contract").

11. On about November 19, 1998, Renda acknowledged receipt of the Corps' Notice to Proceed on the Upper Bayou Project. The completion date required by the contract for the Upper Bayou Project was either 446 or 566 calendar days from Renda's receipt of the notice to proceed. During the course of the Project, Renda encountered differing site conditions and other problems which caused extra time and expense for its work on the Project.

12. When confronting a differing site condition, Renda generally first attempted to negotiate amicably with the Corps to lessen the cost input. But, as a general rule, the Corps tended to ignore the problem.

13. As a result, Renda had to submit a more formal request for equitable adjustment to attract the Corps' attention.

14. When the Corps did not negotiate or negotiate in good faith, Renda then had to submit a formal certified claim.

15. The Corps still has ignored most of the claims, and has refused to negotiate them in good faith.

16. The Corps has failed or refused to respond to Renda's request for a Defendant Contractors Auditing Agency audit of Renda's overhead rates.

17. The Contracting Officer has yet to issue any Contracting Officer's final decision on Renda's certified claims, although many more than sixty days have elapsed.

18. As a result, Renda has had to deem denied the certified claims presented herein, and seek adjudication from this Court.

**South Ferry Landing Differing Site Conditions Claim**

19. On about September 13, 1999, Renda started dredging operations for the Project in the Houston Ship Channel at or near Station 489+60 in Dredge Section 1.

20. On about October 8 and 9, 1999, Renda's dredge (the *Millennium*) hit obstructions on the south side of the Houston Ship Channel while dredging in the vicinity of Station 470+00 (South Ferry Landing). These obstructions were not shown in the Contract Documents.

21. On about October 9, 1999, Renda orally notified the Corps of differing site conditions in the South Ferry Landing area, and relocated the Millennium further upstream in the Houston Ship Channel to avoid the obstructions and to continue dredging.

22. On about March 8, 2000, the Contracting Officer for the Upper Bayou Project issued a cure notice to Renda based in significant part on Renda's not completing dredging in the South Ferry Landing area. The Corps threatened to terminate Renda for default as a result of delays Renda faced in its efforts to complete the Upper Bayou Project.

23. Under pressure from the Corps, on about April 7, 2000, Renda returned to dredge in the South Ferry Landing area. The Corps well knew of the obstructions, and that it would be expensive and perhaps futile to continue dredging in the area.

24. On about April 14, 2000, Renda's dredge still was unable to clear obstructions from the South Ferry Landing area (stations 470+00 to 427+00). Between April 21, 2000, and April 23, 2000, Renda again attempted to dredge the South Ferry Landing area without success due to the presence of rubble and other man-made erosion control materials. Renda again notified the Corps of the conditions.

25. As a result of hitting the rubble and rip-rap in the South Ferry Landing area, Renda's dredge was severely damaged. Dredge repairs occurred between about April 24, 2000, and April 30, 2000. Renda again notified the Corps' Contracting Officer and Administrative Contracting Officer about the South Ferry Landing conditions.

26. On about April 25, 2000, the Contracting Officer decided not to terminate the Contract for default. Instead, on about April 26, 2000, the Contracting Officer imposed strict performance requirements on Renda, which, if not met, would result in an immediate termination of the Contract.

27. On about April 28, 2000, Renda confirmed its differing site conditions concerns in a letter to the Corps about the South Ferry Landing area.

28. The Corps did not respond.

29. Fearing termination, Renda redoubled its efforts and completed dredging in the South Ferry Landing area between about May 1, 2000, and May 3, 2000, but at considerable extra expense to Renda.

30. Thereafter, on about May 8, 2000, the Corps conducted a survey of the dredge template for the South Ferry Landing area. (The "dredge template" is the area that Renda was required to clear of the material indicated in the Contract Documents, and as shown on the soil borings.) The Administrative Contracting Officer attended the survey. However, the Corps refused to provide any results of the survey to Renda for several months despite Renda's repeated requests for the results.

31. As a result of completing the dredging in the South Ferry Landing area, Renda's dredge again sustained severe damage, and had to be extensively repaired between about May 13 and 17, 2000.

32. On about August 11, 2000, responding to a Contracting Officer request, Renda revised its construction schedule, noting that the revised schedule did not take into account delays at the South Ferry Landing. Unable to finalize the schedule without a decision by the Corps on the South Ferry Landing, Renda advised the Administrative Contracting Officer that Renda awaited acceptance of Dredge Section 1, including the South Ferry Landing.

33. On about September 22, 2000, the Administrative Contracting officer accepted Dredge Sections 1 through 3, without mentioning any of the South Ferry Landing problems.

34. On September 22, 2000, Renda transmitted a letter to the Corps summarizing the South Ferry Landing differing site condition.

35. On about November 6, 2000, the Corps met with Renda to discuss construction issues, including the South Ferry Landing claim, and most if not all of the claims in this suit.

36. Despite full knowledge of the various differing site conditions that Renda faced (including, without limitation, the South Ferry Landing claim), and the delays and hindrances that such conditions caused to Renda, on about November 6, 2000, the Contracting Officer issued a Show Cause Notice, advising Renda that the Corps was considering terminating the Contract for default due to allegedly insufficient production since the March 8, 2000, cure notice.

37. On December 13, 2000, the Administrative Contracting Officer denied entitlement for the differing site condition at the South Ferry Landing.

38. On about January 10, 2001, Renda submitted a Certified Claim to the Contracting Officer for the extra costs Renda incurred from the South Ferry Landing differing site conditions. Renda sought $701,753.00, and an 18 day extension of contract time, as well as a Contracting Officer's final decision.

39. On about March 9, 2001, the Contracting Officer responded to the Certified Claim stating that a final decision would be issued by June 13, 2001.

40. On about March 13, 2001, Renda requested that the Corps schedule a claims conference for the South Ferry Landing differing site condition claim. Renda also requested a Defense Contractors Auditing Agency ("DCAA") audit for Renda's overhead rates.

41. On about March 15, 2001, Renda amended the South Ferry Landing differing site conditions claim, and increased the certified claim to $1,049,173.00.

42. A claims conference occurred on about May 2, 2001.

43. On about June 15, 2001, the Contracting Officer informed Renda that his final decision would be delayed until June 25, 2001.

44. On about June 26, 2001, the Contracting Officer requested that Renda submit an amended certified claim to incorporate certain information discussed at the May 2, 2001, claims conference.

45. On about August 23, 2001, Renda submitted an amended certified claim to the Contracting office to reflect the information previously requested. The claim amount remained set at $1,049,173.00.

46. On about October 29, 2001, Renda again inquired as to when the Contracting Officer's final decision would be issued.

47. On about November 6, 2001, the Contracting Officer wrote to Renda to advise that a Contracting Officer's Final Decision would be issued by April 18, 2002.

48. As of the date of this Complaint, no final decision has been issued, and none is in sight.

49. The rubble, rip-rap and man-made obstructions that Renda encountered were not shown on any soil boring or anywhere in the Contract Documents for the Upper Bayou Project.

50. Renda had no reason to suspect or expect such obstructions from studying the Contract Documents or from Renda's pre-contract bid site investigation.

51. The Corps benefitted from Renda's work clearing the obstructions. In fact, the Corps ordered Renda to dredge the area knowing not only that the obstructions were there, but also that they would no doubt damage Renda's dredge.

52. Renda is entitled to payment for its extra costs in the South Ferry Landing area which resulted from the differing site conditions.

**<u>Flare Area Claim</u>**

53. On about January 23, 2000, Renda started dredging operations in the Houston Ship Channel at or near Station 520+00 (Dredge Section 3).

54. Renda had anticipated high rates of production in the Flare Area, and had notified the Corps of Renda's expectation on about January 5, 2000.

55. Renda had expected that high production rates in the Flare Area would compensate for delays elsewhere on the Upper Bayou Project.

56. However, Renda encountered a differing site condition which markedly slowed production. Renda encountered stiff clay material not shown in the Contract Documents.

57. Renda removed the material which had been shown in the Contract Documents – silt and very soft clay – with its dredge between about January 23, 2000, and March 11, 2000. Renda timely notified the Corps of the differing site condition.

58. After the Corps issued a Cure Notice on about March 8, 2000, which complained of low production, Renda was forced to relocate the dredge to find an area with better production, while awaiting a response by the Corps to the differing site condition problem.

59. The Corps acknowledged the Flare Area differing site condition in the Contracting Officer's April 25, 2000, decision not to terminate Renda's contract. The Contracting Officer authorized an outside geotechnical firm to obtain soil borings of the material remaining in the area.

60. On about May 12, 2000, the Corps' geotechnical firm obtained three soil borings and issued a report on about May 30, 2000. The Corps withheld the report from Renda. In late August 2000, however, Renda obtained an unofficial copy of the geotechnical investigation report.

61. The Corps' geotechnical report clearly showed the Flare Area stiff clay to be a differing site condition. Nevertheless, the Corps withheld the findings from Renda, and refused to issue a modification to pay for the obvious change in conditions. Instead, the Corps forced dredging to continue on about July 17, 2000.

62. The Corps used the threat of termination against Renda to prod Renda to dredge in changed conditions. The Corps steadfastly refused to acknowledge that the changed conditions warranted an excusable schedule delay.

63. On about August 3, 2000, and again on about August 22, 2000, Renda advised the Corps of the Flare Area differing site condition, reporting delays in the work schedule, and requesting a determination of the claim's merits. The Corps did not acknowledge these letters.

64. On about November 6, 2000, the Corps met with Renda to discuss construction issues, including the Flare Area differing site condition, and most, if not all, of the claims in this suit. The Corps concurrently issued a Show Cause Notice, advising Renda that the Corps was considering

terminating the contract for default due to insufficient production since the March 8, 2000, Cure Notice.

65. The Contracting Officer signed the Show Cause Notice knowing full well that the production schedule had been delayed due to the Flare Area differing site condition, and most, if not all, of the claims in this suit.

66. On about December 13, 2000, the Corps issued an opinion which determined that the Flare Area differing site condition (among some of the other claims in this suit) did in fact impact the Project. The Administrative Contracting Officer granted entitlement for the issue. However, the Corps still refused to issue a modification to pay for the extra work or to extend the contract time.

67. On about February 14, 2001, Renda submitted a request for equitable adjustment to the Corps for the Flare Area differing site condition. Renda requested payment of $3,641,643.00 and a 76 calendar day extension of contract time.

68. Between about March 2 and 8, 2001, the Corps met with Renda to discuss the Flare Area claim. On about March 7, 2001, Renda amended the claim to reflect the actual overhead rates and dredge depreciation rates. As amended, the Flare Area claim sought damages of $4,691,688.00, and a 76 calendar day extension of contract time.

69. To analyze the claim, the Corps prepared an estimate of what the Corps figured as Renda's extra costs. The Corps' estimate was $4,111,778.00. The Corps agreed to pay Renda 75% of the $4,111,778.00 government estimate for the claim, but then suspended further negotiations pending a DCAA audit of Renda's overhead rates.

70. On about March 13, 2001, Renda requested that the Corps schedule a DCAA audit to verify Renda's overhead rates. The Corps failed to do so within any reasonable amount of time.

71. On about March 14, 2001, the Corps issued Contract Modification No. CO-08 (P00023) for $3,083,833.00, with a 56 calender day extension of contract time, to reflect the 75% of the costs that the Corps estimated that Renda had incurred.

72. By about August 9, 2001, it had become clear that the Corps would not allow Renda to complete the Upper Bayou Project, would not request an audit by the DCAA, and would not conclude negotiations on the Flare Area differing site condition. On that date, Renda submitted a certified claim for the Flare Area differing site condition, requesting a Contracting Officer's final decision.

73. The Contracting Officer has yet to issue a Contracting Officer's final decision.

74. Although the Corps has already conceded entitlement, the Corps has not fully paid to Renda even the money that the Corps has agreed is due and owing.

**HL&P Tower Claim**

75. On about July 16 and 17, 2000, Renda's dredging operations were disrupted by Houston Lighting and Power ("HL&P") crews who were installing a 138 Kilovolt electrical tower in the vicinity of Lost Lake. To accommodate the HL&P construction, Renda had to break down and relocate its discharge piping.

76. HL&P's work was not shown or indicated in the Contract Documents, and constituted a differing site condition.

77. Between about October 16 and 18, 2000, HL&P caused a second disruption, which required another relocation of the discharge piping in Lost Lake.

78. Renda properly and timely notified the Corps of these changes in site conditions.

79. On about December 13, 2000, the Corps acknowledged in writing that construction of the HL&P Tower impacted the Project. Although the Administrative Contracting Officer granted

entitlement, the Corps did not issue a modification to provide for payment of the extra costs Renda incurred.

80. On about April 11, 2001, Renda submitted a request for an equitable adjustment for the HL&P Tower matter, seeking payment of $166,143.00, and a three calendar day extension of contract time.

81. On about May 16, 2001, Renda amended its request, updating the claim to reflect the actual overhead rates and dredge depreciation rates. The amended request for equitable adjustment sought payment of $170,863.00, and a three calendar day extension of contract time.

82. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not negotiate quantum for the HL&P Tower matter, Renda re-submitted its request for an equitable adjustment as a certified claim.

83. The Contracting Officer has yet to issue a Contracting Officer's final decision.

**Section 7 Clay Claim**

84. During dredging operations between about October 2 and November 6, 2000, in Dredge Section 7, Renda encountered stiff clay material between stations 561+00 and 609+00. This type of material was not shown or indicated in the Contract Documents.

85. Renda notified the Corps of the differing site condition on about October 20, 2000.

86. On about December 13, 2000, the Corps issued an opinion in which the Corps concluded that Renda should have anticipated the stiff clay material. The Administrative Contracting Officer denied entitlement, without ever visiting the site. The Corps did not test this material like it had the stiff clay material in the Flare Area.

87. As a result, Renda stockpiled the stiff clay material as evidence of the differing site condition, and showed the material to the Corps during an inspection on about February 12, 2001.

88. On about April 16, 2001, Renda submitted to the Corps a request for equitable adjustment seeking payment of $1,083,779.00, plus a 21 calendar day extension of contract time.

89. By about August 9, 2001, it had become clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not acknowledge the existence of the differing site condition. As a result, Renda re-submitted its request for equitable adjustment as a certified claim.

90. The Contracting Officer has yet to issue a Contracting Officer's final decision.

**West Levee Realignment Claim**

91. While constructing levees during July 2000 at Lost Lake near station 175+00, Renda encountered a problem with the levees. The foundations were extremely soft, and displaced levee foundation material was being forced over the existing levees. On about July 28, 2000, Renda notified the Corps about the problem.

92. On about August 7, 2000, the Corps met with Renda at the site and orally directed Renda that the new levee be realigned so that the new levee was butted up against the existing levee. On about August 18, 2000, Renda confirmed the Corps' levee realignment directive as a change in the contract drawings, which required extra work.

93. Between about September 2000 and November 2000, Renda realigned the levee between stations 166+00 to 183+00 and 183+00 to 188+00. In the course of the realignment work, Renda had to remove and reposition material which had been previously placed.

94. After about November 2000, Renda had repositioned about all of the material which had been previously placed and thereafter followed the Corps' direction for all further levee construction.

95. On about December 13, 2000, the Corps issued an opinion in which the Corps concluded that Renda had created the problem with the West Levee area, and that the Corps had only made suggestions to correct the contractor's errors. The Administrative Contracting Officer denied entitlement for realignment of the West Levees.

96. On about May 23, 2001, the Corps unilaterally issued Contract Modification No. CO-10, concerning the realignment of the west levees. The unilateral modification offered Renda no money.

97. On about May 31, 2001, Renda submitted to the Corps a request for equitable adjustment seeking payment of $789,600.00, plus a 40 calendar day extension of contract time.

98. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Upper Bayou Project, would not request an audit, and would not admit merit to the West Levee Realignment Claim, Renda re-submitted its request for equitable adjustment as a certified claim to the Contracting Officer.

100. The Contracting Officer has yet to issue a Contracting Officer's final decision.

101. Renda clearly had to perform more work to realign the West Levees. Renda had already placed material in the location contractually required. When the Corps changed the location for the levees, Renda had to move material. Moving the material already placed cost Renda extra time and money.

**<u>Obstruction #1 Claim</u>**

102. In or about October and November 2000, Renda was dredging between stations 570+00 and 580+00. Renda's dredge encountered significant quantities of trash and other obstructions in the channel. The trash encountered by far exceeded the amount reasonably expected. The obstructions and the excessive amount of trash both constituted differing site conditions.

103. Marine dredges are designed to remove silt, clay, sand, and other soil-like materials. the dredges are not at their best in trash removal. The excessive amount of trash slowed dredge production. The obstructions caused significant damage to the dredge.

104. Between about October 8 and 18, 2000, Renda's dredge hit three obstructions in Dredge Section 7 of the Houston Ship Channel. On about October 18, 2000, Renda notified the Corps of the obstructions and identified them as differing site conditions. One of the objects appeared to be a CONEX shipping container.

105. On about October 24, 2000, Renda notified the Corps that Renda's dredge had hit another obstruction on about October 23, 2000.

106. On about October 27, 2000, The Corps issued Contract Modification No. CO-05 (P00019) for the removal of rock and rubble, which had been reported in the channel slopes in Dredge Section 5 during May 2000. By way of this modification, the Corps authorized the removal of the previously reported channel obstructions.

107. Between about October 20 and November 15, 2000, Renda's dredge hit two more obstructions, which caused further damage to Renda's equipment. Renda continued to encounter excessive amounts of trash in October and November 2000.

108. Between about November 17 and 20, 2000, Renda's subcontractor located and removed an obstruction near station 575+00 with a bucket dredge. The obstruction was an old dredge stern swivel weighing about ten tons, which Renda's dredge had struck on about October 8, 2000.

109. Between about November 27, 2000, and December 6, 2000, while dredging in the Houston Ship Channel adjacent to the Oxy-Chem Docks, Renda encountered rubble and rip-rap

within the dredge template. The rubble and rip-rap were not indicated in the Contract Documents, and constituted differing site conditions.

110. The conditions Renda encountered were similar to those Renda faced in the South Ferry Landing area. Using its South Ferry Landing experience as a guide, Renda attempted to dredge carefully around the rubble and rip-rap between stations 620+00 and 630+00. The dredging was inefficient, and beset by delays. Unfortunately, the dredge still sustained damage.

111. Between about December 8, 2000, and December 10, 2000, while dredging just past the Oxy-Chem Docks, Renda's dredge hit three more obstructions, which together with the damage from previous obstructions idled the dredge until repairs could be made.

112. On about December 13, 2000, Renda notified the Corps about three more obstructions that Renda hit between December 8 and 10, 2000.

113. Repeated abuse from obstructions, rubble and rip-rap took its toll on Renda's equipment. On about December 20, 2000, Renda again wrote to the Corps about the obstructions, and requested a resolution.

114. As a result of damage caused by obstructions and excessive trash, Renda's dredge was out of operation for repair between about December 11 and 31, 2000, and again between about January 1 and 14, 2001.

115. During the period of about January 7 through 11, 2001, the Corps conducted a survey of the Houston Ship Channel between stations 570+00 and 685+00 (the end of the Project) with a magnetometer and sidescan survey to determine the locations of excessive debris and metal obstructions within the dredge template. Renda received a copy of the report on about January 30, 2001. The report revealed many obstructions and areas full of trash, which it labeled as "debris fields."

116. On about April 16, 2001, Renda submitted to the Contracting Officer a request for equitable adjustment, seeking payment of $1,802,579.00, plus a 35 calendar day extension of contract time.

117. On about June 11, 2001, Renda updated the request for equitable adjustment to seek payment of $2,126,083.00, plus a 36 calendar day extension of contract time.

118. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not acknowledge the merits of this obstruction request for equitable adjustment, Renda re-submitted the request as a certified claim to the Contracting Officer.

119. On about August 22, 2001, the Administrative Contracting Officer orally acknowledged entitlement for the Obstruction #1 Claim. On about August 28, 2001, Renda confirmed the acknowledgment of entitlement in writing to both the Contracting Officer and the Administrative Contracting Officer.

120. The Contracting Officer has yet to issue a Contracting Officer's final decision.

**Obstruction #2 Claim**

121. On about January 14, 2001, after repairing the damage from obstructions and trash, Renda resumed dredging operations.

122. Between about January 27 and 28, 2001, Renda's dredge struck two more obstructions in Dredge Section 8. Renda notified the Corps on about January 31, 2001, concerning the obstructions, and described them as differing site conditions.

123. On about January 31, 2001, with the Corps' report on underwater obstructions and debris in hand, Renda notified the Corps that the obstructions and debris identified in the survey report were hazards to the dredging operations.

124. On about February 9, 2001, Renda started dredging in Dredge Section 9. On about February 13, 2001, Renda hit two obstructions. On about February 15, 2001, Renda hit two more obstructions.

125. On about March 7, 2001, Renda proposed to the Administrative Contracting Officer that the Corps delete the remainder of Dredge Section 9 from the Contract due to the debris fields and obstructions.

126. On about March 8, 2001, the Corps' Project Engineer admitted that Dredge Section 9 was unsuitable for dredging with a hydraulic cutterhead dredge. (Renda was using a hydraulic cutterhead dredge.) On about March 13, 2001, based on the Corps' survey report and the Project Engineer's admission, Renda wrote to the Contracting Officer and advised that Renda could not proceed with further dredging in Dredge Section 9.

127. On or before March 22, 2001, the Contracting Officer provided assurances to Renda that dredging could safely continue, and insisted that Renda complete dredging in Dredge Section 9. On about March 22, 2001, Renda acquiesced to pressure from the Contracting Officer and agreed to resume dredging in Dredge Section 9.

128. On about April 10, 2001, Renda resumed dredging in Dredge Section 9, and on about April 11, 2001, hit an obstruction.

129. On about April 12, 2001, Renda contacted the Administrative Contracting Officer by telephone and requested that the Corps verify the excessive trash in the area. The Corps visited the dredge, and instructed the dredge to continue work, without further assistance by the Corps or investigation.

130. On about April 14, 2001, Renda notified the Corps in writing of the unfavorable dredging conditions in Dredge Section 9.

131. On about April 16, 2001, Renda's dredge hit a sunken ship's mooring buoy, which was neither indicated in the Contract Documents or the Corps' underwater obstruction and trash survey report. The dredge hit the mooring buoy with enough force to knock the dredge out of commission, and caused significant damage to the cutterhead drive assembly.

132. Renda notified the Contracting Officer and again requested that the remainder of Dredge Section 9 be deleted from the contract.

133. Repairs to Renda's dredge occurred between about April 16 and May 8, 2001.

134. As acknowledged by Corps personnel and the Corps' own survey report, the obstructions and debris fields constituted differing site conditions for which Renda should be paid.

135. Although the Contracting Officer made specific assurances at the March 22, 2001, meeting with Renda, and promised various things on behalf of the Corps, the Corps seemed unable to make a decision regarding the completion of Dredge Section 9.

136. On about April 24, 2001, Renda requested that the Contracting Officer allow Renda to demobilize its dredge from the Project until the Corps could reach a decision regarding the completion of Dredge Section 9, i.e. (1) whether to delete Dredge Section 9 from the Contract or (2) whether to remove debris with a bucket dredge and then dredge the remainder of Dredge Section 9 with Renda's hydraulic dredge.

137. After Renda began dredging Dredge Section 9 in about February 2001, and encountered four obstructions, it became clear that the debris fields were not only a major dredging hazard, but one that could destroy Renda's equipment.

138. During March 2001, in order to minimize the downtime Renda was experiencing, Renda proposed to the Corps that Renda's dredge be allowed to pursue private dredging work in the immediate vicinity of the Project. Renda's reasons were (1) Renda was pushing for the Corps to

delete Dredge Section 9 because of the numerous hazards, (2) the private work included deepening an existing harbor/dock area, which would provide substantially more clay material for construction of the levees at Lost Lake than was anticipated in Dredge Section 9, (3) the private work paid more than the Corps was paying for the Corps work, and (4) during the time it took to complete the private work, the Corps could concentrate on resolving the debris fields and obstruction problems.

139. On about May 4, 2001, the Corps issued Contract Modification No. CO-09 (P00026), which suspended dredging operations for 30 to 60 days while Renda's dredge performed work for a private owner on the Houston Ship Channel. While seemingly a favor for Renda, in actuality, it was just the opposite.

140. On about May 18, 2001, the Corps directed that Renda's discharge line across Jacintoport be removed, a direct violation of an agreement reached at the March 22, 2001, meeting, where the Corps promised that if Renda would resume dredging, the line would not be removed until Dredge Section 9 was complete.

141. On about June 1, 2001, the Contracting Officer deleted the remainder of the dredging work in Dredge Section 9 from Renda's Contract and accepted all dredging work for the Upper Bayou Project. However, the Corps did not delete the levee construction work from the Contract. By not releasing Renda from the levee construction work, Renda's equipment was still obligated to the Upper Bayou Project, but could perform no work due to the Suspension Modification.

142. On about June 14, 2001, Renda issued a request for equitable adjustment to the Contracting Officer seeking payment of $1,158,642.00, plus a 36 calendar day extension of contract time. Renda fully expected that the Corps would immediately begin negotiations since, as the Corps had requested, Renda had resumed work in Dredge Section 9.

143. Renda's resumption of work was a gesture of good faith to the Corps, since both parties knew that the dredge faced serious damage from continued dredging in the area.

144. As it turns out, however, the Contracting Officer never intended to pay for any of the damage expected to Renda's dredge. The Contracting Officer was simply bowing to pressure from the Local Sponsor, and promised whatever it took to induce Renda to resume work. Finally, on about July 23, 2001, the Contracting Officer released from the Project Renda's dredge and ancillary equipment.

145. On about August 9, 2001, after it became clear that the Corps would not allow Renda to complete the levee work for the Project, would not request an audit, and would not acknowledge that Obstruction #2 claim resulted from several differing site conditions, Renda resubmitted the request for equitable adjustment as a certified claim.

146. On about August 22, 2001, the Administrative Contracting Officer orally granted entitlement for the Obstruction #2 claim. Renda confirmed the Administrative Contracting Officer's decision in writing on about August 28, 2001, to both the Contracting Officer and Administrative Contracting Officer.

147. The Contracting Officer has yet to issue a Contracting Officer's final decision on the claim.

**Lost Lake Levees Claim**

148. Two types of levees were required on the Project: mechanical levees and hydraulic levees. The Contract Documents set out the sequence for constructing the levees – the mechanical levees had to be completed prior to the start of hydraulic levees.

149. The Contract Documents specified that the unit price for payment for the mechanical levees is measured by the cubic foot of material placed, while that for the hydraulic levees is

measured by the linear foot of completed levee (which equates to approximately 35 cubic yards, neat line).

150. The original Contract Documents specified simply that the foundations for the new levees were expected to be very soft to soft dredged material and sand placed during previous dredging cycles.

151. Minutes for the Pre-Bid Meeting held on about June 23, 1998, were issued as a part of Addendum No. 1. These minutes list the contractors' concerns for the vagueness of the specifications regarding levee foundations and the Government's concern for the availability of suitable material to complete the levees.

152. As a result of the vague and general comments regarding the foundations, Renda naturally had to rely heavily on the soil borings, which were part of the Contract Documents.

153. The Contract Documents contained the following soil borings: Hydraulic Levee areas – 2 from 1963, 12 from 1991, 9 from 1993, 4 from 1994, and 1 from 1996, for a total of 28 borings; Mechanical Levee areas – 7 from 1991, 4 from 1993, 3 from 1994, 1 from 1996, and 1 from 1997, for a total of 16 borings. The majority of soil borings in or near the vicinity of the new levee alignment were obtained during 1991 and 1993, with only one soil boring obtained in 1997, one year prior to the actual bid for the work.

154. The Corps, however, knew of the existence of sidecast borrow areas adjacent to the existing levees, whose locations were in the general vicinity of the new levee alignment corresponding to the new levee foundation areas. These "sidecast borrow areas" were areas where soil material had been removed some time prior to the bid solicitation for the Project.

155. The existence, depth, width, and extent of the sidecast borrow areas were not shown in the Contract Documents and were not revealed to the contractors during the bidding cycle.

156. Renda has discovered that the existing levees were "dressed up" sometime in 1995 or 1996, using sidecast borrow areas adjacent to the existing levees. As a result, any soil boring in the vicinity of the new levee alignment obtained prior to about 1996 is probably inaccurate due to the removal of material from the borrow areas.

157. Only three soil borings in the vicinity of the new levee alignment were obtained after 1994. Unbeknownst to the bidders, these three borings provided the only current information for prospective bidders regarding approximately 24,000 linear feet (approximately 4.5 miles) of new levee.

158. The Corps intentionally failed to perform an up to date survey of the existing levees prior to bidding the work in an effort to minimize the prices bid by prospective contractors. The Corps knew or should have known that had it revealed the true nature and extent of the sidecast borrow areas, prospective bidders would have increased their prices for the Project.

159. The Corps also knew or should have known that the Contract Documents did not provide offsets from the existing levee, which would have allowed Renda to validate the new levee alignment, during the course of construction.

160. During construction of the mechanical levees between about December 1998 and May 1999, Renda discovered that the levee foundation material was highly unstable and exceedingly soft. The condition of the levee foundation was not what was indicated in the Contract Documents. As a result, the levees had to be realigned in order to construct the Project. Although the Corps directed Renda to realign the mechanical levees so that they were placed on top of the existing levees, this part of the job still required approximately 50% more material than anticipated. The Corps has agreed to pay for the additional material required through a contract modification.

161. Due to the very soft foundations, the extent of which were not definable by either the Corps or Renda, several hundred feet of hydraulic levee were deleted in an attempt to avoid very soft conditions in the northeast corner of Lost Lake.

162. Prior to the start of hydraulic levee construction during July 1999, but after the Contract was awarded to Renda, the Corps modified the specifications. These changes in the specifications concerned the construction monitoring requirements, and incorporated a new design criteria, at considerable extra cost to Renda.

163. To underscore the significance of the change, the Corps has issued a new specification section for subsequent embankment construction contracts, and expanded the construction procedures required to achieve successful completion of the work. The Corps, however, refused to issue a Contract Modification for the extra work that Renda had to perform, and required Renda to incorporate the new requirements at no cost to the Corps.

164. The Corps had provided assurances during June 1998 that sufficient material was available to complete the hydraulic levees. However, by July 1999, Renda had become increasingly concerned about the validity of the Corps' representation.

165. As part of the Project, Renda was required to install a new outlet box structure, and a 48" diameter discharge pipe within the new levee.

166. In about February 1999, while Renda was constructing mechanical levees and the new outlet box structure in the northeast corner of Lost Lake, Corps inspectors revised the Corps' representation about the foundations in the area to term the disposal area "deep soft dredge material." The Corps inspectors then noted that the Corps' design should have expected pipe sag due to the soft foundation material. These statements underscored concerns that the foundations would not support the newly installed 48" diameter pipe.

167. The soft foundations discovered beneath the mechanical levees affected the stability of not only the new outlet box structure but also the discharge pipe through the levee. To resolve these problems, the Corps issued Contract Modifications CO-01 (P00004), CO-02 (P00006) and CO-03 (P00008), which reimbursed Renda's subcontractor for the additional costs.

168. On about March 23, 1999, the Corps issued Modification CO-01 unilaterally with a Not to Exceed price of $250,000. On about June 21, 1999, the Corps issued Modification CO-02 to adjust the values of CO-01 with a new value of $436,855.87, plus a 20 calendar day extension of contract time. On about August 4, 1999, the Corps issued Modification CO-03 purportedly to complete all of the extras associated with the mechanical levees and new structural requirements at the outlet box. Modification CO-03 had a value of $364,201.03, plus a contract time extension of 22 calendar days.

169. Additionally, sometime after August 4, 1999, the Corps unilaterally issued Contract Modification VQ011 for a variation in estimated quantities. Modification VQ011 had a value of $0, but awarded a contract time extension of 18 calendar days. With this modification, the Corps set the precedent that additional material required to build the levees would be reimbursed through a modification, and paid by the cubic yard of material placed.

170. When the Corps had to change the hydraulic levee alignment in the northeast corner of Lost Lake due to soft foundation problems at the new outlet box structure, it became clear that the Corps needed more suitable clay material in order to construct the levees. On about March 1, 1999, Renda discussed with the Corps the potential impacts of the increased quantities of material required to complete the work in this area. As it has turned out, the hydraulic levees in the northeast corner would not maintain the required 30' elevation, even after being accepted by the Corps, due to continuing subsidence problems.

171. The Contract Documents require that the hydraulic levees be constructed of suitable materials, which are defined as medium to hard clays and sands. However, the Contract Documents do not require the contractor to segregate soft clays from the suitable materials during dredging and construction of the levees.

172. The Contract Documents assume that sufficient suitable material exists to complete the hydraulic levees. At the June 23, 1998, Pre-Bid Meeting, the Corps stated that sufficient new work material was available to construct the levees even allowing for soft foundations.

173. Despite the Corps' assurances of sufficient material to complete the hydraulic levees, Renda expressed concern in a July 7, 1999, letter to the Corps, and furnished a plan for completion of the work. Renda's plan was designed to minimize the extra cost of resolving the lack of material problem.

174. Renda has discovered that under the circumstances, there was too little acceptable material to construct the levees, a fact that the Corps fully knew prior to the bid opening for the Upper Bayou Project.

175. For example, on about July 26, 1999, prior to the preparatory meeting for the hydraulic levees, the Corps' geotechnical engineer stated that the "Corps had some concerns about there being sufficient quantities available to complete the levees."

176. On about September 13, 1999, hydraulic levee construction started at about station 97+00 in the southeast corner moving downstation towards the already known poor conditions at the northeast corner.

177. The Renda levee crews working on the north levees between stations 48+00 and 51+00 experienced problems with subsidence and soft levee foundations. As a result, the levees could not be raised to or maintained at the required 30' elevation.

178. Renda soon discovered that the levee could not be constructed as designed.

179. Renda discovered that the levee could not be located as shown on the Contract documents.

180. Renda discovered that the levee's foundation was too unstable.

181. Renda discovered that the levee's materials were too soft to allow for proper construction.

182. Renda discovered that there were insufficient materials available to construct the levee.

183. Despite Renda's best efforts, the levee experienced shearing and subsidence, and could not be constructed as per the Contract Documents.

184. Renda notified the Corps of the problems with the levee and of the differing site conditions.

185. As a partial resolution of the differing site conditions and other problems with the levee, the Corps directed Renda to realign the levee.

186. On about August 18, 2000, Renda confirmed in writing the Corps directive to realign the levee, and advised the Corps of differing site conditions and extra costs to perform the work.

187. On about October 23, 2000, the Corps issued a second directive concerning the levee, ordering Renda to change the levee construction again. On about November 1, 2000, Renda confirmed the Corps' second directive.

188. On about November 3, 2000, the Corps sent a letter to Renda changing the method for constructing the levee yet again.

189. At all times material, the Corps knew or should have known that there were insufficient materials available to construct the levees in the manner the Corps directed. The Corps

also knew that under the Contract, Renda would only be paid if Renda completed the levee. As a result, since there was no way for Renda to complete the levee, Renda would receive no money for its efforts and work.

190. On or about May 23, 2001, the Corps unilaterally issued Contract Modification No. CO-10, realigning the west levees, but offering no money to Renda for all the extra work involved.

191. On about June 1, 2001, the Contracting Officer deleted the remainder of Dredge Section 9 from the Contract, but did not delete the levee work. As a result, the levee work still remained outstanding.

192. Renda repeatedly attempted to have the Corps resolve the levee work problems. Renda even had a Congresswoman write to prod the Corps into making a decision as to how to resolve the levee work.

194. On about July 23, 2001, the Contracting Officer finally released Renda's dredge from the Project.

195. On about September 18, 2001, the Corps unilaterally issued Contract Modification CO-11 (P00028) deleting the remaining levee work from the Contract. The modification did not expressly provide for additional payment to Renda, and tentatively denoted the costs would be determined.

196. On about October 16, 2001, Renda submitted a certified claim in the amount of $6,258,853.00, plus a 397 calendar day extension of contract time.

197. The Contracting Officer has yet to issue a Contracting Officer's final decision.

**<u>Liquidated Damages</u>**

Under the circumstances, the Corps should release and/or waive any and all liquidated damages.

**Summary**

| | | |
|---|---|---|
| South Ferry Landing Claim | | 1,049,173.00 |
| Flare Area Claim | 4,691,688.00 | |
| less payment | (3,083,833.00) | |
| | | 1,607,855.00 |
| HL&P Tower Claim | | 170,863.00 |
| Section 7 Clay Claim | | 1,083,779.00 |
| West Levee Realignment Claim | | 789,600.00 |
| Obstruction #1 Claim | | 2,126,083.00 |
| Obstruction #2 Claim | | 1,158,642.00 |
| Lost Lake Levees Claim | | 6,258,853.00 |
| | | 14,244,848.00 |
| Plus Attorney Fees, Court Costs, and Pre-Judgment and Post-Judgment Interest | | TBA |

WHEREFORE, Plaintiff, Renda Marine, Inc., respectfully prays that: (1) a true copy of this Complaint be served on the United States Army Corps of Engineers, and that the Corps be required to appear and answer same; (2) after due proceedings, there be judgment in favor of Renda and against the Corps in accordance with the demands herein; (3) Renda be awarded all costs of this proceeding, together with its reasonable attorney's fees, and pre-judgment and post-judgment interest at the highest rates allowed by law; and (4) Renda receive all such other general and equitable relief as may be appropriate.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: ______________________
Brian W. Erikson, TX Bar No. 06643800
Andrew M. Trusevich, TX Bar No. 00785119

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.