UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC.,<br>PLAINTIFF,<br><br>V.<br><br>UNITED STATES ARMY<br>CORPS OF ENGINEERS,<br>DEFENDANT. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 02-306C<br><br>(JUDGE HEWITT) |

**FIRST AMENDED COMPLAINT**

Plaintiff, Renda Marine, Inc., complaining of Defendant, United States Army Corps of Engineers, respectfully states the following.

**I.**

**Parties**

Plaintiff, Renda Marine, Inc. ("Renda") is a corporation organized under the laws of Texas, with its principal place of business in Denton County, Texas.

Defendant, United States Army Corps of Engineers ("Corps"), is an agency within the Department of Defense of the United States Government. The Corps has appeared and answered herein and may be served through its attorneys of record..

**II.**

**Jurisdiction**

This Honorable Court has jurisdiction under the Contract Disputes Act, since Renda's claims arise from a United States Government construction contract, which is subject to that act.

**III.**

**Venue for Trial**

Renda respectfully requests that trial occur in Houston, Texas.



EXHIBIT A

## IV.

## Factual Background

1. Renda is a marine dredging contractor.

2. The Corps is a government agency which awards many millions of dollars in marine dredging projects each year.

3. The Corps awards many contracts in and around the Port of Houston, Texas, in general, and the Houston Ship Channel, in particular. The Port of Houston is a 25-mile long complex, intermixed with public and private facilities. The Port of Houston is among the largest in the United States, and one of the largest in the world.

4. The Corps is charged with maintaining the navigability of the Port of Houston, and the Houston Ship Channel.

5. The Port of Houston Authority is a local sponsor for many of the Corps' projects for the Port of Houston.

6. On about June 16, 1998, the Corps requested proposals for Invitation No. DACW64-98-B-0004, "Houston-Galveston Navigation Channels, Texas (45-Foot Project) - Dredging Upper Bayou" ("Upper Bayou Project" or "Project").

7. The Contract Documents for the Upper Bayou Project made no mention of (1) the Port of Houston Authority, or (2) any agreement that the Corps had signed or may sign with the Port of Houston Authority, or (3) any engineering consultants for the Port of Houston Authority.

8. On about July 17, 1998, Renda submitted a bid to the Corps to construct the Upper Bayou Project. Renda's bid was $12,526,100.00, and was the lowest bid for the Project.

9. Another dredging contractor filed a protest with the Corps to contest an award to Renda of a contract for the Upper Bayou Project. Although Renda ultimately prevailed, the start of the Project was delayed.

10. On about October 26, 1998, the Corps issued Contract No. DACW64-98-C-0001 to Renda for the Upper Bayou Project ("Contract").

11. On about November 19, 1998, Renda acknowledged receipt of the Corps' Notice to Proceed on the Upper Bayou Project. The completion date required by the contract for the Upper Bayou Project was either 446 or 566 calendar days from Renda's receipt of the notice to proceed. During the course of the Project, Renda encountered differing site conditions and other problems which caused extra time and expense for its work on the Project.

12. When confronting a differing site condition, Renda generally first attempted to negotiate amicably with the Corps to lessen the cost input. But, as a general rule, the Corps tended to ignore the problem.

13. As a result, Renda had to submit a more formal request for equitable adjustment to attract the Corps' attention.

14. When the Corps did not negotiate or negotiate in good faith, Renda then had to submit a formal certified claim.

15. The Corps still has ignored most of the claims, and has refused to negotiate them in good faith.

16. One of the Corps' stalling tactics on negotiation and resolution of Renda's claims was the purported need for an audit of Renda's overhead. To resolve this concern, Renda requested an audit by the Defense Contract Audit Agency ("DCAA") of Renda's claims and overhead rates. The Corps delayed requesting an audit for more than a year.

17. The Contracting Officer did not issue any Contracting Officer's final decision on Renda's certified claims, although many more than sixty days have elapsed, before Renda filed this suit.

18. As a result, Renda has had to deem denied the certified claims presented herein, and seek adjudication from this Court.

19. On November 26, 2002, the Contracting Officer issued a Final Decision, which summarily rejected Renda's claims, and asserted numerous counterclaims. The Government has not asserted those counterclaims in this suit, and has not requested an offset or credit for such counterclaims in this suit.

**Count I -**
**South Ferry Landing Differing Site Conditions Claim**

20. The allegations of paragraphs 1 through 19 are hereby incorporated by reference and reaverred as if fully set out herein.

21. On about September 13, 1999, Renda started dredging operations for the Project in the Houston Ship Channel at or near Station 489+60 in Dredge Section 1.

22. On about October 8 and 9, 1999, Renda's dredge (the *Millennium*) hit obstructions on the south side of the Houston Ship Channel while dredging in the vicinity of Station 470+00 (South Ferry Landing). These obstructions were not shown in the Contract Documents.

23. On about October 9, 1999, Renda orally notified the Corps of differing site conditions in the South Ferry Landing area, and relocated the Millennium further upstream in the Houston Ship Channel to avoid the obstructions and to continue dredging.

24. On about March 8, 2000, the Contracting Officer for the Upper Bayou Project issued a cure notice to Renda based in significant part on Renda's not completing dredging in the South

Ferry Landing area. The Corps threatened to terminate Renda for default as a result of delays Renda faced in its efforts to complete the Upper Bayou Project.

25. Under pressure from the Corps, on about April 7, 2000, Renda returned to dredge in the South Ferry Landing area. The Corps well knew of the obstructions, and that it would be expensive and perhaps futile to continue dredging in the area.

26. On about April 14, 2000, Renda's dredge still was unable to clear obstructions from the South Ferry Landing area (stations 470+00 to 472+00). Between April 21, 2000, and April 23, 2000, Renda again attempted to dredge the South Ferry Landing area but had difficulty doing so due to the presence of rubble and other man-made erosion control materials. Renda again notified the Corps of the conditions.

27. As a result of hitting the rubble and rip-rap in the South Ferry Landing area, Renda's dredge was severely damaged. Dredge repairs occurred between about April 24, 2000, and April 30, 2000. Renda again notified the Corps' Contracting Officer and Administrative Contracting Officer about the South Ferry Landing conditions.

28. On about April 25, 2000, the Contracting Officer decided not to terminate the Contract for default. Instead, on about April 26, 2000, the Contracting Officer imposed strict performance requirements on Renda, which, if not met, would result in an immediate termination of the Contract.

29. On about April 28, 2000, Renda confirmed its differing site conditions concerns in a letter to the Corps about the South Ferry Landing area.

30. The Corps did not respond.

31. Fearing termination, Renda redoubled its efforts and completed dredging in the South Ferry Landing area between about May 1, 2000, and May 3, 2000, but at considerable extra expense to Renda.

32. Thereafter, on about May 8, 2000, the Corps conducted a survey of the dredge template for the South Ferry Landing area. (The "dredge template" is the area that Renda was required to clear of the material indicated in the Contract Documents, and as shown on the soil borings.) The Administrative Contracting Officer attended the survey. However, the Corps refused to provide any results of the survey to Renda for several months despite Renda's repeated requests for the results.

33. As a result of completing the dredging in the South Ferry Landing area, Renda's dredge again sustained severe damage, and had to be extensively repaired between about May 13 and 17, 2000.

34. On about August 11, 2000, responding to a Contracting Officer request, Renda revised its construction schedule, noting that the revised schedule did not take into account delays at the South Ferry Landing. Unable to finalize the schedule without a decision by the Corps on the South Ferry Landing, Renda advised the Administrative Contracting Officer that Renda awaited acceptance of Dredge Section 1, including the South Ferry Landing.

35. On about September 22, 2000, the Administrative Contracting officer accepted Dredge Sections 1 through 3, without mentioning any of the South Ferry Landing problems.

36. On September 22, 2000, Renda transmitted a letter to the Corps summarizing the South Ferry Landing differing site condition.

37. On about November 6, 2000, the Corps met with Renda to discuss construction issues, including the South Ferry Landing claim, and most if not all of the claims in this suit.

38. Despite full knowledge of the various differing site conditions that Renda faced (including, without limitation, the South Ferry Landing claim), and the delays and hindrances that such conditions caused to Renda, on about November 6, 2000, the Contracting Officer issued a Show Cause Notice, advising Renda that the Corps was considering terminating the Contract for default due to allegedly insufficient production since the March 8, 2000, cure notice.

39. On December 13, 2000, the Administrative Contracting Officer denied entitlement for the differing site condition at the South Ferry Landing.

40. On about January 10, 2001, Renda submitted a Certified Claim to the Contracting Officer for the extra costs Renda incurred from the South Ferry Landing differing site conditions. Renda sought $701,753.00, and an 18 day extension of contract time, as well as a Contracting Officer's final decision.

41. On about March 9, 2001, the Contracting Officer responded to the Certified Claim stating that a final decision would be issued by June 13, 2001.

42. On about March 13, 2001, Renda requested that the Corps schedule a claims conference for the South Ferry Landing differing site condition claim. Renda also requested a DCAA audit for Renda's overhead rates.

43. On about March 15, 2001, Renda amended the South Ferry Landing differing site conditions claim, and increased the certified claim to $1,049,173.00.

44. A claims conference occurred on about May 2, 2001.

45. On about June 15, 2001, the Contracting Officer informed Renda that his final decision would be delayed until June 25, 2001.

46. On about June 26, 2001, the Contracting Officer requested that Renda submit an amended certified claim to incorporate certain information discussed at the May 2, 2001, claims conference.

47. On about August 23, 2001, Renda submitted an amended certified claim to the Contracting office to reflect the information previously requested. The claim amount remained set at $1,049,173.00.

48. On about October 29, 2001, Renda again inquired as to when the Contracting Officer's final decision would be issued.

49. On about November 6, 2001, the Contracting Officer wrote to Renda to advise that a Contracting Officer's Final Decision would be issued by April 18, 2002.

50. As of the date Renda filed this suit, no final decision had been issued, and none was in sight.

51. The rubble, rip-rap and man-made obstructions that Renda encountered were not shown on any soil boring or anywhere in the Contract Documents for the Upper Bayou Project.

52. Renda had no reason to suspect or expect such obstructions from studying the Contract Documents or from Renda's pre-contract bid site investigation.

53. The Corps benefitted from Renda's work clearing the obstructions. In fact, the Corps ordered Renda to dredge the area knowing not only that the obstructions were there, but also that they would no doubt damage Renda's dredge.

54. Renda is entitled to payment for its extra costs in the South Ferry Landing area which resulted from the differing site conditions. Such entitlement is based either on the differing site condition clause of the contract or on the Corps' termination of dredging work for convenience.

**Count II -**
**Flare Area Claim**

55. The allegations of paragraphs 1 through 54 are hereby incorporated by reference and reaverred as if fully set out herein.

56. On about January 23, 2000, Renda started dredging operations in the Houston Ship Channel at or near Station 520+00 (Dredge Section 3).

57. Renda had anticipated high rates of production in the Flare Area, and had notified the Corps of Renda's expectation on about January 5, 2000.

58. Renda had expected that high production rates in the Flare Area would compensate for delays elsewhere on the Upper Bayou Project.

59. However, Renda encountered a differing site condition which markedly slowed production. Renda encountered stiff clay material not shown in the Contract Documents.

60. Renda removed the material which had been shown in the Contract Documents – silt and very soft clay – with its dredge between about January 23, 2000, and March 11, 2000. Renda timely notified the Corps of the differing site condition.

61. After the Corps issued a Cure Notice on about March 8, 2000, which complained of low production, Renda was forced to relocate the dredge to find an area with better production, while awaiting a response by the Corps to the differing site condition problem.

62. The Corps acknowledged the Flare Area differing site condition in the Contracting Officer's April 25, 2000, decision not to terminate Renda's contract. The Contracting Officer authorized an outside geotechnical firm to obtain soil borings of the material remaining in the area.

63. In about May 2000, the Corps' geotechnical firm obtained three soil borings and issued a report on about May 30, 2000. The Corps withheld the report from Renda. In late August 2000, however, Renda obtained an unofficial copy of the geotechnical investigation report.

64. The Corps' geotechnical report clearly showed the Flare Area stiff clay to be a differing site condition. Nevertheless, the Corps withheld the findings from Renda, and refused to issue a modification to pay for the obvious change in conditions. Instead, the Corps forced dredging to continue on about July 17, 2000.

65. The Corps used the threat of termination against Renda to prod Renda to dredge in changed conditions. The Corps steadfastly refused to acknowledge that the changed conditions warranted an excusable schedule delay.

66. On about August 3, 2000, and again on about August 22, 2000, Renda advised the Corps of the Flare Area differing site condition, reporting delays in the work schedule, and requesting a determination of the claim's merits. The Corps did not acknowledge these letters.

67. On about November 6, 2000, the Corps met with Renda to discuss construction issues, including the Flare Area differing site condition, and most, if not all, of the claims in this suit. The Corps concurrently issued a Show Cause Notice, advising Renda that the Corps was considering terminating the contract for default due to insufficient production since the March 8, 2000, Cure Notice.

68. The Contracting Officer signed the Show Cause Notice knowing full well that the production schedule had been delayed due to the Flare Area differing site condition, and most, if not all, of the claims in this suit.

69. On about December 13, 2000, the Corps issued an opinion which determined that the Flare Area differing site condition (among some of the other claims in this suit) did in fact impact

the Project. The Administrative Contracting Officer granted entitlement for the issue. However, the Corps still refused to issue a modification to pay for the extra work or to extend the contract time.

70. On about February 14, 2001, Renda submitted a request for equitable adjustment to the Corps for the Flare Area differing site condition. Renda requested payment of $3,641,643.00 and a 76 calendar day extension of contract time.

71. Between about March 2 and 8, 2001, the Corps met with Renda to discuss the Flare Area claim. On about March 7, 2001, Renda amended the claim to reflect the actual overhead rates and dredge depreciation rates. As amended, the Flare Area claim sought damages of $4,691,688.00, and a 76 calendar day extension of contract time.

72. To analyze the claim, the Corps prepared an estimate of what the Corps figured as Renda's extra costs. The Corps' estimate was $4,111,778.00. The Corps agreed to pay Renda 75% of the $4,111,778.00 government estimate for the claim, but then suspended further negotiations pending a DCAA audit of Renda's overhead rates.

73. On about March 13, 2001, Renda requested that the Corps schedule a DCAA audit to verify Renda's overhead rates. The Corps failed to do so within any reasonable amount of time.

74. On about March 14, 2001, the Corps issued Contract Modification No. CO-08 (P00023) for $3,083,833.00, with a 56 calender day extension of contract time, to reflect the 75% of the costs that the Corps estimated that Renda had incurred.

75. By about August 9, 2001, it had become clear that the Corps would not allow Renda to complete the Upper Bayou Project, would not request an audit by the DCAA, and would not conclude negotiations on the Flare Area differing site condition. On that date, Renda submitted a certified claim for the Flare Area differing site condition, requesting a Contracting Officer's final decision.

76. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

77. Although the Corps has already conceded entitlement, the Corps has not fully paid to Renda even the money that the Corps has agreed is due and owing.

**Count III -**
**<u>HL&P Tower Claim</u>**

78. The allegations of paragraphs 1 through 77 are hereby incorporated by reference and reaverred as if fully set out herein.

79. On about July 16 and 17, 2000, Renda's dredging operations were disrupted by Houston Lighting and Power ("HL&P") crews who were installing a 138 Kilovolt electrical tower in the vicinity of Lost Lake. To accommodate the HL&P construction, Renda had to break down and relocate its discharge piping.

80. HL&P's work was not shown or indicated in the Contract Documents, and constituted a differing site condition.

81. Between about October 16 and 18, 2000, HL&P caused a second disruption, which required another relocation of the discharge piping in Lost Lake.

82. Renda properly and timely notified the Corps of these changes in site conditions.

83. On about December 13, 2000, the Corps acknowledged in writing that construction of the HL&P Tower impacted the Project. Although the Administrative Contracting Officer granted entitlement, the Corps did not issue a modification to provide for payment of the extra costs Renda incurred.

84. On about April 11, 2001, Renda submitted a request for an equitable adjustment for the HL&P Tower matter, seeking payment of $166,143.00, and a three calendar day extension of contract time.

85. On about May 16, 2001, Renda amended its request, updating the claim to reflect the actual overhead rates and dredge depreciation rates. The amended request for equitable adjustment sought payment of $170,863.00, and a three calendar day extension of contract time.

86. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not negotiate quantum for the HL&P Tower matter, Renda re-submitted its request for an equitable adjustment as a certified claim.

87. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

**Count IV -**
**<u>Section 7 Clay Claim</u>**

88. The allegations of paragraphs 1 through 87 are hereby incorporated by reference and reaverred as if fully set out herein.

89. During dredging operations between about October 2 and November 6, 2000, in Dredge Section 7, Renda encountered stiff clay material between stations 561+00 and 609+00. This type of material was not shown or indicated in the Contract Documents.

90. Renda notified the Corps of the differing site condition on about October 20, 2000.

91. On about December 13, 2000, the Corps issued an opinion in which the Corps concluded that Renda should have anticipated the stiff clay material. The Administrative Contracting Officer denied entitlement, without ever visiting the site. The Corps did not test this

material like it had the stiff clay material in the Flare Area. The Corps' failure to investigate this differing site condition was a breach of contract.

92. As a result, Renda stockpiled the stiff clay material as evidence of the differing site condition, and showed the material to the Corps during an inspection on about February 12, 2001.

93. On about April 16, 2001, Renda submitted to the Corps a request for equitable adjustment seeking payment of $1,083,779.00, plus a 21 calendar day extension of contract time.

94. By about August 9, 2001, it had become clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not acknowledge the existence of the differing site condition. As a result, Renda re-submitted its request for equitable adjustment as a certified claim.

95. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

96. Renda is entitled to compensation for this claim based either on a differing site condition or due to the Corps' termination for convenience of the dredging and levee construction work.

**Count V -**
**West Levee Realignment Claim**

97. The allegations of paragraphs 1 through 96 are hereby incorporated by reference and reaverred as if fully set out herein.

98. While constructing levees during July 2000 at Lost Lake near station 175+00, Renda encountered a problem with the levees. The foundations were extremely soft, and displaced levee foundation material was being forced over the existing levees. On about July 28, 2000, Renda notified the Corps about the problem.