99. On about August 7, 2000, the Corps met with Renda at the site and orally directed Renda that the new levee be realigned so that the new levee was butted up against the existing levee. On about August 18, 2000, Renda confirmed the Corps' levee realignment directive as a change in the contract drawings, which required extra work.

100. Between about September 2000 and November 2000, Renda realigned the levee between stations 166+00 to 183+00 and 183+00 to 188+00. In the course of the realignment work, Renda had to remove and reposition material which had been previously placed.

101. After about November 2000, Renda had repositioned about all of the material which had been previously placed and thereafter followed the Corps' direction for all further levee construction.

102. On about December 13, 2000, the Corps issued an opinion in which the Corps concluded that Renda had created the problem with the West Levee area, and that the Corps had only made suggestions to correct the contractor's errors. The Administrative Contracting Officer denied entitlement for realignment of the West Levees.

103. On about May 23, 2001, the Corps unilaterally issued Contract Modification No. CO-10, concerning the realignment of the west levees. The unilateral modification offered Renda no money.

104. On about May 31, 2001, Renda submitted to the Corps a request for equitable adjustment seeking payment of $789,600.00, plus a 40 calendar day extension of contract time.

105. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Upper Bayou Project, would not request an audit, and would not admit merit to the West Levee Realignment Claim, Renda re-submitted its request for equitable adjustment as a certified claim to the Contracting Officer.

107. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

108. Renda clearly had to perform more work to realign the West Levees. Renda had already placed material in the location contractually required. When the Corps changed the location for the levees, Renda had to move material. Moving the material already placed cost Renda extra time and money.

109. Renda is entitled to compensation for this claim either under the changes provision in the contract or due to the Corps' termination for convenience of the levee construction work.

**Count VI -**
**<u>Obstruction #1 Claim</u>**

110. The allegations of paragraphs 1 through 109 are hereby incorporated by reference and reaverred as if fully set out herein.

111. In or about October and November 2000, Renda was dredging between stations 570+00 and 580+00. Renda's dredge encountered significant and substantial obstructions in the channel. The obstructions encountered by far exceeded the amount reasonably expected. The obstructions constituted differing site conditions.

112. Marine dredges are designed to remove silt, clay, sand, and other soil-like materials. The dredges are not at their best in non-soil removal. The excessive amount of obstructions slowed dredge production. The obstructions caused significant damage to the dredge.

113. Between about October 8 and 18, 2000, Renda's dredge hit three obstructions in Dredge Section 7 of the Houston Ship Channel. On about October 18, 2000, Renda notified the Corps of the obstructions and identified them as differing site conditions. One of the objects appeared to be a CONEX shipping container.

114. On about October 24, 2000, Renda notified the Corps that Renda's dredge had hit another obstruction on about October 23, 2000.

115. On about October 27, 2000, The Corps issued Contract Modification No. CO-05 (P00019) for the removal of rock and rubble, which had been reported in the channel slopes in Dredge Section 5 during May 2000. By way of this modification, the Corps authorized the removal of the previously reported channel obstructions.

116. Between about October 20 and November 15, 2000, Renda's dredge hit two more obstructions, which caused further damage to Renda's equipment. Renda continued to encounter excessive amounts of obstructions in October and November 2000.

117. Between about November 17 and 20, 2000, Renda's subcontractor located and removed an obstruction near station 575+00 with a bucket dredge. The obstruction was an old dredge stern swivel weighing about ten tons, which Renda's dredge had struck on about October 8, 2000. The Contracting Officer has seen and inspected the dredge swivel.

118. Between about November 27, 2000, and December 6, 2000, while dredging in the Houston Ship Channel adjacent to the Oxy-Chem Docks, Renda encountered rubble and rip-rap within the dredge template. The rubble and rip-rap were not indicated in the Contract Documents, and constituted differing site conditions.

119. The conditions Renda encountered were similar to those Renda faced in the South Ferry Landing area. Using its South Ferry Landing experience as a guide, Renda attempted to dredge carefully around the rubble and rip-rap between stations 620+00 and 630+00. The dredging was inefficient, and beset by delays. Unfortunately, the dredge still sustained damage.

120. Between about December 8, 2000, and December 10, 2000, while dredging just past the Oxy-Chem Docks, Renda's dredge hit three more obstructions, which together with the damage from previous obstructions idled the dredge until repairs could be made.

121. On about December 13, 2000, Renda notified the Corps about three more obstructions that Renda hit between December 8 and 10, 2000.

122. Repeated abuse from obstructions, rubble and rip-rap took its toll on Renda's equipment. On about December 20, 2000, Renda again wrote to the Corps about the obstructions, and requested a resolution.

123. As a result of damage caused by obstructions, Renda's dredge was out of operation for repair between about December 11 and 31, 2000, and again between about January 1 and 14, 2001.

124. During the period of about January 7 through 11, 2001, the Corps conducted a survey of the Houston Ship Channel between stations 570+00 and 685+00 (the end of the Project) with a magnetometer and sidescan survey to determine the locations of excessive debris and metal obstructions within the dredge template. Renda received a copy of the report on about January 30, 2001. The report revealed many obstructions and areas full of trash, which it labeled as "debris fields."

125. On about April 16, 2001, Renda submitted to the Contracting Officer a request for equitable adjustment, seeking payment of $1,802,579.00, plus a 35 calendar day extension of contract time.

126. On about June 11, 2001, Renda updated the request for equitable adjustment to seek payment of $2,126,083.00, plus a 36 calendar day extension of contract time.

127. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not acknowledge the merits of this request for equitable adjustment, Renda re-submitted the request as a certified claim to the Contracting Officer.

128. On about August 22, 2001, the Administrative Contracting Officer orally acknowledged entitlement for the Obstruction #1 Claim. On about August 28, 2001, Renda confirmed the acknowledgment of entitlement in writing to both the Contracting Officer and the Administrative Contracting Officer.

129. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

130. Renda is entitled to compensation for this claim either under the differing site conditions clause of the contract, or due to the Corps' termination for convenience of the dredging work on the Project.

**Count VII -**
**<u>Obstruction #2 Claim</u>**

131. The allegations of paragraphs 1 through 130 are hereby incorporated by reference and reaverred as if fully set out herein.

132. On about January 14, 2001, after repairing the damage from obstructions, Renda resumed dredging operations.

133. Between about January 27 and 28, 2001, Renda's dredge struck two more obstructions in Dredge Section 8. Renda notified the Corps on about January 31, 2001, concerning the obstructions, and described them as differing site conditions.

134. On about January 31, 2001, with the Corps' report on underwater obstructions and debris in hand, Renda notified the Corps that the obstructions and debris identified in the survey report were hazards to the dredging operations.

135. On about February 9, 2001, Renda started dredging in Dredge Section 9. On about February 13, 2001, Renda hit two obstructions. On about February 15, 2001, Renda hit two more obstructions.

136. On about March 7, 2001, Renda proposed to the Administrative Contracting Officer that the Corps delete the remainder of Dredge Section 9 from the Contract due to the debris fields and obstructions.

137. On about March 8, 2001, the Corps' Project Engineer admitted that Dredge Section 9 was unsuitable for dredging with a hydraulic cutterhead dredge. (Renda was using a hydraulic cutterhead dredge.) On about March 13, 2001, based on the Corps' survey report and the Project Engineer's admission, Renda wrote to the Contracting Officer and advised that Renda could not proceed with further dredging in Dredge Section 9.

138. On or before March 22, 2001, the Contracting Officer provided assurances to Renda that dredging could safely continue, and insisted that Renda complete dredging in Dredge Section 9. On about March 22, 2001, Renda acquiesced to pressure from the Contracting Officer and agreed to resume dredging in Dredge Section 9.

139. On about April 10, 2001, Renda resumed dredging in Dredge Section 9, and on about April 11, 2001, hit an obstruction.

140. On about April 12, 2001, Renda contacted the Administrative Contracting Officer by telephone and requested that the Corps verify the excessive debris in the area. The Corps visited the

dredge, and instructed the dredge to continue work, without further assistance by the Corps or investigation.

141. On about April 14, 2001, Renda notified the Corps in writing of the unfavorable dredging conditions in Dredge Section 9.

142. On about April 16, 2001, Renda's dredge hit a sunken ship's mooring buoy, which was neither indicated in the Contract Documents or the Corps' underwater obstruction and trash survey report. The dredge hit the mooring buoy with enough force to knock the dredge out of commission, and caused significant damage to the cutterhead drive assembly.

143. Renda notified the Contracting Officer and again requested that the remainder of Dredge Section 9 be deleted from the contract.

144. Repairs to Renda's dredge occurred between about April 16 and May 8, 2001.

145. As acknowledged by Corps personnel and the Corps' own survey report, the obstructions and debris fields constituted differing site conditions for which Renda should be paid.

146. Although the Contracting Officer made specific assurances at the March 22, 2001, meeting with Renda, and promised various things on behalf of the Corps, the Corps seemed unable to make a decision regarding the completion of Dredge Section 9.

147. On about April 24, 2001, Renda requested that the Contracting Officer allow Renda to demobilize its dredge from the Project until the Corps could reach a decision regarding the completion of Dredge Section 9, i.e. (1) whether to delete Dredge Section 9 from the Contract or (2) whether to remove debris with a bucket dredge and then dredge the remainder of Dredge Section 9 with Renda's hydraulic dredge.

148. After Renda began dredging Dredge Section 9 in about February 2001, and encountered four obstructions, it became clear that the debris fields were not only a major dredging hazard, but one that could destroy Renda's equipment.

149. During March 2001, in order to minimize the downtime Renda was experiencing, Renda proposed to the Corps that Renda's dredge be allowed to pursue private dredging work in the immediate vicinity of the Project. Renda's reasons were (1) Renda was pushing for the Corps to delete Dredge Section 9 because of the numerous hazards, (2) the private work included deepening an existing harbor/dock area, which would provide substantially more clay material for construction of the levees at Lost Lake than was anticipated in Dredge Section 9, (3) the private work paid more than the Corps was paying for the Corps work, and (4) during the time it took to complete the private work, the Corps could concentrate on resolving the debris fields and obstruction problems.

150. At first, the Corps declined to allow Renda to perform such private work. Later, on about May 4, 2001, the Corps changed its mind and issued Contract Modification No. CO-09 (P00026), which suspended dredging operations for 30 to 60 days, and instructed Renda to perform private work, and deposit suitable clay materials at Lost Lake for the levees. While seemingly a favor for Renda, in actuality, it was just the opposite.

151. On about May 18, 2001, the Corps directed that Renda's discharge line across Jacintoport be removed, a direct violation of an agreement reached at the March 22, 2001, meeting, where the Corps promised that if Renda would resume dredging, the line would not be removed until Dredge Section 9 was complete.

152. On about June 1, 2001, the Contracting Officer deleted the remainder of the dredging work in Dredge Section 9 from Renda's Contract and accepted all dredging work for the Upper Bayou Project. However, the Corps did not delete the levee construction work from the Contract.

By not releasing Renda from the levee construction work, Renda's equipment was still obligated to the Upper Bayou Project, but could perform no work due to the Suspension Modification.

153. On about June 14, 2001, Renda issued a request for equitable adjustment to the Contracting Officer seeking payment of $1,158,642.00, plus a 36 calendar day extension of contract time. Renda fully expected that the Corps would immediately begin negotiations since, as the Corps had requested, Renda had resumed work in Dredge Section 9.

154. Renda's resumption of work was a gesture of good faith to the Corps, since both parties knew that the dredge faced serious damage from continued dredging in the area.

155. As it turns out, however, the Contracting Officer never intended to pay for any of the damage expected to Renda's dredge. The Contracting Officer was simply bowing to pressure from the Local Sponsor, and promised whatever it took to induce Renda to resume work. Finally, on about July 23, 2001, the Contracting Officer released from the Project Renda's dredge and ancillary equipment.

156. On about August 9, 2001, after it became clear that the Corps would not allow Renda to complete the levee work for the Project, would not request an audit, and would not acknowledge that Obstruction #2 claim resulted from several differing site conditions, Renda resubmitted the request for equitable adjustment as a certified claim.

157. On about August 22, 2001, the Administrative Contracting Officer orally granted entitlement for the Obstruction #2 claim. Renda confirmed the Administrative Contracting Officer's decision in writing on about August 28, 2001, to both the Contracting Officer and Administrative Contracting Officer.

158. The Contracting Officer did not issue a Contracting Officer's final decision on the claim before Renda filed this suit.

159. Renda is entitled to compensation for this claim either under the differing site conditions clause of the contract, or due to the Corps' termination for convenience of the dredging work on the Project.

**Count VIII -**
**<u>Lost Lake Levees Claim</u>**

160. The allegations of paragraphs 1 through 159 are hereby incorporated by reference and reaverred as if fully set out herein.

161. Two types of levees were required on the Project: mechanical levees and hydraulic levees. The Contract Documents set out the sequence for constructing the levees – the mechanical levees had to be completed prior to the start of hydraulic levees.

162. The Contract Documents specified that the unit price for payment for the mechanical levees is measured by the cubic foot of material placed, while that for the hydraulic levees is measured by the linear foot of completed levee (which equates to approximately 35 cubic yards, neat line).

163. The original Contract Documents specified simply that the foundations for the new levees were expected to be very soft to soft dredged material and sand placed during previous dredging cycles.

164. Minutes for the Pre-Bid Meeting held on about June 23, 1998, were issued as a part of Addendum No. 1. These minutes list the contractors' concerns for the vagueness of the specifications regarding levee foundations and the Government's concern for the availability of suitable material to complete the levees.

165. As a result of the vague and general comments regarding the foundations, Renda naturally had to rely heavily on the soil borings, which were part of the Contract Documents.

166. The Contract Documents contained the following soil borings: Hydraulic Levee areas – 2 from 1963, 12 from 1991, 9 from 1993, 4 from 1994, and 1 from 1996, for a total of 28 borings; Mechanical Levee areas – 7 from 1991, 4 from 1993, 3 from 1994, 1 from 1996, and 1 from 1997, for a total of 16 borings. The majority of soil borings in or near the vicinity of the new levee alignment were obtained during 1991 and 1993, with only one soil boring obtained in 1997, one year prior to the actual bid for the work.

167. The Corps, however, knew of the existence of sidecast borrow areas adjacent to the existing levees, whose locations were in the general vicinity of the new levee alignment corresponding to the new levee foundation areas. These "sidecast borrow areas" were areas where soil material had been removed some time prior to the bid solicitation for the Project.

168. The existence, depth, width, and extent of the sidecast borrow areas were not shown in the Contract Documents and were not revealed to the contractors during the bidding cycle.

169. Renda has discovered that the existing levees were "dressed up" sometime in 1995 or 1996, using sidecast borrow areas adjacent to the existing levees. As a result, any soil boring in the vicinity of the new levee alignment obtained prior to about 1996 is probably inaccurate due to the removal of material from the borrow areas.

170. Only three soil borings in the vicinity of the new levee alignment were obtained after 1994. Unbeknownst to the bidders, these three borings provided perhaps the only current information for prospective bidders regarding approximately 24,000 linear feet (approximately 4.5 miles) of new levee.

171. The Corps intentionally failed to perform an up to date survey of the existing levees prior to bidding the work in an effort to minimize the prices bid by prospective contractors. The

Corps knew or should have known that had it revealed the true nature and extent of the sidecast borrow areas, prospective bidders would have increased their prices for the Project.

172. The Corps also knew or should have known that the Contract Documents did not provide offsets from the existing levee, which would have allowed Renda to validate the new levee alignment, during the course of construction.

173. During construction of the mechanical levees between about December 1998 and May 1999, Renda discovered that the levee foundation material was highly unstable and exceedingly soft. The condition of the levee foundation was not what was indicated in the Contract Documents. As a result, the levees had to be realigned in order to construct the Project. Although the Corps directed Renda to realign the mechanical levees so that they were placed on top of the existing levees, this part of the job still required approximately 50% more material than anticipated. The Corps has agreed to pay for the additional material required through a contract modification.

174. Due to the very soft foundations, the extent of which were not definable by either the Corps or Renda, several hundred feet of hydraulic levee were deleted in an attempt to avoid very soft conditions in the northeast corner of Lost Lake.

175. Prior to the start of hydraulic levee construction during July 1999, but after the Contract was awarded to Renda, the Corps modified the specifications. These changes in the specifications concerned the construction monitoring requirements, and incorporated a new design criteria, at considerable extra cost to Renda.

176. To underscore the significance of the change, the Corps has issued a new specification section for subsequent embankment construction contracts, and expanded the construction procedures required to achieve successful completion of the work. The Corps, however, refused to

issue a Contract Modification for the extra work that Renda had to perform, and required Renda to incorporate the new requirements at no cost to the Corps.

177. The Corps had provided assurances during June 1998 that sufficient material was available to complete the hydraulic levees. However, by July 1999, Renda had become increasingly concerned about the validity of the Corps' representation.

178. As part of the Project, Renda was required to install a new outlet box structure, and a 48" diameter discharge pipe within the new levee.

179. In about February 1999, while Renda was constructing mechanical levees and the new outlet box structure in the northeast corner of Lost Lake, Corps inspectors revised the Corps' representation about the foundations in the area to term the disposal area "deep soft dredge material." The Corps inspectors then noted that the Corps' design should have expected pipe sag due to the soft foundation material. These statements underscored concerns that the foundations would not support the newly installed 48" diameter pipe.

180. The soft foundations discovered beneath the mechanical levees affected the stability of not only the new outlet box structure but also the discharge pipe through the levee. To resolve these problems, the Corps issued Contract Modifications CO-01 (P00004), CO-02 (P00006) and CO-03 (P00008), which reimbursed Renda's subcontractor for the additional costs.

181. On about March 23, 1999, the Corps issued Modification CO-01 unilaterally with a Not to Exceed price of $250,000. On about June 21, 1999, the Corps issued Modification CO-02 to adjust the values of CO-01 with a new value of $436,855.87, plus a 20 calendar day extension of contract time. On about August 4, 1999, the Corps issued Modification CO-03 purportedly to complete all of the extras associated with the mechanical levees and new structural requirements at