the outlet box. Modification CO-03 had a value of $364,201.03, plus a contract time extension of 22 calendar days.

182. Additionally, sometime after August 4, 1999, the Corps unilaterally issued Contract Modification VQ011 for a variation in estimated quantities. Modification VQ011 had a value of $0, but awarded a contract time extension of 18 calendar days. With this modification, the Corps set the precedent that additional material required to build the levees would be reimbursed through a modification, and paid by the cubic yard of material placed.

183. When the Corps had to change the hydraulic levee alignment in the northeast corner of Lost Lake due to soft foundation problems at the new outlet box structure, it became clear that the Corps needed more suitable clay material in order to construct the levees. On about March 1, 1999, Renda discussed with the Corps the potential impacts of the increased quantities of material required to complete the work in this area. As it has turned out, the hydraulic levees in the northeast corner would not maintain the required 30' elevation, even after being accepted by the Corps, due to continuing subsidence problems.

184. The Contract Documents require that the hydraulic levees be constructed of suitable materials, which are defined as medium to hard clays and sands. However, the Contract Documents do not require the contractor to segregate soft clays from the suitable materials during dredging and construction of the levees.

185. The Contract Documents assume that sufficient suitable material exists to complete the hydraulic levees. At the June 23, 1998, Pre-Bid Meeting, the Corps stated that sufficient new work material was available to construct the levees even allowing for soft foundations.

186. Despite the Corps' assurances of sufficient material to complete the hydraulic levees, Renda expressed concern in a July 7, 1999, letter to the Corps, and furnished a plan for completion of the work. Renda's plan was designed to minimize the extra cost of resolving the lack of material problem.

187. Renda has discovered that under the circumstances, there was too little acceptable material to construct the levees, a fact that the Corps fully knew prior to the bid opening for the Upper Bayou Project.

188. For example, on about July 26, 1999, prior to the preparatory meeting for the hydraulic levees, the Corps' geotechnical engineer stated that the "Corps had some concerns about there being sufficient quantities available to complete the levees."

189. On about September 13, 1999, hydraulic levee construction started at about station 97+00 in the southeast corner moving downstation towards the already known poor conditions at the northeast corner.

190. The Renda levee crews working on the north levees between stations 48+00 and 51+00 experienced problems with subsidence and soft levee foundations. As a result, the levees could not be raised to or maintained at the required 30' elevation.

191. Renda soon discovered that the levee could not be constructed as designed.

192. Renda discovered that the levee could not be located as shown on the Contract documents.

193. Renda discovered that the levee's foundation was too unstable.

194. Renda discovered that the levee's materials were too soft to allow for proper construction.

195. Renda discovered that there were insufficient materials available to construct the levee.

196. Despite Renda's best efforts, the levee experienced shearing and subsidence, and could not be constructed as per the Contract Documents.

197. Renda notified the Corps of the problems with the levee and of the differing site conditions.

198. As a partial resolution of the differing site conditions and other problems with the levee, the Corps directed Renda to realign the levee.

199. On about August 18, 2000, Renda confirmed in writing the Corps directive to realign the levee, and advised the Corps of differing site conditions and extra costs to perform the work.

200. On about October 23, 2000, the Corps issued a second directive concerning the levee, ordering Renda to change the levee construction again. On about November 1, 2000, Renda confirmed the Corps' second directive.

201. On about November 3, 2000, the Corps sent a letter to Renda changing the method for constructing the levee yet again.

202. At all times material, the Corps knew or should have known that there were insufficient materials available to construct the levees in the manner the Corps directed. The Corps also knew that under the Contract, Renda would only be paid if Renda completed the levee. As a result, since there was no way for Renda to complete the levee, Renda would receive no money for its efforts and work.

203. On or about May 23, 2001, the Corps unilaterally issued Contract Modification No. CO-10, realigning the west levees, but offering no money to Renda for all the extra work involved.

204. On about June 1, 2001, the Contracting Officer deleted the remainder of Dredge Section 9 from the Contract, but did not delete the levee work. As a result, the levee work still remained outstanding.

205. Renda repeatedly attempted to have the Corps resolve the levee work problems. Renda even had a Congresswoman write to prod the Corps into making a decision as to how to resolve the levee work.

207. On about July 23, 2001, the Contracting Officer finally released Renda's dredge from the Project.

208. On about September 18, 2001, the Corps unilaterally issued Contract Modification CO-11 (P00028) deleting the remaining levee work from the Contract. The modification did not expressly provide for additional payment to Renda, and tentatively denoted the costs would be determined.

209. On about October 16, 2001, Renda submitted a certified claim in the amount of $6,258,853.00, plus a 397 calendar day extension of contract time.

210. The Contracting Officer did not issue a Contracting Officer's final decision before Renda filed this suit.

211. It turns out that the Lost Lake hydraulically placed levees were impossible or commercially impracticable to build. First, there was not enough suitable material available from the areas specified for dredging on the Project. The Corps knew that fact before the Project was put out for bids. The Project's designer so advised the Corps before the Project was put out for bids.

212. Second, the foundations for the new hydraulically placed levees were too soft and unstable to allow the levee to be constructed to 30 feet above mean low tide, or to remain at 30 feet above mean low tide.

213. Third, there was not enough time in the contract for the Project to allow for construction of the Lost Lake levees even if there was enough suitable materials due to the softness and instability of the levee foundations. Consolidation of materials placed on the soft and unstable foundations to reach 30 feet above mean low tide would take more time than permitted under the contract for the Project.

214. The Corps had actual knowledge that the Lost Lake levees could not be constructed as designed. Nevertheless, the Corps insisted that Renda perform the impossible or commercially impracticable, under threat of a default termination and a demand that Renda's bonding company complete the Project at Renda's expense.

215. The Corps hoped that by terminating Renda for default, Renda would be put out of business, and Renda's bonding company would not pursue Renda's claims.

216. Eventually, the Corps instructed Renda to construct foundations for the Lost Lake levees. The Corps knew at that time that there was not enough specified dredge material to construct the levees to the contractually required height. The Corps also knew at that time that the foundations for the new levees were so soft and unstable that Renda would not be able to construct the levees to the contractually required height.

217. The Corps required Renda to attempt to construct the Lost Lake levees even though the Corps knew or should have known that it was not possible or commercially practicable to construct the levees.

218. Under the circumstances, Renda is entitled to reimbursement of the costs and expenses Renda incurred in attempting to construct levees that were impossible or were commercially impracticable to construct. Renda's entitlement is based on either the differing site

conditions and changes provisions of the contract or due to the Corps' termination for convenience of the levee construction work.

**Liquidated Damages**

219. The allegations of paragraphs 1 through 218 are hereby incorporated by reference and reaverred as if fully set out herein.

220. Under the circumstances, the Corps should release and/or waive any and all liquidated damages.

221. The Corps directed Renda to perform work that the Corps knew was not possible or commercially practicable. Renda could not complete such work within the contract time and is entitled to an equitable adjustment of contract time sufficient to offset any and all liquidated damages.

222. Alternatively, Renda is entitled to multiple equitable adjustments of contract time for the Corps' delays and disruptions concerning the following non-exclusive list of acts or omissions: (a) Refusal or failure to make a timely decision on releasing the Dredge Millennium from work on the Project; (b) Refusal or failure to make a timely decision on deleting Section 9 from Renda's work on the Project; (c) Refusal or failure to make a timely decision on how to resolve design and construction problems with the Lost Lake levees; (d) Refusal or failure to recognize a lack of suitable dredge materials to construct the Lost Lake levees; (e) Refusal or failure to recognize that the Lost Lake levees could not be constructed to the contractually required height; (f) Refusal or failure to award Renda appropriate extensions of time in connection with other differing site conditions that Renda encountered on the Project; and (g) Refusal or failure to make a timely decision on the release of Renda's construction equipment from the Project.

223. When the Corps terminated Renda's obligation to perform various work on the Project for the Corps' convenience, Renda cannot be assessed liquidated damages in connection with such work.

224. For example, the Corps terminated for convenience Renda's obligation to perform the dredging work remaining on the Project. Renda could not dredge Section 9 due to rip rap and other obstructions. After an undue delay, the Corps decided to delete Section 9 dredging, which was the only dredging work remaining on the Project. As a result, the Corps cannot assess Renda liquidated damages for dredging work.

225. As another example, the Corps terminated for convenience Renda's obligation to perform levee construction work on the Project. As a result, the Corps cannot assess Renda liquidated damages for the levee construction work.

226. With the Corps effectively terminating for convenience any remaining work on the Project, the Corps cannot assess liquidated damages in connection with such work.

**Count IX -**
**Contracting Officer's Final Decision of November 26, 2002**

227. The allegations of paragraphs 1 through 226 are hereby incorporated by reference and reaverred as if fully set out herein.

228. Renda is entitled to a declaration that the Contracting Officer's Final Decision of November 26, 2002, is a nullity or is otherwise invalid.

229. The Contracting Officer did not submit a proposed final decision to Renda for comment. In fact, the Corps had not mentioned any claims against Renda in at least the year preceding the issuance of the Contracting Officer's Final Decision of November 26, 2003. Renda

had no idea that a final decision asserting claims against Renda was being assembled, or that one would be issued.

230. As a matter of federal procurement law, the Contracting Officer's Final Decision of November 26, 2002, is not valid, and has no effect on Renda.

231. Alternatively, the findings of fact purportedly found by the Contracting Officer, which underlay the Contracting Officer's Final Decision, are incorrect, are arbitrary or capricious, or are not supported by the evidence.

232. The Corps did not terminate Renda for default on the Project. The Corps did terminate for convenience the dredging and levee construction work remaining on the Project. With such work being terminated for convenience, the Government cannot now assess damages against Renda for not completing such work.

233. The Corps was well aware during the Project that Dredge Section 9 could not be dredged by a hydraulic cutterhead dredge. The Corps needlessly dallied on deciding what to do with Section 9. The Corps finally decided to delete for its convenience the dredging in Section 9.

234. The Corps cannot now assess against Renda the costs of completing Section 9 after the deletion of the work for the Corps' convenience.

235. The Corps was well aware during the Project that the Lost Lake levees could not be constructed as designed. The Corps needlessly dallied on resolving the design problems. The Corps finally decided to delete the remaining levee construction work for the Corps' convenience.

236. The Corps cannot now assess against Renda the costs of completing levee construction work after deletion of the work for the Corps' convenience.

237. The Corps had an obligation to investigate the Section 7 Clay differing site condition that Renda submitted. The Corps largely ignored the notice, and failed to investigate the differing site condition. Such failure was a breach of contract.

238. The Corps cannot now assess against Renda the costs of moving Section 7 clay material that the Corps refused to investigate. The Corps cannot now assess against Renda the costs of moving Section 7 clay material after the Corps deleted for convenience the remaining levee construction work.

239. The Section 7 clay material was clearly visible to the Corps and the Corps was fully aware of such pile of material at the time of the deletion of levee construction work for convenience.

240. The Government cannot assess liquidated damages for all the reasons set out above.

**Count X -**
**Damages**

241. The allegations of paragraphs 1 through 240 are hereby incorporated by reference and reaverred as if fully set out herein.

242. Renda is entitled to compensation for the extra or changed work that Renda had to perform or was directed to perform on the Project. Renda's entitlement is based on the differing site conditions and changes provisions in the contract or due to the Corps' termination for convenience of the work at issue.

243. A summary of Renda's damages follows. Renda reserves the right to modify such damages as discovery progresses or as Renda refines its numbers and accountings.

| Count | Description | Claimed Amount |
|---|---|---|
| 1 | Differing Site Condition - Flare Area Stations 520+00 to 550+00 (very stiff clay) | $1,096,179 |
| 2 | Differing Site Condition - South Ferry Landing Stations 470+00 to 472+00 | 947,054 |
| 3 | Changed Conditions - HL&P Transmission Tower Delays | 167,473 |
| 4 | Differing Site Condition - Obstruction in Sections 4 to 8, Stations 570+00 to 685+00 | 1,986,551 |
| 5 | Differing Site Condition - Obstruction in Section 9, Stations 660+00 to 685+00 | 1,148,804 |
| 6 | Changed Conditions - West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 (Modification CO-10, P00027) | Included in Count 8 |
| 7 | Differing Site Condition - Section 7 Clay | 978,271 |
| 8 | Lost Lake Levees | 7,055,037 |
| | Total | **$13,379,367** |
| | Plus Attorney Fees, Court Costs, and Pre-Judgment and Post-Judgment Interest | TBA |

WHEREFORE, Plaintiff, Renda Marine, Inc., respectfully prays that: (1) a true copy of this First Amended Complaint be served on the United States of America through its attorneys of record, and that the Government be required to appear and answer same; (2) after due proceedings, there be judgment in favor of Renda and against the Government in accordance with the demands herein; (3) Renda be awarded all costs of this proceeding, together with its reasonable attorney's fees, and pre-judgment and post-judgment interest at the highest rates allowed by law; and (4) Renda receive all such other general and equitable relief as may be appropriate.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY:________________________________

Brian W. Erikson, TX Bar No. 06643800
Andrew M. Trusevich, TX Bar No. 00785119

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the ___ day of July, 2004, a true and correct copy of the First Amended Complaint, was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson