DEPARTMENT OF THE ARMY
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO
ATTENTION OF

November 26, 2002

Contracting Division

Mr. Oscar Renda
Renda Marine, Inc.
522 Benson Lane
Roanoke , TX 76262

SUBJECT: Contract DACW64-99-C-0001
Houston/Galveston Ship Channel
Dredging Upper Bayou Project

Dear Mr. Renda:

This letter serves as a Contracting Officer counter-claim on Contract DACW64-99-C-0001, Houston/Galveston Ship Channel for items determined to be deficient or incomplete or not in accordance with the contract specifications.

On October 26, 1998, above referenced contract was awarded to Renda Marine, Inc., (RMI) in the amount of $12,526,100.00 to dredge approximately 3,483,700 cubic yards of material. Renda Marine was also responsible for building 381,300 cubic yards of mechanically constructed levees and building 13,700 lineal feet of hydraulically constructed levees. Contract completion was originally set at 18 February 2000 and through several modifications later revised to 28 June 2000. The Notice to Proceed was issued on 16 November 1998.

Each counter-claim is listed below with an explanation and dollar amount associated with each claim:

## FINDINGS OF FACT

I have attached my Findings of Fact and they are incorporated in this document.

## ANALYSIS

**a. Counter Claim No. 1: Dredging Section No. 9**

Modification CO-11, dated 18 September 2001, deleted the remainder of dredging for the project as stated in a Contracting Officer decision dated 01 June 2001.



EXHIBIT
B

The Government deleted the remainder of Section 9 under Modification P00028 dated 18 September 2001 due to your continued and protracted inability to accomplish the work in accordance with contract requirements. Your ineffective and inefficient hydraulic placement of material dredged from the channel resulted in wasting a large quantity of material inside the area instead of such being incorporated into the hydraulic levees. Deletion of the remainder of Section 9 put an end to any further damage to the area by the inefficient operation.

Approximately 135,000 cubic yards of "required dredging" remains to be removed within the channel template in Section 9 and will be removed by another contractor.

Modification P00029 dated 28 September 2001 decreased the total funded amount of the contract by $415,000.00, from $17,052,424.16 to $16,637,424.16. The $415,000.00 deduction is the result of the deletion of Section 9 on this contract.

Our estimate for completing this portion of the work is $2,067,000.00. This amount includes costs for mobilization, pipelines, two boosters and cost to dredge the remaining material from Section 9.

**b. Counter Claim No. 2: Sec. 7 Clay Misplaced Material**

On 20 October 2000, you submitted a letter alleging a differing site condition consisting of "Heavy Red Clay at North Side of Channel, Stations 565+00 to 580+00." The Government never considered this issue to have merit.

You encountered materials commensurate with what was reflected in the borings on the contract drawings, i.e., stiff clays. Hence, that material should have been incorporated into the hydraulic levees around Lost Lake Placement Area (LLPA) but you elected to stockpile such in lieu of what the contract required. The Government decided that it would be more prudent not to incur any further lost time due to inefficient levee construction methods exhibited by you at LLPA. This material is still in this location and will have to be recovered and used to rebuild the incomplete levees by another contractor.

The Government carefully considered your claim in this section, and as stated above, never considered it to have merit. Our estimated cost for excavating the misplaced material, placing it in trucks and hauling to the North Levee is $571,000.00.

**c. Counter Claim No. 3: Incomplete West Levee Realignment (Mechanical Portion Only)**

You failed to complete a significant portion of the west levee to the lines and grades in accordance with the contract specifications during the construction period.

The Government did not recommend that you relocate the completed portion of the levee between approximate levee stations 166+00 and 180+00, but only that work beyond station 180+00. This realignment was to improve the current site conditions and to assist you with your levee construction method. However, you made the decision to relocate this already completed portion of the levee.

In order to bring the levees to lines and grades as specified in the contract documents, the Government estimates it will cost $108,000.00 to complete the work. This work includes mobilization, cutting/hauling and filling material, bonds and contingency.

**d. Counter Claim No. 4: Incomplete, Non-Hydraulic North Levee**

Between approximate levee stations 15+00 to 40+00 you attempted to construct the North Levee mechanically instead of hydraulically displacing the soft foundation with dredged material as required by the construction contract. Consequently, the North Levee was never constructed to the lines and grades as required by the contract documents. You also failed to complete the North Levee to the lines and grades as specified by the contract documents. The contract clearly stipulates that the levees were to be placed hydraulically. This was a requirement so that the soft foundation material would be displaced during the hydraulic operations. Your ability to accomplish an effective and efficient hydraulic fill operation precluded such from occurring. It is apparent that your equipment and management of such were incapable of doing so.

It is noted in this area that you recovered misplaced material from the east side of the levee (one truckload at a time) to attempt to mechanically construct the North Levee. Again, the Government decided that it would be more prudent to delete the work and not incur any further lost time due to inefficient dredging or additional damages at LLPA.

Our estimated cost for another contractor completing the North Levee in accordance with the contract specifications is $3,413,000.00. This estimate includes mobilization of a large dredge capable of excavating new work material, pipelines and associated cost to dredge material from Sections 16-20 in the Mid-Bayou Reach.

**e. Counter Claim No. 5: Recovery of Misplaced/Wasted Material**

Again, due to your inefficiencies in your dredging operations, approximately 1.2 million cubic yards of suitable levee building material was wasted toward the interior of LLPA. A letter from the Bay Area Office, dated November 3, 2000, referenced an October 23, 2000 meeting that recommended continuing to reasonably recover the

misplaced and overplaced satisfactory material along the East Levee. Once again, the Government decided that it would be more prudent to cease any further Renda Marine recovery operations and delete the work and not incur any further lost time or additional damages at LLPA.

Subsequent to the Upper Bayou Contract, the Government contracted with a geotechnical consultant to take numerous soils borings at various locations within LLPA. The borings indicated that suitable levee building material had flowed to the interior approximately 1,000 feet from the levee toe on the east and west sides of LLPA. Also, the borings indicated that the suitable material varied in thickness from about 10 feet near the levee toe to about 1 foot at a distance of about 1,000 feet to the interior. As a result of this, the Government estimates that it will take at least 8 months for another contractor to recover this material and incorporate into the incomplete levees. This work is estimated to cost the Government $5,465,000.00.

**f. Counter Claim No. 6: Liquidated Damages**

At the present time the Government is withholding approximately $259,840.85 in retainage. In addition to this, we are withholding $236,016.00 in liquidated damages calculated by multiplying $528.00 per day multiplied by 447 days the Government estimates is beyond the contract completion date of 28 June 2000.

. To date the Government has refunded $252,000.00 to your company. The amount of $259,840.85 represents the balance remaining in retainage.

Total for all counter claims is summarized below:

| | |
|---|---|
| a. Dredging Section 9: | $2,067,000.00 |
| b. Sec. 7 Clay Misplaced Material: | 571,000.00 |
| c. Incomplete W. Levee Realign. (Mech. Portion Only) | 108,000.00 |
| d. Incomplete, Non-Hydraulic North Levee: | 3,413,000.00 |
| e. Recovery of Misplaced/ Wasted Material: | 5,465,000.00 |
| f. Liquidated Damages: | 236,016.00 |
| Total | $11,860,016.00 |

**<u>FINAL DECISION</u>**

Based upon the above stated facts, I hereby determine that Renda Marine, Inc., is indebted to the Government in the amount of $11,860,000.00 for the additional cost of correction of deficiencies under Contract DACW64-99-C-0001. I hereby direct Renda

Marine to submit a payment in the amount of $11,860,000.00 to me by Certified Check payable to "FAO USAED, Galveston."

Any amount not paid within 30 days from the date of this demand will bear simple interest from the date of this demand at the interest rate established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraph (b) of FAR 52.232-17, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

You may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed. The proposal for deferment should provide the information required in FAR 32.613 and should provide information regarding a proposed bond or other collateral as required.

This is a final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 7th Floor, 5109 Leesburg Pike, Falls Church, Virginia 22041-3204. If you decide to appeal, you must mail or other otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you received this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the E. rd's small claims procedures for claims of $50,000.00 or less or its accelerated procedures for claims of $100,000.00 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Thomas Benero

Thomas Benero
Chief, Contracting Division
Contracting Officer

CF: Brian W. Erikson, Attorney at Law
John Kosloske, Dept.of Justice
Mike McClenan, Bay Area Office

**FINDINGS OF FACT**

1. Solicitation (IFB) DACW64-98-B-0004 for Dredging Upper Bayou (45 foot project) in Harris and Galveston Counties was issued 16 June 1998. The solicitation was amended one time

2. Amendment 0001 dated 7 July 1998 incorporated questions from prospective bidders and provided answers by the Galveston District Design Team.

3. Bids were opened on 17 July 1998.

4. Five bids were received, the lowest being $12,526,100.00.

5. The Government estimate was $13,607,400.00 or approximately 9% higher than the Renda Marine, Inc., (RMI) bid.

6. RMI submitted the lowest bid of $12,526,100.00. Award of the contract was made on 26 October 1998. The Notice to Proceed was issued on 16 November 1998.

7. A total of 30 modifications were issued under this contract. Some modifications were issued unilaterally by the Contracting Officer and some bilaterally after mutual agreement by both parties.

8. On 8 March 2000, a Cure Notice was issued to RMI for what the Government considered RMI's failure to demonstrate that they could achieve satisfactory execution of the project within the times required by its terms.

9. On 4 April 2000, RMI responded to the Cure Notice. In their response RMI provided a contract summary to date and a proposed completion date. This response also provided a proposed production rate of dredged material and utilization of a booster pump. Also included in this letter was a dredging plan for completion of the project.

10. On 16 April 2000, the Government and the local sponsor of the project, the Port of Houston Authority (PHA), met with RMI and their surety to discuss progress of work on the Upper Bayou Contract and RMI's response to the Cure Letter issued 8 March 2000.

11. As a result of the 16 April 2000 meeting, on 25 April 2000, RMI was presented a letter outlining 4 conditions they had to meet in order to avoid being Terminated for Default. These were:

a. Maintaining a monthly production rate as stated in the dredging plan for completion of the project must be met for each pay period;
b. Work must be in accordance with the contract drawings and specs;
c. All materials suitable for constructing levees are to be utilized for levee building, and;
d. RMI was to provide an update of quality control personnel and responsibilities for each work area.

12. On 11 July 2000, a letter was issued to RMI stating that the dredging quantity stated in each pay period appeared reasonable and attainable. However, there was still some concern that the quantities of lineal feet of hydraulic levee proposed to be constructed per pay period appeared to be excessive. RMI was asked to review the proposed quantities and revise as appropriate. RMI was also told the 4 conditions in the Government's 25 April 2000 letter still applied.

13. On 6 October 2000, the Government requested RMI to submit a proposal for removing and disposing the debris on the north side of the channel between approximate channel stations 530+00 and 554+00.

14. Modification P00019 dated 27 October 2000, directed RMI to remove and dispose of the debris on the north side of the channel between approximate channel stations 530+00 and 554+00. This mod also increased the contract amount by $66,000.00 and added 4 calendar days to the contract.

15. On 6 November 2000, a Show Cause Notice was issued to RMI for failure to demonstrate they could achieve satisfactory completion of the project within the times required by its terms. This Show Cause Notice reiterated the 4 conditions of the 25 April 2000 letter. However, RMI continued to demonstrate their inability to complete this project by a definite date.

16. On 15 November 2000, RMI responded to the Show Cause Notice. As a result of this, the Government submitted a letter to RMI on 13 December 2000 responding to the 17 issues summarized in their letter. RMI was asked to submit Requests for Equitable Adjustments (REA's) for issues numbered 3, 4, 9 and 10 within 15 calendar days of receipt of our letter. These four issues were the ones the Government considered to have merit.

17. On 21 December 2000, the Government submitted another letter to RMI requesting an REA for a new differing site condition consisting of unknown obstructions on the south side of the channel between stations 634+90 and 635+00 and station 637+57. This was the result of a letter describing a new differing site condition submitted by RMI on 13 December 2000.

18. On 7 March 2001, RMI made an alternative proposal for project delays due to differing site conditions. RMI suggested that they would complete its dredging work at the North Slope of Dredge Section No. 5 and 6 and then move the

discharge line at Jacinto Port. The Government was to remove the remainder of Dredge Section No. 9 from the contract.

19. On 13 March 2000, RMI submitted a letter proposing furnishing approximately 250,000 cubic yards of clay material from a private contract to LLPA for hydraulic levee construction. As a result of this, Modification P00026 was issued adding up to 60 calendar days to the contract.

20. Modification P00023, dated 14 March 2001, established a revised contract completion date of 28 June 2000. It also provided for payment to RMI in the amount of $3,083,833.00 for dredge work completed in the flare area of the Houston/Galveston Navigation Channel.

21. Modification P00026 dated 4 May 2001allowed up to 60 calendar days to complete dredging from private sources and hydraulically placing it into the new levee template at Lost Lake Placement Area (LLPA). The modification provided for additional time allowed of up to 60 calendar days.

22. On 27 August 2001, the Government issued a letter to RMI directing them to remove any remaining pipelines or appurtenant equipment belonging to RMI from the LLPA.

23. Modification P00028 dated 18 September 2001, deleted the remaining unfinished dredging on the north levees between stations 4+00 and 40+00 and the remaining levee construction from the contract.

24. On November 6 and 7, 2001, the Contracting Officer issued 6 letters to RMI acknowledging receipt of various certified claims submitted by RMI between January thru October 2001. Breakdown of claims and dollar amounts are as follows:

| **Claim** | **Dollar Amt.** |
|---|---|
| Dredging S. Ferry Landing | $1,049,173.00 |
| Dredging Flare Area Clay | 4,691,688.00 |
| Delays due to HL&P Trans. Tower | 170,863.00 |
| Dredging Sec. 7 Clay | 1,083,779.00 |
| Realignment of West Levee | 789,600.00 |
| Dredging obstructions No. 1 (Sec. 4-8) | 2,126,083.00 |
| Dredging obstructions No. 2 (Sec. 9) | 1,158,642.00 |
| Delays due to Hydraulic Levees at LLPA | 6,258,853.00 |
| Total | $17,328,892.00 |

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC.,<br>PLAINTIFF, | §<br>§ | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| UNITED STATES ARMY<br>CORPS OF ENGINEERS,<br>DEFENDANT. | §<br>§<br>§ | |

# RENDA MARINE, INC.'S MEMORANDUM OF CONTENTIONS OF FACT & LAW

Comes now, Renda Marine, Inc. ("Renda"), and files this, its Memorandum of Contentions of Fact and Law.

## I.
## RENDA'S STATEMENT OF FACTS AND RENDA'S POSITION WITH RESPECT TO FACTS ON WHICH DEFENDANT IS EXPECTED TO RELY

### Project Overview

The project at issue in this litigation was entitled "Houston-Galveston Navigation Channels, Texas, 45-Foot Project, Dredging Upper Bayou" ("Project"). The Project involved dredging the Houston Ship Channel in Harris County, Texas. The Project was the beginning of a 5 year, $508 million program to deepen the navigation channel to 45 feet and widen it by an additional 130 feet to facilitate ships delivering cargo to Houston directly rather than unloading part of their cargo in the Gulf of Mexico. Renda was the low bidder on the Project and, following the resolution of a bid protest, Renda and the United States Army Corps of Engineers ("Corps" or "Defendant") entered into Contract No. DACW64-99-C-0001 (Contract) on October 26, 1998. Renda thereafter began work on the Project.

While performing its work, Renda encountered various differing site conditions or changed conditions that caused Renda to expend substantial additional funds and to invest additional time



EXHIBIT C

Blumberg No. 5118

mechanically constructed levees were required to be completed before any of the hydraulically placed levees could be started. The contract time simply did not permit the amount of time necessary for the consolidation of the soft foundations to permit the levees to stand.

As a result of the changes at the Lost Lake Placement Area, most or all of the relevant soil borings were of no use to a contractor bidding on the Project. These levees could not be constructed as designed. Renda is entitled to an equitable adjustment of time and money for this design problem.

The DCAA audited this claim. The DCAA's report does not address the technical validity of the claim. The DCAA labels the entire claim amount of $6,258,853 as "questioned costs" due to Renda allegedly not providing adequate support for its claim. More specifically, the DCAA contends that the claim was not prepared in accordance with Federal Acquisition Regulations because Renda did not provide breakdowns for the basic cost elements claimed.

The amount claimed represents the additional costs to attempt to construct and maintain the levees while they were subsiding. These costs are compensable. Renda had previously used the modified total cost method to quantify this REA, which is an allowable method of quantification in this instance. Renda has now revised its claim to reflect actual costs of $7,055,037, including the levee realignment costs. Renda is entitled to an equitable adjustment in contract time and money for the hard red clay.

**Defendant's Purported Final Decision of November 26, 2002**

On November 26, 2002, Defendant issued what it claimed was a "Contracting Officer's Final Decision" regarding alleged Government claims against Renda relating to the Project. As

discussed below, this purported final decision was not preceded by a dispute as required by the Contract Disputes Act, 41 U.S.C. §601 et seq., and thus is a nullity.

Defendant's Anticipated Factual Response

Defendant is expected to contend that it knew that Renda would not accept Defendant's position with respect to Defendant's purported claims against Renda and therefore is relieved of the requirement of presenting the proposed claims against Renda to Renda for possible resolution before issuing a purported contracting officer's final decision.

Renda's Reply

The Contract Disputes Act has been construed as requiring that a contracting officer's demand for payment from a contractor be preceded by a dispute before the demand constitutes a "claim" under the Contract Disputes Act. Failure to satisfy this condition precedent renders the decision a nullity. The claims included in the purported Contracting Officer's Final Decision were not presented to Renda for possible resolution and the purported Contracting Officer's Final Decision is a nullity.

If Defendant contends that the claims included in the purported Contracting Officer's Final Decision were in fact "disputed" because they directly related to the Renda claims discussed above, then the Court, in determining the validity and entitlement of Renda on each of Renda's claims, also has authority to declare the invalidity of the claims included in the purported Contracting Officer's Final Decision.

II.

STATEMENT OF ISSUES OF FACT AND LAW TO BE RESOLVED BY THE COURT

**Claim 1–Flare Area Differing Site Conditions**

Whether the conditions encountered by Renda in the Flare area constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the damages it sustained resulting from differing site conditions in the Flare area.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions in the Flare area.

**Claim 2–South Ferry Landing Differing Site Conditions**

Whether the conditions encountered by Renda in the South Ferry Landing area constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the additional cost and time it suffered relating to the differing site conditions in the South Ferry Landing area.

Whether Renda provided adequate notice to Defendant of the obstructions in the South Ferry Landing area.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions at the South Ferry Landing area.

**Claim 3–HL&P Towers Differing Site Conditions**

Whether the activities of HL&P Renda encountered constitute differing site conditions.

Whether Renda provided adequate notice to Defendant of the activities of HL&P.

Whether Renda took reasonable steps to mitigate the impact of the activities of HL&P.

What are the measure and amount of damages to which Renda is entitled due to the activities of HL&P.

**Claim 4–Differing Site Conditions – Obstructions in Sections 4 to 8, Stations 570+00 to 630+00**

Whether the conditions encountered by Renda in Sections 4 to 8 constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the additional cost and time it incurred relating to the differing site conditions in Sections 4 to 8.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

Whether Renda provided adequate notice to Defendant of the differing site conditions in Sections 4 to 8.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions in Sections 4 to 8.

**Claim 5–Differing Site Conditions – Objections in Section 9, Stations 660+00 to 684+00**

Whether the conditions encountered by Renda in Section 9 constitute differing site conditions.

Whether, as result of its means and methods of operation, Renda caused the additional time and cost it incurred relating to the differing site conditions in Section 9.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the differing site conditions in section 9.

**Claim 6–West Levee Realignment, Lost Lake Placement Area**

Whether Renda is entitled to compensation for the additional time and cost Renda incurred in constructing the West Levee.

Whether Renda's means and methods of construction are the cause of the difficulty that Renda experienced with construction of the West Levee.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

Whether Renda repositioned sections of the West Levee that Defendant agreed Renda did not have to move.

What are the measure and amount of damages to which Renda is entitled due to the difficulty that Renda experienced with construction of the West Levee.

**Claim 7–Differing Site Conditions – Section 7 Clay**

Whether the clay Renda encountered in Section 7 constitutes a differing site condition.

Whether Renda's means and methods of construction are the cause of the difficulty that Renda experienced with the clay in Section 7.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the clay Renda encountered in Section 7.

**Claim 8–Lost Lake Levees**

Whether the materials Renda encountered during hydraulic construction of the Lost Lake levees constitute a differing site condition.

Whether Renda's means and methods of construction are the cause of the difficulty that Renda experienced with the hydraulic construction of the Lost Lake levees.

Whether Renda caused any damage which would reduce the amount of Renda's claim or recovery herein.

What are the measure and amount of damages to which Renda is entitled due to the difficulty that Renda experienced with the hydraulic construction of the Lost Lake levees.

**Additional Issues**

Whether the differing site conditions Renda encountered entitle Renda to additional time for completing the Project.

Whether Renda is entitled to additional contract time as a result of the Corps' administration or maladministration of the contract for the Project.

Whether Renda is entitled to a remission of the liquidated damages assessed by Defendant.

Whether the Contracting Officer's Final Decision dated November 26, 2002, is a nullity.

III.
A DISCUSSION OF THE LEGAL PRINCIPLES PLAINTIFF CONTENDS ARE APPLICABLE, AND, TO THE EXTENT KNOWN, PLAINTIFF'S RESPONSE TO DEFENDANT'S ANTICIPATED LEGAL POSITION,

A contractor is entitled to recover the extra costs it incurs where "subsurface or latent physical conditions at the site differ materially from those indicated in the contract, *Foster Construction Co. v. United States*, 193 Ct.Cl. 587, 594, 435 F.2d 873, 876 (1970), and . . . these conditions [are] reasonably unforeseeable by the contractor." *J.F. Shea Co., Inc. v. United States*, 4 Cl.Ct. 46, 51 (Cl.Ct., 1983). These types of differing site conditions are known as type I differing site conditions. A contractor is also entitled to recover additional costs incurred due to "unknown and unusual physical conditions at the site, differing materially from those ordinarily encountered and generally recognized as inhering in the work provided for in the contract. " *J.F. Shea Co., Inc. v. United States*, 4 Cl.Ct. 46, 51 (Cl.Ct., 1983). These types of differing site conditions are known as type II differing site conditions. Alternatively, if any of Renda's claims are viewed as involving a situation involving defective plans and specifications, Renda is entitled to recover the additional costs it incurred attempting to comply with defective plans and specifications provided by Defendant. *See e.g. Big Chief Drilling Co. v. United States*, 26 Cl.Ct. 1276 (Cl.Ct., 1992).

A contractor is entitled to recover its additional costs resulting from a type I differing site condition where "1) The contract documents affirmatively indicate the subsurface or latent conditions forming the basis for the claim; 2) The contractor must have acted as a reasonable and prudent contractor in interpreting the contract documents; 3) The contractor must have relied on

the indications of the subsurface or latent conditions in the contract; 4) The subsurface or latent conditions actually encountered at the site must materially differ from the contract indications; 5) The actual conditions encountered must have been reasonably unforseeable; and 6) The costs claimed must be solely attributable to materially different subsurface conditions."
*Appeal of Simpson Const. Co.*, 91-1 BCA P 23,630, VABCA No. 3176 (1990).

A contractor is entitled to recover its additional costs resulting from a type II differing site condition where "it did not know about the physical condition. Second, plaintiff must show that it could not have anticipated the condition from inspection or general experience. Third, plaintiff must show that the condition varied from the norm in similar contracting work." *Lathan Co., Inc. v. United States*, 20 Cl.Ct. 122, 128 (Cl.Ct., 1990).

Where a contractor demonstrates that it suffered a differing site condition, in addition to recovering its extra costs, it is entitled to additional time to perform if the differing site condition delayed the contractor and, if liquidated damages were assessed, a commensurate remission of liquidated damages. *See e.g. Appeal of Praught Const. Corp.*, 93-2 BCA P 25,896, ASBCA No. 39,670 (1993), *et al.*

Renda will demonstrate at trial that each of the elements necessary to recover as either a type I or type II differing site condition are met for each of Renda's Claim's described above. It is anticipated that Defendant will reply that the Contract did not make affirmative representations from which the site differed. However, "[i]t is well settled that 'documents and materials mentioned in the bidding documents' form part of the contract." *W.M. Schlosser, Inc. v. U.S.*, 50 Fed.Cl. 147, 154 (Fed.Cl., 2001). Further, Defendant is expected to argue that it warned of the differing site conditions Renda encountered. However, Defendant cannot insulate itself from

paying for the additional cost caused by differing site conditions by including general warnings in its contract documents that are contradicted by specific site condition information. *See e.g. Appeal of C & G Excavating, Inc.*, 95-1 BCA P 27,289, ENGBCA No. 6063 (1994) ("We agree with C&G that the Differing Site Conditions provision of the contract cannot be 'read out of the contract' by disclaimers, such as the Corps' statement in the IFB that contractors should expect equipment damage and downtime on account of debris."); *see also Appeal of Palmberg Construction Company*, 1959 WL 180, ENGBCA No. 1537 (1959) ("The record of job performance supports the contractor's assertion that quantities of materials in some of these categories,–especially boulders, rock fragments, snags, stumps and pieces of forest wood, were encountered during performance of the job, possibly in quantities exceeding those anticipated. . . It is difficult to reconcile these statements with the specifications which say that the material will 'consist largely of sand, gravel, and some mud or silt' and that 'miscellaneous trash may be encountered' (Underscoring supplied). If considerable debris was expected and was characteristic of such streams why didn't the specifications say so? No other conclusion can be reached but that changed conditions were encountered. The contractor's daily logs and photographs furnished by it show that great amounts of trash, including old tires, cable, iron, boulders, rock fragments and wood fragments were in Section A, B and C. The quantity and character of this trash were subsurface or latent physical conditions at the site differing materially from these indicated in the contract.")

Defendant is expected to argue that Renda did not comply with notice requirements relating to its claims. However, Renda gave timely and complete notice in compliance with all notice provisions in its contract with Defendant. Even assuming, merely for the sake of

argument, that Renda did not, Defendant had actual notice of each of the differing site conditions and thus cannot assert an alleged lack of notice as a defense. See e.g. *Appeal of Bohemia, Inc.*, 84-3 BCA P 17,650, ENGBCA No. 4305 (1984) ("In order to be entitled to an equitable adjustment for a constructive change to a contract, the contractor must give notice thereof to the Government, so that the Government has the opportunity to take remedial action. When the Government has been put on actual notice, the notice requirement is satisfied, irrespective of the medium through which the notice was conveyed," *citing General Casualty Company of America v. Unites States*, 130 Ct. Cl. 520, 175 F. Supp. 805, cert. denied, 349 U.S. 938 (1955)). Further, even a contractor's complete failure to provide "notice will not, per se, preclude recovery for an otherwise proper differing site conditions claim. Failure of notice serves as a defense to such a claim only if the Government can prove that it was prejudiced by the failure of notice," *Appeal of Simpson Const. Co., supra.*

Defendant is also expected to argue that Renda cannot recover on any claim for which it calculated damages using a total cost or modified total cost method of quantification. This is not so. A modified total cost method of recovery is allowable where "(1) the nature of the particular losses make it impossible or highly impractical to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs are reasonable; and (4) it was not responsible for the added expenses." *Delco Electronics Corp. v. U.S.*, 17 Cl.Ct. 302, 327-38 (Cl.Ct., 1989) (Aff'd 909F.2d1495, Fed.Cir., 1990).

Defendant is expected to argue that Renda cannot recover its claim preparation costs. However, claim preparation costs that are part of contract administration of changes are recoverable. *See e.g. In re Appeals of Atherton Const.*, Inc., 00-2 BCA P 30,968, ASBCA No.

48,527 2000) ("However, there are portions of the claim, such as preparation of cost proposals on penetrations, that were undertaken as part of negotiations and which are recoverable.")

The Contract Disputes Act has been construed as requiring that a contracting officer's demand for payment be preceded by a dispute by presentment to the contractor before the demand constitutes a "claim" under the Contract Disputes Act. *See e.g. Keystone Coat & Apron Mfg. Corp. v. United States*, 150 Ct. Cl. 277 (1960); *and Appeal of Instruments & Control Services Company*, 89-3 BCA ¶ 22,237 (1989); *and e.g. Appeals of United Aero, Inc.*, 83-1 BCA ¶ 16,268 (1983). The claims included in the purported Contracting Officer's Final Decision were not presented to Renda for possible resolution and the purported Contracting Officer's Final Decision is a nullity.

If Defendant contends that the claims included in the purported Contracting Officer's Final Decision were in fact "disputed" because they directly related to the claims presented by Renda discussed above, then the Court, in determining the validity and entitlement of Renda on each of Renda's claims, also has authority to declare the invalidity of the claims included in the purported Contracting Officer's Final Decision.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: s/Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of April, 2004, a true and correct copy of Renda Marine, Inc.'s Memorandum of Contentions of Fact & Law was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson