RECEIVED
APR 11 2002
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., PLAINTIFF, | § | |
| | § | |
| | § | CASE NO. 2-306 |
| V. | § | |
| | § | |
| UNITED STATES ARMY CORPS OF ENGINEERS, DEFENDANT. | § | COMPLAINT |
| | § | |
| | § | |

## COMPLAINT

Plaintiff, Renda Marine, Inc., complaining of Defendant, United States Army Corps of Engineers, respectfully states the following.

## I.

## Parties

Plaintiff, Renda Marine, Inc. ("Renda") is a corporation organized under the laws of Texas, with its principal place of business in Houston, Texas.

Defendant, United States Army Corps of Engineers ("Corps"), is an agency within the Department of Defense of the United States Government. The Corps may be served through the Attorney General for the United States of America.

## II.

## Jurisdiction

This Honorable Court has jurisdiction under the Contract Disputes Act, since Renda's claims arise from a United States Government construction contract, which is subject to that act.

## III.

## Venue for Trial

Renda respectfully requests that trial occur in Houston, Texas.



EXHIBIT E

Blumberg No. 5118

IV.

**Factual Background**

1. Renda is a marine dredging contractor.

2. The Corps is a government agency which awards many millions of dollars in marine dredging projects each year.

3. The Corps awards many contracts in and around the Port of Houston, Texas, in general, and the Houston Ship Channel, in particular. The Port of Houston is a 25-mile long complex, intermixed with public and private facilities. The Port of Houston is among the largest in the United States, and one of the largest in the world.

4. The Corps is charged with maintaining the navigability of the Port of Houston, and the Houston Ship Channel.

5. The Port of Houston Authority is a local sponsor for many of the Corps' projects for the Port of Houston.

6. On about June 16, 1998, the Corps requested proposals for Invitation No. DACW64-98-B-0004, "Houston-Galveston Navigation Channels, Texas (45-Foot Project) - Dredging Upper Bayou" ("Upper Bayou Project" or "Project").

7. The Contract Documents for the Upper Bayou Project made no mention of (1) the Port of Houston Authority, or (2) any agreement that the Corps had signed or may sign with the Port of Houston Authority, or (3) any engineering consultants for the Port of Houston Authority.

8. On about July 17, 1998, Renda submitted a bid to the Corps to construct the Upper Bayou Project. Renda's bid was $12,526,100.00, and was the lowest bid for the Project.

9. Another dredging contractor filed a protest with the Corps to contest an award to Renda of a contract for the Upper Bayou Project. Although Renda ultimately prevailed, the start of the Project was delayed.

10. On about October 26, 1998, the Corps issued Contract No. DACW64-98-C-0001 to Renda for the Upper Bayou Project ("Contract").

11. On about November 19, 1998, Renda acknowledged receipt of the Corps' Notice to Proceed on the Upper Bayou Project. The completion date required by the contract for the Upper Bayou Project was either 446 or 566 calendar days from Renda's receipt of the notice to proceed. During the course of the Project, Renda encountered differing site conditions and other problems which caused extra time and expense for its work on the Project.

12. When confronting a differing site condition, Renda generally first attempted to negotiate amicably with the Corps to lessen the cost input. But, as a general rule, the Corps tended to ignore the problem.

13. As a result, Renda had to submit a more formal request for equitable adjustment to attract the Corps' attention.

14. When the Corps did not negotiate or negotiate in good faith, Renda then had to submit a formal certified claim.

15. The Corps still has ignored most of the claims, and has refused to negotiate them in good faith.

16. The Corps has failed or refused to respond to Renda's request for a Defendant Contractors Auditing Agency audit of Renda's overhead rates.

17. The Contracting Officer has yet to issue any Contracting Officer's final decision on Renda's certified claims, although many more than sixty days have elapsed.

18. As a result, Renda has had to deem denied the certified claims presented herein, and seek adjudication from this Court.

**South Ferry Landing Differing Site Conditions Claim**

19. On about September 13, 1999, Renda started dredging operations for the Project in the Houston Ship Channel at or near Station 489+60 in Dredge Section 1.

20. On about October 8 and 9, 1999, Renda's dredge (the *Millennium*) hit obstructions on the south side of the Houston Ship Channel while dredging in the vicinity of Station 470+00 (South Ferry Landing). These obstructions were not shown in the Contract Documents.

21. On about October 9, 1999, Renda orally notified the Corps of differing site conditions in the South Ferry Landing area, and relocated the Millennium further upstream in the Houston Ship Channel to avoid the obstructions and to continue dredging.

22. On about March 8, 2000, the Contracting Officer for the Upper Bayou Project issued a cure notice to Renda based in significant part on Renda's not completing dredging in the South Ferry Landing area. The Corps threatened to terminate Renda for default as a result of delays Renda faced in its efforts to complete the Upper Bayou Project.

23. Under pressure from the Corps, on about April 7, 2000, Renda returned to dredge in the South Ferry Landing area. The Corps well knew of the obstructions, and that it would be expensive and perhaps futile to continue dredging in the area.

24. On about April 14, 2000, Renda's dredge still was unable to clear obstructions from the South Ferry Landing area (stations 470+00 to 427+00). Between April 21, 2000, and April 23, 2000, Renda again attempted to dredge the South Ferry Landing area without success due to the presence of rubble and other man-made erosion control materials. Renda again notified the Corps of the conditions.

25. As a result of hitting the rubble and rip-rap in the South Ferry Landing area, Renda's dredge was severely damaged. Dredge repairs occurred between about April 24, 2000, and April 30, 2000. Renda again notified the Corps' Contracting Officer and Administrative Contracting Officer about the South Ferry Landing conditions.

26. On about April 25, 2000, the Contracting Officer decided not to terminate the Contract for default. Instead, on about April 26, 2000, the Contracting Officer imposed strict performance requirements on Renda, which, if not met, would result in an immediate termination of the Contract.

27. On about April 28, 2000, Renda confirmed its differing site conditions concerns in a letter to the Corps about the South Ferry Landing area.

28. The Corps did not respond.

29. Fearing termination, Renda redoubled its efforts and completed dredging in the South Ferry Landing area between about May 1, 2000, and May 3, 2000, but at considerable extra expense to Renda.

30. Thereafter, on about May 8, 2000, the Corps conducted a survey of the dredge template for the South Ferry Landing area. (The "dredge template" is the area that Renda was required to clear of the material indicated in the Contract Documents, and as shown on the soil borings.) The Administrative Contracting Officer attended the survey. However, the Corps refused to provide any results of the survey to Renda for several months despite Renda's repeated requests for the results.

31. As a result of completing the dredging in the South Ferry Landing area, Renda's dredge again sustained severe damage, and had to be extensively repaired between about May 13 and 17, 2000.

32. On about August 11, 2000, responding to a Contracting Officer request, Renda revised its construction schedule, noting that the revised schedule did not take into account delays at the South Ferry Landing. Unable to finalize the schedule without a decision by the Corps on the South Ferry Landing, Renda advised the Administrative Contracting Officer that Renda awaited acceptance of Dredge Section 1, including the South Ferry Landing.

33. On about September 22, 2000, the Administrative Contracting officer accepted Dredge Sections 1 through 3, without mentioning any of the South Ferry Landing problems.

34. On September 22, 2000, Renda transmitted a letter to the Corps summarizing the South Ferry Landing differing site condition.

35. On about November 6, 2000, the Corps met with Renda to discuss construction issues, including the South Ferry Landing claim, and most if not all of the claims in this suit.

36. Despite full knowledge of the various differing site conditions that Renda faced (including, without limitation, the South Ferry Landing claim), and the delays and hindrances that such conditions caused to Renda, on about November 6, 2000, the Contracting Officer issued a Show Cause Notice, advising Renda that the Corps was considering terminating the Contract for default due to allegedly insufficient production since the March 8, 2000, cure notice.

37. On December 13, 2000, the Administrative Contracting Officer denied entitlement for the differing site condition at the South Ferry Landing.

38. On about January 10, 2001, Renda submitted a Certified Claim to the Contracting Officer for the extra costs Renda incurred from the South Ferry Landing differing site conditions. Renda sought $701,753.00, and an 18 day extension of contract time, as well as a Contracting Officer's final decision.

39. On about March 9, 2001, the Contracting Officer responded to the Certified Claim stating that a final decision would be issued by June 13, 2001.

40. On about March 13, 2001, Renda requested that the Corps schedule a claims conference for the South Ferry Landing differing site condition claim. Renda also requested a Defense Contractors Auditing Agency ("DCAA") audit for Renda's overhead rates.

41. On about March 15, 2001, Renda amended the South Ferry Landing differing site conditions claim, and increased the certified claim to $1,049,173.00.

42. A claims conference occurred on about May 2, 2001.

43. On about June 15, 2001, the Contracting Officer informed Renda that his final decision would be delayed until June 25, 2001.

44. On about June 26, 2001, the Contracting Officer requested that Renda submit an amended certified claim to incorporate certain information discussed at the May 2, 2001, claims conference.

45. On about August 23, 2001, Renda submitted an amended certified claim to the Contracting office to reflect the information previously requested. The claim amount remained set at $1,049,173.00.

46. On about October 29, 2001, Renda again inquired as to when the Contracting Officer's final decision would be issued.

47. On about November 6, 2001, the Contracting Officer wrote to Renda to advise that a Contracting Officer's Final Decision would be issued by April 18, 2002.

48. As of the date of this Complaint, no final decision has been issued, and none is in sight.

49. The rubble, rip-rap and man-made obstructions that Renda encountered were not shown on any soil boring or anywhere in the Contract Documents for the Upper Bayou Project.

50. Renda had no reason to suspect or expect such obstructions from studying the Contract Documents or from Renda's pre-contract bid site investigation.

51. The Corps benefitted from Renda's work clearing the obstructions. In fact, the Corps ordered Renda to dredge the area knowing not only that the obstructions were there, but also that they would no doubt damage Renda's dredge.

52. Renda is entitled to payment for its extra costs in the South Ferry Landing area which resulted from the differing site conditions.

**Flare Area Claim**

53. On about January 23, 2000, Renda started dredging operations in the Houston Ship Channel at or near Station 520+00 (Dredge Section 3).

54. Renda had anticipated high rates of production in the Flare Area, and had notified the Corps of Renda's expectation on about January 5, 2000.

55. Renda had expected that high production rates in the Flare Area would compensate for delays elsewhere on the Upper Bayou Project.

56. However, Renda encountered a differing site condition which markedly slowed production. Renda encountered stiff clay material not shown in the Contract Documents.

57. Renda removed the material which had been shown in the Contract Documents – silt and very soft clay – with its dredge between about January 23, 2000, and March 11, 2000. Renda timely notified the Corps of the differing site condition.

58. After the Corps issued a Cure Notice on about March 8, 2000, which complained of low production, Renda was forced to relocate the dredge to find an area with better production, while awaiting a response by the Corps to the differing site condition problem.

59. The Corps acknowledged the Flare Area differing site condition in the Contracting Officer's April 25, 2000, decision not to terminate Renda's contract. The Contracting Officer authorized an outside geotechnical firm to obtain soil borings of the material remaining in the area.

60. On about May 12, 2000, the Corps' geotechnical firm obtained three soil borings and issued a report on about May 30, 2000. The Corps withheld the report from Renda. In late August 2000, however, Renda obtained an unofficial copy of the geotechnical investigation report.

61. The Corps' geotechnical report clearly showed the Flare Area stiff clay to be a differing site condition. Nevertheless, the Corps withheld the findings from Renda, and refused to issue a modification to pay for the obvious change in conditions. Instead, the Corps forced dredging to continue on about July 17, 2000.

62. The Corps used the threat of termination against Renda to prod Renda to dredge in changed conditions. The Corps steadfastly refused to acknowledge that the changed conditions warranted an excusable schedule delay.

63. On about August 3, 2000, and again on about August 22, 2000, Renda advised the Corps of the Flare Area differing site condition, reporting delays in the work schedule, and requesting a determination of the claim's merits. The Corps did not acknowledge these letters.

64. On about November 6, 2000, the Corps met with Renda to discuss construction issues, including the Flare Area differing site condition, and most, if not all, of the claims in this suit. The Corps concurrently issued a Show Cause Notice, advising Renda that the Corps was considering

terminating the contract for default due to insufficient production since the March 8, 2000, Cure Notice.

65. The Contracting Officer signed the Show Cause Notice knowing full well that the production schedule had been delayed due to the Flare Area differing site condition, and most, if not all, of the claims in this suit.

66. On about December 13, 2000, the Corps issued an opinion which determined that the Flare Area differing site condition (among some of the other claims in this suit) did in fact impact the Project. The Administrative Contracting Officer granted entitlement for the issue. However, the Corps still refused to issue a modification to pay for the extra work or to extend the contract time.

67. On about February 14, 2001, Renda submitted a request for equitable adjustment to the Corps for the Flare Area differing site condition. Renda requested payment of $3,641,643.00 and a 76 calendar day extension of contract time.

68. Between about March 2 and 8, 2001, the Corps met with Renda to discuss the Flare Area claim. On about March 7, 2001, Renda amended the claim to reflect the actual overhead rates and dredge depreciation rates. As amended, the Flare Area claim sought damages of $4,691,688.00, and a 76 calendar day extension of contract time.

69. To analyze the claim, the Corps prepared an estimate of what the Corps figured as Renda's extra costs. The Corps' estimate was $4,111,778.00. The Corps agreed to pay Renda 75% of the $4,111,778.00 government estimate for the claim, but then suspended further negotiations pending a DCAA audit of Renda's overhead rates.

70. On about March 13, 2001, Renda requested that the Corps schedule a DCAA audit to verify Renda's overhead rates. The Corps failed to do so within any reasonable amount of time.

71. On about March 14, 2001, the Corps issued Contract Modification No. CO-08 (P00023) for $3,083,833.00, with a 56 calender day extension of contract time, to reflect the 75% of the costs that the Corps estimated that Renda had incurred.

72. By about August 9, 2001, it had become clear that the Corps would not allow Renda to complete the Upper Bayou Project, would not request an audit by the DCAA, and would not conclude negotiations on the Flare Area differing site condition. On that date, Renda submitted a certified claim for the Flare Area differing site condition, requesting a Contracting Officer's final decision.

73. The Contracting Officer has yet to issue a Contracting Officer's final decision.

74. Although the Corps has already conceded entitlement, the Corps has not fully paid to Renda even the money that the Corps has agreed is due and owing.

**HL&P Tower Claim**

75. On about July 16 and 17, 2000, Renda's dredging operations were disrupted by Houston Lighting and Power ("HL&P") crews who were installing a 138 Kilovolt electrical tower in the vicinity of Lost Lake. To accommodate the HL&P construction, Renda had to break down and relocate its discharge piping.

76. HL&P's work was not shown or indicated in the Contract Documents, and constituted a differing site condition.

77. Between about October 16 and 18, 2000, HL&P caused a second disruption, which required another relocation of the discharge piping in Lost Lake.

78. Renda properly and timely notified the Corps of these changes in site conditions.

79. On about December 13, 2000, the Corps acknowledged in writing that construction of the HL&P Tower impacted the Project. Although the Administrative Contracting Officer granted

entitlement, the Corps did not issue a modification to provide for payment of the extra costs Renda incurred.

80. On about April 11, 2001, Renda submitted a request for an equitable adjustment for the HL&P Tower matter, seeking payment of $166,143.00, and a three calendar day extension of contract time.

81. On about May 16, 2001, Renda amended its request, updating the claim to reflect the actual overhead rates and dredge depreciation rates. The amended request for equitable adjustment sought payment of $170,863.00, and a three calendar day extension of contract time.

82. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not negotiate quantum for the HL&P Tower matter, Renda re-submitted its request for an equitable adjustment as a certified claim.

83. The Contracting Officer has yet to issue a Contracting Officer's final decision.

**Section 7 Clay Claim**

84. During dredging operations between about October 2 and November 6, 2000, in Dredge Section 7, Renda encountered stiff clay material between stations 561+00 and 609+00. This type of material was not shown or indicated in the Contract Documents.

85. Renda notified the Corps of the differing site condition on about October 20, 2000.

86. On about December 13, 2000, the Corps issued an opinion in which the Corps concluded that Renda should have anticipated the stiff clay material. The Administrative Contracting Officer denied entitlement, without ever visiting the site. The Corps did not test this material like it had the stiff clay material in the Flare Area.

87. As a result, Renda stockpiled the stiff clay material as evidence of the differing site condition, and showed the material to the Corps during an inspection on about February 12, 2001.

88. On about April 16, 2001, Renda submitted to the Corps a request for equitable adjustment seeking payment of $1,083,779.00, plus a 21 calendar day extension of contract time.

89. By about August 9, 2001, it had become clear that the Corps would not allow Renda to complete the Project, would not request an audit, and would not acknowledge the existence of the differing site condition. As a result, Renda re-submitted its request for equitable adjustment as a certified claim.

90. The Contracting Officer has yet to issue a Contracting Officer's final decision.

**West Levee Realignment Claim**

91. While constructing levees during July 2000 at Lost Lake near station 175+00, Renda encountered a problem with the levees. The foundations were extremely soft, and displaced levee foundation material was being forced over the existing levees. On about July 28, 2000, Renda notified the Corps about the problem.

92. On about August 7, 2000, the Corps met with Renda at the site and orally directed Renda that the new levee be realigned so that the new levee was butted up against the existing levee. On about August 18, 2000, Renda confirmed the Corps' levee realignment directive as a change in the contract drawings, which required extra work.

93. Between about September 2000 and November 2000, Renda realigned the levee between stations 166+00 to 183+00 and 183+00 to 188+00. In the course of the realignment work, Renda had to remove and reposition material which had been previously placed.

94. After about November 2000, Renda had repositioned about all of the material which had been previously placed and thereafter followed the Corps' direction for all further levee construction.

95. On about December 13, 2000, the Corps issued an opinion in which the Corps concluded that Renda had created the problem with the West Levee area, and that the Corps had only made suggestions to correct the contractor's errors. The Administrative Contracting Officer denied entitlement for realignment of the West Levees.

96. On about May 23, 2001, the Corps unilaterally issued Contract Modification No. CO-10, concerning the realignment of the west levees. The unilateral modification offered Renda no money.

97. On about May 31, 2001, Renda submitted to the Corps a request for equitable adjustment seeking payment of $789,600.00, plus a 40 calendar day extension of contract time.

98. On about August 9, 2001, when it became clear that the Corps would not allow Renda to complete the Upper Bayou Project, would not request an audit, and would not admit merit to the West Levee Realignment Claim, Renda re-submitted its request for equitable adjustment as a certified claim to the Contracting Officer.

100. The Contracting Officer has yet to issue a Contracting Officer's final decision.

101. Renda clearly had to perform more work to realign the West Levees. Renda had already placed material in the location contractually required. When the Corps changed the location for the levees, Renda had to move material. Moving the material already placed cost Renda extra time and money.

**Obstruction #1 Claim**

102. In or about October and November 2000, Renda was dredging between stations 570+00 and 580+00. Renda's dredge encountered significant quantities of trash and other obstructions in the channel. The trash encountered by far exceeded the amount reasonably expected. The obstructions and the excessive amount of trash both constituted differing site conditions.

103. Marine dredges are designed to remove silt, clay, sand, and other soil-like materials. the dredges are not at their best in trash removal. The excessive amount of trash slowed dredge production. The obstructions caused significant damage to the dredge.

104. Between about October 8 and 18, 2000, Renda's dredge hit three obstructions in Dredge Section 7 of the Houston Ship Channel. On about October 18, 2000, Renda notified the Corps of the obstructions and identified them as differing site conditions. One of the objects appeared to be a CONEX shipping container.

105. On about October 24, 2000, Renda notified the Corps that Renda's dredge had hit another obstruction on about October 23, 2000.

106. On about October 27, 2000, The Corps issued Contract Modification No. CO-05 (P00019) for the removal of rock and rubble, which had been reported in the channel slopes in Dredge Section 5 during May 2000. By way of this modification, the Corps authorized the removal of the previously reported channel obstructions.

107. Between about October 20 and November 15, 2000, Renda's dredge hit two more obstructions, which caused further damage to Renda's equipment. Renda continued to encounter excessive amounts of trash in October and November 2000.

108. Between about November 17 and 20, 2000, Renda's subcontractor located and removed an obstruction near station 575+00 with a bucket dredge. The obstruction was an old dredge stern swivel weighing about ten tons, which Renda's dredge had struck on about October 8, 2000.

109. Between about November 27, 2000, and December 6, 2000, while dredging in the Houston Ship Channel adjacent to the Oxy-Chem Docks, Renda encountered rubble and rip-rap

within the dredge template. The rubble and rip-rap were not indicated in the Contract Documents, and constituted differing site conditions.

110. The conditions Renda encountered were similar to those Renda faced in the South Ferry Landing area. Using its South Ferry Landing experience as a guide, Renda attempted to dredge carefully around the rubble and rip-rap between stations 620+00 and 630+00. The dredging was inefficient, and beset by delays. Unfortunately, the dredge still sustained damage.

111. Between about December 8, 2000, and December 10, 2000, while dredging just past the Oxy-Chem Docks, Renda's dredge hit three more obstructions, which together with the damage from previous obstructions idled the dredge until repairs could be made.

112. On about December 13, 2000, Renda notified the Corps about three more obstructions that Renda hit between December 8 and 10, 2000.

113. Repeated abuse from obstructions, rubble and rip-rap took its toll on Renda's equipment. On about December 20, 2000, Renda again wrote to the Corps about the obstructions, and requested a resolution.

114. As a result of damage caused by obstructions and excessive trash, Renda's dredge was out of operation for repair between about December 11 and 31, 2000, and again between about January 1 and 14, 2001.

115. During the period of about January 7 through 11, 2001, the Corps conducted a survey of the Houston Ship Channel between stations 570+00 and 685+00 (the end of the Project) with a magnetometer and sidescan survey to determine the locations of excessive debris and metal obstructions within the dredge template. Renda received a copy of the report on about January 30, 2001. The report revealed many obstructions and areas full of trash, which it labeled as "debris fields."