NO. 02-306C

RENDA MARINE vs THE UNITED STATES

CHRISTOPHER MATHEWSON

APRIL 14, 2004

MERIT COURT REPORTERS - FORT WORTH, TEXAS

817-336-3042 * 1-800-336-4000



EXHIBIT

L

Blumberg No. 5118

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., Plaintiff, vs. THE UNITED STATES, Defendant. ) No. 02-306C ) (Judge Hewitt)

ORAL DEPOSITION OF

CHRISTOPHER MATHEWSON

April 14, 2004

ORAL DEPOSITION OF CHRISTOPHER MATHEWSON, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on April 14, 2004, from 9:04 a.m. to 5:35 p.m., before Gloria Carlin, CSR No. 498 in and for the State of Texas, reported by Stenographic method, at the offices of Quilling, Selander, Cummiskey & Lownds, 2001 Bryan Street, Suite 1800, Dallas, Texas, pursuant to the Rules of the Federal Court of Claims and the provisions stated on the record.

Job No. 040414GJC



A P P E A R A N C E S

FOR THE PLAINTIFF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

FOR THE DEFENDANT:

John E. Kosloske, Esq.
CIVIL DIVISION
DEPARTMENT OF JUSTICE
1100 L Street NW, Room 12052
Washington, D.C. 20005

ALSO PRESENT:

Oscar Renda
Barry L. Smith
William Connole, P.E.



INDEX

Appearances . . . . . . . . . . . . . . . . . . . . 2
Stipulations. . . . . . . . . . . . . . . . . . . . 4
CHRISTOPHER MATHEWSON
Examination by Mr. Kosloske. . . . . . . . . . . 5
Examination by Mr. Erikson . . . . . . . . . . . 214
Re-Examination by Mr. Kosloske . . . . . . . . . 217
Signature and Changes. . . . . . . . . . . . . . . . 219
Reporter's Certificate . . . . . . . . . . . . . . . 221

EXHIBITS

| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 1 | Letter 1-26-04 from Christopher Mathewson to Brian Erikson and Curriculum Vitae | 12 | 13 |
| 2 | Subpoena | 93 | 93 |
| 3 | Letter 7-18-03 from Christopher Mathewson to John Kosloske | 93 | 93 |
| 4 | Upper Bayou Dreding Drawings | 96 | 96 |
| 5 | Specifications for Dredging Upper Bayou | 99 | 100 |
| 6 | Amendment of Solicitation | 99 | 100 |
| 7 | Differing Site Conditions Clause | 101 | 101 |
| 8 | Certified Claim (Revised) | 102 | 103 |
| 9 | Letter 3-30-00 from Eddie Fisher to Corps of Engineers | 103 | 103 |
| 10 | Fax 5-15-01 from Barry Smith to Will Sanford | 104 | 104 |
| 11 | Amendment of Solicitation Modification of Contract | 104 | 104 |
| 12 | Fax 3-12-01 from Will Sanford to Tom Benero | 104 | 105 |
| 13 | Letter 4-16-01 from Steven Bowman to Thomas Benero | 105 | 105 |
| 14 | Transmittal 6-2-00 from Alan Jefts to Patrick Kuhne | 106 | 106 |
| 15 | Stiff Clay Percentages | 107 | 107 |
| 16 | Stiff Clay Percentages | 107 | 107 |



INDEX CONTINUED

| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 17 | Memo 7-13-00 from Eddie Fisher to Kenneth Machacek, Steve Bowman | 107 | 108 |
| 18 | Renda Marine's Fourth Supplemental Answers | 115 | 115 |
| 19 | Renda Marine's Second Supplemental Responses | 116 | 116 |
| 20 | Letter 3-25-04 from Christopher Mathewson to Brian Erikson | 119 | 119 |
| 21 | Drawing | 120 | 120 |
| 22 | Upper Bayou Hydraulic Levees | 120 | 122 |
| 23 | Logs of Borings | 123 | 123 |
| 24 | Memo 4-17-00 from Leon Hrabovsky to Al Jefts | 131 | 131 |
| 25 | Letter 10-13-99 from Eddie Fisher to Mike McClenan | 133 | 133 |
| 26 | Drawing | 161 | 161 |
| 27 | Letter 3-16-04 from Cheryl Moseley to John Kosloske | 182 | 182 |
| 28 | Photographs (1 - 98) | 183 | 183 |

REQUESTED DOCUMENTS/INFORMATION

| NO. | DESCRIPTION | Page/Line |
|---|---|---|
| None | | |

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| NO. | Page/Line |
|---|---|
| None | |

Pl. App. 100

Page 5

THE REPORTER: Pursuant to the Federal Rules of Civil Procedure?
MR. KOSLOSKE: The Rules of the Court of Federal Claims.
THE REPORTER: Would you raise your right hand, please?
Do you solemnly swear or affirm to tell the truth, the whole truth and nothing but the truth?
THE WITNESS: Yes, I do.
THE REPORTER: Thank you.
CHRISTOPHER MATHEWSON,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. KOSLOSKE:
Q. Good morning.
A. Good morning.
Q. Dr. Mathewson, would you state your full name for the record and spell it, please?
**A. Christopher Colville Mathewson, C-H-R-I-S-T-O-P-H-E-R, C-O-L-V-I-L-L-E, and Mathewson, M-A-T-H-E-W-S-O-N.**
Q. And what is your residential address and telephone?
**A. 1307 Glade, G-L-A-D-E, Street, College Station, Texas, 77840, and my home phone is (979) 693-5382.**

Page 6

Q. Dr. Mathewson, for the record, my name is John Kosloske. We met actually last week at another deposition in this case. I'm an attorney with the Department of Justice.
This deposition involves litigation brought by Renda Marine, Inc., against The United States. It's a case that's pending in the Court of Federal Claims, and it involves a dredging project in the Houston Ship Channel, called the Upper Bayou Project. Are you familiar with the project?
**A. Familiar with parts of it, yes.**
Q. If I refer to in the deposition the Upper Bayou Project, would you understand that that refers to a contract between Renda Marine and The United States that was awarded through the Army Corps of Engineers, Galveston District, to Renda for dredging the Upper Bayou reach of the Houston Ship Channel and for certain construction work at the Lost Lake Placement Area?
**A. Yes.**
Q. Just a couple of ground rules. I know you sat through it last week and heard them, but so that the Court Reporter can accurately transcribe your testimony, it's important that you allow me to finish a question before you begin an answer, and I'll endeavor to allow you to finish your answer before I begin a question, so that there's no overlap. That makes it difficult for the Court Reporter to

Page 7

transcribe.
Also, the Court Reporter can't transcribe nods of the head and shakes of the head. You need to answer yes or no if that's what the question calls for, that kind of response.
If you need a break, just let us know. This is not intended to be a marathon or to make you uncomfortable.
**A. I understand the terms of the rules.**
Q. Okay. During the course of the deposition I may refer to The United States Army Corps of Engineers as the Corps. When I use the term "Corps," do you understand that I'm referring to the Army Corps of Engineers?
**A. Yes.**
Q. What is your occupation, sir?
**A. I'm a Professor of Engineering Geology.**
Q. And is that with the Department of Geology and Geophysics at Texas A&M University?
**A. That is correct.**
Q. Do you consider yourself to be an engineering geologist?
**A. Correct.**
Q. What is an engineering geologist?
**A. Engineering geology is an interdisciplinary field between the practice of engineering and the practice of**

Page 8

**geology, so you're basically looking at earth materials and their engineering properties. You're looking at engineering activities and their impact on earth materials. In a general sense engineering geologists are those geologists who deal with managing risk.**
Q. What kinds of services does an engineering geologist provide?
**A. In as broad a sense from groundwater contaminant studies, hazardous materials disposal, municipal landfills, urban design, construction, inspection, geologic investigations, geologic hazards, landslides, floods, basically if it involves people and the earth or the earth and people, engineering geologists sort of fit in that window between the pure scientist geologist and the design engineer.**
Q. What sorts of geologic investigations does an engineering geologist typically perform?
**A. That would be rock properties, rock stratigraphy, site characterization, hazard assessment, groundwater investigations, characterization of aquifers.**
Q. You used the term "site characterization."
**A. Yes.**
Q. Would you just explain that term for us?
**A. Well, that -- that's where you're looking at -- let's use the, well, just a hypothetical project of any kind, you're looking at the characteristics of the site, the**

Page 9

predictability of the physical environment, the geology, and what are the bounds between what a worst case design and a best case design, so that the engineer has some limits to decide what an appropriate safety factor might be. So -- and it might be using geophysical techniques, you might be doing borings and trying to characterize the site from a single bore hole, which is one line data, to three-dimensional understanding of the region.

Q. Does an engineering geologist become involved in subsurface explorations for oil, gas, coal, uranium, precious metals?

A. I was very much involved in coal, in active mining. There are engineering geologists that work in the oil industry that are looking at characterization of deep well reservoirs. I have not been involved in the oil industry. I have been involved with coal, with copper exploration, aggregates.

Q. What are aggregates?

A. Sand and gravel, limestone, construction materials.

Q. The site characterization work that you perform, is that regional or general in nature?

A. No. It's ranged everywhere from a municipal landfill for a small community, like 30 acres worth of land to 30,000 acres worth of land for a coal mine, and, well,

Page 10

home foundations, so we're getting down to an individual property owner and how does the characteristics of that development area affect the expansive soils or foundation problems of the home.

Q. Does the engineering geologist typically provide any services relating to dredging?

A. Yes.

Q. What kind of services?

A. That would be everything from basic dredgeability, variability in the subsurface, what are the conditions that a contractor should expect, to disposal to the long-term fate of dredged material, to facilitation of channels, to shoreline erosion in navigable areas, to environmental impacts of shipping on the -- on a wildlife refuge or a wetland area, so it's a broad base of the field, profession.

Q. Have you ever been employed or retained by a dredging contractor other than Renda Marine?

A. The only one I worked with was -- yes.

Q. And who was that?

A. That was -- I believe it was Lone Star Aggregates, and it was a gravel pit, but I put a question mark after Lone Star Aggregates, because I'm not sure if that's the right name.

Q. This was a firm whose business was dredging?

A. This was a firm that was dredging gravel out of

Page 11

the Colorado River.

Q. And when were you retained by Lone Star?

A. Oh, the year, I have no idea. I've been at Texas A&M for 33 years, so sometime in the last 33 years.

Q. What was the nature of the engagement?

A. The problem was the claim that the dredging operations were causing accelerated bank erosion and land loss to property owners in the area.

Q. And what kind of investigation did you perform?

A. Geomorphic study of the Colorado River channel processes.

Q. What do you mean by the term "geomorphic"?

A. Geomorphology is the shape of the land, so it was what are the river processes doing that are natural and what are the impacts, or if there were impacts from the dredging operations. How did the dredging -- man's interference in the normal processes of the Colorado River.

Q. Was that engagement an engagement in connection with litigation?

A. It was in connection with permit.

Q. And what type of permit?

A. Permit to expand the dredge, the mine site.

Q. And where was the -- strike that.

Where was the -- was this in Texas?

A. Yes.

Page 12

Q. And what was the administrative agency that was -- had the authority to issue the permit?

A. I don't remember.

Q. Did you provide any testimony in the case?

A. Yes.

Q. Were you qualified as an expert of any kind in the case?

A. As an engineering geologist. It was a permit hearing. It was not litigation. I also was involved in research of long-term fate of dredged material.

Q. I'm sorry?

A. I was also involved in a research on long-term fate of dredged material. This was funded through Sea Grant.

MR. KOSLOSKE: Could I have this marked for identification?

(EXHIBIT(S) NO. 1 MARKED.)

Q. (BY MR. KOSLOSKE) Dr. Mathewson, you've been designated by Renda Marine as an expert witness for the litigation by Renda Marine against The United States; is that correct?

A. Yes.

Q. In connection with your testimony I believe you prepared a report in this case; is that correct?

A. Yes.

Q. This was a letter report dated January 26, 2004.

Page 13

A. I believe that's correct.
Q. I'm showing you what has been marked for identification as Deposition Exhibit 1.
A. That is my report.
Q. Okay.
A. Dated 26 January 2004.
Q. And the text of your report is the first three pages of this document; is that correct?
A. Yes.
Q. And then attached to the report is your curriculum vitae; is that correct?
A. That is correct. And for the record it's 63 pages long.
Q. Now --
A. Just a moment, counsel, please. Yes, correct, counselor, and all 63 pages are in Exhibit No. 1.
Q. Now, it's my understanding that you have a Bachelor of Science Degree in Civil Engineering from Case Institute of Technology in Cleveland, Ohio; is that correct?
A. That's correct.
Q. And you received that degree in 1963?
A. Correct.
Q. What is your date of birth?
A. August 12th, 1941.
Q. And you have a Master of Science Degree in

Page 14

Geological Engineering from the University of Arizona, Tucson, Arizona; is that correct?
A. That is correct.
Q. And you received that degree in 1965?
A. Correct.
Q. Did you prepare a Master's thesis or equivalent?
A. Yes, sir.
Q. On what topic?
A. The title is right in my resume on page one, Thesis: "Engineering Significance of Some Sediment from the Hudson Submarine Canyon Region Southeast of Long Island, New York."
Q. And you have a Doctor of Philosophy in Geological Engineering from the University of Arizona, Tucson, Arizona; is that correct?
A. That is correct.
Q. And you received that degree in 1971?
A. Correct.
Q. And you prepared a doctoral dissertation; correct?
A. Yes.
Q. And that's listed on the first page of your curriculum vitae?
A. It is.
Q. And what was the topic of your dissertation?
A. "Engineering Analysis of Subaerial and Submarine

Page 15

Geomorphology Along the North Coast of Molokai, Hawaii."
Q. What kind of analysis did you perform for purposes of your dissertation?
A. "The basic origin of the Great Windward Sea Cliff on the north side of Molokai, is it a landslide scarp, or is it the result of trauma and erosion?"
Q. What was your conclusion?
A. Conclusion was that it was shoreline erosion, the geochemical properties of the rock are either weatherable and the wave attack is perfectly oriented to the cliff.
Q. You have military service, you were a commissioned officer in the National Ocean Survey or its predecessor; is that correct?
A. That's correct.
Q. And that was from 1966 to 1970?
A. Yes.
Q. Where were you stationed?
A. Norfolk, Virginia; Honolulu, Hawaii; Seattle, Washington and Fredericksburg, Virginia.
Q. And what was your rank?
A. I was commissioned as an Ensign, I resigned my commission as a Lieutenant.
Q. What were your duties as an officer for the National Ocean Survey?
A. They ranged from bridge officer on deck, on the

Page 16

oceanographic vessels, I worked with the Magnetic Observatory in Fredericksburg, I worked with some of the geophysicists on the magnetic patterns of the North Pacific Ocean. I worked in a broad spectrum of oceanography. I was oceanographic officer on board the ship. I was weather officer. I worked on coastal charting, basically NOAA used to be the Coast and Geodetic Survey, so they'd make the nautical charts, make the oceanographic charts, and once it became NOAA and the Weather Bureau was with us and we worked on a lot of marine weather.
Q. What was the commission of the National Ocean Survey when you were assigned to it?
A. National Ocean Survey is part of NOAA, National Oceanic and Atmospheric Administration, so it was nautical charting, oceanographic geophysics, marine -- well, not marine safety, that was Coast Guard, but charting to find marine hazards and the updating of charts, marine weather.
Q. Were you assigned to one or more than one vessel?
A. A variety of vessels.
Q. A variety? What were the -- what kind of work was being performed by the vessels to which you were assigned?
A. Most of the work on the Surveyor was mid ocean charting, marine geophysic surveys, we did some oceanographic, sub-bottom sampling and coring. It all depended on what the particular research mission. My function was basically, as NOAA's function was, in the large

Page 17

ship fleet was supporting government research projects, government researchers mostly, they were either NOAA personnel or they would be from some of the research labs.
Q. Either civilians who were performing research?
A. Correct, we had civilians, international civilians. We spent a couple of months off the West Coast of Peru. We had Argen -- Ecuadorian scientists aboard.
Q. Did you have any role in the research that was being performed on these vessels other than to support the mission by operating the ship?
A. Yes. I -- on one of our experiments we were -- we were going to be anchored at sea for 30 days, so I contacted the West Coast research labs, was there anything that we could do to help collect information for them, and so one of the jobs was collecting squid, and I coordinated all the ship operations for that, but also was the one that kind of implemented the -- the ideas.
Q. Was your doctoral dissertation related to any scientific investigation that was performed while you were serving in the National Ocean Survey?
A. Yes, it was part of the -- most of the bathymetric surveying information came from NOAA data. And then I was Chief Scientist on the University of Hawaii research vessel Mahi, and research vessel, I believe it was Terry II, while we were doing marine geophysics and dredge sampling for more

Page 18

detailed studies of the north side of Hawaii.
Q. You used the determine "bathymetric."
A. That's measuring water depth, making contour maps of the sea bottom rather than contour maps of the land. So during my term I did serve as Chief Scientist on research projects.
Q. And in that capacity what were your duties or responsibilities?
A. This was the primary scientific officer onboard. As Chief Scientist I developed the research need, developed the project, gained the financial support, and the Captain and I were the two highest ranking people onboard ship. He was responsible for ship safety and operations. I was responsible for not only the scientific operations but the safety of the scientists onboard.
Q. You're a registered Professional Engineer in Texas; is that correct?
A. That's correct.
Q. What year?
A. I'd have to dig out my license. 1970, I believe, or '71. That's interesting. I thought my license would tell me. It doesn't, so I can't tell you. It was --
Q. Best of your recollection?
A. The best of my recollection would have been '71, and that would have been the same year I was also licensed by

Page 19

examination in the State of Arizona.
Q. For -- as a --
A. As a Licensed Professional Engineer.
Q. Are there any other jurisdictions besides Arizona and Texas in which you're a licensed -- excuse me, a registered Professional Engineer?
A. No, Arizona and Texas are the Professional Engineer.
Q. You're also a Licensed Professional Geologist; is that correct?
A. That is correct.
Q. And you're licensed in --
A. Texas.
Q. Texas?
A. License No. 23.
Q. In Arizona?
A. No, Oregon, and in Oregon I'm also a Licensed Engineering Geologist.
Q. Are you licensed in Alaska?
A. Yes. Well, the Alaska licensure is through the American Institute of Professional Geologists. So I am certified as a geologist in Alaska.
Q. What services does a geologist provide for which a license is required?
A. Engineering geology. Geology that affects the

Page 20

public's health, safety and well-being. So in both Texas and Arizona, if I was to give testimony before a public hearing on behalf of, say, a landfill permit, I would have to be licensed, or to do the work or supervise the work for a landfill permit operation, you would have to be licensed.
Q. I think you mentioned that you were involved with the sampling of ocean bottom while you were at the National Ocean Survey; is that correct?
A. Correct, and at the University of Hawaii.
Q. How was that sampling performed?
A. In deep ocean we frequently used a piston core in the soft sediments; if we were -- knew we were in a rock area, we'd use a rock dredge. We've used free-fall grab samplers, which were the ones you toss overboard and they don't have a cable. They go down and sample and they'd float back to the surface and you go find them. Grab samplers, general kinds of grab samplers. If it's in very shallow water it's done by scuba gear. We are actually collecting it by hand.
Q. What is a piston core?
A. Piston core is a core barrel that's usually around 20 feet long, and at the -- when it's prepared to be set overboard there's a piston at the -- right at the front end of the core, and so you have the pipe, you have the piston at the bottom of the inside of the pipe, you have a weight at

the top. You have a trigger over to the side and a little gravity core. When this hits hard bottom it releases a catch and lets the core barrel fall and as it falls the piston stays fixed so the barrel slides by the piston, and it helps to suck the sediment up into the core so it allows you to get fairly lengthy core samples that you couldn't get by just use of gravity.

Q. What was the range of lengths of the core samples that you would take with a piston core?

A. Generally about 20 feet, be 20, maybe I think the longest one we tried was 30, but you've got to realize you're on a rocking and rolling platform, so you're doing it off a ship, and it's the biggest mechanical problem aboard ship is how to safely handle that long stick.

Q. What is a rock dredge?

A. A rock dredge brings it from as simple as a piece of pipe, 24, 30-inch diameter steel pipe with a grate that's along the back and drag it along the bottom. There are all sorts of designs from the pipe dredge, which would be used in very rugged geology, rough sea bottom, to a flat sort of rectangular face dredge that you drag along in the softer area.

Q. So with a rock dredge or a grab sampler, you wouldn't be taking a core; is that correct?

A. No, you're looking -- in those cases you're



looking for competent materials. Now, when I was at Woods Hole I sailed on one of the geology cruises, and we were looking at -- this time I sailed as a scientist. And they were looking for glacial erratics. That's what we used, the big hollow dredge. We're looking for continental rocks in the middle of the ocean.

Q. That's what you refer to as competent materials?

A. Well, those would be the rocks, and the clays and the mud just washed through the dredge. The soft marine sediments in this case we were not looking for. We were interested in, or the scientist was, in how far south did Arctic glaciers get before they dumped their -- melted and lost their load, iceberg limits. That was one way to -- sort of a geologic record, recent record of how far south did icebergs go before melting.

Q. If I read your curriculum vitae correctly you basically spent your entire professional career at Texas A&M University as a Professor of Geology; correct?

A. Not exactly. Just prior to that I would consider my service at NOAA as a professional career.

Q. Okay. According to your resume you became an Assistant Professor of Geology or Engineering Geology in the Department of Geology and Geophysics at Texas A&M University in 1971; is that correct?

A. No. It's only the Department of Geology. At that



time they were two separate departments, but I joined the faculty in 1971, in the Department of Geology.

Q. And you were Assistant Professor until 1976?

A. Correct.

Q. And then in 1976 or thereabouts, you became an Associate Professor?

A. In 1976 I was tenured and promoted. Actually, I was tenured the year before. I was tenured in 1975, still as an Assistant Professor, and then promoted in '76 to Associate Professor, already tenured.

Q. And was the -- that Associate Professor position in the Department of Geology?

A. Yes.

Q. When was the Department of Geology and Geophysics at Texas A&M University formed?

A. That was in mid '80s I guess the mid '90s somewhere. It's a recent merger of the two departments.

Q. And you were an Associate Professor of Geology until 1982; is that correct?

A. That is correct.

Q. And then in 1982 you became full Professor?

A. That is correct.

Q. And you've been a full Professor of Geology or Engineering Geology from 1982 to the present at Texas A&M?

A. Yes.



Q. Okay.

A. As well as being director and leader of the Engineering Geosciences Research Center, which is a research group within the University, within the college. I was also instrumental in the WES Graduate Institute agreement with Texas A&M.

Q. Your curriculum vitae indicates that 1997 (sic; 1977) to 1978 you were the Director of the Center For Applied Geosciences.

A. What was the date again?

Q. 1977 to '78.

A. Okay. You said 1997. 1977, '78, it was the Center for Applied Geosciences, and then it was changed to Engineering Geoscience Research Program.

Q. So the Center For Applied Geosciences was a research -- excuse me, a research organization?

A. Yes, and it was collegewide, it was the College of Geoscience, so I was effectively in the Dean's office under that title.

Q. And as the Director for that Center For Applied Geosciences what were your responsibilities?

A. Basically research development, supporting the young faculty, directing research, doing my own research, and its dominant purpose was to draw -- bring together the expensive equipment so that multiple scientists had access to

Page 25

it, research equipment.
Q. And then your curriculum vitae indicates that from 1982 to 1996 you were the Director of the Center For Engineering Geosciences?
A. That's correct.
Q. Now, is that different than the Center For Applied Geosciences or was it just renamed?
A. It was an evolution. It evolved from the Center, which was collegewide, to the Dean divided the centers up for atmospheric science, rather than under the applied umbrella. That's when I became leader of the Center For Applied Geosciences, or the Center For Engineering Research, Engineering Geoscience Research Program, you notice in '78 to '82, and that was when the college changed their arrangement. I'm on page two of my vitae, counselor.
That's when the college changed it around, and they divided the centers up based more closely to research challenges. There was little justification to have somebody doing applied research on tornados and somebody doing applied research on foundation failures in the same center. So that's when the department -- the college divided more along academic points.
Then the Engineering Geosciences Research Program became large enough that the Dean appointed me as -- or restructured it and I became the director of an official

Page 26

program, and I retired from that position in 1996.
Q. What do you understand the term "dredging" to mean?
A. Dredging is a physical process of removing material from the surface. It's also used in mining, so it may be dredging in like plaster deposits or hydraulic mining is a form of dredging.
Q. Have you ever heard of the Center For Dredging Studies at Texas A&M University?
A. Yes, I have. I've been active with or involved with some of their work.
Q. Is the Center For Dredging Studies part of the Department of Geology and Geophysics?
A. No, that's in the College of Engineering, the Department of Civil Engineering and the subgroup Ocean Engineering.
Q. Have you ever taught any courses offered by the Center For Dredging Studies?
A. No. I've taught the geology courses, which were companion to theirs.
Q. What has been your involvement with the Center For Dredging Studies?
A. It hasn't been recent. In the past it was dredged material, the fate of dredged material, channel siltation. A lot of the work that the center was doing then was on dredge

Page 27

design. I was -- my interaction with them was in site characterization.
Q. When did you have that interaction?
A. It was probably in, oh, I guess 15 years ago, 10 to -- probably 15 is a closer date.
Q. Late 1980s?
A. Then or even earlier.
Q. Have you ever heard of John Herbich?
A. Yes, I know him very well.
Q. Who is he?
A. He was a Professor of Civil Engineering, Director of the Center for Dredging Studies and very active in ocean engineering.
Q. Have you ever heard of Robert Randall?
A. Rob Randell, yes.
Q. Who is he?
A. I don't -- I can't place him right now.
Q. Have you ever heard of a text titled Handbook of Dredging Engineering?
A. Probably.
Q. Do you know who the author of that text is?
A. It might have been John Herbich, but I would have referred to it as Herbich's book.
Q. Have you ever used Herbich's book for any purpose?
A. If those two books that you referenced are the

Page 28

same book, yes, sir, it's on my bookshelf in my office, yes, sir, I have.
Q. For what purpose or purposes have you used what you call Herbich's book?
A. Basically looking up information for reference. If I want to talk about a problem in an engineering geology class that's dredging and I've forgotten the equation, I go look it up.
Q. Now, according to your curriculum vitae, and I think you mentioned or touched on this earlier in your testimony, you were at the Waterways Experiment Station at Vicksburg, Mississippi, during June to August 19 -- excuse me, 1988; is that correct?
A. That's correct. And also 1992.
Q. And also June to August 1992?
A. That's correct.
Q. And you were attending what's called the WES or WES Graduate Institute?
A. Right.
Q. And the -- excuse me.
A. I was participating in, not attending. I was.
Q. The Waterways Experiment Station is a Army Corps of Engineers activity; is that correct?
A. That is correct.
Q. Now, when you were at the WES Graduate Institute

Page 29

in the summer of 1988, would you describe the nature of your participation?
A. The WES Graduate Institute was an academic arrangement between Texas A&M University, Mississippi State and LSU, and I was to provide graduate courses to WES personnel, and also allow faculty from the various institutions, the three partner institutions to participate with the Waterways Experiment Station personnel on research projects.
Q. And did you, in fact, teach one or more courses in 1988?
A. Correct, both years I taught the course Site Investigation, Geology 632.
Q. And you taught the course Site Investigation both in 1988 and in 1992?
A. Yes.
Q. What did that course cover?
A. That course covered photogrammetry, photo interpretation, remote sensing, geophysics, field sam -- geophysical exploration techniques, field sampling.
Q. When you say "field sampling," what are you referring to?
A. I mean drilling, grab sampling, field mapping, both on land and in marine settings. It's an integrated course on the characterization of the site or sites, and all

Page 30

of the students were WES employees, most -- at least many of them had their Master's degree.
Q. Did you know Dr. Fowler at the Waterways Experiment Station?
A. No. I probably met him when I was there. I was with the geotech lab and I believe he was in the oceanography or ocean engineering lab.
Q. Your curriculum vitae has a section that's titled, "Professional Consulting Activities." Do you see that?
A. Yes.
Q. That's at page three?
A. Page three.
Q. You refer in those activities to lignite mines. Do you see that?
A. About where in the list?
Q. Well, for example, there's one entry that reads, "Engineering geology of Texas lignite mines," and then below that there's, "Assessment of fuel cost from a lignite mine"; do you see that?
A. Oh, okay. Further up the page.
Q. Yeah. Is lignite a type of coal?
A. Yes, it is.
Q. At the -- towards the top of the list of Professional Consulting Activities you have, "Site investigation and design of sanitary landfill."

Page 31

A. That's correct.
Q. When was that engagement performed?
A. Those would have been -- these are in approximate chronological order, so that would have been in the early to mid '70s.
Q. And could you describe more specifically what the engagement involved?
A. That was the -- the complete investigation and supervision of the drilling, analysis of the course, review the lab analyses, the permit application, design the landfill and then presentation to the Department of Health and it was permitted as a small town landfill.
Q. For what purpose were the cores taken?
A. To determine the hydraulic properties, potential leakage from the landfill, leachate control, suitability of cover material and layering material.
Q. Did you say that you designed the landfill?
A. Yes.
Q. What does the design of a sanitary landfill entail?
A. Well, your basic concerns are protection of the environment, so there's a whole groundwater phase of groundwater control, there's a whole surface water portion to prevent surface water from infiltrating into this landfill and leeching contaminated groundwater, contaminants into the

Page 32

groundwater, there's also road access, availability, cover material, layout of the various trenches, operating schedule, so it's a complete -- is it safe to dig the hole, dig the hole, put the waste in it, bury the material and make sure the waste doesn't escape. Make sure you have wet water -- wet weather access, dry weather operating conditions, so you've got to be concerned about weather, you've got to be concerned about the characteristics of the waste that you're handling, particularly in small rural landfills. You have no idea of how many barrels of arsenic Farmer Brown might want to throw in the landfill. So you're trying to control, at least notify and make the operators aware of what to look for.
Q. Did the design of the sanitary landfill require you to design a levee or a dike?
A. There were surface water control diversions, yes.
Q. Would you describe these structures?
A. They were basically low berms to redirect surface water around the landfill instead of into the site, including also the access roads down the ramp, but you had to be able to divert the surface water running down the ramp and you had to let trucks drive over them.
Q. What were the dimensions of these berms?
A. They were small.
Q. More specific.

Page 33

A. More specific, maybe half the size of this table, the top. Eight foot wide at the base, three foot high and a flat enough top that they could get a lawn mower over it.
Q. And how were they constructed?
A. They were basically constructed mechanically, dozers.
Q. How would you describe the foundation, the soil foundation on which these berms were built?
A. They're on competent clays.
Q. What do you mean by "competent clays"?
A. The size of the structure built on the subsurface materials, there was no concern about landslides or stability.
Q. You didn't perform a stability analysis?
A. Didn't need to, no, based on the knowledge of the strength of the material.
Q. Who was the client for which you performed this site investigation and design of sanitary landfill?
A. Brazos County was one of them, Brenham was another, and I don't remember how many precincts in Brazos County, but basically we were trying to get the locals from dumping the trash in a ditch or in the creek.
Q. A few items below the item on page three, "Site investigation and design of sanitary landfill," a few items below that there's an item called, "Prediction of settlement

Page 34

in a reclaimed Montana surface mine"; do you see that?
A. Correct.
Q. Would you describe what that engagement involved?
A. The problem with the Montana mine was they were mining very thick coal seams. They were required by reclamation standards to return the landscape to approximately the original contours, so their concern was, because they were what I termed in my research as a net volume loss mine, that is they took out more material than they had left over, so they had to design how far -- how much deeper they would need to mine to gain excess material to reclaim the surface, and so it was -- it was based on truck dumped and dragline dumped overburden materials. They strip out the overburden, and put it in the mined out trench. When they got finished they were still not up to the original ground surface, so they had to concern themselves with importing material.
The big question was how much of this stuff that was in there was going to settle, so what we were dealing with there was mine land subsidence, basically a surface or settlement problem or subsidence problem.
Q. How did you go about determining how much of the material would settle?
A. Laboratory analyses and the physical properties of this overburden material. The competent rock would settle

Page 35

very little, be very porous fill and you could count on keeping about 95 percent of what you got. The soft sands would flow into the void spaces for a majority and would be washed in during rainstorms, so there was a much higher risk of the loss of the fine sand, and the limited amount of silts and clays that were silt and clay size, so it was a laboratory analysis and a grain size assessment as to how much would they lose of the...
Now, if they put the sand on the bottom of the pit and the rock on top of it, then it was a different story. So what's the mining cycle in the pit and where you put the materials, so that you can preserve the maximum amount of volume.
Q. What kind of laboratory analysis was performed in that case?
A. These were sort of a specialty designed consolidation kind of a test in the rock press. We took the rock materials. We had to model it so it had to be much smaller than what the mine was dumping, but we created samples that were -- would fit in a laboratory size cell, then you put a load on it and you measured how much you would get in subsidence, basically in the rock, which I would call soft rock, it's not granite, sedimentary rocks associated with the coal, it was a function of the angularity and how much the particles would break when you loaded it, and then

Page 36

we measured the water losses by making a column experiment.
Q. Say it again.
A. We measured the water losses by making a column experiment.
Q. What is a column experiment?
A. Creating a plastic tube, we had the rock material at the bottom, we put loose sand on the top and let the water flow through it.
Q. You used the term "subsidence." Would you define that?
A. Subsidence is a loss of surface elevation, brought about by larger scale densification of earth materials.
Q. Is another word for densification consolidation?
A. Consolidation is actually -- yeah, consolidation would be done underneath a load, a building for example. So you would measure subsidence, and I used the term densification, you said settlement, I used the term consolidation. And the difference is settlement is responding to an imposed load, like a foundation.
Q. And the engagement to predict settlement in a reclaimed Montana surface mine, do you recall approximately what year that was performed?
A. That would have been probably in the early, mid '80s when I was very active in coal mine research with the Texas lignite mines, because that was also a problem for

Page 37

Texas mines.
Q. Look further on down the list of Professional Consulting Activities, you have an activity that is described as, "Rural Texas sanitary waste management program and landfill investigation." Do you see that?
A. No, but I know what that one is about. That was basically Brazos County.
Q. It's on page three of your curriculum vitae.
A. Yeah, I found it, yeah. That was working with the County Commissioners in Brazos County.
Q. What was the nature of the engagement there?
A. The first problem was to find out where people were throwing their waste. The classic here's an empty creek beside the road in the weeds, let's throw the trash there, then after the pile got too big, somebody would light a match to it. So we were interested in what was in it and what was its impact on the river, or on the drainage system, water quality. That's where I did the experiment that proved that garbage bags somehow reproduce, we created it with --
Q. Somehow reproduce?
A. That's right. There's some funny thing that happens to garbage bags. We took three trash bags, filled them with crumpled newspaper, put a brick in them so it wouldn't blow away, and in full cooperation with the County Commissioner, picked a brand new ditch or creek that had

Page 38

never been a landfill, put three bags there. Within a week there were about 40. There is something mysterious that happens with trash bags in rural counties. It was such a logical demonstration.
MR. ERIKSON: Must have had male and female bags.
A. They must have been male and female bags. That shouldn't be on the record, but anyway...
We used that as basically education to the county citizens that, look, if you put this stuff here, just because somebody else has dumped, don't join them. Of course, the Sheriff, who was part of the experiment, visited, knocked on doors and said is this yours and that was how we educated them. That was what then got the Commissioners to say here are rural area landfills, here are dumpsters, because we don't have a suitable site near this neighborhood, so we'll haul this and now the county is part of the regional landfill, much bigger scale stuff.
Q. (BY MR. KOSLOSKE) So the landfill investigation in that case was an investigation to determine the accumulation of garbage?
A. Well, but also then where the county did have suitable sites, Batts Ferry Crossing, I've forgotten one's name, were two sites that I then designed for the county, and so that way people could take their trash there.

Page 39

Q. To sanitary landfill sites?
A. Right, that the county operated.
Q. And was the design for those sites similar to the design that you referred to in item number four of your consulting activities?
A. Yes, it's the same basic practice, protection to the environment, protection of the citizens. They're also involved with working with the county to clean up the waste at the illegal spots.
Q. Two below the item we were just discussing, item called, "Analysis of expected excavation conditions"; do you see that?
A. Yes.
Q. When did you do that work?
A. That would have been in the late '80s, early '90s.
Q. And what was the nature of that engagement?
A. I'm trying to remember that one. That was probably associated with the Vicksburg district, Army Corps of Engineers in the construction excavation for the -- a levee, dam and levee structure on the Red River. River sediments, very complex sequence of both modern and paleo sediment, and the contractors were running into extreme groundwater seepage problems.
Q. You were investigating an existing levee?
A. Correct. No, actually, this was one under

Page 40

construction.
Q. Would you describe how you went about your investigation, what you did?
A. I acted as a consultant to the Vicksburg District Corps of Engineers on the Red River project, so a lot of it was a review of the geotechnical data they already had, in an attempt to understand why the sands were as highly permeable as they were when -- in the laboratory analysis, which they should not have been.
Q. Do you remember the number of the dam?
A. No.
Q. Did you have any direct involvement in the construction of the levee?
A. No.
Q. And you would not have had any involvement, I assume, in the design of the levee in that case?
A. That's correct. I was just evaluating the site characterization data in cooperation with some of the geologists in the district.
Q. Do you recall in that case who in the Vicksburg District you remember having dealings with?
A. Yes, but I can't remember his name. There were a number of my former students worked for the Corps, and he was one of the former students, but I don't remember his name.
Q. Former student at Texas A&M?