Page 41

A. **(Moving head up and down.)**
Q. Yes?
A. **Yes. Sorry. He may have been not a student at A&M, but a student in my WES graduate class.**
Q. If he was a student in the WES graduate class, he would have been a Corps of Engineers employee as well?
A. **Yes, he was a Corps of Engineers employee in either case, whether he came to A&M for advanced training in civil engineering or advanced -- I think he was a civil engineer.**
Q. Now, immediately below the item, "Analysis of expected excavation conditions," you have an item called, "Hydrocarbon contamination of soil and groundwater." Do you see that?
A. **Yes.**
Q. What are hydrocarbons?
A. **Oil mostly, oil products, petroleum products. Gas would be a hydrocarbon, but it basically -- it generally volatilizes. I'm talking about natural gas, not gasoline. That would be a refined hydrocarbon.**
Q. So there are naturally occurring hydrocarbons, as well as manmade hydrocarbons?
A. **Well, man modified or refined, and I guess we do generate what could be called a hydrocarbon in its earliest form, methane out of a landfill.**

Page 42

Q. What was the nature of that engagement?
A. **That was a pipeline failure, a low pressure supply line of a fuel tank that leaked.**
Q. And did you perform an investigation?
A. **Yes, we installed some monitor wells and they also had some wells, so we just monitored those wells, trying to define the plume, where it was going and why it was going in the direction it was going.**
Q. And approximately what year was that engagement?
A. **That would have been in probably early to mid '90s.**
Q. Who was your client?
A. **Texas Municipal Power Agency.**
Q. About four items below the one we were just discussing there is an item called, "Analysis of collapsing soils over pipeline"; do you see that?
A. **That's correct.**
Q. When did you perform that engagement?
A. **That would have been probably mid '90s.**
Q. And who was your client?
A. **May I check for a moment?**
Q. Sure.
A. **That was Renda Constructing, Oscar Renda Contracting, Inc., and Gulf Insurance Company versus City of San Antonio in 1992. It went to arbitration in 1992.**

Page 43

Q. I'll come back to that one a little later.
A. **Okay.**
MR. KOSLOSKE: Can we take a few minute break for the restroom?
MR. ERIKSON: Okay.
(Recess from 10:08 to 10:18 a.m.)
MR. KOSLOSKE: Back on the record.
Q. (BY MR. KOSLOSKE) Dr. Mathewson, at page four of your curriculum vitae you list professional societies, membership in professional societies. And you list, I think, about 13 professional societies of which you're currently a member; is that correct?
A. **Yes.**
Q. Are any of these professional societies dredging organizations or associations?
A. **Not directly.**
Q. Have you ever been a member of a dredging organization or association such as, for example, the World Dredging Association?
A. **No.**
Q. If you'll turn to page seven of your curriculum vitae, you have listed there beginning on that page, "Texas A&M University Research Contracts"; correct?
A. **That is correct.**
Q. And for 1972 you have a research contract that's titled, "Fabric of Marine Clays, Office of Naval Research, one year, $12,000"; do you see that?

Page 44

A. **Correct.**
Q. What was the nature of that research?
A. **That was a clay mineral, clay fabric study, part of the slopes -- part of a larger project on the slope stability of the Mississippi River Delta.**
Q. The Mississippi River Delta?
A. **Yes, sir. Well, actually, the offshore, but the Delta.**
Q. So you were dealing with kind of a large region or large --
A. **But when you're looking at the fabric of clay minerals, you're looking at an electron microscope, trying to basically understand a little bit more about the process of flocculation, what creates these very loose clay rich sedimentation in saline environments.**
Q. What is flocculation?
A. **Where the particles bond together to form a large floc. If you think about sheep, you have a sheep, sheep will naturally want to go together as a flock. The same things happens with the right physiochemistry, clay particles will try to form together a floc, and that, of course, affects then the strength properties of the material.**
Q. So that if clay is suspended in a liquid or a

Page 45

fluid, it will tend to try to consolidate and come together?
A. It's not consolidating. It actually produces a much weaker material. If you have the right physical chemistry, physiochemistry between the clay and the fluids, instead of the particles settling down on top of each other, they bond together. Think of a newspaper, crumple up a newspaper sheet, that would be the floc.
Q. On page seven of your curriculum vitae you have, for 1975, a research project "Predicting Erosion of Dredged Material islands by Wave Processes, Sea Grant, one year, $28,000"; do you see that?
A. Correct.
Q. Is that what you were alluding to earlier in your testimony?
A. Yes, it also was done in '74, also done in '73, so it was a three-year contract.
Q. Would you describe what that research entailed?
A. Four-year contract. We were looking at dredged material islands from -- in the Gulf Intercoastal Waterway, as well as surface channels that were dredged for access to oil drilling operations along South Texas, so the study was basically you create a dredged material island, where is the ideal place to locate it so you get maximum stability of the pile, the island, and minimum return of the sediments back into the dredged channel.

Page 46

Q. You were attempting to predict the erosion of the islands as a result of the action of waves against the islands?
A. Waves, wind, ship wake, tidal currents, storm.
Q. These islands were located on the, you call it the Gulf Intercoastal Waterway?
A. That's correct.
Q. Where is that geographically?
A. Well, it runs all along the Gulf of Mexico from the Texas/Mexico border, up along inside the lagoon, Leguna Madre, Matagorda Bay, Galveston Bay and east into Louisiana, goes past Morgan City, intercepts the Mississippi River in the New Orleans area and continues along to Florida. Then it becomes the Atlantic Intercoastal Waterway and goes up to the Atlantic Seaway.
Q. Have you worked on any university research contracts related to dredging since 1977?
A. No. Not that I recall.
Q. Now --
A. Yes, counselor, sorry.
Q. Would you identify --
A. I'll have to go through and find it for you, or -- well, it's in this list of contracts somewhere. It was funded by Texas Municipal Power Agency. It was looking at the feasibility of using hydraulic dredging techniques to

Page 47

mine lignite in river valleys, fluvial settings. There it is, 1983, "Coal and Lignite Mining By Hydraulic Dredging Methods." This was for the Center For Energy and Mineral Resources, Texas A&M and it might have been the year prior to that as well.
Q. You're referring to page 10 of your curriculum vitae?
A. Yes, sir.
Q. That was a $12,000 research grant?
A. That is correct.
Q. Was this research that you performed?
A. Yes, it was.
Q. And would you describe specifically the -- what the research entailed?
A. What we were investigating was the feasibility of using hydraulic dredging methods in lowland areas that have a high groundwater dewatering problem, rather than fight the water, use the water. So the idea was to remove the overburden, which was basically sands, gravels and clays to clay shales and then mine the coal with hydraulic dredge, and dispose of the dredged material in the mined out pit and use a separator to separate the coal at the discharge point.
Q. Aside from that research assignment in 1983 involving coal and lignite mining by hydraulic dredging methods, is there any university research contract listed in

Page 48

your curriculum vitae after 1977 that relates to dredging?
A. I'll have to look, sir. Just a minute. "1990, Sediment Budget and Sediment Load of the Red River, Army Corps of Engineers, Vicksburg District contract." That was a study of the impact of the removal of the raft on the Red River and the river's response to the change in its hydraulics and its impact on river maintenance.
Q. And what did you do as part of that study?
A. The raft was removed in the -- in the -- early 1900s, so it was first a geomorphic study, sediment characteristics, land form characteristics of the Red River, then we looked at the sediment suspension data and then looked at dredge planning for the channel that came up to Shreveport.
Q. You said we looked at --
A. We. I had a graduate student, yeah. Most of these, in fact, most all of this research also supported graduate students.
Q. And you looked at dredge planning?
A. How it affected dredge maintenance, maintenance dredging to the river channel between Alexandria and Shreveport. There were some plans to extend the Red River north up to near Texas, they were concerned about stability or instability of the river channel.
Q. Did you draw any conclusions about the impact on

Page 49

the maintenance dredging?
A. Yeah, they would continue to be significant, because removing the raft, the Red River had not yet come into equilibrium with the new system.
Q. Can you explain how that would be -- in other words, are you saying that the amount of maintenance material to be dredged would be significant?
A. Amount and frequency was the concern, is this going to reduce and as the river comes into equilibrium with the new regime, once you've removed the raft, it's changing its channels. Of course, if you're trying to maintain a navigable channel you don't want the river running all over western Louisiana, and so if you force an unstable geometry to the system, then it increases your maintenance problems, rather than decrease, so we were trying to define or we were defining for the Corps of Engineers for the Vicksburg District what the river was doing in response to something that had been done long before any of us were born.
Q. When you use the term "maintenance dredging," what do you mean by that?
A. Removing areas in the river channel that silt up, removing slope failure debris that falls into the channel, anything that causes the design depth of the channel to decrease.
Q. You're talking about -- when you're talking about

Page 50

maintenance dredging you understand that to mean dredging of a previously dredged prism?
A. Yes.
Q. In the 1983 research work, university research work, did you evaluate whether coal could be excavated by the hydraulic dredge?
A. Yes.
Q. And what did that evaluation entail?
A. Correction, coal had a much harder material and it would tend to shatter. Lignite would tend to break into clumps, so the dredgeability was a function of the mechanical properties of the coal as well as the overburden. If you got into high rank coal, anthracite or bituminous, the rock was too brittle, and so you couldn't use a hydraulic dredge. You would have to go to mechanical, but in the lignites it was soft enough material that it would break into pieces, as long as you didn't pump it long distances you would get usable coal.
Q. You use the term "dredgeability." In this context what do you mean by that term?
A. Means was it -- is it economically viable or physically capable to dredge?
Q. To excavate?
A. To excavate using a dredge and then the different type of dredge.

Page 51

Q. Did you make any determination in that research of how many boosters would be required to transport the coal?
A. No, there was no design.
Q. How was the coal to be disposed?
A. Burned in the boiler.
Q. Are there any other university research contracts related to dredging that we haven't discussed that appear on pages seven through 12 of your curriculum vitae?
A. I believe we've discussed them all. If dredging had a role it would have been a very small part, in any other project. I don't see any, but there might be others that I don't recognize.
Q. At page 13 of your curriculum vitae you list, begin a list of publications; is that correct?
A. That's correct.
Q. And the first subset of that, "Abstracts and Presentations"?
A. Correct.
Q. What do you mean by abstract?
A. Oral presentation and the only thing published was a 200 to, say, 500 word summary.
Q. And what is a presentation?
A. That would have been at -- for example, take page 13, "1968, Magnetic and Bathymetric Orientation of Seamounts and Seafloor Spreading, South of Unimak, Alaska," it was an

Page 52

abstract so it's only a short 200-word paragraph, presented at the Annual Meeting of the Geological Society of America in Mexico City, Mexico. So that's why abstracts and presentations. Some meetings did not have an abstract, just a presentation.
Q. And the presentation could last an hour, several hours?
A. No. They were basically at a technical meeting, yeah, they could range from a 20-minute, 15 to 20-minute technical presentation at a professional society meeting to a -- a lecture at a university for an hour. They're both lumped in this same thing, so...
Q. In 1972 you have an abstract "Fabric of Submarine Clays Related to Geotechnical Properties."
A. Correct.
Q. And this was something that you presented to the Clay Mineral Society Meeting, Woods Hole, Massachusetts?
A. Right.
Q. And could you just describe what that abstract dealt with?
A. That actually came out of my Master's thesis, where I was looking at clay fabric in marine settings, and we were trying to look at the floccing problem and strength properties.
Q. In 1973 you list as an abstract, "Role of Clay

Page 53

Fabric in the Geotechnical Properties of Clay Sediments" --
A. Correct.
Q. -- "Annual Meeting, Clay Minerals Society." Does that deal with the same topic as the '72 abstract?
A. Yes.
Q. On page 14 of your curriculum vitae, in 1975 you list, I guess it's -- would be a presentation, "Physical Processes Affecting Dredge Material Islands."
A. Correct. That was an engineering seminar, that was an hour-long lecture, that was in the Coastal Engineering Group where John Herbich was.
Q. And what did you cover in that lecture?
A. That was the whole thing from strength properties to mostly geomorphology, what's the kind of material and how does the earth process -- how do the earth processes interact with it.
Q. When you say what is the kind of material, you mean the optimum material for building one?
A. No. In most cases if you're looking at dredged material islands in general, it can range from apples to potatoes or whatever, so we looked at the whole genetic -- whole generic stuff that will form an island. If you have low plastic clays that disburse, what you do is create a mud wave, just muddy water to sands or more competent material, shale, and once you create the island, then what happens to

Page 54

the island, how does it erode, how long will it stay around and what's the relationship between the island and the dredged channel.
Q. Could you be a little more specific what you mean by what is the relationship between the island and the channel?
A. Yes, it's geography -- geometry, is the island on -- what's the orientation of this channel, is the islands on the upwind or downwind side or the wave dominant side, so if you're going to dredge a channel and you're going to put the dredged material in an open water space, if it's suitable for an open water space, where is the best place to put it to minimize long-term maintenance or maximize utility of the channel.
Q. At page 20 of your curriculum vitae, for 1985 you have an abstract "Siting of Dredge Material Islands in Bays and Estuaries along Low-Energy Coastlines at the Annual Meeting, Geological Society of America, Orlando, Florida." What did that cover?
A. Same as the previous talks. That was just additional work in terms of the research studies, where was the optimum location of the island, now, not the material, but where to put it with respect to long-term operational success of the project.
Q. Taking into consideration potential for erosion

Page 55

and things like that?
A. Potential for erosion, taking into consideration materials and looking at the large -- not large scale, but the regional scale, tidal currents, wind driven currents, boat traffic, climate and vegetation, so -- to stabilize the island.
Q. When you look at the siting of dredged material islands, is the type of dredging operation a factor?
A. In this case we were not looking at the -- whether you mean a clam shell or hydraulic dredge or something. These were all hydraulic dredge suction pipe dredges and they were all shallow water.
Q. But you weren't looking at the kind of dredging equipment that would be used?
A. No.
Q. At page 22 of your curriculum vitae you have a -- what you describe as an "Invited lecture to the Corps of Engineers, Waterways Experiment Station, Vicksburg, Mississippi, called A Philosophy of Engineering Geology"; do you see that?
A. Yes.
Q. What did you cover in that lecture?
A. Basically what we talked about when you asked me what was engineering geology. I used a number of case histories, outcome from a lot -- results of a lot of my

Page 56

research to show where the input of geology that has an engineering philosophy would have saved a problem or did reduce costs.
Q. Did the lecture cover anything directly related to dredging?
A. It would have, because if I would have used the case histories of the dredge -- the long-term fate of dredged material and that being a major function of the Corps and the water -- and the research of the Waterways Experiment Station, it was an appropriate topic.
Q. Did the lecture cover anything directly related to the design or construction of levees or dikes?
A. Not directly. It may have been used as a case history. A dredge material island is like one spot on a levee.
Q. Did the lecture cover anything having to do with the design or construction of earth structures on soft foundations?
A. Not that I know. There may have been other soft structures in other case histories, but I couldn't give you the details of a lecture that was given in '87.
Q. On the same page of your curriculum vitae, page 22, for 1987, you have an abstract, "Clays and Engineering Geology, Annual Meeting, Clay Minerals Society, Socorro, New Mexico."

Page 57

A. I'm sorry, counselor, I was checking something else. What pages was this on?
Q. Page 22.
A. Okay, what year?
Q. Also 1987.
A. Okay, I've got it.
Q. What did the Clays and Engineering Geology abstract cover?
A. That was actually an invited presentation at that meeting and it was the importance of clays and clay fabric depositional settings, flocculation, physical chemistry of clay, how it affects the engineering properties and how a geologist looking at a depositional environment can interpret or can predict probable physical properties, in guiding the engineer in design and the scientist in research.
Q. Do any of the other publications listed at pages 13 through 44 of your curriculum vitae have anything to do with dredging?
A. I'd have to go through every one of them, counselor. If I talk about hurricanes, page 23, 1988, "Hurricanes and the Coastal Zone, University of Missouri at Rolla, College of Mines, 8th of November, 1988"; do you see that one, on page 23, in 1988, about the fifth or sixth.
Q. Hurricanes and the Coastal Zone?
A. Yes.

Page 58

Q. That had something to do with dredging?
A. Yes, that would have been if you have a dredge channel, what is it doing to the hurricane, enhancing the flood to surge, hurricane erosion, so a lot of these that were coastal zone dredging, not the process of dredging, but the presence of dredging having been done has an impact on what happens in the coast.
Q. And that's what you were evaluating?
A. Well, no, these -- basically these talks, this talk was a general talk to the students at the University of Missouri, Rolla, and it was an hour-long lecture, engineering geology in coastal zones, hurricanes and the coast, and, of course, if you've got a dredged channel that opens the cross section through the inlet, then you have a significantly larger tidal prism in the bay and you have enhanced hurricane risk. So ineffective dredging, it would have been that impact negative, the siting of dredged material.
Hurricanes had very little impact on dredge islands, they flow because you get the storm surge, so they get below the wave base and you don't get the kind of severe erosion you might predict in a severe storm. It's the low day-to-day operations that cause -- or day-to-day processes that cause it, so there are a significant number of talks on the coastal zone which would have incorporated dredging or the impact of dredging, either the impact of dredging on the

Page 59

process or the process on the dredging material, the dredge channel, and same thing would be true if I was giving a general talk in engineering geology, I may have used a coastal dredging case history. That's why I say they're not a dominantly dredging, but dredging is anything in the coast affects them. That's why I say I'd have to go through and say, yeah, I'd probably include dredging in that talk.
Q. Turn to page 45 of your curriculum vitae, subset of publications, styled "Articles and Reports."
A. Yes.
Q. And at page 46 you reference in 1977 an article entitled, "Physical Factors Affecting the Siting of Dredged Material Islands"; do you see that?
A. Yes.
Q. And in 1981 on the same page you reference an article that was published in The Engineering Geologist called, "Dredged Channel Infilling by Erosion from Dredged-Material Islands"; do you see that?
A. Yes.
Q. Would these articles deal generally with the general topic of siting of dredged material islands and the potential for erosion of those islands?
A. Yes, it would be this, yes. There's also a paper --
Q. Which paper is that?

Page 60

A. That's the one by Dynamic Physical Processes on South Texas Barrier Island -- oh, I'm sorry, that was on land, that was 1975. That didn't involve the dredged-material islands.
Q. Okay. Are any of the other articles that are -- or reports that are listed in your curriculum vitae related to dredging?
A. I don't believe that they're specifically dredge related.
Q. They do not concern the process of dredging?
A. I'm sorry, repeat your question.
Q. They do not concern the process of dredging?
A. Not that I -- I'll have to go through and look at every one of them, but they're not -- I don't remember, or I don't recall any -- any papers beyond those early ones that were on the relationship between dredging and the environment.
Q. Take a minute or two and go through the list and see if you can identify any article or report listed there that concerns the process of dredging.
A. 1987, page 48, "Factors Influencing Coastal Processes and Engineering Design Along the Texas Coast, Bulletin of the Association of Engineering Geologists, Volume XXIV, No. 3, August."
Q. What did that article cover?

Page 61

A. Dredging would have been part of. That's all the -- but that's the same basic research on dredging that I've been -- I've been involved in with this program, which was the long-term fate of dredged material.
In 1990, although dredging in this was peripheral to it, this was the Red River study, "Sedimentary Processes and Sedimentary Budget of the Red River Between Denison Dam, Texas and Alexandria, Louisiana." But it didn't directly address dredging, it was the technical material for the Corps of Engineers Vicksburg District. And the subauthor, Tom Weirich, was a graduate student of mine that worked on this, but it was basically river processes.
I suspect 1997, Engineering Geology and Geomorphology of the Coastal Zone -- An Example from the Texas, USA, Coast," this was an invited paper, the International Association of Engineering Geologists, in Greece, and it was published in the Engineering Geology and the Environment, proceedings from that meeting.
Q. How does that relate to dredging?
A. That's the same as we've been talking all the way along.
Q. Long-term fate of dredged material --
A. Long-term fate, the siting of an island relative to the channel, relative to the prevailing winds and prevailing physical processes.

Page 62

Q. Page 54 of your curriculum vitae.
A. I believe that -- yes, 54?
Q. Yes, in your curriculum vitae you have a subset there for articles, publications called "Contributing Author."
A. Yes, sir.
Q. And you have 1977, you and J.E. Stinson, II --
A. Yes, sir.
Q. -- published an article, "Physical Factors Affecting Dredged Material Islands in Shallow Water Environment." What did that cover?
A. That's the same research, physical factors affecting dredged material islands, erosion, sedimentation, dispersion.
Q. What's the difference between a principal author and contributing author?
A. Principal author is the senior author on the paper, Mathewson followed by others; in the contributing author, the lead author was James Stinson and Mathewson the second, so therefore I was not the lead author.
Q. Do any of the other articles and reports listed on page 54 of your curriculum vitae have anything to do with dredging?
A. No.
Q. Do they have anything to do with the design or

Page 63

construction of levees or dikes?
A. Not directly. The closest might be the work with Jeff Keaton and Loren Anderson, "Assessing Debris Flow Hazards on Alluvial Fans." Those would be land dredging or land levees for -- or sedimentation ponds for controlling debris flow hazards to homes on the -- in this case in Utah, but it was building dams.
Q. Do any of the other articles at page 54 of your curriculum vitae involve the design or construction of earth structures on soft foundations?
A. No.
Q. At page 55 of your curriculum vitae you have a category, "Books," and you have authored a textbook in 1981 called "Engineering Geology"; is that correct?
A. That's correct.
Q. Does this textbook address any aspects of dredging?
A. It probably has discussion of the siting and placement of dredged material in the chapter on oceanography and coastal engineering, coastal processes.
Q. And what do you mean by the placement of dredged material?
A. Where is the optimal place to put it, what happens to it, and I don't recall if that's in there or not, but if it was, it would be in the coastal chapter.

Page 64

Q. Does the -- your Engineering Geology text address the design or construction of levees or dikes?
A. Engineering Geology is not a design profession, so there wouldn't be design in it.
Q. At page 56 of your curriculum vitae you list, "Theses and Dissertations"; is that correct?
A. That's correct.
Q. This runs several pages, up through roughly page 61; is that correct?
A. That is correct.
Q. And what does this category cover?
A. These are the theses and dissertations that were published by students whose work I directed, so this is work by my students.
Q. Did any of these theses or dissertations listed in your curriculum vitae involve the process of dredging?
A. No. Would have been impacts of dredging if there was.
Q. Which would be impact on, for example, the dredged material islands; for example?
A. That's right, Stinson's thesis, James Stinson, he would have been on page 60, "Stinson, J.E., 1977, Engineering Geology Criteria for Dredged Material Disposal in Upper Laguna Madre, Texas."
Q. Do any of the theses or dissertations listed in

Page 65

your curriculum vitae involve the design or construction of levees or dikes?
A. No. Again, this is geology thesis, so this is working on the processes that affect the design, not the design itself.
Q. So you would have been directing -- you would not have been directing any kind of dissertation work that addressed or dealt with the design or construction of levees or dikes or the construction of earth structures on soft foundations?
A. No, not with geology students, I would not have been the chair. I have served as a member on many engineering committees, some of which were geotechnical and ocean engineering, but I don't have that documented.
Q. Now, at page 62 of your curriculum vitae, you have category, "Legal Experience - Expert Witness."
A. That's correct.
Q. And the first subcategory is, "Administrative Hearings"; is that correct?
A. Correct.
Q. And the hearings listed appear to concern sanitary landfill, surface mining or solid waste disposal permits; is that correct?
A. Yes. The closest one I mentioned Lone Star Cement, under Administrative Hearings.

Page 66

Q. That is the only one?
A. That's the one where they were disposing, spoil disposal was dredge spoil, and that was in the Colorado River near the Garwood area.
Q. What kind of expert testimony did you provide at these administrative hearings?
A. Which hearing?
Q. The administrative hearings that are listed on page 62 of your curriculum vitae.
A. It varied with the needs for each project. In the Batts Ferry Road Landfill, Turkey Creek Landfill and the Millican Landfills, College Station Landfill, that was all basically groundwater protection, material availability necessary for the filling in the blanks in a permit application. In some cases I was the only expert.
The three Brazos County, Precinct 1 and Precinct 3, Type 1 landfills, I was the design engineer, as well as the -- the site geologist, so I did everything from the geologic investigation through the layout of the -- the site, including being concerned with archaeological impacts or presence or absence.
Q. Sorry, this was for which item?
A. This was for the first four.
Q. First four?
A. Yes.

Page 67

Q. You did the design?
A. First three I did the design.
Q. Okay. The North American Coal Company Surface Mining Permit, what kind of testimony did you provide there?
A. That would have been the overburden characterization, the subsidence, settlement of the reclaimed mined land, impacts of mining on groundwater, characterization of the overburden.
Q. The Texas Municipal Power Agency, Surface Mining Permit, what kind of expert testimony did you provide there?
A. That was the same as North American Coal. That was basically the geologic characterization, groundwater before mining, groundwater impacts after mining, mined land settlement.
Q. Lone Star Cement, you described that engagement earlier.
A. That's correct. That's the dredging operation in the Colorado River.
Q. The City of Brenham, Municipal Solid Waste Disposal Facility, what kind of expert testimony did you provide?
A. That was similar to the three up above. I worked with a geotechnical engineer in that case, so I was more involved in the groundwater protection and groundwater monitoring, public protection, and in that site we did some

Page 68

innovative research as well.
Q. You have a category, "Trials."
A. Correct.
Q. The first item is W.M. Bevly versus, is it --
A. Nueces County.
Q. -- "Nueces County, Drainage and Conservation District No. 2."
A. Yes.
Q. What was the issue in that litigation?
A. The issue in that was the -- Mr. Bevly opposed a drainage improvement project that greatly increased the amount of water running down a natural creek from a proposed big ditch, and the project went from the community to the stream, increasing the amount of runoff, the amount of water carried by the stream by a significant factor, and if I remember, that was a long time ago, it was two or three times the base flow, and Mr. Bevly was a major property owner downstream, and his concern was accelerated erosion and land loss -- he was a farmer -- land loss caused by more frequent, high volume floods in the -- the stream.
Q. And which party did you -- were you retained by in that case?
A. Mr. Bevly.
Q. And what kind of -- did you provide expert testimony at trial?

Page 69

A. Yes.
Q. What kind of expert testimony did you give?
A. Basically the geomorphology and geomorphic evolution of the stream and the conclusion that this drainage district project, without carrying the improvements all the way to the coast would, in fact, accelerate land loss on his farm land.
Q. And in what field or area were you qualified as an expert in that case?
A. Engineering geology.
Q. And the next case is Margaret Lyne Moser, et al, versus U.S. Steel Corporation, Inc., et al; do you see that?
A. Right.
Q. What was the issue in that litigation?
A. That was -- the issue there was ownership of mineral resources.
Q. And which party retained you?
A. Moser.
Q. And did you provide expert testimony at trial?
A. Yes, I did.
Q. And what kind of expert testimony did you provide?
A. This related to the mineral resource law, what is and is not a mineral. In Texas law we define limestone as not a mineral, or clay as not a mineral or clay as not a mineral in the context of the mineral reservation clause in a

Page 70

real estate sale. I sell you the surface, but I retain all other minerals. This one dealt with uranium, was it a mineral or not a mineral. It basically hung onto mining methodology, if the mining methodology effectively destroys beyond recoverable range the surface estate, then it belongs to the surface. That's what gravel, sand and limestone, similar court rulings -- so that was my testimony, how were they mining it and what's its impact on the landscape.
Q. Okay. And what area or fields were you qualified as an expert in that case?
A. Basically engineering geology, recognized as a Licensed Professional Engineer and a Licensed Geologist, I'm in that middle field, with feet in both, both the design side and the scientific side. Dominant design was mine design.
Q. Page 63 of your curriculum vitae you have a case Texas Municipal Power Agency versus Tony Berger. What did that litigation involve?
A. That litigation was -- also revolved around -- that one revolved around land condemnation and the value of lignite in the ground.
Q. And which party retained you?
A. Texas Municipal Power.
Q. And what kind of expert testimony did you provide?
A. This was in mineral resources, engineering geology, basically, is it economically viable to recover this

Page 71

lignite. What's it worth today and what would it be worth 50 years or a hundred years or 200 years from now.
Q. In what field or area were you qualified as an expert in that case?
A. Engineering geology, basically, mineral resources part of it.
Q. The next case is Texas Municipal Power Agency versus H. Molitor. What --
A. Exactly the same as the Tony Berger case. And that's also true for H.L. Gay.
Q. And in each of those cases which party retained you?
A. Texas A -- Texas Municipal Power Agency. To help maybe answer the question for you, counselor, whoever is listed first in the trial or administrative hearing was my client. Whoever was listed second was the other side.
Q. Okay. The C.M. Acker, et al, versus Raymond Wood, what was the litigation in that case, what did it involve?
A. That litigation involved Raymond Wood had filled his backyard on a slope, and his land sloped down to the Acker property. He had filled it with a red clay, and the first rainstorm the red clay was in Mr. Acker's garage and all backed up against his house, with red water inside, so it was -- in essence, it was an earth material trespass case.
Q. And what expert testimony did you give in that

Page 72

case?
A. That was the erodibility, engineering geology of the earth materials, how much of it eroded, why did it erode, what was wrong with his design.
Q. What area or field were you qualified as an expert in that case?
A. Engineering geology, I guess.
Q. Tommy Ray Ware versus Phillips Petroleum Company, what did that litigation involve?
A. This was a building explosion, natural gas explosion in a building in the Amarillo area. He was -- Tommy Ray Ware was -- ran a company that serviced diesel engines and their shop blew up, fortunately one morning very early, and it led to determining the link between a Phillips Petroleum gas, natural gas pipeline, a low pressure pipeline and the overlying geology that allowed the gas to migrate uphill and concentrate inside the barn -- inside his shed. Then the Fire Marshal thinks that when the hot water heater turned on, it was just the right composition of gas to blow up the building.
Q. Harold Freeman versus Professional Geophysics, what did that litigation involve?
A. That was a structural damage -- if I remember that one correctly -- that was a structural damage of a -- a home from a seismic survey, for oil where they were using

explosives.
Q. And what kind of expert testimony did you give in that case?
**A. That would have been related to the change in the physical characteristics of the soil materials around his home caused by vibration loading.**
Q. Vibration loading?
**A. Vibration loading from the seismic record. In the general field it would fall into engineering geology.**
Q. Morrison-Knudsen, Navasota Mining and Texas Municipal Power Agency versus Bob Bullock, Comptroller of Public Accounts for the State of Texas, what did that litigation involve?
**A. This revolved around the decision by Bullock's office to define drag lines and large scale mining equipment as part of the real estate, therefore, coming under real estate tax law rather than vehicle tax law.**
Q. What kind of expert testimony did you provide in that case?
**A. That dealt with the -- the operation of a dragline, its size, what it was used for, why it wasn't a permanent structure, therefore why it did not qualify as a real estate value to the land.**
Q. What experience do you have with draglines?
**A. Worked around them at all of the mines. I've**



**worked construction, not with a dragline, but with a backhoe, cable operated backhoe, so the characteristics of a dragline, being it real estate or a tool, a machine, it was a machine; I haven't been allowed to sit and play with the levers in those.**
Q. What -- strike that. In what area or field were you qualified as an expert in the Morrison-Knudsen litigation?
**A. Would have been mining equipment, mining operations.**
Q. You have in 1992 City of San Antonio, Texas, versus Oscar Renda Contracting, Inc., and Gulf Insurance Company. And we touched on that earlier. You mentioned that this was an arbitration proceeding; is that correct?
**A. Yes. It ended up in arbitration rather than Jury trial.**
Q. Okay. And your client in that case was the City of San Antonio, Texas?
**A. No, it was -- I'm sorry, I apologize. I was in error. I should have let you ask the question earlier. In this case I was with Oscar Renda Contracting, so they're not listed in order -- they're listed in the order in which the trial was filed, so San Antonio filed against Oscar Renda Contractors.**
Q. And Oscar Renda Contracting was represented by



Brian Erikson?
**A. That is correct.**
Q. The same Brian Erikson who is representing Renda Marine in this case?
**A. That's correct.**
Q. Did you provide expert testimony on behalf of Oscar Renda Contracting in that case?
**A. Yes, I did.**
Q. Were you qualified or designated as an expert in any field or area?
**A. Yes.**
Q. What field or area were you qualified --
**A. Engineering geology, the subfield being construction failure.**
Q. What was the issue in that litigation?
**A. Oscar Renda installed a sewer line in an excavation down the middle of a creek in the southeastern -- middle of the street, southeastern San Antonio, followed the geotechnical engineer's or design engineer's design finish, design style.**
**After the pavement was replaced, some months later a person backed out of their driveway and the rear end of the car fell into a hole. The City filed suit against Oscar Renda for failure to provide -- perform work.**
**My investigation of the whole pipeline led**



**to the -- the determination that the backfill soil that the City had specified was a low plastic silt, low plastic clay. It had rained, they had the pipeline embedded in the coarse gravel, they had the low plastic silt compacted on top of it. When that silt was subjected to moisture, it would flake and basically fluidize and flow through the voids with the groundwater flow, and where the pipeline crossed a creek downgradient the silt was able to escape, so it was just basically eroding the silt out from underneath.**
Q. How did you go about making those determinations?
**A. From the engineering design data, from the material properties from the engineering design, and from the design itself. A very common problem is they don't put in a sealing layer. So you don't have a barrier that prevents dispersive materials from moving in the coarse grain void spaces. That was the design failure in this case.**
Q. Did you perform any tests?
**A. No. The project had been repaired and finished and had been redone, so I didn't -- I wasn't involved in the beginning. I was involved in the end. Although it was related to the Montana problem. What happens to fine sand in a coarse broken up rock mass, it filters through the voids, exactly the same geometric process.**
Q. What was the outcome of the arbitration?
**A. I believe Oscar Renda was found not at fault for**

Page 77

the construction, and so the City probably paid them what they still owed them, but I wasn't involved in the economics.

Q. "Gene Everett, Individually and d/b/a 5 Star Diesel Repair versus American Central Gas Companies."

A. I was at error, counselor, in Tommy Ray Ware versus Phillips Petroleum, and the Gene Everett was both up in West Texas. Gene Everett was the leaky gas line and the diesel repair shop that blew up.

Q. Okay. What was the Tommy Ray Ware versus Phillips Petroleum Company, what did that involve?

A. This one -- I believe this one is the one that involve a failure of an irrigation well. Phillips was doing seismic shooting and in the seismic surveys for deep oil reserves it caused vibration-induced compaction, and vertically crushed a irrigation line. Should have realized Harris County is --

Q. Were you qualified -- strike that. On what field or area were you qualified as an expert in the Tommy Ray Ware case?

A. I'm going to have -- I cannot remember the Tommy Ray Ware. Harold Freeman was the groundwater problem. Tommy Ray Ware, I don't remember. I'm sorry, counselor.

Q. Can you identify which -- which case involved the failure of the well as a result of seismic shooting?

A. That would have been Harold Freeman, the

Page 78

structure.

Q. Oh, okay.

A. Professional Geophysics was the seismic shooting, I know that. And for some reason I thought -- oh, Tommy Ray Ware was gas. It was a home, not -- this is two of them that were natural gas. Tommy Ray Ware's house blew up from a natural gas leak, and it was, again, doing the geology that showed the link between the gas pipeline and the source of the -- of the leak in this low pressure line and the position of his house.

Q. In the Harold Freeman case, what area or field were you qualified as an expert?

A. Oh, Harold Freeman would have been the engineering geology, seismic vibration. Tommy Ray Ware and Gene Everett were both defining transports routes for shallow, near-surface natural gas, source, conduit and trap, the building.

Q. You were qualified as an expert on those topics?

A. Yes, again, site characterization.

Q. Ignacio Torres, Sofia Torres and others versus C.C. Speed and John S. McGregor, et cetera, what did that litigation involve?

A. That was a deceptive trade case, in that basics; the "and others" are property owners in a Hispanic, dominantly Hispanic subdivision outside Corpus Christi. The

Page 79

developers did not supply a water supply system, and just said, "Drill your own well." The ground elevation and the relationship to the Gulf of Mexico was such that the groundwater in that area was basically saline, so these low cost lots effectively had no water supply.

Q. What kind of expert testimony did you provide in that case?

A. Groundwater characterization, site geology, the hydraulics between the property and the development.

Q. And what field were you qualified as an expert in that litigation?

A. Would have been engineering geology.

Q. The last case listed is, "Frederick Fulton Tucker, III, et al versus Ozarka Water Company, et al." What did that ligation involve?

A. That litigation involved the overproduction of a spring which led to piping erosion, the piping erosion intersected a town at Midden (sic), which changed the chemistry of the groundwater, which resulted in basically the overproduction, destroying the spring and wiping out that resource as bottled water. And I was an expert for Fred Tucker and family.

Q. What kind of expert testimony did you provide?

A. Groundwater flow systems, the geochemistry, the impact of the oxidation process, the water chemistry that

Page 80

created the problem, the basic erosion process, and the long-term loss of the spring as a water supply.

Q. What field or area were you qualified as an expert in in that case?

A. Engineering geology.

Can I now ask for two minutes? Have you finished my vitae?

Q. Yes, you need two minutes?

A. Yes, can I take two minutes?

MR. KOSLOSKE: Yes.

(Recess from 11:22 to 11:31 a.m.)

MR. KOSLOSKE: Back on the record.

Q. (BY MR. KOSLOSKE) Dr. Mathewson, I may have asked you this earlier in the deposition, but I wanted to make sure that I covered it. Have you ever taught a course or dredging or any aspect of dredging?

A. Only as part of my courses, which would have dealt with the site characterization of the region in which you are doing the dredging and its engineering, environmental and geologic impacts.

Q. So as part of your courses you would have covered dredging to that extent?

A. Right, not the engineering, running the dredge and pulling the levers, but if you're going to dredge a channel, what does it do to the tidal prism, if you're going to put

dredging material in this area, what's it going to do to the resuspension? I included impact of dredging on a lecture just yesterday.
Q. Have you ever worked on a dredge in any capacity?
A. No. I've worked in construction, run construction equipment, but not dredging.
Q. Do you know what a leverman does on a dredge?
A. Controls what the cutter head is doing, just like the operator on a backhoe, except the leverman can't see what he's cutting and I can.
Q. What, if any, experience do you have with the design of fabrication of dredges?
A. None.
Q. Have you ever held yourself out as an expert with respect to dredging with a hydraulic cutter head dredge or any aspects of dredging with a hydraulic cutter head dredge?
A. With respect to what question?
Q. That was my question, have you ever -- let me repeat it. Have you ever held yourself out as an expert with respect to dredging with a hydraulic cutter head dredge?
A. And my question back, counselor, because I don't understand your question, is with respect to what activity, the design of a cutter head dredge, whether a leverman was competent or incompetent or whether a cutter head dredge would or would not dredge X, Y or Z?



Q. All of the above.
A. Well, our involvement with the feasibility of dredging lignite in the alluvial valleys, revolves around looking at what was the capability -- what kind of dredges would work in order to decide whether it was feasible. So in that sense you're looking at the relationship between the cutter head, whether it's a clam shell or hydraulic dustpan dredge or a cutter head dredge on would it cut this material, and if it does cut the material what does it produce?
So in that aspect, yes, in the research. In litigation, no, but in terms of the research and the recommendation to the sponsor.
Q. Have you ever been qualified by a court or an administrative entity as an expert with respect to the operations of a hydraulic cutter head dredge?
A. No.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the operation of any type of dredge?
A. In the Lone Star Aggregate case, which was a series of clamshell products.
Q. In that case you were designated by the Court as an expert with respect to the operation of the clamshell dredge?
A. Not the operation, but its impact, what it does,



not what lever you pull. So I'm having trouble exactly interpreting your question, sir.
Q. My question went to the operation of the dredge as opposed to the effect of the dredge upon the environment.
A. Thanks for the clarification. No, I have not testified as a dredge operator, regardless of the cutter head.
Q. Have you ever been qualified by a Court or administrative entity with respect to -- as an expert with respect to the pumping of dredged material through a pipeline from a hydraulic cutter head dredge to a disposal site for dredged material?
A. No, I have not.
Q. Do you consider yourself to be an expert with respect to the pumping of dredged material through a pipeline from a hydraulic cutter head dredge to a disposal site for dredged material?
A. No. If you're talking about the hydraulics, the design of the pipe, no, I'm not qualified.
Q. Have you ever been on a dredge?
A. Yes.
Q. When?
A. That was in the Lone Star operation when I was observing what they were doing.
Q. Those were clamshell dredges?



A. That's a clamshell dredge, and I think I toured a small cutter head dredge.
Q. What was the size of a dredge?
A. Probably -- oh, probably around 14, 16 inches, a small harbor maintenance type dredge. And I think I toured the Corps of Engineers' big hopper dredge.
Q. The hydraulic cutter head dredge, when were you on that?
A. I don't recall, but it was many years ago.
Q. Do you recall the reason for your going onto the dredge?
A. We were doing the coastal study stuff and there was a contractor working in the vicinity, and my graduate students stopped and said, "If we're going to deal with dredge placement, let's see what one looks like." So I said, "Howdy," and he let us come on and toured us around, and that was my tour on a dredge.
Q. How long did you spend on the dredge?
A. Half an hour, hour. Again, we were not concerned with the dredge. We were concerned with what happened to the stuff that came out the end of the pipe and this was an opportunity to see one.
Q. In the case of the Upper Bayou Project, Renda's dredge was called the Millennium; is that your understanding?
A. Yes.