Q. Have you ever been on the dredge Millennium?
A. No.
Q. Have you ever designed a disposal facility for dredged material?
A. No.
Q. Have you ever participated in the design of a disposal facility for dredged material?
A. I don't recall.
Q. Have you ever designed a levee or a dike for a disposal facility for dredged material?
A. To my knowledge, no.
Q. Have you ever participated in the design of a levee or dike or a disposal facility for dredged material?
A. No.
Q. Aside from the small berms you mentioned in connection with the design of the landfill, have you ever designed a levee or dike of any kind?
A. That what, levee or dike that --
Q. Of any kind.
A. Oh, of any kind. Not that I recall.
Q. Have you ever designed a structure for a soft foundation?
A. By structure, you mean --
Q. I'll break it down. Have you ever designed a -- an earth structure for a soft foundation?



A. No.
Q. Have you ever designed a, say, a building that was to go on a soft foundation?
A. No. I'm not a design engineer.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of disposal facilities for dredged material?
A. No. Not that I recall.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of a levee or dike for a disposal facility for dredged material?
A. No.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of levees or dikes in general?
A. No.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of structures for soft foundations?
A. No.
Q. Do you consider yourself to be an expert with respect to the design of disposal facilities for dredged material?
A. No. Just -- I'll have to qualify that, counselor,



because that's an awfully wide open thing. If you're asking me whether I've done the layout like I did with the municipal landfill for dredged material, that is the whole project, pick the site, design the height of the berms, in litigation, no, I have not. If you're asking whether -- well, in litigation, no, okay.
Q. My question concerned the design of disposal facilities for dredged material. Do you consider yourself to be an expert with respect to the design of a disposal facility for dredged material?
A. No, not the whole design.
Q. Do you consider yourself to be an expert with respect to any aspect of the design of disposal facilities for dredged material?
A. Yes.
Q. What aspect or aspects?
A. Those would be the engineering geologic aspects, long-term fate, settlement and whether it's -- I mean, this is my -- this is the field in which I have been working for many years, environmental impacts, seepage problems.
Q. Do you consider yourself to be an expert with respect to the design of levees or dikes in general?
A. In terms of concepts, yes, and the mechanics and their impacts.
Q. And when you say concepts, what are you referring



to?
A. The capability between the engineer's design and the capability of the landscape to support that design, would be the engineering geology of dredged material, both dredging operations, transporter operations and disposal operations, that's my field of expertise.
Q. Do you consider yourself to be an expert with respect to the design of structures for soft foundations?
A. As a designer, no, as an assessor of the relationship between the structure and the foundation, yes. Again, it's the engineering geology, not how big a footing do I use.
Q. What, if any, experience have you had with the construction of disposal facilities for dredged material?
A. Not direct experience that I could identify. I did while discussing -- remember one other project in which I was -- I acted as a design engineer that involved small levees, and this was the creation of a wetland for wastewater treatment. We had to excavate the ponds.
Q. When was that?
A. That would have been probably mid '90s. That was for TMPA.
Q. I'm sorry. What's TMPA?
A. Texas Municipal Power Agency. We were using a wetland to treat leachate from their -- their fly ash

Case 1:02-cv-00306-FCH Document 119-11 Filed 12/14/2004 Page 2 of 11



disposal site, but it was kind of small --
THE REPORTER: From their what?
A. Fly ash disposal site, but it still falls into the small scale type structure. We might have had to levee it, the dam at the downstream end might have been five feet high.
Q. (BY MR. KOSLOSKE) Have you ever been qualified by a court or administrative agency as an expert with respect to the construction of disposal facilities for dredged material?
A. No.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of a levee or dike or a disposal facility for dredged material?
A. No.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of levees or dikes in general?
A. No.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of structures upon soft foundations?
A. No. I believe you went through those questions earlier.
Q. Have you ever acted as a consultant with respect



to the design or construction of a levee or dike for a disposal facility for dredged material?
A. No, I don't believe I have.
Q. Have you ever acted as a consultant with respect to the design or construction of a levee or dike for any purpose?
A. Yes, those would have been the wetland for TMPA, the surface water control structures for the landfills, and some of the debris flow hazard production evaluations for the Wasatch Front in Utah.
Q. Have you ever acted as a consultant with respect to the design or construction of a structure upon soft foundation?
A. Not that I recall.
Q. Have you ever prepared a construction estimate of any kind?
A. Yes.
Q. What kind of estimate was that?
A. Those were for renovation estimates for the Geology Building, Michael T. Halbouty Geoscience Building, I was building property facilities manager, it was minor construction.
Q. Have you ever prepared an estimate for a dredging job?
A. Only with respect to the research on the



feasibility of coal dredging.
Q. The cost of the research?
A. Yes. No, not cost of research. In the study itself was if it's feasible physically, is it feasible financially, so it was a comparison between cost to move cubic yards material with a dredge, versus dewatering and removing the same yard of material with other equipment.
Q. Have you ever prepared a bid estimate for a dredging job?
A. No. I'm not in the dredging business.
Q. Have you ever prepared a cost estimate for the construction of a disposal facility for dredged material?
A. No.
Q. Have you ever performed a pre-bid site investigation on behalf of a dredging contractor?
A. No.
Q. Have you ever performed a pre-bid site investigation upon behalf of any other type of contractor?
A. No.
Q. Have you ever designed a soils testing program as part of a pre-bid site investigation by any kind of contractor?
A. No.
Q. Have you ever performed a soils investigation upon behalf of a dredging contractor?



A. No.
MR. KOSLOSKE: It's about five to 12. I think this might be a good breaking point for lunch.
MR. ERIKSON: Great.
MR. KOSLOSKE: Say come back at 1:00?
MR. ERIKSON: 1:00 is fine.
(Recess from 11:50 to 12:59 p.m.)
MR. KOSLOSKE: Back on the record.
Q. (BY MR. KOSLOSKE) Dr. Mathewson, you have what's been marked for identification as Exhibit 1 in front of you, your report.
A. Yes, sir.
Q. On the first page of that report you state that the opinions expressed in the report are based upon a review on January 15, 2004, by you in Dallas, Texas, of contract documents provided to you with a further review of those documents made in College Station, Texas; is that correct?
A. That's correct.
Q. When were you first contacted about your engagement in this case?
A. It's probably more than a year ago I got a phone call from Barry at Texas A&M, and he asked some questions and we discussed dredging and dredge disposal, and, of course, I was not at that time retained, but that was the first time I became aware of at least a dredging problem in the Houston

Page 93

Ship Channel area, and that probably happened in a long conversation for which there were no notes, no anything, and Barry hung up and that was the end of the conversation. The next time I knew anything was brewing --

MR. ERIKSON: Listen to his question.

A. Oh, I'm giving the story. Okay. Well, it would have been about a year and a half ago when -- he already told you that part.

(EXHIBIT(S) NO. 2 and 3 MARKED.)

Q. (BY MR. KOSLOSKE) Dr. Mathewson, showing you what's been marked for identification as Deposition Exhibit 2 and Deposition Exhibit 3, would you take a moment and review those documents.

A. Right, this was a --

MR. ERIKSON: There's no question here.

A. Just a minute. Yeah.

Q. (BY MR. KOSLOSKE) Deposition Exhibit 2 is a copy of a subpoena duces tecum dated June 26, 2003, that we issued to you in this case. Do you recall that?

A. Yes.

Q. And is Deposition Exhibit 3 your -- a letter that you provided to me in response to that subpoena?

A. Yes.

Q. In the Deposition Exhibit 3, which is a letter dated July 18, 2003, you state, "I certify that my only

Page 94

involvement in this case was limited to a telephone conversation concerning some construction problems that Renda Marine was encountering during construction in the Houston Ship Channel, Houston, Texas." Do you see that?

A. Yes.

Q. Is this the telephone conversation you were referring to a moment ago?

A. Yes.

Q. At the end of the letter you indicate you don't remember the name of the person who called you, but you state that you -- you know it was not either of the Renda brothers. You say it's possible that the conversation was held with Barry Smith, who is cited in the subpoena, however, you can't confirm this.

Has there been something that occurred between the time of this letter and today that has jogged your recollection as to whether you -- that you had this conversation with Barry Smith?

A. Yes.

Q. What was that?

A. I met Barry Smith.

Q. You mentioned that you discussed some dredging questions and dredge disposal issues with Barry Smith; is that correct?

A. Yes.

Page 95

Q. And what were the dredging questions that Mr. Smith had for you?

A. I don't recall. It was not viewed as -- I don't recall. There were a variety of questions.

Q. And were there dredge disposal questions?

A. Probably.

Q. Do you recall what they were specifically?

A. No.

Q. What was your next contact by any representative of Renda Marine regarding the Upper Bayou Project?

A. I got a phone call from Brian Erikson in '04.

Q. In January of '04?

A. Yes, sir. Yes, sir.

Q. And would you -- strike that. Let me rephrase.

What did Mr. Erikson ask you to do in this case?

A. He asked me if I would assist in providing some expert support in a dredging case.

Q. Did he outline the scope of your engagement to you?

A. Basically initially, as I understood, it was within the realm of engineering geology.

Q. What did he ask you to look at?

A. He did not send me anything. He asked me just to come to Dallas, so I came to these offices in Dallas on

Page 96

January 15th, at which point, to continue your question, the four items I listed in my letter were what he asked me to look at.

Q. And you're referring to the four items that are on the first page of your report of January 26, 2004?

A. That's correct.

Q. What are the contract documents upon which the opinions expressed in your report are based?

A. Mostly it was the site plan and the -- the drawings, well, basically the drawings for the Upper Bayou project and then some of the supporting logs that were from those drawings.

Q. Soil borings?

A. Yeah.

MR. KOSLOSKE: Could I have this marked for identification?

(EXHIBIT(S) NO. 4 MARKED.)

Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 4. Are these the drawings that you reviewed on January 15 and prior to the issuance of your report in this case on January 26, 2004?

A. Yes.

Q. And would the soil borings that you reviewed be the boring logs that are contained in the F drawings in this document?

A. **Yes.**
Q. Did you review any soil borings or boring logs that were not part of the contract drawings that you have in front of you prior to the issuance of your report on January 26, 2004?
A. **No, I did not. Didn't have any.**
Q. Did you review any of Renda's written claims in this case prior to issuing your report of January 26, 2004?
A. **It was either the written reviews or it was by oral discussion with Mr. Erikson.**
Q. So you either reviewed a written report by Renda or Mr. Erikson gave you a summary, a written recap of Renda's claims and you operated on that basis?
A. **Yes.**
Q. What did Mr. Erikson tell you at that time about the South Ferry Landing claim?
A. **Oh, claim two, okay. The basic problem that they ran into trash, rocks and other unidentified obstructions.**
Q. What did Mr. Erikson tell you about the Flare Area claim prior to the issuance of your report?
A. **They had trouble dredging the red clays.**
Q. The red clays, wasn't that the issue with the Section 7 clay claim?
A. **I'm sorry, the red clay claim is in Section 7.**
Q. My question went to the Flare Area claim.



A. **I misunderstood your question. Oh, it was the stiff clays in the Flare Area.**
Q. What did he tell you, that is, Mr. Erikson tell you about that claim?
A. **That Renda Marine did not predict from the information provided the presence of the stiff clays.**
Q. What do you understand to be the Flare Area?
A. **That's the section where the channel was widened, marked in here on one of these pages.**
Q. If you will turn to contract drawing C-3 as part of what's marked for identification as Exhibit 4.
A. **All right.**
Q. Does the Flare Area appear on that page?
A. **I believe the Flare Area is marked sort of just upstream of the Battleship Texas to station 5500, as is labeled on the drawing, the Flare Area goes from station 520+00 to station 550+65.99.**
Q. Do you consider everything that is south or west of the center line to be part of the Flare Area?
A. **Where is your north arrow? Okay. On the west or on the east?**
Q. Do you consider the area to the west of the center line of the channel from station 520 to station 550 to be part of the Flare Area?
A. **That's the existing channel, no.**



Q. I'm going to hand you a pen. Would you trace with the pen that I'm handing you what you understand to be the contours of the Flare Area and put your initials beside it?
A. **Counselor, you can't put contour lines on here. The line you want drawn, there's no data for that.**
Q. Can you indicate with the pen what you consider to be -- rephrase -- will you outline what you believe to be the Flare Area.
A. **Oh. Do you want me to use the dark pen on the dark page or should I use a highlighter or something else?**
Q. I'm handing you a red pen, sir.
A. **All right.**
Q. If you would put your initials beside that or something.
A. **(Witness complies.)**
Q. Prior to issuing your report of January 26, 2004, did you review the specifications for the Upper Bayou project?
A. **Only in very limited. I don't have them memorized. You'd have to show me to refresh my memory.**
MR. KOSLOSKE: May I have these marked as separate exhibits?
(EXHIBIT(S) NO. 5 and 6 MARKED.)
Q. (BY MR. KOSLOSKE) Dr. Mathewson, showing you what's been marked for identification as Deposition Exhibit 5



and represent to you that this is a portion of the specifications for the Upper Bayou project.
Would you review that document and can you tell us whether you reviewed all or any part of that document prior to the issuance of your report in this case on January 26, 2004?
A. **Yes, I've either reviewed or had pieces of it read to me when I asked questions.**
Q. This was prior to the issuance of your January 26, 2004, report?
A. **Yes.**
Q. Are you familiar with Amendment of Solicitation No. 1 to the Upper Bayou project specifications?
A. **I don't know what it amended, sir.**
Q. I'm showing you what's been marked for identification as Exhibit 6. Would you take a look at that document? Can you tell us whether you recognize it?
A. **I may have seen this document, but I know I've had conversations with Mr. Erikson about answers to some of the questions that were in here, so I'm familiar with pieces of it.**
Q. Are you referring to conversations that you had with Mr. Erikson about Amendment No. 1 prior to the date of the issuance of your January 26, 2004, report?
A. **Those conversations probably came after my report,**

Page 101

because I only got the information on the 15th, and my report is dated the 26th.

MR. KOSLOSKE: May I have that marked for identification?

(EXHIBIT(S) NO. 7 MARKED.)

Q. (BY MR. KOSLOSKE) Dr. Mathewson, are you familiar with the Differing Site Conditions clause?

A. No. I haven't read that directly. I probably discussed it with Mr. Erikson.

Q. I'm showing you what's been marked for identification as Exhibit 7. This is a -- I'll represent to you -- a copy of a Differing Site Conditions clause that's included in Renda Marine's contract for the Upper Bayou project. Do you recognize this document?

A. I recognize the topic. I -- I discussed it. I haven't read this document, but I discussed it with Mr. Erikson prior to writing my report.

Q. But you didn't actually review the pages in the contract that you have before you that set out the clause before issuing your January 26, 2004, report?

A. No. As I say, my knowledge of the differing site conditions came from discussions with the attorney.

Q. Prior to your engagement in this case, have you ever had an engagement that involved application of the differing site conditions clause?

Page 102

A. Yes.

Q. When was that?

A. One -- one case was with Renda Contracting and the Trinity River Authority, which never went to trial. It settled.

Q. Was that a Federal Government contract?

A. No. That was a state agency, or a public agency, Trinity River Authority, and with respect to the government, the Red River excavation for the locks involved a differing site condition, more groundwater than was anticipated, but in that case I was a consultant or semi-consultant with the Vicksburg District.

Q. My question went to whether you were familiar with the content of the Differing Site Condition clause prior to your engagement by Renda Marine in this case?

A. Knowledge of this clause or any Differing Site Condition?

Q. I'm talking about specifically the clause, the standard clause, Differing Site Condition clause that's contained in the Federal Acquisition Regulation.

A. Only through discussions with the attorney.

MR. KOSLOSKE: Could I have this marked for identification?

(EXHIBIT(S) NO. 8 MARKED.)

Q. (BY MR. KOSLOSKE) Dr. Mathewson, showing you

Page 103

what's been marked for identification as Deposition Exhibit 8. Would you take a look at that document and tell us whether you recognize it?

A. No, I don't.

Q. Is it fair to say that you did not review or refer to what's marked for identification as Defendant's Exhibit 8 prior to issuing your report of January 26, 2004, in this case?

A. That's correct.

MR. KOSLOSKE: Could I have this marked for identification?

(EXHIBIT(S) NO. 9 MARKED.)

Q. (BY MR. KOSLOSKE) Dr. Mathewson, showing you what's been marked for identification as Exhibit 9, could you take a look at that document and tell us whether you recognize it?

A. I don't recognize it. It may be -- all of these may be in the boxes of data that I have, but I haven't reviewed it. I've discussed it with attorneys, but I don't remember actually sitting down and reading that in the collection of information that I was given to review to...

Q. You wouldn't have read -- strike that.

Prior to the issuance of your January 26, 2004, report, you did not read or review what's marked for identification as Defendant's Exhibit 9?

Page 104

A. That's correct.

MR. KOSLOSKE: May I have these marked separately?

(EXHIBIT(S) NO. 10 through 12 MARKED.)

Q. (BY MR. KOSLOSKE) Dr. Mathewson, showing you what's been marked for identification as Exhibit 10, would you take a look at that document, and can you tell us whether you recognize it?

MR. ERIKSON: Let me see it.

A. No, I have not seen this document or reviewed it prior to my report.

Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 11. Can you take a look at that and tell us whether you recognize it?

MR. ERIKSON: Let me see it first.

A. This is another document I've not reviewed.

Q. (BY MR. KOSLOSKE) Did you review what's marked for identification as Defendant's Exhibit 11 prior to -- strike that. Let me rephrase.

A. No.

Q. I take it then that you didn't review what's marked for identification as Defendant's Exhibit 11 prior to issuing your January 26, 2004, report?

A. That is correct.

Q. Have you reviewed it since that date?

A. When you showed it to me today, sir. At which point I didn't review it. I just know it exists.
Q. I'm showing you what's been marked for identification as Exhibit 12. Take a look at that document. Can you tell us whether you recognize it?
A. I have not reviewed Deposition Exhibit No. 12 prior to the date of 26 January.
Q. Have you reviewed what's marked for identification as Defendant's -- as Deposition Exhibit 12 since January 26, 2004, the date of your report in this case?
A. When you showed it to me today.
Q. Today's the first time you've seen it?
A. Yes, sir.
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 13 MARKED.)
Q. (BY MR. KOSLOSKE) Dr. Mathewson, I'm showing you what's been marked for identification as Exhibit 13. Would you take a look at that document and can you tell us whether you recognize it?
A. I believe that Deposition Exhibit 13 may have been one of the letters from Renda Marine to the Army Corps of Engineers, the Department of Army, that I had read in my initial data study.
Q. Do you believe that you have reviewed what's



marked for identification as Defendant's Exhibit 13 prior to the issuance of your January 26, 2004, report in this case?
A. It may have been, yes.
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 14 MARKED.)
Q. (BY MR. KOSLOSKE) Dr. Mathewson, I'm showing you what's been marked for identification as Exhibit 14. Would you take a look at that document and tell us whether you recognize it?
A. I'm looking at Deposition Exhibit 14. This is the first time I've seen this document.
MR. ERIKSON: Keep looking.
A. Pages one and two. Of course, there are -- unless borings number B-1 and B-2 are included in Deposition Exhibit 4, I may have seen this because of this -- I recognize the grain size curves in the back.
Q. (BY MR. KOSLOSKE) When you say you may have seen it, are you guessing?
A. Well, there were a stack of documents that were letters and things and this may have been part of it, but I -- I don't directly recall. I relied mostly on borings in Deposition Exhibit 4.
Q. Do you recall whether the first time you looked at what's marked for identification as Defendant's Exhibit 14 or



any part of that exhibit was before or after you issued your report dated January 26, 2004, in this case?
A. I believe I did see it, because I recognize this drawing, the additional borings that were done after the contract. I think I have 14 in my file, and I have reviewed it. I recognize the drawing, not the text.
MR. KOSLOSKE: May I have these documents identified separately?
(EXHIBIT(S) NO. 15 through 17 MARKED.)
Q. (BY MR. KOSLOSKE) Dr. Mathewson, I'm showing you what's been marked for identification as Exhibits 15, 16 and 17 in this case. Would you take a look at these documents and can you tell us whether you recognize them?
A. I may have seen them, but I -- I'm not sure if they were in the database or not. In either case, I didn't rely on them. This is the first time I...
Q. Defendant's Exhibit -- excuse me -- Deposition Exhibit 15 is a spreadsheet of stiff clay percentages. Did you review this document prior to the issuance of your January 26, 2004, report?
A. No.
Q. Defendant's Exhibit 16 is another spreadsheet of stiff clay percentages. Did you review Exhibit 16 prior to the issuance of your January 26, 2004, report in this case?
A. No.



Q. What's marked Defendant -- excuse me -- Deposition Exhibit 17 is a memorandum dated July 13th, 2000, from Eddie Fisher to Kenneth Machacek and Steve Bowman, Re Clay in Upper Portion of Project, and appended to it is a Stiff Clay Percentages spreadsheet. Did you review Exhibit 17 prior to the issuance of your report in this case on January 26, 2004?
A. No.
Q. Now, what's marked Exhibit 17, I'll represent to you, you'll notice on the front it has a copy of an Exhibit No. 7, it was an exhibit to a deposition in this case taken by the government, the deposition of Eddie Fisher. Prior to the issuance of your report of January 26, 2004, in this case, did you review the deposition of Eddie Fisher taken by the government in the case?
A. No, I did not.
Q. Have you reviewed any depositions taken by either the government or Renda Marine in this case prior to the issuance of your January 26, 2004, report?
A. No, I have not. I did not.
Q. Have you reviewed -- strike that.
Did you review prior to the issuance of your January 26, 2004, report in this case, any depositions given by either representatives of Renda Marine or the dredging supply company in litigation brought by Renda Marine against the dredging supply company in Federal District Court in

Houston?
A. No, I have not, or I guess, did not would be more correct.
Q. Are you at all familiar with the litigation brought by Renda Marine against the dredging supply company?
A. No, sir.
Q. Do you know who the dredging supply company is; have you ever heard of them?
A. No, not that I recall.
Q. Are you aware that the dredging supply company is the manufacturer of the dredge Millennium?
A. Only if you say so, sir.
Q. Dr. Mathewson, how many hours did you spend reviewing the documents that you did review prior to issuing your report dated January 26, 2004, in this case?
A. Probably 20 hours.
Q. And how many hours did you spend preparing the report that you issued which is dated January 26, 2004, in this case?
A. Probably a total of about three to four hours. And maybe some thinking time which might have added another three or four more hours.
Q. Prior to the issuance of your January 26, 2004, report, you mentioned that you had at least one, if not more, discussions with Brian Erikson about your engagement;



correct?
A. Yes.
Q. Who, if anyone else, did you speak with in conjunction with your engagement in this case prior to the issuance of your January 26, 2004, report?
A. Would you repeat that, who did I --
Q. Yes. Aside from Mr. Erikson, who, if anyone, did you communicate with about -- or in conjunction with your engagement in this case prior to the date of your report in this case, that is January 26, 2004?
A. Could you define for me what you mean by "engagement"?
Q. Yes, engagement as an expert in this case.
A. Well, that discussion was between myself and Mr. Erikson. I, obviously, have talked to the Rendas, Rendas, to Oscar, to Barry Smith.
Q. When you were in Dallas on the 15th of January, 2004, to initially review documents, did you have any discussions in Dallas with anyone other than Mr. Erikson about the matters that are covered in your report?
A. Mr. Renda, Oscar Renda, probably Barry Smith, I think he was here. They were all in a meeting and I was cloistered in a conference room looking at records. There were some other persons that I don't relate, I mean, that I met that came in and either talked to Mr. Erikson or said



hello to me.
Q. Did you have one or more conversations with Mr. Renda?
A. Probably through the course of a day, a number, some social, some specific questions.
Q. What questions did you -- strike that.
What did you discuss with Oscar Renda relative to the matters that are the subject of your report in this case?
A. His experience in those four zones, in general, what happened.
Q. What did Mr. Renda relate to you was his experience in the areas, the four areas covered by your report?
A. They had various levels of either dredging complications or construction complications, problems.
Q. What did you discuss with Barry Smith, if anything, relative to the matters that are the subject of your report?
A. They would have been the same, similar type of a topic. They were not lengthy conversations. They were not, you know, interview type things. They were general what was life like while trying to dredge in the Flare Area, what did you expect, why didn't you get it, what do you think happened.



Q. Do you recall what Barry Smith stated to you specifically about those matters?
A. No.
Q. And you didn't take any notes?
A. No, sir. I was basically trying to educate myself.
Q. Now, after your return to College Station, you indicate in your report that you continued your review; is that correct?
A. Correct.
Q. During the period from when you returned to College Station until the date your report in this case was issued, that's January 26, 2004, who, if anyone, did you have conversations with relative to the matters that are touched on or are the subject of your report?
A. Well, I probably discussed it or commented on it to my wife, about what I was doing here. I may have discussed it with various graduates or undergraduate students, just sort of academic.
Q. Did you have any additional conversations with Barry Smith during that week or that period of time?
A. I don't recall. That was -- it was a busy week with other external meetings as well.
Q. Did you have any conversations with Oscar Renda between the time you returned to College Station and the date

Page 113

that your report in this case was issued?
A. No.
Q. Did you have any conversations with Eddie Fisher prior to the issuance of your January 26, 2004, report in this case?
A. **No, I don't believe I've even met Eddie Fisher yet.**
Q. Did you have any conversations with Steve Bowman prior to the issuance of your January 26, 2004, report in this case?
A. **No.**
Q. Same question as to Ben Goodloe?
A. **No.**
Q. Same question as to Robert McCullough?
A. **No.**
Q. Same question as to Rudy Renda?
A. **No.**
Q. Same question as to Burt Sawan (phonetic)?
A. **No. With respect to Rudy Renda, I don't even -- I know I probably heckled his brother for where was Rudy, because I had known Rudy, and I haven't seen him on this case at all.**
Q. For how long have you known Rudy Renda?
A. **Since the first time I was involved in a construction case with Renda Construction.**

Page 114

Q. Back in 1992?
A. **Prior to that that was the Trinity River Crossing.**
Q. When was that case?
A. **That would have to be in the middle '80s, mid to late '80s. In fact, I don't know -- I think I gave a deposition. It was settled. It was a differing site condition.**
Q. How many times have you consulted for Oscar Renda Contracting up to the present?
A. **If you merge Oscar Renda Contracting and Renda Marine as the same entity, three times, this is the third case.**
Q. Dr. Mathewson, prior to issuing your report of January 26, 2004, did you review Renda Marine's bid estimate for the Upper Bayou project?
A. **No.**
Q. Did you bill for your travel time to Dallas when you came up on the 15th?
A. **Yes.**
Q. And is your -- is your rate a thousand dollars per day?
A. **Correct.**
Q. And then do you also have what's referred to as an odd hours rate?
A. **Well, odd hours -- no, not really. I tend to --**

Page 115

**if I spend an hour on the phone today and two hours tomorrow and it ends up to a day, I just bill a daily rate. If I have a one-hour mission, then I'll bill at an hourly rate, if it's a very short term.**
Q. Your hourly rate is what?
A. **It's about $250 an hour. I believe that's what it is. And I do bill at a full daily rate for any time I'm on the road.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 18 MARKED.)
Q. (BY MR. KOSLOSKE) Dr. Mathewson, I'm showing you what's been marked for identification as Exhibit 18. This is a discovery response in this case that we received from Renda Marine. It's Renda Marine, Inc.'s, Fourth Supplemental Answers to Defendant's First Set of Interrogatories.
Can you tell us whether the information provided in your answer to -- or the supplemental answer to interrogatory number one is accurate?
A. **Oh, 175, right.**
Q. This -- what's marked for identification as Defendant's Exhibit 18 indicates that you charge 175 per hour. Is that your hourly rate?
A. **That's correct. I was -- that's why I said I think. I hadn't -- I use that so seldomly, because I pool**

Page 116

**hours.**
Q. Well, I guess the question I would have is when you said $250 an hour, were you giving Renda a discounted rate or something like that for this case?
A. **No, sir, I was at fault. Sorry I interrupted. That was an error on my part.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 19 MARKED.)
Q. (BY MR. KOSLOSKE) Dr. Mathewson, showing you what's been marked for identification as Exhibit 19. This is another supplemental discovery response by Renda to the government in this case. It's Renda Marine's, Inc.'s Second Supplemental Responses to Second Request For Production and Inspection of Documents of The United States.
Attached to what's marked for identification as Exhibit 19, that's the third page of this exhibit, is a statement for services. Is that your statement?
A. **Yes, it is.**
Q. And this statement is dated March 1, 2004. You charged a thousand dollars a day for the five days, at $5,000. Is that -- does that reflect in that charge all of the time that you spent on this case up to March 1, 2004?
A. **Yes.**
Q. Earlier you indicated you will add up your hours

Page 117

and then charge a daily rate of a thousand dollars. If you charge a thousand dollars for a day, does that mean eight hours?
A. **That's eight hours. It may be 10. I will only charge a thousand dollars for today, whether we go to 9:00 tonight or stop at noon.**
Q. This statement now which is $5,000, that's five days, does that reflect -- is it fair to say the statement indicates that you have expended approximately 40 hours on your engagement for this case as of March 1, 2004?
A. **That would also include travel time.**
Q. Including travel time?
A. **Yes, yeah.**
**(Discussion off record between witness and Mr. Erikson.)**
THE WITNESS: Can I take a two-minute break while you're meditating?
MR. KOSLOSKE: Yes.
(Recess from 1:58 to 2:02 p.m.)
MR. KOSLOSKE: Back on the record.
Q. (BY MR. KOSLOSKE) Dr. Mathewson, prior to issuing your January 26, 2004, report in this case, did you make a visit to the Lost Lake Placement Area?
A. **No.**
Q. Prior to issuing your report of January 26, 2004,

Page 118

in this case, did you visit the South Ferry Landing?
A. **Yes.**
Q. When did you go to the South Ferry Landing?
A. **A number of times as a tourist and leading field trips down in that part of Houston.**
Q. When was the last time you visited South Ferry Landing?
A. **The last coastal field trip would have been spring semester last year.**
Q. So would have been spring semester --
A. **Excuse me, fall semester. It was in the fall, so it would have been probably October.**
Q. 2003?
A. **Yes, sir.**
Q. Prior to issuing your January 26, 2004, report, did you make a visit to the South Ferry Landing for purposes of or as part of your evaluation of Renda Marine's South Ferry Landing claim in this case?
A. **No.**
Q. Prior to issuing your report of January 26, 2004, did you make a site investigation of any kind of the Upper Bayou project?
A. **Literature review, but I have not visited the site, if you mean go out there and do borings, no, I didn't.**
Q. Or visit the site for any other purpose?

Page 119

A. **Right. Well, any other purpose related to Renda?**
Q. Right.
A. **Yes.**
Q. Related to your evaluation of Renda's claims in this case?
A. **No, I have not, did not.**
MR. KOSLOSKE: Could I have this marked for identification?
(EXHIBIT(S) NO. 20 MARKED.)
Q. (BY MR. KOSLOSKE) Dr. Mathewson, showing you what's been marked for identification as Exhibit 20, would you take a look at this document and can you tell us whether you recognize it?
A. **Yes.**
Q. What is Exhibit 20?
A. **It's a letter dated 25 March, 2004, to Brian W. Erikson, that claims or states that I did not submit -- I've transmitted all materials I've generated, which includes the report, an invoice and a CD of digital photographs taken at the dredge site on the 12th of March.**
Q. So as of March 25, 2004, the sum total of what you've generated in this case is your January 26, 2004, report, your March 1, 2004, invoice and a CD of digital photographs taken of the Lost Lake Placement Area on March 12, 2004?

Page 120

A. **That's as far as materials produced. As far as work effort, no.**
MR. KOSLOSKE: May I have these marked as separate exhibits?
(EXHIBIT(S) NO. 21 and 22 MARKED.)
Q. (BY MR. KOSLOSKE) Dr. Mathewson, I'm showing you what's been marked for identification as Exhibit 21. Would you take a look at that document and can you tell us whether you recognize it?
A. **This document, no. I recognize what it's of.**
Q. Have you ever seen what's marked for identification as Exhibit 21 before today?
A. **No.**
Q. So is it fair to say that in your review and valuation of Renda's claims leading up to your report of January 26, 2004, you did not consider what's been marked for identification as Defendant's Exhibit 21?
A. **That's correct.**
Q. I'm showing you what's been marked for identification as Exhibit 22.
A. **Counselor, for clarification on Exhibit 21, are you referring to the color coding and the super position of the dredge channel over the Lost Lake disposal area?**
Q. Yes, I am.
A. **So the color coding is what you're really**

Page 121

addressing? Obviously, I've seen both of those in the construction drawings. So if "this" combines your drawing and the coloring, color coding on Exhibit 21, I have not seen prior to today.

Q. Let's go back and clarify this. Exhibit 21 is a -- a copy of drawing C-14 from Exhibit 4, the plans and spec -- the plans for the case; correct?

A. No. It's a copy of two parts within the plans and specs, counsel. The outer perimeter is the Lost Lake levees. The inside is not the levees, it's the super position of a much reduced drawing of the actual dredged source area or dredged channel.

Q. You're quite correct. And then superimposed on the document are color codes?

A. That's correct, and there is no key to define the color codes.

Q. My question is: Have you seen this document with the color coding and the -- with the portions of the two different plans arranged the way they are on this document, have you seen this prior to today?

A. No, sir, not this document.

Q. So it would be fair to say then that you did not take into consideration what's marked for identification as Exhibit 21 in your -- the evaluation of Renda's claims leading up to your January 26, 2004, report?

Page 122

A. That's correct.

Q. Turning to what's marked for identification as Exhibit 22, do you recognize this document?

A. No.

Q. Exhibit 22 is another spreadsheet titled, "Upper Bayou Hydraulic Levees." Have you seen what's marked for identification as Exhibit 22 prior to today?

A. No, I have not.

Q. So it would be fair to say that did you not take into consideration what's marked for identification as Exhibit 22 in your evaluation of Renda's claims leading up to your January 26, 2004, report in this case?

A. Yes, sir.

Q. Now, the first item of the four specific things that you indicate in your report you considered as the Flare Area, and I'm referring to what's marked for identification as Exhibit 1, your report.

A. Yes, sir.

Q. With respect to the Flare Area, your report states, "My review and evaluation concurs with the opinions expressed by the Corps of Engineers and Renda Marine," et cetera, et cetera; have you seen that?

A. Yes.

Q. What did your review and evaluation of the Flare Area claim consist of?

Page 123

A. Review of the documents shown as Deposition Exhibit No. 4 and the contained borings inside it.

Q. Any other documents?

A. And letters and internal communication within the Corps that were in the stack of data that I looked through. Basically I was interested in the -- the conditions provided to the contractor.

Q. Now, looking at your analysis of the Flare Area claim in your report of January 26, 2004, could you describe for us the -- what are the subsurface geological properties that were not accurately represented in the boring logs and soil descriptions provided to Renda Marine when it did the project?

A. This would be the two borings in the Flare Area, 93-63 and 93-62.

MR. KOSLOSKE: Could I have this marked for identification?

(EXHIBIT(S) NO. 23 MARKED.)

Q. (BY MR. KOSLOSKE) Dr. Mathewson, showing you what's been marked for identification as Exhibit 23, these are, I'll represent to you, blowups of some of the boring logs that are contained in the contract drawings for the Upper Bayou project that are part of Exhibit, what's been marked for identification as Exhibit 4. If you'll refer -- referring you to what's Bates stamped pages Smith 41188 and

Page 124

Smith 41189.

A. All right.

Q. These are the two boring logs that you were referring to a moment ago?

A. Correct.

Q. Now, would you identify for us the subsurface geological properties that were not accurately represented in these boring logs and soil descriptions?

A. Well, you look at the sediments from -- first, if you look at the standard penetration test they imply everything is soft, weight of pipe, so there was no 130 pound hammer, just sand. If you look at the liquid limits and plastic limits compared to the moisture content, the moisture contents in the upper -- down just -- well, almost minus 50, just short of minus 50, are all very soft, and you get very stiff, and then you get stiff below that. And it was my understanding that the excavation department was minus 40 -- or minus 50, even so you would have been in very soft materials, but we -- the hard materials were all below the design project depth, or right at the base.

Q. And you're referring to log 93-62?

A. Correct.

Q. And what about log 93-63?

A. 93-63 shows very soft, some stiff, some hard and now we're at minus 50, we're back into bedrock.

Q. What are the subsurface engineering properties that were not accurately represented in the boring logs and soil descriptions provided to Renda when it bid the project?

**A. Repeat your question, what?**

Q. In your report, page one, the Flare Area --

**A. Oh, I'm --**

Q. -- you state that, "The subsurface geological and engineering properties were not accurately represented in the boring logs and soil descriptions provided to Renda Marine when they did the project."

**A. They -- they accurately presented very soft to soft conditions to the depth of burial, depth of excavation, when Renda encountered very stiff in the zone. I'm not -- the statement does not say that the boring was deceptive or incorrect, because there's no way of evaluating that.**

Q. It is what it is?

**A. It is what it is, it's field data. Now, what it shows, implies to me is that it implies to a contractor in the excavation of the Flare Area from the Corps of Engineers database that this is all soft sediment, so Renda should have anticipated soft sediment dredging, rather than very stiff and stiff conditions.**

Q. And what is your basis for understanding that -- your understanding that Renda encountered stiff or very stiff clay in the Flare Area?



**A. That would have been discussions with Mr. Erikson or Renda when I first started on this.**

Q. So you accepted that as an accurate statement for purposes of your analysis?

**A. Yes, and I had a short time frame, so that was the initial step. "What did you guys encounter," was the basic question, and then, "Is that something you would have anticipated?"**

Q. But the --

**A. Or he would have anticipated from this.**

Q. But the question, "What did Renda encounter," you relied upon the representations made to you by Renda's counsel, Mr. Erikson?

**A. And Mr. Renda.**

Q. And Mr. Renda?

**A. Yes, sir. And there may have been additional letters from -- probably were additional letters to the Corps of Engineers from Renda Marine that were in the database that expressed in writing their concerns. In fact, I know there were. So I had both the letters that were mailed to the Corps plus the conversations with Mr. Renda.**

Q. You refer in your discussion of the Flare Area to subsurface geological and engineering properties. Would you distinguish for us between what you mean by geological and engineering properties?



**A. Yes, engineering of the physical strength, the moisture content, the liquid limit, the plastic limits, geologic properties of the origin, notice the calcareous nodules in 93-63, at approximately minus 55, calcareous nodules, hard brown, this would indicate that these are Gulf Coast bedrocks rather than soft materials, recent materials in the one case and stuff that was probably subjected to desiccation and drying during Pleistocene, low stand of sea level.**

Q. And calcareous nodules occur at 50 -- minus 50?

**A. Minus 50.**

Q. That's below mean tide?

**A. That's my understanding of what this meant. And you see the same bedrock in 93-62.**

Q. Referring you to boring log 93-62, which is Bates stamped Smith 41188. This is on Defendant's Exhibit 23, do you have that in front of you?

**A. Yes.**

Q. What elevation does the first stiff or very stiff clay appear?

**A. It occurs at approximately minus 48.**

Q. And on the boring log 93-63, which is Smith 41189, at what elevation does the first stiff or hard clay appear?

**A. The stiff clay would be about minus 45.**

Q. So that according to these two boring logs, Renda



Marine should have anticipated encountering at least stiff clays at elevations of minus 45 and below?

**A. Yes.**

Q. So if Renda was dredging down to approximately 50 feet below mean tide, it could have anticipated a layer of stiff, very stiff to hard clay about five feet in width; is that correct, or depth?

**A. Anywhere between five and less.**

Q. Did I understand you to testify that calcareous nodules are an indicator of bedrock?

**A. From a geologic perspective, the Pleistocene surface, most likely.**

Q. Is it your reading of the boring logs 93-63 and 93-62, that they indicate the beginning of bedrock at a point below minus 50 and minus 60 degrees below mean tide?

**A. Did you say degrees?**

Q. Feet. I'm sorry.

**A. If you look at the material from a geologic perspective the -- the calcareous nodules, the stiffer materials, the lower moisture content are all indicative of geologic age. If you would like to put another term on it you could use paleosoil, or actually that's not -- that's close enough, it's not exact. It's the difference between the modern recent sediments over the last few thousand years and the sediments that were exposed to the atmosphere during**