Page 129

**Pleistocene, post and antecedent.**
Q. The Pleistocene sediment, do you also refer to them as glacial?
**A. No, glacial deposits would be those deposited by a glacier. We don't have glaciers in Houston.**
Q. In your discussion of the Flare Area in your report of January 26, 2004, the third sentence, you state, "As a result, Renda Marine could not predict, anticipate or expect to encounter the 'stiff clay' which resulted in reduced dredging productivity," et cetera; do you see that?
**A. Yes.**
Q. Why do you put stiff clay in quotes?
**A. Just to identify it as the -- the material that I was referring to.**
Q. Which boring logs in the contract provide relevant information for the Flare Area?
**A. Well, the two that I labeled, which were the ones off to the south side of the channel, where the area is going to be widened.**
Q. Is it your understanding that boring logs 93-62 and 93-63 were taken at or near the toe of the south bank of the Flare Area?
**A. Yes. They were taken in the center of the area that was to be enlarged for the flare, so...**
Q. And the boring for 93-62 begins at approximately

Page 130

what elevation?
**A. Approximately -- 93-62? Approximately minus 33.**
Q. And boring for 93-63 begins at approximately what elevation?
**A. Minus 44.**
Q. What do those borings indicate, if anything, about character of the materials that are at higher elevations in the adjacent bank?
**A. You mean in the area that's not represented in the borings?**
Q. I mean the area of the south bank, the higher elevations, say, from negative -- or minus 10 feet below mean tide to minus 30 feet below mean tide.
**A. They provide absolutely no information.**
Q. That being the case, would it not make sense to look at the boring logs that are in the north bank or near the north bank at higher elevations across from the south Flare Area in order to determine or predict or project the nature of the materials to be encountered in the higher elevations of this south bank?
**A. As a professionally trained engineering geologist, yes, I'd look at all the borings and try to create a three-dimensional model. I was viewing this as a contractor without a degree in geology or a license in either field.**
Q. What experience have you had as a dredging

Page 131

contractor?
**A. As we stated earlier, none.**
Q. You've never prepared a bid estimate on behalf of a dredging contractor?
**A. No.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 24 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 24. Take a moment and review what's been marked for identification as Exhibit 24 and can you tell us whether you've seen this before?
**A. No, I have not seen this before.**
Q. Do you know who Leon Hrabovsky is?
**A. No, sir.**
Q. That's, for the record, H-R-A-B-O-V-S-K-Y. Defendant's -- excuse me -- Exhibit 24 is an email from Mr. Hrabovsky to Al Jefts, Subject: Renda Differing Site Condition Claim. The final paragraph reads, "Since borings 3ST-6 and 3ST-4 were taken on the opposite bank, that is east side, it would be more realistic to use these borings to identify high bank material. They are only 500 to 700 feet from borings 93-63 and 93-62." Do you see that?
**A. Yes, I do.**
Q. And that basically expresses the sentiment that

Page 132

you said you would have as a geotechnical person; is that correct?
**A. Right. I don't know who this person is, so I don't know, you know, what his background is.**
Q. I believe you testified a moment ago that as a geotechnical engineer you would be interested in looking at not just 93-62 and 93-63, but also other borings in the Flare Area; is that correct?
**A. Correct. I would -- an engineering geology site characterization, you would take in all the information.**
Q. Would you be surprised to find that Mr. Hrabovsky spent most of his career as a dredging contractor?
**A. Not necessarily. Depends on where he spent most of his career.**
Q. You testified that -- I'm sorry, strike that.
In your discussions with Oscar Renda prior to issuing your January 26, 2004, report, did Mr. Renda indicate to you or state to you what or how a reasonable dredge contractor would use boring logs for the Upper Bayou project?
**A. No, I never discussed it with him.**
Q. In your evaluation of the Flare Area claim, did you attempt to determine how Renda went about predicting or projecting soil conditions in the Flare Area at time of bid?
**A. I don't recall discussing that with him.**

Case 1:02-cv-00306-ECH Document 149-12 Filed 12/14/2004 Page 2 of 10



MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 25 MARKED.)
Q. (BY MR. KOSLOSKE) Dr. Mathewson, showing you what's been marked for identification as Exhibit 25, would you take a look at this document and tell us whether you recognize it?
**A. Yes, I've seen this letter, that is Exhibit 25.**
Q. It's a letter dated October 13, 1999, from Eddie Fisher of Renda Marine to the Army Corps of Engineers; is that correct?
**A. That's correct.**
Q. When did you see this document initially?
**A. I may -- I think I saw it after I finished my January report. I believe it was in the stacks of information I was reading through in continuing to study.**
Q. Directing your attention to the first page of Exhibit 25, to the fifth paragraph, the penultimate paragraph on that page.
**A. Starts with, "As we are now approaching"?**
Q. Correct. And directing your attention to the third sentence of that paragraph it reads, I quote, "After completing the north half of Section 3 we will dredge across to the flare portions of Sections 4, 5 and 6." And then the letter continues, "These areas contain as much as 400 cubic



yards per lineal foot, and also consist of very soft clays except for the section beginning in Section 6," and then there's a footnote at the end. The footnote, small Roman numeral iv; do you see that?
**A. Yes.**
Q. If you turn to the second page that footnote says, "See borings number 93-62, 3ST-4, 3ST-5 and 93-63."
**A. Right.**
Q. So in this letter Mr. Fisher is referencing not just borings 93-62 and 93-63 when he's characterizing what he expects to encounter in the Flare Area, but borings 3ST-4 and 3ST-5 across the way towards the north bank as well; is that correct?
**A. Yes.**
MR. ERIKSON: While you look for the next document, can we take a short break?
MR. KOSLOSKE: Sure.
(Recess from 2:41 to 2:50 p.m.)
MR. KOSLOSKE: Back on the record.
Q. (BY MR. KOSLOSKE) Would you turn to what's marked for identification as Defendant's Exhibit -- or excuse me -- as Deposition Exhibit 23?
**A. All right.**
Q. And would you turn to the boring log that is Bates stamped Smith 41112, log 3ST-5; do you see that?



**A. Yes.**
Q. What elevation does the hard or stiff clay begin?
**A. About plus 10.**
Q. And it runs from plus 10 to what elevation?
**A. Runs plus 10 to minus 50.**
Q. That's all stiff or hard clay?
**A. Some of it's medium stiff, but it -- it all falls into what would be called --**
Q. Stiff clay?
**A. Yes.**
Q. So basically from top to bottom, stiff clay?
**A. Yes.**
Q. And directing your attention to the page of Defendant's Exhibit 23 that's Bates stamped Smith 41111, boring log 3ST-4.
A. Correct.
Q. At what elevation does the first stiff or hard clay appear?
**A. You get into about minus 28.**
Q. And the stiff clay, at what elevation does it end?
**A. Minus 32 there's soft dark gray.**
Q. So from minus 28 below mean tide to minus 32 there's stiff clay?
**A. Yeah, there's a thin layer there of a clay with sand and --**



Q. What is the next elevation after that at which stiff or hard clay appears?
**A. If these are approximate two-foot sections it would be the next one down, you get hard.**
Q. At what elevation?
**A. That would have been 34 probably, 36.**
Q. And how far does that layer of hard or stiff clay extend?
**A. That continues down to minus about 52, 54.**
Q. Okay. Now, in your report which is Exhibit 1 you state that, in your discussion of the Flare Area, "As a result, Renda Marine could not predict, anticipate or expect to encounter the 'stiff clay' which resulted in reduced dredging productivity and increased operational time to place and handle the dredged materials at the Lost Lake Placement Area." See that?
**A. Correct.**
Q. What did you do to determine that the productivity of the dredge was reduced?
**A. That was in the initial questions with Renda, why was the Flare Area of significance. That was their problem, so my question then was what information do I see in the bid documents that would lead to my conclusion.**
Q. What, if anything, did you do apart from conversations with Renda's representatives to determine that

Page 137

the productivity of the dredge Millenium was reduced in the Flare Area?

A. **That was just their statement.**

Q. So you accepted that as fact for purposes of your analysis?

A. **Yes.**

Q. How did the stiff clay affect the productivity of the dredge?

A. **If you were anticipating soft to very soft materials, you're going to be able to take a deeper bite with a cutter head dredge, you're going to have less shearing resistance. When you go to a stiff or hard clay you've got greater sheering resistance, so the depth of cut has to be reduced in order to run the dredge.**

Q. In order to actually perform the excavation or to transport the material?

A. **Perform the excavation, so you're not getting as much material, because your cut depth is less.**

Q. Have you reviewed the operating characteristics of the cutter head for the dredge Millenium?

A. **No.**

Q. What, if any, calculations did you make as a part of your review and evaluation of the Flare Area claim?

A. **None.**

Q. Have you performed any tests or caused any tests

Page 138

to be performed relative to the Flare Area claim?

A. **No.**

Q. Let me turn to the South Ferry Landing claim. In your report that's Exhibit 1, at the bottom of the first page and then continuing into the second page, your report reads, "The incorporation of the bathymetric data for the North Lynchburg Landing in the contract documents provide unnecessary and misleading information about the dredging conditions to be anticipated at the South Lynchburg Landing," do you see that?

A. **Yes.**

Q. What are the bathymetric data to the North Ferry Landing to which you refer?

A. **The water soundings, depth of water.**

Q. What is the unnecessary misleading information about dredging conditions to be anticipated at the South Ferry Landing that results from incorporating the bathymetric data for the North Ferry Landing in the contract documents?

A. **It's outside the project boundary. There's no construction work or contract work in that area, and so it provides absolutely no information.**

Q. How is that misleading to a dredging contractor such as Renda?

A. **Well, one interpretation is that you look at it and say, well, okay, we don't know anything about south, kind**

Page 139

**of, and then just go on. That would be one way of it being misleading. Why are you giving me all this data on the north side and what do you expect me to infer from it with respect to a project on the south side, and if the two are not -- this is not even in the project, then it's not telling me anything. It's an extra page I've got to spend time studying. So the question in my mind would be what did they provide this for? What are they trying to imply?**

Q. So the drawing of the North Ferry Landing -- I think that's drawing C6 --

A. **That's correct.**

Q. -- has the potential to be misleading; is that right?

A. **Correct.**

Q. What evidence do you have that Renda Marine, in fact, was misled by anything contained in drawing six at the time of its bid on the Upper Bayou project?

A. **The fact that it was misleading was my opinion, because I was misled by it, as I reviewed the documents in terms of Renda's reported problems with debris and rocks and stuff on the South Ferry Landing, I went to this drawing, my first reaction is they don't have a claim. Here's all the rocks. Oops, that's the wrong side of the river, and outside of the project.**

Q. Then how were you misled by the drawing?

Page 140

A. **Because I started to review this, because this is the only bathymetric soundings as a result of surveys, et cetera, and so, okay, maybe north is the wrong side, then you find the north area, and wait a minute, this tells me absolutely nothing.**

Q. What does drawing six indicate about conditions at the South Ferry Landing?

A. **Absolutely nothing. And, in fact, might lead somebody to say, "What are they hiding?"**

Q. You say might, but you don't know?

A. **I don't know. No, I would look at it and say, "Okay, where is the south data? Number one, if the Army has this much good data for the north side, why didn't you provide me the south side in the bid documents? Is this a clerical error or is this an intent to deceive? We'll show them a limited amount of stuff, let them bid low and then we'll hit them with the reality later on."**

Q. Would you have called the Corps of Engineers prior to submitting the bid and asked them why they included drawing six in the plans and specifications?

A. **That's one possibility and I don't know whether the call was made. I was looking at what they had. And...**

Q. But you haven't attempted to discover what Renda's bid estimate for the Upper Bayou project was to determine whether, in fact, at the time of bid Renda Marine was misled

Page 141

by anything contained in drawing six, are you?
A. No, I have not looked at what Renda wrote or -- other than just the question about what happened on the South Landing.
Q. Well, if you were attempting to determine whether Renda was misled by anything in drawing six, wouldn't you have to look at Renda's pre-bid papers and analysis for the project?
A. If I was going to do it in more detail than what I was doing, which was to look at these documents, say where did they fail.
Q. Were you told to make a more limited review and determination of the South Ferry Landing differing site condition claim?
A. I don't understand your question. Was I told what to do? No.
Q. I believe you alluded to in your answer if you went into more detail you would perhaps have looked into Renda's bid estimate?
A. No. I'm sorry. I'm sorry. If -- just as I answered in the Flare Area, as an engineering geologist this comes to mind immediately, where's the other half, if you've got this data you're hiding the other data or you've got an error, and I would have asked the Corps for it. I looked at it and said given this information, what would a person do

Page 142

with it, and I had only the information that was in here, some of the specification documents, and, you know, did an initial evaluation. So that expresses my opinion that this is or could be misleading.
Q. And you would have asked the Corps about it prior to bid?
A. Had I been doing the consulting for the Corps or for anybody, if I reviewed it for the Corps, I would say you've got an error.
Q. If you had been retained by a dredging contractor for -- pre-bid, for purposes of performing a site investigation or evaluating the contract plans and documents, you would have contacted the Corps or advised your client to contact the Corps for an explanation as to why drawing six was included in the plans and specs; is that correct?
A. Yes.
Q. Do you know what a type one differing site condition is, Dr. Mathewson?
A. That's a classification, no, I don't.
Q. Do you know what a type two differing site condition is?
A. No.
Q. Do you know how Renda analyzed the differing site condition that is the subject of the South Ferry Landing claim in its written claim presented to the Corps of

Page 143

Engineers?
A. No, I do not.
Q. Do you think it would be worthwhile to know whether Renda presented it as a type one or type two differing site condition in order to know whether it had any merit?
A. I have no way to answer that question.
Q. Why not?
A. Because you have not defined type one, type two, type 77. Are you looking for the --
Q. I showed you earlier an exhibit that had a --
A. The quantities from the Federal Government contract, all right, okay. I would have to refer to that -- here it is, Deposition Exhibit 7, counselor.
Q. I have it, thanks. Exhibit 7, the first page, sets out the text of the differing site conditions clause, and subparagraph A reads, and I quote, "The contractor shall promptly and before the conditions are disturbed, give a written notice to the contracting officer of, one, subsurface or latent physical conditions at the site which differ materially from those indicated in this contract or, two, unknown physical conditions at the site of an unusual nature which differ materially from those ordinarily encountered and generally recognized as adhering in work of the character provided for in the contract." Do you see that?

Page 144

A. Yes.
Q. In that subparagraph A, item number one, I'll represent to you is what is referred to as a type one differing site condition and item number two is what's referred to as a type two differing site condition.
A. That's interesting new information. It's not even in here, so -- I mean, it's not explained, but go ahead.
Q. Did you review the South Ferry Landing claim as a type one differing site condition or a type two differing site condition?
A. I would say it would fall under either. It's a subsurface or latent condition at the site which differ materially from those indicated. Nothing is indicated, it must be pure water, or two, it's unknown physical conditions at the site of unusual nature. Nothing is indicated. So it could be either. There's no information provided.
Q. Well, it says, "Of an unusual nature which differ materially from those ordinarily encountered and generally recognized as adhering in work with the character provided for in the contract." How did you apply that part of the test?
A. Well, if there is no information, the implication is there is nothing to worry about. If I was going to do -- if the Corps of Engineers does not have this information for the South Ferry Landing or the Coast Guard or somebody

Page 145

**doesn't have the information, then the implication is there's no need to survey. Look at...**
Q. Now, I'd like to turn now to the Section 7 clay claim. This is discussed as item three at page two of your report, which is Exhibit 1.
**A. Yes.**
Q. You stated in the beginning of that analysis that "Renda Marine encountered a 'very stiff red clay' while dredging in Section 7, approximately between stations 565+00 and 580+00." Do you see that?
**A. Yes.**
Q. Why do you put quotation marks around "very stiff red clay"?
**A. To identify it as I did earlier in other cases. Basically a quote of Renda's description.**
Q. Now, at the first page of your report, the item for Section 7 -- well, the report states, "You have asked me to limit my evaluation to four specific sites defined in this project," one of which is Section 7, you say parenthetically, approximately station 565 and 580. You mean approximately between those stations?
**A. Yes.**
Q. What does the Section 7 of the Upper Bayou project consist of, what are the beginning and ending stations?
**A. I'd have to look at the reference.**

Page 146

Q. Do you have Exhibit 4 in front of you?
**A. Yes. Section 7 on sheet C3 ends at 580+00, that's the next line, and starts at 554+00. And then it continues from 580+00 on sheet C 2, at station 612+00, where Section 7 ends.**
Q. So you performed an analysis of the -- whether Renda encountered stiff or very stiff red clay between or only for a portion of Section 7; is that correct?
**A. That's correct, that was the area that was identified as being a concern.**
Q. Now, you have -- turn to Defendant's -- excuse me -- Deposition Exhibit 13.
**A. I have Deposition Exhibit 13.**
Q. Okay. This is an April 16, 2001, letter from Steve Bowman of Renda Marine to Tom -- Thomas Benero, Contracting Officer for the Corps of Engineers. This is Renda's written claim for the Section 7 clay claim. The first paragraph reads, "Attached for the government's review is the Renda Marine, Inc., (RMI) request for equitable adjustment, (REA) of the contract price for differing site conditions encountered while dredging in Section 7." And then parenthetically it reads, "(between stations 561+20 and 609+00 during the period between October 2, 2000 and November 6, 2000"; do you see that?
**A. Yes.**

Page 147

Q. So is the statement by Renda of the stations covered by a Section 7 claim consistent with the scope of what you were asked to look at?
**A. They defined where all of Section 7 was in their letter. Section 7 starts at -- this one looks like it's a hand-penciled note on C-3 that says 554+00 to 609, which is the other page, and this is labeled 612+00. I do not know who wrote the notes on it, but I see where station 610 is and, in fact, their numbers in the Corps' claim don't match.**
Q. Now, your analysis of the Section 7 clay claim then is limited to the properties of the soils materials between stations 565 and 580?
**A. That's what I was asked to look at, yes.**
Q. Do you know where Renda encountered stiff red clays within Section 7?
**A. Not exactly, no.**
Q. What is your basis for concluding that Renda encountered stiff red clay in Section 7?
**A. Discussions with Oscar Renda.**
Q. So you accepted the statement as true for purposes of your analysis?
**A. Yes.**
Q. Now, the second page of Exhibit 13, Renda's written claim on the Section 7 red clay, at the top of the page, contains a statement, "In short RMI" --

Page 148

**A. Just a moment. Oh, second, okay, "In short, RMI encountered."**
Q. -- "encountered hardpan, red clay, which we have explained in meetings and in correspondence, is very difficult to dredge through." Do you see that sign -- that statement?
**A. Yes.**
Q. What is hardpan?
**A. Hardpan would be basically clay material that would behave brittle, it may be clay size, but it would be a hard material with a brittle characteristic.**
Q. Is hardpan, in your view, the same thing as what you characterize in your report as very stiff red clay?
**A. No.**
Q. What's the difference?
**A. The hardpan is more brittle. Stiff is more viscous.**
Q. Do you know -- do you have an opinion as to whether hardpan or very stiff clay is -- which is more difficult to excavate?
**A. You're going to get very different properties in excavation. In hardpan you're going to get a lot of bouncing. In a stiff clay you're going to get a lot of peeling. You'll get long noodles.**
Q. And it's your understanding that in the Section 7

Page 149

clay claim Renda was getting a lot of peeling or long noodles?
A. **Yeah, my understanding was they had stiff material that was giving them dredging problems and they had to take thinner cuts, but more continuous cut.**
Q. Do you agree that the soil borings for the north reach of Section 7 show stiff or hard clays?
A. **Correct. Did not show red.**
Q. Have you done any testing to verify Renda's claim with respect to Section 7 clay?
A. **No.**
Q. Do you know whether Renda had any of the alleged hardpan red clay tested by a soils laboratory?
A. **I have no knowledge.**
Q. At the time of the excavation of the material that's the subject of Section 7 red clay, could Renda have performed any in situ testing or made any cores of material in the areas where it was excavating and sent that to a laboratory for analysis?
A. **They could if they wanted to absorb the expense. I'm not sure that they would.**
Q. But that's certainly one way of determining pretty clearly what the characteristics of the material were; right?
A. **That's one way. You can also do it by equipment performance.**

Page 150

Q. Of course, with equipment performance, you have other potential factors for poor productivity, such as operator errors and that sort of thing; correct?
A. **If it's the same operator, probably you're going to get the same procedures. If they're changing operators on a regular -- irregular schedule, then maybe you've got a problem.**
Q. Or your production could vary depending on whether you had a booster pump that was operating or not?
A. **The production in this case wasn't concerned about the booster pump. That's the ability to get the stuff out of the pipe. It's the depth of the cut and the amount of shearing resistance against the cutting head that's of concern.**
Q. In your opinion, as far as the Section 7 clay claim was concerned, that Renda's progress was slowed by the added difficulty of actually cutting or excavating the material, not by transporting it?
A. **Cutting and then if the material doesn't -- if the material creates an unusual clay ball or a shape or form, then it would impact further down the line, but your first indication is going to be what's happening in the cutter head.**
Q. What evidence do you have that Renda actually experienced additional difficulty excavating red clay versus

Page 151

the stiff or very stiff blue or gray clays that are also indicated in the borings?
A. **Same basis in the report, the discussions with Mr. Renda the day I was in Dallas.**
Q. Did you ask to speak to the leverman or a leverman who was on the dredge during the time covered by the Section 7 red clay claim?
A. **No.**
Q. Why not?
A. **Because the excavation properties relationship are a machine question.**
Q. What soil classification does the color of red indicate?
A. **It provides no -- no classification. It's a way of differentiating clays that are oxidized from clays that are reduced.**
Q. What is the shear strength of the Pleistocene, glacial red clays to which you refer in your report?
A. **It would depend on the materials. I don't -- I haven't measured them.**
Q. What is the shear strength of the younger marine clays that are referred to in your report?
A. **They would be much lower. They haven't been desiccated.**
Q. How much lower?

Page 152

A. **They would be probably in the soft to low strength, rather than the stiff and hard.**
Q. What would be the difference between the shear strength of the Pleistocene or glacial red clays referred to in your report and the stiff or very stiff blue or gray clays that are shown in the soil borings for the Section 7?
A. **You would have to test them. They -- one possibility is the blue or dark gray clays which indicate reduction, reducing condition were not subjected to oxidation, desiccation, grinder and exposure, so they were subsoils to the Pleistocene surface and would have a higher plasticity, more of a plastic material than a stiff material or hard material.**
Q. We don't have any comparative testing of the shear strength, for the shear strength of the Pleistocene, glacial red clays referred to by you in your report and the stiff or very stiff blue or gray clays that are shown in the borings, do we?
A. **That's right. The Corps didn't report it, so they didn't test it.**
Q. And neither did Renda?
A. **And neither did Renda.**
Q. Now, I believe in your report you indicate at the end of your discussion of the Section 7 clay claim, "These 'red clays,' however, would be a superior material for the

Page 153

construction of the foundation of the levees at the Lost Lake Placement Area."
A. **Correct.**
Q. Do you know what Renda did with the soils materials that are the subject of the Section 7 clay claim?
A. **No. I'm sorry, correction. I believe they stockpiled them.**
Q. Would there have been any -- strike. I'll rephrase.
Once the materials that are the subject -- that were the subject of Renda's Section 7 clay claim were transported to and deposited at the Lost Lake Placement Area or stockpiled there, would there have been any point to testing the material from the stockpile to determine whether it was classifiable as hardpan, red clay as Renda alleges?
A. **No, because it changed environment. It's in a different setting. It's been disturbed, it's been exposed to the atmosphere, so you'll get an erroneous result.**
Q. So the only accurate way of testing the assertion by Renda as to the nature of the material would have been to have taken an in situ core boring and sent it to a soils laboratory for analysis?
A. **No. You could have taken a clay ball off the end of the dredge, because it's never been exposed to the atmosphere. You could have sampled what they were actually**

Page 154

**dredging.**
Q. Could have taken a clay ball from the stockpile?
A. **No, from the pipeline as it came out.**
Q. Right as it came out, take a clay ball and send it to a lab?
A. **It will be disturbed mechanically, so it's not necessarily undisturbed material, but the center of the clay ball should be fairly undisturbed. The outside has been rounded off, so you may be able to get some feel for its mechanical properties in that manner.**
Q. What would it have cost to have sent a clay ball such as you've described to a soils laboratory for an analysis of the kind of material that it is, its characteristics?
A. **I probably wouldn't even necessarily send it to a soils lab. If I was the construction inspector for the Corps, I'd just put a vein/shear device in it, see what it shows up as shear strength, and then I can compare it to the core borings, but that would have required some knowledge as geotechnical engineer and soils testing practice or geology, engineering geology.**
Q. So if there was no one on-site that had that ability, then the better practice would be to send a clay ball to a soils laboratory and let an experienced geotech type person, someone who's experienced with classifying

Page 155

soils, take a look at it or test it?
A. **Well, no one on-site, you mean provided by whom? Corps of Engineers or Renda? I mean, I don't follow your question, I guess, counselor. That's what I lost.**
Q. Do you assume that there were personnel at the Lost Lake Placement Area that had the ability to perform the kind of tests or make the kinds of geotechnical judgments about the characteristics of the clay balls that were generated by the area of the project that is the subject of the Section 7 clay claim?
A. **I would certainly have assumed the Corps had their inspection -- construction inspection people there and if Renda had followed the differing site conditions, the Corps knew they were in the different stuff, they should have sent somebody out there to grab a sample. I mean, that's, again, counselor, only an assumption, but if you think about the construction inspector, isn't that what they're supposed to be doing?**
Q. I don't know, is that your opinion?
A. **I don't know, counselor. That's my opinion. I've been an inspector of construction.**
Q. What would it have cost for Renda to have sent a sample to a lab for analysis? I mean, you've been in this business a long time. You must have some idea.
A. **Probably a hundred dollars or less. If you did a**

Page 156

**vein/shear, it would have been less, do it right on-site, so it wouldn't have been time and travel for the expert or their consultant.**
Q. Now, if it doesn't make any sense to -- because of the material being disturbed and so on to take a sample of the stockpile material for testing, in your opinion, was it reasonable for Renda to stockpile a couple of hundred thousand cubic yards of the material and wait for the Corps of Engineers to perform a test on it?
A. **I cannot answer that question. I don't know what Renda's thinking was at the time they encountered the problem.**
Q. You mentioned that -- or in your report you state that this material, at least as described to you, sounds like it was excellent material for levee building; correct?
A. **Correct.**
Q. Can you think of any reason why Renda wouldn't have transported the material and placed it hydraulically along the new levee that was being built?
A. **I have no idea what -- what their thinking was about what to do with that clay.**
Q. Do you have an opinion in this case as to whether stockpiling the red clay or whatever the material was in compliance -- was in compliance with the contract, the Upper Bayou project contract?

Page 157

A. **No.**
Q. Is it your opinion that a construction inspector is normally a person who's qualified to perform a vein/shear test?
A. **I'm sure there's a qualified person in the Galveston district, so a construction inspector would have picked up a sample and said, "Renda says this stuff is different; is it?"**
Q. Turn to the Lost Lake Levee claim, which is item four of your report, the discussion of it appears at the bottom of page two of your report that's marked Exhibit 1. Dr. Mathewson, do you agree that the contract documents for the Upper Bayou Project indicate the soil conditions along the footprint of the new perimeter levee were soft to very soft?
A. Yes.
Q. Now, you didn't visit the Lost Lake Placement Area before issuing your January 26, 2004, report; correct?
A. **Right.**
Q. Have you performed any calculations in evaluating the Lost Lake Levees claim?
A. **No, I have not.**
Q. Have you performed any side slope stability analysis?
A. **No, I have not.**

Page 158

Q. Have you performed any settlement analysis?
A. **No, I have not.**
Q. Have you performed any subsidence analysis?
A. **No, I have not.**
Q. Did you perform or cause to be performed any testing relative to the Lost Lake Levees claim?
A. **No, I did not.**
Q. What was the impossible condition that resulted from the side-cast borrow areas?
A. **The side-cast borrow areas created a break in the harder desiccated surface and allowed then the shear stresses to escape against an area that had lower shear strength.**
Q. Is it your understanding of the design for the perimeter levee at the Lost Lake Placement Area of the Upper Bayou project area that the -- the new perimeter levee foundation was to be the existing layer or crust of foundation material at the site?
A. **Yes. Was to be placed on top of that and built up from there.**
Q. Did you perform a displacement analysis in connection with your evaluation of the Lost Lake Levees claim?
A. **No, I did not.**
Q. Wasn't the design of the hydraulically constructed levees at the Lost Lake Placement Area, didn't it call for

Page 159

displacement of the soft to very soft foundation materials that the contract indicated were present along the footprint of the new perimeter levee?
A. **I believe it anticipated some displacement of those soft materials. The contractor should expect them, expect displacement.**
Q. How did you determine that the side-cast borrow areas resulted in an impossible condition?
A. **Because of the properties of the -- of the soft materials given in the boring logs and the way in which it was loaded and the height at which it was loaded and the speed with which it was loaded and the presence of significant pressure head on the groundwater -- the water system.**
Q. What is your understanding of the height to which the new perimeter levee at Lost Lake was raised by hydraulic placement of fill?
A. **My understanding -- sorry, sir, did you finish the question? My understanding was the contractor was to raise it to 30 feet, plus 30.**
Q. Where were the side-cast borrow areas located in relation to new perimeter levee?
A. **They were on the outer -- mostly on the outer flange. If you think of the levee, the existing levee provided the buttress against failure into the Buffalo Bayou,**

Page 160

**so the inside portion of the levee, about 50 feet or less, the reach of a long arm excavator, to pick up the dry crust and to put it up to build up the levees.**
Q. Do the contract documents indicate the presence of side-cast borrow areas?
A. **I couldn't find any.**
Q. How do you know where the side-cast borrow areas were located?
A. **Just once I heard about the side-cast borrow areas, then the standard procedure how you build up the levees, by stealing the dry material from inside.**
Q. How far were the side-cast borrow areas from the -- from the crown of the new levees to be constructed?
A. **Probably near the -- near the crown or just to the outside edge of the crown, right at the highest load point, and I don't have a drawing, and I don't have any drawings of pre-construction side-cast levees.**
Q. Dr. Mathewson, I'm going to give you a blank piece of paper and I'm going to ask you if you will to draw for us what you've just described in response to my question as to what your understanding is of the location of the side-cast borrow areas in relation to the crown of the new perimeter areas to be constructed at Lost Lake.
A. **(Witness complies.) That's not quite to scale.**
MR. KOSLOSKE: I'm going to have this marked

Page 161

for identification.
(EXHIBIT(S) NO. 26 MARKED.)
**A. Counselor, can I make one more addition to that?**
Q. (BY MR. KOSLOSKE) Yes.
**A. One thing I did not show in here.**
Q. We've had marked for identification as Exhibit 26 a diagram drawn by Dr. Mathewson, and we'll make copies of this at a break.
Dr. Mathewson, what is your understanding of where the side-cast borrow areas were -- strike that.
Is it your understanding that the side-cast borrow areas were located along the footprint of the east, west and north levees?
**A. Define what you mean by along the footprint. You mean paralleling the existing levee or --**
Q. No, along the footprint of the new perimeter levee.
**A. You mean within the footprint?**
Q. Right.
**A. Yes, it's my understanding that the distance from the edge of the existing levee to the borrow area was less than the distance of the design footprint for the new levee.**
Q. Is it your understanding that the side-cast borrow areas were on a continuous line adjacent to the existing levee, on a continuous line for the entire area where the

Page 162

hydraulic levees were to be built?
**A. I don't have any knowledge. I would assume that in spots, there are sections of it where they were repairing the levee and there were sections where the side-cast borrow area would not exist or would not have existed -- or may have existed from a long ago previous time.**
Q. What is your understanding of Renda Marine's construction sequence to raise the levees to elevation 30 feet above mean low tide?
**A. Well, the first phase was a mechanically placed section, and then they went into the hydraulic dredge placement process where they built out, and then proceeded around the side.**
Q. My question is addressed to the hydraulic construction, the portion of the new perimeter levee that was to be constructed by hydraulic placement of fill.
**A. Okay.**
Q. What is your understanding as to the construction sequence used by Renda to build or raise the levees hydraulically to elevation of 30 feet?
**A. They would have strung their dredge pipe out and discharged the dredged material about where the crown of the new levee should be, and then you need a piece of machinery that moved the sediment away from the discharge pipe or it plugs everything up, so you're trying to distribute it as**

Page 163

**you're going, as technique they used to build it. I don't know what you mean by sequence.**
Q. Is it your understanding that the sequence to construct the levees that were to be constructed hydraulically the sequence that was used by Renda or the construction technique, to use your term, was the same for the east levee to west levee and the north levee?
**A. I have no data on what they may have changed.**
Q. Do you know where the borrow areas, the side-cast borrow areas at Lost Lake Placement Area were excavated with backhoe or dragline?
**A. I don't know. Either piece of equipment would have done it.**
Q. Do you know where the excavator was positioned?
**A. It was positioned on -- near the base of the -- at least from those areas I saw when I was there, it would have been positioned near the base -- inside base of the existing levee.**
Q. Would have been -- would the excavator have been positioned on mats?
**A. Probably to distribute the load even better so it wouldn't sink out of sight.**
Q. Was that on compacted or hard?
**A. That would have been on hard, but as soon as you put the mats down you're compacting it, so continued use of**

Page 164

**that dragline pad or excavator pad would have compacted the inside part right at the base of the existing levee.**
Q. What were the dimensions of the side-cast borrow areas?
**A. I have no idea. They were not provided for the contractor.**
Q. You don't know how deep they were?
**A. No.**
Q. You don't know how wide they were?
**A. No. They were all buried and never documented, at least never provided.**
Q. You state in your report that, "Renda experienced significant 'material loss' through displacement of low strength material that had refilled the side cast borrow areas"; is that correct?
**A. That's the beginning of the problem. Then they're displacing -- you've now created a failure plane so you squeeze everything out with it.**
Q. How much material loss did Renda experience through displacement of low strength dredged material that had refilled the side-cast borrow areas?
**A. Well, not only that, but also it starts the failure of everything underneath, so it's more than just what refilled the borrow area. That was the trigger or the weak spot. I may have -- may have a misstatement in my report in**

Page 165

that sense. You have the displacement of the whole thing.
Q. How did you determine that there was a displacement of the whole thing?
A. From the -- well, one would be just the basic mechanics of this process. Once you start materials fluid flowing, they keep flowing, as long as there's a pressure gradient, so that would be one, and the other one is the fact that they were unable to dredge enough material to complete the project. And the other one was obviously Renda's statement and some photographs he showed me about the -- the mud wave problem.
Q. Did Renda Marine experience any difficulty with side-cast borrow areas in the construction of the east levee?
A. I have no knowledge.
Q. Do you know what method of construction Renda used to build the east levee?
A. Unless it was mechanical, it would have been a hydraulic dredge of some form.
Q. Do you know which one it was?
A. No.
Q. Do you know which methods of construction Renda used to build the north levee?
A. Hydraulic dredge placement.
Q. Is it your opinion that mechanical construction of levees was a better method of constructing the new perimeter

Page 166

levee than the hydraulic placement method indicated by the contract?
A. From a mechanical point of view probably yes, because you can control thin lifts, you don't have lots of water, so you have much lower, poor water pressure. From an economic point of view, the volume of material placed by a hydraulic dredge exceeds the volume of material you could move by trucks, so in the economics of dirt moving it's the cost per cubic yard of dirt moved that makes the difference.
A hydraulic dredge will move far more material per unit of time of operation than a mechanical method, but a hydraulic dredge is harder to put -- in fact, it's almost impossible to put thin veneers in an economic manner, so the method of loading on the subsoil conditions by hydraulic dredging is extremely rapid compared to mechanical, and mechanical, you could have loaded the toe and controlled your soil fill with low ground pressure equipment, even long arm and reversing of dragline buckets so you can fill the hole with dry material outside, that you cannot do with hydraulic dredging.
Q. Do you know whether Renda employed that construction technique at the Lost Lake Placement Area?
A. I don't -- no, I don't know that they did, but I don't think they did, because they were doing hydraulic placement.

Page 167

Q. Well, does the higher fill placement to elevation 30 feet above mean low tide create more pressure on the soft soils foundation?
A. Yes, both normal, low and poor water pressure.
Q. Would raising the perimeter levels to 20 feet above mean low tide result in less displacement of soft foundation material than if the levees were raised to 30 feet above mean low tide?
A. It would depend on the properties. If the material is a viscous fluid, you would probably get less displacement, but may not be significantly less. Once you get failure water runs downhill.
Q. Did you make a determination of the properties of the material at Lost Lake?
A. No. Other than described by the Corps in the construction documents, in the bidding documents, very low strength, very soft. And some of them are what are classified as a viscous fluid.
Q. What are some of the techniques for minimizing displacement of foundation materials during hydraulic placement of fill?
A. Don't place it over very soft material. You could have placed that on the original ground surface and then your concern would be training levees to prevent it from spreading out all over the world, if you had a competent basement. If

Page 168

you were building the Lost Lake project new on a hard surface, even a modern soil surface, because you could confine the fluid material from running into the bay and direct it to the inside and control fluids. Now, as soon as you get softer materials, then you're going to have to concern yourself with the loading rates.
Q. What are training dikes?
A. That would be a means of confining the fluid, the mud, in essence, the suspended sediments that would cause environmental problems if they got into the open environment, and would confine -- or limit the -- the spreading out onto the inside, so you move them parallel, just keeping the fines and the clays moving out of the way.
Q. Is one purpose of the training dike to prevent fines from running off to the interior of a dredge disposal facility during hydraulic placement of fill?
A. Yeah, that's exactly what I said. You use a confining levee to keep the fines moving along the construction zone, rather than -- and you'd also use it to create a barrier so that the fluid -- the fluid material has something to stop against to allow it to form the foundation to build the rest of the levee.
Q. Do you have an understanding of whether or not Renda constructed or caused to be constructed training levees for purposes of the hydraulic construction of the new