COPY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO LIMIT TESTIMONY BY PLAINTIFF'S EXPERTS

Defendant, the United States, respectfully requests that the Court limit the scope of testimony of the three trial experts designated by plaintiff, Renda Marine, Inc. (Renda) – Christopher C. Mathewson, Ph.D., P.E., Robert McCullough, P.E., and Mr. Benton Goodloe – in the manner and for the reasons stated below.

The Court "acts as a 'gatekeeper to exclude expert testimony that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case." Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1391 (Fed. Cir. 2003). Under Fed.R.Evid. 702,[1] the Court is assigned the task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)). Rule 702 applies not only to scientific testimony but also to expert testimony based on technical or other specialized knowledge. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147-49 (1999).

---

[1] Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."



EXHIBIT N

The Court's gatekeeping responsibility is two-fold. First, the Court "must determine whether the proffered testimony rests on a reliable foundation – that is, whether the expert's testimony is 'ground[ed] in the methods and procedures of science' and consists of 'more than subjective belief or unsupported speculation.'" Donnelly v. Ford Motor Co., 80 F.Supp.2d 45, 48 (E.D.N.Y. 1999) (quoting Daubert, 509 U.S. at 590). "Ultimately, it is the role of the trial court as gatekeeper to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Donnelly, 80 F.Supp.2d at 49 (quoting Kumbo Tire, 526 U.S. at 152).

The second part of the Court's gatekeeping responsibility is "to determine whether an expert's testimony is 'relevant to the task at hand,' namely, whether the expert's reasoning or methodology can be properly applied to the facts before the court." Donnelly, 80 F.Supp.2d at 49. In order to determine whether the expert's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702, "the testimony must not only be reliable but must be relevant in that it 'fits' the facts of the case." Donnelly, 80 F.Supp.2d at 49 (quoting Daubert, 509 U.S. at 591).

A. Christopher Mathewson, Ph.D., P.E.

(1) Opinions Re: Legal Matters

The written report of Dr. Mathewson, pursuant to RCFC 26(a)(2)(B), contains opinions regarding four of Renda's Flare Area, South Ferry Landing, Section 7 Clay, and Lost Lake Levees claims. Mathewson Report, at 1-3, Def. App. 1-3.[2] Dr. Mathewson opines that each of those

---

[2] "Def. App. ___" refers to the referenced page(s) of the appendix to this response.

"sites" "represents a true differing site condition in which the contract documents failed to report the actual natural or man-made condition." Mathewson Report, at 3, Def. App. 3. Whether a condition encountered by a contractor, such as Renda, constitutes a "differing site condition" turns upon whether the conditions indicated in the contract differ materially from those actually encountered during performance. See, e.g., Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002). "The issue of the indications in the contract is one of law for decision by the tribunal, not an issue of fact to be proven by a preponderance of expert testimony . . . ." Foster Construction C.A. & Williams Brothers Co. v. United States, 193 Ct. Cl. 587, 602, 435 F.2d 873, 880 (1970).

Expert testimony upon legal matters is inadmissible. Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003); accord Christiansen v. City of Tulsa, 332 F.3d 1270, 1283 (10th Cir. 2003) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts."); Stearns Co., Ltd. v. United States, 34 Fed. Cl. 264, 268-69 (1995) (expert testimony that reaches legal conclusions admissible only where testimony concerns state law or a technical provision peculiar to the industry). The Court, therefore, should not receive, much less consider, Dr. Mathewson's legal conclusion that Renda's Flare Area, South Ferry Landing, Section 7 Clay, and Lost Lake Levees claims constitute "true differing site condition[s]."

(2) Opinion Re: "Impossible" Construction Condition

The discussion of the Lost Lake Levees claim contained in Dr. Mathewson's report states, in part: "Under the actual conditions at the Lost Lake Placement Area, Renda Marine could not construct the desired levee to +30 ft until the low strength, fluid materials were displaced from

the foundation of the proposed levee and the high strength materials could be placed to form the foundation. The presence of the buried and unreported 'side cast borrow areas' resulted in an impossible condition that was not indicated in the construction documents." Mathewson Report, at 2, Def. App. 2. Dr. Mathewson's opinion that the presence of side-cast borrow areas made it impossible to construct the new perimeter levees at the Lost Lake Placement Area to the specified dimensions and grade does not rest upon a reliable foundation and, thus, the Court should exclude it.

At his deposition, Dr. Mathewson testified that he determined that the side-cast borrow areas resulted in an "impossible condition" for construction of the levees to be built by hydraulic placement of dredged material "[b]ecause of the properties of the . . . soft materials given in the [contract soil boring logs] and the way in which it was loaded and the height at which it was loaded and the speed with which it was loaded and the presence of significant pressure head on . . . the water system." Tr. 159(7-14),[3] Def. App. 17. He also testified that the "impossible condition" resulting from the side-cast borrow areas was that they "created a break in the harder desiccated surface and allowed the shear stresses to escape against an area that had lower shear strength." Tr. 158(8-12), Def. App. 16.

Dr. Mathewson, however, did not perform any calculations or tests in support of those opinions. Tr. 157(20-22); 158(5-7), Def. App. 15, 16. Dr. Mathewson did not perform a side-slope stability, settlement, subsidence, or displacement analysis. Tr. 157(23-25); 158(1-4, 20-23), Def. App. 15, 16. When asked what the dimensions of the side-cast borrow areas were,

---

[3] "Tr. ____(____)" refers to the referenced page(s) and line(s) of the transcript of the expert's deposition.

he replied: "I have no idea." Tr. 164(3-5), Def. App. 20. Dr. Mathewson could not state how deep or wide the side-cast borrow areas were or even whether they ran continuously along the footprint of the hydraulically-constructed levees. Tr. 162(23-25)-163(1-6); 164(7-10), Def. App. 18-19, 20. He does not know what type of equipment was used to excavate the side-cast borrow areas, e.g., a backhoe or a drag line. Tr. 163(9-13), Def. App. 19. Dr. Mathewson testified that some parts of the hydraulically-constructed levees "probably" were stable, but he could not state which parts of the levees were stable and which parts were unstable. He testified: "I have not investigated it that close." Tr. 176(9-17), Def. App. 21.

Dr. Mathewson admits that he has never designed or even participated in the design of a dredged material disposal facility, such as the Lost Lake Placement Area. Tr. 85(3-8), Def. App. 11. He has no experience with the design of levees or dikes for dredged material disposal facilities or the design of structures for soft foundations, including earth structures. Tr. 85(9-14, 21-25)-86(1-4), Def. App. 11-12. Dr. Mathewson, moreover, has never acted as a consultant with respect to the design or construction of a levee or a dike for a dredged material disposal facility or a structure upon a soft foundation. Tr. 89(25)-90(1-3, 11-14), Def. App. 14-14A. When asked whether he has any experience with the construction of dredged material disposal facilities, Dr. Mathewson testified: "Not direct experience that I could identify." Tr. 88(13-15), Def. App. 13. The only experience that Dr. Mathewson appears to have had with the design or construction of levees is the design of "small," three-foot-high surface-water-control diversion "berms" at a sanitary land-fill constructed with mechanical methods upon firm foundations, Tr. 32(14-25)-33(1-6), Def. App. 9-10, and some "small levees" that were part of a project to create a wetland for the treatment of wastewater. Tr. 88(15-25)-89(1-5), Def. App. 13-14.

Although Dr. Mathewson has testified as an expert in judicial or administrative proceedings in the past, he has never been qualified by a court or an administrative entity as an expert with respect to the design of dredged material disposal facilities, such as the Lost Lake Placement Area, the design of levees or dikes for dredged material disposal facilities, the design of levees or dikes in general, or the design of structures for soft foundations. Tr. 86(5-21), Def. App. 12. Dr. Mathewson's opinion that side-cast borrow areas at the Lost Lake Placement Area resulted in an "impossible condition," therefore, is not sufficiently reliable to assist the Court in understanding the evidence and it should be excluded.

B. Robert McCullough, Jr., P.E.

The written report of Robert McCullough, Jr., sets forth opinions with respect to the interpretation and application of two regulations: EFARS 52.231-5000 and FAR 31.205-47(f)(1). See McCullough Report, at 4, 5, 7-10, 12, 14, 15, 17-18, Def. App. 25, 26, 28-31, 33, 35, 36, 38-39. As discussed above, expert testimony upon legal matters is improper. In Rumsfeld v. United Technologies Corp., 315 F.3d 1361(Fed. Cir. 2003), the issue involved the correct interpretation of Cost Accounting Standards CAS), which are Federal regulations. In approaching that task, the Federal Circuit stated: "The views of the self-proclaimed CAS experts, including professors of economics and accounting, a former employee of the CAS Board, and a government contracts accounting consultant, as to the proper interpretation of those regulations is simply irrelevant to our interpretive task; such evidence should not be received, much less considered, by the Board on the interpretive issue. That interpretive issue is to be approached like other legal issues–based on briefing and argument by the affected parties." Id. at 1369 (footnote omitted). Therefore, Mr. McCullough's opinions regarding the correct interpretation of EFARS 52.231-5000 and

FAR 31.205-47(f)(1), as well as their application in the circumstances of this case, should not be received, much less considered.

In addition, Mr. McCullough's report is replete with opinions that Renda's claims are "valid and compensable" by the Government in a certain amount and that Renda is "entitled" to additional compensation of stated amounts. See McCullough Report, at 3, 5, 8, 10, 13, 15, 18, 24, Def. App. 24, 26, 29, 31, 34, 36, 39, 45. Again, these legal opinions should be disregarded, inasmuch as they "state legal conclusions drawn by applying the law to the facts." Christiansen, 332 F.3d at 1283.

C. Benton Goodloe

The report of Benton Goodloe, a Renda employee, states, with respect to Renda's Lost Lake Levees claim: "There was not sufficient clay to be dredged on the [Upper Bayou Project] to construct the Lost Lake Placement Area levees. The foundations for such levees were so soft that the clay and other suitable materials that Renda attempted to place hydraulically displaced so much muck that it was not possible under the circumstances to build the levees to the design template. . . . Renda property [sic] hydraulically placed the clay, but due to causes beyond Renda's control, the levees could not be built as designed." Goodloe Report, at 2, Def. App. 48.

Mr. Goodloe is not qualified to provide opinion testimony as to the sufficiency of the design of the levees at the Lost Lake Placement Area, i.e., "that it was not possible under the circumstances to build the levees to the design template" or that "the levees could not be built as designed." Mr. Goodloe attended a junior college for two years where he studied "engineering." Tr. 38(24-25)-39(1-6), Def. App. 56-57. He does not have a college degree. Id. The only licenses listed in his curriculum vitae are a Coast Guard towing license and "a private pilot license

with instrument rating." Goodloe Report, at 3, Def. App. 49.

Mr. Goodloe has been in the dredging business for about 33 years. Tr. 39(9-11), Def. App. 57. He was employed by Parkhill Goodloe, a family-owned dredging business, from the early 1970s to 1988, Tr. 40(18-22), Def. App. 58, then by Norfolk Dredging Company from 1988 to 1992, Tr. 42(18-20), Def. App. 60, then by Pine Bluff Sand & Gravel for two years, Tr. 43(12-16, 23-25), Def. App. 61, then by T.L. James from 1995 to about 1998, Tr. 44(16-24); 45(7-10), Def. App. 62, 63, and then by Weeks Marine for about two years until 2000 when Mr. Goodloe took a position with Renda. Tr. 44(24-25)-45(1-6), Def. App. 62-63. During that 30-year span of time, Mr. Goodloe's experience with the construction of levees was limited to one project in Kingsbay, Georgia, when he was employed by Parkhill Goodloe, where "you had to construct some levees" and, during the construction of Interstate 95, there were "some projects going on" that had a "little bit of levee work in it" but Mr. Goodloe "wasn't involved with it a lot." Tr. 41(17-25)-42(1-8), Def. App. 59-60. Mr. Goodloe was not involved with construction of levees at dredge disposal sites when employed by Norfolk Dredging Company, Pine Bluff Sand & Gravel, T.L. James, or Weeks Marine. Tr. 43(8-11); 44(11-15); 45(21-24), Def. App. 61, 62, 63.[4] According to Mr. Goodloe: "There hasn't been a whole lot of levee construction – hydraulic levee construction that I know about going on." Tr. 45(24-25)-46(1), Def. App. 63-64.

Mr. Goodloe, therefore, does not have the education, training, or experience with design or construction of levees – especially hydraulically-constructed levees at dredged material disposal facilities such as the Lost Lake Placement Area – to be qualified as an expert with respect to

---

[4] At Weeks Marine, where Mr. Goodloe worked immediately prior to his employment with Renda, he managed a Florida beach coast construction project and "some maintenance dredging" on the Mobile River for the Corps of Engineers Mobile District. Tr. 46(18-22), Def. App. 64.

the design or construction of levees. Mr. Goodloe's opinions that "it was not possible under the circumstances to build the [Lost Lake] levees to the design template" and that "the levees could not be built as designed," thus, are not sufficiently reliable to assist the Court in understanding the evidence and they should be excluded.

For the foregoing reasons, defendant's motion to limit the scope of testimony of plaintiff's trial experts Christopher Mathewson, Ph.D., P.E., Robert McCullough, Jr., P.E., and Mr. Benton Goodloe should be granted and the Court should exclude the inappropriate aspects of their opinion testimony discussed above.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

MAY 12, 2004

# DEFENDANT'S APPENDIX

# INDEX TO DEFENDANT'S APPENDIX

**Document** **Page**

Report of Christopher C. Mathewson, Ph.D., P.E. dated January 26, 2004 .................. 1

Excerpts from transcript of deposition
of Christopher C. Mathewson, Ph.D., P.E., on April 14, 2004 ......................... 4

Report of Robert McCullough, Jr., dated March 3, 2004 (without exhibits)................. 22

Report of Benton Goodloe dated January 27, 2004 ...................................................... 47

Excerpts from transcript of deposition of Benton Goodloe on January 13, 2004 ......... 50

**CHRISTOPHER C. MATHEWSON, PhD, PE, REG**
**Engineering Geologist**
**1307 Glade Street**
**College Station, TX 77840**

Phone: ......979-845-2488 FAX: ......979-847-9313 E-mail: .......mathewson@geo.tamu.edu

26 January 2004

Brian W. Erikson
Qulling, Selander, Cummiskey & Lownd
2001 Bryan Street, Suite 1800
Dallas, TX 75201

Re: Renda Marine, Inc. *vs.* United States, Case Number 02-306C, United States Court of Federal Claims

Dear Mr. Erikson,

At your request I have evaluated the changed conditions claims filed by Renda Marine related to the dredging of the Houston Ship Channel. The project area includes dredging between Stations 684+06.58 and 470+00, shown as the "Upper Bayou" on the Location Plan (Map C-1), and the construction of a dredged material confinement levee at the Lost Lake Placement Area. You have asked me to limit my evaluation to four specific sites defined in this project. These sites are:

1. Flare Area (STA 520+00 – STA 550+65.99)
2. South Ferry Landing (Section 1, STA 470+00 – STA 480+16.77)
3. Section 7 (Approximately STA 565+00 and 580+00)
4. Lost Lake Placement Area Levees

The professional opinions expressed in this report are based upon a review made on Thursday, 15 January 2004, in Dallas, Texas of the contract documents that were provided to me with further review of these documents made in College Station.

1. The Flare Area: My review and evaluation concurs with the opinions expressed by the Corps of Engineers and Renda Marine in that the subsurface geological and engineering properties were not accurately represented in the boring logs and soil descriptions provided to Renda Marine when they bid the project. As a result, Renda Marine could not predict, anticipate or expect to encounter the "stiff clay" which resulted in reduced dredging productivity and increased operational time to place and handle the dredged materials at the Lost Lake Placement Area.

2. South Ferry Landing: The project drawings do not include any specific information about the bathymetric or submarine conditions of the South Ferry Landing area while they include a detailed map of the North Ferry Landing area (Map C-6). The North landing area is actually outside the limit of the dredging project. The incorporation

of the bathymetric data for the North Lynchburg Landing in the contract documents provides unnecessary and misleading information about the dredging conditions to be anticipated at the South Lynchburg Landing. The complete lack of information or data about the conditions at the South Ferry Landing area, with respect to rubble, shore protection structures, navigational aids or other submarine conditions, strongly suggests that these conditions do not exist in the area. As a result, Renda Marine should not have anticipated the existence of anything other that the naturally occurring Earth materials in this area of the project, except for possible minor amounts of undocumented trash and debris.

3. Section 7: Renda Marine encountered a "very stiff red clay" while dredging in Section 7, approximately between Stations 565+00 and 580+00. The presence of a "red clay" indicates that the dredging operation encountered sediments that are most-likely Pleistocene (Glacial) in age. These sediments, which were exposed to the atmosphere and oxidized during the low stand of sea level, experienced an increased confining pressure through desication, that produced higher strength materials than the Recent marine sediment shown in the contract documents. Because these "red clays" have higher shear strength than the younger marine clays, the dredging effort required to remove these materials is significantly greater than that required to remove Recent marine clays. These "red clays", however would be a superior material for the construction of the foundation for the levees at the Lost Lake Placement Area.

4. Lost Lake Placement Area Levees: The contract documents indicate that the geotechnical characteristics of the materials in the interior perimeter of the Lost Lake Placement Area have low shear strength and that the Atterberg limits of these materials lies between the Liquid Limit (viscous fluid) and the Plastic Limit (plastic material). There are no notes or other information to indicate that the dredged material in the perimeter area was previously "mined" to produce material to rebuild and improve the existing levees around the area. An analysis of the date of sampling indicates that the mining operations occurred recently, after the date of drilling and geotechnical testing, and therefore the geotechnical properties of the foundation materials in the Lost lake Placement Area are significantly weaker than suggested in the contract documents. As a result, Renda Marine experienced significant amounts of "material loss" through the displacement of the low strength dredged material that had refilled the recently mined areas. Hydraulic dredging construction methods, which were specified for much of the levee project, would further decrease the shear strength of the underlying dredged material by increasing the pore-water pressure and decreasing the effective strength of these saturated clays and silts. Under the actual conditions at the Lost Lake Placement Area, Renda Marine could not construct the desired levee to +30 ft until the low strength, fluid materials were displaced from the foundation of the proposed levee and high strength materials could be placed to form the foundation. The presence of the buried and unreported "side cast borrow areas' resulted in an impossible condition that was not indicated in the construction documents.

Thank you for the opportunity to review and evaluate the provided materials and to provide my opinions concerning the differing site conditions at the Flare Area, South Ferry Landing, Section 7 and the Lost Lake Placement Area Levees. It is my opinion that each of these sites represents a true differing site condition in which the contract documents failed to report the actual natural or man-made condition.

Please feel free to contact me should you have any questions or desire a more extensive review and evaluation.

Sincerely yours,

CC Mathewson

Christopher C. Mathewson, PhD, PE, REG
Engineering Geologist

encl: Vitae

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., Plaintiff, | ) | |
| | ) | No. 02-306C |
| VS. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, Defendant. | ) | |

---

ORAL DEPOSITION OF

CHRISTOPHER MATHEWSON

April 14, 2004

---

ORAL DEPOSITION OF CHRISTOPHER MATHEWSON, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on April 14, 2004, from 9:04 a.m. to 5:35 p.m., before Gloria Carlin, CSR No. 498 in and for the State of Texas, reported by Stenographic method, at the offices of Quilling, Selander, Cummiskey & Lownds, 2001 Bryan Street, Suite 1800, Dallas, Texas, pursuant to the Rules of the Federal Court of Claims and the provisions stated on the record.

Job No. 040414GJC

CERTIFIED COPY

4

A P P E A R A N C E S

FOR THE PLAINTIFF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

FOR THE DEFENDANT:

John E. Kosloske, Esq.
CIVIL DIVISION
DEPARTMENT OF JUSTICE
1100 L Street NW, Room 12052
Washington, D.C. 20005

ALSO PRESENT:

Oscar Renda
Barry L. Smith
William Connole, P.E.

5

INDEX

Appearances . . . . . . . . . . . . . . . . . . . . 2

Stipulations. . . . . . . . . . . . . . . . . . . . 4

CHRISTOPHER MATHEWSON

Examination by Mr. Kosloske. . . . . . . . . . . 5
Examination by Mr. Erikson . . . . . . . . . . . 214
Re-Examination by Mr. Kosloske . . . . . . . . . 217

Signature and Changes. . . . . . . . . . . . . . . 219
Reporter's Certificate . . . . . . . . . . . . . . 221

EXHIBITS



| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 1 | Letter 1-26-04 from Christopher Mathewson to Brian Erikson and Curriculum Vitae | 12 | 13 |
| 2 | Subpoena | 93 | 93 |
| 3 | Letter 7-18-03 from Christopher Mathewson to John Kosloske | 93 | 93 |
| 4 | Upper Bayou Dreding Drawings | 96 | 96 |
| 5 | Specifications for Dredging Upper Bayou | 99 | 100 |
| 6 | Amendment of Solicitation | 99 | 100 |
| 7 | Differing Site Conditions Clause | 101 | 101 |
| 8 | Certified Claim (Revised) | 102 | 103 |
| 9 | Letter 3-30-00 from Eddie Fisher to Corps of Engineers | 103 | 103 |
| 10 | Fax 5-15-01 from Barry Smith to Will Sanford | 104 | 104 |
| 11 | Amendment of Solicitation Modification of Contract | 104 | 104 |
| 12 | Fax 3-12-01 from Will Sanford to Tom Benero | 104 | 105 |
| 13 | Letter 4-16-01 from Steven Bowman to Thomas Benero | 105 | 105 |
| 14 | Transmittal 6-2-00 from Alan Jefts to Patrick Kuhne | 106 | 106 |
| 15 | Stiff Clay Percentages | 107 | 107 |
| 16 | Stiff Clay Percentages | 107 | 107 |

## INDEX CONTINUED

| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 17 | Memo 7-13-00 from Eddie Fisher to Kenneth Machacek, Steve Bowman | 107 | 108 |
| 18 | Renda Marine's Fourth Supplemental Answers | 115 | 115 |
| 19 | Renda Marine's Second Supplemental Responses | 116 | 116 |
| 20 | Letter 3-25-04 from Christopher Mathewson to Brian Erikson | 119 | 119 |
| 21 | Drawing | 120 | 120 |
| 22 | Upper Bayou Hydraulic Levees | 120 | 122 |
| 23 | Logs of Borings | 123 | 123 |
| 24 | Memo 4-17-00 from Leon Hrabovsky to Al Jefts | 131 | 131 |
| 25 | Letter 10-13-99 from Eddie Fisher to Mike McClenan | 133 | 133 |
| 26 | Drawing | 161 | 161 |
| 27 | Letter 3-16-04 from Cheryl Moseley to John Kosloske | 182 | 182 |
| 28 | Photographs (1 - 98) | 183 | 183 |

## REQUESTED DOCUMENTS/INFORMATION

| NO. | DESCRIPTION | Page/Line |
|---|---|---|
| None | | |

## QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| NO. | Page/Line |
|---|---|
| None | |

THE REPORTER: Pursuant to the Federal Rules of Civil Procedure?

MR. KOSLOSKE: The Rules of the Court of Federal Claims.

THE REPORTER: Would you raise your right hand, please?

Do you solemnly swear or affirm to tell the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes, I do.

THE REPORTER: Thank you.

CHRISTOPHER MATHEWSON,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. KOSLOSKE:

Q. Good morning.

A. Good morning.

Q. Dr. Mathewson, would you state your full name for the record and spell it, please?

A. Christopher Colville Mathewson, C-H-R-I-S-T-O-P-H-E-R, C-O-L-V-I-L-L-E, and Mathewson, M-A-T-H-E-W-S-O-N.

Q. And what is your residential address and telephone?

A. 1307 Glade, G-L-A-D-E, Street, College Station, Texas, 77840, and my home phone is (979) 693-5382.

groundwater, there's also road access, availability, cover material, layout of the various trenches, operating schedule, so it's a complete -- is it safe to dig the hole, dig the hole, put the waste in it, bury the material and make sure the waste doesn't escape. Make sure you have wet water -- wet weather access, dry weather operating conditions, so you've got to be concerned about weather, you've got to be concerned about the characteristics of the waste that you're handling, particularly in small rural landfills. You have no idea of how many barrels of arsenic Farmer Brown might want to throw in the landfill. So you're trying to control, at least notify and make the operators aware of what to look for.

Q. Did the design of the sanitary landfill require you to design a levee or a dike?

A. There were surface water control diversions, yes.

Q. Would you describe these structures?

A. They were basically low berms to redirect surface water around the landfill instead of into the site, including also the access roads down the ramp, but you had to be able to divert the surface water running down the ramp and you had to let trucks drive over them.

Q. What were the dimensions of these berms?

A. They were small.

Q. More specific.

A. More specific, maybe half the size of this table, the top. Eight foot wide at the base, three foot high and a flat enough top that they could get a lawn mower over it.

Q. And how were they constructed?

A. They were basically constructed mechanically, dozers.

Q. How would you describe the foundation, the soil foundation on which these berms were built?

A. They're on competent clays.

Q. What do you mean by "competent clays"?

A. The size of the structure built on the subsurface materials, there was no concern about landslides or stability.

Q. You didn't perform a stability analysis?

A. Didn't need to, no, based on the knowledge of the strength of the material.

Q. Who was the client for which you performed this site investigation and design of sanitary landfill?

A. Brazos County was one of them, Brenham was another, and I don't remember how many precincts in Brazos County, but basically we were trying to get the locals from dumping the trash in a ditch or in the creek.

Q. A few items below the item on page three, "Site investigation and design of sanitary landfill," a few items below that there's an item called, "Prediction of settlement

Q. Have you ever been on the dredge Millennium?
A. No.
Q. Have you ever designed a disposal facility for dredged material?
A. No.
Q. Have you ever participated in the design of a disposal facility for dredged material?
A. I don't recall.
Q. Have you ever designed a levee or a dike for a disposal facility for dredged material?
A. To my knowledge, no.
Q. Have you ever participated in the design of a levee or dike or a disposal facility for dredged material?
A. No.
Q. Aside from the small berms you mentioned in connection with the design of the landfill, have you ever designed a levee or dike of any kind?
A. That what, levee or dike that --
Q. Of any kind.
A. Oh, of any kind. Not that I recall.
Q. Have you ever designed a structure for a soft foundation?
A. By structure, you mean --
Q. I'll break it down. Have you ever designed a -- an earth structure for a soft foundation?

A. No.

Q. Have you ever designed a, say, a building that was to go on a soft foundation?

A. No. I'm not a design engineer.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of disposal facilities for dredged material?

A. No. Not that I recall.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of a levee or dike for a disposal facility for dredged material?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of levees or dikes in general?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of structures for soft foundations?

A. No.

Q. Do you consider yourself to be an expert with respect to the design of disposal facilities for dredged material?

A. No. Just -- I'll have to qualify that, counselor,

to?

A. The capability between the engineer's design and the capability of the landscape to support that design, would be the engineering geology of dredged material, both dredging operations, transporter operations and disposal operations, that's my field of expertise.

Q. Do you consider yourself to be an expert with respect to the design of structures for soft foundations?

A. As a designer, no, as an assessor of the relationship between the structure and the foundation, yes. Again, it's the engineering geology, not how big a footing do I use.

Q. What, if any, experience have you had with the construction of disposal facilities for dredged material?

A. Not direct experience that I could identify. I did while discussing -- remember one other project in which I was -- I acted as a design engineer that involved small levees, and this was the creation of a wetland for wastewater treatment. We had to excavate the ponds.

Q. When was that?

A. That would have been probably mid '90s. That was for TMPA.

Q. I'm sorry. What's TMPA?

A. Texas Municipal Power Agency. We were using a wetland to treat leachate from their -- their fly ash

disposal site, but it was kind of small --

THE REPORTER: From their what?

A. Fly ash disposal site, but it still falls into the small scale type structure. We might have had to levee it, the dam at the downstream end might have been five feet high.

Q. (BY MR. KOSLOSKE) Have you ever been qualified by a court or administrative agency as an expert with respect to the construction of disposal facilities for dredged material?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of a levee or dike or a disposal facility for dredged material?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of levees or dikes in general?

A. No.

Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of structures upon soft foundations?

A. No. I believe you went through those questions earlier.

Q. Have you ever acted as a consultant with respect