**Damage Summary**

M&A believes these RMI claims are valid and compensable by the USACE in the amount of $13,379,367 as shown below (see Exhibit A for adjustments):

| Claim | Description | Claimed Amount |
|---|---|---|
| 5 | Differing Site Condition – Flare Area Stations 520+00 to 550+00 (very stiff clay) | $1,096,179 |
| 6 | Differing Site Condition – South Ferry Landing Stations 470+00 to 472+00 | 947,054 |
| 7 | Changed Conditions – HL&P Transmission Tower Delays | 167,473 |
| 8 | Differing Site Condition – Obstruction in Sections 4 to 8, Stations 570+00 to 685+00 | 1,986,551 |
| 9 | Differing Site Condition – Obstruction in Section 9, Stations 660+00 to 685+00 | 1,148,804 |
| 10 | Changed Conditions – West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 (Modification CO-10, P00027) | Included in Claim 12 |
| 11 | Differing Site Condition – Section 7 Clay | 978,271 |
| 12 | Lost Lake Levees | 7,055,037 |
| | **Total** | **$13,379,367** |

**Benton Goodloe**
Renda Marine, Inc.
#7 Benson Lane
Roanoke, TX 76262
Phone: (817) 430-0998
Fax: (817) 491-4483

January 27, 2004

Brian W. Erikson
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

Re: Renda Marine, Inc. v. United States; Case Number 02-306C;
United States Court of Federal Claims

Dear Mr. Erikson:

As you requested, I have prepared my report on the claims filed by Renda Marine regarding the dredging of the Houston Ship Channel. I also enclose a copy of my curriculum vitae.

During the course of dredging on the Project, the Dredge Millennium encountered numerous obstructions. The Dredge Millennium reasonably handled the obstructions. The waters are too murky to be able to see the obstructions beforehand. The Corps placed great pressure on Renda to achieve production on the Project.

Renda attempted to dredge on the Project, Renda would inevitably hit any obstructions located in the dredge template, unless such obstructions were specifically denoted in the Contract Documents.

Renda was not required to hire a diver to search for obstructions ahead of the dredging operation. Renda was not required to have sonar or magnetometers or sidescan surveying equipment to search for obstructions ahead of the dredging operation. Industry custom is to rely on the contract documents to indicate underwater obstructions. Industry custom is for a dredger not to have divers, or sonar or magnetometers or sidescan surveying equipment to search for obstructions ahead of the dredging operation.

Dredging in stiff clay results in slower production than dredging in soft clay. Slower production means increased cost. Renda had slower dredging production in the Flare Area and Section 7 due to clay stiffer than the materials indicated in the Contract Documents.

Dredging around or through obstacles or obstructions results in slower production than if the obstacles or obstructions were not present. Renda's dredging production was slowed in the South Ferry Landing due to rubble not indicated in the Contract Documents.

Renda's dredging production was slowed in Sections 4 to 8, Stations 570+00 to 630+00 due to underwater obstructions. Renda faced obstructions not shown in the Contract Documents. Renda faced obstructions beyond that reasonably expected. These obstructions were materially different than what was indicated in the Contract Documents. As a result of these obstructions, Renda's dredging progress was slowed, and the costs of dredging were increased.

Renda's dredging production was slowed in Section 9, Stations 660+00 to 685+00 due to underwater obstructions. Renda faced obstructions not shown in the Contract Documents. Renda faced obstructions beyond that reasonably expected. These obstructions were materially different than what was indicated in the Contract Documents. As a result of these obstructions, Renda's dredging progress was slowed, and the costs of dredging were increased.

There was not sufficient clay to be dredged on the Project to construct the Lost Lake Placement Area levees. The foundations for such levees were so soft that the clay and other suitable materials that Renda attempted to place hydraulically displaced so much muck that it was not possible under the circumstances to build the levees to the design template. The Corps has had similar problems on other levee projects. Renda property hydraulically placed the clay, but due to causes beyond Renda's control, the levees could not be built as designed.

Please feel free to contact me if you should have any questions.

Sincerely,

Benton Goodloe

Enclosure

S:\Construction\Renda Marine\Upper Bayou 565.09\Goodloe Report.wpd

**Benton Goodloe, Sr.-**

**Consultant-Involved in all aspects of projects from pre-bid to overseeing of projects.**

He began working for Parkhill-Goodloe Dredging Co. in 1970. Worked in all positions in company beginning as deckhand and working his way up to Project Superintendent and over all Project Managers. Completed project for the U.S. Army Corp of Engineers in the Jacksonville, Charleston, Wilmington, Norfolk, and Mobile Districts. He also completed projects for the TVA, Jacksonville Electric Authority, Jacksonville Port Authority, Estech Chemical Company and Georgia Port Authority. After Parkhill-Goodloe Dredging Co. sold out in 1988 he worked as Project Manager for Norfolk Dredging Co. and T.L. James Dredging Co. completing multi-million dollar projects for the Army Corp of Engineers from New York to Houston, Texas. In 1991 became Vice President for Renda Marine in charge of all dredging projects along the Gulf Coast of the United States. While at Renda Marine, completed a very difficult 17 million dollar project in the Houston Ship Channel. Currently holds a U.S. Coast Guard Towing license as well as a private pilot license with instrument rating.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
Defendant. )

ORAL DEPOSITION
BENTON B. GOODLOE
January 13, 2004

ORAL DEPOSITION OF BENTON B. GOODLOE, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 13th day of January, 2004, from 9:48 a.m. to 4:11 p.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Esquire Deposition Services, 3401 Louisiana, Suite 300, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

APPEARANCES

FOR THE PLAINTIFF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 800
Dallas, Texas 75201
Telephone: 214-871-2100 - Fax: 214-871-2111

FOR THE DEFENDANT:

John E. Kosloske, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
1100 L Street, N.W., Room 12052
Washington, D.C. 20005
Telephone: 202-307-0282 - Fax: 202514-8624

ALSO PRESENT:

Stacey Whitley, CSR
George J. Strickler

INDEX


| | PAGE |
|---|---|
| BENTON B. GOODLOE | |
| Examination by Kosloske ...................... | 6 |
| Signature Page ............................... | 168 |
| Court Reporter's Certificate ................. | 170 |


EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Renda Marine daily report dated 12-4-00 | 49 |
| 2 | Inspection Report of Dredging - Galveston District dated 12-10-00 | 68 |
| 3 | Letter to Mr. Erikson from Ben Goodloe | 84 |
| 4 | Renda Marine daily report dated 12-29-00 | 113 |
| 5 | Renda Marine daily report dated 1-12-01 | 113 |
| 6 | Renda Marine daily report dated 2-25-01 | 117 |
| 7 | Renda Marine daily report dated 3-10-01 | 118 |
| 8 | Renda Marine daily report dated 10-22-00 | 122 |
| 9 | Renda Marine daily report dated 10-23-00 | 123 |
| 10 | Renda Marine daily report dated | 124 |

| | | |
|---|---|---|
| 11 | Renda Marine daily report dated 10-31-00 | 125 |
| 12 | Renda Marine daily report dated 11-3-00 | 126 |
| 13 | Renda Marine daily report dated 11-4-00 | 127 |
| 14 | Renda Marine daily report dated 11-9-00 | 130 |
| 15 | Renda Marine daily report dated 11-13-00 | 130 |
| 16 | Renda Marine daily report dated 11-14-00 | 132 |
| 17 | Renda Marine daily report dated 11-17-00 | 134 |
| 18 | Renda Marine daily report dated 11-19-00 | 135 |
| 19 | Renda Marine daily report dated 11-29-00 | 135 |
| 20 | Renda Marine daily report dated 11-30-00 | 137 |
| 21 | Renda Marine daily report dated 2-11-01 | 138 |
| 22 | Renda Marine daily report dated 2-19-01 | 140 |
| 23 | Renda Marine daily report dated 2-20-01 | 140 |
| 24 | Renda Marine daily report dated 2-21-01 | 140 |
| 25 | Renda Marine daily report dated February 22 and 23 | 140 |
| 26 | Renda Marine daily report dated 2-24 | 140 |




Phone #713.524.4600
3401 LOUISIANA, SUITE 300

ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002

Fax #713.524.4951
1.800.767.9532

| | | |
|---|---|---|
| | 2-25-01 | |
| 28 | Renda Marine daily report dated 2-26-01 | 141 |
| 29 | Renda Marine daily report dated 2-27-01 | 143 |
| 30 | Renda Marine daily report dated 2-28-01 | 144 |
| 31 | Renda Marine daily report dated 3-5-01 | 144 |
| 32 | Renda Marine daily report dated 3-6-01 | 145 |
| 33 | Renda Marine daily report dated 3-7-01 | 145 |
| 34 | Renda Marine daily report dated 3-8-01 | 146 |
| 35 | Renda Marine daily report dated 3-10-01 | 147 |
| 36 | Renda Marine daily report dated 4-4-01 | 147 |
| 37 | Renda Marine daily report dated 4-5-01 | 147 |
| 38 | Renda Marine daily report dated 4-9-01 | 148 |
| 39 | Renda Marine daily production report dated 11-1-00 | 148 |
| 40 | Renda Marine report of operations dated 10-1-00 | 149 |

BENTON B. GOODLOE,

having been first duly sworn, testified as follows:

EXAMINATION

Q. (BY MR. KOSLOSKE) Would you state your full name for the record and spell it, please?
A. Benton, B-E-N-T-O-N, B. Goodloe, G-O-O-D-L-O-E.
Q. And for the record, what is your business address, sir?
A. For Renda Marine, it's 522 Benson Lane, Roanoke, Texas.
Q. And the ZIP code?
A. 7756 --
MR. ERIKSON: If you know.
A. I don't remember. 77562. I'm not sure.
Q. (BY MR. KOSLOSKE) And business telephone?
A. (817)491-2703.
Q. Okay. Are you presently employed by Renda Marine, Inc.?
A. Yes, I am.
Q. For the record, would you state your residential address and telephone?
A. 905 Bunker, B-U-N-K-E-R V-I-E-W Drive, Apollo Beach, Florida 33572.
Q. Mr. Goodloe, my name is John Kosloske. I'm an attorney with the United States Department of Justice. I'm

having with constructing the perimeter levees at Lost Lake placement center; that is, the portion of the levees that were to be constructed by hydraulic placement of fill?

A. I couldn't tell you. I don't recall if Steve did or he didn't. I don't recall. I don't know. Steve -- Steve Bowman and Rudy Renda were, like I say, basically doing the levees before I got there and I don't know if they did or they didn't.

Q. That didn't happen while you were there?

A. Did I -- I didn't consult anybody, no.

MR. ERIKSON: Do you mind if we take a short break?

MR. KOSLOSKE: Sure.

(Recess taken)

Q. (BY MR. KOSLOSKE) Back on the record. Mr. Goodloe, I would like to drop back a moment and ask you some background questions about your education and employment prior to coming to work for Renda Marine.

A. Okay.

Q. Are you a high school graduate?

A. Yes, I am.

Q. And when did you graduate from high school?

A. 1970.

Q. Did you attend college or university?

A. Two years.



Phone #713.524.4600
3401 LOUISIANA, SUITE 300
ESQUIRE DEPOSITION SERVICES
HOUSTON, TEXAS 77002
Fax #713.524.4951
1.800.767.9532

Q. Where did you attend college?
A. Jacksonville, Florida, Florida Junior College.
Q. And what did you study at Florida Junior College?
A. Engineering.
Q. Did you receive a degree of any sort?
A. No.
Q. What is your date of birth?
A. 2-19-52.
Q. How long have you been involved in the dredging business?
A. Started in 1970. So, it would be 33 years.
Q. Can you briefly outline for us the positions that you've held with the companies, the dates and the type of work you performed starting with the first position in the Seventies and working up to the time that you went to work for Renda Marine?
A. Okay. After graduating high school in 1970, I went to work at my family-owned business, which was Parkhill Goodloe Company in Jacksonville, Florida working the summertime and part-time when I went to college. And I was a deckhand on dredges, engineer on dredges, and eventually I worked my way up to project superintendent, project manager with the family-owned business. And in 1988, we sold out and I worked for -- probably until '92 with Norfolk Dredging Company as a project manager. Worked in the Philadelphia

district, the Norfolk district, Wilmington district, and Charleston district and Jacksonville district of the Corps of engineers doing various different dredging projects.

For a brief period of time, I worked for Pine Bluff Sand & Gravel out of Arkansas. I was a project manager for them. Worked in the Vicksburg district on some projects for the Corps of Engineers, lock and dam projects. Then went to work for T.L. James as a project manager up until '95 when T.L. James sold out -- sold their assets. I worked dredging projects all over the United States, New York district and all over. Then I was sold to Weeks Marine when T.L. James sold out. I was sold with the equipment and didn't like my position there. So, I didn't work for Weeks very long, a couple years. And then I went to work for Manson Construction out of Seattle, Washington for a couple of years as a project manager on hopper dredges. And I found a job a little closer when I went to work for Renda Marine as project manager.

Q. Okay. So, you worked from the early 1970s until approximately 1988 in the family-owned business?

A. That's correct.

Q. And that was Parker Goodloe?

A. It's Parkhill, P-A-R-K-H-I-L-L.

Q. And you held various positions including deckhand, engineer, and project manager?

A. All different positions on a dredge. I worked

summertimes and --

Q. What kind of dredging projects were you involved with?

A. Hydraulic dredging projects all over the East Coast of the United States from Virginia to Miami.

Q. Were they maintenance projects?

A. Generally speaking. We did some new work projects occasionally.

Q. And what was the size of the dredges?

A. Parkhill Goodloe had three 20-inch dredges and a 12-inch dredge.

Q. Were you ever a captain on a dredge?

A. Yeah. Probably for Parkhill Goodloe on a small dredge I was captain for a while and on a 20-inch dredge, yes.

Q. Did you have any experience as a leverman?

A. I pulled levers very little.

Q. And then during the period of time that you worked for the family business, Parkhill Goodloe, did you have experience constructing perimeter levees at dredge disposal areas?

A. If I recall, we had one project in Kingsbay, Georgia, that you had to construct some levees, which I mentioned earlier, which did not end up being built as designed. It was changed by the Corps of Engineers on the project relatively soon after the project started.

Q. Was that your first experience with building levees?

A. As far as building levees, yes. We did some beach work building beaches where you have to construct toe levees and toe dikes. But as far as building levees, the only other experience I had similar to that was the construction of Interstate 95, we had some projects going on then that had a little bit of levee work in it. But I wasn't involved with a lot.

Q. The project that -- was it Kingsbay, Georgia, did you say?

A. That's correct.

Q. And you said the design was changed in that case?

A. The design was changed in the field, that's correct.

Q. And is the reason the design was changed was there was not sufficient suitable material for building levees hydraulically?

A. That's correct.

Q. And you worked at the Norfolk Dredging Company from roughly 1988 to approximately 1992?

A. I think that's correct, right.

Q. And you were project manager the entire time there?

A. That's correct. They called them project superintendents, but they're the same thing.

Q. And the projects that you managed, were they all contract dredging projects?

A. Yes.
Q. And was that maintenance or new work or both?
A. Both.
Q. And what were the -- what kind of dredges were involved in --
A. Hydraulic cutter dredges. They mostly had 22-inch cutter dredges and they had one 16-inch dredge.
Q. And when you were working for Norfolk Dredging Company, were you involved with the construction of levees at dredge disposal areas?
A. No.
Q. And I believe you testified you then took a position with a firm Pine Bluff Sand & Gravel?
A. That's correct.
Q. Is that a dredging company?
A. Yes, it is.
Q. Where are they located?
A. They're in Arkansas and I can't remember the name of the city they're from. But they have a dredging office in Alexandria, Louisiana, or they did.
MR. ERIKSON: How about Pine Bluff?
A. Yeah. It's Pine Bluff. Pine Bluff, Arkansas.
Q. (BY MR. KOSLOSKE) How long were you employed by Pine Bluff Sand & Gravel?
A. Two years, I believe.

Q. And what was your position with that firm?
A. Project manager, superintendent.
Q. And were the projects that you were involved with all dredging projects?
A. Yes, they were.
Q. Were they maintenance or new work?
A. Both.
Q. And what kind of dredges were involved?
A. They had 24-inch dredges and one 18-inch hydraulic dredge.
Q. And did you have any involvement with construction of levees at dredge disposal sites --
A. No. No.
Q. Not while you were at Pine Bluff Sand & Gravel?
A. No, sir.
Q. Then your next position was at T.L. James. And how long were you employed by T.L. James?
A. Until they sold out in -- I think it was 2000. '99, 2000. I don't recall what year they sold out. I went to Weeks at that time. They sold all their assets to Weeks and Great Lakes.
Q. So, you were with T.L. James from roughly 1995 until 1999?
A. 2000, yeah. And then they sold out and then went -- went to work with Weeks.

Q. How long did you spend with Weeks Marine?

A. Until 2000.

Q. Did you -- I have in my notes here that you worked for Weeks Marine for a couple of years.

A. It was 2000. Probably a year and a half, close to two years.

Q. Okay. Does that mean that you would have left T.L. James in approximately 1998?

A. Somewhere around there. That's correct. I don't remember the exact date.

Q. You were a project manager for T.L. James?

A. Project manager, that's correct.

Q. And where was T.L. James located?

A. Used to be in Kenner, Louisiana.

Q. And you managed dredging projects exclusively?

A. That's correct.

Q. Were they both new work and maintenance projects?

A. Both. A lot of beach work, beach restoration.

Q. And what kind of dredges were involved?

A. 30-inch hydraulic dredges.

Q. And were you involved with the construction of any perimeter levees at dredge disposal sites while you were employed by T.L. James?

A. No, sir. No, sir. There hasn't been a whole lot of levee construction -- hydraulic levee construction that I know

about going on.

Q. And then what was your position at Weeks Marine?

A. Project manager.

Q. And was that dredging projects again?

A. That's correct.

Q. When you were with T.L. James, where were the dredging projects located?

A. We did a project for the Jacksonville district Corps of Engineers which is on the St. John's River. And then we did a job for the Palm Beach County, a beach restoration. And then we went to New York and did a project for the New York district Corps of Engineers, beach restoration on the coast of New Jersey. And then we did beach restoration in Hilton Head, South Carolina. I think that was about it.

Q. And Weeks Marine, where are they located?

A. Weeks took over T.L. James' assets. They had an office in Kenner and they moved it to Mandeville, Louisiana.

Q. Where were the dredging projects located that you managed while you were at Weeks Marine?

A. West coast of Florida beach construction. And then for the Mobile district, we did some maintenance dredging for the Mobile district in the Mobile River.

Q. How long were you employed by the Manson Construction Company?

A. About a year and a half, two years.