QSCL
QUILLING · SELANDER · CUMMISKEY · LOWNDS

BRIAN W. ERIKSON

Direct Line: 214.880.1844
E-mail: berikson@qsclpc.com

November 17, 2004

John E. Kosloske, Esq.
Senior Trial Counsel, Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street, N.W., Room 12052
Washington, D.C. 20005

***Via Federal Express***

Re: Case No. 02-306C; *Renda Marine, Inc. v. United States Army Corps of Engineers*; United States Court of Federal Claims; DACW64-99-C-0001, Dredging Upper Bayou

Dear Mr. Kosloske:

I attach a superseding expert report from Christopher Mathewson, Ph.D., P.E., R.E.G. I also enclose Dr. Mathewson's current curriculum vitae.

Dr. Mathewson has reviewed additional documents produced by the Corps of Engineers. I enclose a CD-Rom with images and Bates numbers for such documents. Dr. Mathewson has also reviewed the expert report of Jack Fowler, and the Government's challenge to Renda's experts, as well as depositions of the various Corps personnel, Renda personnel, Jack Fowler, and Kenneth Affolter.

Sincerely yours,

Brian W. Erikson

BWE/ja

Enclosures

cc: Oscar Renda (w/expert report & CV)

S:\Construction\Renda Marine\Upper Bayou 565.09\Kosloske 111704 enc supp expert report.wpd

Pl. App. 294

EXHIBIT
O

Blumberg No. 5118


DEPOSITION EXHIBIT 26
PENGAD 800-631-6989
INSIDE
Crust
Sidecast borrow backfill
soft dredge mat'l fines
2V
Compacted machine platform (Saturated)
? (50'?)
water elevation (variable)
NEW LEVEE
+30 ±
EXISTING LEVEE
Bed rock
ORIGINAL GROUND Surface
Not To Scale
OUTSIDE
EXHIBIT P

# CHRISTOPHER C. MATHEWSON, PhD, PE, REG

**Engineering Geologist**

**1307 Glade Street**

**College Station, TX 77840**

Phone:...... 979-845-2488 FAX:...... 979-847-9313 E-mail:....... mathewson@geo.tamu.edu


6 December 2004

Brian W. Erikson
Qulling, Selander, Cummiskey & Lownd
2001 Bryan Street, Suite 1800
Dallas, TX 75201

Re: Renda Marine, Inc. *vs.* United States, Case Number 02-306C, United States Court of Federal Claims

Dear Mr. Erikson,

Enclosed is a hard copy of my superseding report of 17 November 2004 and the updated copy of my Curriculum Vitae for your files.

I also certify that I have not generated any new work products related to this case except my superseding report of 17 November 2004.

Sincerely yours,

CC Mathewson

Christopher C. Mathewson, PhD, PE, REG
Engineering Geologist

EXHIBIT Q

Blumberg No. 5118

QSCL
QUILLING · SELANDER · CUMMISKEY · LOWNDS

BRIAN W. ERIKSON

Direct Line: 214.880.1844
E-mail: berikson@qsclpc.com

December 13, 2004

John E. Kosloske, Esq.
Senior Trial Counsel, Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street, N.W., Room 12052
Washington, D.C. 20005

***Via Federal Express***

Re: Case No. 02-306C; *Renda Marine, Inc. v. United States Army Corps of Engineers*; United States Court of Federal Claims; DACW64-99-C-0001, Dredging Upper Bayou

Dear Mr. Kosloske:

I enclose a copy of Chris Mathewson's letter to me of December 6, 2004, which indicates that he has no new work papers (aside from his November 17, 2004, report). I also enclose a copy of Dr. Mathewson's invoice of December 6, 2004, and his updated resume.

Sincerely yours,

Brian W. Erikson

BWE/ja

cc: Oscar Renda (w/enc.)

S:\Construction\Renda Marine\Upper Bayou 565.09\041213 Kosloske re Mathewson 12-6 ltr.wpd

Pl. App. 297

EXHIBIT
R

Blumberg No. 5118

# McCullough & Associates
# Robert B. McCullough

# Response to
# Defendant's Motion to Exclude Testimony
# Dated December 2, 2004

**Prepared for:**

Renda Marine, Inc.
Roanoke, Texas

**Prepared by:**

R. McCullough

Robert B. McCullough, PE, CCE, CDT

McCullough & Associates
15938 Midway Road
Addison, Texas 75001
(972) 385-3158

December 10, 2004

EXHIBIT
S

**McCullough & Associates**
**Robert B. McCullough**

# Response to Defendant's Motion to Exclude Testimony Dated December 2, 2004

On November 17, 2004, Dr. Chris Mathewson and Mr. Robert McCullough submitted revised reports superseding those previously issued on January 26, 2004 and March 3, 2004, respectively. Revisions to these reports were allowed due to Court Order No. 02-306 C dated November 4, 2004 "in light of material produced by defendant during discovery." Shortly thereafter, the Defendant's Motion to Exclude Testimony was submitted. The motion stated "defendant, the United States, respectfully requests that, the Court exclude from the trial of this case expert testimony regarding the opinions and other matter contained in the November 2004 reports of the designated trial experts of plaintiff, Renda Marine, Inc. (Renda), Christopher Mathewson, Ph.D., and Robert B. McCullough, P.E., that are not based upon document discovery obtained by Renda pursuant to the Court's May 14, 2004 Order…" On page 15, the Motion states "Under the guise of being afforded an opportunity to supplement the earlier reports of Dr. Mathewson and Mr. McCullough with commentary upon the materials produced by the Government during the past five months, Renda has produced reports that retool, refine, and substantially expand the earlier opinions and analysis of these experts." This is not correct and mischaracterizes the revisions to the report. The November 2004 report incorporates opinions based on the new documents produced by the Government as well as corrects errors identified in the report and incorporates prior adjustments into existing exhibits.

The following changes were made to the November 2004 Report:

**Report Narrative**

The report narrative was updated to include opinions derived after the review of new information produced by the Government. Specifically, this information included:

- Specifications from previous dredging and levee-related projects showing details of side cast borrow pits within the Lost Lake Placement Area and other disposal sites.
- Lost Lake Placement Area Borehole Layout Plan dated June, 1998.
- Lost Lake Placement Area Soil boring logs, dated September and October, 2002.
- Specifications from previous dredging projects showing placement of dredged material within the Lost Lake Placement Area.

**Error Correction**

In the March 2004 on Exhibit C, Corporate Overhead was inadvertently calculated as a percent of Resident Overhead instead of a percent of the Direct Cost total. The formula error was corrected and the Corporate Overhead total was changed from $60,010 to

$341,527 (before other claim adjustments). After other claim adjustments, the Corporate Overhead total is $305,712.

This error was identified in the Franvel March 2004 report work papers.

**M&A Adjustments**
In the March 2004 report, adjustments were made to the claims submitted by RMI and were shown in Exhibit A (Tab1) and Mechanical Levee Labor and Equipment – Proposed Deductions (Tab 14). In the November 2004 report, these adjustments have been incorporated directly into the original claim calculation sheets.

Adjustments, most of which were in the March 2004 report, include:

- Removed duplicated mechanical levee equipment items and related labor.
- Removed "claim-related" professional fees.
- Adjusted Resident and Corporate Overhead Rates to match DCAA audited figures.
- Adjusted Profit percentage to 12.00%.
- Removed duplicated Repair Invoices from claim 8 - Obstruction in Sections 4 to 8, total amount of $57,953.48.

Revised claim calculation sheets were therefore included for reference in the November 2004 report as Exhibits P, Q, R, S, T, and U. The claim calculation sheets have always been included by reference within the McCullough expert report and were covered in the deposition of Mr. McCullough.

**Equipment Rates**
Equipment rates were modified due to issues raised within the Franvel expert report dated January 30, 2004. In no way have the Franvel calculations been fully adopted, but the following specific adjustments were made:

- Equipment rates are now calculated at six-month intervals to more accurately account for variations in the cost of money and the cost of fuel. Both of these items are based on Department of Labor and Bureau of Labor Statistics data. This is a refinement of the equipment pricing consistent with our prior opinions.

  In order to accommodate the rates at six-month intervals, several exhibits were modified; namely, Exhibit I - Claim 12a1 and 12a2, Exhibit J – Claim 12c and Claim 12d, and Exhibit K-2 – Mechanical Levees.

- Previously, individual sheets were prepared for each equipment item. Equipment rates are now calculated on separate sheets for RMI Owned and Rented items and a rate sheet is prepared for each six-month interval (7/1/1999 to 1/31/1999, 1/1/2000 to 6/30/2000, 7/1/2000 to 12/31/2000, 1/1/2001 to 6/30/2001, and 7/1/2001 to 12/31/2001).

- Conditions for certain pieces of equipment were averaged to accurately reflect their actual operating environment. For example, the "Average" and "Severe" rates were averaged to develop a "Difficult" rating. For pipeline items, the "Standby" and "Ocean" conditions were averaged to derive the computed rate.

- Equipment rates are calculated using either the USACE Chapter 3 methodology or the Chapter 4 methodology. A small number of equipment items were recalculated using the Chapter 4 methodology as opposed to the Chapter 3 methodology. Chapter 4 methodology is used for items operating 24 hours per day, 7 days per week; Chapter 3 methodology is used for land-based items and is based on operating 40 hours per week.

- Modified equipment rates were changed throughout the claim. All Exhibits within the report were updated with the new equipment rates. The following exhibits are not affected by this change: Exhibit B, D, E, F, G, H, L, M, and N.

**Hydraulic and Mechanical Levee Crew Adjustment and Dates**

During the course of the report updates, it was discovered that there was a mistake in the hydraulic levee crew size. As a result of this discovery, two "Additional Workers" were removed from Claim 12a1 and Claim 12a2. There was an inconsistency between the hydraulic levee crew size shown in Claim 12a1/12a2 and Mechanical Levee Claim 12b. The "Hydraulic Levee Personnel" on the Mechanical Levee Claim was changed from three to five crew members. This is not a new opinion.

The dates for Claim 12a1 were originally calculated as a contiguous period from September 13, 1999 to July 14, 2000. However, due to other claims consuming available hours, the Claim 12a1 hours were expended over a longer time period. There were different rates for the different time periods. The total number of days in this claim did not change.

**Labor Calculations**

In the March 2004 report, Workmen's Comp was calculated as a percent of the base labor amount, subtotaled; then Payroll Taxes were calculated from that subtotal. Both Workmen's Comp and Payroll Taxes are now calculated directly from the base labor amount. This change has been made throughout the Claim 12 labor amounts. This change is negligible and, in fact, results in a small decrease for all Claim 12 labor totals.

**Miscellaneous Clarifications and Adjustments**

Various other minor clarifications and adjustments were made. None of these items substantially affect the claim pricing methodology or the claimed amount. These include:

- Provided corrected Per Diem amounts for Claim 12a1 and Claim 12a2. The error on Claim 12a2 was identified within the Franvel March 2003 report work papers.

- Added annual and period totals at the bottom on Exhibit E – Analysis of Claimed Days and Exhibit F – Dredge and Levee Data from Daily Logs. Unlabeled totals

were questioned during Mr. McCullough's deposition and have been clarified in this report.

- Added several explanatory notes to Exhibit E – Analysis of Claimed Days and Exhibit F – Dredge and Levee Data from Daily Logs. The explanatory notes were added to clarify items questioned during Mr. McCullough's deposition.

- Deleted "Impact Days" column and 12aRef column on Exhibit E – Analysis of Claimed Days. Both columns were for reference only and were not utilized in the prior or current analysis. These columns were questioned during Mr. McCullough's deposition and have been deleted to prevent any further confusion.

- On Exhibit E – Analysis of Claimed Days, the "L" nomenclature referenced Hydraulic Levee. To avoid confusion, "L" was changed to "HL".

- Booster costs for Claim 12e – Booster Equipment and Labor Calculations (Exhibit L) are now based on the actual amounts obtained from the booster lease agreement. The net change is negligible and represents a reduction.

- Modified three items in the Chronology (Exhibit D). One was a typographical error; two represent more accurate dates. This item represents no change to the claimed amounts.

- Corrected several equipment items within the Mechanical Levee claim (Exhibit K-1 and K-2). This included the combination of two items that were discovered to be the same and the addition or correction of Equipment ID Numbers. Total Equipment Hours claimed on this schedule has not changed. This item represents no change to the claimed amounts.

- Corrected daily usage amounts for Dredge Equipment items on Exhibit J-1a for Claim 12c and Claim 12d – Equipment Calculations. This was done to more accurately represent daily usage hours for each dredge equipment item given the non-effective mode of operation. This reduced the claimed amount.

- Corrected nomenclature of "12e1" to "12f1" and "12e2" to "12f2" on Exhibit J-2 items. This item represents no change to the claimed amounts.

- Replaced Exhibit A with Exhibit A-1 and A-2 to summarize claimed amounts.

**Items Noted in the Defendant's Motion**

Specific items indicated by the defendant are individually addressed below:

1. **The opinion that Renda "was released from the project prior to completing all the work in its contract," and, that "[t]this amounts to a termination for**

**convenience by [the Government]," and that, "[a]s such, [Renda] is entitled to recover the reasonable and necessary costs expanded in prosecuting the work prior to termination." Def. App. 62.**

Mr. McCullough expressed his opinion regarding legitimate, compensable damages in his deposition. See for example page 109.

Page 109:
Q. At page three, the first full paragraph, says, "In general, we have determined the claimed issues are legitimate, and that the claim costs are compensable costs"; do you see that?
A. Yes, sir.
Q. What do you mean by the term "legitimate"?
A. That - - Renda is entitled to compensation for these issues.

2. **Regarding the Flare Area claim, the following statement: "[Renda] encountered differing site conditions related to the clays encountered in the Flare Area. [Renda] utilized appropriate soil borings consistent with industry practice in determining soil conditions. [Renda] encountered stiffer clays than indicated by the bid documents and incurred additional compensation due to this issue as shown in the revised Damage Summary, Exhibit P." Def. App. 64-65.**

This statement was in direct response to deposition question by the Government but does not change prior opinions or testimony. It merely incorporates prior testimony into the current report. See, for example, pages 96, 104, 112.

Page 96:
Q. Are there any areas of disagreement that you have with Mr. Smith's methodology for pricing the Flare Area claim, part from the two areas of cost that are backed out in your report?
A. Apart from the two areas of cost that I backed out in my report, I believe that I agree with his - - with the rest of his claim.

Page 104:
Q. Have you concluded that Renda Marine encountered differing site conditions?
A. Yes.
Q. What were the differing site conditions that Renda Marine encountered in this case?
A. They encountered hard clay, when soft clay was indicated. …I think those were the differing site condition issues.

Page 112:
Q. What is your understanding of what the contract documents indicated to be the conditions for dredging in the Flare Area?
A. Generally that Renda would encounter soft clays.

**3. Regarding the South Ferry Landing claim, the following statement: "It appears that [the Government] had information on the subsurface man-made materials but failed to incorporate any information about those materials in the bid documents. [Renda] properly anticipated it would encounter only naturally occurring soil materials in this area." Def. App. 65.**

This opinion was previously in the South Ferry Claim prepared by Pathfinder Construction Consulting as well as in Mr. McCullough's deposition. See, for example, page 104, 121, 123, and 126. .

Page 104:
Q. What were the differing site conditions that Renda Marine encountered in this case?
A. They encountered hard clay, when soft clay was indicated. The encountered obstructions in the dredge areas that were not indicated on the drawings…

Page 123:
A. I mean manmade erosion protection, stone, concrete and steel.

**4. Regarding the Section 7 Clay claim, the following statement: "[Renda] used the correct soil borings in its analysis to determine the anticipated soil type and conditions." Def. App. 75.**

Mr. McCullough expressed his opinion on this topic in his deposition. See, for example, pages 104, 105, 145-149, 285, 286.

Page 146:
Q. And it's your understanding that this material was different from what Renda Marine should have anticipated?
A. Yes.
Q. What kind of material should Renda Marine have anticipated?
A. Gray and blue clays with the soil borings…
Q. Have you reviewed the relevant soil borings and the contract drawings for the Section 7 of the project?
A. Yes.
Q. Do those soil borings indicate to you the presence of stiff to very stiff gray and blue clay in that section of the project?

Page 285-286:
Q. Then you have a note, "Soil borings are not the same? (COE)"; what are you referring to there:
A. My understanding is that the Corps of Engineers was - - believed that the soil borings were not the same.
Q. Then you have a note, "Hit hard red clay – bad"; do you see that?
A. Yes.

Q. What are you saying there?
A. That the contractor hit hard red clay, that that was bad for his production.
Q. You have a line below that, "Shown stiff grey clay, not the same density as very stiff red clay"; do you see that?
A. Yes.
Q. What are you saying there, what do you mean by that statement?
A. Well, that grey, tan and brown clay - - stiff grey, brown - - tan and brown clay was shown and that it is not the same as the material that was actually encountered, which was a - - the hard red clay or very stiff red clay.

Q. So it's your understanding - - strike that. Is it your opinion that the relevant soil boring logs for the - - in the contract documents for the Section 7 reach of the channel show stiff gray, tan and brown clay?
A. That was my understanding.

5. **Regarding Lost Lake Levees claim, the discussion of the alleged effect of "poor foundations caused by side-cast borrow areas" upon Renda's construction operations at the Lost Lake Placement Area. Def. App. 81.**

Mr. McCullough testified extensively on this topic in his deposition. See, for example, pages 159-167, 170-172. Additional detail was added to this section and specifically came from new information produced by the Government. New opinions include:

- USACE knew about the existence of side cast borrow pits within the Lost Lake Placement Area.
- Soil borings provided with the contract documents were inaccurate.
- Side cast borrow pits were not indicated in the bid documents.
- Limits of side cast borrow pits were known by the USACE.

Page 159-161:
A. The conditions were certainly different than were depicted, yes.
Q. In what way?
A. Well, there was inadequate foundation for the levees to construct them in accordance with the plans and specifications. The levees continued to fail, continued to shear off. It appeared that that was a result of a side-cast borrow operation where materials, good materials were taken from adjacent to the existing levees and that material was removed and placed on top of the existing levees so that when these new levees were being placed they fell off into that area where the material had been taken in the side-cast borrow operation, and that was not indicated on the - - on the drawings - -
Q. The side-cast borrow areas?
A. The side-cast borrow area and conditions that were left by that and were not indicated.
Q. What conditions were left by the side-cast borrow areas?
A. Soft, inadequate foundations for the levee construction.

Q. What, if other, subsurface physical conditions at the Lost Lake Placement Area were not indicated in the contract plans and specifications?
A. I think that was the major - - the major difference.
Q. What is the basis for your understanding that there were side-cast borrow areas at the Lost Lake Placement Area that were not depicted in the contract drawings?
A. My discussion with Mr. Smith and Mr. Bowman.
Q. Where were these side-cast borrow areas located?
A. Running parallel to the existing levees.
Q. And what were the dimension of the borrow - - side-cast borrow areas?
A. I don't have specific dimensions of those.
Q. Do you know how deep the borrow area went?
A. No, sir.
Q. Do you know how wide they were?
A. No, sir.
Q. You say there were adjacent - - did you say there were adjacent to the levees?
A. They were parallel. They were not immediately adjacent.

Page 164
Q. Is it your opinion that the undocumented poor foundations were caused by the side-cast borrow areas?
A. Yes.

Page 165
...by looking at the - - the time that it took Renda to place that material whenever it sheared off, it fell down to the side-cast borrow area...

6. **Exhibit C ("Lost Lake Levees – Summary of Damages"). This is a spreadsheet from the March 2004 report that has been modified. The revised spreadsheet does not contain a "total days" column and, except for the zero values, all dollar amounts have changed. Def. App. 88.**

   Dollar amounts have been changed primarily due to the equipment rate modifications and, of course, this type of a change affects all claim totals. The "total days" column was removed because it was irrelevant and contained contiguous periods as opposed to individually claimed days. A formula mistake was corrected to properly calculate Corporate Overhead. Corporate Overhead percentages have not changed.

7. **Exhibit E ("Analysis of Claimed Delays"). This is a spreadsheet from the March 2004 report that has been modified. The revised spreadsheet does not contain an "impact days" column. In column "Claim 12a1 Planned HL Operations," entries for certain dates have been deleted, entries have been added for other dates that previously did not have an entry, and all entries have been converted from letters to numbers. In column "Claim 12a2," the**

**numerical values have been changed from one decimal to two decimal points, for example, from 0.1 to 0.13. Def. App. 89-90.**

Changes to this exhibit were made simply for clarification. Entitlement or the basis of the claim calculations has not changed. The decimal point adjustment, again, was made for clarification and to show that the calculation was made from hourly source data (fractions of a day). The calculation has not changed.

8. **Exhibit I-1 ("Claim 12a1 – Hydraulic Levees – Labor and Equipment Damage Calculations (Added Costs for Original Duration (10 months)"). This is a spreadsheet from the March 2004 report that has been modified. Two of the "Additional Worker" entries have been deleted. The values in the "Days" columns for labor and equipment for 1999, 2000, and 2001 have changed and the value in the "per diem" column has been changed from $50 to $25. Def. App 91.**

   Changes to this section were made as part of the ongoing evaluation of RMI claims. The two "Additional Worker" entries were deleted because they were duplicative.

9. **Exhibit I-1a ("Claim 12a1 – Equipment Calculations"). This spreadsheet is a new exhibit without a counterpart in the March 2004 report. Def. App. 92.**

   This spreadsheet was added only to account for equipment rates that vary at six-month intervals. In the March 2003 report, equipment rates varied on an annual basis only.

10. **Exhibit I-2 ("Claim 12a2 – Hydraulic Levees – Labor and Equipment Damage Calculations (Additional Costs for Full Crew for Extended Duration"). This is a spreadsheet from the March 2004 report that has been modified. Two of the "Additional Worker" entries have been deleted. The value in the "per diem" column has been changed from $35 to $50. Def App 93.**

    Changes to this section were made as part of the ongoing evaluation of RMI claims. The two "Additional Worker" entries were deleted because they were duplicative.

11. **Exhibit I-1a ("Claim 12a2 – Equipment Calculations"). This spreadsheet is a new exhibit without a counterpart in the March 2004 report. Def. App. 94.**

    This spreadsheet was added only to account for equipment rates that vary at six-month intervals. In the March 2003 report, equipment rates varied on an annual basis only.

12. **Exhibit J-1a ("Claim 12a2 – Equipment Calculations")** ***(sic – should be "Claim 12c and 12d Equipment Calculations").*** **This spreadsheet is a new exhibit without a counterpart in the March 2004 report. Def. App. 95.**

    This spreadsheet was added only to account for equipment rates that vary at six-month intervals. In the March 2003 report, equipment rates varied on an annual basis only.

13. **Exhibit L ("Claim 12e – Booster Equipment and Labor Calculations"). This exhibit has been revised to substitute a rate for the booster based upon a November 2000 equipment lease agreement between Renda and Hendry Corporation. Def. App. 96-102.**

    Changes to this calculation are minor in nature and were made after locating the actual Hendry Booster lease agreement. The amount had been previously estimated based on RMI personnel recollection; accurate information was located thereafter and the corrections were made.

14. **Exhibit O (Equipment Rate Formula Explanations). This is a new exhibit without a counterpart in the March 2004 report. Def. App. 103-105.**

    This exhibit was added to further clarify the methodology used to make equipment rate calculations. The methodology used has not changed significantly with the exception of the development of six-month interval rates as opposed to annual rates. Six-month intervals are used to more accurately account for cost of money variations.

15. **Exhibits O-1 through O-10. This is a series of 25 spreadsheets that contain Mr. McCullough's recalculation of equipment rates for six-month intervals. The spreadsheets are new exhibits without any counterparts in the March 2004 report. The data for Renda's marine equipment (including the dredge *Millennium*) are not set out in the spreadsheets. For that equipment, the spreadsheet contained the following entry: "Rate computed per Chapter 4 methodology for dredging plant; see separate ("Long Form") worksheet for rate calculation." Def. App. 106.**

    These equipment rate spreadsheets were included by implication in the March 2004 report. Again and as indicated by the defendant's motion, the primary change to these spreadsheets is the six-month interval calculations due to the cost of money variations. Previously, equipment calculations were performed on an annual basis and on one sheet per item. Equipment calculations have now been combined into comprehensive spreadsheets allowing the application of the same formula across all items. A set of equipment rates is calculated for each six-month interval (i.e. July – December 1999, January – June 2000, July – December 2000, and January – June 2000) to cover the project period. Significant changes to the equipment pricing have not occurred.

16. **Exhibits P and P-1 through P-8. These exhibits, a "Damages Summary" and spreadsheets for the Flare Area claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 107-115.**

    These documents are nearly identical to those that were included in the original REAs and claims prepared by Mr. Barry Smith, Pathfinder Construction Consulting. Damage summary spreadsheets for each claim were incorporated into the March 2004 report by implication. The statement "In performing this analysis, M&A reviewed the Project correspondence, claim documentation prepared by RMI…" was included in both the March 2004 and November 2005 reports. The actual inclusion of these documents within the November 2004 report does not represent a change. These items were simply incorporated into the November 2004 report for convenience. Moreover, the entitlement and the basic claim pricing methodology have not changed whatsoever. The primary change to the pricing is the change from annual equipment rates to equipment rates based on six-month intervals due to money cost adjustments. In addition, proposed deductions shown in Exhibit A of the March 2003 report have simply been integrated into the pricing for each individual claim rather than being shown on the separate exhibit.

17. **Exhibits Q and Q-1 through Q-7. These exhibits, a "Damages Summary" and spreadsheets for the South Ferry Landing claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 116-123.**

    See "Exhibits P and P-1 through P-8" section for explanation.

18. **Exhibits R and R-1 through R-3. These exhibits, a "Damages Summary" and spreadsheets for the HL&P Transmission Tower Delay claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 124-127.**

    See "Exhibits P and P-1 through P-8" section for explanation.

19. **Exhibits S and S-1 through S-4. These exhibits, a "Damages Summary" and spreadsheets for the Obstruction No. 1 claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 128-132.**

    See "Exhibits P and P-1 through P-8" section for explanation.

20. **Exhibits T and T-1 through T-4. These exhibits, a "Damages Summary" and spreadsheets for the Obstruction No. 2 claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 133-138.**

    See "Exhibits P and P-1 through P-8" section for explanation.

21. **Exhibits U and U-1 through U-5. These exhibits, a "Damages Summary" and spreadsheets for the Obstruction No. 2 claim** ***(sic, should be "Section 7 Area claim")*****, are new exhibits without any counterparts in the March 2004 report. Def. App. 139-144.**

See "Exhibits P and P-1 through P-8" section for explanation.