NO. 02-306C

RENDA MARINE vs THE UNITED STATES

ROBERT McCULLOUGH, VOLUME 1

APRIL 15, 2004

MERIT COURT REPORTERS - FORT WORTH, TEXAS

817-336-3042 * 1-800-336-4000

EXHIBIT

T

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC.,
Plaintiff,

VS. ) No. 02-306C ) (Judge Hewitt)

THE UNITED STATES,
Defendant.

---

ORAL DEPOSITION OF

ROBERT McCULLOUGH

VOLUME 1

April 15, 2004

---

ORAL DEPOSITION OF ROBERT McCULLOUGH, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on April 15, 2004, from 9:24 a.m. to 5:30 p.m., before Gloria Carlin, CSR No. 498 in and for the State of Texas, reported by Stenographic method, at the offices of Quilling, Selander, Cummiskey & Lownds, 2001 Bryan Street, Suite 1800, Dallas, Texas, pursuant to the Rules of the Federal Court of Claims and the provisions stated on the record.

Job No. 040415GJC



A P P E A R A N C E S

FOR THE PLAINTIFF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

FOR THE DEFENDANT:

John E. Kosloske, Esq.
CIVIL DIVISION
DEPARTMENT OF JUSTICE
1100 L Street NW, Room 12052
Washington, D.C. 20005

ALSO PRESENT:

Oscar Renda
Barry L. Smith
William Connole, P.E.
George J. Strickler, P.E.



INDEX

Appearances . . . . . . . . . . . . . . . . . . . 2
Stipulations. . . . . . . . . . . . . . . . . . . 4
ROBERT McCULLOUGH
Examination by Mr. Kosloske. . . . . . . . . . 5
Signature and Changes. . . . . . . . . . . . . . . . 206
Reporter's Certificate . . . . . . . . . . . . . . . 208

EXHIBITS

| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 1 | Curriculum Vitae | 11 | 12 |
| 2 | Request for Equitable Adjustment | 87 | 87 |
| 3 | Evaluation of Claims | 91 | 91 |
| 4 | Inspection Report of Dredging | 179 | 180 |

REQUESTED DOCUMENTS/INFORMATION

| NO. | DESCRIPTION | Page/Line |
|---|---|---|
| None | | |

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| NO. | Page/Line |
|---|---|
| None | |



THE REPORTER: Pursuant to the Rules of the Court of Federal Claims?
MR. KOSLOSKE: Yes.
MR. ERIKSON: Yes.
THE REPORTER: Would you raise your right hand, please?
Do you solemnly swear or affirm to tell the truth, the whole truth and nothing but the truth?
THE WITNESS: I do.
THE REPORTER: Thank you.

ROBERT McCULLOUGH,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. KOSLOSKE:
Q. Good morning, Mr. McCullough, my name is John Kosloske. For the record, I'm an attorney with the Department of Justice in Washington, D.C. I'm representing The United States in litigation between Renda Marine, Inc., and The United States in a case that's pending in the Court of Federal Claims.
I understand that you've been designated as an expert witness on behalf of Renda Marine in the case; is that correct?
A. Yes.
Q. Would you state your full name for the record and

Page 5

spell it, please?
A. Robert Brian McCullough, R-O-B-E-R-T, B-R-I-A-N, M-C-C-U-L-L-O-U-G-H.
Q. And what is your occupation, sir?
A. I am an engineering consultant.
Q. And what is your business address and telephone number?
A. 15938 Midway Road, Addison, Texas 75001. Phone number is (972) 385-3158.
Q. What is your date of birth?
A. 9-14-54.
Q. Are you affiliated with McCullough & Associates?
A. Yes.
Q. What is your position with the firm?
A. President.
Q. What is the nature of McCullough & Associates' business?
A. We do construction consulting.
Q. What does construction consulting entail, at least for McCullough & Associates?
A. We evaluate projects for our clients. We evaluate -- we'll go in when there's a situation and where the contractor may be spending more money, we evaluate it from an owner's perspective or a contractor's perspective. We look at damages, we look at schedule, we look at the

Page 6

contractual obligations of the parties, and we assist the parties in trying to resolve whatever their disputes are.
We also assist -- well, we assist all parties, I guess, primarily contractors, in doing contract management. That's helping them put together change proposals.
We do critical path scheduling. We help them with estimating, and then we do -- so that -- I guess that's probably the bulk of our work.
Q. When you say estimating, what do you mean by that?
A. Estimating the cost of performing work.
Q. For example, preparation of a bid estimate for a construction job?
A. We don't generally assist them in preparing bid estimates, but that would be estimating, yes, sir.
Q. Do you primarily prepare estimates in connection with pricing changes to contracts?
A. Yes, sir.
Q. When was McCullough & Associates formed?
A. I believe we filed a DBA, I'm going to guess, it would have been around 1989.
Q. Today how many employees are with the firm?
A. I've got four full-time employees and I've got, I would say, two regular outside consultants that are basically working full time for me.

Page 7

Q. Who are the four full-time employees and what do they do?
A. Robert McCullough, that's myself. My wife, Ann McCullough, who performs the bookkeeping, Peggy Chaney, C-H-A-N-E-Y, she is formerly a construction paralegal and is now working for me, helping me prepare documentation in cases, and we have a receptionist named Erin, I apologize, I can't remember her last name, she just started.
Q. Who are the two regular outside consultants who are working full time?
A. John Coakley.
Q. Could you spell that for the record?
A. C-O-A-K-L-E-Y. And Greg Lebkowsky, L-E-B-K-O-W-S-K-Y.
Q. Is Mr. Coakley self-employed?
A. Yes.
Q. Does he -- does he have a firm?
A. No.
Q. What are Mr. Coakley's qualifications to assist you? Let me rephrase that for you.
What kind of expertise or services does Mr. Coakley provide for you?
A. He reviews documentation, provides summaries for me to review, so he -- he reviews lots of financial information. He will review correspondence in build issue

Page 8

files.
Q. Anything else?
A. He also does critical path scheduling. Generally that's -- I think that covers it.
Q. Is Mr. Coakley a Registered Professional Engineer?
A. No, sir.
Q. What is his education, if you know?
A. I believe he has a degree in finance and another degree in construction management.
Q. How long have you been working with Mr. Coakley?
A. More than six months. I don't think it's been a year yet.
Q. Has Mr. Coakley provided services to you in connection with your engagement for this litigation?
A. Yes.
Q. What services has he provided, and is he providing?
A. Generally what we discussed. He has gone through the various reports. He's checking the calculations of the damages. He's checking the backup information. He is looking at correspondence and assisting me in going through and evaluating the various claims and the various reports that have been produced.
Q. Has Mr. Coakley performed a CPM analysis for this case?

Page 9

A. **No, sir.**
Q. What kinds of services does Mr. Leb -- is it Lebkowsky -- provide for you?
A. **Lebkowsky.**
Q. Excuse me, Lebkowsky.
A. **He provides similar services.**
Q. Similar to the services that Mr. Coakley provides?
A. **That's correct.**
Q. What is Mr. Lebkowsky's education?
A. **He has a degree in construction management from Texas A&M University.**
Q. Is he a Registered Professional Engineer?
A. **No, sir.**
Q. Does Mr. Lebkowsky have any other certification, to your knowledge?
A. **Not that I'm aware of.**
Q. Does Mr. Coakley have any kind of certification, to your knowledge?
A. **Not that I'm aware of.**
Q. What's -- how old is Mr. Coakley, if you know?
A. **Early 30s.**
Q. And Mr. Lebkowsky?
A. **Late 40s.**
Q. Is Mr. Lebkowsky self-employed?
A. **Yes.**

Page 10

Q. Does he have a firm?
A. **I believe he's operating under Lebkowsky Construction Services, LCS.**
Q. How long have you been working with Mr. Lebkowsky?
A. **Probably 15 years.**
Q. Has Mr. Lebkowsky provided any services to you in connection with your engagement for this litigation?
A. **None that I recall.**
Q. Let me just go over a couple of ground rules for the deposition. So that the Court Reporter can accurately transcribe your testimony, it's important that you let me finish a question before you begin your answer, and I'll endeavor to let you finish your answer before I ask a question. Thus far you've been doing just fine.
A. **Thank you.**
Q. If a question calls for a yes or no answer, it's important that you say yes or no. The Court Reporter can't transcribe nods of the head and shakes of the head. If you need a break at any time, just say so. This isn't intended to make you uncomfortable or be a marathon experience for you or anything like that.
A. **Thank you.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 1 MARKED.)

Page 11

Q. (BY MR. KOSLOSKE) Mr. McCullough, I'm showing you what's been marked for identification as Exhibit 1. Would you take a look at this document, and can you tell us whether you recognize it?
A. **Yes, sir.**
Q. Is Exhibit 1 your resume?
A. **Yes, sir.**
Q. Have you reviewed your resume recently?
A. **Yes, sir.**
Q. Is it accurate and complete?
A. **It appears to be. I just noticed one minor glitch in it.**
Q. You're looking at the last page of the document?
A. **On the last page, there are designations for deposition taken, testimony at trial and serve as an Arbitrator and there's no mark next to served as Arbitrator, so it appears that that mark has dropped out of the -- out of the report for some reason. I apologize.**
Q. So there haven't been dozens of cases where you've served as Arbitrator?
A. **Probably half a dozen cases.**
Q. Let me ask you about your education. Your resume indicates that you have a Bachelor of Science in Civil Engineering; is that correct?
A. **That's correct.**

Page 12

Q. And you received that degree from the University of California at Berkley in 1977?
A. **Yes, sir.**
Q. Do you have any other graduate degrees?
A. **No, sir.**
Q. Are you a Registered Professional Engineer?
A. **Yes.**
Q. In what jurisdictions?
A. **Texas.**
Q. When did you become a Registered Professional Engineer?
A. **November 22nd, 1988.**
Q. Your resume indicates that you have a certification as Certified Cost Engineer; is that correct?
A. **Yes.**
Q. And you received that on September 3, 1986?
A. **Yes, sir.**
Q. Is that a certification given by the American Association of Cost Engineers?
A. **It's formerly the American Association of Cost Engineers. It was that association when I got the certification.**
Q. Has the name of the association changed?
A. **Yes.**
Q. What is it today?

Page 13

A. AACE International.
Q. What is the nature of that organization?
A. It's an international cost engineering association. They look at estimating cost, cost engineering, cost control, damage calculations, schedule analysis, things like that.
Q. What did you have to do, if anything, to become a Certified Cost Engineer?
A. I had to pass an eight-hour examination, and I had to write a paper and have the paper reviewed, peer reviewed and approved. And then every three years you have to recertify, and to do that you have to have continuing education participation, and there's a variety of things you can do.
Q. And you have a designation Certified Document Technologist; is that correct?
A. Yes, sir.
Q. And you received that on April 6, 1991?
A. That's correct.
Q. What is the organization that gives the designation or certification Certified Document Technologist?
A. The Construction Specification Institute.
Q. And what did you have to do to receive that certification?
A. I had to pass a written examination given by that

Page 14

organization.
Q. And what did the examination cover, what kinds of subjects?
A. Construction specifications, the application of specifications to construction projects, the type of information that's contained and the use of those specifications.
Q. When you attended the University of California at Berkley did you take any courses in accounting?
A. No.
Q. Since graduating from college have you taken any kind of -- or received any kind of training in the field of accounting?
A. No, not in accounting.
Q. You've listed a number of professional organizations of which you're a member, and they are the American Arbitration Association, the Association for the Advancement of Cost Engineering, Associated General Contractors, American Society of Civil Engineers, National Society of Professional Engineers. Is that a complete list?
A. Yes, it is.
Q. Have you ever been a member of a dredging association?
A. No, sir.
Q. When you were at the University of California at

Page 15

Berkley, did you have an emphasis of any kind in your engineering curriculum?
A. Construction.
Q. What kind of construction?
A. I don't think they specify.
Q. Let me ask you about your employment. Upon -- you graduated from Berkley in 1977. Upon graduation from Berkley what was your first position?
A. I went to work for Hawaiian Dredging Construction Company.
Q. And what was your position with the firm?
A. Initially I started out as an engineering trainee. Later I became a project engineer and ultimately when I left the company I was senior engineer.
Q. You were with that firm from April 1977 to April 1981; is that correct?
A. That's correct.
Q. And what was the nature of the business of Hawaiian Dredging and Construction?
A. They did dredging work. They did power industrial projects, they did road building, they did high-rise commercial projects. They did -- I shouldn't say high-rise, they were -- they did commercial projects. They did -- they had a pre-cast yard. They rented equipment. They were involved in pretty much every aspect of construction that was

Page 16

available.
Q. So dredging was simply one of their lines of business; is that correct?
A. That's correct.
Q. You mentioned that you were a project engineer; is that right?
A. Yes.
Q. As project engineer, what duties and responsibilities did you have?
A. I would be responsible for managing the contract between the contractor and the owner. I would manage all of the subcontracts between the general contractor and all the subcontractors. I prepared and managed all of the purchase orders, so that meant I did quantity take-offs of all the materials being ordered and tracked the order and the material. I prepared the schedule for the project and tracked the progress against the schedule. I prepared all the change proposals, reviewed all change orders with the owner and with the subcontractors. I think that generally covers it.
Q. While you were project engineer, did you -- were you project engineer on any dredging contract?
A. No, sir.
Q. What kind of contracts or projects were you project engineer on?

Page 17

A. Generally they would be described as commercial building projects.
Q. Then you went from the position of project engineer to senior engineer; is that correct?
A. Yes.
Q. And as senior engineer, what were your duties and responsibilities?
A. They were pretty much the same as project engineer. I would perform project engineering duties on certain projects, but then I was also responsible for supervising other project engineers.
Q. What kinds of projects did you work on as a senior engineer?
A. We had levee projects with the Corps of Engineers. We had road building projects, we had pipeline construction, we had infrastructure work for the Navy. We did commercial projects, hotels. I think that's pretty much all I did.
Q. You were with the company four years; correct?
A. Yes.
Q. And what period of time were you project engineer, what portion of that time?
A. I would estimate I was two and a half years as a project engineer.
Q. And what portion of that time were you senior engineer?

Page 18

A. One year.
Q. During that one year how many projects did you perform services for?
A. 10 to 15 possibly. I don't recall exactly.
Q. All right. Were you providing -- were you providing consultative kinds of services to project engineers, were you supporting project engineers on those projects, or were you solely responsible for the projects, that is, the administration of the projects?
A. Both. I was supervising engineer on some projects and I was providing services on other projects.
Q. While you were with Hawaiian Dredging & Construction Company, did you do any work on any dredging project?
A. We did a dredging -- a dredging project -- I don't recall working on any dredging projects.
Q. Okay. You were involved in preparing a bid estimate for the project?
A. I assisted in it. I was not the primary estimator for the project.
Q. Was the company successful in obtaining the job?
A. No.
Q. What portion of the bid did you work on?
A. I don't recall.
Q. You mentioned that when you were senior engineer

Page 19

you had levee projects with the Corps of Engineers; is that correct?
A. Yes.
Q. How many projects?
A. I think it was two projects.
Q. Let's take them one at a time. The first project, what was that?
A. I don't recall the name of it. We were asked to build a levee to contain flood waters.
Q. And where was the location of this work?
A. It was in Guam.
Q. Were you present at the site?
A. Yes.
Q. Were you continuously there during the course of construction?
A. I was not on-site every day, no, sir.
Q. Approximately how many days were you on the site and how many days were you at the home office?
A. I don't recall.
Q. When you were at the site what were you doing?
A. Inspecting the work that was being performed.
Q. Do you know who designed the project?
A. No.
Q. Did the government provide the design?
A. Yes.

Page 20

Q. What were the dimensions of the levee?
A. I don't recall.
Q. Can you describe the construction sequence for the levee?
A. The -- it was a mechanically constructed levee. Material was trucked in from a borrow area and placed and compacted, built up to a trapezoidal prism, so the trucks brought the material, dumped the material. Dozers would spread that material and rollers would compact that material.
Q. What kind of foundation was the levee built on?
A. It was built on natural material.
Q. Did you consider the foundation to be soft or firm?
A. That material was -- the way the government had designed that, they had an adequate foundation for that levee, so I would consider it to be adequate for the -- for that particular levee. I don't recall specifically whether it was firm or soft.
Q. The -- the other levee building project with the Corps of Engineers, where was that located?
A. It was associated with this project. It was essentially an extension of this project.
Q. And was that levee built in a similar manner?
A. Yes.
Q. Was the levee -- strike that.

Page 21

Were the levees that you -- projects that you worked on in Guam, was that in response to any kind of an emergency?
A. No.
Q. What materials were used to construct the levee?
A. Native soils.
Q. And what -- how would you characterize the soils?
A. Generally those soils were clays and granular corals that were ground up.
Q. Were there any change orders in those jobs?
A. Yes.
Q. Did you price the change orders?
A. Yes. Well, initially somebody else priced them. I negotiated those prices and ultimately resolved the change orders.
Q. Did you work on any bid estimates at the Hawaiian Dredging & Construction Company, in addition to the one for the one dredging project that you assisted in?
A. Yes.
Q. How many estimates did you work on while you were at Hawaiian Dredging & Construction?
A. Honestly, I don't know.
Q. Were there many?
A. I would say several.
Q. And were you responsible for the estimate, or were

Page 22

you assisting with preparing portions of the estimate?
A. Assisting.
Q. Who was the person in the company who was responsible for preparing the estimate?
A. I don't remember the individual's name, but the company had an Estimating Department, and they provided an estimator for the projects.
Q. As senior engineer and project engineer, those positions were not in the Estimating Department; is that correct?
A. That's correct.
Q. Why would the Estimating Department call upon you for services in connection with the preparation of an estimate?
A. Well, in this case -- in several cases I was located in Guam, they were bidding projects in Guam, and they wanted to do several things. I would assist them in site investigations, so I would go out and do site investigations with them. We would talk about problems that we had in managing the contracts with particular owners and then how we should bid the project accordingly. And then I would do -- assist them with quantity take-offs.
Q. Did you assist them with quantity take-offs and site investigations, because you had certain qualifications or skills that the estimators didn't have?

Page 23

A. I don't know that to be the case.
Q. You left Hawaiian Dredging & Construction in April of 1981; is that correct?
A. Yes.
Q. Why did you leave?
A. I had another job offer.
Q. Was that with Mocon Building Corporation in Salem, Oregon?
A. Yes.
Q. You worked for Mocon Building Corporation from May 1981 until February 1983; is that correct?
A. Yes.
Q. And what was your position with that firm when you started?
A. Project engineer.
Q. And when you left what was your position with the firm?
A. Project engineer.
Q. What was the nature of Mocon Building's business?
A. They were a concrete subcontractor.
Q. So that firm's business did not have anything related to dredging?
A. No, sir.
Q. What did you do as a project engineer for Mocon Building?

Page 24

A. I managed two contracts for them.
Q. Were your duties as project engineer similar to your duties as project engineer at Hawaiian Dredging & Construction Company?
A. Yes, with the added duty of hiring and supervising field crews.
Q. You were with Mocon Building Corporation for just under two years; is that correct?
A. That's correct.
Q. And you left Mocon Building in February 1983; correct?
A. That's correct.
Q. Why did you leave?
A. Mocon was closing down their building division.
Q. What was your next position?
A. I went to work as a Senior Forensic Engineer for Frisby & Associates in Tyler, Texas.
Q. And you were with Frisby & Associates from March 1983 until September of 1983?
A. That's correct.
Q. Period of about six months?
A. Yes.
Q. And as Senior Forensic Engineer, what were your duties and responsibilities?
A. We prepared and evaluated and negotiated

Page 25

construction claims primarily. We also provided contract management services for contractors.
Q. Does that pretty much describe the scope of -- and nature of the business of Frisby & Associates at that time?
A. Yes.
Q. And would it be accurate to characterize the work performed by Frisby & Associates as -- or to describe the firm as a litigation consultant for construction litigation?
A. I think that would be a fair representation, yes, sir.
Q. Did you provide any consulting services at Frisby & Associates for litigation that involved matters other than construction?
A. No.
Q. Now, you were with Frisby & Associates for about six months; correct?
A. Yes.
Q. And why did you leave?
A. Mr. Frisby asked me to start my own corporation.
Q. Did he say why?
A. Because he wanted to have an arm's length arrangement with my firm rather than having me in-house. I --
Q. Go ahead.
A. His intent was to use us as expert witnesses on

Page 26

his projects, his cases that he brought in.
Q. Did you -- did you then establish your own firm?
A. Yes.
Q. And was that a firm called Construction Support Services?
A. Yes, sir.
Q. And this was in Tyler, Texas?
A. Yes.
Q. And you were with Construction Support Services from October of 1983 until January of 1987; is that correct?
A. Yes.
Q. And what was your position when you started with the firm?
A. Consulting engineer.
Q. You were asked by Mr. Frisby to establish your own firm, but were you the President of Construction Support Services?
A. No, not at that time.
Q. Well, were you a principal in the firm?
A. Yes.
Q. What was the size of the firm, how many employees did you have?
A. Three employees, yes, we only had three employees.
Q. And who were they and briefly what did they do?
A. Bob Rosebury and Stan Irvin, I-R-V-I-N, and

Page 27

myself. We provided consulting services, the same services we had been providing to Mr. Frisby in-house, we provided to him as a third party consulting company.
Q. Did you work, in Construction Support Services, work almost exclusively for Frisby & Associates?
A. We actually worked directly for the clients, but we did not have any clients that had not been brought to us by Mr. Frisby.
Q. So Frisby & Associates generated the clients?
A. That's correct.
Q. And did you leave Construction Support Services in January of 1987?
A. Technically not. Well, sort of.
Q. Did you -- did your affiliation with Construction Support Services end in or about January of 1987?
A. No, sir. That -- that is still the corporation that I'm working in right now. At that time the corporation stayed in existence, but I took employment with the Heme Consultants.
Q. You were with Heme Consultants for approximately one year, in 1987?
A. Yes.
Q. And the Heme Consultants is in Tyler, Texas?
A. Yes.
Q. What is the nature of the business of Heme

Page 28

Consultants?
A. Doing the same consulting work that I was doing for Frisby & Associates and Construction Support Services.
Q. And you were Vice-President with Heme Consultants?
A. Yes.
Q. Why did you take a position with Heme Consultants -- strike that.
So in 1987 you were essentially employed by two firms, Construction Support Services and the Heme Consultants?
A. Construction Support Services still existed as a corporation, and we maintained that corporation all the way through 1987. We did some work that was carryover work from prior to 1987, clients that we had had. The bulk of my work was through the Heme Consultants.
Q. And why did you leave the Heme Consultants?
A. Mr. Heme decided that he wanted to control over 51 percent of the company and really wanted to move back to his home in Savannah, Georgia, where he had retired as the -- with the Corps of Engineers, after 20 years with the Corps of Engineers. So he moved back to Savannah, Georgia, and we split up the Heme Consultants, and I stayed in Tyler, Texas.
Q. And from January 1988 until January 1989 you were affiliated with a firm called Construction Performance Specialists?

Page 29

A. Yes.
Q. That's in Tyler, Texas?
A. Yes.
Q. Is that the same firm as Construction Support Services?
A. No.
Q. You were President of Construction Performance Specialists?
A. Yes.
Q. What was the nature of the business of Construction Performance Specialists?
A. We did the same work that we did as the Heme Consultants, same work as Construction Support Services and same as the Frisby Associates, Frisby & Associates.
Q. While you were with Frisby & Associates, did you work on any dredging contract claims?
A. I don't recall any dredging projects, no, sir.
Q. While you were with the Construction Support Services, did you become involved in consulting on any dredging projects?
A. No, sir, not that I recall.
Q. While you were with the Heme Consultants, did you become involved in consulting on any dredging projects?
A. No, sir, not that I recall.
Q. While you were with the Construction Performance

Page 30

Specialists, did you become involved in consulting on any dredging projects?
A. Not that I recall, no, sir.
Q. In 1989, January 1989 you formed McCullough & Associates, and you've been President of that firm from 1989 continuously until the present; correct?
A. That McCullough & Associates is a DBA of Construction Support Services, so when I left Construction Performance Specialists I picked up where Construction Support Services had left off and filed a DBA and moved to Dallas.
Q. During the period from January 1989 until the present, what, if any, involvement have you had on any dredging projects?
A. I don't recall working on -- excuse me -- on dredging projects in that time.
Q. So would it be accurate to state that during your professional career you have not had any involvement in any dredging projects in any capacity other than your participation in preparing the one unsuccessful bid by Hawaiian Dredging & Construction for a dredging project?
A. And I apologize. I did work for Oscar Renda on a portion of doing damage calculations for them on some work involved with the previous contract on the Upper Bayou, in that area. These are -- I'm sorry, go ahead.

Page 31

Q. What project?
A. It's listed here. I don't recall the name of it. I called it the sausage tubes. These were the tubes they were filling with dredges.
Q. The geotubes?
A. The geotubes, and I worked on that. Other than that I don't believe that I've been involved on a dredging project.
Q. Except for the present case, of course?
A. That's correct.
Q. Is Construction Support Services or McCullough & Associates registered with the State of Texas to provide engineering services?
A. Yes.
Q. In your resume on the second page you list Continuing Education Courses Completed; do you see that?
A. Yes, sir.
Q. The first course listed as Construction Claims with the Battelle Institute in 1983.
A. Yes, sir.
Q. Where was that course given?
A. I don't recall.
Q. How long was the course?
A. I believe it was two days.
Q. And what aspects of construction claims were

Page 32

covered in that course?
A. All aspects.
Q. Did that course cover Federal contracts?
A. Yes.
Q. Did it cover the Federal Acquisition Regulations?
A. Yes.
Q. What aspects of the Federal Regulation -- strike that --
What aspects of the Federal Acquisition Regulations were covered?
A. I apologize. I don't recall specifically which areas of the Federal Acquisition Regulations were covered.
Q. Were different claims covered in that course?
A. Yes.
Q. Were differing site condition claims covered in that course?
A. Yes.
Q. The next course listed is Certified Cost Engineering Examination Review, AACE International, 1985. Was this a review course that you took to -- prior to taking the test?
A. Yes.
Q. How long did that course last?
A. Two days.
Q. Did you cover construction claims in that course?

A. We covered aspects of construction claims, but I don't recall a specific section entitled construction claims.
Q. What aspects of construction claims did you cover in that review?
A. Scheduling, schedule analysis, cost engineering, damage calculations, interest calculations, you know, equipment pricing, things like that.
Q. You took a course in Construction Cost Estimating & Bidding at Southern Methodist University in 1986; correct?
A. Yes.
Q. How long was that course?
A. I don't recall.
Q. Was it a couple of days or a week?
A. Probably a couple of days.
Q. You took a course, CPM Scheduling in Program Management & Claims, Federal Publications, 1987?
A. Yes.
Q. Where was that course given?
A. I don't recall.
Q. What was the length of the course?
A. That was two days.
Q. What -- what did the course cover in terms of claims?
A. It talked about various methods of doing critical path schedule analysis involving claims.



Q. So basically the application of CPM scheduling and analysis to claims?
A. Yes.
Q. Delay claims?
A. Yes, sir, and productivity impact claims.
Q. The next course listed is Calculating Loss of Efficiency Claims, Federal Publications in 1987. Where was that course given?
A. I don't recall.
Q. How long was that course?
A. Again, it was probably two days long.
Q. What are loss and efficiency claims?
A. Things like are involved in this case, something that affects the contractor's productivity and costs more money, takes longer to perform the work.
Q. The next course listed is 1st Annual Construction Law Conference, University of Texas, 1988. How long did that last?
A. I believe that's two days long.
Q. And what kinds of topics were covered at that course, or, excuse me, at that conference?
A. Well, I don't recall specifically that conference, but they cover things like calculation of damages, schedule analysis, types of exhibits to use as demonstrative exhibits, bond claims, lots of legal -- legal topics. It's primarily



put on for attorneys.
Q. In a conference like this do they break out into groups by different subject areas, and you go into sort of a question and answer format, or there's a presentation followed by question and answer?
A. Presentation followed by question and answer.
Q. Okay. The next course listed is Skills & Knowledge of Cost Engineering, AACE International, 1988. Where was that course given?
A. I don't recall.
Q. How long did that course last?
A. Three days.
Q. What is cost engineering?
A. Cost engineering is starting at the very -- it's the management of costs associated with construction projects or engineering projects, and it starts with budgeting, preliminary estimates all the way up through estimating and then actually bidding the work and controlling the cost during construction and then evaluating costs after construction and life cycle costing.
Q. How does the contractor go about controlling costs during construction?
A. They would evaluate the costs that are being spent through a cost tracking system or cost control system. They would track their costs, and then they would evaluate those



costs against what they anticipated spending, then identifying where they were having overruns, then they would attempt to make corrections to bring that cost back in budget or request extras.
Q. Do contractors, at least larger contractors these days use computerized cost control systems?
A. Some of them do, yes.
Q. And these cost control systems generate periodic job cost reports?
A. Some of them do, yes, sir.
Q. These reports essentially are used to track expenditures on the product -- on the project?
A. They are used to track expenditures, yes, sir.
Q. These are the kinds of reports that during the course of the job the contractor will review to see how the company is doing on the job in terms of the budget and the contract amount?
A. They can use it for that, yes, sir.
Q. What other kinds of purposes would a contractor use this kind of information for during the course of the job?
A. They can look at it to track progress of individual elements of the work. They can use it to report to their bonding company. They could use it for financing options, going to the bank, things like that.

Page 37

Q. Would these job cost control systems be used to set up accounting codes to track costs that relate to a claim or potential claim in the case?

**A. Depending upon the claim, depending upon the circumstances, sometimes they can be used for that, depending upon the system also.**

Q. Assuming you have a system that will enable you to do that, under what circumstances would you be able to use your job cost control system to track costs on events on the job that could result in a claim?

**A. I guess this is purely hypothetical, first, you would have to have a system that was capable of doing that, I believe you mentioned that. Second, you would have to be using that system to do that type of work prior to the problems occurring, generally, in other words, so that you had knowledge of how the system worked and how it tracked cost, so you would have to already be using the system to that level of detail. Then you would have to have the types of costs that could be tabulated that way.**

**For instance, if a contractor was performing work, new work in a different area than they originally anticipated, it's very difficult to do on productivity impact claims or loss of efficiency claims because of the nature of the work, but where the cost can be segregated, as in a separate area, you can do that type of work and segregate**

Page 38

**those claim costs from the original contract costs, so that's one way that can be used.**

Q. Why is it difficult to segregate costs when you're dealing with a productivity loss claim?

**A. Because when you're working and your productivity is impacted, it's impacted incrementally all day long, based upon the -- whatever is causing that impact, and therefore, let's say for every hour that's worked, 20 minutes is done on contract work and 40 minutes is claim work, but you can't say this minute is contract work and this minute is claim work, it's -- you're just being slowed down in doing what you're doing, so every minute of every day is being slowed down by that impact, and is causing you a productivity loss, so it's not easy to separate.**

Q. Are you familiar with a damages methodology known as the measured mile?

**A. Yes.**

THE REPORTER: Known as what?

MR. KOSLOSKE: The measured mile.

Q. (BY MR. KOSLOSKE) What is the measured mile?

**A. It is a methodology that compares the contractor's ability to perform work on a particular contract, measure that performance, that unimpacted performance and measure that against impacted performance on the same project.**

Q. In what kind of circumstances is it appropriate to

Page 39

use the measured mile method of estimating damages?

**A. Most often I see it used on productivity impact claims.**

Q. Have you ever seen it used in any other context?

**A. Not that I recall.**

Q. Have you personally ever used it on any other context other than productivity loss claims?

**A. No, sir.**

Q. Next, Essentials of Texas Construction Law, University of Texas, 1988. How long was that course?

**A. I don't recall.**

Q. Was it more than a week?

**A. No.**

Q. What was covered in that course?

**A. Specific issues related to Texas construction law as opposed to Federal.**

Q. When you say Texas construction law, you mean contracts within the State of Texas?

**A. No. I mean contracts that would be litigated in the State of Texas or performed in the State of Texas.**

Q. And governed by the laws as well as judicial precedence in Texas?

**A. Yes.**

Q. The next course listed is 2nd Annual Construction Law Conference, University of Texas, 1989. How long was that

Page 40

conference?

**A. Two days.**

Q. And what kinds of courses, seminars, talking groups did you attend at that conference?

**A. Again, I don't recall specifically.**

Q. Turning to the third page of your resume, you have listed 3rd Annual Construction Law Conference and then a 4th Annual Construction Law Conference, both at University of Texas in 1990 and 1991. Were they similar to the other construction law conferences at the University of Texas that are listed in your resume?

**A. Yes.**

Q. Then you list a CSI Certification Course. What is CSI?

**A. Construction Specification Institute.**

Q. Okay. That was in 1981?

**A. Yes.**

Q. And then after that are listed 5th and 6th Annual Construction Law Conferences, University of Texas, 1992 and 1993. Are they similar to the earlier construction law conferences you attended at the University of Texas?

**A. Yes.**

Q. Then you list The Construction Superconference, and that was in 1994?

**A. Yes.**