Case 1:02-cv-00306-ECH Document 119-25 Filed 12/14/2004 Page 1 of 11

Page 41

Q. And this was sponsored or given by Andrews Conferences, Inc.?
A. Yes.
Q. Who is Andrews Conferences, Inc.?
A. A company that put on the Construction Superconference.
Q. Is that an annual event?
A. I believe they do it twice a year.
Q. Where was the one that you attended?
A. In New York City.
Q. How long did it last?
A. Two days.
Q. What topics did the conference cover?
A. Generally calculation of damages on construction projects, schedule analysis involving construction projects. I'm sure there were some legal topics talking about preparation of defending claims on construction projects.
Q. Are you presently a member of the Construction Specification Institute?
A. No, sir.
Q. And you list the 8th, 10th, 11th and 12th Annual Construction Law Conferences, and these are -- these were given by the State Bar of Texas in 1995, 1997, 1998, 1999?
A. Yes.
Q. And were they two-day conferences?

Page 42

A. Yes.
Q. Were they similar to the conferences that you attended at the University of Texas?
A. Yes.
Q. Then I guess you attended the Construction Superconference in 1998, and that was again given by Andrews Conferences, Inc.; is that correct?
A. Yes.
Q. Where was that?
A. San Francisco.
Q. What kinds of topics were covered at that conference?
A. Again, it was construction -- calculation of construction damages, contract management issues, critical path scheduling, and then other legal issues related to preparation and defense of claims.
Q. Was your purpose for attending the Construction Superconference solely to receive training?
A. Well, I guess I went there to market also, but primarily to receive training, yes, sir.
Q. It's not unusual for consultants to attend these conferences in attempt to also market services or generate clients; is that correct?
A. Some do.
Q. You have a list of Seminars and Papers Presented

Page 43

in your resume, and begins with a paper in 1986, and runs up through 2001; is that correct?
A. Yes.
Q. Did any of these seminars or papers presented involve dredging projects?
A. I don't recall any of my papers relating to -- specifically to dredging projects, no, sir. Maybe I should qualify. All of the topics presented, or a lot of the topics presented would relate to a dredging project, but I don't recall using dredging projects as specific examples in any of those papers.
Q. They relate to dredging projects in the sense that the skills involved, costing claims, pricing claims and so on could be applied in the context of a dredging project; correct?
A. Absolutely.
Q. But the papers did not themselves address the process of dredging; correct?
A. That's correct.
Q. Now, have any of the papers listed in your resume been published?
A. Yes.
Q. Which ones have been published?
A. Cost Engineering: A Contractor's Perspective.
Q. That was a paper prepared or issued in 1986?

Page 44

A. That's correct.
Q. Any others?
A. CPM Scheduling in Construction Claims, published in Cost Engineering Magazine, 1989; Microcomputers in Construction Claims was published in the American Society of Civil Engineers' Annual Conference materials in 1989; Construction Documentation was published with the Associated Builders & Contractors in 1991; Advances in Cost Control and Schedule Management for Commercial Construction was published at the 14th International Cost Engineers Congress in 1996; CPM Schedules in Construction Claims, Contractor's Perspective, was published for -- in the annual meeting book, for AACE International in 1999; and then one that I don't see on here was I spoke on Critical Path Scheduling at the Construction Law Conference in 2003.
Q. And where was that published?
A. With the State Bar of Texas Construction Law Conference Manual.
Q. And the first paper that you mentioned, Cost Engineering, a Contractor's Perspective in 1986, where was that published?
A. Actually, I'm not sure that was published. It was submitted as part of my certification review, but you're probably right, I don't think it ever got published.
MR. KOSLOSKE: Take about a three minute

Page 45

break?

MR. ERIKSON: Sure.

(Recess from 10:41 to 10:51 a.m.)

MR. KOSLOSKE: Back on the record.

Q. (BY MR. KOSLOSKE) Mr. McCullough, when we took a break we had just completed talking about seminars and papers you presented that are reflected in your resume, Exhibit 1 to this deposition.

I'd like to turn now to the part of your resume that is addressed to Construction Projects and Claims Experience. The information seems to be organized by Project Name in the first column, is that correct, the name of the project?

**A. That's correct.**

Q. And then under Location, is that where the work was performed?

**A. Yes.**

Q. And then under Type is the nature of the project?

**A. Yes.**

Q. Or the kind of project it was?

**A. Yes. It's a general description of the type of project.**

Q. And at the end of the list of Construction Projects and Claims Experience you have a key there for -- if there's an asterisk beside a project that means that your

Page 46

deposition was taken in that case; is that correct?

**A. That's correct.**

Q. And the next designation, what do you call that?

**A. That's actually a tilde, T-I-L-D-E, but I call it a squiggly, so the squiggly designates that I testified at trial or arbitration or that I participated in a mediation.**

Q. Then there's a -- supposed to be a designation for served as Arbitrator and it's not on the copy of the resume. What was that?

**A. I don't remember what designation it was, but it didn't transfer over to Microsoft very well, apparently.**

Q. You testified that you served as an Arbitrator in approximately half a dozen cases?

**A. Yes, sir.**

Q. Are they listed on this Construction Project and Claims Experience?

**A. Yes.**

Q. Would you identify them for us?

**A. I don't know that I can identify all of them, but I'll try.**

Q. Best of your ability, can you identify cases in which you've served as an Arbitrator?

**A. I apologize, none are jumping out at me right now. What I can do is go back and check the file and supply you a new copy, if you would like.**

Page 47

Q. That would be fine. That would be acceptable if you would do that, we appreciate it.

**A. Okay.**

Q. Can you tell us whether any of the cases in which you served as an Arbitrator involved a contract with the Federal Government?

**A. No, none of them involved the Federal Government.**

Q. Are the Construction Projects and Claims Experience, are the entries in any particular order? Are they chronological?

**A. Generally they're chronologic.**

Q. So if we begin with the earliest, would be the Kuakini Medical Center Parking Garage in Hawaii?

**A. Yes.**

Q. One of the projects that is listed in Construction Projects and Claim Experience is the Okfuskee County Road Resurface, Tulsa, Oklahoma, road resurface, it's towards the bottom of the third page of Construction Projects and Claims Experience.

**A. Yes, sir.**

Q. What kind of services did you provide on that project?

**A. That may have been the arbitration that I had. I don't recall right now.**

Q. Was this work performed in Tulsa, Oklahoma?

Page 48

**A. I believe that it would be.**

Q. Is Tulsa, Oklahoma, a part of Okfuskee County?

**A. I don't know.**

Q. What was the issue or problem that you were called to work upon in the Okfuskee County Road resurface job?

**A. I don't recall.**

Q. Just below that, about four entries, there's an entry for a project called Dorchester Levee, Grand Prairie, Texas.

**A. Yes.**

Q. It's described as a levee pipeline job?

**A. Yes.**

Q. What kind of services did you provide in that instance?

**A. I believe we were preparing a change proposal for the contractor.**

Q. And what was the occasion for preparing the change proposal?

**A. I apologize. I'm trying to recall the details of that particular project. I don't recall specifically. I know that we were working on constructing a levee, and there were some issues with constructing that levee and some problems they were having with -- with doing that, but I don't recall exactly what the problems were.**

Q. Who was your client in that instance?

Page 49

A. I believe it would be Oscar Renda Contracting, but I'm not sure.
Q. What kind of levee was involved?
A. What kind of levee? I don't think I understand your question.
Q. What were the -- what kind of material was used to build the levee?
A. It would be clay material.
Q. Where was the levee being constructed?
A. Generally Grand Prairie, but I don't recall specifically.
Q. What were the dimensions of the levee?
A. I don't recall.
Q. Do you recall whether the levee was constructed using mechanical method of construction or some other kind of construction?
A. Generally I would call it mechanical construction.
Q. Are there any other construction projects or claims experience projects listed that involved levee work?
A. Yes.
Q. Would you identify them for the record?
A. On the first page of the construction projects the Agana Sewage Treatment Plant, that's A-G-A-N-A. That was a wastewater treatment plant, and it involved construction of levees for protection of the facility and for containment

Page 50

structures.
Q. Who was your client in that case?
A. The City of Agana, Guam -- excuse me, I was working for Hawaiian Dredging & Construction Company, and we were working for the City of Agana, Guam.
Q. What kind of services did you provide in that case?
A. Contract management.
Q. And was the -- where was the levee being constructed?
A. I'm not sure. In Guam.
Q. Was it part of a containment structure?
A. There were several. There were containment structures that were built, and there was a levee to protect the facility from stormwater runoff, I believe, from adjacent areas.
Q. Was this the levee projects that you described earlier in your testimony today?
A. No, sir, and I don't see those in here for some reason.
Q. What kind of construction method or methods were used to build the levees that were involved in the Agana Sewage Treatment Plant project?
A. Generally I would describe them as mechanical construction methods.

Page 51

Q. Are there any other projects listed that involved levee work?
A. On page four, the sixth item down is ODOT Arbitration, that would have been one that I served as an Arbitrator on in Oklahoma City.
Q. And when was that arbitration?
A. I don't recall.
Q. What was the issue in the case?
A. I don't recall.
Q. Are there any other projects listed that involved levee work?
A. I'm sorry, involved what?
Q. Levee work.
A. Levee work?
Q. Levee projects.
A. The Sam Rayburn Dam and Reservoir. It's on the fifth page, sixth item down.
Q. When was that project?
A. I don't recall.
Q. Who was your client in that case?
A. I was hired by Granite Construction and the Fort Worth District of the Corps of Engineers.
Q. And what services did you provide in that case?
A. The contractor and the Corps had a dispute and they hired me to help them evaluate how they should resolve

Page 52

that dispute.
Q. The contractor and the Corps of Engineers jointly hired you?
A. Yes.
Q. This was a spillway modification job?
A. That was the primary work. There was levee work that was tying into that.
Q. Did the issue between the contractor and the Corps of Engineers relate to the levee work?
A. I believe there were issues that related to the levee work.
Q. Were these mechanically constructed levees?
A. Yes.
Q. And what were the issues that were related to the levees?
A. I apologize. I don't recall.
Q. Did you prepare any written recommendations or analyses for that case?
A. Yes.
Q. Did you submit them to the Corps of Engineers?
A. Yes.
Q. Which district of the Corps of Engineers were you dealing with?
A. It was the Fort Worth office. I don't recall specifically which district.

Page 53

Q. Do you recall specifically the person who was your contact at the Corps of Engineers?
**A. I don't offhand. I may here in a minute.**
Q. Are there any other projects listed on your resume that involved levee construction?
**A. Work similar to levees, but not specifically levee work.**
Q. What do you mean by "work similar to levees"?
**A. Well, for instance, I was hired by Granite Construction down in Florida. They were placing, mechanically placing excavated materials from a borrow area and placing it on top of wet, marshy ground, and they were having a subsidence issue, as they placed the material in, it built up to the prescribed levels, prescribed by the State, the material was settling down. It was causing water to squeeze out of the underlying materials and causing subsidence of the entire structure. They had to build that up and they were claiming extra monies as a result of that.**
Q. What was the project in that case?
**A. What was the name of the project?**
Q. Yes.
**A. I believe that was the Polk Parkway project, page five, about a third of the way down the page.**
Q. Okay, I have it. And your client was Granite Construction?

Page 54

**A. Yes.**
Q. How was the contractor being paid for the excavation in that case?
**A. I believe they were being paid a unit price.**
Q. For cubic yards of material placed?
**A. In place cubic yards of finished construction.**
Q. How was the material measured for payment?
**A. It was surveyed.**
Q. Before and after?
**A. Yes.**
Q. Where was the surveying done?
**A. What do you mean, where?**
Q. Was that the borrow pit?
**A. No, finished product.**
Q. So they weren't surveying the borrow pit before and after the job was finished to determine the quantities removed from the borrow pit?
**A. I don't recall them doing that.**
Q. What kind of services did you provide in that case?
**A. I assisted them in calculating what their damages should be and what the schedule impact was on that project and assisted them in preparing their claim for submittal to the Florida Department of Transportation.**
Q. What did you recommend in that case?

Page 55

**A. I recommended that they be paid their actual cost of performing that additional work, of having to go back in and redo the work and continue to bring the structure up to the elevation.**
Q. Did you perform a subsidence analysis in that case?
**A. I personally did not do that, no, sir.**
Q. Did someone else perform such an analysis?
**A. I don't recall.**
Q. Did you perform a settlement analysis?
**A. Not as such. Well, when you say settlement analysis, I did evaluate the settlement, so I guess I did.**
Q. I guess I don't want to confuse you. I'm thinking of settlement in terms of the material, not settlement in terms of the claim.
**A. I definitely looked at the type of material and determined that they had made a mistake in the design, and the foundation was inadequate to support the structure that they had designed to go on top of it, and the weight of the structure was causing it to go down and that it was a design issue; that it was not a contractor issue.**
Q. What was the mistake in the design that you identified?
**A. That the -- the foundation was not adequate to support the structure they had put on top of it.**

Page 56

Q. What did the foundation consist of?
**A. Wet, marshy materials.**
Q. Have you ever heard of settlement plates before?
**A. Heard of what?**
Q. Settlement plates.
**A. Settlement plates?**
Q. Right.
**A. I've heard the term, but I don't know what you're talking about.**
Q. You don't know what they are?
**A. Not offhand, no.**
Q. Are there any other projects on the list of Construction Projects and Claims Experience that involve levee work or that were levee projects?
**A. Not that I saw.**
Q. Are there any projects on your list of Construction Projects and Claims Experience that were dredging projects?
**A. No, sir.**
Q. Aside from the Polk Parkway project that you testified to a moment ago, are there any projects listed on your Construction Projects and Claims Experience list that involved construction of structures on soft foundation?
**A. I would say lots of -- lots of projects that I've worked on involved constructing structures on top of soft**

Case 1:02-cv-00306-FCH Document 119-25 Filed 12/14/2004 Page 5 of 11

Page 57

foundations.
Q. In those cases were you involved in any way with the design of the project?
A. I did not design any of those projects.
Q. What kind of involvement did you have in the projects that involved the construction of structures on soft foundation?
A. Typically I would go in and look at what the problem was, generally the problem is subsidence of the structure and go in and evaluate what was causing that structure to sink or cave in or fall down or whatever, whatever the failure was, and would evaluate what was causing that. And if it was a design related issue we would recommend that the contractor be paid additional money to fix that.
Q. So in these projects you critiqued -- you evaluated and critiqued the designs?
A. Yes.
Q. Did any of these projects that you were involved in that involved the construction of structures on soft foundations involve the construction of levees or dikes at containment sites for the disposal of dredged material?
A. No, sir.
Q. Would you identify the projects on your list of Construction Projects and Claims Experience that involved

Page 58

contracts awarded by the Army Corps of Engineers?
A. You're asking about projects -- not projects that were constructed for other agencies that were being construction managed by the Corps, but contracts that were actually issued with the Corps of Engineers?
Q. Okay. Let's take, first of all, the contracts that were awarded by the Corps of Engineers and after that I'll ask you about the contracts that were managed by the Corps of Engineers, even though they may not have been awarded by the Corps of Engineers.
A. Offhand I don't -- some of those I'm not sure I would recall at all anyway. The one we talked about, the spillway modification, was being managed by the Corps.
Q. Which project was that?
A. Sam Rayburn Dam and Reservoir.
Q. And what page is that?
A. Page five, sixth item down from the top.
Q. So let me understand. Were there any -- are there any projects listed that involve contracts that, to your knowledge, were awarded by the Army Corps of Engineers?
A. I believe that contract was awarded by the Army Corps of Engineers.
Q. Are there any other projects in your list of Construction Projects and Claims Experience that involved contracts that were awarded by the Army Corps of Engineers?

Page 59

A. I don't see them here on the list, but when I was assigned in Guam I worked on those levee projects that I described to you earlier. My recollection is the majority of the rest of those projects were with the Department of the Navy. I don't believe the Corps was managing those.
I believe the -- on page one, down towards the bottom, the Pacheco Pass Conduit and the Pacheco Pumping Plant were both projects -- well, the Pacheco Pass Conduit was, I believe, a Corps of Engineers project.
The pumping plant, I don't recall if that was Bureau of Land Management for the canals. The Moyer Landfill on page four, the fourth item down, was being managed by the Corps of Engineers. I believe on page four, like two-thirds of the way down the page, the Brooke Army Medical Center, I believe, was being managed by the Corps of Engineers.
Q. Any others?
A. No, sir. That's all I see.
Q. The Pacheco Pass Conduit case, Pacheco Pass, California, Large Bore Concrete Pipeline --
A. Yes, sir.
Q. -- approximately what was the date of your involvement in that project?
A. Probably 1984 or 1985.
Q. And what kind of services did you provide in that

Page 60

case?
A. We were assisting the contractor in preparing a claim.
Q. Who was the contractor?
A. I believe it was Rogers Construction.
Q. And what Corps of Engineers district was involved?
A. I don't recall.
Q. What was the issue in that case?
A. The contractor was being asked to put in a large bore concrete pipeline over Pacheco Pass, and the structures that they were asked -- being asked to put it on, the material, the foundation that they were being asked to put this pipe structure on in several areas was failing. There were clays out there that were unable to support the material, the piping materials, backfilling materials that were on top of it. So we went in and reevaluated whether the design was adequate for the situation and determined that it was not and determined that the contractor should be entitled to additional compensation for that work.
Q. Did you prepare the claim?
A. Yes.
Q. Did the claim include equipment cost?
A. Yes.
Q. How did you price the equipment cost?
A. I don't recall.

Page 61

Q. Do you recall whether you used actual costs in pricing the equipment cost in that case?
A. **I don't recall.**
Q. The Moyer Landfill job in Collegeville, Pennsylvania, EPA Superfund Cleanup, you testified was a project that was being managed by the Corps of Engineers; is that correct?
A. **Yes.**
Q. When did you become involved with that project?
A. **I don't recall the date.**
Q. What kind of services did you provide in that case?
A. **We assisted the contractor in preparing the claim.**
Q. Who was the contractor?
A. **Oscar Renda Contracting.**
Q. And what was the issue in that case?
A. **Differing site conditions, extra work. There was productivity impact, scheduling impact.**
Q. What Corps of Engineers district was involved?
A. **I don't recall.**
Q. Did you price equipment costs as part of that claim or those claims?
A. **Yes.**
Q. How did you price the equipment?
A. **We used the Corps of Engineers Manual, we used**

Page 62

**actual cost. We used invoices, we used --**
Q. When you say the Corps of Engineers Manual, what are you referring to?
A. **I don't recall the specific title of the manual, so there's a Corps of Engineers pricing manual for equipment.**
Q. Is that for ownership an operating expense manual for construction equipment?
A. **I'll take your word for it. That sounds right.**
Q. In your report in this case you talk about the Corps' schedule for construction equipment, ownership and operating costs or expenses. Is that the manual you're referring to?
A. **Same one, yes, but different -- different manual, because it's a different area, but, yes.**
Q. Different region, but same kind of schedule?
A. **That's correct.**
Q. The Moyer Landfill project, that was not one in which you testified in court or in any kind of legal proceeding; is that correct?
A. **That's correct.**
Q. The Brooke Army Medical Center project, San Antonio, Texas, is another one that you testified was a project that was managed by the Corps of Engineers. Who was the -- the owner in that case?
A. **I believe it was the Army.**

Page 63

Q. And who was your client in that case?
A. **The general contractor.**
Q. Who was the general contractor?
A. **It was a joint venture of Manhattan Construction and somebody else. I apologize. I can't remember.**
Q. When did you become involved in that case?
A. **Towards the end of the project.**
Q. What kind of services did you provide in that case?
A. **They had several claims outstanding with the government that they were prosecuting, and they had subcontractor claims against them, and I helped them in assessing the validity of the claims, both sets of claims.**
Q. Did you do any pricing of the claims?
A. **Yes.**
Q. Did you price equipment costs?
A. **Yes.**
Q. How did you do that?
A. **We used actual costs.**
Q. And in that case you said the Corps of Engineers managed the contract. Was the contract officially between the Department of the Army and the general contractor?
A. **I don't recall.**
Q. Are you familiar with the Armed Services Board of Contract Appeals?

Page 64

A. **Yes.**
Q. Have you ever testified before the Armed Services Board of Contract Appeals as an expert witness?
A. **No.**
Q. Are you familiar with the -- what was formerly the Engineering Board of Contract Appeals?
A. **Yes.**
Q. Have you ever testified before the Engineering Board of Contract Appeals as an expert witness?
A. **No.**
Q. Are you familiar with the Court of Federal Claims?
A. **Yes.**
Q. Have you ever testified in a case before the Court of Federal Claims as an expert witness?
A. **I don't -- well, I don't believe so. I testified in Federal Court, but not -- I don't believe it was Court of Claims.**
Q. The appearances in Federal Court, are you referring to United States District Courts?
A. **I believe that's what it was, yes, sir.**
Q. And when you testified in the Federal District Courts has your testimony been in cases between -- that did not involve the Federal government as a party?
A. **There are -- most of them that's true. There was one that was against the Postal Service. I'm trying to -- I**

**believe it was the Postal Service, and that's why I can't remember. I believe it was just a Federal Court, but I don't recall specifically what jurisdiction.**
Q. Is that listed on your Construction Projects and Claims Experience list?
**A. Theoretically it would be. I just -- I don't recall the name of the project either.**
Q. Were you qualified as an expert witness in that case?
**A. Yes.**
Q. In what field or areas were you qualified as an expert witness?
**A. Cost engineering, damage calculations, schedule analysis, generally that was -- that was what my testimony entailed.**
Q. Have you ever been qualified by a court or any administrative entity as a expert witness in any field that relates to geotechnical engineering?
**A. Yes.**
Q. What field or areas have you been qualified as an expert witness that relate to geotechnical engineering?
**A. Well, evaluating soils boring reports, evaluating contract documents, compaction soils, soil classifications, porosity of soils, generally the way soils will act, I call it civil engineering, but the way soils will react to**



**compaction, so I guess that would relate to density testing, and then general soil characteristics, shrink and swell, compaction methods.**
Q. Have you been offered as an expert witness in each of those specific areas and accepted as an expert witness in those areas?
**A. I have been offered as an expert and testified in all of those areas. I don't know that -- I don't recall those specific categories being listed per se in my -- when they offered me as an expert, but it was to talk about all of those topics.**
Q. Well, in those cases were you offered as an expert with respect to damages calculations, cost engineering, that sort of thing?
**A. I was offered as an expert in -- in all of those things, in other words, it would -- it would have been the result of, say, a foundation failure, building structure, I would then -- I would discuss why the failure occurred, and then I would discuss the cost impacts and the schedule impacts that resulted from that.**
Q. But in those cases were you formally qualified as a damages expert?
**A. In almost every case, I'm -- yes, I am shown as the damages expert also.**
Q. So you would have been qualified as a damages



expert or delay expert, and as part of your testimony you discussed things like -- that involved the interpretation of the soil boring reports and evaluation of contract documents, soils classification issues, porosity of soils, those kinds of things?
MR. ERIKSON: Objection, form. You may answer.
**A. I don't agree with your characterization of it. I would have been brought in as a professional civil engineer to talk about those topics as an engineer, not as a cost engineer, just talking about something that happened, but to bring my -- my civil engineering background to bear on those topics, as well as my cost engineering and my scheduling expertise.**
Q. (BY MR. KOSLOSKE) Okay. Now, on your list of Construction Projects and Claims Experience can you identify for us those instances in which you were qualified as an expert witness and gave testimony in which you addressed soils boring reports?
**A. Piilani Highway, page one, halfway down, Category 4, Package B Sewer Line, Big Bear Interceptor Sewer, RM 620 in Austin, Texas, San Patricio County Airport, West Side Basin.**
Q. Which case was that? That's page four?
**A. Yes, sir. City of Alvin Sewer Line, Grapevine**



**Mills Mall. If I didn't mention it, the Big Bear Interceptor Sewer.**
Q. What page is that on? I see it.
**A. Those are all the ones that I recall that we had an issue related to soils materials and soils borings and evaluating the soils borings. I would say all of the utility projects that I worked on, where they were underground projects we evaluated the soils borings. I just can't recall whether we had issues related to the soil borings or not.**
Q. Okay. What about cases in which you've been qualified as an expert witness in which your testimony has addressed porosity of soils? Are they the same as the list of cases that you mentioned, or are they different cases?
**A. They would be the same cases. Not all of them involved porosity.**
Q. What about cases in which your expert testimony has addressed the reaction of soils to compaction, density testing issues? Are they the same cases that you just mentioned or are they different?
**A. Generally speaking, every project that I worked on, on the actual construction of, as working for the general contractor for the subcontractor, I dealt with compaction of soils, and then also I guess the evaluation of those soils using soil borings or tests, so all of my -- my direct construction experience.**

Page 69

As far as testifying as an expert and being brought in as an expert, I'm trying to recall specifically. We've had several highway projects, the Piilani Highway, that would involve density testing of the materials.

All the sewer line projects that I testified in would involve density testing of the soils and compaction of those soils.

I'm trying to think of the commercial projects where -- density is always an issue. It's an issue in placing any kind of structure on any kind of soil, the density is taken into account, so I just got through testifying in some Highway Department cases where density was an issue in road construction, so we deal with it on a lot of projects.

Q. The Piilani Highway project?
A. Yes, sir.
Q. That's one you have an asterisk beside. Would that indicate, according to the legend we discussed earlier, that you gave a deposition in that case, but did not testify at trial; correct?
A. It was resolved prior to going to trial, correct.
Q. So you would not have been formally qualified as an expert in that case; is that correct, by a Court or Board?
A. That would be correct.
Q. There was no trial, the lawyer didn't get up and

Page 70

say, "I offer Mr. McCullough as an expert in various enumerated fields"?
A. That's correct.
Q. Would the same be true for category number four, package B sewer line, that case didn't go to trial; right?
A. That one went to arbitration.
Q. Okay.
A. I did testify as an expert.
Q. You did?
A. Yes.
Q. You were offered as an expert in what area or fields?
A. Soil compaction, the nature of soils, their ability to perform under certain circumstances, density testing.
Q. The Big Bear interceptor sewer case, what was the issue in that case?
A. A contractor was claiming a differing site condition for both porosity of soil and water intrusion into his trench, and the contractor encountered rock under parts of his excavation that he didn't think he should have anticipated.
Q. Who were the parties to the contract in the Big Bear interceptor case?
A. The City of Colleyville, Texas, the contractor --

Page 71

I apologize, I just don't recall the contractor's name offhand.
Q. In what field or areas were you qualified as an expert -- strike that. Was that an arbitration or a court case?
A. Court.
Q. In what area or fields were you qualified as an expert to offer opinion testimony?
A. Well, generally in engineering, because I evaluated the log borings that had been done prior to construction, the adequacy of the log borings. I was representing the City and the testing laboratory. I testified about the adequacy of the contractor's preparation of his claims, so I talked about damages and damage methodologies and calculation of equipment costs and labor costs and things like that. I talked about differing site conditions and whether he had properly done the predicate things to -- to entitle him to a differing site condition claim. So I talked about all those different issues, so damage calculations as well as engineering issues.
Q. Now, this would have been a municipal contract that contained a differing site conditions clause?
A. I don't recall whether it had differing site condition clause, but it would have -- that was the issue that was involved in the case.

Page 72

Q. Did the contract -- it was a written contract, I assume?
A. Yes.
Q. And did it contain a standard clause that was called a differing site conditions clause or a changed conditions clause?
A. It had some type of clause, yes, sir.
Q. Do you know whether it was virtually identical to or different than the differing site condition clause that's inserted in the Federal Government contract?
A. It was similar to those differing site condition clauses. It was not exactly the same.
Q. What did you conclude in that case regarding the differing site conditions clause by the contractor?
A. That in the majority of his claim he was not entitled to a differing site condition claim.
Q. And why was that?
A. Because he failed to take into account the site conditions that were evident from the drawings.
Q. The RM 620 case --
A. Yes, sir.
Q. -- who were the parties to the contract in that case?
A. There was a contractor building the highway. I was working for the engineer who designed the highway, and it

Page 73

would have to be Texas Department of Transportation as the owner.
Q. And what was the issue in that case?
A. The contractor that was making claims about soils that they were -- that they were using on the project, the compaction of those soils, and he had a productivity impact claim based upon, I believe it was based upon his being disallowed -- not allowed to use certain materials that he thought he should have been allowed to use.
Q. And was that a court case?
A. Yes.
Q. And what area or fields were you qualified as an expert witness?
A. Civil engineering and damage calculations and schedule analysis.
Q. The San Patricio County Airport case, Corpus Christi, Texas, who were the parties to the contract in that case?
A. That would have been Bay, Incorporated and San Patricio County.
Q. Who was your client in that case?
A. Bay, Incorporated.
Q. What was the issue in that case?
A. The county had rejected the placement of materials based on density and based on gradation of the materials, and

Page 74

they rejected -- so they rejected the contractor's placement of those materials. The contractor had to remove and replace those materials, and we went in and evaluated the type of soil, the graduation of the soil, the specifications regarding graduation of soils, and the adequacy of the soils -- the acceptability of those soils.
Q. Was that an arbitration or court case?
A. Arbitration.
Q. In what fields were you qualified as an expert witness?
A. Engineering issues and damages and schedule impact.
Q. The West Side Basin Case, who were the parties to the contract in that case?
A. I was representing the general contractor, who I believe was Weitz Corporation, W-E-I-T-Z. There was a subcontractor claim, and I believe the owner would have been the City of Des Moines, Iowa.
Q. And what was the nature of the claim in that case?
A. There was a dispute over the consolidation of soils on the site and then later the impact that that caused on the remainder of the project.
Q. Was that a court case or an arbitration?
A. I believe that was -- I really don't know.
Q. You have an asterisk beside that one. Is that a

Page 75

case in which you gave a deposition but did not testify in court or any other type of hearing?
A. It would appear so, yes.
Q. City of Alvin Sewer Line, who were the parties to that case?
A. The City of Alvin, Texas, was the owner. The contractor, I believe, was Cat Construction.
Q. Who was your client?
A. Cat Construction.
Q. What was the issue in that case?
A. The issue was a acceptability of native materials for backfilling around the sewer line, so we evaluated from the log borings the natural materials that were there and their use in -- compacting those materials and their use in backfilling in accordance with the specifications.
Q. Was that a court case or an arbitration?
A. That was a court case.
Q. And what area or fields were you qualified as an expert witness?
A. Both engineering damages and schedule.
Q. In the City of Alvin Sewer Line case, did you order borings or just review the existing borings?
A. No. We had -- we had existing borings. We didn't need to order new borings.
Q. The Grapevine Mills Mall case --

Page 76

MR. ERIKSON: Are you moving to another case?
MR. KOSLOSKE: Yes.
MR. ERIKSON: Can we take a brief lunch? If we go now we beat the rush.
MR. KOSLOSKE: All right.
(Recess from 11:59 to 1:03 p.m.)
MR. KOSLOSKE: Back on the record.
Q. (BY MR. KOSLOSKE) Mr. McCullough, when we broke we were looking at your resume which is marked for identification as Exhibit 1, and I was about to ask you about a project called Grapevine Mills Mall, Grapevine, Texas, outlet mall?
A. Yes.
Q. Now, that was a case where you gave a deposition, but you didn't testify at a trial or any other kind of proceeding?
A. That's correct.
Q. Who was your client in that case?
A. The contractor that was doing the dirt work.
Q. And who was the other party to the contract?
A. It was a developer. I don't recall their name.
Q. What was the issue in that case?
A. It was a compaction of clay soils and the amount of time and the methodology to compact the clay soils.

Page 77

Q. And what kind of services did you provide in that case?
A. We evaluated the soils testing that was done originally, identified the soils, the soil borings, and we helped the contractor assess the types of material that he actually was encountering and the appropriate methodologies to use to compact those source in accordance with the specifications. They were being held to a higher tolerance, so we evaluated that. We calculated as a result of the engineer changing those specifications verbally the additional work that was required by the contractor to perform that extra work.
Q. You have a -- one of the projects listed as Tinker Air Force Base, Oklahoma City, Oklahoma, fueling system.
A. Yes, sir.
Q. Who were the parties to that contract?
A. The contractor -- I can't remember the name now. They were originally from Kentucky. When I met them they were in Florida. They were the contractor, general contractor for a fueling system for the Air Force Base, and the Air Force managed their own contract, I believe.
Q. So was the dispute in that case between the Air Force and the contractor?
A. Yes.
Q. And you were retained by the contractor?

Page 78

A. That's correct.
Q. And did you provide testimony in a court hearing?
A. I'm trying to remember the venue for that. I would assume it was a court hearing and not an arbitration. I just don't recall.
Q. What was the issue in that case?
A. There were several issues. There was interpretation of the specifications. There was interpretation of the scope of work that the contractor was to perform. The contractor had been delayed in performance of the work and was being asked to perform extra work, so we assisted them in doing the schedule analysis and doing that damage calculation.
Q. When did this occur?
A. I would say possibly four to five years ago.
Q. Did you testify in a trial before the Court of Federal Claims?
A. I don't believe so. I apologize. I don't recall what -- what venue that occurred in.
Q. Do you recall where the trial was held, what city?
A. No, sir. Excuse me, that was an arbitration hearing.
Q. The Tinker Air Force Base case?
A. Yes, that was an arbitration.
Q. And in what area or fields were you qualified as

Page 79

an expert?
A. Damages and contract management and schedule analysis. I'm trying to remember if there were any civil engineering issues on that project. I just don't recall.
Q. One of the projects listed in your resume is the Moyer Landfill project. I believe you testified that your client in that case was Oscar Renda Contracting; is that correct?
A. Yes.
Q. Have you been retained by Oscar Renda Contracting for any other projects that are in the list included in your resume?
A. Yes.
Q. Would you identify which ones they are?
A. Don't know if I can identify all of them. I'll certainly try. On page one, the Category 4 Package B Sewer Line in San Antonio, Texas. The Southside Diversion Sanitary Sewer, the Cadiz Street Sanitary Sewer, C-A-D-I-Z, the Rowlett Creek Water Line. I believe the Trinity River Authority Segment 1 and Segment 2 projects; Lake Texoma Pipeline, Section I; Eastside/Bachman project in Dallas, Texas; Little Walnut Creek project in Austin, Texas; Elm Fork Water Treatment Plant, Carrollton, Texas; Jefferson Avenue Relief Tunnel project; I believe the Big Bear Interceptor, Sections II and III; Dorchester Levee project.

Page 80

Q. What page is that?
A. Three. Westbank Interceptor; I believe the Bachman Creek Relief Wastewater Main. I think that's all.
Q. What, if any, experience do you have with the design or fabrication of dredges?
A. None.
Q. Have you ever held yourself out as an expert with respect to dredging with a hydraulic cutter head dredge or any aspects of dredging with a hydraulic cutter head dredge?
A. Not specifically, no, sir.
Q. Have you ever held yourself out to be an expert with respect to any type of dredge?
A. Not specifically to dredging, no, sir.
Q. Have you ever been qualified by a court or administrative entity as an expert with respect to dredging with a hydraulic cutter head dredge or any aspects of dredging with a hydraulic cutter head dredge?
A. Not that I recall.
Q. Have you ever been qualified by a court or administrative entity as an expert with respect to any type of dredge?
A. Not that I recall.
Q. Do you consider yourself to be an expert with respect to dredging with a hydraulic cutter head dredge or any aspects of dredging with a hydraulic cutter head dredge?

A. To the extent that calculated damages related to that of productivity or schedule, I could evaluate those and would be qualified as an expert in those areas.
Q. Do you consider yourself to be an expert with respect to the pumping of dredged material through a pipeline from a hydraulic cutter head dredge to a disposal site for dredged material?
A. Not to the technical aspects of it, but to the cost of it and the impact that certain things would have on it, yes.
Q. My question was with regard to the technical aspects. Have you ever been qualified by a Court or administrative entity as an expert with respect to the pumping of dredged material through a pipeline from a hydraulic cutter head dredge to a disposal site for dredged material?
A. No, sir.
Q. Have you ever been on a dredge?
A. I don't believe so. Well, it's a technicality, but, yes.
Q. When and where?
A. When I was a boy growing up we took a driving trip through Alaska, we went and looked at all the dredge tailings and I read up on how the dredging was being done up there, we actually climbed aboard several dredges that were abandoned



up there, 50 to a hundred years before, so...
Q. How old were you at the time?
A. Probably junior high school age.
MR. ERIKSON: That's a vacation?
A. I thought it was cool. It is for an engineer.
Q. (BY MR. KOSLOSKE) Have you ever designed a disposal facility for dredged material?
A. No, sir.
Q. Have you ever participated in the design of a disposal facility for dredged material?
A. Not from the design side.
Q. Have you ever designed a levee or dike for a disposal facility for dredged material?
A. No, sir.
Q. Have you ever participated in the design of a levee or dike for a disposal facility for dredged material?
A. Only to the extent that I was associated with it from a construction standpoint, but not -- I didn't perform any of the design work associated with it.
Q. Have you ever designed a levee or dike of any kind?
A. No, sir.
Q. Have you ever participated in the design of a levee or dike of any kind?
A. Other than the construction of them, no.



Q. Have you ever designed a structure that was to be erected on a soft foundation?
A. No, I have not designed a structure to be erected on a soft foundation.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of disposal facilities for dredged material?
A. No, sir.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of a levee or dike for a disposal facility for dredged material?
A. No, sir.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the design of levees or dikes in general?
A. I don't recall.
Q. What, if any, experience do you have with the construction of disposal facilities for dredged material?
A. I reviewed it on this project. I know it exists on other projects. I have seen projects built on material that I had assumed was put there by dredges.
Q. My question was, though, what, if any, experience have you had with the construction of disposal facilities for dredged material?



A. Oh, I apologize. I didn't... I don't recall ever -- I'm sorry, designing or constructing?
Q. Constructing.
A. I don't recall ever constructing a disposal site for dredged materials.
Q. What, if any, experience do you have with the construction of levees or dikes for the -- for disposal facilities for dredged material?
A. I don't recall ever working on dikes that were specifically for disposal of dredged materials.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of disposal facilities for dredged material?
A. No, sir.
Q. Have you ever been qualified by a Court or administrative entity as an expert with respect to the construction of a levee or dike for a disposal facility for dredged material?
A. No, sir.
Q. I'll turn now to your engagement in this case. You're familiar with the Upper Bayou Project?
A. Yes.
Q. When I use that term you understand that what I'm referring to is a contract between Oscar -- between Renda Marine, Inc., and The United States, acting through the Corps