of Engineers, Galveston District, for dredging Upper Bayou and related construction work at the Lost Lake Placement Area?
A. **Yes, sir.**
Q. When were you initially contacted about your engagement in this litigation?
A. **Sometime last year, 2003.**
Q. Who contacted you?
A. **Mr. Brian Erikson.**
Q. Did you discuss the scope of the engagement with him at the time?
A. **I honestly don't recall.**
Q. Do you recall anything in the conversation you had with Mr. Erikson initially?
A. **Nothing specific, just that he talked with me about the project.**
Q. That was sometime in 2003?
A. **Yes.**
Q. What, if any, work did you perform on this engagement in 2003?
A. **I -- I don't recall.**
Q. You don't recall performing any work, or you don't recall one way or the other whether you performed any work?
A. **I don't recall one way or the other whether I performed work in 2003 or not.**



Q. Do you recall submitting an invoice for services related to this engagement to Mr. Erikson for work in 2003?
A. **No, sir.**
Q. You don't work for free, do you?
A. **No, sir.**
Q. When was the next time that you spoke with Mr. Erikson after the initial contact by him in 2003?
A. **I don't recall.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 2 MARKED.)
Q. (BY MR. KOSLOSKE) Have you performed an evaluation of Renda Marine's claims in this litigation?
A. **Yes.**
Q. When did you undertake that that investigation?
A. **I apologize. I don't recall when it started.**
Q. Was it before this year, 2004?
A. **Again, I don't recall.**
Q. I show you what's been marked for identification as Exhibit 2. Do you recognize this document?
A. **Yes, sir.**
Q. Is this an initial report that you prepared for this litigation?
A. **I believe that's correct.**
Q. Does your signature appear at the bottom of the



first page?
A. **Yes.**
Q. When did you begin drafting this report? I note it's dated January 23 of 2004.
A. **Sometime prior to January 23rd. I don't recall specifically what day I started.**
Q. Was it a day in January?
A. **I don't recall.**
Q. Would you have begun drafting it in December of 2003?
A. **It's very possible.**
Q. Did you begin draft -- would you have begun drafting this report in November of 2003?
A. **I could have.**
Q. When is the earliest point in time that you can -- that you may have begun drafting what is marked for identification as Exhibit 2?
A. **I really have no recollection.**
Q. You can't tell us how many hours that you've put into this engagement in 2003?
A. **No, sir.**
Q. How many hours did you expend prior to the issuance of your January 23, 2004, report on the engagement?
A. **I don't recall.**
Q. Do you have records that would show that?



A. **Yes.**
Q. What kind of records?
A. **Invoices.**
Q. Have you produced the invoices?
A. **I don't know if I have or not.**
MR. KOSLOSKE: Mr. Erikson, I'm going to make a request to see the invoices since the witness can't answer the question.
MR. ERIKSON: You didn't produce invoices for Mr. Connole.
MR. KOSLOSKE: Excuse me?
MR. ERIKSON: You didn't produce invoices for Mr. Connole.
MR. KOSLOSKE: So your response is you won't produce invoices because we didn't produce invoices for Mr. Connole?
MR. ERIKSON: I didn't say that. I'm just wondering why you didn't produce Mr. Connole's. Mr. McCullough is in the same situation.
MR. KOSLOSKE: That's a separate issue. I'm requesting that the invoices for Mr. McCullough be produced since he can't remember or even give us a ballpark idea of how much time he's spent on the engagement or when he began.
MR. ERIKSON: Will you agree to produce them for Mr. Connole?

Page 89

MR. KOSLOSKE: No, I will not.
MR. ERIKSON: Then I'll have to talk to my client about it.
Q. (BY MR. KOSLOSKE) Did you draft what is marked for identification as Exhibit 2?
**A. Yes.**
Q. I think you testified earlier that you -- that Mr. Coakley has performed services in connection with this engagement?
**A. That's correct.**
Q. Did Mr. Coakley generate any documents related to this engagement?
**A. Yes.**
Q. And have you produced those documents for the government?
**A. I'm trying to recall how we -- we identified documents. I don't recall whether they've been produced or not, but we identified those documents.**
Q. We received documents that were represented to us to have been your work papers --
**A. Yes, sir.**
Q. -- in the case.
**A. Yes, sir.**
Q. Did those documents include papers or documents generated by Mr. Coakley?

Page 90

**A. Yes.**
Q. So they could -- you consider Mr. Coakley's -- anything that he generated for this case to be part of your work papers?
**A. Yes.**
Q. Have you visited the Upper Bayou Project?
**A. I'm familiar with the area, but, no, I have not gone to the project site.**
Q. You've not visited Lost Lake Placement Area?
**A. No.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 3 MARKED.)
Q. (BY MR. KOSLOSKE) Mr. McCullough, showing you what's been marked for identification as Exhibit 3. Do you recognize this document?
**A. Yes.**
Q. What is Exhibit 3?
**A. It is an evaluation of claims on the Upper Bayou Project.**
Q. Is this your report dated March 3, 2004, in this case?
**A. Yes.**
Q. Did you draft this report?
**A. Yes.**

Page 91

Q. The report has about 16 tabs to it. Did you prepare each of the tabs?
**A. They were prepared under my supervision. I didn't actually do the typing of the data into these, no.**
Q. Were all of the tabs prepared by the same person?
**A. Generally speaking, yes.**
Q. Who was that?
**A. Mr. Coakley.**
Q. How much time has Mr. Coakley spent on the engagement in this case, up to March 3, 2004, when your report was issued?
**A. He spent many hours on it. I don't have an exact number for you. I apologize.**
Q. Does he -- how much does he charge for his time?
**A. His rate to me?**
Q. Yes.
**A. I believe he charges in the neighborhood of 58 to $60 an hour.**
Q. How much have you paid him to date?
**A. I don't know.**
Q. Can you give me a ballpark idea? Was it more than a hundred thousand dollars?
**A. No.**
Q. Was it more than $50,000?
**A. That I don't know.**

Page 92

Q. How much have you been -- how much have you billed for your time in this case to date?
**A. I don't know.**
Q. Has it been a hundred thousand dollars or more?
**A. I doubt that it would have been a hundred thousand dollars.**
Q. Do you know whether it's been more than $50,000?
**A. It might be around $50,000.**
Q. And what is your hourly rate?
**A. My hourly rate is 195 an hour.**
Q. Between January 23, 2004, the date of your initial report in this case, and March 3, 2004, the date of your report that's marked Exhibit 3, did you devote a hundred percent of your time to this engagement?
**A. No, sir.**
Q. Approximately what percentage of your time did you devote to this engagement during that period of time?
**A. Approximately 25 percent.**
Q. Did you speak with anyone in addition to Mr. Coakley in conjunction with the preparation of your March 3, 2004, report?
**A. Yes.**
Q. Who?
**A. We talked with Mr. Bowman, we talked with Barry, we talked with Rudy Renda, we talked with Kent Ray. I**



Pl. App. 334

Page 93

**apologize. There was another one of the project managers for Renda Marine that I talked to.**
Q. Did you speak with Ben Goodloe?
A. **I believe so.**
Q. Do you know who Eddie Fisher is?
A. **Yes.**
Q. Have you spoken with Eddie Fisher?
A. **No, sir.**
Q. Prior to the issuance of your March 3, 2004, report did you review any deposition transcripts?
A. **I don't recall reviewing deposition transcripts, no, sir.**
Q. You testified you spoke with Steve Bowman; correct?
A. **Yes.**
Q. More than once?
A. **Yes.**
Q. How many times have you spoken with Mr. Bowman? This is prior to the issuance of your March 2004 report.
A. **I'll estimate 30 times.**
Q. What did you discuss with Mr. Bowman?
A. **All aspects of the project.**
Q. Did you discuss all of the claims that are the subject of your report with Mr. Bowman?
A. **Yes.**

Page 94

Q. Did you review the facts of the claims with Mr. Bowman?
A. **Yes.**
Q. Did you review -- strike that. Did you discuss with Mr. Bowman Renda's bid estimate for the -- that was prepared for the Upper Bayou Project?
A. **Yes.**
Q. What did you discuss?
A. **Did he prepare it, what was his -- what did it reflect, that sort of thing.**
Q. And what did the bid estimate look like to you, what kind of a document was it?
A. **It was a spreadsheet.**
Q. Did Mr. Bowman provide you with any other documents besides the spreadsheet that were prepared by him or any other representative of Renda Marine prior to the submission of Renda Marine's bid in this case?
A. **No, sir.**
Q. Did you ask Mr. Bowman whether he had any documents to back up any of the numbers that are in the bid estimate spreadsheet that you discussed with him?
A. **I don't recall discussing that with him.**
Q. Did you discuss with Mr. Bowman pre-site investigation?
A. **Yes.**

Page 95

Q. Did he describe what that consisted of?
A. **Not specifically.**
Q. What is your understanding of the pre-bid site investigation conducted by or performed by Renda Marine in this case?
A. **I don't recall having a discussion specifically about what they did on that. I remember asking him whether they did, and my understanding is they did -- they did some amount, but I don't recall exactly what they did.**
Q. Do you have an idea of how much time in total, in the aggregate that you've spent in discussions with Mr. Bowman prior to the issuance of your March 2004 report?
A. **No, sir.**
Q. You testified that you met with Barry Smith; correct?
A. **Yes.**
Q. More than once?
A. **Yes.**
Q. How many times did you meet with Barry Smith or have discussions with Barry Smith about this engagement prior to the issuance of your March 2003 (sic) report?
A. **I would guess probably 10 times.**
Q. What did you discuss with Mr. Smith?
A. **We discussed the project in general, what happened on the project. We discussed his methodology for doing his**

Page 96

**pricing. We discussed -- I guess that's -- how we -- how he went about preparing his calculations and the facts of the case.**
Q. What is your understanding of the methodology used by Mr. Smith to price the Flare Area claim?
A. **Pardon?**
Q. What is your understanding of the methodology used by Mr. Smith to price the Flare Area claim?
A. **That it was appropriate, that he properly applied the principles laid out in the FARs and that it should be paid.**
Q. Do you understand -- is it your understanding that Mr. Smith used a measured mile methodology for that claim?
A. **Yes.**
Q. Have you reviewed his measured mile?
A. **Yes.**
Q. Have you relied upon it for this case?
A. **Yes, I have.**
Q. Are there any areas of disagreement that you have with Mr. Smith's methodology for pricing the Flare Area claim, apart from the two areas of cost that are backed out in your report?
A. **Apart from the two areas of cost that I backed out in my report, I believe that I agree with his -- with the rest of his claim.**

Page 97

Q. Did you discuss with Mr. Smith his methodology for pricing the so-called Section 7 clay claim?
**A. Yes.**
Q. Describe for us the methodology used by Mr. Smith to price the Section 7 clay claim.
**A. Again, he used the measured mile calculation.**
Q. And was this -- was the measured mile calculation used by Mr. Smith the same as the measured mile that was used by Mr. Smith to price the Flare Area claim?
**A. I don't recall.**
Q. Do you believe that it would be appropriate for pricing the Section 7 clay claim to use the measured mile as developed by Mr. Smith for the Flare Area claim?
**A. I'd have to look into that and see.**
Q. Have you developed, yourself, any measured mile for any of the claims in this case?
**A. You mean different than the measured miles that Mr. Smith developed?**
Q. Correct.
**A. No, sir.**
Q. Has Mr. Smith developed more than one measured mile?
**A. My recollection was -- I'd have to go back and check. I recall one measured mile. I don't recall if a second one was used or not.**

Page 98

Q. Do you recall whether Mr. Smith developed a measured mile for the Section 7 clay claim?
**A. Are you asking if he developed an independent one from the first, from the Flare Area claim?**
Q. Yes.
**A. I think I told you I didn't recall.**
Q. You testified that you spoke with Rudy Renda prior to the issuance of your March 2004 report; is that correct?
**A. Yes.**
Q. And did you talk with Mr. Renda more than once?
**A. My recollection is I only talked to him once.**
Q. What did you discuss with Rudy Renda?
**A. Just coordination of reviewing documents.**
Q. Did you discuss anything substantive to the case with him?
**A. No, sir.**
Q. You testified that you have spoken with Kent Ray; is that correct?
**A. Yes.**
Q. More than once?
**A. Yes.**
Q. What did you discuss with Mr. Ray?
**A. His actual cost figures that he calculated. We discussed coordination to meet with the TCAA auditor. I think that's all.**

Page 99

Q. And these actual costs figures, are you referring to job cost schedules that were prepared for the entire Upper Bayou Project by Mr. Ray and that were produced for the government in January of this year?
**A. I don't recall exactly when they were produced, but generally, yes, that's how I would describe them.**
Q. There are about four or five sheets, spreadsheets of schedules?
**A. I believe that's correct, yes.**
Q. And what did you go over specifically with Mr. Ray about those schedules?
**A. I wanted to confirm that these were Renda's actual costs. I wanted to -- I asked him how he produced the equipment costs.**
Q. What did he tell you?
**A. My recollection was that -- that these were the actual costs for Renda on the project and that the equipment costs were based upon hours of use times a rate that I believe he was -- I think he said he was given that rate by Renda.**
Q. Did you ask Mr. Ray to describe how the rate was generated that was used for equipment?
**A. No, sir.**
Q. Did you discuss specifically with Mr. Ray the -- how the hourly rate for the dredge Millenium was computed?

Page 100

**A. No, sir.**
Q. Did you discuss with Mr. Ray how the hourly rate for any particular piece of equipment was computed?
**A. No, sir.**
Q. Are you familiar with a piece of equipment called Melissa B?
**A. Generally, yes.**
Q. What is that?
**A. I believe it's a boat. I believe it's a support boat.**
Q. Is that a piece of equipment that was owned by Renda Marine at the time of the Upper Bayou Project?
**A. I don't recall specifically.**
Q. Did you use Kent Ray's dredge rate in your damage calculations that are contained in your March 2004 report?
**A. No, sir.**
Q. Why not?
**A. Because we didn't need them.**
Q. Why didn't you need them?
**A. The -- the rate had already been calculated by Mr. Smith, using information -- using different information, so we didn't need those rates.**
Q. So did you rely upon equipment rates calculated by Mr. Smith in your 2000 -- March 2004 report?
**A. We did use those. We went through them and**

Page 101

checked them.
Q. Did you make any modifications to them?
A. No, sir.
Q. What did the process of checking those rates consist of?
A. We looked at the basis that he used for pricing the rates. We looked at the process that he went through in actually doing the computations, and we verified that we believed that that computation was accurate and correct in accordance with the Federal Acquisitions Regulations and the contract.
Q. What is your understanding of the basis used by Mr. Smith to compute the hourly rate for the dredge Millennium?
A. I'm not sure how to answer your question. I'm not sure what you're asking.
Q. What is your understanding of how Mr. Smith calculated the rate that he calculated for the dredge Millennium?
A. My understanding is he did it correctly.
Q. How did he do it?
A. How did he do it?
Q. Yes.
A. He used the Corps' equipment pricing guide, followed that, put in information he received from Renda,

Page 102

and -- and from the manual, followed a formula listed in the manual and computed the rate.
Q. You testified that you also had conversations with Ben Goodloe before the issuance of your March 2004 report.
A. Yes, sir.
Q. Did you have more than one conversation with Mr. Goodloe?
A. I only recall having one conversation with him.
Q. And what did you discuss with Mr. Goodloe?
A. The general nature of the project and what was happening on the project.
Q. What did he tell you about what was happening on the project?
A. I asked him about the various claims that occurred. He said, yes, that -- that he was familiar with that, and that they were having those types of problems with the project.
Q. What types of problems?
A. Running into materials, different site conditions with the dredge, running into obstructions. He was aware of other claims, but there were times when he wasn't on the project, so he wasn't specifically aware of the details of those.
Q. Did you call Mr. Goodloe, or did he call you?
A. We called him.

Page 103

Q. Who is "we"?
A. John Coakley and I.
Q. How long did the conversation with Mr. Goodloe last?
A. I don't recall.
Q. Do you recall whether it was longer than an hour?
A. I don't recall.
Q. Did you make any note to the conversation?
A. No, sir.
Q. Did you make any notes of any discussions that you had with Mr. Smith prior to the issuance of your March 2004 report?
A. No, I don't believe that I did.
Q. Did you make any notes of your discussions with Steve Bowman prior to the issuance of your March 3, 2004, report?
A. No, sir, I don't believe we did that either.
Q. Did you make any notes of your conversations with Kent Ray prior to the issuance of your March 3, 2004, report?
A. No, sir.
Q. Did you record any of these conversations with these individuals?
A. No, sir.
Q. Would you turn to page two of your March 3,2004 report, Exhibit 2?

Page 104

A. Yes, sir.
Q. Under project summary you state that while performing work RMI -- RMI is a reference to Renda Marine, encountered different -- various differing site conditions and other situations concerning the project that caused RMI to expand -- expend additional funds and/or to incur additional time to perform its work; do you see that?
A. Yes.
Q. Have you concluded that Renda Marine encountered differing site conditions?
A. Yes.
Q. What were the differing site conditions that Renda Marine encountered in this case?
A. They encountered hard clay, when soft clay was indicated. They encountered obstructions in the dredge areas that were not indicated on the drawings. They encountered inadequate foundation in the Lost Lake Levee Area, when that was not indicated on the drawings. They encountered what appears to be side-cast borrow areas in the Lost Lake Levee Area, which were not indicated. They encountered -- I think those were the differing site condition issues.
Q. What about the Section 7 clay claim?
A. I believe that was a differing site condition.
Q. Did you conclude that there was a differing site condition there?

Page 105

A. I believe that I did, yes, sir.
Q. And what was the -- what was your conclusion as to the differing site condition that is the subject of the Section 7 clay claim?
A. That they were encountering hard, heavy red clay material that was not anticipated.
Q. Do you equate hard, hard heavy red clay material to hardpan?
A. No.
Q. What -- do you know what hardpan is?
A. I've heard it described as several different things.
Q. What is your understanding of hardpan?
A. I've heard hardpan described as hard sand materials where it forms a crust. I've heard it -- I think that's probably the most prevalent use I've heard.
Q. Have you heard it described in any other way?
A. I don't recall.
Q. At page two of the line that I read from, you refer to Renda having encountered or experienced other situations on the job; do you see that?
A. Yes, sir.
Q. What are you referring to there?
A. Well, HL&P transmission tower delays where the Corps let a contract or let a permit for HL&P to perform work

Page 106

in the same area that Renda would be working, causing interference. That was one. Changed conditions in the Lost Lake Levee Area. Generally items that were not included in the differing site conditions.
Q. You did not view the HL&P transmission tower claim as a differing site condition claim?
A. Not specifically.
Q. What kind of a claim do you view it as?
A. Changed condition, interference.
Q. You mentioned changed conditions in the Lost Lake Placement Area area. What are they?
A. West levee realignment between stations 166+00 to 215+00. The changed condition would be the existence of the side-cast borrow areas in the Lost Lake Levee disposal area that generated significant increased quantities of unsuitable material that had to be flushed out of the way of the dredged material in order to place the dredged material. Renda Marine standing by waiting for their dredge to be released by the Corps of Engineers so they could leave that project and go perform work on other projects, and the inadequate quantity of clay material to build the levees on the project, which caused impact to Renda Marine, caused them to spend additional monies attempting to build the levees with the material shown. Those would generally be the changed conditions.

Page 107

Q. Do you understand the term "change condition" to be a term of art?
A. I don't know what you mean by "term of art."
Q. Would you define for us changed condition?
A. A condition that is changed from what was shown or what could have been anticipated on the project at bid time.
Q. What's the difference, if any, between a changed condition and a differing site condition?
A. A changed condition can be any change. For instance, the -- the Corps allowing Houston Light and Power to come in and perform work in the same area that Renda is performing work at the same time would be a changed condition, but I don't think that would necessarily follow the rules of a differing site condition.
Q. In case of the HL&P transmission tower claim, what is the applicable equitable adjustment provision in the contract for the Upper Bayou Project?
A. I think initially I would go with the changes clause of the contract.
Q. And the west levee realignment, what clause would govern that claim?
A. Again, the changes clause.
Q. And you mentioned existence of side-cast borrow areas as a changed condition. What clause would cover that?
A. That would be a differing site condition.

Page 108

Q. And the Renda standby that you referred to?
A. Changes clause.
Q. And the inadequate quantities of clay, what clause would govern that?
A. Changes clause.
Q. At page three of your March 2004 report you state, "We have performed an evaluation of these costs and their basis." Do you see that statement?
A. Yes, sir.
Q. What else, if anything, has McCullough & Associates done for this engagement?
A. I think that covers what we've done, we've performed an evaluation of these -- of these costs and their basis. I guess within that we would say we interviewed the people, we reviewed the documentation that was associated with that, so we evaluated all the claims, where -- so in performing this work, that's what we did.
Q. Have you reviewed the plans and specifications for the Upper Bayou Project?
A. Yes.
Q. Now, page 25 of your March 2004 report you have a damage summary.
A. Yes.
Q. Could you describe for us specifically what is summarized here at this page of your report?

Page 109

A. **What is summarized here are the various claims that were made by Renda Marine, and we have gone back through those and given our assessment of each one of those claims as a total. We assigned a claim number based upon the DCAA audit number that was given to them by the DCAA auditors.**

Q. And are the results of your evaluation of Renda's cost and their basis set forth in the narrative portion of your March 2004 report that is pages 1 through 24?

A. **Yes, sir, that describes the -- what we did and summarized the results.**

Q. In your report you state that, "We have determined the claimed issues are legitimate." What do you mean by "legitimate"?

A. **Where -- I'm sorry, I didn't see where you were reading that.**

Q. At page three, the first full paragraph, says, "In general, we have determined the claimed issues are legitimate, and that the claim costs are compensable costs"; do you see that?

A. **Yes, sir.**

Q. What do you mean by the term "legitimate"?

A. **That -- that Renda is entitled to compensation for these issues.**

Q. At page three of your report, in the discussion under -- for claim five, the Flare Area, you state, "The

Page 110

measured mile approach is the most widely used methods for calculating these types of impact costs in use today." Do you see that?

A. **Yes.**

Q. What types of impact costs are you referring to?

A. **Impact costs for differing site conditions.**

Q. How did you determine the additional costs that were incurred by Renda Marine during the period from January 23, 2000, to March 11, 2000?

A. **We went -- we went through the calculations that were performed by Barry Smith. My recollection is there was a comparison of the measured mile identifying how much time it should have taken to perform that work based upon what was shown in the plans and specifications and the actual time and cost that it took to go through that same area and a comparison of those two would net the difference -- the difference between those two would net the amount of damages.**

Q. How did you determine the additional costs that were incurred by Renda Marine during the period from July 17, 2000, to September 29, 2000?

A. **The same way.**

Q. Did you discuss with Mr. Smith at any point the assumptions that he used in developing his measured mile for the Flare Area claim?

A. **Yes.**

Page 111

Q. And did Mr. Smith relate to you what his assumptions were?

A. **He did talk to me about his assumptions. I don't know if he related every one of his assumptions to me, but we did talk about his assumptions.**

Q. What is your understanding of the assumptions by Mr. Smith that underlie his measured mile for the Flare Area claim?

A. **Generally that the measured mile is representative of the work that was done in the Flare Area and therefore it's a valid measured mile for that particular portion of the work.**

Q. Why is it representative of work performed for the Flare Area?

A. **Because it represented similar work.**

Q. What kind of work was similar work?

A. **Work that's similar to this work that's in the Flare Area, dredging work.**

Q. Is it your understanding that the measured mile for the Flare Area was developed on the assumption that Renda anticipated dredging exclusively soft clays in the Flare Area?

A. **I don't recall that specifically, no, sir.**

Q. How were you able to determine or make a judgment as to whether this measured mile developed by Mr. Smith was

Page 112

representative if -- strike that. Let me rephrase that.

Did you make an independent evaluation of whether the representative -- whether the measured mile developed by Mr. Smith was representative of conditions that Renda Marine expected or anticipated in the Flare Area?

A. **We didn't do a separate calculation of that, but we did do -- we did go back and check the information that was used in -- between the measured mile and the Flare Area, yes, sir.**

Q. Did you examine the conditions for dredging that were encountered by Renda Marine on the dates that were selected by Mr. Smith and used in the measured mile that he developed for the Flare Area claim?

A. **Yes.**

Q. And what is your understanding of the conditions encountered by Renda Marine on those days?

A. **The specifics of that I don't recall offhand. My recollection is they were similar to what was shown to be encountered in the Flare Area.**

Q. You mean what the contract documents indicated?

A. **Yes, sir.**

Q. What is your understanding of what the contract documents indicated to be the conditions for dredging in the Flare Area?

A. **Generally that Renda would encounter soft clays.**

Case 1:02-cv-00306-FCH Document 119-26 Filed 12/14/2004 Page 8 of 11



Q. At page four of your March 3, 2004, report there is a statement, "The hydraulic levee costs are directly related to the dredging operation and are directly related to the delay to the dredge." Do you see that?
**A. Yes.**
Q. How did the cost of the hydraulic levee work increase as a result of the impact of the Flare Area issue upon dredging work?
**A. Because when the dredge is pumping dredged material out, there has to be a hydraulic levee crew that disperses that material at the other end of the pipeline, and therefore, for any increase in time that there is for the dredge crew, as a result of this differing site condition, there is a -- also an increase in the cost of the hydraulic levee crew at the other end of the pipeline.**
Q. Page four of your report you referred to the Corps of Engineers Manual, EP 1110-1-8, Volume 6; do you see that?
**A. Yes.**
Q. And that's titled the Construction Equipment Ownership and Operating Expense Schedule; is that correct; is that your understanding?
**A. I think as I told you before, that sounds right. I just don't have an independent recollection. I didn't memorize the title of the manual.**
Q. Did you refer to the manual in the preparation of



your March 2004 report in this case?
**A. Yes.**
Q. Without marking this for identification I'll show you a binder. Take a look at that and tell me whether that's the Equipment Ownership and Expense Manual that you referred to.
**A. Generally, yes, sir, this looks like the manual.**
Q. Now, have you used this manual on -- or any other versions of it on any other projects?
**A. Yes.**
Q. Okay. On how many other projects have you used the manual or some version of it?
**A. I used it on the Moyer Landfill project. And I don't recall if I used it or if we used -- I don't recall if we used it down in Guam on our government contracts down there. I know we had it available, but we were also using the Rental Rate Equipment Blue Book for lots of our Federal projects.**
Q. You know you used it on one prior project and possibly one other one?
**A. Or several ones prior. I just don't recall. The projects I did down in Guam, we had several government contracts going down there. I just don't recall when we used that book or not.**
Q. Do you consider yourself to be an expert in the



application of EP 1110-1-8?
**A. I believe that I'm competent to do that. I don't know that I'd go out and lecture on it, but, yes, I am, being -- I am an expert that can use that book.**
Q. Are you familiar with the regulation EFARS 52.231-5000?
**A. Yes.**
Q. Have you used it on any other projects?
**A. We did use the FARs. I don't recall if we used these same -- I'm assuming they were previous versions of the EFARS.**
Q. On what projects did you use them?
**A. Again, it would be the Moyer Landfill project, I know we used them on our government contracts down in Guam and Hawaii.**
Q. Do you consider yourself to be an expert on the application of the EFARs 52.231-5000 regulation?
**A. Again, yes, I'm -- I use those in my business.**
Q. Do you know what the actual operating costs were for the cranes that were used to support the dredge Millenium?
**A. Not offhand, no, sir.**
Q. Do you know what the actual operating costs were for land based equipment in this case?
**A. Off the top of my head, no, sir.**



Q. Do you know what the actual fuel cost was for land based equipment in this case?
**A. Again, off the top of my head, no, sir.**
Q. In your report you refer to Blue Book rental rates, at least in conjunction with the costs associated with the dredge Millennium; is that correct?
**A. That's correct.**
Q. What is the relevance of the Blue Book rental rate to the operating cost of the dredge Millennium?
**A. Just as a comparison to see if the rates that were being generated out of the Construction Equipment Ownership and Operating Expense Schedule from the U.S. Army Corps of Engineers were comparable with other industry standards for the same type and size of equipment.**
Q. Were you using the Blue Book rental rate in this case as kind of a standard?
**A. Yes, sir.**
Q. You're not suggesting that is a legally appropriate rate for pricing the operating cost of the dredge Millennium, are you?
**A. No, sir.**
Q. Does the contract in this case provide for the use of Blue Book rental rates?
**A. Not that I'm aware of, no, sir.**
Q. What rates are determined by using the Corps of

Page 117

Engineers Ownership and Operating Expense Schedule?
**A. I don't think I understand your question.**
Q. Well, does that schedule provide for operating rates?
**A. You're asking me does the Corps manual provide for operating rates?**
Q. Yes.
**A. Yes, it does.**
Q. Does it provide for standby rates for equipment?
**A. Yes, sir, I believe it does.**
Q. Does it provide for any other category of rate for equipment?
**A. Other than operating standby, I don't recall.**
Q. Does it provide for a generator only rate for equipment?
THE REPORTER: I'm sorry, for a --
Q. (BY MR. KOSLOSKE) Generator only.
**A. I'm not sure what you mean by a "generator only rate."**
Q. Does it provide for a noneffective dredge rate for equipment?
**A. Yes, I believe that it does.**
Q. Where in the manual does it provide for that?
**A. I'd have to go research that for you and get that for you.**

Page 118

Q. We'll come back to that. If I showed you the manual, could you find it quickly or are we talking about a couple of hours to look at it?
**A. No, I'd need a couple of hours to look it up.**
Q. All right. We don't have that kind of time. Is there such a thing as a "noneffective time rate" consistent with the Corps of Engineers' Construction Equipment Ownership and Operating Expense Schedule?
**A. Yes.**
Q. Does the Corps of Engineers' Construction Equipment Ownership and Operating Expense Schedule expressly allow for that kind of rate?
**A. I don't recall.**
Q. Have you ever been qualified by a Court or Board of Contract Appeals as an expert with respect to the Corps of Engineers' Equipment Ownership and Operating Expense Schedule?
**A. Well, we negotiated the last claim with the Corps based on those rates, and they didn't have objection to those rates, so -- but I don't believe we testified in Court about that. I'm trying to remember if there were -- I don't believe we -- I don't believe I ever testified in Court using those rates.**
Q. Has a Court or Board of Contract Appeals ever qualified you as an expert with respect to the Corps of

Page 119

Engineers' Equipment Ownership and Operating Expense Schedule?
**A. If I understood your question, that would only come when I testified before a Court or Board?**
Q. Right.
**A. I think I just testified that I never testified before a Court or Board, so I think the answer to your question is no.**
Q. We can infer no from that?
**A. Okay.**
Q. Now, do you agree that the mechanical levee operation should be removed from the Flare claim in the amount of $487,378?
**A. You're referring to my Exhibit A amount that I show deducting from that claim?**
Q. Actually, I was -- yes, and also at page four of your report, I think you refer to that.
**A. $487,378, that's correct.**
Q. That represents mechanical levee operations related costs that you backed out of the Flare Area claim?
**A. Yes, we backed those out of the Flare Area claim.**
Q. In connection with the Flare Area claim did you make a determination that the actual ownership and operating costs for individual pieces or groups of equipment could or could not be determined?

Page 120

**A. I did not go independently and investigate that. I relied upon comments made by Renda and DCAA auditors.**
Q. And what were the comments by Renda in that regard?
**A. My recollection was they could not identify actual costs for operating and -- ownership and operating costs for the equipment.**
Q. At page five of your report you have a discussion of equipment repair cost; do you see that?
**A. Yes.**
Q. Did you determine that the equipment repair cost referred to at that part -- point in your report are reasonable?
**A. Yes.**
Q. And how did you determine that those costs are reasonable?
**A. By my discussions with Pathfinder, Barry Smith.**
Q. Are these repair cost estimates that were prepared by Pathfinder Construction?
**A. That's my understanding, yes, sir.**
Q. Did you review any paperwork of Pathfinder Construction with regard to the repair costs?
**A. No.**
Q. What is the equipment rental that is the subject of the repair costs referred to on page five of your report?

A. Generally it would be the dredge equipment.
Q. Did you conclude that Renda Marine is entitled to $1,096,179 in additional compensation on the Flare Area claim?
A. Yes.
Q. Do you have any other opinions related to the Flare Area claim that we haven't touched upon here today?
MR. ERIKSON: Objection, form.
A. Generally I think my opinions, to the extent that they're covered in my report, to the extent that we didn't talk about them, I would have those included, I think my report fairly states what my opinions are.
Q. (BY MR. KOSLOSKE) On page five of your report there's a discussion of claim six, the South Ferry Landing claim.
A. Yes, sir.
Q. You state that this claim involves, "Encountering debris and rubble material (primarily manmade erosion protection, stone, concrete and steel) near the South Ferry Landing Area" -- excuse me, should be close parens after steel, "near the South Ferry Landing Area"; correct?
A. Yes, sir.
Q. How did you arrive at that understanding of what was encountered?
A. By reviewing the claim that was prepared by Renda,



by reviewing the backup information that was provided as part of that claim, by reviewing the -- the dredge logs and contractor's quality control reports, correspondence back and forth between the contractor and the Corps, by interviewing Mr. Bowman, by interviewing Mr. Smith.
Q. What do you mean by -- excuse me.
A. I believe that covers it.
Q. What do you mean by "dredge logs"?
A. There were logs made by the -- the people that were operating the dredge.
Q. Who were those people?
A. Their names? I don't recall their names specifically.
Q. What were their positions?
A. I apologize. I don't recall their position specifically. I'm not sure what you're asking.
Q. Are you --
A. Dredge operator?
Q. Are you referring to leverman's logs?
A. They would be leverman's, yes.
Q. Are the dredge logs that you referred to logs that were prepared by the leverman for the dredge Millennium?
A. I didn't check who actually prepared the logs.
Q. Do you know what a leverman does on a dredge?
A. Not specifically, no, sir.



Q. What do you mean by the term "debris" as used in the statement that I quoted from your discussion of the South Ferry Landing Station claim?
A. I mean manmade erosion protection, stone, concrete and steel.
Q. So debris as you use that term is kind of a catchall for the other descriptors that follow it?
A. In this particular context I'm talking about these manmade materials.
Q. What is the steel that you refer to?
A. I don't recall specifically. I'd have to go back and check the details.
Q. You -- what do you mean by the term "primarily"?
A. Meaning that was a lot of what was encountered, but there may have been other things.
Q. Do you know -- do you have an opinion one way or the other -- another, as to whether, in fact, there were other things that were encountered that aren't part of this claim?
A. Sitting here today, I don't have an independent recollection of that. I didn't make an independent log of that.
MR. ERIKSON: Is this a good time for a break?
MR. KOSLOSKE: Sure, let's take five



minutes.
(Recess from 2:37 to 2:52 p.m.)
MR. KOSLOSKE: Back on the record.
Q. (BY MR. KOSLOSKE) Mr. McCullough, how was dredging to be measured and paid on the Upper Bayou Project contract?
A. My recollection was it was a pre-dredge survey and after-dredge survey to determine the quantity of material removed.
Q. Which section of the ship channel is the South Ferry Landing located?
A. I'm sorry, I don't recall offhand.
Q. Do you know whether Renda placed the material that was dredged from the South Ferry Landing at the Lost Lake Placement Area?
A. I'm sorry, it was section one if I'm not mistaken. Sorry, what was your last question?
Q. Did Renda place the dredged material from the South Ferry Landing Area in the Lost Lake Levees?
A. I believe they did. I assume they did.
Q. Did Renda place the material dredged from the South Ferry Landing at the location at Lost Lake that Renda intended the material to be deposited in at Lost Lake?
A. I'm not sure I understand. I'm not sure I understand the question.

Page 125

Q. Well, where did Renda intend to place the material that was dredged in the area of the South Ferry Landing at Lost Lake?
MR. ERIKSON: Objection, form. You're free to answer.
**A. I don't know that I know. I do remember reviewing a document that talked about that, but I don't have independent recollection of that sitting here now.**
Q. (BY MR. KOSLOSKE) Does your report address the technical validity of the South Ferry Landing claim or only the damages?
**A. I evaluated the technical side of it also.**
Q. Did you determine that Renda's dredge spent significant time in the South Ferry Landing area?
**A. I don't recall if I stated that or not.**
Q. What are the station coordinates for the South Ferry Landing area?
**A. The South Ferry Landing claim is from station 470+00 to 472+00.**
Q. How much time did the dredge Millennium spend dredging in that South Ferry Landing area?
**A. I reviewed that last night. I looked at all of those dates. I just don't have an independent recollection of that right off the top of my head.**
Q. Did you make a determination that Renda Marine

Page 126

encountered -- sustained serious damage to its dredge in the South Ferry Landing area?
**A. Yes.**
Q. What kind of damage was sustained by the dredge in the South Ferry Landing area?
**A. I don't recall the exact nature of the damage off the top of my head.**
Q. How did you determine that the damage sustained by the dredge Millennium in the South Ferry Landing area resulted from obstructions that you concluded Renda Marine encountered in that location?
**A. Based upon my discussions with Mr. Smith, the jobsite personnel, knowing that that type of material will cause damage to -- to a dredge. I think that would be the primary reason.**
Q. What pieces of equipment on the dredge that were damaged are included in the claim for the South Ferry Landing Area?
**A. I don't have an independent recollection of that. I may have a summary of it somewhere, but I don't recall exactly what it is.**
Q. Was the dredge Millennium performing other contract work during periods of time when it was moved away from the South Ferry Landing area?
**A. The dredge Millennium was performing other work on**

Page 127

**this contract when it was not performing work at the South Ferry Landing area.**
Q. Do you know whether Renda Marine ever removed the alleged obstructions at the South Ferry Landing area?
**A. I don't know.**
Q. In your report you indicate that numerous notifications were made as the extent and scale of the problems were realized. What did these notifications consist of?
**A. Both verbal and written communication.**
Q. When did Renda Marine realize the extent and scale of the problems?
**A. I guess -- I guess they would have been aware of the full extent and scale of it after it was over. They were certainly aware of it when it started.**
Q. What did you do to evaluate Renda Marine's measured mile used in the South Ferry Landing claim?
**A. I reviewed the -- the dredge logs that -- during those periods of time. I reviewed the correspondence. I reviewed the contract quality control reports. I reviewed the plans and specifications.**
Q. Who developed the measured mile used in Renda's South Ferry Landing claim?
**A. Mr. Smith.**
Q. Do you disagree with that measured mile in any

Page 128

respect?
**A. No, sir.**
Q. How did Renda Marine account for dredging outside the allowable overdepth on the Upper Bayou Project?
**A. I'm sorry, would you ask that question again?**
Q. How did Renda account for dredging outside the allowable overdepth of the Upper Bayou Project?
**A. What do you mean by "account for"?**
Q. Record.
**A. I believe their dredge logs were recording where they were working, what areas they were working in.**
Q. So if we go to the dredge logs they would indicate the extent of any allowable overdepth dredged by Renda Marine on the Upper Bayou Project?
**A. I don't think it's separated out as such, no.**
Q. Have you examined these logs?
**A. Yes.**
Q. Have you examined them to determine whether, in fact, they include allowable overdepth?
**A. There would be allowable overdepth in the amount of dredging done, yes.**
Q. Have you examined the logs to determine whether they also record dredging outside the allowable overdepth?
**A. I don't recall seeing that designation specifically, no, sir.**