Page 129

Q. In your review of Renda's dredging reports have you seen any report that indicates that Renda dredged below a depth of 48 feet?

**A. Off the top of my head, I don't recall one specifically, no, sir.**

Q. In preparing your report in this case, the March 2004 report, did you look at any photos relative to the South Ferry Landing claim?

**A. I looked at lots of photographs. I don't have an independent recollection of looking at South Ferry Landing photographs specifically.**

Q. Have you seen any stockpile as part of your evaluation of Renda's claims in this case?

**A. I did not go out and look at stockpiles.**

Q. In the case of the South Ferry Landing claim, where did the significant amounts of debris go that were dredged by Renda?

**A. The material that was dredged by Renda would have gone into the Lost Lake Levee disposal area.**

Q. The debris?

**A. Any material that got dredged.**

Q. So if that material included debris, that would go into the levee?

**A. Well, I don't -- I don't believe they dredged the -- the big boulders that we were talking about, the manmade obstructions and things that we referred to as debris in this.**

Page 130

Q. In the South Ferry Landing claim?

**A. That's correct.**

Q. If they didn't dredge it, what did they do with it?

**A. I think I indicated earlier, I don't recall exactly what happened to that material.**

Q. Did Renda send a diver down to take a look?

**A. I don't recall.**

Q. On page seven of your report of March 2004 you have an item there that addresses dredge equipment repair cost; do you see that?

**A. Yes.**

Q. Now, you note that the DCA auditors questioned several rental repair invoices as outside the delay date range; is that correct?

**A. Yes.**

Q. What is the basis of your statement that the parts referred to there were purchased before they were required?

**A. The dates on the invoices.**

Q. Can you describe the parts that were actually used in the equipment repairs?

**A. Not off the top of my head, no, sir.**

Q. What is the normal maintenance cycle for the equipment in an environment such as the dredge Millennium was used from the time Renda Marine received the dredge until the time of these repairs?

Page 131

**A. I don't know.**

Q. At page eight of your report of March 2004, is it your conclusion that Renda Marine is entitled to $947,054 for the South Ferry Landing claim?

**A. Yes.**

Q. The Claim 7, changed conditions, HL&P transmission tower delays discussion that appears on page eight; do you have that in front of you?

**A. Yes, sir.**

Q. You state that Renda was forced to move its discharge line two times because of HL&P transmission line and tower work; is that correct?

**A. Yes.**

Q. What was the transmission line work? Can you describe it?

**A. HL&P wanted to do some protection work on their towers. I remember one of them was driving sheet piles around to protect the towers. I -- and that -- so HL&P went out to do that work. They requested a permit from the Corps of Engineers, that was granted and they went out to perform that work.**

Q. Who forced Renda Marine to relocate its discharge line?

Page 132

**A. I don't know that anybody held a gun to Renda's head, but certainly both the HL&P work and Renda's work was going to occur in the same space. HL&P could not perform their work with the pipe where it was, and the pipe had to be moved.**

Q. Why did -- sorry, go ahead.

**A. So in order for HL&P to perform their work, Renda had to move their line, so I'm not sure exactly if that answers your question or not.**

Q. Why do you state that moving the discharge line is a substantial operation?

**A. Because it takes a significant amount of labor and equipment to do that.**

Q. All right. What labor and equipment is required to move the discharge line?

**A. I'd have to look at the backup documentation that supports that particular claim. I don't have an independent recollection of that off the top of my head.**

Q. Do you believe that the HL&P tower claim is a differing site condition claim?

**A. No, sir.**

Q. When did Renda Marine notify the government about the HL&P transmission tower conflicts?

**A. I recall an October 18th letter from Renda to the**

Page 133

Corps. I don't have an independent recollection of anything else.

Q. Was that before or after Renda moved its discharge line?

A. After.

Q. I believe you've added approximately $5,000 of professional and consultant fees resulting in a modest increase of the claim amount for the HL&P towers; is that correct?

A. I do indicate an adjustment of $5,084 was made.

Q. On what basis did you make that adjustment?

A. We looked at -- we went and looked at the applicability of professional fees to the various claims, and we found that they were, in fact, applicable, that they were appropriate under the FARs and, therefore, we went back and asked Mr. Smith if he would go back through his invoices and indicate what he was -- what he was doing, where he didn't have that already indicated. Based upon that indication, we then reallocated his time, and that's what we show here, so that would be the basis.

Q. When you say "we," who are you referring to?

A. Mr. Coakley and myself.

Q. Did you then give Mr. Smith some guidance as to how to separate out the costs for his consulting work?

A. We discussed it, but I don't know that I gave him

Page 134

any particular guidance.

Q. How was Mr. Smith able to do -- to implement what you desired to be done?

A. Knowing what particular REAs he worked on, when he filed certified claims on each of these, he could identify what areas he was working in.

Q. Did Mr. Smith eventually prepare some kind of a spreadsheet for his time that you've used in your assessment of the claims?

A. Yes.

Q. Is that a tab to your report?

A. No, sir, I don't believe it is.

Q. At page 10 of your report you have a discussion of differing site condition for obstructions in sections four to eight, stations 570 to 685; do you see that?

A. Yes.

Q. You indicate that Renda struck -- that is Renda's dredge struck numerous buried obstructions and sustained serious damage to dredging machinery, as well as significant downtime while repairs were being made; is that correct?

A. Yes, that's correct.

Q. What is the basis or bases of those conclusions?

A. The documentation of this issue and the discussions I had with Renda Marine and Mr. Smith.

Q. What did the documentation for this issue consist

Page 135

of?

A. Correspondence, dredge logs, CQC logs, photographs, correspondence between the Corps and Renda and other parties.

Q. How did you determine what Renda Marine should reasonably have expected to encounter insofar as obstructions are concerned?

A. I read specification section 02482, paragraph 1.11.1.

Q. What does that provide?

A. It's shown on page 10, "Other materials such as scrap, rope, wire cable, snags and stumps may be encountered within the specified limits of required dredging and overdepth dredging. No separate payment will be made for removal and replacement of the debris."

Q. So you, in your report, assumed that if what Renda encountered is not specifically called out in that paragraph, that Renda should not reasonably have been expected to encounter it at the time it prepared the bid?

A. That's correct.

Q. Do you know, in fact, what Renda expected to encounter at the time it prepared the bid?

A. You mean -- no, I don't know if they expected to encounter 20 tires or two stumps, I don't have that information.

Page 136

Q. What evidence have you seen that Renda encountered pieces of automobiles?

A. I don't recall exactly what evidence would say that.

Q. Did Renda pull up the cutter head and there was a bumper on it or something or a piece of a fender that said Chrysler on it or something like that?

A. I don't recall.

Q. What evidence do you have that Renda encountered a large diameter iron pipe?

A. Again, I don't recall specifically what piece of evidence that showed that.

Q. What was the diameter of the pipe?

A. I don't recall.

Q. Now, if you don't recover the pipe from the -- from the -- where you're dredging, how would you be able to determine or how would a contractor be able to determine what the diameter of the pipe was or whether it was an iron pipe?

A. Hypothetically, I guess you could dive down, you could have hooked onto it and seen it, you could find pieces of it, any number of ways.

Q. Did Renda send a diver down in this case and discover there was a large diameter iron pipe?

A. I don't recall.

Q. What evidence do you have that Renda encountered

Case 1:02-cv-00306-ECH Document 119-27 Filed 12/14/2004 Page 3 of 11



heavy industrial construction demolition material?
A. **Again, I don't have an independent recollection of exactly what evidence showed that.**
Q. What is your understanding of the term "heavy industrial construction demolition material"?
A. **Material demolished from heavy industrial projects in the area.**
Q. What might those material be?
A. **Steel scrap, pieces of equipment.**
Q. What is -- strike that.
What evidence do you have that Renda Marine encountered thousands of tires while dredging?
A. **I don't have an independent recollection sitting here right now exactly which piece of evidence said that.**
Q. Do you know whether Renda picked up the tires and stockpiled them and then performed some kind of a count or estimate of the number?
A. **I don't have a recollection that they did that, no, sir.**
Q. What is your definition of a major encounter?
A. **Something out of the ordinary, like running into a CONEX box would be a major encounter, something that would stop the cutter head, break the cutter head, any -- any encounter that would be above and beyond what was anticipated.**



Q. What equipment on the dredge Millennium was damaged as a result of the dredge running up against or into the obstructions that are alleged in the claim eight obstructions claim?
A. **Again, sitting here right now, I don't recall any, what those numbers are, what specific items they were. We looked at the backup information that supported what those were.**
Q. Can you tell me whether the cutter head was damaged?
A. **I don't recall specifically.**
Q. Can you tell me whether the cutter drive was damaged as a result of these obstructions?
A. **I don't recall.**
Q. Do you know what a cutter drive is?
A. **The drive that drives the cutter head.**
Q. Were any ladder pumps damaged as a result of these encounters, the obstructions that are the subject of claim eight?
A. **I don't recall.**
Q. Was the main pump damaged as a result of those obstructions?
A. **I don't recall.**
Q. Was the booster pump damaged as a result of these obstructions?



A. **I don't recall.**
Q. Was the spud damaged as a result of these obstructions?
A. **I don't recall.**
Q. Do you know what a spud is?
A. **Yes.**
Q. What?
A. **The spud that they drive down into the ground that they use to pivot on.**
Q. Was the computer onboard the dredge Millennium damaged as a result of the dredge's encounters with obstruction?
A. **I don't recall.**
Q. Were any of the electrical connections on the dredge damaged as a result of the obstructions that are the subject of claim eight?
A. **I don't recall.**
Q. Do you have an opinion one way or the other as to whether the computer onboard a dredge such as the dredge Millennium could be damaged as a result of an encounter with the type of obstructions that are the subject of claim 8?
A. **Certainly.**
Q. And what's your opinion?
A. **The computer could be damaged.**
Q. How would the computer be damaged as a result of



an obstruction?
A. **Hypothetically, the obstruction could cause stress to the system, which would overload, say, one of the pumps, causing one of the housings to crack, spray water on the computer, the computer short circuits and destroys the computer.**
Q. Do you know whether that occurred in the case of the dredge Millennium?
A. **No, sir, as I said, I don't recall specifically what repairs were done.**
Q. Now, for the obstruction claim eight I believe you conclude that Renda is entitled to $1,986,551; is that correct?
A. **$1,986,551.**
Q. Go back a moment. I asked you a question about the spud. Do you know how a spud is driven down in order for a dredge to be able to pivot?
A. **My understanding is it's hoisted up and dropped.**
Q. Do you know where the computer on the dredge Millennium is located?
A. **No, sir.**
Q. Page 13 of your report there's a discussion, claim nine, which is differing site condition, obstruction in Section 9, station 660 to 685; do you see that?
A. **Yes.**

Q. What dredging work was Renda Marine performing between April 12, 2001, and May 8, 2001?
**A. Dredging work in the channel in Section 9.**
Q. What do you mean by "higher than normal obstructions"?
**A. More obstructions than could have been anticipated from the original information that Renda had at bid time.**
Q. What could have been anticipated from the information available to Renda Marine at bid time?
**A. That they would encounter normal obstructions, things such as scrap, wire, rope, wire cable, rope, snags, stumps, things like that.**
Q. What were the obstructions that are the subject of the Section 9 claim?
**A. What are they?**
Q. Yes.
**A. Again, there's a summary of those. I don't have independent recollection of that sitting right here today.**
Q. Are you familiar with the Houston Ship Channel in the area between stations 658 and 680?
**A. Familiar with it?**
Q. Right.
**A. I've seen the drawings of it. I haven't gone down to personally visit it.**
Q. Did you observe what kind of industry is located



between those stations?
**A. No, sir.**
Q. You note that a sonar survey was performed in January 2001. Do you know whether Renda Marine received the results of that survey?
**A. I remember reading about the sonar, but I don't remember independently whether Renda had a -- received a copy of that.**
Q. Have you reviewed the results of that survey?
**A. Yes.**
Q. So you reviewed the document?
**A. I reviewed something that talked about the survey. I don't know which document you're referring to.**
Q. Were the results of the survey set out in a report?
**A. I don't recall independent. I reviewed something regarding the survey. I don't recall if I reviewed a report or not.**
Q. You don't recall whether you reviewed the report or someone else's paraphrase of the report?
**A. It may have been someone else's paraphrase of the report.**
Q. If you assume that the survey depicted a certain object and that Renda Marine had a copy of the survey, but nevertheless struck the object, resulting in damage to the



dredge Millennium, would you still believe or would it still be your opinion that Renda Marine was entitled to compensation?
MR. ERIKSON: Excuse me, is that a hypothetical question?
MR. KOSLOSKE: Yes.
MR. ERIKSON: Okay.
**A. You're asking if Renda had hypothetically had a copy of the survey that showed an obstruction, and they still struck the obstruction, would they still be entitled to compensation?**
Q. (BY MR. KOSLOSKE) In your opinion.
**A. It would depend upon the circumstances, but, yes, they possibly could.**
Q. Why do you say that?
**A. Because the survey may not show the exact location of the material -- of the obstruction. Renda Marine hypothetically may not have been given compensation to remove that obstruction, but may have been told to dredge around the obstruction, which could cause that type damage, could be the obstruction was like an iceberg, you can see the top of it, but you don't see the rest of it and the dredging hit the rest of it, so all kinds of different hypothetical situations could occur. It's very possible that -- that -- I guess the -- never mind.**



Q. You note that on June 1, 2001, the Corps of Engineers directed Renda Marine to delete the remaining portion of Section 9 from the Upper Bayou contract; is that correct?
**A. That's correct.**
Q. What dredging work remained on the project as of June 1, 2001?
**A. The balance of Section 9, and I guess there was still construction of some of the levees.**
Q. Do you equate construction of levees with dredging work?
**A. Yes.**
Q. One of Renda's claims is the so-called west levee realignment claim; is that correct?
**A. Yes.**
Q. In your analysis or evaluation of Renda's claims you've eliminated the west levee realignment as a separate claim; is that correct?
**A. That's correct.**
Q. And you've included that claim in the Lost Levee -- Lake hydraulic levee claim; is that correct?
**A. I included it in the claim 12, Lost Lake Levees.**
Q. That's under item 12-B of that claim?
**A. Yes.**
Q. On the Section 9 obstructions claim, your

Page 145

conclusion is that Renda Marine is entitled to recover $1,148,804?
**A. Yes.**
Q. Now, page 15 of your report there begins a discussion of claim 11, which is a differing site condition Section 7 clay; do you see that?
**A. Yes.**
Q. How did you determine that Renda Marine encountered heavy red clay at the north side of the channel between station 561+20 to station 609?
**A. Based on my review of the claims prepared by Mr. Smith, my discussions with Renda's personnel and Mr. Smith, review of the correspondence, dredge logs, other documentation related to the claim.**
Q. Which discussion -- which Renda personnel did you have discussions with about what Renda encountered at the north side of the channel between station 561+20 and station 609?
**A. It would be Mr. Bowman and Mr. Smith was -- I don't know if you -- Mr. Smith and Mr. Bowman primarily.**
Q. Now, it's your understanding that Renda Marine encountered heavy red clay at the north side of the channel between station 561+20 and station 609 between October 2, 2000, and November 6, 2000?
**A. Yes, sir.**

Page 146

Q. And it's your understanding that this material was different from what Renda Marine should have anticipated?
**A. Yes.**
Q. What kind of material should Renda Marine have anticipated?
**A. Gray and blue clays with the soil borings.**
Q. And would those have been stiff to very stiff gray and blue clays?
**A. I don't have a list here in my report, so I don't recall independently.**
Q. Have you reviewed the relevant soil borings and the contract drawings for the Section 7 of the project?
**A. Yes.**
Q. Do those soil borings indicate to you the presence of stiff to very stiff gray and blue clay in that section of the project?
**A. I don't recall specifically.**
Q. How did you determine that the dredge Millennium was delayed 20 calendar days in a 35-day period?
**A. Based on the review of the dredge logs, the CQC reports, the correspondence between the parties and the claims that were prepared by Mr. Smith.**
Q. What was the past historical data that Renda Marine used in its approach to calculating damages for the Section 7 clay claim?

Page 147

**A. I honestly don't remember.**
Q. What operating information for the dredge Millennium did Renda Marine use in conjunction with its preparation of the Section 7 clay claim?
**A. That would be the dredge reports.**
Q. Which --
**A. Well, CQC reports and any other -- they were submitting a whole series of reports at that time.**
Q. Which measured mile did Renda Marine use to price the Section 7 clay claim?
**A. I don't recall the specific stations of the measured mile.**
Q. Have you done anything to determine whether Renda Marine encountered hardpan clay in Section 7?
**A. Yes.**
Q. What did you do?
**A. Reviewed the correspondence, talked to the personnel, reviewed the -- the dredge reports and the other -- other reports being prepared.**
Q. Is the presence of hardpan in Section 7 reported in any of the priorities for the project, the individual reports of dredging?
**A. You mean was the word "hardpan" used?**
Q. Yes.
**A. I don't recall.**

Page 148

Q. You don't recall whether Renda reported in the daily dredging reports having encountered hardpan clay while dredging in any part of Section 7?
**A. I don't recall whether they used the word "hardpan" in their description.**
Q. Do you know where Renda Marine planned to place the anticipated gray and blue clays at the Lost Lake Placement Area?
**A. I reviewed the document which showed -- I believe showed that information, but I don't have an independent recollection of it now, no, sir.**
Q. How long a discharge line length did Renda Marine anticipate using to place the gray and blue clays that it anticipated in Section 7 in the Lost Lake Placement Area?
**A. I looked at that. I calculated that, but I don't have an independent recollection of the length of that line.**
Q. What would you look at to determine that?
**A. Where the dredge was and where they would be depositing those materials.**
Q. Do you know where the material that is the subject of the Section 7 clay claim was actually deposited in the Lost Lake Placement Area?
**A. Again, I looked at that, but I don't have an independent recollection of exactly where that was.**
Q. Were any tests performed by Renda Marine of the

Page 149

clay or other material that's the subject of the Section 7 clay claim?
A. **I don't recall.**
Q. In evaluating the Section 7 clay claim, did you inquire of Renda Marine or anyone else whether any testing was performed of the materials that Renda Marine alleges are a differing site condition?
A. **I don't recall having that discussion.**
Q. At page 19 of your March 2004 report there is a section there, "Response to audit report comments"; do you see that?
A. **Yes.**
Q. And you state, "It should be noted that this position contradicts that which was outlined in the original REA-cost detail is not, underline not, required -- required due to a previous agreement with the Army Corps of Engineers regarding unit cost." Do you see that?
A. **Yes.**
Q. What position contradicts that which is in the original Request for Equitable Adjustment?
A. **The position is that the auditors determined that the FAR requires that the contractor provide breakdowns for the basic cost elements of the claim.**
Q. What work was involved in realigning the west levee at Lost Lake?

Page 150

A. **The material was taken out of the location where the levee had been placed and it was replaced where the new alignment was going to be.**
Q. What kind of equipment was used to do that?
A. **Mechanical equipment.**
Q. Can you be more specific?
A. **Off the top of my head, no. It was mechanically realigned.**
Q. Do you know what stations were involved with the realignment of the west levee?
A. **I looked at that. I don't -- I'm just looking here to see if I have -- if it shows where that was done. I don't have an independent recollection of that just off the top of my head, no, sir.**
Q. If I showed you a contract drawing of Lost Lake west levee, do you think you could identify the stations?
A. **No, sir, I don't have an independent recollection of those stations off the top of my head.**
Q. At page 20 of your March 3, 2004, report, there's a discussion of the Lost Lake Levees, and there's a section called, "Response to audit report comments"; do you see that?
A. **Yes, sir.**
Q. And you state there that, "These costs are compensable." Do you see that?
A. **Yes.**

Page 151

Q. And what is the basis for that conclusion?
A. **I believe that the work that Renda had to perform was outside the scope of their original contract. They are entitled to be compensated for that work.**
Q. And at that -- in that -- at this point in your report are you endorsing a total cost methodology used by Renda Marine to price that claim, or are you referring to the calculations contained in your report of March 2004?
A. **I'm referring to the calculations contained in my report.**
Q. What is your understanding of the materials that under the contract for the Upper Bayou contract were defined to be suitable for hydraulic levee construction?
A. **Generally speaking they would be the clay materials as opposed to the silts.**
Q. Is it your understanding that only clay materials were suitable for the part of the levee at Lost Lake that was to be constructed by hydraulic placement of fill?
A. **I don't recall if -- if clays were the only materials that were suitable.**
Q. How was Affolter Contracting compensated for the mechanical levee construction work that it performed on the -- at the Lost Lake Placement Area?
A. **My understanding is that they were paid partially by Renda, based on a subcontract agreement, and that they**

Page 152

**were given additional compensation through Renda by the Corps for the additional work they did because of failures that were occurring to the mechanical levees as a result of the -- same problems that Renda was encountering on the hydraulic levees.**
Q. Is it your understanding that Affolter Contracting was paid under the contract for its work at a unit price per cubic yard of material?
A. **I don't remember whether they -- it wouldn't surprise me if they were, but I don't have an independent recollection of that.**
Q. Page 21 of your report I believe you note that Renda Marine began dredging on September 13, 1999, and began constructing hydraulic levees on the same day; is that correct?
A. **Yes, sir, that's what I stated.**
Q. And is it your opinion or understanding -- strike that.
Is it your understanding that problems with subsidence and displacement and levee failures began shortly thereafter?
A. **Yes.**
Q. When did Renda Marine first give the Corps of Engineers notice of subsidence problems?
A. **We looked at all the notice letters. I don't have**

Case 1:02-cv-00306-FGH Document 119-27 Filed 12/14/2004 Page 7 of 11

Page 153

an independent recollection of when that first one came in.
Q. When did Renda Marine first give the Army Corps of Engineers notice of displacement problems in building the portion of the perimeter levee that was to be constructed by hydraulic placement of fill?
A. I apologize. I looked at that, but I don't have an independent recollection of when that first notice was given.
Q. When did Renda Marine first give the Army Corps of Engineers notice of failures of the portion of the perimeter levee of Lost Lake Placement Area that was to be constructed by the hydraulic construction methods?
A. Again, I looked at that, but I don't recall when that first notice was given.
Q. What is the basis for your conclusion that certain areas of the levees at Lost Lake Placement Area continue to fail to this day?
A. Renda went out and did an inspection of the site and when they left the project there were certain areas that had failed and were continuing to fail, and then when they went back out to the site they found additional areas that -- where repairs had been made, and there were continued failures.
Q. When did Renda Marine return to the site?
A. Recently. I don't know the date.

Page 154

Q. Who told you that Renda Marine returned to the site?
A. I don't recall who told me.
Q. What levees were identified as the levees that had continued to experience failures?
A. I didn't make a list of them. I don't recall.
Q. What is the basis of your conclusion that -- strike that. I'll rephrase.
What is the basis for your conclusion that Renda Marine estimated that it would take 900,000 cubic yards of material to construct the portion of the levees at Lost Lake Placement Area that were to be constructed by the hydraulic placement of fill?
A. Based on my discussions with Steve Bowman.
Q. Now, did you check Renda's bid estimate documents to determine whether they revealed one way or the other the amount of material that Renda Marine estimated would be needed to construct the part of the levees at the Lost Lake Placement Area that were to be constructed using the hydraulic placement method?
A. I looked at their bid documents. I don't recall seeing that calculation.
Q. So you're taking Steve Bowman's word for it?
A. Yes, sir.
Q. Did Mr. Bowman show you any other documentation

Page 155

where he had performed a calculation of any kind to arrive at a figure of 900,000 cubic yards of material to construct the hydraulic levees at Lost Lake?
A. During our discussion he showed me several calculations. He showed me a calculation that he had made and then compared it to the one that the government had made that was very similar. I don't recall specifically what numbers those were, but I remember we did go through that calculation.
Q. Was this a calculation that Mr. Bowman had made prior to the submission by Renda of its bid for the Upper Bayou Project?
A. I don't recall.
Q. Did you evaluate the reasonableness of the estimate that 900,000 cubic yards of material would be required to construct the hydraulic levees of the Lost Lake Placement Area?
A. At this point all I've done is compare it to the numbers that the government had at that same point in time and felt that it was reasonable based on those assumptions. I have not gone beyond that at this time.
Q. What is "reasonable anticipated displacement"?
A. In this case it would be the displacement that would net the 900,000 yards of material from a -- the difference between that and the neat cross section of the

Page 156

levees.
Q. What do you mean by the phrase "lack of reasonable foundations"?
A. In this case I mean that it's the -- that if the Corps was to -- when the Corps designed these levees to the size that they did, that the foundation material should be able to support levees to that level, and that in this -- on this particular project the foundation was not able to support levees as designed by the Corps.
Q. What sorts of analysis did you perform to reach that conclusion?
A. Reviewed the placement of the levees, the continued failure of the levees and the inability to construct the levees to the elevations called for by the Corps.
Q. What do you mean by "placement of the levees," you said you reviewed that?
A. Reviewed the -- the placement of the material by Renda, looked at how they were placing that material, looked at the equipment they were using to distribute that material, looking at the -- the means and methods they used and found that they were getting continuous failures of the levees.
Q. Did you look at how Renda was placing the material on the north levee?
A. I looked at how they were placing material on all

Page 157

the levees.
Q. How was Renda Marine placing material on the south levee?
A. **South levee was mechanically placed by Affolter, I believe.**
Q. And how was Renda placing material on the north levee?
A. **The north levee, I believe, was also placed mechanically by Renda.**
Q. How did Renda place material on the east levee?
A. **I believe the east and west levees were placed hydraulically.**
Q. And what was the construction sequence for the placement of material by Renda at the east and west levees?
A. **The mechanical levees had to be completed first prior to doing the hydraulic levees, which included the south levees and the training levees around the outer structures, then Renda started proceeding with the hydraulic levee construction and after repeated failures of the hydraulic levee construction, then they began to work mechanical levees in the north section, in attempt to get the work completed.**
Q. Well, in placing fill hydraulically on the east and west levees did Renda raise or attempt to raise the levees to 30 feet above mean low tide by hydraulic placement of fill?

Page 158

A. **They attempted to place the material ultimately up to 30 feet above mean low tide, yes.**
Q. What did the contract provide in that regard?
A. **I believe the contract called for the levees to be placed up to 30 feet.**
Q. Earlier I asked you if you reviewed the plans and specifications for the Upper Bayou Project, and I believe you answered affirmatively.
A. **Yes.**
Q. Did you review amendment number one?
A. **Yes.**
Q. What does amendment number one provide in terms of placement of fill hydraulically?
A. **Off the top of my head, it -- I believe it talks about placing material up to elevation, up to 20 feet, and then I don't recall what it -- what it states after that.**
Q. Amendment number one contemplates raising the levees to 20 feet by hydraulic placement of fill and then dressing the dikes or the levees to grade with material from the existing levee, does it not?
A. **I apologize. I don't -- I don't have an independent recollection of that sitting here.**
Q. Is it your opinion that the soil materials at Lost Lake Placement Area were different than what was depicted in the contract plans and specifications?

Page 159

A. **I'm sorry, would you repeat the question?**
Q. Yes. Is it your opinion that the soil materials at the Lost Lake Placement Area were different than what was depicted by the contract plans and specifications for the Upper Bayou Project?
A. **Are you talking about the actual soil types? What -- I'm not sure what you're asking.**
Q. Talking about the conditions, the soil conditions.
A. **The conditions were certainly different than were depicted, yes.**
Q. In what way?
A. **Well, there was inadequate foundation for the levees to construct them in accordance with the plans and specifications. The levees continued to fail, continued to shear off.**
**It appeared that that was a result of a side-cast borrow operation where materials, good materials were taken from adjacent to the existing levees and that material was removed and placed on top of the existing levees so that when these new levees were being placed they fell off into that area where the material had been taken in the side-cast borrow operation, and that was not indicated on the -- on the drawings --**
Q. The side-cast borrow areas?
A. **The side-cast borrow areas and conditions that**

Page 160

**were left by that and were not indicated.**
Q. What conditions were left by the side-cast borrow areas?
A. **Soft, inadequate foundations for the levee construction.**
Q. What, if any other, subsurface physical conditions at the Lost Lake Placement Area were not indicated in the contract plans and specifications?
A. **I think that was the major -- the major difference.**
Q. What is the basis for your understanding that there were side-cast borrow areas at the Lost Lake Placement Area that were not depicted in the contract drawings?
A. **My discussions with Mr. Smith and Mr. Bowman.**
Q. Where were these side-cast borrow areas located?
A. **Running parallel to the existing levees.**
Q. And what were the dimension of the borrow -- side-cast borrow areas?
A. **I don't have specific dimensions of those.**
Q. Do you know how deep the borrow areas went?
A. **No, sir.**
Q. Do you know how wide they were?
A. **No, sir.**
Q. You say they were adjacent -- did you say they were adjacent to the levees?

A. They were parallel. They were not immediately adjacent.
Q. What was the difference -- strike that. What was the distance of the borrow pits from the inside toe of the new perimeter levee?
A. The distance from the toe -- you said borrow pits, are you talking about the side-cast borrow areas?
Q. Yes. I'll -- let me rephrase it for you. Is it your understanding that the -- the new perimeter levees at the Lost Lake Placement Area, the footprint of the new perimeter levees was over the side-cast borrow areas?
A. Yes.
Q. How far from the center line were the new perimeter levees at the Lost Lake Placement Area where the side-cast borrow area was?
A. I don't know that I ever did that calculation.
Q. Is that the kind of information that could be calculated?
A. Generally it could be, yes.
Q. In order to do that how would you do that?
A. Determine where the side-cast borrow areas were and measure how far off the center line of the new levees they were.
Q. But you have not determined where the side-cast borrow areas were?



A. No. I told you I determined they were running parallel to the existing levees.
Q. That's as precise as you can be?
A. No. My understanding is they started approximately 25 feet away from the toe of the slope of the existing levees.
Q. What are the side-cast borrow areas?
A. These were areas used by maintenance contractors hired by the Corps to -- as borrow areas to excavate material and use to build up the tops of the existing levees.
Q. What kind of equipment was used to excavate the side-cast borrow areas at the Lost Lake Placement Area?
A. My recollection was that it was estimated that that was done with dragline operations.
Q. What is the basis of your understanding that it was estimated that a dragline would be used?
A. Just my discussions with Mr. Smith and Mr. Bowman.
Q. When Renda Marine began its hydraulic fill placement operations at Lost Lake Placement Area, were the side-cast borrow areas visible?
A. My understanding is they were not.
Q. Do you have an understanding as to what may have filled the borrow areas, the side-cast borrow areas or hidden them from view?
A. Yes.



Q. What is that?
A. Silts that would have filtered into that area from the surrounding area.
Q. You mean dredged material?
A. Yes, prior dredged material.
Q. When you say prior dredged material, do you mean material that had been dredged and placed in the Lost Lake Placement Area prior to the creation of the side-cast borrow areas?
A. Well, it would be any material that was in the side-cast -- well, it would be any material that was in the Lost Lake Levee and any material that was placed there after the side-cast borrow work was done, but it would have been prior to Renda's starting their work on the project.
Q. What is your understanding of the material that was removed from the side-cast borrow areas to dress up or repair the existing levee?
A. My understanding is that it was acceptable material. I don't know whether it was -- was clays or sands, but it was considered to be acceptable material for building levees.
Q. You note that Renda Marine contends that it required nearly two million cubic yards of material to fill the side-cast borrow areas and construct the portion of the levees at Lost Lake Placement Area that were to be



constructed by the hydraulic placement of fill.
A. Well, other than -- generally that's correct. What I state is that contends that nearly two million cubic yards were required in order to fill the borrow areas and construct the levees.
Q. Have you verified that?
A. No, I have not independently verified that quantity.
Q. So you've taken Renda's word for it basically; right?
A. Yes, sir.
Q. How did you arrive at the conclusion that undocumented poor foundations existed?
A. By reviewing the plans and by talking to Mr. Bowman and Mr. Smith.
Q. Is it your opinion that the undocumented poor foundations were caused by the side-cast borrow areas?
A. Yes.
Q. Is it your opinion that the side-cast borrow areas caused the construction time for the hydraulic levees to be significantly higher or larger than originally anticipated?
A. Yes.
Q. How did you determine that?
A. By looking at the amount of time that it took to place the material and seeing that all of this material that

Page 165

was being placed out there that should have provided an adequate levee was not sinking down into the side-cast borrow areas and therefore it took more material to bring that back up, by looking at the -- the time that it took Renda to place that material whenever it sheared off, it fell down to the side-cast borrow area, for them to have to come back, bring their crew back and place more hydraulically placed material, and then move forward and then come back and dress those areas up multiple times, by knowing that placing two million yards as opposed to 900,000 yards will take significantly longer, and by my discussions with Mr. Bowman and Mr. Smith to determine that it would take longer and cost more.

Q. In your report you state, "In addition, various mechanical levee operations were added to reconstruct failed levees and construct new levees from clay material that had migrated into side-cast borrow areas." Do you see that?

A. Yes.

Q. Could you explain what you mean by clay material that had migrated into side-cast borrow areas?

A. As the levees were being hydraulically constructed, the way they were shown on the plans, they were sitting on top of -- part of the footprint was on top of the side-cast borrow areas. As the material was placed and was brought up, more and more weight being added by the hydraulic levee operation, that material then sloughed off and fell

Page 166

into the side-cast borrow area, displacing the -- the silts and sludge that had filtered down into that area, so that's the material migrating into the side-cast borrow areas, because now it's moving away from where it was being placed and is now moving down and sideways away from the levee. More material is placed on top of that and as more material is placed more material pushes out to the side until it finally becomes relatively stable and the levee is brought up.

Q. What information would you have to have in order to quantify how much clay material migrated into the side-cast borrow areas?

A. What information?

Q. Yes.

A. First I would check the quantity of material that was being dredged, dredged quantities would tell me how much material was placed up there. Then I could go check areas where -- where that material was used, for instance, if I knew that -- and I could check the cross section of that area that's used, where it's visible and where it did not fail, not sink off into the side-cast borrow areas, take the difference between those two and say the rest of that material went into the side-cast borrow areas, unless some of that material was wasted. But that would be one way of doing the calculation.

Page 167

Q. How would you be able to determine whether some of the material was wasted?

A. Well, some of the material is not clays, it's unacceptable materials and would have been put into the disposal areas that are shown on the plans, and so some of that material would be identified in the dredge logs, so you could identify that material, but you could take the amount of clay that was being excavated on the -- based on the logs when that clay was being dredged, and you could identify the quantity of materials that were removed and that should produce -- that should give you a quantity of material.

Q. Is it your understanding that the side-cast borrow area's function is kind of a trap for material that was placed hydraulically, a trap in the sense that the material would go into the side-cast borrow area and not beyond that area into the interior of the Lost Lake Placement Area?

A. No, sir, that's not my understanding.

Q. Where was the dredge discharge pipe backtracked to as levees failed?

A. Back along the levee that had been prior to -- previously constructed.

Q. What materials or documents reference moving discharge pipe back over greater than anticipated distances?

A. We determined that from the -- the daily reports being produced by Renda and from my discussions with

Page 168

Mr. Bowman.

Q. You say "we determined that." What do you mean by "we"?

A. Me and my office, so it was myself and Mr. Coakley at this point.

Q. When was water pumped to "flush displaced material away from the levee construction shown"?

A. Throughout the hydraulic levee placement operation.

Q. What is the basis for your conclusion in that regard?

A. Well, I had discussions with Mr. Bowman who described what was happening, and described the reason for it happening, and then we identified from the -- the diaries, the summaries of diaries when it happened and how long.

Q. What are these summaries of the diaries that you're referring to?

A. Well, these are exhibits in the report.

Q. Which exhibits are they?

A. Exhibit 5 is a summary, Exhibit 6 is a summary, Exhibit 7 is a summary, Exhibit 8 is a summary, that are summarizing the various dredge logs and daily reports, and then these others are pricing summaries showing summaries of various pricing information.

Q. Any of these tabs summarize the daily dredging

Page 169

logs?
A. **Some of them do, yes. For instance, tab eight is the contractor quality control reports. Tab seven is the daily dredging reports. Tab six is a summary of dredge and levee data from the daily logs, and tab five is a summary of log information from the levee operation, hydraulic and mechanical levee operations.**
Q. You referred to summaries of diaries. Were you shown handwritten diaries by Renda personnel?
A. **No, sir. These are what I was referring to.**
Q. These are standardized daily periodic reports, daily reports and so forth?
A. **Correct.**
Q. Page 21 of your report, March 2004, you began a discussion, "The following specific items are included in Lost Lake Placement Area claim"; do you see that?
A. **Yes, sir.**
Q. The first item is item A. What document or documents is -- did you review or use as the source of your information for the original hydraulic levee crew?
A. **The Renda bid.**
Q. These are the bid estimate sheets that you looked at?
A. **Yes, sir.**
Q. Where along the hydraulic levee alignment did

Page 170

"massive amounts of displaced material from the side-cast borrow areas accumulate and surround the discharge area"?
A. **Is there a reference to that in here?**
Q. At page 21 under item A, the second paragraph, about the middle of the paragraph there's a sentence that reads, "During the actual hydraulic levee operation massive amounts of displaced material from the side-cast borrow areas accumulated and surrounded the discharge area." Do you see that?
A. **Yes, sir.**
Q. My question was: Where along the hydraulic levee alignment did the "massive amount of displaced material from the side-cast borrow areas accumulate and surround the discharge area"?
A. **My understanding is it was throughout the hydraulic levee placement operation, so in front of the hydraulic levee placement operation.**
Q. So that would have occurred all along the east levee?
A. **Yes, the east and west levees.**
Q. How did you determine that material was displaced from the side-cast borrow areas?
A. **Because the material that was shearing off of the new levee placement was sliding down into these side-cast borrow areas and so it was displacing that material that was**

Page 171

**in there already.**
Q. Well, did Renda Marine perform any testing or do anything to verify that phenomenon?
A. **I'm not aware that they did. I don't know why they would do that.**
Q. Well, is it your opinion that this would be something that is visible to the naked eye, obvious?
A. **The phenomena of material shearing off, falling down into the side-cast borrow area and displacing that material would be visible, yes.**
Q. When did Renda Marine first become aware of the existence of side-cast borrow areas at the Lost Lake Placement Area?
A. **After they had constructed some of the hydraulic levees and the -- the hydraulically placed material started shearing off, falling off to the side.**
Q. So up to that point they hadn't had this problem with shearing off of material and falling off to the side?
A. **Until the first material sheared off they did not have any problem with material shearing off.**
Q. And it was at that point when the material first sheared off that Renda noticed that it was displacing material from what was a side-cast borrow area?
A. **I don't think at that point they were aware that it was a side-cast borrow area, but they were certainly aware**

Page 172

**that they were losing material off their levee, that it was displacing other material.**
Q. And when did that -- what was the point in time when Renda Marine first became aware of that?
A. **What date, I don't recall offhand.**
Q. You don't recall?
A. **No, sir.**
Q. Do you recall whether it was before or after Steve Bowman assumed responsibility for the day-to-day operations of the Upper Bayou Project?
A. **I don't recall.**
Q. You state that, "Renda Marine never intended to move large amounts of displaced material." Are you referring to the mud wave?
A. **Yes.**
Q. Why was Renda Marine required to move the mud wave?
A. **Because the Corps would not allow them to just continue pushing forward with the hydraulically placed material and force that mud wave forward, because it would then top the existing levee, and the Corps would not allow that.**
Q. And is it your understanding that that was a phenomenon where the mud wave was occurring throughout the construction of the hydraulic portion of the levees?