Page 173

A. My understanding was it was occurring through a significant portion of it. I don't know if it occurred everywhere.
Q. Do you know whether it occurred on the east side?
A. Not specifically.
Q. Do you know whether it occurred on the west side?
A. Yes.
Q. Do you know what the station coordinates were for where it occurred on the west side?
A. No, sir.
Q. Is it your understanding or conclusion that Renda Marine added equipment and labor to the Lost Lake operation in order to move excessive amounts of material from the face of the discharge area and to create contemporary -- excuse me -- temporary containment levees?
A. Yes.
Q. What do you mean by "discharge area"?
A. Where the material is being hydraulically discharged from the dredge line.
Q. What do you mean by "temporary containment levees"?
A. Renda was attempting to construct temporary containment levees, two areas, one is inside the new levee placement area, in order to try to contain this material, contain the new material that's coming out.

Page 174

In addition, they were placing temporary containment levees on top of the existing levee so the mud wave would not top that levee, so they were doing it on both sides of their new levee construction.
Q. Why wouldn't additional pump material continue to move the materials away from the discharge area?
A. It would in theory. The problem is that it would push it up over the existing levee, which was not acceptable to the Corps.
Q. You note that the claim includes extra personnel and equipment to deal with the excessive displaced material.
A. I'm sorry, say that again.
Q. In your report you note that the claim includes extra personnel and equipment to deal with the excessive placed -- excuse me -- displaced material.
A. Yes.
Q. And you state that standby time, or you have standby time in your claim for the entire hydraulic levee construction operation during periods when the dredge was delayed; is that correct?
A. Well, I state, in addition, the standby time for the entire hydraulic levee operation is included during periods where the dredge was delayed. We're only claiming standby time when the dredge was delayed.
Q. Delayed by what?

Page 175

A. Delayed by having to stop the levee operations, the hydraulic placement operations and clear away this mud wave and/or build these hydraulic levees and/or backtrack.
Q. In that statement what do you contemplate as having delayed the dredge?
A. The dredge could not continue to pump new material out and hydraulically place it on the levees, because they could not take any more material out there until they clear this mud wave and do some of this other work, which was not anticipated, and they have to go back and backtrack, they have to break the pipe down, and they're breaking that pipe to go back and repair levees that have now sheared off and fallen in the side-cast borrow areas, the dredge cannot continue to pump these clay materials up there while they're breaking the pipe down and all. So that's when we show that the dredge would be on -- on standby.
Q. So the dredge operation would have to be shut down temporarily?
A. Would have to go on standby, correct, so they could not continue to pump clay materials through.
Q. Would you expect in that situation there would be a note of that in the daily dredging reports?
A. Not necessarily, no, sir.
Q. Why not?
A. Because they may not know exactly what the cause

Page 176

is for that, whereas the levee people may know what's going on, they may be backtracking the pipe, but contractors are notoriously poor about noting things like that in their diaries.
Q. If you're operating the dredge and you're dredging and you're shut down because of some problem at the Lost Lake Placement Area, wouldn't you want to note in your report that the reason you weren't continuing to dredge, at least for purposes of the home office, was that there was a problem at the Lost Lake Placement Area and not a problem with the dredge?
A. Certainly I would like that, yes, sir.
Q. Would you expect the crew on the dredge, the personnel on the dredge to want to make a note of that in the dredge reports?
A. Based upon my 20 years of consulting experience I would say, no, I would not expect that to happen.
Q. Of course, you've never had any involvement in a dredging project before?
A. 20 years experience in all different kinds of projects where people are having to note things like that on diaries, I would -- I would not expect that to happen.
Q. Page 22 of your report.
A. Yes, sir.
Q. You have item B under, "Mechanical Levee

Page 177

Construction, East, North and West Levees."
A. **Yes.**
Q. Approximately, is it April 17th, 2000, to December 31, 2000; do you see that?
A. **Yes, sir.**
Q. Why do you say approximately? Is that the correct time frame or not?
A. **Yes, it is the correct time frame.**
Q. You have item C of your reports, which is, "Additional dredge plant equipment and labor due to relocation of the dredge discharge line"; do you see that?
A. **Yes.**
Q. You basically determined that the dredge was shut down at times to facilitate a move of a discharge pipe at Lost Lake to reconstruct an area previously constructed; is that correct?
A. **Yes.**
Q. And an area previously constructed levee that subsequently failed or subsided?
A. **That's correct.**
Q. And you have a figure of $352,347 for that item?
A. **That's correct.**
Q. How many instances of this were there?
A. **I apologize, I don't recall offhand how many instances.**

Page 178

Q. Did you make a determination that this was a reasonable course of action by Renda Marine?
A. **Yes, I did.**
Q. More reasonable than, say, hauling some material in by truck to repair the damage?
A. **Yes.**
Q. Do you know where these failures and subsidences occurred?
A. **Many of them are noted in the -- in the diaries. I don't have an independent recollection of all of the stations.**
Q. When you say diaries, do you mean the daily dredging reports?
A. **No, sir.**
Q. What are you referring to?
A. **The contractor's diaries, the -- contractor's quality control reports.**
Q. So-called CQC reports?
A. **Yes, sir.**
MR. KOSLOSKE: I need a two-minute break.
(Recess from 4:35 to 4:43 p.m.)
(EXHIBIT(S) NO. 4 MARKED.)
MR. KOSLOSKE: Back on the record.
Q. (BY MR. KOSLOSKE) Mr. McCullough, earlier this afternoon in the deposition we were identifying daily

Page 179

dredging diaries, or you referred to daily dredging diaries, I believe, or daily dredging reports?
A. **(Moving head up and down.)**
Q. I'm showing you what's been marked for identification as Exhibit 4. Is this an example of a daily dredging report or daily dredging diary that you're referring to?
A. **This is one of them. This appears to be, yes, sir.**
MR. ERIKSON: Mr. Kosloske, could I have the extra copy?
MR. KOSLOSKE: Yes.
MR. ERIKSON: Thanks.
Q. (BY MR. KOSLOSKE) When you say one of them, you mean one kind of report?
A. **Well, both, this is one of the reports and this is one type of report.**
Q. What are the other types of reports that you reviewed in evaluating the claims?
A. **They also have the handwritten version of this same report, of the dredging report. They also have CQC reports for -- for the levee building operations and I think that's all I recall.**
Q. Are you familiar with an internal report of Renda called Report of Operations?

Page 180

A. **Yes.**
Q. Did you review that?
A. **Yes, I did.**
Q. Would you turn to tab one of your March 4 -- excuse me, March 3, 2004 report?
A. **Yes.**
Q. Tab one is Exhibit A.
A. **Yes.**
Q. It's titled Summary of Claims.
A. **Yes.**
Q. Is this essentially a summary of the claims and adjustments that you made to the claims that are described in the narrative portion of your report?
A. **Yes.**
Q. Tab two is Exhibit B.
A. **Yes.**
Q. And this is titled Dredge Hourly Rate Calculation.
A. **Yes.**
Q. And this is a rate that you calculated based on the Rental Rate Blue Book?
A. **Yes.**
Q. You calculated operation, hourly rate of $642.77?
A. **Yes.**
Q. And this is the rate that you calculated and used as a kind of sanity check against the rate calculated by

Case 1:02-cv-00306-ECH Document 119-28 Filed 12/14/2004 Page 3 of 11

Page 181

Renda and used in its claim?
A. Yes.
Q. Turn to tab three of your report, Exhibit C.
A. Yes.
Q. What is Exhibit C?
A. **This is a summary of the damages for claim 12, Lost Lake Levee claim.**
Q. Let's take a look at the different columns of information that you have. To the far left you have cost category?
A. Yes.
Q. And under that you have cost categories A through F; correct?
A. Yes.
Q. And these are the claim -- individual claim elements that make up the Lost Lake Levees claim?
A. Yes.
Q. And then the next column you have total days; do you see that?
A. Yes.
Q. What does that refer to?
A. **I think that refers to the days that are shown under the cost category column.**
Q. So, for example, on item A you have the dates 9-13-1999 to 9-18-2001?

Page 182

A. Yes.
Q. That should total up to 483 days?
A. **I believe so.**
Q. You have adjacent to that for 1999 and indeed for apparently the years 2000 and 2001 a total labor column and a total equipment column for each of those years; is that correct?
A. **That's correct.**
Q. What does total labor refer to?
A. **The total labor that was expended during that year for that particular claim category.**
Q. What does total equipment refer to?
A. **The same thing for equipment.**
Q. And then adjacent to the three columns of information for 1999, 2000 and 2001, you have a total labor column and a total equipment column; do you see that?
A. Yes.
Q. What is the -- what are the values that appear in the total labor column?
A. **That would be the total labor from 1999, 2000 and 2001.**
Q. And what is the total equipment column?
A. **Same thing for equipment.**
Q. Then to the far right you have a total cost column; do you see that?

Page 183

A. **Yes, sir.**
Q. What is -- what are the values that appear in that column?
A. **That would be the two previous columns, the total labor and the total equipment added together.**
Q. You have a -- about midway down the page, resident overhead?
A. **Yes.**
Q. And you have different rates there. What is the source of the resident overhead rates?
A. **DCAA auditors.**
Q. And what is the source of the corporate overhead rates?
A. **DCAA auditors.**
Q. You have a profit item, 12 percent?
A. **Yes.**
Q. And how did you determine that 12 percent was an appropriate profit?
A. **I believe that was the rate that was used on the prior claims.**
Q. Which claims do you mean by "prior claims"?
A. **I mean the prior claims submitted by Renda to the Corps of Engineers.**
Q. So you just -- you took the 12 percent rate from Renda's certified claims?

Page 184

A. **Yes.**
Q. Did you do an independent analysis to determine whether 12 percent is a reasonable profit figure?
A. **I didn't -- I mean, it is a reasonable profit figure based upon my experience. I didn't go do any kind of a survey, a formal survey of that.**
Q. Why would 12 percent be reasonable as compared to, say, 10 percent?
A. **If 12 percent had been used by Renda in the past, and I'll have to go back and verify this -- I believe that some of the requests that Renda had made earlier had been paid by the Corps using a 12 percent profit figure. If -- if that has been used in the past on a project, I tend to use that same number, rather than determining some totally arbitrary number that I believe is substantiated. If the Corps has already established that number, then that's what I generally use, and my recollection is that was the case here.**
Q. And you're referring to a profit margin that was used in contract modifications for the Upper Bayou Project?
A. **I believe that's correct.**
Q. And you have a bond figure of 6 -- .65 percent?
A. **Yes.**
Q. What's the source of that?
A. **I believe that is DCAA.**
Q. Then you have a line item professional fees and

Page 185

report preparation?
A. Yes.
Q. How much is that?
A. That is $5,608.
Q. What is the basis for that?
A. That is the summary I got from Barry Smith.
Q. What does that amount cover?
A. The -- the work he did in preparing documentation in pulling together the Lost Lake Levee documentation, this was time he assigned to that particular claim issue.
Q. For purposes to assist you with preparation of your report?
A. No. This would have been prior to my report, in preparation of his original request for additional compensation, the documentation that he pulled together and we used.
Q. Would you turn to tab four? This is titled claim 12 Lost Lake Levees chronology summary.
A. Yes.
Q. Who prepared this tab?
A. I believe this was prepared by John Coakley of my office from a chronology supplied by Barry Smith.
Q. Would you recognize the chronology if I showed it to you, that is, the chronology prepared by Barry Smith?
A. Possibly.

Page 186

Q. Have you seen the chronology that Mr. Coakley used?
A. I -- I don't know that I have seen -- I don't know that I would know that a specific chronology was used to prepare this chronology. I know that we received one from Mr. Smith, and I know Mr. Coakley summarized it here, but I don't know that I watched the correlation of that happen.
Q. In the entry for October 16, 2001, in your summary, what is the basis of the Corps of Engineers' estimate of 75 cubic yards per linear foot of levee?
A. That was documentation that was furnished to me by Mr. Bowman and Mr. Smith from documentation they had received from the Corps.
Q. What is the basis for the entry for October 16, 2001, that the actual requirement was 270 cubic yards of material per linear foot of levee?
A. I'd have to research that. I'm not sure.
Q. As you sit here, do you know who made that calculation?
A. No, sir.
Q. The entry for December 7, 1999, Renda Marine experiences a significant levee "mud slide" or shear at station 65; do you see that?
A. Yes.
Q. What is the source of that information?

Page 187

A. Again, I believe this was a chronology provided by Mr. Smith. I didn't go back and independently verify each one of these against a diary entry.
Q. How did you determine that the mud slide in this instance was significant?
A. Because the note said it was significant.
Q. The note in the chronology that was used to prepare this summary?
A. Yes, sir.
Q. In the entry for January 5, 2000, do you dispute low dredge production due to "stiff clays" and the six month delivery delay for the dredge?
A. Do I dispute that?
Q. Yes.
A. I don't believe so.
Q. The entry for January 24, 2000, "Routinely experiencing significant subsidence of levees," is the basis for that the chronology provided by Barry Smith?
A. Yes, sir.
Q. The entry for January 28, 2000, is the basis for the statement that both the Corps of Engineers and the joint venture personnel realize problem with poor levee foundation materials the chronology prepared by Barry Smith?
A. Yes, sir.
Q. The entry for June 12th, 2000, Renda Marine

Page 188

submitted a revised schedule showing completion of all levees by December 2000. What is the significance of that document?
A. It was showing updated schedules that Renda Marine was supplying updated schedules based upon the impacts that had occurred to date.
Q. What is the significance of that to your analysis?
A. It showed that Renda Marine was managing their work, it shows that they anticipated a later completion date as a result of problems that occurred and the delays that were being blamed on -- it showed the overall delay that was occurring to the project, at least in an incremental view of that.
Q. The entry for October 18, 2000, describes levee failure as catastrophic. Catastrophic according to whom?
A. Whoever wrote the entry.
Q. Would that have been Barry Smith's chronology?
A. I believe so. And I apologize. This may have been a combination of Barry Smith's chronology or entries out of Barry Smith's claims, but the source would still be Barry Smith.
Q. Do you know where this catastrophic levee failure occurred?
A. Not just looking at this chronology, no, sir.
Q. April 16, 2001, the entry is, last day that the dredge Millennium was on this project, by that you mean the

Page 189

Upper Bayou Project; correct?
A. That's what that means, yes, sir.
Q. Where was the dredge Millennium after April 16, 2001?
A. The -- if I recall properly the timing of it, there was some additional work that was being performed on another project. They moved the dredge up there to perform that dredging work, and then I don't know -- I don't know physically where the dredge was located prior to it being released by the Corps, but I know it did perform some additional work for another contract during that time frame.
Q. Do you know where Renda was working on the levees, that is, which station, on October 18, 2000?
A. No, sir, just sitting here I don't have an independent recollection of that.
Q. Do you know which levee Renda was working on on October 18, 2000?
A. No, sir, just sitting here I don't have an independent recollection of that.
Q. It's your understanding that the dredge Millennium was not on the Upper Bayou Project after April 16, 2001?
A. Well, I know it was still -- I would call it under the control of the Corps. The Corps did not release it until July 23rd. I know that it went off to another project with the permission from the Corps to do another project and bring

Page 190

that dredged material back to the levee -- levee disposal area, so I know -- I know that it was off-site doing that work during that period of time.
Q. Do you know what that other project was?
A. The Houston -- Houston oil -- I want to say Houston ship oil but --
Q. Houston Fuel Oil Project?
A. Houston Fuel Oil Project.
Q. What did Renda Marine do with the dredge Millennium when the Houston Fuel Oil Project was completed?
A. I don't know. I know it was not taken to another project that they had, but I don't know exactly where it was placed.
Q. The entry for June 24, 2001, Renda Marine confirms with the Corps of Engineers the decision not to continue with any levee work; is that your understanding?
A. Yes.
Q. Would you turn to tab five of your report?
A. Yes, sir.
Q. Tab five of your report is a spreadsheet, is it not?
A. Yes, it is.
Q. And it's titled impacted dates?
A. Yes.
Q. Claim 12, hydraulic and mechanical levees; is that

Page 191

correct?
A. Yes.
Q. What do you mean by impacted dates?
A. These are the dates on which we claim the work was impacted under one of the claim 12 issues.
Q. And does this spreadsheet address impact to work on hydraulic as well as levees that were per the contract to be constructed mechanically?
A. No, sir.
Q. What does it cover?
A. It covers work that is addressed in claim 12, which would be all work that was anticipated to be done hydraulically, all levees that were planned to be placed hydraulically, but some eventually got placed mechanically, but it does not include the mechanical levee work done by Affolter.
Q. The column on the far left of this spreadsheet is date, and what does that refer to?
A. That's just a count of the number of days, day one being May 19th, 1999.
Q. What is the significance of starting with Wednesday, May 19, 1999?
A. It's the completion of the mechanical levees by Affolter.
Q. So that was the earliest point in time that the

Page 192

hydraulic levees could begin to be built?
A. Yes.
Q. The next column is a column that says date, and that's self-explanatory?
A. Yes, sir.
Q. The next column is description; see that?
A. Yes.
Q. What information appears in the description column?
A. These are just notes from the various diaries or dredge reports or CQC logs, that type of information.
Q. What is the source -- excuse me, strike that.
Who prepared tab five, this spreadsheet?
A. Mr. Coakley and I prepared this.
Q. And to the right of the description column there's a column impact date; do you see that?
A. Yes.
Q. What is that column for?
A. I don't know.
Q. Turn to day 182, which is the third page of tab five. That's Tuesday, November 16, 1999, under impact days there's a value of one is entered, and the description is Renda began moving "misplaced" materials to other stations. Does that refresh your recollection as to what impact days means?

A. No, sir.
Q. To the right of impact days there's a column claim five. What is claim five?
A. **Claim five is claim number five that we reference in our -- in our report. That would be the Flare Area claim.**
Q. What kind of information appears in the claim five column?
A. **Is there an indication in that column when -- when a claim was made, when damages were claimed on that date under claim five.**
Q. And so for the -- the column beside that, claims six, seven, eight, nine, 10 and 11?
A. **Yes.**
Q. Are those -- is the purpose of those columns to record the same kind of information for the claims that correspond to those numbers in your report?
A. **That's correct.**
Q. And then you have claim 12. That refers to the Lost Lake Levees claim?
A. **That's what it refers to, yes.**
Q. If you'll turn to day 250, that's page four of this tab.
A. **Yes, sir.**
Q. Day 250?
A. **Yes.**



Q. For claim five, you have entered the letters DL?
A. **Yes.**
Q. You have a key at the top that explains what DL refers to?
A. **Yes.**
Q. Is that, where you have DL in this spreadsheet, does that refer to both dredging and levee?
A. **Yes.**
Q. What does both dredging and levee mean?
A. **That means that there were claims made for both the dredge crew and the levee crew on that day under claim five.**
Q. If the letter L appeared rather than DL, what would that mean?
A. **L should just be levee. I was looking at the code at the top. I don't see a code just for L, but it means levee work was being claimed at that location or --**
Q. Just levee?
A. **Yes.**
Q. And then if you had -- you have a code D is dredging?
A. **The dredge crew, correct.**
Q. And so that means if you were to have a D appear in any of the columns claims five through 12 that only -- a claim is being made only for dredging crew on those days?



A. **Yeah, I don't see any plain Ds, because I believe in every case where a dredge claim was made the hydraulic levee crew that was associated with that was also claimed.**
Q. Between the column in claim 12 and the next column, which is N/C over D, do you see that?
A. **Yes.**
Q. There is like a row of zeros. Is there any significance to that?
A. **This is the blank column?**
Q. A column of zeros.
A. **Yes, the blank column.**
Q. Is there any significance to that, or is that just to denote a zero?
A. **There was some significance to that, because there's zeros, ones and twos in there. I think it's just a code column in order for this to calculate something, but I don't recall what exactly that was for.**
Q. You don't know what the code is, what zero stands for or what one stands for?
A. **No, sir.**
Q. Or what two stands for?
A. **No, sir.**
Q. In the column N/C over D, what does that -- what kind -- what does that stand for and what kind of information



is to appear in that column?
A. **The first column is dredge, the second column is hydraulic levee, the third column is mechanical levee.**
Q. What does N/C refer to?
A. **I'll have to go back and check, because I don't recall.**
Q. You have a column, the last group of columns is headed up, each column is headed up with a word claim and below that there's a 12 A, REF, 12 A.2, 12 A, 12 B, 12 C, 12 D, 12 E and 12 F, do you see that?
A. **Yes.**
Q. What kind of information is to appear in those columns?
A. **That shows which crew is being claimed for each of those particular elements, hydraulic levee crew and mechanical levee crew.**
Q. Is there a key, a separate key for those columns that appears in this spreadsheet?
A. **I believe that is the same key, HL is hydraulic levee, ML is mechanical levee.**
Q. What is the letter E, or is that a B?
A. **I don't see it.**
Q. Do you have a tab six there? Take any sheet on tab six and let's go over the information that appears at the top of those six or seven columns that appear there that

relate to claim 12. D equals dredging, do you see that?
A. Yes.
Q. What's the significance of that if it appears in these columns?
A. **It means on that day the dredging crew is being claimed.**
Q. And then you have HL equal hydraulic levee, what is the significance of that if it appears in the column?
A. **If it appears on that day that means the hydraulic levee crew is being claimed on that day.**
Q. And then ML refers to mechanical levee, what is the significance of ML that appears in column --
A. **The same as the previous ones, ML means that some portion of the mechanical levee crew is being claimed that day.**
Q. Okay. And if you have simply a letter H that appears in the column, what does that refer to?
A. **I don't see the H and I don't see the code for that.**
Q. I think that in the copy you have that it's been defaced by a hole punch through there, but I think there was an H there that equated to hydraulic levee. If you have an H appearing in the column, would that be days in which only the hydraulic levee crew was affected?
A. **I would assume so. Do you have days where it**



**shows just an H that you can point out to me?**
Q. Actually, I can't find any. I looked.
A. **I don't -- I don't see any that have just Hs.**
Q. Now, the key that appears after the ML, the mechanical levee --
A. **Yes.**
Q. -- what is that?
A. **B, B is booster.**
Q. And if you have a B that would appear in the column, what would that signify?
A. **That means the booster pump, the booster barge was being claimed.**
Q. You have DS, equals dredge standby; correct?
A. **Correct.**
Q. What does it mean that you have DS appearing in one of those columns?
A. **That claim is claiming a dredge standby for that day.**
Q. When you have DP, is that dredge plant?
A. **Yes.**
Q. What does it mean if a DP appears in any one of those columns?
A. **That is the dredge plant excluding the dredge, because there was some plant equipment down towards the end of the job where the dredge was removed, but the plant stayed**



**on until it was released.**
Q. What did the dredge plant excluding the dredge consist of?
A. **It would be the dredge crew less the dredge and booster barge.**
Q. What is the source of the entries that appear in the columns in tab six, the coded entries?
A. **Are we talking tab five?**
Q. I apologize, tab five, the impacted date spreadsheet.
A. **The source of this spreadsheet is the claims that Renda had submitted, produced by Mr. Smith, and the claims in claim 12, 10 and 12 that we reworked and determined hydraulic levee days. That is the source of those two items, the source of the information on the sheet, and, of course, the descriptions and dates and things came from the logs that we discussed earlier.**
Q. If you'll turn to tab six of your report.
A. **Yes.**
Q. Is this a spreadsheet that's titled dredge and levee data from daily logs; is that correct?
A. **Yes.**
Q. Who prepared Exhibit 6?
A. **Mr. Coakley prepared this.**
Q. What is the significance of the 100 percent that



appears just under the title of this spreadsheet?
A. **I have no idea.**
Q. The column on the far left is called already claimed and then parenthetically five through 11, close parenthesis; do you see that?
A. **Yes.**
Q. What is that a reference to?
A. **That appears those are dates when work is already being claimed for the dredge in claims five through 11.**
Q. And what is the source of the information in that column?
A. **That would be the claims that were submitted by Renda.**
Q. The next column is log number, do you see that?
A. **Yes.**
Q. What is that a reference to?
A. **That should be the daily log reference number.**
Q. Okay. Was that the individual -- strike that.
And then you have a column, the date column that's self-explanatory.
Then the next group of columns you have superimposed over that from dredge daily inspection reports, does that mean that the columns, effective working time, handling pipe lines, handling screening lines, clearing pump and pipeline, clearing cutter or suction heads, clearing

Page 201

location of plant on job, move dredge due to traffic, minor operating repairs, miscellaneous and lost time, that the source of the information in those columns is the daily inspection reports?

A. **That's correct.**

Q. And these are the daily dredge reports?

A. **Yes.**

Q. And is an example of those reports, what has been marked for identification as Exhibit 4 in this deposition?

A. **No, sir.**

Q. What are you referring to?

A. **The handwritten copies.**

Q. The handwritten copies of the individual reports of dredging?

A. **Yes.**

Q. So the typewritten copies of those reports were not used to prepare this spreadsheet; is that correct?

A. **That's correct.**

Q. Why did you use the handwritten copies as opposed to the typewritten copies?

A. **Because I believe they showed the breakdown that we showed here.**

Q. Were the handwritten copies of the daily dredge reports given to the Corps of Engineers?

Page 202

A. **I don't know.**

Q. The column effective working time, what does that refer to?

A. **That's the time that the dredge crew recorded as time they were actually able to dredge.**

Q. What does the column handling pipe lines refer to?

A. **That's when they were handling the pipe lines that they were pumping the material, the dredged material through.**

Q. What does the column handling swinging lines refer to?

A. **That's when they were handling the lines that allowed their barge to swing back and forth.**

Q. What does clearing pump and pipeline refer to?

A. **Occasionally the pump and the pipeline would plug up and they would have to spend time clearing that.**

Q. What does clearing cutter or suction head refer to?

A. **Time that the crew recorded for clearing the cutter head or the suction head, the cutter or the suction head.**

Q. What does changing location of plant on job refer to?

A. **That's when they were moving the barge from one location to another.**

Page 203

Q. What does move dredge due to traffic refer to?

A. **The time that the crew recorded for moving the dredge out of the way of ship traffic coming down the ship channel.**

Q. What does minor operating repairs refer to?

A. **The time that the core -- that the crew recorded performing minor operating repairs on the rig.**

Q. What does miscellaneous lost time refer to?

A. **Same thing, the crew recorded time against this item for miscellaneous and lost times.**

Q. What does total refer to?

A. **That is the total of all the hours in the previous columns.**

Q. And what is the column levee delays-pipeline refer to?

A. **Those are hours that were claimed for -- for levee delay as a result of moving the plant. These are levee delays that are impacting the -- the dredge.**

Q. What does levee delays displaced material refer to?

A. **This is the time that the dredge was impacted by the levee operations when they were pumping water is the general description, when they were pumping water to displace the mud wave that had built up in front of the dredged material out on the levees.**

Page 204

Q. What does the second total column refer to?

A. **That appears to be the total of the previous two columns.**

Q. Okay. And the column on the far right for notes, what is it purpose?

A. **Just to record notes.**

Q. And above the levee delay-pipeline column there's a value of 9.61; do you see that?

A. **Yes.**

Q. What does that refer to?

A. **That's the total of that column.**

Q. And above the levee delays-displaced material column there's a value of 32.31; do you see that?

A. **Yes.**

Q. What does that refer to?

A. **That's the total of that column.**

Q. Are the totals for the spreadsheet at tab six hours or days?

A. **Hours.**

MR. KOSLOSKE: I think this is an appropriate time to break.

MR. ERIKSON: Okay.

MR. KOSLOSKE: 9:00 tomorrow morning. We'll go from 9 to noon.

Page 205

MR. ERIKSON: That will work.
(Deposition adjourned at 5:30 p.m.)

Page 206

CHANGES AND SIGNATURE
TO THE ORAL DEPOSITION OF
ROBERT McCULLOUGH
VOLUME 1
April 15, 2004

| Page | Line | Change | Reason |
| --- | --- | --- | --- |

Page 207

I, ROBERT McCULLOUGH, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________
ROBERT McCULLOUGH

STATE OF __________)
COUNTY OF __________)

Before me ______________________ on this day personally appeared ROBERT McCULLOUGH, known to me (or proved to me under oath or through ____________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

(Seal) Given under my hand and seal of office this ______ day of __________, _______.

______________________
Notary Public in and for the
State of ____________

Page 208

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
) No. 02-306C
VS. )
) (Judge Hewitt)
THE UNITED STATES, )
Defendant. )

REPORTER'S CERTIFICATION
DEPOSITION OF ROBERT McCULLOUGH
VOLUME 1
April 15, 2004

I, Gloria Carlin, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ROBERT McCULLOUGH, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on 4-29-04 to the witness or to the attorney for witness for examination, signature and return to Gloria Carlin by 6-01-04;

That the amount of time used by each party at the deposition is as follows:

Brian W. Erikson - (00:00)
John E. Kosloske - (06:22)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Brian W. Erikson, Attorney for Plaintiff;
John E. Kosloske, Attorney for Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements will be certified to

Case 1:02-cv-00306-ECH Document 119-28 Filed 12/14/2004 Page 10 of 11



after they have occurred.

Certified to by me this 29th day of April, 2004.

[signature]

Gloria Carlin, CSR No. 498
Expiration Date: 12/31/04
Merit Court Reporters
Firm Registration No. 133
309 W. 7th Street, Suite 600
Fort Worth, Texas 76102
Job No. 040415GJC (817) 336-3042 (800) 336-4000



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
) No. 02-306C
VS. )
) (Judge Hewitt)
THE UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT McCULLOUGH
VOLUME 1
April 15, 2004
FURTHER CERTIFICATION

The original deposition was/was not returned to the deposition officer on ___________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to John E. Kosloske, Custodial Attorney;

That $1233.75 is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits.

That a copy of this certificate was served on all parties shown herein.

Certified to by me this _______ day of __________, 2004.

_____________________________
Gloria Carlin, CSR No. 498
Merit Court Reporters
Firm Registration No. 133
600 Oil & Gas Building
Fort Worth, Texas 76102
(817) 336-3042 Metro 654-4006
Job No. 040415GJC My Certification Expires 12/31/04

NO. 02-306C

RENDA MARINE vs THE UNITED STATES

ROBERT McCULLOUGH, VOLUME 2

APRIL 16, 2004

MERIT COURT REPORTERS - FORT WORTH, TEXAS

817-336-3042 * 1-800-336-4000