Page 259

A. Yes, sir.
Q. You have a column 1999 days. What do the values in that column represent?
A. **Those are the days that we are claiming were extended duration days for claim 12a2.**
Q. Okay. And the column 2000 days are the days that you're claiming for 12a2?
A. **Yes.**
Q. And 2001 days column are the days or number of days in that year that you're claiming for 12a2?
A. **That's correct.**
Q. You have hours per day, 24; do you see that?
A. **Yes, sir.**
Q. How did you determine that?
A. **From discussions with Mr. Bowman.**
Q. Then you have column 1999 total hours. What does that represent?
A. **An extension of the number of 1999 days times 24 hours a day.**
Q. And the information that appears in the columns 2000 total hours and 2000 total -- excuse me -- 2001 total hours is computed in the same way?
A. **Yes, sir.**
Q. You have a working hourly column. What is that?
A. **That's the hourly rate for the equipment.**

Page 260

Q. How was the -- what is the source of the hourly rate for the equipment, the source of which was Renda Marine?
A. **It would be the Corps' pricing manual.**
Q. What is the source of the hourly rate for the rental equipment?
A. **The rental agreements or invoices.**
Q. What information appears in the working daily column?
A. **That would be the daily rate for that equipment.**
Q. You have a 1999 equipment column; do you see that?
A. **Yes.**
Q. What information appears in that column?
A. **That would be an extension of the hours for 1999 times the rate for that piece of equipment.**
Q. And then the information that appears in the columns for 2000 equipment and 2001 equipment was computed in the same way?
A. **Yes, sir.**
Q. At the bottom of the second page of tab nine you have 12a1 and 12a2 totals; do you see that?
A. **Yes.**
Q. For total labor you have a value there of 205,583; do you see that?
A. **Uh-huh.**
Q. Dollars. What does that represent?

Page 261

A. **That represents the total for claims 12a1, which is the previous page, and 12a2, which is this page, the totals for those two.**
Q. And then you have total equipment, you have a value of $334,009; do you see that?
A. **Yes, sir.**
Q. What does that represent?
A. **That would be the same thing for the equipment numbers, that would be the 1999 totals from claim 12a1 and 12a2.**
Q. And you have similar totals for 2000 and 2001?
A. **That's correct.**
Q. How did you use those values in your calculation of damages in this case?
A. **Those should be the damages that we claimed for those items.**
Q. Would you turn to tab 10 of your report?
A. **Yes, sir.**
Q. Tab 10 is titled Dredge Claims Related to Levee Operations. Who prepared this?
A. **Mr. Coakley entered the data and I reviewed the information.**
Q. What is the purpose of tab 10?
A. **To compute the damages related to the dredge claims and levee operations.**

Page 262

Q. You have on the first page a sheet -- tab 10 is actually four sheets; is that correct?
A. **That's correct.**
Q. Look at the first sheet that's titled Dredge Claims Related To Levee Operations and the box of information has just above it 12c and 12d - dredge delay time. There's a first column, ID; what does that contain?
A. **The identification as to whether that particular line item is claim item 12c or claim item 12d.**
Q. For 12c the claim description is backtracking pipe due to levee failures?
A. **Yes.**
Q. And for that you have days for 1999, days for 2000 and days for 2001?
A. **Yes.**
Q. And you have a column labor cost per day; do you see that?
A. **Yes.**
Q. How was that determined?
A. **Tab 13 shows a tabulation of the certified payroll information. It totals, comes up with an average hourly rate and then goes through a calculation to calculate at the bottom of the page the average daily dredge payroll.**
Q. And tab 13 is titled Payroll Rate Calculation; is that correct?

Page 263

A. Yes.
Q. And the average daily dredge payroll is reported as $5,177?
A. Yes.
Q. And that figure is what appears in labor cost per day on the first sheet of tab 10?
A. That's correct.
Q. What does, on tab 13, average daily dredge payroll, you have parenthetically, 85 percent of total; do you see that?
A. Yes, sir.
Q. What does that mean?
A. That is the percentage of the total payroll that represents the dredge payroll.
Q. How did you determine that?
A. Based on discussions with Mr. Bowman.
Q. And you have -- I'm back now on the first sheet of tab 10, equipment cost per day, $30,796.97; do you see that?
A. Yes, sir.
Q. What does that value represent?
A. That represents the daily cost of the dredge equipment.
Q. How is that value determined?
A. It is a total of dredge costs -- if you flip back two pages in tab 10, it's page three of tab 10, it shows how

Page 264

that was computed.
Q. Page three is Dredge Operating Rate Calculations.
A. Yes, sir.
Q. And it sums to $30,796.97?
A. Correct.
Q. And that's the value that appears in equipment cost per day on the first sheet of tab 10?
A. Yes, sir.
Q. Let's stay with that for a moment with the Dredge Operating Rate Calculations, the third sheet of tab 10, the first column on the left, what is the purpose of that column, what does it show?
A. I don't know.
Q. The next column is Renda equip ID number, do you see that?
A. Yes.
Q. What is the information that appears in that column?
A. That would be the Renda equipment identification number.
Q. The next column is equipment description; do you see that?
A. Yes.
Q. What appears in that column?
A. A description of the equipment.

Page 265

Q. How did you determine which equipment to include in this computation of dredge operating rate calculations?
A. Based on discussions with Mr. Bowman and Mr. Smith.
Q. Then you have a column hours per week; do you see that?
A. Yes.
Q. What does that represent?
A. That represents the hours per week being used in the -- the rate calculation, for the use of that particular piece of equipment.
Q. For item number 47, which doesn't have an equipment identification number, rental tugboat, Melissa B, parenthetically, 800 HP; do you see that?
A. Yes.
Q. You have 168 hours per week, do you see that?
A. Yes.
Q. How did you determine that 168 hours per week value?
A. Based on my discussions with Mr. Bowman and Mr. Smith.
Q. You have an hours per month category, what do the values in that category represent?
A. The hours per month that are being claimed for this particular rate calculation.

Page 266

Q. How did you determine those hours?
A. Based on my discussions with Mr. Smith and Mr. Bowman.
Q. You have adjusted hourly rate column. What information appears in that column?
A. That's the hourly rate that we're claiming for this particular item.
Q. So for the -- take, for example, item number one, the dredge Millennium, you have an adjusted hourly rate of $724.49; correct?
A. Yes.
Q. And what is the source of that rate?
A. Equipment calculations that were performed by Mr. Smith.
Q. And what are those calculations based upon?
A. Based upon costs that were expended by Renda and the Corps manual formulas used to calculate the rates.
Q. You have a column daily operating rate; do you see that?
A. Yes.
Q. What information appears in that column?
A. The operating rate for the piece of equipment.
Q. So for item number 47 rental tugboat, Melissa B, you have $61.84; is that correct?
A. Yes.

Q. What is the source of that information?
A. **These would be rates calculated, that we got from Mr. Smith.**
Q. Then you have an adjusted daily rate column; do you see that?
A. **Yes.**
Q. What information appears in that column?
A. **That is the daily rental rate for that equipment.**
Q. For the Melissa B you have a daily operating rate of $61.84, and an adjusted daily rate of $300; is that correct?
A. **Yes.**
Q. Are you saying the $300 is the daily rental rate for the Melissa B?
A. **That's what it appears, yes, sir.**
Q. And what is the source of that rental rate?
A. **That would be rates that were -- that we got from Mr. Smith.**
Q. Have you seen a rental invoice for the Melissa B?
A. **I don't recall.**
Q. You have a column calculated daily rate; do you see that?
A. **Yes.**
Q. What information appears in that column?
A. **That would be the calculated daily rate that we're**



**using for this rate calculation.**
Q. And how did you calculate the daily rate, say, take, for example, the dredge Millennium?
A. **I'd have to go back and double-check the formula. I don't recall how that was calculated.**
Q. Do you know whether any of the equipment that's listed on the dredge operating rate calculation sheet was on the job during any of the claim periods?
A. **I'm sorry. Would you repeat the question?**
Q. Do you know whether any of the equipment that's listed on the dredge operating rate calculations was on the job, the Upper Bayou Project, during any of the claim periods in this case?
A. **Yes.**
Q. How do you know that?
A. **Based on my review of the documents and based on our discussions with Mr. Bowman and Mr. Smith.**
Q. Your review of which documents?
A. **The correspondence, the diaries, the -- the dredge -- the dredge diaries and the CQC reports, that information.**
Q. If you would go back to the first page of tab 10.
A. **Yes, sir.**
Q. The second item in the chart is -- the ID is 12d and that's downtime due to displaced material/water flushing;



is that correct?
A. **Yes.**
Q. How did you determine the value of 12 days in 1999 for that item?
A. **Based on discussion with Mr. Bowman and his review of the -- our review of the -- the diaries and the information.**
Q. The labor costs and the equipment costs for that item were computed by you in a manner that's the same or similar to the computation that you used for item 12c?
A. **That's correct.**
Q. Turn to the second sheet of tab --
MR. ERIKSON: Is this going to be a good time for a break?
MR. KOSLOSKE: About five minutes maybe.
(Discussion off record.)
Q. (BY MR. KOSLOSKE) Second sheet is 12e1, Awaiting USACE Release; do you see that?
A. **Yes.**
Q. What is the purpose of this sheet?
A. **This is the computation of the damages being claimed while the dredge was awaiting release from the project.**
Q. And you have a date range; do you see that?
A. **Yes.**



Q. It includes all project equipment standby rates and it's from 7-5-2001 to 8-24-2001; do you see that?
A. **Yes.**
Q. How did you determine the start and end dates?
A. **Based upon the diary information that was submitted by Renda.**
Q. The first box under that there's an ID column; do you see that?
A. **Yes.**
Q. What does that represent?
A. **There's nothing in that column.**
Q. Okay. And for equipment, what information appears in that column?
A. **It says, "See dredge B tab for listing."**
Q. Okay. What does that refer to?
A. **That refers to two pages back in that same exhibit, shows a listing of the equipment.**
Q. That's the last page of the exhibit?
A. **Yes, sir.**
Q. And the last page of the exhibit has a -- sums up to a value of 1,931 -- excuse me --
A. **No, sir.**
Q. $1,931.36.
A. **No.**
Q. No?

Page 271

A. There's two columns, the last two columns -- the second to the last column, the total daily standby amount totals to $13,272 per day, and that's the number that's used in -- two pages back in 12e1.
Q. Okay.
A. And then on 12e2, just below that, the cost per day is 1,931 and that's derived from the last column on the -- the last page in Exhibit 10. That's that $1,931.36 per day and that's derived from the -- the full 13,000 for the full list of equipment, subtracting out 11,000 for the list of equipment that's in the last column on the last page of Exhibit D. The remaining items there, the remaining equipment is what totals up to $1,931. So that's the equipment being claimed under 12e2.
MR. KOSLOSKE: Let's take a break.
(Recess from 10:47 to 11:02 a.m.)
MR. KOSLOSKE: Back on the record.
Q. (BY MR. KOSLOSKE) Mr. McCullough, would you turn to tab 11 of your report?
A. Yes, sir.
Q. This is entitled Mechanical Levees - Equipment; is that correct?
A. Yes.
Q. Who prepared this document?
A. This was -- the data was input by John Coakley and

Page 272

Steve Bowman, and then I reviewed it.
Q. And what's the purpose of tab 11?
A. This is summarizing the mechanical levee equipment that was used on the project.
Q. How did you identify the equipment that's listed in the equipment column?
A. By reviewing the -- the -- I believe it's the CQC reports from Renda with Mr. Bowman.
Q. And you have a column ID, a column equipment and a column source, and then columns to the right of that that appear to correspond to days; is that correct?
A. That's correct.
Q. And there are values appearing for some of the equipment in some of the columns; is that correct?
A. That's correct.
Q. What is the source of those values?
A. That would be the CQC reports and discussions with Mr. Bowman.
Q. And are those values hours?
A. Yes.
Q. Then in the box at the bottom of the page you have a column ID and then a column personnel; do you see that?
A. Yes.
Q. What -- what appears in the personnel column?
A. It just has total personnel, so it will list the

Page 273

total people that were there, then it subtracts the hydraulic levee personnel, which leaves the mechanical levee personnel.
Q. Then you have plus any supervision?
A. Then there's supervision.
Q. And then, plus then you have total mechanical levee personnel?
A. Yes, so that's a computation determining the total mechanical levee personnel.
Q. How did you determine the number for personnel that you have there, the lower box on the first page -- excuse me, in the lower box of the tab 11?
A. By reviewing the -- the CQC reports, the payroll information and discussions with Mr. Bowman.
Q. Do the CQC reports or the payroll information break out the personnel in the manner that you have down in the lower box here?
A. I don't think they use the designations that we use, no, sir.
Q. So does the information that appears in the lower box, the numbers for personnel, represent a judgment by you?
A. Yes.
Q. Now, turn to tab 12.
A. Yes, sir.
Q. What is -- tab 12 is entitled Booster Equipment and Labor Calculations. Who prepared this?

Page 274

A. Again, the data was entered by Mr. Coakley and reviewed by myself.
Q. And what is the purpose of tab 12?
A. This is a calculation of the booster equipment and the labor associated with it.
Q. Would you turn to tab 14?
A. Yes, sir.
Q. This is a tab titled, the first page is titled Mechanical Levee Labor and Equipment - Proposed Deductions; do you see that?
A. Yes, sir.
Q. Who prepared this?
A. Mr. Coakley did the data input with Mr. Bowman, and then I reviewed it.
Q. What is the purpose of the first sheet of tab 14?
A. This is a computation of the mechanical levee labor and equipment that was included with the original claims that were submitted by Renda Marine, and these are the proposed deductions, because that mechanical equipment is now being priced separately in a different area.
Q. Is this the costs that were backed out by you for claim items such as the Flare Area?
A. Yes, sir.
Q. Turn to tab 15 that's titled Repair Invoice Duplication.

A. **Yes, sir.**
Q. Who prepared that?
A. **Mr. Coakley typed the data in from information that we got from Mr. Smith.**
Q. Okay. Would you turn to tab 16?
A. **Yes, sir.**
Q. I believe this one is titled Pathfinder Construction Consulting, Inc., Renda Marine, Inc., Billings and Claim Allocations; is that correct?
A. **Yes.**
Q. Who prepared this tab?
A. **Mr. Coakley.**
Q. What is its purpose?
A. **It's just a summary of information that we received from Mr. Smith regarding the hours, where he allocated his hours to the various claims and to -- whether it was claim preparation or whether it was preparation for the proposal or REA.**
MR. KOSLOSKE: Could I have this marked for identification?
(EXHIBIT(S) NO. 6 MARKED.)
Q. (BY MR. KOSLOSKE) Mr. McCullough, I'm showing you what's marked for identification as Exhibit 6. Would you take a look at that? Exhibit 6 is a letter dated March 24, 2004, from Brian Erikson to John Kosloske. It states, among



other things, and I quote, "Mr. McCullough's documents and CD are Bates numbered RBM 00004 to RMB 00494. I suppose that should be RBM 00494. Is that an accurate statement?
A. **I believe you read that accurately.**
Q. Are your work papers and other documents considered by you in preparing your report contained in what are Bates numbered RBM 0004 to RBM 00494?
MR. ERIKSON: Objection, form. You're free to answer.
A. **I believe these -- this is a set of my work papers. I don't think it's everything that I reviewed.**
Q. (BY MR. KOSLOSKE) There's a CD that we received that has a Bates stamp on it of, I believe it's RBM 0005 and it has a title on it, "Renda Marine Upper Bayou Project, McCullough's Copy of Claim Files from Barry Smith." Is that a CD that you caused to be prepared and produced?
A. **Yes.**
Q. Okay. What appears on that CD?
A. **Those were claim calculation sheets that were prepared by Mr. Smith.**
Q. Is everything that appears on the CD a document that was generated by Barry Smith?
A. **Based on the description, I believe so, but I did not personally review those to -- to confirm that.**
Q. Who prepared the CD?



A. **Mr. Coakley did.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 7 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 7. Would you take a look at that and tell us whether you recognize it?
A. **I'm sorry, I don't recall your question.**
Q. Do you recognize this document?
A. **No, sir.**
Q. This -- what's been marked for identification as Exhibit 7 is a handwritten document that has Bates numbers RBM 00317 through RBM 00323. Do you recognize the handwriting on this document?
A. **No, sir.**
Q. The document, if I'm reading correctly, states on the first page at the top, third line, "Review content of Barry's file." Do you see that?
A. **Yes.**
Q. Do you know whether this document is an attempt to summarize Barry Smith's files that are contained on the CD that is Bates stamped RBM 00005?
A. **Yes, sir.**
Q. Are you familiar with the Barry Smith documents that are contained on this computer disk that is Bates



stamped RBM 00005?
A. **Yes.**
Q. The disk contains a measured mile summary for January and February 2000 for the Flare Area for an 11 day period; is that correct?
A. **I don't recall.**
Q. On the first page of Exhibit 7, drop down to the ninth line up from the bottom there's a kind of asterisk in the column, number four, "Measured mile summary, January, February '00 at Flare Area, 11 days"; do you see that?
A. **Yes.**
Q. Have you reviewed that document?
A. **Yes.**
Q. And then on the fourth line up from the bottom there's an asterisk and item number seven that reads, "Measured mile, October/00 with/links daily spreadsheet 10/8 to 10/29"; do you see that?
A. **Yes.**
Q. What is that?
A. **It appears to be a spreadsheet.**
Q. For a different measured mile than the one used for the Flare Area?
A. **It appears to be a different measured mile for a different period.**
Q. What claim does that apply to?

Page 279

A. I don't recall.
Q. Do you recall having actually reviewed the measured mile for the period from October 8th to October 29?
A. I know I reviewed all these documents. I don't know -- so I know I reviewed that, yes.
MR. KOSLOSKE: Could I have this marked for identification?
(EXHIBIT(S) NO. 8 MARKED.)
Q. (BY MR. KOSLOSKE) Mr. McCullough, I'm showing you what's been marked for identification as Exhibit 8. Would you take a look at that document and can you tell us whether you recognize it?
A. Yes, sir.
Q. What is Exhibit 8?
A. These are -- appear to be some handwritten notes written by me on approximately December 31st, 2003.
Q. Okay. This exhibit is Bates stamped RBM 00333 and it runs through Bates stamp RBM 00341. Is all of the writing on this document yours?
A. Yes, sir.
Q. On the first page at the top of the page there's a date that you mentioned 12-31-03. Says Upper Bayou; see that?
A. Yes.
Q. What is the significance of that?

Page 280

A. That would appear to be the date these notes were written.
Q. Were these notes taken by you in a meeting?
A. I don't recall.
Q. Do you recall whether these notes were taken by you in a meeting with Brian Erikson?
A. I don't recall.
Q. On the first page under Flare Area there's a note, "Need geotech expert in reading soil borings, Bill Humphries, Chris Mathewson"; do you see that?
A. Yes.
Q. What's the significance of that entry?
A. Evidently that was discussed.
Q. Was it your determination that a geotechnical expert was necessary to read the soil borings?
A. No, sir.
Q. Would you turn to the page Bates stamped RBM 00334?
A. Yes.
Q. This sheet contains notes on the South Ferry Landing claim; is that correct?
A. Yes.
Q. You have as part of the information or writing on this page a reference to drawing C-6; do you see that?
A. Yes.

Page 281

Q. It says larger drawing of area shows riprap?
A. Yes.
Q. Is that -- is that your conclusion, having reviewed drawing C-6?
A. No, sir.
Q. What does that note mean there; could you explain?
A. That indicates to me that -- that there is a larger drawing of the area that shows the riprap.
Q. Is that a drawing that you hadn't looked at on that date yet?
A. That's correct.
Q. So someone was indicating to you what that document showed?
A. I don't know if it indicates that that drawing C-6 is a larger drawing of the area. That could be what it's showing, yes.
Q. You have drawing C-2 note; do you see that?
A. Yes.
Q. Caution when dredging 470 - 473?
A. Yes.
Q. What does that refer to?
A. Evidently it refers to a note on drawing C-2.
Q. Are you familiar with the note?
A. Not offhand.
Q. Then you have specs, 3.5.2 side and end slopes; do you see that?
A. Yes.
Q. What does that refer to?
A. Spec section -- the specifications in the contract, section 3.5.2.
Q. What is the significance of that specification to the South Ferry Landing claim?
A. I don't recall offhand.
Q. Below that there's a handwritten line, "Excessive," and that's underscored and then it says, "Excessive cutting may cause damage to channel"; do you see that?
A. Yes.
Q. Why did you underscore excessive?
A. I think because they anticipated undercutting, but they -- that indicated to me that excessive undercutting or cutting may cause damage to the channel.
Q. Who told you that Renda Marine anticipated that?
A. What?
Q. Who told you that Renda Marine anticipated undercutting?
A. I don't recall anyone from Renda Marine telling me that.
Q. The page that's Bates stamped RBM 00335 --
A. Yes.

Page 282

Page 283

Q. -- says," levee settling"; see that?
A. Yes.
Q. What's that about?
A. **The levees that were settling, they were shearing off and falling into the side-cast borrow area.**
Q. You have a note, "toe excavated by others, weakened foundation"; do you see that?
A. Yes.
Q. Is that a reference to the side-cast borrow pit --
A. Yes.
Q. -- that were created from the repair activities to the levees?
A. Yes, sir.
Q. The last page of the Exhibit 8 has a Bates stamp RBM 00341; do you see that?
A. Yes.
Q. Bottom of the page there's a diagram; do you see that?
A. Yes.
Q. Is that yours? Did you draw that?
A. Yes.
Q. And would you explain what this is intended to show?
A. **This shows the existing levee, side-cast borrow material coming from the borrow area being brought out to**

Page 284

**dress the levee. It showed the dimension that was shown on the original spec for doing that work, and it shows the area of the crane mat where -- where the edge of the crane mat was, and then it shows superimposed copy -- superimposed picture of the new levee.**
Q. Is that your present understanding of that operation?
A. **Not exactly, no, sir.**
Q. You have a different view today of what that operation consisted of?
A. Yes.
Q. How does your view differ from what's reflected in the diagram here?
A. **Well, this was reflecting the -- the anticipated operation based upon the spec from the side-cast borrow contract, as opposed to what was actually done.**
**What was actually done was the crane mat was put down, the side-cast borrow was pulled all the way into the edge of the crane mat, so there was more borrow closer to the existing levee. The -- so that's what that was representing, so there was actually a larger side-cast borrow area closer to the existing levee.**
Q. Would you turn to the page of Exhibit 8 that's Bates stamped RBM 00340?
A. Yes, sir.

Page 285

Q. This contains some notes on the Section 7 clay claim; is that correct?
A. Yes, sir.
Q. You had written on the first line, "Section 7 clay - same as Flare Area."
A. Yes.
Q. What did you mean "it was same as Flare Area"?
A. **That it was a differing condition site condition claim.**
Q. Then you have, "Use same measured mile from Flare"; is that correct?
A. Yes.
Q. So it was your understanding that for the Section 7 clay claim, the measured mile that was used to evaluate damages or the impact to the contractor's production was the same measured mile as was used for the Flare Area claim?
A. Yes.
Q. Then you have a note, "Soil borings are not the same? (COE)"; what are you referring to there?
A. **My understanding was that the Corps of Engineers was -- believed that the soil borings were not the same.**
Q. Then you have a note, "Hit hard red clay - bad"; do you see that?
A. Yes.
Q. What are you saying there?

Page 286

A. **That the contractor hit hard red clay, that that was bad for his production.**
Q. You have a line below that, "Shown stiff grey clay, not the same density as very stiff red clay"; do you see that?
A. Yes.
Q. What are you saying there, what do you mean by that statement?
A. **Well, that grey, tan and brown clay -- stiff grey, brown -- tan and brown clay was shown and that it is not the same as the material that was actually encountered, which was a -- the hard red clay or very stiff red clay.**
Q. So it's your understanding -- strike that. Is it your opinion that the relevant soil boring logs for the -- in the contract documents for the Section 7 reach of the channel show stiff gray, tan and brown clay?
A. **That was my understanding.**
Q. Is that your understanding today?
A. **Generally speaking. I'd have to go back and look at the specific borings.**
Q. Would you say generally yes, but you'd have to look at specific borings, or are you saying you can't answer as you sit here today?
A. **Generally, yes, that's my understanding.**
MR. KOSLOSKE: May I have this marked for

identification?
(EXHIBIT(S) NO. 9 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 9. Exhibit 9 has a Bates stamp on it of RBM 00262. Do you recognize this?
**A. Yes.**
Q. What is Exhibit 9?
**A. It's a message memo.**
Q. From your office?
**A. Yes.**
Q. And it says -- it's a message of a telephone call from Brian Erikson on Tuesday, December 30; correct?
**A. Yes.**
Q. And the message reads, "Said he talked with you before he left town re meeting with you on Wednesday morning, 12/31 from 9:00 to noon. This is re Renda Marine? Please call him ASAP"; do you see that?
**A. Yes.**
Q. Does this refresh your recollection as to when you began work on your engagement for this case?
**A. No, sir.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 10 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been



marked for identification as Exhibit 10. Exhibit 10 is a Bates number RBM 00263. Do you recognize this document?
**A. Yes.**
Q. It's titled McCullough & Associates Document Control Log, Case Number 536; is that right?
**A. Yes.**
Q. Is Case Number 536 the number that you assigned to your present engagement?
**A. Yes.**
Q. And what is the Document Control Log?
**A. It's just a listing of documents that we've received on a particular case.**
Q. This document indicates, the first item is 12-30-2003, sent by Brian Erikson, two boxes of DCAA audit reports for the Upper Bayou Project; see that?
**A. Yes.**
Q. Is that the first set of materials that you received for this engagement?
**A. Yes.**
Q. Does this refresh your recollection as to when you began work on your -- on this present engagement?
**A. Generally, I guess.**
Q. So you began working on this engagement basically at the end of December 2003; correct?
**A. Yes, sir.**



MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 11 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 11. Exhibit 11 is a -- begins with Bates stamp number RBM 00018 and concludes with Bates stamp number RBM 00046. Are you familiar with this document?
**A. Yes.**
Q. The front page is a blank sheet, looks like it might be a copy from a folder that says RMI Project Chronology from Pathfinder; is that correct?
**A. Yes.**
Q. And is what follows after that front sheet a chronology or history for claims at the Upper Bayou Project?
**A. Yes.**
Q. Did you prepare this document?
**A. No, sir.**
Q. Who prepared it?
**A. Pathfinder.**
Q. Barry Smith?
**A. I believe so.**
Q. Is this the chronology that yesterday during your testimony in this deposition you were referring to for information used in tab, I believe it was five of your



report?
**A. It was -- yes, sir.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 12 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 12. Exhibit 12 begins with Bates stamp number RBM 00047, and it runs through Bates stamp number RBM 00066?
**A. Yes, sir.**
Q. And it's a document that has "Draft" typed on the first page, and it is titled Report of Findings from Barry Smith to Brian Erikson, Rob McCullough, Oscar Renda/Rudy Renda; do you see that?
**A. Yes, sir.**
Q. Do you recognize this document?
**A. Yes, sir.**
Q. Have you reviewed this document?
**A. Yes, sir.**
Q. Have you relied upon this document for any aspect of your findings and conclusions that are contained in your report of March 3, 2004 in this case?
**A. I don't -- I don't know if they are specifically referenced here, but there were adjustments that were made to the -- to certain aspects of the claims that -- that Barry**

Page 291

**Smith was making and we incorporated those into the -- into our current findings.**
Q. Do you recall taking any information in -- that's contained in Defendant's Exhibit 12 from this document and plugging it into any of your calculations?
**A. I don't recall doing that, no, sir.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 13 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 13. Exhibit 13 is Bates stamped number RBM 00128. Do you recognize this document?
**A. Yes.**
Q. What is Exhibit 13?
**A. We -- John Coakley and I reentered the data from the original estimate which was one of the exhibits to my deposition, we just reentered it into a spreadsheet.**
Q. So that it would be typewritten and easier to work with than the handwritten document that you're referring to?
**A. Yes, sir.**
Q. And the document that you used -- from which you took the data to prepare Exhibit 13, is that -- are those the sheets that are -- follow the first page of what is marked for identification as Exhibit 5?
**A. Yes, sir.**

Page 292

MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 14 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 14. Exhibit 14 has a Bates stamp number RBM 00011. It's a chart that's titled Dredging Production Daily and Cumulative. Have you seen this document before?
**A. Yes.**
Q. Did you prepare it?
**A. It was prepared in my office.**
Q. Who prepared it?
**A. Mr. Coakley.**
Q. What is the purpose of this document?
**A. Just a graphical representation of what dredging production was reported.**
Q. Have you used any information that appears in this chart in your report in this case?
**A. No, sir. Well, we have used dredging information. We have not used this chart specifically in my report.**
Q. You're not relying on this chart for any of your opinions in this case?
**A. No, sir.**
MR. KOSLOSKE: May I have this marked for identification?

Page 293

(EXHIBIT(S) NO. 15 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 15. Exhibit 15 is a document that begins with Bates stamp number RBM 00077 and continues up to Bates number RBM 00089. Are you familiar with this document?
**A. Yes.**
Q. And what is Exhibit 15?
**A. This is information we received direct from Barry Smith, but it was produced by Kent Ray.**
Q. Yesterday, if you'll recall during your deposition we discussed information that you received from Kent Ray, and I believe you indicated that you received job cost schedule information for the Upper Bayou Project from Kent Ray; is that correct?
**A. That's correct.**
Q. Is the job cost schedule information what is contained in Exhibit 15?
**A. Yes.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 16 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 16. Exhibit 16 is a spreadsheet document that begins -- it's an 11 and a half by

Page 294

17 inch document, size pages, that begins with Bates number RBM 00139 and runs through page number RBM 00142. Do you recognize this document?
**A. Yes.**
Q. Who prepared this?
**A. This information was input by Mr. Coakley and Mr. Bowman.**
Q. Did you use the information contained in Exhibit 16 in the preparation of your report in this case?
**A. I believe this information is duplicated in exhibits in my report.**
Q. Would you identify the tabs of your report from which information contained in Exhibit 16 is duplicated or set out?
**A. Tab 7 is the dredge information which is the -- contained in Exhibit 16, and tab eight is the levee information contained in Deposition Exhibit 16.**
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 17 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 17. Exhibit 17 is a document titled Equipment Rate Schedule Summary (Revised 2/12/2004). It begins with Bates number RBM 00129 and runs through Bates number RBM 00133. Do you recognize this

Page 295

document?
A. Yes, sir.
Q. Who prepared it?
A. I believe this was prepared by Mr. Smith.
Q. Have you relied upon this document for any of your damages calculations in this case?
A. Yes, sir, I believe we have.
Q. And where do those calculations appear in your report?
A. In the damage calculations portion we use equipment rates that are contained -- that would have come from this -- these sheets.
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 18 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 18. Exhibit 18 is another sort of chart, spreadsheet kind of document that is titled RMI List of Equipment, and then parenthetically below that, (Average Hours of Operation Per Week/Month for Hourly Rate Calculation). Do you recognize this document?
A. Yes.
Q. It begins with Bates number RBM 00134 and continues until Bates number RBM 00138?
A. Yes.

Page 296

Q. Who prepared this document?
A. I believe Mr. Smith prepared this.
Q. Have you relied upon this document for any of the damage calculations that are contained in your report of March 3, 2004?
A. Yes, sir.
Q. Which specific calculations in your report and where do they appear in your report?
A. Tab 10, page three.
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 19 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 19. Exhibit 19 has Bates number RBM 00316. Are you familiar with the document?
A. No, sir.
Q. It's a handwritten document. Do you recognize the handwriting?
A. Not specifically, no, sir.
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 20 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 20. Exhibit 20 is a document that begins with Bates number RBM 00325 and runs up

Page 297

through Bates number RBM 000332; do you see that?
A. Yes, sir.
Q. Do you recognize this document?
A. Yes, sir.
Q. What is Exhibit 20?
A. It's a collection of miscellaneous notes.
Q. Okay. Let's take a look at the first page of Exhibit 20, RBM 00325. Is that your handwriting?
A. Yes, it is.
Q. The second page of the Exhibit, RBM 00326, is that your handwriting?
A. No, it is not.
Q. Do you know whose it is?
A. I believe it's Mr. Coakley's, but I'm not positive.
Q. Third page, RBM 00327, do you recognize the handwriting?
A. Again, I believe it's Mr. Coakley's, but I'm not positive.
Q. The fourth page, RBM 00328, do you recognize the handwriting?
A. Yes.
Q. Whose is it?
A. Mine.
Q. Toward -- on the right-hand side towards the

Page 298

bottom there's an entry 35 CY/LF plus 50 percent for displacement; do you see that?
A. Yes.
Q. What is that?
A. My recollection was that was the government's estimate of how much material was going to be required on the levees.
Q. Okay. The RBM 00329, is that your handwriting?
A. Yes.
Q. And RBM 00330, is that your handwriting?
A. Yes.
Q. RBM 00331, is that your handwriting?
A. Yes.
Q. And RBM 00332, is that your handwriting?
A. Yes.
MR. KOSLOSKE: May I have these marked for identification?
(EXHIBIT(S) NO. 21 and 22 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 21. Exhibit 21 is a two-page document, Bates number RBM 00314 and RBM 00315. It's a handwritten document. Do you recognize the document?
A. No, sir.
Q. Did you prepare Exhibit 21?
A. No, sir.

Page 299

Q. Do you recognize the handwriting?
**A. No, sir.**
**(EXHIBIT(S) NO. 22 MARKED.)**
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 22. Exhibit 22 is another handwritten document that begins with Bates number RBM 00311 and concludes with Bates number RBM 00313. Do you recognize this document?
**A. Not offhand.**
Q. Do you recognize the handwriting on this document?
**A. I believe this is Mr. Bowman's handwriting.**
MR. KOSLOSKE: I don't have anything further.
MR. ERIKSON: We will reserve all of our questions until the time of trial.
(Deposition concluded at 11:55 a.m.)

Page 300

CHANGES AND SIGNATURE
TO THE ORAL DEPOSITION OF
ROBERT McCULLOUGH
VOLUME 2
April 16, 2004

Page Line Change Reason

Page 301

I, ROBERT McCULLOUGH, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________
ROBERT McCULLOUGH

STATE OF __________)
COUNTY OF _________)

Before me ____________________ on this day personally appeared ROBERT McCULLOUGH, known to me (or proved to me under oath or through ____________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

(Seal) Given under my hand and seal of office this ______ day of __________, _______.

____________________
Notary Public in and for the State of ____________

Page 302

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
) No. 02-306C
VS. )
) (Judge Hewitt)
THE UNITED STATES, )
Defendant. )

REPORTER'S CERTIFICATION
DEPOSITION OF ROBERT McCULLOUGH
VOLUME 2
April 16, 2004

I, Gloria Carlin, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ROBERT McCULLOUGH, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on 4-29-04 to the witness or to the attorney for witness for examination, signature and return to Gloria Carlin by 6-1-04;

That the amount of time used by each party at the deposition is as follows:

Brian W. Erikson - (00:00)
John E. Kosloske - (02:32)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Brian W. Erikson, Attorney for Plaintiff;
John E. Kosloske, Attorney for Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements will be certified to after they have occurred.

Page 303

Certified to by me this 29th day of April, 2004.

Gloria Carlin, CSR No. 498
Expiration Date: 12/31/04
Merit Court Reporters
Firm Registration No. 133
309 W. 7th Street, Suite 600
Fort Worth, Texas 76102
(817) 336-3042 (800) 336-4000

Job No. 040416GJC

Page 304

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., Plaintiff,

vs.

THE UNITED STATES, Defendant.

No. 02-306C

(Judge Hewitt)

DEPOSITION OF ROBERT McCULLOUGH
VOLUME 2
April 16, 2004
FURTHER CERTIFICATION

The original deposition was/was not returned to the deposition officer on ___________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to John E. Kosloske, Custodial Attorney;

That $525.05 is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits.

That a copy of this certificate was served on all parties shown herein.

Certified to by me this _______ day of __________, 2004.

Gloria Carlin, CSR No. 498
Merit Court Reporters
Firm Registration No. 133
600 Oil & Gas Building
Fort Worth, Texas 76102
(817) 336-3042 Metro 654-4006
My Certification Expires 12/31/04

Job No. 040416GJC

QSCL
QUILLING · SELANDER · CUMMISKEY LOWNDS

CHERYL MOSELEY, PLS, CLA, TSC
CERTIFIED PARALEGAL
SPECIALTY CERTIFIED - TEXAS CIVIL LITIGATION

Direct Line: 214-880-1845
E-mail: cmoseley@qsclpc.com

December 13, 2004

***Via Federal Express***

John E. Kosloske, Esq.
Senior Trial Counsel, Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street, N.W., Room 12052
Washington, D.C. 20005

Re: Case No. 02-306C; *Renda Marine, Inc. v. United States Army Corps of Engineers*; United States Court of Federal Claims; DACW64-99-C-0001, Dredging Upper Bayou

Dear Mr. Kosloske:

I enclose one set of work papers which Robert McCullough utilized in preparing his report dated November 17, 2004. The supporting documents were previously made available to the DCAA during their audit. During the audit, Barry Smith had discussions with the DCAA auditors concerning the significance of the documents. The documents are in binders Bates numbered MccBdr1 000001-000396; MccBdr2 000001-000375; MccBdr3 000001-000451; and, MccBdr4 000001-000232.

Sincerely yours,

Cheryl Moseley

Cheryl Moseley, PLS, CLA, TSC
Paralegal to Brian W. Erikson

/cam
Enclosures
S:\Construction\Renda Marine\Upper Bayou 565.09\Kosloske 082.wpd

EXHIBIT
U
Blumberg No. 5118