UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | § | |
| PLAINTIFF, | § | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| UNITED STATES ARMY | § | |
| CORPS OF ENGINEERS, | § | |
| DEFENDANT. | § | |

# RENDA MARINE, INC.'S MEMORANDUM OF CONTENTIONS OF FACT & LAW

Comes now, Renda Marine, Inc. ("Renda"), and files this, its Memorandum of Contentions of Fact and Law.

## I.
## RENDA'S STATEMENT OF FACTS AND RENDA'S POSITION WITH RESPECT TO FACTS ON WHICH DEFENDANT IS EXPECTED TO RELY

### Project Overview

The project at issue in this litigation was entitled "Houston-Galveston Navigation Channels, Texas, 45-Foot Project, Dredging Upper Bayou" ("Project"). The Project involved dredging the Houston Ship Channel in Harris County, Texas. The Project was the beginning of a 5 year, $508 million program to deepen the navigation channel to 45 feet and widen it by an additional 130 feet to facilitate ships delivering cargo to Houston directly rather than unloading part of their cargo in the Gulf of Mexico. Renda was the low bidder on the Project and, following the resolution of a bid protest, Renda and the United States Army Corps of Engineers ("Corps" or "Defendant") entered into Contract No. DACW64-99-C-0001 (Contract) on October 26, 1998. Renda thereafter began work on the Project.

While performing its work, Renda encountered various differing site conditions or changed conditions that caused Renda to expend substantial additional funds and to invest additional time

in performing its work. Because of these differing site conditions or changed conditions, Renda submitted multiple Requests for Equitable Adjustment ("REA") to Defendant. When Defendant ignored the REA's, Renda resubmitted them as Certified Claims. Defendant granted parts of some of the claims while denying parts or all of others.

**Claim Summary**

Renda filed the following claims relating to the Project based on the substantial additional costs and additional time Renda incurred.

| Claims | Description | Certified Claim Amount | McCullough Revised Amount |
|---|---|---|---|
| 1 | Differing Site Condition – Flare Area Stations 520+00 to 550+00 (very stiff clay) | $1,607,855 | $1,096,179 |
| 2 | Differing Site Condition – South Ferry Landing Stations 470+00 to 472+00 | $1,049,173 | $947,054 |
| 3 | Changed Conditions – HL&P Transmission Tower Delays | $170,863 | $167,473 |
| 4 | Differing Site Condition – Obstruction in Sections 4 to 8, Stations 570+00 to 685+00 | $2,126,083 | $1,986,551 |
| 5 | Differing Site Condition – Obstruction in Section 9, Stations 660+00 to 685+00 | $1,158,642 | $1,148,804 |
| 6 | Changed Conditions – West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 (Modification CO-10, P00027) | $789,600 | Included in Claim 8 |
| 7 | Differing Site Condition – Section 7 Clay | $1,123,884 | $978,271 |
| 8 | Differing Site Condition – Lost Lake Levees | $6,380,546 | $7,055,037 |
| | **Total** | **$14,406,646** | **$13,379,369** |

Renda's position on each of these claims, as well as Defendant's anticipated response, are discussed below. The certified claim amounts were revised by Rob McCullough in his March 3, 2004, report, and the revised amounts are used for this Memorandum.

**Claim 1–Flare Area Differing Site Conditions – $1,096,179**

The soil conditions that Renda encountered were materially different and significantly stiffer than the conditions indicated in the Contract Documents and bid solicitation for the Project. Renda had more difficulty dredging the stiffer clays of the Flare Area than Renda would have had the

conditions been as shown in the Contract Documents. As a direct result of the conditions encountered in the Flare Area, Renda's dredging progress was slowed, and Renda incurred significantly more expense. A significant amount of the extra expense involved Renda's land-based equipment, which was idled or delayed due to the extended time required by dredging. This land-based equipment was slowed awaiting suitable material dredged from the Flare Area.

Renda submitted a claim for $4,691,688. Defendant issued and paid a change order for $3,083,833, paying 75% of the claim pending the results of an audit of Renda's overhead. The payment left a current claim balance of $1,096,179. As of the date of this analysis, the balance of Renda's claim has not been paid.

**Defendant's Anticipated Factual Response**

Defendant is expected to contend that the conditions encountered are consistent with the Contract Documents and therefore do constitute a differing site condition. Defendant is also expected to contend that Renda contributed to the damages sustained. Defendant is also expected to contend that Renda's alleged additional cost is not recoverable in the amount claimed.

**Renda's Reply**

The Contract Documents indicated a soft gray clay. Renda actually encountered a stiff clay, materially different than that indicated in the Contract Documents, causing Renda extra time and expense. This constitutes a compensable differing site condition.

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA"). The report does not address the technical validity of the claim. The DCAA identifies $1,306,729 of "questioned costs" in the following categories – Equipment & Labor ($875,784), Equipment Repair Cost ($50,000), Indirect Expenses ($208,116) and Professional Fees/Consultants

($50,000). Overall, the DCAA indicates that "because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."

The DCAA primarily questioned two items – inclusion of equipment related to levee construction ($548,951) and depreciation periods for the dredge *Millennium* and the booster barge, which added $530,502 to the claim. Also, the DCAA questioned $120,070 because it appears to be due to levee labor costs which Defendant contends should not appear in the claim. Renda disagrees with Defendant's contention as the costs claimed are actual costs, for which Renda is entitled to compensation. The levee costs are recoverable since they are directly related to the delay to the dredge. The cost of the levee work increased as a direct result of the impact to the dredging work. In other words, the extra time and cost for Renda's levee crew to stand by waiting for dredged materials to arrive at Lost Lake should be compensable under this claim. If not, the extra time and cost should be compensable as part of Renda's Levee DSC claim, discussed below.

For depreciation, Renda calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. EFARS 52.231-5000 allows Renda to use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. It is not mandatory that Renda use the Government's Equipment Manual depreciation period since actual supporting cost information and/or related accounting records are available for the dredge and the barge.

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts, to which

Renda objects.

DCAA states that claim preparation costs are unallowable. However, preparation costs incurred prior to this item becoming a claim are allowable.

**Claim 2–South Ferry Landing Differing Site Conditions–$947,054**

The Dredge Millennium encountered rubble (primarily man-made erosion protection stone, concrete and steel) at the South Ferry Landing. No such rubble was shown or indicated in the Contract Documents. After encountering the rubble, Renda notified Defendant of the differing site condition. At that time, Renda was threatened with a default termination by the Corps. The default termination was premised on an alleged lack of progress. That left Renda with difficult choices. Renda could proceed with work through the differing site condition area, but at extra expense, and facing damage to its equipment. Alternatively, Renda could await a resolution by the Corps of the differing site condition. Waiting for the Corps to investigate would mean no progress in the area. When the Corps did not address or resolve or even investigate this differing site condition, Renda chose to attempt to work through it. Renda incurred extra expense and was delayed in the progress. Since Renda had no notice to stop or to do anything else, Renda reasonably proceeded with the dredging work in the South Ferry Landing area. Renda incurred extra cost as a result of the differing site conditions, and is entitled to an equitable adjustment of time and money. The dredge *Millennium* was also moved to other locations while awaiting responses from Defendant for appropriate action, increasing Renda's cost and time to perform.

**<u>Defendant's Anticipated Factual Response</u>**

Defendant is expected to contend that the rubble Renda encountered does not constitute a differing site condition. Defendant is also expected to contend that Renda did not provide adequate

notice and that Renda contributed to the damages sustained. Defendant is also expected to contend that Renda's alleged additional cost is not recoverable in the amount claimed.

**Renda's Reply**

The Contract Documents do not show any rubble or other obstructions at the South Ferry Landing. However, the Dredge Millennium encountered rubble (primarily man-made erosion protection stone, concrete and steel) at the South Ferry Landing. The rubble was inside the pay template and had to be removed to allow for acceptance and full payment. Under the circumstances, the unexpected, un-indicated rubble constitutes a differing site condition.

After encountering the rubble, Renda notified Defendant of the differing site condition. Defendant should have immediately investigated, but did not. Renda was under significant pressure by Defendant to maintain and increase production on the Project. Bowing to the pressure of a possible default termination, Renda advised Defendant that Renda would proceed with dredging through the South Ferry Landing area unless notified to do otherwise. Defendant did not notify Renda to do or not do anything. With no notice to stop or to do anything else, Renda reasonably proceeded with the dredging work in the South Ferry Landing area. Renda incurred extra cost as a result of the differing site conditions, and is entitled to an equitable adjustment of time and money.

An audit of this claim was performed by the DCAA. The report does not address the technical validity of the claim. The DCAA identifies $334,881 of "questioned costs" in the following categories – Equipment & Labor ($200,034), Dredge Equipment Repair Cost ($16,489), Indirect Expenses ($48,675) and Professional Fees/Consultants ($40,000). Overall, the DCAA indicates that "because the noncompliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."

The DCAA primarily questioned two items – inclusion of equipment related to levee construction ($136,930) and depreciation periods for the dredge *Millennium* and the booster barge ($86,434). The levee construction amount of $136,930 was made up of $93,575 for equipment and $43,355 for labor. Renda disagrees with the DCAA. The costs claimed are actual costs that must be recovered. The levee costs are recoverable since they are directly related to the delay to the dredge. The cost of the levee work increased as a direct result of the impact to the dredging work. In other words, the extra time and cost for Renda's levee crew to stand by waiting for dredged materials to arrive at Lost Lake should be compensable under this claim. If not, the extra time and cost should be compensable as part of Renda's Levee DSC claim, discussed below.

The primary item questioned by DCAA within the Equipment category is the depreciation period allowed for the dredge *Millennium* and the booster barge. EFARS 52.231-5000 allows Renda to use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. It is not mandatory that Renda use Defendant Equipment Manual depreciation period if other supporting cost information and/or related accounting records are available for the dredge and the barge.

Several rental equipment repair invoices occurred outside the delay date range. DCAA questioned these costs. These costs were incurred for spare parts which are purchased before they are required and were used to repair damage caused by the encountered debris and rubble. Accordingly, these costs are compensable.

Indirect expenses were calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts, with which Renda disagrees. The claimed amounts are compensable.

DCAA states that claim preparation costs are unallowable. However, preparation costs incurred prior to this item becoming a claim are allowable.

**Claim 3–HL&P Towers Changed Conditions– $167,473**

There was one Houston Light & Power ("HL&P") transmission tower at the Lost Lake Placement Area at the time that the Project bid. During Renda's work, HL&P twice halted Renda's dredging operations to construct or improve an additional tower. HL&P tower disruptions were not anticipated by Renda before the Project. The HL&P tower disruptions constitute changed conditions for which Renda is entitled to an equitable adjustment in contract time and money.

**Defendant's Anticipated Factual Response**

Defendant is expected to contend that the activities of HL&P encountered by plaintiff while dredging do not constitute differing site conditions. Defendant is also expected to contend that did not provide adequate notice to Defendant of the activities of HL&P that allegedly constitute differing site conditions. Defendant is also expected to contend that, in any case, Renda did not take reasonable steps to mitigate the impact of the differing conditions. Defendant also questions the amount claimed by Renda.

**Renda's Reply**

During the course of Renda's work on the Project, HL&P arrived at the Lost Lake Placement Area and announced that it was constructing a second tower. HL&P instructed Renda to move Renda's disposal pipeline to clear room for the tower construction. Renda moved its pipeline. Later, HL&P returned and again advised Renda to move its disposal pipeline a second time. Renda moved its pipeline a second time. The contract documents show one and only one HL&P tower at Lost Lake. Renda had no expectation that its work would be disrupted for the construction of a

second HL&P tower. However, the Corps knew that a second tower was imminent. The Corps processed HL&P's application to construct the second tower, without ever advising prospective bidders or Renda.

The Corps' history of responding to Renda's notices of differing site conditions on the Project was less than stellar. If Renda were to wait for the Corps' response to HL&P's request for Renda to move the pipeline, Renda would have been delayed a great deal more. Renda mitigated its delay and disruption costs by seizing the initiative and moving its pipeline without waiting for the Corps to ignore the notice.

Simply put, Renda's movement of its pipeline without instruction from the Corps to do so saved time and expense. The Corps was in no way prejudiced. Renda would have had to move its pipeline in any event, and would have sustained the same delay and expense.

The DCAA audited this claim. The DCAA's report does not address the technical validity of the claim. The DCAA identifies $45,000 of "questioned costs" in the following categories – Equipment ($26,000), Indirect Expenses ($6,000) and Professional and Consulting Cost ($10,000). Overall, the DCAA indicates that "because the noncompliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."

For depreciation, Renda calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. EFARS 52.231-5000 allows Renda to use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. It is not mandatory that Renda

use Defendant's Equipment Manual depreciation period since actual supporting cost information and/or related accounting records are available for the dredge and the barge.

Indirect expenses were calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts, with which Renda disagrees. The claimed amounts are compensable.

DCAA states that claim preparation costs are unallowable. However, preparation costs and costs incurred prior to this item becoming a claim are allowable.

**Claim 4–Differing Site Conditions – Obstructions in Sections 4 to 8, Stations 570+00 to 630+00 –$1,986,551**

During the course of dredging work in Sections 4 to 8, Renda encountered numerous obstructions not indicated in the Contract Documents. Renda notified Defendant of the obstructions. The obstructions constitute differing site conditions for which Renda is entitled to an equitable adjustment in contract time and money.

**Defendant's Anticipated Factual Response**

Defendant is expected to contend that the conditions encountered do not constitute differing site conditions. Defendant is also expected to contend that Renda did not provide adequate notice to Defendant of the alleged obstructions. Defendant is also expected to contend that Renda contributed through its "means and methods" of construction to the damages claimed. Finally, Defendant is expected to contend that Renda is not entitled to compensation in the amount claimed.

**Renda's Reply**

While performing dredging work on the Project, Renda incurred additional costs due to substantially greater than normal obstructions within the channel between stations 570+00 and

640+00. The Contract documents indicate that materials such as scrap, rope, wire cable, snags, and stumps may be encountered. However, Renda struck extremely heavy items (one approximately 10 tons) and extremely large items (a CONEX sea shipping container), which caused serious damage to Renda's machinery as well as significant downtime while repairs were being made. Other obstructions included, but were not limited to old large diameter iron pipe, pieces of cars, heavy industrial construction demolition material and literally thousands of tires. Immediately after each major encounter, Renda notified Defendant. In certain cases, Defendant subsequently directed Renda to remove obstructions with appropriate additional compensation. Other obstructions were either removed by third parties or left in the channel. On December 13, 2000, Defendant, via correspondence, granted "merit" to several notifications as the existence of debris was noted to be in excess of what is considered "normal." During the period between January 7 and January 11, 2001, an underwater survey of the Upper Bayou channels was performed. Several large objects were located and various scattered debris fields were confirmed to exist and mapped. As of the date of this analysis, Renda's claim has not been resolved.

During the heat of the battle, Renda was being pressured to achieve progress under threat of a default termination. Renda could not afford the luxury of leisurely and delicate dredging operations. Renda had not incorporated in its bid the cost of divers to scour the channel and work areas ahead of the dredging. The waters were so turbid and murky that it was difficult to see obstructions before the dredge collided with them. Besides, the channel had been dredged in prior projects, and all significant obstructions should have been removed. Renda had no reason to expect more than a reasonable amount of debris or trash.

The DCAA audited this claim. The DCAA's report does not address the technical validity of the claim. The DCAA identifies $351,000 of "questioned costs" in the following categories – Equipment ($171,000), Dredge Equipment Repair Cost ($58,000), Indirect Expenses ($51,000) and Professional Fees/Consultants ($34,000). Overall, the DCAA indicates that "because the noncompliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."

For depreciation, Renda calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. EFARS 52.231-5000 allows Renda to use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. It is not mandatory that Renda use Defendant's Equipment Manual depreciation period since actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The DCAA also questioned $53,657 in costs that were included for equipment that they believe to be related to levee construction. Renda disagrees and contends that these are actual costs that must be recovered. The levee costs are recoverable since they are directly related to the delay to the dredge. The cost of the levee work increased as a direct result of the impact to the dredging work. In other words, the extra time and cost for Renda's levee crew to stand by waiting for dredged materials to arrive at Lost Lake should be compensable under this claim. If not, the extra time and cost should be compensable as part of Renda's Levee DSC claim, discussed below.

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts, with which Renda disagrees.

DCAA states that claim preparation costs are unallowable. However, preparation costs incurred prior to this item becoming a claim are allowable.

**Claim 5–Differing Site Conditions – Obstructions in Section 9, Stations 660+00 to 684+00 – $1,148,804**

During the course of dredging work in Section 9, Renda encountered numerous obstructions not indicated in the Contract Documents. Renda notified Defendant of the obstructions. The obstructions constitute differing site conditions for which Renda is entitled to an equitable adjustment.

**Defendant's Anticipated Factual Response**

Defendant is expected to contend that the conditions encountered do not constitute differing site conditions. Defendant is also expected to contend that Renda did not provide adequate notice to Defendant of the alleged "obstructions" that are the subject of this differing site conditions claim. Defendant is also expected to contend that Renda contributed through its "means and methods" of construction to the damages claimed. Finally, Defendant is expected to contend that Renda is not entitled to compensation in the amount claimed.

**Renda's Reply**

Even after it became quite clear that Section 9 was a trash heap, Defendant instructed Renda to proceed with dredging in Section 9. Defendant's internal emails indicate that Section 9 could not be dredged by ordinary means, and that enough was enough. Defendant released Renda from further dredging operations in Section 9.

Defendant pressured Renda to dredge in Section 9 because Defendant had over represented the amount of clay and other suitable materials available to construct the Lost Lake levees. Section

9 had a significant amount of clay that Defendant had anticipated would be available for levee construction. Forgoing the remaining Section 9 clay would leave the project that much shorter of levee construction materials.

The DCAA audited this claim. The DCAA's report does not address the technical validity of the claim. The DCAA identifies $131,000 of "questioned costs" in the following categories – Equipment ($87,000), Indirect Expenses ($19,000) and Professional Fees/Consultants ($10,000). Overall, the DCAA indicates that "because the noncompliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."

For depreciation, Renda calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. EFARS 52.231-5000 allows Renda to use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. It is not mandatory that Renda use Defendant's Equipment Manual depreciation period since actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The DCAA also questioned $11,962 in costs that were included for equipment that they believe to be related to levee construction. Renda disagrees and contends that these are actual costs that must be recovered. The levee costs are recoverable since they are directly related to the delay to the dredge. The cost of the levee work increased as a direct result of the impact to the dredging work. In other words, the extra time and cost for Renda's levee crew to stand by waiting for dredged

materials to arrive at Lost Lake should be compensable under this claim. If not, the extra time and cost should be compensable as part of Renda's Levee DSC claim, discussed below.

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts. Renda disagrees with this reduction.

DCAA states that claim preparation costs are unallowable. However, preparation costs incurred prior to this item becoming a claim are allowable.

**Claim 6–West Levee Realignment, Lost Lake Placement Area – (See Claim 8 for Damages)**

The Contract Documents locate the position of the new levees at the Lost Lake Placement Area. The design intent was to have the new levees abut the existing levees. Along the west side of the Lost Lake, the new levee strayed significantly from the existing levee. Renda constructed the new levees at the contractually required location. However, the existing levee was too far away to lend support to the new levee, and the new levee was sinking too much into the muck.

Defendant instructed Renda to realign the new levee so that it was shifted westward closer to the existing levee. Defendant wanted Renda to move the materials from the existing new levee to the position of the realigned new levee. Renda did so. The realigned levee performed much better. Renda confirmed the realignment instruction in writing more than once. Renda is entitled to an equitable adjustment in contract time and money for realignment change.

**Defendant's Anticipated Factual Response**

Defendant is expected to contend that Renda's "means and methods of construction" are the cause of the difficulty that Renda experienced with construction of the West Levee. Defendant is

also expected to contend that Renda repositioned sections of the West Levee that Defendant agreed Renda did not have to move. Finally, Defendant claims that Renda is not entitled to compensation in the amount claimed.

**Renda's Reply**

In July, 2000, Renda became aware of a levee alignment design problem at Lost Lake. On about July 28, 2000, Renda notified Defendant that the west levees between Stations 166+00 and 215+00 strayed too far from the existing levee and would not stand up. Subsequent discussions and correspondence led to Modification CO-10, by which Defendant directed Renda to realign the levee as per a new drawing without any change to the contract cost or completion period. Renda notified Defendant on May 31, 2001, that the cost and time portions of the modification were unacceptable noting that additional costs were incurred and time required to complete the levee realignment. Renda submitted a request for equitable adjustment on the same date to request an additional $789,600 and an additional 40 days in adjustments to the contract. Renda further noted that it did not believe that cost and pricing data was required for this REA Proposal as unit prices had been agreed to in earlier modifications CO-1 and CO-2. In its REA, Renda references the Unit Price of $4.70/CY for realignment and relocation of levees per Modification Pay Item Nos. ICO-2, 3CO-2, 4CO-2 and 5CO-2 and used that amount to calculate the amount claimed by Renda. Renda mentions that the Unit Price of $4.70/CY was approved by Defendant in March 1999. Also related to this claim is a dispute over the amount of material hydraulically placed by Renda. On August 16, 2000, a quality assurance survey was made by JV consultants for Defendant. The JV stated "quantity calculations indicate the contractor has pumped 132,937 CY of material versus a required quantity of 59,087 or about 2.5 times the needed quantity." Renda states that material was not wasted, as