**PLAINTIFF'S APPENDIX**

# INDEX TO PLAINTIFF'S APPENDIX

**Document** **Page**

Excerpts from deposition of Luis Saenz . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Excerpts from deposition of Herbie Maurer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Excerpts from deposition of Johnny Rozsypal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
Defendant. )

ORAL DEPOSITION
LUIS SAENZ
January 9, 2004

ORAL DEPOSITION OF LUIS SAENZ, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 9th day of January, 2004, from 9:08 a.m. to 11:24 a.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of the United States Corps of Engineers, 2000 Fort Point Road, 2nd Floor, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

my question. Okay?
A. Okay.
Q. Tell us about your education background, Mr. Saenz. Where did you go to school?
A. Texas A&I. I have a bachelor of science in civil engineering.
Q. When did you graduate, sir?
A. 1974, December.
Q. Do you have any postgraduate education?
A. No.
Q. Are you a registered PE?
A. No.
Q. Did you ever sit for the exam?
A. No.
Q. What do you do for the Corps of Engineers, Mr. Saenz?
A. Right now I develop plans and specs for dredging jobs.
Q. Which section are you in?
A. I'm in the northern area office. I have the GIWW, Texas City, and Galveston.
Q. What's your title with the Corps?
A. Project engineer, I believe, is the title. It's a civil engineer position.
Q. Okay. After you graduated in 1974 from Texas A&M,

where did you go to work?
A. Here.
Q. So, you've been with the Corps continuously since about 1974?
A. Yes. Since January of '75.
Q. When you got to the Galveston district, which division or section did you go into?
A. I worked in hydrology and hydraulics right after I got out of the training program. I did channel design, and I did flood insurance studies.
Q. How long did you stay in hydrology, hydraulics?
A. I think I left in 1983. Went into emergency management. Stayed there until 1988 and then went to the area office.
Q. Now, the area office, would that be the northern area office?
A. No. That would have been called Fort Point.
Q. What did you do at the area office?
A. Plans and specs, project management, contract admin.
Q. Plans and specs for what kind of projects, sir?
A. Dredging.
Q. Okay. How long did you stay at the Fort Point area office?
A. I believe that they reorganized and they put me in technical support branch, which is part of operations division

Q. Okay.
A. It's very soft silts.
Q. Do you recall who the contractor was for that project?
A. Yeah. We had -- I think it was Luhr Brothers.
Q. I'm sorry. Say again.
A. Luhr Brothers.
Q. How do you spell that?
A. L-U-H-R.
Q. Okay. What was Luhr Brothers supposed to do? Do you recall?
A. They were supposed to construct the levees and do the erosion protection with the riprap along the east and part of the north face.
Q. And how high was the berm supposed to be?
A. I don't recall the height. I mean, have to go back and take a look at the plans and specs.
Q. Typically berms aren't as high as the main part of the levee, right?
A. No, they're not. They're meant as a foundation, as a counterweight.
Q. I think you said you've designed levees before, right?
A. I mean, I draw them on paper and we build them. I don't do a lot of the geotechnical analysis, if I'm pretty

comfortable with the soil conditions.

Q. And the way you get comfortable with the soil conditions is through soil borings, right?

A. Well, yes. And observing people excavating the area and knowing what kind of materials are there.

Q. And you really need to know how soft the material is going to be, right?

A. Right.

Q. And the softer it is, the more unstable the foundation is going to be, right?

A. Yes.

Q. And if you've got an unstable foundation, then your levee is going to have trouble standing up, right?

A. Well, that depends on the design.

Q. Okay. Well, if you have a very soft foundation, how do you go about tailoring the design to accommodate that?

A. Well, this would be only opinion but, I mean --

Q. You're the expert, right?

A. No, I'm not. Who tells you that I'm the expert?

Q. You design levees for a living, right?

A. Well, I design stuff that is -- doesn't need any kind of geotechnical analysis.

Q. When you've come across a very soft foundation in the past, how did you tell your design to accommodate the very soft foundation?

A. There's two ways of doing it. If I'm building something that's very shallow, I can use berms to counterbalance it. Or if we are pumping material in, we can pump in heavy clays or whatever and displace it hydraulically.

Q. Now, let's talk about your first method. The use of the berms would tend to counterbalance the weight of the levee, right?

A. No. They were already there. They weren't -- the use of the berms that I constructed?

Q. We were just talking about how to tailor a design to accommodate very soft foundations and I think you testified that you could add berms to the design to help counterbalance the weight, right?

A. Yeah.

Q. And the weight that you're talking about counterbalancing is the weight of the main levee itself, right?

A. Right.

Q. And so, if you add a berm to both sides of the levee, that will tend to support the foundation for the main part of the levee, right?

A. Yeah.

Q. Now, when you've designed berms in that instance, how tall were the levees?

A. I was probably building 7 to 8 feet, you know, above

natural ground, above the existing ground.

Q. So, if you've got a very soft foundation and you're trying to construct a levee that's 7 or 8 feet above natural ground, you would recommend adding berms?

A. If I had a very soft foundation, I would probably consider using berms.

Q. Okay.

A. Depends on the base and the slope of the levee.

Q. In an instance where you had a very soft foundation, what degree of slope would you recommend? One on three, one on four, or what?

A. I have used mostly one on three but there have been instances where I probably have kicked it down on one -- I've used one or tens on Rosa Allen.

Q. Now, when we're talking about one or three or one on ten, it's 1 foot vertical for 3 feet horizontal, right?

A. Right. The bigger number being the horizontal component.

Q. Now, you said Rosie Island?

A. Rosa Allen.

Q. How do you spell that?

A. R-O-S-A Allen, A-L-L-E-N. There's some severe seepage problems in that one.

Q. Tell me about the severe seepage problems.

A. They are caused by piping through lenses of sand.

through. You've seen this sheet before, right?
A. A long time ago, yeah.
Q. And you recognize that these are the levees for the Lost Lake placement area Upper Bayou project, right?
A. Yes.
Q. Okay. Now, at the Lost Lake placement area there was borrowing of material off and on through the years to renew and enhance the perimeter levees, right?
A. Yes.
Q. Do you remember when that last occurred?
A. '92.
Q. Tell me about that project.
A. It's the same one that I had with Spillman. It was part of Morgans to Carpenters maintenance job and I had Spillman, Alexander, and Lost Lake, the rehab.
Q. Okay. When did the borrowing of material near the levees occur at Lost Lake? Was it 1992?
A. It was before 1992. We had actually done the borrowing of material, I think, a year before that or six months before that, somewhere around there. And the material was placed on the slopes so that it could be used for levee construction later so it would dry.
Q. Okay. If the material is too wet, it doesn't make good levee building material, right?
A. Unless you add straw like the Jewish people did in

doing that levee raising project is to make the levee higher?

A. The levee itself doesn't go down. The interior goes down. The levee itself stays pretty constant. It's not going to go down unless there's actual displacement due to foundation problems. It will stay pretty much constant unless you raise it again or there's erosion.

Q. Now, when you were talking about the new work before, were you talking about the Houston-Galveston widening and deepening projects?

A. I was trying to -- yes, trying to build capacity -- at least trying to build enough capacity so it wouldn't be such a hassle to get up to that point for cycles -- for dredging maintenance cycles and for the new work.

Q. Okay. Now, when you were doing the work in 1992 or so at Lost Lake, how tall were the levees then, the perimeter levees?

A. I don't recall. I don't recall the elevation. It could have been 15 feet. It could have been 20. I don't know.

Q. How high were you trying to raise the levees?

A. Probably between 5 to 7 feet.

Q. And you were going to raise the levees using materials borrowed from inside Lost Lake?

A. Right.

Q. And the way that the material was collected was

using draglines on mats immediately adjacent to the existing levee?
A. Yes.
Q. Who was the contractor using the draglines?
A. Affolter.
Q. Do you remember if it was Kenny Affolter or one of the other --
A. It was Kenny that was the project manager for that particular project.
Q. Do you remember any better what the name of that project was?
A. It was Morgans to Carpenters. It was Contract 49.
Q. Contract 49. It was called what? Morgan to Carpenter?
A. Morgans to Carpenters. Dredging Morgans to Carpenters.
Q. Now, what's Morgans?
A. Morgans Point.
Q. Okay. And what's Carpenters?
A. Carpenters Bayou.
Q. And Contract 49, what year was that?
A. I don't remember. It was around '90, '91, somewhere around there.
Q. Okay.
A. I know it was 49 because the last digits were 49 on

it.

Q. Now, prior to that project, the Morgans Point to Carpenters Bayou dredging project, was there any previous efforts to raise the height of the levees at Lost Lake?

A. Yeah. I'm sure there was.

Q. Do you recall any, sir?

A. I don't recall any specific efforts. But I'm sure Johnny or Herbie do because they were there or Hopkins. He was the project engineer for Houston.

Q. Now, how often is the Lost Lake disposal site used?

A. I think the cycle there was ranging from two to three years. Two years was probably more closely related to the cycle. Every two years you have to have a contract there for dredging.

Q. For maintenance dredging?

A. Yes.

Q. So, the maintenance dredging would occur to pick up maintenance material in the Houston Ship Channel?

A. Right.

Q. And then through pipelines, the material would be deposited in the interior of the Lost Lake placement center?

A. Correct.

Q. Now, in the Morgans Point to Carpenters Bayou dredging project, the one where you were talking about Affolter was using draglines?

A. Uh-huh.
Q. Was that --
A. He also -- he also hauled in Spillman. He did haul in Spillman. But for Lost Lake he used draglines.
Q. Okay. And I'm interested right now in Lost Lake. Was that the kind of project where the dragline moved on mats along the interior perimeter of the levee?
A. Yes.
Q. And so, the dragline would work borrowing material from the interior and then placing it on the levee and then move forward?
A. Right.
Q. Were there any records kept on either how much material was borrowed or where that material was borrowed?
A. No. The contract was based on lineal feet for the ditching. You're talking about the ditching that was placed up on the levees, right?
Q. Yes, sir.
A. That was based on lineal feet. I mean, we made an estimate on how much volume but that wasn't the way it was bid. It was bid by lineal feet.
Q. Okay. So, it was bid by lineal feet and what were the parameters of the ditch that was supposed to be dug?
A. We had -- I don't remember but I know that the perimeter ditch was bigger and wider than the lateral ditches.

I don't recall the exact configuration.

Q. Now, the perimeter ditch would have been immediately inside the perimeter levees?

A. The one that is adjacent to the perimeter levee, the containing levee.

Q. But it would have been on the inside of the levee, right?

A. Yeah. Sure.

Q. As opposed to the Houston Ship Channel side of the levee?

A. Yeah.

Q. And then there were some lateral levees that would just run through the middle of the placement site?

A. Right. Just an attempt to get to the interior of the placement area to dry it out, to drain the water out of it.

Q. Okay.

A. Those you normally have marsh buggies with those rotating ditching machines in the back.

Q. Okay. Now, back to the ditch. The equipment that was used was draglines?

A. For the perimeter, yes.

Q. The way that a dragline works is it reaches out as far as it can go and then with a bucket it pulls material and then scoops it up, right?

A. Yeah. But the initial ditching stuff that we did for Lost Lake which you're alluding to was done with double and triple handling of the material. We went way out. We went way out to scrape out material and bring it in. It wasn't done just immediately. Matter of fact, we covered the immediate perimeter ditch.

Q. There was an immediate perimeter ditch?

A. Yeah.

Q. When was the immediate perimeter ditch dug?

A. I don't know.

Q. Some time --

A. Some time way before I got there.

Q. Okay.

A. There was already one there.

Q. How deep was that immediate perimeter ditch?

A. Probably 3 or 4 feet.

Q. Now, it sounds like the Lost Lake disposal site was fairly dry when this Morgans Point to Carpenters Bayou project was going on.

A. We drained -- the ditching worked very well, the one that we did before we got there. Yes. It worked extremely well and we had it -- you could actually walk across the entire area.

Q. So, it was really like an island as opposed to Lost Lake?

A. Yeah. You could actually walk across it once the ditching was finished.

Q. Okay.

A. You could not do that before then.

Q. Now, after a dredging and disposal cycle, is the interior of Lost Lake usually covered with water?

A. Yes.

Q. So, if you were out there looking to see what the surface was of the interior areas of Lost Lake, it would be covered with water and it would be hard to see?

A. Yes. And you would also have a lot of it covered with maintenance material, depends on what kind of volume you are pumping in there. So, after we got done with this thing, you could see the swales still there but they were just swales. Okay?

Q. Now, in 1997 or 1998, was there any maintenance dredging cycles that deposited disposal in the Lost Lake placement center?

A. Sure. There were two.

Q. When did they occur?

A. One was after the flood of '94. We had an emergency dredging contract done. Hooks did that one. And then we did one after that, another emergency job after that in '97 or '98 with King Fisher. And they both lost their shirts there.

Q. Why did they lose their shirts?

right.

Q. Now, the '97 or '98 dredging, was that a significant project?

A. It was similar to the one that we did with Hooks in volume.

Q. What sort of volumes are you talking about?

A. A little less than the maintenance cycle volume because it was just critical areas that were shoaled, just in the confluence there around maybe Lost Lake, right there where the San Jacinto meets the Houston and then a little further down where the real critical areas were.

Q. Now, when you measure volume, do you measure it by cubic yards?

A. Yeah. I'm sure you can go back to the contracts and look at the volume.

Q. About how many cubic yards would you be talking about?

A. I don't recall. But it certainly was over a million probably.

Q. Okay. So, if you got over a million cubic yards of dredged material being removed and placed in the Lost Bay -- the Lost Lake disposal site, you would have a whole lot of water going with it, too, right?

A. Normally you run, right -- I mean, the most efficient I've ever seen is 85/15.

Q. 85 percent water, 15 percent solids?
A. Right.
Q. And that's the most efficient you've seen?
A. I've ever seen.
Q. Who was that?
A. T.L. James.
Q. But usually it's less than that?
A. Yeah.
Q. Or less solid content than that?
A. Yes.
Q. Is there an average or a standard?
A. We don't keep track of it. We don't delve into that. We just let the contractors bid whatever they feel they can do. We put in a production rate based on historical values.
Q. What's typical solid content?
A. Typical?
Q. Yeah. Is there a typical?
A. I wouldn't think so. I mean, it depends on what kind of horsepower and pumps you have. But I mean, 85 to 15 is normally what it runs along here, is probably the best. I don't think I've seen too many people do much better than that.
Q. What's the worst? I'm trying to figure out what the range is?

A. I don't know. I mean, they could be -- there's two types and I don't know exactly which ones are which.

Q. (BY MR. ERIKSON) But somebody within the Corps would have a file of whatever these permits were, right?

A. Regulatory would.

Q. Regulatory. Okay. Now, did you testify previously that you had reviewed the plans and specifications for the Upper Bayou project before it was bid?

A. I looked at them but I think I told you that I had not provided any -- I don't recall providing any formal comment.

Q. Did you look at them enough to form an opinion as to whether or not the design was suitable or you just didn't look at them enough or what?

A. Well, as far as, you know, the way the levees were done, I did have an opinion. And I think -- I know what some of the arguments are. But, you know, one of the things that was -- I recall vividly being brought one of these things and I think it was the cross-sections. And, you know, the fact that we were going to build over the old borrow pits, which was fine if you were going to incorporate hydraulically placed material, which is what we asked for. If it was mechanical, then it could present a problem because you would have bridging of the material. But that's what I was asked to look at and see, well, what do you notice about this?

I said well, everything is over the old borrow pit, which is fine. It's nothing unusual. I mean, we've done it many times before. It's just that you have to incorporate certain construction methods to build over the borrow pit if you're going to build that much.

Q. Now, one of the reasons that the foundations -- and you notice that on the drawing it indicates that the foundations are soft to very soft, right? There's a note?

A. Yeah. I mean, I don't recall what the note said.

Q. You can read the note. It talks about the foundations being soft to very soft. Do you see that particular note?

A. Note 8?

MR. SMITH: Note 10.

A. Note 10? Okay. So, it tells you that.

Q. (BY MR. ERIKSON) Now, you expected that the foundations would be soft to very soft?

A. Yes. Especially in the north face.

Q. And the north face would be the area where you would have the lightest of the materials, mostly the silt, right?

A. Correct. Because that's where your old spill box was at. That's where all your fines would collect.

Q. Now, one of the reasons that the foundations would be soft to very soft is that it was in an area where the old borrow pits were, right?

A. Right. It was over some of the old borrow pits, right.
Q. Did the Corps do any sort of analysis on how wide or deep the old borrow pits were before this project?
A. No. I don't know. They had old surveys and I think we provided all the surveys that we had at the time. It would show where the borrow pits are.
Q. When you are talking about surveys, you're talking about borings?
A. No. Land surveys that show where the pits were in relationship to the levee.
Q. Okay. What do these surveys look like?
A. They look pretty much like that right there except it's mostly natural ground but they look -- it's a cross-section like this.
Q. Okay. And you're looking at page what?
A. C-15. This is the design template here but we would show like this dash line but the interior would show where the depression was.
Q. All right. Let me swing over to your side and see what you're talking about.
A. Do you see this right here? That's a cross-section of the existing ground. And on the interior, wherever that may wind up being over here, we would show a depression over here where the old pit was.

Q. Okay. You are looking at Page C-15?

A. I'm just showing you that this is something we would have -- if somebody asked us for surveys of what we had, this is what we would have given them.

Q. You are looking at Page C-15 of Rozsypal Exhibit No. 2 and the first thing you pointed to was the cross-section that's referenced Station 39+00?

A. It's just an example. I'm not saying that cross-section or anything -- that has anything specific about it. I'm just saying that this would have been a typical outline of what the ground looked like and if we would have -- if we were able to go in far enough, it would have shown a depression where the ditch was.

Q. Okay. Now, take a look at these cross-sections and see if they show the borrow area on the interior of the perimeter levees at Lost Lake.

A. These do not but I have seen others -- I'm pretty sure I saw others that did. The -- that's what I was telling you earlier is that, you know, we were shown where some of these things were and we had cross-sections and I'm not sure if those are all the ones that are shown there. Are these all the ones that are on there?

Q. This is what was given to the bidders in the bid solicitation package for the Upper Bayou project. But take your time and look through the plans and tell me if --

A. They may have been filled in. I mean, that's not to say that -- you know, remember we had several dredging cycles that went in there. And the borrow pit is covered already by maintenance material. We have two dredging cycles that went in there after I did that.

Q. Okay.

A. So, these surveys -- does it have a date on it? We need to find out what date these surveys are but if they're after 1997 or '98, then it's after the King Fisher job and that means there were two dredging cycles put into Lost Lake.

Q. All right. So, you would expect that after the dredging cycles occurred at Lost Lake, that whatever borrow areas existed after your project in about 1992 would be filled in with maintenance material?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And so, then, if somebody were looking at the site or taking a cross-section of the site, it would show -- the borrow area would be covered up in --

A. The borrow area would be covered up. I'm sure it would. We pretty much covered it up in the dredging that we did for the dredging to Morgans to Carpenters. I told you that what was left was swales, just a little depressions that were evident of the ditching. But we had a lot of material

for that job.
Q. Now, in the Morgans to Carpenters dredging project, was that new work or maintenance?
A. I'm sorry. Would you repeat the question?
Q. The Morgans to Carpenters dredging project, was that new work or was it maintenance?
A. No. It was maintenance.
Q. And so, you would expect mostly what would come from one would be silts, right?
A. Silts and sands. Lost Lake had some sands. The reaches that we would get out of there would normally be between the ferry and Carpenters.
Q. Okay. So, I assume that you didn't use those kinds of materials to raise the levees at Lost Lake because those are not your favorite materials?
A. I did use those materials. I did not have a choice. I used those in 1991 in the ditching job to put on the levee and I said I double handled those things. I put them up to the levee. They dried and then I used them in the dredging job, you know, in '92, whatever year it was.
Q. Okay. Now, any other projects that you recall other than the Upper Bayou project --
A. Uh-huh.
Q. -- that occurred out at Lost Lake?
A. Well, I mean, there were all the maintenance

projects.

Q. We talked about one involving Hooks. What year was that one?

A. That would have been the one immediately after the '94 flood of October. So, it would have probably been a '95 contract. That would have been already into our '95 fiscal year.

Q. And then there's the King Fisher one in '97 or '98?

A. '97 or '98.

Q. Any other ones you can recall, sir?

A. No. Because I was already out of the -- I should have been out of the technical support branch. I don't think there was anything after that because I think after '98 -- I don't recall exactly when these started but it should have been around '99 or 2000.

Q. Now, prior to the Hooks contract in '95, there would have been previous maintenance disposal in there, right?

A. Yes.

Q. And is this something that occurs every couple of years?

A. Every couple of years. I think the most we stretched it out has been three.

Q. Now, turn back to Sheet C-14.

A. Okay.

Q. You're there, sir. You notice that there's the

existing perimeter levee and then this design calls for a new levee that's inside and offset from the perimeter levee, right?

A. Yeah.

Q. Based on your experience in designing levees, would the ground have been more stable, in other words, the foundation more stable the closer you got to the existing levee?

A. The closer you get to the footprint, yes. It tends to compact more. I'm not -- yeah. I agree.

Q. When you were reviewing the design for the Lost Lake placement levees, did you give any thought to raising the height of the existing levees or incorporating the new levees closer together to the existing levees?

A. No. And I wasn't involved in any of the design effort for the new work. Okay. I was given these drawings to look at and maybe provide some comment. But I did not -- I was not involved in any of the analysis or geotechnical analysis of the levee for the new work.

Q. Now, when you prepare levee designs, do you also prepare the notes on the drawings and maybe parts of the specification?

A. When I'm doing maintenance work.

Q. If you have information about borrow areas or something that isn't readily apparent, do you put notes on the

plans?
A. Yes. I do put notes on the plans of things that are not -- that are missed or not there.
Q. Okay. Like in this case, if you look at the cross-sections like we just did, the borrow areas don't show up because they've been filled in with maintenance material, right?
A. They've been filled in but I remember -- I remember them being discussed distinctly during the pre-bid conference.
Q. Well, there's notes for the pre-bid conference. Did you attend the pre-bid conference?
A. I was there and I remember -- I thought I remembered Rick Smith bringing it up.
Q. Let me show you Rozsypal Exhibit No. 1 and we'll turn to the questions by prospective bidders and answers by the Galveston district and it's issued as Amendment No. 1. Now, you know that if there's a pre-bid conference and there's questions by bidders, generally the Corps of Engineers is going to issue an addendum or an amendment to provide answers so that all the bidders see what the questions and answers are, right?
A. Yeah.
Q. All right. Please look through those questions and answers and let me know if there's any discussion of borrow areas immediately adjacent to the perimeter levees, on the

inside of the perimeter levees.

A. (Witness reviews document.)

Q. It looks like this may take some time. Let me interrupt you and say this: If there was discussion about borrow areas, is that something that should have been put in Amendment No. 1 that's in Rozsypal Exhibit No. 1?

A. I mean, I can't say whether it should have been put in there or not. But I was sitting right behind him, I think. I was sitting right behind Rick Smith. I don't know if you know Rick Smith but he can get quite vocal.

Q. Who is he with?

A. Rick Smith is probably with Great Lakes now.

Q. Okay. And who was he --

A. He was working for T.L. James at that time. And Rick Smith, I believe, brought up the borrow situation, building over the old borrow pit.

Q. There's a flag -- let me step over here and I can help you a little bit. Question No. 6 says, "Why is the levee alignment so far from the perimeter where the foundation is crummy?" Do you see this?

A. Right.

Q. Was that a Rick Smith question, or do you recall?

A. Well, "crummy" sounds like the word he would use. It could have been him, but I do remember somebody bringing it up. I mean, I -- you know, the -- it wasn't -- it was even

brought up to me before the pre-bid conference. You know, why are we putting this over an old borrow pit? I said, well, you know, it will work if you hydraulically pump it. It will work if you do that. If you don't do that, it won't.

Q. Now, in your mind when you saw this design, where they were building a new levee over an old borrow pit and the design called for hydraulic pumping of dredged material, how did you envision that that process was going to go? In other words, what did you envision the contractor was going to have to do to make it work?

A. Well, the only thing he had to do was make sure he trained the material in there and stayed the course and beaded it along the proposed alignment.

Q. When you say train the material in there, how would he do that?

A. Bringing in a little bit of material from the sides to make sure that the material didn't run out on him.

Q. Okay. And when you say bringing in a little material, how much would that be?

A. I don't know. That's up to the -- that would have been maybe 3 or 4 feet, 5 feet of training material from the inside.

Q. Okay. So, you are talking building like a training levee?

A. Yeah. Just like what Great Lakes did to keep the