material over at Spillman.

Q. All right. Now, the drawings themselves say that the foundation is soft to very soft. Do you know if a training levee would stand up?

A. Well, I've seen them do it in House Track where it was very soft.

Q. We're talking about Lost Lake. Do you know if a training levee would stand up out at Lost Lake?

A. I have no idea unless they tried it but I don't think anybody tried it.

Q. You weren't -- you never inspected the Lost Lake project, did you --

A. No.

Q. -- while Renda was working on it?

A. No.

Q. So, you don't know what Renda did concerning training levees?

A. I don't have any idea what they did.

Q. Do you know whether Affolter tried to build training levees and they wouldn't work out at Lost Lake?

A. No. I don't know.

Q. Do you know whether or not Affolter was given a change order to change the design of the training levees because the training levees wouldn't stand up?

A. No.

Q. Now, if the designer wants training levees to be constructed, should the designer list that in either the drawings or the specifications?

A. If they are to be a permanent feature of it or a significant temporary feature.

Q. Okay. Now in this case, I think it's your testimony that the only way to get these hydraulic levees to stand up would be to build training levees, right?

A. Yeah. To make some effort to keep the material in place, right. In other words, the key to the thing is the weight of the displacement. The more weight you have concentrated in a certain area, the more muck you are going to push out.

Q. Right. And if you've got a 30-foot high levee, you've got significant weight?

A. That's right.

Q. And we could sit down and calculate what a 30-foot column of clay is going to weigh, right?

A. About 150 pounds per cubic foot.

Q. Now, when you were reviewing the design for the Lost Lake levees, did you get any feel for how much material it was going to take to build the levees?

A. No. I didn't make any estimate of how much material.

Q. I'm going to represent to you that if you took a

neat line of the new levee, you took the cross-section and calculated the neat line, per foot it would be about 35 cubic yards. Does that sound about right for 30-foot high?

A. I don't know. But I don't know what ground elevation are you talking about. 30-foot high.

Q. I'm just going to represent that to you. Just assume that that's correct. Okay? How much material would you expect that the contractor would have to place to achieve a neat line levee of about 35 cubic yards per lineal foot?

MR. PETTY: I'm going to object to the form of the question.

MR. SMITH: I'm sorry?

Q. (BY MR. ERIKSON) You can answer and answer it based on your experience.

A. Well, I don't have any clue right now because I don't know what -- what displacement people figured on and what factor they used for the displacement.

Q. Okay. If somebody is designing this levee, should they come up with a displacement factor?

A. Yeah. And I'm sure they did.

Q. Now, when you've designed levees in the past, have you come up with a displacement factor?

A. Yes. I've always estimated a displacement factor in soft material.

Q. What displacement factor have you come up with in

the past?

A. It's ranged between 20 to 50 percent.

Q. Okay. So, in other words, if it's -- let's just take 50 percent. If it's 50 percent displacement factor, that would mean that the -- and if you are looking at a 35 cubic yard neat line for the levee, that the contractor would have to add 50 percent more to accomplish -- to accommodate the displacement, right?

A. That is correct. But you're assuming that 50 percent would be over land and I've built levees over water. And 50 percent would be my guess over very soft or watery substrates. I've built stuff over water.

Q. All right. Now, I guess if you're building over water, there's going to be a significant amount of material that just gets lost in the water?

A. Yeah. If it's clay, it will stay; but you do have some displacement. And then some of it will melt away or should I say --

Q. Erode.

A. Not erode but go in dissolution.

Q. Dissolve?

A. Dissolve.

Q. Now, you would expect less dissolving out at Lost Lake if the levee material was being placed inside the perimeter levees?

quite a bit, yes.

Q. So, the more recent ones would be the ones that would be more reliable in terms of the material that was actually out there, right?

A. Yeah. And I see quite a few 93s in there. Are some of the other ones older than that? I'm not aware of what the dates of the borings are. I haven't looked.

Q. There's a legend and the legend says that the HA borings are from -- they're hand augers in 1964 and then there's some 3ST borings and they're done from 1963.

A. What are the depths of those borings?

Q. The information is actually in there, but we don't need to look at those right now.

A. Okay.

Q. Now, based on your experience in designing levees, if the neat line calculation for a new levee is, say, 35 cubic feet per linear foot. Assume that. Okay?

A. Uh-huh.

Q. And the designer felt that at the worst case scenario it would take 75 cubic feet of material to accomplish this 35-foot -- 35 cubic foot -- per foot neat line, would you consider that an indication that the foundations were very soft?

A. Yes.

Q. So, if it took twice as much material, that would

indicate that the foundation was very soft?

A. Yeah.

Q. Okay. And if the foundations were stronger, then it would require less additional material, right?

A. Yeah. The displacement factors would be much less.

Q. Now, when you have displaced material, you end up with mud waves, right?

A. Yes. In most cases you do.

Q. Did you have involvement in any way during the course of the construction of the Upper Bayou project?

A. Not during the construction.

Q. Did you go visit the site during the course of construction?

A. No.

Q. Did you go watch Renda Marine work during the course of the construction of the Upper Bayou project?

A. No. I was given on occasion a couple of surveys of the channel, and I was also given copies of reports.

Q. So, you got surveys of how the dredging was going?

A. Yes. Once.

Q. And you got reports on what some of the issues or problems on the job?

A. I got copies of their daily reports on occasion for some reason.

Q. Okay. Did you read them?

go back to the area office, wanted to get my interest up again and it wasn't there.

Q. Somebody was trying to get you to change jobs. Is that what you're telling me?

A. Yeah.

Q. Okay. So, they would get you to change jobs by showing you hydrologic surveys?

A. Things that they thought were problems that I should go and fix.

Q. All right. Did they detect that you're somebody that likes challenges?

A. Well, I don't know. I mean, survey guys have always gotten along with me pretty well. I think they like me.

Q. How many hydraulic levees have you designed for the Corps?

A. I don't recall. I mean, I've done a little bit on most jobs. There's some jobs that have not required any at all.

Q. More than ten? Less than ten?

A. More than ten.

Q. More than ten? More than 20?

A. Yeah.

Q. More than 50?

A. I'm not sure if it's 50, but it will probably be close.

Q. Okay. And that's something you've been doing for how long?
A. Since '88.
Q. Okay. I think you're probably aware that there was some discussion about possibly terminating Renda Marine for default on the Upper Bayou project, right?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. The court reporter needs "yes's" or "no's."
A. Okay.
Q. Did you ever formulate an opinion as to whether or not Renda should be terminated for default on the Upper Bayou project?
A. I had an opinion. And my opinion was yes, you know, that they should be.
Q. What was your opinion based on?
A. That they weren't getting the production rates and they were actually starting to -- Lost Lake was actually starting to affect my O&M program.
Q. Did you do any investigation to determine why it is that Renda wasn't achieving higher production rates?
A. Not in any great depth or any great detail.
Q. Now, you understand that the contracting officer was the only person with the authority to actually terminate Renda

A. Yeah. But I mean, that -- I had an opinion but that doesn't mean I gave it.
Q. Okay. Did you ever give your opinion to anybody about Renda being terminated for default?
A. They never asked me in a formal sense. No. So, I never gave it to Tom to terminate.
Q. And the reason that no one ever asked you for your opinion is that you really weren't associated with the project, right?
A. I wasn't associated with it.
Q. Okay. Now, the -- do you understand that there were mud waves out at Lost Lake when Renda was trying to construct the hydraulically placed levees?
A. I had heard that there were mud waves, yes.
Q. And that's something that naturally is going to happen, right?
A. If there is soft material, yes. Displacement will cause that.
Q. And that's not something that is the contractor's fault. That's something that actually the Government wants to happen, right?
A. Yeah.
MR. PETTY: Object to the form of the question.
A. The mud waves are there if displacement is happening and, you know, if -- if they were in an area that that was

where it was meant to occur, then that's what is supposed to happen.

Q. (BY MR. ERIKSON) If you're going to -- if you're going to get a 30-foot hydraulic levee to stand up, you're going to have to have some mud waves, right, if it's over soft foundations?

A. You are going to have some mud waves.

Q. And that's not the contractor's fault, right?

A. I would say not unless there's, you know, reason to believe otherwise.

Q. Okay. Ordinarily it's not the contractor's fault?

A. Ordinarily, no.

Q. If the contractor wanted to cause some mud waves, what would the contractor have to do? Mud waves that wouldn't ordinarily occur, what would a contractor have to do?

A. I've seen a contractor bring in heavier equipment or role stuff in there where it didn't belong to cause mud waves.

Q. Now, on this project, there's a specification that says that the equipment has to weigh at least 30,000 pounds that are working on the levees. Have you seen that?

A. Yes. For semicompacted fill.

Q. And you understand that for the hydraulically placed areas of the levee, the material that gets put on the levees after it gets collected is supposed to be put on in lifts. You've seen that, right?

Q. Did you have any involvement in the magnetometer and side scan survey that occurred concerning the obstructions in the Houston Ship Channel?

A. No. I was asked about companies who could do it, but I was not involved in them.

Q. Have you ever worked on any projects where Renda was a contractor?

A. No.

Q. So, other than maybe some secondhand information that you've acquired about Renda, you don't really have any firsthand information; is that correct?

A. Well, other than the reports that I read that were written by Renda.

Q. You mean the daily reports?

A. Uh-huh.

Q. And when you happened to read those, you were reading sort of in passing, right? It wasn't part of your job?

A. It was not part of my job, no.

Q. When you've been associated with dredging work on -- in the Galveston district, have you visited the dredges themselves?

A. On occasion.

Q. Have you become familiar with the kinds of equipment they have on the dredges?

A. Yeah.
Q. Is it usual for a dredge in the Galveston district to have a magnetometer on it?
A. No. They do not normally have it. But if they do encounter trash, we expect them to go and try and seek a method for finding it if it's -- if they agree to it.
Q. Okay. Is it usual for a dredge in the Galveston district to have the capability of performing side scan surveys?
A. No. We don't require it.
(Exhibit 2 marked)
Q. (BY MR. ERIKSON) Now, Mr. Saenz, the court reporter has marked for identification as Saenz No. 2 an E-mail from James Few to Mr. Russek dated November 6, 2000, and you're shown as getting a copy, right?
A. Yeah. But it's from Tim. I probably didn't read it.
Q. James T. Few. James Tim Few, right?
A. Yeah.
Q. And you probably didn't read it?
A. No.
Q. Do you look and see whether it's from Mr. Few and then you say "This is one I don't have to read"?
A. This is a short one from Mr. Few.
Q. It's only a little more than half a page.

Affolter has gone out and done some additional work on the levees at Lost Lake disposal site?

A. No. I'm not in that area anymore. So, I'm not even trying to keep up with it.

Q. Have you seen levees that failed due to soft foundations in the past?

A. Yeah, I have.

Q. I'm going to show you some photographs. I'm going to show you what's previously been identified as Rozsypal Exhibit No. 11, Rozsypal Exhibit No. 12, Rozsypal Exhibit No. 13, and Rozsypal Exhibit No. 14. And I'll represent to you that these photographs were taken on April 11, 2003, in an area at Lost Lake displacement -- I'm sorry -- disposal site where Affolter had placed levee material.

A. Okay.

Q. Does that appear to you to be a levee that's failing?

A. I mean, I can't tell from the photo; but I mean, it looks like that's a displacement ridge there.

Q. And you're looking at Rozsypal Exhibit No. 11?

A. Uh-huh.

Q. Now, on Rozsypal Exhibit No. 12, you see a picture of Mr. Oscar Renda, right?

A. Yeah.

Q. You've met him prior to today?

A. Yes.
Q. And he is standing in a crevice in the middle of the levee, right?
A. Yes. And I have fallen in those crevices in Lost Lake many times before.
Q. Okay. When have you fallen?
A. When I built -- when I used to build levees, they would do the same thing.
Q. When was that, sir?
A. '91, '92 that we had cracks like that and we -- they were dressed up and fixed. They weren't extensive but they were small cracks but I've fallen into them.
Q. And the cracks develop like that as a result of soft foundations?
A. Sometimes because of rains, heavy rains, too. They get into veins of sand and that leaches out and then you have big holes in between.
MR. ERIKSON: Okay. Mr. Saenz, we're going to adjourn my questioning for you at this time. There are other documents that -- there are other documents that we may get from the Corps of Engineers that we might ask you questions about in the future. But for the purposes of today, I'm going to adjourn my questioning.
MR. PETTY: The Government would reserve any questioning for a future date. We do want to read and sign.

CHANGES AND SIGNATURE

WITNESS NAME: ______________ DATE OF DEPOSITION: ___________

| PAGE | LINE | CHANGE | REASON |
| --- | --- | --- | --- |
| 23 | 14 | change "or" to "on" | |
| 35 | 22 | change "we had it---" to "we had it to where" | |

I, LUIS SAENZ, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

LUIS SAENZ

THE STATE OF TEXAS )
COUNTY OF GALVESTON )

Before me, RUBEN R. VILLAGRAN, on this day personally appeared LUIS SAENZ, known to me ~~or proved to me on the oath of~~ ~~or through~~ ~~(description of identity card or other document)~~ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this 6th day of MAY, 2004.

NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

My Commission Expires:

RUBEN R. VILLAGRAN NOTARY PUBLIC STATE OF TEXAS EXPIRES 1-2-2006

STATE OF TEXAS
COUNTY OF HARRIS

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF LUIS SAENZ
January 9, 2004

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 27th day of January, 2004.

Stacey Whitley

Stacey Whitley, CSR
Texas CSR 3999
Expiration: 12/31/2005
ESQUIRE DEPOSITION SERVICES
Firm Registration No.: 03
3401 Louisiana, Suite 300
Houston, Texas 77002
713-524-4600

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
Defendant. )

ORAL DEPOSITION
HERBIE A. MAURER
January 7, 2004

ORAL DEPOSITION OF HERBIE A. MAURER, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 7th day of January, 2004, from 9:10 a.m. to 11:58 a.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of the United States Corps of Engineers, 2000 Fort Point Road, 2nd Floor, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

COPY

HERBIE A. MAURER,

having been first duly sworn, testified as follows:

EXAMINATION

Q. (BY MR. ERIKSON) Good morning, Mr. Maurer. My name is Brian Erikson. I represent Renda Marine, the claimant in this case. Have you ever been deposed before?

A. Yes.

Q. Okay. First things first, could you state your full name for the record?

A. Herbie A. Maurer.

Q. It's not Herb? It's Herbie?

A. Herbie.

Q. Okay. Now, you're employed with the Corps of Engineers, right?

A. Yes.

Q. What's your title, sir?

A. I'm the deputy district engineer for programs and project management.

Q. Mr. Maurer, you had the unfortunate situation that your name appears on a lot of the documents. And so, I'm going to have to ask you a lot of questions to figure out what you know and what your role was. And I guess the first thing I'm going to ask for you to do is to help me with an organizational chart. And if I give you a piece of paper -- we'll get the court to mark it for an exhibit -- would you

Q. All right. Where does the construction -- is it a construction division or construction branch?
A. There's an engineering and construction division and under it you have a construction branch and an engineering branch.
Q. You're pretty good at writing upside down. And then you're going to get us an official organizational chart later so we don't have to flush this out?
A. I can.
Q. If you don't mind; otherwise, I'm going to have to ask you to spell out things so that in the future somebody looking at this could determine that OC means office of counsel.
Now, other than the projects and programs people, are there any other people who report to you?
A. I have a small business administration person and I have the emergency management.
Q. Okay. Do you have any oversight over the heads of operations or engineering and construction, like that?
A. I have technical oversight of the technical divisions.
Q. Now, before you became the deputy district engineer, were you in a different section or division? Did you rise in the ranks in the programs and project management?
A. I was chief of operations.

Q. Do you understand what the Upper Bayou Project was intended to do?
A. I'm not sure I understand what you say, "intended to do."
Q. Why did they want to build it? Do you know?
A. To make the ship channel wider and deeper.
Q. Okay. And then you understand that there was a Lost Lake aspect of the dredging Upper Bayou project? Do you understand that?
A. I understand that, yeah, the Lost Lake would be in that vicinity.
Q. And they took the dredge material from the ship channel and used it to increase the size of the levees at Lost Lake?
A. If it's in that reach, I assume that, yes.
Q. Did you not know that or didn't recall that?
A. Well, you know, you're asking me to say something that -- you know, I would have to look in the specs or the plans to say specifically if it's in that contract. It's been a while. In fact, I'm not sure I even reviewed the or -- you know, reviewed the plans and specs to that detail.
Q. Let me ask you -- well, let me just show you an exhibit and then we'll figure it out from there.
(Exhibit 1 marked)
Q. (BY MR. ERIKSON) The court reporter has marked for

Q. Tell us about your education. Where did you go to school?
A. Texas -- it was then Texas A&I in Kingsville but it's now formally Texas A&M in Kingsville.
Q. That's down in the valley?
A. Corpus Christi area.
Q. And what was your degree, sir?
A. Civil engineering.
Q. When did you graduate?
A. '64.
Q. Are you a licensed professional engineer?
A. Yes, I am.
Q. When did you get your registration?
A. I couldn't tell you. Probably -- probably around two years after I graduated. Probably '66. No. Four years it takes. So, it would be '68, somewhere around there.
Q. All right. Did you sit for the exam or did you take it based on -- did you acquire it based on experience?
A. Exam.
Q. Now, any post college graduate work?
A. Some off and on throughout my career.
Q. Do you have a masters or any advanced degrees?
A. No.
Q. About 1964, where did you go to work?
A. Corps of Engineers.

Q. So, have you been with the Corps of Engineers continuously since about 1964?
A. I have.
Q. Have you been with the Galveston District continuously since 1964?
A. I have.
Q. Okay. You testified previously that you used to be the chief of the operations division, right?
A. That's correct.
Q. From about 1964 to when you became chief of the operations division, were you in the operation division?
A. No. I was pretty well all around in the district. Started out in engineering. And I don't know the date sequence. Went to regulatory. Started up enforcement. Went to construction. Went out to area engineer. Come back to construction operations and headed up O&M program. And we were -- we were construction operation division at that time and then I helped temporary chief of construction ops for a period of time. And then we restructured and it become operations and then I've come up to the deputy.
Q. Excuse me a second. All right. Does that bring us up to date?
A. Brings you up to date.
Q. Okay. So, when did you become the deputy district engineer?

A. It was August. It will be three years in August of -- we subtract five months from it. So, about two years seven months. Let's see. Buechler was gone a year. Yeah. He'll be gone three years in August and I come up a year after he was. So, it was two years and -- three years in August. So, two years and seven months, I guess.

Q. So, August, 2001?

A. It would have been around there.

Q. All right. And Colonel Buechler left when?

A. August, 2000, I believe. Wait a minute. I had one year with Buechler. I had one year with Buechler. So, he must have left in --

Q. 2002?

A. He'll be three -- 2001. I come up in 2000.

Q. So, he left 2001?

A. 2001 and I come up in 2000.

Q. Okay. Now, back to Exhibit No. 1. In the second paragraph, it talks about the mouth of the Colorado River project. Do you see that?

A. Okay.

Q. Did you have any involvement in whether or not Renda should go back to work on the mouth of the Colorado River?

A. The best I can remember at this time is I sat in some meetings that there was discussions on that, but I don't remember the details.

that particular area and I believe that was Sutcliffe.
Q. Harrison Sutcliffe?
A. I believe that.
Q. Okay. What was Mike McClenan? What was his role on this project? Was he project engineer?
A. I really can't answer you at this time.
Q. Okay. Now, have you ever been involved in levee construction claims that concerned soft foundations?
A. Through my career I have.
Q. Now, you understand that in this part of the world, there's a lot of areas of soft foundations, right?
A. Yes.
Q. And when you have a soft foundation and you are trying to put levee materials on top of it, the foundation might give way and the materials settle, right?
A. Well, you're talking hypothetically?
Q. Yes, sir.
A. It could happen, yes.
Q. Okay. Have you ever seen a mud wave?
A. Yes.
Q. What causes a mud wave?
A. Generally displacement of the mud by some weight or some -- you know, either placing more material on top of it or whatever.
Q. Now, in connection with the Upper Bayou project, did

Q. Well, have you ever seen a situation where it was literally impossible to construct the size of levee that the Corps wanted -- the Corps of Engineers wanted due to soft foundations?

A. Repeat that.

Q. Have you ever seen a situation where it was literally impossible to construct the size of levee that the Corps of Engineers wanted due to soft foundations?

A. I'll just have to answer that by saying you may have to modify something that you need to do there to get it done.

Q. So, in other words, you wouldn't have a levee quite as high as maybe was originally intended by the designer?

A. Well, you may or may not.

Q. Or you may have to broaden the base of the levee to accomplish what the Corps wants, right?

A. That would be one avenue.

Q. Or you may have to construct a berm to allow some support for the levee, right?

A. That would be a counterbalance, that's another avenue.

Q. Now, did you have any involvement with the Port of Houston Authority in connection with the Upper Bayou project?

A. I guess I'm not clear as to what you're saying. In what manner?

Q. You understand that the Port of Houston Authority

A. I don't have that on top of my head.
Q. Was he the immediate predecessor of Colonel Buechler?
A. No. In fact, I never worked for him my whole tenure here. So, he had to leave before '64.
Q. Okay. Now, if the Corps of Engineers determined that a particular project required, say, a 30-inch dredge, the Corps should indicate that in the bid solicitation; isn't that true?
A. No. If the Corps required a 30-inch dredge? Then if we required a 30-inch dredge, we would solicit that. If we are -- if we are -- and doing a hired plant, so to speak, it would be listed. If we do not, then we would provide a production on most of our maintenance jobs. And it would be the -- the type of equipment basically that comes in is really the responsibility of the contractor in the performance. We just put performance measures in our contracts.
Q. Okay. Do you have any opinion about the MILLENNIUM that Renda Marine owned one way or another?
A. If you're talking about now or then, I think you need to clarify it.
Q. Do you have any opinion about the MILLENNIUM now?
A. No.
Q. Do you have any opinion about the MILLENNIUM then?
A. I think we were concerned at that time, here we had

a new -- basically a new dredging contractor that was having a plant built and we were concerned if he could meet the performance measures. Now, I don't remember what those performance measures are.

Q. Okay.

A. It had to be the length of the contract or we specified a daily production or whatever.

Q. So, that's one reason why the Corps commissioned the pre-award investigation that the Joint Venture undertook, correct?

A. We always do a pre-award investigation and it's generally on past history of the contractor. In this case, we didn't have that past history for the contractor.

Q. Did you personally investigate the construction of the MILLENNIUM at any time?

A. I did.

Q. And what did you do?

A. I was in New Orleans for a meeting, best I can remember and I got -- I think, I met -- I'm trying to remember his first name. Gibbs is his last name.

Q. Gary Gibbs?

A. Gary Gibbs and Eddie Fisher, I believe, and we went over to the site where the MILLENNIUM was being constructed.

Q. Okay. Was that at Red Fox at that time or was it in --

A. I couldn't tell you.

Q. -- LaPlas or Reserve?

A. It was in LaPlas. Over in the LaPlas area. I don't remember the name. But it was before it was --

Q. Assembled?

A. -- commissioned. It was in the process of being assembled.

Q. Okay. And did you formulate any opinions or evaluations at that time?

A. The main purpose is I was over there and we had reports and we were getting reports on the progress. So, it was just -- just went over to basically confirm those reports. And with the experience of Mr. Gibbs, we talked about some of the features that he was recommending putting in and some of the equipment he was putting in and so forth. But there was no -- no opinions of performance or anything at that point in time. Mr. Gibbs at that time was -- was quite -- quite excited about some of the things that it was supposed to do.

Q. Now, did you have people in the New Orleans district help you out in that regard?

A. We may have called the New Orleans district and had them look at it a time or two. I just can't recall. And then we hired -- if you've got evidence of that, I would like to see it.

(Exhibit 5 marked)