Q. (BY MR. ERIKSON) The court reporter has marked for identification as Maurer Exhibit 5 a couple of E-mails. The top one is one from Mr. Rozsypal to Mr. Krueger, March 11, 1999. And the bottom one is from David Pickett of the New Orleans district which sent along a number of photographs. Do you see that?

A. I see that.

Q. Now, this would have been the kind of thing that you would have looked at back around March, 1999, time period?

A. And I couldn't tell you in perspective if this was before my visit or after. But we were -- we were -- yes. We -- Mr. Rozsypal handled this. We were keeping tabs on the construction progress.

Q. Now, who tasked Mr. Rozsypal with overseeing the construction of the MILLENNIUM?

MR. PETTY: Object to the form of the question.

A. At that point in time, Mr. Rozsypal was my assistant as chief of operations. In fact, he was chief -- my chief of navigation branch. And at this point in time, it was his duty, best I can recall, to put all the -- to evaluate all the pre-award information along with the contracting officer.

Q. (BY MR. ERIKSON) Okay. Now, by the time you got done with your investigation, your site visit to Louisiana to look at the construction of the MILLENNIUM, were you satisfied?

A. If you're talking in terms of after we did all our investigations, we were satisfied. We awarded the contract.

Q. Okay. So, you didn't have any concerns that a 24-inch dredge could undertake the new work -- the new work dredging; is that correct?

A. We -- I guess to answer it, it's -- your word "concerns," it's kind of vague. We had satisfied ourself enough in the requirements of the contract, the dredge could perform the work in accordance with what the contractor had submitted. We awarded the -- you know, obviously we awarded the contract.

Q. Now, Mr. Rozsypal, when we took his deposition, said that he did not want Renda to be awarded the contract. Do you recall that?

MR. PETTY: Object to the form of the question.

A. I don't specifically remember him saying that but there was -- there was that through the pre-award -- pre-award period when we was gathering all that information that there was a lot of concerns in the fact that, gee, you didn't -- you had a new plant being built. You had basically an experienced contractor going into the dredging business and then providing new crews with those things. So, there were a lot of concerns that had to be evaluated in this process. I don't recall him specifically saying that but as a result of it all, we awarded the contract. So, those concerns were satisfied in one way or

Renda was wanting a partial termination for convenience on the remaining levees?

A. I read the rest of it. I do not recall offhand. The reason I was looking for the date is because Barbara Watts, small business officer, and so forth. So, I've changed jobs in between here. Because I hired Barbara Watts in the position I'm at now. Whatever that does. I don't remember.

Q. So, this is some time after August, 2000?

A. Yes, sir. I would say so.

Q. Okay. Now, back to the Renda's request for partial termination for convenience. Do you remember Renda requesting a partial termination for convenience for any reason concerning the levees?

A. I vaguely remember the request. I don't recall the reason or the rationale.

Q. Okay. Now, in the past when you've had a project where you ran out of suitable levee construction materials, what would happen?

A. Well, we either investigated and found suitable material to continue on with the job or we modified it in some way that required less material.

Q. Did you ever hold the contractor responsible for there being an insufficient amount of materials to construct the levee?

A. Only if there was waste involved.

the contractor's fault. If, in fact, everything was done properly, then it is probably the foundation's fault.

Q. Now, the Corps has inspectors on site, right?

A. That's correct.

Q. And a part of the on site inspectors responsibility is to document what the contractor is doing on a daily basis, right?

A. Generally has a daily report.

Q. And if there's something that the contractor is doing that deviates from the requirements of the plans and specifications, the on-site inspector would record that, right?

A. If he picks it up, yes.

Q. And it's his job to look for those sorts of things, right?

A. Yes. Yes.

Q. And then if the Corps detects that the contractor is doing something that deviates or violates the plans and specifications, then the Corps should alert the contractor of that, right?

A. Yes.

Q. Now, one reason you want that to happen is that then the contractor could correct the problem and wouldn't be building on something that the Corps deemed deficient, right?

A. That's correct.

CHANGES AND SIGNATURE

WITNESS NAME: HERBIE MAURER DATE OF DEPOSITION: 01/07/04

PAGE LINE CHANGE REASON

PAGE 10-3 CHANGE: MR SUTCLIFFE WAS SR SUPERVISOR OF GEOTECHNICAL PERSONNEL.
REASON: CHANGE IN ORGANIZATIONAL STRUCTURE

PAGE 23 LINE 1
CHANGE: AREA ENGINEER FOR PROJECT WAS MIKE MCCLENAN
REASON: CHANGE IN ORGANIZATIONAL STRUCTURE

PAGE 17 LINE 18
CHANGED: "HELPED" TO "HELD"
REASON: TRANSCRIPTION ERROR

PAGE 19 LINE 13
CHANGED: "OR" TO "ON"
REASON: TYPO

PAGE 22 LINE 19
CHANGED: "WOULD" TO "COULD"
REASON: TYPO

I, HERBIE A. MAURER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Herbie A. Maurer

HERBIE A. MAURER

THE STATE OF Texas )
COUNTY OF Galveston )

Before me, Ruben R. Villagran, on this day personally appeared HERBIE A. MAURER, known to me ~~or proved to me on the oath of~~ ~~or through~~ (~~description of identity card or other document~~) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this 10th day of March, 2004.

Ruben R. Villagran
NOTARY PUBLIC IN AND FOR
THE STATE OF Texas

My Commission Expires:

NOTARY PUBLIC STATE OF TEXAS
RUBEN R. VILLAGRAN
Notary Public, State of Texas
My Commission Expires
January 02, 2005

STATE OF TEXAS
COUNTY OF HARRIS

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF HERBIE A. MAURER

January 7, 2004

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 22nd day of January, 2004.

Stacey Whitley

Stacey Whitley, CSR by Norma Deja
Texas CSR 3999
Expiration: 12/31/2005
ESQUIRE DEPOSITION SERVICES
Firm Registration No.: 03
3401 Louisiana, Suite 300
Houston, Texas 77002
713-524-4600

04-E-58578

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

RENDA MARINE, INC., )
)
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
)
Defendant. )

ORAL DEPOSITION
JOHNNY ROZSYPAL
JANUARY 5, 2004

THE ORIGINAL OF THIS TRANSCRIPT
WILL BE IN THE CUSTODY OF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 800
Dallas, Texas 75201

JOHNNY ROZSYPAL,

having been first duly sworn, testified as follows:

EXAMINATION

Q. (BY MR. ERIKSON) Mr. Rozsypal, my name is Brian Erikson; and I represent Renda Marine in this case.

You understand that, right?

A. Yes.

Q. Okay. If at any time during the course of this deposition I ask you a question and you didn't hear it, you didn't understand it, it was a incomprehensible question -- which may happen -- will you agree to stop me and ask me to repeat or rephrase it?

A. Yes.

Q. Otherwise, if you give an answer, we're going to assume that you understood the question, okay?

A. All right.

Q. Could you state your name for the record?

A. Johnny Rozsypal.

Q. How many years have you been with the Corps of Engineers?

A. A little over 30 years. Going on 31.

Q. What's your educational background, sir?

A. I have a degree from Texas A & M University in 1973 and came to work for the Corps of Engineers in 1973.

Q. And what was your degree from Texas A & M?

A. Agricultural engineering.

Q. Okay. Have you ever sat for the professional engineer exam?

A. No.

Q. Are you a PE?

A. Yes.

Q. Did you get it through what they proverbially call the Grandfather Clause?

A. No. Well, not in my opinion. Based on experience when I applied back in -- and I don't even remember which year -- I think it was 1979 or '80, one could get registered based on experience.

Q. Okay. And that occurred in 1979 or '80?

A. Pretty sure it was '80.

Q. Okay. Now, you are currently the chief of the construction section?

A. Construction branch.

Q. Construction branch. All right. What do you do as chief of the construction branch?

A. Oversee the district's construction program, which would include both vertical construction and dredging.

I have the area offices, or the area engineers work for me.

Q. Okay. What's vertical construction?

A. Building construction. We have a certain amount of

that down in The Valley for what was INS border patrol and now has a different name under Homeland Security.

Q. Okay. Now, when you got your professional registration, did you get it in any particular aspect of engineering?

A. Civil.

Q. Okay. Now, you know that we're here about the Upper Bayou Project, right?

A. Yes.

Q. So, when I talk about "the project," I'm going to be referring to the Upper Bayou Project unless --

A. Right.

Q. -- I designate something else, okay?

First off, how many times have you been deposed before?

A. Three, if I remember correctly.

Q. Okay. What kinds of cases? Very briefly.

A. All of them -- well, let me think a minute -- had to do with contracts with the Corps of Engineers. Just contractual issues and that's it.

Q. Contractors seeking equitable adjustments, that sort of thing?

A. Basically, yes.

Q. Okay. When was the last time you were deposed before today?

Who was the most senior person in the construction and professional services branch back then?

A. The chief of the branch was Dewey Brunt.

Q. How do you spell the last name?

A. B-R-U-N-T.

Q. Okay. And who were Mr. Brunt's grunts, the people that actually did the work?

A. I think it was David Brown at the time.

Q. Okay. Now, based on your 30-plus years of experience with the Corps, the Corps wouldn't knowingly issue a contract to a contractor that the Corps knew was not qualified; isn't that true?

A. If we knew unequivocally, no.

Q. Well, you understand that under the bid solicitation, it says that the Corps will accept bids and then award a contract to the lowest responsible bidder?

A. Right.

Q. So, it's not just the lowest bidder, but it's the lowest responsible bidder?

A. Correct.

Q. So, there is some preaward investigation that the Corps does, right?

A. Yes.

Q. All right. Let me switch gears. Let's talk about Differing Site Conditions. You understand that the bid

solicitation for Upper Bayou Project incorporates, by reference, the standard Federal Acquisition Regulation for Differing Site Conditions?

A. Right.

Q. In your mind, what's the purpose of the Differing Site Condition clause?

A. If conditions differ materially -- or what's encountered -- I'm sorry -- differs materially from what's represented, then there's an avenue for redress by the contractor.

Q. Well, actually it could go both ways, can't it?

A. Yes.

Q. If the conditions are much more favorable, the Corps can turn to the contractor and say, "Now, wait a minute. We've got a Differing Site Condition that favored you. So, we want an equitable adjustment in our favor," right?

A. True.

Q. That doesn't happen very often, though, does it?

A. Not that I know about.

Q. Now, you understand one of the purposes of having a Differing Site Conditions clause is so that the contractors don't insert contingencies about things they don't know about, right?

A. Yes.

Q. Now, how different do things need to be before, in your mind, there would be a Differing Site Condition?

MR. PETTY: Object to the form of the question.

A. That's difficult to answer.

Q. (BY MR. ERIKSON) Case-by-case basis?

A. Yes.

Q. Okay. Now, what's supposed to happen when the contractor encounters what the contractor thinks is a Differing Site Condition? What's the contractor supposed to do?

A. Notify the Government.

Q. In writing? Orally? Daily reports? Does it matter?

A. All of the above, hopefully; but as a minimum, orally. Should follow up in writing in some manner.

Q. Okay. Once there's been notice of a Differing Site Condition, what's the Government supposed to do?

A. Investigate.

Q. How quickly is that supposed to happen?

A. As quickly as possible.

Q. And the Government's supposed to investigate before conditions are disturbed further, right?

A. Correct.

Q. Because the Government may then be able to figure

out how to overcome the Differing Site Condition in one, way, shape, form, or another, right?

A. Yes.

Q. Sometimes you may just simply delete that work because it would be too expensive to overcome the Differing Site Condition, right?

A. Yes.

Q. Or sometimes you may change the design so that there's a no-cost resolution, right?

A. Correct.

MR. ERIKSON: Now, I'm going to get the court reporter to mark this; but I'm going to hang on to it just like Mr. Kosloske hung on to his copy of the project manual.

But we'll mark this as Rozsypal No. 1.

(Exhibit 1 was marked.)

(This exhibit, Rozsypal Exhibit No. 1, was retained by Plaintiff's counsel.)

Q. (BY MR. ERIKSON) Now, Mr. Rozsypal, the court reporter's marked for identification a copy of the project manual containing the specifications and terms and conditions for this contract.

Do you recognize that?

And I'm not going to ask you to go through all the pages. I'll just represent to you that it's listed for who's to vie as the Upper Bayou specifications.

MR. ERIKSON: And I'm going to get the court reporter to mark this as Rozsypal Exhibit No. 2.

(Exhibit 2 was marked.)

(This exhibit, Rozsypal Exhibit No. 2, was retained by Plaintiff's counsel.)

Q. (BY MR. ERIKSON) Do you recognize the drawings for the Upper Bayou Project?

A. Yes.

Q. Okay. Now, essentially that's the bid solicitation package that the contractors get when they want to bid on a project, right?

A. Yes.

Q. Now, as you understand the bidding process, the contractors are not supposed to assume things that aren't in the bid solicitation package, right?

A. Yes.

Q. They're supposed to take the package at face value and submit a price based on what the Government has shown in the bid solicitation package, correct?

A. Correct.

Q. Now, did you happen to attend the pre-bid meeting for the Upper Bayou Project?

A. Yes. I think so.

Q. And you understand the purpose of the pre-bid meeting is to allow contractors to raise questions and voice

Q. Now, you understand that in the drawings -- we'll turn over to C-14. Okay, I got you at Drawing C-14.

As understood, the design intent for the Upper Bayou Project, there was an existing levee; and then a new levee was going to be constructed to the inside of the existing levee around Lost Lake, right?

A. Yes.

Q. And so, when the question comes in, "Why is the levee alignment so far from the perimeter where the foundation is crumby," that would indicate that the new levee was being built inside; and then whoever asked the question, they thought that the foundation would be crumby in there, right?

A. Yes.

Q. Now, did you ever have the opinion that the foundation in the interior of the existing levees was crumby at Lost Lake?

A. Yes.

Q. When did you first form that opinion?

A. When I became the area engineer at the Fort Point area office in 1982, part of my jurisdiction was the Houston Ship Channel. So, I oversaw the raising of the levees at Lost Lake several times from -- between 1982 and 1995, as the area engineer.

Q. Okay. Let's talk about what happened in 1995,

before we move on. Tell me about that raising of the levees. What was that project about?

A. In 1995?

Q. Yes. You said there was a raising of the levees in 1995 that you oversaw.

A. No. Actually what I said was between 1982 and 1995, I was the area engineer and I oversaw the levees in that time frame.

I don't remember, honestly, if there was a job in '95. I'd have to go back and look.

Q. Okay. When the levees were raised at Lost Lake, how do they do it?

MR. PETTY: Object to the form of the question.

A. It depended on whether we had virgin material or not. Sometimes we had virgin material clay from permit activities. If that were the case, then sometimes we would do haul construction.

If not -- and more times than not -- we would cast the levees from -- in from -- with material inside the disposal area draglines.

Q. (BY MR. ERIKSON) You're familiar with the term, "sidecast borrowing"?

A. Yes.

Q. What is a "sidecast borrowing"?

A. We take material from inside the disposal area. Normally it's done with either a dragline or a long-reach backhoe. And typically you're taking material from inside, from one side of your machine, and going to the other side and depositing it in the levee.

Q. Okay. Now, is there any Corps regulation on how close the sidecast borrowing can be to the existing levee?

A. Normally what we used in our spec was 50 foot from the toe of the levee that we were constructing, that application.

Q. Okay. Now, what happens if the contractor gets closer than 50 feet with the sidecast borrowing?

A. Normally we try to not let that occur.

Q. Well, why not? Why do you want them to stay 50 feet away?

A. For the stability of the levee that you're putting in place.

Q. Okay. When you talk about stability, what would happen or what have you seen happen if someone cuts too close to the levee toe of the levee?

A. The levee can fail.

Q. Well, when it fails, does it shear? Or what happens to it? Does it fail in a variety of ways?

A. It can fail in a variety of ways.

Q. But one of the things you're trying to avoid by

keeping the borrowing as far from the toe of the levee as possible is to keep portions of the levee from filling in the area you just borrowed from, right?

A. Yes.

Q. As you put additional weight on the top of the levee, it would tend to force the levee to fill in a borrow area adjacent to the toe; isn't that correct?

A. It could, and/or it could displace material into that borrow area.

Q. Okay. And displacing material, is that like a mudwave?

A. Can be, yes.

Q. For the record, what's a "mudwave"?

A. Typical term that applies to: As the weight of the levee is increased and the foundation beneath that levee is weighted, then if there's any softer material that is -- it's not unlike a surcharge because of the weight -- being applied.

But nevertheless, as the foundation beneath that levee compacts, then the softer materials can be displaced; and they'll create a mud roll to the -- well, to one or both sides, but typically to the side that has less density or is softer material.

Q. Okay. Now, before the Upper Bayou Project, how many times had you been to the Lost Lake levees?

A. (No response.)
Q. Bunch a times? Couple a times?
A. Bunch a times.
Q. And that was because you were the area engineer and you oversaw raising the levees periodically?
A. Correct.
Q. Now, prior to the issuance of the bid solicitation for the Upper Bayou Project, what if any investigation did the Corps do concerning the foundations for where the Corps wanted the new levee at Lost Lake?
A. My understanding is borings to ascertain what the foundation was in an effort to discern what amount of soft material we wanted to displace from old borrow areas because we were looking to accomplish a long-term foundation for the levees at Lost Lake.
Q. Now, we haven't discussed this; but let's get this out of the way: What does Lost Lake do? What's the general intention of this project? Why is there a Lost Lake?
A. Okay. It is a dredge material placement area that is pretty strategic in its location along the Houston Ship Channel in that it's in a reach that we dredge relatively often and we have to have a place to put or place that material and there is not a disposal area above Lost Lake for a significant distance.
I'm trying to remember the next one up, and I

want to say it's -- let me think -- I want to say it's East and West Jones placement areas. But there is a large distance, some 30,000 feet or more, between those two areas.

So, you have a significant volume of material that we have to do -- we have to put somewhere. So, again it's there to receive material dredged from the Houston Ship Channel for a considerable reach.

Q. Now, Upper -- this project is called, "Dredging Upper Bayou, 45-Foot," right?

A. Correct.

Q. How many feet was it before?

A. It was a 40-foot project.

Q. 40 foot. Okay. So, there was an additional 5 feet plus some overdepth that was dredged on the Upper Bayou Project, right?

A. Correct.

Q. And then the channel was also widened, too, right?

A. Correct.

Q. So, the suitable material from that dredging could be used to create the additional levees at Lost Lake, right?

A. Yes.

Q. And that was the whole design intent: You'd get a 45-foot-plus channel, a wider channel; and you'd have additional levees at Lost Lake?

A. Yes.

Q. Who was in charge of determining how many additional borings to get at Lost Lake for the bidding purposes for this project?
A. Again, that would have been our geotechnical section.
Q. Now, how often were the existing levees raised at Lost Lake while you were the area engineer? Was that something that happened every year or every couple of years?
A. A rough order, probably every two to three years.
Q. Now, were they raised because the levee had settled or because you just wanted a higher levee?
A. Primarily because we needed a higher levee. Routinely on our maintenance dredging jobs, we would only go in and raise the levees enough to accommodate that job plus maybe one more. And so, we would have to then come back and raise it again.
So, yes, to accommodate the material we needed to pump in there that time and maybe one other function. To give us a little breathing room, too, for storm events and so on.
Q. How often is the Houston Ship Channel in this area dredged for maintenance purposes?
A. I'd have to go back to the database to get precise, but roughly every two to three years.
Q. And we talk about maintenance material, by and

large that's silt?

A. Depending on where you are in the channel, yes, silt, although this one also has quite a bit of sand in it because of the confluence with the San Jacinto River.

Q. Let me switch gears. At some point prior to today, you've read the plans and you've read the specifications for the Upper Bayou Project, right?

A. Some time ago, yes.

Q. Now, it's expected that there's going to be some debris in the area that's going to be dredged, right?

A. Correct.

Q. Contractors should expect to run into some sorts of debris in the area, right?

A. Yes.

Q. As a matter of fact, I think there's references in either the plans or specs or both that talk about the contractor's going to encounter debris, right?

A. Yes.

Q. Is there anything in the specifications or the drawings that tell the contractor the contractor is going to run into a Conex shipping container?

A. No.

MR. ERIKSON: C-O-N-E-X.

Q. (BY MR. ERIKSON) Were you aware, prior to this project, that there was a Conex shipping container that would

be encountered by the dredge?
A. No.
Q. Now, y'all are aware that the dredge MILLENNIUM hit a Conex shipping container on the Upper Bayou Project, right?
A. Actually, I didn't remember that. I remembered something else, but...
Q. Okay. Do you remember the MILLENNIUM hitting a mooring buoy on this project?
A. Yes.
Q. Do you remember the MILLENNIUM hitting a dredge swivel crane?
A. Swivel... I'm sorry?
Q. Swivel hoist.
A. I think I remember, yes, some term like that, something, you know, with the dredge.
Q. Now, would you agree that there's nothing in either the plans or the specifications that alert the contractor that the contractor might hit a swivel hoist or a mooring buoy?
MR. PETTY: Object to the form of the question.
A. We don't list specific items. What we typically list in there is debris inherent to the dredging process --
Q. (BY MR. ERIKSON) Okay.
A. -- in general terms.

Q. Now, typically what happens if a contractor hits something unusual like a Conex shipping container, the Corps will issue some sort of a modification or enter into another contract to have somebody remove that, right?
A. Right.
Q. Typically, that's not the dredger's responsibility to dredge a Conex shipping container, right?
A. Yes.
Q. You're agreeing with me?
A. I'm agreeing with you.
Q. Okay. And then the same thing with a swivel hoist and a mooring buoy, typically what happens is the Government will either issue a contract modification or another contract for somebody to remove those things, right?
A. Correct.
Q. That's not the dredger's responsibility to remove under a dredging contract; isn't that true?
A. That's right.
Q. Now, are you familiar with the capabilities of the dredge to handle trash, or debris?
A. To an extent, yes.
Q. Do you know whether a dredge should be able to suck up tires or handle tires?
A. Depends on several items: One, the size of the tire; two, the size of the impeller in the pump. So, there's

barge.

Q. Okay. So, you saw pictures of the material that had been -- debris --

A. Correct.

Q. -- that had been taken out of the channel --

A. Correct.

Q. -- and put on a barge?

A. Yes.

Q. Do you have any opinion, one way or another, whether the amount of debris -- and I'm not talking Conex shipping containers or dredge swivel hoists or mooring buoys, but the amount of debris -- that Renda encountered was unusually high?

A. My opinion is that, no, it was not.

Q. Okay. What's your opinion based on?

A. The experience I cited with dredging contracting for quite a few years.

Q. Now, there's concern obstructions that you don't wanted the contractor to move, like riprap, right?

A. Hopefully not, yes.

Q. Because the riprap is generally there serving a purpose, right?

A. Generally.

Q. And one of the purposes is to stabilize the side slope on the channel, right?

A. Normally, correct.

Q. But it's kind of hard to dredge riprap, isn't it?

A. Yes, yes.

Q. As a matter of fact, you don't even want the contractor to dredge riprap, right?

A. Normally you wouldn't.

Q. And you recall in these plans and specifications you attempted to locate where riprap was, right?

A. Yes, with the clarification that up in that area, we also have a lot of broken concrete that is used, perhaps as riprap. But there's quite a bit of that up there, too.

Q. Okay. And if the contractor encountered riprap or broken concrete in areas not shown in the plans or specifications or soil borings, that would be a Differing Site Condition, right?

MR. PETTY: Object to the form of the question.

A. Could -- could very well be, yes.

Q. (BY MR. ERIKSON) Okay. Now, do you remember approximately when the issue of whether or not the claims that were coming from Renda Marine needed to be audited by the Defense Contractors Audit Agency?

A. I don't remember precisely when. I remember that they exceeded a value where -- or a threshold where typically we would do an audit or request an audit from DCAA.

Q. You happen to be the gentleman with the Corps that asked for a DCAA audit, right?

A. I don't recall doing it specifically; but if it exceeded a certain value, I may have very well have made the statement.

MR. ERIKSON: Why don't we get the court reporter to mark this.

(Exhibit 3 was marked.)

Q. (BY MR. ERIKSON) All right. The court reporter's marked for identification as Rozsypal Exhibit 3 a memorandum that it looks like you prepared, dated 4 February 2002, that requests an audit for Renda's claims, right?

A. Yes.

Q. And then you list Claims A through H, and they total something over $17 million, right?

A. Correct.

Q. Now, do you know when Renda first requested that an audit occur in connection with its claims?

A. No.

Q. Do you know why the audit was suggested?

A. We -- again when we exceed a certain threshold, typically we will ask, although -- so, in this case, they did exceed that threshold; so, we requested an audit.

Q. Well, the audit was principally concerned about Renda's overhead rates, right? I mean that's why an audit