was deemed necessary by the Government, right?

A. That's one of the things that an audit will assess or analyze.

Q. Okay. And another thing an audit will look at is to see if the contractor actually incurred the costs to support the claims that the contractor is asserting?

A. It makes an -- it checks the contractor's records to make sure that they have a recordkeeping system that's in accordance with accounting practices that are acceptable, tries to ascertain what factual information is in there.

Q. Now, do you recall getting a response from the Defense Contract Audit Agency?

THE COURT REPORTER: Do you want me to mark that?

MR. ERIKSON: Yes, please.

(Exhibit 4 was marked.)

A. That they would schedule the audit and needed funds to do so to accomplish it.

Q. (BY MR. ERIKSON) Okay. Now, we've marked for identification as Rozsypal Exhibit No. 4 a letter -- or a memo -- dated April 6th, 2002, from William Daneke, D-A-N-E-K-E, branch manager for the Defense Contract Audit Agency.

You recall getting this memorandum, sir?

A. Yes.

Q. It may have gone to you by e-mail. I see your e-mail listed up there.

A. I want to say it did, yes.

Q. Now, do you recall whether or not the DCAA asked for technical assistance from the Corps?

A. They -- if I remember correctly, they asked for a technical analysis, which, normally, we try to provide to the auditors before they do the audit.

MR. ERIKSON: Mark that.

(Exhibit 5 was marked.)

Q. (BY MR. ERIKSON) Now, Rozsypal Exhibit No. 5 is a memorandum, May 2, 2002, from the Defense Contract Audit Agency to you.

Do you recall receiving this?

A. Yes.

Q. And in sum, it asks for some technical assistance concerning some of Renda's claims?

A. Uh-huh. Right.

Q. And another one of the rules for depositions is: You need to say either "Yes" or "No."

A. Yes.

Q. The court reporter has a hard time with "uh-huh's" like that.

Now, did you have any involvement in responding to the DCAA's request for technical assistance?

A. Yes, I had -- well, as I mentioned before, the area office worked for me. So, if I remember correctly, I had them involved somewhat and then one of the construction engineers out of my office, Mike Rawls.

Q. All right. So, did the Corps respond and provide the technical assistance that the DCAA was asking for?

A. I don't remember, as I sit here. I assume we did, but I'd have to go look.

Q. Well, isn't it true that the Corps made the decision that because Renda's claims were in litigation that the Corps was just simply not going to provide any technical assistance to the DCAA?

MR. PETTY: Object to the form of the question.

A. I don't know. I don't think that's the case, but I don't know.

MR. PETTY: I would also object on the exhibit now being marked to any attorney-client privileged information that is included in this. There are apparently some remarks in here attributed to counsels' office here at the Corps, and I would object to those as privileged.

(Exhibit 6 was marked.)

Q. (BY MR. ERIKSON) The court reporter's marked for identification as Rozsypal Exhibit No. 6 a series of e-mails. The top one is from you, dated May 14, 2002, concerning a

call to the auditor.

You see that?

A. Uh-huh, yes.

Q. And bottom line of this series of e-mails is that the Corps decided that the Corps wasn't going to provide the technical assistance that the DCAA was asking for; isn't that true?

MR. PETTY: Object to the form of the question. Object on the basis of privileged.

A. What this indicates is that we perhaps delayed provision of some information until some later date.

Q. (BY MR. ERIKSON) All right. Well, has that later date ever happened? Has the Corps ever provided the technical assistance to the DCAA that the DCAA was asking for?

A. Again I haven't reviewed the file in a long time. I honestly don't remember.

Q. Okay. So, you don't recall one way or another?

A. No. I remember there were conversations between my staff -- in fact, I participated in some -- with the DCAA auditors. There was information conveyed in some of those telephone calls. I don't remember what all was put in writing and sent to them.

Q. Okay. Now, you understand why the DCAA was asking for the technical input from the Corps, right?

financial aspects of the contractor's claims, the DCAA needs to know the facts, also, right?

A. Yes. And help with some of the judgmental issues.

Q. What finally prompted you to request a DCAA audit?

A. In consultation with contracting officer Tom Benero, we had all the claims and mutually decided it was time to request one.

Q. Let me switch gears. Let's talk about the soil borings.

Now, in Exhibit No. 2, Sheet No. C-14, there is an indication of numerous soil borings, right?

A. Yes.

Q. And I don't know if you remember or not, but there is a log that shows -- or a legend that shows what the descriptions of the soil borings mean, in other words, when the soil borings were taken.

A. Yes.

Q. For example, the ones that are indicated, "HA," mean hand augering. And that was done, I believe, in 1964.

A. I know that some of those are not recent.

Q. Okay. And some of them are -- have numbers before it like, "93." So, that would have been done in 1993, right?

A. Yes.

Q. Now, you probably know better than most that a lot of these borings were taken at a time before which a lot of

changes occurred out at Lost Lake, right?
MR. PETTY: Object to the form of the question.
MR. ERIKSON: I'll rephrase the question.
Q. (BY MR. ERIKSON) A boring taken in 1964 would have seen a lot of changes occur thereafter, right?
A. Yes.
Q. And let's take "HA-38." Do you see that right here --
A. Yes.
Q. -- sheet No. 14 of Exhibit 2?
A. Uh-huh, yes.
Q. That particular boring, more than likely, is probably in a place where some of the material had been borrowed to raise the levees in the years after 1964, right?
A. Difficult to say. Just looking at it, physically, here, it's looks like it's some 300 feet away from the levee. So, it might or might not have been. One would just have to really try to analyze whether it was or not.
Q. Well, the only way to analyze whether it was or not would be to go take another boring in the same spot, correct?
A. Yes.
Q. Now, when the Upper Bayou Project was issued for bid solicitations, did you have any idea which of these borings had accurate information and which didn't?

A. No.
Q. Now, the bid solicitation package for Upper Bayou came out in 1998.
You recall?
A. Yes.
Q. I think the bids were opened maybe July of 1998.
Do you recall that?
A. Yes.
Q. So, if you use the two-to-three-year cycle of how often the levees were raised out at Lost Lake, then that would mean that somewhere, '95 '96, the levees would have been raised previously, right?
A. Probably. Wouldn't surprise me.
Q. Now, you would agree that the soil borings that would most likely have the best information would be the newest soil borings, right?
A. Yes.
Q. Because there's less chance of those soil borings having been disturbed by other conditions?
A. Yes.
Q. All right. Let me switch gears -- by the way, are you -- do you consider yourself to be a geotechnical expert?
A. No.
Q. So, if I were to show you soil borings, would you consider yourself qualified to determine whether or not

clay, it's going to be slower going and more expensive than if the contractor hits very soft clay, correct?

A. Yes. Very much so.

Q. Okay. Let me switch gears with you on the Section 7 clay claim. Do you remember Renda made a claim in connection with the Section 7 clay being much stiffer than was represented in the contract?

A. Yes.

Q. Do you know what Renda actually encountered in Section 7?

A. No, I do not.

Q. Okay. Do you have an opinion one way or the other that the Court could use as to whether or not that claim has any merit?

MR. PETTY: Object to the form of the question.

A. No. I mean I didn't see it. I'd have to rely on others.

Q. (BY MR. ERIKSON) Okay. When did you first decide that Renda ought to be terminated for default?

MR. PETTY: Objection to the form of the question.

A. I don't recall the exact date. However, I did formulate that conclusion.

Q. (BY MR. ERIKSON) You were a proponent of Renda

being terminated for default, right?

A. That's correct.

Q. Does that go back to the preaward time when you thought Renda wasn't qualified?

A. That has -- only from the context that what they had asserted they could produce had not occurred.

Q. Well, you'd agree that if Renda ran into Differing Site Conditions, that would be an excuse -- a legal, valid excuse -- for lesser production, right?

A. Depending on the extent of those Differing Site Conditions, yes.

Q. Okay. Now, when Renda submitted its claim for the Differing Site Condition for the flare area, were you involved in preparing a response by the Corps of Engineers to that claim?

A. I don't remember being involved in the early stages. I think I was later.

Q. Well, isn't it true that the Corps never officially responded with the contracting officer's decision to the flare area claim?

A. I thought we responded much later, much after the physical or substantial -- after the dredge left, I thought there was a response; but again, I'd have to go back and look.

Q. You mean after the lawsuit was filed?

Renda had to deem the claims denied because the contracting officer never issued a final decision.

Do you recall that?

A. I want to say I remember something, yes.

Q. And when you read that, did you think, "Gee, that's odd because the contracting officer did issue a final decision"? Or did you agree that that was correct at the time that was written?

A. Again, without going back and looking at all the correspondence, I'm reluctant to say.

Q. Okay. So, you just don't recall one way or the other?

A. Well, I thought we -- that ultimately they had been responded to; but again, I'd have to go and look.

Q. And you think the ultimate response occurred after this lawsuit was filed?

A. Don't honestly -- don't actually know. I think that's right.

Q. Does the Corps have any sort of policy about responding to contractor claims?

A. Normally our policy is, yes, to respond in some kind of timely fashion.

Q. Respond in a timely manner?

A. Right, yes.

Q. Because you understand generally if the contractor

is making a claim, the contractor is incurring extra costs in the contractor's mind, right?

A. Right. And typically, it does not get better with time.

Q. Yeah. Well, I mean the Corps may disagree; but the contractor is contending that the contractor's ox is being gored and that's why the contractor is issuing a claim, right?

A. Yes.

Q. Does the Corps have any sort of either formal or informal policy about how quickly the Corps should respond to the contractor's claims?

A. As soon as possible.

Q. Does the Corps have any sort of policy, either formal or informal, about how quickly the Corps should issue a contract modification if the Corps feels that the contractor's claim has some merit.

A. Again, normally it would be as soon as possible unless there's some other extenuating circumstance.

Q. In connection with the Renda Marine claims, are you aware of any extenuating circumstances that would delay the Corps' response of the claims and the Corps' issuance of the contract modification where the Corps thought that the claim had merit?

A. I do remember that -- just as you pointed out --

there were several. And it seems I remember discussions about them being lumped perhaps and I think that had bearing, too, on ultimately coming up with a response and then at some point, in addition, the Corps counterclaim.

Q. Are you aware of when a counterclaim occurred?

A. My understanding is -- because I saw the letter and I -- again, I assume it went out -- that was to a counterclaim.

Q. Was it supposed to be a counterclaim in the lawsuit that Renda filed?

A. Counterclaim against the lawsuit, yes.

(Recess taken.)

Q. (BY MR. ERIKSON) Now, you recall that in the spring of 2000, the contracting officer issued a Show Cause Notice to Renda Marine concerning why it is that Renda Marine shouldn't be determined at fault in the Upper Bayou Project?

A. Yes.

Q. And you were a proponent for Renda getting terminated for default?

A. Yes.

(Exhibit 7 was marked.)

Q. (BY MR. ERIKSON) Mr. Rozsypal, I've handed you what's been marked for identification as Rozsypal Exhibit No. 7, and it's an e-mail from Tom Benero, dated April 6, 2002, to a variety of people, including you.

Do you see that?

A. Yes.

Q. And it concerns a meeting held with Renda Marine and Renda Marine Surety concerning both the Mouth of the Colorado River Project and the Upper Bayou Project, right?

A. Yes.

Q. And on the Upper Bayou Project, the contracting officer decided to allow Renda Marine to continue working, right?

A. Yes.

Q. Now, Item B under "Upper Bayou" says, "The contractor will be issued a letter detailing what conditions we expect them to meet again, based on their own production schedule, i.e., dredging on a monthly basis the amount of cubic yards they indicated they would dredge as well as building the hydraulic levees at the rate they stated would be built."

Do you see that?

A. Yes.

Q. Did you have any involvement in determining what an appropriate amount of production from the contractor should be?

A. In the context of that B paragraph, no. What I remember is Tom indicated that Renda would be asked what they could accomplish.

Q. Now, were you involved in the meeting that's referenced in the very first paragraph of Exhibit No. 7?

A. I think I was, yes.

Q. Was there a discussion during that meeting about the various Differing Site Conditions that Renda was encountering?

A. I don't remember if there was. There probably was, but I just remember.

Q. That's fine. I'm not asking you to guess at any time.

I think you understand that it was a contractor's position that they would like to have faster production, but they were running into Differing Site Conditions, right?

A. Yes.

Q. And it was the Corps' position that the Corps just wanted the contract done as quickly as possible as per contract plans and specs, right?

A. Yes.

MR. ERIKSON: Would you mark that, please?

THE COURT REPORTER: (Complies.)

(Exhibit 8 was marked.)

Q. (BY MR. ERIKSON) Now, our court reporter has marked for identification as Rozsypal Exhibit No. 8 a series of e-mails. The top one is from you dated Friday, April 7,

know exactly where.

Q. Okay. So, the rest of the proposed hydraulically-constructed levee foundations would be soft?

A. A good chance, especially the north end where the old -- where the spillbox was because typically it would have gotten the majority of the finer-grained materials and --

Q. Okay. Now, was it the intent of the design for the hydraulically-constructed levees, that as heavier materials were pumped to create the levees, it would force the lighter, siltier material out?

A. Yes.

Q. That was the intent?

A. Yes.

Q. Did you talk to anybody who designed the hydraulically-constructed levees to confirm that, or is that just something that you know?

A. I haven't had detailed -- well, actually -- well, I've had conversation with Tim Few about that, that that was our intent, to displace the soft material.

Q. Okay.

A. And in fact, the question you showed me previously from the pre-bid meeting alluded to that.

Q. Okay. So, is it your testimony that it's Tim Few's position that as hydraulically-constructed, suitable materials were placed for the hydraulically-constructed levee

alignment, it would force out the softer materials?

MR. PETTY: Object to the form of the question.

A. I'm not going to speak for Tim Few. I know that's what the Corps listed at the pre-bid meeting as our intent; and that was my understanding of what our intent -- the Corps' or the district's intent -- had been.

Q. (BY MR. ERIKSON) Okay. Would you be surprised to find out that Tim Few said that isn't true, that actually what he intended was a floating levee? Would that surprise you?

A. Yes, it would.

Q. Would you think that that just couldn't possibly be true?

A. Well, I think you'll get some bridging and a certain amount of floating. But I think you'll probably get more displacement than you will bridging.

Q. Now, if you do have displacement of the softer materials, you end up with the mud rolls or mudwaves you were talking about before, right?

A. Usually, yes.

Q. Now, when Affolter went out to do the corrective work under that Goat Island contract, do you know if Affolter ran into the same sort of problems that Renda had in getting the levees to stand up?

A. No, I don't know specifically. I don't.

Q. Do you know whether or not the levees constructed by Affolter under the Goat Island contract are shearing and settling?

A. No, I don't. I haven't been out to look.

Q. All right. Let's look at some photographs. Let me show you Rozsypal Exhibit No. 11. You recognize the gentleman in that picture, right?

A. Yes, I do.

Q. That happens to be Oscar Renda, who is sitting next to me today.

That happens to be some of Affolter's work out at the Lost Lake project. Now, have you seen levees shear shear and fail before?

A. Yes, I have.

Q. Does that levee appear as though it's shearing and failing?

A. It may very well. Again, I would have preferred to look at it. Or I would prefer to look at it, just as Oscar is doing, physically.

But I think I'm seeing a crack, which would suggest that the foundation beyond -- or below it failed.

Q. Well, let's look at Rozsypal Exhibit No. 12. That's another picture of Mr. Renda, and he's standing in a crack.

A. Okay.
Q. Does that indicate the foundation has failed?
A. It usually does, yes.
Q. Are you aware of anything that Affolter did incorrectly when Affolter was doing its work under the Goat Island contract?
A. Not as I sit here, no.
Q. Did the Corps do any testing on the suitability of the materials that Affolter was using to raise the levees that Renda had done?
A. I'm trying to remember. It seems like we did because we did some additional borings after the Renda contract or some additional testing. I don't know if it made it -- made it all in there by the time we put the contract out.
Q. Now, as you understand under the plans and specifications for the Upper Bayou Project for the hydraulically-constructed levees, Renda was supposed to dredge and then send the suitable materials to be placed to build the hydraulically-constructed levees out at Lost Lake, right?
A. All right.
Q. You understand that that was the intent of the design, right?
A. Yes.

A. Right. As there is in Alexander and Spillman disposal areas as well.

Q. Now, before July 1998, when was the last time that Lost Lake had been used as a disposal area?

A. As I indicated earlier, I don't remember. I remember that -- well, rather I think -- I think it was utilized --

Because I remember we had a dewatering contract under, I think, a maintenance contract that T.L. James had. And I say that, I'm trying to remember when the company was sold and all of that; but I remember when Jim Van Norman being involved.

But nevertheless, they hired King Fisher Marine Service to dig some dewatering ditches. But I don't honestly remember, as I sit here -- I'd have to go back and check records -- whether or not we pumped in that site at that time or whether we just did the dewatering in anticipation of another contract.

Q. Now, what was the role of the joint venture?

And you know what I'm talking about when I say, "joint venture," correct?

A. Yes.

Q. For the record, who is the joint venture?

A. The joint venture is the joint venture of Turner Collie & Braden and HVJ Simmons & Associates. And

they are our local sponsor to the Port of Houston's architect engineering contract.

Q. Engineering consultants?

A. Yes.

Q. Okay. And when I talk about the joint venture, that's who I'm talking about, the people you just described, okay?

A. Yeah.

Q. What was the joint venture's role on the Upper Bayou Project?

A. If I remember correctly, there was some -- there was at least dialogue during some of the design, for example, out at Lost Lake. Because ultimately the local sponsor becomes responsible for maintaining the sites after the project is complete.

And then in addition, they were to augment the inspection during the construction -- or augment our inspection during the construction.

Q. And when you say, "augment," what would that be? Provide quality assurance? What?

A. I said, "augment." Yes, to the extent that they have no authority because the contracts are between Renda and the Corps of Engineers. But they were to supplement inspections out there and report to us, report to the area.

Q. By the way, as the local sponsor, the

Port of Houston Authority had some financial contribution for this project, right?

A. Yes.

Q. About 20 percent? Is that the figure?

A. 25 percent. Insofar as, for example, this contract, 25 percent would have been funded by the local sponsor.

And then there's a larger percentage that ultimately is not to exceed 35 percent of the total cost of the project, for example, not just this contract but the project. But that 35 percent includes other things -- lands, right-of-ways, easements, things like that.

But for the contract itself, 25 percent.

Q. Okay. That would be 25 percent of any change orders or modifications in addition, right?

A. Yes.

Q. Are there any change orders or modifications for the Upper Bayou Project that you're aware of that either the joint venture or the Port of Houston Authority said, "Yes, go ahead. We'll pay our 25 percent"? Any change orders that they approved?

A. Well, they don't have approval authority, per se. And as far as I know, the ones that we've paid have included 25 percent of the local funds.

Q. Well, you were a big proponent of keeping joint

venture in the loop to make sure the joint venture knew everything and anything that was going on concerning possible change orders with Renda Marine, right?

A. That's correct.

Q. So, in the keeping of the joint venture in the loop, are you aware of any change orders that the joint venture said, "Yes, go issue the change order. We owe our portion of the money"?

A. With respect to this contract, I don't remember any. They were not supportive, no.

Q. Did you want to default/terminate Renda to set an example for other dredging contractors?

MR. PETTY: Object to the form of the question.

A. No, not -- no, not necessarily.

Q. (BY MR. ERIKSON) Were you worried at any time that the Corps' allowing Renda to continue on the Upper Bayou Project set a bad example for the other dredging contractors --

A. Yes.

Q. -- for the Houston Ship Channel area?

A. Yes, but not just the Houston Ship Channel area.

Q. By the way, was the Port of Houston Authority ever supportive for any contract modifications for Renda Marine, whether it was the Upper Bayou Project or the Lower Bay

Project?

MR. PETTY: Object to the form of the question.

A. Yes. They had been supportive of some. In the last -- you know, in the claims that I've seen from Renda, they were not necessarily -- they were not supportive, no.

I don't know, in the early stages, some of the changes, whether they were or not. I just really wasn't involved.

Q. (BY MR. ERIKSON) So, back to my question: Are you aware of any contract modifications that the Port of Houston Authority actually supported for Renda whether it's on the Upper Bayou Project, the Lower Bay Project, or any other project that Renda was associated with?

A. (No response.)

Q. If there are, I'm going to ask you about the particular change.

A. No, no. Not that I'm aware.

Q. Okay. Now, you would agree that there isn't any reference to the Port of Houston Authority or the joint venture in the plans and specifications for the Upper Bayou Project, right?

A. Yes.

Q. Yes, you'd agree, right?

A. Yes.

partner agreement. Do you know whether that ever occurred?

A. No, I don't. I really don't.

Q. You understand that the project manual, Exhibit No. 1, talks about the contractor visiting the site, pre-bid?

A. Yes.

Q. In your mind, what is a contractor supposed to do during that pre-bid visit?

A. Reasonable site inspection, which, in my opinion would include looking at the dredge disposal area. Perhaps -- in fact, I would highly recommend walking it; perhaps even overflight, with helicopter or otherwise, to get a good idea of what's there. And then looking at the area for other signs of things that one might encounter. For example, we were talking about the spin concrete that's used as riprap and how prevalent that was. Those kinds of things.

The traffic pattern, insofar as ship traffic, barge traffic, recreational traffic -- in addition to perhaps going further and looking for logs or that kind of traffic and previous dredging jobs that occurred in the area to get a good idea of what running time was.

The other thing that a good, physical, reasonable site inspection would pick up on is something I mentioned earlier; and that was that it's a relatively severe or radical curve in the Houston Ship Channel. So, what

you're going to see when ships come through there is that they come through there relatively fast because they have to, to maintain steerage, which would affect your operation of the dredge, the confluence of the San Jacinto River and all that traffic. And then the ferryboat going back and forth across there, all those things would be things that are visible.

Q. So, among other things, you would expect that the contractor would go out and walk the entire perimeter of the existing levee?

A. I would --

Q. Okay.

A. -- and I'd walk inside it, too. Probably do -- in addition to looking at borings that I've got -- I'd probably even do some hand probing just to confirm what's there. Granted -- and to confirm that, yes, it is -- was -- is a previously used dredge disposal area that will have bar pits, that kind of thing.

So, you know, it just confirms the things that are on paper and what I suspect I'm up against.

Q. Did you expect the contractor to go out there with a backhoe or do any excavation, pre-bid?

A. I've seen them do it.

Q. Did you expect the contractor on this project to go out and do any backhoe excavation, pre-bid?

A. Personally, I would not have expected Renda to do it because they employed Eddie Fisher; and he'd been to Lost Lake many times on previous contracts.

Q. Okay. Have you ever gone hunting with Tim LaQuay?

A. No, I haven't.

Q. Have you ever gone hunting or fishing with any other dredging companies or its employees?

A. No.

MR. ERIKSON: All right. What I'd like to do is adjourn the deposition of Mr. Rozsypal -- meaning you're free to go -- and reserving our right to re-question him at some future time and then break for lunch because we need to get ready for Mr. Tim Few this afternoon.

MR. PETTY: That's fine with me.

As I stated earlier, we'll reserve all questioning until later anyways.

MR. ERIKSON: That's fine.

(Proceedings recessed.)

# CHANGES AND SIGNATURE

WITNESS NAME: J. Rozsypal DATE OF DEPOSITION: 5 Jan. 2004

| PAGE LINE | CHANGE | REASON |
|---|---|---|
| 12: 3 | Change "dimensioned" to "diminished" | Transcribed incorrectly |
| 13: 11 | Change "and" to "aspart" | " |
| 13: 16 | Change "that" to "in which" | " |
| 13: 17 | Change "in" to "as to" | " |
| 13: 21 | Change "NC" to "E & C" | " |
| 22: 23 | Change "crumby" to "crummy" | " |
| 23: 12 | " " " | " |
| 23: 16 | " " " | " |
| 24: 20 | Delete ~~Change~~ "from -- in from --" | " |
| 24: 20 | Insert "from" after material | " |
| 24: 21 | Insert "from" after area | " |
| 81: 25 | Delete "and HVJ Simmons and Associates." and replace with ", HVJ, J. Simmons and Associates, and Gahagan & Bryant." | " |
| 82: 1 & 2 | Replace with "they are our local sponsor's (the Port of Houston) architect engineering firm." | " |
| 82: 24 | Add the word "engineer" after area. | " |
| 94: 24 | Delete "parallel slope," and insert "repair of Lost Lake." | " |
| 99: 23 | Delete "go to" and insert "required" | " |
| 100: 15 | Delete "spin" and insert "spent" | " |
| 101: 17 | Remove "bar" and replace with "borrow" | " |

I declare under penalty of perjury that the foregoing is true and correct.

JOHNNY ROZSYPAL

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, by the witness, JOHNNY ROZSYPAL, on this the 17th day of February, 2004.

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

My Commission Expires:

RUBEN R. VILLAGRAN
Notary Public, State of Texas
My Commission Expires
January 02, 2005

STATE OF TEXAS
COUNTY OF HARRIS

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF JOHNNY ROZSYPAL
JANUARY 5, 2004

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 24 day of January, 2004.

Erica M. Davis

Erica Davis, CSR
Texas CSR 6479
Expiration: 12/31/2004
Esquire Deposition Services
3401 Louisiana
Suite 300
Houston, Texas
(713)524-4600