IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REVISED MEMORANDUM OF CONTENTIONS OF FACT AND LAW

Pursuant to ¶ 14(b) of Appendix A and ¶ 5 of the Court's November 4, 2004 Order, defendant, the United States, respectfully submits the following contentions of fact and law:

## I. Nature Of The Case

This case involves claims governed by the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13), arising under Contract No. DACW64-99-C-0001 (the Contract) between plaintiff, Renda Marine, Inc., and the United States, acting through the Army Corps of Engineers, Galveston, Texas District (the Corps), to dredge a reach of the Galveston-Houston Ship Channel known as the Upper Bayou and to construct containment levees and other structures at the Lost Lake Placement Area, a disposal facility for dredged material owned and operated by the Port of Houston Authority. The scope of work under the Contract is referred to in the complaint and other documents as the "Upper Bayou Project." In its most recent statement of damages, plaintiff seeks to recover approximately $13.38 million in the aggregate, based upon differing site conditions allegedly encountered by plaintiff while performing the Upper Bayou Project.

II. Background

A. The Project To Widen And Deepen The Galveston-Houston Navigation Channels

The Upper Bayou Project is part of a larger $500 million project by the Corps, among other things, to widen and deepen the Galveston and Houston Navigation Channels (frequently referred to as the "45-Foot Project") which serves the Port of Houston, in order that ships with larger droughts can have direct access to the Port of Houston. The 45-Foot Project is the largest dredging project in the Western Hemisphere since the construction of the Panama Canal. The 45-Foot Project consisted of eight separate dredging contracts awarded by the Corps' Galveston District, one of which was the Upper Bayou Project.[1/]

B. The Port Of Houston Authority

The Port of Houston Authority (PHA), an agency of the State of Texas, manages the Port of Houston, including disposal sites for dredged material, such as the Lost Lake Placement Area involved in this litigation, which the PHA owns. The PHA is a co-sponsor of the 45-Foot Project. In June 1998, the PHA and the Government entered a "Project Cooperation Agreement" (the Agreement) with respect to the 45-Foot Project in which the PHA assumed responsibility for 25% of the construction costs, including the costs of "general navigational features," such as dredging to deepen and widen the existing Bayou Reach to the authorized depth and width, and directly related costs, including "costs of contract dispute settlements or awards." Agreement, Article I, § B.3, F; Article II, § G.

[1] The other seven dredging projects that made up the 45-Foot Project are the Lower Bay, Mid-Bay, Upper Bay, Lower Bayou, and Mid-Bayou projects.

The Agreement provided for the establishment of a "Project Coordination Team" composed of representatives of the PHA and the Corps to provide general oversight for the project, including recommendations to the Corps' District Engineer upon project matters. Agreement, Article V, §§ A, C, D. However, "[t]he Government, having the legal authority and responsibility for construction of the Project . . . , has the discretion to accept or reject, in whole or in part, the Project Coordination team's recommendations." Id. The PHA's representatives for the Project included the so-called "Joint Venture" (which consisted of two consulting firms, Turner, Collie & Bradon, Inc., and Gahagan & Bryant Associates), and Richard Gorini of the J. Simmons Group, another consultant to the PHA who is a former employee of the PHA.[2] The Agreement also provided that, "[i]n the exercise of their respective rights and obligations under this Agreement, the Government and [the PHA] each act in an independent capacity, and neither is to be considered the officer, agent, or employee of the other." Agreement, Article XII, § A.

Beginning in or about April 1999, pursuant to an agreement between the PHA and the Corps, the Joint Venture provided construction inspection services for the Upper Bayou Project. The records of their inspections included the preparation of periodic "Quality Assurance Reports" that were submitted to the Corps.

C. Renda Marine, Inc.

Renda Marine, Inc. (Renda) is a marine dredging contractor. Renda was formed in May 1998 for the purpose of performing dredging work in and about Texas and along the Gulf Coast.

---

[2] The Project Coordination Team was co-chaired by Dalton Krueger, Project Manager, the Corps, and Richard Gorini, Senior Vice-President, J. Simmons Group. The other members of the Project Coordination Team were: (1) for the Corps, Johnny Rozsypal, C. Michael McClenan, and David Brown, and (2) for the PHA, Ted Walters (a PHA official), Grady Bryant (Gahagan & Bryant Associates), and Alan Jefts (Turner, Collie & Bradon, Inc.).

At all relevant times, Renda's yard was located at Freeport, Texas. Oscar Renda is the President of both Renda and Oscar Renda Contracting, Inc. (OCRI), Roanoke, Texas, near Dallas, Renda's parent company. Rudy Renda, Oscar Renda's brother, is a Vice President of OCRI and, for a time, was an administrative consultant to Renda. Eddie R. Fisher and Steve Bowman were Vice Presidents of Renda. Mr. Bowman also was a Vice President of OCRI.

Mr. Fisher was responsible for the day-to-day operations of Renda, including the Upper Bayou Project, until on or about July 30, 2000, when he resigned from Renda. Mr. Bowman took an active role in Renda's day-to-day operations beginning in May 2000 and, upon Mr. Fisher's resignation, Mr. Bowman assumed responsibility for Renda's day-to-day operations, including the Upper Bayou Project. Mr. Bowman's employment with Renda and OCRI was terminated in October 2001. Renda (Bowman) hired Ben Goodloe in or about late September 2000. Mr. Goodloe became Renda's Project Manager for the Upper Bayou Project.

Initially, Burson Warren was employed by OCRI where he eventually was promoted to the position of Chief Equipment Manager. Mr. Warren was reassigned from OCRI to Renda in May 2000 as its equipment manager, responsible for the maintenance and repair of Renda's equipment, including the dredges owned by Renda. In June 2001, Mr. Warren was reassigned from Renda to OCRI as a Project Superintendent, a position that he has held continuously to the present.

D. Government Administration Of The Upper Bayou Project

The Contracting Officer who awarded the Contract to Renda and who had the authority to issue modifications for any amount, including amounts that exceeded $100,000, was Thomas Benero. At all material times, responsibility for day-to-day administration of the Contract was

delegated to C. Michael McClenan, P.E., the Administrative Contracting Officer (ACO). The ACO was authorized to issue Contract modifications not exceeding $100,000. Mr. McClenan was the head of the Bay Area Office, one of three Area Offices within the Galveston District. The Bay Area Office and Galveston District share the same facilities, i.e., they are co-located.

Mr. McClenan reported to Johnny Rozsypal, Chief of the Galveston District's Construction Branch. Mr. McClenan was assisted in the administration of the Upper Bayou Project by Eric G. Russek, P.E., a Project Engineer in the Bay Area Office. Mr. Russek reported to Mr. McClenan.

III. The Upper Bayou Project

A. The Contract

(1) Dredging

(a) Introduction

The Contract was for Dredging Upper Bayou, a 3.9-mile segment of the Houston Ship Channel from Station (Sta.) 470+00 to Sta. 684+06.58, in Harris/Galveston Counties, Texas,[3] southeast of Houston, Texas. There was an estimated 3,483,000 cubic yards of material to be dredged, which consisted mostly of new (virgin) work. The dredging involved increasing the bottom width and deepening the existing channel to a required depth of 47 feet below Mean Low Tide (MLT). Side and end slopes were to be 3 horizontal to 1 vertical (3H:1V).

The amount of material removed from the within the areas to be dredged and to be paid for was measured by the cubic yard in-place. Contract, § 02482.1.13.1. The measurement was determined from dredging surveys by comparing the before-dredging (BD) volume of material

---

[3] Near the upstream limit, between Sta. 650+00 and 658+00, no dredging was permitted.

within the required dredging prism[4] with the after-dredging (AD) volume of material remaining within the dredging prism. Id. Under the Contract, Renda was paid for dredging work by the cubic yard of excavated material based upon a unit price per cubic yard of dredged material. In addition to payment for material removed to the required bottom depth of -47 feet MLT, the Contract accounted for inaccuracies inherent in the dredging process by measuring and paying Renda at the contractual unit price for material actually removed up to one foot below the required bottom depth, referred to as "allowable overdepth." See Contract, § 02482.3.5.1. No additional compensation was authorized for material removed outside the required side slopes. See Contract § 02482.3.5.2.

For purposes of acceptance of dredging work, the Contract divided the length of the channel into nine sections. Dredge Section 1 began at Sta. 470+00 (the downstream limit of dredging) and Dredge Section 9 ended at Sta. 684+06.58 (the upstream limit of dredging). See Contract Drawings C-2 & C-3.[5]

(b) Character Of Materials: Earth Materials

The Contract contained a "Character of Materials" clause which stated that "[e]xplorations, including core borings, to determine the character of materials to be removed have been made by the Government, and the results are as shown." Contract § 02482.1.11. The soil boring logs were included in the Contract. See Drawings F-1 through F-4.

---

4 The "required dredging prism" refers to the trapezoidal design template for dredging that consisted of a specified depth, width, and side slope within the channel.

5 The stations along the channel are 100 feet apart. To illustrate, the distance between Sta. 470+00 and 480+00 is 1,000 feet. The distance between Sta. 480+50 and 481+25 would be 75 feet.

(c) Character Of Materials: Trash And Debris

The "Character of Materials" clause provided that "[o]ther materials such as scrap, rope, wire cable, snags, and stumps may be encountered within the specified limits of dredging and overdepth dredging," but that "[n]o separage [sic] payment will be made for removal and placement of this debris." Contract § 02482.1.11.1. With respect to "debris," the Contract provided:

> *Prior to dredging, the Contractor shall carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the Contractor deems suitable to locate any debris which may interfere with dredging*. The contractor is cautioned to use extreme care when working in the vicinity of any pipeline or utility crossings. During the progress of the work, the Contractor shall not deposit worn out discharge pipe, wire rope, scrap metal, timbers, or obstructive material in the Placement Areas, or along the banks of navigable waters. Such material, *together with scrap, rope, wire cable, piles, pipe, or other obstructive material which may be encountered during dredging operations*, shall be placed by the Contractor at approved locations.

Contract § 02482.3.4.4.2 (emphases added).

(d) Man-Made Structures

Contract Drawing C-2, Note 4, provided that "[t]he Contractor shall be required to use caution when dredging the side slopes in the channel from Sta. 470+00 to Sta. 473+00, from Sta. 514+00 to Sta. 537+00, and from Sta. 610+00 to Sta. 625+00. See Specifications." The specifications, in turn, provided:

> The Contractor shall be required to use caution when cutting the side slopes in the Channel from Station 470+00 to Station 473+00, from Station 514+00 to Station 537+00, and from Station 610+00 to Station 625+00. *Excessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel.*

Contract, § 02482.3.5.2 (emphasis added).

(2) Levee Construction At Lost Lake Placement Area

Under the Contract, dredged materials were to be transported by pipeline and placed at Lost Lake Placement Area (Lost Lake), a disposal site for dredged material. See Contract Drawing C-14. Lost Lake is a 650-acre island located north of the Houston Ship Channel at approximate Sta. 480+00. There was an existing containment levee around the approximately four-mile perimeter of Lost Lake. New perimeter levees were to be constructed inside the existing levees by two methods, hydraulically and mechanically. Drawing C-14, Note 7, stated that it was "the intent of the plans and specifications that the levees be raised to a minimum crest elevation of +30 feet MLT, with crest width of at least 10 feet, and side slopes no steeper than 1V:3H."

The scope of work for the hydraulically and mechanically constructed levees is addressed at Contract § 02223 ("Retaining Levees") and in notes contained in Drawing C-14.[6] The Contract required that Renda complete construction of a new drop-outlet structure at the northeast corner of Lost Lake, modifications to the existing drop-outlet structure at the northeast corner of Lost Lake, and the mechanically-constructed part of the new levee at Lost Lake prior to placement of the hydraulically-constructed part of the new perimeter levee.

Fill material used for the mechanically-constructed levee was measured and paid by the cubic yard at the unit price per cubic yard bid by Renda, based upon cross sections at the land-based borrow areas from which the fill was obtained. See Contract §§ 02223.1.5.1, 02223.1.6.1. Hydraulic levees were measured and paid by the linear foot of levee constructed based upon the unit price per cubic yard bid by Renda. See Contract §§ 02223.1.5.2, 02223.1.6.2.

---

[6] The results of explorations to determine the character of the earth materials at Lost Lake are contained in soil boring logs. See Contract Drawings F-5 through F-9.

(a) Mechanically-Constructed Levee

The mechanical levees were composed of an estimated quantity of 381,300 cubic yards. The mechanically-constructed levee was to be built along the south perimeter of the Lost Lake from Levee Sta. 97+00 to Sta. 166+00 (6,900 feet or about one-quarter of the length of the new levee) and near the drop-outlet structures. Land-based borrow areas at Lost Lake were furnished by the Government to Renda as the source of material for those purposes. See Contract Drawing C-14. Earth fill materials were to be excavated by draglines, backhoes, or other suitable equipment from the designated land-based borrow areas and transported to the site of the mechanically-constructed levee.

The Contract required that the mechanically-constructed levees be placed in 18" layers ("lifts") of satisfactory materials prior to compaction, except in areas having standing water or soft foundations. In areas with standing water or soft foundations, borrow materials had to be placed in a single lift as required to support the weight of the hauling and compacting equipment.

(b) Hydraulically-Constructed Levees

The Contract required that all parts of the new perimeter levee at Lost Lake, except for the specified mechanically-constructed levee locations discussed above, were to be constructed by the hydraulic placement of satisfactory earth fill materials (medium to hard clay and sands) obtained from the required dredging. See Contract § 02223.1.4.3(2) (as modified by pre-bid Amendment No. 1, ¶ (b)(9)); Drawing C-14, Notes 8 & 9.

The hydraulic levees were to be raised to +20 feet MLT and then dressed up to final lines and grades by mechanical means with material removed from the adjacent existing levee. In that regard, the Contract provided that "[t]he Contractor shall place Hydraulically Constructed Levees

. . . until the entire perimeter levee has been completed to Elevation +20 feet MLT" and that "[t]he Contractor shall not be permitted to grade the area outside the slope of the newly constructed levee until the entire perimeter levee has been completed to Elevation +20 feet MLT." See Contract Section 02223.1.4.3(2),(3) (as modified by Amendment No. 1 to the Solicitation, ¶¶ (b)(9)&(10)). Section 02223.3.1.5 ("Final Grading") similarly provided that "material shall not be removed from the existing levee until the new levee crest exceeds +20 feet MLT around the entire Placement Area." The Contract further provided:

> Satisfactory materials used for Hydraulically Constructed levees shall be obtained from required dredging. The Contractor shall evenly distribute sufficient hydraulic material at all locations along the levee so that the final new levee section can be constructed to the minimum lines and grades. During the shaping process, the material shall be placed using the same lift thickness and compaction requirements as those required for the Mechanically Constructed levees. The Contractor shall excavate material from the adjacent existing levee to the limits shown. The "slope to drain" requirement shall apply to the entire placement area perimeter levee.

Contract Section 02223.3.1.2.

The Contract, Drawing C-14, Note 10, describes the foundation for the new levees (both mechanical and hydraulic) as "very soft to soft dredged material and sand placed in past dredging maintenance cycles" and states that "[i]t is anticipated that very soft to soft foundation material will be displaced by the new levee material." This description of the foundation is consistent with soil boring logs for Lost Lake included in the Contract. See Drawings F-1 through F-4.

This description of the foundation for the levees and the anticipated displacement of the foundation material by the new levee material, moreover, is underscored in the Government's answers to questions by prospective bidders contained in Amendment No. 1 to the Solicitation

for the Upper Bayou Project. In response to the question "How is mining paid?," the Government responded that "[t]he designers believe that there is sufficient new work material available to construct the levees hydraulically where indicated, *even allowing for the soft foundations*, without having to mine." Amendment No. 1, Questions & Answers, Item #5.a, at 2 (emphasis added). In response to the comment "Existing levees in hydraulic constructed levee reach should be raised prior to dredging in order to maintain the required 2-ft of freeboard," the Government stated: "The designers believe a more flexible approach is possible, where the hydraulic dredging can occur to place material to raise the levees while containing the produced fines inside the existing placement area. *This will be the most efficient way to displace the soft foundation material beneath the new levee alignment.*" Amendment No. 1, Questions & Answers, Item #2 under "Drawings," at 3 (emphasis added). In addition, the questions by prospective bidders and answers contain the following exchange:

> *Why is the levee alignment so far from the perimeter where the foundation is crummy? It makes it harder to build on weaker ground.* What's the purpose of leaving a hundred feet, or whatever it is, on the outside where the base is the best?
>
> Answer: The intent of the design is to use the new work material to enhance the long term stability of the levees. *For this reason, the designers intend the new work material to be used to displace the very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material.*

Amendment No. 1, Questions & Answers, Item 6, at p. 4 (emphases added).

(c) <u>The Mining Clause</u>

The Contract contained a "Mining" clause that provided:

> Suitable materials obtained from the required dredging shall be used

> for placement of the Hydraulically Constructed Levees. If, upon completion of required dredging in the Channel reach (or reaches) containing suitable material, sufficient suitable materials are not available to complete the Hydraulically Constructed Levees to the lines and grade specified, the Contractor shall be required to complete the Hydraulically Constructed levees with suitable materials obtained from mining below the Channel template in the reach of Channel as shown.[[7] ] Mining will not be paid at the unit price for "Dredging," but will be measured and paid for as specified in the Paragraphs: MEASUREMENT and PAYMENT above[[8]].

Contract, § 02223.3.1.4.

(3) Contract Performance Time

The Contract required that Renda complete the Upper Bayou Project "not later than 446 calendar days after the date of receipt by it of Notice to Proceed." Contract, § 00820.1(c) (see Amendment No. 0001 dated July 7, 1998, at ¶ 1(b)(2)).

(4) Standard Clauses

The Contract contained numerous standard FAR clauses, including "Differing Site Conditions (APR 1984)," FAR 52.236-2, "Site Investigation and Conditions Affecting the Work (APR 1984)," FAR 52.236-3, and "Pricing of Contract Modifications (DEC 1991)," FAR 252.243-7001 discussed below. See Contract, § 00700, ¶¶ 60, 61, & 92.

B. Renda's Bid For And Award Of The Contract For The Upper Bayou Project

On June 16, 1998, the Corps issued the Solicitation for the Upper Bayou Project contract. Amendment No. 1 to the Solicitation was issued on July 7, 1998. Renda's bid estimate for the

---

[7] Contract Drawing C-3 contained the following note: "If additional material is required for construction of levees, mine Channel from Sta. 470+00 to Sta. 514+00. See Typ. Section Dwg. C-5."

[8] See Contract, §§ 02223.1.5, 02223.1.6.

Upper Bayou Project was prepared by Steve Bowman and Eddie Fisher. Mr. Bowman lacked significant dredging experience. He relied upon Mr. Fisher to prepare the parts of the bid estimate that involved dredging work and the hydraulically-constructed levees at Lost Lake.

Bids for the Upper Bayou Project were opened on July 17, 1998, and Renda was the low bidder, with a bid of $12,526,100. Great Lakes Dredge & Dock Co., a disappointed bidder, protested the award of the Upper Bayou Project to Renda. The protest was denied and, on October 26, 1998, after Renda was permitted by the Contracting Officer to correct a mistake on the unit price for the hydraulic levees bid item, the Contract for the Upper Bayou Project was awarded to Renda.

C. Contract Performance

On November 16, 1998, the Corps issued the Notice to Proceed with the Upper Bayou Project, which Renda received on November 19, 1998. The Contract required that Renda complete the work not later than 446 calendar days after date of receipt of the Notice to Proceed. See Contract, § 00820(c). The original contract completion date, therefore, was February 8, 2000.

Renda subcontracted with Affolter Contracting Co., Inc. (Affolter) for construction of the mechanical levees at Lost Lake (i.e., the south levee). Affolter completed that work in mid-May 1999. Renda, however, did not begin dredging (and, consequently, construction of hydraulic levees at Lost Lake) until September 13, 1999. The reasons for this delay were a delay in the manufacture and delivery to Renda of the dredge that Renda used on the Upper Bayou Project, i.e., the Dredge *Millennium*, Renda's decision to use the *Millennium* on another dredging project (the so-called "Boggy Bayou" or "Mouth-of-the-Colorado" project) before moving it to the Upper Bayou Project, and malfunctioning equipment on the *Millennium*.

As of July 17, 1998, when Renda submitted its bid for the Upper Bayou Project, Renda did not have a dredge that was capable of performing the Upper Bayou Project. Renda had been negotiating with dredge manufacturers to acquire a dredge for several months. On or about July 30, 1998, Renda placed an order with the Dredge Supply Co., Inc., located in Louisiana, for the design and manufacture of a 24" x 24" suction cutterhead dredge that became the *Millennium* and which Renda intended to use for the Upper Bayou Project. The *Millennium* was scheduled to be completed and delivered to Renda by mid-December 1998. In fact, however, the *Millennium* was not completed until April 1999.

When the dredge *Millennium* was delivered, Renda did not take the *Millennium* to the Upper Bayou Project site. Instead, Renda moved the *Millennium* to the site of the Boggy Bayou Project (also referred to as the "Mouth-of-the-Colorado" project), another dredging job awarded by the Corps to Renda. While performing the Boggy Bayou Project, the *Millennium* experienced significant mechanical problems that retarded its progress on that job.[9] Eventually, in the July-August 1999 time frame, Renda moved the *Millennium* from the Boggy Bayou Project (without having completed that project) to its Freeport, Texas facility where it performed repairs and modifications to the *Millennium* in an effort to make the dredge ready to perform the Upper Bayou Project.

Renda moved the dredge *Millennium* to the Upper Bayou Project site in September 1999 and began dredging on September 13, 1999. Dredging operations continued until April 2001 as of which time the *Millennium* was dredging in Dredge Section 9, the only unfinished dredging

---

[9] Renda subsequently sued Dredge Supply Co., Inc., the manufacturer of the *Millennium*, in Federal district court, seeking compensation for alleged design defects in the *Millennium*.

acceptance section, and Renda had not completed construction of the west and north hydraulic levees at Lost Lake.

On May 4, 2001, pursuant to a bilateral modification, dredging under the Contract was suspended for a period of 60 days to allow Renda to use the dredge *Millennium* to perform a private dredging job in the vicinity of the Upper Bayou Project that would be a source of suitable material for construction of hydraulic levees at Lost Lake. See Contract Modification P00026 dated May 4, 2001. This contract modification provided that the suspension of dredging work on the Upper Bayou Project was "contingent upon the Contractor placing approximately 250,000 cubic yards of virgin material that the Contractor will be dredging from private sources and hydraulically placing it into the new levee template between levee Stations 200+00 and 215+00 in the Lost Lake Placement Area," that the modification was "for time only," and that "[t]he completed and accepted levees constructed within this time suspension in accordance with the contract specifications and the attached sketch shall be paid at the contract price of $100 per cubic yard." Id.

On June 1, 2001, the Corps notified Renda that the unfinished part of the dredging work under the Contract would be deleted from the Contract. This decision is reflected in unilateral Contract Modification P00028 dated September 18, 2001, issued by the Contracting Officer, Thomas Benero. That modification also deleted from the Contract the unfinished parts of the levee construction work, i.e., construction of the west and north hydraulic levees at Lost Lake.

Renda submitted the eight certified claims in this litigation to the Contracting Officer during March-October 2001. The litigation, which is an appeal from the "deemed denial" by the Contracting Officer of Renda's claims, pursuant to 41 U.S.C. § 605(c)(5) (2000), was instituted

in April 2002.

IV. The Differing Site Conditions Clause

A. Introduction

The Contract in this case contained the standard Differing Site Conditions clause. This clause provides for an equitable adjustment of the contract price or time required for performance of the work for "(1) subsurface or latent physical conditions at the site which differ materially from those indicated in the contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." See FAR 52.236-2, "Differing Site Conditions" (APR 1984) (Contract Section 00700, ¶ 60).

The purpose of the Differing Site Conditions clause is "to shift the risk of adverse sub-surface or latent physical conditions from the contractor, who normally bears such risk under a fixed-price contract, to the government." Olympus Corp. v. United States, 98 F.3d 1314, 1316 (Fed. Cir. 1996). The object of the clause is "to take at least some of the gamble on subsurface conditions out of bidding." Foster Construction C.A. & Williams Brothers Co. v. United States, 193 Ct. Cl. 587, 613-14, 435 F.2d 873, 887 (1970); see also H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1343 (Fed. Cir. 1998) ("The purpose of the Differing Site Conditions clause is to allow contractors to submit more accurate bids by eliminating the need for contractors to inflate their bids to account for contingencies that may not occur.").

Although "the Differing Site Conditions clause is a risk-shifting device, it does not . . . shift the risk of all unanticipated adverse site conditions from the contractor to the government." Olympus, 98 F.3d at 1317. This clause and its predecessor, the Changed Conditions clause,

"have only been applied to conditions existing when a contract was executed, not to those that developed during performance." Id. The Differing Site Conditions clause, thus, applies "only to conditions existing at the time of contracting." Id. at 1318; accord Fru-Con Construction Corp. v. United States, 43 Fed. Cl. 306, 317 (1999) (Differing Site Conditions clause "strictly limited to those physical conditions present at the time of contracting"), aff'd, 250 F.3d 762 (Fed. Cir. 2000) (Table).

B. The Notice Requirement

The Differing Site Conditions clause provides that, when the contractor encounters what it believes is a differing site condition, the contractor "shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer . . . ." FAR 52.236-2(a) (Contract, §00700, ¶ 60). While the notice need not be any particular form, it must be sufficient to inform the Government of the facts surrounding the claim. Engineered Maintenance Services, Inc. v. United States, 55 Fed. Cl. 637, 641 (2003). "Mere notice that the contractor encountered a 'condition' falls short of the contractual requirement that the contractor notify the Government that it considered the condition to be a 'differing site condition.'" Id. at 641-42. It has been held, however, that the failure of a contractor to provide such written notice will not defeat a differing site conditions claim if the Government otherwise had actual notice of the condition and had the opportunity to investigate the condition before it was disturbed and order alternative corrective action. See Hoel Steffen Construction, Inc. v. United States, 197 Ct. Cl. 561, 573, 456 F.2d 760, 767-68 (1972); Engineered Maintenance Services, 55 Fed. Cl. at 642; C & L Construction Co., Inc., ASBCA Nos. 22993, 23040, 81-1 BCA ¶ 14,943, at 73,962-63.

C. The Elements Of A Type I Differing Site Condition

To prevail upon a Type I differing site condition claim, a contractor, such as Renda, must demonstrate six "indispensable elements:"

> 1. The contract documents must have affirmatively represented or indicated the subsurface conditions upon which the claim is based.
>
> 2. The contractor must have acted as a reasonably prudent contractor in interpreting the contract documents and related pre-award data.
>
> 3. The contractor must have reasonably relied upon the representations or indications of subsurface conditions in the contract documents.
>
> 4. The subsurface conditions encountered during contract performance must have differed materially from the subsurface conditions represented or indicated by the contract documents or related pre-award data.
>
> 5. The subsurface conditions encountered during contract performance must have been reasonably unforeseeable based upon the information available to the contractor at the time of bidding.
>
> 6. The contractor's claimed excess costs must be solely attributable to the materially different subsurface condition within the contract site.

Weeks Dredging & Contracting, Inc. v. United States, 13 Cl. Ct. 193, 218 (1987), aff'd, 861 F.2d 728 (Fed. Cir. 1988).

Element #1: Contract Indications

A contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be. Comtrol, Inc. v. United States, 294 F.3d 1357, 1363 (Fed. Cir. 2002); H.B. Mac, 153 F.3d at 1345. There must be "reasonably

plain or positive indications in the bid information or contract documents that [the] subsurface conditions would be otherwise than as actually found in contract performance, or to view the other side of the coin, that there were such indications which induced reasonable reliance by the successful bidder that subsurface conditions would be more favorable than those encountered." Pacific Alaska Contractors, Inc. v. United States, 193 Ct. Cl. 850, 869, 436 F.2d 461, 469 (1971). A Type I differing site condition cannot be demonstrated, therefore, where "the plans and specifications do not 'show' or 'indicate' anything about the alleged unforeseen condition, i.e., if they say 'nothing one way or the other about [the subsurface condition].'" United Contractors v. United States, 177 Ct. Cl. 151, 161, 368 F.2d 585, 595 (1971) (quoting Ragonese v. United States, 128 Ct. Cl. 156, 159, 120 F.Supp. 768, 769 (1954)).

What is "indicated" by contract documents "is a matter of contract interpretation and thus presents a question of law" to be decided by the Court. P.J. Maffei Building Wrecking Corp. v. United States, 732 F.2d 913, 916 (Fed. Cir. 1984); accord Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed. Cir. 2001) ("Determining what the contract indicated is a task of contract interpretation that this court performs de novo."); Foster Construction, 193 Ct. Cl. at 602, 435 F.2d at 880 ("The issue of the indications in the contract is one of law for decision by the tribunal, not an issue of fact to be proven by a preponderance of expert testimony[.]").

A "proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents." Randa/Madison, 239 F.3d at 1274 (quoting P.J. Maffei, 732 F.2d at 917). The phrase "contract documents" includes "not only the bidding documents (Invitation for Bids, drawings, specifications and other documents physically furnished to bidders) but doc-

uments and materials mentioned in the bidding documents as well." McCormick Construction Co., Inc. v. United States, 18 Cl. Ct. 259, 263 (1989), aff'd, 907 F.2d 159 (Fed. Cir. 1990) (Table). Summaries of minutes of pre-bid conferences that the Government distributes to bidders are contract documents. Goss Fire Protection, Inc., DOTBCA No. 2782, 97-1 BCA ¶ 28,853.

Element #2: Reasonableness Of Contractor's Interpretation Of Contract Documents

The "knowledge imputed to a contractor is the understanding that a reasonably competent bidder would have from reading the contract documents." Pleasant Excavating Co. v. United States, 229 Ct. Cl. 654, 656 (1981). Contractors are "presumed to understand the complexities of their undertakings" and they are "bound by any information contained in bidding materials, whether they read them or not." Id. at 658. A "contractor who submits his bid without reading all of the specifications does so at his peril." Dale Ingram, Inc. v. United States, 201 Ct. Cl. 56, 70, 475 F.2d 1177, 1184 (1973).

A contractor must have acted as a reasonably prudent contractor in interpreting contract documents. Youngdale & Sons Construction Co. v. United States, 27 Fed. Cl. 516, 532, 534 (1993). Where the bid documents contain or refer bidders to boring logs, the contractor is "held to the standard of a reasonably prudent contractor in deciphering the meaning of such logs." Id. at 534.

Element #3: Reasonable Reliance Upon Contract Indications Of Subsurface Conditions

A "crucial element" of a differing site conditions claim is reliance: "To prevail on a differing site conditions claim, the contractor must show reliance on the representations in the contract." Comtrol, 294 F.3d at 1363; accord Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed. Cir. 1987) ("The contractor . . . must show that it reasonably relied

upon its interpretation of the contract and contract-related documents . . ."); Fru-Con, 43 Fed. Cl. at 321 ("A Type I differing site conditions claim is intended to compensate a contractor that, in good faith, relies upon the available information to its detriment.").

Element #4: Material Difference Between Conditions Encountered And Indicated

The subsurface conditions actually encountered by the contractor at the contract site must have differed materially from the subsurface conditions indicated by the contract documents for the same site area. Youngdale, 27 Fed. Cl. at 535. What conditions actually were encountered is a question of fact. Arundel Corp. v. United States, 207 Ct. Cl. 84, 105, 515 F.2d 1116, 1123 (1975). Typically, a material difference is demonstrated by evidence of a larger amount of work than initially contemplated or that an alternative method of workmanship was required to complete the contract. McCormick, 18 Cl. Ct. at 263.

In evaluating whether the conditions actually encountered by a contractor differ materially from the conditions indicated by the contract documents, the proper comparison is between *contract site* conditions indicated and *contract site* conditions encountered. Proof of a material difference requires "a comparison of the subsurface conditions, both estimated and actual, contained within the *precise work site as defined in the parties' contract* . . . ." Weeks Dredging, 13 Cl. Ct. at 228 (emphasis added).

Element #5: Reasonably Unforeseeable Conditions

The actual subsurface conditions encountered must have been reasonably unforeseeable based upon all information available to the contractor at the time of bidding. Stuyvesant Dredging, 834 F.2d at 1581; United Contractors, 177 Ct. Cl. at 168, 368 F.2d at 594. The Court "looks generally to the information which the contractor possessed or was available to the contractor at

the time of bidding in determining whether the encountered subsurface conditions would have been clearly foreseeable." Youngdale, 27 Fed. Cl. at 535.

Where, as in this case, the Contract contains the standard clause "Site Investigation and Conditions Affecting the Work (APR 1984)," FAR 52.236-3,[10] the contractor is "charged with knowledge of the conditions that a pre-bid site visit would have revealed." H.B. Mac, 153 F.3d at 1346; accord Ambrose-Augusterfer Corp. v. United States, 184 Ct. Cl. 18, 36, 394 F.2d 536, 546 (1968) (contractor bound by what it would have discovered if it had adequately investigated the site); S.S. Mullen, Inc. v. United States, 182 Ct. Cl. 1, 9, 389 F.2d 390, 393 (1968) (where contractor made no actual site investigation with respect to its intended use of a tramway to perform contract, contractor was "bound by what it would have discovered if it had investigated").

Element #6: Nexus Between Differing Site Condition And Increased Performance Costs

A contractor "must demonstrate that the increased costs of performance "are attributable entirely to the materially different subsurface condition." Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 94 (1989). Thus, "expenses which a contractor would have been required to expend anyway had no [differing site condition] occurred are not recoverable as part of an equitable adjustment." Dale Ingram, 201 Ct. Cl. at 71, 475 F.2d at 1185.

D. Type II Differing Site Condition

A "Type II differing site condition exists when the conditions at the site differ from those normally encountered." Fru-Con, 43 Fed. Cl. at 321. Renda "must demonstrate that the physical

---

[10] The Site Investigation clause provides, in part, that "[t]he Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost . . . ." See Contract, § 00700, ¶ 61.

condition it experienced was unknown, unusual, and "differed materially from [those] conditions ordinarily encountered and generally recognized as inhering in the work of the character provided for in this contract.'" Id. The "unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience if any, as a contractor in the area." Randa/Madison, 239 F.3d at 1276 (quoting Perini Corp. v. United States, 180 Ct. Cl. 768, 780, 381 F.2d 403, 410 (1967)). "The applicable standard with regard to a Type II differing site conditions claim is 'that of a reasonably intelligent and experienced contractor with construction experience' in the area and type of work 'who reviewed the contract documents and made a site investigation.'" Fru-Con, 43 Fed. Cl. at 321 (quoting J. Lawson Jones Construction Co., ENGBCA No. 4363, 86-1 BCA ¶ 18,719, at 94,172).[11/]

A contractor seeking to establish a Type II differing site condition "is confronted with a relatively heavy burden of proof" because, under Type II, the Government has not represented the subsurface conditions, "with the result that the claimant must demonstrate that he has encountered something materially different from the 'known' and the 'usual.'" Charles T. Parker Construction Co. v. United States, 193 Ct. Cl. 320, 333, 433 F.2d 771, 778 (1970). "This is necessarily a stiffer test because of the wide variety of materials ordinarily encountered when excavating the earth's crust." 193 Ct. Cl. at 333-34, 433 F.2d at 778. A Type II differing site condi-

[11] As in the case of a Type I differing site conditions claim, to succeed with a Type II claim, the contractor must have made an adequate investigation of conditions at the contract site and is charged with knowledge of any facts that such an investigation would have revealed. See S.T.G. Construction Co., Inc. v. United States, 157 Ct. Cl. 409, 415-16 (1962) (existence of a layer of hardpan, rock, gravel, and clay just below the surface of the bottom of the harbor was "common knowledge" available to contractor through simple inquiry).

tion is more readily found where "the contractor encounters an artificial or man-made obstruction, totally unexpected by both parties." Id. at n. 16.

V. Damages

A. General Principles

To "receive an equitable adjustment from the Government, a contractor must show three necessary elements – liability, causation, and resultant injury." Servidone Construction Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991) (citing Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965)). The contractor "bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount will be more than mere speculation." Willems Industries, Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961), cert. denied, 370 U.S. 903 (1962). The measure of the amount of an equitable adjustment under the Differing Site Conditions clause is "the difference between what it cost to do the work and what it would have cost if the unforeseen conditions had not been encountered." Tobin Quarries, Inc. v. United States, 114 Ct. Cl. 286, 334, 84 F.Supp. 1021, 1023 (1949).

B. Total Cost Method

Under the total cost method, "the measure of damages is the difference between the actual cost of the contract and the contractor's bid." Raytheon Co. v. White, 305 F.3d 1354, 1365 (Fed. Cir. 2002); see also Miller Elevator Co., Inc. v. United States, 30 Fed. Cl. 662, 705 (total cost method "calculates the monetary difference between the amount of costs anticipated in the bid price from the actual costs of performance plus profit."), appeal dismissed, 36 F.3d 1111 (Fed. Cir. 1994) (Table). "The total cost method of recovery is not favored and will not be used if . .

. there is another, more reliable method available by which to establish the contractor's damages." Hi-Shear Technology Corp. v. United States, 356 F.3d 1372, 1383 (Fed. Cir. 2004). "In any event, before a contractor can obtain the benefit of the total cost method, it must prove: (1) the impracticability of proving its actual losses directly; (2) the reasonableness of its bid; (3) the reasonableness of its actual costs; and (4) lack of responsibility for its added costs." Id.

The "modified total cost method" is "the total cost method adjusted for any deficiencies in the contractor's proof in satisfying the requirements of the total cost method." Propellex Corp. v. Brownlee, 342 F.3d 1335, 1339 (Fed. Cir. 2003)). When a contractor uses a modified total cost method to demonstrate its losses, it "still has the burden of proving the four requirements for a total cost recovery . . . ." Id. "The modified method simply [is] a way of easing that burden somewhat." Id.

Where "it is impractical for a contractor to prove its actual costs because it failed to keep accurate records, when such records could have been kept, and where the contractor does not provide a legitimate reason for its failure to keep the records, the total cost method of recovery is not available to the contractor." Propellex, 342 F.3d at 1342; see also Circle, Inc., ENGBCA No. 6048, 95-1 BCA ¶ 27,568 ("Where a litigant seeking to recover under a 'total cost' approach has failed to maintain and offer accurate cost records, which should be prepared in accordance with a normal accounting procedures and which would help substantiate the claim, courts and boards have been generally unwilling to adopt the total cost method.").

As noted above, a contractor seeking to use the total cost method of calculating damages must establish, among other things, the reasonableness of its bid. In Youngdale, the contractor failed to demonstrate with any degree of specificity how it developed its bid estimate. 27 Fed.

Cl. at 543. The only documentary evidence offered by the contractor to prove that its bid was reasonable was a summary bid sheet without the supporting detail sheets used at the time the bid estimate was prepared. Id. Under those circumstances, and absent any other testimony regarding what would have been a reasonable bid, the court concluded that "an average of the government's estimate and the 11 other bids would be the appropriate method for calculating the fairest basis by which to compare the reasonableness of [the contractor's] increased costs (bid)." Id.

C. Equipment Costs

The Contract contained FAR 252.243-7001 ("Pricing of Contract Modifications (DEC 1991)"), which provides that, "[w]hen costs are a factor in any price adjustment under this contract, the principles and procedures in FAR Part 31 and DFARS Part 231, in effect on the date of this contract, apply." Contract, § 00700, ¶ 92. FAR 31.105(d)(2) in effect on October 26, 1998 – the date of award of the Contract – provided, with respect to "construction equipment" (including marine equipment) owned or controlled by the contractor:

> (i) Allowable ownership and operating costs shall be determined as follows:
>
> (A) Actual cost data shall be used when such data can be determined for both ownership and operating costs for each piece of equipment, or groups of similar serial or series equipment, from the contractor's accounting records. When such costs cannot be so determined, the contracting agency may specify the use of a particular schedule of predetermined rates or any part thereof to determine ownership and operating costs of construction equipment . . . .
>
> (B) Predetermined schedules of construction equipment use rates (e.g., the Construction Equipment Ownership and Operating Expense Schedule published by the U.S. Army Corps of Engineers . . . . ) provide average ownership and operating rates for construction equipment. The allowance for ownership costs should include the cost of depreciation and may include facilities capital cost of money.

> The allowance for operating costs may include costs for such items as fuel, filters, oil, and grease; servicing, repairs, and maintenance; and tire wear and repair. Costs of labor, mobilization, demobilization, overhead, and profit are generally not reflected in schedules, and separate consideration may be necessary.
>
> (C) When a schedule of predetermined use rates for construction equipment is used to determine direct costs, all costs of equipment that are included in the cost allowances provided by the schedule shall be identified and eliminated from the contractor's other direct and indirect costs charged to the contract. . . . In periods of suspension of work pursuant to a contract clause, the allowance for equipment ownership shall not exceed an amount for standby cost as determined by the schedule or contract provision.

48 C.F.R. 31.105(d)(2) (1998); see also Neal & Co., Inc. v. United States, 17 Cl. Ct. 511, 519 (1989) ("In the absence of actual cost data, schedules of construction equipment use rates apply," citing FAR 31.105(d)(2)(i)(A)).[12]

The Contract in the present case contained the clause "Equipment Ownership and Operating Expense Schedule (MAR 1995) (EFARS 52.231-5000)," which provided, with respect to

---

[12] FAR 31.205(d)(2)(i) essentially codifies the case law concerning recovery of construction equipment ownership and operating expense under Government contracts. In L.L. Hall Construction Co. v. United States, 177 Ct. Cl. 870, 885 (1966), the Court of Claims held that the primary evidence of a contractor's equipment costs is its "actual, booked costs." Accord Weaver v. United States, 209 Ct. Cl. 714, 715 (1976). A contractor may not use secondary evidence, e.g., equipment rental or ownership rates schedules, to establish equipment costs unless it proves that its actual, booked costs are unavailable, inadequate, or do not fairly represent the full costs rightly attributable to the particular contract, *unless the contract provides otherwise*. Meva Corp. v. United States, 206 Ct. Cl. 203, 221 & n.10a, 511 F.2d 548, 559 (1975); L.L. Hall, 177 Ct. Cl. at 885. When the contract permits a contractor to use a specified equipment ownership expense schedule to establish equipment costs, the fair and reasonable measure of damages for equipment owned by the contractor is the formula set forth in the schedule applied to the *acquisition* cost for each piece of equipment at issue. Weaver, 209 Ct. Cl. at 715; Cornell Wrecking Co. v. United States, 184 Ct. Cl. 289, 291 (1968); L.L Hall, 177 Ct. Cl. at 886. Where a contractor is allowed to resort to secondary evidence to establish equipment costs, the contractor may not do so by reference to rental rates schedules unless the contractor is in the business of leasing or distributing equipment. Bennett v. United States, 178 Ct. Cl. 61, 67, 371 F.2d 859, 862 (1967).

expenses for equipment owned by Renda:

> Allowable cost for construction and marine plant and equipment in sound and workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region VI. Working conditions shall be considered to be average for determining equipment rates using the schedule unless specified otherwise by the contracting officer. For equipment not included in the schedule, rates for comparable pieces of equipment may be used or a rate may be developed using the formula provided in the schedule.

Contract, § 00800, ¶ 7. This clause further provided that, "[f]or retroactive pricing, the schedule in effect at the time the work was performed shall apply." Id. The ownership and operating expense schedule in effect during Renda's performance of the Upper Bayou Project is the June 1999 version of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region VI.[13]

D. Claim Preparation Costs

As noted above, the Contract contained FAR 252.243-7001 ("Pricing of Contract Modifications (DEC 1991)"), which provides that, "[w]hen costs are a factor in any price adjustment under this contract, the principles and procedures in FAR Part 31 and DFARS Part 231, in effect

[13] The only part of the Upper Bayou Project performed prior to June 1999 was the mechanically-constructed levees at Lost Lake, which Renda's subcontractor, Affolter, completed in May 1999. None of Renda's claims is concerned with or seeks additional compensation for any of that work. Renda's equitable adjustment claims involve dredging and the construction of that part of the Lost Lake levees to be built by hydraulically-placed, i.e., dredged, fill material. Renda did not start dredging until September 1999.

on the date of this contract, apply." Contract, § 00700, ¶ 92. FAR 31.205-33(b) ("Professional and consultant service costs") in effect on October 26, 1998 – the date of award of the Contract – provided that "[c]osts of professional and consultant services are allowable subject to this paragraph and paragraphs (c) through (f) of this subsection when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Government (but see 31.205-30 and 31.205-47)." Subsection (f)(1) of FAR 31.205-47 ("Costs related to legal and other proceedings") provides that "[c]osts not covered elsewhere in this subsection are unallowable if incurred in connection with . . . the prosecution of claims or appeals against the Government (see 33.201)." "Costs" are defined to include "the costs of the services of accountants, consultants, or others retained by the contractor to assist it." Id. at subsection (a).

A "legal, accounting, or consulting cost incurred in connection with the prosecution of a [Contract Disputes Act (CDA)] claim or an appeal against the Government is *per se* unallowable." Bill Strong Enterprises, Inc. v. Shannon, 49 F.3d 1541, 1549 (Fed. Cir. 1995); accord Plano Builders Corp. v. United States, 40 Fed. Cl. 635, 638 (1998) ("[T]he reference in FAR 31.205-47(f) to 'the prosecution of claims . . . against the Government" covers CDA claims, and the prosecution of a CDA claim includes the contractor's submission of the claim to the contracting officer for a final decision."). The phrase "in connection with" "broadens the scope of FAR 31.205-47(f) so as to encompass consulting fees that are merely associated with or related to the prosecution of a CDA claim." Plano Builders, 40 Fed. Cl. at 638.

In Bill Strong, the Federal Circuit identified three categories of legal, accounting, and consultant costs in the contract cost principles: "(1) costs incurred in connection with the work performance of a contract; (2) costs incurred in connection with the administration of a contract;

and (3) costs incurred in connection with the prosecution of a CDA claim." The court held that "costs that fall within the first and second categories are presumptively allowable if they are also reasonable and allocable." Id. The court further explained that

> [i]n classifying a particular cost as either a contract administration cost or a cost incidental to the prosecution of a claim, contracting officers, the Board, and courts should examine the objective reason why the contractor incurred the cost. If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should normally be a contract administration cost allowable under FAR 31.205-33, even if negotiation eventually fails and a CDA claim is later submitted. On the other hand, if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable under FAR 31.205-33.

Id. at 1550 (citations omitted).

VI. Renda's Claims

A. South Ferry Landing Claim

Renda alleges that, while operating in the vicinity of the South Ferry Landing (which is in Dredge Section 1) on April 14, 2000, during April 21-23, 2000, and during April 30-May 3, 2000, the dredge *Millennium* "encountered rubble (primarily man-made erosion protection stone, concrete and steel)," which Renda asserts constitutes either a Type I or Type II differing site condition. Pl. Mem. 5; see also Compl. ¶¶ 24-29.[14/] Renda seeks $947,054 for loss-of-productivity and repairs to the *Millennium* and a time extension of 18 calendar days.

---

[14] "Pl. Mem. ____" refers to the referenced page(s) of "Plaintiff's Memorandum of Contentions of Fact and Law" filed on January 12, 2005; "Compl. ¶ ____" refers to the referenced paragraph(s) of the "Complaint" in this case filed on April 11, 2002.

Government's Position:

Renda did not provide the Corps with timely notice of the alleged differing site condition. The first note in Renda's daily dredging reports of any rocks or rip rap encountered by the *Millennium* at the South Ferry Landing appears in Renda's report for April 22, 2000. The daily report for April 23, 2000, contains the statement that, during a telephone call on that date with ACO McClenan, Renda's Project Engineer (Leo Herrera) indicated that, because of "too much down time" due to "rocks and rip rap" at the South Ferry Landing, Renda moved the Millennium away from that location.

Renda cannot demonstrate a Type I differing site condition claim. *First*, the contract documents do not affirmatively represent or indicate that the contract site would not contain the rubble allegedly encountered by the *Millennium* at the South Ferry Landing while dredging.

*Second*, Renda cannot demonstrate reliance at time of bid, let alone reasonable reliance, upon its interpretation of the contract documents. Eddie Fisher, who prepared the dredging part of Renda's bid estimate, anticipated the presence of trash and debris, including rip rap, in the vicinity of the South Ferry Landing. Mr. Fisher's assumption was quite reasonable, given the commercial and urban marine setting of the Upper Bayou Contract. See Gulf Coast Trailing Co., ENGBCA No. 6050, 96-1 BCA ¶ 28,217, at 140,883 ("The contract project area is an old industrial harbor used since colonial days. The area has a long history of collecting debris. As generally understood in the dredging industry, 'new work dredging' can be expected to contain most anything."); D.W. Sandau Dredging, ENGBCA No. 5812, 96-1 BCA ¶ 28,064, at 140,157 (urban and commercial marine settings of the project site were "implicit indications" of the types of trash and debris that could be encountered during dredging operations); Stuyvesant Dredging

Co., ENGBCA No. 5558, 89-3 BCA ¶ 22,222, at 111,747 ("This contract does not attempt an exhaustive listing of items to be found and dredged. In fact, this would be impractical, if not impossible, particularly given the nature of the new work dredging work required. As the evidence clearly supports, it is well understood in the dredging industry that virtually anything may be dredged in new work dredging.").

*Third*, there is no evidence that Renda encountered rubble within the contract site, i.e., the required dredging prism. If anything, Renda itself caused or contributed to the obstructions by overdredging the Contract dredge template, which undermined the shore protection materials in the South Ferry Landing area. The Contract, § 02482.3.5.2 (Side and End Slopes), required that Renda "use caution when cutting the side slopes in the channel from Station 470+00 to Station 473+00," that "[e]xcessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel," and that "the Contractor may consider shaping the top of the cut in these reaches by using the dredge cutter head or mechanical equipment." Renda disregarded this requirement.

*Fourth*, Contract, § 02482.3.4.4.2 (Debris), required that Renda "carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the Contractor deems suitable to locate any debris which may interfere with dredging operations." Renda failed to comply with this requirement.

Renda cannot demonstrate a Type II differing site condition claim, either. The alleged conditions that form the basis of this differing site conditions claim are not unknown physical conditions at the site, of an unusual nature, that differ materially from conditions ordinarily encountered and generally recognized as inhering in the dredging work provided for in the

Contract.

Even assuming that it encountered a differing site condition, Renda has not demonstrated that it was damaged as alleged. The "measured mile" selected by Renda to demonstrate loss-of-productivity is not representative of the conditions that Renda reasonably should have anticipated because that measured mile (a) does not include complete removal of the side slope and bottom, (b) includes work in Section 2 with shorter pipeline lengths than the pipeline lengths from the South Ferry Landing area to Lost Lake, (c) considers only high-production days on the south side of Sections 1 and 2, and (d) includes the removal of only 30-percent clay materials notwithstanding that 50 percent of the materials at the South Ferry Landing was composed of clays.

In addition, Renda has not demonstrated that the rubble allegedly encountered by the *Millennium* damaged the dredge, resulting in the claimed repairs. Renda's daily dredging reports do not discuss individual repairs or explain how rubble resulted in the need for the repairs. The claimed repairs, e.g., cracked and leaking heads on the pump engine, were of a kind that could not have been caused by the alleged encounters with rubble. For other repairs, Renda solicited price quotes one month *before* excavating in the South Ferry Landing Area. Still other repairs to the *Millennium* performed by Renda and not claimed by Renda, such as repairs to the spuds and the spud winch drums, are concurrent delays that would have prevented operation of the *Millennium* during the damages impact period claimed by Renda.

Assuming for the sake of argument that the Government is liable to Renda upon the South Ferry Landing claim, Renda's damages are overstated. Renda would be entitled to no more than $34,003 and a time extension of two calendar days.

B. Flare Area Claim

Renda alleges that, while dredging in the so-called "Flare Area (Sta. 520+00 to Sta. 550+65), it encountered stiff clays at elevations where soft clays had been anticipated and that this lowered its productivity. Pl. Mem. 2-3; Compl. ¶¶ 56, 57. Renda submitted a request for an equitable adjustment (REA) to the Contracting Officer, seeking compensation of $4,691,688 for loss-of-productivity and a time extension of 76 calendar days.

The Contracting Officer issued unilateral Modification P00023 to the Contract, which states that the Contracting Officer "has determined that [Renda] incurred a changed condition from that shown in the contract" while dredging in the Flare Area and that Renda "is therefore entitled to be compensated for the additional work." Modification P00023 increased the contract price by "Not to Exceed $3,083,833" and extended the time for completing the project by 56 days, from May 3, 2000, to June 28, 2000. Modification P00023 also provided, however, that the "not-to-exceed price" "does not necessarily represent the Government's estimate of the cost of the work," that "[t]he final negotiated price for this modification may be less than the not-to-exceed price," and that "[a] supplemental agreement will be issued to definitize any time and pricing adjustments related to this change upon mutual agreement." In accordance with Modification P00023, the Corps paid Renda $3,083,833 for the Flare Area REA.

Renda subsequently submitted a certified claim to the Contracting Officer, seeking an additional $1,607,855 for the Flare Area claim, which is the difference between the $4,691,688 total amount claimed by Renda and the $3,083,833 that the Government paid Renda under Modification P00023, and an additional 20-day time extension. Renda has since lowered the amount of this claim to $1,096,179.

Government's Position:

The Government is not precluded by anything contained in Modification P00023 from litigating all aspects of the Flare Area Claim, including liability, causation, and damages. See England v. Sherman R. Smoot Co., 388 F.3d 844, 853-57 (Fed. Cir. 2004).[15] In a CDA case, "once an action is brought following a contracting officer's decision, the parties start in court or before the board with a clean slate." Wilner v. United States, 24 F.3d 1397, 1402 (Fed. Cir. 1994) (en banc). The CDA provides that a judicial action upon a claim "shall proceed de novo in accordance with the rules of the appropriate court," 41 U.S.C. § 609(a)(3), which means that, in the case of a claim by a contractor against the Government, such as Renda's Flare Area claim, "[t]he contractor has the burden of proving the fundamental facts of liability and damages de novo." Wilner, 24 F.3d at 1401. The effect of the "deemed denial" of Renda's Flare Area claim thus is to "negate" unilateral Modification P00023, so that Renda is forced to litigate entitlement to the entire equitable adjustment amount claimed, not just the difference between what Renda claimed and what it has been paid. Transamerica Insurance Corp. v. United States, 28 Fed. Cl. 418, 423 & n.4 (1993).

Renda cannot demonstrate a Type I differing site condition claim. *First*, relevant soil boring logs contained in the Contract drawings indicate the presence of stiff or very stiff clays

---

[15] Sherman R. Smoot involved modifications issued by the contracting officer under a construction contract governed by the CDA that extended the contract performance time as a result of certain delays to the project. The Federal Circuit held that the modifications did not raise a rebuttable presumption that the Government was responsible for the delays that had resulted in the time extensions granted by the modifications: "Congress made it clear in the CDA that any findings by a contracting officer in a final decision are not binding in any subsequent proceeding. Although, by its terms, the CDA only applies to contracting officers' final decisions, in light of the policies underlying the CDA, we see no basis for drawing a distinction between an interim and a final decision of a contracting officer." 388 F.3d at 856.

in the Flare Area at the higher elevations where Renda alleges it did not anticipate such materials. Renda's interpretation of the character of materials to be encountered is based upon a reading of two boring logs, 93-62 and 93-63, without regard for information contained in other relevant logs. The boring logs upon which Renda relies were taken at or near the toe of the south bank in the Flare Area and, consequently, they are a poor indicator of the character of the materials to be found at higher elevations in the Flare Area's south bank to be dredged. As a matter of fact, in correspondence to the Corps prior to beginning dredging in the Flare Area, Renda itself referred to other boring logs besides 93-62 and 93-63 to predict what earth materials it expected to encounter in the Flare Area. A reasonably prudent dredging contractor would not have used boring logs 93-62 or 93-63 to predict the character of the earth materials at higher elevations in the south bank of the Flare Area.

*Second*, the "stiffness" of clay typically refers to the ability of the dredge cutter to excavate the material. Renda's daily dredging records do not indicate that the dredge Millennium had any difficulty in cutting the material to be dredged in the Flare Area, including stiff clays.

Renda's problems were with the transporting of excavated materials through the discharge pipeline to Lost Lake, not cutting the material to be transported. Once excavated, clays – be they soft or stiff – are transported in the same manner. Both soft and stiff clays tend to form what are known as "clay balls" in the pipeline, which increases the difficulty of pumping the material. If adequate velocity of the materials in the pipeline is not maintained, the heavier materials, i.e., the clay balls, settle out in the pipeline, which results in plugged lines that must be cleared before the dredging operations may continue.

The frequent plugged pipelines that slowed Renda's production in the Flare Area could have been alleviated by the addition of a booster pump in the pipeline to increase the pumping velocity. A reasonable and prudent dredging contractor would have added a booster pump while dredging in the Flare Area, but Renda did not do so.

*Third*, Renda cannot demonstrate reliance, much less reasonable reliance, upon its interpretation of the contract documents at the time of bidding. Renda's bid estimate documents do not identify the types of earth materials (clay, silt, mud, sand) anticipated in the Flare Area.

Renda cannot demonstrate a Type II differing site condition claim, either. The alleged conditions upon which this differing site conditions claim is based are not unknown physical conditions at the site, of an unusual nature, that differ materially from conditions ordinarily encountered and generally recognized as inhering in the dredging work provided for in the Contract.

Even assuming that it encountered a differing site condition, Renda has not demonstrated that it was damaged as alleged. The measured mile selected by Renda to demonstrate loss-of-productivity is not representative of the conditions that Renda reasonably should have anticipated because that measured mile (a) includes only days when Renda did not experience any plugged pipelines, (b) includes only days when Renda was dredging predominately muds and silts, i.e., loose, unconsolidated maintenance materials, (c) includes work with shorter pipeline lengths than the pipeline lengths from the Flare Area to Lost Lake, and (d) does not account for changes in dredging equipment.

Assuming for the sake of argument that the Government is liable to Renda upon the Flare Area claim, Renda's damages are overstated. Renda would not be entitled to recover more than

$296,477 and a time extension of 11 calendar days, both of which are *less* than the $3,083,833 and 20-day time extension received by Renda under Modification P00023 for the Flare Area Claim.

C. Section 7 Clay Claim

Renda alleges that, while dredging in Section 7 on the north side of the channel between Sta. 561+20 and Sta. 609+00 from October 2, 2000, through November 2, 2000, the *Millennium* encountered what Renda at times has described as "stiff," "hard," "hardpan," or "heavy" red clay. Renda asserts that it anticipated having to dredge "gray and blue clays" in this area which, though "stiff" or "hard," are "relatively easy for the cutterhead to dredge through." See April 16, 2001 letter from Renda (Bowman) to the Contracting Officer (Benero), DX 567. According to Renda, the red clay was "very difficult to dredge through," which lowered production of the *Millennium*. Renda seeks $978,271 and a time extension of 20 days.

Government's Position:

Renda cannot demonstrate a Type I differing site condition claim. *First*, the soil conditions indicated by the soil boring logs contained in the Contract drawings do not differ materially from the conditions encountered by Renda that form the basis of its claim. Renda admits that the boring logs show stiff or hard gray and blue clays.

Color is not a reliable index of the properties of sediments such as clay. Color does not have any effect upon the consistency or stiffness of clay. Earlier in the Upper Bayou Project, Renda had excavated red, orange, and brown clays and deposited them at Lost Lake without any complaints.

The Contract boring logs generally show very stiff or hard clays with a few medium and soft clay layers beginning at Sta. 568+90 in Section 7 and continuing through the remainder of Section 7, which ends at Sta. 612+00, a distance of 4,310 feet.

Renda did not make any tests of the red clay material that it contends is a differing site condition, either in situ or from the stockpile of this material that Renda created at Lost Lake by Levee Sta. 118+00 (instead of placing this material hydraulically in the new levees, as the Contract required Renda to do), in order to demonstrate the alleged difference(s) between the red clay dredged and the gray and blue clays that Renda allegedly anticipated.

*Second*, Renda cannot demonstrate reliance, much less reasonable reliance, upon its interpretation of the contract documents at the time of bidding. Renda's bid estimate documents do not identify the types of earth materials (clay, silt, mud, sand) anticipated in Section 7.

Renda cannot demonstrate a Type II differing site condition claim, either. The alleged conditions upon which this differing site conditions claim is based are not unknown physical conditions at the site, of an unusual nature, that differ materially from conditions ordinarily encountered and generally recognized as inhering in the dredging work provided for in the Contract.

Even assuming that it encountered a differing site condition, Renda has not demonstrated that it was damaged as alleged. Renda relies upon the measured mile selected for the Flare Area claim to demonstrate loss-of-productivity while dredging in Section 7. The measured mile used in the Flare Area claim, however, is not representative of the stiff or hard clay conditions Renda itself admits that it anticipated in Section 7. The measured mile for the Flare Area claim includes only days when Renda was dredging predominately muds and silts, i.e., loose, unconsolidated

maintenance materials, and involves work with shorter pipeline lengths than the pipeline lengths from Section 7 to Lost Lake. Renda, therefore, is not entitled to any additional time or monetary damages.

D. HL&P Tower Claim

Renda alleges that, on July 16 and 17, 2000, its dredging operations were disrupted by Houston Lighting and Power (HL&P) crews, who were installing a second electrical transmission tower at Lost Lake. Compl. ¶ 75. Renda asserts that, "[t]o accommodate the HL&P construction, Renda had to break down and relocate its discharge piping." Id. According to Renda, "HL&P's work was not shown or indicated in the Contract Documents, an constituted a differing site condition." Compl. ¶ 76.

Renda further alleges that, between October 16 and 18, 2000, "HL&P caused a second disruption, which required another relocation of the discharge piping in Lost Lake." Compl. ¶ 77. Renda asserts that it "properly and timely notified the Corps of these changes in site conditions." Compl. ¶ 78. Renda seeks to recover $167,473 and a time extension of three calendar days.

Government's Position:

The conditions that form the basis for this claim developed after contract award during Renda's performance of the Contract. It is undisputed that HL&P did not apply to the Corps for a permit to install the second transmission tower until January 1999 and the permit was not issued by the Corps until April 1999.[16] The Contract was awarded on October 26, 1998. The Differing

[16] The permit issued by the Corps to HL&P for the second transmission tower stated that it did not authorize HL&P to interfere with any Federal project, such as the Upper Bayou Project at issue in this litigation.

Site Conditions clause only applies to physical conditions existing at the time of contracting, as noted above. Olympus, 98 F.3d at 1318; Fru-Con, 43 Fed. Cl. at 317. The Differing Site Conditions clause, moreover, only applies to subsurface and latent physical conditions, not to visible, patent conditions such as HL&P's above-ground construction activities at Lost Lake.

Renda did not provide timely notice of the alleged differing site condition, as required by the Contract. Renda took unilateral action without requesting input or direction from the Corps, thereby depriving the Contracting Officer the opportunity to coordinate or accommodate HL&P's needs in a manner that would not have interfered with Renda's dredging operations. Renda did not provide the Government with notice of either the July or October 2000 events until after it had relocated its pipeline for the second time in October 2000.

The claim submitted by Renda to the Contracting Officer and which is the subject of the complaint in this case is based upon the Differing Site Conditions clause. But even if the claim before the Court could be viewed as one for a constructive change based upon interference with Renda's access to the work site, the claim would fail. While interference by the Government with a contractor's access to the work site may constitute a breach of the Government's duty to cooperate, the Government is not responsible for the actions of third parties that impeded a contractor's performance, absent a specific contractual provision. See Oman-Fischbach International (JV) v. Pirie, 276 F.3d 1380, 1385 (Fed. Cir. 2002); Olympus, 98 F.3d at 1318.

Unless Renda and the Corps agreed in unmistakable terms to shift the risk of increased costs due to acts by HL&P, no liability on the part of the Government attaches from such acts. Renda has not identified a contractual provision under which the Government assumed the risk

of increased costs resulting from any acts of HL&P.[17]

Assuming for the sake of argument that defendant is liable to plaintiff upon the HL&P Tower differing site conditions claim, Renda's damages are overstated. Renda would be entitled to no more than $18,780 and a time extension of two calendar days.

E. Obstructions No. 1 Claim

Renda seeks $1,986,551 and a time extension of 36 calendar days for three types of "obstructions" allegedly encountered by the dredge *Millennium* while excavating from Sta. 570+00 to Sta. 630+00, which Renda contends are differing site conditions:

1. Excessive trash between Sta. 570+00 and Sta. 580+00.
2. Shore protection material on the south bank near the Oxy Chemical Dock.
3. Discrete objects (dredge stern swivel assembly, Conex steel box, steel mooring buoy and anchor chain).

Government's Position:

(1) Excessive Trash

Renda cannot demonstrate a Type I differing site condition claim. *First*, Renda asserts a differing site condition based upon an excess quantity of trash. "Claims alleging differences in anticipated quantity of materials rather than differences in character and nature, do not constitute a typical differing site condition claim." Spirit Leveling, 19 Cl. Ct. at 94. The Contract identifies the kind of trash encountered by Renda, but *not* a quantity to be expected.

*Second*, the extensive nature of the actual trash has not been documented. Renda did not

[17] The April 1999 permit issued by the Corps to HL&P did not approve construction of the new Tower #20371 at Lost Lake that is the subject of Renda's complaint. The regulatory jurisdiction of the Corps extends only to actions that affect navigable waters, not structures on land such as new Tower #20371.

provide evidence of the alleged excessive trash, which deprived the Contracting Officer of the opportunity to determine if the trash encountered in fact was excessive. The Contract required that Renda place "scrap, rope, wire cable, piles, pipe or other obstructive material which may be encountered during the dredging operations" at approved locations. Contract, § 02482.3.4.4.2 ("Debris"). Renda, however, neglected to do so.

*Third*, Renda cannot demonstrate reliance, much less reasonable reliance, upon its interpretation of the contract documents at the time of bidding. Renda's bid papers do not identify the amount of time or quantity expected in the dredging process with trash or other debris.

*Fourth*, while there was a slow-down in production in the area between Sta. 570+00 and Sta. 580+00, the additional time required to clear the cutter and pumps was not significant given that it is not uncommon to encounter pockets of trash. Moreover, when averaged, the reach of channel covered by Renda's Obstruction No. 1 claim does not reflect an increase in trash clears.

Renda cannot demonstrate a Type II differing site condition claim, either. The alleged conditions upon which this differing site conditions claim is based are not unknown physical conditions at the site, of an unusual nature, that differ materially from conditions ordinarily encountered and generally recognized as inhering in the dredging work provided for in the Contract.

(2) Shore Protection

Renda cannot demonstrate a Type I differing site conditions claim. *First*, a reasonable pre-bid site investigation would have disclosed the presence of shore protection material on the exposed banks by the Oxy Chemical Dock. This is an old industrial area. A reasonable and prudent contractor would assume that some of the shore protection material could have migrated

into the deeper water and might be encountered in the widening and deepening of this area.

*Second*, the Contract warned Renda of an existing structure near the Oxy Chemical Dock, i.e., specifically between Sta. 610+00 and Sta. 625+00 and required that Renda exercise caution when cutting side slopes in that area to avoid damaging the structure. Contract, § 02482.3.5.2 & Drawing C-2, Note 4.

Nor can Renda demonstrate a Type II differing site condition claim. The alleged conditions upon which this differing site conditions claim is based are not unknown physical conditions at the site, of an unusual nature, that differ materially from conditions ordinarily encountered and generally recognized as inhering in the dredging work provided for in the Contract.

(3) Discrete Objects

Renda has not demonstrated that these larger objects damaged the dredge *Millennium*. The encounters with such objects should not have presented a major problem to a reasonably prudent dredging contractor. A prudent contractor, dredging in an active waterway such as the Houston Ship Channel, should have reasonably anticipated encountering miscellaneous debris, trash and other objects (navigational markers) from ship traffic, nearby industry, contributories, etc. Except for the Conex box, the objects encountered were not unusual for an environment such as the Houston Ship Channel.

Renda seeks compensation for repairs to underwater pump seals, the cutter gearbox, and main pump shaft allegedly necessitated by damages to the *Millennium* supposedly caused by the obstructions. Assuming that these alleged obstructions damaged that equipment on the dredge, Renda would be entitled to recover no more than (a) $42,854 for the underwater pump seals, (b) $180,294 for the cutter gearbox, and (c) $276,527 for the main pump shaft. The maximum num-

ber of days that the *Millennium* was idled because of the alleged obstructions is (a) two days for the repairs to underwater pump seals, (b) seven days for the cutter gear box repairs, and (c) five days for the repairs to the main pump shaft.

F. Obstructions No. 2 Claim

Renda alleges that it encountered excessive trash and debris and one object, a mooring buoy, damaged the dredge *Millennium* while operating between Sta. 660+00 and Sta. 685+00 in Section 9, which Renda contends are differing site conditions. Renda seeks $1,148,804 for repairs to the dredge allegedly attributable to these "obstructions."

Government's Position:

(1) Excessive Trash

Renda cannot demonstrate a Type I differing site condition claim. *First*, Renda asserts a differing site condition based upon an excess quantity of trash. As noted above, "[c]laims alleging differences in anticipated quantity of materials rather than differences in character and nature, do not constitute a typical differing site condition claim." Spirit Leveling, 19 Cl. Ct. at 94. The Contract identifies the kind of trash encountered by Renda, but *not* a quantity to be expected.

*Second*, Renda cannot demonstrate reliance, much less reasonable reliance, upon its interpretation of the contract documents at the time of bidding. Renda's bid papers do not identify the amount of time or quantity expected in the dredging process with trash or other debris.

Renda cannot demonstrate a Type II differing site condition claim, either. The alleged conditions upon which this differing site conditions claim is based are not unknown physical conditions at the site, of an unusual nature, that differ materially from conditions ordinarily

encountered and generally recognized as inhering in the dredging work provided for in the Contract.

If the trash in Section 9 constitutes a differing site condition, Renda would be entitled to no more than $90,283 and a time extension of three calendar days.

(2) Mooring Buoy

Renda has not demonstrated that this object damaged the *Millennium*. An encounter with that object should not have presented a major problem to a reasonably prudent dredging contractor. A prudent contractor, dredging in an active waterway such as the Houston Ship Channel, should have anticipated encountering miscellaneous debris, trash and other objects (navigational markers) from ship traffic, nearby industry, contributories, etc. A mooring buoy is not unusual for an environment such as the Houston Ship Channel.

If the mooring buoy is determined to be a differing site condition and the cause of damage to the cutterhead gearbox assembly, Renda would be entitled to no more than $327,886 and a time extension of 23 calendar days.

G. West Levee Realignment Claim

Renda seeks compensation for costs associated with the realignment of a portion of the new levee along the west side of Lost Lake, which, Renda asserts, the Corps directed Renda to realign. The costs in the claim submitted to the Contracting Officer are calculated based upon a unit price of $4.70 per cubic yard of material that was used in earlier Contract modifications. The DCAA audit of this claim questioned the costs in their entirety because Renda had not provided "adequate support" for the claim. Renda now states that, "[t]o resolve the DCAA's concerns, Renda revised this claim to reflect actual cost, and incorporated it into the Lost Lake

Levees Claim (Claim 8)." Pl. Mem. 16. See March 3, 2004 Report of Robert McCullough, Jr. The West Levee Realignment Claim, thus, is no longer a separate claim.

Government's Position:

Renda did not construct the West Levee in accordance with the alignment specified by the contract documents. The Corps agreed to a realignment of the West Levee to mitigate the impact of Renda's misalignment of the West Levee. Consequently, the realignment of the West Levee is not compensable under the contract's Changes Clause. At any rate, Renda realigned sections of the West Levee that the Corps agreed could remain as initially placed by Renda. This resulted in increased costs of performance for which the Government in any event should not be responsible.

In the original claim, Renda's damages and delays are overstated because they are based upon rates established for unrelated work, rather than actual, incurred costs. Renda's claimed increased costs of performance are based upon estimates and are not supported by cost element or pricing data. See DCAA Audit Report No. 3511-2003M17200010 dated December 12, 2002.

Renda contends that it was not required to produce evidence of its actual costs of realigning the part of the West Levee involved in this claim because of "a previous agreement with [the Government] regarding unit costs." Pl. Mem. 17. We disagree. The referenced "previous agreement" is Contract Modification P00006 dated June 28, 1999, which compensated Renda for certain changed work performed by Affolter, Renda's subcontractor for the mechanical levee work. The changed work covered by Modification P00006 was paid for at an agreed unit price of $4.70 per cubic yard of material. Modification P00006, however, does not purport to establish a unit price for any earth-moving work under any subsequent contract modification or that might be the subject of a claim by Renda, such as the West Levee Realignment Claim.

H. Lost Lake Levees Claim

Renda alleges that the portion of the Lost Lake levees that the Contract provided were to be built with hydraulically-placed, dredged fill material were not "constructible" because: (1) "there was not enough suitable material available from the areas to be dredged;" (2) the Government "did not allow Renda to dredge from all the private sources of clay that the Project designer had envisioned;" (3) the Government "shortened the Project, eliminating the lower reach;" (4) the Government "released Renda from dredging in areas which had too many obstructions (like Section 9), further aggravating the shortage problem;" and (5) "undisclosed side cast borrow areas along the interior of the levees swallowed an inordinate amount of the levee materials." Pl. Mem. 20.

Renda also contends that "[t]he hydraulic levees could not be maintained at the required 30 foot height due to the extremely soft foundations," that "[t]he foundations were extremely soft because [the Government] had had prior contractors excavate materials and create side cast borrow areas along the interior of the perimeter levees at Lost Lake," and that, "[a]s a result, it was not possible in the time allowed by the contract to construct and maintain the hydraulically placed levees at the at the required 30 foot height and template. Pl. Mem. 20.

Government's Position:

Liability

As a preliminary matter, it is not clear whether Renda is attempting to establish a differing site conditions claim or a defective specifications claim (or both) with respect to the part of the Lost Lake levees that the Contract required be constructed with hydraulically-placed material. Regardless, in Comtrol, 294 F.3d at 1362, the Federal Circuit held that, "[a]lthough differing site

conditions and defective specifications claims are distinct in theory, they collapse into a single claim . . . where the alleged defect in the specification is the failure to disclose the alleged differing site condition," which would appear to be the case with Renda's Lost Lake levees claim. In that circumstance, "[t]he claim will be governed by the specific differing site conditions clause and the cases under that clause." Id.[18]

Renda's claim regarding the Lost Lake levees is without merit. There was sufficient suitable material available in the area of the Channel to be dredged under the Upper Bayou Project to build the parts of the Lost Lake levees for which the Contract specified the hydraulically-placed fill method of construction, i.e., the East, West, and North levees.

Renda incorrectly asserts that the Government would not permit Renda to dredge from all the sources of private clay that the Project designer had envisioned. The Government informed Renda that it would have to obtain the permission of the PHA – the owner of the Lost Lake site – before it could deposit dredged material from private sources at Lost Lake.

---

[18] The Government contends that Renda did not comply in important respects with the Contract's plans and specifications. For, example, it attempted to build the North levee exclusively by mechanical methods, notwithstanding that the Contract specified the hydraulically-placed fill construction method. Therefore, assuming for the sake of argument that it would be appropriate to apply defective specifications principles to the Lost Lake Levees claim, Renda would be faced with the "difficult burden" of having to demonstrate that had it followed the plans and specifications, it would have experienced the same construction difficulties. See Al Johnson Construction Co. v. United States, 854 F.2d 467, 470 (Fed. Cir. 1988) (where contractor did not comply with contract specifications, it had the burden of demonstrating that "nonconformance to specifications had no logical relationship to the failure of the berm"); Tyger Construction Co. v. United States, 31 Fed. Cl. 177, 243 (1994) ("The implied warranty attached to design specifications only applies if the contractor complies with the specifications."). In addition, to prevail upon a defective specifications claim, Renda would have to establish that it was misled by the erroneous statements in the specifications. Comtrol, 294 F.3d at 1364 (citing Robins Maintenance, Inc. v. United States, 265 F.3d 1254, 1257 (Fed. Cir. 2001)).

The detailed design for the Lost Lake levees prepared by HVJ Associates for the Corps contemplated that the downstream limit of dredging would be Channel Sta. 458+40 instead of Sta. 470+00. However, the fact that the Upper Bayou Project did not include dredging between Sta. 458+40 and Sta. 470+00 did not result in a lack of suitable material with which to construct the hydraulically-placed levees.

Near the end of the Upper Bayou Project, when Renda was dredging in Section 9, the contracting officer, at Renda's behest, suspended the Contract so that Renda could perform a dredging job for Houston Fuel Oil, a private firm, with the understanding that the anticipated suitable levee building material from that job would be incorporated into the Lost Lake levees. The quantity of suitable levee building material that was contained in the portion of Section 9 that was deleted from the Upper Bayou Project was more than offset by the quantity of suitable levee building material generated by the Houston Fuel Oil project, not to mention the additional, volume of suitable levee building material (stiff clay) that is the subject of Renda's Flare Area Claim.

Insofar as side-cast borrow areas are concerned, there is no evidence to support Renda's contention that the side-cast borrow areas "swallowed an inordinate amount of the levee materials." Renda's claim is pure speculation. Renda did not perform any testing during or after the Upper Bayou Project to quantify or otherwise determine the extent to which side-cast borrow areas "swallowed" levee building material. Renda cannot even establish the dimensions of the side cast borrow areas.

Renda's construction methods, not the design of the Upper Bayou Project, were responsible for the shortage of suitable levee building material that Renda experienced when construc-

ting the West and North levees at Lost Lake. Renda wasted material suitable for the construction of levees by not constructing training levees (also referred to as "toe dikes") to keep the suitable levee building material within the alignment of the new levee and prevent it from escaping to the interior of Lost Lake where it could not be recaptured.

When constructing the levees at Lost Lake, Renda failed to comply with the Contract requirement to evenly distribute sufficient dredged fill around the entire perimeter to elevation +20 feet MLT before shaping it to final grade. Instead, Renda elected to place the hydraulic fill to final grade, i.e., +30 feet MLT. This placement technique both increased the amount of soft foundation material displaced and resulted in large quantities of excess material on the side slopes of the levee that could not be used to shape or cap the hydraulically-placed levee to final grade – as much as three times the required volume of material needed to complete the final minimum cross section to elevation +30 feet MLT.

Even assuming for the sake of discussion that Renda could demonstrate that there was not enough suitable material available from dredging to construct the East, West, and North levees at Lost Lake, Renda has not identified any damages, i.e., increased costs of performance, that it incurred as a result of that circumstance.

The Contract contemplated that the hydraulically-placed levees would be constructed by displacement method. The design contemplated that the soft to very soft foundation materials along the alignment of the new perimeter levee would be displaced laterally from beneath the embankment by the hydraulically-placed, dredged fill material, thereby improving the foundation for the new levee. Contrary to Renda's claim, the soft existing foundation was not caused by the side-cast borrow areas along the interior of the levees.

The intent of the design of the hydraulically-placed levees was to displace as much of the soft foundation material as possible from beneath the embankment to increase the strength of the foundation. The presence and location of the side-cast borrow areas were not important aspects of the Lost Lake levee design. The side-cast borrow areas potentially could have an impact upon where displacement began, i.e., where the hydraulically-placed fill began to push the soft foundation material from beneath the embankment. Because displacement was expected, where it might begin was not important to the levee design.

The side-cast borrow areas, therefore, are a red herring. It is worthy of note that Renda constructed the entire East levee without any complaint of excessive displacement of foundation material or side-cast borrow areas, notwithstanding that the side-cast borrow areas at Lost Lake were visible from the outset of the levee-building operation.

The difficulty that Renda experienced with the construction of the North levee was of its own making. Renda elected to construct the North levee entirely by mechanical methods instead of by the hydraulic-placement method specified by the Contract. When the hydraulic-placement operation reached the northeast corner of Lost Lake, the East levee was complete. At that point, instead of continuing to place fill hydraulically along the alignment of the North levee, Renda retraced its steps along the East levee depositing additional fill material on the East levee. The reason Renda continued to place fill material along the East levee is that its dredge plant did not have the capacity to transport fill from the location of its dredge in the Channel (approximately Sta. 520+00). Renda needed a booster pump to transport levee building material that distance but failed to provide one.

Renda elected to attempt to construct the North levee by hauling excess the fill material misplaced along the East levee to the North levee and placing it mechanically. Constructing the North levee mechanically proved more difficult for Renda because the rate of displacement of the soft foundation when fill is placed mechanically is a much slower process than when the fill is placed hydraulically.

We also contend that Renda cannot demonstrate a Type I differing site conditions claim. *First*, the conditions indicated by the Contract documents do not differ materially from the conditions that Renda encountered when constructing the hydraulic levees at Lost Lake. The foundations of the new levees encountered by Renda during contract performance – including the material with which Renda contends the side-cast borrow areas were filled – were as indicated in the Contract documents: "very soft to soft dredged material and sand placed during previous dredging cycles." Contract Drawing C-14, Note 10. The Contract documents, moreover, explicitly advised the bidders that it was both anticipated and intended by the Government that the "very soft to soft foundation material" would be displaced by the "new work" material excavated by the dredge. Id.; Amendment No. 1, Questions & Answers, Item 2 under "Drawings," at p. 3, Item 6, at p. 4.

*Second*, Renda cannot demonstrate reliance, much less reasonable reliance, upon its interpretation of the contract documents at the time of bidding. Renda's bid estimate documents do not reflect assumptions about displacement or retention of hydraulically-placed material.

*Third*, Renda knew, or reasonably should have known, that levees at disposal areas for dredged material such as Lost Lake are commonly raised and/or maintained by “borrowing” material from the interior perimeter of the placement area.

*Fourth*, Renda also did not construct the portions of the levees to be constructed by the hydraulic placement of dredged material in accordance with the alignment specified by the contract documents. Consequently, Renda subsequently had to realign levees and otherwise place levees by mechanical methods, which increased its costs of performance.

Nor can Renda demonstrate a Type II differing site condition claim. The conditions upon which the Lost Lake Levees Claim is based are not unknown physical conditions at the site, of an unusual nature, that differ materially from conditions ordinarily encountered and generally recognized as inhering in the dredging work provided for in the Contract.

Damages:

Renda's total cost method of calculating its damages lacks merit because, among other things, Renda cannot demonstrate the impracticability of proving its alleged losses directly. Before a contractor can obtain the benefit of the total cost method, it must prove several things, one of which is "the impracticability of proving its actual losses directly." Propellex Corp. v. Brownlee, 342 F.3d 1335, 1339 (Fed. Cir. 2003). On March 3, 2004, Renda's trial expert, Robert B. McCullough, issued a report in which he devised a method of demonstrating Renda's alleged losses under the Lost Lake Levees claim directly. That being so, Renda cannot establish the impracticability of proving its losses directly.

Renda itself appears to have abandoned the total cost method of establishing its damages. Renda notes that it "previously used the modified total cost method to quantify" the Lost Lake Levees Claim, but that "Renda has now revised its claim to reflect actual costs of $7,055,037, including the levee realignment costs." Pl. Mem. 24.

Assuming for the sake of argument that the Government is liable to Renda upon the Lost Lake Levees Claim, Renda's damages, as revised, are overstated. Renda would be entitled to no more than $38,375 and no time extension for the work to realign the West Levee that originally was the subject of a separate claim discussed above. The balance of the claimed increased costs of performance are unsupported.

I. <u>Equipment Costs</u>

In computing damages for each its claims, except under the total cost method for the Lost Lake Levees claim, Renda used the Corps' Construction Equipment Ownership and Operating Expense Schedule, EP 1110-1-8, Volume VI (June 1999)) (the Schedule), to calculate claimed equipment ownership and operating costs. Renda used the correct edition of the Schedule, but misapplied the Schedule by varying the prescribed factors and formulas:

1. Renda selected a shorter useful and physical life than that specified by the Schedule for the dredge *Millennium* and the booster pump owned by Renda, which affects the operating rate and depreciable life of the equipment. By reducing the useful life of the equipment, Renda more than doubled the recovery of allowable depreciation expense and accelerated recovery of those operating repairs which are to be recovered over the specified physical life of the equipment.

2. Renda developed and applied a "non-effective time" rate for the Millennium and hydraulic booster pump, which is not allowed or consistent with the Schedule.

3. Renda developed and applied a "main generator only" rate for the Millennium and hydraulic booster pump, which is not allowed or consistent with the Schedule.

4. Renda used the Schedule's Chapter 3 methodology to compute hourly rates for the majority of the equipment in its claims, but either did not make all of the adjustments required when that methodology is used or made incorrect adjustments.

5. Renda used the Schedule's "severe" working conditions rates for marine equipment that it priced using the Schedule's Chapter 2 methodology when it should have applied "average" working conditions rates to that equipment. Working conditions at the Upper Bayou Project, an inland dredging job, were normal and customary. Although the bayou water is brackish and subject to tidal influences, the Upper Bayou Project was not an ocean environment subject to the pounding of medium to heavy waves, which would warrant application of the Schedule's "severe" rates to marine equipment.

6. The Schedule's Chapter 4 methodology should be used to compute ownership and operating rates for the dredging plant, which includes, in addition to the dredge, work barges, tugs, and tenders, pipelines, pontoons, boats, and other floating equipment used to support the dredging operation. Renda incorrectly used the Schedule's Chapter 3 methodology to calculate ownership and operating expense rates for the barges and tenders that supported the *Millennium*.

VII. Renda's Challenge To The Contracting Officer's
November 2002 Decision Upon Government Claims

On November 26, 2002, seven months after Renda instituted the present litigation, the contracting officer issued a decision upon *Government* claims under or relating to the Upper Bayou Project Contract. Renda did not appeal that decision either to the Court of Federal Claims or the Armed Services Board of Contract Appeals. Renda takes the position that the decision is a "nullity" and asks this Court to ratify Renda's position by declaring the decision null and void.

The validity of the contracting officer's November 26, 2002 decision, however, is not a subject of Renda's complaint in this case and the Government has not sought to place that decision in issue here by way of pleading a set-off or a counterclaim. And it is not necessary for the Court to decide that question in order to resolve any of Renda's claims. A decision by the Court upon the validity of the Contracting Officer's November 26, 2002 decision, therefore, would be tantamount to an advisory opinion.

The Court, moreover, has rejected an attempt by Renda to raise the issue of the validity of the contracting officer's November 26, 2002 final decision in this proceeding when the Court denied Renda's motion for leave to file an amended complaint in which, among other things, Renda sought a declaration from the Court that the November 26, 2002 decision is "a nullity or otherwise invalid." See July 30, 2004 Order, at 7 ("Plaintiff's explanation for its belated challenge to the contracting officer's November 26, 2002 final decision is . . . unpersuasive. Plaintiff does not dispute either that it timely received the final decision or that it declined to exercise its appeal rights under the Contract Disputes Act . . . .").

VIII. Renda's Spoliation-Of-Evidence Claim

Renda has invoked the "spoliation" doctrine with respect to the contracting officer's practice of deleting electronic mail messages (e-mails) from his personal computer. “Spoliation” refers to “the destruction or withholding of critically probative evidence resulting in prejudice to the opposing party.” Slattery v. United States, 46 Fed. Cl. 402, 404 (2002). Under that doctrine, “a party’s destruction or ‘spoliation’ of evidence can give rise to an inference that the destroyed evidence would have been damaging to that party’s case.” Hardwick Bros. Co., II v. United States, 36 Fed. Cl. 347, 417 (1996), aff’d, 168 F.3d 1322 (Fed. Cir. 1998), cert. denied, 526 U.S. 1111 (1999).

In the Court of Federal Claims, bad faith is an indispensable element of the spoliation doctrine. Slattery, 46 Fed. Cl. at 405.[19] The Court, thus, may draw an inference under the spoli-

---

[19] Government officials “are presumed to act conscientiously and in good faith in the discharge of their duties.” The Libertatia Associates, Inc. v. United States, 46 Fed. Cl. 702, 706 (2000). This presumption may be overcome only by clear and convincing proof that, in a given case, the Government acted in bad faith, i.e., with animus toward a party or with specific intent to injure a party. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1238-40

ation doctrine only "where it can be shown that the destroyed evidence was critical or controlling on an issue of liability and the evidence was destroyed in bad faith." Hardwick, 36 Fed. Cl. at 416; accord Columbia First Bank, FSB v. United States, 54 Fed. Cl. 693, 703 (2002) ("[T]here must be a showing of bad faith before [a party] can be sanctioned under the spoliation doctrine for the loss of documents."); Klump v. United States, 54 Fed. Cl. 167, 175 (2002); ("[T]he fact that the [Government] destroyed evidence does not, absent some proof of bad faith, warrant an inference that the evidence was adverse to the [Government]."); see also Eaton Corp. v. Appliance Valves Corp., 790 F.2d 874, 878 (Fed. Cir. 1986) ("If a court finds that both conditions precedent, evidence destruction and bad faith, are met, it may then infer that the evidence would be unfavorable to the destroying party if introduced in court."); Columbia First Bank, FSB v. United States, 58 Fed. Cl. 54, 55 (2003) (finding of bad faith a prerequisite to any type of sanction under spoliation doctrine).

Renda has not demonstrated – and cannot demonstrate – that the contracting officer's deletion of e-mails from his personal computer resulted in the destruction or loss of any e-mails that are critical or controlling upon an issue of liability in this litigation or that the contracting officer deleted the e-mails in bad faith.

In Hardwick, another case involving differing site conditions claims under a contract awarded by the Corps, the plaintiff contended that, under the spoliation doctrine, it was entitled to favorable presumptions in support of its claims because of the Corps's inability to produce a claim-related file assembled by Corps officials for a review by Corps counsel. The court, however, rejected the spoliation claim, inasmuch as there was "no evidence in the record as to the

---

(Fed. Cir. 2002); Slattery, 46 Fed. Cl. at 405.

probative value of any missing documents relative to the issues in this case." 36 Fed. Cl. at 417. "In these circumstances," the court stated, it could not find "that the missing documents would be critical or controlling in the resolution of issues respecting alleged contour errors in the [contract] Plans, or of any other relevant issues in this proceeding." Id. Because of plaintiff's failure to "demonstrate[] the criticalness or controlling nature of any lost or destroyed documents," the court declined "to speculate on the nature or content of these documents" and, therefore, refused to draw any adverse inferences with respect to the missing documents. Id. at 418.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

FEBRUARY 2, 2005