# DEFENDANT'S APPENDIX

**INDEX TO DEFENDANT'S APPENDIX**


| **Document** | **Page** |
|---|---|
| Portions of deposition of Robert McCullough on April 15 and 16, 2004 .................... | 1 |
| Letter dated March 10, 2004, from Kent A. Ray, C.P.A., Milbern Ray & Co. LLP, to John E. Kosloske, Esq., re: documents produced in response to subpoena *duces tecum* .................. | 19 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., Plaintiff, vs. THE UNITED STATES, Defendant. ) No. 02-306C (Judge Hewitt)

ORAL DEPOSITION OF

ROBERT McCULLOUGH

VOLUME 1

April 15, 2004

ORAL DEPOSITION OF ROBERT McCULLOUGH, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on April 15, 2004, from 9:24 a.m. to 5:30 p.m., before Gloria Carlin, CSR No. 498 in and for the State of Texas, reported by Stenographic method, at the offices of Quilling, Selander, Cummiskey & Lownds, 2001 Bryan Street, Suite 1800, Dallas, Texas, pursuant to the Rules of the Federal Court of Claims and the provisions stated on the record.

Job No. 040415GJC



A P P E A R A N C E S

FOR THE PLAINTIFF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

FOR THE DEFENDANT:

John E. Kosloske, Esq.
CIVIL DIVISION
DEPARTMENT OF JUSTICE
1100 L Street NW, Room 12052
Washington, D.C. 20005

ALSO PRESENT:

Oscar Renda
Barry L. Smith
William Connole, P.E.
George J. Strickler, P.E.



INDEX

Appearances . . . . . . . . . . . . . . . . . . . . 2
Stipulations. . . . . . . . . . . . . . . . . . . . 4
ROBERT McCULLOUGH
Examination by Mr. Kosloske. . . . . . . . . . . 5
Signature and Changes. . . . . . . . . . . . . . . . 206
Reporter's Certificate . . . . . . . . . . . . . . . 208

EXHIBITS

| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 1 | Curriculum Vitae | 11 | 12 |
| 2 | Request for Equitable Adjustment | 87 | 87 |
| 3 | Evaluation of Claims | 91 | 91 |
| 4 | Inspection Report of Dredging | 179 | 180 |

REQUESTED DOCUMENTS/INFORMATION

| NO. | DESCRIPTION | Page/Line |
|---|---|---|
| None | | |

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| NO. | Page/Line |
|---|---|
| None | |



THE REPORTER: Pursuant to the Rules of the Court of Federal Claims?
MR. KOSLOSKE: Yes.
MR. ERIKSON: Yes.
THE REPORTER: Would you raise your right hand, please?
Do you solemnly swear or affirm to tell the truth, the whole truth and nothing but the truth?
THE WITNESS: I do.
THE REPORTER: Thank you.

ROBERT McCULLOUGH,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. KOSLOSKE:
Q. Good morning, Mr. McCullough, my name is John Kosloske. For the record, I'm an attorney with the Department of Justice in Washington, D.C. I'm representing The United States in litigation between Renda Marine, Inc., and The United States in a case that's pending in the Court of Federal Claims.
I understand that you've been designated as an expert witness on behalf of Renda Marine in the case; is that correct?
A. Yes.
Q. Would you state your full name for the record and

spell it, please?
A. Robert Brian McCullough, R-O-B-E-R-T, B-R-I-A-N, M-C-C-U-L-L-O-U-G-H.
Q. And what is your occupation, sir?
A. I am an engineering consultant.
Q. And what is your business address and telephone number?
A. 15938 Midway Road, Addison, Texas 75001. Phone number is (972) 385-3158.
Q. What is your date of birth?
A. 9-14-54.
Q. Are you affiliated with McCullough & Associates?
A. Yes.
Q. What is your position with the firm?
A. President.
Q. What is the nature of McCullough & Associates' business?
A. We do construction consulting.
Q. What does construction consulting entail, at least for McCullough & Associates?
A. We evaluate projects for our clients. We evaluate -- we'll go in when there's a situation and where the contractor may be spending more money, we evaluate it from an owner's perspective or a contractor's perspective. We look at damages, we look at schedule, we look at the



contractual obligations of the parties, and we assist the parties in trying to resolve whatever their disputes are.
We also assist -- well, we assist all parties, I guess, primarily contractors, in doing contract management. That's helping them put together change proposals.
We do critical path scheduling. We help them with estimating, and then we do -- so that -- I guess that's probably the bulk of our work.
Q. When you say estimating, what do you mean by that?
A. Estimating the cost of performing work.
Q. For example, preparation of a bid estimate for a construction job?
A. We don't generally assist them in preparing bid estimates, but that would be estimating, yes, sir.
Q. Do you primarily prepare estimates in connection with pricing changes to contracts?
A. Yes, sir.
Q. When was McCullough & Associates formed?
A. I believe we filed a DBA, I'm going to guess, it would have been around 1989.
Q. Today how many employees are with the firm?
A. I've got four full-time employees and I've got, I would say, two regular outside consultants that are basically working full time for me.



Q. Who are the four full-time employees and what do they do?
A. Robert McCullough, that's myself. My wife, Ann McCullough, who performs the bookkeeping, Peggy Chaney, C-H-A-N-E-Y, she is formerly a construction paralegal and is now working for me, helping me prepare documentation in cases, and we have a receptionist named Erin, I apologize, I can't remember her last name, she just started.
Q. Who are the two regular outside consultants who are working full time?
A. John Coakley.
Q. Could you spell that for the record?
A. C-O-A-K-L-E-Y. And Greg Lebkowsky, L-E-B-K-O-W-S-K-Y.
Q. Is Mr. Coakley self-employed?
A. Yes.
Q. Does he -- does he have a firm?
A. No.
Q. What are Mr. Coakley's qualifications to assist you? Let me rephrase that for you.
What kind of expertise or services does Mr. Coakley provide for you?
A. He reviews documentation, provides summaries for me to review, so he -- he reviews lots of financial information. He will review correspondence in build issue



files.
Q. Anything else?
A. He also does critical path scheduling. Generally that's -- I think that covers it.
Q. Is Mr. Coakley a Registered Professional Engineer?
A. No, sir.
Q. What is his education, if you know?
A. I believe he has a degree in finance and another degree in construction management.
Q. How long have you been working with Mr. Coakley?
A. More than six months. I don't think it's been a year yet.
Q. Has Mr. Coakley provided services to you in connection with your engagement for this litigation?
A. Yes.
Q. What services has he provided, and is he providing?
A. Generally what we discussed. He has gone through the various reports. He's checking the calculations of the damages. He's checking the backup information. He is looking at correspondence and assisting me in going through and evaluating the various claims and the various reports that have been produced.
Q. Has Mr. Coakley performed a CPM analysis for this case?

Page 185

report preparation?
A. Yes.
Q. How much is that?
A. That is $5,608.
Q. What is the basis for that?
A. That is the summary I got from Barry Smith.
Q. What does that amount cover?
A. The -- the work he did in preparing documentation in pulling together the Lost Lake Levee documentation, this was time he assigned to that particular claim issue.
Q. For purposes to assist you with preparation of your report?
A. No. This would have been prior to my report, in preparation of his original request for additional compensation, the documentation that he pulled together and we used.
Q. Would you turn to tab four? This is titled claim 12 Lost Lake Levees chronology summary.
A. Yes.
Q. Who prepared this tab?
A. I believe this was prepared by John Coakley of my office from a chronology supplied by Barry Smith.
Q. Would you recognize the chronology if I showed it to you, that is, the chronology prepared by Barry Smith?
A. Possibly.

Page 186

Q. Have you seen the chronology that Mr. Coakley used?
A. I -- I don't know that I have seen -- I don't know that I would know that a specific chronology was used to prepare this chronology. I know that we received one from Mr. Smith, and I know Mr. Coakley summarized it here, but I don't know that I watched the correlation of that happen.
Q. In the entry for October 16, 2001, in your summary, what is the basis of the Corps of Engineers' estimate of 75 cubic yards per linear foot of levee?
A. That was documentation that was furnished to me by Mr. Bowman and Mr. Smith from documentation they had received from the Corps.
Q. What is the basis for the entry for October 16, 2001, that the actual requirement was 270 cubic yards of material per linear foot of levee?
A. I'd have to research that. I'm not sure.
Q. As you sit here, do you know who made that calculation?
A. No, sir.
Q. The entry for December 7, 1999, Renda Marine experiences a significant levee "mud slide" or shear at station 65; do you see that?
A. Yes.
Q. What is the source of that information?

Page 187

A. Again, I believe this was a chronology provided by Mr. Smith. I didn't go back and independently verify each one of these against a diary entry.
Q. How did you determine that the mud slide in this instance was significant?
A. Because the note said it was significant.
Q. The note in the chronology that was used to prepare this summary?
A. Yes, sir.
Q. In the entry for January 5, 2000, do you dispute low dredge production due to "stiff clays" and the six month delivery delay for the dredge?
A. Do I dispute that?
Q. Yes.
A. I don't believe so.
Q. The entry for January 24, 2000, "Routinely experiencing significant subsidence of levees," is the basis for that the chronology provided by Barry Smith?
A. Yes, sir.
Q. The entry for January 28, 2000, is the basis for the statement that both the Corps of Engineers and the joint venture personnel realize problem with poor levee foundation materials the chronology prepared by Barry Smith?
A. Yes, sir.
Q. The entry for June 12th, 2000, Renda Marine

Page 188

submitted a revised schedule showing completion of all levees by December 2000. What is the significance of that document?
A. It was showing updated schedules that Renda Marine was supplying updated schedules based upon the impacts that had occurred to date.
Q. What is the significance of that to your analysis?
A. It showed that Renda Marine was managing their work, it shows that they anticipated a later completion date as a result of problems that occurred and the delays that were being blamed on -- it showed the overall delay that was occurring to the project, at least in an incremental view of that.
Q. The entry for October 18, 2000, describes levee failure as catastrophic. Catastrophic according to whom?
A. Whoever wrote the entry.
Q. Would that have been Barry Smith's chronology?
A. I believe so. And I apologize. This may have been a combination of Barry Smith's chronology or entries out of Barry Smith's claims, but the source would still be Barry Smith.
Q. Do you know where this catastrophic levee failure occurred?
A. Not just looking at this chronology, no, sir.
Q. April 16, 2001, the entry is, last day that the dredge Millennium was on this project, by that you mean the

Upper Bayou Project; correct?
A. That's what that means, yes, sir.
Q. Where was the dredge Millennium after April 16, 2001?
A. The -- if I recall properly the timing of it, there was some additional work that was being performed on another project. They moved the dredge up there to perform that dredging work, and then I don't know -- I don't know physically where the dredge was located prior to it being released by the Corps, but I know it did perform some additional work for another contract during that time frame.
Q. Do you know where Renda was working on the levees, that is, which station, on October 18, 2000?
A. No, sir, just sitting here I don't have an independent recollection of that.
Q. Do you know which levee Renda was working on on October 18, 2000?
A. No, sir, just sitting here I don't have an independent recollection of that.
Q. It's your understanding that the dredge Millennium was not on the Upper Bayou Project after April 16, 2001?
A. Well, I know it was still -- I would call it under the control of the Corps. The Corps did not release it until July 23rd. I know that it went off to another project with the permission from the Corps to do another project and bring



that dredged material back to the levee -- levee disposal area, so I know -- I know that it was off-site doing that work during that period of time.
Q. Do you know what that other project was?
A. The Houston -- Houston oil -- I want to say Houston ship oil but --
Q. Houston Fuel Oil Project?
A. Houston Fuel Oil Project.
Q. What did Renda Marine do with the dredge Millennium when the Houston Fuel Oil Project was completed?
A. I don't know. I know it was not taken to another project that they had, but I don't know exactly where it was placed.
Q. The entry for June 24, 2001, Renda Marine confirms with the Corps of Engineers the decision not to continue with any levee work; is that your understanding?
A. Yes.
Q. Would you turn to tab five of your report?
A. Yes, sir.
Q. Tab five of your report is a spreadsheet, is it not?
A. Yes, it is.
Q. And it's titled impacted dates?
A. Yes.
Q. Claim 12, hydraulic and mechanical levees; is that



correct?
A. Yes.
Q. What do you mean by impacted dates?
A. These are the dates on which we claim the work was impacted under one of the claim 12 issues.
Q. And does this spreadsheet address impact to work on hydraulic as well as levees that were per the contract to be constructed mechanically?
A. No, sir.
Q. What does it cover?
A. It covers work that is addressed in claim 12, which would be all work that was anticipated to be done hydraulically, all levees that were planned to be placed hydraulically, but some eventually got placed mechanically, but it does not include the mechanical levee work done by Affolter.
Q. The column on the far left of this spreadsheet is date, and what does that refer to?
A. That's just a count of the number of days, day one being May 19th, 1999.
Q. What is the significance of starting with Wednesday, May 19, 1999?
A. It's the completion of the mechanical levees by Affolter.
Q. So that was the earliest point in time that the



hydraulic levees could begin to be built?
A. Yes.
Q. The next column is a column that says date, and that's self-explanatory?
A. Yes, sir.
Q. The next column is description; see that?
A. Yes.
Q. What information appears in the description column?
A. These are just notes from the various diaries or dredge reports or CQC logs, that type of information.
Q. What is the source -- excuse me, strike that.
Who prepared tab five, this spreadsheet?
A. Mr. Coakley and I prepared this.
Q. And to the right of the description column there's a column impact date; do you see that?
A. Yes.
Q. What is that column for?
A. I don't know.
Q. Turn to day 182, which is the third page of tab five. That's Tuesday, November 16, 1999, under impact days there's a value of one is entered, and the description is Renda began moving "misplaced" materials to other stations. Does that refresh your recollection as to what impact days means?

Page 193

A. No, sir.
Q. To the right of impact days there's a column claim five. What is claim five?
A. Claim five is claim number five that we reference in our -- in our report. That would be the Flare Area claim.
Q. What kind of information appears in the claim five column?
A. Is there an indication in that column when -- when a claim was made, when damages were claimed on that date under claim five.
Q. And so for the -- the column beside that, claims six, seven, eight, nine, 10 and 11?
A. Yes.
Q. Are those -- is the purpose of those columns to record the same kind of information for the claims that correspond to those numbers in your report?
A. That's correct.
Q. And then you have claim 12. That refers to the Lost Lake Levees claim?
A. That's what it refers to, yes.
Q. If you'll turn to day 250, that's page four of this tab.
A. Yes, sir.
Q. Day 250?
A. Yes.

Page 194

Q. For claim five, you have entered the letters DL?
A. Yes.
Q. You have a key at the top that explains what DL refers to?
A. Yes.
Q. Is that, where you have DL in this spreadsheet, does that refer to both dredging and levee?
A. Yes.
Q. What does both dredging and levee mean?
A. That means that there were claims made for both the dredge crew and the levee crew on that day under claim five.
Q. If the letter L appeared rather than DL, what would that mean?
A. L should just be levee. I was looking at the code at the top. I don't see a code just for L, but it means levee work was being claimed at that location or --
Q. Just levee?
A. Yes.
Q. And then if you had -- you have a code D is dredging?
A. The dredge crew, correct.
Q. And so that means if you were to have a D appear in any of the columns claims five through 12 that only -- a claim is being made only for dredging crew on those days?

Page 195

A. Yeah, I don't see any plain Ds, because I believe in every case where a dredge claim was made the hydraulic levee crew that was associated with that was also claimed.
Q. Between the column in claim 12 and the next column, which is N/C over D, do you see that?
A. Yes.
Q. There is like a row of zeros. Is there any significance to that?
A. This is the blank column?
Q. A column of zeros.
A. Yes, the blank column.
Q. Is there any significance to that, or is that just to denote a zero?
A. There was some significance to that, because there's zeros, ones and twos in there. I think it's just a code column in order for this to calculate something, but I don't recall what exactly that was for.
Q. You don't know what the code is, what zero stands for or what one stands for?
A. No, sir.
Q. Or what two stands for?
A. No, sir.
Q. In the column N/C over D, what does that -- what kind -- what does that stand for and what kind of information

Page 196

is to appear in that column?
A. The first column is dredge, the second column is hydraulic levee, the third column is mechanical levee.
Q. What does N/C refer to?
A. I'll have to go back and check, because I don't recall.
Q. You have a column, the last group of columns is headed up, each column is headed up with a word claim and below that there's a 12 A, REF, 12 A.2, 12 A, 12 B, 12 C, 12 D, 12 E and 12 F, do you see that?
A. Yes.
Q. What kind of information is to appear in those columns?
A. That shows which crew is being claimed for each of those particular elements, hydraulic levee crew and mechanical levee crew.
Q. Is there a key, a separate key for those columns that appears in this spreadsheet?
A. I believe that is the same key, HL is hydraulic levee, ML is mechanical levee.
Q. What is the letter E, or is that a B?
A. I don't see it.
Q. Do you have a tab six there? Take any sheet on tab six and let's go over the information that appears at the top of those six or seven columns that appear there that

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., Plaintiff,
vs.
THE UNITED STATES, Defendant.

No. 02-306C
(Judge Hewitt)

---

ORAL DEPOSITION OF
ROBERT McCULLOUGH
VOLUME 2
April 16, 2004

---

ORAL DEPOSITION OF ROBERT McCULLOUGH, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on April 16, 2004, from 9:06 a.m. to 11:55 a.m., before Gloria Carlin, CSR No. 498 in and for the State of Texas, reported by Stenographic method, at the offices of Quilling, Selander, Cummiskey & Lownds, 2001 Bryan Street, Suite 1800, Dallas, Texas, pursuant to the Rules of the Federal Court of Claims and the provisions stated on the record.

Job No. 040416GJC



A P P E A R A N C E S

FOR THE PLAINTIFF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

FOR THE DEFENDANT:

John E. Kosloske, Esq.
CIVIL DIVISION
DEPARTMENT OF JUSTICE
1100 L Street NW, Room 12052
Washington, D.C. 20005

ALSO PRESENT:

Oscar Renda
Barry L. Smith
William Connole, P.E.
George J. Strickler, P.E.



INDEX

Appearances . . . . . . . . . . . . . . . . . . . 2
Stipulations. . . . . . . . . . . . . . . . . . . 4
ROBERT McCULLOUGH
Examination by Mr. Kosloske. . . . . . . . . . 5
Signature and Changes. . . . . . . . . . . . . . . 301
Reporter's Certificate . . . . . . . . . . . . . . 303

EXHIBITS

| NO. | DESCRIPTION | MARKED | IDENTIFIED |
|---|---|---|---|
| 5 | Fax 2-3-04 from Barry Smith to McCullough & Associates | 249 | 249 |
| 6 | Letter 3-24-04 from Brian Erikson to John Kosloske | 276 | 276 |
| 7 | Handwritten notes | 278 | 278 |
| 8 | Handwritten notes | 280 | 280 |
| 9 | Copy of telephone message | 288 | 288 |
| 10 | Document Control Log | 288 | 289 |
| 11 | Chronology/History for Claims at Upper Bayou Project | 290 | 290 |
| 12 | Memo 2-9-04 from Barry Smith to Brian Erikson | 291 | 291 |
| 13 | Original Estimate | 292 | 292 |
| 14 | Dredging Production | 293 | 293 |
| 15 | Fax 1-8-04 from Milbern Ray and Company to Barry Smith | 294 | 294 |
| 16 | Dredge Report | 294 | 294 |
| 17 | Equipment Rate Schedule Summary | 295 | 295 |
| 18 | RMI - List of Equipment | 296 | 296 |
| 19 | Handwritten notes | 297 | 297 |
| 20 | Handwritten notes | 297 | 298 |
| 21 | Handwritten notes | 299 | 299 |
| 22 | Handwritten notes | 300 | 300 |



INDEX CONTINUED

REQUESTED DOCUMENTS/INFORMATION

| NO. | DESCRIPTION | Page/Line |
|---|---|---|
| None | | |

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| NO. | Page/Line |
|---|---|
| None | |

THE REPORTER: Pursuant to the same rules as yesterday?
MR. KOSLOSKE: Right.
THE REPORTER: I'll just remind you you're still under oath.
THE WITNESS: Thank you.
ROBERT McCULLOUGH,
having been previously sworn, testified as follows:
EXAMINATION
BY MR. KOSLOSKE:
Q. Good morning, Mr. McCullough.
A. Good morning.
Q. When we broke off yesterday we were looking at the tabs to your report in this case which is marked for identification as Exhibit 3.
A. Yes.
Q. Would you turn to tab five of your report?
A. Yes, sir.
Q. This is the tab that's titled Impacted Days; correct?
A. Yes.
Q. The column on this spreadsheet that reads impact days, if you'll turn to page three of 13 of this tab, for day 182 there's a value of one placed in that column; do you see that?



A. Yes.
Q. What does the one represent?
A. I don't recall.
Q. Do you know what document or documents were used to generate that number?
A. No, sir.
Q. And if you'll go back to the -- stay on the page three of 13, if you will. If you go to the column that reads N/CD; do you see that?
A. Yes, sir.
Q. And you have -- for a number, many of the days, you have a value one there. What does that represent?
A. I apologize. I still don't recall.
Q. Do you know what documents were used to generate that value?
A. No, sir.
Q. And then would your answer be the same for the column that is headed up N/CHL?
A. Yes, sir.
Q. Would your answer be the same for the column headed up N/CML?
A. Yes.
Q. And you have a column claim, 12A REF; do you see that?
A. Yes.



Q. What does REF refer to?
A. I don't know specifically what REF refers to.
Q. Okay. Now, the code in the column claim 12-A, REF, HL, that refers to what?
A. Hydraulic levee.
Q. And specifically what about hydraulic levee?
A. It is the hydraulic levee crew.
Q. And what document or documents were used to generate the -- the code HL for the days in which it appears in this column?
A. It would be our assessment of whether an impact was occurring on claim 12-A on that particular date.
Q. So the -- when the code HL appears in column 12-A, REF, that reflects a judgment being made by you, rather than a summary of information that is contained in a daily report or a CQC report?
A. Yes.
Q. And the column that's headed up claim 12-A.2; do you see that?
A. Yes.
Q. You have differing values appearing in that column, again, I'm looking at page three of 13. There's a 0.3, 0.5, 0.6, 0.2 all, what are those values?
A. I apologize. I'm going to have to double-check, to see how it ties through, because I can't -- I can't find



the exact reference to that.
Q. Is that a reference to hours or portions of hours?
A. That's what I'm trying to check, and I can't find that.
Q. How were those hours derived?
A. I don't know. That's what I'm telling you, I need to go check.
Q. As you're sitting here today, you can't tell us what the source of that information is?
A. The source of that information was our review of the hydraulic levee logs or daily reports that were submitted by Renda.
Q. And did those specific values appear on those documents, or do they reflect a judgment on your part?
A. It reflects a judgment on our part.
Q. So those particular values, if we went to the report, we wouldn't see 0.1, 0.2 and so on?
A. That's correct.
Q. And in the column 12-A reference, when you have HL, do you know whether that's supposed to indicate a entire day of hydraulic levee crew?
A. I'm not sure what you're asking.
Q. See the column claim 12-A reference?
A. Yes.
Q. You have HL as a code?

A. Yes.
Q. When you have HL as a code for a particular day, does that indicate that that represents a full day of hydraulic levee crew costs?
A. What about a full day of hydraulic levee crew costs?
Q. Well, we have, for example, day 165, Saturday, October 30, 1999, HL, does that mean you had the hydraulic levee crew working the entire day?
A. That's not what that means, no.
Q. Would you turn to page five of 13 of tab five.
A. Yes, sir.
Q. There's a column that you have, claim 12-B; see that?
A. Yes.
Q. Then about halfway down the page, beginning with, I believe it's day 339, Friday, April 21, 2000, the code ML appears in that -- in that column that's titled claim 12-B.
A. Yes, sir.
Q. And ML refers to what?
A. Mechanical levee.
Q. And it's mechanical levee crew; is that what that means?
A. It refers to a mechanical levee crew, that's correct.



Q. And what documents or documents were used to generate that information?
A. The -- the daily logs that were submitted by Renda for the levee crews.
Q. Did those logs break out the personnel working at Lost Lake into the mechanical levee and the hydraulic levee crews?
A. There was some breakout of crews on the -- on the sheet showing certain work that was done, but not every day, and did not -- did got give a complete breakout of mechanical and hydraulic levee crews.
Q. So the designation ML in tab five, in the column titled claim 12-B reflects a interpretation or judgment by your part -- on your part?
A. No. The designation ML does not require any interpretation.
Q. Do any of the documents that you looked at in order to make the designation ML distinguish between Renda personnel at Lost Lake Placement Area that are assigned to a crew that's doing mechanical levee work and Renda personnel at Lost Lake Placement Area that are performing hydraulic levee work; is such a distinction made in the daily records?
A. In certain cases it is. Not in all cases.
Q. And in those cases in which it does not appear, then you had to make a judgment as to what personnel were



doing hydraulic levee work and what personnel were doing mechanical levee work?
A. Yes.
Q. Would you turn to page nine of 13 of tab five?
A. Yes, sir.
Q. And the claim -- the column is titled claim 12-E for, I believe it's day 563, you have a B, a letter B.
A. Yes.
Q. What does that represent?
A. That represents the booster barge.
Q. What document or documents did you use as a source of that information?
A. The -- the logs submitted by Renda.
Q. And do those logs show booster barge as a piece of equipment?
A. Yes, sir, I believe they do.
Q. Were you making any kind of inference from the documents, or just simply attempting to summarize what appears on the documents?
A. We're identifying days when we believe the booster barge was being impacted and should be claimed as an extra cost for that particular day.
Q. And if you'll turn to page 12 of 13 of tab five.
A. Yes, sir.
Q. The column to the far right that's titled claim



12-F; do you see that?
A. Yes.
Q. If you go down the page to -- I believe that's day 779, Thursday, July 5, 2001, code DS is entered in that box, and then following down for the rest of that page; do you see that?
A. Yes.
Q. DS refers to what?
A. Dredge standby.
Q. And what document or documents did you base that determination on?
A. Again, the daily logs that were submitted by Renda.
Q. Okay. Do the daily logs reflect -- do they state, do they indicate standby, or does that involve a judgment made by you after reviewing the report?
A. I don't recall.
Q. If you'll turn to page 13 of 13 of tab five.
A. Yes, sir.
Q. You have at the bottom of that sheet, in the far left total number of days; do you see that? Lower left-hand side of that page.
A. Yes.
Q. Total number of days?
A. Yes.

A. Yes, sir.
Q. When you say dredge equipment?
A. Yes, sir, that's what the D refers to is dredge equipment.
Q. Okay. And the code DP, specifically what daily log did you use to determine days on which that code was applicable?
A. The same daily logs.
Q. Would you turn to tab six of your report, please?
A. Yes, sir.
Q. This is a spreadsheet that's titled Dredge and Levee Data From Daily Logs?
A. Yes.
Q. Would you turn to page six of 21 of tab six?
A. Yes.
Q. Directing your attention to log, the entries for Monday, September 13, 1999.
A. Yes, sir.
Q. For the column levee delays, displaced material you have a value of two there; do you see?
A. Yes.
Q. 2:00. What does that represent?
A. That represents time when the dredge was not able to deposit dredge materials on the levees because the crew was displacing -- well, was removing the displaced material.



This is the material that's coming up out of the side-cast borrow areas, and they're having to remove that material so they can continue placing material on the levees.
Q. Did the Dredge Daily Inspection Reports contain a category for time for levee delays, displaced material?
A. I'm sorry, would you repeat the question?
Q. Right, do the Daily Inspection Reports for the dredge contain a category for collecting or reporting time for levee delays, displaced material?
A. They do not have a specific category or item, I guess is what they call it, they do not have a separate item for that category, that's right.
Q. How were the hours, the two hours that are -- appear in the column for levee delays, displaced material for September 13, 1999, determined?
A. Mr. Coakley and I sat down with Mr. Bowman and we pulled out all of the -- the inspection reports, the dredging inspection reports and the levee diary information, and that's all of the diary information, we pulled all that out and reviewed that information and made a determination, Mr. Bowman made a determination that two hours was the appropriate amount of time for that work.
Q. If you'll drop down on that same page, six of 21 of tab six to the entry for Thursday, September 30, 1999; do you have that?



A. Yes.
Q. You have a -- in the column effective working time, a value of five minutes; is that correct?
A. Yes.
Q. So for that day what this spreadsheet shows is that the dredge had effective working time of five minutes?
A. Yes.
Q. And 23 hours and 55 minutes of lost time?
A. Yes.
Q. How did you determine that the dredge had five minutes of effective working time on that date?
A. I believe that came off of the dredge log.
Q. You have for that particular date, in the notes column, see CQCR. What is the significance of that?
A. It's simply reference to the CQCR diary that Renda had submitted.
Q. But if that value was determined from the Dredge Daily Inspection Reports, why would you be referring to the CQCR report?
A. Well, because the -- the columns here that are stated from Dredge Daily Inspection Reports are, in fact, from the Dredge Daily Inspection Reports, and the allocation of the levee impact that is occurring is being reported on the CQCR reports, which is reporting the levee operations, so that's why there's a reference to both.



Q. So that are you saying that for the -- the date of September 30, 1999, where you have from the daily -- the Dredge Daily Inspection Reports in the column miscellaneous and lost time, 23 hours and 55 minutes, that's the time the dredge was down, are you saying that the determination that that 23 hours and 55 minutes was attributable to levee delays, displaced material, is based upon an examination of a CQCR?
A. No, sir.
Q. No?
A. When we started this analysis I explained to you that this entire analysis is based upon reviewing the Daily Dredge Inspection Reports, the typed copy submitted to the Corps, as an example, Deposition Exhibit 4, in addition to the handwritten copies of those same reports, in addition to the CQCR reports, in addition to the -- the other Renda diary that was performed, so it is a combination of all of those documents that makes up the evaluation and assessment of those times.
Q. So the note -- the note that says "CQCR" is misleading, because it only refers to one of those reports?
A. No, sir.
Q. For the time that you have in -- appearing in the column levee delays, displaced material, is the dredge on standby or working?

A. Yes.
Q. What does that value represent?
A. The total cubic yardage reported in the CY column.
Q. And then for the column LF there's a value at the end of 9,814; do you see that?
A. Yes.
Q. What does that represent?
A. That is the total of the numbers listed in the LF column on the spreadsheet.
Q. How was the information that appears in tab eight used by you to calculate or compute any of the damages that you've computed that are reflected in your report?
A. It was used as a reference tool to refer back to when reviewing when delays occurred and when -- when delays and impacts occurred on the project.
Q. Are any of the totals that we referred to a moment ago for the column CY and LF, are either of those totals used in any of your computations or calculations?
A. I don't recall using either of those totals in any of my computations --
Q. Do you know --
A. -- of damages.
Q. I'm sorry.
A. I apologize.
Q. Do you know how many linear feet of levee was paid



to Renda for completed levee?
A. No, I don't recall that, sir.
Q. Would you turn to tab nine of your report?
A. Yes, sir.
Q. Who prepared tab nine?
A. Mr. Coakley prepared it.
Q. What is the purpose of tab nine?
A. To compute the damages being claimed for issue 12a1.
Q. And issue 12a1 is added cost for original duration?
A. Yes.
Q. In the upper left-hand portion of this, the first page of tab nine, under 12a1 - added cost for original duration, parenthetically, 10 months, and then a colon. The third line you have daily per diem equals $25 per worker, $50 for 24-hour shift, two workers; do you see that?
A. Yes.
Q. How did you determine the daily per diem of $25 per worker?
A. We asked Mr. Bowman.
Q. And he told you it was $25 a day?
A. Yes, sir.
Q. Did you ask for any documentation to support that?
A. No, sir.



Q. Then you have $50 per 24-hour shift, two workers. How did you determine two workers would be appropriate for this calculation?
A. Because they were working two workers on a 24-hour shift.
Q. And what work was being performed by these two workers?
A. The -- these workers were part of the hydraulic levee crew, which was managing the pipe and managing the disbursement of the materials coming out, the levee materials that are being dredged and pumped out by the dredge.
Q. And then in your calculation for this claim item you have assumed that these additional workers were at the work site at Lost Lake beginning on September 13, 1999?
A. Yes.
Q. From the first day of dredging?
A. Yes.
Q. You have a value of, it appears to be, 304 to the right of the information that's 12a1 added cost for original duration, 10 months, do you see that between that information and a box that has days for '99 and days for 2000; do you see that?
A. Yes, sir.
Q. What does the 304 represent?
A. The total number of days between September 13th,



'99 and September -- July 14th, 2000.
Q. For -- for 2000 you have an end date of July 14; is that correct?
A. Yes.
Q. How did you determine that end date?
A. The 304 was calculated from -- it's 10 months based on 365 days a year, starting 304 days from September 13th, comes out to July 14th, 2000.
Q. And what happened after July 14, 2000, were these additional workers assigned to other duties?
A. No, sir.
Q. What happened to them?
A. They remained there. They remained on the hydraulic levee crew.
Q. But you're not claiming for them after July 14th?
A. Not on claim 12a1.
Q. Are you claiming for them on another claim?
A. Yes, sir.
Q. What would that be?
A. That would be 12a2.
Q. And 12a2 is the additional cost for full crew for extended duration?
A. Yes, sir.
Q. Now, let's drop down to the first box of information with columns, titled additional labor; do you see

Page 247

that? I'm on the first page, the first sheet of tab nine.
A. Yes, sir, additional labor.
Q. Following that there's a column ID, do you see that?
A. Yes.
Q. What does ID refer to?
A. The ID number for the piece of equipment.
Q. Then you have a box equipment; what information appears in that column?
A. The additional worker designation.
Q. Why do you have additional worker in a column that's headed up equipment?
A. It would appear that we have a -- well, it's a mistake. It's a typographical error on the spreadsheet.
Q. So what should the title of that column be?
A. It should be labor.
Q. Then you have a column that says planned; do you see that?
A. Yes.
Q. What does that refer to?
A. An indication as to whether that additional worker was planned to be on the hydraulic levee crew in Renda's original bid.
Q. How did you go about determining whether that was 'he case or not?

Page 248

A. We reviewed the original bid with Mr. Bowman and determined that these additional workers were not on that crew.
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 5 MARKED.)
Q. (BY MR. KOSLOSKE) Mr. McCullough, showing you what's been marked for identification as Exhibit 5. This is a document that is -- begins with a Bates stamped RBM 00007, ends with a Bates stamp RBM 00010. It's from your work papers; is that correct?
A. Yes, sir.
Q. The first sheet, that is a facsimile cover sheet from Barry Smith, to McCullough & Associates, to your attention, and that of John Coakley, it's dated February 3, 2004, and in the comments portion it reads Rob/John, "Attached is RMI's original bid calculation. I could only find a copy (8.5 times 11) of the document, and it's marginal. The original is much larger." Do you see that?
A. Yes, sir.
Q. Are the sheets that are attached and follow this over sheet the bid estimate that you referred to a moment ago in your testimony that you used to determine whether the additional workers that are reported in the additional labor item on the first page of tab nine were planned or not?

Page 249

A. Yes.
Q. Next to the planned column you have column 1999 days; do you see that?
A. Yes, sir.
Q. And what information appears in that column?
A. 109.
Q. What does that represent?
A. The 109 days that are referenced directly above it for 1999. It would be the days from September 13th, 1999, through December 31st, 1999.
Q. How did you determine that those additional workers were on the job during that period of time?
A. We reviewed the contractor CQC reports and the other -- the other reports that Renda submitted.
Q. Is the same true for the days reported under 2000?
A. Yes.
Q. Then you have a column hours per day. Do you see that?
A. Yes.
Q. You have 24 hours. How did you determine the 24 hours?
A. Based on discussions with Mr. Smith and Mr. Bowman.
Q. Then you have a column 1999 total hours; do you see that?

Page 250

A. Yes.
Q. And how are the values in that column determined?
A. That would be the number of days times hours per day.
Q. The same would be true for the column 2000 total hours?
A. Yes, sir.
Q. You have a column average hourly rate; do you see that?
A. Yes, sir.
Q. And how was that value determined?
A. That rate comes from tab 13, and it's an average hourly rate based upon the certified payroll reports which show the payroll amounts and the hours, and we averaged that for -- for the job and came up with an average hourly rate.
Q. You have a column 1999 labor. What is the -- or what do the values in that column represent?
A. That represents the 1999 hours times the hourly rate times the daily per diem, including the daily per diem.
Q. Are the values in the column under 2000 labor determined the same way?
A. Yes, sir.
Q. Below that you have add workmen's comp for nonmarine, (7.26 percent); do you see that?
A. Yes.

Page 255

Q. And then the second page of tab nine, who prepared this sheet?
**A. Again, this was prepared by Mr. Coakley under my direction and reviewed by myself.**
Q. This is for item 12a2, additional cost for full crew for extended duration; is that correct?
**A. Yes.**
Q. In the actual labor box that that has numerous columns in it, you have on the far left ID, what does that refer to?
**A. For labor there is -- they are listed as NA, which is not applicable, because that is the equipment number.**
Q. And the second column is the equipment. Should that read labor?
**A. Yes, it should.**
Q. And then that column you have entered either planned worker or additional worker; do you see that?
**A. Yes, sir.**
Q. How did you determine whether a worker was planned or additional?
**A. By reviewing the crew and the original bid estimate with Mr. Bowman.**
Q. Okay. And by original bid estimate, you mean the sheets that are attached to what is marked for identification as Exhibit 5?

Page 256

**A. Yes, sir.**
Q. You have a column 1999 days. What do the values in that column represent?
**A. The days in 1999 that we are claiming under claim 12a2.**
Q. Okay. And for 2000 days, those are the days in 2002 (sic) that you're claiming under 12-A.2?
**A. Correct.**
Q. 2001 days are the days in 2001 that you're claiming under 12a2?
**A. Correct.**
Q. And you have hours per day, 24, how is that value determined?
**A. By discussing the number of hours the crew was working with Mr. Bowman.**
Q. Then you have column 1999 total hours; is that the product of 1990 (sic) days and 24 hours?
**A. Yes.**
Q. And the hours that appear in the columns, total hours column for 2000, 2001, are computed in a similar way?
**A. Yes.**
Q. You have an average hourly rate of $15.64. Do you see that?
**A. Yes, sir.**
Q. Is that value determined in the same manner that

Page 257

we discussed a moment ago with respect to average hourly rate that appears on the first sheet of tab nine?
**A. Yes, from tab 13.**
Q. You have daily per diem, $25?
**A. Yes.**
Q. 1999 labor, what do the values or value that appear in that column represent?
**A. That's the extension of the hours times the rates and a per diem for 1999.**
Q. And for the columns 2000 labor and 2001 labor, they're computed in a similar manner to the values that appear in 1999 labor?
**A. Yes, sir.**
Q. And the box below that, actual equipment?
**A. Yes, sir.**
Q. You have at the far left, ID. Is that the equipment identification number?
**A. Yes, sir.**
Q. And we have a box, equipment is the description of the item of equipment; is that correct?
**A. That's correct.**
Q. How did you identify the equipment that is -- appears in the actual equipment box for claim item 12a2?
**A. This was equipment we identified from the diaries that were submitted and prepared by Renda.**

Page 258

Q. Do those documents have a category additional cost for full crew for extended duration?
**A. I'm sorry, I don't think I understood the question.**
Q. You said you identified the equipment for actual equipment from daily reports; is that correct?
**A. Yes, sir.**
Q. Do the daily reports contain a category that lists equipment that relates to additional cost for full crew for extended duration?
**A. No, sir.**
Q. So that's a judgment determination based upon a review of those documents?
**A. Yes, sir.**
Q. Then you have column source. What is -- what information appears in that column?
**A. That's the source of that particular equipment.**
Q. Then you have a column planned; do you see that?
**A. Yes, sir.**
Q. What does that represent?
**A. That represents whether that equipment was in the planned hydraulic levee crew or not.**
Q. And did you make that determination by reference to the sheets that are attached to the first page of Defendant's -- what's marked for identification as Exhibit 5?

A. Yes, sir.
Q. You have a column 1999 days. What do the values in that column represent?
A. Those are the days that we are claiming were extended duration days for claim 12a2.
Q. Okay. And the column 2000 days are the days that you're claiming for 12a2?
A. Yes.
Q. And 2001 days column are the days or number of days in that year that you're claiming for 12a2?
A. That's correct.
Q. You have hours per day, 24; do you see that?
A. Yes, sir.
Q. How did you determine that?
A. From discussions with Mr. Bowman.
Q. Then you have column 1999 total hours. What does that represent?
A. An extension of the number of 1999 days times 24 hours a day.
Q. And the information that appears in the columns 2000 total hours and 2000 total -- excuse me -- 2001 total hours is computed in the same way?
A. Yes, sir.
Q. You have a working hourly column. What is that?
A. That's the hourly rate for the equipment.



Q. How was the -- what is the source of the hourly rate for the equipment, the source of which was Renda Marine?
A. It would be the Corps' pricing manual.
Q. What is the source of the hourly rate for the rental equipment?
A. The rental agreements or invoices.
Q. What information appears in the working daily column?
A. That would be the daily rate for that equipment.
Q. You have a 1999 equipment column; do you see that?
A. Yes.
Q. What information appears in that column?
A. That would be an extension of the hours for 1999 times the rate for that piece of equipment.
Q. And then the information that appears in the columns for 2000 equipment and 2001 equipment was computed in the same way?
A. Yes, sir.
Q. At the bottom of the second page of tab nine you have 12a1 and 12a2 totals; do you see that?
A. Yes.
Q. For total labor you have a value there of 205,583; do you see that?
A. Uh-huh.
Q. Dollars. What does that represent?



A. That represents the total for claims 12a1, which is the previous page, and 12a2, which is this page, the totals for those two.
Q. And then you have total equipment, you have a value of $334,009; do you see that?
A. Yes, sir.
Q. What does that represent?
A. That would be the same thing for the equipment numbers, that would be the 1999 totals from claim 12a1 and 12a2.
Q. And you have similar totals for 2000 and 2001?
A. That's correct.
Q. How did you use those values in your calculation of damages in this case?
A. Those should be the damages that we claimed for those items.
Q. Would you turn to tab 10 of your report?
A. Yes, sir.
Q. Tab 10 is titled Dredge Claims Related to Levee Operations. Who prepared this?
A. Mr. Coakley entered the data and I reviewed the information.
Q. What is the purpose of tab 10?
A. To compute the damages related to the dredge claims and levee operations.



Q. You have on the first page a sheet -- tab 10 is actually four sheets; is that correct?
A. That's correct.
Q. Look at the first sheet that's titled Dredge Claims Related To Levee Operations and the box of information has just above it 12c and 12d - dredge delay time. There's a first column, ID; what does that contain?
A. The identification as to whether that particular line item is claim item 12c or claim item 12d.
Q. For 12c the claim description is backtracking pipe due to levee failures?
A. Yes.
Q. And for that you have days for 1999, days for 2000 and days for 2001?
A. Yes.
Q. And you have a column labor cost per day; do you see that?
A. Yes.
Q. How was that determined?
A. Tab 13 shows a tabulation of the certified payroll information. It totals, comes up with an average hourly rate and then goes through a calculation to calculate at the bottom of the page the average daily dredge payroll.
Q. And tab 13 is titled Payroll Rate Calculation; is that correct?

A. Yes.
Q. And the average daily dredge payroll is reported as $5,177?
A. Yes.
Q. And that figure is what appears in labor cost per day on the first sheet of tab 10?
A. That's correct.
Q. What does, on tab 13, average daily dredge payroll, you have parenthetically, 85 percent of total; do you see that?
A. Yes, sir.
Q. What does that mean?
A. That is the percentage of the total payroll that represents the dredge payroll.
Q. How did you determine that?
A. Based on discussions with Mr. Bowman.
Q. And you have -- I'm back now on the first sheet of tab 10, equipment cost per day, $30,796.97; do you see that?
A. Yes, sir.
Q. What does that value represent?
A. That represents the daily cost of the dredge equipment.
Q. How is that value determined?
A. It is a total of dredge costs -- if you flip back two pages in tab 10, it's page three of tab 10, it shows how



that was computed.
Q. Page three is Dredge Operating Rate Calculations.
A. Yes, sir.
Q. And it sums to $30,796.97?
A. Correct.
Q. And that's the value that appears in equipment cost per day on the first sheet of tab 10?
A. Yes, sir.
Q. Let's stay with that for a moment with the Dredge Operating Rate Calculations, the third sheet of tab 10, the first column on the left, what is the purpose of that column, what does it show?
A. I don't know.
Q. The next column is Renda equip ID number, do you see that?
A. Yes.
Q. What is the information that appears in that column?
A. That would be the Renda equipment identification number.
Q. The next column is equipment description; do you see that?
A. Yes.
Q. What appears in that column?
A. A description of the equipment.



Q. How did you determine which equipment to include in this computation of dredge operating rate calculations?
A. Based on discussions with Mr. Bowman and Mr. Smith.
Q. Then you have a column hours per week; do you see that?
A. Yes.
Q. What does that represent?
A. That represents the hours per week being used in the -- the rate calculation, for the use of that particular piece of equipment.
Q. For item number 47, which doesn't have an equipment identification number, rental tugboat, Melissa B, parenthetically, 800 HP; do you see that?
A. Yes.
Q. You have 168 hours per week, do you see that?
A. Yes.
Q. How did you determine that 168 hours per week value?
A. Based on my discussions with Mr. Bowman and Mr. Smith.
Q. You have an hours per month category, what do the values in that category represent?
A. The hours per month that are being claimed for this particular rate calculation.



Q. How did you determine those hours?
A. Based on my discussions with Mr. Smith and Mr. Bowman.
Q. You have adjusted hourly rate column. What information appears in that column?
A. That's the hourly rate that we're claiming for this particular item.
Q. So for the -- take, for example, item number one, the dredge Millennium, you have an adjusted hourly rate of $724.49; correct?
A. Yes.
Q. And what is the source of that rate?
A. Equipment calculations that were performed by Mr. Smith.
Q. And what are those calculations based upon?
A. Based upon costs that were expended by Renda and the Corps manual formulas used to calculate the rates.
Q. You have a column daily operating rate; do you see that?
A. Yes.
Q. What information appears in that column?
A. The operating rate for the piece of equipment.
Q. So for item number 47 rental tugboat, Melissa B, you have $61.84; is that correct?
A. Yes.

Page 271

A. There's two columns, the last two columns -- the second to the last column, the total daily standby amount totals to $13,272 per day, and that's the number that's used in -- two pages back in 12e1.
Q. Okay.
A. And then on 12e2, just below that, the cost per day is 1,931 and that's derived from the last column on the -- the last page in Exhibit 10. That's that $1,931.36 per day and that's derived from the -- the full 13,000 for the full list of equipment, subtracting out 11,000 for the list of equipment that's in the last column on the last page of Exhibit D. The remaining items there, the remaining equipment is what totals up to $1,931. So that's the equipment being claimed under 12e2.
MR. KOSLOSKE: Let's take a break.
(Recess from 10:47 to 11:02 a.m.)
MR. KOSLOSKE: Back on the record.
Q. (BY MR. KOSLOSKE) Mr. McCullough, would you turn to tab 11 of your report?
A. Yes, sir.
Q. This is entitled Mechanical Levees - Equipment; is that correct?
A. Yes.
Q. Who prepared this document?
A. This was -- the data was input by John Coakley and

Page 272

Steve Bowman, and then I reviewed it.
Q. And what's the purpose of tab 11?
A. This is summarizing the mechanical levee equipment that was used on the project.
Q. How did you identify the equipment that's listed in the equipment column?
A. By reviewing the -- the -- I believe it's the CQC reports from Renda with Mr. Bowman.
Q. And you have a column ID, a column equipment and a column source, and then columns to the right of that that appear to correspond to days; is that correct?
A. That's correct.
Q. And there are values appearing for some of the equipment in some of the columns; is that correct?
A. That's correct.
Q. What is the source of those values?
A. That would be the CQC reports and discussions with Mr. Bowman.
Q. And are those values hours?
A. Yes.
Q. Then in the box at the bottom of the page you have a column ID and then a column personnel; do you see that?
A. Yes.
Q. What -- what appears in the personnel column?
A. It just has total personnel, so it will list the

Page 273

total people that were there, then it subtracts the hydraulic levee personnel, which leaves the mechanical levee personnel.
Q. Then you have plus any supervision?
A. Then there's supervision.
Q. And then, plus then you have total mechanical levee personnel?
A. Yes, so that's a computation determining the total mechanical levee personnel.
Q. How did you determine the number for personnel that you have there, the lower box on the first page -- excuse me, in the lower box of the tab 11?
A. By reviewing the -- the CQC reports, the payroll information and discussions with Mr. Bowman.
Q. Do the CQC reports or the payroll information break out the personnel in the manner that you have down in the lower box here?
A. I don't think they use the designations that we use, no, sir.
Q. So does the information that appears in the lower box, the numbers for personnel, represent a judgment by you?
A. Yes.
Q. Now, turn to tab 12.
A. Yes, sir.
Q. What is -- tab 12 is entitled Booster Equipment and Labor Calculations. Who prepared this?

Page 274

A. Again, the data was entered by Mr. Coakley and reviewed by myself.
Q. And what is the purpose of tab 12?
A. This is a calculation of the booster equipment and the labor associated with it.
Q. Would you turn to tab 14?
A. Yes, sir.
Q. This is a tab titled, the first page is titled Mechanical Levee Labor and Equipment - Proposed Deductions; do you see that?
A. Yes, sir.
Q. Who prepared this?
A. Mr. Coakley did the data input with Mr. Bowman, and then I reviewed it.
Q. What is the purpose of the first sheet of tab 14?
A. This is a computation of the mechanical levee labor and equipment that was included with the original claims that were submitted by Renda Marine, and these are the proposed deductions, because that mechanical equipment is now being priced separately in a different area.
Q. Is this the costs that were backed out by you for claim items such as the Flare Area?
A. Yes, sir.
Q. Turn to tab 15 that's titled Repair Invoice Duplication.

A. Yes, sir.
Q. Who prepared that?
A. Mr. Coakley typed the data in from information that we got from Mr. Smith.
Q. Okay. Would you turn to tab 16?
A. Yes, sir.
Q. I believe this one is titled Pathfinder Construction Consulting, Inc., Renda Marine, Inc., Billings and Claim Allocations; is that correct?
A. Yes.
Q. Who prepared this tab?
A. Mr. Coakley.
Q. What is its purpose?
A. It's just a summary of information that we received from Mr. Smith regarding the hours, where he allocated his hours to the various claims and to -- whether it was claim preparation or whether it was preparation for the proposal or REA.
MR. KOSLOSKE: Could I have this marked for identification?
(EXHIBIT(S) NO. 6 MARKED.)
Q. (BY MR. KOSLOSKE) Mr. McCullough, I'm showing you what's marked for identification as Exhibit 6. Would you take a look at that? Exhibit 6 is a letter dated March 24, 2004, from Brian Erikson to John Kosloske. It states, among



other things, and I quote, "Mr. McCullough's documents and CD are Bates numbered RBM 00004 to RMB 00494. I suppose that should be RBM 00494. Is that an accurate statement?
A. I believe you read that accurately.
Q. Are your work papers and other documents considered by you in preparing your report contained in what are Bates numbered RBM 0004 to RBM 00494?
MR. ERIKSON: Objection, form. You're free to answer.
A. I believe these -- this is a set of my work papers. I don't think it's everything that I reviewed.
Q. (BY MR. KOSLOSKE) There's a CD that we received that has a Bates stamp on it of, I believe it's RBM 0005 and it has a title on it, "Renda Marine Upper Bayou Project, McCullough's Copy of Claim Files from Barry Smith." Is that a CD that you caused to be prepared and produced?
A. Yes.
Q. Okay. What appears on that CD?
A. Those were claim calculation sheets that were prepared by Mr. Smith.
Q. Is everything that appears on the CD a document that was generated by Barry Smith?
A. Based on the description, I believe so, but I did not personally review those to -- to confirm that.
Q. Who prepared the CD?



A. Mr. Coakley did.
MR. KOSLOSKE: May I have this marked for identification?
(EXHIBIT(S) NO. 7 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 7. Would you take a look at that and tell us whether you recognize it?
A. I'm sorry, I don't recall your question.
Q. Do you recognize this document?
A. No, sir.
Q. This -- what's been marked for identification as Exhibit 7 is a handwritten document that has Bates numbers RBM 00317 through RBM 00323. Do you recognize the handwriting on this document?
A. No, sir.
Q. The document, if I'm reading correctly, states on the first page at the top, third line, "Review content of Barry's file." Do you see that?
A. Yes.
Q. Do you know whether this document is an attempt to summarize Barry Smith's files that are contained on the CD that is Bates stamped RBM 00005?
A. Yes, sir.
Q. Are you familiar with the Barry Smith documents that are contained on this computer disk that is Bates



stamped RBM 00005?
A. Yes.
Q. The disk contains a measured mile summary for January and February 2000 for the Flare Area for an 11 day period; is that correct?
A. I don't recall.
Q. On the first page of Exhibit 7, drop down to the ninth line up from the bottom there's a kind of asterisk in the column, number four, "Measured mile summary, January, February '00 at Flare Area, 11 days"; do you see that?
A. Yes.
Q. Have you reviewed that document?
A. Yes.
Q. And then on the fourth line up from the bottom there's an asterisk and item number seven that reads, "Measured mile, October/00 with/links daily spreadsheet 10/8 to 10/29"; do you see that?
A. Yes.
Q. What is that?
A. It appears to be a spreadsheet.
Q. For a different measured mile than the one used for the Flare Area?
A. It appears to be a different measured mile for a different period.
Q. What claim does that apply to?

Q. Do you recognize the handwriting?
A. No, sir.
(EXHIBIT(S) NO. 22 MARKED.)
Q. (BY MR. KOSLOSKE) I'm showing you what's been marked for identification as Exhibit 22. Exhibit 22 is another handwritten document that begins with Bates number RBM 00311 and concludes with Bates number RBM 00313. Do you recognize this document?
A. Not offhand.
Q. Do you recognize the handwriting on this document?
A. I believe this is Mr. Bowman's handwriting.
MR. KOSLOSKE: I don't have anything further.
MR. ERIKSON: We will reserve all of our questions until the time of trial.
(Deposition concluded at 11:55 a.m.)



CHANGES AND SIGNATURE
TO THE ORAL DEPOSITION OF
ROBERT McCULLOUGH
VOLUME 2
April 16, 2004

| Page | Line | Change | Reason |
|---|---|---|---|
| | | | |



I, ROBERT McCULLOUGH, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________
ROBERT McCULLOUGH

STATE OF __________)
COUNTY OF __________)

Before me ____________________ on this day personally appeared ROBERT McCULLOUGH, known to me (or proved to me under oath or through ____________ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

(Seal) Given under my hand and seal of office this ______ day of __________, _______.

____________________
Notary Public in and for the State of __________



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., Plaintiff, ) VS. ) THE UNITED STATES, Defendant. ) No. 02-306C (Judge Hewitt)

REPORTER'S CERTIFICATION
DEPOSITION OF ROBERT McCULLOUGH
VOLUME 2
April 16, 2004

I, Gloria Carlin, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ROBERT McCULLOUGH, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on 4-29-04 to the witness or to the attorney for witness for examination, signature and return to Gloria Carlin by 6-1-04;

That the amount of time used by each party at the deposition is as follows:

Brian W. Erikson - (00:00)
John E. Kosloske - (02:32)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Brian W. Erikson, Attorney for Plaintiff;
John E. Kosloske, Attorney for Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements will be certified to after they have occurred.

Page 303

Certified to by me this 29th day of April, 2004.

Gloria Carlin, CSR No. 498
Expiration Date: 12/31/04
Merit Court Reporters
Firm Registration No. 133
309 W. 7th Street, Suite 600
Fort Worth, Texas 76102
(817) 336-3042 (800) 336-4000

Job No. 040416GJC

Page 304

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., Plaintiff, | ) | |
| VS. | ) | No. 02-306C |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, Defendant. | ) | |

DEPOSITION OF ROBERT McCULLOUGH
VOLUME 2
April 16, 2004
FURTHER CERTIFICATION

The original deposition was/was not returned to the deposition officer on ____________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to John E. Kosloske, Custodial Attorney;

That $525.05 is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits.

That a copy of this certificate was served on all parties shown herein.

Certified to by me this _______ day of __________, 2004.

Gloria Carlin, CSR No. 498
Merit Court Reporters
Firm Registration No. 133
600 Oil & Gas Building
Fort Worth, Texas 76102
(817) 336-3042 Metro 654-4006
My Certification Expires 12/31/04

Job No. 040416GJC

*Milbern Ray and Company*
L.L.P.
*Certified Public Accountants*

MILBERN D. RAY, C.P.A.
RONALD D. RAY, C.P.A.
KENT A. RAY, C.P.A.

150 Westpark Way #100
Euless, Texas 76040

P.O. Box 849
Bedford, Texas 76095-0849
(817) 571-7661 Metro (817) 267-2895
FAX (817) 571-1391

MEMBER:
AMERICAN INSTITUTE
OF CERTIFIED PUBLIC
ACCOUNTANTS

March 10, 2004

Mr. John E. Kosloske
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
1100 L Street, N.W., Room 12052
Washington, D.C. 20005

Re: Renda Marine, Inc. v. United States, No. 02-306C (Fed. Cl.)

Dear Mr. Kosloske:

We are providing additional information pursuant to your subpoena deuces tecum dated November 5, 2003 to substantiate the basis of the "Cost" of $19,511,345 for the "Upper Bayou" job appearing in the "Schedule of Completed Jobs for the Year Ended October 31, 2001," contained in the "Supplementary Information" appended to the "Financial Statements, October 31, 2001 and 2000" for Renda Marine, Inc.

Enclosed are binders that contain copies of documents provided to us by Renda Marine, Inc. while our firm was engaged to close out their books on a monthly basis. Binders also contain copies of adjusting journal entries and job schedules prepared monthly by our firm. We are also providing copies of audit work papers for October 31, 1998 – 2002 that pertain to the "Upper Bayou" job as well as a compact disc that contains the Excel data file we used to present the accumulation of job costs.

If any additional information is needed, please notify me.

Sincerely,

Kent A. Ray, CPA

Cc: Brian W. Erikson
KAR/jw
Enclosures

J:\WordData\Renda Marine\Kosloskee...RMI v US.doc

CPA™