IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REVISED MOTION
TO LIMIT TESTIMONY BY PLAINTIFF'S EXPERTS

Defendant, the United States, respectfully requests that the Court limit the scope of testimony of the three trial experts designated by plaintiff, Renda Marine, Inc. (Renda) – Christopher C. Mathewson, Ph.D., P.E., Robert McCullough, P.E., and Mr. Benton Goodloe – in the manner and for the reasons stated below.

The Court "acts as a 'gatekeeper to exclude expert testimony that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case." Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1391 (Fed. Cir. 2003). Under Fed.R.Evid. 702,[1] the Court is assigned the task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)). Rule 702 applies not only to scientific testimony but also to expert testimony based on technical or other specialized knowledge. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147-49 (1999).

---

[1] Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine the fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The Court's gatekeeping responsibility is two-fold. First, the Court "must determine whether the proffered testimony rests on a reliable foundation – that is, whether the expert's testimony is 'ground[ed] in the methods and procedures of science' and consists of 'more than subjective belief or unsupported speculation.'" Donnelly v. Ford Motor Co., 80 F.Supp.2d 45, 48 (E.D.N.Y. 1999) (quoting Daubert, 509 U.S. at 590). "Ultimately, it is the role of the trial court as gatekeeper to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Donnelly, 80 F.Supp.2d at 49 (quoting Kumbo Tire, 526 U.S. at 152).

The second part of the Court's gatekeeping responsibility is "to determine whether an expert's testimony is 'relevant to the task at hand,' namely, whether the expert's reasoning or methodology can be properly applied to the facts before the court." Donnelly, 80 F.Supp.2d at 49. In order to determine whether the expert's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702, "the testimony must not only be reliable but must be relevant in that it 'fits' the facts of the case." Donnelly, 80 F.Supp.2d at 49 (quoting Daubert, 509 U.S. at 591).

A. Christopher Mathewson, Ph.D., P.E.

The November 2004 report of Dr. Mathewson, pursuant to RCFC 26(a)(2)(B), contains opinions regarding four of Renda's claims: the Flare Area claim, the South Ferry Landing claim, the Section 7 Clay claim, and the Lost Lake Levees claim. Mathewson Report, at 1-7, Def. App. 1-7.[2] Dr. Mathewson opines that each of those "sites" "represents a true differing site condition

---

[2] "Def. App. ___" refers to the referenced page(s) of the appendix to this response.

in which the contract documents failed to report the actual natural or man-made condition." Mathewson Report, at 7, Def. App. 7.

Whether a condition encountered by a contractor, such as Renda, constitutes a "differing site condition" turns upon whether the conditions indicated in the contract differ materially from those actually encountered during performance. See, e.g., Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002). "The issue of the indications in the contract is one of law for decision by the tribunal, not an issue of fact to be proven by a preponderance of expert testimony . . . ." Foster Construction C.A. & Williams Brothers Co. v. United States, 193 Ct. Cl. 587, 602, 435 F.2d 873, 880 (1970).

Expert testimony upon legal matters is inadmissible. Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003); accord Christiansen v. City of Tulsa, 332 F.3d 1270, 1283 (10th Cir. 2003) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts."); see also Stearns Co., Ltd. v. United States, 34 Fed. Cl. 264, 268-69 (1995) (expert testimony that reaches legal conclusions admissible only where testimony concerns state law or a technical provision peculiar to the industry). The Court, therefore, should not receive, much less consider, Dr. Mathewson's legal conclusion that Renda's Flare Area, South Ferry Landing, Section 7 Clay, and Lost Lake Levees claims constitute "true differing site condition[s]."

B. Robert McCullough, Jr., P.E.

The written report of Robert McCullough, Jr., sets forth opinions with respect to the interpretation and application of two regulations: EFARS 52.231-5000 and FAR 31.205-47(f)(1). See McCullough Report, at 4, 5, 7-10, 12, 14, 15, 17-18, Def. App. 11, 12, 14-17, 19, 21, 22, 24-25.

Opinion testimony concerning the meaning of a regulation is improper. In Rumsfeld v. United Technologies Corp., 315 F.3d 1361(Fed. Cir. 2003), the issue involved the correct interpretation of Cost Accounting Standards (CAS), which are Federal regulations. In approaching that task, the Federal Circuit stated:

> The views of the self-proclaimed CAS experts, including professors of economics and accounting, a former employee of the CAS Board, and a government contracts accounting consultant, as to the proper interpretation of those regulations is simply irrelevant to our interpretive task; such evidence should not be received, much less considered, by the Board on the interpretive issue. That interpretive issue is to be approached like other legal issues–based on briefing and argument by the affected parties.

Id. at 1369 (footnote omitted). Therefore, Mr. McCullough's opinions regarding the correct interpretation of EFARS 52.231-5000 and FAR 31.205-47(f)(1), as well as their application in the circumstances of this case, should not be received, much less considered.

In addition, Mr. McCullough's report is replete with opinions that Renda's claims are "valid and compensable" by the Government in a certain amount and that Renda is "entitled" to additional compensation of stated amounts. See McCullough Report, at 3, 5, 8, 10, 13, 15, 18, 24, Def. App. 10, 12, 15, 17, 20, 22, 25, 31. Again, these legal opinions should be disregarded, inasmuch as they "state legal conclusions drawn by applying the law to the facts." Christiansen, 332 F.3d at 1283.

C. Benton Goodloe

The report of Benton Goodloe, a Renda employee, states, with respect to Renda's Lost Lake Levees claim: "There was not sufficient clay to be dredged on the [Upper Bayou Project] to construct the Lost Lake Placement Area levees. The foundations for such levees were so soft

that the clay and other suitable materials that Renda attempted to place hydraulically displaced so much muck that it was not possible under the circumstances to build the levees to the design template. . . . Renda property [sic] hydraulically placed the clay, but due to causes beyond Renda's control, the levees could not be built as designed." Goodloe Report, at 2, Def. App. 34.

Mr. Goodloe is not qualified to provide opinion testimony as to the sufficiency of the design of the levees at the Lost Lake Placement Area, i.e., "that it was not possible under the circumstances to build the levees to the design template" or that "the levees could not be built as designed." Mr. Goodloe attended a junior college for two years where he studied "engineering." Tr. 38(24-25)-39(1-6), Def. App. 42-43. He does not have a college degree. Id. The only licenses listed in his curriculum vitae are a Coast Guard towing license and "a private pilot license with instrument rating." Goodloe Report, at 3, Def. App. 35.

While Mr. Goodloe has been in the dredging business for about 30 years, Tr. 39(9-11), Def. App. 43,[3] during that entire span of time, Mr. Goodloe's experience with the construction of levees was limited to one project in Kingsbay, Georgia, when he was employed by Parkhill Goodloe where "you had to construct some levees." Tr. 41(17-25), Def. App. 45. The only other experience that Mr. Goodloe had with the construction of levees was during the dredging of material for the construction highway Interstate 95. Tr. 42(1-8), Def. App. 46. Mr. Goodloe testified that the Interstate 95 project had a "little bit of levee work in it" but that he "wasn't involved with

---

[3] Mr. Goodloe was employed by Parkhill Goodloe, a family-owned dredging business, from the early 1970s to 1988, Tr. 40(18-22), Def. App. 44, then by Norfolk Dredging Company from 1988 to 1992, Tr. 42(18-20), Def. App. 46, then by Pine Bluff Sand & Gravel for two years, Tr. 43(12-16, 23-25), Def. App. 47, then by T.L. James from 1995 to about 1998, Tr. 44(16-24); 45(7-10), Def. App. 48, 49, and then by Weeks Marine for about two years until September or October 2000 when Mr. Goodloe was hired by Renda. Tr. 44(24-25)-45(1-6), Def. App. 48-49.

it a lot." Id. Mr. Goodloe was not involved with the construction of levees at dredge disposal sites when employed by Norfolk Dredging Company, Pine Bluff Sand & Gravel, T.L. James, or Weeks Marine. Tr. 43(8-11); 44(11-15); 45(21-24), Def. App. 47, 48, 49.[4] Mr. Goodloe testified that "[t]here hasn't been a whole lot of levee construction – hydraulic levee construction that I know about going on." Tr. 45(24-25)-46(1), Def. App. 49-50.

Mr. Goodloe, therefore, is not qualified by education, training, or experience with the design or construction of levees – especially hydraulically-constructed levees at dredged material disposal facilities such as the Lost Lake Placement Area – to testify as an expert concerning the design or construction of levees, including the adequacy of the design for the hydraulically-constructed levees at the Lost Lake Placement Area. Mr. Goodloe's opinions that "it was not possible under the circumstances to build the [Lost Lake] levees to the design template" and that "the levees could not be built as designed" are not sufficiently reliable help the Court understand the evidence. That opinion testimony, therefore, should be excluded.

For the foregoing reasons, defendant's motion to limit the scope of testimony of plaintiff's trial experts Christopher Mathewson, Ph.D., P.E., Robert McCullough, Jr., P.E., and Mr. Benton Goodloe should be granted and the Court should exclude the inappropriate aspects of their opinion testimony discussed above.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

---

[4] At Weeks Marine, where Mr. Goodloe worked immediately prior to his employment with Renda, he managed a Florida beach coast construction project and "some maintenance dredging" on the Mobile River for the Corps of Engineers Mobile District. Tr. 46(18-22), Def. App. 50.

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

FEBRUARY 2, 2005