# DEFENDANT'S APPENDIX

# INDEX TO DEFENDANT'S APPENDIX

**Document** **Page**

Report of Christopher C. Mathewson, Ph.D., P.E. dated January 26, 2004 .................. 1

Report of Robert McCullough, Jr., dated March 3, 2004 (without exhibits)................. 8

Report of Benton Goodloe dated January 27, 2004 .................................................... 33

Excerpts from transcript of deposition of Benton Goodloe on January 13, 2004 ......... 36

**CHRISTOPHER C. MATHEWSON, PhD, PE, REG**
**Engineering Geologist**
**1307 Glade Street**
**College Station, TX 77840**

Phone:....979-845-2488 FAX:......979-847-9313 E-mail:..... mathewson@geo.tamu.edu

17 November 2004

Brian W. Erikson
Qulling, Selander, Cummiskey & Lownd
2001 Bryan Street, Suite 1800
Dallas, TX 75201

Re: Renda Marine, Inc. *vs.* United States, Case Number 02-306C, United States Court of Federal Claims

Dear Mr. Erikson,

This is the superseding report concerning my investigation and evaluation of the changed conditions claims filed by Renda Marine related to the dredging of the Houston Ship Channel. The project area includes dredging between Stations 684+06.58 and 470+00, shown as the "Upper Bayou" on the Location Plan (Map C-1), and the construction of a dredged material confinement levee at the Lost Lake Placement Area. I have continued to limit my evaluation to four specific sites defined in this project. These sites are:

1. Flare Area (STA 520+00 – STA 550+65.99)
2. South Ferry Landing (Section 1, STA 470+00 – STA 480+16.77)
3. Section 7 (Approximately STA 565+00 and 580+00)
4. Lost Lake Placement Area Levees

The professional opinions expressed in this report are based upon my letter to you of 26 January 2004, plus:

- my visit to the project site, including an examination of the Section 7 clay issue and a number of on-site photographs; and
- my review of numerous other documents, photographs, videos and CD's that you provided.

I understand that you have listed the documents and information that I reviewed and that you provided this information to the Government's attorney along with the site photographs that I took.

As requested, I have listed my qualifications and experience with respect to dredging operations, coastal geology and geotechnology, navigation and marine surveying as it relates to the opinions presented in this report in response to the challenge of my qualifications offered by the government. My experience is listed below:

1. I have spent many years studying soil borings, and am very familiar with the engineering and geotechnical properties of earth materials and how they impact and control the dredgeability of clays and other earth materials.
2. I have been involved with engineering projects often enough that I can appreciate and do understand the relative difficulty of excavating, transporting, pumping and handling clays and other earth materials.
3. I am familiar with the geological and soil materials in the project area. I know that the natural materials vary from location to location, and that it is difficult and often dangerous to extrapolate from soil borings and to interpolate between them with any real degree of certainty. Borings show only what is present at the particular location of the boring and therefore must be generalized when used to interpret the local geological and soils conditions at a site.
4. I have often reviewed soil, geotechnical and exploration borings to determine what conditions are depicted at each boring location. Whether the earth materials are materially different from those shown in a boring is a function of their geological characteristics and formational environment.
5. I assess the geological characteristics of soils and earth materials routinely, regularly, and as a part of my occupation. It is not difficult to determine if an earth material actually encountered in an excavation is physically different from that indicated in a boring.
6. I have practical experience and I teach the processes of rock and soil weathering and formation that qualifies me to express professional opinions concerning the geologic history of sediments and sedimentary rocks.
7. I have experience as a commissioned officer in the National Ocean Survey and as a coastal process research scientist in the technology and techniques of marine surveying and the generation of nautical charts. Appropriate scale and accuracy nautical maps are critical for the safe navigation and for the design and operation of marine operations, including dredging activities.
8. I have both field and teaching experience in the evaluation and analysis of slope stability and landslide processes and mechanics. Geological and geotechnical investigations of landslides are, in fact, investigations of existing failures, be they natural or human induced. The evaluation of the slope failures at the Lost Lake Placement Area is well within my field of practice. A post mortem on the levee failures does not require a new stability analysis. The purpose of a stability analysis is to verify that the levee will not fail in the first place. The actual levee failures under the acknowledged amount of dredged material placed on the soft foundations constitute real world tests of the site conditions existing at the time of failure. One does not need to know the actual width, depth, and extent of the side cast borrow areas to know that the borrow areas were significant contributors to the ultimate failure of the levees.
9. It does not matter how the side cast borrow areas were excavated. The important fact is the side-cast borrow areas existed, and turned out to be so extensive that they consumed much more dredged material than any one had anticipated.
10. One does not need to perform stability analyses after the levee failures to prove that the levees failed. The fact that the levees failed clearly indicates that the levees were not stable. If the levees were to be rebuilt under different design parameters, a stability analysis would then be warranted.

My revised evaluations and opinions related to the four areas of concern are listed in the numbered sections given below:

1. The Flare Area:
   My review and evaluation concurs with the opinions expressed by the Corps of Engineers and Renda Marine in that the subsurface geological and engineering properties were not accurately represented in the boring logs and soil descriptions provided to Renda Marine when they bid the project. As a result, Renda Marine could not predict, anticipate or expect to encounter the "stiff clay" which resulted in reduced dredging productivity and increased operational time to place and handle the dredged materials at the Lost Lake Placement Area.

   It is my opinion that Renda Marine encountered clays in the Flare Area that were stiffer than the clays and other materials indicated in the applicable soil borings for the Flare Area. Renda relied on the appropriate soil borings. Soil borings taken elsewhere would not be as accurate as the ones actually taken at the Flare Area.

2. South Ferry Landing:
   The project drawings do not include any specific information about the bathymetric or submarine conditions of the South Ferry Landing area while they include a detailed map of the North Ferry Landing area (Map C-6). The North landing area is actually outside the limit of the dredging project. The incorporation of the bathymetric data for the North Lynchburg Landing in the contract documents provides unnecessary and misleading information about the dredging conditions to be anticipated at the South Lynchburg Landing. The complete lack of information or data about the conditions at the South Ferry Landing area, with respect to rubble, shore protection structures, navigational aids or other submarine conditions, strongly suggests that these conditions do not exist in the area.

   It appears, from Corps data and permit applications that the Corps of Engineers had information to indicate that revetments and riprap were placed in the area of the South Ferry Landing. However, this information was not contained in the contract documents. The Corps should have made such information known to the prospective bidders.

   It is my opinion that Renda Marine should not have anticipated the existence of anything other that the naturally occurring earth materials in this area of the project, except for possible minor amounts of undocumented trash and debris.

3. Section 7:
   Renda Marine encountered a "very stiff red clay" while dredging in Section 7, approximately between Stations 565+00 and 580+00. The presence of a "red clay" indicates that the dredging operation encountered sediments that are most likely Pleistocene (Glacial) in age. These sediments were exposed to the atmosphere and the iron in them was oxidized to produce the red color during a low stand of sea level. The oxidization and drying of these clays resulted in an increased confining pressure through dissection (negative pore-water pressure) that produced higher strength materials than the Recent marine sediment shown in the contract documents. I examined some of the Section 7 clay during my visit to the Lost

Lake site and determined from field tests that it was much harder and more competent than the clays and other materials indicated in the contract documents for the Section 7 area.

Because these "red clays" have higher shear strength and greater competence than the younger marine clays, the dredging effort required to remove these materials is significantly greater than that required to remove the Recent marine clays. These "red clays", however would be a superior material for the construction of the foundation for the levees at the Lost Lake Placement Area.

It is therefore my opinion that Renda Marine's dredging production and advance rate would be significantly less than that in the lower shear strength and less competent Recent clays shown in the contract documents.

4. Lost Lake Placement Area Levees:

In my review of the contract documents and other data and of the construction failures in the new, elevated levee at the Lost Lake disposal area, I have identified two related unfavorable site conditions:

- the very low strength and slope failures of the constructed levee and
- the lack of available and suitable construction material for the completion of the project.

A. Physical and mechanical properties of the site materials:

The contract documents indicate that the geotechnical characteristics of the materials in the interior perimeter of the Lost Lake Placement Area have low shear strength and that the Atterberg limits of these materials lies between the Liquid Limit (viscous fluid) and the Plastic Limit (plastic material). However, to date I have found no notes or other information in the construction documents to indicate that the dredged material in the perimeter area was previously "mined" to produce material to rebuild and improve the existing levees around the site. An analysis of the date of sampling indicates that the mining operations occurred recently, after the date of drilling and geotechnical testing, and therefore the geotechnical properties of the foundation materials in the Lost Lake Placement Area are significantly weaker than suggested in the contract documents.

Hydraulic dredging construction methods, which were specified for much of the levee project, would further decrease the shear strength of the underlying dredged material by increasing the pore-water pressure and decreasing the effective strength of these saturated clays and silts.

Documentation from previous maintenance projects at Lost Lake and other disposal areas prepared by the U. S. Government indicates that the Corps of Engineers had previously required contractors to excavate borrow pits along the interiors of the perimeter levees at Lost Lake in order to increase the height of the levees. The contract documents for those projects indicate that these side cast borrow areas were to be no closer than 50 feet from the interior toe of the levee, and no more than 3 or 4 feet deep.

It appears based on the levee failures that Renda Marine experienced that the side-cast borrow areas were much closer to the existing levee toe than 50 ft. In fact, it appears

that Renda's newly constructed levees often failed along a line about 20 ft from the toe of the existing levees. Twenty feet is about the width of a crane mat, which reasonably could have been used by most contractors to support a dragline for excavation and placement of the "mined" materials on the levee. The photographs and descriptions of the levee failures show that the failures often occurred in a relatively straight line at approximately 20 ft from the interior base of the existing levee, indicating a lack of foundation support at that point.

Contractors bidding on the Upper Bayou Project should expect some displacement of these soft foundation materials. The contract documents themselves indicate that the foundations for the new levees are soft to very soft. However, the contract documents do not indicate the true nature of the depth and width of the side-cast borrow areas that underlay the new levees.

Mr. Devarajan Chelliah, P.E., Project Manager of HVJ Associates, Inc., expressed concerns in his letter of 1 October 1997 to Mr. Ira Brotman, U.S. Corps of Engineers, that there was inadequate field and laboratory testing of the mechanical and geotechnical properties of the "soft new work material" at the Lost Lake site to support the geotechnical assumptions made during the design of the proposed levee raising.

In addition, the HVJ Associates geotechnical stability analysis of the Lost Lake materials assumes a circular failure surface that extends well below the base of the "soft new work material" at the site. A more appropriate analysis model would have used a sliding block solution in which the soft new work materials formed the base of a sliding block rather than a circular failure surface that progressed below these weak materials.

B. Availability of suitable construction materials for levee construction:

The contract documents provided specific locations for Renda Marine to obtain suitable dredged materials to construct the new Lost Lake levees. The majority of the levees that Renda Marine was to construct were required to be hydraulically placed. Renda's dredging operations were supposed to generate enough suitable materials to be able to construct the hydraulically placed levees.

It is clear that Renda Marine did not have enough clay and other suitable materials available from the contractually authorized dredging areas to construct the levees at Lost Lake. The levee designers envisioned that the contractor would need substantial additional clay and other suitable materials from non-government work areas to construct the Lost Lake levees. However, according to official government correspondence the Corps reluctantly approved only one non-government work area, and helped to dissuade at least one other non-government work area owner from providing clay for the project. With the amount of settlement and foundation displacement, Renda Marine simply did not have enough clay and other suitable materials to construct the Lost Lake levees.

The Corps, however, had assured the bidders in the pre-bid conference, as shown in the addenda and minutes of the pre-bid conference, that sufficient suitable dredged material

was available to construct the hydraulically placed levees. Bidders should be able to construct the Corps' design as designed. The Corps did not advise the bidders that the levee designers had anticipated incorporating substantial amounts of suitable material from non-government work areas.

The contract documents required that Renda Marine construct the new Lost Lake levees to fit the design template, which required a crest elevation of 30 feet above mean low tide. In addition, the contract documents required Renda Marine to construct the project within 446 calendar days. However, the contract documents also required that construction of the levees by mechanical methods be completed before construction of the levees by hydraulic methods could start. One method of constructing the hydraulic levees that would ensure that the levees could reach and maintain a 30-foot elevation involves placing the hydraulic fill of clay and other suitable materials in lifts and allowing time for consolidation and dewatering of the materials before applying additional lifts. This process, however, would require more time than that allowed under the contract documents.

My opinions concerning the levee failures are based on my investigation of the actual levee failures, including, without limitation, photographs, videos, site inspections, discussions with fact witnesses, deposition testimony, design documents, and other project documents. Therefore, it is my professional opinion that under the actual conditions at the Lost Lake Placement Area, Renda Marine could not construct the desired levee to +30-ft MLT until the low strength, fluid materials were displaced and high strength materials could be placed to form the foundation. The presence of the buried and unreported "side-cast borrow areas' resulted in an impossible condition that was not indicated in the construction documents. As a result, Renda Marine experienced significant amounts of "material loss" through the displacement of the low strength dredged material that had refilled the recently mined areas. It is also clear that Renda Marine did not have enough suitable material to be able to maintain the 30-ft elevation because of the excessive settlement and foundation failures.

Based on the amount of settlement it appears clear that much more than 3 to 4 feet were removed from the side cast borrow areas. Although Luis Saenz testified in his deposition that the Corps had surveys of the excavated side cast borrow areas, I have been unable to find evidence that those survey results were made available to Renda Marine or the other prospective bidders for the Upper Bayou Project. Without knowing the extent of the side-cast borrow areas, no one can predict with accuracy how much displacement of soft foundation materials would occur, and how much clay and other suitable material was required to construct new levees. Even the designers of the new levees apparently did not know how much foundation displacement or settlement would occur.

It is clear that the excavations in the borrow areas were larger than they were permitted to be under previously issued contracts. The side-cast borrow areas consumed more clay and other suitable materials than the levee designers had envisioned. The side-cast borrow areas swallowed so much of Renda Marine's hydraulically placed dredged materials that there was an insufficient amount of such materials to construct the levees. Although I still do not know how wide and deep the side cast borrow areas were, I do know that under the

circumstances the borrow areas were extensive enough that the levees could not be constructed as designed.

It is therefore my professional opinion that; (1) there was insufficient volume of suitable material available to Renda Marine to construct the Lost Lake levees as designed, (2) that the levees could not be constructed to reach and remain at the required 30-foot elevation under the circumstances, (3) the side-cast borrow areas were larger than reported and consumed excessive amounts of suitable levee construction material and (4) that there was insufficient time allowed by the contract to construct the levees in lifts to reduce the significance of slope failures.

Thank you for the opportunity to review and evaluate the provided materials and to provide my opinions concerning the differing site conditions at the Flare Area, South Ferry Landing, Section 7 and the Lost Lake Placement Area Levees. It is my opinion that each of these sites represents a true differing site condition in which the contract documents failed to report the actual natural or man-made condition.

Please feel free to contact me should you have any questions or desire a more extensive review and evaluation.

Sincerely yours,

CCMathewson

Christopher C. Mathewson, PhD, PE, REG
Engineering Geologist

Encl: Vitae

# Evaluation of Claims

Contract No. DACW64-99-C-0001

## Houston-Galveston Navigation Channels, Texas
## Dredging Upper Bayou, (45-Foot Project)
## Harris and Galveston Counties, Texas

**Prepared for:**

Renda Marine, Inc.
Roanoke, Texas

**Prepared by:**

McCullough & Associates
15938 Midway Road
Addison, Texas 75001
(972) 385-3158

March 3, 2004



EXHIBIT
D

## Introduction

McCullough & Associates (M&A) was asked to evaluate the claims made by Renda Marine, Inc. (RMI) to the U.S. Army Corps of Engineers, Galveston District Office (Government or USACE) and to evaluate the USACE response. In performing this analysis, M&A reviewed the Project correspondence, claim documentation prepared by RMI, talked to various employees of RMI, talked to Pathfinder Construction Consulting, Inc. (Pathfinder), reviewed documentation prepared by the USACE in response to RMI's claims, and reviewed the DCAA audit reports. Since discovery in the case is ongoing M&A is continuing to analyze depositions and reports of USACE personnel and experts and reserves the right to revise this report as additional information becomes available.

## Project Summary

The Project is the Houston Ship Channel, Dredging Upper Bayou, located in Harris County, Texas (Project). The Project was the beginning of a five-year, $508 million program to deepen the navigation channel to 45 feet and widen it by an additional 130 feet to facilitate ships delivering cargo to Houston directly rather than unloading part of their cargo in the Gulf of Mexico. RMI was acknowledged as the low bidder on July 17, 1998, but due to a bid protest initiated by another bidder, RMI's bid was not accepted until October 26, 1998. RMI and the Government entered into Contract No. DACW64-99-C-0001 (Contract) on October 26, 1998. The Notice to Proceed issued by the Government was acknowledged by RMI on November 19, 1998, and work associated with the Project started shortly thereafter.

While performing its work, RMI encountered various differing site conditions and other situations concerning the Project that caused RMI to expend additional funds and/or to incur additional time to perform its work. Because of these situations, RMI submitted various Requests for Equitable Adjustments (REA's) to the Government that subsequently were presented to the Government as Certified Claims.

RMI submitted the following claims:

| Claim* | Description | Claimed Amount |
|---|---|---|
| 5 | Differing Site Condition – Flare Area Stations 520+00 to 550+00 (very stiff clay) | **$1,607,855 |
| 6 | Differing Site Condition – South Ferry Landing Stations 470+00 to 472+00 | 1,049,173 |
| 7 | Changed Conditions – HL&P Transmission Tower Delays | 170,863 |
| 8 | Differing Site Condition – Obstruction in Sections 4 to 8, Stations 570+00 to 685+00 | 2,126,083 |
| 9 | Differing Site Condition – Obstruction in Section 9, Stations 660+00 to 685+00 | 1,158,642 |
| 10 | Changed Conditions – West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 | 789,600 |

| | | |
|---|---|---|
| | (Modification CO-10, P00027) | |
| 11 | Differing Site Condition – Section 7 Clay | 1,123,884 |
| 12 | Differing Site Condition – Lost Lake Levees | 6,258,853 |
| | Total | $14,284,953 |

* Claim numbers refer to the last two digits of the DCAA audit report numbers.

** Original REA amount ($4,691,688) less change order amount paid by USACE ($3,083,833) equals remaining amount of $1,607,855

We have performed an evaluation of these costs and their basis. The results of our evaluation are contained in the narratives that follow and are summarized at the end of the report. In general, we have determined the claimed issues are legitimate and that the claimed costs are compensable costs. We have provided more detail for some of the claim items and made adjustments where appropriate. As a result of our evaluation, M&A believes these RMI claims are valid and compensable by the USACE in the amount of $13,379,367 (see Exhibit A).

**Claim 5 - Differing Site Condition – Flare Area Stations 520+00 to 550+00 (very stiff clay)**

On February 14, 2001, RMI submitted a revised Request for Equitable Adjustment (REA) for differing site conditions pertaining to the Flare Area in the amount of $4,691,688 to the USACE, Galveston, Texas. The "Measured Mile" approach is used to calculate damage dollar amounts and delay days. The measured mile approach is the most widely used method for calculating these types of impact costs in use today. Additional costs were incurred by RMI during the periods between January 23, 2000 through March 11, 2000 and July 17, 2000 through September 29, 2000. The USACE granted merit to the Differing Site Condition on December 13, 2001 in correspondence to RMI. RMI submitted a revised REA and, per various Government regulations, simultaneously, "certified" it as a Certified Claim. RMI submitted its REA for $4,691,688. USACE issued and paid a Change Order for $3,083,833 leaving a balance of $1,607,855 being claimed by RMI. As of the date of this analysis, the balance of RMI's claim has not been resolved.

<u>Audit Report Comments</u>

An audit report for this specific claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $1,306,729 of "questioned costs" in the following categories – Equipment & Labor ($875,784), Equipment Repair Cost ($50,000), Overhead, Profit, and Bond ($329,945), Professional Fees/Consultants ($50,000), and Report Preparation ($1,000). Overall, the DCAA indicates that:

> ***"Because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment & Labor

The DCAA questioned two items – inclusion of labor and equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

RMI disagrees with the levee-related amounts questioned and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and are directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $487,378 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental

Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $542.49 (Non-Effective Time) and $831.83 (Effective Time) per hour rates specified in the RMI claim.

Equipment Repair Cost

DCAA questions the entire $50,000 amount due to RMI "being unable to support the claimed costs." These costs represent estimated rental equipment repair costs and were provided by Pathfinder. These costs are reasonable.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has identified time associated with the preparation of REA's. An adjustment of ($24,298) (includes Bond) was made to the claim amount.

Conclusion

RMI is entitled to $1,096,179 in additional compensation due to this issue.

**Claim 6 - Differing Site Condition – South Ferry Landing Stations 470+00 to 472+00**

On August 23, 2001, RMI submitted to the USACE, Galveston, Texas a revised REA for differing site conditions pertaining to the South Ferry Landing Area in the amount of $1,049,173. The REA was originally submitted to the USACE on January 10, 2001 and revised on March 6, 2001.

This claim involves dredging problems when encountering debris and rubble material (primarily man-made erosion protection stone, concrete and steel) near the South Ferry Landing Area. Between April 7, 2000 and May 17, 2000 while dredging, RMI incurred additional costs due to unanticipated obstructions within the channel between stations 470+00 and 472+00 of the Upper Bayou Project near Houston, Texas. Specification Section 02482 – Dredging, paragraph 1.11.1 states:

> "Other materials such as scrap, rope, wire cable, snags, and stumps may be encountered within the specified limits of required dredging and overdepth

dredging. No separate payment will be made for removal and placement of the debris."

However, RMI believes it encountered significant amounts of man-made materials, not identified in the plans and specifications, above and beyond what a reasonable contractor would expect. As a result, significant time was expended in this area or "lost" (approximately 18 days) and the dredging machinery sustained serious damages. The dredge *Millennium* was also moved to other locations while awaiting responses from the USACE for appropriate action increasing RMI's cost and time. Numerous notifications were made as the extent and scale of the problems were realized.

RMI uses the "measured mile" approach to calculate damages for this claim. The claimed costs are compensable. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $334,881 of "questioned costs" in the following categories – Equipment & Labor ($200,034), Dredge Equipment Repair Cost ($16,489), Overhead, Profit, and Bond ($77,358), Professional Fees/Consultants ($40,000), and Report Preparation Costs ($1,000). Overall, the DCAA indicates that:

> ***"Because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment & Labor

The DCAA questioned two items – inclusion of labor and equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $60,853 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

The primary item within the Equipment category is the depreciation period allowed for the dredge *Millennium* and the booster barge. RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25

year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if other supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $542.49 (Non-Effective Time) and $831.83 (Effective Time) per hour rates specified in the RMI claim.

<u>Dredge Equipment Repair Cost</u>

Several rental equipment repair invoices occurred outside the delay date range. DCAA questioned these costs. These costs were incurred for spare parts which are purchased before they are required and were used to repair damage caused by the encountered debris and rubble. These costs are compensable.

<u>Indirect Expenses</u>

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." Pathfinder has identified time associated with preparation of REA's. An adjustment of ($41,267) was made to the claim amount.

Conclusion

RMI is entitled to $947,054 in additional compensation due to this issue.

**Claim 7 - Changed Conditions – HL&P Transmission Tower Delays**

On May 16, 2001, RMI submitted to the USACE, Galveston, Texas a revised REA for changed conditions pertaining to the Houston Lighting & Power ("HLP") Transmission Tower Delays in the amount of $170,863. The REA was originally submitted to the USACE on April 11, 2001. While performing dredging work on the Upper Bayou near Houston, Texas, RMI was forced to move its discharge line two times because of HLP transmission line and tower work in the immediate area. Additional costs were incurred by RMI during the periods of July 16 and 17, 2000 and October 16, 17, and 18, 2000. To prevent a disruption of the HLP work, RMI had to move the discharge line for the dredge *Millennium* during each of these periods. Moving the discharge line is a substantial operation that cannot be accomplished without significant labor and equipment costs and production delays. The USACE granted "merit" to the claim in its December 13, 2000 correspondence to RMI, acknowledging "HLP failed to coordinate with the government with respect to this tower." RMI submitted the Request for Equitable Adjustment (REA) which was later changed to a Certified Claim on August 9, 2001. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this specific claim was performed by the DCAA and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $45,2320 of "questioned costs" in the following categories – Equipment ($25,563), Overhead, Profit, and Bond ($9,170), Professional and Consultants ($10,000) and Report Preparation Costs ($500). Overall, the DCAA indicates that:

> ***"Because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment

The DCAA questioned two items – inclusion of labor and equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $8,474 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $483.24 (Non-Effective Time) per hour rate specified in the RMI claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with. Therefore, the claimed amounts are compensable.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has identified time associated with preparation of REA's. An adjustment of $5,084 was made to the claim amount.

Conclusion

RMI is entitled to $167,473 in additional compensation due to this issue.

**Claim 8 - Differing Site Condition – Obstructions in Sections 4 to 8, Stations 570+00 to 685+00**

On June 11, 2001, RMI submitted to the USACE, Galveston, Texas a revised REA for differing site conditions related to channel obstructions (Sections 4 through 8) in the amount of $2,126,083. The REA was originally submitted to the USACE on April 16, 2001. While performing dredging work on the Upper Bayou near Houston, Texas between October 20, 2000 and December 20, 2000, RMI incurred additional costs due to higher than normal obstructions within the channel between stations 570+00 and 640+00. Specification Section 02482 – Dredging, paragraph 1.11.1 states:

> "Other materials such as scrap, rope, wire cable, snags, and stumps may be encountered within the specified limits of required dredging and overdepth dredging. No seperage (sic?) payment will be made for removal and placement of the debris."

However, RMI struck numerous buried obstructions and sustained serious damage to dredging machinery as well as significant downtime while repairs were being made. Some of these objects were extremely heavy (one approximately 10 tons) and extremely large (a CONEX sea container). Other obstructions included, but were not limited to old large diameter iron pipe, pieces of cars, heavy industrial construction demolition material and literally thousands of tires. Immediately after each major encounter, notification was provided to the USACE by RMI. In certain cases, the USACE subsequently directed RMI to remove obstructions and specified additional compensation. Other obstructions were either removed by third parties or left in the channel. On December 13, 2000, the USACE, via correspondence, granted "merit" to several notifications as the existence of debris was noted to be in excess of what is considered "normal."

During the period between January 7 and January 11, 2001, an underwater survey of the Upper Bayou channels was performed. Several large objects were located and various scattered debris fields were confirmed to exist and mapped. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this specific claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $351,460 of "questioned costs" in the following categories – Equipment ($171,086), Dredge Equipment Repair Cost ($57,953), Overhead, Profit, and Bond ($87,421), Professional Fees/Consultants ($34,000), and Report Preparation ($1,000).

Overall, the DCAA indicates that

> ***"Because the noncompliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment

The DCAA questioned two items – inclusion of labor and equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $35,513 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their

calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $483.24 (Non-Effective Time) and $772.58 (Effective Time) per hour rates specified in the RMI claim.

Dredge Equipment Repair Cost

Four repair invoices were discovered that occurred prior to the first obstruction in this claim. Per RMI, these items were mistakenly included in this claim as well at the South Ferry Landing claim. Both DCAA and RMI concur that these items are duplicated and should be removed from this differing site condition claim. The total of $78,540 (including Overhead, Profit, and Bond) for duplicated repair invoices has been removed from this claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has

identified time associated with preparation of REA's. An adjustment of ($25,479) was made to the claim amount.

Conclusion

RMI is entitled to $1,986,551 in additional compensation due to this issue.

**Claim 9 - Differing Site Condition – Obstructions in Section 9, Stations 660+00 to 685+00**

On June 14, 2001, RMI submitted to the USACE, Galveston, Texas a Request for Equitable Adjustment (REA) for differing site conditions related to channel obstructions (Section 9) in the amount of $1,158,642. While performing dredging work on the Upper Bayou near Houston, Texas between April 12, 2001 and May 8, 2001, RMI incurred additional costs due to higher than normal obstructions within the channel between stations 658+00 and 680+00. Specification Section 02482 – Dredging, paragraph 1.11.1 states:

> "Other materials such as scrap, rope, wire cable, snags, and stumps may be encountered within the specified limits of required dredging and overdepth dredging. No seperage (sic?) payment will be made for removal and placement of the debris."

However, RMI struck numerous buried obstructions and sustained serious damage to dredging machinery as well as significant downtime while repairs were being made. In addition, the occurrences were made after a sonar survey performed between January 7 and January 11, 2001 indicated the presence of debris fields and other large obstructions within the Section 9 channel. Because of previous difficulties with obstructions in dredging Sections 4 through 8 and the survey results, RMI suggested to the USACE that, before hydraulic dredging proceeds in Section 9, the debris should be removed by clamshell cranes. The USACE directed RMI to proceed with the work regardless of this warning on March 29, 2001 and contact the USACE for verification if excessive debris is encountered. Work proceeded in Section 9 and on April 12, 2001 after encountering several obstructions, RMI contacted the USACE for verification of the conditions and possible solutions. RMI suggested that, if dredging continued, the dredge may be extensively damaged causing delays and dollar damages. After additional encounters with objects and significant damages to the dredge *Millennium*, RMI again sought change or deletion of this section of the contract. On June 1, 2001, the USACE directed RMI to delete the remaining portion of Section 9 in the contract. The claim submitted by RMI on June 14, 2001 relates to damages and additional costs incurred before this contract change. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $131,702 of "questioned costs"

in the following categories – Equipment ($86,645), Overhead, Profit, and Bond ($33,058), Professional Fees/Consultants ($10,000), and Report Preparation ($1,000). Overall, the DCAA indicates that:

> ***"because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost of the hydraulic levee work increased as a direct result of the impact to the dredging work. Hydraulic levee amounts are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $474.60 (Non-Effective Time) per hour rate specified in the RMI claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has identified time associated with preparation of REA's. An adjustment of ($9,838) was made to the claim amount.

Conclusion

RMI is entitled to $1,148,804 in additional compensation due to this issue.

**Claim 10 - Changed Conditions – West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 (Modification CO-10, P00027)**

This levee-related claim item has been combined with Claim 12 – Lost Lake Levees. DCAA Audit Report comments and pricing issues are addressed in the claim Item 8 section below.

**Claim 11 - Differing Site Condition – Section 7 Clay**

On April 16, 2001, RMI submitted to the USACE, Galveston, Texas a REA for dredging in clay areas pertaining to the Section 7 Area in the amount of $1,083,779. RMI submitted a certified claim on August 9, 2001 and revised it on April 19, 2002. The total damages are now stated to be $1,123,884 supported by a revised Damages Summary report and audit-related documents. While performing dredging work on the Upper Bayou near Houston, Texas, RMI encountered heavy red clay material at the north side of the channel between Station Nos. 561+20 and 609+00 during the period between October 2, 2000 and November 6, 2000. RMI had notified the USACE on October 20, 2000 in writing that hardpan clay had been encountered. This type of clay, per the REA, is "very difficult to dredge through." The USACE denied "merit" to the issue in correspondence dated December 13, 2000 and indicated:

> "The soils borings shown in the contract drawings pertaining to this area indicate stiff to very stiff clays and medium dense to dense sands. Encountering these materials should be anticipated in various areas during dredging operations."

In the REA, RMI states it anticipated dredging gray and blue clays per the soil borings but not hardpan or red clay as the December 13 USACE correspondence implied. The log borings in the impacted area do not show the conditions actually encountered. The dredge was delayed 20 calendar days in a 35 day period and incurred additional equipment, labor, and overhead costs. RMI uses past historical data, operating information for the dredge, and the "measured mile" approach to calculate damages for this claim. A "Show Cause Notice", dated November 6, 2000, was issued by the USACE indicating the USACE was considering terminating the contract for default. RMI responded to the Show Cause Notice on November 15, 2000. On November 29, 2000, the JV consultants reviewed RMI's response to the Show Cause Notice and were of the belief that there was no differing site condition. More specifically, the JV wrote that RMI "has not provided notice and allowed the Government it's right to investigate" and "heavy clays are depicted in the soil borings and drawings." In a subsequent letter dated June 1, 2001, the JV stated they had further reviewed the boring logs which indicated the presence of hard clays ranging from light gray, blue gray, olive, brown, rust, red, and mixtures thereof. As of the date of this analysis, RMI's claim has not been resolved nor does there appear to be any evidence that the USACE has given "merit" to this issue.

Audit Report Comments

An audit report for this specific claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA identifies $256,142 of "questioned costs" in the following categories – Equipment ($166,564), Overhead, Profit, and Bond ($63,578), Professional Fees/Consultants ($25,000), and Report Preparation ($1,000). Overall, the DCAA indicates that:

> ***"Because the non-compliances and inadequacies are considered insignificant, we believe the claim is an acceptable basis for settlement of the price adjustment claim request."***

Response to Audit Report Comments

Equipment

The DCAA questioned two specific items – inclusion of equipment related to levee construction and depreciation periods for the dredge *Millennium* and the booster barge.

The DCAA questioned costs that were included for levee construction. RMI disagrees and indicates that these are actual costs that must be recovered. The hydraulic levee costs are directly related to the dredging operation and directly related to the delay to the dredge. The cost

of the hydraulic levee work increased as a direct result of the impact to the dredging work. However, labor and equipment related to mechanical levee operations in the amount of $129,452 (includes Overhead, Profit, and Bond) has been reallocated to Claim 12 – Lost Lake Levees. Hydraulic levee labor and equipment are valid costs and remain within this claim.

For depreciation, RMI calculated project expenses for the dredge using a 10 year depreciation period and a 7 year period for the booster barge. DCAA implies that a 25 year period must be used for both. RMI based its depreciation calculations on the USACE Manual EP 1110-108, Volume 6 worksheets provided in Chapter 4, Methodology for Dredging Plant and used its actual depreciation amounts. DCAA determined that RMI must use both EFARS regulations and the USACE Manual EP 1110-1-8, Volume 6 to determine the useful life period for the dredge. DCAA further determined the amount in the Equipment category to be specifically noncompliant with EFARS provision 52.231-5000 and that RMI must use the manual for both operating and ownership costs – not either or. Upon review of the EFARS 52.231-5000 regulation, RMI may use a depreciation period of its choice if appropriate records are available to support their calculations with regard to both ownership and operating expenses. EFARS 52.231-5000 (b) states:

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region."

It is not mandatory that RMI use the USACE Equipment Manual depreciation period if actual supporting cost information and/or related accounting records are available for the dredge and the barge.

The rates proposed by RMI and the USACE were checked against an industry standard cost publication, "Rental Rate Blue Book for Construction Equipment" Volume 1, 2000. The Rental Rate Blue Book specifies an hourly operating rate of $642.77 per hour not including ancillary equipment (Exhibit B). This rate is consistent with the $483.24 (Non-Effective Time) and $772.58 (Effective Time) per hour rates specified in the RMI claim.

Indirect Expenses

Indirect expenses are calculated as a percentage of the claimed amounts. The indirect expense amounts questioned by DCAA were based on reducing the claimed amounts which we disagree with. Therefore, the claimed amounts are compensable.

Professional Fees/Consultants

DCAA states that claim preparation costs are unallowable under FAR 31.205-47(f) (1). A check of this regulation was made and "costs are unallowable if incurred in connection with the prosecution of claims or appeals against the Federal Government." However, REA preparation costs and costs incurred prior to this item becoming a claim are allowable. Pathfinder has identified time associated with preparation of REA's. An adjustment of ($16,161) was made to the claim amount.

Conclusion

RMI is entitled to $978,271 in additional compensation due to this issue.

**Claim 12 - Lost Lake Levees**

The Lost Lake Levees claim previously excluded the West Levee Realignment claim – claim, know as Claim 10 in this report. All levee-related issues have been incorporated into Claim 12 – Lost Lake Levees. The DCAA audit reports were provided separately and have been separately addressed below. Following the audit report discussion is a detailed assessment of the entire levee claim along with pricing details.

***West Levee Realignment between Stations 166+00 to 215+00 (formerly Claim 10):***

On May 31, 2001, RMI submitted to the USACE, Galveston, Texas an REA for Levee Realignment between Stations 166+00 to 215+00 in the amount of $789,600. Modification CO-10 had been issued previously but RMI was not in agreement with the cost and time provisions suggested by the USACE. Therefore, RMI submitted the REA to recover its additional costs. In July, 2000, while performing dredging work on the Upper Bayou near Houston, Texas, RMI became aware of a design problem with the levee alignment as described in the contract documents, and on July 28, 2000, notified the USACE. Subsequent discussions and correspondence led to Modification CO-10 issued by the USACE directing RMI to realign the levee per an attached new drawing without any change to the contract cost or completion period. RMI notified the USACE on May 31, 2001 that the cost and time portions of the modification were unacceptable noting that additional costs were incurred and time required to complete the levee realignment. The REA was submitted on the same date to request cost (an additional $789,600) and time (an additional 40 days) adjustments to the contract. RMI further noted that it did not believe that cost and pricing data was required for this REA Proposal as unit prices had been agreed to in earlier modifications CO-1 and CO-2. In its REA, RMI references the Unit Price of $4.70 per Cubic Yard (CY) for realignment and relocation of levees per Modification Pay Item Nos. 1CO-2, 3CO-2, 4CO-2 and 5CO-2 and used that amount to calculate the amount claimed by RMI. RMI mentions that the Unit Price of $4.70/CY was approved by the Government in March 1999. Also related to this claim is a dispute over the amount of material hydraulically placed by RMI. On August 16, 2000, a quality assurance survey was made by Joint Venture (JV) consultants for the USACE. The JV stated "quantity calculations indicate the contractor has pumped 132,937 CY of material versus a required quantity of 59,087 or about 2.5 times the needed quantity." RMI states that material was not wasted, as alleged by the JV but