was used to fill borrow areas and displace unsuitable material. As of the date of this analysis, RMI's claim has not been resolved.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA labels the entire claim amount of $789,600 as "questioned costs" due to "RMI not providing adequate support for its claim related to Changed Conditions-West Levee Realignment, Lost Lake Placement Area." More specifically, the DCAA stated the claim was not prepared in accordance with Federal Acquisition Regulation (FAR) 15, particularly FAR 15.408, Table 15-2. This FAR requires that the contractor provide breakdowns for the basic cost elements claimed. This FAR provides instructions on the format of cost/price proposals and requires specific cost break outs - for example: Materials and Services, Direct Labor, Indirect Costs, etc.

Response to Audit Report Comments

It should be noted that this position contradicts that which was outlined in the original REA – cost detail is not required due to a previous agreement with the USACE regarding unit costs. The additional costs are compensable. A more detailed evaluation of costs within this claim has been conducted and is provided below.

*Lost Lake Levees:*

On October 16, 2001, RMI submitted to the USACE, Galveston, Texas a REA for differing site conditions and changed conditions related to hydraulic levees at the Lost Lake Placement Area in the amount of $6,258,853. While performing dredging work on the Upper Bayou near Houston, Texas between September 13, 1999 and September 18, 2001, RMI incurred additional costs due to a combination of several Changed Conditions and/or Differing Site Conditions discovered at the Lost Lake Disposal Placement Area. This claim encompasses a wide time-frame and is supported by numerous reports, letters, and other documents. Essentially, it involves extra costs for work and effort incurred to reconstruct levees damaged by subsidence of existing foundation materials, impacts to the dredging operation as a result, and standby time for equipment while awaiting an official release from the USACE to demobilize the project. On December 13, 2000, the USACE via correspondence denied "merit" for the differing site conditions within the claim. The JV also supported this position and indicated that over-dredging, improper levee construction methods, use of unsuitable material, and inexperience are likely causes. RMI disagrees with the USACE and JV positions and believes the USACE did not accurately estimate quantities of suitable materials nor did it provide proper contract specifications and drawings in order to construct the levees as desired and that the foundation materials were unstable causing subsidence of the newly placed levees.

Audit Report Comments

An audit report for this claim was performed by the Defense Contract Audit Agency ("DCAA") and submitted to the USACE on December 12, 2002. The purpose of the audit was primarily to determine if the claimed costs were acceptable as a basis for settlement. The report does not address the technical validity of the claim. The DCAA labels the entire claim amount of $6,258,853 as "questioned costs" due to RMI not providing adequate support for its claim. DCAA indicates the claim was not prepared in accordance with Federal Acquisition Regulation (FAR) 15, particularly FAR 15.408, Table 15-2 and states:

> ***"Because the cost or pricing data inadequacies are considered significant, we do not believe the claim is an acceptable basis for settlement of the price adjustment claim request...".***

Response to Audit Report Comments

The amount claimed represents the additional costs to attempt to construct and maintain the levees while they were subsiding. RMI indicates that the claim was prepared using the Modified Total Cost approach. RMI indicates that at a later date it will prepare and break out the claimed costs. These costs are compensable. A more detailed evaluation of the costs within this claim has been performed and a detailed discussion follows. Claim calculations are included as Exhibit C, Damage Calculations.

***Assessment of Levee Claims (Claims 10 and 12):***

While performing dredging work on the Upper Bayou near Houston, Texas between September 13, 1999 and September 18, 2001, RMI incurred additional costs due to a combination of several Changed Conditions and/or Differing Site Conditions discovered at the Lost Lake Placement Area. Between September 1999 and early April 2001 dredging and levee work was proceeding. In April 2001 the dredge hit obstructions which stopped the dredging operation. In May 2001 the dredge *Millennium* moved to the Houston Fuel Oil project in an attempt to mitigate damages on this project. After the Houston Fuel Oil project was complete the dredge and levee equipment were idle while awaiting an official release from the project. During this time RMI was able to perform the Simm's Bayou project to mitigate some of its damages.

As part of the Dredging Upper Bayou contract, RMI was to construct a total of 20,500 Linear Feet (LF) of levees around the Lost Lake Placement Area. Affolter Construction (La Marque, Texas) was subcontracted by RMI to mechanically construct 6,900 Linear Feet (LF) of the levees using clay material available at existing on-site borrow areas. The remainder, approximately 13,600 LF of levees, was to be hydraulically constructed by RMI using suitable clay materials obtained from the dredging template in the Houston Ship Channel. The balance of the dredged materials were to be placed within disposal areas inside the Lost Lake Placement Area.

The Affolter section of the contract was completed on May 19, 1999. Subsidence issues occurred where Affolter was working on the mechanical levee sections and were attributed to poor existing foundations. RMI submitted change orders and quantity modification requests on Affolter's behalf in excess of $1,600,000 of which over $1,200,000 resulted directly from poor foundations and subsidence found in the Lost Lake Placement Area. The USACE agreed to the

changes with minimal documentation, certain sections were unit-priced, and Affolter was fully compensated.

RMI began their dredging operation on September 13, 1999 and on the same date began constructing hydraulic levees from Station 97+00, near the East end of the recently constructed mechanical levees. Subsidence, displacement, and levee failures began shortly thereafter and are well-documented throughout the entire construction period. In fact, certain areas of the levees continue to fail to this day. RMI estimated 900,000 total CY or 70 Loose Cubic Yards (LCY) per LF would be required to construct the levees to compensate for reasonable, anticipated displacement. This amount represented almost twice the neat cross section quantity and was similar to the USACE estimate of 73 CY per LF. Due to lack of reasonable foundations and the presence of extensive side-cast borrow areas which were not indicated on the contract documents, RMI contends that nearly 2,000,000 CY were required in order to fill the borrow areas and construct the levees. RMI further contends that the clay indicated to be available in dredging Sections 1 through 6 (based on quantities derived from dredging cross sections in the contract documents) should have been adequate to construct the levees.

The existence of undocumented poor foundations caused by side-cast borrow areas from previous levee building activities in the Lost Lake Placement Area caused the levee material requirements and construction time to be significantly higher than originally anticipated. In addition, various mechanical levee operations were added to reconstruct failed levees and construct new levees from clay material that had migrated into side-cast borrow areas. Furthermore, the dredging operation suffered directly related delays and downtime while the dredge discharge pipe was backtracked as levees failed, moved material over greater than anticipated distances, and while pumping water in order to "flush" displaced material away from the levee construction zone. This claim includes all costs related to the above differing site conditions as well as additional time the dredge was held on the project while awaiting an official demobilization release from the USACE.

The following specific items are included in the Lost Lake Placement Area Claim:

A. Additional levee equipment and labor required to construct the levees above and beyond what could have been reasonably anticipated from the contract documents ($1,549,759 total direct costs).

   The original crew anticipated for hydraulic levee construction per the RMI bid estimate was one supervisor and a crew of three operators. The operators were employed for shaping and finishing levees by operating a dozer, backhoe, and marsh equipment as needed. In addition, the operators would rough shape initial clay placement from the dredge and add shore pipe as required. During the actual hydraulic levee operation, massive amounts of displaced material from the side-cast borrow areas accumulated and surrounded the discharge area. This material became known as the "mud wave". RMI never intended to move large amounts of displaced material and the planned crew and equipment spread was not adequate. Because of this differing site condition, RMI was forced to add additional personnel and equipment to continually move the excessive amounts of material from the face of the discharge area and create temporary

containment levees. This extra work was necessary in order to continue to construct the levees as well as preventing the material from breaching the levees and potentially entering the surrounding water channels. Also, the hydraulic levee crew and equipment was extended when the dredge was delayed and the levee operation was forced into a standby mode. This claim item includes additional personnel and equipment required to deal with the excessive displaced material. In addition, the standby time for the entire hydraulic levee operation is included during periods were the dredge was delayed.

B. Mechanical Levee Construction – East, North, and West Levees (approximately 4/17/2000 to 12/31/2000). ($1,281,581 total direct costs).

RMI constructed the East levee section beginning from Station 97+00 during the Fall, 1999. Material from the dredging operation was placed continually at Station 97+00 in an attempt to get the levees to develop out of the existing disposal area. The material continued to flow into the side-cast borrow areas creating a continual problem as displaced mud was forced from the side-cast borrow areas. Attempts to construct the East levee using material discharged from the dredge were made with many failures and this area required numerous reconstruction efforts. RMI then moved the hydraulic discharge line and levee building operation to the West side of the project in the Spring, 2000 in an attempt to construct the West levee. A decision was made at this time and after informing the USACE that additional personnel and equipment would be employed to rebuild the failed levees. RMI brought in additional resources and utilized the clay material that had flowed into the adjacent borrow areas in an attempt to complete the levee. RMI rebuilt the East levees several times from Station 97+00 to Station 104+00 and finally this section was accepted by the USACE around August 4, 2000.

RMI then continued operating several additional crews with mechanical and hauling equipment to mechanically move material that had flowed into the side-cast borrow areas. RMI reclaimed this material and hauled it to the North levee areas in an attempt to construct this section.

In addition, RMI sent crews to the West levee to complete this section and realign a segment per the USACE instructions. The West levee operation also utilized clay material that had filled adjacent side-cast borrow areas. The chronology of the mechanical levee operations are well-documented from June, 2000 forward and supported by a number of USACE directives, instructions, and letters. The mechanical operations would not have been required if the side-cast borrow areas had not been so close to the new levee and had not been so large, and poor foundation conditions were not present in the Lost Lake Placement Area. All mechanical levee claim items have been addressed in this claim item including the previously separated claim entitled "West Levee Realignment Between Stations 166+00 to 215+00" ($789,600 total claim amount).

C. Additional dredge plant equipment and labor due to relocation of the dredge discharge line (primarily removing and replacing pipe segments) while reconstructing levees that had subsided ($352,347 total direct costs).

The dredge *Millennium* lost time as RMI attempted to reconstruct the failed levees, time was lost while the dredge itself had to shutdown while land-based pipe was pulled back to reattempt to construct the levees to planned elevation. This claim item represents non-productive standby costs for the dredge while discharge pipe was back-tracked.

D. Dredge plant time while waiting for displaced material to settle and while pumping water (non-productive time) to flush displacement material ($1,184,162 total direct costs).

The dredge *Millennium* lost time due to the levee operation directing that water be pumped in order to flush displaced material from the levee construction area and while waiting for displaced material to subside. Most of this lost time occurred during the Fall, 1999 and Spring, 2000. RMI was forced to stop pumping clay due to the buildup of displaced mud and sediment from the side-cast borrow areas surrounding the hydraulic levee construction area. RMI then had to request that the dredge operator pump only water in an attempt to flush the corridor so that hydraulic levee construction efforts could resume. In other cases, the dredge would pump water while waiting for displaced material to subside away from the levee construction area. This claim item represents dredge costs while pumping water as well as time waiting for displaced material to settle before additional material could be pumped to the levee construction discharge area.

E. Additional booster pump equipment required to pump dredge material longer distances due to additional material requirements to construct the levees ($211,035 total direct costs).

RMI contends that the hydraulic levees should have been constructed using material from dredging Sections 1 through 6. Should this have occurred as presumed according to the contract documents, RMI planned to place material from Sections 7, 8, and 9 in the West discharge corridor. Because of the additional clay material required to fill the side-cast borrow pits, the clay from Sections 1 through 6 did not complete the levees. The material for the North and East Levees now had to be pumped from Section 7 through 9. RMI determined that an additional booster was necessary to efficiently pump the sediment and clays to the upper levee areas where levee construction had not been completed. If the levee yield would have been as anticipated, the levees would have been completed with material no further than Sections 5 or 6 thus eliminating the need for all hydraulic levee construction equipment thereafter and minimizing the use of dredge boosters. Pumping distances were increased up to an additional 3,000 feet to reach the further quadrants of the Lost Lake Placement Area while dredging within Sections 6 through 9 during the period beginning October, 2000 to April, 2001. This claim item represents actual additional costs of RMI for owned and rented booster equipment.

F. Extended non-effective time for dredge and dredge plant while awaiting official USACE release from the project ($725,191 total direct costs).

In April, 2001, RMI was dredging in Section 9 and encountered obstructions which damaged the dredge. The USACE put the work on hold while it investigated the problem and evaluated removing the balance of the RMI contract. In early May, 2001, the dredge

*Millennium* moved to a Houston Fuel Oil project with permission from the USACE. After completing this project on July 4, 2001, the *Millennium* and associated dredge plant was moved back to the Upper Bayou project area on the Houston Ship Channel. During the next several months, the USACE did not release the dredge and other dredge plant equipment from the Upper Bayou project to await the USCOE's decision. During this period until August 24, 2001, the dredge and its crew were in a standby mode. Thereafter, the dredge and a portion of the associated dredge equipment were moved to the Sims Bayou project. On September 18, 2001, the USACE issued Change Order #11 which officially released the dredge *Millennium* and associated equipment from the Upper Bayou project. This claim item represents dredge standby time from July 5, 2001 to August 24, 2001 and other dredge equipment in standby mode for the period from July 5, 2001 to Sept 18, 2001.

Damage Summary

Total damages for the Lost Lake Placement Area claim are as follows:

| Claim | Description | Total Cost |
|---|---|---|
| 12a. | Hydraulic Levees – Additional Equipment and Labor | $1,549,759 |
| 12b. | Mechanical Levees – East, North, and West Levees | 1,281,581 |
| 12c. | Dredge Delays – Removing and Replacing Pipe Segments | 352,347 |
| 12d. | Dredge Plant Time Due to Displaced Material / Water Flushing | 1,184,162 |
| 12e. | Additional Booster Equipment for Greater Pumping Distances | 211,035 |
| 12f. | Equipment Standby Time While Waiting for USACE Release | 725,191 |
| | **Subtotal** | **$5,304,075** |
| | Add: Resident Overhead | 889,368 |
| | Add: Corporate Overhead | 60,010 |
| | **Subtotal** | **$6,253,452** |
| | Add: Profit – 12% | 750,414 |
| | **Subtotal** | **$7,003,867** |
| | Add: Bond – 0.65% | 45,525 |
| | **Subtotal** | **$7,049,392** |
| | Add: Professional Fees and Report Preparation + Bond – 0.65% | $5,644 |
| | **Total Impact Cost** | **$7,055,037** |

Supporting documentation, damage calculations, and other information are included in Exhibit C.

Conclusion

RMI is entitled to $7,055,037 in additional compensation due to this issue.

**Damage Summary**

M&A believes these RMI claims are valid and compensable by the USACE in the amount of $13,379,367 as shown below (see Exhibit A for adjustments):

| Claim | Description | Claimed Amount |
|---|---|---|
| 5 | Differing Site Condition – Flare Area Stations 520+00 to 550+00 (very stiff clay) | $1,096,179 |
| 6 | Differing Site Condition – South Ferry Landing Stations 470+00 to 472+00 | 947,054 |
| 7 | Changed Conditions – HL&P Transmission Tower Delays | 167,473 |
| 8 | Differing Site Condition – Obstruction in Sections 4 to 8, Stations 570+00 to 685+00 | 1,986,551 |
| 9 | Differing Site Condition – Obstruction in Section 9, Stations 660+00 to 685+00 | 1,148,804 |
| 10 | Changed Conditions – West Levee Realignment, Lost Lake Placement Area Between Stations 166+00 to 215+00 (Modification CO-10, P00027) | Included in Claim 12 |
| 11 | Differing Site Condition – Section 7 Clay | 978,271 |
| 12 | Lost Lake Levees | 7,055,037 |
| | **Total** | **$13,379,367** |

**Benton Goodloe**
Renda Marine, Inc.
#7 Benson Lane
Roanoke, TX 76262
Phone: (817) 430-0998
Fax: (817) 491-4483

January 27, 2004

Brian W. Erikson
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

Re: Renda Marine, Inc. v. United States; Case Number 02-306C;
United States Court of Federal Claims

Dear Mr. Erikson:

As you requested, I have prepared my report on the claims filed by Renda Marine regarding the dredging of the Houston Ship Channel. I also enclose a copy of my curriculum vitae.

During the course of dredging on the Project, the Dredge Millennium encountered numerous obstructions. The Dredge Millennium reasonably handled the obstructions. The waters are too murky to be able to see the obstructions beforehand. The Corps placed great pressure on Renda to achieve production on the Project.

Renda attempted to dredge on the Project, Renda would inevitably hit any obstructions located in the dredge template, unless such obstructions were specifically denoted in the Contract Documents.

Renda was not required to hire a diver to search for obstructions ahead of the dredging operation. Renda was not required to have sonar or magnetometers or sidescan surveying equipment to search for obstructions ahead of the dredging operation. Industry custom is to rely on the contract documents to indicate underwater obstructions. Industry custom is for a dredger not to have divers, or sonar or magnetometers or sidescan surveying equipment to search for obstructions ahead of the dredging operation.

Dredging in stiff clay results in slower production than dredging in soft clay. Slower production means increased cost. Renda had slower dredging production in the Flare Area and Section 7 due to clay stiffer than the materials indicated in the Contract Documents.

Dredging around or through obstacles or obstructions results in slower production than if the obstacles or obstructions were not present. Renda's dredging production was slowed in the South Ferry Landing due to rubble not indicated in the Contract Documents.

S:\Construction\Renda Marine\Upper Bayou 505 09\Goodloe Report.wpd

Renda's dredging production was slowed in Sections 4 to 8, Stations 570+00 to 630+00 due to underwater obstructions. Renda faced obstructions not shown in the Contract Documents. Renda faced obstructions beyond that reasonably expected. These obstructions were materially different than what was indicated in the Contract Documents. As a result of these obstructions, Renda's dredging progress was slowed, and the costs of dredging were increased.

Renda's dredging production was slowed in Section 9, Stations 660+00 to 685+00 due to underwater obstructions. Renda faced obstructions not shown in the Contract Documents. Renda faced obstructions beyond that reasonably expected. These obstructions were materially different than what was indicated in the Contract Documents. As a result of these obstructions, Renda's dredging progress was slowed, and the costs of dredging were increased.

There was not sufficient clay to be dredged on the Project to construct the Lost Lake Placement Area levees. The foundations for such levees were so soft that the clay and other suitable materials that Renda attempted to place hydraulically displaced so much muck that it was not possible under the circumstances to build the levees to the design template. The Corps has had similar problems on other levee projects. Renda property hydraulically placed the clay, but due to causes beyond Renda's control, the levees could not be built as designed.

Please feel free to contact me if you should have any questions.

Sincerely,

Benton Goodloe

Enclosure

S:\Construction\Renda Marine\Upper Bayou 565.09\Goodloe Report.wpd

**Benton Goodloe, Sr.-**

**Consultant-Involved in all aspects of projects from pre-bid to overseeing of projects.**

He began working for Parkhill-Goodloe Dredging Co. in 1970. Worked in all positions in company beginning as deckhand and working his way up to Project Superintendent and over all Project Managers. Completed project for the U.S. Army Corp of Engineers in the Jacksonville, Charleston, Wilmington, Norfolk, and Mobile Districts. He also completed projects for the TVA, Jacksonville Electric Authority, Jacksonville Port Authority, Estech Chemical Company and Georgia Port Authority. After Parkhill-Goodloe Dredging Co. sold out in 1988 he worked as Project Manager for Norfolk Dredging Co. and T.L. James Dredging Co. completing multi-million dollar projects for the Army Corp of Engineers from New York to Houston, Texas. In 1991 became Vice President for Renda Marine in charge of all dredging projects along the Gulf Coast of the United States. While at Renda Marine, completed a very difficult 17 million dollar project in the Houston Ship Channel. Currently holds a U.S. Coast Guard Towing license as well as a private pilot license with instrument rating.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
Defendant. )

ORAL DEPOSITION
BENTON B. GOODLOE
January 13, 2004

ORAL DEPOSITION OF BENTON B. GOODLOE, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 13th day of January, 2004, from 9:48 a.m. to 4:11 p.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Esquire Deposition Services, 3401 Louisiana, Suite 300, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

36

APPEARANCES

FOR THE PLAINTIFF:

Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 800
Dallas, Texas 75201
Telephone: 214-871-2100 - Fax: 214-871-2111

FOR THE DEFENDANT:

John E. Kosloske, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
1100 L Street, N.W., Room 12052
Washington, D.C. 20005
Telephone: 202-307-0282 - Fax: 202514-8624

ALSO PRESENT:

Stacey Whitley, CSR
George J. Strickler

INDEX


| | PAGE |
|---|---|
| BENTON B. GOODLOE | |
| Examination by Kosloske ........................ | 6 |
| Signature Page .............................. | 168 |
| Court Reporter's Certificate .................. | 170 |


EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Renda Marine daily report dated 12-4-00 | 49 |
| 2 | Inspection Report of Dredging - Galveston District dated 12-10-00 | 68 |
| 3 | Letter to Mr. Erikson from Ben Goodloe | 84 |
| 4 | Renda Marine daily report dated 12-29-00 | 113 |
| 5 | Renda Marine daily report dated 1-12-01 | 113 |
| 6 | Renda Marine daily report dated 2-25-01 | 117 |
| 7 | Renda Marine daily report dated 3-10-01 | 118 |
| 8 | Renda Marine daily report dated 10-22-00 | 122 |
| 9 | Renda Marine daily report dated 10-23-00 | 123 |
| 10 | Renda Marine daily report dated | 124 |

| | | |
|---|---|---|
| 11 | Renda Marine daily report dated 10-31-00 | 125 |
| 12 | Renda Marine daily report dated 11-3-00 | 126 |
| 13 | Renda Marine daily report dated 11-4-00 | 127 |
| 14 | Renda Marine daily report dated 11-9-00 | 130 |
| 15 | Renda Marine daily report dated 11-13-00 | 130 |
| 16 | Renda Marine daily report dated 11-14-00 | 132 |
| 17 | Renda Marine daily report dated 11-17-00 | 134 |
| 18 | Renda Marine daily report dated 11-19-00 | 135 |
| 19 | Renda Marine daily report dated 11-29-00 | 135 |
| 20 | Renda Marine daily report dated 11-30-00 | 137 |
| 21 | Renda Marine daily report dated 2-11-01 | 138 |
| 22 | Renda Marine daily report dated 2-19-01 | 140 |
| 23 | Renda Marine daily report dated 2-20-01 | 140 |
| 24 | Renda Marine daily report dated 2-21-01 | 140 |
| 25 | Renda Marine daily report dated February 22 and 23 | 140 |
| 26 | Renda Marine daily report dated 2-24 | 140 |

| | | |
|---|---|---|
| | 2-25-01 | |
| 28 | Renda Marine daily report dated 2-26-01 | 141 |
| 29 | Renda Marine daily report dated 2-27-01 | 143 |
| 30 | Renda Marine daily report dated 2-28-01 | 144 |
| 31 | Renda Marine daily report dated 3-5-01 | 144 |
| 32 | Renda Marine daily report dated 3-6-01 | 145 |
| 33 | Renda Marine daily report dated 3-7-01 | 145 |
| 34 | Renda Marine daily report dated 3-8-01 | 146 |
| 35 | Renda Marine daily report dated 3-10-01 | 147 |
| 36 | Renda Marine daily report dated 4-4-01 | 147 |
| 37 | Renda Marine daily report dated 4-5-01 | 147 |
| 38 | Renda Marine daily report dated 4-9-01 | 148 |
| 39 | Renda Marine daily production report dated 11-1-00 | 148 |
| 40 | Renda Marine report of operations dated 10-1-00 | 149 |

BENTON B. GOODLOE,

having been first duly sworn, testified as follows:

EXAMINATION

Q. (BY MR. KOSLOSKE) Would you state your full name for the record and spell it, please?

A. Benton, B-E-N-T-O-N, B. Goodloe, G-O-O-D-L-O-E.

Q. And for the record, what is your business address, sir?

A. For Renda Marine, it's 522 Benson Lane, Roanoke, Texas.

Q. And the ZIP code?

A. 7756 --

MR. ERIKSON: If you know.

A. I don't remember. 77562. I'm not sure.

Q. (BY MR. KOSLOSKE) And business telephone?

A. (817)491-2703.

Q. Okay. Are you presently employed by Renda Marine, Inc.?

A. Yes, I am.

Q. For the record, would you state your residential address and telephone?

A. 905 Bunker, B-U-N-K-E-R V-I-E-W Drive, Apollo Beach, Florida 33572.

Q. Mr. Goodloe, my name is John Kosloske. I'm an attorney with the United States Department of Justice. I'm

having with constructing the perimeter levees at Lost Lake placement center; that is, the portion of the levees that were to be constructed by hydraulic placement of fill?

A. I couldn't tell you. I don't recall if Steve did or he didn't. I don't recall. I don't know. Steve -- Steve Bowman and Rudy Renda were, like I say, basically doing the levees before I got there and I don't know if they did or they didn't.

Q. That didn't happen while you were there?

A. Did I -- I didn't consult anybody, no.

MR. ERIKSON: Do you mind if we take a short break?

MR. KOSLOSKE: Sure.

(Recess taken)

Q. (BY MR. KOSLOSKE) Back on the record. Mr. Goodloe, I would like to drop back a moment and ask you some background questions about your education and employment prior to coming to work for Renda Marine.

A. Okay.

Q. Are you a high school graduate?

A. Yes, I am.

Q. And when did you graduate from high school?

A. 1970.

Q. Did you attend college or university?

A. Two years.

Q. Where did you attend college?
A. Jacksonville, Florida, Florida Junior College.
Q. And what did you study at Florida Junior College?
A. Engineering.
Q. Did you receive a degree of any sort?
A. No.
Q. What is your date of birth?
A. 2-19-52.
Q. How long have you been involved in the dredging business?
A. Started in 1970. So, it would be 33 years.
Q. Can you briefly outline for us the positions that you've held with the companies, the dates and the type of work you performed starting with the first position in the Seventies and working up to the time that you went to work for Renda Marine?
A. Okay. After graduating high school in 1970, I went to work at my family-owned business, which was Parkhill Goodloe Company in Jacksonville, Florida working the summertime and part-time when I went to college. And I was a deckhand on dredges, engineer on dredges, and eventually I worked my way up to project superintendent, project manager with the family-owned business. And in 1988, we sold out and I worked for -- probably until '92 with Norfolk Dredging Company as a project manager. Worked in the Philadelphia

district, the Norfolk district, Wilmington district, and Charleston district and Jacksonville district of the Corps of engineers doing various different dredging projects.

For a brief period of time, I worked for Pine Bluff Sand & Gravel out of Arkansas. I was a project manager for them. Worked in the Vicksburg district on some projects for the Corps of Engineers, lock and dam projects. Then went to work for T.L. James as a project manager up until '95 when T.L. James sold out -- sold their assets. I worked dredging projects all over the United States, New York district and all over. Then I was sold to Weeks Marine when T.L. James sold out. I was sold with the equipment and didn't like my position there. So, I didn't work for Weeks very long, a couple years. And then I went to work for Manson Construction out of Seattle, Washington for a couple of years as a project manager on hopper dredges. And I found a job a little closer when I went to work for Renda Marine as project manager.

Q. Okay. So, you worked from the early 1970s until approximately 1988 in the family-owned business?

A. That's correct.

Q. And that was Parker Goodloe?

A. It's Parkhill, P-A-R-K-H-I-L-L.

Q. And you held various positions including deckhand, engineer, and project manager?

A. All different positions on a dredge. I worked

summertimes and --

Q. What kind of dredging projects were you involved with?

A. Hydraulic dredging projects all over the East Coast of the United States from Virginia to Miami.

Q. Were they maintenance projects?

A. Generally speaking. We did some new work projects occasionally.

Q. And what was the size of the dredges?

A. Parkhill Goodloe had three 20-inch dredges and a 12-inch dredge.

Q. Were you ever a captain on a dredge?

A. Yeah. Probably for Parkhill Goodloe on a small dredge I was captain for a while and on a 20-inch dredge, yes.

Q. Did you have any experience as a leverman?

A. I pulled levers very little.

Q. And then during the period of time that you worked for the family business, Parkhill Goodloe, did you have experience constructing perimeter levees at dredge disposal areas?

A. If I recall, we had one project in Kingsbay, Georgia, that you had to construct some levees, which I mentioned earlier, which did not end up being built as designed. It was changed by the Corps of Engineers on the project relatively soon after the project started.

Q. Was that your first experience with building levees?
A. As far as building levees, yes. We did some beach work building beaches where you have to construct toe levees and toe dikes. But as far as building levees, the only other experience I had similar to that was the construction of Interstate 95, we had some projects going on then that had a little bit of levee work in it. But I wasn't involved with a lot.
Q. The project that -- was it Kingsbay, Georgia, did you say?
A. That's correct.
Q. And you said the design was changed in that case?
A. The design was changed in the field, that's correct.
Q. And is the reason the design was changed was there was not sufficient suitable material for building levees hydraulically?
A. That's correct.
Q. And you worked at the Norfolk Dredging Company from roughly 1988 to approximately 1992?
A. I think that's correct, right.
Q. And you were project manager the entire time there?
A. That's correct. They called them project superintendents, but they're the same thing.
Q. And the projects that you managed, were they all contract dredging projects?



Phone #713.524.4600 ESQUIRE DEPOSITION SERVICES Fax #713.524.4951
3401 LOUISIANA, SUITE 300 HOUSTON, TEXAS 77002 1.800.767.9532

A. Yes.

Q. And was that maintenance or new work or both?

A. Both.

Q. And what were the -- what kind of dredges were involved in --

A. Hydraulic cutter dredges. They mostly had 22-inch cutter dredges and they had one 16-inch dredge.

Q. And when you were working for Norfolk Dredging Company, were you involved with the construction of levees at dredge disposal areas?

A. No.

Q. And I believe you testified you then took a position with a firm Pine Bluff Sand & Gravel?

A. That's correct.

Q. Is that a dredging company?

A. Yes, it is.

Q. Where are they located?

A. They're in Arkansas and I can't remember the name of the city they're from. But they have a dredging office in Alexandria, Louisiana, or they did.

MR. ERIKSON: How about Pine Bluff?

A. Yeah. It's Pine Bluff. Pine Bluff, Arkansas.

Q. (BY MR. KOSLOSKE) How long were you employed by Pine Bluff Sand & Gravel?

A. Two years, I believe.

Q. And what was your position with that firm?
A. Project manager, superintendent.
Q. And were the projects that you were involved with all dredging projects?
A. Yes, they were.
Q. Were they maintenance or new work?
A. Both.
Q. And what kind of dredges were involved?
A. They had 24-inch dredges and one 18-inch hydraulic dredge.
Q. And did you have any involvement with construction of levees at dredge disposal sites --
A. No. No.
Q. Not while you were at Pine Bluff Sand & Gravel?
A. No, sir.
Q. Then your next position was at T.L. James. And how long were you employed by T.L. James?
A. Until they sold out in -- I think it was 2000. '99, 2000. I don't recall what year they sold out. I went to Weeks at that time. They sold all their assets to Weeks and Great Lakes.
Q. So, you were with T.L. James from roughly 1995 until 1999?
A. 2000, yeah. And then they sold out and then went -- went to work with Weeks.

Q. How long did you spend with Weeks Marine?
A. Until 2000.
Q. Did you -- I have in my notes here that you worked for Weeks Marine for a couple of years.
A. It was 2000. Probably a year and a half, close to two years.
Q. Okay. Does that mean that you would have left T.L. James in approximately 1998?
A. Somewhere around there. That's correct. I don't remember the exact date.
Q. You were a project manager for T.L. James?
A. Project manager, that's correct.
Q. And where was T.L. James located?
A. Used to be in Kenner, Louisiana.
Q. And you managed dredging projects exclusively?
A. That's correct.
Q. Were they both new work and maintenance projects?
A. Both. A lot of beach work, beach restoration.
Q. And what kind of dredges were involved?
A. 30-inch hydraulic dredges.
Q. And were you involved with the construction of any perimeter levees at dredge disposal sites while you were employed by T.L. James?
A. No, sir. No, sir. There hasn't been a whole lot of levee construction -- hydraulic levee construction that I know

about going on.

Q. And then what was your position at Weeks Marine?

A. Project manager.

Q. And was that dredging projects again?

A. That's correct.

Q. When you were with T.L. James, where were the dredging projects located?

A. We did a project for the Jacksonville district Corps of Engineers which is on the St. John's River. And then we did a job for the Palm Beach County, a beach restoration. And then we went to New York and did a project for the New York district Corps of Engineers, beach restoration on the coast of New Jersey. And then we did beach restoration in Hilton Head, South Carolina. I think that was about it.

Q. And Weeks Marine, where are they located?

A. Weeks took over T.L. James' assets. They had an office in Kenner and they moved it to Mandeville, Louisiana.

Q. Where were the dredging projects located that you managed while you were at Weeks Marine?

A. West coast of Florida beach construction. And then for the Mobile district, we did some maintenance dredging for the Mobile district in the Mobile River.

Q. How long were you employed by the Manson Construction Company?

A. About a year and a half, two years.