# FINAL REPORT

# Expert Witness Evaluation

Prepared by

Geotec Associates – Jack Fowler, Ph. D., P.E.
5000 Lowery Rd
Vicksburg, MS 39180
Contract Number 3W-CIV01-0163

Date: 2 February 2004

Case Name

Renda Marine, Inc. v United States
U. S. Court of Federal Claims No. 02-306C (Fed. C1)

Requesting Office

Department of Justice
National Courts Section
Commercial Litigation Branch
Civil Division



EXHIBIT B

Blumberg No. 5118

February 2, 2004

Renda Marine, Inc. v. United States
No. 02-306C (Fed. Cl)

Contract No. DACW64-99-C-0001
Houston-Galveston Ship Channel, Texas
Dredging Upper Bayou, (45 foot Project)
Harris and Galveston Counties, Texas

This report was prepared for the U.S. Department of Justice, Civil Division, Commercial Litigation Branch by the undersigned, Dr. Jack Fowler. Included in this report are four tables and five appendices. Appendix A provides a glossary of geotechnical descriptors and includes three tables, A-1 through A-3, Geotechnical Characteristics of Dredge Channel Soils and cohesive and cohesionless material descriptors. Appendix B is a list of cases where I testified as an expert at trial or by deposition. These demonstrate my experience as an expert witness in dredging and differing site condition claims. My resume and experience are included in Appendix C, and a list of publications I have written is in Appendix D. Documents pertaining to this case that were provided by the Galveston District Corps of Engineers, Capital Project Management, Inc., Franvel Corporation, and the U.S. Department of Justice are listed in Appendix E.

In the course of my investigation into this case I visited the Lost Lake Placement Area with Galveston District Corps of Engineer personnel and Gahagan and Bryant, Inc. personnel. I also met with HVJ Associates, Inc., Gahagan and Bryant Associates, Inc., and District personnel concerning volume calculations of different types of dredged materials. I met with District personnel during the hydraulic construction of levees along the Houston-Galveston Ship Channel by Bean Stuyvesant LLC.

I have reviewed the plans and specifications for Contract No. DACW64-99-C-0001, Houston-Galveston Navigation Channels, Texas, Dredging Upper Bayou, (45-Foot Project), Harris and Galveston Counties, Texas, Amendment No. 1, Renda Marine's Certified Claim for Equitable Adjustment of the Contract Price for Differing Site Conditions & Changed Conditions for Hydraulic Levees At Lost Lake Placement Area, October 16, 2001. I have also reviewed the documents listed in Appendix E.

The U.S. Department of Justice is compensating me at a rate of $200 per hour for my professional services in the litigation case regarding Renda Marine, Inc. vs. United States N. 02-306C(Fed.C1.)

The following are answers to questions provided by John E. Kosloske, Senior Trial Counsel, Commercial Litigation Branch, United States Department of Justice in letters dated October 24, 2003 and November 21, 2003.

<u>Section 7 Clay Claim</u>

**1-1 Identify each soil boring depicted in the contract documents that is relevant to a prediction about the *character* and *location* of materials *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00.**

Soil borings in Section 7 that are relevant to predicting the character and location of the materials within the maximum pay template are boring logs 3ST-8W, 3ST-9W, 93-64, 3ST-10W, 3ST-11W, 93-65, 3ST-12W, 3ST-13W, 72-106, 3ST-14, 3ST-15, 93-66, 3ST-16, 3ST17, 3ST-18 and 3ST19.

**1-2 What, if anything, do the logs for the borings identified in response to 1-1 above indicate about stiff to very stiff materials *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Table 1 is a summary of the consistency, relative density, and laboratory classification for the remaining depth in the channel for all profiles and boring logs for Sections 1 through 9. Tables 2 and 3 summarize the remaining depth and allowable overdepth for Sections 1 through 9.

The results as shown in Table 2 indicated that the consistency of the cohesive materials (CH, CL and ML) in Section 7 was 30% very soft, 20% soft, 6% medium stiff, 6% stiff, 12% very stiff, and 21% hard of the total volume. The relative density of the cohesionless materials (SC and SM) in Section 7 was 0.5% medium dense, 3% dense and 2% very dense of the total volume.

The results as shown in Table 3 indicated that the laboratory classification of the materials in the remaining depth and allowable overdepth consisted of 53% CH (inorganic clays of high plasticity, fat clays), 41% CL (inorganic clays of low to medium plasticity, gravelly clays, sandy clays, silty clays, lean clays), 1% SC (clayey sands, sand-clay mixtures) and 5% SM (silty sands, sand-silt mixtures) of the total volume in Section 7. Appendix A includes a detail description of the geotechnical properties for cohesive and cohesionless material in tables A-1 and A-3.

The conclusions are that the cohesive clays (CH, CL and ML) make up 94% of the total volume and the cohesionless materials (SC and SM) were 6% of the total volume in Section 7 (Table 3). The medium stiff to hard cohesive materials in Section 7 (Table 2) were 39% of the total volume in this section. The very soft, soft and medium stiff cohesive materials totaled 56% of the total volume in Section 7 (Table 2). The dense to very dense cohesionless materials (SC and SM) were 6% of the total volume in Section 7 (Table 2).

**1-3 What boring logs identified in response to 1-1 above indicate stiff red clays *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Boring log 3ST-16, Station 593+90 indicated very stiff to hard grayish red to red cohesive clay from elevation -44 to -47 MLT. Boring log 3ST-18, Station 603+60 indicated hard red cohesive (CL) materials from elevation -42 to -45 MLT and hard blue to rust material below elevation -45 MLT. Boring log 3ST-19, Station 608+40 indicated hard red cohesive (CH) materials below elevation -40 MLT. All of the soils described by the boring logs and elevations were within the maximum pay template for the area in Section 7.

The basis of color used in describing cohesive soil has been well established in the geotechnical literature. Color observed in field surveys is often helpful in distinguishing between various soils strata. To an engineer or dredger with sufficient preliminary experience with local soils, color may be useful in identifying individual soil types and their consistency and/or their relative density and depth profile which would also indicate their dredgeability. Dredgeability is defined as the difficulty or ease of excavating, removing, transporting and placing of dredged materials.

Cohesive inorganic soils described are generally associated with the brighter colors such as medium and light gray, olive green, brown red yellow, and white. Cohesive and cohesionless materials have a variety of colors and combination of colors ranging from black, gray, brown, yellow, green, blue, white, red or rust (oxidation of ferric or iron minerals). It is concluded that the color of dredge material sediments do not have any relationship as to its dredgeability.

**1-4 What, if anything, do the logs for the borings identified in response to 1-1 above indicate about stiff rust-colored clays *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Boring log 3ST-11W, Station 568+90 indicated hard, rust and grayish colored, cohesive clay from elevation -40 to -47 MLT. Boring log 3ST-12W, Station 574+00 indicated very stiff to hard rust colored cohesive clay from elevation -21 to -47 MLT. Boring log 3ST-13W, Station 579+00 indicated very stiff to hard, rust, blue, and grayish colored, cohesive clay from elevation -38 to -47 MLT. Boring log 3ST-14, Station 583+70 and Boring log 3ST-15, Station 588+20, indicated very stiff, rust and light grayish colored cohesive clay from elevation -45 to -47 MLT. All of the soils described by the boring logs and elevations were within the maximum pay template for the area in Section 7. These materials had laboratory classifications of CL and CH, and the consistency of these cohesive soils varied from very stiff to hard. These rust colored, cohesive clays were generally found in the last few feet of the bottom of the maximum pay template and allowable overdepth.

It is concluded, as in 1-3, that the color of dredge material sediments does not have any relationship to its dredgeability. Based on the boring logs provided in the contract, an experienced and prudent contractor should have expected to encountered stiff, very stiff to hard cohesive clays.

**1-5 What, if any, significance to dredging is there between red, rust, or any other similarly colored stiff to very stiff clay?**

The red, rust or blue color of clay sediments does not have any effect on the consistency or stiffness of the material nor does it have any affect on the excavating or cutting, removal, transport through the dredge pipeline and/or placement in the Confined Disposal Facility (CDF).

**1-6 What, if any, significance to dredging is there between, on the one hand, stiff to very stiff red or rust-colored clays and, on the other hand, stiff to very stiff gray or blue clays?**

There is no significant difference in the dredgeability of different colored stiff to hard clays and it is concluded that the color of dredge material sediments does not have any relationship to its dredgeability. Dredgeability is referred to as the ease or difficulty of excavating, removing, transporting and disposing of dredged material sediments.

**1-7 Define "hardpan."**

Hardpan soils is a term used to describe any hard, over consolidated or cemented impermeable layer that does not soften very easily when wet. This term is also used to describe boulder clay or glacial till which is a very tightly packed deposit from glacial origin ranging from boulders to rock flour. Hardpan can also be a layer of extremely hard impermeable cohesive soil that is difficult to excavate and will not allow water penetration. These soils are over consolidated clays that have been subjected to large overburden loads or to a long period of desiccation drying. During the ice age when the ocean levels dropped, large exposed mud flats dried up resulting in hard impermeable clay layers. Salt or simply water migration through a clay soil can also cause the clay particles to come closer together, consolidate and form a hardpan. This phenomenon is referred to as seepage consolidation.

## Hydraulic Levees Claims

**2-1 Regarding the levees at the Lost Lake Placement Area (Lost Lake) to be constructed by the hydraulic placement of dredged material, describe what the contract required Renda Marine to construct (height, base width, crown width, slope, etc.).**

The contract required the contractor to construct 13,650 ft of levees to elevation +30 ft M.L.T with hydraulically placed fill during dredging of Upper Bayou dredge channel. Typical levee cross sections had a 10 ft wide crest and 3 to 1 side slopes. The levee

height varied depending on the existing dike height but the average dike height was about 17 ft at an elevation of +30 ft M.L.T. and the average base width was about 114 ft.

**2-2 Calculate the "neat line" volume per lineal foot of the levees at Lost Lake to be constructed by hydraulic placement of dredged material.**

Table 4 shows the hydraulic levee "neat line" volumes, dimensions and stations. The hydraulic levees at Lost Lake were to be constructed from Station 166+00 to 215+00, 4+00 to 56+00 and 61+50 to 97+00 for a distance of 13,650 ft. The total "neat line" volume required for the hydraulically constructed levees was 522,737 CY and the "neat line" volume per linear ft was 38 CY per linear ft.

**2-3 What do the contract documents indicate about the foundation materials in the levee alignment along the east levee? The west levee? The north levee?**

The contract states on contract Drawing No. C-14 Note: 9: ***"Upon completion of the mechanical constructed levees to the lines and grades specified. The contractor must complete the remainder of the perimeter levee to the minimum template limits shown on the drawings, using hydraulically constructed levees,"*** and Note 10. ***"The foundation of the new levee is very soft to soft dredged material and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material."***

The boring logs in the contract indicate that the foundation conditions along the east levee consisted of 56% very soft to soft and 44% medium stiff to hard cohesive soils near the surface with minor amounts of loose to medium dense cohesionless sandy soils. The foundation conditions along the west levee consisted of 50% very soft to soft and 25% medium stiff to stiff cohesive soils near the surface with 12.5% very loose to 12.5% medium dense cohesionless sandy soils. Boring logs along the north levee indicated that the levee foundation consisted of 57% very soft to soft and 36% medium stiff to hard cohesive materials near the surface with minor amounts of very loose cohesionless soils.

Based on the results of the boring log data, it appears that the east and west levees may have had slightly more foundation bearing capacity than the north levee but not a significant amount. Most of the stiff to hard soils occurred at the surface as a result of dewatering, drainage and consolidation by desiccation drying of surface water. Many areas would have a layer of sandy or desiccated clay crust; but underneath the layer would be very soft to soft cohesive materials. In the past the coarse grained sands, shells and clay balls at the Lost Lake CDF normally settled out at the end of the dredge pipe or dump site near the south perimeter levee providing about 36% very soft to soft and 21% medium to stiff cohesive materials and 43% very loose to medium dense cohesionless materials. These upland dredged material placement areas are commonly referred to by the Corps of Engineers as confined disposal facilities or CDF. Elevation of the dredged materials deposited in the south side of the CDF is higher than the north side: therefore, fine grained sediments and water from dredging or rainfall would collect on the north

side before exiting the site through the weir. Depositions of sediments on the north side of the CDF near the weir site were very fine grained high water content soft cohesive materials. Construction of levees on these types of materials should have the worst foundation conditions in a CDF.

**2-4 Based upon what is contained in the contract documents, would it be reasonable to assume that construction of the north and/or west levees would be more difficult than construction of the east levee? Explain why or why not.**

Based on the results of the boring logs, it does not appear to be much difference in the bearing capacity of the either the east, west or north levee foundation conditions. There should not be any problems constructing hydraulically placed embankments on either the east, west or north embankments. Taking advantage of the desiccated surface materials in a CDF is very important for the support of equipment and dredged material placement without causing a bearing capacity failure.

**2-5 What kind(s) of dredged material would be suitable for the hydraulic construction of levees at a placement or disposal area such as Lost Lake?**

The most suitable dredge materials for building hydraulic levees at Lost Lake would be a combination of shells, sand and clay balls. These materials are readily available in the dredge channel and retention rates of the sand and clay balls are normally 60% of the in situ volume. Very soft to hard cohesive CH material will develop into clay balls that are suitable for the hydraulic construction of levees.

**2-6 What, if anything, do the contract documents indicate about the *character, location,* and/or *quantity* (expressed either in cubic yards or as a percentage of total cubic yards to be dredged) within the maximum pay template of materials suitable for the hydraulic construction of levees at Lost Lake?**

The contract provided the results of the geotechnical exploration which included soil boring logs for the contractor to examine and determine the character, location and quantity of dredged material to be removed. The contractor was expected to examine the site and make his own determination as to the character and quantity of the materials to be dredged. The contract provided a table of remaining quantities on page 02482-9 which stated a total estimated quantity of 3,105,500 CY to be dredged from Sections 1 through 9 and an allowable overdepth quantity of 378,200 CY: but the contract did not express the characteristics of the material in volumes or percentage of the total. The total remaining quantity of dredge material and allowable overdepth was 3,483,700 CY.

Volumes of different materials were determined graphically using the COE channel profiles and boring logs and average end area measurement methods shown for typical channel profiles in Figures 1 and 2 below. The geotechnical characteristics, volumes and percentages that were determined are shown in Tables 2 and 3 for Sections 1 through 9.

1. Determine individual areas and total areas of different classifications, consistency and relative density of material in the Remaining Depth Areas

2. Using these individual areas in the Remaining Depth Areas determine the percent of the total Allowable Overdepth Area

3. Multiply these individual percentages times the Remaining Depth Volumes measured by the COE




**Method for Determining the Percentages and Volumes of the COE Remaining Depth Volumes**

Figure 1

Figure 1. Method for Determining the Percentages and Volumes of the COE Remaining Depth Volumes

1. Determine individual areas and total areas of different classifications, consistency and relative density of material in the Allowable Overdepth Areas

2. Using these individual areas in the Allowable Overdepth Area determine the percent of the total Allowable Overdepth Area

3. Multiply these individual percentages times the Allowable Overdepth Volumes measured by the COE




**Method for Determining the Percentages and Volumes of the COE Allowable Overdepth Volumes**

Figure 2

Figure 2. Method for Determining the Percentages and Volumes of the COE Allowable Overdepth Volumes

Table 2, remaining depth and allowable overdepth materials, shows the consistency of the cohesive soils for the total dredged volume. They were 23% very soft, 25% soft, 8% medium stiff, 5% stiff, 14% very stiff and 11% hard. Table 2 also shows the relative density or compactness of the cohesionless soils for the total dredged volume to be dredged. They were 1% very loose, 1% loose, 3% medium dense, 8% dense and 2% very dense.

The quantity of cohesionless material (SC and SM) suitable for hydraulic levee construction was 15% of the total volume to be dredged or 522,123 CY.

Table 3 shows the geotechnical or laboratory classification for the remaining depth and allowable overdepth cohesive soils. They were 46% CH, 35% CL and 5% ML of the total volume to be dredged. The laboratory classification for the cohesionless materials was 4% SC, 10% SM and 1% OH.

The quantity of cohesive material (CH, CL and ML) suitable for hydraulic levee construction consisted of 8% medium stiff, 5% stiff, 14% very stiff and 11% hard materials for a total of 38% of the total volume to be dredged or 1,355,558 CY. These materials are capable of forming clay balls that trap sand, shell and soft clays in the void space between the clay balls.

The total quantity of cohesionless and cohesive dredged material suitable for hydraulic levee construction was 1,877,681 CY.

**2-7 What capture rate (<u>i.e.,</u> material pumped that is suitable for levee construction vs. material retained that is suitable for levee construction) would be anticipated for a project such as the Upper Bayou Project?**

The retention rate for cohesionless materials (SC & SM) resulting from placement and sedimentation between the training dikes should be about 70% of the in situ dredged volume of 522,123 CY or 365,486 CY. The retention rate of the medium stiff to hard cohesive materials should be about 90% of the in situ dredged volume of 1,355,558 CY or 1,220,002 CY.

The total quantity of cohesionless and cohesive dredged material suitable for hydraulic dike construction was a total of 1,585,488 CY or 44% of the grand total graphical volume 3,584,392 CY shown in Tables 2 and 3.

**2-8 Assuming 60% retention rate, what quantity of suitable dredge material is needed to hydraulically construct the perimeter levees at the Lost Lake CDF.**

If we divide the required "neat line" levee volume 522,737 CY by 0.60, then the required suitable volume of dredged for hydraulic levee construction is 871,228 CY. Based on

this assumption there should be sufficient suitable dredged material to construct the perimeter hydraulic displacement levees at Lost Lake Placement Area.

**2-9 In the context of dredge placement or disposal areas, what is a "side cast borrow area?"**

Side cast borrow areas are formed when dredged material is excavated with a dragline or long stick backhoe from within the CDF adjacent to and parallel to the perimeter containment levee. These borrowed materials are used to raise the levee height and berm to increase the safety and storage capacity of the CDF. When possible the excavator is supported by pontoons or wooden mats and is located on an inside stability berm so the borrow area ditch is not too close to the perimeter retaining dike.

**2-10 Is maintenance upon existing levees at dredge placement or disposal areas ever performed with materials taken from side cast borrow areas? How common is it to maintain existing levees at dredge placement or disposal areas with materials from side cast borrow areas?**

It is very common to excavate perimeter trenches for the purpose of surface water management practices to increase the levee heights. The borrow material excavated from the side cast borrow areas along the inside of the levee is placed on the levee and berm. These trenches promote surface and subsurface water drainage and consolidation of the dredged materials in the CDF increasing the storage capacity and improving the consistency and/or stability of the surface material for incremental levee heights. Once the surface strength is improved to support trenching equipment, continued surface trenching is implemented to increase storage capacity by dewatering, consolidation and desiccation drying.

**2-11 Assume that side cast borrow areas were located within the planned footprint of the alignment of the hydraulic levee to be constructed at Lost Lake. What, if any, impact would that have upon construction of the levee? Would any such impact upon levee construction diminish over time, <u>e.g.,</u> if the side cast borrow area had been excavated eight years prior to levee construction vs. three years prior to levee construction?**

If levees are constructed over very soft dredged material filled side cast borrow areas the very heavy clay balls and sand filled levees may cause these soft foundation materials to be displaced. In some COE Districts these side cast borrow areas and all surface water management trenches are normally filled in with dried surface crust prior to dredged material placement in a CDF. These deep side cast borrow areas will not dewater and consolidate at the same rate as the rest of the site; because they are too deep and soft. The material in these areas will be very soft and deep and may not support the levee heights required for dredged material placement for subsequent fillings. The time period of whether it was 3 or 8 years since the borrow areas were excavated is not important. What is important is depth and softness of the material placed in the borrow areas. Also was there a surface water management plan and how aggressive was the surface water