**U.S. Department of Justice**

Civil Division

JKosloske
DJ # 154-02-306

Telephone: (202) 307-0282
Telecopy: (202) 514-8624

*Washington, D.C. 20530*

By Federal Express

February 27, 2004

Brian W. Erikson, Esq.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201
(Tele: (214) 871-2100)

Re: Renda Marine, Inc. v. United States,
No. 02-306C (Fed. Cl.)

Dear Mr. Erikson:

Enclosed is a report dated February 26, 2004, that we received from Jack Fowler, Ph.D., P.E., which is addressed to the discussion of the Flare Area and Lost Lake Placement Area Levees claims in the report of Christopher C. Mathewson, Ph.D., P.E., dated January 26, 2004.

Very truly yours,

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch

Enclosure

EXHIBIT C

Blumberg No. 5118

February 26, 2004

John E. Kosloske
Senior Trial Counsel
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
Washington, D.C. 20530

Renda Marine, Inc. v. United States
No. 02-306C (Fed. Cl)

Subject: Review of Dr. Christopher C. Mathewson's expert opinion report dated January 26, 2004 regarding changed site conditions claim by Renda Marine, Inc. (Renda Marine vs US, Case No. 02-306C, US Court of Federal Claims)

I have reviewed Dr. Mathewson's evaluation of changed conditions claim filed by Renda Marine and have made the following comments.

1. Flare Area (STA 520+00 – STA 550+65.99)

Dr. Mathewson states that after, his review and evaluation of the boring logs and soil description in the Flare Area (STA 520+00 – STA 550+65.99), he concurs with the opinions expressed by both the Corps of Engineers and Renda Marine that geological and engineering properties were not accurately represented in the boring logs and soil descriptions provided Renda Marine when they bid the project.

It is my opinion that the boring logs contained in the plans and specifications are accurate representations of the geological and engineering properties in the Flare Area ((STA 520+00 – STA 550+65.99). The geotechnical data represented in boring logs (3ST-2, 3ST-3, 93-62, 3ST-4, 3ST-5, 93-63, 3ST-6, 3ST-7, and 72-105) indicated that 22% of the cohesive materials were very stiff to hard consistency and 26% of the cohesionless materials were medium dense to very dense. It is my opinion that 48% of the dredged materials found in the Flare Area would have been more difficult to dredge than the less stiff and less dense dredged materials in this area.

Dr. Mathewson also indicated that Renda Marine could not predict, anticipate or expect to encounter the "stiff clay" which resulted in reduced dredging productivity and increased operational time to place and handle the dredged material at the Lost Lake Placement Area.

It is my opinion that, from the boring logs, Renda Marine should have been able to predict and anticipate encountering very stiff to hard cohesive materials and medium dense to dense cohesionless materials to be dredged. These materials are to be very suitable materials for hydraulic levee construction and should have reduced the amount of time required for levee construction.

2. Lost Lake Placement Area Levees

Dr. Mathewson indicate that, the contract documents indicate that the geotechnical characteristics of the materials in the interior perimeter of the Lost Lake Placement Area have low shear strength and that the Atterberg Limits of these materials lie between the Liquid Limit (viscous fluid) and the Plastic Limit (plastic material).

It is my opinion that in situ moisture contents for the boring logs (96-LL-12, 91-148, 91-149, 91-150, 93-118, 93-118, 93-126, 93-127, 93-128, 93-129, and 93-129A) located along the proposed foundation for the perimeter levee were between the Liquid Limits and Plastic Limits and not the "Atterberg Limits." The Atterberg Limits are laboratory tests of moisture contents used to determine when a soil is on the verge of being a viscous liquid (liquid limit, LL) or non-plastic (plastic limit, PL). The plasticity index (PI), PI = LL – PL is the range of water contents for which a soil is plastic.

If Dr. Mathewson is indicating that the in situ moisture content lies between the LL and PL for the boring logs located along inside perimeter of the proposed levee foundation, then the consistency of these soils are very soft to soft as they are indicated in contract documents. Many of the in situ moisture values found in the boring logs (1991, 1993 and 1996) are well below the Liquid Limit.

Dr. Mathewson indicates that, there were no notes or other information to indicate that the dredged material in the perimeter area was previously "mined" to produce material to rebuild and improve existing levees around the area.

It is my opinion that, an experienced dredging contractor would have known that it is common practice during site preparation to excavate one to two feet of dried dredged material crust from inside the levee perimeter to raise the levees in the dredged material placement area. It is also common practice to excavate shallow perimeter drainage trenches for surface water management practices, dewatering and consolidation for increased storage capacity.

There were notes on the Drawing Number C-14, Notes 9 and 10 that indicated very soft to soft foundation materials. Note 9. "Upon completion of the mechanically constructed levees to the lines and grades specified the contractor must complete the remainder of the perimeter levee to the minimum template limits shown on the drawings using hydraulically constructed levee material." Note 10. "The foundation of the new levee is very soft to soft dredged material and sand placed in the past dredging maintenance cycles. It is anticipated that these very soft to soft foundation materials will be displaced by the new levee material."

Dr. Mathewson indicate that an analysis of the date of sampling indicates that the mining operations occurred recently, after the date of drilling and geotechnical testing, and

therefore the geotechnical properties of the foundation materials in the Lost Lake Placement Area are significantly weaker than suggested in the contract documents.

After reviewing the dates that the boring logs were taken (1996, 1993 and 1991) along the inside of the perimeter levee I could not find any evidence that would suggest where any recent mining operations had occurred. I could not find any soil characteristic in the boring logs that would suggest that the foundation conditions where significantly weaker than a consistency of very soft to soft as described in the contract documents. Any soil condition that would be significantly weaker than very soft would be described as a "fluid or viscous mud." For these foundation soils to be a "fluid mud" the moisture content would have to be greater than the Liquid Limit. There are no moisture content values in the boring logs (1996, 1993 and 1991) that are greater than the Liquid Limit.

Taking borings prior to dredging is a common practice when it is anticipated that perimeter levees will be raised with or without anticipated foundation displacement. The design engineer can use this information to estimate the levee volume and displacement volume necessary to complete the levees. It is not uncommon to allow several years of drainage and desiccation drying and consolidation of these fine grained materials to provide good foundation support.

Based upon my conversation with Eric Russek, Galveston Corps of Engineers, on February 25, 2004, I understand that T.L. James (prime contractor) and King Fisher (sub contractor) raised the dikes, at Lost Lake Placement Area prior to dredging and placement in the area, by side cast borrowing thin layers of crust from the surface sometime during 1994-1996, in that, after the levees were raised, T.L. James placed about 1,000,000 CY of dredged material in Lost Lake (1000 acres) to a depth of less than one foot. Therefore it was not necessary to take additional borings.

Dr. Mathewson indicates that Renda Marine experienced significant amounts of "material loss" through the displacement of the low-strength dredged material that had refilled the recently mined-areas.

There is no evidence of recently-mined areas and, if there were any low areas, it is my opinion, based upon my experience, that it is necessary to displace these thin layers of very soft sediments down to a more consistent foundation material for levee support. These suitable materials are not lost but are part of the levee foundation. During my visit to the Lost Lake Placement Area, I observed significant losses of suitable hydraulic levee construction material misplaced by the contractor out into Lost Lake.

The contract drawings indicate that hydraulically-placed dredged material levees would displace the very soft to soft materials along the inside of the perimeter levees. An experienced dredging contractor should have anticipated volume losses due to displacement of these very soft to soft materials during hydraulic levee construction. Proper placement of hydraulically-filled levees will minimize large losses of fill material because a hydraulically-constructed levee causes fewer disturbances to the very soft to soft foundation materials. Mechanically-constructed levees with heavy construction

equipment will cause excessive foundation displacement and required larger quantities of fill material than hydraulically-constructed levees. Improper hydraulic fill techniques by inexperienced contractors will also result in the loss of large quantities of suitable levee construction materials due to excessive foundation displacement.

Dr. Mathewson indicate that hydraulic dredging construction methods, which were specified for much of the levee project, would further decrease the shear strength of the underlying dredged material by increasing the pore-water pressure and decreasing the effective strength of theses saturated clays and silts.

It is my opinion that any type of loading, whether it resulted from mechanical or hydraulic placement of dredged material on this very soft to soft cohesive, saturated, high moisture content, high-void-ratio and very sensitive material in the disposal area would cause an increase in pore pressure thus decreasing the effective stress. Hydraulic placement of dredged material along the levee alignment will result in a more controlled loading and less bearing capacity failures than mechanically-placed levees. During hydraulic placement, the levee displaces the very to soft foundation material to a depth where the levee foundation will finally rest on more stable foundation materials.

Dr. Mathewson indicate that, under actual conditions at the Lost Lake Placement Area, Renda Marine could not construct the desired levee to +30ft until the low-strength, fluid materials were displaced from the foundation of the proposed levee and high-strength materials could be placed to form the foundation.

It is my opinion that these in situ, low-strength materials are not a "fluid material" because the moisture content was below the Liquid Limit. These very soft to soft, high-moisture-content and sensitive materials will loose 80 to 90 percent of their initial in situ strength due to remolding during levee construction and will flow as a fluid mud during foundation displacement and bearing capacity failure, but they are not properly classified as a "fluid material."

An experienced contractor should have anticipated that these very soft to soft dredged materials would displace during hydraulic levee construction. The Corps of Engineers expected the contractor to construct a controlled displacement levee cross section with hydraulic placed dredged material.

Based on my experience, it is my opinion that it was not impossible to construct hydraulically-placed dredged material fill levees at Lost Lake Placement Area.

Jack Fowler, PhD, PE