weeks that would be enough time.

Tr. 19(23-24)-20(1-5), Def. App. 25-26. Regarding the need for any rebuttal report(s) by the Government's trial expert(s), defendant's counsel stated:

> It is difficult for the [G]overnment to really say anything until we see [Renda's revised report(s)] . . . . [W]e have no idea of how extensive the changes or revisions might be to the previously expressed opinions. . . . It could be relatively insignificant; they may be major. Until we see the reports, we don't know.

Tr. 20(10-13; 15-17), Def. App. 26.

Following the status conference, the Court entered an Order re-setting the pretrial and trial dates. November 4, 2004 Order, ¶¶ 4-7. With respect to "Expert Discovery," the Order provides:

> Plaintiff has requested the opportunity to revise its previously submitted expert reports, in light of material produced by defendant during discovery. Plaintiff also has represented to the court that it intends only to supplement its previously submitted expert reports, and that it does not intend to submit reports by any new expert witnesses. In accordance with RCFC 26(a)(2), plaintiff shall submit updated versions of its existing expert reports on or before November 18, 2004.

Order, ¶ 2, Def. App. 28. Concerning "Rebuttal Expert Discovery," the Order provides that, "[i]n accordance with RCFC 26(a)(2), defendant shall submit updated rebuttal expert reports, if any, on or before December 16, 2004." Id., ¶ 3, Def. App. 29.

F. Renda's Revised Expert Reports

(1) The November 2004 Mathewson Revised Report

On or about November 18, 2004, Renda produced for the Government a report dated November 17, 2004, issued by Dr. Mathewson that "supercedes" his January 26, 2004 report,

which is seven pages (not counting the curriculum vitae). See Def. App. 50-57. The revised report recites that the opinions therein are based upon his January 26, 2004 report, his "visit to the project site, including an examination of the Section 7 clay issue and a number of on-site photographs," and his "review of numerous other" unspecified "documents, photographs, videos and CD's that [Renda's counsel provided]." Def. App. 51.

Dr. Mathewson's November 2004 report substantially revises and adds to the opinions and other matters contained in his initial January 2004 report. Contrary to Renda's counsel's representations during the November 4, 2004 telephonic status conference, with one exception, the revisions and additions to Dr. Mathewson's January 2004 do *not* comment upon and are *not* based upon the discovery materials produced by the Government during the past five months in compliance with the Court's May 14, 2004 Order granting Renda's April 14, 2004 motion to compel. Rather, the changes and additions to the scope of Dr. Mathewson's expert testimony are based upon materials that Renda possessed as of January 2004 when Dr. Mathewson's initial report was issued or a visit to the Lost Lake Placement Area by Dr. Mathewson in March 2004.

The only comment in Dr. Mathewson's November 2004 revised report addressed to the discovery materials produced by the Government during recent months in compliance with the Court's May 14, 2004 Order is the following paragraph at the fourth page of the revised report:

> Documentation from previous maintenance projects at Lost Lake and other disposal areas prepared by the U.S. Government indicates that the Corps of Engineers had previously required contractors to excavate borrow pits along the interiors of the perimeter levees at Lost Lake in order to increase the height of the levees. The contract documents for those projects indicate that these side cast borrow areas were to be no closer than 50 feet from the interior toe of the levee, and no more than 3 or 4 feet deep.

Def. App. 54.

The following *new* aspects of Dr. Mathewson's revised report, by contrast, are not based upon anything that he might have learned from documents recently produced by the Government:

1. The 10 numbered paragraphs on the second page of the revised report. Def. App. 52.

2. Regarding Renda's Flare Area claim, the following statement at the third page of the revised report: "It is my opinion that Renda Marine encountered clays in the Flare Area that were stiffer than the clays and other materials indicated in the applicable soil borings. for the Flare Area. Renda relied on the appropriate soil borings. Soil borings taken elsewhere would not be as accurate as the ones actually taken at the Flare Area." Def. App. 53.

3. Regarding Renda's South Ferry Landing claim, the following statement at the third page of the revised report: "It appears, from Corps data and permit applications that the Corps of Engineers had information to indicate that revetments and riprap were placed in the area of the South Ferry Landing. However, this information was not contained in the contract documents. The Corps should have made such information known to the prospective bidders." Def. App. 53.

4. Regarding Renda's Section 7 Clay claim, the following statement at the bottom of the third and top of the fourth pages of the revised report: "I examined some of the Section 7 clay during my visit to the Lost Lake site and determined from field tests that it was much harder and more competent than the clays and other materials indicated in the contract documents for the Section 7 area." Def. App. 53-54.

5. Regarding Renda's Lost Lake Levees claim, the following parts of the analysis at the fourth, fifth, sixth, and seventh pages of the revised report:

   (a) The statement on the fourth page that Dr. Mathewson has "identified two related unfavorable site conditions," which are "the very low strength and slope failures of the constructed levees" and "the lack of available and suitable construction material for the completion of the project." Def. App. 54.

   (b) The opinions and other matter in the paragraph at the bottom of the fourth page and top of the fifth page and the first three full paragraphs on the fifth page, including the observation about the design stability circular failure analysis performed by HVJ Associates for the Corps of Engineers and the opinion that "[a] more appropriate analysis model would have used a slid-

ing block solution in which the soft new work materials formed the base of a sliding block rather than a circular failure that progressed below these weak materials." Def. App. 54-55.

(c) The discussion under Section B beginning in the middle of the fifth page, including the statement on the fifth page that "Renda Marine did not have enough clay and other suitable materials available from contractually authorized dredging areas to construct the levees at Lost Lake" and the statement on the sixth page that "[b]ased on the amount of settlement it appears clear that more than 3 or 4 feet were removed from the side cast borrow areas." Def. App. 55.

(d) The following statement on the sixth page: "One method of constructing the hydraulic levees that would ensure that the levees could reach and maintain a 30-foot elevation involves placing the hydraulic fill of clay and other suitable materials in lifts and allowing time for consolidation and dewatering of the materials before applying additional lifts. This process, however, would require more time than that allowed under the contract documents." Def. App. 56.

(e) The four concluding opinions on the seventh page that: (i) "there was insufficient volume of suitable material available to Renda Marine to construct the Lost Lake levees as designed; (ii) "the levees could not be constructed to reach and remain at the required 30-foot elevation under the circumstances;" (iii) "the side-cast borrow areas were larger than reported and consumed excessive amounts of suitable levee construction material;" and (iv) "there was insufficient time allowed by the contract to construct the levees in lifts to reduce the significance of slope failures." Def. App. 57.

Renda has not produced for the Government any work papers created by Dr. Mathewson relating to any of the new matter described above contained in his November 2004 revised report despite the Government's document production request for such materials. See Document Request No. 2 contained in "Defendant's First Set of Interrogatories and Second Request for Production of Documents" dated January 23, 2003, Def. App. 39.

On November 23, 2004, five days after Renda produced Dr. Mathewson's revised report, Renda's counsel "advised" defendant's counsel that Renda has provided to Dr. Mathewson, "for

his review," seven enumerated Corps of Engineers manuals, implying that yet another disclosure of expert testimony by Dr. Mathewson may be forthcoming, notwithstanding the Court's November 4, 2004 Order. See Def. App. 58. *None* of those manuals was part of the materials produced by the Government this past summer. *All* of the Corps of Engineers manuals existed and were available to Renda as of January 26, 2004, when Dr. Mathewson's initial report was issued.

(2) The November 2004 McCullough Revised Report

On or about November 18, 2004, Renda produced for the Government a report dated November 17, 2004, issued by Mr. McCullough. See Def. App. 59. The revised report states that, "[McCullough & Associates (M&A)] has revised its [March 3, 2004] report to incorporate new information as well as adjusted equipment rates based on our evaluation of audit comments and expert reports," that "we have incorporated the new rates as well as amounts shown as adjustments in our previous report into the damage calculations for Claim 5 through Claim 12," and that, "[a]s a result of these changes, we have revised the damage pricing sheets for Claim 5 through Claim 12." Def. App. 61. The revised McCullough report further states that, "[s]ince discovery in this case is ongoing M&A is continuing to analyze depositions and reports of [Corps of Engineers] personnel and experts *and reserves the right to revise these opinions as additional information becomes available.*" Id. (emphasis added).

Mr. McCullough's revised report contains a revised estimate of Renda's damages, based in large part upon an overhaul of the rates for more than 100 pieces of marine and land-based equipment included in Renda's claims. The estimate of Renda's damages has *increased*, in the aggregate, by approximately $635,000, from the estimate of $13,379,369 contained in his March 2004 report to the $14,015,884 estimate contained in his November 2004 "update." See Exhibit

A-1 "Summary of Claims"), Def. App. 87. The damage estimate for each of Renda's claims has changed:

| | March 2004 | Nov. 2004 |
|---|---|---|
| Flare Area | $1,096,179 | $1,838,935 |
| South Ferry Landing | $ 947,054 | $1,016,292 |
| HL&P Transmission Tower Delays | $ 167,473 | $ 208,665 |
| Obstruction No. 1 | $1,986,551 | $2,092,372 |
| Obstruction No. 2 | $1,148,804 | $1,062,086 |
| Section 7 Clay | $ 978,271 | $1,230,072 |
| Lost Lake Levees | $7,055,037 | $6,567,464 |
| Total: | $13,379,369 | $14,015,884 |

Def. App. 87.

Again, contrary to Renda's counsel's representations during the November 4, 2004 telephonic status conference, most of the revisions to Mr. McCullough's March 2004 report do *not* comment upon and are *not* based upon the discovery materials produced by the Government during the past five months in compliance with the Court's May 14, 2004 Order granting Renda's April 14, 2004 motion to compel. Rather, the changes and additions to the scope of Mr. McCullough's expert testimony, in particular the new equipment rates, are a rehash of information that was available to Renda (and hence, Mr. McCullough) at the time that he issued the March 2004 report.

The following *new* aspects of Mr. McCullough's revised report are not based upon anything that he might have learned from documents recently produced by the Government in compliance with the Court's May 14, 2004 Order granting Renda's April 14, 2004 motion to compel:

1. The opinion that Renda "was released from the project prior to completing all the work in its contract," and, that "[t]his amounts to a termination for convenience by [the Government]," and that, "[a]s such, [Renda] is entitled to recover the reasonable and necessary costs expended in prosecuting the work prior to termination."

Def. App. 62.

2. Regarding the Flare Area claim, the following statement: "[Renda] encountered differing site conditions related to the clays encountered in the Flare Area. [Renda] utilized appropriate soil borings consistent with industry practice in determining soil conditions. [Renda] encountered stiffer clays than indicated by the bid documents and incurred additional compensation due to this issue as shown in the revised Damage Summary, Exhibit P." Def. App.64-65.

3. Regarding the South Ferry Landing claim, the following statement: "It appears that [the Government] had information on the subsurface man-made materials but failed to incorporate any information about those materials in the bid documents. [Renda] properly anticipated it would encounter only naturally occurring soil materials in this area." Def. App. 65.

4. Regarding the Section 7 Clay claim, the following statement: "[Renda] used the correct soil borings in its analysis to determine the anticipated soil type and conditions." Def. App. 75.

5. Regarding the Lost Lake Levees claim, the discussion of the alleged effect of "poor foundations caused by side-cast borrow areas" upon Renda's construction operations at the Lost Lake Placement Area. Def. App. 81.

6. Exhibit C ("Lost Lake Levees – Summary of Damages"). This is a spreadsheet from the March 2004 report that has been modified. The revised spreadsheet does not contain a "total days" column and, except for the zero values, all dollar amounts have changed. Def. App. 88.

7. Exhibit E ("Analysis of Claimed Delays"). This is a spreadsheet from the March 2004 report that has been modified. The revised spreadsheet does not contain an "impact days" column. In column "Claim 12a1 Planned HL Operations," entries for certain dates have been deleted, entries have been added for other dates that previously did not have an entry, and all entries have been converted from letters to numbers. In column "Claim 12a2," the numerical values have been changed from one decimal to two decimal points, for example, from 0.1 to 0.13. Def. App. 89-90.

8. Exhibit I-1 ("Claim 12a1 – Hydraulic Levees – Labor and Equipment Damage Calculations (Added Costs for Original Duration (10 months)"). This is a spreadsheet from the March 2004 report that has been modified. Two of the "Additional Worker" entries have been deleted. The values in the "Days" columns for labor and equipment for 1999, 2000, and 2001 have changed and the value in the "per diem" column has been changed from $50 to $25. Def. App 91.

9. Exhibit I-1a ("Claim 12a1 – Equipment Calculations"). This spreadsheet is a new exhibit without a counterpart in the March 2004 report. Def. App. 92.

10. Exhibit I-2 ("Claim 12a2 – Hydraulic Levees – Labor and Equipment Damage Calculations (Additional Costs for Full Crew for Extended Duration"). This is a spreadsheet from the March 2004 report that has been modified. Two of the "Additional Worker" entries have been deleted. The value in the "per diem" column has been changed from $25 to $50. Def. App 93.

11. Exhibit I-1a ("Claim 12a2 – Equipment Calculations"). This spreadsheet is a new exhibit without a counterpart in the March 2004 report. Def. App. 94.

12. Exhibit J-1a ("Claim 12a2 – Equipment Calculations"). This spreadsheet is a new exhibit without a counterpart in the March 2004 report. Def. App. 95.

13. Exhibit L ("Claim 12e – Booster Equipment and Labor Calculations"). This exhibit has been revised to substitute a rate for the booster based upon a November 2000 equipment lease agreement between Renda and Hendry Corporation. Def. App. 96-102.

14. Exhibit O (Equipment Rate Formula Explanations). This is a new exhibit without a counterpart in the March 2004 report. Def. App. 103-105.

15. Exhibits O-1 through O-10. This is a series of 25 spreadsheets that contain Mr. McCullough's recalculation of equipment rates for six-month intervals. The spreadsheets are new exhibits without any counterparts in the March 2004 report. The data for Renda's marine equipment (including the dredge *Millennium*) are not set out in the spreadsheets. For that equipment, the spreadsheet contained the following entry: "Rate computed per Chapter 4 methodology for dredging plant; see separate ("Long Form") worksheet for rate calculation." Def. App. 106.

16. Exhibits P and P-1 through P-8. These exhibits, a "Damages Summary" and spreadsheets for the Flare Area claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 107-115.

17. Exhibits Q and Q-1 through Q-7. These exhibits, a "Damages Summary" and spreadsheets for the South Ferry Landing claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 116-123.

18. Exhibits R and R-1 through R-3. These exhibits, a "Damages Summary" and spreadsheets for the HL&P Transmission Tower Delay claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 124-127.

19. Exhibits S and S-1 through S-4. These exhibits, a "Damages Summary" and spreadsheets for the Obstruction No. 1 claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 128-132.

20. Exhibits T and T-1 through T-4. These exhibits, a "Damages Summary" and spreadsheets for the Obstruction No. 2 claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 133-138.

21. Exhibits U and U-1 through U-5. These exhibits, a "Damages Summary" and spreadsheets for the Obstruction No. 2 claim, are new exhibits without any counterparts in the March 2004 report. Def. App. 139-144.

Renda has not produced for the Government any work papers created by Mr. McCullough relating to any of the new matter described above contained in his November 2004 revised report despite the Government's document production request for such materials. See Document Request No. 2 contained in "Defendant's First Set of Interrogatories and Second Request for Production of Documents" dated January 23, 2003, Def. App. 39.

## ARGUMENT

### A. Renda's Experts Mathewson And McCullough Should Not Be Permitted To Testify Regarding The Matter Contained In Their November 2004 Reports, Except To The Extent That It Is Addressed To Information Contained In The Discovery Obtained By Renda From The Government After May 14, 2004, In Response To The Court's May 14, 2004 Order.

In May 2004, the Court vacated the trial for the purpose of allowing Renda to obtain discovery of Corps of Engineers Galveston District electronic mail messages and documents relating to certain previous dredging and/or levee maintenance contracts involving the Lost Lake Placement Area or the site of the Upper Bayou Project. The Government produced the materials and, during the November 4, 2004 status conference to reset the schedule for post-discovery pretrial and trial dates, Renda requested that it be afforded the opportunity to revise its previous expert testimony disclosures to address information gleaned from the documents

produced by the Government. The Court allowed that request and set a date of November 18, 2004, for the production of "updated versions" Renda's existing expert reports, with the understanding that, consistent with Renda's representation to the Court during the November 4 status conference, Renda was being afforded an opportunity "to revise its previously submitted expert reports, in light of material produced by defendant during discovery." Order, ¶ 2, Def. App. 28.

The revised expert reports produced by Renda do not comply with the Court's November 4, 2004 Order. Those reports do not consist of the opinions and analysis contained in the reports previously issued by Dr. Mathewson and Mr. McCullough, revised to include commentary, opinions, or analysis based upon information contained in the Galveston District electronic mail messages or documents relating previous dredging and/or levee maintenance contracts involving the Lost Lake Placement Area or the site of the Upper Bayou Project. As discussed above, with one exception, the November 2004 reports issued by Dr. Mathewson and Mr. McCullough are laden with new opinions and expanded analyses that are not based upon the materials produced by the Government in response to the Court's May 14, 2004 Order. Under the guise of being afforded an opportunity to supplement the earlier reports of Dr. Mathewson and Mr. McCullough with commentary upon the materials produced by the Government during the past five months, Renda has produced reports that retool, refine, and substantially expand the earlier opinions and analysis of these experts.

In its September 2003 scheduling order, as amended by its March 2004 order, the Court established deadlines for completing discovery of experts, including the disclosures required by RCFC 26(a)(2). The Government met that schedule, but Renda has not done so. The revisions to the previously-issued reports of Dr. Mathewson and Mr. McCullough reflected in the Novem-