JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

JANUARY 23, 2003

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 23rd day of JANUARY, 2003, I caused to be sent by United States Mail (postage prepaid) the original of "DEFENDANT'S FIRST SET OF INTERROGATORIES AND SECOND REQUEST FOR PRODUCTION OF DOCUMENTS" addressed as follows:

BRIAN W. ERIKSON, ESQ.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201

John Koslosky

**U.S. Department of Justice**

Civil Division

JKosloske
DJ # 154-02-306

Telephone: (202) 307-0282
Telecopy: (202) 514-8624

*Washington, D.C. 20530*

By Federal Express

February 3, 2004

Brian W. Erikson, Esq.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201
(Tele: (214) 871-2100)

Re: Renda Marine, Inc. v. United States,
No. 02-306C (Fed. Cl.)

FILE

Dear Mr. Erikson:

Enclosed are "Defendant's Fourth Supplemental Response to Plaintiff's First Request for Production of Documents" dated February 3, 2004, "Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories" dated February 3, 2004, "Defendant's Disclosure of Expert Testimony" dated February 3, 2004, and the reports of defendant's trial experts Robert Lofgren, Jack Fowler, Ph.D., P.E., and William F. Connole, P.E., pursuant to RCFC 26(a)(2)(B). The reports of Messrs. Lofgren, Fowler, and Connole are contained in two boxes.

Very truly yours,

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch

Enclosures

**U.S. Department of Justice**

Civil Division

JKosloske
DJ # 154-02-306

Telephone: (202) 307-0282
Telecopy: (202) 514-8624

*Washington, D.C. 20530*

By Federal Express

February 3, 2004

Brian W. Erikson, Esq.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201
(Tele: (214) 871-2100)

Re: Renda Marine, Inc. v. United States,
No. 02-306C (Fed. Cl.)

FILE

Dear Mr. Erikson:

Enclosed are documents produced in accordance with "Defendant's Fourth Supplemental Response to Plaintiff's First Request for Production of Documents" dated February 3, 2004 (listed in Exhibits A, B, and C to that supplemental discovery response), except the reports of Robert Lofgren, Jack Fowler, Ph.D., P.E., and William F. Connole, P.E., which are being sent to you by overnight mail under a separate transmittal letter. The documents relating to Robert Lofgren (Anchor Environmental) are contained in seven boxes. The documents relating to Jack Fowler, Ph.D., P.E. (Geotec Associates) are contained in two boxes. The documents relating to William F. Connole, P.E. (Franvel Corporation) are contained in twelve boxes.

Very truly yours,

John Kosloske

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch

Enclosures

**U.S. Department of Justice**

Civil Division

JKosloske
DJ # 154-02-306

Telephone: (202) 307-0282
Telecopy: (202) 514-8624

*Washington, D.C. 20530*

By Federal Express

February 27, 2004

Brian W. Erikson, Esq.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201
(Tele: (214) 871-2100)

Re: Renda Marine, Inc. v. United States,
No. 02-306C (Fed. Cl.)

Dear Mr. Erikson:

Enclosed is a report dated February 26, 2004, that we received from Jack Fowler, Ph.D., P.E., which is addressed to the discussion of the Flare Area and Lost Lake Placement Area Levees claims in the report of Christopher C. Mathewson, Ph.D., P.E., dated January 26, 2004.

Very truly yours,

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch

Enclosure

**U.S. Department of Justice**

Civil Division

JKosloske
DJ # 154-02-306

Telephone: (202) 307-0282
Telecopy: (202) 514-8624

*Washington, D.C. 20530*

FILE

By Federal Express

May 14, 2004

Brian W. Erikson, Esq.
Quilling, Selander, Cummiskey & Lownds, P.C.
2001 Bryan Street, Suite 1800
Dallas, TX 75201
(Tele: (214) 871-2100)

Re: Renda Marine, Inc. v. United States, No. 02-306C (Fed. Cl.)

Dear Mr. Erikson:

Enclosed is the rebuttal report of defendant's expert, William F. Connole, P.E., to the March 3, 2004 report of plaintiff's expert, Robert B. McCullough. In addition, we enclose a copy of the work papers relating to Mr. Connole's rebuttal report.

Very truly yours,

John Kosloske

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch

Enclosures

QSCL
QUILLING · SELANDER · CUMMISKEY · LOWNDS

# FAX TRANSMITTAL

TO: John E. Kosloske
Senior Trial Counsel, Commercial Litigation
Department of Justice, Civil Division

FAX NO: (202) 514-8624

FROM: Cheryl Moseley, PLS
Specialty Certified - Texas Civil Litigation
Legal Assistant to Brian W. Erikson

DATE: January 27, 2004

CLIENT MATTER NUMBER: Renda Marine / Upper Bayou / 565.0009

NUMBER OF PAGES INCLUDING COVER PAGE: __67____

IF YOU DO NOT RECEIVE ALL MATERIALS BEING TRANSMITTED, PLEASE CALL OUR OFFICE AT (214) 871-2100.

**COMMENTS:**

I transmit the report from one of Renda's experts, Christopher C. Mathewson, Ph.D., along with his curriculum vitae.

Please feel free to call me if you have any questions.



The information contained in this facsimile message is legally privileged and confidential information which is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any use, dissemination, distribution or reproduction of this message is strictly prohibited. If you have received this message in error, the material herewith should be destroyed immediately and the sender listed above should be notified by telephone.

S:\Construction\Renda Marine\Upper Bayou 565 09\Kosloske-cam Fax.wpd

Bryan Tower 2001 Bryan St., Suite 1800 Dallas, TX 75201 | ph. 214.871.2100 fx. 214.871.2111 www.qsclpc.com
A PROFESSIONAL CORPORATION | ATTORNEYS AND COUNSELORS

**CHRISTOPHER C. MATHEWSON, PhD, PE, REG**
**Engineering Geologist**
**1307 Glade Street**
**College Station, TX 77840**

Phone: ......979-845-2488 FAX: ......979-847-9313 E-mail: .......mathewson@geo.tamu.edu

26 January 2004

Brian W. Erikson
Qulling, Selander, Cummiskey & Lownd
2001 Bryan Street, Suite 1800
Dallas, TX 75201

Re: Renda Marine, Inc. *vs.* United States, Case Number 02-306C, United States Court of Federal Claims

Dear Mr. Erikson,

At your request I have evaluated the changed conditions claims filed by Renda Marine related to the dredging of the Houston Ship Channel. The project area includes dredging between Stations 684+06.58 and 470+00, shown as the "Upper Bayou" on the Location Plan (Map C-1), and the construction of a dredged material confinement levee at the Lost Lake Placement Area. You have asked me to limit my evaluation to four specific sites defined in this project. These sites are:

1. Flare Area (STA 520+00 – STA 550+65.99)
2. South Ferry Landing (Section 1, STA 470+00 – STA 480+16.77)
3. Section 7 (Approximately STA 565+00 and 580+00)
4. Lost Lake Placement Area Levees

The professional opinions expressed in this report are based upon a review made on Thursday, 15 January 2004, in Dallas, Texas of the contract documents that were provided to me with further review of these documents made in College Station.

1. The Flare Area: My review and evaluation concurs with the opinions expressed by the Corps of Engineers and Renda Marine in that the subsurface geological and engineering properties were not accurately represented in the boring logs and soil descriptions provided to Renda Marine when they bid the project. As a result, Renda Marine could not predict, anticipate or expect to encounter the "stiff clay" which resulted in reduced dredging productivity and increased operational time to place and handle the dredged materials at the Lost Lake Placement Area.

2. South Ferry Landing: The project drawings do not include any specific information about the bathymetric or submarine conditions of the South Ferry Landing area while they include a detailed map of the North Ferry Landing area (Map C-6). The North landing area is actually outside the limit of the dredging project. The incorporation

of the bathymetric data for the North Lynchburg Landing in the contract documents provides unnecessary and misleading information about the dredging conditions to be anticipated at the South Lynchburg Landing. The complete lack of information or data about the conditions at the South Ferry Landing area, with respect to rubble, shore protection structures, navigational aids or other submarine conditions, strongly suggests that these conditions do not exist in the area. As a result, Renda Marine should not have anticipated the existence of anything other that the naturally occurring Earth materials in this area of the project, except for possible minor amounts of undocumented trash and debris.

3. Section 7: Renda Marine encountered a "very stiff red clay" while dredging in Section 7, approximately between Stations 565+00 and 580+00. The presence of a "red clay" indicates that the dredging operation encountered sediments that are most-likely Pleistocene (Glacial) in age. These sediments, which were exposed to the atmosphere and oxidized during the low stand of sea level, experienced an increased confining pressure through desication, that produced higher strength materials than the Recent marine sediment shown in the contract documents. Because these "red clays" have higher shear strength than the younger marine clays, the dredging effort required to remove these materials is significantly greater than that required to remove Recent marine clays. These "red clays", however would be a superior material for the construction of the foundation for the levees at the Lost Lake Placement Area.

4. Lost Lake Placement Area Levees: The contract documents indicate that the geotechnical characteristics of the materials in the interior perimeter of the Lost Lake Placement Area have low shear strength and that the Atterberg limits of these materials lies between the Liquid Limit (viscous fluid) and the Plastic Limit (plastic material). There are no notes or other information to indicate that the dredged material in the perimeter area was previously "mined" to produce material to rebuild and improve the existing levees around the area. An analysis of the date of sampling indicates that the mining operations occurred recently, after the date of drilling and geotechnical testing, and therefore the geotechnical properties of the foundation materials in the Lost lake Placement Area are significantly weaker than suggested in the contract documents. As a result, Renda Marine experienced significant amounts of "material loss" through the displacement of the low strength dredged material that had refilled the recently mined areas. Hydraulic dredging construction methods, which were specified for much of the levee project, would further decrease the shear strength of the underlying dredged material by increasing the pore-water pressure and decreasing the effective strength of these saturated clays and silts. Under the actual conditions at the Lost Lake Placement Area, Renda Marine could not construct the desired levee to +30 ft until the low strength, fluid materials were displaced from the foundation of the proposed levee and high strength materials could be placed to form the foundation. The presence of the buried and unreported "side cast borrow areas' resulted in an impossible condition that was not indicated in the construction documents.

Thank you for the opportunity to review and evaluate the provided materials and to provide my opinions concerning the differing site conditions at the Flare Area, South Ferry Landing, Section 7 and the Lost Lake Placement Area Levees. It is my opinion that each of these sites represents a true differing site condition in which the contract documents failed to report the actual natural or man-made condition.

Please feel free to contact me should you have any questions or desire a more extensive review and evaluation.

Sincerely yours,

C.C. Mathewson

Christopher C. Mathewson, PhD, PE, REG
Engineering Geologist

encl: Vitae

QSCL
QUILLING · SELANDER · CUMMISKEY · LOWNDS

BRIAN W. ERIKSON

Direct Line: 214.880.1844
E-mail: berikson@qsclpc.com

November 17, 2004

John E. Kosloske, Esq.
Senior Trial Counsel, Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street, N.W., Room 12052
Washington, D.C. 20005

***Via Federal Express***

Re: Case No. 02-306C; *Renda Marine, Inc. v. United States Army Corps of Engineers*; United States Court of Federal Claims; DACW64-99-C-0001, Dredging Upper Bayou

Dear Mr. Kosloske:

I attach a superseding expert report from Christopher Mathewson, Ph.D., P.E., R.E.G. I also enclose Dr. Mathewson's current curriculum vitae.

Dr. Mathewson has reviewed additional documents produced by the Corps of Engineers. I enclose a CD-Rom with images and Bates numbers for such documents. Dr. Mathewson has also reviewed the expert report of Jack Fowler, and the Government's challenge to Renda's experts, as well as depositions of the various Corps personnel, Renda personnel, Jack Fowler, and Kenneth Affolter.

Sincerely yours,

Brian W. Erikson

BWE/ja

Enclosures

cc: Oscar Renda (w/expert report & CV)

S:\Construction\Renda Marine\Upper Bayou 565.09\Kosloske 111704 enc supp expert report.wpd



Bryan Tower 2001 Bryan St., Suite 1800 Dallas, TX 75201 | ph. 214.871.2100 fx. 214.871.2111 www.qsclpc.com

A PROFESSIONAL CORPORATION | ATTORNEYS AND COUNSELORS

**CHRISTOPHER C. MATHEWSON, PhD, PE, REG**
**Engineering Geologist**
**1307 Glade Street**
**College Station, TX 77840**

Phone:....979-845-2488 FAX:......979-847-9313 E-mail:..... mathewson@geo.tamu.edu

17 November 2004

Brian W. Erikson
Qulling, Selander, Cummiskey & Lownd
2001 Bryan Street, Suite 1800
Dallas, TX 75201

Re: Renda Marine, Inc. *vs.* United States, Case Number 02-306C, United States Court of Federal Claims

Dear Mr. Erikson,

This is the superseding report concerning my investigation and evaluation of the changed conditions claims filed by Renda Marine related to the dredging of the Houston Ship Channel. The project area includes dredging between Stations 684+06.58 and 470+00, shown as the "Upper Bayou" on the Location Plan (Map C-1), and the construction of a dredged material confinement levee at the Lost Lake Placement Area. I have continued to limit my evaluation to four specific sites defined in this project. These sites are:

1. Flare Area (STA 520+00 – STA 550+65.99)
2. South Ferry Landing (Section 1, STA 470+00 – STA 480+16.77)
3. Section 7 (Approximately STA 565+00 and 580+00)
4. Lost Lake Placement Area Levees

The professional opinions expressed in this report are based upon my letter to you of 26 January 2004, plus:

- my visit to the project site, including an examination of the Section 7 clay issue and a number of on-site photographs; and
- my review of numerous other documents, photographs, videos and CD's that you provided.

I understand that you have listed the documents and information that I reviewed and that you provided this information to the Government's attorney along with the site photographs that I took.

As requested, I have listed my qualifications and experience with respect to dredging operations, coastal geology and geotechnology, navigation and marine surveying as it relates to the opinions presented in this report in response to the challenge of my qualifications offered by the government. My experience is listed below:

1. I have spent many years studying soil borings, and am very familiar with the engineering and geotechnical properties of earth materials and how they impact and control the dredgeability of clays and other earth materials.
2. I have been involved with engineering projects often enough that I can appreciate and do understand the relative difficulty of excavating, transporting, pumping and handling clays and other earth materials.
3. I am familiar with the geological and soil materials in the project area. I know that the natural materials vary from location to location, and that it is difficult and often dangerous to extrapolate from soil borings and to interpolate between them with any real degree of certainty. Borings show only what is present at the particular location of the boring and therefore must be generalized when used to interpret the local geological and soils conditions at a site.
4. I have often reviewed soil, geotechnical and exploration borings to determine what conditions are depicted at each boring location. Whether the earth materials are materially different from those shown in a boring is a function of their geological characteristics and formational environment.
5. I assess the geological characteristics of soils and earth materials routinely, regularly, and as a part of my occupation. It is not difficult to determine if an earth material actually encountered in an excavation is physically different from that indicated in a boring.
6. I have practical experience and I teach the processes of rock and soil weathering and formation that qualifies me to express professional opinions concerning the geologic history of sediments and sedimentary rocks.
7. I have experience as a commissioned officer in the National Ocean Survey and as a coastal process research scientist in the technology and techniques of marine surveying and the generation of nautical charts. Appropriate scale and accuracy nautical maps are critical for the safe navigation and for the design and operation of marine operations, including dredging activities.
8. I have both field and teaching experience in the evaluation and analysis of slope stability and landslide processes and mechanics. Geological and geotechnical investigations of landslides are, in fact, investigations of existing failures, be they natural or human induced. The evaluation of the slope failures at the Lost Lake Placement Area is well within my field of practice. A post mortem on the levee failures does not require a new stability analysis. The purpose of a stability analysis is to verify that the levee will not fail in the first place. The actual levee failures under the acknowledged amount of dredged material placed on the soft foundations constitute real world tests of the site conditions existing at the time of failure. One does not need to know the actual width, depth, and extent of the side cast borrow areas to know that the borrow areas were significant contributors to the ultimate failure of the levees.
9. It does not matter how the side cast borrow areas were excavated. The important fact is the side-cast borrow areas existed, and turned out to be so extensive that they consumed much more dredged material than any one had anticipated.
10. One does not need to perform stability analyses after the levee failures to prove that the levees failed. The fact that the levees failed clearly indicates that the levees were not stable. If the levees were to be rebuilt under different design parameters, a stability analysis would then be warranted.

My revised evaluations and opinions related to the four areas of concern are listed in the numbered sections given below:

1. The Flare Area:
   My review and evaluation concurs with the opinions expressed by the Corps of Engineers and Renda Marine in that the subsurface geological and engineering properties were not accurately represented in the boring logs and soil descriptions provided to Renda Marine when they bid the project. As a result, Renda Marine could not predict, anticipate or expect to encounter the "stiff clay" which resulted in reduced dredging productivity and increased operational time to place and handle the dredged materials at the Lost Lake Placement Area.

   It is my opinion that Renda Marine encountered clays in the Flare Area that were stiffer than the clays and other materials indicated in the applicable soil borings for the Flare Area. Renda relied on the appropriate soil borings. Soil borings taken elsewhere would not be as accurate as the ones actually taken at the Flare Area.

2. South Ferry Landing:
   The project drawings do not include any specific information about the bathymetric or submarine conditions of the South Ferry Landing area while they include a detailed map of the North Ferry Landing area (Map C-6). The North landing area is actually outside the limit of the dredging project. The incorporation of the bathymetric data for the North Lynchburg Landing in the contract documents provides unnecessary and misleading information about the dredging conditions to be anticipated at the South Lynchburg Landing. The complete lack of information or data about the conditions at the South Ferry Landing area, with respect to rubble, shore protection structures, navigational aids or other submarine conditions, strongly suggests that these conditions do not exist in the area.

   It appears, from Corps data and permit applications that the Corps of Engineers had information to indicate that revetments and riprap were placed in the area of the South Ferry Landing. However, this information was not contained in the contract documents. The Corps should have made such information known to the prospective bidders.

   It is my opinion that Renda Marine should not have anticipated the existence of anything other that the naturally occurring earth materials in this area of the project, except for possible minor amounts of undocumented trash and debris.

3. Section 7:
   Renda Marine encountered a "very stiff red clay" while dredging in Section 7, approximately between Stations 565+00 and 580+00. The presence of a "red clay" indicates that the dredging operation encountered sediments that are most likely Pleistocene (Glacial) in age. These sediments were exposed to the atmosphere and the iron in them was oxidized to produce the red color during a low stand of sea level. The oxidization and drying of these clays resulted in an increased confining pressure through dissection (negative pore-water pressure) that produced higher strength materials than the Recent marine sediment shown in the contract documents. I examined some of the Section 7 clay during my visit to the Lost

Lake site and determined from field tests that it was much harder and more competent than the clays and other materials indicated in the contract documents for the Section 7 area.

Because these "red clays" have higher shear strength and greater competence than the younger marine clays, the dredging effort required to remove these materials is significantly greater than that required to remove the Recent marine clays. These "red clays", however would be a superior material for the construction of the foundation for the levees at the Lost Lake Placement Area.

It is therefore my opinion that Renda Marine's dredging production and advance rate would be significantly less than that in the lower shear strength and less competent Recent clays shown in the contract documents.

4. Lost Lake Placement Area Levees:
   In my review of the contract documents and other data and of the construction failures in the new, elevated levee at the Lost Lake disposal area, I have identified two related unfavorable site conditions:
   - the very low strength and slope failures of the constructed levee and
   - the lack of available and suitable construction material for the completion of the project.

   A. Physical and mechanical properties of the site materials:
      The contract documents indicate that the geotechnical characteristics of the materials in the interior perimeter of the Lost Lake Placement Area have low shear strength and that the Atterberg limits of these materials lies between the Liquid Limit (viscous fluid) and the Plastic Limit (plastic material). However, to date I have found no notes or other information in the construction documents to indicate that the dredged material in the perimeter area was previously "mined" to produce material to rebuild and improve the existing levees around the site. An analysis of the date of sampling indicates that the mining operations occurred recently, after the date of drilling and geotechnical testing, and therefore the geotechnical properties of the foundation materials in the Lost Lake Placement Area are significantly weaker than suggested in the contract documents.

      Hydraulic dredging construction methods, which were specified for much of the levee project, would further decrease the shear strength of the underlying dredged material by increasing the pore-water pressure and decreasing the effective strength of these saturated clays and silts.

      Documentation from previous maintenance projects at Lost Lake and other disposal areas prepared by the U. S. Government indicates that the Corps of Engineers had previously required contractors to excavate borrow pits along the interiors of the perimeter levees at Lost Lake in order to increase the height of the levees. The contract documents for those projects indicate that these side cast borrow areas were to be no closer than 50 feet from the interior toe of the levee, and no more than 3 or 4 feet deep.

      It appears based on the levee failures that Renda Marine experienced that the side-cast borrow areas were much closer to the existing levee toe than 50 ft. In fact, it appears

that Renda's newly constructed levees often failed along a line about 20 ft from the toe of the existing levees. Twenty feet is about the width of a crane mat, which reasonably could have been used by most contractors to support a dragline for excavation and placement of the "mined" materials on the levee. The photographs and descriptions of the levee failures show that the failures often occurred in a relatively straight line at approximately 20 ft from the interior base of the existing levee, indicating a lack of foundation support at that point.

Contractors bidding on the Upper Bayou Project should expect some displacement of these soft foundation materials. The contract documents themselves indicate that the foundations for the new levees are soft to very soft. However, the contract documents do not indicate the true nature of the depth and width of the side-cast borrow areas that underlay the new levees.

Mr. Devarajan Chelliah, P.E., Project Manager of HVJ Associates, Inc., expressed concerns in his letter of 1 October 1997 to Mr. Ira Brotman, U.S. Corps of Engineers, that there was inadequate field and laboratory testing of the mechanical and geotechnical properties of the "soft new work material" at the Lost Lake site to support the geotechnical assumptions made during the design of the proposed levee raising.

In addition, the HVJ Associates geotechnical stability analysis of the Lost Lake materials assumes a circular failure surface that extends well below the base of the "soft new work material" at the site. A more appropriate analysis model would have used a sliding block solution in which the soft new work materials formed the base of a sliding block rather than a circular failure surface that progressed below these weak materials.

B. Availability of suitable construction materials for levee construction:
The contract documents provided specific locations for Renda Marine to obtain suitable dredged materials to construct the new Lost Lake levees. The majority of the levees that Renda Marine was to construct were required to be hydraulically placed. Renda's dredging operations were supposed to generate enough suitable materials to be able to construct the hydraulically placed levees.

It is clear that Renda Marine did not have enough clay and other suitable materials available from the contractually authorized dredging areas to construct the levees at Lost Lake. The levee designers envisioned that the contractor would need substantial additional clay and other suitable materials from non-government work areas to construct the Lost Lake levees. However, according to official government correspondence the Corps reluctantly approved only one non-government work area, and helped to dissuade at least one other non-government work area owner from providing clay for the project. With the amount of settlement and foundation displacement, Renda Marine simply did not have enough clay and other suitable materials to construct the Lost Lake levees.

The Corps, however, had assured the bidders in the pre-bid conference, as shown in the addenda and minutes of the pre-bid conference, that sufficient suitable dredged material

was available to construct the hydraulically placed levees. Bidders should be able to construct the Corps' design as designed. The Corps did not advise the bidders that the levee designers had anticipated incorporating substantial amounts of suitable material from non-government work areas.

The contract documents required that Renda Marine construct the new Lost Lake levees to fit the design template, which required a crest elevation of 30 feet above mean low tide. In addition, the contract documents required Renda Marine to construct the project within 446 calendar days. However, the contract documents also required that construction of the levees by mechanical methods be completed before construction of the levees by hydraulic methods could start. One method of constructing the hydraulic levees that would ensure that the levees could reach and maintain a 30-foot elevation involves placing the hydraulic fill of clay and other suitable materials in lifts and allowing time for consolidation and dewatering of the materials before applying additional lifts. This process, however, would require more time than that allowed under the contract documents.

My opinions concerning the levee failures are based on my investigation of the actual levee failures, including, without limitation, photographs, videos, site inspections, discussions with fact witnesses, deposition testimony, design documents, and other project documents. Therefore, it is my professional opinion that under the actual conditions at the Lost Lake Placement Area, Renda Marine could not construct the desired levee to +30-ft MLT until the low strength, fluid materials were displaced and high strength materials could be placed to form the foundation. The presence of the buried and unreported "side-cast borrow areas' resulted in an impossible condition that was not indicated in the construction documents. As a result, Renda Marine experienced significant amounts of "material loss" through the displacement of the low strength dredged material that had refilled the recently mined areas. It is also clear that Renda Marine did not have enough suitable material to be able to maintain the 30-ft elevation because of the excessive settlement and foundation failures.

Based on the amount of settlement it appears clear that much more than 3 to 4 feet were removed from the side cast borrow areas. Although Luis Saenz testified in his deposition that the Corps had surveys of the excavated side cast borrow areas, I have been unable to find evidence that those survey results were made available to Renda Marine or the other prospective bidders for the Upper Bayou Project. Without knowing the extent of the side-cast borrow areas, no one can predict with accuracy how much displacement of soft foundation materials would occur, and how much clay and other suitable material was required to construct new levees. Even the designers of the new levees apparently did not know how much foundation displacement or settlement would occur.

It is clear that the excavations in the borrow areas were larger than they were permitted to be under previously issued contracts. The side-cast borrow areas consumed more clay and other suitable materials than the levee designers had envisioned. The side-cast borrow areas swallowed so much of Renda Marine's hydraulically placed dredged materials that there was an insufficient amount of such materials to construct the levees. Although I still do not know how wide and deep the side cast borrow areas were, I do know that under the

circumstances the borrow areas were extensive enough that the levees could not be constructed as designed.

It is therefore my professional opinion that; (1) there was insufficient volume of suitable material available to Renda Marine to construct the Lost Lake levees as designed, (2) that the levees could not be constructed to reach and remain at the required 30-foot elevation under the circumstances, (3) the side-cast borrow areas were larger than reported and consumed excessive amounts of suitable levee construction material and (4) that there was insufficient time allowed by the contract to construct the levees in lifts to reduce the significance of slope failures.

Thank you for the opportunity to review and evaluate the provided materials and to provide my opinions concerning the differing site conditions at the Flare Area, South Ferry Landing, Section 7 and the Lost Lake Placement Area Levees. It is my opinion that each of these sites represents a true differing site condition in which the contract documents failed to report the actual natural or man-made condition.

Please feel free to contact me should you have any questions or desire a more extensive review and evaluation.

Sincerely yours,

CC Mathewson

Christopher C. Mathewson, PhD, PE, REG
Engineering Geologist

Encl: Vitae

QSCL
QUILLING · SELANDER · CUMMISKEY · LOWNDS

BRIAN W. ERIKSON

Direct Line: 214.880.1844
E-mail: berikson@qsclpc.com

November 23, 2004

John E. Kosloske, Esq.
Senior Trial Counsel, Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street, N.W., Room 12052
Washington, D.C. 20005

*Via Facsimile*

Re: Case No. 02-306C; *Renda Marine, Inc. v. United States Army Corps of Engineers*; United States Court of Federal Claims; DACW64-99-C-0001

Dear Mr. Kosloske:

This is to advise that we have provided to Christopher Mathewson for his review the following manuals produced by the Corps of Engineers:

- EM 1110-1-1804 Geotechnical Investigations: (Chapter 2, Appendix A & Appendix F-Section 2).
- EM 1110-2-1902 Slope Stability.
- EM 1110-2-1913 Design & Construction of Levees.
- EM 1110-2-5027 Confined Disposal of Dredged Material.
- ER 415-1-11 Biddability, Constructibility and Operability.
- ER 415-2-100 Construction — Staffing for Civil Works Projects.
- ER 1180-1-6 Construction Quality Management.

If you would like a copy, please advise.

Sincerely yours,

Brian W. Erikson

BWE/cam
S:\Construction\Renda Marine\Upper Bayou 565.09\Kosloske 081.wpd

58

QUILLING SELANDER CUMMISKEY LOWNDS

BRIAN W. ERIKSON

Direct Line: 214.880.1844
E-mail: berikson@qsclpc.com

November 18, 2004

John E. Kosloske, Esq.
Senior Trial Counsel, Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street, N.W., Room 12052
Washington, D.C. 20005

***Via Email and Federal Express***

Re: Case No. 02-306C; *Renda Marine, Inc. v. United States Army Corps of Engineers*; United States Court of Federal Claims; DACW64-99-C-0001, Dredging Upper Bayou

Dear Mr. Kosloske:

I transmit the superseding expert report of Robert McCullough. Mr. McCullough's curriculum vitae has been previously furnished. If you would like another copy, please advise.

Mr. McCullough has reviewed the additional documents furnished by the Corps of Engineers, copies of which are contained on the CD-Rom I transmitted with Dr. Mathewson's report. Mr. McCullough has also reviewed the documents and materials listed in his report.

As you can see, Mr. McCullough's damage numbers have changed. The changes should be self-explanatory. If you feel the need to redepose Mr. McCullough or Dr. Mathewson, please advise.

Sincerely yours,

Brian W. Erikson

BWE/ja

Enclosure

cc: Oscar Renda (w/enc.)

S:\Construction\Renda Marine\Upper Bayou 565.09\Kosloske 111804 enc supp exp rprt - McCullough.wpd



Bryan Tower 2001 Bryan St., Suite 1800 Dallas, TX 75201 | ph. 214.871.2100 fx. 214.871.2111 www.qsclpc.com

A PROFESSIONAL CORPORATION | ATTORNEYS AND COUNSELORS