EXPERT WITNESS REPORT
RENDA MARINE, INC. VS UNITED STATES
NO. 02-306C (FED. CL.)

SUBMITTED TO
COMMERCIAL LITIGATION BRANCH, CIVIL BRANCH
US DEPARTMENT OF JUSTICE
1100 L STREET, NW, ROOM 12052
WASHINGTON, D.C. 20005

BY
HVJ ASSOCIATES, INC.
JANUARY 30, 2005

REPORT NO. 04-209GH-0

HVJ ASSOCIATES

EXHIBIT F

## TABLE OF CONTENTS


Page

I. Introduction .......... 1
II. Expert Witness Background .......... 1
A. Qualifications .......... 1
1. Education .......... 1
2. Professional Experience .......... 2
3. Dredge Disposal Site Levee Design Experience .......... 2
4. Lost Lake Disposal Area Experience .......... 3
B. Engagement Details .......... 3
C. Prior Testimony or Deposition as Expert .......... 3
III. Design Background .......... 4
A. Maintenance Dredging .......... 4
B. Houston Ship Channel 45-Foot Project .......... 4
C. Lost Lake Placement Area Levee Design .......... 5
1. Capacity Evaluation .......... 5
2. Levee Raising .......... 6
3. Levee Construction over Soft Soils .......... 7
IV. Expert Opinions .......... 9
A. Mathewson Report Section 4A .......... 9
1. Evaluation of Side Cast Borrow Ditches during Design .......... 10
2. Potential Effect of Berm Excavation during Construction .......... 10
3. Clarification of the Oct. 1, 1997 Letter .......... 11
4. Sliding Block vs. Circular Arc Stability Analysis .......... 11
B. Mathewson Report Section 4B .......... 13
1. Amount of Levee Building Material and Minimum Retention Factor .......... 13
2. Staged Levee Construction .......... 17
3. Use of DAMP Project Borings .......... 17
4. Conclusion .......... 18


## ILLUSTRATIONS


Plate

Maintenance Dredging .......... 1
Maintenance Dredging, Levee Raising .......... 2
New Work Dredging .......... 3
Clay Balls .......... 4
Soft New Work Discharge .......... 5
Typical Lost Lake Levee Section, Lost Lake Contract Drawing C-15 .......... 6
Interior/Exterior Discharge .......... 7
Lost Lake Levee Stability Analysis, Plate 22A of February 1998 Design Report .......... 8
Lost Lake Dredge Quantities, Plate 8 of February 1998 Design Report .......... 9
Lost Lake Levee Material, Plate 9 of February 1998 Design Report .......... 10
Lost Lake Levee Quantities , Plate 23 of February 1998 Design Report .......... 11

# APPENDICES

Appendix A: Michael Hasen Resume
Appendix B: Engagement Documents
Appendix C: Terzaghi, Peck, & Mesri (1996) Soil Mechanics in Engineering Practice, Third Edition Excerpts
Appendix D: Calculations

# I. Introduction

This report provides the expert witness opinions formulated in partial response to the report of November 17, 2004 by Christopher C. Mathewson, PhD, PE, REG. My opinions are about topic 4 of that report related to the Lost Lake Placement Area Levees. Specifically, I will offer an opinion related to the following issues:

1. The extent to which the presence of side cast borrow ditches at Lost Lake was a factor in the design of the levees and why or why not.
2. The potential effect on stability, on mechanical and hydraulic construction of the Lost Lake levees, of Renda's excavation of some amount of material from the berm to the interior of the existing perimeter levees.
3. The 10-1-97 correspondence relative to properties of the "soft new work material".
4. The propriety of the sliding block and circular arc failure surfaces in evaluating the stability of the internal and external levee slope.
5. The amount of suitable levee building material available and the minimum retention factor needed to construct the portion of the new perimeter levees at Lost Lake to be constructed with hydraulically placed dredged material.
6. The use made during project design of the borings conducted at the Lost Lake Disposal Area for the Disposal Area Management Plan (DAMP) work.

The report will first present my qualifications and the retention arrangements related to my expert witness services. Following will be general background on the project and design, and I will conclude with my opinions on the items listed above.

# II. Expert Witness Background

## A. Qualifications

My full resume is provided in Appendix A, with a summary here and a more detailed presentation of my experience related to this project.

### 1. Education

I was educated as a Civil Engineer with an emphasis in Geotechnical Engineering at the Masters level. I was admitted to the degree of Bachelor of Science in Civil Engineering, High Honors, by the University of Illinois at Urbana Champaign Board of Trustees in 1980. While at the University I was awarded the A.L. Thomas Award for scholarship. I was conferred the degree of Master of Science in Engineering by the regents of the University of California, Berkeley in 1981. I attended Berkeley under an academic fellowship and received the Converse Ward Davis Dixon prize for scholarship from the Department of Civil Engineering, Geotechnical Engineering School.

## 2. Professional Experience

I have been practicing geotechnical engineering since graduation (in 1981) and am a licensed Professional Engineer in Texas. I've worked at HVJ Associates, Inc., since 1992 and currently hold the position Executive Vice President. I serve as the Geotechnical Practice Leader for the firm and in that role provide technical leadership for our geotechnical service line. I'm professionally active through the Geo Institute of the American Society of Civil Engineers, and I'm currently Chair of the Sections & Branches Council and a member of the Professional Practices Council.

## 3. Dredge Disposal Site Levee Design Experience

I have extensive experience with levee design and stability evaluation at dredge disposal areas in the Houston area The levee evaluation work began with assessments of the Lost Lake, Peggy Lake, Alexander Island, and Spilmans Island confinement levees during development of a Disposal Area Management Plan (DAMP) for the Port of Houston Authority. The levee design work was in connection with design for dredge disposal areas and beneficial use sites for the Houston Ship Channel 45-Foot Project and Bayport Container Terminal Phase IA. Note that a Beneficial Use Site is a dredge disposal area constructed with the primary purpose of creating a benefit to the environment. In contract a Dredge Disposal Area has a primary purpose of containing soil produced during dredging. I began working on these sites in 1992, and have continued through the present. Following is a list of Houston area sites for which I performed levee evaluation, design, and/or stability analysis:

- Lost Lake,
- Peggy Lake,
- Alexander Island,
- Spilmans Island,
- Goat Island,
- San Jacinto Beneficial Use Site,
- Cell 16 (Atkinson Island),
- Demonstration Marsh,
- Atkinson Island Beneficial Use Site,
- Cell 15,
- Cell 14,
- Mid-Bay Marsh,
- Bolivar Marsh, and
- Bayport Container Terminal.

Prior to being involved with these projects my career was heavily related to marine geotechnical engineering for offshore oil platform design. As part of that experience I evaluated submarine slope stability which helped me to understand the slope stability of very soft marine clay deposits. I participated in several major studies of sites offshore from the

Mississippi River delta that are prone to mudslides during extreme storm events. A project typical of this experience was design of platform foundations in South Pass Block 45 for Freeport-McMoran. During these studies I would evaluate the seafloor stability upslope from the platform location, determine the depth to which a landslide might occur, evaluate the lateral loading on the platform foundation due to the design landslide, and design the platform foundation to withstand these loads. These analyses were heavily dependent on analysis of slope stability of very soft marine clay deposits which are similar in some respects to the soft fill material in the interior of a dredge disposal site.

#### 4. Lost Lake Disposal Area Experience

My specific experience related to Lost Lake began with the Disposal Area Management Plan (DAMP) work. I participated in two studies of the Lost Lake site during DAMP development; the first investigated the condition of the levees and the second on the condition of the site interior. This work was focused on planning management at the site to enhance its long term storage capacity. When the Houston Ship Channel 45-Foot Project was authorized our firm was retained by the U.S. Army Corps of Engineers, Galveston District to perform the Lost Lake Disposal Area design work as part of the Upper Bayou project design. I was Principal Engineer for all of these studies. The levee design portion of the work is summarized in more detail in Section III.C.

### B. *Engagement Details*

My expert witness services are provided as described in HVJ Proposal No. 04-209GH-0 dated December 28, 2004. My services include file review, preparation of this report, related document production, attending the deposition of Dr. Mathewson, a possible deposition of my own, and testimony at trial as needed. The total estimated fee for this work is $26,550 as authorized by U.S Department of Justice Contract No. 5W-CIV01-0229, dated January 7, 2005. A copy of the proposal and the authorization is presented in Appendix B.

I also have been reimbursed for my participation in preparation of the defense as allowed under our original design contract. These services were provided during the period March 1 to December 7, 2004 and a total of $5,335.72 has been invoiced to date. A copy of our invoice for these services is provided in Appendix B.

### C. *Prior Testimony or Deposition as Expert*

I certify that I have not testified as an expert witness in either a trial or deposition.

# III. Design Background

This section provides general background about maintenance dredging and how it contrasts to the dredging associated with the Houston Ship Channel 45-Foot project. That is followed by an overview of Lost Lake Levee Design work I performed.

## *A. Maintenance Dredging*

Most dredging is focused on maintenance of an existing channel. Over time sediment accumulates in navigation channels, and they need periodic cleaning as shown on Plate 1. The material dredged, referred to as maintenance material, is relatively loose. Maintenance material generally can't be used for levee raising purposes until it has dried. The exception is the discharge mound that typically forms at the end of the pipe where the material spills into the site. The discharge mound is usually comprised of sandy soils, but the mound volume represents a small fraction of the volume generated during a maintenance dredging cycle.

From time to time the levees at most dredge disposal areas need to be raised to create more capacity. As material accumulates from periodic maintenance dredging the site capacity is reduced. When the capacity no longer satisfies the storage requirements the levees are raised. These levee raisings usually are accomplished by excavating dried dredge material from the interior of the site and placing it on top of the existing levee. The levees are generally raised 2 to 4 feet at a time. During the raising the location of the levee is usually offset toward the interior of the site since less material overall is needed to accomplish the raising to that side, as shown on Plate 2. This sort of levee raising has occurred at various intervals at all of the dredge disposal areas serving the Houston Ship Channel.

## *B. Houston Ship Channel 45-Foot Project*

The Houston Ship Channel 45-Foot Project is fundamentally different in that the main purpose was not to maintain the existing channel but to expand the existing channel. The Houston Ship Channel has been expanded periodically over the years; the most recent prior expansion occurred in the 1960's with the construction of the 40-Foot Project. Since the channel template was being widened by 130 feet and deepened by 5 feet there would be a large volume of material requiring disposal relative to a typical maintenance dredging event. The typical dredging for the 45-Foot project is shown on Plate 3.

As a point of reference, the Houston Ship Channel 45-Foot Project is the largest dredging project in the Western Hemisphere since the construction of the Panama Canal. This illustrates the large scale of the project. The Upper Bayou contract was one of eight main dredging contracts that together comprised the overall 45-Foot Project.

For this project most of the dredging was in natural soils, referred to as new work material. These soils had never been previously dredged and so were similar to the soils found on the bank. This soil was denser both prior to excavation and once it was deposited in the

disposal area than typical maintenance dredge material. Levees at all of the disposal areas or beneficial use sites used in the 45 Foot Project were raised, constructed, or improved using new work material.

After the natural soil was dredged and placed inside the disposal area there were three typical components: clay balls, sand, and slurry. Plate 4 shows a photo of typical clay ball material after dredging; this material is produced when stiff to hard new work clay material is dredged. Plate 5 shows a photo of typical slurried clay discharge, this material is produced when soft to firm new work clay material is dredged. Maintenance dredging discharge usually looks very similar to the slurried clay discharge shown in Plate 5.

## C. Lost Lake Placement Area Levee Design

The levee design activities I performed were focused on two time-frames: one was a study of the site capacity over a period of 50 years into the future, and the other a more detailed evaluation of the site for the Houston Ship Channel 45-Foot project. The purpose of the 50 year study was solely to satisfy a requirement of proving that sufficient capacity existed to contain the dredge material to be produced over that time period prior to proceeding with the construction.

The more relevant part of the study to the construction of the Lost Lake Placement Area (LLPA) levees is the design related specifically to the 45-Foot project. That design is a two step process. First, based on estimates of the quantity and type of material to be dredged, the required site capacity is determined. Second, any modifications to the site to provide the required capacity are designed. Our design was presented in detail in HVJ Associates Report No. 97-145G-LL, Engineering Design Report, Design of Dredged Material Placement Area – Lost Lake, Houston-Galveston Navigation Channel 45-Foot Project, dated February 2, 1998.

### 1. Capacity Evaluation

The required site capacity is the volume required to hold the soil and water produced by the dredge by the end of construction. For a simple analogy I would be estimating the size of the "bowl" I would need to hold the soil and muddy water produced during the dredging. If I pour a gallon of fluid into a two quart bowl then I spill a lot of fluid. A successful design avoids this. Such spillage would potentially threaten the stability of the levees, and it would certainly cause a release of sediment into adjacent waterways potentially harming marine organisms and/or interfering with navigation.

Given that I know the required site capacity, I then evaluate the existing site capacity to determine if it is adequate. In the case of the LLPA the existing site capacity was far less than the estimated capacity required during construction (i.e., I had a two quart bowl and a gallon of fluid/mud). Therefore, I needed to increase the capacity of the site. This is accomplished by raising the levees (making the bowl deeper). Section 3.3 of our design report dated Feb. 2, 1998 addresses this topic and reads as follows:

*"Based on the available levee cross sections the average minimum levee crest is about at El. 18 (Plate 13). Based on the survey data obtained in April 1997, transmitted by USACE, we have estimated the available volume of the disposal area (Plate 14). The existing available volume is only adequate to contain about 1,836,262 cubic yards of the dredged material from the initial widening and deepening project assuming one foot ponding and one foot freeboard. Note that some of this capacity has been consumed by site usage subsequent to the survey.*

*Based on the SETTLE analysis, the total estimated fill volume after completion of both the government contract and private contracts is about 11,693,162 cubic yards. This estimate includes levee material (clay balls and sand) from the government contract and private contract in addition to the fine fill material. Based on the SETTLE run (Appendix A) the required final levee height is about El. 30 which includes an allowance of about 2 feet of ponding and 2 feet of freeboard."*

## 2. <u>Levee Raising</u>

In the smaller, more typical, raisings of 2 to 4 feet for maintenance dredging the new fill is placed almost entirely on top of the existing crest and interior slope of the levee as shown on Plate 2. Therefore the issue of supporting the new fill on the very soft disposal material in the interior of the site is not a factor in the design. For the 45-Foot Project the LLPA levees needed to be raised from El. +18 to El. +30 feet MLT or a total of 12 feet. A levee raising of 12 feet requires a width of fill of at least 82 feet assuming a 3H:1V levee slope and 10-foot wide crest (by 3H:1V I mean a slope that rises one foot vertically for every three feet horizontally). If this additional levee is located to the interior of the centerline, as typically done for maintenance dredging, then it would extend a substantial distance over the soft dredge disposal material in the interior of the site. This situation is illustrated on Plate 6.

One of the questions I explored was whether the raising could be accomplished by placing the new embankment fill either directly on top of the existing levee or over the exterior levee slope. Raising the levee this way would avoid the need to place embankment fill on top of the very soft foundation in the site interior. This was not possible for several reasons, but the most prominent and the main deciding issue was the ability to contain and clarify the dredge discharge water. In order to satisfy requirements for the clarity of the water flowing from the project back into the natural waterways the dredge discharge must be contained to allow the soil particles to settle. This is the principal purpose of the dredge placement areas, to contain the soil combined with the dredge discharge and allow only the water to return to adjacent waterways. If the levee fill was to be placed hydraulically, it would need to be placed in the interior of the site to contain the discharge as illustrated on Plate 7.

To raise the levees to the exterior or directly over the existing levee would require that the dredge fill be placed hydraulically in the interior and then moved mechanically to the exterior. This double handling of the material increases the project cost and so this option was not considered the most cost effective approach to the construction. There were other issues that also contributed to the decision to raise the levees to the interior (as shown on Plate 6). These issues included global stability problems, lack of land to build on to the exterior in portions of the site, shoreline erosion issues, and the overall volume of material required to construct to the exterior.

### 3. Levee Construction over Soft Soils

Given that the levee needed to be raised to the interior of the site the question arises of how to design for the very soft foundation soils. This topic has been addressed by Terzaghi, Peck, and Mesri (1996) in Soil Mechanics in Engineering Practice, Third Edition. Karl Terzaghi is widely credited by the profession with developing the fundamental principles of modern soil mechanics on which the practice of geotechnical engineering is based. The most relevant section for our discussion is Article 48.7 "Fills on Very Soft Organic Silt or Clay":

> *"Under these circumstances* (fills on very soft clay foundations) *the engineer may choose between two alternatives: to remove or displace the soft material or to apply the fill at such a rate that the soft soil does not fail but gains sufficient strength by consolidation to support the fill at its final height with acceptable settlement. The latter alternative may require surcharging with or without the use of vertical drains." (p. 380, first paragraph).*

The three methods mentioned are described in the following table along with an assessment of their feasibility for the levee construction at LLPA for the 45-Foot Project.

| Method | Description | Feasibility for LLPA |
|---|---|---|
| Excavate and Replace | Using excavation equipment to dig out the very soft soil and replace it with stronger soil. | Not feasible. Beneath the portion of levee that was to be constructed hydraulically, the thickness of the soft soil and the presence of contained water in the site made the excavation and backfilling process unworkable. |
| Displacement | As the weight of the fill increases the fill sinks into the soft soils displacing them laterally from beneath the embankment. | Feasible and cost effective. It requires no additional equipment or consumables beyond those normally used for hydraulic dredging and a limited amount of additional time during construction. |
| Preconsolidation | A fill is placed in stages. The weight of the fill causes consolidation which is the squeezing of water from the soil under the pressure of the fill. This process often includes vertical drains, called wick drains, to speed up the consolidation process. | Not feasible due to soil characteristics. Even with vertical drains to accelerate the preconsolidation process the time to complete consolidation is in excess of the contract schedule. |

Various articles from the text, including Article 48.7, are reproduced in Appendix C. Fig. 48.1 illustrates an embankment constructed by the displacement method.

The displacement method was commonly employed on the 45-Foot project at sites where levee embankments were constructed hydraulically over weak foundation soils. Displacement was the design approach for embankment construction over soft soils at LLPA. The amount of displacement expected was addressed specifically in the design report in Section 3.4 as follows:

> *It is anticipated, as is the experience with similar conditions, that the very soft clays existing in the disposal area interior will be displaced by the levee material as the fill is placed to raise the levees. This phenomenon existing in the disposal area interior is essentially a bearing capacity failure where the weight of the fill material exceeds the capacity of the weak foundation soil to support it. Consequently, the foundation soil experiences a general shear failure. This type of failure occurs during construction and is different from the time-dependent consolidation settlement of the foundation. The displaced soil is evident in the form of visible mud waves adjacent to the fill. The bearing capacity of soils generally increases with depth and the amount of soft foundation displaced will depend on the height and area of the fill.*
>
> *Our displacement analysis was based on levee crest elevation of +30 feet MLT and a crest width of 10 feet; the levee side slope was assumed to be 3H:1V. Estimated displacements for selected cross section locations are presented in the table below. Based on the soil boring data, it was determined that displacement of very soft material will not occur between about stations 98+00 and 166+50. The summary of the displacement of very soft material is presented below.*

| *Selected Cross Section* | *Approximate Displacement Elevation, Feet (MLT)* | *Displacement of Soft Clay per Unit Length of the Levee, Cu. Yd/ft* | *Estimated Total Displacement Cu. Yd* |
|---|---|---|---|
| *20+93* | *-12.5* | *85.4* | *241,938* |
| *39+44* | *-12.0* | *86.7* | *139,500* |
| *53+32* | *-2.2* | *56.8* | *80,258* |
| *68+32* | *-3.0* | *59.7* | *76,118* |
| *90+18* | *-4.0* | *61.9* | *159,393* |
| *166+69* | *+8.3* | *24.0* | *15,912* |
| *182+20* | *-6.5* | *79.4* | *149,669* |
| *199+92* | *+2.5* | *41.7* | *41,533* |
| *212+51* | *-2.0* | *57.3* | *105,948* |
| | | ***Total*** | *1,010,269* |

> *We have estimated approximately 1,000,000 cubic yards of very soft material may be displaced by the levee fill. Note that this does not reduce the disposal volume needed for the project, since the displaced soil will remain within the disposal area.*

A note indicating that foundation displacement was anticipated was included on Drawing No. C-14 of the Upper Bayou project plan set:

> *10. The foundation of the new levee is very soft to soft dredged material, and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material.*

Since foundation improvement by displacement of the soft dredge disposal material was contemplated as an integral part of the design, the levee stability evaluations performed for the project assumed that such displacement had occurred.

# IV. Expert Opinions

In this section I will offer expert opinion relating to Section 4 of Dr. Mathewson's report.

## *A. Mathewson Report Section 4A*

There is a general theme that I wish to elaborate on as background which is characterization of the observed behavior of the fill as "failures". As explained previously, displacement of the soft dredge disposal material foundation was contemplated in the design as a means to improve the levee foundation. In order for displacement to occur the fill must penetrate into the dredge material to move it out from under the embankment, as indicated in Figure 48.1 of Terzaghi, Peck and Mesri as reproduced in Appendix C. What Dr. Mathewson refers to as a "failure" represents the beginning of the displacement process.

Using the term "failure" to describe the conditions observed at the start of foundation displacement is inappropriate due to the connotation of the word "failure". The term "failure" is typically used to describe a condition that prevents the use a constructed facility for its intended purpose. Since displacement of the soft dredge disposal material by the hydraulically placed fill was necessary to improve the levee foundation, instead of preventing the intended use it was required to achieve the intended use.

To refer to the onset of foundation displacement as a "failure" would be analogous to referring to a carpenter driving a nail as having caused "failure" of the wood when the nail begins to penetrate after the initial hammer blow. Just as penetrating wood with nails is an expected condition during wood construction, the penetration of the fill into the soft foundation was an expected condition during the hydraulic levee construction at LLPA as discussed in Section III.C.3 of this report.