## 1. Evaluation of Side Cast Borrow Ditches during Design

In paragraphs 1, 3, 4, and 5 of Section 4.A. Dr. Mathewson discusses at some length conjecture about the presence of "side-cast borrow areas" that were not indicated on the plans. The levee raising process that creates these borrow areas is illustrated on Plate 2. He concludes that the presence and location of these features contributed to causing "failures" of the levee during construction. Quoting the first sentence of paragraph 4:

> *"It appears based on the levee failures that Renda Marine experienced that the side-cast borrow areas were much closer to the existing levee toe than 50 feet."*

As discussed previously in Section III.A of this report, levee raisings to accommodate maintenance dredging by borrowing dried material from the site interior is common practice, and should surprise no one experienced in this kind of work in this area.

The design intent was to displace as much of the soft dredge disposal material as possible from beneath the embankment to improve the foundation strength for the portion of the levee intended to be raised by hydraulic filling (reference Section III.C.3). The presence and location of "side-cast borrow areas" were not important aspects of the Lost Lake levee design. The site interior was at about El. +14 feet MLT prior to construction, and displacement was expected to El. +8.3 and -12.5 feet MLT as presented in Section III.C.3. Therefore, I had expected that foundation displacement would occur to depths of at least 5.7 feet, and to depths of greater than 15 feet in most locations. The presence of "side-cast borrow ditches" did not affect the overall volume of foundation displacement. Such features would potentially impact the location where displacement initiated (i.e. where the fill first began to push the soft foundation material from beneath the embankment). Since initiating displacement was expected, an evaluation of where displacement might begin was not important to the design.

## 2. Potential Effect of Berm Excavation during Construction

Given that much was made by Dr. Mathewson of the presence of "side-cast borrow areas", I have been asked to offer an opinion on the potential effect on stability, on mechanical and hydraulic construction of the Lost Lake levees, of Renda's excavation of some amount of material from the berm to the interior of the existing perimeter levees. Excavation of material from the interior berm during construction would potentially have a similar effect to the presence of "side-cast borrow areas" from previous construction at the site. Such features could create areas of weakness where foundation displacement might initiate during fill placement. They could also be responsible for localized sloughing of the interior levee slope depending on their depth and location. To the extent that excavation on the interior berm contributed to the initiation of foundation displacement it would not be of concern to the design, since foundation displacement was expected. Sloughing of the interior levee slope would indicate existence of an unstable slope condition that might spread to other areas of the levee, and would be of some concern if it did in fact occur.

### 3. Clarification of the Oct. 1, 1997 Letter

In Paragraph 6 of Section 4.A. Dr. Mathewson discusses a letter from Mr. Devarajan Chelliah, P.E. regarding our concerns about testing of "soft new work material". He goes on to infer that this letter is relevant to evaluation of levee stability, quoting from the end of the paragraph:

> *"...that there was inadequate field and laboratory testing of the "soft new work material" at the Lost Lake site to support the geotechnical assumptions made during design of the proposed levee raising."*

The soft new work material referred to in the letter is material that was to be excavated from the channel during dredging, as indicated on Plate 3. It would not provide any significant volume of material suitable for levee construction. Rather it would be mixed with discharge water and enter the site as muddy outflow from the discharge pipe as shown on Plate 5.

This material was important to the design in that its properties were a key factor in estimating the volume of material that would need to be contained in the site during construction. This analysis was discussed in Section 3.3 of our Feb., 1998 report as previously excerpted in Section III.C.1 of this report. It's relevance to the levee design is in connection with determining the required site capacity (i.e. how big a bowl we needed).

The soil in question was located outside the LLPA prior to the start of construction. It was present inside the LLPA only as slurried mud in the dredge discharge during the project. Our concern about the available data was completely unrelated to any stability analysis of the levees conducted for the design.

### 4. Sliding Block vs. Circular Arc Stability Analysis

In paragraph 7 of Section 4A Dr. Mathewson discusses the approach to the stability analysis performed for the Lost Lake Levees and opines that a sliding block failure would be a more appropriate analysis than the circular failure presented in the design report. Quoting the second sentence:

> *"A more appropriate analysis model would have used a sliding block solution in which the soft new work materials formed the base of the sliding block rather than a circular failure surface that progressed below these weak materials."*

For clarification, as discussed in Section IV.A.3 of this report, the "soft new work materials" as referred to in our design was a designation for soft natural soils to be dredged. While soft soils were certainly present beneath the levee location as designed, they were not the "soft new work materials" referenced in Mr. Chelliah's letter of Oct. 1, 1997. The inference from Paragraph 7 that the levee stability analysis was affected by concerns about the design data available for the "soft new work material" is not accurate.

HVJ ASSOCIATES

Some background on slope stability analysis is necessary. When a slope failure occurs, a mass of soil along the slope slides down usually along a distinct surface referred to as a slip surface as illustrated in Figure 35.1 from Terzaghi, Peck, & Mesri (reproduced in Appendix C). In slope stability analysis the weight of an assumed mass of soil is compared to the strength of the ground along the edge of the mass (the assumed slip surface). This comparison is expressed as a factor of safety, taken as the ratio of resisting force (strength along the slip surface) to driving force (weight of the slide mass). Many trial masses and slip surfaces are analyzed (by computer) in order to determine the surface with the lowest factor of safety, which is referred to as the critical failure surface.

There are several common slip surfaces. Dr. Mathewson refers to two of the most common, the circular and sliding block. Many slope failures are characterized by a rotational movement of the soil where the top of slope falls and the toe (or bottom) of the slope rises. The movement occurs along a roughly circular failure surface as illustrated in Figure 35.2 reproduced in Appendix C. This failure mode is perhaps the most common. A sliding block analysis, as referred to by Dr. Mathewson, is a means of analyzing non-circular failure surfaces. A non-circular surface can occur when there is a weak layer in the foundation, particularly if the layer is relatively thin compared to the height of the slope. In this case the failure surface will have a tendency to follow the weak layer preferentially, and this layer governs the location of the critical failure surface. This case is illustrated in Figure 35.12, also reproduced in Appendix C.

Dr. Mathewson's opinion in this matter assumes that soft dredge disposal material would be present in the foundation beneath the levee embankment. For this case a sliding block analysis would be appropriate. This approach would be useful to model the stability of the fill prior to the beginning of foundation displacement. I didn't use this method because the design was based on the displacement of the soft foundation material from beneath the embankment as previously discussed in Section III.C.3. Any analysis of the embankment prior to the start of displacement would represent an intermediate stage of the construction.

For analysis of the final levee there would be no soft foundation material beneath the levee, and so the circular failure surface was the more appropriate analysis. To illustrate, Plate 8 presents Plate 22A from our Feb. 1998 design report. The cross section shows the soils and their relative position. Material I represents the existing levee. Material II represent the soft clay dredge material in the interior of the site. Material III represents the new levee embankment. Material IV represents the fill that displaced the soft dredge material (Material II) from beneath the new embankment. Since Material II does not extend beneath the embankment fill at the end of construction the sliding block analysis is not relevant to the stability analysis for the design. Note that the failure surfaces shown on Plate 8 are in actuality circular, they show as elliptical because the vertical scale on the drawing is exaggerated for clarity.

## B. *Mathewson Report Section 4B*

### 1. <u>Amount of Levee Building Material and Minimum Retention Factor</u>

In Section 4B Dr. Mathewson opines that the amount of material available for levee construction was inadequate to the construction. In the following sections I will summarize the design analysis results regarding sufficiency of levee building material.

### a) Available Levee Building Material

#### *(1) Material Distribution*

The volume of levee building material is related to the component volumes of the various types of soil making up the total dredge volume. These are expressed as percentage breakdowns of soil types shown on Plate 8 of the Feb. 1998 design; this Plate is reproduced in Plate 9 of this report.

#### *(2) Clay Ball Retention*

Each type of soil behaves differently during dredging. In Section III.B of this report I presented background on the nature of the new work dredging. As seen in Plates 4 stiff to hard clay new work material produces "clay ball" fill that is very suitable for both levee building and foundation displacement. Plate 5 shows that the fill produced by dredging soft new work material is essentially muddy water and was not suitable for levee construction. Sand was also dredged and can be used for levee construction if it can be contained; it has a tendency to run laterally large distances from an uncontrolled discharge.

The differences between the types of soil mean that varying portions would reach the LLPA in a form suitable for levee construction (referred to as retention). The following discussion from Section 3.2 of our Feb. 1998 design report presents the estimated retention.

> *"Based on the above discussion, clay ball retention must consider the following factors: non-ball mass losses, transportation mass losses, and volumetric bulking at deposition. We have assumed a retention factor of 0.677 for clay ball I (Unified Soil Classification CL) and 0.9 for clay ball II (Unified Soil Classification CH) in estimating available levee material. A retention factor of 1.0 was used for sandy soil (Unified Classification SM, ML and SM/SC). Estimated levee material is presented in Plate 9."*

Clay ball retention had to be assumed for the design since it is dependent on the actual dredging equipment used and the construction procedures employed by the contractor. My assumptions were based on both research done at the U.S. Army Corps of Engineers Waterways Experiment Station and also on experience on past projects.

As an example of the impact of equipment and procedures on clay ball retention, the dredge equipment size and management of line length are important. Clay balls degrade during transport as they travel through the discharge pipe. Therefore, clay ball retention is lower (i.e. a smaller volume of clay balls is produced) if a longer line is needed. Depending on the Contractor's choices regarding order of dredging and location of the discharge the maximum line length can vary significantly on a given project. If the dredge is not powerful enough to keep the soil moving in the line a booster pump is needed. A booster pump agitates the soil a second time breaking down the clay balls and causing lower retention (less yield) of clay ball material than if no booster had been used. Therefore, if dredging is managed to minimize the average line length and the dredge is sized so a booster is not needed the yield of clay balls will be higher. During design the dredging equipment that may be used on the project and the Contractor's sequence of dredging is not known.

### *(3) Levee Construction Material Estimate*

The volume of material estimated to be available for levee construction is shown on Plate 9 of the Feb. 1998 design report; the Plate is reproduced as Plate 10 of this report. The Upper Bayou construction contract was issued after completion of the design study and the channel alignment changed somewhat after the design study was completed. Due to these changes, the results shown on Plate 10 of this report are not representative of the contract as bid. Page 02482-9 of the contract documents (Ref. RM-COE-04014) shows the final contract limits and total estimated dredge quantities. The limits of the dredging for the contract extend from Station 470+00 to 684+06.85, with a total estimated quantity of 3,483,700 cubic yards. While there is some variation of dredge quantities within the contract sections compared to the design study, the main change was to move the upstream limit of the project from Station 458+00 to 470+00. Compared to the design study, this removes a substantial volume of dredging from the project.

If we adjust the levee building material estimate as presented on Plate 10 of this report for the change in project limits (i.e. remove the levee building material estimated from between Stations 458+00 and 470+00) we can get an estimate of the available levee building material for the contract as bid. The total estimated levee building material quantity as adjusted is 1,827,006 cubic yards (2,137,211 – 310,205 cubic yards).

I made calculations of the levee building material volume based on the dredge volumes indicated in the contract documents using the procedure I used in the design report. I made those calculations in order to estimate the volume of levee building material more closely based on the final contract dredge volumes. Those calculations (presented in Appendix D) indicate a total volume of levee building material of 1,789,986 cubic yards as shown in the table below.

Estimated Levee Building Material

| Section | Station | Levee Building Material, Cubic Yards | | | |
|---|---|---|---|---|---|
| | | Ball 1 | Ball 2 | Sand | Total |
| 1 & 2 | 470+00 – 510+00 | 176,832 | 193,677 | 117,735 | 488,244 |
| 3,4,5 | 510+00 – 540+00 | 190,972 | 336,877 | 119,167 | 647,016 |
| 6 & 7 | 540+00 – 612+00 | 253,778 | 8,477 | - | 262,255 |
| 8 | 612+00 – 650+00 | 105,180 | 3,347 | 11,156 | 119,683 |
| 9 | 658+00 – 684+06.85 | 23,943 | 69,588 | 179,257 | 272,788 |
| | TOTAL | 750,705 | 611,966 | 427,315 | 1,789,986 |

## b) Required Levee Building Material

The amount of levee building material required for the project was discussed in Section 3.8 of the Feb. 1998 design report:

> *"Based on the selected cross section minimum template, approximately 700,000 cubic yards of levee material will be required to construct the proposed levee sections to a minimum elevation of about El. 30 feet MLT. This estimate does not include quantity required for displacement of very soft dredged material. Our estimate indicates about 1,000,000 cubic yards of additional levee material will be required for displacement of very soft dredged material. This data is provided for only general information and should be expected to vary depending on the levee construction methods used. The estimated quantities at selected cross sections are presented in Plate 23.*

Plate 23 is reproduced on Plate 11 of this report. It shows that 1,010,269 cubic yards of fill would be required for foundation displacement below the hydraulically constructed levee. Foundation displacement was discussed in some detail in Section III.C.3 earlier in this report. Of the material required to construct the levee minimum template 538,786 cubic yards of fill would be required for the section to be constructed by hydraulic filling. Therefore, a total of 1,549,055 cubic yards of fill was estimated to be needed for the section of the levee constructed by hydraulic filling as designed for the LLPA.

Note that the section of the levee to be constructed mechanically, requiring 160,222 cubic yards of fill, was built by borrowing material from the LLPA interior. This material came from two discharge mounds located near the southern site levee.

## c) Levee Building Material Sufficiency

In paragraph 2 of Section 4B Dr. Mathewson stated the following:

> *"It is clear that Renda Marine did not have enough clay and other suitable materials available from the contractually authorized dredging areas to construct the levees at Lost Lake."*

HVJ ASSOCIATES

Comparing the amount of levee building material available from hydraulic dredging (1,789,986 cubic yards) to the amount estimated to be needed for the section to be constructed hydraulically (1,549,055 cubic yards) we have an excess of 240,931cubic yards available from the Federal project. Therefore, there was a sufficient amount of levee building material available for construction from the Federal project. Overall, the available material was substantially in excess of the needed material by more than 200,000 cubic yards (> 15% of the total volume needed for levee construction).

For the Feb. 1998 design study I took a conservative view that sand was not an appropriate levee building material for the project. Galveston District personnel were more confident that sand could be successfully used for constructing levees based on their experience. A total of 427,315 cubic yards of sand is included in the total amount of levee building material, so the decision of whether sand is a suitable levee building material is the difference between the having ample material and having a deficit. In Section 3.8 of our Feb. 1998 design report I conclude as follows:

> *"We have estimated that 340,000 cubic yards of levee material may need to be obtained by mining for the project. This estimate is based on the assumptions that the levee raisings will be accomplished hydraulically where possible, and that mining will occur only between stations 458+40 and 520+00 and between stations 660+00 and 683+81. Note that the amount of mining which may be needed is highly dependent on construction sequences and procedures, and the actual volume required can be expected to vary from the estimate provided here."*

I concluded at that time that there may be a material deficit that might need to be made up by mining. Mining refers to the excavation of soil from beneath the design template of the channel to provide required levee building material. I've seen several levees constructed of sand perform successfully and am less concerned about recommending the use of sand fill in disposal area levees today than I was at the time of the Feb. 1998 design study. Based on the available fill estimates presented in Section IV.B.1.a.3 and my current knowledge of levee performance I believe that there was ample material available for LLPA levee construction from the Federal project dredging.

## d) Retention Factor

I have been asked to offer my opinion on the minimum retention factor needed to construct the portion of the new perimeter levees at Lost Lake to be constructed with hydraulically placed dredged material. Unfortunately, the term retention factor as used in this case is different from the clay ball retention factor discussed in Section IV.B.1.a. For the purposes of this section, retention factor refers to the fraction of the total material dredged that produces raised levee in the disposal area. In this usage, fill used to displace levee foundation is considered incidental since it does not physically result in levee raised above the pre-existing elevation of the site.

The total volume of dredging for the project according to the contract documents is 3,483,700 cubic yards. Plate 11 of this report presents the total volume required to construct the minimum template of the hydraulically constructed levee, and shows that the total fill required is 538,736 cubic yards. The retention factor required for the levee construction is calculated as follows:

Retention Factor = 538,736/3,483,700 = 0.1546 or about 15%

## 2. Staged Levee Construction

In Paragraph 4 of Section 4B Dr. Mathewson opines as follows:

> *"One method of constructing the hydraulic levees that would ensure that the levees could reach and maintain a 30-foot elevation involves placing the hydraulic fill of clay and other suitable materials in lifts and allowing time for consolidation and dewatering of the materials before applying additional lifts. This process, however, would require more time than that allowed under the contract documents."*

Dr. Mathewson is correct in his assertion that constructing the levees in lifts allowing time for consolidation between lifts is one method of construction. This method was discussed in Section III.C.3 of this report under the heading preconsolidation.

My calculations confirm that it would not have been feasible to construct the levees this way within the construction period of 446 days, even with the use of vertical drains to reduce the time for consolidation. Vertical drains reduce the time required for consolidation to occur by reducing the distance to water has to flow to drain from the soil. This is accomplished by penetrating the layer vertically with drains at a close spacing. My calculations show that with vertical drains spaced at a center-to-center distance of about 6 feet, the time to complete 95% consolidation under a filling stage was longer than the construction period. The calculations are shown in Appendix D. As discussed in Section III.C.3 of this report, of the three potential methods available to construct the project levees – excavation & replacement, displacement, and preconsolidation – only the displacement method was feasible.

## 3. Use of DAMP Project Borings

Dr. Mathewson opines in Paragraph 6 of Section 4B of his report as follows:

> *"Even the designers of the new levees apparently did not know how much foundation displacement would occur."*

I've made an extensive presentation of displacement in Section III.C.3 of this report, and shown how the quantity of displacement was used in estimating the volume of levee building material required for the construction in Section IV.B.1.b. It is clear that the Feb. 1998 design report contained a specific estimate of the volume of fill required to displace the soft foundation soils (1,010,269 cubic yards).

In Section II.A.4 I described the history of my levee design and evaluation work at LLPA, which began with two studies related to Disposal Area Management Plan (DAMP) development. I drilled soil borings for both studies, which are test holes in which I perform tests and obtain soil samples. Based on the field and lab data, logs representing the soil layering, description, properties, and groundwater conditions at the time of the investigation were prepared. The location of those borings in the Lower Bayou Plans was shown on Drawing C-14 as borings 94LL-** and 96LL-**. Boring logs from these borings were presented in the plans on Drawing F-5. Note that the borings shown on Plate F-6 designated 97LL-** were obtained to investigate the mechanical fill borrow areas at the LLPA and were unrelated to the DAMP work we did previously.

The 96LL-** borings were drilled in the site interior, and were particularly helpful in estimating the volume of displacement required. The volume of displacement depends on two fundamental factors, the width of the embankment constructed over the soft foundation, and the thickness of the soft soil. The width of the embankment was developed during the design, and so was known. The thickness of the soft soil could only be known based on borings taken in the site interior. Very few such borings are usually obtained, primarily since it is very difficult to access the site interior with heavy equipment such as a drill rig. The availability of the 96LL-** borings was helpful in estimating the thickness of the soft foundation material.

## 4. Conclusion

Dr. Mathewson concludes Section 4B with Paragraph 8 as follows:

> *"It is therefore my professional opinion that; (1) there was insufficient volume of suitable material available to Renda Marine to construct the Lost Lake levees as designed, (2) that the levees could not be constructed to reach and remain at the required 30-foot elevation under the circumstances, (3) the side-cast borrow areas were larger than reported and consumed excessive amounts of suitable levee construction material and (4) that there was insufficient time allowed by the contract to construct the levees in lifts to reduce the significance of slope failures.*

In my opinion, most of Dr. Mathewson's numbered points above are incorrect: (1) Section IV.B.1.c demonstrates that there was a 240,000 cubic yard surplus of material suitable for levee construction, (2) the stability analysis discussed in Section IV.A.4 clearly demonstrated that stable levees could be constructed to El. 30 by the foundation displacement method, and (3) Section IV.A.1 demonstrates that the presence, depth, and location of side-cast borrow areas was not a controlling factor in the volume of fill required for foundation displacement. I concur with point (4) in part; Section IV.B.2 of this report demonstrates that there was not sufficient time to construct the levee in lifts. However, this point is of limited relevance since displacement method as discussed in Section III.C.3 was expected to be used. As discussed in Section IV.A, I disagree with use of the term "failure" in point (4). The fill penetration into the foundation was the beginning of foundation displacement, which was an expected part of the levee construction.

# ILLUSTRATIONS

HVJ ASSOCIATES