UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC.,<br>PLAINTIFF,<br><br>V.<br><br>UNITED STATES ARMY<br>CORPS OF ENGINEERS,<br>DEFENDANT. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 02-306C<br><br>(JUDGE HEWITT) |

**PLAINTIFF'S MOTION FOR INCLUSION OF MATTER**
**AT SCHEDULED PRE-TRIAL CONFERENCE**

TO THE HONORABLE COURT:

COMES NOW, Renda Marine, Inc. "Plaintiff" in the above captioned case, and respectfully submits to the Court as follows:

**I.**

**BACKGROUND**

1. As the Court is aware, this matter has been the subject of several scheduling orders. Prior to the Court's current Order of November 4, 2004, the operative Order was the one dated September 10, 2003 as modified by Order dated March 19, 2004 (the "Previous Schedule"). Pursuant to the Previous Schedule, the case was to proceed to trial on June 15, 2004. Accordingly, the parties proceeded to prepare for trial and to prepare for the Pretrial Conference which was previously scheduled for June 2, 2004, until the Previous Schedule was vacated by Order dated May 14, 2004.

2. By Order dated November 4, 2004, a new schedule was set by the Court that included the various matters previously set forth in the Previous Schedule. The necessity of rescheduling the

trial was due to the failure by the Government to produce and/or preserve certain documentary evidence.[1]

## II.

## RENDA MARINE, INC.'S MOTION TO LIMIT TESTIMONY

3. Pursuant to the Previous Schedule, Plaintiff timely filed its Motion to Limit Testimony by Defendant's Experts ("Plaintiff's Motion to Limit"), on April 4, 2004. A true and correct copy of Plaintiff's Motion to Limit Testimony is contained in the appendix to this request as **Exhibit "A"** for the convenience of the Court. The Government filed its response to Plaintiff's Motion to Limit Testimony, on or about April 30, 2004. A true and correct copy of Defendant's Response to Plaintiff's Motion to Limit Testimony by Defendant's Experts is contained in the appendix to this request as **Exhibit "B"** for the convenience of the Court. Although the matter was fully briefed, due to the Court's Order of May 14, 2004 vacating the Previous Schedule, Plaintiff's Motion to Limit Testimony was never ruled on by the Court.

4. Notwithstanding the passage of time and the entry of a new scheduling order, the matters raised in Plaintiff's Motion to Limit Testimony are still germane to the trial of this matter, and Plaintiff still requests a ruling. This matter is presently scheduled for Pretrial Conference in accordance with RCFC 16(d) on February 16, 2005. The Plaintiff respectfully requests that the merits of Plaintiff's Motion to Limit Testimony be considered by the Court at that time.

[1]. The May 14, 2004 Order vacating the Previous Schedule was necessitated by the Court's order granting the Plaintiff's Motion to Compel against the Government which was contained in the May 14, 2004 Order.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Plaintiff's Motion to Limit Testimony be considered, and if appropriate, ruled upon, by the Court at the Pretrial Conference, scheduled for February 16, 2005, and further requests that all parties take notice of the Plaintiff's request.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: s/Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of February, 2005, a true and correct copy of Plaintiff's Motion for Inclusion of Matter at Scheduled Pre-Trial Conference was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson

# APPENDIX TO PLAINTIFF'S MOTION FOR INCLUSION OF MATTER AT SCHEDULED PRE-TRIAL CONFERENCE

APPENDIX TABLE OF CONTENTS


| Exhibit | Description | Page |
|---|---|---|
| A | Renda Marine, Inc.'s Motion to Limit Testimony by Defendant's Experts | 1-278 |
| B | Defendant's Response to Plaintiff's Motion to Limit Testimony by Defendant's Experts | 279-298 |

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., PLAINTIFF, | § § | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| UNITED STATES ARMY CORPS OF ENGINEERS, DEFENDANT. | § § § | |

**RENDA MARINE, INC.'S MOTION TO LIMIT**
**TESTIMONY BY DEFENDANT'S EXPERTS**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Renda Marine, Inc. ("Renda"), files this motion to limit the trial testimony of the expert witnesses designated by Defendant, United States, as follows:

Renda took the depositions of Defendant's experts Jack Fowler and William Connole on April 8 and 9, 2004, respectively. Based on the experts' deposition testimony and resumes, the trial testimony of each witness should be limited to their areas of expertise. Renda respectfully reserves the right to supplement this motion upon receipt of the deposition transcripts.

**Jack Fowler**

Mr. Fowler is a geotechnical engineer with a bachelors, masters and doctorate in civil engineering. His resume and report are attached as Exhibits A and B, respectively. While Mr. Fowler certainly has substantial expertise in geotechnical matters, he admitted in his deposition that he has no experience as a dredger and is not a dredging expert. He does not know the differences between the various dredging cutter heads and cannot testify as to production rates. His resume does not show any dredging experience.

Mr. Fowler's testimony should be limited to geotechnical matters. Mr. Fowler should not be permitted to testify about dredging and dredgeability matters.



EXHIBIT
A

Besides, Defendant has a dredging expert, Robert Lofgren, and Mr. Fowler's testimony would be cumulative.

**William Connole**

Mr. Connole is a construction claims consultant. He has degrees in Psychology and Civil Engineering. Mr. Connole's resume and Volume I of his report are attached (without exhibits) as Exhibits C and D, respectively. Through most of his career, he has assembled or reviewed construction claims.

In his deposition, Mr. Connole admitted that: (1) he is not a geotechnical expert; (2) he is not a dredging expert; (3) he is not a geotechnical engineer; (4) he is not a geologist; (5) he is not a hydraulic levee designer; and (6) he is not a hydraulic levee constructor. His resume shows no dredging experience or levee design or construction experience.

While Mr. Connole may be an excellent construction claims preparer or evaluator, he lacks sufficient expertise to testify as an expert concerning geotechnical and geological matters. He also lacks sufficient expertise to testify as an expert concerning dredging, dredging expectations, hydraulic levee design, and hydraulic levee construction. He should not be permitted to testify as an expert on these matters.

Besides, Defendant has Mr. Fowler to testify about geotechnical and levee design matters, and Robert Lofgren to testify about dredging issues. Any testimony by Mr. Connole on these matters would be cumulative.

**Robert Lofgren**

Robert Lofgren has substantial dredging experience and has a bachelors and masters degree in civil engineering. Mr. Lofgren's resume and report (without exhibits) are attached as Exhibits E and F, respectively.

He is not a geotechnical engineer, and has not worked as a geologist. He is not a hydraulic levee designer. He is not a claims consultant.

Mr. Lofgren's testimony should be limited to his demonstrated expertise concerning dredging and design of dredges. He should not be permitted to testify as an expert concerning geotechnical matters, hydraulic levee design, and construction claims assembly.

Besides, Defendant has Mr. Fowler to testify concerning geotechnical and levee design matters, and Mr. Connole to testify about construction claims assembly. Any testimony by Mr. Lofgren on these matters would be cumulative.

The admissibility of expert testimony in proceedings in the Court of Federal Claims is governed by the same standards and requirements applicable in federal trial courts, including the requirement that the expert be qualified in the *specific area* in which an opinion is proffered:

> The admissibility of expert testimony is governed by Fed.R.Evid. 702. . .The Supreme Court has held that a trial judge acts as a 'gatekeeper'under Rule 702 to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) *(quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). . . . Defendant stated in its conclusion that the "proposed expert need only possess some specialized 'knowledge, skill, experience, training or education' that will be helpful to the trier of fact in understanding the evidence or determining a fact in issue." Def.'s Hamm Resp. at 44. The court disagrees. In addition to possessing 'knowledge, skill, experience, training, or education,' an expert's testimony must also be both relevant and reliable in order to be admitted into evidence. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786; *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167.

*Westfed Holdings, Inc. v. U.S.*, 55 Fed.Cl. 544, 570-571 (Fed.Cl., 2003). Further, the Court of Federal Claims made clear in "that the issue is not the qualifications of the witness in the abstract or in general but "whether those qualifications provide a foundation for a witness to answer a specific question." *Westfed Holdings, Inc. v. U.S.*, 55 Fed.Cl. at 571, *citing Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994) ("A divorce lawyer is no more qualified to opine on patent law

questions than anyone else, and it is a mistake for a trial judge to declare anyone to be generically an expert.") *and citing Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir.2001) ("Once initial expert qualifications and usefulness to the jury are established, however, a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702, *Kumho Tire*, and related precedents."). *See also* Moore's Federal Practice, Reference Manual on Scientific Evidence 58 (Matthew Bender ed., 1995) ("before the expert is found qualified to offer an opinion about a particular issue, the court must also decide whether the actual qualifications of the expert enable him or her to assist the trier of fact with regard to each controverted issue about which the expert seeks to testify ")

Wherefore, Plaintiff, Renda Marine, Inc., respectfully requests that the Court limit the expert testimony of Defendant's expert witnesses to their areas of respective expertise, and avoid cumulative testimony.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: s/Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)

ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of April, 2004, a true and correct copy of Renda Marine's Motion to Limit Testimony by Defendant's Experts, was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson

## APPENDIX C

Dr. Fowler's Resume

Jack Fowler, Ph.D., P.E.
Geotechnical Consultant
Geotec Associates
5000 Lowery Road
Vicksburg, Mississippi 39180
Telephone: 601-636-5475 FAX: 601-630-9911
E-mail jfowler@geotec.biz and www.geotec.biz

**Education:**

Dr. Fowler received his BS degree in Civil Engineering from the University of Mississippi in 1961, his MS degree in Civil Engineering from Mississippi State University in 1972, and his Ph.D. degree in Civil Engineering from Oklahoma State University in 1979. His major field of study was in Geotechnical Engineering. Dr. Fowler is a Registered Professional Engineer in the State of Mississippi, a member of ASCE, SAME, PIANC, WEDA and Chi Epsilon (Honorary Engineering Fraternity).

**Experience:**

Dr. Fowler worked for the Soil Conservation Service for 1 year while attending the University of Mississippi. After receiving his BS degree in 1961, he was employed by the Corps of Engineers Ballistic Missile Construction Office, Inglewood, California, as a construction inspector at the Jacksonville, Arkansas, Field Office. This work involved construction of 18 Titan II Missile Bases. Dr. Fowler was on Military leave of absence for 3 months in 1962 at Fort Polk, Louisiana, during the Berlin Crisis.

From 1962 to 1994, Dr. Fowler was employed at the US Army Engineer Waterways Experiment Station (WES) as a Research Civil Engineer. From 1962 to 1974 he participated in Geophysical exploration and vibroseismic surveys and design of vibration sensitive structures, dynamic testing of model radar foundations, development of design criteria and subsequent application and verification of design criteria from dynamic measurements from prototype structures. He also participated in the National Aeronautical Space Administration Saturn V Moon Exploration Program by conducting static and dynamic load tests of foundation piles prior to construction and instrumentation of selected foundation piles for static and dynamic measurements during static test firing of the first and second stages in test stands located at Stennis Space Center.

His master's thesis in 1972 consisted of evaluating an existing procedure for determining shear modulus of in situ soils at depth by vibratory techniques. He also participated in studies involving liquefaction phenomena of soils caused by earthquakes or other seismic sources, earthquake resistance of earth and rock fill dams and model studies of concrete arched structures subjected to both controlled and random vibrations.



EXHIBIT
A
Blumberg No. 5118

His Ph.D. thesis in 1979 was concerned with design, construction and analysis of the first geotextile fabric reinforced embankment constructed on soft foundations in the United States. He participated in the Dredge Material Research Program as a Senior Project Engineer and principal investigator on numerous projects involving dewatering of dredged materials and design and construction of fabric reinforced containment levees and construction haul roads. He participated in the design of the first geomembrane and soil bentonite slurry wall trenches constructed for under seepage under one of the first successfully designed and constructed welded wire reinforced embankments for flood control protection. He was a principal leader in the preparation of a Technical Manual for Engineering use of Geotextiles for the Department of the Army. He was a principal investigator in the Dredged Research Program responsible for development of a Knowledge Based Expert Systems program for determining dredgeability of sediments for a work unit entitled "Descriptors for Bottom Sediments to be Dredged." He was also a principal assistant to the Chief, Soil Mechanics Branch, and was responsible for planning, executing, and analyzing the results from research and development studies for construction control of earth and rock fill dams and levee design.

Dr. Fowler has served as a consultant with the Construction Productivity Advancement Research Program (CPAR) at WES for "The Development and Demonstration of Dredged Material Containment Systems Using Geotextiles" and "Research, Development and Commercialization of a Ballistic Soil Nailing Systems." He is currently working with several Corps Engineer Districts, Port Authorities, consulting firms and the Navy concerning the containment of contaminated dredged material, municipal fly ash, lime, alum, animal waste and sewage sludge wastes in geotextile containers. He developed a proposed ASTM filtration protocol for geotextile container systems for fine grained sediments. He was responsible for planning and designing the first geotextile tubes and containers for fine-grained contaminated dredged material. Since his retirement in 1994 he has worked in research and consultation involving filling geotextile tubes with concrete and high solids contaminated dredged material using positive displacement pumps. He has prepared documentations for several dredging claims and has served as an expert witness where different site condition claims were involved in dredging projects. He has served as an expert witness involving siltation damage to oyster beds as a result of dredging activities. He also teaches annually in the Texas A&M Dredging Engineering Short Course and an adjunct professor at Mississippi State University.

**Publications:**

Dr. Fowler has authored or coauthored 7 Journal papers, chapters in 5 textbooks, 45 technical publications, 53 papers and holds patents for a telescoping weir and a Geotube Bio-Waste Digester. He was also a technical contributor to 25 technical publications in the fields of geophysics, dynamics, soil mechanics, soil and structural interaction and pile supported foundations, seismic wave phenomena, earthquake engineering, containment and dewatering of dredged materials, vertical plastic strip drains (wicks), geomembrane soil bentonite slurry trenches, and steel wire and fabric reinforced earth structures, geotextile tubes, bags and containers.

# FINAL REPORT

# Expert Witness Evaluation

Prepared by

Geotec Associates – Jack Fowler, Ph. D., P.E.
5000 Lowery Rd
Vicksburg, MS 39180
Contract Number 3W-CIV01-0163

Date: 2 February 2004

Case Name

Renda Marine, Inc. v United States
U. S. Court of Federal Claims No. 02-306C (Fed. C1)

Requesting Office

Department of Justice
National Courts Section
Commercial Litigation Branch
Civil Division

EXHIBIT
B

February 2, 2004

Renda Marine, Inc. v. United States
No. 02-306C (Fed. C1)

Contract No. DACW64-99-C-0001
Houston-Galveston Ship Channel, Texas
Dredging Upper Bayou, (45 foot Project)
Harris and Galveston Counties, Texas

This report was prepared for the U.S. Department of Justice, Civil Division, Commercial Litigation Branch by the undersigned, Dr. Jack Fowler. Included in this report are four tables and five appendices. Appendix A provides a glossary of geotechnical descriptors and includes three tables, A-1 through A-3, Geotechnical Characteristics of Dredge Channel Soils and cohesive and cohesionless material descriptors. Appendix B is a list of cases where I testified as an expert at trial or by deposition. These demonstrate my experience as an expert witness in dredging and differing site condition claims. My resume and experience are included in Appendix C, and a list of publications I have written is in Appendix D. Documents pertaining to this case that were provided by the Galveston District Corps of Engineers, Capital Project Management, Inc., Franvel Corporation, and the U.S. Department of Justice are listed in Appendix E.

In the course of my investigation into this case I visited the Lost Lake Placement Area with Galveston District Corps of Engineer personnel and Gahagan and Bryant, Inc. personnel. I also met with HVJ Associates, Inc., Gahagan and Bryant Associates, Inc., and District personnel concerning volume calculations of different types of dredged materials. I met with District personnel during the hydraulic construction of levees along the Houston-Galveston Ship Channel by Bean Stuyvesant LLC.

I have reviewed the plans and specifications for Contract No. DACW64-99-C-0001, Houston-Galveston Navigation Channels, Texas, Dredging Upper Bayou, (45-Foot Project), Harris and Galveston Counties, Texas, Amendment No. 1, Renda Marine's Certified Claim for Equitable Adjustment of the Contract Price for Differing Site Conditions & Changed Conditions for Hydraulic Levees At Lost Lake Placement Area, October 16, 2001. I have also reviewed the documents listed in Appendix E.

The U.S. Department of Justice is compensating me at a rate of $200 per hour for my professional services in the litigation case regarding Renda Marine, Inc. vs. United States N. 02-306C(Fed.C1.)

The following are answers to questions provided by John E. Kosloske, Senior Trial Counsel, Commercial Litigation Branch, United States Department of Justice in letters dated October 24, 2003 and November 21, 2003.

## Section 7 Clay Claim

**1-1 Identify each soil boring depicted in the contract documents that is relevant to a prediction about the *character* and *location* of materials *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00.**

Soil borings in Section 7 that are relevant to predicting the character and location of the materials within the maximum pay template are boring logs 3ST-8W, 3ST-9W, 93-64, 3ST-10W, 3ST-11W, 93-65, 3ST-12W, 3ST-13W, 72-106, 3ST-14, 3ST-15, 93-66, 3ST-16, 3ST17, 3ST-18 and 3ST19.

**1-2 What, if anything, do the logs for the borings identified in response to 1-1 above indicate about stiff to very stiff materials *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Table 1 is a summary of the consistency, relative density, and laboratory classification for the remaining depth in the channel for all profiles and boring logs for Sections 1 through 9. Tables 2 and 3 summarize the remaining depth and allowable overdepth for Sections 1 through 9.

The results as shown in Table 2 indicated that the consistency of the cohesive materials (CH, CL and ML) in Section 7 was 30% very soft, 20% soft, 6% medium stiff, 6% stiff, 12% very stiff, and 21% hard of the total volume. The relative density of the cohesionless materials (SC and SM) in Section 7 was 0.5% medium dense, 3% dense and 2% very dense of the total volume.

The results as shown in Table 3 indicated that the laboratory classification of the materials in the remaining depth and allowable overdepth consisted of 53% CH (inorganic clays of high plasticity, fat clays), 41% CL (inorganic clays of low to medium plasticity, gravelly clays, sandy clays, silty clays, lean clays), 1% SC (clayey sands, sand-clay mixtures) and 5% SM (silty sands, sand-silt mixtures) of the total volume in Section 7. Appendix A includes a detail description of the geotechnical properties for cohesive and cohesionless material in tables A-1 and A-3.

The conclusions are that the cohesive clays (CH, CL and ML) make up 94% of the total volume and the cohesionless materials (SC and SM) were 6% of the total volume in Section 7 (Table 3). The medium stiff to hard cohesive materials in Section 7 (Table 2) were 39% of the total volume in this section. The very soft, soft and medium stiff cohesive materials totaled 56% of the total volume in Section 7 (Table 2). The dense to very dense cohesionless materials (SC and SM) were 6% of the total volume in Section 7 (Table 2).

**1-3 What boring logs identified in response to 1-1 above indicate stiff red clays *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Boring log 3ST-16, Station 593+90 indicated very stiff to hard grayish red to red cohesive clay from elevation -44 to -47 MLT. Boring log 3ST-18, Station 603+60 indicated hard red cohesive (CL) materials from elevation -42 to -45 MLT and hard blue to rust material below elevation -45 MLT. Boring log 3ST-19, Station 608+40 indicated hard red cohesive (CH) materials below elevation -40 MLT. All of the soils described by the boring logs and elevations were within the maximum pay template for the area in Section 7.

The basis of color used in describing cohesive soil has been well established in the geotechnical literature. Color observed in field surveys is often helpful in distinguishing between various soils strata. To an engineer or dredger with sufficient preliminary experience with local soils, color may be useful in identifying individual soil types and their consistency and/or their relative density and depth profile which would also indicate their dredgeability. Dredgeability is defined as the difficulty or ease of excavating, removing, transporting and placing of dredged materials.

Cohesive inorganic soils described are generally associated with the brighter colors such as medium and light gray, olive green, brown red yellow, and white. Cohesive and cohesionless materials have a variety of colors and combination of colors ranging from black, gray, brown, yellow, green, blue, white, red or rust (oxidation of ferric or iron minerals). It is concluded that the color of dredge material sediments do not have any relationship as to its dredgeability.

**1-4 What, if anything, do the logs for the borings identified in response to 1-1 above indicate about stiff rust-colored clays *within* the maximum pay template for the area in Section 7 between stations 561+20 and 609+00? Explain the basis of these findings and conclusions.**

Boring log 3ST-11W, Station 568+90 indicated hard, rust and grayish colored, cohesive clay from elevation -40 to -47 MLT. Boring log 3ST-12W, Station 574+00 indicated very stiff to hard rust colored cohesive clay from elevation -21 to -47 MLT. Boring log 3ST-13W, Station 579+00 indicated very stiff to hard, rust, blue, and grayish colored, cohesive clay from elevation -38 to -47 MLT. Boring log 3ST-14, Station 583+70 and Boring log 3ST-15, Station 588+20, indicated very stiff, rust and light grayish colored cohesive clay from elevation -45 to -47 MLT. All of the soils described by the boring logs and elevations were within the maximum pay template for the area in Section 7. These materials had laboratory classifications of CL and CH, and the consistency of these cohesive soils varied from very stiff to hard. These rust colored, cohesive clays were generally found in the last few feet of the bottom of the maximum pay template and allowable overdepth.

It is concluded, as in 1-3, that the color of dredge material sediments does not have any relationship to its dredgeability. Based on the boring logs provided in the contract, an experienced and prudent contractor should have expected to encountered stiff, very stiff to hard cohesive clays.

**1-5 What, if any, significance to dredging is there between red, rust, or any other similarly colored stiff to very stiff clay?**

The red, rust or blue color of clay sediments does not have any effect on the consistency or stiffness of the material nor does it have any affect on the excavating or cutting, removal, transport through the dredge pipeline and/or placement in the Confined Disposal Facility (CDF).

**1-6 What, if any, significance to dredging is there between, on the one hand, stiff to very stiff red or rust-colored clays and, on the other hand, stiff to very stiff gray or blue clays?**

There is no significant difference in the dredgeability of different colored stiff to hard clays and it is concluded that the color of dredge material sediments does not have any relationship to its dredgeability. Dredgeability is referred to as the ease or difficulty of excavating, removing, transporting and disposing of dredged material sediments.

**1-7 Define "hardpan."**

Hardpan soils is a term used to describe any hard, over consolidated or cemented impermeable layer that does not soften very easily when wet. This term is also used to describe boulder clay or glacial till which is a very tightly packed deposit from glacial origin ranging from boulders to rock flour. Hardpan can also be a layer of extremely hard impermeable cohesive soil that is difficult to excavate and will not allow water penetration. These soils are over consolidated clays that have been subjected to large overburden loads or to a long period of desiccation drying. During the ice age when the ocean levels dropped, large exposed mud flats dried up resulting in hard impermeable clay layers. Salt or simply water migration through a clay soil can also cause the clay particles to come closer together, consolidate and form a hardpan. This phenomenon is referred to as seepage consolidation.

**<u>Hydraulic Levees Claims</u>**

**2-1 Regarding the levees at the Lost Lake Placement Area (Lost Lake) to be constructed by the hydraulic placement of dredged material, describe what the contract required Renda Marine to construct (height, base width, crown width, slope, etc.).**

The contract required the contractor to construct 13,650 ft of levees to elevation +30 ft M.L.T with hydraulically placed fill during dredging of Upper Bayou dredge channel. Typical levee cross sections had a 10 ft wide crest and 3 to 1 side slopes. The levee

height varied depending on the existing dike height but the average dike height was about 17 ft at an elevation of +30 ft M.L.T. and the average base width was about 114 ft.

**2-2 Calculate the "neat line" volume per lineal foot of the levees at Lost Lake to be constructed by hydraulic placement of dredged material.**

Table 4 shows the hydraulic levee "neat line" volumes, dimensions and stations. The hydraulic levees at Lost Lake were to be constructed from Station 166+00 to 215+00, 4+00 to 56+00 and 61+50 to 97+00 for a distance of 13,650 ft. The total "neat line" volume required for the hydraulically constructed levees was 522,737 CY and the "neat line" volume per linear ft was 38 CY per linear ft.

**2-3 What do the contract documents indicate about the foundation materials in the levee alignment along the east levee? The west levee? The north levee?**

The contract states on contract Drawing No. C-14 Note: 9: ***"Upon completion of the mechanical constructed levees to the lines and grades specified. The contractor must complete the remainder of the perimeter levee to the minimum template limits shown on the drawings, using hydraulically constructed levees,"*** and Note 10. ***"The foundation of the new levee is very soft to soft dredged material and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material."***

The boring logs in the contract indicate that the foundation conditions along the east levee consisted of 56% very soft to soft and 44% medium stiff to hard cohesive soils near the surface with minor amounts of loose to medium dense cohesionless sandy soils. The foundation conditions along the west levee consisted of 50% very soft to soft and 25% medium stiff to stiff cohesive soils near the surface with 12.5% very loose to 12.5% medium dense cohesionless sandy soils. Boring logs along the north levee indicated that the levee foundation consisted of 57% very soft to soft and 36% medium stiff to hard cohesive materials near the surface with minor amounts of very loose cohesionless soils.

Based on the results of the boring log data, it appears that the east and west levees may have had slightly more foundation bearing capacity than the north levee but not a significant amount. Most of the stiff to hard soils occurred at the surface as a result of dewatering, drainage and consolidation by desiccation drying of surface water. Many areas would have a layer of sandy or desiccated clay crust; but underneath the layer would be very soft to soft cohesive materials. In the past the coarse grained sands, shells and clay balls at the Lost Lake CDF normally settled out at the end of the dredge pipe or dump site near the south perimeter levee providing about 36% very soft to soft and 21% medium to stiff cohesive materials and 43% very loose to medium dense cohesionless materials. These upland dredged material placement areas are commonly referred to by the Corps of Engineers as confined disposal facilities or CDF. Elevation of the dredged materials deposited in the south side of the CDF is higher than the north side: therefore, fine grained sediments and water from dredging or rainfall would collect on the north

side before exiting the site through the weir. Depositions of sediments on the north side of the CDF near the weir site were very fine grained high water content soft cohesive materials. Construction of levees on these types of materials should have the worst foundation conditions in a CDF.

**2-4 Based upon what is contained in the contract documents, would it be reasonable to assume that construction of the north and/or west levees would be more difficult than construction of the east levee? Explain why or why not.**

Based on the results of the boring logs, it does not appear to be much difference in the bearing capacity of the either the east, west or north levee foundation conditions. There should not be any problems constructing hydraulically placed embankments on either the east, west or north embankments. Taking advantage of the desiccated surface materials in a CDF is very important for the support of equipment and dredged material placement without causing a bearing capacity failure.

**2-5 What kind(s) of dredged material would be suitable for the hydraulic construction of levees at a placement or disposal area such as Lost Lake?**

The most suitable dredge materials for building hydraulic levees at Lost Lake would be a combination of shells, sand and clay balls. These materials are readily available in the dredge channel and retention rates of the sand and clay balls are normally 60% of the in situ volume. Very soft to hard cohesive CH material will develop into clay balls that are suitable for the hydraulic construction of levees.

**2-6 What, if anything, do the contract documents indicate about the *character, location,* and/or *quantity* (expressed either in cubic yards or as a percentage of total cubic yards to be dredged) within the maximum pay template of materials suitable for the hydraulic construction of levees at Lost Lake?**

The contract provided the results of the geotechnical exploration which included soil boring logs for the contractor to examine and determine the character, location and quantity of dredged material to be removed. The contractor was expected to examine the site and make his own determination as to the character and quantity of the materials to be dredged. The contract provided a table of remaining quantities on page 02482-9 which stated a total estimated quantity of 3,105,500 CY to be dredged from Sections 1 through 9 and an allowable overdepth quantity of 378,200 CY: but the contract did not express the characteristics of the material in volumes or percentage of the total. The total remaining quantity of dredge material and allowable overdepth was 3,483,700 CY.

Volumes of different materials were determined graphically using the COE channel profiles and boring logs and average end area measurement methods shown for typical channel profiles in Figures 1 and 2 below. The geotechnical characteristics, volumes and percentages that were determined are shown in Tables 2 and 3 for Sections 1 through 9.