Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs



| Volume | Tab | Description |
|---|---|---|
| V | 43 | Franvel Corp HL&P Equipment Cost Report |
| V | 44 | Franvel Corp Attendant Plant Report for October 16, 17 and 18, 2000 |
| V | 45 | Defense Contract Audit Agency Report No. 3511-2003M17200007 dated December 12, 2002 and Franvel Corp Overhead Rate Summary |
| V | 46 | Franvel Report Recalculating Renda Stiff Clay Percentages |
| V | 47 | Franvel Report Summarizing Renda Soft Clay Area |
| V | 48 | Weeks Marine, Inc. Letter dated March 23, 2000 |
| V | 49 | Renda Marine Letter dated March 27, 2000 |
| V | 50 | Renda Marine Facsimile dated March 29, 2000 |
| V | 51 | Renda Marine Excerpt from South Ferry Landing Claim, page 14 and 15 |
| V | 52 | HVJ Associates, Inc. Letter dated May 30, 2000 |
| V | 53 | Renda Marine Excerpt for the Measured Mile at the Flare Area and Franvel Report on Production |
| V | 54 | Franvel Report for Flare Area Dredging before March 12, 2000 |
| V | 55 | Franvel Corp Report for Flare Area Dredging after March 11, 2000 |
| V | 56 | Renda Marine Lost Time and Damage Analysis for Flare Area and Franvel Corp Report for Flare Area |
| V | 57 | Franvel Corp Graph and Data for Plugged Discharged Pipelines |
| V | 58 | Renda Marine Memorandum dated March 18, 2000 |
| V | 59 | Franvel Corp Report for Labor Cost at Flare Area |
| V | 60 | Franvel Corp Report for Additional Equipment Cost at Flare Area |
| V | 61 | Franvel Corp Report Comparing Renda Equipment in Renda's Measured Mile and Impact Periods |
| V | 62 | Franvel Corp Report for Renda's Measured Mile in Flare Area |
| V | 63 | Defense Contract Audit Agency Report No. 3511-2003M17200005 dated December 12, 2002 and Franvel Corp Overhead Rate Summary |
| V | 64 | Franvel Corp Report for Profit at Flare Area |
| V | 65 | Turner Collie & Braden Inc/Gahagan & Bryant Associates Inc., JV Letter dated January 24, 2001 |
| V | 66 | Renda Marine Letter dated December 20, 2000 |
| V | 67 | Franvel Corp Report for Section 7, Stations 570+00 through 580+00 |
| V | 68 | Franvel Corp Report for Section 7, Stations 580+00 through 640+00 |
| V | 69 | Franvel Corp Report for Section 7, Stations 570+00 through 640+00 |
| V | 70 | Franvel Corp Report for Sections 1, 2, 3, 4, 5 and 6 |
| V | 71 | Renda Marine Daily Report for December 4, 5, 7, 8, 9, 11, 29, 30, 31, 2000 and January 1-14, 2001 |
| V | 72 | Deposition of Stephen Bowman dated November 22, 2000, page 133-140 |
| V | 73 | Renda Marine Letter dated December 18, 2000 |

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs


| Volume | Tab | Description |
|---|---|---|
| V | 74 | Lufkin Industries, Inc. Letter dated January 8, 2000 |
| V | 75 | Gahagan & Bryant Associates, Inc. Memorandum dated May 11, 2001 |
| VI | 1 | Franvel Report for Obstructions No. 1 Productivity Loss Equipment Cost |
| VI | 2 | Franvel Report for Obstructions No. 1 Impact Equipment Cost |
| VI | 3 | Franvel Report for Obstructions No. 1 Labor Cost |
| VI | 4 | Franvel Report for Obstructions No. 1 Dredge Repair Cost |
| VI | 5 | Quilling, Selander, Cummiskey & Lownds Letter dated April 30, 2001 |
| VI | 6 | Franvel Report Summarizing Report of Operations for Obstructions No. 1 Claim |
| VI | 7 | Renda Marine Daily Production Report for December 4 and 5, 2000 and Cross Sections for Stations 620+00, 622+00, 622+74, 624+00, 628+00, 630+00 |
| VI | 8 | Franvel Corp Report on Section 7 Station 566+35 to Station 609+00 |
| VI | 9 | Franvel Corp Report on Section 7 Station 558+00 to Station 566+35 |
| VI | 10 | Defense Contract Audit Agency Report No. 3511-2003M17200011 dated December 12, 2002 |
| VI | 11 | Renda Marine Daily Production Reports for February 9-19, 2001 |
| VI | 12 | Renda Marine Daily Report February 10-18, 2001 |
| VI | 13 | Franvel Report for Stations 660+00 through 685+00 |
| VI | 14 | Franvel Graph for Forecasting Clear Time in Sections 7, 8 and 9 |
| VI | 15 | Franvel Report Comparing Renda Report Entries between November 30, 2000 and January 31, 2001 and a Dredging Supply Company Letter dated December 12, 2000 |
| VI | 16 | Excerpt from Renda Obstruction No. 2 Claim for Repair Costs and Houston Dynamic Service Inc. Facsimile dated February 8, 2001 |
| VI | 17 | Turner Collie & Braden Inc/Gahagan & Bryant Associates Inc., JV Memo dated May 10, 2001 |
| VI | 18 | Gahagan & Bryant Email dated April 17, 2001 |
| VI | 19 | Krupp Hagler Letter dated May 11, 1999 |
| VI | 20 | Franvel Corp Report for Productivity Loss Equipment Cost for Obstructions No. 2 |
| VI | 21 | Franvel Corp Report for Labor Cost for Obstructions No. 2 |
| VI | 22 | Franvel Corp Report for Impact Equipment Cost for Obstructions No. 2 |
| VI | 23 | Franvel Corp Report on Equipment Repair Cost for Obstructions No. 2 |
| VI | 24 | Defense Contract Audit Agency Report No. 3511-2003M17200009 dated December 12, 2002 and Franvel Corp Overhead Rate Summary |
| VI | 25 | Franvel Corp Report on Quantities at Levee Stations 188+82 to 188+50 |
| VI | 26 | Government Email dated August 3, 2000 |
| VI | 27 | Government Email dated August 8, 2000 |

Franvel Corp
Renda Marine Inc. v United States
No. 02-306C (Fed. Cl.)

List of Tabs



| Volume | Tab | Description |
|---|---|---|
| VI | 28 | Turner Collie & Braden Inc/Gahagan & Bryant Associates Inc., JV Letter dated September 1, 2000 |
| VI | 29 | Renda Marine Daily Production Report for July 25, 2000 |
| VI | 30 | Oscar Renda Contracting Memorandum dated March 1, 1999 |
| VI | 31 | Government Memorandum dated October 6, 1999 |
| VI | 32 | Gahagan & Bryant Associates Inc. Email dated December 16, 1999 |
| VI | 33 | Excerpt from Renda Hydraulic Levee Claim, page 35 |
| VI | 34 | Franvel Corp Report on Revised Mechanical Levee Lengths |
| VI | 35 | Franvel Corp Report on Lost Lake Boring Logs |
| VI | 36 | Franvel Corp Report on North Levee Hauling between April 15, 2000 and June 28, 2000 |
| VI | 37 | Franvel Corp Report on North Levee Hauling between September 5, 2000 and December 11, 2000 |
| VI | 38 | Franvel Corp Report on Levee Cross Section |
| VI | 39 | Franvel Corp Report on Levee Equipment Arrival and Departure |
| VI | 40 | Franvel Corp Report on Levee Equipment Operating Time |
| VI | 41 | Copy of Renda Complaint against Dredge Supply Co., Inc., Case No. H00-1721 |
| VI | 42 | Renda Marine Financial Statements for the Years Ending October 31, 2001 and 2000 |
| VI | 43 | Franvel Graph and Report of Dredged Material Deposit Locations |
| VI | 44 | Houston Fuel Oil Terminal Company Facsimile dated July 20, 2001 |
| VI | 45 | Franvel Corp Worksheet on Flare Area Boring Logs |
| VI | 46 | Franvel Corp Worksheet on Section 7 Boring Logs |
| VI | 47 | Excerpt of the Deposition of Eddie Fisher taken on February 1, 2001, page 42-45 |
| VI | 48 | Franvel Corp Graph and Report of Material Deposited on Levee by Section |
| VI | 49 | Intentionally left blank |
| VI | 50 | Intentionally left blank |

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 1.0 Introduction

On March 10, 2003, William F. Connole, P.E., President of Franvel Corp., contracted with the United States Department of Justice to provide expert technical evaluation and assessment of the alleged claims including the delay and lost productivity components presented under Renda Marine, Inc. vs United States (No. 02-306C Fed Cl.). The Curriculum Vitae for Mr. Connole is found in Appendix A of this volume.

Renda Maine, Inc. (Renda) asserts that it encountered difficulties during dredging and fill placement for the Upper Bayou Dredging project of the Houston-Galveston Navigation Channel. The objectives of this independent investigation were:

- To summarize the dredging history and levee construction.
- To assess the alleged claims and the associated contract plans and specifications.
- To evaluate the alleged damages and measure actual delay and disruption for each claim.
- To evaluate and compute equipment ownership and operating rates using the U.S. Army, Corps of Engineers Schedule EP1110-1-8 for Region VI dated 1999.
- To provide opinions about the bid estimate, contract interpretation, construction means and methods and contract adjustments in price and time.

The objectives were accomplished by reviewing design, pre-bid and post-bid project documents, depositions, performing a field investigation, interviewing project personnel and conducting an evaluation of the collected information. The documents reviewed in preparation of this report are given in Appendix B of this volume.

This report contains sections on a description of the project; a summary of the dredging and hydraulic fill history, the analysis of the individual issues or difficulties and finally the

summary and conclusion. The report contains six volumes. When a document is referenced, it will be designated as "Volume Roman Numeral, Tab Number, page number" and will generally appear as "Vol __, Tab __, RM-COE - ###". A page number is not always reported.

Volume I is the narrative report.

Volume II is the database compiled from project records.

Volume III is Renda equipment rate calculations used in computing damages.

Volume IV is project correspondence, reports, and other documentation referenced in the report for review.

Volumes V and VI are documents and reports generally referenced in Volume I of the report.

During the past four years, Mr. Connole has provided a deposition (D) and/or testimony (T) as an expert witness in the following cases:

1) American Arbitration Association
Case No. 71 110 00366 02
LCG Company, LLC. v. Tulsa Steel Manufacturing Company, Inc. (D/T)
Air National Guard Composite Support Complex,
Subcontract No. 500051-505,
Tulsa, Oklahoma

2) United States District Court for Western District of Tennessee (D)
Case No. 98-2966-MI Bre
Luhr Bros., Inc. vs. Memphis-Shelby County Airport Authority, et al.
Contract No. 9706.30
Hurricane Creek Relocation
Memphis, Tennessee

3) United States Court of Federal Claims, (D)
Case No. 98-695C
Appeal of LaForge and Budd Construction Co., Inc.
Contract No. DACA56-86-C-0074
Transient Munitions Facility
Tinker Air Force Base, Oklahoma

Mr. Connole is being compensated at the rate of $140.00 per hour plus out-of-pocket expenses. Engineering technicians are billed at $50 per hour, Cadd technicians are billed at $60 per hour and secretarial staff is compensated at $35 per hour.

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 2.0 Project Description

The investigation reported herein is related to Contract No. DACW64-C-99-0001 between the US Army, Corps of Engineers (Government) and Renda Marine, Inc. (Renda) for Dredging Upper Bayou, a 3.9-mile segment of the Houston Ship Channel from Station (Sta.) 470+00 to Sta. 684+06.58[1], in Harris and Galveston Counties, Texas. Figure 2.0.1 shows the location of the project southeast of Houston, Texas.

Figure 2.0.1
Upper Bayou Project Location




[1] Near the upstream limit, between Sta. 650+00 and 658+00, no dredging was permitted.

The dredging had an estimated quantity of 3,483,000 cubic yards and consists of mostly new (virgin) work. The work involves increasing the bottom width and deepening the existing ship channel to a required depth of 47 feet below Mean Low Tide (MLT). The bottom widths and lengths are referred to in Contract Section 02482-Dredging and shown on Drawing Nos. C-2 and C-3[2]. Side and end slopes were to be 3 horizontal to 1 vertical. The amount of material removed from within the specific areas to be dredged is measured by the cubic yard (cy). The measurement is determined from surveys by computing the before-dredging (BD) volume within the required dredging prism[3] and then deducting the computed volume of the after-dredging (AD) survey of the material surface remaining within the dredging prism as soon as practicable after the work has been completed. In addition to the amount of material removed to the required depth of -47 feet MLT, the contract provides for the inherent inaccuracies in the dredging process by measuring and paying for material actually removed up to one foot below the required bottom depth (allowable overdepth). No additional payment was made for material removed outside the required side slopes. Figure 2.0.2 shows conceptually the project dimensions and quantity of material considerations to determine contract payment yardage.

Figure 2.0.2 - Concept Drawing of Project Dimensions




MAXIMUM PAY YARDAGE = REQUIRED YARDAGE + ALLOWABLE OVERDEPTH YARDAGE
NET PAY YARDAGE = MAXIMUM PAY YARDAGE – ALLOWABLE OVERDEPTH NOT DREDGED
GROSS YARDAGE = NET PAY YARDAGE + NON-PAY YARDAGE

---

[2] The contract specifications and drawings have not been attached to this report.
[3] Required dredging prism refers to the trapezoidal design template for dredging consisting of a specified depth, width and side slope within the channel.

Explorations, including core borings, to determine the character of the earth materials to be removed were made by the Government and the results were provided in the solicitation and contract. Cores and samples obtained by the Government with a "93" prefix were available for inspection at the Galveston District Office. For purposes of acceptance, the contract divided the length of the channel into nine sections. Section 1 began at Sta. 470+00 and Section 9 ended at Sta. 684+06.58. The sections are:

| Section No. | From Station | To Station | Length of Section (Feet) | Required Depth (cy) | Allowable Overdepth (cy) | Total Estimated (cy) |
|---|---|---|---|---|---|---|
| 1 | 470+00 | 484+00 | 1,400.00 | 219,000 | 22,600 | 241,600 |
| 2 | 484+00 | 510+00 | 2,600.00 | 394,400 | 42,000 | 436,400 |
| 3 | 510+00 | 524+00 | 1,400.00 | 361,700 | 26,600 | 388,300 |
| 4 | 524+00 | 532+00 | 800.00 | 432,300 | 25,200 | 457,500 |
| 5 | 532+00 | 540+00 | 800.00 | 454,500 | 25,600 | 480.100 |
| 6 | 540+00 | 554+00 | 1,400.00 | 379,500 | 34,700 | 414,200 |
| 7 | 554+00 | 612+00 | 5,800.00 | 320,600 | 84,200 | 404,800 |
| 8 | 612+00 | 650+00 | 3,800.00 | 300,300 | 59,000 | 359,300 |
| 9 | 658+00 | 684+06.58 | 2,606.85 | 243,200 | 58,300 | 301,500 |
| | | | Cumulative Total: | 3,105,500 | 378,200 | 3,483,700 |

Materials removed from the channel were to be transported via pipeline and placed at Lost Lake Placement Area, Contract Drawing C-14. Figure 2.0.3 shows in plan view Lost Lake Placement Area. The Lost Lake Placement Area is an approximate 650 acre island located north of the Houston Ship Channel at approximately Sta. 480+00. Around the approximate four mile perimeter of the Lost Lake Placement Area was an existing levee. The existing levee is represented by the line on the outside perimeter of Lost Lake Placement Area. New levees (interior perimeter line on Figure 2.0.3) were to be constructed at Lost Lake Placement Area by two methods, hydraulically and mechanically.

Figure 2.0.3

Lost Lake Placement Area

(Re: Contract Drawing C-14)




Contract Section 02223 – Retaining Levees contains the scope of work required for mechanically and hydraulically constructed levees. Section 02223, paragraph 1.4.3, Order of Work, required the contractor to complete a new Drop-outlet Structure, modifications to the existing Drop-outlet Structure and the mechanically constructed levees prior to beginning placement of the hydraulically constructed levee. The mechanical levees had an estimated quantity of 381,300 cy. A land-based borrow area was furnished by the government to the contractor for constructing the levees. The mechanically constructed levee was to be constructed along the south perimeter of Lost

Lake (1/4 of the perimeter) and near the drop-outlet structures. Earth fill materials were to be excavated by draglines, backhoes or other suitable equipment and transported to the mechanically constructed levee site.

Mechanically constructed levees required placement of satisfactory materials in 18-inch layers prior to compaction, except in areas having standing water or soft foundations. In areas having standing water or soft foundation conditions, borrow materials were required to be placed in a single lift (layer) as required to support the weight of the hauling and compacting equipment. Fill material used for the mechanically constructed levee was measured and paid by the cubic yard. Measurement of the earth fill materials used to construct the mechanically constructed levee was taken in Borrow Areas No. 1 and No. 2.

Except for the specified mechanically constructed levee locations, hydraulically constructed levees were to be constructed in all other locations.

For hydraulically constructed levees, satisfactory materials (medium to hard clay and sand) were to be obtained from the required dredging. Contract Specification Section 02224, paragraph 3.1.2, states,

> "Satisfactory materials used for Hydraulically Constructed Levees shall be obtained from required dredging. The Contractor shall evenly distribute sufficient hydraulic material at all locations along the levee so that the final new levee section can be constructed to the minimum lines and grades. During the shaping process, the material shall be placed using the same lift thickness and compaction requirements as those required for the Mechanically Constructed Levees. The Contractor shall excavate material from the adjacent existing levee to the limits shown. The "slope to drain" requirements shall apply to the entire placement area perimeter levee."

As quoted above, during dredging, the contractor was required to evenly distribute sufficient hydraulic fill material (a slurry of earth materials and water) at all locations along the levee. The fill material, transported in the pipeline and placed hydraulically, was to be used to build the final new levee cross section to elevation +30 feet MLT. During the shaping process, lifts were to be built under the thickness and compaction requirements of the mechanically placed levee.

Contract Section 02224, paragraph 1.3.1 Construction Plan required the contractor to plan the construction of the levees. The contractor was to phase the mechanical and hydraulic placement work and consider techniques to minimize foundation displacements.

Contract Drawing C-14 also contained thirteen Notes important to the construction of the hydraulically and mechanically constructed levees. Some of the Notes are (exclusion of a Note does not diminish its importance or applicability):

No. 2 Survey date of Lost Lake contours: April 1997, with additional surveys taken Dec. 1997 around borrow area No. 2. Dredging has occurred since the survey date. Interior elev. may differ.

No. 6 Discharge corridors to be used for hydraulic fill placement not associated with levee construction. It is the intent of the plans that hydraulically placed material not used in levee construction be discharged in approximately equal volumes within the discharge corridors. The discharge pipe shall be moved as directed by contracting officer to achieve this.

No. 7 It is the intent of the plans and specifications that the levees be raised to a minimum crest elevation of +30 feet MLT, with crest width of at least 10 feet, and side slopes no steeper than 1V:3H.

No. 9 Upon completion of the mechanically constructed levees to the lines and grades specified, the contractor must complete the remainder of the perimeter levee to the minimum template limits shown on the drawings, using hydraulically constructed levees.

No. 10 The foundation of the new levee is very soft to soft dredged material, and sand placed in past dredging maintenance cycles. It is anticipated that very soft to soft foundation material will be displaced by the new levee material.

Also of importance, is Amendment No. 1 (Vol IV, Tab 4) to the solicitation. Amendment No. 1 modified the specifications, including but not limited to, Section 02223 – Retaining Levees and the Bidding Schedule. Amendment No. 1 also provided written responses to questions submitted by prospective bidders.

2.1 – Daily Reports

The contract required, and Renda prepared, two daily reports that were submitted to the Government: the Contractor's Quality Control Report and the Inspection Report of Dredging (IRD). As the name suggests, the Inspection Report of Dredging (IRD) reported the progress of the dredging work in the ship channel. The Contractor Quality Control Report (CQCR) reported levee construction activities and occasionally commented about dredging activities. To assist in organizing the factual information and issues, these daily reports were entered into a database. The database was used as an aid in my evaluation and assessment of Renda's claims. Volume II of this report contains copies of the database: Volume II, Tabs 1 through 6 contain the Inspection Report of Dredging (IRD) data, whereas, Tabs 7 through 10 contain the Contractor Quality Control Report (CQCR) data.

The Inspection Report of Dredging (IRD) and Contractor Quality Control Report (CQCR) databases were used extensively in the preparation of this report. However, other Renda documents, such as the Report of Operations[4] was consulted often since it provided greater detail about daily dredging operations and difficulties.

Additionally, the Government prepared a Quality Assurance Report (QAR). This report has also been entered into a database for use in my evaluation. This data is reproduced in Volume II, Tab 11.

The Inspection Report of Dredging (IRD) is generally consistent with the Report of Operations and reflects the effective time the dredge was producing or pumping material through the pipeline. The non-effective time is time during the dredging operation when the dredge is operational, but no production is taking place. An example of non-effective time would be making changes to the pipeline. Lost time is generally logged when the dredge is not operational due to such things as repairs and lack of crew. Based on a

[4] Not all of the Reports of Operations have been attached to this report. However, certain reports are referred to in the report and are included.

comparison with the Report of Operations, the Inspection Report of Dredging (IRD) does not always properly distinguish between lost time and non-effective time.

The gross quantity reported on the Inspection Report of Dredging (IRD) is intended to represent the total (pay and non-pay) quantity dredged. In general, Renda reports their gross quantity as five percent more than the credited (pay) quantity. Based on a review of the after-dredging (AD) cross sections, the gross quantity is under reported on the Inspection Report of Dredging (IRD) because the non-pay quantity is more than five percent. This over-excavation will be addressed later in the report.

Additionally, the Inspection Report of Dredging (IRD) gross quantity reported is generally inconsistent with the quantities which can be computed based upon the reported advance, width of cut and depth of cut (Vol V, Tab 1). It appears that the dredge quantity within the maximum pay prism for a section or reach was pre-determined by Renda and reported based upon the amount of advance the dredge accomplished per day (Vol V, Tab 2). The quantity reported is not dependent upon productive, effective time of the dredge. However, the Inspection Report of Dredging (IRD) daily gross quantity coincides closely with the monthly payment quantities (Vol V, Tab 4). Therefore, the Inspection Report of Dredging (IRD) gross quantities generally represent the pay quantities removed from the maximum pay prism.

## 3.0 Background

Government Invitation No. DACW64-98-B-0004, for Dredging Upper Bayou, was issued for bid on June 16, 1998, with a subsequent Amendment issued on July 7, 1998.

Renda submitted its bid in response to the Invitation on July 17, 1998 and was notified by the Government that they were the apparent low bidder. However, Renda's bid was not accepted by the Government until October 26, 1998, due to a Renda unit price bid correction and a Bid Protest filed by Great Lakes Dredge & Dock Company. The project was assigned Contract No. DACW64-99-C-0001, and the contract was awarded on October 26, 1998.

The notice to proceed, issued by the Government on November 16, 1998, was received by Renda on November 19, 1998, thereby establishing the contract start date in accordance with Specification Section 00820-Specific Requirements, as follows:

> "(c) complete the work not later than 446 calendar days after the date of receipt.. of Notice to Proceed."

The original contract time, as established by the Contract, is 446 calendar days, which makes the contract completion date February 8, 2000[1].

During the course of the project, Renda received 30 Modifications from the Government, consisting of nineteen (19) Funding Modifications (either increasing or decreasing the Government-obligated Contract funding), and eleven (11) Change Orders. The Modifications which changed the contract are listed as follows:

[1] It is Renda's contention that the "As-planned" contract completion date is June 7, 2000 (566-CD), and will be addressed in Section 6.0 of this report.

| Modification No. | Effective Date | Type of Mod. | Amount | | Contract Time (CD) |
|---|---|---|---|---|---|
| P00004 (CO-1) | 3/23/1999 | Unilateral Part 1 | $250,000.00- | NTE | --- |
| P00006 (CO-2) | 6/21/1999 | Bilateral – Settles CO-1-Affolter | $436,855.87- | Add | +20 |
| P00008 (CO-3) | 8/4/1999 | Bilateral-Affolter | $364,201.03- | Add | +22 |
| P00011 (CO-4) | Unknown | Bilateral-Changes Acceptance of Levees | 0.00- | No Change | --- |
| (Government "no cost" modification to Specification Section 02223, Retaining Levees, adding paragraphs 3.3.1, 3.3.1.1 and 3.3.1.2) | | | | | |
| P00009 | 6/21/2000 | Bilateral – Time for Variations in Quantities | 0.00- | No Change | +18 |
| P00019 (CO-5) | 10/27/2000 | Unilateral Part 1- Rubble Removal | $66,000.00- | NTE | +3 |
| P00021 (CO-7) | 11/17/2000 | Unilateral – Settles CO-5 Rubble Removal | $137,000.00- | | +11 |
| P00023 (CO-8) | 3/14/2001 | Unilateral Part 1 – Flare Area | $3,083,833.00- | NTE | +56 |
| P00026 (CO-9) | 5/4/2001 | Bilateral Part 1 – Dredging Suspension | 0.00- | No Change | +60-NTE |
| P00027 (CO-10) | 5/23/2001 | Unilateral – Shifted Cross-Section of Levee | 0.00- | No Change | --- |

## 3.1 The Bid and Award

On January 26, 1998, the pre-solicitation notice (Vol IV, Tab 1) for Solicitation No. DACW64-98-B-0004, Dredging Upper Bayou, was issued by the Galveston District, U.S. Army, Corps of Engineers for the Houston-Galveston Navigation Channels, Texas (45 foot project). Also in early 1998, the principals of Renda Marine, Inc. developed a business plan to enter the maintenance dredging market[2] along the Gulf Coast. The

[2] February 1, 2001, Deposition of Eddie Fisher stated, "What I had discussed with Steve Bowman and Rudy was that I thought, with the widening and deepening of the Houston Ship Channel, that there would be a market for a dredge with a ladder pump to do maintenance dredging once Houston got to be 45 feet, because Corpus Christi was already 49 feet. Freeport was 45 feet, and Houston was a large port. And when it got deep into 45 feet, some of the conventional dredges would have a hard time providing the maintenance work at that depth." (Vol IV, Tab 2)

Dredge Millennium was an off shoot of the business plan, "that there would be a market for a dredge that could effectively provide maintenance dredging at a 45 foot depth and greater because it had a ladder pump" (Vol IV, Tab 2). On or about April 30, 1998, Renda received at least one "ball park" quote for a 24 inch hydraulic cutter dredge from Dredge Supply Company, Inc. (Vol IV, Tab 3). On July 17, 1998, the U.S. Army Corps of Engineers opened bids for the Upper Bayou Dredging solicitation. Bid results (Vol IV, Tab 5) are presented in Table 3.1.1.

Table 3.1.1

Solicitation No. DACW64-98-C-0004
Bid Results of Two Lowest Bidders

| Item No | Description | Qty | UM | Government Estimate | Renda | Great Lakes Dredge Dock Co. |
|---|---|---|---|---|---|---|
| 1 | Stripping | 1 | Job | 55,500 | 150,000 | 55,000 |
| 2 | Mechanically Constructed Levees | 381,300 | cy | 930,372 | 1,753,980 | 1,651,029 |
| 3 | Drop-outlet Structure (existing) | 1 | Job | 22,700 | 66,350 | 35,000 |
| 4 | Drop-outlet Structure (new) | 1 | Job | 229,200 | 240,000 | 150,000 |
| 5 | Seeding & Fertilizing | 1 | Job | 60,700 | 80,000 | 80,000 |
| 6 | Hydraulically Constructed Levees | 13700 | LF | 621,021 | 1,370,000 | 27,400 |
| 7 | Mobilization and Demobilization | 1 | Job | 535,000 | 800,000 | 1,250,000 |
| 8 | Dredging | 3,483,700 | cy | 10,834,307 | 7,315,700 | 11,322,025 |
| 9 | Pipelines | 1 | Job | 187,200 | 650,000 | 50,000 |
| 10 | Bond Cost | 1 | Job | 131,400 | 100,000 | 60,000 |
| Total | | | | 13,607,400 | 12,526,100 | 14,680,454 |

Although Renda had not yet procured a dredge, Renda bid the Upper Bayou Project. Renda's low bid was $12,526,100, but contained a mistake in the bid price for Item No. 6, Hydraulically Constructed Levees. Renda's unit price bid of $1.00 was a mistake and Renda was permitted to correct the mistake to the intended bid price of $100.00 per linear foot (LF). However, Mr. Eddie Fisher, Vice President of Renda Marine, Inc., recognized that the Upper Bayou Project "was a very – a difficult project, and it wasn't something that I had originally had in the business plan" (Vol IV, Tab 6).

Renda submitted bid papers and worksheets in support of its requested bid correction. Mr. Eddie Fisher "took the first stab at preparing the bid estimate for the referenced

project."[3] Eddie Fisher's original estimate (Fisher Original Estimate) was given to Steve Bowman, Vice President of Renda. Mr. Bowman provided his input into the estimate by changing line items, moving line items and deleting line items and making final adjustments to the bid. Mr. Bowman's estimate supports Renda's intended bid (Vol IV, Tab 8). By reviewing the bid sheets and affidavits, the Contracting Officer was satisfied that a mistake had been made and allowed a correction to Renda's unit price on Line Item No. 6 from $1.00 to $100.00 per LF. Additionally, a bid protest was filed by the next low bidder, Great Lakes Dredge and Dock Co. In response to the bid protest, Renda prepared a large pre-award submittal (Vol IV, Tab 13).

In the pre-award submittal dated August 3, 1998, Renda proposed to use the dredge Millennium which was under construction in New Orleans, Louisiana, and represented that it would be ready to commence work on or about January 8, 1999. Renda stated that the dredge was specially designed to work in virgin clays and coastal waters. Renda believed that the dredge which was ordered on July 31, 1998 (Vol IV, Tab 13, RM-COE-05756), would have distinct advantages at Upper Bayou. In particular, it was noted that the cutter diameter was more suited to maintaining the design slopes, avoiding the dangers of overcutting noting that the contract warned bidders to use caution in certain reaches of the channel such as the South Ferry Landing. Renda also provided tentative dredging plan which anticipated completing the hydraulic levees by using the dredged materials from Sections 1, 2, 3, 4, 5 and 6 of the channel (Vol IV, Tab 13, RM-COE-05737).

On August 21, 1998, Renda provided several clarifications to Government questions (Vol IV, Tab 15). Government was concerned that the system, among other things, did not have sufficient horsepower and discharge velocity to prevent plugging of the pipelines. Booster pumps were represented as being readily available and Renda believed the system to be powerful enough to prevent plugs from developing in the pipeline. On August 26, 1998, Renda was awarded the Upper Bayou Dredging Project.

---

3 September 18, 1998, affidavit of Steve Bowman (Vol IV, Tab 10, RM-COE-23230).

## 4.0 The Issues

In three of Renda's claims, Renda asserts that dredging production was less than anticipated. Renda attempts to support its claim for differing site conditions by use of the measured mile method in the following claims:

1. South Ferry Landing – Concrete rubble
2. Flare Area – Stiff clay
3. Section 7 Area – Heavy, red clay

In two other dredging claims, Renda seeks idle, delay and repair damages for encountering excessive trash and obstructions in the work. These claims are:

4. Obstructions No. 1, from Sta. 570+00 to 630+00
5. Obstructions No. 2, Section 9, Sta. 660+00 to 685+00

Three other claims for delays, changes and differing site conditions are asserted by Renda in connection with the Lost Lake Placement Area. They are:

6. Houston Light and Power Transmission
7. Realignment of the West Levee
8. Total Cost Claim for Hydraulic Levees

As previously mentioned, Renda made a mistake in their bid which was allowed to be corrected. Renda was permitted to correct its unit price for Bid Item No. 6, Hydraulically Constructed Levees. To support the intended bid by Renda, Mr. Bowman and Mr. Fisher, both Vice Presidents of Renda Marine and the individuals who prepared the bids, provided what Mr. Fisher characterized as, "all of the working sheets used to create the bid" (Vol IV, Tab 10, RM-COE-23229). While the bid papers were sufficient to correct the mistake and be awarded the job, the bid papers do not establish reliance on the boring logs or identify any particular anticipated type or consistency of soil material. Two of Renda's claims, the Flare Area and Section 7 Area, concern allegations of different soils being encountered from the soils anticipated at bid. Renda's work papers do not address or analyze the types of materials to be encountered in any area along the channel.

Post-bid, Renda documents carrying the date of August 1998 identify anticipated amounts of stiff clay, which is very good levee building material, being present in different areas of the channel. This document (Vol IV, Tab 16) shows stiff clay through Section 9 and is hereinafter referred to as the August 1998 Stiff Clay Spreadsheet. The August 1998 Stiff Clay Spreadsheet is dated about the same time that Renda submitted its responses to the Government's concerns about Renda's pre-award package.

Renda's Obstructions No. 1 claim and, to some extent, their Obstructions No. 2 claim, seeks adjustments for trash and debris encountered beyond what any reasonable bidder could expect. However, the amount of trash and/or debris expected by Renda cannot be found in its bid papers. Renda also seeks delay time for Houston Lighting & Power decision to construct a new transmission tower on Lost Lake Placement Area. Finally, Renda submits what it characterizes as a modified total cost claim for differing site conditions during construction of the hydraulic levees. The value of these claims totals $14,244,848.

I have evaluated each of Renda's claims and provided conclusions about the additional time and price caused by each claim.

Central to measuring the damages and evaluating cost is the equipment rate(s) component for the dredging plant or construction equipment which is affected by the change or differing site condition. These rates were also evaluated and re-computed.