Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 4.1 South Ferry Landing – Differing Site Condition

### 4.1.1. General

In January 2001, Renda submitted a certified claim for $701,753 and 18 additional days due to an alleged Differing Site Condition encountered while performing dredging activities in vicinity of the South Ferry Landing during three separate periods of April 14, April 21 through April 23, and April 30 through May 3, 2000, a total of 8 days. In addition, Renda also seeks as impact ten dredge repair days and other move-in and move-out days. On March 15, 2001, Renda revised its claim by increasing the amount to $1,049,173. The March 15, 2001 revisions to the cost proposal can be recognized by the date of March 6, 2001, in the footer and include increases to the jobsite equipment and labor and indirect overhead rates.

### 4.1.2. Work History

On August 23, 2001, Renda supplemented the March 15, 2001 revised claim by providing a supporting statement of facts and other documentation. Renda asserts that dredging production on the south side of the Houston Ship Channel in the area located approximately between Stations 470+00 and 472+00 was substantially affected by rubble consisting of large rocks or stone and debris consisting of pieces of concrete and steel which delayed completion of the work and caused damage to the dredge Millennium. Renda asserts that it encountered a differing site condition. Renda claims that the conditions it encountered near the South Ferry Landing were of an unusual physical nature which differs materially from those ordinarily encountered and generally recognized in the work of the character provided for in the contract and not discernable at bid.

Section 02482 – Dredging, paragraph 3.5, Overdepth, Side and End Slopes, subparagraph 3.5.2 Side and End Slopes requires the Contractor "... to use caution when cutting the side slopes in the Channel from Station 470+00 to Station 473+00, from Station 514+00 to Station 537+00 and from Station 610+00 to Station 625+00. Excessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel" (underscore added).

Shore protection consisting of riprap and rubble is shown on Contract Drawing C-6 for the North Lynchberg Ferry Landing and also depicts submerged stone structures and piling. The North Lynchberg Ferry Landing is outside the lower (downstream) dredging limits of the channel; however, similar structures along the side of the channel are protecting the South Lynchberg Ferry Landing which is also outside the side slope dredging limits.

As part of its claim, Renda provides a work history for the dredge while performing work in and around the South Lynchberg Ferry Landing. Renda correctly states that the dredge Millennium completed its first pass on the north side of Section 1 on the Houston Ship Channel on October 8, 1999. However, Renda then states that the dredge was relocated "to the South side of the channel at Station 470+00 (near the South Ferry Landing Area) and attempted to start dredging operations late October 8, 1999 (note 2.25 hour charged to 'Changing location of plant on job' on the Inspection Report of Dredging)". This is not consistent with the project records. Renda's internal, handwritten Report of Operations[1] that was contemporaneously completed on the dredge by the leverman does not report dredging on the south side. Rather, after north side dredging had reached Station 470+00, the dredge Millennium stopped work at 9:45 pm (2145) and was moved upstream to Station 488+50. No work occurred on October 8, 1999, on the south side near the Ferry Landing after 9:45 pm. The two hour and fifteen minute travel time accounts for movement of the dredge till midnight.

[1] The Report of Operations accounts for interruptions to the effective operation (pumping time) of the dredge in consecutive five minute increments.

Further, Renda states that on October 9, 1999, the dredge was relocated a second time to Station 488+50 "to allow the Government sufficient time to respond to the problem(s), Renda relocated the dredge (note 3.0 hours charged to 'Changing location of plant on the job' on the Daily Report..." Again, this is inconsistent with job records. A second relocation did not occur. A single continuous relocation of the dredge began at 9:45 pm on October 8, 1999[1] and was completed at 3:00 am on October 9, 1999, when dredging started at Station 488+50. Therefore, the Government could not have been verbally notified of obstructions near the South Ferry Landing on October 8, 1999, since no work was performed at that location.

Approximately six months later, after Government demands for Renda to complete sections of work, on April 7, 2000, the dredge Millennium was returned to Sections 1 and 2. Renda is correct that the dredge began work at Station 478+75 on the south side of the channel and proceeded down station toward Station 470+00.

On April 11, 2000, in a facsimile, Renda described the remaining work along the south and north sides of the channel in Section 1 and did not indicate any previous problems in the area (Vol V, Tab 6). Earlier, in a February 1, 2000, email to the Government (Vol V, Tab 7), Renda commented on the accuracy of the contract boring logs in depicting the character of the soils. These records do not support Renda's assertion that rubble at the South Ferry Landing had been encountered or verbally reported to the Government prior to April 2000.

On April 14, 2000, the dredge progressed 50 feet from station 472+00 to 471+50. Renda states that work was abandoned due to the unknown extent of the rubble (large rocks or stone) and debris (pieces of concrete and steel) being encountered and the dredge relocated due to the unknown extent of the debris. Renda cites the "1.7 hours charged to 'Changing location of plant on job' on the April 14, 2001 Daily Report" as the time used to abandon the work. Contrary to Renda assertions of encountering large rocks or stone and concrete and steel, Renda's records are silent about encountering these types of materials and do not indicate any verbal notice to the Government on April 14, 2000.

[1] The Report of Operations for October 8, 1999 and October 9, 1999 are in Vol V, Tab 5 of this report.

The reason for setting the dredge back (changing locations) to Station 492+00 is not stated. However, Renda had not yet coordinated the work around the ferry with the Lynchberg Ferry Operator[3] and continued dredging down station by Renda would have interfered with the Ferry operations. On April 20, 2000, in a facsimile (Vol V, Tab 8, REM31146), Renda's agreements with the ferry operator were reported to the Government.

For the second time, on April 21, 2000, the dredge entered the area between Sta. 472+00 and 471+50 to sweep it clean[4]. Contradicting Renda's own daily report for April 21, 2000, Renda says in its revised claim that "the dredge immediately encountered heavy debris and rubble making 50 feet of headway with no material[5] removed that day" (footnote added). The IRD and the internal Report of Operations[6] for April 21, 2000, do not report encountering concrete debris or stone rubble from Sta. 472+00 to 471+50.

On Saturday, April 22, 2000, under Remarks on the Inspection Report of Dredging (IRD) is the first mention of lost time due to rocks/riprap being encountered at or near the Lynchberg South Ferry Landing. Again on April 23, 2000, rocks and riprap are noted on the IRD between Sta. 471+80 and 471+50. These dates are Renda's third and fourth attempt to dredge the area. No photos were taken or samples collected by Renda to demonstrate the alleged differing materials or volume of materials being encountered. It is of interest to note that Renda fails to mention that excessive dredging outside the side slope was performed in this area, contrary to the warnings in Contract Section 02482. The excessive cutting will be addressed later in this report.

---

[3] According to an internal Renda Marine Daily Report (Vol V, Tab 8, REM 05648), coordination for dredging work across the South Ferry Landing was accomplished on April 19, 2000. The report states, "I talked with Henry L. Jackson Ass. Superintendent of ferries about which time of the night there was the least amount of traffic, so we could dredge across the ferries docks. He told me they would shutdown from 10:30 pm – 6:00 am both Friday, and Saturday nights, then from 10:30 pm – 3:00 am on Sunday night if we need it." (underscore added)

[4] The dredge moved 50 feet while sweeping between Sta. 472+00 and 471+50 on April 21, 2000. Other dredging on April 21, between Sta. 473+00 and 472+00 reported a quantity of 3,000 cy. (Re: IRD for April 21, 2000 at Vol V, Tab 9)

[5] When sweeping, Renda does not report a quantity of material removed.

[6] Internal Report of Operation notes sweeping from Station 472+00-471+50. (Vol V, Tab 9, REM06042)

Further, Renda's assertion that the rocks and riprap were the proximate cause of the decision to move the dredge on April 23, 2000, is contradicted by the previous April 19, 2000 agreement with the ferry operator. At 5:30 am, in accordance with its agreement with the ferry operator, on Easter Sunday, April 23, 2000, Renda stopped dredging, broke the discharge line and moved the dredge to Station 506+00 to avoid interference with the operations of the Lynchberg Ferry which started at 6:00 am. As stated earlier, this was a planned relocation coordinated with the ferry operator which was required by the contract.

On April 25, 2000, internal Renda Daily Report (Vol V, Tab 10, REM05644) notes that the Corps of Engineers was verbally notified about trash at the South Ferry Landing and that a submerged discharge pipeline would be used. It is also reported that Renda worked 12 hours on the submerged line and "would attack the material at the Ferry from the downstream side next time". Use of a submerged discharge line instead of a floating line downstream of the South Ferry Landing would permit continuous operation of the Ferry while dredging operations were being accomplished.

During the period between 11:00 am on April 23 and April 29, 2000, Renda continued sweeping operations upstream away from the North and South Ferry Landings. The locations are:

Table 4.1.1
Sweeping Work Re: Renda Report of Operations (Vol V, Tab 11)

| | From Sta. | To Sta. | Advance (ft) |
|---|---|---|---|
| April 23, 2000 | 506+00 | 510+00 | 400 |
| April 24, 2000 | 513+00 | 524+00 | 1100 |
| April 25, 2000 | 524+00 | 521+00 | 300 |
| April 26, 2000 | 484+80 | 482+50 | 170 |
| April 27, 2000 | down pump engine & main generator water pumps. | | |
| April 28, 2000 | 482+50 | 480+50 | 350 |
| April 29, 2000 | 477+00 | 473+00 | 400 |

In its claim, Renda complains that the sweeping work was not contractually necessary and only served to "test" run the dredge following repairs caused by the rubble encountered. However, no quantity was reported being moved during this period because sweeping was being accomplished. Sweeping is rework necessitated by failing to remove

all the material within the dredge prism when the area was previously dredged. During this period of time, Renda was performing necessary cleaning of the channel and side slopes for acceptance of sections of work as indicated in the April 11, 2000 facsimiles (Vol V, Tab 6) and the Internal Daily Reports (Vol V, Tab 12).

Renda fails to identify the damage caused or the repairs necessitated by encountering rubble or debris near the South Ferry Landing. Table 4.1.2 provides a summary of the repair time reported during the sweeping period from April 23, 2000 to April 30, 2000. Renda does not discuss the individual repairs nor explain how rubble caused the repairs actually performed. The longest period of downtime for pump engine repairs was on April 25, 26 and 27, due to the engine heads having cracks and leaking (Vol V, Tab 12, REM05641 and Vol V, Tab 13).

Table 4.1.2
Comparison of Repair Time
during Renda Impact Period of April 23, 2000 to April 30, 2000.

| Renda Marine Table 1 Data | | | | Renda Marine Report of Operations Data | | | | |
|---|---|---|---|---|---|---|---|---|
| Date (2000) | Station Location(s) | "Pumping Time" (hours) | "Minor Operating Repairs" Time (hrs) | "Pumping Time" (hours) | Repair Time (hours) | Explanation of Repair | Other Non-pumping (hours) | Non-pumping Explanation |
| April 23 | 506+00 to 510+00 | -- | -- | 6.91 | 1.42 | Spud friction (1.42 hrs) | 5.67 | Pass ships (0.25); Pump trash (0.25); add submerged pipeline (5.17) |
| April 24 | 513+00 to 524+00 | 6.9 | 1.75 | 6.91 | 1.75 | Engine Room – fix water – illegible - | 15.33 | Trash (0.83); Anchors (0.08); Swing wire (2.0); Submerged Pipe (12.0); Pass ships (0.42) |
| April 25 | 524+00 to 521+00 | 4.2 | 12.4 | 4.17 | 12 | Engine Room – Booster Engine (12) | 7.84 | Anchors (0.42); Spud pin (0.17); Ships (0.08); Move dredge(6.0);Add pipeline (1.17) |
| April 26 | 484+80 to 482+50 | 10.5 | 10.75 | 10.5 | 10.75 | Booster Engine (Seven times for 10.75 hrs) | 2.74 | Trash Cutter (1.0); Ships (0.83); Anchors (0.58); Trash pump (0.33) |
| April 27 | 482+50 | 0 | 24 | 0 | 24 | Booster EMD (Engine) (Two times for 11.3 hrs); Main Generator Water Pump (12.7) | | |
| April 28 | 482+50 to 480+50 | 8.75 | 10.6 | 8.75 | 10.58 | Engine Room – Engine (Three times for 10.58 hrs) | 4.67 | Ships (1.17); Move dredge (3.5) |
| April 29 | 477+00 to 473+50 | 12.2 | 8.4 | 12.2 | 7.8 | Swing Sheeve (5.67: Spud Friction (1.17) | 3.99 | Ships (1.0); Move dredge (1.5); Suction trash (0.33); Pump trash (0.33); Pump leak (0.58); Pump |
| April 30 | 473+50 to 470+80 | 16.25 | 2.7 | 16.25 | 4.25 | Spud Friction (1.08 hrs); Swing Cable (1.67 hrs); Water pump (1.5 hrs) | 3.5 | Tows (2.0); Ships (0.92); Dump (0.25); Anchor (0.33) |

Following the sweeping period, Renda claims that the dredge Millennium "again began dredging near the South Ferry Landing Area on May 1, 2000... only 50-feet of headway was made and no material was removed." This is not accurate. The dredging which was performed on April 30, 2000 and May 1, 2000, between Station 472+00 and 470+00, was sweeping on the north side of the channel; not the south. Generally, no material is reported being removed while sweeping. On April 11, 2000, Renda advised the Government that material remained to be cleaned (swept) on the north side of Section 1. On April 11, 2000, the Government agreed by email and told Renda to sweep the north side of Sections 1 to 3 (Vol V, Tab 6, REM35012). On April 25, 2000, the IRD (Vol V, Tab 14), reports the dredge being moved to the north side of the channel and proceeded to sweep the north side in a down station direction until May 1, when the dredge reached Sta. 470+00. This is the only time period when north side sweeping work could have been performed. Cross sections at Sta. 470+00, taken on April 28, 2000 (Vol V, Tab 15, REM04105), show material remaining above the required lines and grades on the north side of the channel. The cross section taken at Sta. 470+00 on May 8, 2000, shows the north side material removed from the channel (Vol V, Tab 15). Likewise, cross sections taken for Sta. 472+00 (Vol V, Tab 16) show the north side material removed during this same time period of April 28 and May 8, 2000. Renda fails to account for any north side work and improperly includes the time for the north side sweeping in its claim for the south side.

At 3:45 pm, on May 1, 2000, after completing operations on the north side, the dredge was moved to the south side of the channel. The internal Report of Operations documents the movement from 3:45 pm to 11 pm (Vol V, Tab 11, REM 06032). At 1:00 am on May 2, 2000, the dredge Millennium began as previously stated by Renda to "attack the material at the ferry from the downstream side". On May 2 and 3, 2000, the dredging of the south side of the channel near the South Ferry Landing proceeds as predicted on April 25, 2000, in an upstream direction. Contrary to Renda's claim narrative about "the extensive amount of rubble/debris present" during May 2 and 3, the Report of Operations (Vol V, Tab 11), Inspection Report of Dredging (IRD), and Internal Renda Marine Daily Report (Vol V, Tab 12, REM05634) are silent about encountering

rubble. The IRD reports trash and several pump/cutter clears, but do not indicate rubble was encountered.

Following completion of the dredging work at the South Ferry Landing at 3:35 am on May 4, 2000, the dredge Millennium began to move out of the South Ferry Landing Area to begin sweeping at Sta. 476+00. As part of the delay and impact, Renda claims that while performing sweeping operations, on May 13, 2000, the dredge Millennium began to experience operational problems and was down 17.7 hours for repairs. On May 14, Renda states that the dredge was completely down due to problems with the cutterhead and pump shell. Renda claims that the repair work associated with the rubble at the South Ferry Landing was completed on May 17, 2000, but other repairs which prevented operation of the dredge continued through May 18, 2000. Other documents, such as the Report of Operations are missing for these dates.

As part of its damages, Renda seeks the move-out on May 4, 2000, a contractual move, and the repair days of May 14 through May 17, 2000. Renda also seeks reimbursement for repairs to the pump impeller and shell.

### 4.1.3 South Ferry Landing – Technical Evaluation

At the South Ferry Landing, Renda asserts that its monetary damages consist of reduced production while working in the vicinity of the alleged differing site condition on the south side of the channel from Sta. 470+00 to Sta. 472+00 and delay (movement and repair) time caused by the alleged differing site condition.

Renda applies a measured mile analysis to quantify the damages for the loss of production as a result of encountering unanticipated concrete rubble and/or riprap. The measured mile analysis is generally recognized as the best available method for comparing the contractor's productivity (efficiency) on the work that was affected by a differing site condition or change with productivity actually achieved on similar work that was not affected. The approximations involved in the comparison do not need to be

exact, but the underlying assumptions and facts about the work and production must be accurately identified.

The threshold issue at the South Ferry Landing is whether Renda encountered concrete rubble and/or riprap within the required lines and grades to be dredged? There is no evidence to support that it did.

The dredge Millennium was equipped with GPS for locating the dredge, computerized instruments[7] to visualize the dredging process as it happened and independent winch control for raising the ladder and controlling the swing. With this technology and data, Renda should have been able to trim the required slopes to grade and report coordinates of any piling or riprap encountered. No electronic data has been provided from the dredge instruments or computer based systems.

Contract Drawing C-14, in the lower center of the page, shows the close proximity of the new alignment of the Houston Ship Channel to the shoreline of the South Ferry Landing. The centerline of the channel is depicted with station marks. The parallel dashed lines on each side of the centerline represent the bottom width of the required channel at the toe of the slope. At Sta. 472+00, the horizontal distance between the channel's south toe of the slope at elevation -47 feet MLT and the shoreline (assuming elevation 0 feet MLT) at the South Ferry Landing is approximately 200 feet. However, the cross section for Sta. 472+00 shows the top of the 1 vertical to 3 horizontal (1V to 3H) channel side slope on the south side to terminate at -25 feet MLT. This means that the horizontal distance between the shoreline and the top of the new channel side slope on the south side near the South Ferry Landing is only 134 feet.

Further, the cross section for Sta. 472+00 on Contract Drawing C-13 shows existing ground extending upward on a straight line outside the limits of the work on the south side of the channel from approximate elevation -21 feet MLT to -14 feet MLT. Because it is a straight line, it appears to be a "man-made" slope. If the man-made slope line is projected to elevation 0 MLT, that point measures approximately 200 feet from the

[7] The dredge operations computer software manual is located at Volume V, Tab 17.

channel bottom toe of the slope; the same point as the shoreline depicted on the Contract Drawing C-14.

If the man-made slope is on a 1V to 3H slope and extends from elevation 0 MLT at the shoreline down to elevation -21 MLT, the horizontal distance from the slope toe from the south shoreline is 63 feet. Sixty-three feet deducted from the distance from the shoreline to the top of the channel side slope (134 ft) is 71 feet. Therefore, the contract represents that at Sta. 472+00 Renda had only 71 feet between the toe of the shoreline slope and the top of the channel side slope, about the length of the dredge ladder. The foundation dimensions of the erosion/wave protection are unknown which would reduce the clearance between the shore protection and top of slope.

Further, the docking facilities for the South Ferry Landing extend out into the water from the shoreline. This facility has a chute for docking the ferry constructed out of wood piling driven vertically and on a batter (angle). In the immediate ferry chute area of Sta. 472+00 to 471+50, Renda had less than 71 feet of clearance between the top of the channel slope and the docking facilities. This clearance assumes that Renda did not cut or dredge beyond the required side slope or bottom.

Since the South Ferry Landing facilities were so close to the required side slope on the south side of the channel, it would have been reasonable to locate all the structures prior to dredging the area. Further, when concrete rubble, riprap and/or piling were struck on April 22, 2000, and the contract warned of existing structures in the area, Renda should have discontinued dredging at that location. Instead, on April 23, 2000 Renda strikes the structure(s) again. It is only on April 22 and 23, 2000, that Renda reports encountering concrete debris, the third and fourth time for the dredge to work between Sta. 472+00 and 471+50, the closest alignment of the channel to the South Ferry Landing.

The contract drawings detail other erosion control structures such as the concrete rubble and/or riprap at the North Ferry Landing. Further, although not within Upper Bayou Dredging limits, the Lost Lake Placement Area Drop Outlet Structure also indicates existing riprap structures below the water surface. Other types of shore protection also



Figure 4.1.1 – Photo taken November 12, 2003 from South Ferry Landing looking southwest at the upstream shoreline. Note concrete rubble used as shore protection.



Figure 4.1.2 – Photo taken November 12, 2003 from the south top of bank at approximately Station 470+00 looking up stream along shoreline. Note broken concrete used as shore protection. The South Ferry Landing docking facilities are shown in the upper right corner.

line the ship channel from sheetpile walls, rock filled wire basket gabions, concrete slope paving and riprap. As shown in Figure 4.1.1 and Figure 4.1.2, a pre-bid site visit would have revealed existing concrete rubble shore protection at the South Lynchberg Ferry Landing site[8].

Contrary to the express warning in the contract, dredging outside the south side slope line and grade was performed by Renda from Sta. 470+00 to 472+00. At Sta. 472+00, at least 30 feet of excessive dredging occurred where Renda claims the dredge encountered rubble and piling. This distance reduces the possible clearance and places the dredging on top of the South Ferry Landing facilities. The plotted after-dredging (AD) cross sections show the non-pay dredging performed outside the required slope line and grade on the south side of the channel (Vol V, Tab 15, REM03566 and Vol V, Tab 16, REM03567.

4.1.3.1 Renda's Productivity Loss Period

While in the vicinity of the South Ferry Landing, Renda claims that its productivity was reduced due to the unanticipated rubble encountered on eight days (April 14, 21, 22, 23, 30 and May 1, 2 & 3). Based on a review of the records, Renda's productivity loss is based on inaccurate data at the South Ferry Landing. Renda relied solely on the Inspection Report of Dredging (IRD). Renda disregards information contained in other reports. Renda overstates the hours spent dredging the South Ferry Landing. Renda incorrectly identified 82.6 pumping hours in its claim. This error increases the claimed costs when compared with a measured mile or baseline. The effective or pumping time Renda spent in the claimed area is summarized in Table 4.1.3. As shown in Table 4.1.3, only 46.4 hours were actually spent in dredging operations at the South Ferry Landing.

---

[8] Concrete rubble protects the shoreline near the South Ferry Landing. November 12, 2003, discussions with the Ferry pilot James Borgue, and Superintendent David Starett, both of whom have been with the Lynchberg Ferry operations for 20 years, stated that the concrete rubble shore protection was placed there before they began working at the ferry. Mr. Borgue remembers Renda dredging inside the ferry chute.

Table 4.1.3

Supported Pumping Hours at South Ferry Landing

| Renda Impacted Dredging Dates | Renda Claim Data (Impacted Period) — Dredging Location From Station | Dredging Location To Station | Daily Dredged Amount (c.y.) | Pumping Time (hours) | Daily Advance (feet) | Inspection Report of Dredging Data — Dredging Location From Station | Dredging Location To Station | IRD Quantity in Impact Area (c.y.) | Quantity Outside Impact Area (c.y.) | Advance (feet) | Supported Pumping Time Inside Claimed Area | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14-Apr-2000 | 472.00 | 471.50 | 2,400 | 7 | 50 | 472.00 | 471.50 | 2400 | | 50 | 7.00 | Pumping time from Report of Operations |
| | | | | | | | | | | | | |
| 21-Apr-2000 | | | | | | 473.00 | 472.00 | | 3000 | 100 | | 10.60 hrs pumping outside limits of Claim Area |
| 21-Apr-2000 | 472.00 | 471.50 | - | 3.2 | 50 | 472.00 | 471.50 | 0 | | 50 | 5.28 | Pumping time porportioned based on advance |
| **22-Apr-2000** | **472.00** | **471.80** | **400** | **10.7** | **20** | **472.00** | **471.80** | **400** | | **20** | **4.58** | Pumping time from Report of Operations |
| 22-Apr-2000 | | | | | | 481.00 | 488.00 | | 0 | 700 | | |
| **23-Apr-2000** | **471.80** | **471.50** | **750** | **9** | **30** | **471.80** | **471.50** | **750** | | **30** | **1.75** | Pumping time from Report of Operations |
| 23-Apr-2000 | | | | | | 506.00 | 510.00 | | 0 | 400 | | |
| | | | | | | | | | | | | |
| 30-Apr-2000 | 470.80 | 473.50 | - | 16.25 | 270 | 473.50 | 472.00 | | 0 | 150 | 0 | Sweeping North Side in downstream direction |
| 30-Apr-2000 | | | | | | 472.00 | 470.80 | | 0 | 120 | 0 | |
| 1-May-2000 | 470.00 | 470.50 | - | 10 | 50 | 470.50 | 470.00 | | 0 | 50 | 0 | Sweeping North Side (moved at 11:00 pm to south) |
| 2-May-2000 | 470.00 | 470.50 | 2,350 | 11.75 | 50 | 470.00 | 470.50 | 2350 | | 50 | 11.75 | Dredging began at 1:00 am from Report of Operations |
| 3-May-2000 | 470.50 | 471.50 | 4,800 | 14.7 | 100 | 470.50 | 471.50 | 4800 | | 100 | 14.67 | |
| 4-May-2000 | | | | | | | | | | 1 | 1.33 | Report of Operation has work continue till 5:10 am |
| Totals | | | 10,700 | 82.6 | | | | 10,700 | | | 46.36 | |

**Bold Data indicates when rubble or stone reported on IRD**

Average number of pumping hours per day 7.73

With the adjusted pumping hours (46.4) and the gross quantity reported on the IRD (10,700 cy), the actual hourly production rate experienced at the South Ferry Landing is 231 cy per hour; not the 130 cy per hour used in Renda's claim.

4.1.3.2 Renda's Measured Mile – Production Days

Unlike the claimed loss productivity area of 470+00 to 472+00, where Renda excavated all material within the channel down to required line and grade, Renda selected a measured mile that did not include complete removal of the material from the side slope and bottom. Renda's measured mile also includes work in Section 2 which had shorter discharge pipeline lengths.

Figure 4.1.3 in Volume V, Tab 19, graphically shows Renda's measured mile versus the claim area. Renda uses a measured mile (represented in yellow on the graph) that does not consider cutting to grade. Each horizontal bar in Figure 4.1.3 shows the dredging location reported on the Inspection Report of Dredging (IRD). It is noted that Renda only used high production days on the south side in Section 1 and 2 instead of all production days for removal of the soil material down to grade. Additionally, Renda's measured mile primarily includes the removal of only 30 percent clay material (Vol V, Tab 20). The South Ferry Landing claim area contains approximately 50 percent clay soil materials (Vol V, Tab 21).

4.1.3.3 New Measured Mile

Because of the differences between Renda's baseline or measured mile and the claim area, a new measured mile area on the south side of the channel from Sta. 478+00 to Sta. 472+00 was investigated and includes all dredging time and quantities within the same area (see dimpled area on Figure 4.1.3 in Vol V, Tab 19). Part of the new measured mile overlaps and uses a portion of Renda's selected period of time. Results of this investigation find that Sta. 478+00 to 472+00 is a good measured mile because of the similarities in the work. They are:

- Clay content is similar (49 percent) to claim area (Vol V, Tab 22)
- Side slope and channel bottom cut to grade (similar digging depths)
- Discharge line lengths similar

This new measured mile results in consistent, more direct comparison[9] for evaluation of the disruption, if any, in the operating time needed to perform the work near the South Ferry Landing.

The pumping time used in the new measured mile to remove the quantity between Sta. 472+00 and Sta. 478+00 includes all effective time spent in the area. This time is summarized on Table 4.2.3. Table 4.2.3 shows that 121.8 pumping hours were required to remove 42,900 cy of material. This measured mile results in a production rate outside the influence of the South Ferry Landing of 352.2 or 352 cy per hour.

Table 4.2.3
Franvel Corp
Measured Mile for South Ferry Landing
Re: Inspection Report of Dredging

| Date | Station From | Station To | Advance | Effective Hours | Gross Cy | Comments about IRD/allocation |
|---|---|---|---|---|---|---|
| 4-8-00 | 478+25 | 477+20 | 105 | 13.83 | 5040 | |
| 4-9-00 | 477+70 | 476+90 | 80 | 6.08 | 3840 | |
| 4-10-00 | 476+90 | 475+80 | 110 | 13.92 | 5280 | |
| 4-11-00 | 475+80 | 474+60 | 120 | 13.25 | 5760 | |
| 4-12-00 | 474+60 | 473+20 | 140 | 14.75 | 6720 | |
| 4-13-00 | 473+20 | 472+00 | 120 | 9.42 | 5760 | |
| 4-19-00 | 478+00 | 475+50 | 250 | 15.5 | 3750 | |
| 4-20-00 | 475+50 | 473+00 | 250 | 16.08 | 3750 | |
| 4-21-00 | 473+00 | 472+00 | 100 | 10.55 | 3000 | Two locations hours split based on Advance |
| 5-4-00 | 476+00 | 476+20 | 20 | 1.42 | 0 | |
| 5-5-00 | 476+50 | 478+00 | | 7.04 | 0 | Two locations hours split based on Advance |
| Totals for Area | | | | 121.8 | 42,900 | |
| Production in New Measured Mile Area | | | | 352 | | |

Accurate summaries of the production time and quantities in the alleged impact area and new measured mile areas do identify a slow down in the work while performing dredging at the South Ferry Landing on 6 days; not the claimed 8 days. The loss of productivity is identified as 34.4 percent [(1-231/352)x100]. Renda expended 46.4 pumping hours in the

[9] Differences still exist, such as more night-time operation at the South Ferry Landing.

South Ferry Landing. The additional amount of operating time Renda expended due to the difference in production is 15.96 hours (46.4 hours times 34.4 percent).

4.1.3.4 Renda Requested Impact Days

In addition to the productivity loss requested, Renda asserts entitlement to delay days for additional move-in and move-out and repair days. If Renda is not entitled to an adjustment for a loss in productivity, then Renda is not entitled to any of the eleven requested impact days which are alleged to flow directly from encountering rubble at the South Ferry Landing. However, if Renda is entitled to additional time for allowable repairs, only the actual lost time should be paid at the standby rate. Any operating time should be deducted and the price and time adjusted accordingly.

As previously discussed, Renda seeks full reimbursement for April 24, 25, 26, 27, 28 and 29. Renda was performing required work, sweeping of the areas, during this time period and repairs performed amounted to 80.35 hours or about 56 percent of the total available time. As detailed in Table 4.1.2, repair time (25.2 hours) to the swing sheave, spuds and main generator water pump are not contact items that could be damaged by rubble and are unrelated to a differing site condition at the South Ferry Landing. Further, Renda had problems with the main pump engine becoming overheated. Two of the main pump engine's heads had cracked and other heads were leaking. These engine repairs are not related to rubble at the South Ferry Landing. Because the dredge was performing contract required sweeping and the repairs are unrelated to alleged rubble damage at the South Ferry Landing, no allowance for this period is considered in my evaluation.

Renda also seeks move-out time on the May 4, 2000, which would be the contractual move-out after completing the dredging. As addressed elsewhere, coordination with the Lynchberg Ferry operators required several move-ins/outs and additional time is unwarranted and unsupported. Further, other contract work was performed on May 4, which would reduce the request, if valid.

Ten days after leaving the South Ferry Landing and two hundred and thirty-three days after starting dredging, Renda claims that the rubble encountered at the South Ferry Landing caused extensive repairs to the dredge cutterhead, pump impeller and shell which were performed on May 14, 15, 16 and 17, 2000. May 17, 2000[10], should be excluded from the repair period because on-going repairs to the spud winch prevented operation, not the impeller and pump. In the claim, invoices which Renda used to support the cost of the work are dated months after the repairs were made (outside the claim periods). For instance, the pump shell which was charged to the South Ferry Landing has an order date of May 30, 2000 and a ship date of September 1, 2000. No support is provided for the cost of the repair parts that were installed during the May 14 through 16 period.

By claiming that the South Ferry Landing damaged the cutter teeth, pump impeller and shell, Renda implies that this repair work was unexpected and occurred prematurely. No supporting or historical data was submitted to support this assertion. These parts are wear items on the dredge. Periodically, the pump impeller and shell will require rebuilding or replacing. Cutter teeth will require changing and rebuilding due to wear and may be changed due to dredging conditions.

The cutter teeth on the dredge were reported as being changed on October 8, 1999. The Report of Operations (Vol V, Tab 5) for that date indicates that the teeth were changed in two hours. Additionally, Renda used the dredge Millennium to accomplish work prior to performing the Upper Bayou Project. On at least one of those projects, sand (a very abrasive material for pumps, liners, impellers and pipelines) was the primary material hydraulically excavated and transported by the dredge. The wear from these operations must be considered when replacing the pump shell, liners, wear ring, etc.

Further, Renda management decisions when procuring the dredge contributed to the need to replace the pump shell sooner than expected. When the pump shell was made by

[10] Repairs for which Renda claims entitlement were complete on May 16, 2000. The Inspection Report of Dredging for May 16, 2000 states, "New pump in (sic) now finished on the dredge. Cutter teeth are now installed on the dredge. Work is in progress on the spud winch drum." (underscore added).

Mobile Pulley and Machine Works (Mobile Pulley), Renda declined to have a hard surface (HS) overlay applied to the interior shell prior to being used (Vol V, Tab 23). When Renda had the pump shell rebuilt[11], the hardening process was applied. If entitled to the pump shell repair, this betterment should be credited to the Government.

Finally, with respect to the claimed unanticipated repairs performed in the May 14 to 16 period, Renda solicited quotes for these precise repairs prior to March 22, 2000, approximately one month before excavating the South Ferry Landing (Vol V, Tab 25). Because of the pre-planning for the repairs in March 2000, the alleged differing site condition is not the proximate cause of the repairs.

Further, the equipment rates used by Renda and specified in the contract have a component for repair parts. An allowance for specific repairs in May 2000 would result in a double recovery of cost.

Renda itself notes that other repairs were performed during the May 14 through 18 period. Repairs to the spuds and spud winch drums are concurrent delays which would prevent operation of the dredge. A concurrent delay would result in time, but no price adjustment. For the reasons stated above, no delay time is warranted for the May impact periods.

Should merit be found for any of the repair days to the dredge during the two delay periods, then the daily standby rate of $10,532 which is computed at Vol V, Tab 26, should be used.

[11] May 26, 2000, quote from Mobile Pulley for Pump Shell, 24"A4891 ACS – 3 hs states, "With two passes of hard rod in the inside wear area of the shell" for a price of $43,136. May 30, 2000, order date and invoice included in Renda's claim shows a price of $43,136 for a "Pump Shell, 24" A4891 ACS3 w/HS (Vol V, Tab 24).

4.1.4 Technical Results

On April 22 and 23, 2000, concrete rubble and wood pilings were struck by Renda while dredging between Sta. 471+50 and 472+00. However, a differing site condition at the South Ferry Landing did not occur during the dredging process.

At this location, concrete rubble, riprap and wood pilings should have been expected to be encountered at the structures, ferry dock and shore protection, if dredging outside the required slopes. April 22 and 23, 2000 were Renda's third and fourth day to dredge in the area. The contract specifically warned about encountering structures if cutting or dredging outside the required side slopes. The dredge did cut outside the required side slopes.

Contract Section 800, Special Clauses, paragraph 6, Layout of the Work, requires Renda to lay-out its work and be responsible for all measurements in connection with the layout. Further, paragraph 6 states, in part, "The Contractor shall be responsible for excavating the work to the lines and grades that may be established or indicated by the Contracting Officer." Clearly, dredging beyond the south side slope occurred, structure materials were encountered and Renda is responsible for being outside the dredging limits.

A site visit to the project site prior to bidding by Renda is undocumented. However, if one occurred, the shore protection constructed of broken concrete with imbedded reinforcing steel and angle irons and the ferry dock constructed out of wood piling would have been visible. The close proximity of these facilities to the top of the channel side slopes should have been a warning to Renda to trim the slopes carefully or to locate the structures prior to starting work in the area.