4.1.5 Cost and Time Evaluation

As indicated, a loss of production of 34.4 percent did occur at the South Ferry Landing. Renda claims that the Government is responsible for the inefficiency due to the presence of a differing site condition. A detailed evaluation of the additional cost and time claimed has been performed.

As identified herein, Renda worked 46.4 productive hours performing the dredging at the South Ferry Landing between Sta. 470+00 and 472+00. Therefore, with the actual loss of efficiency factor, Renda performed 15.96 or 16 hours of added work.

An adjustment in price based upon a loss of productivity or overrun of pumping time of 16 hours is calculated.

4.1.5.1 Results of Cost Evaluation

Renda's Claimed Cost and Results of Technical Evaluation

| | Renda Claim | Supported Cost | Note |
|---|---|---|---|
| Direct Costs | | | |
| Additional Labor ($8,053) and Equipment (12,894) | $650,880 | $20,947 | A |
| Equipment Repair Cost | 61,075 | 0 | B |
| Job Site Field Cost | 31,318 | 2,542 | C |
| Total Direct Cost | $743,273 | $23,489 | |
| Overhead: | | | |
| Resident Home Office (4.55%) | 118,032 | 1,069 | D |
| Corporate Office (2.83%) | 49,056 | 665 | D |
| Total Indirect & Direct Cost | $910,361 | $25,223 | |
| Profit (7.15%) | 91,036 | 1,803 | E |
| Bond (0.65%) | 6,509 | 176 | F |
| Total Adjustment | $1,007,906 | $27,202 | |
| Miscellaneous Cost | | | G |
| Professional Fees/Consultant | 40,000 | 0 | |
| Report Preparation Cost | 1,000 | 0 | |
| Bond on Miscellaneous (0.65%) | 267 | 0 | |
| Total Amount | $1,049,173 | $27,202 | |

Explanatory Notes:

A) The additional labor and equipment proposed by Renda include the levee personnel and dredging personnel. As noted in Renda's pre-award submittal (Vol IV, Tab 13, RM-COE-05737), dredging work was anticipated to take 269 days and was continuous from the start of work until complete. The hydraulic levee shaping work was anticipated to take only 172 days and could be performed when the dredge was not actively pumping material. Therefore, the hydraulic levee shaping work is not the controlling activity and is separate from the dredge operation. No allowance is made for levee equipment or personnel performing the shaping operation, which includes hauling equipment.

Renda proposed 19 days of actual cost (8 operating and 11 impacted days) and subtracted 1.75 days of estimated cost from an earlier time period. The actual cost of the disruption is calculated from the six days where production was reduced. No additional time or cost is considered for the impact periods for reasons stated previously.

> 1) Labor – Renda allocates 100 percent of the direct labor cost for April 14, April 21 thru May 4, and May 14 thru May 17, 2000 to the differing site condition encountered at the South Ferry Landing. Only six days have been identified as being disrupted by the loss of production at the South Ferry Landing Area. Volume V, Tab 27 has the labor calculations for the disruption period.
>
> 2) Equipment – Volume V, Tab 28 contains the equipment cost calculation for the loss of production at the South Ferry Landing. The equipment rates used by Renda did not reflect the rates permitted by the Contract. Further discussion about equipment rates can be found in Section 5 of this report.

B) Specific Equipment Repair Parts –No allowance has been made for specific repair parts. Among the numerous reasons cited above, the repair cost factor in the equipment rates compensates for major and minor repairs and maintenance. For the repairs claimed in May, Renda had planned for them prior to performing the South Ferry Landing work.

C) Jobsite Field Costs - This cost component includes cost incurred in the field and generally is for miscellaneous expenses such as freight, communications, and the like. However, many of the elements for supplies included in the monthly field costs appear to be equipment fuel, parts and/or repairs[12] which should be eliminated since the Corps Manual includes an allowance for equipment repairs in the rates. Without the specific invoice, the items in question cannot be confirmed. Therefore, the monthly field cost as presented by Renda is used to calculate a daily rate of $1,815.53 and is considered acceptable at this time. The daily rate is multiplied by the 1.4 days of actual delay.

D) Resident Home Office and Corporate Office Overheads - The DCAA audit (Vol V, Tab 29) found that, for the year 2000, the overhead rates were 16.14 percent for Resident Home Office and 6.60 percent for Corporate Office. However, the audit notes that the Resident Home Office rate and the Corporate Office rate is comprised of two components, office and shop rates. I question the shop rate component of the overhead rates since the Corps Manual, which Renda was required to use, allows for shop expenses in the equipment rate. Only the DCAA-verified overhead office rates[13] for Resident Home Office (4.55%) and Corporate Office (2.83%) are used in this price evaluation. The shop component of the rate is omitted since it is a duplication of cost. The Corps Manual states that an allowance has been made for "Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead."

E) Profit is calculated by using the weighted guidelines method and is 7.15%. Development of the profit rate is in Volume V, Tab 30.

F) Bond is verified by the DCAA audit of the South Ferry Claim.

---

[12] For example, April 2000 Monthly Vendor Cost for Southwest Wire Rope at $5,953.77, Metal Supply at $9,727.63, Exxon at $1,987.87 and ABB Automation at $5,850.00.

[13] The office overhead rates are included in Volume V, Tab 29 behind the audit.

G) The miscellaneous costs were questioned in their entirety by the DCAA audit. No allowance has been made for these cost items.

4.1.5.2 – Time Evaluation

The slowdown in the work at the South Ferry Landing required 1.4 days to actually perform. Since the performance time is greater than 1, the time has been rounded up to the next whole day. Therefore, the time extension associated with the slowdown is two calendar days.

4.1.5.3 – Over-Excavation Beyond Required/Allowable Pay Prism – Non-Pay Yardage

Renda excavated outside the maximum pay prism in the area of the South Ferry Landing and in my new measured mile area. Therefore, a portion of the productive time expended in each area was wasted while performing non-pay work. The amount of over-excavation (non-pay yardage) in Renda's impacted area from Sta. 470+00 to 472+00 is 15,397 cy or an additional 77 cy/ft of channel length (Vol V, Tab 31). In the measured mile area from Sta. 472+00 to 478+00, the amount of non-pay yardage is 96 cy/ft of channel length. Because the amount of over excavation in the claim area is less than in the measured mile area, the cost and time evaluation above for the South Ferry Landing understates the adjustment by 25 percent to which Renda is entitled, if found that Renda did encounter a differing site condition.

Therefore, Renda's cost and time should be adjusted to account for this non-pay work. The cost increase Renda incurred at the South Ferry Landing is $34,003 ($27,202 times 1.25). The time extension remains at 2 calendar days because 1.4 actual days of delay times 1.25 percent is 1.75 and the time extension has been rounded to 2 calendar days.

4.1.6 Conclusion

My evaluation has identified a slow down in the work at the South Ferry Landing. The maximum damages measured by this slow down are $34,003 and required two calendar days to perform. However, no differing site condition was encountered at the South Ferry Landing. The concrete rubble/rip rap and the wood piling were encountered by Renda dredging beyond the required side slopes and bottom.

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 4.2 Houston Lighting and Power (HL&P) Transmission Tower Delay

### 4.2.1 General

On May 16, 2001, Renda submitted its revised claim in the amount of $170,863 for the suspension of dredging work caused by the construction of a new transmission tower by others at Lost Lake Placement Area. Renda claims interruptions during two periods, July 16 and 17, 2000, and October 16, 17, and 18, 2000. Included with its revised claim, Renda provided updates on the damages summary and analyses of labor and equipment.

After contract award to Renda, Houston Lighting and Power Company (HL&P) received permission from the Government to relocate a transmission tower within the existing easements on Lost Lake Placement Area. HL&P's work on Lost Lake interfered with the location of Renda's discharge pipeline. HL&P was to complete its work no later than December 31, 2002 (Vol V, Tab 35). HL&P performed its work in 2000 which conflicted with Renda's construction activities.

### 4.2.2 HL&P Claim Period One – July 16 and 17, 2000

Renda's cover letter for the HL&P transmission tower claim states that work was affected on two days, July 16 and 17, 2000. However, the labor charged to the delay is only for July 16, 2000, and allocated as "50% of Gross Payroll (less Levee Payroll) to Claim". Renda states that July 17, 2000, is "Claimed in Flare Area".

July 16, 2000, is claimed by Renda for 50 percent of the day. The basis for allocating 50 percent of the day is unknown[1]. On July 16, 2000, the Inspection Report of Dredging (IRD) states that Renda was performing contract work on that day and had 8 hours and 45

[1] The Report of Operations for that day is missing which would present a precise accounting of the time.

minutes of effective operating time "sweeping bad stations on the north side of the channel". There is no documentation to allocate the remaining hours to the HL&P tower delay.

However, based upon historical data for the job, the proportion of non-effective time to effective time, Renda would have experienced approximately 1.0 hour of non-effective time for each hour of effective operating time (Vol V, Tab 36). Therefore, on July 16, approximately 17.75 hours (17 hours and 45 minutes) of contract time would be associated with the sweeping in Sections 2 and 3.

On July 16, after sweeping, the Inspection Report of Dredging (IRD) notes that Renda "moved the dredge out of the way to sink submerge(d) crossing." This submerged crossing was laid the following day across the ship channel to perform the work on the south side of the channel in the Flare Area. Movement of the dredge by Renda would have taken additional time and is unrelated to work at the transmission tower. Again, no mention of any delay due to the transmission tower is mentioned on July 16, 2000 in the IRD, or on any other contemporaneous document. No delay or disruption to Renda's dredging operation on July 16, 2000, is documented.

On July 17, other internal Renda documents report laying the submerged pipeline crossing across the Houston Ship Channel, fixing discharge pipe on the dredge and setting up the dredge to resume work in the Flare[2]. All of the above preparations are for beginning work in the Flare Area and unrelated to the transmission tower.

For the July period, in an email dated June 4, 2002, Mr. Barry Smith (Vol V, Tab 38), after consulting with project personnel, advised the DCAA auditor that Renda "was able to rally sufficient forces to basically move/chivy or push the pipeline out of the way with <u>a minimum of difficulty</u>"[3] (underscore added).

---

[2] See internal Renda Marine Daily Production Reports – Vol V, Tab 37).

[3] Renda did not provide notice of additional work or a conflict with the HL&P transmission tower until October 2000.

However, on July 14, and July 18, 2000, the Inspection Report of Dredging (IRD) reports some additional work caused by the new transmission tower[4]. This work consisted of welding pipe fittings (elbows) onto the metal shore pipe. The Contractor's Quality Control Report (CQCR) does not mention any work caused by the transmission line until July 18, 2000, when it states, "We re-routed shoreline around new tower at disposal area." However, the CQCR did not identify the personnel or time required to "move/chivy the pipeline" which required a minimal amount of time.

4.2.3 HL&P Claim Period Two – Oct 16, 17 and 18, 2000

For claim period two, Renda's claim for equipment states, "Since the actual hours of delay are not specifically defined in the reports hours of operation are JUDGMENTAL". Likewise, for the labor hours, Renda states that the delay costs are judgmental. The hours need not be judgmental. Renda relies on only the IRD in preparing its claim. Renda disregards other internal reports which identify actual hours, specifically the Report of Operations.

Renda claims 67 percent of the weekly dredging payroll (does not include levee payroll) which ends on October 22, 2000. This allocation of labor is inconsistent with the time (48 hours) Renda identified as being delayed. Renda says the transmission line delayed the work as follows:

| | |
|---|---|
| October 16, 2000 | (50% of the day) |
| October 17, 2000 | (100% of the day) |
| October 18, 2000 | (50% of the day) |

The basis for selecting the above percentages is undocumented. However, the claimed 48 hours is only 29 percent of the week; not the 67 percent Renda uses to allocate its weekly labor cost. Additionally, had Renda consulted its internal Report of Operations, the actual delay time for period two would have been easily discerned.

[4] The IRD for July 14, 2000, states, in pertinent part, "Welded 45 elbow onto 200' steel pipe to make turn around high line wire." The IRD on July 18, 2000, states, in pertinent part, "Worked on 90 degree elbow to repipe around new tower @ Lost Lake disposal area."

On October 16, 2000, according to the Report of Operations (Vol V, Tab 39), Renda began the pipeline relocation for the transmission tower at 3:45 pm and was delayed 8.25 hours till midnight. On October 17, 2000, Renda was down all day (24 hours). On October 18, 2000, Renda was delayed until 3:50 am due to the relocation of the shore pipe to accommodate the HL&P transmission tower construction. In sum, Renda's critical dredging work was actually idled thirty-six hours.

HL&P had been coordinating their work with Renda since July 2000. Sometime prior to October 16, 2000, unbeknownst to the Government, Renda met with HL&P representatives to resolve the conflict with Renda's pipeline at the new transmission tower (Vol V, Tab 40). Renda agreed to additional shutdown cost with HL&P without notifying the Government of the transmission tower conflict or its negotiations with HL&P. Not until after the additional work was performed did Renda notify the Government on October 18, 2000, of the additional cost to Renda's operation (Vol IV, Tab 20). The Government did not have an opportunity to avoid the additional cost Renda agreed to incur during Renda's undisclosed negotiations with HL&P.

4.2.4 Technical Evaluation

For claim period one, July 16, 2000, delay to Renda's dredging operation by the HL&P transmission tower is undocumented and unsupported. Other Renda work (laying submerged pipeline to Flare Area, and dredge relocation) was non-effective time which is unrelated to the transmission line and not the responsibility of the Government. Renda acknowledges that the work performed for the transmission tower relocation in July was accomplished with a minimum of difficulty. In July 2000, notably the 14th and 18th, Renda did perform some additional work by welding fittings on the discharge pipeline and pushing the pipeline on the shore out of the way with "a minimum of difficulty." The personnel and equipment Renda used to accomplish the added work is not documented. I have estimated the personnel and equipment used during July 2000 to measure the adjustment for Period One.

For HL&P period two, the actual delay time of 36 hours is documented through the Report of Operations. Thirty-six hours of delay time to the critical dredging operation is used to measure the damages. I have made no deduction in time for relocation of the dredge and preparatory work for dredging a different location.

4.2.5 Technical Results

An adjustment in time and price is computed for additional work in July 2000 and delay in October 2000. A detailed evaluation of the additional cost and time claimed has been performed.

4.2.5.1 Results of Cost Evaluation

Renda's Claimed Cost and Results of Technical Evaluation

| | Renda Claim | Supported Cost | Note |
|---|---|---|---|
| Direct Costs | | | |
| Additional Labor | $18,460 | $5,880 | A |
| Additional Equipment | 95,460 | 9,061 | |
| Job Site Field Cost | 4,068 | 2,435 | B |
| Total Direct Cost | $118,208 | $17,376 | |
| Overhead: | | | |
| Resident Home Office (4.55%) | 18,771 | 791 | C |
| Corporate Office (2.83%) | 7,802 | 492 | C |
| Total Indirect & Direct Cost | $144,781 | $18,659 | |
| Profit (0.00%) | 14,478 | 0 | E |
| Bond (0.65%) | 1,035 | 121 | F |
| Total Adjustment | $160,294 | $18,780 | |
| Miscellaneous Cost | | | G |
| Professional Fees/Consultant | 10,000 | 0 | |
| Report Preparation Cost | 500 | 0 | |
| Bond on Miscellaneous (0.65%) | 68 | 0 | |
| Total Amount | $170,863 | $18,780 | |

Explanatory Notes:

A) The additional labor and equipment proposed by Renda for this HL&P claim generally does not include the levee personnel. However, Renda calculated 2.5 days of delay cost. The actual cost of the delay is determined to be 1.5 days where dredging was idled due to the HL&P transmission tower work by others. Additional cost, but no time delay, is considered for the July work for reasons stated previously.

1) Labor – Renda allocates 50 percent of the dredging labor cost for July 16, October 16 and 18 and 100 percent of the dredging labor cost for October 17, 2000 to the HL&P delay. Only portions of three days have been identified as being stopping contract work. Volume V, Tab 41 has the labor cost ($4,529) calculations for the delay period in October and Volume V, Tab 42 has the additional labor cost ($1,351)in July 2000.

2) Equipment – Volume V, Tab 43 contains the equipment cost calculation for the October 2000 delay caused by the HL&P transmission tower construction by others. Volume V, Tab 42 has the estimated equipment cost ($1,545) for the additional work performed in July 2000. The equipment rates used by Renda do not reflect the operating and standby rates permitted by the Contract. Further discussion about equipment rates can be found in Section 5 of this report.

B) Jobsite Field Costs: - This cost component includes cost incurred in the field and generally is for miscellaneous expenses such as freight, communications, and the like. However, many of the elements appear to be costs which would be included in the Resident Office Overhead and duplicated in this cost item. Also, supplies included in the monthly field costs which appear to be equipment fuel, parts and/or repairs[5] that should be eliminated since the Corps Manual includes an allowance for equipment repairs in the rates. Without the specific invoice, the items in question cannot be confirmed. Therefore, the monthly October field cost as presented by Renda is used to calculate a

---

[5] For example, April 2000 Monthly Vendor Cost for Southwest Wire Rope at $5,953.77, Metal Supply at $9,727.63, Exxon at $1,987.87 and ABB Automation at $5,850.00.

daily rate of $1,623.49 and is considered acceptable at this time. The daily rate is multiplied by the 1.5 days of actual delay.

C) Resident Home Office and Corporate Office Overheads - The DCAA audit (Vol V, Tab 45) found that the actual rates for 2000 were 16.14 percent for Resident Home Office and 6.60 percent for Corporate Office overheads. However, the audit states that the Resident Home Office rate and the Corporate Office rate is comprised of two components, office and shop rates. I question the shop rate component of the overhead rates, since the Corps Manual, which Renda was required to use, allows for shop expenses in the equipment rate. The shop rate component in the Resident Home Office and Corporate Office overheads duplicates the Corps Manual allowance and is omitted. The Corps Manual specifically states that an allowance has been made for "Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead." Without the shop component, the Resident Office Overhead rate is 4.55 percent and the Corporate Office Overhead rate is 2.83 percent.

D) Profit is not allowed on suspensions of work. Since the work was idled or on standby, no profit is allowed.

E) Bond is verified by the DCAA audit of the HL&P transmission tower delay proposal.

F) The miscellaneous costs were questioned in their entirety by the DCAA audit. No allowance has been made for these cost items.

4.2.5.2 Time Evaluation

The dredging work was delayed by 1.5 days. Since the time exceeded one day, by rounding up, a time extension should be granted for 2 calendar days.

4.2.6 Conclusion

Due to the HL&P transmission tower construction, Renda was stopped from performing critical dredging work for 36 hours. If the stoppage is found to have merit, a time extension should be granted for 2 calendar days and increased cost of $18,780.

Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 4.3 Flare Area – Differing Site Condition

### 4.3.1 General

The Flare Area is a wide area on one side of the channel that is adjacent to and contiguous with the channel between Sta. 520+00 and 550+65. The channel bottom before entering the Flare Area is 530 feet wide. The transition in the bottom width begins to expand at Sta. 520+00 and ends at Sta. 527+35. At Sta. 527+35 the Flare Area has an additional bottom width of 385 feet on the right side of the channel if looking downstream or down station. This side of the channel is referred to as the south side of the channel. Generally, all earth material in this area is outside the existing channel limits and new or virgin work. At Sta. 544+06, the Flare Area width transitions back to the channel width of 530 feet (265 ft on each side of the centerline). The Flare Area is shown on Contract Drawing C-3 and C-5 and is shown in Figure 4.3.1 below.

Figure 4.3.1
Flare Area (Re: Contract Drawing C-3)



After two months of working in the Flare Area, Renda notified the Government on March 30, 2000, that it had encountered stiff clays at elevations where soft clays had been anticipated. Renda requested a time extension of 100 days. On February 21, 2001, Renda submitted its claim for the Differing Site Conditions in the Flare Area and requested a 76-calendar day time extension and $2,973,227 in additional cost. On March 7, 2001, Renda revised its claim to a request for 76 calendar days and $4,691,688 in additional cost. The difference is based primarily on revised equipment rates and overhead markup.

Renda claims that the Flare production was impacted (disrupted) by stiff clay during two periods. The periods are:

| Renda Impact Period | Date | Station |
|---|---|---|
| Period One | 23-Jan-00 to 11-Mar-00 | 520+00 to 540+00 |
| Period Two | 17-Jul-00 to 29-Sep-00 | 522+60 to 550+50 |

Period One was accomplished without the assistance of a booster pump to transport the earth materials in the discharge pipeline from the channel to the Lost Lake Placement Area. Period Two begins when Renda re-enters the area with a barge-mounted booster pump placed in the discharge pipeline.

### 4.3.2 Materials to be Encountered

Renda's pre-bid worksheets and bid papers do not identify the types of earth materials (clay, silt, mud, sand) anticipated in the Flare Area. Renda must demonstrate that it relied on, and correctly interpreted, the boring logs to successfully prevail on a differing site condition in the Flare Area. If Renda had no expectations of the material it would encounter at bid, then the soils cannot be materially different and a differing site condition cannot exist.

Two contract boring logs were located on the south bank in the Flare Area, 93-63 and 93-62. Both boring logs are located below water surface elevation close to the existing channel in the toe of the bank of earth material to be excavated. The surface elevation of boring log 93-62 is approximately elevation -33 MLT. The surface elevation for boring log 93-63 is approximately elevation -45 MLT. As shown on the cross sections included in the contract, the surface elevation for the earth materials in the Flare Area slopes upward to approximate elevation -10 MLT. Renda does not explain what documents were relied on to determine that earth materials (approxi-mately 30 feet thick above the top elevations of boring logs 93-62 and 93-63) are soft to very soft clays. There are nine other borings in the general vicinity of the Flare Area, some of which have higher surface elevations, but Renda makes no reference to these. The surface elevation for these logs range from elev. +10 MLT to elev. -41 MLT.

Renda's August 1998 Stiff Clay Spreadsheet (Vol IV, Tab 16) shows Renda's interpretation of the locations and quantities of very stiff to stiff clay anticipated to be encountered while dredging the channel. Renda identified 1,051,871 cy of very stiff to stiff clay to be dredged from the channel. Renda's calculation contains some math errors and artificially narrows the range or location of the very stiff to stiff clays. The Average End Area Method (Vol V, Tab 46) was used to check Renda's math and identification of locations contained in Renda's August 1998 Stiff Clay Spreadsheet. Using the Average End Area Method, Renda should have expected 1,084,512 cy of stiff to very stiff clay on the project. Of particular interest, Renda identifies on its August 1998 Stiff Clay Spreadsheet very stiff to stiff clay in the Flare Area at the following locations:

| Location: Stations | Acceptance Section | Very Stiff to Stiff Clay Quantity (CY) |
|---|---|---|
| 520+00 to 522+00 | 3 | 7,044 |
| 522+00 to 524+00 | 3 | 15,256 |
| 524+00 to 527+35 | 4 | 13,754 |
| 527+35 to 530+00 | 4 | 0 |
| 530+00 to 534+00 | 4/5 | 6,778 |
| 534+00 to 538+00 | 5 | 6,778 |
| 538+00 to 544+00 | 5/6 | 82,147 |
| 544+00 to 550+65 | 6 | 89,331 |
| Total for Flare Area | | 221,088 |

At least in August 1998, Renda expected 221,088 cy of stiff to very stiff clay in the Flare Area. According to Renda, that represents approximately 13 percent of all materials to be removed from within the channel limits, which includes the Flare Area. It is important to note that the bulk of this very stiff to stiff clay quantity in the Flare Area is located at the lower elevations (near or at required grade) and upstream at the upper end of acceptance Section 5 and in Section 6.

Also of interest on Renda's August 1998 Stiff Clay Spreadsheet is an area between Sta. 509+33 and Sta. 520+00 which is identified as containing no stiff clay. This area was anticipated by Renda to contain a total of 384,000 cy and is contiguous with, but downstream of, the Flare Area which begins at Sta. 520+00.

4.3.3 The Work

Dredging work began on September 13, 1999, in Section 2. On October 13, 1999, Renda advised the Government in a letter (Vol IV, Tab 21) that the slow production in Sections 1 and 2 would not continue. Renda stated,

> "As we are now approaching Station 500+00, the material will increase to near 275 cy per lineal foot at Station 510+00 and will consist of very soft clays to –45[ii]. We anticipate productions to increase to more than 20,000 cubic yards per day. After completing the north half of Section 3, we will dredge across to the flare portions of Sections 4, 5 and 6. These areas contain as much as 400 cubic yards per lineal foot[iii] and also consist of very soft clays except for the section beginning in Section 6[iv]."

This Renda statement is consistent with the August 1998 Stiff Clay Spreadsheet where stiff clays are not expected from approximately Sta. 510+00 to 524+00 (end of Section 3) except in the lower elevations and predicts that stiff clays will be more abundant near the beginning of Section 6. Additionally, in the October letter, Renda compares the anticipated very soft clays in the flare portions of Section 4 and 5 to the very soft clays to be dredged beginning at Station 510+00 (Section 3).

Between approximately Sta. 510+00 to Sta. 520+00, Renda had a production rate in the Renda identified very soft clays (hereinafter referred to as "Renda Soft Clay Area") of

about half (9,657 cy/day)[1] of the October 13, 1999 anticipated production of 20,000 cy/day. Analysis of the Inspection Report of Dredging (IRD) reveals that in the Renda Soft Clay Area, production did not reach the anticipated production because the dredge averaged 13.6 running hours per day and had an hourly production rate of 709.5 cy per hour[2].

On January 5, 2000, Renda responded to the Government's concern about the lack of progress on the job (Vol IV, Tab 22). Renda acknowledged that production had not met projections because of the stiff clays encountered. Renda also attributed low production to the late delivery and unsatisfactory condition of the dredge which had delayed the start of work and reduced efficiency of the dredge. However, contrary to Renda's statement in the January 5 letter that stiff clays had been encountered, Renda had already dredged the Renda Soft Clay Area where production was expected to be more than 20,000 cy/day. As noted above in this report, production did not meet with Renda's expectations or predictions in October 1999. The production, however, more closely matched the bid production[3].

In an e-mail to the Government on February 1, 2000 (Vol IV, Tab 23), Renda admits that low productions continued and acknowledges that the low production is due to the limitations of the head[4] available from the dredge and ladder pump while pumping clay. Renda then indicates that it did not expect to be pumping clay without a booster further upstream than Sta. 524+00. Renda states that a booster is scheduled to arrive in February

---

[1] Actual production is from evaluation of IRD and is contained in Volume V, Tab 47.

[2] Ibid.

[3] Fisher's initial bid did not separate the anticipated production into stations or sections. Fisher's Bid anticipated 8,000 cy per day (Vol IV, Tab 9, RM-COE-23218) and running 13 hours per day (Vol IV, Tab 15, RM-COE-02672 ). Fisher's hourly bid production for the project was 615 cy/hr (8,000 divided by 13). Bowman's bid (Vol IV, Tab 8), the one supporting Renda's bid amounts, did not separate the anticipated production into sections, stations or different types of earth materials. Bowman's bid had a range shown for daily production of 8,500 to 11,000 cy per day. Therefore, the anticipated bid production range was 845 cy/hr to 654 cy/hr. Bowman anticipated average production at bid was 750 cy/hr assuming 13 productive (effective) hrs/day.

[4] Head refers to hydraulics. When a liquid, or in this case a slurry of water and soil, exerts a force against its container, it is called pressure. Pressure in dredging is also referred to as head. The dredge pump(s) creates the positive pressure to move the slurry through the pipeline. Negative losses include discharge head, entrance head and pipeline (friction) head, among others and reduce the velocity of the slurry as it travels through the pipeline. The type of material can also affect the head loss. These types of head losses affect production.

to mid-March 2000. Renda concludes the February 1, 2000 e-mail by stating that the boring logs have been accurate to date showing "locations of muds, sands, soft, medium and stiff clays." As of January 31, after four and a half months of dredging, Renda has not encountered any differing site conditions or been given any change orders for dredging.

Contrary to the February 1, 2000 email that Renda would not dredge clay upstream of Sta. 524+00 without a booster[5], Renda continued to excavate in the Flare up to Sta. 540+50. On March 12, 2000, Renda left the Flare Area of Sections 4 and 5 and returned to Section 1, 2 and 3 to finish the areas for acceptance.

After leaving the Flare Area on March 12, 2000, Renda solicited quotes from other dredging companies for completing the remaining work. On March 23, 2000, Weeks Marine (Weeks) responded to Renda's verbal request for a quote to complete the upstream acceptance sections of 7, 8 and 9 (Vol V, Tab 48). The unit price quoted for performing Section 7, 8 and 9 dredging was $4.95 per cy ($2.85 per cy more than Renda's price to the Government). On March 27, Renda solicited another proposal from Weeks Marine (Vol V, Tab 49) this time requesting an additional price for completing the remainder of the dredging in Sections 5 and 6, as well as, placing the clay in the hydraulic levee on the north side of Lost Lake Placement Area between the existing drop-outlet structure and the new drop-outlet structure. Renda points out that approximately 838,000 cy of primarily clay (levee building material) remains in all of Sections 5 and 6. A response is not documented.

In addition, on March 29, 2000, Renda sought another price from Bean Dredging Corp. (Bean) for completing the dredging in Sections 5 and 6 (Vol V, Tab 50). Renda expressed the "need to have the Meridian[6] work in Sections #5 and #6 pumping clay" (footnote added). Again, for the quote, the clay to be removed from Sections 5 and 6 was to be transported to the backside of the placement area (north levee alignment) to build

[5] The Renda booster pump did not arrive on the job until May 2000 and did not work properly until July 2000.

[6] The Meridian is a 30-inch hydraulic dredge.

hydraulic levees; a long discharge pipeline. Renda provided Bean a plan view and a typical cross section of the channel. In the typical cross section provided to Bean, Renda stated that the <u>mud</u> in the area had been dredged off of the remaining stiff clay in Sections 5 and 6 (see Figure 4.3.2 for reproduction of cross section contained in Volume V, Tab 50).

Figure 4.3.2

Reproduction of typical cross section provided in Renda Solicitation to other contractors. (Vol V, Tab 50)




Also in Volume V, Tab 50, REM35088, Renda provided a quantity calculation showing approximately 838,000 cy of clay remaining in all of Sections 5 and 6, including the north bank and Flare Area on the south side of the channel. No documented response has been found in response to this request.

On March 30, 2000, Renda gave notice to the Government of a Differing Site Condition in the "Flare" area. Renda states that stiff clays were encountered at a much higher elevation than the –47 feet MLT as shown on the borings. Renda requested "an additional 100 days for the difference in the production to dredge soft clays versus the time required to dredge stiff clays, and the associated down time caused by plugged lines caused by encountering stiff clays…." (Vol IV, Tab 24).

Renda refers to borings 93-62 and 93-63 as indications of what material to expect in the Flare. However, these borings are located low elevation in the south channel slope toe

and not in the virgin (new) bank material where Renda asserts it encountered differing materials. In particular, boring log 93-62 describes the top ten or fifteen feet as being loose maintenance material contaminated with hydrocarbons. Renda does not mention that boring logs exist in the virgin bank on the north side of the channel. These north bank boring logs show very stiff and hard clay at elevation –35 feet MLT, much higher than where Renda states that stiff clays were anticipated[7].

Renda's reliance on only boring logs 93-62 and 92-63 represent that soil characteristics of the earth materials in the Flare Area is inconsistent with its stated "Character of Dredged Material and Dredging Assumptions" (Vol V, Tab 51) explained in its South Ferry Landing claim. For the South Ferry Landing, which is located at approximately Sta 472+00 on the south side of the channel, Renda states that it relied on Boring 3ST-162 at Sta 473+90 on the north side of the channel approximately 560 feet away on the opposite bank. Additionally, Renda notes that Boring Log Nos. 93-60, 3ST-163, 93-61 and 3ST-164 are equally applicable. Boring Log 3ST-164 is located farthest upstream on the north side of the channel and over 5000 feet away from the South Ferry Landing. In contrast, the Flare Area is directly across the channel and less than 600 feet from Boring Logs 3ST-3, 3ST-4, 3ST-5, 3ST-6, 72-105 and 3ST-7 which are allegedly not used by Renda for determining the character of the material to be dredged. These boring logs describe stiff and hard clays at or above elevation –35 feet MLT. Renda's March 30, 1999, notice letter states, "At the downstream end of the flare, borings showed the stiff clay line to be at approximately –46 mlt. We encountered the clays at near –40 mlt and dredged the area to grade up to Station 534+00."

Renda is correct that boring log 93-62 describes stiff (S), hard (H) and very stiff (VS) clay in the toe of the south slope at approximate elevation –46 MLT. However, for the virgin material above elevation –46 feet MLT, Renda ignores the north side boring logs

---

7 In the South Ferry Landing claim asserted by Renda, Renda states that it uses boring logs on the opposite, north bank to predict characteristics of the soil materials on the south bank (Vol V, Tab 51). That type of assumption is exactly what has been done on Renda's August 1998 Stiff Clay Spreadsheet. For each cross section, the depth of stiff clay has been estimated and multiplied times the entire width of the channel. Material anticipated on one side of the channel is represented to exist across the width of the channel to the other side.

3ST-3 and 3ST-4. These north side boring logs describe stiff (S) clay at –35 feet MLT approximately five feet higher in elevation than where Renda describes encountering stiff clay (at near elevation –40 feet MLT) at the downstream end of the flare. For demonstrative purposes, Figure 4.3.3 shows graphically elevations of the clay materials on boring log 3ST-3 versus the elevations at which Renda states that they anticipated and unexpectedly encountered stiff (S) clay. In the boring logs, the symbols for soft and very soft clay are SO and VSO, respectively.

Figure 4.3.3
Boring 3ST-3 with Elevations noted for Stiff Clay

