Renda's notice letter continues, "from Sta 534+00 upstream, the clay level continued to rise reaching as high as –10 mlt on the slopes and –15 mlt in the center of the flare." Boring log 3ST-6, located upstream of Sta 534+00 at Sta 539+00, describes very stiff clay from approximate elevation –5 feet MLT down to elevation –10 feet MLT again where Renda says it encountered stiff clay.

Renda's statement that it anticipated stiff clays in the Flare Area at -47 MLT from its review of the Boring Logs is contradicted by its August 1998 Stiff Clay Spreadsheet. The August 1998 Stiff Clay Spreadsheet anticipates as much as 10 feet of stiff clay (-38 MLT) to be encountered at Sta. 554+06 near the beginning of Section 6 (Sta 540+00 in the Flare). The stiff clay in this Section 6 of the Flare was also anticipated by Renda in its October 13, 1999 letter.

As previously mentioned, when Renda left the flare area on March 13, 2000, Renda was excavating beyond Sta. 524+00 and did not have a booster pump operating at that time. On July 17, 2000, Renda returned to the Flare Area and began to work upstream. This time, Renda was using a booster pump to assist in transporting the material to the placement area, but did not hydraulically place the material on the north side of the placement area. This material was deposited on the west levee in the disposal area, short of the planned placement area discussed with Weeks and Bean.

Renda completed Period Two dredging on September 29, 2000. Additionally, Renda returned to the Stations of Sta. 531+00 to Sta. 550+00 during the period February 26, 2001 through April 3, 2001, and performed 31 days of dredging. This work was on the north side of the channel following removal of unanticipated shore protection (bilateral modification work). However, discharge line lengths averaged 12,871 feet and production with a booster (possibly two at times) averaged 548.72 per day. This final sweeping work would have occurred in the stiff clays that are shown on the north side and that exist at the bottom of the channel, in the allowable overdepth or in the non-pay areas excavated outside the dredge prism.

Following Renda's notice of a differing site condition in the Flare Area on March 30, 2000, the Government investigated the soils which occupied the Flare Area. Three additional boring logs were performed. These borings found that harder clay soils did exist in the bank of soils above the surface elevations which are represented by boring logs 93-62 and 93-63. The Government's new boring logs also confirmed the stiff virgin soils identified by boring logs 93-62 and 93-63 (Vol V, Tab 52).

4.3.4 Renda's Measured Mile

Renda proposes to use the measured mile analysis to measure the loss of production and additional cost due to dredging unanticipated stiff clay versus an anticipated soft clay. Renda also seeks the time and cost associated with plugged lines that resulted from pumping unanticipated stiff clay.

The measured mile method is the preferred method for measuring a loss of productivity due to a change. It eliminates the possible errors or inefficiency included in the bid and considers the contractor's actual capability and capacity. Although comparison of a measured mile (baseline) period with a changed work period does not need to be exact, the work must be similar in nature and scope[8].

Further, Renda's measured mile is based upon eleven non-continuous days dredging between Sta. 522+00 and Sta. 538+15 (Vol V, Tab 53). Renda does not appear to make an analysis of the work or materials to select the eleven measured mile days, except that extraordinary production was reported on those days. Further, Renda's measured mile is during January and February 2000, when plugged discharge pipelines were common-place. However, the days selected by Renda for the measured mile contain no plugged pipelines.

[8] Volume V, Tab 61 shows that the equipment used during the measured mile was less than that used during period two. By using the labor and equipment cost incurred during the measured mile period, Renda seeks reimbursement for 32 additional pieces of equipment that operate in period two only.

Analysis of the soil material types removed by the dredge and transported in the pipeline to the disposal area during Renda's measured mile eleven day period reveals that primarily mud (56 percent) was encountered. Table 4.3.1 shows the material types reported on the Inspection Report of Dredging (IRD).

Table 4.3.1
Material Types during Renda's Measured Mile Period

| IRD Date | Percent | | | |
|---|---|---|---|---|
| | Mud | Silt | Clay | Sand |
| 28 Jan 00 | 50 | 25 | 15 | 10 |
| 29 Jan 00 | 50 | 25 | 15 | 10 |
| 30 Jan 00 | 50 | 25 | 15 | 10 |
| 31 Jan 00 | 50 | 15 | 25 | 0 |
| 1 Feb 00 | 60 | 15 | 25 | 0 |
| 2 Feb 00 | 60 | 15 | 25 | 0 |
| 3 Feb 00 | 50 | 25 | 15 | 10 |
| 15 Feb 00 | 60 | 20 | 10 | 10 |
| 16 Feb 00 | 60 | 20 | 10 | 10 |
| 17 Feb 00 | 60 | 20 | 10 | 10 |
| 18 Feb 00 | 60 | 20 | 10 | 10 |
| Average | 56 | 21 | 16 | 7 |

Renda uses the production achieved while dredging and transporting primarily mud with an average discharge pipeline length of 7,286 feet as the measured mile. Production should be excellent and it was[9]! Renda's measured mile does not represent dredging and transporting soft clay for the use in measuring the differences between soft clays and stiff clays. Renda's claim states that it encountered stiff clays at an elevation where soft clays were anticipated. Because Renda's Measured Mile is based on mud and not soft clay, the measured mile selected by Renda is invalid for use as production in soft clay.

Additionally, production achieved during Renda's Measured Mile is the exception, and not the norm. The eleven days selected by Renda are eleven of the best twenty-four production days reported during the entire contract. Statistically, assuming normal distribution of values, only 2.5% of all values fall above two standard deviations from the average and are not representative of most of the dredging on the project. Renda's

[9] Renda's production for its skewed measured mile was 1,540 cy per effective hour (Vol V, Tab 62). This exceeded Renda's average bid production of 750 cy per effective hour by 791 cy per effective hour.

measured mile should not be used for comparison anywhere on the job. The Renda measured mile production dates are shown on Figure 4.3.4. and Volume V, Tab 53.

Figure 4.3.4




To compute damages in the Flare, Renda improperly projected the daily direct cost of labor and equipment and field overhead incurred during the measured mile period into the impact period. By doing so, Renda over estimates the additional cost of the impacted work. This method does not consider changes in the equipment and allocates all thirty-two of the additional pieces of equipment (e.g. booster and levee equipment) and labor to the Government. To apply the measured mile correctly, the difference in production found from the measured mile should be applied to the equipment and labor and field overhead actually performing the work. In that way, any difference (higher or lower) in equipment, labor and field overhead are properly considered in the adjustment.

## 4.3.5 Analysis of Production Disruption in Flare Area

As previously mentioned, Renda's claim in the Flare consists of two periods. In Period One Renda does not use a booster pump and the performance period is non-continuous

days from January 23, 2000[10] to March 11, 2000 (Vol V, Tab 54). For Period Two, Renda uses a booster pump, has much longer discharge pipeline and the performance period is a generally continuous from July 17, 2000 to September 30, 2000 (Vol V, Tab 55). Renda combines the two periods and averages the production in both to establish a disrupted production (Vol V, Tab 56).

As shown, Renda's measured mile was for pumping mud. To select a period for comparison with Renda impact Period One, the impact area is analyzed for type of soil materials and pipeline length. Volume V, Tab 54 for Period One and Volume V, Tab 55 for Period Two includes summaries of the daily information contained on Renda's Inspection Report of Dredging (IRD) for the claimed Impact Area. For Renda's impact (disruption) periods, Renda had the following average performance data:

Renda Claim Period

| Claimed Flare Impact Periods | Production | Material Type Mud | Silt | Clay | Sand | Total Line Length |
|---|---|---|---|---|---|---|
| One | 714 cy/hr | 50 | 15 | 28 | 8 | 7103 |
| Two | 361 cy/hr | 17 | 3 | 62 | 13 | 12,208 |
| Combined | 473 cy/hr | 29 | 7 | 50 | 12 | 9,933 |

Claim Periods One and Two are completely different soil materials and line lengths. As previously stated, Period Two also used a booster and was expected post-bid by Renda to have more stiff clay.

4.3.5.1 Disruption Period One in Flare

For Period One, Renda's Soft Clay Area from approximately Sta. 510+00 to Sta. 520+00 was examined as a possible measured mile since this was an area identified in Renda's correspondence and post-bid material analysis as having soft clays similar to the Flare and free of claim. Also Renda's Soft Clay Area is located immediately downstream of

10 Renda provides no explanation for including January 23, 24, 25, 26 and 27 in the Flare claim when on February 1, 2000, Renda advised the Government that the soils encountered to date were accurately depicted in the boring logs (Vol IV, Tab 23).

Period One area which begins at Sta. 520+00. Vol V, Tab 47 summarizes the performance data on the IRD for work performed between Sta. 510+00 to Sta. 520+00. The results are:

Renda's Soft Clay Area Sta. 510+00 to Sta. 520+00

| | Material Type | | | | Total Discharge |
|---|---|---|---|---|---|
| Production | Mud | Silt | Clay | Sand | Line Length |
| 709 cy/hr | 44 | 13 | 32 | 11 | 8662 |

When Renda's Period One Area is compared with Renda's Soft Clay Area, there is no significant difference between the average clay content encountered (28 vs. 32, respect-tively) and the production is almost identical, 714 cy/hr and 709 cy/hr, respectively. Renda's Soft Clay Area has a somewhat longer line length, but there is virtually no difference in the actual production between Claim Period One and Renda's Soft Clay Area. Because of Renda's Soft Clay Area is so similar in clay content, recognized by Renda as being a soft clay area and has similar pipeline lengths, it is an excellent measured mile location. For Renda's Claim Period One from January 23, 2000 to March 11, 2000, based on comparison with the new measured mile, no disruption to its dredging operations occurred. It does not appear that stiff clays were encountered or hindered operations. Certainly, the information provided to Weeks and Bean indicates that the mud (easy stuff) has been removed from the Flare and that clay material remains to be dredged in the future.

4.3.5.2 Disruption – Period Two

Renda's Period Two has an actual production rate of 361 cy per hour. This production rate is similar to the production for dredging Renda identified stiff clays in Section 1 and 2 and the measured mile at the South Ferry Landing of 352 cy per hour. Several locations were examined for possible use as the measured mile for claim Period Two. The locations are summarized in Table 4.3.2.

Table 4.3.2
Measured Mile Investigation

| Item | Area | Production | Line Length | Clay Content | Booster |
|---|---|---|---|---|---|
| 1 | Sta. 550+65 to 562+00 (no claims) | 640 cy/hr | 13,081 | 20% | Yes |
| 2 | Channel adjacent to Flare Sta. 520+00 to 550+00 North side (no claims) | 481 cy/hr | 11,182 | 33% | Yes |
| 3 | Renda Soft Clay Area 510+00 to 520+00 | 709 cy/hr | 8,662 | 32% | |
| 4 | Section 1 Renda Stiff Clay | 325 cy/hr | 6,633 | 61% | |
| 5 | Section 2 Renda Stiff Clay | 417 cy/hr | 7,074 | 58% | |
| 6 | Period Three Sta. 531+40 to 549+50 | 549 cy/hr | 12,871 | 30% | Yes |

None of the investigated areas are a direct match for the alleged stiff clays encountered in Flare Area. However, Renda's Soft Clay Area, remains the best choice[11] for a measured mile comparison since Renda has identified the materials as being very soft clay (materials it expected) and it is an area free of claims. Renda's Soft Clay Area has a shorter line length and less clay content than the Period Two Area which means production should be reduced because of longer line length used in Period Two area. However, in the Period Two area, Renda used a booster pump which would tend to keep production up. Therefore, I consider these issues to offset one another and the Renda Soft Clay Area is used as the measured mile to measure the loss of production in the Period Two Claim Area[12].

Renda's loss of production or disruption is applied to the identified 54 days of dredging identified in the claim. Period Two contains 66 total calendar days, 9 are sweeping, one day is lost due to a plugged line and two days the dredge is down. The loss of efficiency for the area is 49.1 percent [1-(361/709) x 100].

During Renda claim Period Two, the dredge operated 890.58 hours. The additional operating hours identified by use of the measured mile is 437.5 or 438 operating hours.

[11] Use of this area may be an overstatement of the production capable of being achieved since the channel excavation for the corresponding stations in Item 2 and Item 6 is less.
[12] Average production for the entire job is 586 cy per hour (Vol V, Tab 36).

Renda operated an average of 13.5 hours per day while in the Period Two area. Therefore, the extended time of the job is 32.4 days. Again, rounding up, the time extension for the alleged slow down in production at the Flare Area is 33 calendar days.

4.3.5.3 Plugged Discharge pipeline

Renda requests reimbursement for plugged pipelines as a result of encountering unanticipated stiff clays in the Flare Area. As indicated above, Renda operated in the Flare Area on two separate occasions.

During Impact Period One, which contains 38 calendar days, Renda experienced plugged lines on eleven of those days for a total lost time of 231 hours. This is equivalent to 9.6 days and is 25.3 percent of the total time available for dredging.

During Impact Period Two in the Flare Area, which contains 66 calendar days, Renda experienced plugged lines on 12 days for a total lost time of 86.66 hours. This is equivalent to 3.6 days and is 5.5 percent of the total time available for dredging.

The differences in Renda's claim periods is significant, and is contrary to the expected outcome if stiff clays caused plugged discharge pipelines. As shown above, production in Period Two in the Flare Area was allegedly reduced by stiff clays. Plugged lines, if caused by stiff clay material, would be expected to increase in the area. However, the opposite is true. Plugged lines decreased in Period Two by almost 80 percent over Period One that did not have disrupted production. However, dredging work in Period Two of the Flare Area was accomplished by using a booster pump to help transport the slurry of water and clay materials to the Placement Area. The booster pump added horsepower (head) and transported the clay material by keeping the velocity up in the pipeline to prevent the materials from setting out before they reached the discharge point.

Additionally, the new measured mile from Sta. 510+00 to Sta. 520+00 (Renda Soft Clay Area) was performed primarily during the months of November and December 1999. As

seen in Figure 4.3.5, Renda was experiencing approximately one hour of plugged line for every 100 feet of pipe Renda had in the system during the months of November 1999, December 1999 and January 2000. Based on that frequency, Renda should have experienced 71 hours of plugged pipelines or the equivalent of 3.0 days in Impact Period One. Renda actually encountered the equivalent of 9.6 days or 6.6 days more than projected based on job history of work in areas with no claims and containing soft clay.

Figure 4.3.5
Plugged Lines and Pipeline Length




For Period One in the Flare Area, which ended on March 11, 2000, plugged lines are approximately 3 times greater than when compared to the Renda Soft Clay Area. This increase in non-effective (lost) time can be traced to a malfunction in the dredging equipment. On March 18, 2000, in a memo (Vol V, Tab 58 ) Mr. Fisher, Vice-President of Renda, advised Superintendent Machack that the flow meter which had been out for “a good while” would be back on line as soon as possible. However, Mr. Fisher noted, in part,

> “Without the flow meter, we are constantly in danger of plugging the line and cannot maximize production.”

Indeed, plugging the discharge pipeline had been occurring for some time as noted in Flare Area Period One which ended about the time the memo was issued. It is undocumented when the flow meter ceased to function or when it was repaired.

Period Two in the Flare Area experienced the equivalent of 3.6 days of plugged discharge pipelines or 5.5 percent of the total available time for dredging. Based on Figure 4.3.4, Renda experienced approximately 1 hour of plugged pipeline for each 100 feet of discharge pipeline per month. Using this frequency, Renda should have experienced 244 hours of plugged lines in Period Two of the Flare Area. However, Renda only experienced 86.6 hours of plugged pipelines. The difference is explained by the use of the booster pump which added horsepower and velocity to the transporting pipeline system.

Further, on three days (29.5 hours) that pipeline plugs did occur in Period Two, the booster was not in use. Further emphasizing the importance of a booster pump in preventing pipeline plugs in the discharge line.

4.3.6 Technical Results

As noted earlier, Renda's reliance on only boring logs 93-62 and 93-63 is not consistent with their assertions on the South Ferry claim and is unreasonable.

Further, stated reliance on only boring logs 93-62 and 93-63 contradicts earlier Renda correspondence dated October 13, 1999.

For the South Ferry Landing claim, Renda states that it used five borings on the north side of the channel, one up to 5,000 feet away, to predict or forecast the character of the material to be encountered in the dredging prism on the south side of the channel from Sta 472+00 to 470+00. This dredging assumption is illustrated in Figure 4.3.6.

Figure 4.3.6




In the Flare Area, prior to asserting a claim for the Flare Area, Renda used the boring logs on the north side, as well as the south side of the channel, for determining the character of the materials to be dredged. On October 13, 1999, Renda stated,

> "After completing the north half of Section 3, we will dredge across to the flare portion of Sections 4, 5 and 6. These areas contain as much as 400 cubic yards per lineal foot[iii] and also consist of very soft clays except for the section beginning in Section 6[iv]."

For the Flare Area, Renda interprets the boring logs to contain primarily soft clays. For Sections 4, 5 and 6 of the Flare, Renda uses the boring logs noted in footnote iv to the October 13, 1999, letter (Vol IV, Tab 21) which states,

> "[iv]See Borings No. 93-62, 3ST-4, 3ST-5 and 93-63"

Consistent with Renda's "Bid Assumptions and Character of Dredged Material" boring logs 3ST-4 and 3ST-5 are on the north side of the channel and used to identify the material to be dredged on the south side of the channel.

However, for the Flare Area claim, Renda has not used these same assumptions for the virgin material which exists on the south side of the channel at elevations above the two borings referenced by Renda. As illustrated in Figure 4.3.7, borings 3ST-3, 3ST-4, 3ST-5, 3ST-6, 72-105 and 3ST-7 are in close proximity to the work and should have been used by Renda in determining the "Character of the Dredged Material."

Figure 4.3.7




Using Renda's "Dredging Assumptions", I evaluated the character of the dredged material using the borings on the north side of the channel. On the north side of the channel within the Flare Area, boring log 3ST-3 at Sta 524+10 describes approximately ten feet of very soft clay from elevation –20 feet to –30 feet MLT lying on top of a layer of medium dense sand. Below the medium dense sand starting at elevation –35 feet MLT, boring log 3ST-3 describes 15-foot thick layer of stiff, hard and very stiff clay down to elevation –50 feet MLT. Below elevation –50 feet MLT, the boring log terminates in very stiff clay. These elevations were shown graphically on Figure 4.3.3.

Continuing upstream on the north side of the channel within the limits of the Flare Area at Sta 529+10 is boring log 3ST-4. It too describes hard and very stiff clay starting at elevation –35 feet MLT and extending to the termination depth at approximate elevation –52 feet MLT.

The next boring log upstream is 3ST-5 at Sta 534+50. From approximate elevation –15 MLT down to elevation –25 feet MLT, is a layer of medium and medium dense sand. From –25 feet MLT to –37 feet MLT, the boring logs describe the materials as soft to very soft clay. From elevation –37 to elevation –50 feet MLT, the boring log describes the earth materials as medium, hard and very stiff clay. This boring also terminates in

hard clay. Volume V, Tab 45 shows the elevations of soft and stiff clays that I identified on the boring logs.

The result of my evaluation of the north side boring logs is that if Renda was consistent with its "Dredging Assumptions" stated in the South Ferry Landing claim, Renda should have anticipated hard and stiff clays in the Flare Area beginning at approximate elevation –35 feet MLT instead of –47 feet MLT. Cross section data Renda provided to Bean Dredging and Weeks Marine shows stiff clay being encountered at approximate elevation –30 feet MLT or about 5 feet higher than shown in the boring logs on the north bank. Using the general dimensions of the Flare Area, 3000 feet long and 300 feet wide, there is approximately 166,000 cy of unanticipated stiff clay if the clay layer is 5 feet thicker than shown in the boring logs on the north side of the channel.

Renda seeks compensation for both dredging plant and labor and levee construction equipment and labor. However, dredging is the critical item of work throughout the project until the work is deleted in April/May 2001. At that time, levee work still remained to be performed and became critical. A slowdown in dredging, if any, did not result in a delay to the hydraulic levee construction (Bid Item No. 6) since preparation for hydraulic levee construction and final shaping could be performed.

Further, no segregation of the added expense of mechanically removing and placing the misplaced hydraulic material on the east side of Lost Lake Placement Area has been performed by Renda. As discussed in Section 4.8, Hydraulic Levees, this cost can be segregated and should be eliminated from any dredging claim. My price evaluation does not include the levee equipment and personnel for hauling and shaping.

4.3.6.1 Time Evaluation

As indicated in Section 4.3.5.2 of this report, a loss of production of 49.1 percent occurred while performing dredging work in the Flare Area during Renda's Period Two.

Renda claims that the Government is responsible for the inefficiency due to the unanticipated presence of stiff clay, a differing site condition.

As identified herein, Renda worked 891 hours performing dredging in the Flare Area Period Two (Vol V, Tab 55). Therefore, with the actual loss efficiency factor, all the materials (medium clay and sand) in the Flare including the stiff clay required 437.5 (891 times 50.2 percent) or 438 hours of added work beyond that required for soft clays. During performance of work in Period Two of the Flare Area Renda had an average daily operating (effective) time of 13.49 hours. Therefore, the days required to operate the additional 438 hours is 32.5. Again, rounding up, results in 33 additional days for dredging all materials including the stiff clays in the Flare Area during Period Two (approximately 321,500 cy).

However, not all the quantity is eligible for an adjustment. The portion of the total volume which is represented by the contract to be stiff clay needs to be deducted from this total quantity. Renda's August 1998 Stiff Clay Spreadsheet anticipated 221,088 cy of stiff clay in the Flare Area. Proportioning this total quantity based upon the width of the channel results in 71 percent of the anticipated stiff clay (156,973 cy) to be on the south side of the channel. During Period Two, Renda reports excavating 321,530 cy of stiff clay. Therefore, only 164,557 cy of stiff clay is additional[13]. The additional time due to the unexpected portion of stiff clay in the Flare Area is 51.2 percent (164,557 divided by 321,530) of the added time for dredging stiff clay. Multiplying 51.2 percent times the total 33 days for stiff clay results in 16.9 days additional (or 224 additional hours) for the stiff clays over and above the volume of stiff clays Renda anticipated or should have anticipated.

---

[13] Gahagan & Bryant Associates, Inc. evaluated the additional stiff clay quantity found in the Flare Area and identified 99,065 cubic yards more than could be identified as being in the south bank from a review of the contract boring logs (Vol V, Tab 75, RM-GBA-00101). Also in Section 4.3.6, I determined that based on the general dimensions of the Flare Area and an unanticipated 5 feet thick layer of stiff clay, that 166,000 cy of additional stiff clay was dredged assuming Renda's depiction of stiff clay remaining in the channel was accurate.

When calculating cost on a daily rate, 16.9 or 17 calendar days are used. If the quantity of additional material is found to be more or less than the unanticipated quantity of stiff clay of 164,557 cy, then an adjustment needs to be made in the time and cost presented herein.

4.3.6.2 Results of Cost Evaluation

As noted above, if the unanticipated quantity of stiff clay is more or less than 164,577 cy than the cost evaluation below should be adjusted. The corresponding hours to perform the identified additional quantity of stiff clays is 224.5 effective hours and 17 calendar days. The cost evaluation below is based on this additional time.

Renda's Claimed Cost and Results of Technical Evaluation

| | Renda Claim | Supported Cost | Note |
|---|---|---|---|
| Direct Costs | $3,311,817 | | |
| Additional Labor | | $106,660 | A |
| Additional Equipment | | 258,105 | A |
| Equipment Repair Cost | 50,000 | 0 | B |
| Job Site Field Cost | 60,180 | 13,461 | C |
| Total Direct Cost | $3,421,998 | $378,226 | |
| Overhead: | | | |
| Resident Home Office (4.55%) | 543,413 | 17,209 | D |
| Corporate Office (2.83%) | 225,852 | 10,704 | D |
| Total Indirect & Direct Cost | $4,191,263 | $406,139 | |
| Profit (8.25%) | 419,126 | 33,506 | E |
| Bond (0.65%) | 29,968 | 2,858 | F |
| Total Adjustment | $4,640,357 | $442,503 | |
| Miscellaneous Cost | | | G |
| Professional Fees/Consultant | 50,000 | 0 | |
| Report Preparation Cost | 1,000 | 0 | |
| Bond on Miscellaneous (0.65%) | 332 | 0 | |
| Total Amount | $4,691,688 | $442,503 | H |

Explanatory Notes:

A) The additional labor and equipment proposed by Renda includes the dredging operations personnel and the levee personnel for hauling fill from the east levee to the north levee. The levee operation was not impacted by a slow down in the dredging and is

not included in the supported cost. Renda calculated 103 days of cost (81 dredging days and 23 lost days for plugged lines and move in/outs) and subtracted 11 days of estimated cost from an earlier time period. The actual cost of the disruption is calculated from Period Two where I determined production was reduced. No additional time or cost is considered for the Period One or for plugged lines for reasons stated previously.

1) Labor – Renda allocates 100 percent of the direct labor cost for Period One and Period Two to the alleged differing site condition encountered at the Flare Area. Seventeen days of additional work have been identified. Volume V, Tab 59 has the labor calculations for the disruption period.

2) Equipment – Volume V, Tab 60 contains the equipment cost calculation for the loss of production at the Flare Area and uses 225 hours of additional effective time to measure the added cost. The equipment rates used by Renda did not reflect the rates permitted by the Contract. Further discussion about equipment rates can be found in Section 5 of this report.

B) Specific Equipment Repair Parts – No allowance has been made for specific repair costs. Among the numerous reasons cited above, the repair cost factor in the Corps Manual equipment rates compensates for major and minor repairs and maintenance. The DCAA audit found that the $50,000 identified was an estimate and unsupported.

C) Jobsite Field Costs - This cost component includes cost incurred in the field and generally is for miscellaneous expenses such as freight, communications, and the like. However, many of the elements for supplies included in the Monthly Field Costs appear to be equipment fuel, parts and/or repairs[14] which should be eliminated since the Corps Manual includes an allowance for equipment repairs in the rates. Without the specific invoice, the items in question can not be confirmed. Therefore, the monthly Field Cost as presented by Renda is used to calculate a daily rate of $791.85 is considered acceptable at

[14] For example, September 2000 Monthly Vendor Cost for Southwest Wire Rope at $1,001.69, Metal Supply at $7,633.88, Exxon at $2,268.34 and Haynes Wire Rope at $2,574.00.

this time. The daily rate is multiplied by the 17 days of actual delay for a total amount of $13,461.36.

D) Resident Home Office and Corporate Office Overheads - The DCAA audit (Vol V, Tab 63) found the combined rate of 16.14 percent for Resident Home Office and 6.60 percent for Corporate Office overheads. However, the audit notes that the Resident Home Office rate and the Corporate Office rate is comprised of two components, office and shop rates. I question the shop rate component of the overhead rates since the Corps Manual, which Renda was required to use, allows for shop expenses in the equipment rate. Only the DCAA-verified overhead office rates[15] for Resident Home Office (4.55%) and Corporate Office (2.83%) are used in this price evaluation. The shop rate component represents a cost duplication. The Corps Manual states that an allowance has been made for "Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead." For the fiscal year 2000, the resident office rate of 4.55 percent is used and 2.83 percent is used for the corporate office.

E) Profit is calculated by using the weighted guidelines method and is 8.25 percent. Development of the profit rate is in Volume V, Tab 64.

F) Bond at 0.65 is verified by the DCAA audit of the Flare Area Claim.

G) The miscellaneous costs were questioned in their entirety by the DCAA audit. No allowance has been made for these cost items.

H) The additional cost of $442,503 is for 164,577 cy of unanticipated stiff clay or $2.69 per cy. If an adjustment (increase or decrease) in the quantity is required then the $2.69 per cy can be used to adjust the amount due. Likewise, time extension for unanticipated very stiff clay in the Flare Area can be adjusted if the quantity is found to be different than the 164,577 cy. One calendar day can be added or subtracted for each 9,680 cy of unanticipated stiff clay found in the Flare Area.

[15] The office overhead rates are included in Volume V, Tab 29 behind the audit.

4.3.6.3 Excessive Dredging Beyond Required/Allowable Pay Prism – (Non-Pay Yardage)

Renda excavated beyond the maximum pay prism in the Flare Area and in Renda Stiff Clay Area used as the measured mile. The productive time expended in each area was wasted while performing non-pay work. The amount of over-excavation or excessive dredging in the Flare Areas is 221,049 cy or 72 cy of excavation per foot of channel (Vol V, Tab 31). In the measured mile area from Sta. 510+00 to 520+00, the quantity of non-pay yardage is 47,485 cy of excavation per foot of channel. Renda wasted more excavation time in the Flare Area than in the measured mile area. Therefore, the cost and time evaluation above overstates the adjustment by 38 percent to which Renda is entitled if a differing site condition is found in the Flare Area.

The adjustment in the time and cost should be made to account for the quantity of non-pay work performed. The cost increase Renda incurred during performance of the Flare Area is $274,352 ($442,503 times 1-.38). The time adjustment is modified to also account for the wasted effort and results in an eleven calendar day extension of time. If an adjustment for the volume of unanticipated stiff clay is found due, that adjustment should be made first prior to adjusting for the disproportionate share of non-dredging work performed in the Flare Area over the measured mile area.

4.3.7 Conclusion

My evaluation has identified a slow down in the work at the Flare Area for 164,577 cy. The price adjustment is determined to be $275,352 and an eleven calendar day time extension.