Franvel Corp
Renda Marine Inc. v. United States
No. 02-306C (Fed. Cl.)

## 4.4 Obstructions in Channel Sta. 570+00 to Sta. 630+00

### 4.4.1 General

On June 11, 2001, Renda submitted a revised request for an equitable adjustment under the Differing Site Conditions clause for encountering unexpected obstructions while dredging within the Houston Ship Channel. Renda asserts that the obstructions were generally located between Sta. 570+00 and Sta. 640+00 during the time period between October 20, 2000 and December 10, 2000.

Renda reports striking several discrete objects, concrete shore protection between Sta. 620+00 and Sta. 630+00 and a debris field between Sta. 570+00 and 580+00. In addition, Renda asserts that rock and rubble slope protection encountered in the north slope of Sections 5 and 6 between Sta. 530+00 and 554+00 also damaged the dredge.

Renda seeks the idle time and repairs caused by encountering the alleged differing site conditions. Renda claims a 36-calendar day time extension and additional cost in the amount of $2,126,083.

### 4.4.2 Technical Evaluation

A. Excessive Debris between Sta. 570+00 and 580+00

Renda claims that during October and November, while dredging between Sta. 570+00 and 580+00, a significant amount of trash, far in excess of what a reasonable contractor would have assumed from the contract documents, was encountered. Renda acknowledges Contract Specification Section 02482 – Dredging, paragraph 1.11.1, Character of Materials, that states in pertinent part,

> "Other materials such as scrap, rope, wire cable, snags and stumps may be encountered within the specified limits of required dredging and overdepth dredging. No separage (sic) payment will be made for removal and placement of this debris."

However, Renda contends that it could not have reasonably expected such an extensive quantity of trash in a relatively confined area.

Renda's bid papers (Vol IV, Tab 8) do not identify the amount of time or quantity expected during the dredging process in dealing with trash and other debris. However, in the notice letter for the South Ferry Landing dated April 28, 2000 (Vol IV, Tab 18), Renda acknowledges that the debris encountered was normal debris. I do not know if Renda's assessment of debris increased as one progresses upstream.

The extensive nature of the actual debris has not been documented by Renda. Normally, excessive debris is collected and assessed for character and quantity. The volume has not been documented.

Renda explains in its revised claim that in October and November of 2000, it encountered debris fields consisting of "hundreds of feet of steel cable, hundreds of pieces of steel scrap, anchors, anchor chains and cable, old iron large diameter pipe, concrete footings and pieces of concrete rubble, pieces of car bodies, heavy industrial construction demolition material, and thousands of the, ever-present, tires." Renda claims that its production was affected and that the dredging equipment was damaged which required repair in December 2000 and January 2001. However, Renda provided no notice of the large amounts of trash and debris while in the area[1].

For this same area in Section 7, Renda asserts another claim for unanticipated heavy red clay. For the trash interference, Renda does not claim any disruption to the dredging

[1] The Government had a side scan sonar and magnetometer survey performed of the area in January 2001. Results of this survey identified 17 targets that may have interfered with dredging operations. Additionally, other larger areas of scattered tires were noted as remaining between Sta. 570+00 and 580+00 (Vol V, Tab 65).

production in this period of time, presumably because impact to productive (effective) time is claimed in the Section 7 clay claim.

However, if the debris was so extensive, then the dredge should be less productive and the non-effective time should increase due to clearing the pump and cutter of trash. In particular, the non-effective time for clearing the pump and cutter are recorded on the Inspection Report of Dredging (IRD). If there is a significant amount of debris at this location over another location, then there should be a corresponding increase in the amount of clear time.

Table 4.4.1 summarizes the production time Renda achieved while performing work in the areas that Renda claims to be disrupted due to trash. Two periods area were evaluated, the narrowly-focused Sta. 570+00 to 580+00 (Vol V, Tab 67) and the entire claim area of Sta. 570+00 to 640+00 (Vol V, Tab 69). The amount of non-effective time for pump and cutter clears are shown as a percent of the total available dredge time.

Table 4.4.1
Pump/Cutter Clean Times for Claim Areas

| Claim Areas | Percent Effective Time | Percent Non-Effective Time | Percent Pump/Cutter Clean Time |
|---|---|---|---|
| Sta. 570+00 to 580+00 | 56.4 | 43.6 | 18.1 |
| Sta. 580+00 to 640+00 | 49.7 | 50.3 | 11.5 |
| Combined Area 570+00 to 640+00 | 52.6 | 47.4 | 12.5 |

As seen above, the amount of pump and cutter clear time is 18.1 percent of the total time available in the concentrated area of Sta. 570+00 to 580+00. This is 6.6% more clearing time than for the remainder of the claimed area Sta. 580+00 to 640+00. For comparison, to evaluate whether the amount of trash and/or pump and cutter clears increased, Sections 1 through 6 (Vol V, Tab 70) were evaluated and summarized. Table 4.4.2 shows these results.

| Table 4.4.2<br>Pump/Cutter Clean Times in Other Areas of Channel | | | |
|---|---|---|---|
| Claim Areas | Percent Effective Time | Percent Non-Effective Time | Percent Pump/Cutter Clean Time |
| Section 1 | 49.1 | 50.9 | 8.6 |
| Section 2 | 51.5 | 48.5 | 10.6 |
| Section 3 | 50.8 | 49.2 | 11.1 |
| Section 4 | 63.7 | 36.3 | 10.3 |
| Section 5 | 57.0 | 43.0 | 11.7 |
| Section 6 | 56.4 | 40.9 | 11.5 |

Comparison of the claim areas with other areas where trash was encountered, but not claimed by Renda as excessive, shows a difference in the amount of time spent clearing the cutter and pump of debris in the limited area of Sta. 570+00 to 580+00 only. The portion of the claimed area between Sta. 580+00 and 640+00 is not effected by excessive trash. If the entire area is considered, then virtually no difference occurred in trash and debris clean time.

The areas used for comparison, Sections 1 through 6, consist primarily of new work areas. However, decades of trash would have built up on the banks outside the existing channel. It is also noted from Table 4.4.2 that the general trend is for trash to be increasing in volume as work progresses upstream to Sections 7, 8 and 9.

B. Shore Protection between Sta. 620+00 and 630+00

Renda also claims that the shore protection encountered on the south bank between Sta. 620+00 and Sta. 630+00 was unexpected. However, Renda claims no direct cost for encountering the alleged unanticipated materials other than it contributed to the idle and repair time (impact) in December 2000. Renda provided notice of encountering this structure on December 20, 2000, after the dredge was shut down.

Renda notes that the rubble shore protection is on the south bank near Oxy Chemical Dock. Renda states that it performed over-cutting to undermine and dislodge the upper riprap materials prior to providing notice to the Government. Again, contract

specification 02482-Dredging, paragraph 3.5.2 warned the Contractor of an existing structure between Sta. 610+00 and 625+00, by stating,

> "The Contractor shall be required to use caution when cutting the side slopes in the Channel from Station 470+00 to Station 473+00, from Station 510 to Station 537+00, and from Station 610+00 to Station 625+00. Excessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel."

Renda encountered shore protection that was identified in the contract and where measures should have been exercised to avoid damage to the existing structure or to the dredge.

Final after dredging surveys, for the most part, locate this shore protection outside of the required dredging prism, except at Sta. 624+00 and at Sta. 624+74. After notice was given, the Government did not require removal of this shore protection. Had Renda notified the Government prior to over-cutting the toe of the slope to undermine the structure, the Government may not have authorized Renda's earlier attempts to dislodge the shore protection.

C. Discrete Objects

Additionally, Renda discusses discrete occurrences where the daily report states that the dredge encountered or struck something in the channel. However, Renda acknowledges in its revised claim that most of these obstructions were not recovered. The noted items were a dredge stern swivel assembly, conex steel box container, and a steel mooring buoy and anchor chain (Section 9 and part of Obstruction No. 2 claim). The added cost of removing the dredge stern swivel has been paid in bilateral Modification No. P00019. The conex box was removed by others.

Renda states that the jarring impacts to the dredge cutterhead were devastating to the equipment, placing undue stresses on the seals and rigid components such as shafts and bolted connections. Renda claims 36 days impact between December 4, 2000 and

January 14, 2001 due to alleged repairs caused by the obstructions. As a result of the jarring effects of striking the unanticipated objects and trash, the dredge is alleged to have required extensive, unscheduled repairs to the cutterhead, the cutter drive and the main pump shaft. However, no historical or supporting information is provided to establish a normal repair cycle for these components of the dredge.

In general, for the alleged 35.5 repair days claimed by Renda, the dredge is being repaired. However, the hours or percent of daily delay Renda attributes to the obstruction damages are overstated based upon the review of the Report of Operations and other internal Renda reports.

Below is a list of differences identified by use of the Report of Operations where Renda claims the obstruction repairs were performed. Details are presented in Volume VI, Tab 6.

| Date | Claim | Supported | Hours Difference |
|---|---|---|---|
| December 5, 2000 | 100% | 94% | 1.5 |
| December 7, 2000 | 50% | 0% | 12.0 |
| December 9, 2000 | 100% | 63% | 8.0 |
| December 29, 2000 | 50% | 0% | 12.0 |
| December 31, 2000 | 30% | 20% | 2.0 |
| January 13, 2001 | 60% | 0% | 14.0 |
| January 14, 2001 | 75% | 0% | 18.0 |
| Total | | | 67.5 |
| | | | 2.8 days |

The alleged obstruction repairs were actually performed on 32.7 days; not the 35.5 days claimed by Renda. From the Report of Operations, other repairs to the spuds, generator and raw water pumps account for the difference.

During the period between December 3 and 6, 2000, repairs to the underwater pump seals are reported. On or about December 3, 2000, the thrust bearing seals on the underwater pump failed. The seals were temporarily patched, repairs were not completed, or they

were not properly repaired by Renda because on December 8 and 9, 2000, the Inspection Report of Dredging reports replacing the seals a second time. On December 4, 2000, the internal Renda Marine Daily Report notes that spare parts were not available to effect repairs (Vol V, Tab 71). Renda Vice-President, Mr. Bowman, who was managing the project at this time, stated in a November 22, 2000, deposition that the Renda "spare part program was woefully deficient" (Vol V, Tab 72, p. 137). Therefore, I question if Renda performed the underwater pump seal repairs in a reasonable amount of time for a well-equipped contractor given the deficient spare parts program. Renda claims four days for this period of time. Only 2 days were required to repair and fix the seals on December 8 and 9, 2000. On December 9 and 10, 2000, the dredge resumed work in the channel.

On December 11, 2000, Renda reports stopping the dredge again asserting that the cutter gear box had been damaged due to obstructions in the channel. These repairs were forecasted by Renda in the IRD to require up to ten days repair.

On December 18, 2000, Renda stops reporting repairs to the cutter gear box on the Inspection Report of Dredging (IRD). The dredge, however, is still idle due to reported work on the "cutter drive systems". Repairs to the cutter drive system were finished on December 29, 2000. The Government's Quality Assurance Report (QAR) details that computer/electronic repairs was the failure causing the repairs to the cutter drive system. Computer and electronic repairs could not be caused by encountering obstruction and this time period from December 18 to December 28 is removed from the obstruction period. On December 29, 2000, the dredge returns to work in the channel.

Two days following repair of the cutterhead and drive assembly, the dredge main pump shaft failed on January 1, 2001.

On January 12, 2001, the shaft was repaired and dredging resumed. However, the main pump engine was used equipment that had been installed on the dredge (Vol VI, Tab 47). Pre-award, at the time when Renda believed the dredge would consist of primarily new components, Renda stated,

> "The fact that an older dredge has been working for years does not preclude it from having serious problems such as corrosion or metal fatigue that could produce a catastrophic failure." (Vol IV, Tab 15, RM-COE-02676).

Renda, by this statement, implies that newer equipment is less susceptible to failures, but that failures do occur. The pump shaft failure may be one of those occurrences.

During the December 2000 shutdown period other repairs unrelated to the obstructions may have been performed which also would have idled the dredge. The performance of these repairs is largely undocumented except for a December 18, 2000 letter from Renda to Lufkin Industries (Vol V, Tab 73) which states,

> "New gear set installed in Renda Marine, Inc Dredge Millennium... Renda Marine had a new gear set manufactured for the main pump gear box... we do have concerns, however, that the improper gear set, missing full contact (by .25 inch) may create a problem under full operating load. Renda's concern is also that making a new pinion only may have an adverse affect on the bull gear because of the distortion of the mating surface."

This gear box for the main pump engine was discovered to be operating in reverse since the dredge was commissioned in May 1999[2]. The effects on the pump drive shaft from this improper installed gear box and the subsequent distortions and vibrations may have accelerated the drive shaft failure.

It is also of interest to note that, in Mr. Bowman's deposition, referred to in the previous footnote, Renda planned to shutdown over Christmas 2000 to complete repairs prior to experiencing the alleged obstruction damage. In fact, the personnel working on the levee were off between December 22, 2000, and January 3, 2001. It is unexplained why the levee personnel were not working, when the dredge resumed work on January 1, 2001.

---

[2] In a letter dated January 8, 2000, Lufkin Industries, Inc reported to Renda that the dredge pump gear box was being run in reverse of its original designed rotation direction (counter clockwise) causing wear on the backside of the gear teeth (Vol V, Tab 74). Almost a year later, in a November 22, 2000 deposition, Mr. Bowman, Renda Vice-President, responded to a question about the booster pump gear box by stating, "That was a gear box that was furnished for the main pump engine that was the wrong rotation. We were going to be involved over Christmas and changing the entire guts of that Lufkin box out" (Vol V, Tab 72, p. 134).

Technical Results

Renda claims no productivity loss from the Obstructions claimed between Sta. 570+00 and 640+00. A loss of productive time has been identified in the limited area of Sta. 570+00 to 580+00. However, a 6.6 percent difference in cutter and pump clears does not appear to be significant when concentrations of debris may be expected.

Renda primarily claims impact, repair and idle time, in December 2000 and January 2001 allegedly attributable to the cumulative effects of the trash, discrete obstructions and shore protection structure encountered from Sta. 620+00 to 630+00 and from 530+00 to 550+00.

A. Loss of Productivity

Within the channel from Sta. 570+00 to 580+00, pump and cutter clears were 18.1 percent of the total time available for dredging. In other claimed areas of the channel, Sta. 580+00 to 640+00, non-effective time for clearing the pump and cutter does not differ than other reaches of the channel. The non-effective time for pump and cutter clears were 11.5 percent of the total available time. Therefore, in the limited area between Sta. 570+00 to 580+00, pump and cutter clears shows an increase of 6.6 percent. Within the area between 570+00 and 580+00, there were 408 total hours available for operating the dredge. A loss of 6.6 percent of this available time is attributable to the additional pump and cutter clears required in this area. Therefore, production loss due to the increased time due to cutter and pump clears is 26.9 hours or 27 hours.

The following summarizes the additional dredging cost Renda incurred due to the loss in production time in the limited area between Sta. 570+00 and 580+00.

Productivity Loss Summary

| | | |
|---|---|---|
| Equipment (Vol VI, Tab 1) | | $29,600 |
| Labor (Vol V, Tab 3) | | 7,665 |
| Jobsite $764 per day x 1.2 days (Renda claims 15,280.94/20 days) | | 917 |
| | Subtotal | 35,776 |
| Resident Office Overhead (8.83%) | | 5,774 |
| Corporate Office Overhead (4.23%) | | 2,261 |
| | Subtotal | 43,911 |
| Profit | | 3,074 |
| | Subtotal | 46,985 |
| Bond | | 305 |
| | | $47,290 |

B. Impact Idle Period

Renda claims that repairs to the underwater pump seals, cutterhead gearbox, cutter drive system and main engine pump shaft were required as a result of striking obstructions in the channel. These repairs were performed on the equivalent of 33 days during the period between December 4, 2000, and January 14, 2001.

All the repairs and associated repair time are not compensable occurrences as alleged by Renda, if the obstructions are found to have caused the damage.

The repair to the underwater pump seals was performed on five days between December 3 and 9, 2000. The two days required on December 8 and 9, 2000, are a reasonable repair time. Therefore, three days are not the responsibility of the Government.

On December 11, 2000, an obstruction is asserted to have caused damage to the cutter gearbox. Repairs to the gearbox were completed on or about December 17, 2000, a period of seven days. However, these repairs did not permit the dredge to resume operations. Repair work continued on the computers and electrical system until December 29, 2000, when the dredge resumed work, a period of eleven days. These eleven days are not the responsibility of the Government. Repairs performed are not relevant to the obstructions.

On or about January 1, 2001, the dredge is allegedly down again due to obstructions. This time the main pump shaft has failed. These twelve days would be compensable if the pump shaft failure is related to the obstruction.

The following cost summary computes the cost for a period of 33 days during the alleged impact period for obstruction repairs. This cost is converted to a daily rate to use if any days are found to be related to obstruction damage.

Cost Summary for 33-day Impact Period

| | | |
|---|---|---|
| Equipment (Vol VI, Tab 2) | | $272,014 |
| Labor (Vol VI, Tab 3) | | 209,715 |
| Jobsite $2,250.14 times 33 days (Renda claims $81,005.08 for 36 days) | | 74,255 |
| Dredge Repair Costs (Vol VI, Tab 4) | | 94,501 |
| | Subtotal | $650,485 |
| Resident Office Overhead (8.63%) | | 56,137 |
| Corporate Office Overhead (4.23%) | | 27,516 |
| | Subtotal | $734,138 |
| Profit Suspension (No profit) | | 0 |
| | Subtotal | $734,138 |
| Bond (0.65%) | | 4,772 |
| Total | | $738,910 |
| Average Daily Cost During Period Without Dredge Repair Parts ($107,346) | | $19,138 |

Conclusions

Although I determined a slow-down in production in the limited area between 570+00 and 580+00, it is not uncommon to encounter pockets of trash. Since the entire section, when averaged, shows no increase in trash clears, an adjustment for this loss of productivity is not warranted.

Renda claims impact for 33 days. I have determined the maximum days the dredge was idled due to the alleged obstructions to be:

a) 2 days for underwater pump seals

b) 7 days for the cutter gear box repairs

c) 5 days for the repairs to the main pump shaft

Further, assuming the alleged obstructions caused the damage, I have determined:

a) An additional price adjustment for pump seals only would be $38,276 plus an allowance for parts of $4,578 for a total of $42,854

b) An additional price adjustment for cutter gearbox repairs would be $133,966 plus an allowance for parts of $46,328 for a total of $180,294

c) An additional price adjustment for the main pump shaft would be $220,087 plus an allowance for parts of $56,440 for a total of $276,527

## 4.5 Section 7 – Heavy Red Clay – Differing Site Condition

### 4.5.1 General

On April 26, 2001, Renda submitted a request for adjustment seeking a three day time extension and an increase in cost of $1,083,779 for encountering hardpan, heavy red clay. In April of 2002, Renda updated its request by providing additional details. Renda's revised cost is $1,123,884 and seeks a 20-day time extension.

### 4.5.2 The Work

Section 7 extends from Sta. 554+00 to Sta. 612+00 along the Ship Channel. Dredging work began in Section 7 on or about July 11, 2000. Dredging work was accomplished within Section 7 on a few days in July and September 2000. On October 1, 2000, dredging work resumed in Section 7 and proceeded essentially uninterrupted until November 23, 2000. Renda returned to Section 7 for three days in January 2001.

Renda's claim is for a portion of the work performed in Section 7. Renda asserts that during the 35 day period between October 2 and November 6, 2000, unanticipated red clay was encountered while performing dredging work between Sta. 558+00 and Sta. 609+00 of Section 7.

On October 20, 2000, Renda notified the Government (Vol IV, Tab 26) that "the dredge encountered hardpan, heavy red clay" between Sta. 565+00 and Sta. 580+00 on the north side of the channel. Renda also noted that the heavy red clay may continue in Section 7 where none was anticipated. Renda's claim for heavy, red clay is for both north and south sides of the channel and extends from Sta. 558+00 to Sta. 609+00. Renda does not

explain why Sta. 558+00 to 565+00 was included in the claim area when work had been performed at that location prior to the notice letter and not included in its notice.

4.5.3 Technical Evaluation

Renda claims that the clays encountered while dredging a portion of Section 7, were unanticipated hardpan, heavy red clay. Renda asserts that, during the period between October 2, and November 6, 2000, an additional twenty days were required to remove 306,184 cy of unanticipated, red clay materials when soft gray clays were anticipated.

Renda does not explain how its description of "heavy" varies from stiff, very stiff, hard, medium or soft clay. Renda's word describing the soils as hardpan is not explained, but hardpan materials, as noted on the Inspection Report of Dredging (IRD), are not reported as being encountered anywhere on the job, much less Section 7.

Section 7 extends from Sta. 554+00 to Sta. 612+00. There are 17 boring logs within the general vicinity of Section 7. Many of these boring logs have soil color descriptions as rust, brown, red, grey and all color combinations in-between. Renda does not explain how color affects the hardness of the clay material. Color is not a reliable measure of the properties of the clay. Red, orange and brown clays had been previously excavated and placed in the disposal area without raising any concern[1].

I reviewed the seventeen boring logs from Sta. 553+90 to 613+80 for a description of the consistency (soft, hard, etc) of the soil materials. Between boring log 3ST-8W (Sta. 553+90) and 3ST-10W (Sta. 563+80), a distance of approximately 1000 feet, the clay consistency is described as generally Soft to Very Soft with some medium clay layers and medium dense sand layers. However, the consistency of clays described approximately 500 feet upstream from 3ST-10W at boring 3ST-11 (Sta. 568+90) is described as generally Very Stiff or Hard with a few medium and soft clay layers. This general

[1] In an email from Mr. Eddie Fisher on September 25, 1999, Mr. Fisher noted, "At the dump there appears to be very little silt, sand or soft clays. The clays are red, gray and orange." (Vol IV, Tab 27)

description of stiffer hard clays continues all the way through the remainder of Section 7 which ends at Sta. 612+00, a distance of 4,310 feet.

In Renda's December 20, 2000, response to the Government's conclusion that the boring logs in Section 7 indicated stiff to very stiff clays and dense sands which Renda should have anticipated, Renda points to boring logs 93+65 at Sta. 569+20, 3ST-13W at Sta. 579+00 and 3ST-14 at Sta. 583+70 and states, "An analysis of the soil borings shows that the majority of the material should have been soft to very soft light grey to gray silty and sandy clays, except small pockets (shown on only one boring) of stiff rusty-blue grey clays near the bottom of the dredging prism." (Vol IV, Tab 28, RM-COE-01637)

An analysis by Renda of the expected materials other than the above description can be found in the August 1998 Stiff Clay Spreadsheet (Vol IV, Tab 16). Although the spreadsheet contains mathematical errors, and generally understates quantities, in this limited area of Section 7, Renda's spreadsheet anticipates encountering 131,889 cy of stiff to very stiff clay; 76 percent of the total anticipated quantity of material to be dredged in that reach of Section 7. Renda's August 1998 spreadsheet was prepared two years prior to performing work in the area and supports the Government's interpretation of the boring logs. The August spreadsheet also contradicts Renda's statement in the December 2000 letter, that a majority of the material should have been soft to very soft clay.

The heavy, red clay that Renda asserts was unanticipated was deposited at approximately Sta. 118+00 on Lost Lake. Renda states in its December 20, 2000 letter that,

> "The Government directed that all clay material recovered from this area of Dredge Section 7 be placed on the new levees… Fortunately, for RMI, the hard red clay material has not been placed on the levee and is available for Government review and analysis… RMI will not relocate this material without a written directive from the Government." (Vol IV, Tab 28, RM-COE-01637).

Whether the red clay was placed in the stockpile or in the levee, it would have been available for review and analysis if Renda would have identified where it was located in the levee.

Even though the material was stockpiled by Renda, no geotechnical tests were provided by Renda to evaluate the properties of the clays encountered. Four and a half months after placement at Sta. 118+00, on March 12, 2001, the Government directed Renda to use the clay material in the levee which was to be hydraulically constructed and considered the clay "Misplaced Excavated Material". Further discussion about the materials placed in the levees which were to be hydraulically constructed can be found in Section 4.8 of this report.

4.5.4 Technical Results

Renda's August 1998 Stiff Clay Spreadsheet does not support the claim that soft soils were anticipated where heavy, red clay materials were found. Multiple colors of red, rust, brown and gray are indicated on the boring logs for this area. Generally, no inference can be drawn from the color about a soil's properties and Renda has not documented any.

Aside from Renda's August 1998 Stiff Clay Spreadsheet, from my review, the soil descriptions in the boring logs do appear to change from soft clays to stiff clays between Sta. 563+80 and Sta. 568+90. Because of this description change, I performed an evaluation of production. Two areas were evaluated that are part of Renda's claim area. Area One contains the soft clays that I identified on the boring logs and extends from Sta. 558+00 (beginning of Renda's claim) to Sta. 566+35, midway between boring logs 3ST-10W and 3ST-11. The second area, Area Two, contains descriptions of primarily stiff clays and extends from Sta. 566+35 to Sta. 609+00, the end of Renda's claim area. Area Two has stiff and hard consistency clays and color descriptions in the boring logs and do not support Renda's claim of a Differing Site Condition. In fact, the boring logs starting at Sta. 568+90 (3ST-11) appear to be the materials described by Renda. Production for

Area Two, in hard and very stiff clay as described in the boring logs was 663 cy per effective hour; some of the best production on the entire project (Vol VI, Tab 8). By contrast, the production in Area One of Section 7 where I determined the boring log to describe soft clays, is 205 cy per hour (Vol VI, Tab 9). These results seem to support Renda's allegations that production was hampered in the limited area from Sta. 558+00 to 566+35. However, somewhat confounding was the production in the stiff clays outside Sta. 558+00 to 566+35, which was three times higher than in the soft clays I identified in Area One.

Further investigation into why production was so poor in Area One reveals that Renda's barge-mounted booster pump was not operating for much of the time. The Government is not responsible for equipment malfunctions that reduce production. Below is a summary of the booster pump use during performance of Area One.

Booster Use
Area One
Renda Section 7 Clay

| IRD Date | Booster Use |
|---|---|
| October 2, 2000 | 12 hours only |
| October 3, 2000 | 0 hours |
| October 4, 2000 | 0 hours |
| October 5, 2000 | 0 hours |
| November 14, 2000 | 3 hours |

In measuring damages caused by the alleged Section 7 Clay, Renda used an estimated measured mile cost developed on eleven days for use in the Flare Area. As stated in 4.3.3, Renda's Measured Mile is flawed and it is not relevant to dredging in Section 7.

As stated above, production in the very stiff and hard clay described by the boring logs of Section 7 was above the job average. No adjustment should be made for this section. Renda states that claimed equipment expense for the Section 7 claim period is $1,097,792. The backup detail for Renda's claimed equipment cost is missing from the record. Renda documents and Government documents do not contain any equipment

details. Therefore, comments about the equipment rates and hours of operation are qualified. However, the Inspection Report of Dredging (IRD) shows what equipment operated during the period.

Renda, if like other claims, may have included mechanical levee construction equipment in the adjustment calculations. This equipment should be eliminated in Section 7. Renda's measured mile has no booster pump or mechanical levee construction equipment where, if like the Flare claim period, the impact period has booster pump equipment and mechanical levee construction equipment. The unanticipated clay, if encountered, did not cause the need for the booster pump or the mechanical levee construction equipment.

Since no adjustment is warranted, the dredging labor is questioned in its entirety.

Conclusion

Renda's claim for Section 7 Area – Heavy Red Clay is without merit based upon a review of the boring logs and corresponding production. Additionally, the Renda August 1998 Stiff Clay Spreadsheet contradicts Renda's assertion that it anticipated soft clays.

## 4.6 Obstructions in Channel Sta. 660+00 to Sta. 685+00 (Obstructions No. 2)

### 4.6.1 General

On August 10, 2001, the Government received a claim from Renda for encountering obstructions and excessive trash while accomplishing the dredging in a portion of Section 9, from Sta. 658+00 to 672+50. The remainder of Section 9 was deleted from the contract.

### 4.6.2 The Work

Renda began dredging in Section 9 at Sta. 660+00, middle cut, on February 9, 2001, after relocating from Section 8. Renda performed dredging in Section 9 for nine consecutive days. On February 19, the dredge is reported down due to the Lufkin gear. After the Lufkin gear box repair, the dredge was relocated to Sections 5 and 6 where it began operations on February 26, 2001.

In the claim, Renda alleges that on February 13 and 15, 2001, two obstructions were struck on each day. The IRD does not mention the obstructions or coordinates. Further, the internal Renda Daily Production Reports (Vol VI, Tab 11) for these dates do not indicate anything out of the ordinary. Another internal Renda Daily Report (Vol VI, Tab 12) is also silent about encountering discrete obstructions during the February 10 through 18, 2001, time period. Renda has been very specific about encountering four obstructions at x,y coordinates, but no supporting documentation can be found, except in the claim correspondence.

The February dredging in Section 9 is rather unremarkable as noted in the internal Renda Daily Production Report, except for equipment repairs. On February 11, 2001, the Renda

Daily Production Report notes "Normal Operations". During the nine day period, the Inspection Report of Dredging (IRD) reports the dredge being stopped for trash clears on the pump and cutterhead for 39.5 hours or 18.3 percent of the time (Vol VI, Tab 13).

In March 2001, armed with the Government's January 2001 magnetometer and side scan survey report[1], Renda lobbied the Government to remove Section 9 from the contract. On March 22, 2001, a meeting was held addressing the work remaining in Section 9. Renda was directed to return to Section 9 to complete dredging. However, the Government did not want Renda to damage the dredge Millennium by attempting to remove excessive debris, trash or obstructions (Vol IV, Tab 30). It was agreed that if the dredge were to encounter excessive debris, trash or obstructions, Renda was to contact the Government for verification. Upon verification of the excessive debris, the Government reserved the right to delete Section 9 or require other changes in the work. Renda returned to Section 9 on April 10, 2001[2].

On April 12, 2001, the Government was called to verify the existence of excessive debris. An on-site visit occurred but the Government did not agree with Renda that the volume or type of trash was excessive or unexpected. On April 14, 2001, Renda complained (Vol IV, Tab 31) to the Government that excessive pump and cutter cleans were required since returning to Section 9. On April 16, 2001, Renda advised that the dredge had struck a mooring buoy and was damaged (Vol IV, Tab 32). After April 16, 2001, the Government determined that it was appropriate to delete the remainder of Section 9.

Repairs were performed to the dredge Millennium during the April 16, 2001, to May 8, 2001, time period. Renda claims reimbursement for eighty percent of the day on April 16, fifty percent of the day on May 8 and all days between.

---

[1] Renda had a copy of the "Survey Report" on January 31, 2001, when they requested a meeting with the Government for performing future work (Vol IV, Tab 29). The Survey Report is contained in Vol V, Tab 65.

[2] Figure 4