4.6.3 Technical Evaluation

Based on my analysis of cutterhead and pump clears performed in Sections 1 through 6 and projecting those increasing clear times into Section 9 (see figure 4.6.1), Renda should have expected approximately 13 percent of the time to be involved in clearing the pump and cutterhead of trash. In the February 2000 period, Renda spent 18.3 percent of the time (Vol VI, Tab 13) performing pump and cutter clears, a 5.3 percent difference or about 1.3 hours more each day above the forecasted amount.

Figure 4.6.1




During performance of the second period in Section 9, April 10 through 16, 2001, Renda was on the north side of the channel. I evaluated the second period to see if pump and cutter clears varied from that which could be expected from previous work. Pump and cutterhead clears in the second period increased to 24.67 percent of the time (Vol VI, Tab 13), almost double the time that could be forecasted from Renda's experience in Sections 1 through 6 and over six percent more than Renda experienced in the middle cut of Section 9.

Section 9 is the farthest upstream acceptance section of the project. It is separated from Sections 1 through 8 by a "No Dredging" zone, from the end of Section 8 at Sta. 650+00 to the beginning of Section 9 at Sta. 658+00. In the "No Dredging" zone, Contract Drawing C-2 shows several pipeline crossings at elevation -45 ft MLT, above the planned grade.

Renda also lost a large amount of productive time due to channel traffic in Section 9. Renda's bid papers do not document the amount of non-effective time Renda allowed in its bid for traffic moves, pump/cutter clears or other non-productive operations. However, traffic moves and pump/cutter clears were remarkably more (approximately 25 percent each) in Section 9.

4.6.4 Technical Results

Renda is claiming that excessive trash and debris, and particularly one object, a mooring buoy, damaged the dredge and Renda is seeking the repair time and cost from April 16, 2001 to May 8, 2001. Renda makes no claim for the loss in productive time due to excessive trash and debris.

In this report, Renda's damages for the excessive trash and debris are recomputed based on a loss of productive time to the dredging in Section 9, stand-by while the dredge repairs were being performed and some repair parts. However, not all the time requested by Renda is considered during the repair period.

In general, there is an absence of daily reports for the repair period and it is undocumented what repairs, other than the cutterhead gear box assembly, were actually accomplished. From the repair invoices submitted (Vol VI, Tab 23) and other memoranda, the cutterhead gear box was removed from the dredge on April 18, 2001, two days after the alleged damage occurred, and taken into Houston Dynamic Service, Inc.'s (HDS) shop for repair. HDS invoice shows that the cutter box assembly was

completely repaired and sent back to Renda no later than April 27, 2001, a period of nine days.

There is no explanation of what delayed completion of the dredge repairs until May 8, 2001. It is noted that on May 2, 2001, HDS explains in a facsimile to Renda, "This is everything except the new shaft we are still machining." According to the claim documents used to support the shaft's cost, the shaft was ordered by Renda on February 8, 2001, the day before beginning work in Section 9. The delivery date for the spare shaft is undocumented.

Based upon review of the repair invoices, it appears that repairs to the cutterhead gear box were complete in approximately two weeks. This allows Renda two days to remove the gear box, the nine actual days to repair the gear box off-site at HDS, and two days to re-install the gear box. Therefore, the remainder of the repair time after April 30, 2001[3] is determined to be unreasonable.

I also question Renda's choice of cutterheads to use in Section 9. Renda continued to use the Vosta cutterhead with chisel teeth[4] which are best for cutting stiff clays. However, chisel teeth tend to pick up trash which then become stuck in the cutterhead. In Section 9, after receipt of the Government's side scan sonar and magnetometer data indicating the locations of certain obstructions and trash, Renda should have selected to use plain edge adapters to minimize the amount of down time due to trash (Vol VI, Tab 19 and Vol IV, Tab 33).

---

[3] A site visit entry for April 30, 2001, from Mr. Hrvabovsky, a Turner Collie & Braden representative, who were consultants to the Government's cost share partner on the project, writes, "On Monday, April 30th, I made a site visit to Upper Bayou. There were two dozers shaping levee at Lost Lake around Stations 175+00 to 185+00. The dredge was still tied up around Sta. 534+00. The cutter tail shaft and cutter had been installed on the dredge as it appeared to be ready to dredge." (Vol VI, Tab 17).

[4] Photos from April 16, 2001, show that the cutterhead had chisel teeth with trash (tires, chains) stuck on and between the teeth (Vol VI, Tab 18).

4.6.4.1 Time Extension

For the loss in productivity due to the additional time required for pump and cutterhead clears, the February time period had a total available dredge time of 216 hours (Vol VI, Tab 13). Renda's non-effective time (or an equal deductive loss in productive time) was increased 5.3 percent because of the added pump and cutterhead cleans. Therefore, for the February period, Renda had reduced productions for 11.5 hours (216 hours times 5.3 percent).

In the second time period, April, Renda had a total dredge time available of 168 hours (Vol VI, Tab 13). For this time period, Renda experienced an increased loss of productive time of 11.7 percent due to the additional time expended clearing the pump and cutterhead. Therefore, for the April period, Renda had reduced production for 19.7 hours (168 hours times 11.7 percent). Total production loss in Section 9 is 31.2 hours. Renda operated an average of 10.8 hours per day for sixteen days in Section 9. Therefore, 3 days were lost due to the additional pump and cutter clears in Section 9 (31.2 hours divided by 10.8 hours). For additional cost computed on a daily rate, 3 days will be used for the adjustment. For additional dredging equipment cost, the 31.2 hours of lost productive time is used.

The total time extension for the disruption (3 day) and impact (14 days) is 17 calendar days.

4.6.4.2 Additional Cost

A. Loss in Productive Time

Renda did not quantify a loss in productive time for the dredging operation. However, evaluation shows that the dredging work was disrupted by the additional time required to clear the pump and cutterhead in Section 9. The loss in productive time is used to compute the additional labor and equipment cost expended during this period for the

dredge and its attendant plant. The cost calculation for the equipment is contained in Volume VI, Tab 20, and the labor computations are in Volume VI, Tab 21.

Productivity Loss Summary

| | | |
|---|---|---|
| Equipment (Vol VI, Tab 20) | | $48,942 |
| Labor (Vol VI, Tab 21) | | 20,028 |
| Field Cost $1,735 x 3 days | | 5,205 |
| (Renda claims $41,116/31 days) | | |
| | Subtotal | $74,175 |
| Resident Office Overhead (8.63%) | | 6,401 |
| Corporate Office Overhead (4.23%) | | 3,138 |
| | Subtotal | $83,714 |
| Profit @ 7.15% based on S.Ferry Landing | | 5,986 |
| | Subtotal | $89,700 |
| Bond @ 0.65% | | 583 |
| | | $90,283 |

B. Impact Period

Renda has claimed 22.3 days between the dates of April 16 and May 8, 2001, for repairs to the dredge. The idle time caused by the damage to the cutterhead gear box assembly has been found to be fourteen days or 336 hours. The cost incurred for the cutterhead gear box assembly repair has been recomputed and is as follows:

| Direct Costs | Renda Claim | Supported | Notes |
|---|---|---|---|
| Dredging Equipment | $552,664 | $149,466 | A |
| Dredging Labor | 153,751 | 93,460 | B |
| Field Cost (1735 x 14 days) | 38,683 | 24,290 | C |
| Dredge Equipment Repair Cost | 86,058 | 21,432 | D |
| Subtotal | $831,156 | $288,648 | |
| Resident Home Office Overhead 8.63% | 131,988 | 24,910 | E |
| Corporate Home Office Overhead 4.23% | 54,856 | 12,210 | E |
| Subtotal | $1,017,999 | $325,768 | |
| Profit | 122,160 | 0 | F |
| Bond @ 0.65% | 7,411 | 2,118 | G |
| Subtotal | $1,147,570 | $327,886 | |
| Miscellaneous Cost | | | |
| Consultant Services | 10,000 | -- | H |
| Report Preparation Cost | 1,000 | -- | |
| Bond @ 0.65% on Misc Cost | 72 | -- | |
| Total | $1,158,642 | $327,886 | |

A – For equipment calculations, see VI, Tab 22. For explanations of the equipment rates, see Section 5

B – Labor cost for the period is developed in Volume VI, Tab 21

C – Field Cost is considered acceptable at this time. However, some costs appear to be for parts which would be a duplication of equipment rates. Some costs appear to be resident office expense which would also be a duplication. Individual invoices were not available for review.

D – See Volume VI, Tab 23, for discussion of individual repair parts.

E – The DCAA audit (Vol VI, Tab 24) developed overhead rates for Resident Office and Corporate Office. Those rates contained two components, shop and office. The shop component is unallowable since the Corps Manual includes an allowance for shop expense. Rates used are shown at the end of the audit.

F – Suspension of Work. No profit is allowed on suspensions of work.

G – Bond rate verified by DCAA audit, Volume VI, Tab 24

H – Miscellaneous Cost – Cost disallowed by DCAA audit (Vol VI, Tab 24). Consultant Services are litigation expense and the report preparation cost is field office or home office expenses for which an allowance has already been made.

### 4.6.5 Conclusions

Additional time was performed in clearing the pump and cutterhead of trash and debris in Section 9 when compared to the trash clear time experienced in other areas of the project. Additionally, the mooring buoy obstruction may be the proximate cause of the cutterhead gear box assembly repairs because it is closely related in time. However, the cutterhead gearbox failure is a recurring problem. For seven days in December 2000, Renda claims repairs were necessary. However, with the failure again in April 2001, the repairs allegedly performed in December are suspect. If the cutterhead gear box was not properly repaired in December, that may account for reduced productivity and failure in April 2001.

In measuring the damages incurred during the repair period, Renda makes no adjustment for other repairs which would have prevented the dredge from working or failure to stock spare parts. Also, the equipment rates which Renda developed are improper, particularly for the dredge and booster. A discussion about the equipment rates can be found in Section 5 of this report. Assuming that the trash is found to be excessive in Section 9, the maximum adjustment in price is $99,352 and a time extension of 3 calendar days is warranted.

If the mooring buoy is determined to be a differing site condition, then the cost increase for this occurrence is $380,973 and the time adjusted twenty-four calendar days.

## 4.7 West Levee Realignment Lost Lake Placement Area

### 4.7.1 General

On May 31, 2001, Renda submitted a claim for realigning the West Levee between Sta. 166+00 and 188+50 during the general time period of September to November 2000. Renda is seeking a time extension of 40 calendar days and a cost increase of $789,600. Renda measures its damages by other unit-priced work completed under a bilateral modification executed in 1999 for work that was performed by its subcontractor, Affolter Contracting, Inc.

### 4.7.2 The Work

After preparing the discharge pipeline for almost one month, the hydraulic placement of the West Levee began on March 11, 2000, at Sta.188+82. Renda placed hydraulic fill material at levee Sta. 188+82 for seventeen consecutive days trying to build up the materials to the required elevation of +30 feet MLT. On March 28, 2000, Renda's discharge pipeline broke and, with the permission of the Government, flow was diverted to Borrow Area No. 2 on the south side of Lost Lake at approximate Levee Sta. 118+00 or Sta. 120+00 to permit the continued operation of the dredge. For five days, the discharge (18,320 cy) was placed in Borrow Area No. 2 while repairs to the discharge pipeline were made. On April 3, the levee-building materials were again placed on Sta. 188+82. For another week, except for April 6, 2000, due to another pipeline break, Renda continued to place levee discharge at levee Sta.188+82 or Sta.188+50. Between the period of March 13, 2000, and April 10, 2000, Renda placed 179,225 cy of levee building material at approximate Sta.188+82 (Vol VI, Tab 25).

On April 11, 2000, Renda moved the discharge point to levee Sta. 166+00 and proceeded to place hydraulic fill in a northerly direction along the new alignment. On April 18, 2000, the QAR states that the Government disagreed with the "wide placement of material at the discharge point".

Hydraulic fill placement at levee Sta 170+85 was to +25 feet MLT or higher as noted on the CQCR on May 5, 2000, and the slopes extended into Lost Lake creating a wide placement area.

On July 27, 2000, while on a site visit, the Government was approached by Renda about a mud wave created by the new levee alignment. The hydraulic fill placement, which had started at Sta. 166+00, had reached approximate Sta. 180+33.

On July 28, 2000, Renda confirmed its discussions with the Government about the mud wave and new levee alignment. In its letter (Vol IV, Tab 34), Renda states,

> "The centerline is too far to the East of the existing old levee. The new levee placement will cause the mud to be displaced to the West in a mud wave that will go over the old levee and into the Old River. As per our conversation it would seem that the proper thing to do would be to construct the new levee so that the toe of the new levee would be against the old levee, thus using the old levee as a berm to support the new levee and also keep the mud wave to the inside of the new levee and not push it over the old levee. Please advise me of the possibility of moving the centerline to the West so we can tie in to the old levee." (underscore added)

Renda had been constructing the West Levee for approximately 100 days before the mud wave and new levee alignment became a problem and brought it to the Government's attention.

On August 7, 2000, the Government met on site with Renda to again review the new centerline location with Renda. The Government agreed that the new levee should abut the existing West Levee to prevent trapping mud between the two levees and forcing mud up over the old levee. On August 7, 2000, the Government changed the new alignment. In an August 8, 2000, internal email (Vol VI, Tab 27), the Government agreed that "the increased distance between the new hydraulic fill alignment and the existing levee, near station 180+00 … is more than was intended…" It was also noted that because of the

increasing distance[1] between the two levees "that underlying, very soft, displaced dredged material is trapped, and forced upwards as a mud wave between the two fills". The August 8 email confirms the verbal directions discussed in the field to use the existing levee as a guide for the new levee alignment and place all future hydraulic fill closer to the existing levee.

On August 18, 2000, Renda confirmed the verbal instructions given on August 7, 2000. In that letter (Vol IV, Tab 36), Renda states,

> "Following the specified levee alignment, mud waves were being formed which threatened to top the old levee. RMI personnel met with you, Erik Russek and Tim Few on August 7th at the Placement Area. At this meeting, the Government verbally agreed to realign the levee such that the toe of the new levee would be against the existing, old levee."

On August 16, 2000, the Government conducted a survey of the West Levee from Sta. 166+00 to Sta. 183+67. The survey (Vol VI, Tab 28) identified 132,937 cy of dredged material remaining above the existing ground that had been distributed along the west alignment. This section of the West Levee required only 59,087 cy of fill. Approximately 74,000 cy too much material had been deposited parallel to the levee alignment for use in the shaping and final grading process.

It its claim, Renda states that "after the survey on August 16, 2000, foundation-building materials were deposited between Stations 183+50 and 188+00 to an elevation of approximately +27 MLT extending across at least a 200' base with a 100' top, and a 6:1 slope of repose." Renda continues, stating that "in this area an approximate quantity of 35,000 cy was mechanically relocated to the new levee alignment which abutted the existing levee." However, this second area was placed after receiving instructions to place future dredged materials on the new alignment and after Renda had confirmed the placement instructions on August 8, 2000. Therefore, the Government should not be responsible for relocating this misplaced material.

In February 2001, Renda returned to perform contract-required final grading on the West Levee and place additional material at approximate Sta. 198+00.

---

[1] See Sketch Vol VI, Tab 26

On May 23, 2001, the Government issued Modification CO-10, P00027, to formalize the West Levee alignment change. This change notified Renda that the alignment given on August 7, 2000, incorporated the verbal instruction into the contract and incorporated Sketch, SK-CO10-01. Renda did not agree with the proposed modification as it was issued with no time or cost increase. Eight days later, Renda submitted its claim.

4.7.3 Technical Evaluation

Contract Drawing No. C-14 shows in plan view the Lost Lake Placement Area Plan (Lost Lake). The hydraulically constructed levee on the west side of Lost Lake begins at Sta. 166+00 and proceeds north to approximate Sta. 210+00, where the levee turns to the east. Note No. 10 on Contract Drawing C-14 states that "very soft to soft foundation material will be displaced by the new levee."

Further, Amendment No. 1 to the solicitation (Vol IV, Tab 4) provided, among other things, a response to a prospective bidder's question about "Why is the levee alignment so far from the perimeter where the foundation is crummy?" The Government stated in part that, "the intent of the design is to use the new work material to enhance the long term stability of the levees. For this reason, the designers intend the new work material be used to displace the very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material."

The plan view on Contract Drawing No. C-14 shows the location of the existing west levee centerline to be somewhat parallel to the new west levee centerline. The new west levee is to be constructed to the inside or east of the existing levee. By scaling distances from Drawing No. C-14 at approximately Sta. 166+00, the distance from the existing west levee centerline to the new west levee centerline is approximately 75 feet. At Sta. 179+50, from the plan view on Drawing C-14, the distance between the old centerline and the new west levee centerline has increased to around 125 feet. At approximate Sta. 189+50, the distance between the two levee centerlines remains about the same distance

apart, 125 feet. At Sta. 197+00, the distance between the new levee centerline location and the old existing west levee centerline decreases to approximately 100 feet. Therefore, between Sta. 179+50 and 190+00, the new west levee centerline was the farthest distance away from the existing west levee. The contract anticipated the new west levee centerline to be further to the east of the existing levee for approximately 1,050 feet. This shift of the new west levee to the east of the existing levee can be seen in cross section on Contract Drawing No. 16. On Contract Drawing No. 16 the new levee cross section at Sta. 165+50 shows the new levee toe intersecting the existing levee toe about 45 feet to the left or west. However, on that same drawing, C-16, the cross section at Sta. 179+50, shows the new west levee shifted to the east and the new levee toe terminates on existing ground at about 55 feet to the left and does not intersect the existing levee toe. There is approximately 20 feet between the east toe of the existing west levee and the new west levee. The 20-foot gap would exist for approximately 1,000 feet or more until the new levee alignment shifted back to the east or the existing levee toe extended further to the west.

As noted by Renda's CQCR on July 24, 2000, at approximately Sta. 180+00, Renda began "beefing-up" the potato roll on the levee ahead of the discharge point. This is in the same location as the 20-foot gap between the levees. It is assumed that the need to beef-up the height of the perimeter levee was necessary to contain the mud wave which began to be trapped at approximate Sta. 180+00.

A gap between the levees is contemplated by the contract drawings. However, what was not anticipated or desired by the Government was for displaced foundation/mud trapped between the new and existing levees. A mud wave up against the existing levee was a concern for Renda, as well. The contract required all materials to be retained within Lost Lake.[2] As noted in Renda's July 28 letter to the Government, continued use of the new levee alignment would cause the mud wave to "go over the old levee" and moving the future alignment would "also keep the mud wave to the inside of the new levee".

---

[2] Contract Section 02223-5, Retaining Levees, paragraph 3.1, Embankment Construction, subparagraph 3.1.3, Misplaced Materials, states, "At no time will material or water be allowed to overflow the existing perimeter levee."

Renda states in their claim that the additional cost for the realignment work took place between early September 2000 and November 2000 due to mechanically relocating significant quantities of material previously placed between Sta. 166+00 and Sta. 188+50. Renda states that "subsequent levee construction after November 2000, up to and including work beyond approximately Sta. 205+00, has been performed in accordance with Sketch SK-C010-01, requiring no additional costs to the Government for work associated with realignment of the levees."

Renda segregated the modification proposal into two parts:

1) Realignment and Relocation of Material between Sta. 166+00 and 183+00 and,
2) Realignment and Relocation of Material between Sta. 183+00 and 188+50.

Renda does not identify any equipment or labor expended in performance of the relocation work during either part of their proposal. Renda does not provide survey data to quantify the materials actually relocated. Renda asserts that the quantity relocated may be double that identified by the Government survey. However, the Government survey does not support the movement of any material[3].

Renda's CQCR report does not support a claim for mechanically relocating significant quantities of previously placed material on the west levee between Sta. 166+00 and 188+50. From September 4, 2000 to November 11, 2000, the CQCR reports Renda mechanically excavating misplaced hydraulic fill material along the inside of the east levee and relocating it by hauling to the north levee where it was placed as mechanical fill instead of the required hydraulic fill.

---

[3] The Government survey performed by Turner Collie & Braden, Inc. on August 16, 2000, quantifies the material existing between the existing ground surface and the top of ground on that date (Vol VI, Tab 28). The CQCR reports no activity between August 7 and the date of the survey. Therefore, material relocated or handled a second time would have occurred after August 16. Another survey has not been taken to quantify the movement of material. Further, at the end of the contract, the material misplaced along the west levee alignment was contemplated by the Government to be relocated but that work was not performed.

The CQCR does identify some additional work on the west levee. After the Government met with Renda on the site on August 7, 2000, and provided direction to shift the centerline of the new levee so that it abutted the existing levee, the CQCR records material being pushed "ahead of the discharge point up against old levee base to force the mud wave towards the inside." This added work of pushing the dredged fill material against the old levee continues being reported on the CQCR through August 21, 2000. The CQCR does not describe or segregate the equipment or personnel performing this west levee added activity (other than listing the total amount of equipment and personnel working each day at Lost Lake). However, on August 22, 2000, the QAR reports,

> "The discharge point on the levee was at about station 188+50 and material was being discharged on the levee at the time of this inspection. There were two bulldozers working the levee at station 175+00. Komatsu D6 walking in cast material. Cat D6 dressing toe area where track hoe excavated moving dike inward. One D-550 dozer working discharge area. One long reach one marsh tractor working inside the levee placing pontoons on line. One idle D-6 and one idle long-reach at station 190+00 of the levee."

The QAR identifies two dozers working behind the discharge, moving the levee inward toward the old levee and compacting cast material[4]. Renda had an excavator available to cast material. However, added work must be distinguished from the contractually required work.

Shaping of the levee to final line and grade was a requirement of the contract. Shaping is performed by obtaining adjacent hydraulic fill material and mechanically placing it to required line and grade. On August 28, 2000, Renda CQCR reports, "Checking C/L to establish toe and shoulder stays to begin final dressing Sta. 167+00 – 189+00." Final dressing of the West Levee up to Sta. 189+50 continued until September 8, 2000; with one additional day reported on September 11, 2000. After that date, the Renda CQCR report is silent about work on the West Levee between Sta. 166+00 and 188+50 until March 5, 2001, when dressing the West Levee is reported again.

[4] Cast material is material excavated by a machine, trackhoe or dragline, and then placed at another location by the same machine.

4.7.4 Technical Results

On August 7, 2000, at approximately Sta 180+00, the Government changed the future alignment of the new West Levee. The remainder of the levee from Sta 180+00 to 215+00 was to be constructed in accordance with the verbal instructions. Prior to the change, the West Levee alignment from Sta. 166+00 gradually veered to the east away from the existing levee alignment. At its maximum distance, at approximate Sta. 180+00, a mud wave developed between the existing levee and the new hydraulic levee.

Due to the planned alignment of the new West Levee, a mud wave was generated between the existing levee and the new levee. This mud wave could have overtopped the existing levee. On July 24, 2000, Renda CQCR notes additional work on the potato roll out ahead of the discharge point. The day after the potato roll work began, on July 25, 2000, Renda personnel on the levee asked Renda management if the new levee centerline could be moved over toward the existing levee (Vol VI, Tab 29). The potato roll work (extension of the height of the levee to contain the encroaching material) continues until August 8, 2000, a day after the Government permitted Renda to move the alignment closer to the existing levee.

Due to the proximity in time, the seventeen days of constructing potato roll on top of the existing levee is considered as additional work caused by the mud wave which was a result of the new alignment in this area. This work would have required a hydraulic excavator to perform.

After directions were received from the Government to shift the alignment closer to the old levee, Renda notes additional work on eleven days by pushing material toward the old levee. This work would require dozers to perform. Although the CQCR is silent about personnel and equipment performing this work, the QAR on August 22 and 23, 2000, reports that two dozers and a long reach excavator were working on the spoil area.

No time extension is justified for the work. The dredge continued to excavate, transport and place fill materials for the levee construction while the potato roll and realignment was taking place. Therefore, no stoppage to the critical dredging work was experienced.

Quantities of materials relocated by Renda were not documented. In general, the time is undocumented for the labor and equipment for creating the potato roll and pushing the fill materials after August 17 into the new alignment. For both of these tasks, an estimate of the added work is computed using the days identified from the CQCR and the QAR. No other work is documented for the realignment of the West Levee.

The following computes cost for additional West Levee work caused by the new alignment of the West Levee and associated mud wave.

A. Additional West Levee Potato Roll Work

| | |
|---|---|
| Labor | |
| 1 – Operator 12 hrs/day x 17 days x $15.57/hr | $3,176 |
| (for operator hourly rate, see Vol V, Tab 42) | |
| Plus: | |
| Workman Compensation @ 7.26% | 231 |
| Payroll Tax and Insurance @ 8.2% | 260 |
| Labor Subtotal | $3,667 |
| Equipment | |
| 1 – Trackhoe 12 hrs/day x 17 days x $53.68/hr | $10,951 |
| (for trackhoe rate, see Vol II, Tab 100) | |
| Total Estimated Direct Cost | $14,618 |
| Plus Overhead: | |
| Resident Home Office @ 16.14% | $2,359 |
| Corporate Home Office @ 6.60% | 965 |
| Total Estimated Direct & Indirect Cost | $17,942 |
| Profit @ 7.15% (See South Ferry Landing) | 1,283 |
| Bond @ 0.65% | 125 |
| Total Estimated Adjustment for Potato Roll | $19,350 |

B. Additional West Levee Alignment Work

| | |
|---|---|
| Labor | |
| 2 – Operators 12 hrs/day x 11 days x $15.57/hr (for operator hourly rate, see Vol V, Tab 42) | $4,110 |
| Plus: | |
| Workman Compensation @ 7.26% | 298 |
| Payroll Tax and Insurance @ 8.2% | 337 |
| Labor Subtotal | $4,745 |
| Equipment | |
| 2 – Dozers 12 hrs/day x 11 days x $46.08/hr (for dozer rate, see Vol II, Tab 100) | $12,165 |
| Total Estimated Direct Cost | $16,910 |
| Plus Overhead: | |
| Resident Home Office @ 16.14% | $2,729 |
| Corporate Home Office @ 6.60% | 1,116 |
| Total Estimated Direct & Indirect Cost | $20,755 |
| Profit @ 7.15% (See South Ferry Landing) | 1,484 |
| Bond @ 0.65% | 145 |
| Total Estimated Adjustment for New West Levee Alignment | $22,404 |

4.7.5 Conclusion

Due to the planned location of the new levee alignment, some additional work was performed consisting of preventative potato roll work to keep the mud wave from overtopping the existing east levee and shifting work to direct the existing mud wave away from the existing levee. Other levee or dredging operations were not stopped or impacted by performance of the added work. Therefore, no time is considered allowable, but the cost of the added work is $41,754.

## 4.8 Differing Site Condition Encountered During Construction of Hydraulic Levees at Lost Lake Disposal Area

### 4.8.1 General

On October 16, 2001, Renda submitted a certified claim in the amount of $6,258,853 for the alleged differing site condition encountered during construction of the hydraulic levees at Lost Lake Disposal Area. Renda priced this claim on the total cost basis where payments and claims have been subtracted from the alleged total cost. Renda does not make any downward adjustments to the apparent total cost for additional costs that were the sole responsibility of Renda. Similarly, no adjustments were made for errors or inaccuracies in the bid estimate.

The total cost method is not preferred but has been accepted where four criteria are satisfied. They are:

1. The nature of the particular loss must make it impractical to determine the economic loss with a reasonable degree of accuracy;
2. The original estimate or bid must be reasonable and free of error;
3. The actual cost must be reasonable and accurately recorded; and
4. The contractor must show that it was not responsible for any cost overruns.

While a modified total cost calculation more closely represents the additional costs attributable to a claim than a pure total cost submission, it still fails to provide a direct link between the costs and the changes to the work caused by the alleged differing site condition.

On December 12, 2002, the Defense Contract Audit Agency (DCAA) issued its Audit Report No. 3511-2003M172 00012 (Vol IV, Tab 38) for the differing site condition on the hydraulic levees. The auditor did not address the issue of entitlement, but offered

conclusions on the claimed amount, the magnitude and reasonableness. In the results the audit states, in pertinent part,

> "Because the cost or pricing data inadequacies are considered significant, we do not believe the claim is an acceptable basis for settlement of the price adjustment claim request, as discussed with Mr. Thomas Benero and confirmed in our teleconference with your office on May 7, 2002. FAR 15.403-4 requires the submission of cost or pricing data applicable to the modification of any sealed bid contract. To make the cost or pricing data adequate, the contractor must prepare its claim in the format of FAR 15.408, Table 15-2. Table 15-2 Section II-Cost Elements, requires that the contractor provide breakdowns for the basic cost elements claimed."

Almost two years after the exit conference of the audit, an additional breakdown of the alleged total cost has just been received from Renda. A supplemental report will be issued should the data affect any of the conclusions or evaluations contained herein.

4.8.2 Contract Requirements for Hydraulic Constructed Levees

Contract Section 02223 – Retaining Levees contains the specification requirements for constructing the mechanically constructed levee, the hydraulically constructed levee and compacted fill and backfill for the new drop-outlet structure work.

Contract Section 02223, paragraph 1.3.1, required a plan for the construction of the mechanically constructed levee and the hydraulically constructed levees. The minimum requirements of the plan were, in part,

> (1) The phasing and construction of the Mechanically Constructed Levee, Drop-outlet Structure, and the Hydraulically Constructed Levees, including discharge pipeline placements, with sketches when applicable, and techniques to minimize foundation displacements.
>
> (2) Approximate Houston Ship Channel stations between which the material to be used to construct the Hydraulically Constructed Levees will be dredged.

At the preparatory meeting on December 3, 1998, Renda's plan for constructing the mechanically constructed levee, drop-outlet structure, and the hydraulically constructed levee (Vol IV, Tab 39) was discussed. Figure 4.8.1 shows the Renda sketch which complies with Section 02223, paragraph 1.3.1(2) depicting the location of the planned borrow material and their intended placement sequence in the respective levee section.

Figure 4.8.1

Renda Placement Sketch



No sketch or data similar to Figure 4.8.1 has been located which would show Renda's intentions pre-bid. However, this sketch shows Renda's planned use of the materials prior to the start of work.

From Figure 4.8.1, Renda anticipated the hydraulically constructed levees would be built from satisfactory material obtained from Channel Sections 1, 2, 3, 4 and 5. Section 1 dredged material would be used to construct the levee from Sta. 97+00 to approximately 77+00 on the east side. Section 2 dredged material would be used to construct the remaining east levee and the western third of the north levee from approximately Sta. 77+00 to Sta. 30+00. Section 3 dredged material was anticipated to be pumped to the

north levee and would be used to complete the hydraulic fill from Sta. 30+00 to Sta. 4+00 at the existing drop-outlet structure. Although the color coding is difficult to distinguish, Section 4 and the corresponding Flare Area[1] would be used to complete the north half of the west levee starting at approximately Sta. 185+00 and the eastern third of the north levee that ties into the existing drop-outlet structure. Section 5 of the channel is shown to complete the southern half of the west levee from Sta. 166+00 to approximate Sta. 185+00.

Section 02223, paragraph 1.4, General Provisions, requires the embankments to be constructed to the lines, grades and cross sections shown on the drawings. Government directed field changes in embankment sections would be covered in accordance with the Changes clause of the contract. Under paragraph 1.4.2, Conduct of Work, the contractor was required to maintain and protect the embankment in satisfactory condition at all times until completion and acceptance of the work.

Section 02223, paragraph 1.4.3, Order of Work, required the work be performed in the following order:

(1) The Contractor shall fully complete placement of the Mechanically Constructed Levee between Stations 97+00 and 166+00; and at the areas for the construction of the new Drop-outlet Structure and the modification of the existing Drop-outlet Structure as shown, to the lines and grades specified. The Contractor shall also complete construction of the new Drop-outlet Structure prior to beginning work on placement of the Hydraulically Constructed Levees.

(2) The Contractor shall place Hydraulically Constructed Levees at all levee stations not listed above, until the entire perimeter levee has been completed to Elevation +20 feet Mean Low Tide (MLT).

(3) The Contractor shall not be permitted to grade the area outside the slope of the newly constructed levee until the entire perimeter levee has been completed to Elevation +20 feet MLT.

Section 02223, paragraph 1.4.4, Slides, states that if any part of the levee, during its construction or after its completion, but prior to acceptance, was sliding, the contractor, after written order from the Government, was required to rebuild that portion of the levee.

---

[1] It is of interest to note that in December 1998, Renda anticipated the Flare Area of Section 4 and 5 to contain medium to hard clays and sands suitable to build hydraulic levees. This is not consistent with Renda's claim addressed previously in this report at Section 4.3.

If the contractor caused the slide, the rebuilding operations were to be performed at no cost to the Government.

Section 02223, paragraph 1.4.5, states that the Government could make changes on the levee alignment before completion of the work. If, however, a section of the levee on which work had been done was abandoned, the contractor would be compensated at the contract unit price for that section or location abandoned.

Section 02223, paragraph 1.5, Measurement, subparagraph 1.5.2, Hydraulically Constructed Levees, states that payment for hydraulic levees constructed to the minimum lines and grades shown would be made by the linear foot (LF) of levee completed. Subparagraph 1.5.1, Mechanically Constructed Levee, provided for payment by the cubic yard (cy). A distinction is made between the mechanically and hydraulically constructed levees because payment for the mechanically constructed levee included the cost of excavation, hauling and placement, whereas payment for the hydraulically constructed levee only included mechanically shaping and final grading. Hydraulic fill payment was for dredging and transport and was paid separately under Section 02482 of the contract.

Section 02223, paragraph 2.2.3, Material for Hydraulically Constructed Levees, states,

> "Material for the Hydraulically Constructed Levees shall be medium to hard clays and sands, as described on the Logs of Borings. Material shall be obtained from the required dredging shown. The Contractor will not be required to segregate the soft clays from the suitable construction materials during dredging and construction of the Hydraulic Levees."

The satisfactory fill materials were to be obtained from the required dredging, which measured and for which contractor paid separately under Contract Section 02482 – Dredging. Medium to hard clays and sands and soft clays were acceptable. However, Renda was not required to segregate soft clays from other materials for use in the hydraulically constructed levee.

The performance of the embankment construction is addressed under Section 02223, paragraph 3.1. This paragraph 3.1, Embankment Construction, states, in its entirety,