interior of Lost Lake where the new alignment is located ranges from +11 feet MLT to +15 feet MLT. Therefore, the existing levees were small and ranged in height from 5 to 11 feet. Assuming all material used to maintain the levees came from the interior of Lost Lake, the side cast borrow areas would be very shallow. Further, once excavated, these borrow areas would fill with additional maintenance material dredged from the channel, the very material identified in the contract.

The contract advised the bidders that the foundations for the new levee were very soft previously dredged materials. The boring logs indicate the depth of the very soft material to be at least 15 feet thick. The presence of side cast borrow areas, if any, located on the new alignment would have a minimal affect on hydraulically constructed levees.

The presence of "side cast borrow areas" adjacent to the levee alignment may have required additional dredged fill to displace the soft foundation material and to construct the hydraulically constructed levees. However, the contract provided payment for the dredged fill separately under Bid Item No. 8, Dredging.

The location of the side cast borrow areas with respect to the new levee alignment has not been documented. If the side cast borrow areas were significant and existed in close proximity to the new or existing levee alignment, then they should have been identified on a pre-bid site visit or during the performance of the required mechanically constructed levees. The side cast borrow areas issue did not arise until late October 2000, when Renda was constructing the north levee mechanically in violation of the contract which required hydraulically constructed levee at that location.

4.8.6 Technical Results

In Renda's hydraulic levee claim, Renda fails to address the contract requirement to place hydraulic fill around the entire perimeter to elev. +20 feet MLT prior to degrading the existing levee. Renda does not explain why the requirement was not followed or what prevented it.

Renda failed to evenly distribute hydraulic fill at all locations along the levee, so that the final new levee section could be constructed. Some over-placement areas are:

- On the east levee, over-placement occurred between Sta. 97+00 and Sta. 61+50. This over-placement area was later used as a borrow source for mechanically constructing the north levee. Renda placed approximately 620,000 cy in this area.
- On the west levee, over-placement occurred between Sta. 166+00 and Sta. 188+82. Renda overplaced at least 73,850 cy in this segment of the levee.
- In Borrow Area 2, Renda deposited over 300,000 cy of clay material from Section 7 which Renda claims as being excellent levee building stiff clay.

Renda failed to hydraulically construct the required levees at the following locations:

- On the north levee, hydraulic fill was not placed along the levee from approximately Sta. 51+00 to Sta. 4+00 and from approximately Sta. 205+00 to Sta. 215+00.

Figure 4.8.2 shows the locations along the levee alignment where dredged materials were reported to have been deposited.

The contract required Renda to minimize the displacement of the very soft to soft foundation materials. Renda was also required to evenly distribute sufficient dredged fill around the site to elev +20 feet MLT. Renda did not exercise any measures to minimize displacement of the very soft to soft foundation soils. This lack of placement control contributed to the loss of material by displacement and width of placement. Further, Renda's election to initially place the hydraulically constructed levee to "as close to grade as the material would allow" (+30 feet MLT) reduced the amount of hydraulic fill material available for placement at all locations to the interim elevation of +20 feet MLT.

As noted, Renda placed the hydraulic fill to elevation +30 feet MLT or above. This placement technique causes several problems. The geometry of the levee cross section alone, without considering displacement, results in an excess of dredged material

deposited along the levee alignment (see Vol VI, Tab 38 for calculations). An increase in the side slope beyond the required final minimum cross section slope of 1 vertical to 3 horizontal (1V:3H) would contain excess material on the side slope which could be used for shaping or capping the hydraulic placement to grade.

Renda's initial placement method to elev. +30 feet MLT results in large quantities of excess material on the side slopes if the material would not stand on a 1V to 3H slope. If the side slopes had a natural angle of repose after being discharged of 1V:10H then placement to elev. +30 feet MLT (assuming a best case scenario of existing ground at elev. +15 MLT) would result in three times the required volume necessary to complete the final minimum cross section to elevation +30 feet MLT.

As Renda's initial placement slopes became flatter (more than 1V to 3H), the height of the dredge fill could be lowered. Material needed to complete the final levee cross section would exist in the slopes which would be shaped under Bid Item No. 6.

Based on the geometry of the initial hydraulic fill placement cross section, Table 4.8.1 shows the levee elevations at which sufficient material would have been available to shape the new levee to final cross section grade of elev +30 feet MLT. (These calculations do not include the additional quantities available from degrading the existing levee outside the new alignment.)

Table 4.8.1
Maximum Initial Placement Elevation to Produce Sufficient Hydraulic Fill for Shaping to Final Grade

| Existing Ground Elevation | Top Elevation with 1V to 10H Slope | Top Elevation with 1V to 6H Slope |
|---|---|---|
| +11 | 21 | 23 |
| +13 | 22 | 24 |
| +15 | 23 | 25 |

In addition, a neat-line quantity of material, approximately 15 cy per lf, is placed above elev +20 ft MLT in the completed levee. If insufficient material existed in the channel to construct the entire perimeter levee to +20 feet MLT, then Renda unreasonably placed the

available material to final grade. Placing the dredged material to final grade initially would result in a cost saving to Renda for required shaping under Bid Item No. 6, if sufficient material existed in the channel.

On August 2, following the preparatory meeting for the hydraulically constructed levees, Renda confirmed its plan "to build the levees as close to grade as the material would allow." Renda did not waiver from that plan.

As noted by Renda on its "Topics for Preparatory Meeting 1030 7/30/99", Renda recognized that building the hydraulic levees may need special consideration. Possible solutions noted by Renda were:

1) Build bases with best clay even if not to grade
2) Use clay from private jobs if better
3) Let inside slope firm up over time and use this material as cap over solid base with large dragline
4) Mine clays by widening channel on north sides of Sections #1 and #2 where best clays exist

However, other options existed for evenly distributing the satisfactory dredged materials such as Item 1 suggests. Dredged material could be placed in multiple passes, multiple discharge locations along the same alignment, or multiple discharge points along the north, west and east levee simultaneously. However, as stated in an October 25, 1999, letter (Vol IV, Tab 45), Renda was overbuilding the final crown width (elev +30 feet MLT) "to prevent time consuming multiple passes with the discharge and/or hauling". Renda continued,

> "We are using the experience gained during the construction of the mechanical levees to help us determine where more overbuild may be necessary."[7]

However, instead of overbuilding the areas known to be prone to significant subsidence, which would create more displacement, Renda should have limited the build-up of the

[7] The experience which Renda should have gained from construction of the mechanical levees is that when the mechanical levees began to subside, the initial placement height was lowered. In Modification P00008, the Government reduced the required height of the levees in response to subsidence; not increased it.

materials to elev +20 feet MLT and made multiple passes through the area. This would have accomplished two requirements of the contract: efficient distribution of the hydraulic fill and minimization of foundation displacement.

4.8.7 Renda Claimed Cost

Renda states that "Due to the extreme difficulty and unreasonable time required to distinguish between damages allocable to the hydraulic levee construction and other claims, the modified total cost method was used. All costs or claims not part of the hydraulic levee work were itemized and deducted from the total cost for the project." This is an inaccurate statement. It is true that all claimed costs and contract payments have been deducted from an unsupported total cost, but none other. To use the total cost method, it must be shown that other more reasonable approaches are not possible.

In this case, levee equipment is easily distinguishable from the dredging equipment and levee equipment can be segregated by operation and time periods. For instance, it is assumed that Renda claims the mechanically constructed north levee as part of the hydraulically constructed levee claim. This would form the bulk of the added cost and most of the equipment was rented. The relocation of misplaced, stockpiled hydraulic fill was performed during three periods, November 16 to December 19, 1999; May 4, 2000, to June 28, 2000, and September 9, 2000, to December 12, 2000. The Contractor's Quality Control Report (CQCR) identifies the equipment used to perform these operations. Other contract costs such as final grading the existing east levee can be segregated. Vol VI, Tab 39 contains a summary of the levee equipment by start date. Vol VI, Tab 40 contains a summary of the average daily work hours for the equipment reported as working on the hydraulic levees. Renda has adequately separated levee labor cost from dredging cost as identified in Sections 4.1, 4.2, 4.3, 4.4 and 4.5 of this report. A more direct approach is certainly available for pricing the additional men and equipment directly related to the hydraulic levee claim.

Further, Renda must show that it was not responsible for other increased costs or that it made an adjustment for those costs. However, during dredging, plugged discharge pipelines contributed to reduced efficiency and operation time of the dredge before adding a booster pump in the discharge line (Vol V, Tab 57). Also, during dredging, Renda performed an excessive amount of non-pay dredging outside the allowable overdepth limits (Vol V, Tab 31). Renda has a final pay quantity for Bid Item No. 8, Dredging of 3,425,642 cubic yards (cy). However, Renda also performed 825,644 cy of non-pay dredging or twenty-four percent more. This means that Renda is responsible for 24 percent of the dredging cost and time which has not been addressed in the total cost claim.

Renda must adjust a total cost claim for the reduced efficiency of the dredge. The dredge did not perform as anticipated when purchased from Dredging Supply Company. Renda sued Dredging Supply Company for failure of the dredge to achieve the anticipated production (Vol VI, Tab 41). On May 24, 2000, the case was filed in the U.S. District Court for the Southern District of Texas, Houston Division, Civil Action No. H-00-1721. In April 2001, the problems were still not worked out with the dredge Millennium (Vol VI, Tab 5).

As for the hydraulically constructed east levee, Renda has not made any adjustment for increased cost at that location.

Renda has not identified any additional cost for being off alignment when dredging began in 1999 when no survey work was performed on Lost Lake. Further, Renda has not credited the Government for mechanically relocating Section 7 clay that was directed to be placed hydraulically.

Renda must show that it did not contribute to the increased cost of placing the hydraulic levees or mechanically placing the north levee when hydraulic placement was required. This is a heavy burden to prove since Renda's initial placement of hydraulic fill to final grade +30 feet MLT results in more quantity than necessary for completion of the levee

because of the geometry of the levee cross section. Also, by stacking the dredged fill material to grade it displaced more material than if it had been initially placed to elevation +20 feet MLT or +25 feet MLT. The added displacement contributes to exhausting the available dredged material prior to distributing it evenly around the perimeter.

To be able to use the total cost method, Renda's bid must be free of material error. In Renda's bid, the dredge crew size is 16 men per shift. As shown by Renda in the South Ferry Landing claim, the dredging crew size was up to 19 for the week ending May 5, 2000 and 20 for the week ending May 21, 2000. Dredging crew sizes continued to increase, and in Section 7 Clay claim, Renda shows 24 men working per shift for the week ending October 22, 2000. Even in the Obstructions Claim in 2001, Renda shows an average of 23 men per shift on the dredge crew for the weeks ending April 29 and May 6, 2001.

Another adjustment that should be made in the bid estimate is for fuel cost. Renda estimated diesel fuel at 80 cents per gallon. As shown in the Equipment Section, actual average fuel cost was approximately 94 cents per gallon, a seventeen percent increase in fuel cost.

As a final note, overhead markups and profit in the bid estimate are approximately a combined 13.6 percent of the total cost of the project. The DCAA has determined that markups are 14.13% for resident office overhead and 6.06% for home office corporate overhead in the year 2000. In the year 2001, these overhead rates increased. The project, if performed as bid, would not cover the actual overhead expense.

Conclusion

The DCAA has determined that the hydraulic levee claim proposed is inadequate as it did not include cost or pricing data. Further, the alleged total actual cost to date of $24,568,660.15 until recently has been unsupported. Renda's audited financial statements

as of October 31, 2001, shows an actual cost of $19,511,345 (Vol VI, Tab 42). Moreover, the total cost method or modified total cost method is not appropriate in this circumstance. The additional work, if any, can be directly identified from the project records and should be used to support a claim for construction of hydraulic levees at Lost Lake.

Renda had control of his placement methods, discharge elevation, location and width. Had Renda discharged the dredged material from the ship channel at elev. +24 feet MLT around the perimeter of Lost Lake, sufficient materials would have been available from the initial hydraulic placement from the slopes and outside existing perimeter levee to complete all the hydraulically constructed levees to the final minimum cross section envisioned by the contract.

Renda did not manage the dredged fill properly. Renda elected to discharge the dredged fill materials at el. +30 feet MLT. When the quality of the materials reduced from very stiff clays to medium clays and sand, the discharge elevation should have been lowered because the material would not "stack up" on a 3H to 1V slope. Renda did not react to the change in dredged materials and displacement, such as mud waves. When displacements developed at placement elevations above +20 feet MLT, the discharge elevations should have been lowered or advanced to another location. These methods were within the sole control of Renda.

As shown in Figure 4.8.2, Renda misplaced 350,000 cy of satisfactory material in Borrow Area 2. Additionally, during the months of January, February and early March, Renda placed 620,000 cy of satisfactory material on the east levee instead of the north. The north levee should have had dredged material placed on it beginning in January 2000, but Renda chose to deposit excess material along the east alignment[8]. Renda chose to mechanically construct the north levee. To construct the north levee, Renda transported approximately 174,000 cy in trucks which was recovered material from the east

[8] Renda acknowledges that the dredge ladder pump and main pump was limited in ability to transport materials without a booster pump (Vol IV, Tab 23).

alignment (only 28 percent of the stockpiled material) and 37,000 cy from Borrow Area 2 (about 10 percent of the misplaced material.)

For these reasons and others stated herein, Renda does not support a total cost claim for hydraulic levee construction or constructing levees mechanically when they should have been built hydraulically.

## 5.0 Equipment Rates

### 5.1 General

For the equipment cost element in Renda's claims, the U.S. Army Corps of Engineers Manual, EP1110-1-8, Construction Equipment Ownership and Operating Expense Schedule (Corps Manual) described in Contract Special Clause Section 800, Paragraph 7 was used. Paragraph 7(b) states

> "Allowable cost for construction and marine plant and equipment in sound workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region VI. Working conditions shall be considered to be average for determining equipment rates using the schedule unless specified otherwise by the contracting officer. For equipment not included in the schedule, rates for comparable pieces of equipment may be used or a rate may be developed using the formula provided in the schedule. For forward pricing, the schedule in effect at the time of negotiations shall apply. For retroactive pricing, the schedule in effect at the time the work was performed shall apply."

Section 800, Paragraph (7) further states for rental equipment that

> "(c) Equipment rental costs are allowable, subject to provisions of FAR 31.105(d)(ii) and FAR 31.205-36. Rates for equipment rented from an organization under common control, lease-purchase arrangements and sale-leaseback arrangements, will be determined using the schedule, except that actual rates will be used for equipment leased from an organization under common control that has an established practice of leasing the same or similar equipment to unaffiliated lessees."

The Corps Manual in effect at the time the work was performed is the June 1999 edition for Region VI. Renda used the correct edition of the Corps Manual, but varied the prescribed factors, formulas, and application.

The Defense Contract Audit Agency (DCAA) has performed an examination of each of Renda's claims. For the equipment, the DCAA "determined that the contractor's accounting system is able to track depreciation expense by asset, but not other expenses." Since both ownership and operating costs cannot be determined for any piece of equipment or similar groups of equipment, the contract required the use of the Corps Manual to determine the equipment rates. However, the DCAA miscalculated rates[1] and did not apply the Corps Manual correctly.

Further, the DCAA did not evaluate whether Renda misapplied the Corps Manual, changed factors or formulas, selected the improper equipment for pricing, or made allowances for costs which are included in overhead rates.

Renda selected a shorter useful and physical life than specified by the Corps Manual for the dredge Millennium and its owned booster pump. Such a variation is improper and affects the operating rate as well as the depreciable life of the equipment as noted by the DCAA. By shortening the useful life of the equipment, Renda more than doubles the recovery of the allowable depreciation expense, and likewise accelerates recovery of operating repairs which are to be recovered over the specified physical life. Renda's invention of rates, such as "non-effective time" and "main generator only" is not allowed or consistent with the Corps Manual. The contractor cannot use one element of the manual and disregard others. The equipment rates that result from use of the formulas contained in the Corps Manual include an allowance for the cost incurred during non-effective operating time. Development and use of a "non-effective time" rate results in a deviation in prescribed methodology and double recovery of cost.

---

[1] From reviewing Renda's equipment rates, the DCAA did identify the following:

- For the dredge Millennium and hydraulic booster pump, Renda developed a "non-effective time" category.
- For the dredge only, Renda developed a "main generator only" category.
- Renda selected a severe operating rate, where a choice was possible.
- Renda used a shorter useful life for the dredge and booster pump instead of the useful life required by the specified schedule.

5.2 The Corps Manual

The Corps Manual provides a method for computing the total hourly ownership and operating rates for construction equipment and dredging plant if actual ownership and operating costs are not available. The method includes formulas and factors to compute both total hourly rates and standby rates for individual pieces of equipment. The methodology assumes "that the equipment furnished to the job is in sound, workable condition. Furthermore, the methodology applies only to equipment which prime contractors or subcontractors either own or control."

The hourly rate is the sum of ownership and operating costs. The standby rate consists of the ownership element of the hourly rate. Ownership cost consists of an allowance for depreciation and facilities capital cost of money (FCCM) which is based on the Cost of Money Rate established by the U.S. Treasury. The operating cost element includes allowances for the following:

- Fuel
- Filters, oil and grease (FOG) and includes servicing
- Repairs, which include maintenance and major overhauls
- Tire wear (replacement), and
- Tire repair

"The hourly rates for operating and owning equipment do not include allowances for the following:

Operating Labor
Mobilization and demobilization
Field Office overhead expenses
Home Office &/or G&A overhead expenses
Investment Tax Credit
Contingency allowance
Profit."

Costs which are allowable and normally included in a contractor's field office or home office rate calculations are license fees, property taxes, storage and insurance. These costs are considered by the Corps Manual to be indirect costs and are not included in the total hourly rate.

Further, of importance to the auditor, because it affects the allowable overhead rates, is the repair costs component of the operating rate. The Repair Cost "is an allowance for equipment repairs, maintenance, and major overhauls (including undercarriage wear) performed in either the field or the shop." Items included in the Repair Cost Factor (p. 2-9 of EP1110-1-8) compensate the contractor for:

1. Mechanic labor including base wages, fringe benefits, supervision and all other costs for labor engaged in the direct repair of equipment.

2. Repair parts and supplies, including those items which are required for all repairs and major overhauls.

3. Service trucks and other equipment used during repair and maintenance work, including tools.

4. Supporting repair facilities including field and main repair shops complete with parts and supplies inventory, and shop overhead.

The DCAA should not include repair facilities and shop overhead in the Resident Office and Home Office Overhead rates. Current DCAA overhead rates include an allowance for shop and duplicate the allowance in the equipment rates.

The Corps Manual provides for calculation and/or adjustment of rates based upon the operating conditions. Operating conditions may be average, difficult or severe. The determination of the operating condition is based on the contract specifications, the site conditions, the basis of any supporting evidence, and Appendix C guidance given in the Corps Manual.

For the majority of the equipment, Renda did not use the step-by-step computation methodology presented in Chapter 2 or 4 to obtain the total hourly rates. Renda used the alternative method in Chapter 3, which uses the equipment rates developed and shown in Table 2-1 and Table 2-2 of the Corps Manual. Use of Chapter 3 is permitted provided that:

a. Cost and pricing data is not available.

b. The Contractor's actual unit of equipment is equivalent in size, capacity, horsepower and value to the unit listed in Table 2-1.

If the Chapter 3 method is used, the Corps Manual requires that the ownership and/or operating portion of the total hourly rates be adjusted. Adjustments are to be made when one or more of the following conditions exist:

Changes in operating conditions
Changes in FCCM rate
Work shifts greater than 40 hours per week.
Changes in Fuel Cost
Equipment of a different age than Table 2-1

For the equipment rates computed by using Chapter 3 methodology, Renda listed adjustments for all the above conditions, except fuel cost. However, not all the adjustment factors were used by Renda, and some were used improperly. In the Table 2 rates, fuel cost for a gallon of diesel (off-road use) is at $0.74 per gallon. During the Renda claim periods from April 2000 thru April 2001, off-road diesel averaged $0.943 per gallon per month (Vol III, Tab 99). The equipment rates re-calculated herein use a fuel adjustment factor for diesel fuel and the rate of $0.943 per gallon. Use of this average fuel rate will result in over-compensation during some periods and in under-recovery for other periods.

5.3 Selection of Operating Conditions

Rates calculated herein make adjustments for operating condition. Contract Section 800– Special Clauses Paragraph 7 states, "Working conditions shall be considered to be average for determining equipment rates using the schedule, unless specified otherwise by the contracting officer". The contracting officer has not determined that working conditions were anything but average.

For the marine equipment, the site working conditions are normal and customary. The dredge, boats and barges are working sheltered, inland service areas of lakes, bays and sounds (See Service in Dredge Millenniums' Survey Report No. 99-4285 (Vol III, Tab 1).

Although the bayou water is subject to tidal influences, the Upper Bayou Project is not an ocean environment subject to the pounding of medium to heavy waves. For the dredging plant, average condition rates are used.

For the land-based construction equipment. Appendix C of the Corps Manual indicates that a salt water environment is a condition for considering the use of severe rates for construction equipment. Since the water is subject to tides and slightly salty, the severe rate was selected and used for the land-based construction equipment when a choice was possible.

5.4 Rental Equipment Rates

For the rental equipment, the Corps Manual states that the hourly rates computed do not represent rental rates. However, it is common practice to calculate an operating fuel rate for the rental equipment from the Corps Manual and add the result to the actual rental rate. Rental equipment companies are generally required to perform repairs on their equipment. It is my experience that a 50/50 split of the repair cost shown in the Corp Manual has been a reasonable compromise for the maintenance that the contractor must perform. Therefore, the actual rental equipment cost is used to compute the rental rate plus an operating rate of fuel, FOG, and half of the repair cost, including tire repair.

5.5 Dredging Plant

The methodology of Chapter 4 of the Corps Manual is to be used to compute the ownership and operating rates for dredging plant. The dredging plant is more than just the dredge. Dredging plant is all floating equipment engaged in support of the dredging operation including but not limited to, work barges, tugs and tenders, pipelines, pontoons and boats.

Often, Renda uses Chapter 3 methodology incorrectly for calculating the ownership and operating expense rate for the barges and tenders. For smaller boats (e.g. boats with horsepower less than 500) the methodology of Chapters 2 and 3 (non-dredging

equipment) may be used, but those rates must be adjusted for dredge operation hours in accordance with the methodology presented in Chapter 4. This was not done by Renda.

Evaluation of Renda's equipment rates reveals that Chapter 4 Methodology for Dredging Plant was not used on seven pieces of attendant plant. They are:

| Item | |
|---|---|
| 3 | Duplex High Pressure Pump |
| 8 | Workboat 'Marilyn McFarland' |
| 9 | Workboat 'Crista Dian' |
| 10 | Anchor Barge AB102 |
| 13 | Work Barge #1 |
| 18 | Fuel Barge 1 |
| 21 | Work Barge #2 |

Renda also uses the Chapter 3 methodology for small work boats (dredging plant) but does not adjust the shift factor to make those rates consistent with Chapter 4 methodology, as required by Paragraph 4-2 of EP1110-1-8.

Renda's selection of equipment in Chapter 2 comparable to the equipment owned by Renda is questionable. Insufficient equipment descriptions are provided by Renda for its owned equipment (horsepower, value, capacity and size) to determine whether the underlying assumption for selecting a particular unit from Chapter 2 was reasonable. Chapter 3 Methodology (p 3-8, EP1110-1-8) permits the selection of rates from Chapter 2, Table 2-1 if the comparable unit of equipment (horsepower, value, capacity and size) is similar. Some of the more notable discrepancies are:

| Item | Equipment | Remarks |
|---|---|---|
| 3 | Duplex High Pressure Pump | From discussions with Mr. Eric Russek, COE, this pump is a component of the dredge Millennium. Comparable equipment selected M10CP0002 is a stand-alone hydraulic dredge. Improper selection of equipment by Renda. |
| 8 | Workboat 'Marilyn K. McFarland' | Comparable equipment selected M10SM020 is a 600 horsepower (HP) boat; Marine Survey |

| | | |
|---|---|---|
| | | Report for the McFarland shows 390 HP. No adjustment and improper selection by Renda. |
| 9 | Workboat"Crista Dian' | Comparable equipment selected M10SM021, a tug with 1000 HP valued at $454,208. No marine survey located to compare horsepower. Horsepower listed for Crista Dian on IRD is 400 HP. From Renda's Asset Detail, value of equipment is only $86,600. No adjustment made to ownership – improper selection by Renda. |
| 47 | Tugboat'Melissa B' | 'Melissa B' is represented to be rental equipment. However, 'Melissa B' is listed in Renda Asset Detail as being owned. Rental rate questioned. |
| 12 | Grove Hydraulic Crane | Renda selects a C75GV005 as comparable equipment. The C75GV005 is an 18-ton hydraulic crane valued at $224,000. Renda's Asset Detail lists a Grove Crane Rough terrain crane 15-ton purchased in 1998 for $30,657. Poor selection and no adjustment for value by Renda. |
| 22 | Skid Loader–Timberjack 450 | Renda selects a Cat L60CA013 as comparable equipment. The L60CA013 is a 160-HP machine valued at $157,000. Renda purchased the skidder in 1998 for $13,200 per Asset Detail. While horsepower and capacity are similar, no value adjustment is made by Renda. |

Other questions and comments concerning the individual pieces of equipment are contained in Volume 5, Equipment. However, as a general note, it was difficult to check the selection of comparable equipment from Table 2-1 and 2-2 when such sketchy information was provided by Renda for most of its owned construction equipment or marine plant. In most cases, the value, size, horsepower and capacity of the Renda owned equipment was not presented for comparison with Table 2. Therefore, most of the equipment rates calculated herein are based on the value, size, horsepower and capacity of comparable equipment selected by Renda.

The equipment rates calculated are adjusted for the actual operating hours. For attendant marine plant (e.g. work skiff) where Chapter 3 methodology was used for calculation of the rate, the shift hours were adjusted to correspond with the operation hours of the dredge. However, most marine plant was recalculated using the methodology of Chapter 4. Each individual calculation by Chapter 4 methodology is present in Volume 5 under the individual tab for the equipment.

The following is a summary of the equipment rates. Following the summary are the calculations for the equipment using the methodology presented in Chapter 3 of the Corps Manual.