## 2 BACKGROUND AND EXPERIENCE OF QUALIFYING EXPERTS TO ADDRESS AND OFFER OPINIONS

This expert report was prepared based on my experience and expertise with dredging as both a contractor and consultant. Anchor staff provided administrative and technical editing support. My role will be to testify on the issues of dredging, transport of dredged materials, equipment capability, and construction operations during the conduct of the Upper Bayou project. I have not authored a publication within the preceding ten years, and have not testified as an expert at trial or by deposition within the preceding four years.

Anchor technical staff that assisted me in preparation of this document included Mr. Tom Wang, P.E. and Mr. Greg Guannel. They assisted me with preparing figures and report technical editing. Following are biosketches for Mr. Wang, Mr. Guannel, and myself.

**Robert W. Lofgren, M.S.**, a subconsultant to Anchor Environmental, L.L.C., is a nationally recognized expert in the design of hydraulic dredges and management of large hydraulic and mechanical dredging projects. Mr. Lofgren has over forty years of national and international dredging experience with both hydraulic and clamshell dredges.

Mr. Lofgren started his career in the dredging industry as a field engineer on large hydraulic dredges in 1956. His tasks varied between cost keeping, surveying, and management of dredging operations. He advanced to become Vice-President and President of Western Pacific Dredging, a dredging contractor. During these years, Mr. Lofgren was responsible for the design and assembly of five hydraulic dredges. He also managed many major dredging projects such as the deepening of the Columbia River in the mid-1960s and the restoration of navigation and flood control channels following the eruption of Mount St. Helens in 1980. He was responsible for dredging of the foundations for the cofferdams at the Itaipu Dam in Brazil. Mr. Lofgren currently consults with national dredging contractors and dredging consultants nationwide. His resume is attached in Appendix A.

**Thomas S. Wang, P.E.**, a partner with Anchor, is an expert in the design and implementation of dredging and remediation projects. Mr. Wang has over 13 years experience managing numerous dredging and marine projects from the initial planning and permitting stages through design and construction.

Mr. Wang's dredging experience includes domestic and international sites in river, lake and coastal environments, and includes: equipment selection, development of dredge and disposal plans, permitting and regulatory assistance, assessment of environmental impacts from construction activities, sediment characterization, in-water disposal facility evaluation and design, cost estimating, preparation of bid plans and specifications, disposal area management, and construction management.

**Gregory E. Guannel, M.S.**, has two years of experience in the field of dredging. As a staff engineer, he provides engineering assistance in the design of dredge plans, dredging operation oversight, bid plans and specifications preparation, and cost estimating.

## 3 INFORMATION AND DATA REVIEWED AND CONSIDERED BY EXPERTS

In order to understand the project and claims, there were several steps I took in order to form my opinions. First, I reviewed information obtained from the DOJ that is listed below. I then conducted two separate site visits in the summer of 2003 to investigate the dredging and disposal sites, and to meet with individuals who were involved with the project. During my site visit, the key individuals I met with to gain a more comprehensive understanding of local site conditions included: Erik Russek of the USACE, Galveston District, Leon Hrabovsky of Gahagan and Bryant (an engineer working for the Port of Houston), and Wendall Mears of Gahagan and Bryant. I also contacted Ben Goodloe (Renda Marine supervisor) by telephone to discuss the project and site conditions.

As part of my review, I received the following documents from DOJ and reviewed all of them:

- Department of Justice, February 2003. CD-ROM Contract Drawings.
- Renda Marine, February 2003. CD-ROM Volume 1.
- Renda Marine, February 2003. CD-ROM Volume 2.
- Department of Justice, February 2003. CD ROM RM-COE-19888-21559 Job 120380, Box 001.
- Department of Justice, March 2003. CD ROM RM-COE-05958-RM-COE-11138 Job 100483, Boxes 004 to 005.
- Department of Justice, March 2003. CD ROM RM-COE-11139-RM-COE-18552 Job 1004383, Boxes 006 to 008.
- Department of Justice, March 2003. CD ROM RM-COE-18523-RM-COE-19887 Job 100483, Box 009.
- Department of Justice, March 2003. CD ROM RM-COE-00001-RM-COE-05957 Job 100483, Boxes 001 to 003.
- Department of Justice, March 2003. CD ROM RM-COE-21569-RM-COE-22692 Job 020172, Box 001.
- Department of Justice, April 2003. CD ROM RM-PHA-0001-RM-PHA-00871 Job 040087, Box 001.
- Department of Justice, April 2003. CD ROM RM-HVL-00001-RM-HVJ-01747 Job 100483, Boxes 001 to 003.
- Department of Justice, April 2003. CD ROM RM-JSG-0001-RM-JSG-00606 Job 030241, Box 001.

- Department of Justice, April 2003. CD ROM RM-GBA-00001-RM-GBA-00140 Job 030241, Boxes 001 to 008.
- Department of Justice, April 2003. CD ROM RM-TCB-0001-RM-TCB-01735 Job 030241, Boxes 001 to 008.
- Department of Justice, May 2003. CD ROM RM-CHU-00001-001438 Job 050444, Box 001.
- Department of Justice, June 2003. CD ROM RM-COE-22744-2324 Job 050446, Box 001.
- Department of Justice, September 2003. CD ROM-Drawings, Pre- and Post Dredging Cross-Sections, Surveys, Volumes.
- Leefe, Gibbs, Sullivan, April 2003. CD ROM RM-DSC-0001-RM-DSC-05684 Job 030596, Boxes 001 to 008.
- Renda Marine, July 1999. Letter from Renda Marine to Mr. McClenan, Department of the Army, Galveston District Corps of Engineers.

I reviewed the content of each CD, and considered the specific documents (listed below) found on the CDs to be the most relevant in forming my opinions. In order to address some of the questions asked by DOJ in letters from DOJ to Anchor dated May 9, 2003 and October 24, 2003 (Appendix B), I also referenced several industry accepted dredging publications by Tom Turner (listed below) to evaluate pumping and production rate capabilities, and performed some additional analyses of pumping capabilities using both hydraulic head loss equations (as discussed in later sections) and the model "PIPELINE," which is a proprietary hydraulic dredge production rate model developed by Parsons Brinckerhoff. These references and additional information that I used in evaluating the claims are listed below:

- DuPont, A., October 1998. Letter to USACE concerning the evaluation of Dredge *Millennium* production capacity.
- Gahagan and Bryant, November 1999. Letter to USACE concerning the evaluation of Dredge *Millennium* production capacity.
- Mears, W., August 1999. Memorandum from Robert Kite regarding the Upper Bayou Volumes, Station 520+00 to 550+65.99.
- Parsons Brinckerhoff, 2003. "PIPELINE" Model. Proprietary model to calculate production rates for hydraulic dredges.
- Renda Marine Report of Operations
- Renda Marine Daily Reports

- Renda Marine Daily Production Reports
- Renda Marine, 2001. "Request for Equitable Adjustment (Revision No. 1) for Differing Site Conditions Damages and Delays Related to Obstructions in Channel (Station Nos. 570+00 thru 630+00)", Binder No. 1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.
- Renda Marine, 2001. "Certified Claim for Differing Site conditions South Ferry Landing Area, Dredge Station No's. 470+00 to 472+00", Binder No. 1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.
- Renda Marine, 2001. "Request for Equitable Adjustment for Differing Site Conditions Damages and Delays Related to Obstructions No. 2 in Channel (Station No's. 660+00 thru 685+00)", Binder No.1 of 1, Contract No. DACW64-99-C-0001, Houston – Galveston Navigation Channels, Texas Dredging Upper Bayou, (45-foot Project), Harris and Galveston Counties, Texas.
- Renda Marine, July 1999. Letter from Renda Marine to Mr. McClenan, Department of the Army, Galveston District Corps of Engineers.
- Renda Marine, 1999. "Dredge *Millennium* Accepted Proposal", letter to William J. Wetta II, from Eddie R. Fisher from Renda Marine Inc.
- Turner, T.M., 1984. "Fundamentals of Hydraulic Dredging", Cornell Maritime Press.
- Turner, T.M., 1996. "Fundamentals of Hydraulic Dredging", Second Edition, ASCE Press, 258 pp.
- U.S. Army Corps of Engineers (USACE), 1998. "Houston-Galveston Navigation Channels, Texas (45-Foot Project), Specifications for Dredging the Upper Bayou", Department of the Army Galveston District, Corps of Engineers Galveston Texas, Invitation No. DACW64-98-B-004.
- U.S. Army Corps of Engineers (USACE), 1998. Houston-Galveston Navigation Channels, Texas (45-Foot Project), Construction Drawings.
- U.S. Army Corps of Engineers (USACE) Inspection Report of Dredging – Galveston District

# 4 STATEMENT OF OPINIONS

I was asked by the DOJ to provide my expert opinion on the three claims made by Renda Marine, and on various other questions asked in letters from DOJ dated May 9, 2003 and October 24, 2003 (Appendix B). The following sections will present my responses to questions that I was asked to consider. For each claim, I will provide a brief summary of my general understanding of the claim, and then present my general opinions regarding each claim. I will then address the specific questions asked by DOJ.

## 4.1 Pre-Bid Site Investigation

In the May 9, 2003 letter from DOJ to Anchor, I was asked to address the following question:

> *"Would a reasonably prudent dredging contractor have performed a site investigation prior to submitting a bid for the Upper Bayou Project? If so, what should the pre-bid site investigation have entailed insofar as the dredging part of the scope of work is concerned, considering (a) the nature and size of the undertaking, (b) the time available for performing a site investigation prior to submission of a bid, and (c) the Site Investigation clause contained in the contract?"*

Prior to submitting a bid, a contractor has to consider different features that will affect the production of a hydraulic dredging job and that can have an impact on the dredging activity. These features are related to material characteristics as well as site use and conditions. For example, before bidding on a job, a dredge contractor has to pay particular attention to items such as:

1. Characteristics of the material to be dredged including grain size and specific gravity
2. Stiffness of material to be dredged
3. Depth of dredging to grade
4. Depth of dredge cut face
5. Width of dredge cut
6. Length of pipeline
7. Elevation change from the dredge site to the disposal area
8. Current velocity condtions
9. Tidal range
10. Ship or vessel traffic, number of passings
11. Number of stoppages due to debris
12. Existing industry along the shorelines
13. Ferry or other vessel supervisor coordination

Prior to submitting a bid for this dredging project, a reasonably prudent contractor would perform a site investigation in order to familiarize himself with the site and to identify features that affect dredging operation in addition to the information presented in the project specifications. This site visit is an important step in the preparation of the bid package. The range of site conditions and dredge material characteristics will dictate the type of equipment and the power required of the pumps and cutter to achieve the desired rate of dredging. A clear identification of site specificities will help the contractor to determine additional items to consider in selecting his dredge specifications such as:

1. Length of the ladder and ladder angle/max
2. Length of dredge hull
3. Width of dredge cut for a 45° to 45° swing
4. Cutter type, horsepower, and RPM (revolutions per minute)
5. Ladder pump vs. no ladder pump
6. Maximum discharge pressure available
7. Pump horsepower available
8. Power and speed of swing winches
9. Need for a booster pump (located on the hydraulic transport pipeline)
10. Power and speed of spud operations

The job was advertised on June 16, 1998 with an original bid opening date on July 17, 1998. A pre-bid meeting with project personnel from the USACE was held for the contractors on June 23, 1998 for the purpose of answering contractors' questions and/or giving clarification of the specifications. Renda Marine did not sign the attendance list at this meeting and is presumed to have not attended.

The one-month period allowed to contractors to prepare their bid is typical of the USACE contracting practice. Based on my past experience as a dredging contractor, there was sufficient time from advertisement to bid opening for a contractor to perform a thorough site investigation on which to base their bid.

Although primarily concerned with the deepening and widening of the Houston Ship Channel, the contract specifications were also concerned with the construction of disposal area levees on Lost Lake Island. Because of the specified complexities for this type of project

(i.e., dredging, transport to upland placement sites, active navigation channel), it is standard practice for a contractor who intends to bid on a project to visit the dredging project site and dredged material placement locations to determine answers to their logistical questions (e.g., where to change crews, where to install pipelines both floating and submerged, and to determine the vessel traffic pattern for the area), in order to limit their risk and prepare a bid.

A reasonably prudent contractor, during the site investigation in preparation of his bid, should have examined the existing shoreline bank protection and noted the type of shoreline protection materials used, as well as estimating (using best professional judgment or contacting the group responsible for maintaining the shoreline protection, such as County public works) when the shoreline protection material was originally placed and/or maintained, and what equipment was likely used to place the material.

Bank protection material that was placed with floating equipment and floating material barges will likely extend farther into the water than bank protection material placed with land-based equipment. A marine operation is also likely to spill some quantity of shore protection material outside of the required or designed slope protection areas. This spilled quantity may be significant and could affect dredging productions and stoppages for cleaning the pump. A reasonably prudent contractor also needs to determine the tide and currents to be expected in the areas and to generally observe any job features that could impact the cost of performing the work such as exposed riprap close to the channel and vessel traffic.

The presence of vessels within an active navigation channel should always be anticipated, regardless of whether a site investigation is performed. However a site investigation would reveal traffic patterns, frequency of vessels transit within the dredge area, size of vessels and their navigation needs. Please note that contract drawing C-6 required the contractor to "*...coordinate with ferry supervisor to avoid conflicts with ferry operations.*"

This project also included a levee building/raising aspect for the disposal area levees on Lost Lake Island. A reasonably prudent contractor would have investigated the Lost Lake area at great length to evaluate several key aspects of this job such as (a) the condition of the

existing disposal area and dikes, and (b) the type of material previously disposed on the area taking note of its stiffness, color, specific gravity, size of any "clay balls" still visible and any other soil characteristics that could hinder or help the construction of the levees. The contractor would also need to identify a location for staging the shore operation (i.e., where the hydraulic pipeline transporting the dredged material comes up on shore) as well as to inspect the areas of the proposed weirs.

In conclusion, a reasonably prudent contractor would have spent considerable time investigating the site to assist in determining the cost of dredging and the construction of the disposal area levees. This site investigation typically would be performed with an experienced person or team, familiar with the job requirements including current methods of constructing levees using hydraulically placed clay materials, and the costs associated with the dredging and construction of levees using the hydraulic dredge method.

## 4.2 South Ferry Landing Claim

This section presents an overview of my opinions regarding the South Ferry Landing Claim, and presents my responses to DOJ questions asked in their May 9, 2003 letter.

### General Understanding of Claim

My general understanding of the South Ferry Landing Claim is that Renda Marine claims there was riprap, rubble and other debris encountered within the required excavation prism, and that Renda Marine was not given sufficient information to anticipate the presence of these impediments to dredging.

### General Opinion

Upon reviewing the available information, my opinion is that the amount of debris present was not excessive and should have been expected by a reasonably prudent contractor upon conducting a pre-bid site investigation. The basis for my opinion is discussed in more detail in the following response to question sections. It is also important to note that the bid specifications (Section 02482 - Dredging, paragraph 3.4.4.2 Debris) required the contractor to conduct its own pre-construction inspection to determine the presence of debris that may interfere with dredging:

> *"Prior to dredging, the Contractor shall carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the Contractor deems suitable to locate any debris which may interfere with dredging operations..."*

In addition, the post-dredge cross sections taken in the South Ferry Landing area (post-dredge cross sections 470+00, 472+00, 476+00, 480+00 and 484+00 [Figures 2-5]) all indicate that the contractor severely overdredged both the slopes and required dredge elevation, beyond the required design. I conclude that if there were dredging delays caused by riprap, rubble, or other debris, those difficulties were caused by the overdredging of the side slopes, which would cause slope protection materials outside of the required dredging limits to fall into the required excavation prism, resulting in the need to remove those materials. The basis for this opinion is discussed in more detail in the following response to questions sections.

The contractor initially attempted to dredge the South Ferry Landing area using a floating pipeline when working from the east end of the site and proceeding westerly. These initial operations resulted in significant downtime due to having to reposition the dredge and floating pipeline in relation to ferry and ship traffic. It is important to note that a reasonably prudent contractor should have coordinated with the ferry supervisor as required in Contract Drawing C-6 to ascertain the type, frequency and timing of vessels calling at the landing. Based on experience, a reasonably prudent contractor would also have installed a submerged pipeline at the start of the project in that location to avoid excessive downtime from vessel traffic. It is important to also note that Renda Marine did in fact replace the floating pipeline with a submerged pipeline on April 7, 2000 and dredged in the northerly downstream direction, which resulted in fewer delays and increased production.

#### 4.2.1 South Ferry Landing Claim, Question 1, May 9, 2003 letter.

*"Considering the soundings and depiction of "existing riprap and rubble shore protection" at the North Ferry Landing and the note that the contractor "shall coordinate with ferry supervisor to avoid conflicts with ferry operations" on Drawing C-6, what action(s) would a reasonably prudent dredging contractor take?"*

The specifications (Section 02482 - Dredging, paragraph 3.5.2 Side and End Slopes) state that:

*"The Contractor shall be required to use caution when cutting the side slopes in the Channel from station 470+00 to station 473+00...Excessive cutting outside the side slope lines and grades in theses reaches of the Channel may cause damage to existing structures along Channel. If the Contracting officer determines that excessive cutting of the side slopes in these reaches causes failure of existing structures, the Contractor shall be responsible for restoring the structures to their pre-dredging condition. Therefore, the Contractor may consider shaping the top of the cut in these reaches by using the dredge cutter head or mechanical equipment."*

This warning was meant to alert the contractor for the need to take extra care in excavating the slopes in this area. The contract drawings indicate the presence of slope protection on the north side of the channel. I also noted the presence of that riprap during my site visits. Based on the overall appearance and condition of the slope protection, I observed that this slope protection material had been in place for many years. Also, I observed that slope protection material is placed on the above water part of the upper slope, most likely to prevent erosion from wave forces. Based on my experience, it is unlikely that there would be significant slope protection material found within the channel lines. Wind induced and ship induced waves within a confined navigation channel are typically not large (i.e., less than a few feet in height) therefore, slope protection typically is placed on the upper slope extending to several feet below the waterline to prevent erosion from wave attack, but would not typically extend below water depths of greater than approximately ten feet. This is evidenced on the contract drawings of the north slope (Contract Drawing C-6) where the riprap material ends approximately 70 feet from the toe of slope. During my site inspection, the presence of visible riprap on the south side access road alerted me (and should have alerted the contractor) to the probable presence of riprap on the south side, adjacent to the South Ferry Landing.

A box-cut is simply a series of small cuts down the slope that resemble stair steps because the contractor is attempting to match the required slope grade without excavating excessive material from the slope (Figure 10). Box-cutting of the slope is to be used sparingly and when used, the boxes need to be quite small, less than one cutter diameter, and confined to the outer face of the slope line.

With respect to downtime from vessel traffic, the contract specifications (Section 02482 – Dredging, paragraph 3.4.4.2 Debris) and contract drawings (Drawing C-6 Note 2) were clear that the contractor was responsible for coordinating with the ferry supervisor to avoid conflicts with ferry operations. As previously mentioned, based on experience, a reasonably prudent contractor would have installed submerged pipeline at the start of the project in that location to avoid excessive downtime from vessel traffic. It is important to also note that Renda Marine did in fact replace the floating pipeline with submerged pipeline on April 7, 2000 that resulted in fewer delays and increased production.

### 4.2.2 South Ferry Landing Claim, Question 2. May 9, 2003 letter.

*"What, if any, assumption(s) would a reasonably prudent dredging contractor make about conditions, including shore protection at the opposite terminal, i.e., the South Ferry Landing?"*

A reasonably prudent contractor would assume that slope protection on the south side would be similar to the slope protection as shown on the north side since it is reasonable to assume that the wave conditions and slope material conditions are similar on both sides of the channel. This erosion protection would typically extend to near the top of the slope and would be subject to sloughing into the required dredge cut if the slopes were overcut.

A. *"Would a pre-bid site investigation by a reasonably prudent contractor have disclosed the presence of riprap and rubble shore protection at the South Ferry Landing?"*

A reasonably prudent contractor conducting a pre-bid site investigation would notice that the approach road leading to the South Ferry Landing was protected with riprap and some broken concrete to protect the road from erosion from waves

generated by the wind and passing vessels. During my site visit in June 2003, I observed, based on the aged condition and disrepair of the slope protection, that the South Ferry Landing area slope protection appeared to be well used and the slope protection probably had been repaired at various times in its past.

B. *"Did the riprap and rubble shore protection at the South Ferry Landing constitute an impediment to dredging operations? If so in what way(s)? If not, why not?"*

The slope protection on the approach road to the ferry landing did not constitute an impediment to the required dredging. The slope protection material on the north side of the channel (as shown on Contract Drawing C-6) did provide a basis for assuming that the slope protection on the south side was similar to the slope protection on the north side as shown on Drawing C-6. The slope protection on the north side extended to within approximately 70 feet of the toe of the cut. A reasonably prudent contractor should have assumed that a similar situation existed on the south side of the channel. A reasonably prudent contractor would have used the visual observation of slope protection material in close proximity to the top of the designed slope as a warning that they needed to take extra care while dredging the slope. A reasonably prudent contractor would not have overcut the slope causing it to slough which could bring slope protection materials into the required dredged cut.

C. *"Would it be reasonable to assume that dredging operations could disturb the riprap and rubble shore protection at the South Ferry Landing?"*

It is not reasonable to assume that dredging operations could disturb the riprap and rubble shore protection at the South Ferry Landing had the contractor stayed within the required limits of dredging. The actual South Ferry Landing is outside of the dredge slope line limits; therefore the slope protection should not have been disturbed, provided the contractor took care not to overdredge the design slope.

Based on reviewing the excessive overcutting of the slopes at the South Ferry Landing area, it is reasonable to assume that the dredging operations disturbed the

riprap and rubble shore protection material and that some of this material sloughed off the slope and down into the required dredging prism. See Figures 2 to 5 for the post-dredge cross sections that indicate the extreme overcutting that occurred.

Based on my experience, a hydraulic dredge could effectively excavate the design slopes specified without causing a failure of the slope outside of the designed slope line (i.e., 1 vertical to 3 horizontal [1:3]), and could excavate the design slopes without significantly overcutting the slopes. Modern positioning equipment such as a Global Positioning System (GPS) or Differential GPS (DGPS) with an on-board monitor will allow a dredge operator to conduct their dredging to within a typical equipment accuracy of ± 3 feet horizontally and ± 0.5 to ± 1 foot vertically of the designed cut lines on slopes and in the channel. Using real time positioning equipment, which is fairly standard within the dredging industry, the dredge operator can actually see the position of the dredge cutterhead in relation to the designed slope on a monitor and avoid over-cutting the slope. It should be noted that it is not sufficient to have this modern equipment on board; it must also be calibrated and working properly and operated by an experienced crew.

A contractor that does not take advantage of the modern positioning equipment is likely to overcut the slopes and excavate considerable quantities of material from outside of the authorized pay-lines. However, based on past experience, the degree to which Renda Marine overcut the slopes and channel areas is extremely excessive. A reasonably prudent and experienced contractor would not have intentionally allowed such excessive overcutting. The post-dredge survey cross sections (Figures 2 to 5) are direct evidence that the contractor either (a) did not have adequate positioning control equipment, (b) did not properly utilize their positioning control equipment, or (c) did not have an experienced dredge operator to ensure that care was taken when dredging the slope area as specified in the USACE bid specifications (Section 02482 – Dredging, paragraph 3.5.2 Side and End Slopes).

i. *"If so, what amount of overcut might be a disturbance to the riprap and rubble shore protection at the South Ferry Landing?"*

Based on my experience, the design slope (1V:3H) selected by the design engineer is based on a static slope stability evaluation to determine a slope that will remain stable under ambient conditions. A 1:3 slope usually represents a stable condition for sandy material. Since the slope area, which included new work areas, likely comprised both consolidated and unconsolidated[1] materials, a temporary construction slope steeper than 1:3 (between 1:1 to 1:2) would occur. Because the design slope was 1:3, the contractor would likely have had to grade the slope, using box-cuts for example, to ensure removing the slope material above a 1:3 grade. Any amount of over excavation at the toe of slope would cause some failure of the slope but this failure would be relatively confined to the area of overcutting when excavating in new work areas. Figure 11 illustrates this point.

The only indication in the specifications of the proximity of the slope protection to the toe of cut in the channel is on Contract Drawing C-6 that shows the approximate location of riprap on the north side of the channel (approximately 70 feet from the toe). It would be reasonable to anticipate that a similar situation exists on the south side of the channel. The specifications (Section 02482 - Dredging, paragraph 3.5.2 Side and End Slopes) warn of excessive cutting of the side slope in this area and caution that, *"...the Contractor may consider shaping the top of the cut [...] by using the dredge cutter head or mechanical equipment."* It is not unusual in the dredging industry to use a clamshell dredge or other special equipment to excavate areas where there is a possibility of coming across riprap within the dredge prism.

[1] Sediments consolidate over time as additional layers of sediment are deposited, or when external loads (i.e., logs and other debris) are placed at the surface. The weight of the overlying material or external load causes water to be expelled from within the sediment mass thus resulting in a stiffer/harder material (consolidated material). These sediments are generally more difficult to excavate in comparison to softer, more recently deposited sediment (unconsolidated material).

Based on experience with how slopes behave temporarily during construction, it appears likely that Renda Marine box-cut the slope in order to achieve the required grade, but had poor positioning control that resulted in their excavating excessive slope material, including any slope protection material that was present on the overcut slopes. For example, the post-dredge cross section at station 472+00 (Figure 3) shows an overcut of approximately 35 feet horizontally at the top of the dredged slope (approximate elevation of –22 feet MLT [Mean Low Tide]). This overcut likely caused any slope protection material in this area to fall into the required dredge cut that would become a problem for the hydraulic dredge to excavate.

ii. *"What amount of overcut would a reasonably prudent dredge operator allow in the vicinity of the South Ferry Landing?"*

Modern positioning equipment such as GPS or DGPS allows a contractor to position the dredge cutterhead with a horizontal tolerance of ± 3 feet. Modern depth gauges will allow for vertical tolerances of around ± 0.5 feet. Actual vertical accuracy varies depending upon the dredge equipment, but vertical accuracy within ± 1 foot is considered typical and reasonable. The allowable overdepth specified in the design is a standard allowance in dredging contracts to account for equipment accuracy when trying to meet the required dredging depth. Therefore, based on my experience, overcutting in the horizontal direction of less than approximately six feet is considered reasonable, while overcutting in the vertical of less than two feet is considered reasonable with standard hydraulic dredging equipment. These values represent twice the accuracy that typically can be achieved using adequate positioning equipment.

For this project, the post-dredge survey cross sections show an excessive amount of overcutting, both horizontally and vertically. The new (i.e., post-dredge) toe of slope (based on the post-dredge survey) extends horizontally as much as approximately 25 to 30 feet past the design toe of slope (Figures 2 to 5). The new top of slope (based on the post-dredge survey) extends as much as 35 feet past the design slope line. The post-dredge survey cross sections also show that

Renda Marine overdredged up to six feet below the required dredge depth, and consistently overdredged by several feet throughout the South Ferry Landing area. These slope and channel overcuts are consistent on both the south and north sides of the channel, indicating that this problem was due to a lack of adequate positioning control.

iii. *"What factor(s) relating to the operation of the dredge Millennium might contribute or result in a disturbance to the riprap and rubble shore protection at the South Ferry Landing (e.g., equipment not functioning properly, operator inexperience with the dredge)? Did any such factors contribute or result in a disturbance to the riprap and rubble shore protection at the South Ferry Landing?"*

The main factor that likely contributed to sloughing of hard slope protection materials appears to be due to a lack of adequate positioning control on the dredge. A determination could not be made whether this involved a lack of adequate equipment, equipment malfunctions, or inexperienced dredge operators. The Renda Marine Report of Operations (Daily Report of Operations showing locations, delays, volumes, dredges), do not indicate that the dredge operator was utilizing modern navigation equipment in this area. The post-dredge survey cross sections show that the operator did not have adequate horizontal and vertical positioning equipment for performing close tolerance dredging on the slopes or on the bottom of the cut. The pay volume in the USACE payment estimate (Appendix C) indicates that Renda Marine dredged a "Total to Date" dredging pay volume of 3,425,642 CY of material. The CD-Rom obtained from DOJ containing Drawings, Pre- and Post Dredging Cross-Sections, Surveys and Volumes (DOJ September 2003) indicate a Total Excessive Dredging volume of 843,095 CY. This over-dredging amounted to approximately 25 percent of the total project volume. Based on experience, over-dredging typically does not exceed 5 to 10 percent of the total project volume. This large over-dredge volume indicates that the dredge either did not have good positioning equipment that functioned properly, or if such equipment was on board and working properly, the leverman was not paying close attention to the position monitor.

Over-dredging the slope in this area would disturb any slope protection material within the area adjacent to the top of the slope and would cause this material to travel down the slope and encounter the cutter, causing plugs in the pump, cutter, and pipeline.

### 4.3 Flare Area Claim

This section presents an overview of my opinions regarding the Flare Area Claim, and presents the responses to DOJ questions asked in the letter dated May 9, 2003.

**General Understanding of Claim**

My general understanding of the Flare Area Claim is that Renda Marine claims that differing material conditions than those shown on the contract drawings, and as indicated in the contract boring logs (presented in the plans and specifications) within the Flare Area, resulted in decreased production rates. Renda Marine claims that the unanticipated presence of "stiff or dense" clay was substantially different from the softer clays that were indicated in the bid documents, as interpreted by Renda Marine, and that the dredge production was substantially reduced by the presence of these "stiff clays."

**General Opinion**

There are four main parts to my opinion with regards to the Flare Area Claim:

- The boring logs and pre-bid site investigation are considered sufficient information for a reasonably prudent contractor to anticipate that there is clay material throughout the dredge cut, and to determine that the clay material would be likely to form "clay balls" (based on moisture content from the boring logs). The formation of clay balls is the main reason that clay material is difficult to transport in a hydraulic dredged pipeline. The "stiffness" of clay typically refers to the ability of the dredge cutter to excavate the material, rather than describe its difficulty in transporting the material. Once excavated from the in-situ, soft clays or stiff clays are transported in the same manner, and only the presence of "clay balls" results in difficulty in pumping the clay material. A site visit to the levee areas in June 2003 indicated the presence of "clay balls" based on visual observations alone. A pre-bid site investigation of the placement areas, where the USACE specified the clay material to be used for the levee maintenance, would also have indicated the presence of "clay

balls" and "stiff" clay from past dredging activities. A reasonably prudent contractor would have assumed that new work dredging (i.e., Flare Area) would also result in the formation of "clay balls" that are more difficult to transport than finer grained material.

- Renda Marine did not use a booster pump[2] until July of 2000. Until then, they did not provide sufficient pipeline pressure (in feet of head) in the pipeline system to effectively pump the clay material the required distance at the required velocity. The basis for this opinion is discussed in Section 4.5.1.
- The available Renda Marine Report of Operations do not mention the presence of stiff clay in the material description section of their report (reports from January 17 to March 15, 2000) and do not indicate that Renda Marine had difficulty in cutting the material to be dredged (including the alleged "stiff" clay), indicating that the "stiff" clay did not behave significantly differently, as far as "cutting" the material, than other clays that were being dredged. Renda Marine's problem was the inability to maintain an adequate pipeline velocity while pumping "clay balls" over long distances.
- When it became evident that the contractor could not pump the clay material at a reasonable production rate using only the ladder pump and dredge main pump (as evidenced by decreased hourly production rates and by significant plugging within the pipeline), a reasonably prudent contractor would have quickly installed a booster pump in the transport system to increase the velocity of the slurry and to avoid plugging the pipeline.

My interpretation of the boring logs within and adjacent to the Flare Area (boring logs 3ST-4, 3ST-5, 3ST-6, 3ST-7, 93-62, 93-63, 72-105, 3ST-8W [Figures 2, 7, 8 and 9 ]) is that below approximate elevation –30 feet MLT there is a significant amount of clay with moisture contents of less than 20 percent. The -30 feet MLT elevation represents an average approximation using the boring logs. It has been my experience that clays with lower

[2] A booster pump is an additional material handling pump used to increase pipeline pressure. This pressure increase will result in an increase in the velocity of the fluid mixture in the pipeline. The booster pump is usually separate from the dredge, and is not to be confused with the ladder pump and /or the main dredge pump, which are a part of the dredge. The booster pump can be located close to the dredge or could be separated from the dredge by long distances. Most dredge operators prefer to place the booster in a convenient location for crews and supplies and also prefer to place the booster in a location where the hydraulic transport pipeline still has positive pressure when the material enters the booster pump.

moisture content can be expected to form balls (i.e., "clay balls") in the pipeline thus increasing the difficulty to pump the material.

"Clay balls" behave as large sized particles, such as gravel or rock, rather than as fine-grained materials, and require much higher pipeline velocity to keep them in suspension. Once the "clay balls" fall out of suspension (due to low pipeline velocity), they start to clog the pipeline, eventually plugging it unless the dredge operator adjusts their operations to increase flow velocity, or decrease the solids concentration within the pipeline. "Clay balls" are a common occurrence on hydraulic dredging projects where clay is present and a reasonably prudent contractor would have factored the likely formation of "clay balls" in its pipeline in determining whether to use a booster pump in the hydraulic system.

Because the USACE contract specified that the clays present in the required excavation were to be used for the construction of levees, based on my experience as a dredging contractor, it is my opinion that a reasonably prudent contractor should assume for their bid that there were adequate levee building clays in the required excavation and would realize that the primary source of clays was in the widening areas (since those were the new work areas), and mainly within the Flare Area. The dredging within the channel limits would not be expected to have material suitable for levee construction, since the material within the channel limits are infill material, thus predominantly expected to be loose silts, sands, and clays. The widening areas would be expected to contain consolidated material that would be much more suitable for levee construction, and the Flare Area has the widest cuts of new work material thus containing the greatest volume of new work material.

It is my understanding that the contractor used a concept termed the "Measured Mile" (see Flare Area Claim) to negotiate with the USACE additional cost to complete the Flare Area job. The "Measured Mile" concept, as understood, is based on an average production rate that was achieved by dredging maintenance material. The "Measured Mile" was used as the basis for the production rate that should have been achieved within the Flare Area when dredging "stiff" clay.

It is critical to note that the "Measured Mile" production rate was obtained by using the rates achieved by dredging loose, unconsolidated infill material (otherwise known as