maintenance material). The maintenance material was primarily fine-grained material and would easily be dredged and transported long distances without the need for a booster pump, as is common for maintenance material. Figure 12 shows relative differences between the production rates for maintenance material (typically silts), versus larger particle sized material (such as sands, gravels and "clay balls.")

I do not consider Renda Marine's "Measured Mile" example to be valid for negotiating a reasonable price for delay of work at the Flare Area, since there was a significant difference in material type and "pumpability" when dredging maintenance material versus the specified new work material (i.e., Flare Area clays). Based on my experience, the "Measured Mile" production rate is not representative of the production rate achieved when dredging clay material.

### 4.3.1 Flare Area Claim, Question 1, May 9, 2003 letter.

*"How would a reasonably prudent dredging contractor have interpreted the contract plans and specifications insofar as the nature of the materials to be dredged in the Flare Area (approximately station 520+00 to 550+66) is concerned?"*

The Flare Area is a widening of the channel to allow for the passage of vessels or to provide an area for vessels and tows to stop and be out of the way of normal traffic in the ship channel. This Flare Area is a new widening of the channel and contains material that has never been dredged (i.e., new work material) that can be assumed to be native material.

The borings taken directly within the Flare Area (93-63 and 93-64) are more recent borings, taken in the past few years, while the other borings in the adjacent channel (i.e., borings 3ST-1 to 3ST-11) were taken prior to the last deepening of the channel in the 1960s. The newer borings indicated the presence of clay material below the soft top material. The older borings are consistent in taking note that there are clays present throughout the boring but more concentrated below approximate elevation –30 feet MLT.

The older borings represented pre-1960s conditions adjacent to the Flare Area; a reasonably prudent contractor would use both sets of boring data and would assume

that the older borings would likely be representative of the new work condition in the Flare Area. An experienced dredging contractor knows that "clays" are older, sedimentary deposits and are usually deposited in fairly uniform layers. It would be unreasonable to assume that this Flare Area was the only area in the channel that did not contain clays with low moisture content below approximate average elevation of –30 feet MLT.

Based on experience, I conclude that a reasonably prudent contractor would assume that the materials to be dredged in the Flare Area below approximate average elevation of –30 feet MLT would be a clay type material consistent with the older, adjacent borings.

As discussed previously, clays with low moisture content have an increased likelihood of forming "clay balls," which impact the ability of the hydraulic system to transport the material long distances. The Renda Marine Report of Operations dated December 1999 indicates that when Renda Marine started to dredge immediately east of the Flare Area at approximate channel Station 519+00, the shore pipeline had been extended to a placement area that required clay for the construction of levees. This indicates that Renda Marine expected to encounter clay materials in the Flare Widening Area. In addition, Renda submitted to the USACE a dredge material disposal map (Appendix D) that shows that Renda anticipated pumping "clay materials" from this area for the construction of the levees.

The plugged pipelines, commencing on about December 15, 1999, are direct evidence that Renda Marine did not provide sufficient pipeline pressure to provide a pipeline flow velocity to effectively pump "clay balls" for distances in excess of approximately 9,000 feet. This situation resulted in significantly reduced production rates for pipeline lengths between 9,000 feet and 11,000 feet, accompanied by plugged pipelines at distances over 11,000 feet, as shown in a summary of Renda Marine's Report of Operations (Appendix E). As previously noted, a reasonably prudent contractor would have installed a booster pump in the system as soon as they were aware of the reduced production rates or pipeline plugging.

#### 4.3.2 Flare Area Claim, Question 2, May 9, 2003 letter.

*"Do the soil borings 93-62 and 93-63 constitute a reasonable basis upon which to assess or predict the nature of the material in the Flare Area? Would a reasonably prudent dredging contractor consider any other soil borings in assessing or predicting the nature of the material in the Flare Area? If so, which soil boring(s) and why?"*

Boring logs 93-62 and 93-63 are more recent borings and show clay of varying moisture content for almost the entire depth of the borings except for a thin layer of recent infill at the top of the boring (i.e., surface). The elevations noted at the boring locations are approximately –33 feet MLT for boring 93-62 and –46 feet MLT for boring 93-63. Both borings show clay below the surface. There are other borings (i.e., 3ST-1 to 3ST-11) in the adjacent channel that represent pre-dredge conditions before the channel was dredged in the 1960s and that also show the presence of clay.

A reasonably prudent contractor would have used all available borings in the general area to assess the nature of the material to be dredged. For the Flare Area, this would include borings 3ST-1 to 3ST-11 and 93-62 to 93-65. A reasonably prudent contractor would have assumed that the clay materials would be encountered in most of the widening areas below approximate elevation –30 feet MLT. The clay materials in the channel widening and the Flare Area are the clays intended for use in the construction of the new levees. Based on my experience in preparing bids for similar projects, I conclude that the borings provide a reasonable basis for a reasonably prudent contractor to predict the nature of material within the Flare Area.

### 4.4 The Obstruction Claims

This section presents an overview of my opinions regarding the Obstruction Claims, and presents the responses to DOJ questions asked in the letter dated May 9, 2003.

**General Understanding of Claims**

My general understanding of the obstruction claims is that Renda Marine has claimed that they encountered miscellaneous debris items and trash that caused plugs in the ladder and main pump, as well as causing the need to clean the cutter of wire and other debris. Renda Marine claimed that the debris and trash encountered was not identified in the bid documents and was unusual in nature, and should not have been anticipated. Renda

Marine also claimed that they encountered several "obstructions" which consisted of 1) a Conex steel container box, 2) a sunken steel mooring buoy, anchor, and chain, 3) an old piece of stern swivel from a large dredge, 4) other items such as wire rope, tires, chain, metal trash, and other miscellaneous debris; and that these obstructions caused damage to equipment and delays to the project.

**General Opinion**

Based on my experience working as a dredging contractor, my opinion is that a reasonably prudent contractor would have known that this channel has been in use for approximately 100 years and would have expected to encounter miscellaneous debris and trash as part of dredging (i.e., debris and trash are considered incidental to performing dredging within the ship channel). The Houston Ship Channel has seen all types of marine traffic from large ships to small vessels and miscellaneous marine construction equipment. This marine construction equipment included large suction dredges that had been used to deepen and maintain the ship channel.

The specifications (Section 02482 paragraph 3.4.4.2 Debris) instruct the contractor to *"…carefully inspect the entire area to be dredged, from estimated top of cut to top of cut to locate any debris which may interfere with dredging operations."* An experienced dredging contractor would realize, for example, that sometimes buoys sink and are not found and recovered, or sometimes parts are knocked off a dredge or other vessels and not found. Active navigation channels that are routinely maintained or have constant vessel traffic almost always have debris and trash present, especially in areas used by water dependent industries. In the past, it had been common practice for dredgers and other marine contactors to dispose of used wire rope and miscellaneous steel and debris on the banks of the ship channel. A reasonably prudent contractor would have anticipated that the act of widening this channel would cause the dredge to encounter some of this old discarded debris.

The larger obstructions encountered during dredging (for example, the Conex steel container box and the dredge stern swivel) are not typical of what a reasonably prudent contractor would anticipate as part of the dredging. Upon encountering the large obstructions however, a reasonably prudent contractor would cease dredging operations in

that area, move to another area to continue dredging operations, and notify the USACE construction manager of the obstruction to determine its disposition.

### 4.4.1 Obstruction Claims, Question 1, May 9, 2003 letter.

*"What allowance for trash in the Houston Ship Channel would a reasonably prudent dredging contractor include in a bid for the Upper Bayou Project?"*

The Houston Ship Channel is similar to other ship channels, with respect to the presence of debris and trash, such as the channels at the Ports of Los Angeles and Long Beach (California) the Columbia River Ship Channel (Oregon), as well as the Sacramento and San Joaquin Ship Channels in California. Ship channels contain many types of trash from the surrounding area and industries that are adjacent to or use the channels.

The Houston Ship Channel has been in use by small vessels as well as large ships for over 100 years. Over the course of time, vessels as well as industries have dumped unwanted materials in the area as a natural disposal area with little thought to its impact on the environment or any future deepening of the channel. The project site has undergone numerous maintenance dredging events in the past and there would be many past opportunities for previous contractors and vessel operators to leave old cables and other miscellaneous debris on the slopes adjacent to the main channel.

The Upper Bayou Project's main objective was to widen and deepen the Houston Ship Channel, which means that much of the area outside of the existing channel lines had never been dredged. Consequently, a reasonably prudent contractor would have assumed that trash and debris from many years would have been deposited and accumulated along the channel. There are also many small industries on the bank of the Houston Ship Channel that contributed to the amount of trash and debris in the area.

A reasonably prudent contractor would have noted the presence and type of industries, old and new, bordering the channel and would have also noted the debris on the slopes. They would have been aware of the multiple use of the channel over time and would have expected to find a considerable amount of trash and debris in some of the areas outside of the established and maintained channel lines. Based on experience with dredging in many ship channels throughout the United States, I consider the Houston

Ship Channel to be typical of other ship channels, and am of the opinion that the debris/trash situation in the Houston Ship Channel dredge area is normal for the age, location, and past use of this channel.

Based on my experience, a reasonably prudent contractor would include in their bid an allowance for approximately 10 to 20 pump/cutter cleanings per day for the portions of this job that border industry, such as the area around Stations 520+00 to 570+00 (Figure 2) and the area around the South Ferry Landing. The remainder of the job could have an average of 5 to 10 pump/cutter cleanings per day. A reasonably prudent contractor would have an easy and quick method for cleaning the pumps and cutter in order to reduce the downtime due to these work stoppages.

#### *4.4.2 Obstruction Claims, Question 2, May 9, 2003 letter.*

*"How would allowance for trash on the Upper Bayou Project be reflected in a bid for that contract? Down time due to trash? Lower production rate due to trash?"*

A reasonably prudent and experienced dredging contractor would consider how the presence of trash and miscellaneous debris would affect the dredging plant proposed for this work. For instance, a 24-inch dredge cannot pass as large an object as a 27 or 30-inch dredge. Additionally, a contractor must also allow for the additional time required for each shut down when dredging with a long discharge line. This is due to the added time required to start material moving again in a long line. An experienced contractor would have a method of cleaning the main pump in approximately five minutes, the ladder pump in ten minutes and also have the proper attendant plant for rapidly clearing wire rope and other debris from the cutter.

An experienced contractor would also realize that it takes a longer time to restart dredging when pumping on a long pipeline such as a 10,000-foot pipeline. Therefore, each shut down for cleaning the pump, cutter or for other reason requires more time than would be required with a short line (e.g., less than 5,000 feet). Additionally, a submerged line requires a slower start up to allow for the air trapped in the line during a pump cleaning to be purged from the line to prevent floating of the submerged pipeline. A combination of all of these items can increase the down time due to cleaning pumps and cutter to 15 to 20 minutes for an average cleaning.

A dredging contractor usually has worked in areas with trash and has a feel as to how many stoppages might be required per shift. An examination of the river and the industries on or near the channel would provide some idea of the area that could be impacted by excessive debris that could cause the dredge to shut down or reduce production. It is not unusual to have pump blockages of 10 to 20 times per day in areas that border industries, new and old, and to have some areas with minimal stoppages when not in the vicinity of industries or mooring areas. The time required to clean the cutter or one of the pumps can vary according to the dredge and methods of cleaning.

Based on my experience, it would be reasonable for a contractor with a 24-inch dredge to experience downtime due to debris and trash and to expect up to 6 hours per day of downtime in areas near new and old industries that contain substantial quantities of trash. The normal anticipated delays in areas not subjected to discarded trash would be in the range of two to three hours of downtime per day. According to the Renda Marine letter to USACE dated July 7, 1999 (Appendix F), it appears that Renda Marine anticipated working approximately 14.5 hours per day, or 9.5 hours of downtime per day. No mention of downtime required to handle debris was mentioned: *"c. We are using a conservative daily effective pumping rate of 14.5 hours per day to take into account, movement of the dredge, pipelines and ship traffic."*

The hourly production rate will decrease in areas with significant debris due to the operator continuing to try to dredge material when a pump or cutter is half plugged. It is a natural tendency for the dredge operator to continue to pump for a period of a few minutes, with a partial plug in the pump or cutter, in the hopes that the plug will clear itself, which it sometimes does. This pumping with a partial plug results in lowered productions until the dredge is shut down and the debris is removed.

Continuing to pump with a partial plug in a pump can also cause substantial damage to the pump bearing and shaft. A rock or piece of debris in the pump causes a vibration that can be severe due to unbalancing the impeller. I have found that continuing to run the pump during a partial plug is one of the main causes of bearing seals and shaft failures on a hydraulic dredge pump pressure and vacuum.

### 4.4.3 Obstruction Claims, Question 3, May 9, 2003 letter.

*"Did any of the following factors cause or contribute to the damage to the dredge Millennium that Renda Marine attributes to encounters with obstructions and, if so, to what extent did such factor(s) cause or contribute to any such damage?"*

A. *"Faulty operation of the dredge Millennium?"*

Renda Marine's daily Report of Operations did not adequately document standard operational conditions, such as pump pressure and vacuum, and type of debris. Because of this lack of adequate documentation, it was not possible to conclusively determine whether alleged encounters with obstructions caused any damage. I did not have first hand knowledge of the operations of the dredge *Millennium*, but based on review of the dredging records and my own experience, I have identified several key points regarding the operation of the dredge plant that are presented below.

The Renda Marine Report of Operations indicates that early in the job, when working in Section I, the dredge *Millennium* broke a spud on September 29, 1999, and replaced it on December 23, 1999, nearly three months later. This was confirmed by Leon Hrabovsky (personal communication with Leon Hrabovsky in June 2003), who indicated that Renda Marine continued to dredge for a considerable length of time before repairing the spud. This is considered "faulty operation" of a dredge by reducing the consistency of setups or advances of the dredge and reducing the horizontal positioning control of the dredge.

The Renda Marine Report of Operations shows substantially reduced hourly productions and plugged pipelines while pumping clay material from the Flare Area to the Lost Lake levee area. A summary of Renda Marine's Report of Operations is presented in Appendix E. The pipeline lengths approached 11,500 feet and the hourly production was reduced to less than 50 percent of the logged hourly productions for pipeline lengths of 8,000 feet or less. The addition of a booster to the pumping system would have enabled the dredge to maintain substantially higher production with a resultant lower unit cost even after allowing for the cost of the booster.

It is our understanding that part of the damage suffered by the dredge *Millennium* included damage to its pump shaft bearings and shaft. Based on experience, this type of damage to these equipment parts are seldom caused by the presence of debris, but are damaged if the operator continues to run the pump after it is apparent that the pump has debris in the vanes. The practice of continuing to pump with debris in the vanes is one of the main causes of failure of the pump shaft bearings and shaft. It is also standard practice to inspect pump bearings, seals, and oil and grease levels on a regular basis.

*B. "Inadequate maintenance of the dredge Millennium?"*

Based on a discussion with the Port of Houston inspector, Leon Hrabovsky (personal communication with Leon Hrabovsky in June 2003), it appears that at the beginning of the job, the mechanics on the dredge were not aware of the oil requirements for the underwater reduction gear for the cutter. The lack of oil for the gear plus the unprotected coupling between the reduction gear and the shaft would be a significant source of potential problems for the dredge.

Shaft problems with this reduction gear did occur during the job; at the end of the job, much time was lost and costs incurred due to the failure of the cutter reduction gear. The underwater cutter reduction gear had an oil seal that was subject to damage if the seal was not protected from contact by wire rope or other debris becoming entangled with the seals. The cutter gear box as well as the pump shaft and bearing problems could possibly have been prevented with an active maintenance program that would involve periodic shut-downs for maintenance where these items were thoroughly inspected and maintained. It is standard procedure for dredging contractors to try to replace worn or damaged parts prior to total failure of the parts.

I was unable to locate records indicating that Renda Marine had an established maintenance program, which is standard procedure for a dredging contractor. If no maintenance records exist, this would indicate that Renda Marine did not take maintenance of equipment seriously; reasonably prudent contractors keep detailed maintenance logs. The Renda Marine Report of Operations appears to indicate that

Renda Marine only fixed items that had broken and did not have an established preventative maintenance program.

C. *"The use of any "refurbished" equipment on the dredge Millennium?"*

Many dredges use refurbished equipment. This practice is fairly standard in the dredging industry. However, the equipment must be refurbished by qualified people and inspected to see that it was re-assembled and installed correctly. This was not done in the instance of the main swing winch that had to be re-assembled properly after the initial installation (personal communication with Leon Hrabovsky in June 2003).

One of the main drawbacks to older, refurbished equipment is the lack of spare parts at the factory level. Often, the replacement parts have to come off of similar older equipment and be repaired prior to installation on the damaged equipment. This process is time consuming and often more costly than using new parts if available.

The underwater (lower) cutter reduction gear was of Italian design that made the replacement of parts very time consuming. The use of a foreign designed gear such as this was a poor choice from the standpoint of obtaining replacement parts.

#### 4.4.4 *Obstruction Claims, Question 4, May 9, 2003 letter.*

*"Did access to spare parts for the dredge Millennium contribute to the amount of down time required by Renda Marine to repair damage to the dredge Millennium? If so, please answer the following questions:*

A. *Did Renda Marine maintain adequate spare parts for a dredge the size and complexity of the dredge Millennium?*
B. *Did Renda Marine maintain adequate spare parts for the dredge Millennium given the use of refurbished equipment on the dredge?"*

The dredge *Millennium* was mostly constructed of parts and equipment manufactured in the United States, and for the most part could be repaired within a reasonable length of time, based on my experience. The engines were General Motor standard engines with spare parts readily available. The pumps were standard Mobile Pulley pumps with

parts available within a reasonable time, although a reasonably prudent contractor would be expected to have an inventory of spare pump parts with the exception of the pump shaft. The underwater reduction gear was the main item that required a long lead-time for replacement parts and in the end it was the reduction gear that failed and caused a prolonged delay.

Upon discussing the dredge *Millennium* design with Leon Hrabovsky (personal communication with Leon Hrabovsky in June 2003), it was evident that this reduction gear had the potential for problems due to the exposure of the oil seals to damage from wire, trash, and other objects. In the end, it was a costly and time consuming delay that likely could have been prevented by better maintenance of the gear or by selecting a locally manufactured gear such as a Lufkin, Faulk, or Western gear.

### 4.4.5 Obstruction Claims, Question 5, May 9, 2003 letter.

> *"What is a reasonable amount of time to make the repairs that Renda Marine alleges were caused by the obstructions?"*

The most time consuming repair, allegedly caused by obstructions, was the repair to the underwater cutter reduction gear as previously mentioned. The main pump and ladder pump also required major repair but spare parts were readily available. For this or any other reduction gear, the time required to remove, repair, and replace the reduction gear would have been a matter of three to four days with a one-week delay at the most. Faulk, Western and Lufkin gears are manufactured in the United States and in my opinion, could have been used as a replacement gear instead of the foreign built gear. If spare parts are not readily available from the gear manufacturer, there are shop drawings readily available so that a machine shop can begin making a new part within a day or so, on an accelerated basis, typically completing a new gear within a few days.

My opinion is that the repair delay would have been much shorter if Renda Marine had replaced the gear with an alternate brand, rather than repair the existing gear. A reasonably prudent contractor would have compared the options of replacement versus repair.

### 4.5 Other Questions

This section presents the response to questions asked under the "Other Questions" section in the DOJ letter dated May 9, 2003. These questions potentially relate to any of the previous claims.

#### *4.5.1 Other Questions, Questions 1 to 3, May 9, 2003 letter*

*"Was the dredge Millennium capable of discharging materials from dredge section no. 3 to the north levee of the Lost Lake Containment Area without the use of a booster pump?"*

In order to address this question, the concept of how a hydraulic dredge transports dredged material, and what key factors affect transport distance and production rates need to be briefly discussed. This discussion pertains to questions regarding whether the dredge *Millennium* had sufficient power to pump the dredged material the required distances; therefore, this discussion also addresses Other Questions 1 to 3 and 8 to 11.

The production capacity of a hydraulic pipeline dredge is usually expressed in terms of cubic yards per pumping hour. The estimated production rate consists of (a) the total volume of slurry pumped per hour, and (b) the solids content of the slurry (the mixture of material to be dredged and entrained water that form a homogenized mixture that is pumped through the pipeline), usually expressed in terms of "percent solids by weight."

The method of predicting the required flow velocity to prevent the plugging of the pipeline, and the resulting production rate, involves a complex relationship that takes into account the following parameters:

1. The inside diameter of the pipeline
2. The roughness (i.e., friction factor) of the pipeline, joints, and turns that cause loss of pressure (i.e., head loss) over pipeline distance
3. The length of the pipeline
4. The average grain size of the solid particles
5. The specific gravity[3] of the solid particles

[3] Specific gravity represents the ratio of the density of the material to be dredged divided by the density of water.

6. The percentage of solids in the slurry mixture (i.e., mix of water and solids that are intermixed by the process of disturbing and hydraulically transporting the material to be dredged) and the resultant unit weight of the slurry mixture
7. The terminal elevation of the pipeline (i.e., elevation of the discharge end of the pipeline with respect to the elevation of the dredge)

A modern dredge pumping system is typically capable of pumping fine-grained materials such as loose sands and silts for distances in excess of 10,000 feet (when the percent solids of the slurry mixture in the pipeline is low). An increase in the grain size of the material, such as gravels and clay balls, results in an increase in the velocity required to transport the coarser material with a subsequent increase in the required pipeline pressure (or head).

The attached production rate curves (Figure 12) illustrate how relative production rates change as material type varies. These relative production rates were developed by Tom Turner of Ellicott Machine Corporation over many years, and were published in his book, *"Fundamentals of Hydraulic Dredging, 2nd Ed."* (Turner 1996), and are considered to be reasonable approximations. Another key element for transporting material through a hydraulic pipeline is to make sure that the flow velocity within the pipeline is fast enough to keep the solids suspended. As the particle size increases from silt to clay, to a larger size, such as a quarter-inch gravel particle, so does the required flow velocity to prevent the pipeline from plugging. Table 1, obtained from the charts developed by Turner in the first edition of his book, *"Fundamentals of Hydraulic Dredging"* (Turner, 1984) and presented in Appendix G, shows typical flow velocities required for different material types and percent solids concentration.

**Table 1**
**Flow Velocity versus Material Type**

| Material Type | Pipe Diameter (inches) | Percent Solids Conc. (by weight) | Required Flow Velocity (ft per second) |
|---|---|---|---|
| Fine sand | 24 | 5 | 7.5 |
| | | 10 | 10.5 |
| | | 15 | 11.5 |
| Medium sand | 24 | 5 | 9.0 |
| | | 10 | 10.5 |
| | | 15 | 12.5 |
| Coarse sand | 24 | 5 | 11.0 |
| | | 10 | 13.0 |
| | | 15 | 14.0 |
| Small gravel/clay balls | 24 | 5 | 13.0 |
| | | 10 | 16.0 |
| | | 15 | 17.5 |

These values are approximate but are a guide to the velocity required to maintain a steady flow condition. It is important to have a condition where the materials in the slurry do not begin to settle to the bottom of the pipe, which can result in a fully or partially plugged pipeline. When the velocity in the pipeline is insufficient to maintain the dredged materials in full suspension, the materials tend to become more concentrated in the bottom portion of the pipe and begin to move slowly by sliding on the bottom of the pipe. These materials are moving slower than the average velocity, which causes them to concentrate further. When the material on the bottom of the pipe moves as a combined mass (i.e., bed load) rather than as individual particles, the cross sectional area of the pipe is decreased (i.e., the internal diameter of the pipeline effectively becomes smaller). This effective reduction in pipeline diameter further increases the friction loss per unit length of pipeline (i.e., greater head loss[4]) that causes a further decrease in velocity, eventually leading to the material blocking the pipeline. This is what is meant by the phrase, "plugging the pipeline."

[4] Reduction in pressure and energy over pipeline distance due to the friction and turbulence within the pipeline, pipe turns, bends, joints, etc.

The leverman or dredge operator must have the proper gauges and monitoring equipment to detect any decrease in the pipeline velocity. When the pipeline velocity begins to drop, it is often possible to avoid a plugged pipeline by decreasing the amount of material entering the pipeline (i.e., reducing the percent solids concentration within the pipeline). From an energy point of view, the horsepower required to pump material is a function of the cube power of the flow velocity, as shown in the following equation. All equations presented in this section were taken from Turner (1996), *Chapter 7: Horsepower vs. Line Length.*

The horsepower required to pump material over a certain pipeline length is a function of different variables:

$$HP = Q\rho H$$

where:

$HP$ represents the horsepower required to transport material.
Q represents the volume of slurry mixture that is transported in cubic feet per second.
$\rho$ represents the slurry mixture specific gravity, which is typically between 1.0 and 1.3.
$H$ represents the Head Loss over the length of the pipeline, in feet.

Furthermore, considering that:

$$Q = VA = V\frac{\pi d^2}{4}$$

where:

$V$ represents the slurry velocity in the pipeline, in feet per seconds.
$A$ represents the pipeline cross-sectional area, in square feet.
$d$ represents the pipeline diameter, in feet.

and H, the head loss, can be expressed with the following equation:

$$H = \rho f \frac{l}{d}\frac{V^2}{2g}$$

where:

*f* represents the pipe friction factor. This friction factor is specific to the pipe and depends on the pipe material, type of joints, turns etc. *f* is usually between 0.01 and 0.015.

*l* represents length of the pipeline, in feet.

*g* represents the gravity force coefficient and is equal to 32.2 feet per second squared.

Thus, it follows that the horsepower can be expressed as:

$$HP = V\frac{\pi d^2}{4} \times \rho \times f\rho \frac{lV^2}{2dg} = f\rho^2 \frac{\pi dl}{8g} V^3$$

The horsepower is a function of the cube of the slurry velocity; doubling the velocity in the pipeline requires an eightfold increase in horsepower. The above discussion conceptually illustrates the factors that affect hydraulic dredging and transport, and the remaining discussion in this section addresses questions 1 through 3.

Dredge section No. 3 starts at approximate station 510+00 and ends at station 524+00 (Figure 2). The distance from the approximate center of dredge section No. 3 to a logical landing point on the Lost Lake main levee is approximately 3,600 feet. The direct distance from the assumed landing point to the north levee is 5,000 feet while the distance via the levee is 9,500 feet, resulting in an assumed pipeline length between 8,600 and 13,100 feet (Figure 14). I determined these approximate distances by using the site map (Contract Drawing C-14) and scaling the distances from the dredging areas to various locations along the new levee alignment.

In order to evaluate the theoretical production capability of the dredge, it was necessary to establish a reasonable range of pressures that the dredge was capable of generating. I

determined the pump pressure by taking typical pump operational characteristics from the dredge specification sheet from the dredge manufacturer (Appendix F) and applying those characteristics to the pump curves for the dredge pump obtained from Mobile Pulley (Appendix H). Since the dredge daily reports from Renda Marine did not identify the pressure or RPM of the engines or electric motors, the dredge specification sheet from the dredge manufacturer was used to provide the operational characteristics of the dredge. The dredge specification sheet indicates that the following horsepower and engine speeds were typical for the dredge *Millennium*.

- Main pump maximum engine horsepower equals 3600 HP at 900 RPM
- Reduction gear ratio, 2.093:1
- The engine RPM recorded on the Renda Marine Report of Operations (800-850 RPM) are converted to pump speed by dividing the engine RPM by the reduction gear ratio (2.093), which results in pump speeds of 380 to 406 RPM
- Ladder pump rated maximum horsepower equals 650 HP

Table 2 identifies the pump pressure estimated from the pump curves; this pump pressure is the initial pressure (in feet of head) at the dredge pump location.

**Table 2**
**Pump Pressure (feet of head) from Pump Curves***

| | Main Pump | Ladder Pump | Combined |
|---|---|---|---|
| Minimum | 260 ft | 80 ft | 340 ft |
| Maximum | 290 ft | 100 ft | 390 ft |

*Pump Curves were obtained from Mobile Pulley and Machine Works, manufacturer of the *Millennium* pumps.

Using a simple relationship of head loss over pipeline length, a contractor can roughly estimate the effective pipeline length a dredge can theoretically pump without a booster using the initial pressure (in feet of head) and subtracting out the change of elevation between the water surface and the elevation of the point of discharge. Assuming a typical head loss of five feet (typical for sand material) for every 100 feet of pipeline (Turner 1996), the distance the dredge *Millennium* theoretically could pump without a booster was between 6,800 and 7,800 feet (based on the assumed 340 and 390 initial feet of head [Table 2]). These distances are less than many of the required pumping distances for the Upper Bayou Project.

Consequently, a reasonably prudent contractor should have anticipated the need for a booster pump given the capability of the dredge, and the type of material to be pumped. Figure 13 (Turner 1996) illustrates the effect of adding a booster pump to production rates for fine-grained sand. The same relative increase in production rates would be expected for pumping clay material.

To provide another method of evaluating the *Millennium*'s production capability, production rates were calculated for the various dredge sections and using different material types. The production rates were generated for operating pressures (feet of head) of 340 feet, 360 feet, and 390 feet to cover the assumed range of values. The production rates were calculated using a hydraulic production rate computer model, "PIPELINE" (Parsons Brinckerhoff 2003), and the modeling results are attached in Appendix I. Table 3 shows that the production rate is greatly reduced when the pipeline length increases, or when the material type changes from fine-grained sediment to larger particle sizes (such as "clay balls"). The model results (summarized in Table 3) demonstrate how different material types affect dredging production rates, and why a reasonably prudent contractor needs to closely monitor the material types being dredged. Table 3 identifies the assumed approximate pipeline lengths for various dredge sections and the estimated maximum carrying capacity of the dredge for each section assuming the dredge main pump was operating near an assumed maximum rated pressure. The representative pipeline lengths on Table 3 are only intended to approximate the distances to the North Levee from each dredge section. Table 3 shows the same relative relationship between decreasing production rates as material grain size increases, as was previously discussed and shown on Figure 12 (Turner 1996).

The estimated maximum production rates in Table 3 are intended to give an approximation of maximum carrying capacity of the system, without taking into consideration factors that could reduce the overall production, such as (1) small dredging face or bank, (2) currents, (3) inability to feed the system due to operator limitations, and (4) inability to feed the system due to difficulty in dredging the materials.