UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC.,<br>PLAINTIFF,<br><br>V.<br><br>UNITED STATES,<br>DEFENDANT. | §<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 02-306C<br><br>(JUDGE HEWITT) |

## STIPULATION OF FACTS

Pursuant to Appendix A, ¶17, of the Rules of the United States Court of Federal Claims, Plaintiff, Renda Marine, Inc. ("Renda"), and Defendant, the United States, hereby agree and stipulate to the facts set forth herein below, and respectfully submit this Stipulation of Facts. The purpose of this Stipulation of Facts is to avoid the time and expense of formal proof of facts that are not reasonably in dispute. The Parties agree, however, that by entering into this Stipulation, they shall not be precluded from offering evidence to further explain or supplement a particular fact covered by this Stipulation.

## GENERAL BACKGROUND

1. On about June 16, 1998, the United States Army Corps of Engineers, Galveston District (the "Corps") requested proposals for Invitation No. DACW64-98-B-0004, "Houston-Galveston Navigation Channels, Texas (45-Foot Project) - Dredging Upper Bayou," for the Upper Bayou Project.

2. Invitation No. DACW64-98-B-0004 for the Upper Bayou Project made no mention of the Port of Houston Authority.

3. Invitation No. DACW64-98-B-0004 for the Upper Bayou Project made no mention of any agreement that the Corps had signed or may sign with the Port of Houston Authority.

4. Invitation No. DACW64-98-B-0004 for the Upper Bayou Project made no mention of any engineering consultants for the Port of Houston Authority.

5. On about July 17, 1998, Renda submitted a bid to the Corps to construct the Upper Bayou Project.

6. Renda's bid for the Upper Bayou Project was $12,526,100.00.

7. Renda's bid on the Upper Bayou Project was the lowest bid that the Corps received, for the Upper Bayou Project.

8. Another dredging contractor filed a protest with the Corps to contest an award to Renda of a contract for the Upper Bayou Project.

9. As a result of the protest referenced in 8, above, the start of the Upper Bayou Project was delayed.

10. The protest of the award of the contract for the Upper Bayou Project to Renda by another dredging contractor was unsuccessful.

11. On or about October 26, 1998, the contract for the Upper Bayou Project (the "Contract") was awarded to Renda.

12. On or about November 16, 1998, Renda was given Notice to Proceed for the Upper Bayou Project.

13. On or about November 19, 1998, Renda acknowledged receipt of the Corps' Notice to Proceed on the Upper Bayou Project.

14. The completion date originally required by the Contract for the Upper Bayou Project was 446 calendar days from Renda's receipt of the notice to proceed.

15. A total of about thirty (30) modifications were issued in connection with the Contract.

16. Thirty (30) or more modifications were issued to Renda in connection with the Contract.

17. A number of modifications on the Upper Bayou Project were issued by the Corps unilaterally.

18. On or about September 13, 1999, Renda started dredging operations for the Upper Bayou Project in the Houston Ship Channel at or near Station 489+60 in Dredge Section 2.

19. On or about March 8, 2000, the Contracting Officer for the Upper Bayou Project issued a cure notice to Renda.

20. The Contracting Officer's cure notice to Renda of March 8, 2000, is Joint Exhibit 45.

21. The Corps threatened to terminate Renda for default as a result of delays Renda faced in its efforts to complete the Upper Bayou Project.

22. On or about April 25, 2000, the Contracting Officer decided in a letter to Renda not to terminate the Contract for default.

23. The Contracting Officer's April 25, 2000, letter to Renda is Joint Exhibit 49.

24. A true copy of the Contracting Officer's November 6, 2000, letter to Renda concerning a show cause notice is Plaintiff's Exhibit 1083.

## SOUTH FERRY LANDING CLAIM

25. In April 2000, Renda notified the Corps of the presence of rubble and other man-made erosion control materials, in the South Ferry Landing area.

26. In or about April 2000, Renda notified the Corps' Contracting Officer and Administrative Contracting Officer about obstructions in the South Ferry Landing area.

27. A true copy of Renda's April 28, 2000, letter to the Corps about differing site conditions in the South Ferry Landing area is Joint Exhibit 50.

28. On or about May 8, 2000, the Corps conducted a survey of the dredge template for the South Ferry Landing area.

29. On or about August 11, 2000, Renda submitted a schedule to the Corps advising that the revised schedule did not take into account delays at the South Ferry Landing.

30. In a letter dated September 22, 2000, among other things, the Administrative Contracting Officer accepted Dredge Section 1, without reference to problems at the South Ferry Landing.

31. On or about September 22, 2000, Renda sent a letter to the Corps regarding a claimed differing site condition at the South Ferry Landing area of the Upper Bayou Project.

32. A true copy of Renda's September 22, 2000, letter to the Corps concerning the South Ferry Landing differing site condition is Plaintiff's Exhibit 1006.

33. On or about December 13, 2000, the Administrative Contracting Officer denied entitlement for the differing site condition at the South Ferry Landing.

34. On or about January 10, 2001, Renda submitted a Certified Claim to the Corps for costs associated with alleged differing site conditions at the South Ferry Landing area of the Upper Bayou Project.

35. On or about March 9, 2001, the Contracting Officer advised Renda that a final decision would be issued upon the South Ferry Landing certified claim by June 13, 2001.

36. On or about March 13, 2001, Renda requested that the Corps schedule a claims conference for the South Ferry Landing differing site condition claim.

37. On or about March 13, 2001, Renda requested a Defense Contract Audit Agency ("DCAA") audit for Renda's overhead rates.

38. On about March 15, 2001, Renda amended the South Ferry Landing differing site conditions claim, and increased the certified claim to $1,049,173.00.

39. A claims conference occurred on or about May 2, 2001, concerning Renda's claims on the Upper Bayou Project.

**FLARE AREA CLAIM**

40. On or about January 23, 2000, Renda started dredging operations in the Houston Ship Channel at or near Station 520+00 (Dredge Section 3).

41. By letter of March 30, 2000, Renda notified the Corps' Administrative Contracting Officer that Renda had encountered a differing site condition in the Flare Area, namely stiff clay.

42. Renda's letter of March 30, 2000, is Plaintiff's Exhibit 793.

43. By letter of April 25, 2000, the Contracting Officer wrote to Renda to advise that the Corps and the Port of Houston Authority's consultant had determined that additional soil borings were necessary to properly analyze Renda's differing site condition notice.

44. The Contracting Officer's letter of April 25, 2000, to Renda is Joint Exhibit 49.

45. The Contracting Officer authorized an outside geotechnical firm to obtain soil borings of the material remaining in the area.

46. On or about May 12, 2000, the Corps' geotechnical firm obtained three soil borings in the Flare Area and issued a report on about May 30, 2000.

47. On August 3, 2000, and on August 22, 2000, Plaintiff transmitted additional letters to the Corps relative to the alleged differing site condition in the Flare Area, reporting delays in the work schedule and requesting a determination of the claim's merits.

48. A true copy of Renda's letter to the Corps of August 3, 2000, is Joint Exhibit 59.

49. A true copy of Renda's letter to the Corps of August 22, 2000, is Plaintiff's Exhibit 975.

50. On or about November 6, 2000, representatives of Renda and the Corps had a meeting to review certain issues relating to the Upper Bayou Project, including the Flare Area.

51. On or about November 6, 2000, the Corps issued a Show Cause Notice, advising Renda that the Corps was considering terminating the contract for default due to insufficient production since the March 8, 2000, Cure Notice.

52. In a letter dated December 13, 2000, from the Administrative Contracting Officer to Renda, the Administrative Contracting Officer stated, with respect to "Differing Site Condition – Heavy Clay in the Flare Area," that "[a]n additional three soils borings were taken in this area to quantify the difference between existing materials and those shown in the contract drawings" and that "[t]he additional soils borings indicate that there is a difference in materials that will impact the project."

53. The Administrative Contracting Officer's December 13, 2000, letter to Renda is Plaintiff's Exhibit 1158.

54. On or about December 13, 2000, the Administrative Contracting Officer acknowledged that the Flare Area differing site condition had merit.

55. On or about February 14, 2001, Renda submitted a request for equitable adjustment to the Corps for the Flare Area differing site condition.

56. Renda's February 14, 2001, transmittal letter for the Flare Area request for equitable adjustment is Plaintiff's Exhibit 1275.

57. With respect to the alleged Flare Area differing site condition, the Corps prepared an estimate of the increased costs of performance allegedly incurred by Renda.

58. With respect to the alleged Flare Area differing site condition, the estimate prepared by the Corps of the increased costs of performance allegedly incurred by Renda was $4,111,778.00, which was subject to an audit.

59. On March 14, 2001, the Corps issued Modification P00023.

60. Modification P000023 established a revised Contract completion date of June 28, 2000, and provided for additional payment to Renda in the amount of $3,038,833.00.

61. Renda did not sign Modification P00023.

62. The Corps suspended further negotiations on the Flare Area claim pending a DCAA audit of Renda's overhead rates.

63. On or about March 13, 2001, Renda requested that the Corps accept revised overhead rates or schedule a DCAA audit to verify Renda's overhead rate.

**HOUSTON LIGHT & POWER TOWER CLAIM**

64. On or about July 16, 2000, Houston Light and Power ("HL&P") crews were installing a 138 Kilovolt electrical tower in the vicinity of the Lost Lake Placement area.

65. HL&P's work on the 138 Kilovolt electrical tower was not shown or indicated in the Contract Documents.

66. Between October 16 and 18, 2000, HL&P crews were again working in the vicinity of Lost Lake Placement Area.

67. Although the Administrative Contracting Officer acknowledged the merit of Renda's claim, the Corps did not issue a modification to provide payment for the extra costs Renda incurred due to the construction of any HL&P towers.

68. On or about April 11, 2001, Renda submitted a request for an equitable adjustment for the HL&P Tower matter, seeking payment of $166,143.00, and a three (3) calendar day extension of contract time.

69. Renda's April 11, 2001, transmittal letter for the HL&P Tower claim is Plaintiff's Exhibit 1381.

70. On or about May 16, 2001, Renda updated its request for an equitable adjustment of the contract price relative to the HL&P tower, revising the claimed overhead and dredge depreciation rates.

71. Renda's amended request for equitable adjustment for the HL&P Tower matter sought payment of $170,863.00, and a three calendar day extension of contract time.

## SECTION 7 CLAY CLAIM

72. During dredging operations between about October 2 and November 6, 2000, in Dredge Section 7, Renda encountered stiff clay material between stations 561+00 and 609+00.

73. Renda notified the Corps of alleged differing site conditions in Dredge Section 7 on or about October 20, 2000.

74. Renda's October 20, 2000, notice letter of alleged differing site conditions in Dredge Section 7 is Plaintiff's Exhibit 1027.

75. The Administrative Contracting Officer denied Renda's request for an equitable adjustment of the contract price based upon an alleged differing site condition in Dredge Section 7.

76. On or about February 12, 2001, Renda showed stiff clay material to a representative or representatives of the Corps.

77. On or about April 16, 2001, Renda submitted to the Corps a request for equitable adjustment seeking payment of $1,083,799.00, plus an extension of contract time, concerning the Dredge Section 7 stiff clay.

## WEST LEVEE REALIGNMENT CLAIM

78. During July 2000, Renda had difficulty constructing levees at the Lost Lake Placement Area near station 175+00.

79. On or about July 28, 2000, Renda notified the Corps of an alleged problem with the centerline of the West Levee at the Lost Lake Placement Area.

80. Renda's July 28, 2000, notice letter is Plaintiff's Exhibit 926.

81. On August 7, 2000, representatives of the Corps and Renda met at the site and agreed to a revised levee alignment.

82. Between about September 2000 and November 2000, Renda realigned the levee between stations 166+00 to 183+00 and 183+00 to 188+00.

83. On or about May 23, 2001, the Corps issued Contract Modification No. CO-10, concerning the realignment of the west levees which was not signed by Renda.

84. Contract Modification No. CO-10 offered no money to Renda and did not increase the contract price.

85. On or about May 31, 2001, Renda submitted to the Corps a request for equitable adjustment seeking payment of $789,600.00, plus a 40 calendar day extension of contract time, concerning the Lost Lake levee realignment claim.

86. Renda's May 31, 2001, transmittal letter for the Levee Realignment Claim is Plaintiff's Exhibit 1497.

**OBSTRUCTIONS NO. 1 CLAIM**

87. In or about October and November 2000, Renda was dredging between stations 570+00 and 580+00.

88. In or about October and November, 2000, Renda's dredge *Millennium* encountered trash and obstructions between Stations 570+00 and 580+00.

89. The Conex box and stern swivel encountered in the channel between Stations 570+00 and 580+00 constituted a differing site condition.

90. Between October 8 and 18, 2000, Renda's dredge *Millennium* encountered an obstruction, *i.e.*, the Conex box, in Dredge Section 7.

91. On or about October 20, 2000, Renda notified the Corps of the obstructions in Dredge Section 7 and identified them as differing site conditions.

92. Renda's October 20, 2000, letter to the Corps is Plaintiff's Exhibit 1027.

93. On or about October 24, 2000, Renda notified the Corps that Renda's dredge had hit another obstruction on or about October 23, 2000, between stations 570+00 and 580+00.

94. Renda's October 24, 2000, notice letter to the Corps is Joint Exhibit 63.

95. On or about October 27, 2000, the Corps issued Contract Modification No. CO-05 (P00019) for the removal of rock and rubble, which had been reported in the channel slopes in Dredge Section 5 during May 2000.

96. Contract Modification CO-05 (P00019) authorized removal of obstructions in and about approximate Stations 575+00 (pipe or piling) and 580+00 (Conex box).

97. Modification P00019 was issued by the Corps and was not signed by Renda.

98. Between about October 20 and November 15, 2000, Renda's dredge *Millennium* encountered obstruction(s) between Stations 570+00 and 580+00.

99. Between about November 17 and 20, 2000, Renda's subcontractor located and removed an obstruction near station 575+00 with a bucket dredge.

100. The obstruction removed from near station 575+00 between about November 17 and 20, 2000, was an old dredge stern swivel weighing about ten tons.

101. Between about December 8, 2000 and December 10, 2000, while dredging in the vicinity of the Oxy-Chem Docks, Renda's dredge encountered two obstructions.

102. On or about December 13, 2000, Renda notified the Corps of two obstructions encountered by Renda's dredge between December 8 and 10, 2000.

103. Renda's December 13, 2000, notice letter is to the Corps is Joint Exhibit 73.

104. On or about December 20, 2000, Renda again wrote to the Corps about rubble or man made rip-rap between Stations 620+00 and 630+00 and requested a resolution.

105. The Corps caused a survey of the Houston Ship Channel between approximate Stations 570+00 and 685+00 to be performed in January 2001 and the survey revealed obstructions and areas of trash.

106. On or about April 16, 2001, Renda submitted to the Contracting Officer a request for equitable adjustment, seeking payment of $1,802,579.00, plus a 35 calendar day extension of contract time for the Upper Bayou Project.

107. Renda's revised request for equitable adjustment is Plaintiff's Exhibit 4.001.

108. On or about June 11, 2001, Renda updated the request for equitable adjustment to seek payment of $2,126,083.00, plus a 36 calendar day extension of contract time.

109. Renda's updated request for equitable adjustment is Plaintiff's Exhibit 4.002.

110. Renda notified the Corps on or about January 31, 2001, concerning the obstructions in Dredge Section 8, and described them as differing site conditions.

111. On or about January 31, 2001, Renda notified the Corps that obstructions and debris identified in the "survey report" for Dredge Section 7 through Dredge Section 9 constituted a potential hazard to future dredging operations.

112. Renda's January 31, 2001, notice letter to the Corps is Plaintiff's Exhibit 1221.

## OBSTRUCTIONS NO. 2 CLAIM

113. On or about February 9, 2001, Renda started dredging in Dredge Section 9 on the Project.

114. On or about March 7, 2001, Renda wrote to the Administrative Contracting Officer and proposed that the unfinished portion of dredging services in Dredge Section 9 be deleted from Contract No. DACW64-99-C-0001 because of, among other reasons, debris fields and obstructions.

115. Renda's March 7, 2001, letter to the Administrative Contracting Officer is Joint Exhibit 76.

116. Renda was using a hydraulic cutterhead dredge on the Upper Bayou Project.

117. On or about March 22, 2001, the Contracting Officer directed Renda to complete the dredging of Dredge Section 9.

118. On or about April 10, 2001, Renda resumed dredging in Dredge Section 9 on the Upper Bayou Project.

119. On or about April 12, 2001, representatives of the Corps visited Renda's dredge.

120. On or about April 14, 2001, Renda notified the Contracting Officer in writing of adverse dredging conditions in Dredge Section 9 on the Upper Bayou Project.

121. Renda's April 14, 2001, letter to the Contracting Officer is Plaintiff's Exhibit 1385.

122. On or about April 16, 2001, Renda's dredge hit a submerged ship's mooring buoy on the Project.

123. The submerged ship's mooring buoy was not shown in the Contract Documents or the Corps' underwater obstruction and trash survey report in Dredge Section 9 on the Upper Bayou Project.

124. After Renda's dredge hit a submerged ship's mooring buoy, Renda wrote to the Contracting Officer on April 16, 2001, and again requested that the remainder of Dredge Section 9 be deleted from the Contract.

125. Renda's April 16, 2001, letter to the Contracting Officer is Plaintiff's Exhibit 1390.

126. On about April 24, 2001, Renda wrote to the Contracting Officer to request that he allow Renda to demobilize its dredge from the Project until the Corps could reach a decision regarding the completion of Dredge Section 9 on the Upper Bayou Project.

127. Renda's April 24, 2001, letter to the Contracting Officer is Plaintiff's Exhibit 1404.

128. During March 2001, Renda proposed to the Corps that Renda's dredge *Millennium* be allowed to pursue private dredging work in the immediate vicinity of the Upper Bayou Project.

129. On about May 4, 2001, the Corps issued Contract Modification No. CO-09 (P00026), which suspended dredging operations for 30 to 60 days while Renda's dredge performed work for a private owner on the Houston Ship Channel.

130. On about March 22, 2001, the Corps and Renda had a meeting concerning the Upper Bayou Project.

131. On about March 22, 2001, during a meeting, the Corps and Renda discussed dredging in Dredge Section 9 on the Upper Bayou Project.

132. On or about March 22, 2001, during a meeting, a representative or representatives of the Corps represented to Renda that, if Renda resumed dredging in Dredge Section 9, the Jacintoport submerged line crossing was to remain in place until dredge Section 9 was complete.

133. On or about May 18, 2001, the Corps requested that Renda remove its discharge pipe across Jacintoport.

134. As of May 18, 2001,the dredging required by the contract plans and specifications for Dredge Section 9 had not been completed.

135. In a letter dated June 1, 2001, the Corps advised Renda that, as discussed at a meeting between representatives of the Corps and Renda on May 24, 2001, the Contracting Officer had decided to delete from the Upper Bayou Project the remaining portion of Dredge Section 9.

136. The Corps' letter of June 1, 2001, to Renda is Plaintiff's Exhibit 1499.

137. On or about June 1, 2001, the Corps did not delete the levee construction work from Contract No. DACW64-99-C-0001.

138. On or about June 1, 2001, Renda was still obligated under Contract No. DACQ64-99-C-0001 to construct levees on the Upper Bayou Project.

139. On or about June 1, 2001, Renda was obligated to construct levees on the Upper Bayou Project.

140. On or about June 1, 2001, the Contracting Officer had the right under Contract No. DACW64-99-C-0001 to direct that Renda complete construction of the levees at the Lost Lake Placement Area.

141. On or about June 14, 2001, Renda issued a request for equitable adjustment to the Contracting Officer seeking payment of $1,158,642.00, plus a 36 calendar day extension of Contract time.

142. Renda's June 14, 2001, letter to the Corps requesting such equitable adjustment is Plaintiff's Exhibit 1518.

143. On or about July 23, 2001, the Administrative Contracting Officer wrote to Renda and advised that there would be no further need for the use of a hydraulic dredge on the Upper Bayou Project.

144. The Administrative Contracting Officer's July 23, 2001, letter to Renda is Plaintiff's Exhibit 1547.

145. On or about August 22, 2001, the Administrative Contracting Officer orally acknowledged partial merit for the "Obstruction #2 Claim."

146. Renda conveyed its understanding of the Administrative Contracting Officer's oral acknowledgment of partial merit with respect to obstructions in Dredge Section 9 in writing on about August 28, 2001, to both the Contracting Officer and Administrative Contracting Officer.

147. Renda's August 28, 2001, letter to the Contracting Officer and Administrative Contracting Officer is Joint Exhibit 90.

## LOST LAKE LEVEES CLAIM

148. The contract for the Upper Bayou Project required that part of the levees at the Lost Lake Placement Area be constructed with a mechanical method of construction and that part of the levees at the Lost Lake Placement Area be constructed with a hydraulic method of construction.

149. The Contract Documents set out the sequence for constructing the levees.

150. Under the Contract Documents, the mechanical levees had to be completed prior to the start of the hydraulic levees.

151. Among other things, the Contract Documents indicated that the foundation for the new levee to be constructed at the Lost Lake Placement Area is very soft to soft dredged material and sand placed in past dredging cycles.

152. Minutes for the Pre-Bid Meeting held on about June 23, 1998, were issued as a part of Addendum No. 1.

153. It would have been reasonable for Renda to have relied upon soil borings that the Corps provided with the bid solicitation materials concerning the foundation for the Lost Lake Levees on the Upper Bayou Project.

154. The Corps expected that contractors bidding on the Upper Bayou Project would rely on soil borings the Corps provided with the bid solicitation materials.

155. The soil borings that the Corps provided with the bid solicitation materials for the Upper Bayou Project were part of the Contract Documents.

156. Prior to June 16, 1998, the Corps knew of the existence of soft to very soft material areas adjacent to the existing levees in the Lost Lake Levee area of the Upper Bayou Project.

157. A section of the levee to be built with a hydraulic method of construction was deleted in the northeast corner of the Lost Lake Placement Area.

158. In about February, 1999, Renda was building mechanically-constructed levees and the new outlet box structure at the northeast corner of the Lost Lake Placement Area.

159. The Corps' inspectors have noted that the Corps' design should have expected pipe sag due to the soft foundation material.

160. The Contracting Officer issued Contract Modifications CO-01 (P00004), CO-02 (P00006), and CO-03 (P00008), which compensated Renda for additional costs of performance.

161. On or about March 23, 1999, the Corps issued Contract Modification CO-01 with a Not to Exceed price of $250,000.00 which Renda was not required to sign.

162. The Contracting Officer issued Contract Modification CO-02, dated June 28, 1999, which adjusted one of the quantities in Modification CO-01, set unit prices, increased the contract price by $436,855.87 (inclusive of the $250,000 that was the subject of Modification CO-01), and extended the time for performance of the Contract by 20 calendar days.

163. On or about August 4, 1999, the Contracting Officer issued Contract Modification CO-03.

164. Contract Modification CO-03 increased the contract amount by $364,201.03 and extended the time for performance of the Contract by 22 calendar days.

165. Sometime after August 4, 1999, the Contracting Officer issued Contract Modification VQ011 for a variation in quantities.

166. Contract Modification VQ011 had a value of $0, but granted a contract time extension of 18 calendar days.

167. Renda did not sign Contract Modification CO-01 on the Upper Bayou Project.

168. On or about March 1, 1999, Renda discussed with the Corps the need for increased quantities of material to complete work on the levees at the Lost Lake Placement Area to be constructed by or with mechanical construction methods, for the Upper Bayou Project.

169. The Contract Documents for the Project anticipate that sufficient suitable material exists to complete the levees in accordance with the Contract Documents.

170. A pre-bid meeting concerning bids for the contract for the Upper Bayou Project was held on June 23, 1998.

171. At the June 23, 1998, Pre-Bid Meeting for the Upper Bayou project, a representative or representative(s) of the Corps stated that there would be sufficient material within the dredged template to construct new levees at the Lost Lake Placement Area with a hydraulic method of construction, even allowing for the soft foundations.

172. Renda's crews working on the North Levee at the Lost Lake Placement Area experienced problems.

173. Renda notified the Corps of difficulties that it experienced with construction of the North Levee at the Lost Lake Placement Area.

174. On or about August 18, 2000, Renda confirmed in writing its understanding of an oral agreement with the Corps to realign the West Levee at the Lost Lake Placement Area.

175. On August 18, 2000, Renda advised the Corps of alleged differing site conditions concerning the levees at the Lost Lake Placement Area.

176. Renda's letter of August 18, 2000, to the Corps is Joint Exhibit 60.

177. In a letter dated November 1, 2000, Renda purported to confirm an alleged oral directive by the Corps to Renda regarding construction of levees at the Lost Lake Placement Area.

178. Renda's letter of November 1, 2000, to the Administrative Contracting Officer is Plaintiff's Exhibit 1067.

179. On or about May 4, 2001, the Corps issued Contract Modification P00026.

180. Contract Modification P00026 allowed up to 60 calendar days to complete dredging from private sources.

181. Contract Modification P00026 required Renda to hydraulically place material dredged from private sources into the new levee template.

182. Contract Modification P0026 provided for additional time allowed of up to sixty (60) calendar days.

183. On or about May 23, 2001, the Corps issued, but Renda was not required to sign, Contract Modification No. CO-10.

184. Contract Modification No. CO-10 was issued with no increase in the contract price.

185. On or about June 26, 2001, the Contracting Officer requested that Renda submit an amended certified claim concerning the levees to incorporate certain information discussed at the May 2, 2001, claims conference.

186. On or about July 23, 2001, at Renda's request, the Administrative Contracting Officer sent a letter to Renda to advise that there would be no further requirements for the use of a hydraulic dredge on the contract for the Upper Bayou Project.

187. The Administrative Contracting Officer's July 23, 2001, letter to Renda is Plaintiff's Exhibit 1547.

188. On or about August 27, 2001, the Contracting Officer issued a letter to Renda directing Renda to remove any remaining pipelines or appurtenant equipment belonging to Renda from the Lost Lake Placement Area.

189. The Contracting Officer's August 27, 2001, letter to Renda is Plaintiff's Exhibit 1583.

190. On or about September 18, 2001, the Contracting Officer issued, but Renda was not required to sign, Contract Modification CO-11 (P00028) deleting the remaining unfinished levee construction at the Lost Lake Placement Area from the contract.

191. Contract Modification CO-11 (P00028) states "CHANGE IN COST AND QUANTITIES. To be determined."

192. Contract Modification P00028 deleted the remaining, unfinished levee construction at the Lost Lake Placement Area from the contract for the Upper Bayou Project.

193. Contract Modification P00028 was a modification that the Corps issued to Renda on the Project.

194. As a result of Contract Modification P00028, Renda was not required to complete the remaining, unfinished levee construction at the Lost Lake Placement Area.

195. Renda did not sign Contract Modification P00028.

196. On about October 16, 2001, Renda submitted a request for equitable adjustment to the Corps in the amount of $6,258,853.00, plus a 397 calendar day extension of contract time, concerning the Lost Lake Levees.

AGREED AND STIPULATED:

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: /s Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800
Clark B. Will, P.C. TXBar No. 21502500

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s John E. Kosloske
John E. Kosloske, Esq.
Senior Trial Counsel
Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street N.W., Room 8012
Washington, DC 20530

ATTORNEYS FOR DEFENDANT