UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., PLAINTIFF, | § § § | CASE NO. 02-306C |
| V. | § § | (JUDGE HEWITT) |
| THE UNITED STATES DEFENDANT. | § § | |

**JOINT MOTION FOR CLARIFICATION OF PORTIONS OF TRIAL TRANSCRIPT**

COMES NOW, Plaintiff, Renda Marine, Inc. ("Renda"), and Defendant, the United States, and respectfully request that this Court review and modify two instances within the trial transcript where errors have occurred. In support, the parties show the following:

Trial Transcript, Volume 4, March 3, 2005:

During the Plaintiff's direct examination of Steven Bowman, the witness was shown Plaintiff's Exhibit 1415 (copy attached). A discussion ensued regarding identification of the exhibit and its contents (Tr., Vol. 4, p. 982, l.7 through p. 983, l. 9; copy attached). The Court admitted said exhibit into evidence. Unfortunately, when the court reporter's recording from trial on March 3, 2005, was transcribed by Heritage Reporting Corporation, the exhibit was identified as Plaintiff's Exhibit 1450. A review of Plaintiff's exhibit list filed with the Court, as well as a review of the physical exhibit books, will verify that Plaintiff did not use nor produce any document labeled Exhibit 1450. By way of explanation, Exhibit 1450 was previously assigned to an exhibit, but was deleted prior to commencement of trial, and no physical exhibit was produced bearing that number.

Upon discovery of the error, the undersigned's paralegal (Cheryl Moseley) contacted the paralegal for Defendant (Deborah Barbour) and the law clerk assigned to this case (Sharon Nokes) and requested that they review their notes regarding exhibits. Ms. Barbour and Ms. Nokes confirmed

that their notes regarding exhibits admitted on March 3, 2005, matched that of Ms. Moseley and indicated that the exhibit referred to and admitted was Plaintiff's Exhibit 1415. It is clear from the discussion in the transcript that the exhibit referred to and admitted was Plaintiff's Exhibit 1415, and not Plaintiff's Exhibit 1450. Accordingly, the parties request the Court to issue an order indicating that the following pages and lines of the trial transcript are corrected to accurately reflect the exhibit admitted:

Trial Transcript Volume 4, March 3, 2005, p. 968, l. 7

Trial Transcript Volume 4, March 3, 2005, p. 982, l. 7

Trial Transcript Volume 4, March 3, 2005, p. 982, l. 10

Trial Transcript Volume 4, March 3, 2005, p. 982, l. 12

Trial Transcript Volume 4, March 3, 2005, p. 982, l. 17

Trial Transcript Volume 4, March 3, 2005, p. 982, l. 20

Trial Transcript Volume 4, March 3, 2005, p. 982, l. 23

<u>Trial Transcript, Volume 18, April 6, 2005</u>:

During the Defendant's direct examination of William Connole, the witness was shown Joint Exhibit 15.125.0006. The Court admitted said exhibit into evidence, as is reflected in the trial transcript (Tr. Vol. 18, p. 5060, l. 21 through p. 5061, l. 21; copy attached). Unfortunately, in the court reporter's recap of exhibits admitted on April 6, 2005 (Tr. Vol. 18, p. 4881; copy attached), the exhibit is reflected as JX-15.015.0006.

Upon discovery of the error, the undersigned's paralegal (Cheryl Moseley) contacted the paralegal for Defendant (Deborah Barbour) and the law clerk assigned to this case (Sharon Nokes) and requested that they review their notes regarding exhibits. Ms. Barbour and Ms. Nokes confirmed that their notes regarding exhibits admitted on April 6, 2005, matched that of Ms. Moseley and

indicated that the exhibit referred to and admitted was Joint Exhibit 15.125.0006. It is clear from the discussion in the transcript that the exhibit referred to and admitted was Joint Exhibit 15.125.0006, and not Joint Exhibit 15.015.0006. Accordingly, the parties request the Court to issue an order indicating that the following page and line of the trial transcript is corrected to accurately reflect the exhibit admitted:

Trial Transcript Volume 18, April 6, 2005, p. 4881, l. 18.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: /s Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800
Clark B. Will, P.C. TXBar No. 21502500

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
ATTORNEYS FOR RENDA MARINE, INC.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s John E. Kosloske
John E. Kosloske, Esq.
Senior Trial Counsel
Commercial Litigation Branch
Department of Justice
Attn.: Classification Unit
1100 L Street N.W., Room 8012
Washington, DC 20530
ATTORNEYS FOR DEFENDANT

RENDA MARINE

P.O. Box 1036
Freeport, TX 77542
Phone: (979) 230-9911
Fax: (979) 230-9966

Freeport Office Physical Address:
2307 FM 1495, Suite 218
Freeport, TX 77541
URL: http://www.rendamarine.com

**VIA U.S. MAIL & FACSIMILE**

April 30, 2001

Michael McClenan, P.E.
Area Engineer
DEPARTMENT OF THE ARMY
Galveston District, U.S. Army Corps of Engineers
P.O. Box 1229
Galveston, TX 77553-1229

Re: Dredging Upper Bayou
Contract No. DACW64-99-C-0001
Lost Lake Site Meeting Held April 26, 2001

Dear Mr. McClenan:

Renda Marine, Inc. (RMI) wants to thank the Government for meeting with us at the Lost Lake Site on Thursday, April 26, 2001 for the Levee Conference. This meeting was requested by RMI on March 13, 2001 in response to the Contracting Officer's directive dated March 12, 2001. The attendees at the site meeting were as follows:

- Michael McClenan, P.E. – Area Engineer, USACE
- Dalton Krueger – Project Representative, USACE
- Eric Russek, Project Engineer, USACE
- Wendell Mears – Gahagan & Bryant Associates, Inc. (Non-Federal Sponsor, Joint Venture)
- Michael Ulekowski, P.E. – Vice President, URS Corporation (representing USACE)
- Oscar Renda – President, RMI
- Steve Bowman – Vice President & Construction Manager, RMI
- Ben Goodloe – Project Manager, RMI
- Barry Smith – Principal, Pathfinder Construction Consulting, Inc. (representing RMI)

As you may recall from our March 13, 2001 letter to the Contracting Officer (which you were listed as a recipient), RMI clearly stated that, "We consider this directive to be a change to the Contract Documents." At the beginning of our site inspection, you can understand our consternation when you stated that the Government wanted RMI to proceed with and complete the work in Dredge Section 9, proceed with and complete the levee construction, and then request reimbursement of appropriate costs. This is an unacceptable and unreasonable proposal, and was rejected vociferously by RMI.

Although the Government did not want to discuss the general levee construction issues, which have brought us to this point, it was necessary to recap RMI's concerns to properly evaluate the problem(s) and solution(s) for completing the levees. RMI's position and evaluation of the levee problems has not changed since responding to the Government on December 20, 2001. RMI contends that "neat line" levee construction should have required approximately 400,000 cubic yards of material to complete. To date, RMI has installed approximately 1.8 million cubic yards of levee-building material, the levees are not complete, and the levees are not constructible as originally designed due to hidden and unknown conditions. Nevertheless, RMI has proven that the levees **are constructible if the design is modified** in accordance with our recommendations initially made to you in August 2000. It is unfortunate that your office chose to follow poor advice from the Government's Geotechnical Engineer and JV concerning levee construction and RMI's means and methods, given that the levees could have been completed in late October 2000 if the Government had lent credence to RMI's recommendations.

We are very disturbed and have grave concerns that the Government remains in denial that "borrow areas", adjacent to the old levees, not only exist, but are the culprit of the levee shear failures and excessive "loss" of levee-building material. We do not understand the Government's reluctance to accept the existence of these borrow areas, when it was the Non-Federal Sponsor or Joint Venture (JV) personnel who first brought this fact to the attention of RMI. After considerable time spent interviewing Contractors and verifying that significant borrow areas were dug to recharge the old levees during the 1960's to present, RMI is confident that the borrow areas are real.

We want to apologize for making you uncomfortable at the meeting/inspection tour with our blunt language and aggressive directness. However, it was obvious to RMI that all the meetings and correspondence documenting events since August 2000 were forgotten or are being ignored. I was shocked when you stated to me that you did not have time to read all of the correspondence related to this Project. Taking into consideration the significant issues facing this Project, your comments were discouraging. The Government keeps asking us to remain calm and professional, when RMI has not, in our opinion, been afforded the same consideration. RMI is attempting to remain professional, but the Government is discounting the following facts:

- The original Contract value is approximately $12.5 million.
- Executed Modifications to date total approximately $1.4 million, of which 90% are levee-related.
- Five Claims/Requests for Equitable Adjustment (REA) have been submitted to the Government totaling approximately $8.8 million, of which three issues have been granted merit. Two of the submitted Claims/REA's involve the dredging and placement of an additional 1.0 million+ cubic yards of clay material (not shown on the drawings) in the levees at an estimated cost of $5.8 million.
- One significant REA remains to be submitted regarding dredge damages and delays due to obstructions in Section 9, which may total $400,000.

- The significant levee issues claim remains to be submitted regarding the excessive time and equipment used to perform the work to date. Due to insufficient quantities of levee-building material and borrow areas, the claim may be in excess of $3.0 million.

Currently, RMI, a Small Business Contractor, is funding dredging and levee changes due to Differing Site Conditions from its own pocket, at a conservative amount of $9 million (RMI has received a payment of $3.08 million for Flare changes, which is not part of the outstanding $9 million). In all likelihood, changes to this Contract will easily exceed $10.4 million and the Contract value will have increased 83% from the original. As a result of all the changes, disputes, and conflicts with the Non-Federal Sponsor, RMI's Bonding Company has refused to allow RMI to bid any future work for the Galveston District until such time as the disputes are resolved.

RMI's plight is real. The work is over 93% complete, we are easily $9 million out-of-pocket, retention withheld exceeds $500,000, our Bonding capacity is wrecked, the Contract is over a year behind schedule, and our dredge is currently out of commission due to collisions with unknown obstructions in the dredging prism. Certainly the Government can understand why RMI is upset!

At the end of the meeting on Thursday, April 26th, you stated five Options were available to the Government, listed as follows:

1. The Government could Terminate the Contract for Default.
2. The Government could Terminate the Contract for Convenience.
3. The Government could delete the remainder of the work, both levee construction and Section 9 dredging, from the Contract.
4. The Government could delete the remaining work in Dredge Section 9 from the Contract and complete the levee construction.
5. The Government could direct the Contractor to proceed with the remaining dredge and levee construction work, irrespective of the currently identified issues.

In our opinion, the Government cannot justify Option 1 with the substantial unknown conditions and issues identified to date. Option 5 is not reasonable or realistic considering the Differing Site Condition issues, failure of the Government to provide direction on how to address the changed conditions, and the significant costs RMI would expend attempting to perform work, which is insufficiently detailed. Options 2, 3 and 4 are viable options for the Government. However, RMI made it very clear at the meeting that it will preserve and protect its rights, including the use of legal action, to prevent the Government from altering the as-built conditions at the Lost Lake levees, pending resolution of the claim issues.

As we expressed at the meeting, RMI prefers Option 4. The Government will delete the remaining work in Dredge Section 9, in accordance with our March 22, 2001 meeting with the Contracting Officer. RMI will proceed with and complete the new levee construction under modified conditions. However, prior to proceeding with further levee construction, RMI must receive confirmation from the Government of our plan to complete the West levees using material from an outside Contract, and complete the North levees by building them on top of the old levees. Levee-building material may have to be moved by truck from the West side to the North if sufficient material is not available. Further, RMI requests that the Government provide a complete survey of the current as-built conditions, which we have requested several times, both verbally and in writing, from the Government since September 2000. This survey should be complete enough to allow RMI to properly estimate the cost for the additional work to be completed. Finally, the Government must issue a Modification prior to the work proceeding.

It is RMI's sincerest desire to complete this Contract to the satisfaction of the Government. However, the Government cannot continue to ignore the impact that identified conditions have had on this Contract. The conditions at Lost Lake regarding levee construction are materially different than what were represented in the Contract Documents. RMI has suffered enormous economic impacts, which must be addressed prior to proceeding with any additional work. RMI looks forward to the Government quickly concluding discussions with us regarding completion of the levee construction and issuing appropriate direction for the work to proceed.

Should you have any questions concerning this matter or additional thoughts regarding the meeting, please contact me in writing.

Sincerely,

Steven C. Bowman
Vice President & Construction Manager
Renda Marine, Inc.

cc: ✓Tom Benero, Contracting Officer, USACE
Dalton Krueger, Project Manager, USACE
Eric Russek, Project Engineer, USACE
Barbara Watts, Director SBA, USACE
RMI/QC
Oscar Renda
Ben Goodloe
Barry Smith, Pathfinder

Page 965

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
v. ) Docket No. 02-306C
UNITED STATES, )
Defendant. )

Courtroom 11-D
Casey Federal Courthouse
515 Rusk
Houston, Texas
Thursday,
March 3, 2005

The parties met, pursuant to the notice of the Judge, at 9:00 a.m.

BEFORE: HON. EMILY C. HEWITT
Judge

APPEARANCES:

For the Plaintiff:
BRIAN W. ERIKSON, ESQ.
CLARK B. WILL, ESQ.
Quilling Selander Cummiskey Lownds, PC
201 Bryan Street, Suite 1800
Dallas, Texas 75201

For the Defendant:
JOHN E. KOSLOSKE, ESQ.
USDOJ Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20005

Page 966

C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| Steven Craig Bowman | 975 | | | | |
| | 1121 | | | | |

Page 967

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| PX-2.001 | 1075 | 1076 | REA, HL&P tower |
| PX-2.002 | 1076 | 1077 | Bowman letter, 8/9/01 |
| PX-3.001-3.005 | 1186 | 1188 | Claim, Lost Lake levees |
| PX-5 | 1027 | 1027 | same as PX-1518 |
| PX-7.001 | 1058 | 1059 | Claim, South Ferry Landing |
| PX-7.002 | 1059 | | Bowman letter, 3/15/01 |
| PX-7.003 | 1060 | 1062 | Revised claim, South Ferry Landing |
| PX-18.032 | 1094 | 1095 | Photo, line thru SW corner disposal area |
| PX-50 | 1027 | 1027 | Fisher letter |
| PX-87 | 1023 | 1024 | Bowman letter, 8/9/01 |
| PX-926 | 1077 | 1079 | Duke letter, 7/28/00 |
| PX-954 | 1035 | 1036 | Bowman letter, 8/11/00 |
| PX-1023 | 1068 | 1068 | HL&P letter, 10/16/00 |
| PX-1026 | 1066 | 1067 | Bowman letter, 10/18/00 |
| PX-1058 | 1072 | 1072 | McClenan letter, 10/30/00 |
| PX-1062 | 1085 | 1085 | Bowman letter, 10/31/00 |
| (stricken as identical to PX-1064) | | | |
| PX-1070 | 1136 | 1137 | Bowman letter, 11/2/00 |
| PX-1192 | 1053 | 1054 | Bowman letter, 1/10/01 |
| (replaced by PX-7.001) | | | |
| PX-1285 | 1160 | 1161 | Bowman letter, 3/1/01 |
| PX-1314 | 1055 | 1056 | Benero letter, 3/9/01 |
| PX-1323 | 1098 | 1099 | Benero letter, 3/12/01 |

Page 968

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| PX-1330 | 1057 | 1057 | Bowman letter, 3/13/01 |
| PX-1404 | 978 | 979 | Bowman letter, 4/24/01 |
| PX-1419 | 984 | 985 | Bowman letter, 5/1/01 |
| PX-1450 | 982 | 982 | Bowman letter, 4/30/01 |
| PX-1460 | 1112 | 1113 | Bowman letter, 5/01 |
| PX-1474 | 998 | 996 | McClenan letter re: submerged pipeline |
| PX-1504 | 1172 | 1173 | Bowman letter, 6/5/01 |
| PX-1518 | 1018 | 1019 | Bowman letter, 6/14/01 |
| (replaced by PX-5) | | | |
| PX-1525 | 1183 | 1184 | Bowman letter, 6/19/01 |
| PX-1526 | 1021 | | Bowman letter, 6/20/01 |
| PX-1551 | 1179 | 1182 | Bowman letter, 7/24/01 |

Page 981

And I'm interested in reading in paragraphs 8 and 9. Paragraph 8 on page 3 states, Obstruction and delay of Section 9 REA: On April 13 and April 16, 2001, Renda notified the contractor's office that obstructions were encountered in Section 9; a buoy may be submerged or, related to damages to the dredge. The latest information available shows that Houston Dynamics will complete machine shop repairs no later than Saturday, April 28, 2001, and the dredge will again be operational late Sunday, April 29, 2001. Renda plans to submit forward-priced costs associated with the damage this week and will follow when actual costs become available. Now, first off, who is Houston Dynamics?

A They were a – this cover had an assembly so massive that – I don't recall the way – so massive that we had to secure the services of a local large machine shop to disassemble this. It took hydraulic backs to disassemble this unit. It had to go into – to pull this thing apart it was a massive effort. This thing was five or six foot, and go through it and clean it up, and install new seals.

Q All right, turn to paragraph 9. Nine says, Dredge Section 9, April 16, 2001, following obstructions, damaging debris, Renda requests the contracting officer delete the remainder of Section 9 dredging operations (approximately 150,000 cubic yards of material) from its

Page 982

contracts. We are awaiting direction from the Government and a response to our April 16 request to move dredge to project and perform private work. The Government has actually approved that request, sir?

A Yes.

Q Next is Plaintiff's Exhibit Number 1450, sir.

(The document referred to was marked for identification as PX-1450.)

BY MR. ERIKSON:

Q Plaintiff's Exhibit Number 1450, a two-page letter from you to Mr. McClenan, April 30, 2001 – you write this letter to the Government to advise the Government of what transpired at a meeting with the Government.

A Yes.

MR. ERIKSON: Move Plaintiff's Exhibit 1450 be entered into evidence.

MR. KOSLOSKE: No objection.

THE COURT: PX-1450 is admitted.

(The document referred to, having been previously marked for identification as PX-1450, was received in evidence.)

BY MR. ERIKSON:

Page 983

Q The first page of all this, there's a recap of the attendees for the meeting on site. Who attended for the Government?

A Mike McClenan, Dalton Krueger, who was the – Mike was liaison for the Government with the – Eric Russek project engineers. Wendell Mears, he was – Michael Ulekowski, I guess is how you pronounce that. I'm not sure why he was there; he was the ERS Corporation. I think he was there for the Corps.

Q Okay, turn over to page 3, sir. Take a look at the third full paragraph, the one that has bullet points. The paragraph starts out, at the end of the meeting on Thursday, April 27, options were available for the Government listed as follows: Dredge Section 9, when the contractor completes the levee construction. Which of those options did Renda prefer?

A You know, personally at that point in this project, I wanted to finish it. And I had given them solutions to complete the levees which still aren't complete. And I felt like our plan was viable. Termination for the contractor's convenience seemed the most reasonable to me simply because what we were building is not what we were offered at bid time, and they were finally to the point of admitting that. The other options – five wasn't reasonable,

Page 984

because we were just getting continued essentially. Obviously the first one was – we felt was absolutely unreasonable.

Q Now, after the meeting, did Mr. Benero tell you or Mr. McClenan tells you which of the options the Government was leaning towards?

A Well, at that point, Mike McClenan really wasn't sure what – I don't think he really knew what the Government felt, but he indicated to me that the joint venture was pushing for either termination or default, or they wanted to force us to continue dredging and complete the levees in the conditions –

THE COURT: I wonder if you could answer the question that was asked, which is, what did the Government want?

THE WITNESS: Well, I'm not real sure what the Government wanted, to answer your question. I don't think they had an absolute answer, okay.

BY MR. ERIKSON:

Q Turn to Plaintiff's Exhibit Number 1419, sir.

(The document referred to was marked for identification as PX-1419.)

BY MR. ERIKSON:

Q Exhibit 1419 is a two-page letter from you to Mr.

Page 4878

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
v. ) Docket No. 02-306C
UNITED STATES, )
Defendant. )

Courtroom 402
Casey Federal Courthouse
515 Rusk
Houston, Texas
Wednesday
April 6, 2005

The parties met, pursuant to the notice of the Judge, at 8:00 a.m.

BEFORE: HON. EMILY C. HEWITT
Judge

APPEARANCES:

For the Plaintiff:
BRIAN W. ERIKSON, ESQ.
Quilling Selander Cummiskey Lownds, PC
201 Bryan Street, Suite 1800
Dallas, Texas 75201

For the Defendant:
JOHN E. KOSLOSKE, ESQ.
USDOJ Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20005

Page 4879

ALSO PRESENT:

For Plaintiff:
RUDY RENDA
OSCAR RENDA
CHERYL MOSELEY
DANIEL BRAY

For Defendant:
ALEX PETTY
GEORGE STRICKLER
DEBBIE BARBOUR

Page 4880

C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Defendant: | | | | | |
| William F. Connole | 4882 | | | | |
| | 5015 | | | | |

Page 4881

E X H I B I T S

| JOINT EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| JX-15.011.0002 | 4960 | 4961 | Hydrographic survey, 470 |
| JX-15.011.0003 | 4961 | 4961 | Hydrographic survey, 472 |
| JX-15.015.0002 | 4962 | 4964 | Hydrographic survey, 470+00 |
| JX-15.015.0003 | 4933 | 4935 | Hydrographic survey, 472+00 |
| JX-15.015.0006 | 5060 | 5061 | Hydrographic survey, 528 |

Page 5058

1940.
Q What is the document at DX-19/1940?
A This is a graph of the daily – it's a graph of an ordinal plot of the daily hourly – I mean, it's not daily, but the hourly production on each day from the best production to the worst, and then along the Y axis on the left-hand side is the gross cubic yards per pumping hour, and then instead of giving it a date number down at the bottom, we've given it an ordinate number from the best day of pumping to the worst. Now, this graph does not include any sweeping days where they reported zero production.
Q What does the graph show about production on the days included in Renda's measured mile?
A Well, assuming that the values are normally distributed, that is, they're on a bell-shaped curve, the values all fall within 2-1/2 percent of one end of those curves. That's the extreme values in the distribution, which means that those are the exception and not part of the normal base or the distribution of the averages.
Q What are the data that are contained in DX-19/1941 through DX-19/1950?
A Behind the graph sheet is the actual plotted data. This is a work sheet that I've printed out to show physically the date, the line length , and the percent clay that was actually pumped on those high-value days. And then

Page 5059

on the far right-hand column, I put in the notes as to what was Renda's measured mile days.
Q And where do Renda's measured mile days fall on the graph that's shown on DX-19/1940?
A They fall on the extreme end, greater than two standard deviations above the mean or average.
THE COURT: Just to be clear, one of them is not two standard deviations, although it is a large one.
THE WITNESS: Your Honor is correct. I think it's on 217. It falls just to the side of that line.
BY MR. KOSLOSKE:
Q Did you evaluate over-dredging with respect to Renda's lost productivity period?
A Yes, I did.
Q What did you determine in that regard?
A That Renda had over-dredged in the flare area.
Q What is the effect upon a lost productivity analysis of including over-dredging time in the lost productivity period? Strike that. Let me rephrase.
Did Renda's measured mile include over-dredging in the measured mile days?
A No, it did not.
Q How did you determine that?
A Well, in the dredge days that they selected, which were first passes through the area, even on some of

Page 5060

daily reports, it didn't even indicate that they were dredging down at 47 plus 1. They stopped short like at 38. And so those days that they included in the measured mile definitely didn't include any over-dredging.
Q What is the effect upon loss of productivity analysis of including over-dredging time in the lost productivity period but not in the measured mile period?
A It will skew the analysis.
Q In what way?
A It will take – it will increase – it will decrease production in the impacted period and basically increase the cost of performance.
Q How did you determine that Renda's lost productivity period for the flare area claim includes over-dredging?
A A review of the hydrographic surveys for the flare area.
Q What do they indicate?
A They indicate over-dredging was performed in the flare area, which increased the time to perform the work.
MR. KOSLOSKE: Would you show Mr. Connole JX-15.125.0006.
(The document referred to was marked for identification as Joint Exhibit JX-15.125.0006.)

Page 5061

BY MR. KOSLOSKE:
Q Do you have JX-15.125.0006?
A Yes.
Q Do you recognize the document?
A Yes.
Q What is it?
A This is a after-dredging hydrographic survey that was – it looks like it came out of the Corps of Engineers' file.
Q And why do you say that?
A This has the title block up on the left-hand side, and it has AD, after-dredging, on it.
MR. KOSLOSKE: Defendant moves into evidence JX-15.125.0006.
MR. ERIKSON: No objection.
THE COURT: JX-15.125.0006 is admitted.
(The document referred to, having been previously marked for identification as Joint Exhibit JX-15.125.0006, was received in evidence.)
BY MR. KOSLOSKE:
Q Now, what station is this survey taken at?
A This is Station 528.
Q Is that in the flare area?