IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to ¶ 6 of the Court's February 23, 2005 Order, defendant, the United States, respectfully submits the following post-trial brief:[1]

I. Nature Of The Case

This case involves claims governed by the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13), arising under or relating to Contract No. DACW64-99-C-0001 between plaintiff, Renda Marine, Inc., and the United States, acting through the Army Corps of Engineers, Galveston, Texas District (the Corps), to dredge a reach of the Houston Ship Channel known as the Upper Bayou and to construct containment levees and other structures at the Lost Lake Placement Area, a disposal facility for dredged material owned and operated by the Port of Houston Authority (PHA). The scope of work under the contract is referred to in the complaint and other documents as the "Upper Bayou Project."

---

[1] In this post-trial brief, "JX ____" refers to the referenced joint trial exhibit, "PX ____" refers to the referenced plaintiff trial exhibit, "DX ____" refers to the referenced defendant trial exhibit, "Tr. ____ (____)" refers to the referenced page(s) of the trial transcript and parenthetically) the last name of the witness, "Stip. ¶ ____" refers to the referenced paragraph(s) of the "Stipulation of Facts" filed in this case on or about February 23, 2005; "Compl. ¶ ____" refers to the referenced paragraph(s) of the Complaint filed in this case on April 11, 2002; and "Answer ¶ ___" refers to the referenced paragraph(s) of "Defendant's Answer" filed on July 25, 2002.

The complaint filed by Renda sought a recovery of a total of $14,244,848, plus interest under the CDA (41 U.S.C. § 611),[2] upon eight claims:

| Claim | Amount |
|---|---|
| South Ferry Landing Claim | $1,049,173 |
| Flare Area Claim | 1,607,855[3] |
| HL&P Tower Claim | 170,863 |
| Section 7 Clay Claim | 1,083,779 |
| West Levee Realignment Claim | 789,600 |
| Obstruction # 1 Claim | 2,126,083 |
| Obstruction # 2 Claim | 1,158,642 |
| Lost Lake Levees Claim | 6,258,853 |
| | $14,244,848 |

Compl., at 29.

Prior to trial, through a report issued on March 3, 2004, by Robert McCullough, P.E. (the March 2004 McCullough Report), Renda's damages expert, the amount of Renda's claims was revised to $13,379,367:

| Claim | Amount |
|---|---|
| South Ferry Landing Claim | $ 947,054 |
| Flare Area Claim | 1,096,179 |
| HL&P Tower Claim | 167,473 |

[2] Section 611 of chapter 41, United States Code, provides, in relevant part, that "[i]nterest found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim pursuant to [41 U.S.C. § 605(a)] until payment thereof." The certified South Ferry Landing Claim was submitted to the contracting officer on January 10, 2001. See Stip. ¶ 34. The certified Flare Area Claim, HL&P Tower Claim, Section 7 Clay Claim, Obstruction # 1 Claim, and Obstruction # 2 Claim were submitted to the contracting officer on August 9, 2001. See Compl. ¶¶ 72, 82, 89, 118, 145; Answer ¶¶ 72, 82, 89, 118, 145. The Lost Lake Levees Claim was submitted to the contracting officer on October 16, 2001. See PX 3.001.0003.

[3] For the Flare Area Claim, Renda sought to recover $1,607,855, which represents the difference between the amount of the claim presented to the contracting officer, i.e., $4,691,688, and the amount paid by the Government to Renda for that claim pursuant to unilateral contract Modification P00023, i.e., $3,083,833.

| | |
|---|---|
| Section 7 Clay Claim | 978,271 |
| West Levee Realignment Claim | -----------[4] |
| Obstruction # 1 Claim | 1,986,551 |
| Obstruction # 2 Claim | 1,148,804 |
| Lost Lake Levees Claim | 7,055,037 |
| | $13,379,367 |

PX 1863.0025.

Whereas Renda's certified Lost Lake Levees Claim submitted to the contracting officer presented the claim one for $6,258,853 based upon the total cost damages method, the March 2004 McCullough Report redefined the Lost Lake Levees Claim by breaking it out into six claim items, totaling $7,055,037, based upon a direct cost pricing method:

| Claim Item | | Direct Costs |
|---|---|---|
| 12a. | "Additional levee equipment and labor required to construct levees above and beyond what could have been reasonably anticipated from the contract documents" ........................................ | $1,549,759 |
| 12b. | "Mechanical Levee Construction – East, North, and West Levees (approximately 4/17/2000 to 12/31/2000)"[5] .................................... | $1,281,581 |
| 12c. | "Additional dredge plant equipment and labor due to relocation of the dredge discharge line (primarily removing and replacing pipe segments) while reconstructing levees that had subsided" ................ | 352,347 |
| 12d. | "Dredge plant time while waiting for displaced material to settle and while pumping water (non-productive time) to flush displacement material" ........................................................................ | 1,184,162 |
| 12e. | "Additional booster pump equipment required to pump dredge material longer distances due to additional material requirements to construct the levees" ......................................................... | 211,035 |

---

[4] The March 2004 McCullough Report does not treat the West Levee Realignment Claim as a separate claim, but "combines" it with the revised Lost Lake Levees Claim. See PX 1863.0015.

[5] In the March 2004 McCullough Report, the West Levee Realignment Claim is folded into this item of the reformulated Lost Lake Levees Claim. See PX 1863.0022.

12f. "Extended non-effective time for dredge and dredge plant while awaiting official Corps of Engineers release from the project" .......... 725,191

Total Direct Cost: $5,304,075

PX 1863.0018-0024. When indirect expenses (overhead), profit, bond, and "professional fees and report preparation" are added to direct costs, the Lost Lake Levees Claim, as recalculated by the March 2004 McCullough Report, comes to $7,055,037. PX 1863.0024.

At the trial of this case, through the testimony of its damages expert, Mr. McCullough, Renda revised its claimed damages again:

| Claim | Amount |
|---|---|
| South Ferry Landing Claim | $ 839,657 |
| Flare Area Claim | 906,364 |
| HL&P Tower Claim | 159,353 |
| Section 7 Clay Claim | 944,099 |
| West Levee Realignment Claim | -----------[6] |
| Obstruction # 1 Claim | 1,531,822 |
| Obstruction # 2 Claim | 801,036 |
| Lost Lake Levees Claim | 5,660,479 |
| | $10,842,811 |

PX 1863A.001. In this latest damages revision, the six items contained in the Lost Lake Levees Claim are priced as follows:

| Claim Item | Amount |
|---|---|
| 12a - Hydraulic Levees | $1,208,836.25 |
| 12b - Mechanical Levees | 1,176,648.59 |
| 12c - Backtracking Pipe | 270,070.98 |
| 12d - Dredge Plant Downtime | 836,495.53 |
| 12e - Additional Booster Equipment | 209,416.33 |
| 12f - Equipment Standby Time | 527,719.62 |
| | $5,660,479.36 |

[6] The March 2004 McCullough Report does not treat the West Levee Realignment Claim as a separate claim, but "combines" it with the revised Lost Lake Levees Claim. See PX 1863.0015.

PX 1863A.008.

II. Background

A. The Project To Widen And Deepen The Galveston-Houston Navigation Channels

The Upper Bayou Project is part of a larger $500 million project by the Corps, among other things, to widen and deepen the Galveston and Houston Navigation Channels (frequently referred to as the "45-Foot Project") which serves the Port of Houston, in order that ships with larger droughts can have direct access to the Port of Houston. The 45-Foot Project consisted of eight separate dredging contracts awarded by the Corps' Galveston District, one of which was the Upper Bayou Project. See DX 309; Tr. 3089-3091 (McClenan).

The first two contracts under the 45-Foot project were the Upper Bayou and Lower Bay projects. Tr. 3093-3094 (McClenan). Great Lakes Dredging and Dock Co. (GLDD) was the prime contractor for the Lower Bay Project, the dredging portion of which was performed with a 30" hydraulic pipeline dredge. Id., at 3094. Renda was a subcontractor to GLDD on the Lower Bay Project, installing "geotubes" (shore protection) for the marsh site. Id., at 3094-3095.

The next two contracts awarded under the 45-Foot Project were the Lower Bayou and Upper Bay projects. Tr. 3095 (McClenan). Weeks Marine performed the Upper Bay Project with a 30" hydraulic pipeline dredge. Id. The placement areas for that project were Atkinson Island Placement Areas Nos. 14 and 15. Id., at 3096. Bean Stuyvesant performed the Lower Bayou Project with a 30" hydraulic pipeline dredge. Id. The placement areas for that project were Spillman Island and Alexander Island. Id.

The next two contracts awarded under the 45-Foot Project were the Mid-Bay and Mid-Bayou projects. Tr. 3096 (McClenan). Weeks Marine performed the Mid-Bay Project with a 30"

hydraulic pipeline dredge, constructing a marsh site with levees in the Middle Bay area. Id., at 3097.

GLDD was the contractor for the Mid-Bayou Project, which GLDD performed with a 30" hydraulic cutterhead suction dredge (the Dredge California). Tr. 3528 (Van Norman). The Mid-Bayou Project involved 6 million cubic yards of new work dredging in the Houston Ship Channel from below Lynchburg Ferry to Oil Tanking. Id. The Mid-Bayou Project also involved the construction of levees at Lost Lake that were not completed by Renda, the restoration of North Goat Island and South Goat Island, and restoration of shoreline protection for San Jacinto State Park. Id. As part of the Mid-Bayou Project, GLDD dredged the part of the Houston Ship Channel that previously had been included in the Upper Bayou Project as Dredge Section No. 9, but not completed by Renda. Id., at 3528-3530. The levee work at Lost Lake consisted of the construction of the North Levee by hydraulic placement of material, which was performed by GLDD's forces, and the construction of the West Levee by mechanical means, which was performed by Affolter Contracting Co., pursuant to a subcontract with GLDD. Id., at 3530-3531 (Van Norman).[7]

B. Renda Marine, Inc.

Renda Marine, Inc. (Renda) is a marine dredging contractor. Renda was formed in May 1998 for the purpose of performing dredging work in and about Texas and along the Gulf Coast. Tr. 1479 (Bowman); JX 102A, at 15. Renda had a facility at Freeport, Texas, which is between

[7] The jetty and entrance channel and extension projects – offshore projects that could not be performed with hydraulic pipeline dredges because of the high-wave conditions – were dredged with hopper dredges. Tr. 3092-3093 (McClenan).

Galveston and Corpus Christi. JX 98A, at 66, 67.[8]

Mr. Oscar Renda is President of Renda, a position that he has held from the inception of the firm. JX 101A, at 12.[9] At the time Renda was created, Mr. Rudy J. Renda, Oscar Renda's brother, was a Vice President of Renda.[10] JX 102A, at 15.[11] Mr. Eddie Fisher and Mr. Steven Bowman also were Vice Presidents of Renda. JX 102A, at 15.[12]

(1) Eddie Fisher

Mr. Fisher worked for Shoreline Dredging, a dredging contracting business located in Port Lavaca, Texas, started by his father, from 1977 to 1991. JX 98A, at 17-18. Shoreline operated "almost exclusively" in Texas, primarily along the Gulf Coast. Id., at 18. Shoreline

---

[8] Renda's operations division and equipment were located at the Freeport facility. JX 98A, at 66. There was a dock with floating equipment that could be moored and a "laydown" yard for other types of equipment, such as discharge pipe for dredging. Id.

[9] Oscar Renda is also the President of Oscar Renda Contracting, Inc. (OCRI). OCRI was created in 1974. JX 101A, at 10. Oscar Renda has been the President of OCRI since 1974. Id. OCRI is located in Roanoke, Texas, about 20 miles from Dallas. JX 102, at 14-15. Oscar Renda owns about 80% of the OCRI stock and Rudy Renda owns the other 20% of the stock. JX 101A, at 11; JX 102A, at 14. OCRI is engaged in the construction of water and sewer water and sewer pipelines, construction of water and wastewater treatment plants, pipelines, tunnels, roadways, river crossings, and the recycling of "biosolids" and "organics." JX 101A, at 11; JX 102A, at 9-10.

[10] As Vice President of Renda, Rudy Renda assisted Renda with the acquisition of equipment. JX 102A, at 16. He made visits to the Freeport office for meetings, but never had an office at the Freeport facility. Id., at 18.

[11] Rudy Renda, joined OCRI in 1976 as Vice President, a position that he has held since joining the firm. As Vice President for OCRI, Rudy Renda's duties include "administration," equipment purchasing, corporate representative in legal matters, and "consultant to any technical matters in field operations." JX 102A, at 8-9.

[12] Oscar Renda owned about 70% of Renda's stock and Messrs. Fisher and Bowman were the other stockholders in Renda. JX 101A, at 12. Mr. Fisher has a 15% ownership interest in Renda. JX 98A, at 63-64. Mr. Bowman owned about 17% of Renda's stock. Tr. 1479 (Bowman).

performed maintenance and new work dredging jobs "almost exclusively" in Texas, primarily along the Gulf Coast, including some dredging work in the Houston Ship Channel. Id., at 18-20.[13] Mr. Fisher began his employment with Shoreline as a deck hand and he subsequently was promoted to the position of leverman.[14] Mr. Fisher also prepared bid estimates for dredging work while employed by Shoreline. Id., at 38.

In 1991, Shoreline was sold to Allwaste, Inc., and Mr. Fisher became the Vice President of Allwaste's Gulf Coast region. JX 98A, at 36-37. Among other things, he prepared estimates for dredging projects. Id., at 39.

In 1993, Mr. Fisher left Allwaste and took a position King Fisher Marine Services, a dredging and marine construction contractor in Port Lavaca, Texas. JX 98A, at 45, 46. Mr. Fisher was a superintendent of dredging operations for King Fisher Marine, the duties of which involved bidding, estimating, and supervising dredging contracts. Id., at 45-46. In that capacity, Mr. Fisher assisted with the preparation of bids for dredging work in the Houston Ship Channel, including both Corps project and private dredging work. Id., at 47, 49.

---

[13] As Mr. Fisher explained, "maintenance" dredging "is the dredging of a channel that has previously been dredged to its authorized depth, and it's being dredged again to remove material that has shoaled in since the time it was dredged." JX 98A, at 19. Mr. Fisher described what he means by "shoaled in" as follows: "There is a variety of ways that material enters a channel. When you make an artificial channel, nature tries to return it to the state that it was previously, and material that is suspended or comes through runoff from drainage channels will sooner or later fill the channel to some degree or another." Id. "New work" dredging, by contrast, is "the creation or alteration of an existing channel to a prescribed depth or width." Id., at 20.

[14] Mr. Fisher described the "leverman" on a dredge as "the person who operates levers that control the movement of the dredge." JX 98A, at 28. The leverman "controls the excavating operations of the dredge." Id.

In 1996, Mr. Fisher left King Fisher Marine for a position with Soli-Flo, the dredging division of Fluor Daniel, a large, multinational construction firm. JX 98A, at 50-51. Mr. Fisher was hired by Soli-Flo as the Project Manager for the White Rock Lake project in Dallas, Texas. Id., at 51.[15/] Soli-Flow owned an 18" electric diesel cutterhead suction dredge named the White Rock. Id., at 53, 54. The White Rock Lake project was a project to dredge sediment that had accumulated in a lake located in Dallas and transport that material by slurry to a placement area some distance away. Id., at 55.

The dredging enterprise Renda was hatched from discussions between Messrs. Fisher, Bowman, and Rudy Renda about plans for the Dredge White Rock and related equipment after the White Rock Lake project was finished. JX 98A, at 63. Rudy Renda was a Vice President of Renda at the time Renda was created. and, he presently is Acting Vice-President of Renda. JX 102A, at 8. and, for a time, was an administrative consultant to Renda. Mr. Eddie R. Fisher and Mr. Steve Bowman also were Vice Presidents of Renda. Mr. Bowman also was a Vice President of OCRI.

Prior to June 2000, Mr. Fisher was responsible for the day-to-day operations of Renda. Tr. 1479 (Bowman); JX 102A, at 16. His offices were located at Renda's Freeport facility. Id., at 17. Mr. Fisher functioned as the project manger for the Upper Bayou Project until on or about June 5, 2000, tr. 1483 (Bowman), at which time Mr. Bowman assumed the responsibility for

[15] Soli-Flow was a subcontractor to OCRI, the prime contractor for the White Rock Lake project. JX 98A, at 56. Before the dredging work began, however, OCRI acquired the assets of Soli-Flow (including the Dredge White Rock), took over the Soli-Flow subcontract, and completed the White Rock Lake project. Id., at 56-57. Mr. Fisher was retained by OCRI to manage the dredging part of the job and he also became involved with the operations of the slurry transport system. Id., at 58. Mr. Steve Bowman was the project manager for the White Rock Lake project. Id., at 59.

coordinating the operations of Renda's dredges and crews. Id., at 1482. Mr. Fisher resigned from Renda on or about July 30, 2000, at which time Mr. Bowman took over the management of Renda's projects, including the Upper Bayou Project. Id.

(2) Steven Bowman

Mr. Bowman has had a career in the construction industry, but not in the dredging business. He was employed by the Martin K. Eby Construction Co. from 1979 until 1991. Tr. 1469 (Bowman). Mr. Bowman had one assignment with Martin K. Eby that gave him "some exposure to hydraulic cutterhead dredging," id., at 1472, but he has never held a position of any type on a dredge. JX 99A, at 21.[16]

In 1991, Mr. Bowman took a position with OCRI. Tr. 1474 (Bowman). Mr. Bowman became a Vice President of Renda when it was formed in 1998. Id., at 1479. Initially, however, Mr. Bowman's involvement in Renda's affairs was limited to estimating work; he did not have any significant involvement in Renda's day-to-day operations until June 2000. JX 99A, at 32-33. Before June 2000, Mr. Bowman worked out of his office in the Dallas-Fort Worth area. Tr. 1483 (Bowman). Although Mr. Bowman visited Renda's Freeport facility prior to June 2000, he spent most of his time in his Dallas-Fort Worth office. Id.

As noted above, Mr. Bowman did not take an active role in Renda's day-to-day affairs until June 2000, at which time he assumed responsibility for coordinating the operations activities with Renda's dredges and crews. When Mr. Fisher resigned from Renda at the end of July 2000, Mr. Bowman took over the management of Renda's projects, including the Upper Bayou

[16] As of November 22, 2000, at least, Mr. Bowman did not consider himself to be a dredging expert. Tr. 1477 (Bowman).

Project. Mr. Bowman's employment with both OCRI and Renda terminated in November 2001, shortly after the Upper Bayou Project was completed. Tr. 1474, 1479 (Bowman).

(3) Burson Warren

Mr. Burson Warren is employed by OCRI as a Project Superintendent, a position that he assumed after his involvement in the Upper Bayou Project. JX 100A, at 7. As a project superintendent, Mr. Warren oversees sewer water and sewer pipeline utility construction projects from start to finish. Id., at 8.

Mr. Warren was initially employed by OCRI in 1992. He was a Field Mechanic from 1992 to 1995, in which capacity he repaired and maintained OCRI equipment.. JX 100A, at 16. Mr. Warren was a Shop Foreman at OCRI from 1995 to 1999, responsible for coordinating the activities of field and shop mechanics "to facilitate repair and maintenance" of OCRI equipment. Id. In 1999, Mr. Warren became OCRI's Chief Equipment Operator, a position that he held until April or May 2000. Id., at 16-17. He supervised OCRI equipment maintenance staff and coordinated equipment repairs with OCRI's construction divisions.[17/]

In April or May 2000, Mr. Warren became Renda's Equipment Manager, a position that he held until June 2001. JX 100A, at 17-19.[18/] In that capacity, Mr. Warren was responsible for maintenance and repair of RMI's equipment, including the dredge *Millennium*; devoted most of his time to maintenance and repair of RMI's land-based equipment at Lost Lake, such as dozers, excavators. Id., at 18-19. Prior to Upper Bayou Project, Mr. Warren did not have any experience

---

[17] According to Mr. Warren, OCRI had three divisions: Construction, Environmental, and Marine. JX 100A, at 17. The Marine Division and Renda are one and the same. Id.

[18] Mr. Warren reported to Mr. Fisher until Mr. Fisher left Renda, at which time Mr. Warren reported to Mr. Bowman. JX 100A, at 18.

with the maintenance or repair of hydraulic cutterhead dredges. Id., at 36.

(4) Barry Smith

Mr. Barry Smith is a construction consultant. He has been described by Mr. Bowman as a "hired gun." Tr. 1509 (Bowman); JX 99A, at 67. In March 2000, Mr. Smith he went into business for himself as Pathfinder Construction Consulting, Inc. Tr. 1636 (Smith).

According to Mr. Smith, his initial involvement with Renda concerned the Lower Bay and Boggy Bayou (Mouth-of-the-Colorado) projects. Tr. 1642, 2063 (Smith).[19] Mr. Smith had some dealings with Mr. Fisher concerning the March 2000 cure notice issued by the contracting officer with respect to the Upper Bayou Project. Id., at 2064. Apart from that, Mr. Smith did not have any significant involvement in the Upper Bayou Project until after Mr. Fisher left Renda at the end of July 2000. Id., at 1643.

Mr. Bowman first met Mr. Smith in May 2000. Tr. 1509 (Bowman); JX 99A, at 66-67. From essentially August 2000 until mid-Spring 2001, Messrs. Bowman and Smith "were pretty much around each other the entire time." JX 99A, at 70. Mr. Bowman used Mr. Smith for a variety of things, including working on claims, scheduling issues, and strategy for the Upper Bayou Project. Tr. 1509 (Bowman); JX 99A, at 68-69. Mr. Bowman, however, did not consult Mr. Smith "extensively" about the means and methods of the physical work on the Upper Bayou Project. Tr. 1509 (Bowman); JX 99A, at 69.

---

[19] Renda was a subcontractor to Great Lakes Dock & Dredging Co. on the Lower Bay Project. shaping levees constructed by Great Lakes and installing geotextile tubes. Tr. 2707 (Renda).

(5) Benton Goodloe

Mr. Ben Goodloe's employment with Renda began on October 1, 2000. Tr. 2789. He was hired for the position of Project Manager/Superintendent. Id.[20] Mr. Goodloe functioned as project manager and superintendent for the Upper Bayou Project, devoting 100% of his time to that project. Id. His primary duties were as superintendent of the Millennium and oversight of the dredging portion of the Upper Bayou Project. Id., at 2751-2752, 2789. Mr. Goodloe was on the dredge daily for between six and eight hours. Id., at 2789-2790.

Mr. Goodloe did not have any involvement with the levee construction work at Lost Lake until Mr. Rudy V. Renda (son of Rudy J. Renda) left the Upper Bayou Project. Id., at 2790. Mr. Goodloe took charge of the entire Upper Bayou Project during the last two months of the project, but with "a lot of input" from Mr. Bowman. Id.

(6) Rudy V. Renda

Mr. Rudy V. Renda is the son of Rudy J. Renda. Tr. 2597 (Renda). His involvement with the Upper Bayou Project did not begin until August 7, 2000, the day of the meeting at Lost Lake between representatives of Renda, the Corps, and the Joint Venture concerning the alignment of the West Levee. Id., at 2598. Prior to that time, Mr. Renda had been involved with the Lower Bay Project. Id., at 2706-2707 (Renda).

Mr. Renda oversaw levee construction operations at Lost Lake, including the hydraulically-constructed West Levee and the mechanically-constructed North Levee. Tr. 2599 (Renda).

---

[20] Mr. Goodloe has worked continuously in the dredging business since 1970. Tr. 2747 (Goodloe). He has worked in the dredging field as a deck hand, mechanic, leverman, project engineer, project superintendent, and project manager. Id.

C. Government Administration Of The Upper Bayou Project

The contracting officer who awarded the Upper Bayou Project contract to Renda was Thomas Benero, Chief of the Galveston District's Contracting Division. Tr. 68 (Benero). He had has an unlimited contracting officer warrant. Id. When he awarded the Upper Bayou Project contract to Renda, Mr. Benero designated William J. Hopkins, Area Engineer for the Galveston District's Northern Office, as the administrative contracting officer (ACO) for the Upper Bayou Project. Tr. 320 (Benero); DX 349. Mr. Hopkins was the ACO for the Upper Bayou Project from the time of award of the contract in October 1998 until Mr. C. Michael "Mike" McClenan, P.E., became the ACO for the Project in the Fall of 1999. Tr. 3104 (McClenan).

Mr. McClenan became the Area Engineer for the Galveston District's Bay Area Office in 1998. Tr. 3082 (McClenan). The Bay Area Office was responsible, among other things, for administration of construction contracts that were part of the 45-Foot Project, including the Upper Bayou Project. Id., at 3083. However, as of October 1998, when the Upper Bayou Project was awarded to Renda, Mr. McClenan did not have a contracting officer's warrant and, consequently, could not act as ACO for the Upper Bayou Project. Id., at 3105-3106. Mr. McClenan received his contracting officer's warrant in or about September 1999 and he replaced Mr. Hopkins as ACO for the Upper Bayou Project shortly thereafter. Id., at 3085, 3105.[21] Mr. Hopkins did not have any involvement with the Upper Bayou Project after Mr. McClenan became ACO for the Project. Id., at 3105.

[21] During the time that Mr. Hopkins served as ACO for the Upper Bayou Project, the Bay Area Office under Mr. McClenan's direction prepared correspondence for Mr. Hopkins and performed the day-to-day administration of the Upper bayou Contract, except that Mr. McClenan lacked the authority to issue changes to the contract or approve pay estimates. Tr. 3105, 3106 (McClenan).

Mr. McClenan was assisted in the administration of the Upper Bayou Project by Mr. Eric Russek, a Project Engineer in the Bay Area Office. Tr. 3111 (McClenan). Mr. Russek prepared project correspondence and contract modifications (other than funding modifications), processed Renda's monthly pay applications, and monitored Renda's contract performance, which required periodic visits to the construction site. Id., at 3111-3112.

D. The Port Of Houston Authority

The Port of Houston Authority (PHA), an agency of the State of Texas, is responsible for the operations of the Port of Houston. Tr. 3097 (McClenan); Tr. 3905 (Mears). The PHA owns and manages several sites for the disposal and containment of material dredged from the Houston Ship Channel, one of which is the Lost Lake Placement Area. Tr. 3906 (Mears).

The PHA is a co-sponsor of the 45-Foot Project. Tr. 3097. In June 1998, the PHA and the Government entered a "Project Cooperation Agreement" (the Agreement) with respect to the 45-Foot Project in which the PHA assumed responsibility for 25% of the construction costs, including the costs of "general navigational features," such as dredging to deepen and widen the existing Bayou Reach to the authorized depth and width, and directly related costs, including "costs of contract dispute settlements or awards." Agreement, Article I, § B.3, F; Article II, § G, DX 327/4, 327/5, 327/14; Tr. 3099 (McClenan). The Agreement further provided that, "[i]n the exercise of their respective rights and obligations under this Agreement, the Government and [the PHA] each act in an independent capacity, and neither is to be considered the officer, agent, or employee of the other." Agreement, Article XII, § A, DX 327/33.

The Agreement provided for the establishment of a "Project Coordination Team" composed of representatives of the PHA and the Corps to provide general oversight for the project,

including recommendations to the Corps' District Engineer upon project matters. Agreement, Article V, §§ A, C, D, DX 327/24-25; Tr. 3100 (McClenan). However, "[t]he Government, having the legal authority and responsibility for construction of the Project . . . , has the discretion to accept or reject, in whole or in part, the Project Coordination team's recommendations." Article V, § D, DX 327/25.

During the Upper Bayou Project, the PCT consisted of Mr. McClenan, Dalton Krueger, Johnny Rozsypal, and David Brown for the Corps, and Richard Gorini (J. Simmons Group), Grady Bryant (Gahagan & Bryant Associates), Alan Jefts (Turner Collie & Bradon), and Ted Walters (a PHA employee) for the PHA. Tr. 3101 (McClenan), 3910 (Mears).

E. The Joint Venture

The Joint Venture is a business enterprise formed in about 1992 by two firms, Gahagan & Bryant Associates (GBA) and Turner Collie & Bradon (TCB), for the purpose of providing consulting services to the PHA with respect to, among other things, the 45-Foot Project. Tr. 3904-3908 (Mears). GBA is consulting engineering firm that specializes in dredging and marine construction. Tr. 3890 (Mears). TCB is a civil engineering firm that provides a broad range of services. Id., at 3904-3905.

In April 2000, the Joint Venture began providing quality assurance services to the Corps pursuant to a Supplemental Quality Assurance (SQA) agreement between the Corps and PHA. See JX 46; Tr. 3124-3131 (McClenan); 3914-3915 (Mears). The Joint Venture entered a subcontract with the J. Simmons Group for, among other things, personnel to provide SQA inspection services. Tr. 3913 (Mears). The individuals who provided the SQA inspection services prepared written records of their inspections on the Corps's standard-form "Quality Assurance Reports."

Id., at 3915-3916.[22]

III. The Upper Bayou Project

A. The Contract

(1) Dredging

(a) Introduction

The Contract was for Dredging Upper Bayou, a 3.9-mile segment of the Houston Ship Channel from Station (Sta.) 470+00 to Sta. 684+06.58, in Harris/Galveston Counties, Texas,[23] southeast of Houston, Texas. Specification § 02482.1.1.1 (JX 2.0107). There was an estimated pay quantity of 3,483,000 cubic yards of material to be dredged, which consisted mostly of new (virgin) work. Specification § 02482.3.3 (JX 2.0115). The dredging involved increasing the bottom width and deepening the existing channel to a required depth of 47 feet below Mean Low Tide (MLT). Specification §§ 02482.1.1.1 (JX 2.0107), 02482.3.5.4 (JX 2.0118). Side and end slopes were to be 3 horizontal to 1 vertical (3H:1V). Specification § 02482.3.5.4 (JX 2.0118).

The amount of material removed from the within the areas to be dredged and to be paid for was measured by the cubic yard in-place. Specification § 02482.1.13.1 (JX 2.011). The measurement was determined from dredging surveys by comparing the before-dredging (BD) volume of material within the required dredging prism[24] with the after-dredging (AD) volume of material

---

[22] The Joint Venture also had a subcontract with HVJ Associates, a consulting engineering firm that specializes in geotechnical work, for services that included soils investigations and design services for beneficial use sites that were a part of the 45-Foot Project. Tr. 3913 (Mears).

[23] Near the upstream limit, between Sta. 650+00 and 658+00, no dredging was permitted. See Specification § 02482.1.1.1 (JX 2.0108).

[24] The "required dredging prism" refers to the trapezoidal design template for dredging that consisted of a specified depth, width, and side slope within the channel. Specification § 3.3

remaining within the dredging prism. Id. Under the contract, Renda was paid for dredging work by the cubic yard of excavated material based upon a unit price per cubic yard of dredged material. Bidding Schedule Item #0002 (JX 1.0003). In addition to payment for material removed to the required bottom depth of -47 feet MLT, the contract accounted for inaccuracies inherent in the dredging process by measuring and paying Renda at the contractual unit price for material actually removed up to one foot below the required bottom depth, referred to as "allowable overdepth." See Specification § 02482.3.5.1 (JX 2.0117). No additional compensation was authorized for material removed outside the required side slopes. See Specification § 02482.3.5.2 (JX 2.0118).

For purposes of acceptance of dredging work, the contract divided the length of the channel into nine sections. Specification § 02482.3.3 (JX 2.0114-0115). Dredge Section #1 began at Sta. 470+00 (the downstream limit of dredging) and Dredge Section 9 ended at Sta. 684+06.58 (the upstream limit of dredging). Id.[25]

(b) Character Of Materials: Earth Materials

The Contract contained a "Character of Materials" clause which stated that "[e]xplorations, including core borings, to determine the character of materials to be removed have been made by the Government, and the results are as shown." Specification § 02482.1.11 (JX 2.0110). The boring logs were included in the contract. See Drawings F-1 through F-4 (JX 2.019-022).

---

(Note 1) (JX 2.0115).

[25] The stations along the channel are 100 feet apart. To illustrate, the distance between Sta. 470+00 and 480+00 is 1,000 feet. The distance between Sta. 480+50 and 481+25 would be 75 feet.

(c) Character Of Materials: Trash And Debris

The "Character of Materials" clause provided that "[o]ther materials such as scrap, rope, wire cable, snags, and stumps may be encountered within the specified limits of dredging and overdepth dredging," but that "[n]o separage [sic] payment will be made for removal and placement of this debris." Specification § 02482.1.11.1 (JX 2.0110). With respect to "debris," the contract provided:

> *Prior to dredging, the Contractor shall carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the Contractor deems suitable to locate any debris which may interfere with dredging*. The contractor is cautioned to use extreme care when working in the vicinity of any pipeline or utility crossings. During the progress of the work, the Contractor shall not deposit worn out discharge pipe, wire rope, scrap metal, timbers, or obstructive material in the Placement Areas, or along the banks of navigable waters. Such material, *together with scrap, rope, wire cable, piles, pipe, or other obstructive material which may be encountered during dredging operations*, shall be placed by the Contractor at approved locations.

Specification § 02482.3.4.4.2 (JX 2.0117) (emphases added).

(d) Man-Made Structures

Contract Drawing C-2, Note 4, provided that "[t]he Contractor shall be required to use caution when dredging the side slopes in the channel from Sta. 470+00 to Sta. 473+00, from Sta. 514+00 to Sta. 537+00, and from Sta. 610+00 to Sta. 625+00. See Specifications." JX 5.002. The specifications, in turn, provided:

> The Contractor shall be required to use caution when cutting the side slopes in the Channel from Station 470+00 to Station 473+00, from Station 514+00 to Station 537+00, and from Station 610+00 to Station 625+00. *Excessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel*. . . . Therefore, the Contractor may

> consider shaping the top of the cut in these reaches by using the dredge cutter head or mechanical equipment.

Specification § 02482.3.5.2 (JX 2.0118) (emphasis added).

(2) Levee Construction At Lost Lake Placement Area

Under the Contract, dredged materials were to be transported by pipeline and placed at Lost Lake Placement Area (Lost Lake), a disposal site for dredged material. See Drawing C-14 (JX 5.014). Lost Lake is a 650-acre island located north of the Houston Ship Channel at approximate Sta. 480+00. Id. There was an existing containment levee around the approximately four-mile perimeter of Lost Lake. New perimeter levees were to be constructed inside the existing levees by two methods, hydraulically and mechanically. Id. (Notes 8, 9). Drawing C-14, Note 7, stated that it was "the intent of the plans and specifications that the levees be raised to a minimum crest elevation of +30 feet MLT, with crest width of at least 10 feet, and side slopes no steeper than 1V:3H." Id.

The scope of work for the hydraulically and mechanically constructed levees is set forth at Specification § 02223 ("Retaining Levees") and in notes in Drawing C-14 (Notes 8, 9).[26/] The contract required that Renda complete construction of a new drop-outlet structure at the northeast corner of Lost Lake, modifications to the existing drop-outlet structure at the northeast corner of Lost Lake, and the mechanically-constructed portion of the new levee at Lost Lake prior to placement of the hydraulically-constructed part of the new levee. Specification § 02223.1.4.3 (JX 2.0100).

[26] The results of explorations to determine the character of the earth materials at Lost Lake are contained in soil boring logs. See Drawings F-5 through F-9 (JX 5.023-027).

Fill material used for the mechanically-constructed levee was measured and paid by the cubic yard at the unit price per cubic yard bid by Renda, based upon cross sections at the land-based borrow areas from which the fill was obtained. Specification §§ 02223.1.5.1 (JX 2.0101), 02223.1.6.1 (JX 2.0101). Hydraulic levees were measured and paid by the linear foot of levee constructed based upon the unit price per cubic yard bid by Renda. Specification §§ 02223.1.5.2 (JX 2.0101), 02223.1.6.2 (JX 2.0101).

(a) Mechanically-Constructed Levee

The mechanical levees were composed of an estimated quantity of 381,300 cubic yards. See Bidding Schedule, Item #0002 (JX 1.0003). The mechanically-constructed levee was to be built along the south perimeter of the Lost Lake from Levee Sta. 97+00 to Sta. 166+00 (6,900 feet or about one-quarter of the length of the new levee) and near the drop-outlet structures. See Drawing C-14 (Note 8) (JX 5.014). Land-based borrow areas at Lost Lake were furnished by the Government to Renda as the source of material for those purposes. See Drawing C-14 (JX 5.014). Earth fill materials were to be excavated by draglines, backhoes, or other suitable equipment from the designated land-based borrow areas and transported to the site of the mechanically-constructed levee. Specification § 02223.3.1.1 (JX 2.0102).

The contract required that the mechanically-constructed levees be placed in 18" layers ("lifts") of satisfactory materials prior to compaction, except in areas having standing water or soft foundations. Specification § 02223.3.1.1 (JX 2.0102). In areas with standing water or soft foundations, borrow materials had to be placed in a single lift as required to support the weight of the hauling and compacting equipment. Id.

(b) Hydraulically-Constructed Levees

The Contract required that all parts of the new perimeter levee at Lost Lake, except for the specified mechanically-constructed levee locations discussed above, were to be constructed by the hydraulic placement of satisfactory earth fill materials (medium to hard clay and sands) obtained from the required dredging. Specification § 02223.1.4.3(2) (JX 2.0100) (as modified by Amendment No. 0001, ¶ 1(b)(9) (JX 3.0002); Drawing C-14 (Notes 8 & 9) (JX 5.014).

The hydraulic levees were to be raised to +20 feet MLT and then dressed up to final lines and grades by mechanical means with material removed from the adjacent existing levee. In that regard, the Contract provided that "[t]he Contractor shall place Hydraulically Constructed Levees . . . until the entire perimeter levee has been completed to Elevation +20 feet MLT" and that "[t]he Contractor shall not be permitted to grade the area outside the slope of the newly constructed levee until the entire perimeter levee has been completed to Elevation +20 feet MLT." See Specification § 02223.1.4.3(2),(3) (JX 2.0100) (as modified by Amendment No. 0001 to the Solicitation, ¶¶ (b)(9)&(10) (JX 3.0002)). Specification § 02223.3.1.5 ("Final Grading") similarly provided that "material shall not be removed from the existing levee until the new levee crest exceeds +20 feet MLT around the entire Placement Area." JX 2.0103. The contract further provided:

> Satisfactory materials used for Hydraulically Constructed levees shall be obtained from required dredging. The Contractor shall evenly distribute sufficient hydraulic material at all locations along the levee so that the final new levee section can be constructed to the minimum lines and grades.

Specification § 02223.3.1.2 (JX 2.0103).

Drawing C-14, Note 10, describes the foundation for the new levees (both mechanical and hydraulic) as "very soft to soft dredged material and sand placed in past dredging maintenance cycles" and states that "[i]t is anticipated that very soft to soft foundation material will be displaced by the new levee material." JX 5.014. This description of the foundation is consistent with soil boring logs for Lost Lake included in the Contract. See Drawings F-5 through F-9 (JX 5.023-027).

This description of the foundation for the levees and the anticipated displacement of the foundation material by the new levee material, moreover, is underscored in the Government's answers to questions by prospective bidders contained in Amendment No. 0001 to the Solicitation for the Upper Bayou Project. In response to the question "How is mining paid?," the Government responded that "[t]he designers believe that there is sufficient new work material available to construct the levees hydraulically where indicated, *even allowing for the soft foundations*, without having to mine." See Amendment No. 0001, Questions & Answers, Item #5.a, at 2 (JX 3.0005) (emphasis added). In response to the comment "Existing levees in hydraulic constructed levee reach should be raised prior to dredging in order to maintain the required 2-ft of freeboard," the Government stated: "The designers believe a more flexible approach is possible, where the hydraulic dredging can occur to place material to raise the levees while containing the produced fines inside the existing placement area. *This will be the most efficient way to displace the soft foundation material beneath the new levee alignment.*" Amendment No. 0001, Questions & Answers, Item #2 under "Drawings," at 3 (JX 3.0006) (emphasis added). In addition, the questions by prospective bidders and answers contain the following exchange:

> *Why is the levee alignment so far from the perimeter where the foundation is crummy? It makes it harder to build on weaker ground.* What's the purpose of leaving a hundred feet, or whatever it is, on the outside where the base is the best?
>
> Answer: The intent of the design is to use the new work material to enhance the long term stability of the levees. *For this reason, the designers intend the new work material to be used to displace the very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material.*

Amendment No. 0001, Questions & Answers, Item 6, at p. 4 (JX 3.0007) (emphases added).

(3) Contract Performance Time

The contract required that Renda complete the Upper Bayou Project "not later than 446 calendar days after the date of receipt by it of Notice to Proceed." Specification § 00820.1 (JX 2.0014) (as modified by Amendment No. 0001, at ¶ 1(b)(2) (JX 3.0002).

(4) Standard Clauses

The Contract contained numerous standard FAR clauses, including "Differing Site Conditions (APR 1984)," FAR 52.236-2, "Site Investigation and Conditions Affecting the Work (APR 1984)," FAR 52.236-3, and "Pricing of Contract Modifications (DEC 1991)," FAR 252.243-7001 discussed below. See Specification § 00700, ¶¶ 60 (JX 1.0094), 61 (JX 1.0095), 92 (JX 1.0126).

B. Renda's Bid Estimate For The Upper Bayou Project

On or about June 16, 1998, the Corps issued the Solicitation for the Upper Bayou Project contract. Stip. ¶ 1; JX 1.0001. Amendment No. 0001 to the Solicitation was issued on July 7, 1998. JX 3.0001.

Messrs. Bowman and Fisher prepared Renda's bid estimate for the Upper Bayou Project. JX 98A, at 70. According to Mr. Fisher, he and Mr. Bowman brought different strengths to the

preparation of the estimate for the Upper Bayou Project. Id., at 72. Mr. Fisher's strengths were: logistics of the dredging operation; types of equipment required for the dredging operation; locations where equipment could be placed; the most effective pipeline routes; where booster pumps would be added to the discharge pipeline; dredge production rates; fuel logistics; aspects of the project relating to working in a marine environment; and working on a navigable waterway. Id. Mr. Bowman's strengths in preparing the bid were the overall logistics of setting up a large-scale project and earth work calculations. Id., at 73. Insofar as the perimeter levees at Lost Lake were concerned, Mr. Fisher had experience with hydraulic placement of levees and Mr. Bowman had experience with the construction of levees by mechanical methods. Id., at 74.

In preparing the bid estimate for the Upper Bayou Project, Mr. Bowman relied upon Mr. Fisher's dredging experience in the Houston Ship Channel, including production experience. Tr. 1493-1494 (Bowman); JX 99A, at 37-38. Mr. Fisher prepared the part of the bid estimate for the Upper Bayou Project pertaining to dredging and Mr. Bowman reviewed the dredging worksheets prepared by Mr. Fisher. Tr. 1489 (Bowman).

To prepare the bid estimate, Mr. Fisher relied upon the soil boring logs contained in the contract plans. JX 98A, at 112. Specifically, he used the boring logs to identify (a) types and location of different materials to be dredged in order to estimate production rates and (b) areas of the channel to be dredged that contained sand and medium to stiff clays that would be suitable for building levees. Id., at 114; see also Tr. 1490 (Bowman). [27] Mr. Fisher used the soil boring

---

[27] Specification § 02223.2.2.3 provided that suitable materials for the hydraulically-constructed levees "shall be medium to hard clays and sands, as described in the Logs of Borings." Mr. Fisher understood the phrase "medium to hard clays" to include stiff or very stiff clays. JX 98A, at 93-94.

logs to identify areas of the Channel to be dredged that contained suitable levee-building material and the quantities of such material in those areas so as to determine how quickly the hydraulic levees would be completed. Id. This enabled Mr. Fisher to assess the length of discharge pipe-line that would be required to transport levee-building material to locations at Lost Lake where hydraulic levees were to be constructed. Id.

Mr. Fisher produced a "stiff clay percentages" spreadsheet in which he identified, by station numbers, areas of the Channel where he anticipated that stiff or very stiff clays would be encountered, including the depth at which stiff or very stiff clays would be encountered and the quantity of stiff or very stiff clays. See JX 28.[28] Mr. Fisher testified that he created a spreadsheet before the submission of Renda's bid for the Upper Bayou Project, but he does not know whether the version of the spreadsheet that is JX 28 was created before or after the bid. JX 98A, at 134-135.[29] Mr. Bowman testified that Mr. Fisher prepared a version of JX 28 prior to the submission of Renda's bid and that Mr. Fisher had used the boring logs and Channel cross-sections contained in the solicitation package for the Upper Bayou Project to do so. Tr. 577-578 (Bowman).

Mr. Fisher made projections of dredging rates of production based upon his analysis of the types of soils to be encountered at different reaches or parts of the Houston Ship Channel. Tr. 1490 (Bowman). In making those projections, Mr. Fisher broke out the project by channel stations. Id.

---

28 According to Mr. Fisher, "[h]ard clays . . . would be another way to say stiff clays." Id., at 94.

29 The record in this case also contains July 7, 1999 "stiff clay percentages" spreadsheet and a July 13, 2000 "stiff clay percentages" spreadsheet. See JX 38, DX 477/2-3. These later stiff clay percentages spreadsheets are identical to JX 28, except that the former contain more descriptive column headings.

The bid estimate process generated what is described by Mr. Bowman as a bid estimate recap, which is JX 24.0004-0011. The bid estimate recap is the product of calculations that are contained in detailed worksheets prepared by Messrs. Fisher and Bowman, including worksheets that calculated "dredging productions." Tr. 1487-1489 (Bowman). Those detailed worksheets, however, were not offered by Renda at trial. According to Mr. Bowman, he kept a complete file of all bid estimates he worked on when his office was in Fort Worth, including the estimate for the Upper Bayou Project. Tr. 1491 (Bowman). He testified that the estimates were "boxed up" in the Fort Worth office when he left that office and began working out of Renda's Freeport facility and that, when he returned to the Fort Worth office after the Upper Bayou Project ended, "I did not have the estimate file on the Upper Bayou job." Id., at 1490-1491. When asked whether those worksheets would have contained Renda's anticipated production rates for reaches of the the Upper Bayou Project such as, for example, the Flare Area, Mr. Bowman testified: "I would assume so, yes." Id., at 1491 (Bowman).

Mr. Fisher testified that, in preparing the estimate for the Upper Bayou Project, he anticipated non-pay over-dredging quantities of as much as 25% of the contract bid quantity. JX 98B, at 237. According to Mr. Bowman, he allowed for "at least 15 percent non-pay [over-dredging]" in the bid estimate. Tr. 1499-1500 (Bowman).

Mr. Fisher testified that, in preparing the bid estimate for the Upper Bayou Project, he anticipated that the dredge would encounter "typical" or "common" types of trash" such as "metal debris" ("a lot" of which "is from dredge and barge work"), "ropes," "cables," "large pieces of metal," and "rock, debris from . . . riffraff [sic] from shore protection projects." JX 98A, at 222. According to Mr. Fisher, he accounted for the quantity of trash and debris to be encoun-

tered during the project by estimating the "down time to remove and address trash problems . . . ." Id., at 223-224. Mr. Fisher identified "both banks" of the area between Channel Sta. 470+00 and Sta. 476+00 as areas that could contain trash: "They are adjacent to the ferry landing, which is a vessel that's out all the time that . . . could possibly discard ropes and other debris that could cause problems, and also an area where some underwater support or landing could contain some debris." Id., at 224.[30/]

C. The Pre-Bid Meeting For Potential Bidders On The Upper Bayou Project

There was a pre-bid meeting for potential bidders on the Upper Bayou Project sponsored by the Corps at which potential bidders were afforded the opportunity to make inquiries about the project or ask for any desired clarification of the plans and specifications. Questions by potential bidders and answers by the Corps appear in Amendment No. 0001 to the Solicitation package. See JX 3.0004-0008.

Messrs. Fisher and Bowman, however, did not attend the pre-bid meeting for potential bidders because they did not wish to tip their hand to other bidders that Renda was interested in the Upper Bayou Project. Tr. 1502-1503 (Bowman). Mr. Bowman testified that they felt that the element of surprise was critical to bidding the Upper Bayou Project. Id., at 1502. He acknowledged that "anonymity was critical in the process of bidding the Upper Bayou Project . . . right up until the time the bid was turned in." Id.

[30] Mr. Fisher's worksheets for the dredging part of the bid estimate, which were not produced at trial, had "downtime for ship traffic . . . which included the cutterhead cleaning activities." Tr. 1499 (Bowman). According to Mr. Bowman, it was anticipated that trash would be removed from the cutterhead during periods of down time due to ship traffic when the dredge was moved to the side of the Channel. Id., at 1498. Mr. Bowman does not recall the exact amount of down time allowed for ship traffic, but believes that it was "around ten hours a day[.]" Id., at 1498-1499.

D. Renda's Pre-Bid Site Investigation

The desire to gain a tactical advantage in the bidding process from anonymity led Messrs. Fisher and Bowman to scale back the scope of their pre-bid site investigation as well. According to Mr. Bowman, if they had taken soil borings or other soil tests "and spent a lot of time being very visible down there, obviously, we would have played our hand to the other contractors." Tr. 1503-1504 (Bowman).

Messrs. Fisher and Bowman gave conflicting accounts of what they did do on the pre-bid site investigation of the Upper Bayou Project. According to Mr. Fisher, he and Mr. Bowman took a boat ride up and down the reach of channel to be dredged and they spent part of a day at Lost Lake, walking the perimeter where the new containment levee was to be built. JX 98A, at 84. By contrast, Mr. Bowman testified that he did not take a boat ride up and down the Channel or go to Lost Lake. Tr. 1504, 1507-1508 (Bowman). According to Mr. Bowman, he and Mr. Fisher drove in a car up and down the Channel. Id., at 1507.

E. Renda's Bid For And Award Of The Contract For The Upper Bayou Project

On July 17, 1998, Renda submitted a bid of $12,526,100 for the Upper Bayou Project. Stip. ¶ 6. Bids were opened on July 17, 1998, and Renda was the low bidder. Stip. ¶ 7. Another bidder protested the award of the Upper Bayou Project, but the protest was unsuccessful. Stip. ¶¶ 8, 10. On October 26, 1998, the contract for the Upper Bayou Project was awarded to Renda. Stip. ¶ 11; DX 349; Tr. 319-312 (Benero).

IV. The Differing Site Conditions Clause

A. Introduction

The Contract in this case contained the standard Differing Site Conditions clause. This clause provides for an equitable adjustment of the contract price or time required for performance of the work for "(1) subsurface or latent physical conditions at the site which differ materially from those indicated in the contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." See FAR 52.236-2, "Differing Site Conditions" (APR 1984) (Contract Section 00700, ¶ 60).

The purpose of the Differing Site Conditions clause is "to shift the risk of adverse subsurface or latent physical conditions from the contractor, who normally bears such risk under a fixed-price contract, to the government." Olympus Corp. v. United States, 98 F.3d 1314, 1316 (Fed. Cir. 1996). The object of the clause is "to take at least some of the gamble on subsurface conditions out of bidding." Foster Construction C.A. & Williams Brothers Co. v. United States, 193 Ct. Cl. 587, 613-14, 435 F.2d 873, 887 (1970); see also H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1343 (Fed. Cir. 1998) ("The purpose of the Differing Site Conditions clause is to allow contractors to submit more accurate bids by eliminating the need for contractors to inflate their bids to account for contingencies that may not occur.").[31/]

---

[31] Although "the Differing Site Conditions clause is a risk-shifting device, it does not . . . shift the risk of all unanticipated adverse site conditions from the contractor to the government." Olympus, 98 F.3d at 1317. This clause and its predecessor, the Changed Conditions clause, "have only been applied to conditions existing when a contract was executed, not to those that developed during performance." Id. The Differing Site Conditions clause, thus, applies "only to conditions existing at the time of contracting." Id. at 1318; accord Fru-Con Construction Corp. v. United States, 43 Fed. Cl. 306, 317 (1999) (Differing Site Conditions clause "strictly

B. The Elements Of A Type I Differing Site Condition

To prevail upon a Type I differing site condition claim, a contractor, such as Renda, must demonstrate six "indispensable elements:"

1. The contract documents must have affirmatively represented or indicated the subsurface conditions upon which the claim is based.

2. The contractor must have acted as a reasonably prudent contractor in interpreting the contract documents and related pre-award data.

3. The contractor must have reasonably relied upon the representations or indications of subsurface conditions in the contract documents.

4. The subsurface conditions encountered during contract performance must have differed materially from the subsurface conditions represented or indicated by the contract documents or related pre-award data.

5. The subsurface conditions encountered during contract performance must have been reasonably unforeseeable based upon the information available to the contractor at the time of bidding.

6. The contractor's claimed excess costs must be solely attributable to the materially different subsurface condition within the contract site.

Weeks Dredging & Contracting, Inc. v. United States, 13 Cl. Ct. 193, 218 (1987), aff'd, 861 F.2d 728 (Fed. Cir. 1988).

---

limited to those physical conditions present at the time of contracting"), aff'd, 250 F.3d 762 (Fed. Cir. 2000) (Table).

Element #1: Contract Indications

A contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be. Comtrol, Inc. v. United States, 294 F.3d 1357, 1363 (Fed. Cir. 2002); H.B. Mac, 153 F.3d at 1345. There must be "reasonably plain or positive indications in the bid information or contract documents that [the] subsurface conditions would be otherwise than as actually found in contract performance, or to view the other side of the coin, that there were such indications which induced reasonable reliance by the successful bidder that subsurface conditions would be more favorable than those encountered." Pacific Alaska Contractors, Inc. v. United States, 193 Ct. Cl. 850, 869, 436 F.2d 461, 469 (1971). A Type I differing site condition cannot be demonstrated, therefore, where "the plans and specifications do not 'show' or 'indicate' anything about the alleged unforeseen condition, i.e., if they say 'nothing one way or the other about [the subsurface condition].'" United Contractors v. United States, 177 Ct. Cl. 151, 161, 368 F.2d 585, 595 (1971) (quoting Ragonese v. United States, 128 Ct. Cl. 156, 159, 120 F.Supp. 768, 769 (1954)).

What is "indicated" by contract documents "is a matter of contract interpretation and thus presents a question of law" to be decided by the Court. P.J. Maffei Building Wrecking Corp. v. United States, 732 F.2d 913, 916 (Fed. Cir. 1984); accord Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed. Cir. 2001) ("Determining what the contract indicated is a task of contract interpretation that this court performs de novo."); Foster Construction, 193 Ct. Cl. at 602, 435 F.2d at 880 ("The issue of the indications in the contract is one of law for decision

by the tribunal, not an issue of fact to be proven by a preponderance of expert testimony[.]").[32]

Element #2: Reasonableness Of Contractor's Interpretation Of Contract Documents

The "knowledge imputed to a contractor is the understanding that a reasonably competent bidder would have from reading the contract documents." Pleasant Excavating Co. v. United States, 229 Ct. Cl. 654, 656 (1981). Contractors are "presumed to understand the complexities of their undertakings" and they are "bound by any information contained in bidding materials, whether they read them or not." Id. at 658. A "contractor who submits his bid without reading all of the specifications does so at his peril." Dale Ingram, Inc. v. United States, 201 Ct. Cl. 56, 70, 475 F.2d 1177, 1184 (1973).

A contractor must have acted as a reasonably prudent contractor in interpreting contract documents. Youngdale & Sons Construction Co. v. United States, 27 Fed. Cl. 516, 532, 534 (1993). Where the bid documents contain or refer bidders to boring logs, the contractor is "held to the standard of a reasonably prudent contractor in deciphering the meaning of such logs." Id. at 534.

Element #3: Reasonable Reliance Upon Contract Indications Of Subsurface Conditions

A “crucial element” of a differing site conditions claim is reliance: “To prevail on a differing site conditions claim, the contractor must show reliance on the representations in the

---

[32] A "proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents." Randa/Madison, 239 F.3d at 1274 (quoting P.J. Maffei, 732 F.2d at 917). The phrase "contract documents" includes "not only the bidding documents (Invitation for Bids, drawings, specifications and other documents physically furnished to bidders) but documents and materials mentioned in the bidding documents as well." McCormick Construction Co., Inc. v. United States, 18 Cl. Ct. 259, 263 (1989), aff'd, 907 F.2d 159 (Fed. Cir. 1990) (Table). Summaries of minutes of pre-bid conferences that the Government distributes to bidders are contract documents. Goss Fire Protection, Inc., DOTBCA No. 2782, 97-1 BCA ¶ 28,853.

contract." Comtrol, 294 F.3d at 1363; accord Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed. Cir. 1987) ("The contractor . . . must show that it reasonably relied upon its interpretation of the contract and contract-related documents . . ."); Fru-Con, 43 Fed. Cl. at 321 ("A Type I differing site conditions claim is intended to compensate a contractor that, in good faith, relies upon the available information to its detriment.").

Element #4: Material Difference Between Conditions Encountered And Indicated

The subsurface conditions actually encountered by the contractor at the contract site must have differed materially from the subsurface conditions indicated by the contract documents for the same site area. Youngdale, 27 Fed. Cl. at 535. What conditions actually were encountered is a question of fact. Arundel Corp. v. United States, 207 Ct. Cl. 84, 105, 515 F.2d 1116, 1123 (1975). Typically, a material difference is demonstrated by evidence of a larger amount of work than initially contemplated or that an alternative method of workmanship was required to complete the contract. McCormick, 18 Cl. Ct. at 263.[33/]

Element #5: Reasonably Unforeseeable Conditions

The actual subsurface conditions encountered must have been reasonably unforeseeable based upon all information available to the contractor at the time of bidding. Stuyvesant Dredging, 834 F.2d at 1581; United Contractors, 177 Ct. Cl. at 168, 368 F.2d at 594. The Court "looks generally to the information which the contractor possessed or was available to the contractor at

[33] In evaluating whether the conditions actually encountered by a contractor differ materially from the conditions indicated by the contract documents, the proper comparison is between *contract site* conditions indicated and *contract site* conditions encountered. Proof of a material difference requires "a comparison of the subsurface conditions, both estimated and actual, contained within the *precise work site as defined in the parties' contract* . . . ." Weeks Dredging, 13 Cl. Ct. at 228 (emphasis added).

the time of bidding in determining whether the encountered subsurface conditions would have been clearly foreseeable." Youngdale, 27 Fed. Cl. at 535.

Where, as in this case, the Contract contains the standard clause "Site Investigation and Conditions Affecting the Work (APR 1984)," FAR 52.236-3,[34] the contractor is "charged with knowledge of the conditions that a pre-bid site visit would have revealed." H.B. Mac, 153 F.3d at 1346; accord Ambrose-Augusterfer Corp. v. United States, 184 Ct. Cl. 18, 36, 394 F.2d 536, 546 (1968) (contractor bound by what it would have discovered if it had adequately investigated the site); S.S. Mullen, Inc. v. United States, 182 Ct. Cl. 1, 9, 389 F.2d 390, 393 (1968) (where contractor made no actual site investigation with respect to its intended use of a tramway to perform contract, contractor was "bound by what it would have discovered if it had investigated").

Element #6: Nexus Between Differing Site Condition And Increased Performance Costs

A contractor "must demonstrate that the increased costs of performance "are attributable entirely to the materially different subsurface condition." Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 94 (1989). Thus, "expenses which a contractor would have been required to expend anyway had no [differing site condition] occurred are not recoverable as part of an equitable adjustment." Dale Ingram, 201 Ct. Cl. at 71, 475 F.2d at 1185.

---

[34] The Site Investigation clause provides, in part, that "[t]he Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost . . . ." See Contract, § 00700, ¶ 61.

V. Damages

A. General Principles

To "receive an equitable adjustment from the Government, a contractor must show three necessary elements – liability, causation, and resultant injury." Servidone Construction Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991) (citing Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965)). The contractor "bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount will be more than mere speculation." Willems Industries, Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961), cert. denied, 370 U.S. 903 (1962). The measure of the amount of an equitable adjustment under the Differing Site Conditions clause is "the difference between what it cost to do the work and what it would have cost if the unforeseen conditions had not been encountered." Tobin Quarries, Inc. v. United States, 114 Ct. Cl. 286, 334, 84 F.Supp. 1021, 1023 (1949).

B. Equipment Costs

The Contract contained FAR 252.243-7001 ("Pricing of Contract Modifications (DEC 1991)"), which provides that, "[w]hen costs are a factor in any price adjustment under this contract, the principles and procedures in FAR Part 31 and DFARS Part 231, in effect on the date of this contract, apply." Contract, § 00700, ¶ 92. FAR 31.105(d)(2) in effect on October 26, 1998 – the date of award of the Contract – provided, with respect to "construction equipment" (including marine equipment) owned or controlled by the contractor:

> (i) Allowable ownership and operating costs shall be determined as follows:

> (A) Actual cost data shall be used when such data can be determined for both ownership and operating costs for each piece of equipment, or groups of similar serial or series equipment, from the contractor's accounting records. When such costs cannot be so determined, the contracting agency may specify the use of a particular schedule of predetermined rates or any part thereof to determine ownership and operating costs of construction equipment . . . .

48 C.F.R. 31.105(d)(2) (1998); see also Neal & Co., Inc. v. United States, 17 Cl. Ct. 511, 519 (1989) ("In the absence of actual cost data, schedules of construction equipment use rates apply," citing FAR 31.105(d)(2)(i)(A)).[35/]

The Contract in the present case contained the clause "Equipment Ownership and Operating Expense Schedule (MAR 1995) (EFARS 52.231-5000)," which provided, with respect to expenses for equipment owned by Renda:

> Allowable cost for construction and marine plant and equipment in sound and workable condition owned or controlled and furnished by a contractor or subcontractor at any tier shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records. When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the

---

[35] FAR 31.205(d)(2)(i) essentially codifies the case law concerning recovery of construction equipment ownership and operating expense under Government contracts. In L.L. Hall Construction Co. v. United States, 177 Ct. Cl. 870, 885 (1966), the Court of Claims held that the primary evidence of a contractor's equipment costs is its "actual, booked costs." Accord Weaver v. United States, 209 Ct. Cl. 714, 715 (1976). A contractor may not use secondary evidence, e.g., equipment rental or ownership rates schedules, to establish equipment costs unless it proves that its actual, booked costs are unavailable, inadequate, or do not fairly represent the full costs rightly attributable to the particular contract, *unless the contract provides otherwise*. Meva Corp. v. United States, 206 Ct. Cl. 203, 221 & n.10a, 511 F.2d 548, 559 (1975); L.L. Hall, 177 Ct. Cl. at 885. When the contract permits a contractor to use a specified equipment ownership expense schedule to establish equipment costs, the fair and reasonable measure of damages for equipment owned by the contractor is the formula set forth in the schedule applied to the *acquisition* cost for each piece of equipment at issue. Weaver, 209 Ct. Cl. at 715; Cornell Wrecking Co. v. United States, 184 Ct. Cl. 289, 291 (1968); L.L Hall, 177 Ct. Cl. at 886.

> contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region VI. Working conditions shall be considered to be average for determining equipment rates using the schedule unless specified otherwise by the contracting officer. For equipment not included in the schedule, rates for comparable pieces of equipment may be used or a rate may be developed using the formula provided in the schedule.

Specification § 00800, ¶ 7 (JX 2.0009). This clause further provided that, "[f]or retroactive pricing, the schedule in effect at the time the work was performed shall apply." Id. The ownership and operating expense schedule in effect during Renda's performance of the Upper Bayou Project is the June 1999 version of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region VI. See DX 43.[36]

C. Claim Preparation Costs

As noted above, the Contract contained FAR 252.243-7001 ("Pricing of Contract Modifications (DEC 1991)"), which provides that, "[w]hen costs are a factor in any price adjustment under this contract, the principles and procedures in FAR Part 31 and DFARS Part 231, in effect on the date of this contract, apply." Specification § 00700, ¶ 92 (JX 1.0126). FAR 31.205-33(b) ("Professional and consultant service costs") in effect on October 26, 1998 – the date of award of the Contract – provided that "[c]osts of professional and consultant services are allowable subject to this paragraph and paragraphs (c) through (f) of this subsection when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Government (but see 31.205-30 and 31.205-47)." Subsection (f)(1) of FAR 31.205-47 ("Costs related to legal

[36] Renda's equitable adjustment claims involve dredging and the construction of that part of the Lost Lake levees to be built by hydraulically-placed, i.e., dredged, fill material. Renda did not start dredging and, consequently, construction of the hydraulic levees until September 1999.

and other proceedings") provides that "[c]osts not covered elsewhere in this subsection are unallowable if incurred in connection with . . . the prosecution of claims or appeals against the Government (see 33.201)." "Costs" are defined to include "the costs of the services of accountants, consultants, or others retained by the contractor to assist it." Id. at subsection (a).

A "legal, accounting, or consulting cost incurred in connection with the prosecution of a [Contract Disputes Act (CDA)] claim or an appeal against the Government is *per se* unallowable." Bill Strong Enterprises, Inc. v. Shannon, 49 F.3d 1541, 1549 (Fed. Cir. 1995); accord Plano Builders Corp. v. United States, 40 Fed. Cl. 635, 638 (1998) ("[T]he reference in FAR 31.205-47(f) to 'the prosecution of claims . . . against the Government" covers CDA claims, and the prosecution of a CDA claim includes the contractor's submission of the claim to the contracting officer for a final decision."). The phrase "in connection with" "broadens the scope of FAR 31.205-47(f) so as to encompass consulting fees that are merely associated with or related to the prosecution of a CDA claim." Plano Builders, 40 Fed. Cl. at 638.

In Bill Strong, the Federal Circuit identified three categories of legal, accounting, and consultant costs in the contract cost principles: "(1) costs incurred in connection with the work performance of a contract; (2) costs incurred in connection with the administration of a contract; and (3) costs incurred in connection with the prosecution of a CDA claim." The court held that "costs that fall within the first and second categories are presumptively allowable if they are also reasonable and allocable." Id..

VI. Renda's Claims

A. South Ferry Landing Claim

(1) Liability

Renda seeks $839,657 in the South Ferry Landing Claim. Renda alleges that, while operating in the area of the South Ferry Landing between Sta. 470+00 and Sta. 472+00,[37] in April and May 2000, the Dredge *Millennium* encountered "rubble"[38] or "rip-rap," which Renda contends is a Type I differing site condition. See Compl. ¶¶ 24, 25.

In a letter dated April 28, 2000, Mr. Fisher provided the Corps with written notice of the alleged differing site condition that is the subject of the South Ferry Landing Claim:

> This letter is notice of differing site conditions encountered at the south ferry landing in Section #1 on the south side of the channel between Stations 472+00 and 470+00. We have attempted to dredge this small section on portions of five days thus far and have encountered what is apparently a subsurface man-made slope protection consisting of limestone rock.

JX 50.

The South Ferry Landing Claim has two components: a claim for lost productivity and a claim for what are termed "[d]redge repair & move-in/out days." See Renda's "Lost Time and Damages Analysis" summary for the South Ferry Landing Claim, PX 7.001.0007; tr. 4942, 4973 (Connole). The dates of the lost productivity element of the claim are April 14, 21-23, 30, and May 1-3, 2000. See PX 7.001.0007; tr. 4942-4943 (Connole). The dates of the "dredge repair

[37] The South Ferry Landing itself is located at about Station 471+50. Tr. 4908 (Connole).

[38] "Rubble" is construction debris, which can be concrete or asphalt. Tr. 4909 (Connole). In this case, the rubble allegedly encountered by Renda was broken concrete with reinforcing steel and anchor plates. Id. "Rip rap" is a graded stone or rock that generally is used for slope protection or erosion control." Id.

and move-in/out days" element of the claim are April 24-29 and May 4, 14-17, 2000. See PX 7.001.0007; tr. 4973 (Connole).

Renda cannot demonstrate a Type I differing site conditions claim with respect to rubble or rip rap in the area of the South Ferry Landing. *First*, the contract for the Upper Bayou Project does not affirmatively represent or indicate that rubble or rip rap would *not* be encountered in the dredging prism at that location. The contract does not say anything one way or the other about rubble or rip rap within the dredging prism at the South Ferry Landing.

*Second*, Renda cannot demonstrate reliance at time of bid, let alone reasonable reliance, upon the contract documents. Mr. Fisher testified that, in preparing the bid estimate for the Upper Bayou Project, he anticipated that the *Millennium* would encounter rock and rip rap from shore protection projects. JX 98A, at 222. Mr. Fisher testified that he anticipated that the dredge would encounter, among other things, "rock, debris from . . . riffraff [sic] from shore protection projects." Id. He identified "both banks" of the area between Channel Sta. 470+00 and Sta. 476+00 as areas that could contain trash: "They are adjacent to the ferry landing, . . . an area where some underwater support or landing could contain some debris." Id., at 224.[39] In light of

[39] Mr. Fisher's assumption was quite reasonable, given the commercial and urban marine setting of the Upper Bayou Contract. See Gulf Coast Trailing Co., ENGBCA No. 6050, 96-1 BCA ¶ 28,217, at 140,883 ("The contract project area is an old industrial harbor used since colonial days. The area has a long history of collecting debris. As generally understood in the dredging industry, 'new work dredging' can be expected to contain most anything."); D.W. Sandau Dredging, ENGBCA No. 5812, 96-1 BCA ¶ 28,064, at 140,157 (urban and commercial marine settings of the project site were "implicit indications" of the types of trash and debris that could be encountered during dredging operations); Stuyvesant Dredging Co., ENGBCA No. 5558, 89-3 BCA ¶ 22,222, at 111,747 ("This contract does not attempt an exhaustive listing of items to be found and dredged. In fact, this would be impractical, if not impossible, particularly given the nature of the new work dredging work required. As the evidence clearly supports, it is well understood in the dredging industry that virtually anything may be dredged in new work dredging.").

that testimony, Renda cannot demonstrate either that the rock or rip rap allegedly encountered in the South Ferry Landing area was reasonably unforeseeable or that, in bidding the Upper Bayou Project, Renda relied upon, i.e., was misled by, anything contained in the contract documents, including Specification § 02482.1.11.1 cited by Mr. Fisher in his April 28, 2000 correspondence quoted above.

*Third*, the record does not contain any evidence that Renda encountered rubble or rip rap within the contract site, i.e., the required dredging prism.[40] Renda did not produce for the Corps any evidence of the rubble or rip rap allegedly encountered, such as samples or photographs of the rubble or rip rap. The Corps attempted to investigate Renda's claim of rubble or rip rap at the South Ferry Landing by performing a hydrographic survey of the area. Tr. 3155 (McClenan); DX 458. The results of the survey were inconclusive, however, because Renda dredged the area before the survey was performed. Tr. 3155 (McClenan).

Even assuming for the sake of discussion that Renda encountered rubble or rip rap in the dredging prism, i.e., within the contract site, if anything, the evidence indicates that the rubble or rip rap encountered was not in the dredging prism to begin with, but rather entered the contract site as a result of over-dredging by Renda outside the required dredging prism, which dislodged the shore protection material from the adjacent bank, causing it to enter the contract site.[41]

---

[40] In Weeks Dredging, which also involved Type I differing claims by a dredging contractor on a Corps dredging project, the court emphasized that "any proof of actual conditions encountered, proferred by the [contractor] to establish a differing site condition, is . . . relevant only to the extent that it represents those conditions encountered 'at the site,' in this case, the maximum pay template." 13 Cl. Ct. at 228 (emphasis in original).

[41] Mr. Connole, the Government's damages expert, visited the South Ferry Landing in November 2003 and observed shore protection material ("rubble") along the bank at the South Ferry Landing, of which he took photographs. Tr. 4928-4931; DX 19/39. Mr. Connole confirmed with

Based upon their review of after-dredging surveys taken at Sta. 470+00 and Sta. 472+00 in the area of the South Ferry Landing Claim, the Government's hydraulic dredging expert, Mr. Robert Lofgren, and the Government's damages expert, William Connole, P.E., both opined that Renda had overdredged the area excessively and this could have caused shore protection material on the bank outside the dredging template to fail and fall into the template. See Tr. 4395, 4398-4400 (Lofgren); DX 15/64; 4933-4938 (Connole); JX 15.015.0003. Mr. Lofgren testified that the after-dredging survey at Sta. 470+00 reflected that Renda excavated the side slope on the south bank by as much as 20 to 30 feet outside the dredging prism and that the survey at Sta. 472+00 reflected Renda had over-dredged the side slope by the south bank by as much as 30 feet at the top of the side slope and by 20 feet at the bottom of the side slope. Tr. 4398-4399, 4401-4402 (Lofgren); see also DX 15/64 (Figure 3). Mr. Connole testified that the after-dredging survey at Sta. 472+00 reflected that Renda had excavated the side slope on the south bank by "about 50 feet outside the template" at elevation -32.5 MLT and by "about 30 feet" outside the dredging template at the top of the side slope (elevation -24 MLT or -25 MLT). Tr. 4937-4938 (Connole); see also JX 15.015.0003 (5/8/00 after-dredging survey at Sta. 472+00).

The contract required that Renda "use caution when cutting the side slopes in the Channel from Station 470+00 to Station 473+00,"[42/] that "[e]xcessive cutting outside the side slope lines

---

Ferry personnel that the shore protection material at the location had been there for at least 20 years. Tr. 4928-4929 (Connole).

[42] The reference to "Station 470+00 to Station 473+00" encompasses the South Ferry Landing area. See Tr. 4403 (Lofgren); 4939 (Connole); see also Tr. 3648-3649 (Meyer) (testimony with respect to corresponding provision contained in Note 4 on Drawing C-2 (JX 5.002)). During the Upper Bayou Project, at a meeting between representatives of Renda, the Corps, and the Joint Venture to discuss the Flare Area Claim, Mr. Bowman asserted that Specification § 02482.3.5.2's caveat about excessive dredging between Sta. 470+00 and Sta. 473+00 referred to the north bank

and grades in these reaches of the Channel may cause damage to existing structures along the Channel,"[43] and that "the Contractor may consider shaping the top of the cut in these reaches by using the dredge cutter head or mechanical equipment."[44] Specification § 02482.3.5.2 (Side and End Slopes).

Renda did not heed the warning contained in Specification § 02482.3.5.2 with respect to dredging the side slopes in the area of the South Ferry Landing. When asked what a reasonably prudent dredging contractor would allow in the vicinity of the South Ferry Landing horizontally insofar as over-cutting is concerned, Mr. Lofgren opined: "Well, I don't think you should allow any, but the maximum would be about six feet. And he should try to do it – try to hit that line as close as possible." Tr. 4399-4400 (Lofgren). Mr. Lofgren explained that, when a contractor is not careful in cutting the side slope in the vicinity of the South Ferry Landing and over-cuts the side slope to the extent that Renda over-cut it, one thing that can happen is that, "if that riprap underwater groin that's on the north side[[45]] is on the south side, it's laying right on that little

---

of the Channel, not the south bank by the South Ferry Landing. Tr. 3786 (Hrabovsky). If other Renda employees – the levermen on the dredge in particular – read Specification § 02482.3.5.2 to apply only to the north side of the Channel between Sta. 470+00 and Sta. 473+00, Bowman apparently did, that could account for the lack of care in dredging the side slope in the area of the South Ferry Landing.

[43] This provision means that, dredging outside the side slope lines and grades in this reach of the Channel may damage existing facilities or structures along the Channel, including submerged shore protection material that is not visible from the surface. Tr. 4939-4941 (Connole).

[44] This provision is suggesting that the contractor consider raising the cutterhead to the top of the slope and dredge down the slope in this reach of the Channel. Tr. 4405 (Lofgren). Or the contractor may consider using a clamshell or bucket dredge to excavate the top of slope in this reach of the Channel. Id.

[45] The "riprap underwater groin that's on the north side" is a reference by Mr. Lofgren to the North Ferry Landing depicted in Drawing C-6. See JX 5.006. Mr. Lofgren testified that Draw-

ledge there, and it's probably going to – it's going to slide right down into the cut and the cutter is going to encounter it, and this is going to cause the cutter to get plugged." Tr. 4400 (Lofgren).

(2) Damages: Lost Productivity

As noted above, the dates of the lost productivity element of the South Ferry Landing Claim are April 14, 21-23, 30, and May 1-3, 2000. There are several problems with Renda's lost productivity claim.

*First*, Renda has not established that it encountered rubble or rip rap on all the days that Renda claims it did. The only Inspection Reports of Dredging (IRDs) that mention of "rock" or "rip rap" at the South Ferry Landing are the IRDs for April 22 and 23, 2000. See JX 9.227.0002, JX 9.228.0002. The daily dredging reports for the rest of the claimed lost productivity days, i.e., the reports for April 14, 21, 30, and May 1-3, 2000, are silent about encounters with rubble or rip rap on those dates. See JX 9.219, JX 9.226, JX 9.235-JX 9.238. At trial, Renda did not call anyone who worked on the dredge during April or May 2000 to testify about encounters with rubble or rip rap on April 14, 21, 30, and May 1-3, 2000. The failure of Renda to present any such testimony warrants an inference that had Renda done so, the testimony would have been unfavorable to Renda's case. Weeks Dredging, 13 Cl. Ct. at 233.

---

ing C-6 "shows a submerged rock groin, I will call it, located just approximately at the top of the slope line on that side." Tr. 4395 (Lofgren). He further testified: "I think it's to assume that if there's a submerged rock run on that side, there's probably one on the other side. And they're liable to find that rock groin right on top of the slope so any overexcavation is going to bring that rock down to you. The [specifications] caution you to examine the area from top of slope to top of slope, and though a contractor may say, That's too long a job to do, this is one area that surely deserves some examination." Id., at 43-95-4396; see Specification § 02482.3.4.4.2 ("Prior to dredging, the Contractor shall carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the Contractor deems suitable to locate any debris which may interfere with dredging operations."). JX 2.0117.

*Second*, the *Millennium* was not even operating in the area of the South Ferry Landing on April 30 and May 1, 2000. As the Government's damages expert, Mr. Connole, demonstrated, the *Millennium* was engaged in sweeping operations on the *north* side of the Channel on those dates. Tr. 4953, 4955-4966 (Connole) (discussing JX 9.230.0002, JX 13.127, JX 15.011.0002, JX 15.011.0003, JX 15.015.0002, JX 15.015.0003, JX 12.211, JX 12.212).

*Third*, the "measured mile"[46] selected by Renda to demonstrate loss-of-productivity for the South Ferry Landing Claim is flawed because it is not representative of the conditions that Renda reasonably should have anticipated at that location. The days in Renda's measured mile are days when the dredge made a first pass through an area and did not dredge the side slopes and to the bottom of the template. Tr. 4944-4945 (Connole). By contrast, the dredging at the South Ferry Landing involved dredging to the bottom of the template and to the side slopes. Id. Moreover, the days included in Renda's measured mile are days on which 30 percent of the materials dredged are clay, whereas the materials dredged by Renda at the South Ferry Landing had a 50 percent clay content. Id., at 4944-4946.

(3) Damages: Dredge Repair And Move-In/Out Days

As noted above, the dates of the "dredge repair and move-in/out" days of the South Ferry Landing Claim are April 24-29 and May 4, 14-17, 2000. None of those days should be included in the South Ferry Landing Claim. *First*, as Mr. Connole demonstrated, during the April 24-29,

---

[46] While a measured mile is an accepted way of measuring lost productivity for a differing site conditions claim (see tr. 4944 (Connole)), it must be representative of the conditions that the contractor reasonably should have anticipated. See P.W. Construction, Inc. v. United States, 53 Fed.Appx. 555, 557-58, 2002 WL 31780958 (Fed. Cir. 2002) (productivity rates should compare equivalent work).

2000 period, the *Millennium* was engaged in sweeping operations,[47] except April 27, 2000, when the dredge was down all day for repairs to the main pump engine and to replace a water pump on the main generator engine. Tr. 4974-4979 (Connole). The sweeping operations are indicated by Renda's internal Report of Operations for those dates. See JX 12.204 through JX 12.209. That the dredge was engaged in sweeping operations during the April 24-29 period is also reflected by a April 28, 2000 letter from Mr. Fisher to Mr. Smith in which Mr. Fisher notes "we are sweeping sections now[.]" DX 451.

*Second*, as Mr. Connole demonstrated through an analysis of Renda's daily reports, the repairs to the *Millennium* during the April 24-29, 2000 period were not related to encounters with rubble or rip rap at the South Ferry Landing. The most time-consuming repairs involved cracked and leaking heads on the main pump engine (see JX 13.129), replacement of a water pump on the main generator engine, and repairs to the swing sheeve.[48] As Mr. Connole opined, none of those repairs can be attributed to a subsurface encounter by the dredge with rubble or rip rap. Tr. 4979-4980, 4987-4988. If the dredge had picked up rubble while dredging at the South Ferry Landing, it would pass over the cutterhead, through the ladder pump, up the pipeline, and through the main pump into the discharge line without entering the main pump engine. Tr. 4985-4986 (Connole).

*Third*, as Mr. Connole testified, May 4, 2000, should not be included in the South Ferry

---

[47] As Mr. Connole explained, "sweeping" is "clearing the channel of material that remains above the dredge prism, but generally they've already taken pay quantity credit for that material in a previous report, and so they don't report any material being removed that day." Tr. 4978.

[48] The *Millennium* was down for 10.75 hours on April 26, 2000, because of problems with the engine on the main pump, for 24 hours on April 27, 2000, because of the main pump engine and to replace the water pump on the main generator engine, and for 10.58 hours on April 28, 2000, because of a problem in the engine room, and for 5.67 hours on April 29, 2000, because of a problem with the swing sheeve. See Tr. 4984 (Connole); DX 19/34 (Table 4.1.2).

Landing Claim because it is a contractual move-out day: "[t]hey completed dredging . . . early in the morning on May 4, and they had other contract work to do, so they moved to do that other work as part of the original contract." Tr. 4990-4991 (Connole).

*Fourth*, the May 14-17, 2000 period should not be included in the South Ferry Landing Claim because that was a scheduled maintenance period. Tr. 4991-4993 (Connole). There are two documents which reflect that, during May 14-17, 2000, the dredge was down for scheduled maintenance. One of those documents is a spreadsheet of data based upon Renda's daily dredge reports prepared by Renda's damages expert, Robert McCullough, which states that the dredge was undergoing "scheduled maintenance" during May 15-20, 2000. See PX 1863.0076. The other document is a May 19, 2000 Quality Assurance Report filed by Mr. Russek which states: "Dredge Millennium down for scheduled maintenance for past five-plus days." JX 11.023.0001.

*Fifth*, even assuming for the sake of discussion that the repairs to the *Millennium* during the May 14-17, 2000 period were unscheduled repairs, Renda has not demonstrated that any of the repairs to the dredge – including the main pump impeller and the new pump shell – resulted from encounters with rubble or rip rap. And, in any case, the repair on May 17, 2000, concerned the spud winch drum located at the stern of the dredge, see JX 9.252.0002, which Mr. Connole testified could not have been damaged by rocks at the South Ferry Landing. See Tr. 4997.

(4) Damages: Quantum

Mr. Connole did not use the unrepresentative measured mile selected by Renda for the South Ferry Landing Claim. Tr. 4946 (Connole). Mr. Connole selected a new measured mile representative of the dredging operations at the South Ferry Landing: it includes days when the dredge was excavating material that contained 50 percent clay and that involved dredging to the

bottom of the Channel and the side slopes. Tr. 4946-4947 (Connole); DX 19/43 (Table 4.2.3). Based upon that measured mile, which generated an hourly pumping rate of 352 cubic yards of material (as opposed to the hourly pumping rate of 593 cubic yards of material in Renda's flawed measured mile, see PX 7.001.0007), Mr. Connole determined that the *Millennium* experienced a loss of productivity in the South Ferry Landing area of 16 hours. Tr. 4969-4973, 4997; DX 19/44. Based upon his determination of a 16-hour loss of productivity or overrun of pumping time, Mr. Connole calculated an adjustment of $27,202. Tr. 5000, 5023; DX 19/48-51.

Mr. Connole then adjusted the calculated $27,202 because Renda dredged outside the maximum pay template both at the South Ferry Landing and in Mr. Connole's measured mile area. Because the amount of over-excavation in the South Ferry Landing area was 25 percent less than in his measured mile area, the lost time analysis understated the adjustment to which Renda would be entitled if the Government were liable to Renda for a Type I differing site condition. To account for the influence of the uneven over-dredging amounts upon his lost productivity analysis, Mr. Connole increased the $27,202 calculated adjustment by a factor of 1.25, resulting in a final adjustment for the South Ferry Landing Claim of $34,003. See Tr. 5024-5026; DX 19/51-52.

B. Flare Area Claim

Renda seeks $906,364 for the Flare Area Claim. Renda alleges that, while dredging in the Flare Area (Sta. 520+00 to Sta. 550+65), it encountered stiff clays at elevations where soft clays had been anticipated and that this is a Type I differing site condition which had an adverse effect upon the *Millennium*'s productivity in the Flare Area. In a letter dated March 30, 2000, to the Corps, Mr. Fisher set out the parameters of the Flare Area Claim:

> This letter is a request for additional contract days for work on the [Upper Bayou Project]. In a previous correspondence of January 5, 2000 we had responded to requests concerning production rates and the ability to met schedule.
>
> At that time our dredge was entering the "flare" area of the project where the bulk of the material is located. We had planned for productions of near 25,000 cubic yards per day in most of the area.
>
> Borings 93-62 and 93-63 show very soft materials to near the required dredging line at -47 mlt. Based on this information we estimated productions in the 25,000 cubic yard per day range in this area that contains approximately 900,000 cubic yards. Based on that production estimate, the area should have been able to be dredged in 36 days.
>
> Upon reaching the area, we encountered stiff clays at a much higher elevation than the -47 mlt as shown on the borings. At the downstream end of the flare, borings showed the stiff clay line to be at approximately -46mlt. We encountered the clays at near -40 mlt and dredged the area to grade up to Station 534+00. From Station 534+00 upstream, the clay level continued to rise reaching as high as -10 mlt on the slopes and 15 mlt in the center of the flare area.
>
> Our production estimates for soft muds were proven correct by production rates in excess of the 25,000 cubic yard per day when dredging very soft clays. During the period from January 29 to February 21 when making the first pass over this area, the dredge had production rates of 20,000 cubic yards eight days; in excess of 25,000 cubic yards four days and in excess of 30,000 cubic yards once.
>
> During this period, however, as has been noted the productions were inconsistent. At a time when clays were not shown to be present at the depths being dredged, we did encounter stiff clays, which slowed production and also contributed to the plugged lines, which also hindered production.
>
> We are requesting an additional 100 days fore the difference in the production to dredge soft clays versus the time required to dredge stiff clays, and the associated down time caused by plugged lines caused by encountering stiff clays in areas where borings indicated soft clays.

DX 437.

Renda thereafter submitted a request for an equitable adjustment (REA) to the Corps, seeking compensation of $4,691,688 for loss-of-productivity (including down time associated with plugged lines). There are 104 days in the claim period, 81 days of which are "dredging days" and 23 days of which are "'lost' days for line plugs & move-in/out days." PX 1.001.0004. The claim ("impact") period includes January 23-27, 2000, February 4-14, 2000, February 19-29, 2000, March 1-11, 2000, July 17-August 2, 2000, August 4-September 5, 2000, September 7-11, 2000, and September 19-29, 2000. See PX 1.001.0139-0140; Tr. 2080-2083 (Smith); Tr. 5071 (Connole).

On March 14, 2001, the Contracting Officer (Mr. Benero) issued unilateral Modification P00023 to the contract, which relates to the Flare Area REA. JX 6.023.0001. The modification stated that the contracting officer "determined that [Renda] incurred a changed condition from that shown in the contract" while dredging in the Flare Area and that Renda "is therefore entitled to be compensated for the additional work." JX 6.023.0002. Modification P00023 increased the contract price by "Not to Exceed $3,083,833.00" and extended the time for completing the Upper Bayou Project by 56 calendar days, from May 3, 2000, to June 28, 2000. Id. It further provided that the "not-to-exceed price" "does not necessarily represent the Government's estimate of the cost of the work," that "[t]he final negotiated price for this modification may be less than the not-to-exceed price," and that "[a] supplemental agreement will be issued to definitize any time and pricing adjustments related to this change upon mutual agreement." Id. Consistent with Modification P00023, the Corps paid Renda the not-to-exceed amount of $3,083,833 for the Flare Area REA.

Renda subsequently submitted a certified claim to the contracting officer, seeking an additional $1,607,855 – the difference between the $4,691,688 total amount claimed by Renda under the Flare Area REA and the $3,083,833 that the Government paid Renda under Modification P00023. The amount presently sought by Renda for the Flare Area Claim is $906,364.

(1) The Effect Of Unilateral Modification P00023

The Government is not precluded by anything contained in Modification P00023 from litigating all aspects of the Flare Area Claim, including liability, causation, and damages. See England v. Sherman R. Smoot Co., 388 F.3d 844, 853-57 (Fed. Cir. 2004). In a CDA case, "once an action is brought following a contracting officer's decision, the parties start in court or before the board with a clean slate." Wilner v. United States, 24 F.3d 1397, 1402 (Fed. Cir. 1994) (en banc). The CDA provides that a judicial action upon a claim "shall proceed de novo in accordance with the rules of the appropriate court," 41 U.S.C. § 609(a)(3), which means that, in the case of a claim by a contractor against the Government, such as Renda's Flare Area claim, "[t]he contractor has the burden of proving the fundamental facts of liability and damages de novo." Wilner, 24 F.3d at 1401.

Sherman R. Smoot involved modifications issued by a contracting officer under a construction contract governed by the CDA that extended the contract performance time as a result of certain delays to the project. The Federal Circuit held that the modifications did not raise a rebuttable presumption that the Government was responsible for the delays that had resulted in the time extensions granted by the modifications:

> Congress made it clear in the CDA that any findings by a contracting officer in a final decision are not binding in any subsequent proceeding. Although, by its terms, the CDA only applies to

> contracting officers' final decisions, in light of the policies underlying the CDA, we see no basis for drawing a distinction between an interim and a final decision of a contracting officer.

388 F.3d at 856.

The effect of the "deemed denial" of Renda's Flare Area claim thus is to "negate" unilateral Modification P00023, so that Renda is forced to litigate entitlement to the entire equitable adjustment amount claimed, not just the difference between the amount Renda claimed and what it was paid. Transamerica Insurance Corp. v. United States, 28 Fed. Cl. 418, 423 & n.4 (1993).

(2) Liability

Renda cannot demonstrate a Type I differing site condition claim. *First*, relevant soil boring logs contained in the contract drawings indicate the presence of stiff or very stiff clays in the Flare Area at higher elevations where Renda alleges it did not anticipate such materials. Specifically, boring logs 3ST-3, 3ST-4, and 3ST-6, which are located on the opposite side of the Channel from the Flare Area, show stiff clay at an elevation of about -35' MLT. Tr. 5039-5042, 5046-5047 (Connole); see also Tr. 1983 (Mathewson) (discussing log 3ST-4). Boring log 3ST-5 shows stiff clay at an elevation of about -41' MLT. Tr. 5042-5044 (Connole).

*Second,* Renda has not demonstrated that, in its bid for the Upper Bayou Project, Renda anticipated that the clays in the Flare Area were soft or very soft clays. To prepare the bid estimate, Mr. Fisher used the boring logs to identify, among other things, the types and location of different materials to be dredged in order to estimate production rates. Id., at 114; see also Tr. 1490 (Bowman). According to Mr. Bowman, Mr. Fisher made projections of dredging rates of production based upon his analysis of the types of soils to be encountered at different reaches or parts of the Houston Ship Channel. Tr. 1490 (Bowman). In making those projections, Mr.

Fisher broke out the project by channel stations. Id.

The bid estimate process generated what is described by Mr. Bowman as a bid estimate recap, which is JX 24.0004-0011. The bid estimate recap does not contain dredging production estimates for discrete parts of the Upper Bayou Project, such as the Flare Area. Those estimates were contained in detailed worksheets prepared by Messrs. Fisher and Bowman that contained anticipated production rates for reaches of the Upper Bayou Project such as the Flare Area. The detailed worksheets, however, were not offered by Renda at trial to establish what Renda predicted at time of bidding the Upper Bayou Project. Tr. 1487-1489, 1491 (Bowman).[49]

*Third,* assuming for the sake of argument that, in bidding the Upper Bayou Project, Renda relied upon the two boring logs in the Flare Area, i.e., logs 93-62 and 93-63 to predict the character of materials to be encountered in the Flare Area, without regard for information contained in other relevant boring logs, Renda did not act as a reasonably prudent contractor in interpreting the contract documents. The top of log 93-62 is approximately -33' MLT and the top of log 93-63 is approximately -44' MLT. Tr. 1974 (Mathewson). It is reasonable to assume that water is above the tops of those boring logs. Id. Boring log 93-62 does not indicate anything about the character of soils in the Flare Area above elevation -33' MLT and boring log 93-63 does not indicate anything about the character of soils in the Flare Area above elevation -33' MLT. Tr. 5037, 5038 (Connole); see also Tr. 1974-1975 (Mathewson) (boring logs 93-62 and 93-63 do not indicate anything about the character of soils between -10' MLT and -30' MLT in the adjacent bank).

---

[49] According to Mr. Bowman, his bid estimate file was "boxed up" when he moved from his office to Renda's faciltiy in Freeport, Texas, and, when he returned to the Fort Worth office after the Upper Bayou Project, the file was missing. Tr. 1490-1491.

Because of the depths of the elevations at the tops of boring logs 93-62 and 93-63, it is not reasonable to rely exclusively upon boring logs 93-62 and 93-63 to evaluate the kind of material to be encountered in the Flare Area, particularly in the higher elevations of the side slope. Tr. 4411 (Lofgren); 5039 (Connole). In addition to boring logs 93-62 and 93-63, a reasonably prudent contractor would consider the boring logs on the opposite side of the Channel from the Flare Area, including logs 3ST-3, 3ST-4, 3ST-5, and 3ST-6, to predict the character of the soils to be encountered in the Flare Area. Tr. 5039 (Connole); 4410-4411 (Lofgren).

In correspondence with the Corps prior to dredging operation in the Flare Area, Renda itself referenced boring logs on the opposite side of the Channel from the Flare Area in discussing the kind of material anticipated in the Flare Area. In a October 13, 1999 letter to the Corps (McClenan), Mr. Fisher stated: "After completing the north half of Section 3, we will dredge across the to the flare portions of Sections 4, 5, and 6. These areas . . . consist of very soft clays except for the section beginning in Section 6[iv]." JX 41. Footnote "iv" at the end of this statement reads: "See borings Nos. 93-62, 3ST-4, 3ST-5, and 93-63." JX 41.0002. Boring logs 3ST-4 and 3ST-5, as noted above, are on the opposite side of the Channel from the Flare Area.

Renda did not conduct a reasonable pre-bid site investigation insofar as the character of the materials to be found in the Flare Area is concerned. Leon Hrabovsky of the Joint Venture, who spent his entire career as a dredging contractor prior to joining GBA in 1997, testified that, on pre-bid site investigations, he would take a boat ride in the area to be dredged and use a probe – a rod or pipe – to get an idea of where "firm bottom was on most of the area." Tr. 3726 ("with probings you can mainly just find where the material is firm"). Mr. Hrabovsky also testified that, on new work dredging projects, he would take soil borings "[i]f we were unfamiliar with the site

and felt like there weren't sufficient borings in the plans that covered the area[.]" Id., at 3727.

Mr. Bowman acknowledged that Renda could have probed the Flare Area with a rod during the course of its pre-bid site investigation for the Upper Bayou Project, which would not have been an expensive operation. Tr. 2256-2257 (Bowman).[50] Renda also could have taken borings in the Flare Area, considering the uselessness of boring logs 93-62 and 93-63 as indicators of the character of the soils at higher elevations in the embankments at the Flare Area, but it did not do so. Such tests could have revealed the stiffness of the clay at the higher elevations in the Flare Area. But Renda was more interested in preserving its anonymity to enhance its chances of a successful bid for the Upper Bayou Project. According to Mr. Bowman, if Renda had taken soil borings or other soil tests "and spent a lot of time being very visible down there, obviously, we would have played our hand to the other contractors." Tr. 1503-1504.

In correspondence with the Corps after the award of the Upper Bayou Project to Renda, Mr. Fisher vacillated about the character of the clay that Renda would find in the Flare Area. In December 1998, as part of a submittal to the Corps regarding the sequence of construction of the hydraulic levees, Mr. Fisher prepared a color-coded chart which showed that part of the hydraulic levees would be constructed from levee-building material (i.e., medium to hard clays) to be obtained from Dredge Sections 4 and 5, including the parts of those sections that are in the Flare Area. Tr. 3557-3560 (Herrera); DX 356/8; DX 357/9. In July 1999, however, Mr. Fisher stated in a letter to Mr. McClenan:

---

[50] In his testimony on direct examination, Mr. Bowman testified that Renda expected that the Corps, as a preliminary matter, would investigate Renda's Flare Area differing site condition claim by probing the material in the Flare Area with a rod to verify the stiffness of the material. Tr. 2256.

> The construction of the hydraulic levees will be able to be judged more accurately after dredging begins in Sections #4 and #5. These sections contain almost one million cubic yards of material, but very little that is classified as stiff or very stiff clay. If this soft to medium clay is able to be worked with the hydraulic levees, this phase of the project will be completed by the time the dredge completes Section #6. If very little of this material in this area is used, the hydraulic levee construction will continue throughout most of the project.

JX 36.0002. And, in a recap of the hydraulic levees preparatory meeting prepared by Mr. Darillo "Leo" Herrera, Renda's project engineer and quality control coordinator for the Upper Bayou Project, Mr. Herrera noted:

> Mr. Fisher commented to the corps representatives that, based on his review of the core borings, there would be stiff clays present in the north side of sections #1 and 2. However, the material in Sections #3, 4 and 5 was not able to be sufficiently identified by borings as material suitable for the construction of hydraulic levees.

Tr. 3583 (Herrera); JX 39.

Given Renda's uncertainty about the character of the materials in the Flare Area and, in particular, the clays to be found in the Flare Area, Renda could have done one of two things in preparing its bid for the Upper Bayou Project: (a) not make any assumption about what was in the Flare Area or (b) conduct a site investigation to determine what was in the Flare Area. Renda did neither.

(3) <u>Damages: Lost Productivity</u>

(a) <u>Renda's Measured Mile</u>

Renda used a measured mile to evaluate lost productivity for the Flare Area Claim. The measured mile used by Renda consists of 11 days in January and February 2000: January 28-31, 2000, and February 1-3, 15-18, 2000. PX 1.001.0143; Tr. 5055 (Connole).

Renda's measured mile for the Flare Area Claim is not appropriate because it is not representative of the conditions that Renda alleges it anticipated in the Flare Area. *First*, the material dredged by the *Millennium* on the days included in Renda's measured mile consisted primarily of muds and silts, not clays. Tr. 5053-5054 (Connole). The percentages of materials dredged on the dates included in Renda's measured mile (from the daily dredging reports (Inspection Reports of Dredging (IRDs)), were 56% mud, 21% silt, 16% clay, and 7% sand. Tr. 5055-5057 (Connole); DX 19/72 (Table 4.3.1).

*Second*, Renda selected days for its measured mile when the *Millennium* was making a first pass through an area that did not involve a full cut to the bottom of the dredging template. *Third*, Renda's measured mile is based upon noncontiguous days when the production achieved deviated from the norm on the Upper Bayou Project. A graph prepared by the Government's damages expert, Mr. Connole, of Renda's hourly production rates for the Upper Bayou Project reflects that all but one of Renda's measured mile days fall "on the extreme end, greater than two standard deviations above the mean or average." Tr. 5058-5059 (Connole); DX 19/1940.

(b) Renda's Impact Period

There are several problems with Renda's "impact period" for the Flare Area Claim. *First*, the January 23-27, 2000 period should not be a part of the Flare Area Claim for two reasons. As Mr. Fisher indicated in a February 1, 2000 e-mail message to the Corps (Russek), the dredge was operating in the center of the Channel during that period, not in the Flare Area. PX 708.0001; Tr. 2088, 2093-2094 (Smith). In that communication, recapping daily production quantities, Mr. Fisher states for "1/26" "still in center of channel," and for "1/27" "still in center." PX 708.0001. For "1/28, Mr. Fisher states "[f]irst real cut in flares." Id. Mr. Fisher further states in that e-mail

that he is "real pleased that borings are still very accurate in location of muds, sands, soft, medium and stiff clays" and that, "[b]ased on the high accuracy of borings to date, I think we can plan to be ready for just what is shown . . . ." PX 708.0001-0002; see also 2088-2089 (Smith). If, as Mr. Fisher stated, the borings accurately depicted what Renda encountered up to that point, i.e., February 1, 2001, there can be no Type I differing site condition for the January 23-27 period, inasmuch as the boring logs accurately depicted what Renda dredged during that period. The soils encountered did not materially differ from the soils indicated in the contract documents.

*Second*, Renda's impact period for the Flare Area Claim improperly includes time that Renda spent dredging in Dredge Section #6 – the part of the Flare Area in which Mr. Fisher had anticipated that Renda would encounter stiff clays. In his stiff clay spreadsheet for the Upper Bayou Project, Mr. Fisher identified 178,933 cubic yards of stiff or very stiff clay in Section #6. See JX 28; JX 38. Mr. Fisher acknowledged in his October 13, 1999 letter to Mr. McClenan that the clay in the part of the Flare Area that is in Section #6 would not be soft. See JX 41.0002.

*Third*, there are only two days in the January-March 2000 portion of the impact period for the Flare Area Claim on which Renda noted stiff clays in its IRDs: March 3 and 4, 2000. See JX 9.178, JX 9.179. The IRDs for the rest of the days in the January-March 2000 portion of the impact period do not indicate whether any clay dredged was soft or stiff. See Tr. 2084-2087, 2096-2107 (Smith); JX 9.136 to JX 9.140, JX 9.149 to JX 9.159; JX 9.164 to JX 9.176, and JX 9.179 to JX 9.185.

*Fourth*, Renda's impact period for the Flare Area Claim improperly includes four days on which Renda did not report in its IRDs dredging *any* clay: March 8, 9, 10, and 11, 2000. See Tr. 2105-2107 (Smith); JX 9.182 to JX 9.185.

*Fifth*, Renda's impact period for the Flare Area Claim improperly includes days on which the dredge was sweeping but does not include any such days in its measured mile: March 1 and 2, 2000. Tr. 2103 (Smith); JX 9.175, JX 9.176. The effect of including sweep days – i.e., days of zero production – in the impact period but not in the measured mile is to increase the damages. Tr. 2067-2068 (Smith).

*Sixth*, Renda's impact period for the Flare Area Claim improperly includes over-dredging whereas its measured mile does not include any over-dredging. Tr. 5059-5062 (Connole); JX 15.125.0006. The effect of including over-dredging in the impact period but not in the measured mile is to skew the productivity analysis by decreasing Renda's performance in the impact period, the result of which is to increase the claimed cost of performance. Tr. 5060 (Connole).

(4) Damages: Plugged Line Days

Renda's impact period for the Flare Area Claim improperly includes days on which the *Millennium* was down due to plugged lines without any proof that the lines were plugged due to dredging stiff clays. Mr. Smith, the consultant who prepared the Flare Area Claim, admitted that "[d]redging in any material can result in a plugged line[.]" Tr. 2554. Mr. Goodloe testified that trash can plug a line. Tr. 2782.

There is also evidence that a malfunctioning flow or velocity meter on the *Millennium* contributed to the plugged line that Renda experienced during the January-March 2000 period when the dredge was operating in the Flare Area. On March 18, 2000, Mr. Fisher sent a memo to Kenneth Machacek, the captain of the *Millennium*, and Ed Tacha, in which Mr. Fisher stated:

> I know we have been operating without the flow meter for a good while, but we are working to get it on line ASAP. *Without the flow meter, we are constantly in danger of plugging the line* and cannot

maximize production.

DX 429 (emphasis added); Tr. 2556 (Smith).

The Government's damages expert, Mr. Connole, performed an analysis of plugged lines. He concluded that there appeared to be a relationship between the plugged lines and the length of pipeline, except during the January-March 2000 time frame when the amount of plugged lines stayed the same notwithstanding that the pipeline length decreased dramatically. Tr. 5092-5096 (Connole); DX 19/2003. Mr. Connole attributed that anomaly to the malfunctioning flow meter on the dredge. Tr. 5094-5096.

(5) Damages: Government Expert's Lost Productivity Analysis

Mr. Connole, did not use Renda's flawed measured mile to evaluate Renda's loss of productivity claim. Tr. 5063. Instead, he selected a new measured mile that was representative of the soft clay conditions Renda allegedly anticipated in the Flare Area. Id., at 5063-5069. Using that measured mile, Mr. Connole determined a production rate in soft clay of 709 cubic yards per hour. Id., at 5069. He then determined the production rate of the dredge the January 23-March 11, 2000 portion of the Flare Area Claim impact period (when the dredge was operating without a booster pump), which was 714 cubic yards per hour. Id., at 5071. Comparing those two rates of production, Mr. Connole reasonably concluded that there was no impact during the first part of the Flare Area Claim period. Id., at 5074.

With respect to the second part of the Flare Area Claim period, i.e., July-September 2000, when the *Millennium* was operating with a booster pump, Mr. Connole determined a 49.1% loss of efficiency. Tr. 5074-5075; DX 19/76. He calculated a $442,503 price adjustment for loss of productivity in the second part of the Flare Area Claim impact period. Tr. 5090; DX 19/84. But

because the over-dredging in the Flare Area was greater than the over-dredging in the area of Mr. Connole's measured mile, he made an adjustment to account for that disparity which resulted in the reduction of the calculated adjustment for the Flare Area Claim from $442,503 to $296,477. Tr. 5091; DX 19/87.

Therefore, even assuming the Government were liable to Renda upon the Flare Area Claim, Renda would not be entitled to recover any more than $296,477, a sum that is *less* than the $3,083,833 received by Renda for the Flare Area Claim under Modification P00023.

C. Section 7 Clay Claim

Renda seeks $944,099 in the Section 7 Clay Claim. On October 20, 2000, Renda notified the Corps (McClenan) that, while dredging on the north side of the Channel between Sta. 565+00 and Sta. 580+00, the *Millennium* encountered "heavy red clay," a differing site condition which allegedly affected the dredge's productivity. See PX 1027; Tr. 2192-2193 (Bowman). On April 16, 2001, Renda submitted a request for equitable adjustment (REA) for "[d]iffering [s]ite [c]onditions encountered while dredging in Section 7 (between stations 561+20 and 609+00) during the period between October 2, 2000 and November 6, 2000." PX 6.001.0002; Tr. 2191-2192 (Bowman). In the REA correspondence, Renda described the alleged differing site condition as follows:

> In short, Renda encountered hardpan, red clay, which we have explained in meetings and correspondence, is very difficult to dredge through. Conversely, the soil borings for the North reach of Section 7 clearly show gray and blue clays, which although "stiff" of "hard", are relatively easy for the cutterhead to dredge through. [Renda] anticipated having to dredge gray and blue clays, not hardpan, red clay . . . .

PX 6.001.0003.

(1) Liability

Renda cannot demonstrate a Type I differing site condition claim. It has not established that the hard red clay encountered by the dredge on the north side of Section #7 was materially different, i.e., significantly more difficult to excavate, than the stiff or hard gray and blue clays Renda admits are indicated by the contract boring logs in that area. As Mr. Bowman acknowledged at trial, in the stiff clay spreadsheet prepared by Mr. Fisher for the Upper Bayou Project, Mr. Fisher estimated that 100 percent of the material to be dredged between Sta. 566+00 and Sta. 586+00 and at Sta. 602+00 and 608+00 would be stiff to very stiff clay. Tr. 2200-2201 (Bowman); DX 477; see also JX 28; JX 38 (earlier versions of Fisher stiff clay spreadsheet).

Renda has not demonstrated a material difference between the strength of the red clay encountered and the soils that it admittedly anticipated on the north side of Section #7. Renda did not perform any soils tests upon the red clay in an attempt to verify that it was more difficult to dredge than the soils indicated by the contract documents, JX 101A, at 24 (O. Renda), even though, according to Renda's geotechnical expert, Dr. Mathewson, Renda could have taken a clay ball from the end of the discharge pipe and had it tested it for about $100. Tr. 2002.[51/]

(2) Damages: Lost Productivity

To evaluate lost productivity for the Section 7 Clay Claim, Renda used the measured mile selected by its consultant, Mr. Smith, for the Flare Area Claim. Tr. 2493 (Smith); Tr. 5101 (Connole); PX 6.003.0003. As Mr. Connole opined, the measured mile used for the Flare Area Claim

[51] Mr. Bowman admits that the red clay was a suitable levee-building material. Nevertheless, instead of transporting the red clay to the new perimeter levee and placing the material hydraulically, as the contract required, Renda stockpiled the red clay at Levee Sta. 118+00, ostensibly to give the Corps an opportunity to test it. Tr. 2186-2187 (Bowman); see also Tr. 2001 (Mathewson).

is an inappropriate means of assessing lost productivity for the Section 7 Clay Claim because it is not representative of the conditions Renda anticipated on the north side of Section #7. The Flare Area measured mile is based upon pumping primarily mud and silt whereas the condition anticipated in Section #7 was stiff clay. Tr. 5101-5102. To properly evaluate lost productivity in Section #7, therefore, a measured mile should model Renda's performance in dredging the *stiff* clay it anticipated in Section #7, not Renda's performance in mud, silt, or, for that matter, soft clay.[52]

Moreover, the impact period for the Section 7 Clay Claim is overstated. As Mr. Bowman acknowledged at trial, only the daily dredging reports (Inspection Report of Dredging (IRDs)) for October 18-25, 2000, report that the dredge encountered hard red clay. Tr. 2196-2198; see also JX 9.406.0001 to JX 9.413.0002 (IRDs for October 18-25, 2000). The IRDs for the other days included in the Section 7 Clay Claim do not indicate that the dredge encountered hard red clay on those dates. Tr. 2196-2198 (Bowman).

D. HL&P Tower Claim

Renda seeks $159,353 for the HL&P Tower Claim. The complaint alleges that, "[o]n about July 16 and 17, 2000, Renda's dredging operations were disrupted by Houston Lighting and Power ('HL&P') crews who were installing a 138 Kilovolt electrical tower in the vicinity of Lost Lake" and that, "[t]o accommodate the HL&P construction, Renda had to break down and relocate its discharge piping." Compl. ¶ 75. The complaint further alleges that, between October 16 and 18, 2000, "HL&P caused a second disruption, which required another relocation of the

---

[52] Renda does not suggest that the dredge's production in mud, silt, or soft clay is similar to the production in stiff clay. To do so would remove the underpinnings of the Flare Area Claim, which is predicated upon the assumption that it is more difficult, i.e., time-consuming, to dredge stiff clay than to dredge soft clay.

discharge piping in Lost Lake." Compl. ¶ 77.

In its complaint, Renda alleged that "HL&P's work was not shown or indicated in the Contract Documents, and constituted a differing site condition." Compl. ¶ 76. Mr. Bowman admitted that construction of the new transmission tower by HL&P at the Lost Lake site occurred after the award of the contract for the Upper Bayou Project to Renda and that the tower was built on land above ground. Tr. 2203 (Bowman).

At the pretrial conference, Renda conceded that it could not demonstrate that the actions of HL&P constitute a differing site condition, inasmuch as the Differing Site Conditions clause applies only to physical conditions which exist at the time of contracting. Olympus, 98 F.3d at 1318; Fru-Con, 43 Fed. Cl. at 317. Moreover, by its terms, the Differing Site Conditions clause applies only to *subsurface* or *latent* physical conditions, not to visible, patent conditions such as HL&P's above-ground construction activities at Lost Lake.

At the pre-trial conference, Renda argued that its HL&P Tower Claim is a claim for breach by the Government of the implied duty not to do anything that will hinder or delay a contractor in its performance of the contract. The court allowed Renda to file a memorandum "discussing its theory that the government is under an obligation not to hinder a contractor in situations analogous to that presented in plaintiff's 'HL&P Tower Claim.'" See February 23, 2005 Order, ¶ 9.

The memorandum filed by Renda raises two theories of relief. Renda contends that the issuance by the Corps of a permit to HL&P for its activities at Lost Lake" hindered Renda in its performance of the Upper Bayou Project, which constitutes a constructive change to the contract, thereby entitling Renda to an equitable adjustment of the contract price for any costs or expenses

incurred as a result of the constructive change. Plaintiff's Memorandum Brief, at 2. In addition (or in the alternative), Renda invokes a second basis for recovery not raised during the pretrial conference: the "superior knowledge" doctrine. Id., at 2-3. Renda asserts that the Government withheld from bidders for the Upper Bayou Project, including Renda, the "superior knowledge that the Corps had with regard to HL&P lines, and the impact that it would have on any contractor's performance of the Contract, [which] should have been disclosed." Id.

(1) The Interference Claim

On October 18, 2000, Renda sent a letter to ACO McClenan regarding "Notification of Changed Condition – Interference with Contract Work by Other Contractor (Reliant Energy – HL&P)." PX 1026. In this letter, Renda stated that it had "encountered" a "changed condition," i.e., Renda was required by HL&P to relocate its discharge pipe "to accommodate sheet pile work for HL&P's new tower location" at Lost Lake. Id. Renda further stated that this was the second "similar-type delay encountered as a result of interferences with HL&P at the Lost Lake Area" and that, "[s]ince the delays were neither caused by nor were they the responsibility of [Renda], we will compile our costs and forward them to you for action." Id.

Every contract contains an implied provision "that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." Lewis-Nicholson, Inc. v. United States, 213 Ct. Cl. 192, 204, 550 F.2d 26, 32 (1977) (quoting George A. Fuller Co. v. United States, 108 Ct. Cl. 70, 94, 69 F.Supp. 409, 411 (1947)); accord Essex Electro Engineers, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000); Blackstone Consulting, Inc. v. United States, No. 02-1728C (Fed. Cl., March 25, 2005), slip op. at 15. But while interference by the Government with a contractor's access to the work site may

constitute a breach of the implied duty not to hinder or delay a contractor in the performance of its work, the Government is not responsible for the actions of third parties that impede a contractor's performance, absent a specific contractual provision that places the risk of such interference upon the Government. See Oman-Fischbach International (JV) v. Pirie, 276 F.3d 1380, 1385 (Fed. Cir. 2002); Olympus, 98 F.3d at 1318.

The Corps administers section 10 of the River and Harbor Act of 1899, pursuant to which it regulates structures and work in navigable waters through permits. Tr. 3616-3617 (Bennett). The Galveston District – through its North Evaluation Unit[53] – evaluates and processes permit applications for structures or activity in navigable waters in Harris County, Texas, where Lost Lake is located. Id., at 3618, 3620.

In this case, the permit issued by the Galveston District to HL&P did not authorize HL&P to build the new transmission tower at Lost Lake that allegedly disrupted Renda's performance of the Upper Bayou Project. HL&P submitted, under a transmittal letter, an application for a permit dated January 27, 1999, to the Corps, which the Corps received on February 1, 1999. See JX 31; JX 32; tr. 3623-3624 (Bennett). The application described HL&P's proposed activity as follows:

> The proposed project consists of relocating tower #20371 of the existing 138 KV aerial transmission line crossing at Old (San Jacinto) River and the Houston Ship Channel approximately 350 feet from its current location. The existing tower #20371 will be removed and a 230 foot steel tower structure will be built onto driven concrete pile leg foundations on the high east bank approximately 1370 feet east of tower #20370 within the existing easement. . . . In addition, 3 – 19 pile timber dolphins will be installed at tower #20370. Tower #20370 is approximately 546.5 feet east of the west bank of the Old (San Jacinto) River. . . . Construction is scheduled to begin in October

[53] The North Evaluation Unit is located in the Evaluation Section of the Galveston District's Regulatory Branch. Tr. 3615, 3617 (Bennett).

1999. See attached drawings for additional information.

JX 31.0002 (Block 17).

The HL&P permit application was processed by the Galveston District's North Evaluation Unit, which prepared a "Statement of Findings" dated March 30, 1999, that recited the proposed activity by HL&P and made the following finding: "We believe that the proposed retention of the existing aerial transmission tower #20370 is minor and will not have an adverse impact on the surrounding areas of Old (San Jacinto) River or on fish and wildlife resources." DX 369/2; tr. 3627 (Bennett). Tower #20370 was the tower that was to remain in the water, not the tower that HL&P proposed to construct on land at Lost Lake. Tr. 3627 (Bennett).

Consistent with the "Statement of Findings," the Galveston District thereafter issued a "Letter of Permission" to HL&P which stated: "Your February 1, 1999, request to retain tower #20370, which supports an existing 138 kV aerial transmission line crossing at its present location, and to install three 19-pile timber dolphins to protect the tower foundation is approved pursuant to Section 10 of the Rivers and Harbors Act of 1899." DX 373; tr. 3628 (Bennett). The "Letter of Permission" further stated that "[a]ll work is to be performed in accordance with the enclosed plans . . . and the permit conditions." DX 373. The "Permit Conditions," at ¶ 2.d., provided that "[t]his permit does not authorize interference with any existing or proposed Federal project." DX 373/5; tr. 3629-3630 (Bennett).

The "Letter of Permission" and "Statement of Findings" were signed by Bruce H. Bennett, Leader, North Evaluation Unit. As he testified, the permit issued to HL&P did not address the construction of the new tower #20371 to be build on land at Lost Lake described in HL&P's permit application because the Corps' authority under section 10 of the Rivers and Harbors Act of

1899 does not extend to structures built on land. Tr. 3629 (Bennett). "Only work or structures in navigable waters . . . would be something that requires a permit." Id.

Contrary to Renda's contention, the permit issued by the Corps to HL&P did not sanction the construction of the new transmission tower on land at Lost Lake that allegedly interfered with Renda's performance of the Upper Bayou Project, i.e., its dredging operations. Even assuming for the sake of discussion that the permit could be construed as approving the construction of the new tower, the permit conditions expressly provided that the permit "does not authorize interference with any existing or proposed Federal project," e.g., the Upper Bayou Project. DX 373/5.

Unless, therefore, Renda and the Government agreed in unmistakable terms to shift to the Government the risk of increased costs of contract performance attributable to acts by HL&P, no liability on the part of the Government attaches from any such acts. Renda has not identified a contractual provision under which the Government assumed the risk of increased costs resulting from any acts of HL&P, such as the construction of the new tower on land at Lost Lake and we are not aware of any such risk-shifting provision contained in the contract for the Upper Bayou Project. Renda's constructive change claim, thus, lacks merit.

(2) The Superior Knowledge Claim

The threshold difficulty with Renda's invocation of a superior knowledge theory of recovery is that the Court lacks jurisdiction to entertain such a claim because Renda did not present a superior knowledge claim to the contracting officer. The contract for the Upper Bayou Project contract is subject to the CDA. Renda itself acknowledges as much in the complaint: "This Honorable Court has jurisdiction under the Contract Disputes Act, since Renda's claims arise from a United States Government construction contract, which is subject to that act." Compl., § II ("Jur-

isdiction").

For this Court to entertain a claim governed by the CDA, the statute imposes two pertinent jurisdictional prerequisites. First, the contractor must have presented a written "claim" to the contracting officer for decision. The CDA mandates that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). Second, there must be either an actual contracting officer's decision upon the claim or the contracting officer must have failed to issue a decision upon the claim within the statutory time period, in which case the CDA provides that the contracting officer is deemed to have made a decision denying the claim. 41 U.S.C. § 605(c); see Witherington Construction Corp. v. United States, 45 Fed. Cl. 208, 210 (1999); accord Kiewit Construction Co. v. United States, 56 Fed. Cl. 414, 419 (2003). Absent a "claim," no decision is possible and, thus, there is no basis for jurisdiction in this Court. Vanalco, Inc. v. United States, 48 Fed. Cl. 68, 76 (2000).[54/]

It has been held that the Court may assert jurisdiction over a CDA complaint that is "based on the same set of operative facts" underlying the certified claim presented to the contracting officer. Cerebronics, Inc. v. United States, 13 Cl. Ct. 415, 417 (1987); see also Scott Timber Co. v. United States, 333 F.3d 1358 (Fed. Cir. 2003) (trial court correctly found that it

[54] The term "claim" is not defined in the CDA itself. To determine the meaning of that term, the courts have looked to the definition of "claim" supplied by the FAR, the language of the contract in dispute, and the facts of the particular case. Reflectone, Inc. v. United States, 60 F.3d 1572, 1575 (Fed. Cir. 1995); Garrett v. General Electric Co., 987 F.2d 747, 749 (Fed. Cir. 1993). The FAR defines "claim," in relevant part, as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 33.201.

had jurisdiction over the contractor's claims "because they arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery"). That legal precedent is of no help to Renda, however, because the "changed condition" claim presented to the contracting officer that is the subject of Renda's October 18, 2000 letter to the ACO, PX 1026, and the superior knowledge claim presently advanced by Renda are not based upon the same operative facts.

Under the "superior knowledge" doctrine, "where the Government has special knowledge, not shared by the contractor, which is vital to the [performance of the contract, the Government has an affirmative duty to disclose such knowledge" and "[i]t cannot remain silent with impunity." Hardeman-Monier-Hutcherson v. United States, 198 Ct. Cl. 472, 487, 458 F.2d 1364, 1371-72 (1972). The "doctrine of superior knowledge," thus, "is generally applied in situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information." American Ship Building Co. v. United States, 228 Ct. Cl. 220, 228, 654 F.2d 75, 79 (1981). The same elements must be satisfied irrespective of whether the claim is characterized as one for a breach of contract or seeking an equitable adjustment under a contract clause, such as the "Changes" clause. Petrochem Services, Inc. v. United States, 837 F.2d 1076, 1078-79 (Fed. Cir. 1988). To recover damages under the superior knowledge doctrine, a contractor must demonstrate, in addition to an omission to disclose superior knowledge, that it was misled by that omission and that the omission to disclose the vital information was the cause of the contractor's

increased costs of performance. J.A. Jones Construction Co. v. United States, 182 Ct. Cl. 615, 628, 390 F.2d 886, 893 (1968); Miller Elevator Co., Inc. v. United States, 30 Fed. Cl. 662, 676, appeal dismissed, 36 F.3d 1111 (Fed. Cir. 1994) (Table).

To establish a superior knowledge claim in the circumstances of this case, Renda would have to demonstrate that the Government had knowledge of the HL&P construction activities that allegedly disrupted its dredging operations in July and October 2000, that such information was vital to Renda's bid upon, or performance of, the Upper Bayou Project, that the Government was aware that Renda had no knowledge of and had no reason to obtain such information, that the contract for the Upper Bayou Project, as written, misled Renda or did not put it on notice to inquire, and that the Government failed to disclose that information to Renda. The correspondence from Renda to the Government, PX 1026, about the HL&P Tower Claim does not contain any such allegations. The Court, therefore, lacks jurisdiction to entertain Renda's superior knowledge theory of recovery for the HL&P Tower Claim.

Even assuming for the sake of argument that the Court has jurisdiction to entertain the superior knowledge claim, it is without merit. The evidence upon which Renda apparently relies for that claim is an internal e-mail message dated April 21, 1998, from Dalton Krueger, Project Manager for the 45-Foot Project, tr. 3101 (McClenan), concerning power lines that cross the Houston Ship Channel. See PX 358. In this e-mail, Mr. Krueger states that, at a April 16, 1998 meeting between the PHA and the Corps, "it was agreed that all the lines which cross the HSC are in violation today and it would not make any difference if the widening and deepening project was built." Id. "Therefore, the decision to get the lines in compliance with the Coast Guard regulations should be handled under the permit process and not the in connection with the HGNC

project." This e-mail does not reflect that, prior to the award of the Upper Bayou Project, the Corps was aware of any plan by HL&P to build a new transmission tower on land at Lost Lake, that any such activity would interfere with Renda's dredging work under the Upper Bayou Project, or that the Corps was aware that Renda had no knowledge of and had no reason to obtain such information.

(3) Damages

Renda seeks to recover $159,353 for the HL&P Tower Claim. Assuming for the sake of argument that the Government is liable to Renda upon that claim, Renda's damages are overstated. For the first alleged disruption period, i.e., July 16 and 17, 2000, Mr. Connole, the Government's damages expert, determined, based upon a review of Renda's daily reports, that installation of the new transmission tower at Lost Lake did not have an adverse impact upon Renda's dredging operations. Tr. 5164-5165; DX 19/53–55. For the second alleged disruption period, i.e., October 16-18, 2000, Mr. Connole determined that the delay to the dredge was 36 hours, based upon a review of Renda's Report of Operations, not the 48 hours claimed by Renda. Tr. 5165-5168 (Connole); DX 19/55-56, 60. Based upon the actual delay of 36 hours supported by Renda's internal Report of Operations, Mr. Connole reasonably calculated that Renda's costs attributable to the October 2000 disruption (and hence the HL&P Tower Claim) are $18,780. Tr. 5163 (Connole); DX 19/57-60.

E. Obstruction #1 Claim

Renda seeks $1,531,822 in the Obstruction #1 Claim for damages allegedly sustained as a result of encounters with trash and obstructions in Dredge Section Nos. 7 and 8 of the Houston Ship Channel between Stations 570+00 and 640+00 during October-December 2000. Compl. ¶¶

102-120. Renda alleges that, "[a]s a result of damage caused by obstructions and excessive trash, Renda's dredge was out of operation for repair between December 11 and 31, 2000, and between January 1 and 14, 2001. Compl. ¶ 114.

Renda alleges that, in or about October and November 2000, the *Millennium* encountered "significant quantities of trash and other obstructions in the channel" and that the "trash encountered by far exceeded the amount reasonably expected." Compl. ¶ 102. Renda asserts that "[t]he excessive amount of trash slowed dredge production" and "[t]he obstructions caused significant damage to the dredge." Compl. ¶ 103.

The obstructions that are the subject of this claim include the following: (a) a Connex shipping container, Compl. ¶ 104, PX 1027.0002; (b) a dredge stern swivel assembly, Compl. ¶ 108; (c) "rubble and rip rap" on the south bank of the Channel near the Oxy-Chemical Dock, Compl. ¶ 109, PX 1176; and (d) steel pipe or other steel objects, JX 63, JX 71, JX 73.

(1) Excessive Trash

Renda has not demonstrated that the excessive trash allegedly encountered by the dredge is a Type I differing site condition. "Claims alleging differences in anticipated quantity of materials rather than differences in character and nature, do not constitute a typical differing site condition claim." Spirit Leveling, 19 Cl. Ct. at 94. The contract for the Upper Bayou Project contains provisions that describe the *kinds* of trash or debris that Renda might encounter in the Houston Ship Channel during dredging operations (see Specification §§ 02482.1.11.1 (JX 2.0110), 02482.3.4.4.2 (JX 2.0117), but it does *not* indicate a *quantity* of trash or debris that might be encountered in the Channel during dredging operations. Renda, therefore, cannot show that the amount of trash encountered between Stations 570+00 and 580+00 was differed materially from

anything indicated by the contract or that it reasonably relied upon anything indicated by the contract.

In any event, Renda has not presented any evidence demonstrating that the quantity of trash encountered by the dredge between Stations 570+00 and 580+00 exceeded a quantity of trash estimated by Renda for that area of the Channel in preparing its bid for the Upper Bayou Project, much less that the quantity encountered was an excessive amount of trash.

The testimony of the Government's expert, William Connole, P.E.,[55] established just the opposite. He compared the percentage of time reported by Renda in its daily dredging reports (Inspection Report of Dredging) for cleaning the dredge cutterhead and pump during the period covered by the Obstruction #1 Claim and the percentages of time reported by Renda for cleaning the cutterhead and pump in the previously-dredged Section Nos. 1 through 6 of the Channel. Tr. 5114 (Connole). Renda's dredging reports reflected that 18.1% of the time spent in the area from Sta. 570+00 to Sta. 580+00 was for cutterhead/pump clears, that 11.5% of the time spent in the area from Sta. 580+00 to Sta. 640+00 was for cutterhead/pump clears, and the percentage of time expended on cutterhead/pump clears for the combined area covered by the Obstruction #1 Claim between Sta. 570+00 and Sta. 640+00 was 12.5%. Tr. 5115-5118 (Connole); DX 19/90).

Mr. Connole compared the 12.5% of time for cutterhead/pump clears in the area covered by the Obstruction # 1 Claim to the 11.5% reported in the dredging reports for Dredge Section No.6 (see Tr. 5117 (Connole); DX 19/91 (Table 4.4.2)). When averaged, the reach of Channel covered by Renda's Obstruction #1 claim does not reflect a significant increase in time for trash

[55] Mr. Connole was qualified as an expert in, among other things, delay, disruption, and damages claims. See Tr. 4830.

clears from the time for trash clears in previously-dredged sections of the Channel. Tr. 5118 (Connole).

(2) Connex Shipping Container; Dredge Stern Swivel Assembly

The Government has conceded that the Connex shipping container and the dredge stern swivel assembly are Type II differing site conditions. See February 23, 2005 Order, ¶ 8(a).[56]

(3) Rubble/Rip Rap On South Bank Of Channel Near Oxy-Chemical Dock

Renda cannot demonstrate a Type I differing site conditions claim with respect to rubble or rip rap on the south side of the Houston Ship Channel near the Oxy-Chemical Dock. *First*, the contract for the Upper Bayou Project does not affirmatively represent or indicate that rubble or rip rap would *not* be encountered on the south bank of the Channel near the Oxy-Chemical Dock.

*Second*, in preparing the bid estimate for the Upper Bayou Project, Mr. Fisher anticipated that the *Millennium* would encounter rock and rip rap from shore protection projects. JX 98A, at 222. The conditions encountered by the dredge at the Oxy-Chemical Dock, therefore, was not reasonably unforeseeable.

*Third*, the contract for the Upper Bayou Project required that Renda "use caution when cutting the side slopes in the Channel from . . . Station 610+00 to Station 625+00" and warned that "[e]xcessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to *existing structures along the Channel*." Specification § 02482.3.5.2, JX 2.0118 (emphasis added); see also Drawing C-2, Note 4, JX 5.002.

[56] A "Type II differing site condition exists when the conditions at the site differ from those normally encountered." Fru-Con, 43 Fed. Cl. at 321.

The design of the Channel for the Upper Bayou Project, including the dredging specifications, was prepared by Alton Meyer, P.E., of the Corps' Galveston District. Tr. 3640 (Meyer). As Mr. Meyer testified, the Oxy-Chemical Dock is located between Sta. 610+00 and Sta. 625+00 on the south side of the Channel, one of the areas called out by Specification § 02482.3.5.2 and Drawing C-2, Note 4. Tr. 3649-3650 (Meyer).

Specification § 02482.3.5.2 further provides that "[t]he contractor may consider shaping the top of the cut" in the reaches of Channel identified, including between Sta. 610+00 and Sta. 625+00, "by using the dredge cutterhead or mechanical equipment." JX 2.0118. As Mr. Meyer, explained, it is a common dredging practice for a contractor, when dredging a side slope, to "cut below the pay template . . . so that the portion above the that pay template can fall in its place," which Mr. Meyer described as "box-cutting," "as opposed to having to walk the cutterhead up the side slope." Tr. 3651 (Meyer). Mr. Meyer testified that, in Specification § 02482.3.5.2, because of the proximity of the structures between 610+00 and Sta. 625+00 – including the Oxy-Chemical Dock – to the dredging prism, "we're trying to tell the contractor, We don't want you to box-cut in this reach." Id., at 3652.

Renda ignored the warning given by Specification § 02482.3.5.2 when dredging on the south bank near the Oxy-Chemical Dock. On December 20, 2000, Renda wrote the Government a letter notifying the Government that it considered the "rubble or man made riprap" encountered near the Oxy-Chemical Dock to be a differing site condition. PX 1176. In that correspondence, Renda states that, in an unsuccessful attempt to dislodge riprap materials from the upper elevations of the slope, it employed the very dredging practice that Specification § 02482.3.5.2 warned it not to use in the area of the Oxy-Chemical Dock: "overcutting at the lower elevations of the

slope." Id.; see also Tr. 5119-5120 (Connole).

(4) Steel Pipe Or Other Steel Objects

Renda cannot demonstrate a Type I differing site conditions claim with respect to steel pipe or other steel objects (other than the Connex shipping container and dredge stern swivel assembly discussed above). *First*, the contract for the Upper Bayou Project expressly identified "pipe" as "an obstructive material which may be encountered during dredging operations[.]"

*Second*, in preparing the bid estimate for the Upper Bayou Project, Mr. Fisher anticipated that the *Millennium* would encounter "metal debris" ("a lot" of which "is from dredge and barge work") and "large pieces of metal." JX 98A, at 222. Therefore, the pipe or other metal objects encountered by the dredge in the reach of the Houston Ship Channel covered by the Obstruction #1 Claim were not reasonably unforeseeable (except the Connex shipping container and dredge stern swivel assembly, as noted above).

(5) Damages: Causation

Renda seeks compensation for repairs to the *Millennium* allegedly required because of supposedly caused by the trash and obstructions that are the subject of Obstruction #1 and the dredge down time associated with the repairs. Neither Renda's damages expert nor any other witness presented by Renda at the trial provided a detailed explanation of the damages claimed by Renda in the Obstruction #1 Claim. As explained by the Government's damages expert, Mr. Connole, the claimed repairs and related down time are:

| Repair | Down Time |
|---|---|
| Underwater Pump Seals | December 3-5, 8, and 9, 2000 |
| Cutterhead Gearbox | December 11-17, 2000 |
| Computer/Electrical System | December 18-28, 2000 |
| Main Pump Shaft | January 1-12, 2001 |

Tr. 5130-5131 (Connole); DX 19/2265-2266.

There are several problems with Renda's claimed damages in Obstruction #1. *First*, there is no evidence that the *Millennium*'s encounters with the Connex shipping container and dredge stern swivel assembly were the sole or proximate cause of any of the damages addressed by the repairs listed above. Mr. Goodloe, Renda's dredging superintendent during the time covered by the Obstruction #1 Claim, testified only that "continued hitting" obstructions such as the Connex shipping container and dredge stern swivel assembly would eventually damage the cutterhead gearbox, bearings, and seals. Tr. 2766-2767 (Goodloe). Therefore, insofar as the trash, rubble or rip rap, and/or steel pipe encountered by the *Millennium* – which are not Type I differing site conditions – were a contributing cause of the damage to the cutterhead gear box, bearings, and seals, Renda cannot demonstrate that the two items for which the Government concedes liability (i.e., the Connex shipping container and dredge stern swivel assembly), are the sole or proximate cause of such damage.

*Second*, none of the witnesses presented by Renda – not even Mr. Goodloe – testified that the problems with the dredge's computer electrical system or the broken main pump shaft were caused by the encounters with trash or obstructions that are the subject of the Obstruction #1 Claim, much less demonstrated how any of those subsurface encounters could have damaged those parts of the dredge.

The testimony of Mr. Christopher Babitzke[57] and the reports that he prepared of visits

[57] Mr. Babitzke was one of the inspectors for the Upper Bayou Project provided by the Joint Venture pursuant to the agreement for Supplemental Quality Assurance services between the PHA and the Corps. Tr. 3476-3477, 3480. Prior to the inspector position, Mr. Babitzke had been employed by a dredging contractor, Mid-South Dredging, for about eight years, where he worked as a dech hand, oiler, engineer, quality control employee, and assistant project manager

to and contact with the *Millennium* during the December 12, 2000-January 3, 2001 time frame reflect that, during December 20-28, 2000, the dredge was down for repairs to the computer/-electrical system. See Tr. 3493-3507 (Babitzke); JX 11.123-JX 11.131. On December 29, 2000, the dredge started operations again, but went down again on December 31, 2000, as a result of a broken main pump shaft. Tr. 3507; JX 11.131. On cross-examination, Mr. Babitzke was asked whether he had ever been in a situation where a dredge had "hit" an underwater obstruction and could that cause "a lot of problems" for the dredge and he replied "Yes." Tr. 3520. Mr. Babitzke was then asked by Renda's counsel whether such an encounter could cause problems to a dredge's electrical system, to which he replied "Not the ones I've been on." Id. Renda's counsel inquired again "Is it possible it could cause problems with the electrical system?" to which Mr. Babitzke flatly replied "No." Id.

Regarding the main pump shaft, there is simply nothing in the record that would establish a causal relationship between, on the one hand, encounters by the *Millennium* with underwater obstructions in the Channel during October, November, and early December 2000, and, on the other hand, the failure of the dredge's main pump shaft on December 31, 2000, after the dredge had resumed dredging operations on December 29, 2000.

Testimony by William J. Wetta, II, President of Dredging Supply Co., the manufacturer of the *Millennium,*[58] also undercuts the notion that the main pump shaft failed by reason of an

---

on cutterhead suction dredges. Id., at 3472-3476. Mr. Babitzke presently is employed by J.F. Brennan, a marine construction firm, as a dredging superintendent. Id., at 3470.

[58] Mr. William J. Wetta, II, has been President of Dredging Supply since 1991. JX 103A, at 4. The *Millennium* was manufactured by Dredging Supply in the fall of 1998 and spring of 1999. Id., at 5.

encounter by the dredge with a subsurface obstruction:

> Q. What kind of condition or event could cause a shaft on the main pump to fail?
>
> A. A whole number of different reasons. It could have been a bad shaft, hanging clay in an impeller [vane], cavitation, any type of obstruction that hung just in one [vane]. That's not an uncommon occurrence.
>
> Q. Could striking a large object with a cutter cause the shaft on the main pump to fail?
>
> A. Not striking it with the cutter. I wouldn't see how it could, no.

JX 103A, at 185.

According to Mr. Warren, Renda's Equipment Manager, when the main pump shaft failed, Renda obtained a new pump shaft from Mobile Pulley, the manufacturer of the main pump. JX 100A, at 28. Mr. Warren does not recall what Renda did with the broken main pump shaft. Id., at 29. He does not know whether Renda shipped the broken shaft to Mobile Pulley. Id. Nor does Mr. Warren recall that Renda had anyone perform a metallurgical analysis on the broken main pump shaft to determine why it failed. Id.[59]

---

[59] In October 2000, Messrs. Bowman and Warren jointly issued a "company memorandum" which provided, among other things, that Renda would develop an "equipment repair report" for units repaired on Renda projects. See DX 499; tr. 1537-1538 (Bowman). The equipment repair report was to contain the following information: (1) unit number; (2) parts number; (3) reason for breakage; (4) actions taken to repair; (5) time and place; (6) names of person(s) making repair; and (7) persons notified. DX 499/5. An equipment repair report was not prepared for the broken main pump shaft on the *Millennium*. JX 100A, at 35-36. Neither Mr. Warren nor Mr. Bowman recalls seeing any written repair reports for any failed parts on or repairs to the *Millennium* during the Upper Bayou Project. JX 100A, at 36; tr. 1540 (Bowman).

(6) Damages: Quantum

Assuming for the sake of argument that the Government is liable to Renda for any of the damages that are the subject of the Obstructions #1 Claim, the Government's damages expert, Mr. Connole, calculated an average daily cost of $19,138 for the *Millennium* during the December 3-January 12, 2001 period when the dredge was down for repairs. Tr. 5132-5133; DX 19/98. Mr. Connole determined that the cost for the repair parts themselves are: (1) $4,578 for the pump seals; (2) $46,328 for the cutter gear box repairs; and (3) $56,440 for the main pump shaft. See DX 19/99.

F. Obstruction #2 Claim

Renda seeks $801,036 in the Obstruction #2 Claim for damages allegedly sustained by the *Millennium* as a result of striking a "sunken ship's mooring buoy" in Dredge Section No. 9 on April 16, 2001. See Compl. ¶ 131.[60] Renda alleges that the repairs to the dredge stemming from the encounter with the mooring buoy occurred between April 16 and May 8, 2001. See Compl. ¶ 133.[61]

Renda cannot demonstrate a Type I differing site conditions claim with respect to the mooring buoy and chain. *First*, the contract for the Upper Bayou Project does not affirmatively

---

[60] The mooring buoy and chain appear in a photograph of trash, debris, and other materials on a barge taken on April 16, 2001, during an inspection of the barge by Leon Hrabovsky, P.E., of GBA (one of the firms that make up the Joint Venture). See PX 18.211; tr. 3794-3795.

[61] To the extent that, in the Obstruction #2 Claim, Renda is asserting a claim for excessive trash, it cannot demonstrate a Type I differing site condition for the reasons stated above with respect to Renda's excessive trash contention in the Obstruction #1 Claim. Simply put, the contract for the Upper Bayou Project does not contain an affirmative representation or indication of the *quantity* of trash to be expected, only a description of the kind of trash or debris that Renda might encounter during dredging operations.

represent or indicate that Renda would not encounter a sunken mooring buoy or like object. The contract does not say anything one way or the other about mooring buoys or the like.

*Second*, Renda has not demonstrated that the *Millennium*'s encounter with the mooring buoy was the sole or proximate cause of the repairs to the *Millennium* during the period covered by the Obstruction #2 Claim. Renda's daily dredge report for April 16, 2001, states: "The cutter gearbox was damaged when a large mooring buoy was encountered." JX 9.586.0002. When asked at trial what the encounter with the mooring buoy did to the dredge, Mr. Goodloe testified: "[I]t didn't do it any good. *When you continually get these things like* chain, mooring buoys, it shortens the life of your seals and bearings and your drive." Tr. 2773 (Goodloe). That response implies that striking the mooring buoy was not the sole cause of the damage to the cutterhead gear box – that there were other encounters with obstructions that are not part of this claim and for which Renda has not established the Government is responsible.

If the Court were to determine that the mooring buoy is a Type I differing site condition and the cause of the damage to the cutterhead gearbox assembly, Renda's claimed costs are over-stated. Renda seeks compensation for down time to the *Millennium* due to the cutterhead gear-box repairs allegedly caused by the encounter with the mooring buoy, 80% of the day on April 16, 2001, 100% of the days during April 17, 2001, through May 7, 2001, and 50% of the day on May 8, 2001, a total of 22.3 days. Tr. 5153-5154 (Connole); DX 19/112.

At trial, Renda did not demonstrate, through the testimony of its damages expert, Robert McCullough, or any other witness, that the *Millennium* was down for 22.3 days for repairs to the cutterhead gearbox. When asked how long he recalled the dredge being down for the cutterhead gearbox repairs, Renda's dredging superintendent, Mr. Goodloe, could not substantiate a period

greater than 13 days for those repairs. See Tr. 2775-2776 (Goodloe).

Mr. Goodloe's testimony is consistent with the testimony of the Government's damages expert, Mr. Connole, and Mr. Hrabovsky. Mr. Connole determined that he could support 14 days of down time for the cutterhead gearbox repairs, based upon a document that he had reviewed that was prepared by Mr. Hrabovsky. Tr. 5158-5159 (Connole). Mr. Connole testified that he recalled that Mr. Hrabovsky had reported that the cutter tail shaft was installed on the *Millennium* on April 30, 2001. Id., at 5159; see also DX 19/110 & n.3. At trial, Mr. Hrabovsky confirmed in his testimony that, during a visit to the Upper Bayou Project on April 30, 2001, he visited the dredge and observed that the cutterhead tail shaft had been reinstalled and the dredge "appeared to be ready to go back to work." Tr. 3798 (Hrabovsky).

When the down time associated with the repair of the *Millennium*'s cutterhead gearbox is reduced to 14 days, Renda's supported costs for the idle time and repairs to the gearbox determined by Mr. Connole are $327,886. Tr. 5162 (Connole); DX 19/112.

G. West Levee Realignment Claim

Renda seeks compensation for costs associated with the realignment of a portion of the new levee along the west side of Lost Lake, which, Renda asserts, the Corps directed Renda to realign. The costs in the claim submitted to the Contracting Officer are calculated based upon a unit price of $4.70 per cubic yard of material that was used in earlier Contract modifications. The DCAA audit of this claim questioned the costs in their entirety because Renda had not provided "adequate support" for the claim. See DCAA Audit Report No. 3511-2003M17200010 (12/12/02), at JX 22.0002, JX 22.0004. In its pretrial memorandum, Renda states that, "[t]o resolve the DCAA's concerns, Renda revised this claim to reflect actual cost, and incorporated it

into the Lost Lake Levees Claim (Claim 8)." "Renda Marine, Inc.'s Memorandum of Contentions of Fact & Law" filed on January 12, 2005, at 17; see also March 2004 McCullough Report, PX 1863.0015. The West Levee Realignment Claim, thus, is no longer a separate claim.

The dispute concerning the realignment of the West Levee centers around the scope of a field change given by the Government to Renda on August 7, 2000, at a meeting at Lost Lake between representatives of the Corps (McClenan, Russek, Few), Renda (Bowman, Smith, Rudy V. Renda), and the Joint Venture (Wendell Mears). Mr. McClenan testified that he issued a no-cost field change to Renda to modify the alignment of portions of the West Levee that remained to be constructed, but not to change the alignment of any part of the West Levee that Renda had previously built. That testimony was confirmed by Mr. Mears of the Joint Venture. By contrast, Mr. Few of the Corps and Messrs. Bowman, Smith, and Rudy V. Renda testified that, in addition to changing the alignment of the part of the West Levee that remained to be built, Renda was directed to realign the part of the West Levee that it already had constructed.

If the Court were to hold that the Government is not liable to Renda upon the Lost Lake Levees Claim, except for the part of that claim which presently incorporates what previously was set forth as a separate West Levee Realignment Claim, Renda's recovery should not exceed the estimate by the Government damages expert for the additional effort associated with repositioning the levee. Mr. Connole estimated the extra effort to be $17,792 for "potato roll work" and $20,583 for the 11 days that Renda took to reposition the previously-constructed part of the West Levee, for a total price adjustment of $38,375. See Tr. 5169-5176 (Connole); DX 19/123-124.

H. Lost Lake Levees Claim

(1) Liability

At trial in its opening statement, Renda asserted three bases for the Lost Lake Levees differing site conditions claim: (1) "insufficient suitable material" from the required dredging areas to build the hydraulic levees; (2) the levees "would not stand due to the soft foundations;" and (3) the levee "could not be completed within the contract time if you were to undertake some method different than what was specified in the contract "to try and get the levees to stand by allowing time for consolidation and [dewatering]." Tr. 51. Renda also contended that side cast borrow areas that were not disclosed in the contract documents interfered with the maximum displacement design for the hydraulic levees prepared by HVJ Associates for the Corps. Id., at 59-62.

Renda has not demonstrated a Type I differing site condition with respect to the hydraulic levees. The soft foundations for the hydraulic levees, including the displacement phenomenon, are what the contract indicated. Drawing C-14, Note 10, describes the foundation for the new levees as "very soft to soft dredge material and sand placed in past dredging maintenance cycles" and states that "[i]t is anticipated that very soft to soft foundation material will be displaced by the new levee material." JX 5.014. This description of the foundation for the levees and the anticipated displacement of the foundation material by the levee-building material obtained from dredging is underscored in the Government's responses to questions by potential bidders incorporated in Amendment No. 0001 to the Solicitation: "[T]he designers intend the new work material to be used to displace very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material." JX 3.0007.

The side cast borrow areas do not constitute a site condition that differed materially from what the contract documents indicated. The side cast borrow areas contained dredged material from past maintenance dredging jobs. Tr. 4209 (Few). That is precisely what the plans indicate the contractor should expect to find when it builds the hydraulic levees.

Renda contends that, the side-cast borrow operation, which was performed by a drag line on a mat, left a 20-foot crust of material that acted like "snow shoes." Tr. 62. Renda asserts that the new levee "floated" on the 20-foot crust which prevented the maximum displacement of the soft foundation material envisioned by the HVJ Associates design. Id. According to its expert, Dr. Mathewson, the side cast borrow area under the new levee resulted in "conflicting foundation conditions" that caused the levees to fail. Tr. 1948. Dr. Mathewson opined that, if there is a side cast borrow area that has taken some of the crust away, leaving a 20-foot piece of crust next to the levee, "You create chaos, because you've created a geological condition, a physical condition at the site, that is neither compatible with the total displacement or the float . . . . And the net result is you have a geotechnical barrier, a foundation condition, in the middle of your levee, giving you two different behaviors and problems with maintaining the stability of the levee." Tr. 1928. He contended that "you could not build the project the way it was specified by hydraulic dredging and rapid placement because the foundation had two distinctly different physical properties," id., at 1949, a condition that Dr. Mathewson attempted to illustrate by a drawing. See PX 1875.02, PX 1875.02.

On cross-examination, Dr. Mathewson admitted that he did not perform any calculations or tests in support of his opinion that the side-cast borrow operation created an impossible condi-

tion. Tr. 2004.[62] He did not perform side-slope stability, settlement, subsidence, or displacement analyses in connection with his opinion concerning the effect of the side-cast borrow areas upon the construction of the hydraulic levees. Id. In point of fact, Dr. Mathewson does not even know the dimensions of the side-cast borrow areas or whether they ran continuously along the footprint of the hydraulic levees. Id., at 2004-2005.[63]

Dr. Mathewson's unsupported hypothesis is flawed. Mr. Michael Hasen of HVJ Associates, an expert in the design of levees for dredged material disposal sites who designed the Lost Lake levees, explained that side-cast borrow areas were not a factor in the design for the hydraulic levees at Lost Lake because "[t]hey're relatively small features compared to the size of the embankments that we're designing, and the displacement would eliminate them. They'd be gone by the time the displacement was finished. So they just weren't relevant." Tr. 4552. Turning to Dr. Mathewson's drawings (PX 1875.02, PX 1875.02), Mr. Hasen testified that he did not agree with what they depicted for two reasons: the geometry of the levee was incorrect and the clay mat or crust "just isn't capable of supporting that weight of embankment in a floating condition." Tr. 4555-4556.

Mr. Hasen performed a calculation – unrebutted by Renda – which demonstrates that any clay mat or crust underneath the hydraulically-placed levee would not support the new levee but

---

[62] After the Upper Bayou Project, GLDD constructed a substantially larger levee hydraulically along the north side of Lost Lake to a height of no less than 30' MLT and, in some areas, as high as 36' MLT. Tr. 3534-3535 (Van Norman); Tr. 1624 (Affolter).

[63] The side case borrow area (dewatering ditch) that ran parallel to the inside of the existing levee constructed by T.L. James in 1996 resembled a shallow swale or pan about 35 feet wide and no deeper than 4 feet. Tr. 3749-3750 (Hrabovsky); DX 1067/4. The ditch did not extend along the entire area where the hydraulic levees were to be built by Renda. See Tr. 3740-3744 (Hrabovsky); DX 1067/3.

would be displaced when the hydraulically-placed levee-building material attains a height of five feet. Tr. 4558-4560; DX 1082-B. And once the displacement has been initiated by placement of the fill material, the crust will "be broken into pieces and it will form a kind of flat clay ball basically and go down with the rest of the clay balls into the muck." Tr. 4561.

The side-cast borrow areas, therefore, are a red herring. It is worthy of note that Renda constructed the entire East Levee without any complaint of excessive displacement of foundation material or side-cast borrow areas or even problems with soft foundations. The first complaint by Renda to the Corps about soft foundations or displacement issues was made in August 2000, shortly after Mr. Fisher left Renda and was replaced by Mr. Bowman. See JX 59.0002. There were no complaints by Mr. Fisher about the construction of the East Levee while he was there.

Renda has not demonstrated that there was insufficient suitable material from the required dredging areas to build the hydraulic levees, either. Renda offers no calculations to support that charge, only the naked assertion that, because Renda exhausted the materials, there must not have been a sufficient quantity to build the hydraulic levees.

Mr. Hasen, by contrast, provided an estimate of the amount of suitable material for levee building available in the reach of the Channel dredged in the Upper Bayou Project. He calculated that the available quantity of levee-building material for the Upper Bayou Project is 1,789,986 cubic yards of material. Tr. 4547-4549; DX 1068/19; DX 1068/65-69. Mr. Hasen estimated that the amount of levee-building material required to build the hydraulic levees, including a quantity sufficient to displace the soft foundation material to a firm base, is 1,549,055 cubic yards. Tr. 4544. The available quantity of levee-building material, thus, exceeded the quantity required to construct the hydraulic levees by 240,000 cubic yards. Mr. Hasen's unrebutted estimates, thus,

demonstrate that the quantity of suitable levee-building material to be obtained from dredging was sufficient to build the hydraulic levees at Lost Lake.

(2) Damages

(a) Claim Item #12a: Hydraulic Levees

Claim Item #12a concerns hydraulic levee labor and equipment. There are two aspects to this damages item: (1) additional labor and equipment during the planned performance period (10 months) (item #12a1) and (2) "actual" labor and equipment for additional time required to build the hydraulic levees (approximately 42 days) (item #12a2). See PX 1863.0021-0022; PX 1863A.08 (damages update); DX 1070; DX 1071 (work papers relating to damages update).

There are several problems with Claim Item #12a1. *First*, a planned performance period of ten months for the hydraulic levees does not appear anywhere in Renda's bid estimate recap for the Upper Bayou Project. Tr. 2867 (McCullough); JX 24. The basis for Mr. McCullough's assumption of a ten-moth planned performance period is a breakout of Renda's bid for the Upper Bayou Project by cost codes that was prepared by Mr. Bowman *after* Renda submitted its bid for the project. See Tr. 2838, 2866-2867 (McCullough); DX 1045/3; Tr. 2519 (Smith); Tr. 2174-2175 (Bowman); DX 315.

*Second*, the putative unanticipated, additional equipment identified by Mr. McCullough (i.e., a Cat D-5 dozer and a marsh trackhoe) was included in Renda's bid estimate recap, its pre-award submittal to the Corps, and in a July 1999 letter to the Corps. JX 24.0007; DX 334/131; JX 36; Tr. 2861-2865).

*Third*, neither Mr. McCullough nor any other witness called by Renda explained why Renda had this extra labor and equipment on site from the very first day of the hydraulic levee

operations, i.e., September 13, 1999. How could Renda have realized the need for additional personnel and equipment to deal with displacement problems before a single cubic yard of material had been placed?

Mr. McCullough confirmed that his actual adjusted levee crew size in Claim Items #12a1 and #12a2 was five workers at 24 hours per day, or the equivalent of ten workers at 12 hours per day. Mr. McCullough was asked to review the CQC Reports for the September 13-November 9, 1999 period, which depicted a 10-worker crew at 12 hours per day, and he confirmed that this supported his analysis. However, Mr. McCullough did not explain the impact of subsequent CQC Reports, from November 11, 1999, to March 2000, which indicated a crew size of only six workers per day – a plain conflict with the size of Mr. McCullough's alleged hydraulic levee crew. See Tr. 2852-2858 (McCullough).

As noted on cross-examination, adding one additional crew member at 24 hours per day does not support adding two additional pieces of equipment at 24 hours per day for each piece of equipment. The best that Mr. McCullough could offer was that a single operator could use two different pieces of equipment during a shift. See Tr. 2850-2852. Assuming that he supported the equipment as additional, the maximum *operating* time for the two pieces of equipment should total 24 hours per day, *not* 48 hours per day as his analysis assumes, with the added crew being the limiting factor. Any equipment hours beyond 24 operating hours per day should have been priced at the lower standby rates for idle equipment.

(b) Claim Item #12b: Mechanical Levees

Claim Item #12b is addressed to the cost of constructing the North Levee by mechanical means, a haul-and-fill operation, during the April 17-December 31, 2000 period. PX 1863.0022;

PX 1863A.08 (damages update); DX 1072 (work paper relating to damages update).

Mr. McCullough's analysis of this damages element is set forth in a spreadsheet appended to his March 2004 report titled "Mechanical Levees–Equipment.". See PX 1863.0102-0118. The basic source of information is the CQC Reports and the recollections of Messrs. Bowman and Smith of the equipment used. Tr. 2890 (McCullough). The top part of the spreadsheet includes a table of equipment hours as shown in the CQC Reports. The bottom includes labor in the CQC Reports along with calculations that allegedly separate hydraulic levee crew from the mechanical levee work. Mr. McCullough acknowledged that he had made an adjustment to the hydraulic levee crew, increasing the size of the crew from the three or four person crews in his March 2004 report to a five-person crew. Tr. 2886. This adjustment would result in a smaller crew for the mechanical levee work. Id. The numbers are not consistent with Mr. Smith's determination of hydraulic levee crews, tr. 2125-2131 (Smith), the primary difference being the size of the total personnel in the CQC Reports. On the one hand, if the crew size in the CQC Reports is correct, then Mr. Smith's sizing of the levee crew was understated and Mr. McCullough's adjustments to the various dredging claims (removing the mechanical part of the levee operations) is under-stated. On the other hand, if Mr. Smith's calculation of the levee crew (based upon certified payrolls) is correct, then Mr. McCullough's calculation of the mechanical levee labor is incorrect.

(c) Claim Items #12c & 12d: Backtracking Pipe/Dredge Plant Downtime

Claim Item #12c is Mr. McCullough's calculation of costs for "[a]dditional dredge plant equipment and labor due to relocation of the dredge discharge line (primarily removing and replacing pipe segments) while reconstructing levees that had subsided[.]" PX 1863.0022; Tr. 2902-2903. Claim Item #12d is Mr. McCullough's calculation of costs for "[d]redge plant

time while awaiting for displaced material to settle and while pumping water (non-productive time) to flush displacement material[.]" PX 1863.0023; Tr. 2903-2904.

The time claimed for these damages items is identified in the spreadsheet "Dredge and Levee Data from Daily Logs" appended to the March 2004 McCullough Report. PX 1863.0056-0061; PX 1863.0064-0066; Tr. 2912 (McCullough). Mr. McCullough updated the claimed damages for Claim Items #12c and #12d at trial. See PX 1863A.08 ("Claim 12 Lost Lake Levees"); DX 1073 (work paper relating to damages update); Tr. 2910 (McCullough). However, the time component in these items did not change in the damages update. Tr. 2911 (McCullough).

On cross-examination, Mr. McCullough was unable to support any of the hours quantified in these damages items. See Tr. 2912-2980. Mr. McCullough testified that he did not make an "independent interpretation" of the data contained in Renda's daily reports to identify or quantify time associated with the activities that are the subject of Claim Items #12c and 12#d. Tr. 2915-2916. Rather, Mr. McCullough relied upon Mr. Bowman to decipher what the daily reports indicated about those activities. Tr. 2915, 2916. For example, when asked whether there is any indication in Renda's Report of Operations, Inspection Report of Dredging, or Contractor Quality Control Report for October 23, 1999, that the dredge was delayed ten hours due to backtracking or breaking back pipe at the Lost Lake site (as set forth in the spreadsheet appended to the March 2004 McCullough Report), Mr. McCullough responded: "There's not a specific entry that I see that states that. But, again, Mr. Bowman found information in these three documents that would indicate that to him." Tr. 2920.

At best, Mr. McCullough offered that Mr. Bowman saw something in the daily reports for the Upper Bayou Project that enabled Mr. Bowman to determine some amount of time that

should be charged to backtracking pipe, waiting for displaced material to settle, or pumping water to flush displaced material. Mr. Bowman, however, did not testify to any of this and he never offered any explanation as to the how the hours identified in the spreadsheet appended to the March 2004 McCullough Report were quantified. Renda failed to produce even one report of any kind that supported the premises underlying these claim items. The damages in Claim Items #12c and #12d, therefore, fail for lack of proof.

(d) Claim Item #12e: Additional Booster Equipment

Claim Item #12e is Mr. McCullough's calculation of costs for "[a]dditional booster pump equipment required to pump dredge material longer distances due to additional material requirements to construct the levees[.]" PX 1863.0023; Tr. 2981-2982 (McCullough).

The days claimed for this damages item are identified in the spreadsheet "Impacted Dates – Hydraulic and Mechanical Levees" appended to the March 2004 McCullough Report. See PX 1863.0046-0047; Tr. 2982-2983 (McCullough). Mr. McCullough updated the damages claimed for Claim Item #12e at trial. See PX 1863A.08 ("Claim 12 Lost Lake Levees"); DX 1074 (work paper relating to damages update); Tr. 2984-2985 (McCullough). However, the days claimed in this item did not change in the damages update. Tr. 2986 (McCullough).

Claim Item #12e is based upon the assumption that Renda planned to build the hydraulic levees at Lost Lake with suitable levee-building material to be obtained from Sections 1 through 6 in the Channel. If, as allegedly planned, this had occurred, Renda could have completed the dredging in Sections 7 through 9 without an additional booster pump because Renda only would have had to transport the dredged material to the designated discharge corridor at the West Levee at Lost Lake. However, because of the conditions at Lost Lake (side cast borrow areas) there was

not enough clay in Sections 1 through 6 to complete the hydraulic levees and, consequently, additional levee-building material had to be pumped to the west and north levee at Lost Lake, which because of the extra distance required an additional booster pump. See PX 1863.0023; Tr. 2981-2982 (McCullough).

Mr. Fisher's stiff clay spreadsheets do not support the premise of Claim Item #12e that adequate material should have been available in Sections 1 through 6 to complete the hydraulic levees, based upon Mr. Bowman's quantity estimates. According to Mr. Bowman, he estimated that 70 cubic yards of levee-building material would be required to complete one linear foot of hydraulic levee. Tr. 2317. Based upon Mr. Bowman's estimate, therefore, 959,000 cubic yards of material would be required to complete the 13,700 linear feet of hydraulic levees at Lost Lake. Id. Mr. Fisher's stiff clay spreadsheet, however, estimates only 520,780 cubic yards of stiff clay in Sections 1 through 6. Id., at 2318-2319; see also JX 28, JX 38 (Fisher stiff clay spreadsheets). The primary link to cause of damage in Mr. McCullough's analysis, therefore, is missing.

Apart from that, Renda's bid estimate recap and pre-award submittal for the Upper Bayou Project reflect that Renda intended from the beginning to use two booster pumps on the project. See JX 24.0007, JX 24.0010 (bid estimate recap lists two boosters); Tr. 2148-2149 (Bowman); DX 334/99, DX 334/129 (Renda pre-award submittal); see also Tr. 2174-2175 (Bowman); DX 315/2 (Bowman post-bid budget breakout for Upper Bayou Project); Tr. 2982 (Bowman); JX 36 (7/7/99 Fisher letter). Renda, thus, bid two booster pumps and not demonstrated that it could pump the material even to the front of Lost Lake from Sections 8 and 9 without two boosters. The only mathematical computation of Renda's pumping capability was made by the Government's hydraulic dredging expert, who opined that Renda was short on horsepower. See Tr. 4425

(Lofgren); DX 15/38-46.

Finally, Mr. Fisher's July 13, 2000 memo to Messrs. Machacek and Bowman (DX 477), he states that, to pump clays from Dredge Section #9, Renda would have to pump the material into the Flare Area and then pump without a booster to the front Lost Lake. Thus, Renda either needed the second booster or, alternatively, would have to double pump the material even where transporting it only as far as the front of Lost Lake.

(e) Claim Item #12f: Equipment Standby Time

Claim Item #12f is Mr. McCullough's calculation of costs for "[e]xtended non-effective time for dredge and dredge plant while awaiting official [Corps] release from the project[.]" PX 1863.0023; Tr. 2987 (McCullough). Mr. McCullough updated the damages claimed for Claim Item #12f at trial. See PX 1863A.08 ("Claim 12 Lost Lake Levees"); DX 1075 (work paper relating to damages update); Tr. 29922993 (McCullough).

The basis of Claim Item #12f is that, upon completion of the private dredging project at the Houston Fuel Oil terminal on July 4, 2001, pursuant to Modification P00026 (JX 6.026), the *Millennium* was moved back to the Upper Bayou Project area because it had not been released from the project. This claim item represents dredge standby time from July 5, 2001, to August 24, 2001, when the *Millennium* and part of the crew were moved to the Sims Bayou Project, a dredging job that Renda bid and which was awarded to Renda in or about the beginning of July 2001. Renda also seeks compensation for standby time for the balance of the dredge plant on the Upper Bayou Project from August 24, 2001, to September 18, 2001, the date upon which Modification P00028 was issued.

This damages item lacks merit. On June 1, 2001, the contracting officer (Cole), notified Renda that, as discussed at a May 24, 2001 meeting with Renda, the Government had decided to "delete the remaining portion of dredging Section 9 in your contract." PX 1499.0002. The contracting officer further advised Renda that, except for the deleted part of Section #9, all areas to be dredged under the Upper Bayou Project had been accepted by the Corps. Id. Thus, there was no further requirement for a dredge on the Upper Bayou Project.

Renda's contemporaneous conduct reflects that it understood that the *Millennium* had been released from the Upper Bayou Project as of June 1, 2001. On June 1, 2001, Renda submitted an application for payment to the Corps in which it requested payment of $248,000 – the unpaid balance under Bidding Schedule #0007 (Mobilization/Demobilization). JX 8.030.0009. The application for payment was accompanied by a June 1, 2001 letter from Mr. Bowman to the contracting officer in which Mr. Bowman stated, in relevant part:

> [A]t a meeting with the Government on May 24, 2001, [Renda] was informed that you had decided to delete the remainder of dredging work from the Contract, i.e. work remaining in Section 9. *In effect, the Government's actions complete [Renda's] Contract dredging work.* Further, there is no additional levee-building material available under the Contract to complete the levees, as designed.

JX 8.030.0007 (emphasis added). On June 20, 2001, the Government approved payment of the requested demobilization funds. See JX 8.030.0001; Tr. 3160-3162 (McClenan).

Renda's claim for dredge plant standby costs is also conflicts with two other letters from a the Government to Renda in July and August, 2001. *First*, on July 23, 2001, ACO McClenan wrote Renda: "In accordance with your request for written notification, this is to advise you that will be no further requirements for the use of a hydraulic dredge under this contract." PX 1547;

Tr. 3159-3160 (McClenan). *Second*, on August 27, 2001, the contracting officer (Benero) wrote Renda: "Since there are no further requirements for placement of dredged material under this contract you are directed to remove any remaining pipelines or appurtenant equipment belonging to Renda Marine from the Lost Lake Placement Area not later than 30 days from receipt of this letter." PX 1583. As Mr. McClenan testified, the Government sent this letter to Renda because "[t]he contract work was completed and we needed the contractor to demob, to remove his equipment from the placement area." Tr. 3162-3163.

I. Equipment Costs

The issue of equipment rates spans all of the claims. A fundamental question remains as to what rates are being used by Renda in their claims as quantified by Mr. McCullough. The record does not contain anything that shows the rates for any and all of the equipment for which Renda is claiming. Moreover, none of the calculations that were presented by Mr. Smith at trial were correct or even used by Mr. McCullough.

The Government auditor, Darrell Shobert, C.P.A., determined that Renda's rates for the dredge and the booster barge do not comply with the Corps' Construction Equipment Ownership and Operating Expense Schedule, EP 1110-1-8, Volume VI (June 1999)) (the Schedule) (DX 43). The Schedule specifies a useful life of 25 years to be used in calculating the rates for a 24" hydraulic dredge and a 24" booster barge, such as the Renda's dredge and booster barge for the Upper Bayou Project, a fact that Mr. Shobert confirmed with Kim Callum, Chief of Cost Engineering in the Corps' Walla Walla, Washington office. See DX 43/316 (Table 4-1); JX 21.0006. Renda's rates were based upon a 10-year useful life for the dredge and a 7-year useful life for the booster barge. See JX 21.0006, JX 21.0007; Tr. 4565-4597, 4600-4602.

Mr. Shobert's determination that Renda's rates for the dredge and booster barge conflicted with the Schedule were not rebutted by Renda or even challenged by Renda's counsel on cross-examination. Mr. Shobert's determination, moreover, is consistent with Specification § 00800, ¶ 7, contained in the contract for the Upper Bayou Project, which provides: "When both ownership and operating costs cannot be determined for any piece of equipment or groups of similar serial or series equipment from the contractor's accounting records, costs for that equipment *shall* be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region VI." JX 2.0009 (emphasis added). The Schedule does not authorize any deviation from the useful life (and other dredge plant expense factors) specified in Table 4-1.

J. Claim Preparation Costs

Renda has not demonstrated that it is entitled to recover the costs or fees of its consultant, Mr. Smith, relating to any claim for the Government may be found liable. Subsection (f)(1) of FAR 31.205-47 ("Costs related to legal and other proceedings") provides that "[c]osts . . . are unallowable if incurred in connection with . . . the prosecution of claims or appeals against the Government (see 33.201)." Renda has not shown that the fees of its consultant were incurred for anything other than the prosecution of claims against the Government. The DCAA auditor, Mr. Shobert, testified about a telephone conversation that he had with Mr. Smith on April 19, 2002, in which Mr. Smith stated that "he and his attorney agreed to consider the claim consultant costs of $169,000 as claim preparation costs and therefore unallowable." Tr. 4618 (Shobert); see also JX 17.0384 (Shobert handwritten record of 4/19/02 telephone contact with Mr. Smith).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

APRIL 21, 2005