UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | § | |
| PLAINTIFF, | § | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| THE UNITED STATES | § | |
| DEFENDANT. | § | |

**POST TRIAL BRIEF BY**
**PLAINTIFF, RENDA MARINE, INC.**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ii-

ANALYSIS OF PROOF PRESENTED
AND ELEMENTS OF PLAINTIFF'S RECOVERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Table 1: Plaintiff's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Table 2: Proof Analysis Table . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Flare Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Section 7 Clay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Obstructions No. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Obstructions No. 2 (Section 9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

South Ferry Landing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

HL&P Tower Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Levee Realignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Levee DSC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Renda's Discovery of the Levee DSC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

**TABLE OF AUTHORITIES**

CASES

*CEMS v. United States,*
59 Fed. Cl. 168, 194-95 (2003) . . . . . . . . . . 50

*Essex Electro Engineers, Inc. v. Danzig*,
224 F 3d. 1283, 1291 (Fed. Cir. 2000) . . . . . . . . . . 50

*George A. Fuller Co. v. United States,*
108 Ct. Cl. 70, 69 F. Supp. 409, 411 (1947) . . . . . . . . . . 50

*Charles T. Parker Construction Co. v. United States*,
193 Ct. Cl. 320, 333, 433 F.2d 771, 778 (1970) . . . . . . . . . . 3

*Weeks Dredging & Contracting, Inc. v. United States*,
861 F.2d 728 (Fed. Cir. 1988, *per curiam*) . . . . . . . . . . 1

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | § | |
| PLAINTIFF, | § | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| THE UNITED STATES | § | |
| DEFENDANT. | § | |

**POST TRIAL BRIEF BY PLAINTIFF, RENDA MARINE, INC.**

Plaintiff, Renda Marine, Inc. ("Renda"), presents this Post Trial Brief to demonstrate that Renda has satisfied its burden of proof and prevailed on its claims against Defendant, United States of America.

**ANALYSIS OF PROOF PRESENTED AND ELEMENTS OF PLAINTIFF'S RECOVERY**

Renda's claims (aside from the HL&P Tower claim) principally arose from type I differing site conditions. A type I differing site condition claim has six elements. *Weeks Dredging & Contracting, Inc. v. United States*, 861 F.2d 728 (Fed. Cir. 1988, *per curiam*). Those elements are (and shall be summarily referred to herein below, as indicated) as follows:

1. The contract documents must have affirmatively indicated or represented the subsurface conditions which form the basis of plaintiff's claim ("contract representation");

2. The contractor must have acted reasonably in interpreting the contract documents ("reasonable interpretation");

3. The indications must have induced reasonable reliance by the contractor that the subsurface conditions were more favorable than those actually encountered ("reasonable reliance");

4. The subsurface conditions actually encountered within the contract site area must have differed materially from the subsurface conditions indicated in the same contract area ("material difference");

5. The actual subsurface conditions encountered must have been reasonably unforeseeable ("reasonably unforeseeable"); and

6. The contractor must show its claimed excess costs were solely attributable to the materially different subsurface conditions within the contract site ("damages").

Renda presented seven claims at trial:

**Table 1: Plaintiff's Claims**

| Claim | Claim Title | Amount Proven at Trial | Notes and Transcript Reference |
|---|---|---|---|
| 1 | Flare Area | $ 906,364 | Trial Trans. at 2426-2428 |
| 2 | Section 7 Clay | $ 944,099 | Trial Trans. at 2426-2428 |
| 3 | Obstructions No. 1 (Sections 4-8) | $ 1,531,822 | PX1863.01 |
| 4 | Obstructions No. 2 (Section 9) | $ 801,036 | PX1863.01 |
| 5 | South Ferry Landing | $ 839,657 | Trial Trans. at 2433-2436 |
| 6 | HL&P Tower | $ 159,353 | PX1863A.01 |
| 7 | Lost Lake Levees[1] | $ 5,660,479 | PX1863A.01 |
| | **TOTAL** | $ 10,842,811 | Reflects rounding to the nearest dollar. |

During the pre-trial conference on February 23, 2005, the Government conceded that the Dredge Millennium's collisions with the stern swivel and Conex box (Obstructions No. 1) and

[1]This claim is the combination of two certified claims: realignment of the west levee at Lost Lake, and the Lost Lake levees issues, generally.

mooring buoy (Obstructions No. 2) constituted type II differing site conditions and that only Renda's damages were an issue at trial.[2] The elements of a type II differing site condition differ from a type I condition. To prove a type II differing site condition, the Plaintiff must prove that it has encountered something materially different from the known and the usual. *Charles T. Parker Construction Co. v. United States*, 193 Ct. Cl. 320, 333, 433 F.2d 771, 778 (1970). Since these claims also qualify as type I, they are included in the following table and discussions.

The trial of this matter lasted almost four weeks, and the combined admitted exhibits contain thousands of pages. To demonstrate that Renda has introduced competent evidence for each and every element of Renda's claims, Renda presents table 2, below, tabulating elements of each claim with record citations to the proof. Although the record is replete with evidence supporting Renda's claims, Renda's *prima facie* case was made through the testimony and evidence of Messrs. Steve Bowman, Barry Smith, Rob McCullough and Dr. Mathewson. For the sake of brevity, Renda's *prima facie* case in table 2, below, is limited to citations to the record from these witnesses, as well as *major* exhibits that support each element of Renda's recovery. The remainder of the evidence will be analyzed and discussed in a subsequent portion of this brief.

---

[2]At the February 23, 2005, pre-trial conference, Mr. Kosloske conceded that the Plaintiff's Obstructions No. 2 claim constituted a type II differing site condition, and that only damages were being contested. Said concession is at pages 290-291 of the transcript of said pre-trial conference. Additionally, the government conceded that a portion of the Obstructions No. 1 claim, dealing with Plaintiff hitting a stern swivel and Conex box, also constituted a type II differing site condition.

**Table 2: <u>Proof Analysis Table</u>**

| No. | Claim | Element | Proof | Comments |
|---|---|---|---|---|
| 1 | Flare Area | Contract Representation | 1. JX 5.021<br>2. PX 0371<br>3. Dr. Mathewson | 1. Soil borings numbered 93-62 & 93-63 showed the presence of only very soft clay through the dredging template area<br>2. Enlargements of JX 5.021<br>3. Tr. Vol. 7, pp. 1859-1863 |
| | | Reasonable Interpretation | 1. Steve Bowman<br>2. JX 38<br>3. Dr. Mathewson | 1. Tr. Vol. 2, pp. 381, 517-522, 523-525, 527; Tr. Vol. 3, pp. 754-755, 757, 758, 759-768<br>2. Stiff clay percentages spreadsheet<br>3. Tr. Vol. 7, pp. 1865-1867, 1872, 1875-1877, 2010-2011 |
| | | Reasonable Reliance | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Tr. Vol. 2, pp. 504-508, 509-511, 517-522, 523-525, 527; Tr. Vol. 3, pp. 754-755, 757, 758, 759-768, 776-777<br>2. Tr. Vol. 7, pp. 1875-1877, 1882-1884 |
| | | Material Difference | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Tr. Vol 3, pp. 782-785, 791-793, 803-804<br>2. Tr. Vol. 7, pp. 1875-1877, 1882-1884 |
| | | Reasonably Unforeseeable | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Tr. Vol. 3, pp. 782-785, 791-793, 803-804<br>2. Tr. Vol. 7, pp. 1875-1877, 1882-1884 |

| No. | Claim | Element | Proof | Comments |
|---|---|---|---|---|
| | | Damage | 1. Steve Bowman<br>2. JX 1.001 and 1.002<br>3. Barry Smith<br>4. Rob McCullough<br>5. PX 1863A.01 | 1. Tr. Vol 3, pp. 803-807, 831-837<br>2. Plaintiff's certified claim<br>3. Tr. Vol. 6, pp. 1653-1654, 1655, 1671-1719, 1721-1748, 1750-1788; Tr. Vol. 7, pp. 2016-2023, 2072-2107, 2121, 2124-2131<br>4. Tr. Vol. 9, pp. 2414-2433<br>5. Rob McCullough's report |
| 2 | Section 7 Clay | Contract Representation | 1. JX05.003 & associated bore logs at JX 05.019-.027<br>2. Dr. Mathewson | 1. Do not show the presence of the hard pan clay encountered, but sandy and silty clays<br>2. Tr. Vol. 7 pp. 1891-1898 |
| | | Reasonable Interpretation | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Tr. Vol. 5, pp. 1235-1239, 1242-1247<br>2. Tr. Vol. 7, pp. 1891-1898, 1935-1941, 1947-1949 |
| | | Reasonable Reliance | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Tr. Vol 2, pp. 504-508; Tr. Vol. 5, pp. 1235-1239, 1242-1247<br>2. Tr. Vol. 7, pp. 1891-1898, 1935-1941, 1947-1949 |
| | | Material Difference | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Tr. Vol. 5, pp. 1232-1233, 1242-1247<br>2. Tr. Vol. 7, pp. 1891-1898, 1935-1941, 1947-1949 |
| | | Reasonably Unforeseeable | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Tr. Vol. 5, pp. 1223-1233, 1235-1239, 1242-1247<br>2. Tr. Vol. 7, pp. 1891-1898, 1935-1941, 1947-1949 |
| | | Damage | 1. Steve Bowman<br>2. PX 6.002<br>3. PX 6.003<br>4. Rob McCullough<br>5. PX 1863A.01 | 1. Tr. Vol. 5 pp. 1232, 1241<br>2. Plaintiff's Request for Equitable Adjustment<br>3. Damages summary<br>4. Tr. Vol. 9, pp. 2443-2447<br>5. Rob McCullough's report |

| No. | Claim | Element | Proof | Comments |
|---|---|---|---|---|
| 3 | Obstructions No. 1[3] | Contract Representation | 1. JX 02.0110<br>2. Steve Bowman | 1. Character of Materials: para. 1.11 and 1.11.1 indicate that the contractor could reasonably expect to encounter scrap, rope, wire cable, snags and stumps, and affirmatively indicated that "explorations, including core borings" had been made.<br>2. Tr. Vol. 2, pp. 373-375 |
| | | Reasonable Interpretation | 1. Steve Bowman | 1. Tr. Vol. 2, pp. 373-375; Tr. Vol. 3, pp. 842, 846 |
| | | Reasonable Reliance | 1. Steve Bowman | 1. Tr. Vol. 3, pp. 842, 846 |
| | | Material Difference | 1. Steve Bowman | 1. Tr. Vol. 3, pp. 842, 846, 897-904, 932; Tr. Vol. 4, pp. 1011-1021 |
| | | Reasonably Unforeseeable | 1. Steve Bowman<br>2. PX 1221 | 1. Tr. Vol. 3, pp. 842, 846, 897-904; Tr. Vol. 4, pp. 1011-1021<br>2. Gahagan & Bryant survey for obstructions |

[3]As noted by the Court, the Conex box that is part of this claim, was conceded by the Government as being a type II differing site condition. Trial Trans. at 844.

| No. | Claim | Element | Proof | Comments |
|---|---|---|---|---|
| | | Damage | 1. Steve Bowman<br>2. PX 1056<br>3. JX 79 & 86<br>4. JX 90<br>5. Barry Smith<br>6. PX 1863A.01 | 1. Tr. Vol. 3., pp. 860-861, 867-868, 870-877, 878-889, 905-908; Tr. Vol. 4, pp. 976-977, 1023<br>2. Contract for Weeks dredging to bucket dredge the area<br>3. Obstructions claim<br>4. Letter from Contracting Officer advising of merit to the claim<br>5. Tr. Vol. 9, pp. 2493-2527<br>6. Rob McCullough's report |
| 4 | Obstructions No. 2[4] | Contract Representation | 1. JX 02.0110<br>2. Steve Bowman | 1. Character of Materials: para. 1.11 and 1.11.1 indicate that the contractor could reasonably expect to encounter scrap, rope, wire cable, snags and stumps, and affirmatively indicated that "explorations, including core borings" had been made.<br>2. Tr. Vol. 2, pp. 373-375 |
| | | Reasonable Interpretation | 1. Steve Bowman | 1. Tr. Vol. 2, pp. 373-375; Tr. Vol. 3, pp. 842, 846 |
| | | Reasonable Reliance | 1. Steve Bowman | 1. Tr. Vol. 3, pp. 842, 846 |
| | | Material Difference | 1. Steve Bowman | 1. Tr. Vol. 3, pp. 842, 846, 897-904, 932; Tr. Vol. 4, pp. 1011-1021 |
| | | Reasonably Unforeseeable | 1. Steve Bowman | 1. Tr. Vol. 3 pp. 956-959 |
| | | Damage | 1. Steve Bowman<br>2. PX 0005.0002<br>3. PX 1863A.01 | 1. Vol. 4, pp. 980-990, 1023<br>2. Plaintiff's Certified Claim<br>3. Rob McCullough's report |

[4] As also indicated above, part of this claim was conceded by the government as being at type II differing site condition.

| No. | Claim | Element | Proof | Comments |
|---|---|---|---|---|
| 5 | South Ferry Landing | Contract Representation | 1. JX 5.006<br>2. JX5.013 & JX5.010<br>3. JX 02.0110 | 1. The drawing did not show debris or man made material extending into the dredging template<br>2. Cross sections do not show any rip rap or man made material extending into the dredge template and there is no warning such as at sta. 544+06.55 of any obstruction<br>3. Character of Materials: para. 1.11 and 1.11.1 indicate that the contractor could reasonably expect to encounter scrap, rope, wire cable, snags and stumps, and affirmatively indicated that "explorations, including core borings" had been made. |
| | | Reasonable Interpretation | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Vol. 2, pp. 373-374, 385-386, 416, 504-508; Tr. Vol. 4, pp. 1023-1025<br>2. Tr. Vol. 7, pp. 1886-1890 |
| | | Reasonable Reliance | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Vol. 2, pp. 373-374, 385-386, 416, 504-508, 509-511<br>2. Tr. Vol. 7, pp. 1886-1890 |
| | | Material Difference | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Vol. 4, pp. 1023-1025, 1033-1034, 1044<br>2. Tr. Vol. 7 pp. 1886-1890 |
| | | Reasonably Unforeseeable | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Vol. 4, pp. 1023-1025, 1030, 1033-1034, 1044, 1050<br>2. Tr. Vol. 7, pp. 1886-1890 |
| | | Damage | 1. Steve Bowman<br>2. PX 7.002<br>3. Rob McCullough<br>4. PX 1863A.01 | 1. Tr. Vol. 4, pp. 1030, 1044, 1048<br>2. Plaintiff's Revised Certified Claim<br>3. Tr. Vol. 9 pp. 2433-2436<br>4. Rob McCullough's Report |

| No. | Claim | Element | Proof | Comments |
|---|---|---|---|---|
| 6 | HL&P[5] | Contract Representation | 1. JX05.014 | 1. At station117+00 there is a note of "HL&P overhead lines"; the presence of one tower was clear from observation–there was not, however, a notation in the documents that the tower would be replaced or improved. |
| | | Government Knowledge | 1. PX 0358<br>2. JX 31<br>3. DX 373<br>4. Bruce Bennett | 1. Internal e-mail at the Corps from April of 1998 re: need for new tower<br>2. HL&P's application to the Corps for permit, dated 2/1/99<br>3. letter from Corps giving HL&P permission<br>4. Tr. Vol. 13, pp. 3622-3633 |
| | | Non-disclosure | 1. Steve Bowman<br>2. Ben Goodloe | 1. Tr. Vol. 4, pp. 1064-1077<br>2. Tr. Vol. 10, pp. 2753-2757 |
| | | Interference w/ Contractor | 1. Steve Bowman<br>2. Ben Goodloe | 1. Tr. Vol. 4 pp. 1064-1077<br>2. Tr. Vol. 10 pp. 2753-2757 |
| | | Damage | 1. PX 2.001<br>2. PX 2.002 | 1. Request for equitable adjustment<br>2. Certification of REA as claim |

[5]Plaintiff briefed the HL&P issue prior to trial, at the Court's direction. The legal basis for this claim and the authorities supporting Plaintiff's claim are contained in Plaintiff's Memorandum Brief, dated February 24, 2005.

| No. | Claim | Element | Proof | Comments |
|---|---|---|---|---|
| 7 | Lost Lake | Contract Representation | 1. JX05.014<br>2. JX 05.015-016<br>3. JX 03.005-.008<br>4. JX 05.026-.027 | 1. Drawings and notes state that the soft to very soft foundations can be displaced with hydraulically placed material and dictate levee alignment<br>2. Fail to disclose the "side cast borrow ditches" known to the Corps<br>3. In response to questions regarding levee foundations and alignment, the Corps re-emphasizes the displacement method and that sufficient material exists to accomplish the displacement<br>4. Boring logs from Lost Lake |
| | | Reasonable Interpretation | 1. Steve Bowman<br>2. JX 28<br>3. Dr. Mathewson | 1. Tr. Vol 2, page 383, 417-418, 424, 483-491, 532-534, 543-550, 551-553<br>2. Tr. Vol 2, pp. 577-579; Tr. Vol. 4, pp. 1079-1094, 1126, 1128, 1132, 1150<br>3. Tr. Vol. 7, pp. 1899-1932 |
| | | Reasonable Reliance | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Tr. Vol. 2, pp. 417-418, 424, 483-491, 532-534, 543-550, 586-588; Tr. Vol. 3, pp. 703; Tr. Vol. 4, pp. 1079-1094, 1095-1104, 1111-1119, 1122, 1128,1132, 1147<br>2. Tr. Vol. 7, pp. 1899-1932 |

| No. | Claim | Element | Proof | Comments |
|---|---|---|---|---|
| | | Material Difference | 1. Steve Bowman<br>2. Barry Smith<br>3. Dr. Mathewson | 1. Tr. Vol. 2, pp. 600-603; Tr. Vol. 3, pp. 675-677, 682-686, 687-703, 725, 735; Tr. Vol. 4, pp. 1079-1094, 1095-1104, 1111-1119, 1122, 1128, 1132, 1142-1144, 1147-1150<br>2. Tr. Vol. 6, pp. 1814-1815, 1817<br>3. Tr. Vol. 7, pp. 1899-1932 |
| | | Reasonably Unforeseeable | 1. Steve Bowman<br>2. Dr. Mathewson | 1. Tr. Vol 2, pp. 483-491, 544, 545-549, 600-603, 604-606, 651-653, 687-703, 705-713, 722-723, 725; Tr. Vol. 3, pp. 728, 735, 742; Tr. Vol. 4, pp. 1079-1094, 1095-1104, 1111-1119, 1122, 1128,1132, 1142-1144, 1147-1150, 1154<br>2. Tr. Vol. 7, pp. 1899-1932 |
| | | Damage | 1. Steve Bowman<br>2. PX 3.1, 3.2, 3.3, 3.4, 3.5<br>3. Rob McCullough<br>4. PX 1863A.01 | 1. Tr. Vol. 4, pp. 993-994, 999-1001, 1005<br>2. Plaintiff's Certified Claim for Hydraulic Levee<br>3. Tr. Vol. 9 pp. 2447-2457<br>4. Rob McCullough's report |

**Flare Area**

[Measured Mile Days: 1/28-2/3/00; 2/15-18/00]

[Impact Days: 1/23-27/00; 2/4-6/00; 2/12-14/00; 2/19-26/00; 3/3-11/00; 7/17-8/2/00; 8/4-9/5/00; 9/7-11/00; 9/19-29/00]

The Flare Area claim arose when Renda encountered very stiff clay where the soil borings showed very soft clay. Renda had anticipated high daily production – the highest on Project since the

Flare Area was out of ship traffic and contained a large bank of material that Renda could dredge without significant movement.

As testified to at trial by Steve Bowman, Renda relied on the soil borings in anticipating that the majority of Flare Area materials would be soft clay. Trial Trans. at 381. Soil borings 93-62 and 93-63 were taken directly from the Flare Area, and predominantly show soft clay. JX05.021 (logs of borings, drawing F-3). In reviewing soil boring 93-62, based upon the liquid limit and the soil classifications, he expected a soft clay with extremely high productions. In response to inquiry from the Court, Mr. Bowman expected to be able to pump as much as 30,000 yards of material per day from this location. Trial Trans. at 520-522 & 527.

Renda's actions before the project was bid and before encountering the very stiff clay in the Flare Area show that Renda anticipated very soft clay. To assist in bid preparation, Mr. Fisher had prepared a Stiff Clay Percentages spreadsheet which indicated that in the Flare Area only the bottom most portion of the dredge template would have stiff to very stiff clay. JX38. Before Renda began dredging in the Flare Area, by letter of October 13, 1999, Mr. Fisher wrote to Mr. McClenan that as Renda approached the Flare Area, Renda anticipated production to increase to more than 20,000 cubic yards per day. JX41.

By letter of January 5, 2000, Mr. Fisher wrote to Mr. Benero enclosing a revised schedule. JX43. Mr. Fisher acknowledged that his production estimates may be optimistic, but listed factors which favored higher production in the Flare Area: the type of material contained more mud and soft clays, and the material to be dredged was not on the side slopes, which decreases production, but was in the wider flare areas. JX43. Mr. Bowman testified at trial that because production in the Flare

Area would be outside of normal shipping traffic, daily production hours would be higher. Trial Trans. at 762.

By email of February 1, 2000, to Mr. Russek, Mr. Fisher noted that the daily reports should show improved production in the flares and that he was estimating the mid 20,000's of cubic yards per day. PX708.

By letter of March 30, 2000, Mr. Fisher wrote to Mr. McClenan to request a time extension due to encountering stiff clays at a much higher elevation than the -47 MLT shown on the borings. DX437. Mr. Fisher noted that he had estimated production in the 25,000 cubic yard per day range in this area, which contained approximately 900,000 cubic yards. PX437.

By letter of April 4, 2000, Mr. Fisher wrote to Mr. Benero to respond to the Corps' March 8, 2000, Cure Notice. PX798. Mr. Fisher wrote that the Flare Area was represented by the contract borings to contain very soft clays. Mr. Fisher noted that if the contract borings had been correct, Renda's anticipated daily production levels for January 2000 should have exceeded 25,000 cubic yards for more than one month. Mr. Fisher observed that since production in stiff clays drops off considerably from production in soft clays, Renda's actual daily production of less than 10,000 cubic yards was an indication of a differing site condition and the basis for the request for contract time extension. PX798.0003.

By email of April 6, 2000, Daniel Anderson wrote to Tim Few, among others, concerning Renda's request for a time extension due to a differing site condition in the Flare Area. PX802. Mr. Anderson wrote: "I have reviewed the data and discussed it with Mike McClenan and Eric Russek. He is correct that the logs in the flare show stiff material at -47 MLT or so but the adjacent

channel borings show a very stiff to hard clay at -35 to - 40 MLT. I think a judge would say that he should have expected soft material down to -47 MLT based on the two logs in the flare."

By email of April 17, 2000, Mr. Few wrote to Mr. Mears, among others, regarding the very soft clay shown on boring 93-62. PX826. Mr. Few noted that although the presence of hydrocarbons makes the material appear to be relatively recent (the last 100 years), the liquid limit and the dry unit weight and the moisture content are more in line with "natural" fully self-consolidated very soft clays. Mr. Few indicated that it was his feeling that the Corps could not credibly say it should be obvious to the contractor that the very soft materials shown at the top of both borings was redeposit. Mr. Few stated that his gut-feeling was that although the contractor could have made the same interpretation as Leon Hrabovsky, the contractor can sure convincingly say he made a reasonable interpretation that the borings indicate there would not be any stiff material above -46. Mr. Few indicated that he would not want to try to disprove this to the judge. Finally, Mr. Few wrote that Mr. Russek said that he has seen quite a bit of "good clay" dredged and deposited at Lost Lake from the flare, which indicates there is at least some validity to Renda's differing site condition justification. PX836.0001.

By letter of April 25, 2000, Mr. Benero wrote to Mr. Fisher to advise that the Corps and Joint Venture have developed a plan to drill three additional borings in the Flare Area to further determine soil characteristics. JX49.

By memo of April 28, 2000, Mr. Fisher wrote to Mr. Smith to advise that the Corps had invited Renda to witness the Flare Area soil borings. DX451.

By letter of May 3, 2000, Mr. Fisher wrote to Mr. Benero to acknowledge the Government's intent to obtain three additional soil borings in the Flare Area and to confirm Renda's interest in observing the tests. JX51.

By email of May 2, 2000, Mr. Jefts wrote to Mr. Russek to advise that sometime early the next week, HVJ would be performing the three additional soil borings. DX454. Mr. Jefts noted that the total cost of the investigation would be about $18,000.00.

By email of May 16, 2000, Mr. Anderson wrote to Mr. Few and Mr. Mears to advise that he had observed the drilling of one boring in the Flare Area and that based on the one boring, it appeared that some of the material in the flare assumed to be soft clay was stiff to hard clay. PX866.

Although Renda had expressed an interest in observing the soil borings, Renda was never advised of the time or date or allowed an opportunity to inspect the borings.

The next that Renda knew, Renda received word from Mr. Benero that the soil borings had been taken and that the lab results were anticipated within a week. PX875. Mr. Benero wrote that based on the lab results, a soil analysis would be performed by the Corps' geotechnical staff and the PHA consultants. PX875.0001.

By letter of June 2, 2000, Mr. Jefts wrote to the Corps to provide the May 30, 2000, HVJ Associates geotechnical report for the three new soil borings to analyze Renda's differing site condition claim in the Flare Area. JX52.

By email of July 18, 2000, Mr. Few wrote to Mr. Russek and advised that based on Mr. Few's calculations, Renda has a legitimate basis for a 57 day time extension. PX920.

By letter of August 3, 2000, Mr. Bowman wrote to Mr. Benero concerning differing site conditions which have significantly decreased production on the Project. JX59. Mr. Bowman stated that the Flare Area differing site condition (Stations 520+00 to 550+66) involved Renda encountering very stiff clays. Mr. Bowman stated that Renda's March 30, 2000, letter addressed the issue of the boring logs indicating very soft materials near the dredge line of -47 MLT. Mr. Bowman stated that

as a result of the soft materials indicated in the contract documents, Renda had anticipated dredge production in the area at an average of 25,000 cubic yards per day. JX59.0001-02.

By letter of August 22, 2000, Mr. Bowman wrote to Mr. McClenan concerning the Flare Area and Renda's request for an increase in the contract time of 100 days due to stiff clay material. PX975. Mr. Bowman wrote that although Renda has a copy of HVJ Associates' geotechnical report for the three additional soil borings, the Government had not provided any written response to Renda regarding the geotechnical report results. Mr. Bowman requested that the Government provide a written determination, stating whether or not, based on the geotechnical report analysis, the soil conditions currently being dredged by the Millennium, differ from what was anticipated and specified. Mr. Bowman noted Renda's concern about the Government continued threat of termination for default based on perceived low dredge production rates despite Renda's having notified the Government of this and several other differing site conditions. PX975.0002.

By email of September 18, 2000, Mr. Mears wrote to Mr. Russek and Mr. McClenan transmitting a first draft of the minutes of a September 14, 2000, meeting concerning the Project. PX997. Mr. Mears noted that the Joint Venture had provided the Corps with an analysis and distribution of hard and soft materials in the cut using the borings in the advertised plans and with the additional three borings taken by the Joint Venture for the Corps. PX997.0004.

By letter of September 22, 2000, Mr. Bowman wrote to Mr. McClenan to recap several differing site condition issues which had impeded progress on the Project. PX1006. Mr. Bowman noted that the dredge had recently completed work in the Flare Area (approximately September 15, 2000), and is currently dredging maintenance material on the south side of Section 7. Mr. Bowman

stated that the dredge's decreased production caused by the very stiff clay material, has increased Renda's equipment cost and delayed completion of the Project. PX1006.0001.

By letter of October 31, 2000, Mr. Bowman wrote to Mr. McClenan concerning problems with the hydraulic levee construction, noting that Renda had dredged an estimated 700,000 cubic yards of unanticipated stiff clay from the Flare Area. PX1064.0004.

By letter of November 15, 2000, Mr. Bowman wrote to Mr. Benero to respond to the Government's Show Cause Notice. JX69. Mr. Bowman wrote that Renda had notified the Government of differing site conditions or changed conditions, which included the heavy clay in the Flare Area. JX69.0003.

By letter of December 13, 2000, Mr. McClenan wrote to Mr. Bowman and reported for the first time that the Flare Area issue had merit. PX1158.0001. Mr. McClenan requested that Renda submit a request for equitable adjustment for the Flare Area matter. PX1158.0006-07.

By letter of February 14, 2001, Mr. Bowman wrote to Mr. McClenan and transmitted Renda's REA for the Flare Area issue. PX1275. Renda subsequently converted the Flare Area REA to a certified claim. See PX1.001 and PX1.002.

Renda negotiated the Flare Area claim with Will Sanford from the Corps' Fort Worth District office. Renda had a damage model involving the use of a measured mile. Renda had previously negotiated with Mr. Sanford on the Lower Bay Project, where Renda was a subcontractor to Great Lakes Dredge and Dock Company ("Great Lakes"). Concerning the use of a measured mile, Mr. Sanford had previously written that his interpretation was that a reasonable measured production rate does not necessarily have to be in the same area as the impacted area. It can be anywhere in the job as long as it is similar material. PX1283.

During negotiations with Mr. Sanford, Mr. Sanford became convinced that the Flare Area had unique characteristics which dictated that the measured mile be located inside the Flare Area. By email of March 6, 2001, Mr. Sanford wrote to Mr. Benero and Mr. McClenan and reported that: "After much discussion, it was concluded that this approach [measured mile outside the Flare Area] was not equitable because the production of the channel dredging is impaired by down time for shipping traffic and obstructions located in the channel whereas the Flare Area is outside the channel limits and not subject to the same conditions. It was agreed that the Government will compare dredging production only in the Flare Area." PX1303. Mr. Sanford promised to prepare a Finding of Fact for the Galveston District to issue a not to exceed modification based on the Government estimate of cost difference to dredge stiff clay versus soft clay in the flare. PX1303.0001.

Mr. Sanford's Government Estimate is attached to PX155. Mr Sanford's Government Estimate indicates that the total additional costs were $4,111,778.00. In the modification issued to Renda, the Corps paid 75% of that amount, or $3,083,833.00. See the last page of PX155.

By telecopy of March 14, 2001, the Corps sent to Renda a copy of the Flare Area modification. JX77. The modification allowed Renda 56 calendar days of additional contract time and paid Renda $3,083,833.00 for extra dredging expenses.

Unfortunately for Mr. Sanford, he had to negotiate both with Renda and with the Joint Venture. By email of March 21, 2001, Mr. Benero wrote to Mr. Sanford and Mr. Russek to confirm his agreement that he was not crazy about negotiating with both the Joint Venture and the contractor. PX1346. Mr. Benero stated that Mr. Sanford should receive recommendations from the Joint Venture and proceed to negotiate with assistance from the Bay Area office.

In the second paragraph of Mr. Benero's March 21, 2001, email to Mr. Sanford, Mr. Benero wrote that he knows "Wendell [Mears] strongly believes Renda is trying to defraud the Government but we won't know anything until you've had a chance to review it. If it turns out Wendell is right there are procedures in place to deal with Renda." PX1346.

The Joint Venture was a thorn in Renda's side. By letter of March 23, 2001, Mr. Bowman wrote to Mr. Benero concerning the interference by the Joint Venture in Renda's operations and with Renda's REA. PX1352. Mr. Bowman wrote concerning the Joint Venture's assertion that equipment hour meters should be used to determine hourly usage of the equipment. Mr. Bowman also noted that the Joint Venture had informed Mr. Sanford that the Joint Venture was conducting an independent analysis of Renda's equipment usage, incorporating the Joint Venture's quality assurance reports, which had never been transmitted to Renda during the entire course of the Project. PX1352.0003.

To address the Joint Venture's concerns about Renda's claim by memo of April 2, 2001, Mr. Smith wrote to Mr. Sanford to respond to the Joint Venture's accusations. JX78. This exhibit is significant in two respects. First, in the few instances where the Joint Venture had raised a legitimate point, Mr. Smith reduced Renda's claim. Second, the Corps and the Joint Venture never brought up the issue again.

By email of March 27, 2001, Mr. Russek wrote to Mr. Sanford to forward an email from Mr. Few, whom Mr. Russek described as "one of our best geotechs." PX1354. Mr. Russek indicated that Mr. Few's interpretation is most likely "right on," but it still doesn't help us any. Mr. Few's email points out that the two soil borings 93-62 and 93-63, indicate that the top of stiff material to be about -55 and -55, respectively, do, at first glance, suggest that the entire quantity of material on the left descending bank can be expected to consist of very soft material overlying the stiff clay and the

boring locations. Mr. Few concluded that the Corps' weakness will remain – showing only two borings on the left descending bank, and both of them show only soft silt above -50. PX1354.0001-02.

By letter of April 24, 2001, Mr. Bowman wrote to Mr. Benero concerning the outstanding issues related to the Project, including the Flare Area REA. PX1405. Mr. Bowman wrote that the Flare Area REA was submitted to the Government on February 14, 2001, and that the Government paid Renda $3,083,833.00 (75% of the current Government Estimate) in late March 2001. Mr. Bowman noted that Renda was awaiting an audit of its overhead rates so that the final 25% of the Government Estimate could be paid and the negotiations concluded. PX1405.0002.

By letter of May 11, 2001, Mr. Bowman wrote to Mr. McClenan to provide the cost and pricing information for the Government's use in the audit process, as requested by Mr. Sanford. PX1443.

By letter of May 17, 2001, Mr. Bowman wrote to Mr. McClenan to request that the Government either accept Renda's overhead rates presented in the Flare Area REA or schedule an audit with the Defense Contract Audit Agency. Mr. Bowman noted that Renda requested a response from the Government, in writing, as to when or if a DCAA audit would be scheduled. PX1467.

Renda prepared an agenda for a meeting with the Corps on about May 24, 2001. PX1481. Among the agenda items concerning the Flare Area REA was a question: When will the audit be scheduled? Renda noted that the audit was initially requested in writing in a March 13, 2001, letter to Mr. McClenan. PX1481.0002.

By letter of June 20, 2001, Mr. Bowman wrote to Mr. Benero to report on the current status of outstanding issues, including the Flare Area REA. PX1526. Mr. Bowman noted that Renda

continued to await an audit of its overhead rates (requested by Renda on March 13, 2001). Mr. Bowman wrote that at the May 24, 2001, status meeting, Mr. McClenan stated that the Joint Venture had demanded that the Joint Venture be involved in the audit process and requested that all Renda equipment be subject to the audit. Mr. Bowman noted that this again confirms Renda's belief that the Joint Venture continues to interfere in Renda's contract with the Government. PX1526.0002.

By letter of July 31, 2001, Mr. Bowman wrote to Mr. Benero concerning the Government's refusal to schedule an audit of Renda's overhead and indirect rates, which was delaying the conclusion of negotiations for the Flare Area REA. PX1555.

Finally, on August 9, 2001, Mr. Bowman wrote to Mr. Benero to re-submit the Flare Area REA as a certified claim. JX89.

By letter of November 6, 2001, Mr. Benero responded observing that a Contracting Officer's final decision would be issued by April 18, 2002, and observing that Renda's claim was for $1,607,855.00 and 76 days. JX92.

At trial, Barry Smith testified at length as to how he assembled the Flare Area REA, and later the certified claim. Mr. Smith testified concerning the negotiations with Mr. Sanford and the Corps, and how they had developed a template for the presentation of claims, calculation of equipment rates, and inclusion of specific pieces of equipment. Since the Government chose not to call Mr. Sanford as a witness, although Mr. Sanford was readily available and waiting in the courthouse, Mr. Smith's testimony went unrebutted.

Both Mr. Smith and Rob McCullough testified that they had made various reductions to Renda's claim to reflect errors or concessions. Mr. McCullough testified that after all deductions,

offsets, and credits, $906,364.00 was owed to Renda as the reasonable and necessary cost of overcoming the unanticipated very stiff clay in the Flare Area. PX1863A.

**Section 7 Clay**

The Section 7 Clay claim arose when Renda encountered hardpan or hard clay, when the soil borings showed stiff or very stiff clay. Steve Bowman testified that Renda first encountered the hardpan clay when dredging the north side of the channel. Ben Goodloe, who was the project manager on site at the time, called him and reported that the dredge's cutter head was "chattering" meaning that it wouldn't bite into the material. Trial Trans. at 1232.

By letter of October 20, 2000, Mr. Bowman wrote to Mr. McClenan to provide notice of a differing site condition in Section 7. See PX1027. Mr. Bowman wrote that Renda's "dredge encountered hardpan, heavy red clay."

By letter of December 13, 2000, Mr. McClenan rejected the claim, stating that the soil borings indicate stiff to very stiff clays. PX1158. Mr. Bowman described the material as like a red sandstone. Trial Trans. at 1233. According to Mr. Bowman's testimony, if the material were actually what was shown by boring 93-65 (JX05.021), it would have been very saturated material, which would have resulted in some of the most "pumpable" material on the project. Trial Trans. at 1238.

Mr. Bowman responded by letter of December 20, 2000, explaining at length about the "hard" clay that Renda encountered in Section 7. PX1175.0004-05.

Mr. McClenan admitted at trial that "hardpan" is a different kind of material character than stiff or very stiff clay. Trial Trans. 3438. In fact, the Corps' form for the Inspection Reports of Dredging lists hardpan as an identifiable material character. See, for example, Joint Exhibit 09.001.

Mr. McClenan admitted that Renda's concern with the Section 7 clay was that it was way beyond stiff or very stiff. Trial Trans. at 3438. Mr. McClenan admitted that in reading soil borings, the character of material runs from stiff to very stiff to hard. Trial Trans. at 3438.

In fact, Mr. McClenan admitted that other than looking at the soil borings for the Section 7 area, the Government did no other investigation of Renda's notice of differing site condition. Trial Trans. at 3439. Mr. McClenan candidly acknowledged that without even examining the material as it sat out in Section 7, the Government just simply denied the claim. Trial Trans. at 3439. Mr. McClenan knew that Renda had piled up Section 7 clay at about Station 118 at Lost Lake for the Government to inspect. Trial Trans. at 3439. Mr. McClenan observed the stock pile. Trial Trans. at 3440. So did Mr. Bonero, as well as Dan Keys, counsel for the Galveston area. Trial Trans. at 1242. Joint Exhibit 74 documents that Renda showed the stock pile to the Government during the levee inspection conducted on February 12, 2001.

Mr. McClenan admitted that the Corps ordered up soil borings for the Flare Area after Renda sent in a notice of differing site condition because the character of the material was stiffer. Trial Trans. at 3441. However, Mr. McClenan could not recall why the Corps did not order up soil borings for Section 7 after Renda sent in a notice that the character of the Section 7 material was stiffer than anticipated. Trial Trans. at 3441.

Mr. McClenan acknowledged that it was really the stiffness of the material that should have concerned everybody. Trial Trans. at 3442. Mr. McClenan also acknowledged that hardpan is a different classification than stiff or very stiff. Trial Trans. at 3462.

By letter of March 13, 2001, Mr. Bowman wrote to Mr. Benero to request that the Government review its determination of entitlement for the hard, red clay discovered in Dredge Section 7. PX1327.0002.

Renda later submitted an REA for the Section 7 Clay claim. PX6.001.

By letter of April 24, 2001, Mr. Bowman wrote to Mr. Benero to request a meeting to discuss the Section 7 Clay REA. PX1405.0002.

By letter of April 25, 2001, Mr. McClenan sent the Section 7 Clay REA to the Joint Venture for an independent review and analysis. PX1409.

By letter of June 20, 2001, Mr. Bowman wrote to Mr. Benero to request that the Corps respond to the Section 7 Clay REA. PX1526.0003.

When the Corps would not respond, Renda resubmitted the Section 7 Clay REA as a certified claim. PX6.002 & PX6.003.

HVJ's 1996 report on Lost Lake soil borings (PX195) contains a description of the geological setting, including the Beaumont Clay at issue with the Section 7 Clay claim:

> The project site occupies an area which was deeply eroded during final glaciation of the Pleistocene Age when sea level had dropped more than 400 feet below existing continental shelf, southeast of Galveston. Erosion was caused by the Trinity and San Jacinto Rivers and their local tributaries including Buffalo Bayou. The eroded soil material consisted of earlier Pleistocene fluvial and deltaic deposits. The soil which forms the upper limit of the Pleistocene formation is a stiff clay material varying from red, yellow and brown in color, and is locally referred to as the Beaumont clay.

PX195.0004.

The Clay Ball Degradation study (PX185) ran tests on Beaumont Clay. The study contained charts showing that clay samples had shear strengths of 3.25 (PX185.0184) and 3.75 and 4.00 (PX185.0185) tons per square foot.

A shear strength chart appears in JX52 at JX52.0007. The Consistency of Cohesive Soils Chart on that page shows that soft materials have a shear strength of 0.125-0.25; firm materials 0.25-0.5; stiff materials 0.5-1.0; very stiff materials 1.0-2.0; and hard materials >2.0, all figures measured in tons per square foot.

Several samples in the Clay Ball Degradation Study (PX185) had shear strengths in excess of 2.0, and were in the "hard" category. PX185.0184 & 85. So, it would not be surprising that Renda would encounter "hard" clay in Section 7.

Dr. Mathewson testified to the effect of hard Beaumont Clay on a dredge cutter head, causing the cutter head to chatter, and slowing production. Trial Trans. at 1897.

Mr. Smith testified to his preparation of the REA and later certified claim for the Section 7 Clay claim. Mr. McCullough testified that his figure of $944,099.00 reflected all credits and reductions, and represented reasonable and necessary costs for the work. PX1863A.

**Obstructions No. 1**

The Obstructions No. 1 claim arose from damage to and down time for the Dredge Millennium from collisions with unanticipated and unknown obstructions in the Houston Ship Channel. The principal obstructions included a stern swivel and Conex box, both of which the Government has conceded are Type II differing site conditions. Renda is not seeking the cost for dredging trash and debris. Renda is seeking the cost of having to repair its dredging equipment, which resulted from collisions with unknown obstructions (other than trash and debris). Trial Trans. at 843.

As stated on direct at trial, Mr. Bowman conceded that he expected to encounter a reasonable amount of debris and trash in the ship channel. Since the channel had recently been maintenance

dredged, however, since it was against a host of regulations to throw trash and debris off of a vessel while in the channel, he did not expect to encounter much debris or trash. Further, it was Renda's understanding that the channel had recently been maintenance dredged, which would also reduce the amount of trash or debris reasonably expected to be encountered. Trial Trans. at 846.

Mr. McClenan testified that when a dredging contractor encounters a differing site condition in the dredging template, he should alert the Government and request that the Government direct the contractor as to what to do. Trial Trans. at 3362. Typically, when Mr. McClenan received a notice that Renda had hit another obstruction, Mr. McClenan would get a survey boat out to look at it, or have Mr. Russek go out and look at it. Trial Trans. at 3362.

Mr. McClenan stated that when a dredger encounters an obstruction, the Corps can handle it in a number of ways. Trial Trans. at 3363. Mr. McClenan testified that one way is to solicit a proposal from the dredging contractor for the removal of the unforeseen obstacle. Trial Trans. at 3363. Mr. McClenan testified that otherwise he could tell the contractor to skip it and the Corps would get someone else to remove it. Trial Trans. at 3363.

Mr. McClenan was not aware of any dredgers that have magnetometers or sidescan surveys on their dredges. Trial Trans. at 3363. Mr. McClenan did not expect Renda to have that sort of equipment on the Dredge Millennium for this Project. Trial Trans. at 3363.

By letter of May 30, 2000, Mr. Fisher reported a notice of differing site condition on the north side of the channel between Stations 530+00 and 540+00. JX53. Mr. Fisher reported "the remains of what was apparently a subsurface man-made slope protection consisting of limestone rock." JX53. Mr. Fisher also stated that "Our initial assessment of this area is that without advance mechanical removal of the slope protection, hydraulic dredging will not be possible." JX53.0002.

By letter of August 3, 2000, Mr. Bowman wrote to Mr. Benero to report again on the riprap and man-made slope protection between Stations 533+00 and 550+00. JX59. Mr. Bowman wrote that "As a result of the riprap, the dredge had to be moved to avoid further damage from the limestone rock." JX59.0002. Mr. Bowman also wrote that Renda had encountered a differing site condition between Stations 532+00 and 537+00 identified as riprap and man-made slope protection on the south side of the channel. JX59.0002.

When Renda met with Mr. Russek to discuss the status of the Project, Renda requested that the Corps provide direction regarding the north slope between Stations 530+00 and 550+00 where Renda had encountered riprap, slope protection and other debris, beyond that described in the contract. PX949.0002. Mr. Russek stated that a "sidescan of these two areas will be performed by the Corps to determine the magnitude of the debris." PX949.0002.

The Joint Venture documented the concerns. By memo of September 14, 2000, Wendell Mears wrote about the differing site condition involving the rubble on the north channel toe, between Stations 534+00 and 550+00. PX994. Mr. Mears noted that numerous discussions regarding methods to remove the debris, including using a barge mounted clam shell dredge and dragline working from the top of bank on the Cooper Industries property. PX994.0003. Mr. Mears then prepared meeting minutes to similar effect. PX997.

To push the Corps along, on September 22, 2000, Mr. Bowman wrote to Mr. McClenan to report on Renda's various notices of differing site conditions and the construction issues which had impeded progress on the Project. PX1006. Among the issues were the man-made slope protection and rubble material at the north channel slope of Section Nos. 5 and 6, generally located between Station Nos. 530+00 to 554+00. PX1006.0002.

Renda continued to report differing site conditions in the same general vicinity. By letter of October 20, 2000, Mr. Bowman wrote to Mr. McClenan to report a differing site condition styled as an unknown obstruction located at Station 580+00 on the north side of the channel, which could have been a Conex box. PX1027.

By letter of October 6, 2000, Mr. McClenan wrote to Mr. Bowman and requested that Renda provide a proposal for a change order to bring in a bucket dredge to remove riprap and debris. PX1018. By letter of October 18, 2000, Mr. Bowman wrote to Mr. Russek and provided preliminary pricing for what would become Change Order No. 5. JX62.

By letter of October 24, 2000, Mr. Bowman wrote to Mr. McClenan to report on another differing site condition, believed to be a 50-foot section of steel pipe, at approximate Station No. 575+00. JX63.

On October 27, 2000, the Corps issued Determination and Findings for Change Order 5. PX1545. In its Findings, the Corps noted that: "The issuance of an unpriced change order is necessary to stop the contractor from working at it's own risk by providing direction on the levees to be constructed and a method of payment for costs incurred." PX1545.0002. Change Order No. 5 is located at JX06.019.

With the issuance of Change Order 5, Renda entered into a Time Charter Agreement with Weeks Marine to bring in a bucket dredge. PX1056. The time charter agreement was for Weeks Marine to utilize a bucket dredge to remove the obstructions. Mr. Bowman testified that the cost was a flat fee of $500.00 per hour. Trial Trans. at 879-881.

By letter of November 15, 2000, Mr. Bowman wrote to Mr. Benero and reported on a number of differing site conditions which affected the design, construction, and completion of the Project,

including differing site conditions for rubble on the north channel slope in Sections 5 and 6, obstruction at Station 575+00 in Section 7, and an obstruction at Station 580+00 in Section 7. JX69.

By letter of November 16, 2000, Mr. Bowman wrote to Mr. McClenan to provide notice of a differing site condition at approximate Station 573+26 where the dredge struck an obstruction, which Renda believed to be a 30 to 40 foot section of steel pipe at an approximate depth of -47 feet MLT. JX71.

As part of the Corps' Lessons Learned exercise, Mr. Meyer sent an email to Mr. McClenan and noted that: "Significant amounts of debris have been encountered on both the Bayou contracts. On future new work jobs, we should make a concerted effort using sidescan, multifrequency, multi-beam, or whatever to try to identify as much as possible what debris is out there." PX1122.

Mr. McClenan admitted that he does not expect that a dredging contractor is going to have to damage his dredge to be able to clear a section. Trial Trans. at 3364. However, Mr. McClenan stated that the dredger was not going to be paid until the section is cleared. Trial Trans. at 3364.

Mr. McClenan testified that if you can identify in advance what the obstruction problems are, then you can save the Government money. Trial Trans. at 3374. Mr. McClenan also testified that if the contractor knows about the obstructions, then there is less chance that the contractor is going to damage the contractor's dredge. Trial Trans. at 3374.

By letter of November 13, 2000, Mr. McClenan wrote to Mr. Bowman and advised that the Corps considered Renda's differing site condition notices for rubble on the north channel slope in Sections 5 and 6, and the obstruction at Station 575+00 in Section 7, to have merit. PX1158. Mr. McClenan requested that Renda submit Requests for Equitable Adjustment for those notices. PX1158.0006. As stated by Mr. Bowman at trial, after reviewing PX 1182, he wished he'd have seen

it prior to undertaking the project. It made it clear to him that he would never have hydraulically dredged the upper reaches of the channel without first taking a bucket dredge and cleaning it out. Both Mr. Russek and Mr. Meyer concurred with him in this conclusion. Trial Trans. at 901.

By letter of November 13, 2000, Mr. Bowman wrote to Mr. McClenan and advised that Renda had discovered two new obstructions, which severely damaged the Millennium's underwater cutter head assembly and forced Renda to shut down its dredging operations. JX73.

By letter of December 20, 2000, Mr. Bowman wrote to Mr. McClenan to advise that Renda would be submitting a request for equitable adjustment for the obstructions. PX1175.0005.

By letter of December 20, 2000, Mr. Bowman wrote to Mr. McClenan to report another differing site condition at the south slope of the channel between Station Nos. 620+00 and 630+00 in the channel vicinity of the Oxy Chemical dock involving rubble or man-made riprap which intruded into the dredging prism. PX1176. Mr. Bowman reported that Renda had attempted to complete the dredging in the area twice with no success and that the differing site condition was similar to the problems encountered on the South Ferry Landing. Mr. Bowman requested that Government immediately investigate the condition prior to further disturbance and that Renda has pulled out of the area to continue dredging operations. PX1176.

By letter of December 21, 2000, Mr. McClenan wrote to Mr. Bowman concerning the differing site conditions consisting of unknown obstructions reported by Mr. Bowman in JX73. PX1178. Mr. McClenan observed that the obstructions "were not known to exist or shown on the contract drawings. The three obstructions referenced in your letter were included in the Notice - To Proceed modifications, CO-5 and CO-7, effective October 27, 2000 and November 17, 2000, respectively for debris removal by a bucket dredge along the north bank in the Sections 5 and 6."

PX1178.0001. Mr. McClenan also advised that the Government was considering the use of "magnetometer survey to investigate these obstructions and to determine the potential of other obstructions of the remaining channel reaches." Finally, Mr. McClenan wrote that "once you are able to resume production, you are instructed to avoid those locations where known obstructions exist." PX1178.0001.

Mr. McClenan testified at trial that if he knew that there were obstructions, he did not want the contractor dredging in the area. Trial Trans. at 3376. Mr. McClenan did not want the contractor dredging because the contractor might damage the contractor's dredge, and if the contractor damages the contractor's dredge, then the Government might face a claim. Trial Trans. at 3376.

On December 21, 2000, Mr. McClenan sent an email to Alan Jefts of the Joint Venture, requesting a magnetometer survey in the Houston Ship Channel between Stations 570+00 to 685+00 within the template of the new channel. PX1179.

A sidescan and magnetometer survey between Stations 570+00 to 685+00 was performed between January 7 and January 11, 2001. The Survey Report is PX1187 (DX542), while the graphical drawings are located at PX1182 (DX542A).

By letter of January 31, 2001, Mr. Bowman wrote to Mr. McClenan to report on two additional differing site condition obstructions located in the Houston Ship Channel. PX1221. Mr. Bowman advised that Renda could not complete dredging in the two areas until the obstruction was removed and that the condition may delay the orderly completion of the work. PX1221.0001.

By letter of March 7, 2001, Mr. Bowman wrote to Mr. McClenan to discuss the damages that the Dredge Millennium had sustained due to hitting numerous obstructions. Mr. Bowman wrote that "on December 11, 2000, the Dredge Millennium ceased dredging operations due to severe damage

caused by hitting numerous obstructions and man-made erosion control material (concrete, riprap, etc.) near the Oxy-Chemical dock area. As a result, dredging operations were delayed approximately 31 days for dredge repairs (not including three days for partial repairs and shake out), . . . ." JX76.0002.

On March 8, 2001, the Corps had a meeting with Renda concerning a number of issues. By email of March 9, 2001, Mr. Benero provided a recap of the prior day's meeting with Renda, and noted among other things that Renda would be submitting a claim for down time of the Dredge Millennium due to obstructions encountered in the channels in this contract. PX1315.

After encountering the immovable objects in the channel, the seals and ring gear in the cutter head assembly were damaged, which essentially destroyed the cutter head. Trial Trans. at 904. They took the cutter head to a 24 hour machine shop and broke it down to begin repairs. Because some parts had to be obtained, the dredge was down 31 days due to the damage to the cutterhead. Trial Trans. at 905.

As Mr. McClenan had requested, Renda submitted a request for equitable adjustment for the Obstructions No. 1 claim. PX4.001. By letter of April 25, 2001, Mr. McClenan forwarded to Mr. Jefts copies of Renda's Obstructions No. 1 claim (with two others) and requested an independent review and analysis. PX1409.

On about May 24, 2001, Renda prepared an agenda for a meeting with the Corps. PX1481. Among the issues listed was "VIII Obstruction REA," which noted that the Corps had been notified of over six obstructions in the channel for Sections 5 through 8, and queried: "Why can't COE respond whether merit exists for this REA?" PX1481.0002.

On about June 11, 2001, Renda submitted Revision No. 1 for its Obstructions No. 1 Claim. PX4.002.

When the Corps still did not respond, on August 9, 2001, Mr. Bowman wrote to Mr. Benero and resubmitted Renda's REA as a certified claim for the Obstructions No. 1 issue. JX86.

When Renda persisted, Mr. McClenan finally declared merit for the Obstructions No. 1 claim. PX1573, PX1576, and JX90.

Mr. Smith testified to his preparation of the REA and certified claim for the Obstructions No. 1 issue. Mr. McCullough testified that his calculation of $1,531,822.00 reflected appropriate reductions, and represented the reasonable and necessary costs for the claim. PX1863A.

**<u>Obstructions No. 2 (Section 9)</u>**

The Obstructions No. 2 or Section 9 claim arose from Renda's having encountered obstructions, and excessive trash and debris in Dredge Section 9 of the Project. The claim seeks to recover for the cost of repairs to the Dredge Millennium, and for downtime and standby while the Corps unreasonably refused to release the Millennium from the Project and essentially held the dredge and Renda's equipment hostage.

Long before Renda reached Section 9, Renda alerted the Corps to the prospects of that section containing an unreasonable amount of debris. On August 7, 2000, Eric Russek visited Lost Lake and met with Steve Bowman and others. At that meeting, Renda identified the flare in Section 9, between approximate Station 658+00 and 663+00 as a second area containing debris beyond that described in the contract. Mr. Russek advised Renda that a sidescan of these two areas will be performed by the Corps to determine the magnitude of the debris. PX951.0002.

The obstruction and debris survey was not performed until January 2001. On January 24, 2001, the Joint Venture transmitted its survey report for magnetometer and sidescan surveys to the Corps. DX542 (PX1187). The graphics for the sidescan and magnetometer surveys are located at DX542A and PX1182.

At trial, Mr. McClenan testified that Mr. Russek did not write back to Renda and advise that it would be five or six months until the Corps had performed the sidescan survey. Trial Trans. at 3330.

The survey report and the graphics indicated significant debris fields and obstructions in Section 9. Renda began dredging in Section 9 on about February 9, 2001. JX09.520. Dredging in Section 9 continued until about February 18, 2001. JX09.529. By then, Renda had discovered that Section 9 contained so much trash, debris, and obstructions, that dredging with a cutter head dredge was not practical.

Nevertheless, Renda was under pressure to dredge in Section 9. At a meeting between the Corps and the Joint Venture on February 6, 2001, the Corps and the Joint Venture reached a consensus on if and when to terminate Renda for default. By email of February 7, 2001, Mr. Krueger summarized the points on which there was consensus at the prior day's meeting, which included: (1) Renda would be allowed to perform dredging in Section 9; and (2) if Renda could not perform the dredging in Section 9, termination would be finalized. PX1260.

By letter of March 7, 2001, Mr. Bowman wrote to Mr. McClenan and attempted to negotiate the deletion of Section 9 from the contract. JX76. Mr. Bowman pointed out that little or no clay was available for building levees at Lost Lake, the area was full of trash and obstructions, and the plug

between dredge Station Nos. 650+00 and 658+00 would not allow deeper draft vessels to enter Section 9, even if it was dredged to -48 feet as specified in the contract. JX76.0002-03.

By email of March 9, 2001, Mr. Benero provided a recap of the prior day's meeting with Renda including, among other things, Renda's request for a partial termination for convenience on the remaining levees and Section 9 of the Project. PX1317.

By letter of March 12, 2001, Mr. Benero wrote to Renda and directed Renda to continue hydraulically placing all remaining suitable material from the channel dredging into construction of the west and north levees. PX1323.

In response, by letter of March 13, 2001, Mr. Bowman wrote to Mr. Benero and advised that the completion of dredge Section 9 in its present state was not practical. PX1326.

The same day, March 13, 2001, Mr. Bowman wrote another letter to Mr. Benero reiterating Renda's request that the remainder of dredge Section 9 be removed from the contract. PX1327. Mr. Bowman noted that the Joint Venture's magnetometer study revealed that dredge Section 9 contained an unreasonable quantity of trash, making the area unsuitable for further dredging by a hydraulic, cutter head dredge. Mr. Bowman noted that due to damages to the dredge and booster pump, caused solely by inordinate amounts of trash, Renda did not intend to return the area with the Dredge Millennium. Mr. Bowman again requested that the Government issue a partial termination for convenience for dredge Section 9 due to excessive trash or issue a modification to remove the trash with a bucket dredge and then complete the remainder of the dredging with a hydraulic dredge. PX1327.0003.

By email of March 20, 2001, Mr. Russek wrote to Mr. Benero and Mr. McClenan concerning the use of a bucket dredge to remove debris on the north and south sides of Section 9. PX1342.

Mr. Russek indicated that the modification could easily reach or even exceed one million dollars if any and all the contingencies are included.

By letter of March 23, 2001, Mr. Bowman wrote to Mr. Benero to recap the discussions during a meeting on February 20, 2001, between Renda and the Corps. PX1352. Among the issues was deletion of dredge Section 9 from the contract. PX1352.0002.

By letter of March 29, 2001, Mr. Benero wrote to Mr. Bowman to provide a summary of the meeting between the Corps and Renda on March 22, 2001. PX1361. Mr. Benero directed Renda to continue dredging Section 9 until complete. Mr. Benero noted that despite the large debris fields, confirmed by the Joint Venture's magnetometer and sidescan survey and Renda's initial attempt at dredging Section 9, Renda was not to jeopardize damaging the Dredge Millennium by attempting to remove excessive debris, trash or obstructions. PX1361.0001.

The same day, March 29, 2001, Mr. Bowman wrote to Mr. Benero also confirming the discussions during the March 22, 2001, meeting. PX1362. Mr. Bowman recapped Renda's proposed three likely scenarios for completing the dredging in Section 9 including removal of the remainder of the dredge Section 9 for convenience of the Government, the issuance of a modification to have the remaining parts of Section 9 dredged with a bucket dredge, and an attempt by the Millennium to dredge the remaining portions of Section 9 until the dredge encountered unreasonable quantities of trash, tires, rubbish, wire, etc. PX1362.0001-02. Mr. Bowman finally noted that since the Government wanted Renda to complete all the dredging work, Renda was planning to proceed with the dredging work in Section 9 as soon as work was completed at the north slopes of dredge Sections 5 and 6. PX1362.0002.

At trial, Mr. McClenan testified that he was not sure how Renda was supposed to not jeopardize damaging the Dredge Millennium while dredging in Section 9. Trial Trans. at 3336.

Renda resumed dredging in Section 9 on about April 10, 2001. JX09.580. Renda continued dredging in Section 9 until April 16, 2001, when the dredge was introduced to the mooring buoy. JX09.586.

By letter of April 14, 2001, Mr. Bowman wrote to Mr. Benero to report on the trash and obstructions that Renda had so far encountered in Section 9. PX1385. Mr. Bowman noted that since beginning dredging the northern reach of Section 9, Renda has encountered a large quantity of trash (wire, rope, tires, etc.), which plugged the booster barge pump and rendered the dredge non-effective for eight hours on Wednesday, April 11, and six hours on Thursday, April 12, 2001. PX1385.0001-02. Mr. Bowman noted that the dredge hit another obstruction near Station 662+51 at a depth of 45 feet and that the unexpected obstruction was struck full force by the cutterhead assembly, which may have been seriously damaged. PX1385.0002. Mr. Bowman reported that Section 9 had turned out to be a "trash pit" or "junk yard" requiring extraordinary efforts to clear. PX1385.0002. Mr. Bowman indicated that Renda would like to complete the work, as specified, but was very concerned that continued dredging in Section 9 will continue to damage the equipment, forcing unanticipated repairs, down time, and additional costs. Mr. Bowman again requested that the Government not require Renda to further jeopardize the dredge working in Section 9. Mr. Bowman concluded by again requesting that the contracting officer delete the remainder of the work in Section 9, or proceed with the remaining work with a bucket dredge. Mr. Bowman requested that the Government reasonably assess the risk to Renda's dredge of continued dredging in Section 9 when

the Government has already acknowledged that the work in the area should not be performed by a hydraulic dredge. PX1385.0004.

By letter of April 16, 2001, Mr. Bowman wrote to Mr. Benero to report that the Dredge Millennium had again struck another obstruction at approximately Station 670+00 (just inside the "debris field" identified by the Joint Venture survey), which knocked the dredge out of action. PX1390. Mr. Bowman reported that Renda retrieved the obstruction, which turned out to be a five foot diameter by 15 foot long mooring buoy with anchor chain attached. Mr. Bowman restated his belief that this portion of the channel was a junk yard and trash pit. Mr. Bowman wrote that it was time for all parties to admit that Section 9 would require other efforts at dredging, other than the Millennium. PX1390.0002.

By email of April 16, 2001, Mr. Benero wrote to Mr. McClenan and others concerning Renda's encountering obstructions and excessive trash in Section 9, including the mooring buoy. PX1394. Mr. Benero noted that the mooring buoy was underwater and no one was aware this buoy was there. Mr. Benero stated that he believed that enough was enough and that the Corps has gone about as far as the Corps can go with Renda under this contract in Section 9. Mr. Benero wrote that he considered it to be unreasonable to direct Renda to continue working in Section 9, and that enough damage has been done to Renda's equipment. Mr. Benero concluded that this is more than any contractor should have reasonably expected under this contract. PX1394.

At trial, Mr. McClenan testified that the Government certainly did not tell Renda that this amount of debris would be in Section 9. Mr. McClenan admitted that if the Government knew about it, the Government would have told Renda. So both parties did not know about the unanticipated obstructions and debris. Trial Trans. at 3342.

By email of April 17, 2001, Mr. Mears sent to Mr. McClenan photographs of the mooring buoy and the Millennium's damaged lower cutter drive assembly. DX568.

By email of April 23, 2001, Mr. Russek wrote to Mr. McClenan listing two options to complete Section 9: deleting the Section 9 work, and including it in another contract with the plug between Sections 8 and 9; or continuing with the Section 9 work with a bucket dredge. PX1398.

By email of April 23, 2001, Mr. Russek sent photographs of the mooring buoy and other trash from Section 9 to Mr. McClenan. PX1402.

Mr. McClenan testified at trial that if Section 9 was deleted, it could be included in another contract with the plug between Sections 8 and 9. Trial Trans. at 3344. Mr. McClenan testified that the Corps had to have another contract to complete the plug, the area between Stations 650 and 658. Trial Trans. at 3344. Mr. McClenan testified that as long as another contractor was coming back to complete the plug, they could do Section 9 with a bucket dredge. Trial Trans. at 3344.

(In fact, that is what happened. When the Corps solicited bids for the Mid Bayou/Goat Island Project, the Corps had the contractor remove the plug between Stations 650+00 and 658+00, and complete the remainder of Section 9. PX1751.0013.)

By letter of April 24, 2001, Mr. Bowman wrote to Mr. Benero to request demobilization of the Dredge Millennium from the Project to pursue work at another private project in the immediate area. PX1404. Mr. Bowman wrote that he believed that demobilization was a reasonable approach to mitigating project damages, i.e., standby time for the dredge, related to excessive trash and debris in Section 9, while the Government decides whether or not to delete the remainder of Section 9 work from the contract or to pursue removal of the debris with a bucket dredge, prior to completing the work with a hydraulic dredge. PX1404.

By letter of April 24, 2001, Mr. Bowman wrote to Mr. Benero to report on the current status of outstanding issues related to the Project. PX1405. Concerning Section 9, Mr. Bowman wrote that on April 16, 2001, following obstructions damaging the dredge, Renda requested that the Contracting Officer delete the remainder of Section 9 dredging operations from the contract. Mr. Bowman stated that Renda was awaiting direction from the Government and a response to Renda's April 16, 2001, letter (PX1390). Mr. Bowman concluded that to mitigate any additional damages due to delays in Section 9, Renda intended to demobilize its dredge to another project to perform private work. PX1405.0003.

On April 26, 2001, the Corps, Renda, and Joint Venture had a meeting concerning Section 9, among other things. At the meeting, Mr. McClenan summarized the options he was evaluating as follows: delete the remainder of Section 9, completing the levees; direct completion of Section 9 and the levees; and delete the remainder of Section 9 and the remaining levees. PX1413.

By letter of April 30, 2001, Mr. Bowman wrote to Mr. McClenan concerning the April 26, 2001, conference. PX1415. Mr. Bowman vociferously objected to Mr. McClenan's indication that the Government wanted Renda to proceed with and complete the work in dredge Section 9, proceed with and complete the levee construction, and then request reimbursement of appropriate costs. PX1415.0001. Mr. Bowman confirmed Mr. McClenan's five options: (1) the Government could terminate the contract for default; (2) the Government could terminate the contract for convenience; (3) the Government could delete the remainder of the work, both levee construction and Section 9 dredging, from the contract; (4) the Government could delete the remaining work in dredge Section 9 from the contract and complete the levee construction; and (5) the Government could direct the contractor proceed with the remaining dredge and levy construction work, irrespective of the currently

identified issues. PX1415.0003. Mr. Bowman noted that Renda preferred option 4, with the Government deleting the remaining work in Section 9. PX1415.0004

By letter of May 1, 2001, Mr. Bowman wrote to Mr. Benero and advised that Renda believed it was appropriate for the Government to stop charging Renda contract days for the project since no further contract work could be performed in Section 9 without a modification to clear the debris field and obstructions. PX1419.

On about May 4, 2001, the Corps issued Change Order 9, which suspended dredging for at least 30 days, but not exceeding 60 days, to allow Renda to dredge approximately 250,000 cubic yards of virgin material from the Houston Fuel Oil Terminal and use the clay to construct the west levees at Lost Lake. JX06.026.

By letter of May 17, 2001, Mr. Bowman wrote to Mr. McClenan concerning Change Order 9 and Renda's concern that the Government had simply suspended the contract dredging, and not deleted the remainder of Section 9 from the contract. JX81. Mr .Bowman pointed out that it was unreasonable for the Government to hold Renda's dredge "hostage" to the contract if the Government did not intend on proceeding with work in Section 9.

On about May 24, 2001, Renda prepared an agenda for a meeting with the Corps concerning Section 9. PX1481. In this agenda, Renda noted two concerns about Section 9: (A) status of deletion of remaining work, or Renda to perform with bucket dredge; and (B) problems with scheduling of bucket dredge - need time. PX1481.0002.

By letter of June 1, 2001, Mr. Bowman wrote to Mr. Benero regarding Renda's May 1, 2001, request that Renda's retention be reduced and that the Government cease withholding liquidated damages. JX83. Mr. Bowman stated that he had been informed after May 1, 2001, that no liquidated

damages were being withheld and that retention was adequate. Mr. Bowman reported that at a meeting with the Government on May 24, 2001, Renda was informed that Mr. Benero had decided to delete the remainder of the dredging work from the contract, i.e., work remaining in Section 9. Mr. Bowman noted that in effect, the Government's actions completed Renda's contract dredging work and that there was no additional levee-building material available under the contract to complete the levees as designed. JX83.0001.

That same day, June 1, 2001, Mr. Curtis Cole wrote to Mr. Bowman and confirmed the deletion of the remaining portion of Section 9 from the contract. PX1499.

By letter of June 19, 2001, Mr. Bowman wrote to Mr. Benero to stimulate a decision concerning the completion of the levees. PX1525. Mr. Bowman noted that his May 17, 2001, letter (JX81), advised that the dredge work remaining in Section 9 remained in limbo awaiting a Government decision. PX1525.0002. Mr. Bowman stated that although the decision to delete Section 9 finally came on June 4, 2001, the levee construction issues had supplanted the Section 9 decision. PX1525.0003. Mr. Bowman stated that following completion of private source work, Renda's equipment would go on standby until such time as (1) the Government makes a decision regarding the remaining contract levee work, or (2) the Government releases Renda's equipment from the Contract, thereby allowing Renda to pursue additional work, or (3) the Government terminates the Contract for convenience, or (4) Renda is able to obtain additional work; whichever item occurs first. PX1525.0003. Mr. Bowman then attached a listing for Daily Standby Cost for Renda's equipment and personnel. Mr. Bowman noted that the Daily Standby Cost currently stood at $54,485, and that Renda would seek compensation for the Government's failure to provide timely direction. Mr. Bowman concluded: **WHAT DO YOU WANT US TO DO?** PX1525.0004.

By letter of June 20, 2001, Mr. Bowman wrote to Mr. Benero concerning the current status of outstanding issues related to the Project. PX1526. Concerning Section 9, Mr. Bowman wrote that the Request for Equitable Adjustment for damages was associated with obstructions encountered in Section 9. Mr .Bowman stated that the Government requested, over Renda's strenuous objections, that Renda proceed with dredging in Section 9, knowing full well that a debris field and extensive trash existed in the area which ultimately damaged Renda's dredge. PX1526.0004.

By letter of July 23, 2001, Mr. McClenan wrote to Mr. Benero to advise that "there will be no further requirements for the use of a hydraulic dredge under this contract." PX1547.

By letter of August 9, 2001, Mr. Bowman wrote to Mr. Benero to resubmit Renda's REA for damages and delays related to obstructions in Section 9 as a certified claim. JX87. Renda's REA for Section 9 damages is PX5.

At trial, Mr. McClenan did not take issue with what Mr. Benero had written about Section 9 just simply not being suitable for a cutter head dredge. Trial Trans. at 3349. Mr. McClenan agreed that since Renda could not dredge in Section 9, and there was no more hydraulic material to be placed on the levees, it was time to delete the remainder of the work. Trial Trans. at 3349.

Mr. McClenan stated that if Section 9 was deleted that meant that Renda would not be paid the contract unit price for the materials not dredged. Trial Trans. at 3350. Mr. McClenan testified that the deletion of Section 9 meant that as one option a bucket dredge would have to be brought in to clean up Section 9. Trial Trans. at 3350. Mr. McClenan testified that that would not happen at Renda's expense and that the Government would simply add Section 9 and the plug between 650 and 658 to another contract. Trial Trans. at 3350-51.

Mr. McClenan testified that when the Government decided to delete the remaining work in Section 9, the Government was not faulting Renda. Trial Trans. at 3352. Mr. McClenan testified that there were obstructions sufficient that Renda could not be expected to dredge in Section 9. Trial Trans. at 3352.

However, simply deleting Section 9 did not release the dredge or Renda from the Project. The Corps could still require Renda to mine clay or dredge clay from another source to construct the levees. Mr. McClenan testified that simply because Mr. Curtis Cole had deleted Section 9 did not mean that Renda's dredge was free to go. Trial Trans. at 3270. Mr. McClenan testified that between June 1 and July 23, 2001, Renda was still on the hook for needing a dredge for the Project. Trial Trans. at 3270.

However, the Corps did not issue a modification releasing Renda before Mr. McClenan's letter of July 23, 2001 (PX1547). Trial Trans. at 3270. Mr. McClenan testified that his July 23, 2001, letter (PX1547) was not a modification. Trial Trans. at 3271. Mr. McClenan acknowledged that he did not have the authority himself to terminate Renda for convenience – that would require Mr. Benero. Trial Trans. at 3271.

Mr. McClenan testified that if the Government wanted Renda to complete the levees hydraulically, Renda would have needed a dredge. Trial Trans. at 3273. Mr. McClenan admitted that if he or Mr. Benero had wanted Renda to take their dredge and go home, Mr. McClenan could have written a letter on June 20, 2001, right after Mr. McClenan got Mr. Bowman's June 19, 2001 letter. (PX1525). Trial Trans. at 3273. Mr. McClenan admitted that he could have written a letter like PX1547 releasing the dredge in April or May 2001. Trial Trans. at 3274.

Mr. McClenan testified that Change Order 11, JX06.028, was intended to delete all remaining dredging and levee work in the contract. Trial Trans. at 3275. Mr. McClenan testified that when his office prepared Change Order 11, it was intended to delete the remaining work because there were obstacles in front of the contractor that the contractor could not overcome. Trial Trans. at 3278.

Mr. Smith testified at trial about his preparation of the REA and certified claim for Obstructions No. 2. Mr. McCullough testified that $801,036.00 was the proper figure for the claim and reflected appropriate reductions from the original claim amount. Mr. McCullough testified that the costs were reasonable and necessary. Trial Trans. at 2443.

**South Ferry Landing**

[Measured Mile Days: 4/3-5/00; 4/7-13/00]

[Impact Days: 4/14, 4/21-5/4/00; 5/14-17/00]

The South Ferry Landing claim seeks recovery for Renda's incurring extra time and expense and equipment repairs for encountering unanticipated rubble and riprap within the dredge template at or near the South Ferry Landing on the Project. Renda had notified the Government about the problem, and lost significant time while waiting for the Government to respond. The Government never did respond with any direction. A discussion of the pertinent exhibits follows.

There should not have been any rubble or riprap at the South Ferry Landing. Mr. Bowman testified that a visual inspection did not reveal anything that should have put Renda on notice that shore protection might extend into the dredging template. Certainly there was nothing in the contract documents to indicate the presence of such rubble in the dredging template. While the documents did warn the contractor to be "careful", it did not warn of what to be careful. Trial Trans. at 373-375 & 416. Mr. McClenan admitted that if someone wants to place a structure in navigable waters, they

have to get a permit from the Corps. Trial Trans at 3401. Plaintiff's Exhibit 175 is an illustrative Department of Army permit for the placing of revetment along a navigable water. Trial Trans. at 3401. Mr. McClenan admitted that PX175 is the sort of permit one has to get if they want to place an obstruction in navigable waters. Trial Trans. at 3401. Mr. McClenan stated that the permit process allows the Corps to have a record of the sorts of obstructions that are placed in navigable waters. Trial Trans. at 3401.

Plaintiff's Exhibit 299 documents a meeting between the Corps and Henry Jackson, superintendent for the Lynchburg Ferry, to have Mr. Jackson review the Corps' plans concerning the Lynchburg Ferry. Trial Trans. at 3409. Mr. McClenan admitted that if Mr. Jackson did not know and the Government did not know then the information would not appear on the plans. Trial Trans. at 3410.

Mr. McClenan admitted that typically when the Government knows that there is going to be riprap or rubble in the dredge template, then the Government will put information about the obstructions in the specifications. Trial Trans. at 3412. Mr. McClenan stated that the Government would provide direction to the Contractor about what to do with such intrusions. Trial Trans. at 3412.

By January 6, 2000, Renda had completed the entire north half of the channel from the Lynchburg Ferry upstream to near the Battleship Texas, except for some minor sweeping. PX691.

Mr. McClenan admitted that he did not see any riprap or rubble shown in the plans at the South Ferry Landing. Trial Trans. at 3414. Mr. McClenan admitted that he knew that Renda had hit concrete riprap even before Renda formally turned in a notice of differing site condition. Trial Trans. at 3417. In the Project Coordination Team meeting for April 20, 2000 (attended by Mr. McClenan), the minutes reported that the Dredge Millennium ran into debris at the South Ferry Landing and shut

down to clear the cutter head last Friday. PX840.0002. Mr. McClenan then authored an email to Mr. Kohler and the district engineer reporting on Renda's unsuccessful attempt to dredge at the South Ferry Landing "because they encountered so much concrete riprap (large blocks of broken concrete)." PX 846. Trial Trans. at 3418.

Finally, on April 28, 2000, when the Corps had done nothing concerning the riprap and rubble at the South Ferry Landing, Mr. Fisher wrote to Mr. McClenan to provide a notice of the differing site condition. JX50. Mr. Fisher wrote that "we have attempted to dredge this area on five different occasions and progress has been extremely slow. We still have not completed this small stretch and are scheduled to move back into the area again this weekend. At this point the differing site condition has cost us portions of five days and this will increase as we move back into the area as we try to complete this section. If you do not wish to dredge this area, please notify us, otherwise we must continue to try and complete the area, as it is one of the last areas remaining to be dredge in Section Number 1 that we are trying to have ready for acceptance surveys next week." JX50.0002.

Mr. McClenan admitted that if he did not want Mr. Fisher to continue trying to dredge around South Ferry Landing, he would have written back to Mr. Fisher. Trial Trans. at 3421. Mr. McClenan also acknowledged that if he had wanted Mr. Fisher to stop so that the Corps could investigate, Mr. McClenan would have written back to say stop, let's go investigate. Trial Trans. at 3421.

If fact, Mr. McClenan admitted that no one from the Corps gave Renda any guidance as to what Renda was supposed to do concerning the South Ferry Landing. Trial Trans. at 3422.

By letter of May 3, 2000, Mr. Fisher wrote to Mr. Benero and reported that "during the April 20 to May 20 period, we have encountered a differing site condition at the South Ferry Landing, which to date has delayed work portions of six days." JX51.0003. This letter highlights the threat

of default termination that Renda faced. Under such threat, Renda had to do something about completing the South Ferry Landing if the Government would not provide direction.

That same day, Alton Meyer sent an email to Mr. McClenan reporting that Mr. Meyer had two phone conversations with Leo Herrera, who verified Eddie's comment about running into a lot of piling and riprap on the south side of the channel. PX857. Mr. Meyer also wrote that he had "stated that we would try to survey the area on Monday using sidescan sonar so that both the Govt and the Contractor could get a better handle on what and how much is out there." In the second email in the exhibit, Mr. Fisher wrote to Mr. Meyer that Mr. Fisher had "notified Mike last week that we ran into underground obstructions at the South Ferry Landing, mainly riprap." PX857.

Mr. McClenan admitted that if he had wanted Renda to stop work so that Renda would not disturb what was there, Mr. McClenan would have written Renda a letter. Trial Trans. at 3424. Mr. McClenan admitted that he did not write a letter to Renda saying please stop work. Trial Trans. at 3424.

Mr. McClenan acknowledged that when the Government did not respond, Renda had to do something concerning the South Ferry Landing, either continue work or avoid the area. Trial Trans. at 3424. In fact, Mr. McClenan stated that the Government wanted Renda to continue dredging at the South Ferry Landing. Trial Trans. at 3424.

Mr. McClenan acknowledged that Renda was under a threat of default termination at the time. Trial Trans. at 3425. Mr. McClenan stated that if Renda did not maintain schedule, Renda would be in trouble. Trial Trans. at 3425.

Renda lost time while waiting for the Government to investigate the rubble and riprap. When the Government failed to respond in a timely manner, Renda notified Mr. McClenan that Renda

would proceed with the dredging unless directed to stop. Mr. McClenan did not direct Renda to stop. In fact, Mr. McClenan wanted Renda to proceed forward. Renda continued dredging, and damaged its pump and other equipment.

Mr. Smith testified about his preparation of Renda's costs and expenses, and his preparation of Renda's claim. Mr. McCullough testified that based on all credits and reductions, the South Ferry Landing claim totaled $839,657.00, a figure that reflected reasonable and necessary costs. PX1863A.

**HL&P Tower Claim**

[Impact Days: 7/16-17/00 and 10/16-17/00]

Prior to trial, at the court's direction, the Plaintiff briefed and presented its position with regard to the HL&P Claim in Plaintiff's Memorandum Brief, filed on February 24, 2005. As is set out in said brief, the Corps of Engineers (the "Corps") had an affirmative duty not to undertake any activity that would hinder Plaintiff in the performance of the contract in question, and that the Corps had an affirmative duty to do whatever was necessary to enable Plaintiff's performance. Thus, the issuance by the Corps of a permit to HL&P to erect and improve an electrical tower in the area where Plaintiff was conducting operations in performance of the contract operated as a constructive change, entitling Plaintiff to an equitable adjustment for costs and expenses incurred as a result of the constructive change.

The testimony at trial from Mr. Bowman (Trial Trans. at 1064-1077), Mr. McCullough (Trial Trans. at 2436-2439) and Mr. Goodloe (Trial Trans. at 2753-2757) made it clear that the HL&P

operation was an impermissible hindrance to Plaintiff's performance.[6] The cost to Plaintiff was quantified as $159,353.00 as testified to at trial by Mr. Robert McCullough. Trial Trans. at 2436-2439.

The HL&P Tower claim concerns the construction by HL&P (or Reliant Energy) of an electrical tower and appurtenances at Lost Lake, disrupting Renda's dredging operations on two occasions. There was no mention of HL&P's work in the contract documents, and Renda did not anticipate any such disruption. The Corps knew or should have known that HL&P would be performing the work during the Project since the Corps knew in advance of the Project that HL&P would have to replace one tower in the water with one on Lost Lake dry land.

As testified to at trial by Mr. Bowman, Houston Light & Power ("HL&P") appeared, unannounced, and began constructing a tower at the Lost Lake Placement Facility, at or near station 117+00. This was also where the dredge discharge line came ashore at Lost Lake. There was nothing in the contract documents that indicated that this work would be undertaken, and HL&P insisted that the discharge line be moved, because it was in the way of the sheet pile structure that was being installed. Trial Trans. at 1064-1067.

As Ben Goodloe testified, it was not a situation where there were just a few workers from HL&P. They had an entire crew and heavy equipment on the scene, and were ready to proceed. Trial Trans. at 2757. As Mr. Bowman further pointed out during his direct testimony, Renda had to shut their entire operation down, move the pipe, and move their underwater crossing back to Old River.

---

[6]For cases discussing the impropriety of such a hindrance and the Plaintiff's entitlement to damages, *see e.g., Essex Electro Engineers, Inc. v. Danzig*, 224 F 3d. 1283, 1291 (Fed. Cir. 2000); *George A. Fuller Co. v. United States,* 108 Ct. Cl. 70, 69 F. Supp. 409, 411 (1947); *CEMS v. United States,*59 Fed. Cl. 168, 194-95 (2003).

They verbally informed the Corps, and later followed it up with a letter, but received no guidance or direction from Mr. McClenan. Trial Trans. at 1070-1071.

Well before the bids were solicited for the Project, by email of April 21, 1998, Dalton Krueger (Corps' Project Manager) wrote to Casey Cutler to report on an April 16, 1998, meeting with the Port of Houston Authority and numerous Corps personnel. PX358. Mr. Krueger wrote that it was agreed at the meeting that all power lines which cross the Houston Ship Channel were in violation today, and it would not make any difference if the widening and deepening project was built. Mr. Krueger stated that the decision to get the power lines in compliance with the Coast Guard regulations should be handled under the permit process, and not in connection with the Houston-Galveston Navigation Channel project. PX358.

HL&P had power lines that crossed the Houston Ship Channel. In fact, Mr. Hasen of HVJ reported on a power transmission tower inside Lost Lake by email of January 13, 1998. PX316.

As reported by Mr. Krueger, HL&P proceeded under the Corps' permit process to upgrade its transmission towers and power system. HL&P submitted an Application for Department of Army Permit to relocate the transmission tower in the water 350 feet to the east on to Lost Lake. JX31.

HL&P later decided to request permission to abandon its water borne tower, and leave it in place. DX369. On April 13, 1999, the Corps issued a Letter of Permission to allow HL&P to leave its water borne tower in place. DX373.

By letter of October 16, 2000, HL&P wrote to Renda's Ben Goodloe confirming that Renda would move its dredge disposal line to accommodate HL&P's work on its transmission tower. PX1023.

By letter of October 18, 2000, Mr. Bowman wrote to Mr. McClenan to notify the Corps of the changed condition caused by HL&P. PX1026. Mr. Bowman advised Mr. McClenan that this was the second time that HL&P had interfered with and delayed Renda, and that Renda would compile its costs and forward them to the Corps.

By letter of October 30, 2000, Mr. McClenan responded that the HL&P Transmission tower was identified in the contract documents, and Renda's pipeline relocation costs were not the Government's responsibility. PX1058.

By letter of October 31, 2000, Mr. Bowman wrote to Mr. McClenan to advise that HL&P had constructed a "new" tower not identified, located, or alluded to in the contract documents. JX65. Mr. Bowman provided further explanation of the situation and stressed that Renda was not responsible for delays associated with work not shown on or in the Contract Documents.

After Renda received the Show Cause Notice, Mr. Bowman responded by letter of November 15, 2000, indicating that the Contracting Officer had not considered the delays caused by the HL&P interference. JX69.0003.

By letter of December 13, 2000, Mr. McClenan responded, acknowledging that the contract drawings do not identify a "new" or "second" electrical transmission tower to be constructed at Lost Lake, and that HL&P failed to coordinate with the Government with respect to the tower. PX1158.0003. Mr. McClenan concluded that the issue had merit, and directed Renda to submit a request for equitable adjustment.

Renda submitted an REA for the HL&P Tower claim (PX2.001), and later a certified claim (PX2.002).

Mr. McClenan admitted at trial that the plans and specifications did not indicate that a new tower was going to be located at Lost Lake. Trial Trans. at 3426. Mr. McClenan admitted that he did not know of any reason why Renda should have known before the project started that HL&P was going to put another tower out at Lost Lake. Trial Trans. at 3426. Mr. McClenan did know that there was a permit process going on to have HL&P empowered to put another tower out at Lost Lake. Trial Trans. at 3426.

On August 28, 2001, Mr. Bowman wrote to Mr. McClenan and Mr. Benero and confirmed that Mr. McClenan had affirmed merit for the HL&P Tower claim. JX90. Trial Trans. at 3400. Mr. McClenan stated that when he declares merit for a claim, it is based on his having analyzed the conditions surrounding the incident, the plans, specifications, correspondence, and daily reports. Trial Trans. at 3400.

At trial, Mr. Smith testified to his preparation of the REA and certified claim. Mr. McCullough testified that he had reduced the claim to $159,353.00 to reflect appropriate credits and reductions, and that that figure represented the reasonable and necessary costs for the claim. PX1863A.

**<u>Levee Realignment</u>**

The Levee Realignment claim principally concerns the extra costs that Renda incurred to realign the west levees. Although the money that this issue seeks has been combined with the Levee DSC claim, the factual basis is significant enough for this separate discussion.

The drawings for the Project (JX05.014) contain coordinates for the location of the hydraulic levees at Lost Lake. The coordinates use global positioning system information. For the west levees, the coordinates in the drawings required Renda to embark on a path that strayed significantly from

the existing levee and into what Mr. Bowman described as no man's land. With the new hydraulic levees separated from the existing levee, displacement of the soft foundations created mud waves on both sides of the new levee.

By letter of July 28, 2000, Pat Duke wrote to Mr. Russek to follow up on the their conversation about the levee straying too far to the east of the existing old levee. PX926. Mr. Duke wrote that the new levee placement was causing mud to be displaced to the west in a mud wave that will go over the old levee and into the Old River. Mr. Duke wrote that it seemed that the proper thing to do was to construct the new levee so that the toe of the new levee would be against the old levee, thus using the old levee as a berm to support the new levee and also keeping the mud wave to the inside of the new levee, and not pushing it over the old levee. PX926.

On August 7, 2000, Mike McClenan, Tim Few, and Eric Russek met with Steve Bowman, Ken Machacek, Rudy Renda, Jr., Pat Duke, Burson Warren, and others of Renda Marine, and Mr. Smith at the Project site. PX949. In a memo of August 8, 2000, Mr. Russek wrote that the purpose of the meeting was to observe and verify the alignment of the levee centerline in this area relative to the contract drawings. Mr. Russek noted that the areas visited included the west levee between approximate levee stations 182+00 and 186+50. Mr. Russek concluded that the contractor would be directed to forego use of the alignment shown in the drawings (both on plan and the cross sections) and place future material closer to the existing levee, based on the observed location of the outside edge of the grated top of levee used for hauling. PX949.0001.

Mr. McClenan testified that he attended the August 7, 2000, meeting, and provided the verbal direction to realignment the west levee. Trial Trans. at 3301 and 3304. Mr. McClenan testified that if the Bay Area office was making a change, it was best for the contractor to have something from

Mr. McClenan in writing about what the change was going to be. Trial Trans. at 3304. Mr. McClenan acknowledged that if you just told the contractor orally, then later there may be some misunderstanding about what was said in the field. Trial Trans. at 3304.

When Mr. Russek wrote "the contractor will be directed," Mr. McClenan testified that that was a reference to something that is going to happen in the future. Trial Trans. at 3304. Mr. McClenan also testified that Mr. Russek's reference to "it will be directed" means that there is going to be a writing that is going to come in the future. Trial Trans. at 3304.

Mr. McClenan testified that when he indicates that he is going to give the contractor direction, he tries to do it as quickly as resources permit. Trial Trans. at 2205. Mr. McClenan testified that when Mr. Russek returned to the office, Mr. Russek began working on a draft of the direction to the contractor. Trial Trans. at 3305.

By August 18, 2000, the Corps had not given Renda written direction concerning the west levee realignment. On that date, Mr. Bowman wrote to Mr. McClenan concerning the issue. JX60. Mr. Bowman indicated that on July 28, 2000, Mr. Duke had notified Mr. Russek about the levee alignment problems on the west side of Lost Lake. Mr. Bowman reported that at the August 7, 2000, meeting at the placement area, the Government "verbally agreed to realign the levee such that the toe of the new levee would be against the existing, old levee." Mr. Bowman stated that Renda was awaiting written confirmation of the instructions and changes to the drawings. Mr. Bowman indicated that the realignment constituted a changed condition and that Renda would submit a request for equitable adjustment. JX60.0001.

At trial, Mr. McClenan testified that when Renda wrote that in Renda's opinion the field direction constituted a changed condition, Mr. McClenan should have written a letter back saying that

the Corps did not consider it a changed condition. Trial Trans. at 3306. Mr. McClenan testified that Renda was required to locate the new hydraulic levee where is was shown on the plans and specifications, until Mr. McClenan made the field change. Trial Trans. at 3306-07. As it turns out, the existing levee was not where it was shown in the plans and specifications in some instances. Trial Trans. at 3308.

Mr. McClenan testified that if he had any issues concerning what Mr. Bowman had written, Mr. McClenan should have responded within a reasonable time. Trial Trans. at 3309.

Following the direction given on August 7, 2000, Renda moved a whole lot of material from the proper alignment shown in the plans so that the material would be against the existing levee. Trial Trans. at 3309.

Mr. Russek prepared a draft letter for Mr. McClenan dated August 18, 2000, to provide written direction to Renda concerning the levee realignment directive. PX969. About one month later, on September 18, 2000, Mr. Russek prepared another draft for Mr. McClenan to provide Renda with written direction concerning the August 7, 2000, levee realignment directive. PX999. Three days later on September 21, 2000, Mr. Russek prepared another draft for Mr. McClenan to send to Renda confirming the direction provided on August 7, 2000, about realigning the levee. PX1005. In this draft, Mr. McClenan confirmed "the verbal direction you were provided during that site visit, i.e., you are to forego use of the alignment shown in the contract drawings, and proceed along an alignment closer to, and paralleling, the existing levee." PX1005.0001.

Mr. McClenan testified at trial that if the direction in PX1005 is what Mr. McClenan told the contractor on August 7, 2000, and the contractor abandoned the previous alignment, the contractor should have arguably moved material. Trial Trans. at 3313.

By letter of September 22, 2000, Mr. Bowman wrote to Mr. McClenan concerning the levee alignment problems on the west side of Lost Lake. PX1006. Mr. Bowman wrote that at the August 7, 2000, site visit, the Government verbally instructed Renda that the intent of the new levee design was that the outside toe of the hydraulically constructed levee should tie into the inside top of the slope of the existing levees, while specified levee slopes should be maintained. PX1006.0003.

Mr. McClenan testified at trial that if for any reason he disagreed with what Mr. Bowman had written, Mr. McClenan would have written back to Renda. Trial Trans. at 3315.

By letter of October 31, 2000, Mr. Bowman wrote to Mr. McClenan concerning another new levee design change being the second verbal levee design change directive issued by the Government to date. PX1064. Mr. Bowman stated that on August 7, 2000, in response to alignment problems on the west side of the site, the Government directed that it was the intent of the drawings that the outside toe of the new levee tie into the inside top edge of the existing levy, although this is not clearly delineated in the contract documents. PX1064.0003.

On November 6, 2000, there was a meeting between Renda and the Corps concerning various levee construction issues, including realignment. PX1085. The sign in sheet for the November 6, 2000, meeting, is PX1084. Unbeknownst to Renda, while the meeting was occurring, Mr. Benero was signing a Show Cause Notice. PX1083.

By letter of November 15, 2000, Mr. Bowman responded to Mr. Benero's Show Cause Notice. JX69. Mr. Bowman stated that the Show Cause Notice made no mention and apparently had not considered the impact of the differing site conditions, which included a changed condition – the Government directive to realign the levee near Station 170+00 on the west side of Lost Lake. JX69.0003.

By letter of December 13, 2000, Mr. McClenan responded to Mr. Bowman's November 15, 2000 letter (JX69). PX1158. Mr. McClenan stated that the verbal directive to realign the west levee was issued to improve a worsening situation on the west levee and to assist in resolving problems with the upwelling of soft material between the hydraulically placed levee and the existing exterior levee. Mr. McClenan advised that he did not consider the issue to have merit since the directive was issued to correct an improper construction method. PX1158.0002.

However, the Corps never wrote a letter to Renda documenting such purpose or of any such problem. In fact, the drafts which Mr. Russek prepared for Mr. McClenan (PX969, 999, and 1005) did not mention any such purpose or any such contractor-caused problem.

Mr. McClenan testified that Mr. Russek made site visits about once a week. Trial Trans. at 3318. Mr. McClenan testified that when Mr. Russek made a site visit, Mr. Russek was supposed to create a memo documenting the visit. Trial Trans. at 3318. Mr. McClenan testified that if the contractor was doing something incorrectly, then Mr. Russek should make note of it. Trial Trans. at 3318.

For example, on January 14, 2000, Mr. Russek prepared a site visit memorandum in which he noted that: "In general, there has been continued improvement on this project especially with regards to the hydraulic levee construction and dredge material placement." PX699.

Mr. McClenan testified that if Mr. Russek saw the contractor doing something woefully deficient, Mr. Russek would have identified it in the field and probably followed up with a memorandum. Trial Trans. at 3319. Mr. McClenan testified that when it came to how the contractor was performing on the Upper Bayou Project, Mr. Russek had a better grasp than Mr. McClenan. Trial Trans. at 3322. Mr. McClenan testified that Mr. Russek saw what Renda was doing a lot more than

Mr. McClenan. Trial Trans. at 3322. Mr. McClenan testified that if it was Mr. Russek's opinion that Renda was using the proper equipment, Mr. McClenan would not object. Trial Trans. at 3322. Mr. McClenan concluded that if Mr. Russek had the opinion that Renda's hydraulic fill placement generally conformed to the contract requirements, Mr. McClenan would not take issue with it. Trial Trans. at 3322.

By letter of December 20, 2000, Mr. Bowman responded to Mr. McClenan's December 13, 2000 letter (PX1158), pointing out that the newly constructed west levee was shifting to the interior although the levee was being constructed on the line in accordance with the contract drawings. PX1175. Mr. Bowman pointed out that clarifications issued in addendum number one made it clear that the Government intended that the new levee not be placed against the existing levee due to concerns about weaknesses and integrity of the existing levee. PX1175.0007-08.

Mr. Bowman's comments are supported by addendum number one, Joint Exhibit 3. In the Answers to the Questions from the Bidders, JX3.0007, one of the bidders had asked "Why is the levee alignment so far from the perimeter where the foundation is crummy? It makes it harder to build on weaker ground. What's the purpose of leaving 100 feet, or whatever it is, on the outside where the base is best?

"Answer: The intent of the design is to use the new work material to enhance the long term stability of the levees. For this reason, the designers intend the new work material to be used to displace the very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this matter. In addition, there are several locations around the placement area where the levee centerline must be located as shown due to overall slope stability concerns."

Mr. Bowman's comments are further supported by the HVJ Associates' design report, PX322. HVJ's design report indicates concerning levee stability that the second most critical levee section at Station 183+77 was located along the west side of the site near the southern end. PX322.0013.

In his December 20, 2000 letter, Mr. Bowman further noted that Renda agreed that the new levee had to be realigned due to significant problems with upwelling of soft material (mud wave), which threatened to top the existing levee. Mr. Bowman noted that at the August 7, 2000, meeting at the site, Mr. Few stated that it was the Government's design intent that the new levee would be tied into the old levee, thereby preventing the trapping of soft materials between the levees. Mr. Bowman stated that realignment of the levee did not correct an improper construction method. Mr. Bowman noted that, in fact, the levee was realigned by the Government to correct an improper design, which was concerned with inherent weaknesses in the existing levee as stated in Addendum No. 1, but failed to account for the significant amount of soft materials, which would be displaced and trapped between the new and existing levees when the new levee was constructed. PX1175.0007-08.

By letter of March 12, 2001, Mr. Benero wrote to Mr. Bowman for the first time confirming that the Government had directed Renda to realign the center of the new levee to fall closer to the existing levee between Station 166+00 and 176+00. PX1323. This instruction directly contradicts the position that the Government attempted to take at the trial. Mr. McClenan testified that Renda should have left alone the material from Station 166 to about 183, and then gradually moved the new levee closer to the existing levee from that point. Trial Trans. at 3325-26.

By letter of March 13, 2001, Mr. Bowman wrote to Mr. Benero in response to Mr. Benero's March 12, 2001, letter (PX1323), and advised that Renda considered Mr. Benero's directive

concerning alignment of the hydraulic levees to be a change to the contract documents. PX1326. Mr. Bowman wrote that prior to submitting a forward-priced cost estimate for this work, Renda requested an immediate meeting with the Area Engineer (Mr. McClenan) to discuss procedures for the work, details relevant to the change, and issuance of a modification by the Government. PX1326.0001.

By letter of March 29, 2001, Mr. Bowman wrote to Mr. Benero concerning their meeting on March 22, 2000. PX1362. Mr. Bowman noted that on March 12, 2001, the Government directed Renda "to continue with the revised alignment as previously instructed by the Bay Area office." Mr. Bowman wrote that Renda had responded to the directive on March 13, 2001, stating that Renda considered the directive to be a modification to the contract documents, and that Renda had requested an immediate meeting with the Area Engineer to discuss procedures for the work. Mr. Bowman noted that the Government has not scheduled this meeting to date, and Renda cannot proceed with the work without a full understanding of the work scope changes. PX1362.0002.

By letter of April 13, 2001, Mr. Jefts wrote to Mr. McClenan to document the Joint Venture's understanding of a conference call on April 11, 2001. PX1384. Mr. Jefts wrote that the call was to discuss to Renda's request for a meeting in the field to obtain clarification for the construction of the remaining levee at Lost Lake. Mr. Jefts noted that the issue stems from Mr. Benero's letter of March 12, 2001, directing a realignment of the remaining west and north levee. Mr. Jefts stated that unfortunately the letter was not clear as to the specific realignment, as compared to previous direction, and is not definitive as to the expected end product for acceptance. Mr. Jefts noted that the west levee alignment has been revised such that the outside toe of the new levee is to match the inside crown of

the old levee, consistent with the March 12 letter and the previous verbal direction given to Renda by the Bay Area office. PX1384.0001.

At trial, Mr. McClenan testified that Mr. Jefts' letter had captured what Mr. McClenan had intended. Trial Trans. at 3324. However, Mr. McClenan admitted that the letter does not say that the direction for the outside toe of the new levee to match the inside crown of the old levee was to occur after a certain period. Trial Trans. at 3325.

Mr. McClenan testified at trial that Renda had constructed approximately 1,000 feet along the design alignment for the west levee. Trial Trans. at 3325. Mr. McClenan testified that when he went out to the site on August 7, 2000, he was standing at approximate Station 183+00 or so, and the west levee had started at Station 166. Trial Trans. at 3325. Mr. McClenan testified that Renda had constructed the levees out to approximate Station 183. Trial Trans. at 3325.

Mr. McClenan testified that he did not provide guidance on how Renda was supposed to tie the original levee alignment into the new levee alignment closer to the existing levee. Trial Trans. at 3326. Mr. McClenan did not write a letter advising what Renda was supposed to do. Trial Trans. at 3326.

By letter of April 24, 2001, Mr. Bowman wrote to Mr. Benero to inform Mr. Benero the current status of outstanding issues related to the Project. PX1405. Among the issues, Mr. Bowman discussed were the levee construction conference and Renda's reaction to Mr. Benero's March 12, 2001, directive to revise the alignment of the new levees in accordance with the instructions of the Area Engineer. Mr. Bowman stated that the issue has now reached a critical point as no additional materials are available for levee construction, and Renda's levee building operations have ceased awaiting further clarification and direction from the Government. PX1405.0001.

By letter of May 16, 2001, Mr. Bowman wrote to Mr. McClenan concerning Renda's numerous requests, both verbally and in writing, for survey information concerning the Project. PX1460. Mr. Bowman also wrote that to date, the Government had issued four verbal or written directives regarding alignment changes for the new levees. Mr. Bowman noted that the fact remains the new levee alignment was changed several times to accommodate problems with levee design criteria, survey issues and/or latent conditions existing at the site and known to the Government. Mr. Bowman stated that survey has been a significant issue for the Project, and an honest exchange of survey information/data between Renda and the Government is the only way to adequately address the final levee construction solution. PX at 1460.0002

The Corps finally issued a change order concerning the levee realignment on about May 23, 2001. See JX06.027, Change Order No. 10. By that time, Mr. McClenan had testified that Renda had already moved the material from the contract alignment so it was closer to the existing levee. Trial Trans. at 3327.

Renda submitted its claim for the levee realignment on about May 31, 2001. See PX8.

By letter of June 20, 2001, Mr. Bowman wrote to Mr. Benero to inform Mr. Benero the current status of outstanding issues related to the Project. PX1526. One of the issues concerned the completion of levee construction. Mr. Bowman wrote that Renda was unable to construct additional levees since no additional materials were available for levee construction, and that Renda's levee building operations have ceased awaiting further clarification and direction from the Government. PX1526.0001. Mr. Bowman also wrote that Renda had received Change Order 10, realignment of levees, a unilateral modification, at the May 24, 2001, issues status meeting with the Government. Mr. Bowman stated that the modification accepts the previous realignment of the levees by Renda

between Stations 166+00 and 182+33, and revises the alignment in the contract drawings between Stations 182+33 and 215+00. Mr. Bowman pointed out that on May 31, 2001, Renda responded to modification Change Order 10 disagreeing with the Government's position that there was no cost or time impact as a result of the levee realignment. PX1526.0006.

By letter of August 9, 2001, Mr. Bowman wrote to Mr. Benero to resubmit Renda's REA for levee realignment as a certified claim. JX88. By letter of November 6, 2001, Mr. Benero wrote to Mr. Renda to indicate that Mr. Benero had received Renda's claim for levee realignment, and that his initial review of the claim revealed that it was for $789,600.00, and 40 days. PX1617.

The levee realignment costs have since been incorporated in the larger Levee DSC claim.

**Levee DSC**

The Levee DSC claim arose from an insufficient amount of suitable levee building material from the contractually provided dredged areas in the Houston Ship Channel,unanticipated sidecast borrow areas which swallowed inordinate amounts of hydraulically-placed clay, foundations much softer than anticipated, an inability to construct the hydraulically-placed levees to the contract design template, and an inability to maintain the hydraulically-placed levees at the contract design elevation without failure. These issues will be discussed below.

The evidence at trial showed that HVJ Associates, the designer of the levees, and the Corps knew before accepting bids for the Project, that there were an insufficient amount of suitable materials to construct the hydraulically placed levees. Although the Corps knew or should have known that it would lack sufficient suitable materials to be able to construct the hydraulically placed levees, the Corps nevertheless assured prospective bidders the there were sufficient materials.

During the design review process, HVJ acknowledged that "Based on the estimated displacement available levee material quantities it has been determined that not enough quantities will be available to raise the dike hydraulically. Therefore, mechanical levee is proposed above the hydraulic levee." See PX301.0005.

In HVJ's February 2, 1998, design report, HVJ anticipated that the very soft clays in the disposal area interior would be displaced by the levee material as the fill was placed to raise the levees. PX322.0010. Based on a levee crest elevation of +30 feet MLT, a crest width of 10 feet, and levee side slopes of three horizontal to one vertical, HVJ estimated that displacement of very soft material would total 1,010,269 cubic yards. PX322.0010.

In addition to displacement, HVJ calculated that there would be between one and four feet of settlement within the hydraulically placed levee fill during the course of the Project. HVJ wrote that the "contractor should be aware of this situation and be prepared to compensate the loss of levee height due to settlement within the fill." PX322.0014. (Significantly, there is nothing in the contract documents that alerts the contractor to an estimated settlement of one to four feet during the construction project.)

HVJ calculated that approximately 538,786 cubic yards of levee material would be required for the neat line area for the hydraulically placed levees. PX322.0042. HVJ's estimate for the neat line area did not include any estimate for the amount of material that a contractor would have to actually place to achieve the neat line. HVJ also noted that in addition about one million cubic yards of additional levee material would be required for the displacement of the very soft dredge material. HVJ concluded that an estimated 340,000 cubic yards of levee material may need to obtained by mining for the Project. PX322.0014.

On plate 9 of HVJ's design report, the amount of material which may be suitable for levee construction is listed. PX322.0024. The total of the clay material listed is approximately 1.34 million cubic yards. Although a significant amount of sand is also listed, the testimony at trial both from Dr. Christopher Mathewson and HVJ's Michael Hasen was that the sand would tend to run, and unless it was bound into a clay ball, would not have the mass to displace the soft foundations. Trial Trans. at 1903; Trial Trans. at 4766.

On plate 23 of HVJ's design report, HVJ lists the total quantity of soft foundations lost due to displacement at 1,010,269 cubic yards. PX322.0042. The loss due to displacement, plus just the neat line quantity for the construction of the hydraulically placed levees, 538,786 cubic yards, is about 1.5 million cubic yards, substantially more than the 1.34 million cubic yards available from the dredged areas.

The quantities to use for the design of the levees for Lost Lake were provided by the Corps to HVJ. See PX225. HVJ's design report states that the materials considered suitable for embankment construction consisted of stiff to hard clay. PX322.0008. HVJ acknowledged that as a result of degradation during transportation through the dredging pipelines, the volume of material available for levee construction would be less than the in situ (or existing in place) volume. HVJ noted that the volume of available material depends on the material type and the length of dredging pipe; the longer the dredging pipe, the less the volume of material available. PX322.0008. HVJ noted that the portion of the firm to very stiff clay which will be dredged for embankment construction that forms "clay balls" was the material of interest for evaluating the fill/cut ratio. HVJ noted that the fraction of the dredged material that does not form clay balls was assumed not to be available for dike construction. HVJ stated that this fraction certainly contains any coarse, sandy

material not firmly bound by the clay along with any very soft to soft material which exists at the cut area. PX322.0008.

The quantities expected to be dredged from the Houston Ship Channel and the quantities expected to be discharged from the end of the pipeline are listed in PX252. Although HVJ's design report stated that suitable materials consisted of stiff to hard clays (PX322.0008), the quantities listed as discharged from the pipe included clay that was medium to hard. The medium to hard clay discharged from the end of the pipeline for Lost Lake totaled 965,071 cubic yards. PX252. Significantly, PX252 shows that the medium to hard clay in terms of dredged quantities at the cutter head constituted 37% of the total materials dredged, while the medium to hard clay balls discharged from the pipe had degraded to 22% of the total dredged. The reduction of 15% is an approximate degradation of about 40%. (22% is approximately 60% of 37%; conversely from 37% to 22% is an approximate reduction of about 40%.) This comports with the results of the Clay Ball Degradation study. PX185. Mr. Few testified that the results of the clay ball degradation study indicated that the degradation was approximately 50%. Trial Trans. at 4279.

The Corps also knew that depositing the hydraulically placed material along the levee alignment would result in significantly more material being placed than the hypothetical neat line. By letter of September 17, 1997, HVJ's Mr. Chelliah wrote to the Corps' Ira Brotman concerning the status of design issues. PX244. Mr. Chelliah wrote that Mr. Hasen presented a preliminary dike cross section based on preliminary calculations. Mr. Chelliah noted that the proposed dike has a slope of three horizontal to one vertical with a crest elevation of 30 feet. Mr. Chelliah noted that John Cleveland of the Corps indicated that a slope of three horizontal to one vertical will be impractical and that the slope will more likely be eight to ten horizontal to one vertical. PX244.0001.

HVJ anticipated that the material used for levee construction would come from dredge sections 1, 2 and 3, and 10. PX294. However, if the material for levee construction is limited to those four sections, then the amount of suitable material is substantially less than that listed in HVJ's design report (PX322).

Periodically, HVJ prepared design summaries which reflected the average levee raising material that was available from dredging on the Project. See, e.g., PX255. On PX255.0001, HVJ listed the average levee raising material available at 82.69 cubic yards per linear foot. If one multiplies 82.69 cubic yard per linear foot times the 15,350 linear feet which HVJ had listed as the length of hydraulic levee, one obtains 1,269,291.5 cubic yards. This figure also reflects sand that HVJ expected to remain from the raising of the mechanically constructed levees, as is shown on page 7 of the exhibit. On PX255.0007, Mr. Chelliah runs through calculations concerning the existing sand mound at Lost Lake and the amount necessary to raise the south levees between Stations 98+00 and 166+50. Mr. Chelliah calculates the remaining sand at 95,188 cubic yards and adds that figure to the 1,136,401 cubic yards from the new work material from the Government contract to get 1,231,589 cubic yards. When Mr. Chelliah divides 1,231,589 cubic yards by the length of the hydraulic levee at that time, 15,350 linear feet, Mr. Chelliah arrives at an available levee material per linear foot of 80.23. (Incidentally, HVJ incorrectly assumed a surplus of sand from the Lost Lake borrow areas. As it turned out, Affolter Contracting ran through all the available sand, and a third borrow area had to be located, resulting in a $364,201.03 change order. JX06.008.0002.)

The average levee raising material available calculations in PX255 show that there is an insufficient amount of levee raising material from the new work Government contract. If one takes the amount of displacement HVJ calculated at 1,010,269 cubic yards and divides by the 15,350 linear

feet which HVJ was estimating for the hydraulic levee, the result is 65.82 cubic yards per linear feet of material needed simply to displace the soft foundations. If one takes the 538,786 cubic yards which HVJ estimated for the neat line design template for the levees and divides by the 15,350 linear feet of hydraulic levee, the result is 35.10 cubic yards per linear feet. If 65.82 cubic yards per linear feet and 35.10 cubic yards per linear feet are added, the material required would be 100.92 cubic yards per linear feet for just displacement and the neat line area. Obviously, HVJ's design summary showed that less than 100.92 cubic yards per linear feet was available.

In PX291, HVJ's design summary indicates that the average available material for levee raising is 78.20 cubic yards per linear foot, a figure which dictated the need for mining to develop sufficient material.

By email of January 13, 1998, Mr. Hasen wrote to Mr. Chelliah and queried whether HVJ has responded to Ira/Al Meyer about the volume of mining which might occur. PX316.

Subsequently, the downstream limits of the channel was changed from Station 464+00 to 470+00, reducing the amount of dredging. By email of April 16, 1998, Mr. Meyer wrote to Mr. Few and noted that the change of downstream channel limits reduced the dredging volume by 171,000 cubic yards. PX355. Mr. Meyer asked Mr. Few to verify that the change will not result in too little material to build the hydraulic levees at Lost Lake. By email of April 16, 1998, less than five minutes after Mr. Meyer's email, Mr. Few responded that "This amount should not affect the building of the hydraulic levee. Please carry on." PX354.

On June 29, 1998, Mr. Few did a quick check on Lost Lake. PX402. On page 3 of the exhibit, Mr. Few wrote: "We need +28 to be comfortable. If we don't have that, we need HVJ to show us why they don't think we need it. If it turns out that we do, we will need to add const of

maybe 6,000 feet of cast fill levee to the contract." PX402.0003. Mr. Few testified similarly at trial. Trial Trans. at 4282.

Just prior to the start of hydraulic levee construction, Mr. Few told Renda that the "Corps had some concerns about there being sufficient quantities available to complete the levees." JX39. During trial, Mr. Few admitted that he had made that statement. Trial Trans. at 4222.

Mr. McClenan admitted during trial that he had not read HVJ's design report when he got involved in the Project. Trial Trans. at 3175. Well after Renda had raised questions about there being sufficient levee building material, Mr. McClenan wrote by email of May 3, 2001, to Mr. Few to request that Mr. Few locate Ira Brotman's calculations about the amount of material needed to hydraulically construct the Lost Lake levees. PX1425. By email of May 6, 2001, Mr. Few wrote back to Mr. McClenan and stated: "I'll see if I can gather up all the calculations that have been made regarding amount of hydraulic levee that can be built at each of the areas by different people using different assumptions. The high level of uncertainty particularly for Lost Lake was recognized throughout the design. . . . Our intent was also that the hydraulic filled template would be modified during construction, to address any difference in retention that occurred to no fault of the contractor - if a material shortage appeared likely - just like we did with the Lower Bay/Bolivar Marsh Contract." PX1432.

However, none of this uncertainty about sufficient quantities of suitable material to construct the hydraulic levees was made known to the prospective contractors. In fact, in Amendment No. 1 (JX3), in the Questions by Prospective Bidders and Answers by the Galveston District Design Team, the Corps indicates in two places that there is sufficient new work material to construct the levees hydraulically where indicated. In response to question 5.a: How is mining paid, the Corps' answer

was: "Specifications will be revised to state that there will be no payment for mining. A lot of discussion followed this question regarding how the bidder can estimate how much mining will be required. The designers believe that there is sufficient new work material available to construct the levees hydraulically where indicated, even allowing for the soft foundations, without having to mine. An area for mining was established only in the event that the Contractor chose to place the material in such a way as to exhaust the available pay new work material before levee raising was complete." JX3.0005. Two pages later, the Corps answered the following question: "With regard to mining, why was that even put in there? Does the Corps really think there won't be enough clay to build the levees? Answer: The Corps believes that there will be sufficient material within the dredge template to construct the required levees, provided the contractor carefully manages handling at the discharge pipe. The need to mine is under the contractor's control." JX3.0007.

The Government provided no infomation to the prospective bidders about the million cubic yards of displacement that HVJ anticipated, the shortfall that HVJ anticipated, the amount of mining that HVJ anticipated, or the amount of settlement within the hydraulically placed fill itself that HVJ anticipated. Lacking such information, the prospective contractors could only take the Corps at its word and trust that there would be sufficient suitable new work material to be able to construct the hydraulically placed levees. Trial Trans. at 544 (McClenan testimony). In fact, Mr. Bowman testified that he would not have agreed to submit a bid for the Upper Bayou Project without such assurances by the Corps. Trial Trans. at 489-490.

Mr. McClenan testified at trial concerning some of the design review processes that occurred before bids were solicited for the Project. Concerning the "BCOE" review comments in PX301, Mr. McClenan testified that "BCOE" stood for buildability, constructability, operability, and

environment. Trial Trans. at 3168. Mr. McClenan then testified that to determine if a project was buildable or constructable, you need to know if you have enough suitable material to build the project. Trial Trans. at 3169.

At trial, Mr. McClenan acknowledged that HVJ did the design for the levees for Lost Lake. Trial Trans. at 3170. Mr. McClenan testified that if HVJ had something to say about the levees, it would be important for the Corps to pay attention. Trial Trans. at 3172. Mr. McClenan acknowledged that HVJ had indicated that there was not enough levee building material available to raise the dikes hydraulically. Trial Trans. at 3173.

Mr. McClenan testified that he knew that the construction of the hydraulically placed levees was going to displace soft foundation materials. Trial Trans. at 3177. Mr. McClenan acknowledged that note 10 on drawing C-14, JX05.014, indicates that very soft to soft foundation material will be displaced by the new levee material. Trial Trans. at 3177. However, Mr. McClenan admitted that note 10 does not say how much material will be displaced. Trial Trans. at 3178. Mr. McClenan acknowledged that to find out how much material is going to be displaced, you need to look at the design report. Trial Trans. at 3178.

Mr. McClenan testified that there were different philosophies on whether the new levees would displace the soft foundation materials or whether the new levees would float on top. Trial Trans. at 3177. Mr. Hasen and HVJ were in the camp of maximum displacement. Mr. Hasen testified that that was HVJ's intent for the design. Trial Trans. at 4669-4770. In HVJ's design report, HVJ wrote: "It is anticipated, as is the experience with similar conditions, that the very soft clays existing in the disposal area interior will be displaced by the levee material as the fill is placed to raise the levees. This phenomenon existing in the disposal area interior is essentially a bearing capacity

failure where the weight of the fill material exceeds the capacity of the weak foundation soil to support it. Consequently, the foundation soil experiences a general shear failure. This type of failure occurs during construction and is different from the time dependent consolidation settlement of the foundation. The displaced soil is evident in the form of visible mud waves adjacent to the fill. The bearing capacity of soils generally increases with depth and the amount of soft foundation displaced will depend on the height and area of the fill." PX322.0010.

However, Mr. Few, the Corps' geotechnical engineer for the Project, envisioned that the new hydraulic levee would "float" on the soft foundation materials. For example, by email of January 26, 2001, Mr. Few wrote to Mr. Russek and Mr. McClenan concerning the design intent. PX1210. Mr. Few wrote that "Johnny [Rozsypal] and Wendell [Mears] are convinced that hydraulic placement 'blows out' soft foundation material, and creates maximum displacement, which results in a better foundation for future levee construction. The AO has included this in at least one letter. I will dispute this every time I'm asked." PX1210.0002. Mr. Few continued: "This is totally contradictory to basic soil mechanics. Wendell has explained his simplified theory of foundation failure to me, and it is not correct. My bottom line is that I can prove that the hydraulic levee, as compared to a mechanically placed levee, has a lower percentage of overall displacement, and even lower relative depth of displacement, flatter slopes during and after material placement and basically is more of a 'floating' levee than one constructed mechanically." PX1210.0002. Mr. Few then confirmed that "Johnny and Wendell have suggested I back away from this statement, as it apparently is not consistent with something that they want to promote. I can't do that. If the Government wants me to adopt Johnny and Wendell's spin, I need for a geotechnical engineer to prove it to me." PX1210.0002.

The problem with the "maximum displacement" and "minimum displacement" or "floating levee" is that the theories assumed that settlement would be uniform. However, the existence of the sidecast borrow areas spelled trouble for both theories.

During his testimony, Mr. Leon Hrabovsky testified concerning the sidecast borrowing which occurred in 1996. By letter of August 8, 1996, William Hopkins wrote to James Van Norman (then at T.L. James & Company) to request a proposal for approximately 22,000 linear feet of ditching along the interior of the perimeter levees at Lost Lake. DX1066. Sketch No. 2 to Mr. Hopkins' letter showed the existing levee, a 50 foot berm and a depression reflecting prior sidecast borrowing at Lost Lake. DX1066/3

Mr. Hrabovsky testified about DX1067 as the modification which authorized ditching or sidecast borrowing along the interior of the perimeter levees at Lost Lake. DX1067. Trial Trans. at 3741. In the course of the sidecast borrowing, Mr. Hrabovsky testified that although King Fisher Marine Services (who was doing the borrow work) attempted to maintain a 50 foot berm, the contractor had trouble maintaining a one vertical to three horizontal slope and the resulting borrow area may have been closer to the existing levee than 50 feet. Trial Trans. at 3862. Mr. Hrabovsky also testified that in placing the borrowed material on the toe of the existing levee, the material was soft enough that it tended to shift toward the drag line, which had the result of causing the existing levee to be less than 50 feet from the sidecast borrow area. Trial Trans. at 3862.

During Mr. Few's trial testimony, he testified concerning sidecast borrowing at Lost Lake. Mr. Few testified that generally the sidecast borrowing went no more than two or three feet deep. Trial Trans. at 4203. However, on occasion, Mr. Few testified that they had to do very deep sidecast borrowing to find suitable materials. Trial Trans. at 4207.

The net result of the creation of sidecast borrow areas adjacent to the perimeter levees was that the levee berm had firm material (at least at the surface) while the sidecast borrow area had very soft material even at the surface.

This differential in surface characteristic is supported by HVJ's technical investigation which resulted in a report transmitted by letter of August 19, 1996. PX195. In its report, HVJ stated that a geotechnical investigation was performed at Lost Lake as a part of the implementation of the Port of Houston Authority's Disposal Area Management Plan for the Houston Ship Channel. PX195.0003. HVJ noted that the purpose of the investigation was to evaluate the engineering characteristics of the dredge materials and foundation soils within the disposal area and for use in the design and management of disposal sites. PX195.0003. HVJ noted that two groups of soils were encountered in the soil borings during the field investigation: imported soils, which HVJ inferred were deposits from dredging operations, with a thickness that varied from 18 to 29 feet; and underlying native soils consisting of soft of medium stiff clays and sandy/silty clays and loose to medium dense clays, clays, sands and silts. PX195.0003. HVJ noted that the levees were constructed along the perimeter of the island to contain the dredge material. The levees were raised in 1992 to elevations ranging from plus 19 MLT to plus 23 MLT using sidecast borrow methods. PX195.0004. HVJ stated that: "The perimeter dikes appear to the stable and drilling soil borings along the levee were not included in the investigation. . . . however, very soft ground conditions and ponded water (in some areas) run parallel to and extend about 100 feet from the toe of the dike." PX195.0005. HVJ reported further on the surface conditions: "Very soft ground and/or ponded water extend from the toe of the perimeter dike approximately 100 feet into the disposal area along the north, west and east sides. Except for very soft ground around the perimeter of the dike, the interior of the disposal

site was firm and presented no difficulties to the drilling equipment." PX195.0008. As Mr. Hasen testified and the report shows, HVJ's field work was done from June 24 to July 2, 1996. Trial Trans. at 4710; PX195.0005.

The sidecast borrowing about which Mr. Hrabovsky testified had to occur after HVJ's field work in 1996, as the request for proposal (DX1066) and modification authorizing the sidecast borrowing (DX1067) have dates after July 1996. As a result, the surface of the sidecast borrow area would be even softer than when HVJ had visited.

Over time, the surface of the material inside of Lost Lake would undergo evaporative drying, consolidation, and dessication, as reported by HVJ in its design report of February 2, 1998. PX322.0012. As HVJ noted, dessication would shrink the material to a hard crust. PX322.0012.

Dr. Mathewson testified to the effect of having a hard crust berm under a portion of the newly placed hydraulic levee and a very soft sidecast borrow area under other areas of the levee. Trial Trans. at 1928. The presence of the sidecast borrow area would tend to promote differential settlement and the levee shearing or cracking which Renda experienced. Trial Trans. at 1931-1932.

In his expert report, Mr. Hasen included text from a book written by Karl Terzaghi, which described stability problems. DX1068/56. In paragraph 48.7 Fills on Very Soft Organic Silt or Clay, Dr. Terzaghi states: "In many regions, soft marshy ground is covered with a mat up to a meter thick that is stiffer than the deeper layers and is effectively reinforced by a dense network of roots. The mat acts as a raft and may be able to carry, at least temporarily, the weight of a fill several meters high. However, fills on such foundations may continue to settle excessively for many years or decades, and maintenance records show that they may even suddenly break through the mat long after construction." DX1068/63-64.

As Mr. Hasen testified, he simply assumed that the existing berm at Lost Lake would immediately fail, and did no stability analysis on whether the failure would occur or how long it would take the failure to occur. Trial Trans. at 4717. Dr. Mathewson testified that the assumption was problematic and led to the differential settlement condition. Trial Trans. at 1932. In fact, Dr. Mathewson prepared sketches detailing the differential settlement problem. PX1875.01 and PX1875.02.

Under HVJ's professional services agreement with the Government, HVJ was required to use certain specified Corps manuals. PX216.0009-10. One of the manuals that was required was the Design and Construction of Levees. PX853. Under paragraph 2-9 Borings of Design and Construction of Levees Manual, the manual indicates the required depth of borings for embankment or levee structures: "Depth of borings along the alignment should be at least equal to the height of proposed levee at its highest point but not less than three m (nominally ten feet). Boring depth should always be deep enough to provide data for stability analyses of the levee and foundation. This is especially important when the levee is located near the riverbank were borings must provide data for stability analyses involving both levee foundation and river bank. Where pervious or soft materials are encountered, boring should extend through the permeable material to impervious material or through the soft material to firm material." PX853.0018.

During his direct examination, Mr. Hasen discussed a single boring at Lost Lake (boring 96-LL12), with the implication that such boring was typical of borings where the new hydraulic levee was to be placed. However, during cross examination, Mr. Hasen testified about most of the borings which actually underlay the location of the new hydraulic levees. Trial Trans. at 4686. In fact, Mr. Hasen prepared a chart (PX1876) which detailed seven borings which underlay the new hydraulic

levee, none of which extended to firm subsurface soils, and all of which ended with a very soft character of material. Trial Trans. at 4686-4687; PX1876. Mr. Hasen admitted that from the boring information, he could not tell how deep the very soft materials extended or where the "bottom" of the borings actually would be. As a consequence, HVJ's design violated the Corps' Design and Construction of Levees manual (PX853). The net result was that HVJ simply had to guess as to the foundation conditions underlaying the new hydraulic levee..

The Government attempted to imply that Renda somehow was itself responsible for the shortage of suitable levee construction materials. The Government intimated that Renda somehow failed to properly manage discharge control at the end of the dredge disposal pipeline. However, Mr. Hasen among others admitted that there are no provisions in the contract documents concerning techniques for discharge control. Trial Trans. at 4765.

Concerning discharge control, by email of April 10, 2000, Mr. Jefts wrote to Ted Walters of the PHA and stated: "In addressing the hydraulic levees, the only requirement is that the contractor construct the levees with suitable material and any excess suitable material will be placed within the discharge corridors." PX817.

The Government intimated that Renda should have done a better job of capturing the sand which was deposited from the dredge disposal pipeline. However, Mr. Hasen admitted that there was no warning in the contract documents that the contractor must do all it could to capture the sand. Trial Trans. at 4765. Moreover, HVJ's design report, itself, says it is relying on stiff to very stiff clay to build the levees, not sand. PX322.0008; Trial Trans. at 4766. Further, HVJ required dense material to displace the soft foundations. Trial Trans. at 4767. The dense material would be stiff to very stiff clay, not saturated sand. Trial Trans. at 4767. Mr. Hasen testified that saturated sand is not

cohesive and pours and runs. Trial Trans. at 4766. Sand or other pervious materials can cause problems for levees. Mr. Hasen testified concerning the Teton Dam failure which occurred due to piping (leaking water) through pervious materials. Trial Trans. at 4692.

Mr. McClenan testified that to determine whether or not the levees could be built, you would have to figure out how much material was going to be replaced by the new levees. Trial Trans. at 3180. Mr. McClenan also testified that you would have to figure out how much the levees were going to settle themselves after you put them in place. Trial Trans. at 3181. Mr. McClenan testified that these items should have been taken into consideration by the designers. Trial Trans. at 3181.

Mr. McClenan testified that contractors receiving the bid solicitation for the Project should be able to assume that there would be enough material to build the hydraulically constructed levees. Trial Trans at 3181. Mr. McClenan admitted that there should be enough material to be able to build the hydraulically constructed levees including all of the displaced material, and all of the settlement for the levee fill that was placed. Trial Trans at 3181.

Mr. McClenan testified that somehow the contractor needed to come up with at least 1.5 million cubic yards from the dredged areas to be able to build the hydraulically placed levees. Trial Trans at 3187. However, Mr. McClenan did not recall any place in the plans or specifications where the Government told the contractor that the contractor had to find approximately 1.5 million cubic yards of suitable material to be able to build the hydraulically placed levees. Trial Trans at 3188.

Mr. McClenan agreed that materials considered suitable for embankment construction consisted of stiff to hard clays. Trial Trans at 3189. Mr. McClenan testified that if you are going to construct a levee, you are going to look for stiff to hard clays. Trial Trans at 3189.

Mr. McClenan testified that he was not aware that Mr. Few was aware that there was not going to be enough suitable material from the hydraulically dredged areas to be able to construct the hydraulically place levees. Trial Trans at 3190.

Mr. McClenan was then shown JX39, Mr. Herrera's letter of August 5, 1999, to Mr. McClenan concerning the preparatory meeting for the hydraulic levee construction. In that letter, Mr. Herrera wrote that "Mr. Few stated that the Corps had some concerns about there being sufficient quantities available to complete the levees." JX39. When he received Mr. Herrera's letter, no alarms when off, although Mr. McClenan admitted that it could be an important thing. Trial Trans at 3193.

Mr. McClenan admitted that the contractor only gets paid for the hydraulically constructed levee that reaches the contract lines and grades. Trial Trans at 3193.

Mr. McClenan testified that the bidders are supposed to rely on the amendments to the bid solicitation when the bidders prepare their bids. Trial Trans at 3195. In connection with the assurances by the Corps that there was sufficient new work material to be able to construct the hydraulic levees, Mr. McClenan testified that he believed that the designers believed that there was sufficient new work material available to build the levees. Trial Trans at 3197. Mr. McClenan admitted that Amendment No. 1 contained representations by the Government to the prospective bidders that there would be sufficient new work material available to build the hydraulically constructed levees. Trial Trans at 3197.

Mr. McClenan admitted that when the bidders saw Amendment No. 1, they were supposed to take from that they could build the new levees hydraulically without having to mine if they properly managed the disposal pipeline. Trial Trans at 3197-98.

Affolter Contracting performed its work on the Project early in the Project. Affolter ran into similar problems with its mechanically constructed levees standing up due to the soft foundation conditions. To resolve the problem that Affolter was having with the soft foundations, the Corps issued Change Order 1 (JX06.004.0001). Change Order One required Affolter to construct 50-foot wide berms on both sides of the two training levees, among other things, to resolve the soft foundation problem (JX06.004.0002). Change Order 1 obligated the Government to a not to exceed price of $250,000.00. JX06.004.0003.

Change Order Two (JX06.006.0001) increased Affolter's money to a total of $436,855.87, and allowed for an additional 20 calendar days of contract time for the soft foundation problem. JX06.006.0003. (Although Renda encountered virtually identical soft foundations with its levee work, the Corps was not so accommodating.)

By email of February 16, 1999, Mr. Few wrote to Harrison Sutcliff concerning Mr. Few's trip to Lost Lake with Mr. Russek to investigate Affolter's problems with the training levees (among other things). JX33. In his Lessons Learned section, Mr. Few wrote that "In the future, we should probably show the training dike template with 25 to 40 foot wide berms, since this is usually required in these types of foundations in old disposal areas." JX33.

Mr. Few followed up with another email of March 2, 1999, further detailing the Lessons Learned. PX548. In his March 2, 1999, email, Mr. Few wrote that "The Multi-faceted Mistake was related to the handling of the training levees. In these old disposal areas, you can generally get away with adding 15-30% for displacement, for Perimeter Levees, since the levees are built mostly atop the existing levees, and the displacement is relatively minimal, and within the 15% margin of concern. New training levees, built out into the interior, as these are, generally require preconstruction of a

'base' (stability berms essentially) having a width of 30 to 50 feet on both sides. In addition to this extra material quantity, there is generally 30-100% additional quantity from displacement of the very soft dredge material foundation." PX548.0001.

Significantly, the levee design for Lost Lake did not call for berms. Constructing berms would have required even more material when there was already an insufficiency problem.

**Renda's Discovery of the Levee DSC**

By email of June 13, 2000, Dan Anderson of the Corps wrote to Mr. McClenan concerning the definition of the differing site condition clause as set out in the Negotiating Construction Contract Modifications Guide: "The Government describes in the technical specifications and drawings, some of the physical conditions of the construction site, but other conditions may be unknown to the parties. Both parties assume that the unknown conditions are not of any unusual nature, do not differ materially from those ordinarily encountered in the performance of the type of construction specified and, further, do not inhibit performance. The contract terms then - and thus the rights and obligations of the parties - are based on two sets of conditions: (1) those represented by the Government and (2) those unknown, but ordinarily encountered."

By letter of August 3, 2000, Mr. Bowman wrote to Mr. Benero to provide notice that Renda had encountered a differing site condition in the levee area. Mr. Bowman wrote that "RMI has encountered very soft material in the levee area, which will not allow the construction of the levee in many areas. This soft material when compacted, causes a 'mud wave', resulting in significant production losses and time delays. RMI intends to further investigate these conditions, request additional Contract Time for delays and request compensation for the production losses." JX59.0002.

By letter of August 18, 2000, Mr. Bowman wrote to Mr. McClenan and stated that Renda had expected and planned for displacement of a reasonable amount of soft material in its bid for the work. JX60.0002. Mr. Bowman noted that Renda could not have anticipated the sheer magnitude of displaced material, which has caused mud waves and prevented the efficient and economic use of equipment and personnel placing good available clay material. Mr. Bowman stated that while attempting to construct these levees, enormous amounts of clay have been required to displace the soft material and stabilize the levee foundations. Mr. Bowman wrote that the availability of good clay material was being rapidly depleted, forcing Renda to either, search for clay in farther sections or mine the clay at no cost. Mr. Bowman then requested the Government's opinion/position. JX60.0002.

By memo of September 14, 2000, Mr. Mears wrote to other Joint Venture personnel and advised that the "Finished levee elevation is unknown at this time due to unknown material availability." PX994.

By email of September 18, 2000, Mr. Mears wrote to Mr. Russek and Mr. McClenan concerning Renda's construction of the north levees. PX997. Mr. Mears stated that Renda had estimated a neat line fill quantity of 34 cubic yards per foot for a total fill quantity of approximately 125,000 cubic yards. Mr. Mears noted that in the previously accomplished mechanical levees (166+00 to 97+00), Renda's subcontractor experienced two to one cut to fill ratios. Mr. Mears observed that the Joint Venture would anticipate greater ratios as the contract borings indicate higher moisture content subgrade materials.

By letter of September 22, 2000, Mr. Bowman wrote to Mr. McClenan and stated that Renda had approached the Project based on the experience of past contractors in the area and had to make

certain assumptions concerning the effects of very soft to soft foundation materials, as specified in note 10 of drawing number C-14. PX1006. Mr. Bowman stated that in Renda's opinion, the amount of observed displacement far exceeds that anticipated or considered reasonable by a prudent contractor. Mr. Bowman stated that Renda would endeavor to complete the levees until all available clay material was exhausted, but wanted to provide the Government with sufficient opportunity to prepare for the likelihood of insufficient available clay to complete the levees. PX1006.0003.

By letter of October 20, 2000, Mr. Bowman wrote to Mr. McClenan concerning the failure of the Lost Lake levees between Station Nos. 40+00 through 15+00. PX1027. Mr. Bowman stated that Renda had experienced some minor failures (sinking or sagging) of the levee up to the 25 foot elevation, which had been repaired as required. Mr. Bowman stated that levee failures began to increase in number and magnitude approximately two weeks ago as clay material was loaded above the 25 foot elevation, but that on Wednesday, October 18, 2000, the levee between Stations Nos. 40+00 through 15+00 began failing catastrophically, sagging and dropping between three feet and five feet below the existing elevation. PX1027.0002. Mr. Bowman stated that Renda has stopped work at the failed areas of the levee awaiting instructions from the Government. Mr. Bowman requested an emergency meeting with the Government and Joint Venture personnel on Monday, October 23, 2000, at 1:00 p.m. at the site of the failed levee, to review the issue. PX1027.0002.

By letter of October 31, 2000, Mr. Bowman wrote to Mr. McClenan concerning discussions involving the catastrophic failure of the new levee between Station Nos. 40+00 to 15+00 on the north side of Lost Lake. PX1064. Mr. Bowman noted that the levee had essentially sheared the entire 2,500 foot length and that the levee had sagged or subsided to an approximate elevation of plus 23 MLT. Mr. Bowman noted that the shear line occurs at an approximate location 20 feet from the

inside toe of the existing levee and 50 to 55 feet (plus/minus) from the outside crown of the existing levee. Mr. Bowman stated that the depth to the bottom of the shear line is up to eight feet, in places. PX1064.0002. Mr. Bowman reported on the meeting with the Corps and the Joint Venture on October 23, 2000. Mr. Bowman noted that during the meeting, the Joint Venture stated that the existing levees were built up or added using a crane with a drag line rig working off of mats with their work taking place as 1996. Mr. Bowman stated that the drag line, located inside the existing levee and sitting on crane mats, excavated material inside the existing levee location, creating a borrow pit or borrow area running continuously parallel to the existing levee. Mr. Bowman stated that the borrow material was then used to build up or add to the existing levees. Mr. Bowman stated that although Tim Few indicated that a 50 feet minimum distance was specified and required by the Government to be maintained from the inside toe of the levee to the beginning of the borrow area, the Joint Venture seriously doubted that the 50 feet set back limit was closely monitored. Mr. Bowman wrote that the Joint Venture stated that they had discussed potential borrow area problems with the Government prior to bidding the Project. Mr. Bowman stated that the Joint Venture's hypothesis appears reliable since crane mats are typically 20 feet wide, and the new shear line, located approximately 20 feet from the toe of the existing levee, corresponds with the general size of the crane mats and what appears to be the leading edge of the existing borrow area. Mr. Bowman stated that since the entire 2,500 feet of shear line at the new Renda levee appears consistently within the 20 plus/minus 5 feet dimension from the toe of the existing levee, Renda believed that the Joint Venture theory may be correct. Mr. Bowman pointed out that the east levees, which had already been accepted by the Government, now had a shear line hundreds of fees in length, also corresponding to approximately 20 feet from the inside toe of the existing levees. PX1064.0002.

By letter of November 2, 2000, Mr. Bowman wrote to Mr. McClenan concerning Renda's construction of the north levees mechanically. PX1070. Mr. Bowman stated that it was Renda's opinion that whether soft foundation materials are displaced by discharge from the dredge and the clay settling or displaced by placing the heavier clay material on top of the soft mud and silts, the effect remains the same, i.e., the material is displaced until good clay material rests on a stable foundation. Mr. Bowman noted that in this case, up to 700% of clay material is required to displace the soft foundation materials (far in excess of anyone's estimate), and Renda has reason to believe that the reason for this low yield of clay material is that the contour of the stable foundation includes a parallel borrow area running adjacent to the new levee construction. Mr. Bowman stated that the suggestion that a dredge pipe on the surface would "blast" or "blow out" soft foundation materials to the depths and volumes that comprise these borrow areas is not physically reasonable. PX1070.0001. Mr. Bowman indicated that Renda believed that the acknowledged existence of the borrow areas have contributed greatly to the lack of efficiency during new levee construction operations. Mr. Bowman stated that the borrow areas are not shown in the contract documents are were not anticipated in the bid by Renda and are a changed condition. PX1070.0002.

By letter of November 3, 2000, Mr. McClenan wrote to Mr. Bowman to schedule a meeting at Lost Lake on November 6, 2000, concerning the west levee realignment and other issues. DX519.

Renda prepared a meeting agenda for the November 6, 2000, meeting, concerning various construction issues on the Project. PX1085. The sign in sheet for the November 6, 2000, meeting is PX1084.

While Renda was meeting with Mr. McClenan and the Bay Area Office concerning various construction problems on the Project, Mr. Benero was signing a Show Cause Notice based on Renda's alleged lack of progress. PX1083.

Mr. Bowman responded by letter of November 15, 2000, to Mr. Benero to point out that Mr. Benero had not accounted for various differing site conditions or changed conditions, including the soft levee foundation issue and the general levee failure of complete and accepted levees due to the existence of sidecast borrow areas. JX69.0003.

By letter of December 6, 2000, Mr. Bowman wrote to Mr. McClenan and advised that Renda was continuing with its dredging and levee building operations as discussed and agreed to in the November 6, 2000, meeting. JX72. Mr. Bowman wrote that Renda contends that the voids being filled in the borrow areas have consume the clay available for the Project, and that Renda believed that insufficient clay was available to complete the levees to the current design template. Mr. Bowman noted that it had been agreed that Renda had used in excess of 100% (having recovered clay material from previous dredging operations) of the available clay material on the site, Renda believed that discussions regarding mining operations should be of no further issue. JX72.0002.

By letter of December 13, 2000, Mr. McClenan responded to Mr. Bowman's letter of December 6, 2000 (JX72), and rejected Renda's differing site condition claims concerning the levees. PX1158.0002-06.

By letter of December 20, 2000, Mr. Bowman wrote to Mr. McClenan to respond to Mr. McClenan's December 13, 2000, letter (PX1158). PX1175. Mr. Bowman wrote that the Government's deliberate omission from the contract drawings and specifications that borrow areas existed adjacent to the inside of the existing levees was a major problem. PX1175.0005.

Mr. Bowman wrote that the Government's design failure to verify the sufficient quantities of clay were available to complete the work, knowing that borrow areas existed and would affect the amounts of clay required for new construction was a major problem. Mr. Bowman wrote that the Government furnished admittedly inaccurate geotechnical infomation, showing a site repeatedly filled with sands, silts, and clays from prior dredging operations with areas of undisturbed existing bay bottom. Mr. Bowman noted that actual conditions, omitted by the Government, included the fact that significant mining was performed in the borrow areas, where the new levees were to be constructed, causing the significant majority of the Government furnished soil borings shown on the contract drawings to differ materially from what was actually encountered. PX1175.0006. Mr. Bowman also stated that the Government failed to quantify the amount of satisfactory material required to "fill" the borrow area voids. PX1175.0006. The balance of Mr. Bowman's 30-page letter fleshes out these major deficiencies.

By email of February 8, 2001, Mr. Few wrote to Mr. McClenan concerning the Joint Venture disparaging the Corps' design in the presence of Renda personnel. PX1267. Mr. Few wrote that Leon and Yogi made a point to tell Mr. Bowman about some "big" borrow areas that were "hidden" in the contract and discussed with them information the Joint Venture obtained during their supplemental quality assurance work for the Corps to "help" Renda try to redesign hauled fill levees.

By letter of March 1, 2001, Mr. Bowman wrote to Mr. Benero to state that since August 2000, Renda has attempted to make the Government aware that sufficient quantities of clay material were not available to complete the Lost Lake levees specified in the contract documents. PX1285. Mr. Bowman stated that due to various differing site conditions and the existence of unreported borrow areas adjacent to the existing levees, unanticipated and disproportionate quantities (upwards

of seven times neat line quantity) of hydraulically placed material had been required to construct the new levees. Mr. Bowman stated that unfortunately, the new levees continued to fail (subsidence and shear failures), and that the remaining clay material available from dredging operations is not likely to allow completion of the north and northwest reaches of the new levee system. PX1285.0001.

Later, on March 8, 2001, the Corps held a meeting to discuss outstanding issues. By email of March 9, 2001, Mr. Benero wrote to Mr. McClenan and Mr. Russek to provide a recap of the prior day's meeting with Renda. PX1315. Mr. Benero noted that Renda had requested a partial termination for convenience on the remaining levees and that there were many different issues on the levees for which Renda planned to combine its claims into one big claim and submit it to the Corps. Mr. Benero noted that the Bay Area Office was working on a letter to give Renda concerning the way that the Corps wanted Renda to complete the levees. Mr. Benero noted that Renda will not be able to complete this portion of the levees to grade and that the big plan was to add this portion of the levees to a succeeding contract.

By email of March 9, 2001, Barbara Watts of the Corps wrote to Mr. McClenan and others that "there seems to be a small problem with no material to finish to the levees with." PX1319. Ms. Watts noted that "last but not least WHAT DIRECTION DO WE GIVE THEM FOR THE LEVEES? I didn't see any clear direction in the meeting."

By letter of March 12, 2001, Mr. Benero wrote to Mr. Bowman to provide direction concerning the completion of the levees. PX1323. Mr. Benero wrote that although there may not be enough suitable material to complete the levees to contract grade, you are directed to make efficient use of the remaining material available to complete the levees to the extent possible. PX1323.0002.

By letter of March 13, 2001, Mr. Bowman responded to Mr. Benero's March 12, 2001, letter (PX1323), by stating that Renda must again remind the Government that insufficient quantities of clay are available in the remaining contract for completion of the levee construction, as specified. PX1327.0001. Mr. Bowman noted that the Government has been aware of this deficiency since August 2000, when Renda notified the Area Engineer of the problem.

By letter of March 23, 2001, Mr. Bowman wrote to Mr. Benero concerning various problems caused by the Joint Venture. PX1352. Mr. Bowman wrote that Renda discovered that the Joint Venture was intimately aware of withheld information regarding the existence of borrow areas adjacent to the new levee construction, which is now subject to significant claims by Renda. PX1352.0004.

By letter of March 29, 2001, Mr. Bowman wrote to Mr. Benero concerning levee construction at Lost Lake. PX1362. Mr. Bowman stated that as a historic reminder, Renda anticipated from the contract drawings that 850,000 to 900,000 cubic yards of very stiff material would be available for construction of the hydraulic levees. Mr. Bowman noted that to date Renda has hydraulically dredged approximately 1.6 million cubic yards of clay material for the levees, and the levees remain incomplete. Mr. Bowman stated that Renda's construction efforts had been hampered by unstable foundation conditions, Government claims of over placed material, and the Joint Venture's continual critique and involvement in Renda's construction means and methods. PX1362.0002. Mr. Bowman concluded that Renda could not proceed without Mr. Benero's directive until the extent of the directive is fully understood by the Government and Renda. PX1362.0003.

By letter of April 24, 2001, Mr. Bowman wrote to Mr. Benero to inform Mr. Benero of the current status of outstanding issues related to the Project. PX1405. Mr. Bowman stated concerning

the Lost Lake levee changes and differing site conditions request for equitable, that the REA was comprised of many different sub-issues, including but not limited to, insufficient levee-building material to construct the levees, existence of unreported borrow areas adjacent to the new levees causing significant construction problems and additional work for Renda's levees building crews and equipment, excessive over placement issue, Government survey information and existing levee as-built information which did not correspond to actual conditions, and levee alignment changes directed by the Government. Mr. Bowman noted that these issues will be addressed as soon as the Government decides what type of corrective action will be required to correct/complete the levees. PX1405.0003.

By letter of April 30, 2001, Mr. Bowman wrote to Mr. McClenan concerning the April 26, 2001, levee conference at the Lost Lake site. PX1415. Mr. Bowman stated that the meeting was prompted by Mr. Benero's March 12, 2001, directive. Mr. Bowman observed that the levees are not constructable as originally designed due to hidden and unknown conditions, but that Renda has proven that the levees are constructable if the design is modified in accordance with recommendations initially made in August 2000. PX1415.0002.

By email of May 16, 2001, Mr. McClenan wrote to Mr. Benero concerning some reasons to have Renda complete the north levee. PX1459. Mr. McClenan wrote that Renda has demonstrated that Renda can effectively perform mechanical construction of levees.

By letter of May 16, 2001, Mr. Bowman wrote to Mr. McClenan concerning Renda's request for surveys of the levees. PX1460. Mr. Bowman noted that Renda has numerous times, both verbally and in writing, requested any and all survey information from the Government related to the Project. Mr. Bowman lists the survey information that Renda needs, and points out that an honest exchange

of survey information/data is the only way to adequately address the final levee construction solution. PX1460.0002.

By letter of May 17, 2001, Mr. Bowman wrote to Mr. McClenan to advise that Renda's work remains in limbo and that the Joint Venture continued to interfere in Renda's contract. JX81. 0002. Mr. Bowman stated that during the design development phase for the Project, the Joint Venture withheld significant information, which was not included in the bid documents regarding the existence of "borrow areas" adjacent to the proposed alignment of the new levees. JX81.0002.

Renda continued to try to construct the levees. Renda prepared an agenda for a meeting on May 24, 2001, concerning the status of construction of the levees using clay from the Houston Fuel Oil Terminal. PX1481. In that agenda, Renda noted that the levee remaining to be completed was approximately 1,100 feet. Renda noted that if you assume 270 cubic yards of required material, the shortfall would be 150,000 cubic yards.

By letter of June 5, 2001, Mr. Bowman wrote to Mr. Benero to advise that Renda felt confident that a levee could be constructed to a finished elevation of 28 to 30 feet MLT over the existing levee maintaining a slope of 1-1/2 to 1 minimum to 2 to 1 maximum dependent on the location of the borrow area shear line relationship to the existing levee. PX1504. Mr. Bowman noted that new levee work consumed an average of 270 cubic yards of levy building quality material per linear foot constructed to an elevation of 26 plus/minus feet MLT. Mr. Bowman noted that the new levee template volume is 34 cubic yards per linear foot neat line, with a yield of 50 to 70 cubic yards per linear foot when constructed areas with undisturbed bay bottom. PX1504.0002. Mr. Bowman pointed out that the Government must understand that Renda would have completed the north levee if allowed to continue uninterrupted in the fall of 2000 with the second directive. PX1504.0003.

By email of June 8, 2001, Mr. Benero wrote to Mr. Keys and Mr. Krueger concerning Barry Smith having informed the Corps that Renda would be about 600 to 800 feet short of completing the west levees. PX1511. Mr. Benero stated that the Corps told Mr. Smith to do as much as they could on the levees and the Corps would give them direction in the future about what the Corps was going to do about completing them. Mr. Benero also noted that he had received a $825,000.00 proposal from Renda to complete the north levees which he thinks is excessive.

By letter of June 19, 2001, Mr. Bowman wrote to Mr. Benero to advise that since receiving Mr. Benero's letter directive on March 12, 2001, Renda has been patiently waiting 3.5 months (99 days) for the Government to decide how, when, or even whether or not to proceed with the remaining levee construction at Lost Lake. PX1525.0002. Mr. Bowman noted that Renda has explained numerous times how the work can/will be completed by mechanical means using clay previously placed by Renda to fill the borrow areas. PX1525.0002. Mr. Bowman again urged the Government to provide clear and concise direction for the levee issues, or at least give some idea when a decision will be forthcoming. Mr. Bowman concluded with a statement: **"WHAT DO YOU WANT US TO DO?"** PX1525.0004.

By letter of June 20, 2001, Mr. Bowman wrote to Mr. Benero to provide information on the current status of outstanding issues related to the Project. PX1526. Mr. Bowman wrote concerning the Lost Lake Levee Changes and Differing Site Conditions REA. PX1526.007. Mr. Bowman stated that Renda had submitted numerous letters and met with the Government and Joint Venture personnel several times regarding levee construction issues, but still awaited a Government decision on what type of corrective action would be required to correct/complete the levees. PX1526.0007.

By letter of July 24, 2001, Mr. Bowman wrote to Mr. Benero to state that Renda contended that the Lost Lake levee issues were not the fault of the contractor, but were the result of lack of site investigation and research into the "borrow areas" during the design process. PX1551. Mr. Bowman stated that Renda has continually throughout the contract, suggested and requested that the Government reevaluate the design the scope of work needed to satisfy the original levee design. Mr. Bowman stated that Renda has to date incorporated in excess of 2 million cubic yards of levee quality building material into the levee system, which by all accounts should have required less than 700,000 cubic yards to complete. PX1551.0001.

By letter of August 27, 2001, Mr. Benero wrote to Mr. Bowman to advise that since there are no further requirements for placement of dredged material under this contract, you are directed to remove any remaining pipelines or pertinent equipment belonging to Renda from Lost Lake not later than 30 days from receipt of this letter. PX1583. On September 18, 2001, the Corps issued Change Order No. 11, deleting the remainder of dredging and levee construction work on the Project. JX06.028. Mr. Benero testified that the change order was issued to terminate Renda for convenience of the Government.

After the termination for convenience, the Government solicited bids for the Mid Bayou/Goat Island Project. The pre-bid meeting for the Goat Island Project occurred on July 24, 2002. The transcript for the pre-bid meeting is PX1751. In the Goat Island pre-bid conference, the Corps and the Joint Venture discussed the project with various prospective bidders. The project concerned in part, dredging of the plug between Station 650+-00 and 658+00 and the deleted work in Section 9. PX1751.0013. The dredged material was required to go into the Lost Lake disposal area. PX1751.0013. Work on rebuilding the levees would start with the west levee from Station 170 to 206

and would be strictly mechanical. PX1751.0017. The Corps required the prospective contractor to build a 100 foot berm and to borrow material beyond that 100 foot berm. PX1751.0017. The west levee work from Station 170 to 206 was mechanical, just earth work, building, constructing a levee to plus 36 and three slopes, and a little berm and a side bar ditch. PX1751.0019. Once the earth work was completed for the west levee and the north levee retaining levees are in place, then the contractor would be required to start dredging at Section 16 and progress to Section 20. The material would be placed hydraulically along the existing perimeter levee building it up to an elevation such that when the contractor did its final shaping the contractor would have a crown of 20 feet wide and an elevation of 36 feet. PX1751.0021 & 23. The pre-bid meeting continued with discussion concerning the hydraulic placement, which continued to page PX1751.0029.

Later at the pre-bid conference, the Corps provided assurances to the contractors that there would be sufficient suitable new work material to be able to construct the hydraulic levees. Mr. Jefts of the Joint Venture stated that "Basically the intent of the hydraulic or the specification of the hydraulic levees basically is using a displacement method to construct those levees. We've got soil foundations on that north side. We expect to pump a lot of hydraulic material in here to create those levees. We also – from what our quantity calculations are looking like, we've got a lot of material being dumped into that site for those levees. We don't anticipate problems getting those sections. In fact, that's one of the reasons why John [McManus] has provided that this discharge core on the east side, so that if we do have material left over, we've got a place for it. So we don't expect that. If for some unreal reason occurs that all of a sudden we have ourselves in a situation where we're not getting the hydraulic levee to the cross section that is shown on the plans, as we monitor the construction, then we'll make changes as we go." PX1751.0067.

Mr. Grady Bryant with the Joint Venture then added to Mr. Jefts comments: "Just to reiterate what Alan said, it is the intent of this hydraulic construction to build these levees through displacement methods, meaning that we fully expect the soft muds that have been pumped through years and years of maintenance dredging that a line within this levee to be fully displaced and have mud running through the site. That is the intent of the spec is to displace the soft muds to build the levee and provide foundation for future raisings for maintenance in the future. PX1751.0069.

Mr. Hrabovsky added: "We've taken a look at it. And it appears that we've got enough material to build the 35, 36 foot, whatever we'd asked for there. There is a possibility that we may – we don't see it. We think we have excess material, but if there's a possibility, it may be that the grade would change to a foot one way or the other. We're not looking to go any higher at this time. It's a possibility that if we did run short of material and you didn't have enough material to dress it 36 feet, you may go 35, whatever we have there. But its – from the way it looks right now, with the amount of material and the clay we have, we should have more than enough material to build it 36 foot." PX1751.0069.

In response to a question concerning insufficient material on another project, Mr. Hrabovsky stated that "we've looked at that. And actually more study was done on that on the Upper Bayou job. And we intended to displace that. If you look at the borings, you can see to where there's soft material in places down below zero. And we expect to displace that material or some portion of it with a – with a heavier material berm there. And, you know, we're not asking for a one-to-one displacement or two to one or three to one. What we're asking for is a berm large enough to build that dike. Like I said earlier, it may be that we don't have as much material as we think we have. We may not get to 36. We may decide to change it to 35, 34, whatever. But we feel now in talking with

John and Geotech people that we've got more than enough to build it to 35 or 36 foot, whatever we asked for. Because most of that material appears to be pretty good clay, sand, whatever of structural materials in those Sections 16 through 20. PX1751.0073 & 75.

Kenneth Affolter was the project manager for Affolter Contracting for Affolter's work on the Goat Island Project. Mr. Affolter testified that he could not find suitable clay to construct the west levees. Affolter and Great Lakes turned in a notice of differing site condition due to a lack of suitable clay materials. Ultimately, the Corps investigated the matter and determined that the material was unsuitable for use in the levee construction since it was basically a supersaturated high silt clay. PX1794; Trial Trans. at 3289.

By memo of December 8, 2002, Jamie Hansen wrote to Mr. McClenan concerning his investigation of the differing site condition notice concerning a lack of suitable clay material. PX1796. Mr. Hansen cited frm the contractor's quality control report, which stated that the borrow material "is more consistent with a maintenance material than a new work quality material usually associated with new levee construction." PX1796.0004. Mr. Hansen's conclusion was that whether or not this is a differing site condition has not been determined. PX1796.0005.

In 2002, the Corps had commissioned soil borings to find allegedly wasted clay. However, by late 2002, the Corps had not even opened the boring log mailing envelopes. PX1800. The borings by Geotest Engineering are contained in PX1868.

As Mr. Affolter testified, Affolter attempted to construct the west levee but was unsuccessful as it repeatedly failed. Mr. Affolter testified to his frustration at excavating in a borrow area placing material on the west levee, only to have the borrow area fill up when the west levee subsided. Trial Trans. at 1591-1593.

Mr. Van Norman testified that Great Lakes hydraulically pumped a million or more yards of material on the north levee, without successfully completing the north levee. Trial Trans. at 3536-3537. Mr. Affolter testified that in Affolter's attempts to shape the north levee, Affolter confronted numerous failures. Trial Trans. at 1606-1607.

In sum, the hydraulic levees were not constructable as designed, and under the circumstances.

Mr. Smith testified to his preparation of the REA and certified claims for the Levee DSC claim. Mr. McCullough testified to $5,660,479, as the proper figure for the claim (including the levee realignment costs), with all appropriate reductions. PX1863A.

**CONCLUSION**

Renda has carried its burden and the Court should award Renda $10,842.811.00 for Renda's claims in this suit.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: s/Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800
Clark B. Will, P.C. TX Bar No. 21502500

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)

ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the21st day of April, 2005, a true and correct copy of the Post Trial Brief by Plaintiff, Renda Marine, Inc., was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson

# APPENDIX

## Table of Contents

ADMITTED EXHIBITS: FLARE AREA CLAIM . . . . . -- 1 --

ADMITTED EXHIBITS: SECTION 7 CLAY CLAIM . . . . . -- 3 --

ADMITTED EXHIBITS: OBSTRUCTIONS #1 CLAIM . . . . . -- 4 --

ADMITTED EXHIBITS: OBSTRUCTIONS #2 (SECTION 9) CLAIM . . . . . -- 6 --

ADMITTED EXHIBITS: SOUTH FERRY LANDING CLAIM . . . . . -- 7 --

ADMITTED EXHIBITS: HL&P TOWER CLAIM . . . . . -- 8 --

ADMITTED EXHIBITS: LEVEE REALIGNMENT CLAIM . . . . . -- 9 --

ADMITTED EXHIBITS: LEVEE DIFFERING SITE CONDITION CLAIM . . . . . -- 10 --

ADMITTED EXHIBITS: PHOTOGRAPHS BY ISSUE . . . . . -- 13 --

## ADMITTED EXHIBITS: FLARE AREA CLAIM

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| JX38 | 07/09/1999 | Spreadsheet | | | Vol. 8, p. 2170 |
| JX41 | 10/13/1999 | Letter | Fisher, E. | McClenan, M. | Vol. 3, p. 763 |
| JX43 | 01/05/2000 | Letter | Fisher, E. | Benero, T. | Vol. 3, p. 765 |
| PEX0708 | 02/02/2000 | Email | Russek, E. | McClenan, M. | Vol. 3, p. 767 |
| DX0429 | 03/18/2000 | | Fisher, E. | Laco & Arturo | Vol. 9, p. 2557 |
| DX0437 | 03/30/2000 | | Fisher, E. | McClenan, M | Vol. 1, p. 317 |
| PEX0798 | 04/04/2000 | Letter | Fisher, E. | Benero, T. | Vol. 1, p. 173 |
| PEX0802 | 04/06/2000 | Email | Anderson, D. | Few, T. | Vol. 7, p. 1872 |
| PEX0823 | 04/14/2000 | Email | Few, T. | Mears, W. | Vol. 15, p. 4019 |
| PEX0826 | 04/17/2000 | Email | Few, T. | Mears, W. | Vol. 7, p. 1873 |
| JX49 | 04/25/2000 | Letter | Benero, T. | Fisher, E. | Vol. 1, p. 182 |
| DX0451 | 04/28/2000 | | Fisher, E. | Smith, B. | Vol. 7, p. 2065 |
| JX51 | 05/03/2000 | Letter | Fisher, E. | Benero, T. | Vol. 3, p. 778 |
| DX0454 | 05/04/2000 | | Russek, E. | Fisher, E. | Vol. 13, p. 3602 |
| PEX0866 | 05/16/2000 | Email | Few, T. | Anderson, D. | Vol. 7, p. 1875 |
| PEX0875 | 05/31/2000 | Letter | Benero, T. | Fisher, E. | Vol. 3, p. 780 |
| JX52 | 06/02/2000 | Letter | Jefts, A. | Kuhne, P. | Vol. 3, p. 782 |
| DX0477 | 07/13/2000 | | Fisher, E. | Bowman, S. | Vol. 8, p. 2167 |
| PEX0920 | 07/18/2000 | Email | Few, T. | Russek, E. | Vol. 7, p. 1877 |
| JX59 | 08/03/2000 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 794 |
| PEX0954 | 08/11/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 1036 |
| PEX0975 | 08/22/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 797 |
| PEX0994 | 09/14/2000 | Memo | Mears, W. | Gorini, R. | Vol. 15, p. 4089 |
| PEX0997 | 09/18/2000 | Email | Mears, W. | Russek, E. | Vol. 12, p. 3217 |
| PEX1006 | 09/22/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 801 |
| PEX1064 | 10/31/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 700 |
| JX69 | 11/15/2000 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 215 |
| PEX1158 | 12/13/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 1, p. 227 |
| PEX0001.002 | 02/13/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 3, p. 837 |
| PEX0001.001 | 02/13/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 3, p. 837 |
| PEX1275 | 02/14/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 805 |
| PEX1283 | 02/22/2001 | Email | Sanford, W. | Benero, T. | Vol. 13, p. 3430 |
| PEX1303 | 03/06/2001 | Email | Sanford, W. | Benero, T. | Vol. 13, p. 3432 |
| JX77 | 03/14/2001 | Fax Cover Sheet | Smith, L. | Bowman, S. | Vol. 3, p. 809 |
| PEX1346 | 03/21/2001 | Email | Benero, T. | Sanford, W. | Vol. 13, p. 3436 |
| PEX1352 | 03/23/2001 | Letter | Bowman, S. | Benero, T. | Vol. 2, p. 609 |
| PEX1354 | 03/27/2001 | Email | Russek, E. | Sanford, W. | Vol. 7, p. 1882 |
| PEX0075 | 04/00/2001 | Chart - Cross sections | Fisher, E. | | Vol. 3, p. 761 |

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| JX78 | 04/02/2001 | Memo | Smith, B. | Sanford, W. | Vol. 3, p. 813 |
| PEX1405 | 04/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 819 |
| PEX1443 | 05/11/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 821 |
| PEX1467 | 05/17/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 822 |
| PEX1481 | 05/24/2001 | Agenda for Meeting | Renda Marine | COE-Galveston | Vol. 3, p. 824 |
| PEX1526 | 06/20/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 825 |
| PEX1555 | 07/31/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 827 |
| JX89 | 08/09/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 833 |
| JX92 | 11/06/2001 | Letter | Benero, T. | Renda, O. | Vol. 1, p. 310 |

## ADMITTED EXHIBITS: SECTION 7 CLAY CLAIM

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| JX38 | 07/09/1999 | Spreadsheet | | | Vol. 8, p. 2170 |
| PEX1027 | 10/20/2000 | Letter | Bowman, S. | McClenan, C. | Vol. 1, p. 207 |
| JX69 | 11/15/2000 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 215 |
| PEX1158 | 12/13/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 1, p. 227 |
| PEX1175 | 12/20/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 752 |
| JX74 | 03/01/2001 | Letter | Bowman, S. | Benero, T. | Vol. 5, p. 1248 |
| PEX1315 | 03/09/2001 | Email | Benero, T. | Keys III, Dan | Vol. 12, p. 3379 |
| PEX1327 | 03/13/2001 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 246 |
| PEX0006.001 | 04/16/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 5, p. 1252 |
| PEX1405 | 04/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 819 |
| PEX1409 | 04/25/2001 | Letter | McClenan, M. | Jefts, Alan R | Vol. 12, p. 3382 |
| PEX1481 | 05/24/2001 | Agenda for Meeting | Renda Marine | COE-Galveston | Vol. 3, p. 824 |
| PEX1526 | 06/20/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 825 |
| PEX0006.002 | 08/19/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 5, p. 1254 |
| PEX1614 | 11/06/2001 | Letter | Benero, T. | Renda, Oscar | Vol. 1, p. 303 |
| PEX0006.003 | 04/19/2002 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 5, p. 1254 |
| JX19 | 12/12/2002 | DCAA Papers | DCAA | COE-Galveston | Vol. 17, p. 4589 |

## ADMITTED EXHIBITS: OBSTRUCTIONS #1 CLAIM

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| JX53 | 05/30/2000 | Letter | Fisher, E. | McClenan, M. | Vol. 3, p. 848 |
| JX59 | 08/03/2000 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 794 |
| PEX0949 | 08/08/2000 | Memo | Russek, E. | File - COE | Vol. 12, p. 3303 |
| PEX0951 | 08/08/2000 | Memo | Russek, E. | | Vol. 3, p. 934 |
| PEX0994 | 09/14/2000 | Memo | Mears, W. | Gorini, R. | Vol. 15, p. 4089 |
| PEX0997 | 09/18/2000 | Email | Mears, W. | Russek, E. | Vol. 12, p. 3217 |
| PEX1006 | 09/22/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 801 |
| PEX1027 | 10/20/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 1, p. 207 |
| JX63 | 10/24/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 869 |
| PEX1545; pp. 2 & 3 only | 10/27/2000 | Bid Document | Benero, T. | | Vol. 3, p. 873 |
| PEX1056 | 10/27/2000 | Agreement/Contract | Weeks Marine | Renda Marine | Vol. 3, p. 878 |
| JX69 | 11/15/2000 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 215 |
| JX71 | 11/16/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 882 |
| PEX1122 | 11/30/2000 | Email | Meyer, A. | McClenan, M. | Vol. 12, p. 3373 |
| JX73 | 12/13/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 19, p. 5121 |
| PEX1158 | 12/13/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 1, p. 227 |
| PEX1175 | 12/20/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 752 |
| PEX1176 | 12/20/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 888 |
| PEX1178 | 12/21/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 1, p. 229 |
| PEX1179 | 12/21/2000 | Email | McClenan, M. | Jefts, Alan R | Vol. 12, p. 3377 |
| PEX1187 | 01/01/2001 | Survey | | | Vol. 3, p. 895 |
| DX0542 | 01/24/2001 | Report | | | Vol. 16, p. 4469 |
| DX0542A | 01/24/2001 | Survey | | | Vol. 16, p. 4469 |
| PEX1221 | 01/31/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 891 |
| PEX1260 | 02/07/2001 | Email | Krueger, D. | Gorini, R. | Vol. 12, p. 3331 |
| JX76 | 03/07/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 1, p. 240 |
| PEX1317 | 03/09/2001 | Email | Benero, T. | Keys, D. | Vol. 12, p. 3333 |
| PEX1315 | 03/09/2001 | Email | Benero, T. | Keys, D. | Vol. 12, p. 3379 |
| PEX1327 | 03/13/2001 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 246 |
| PEX1326 | 03/13/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 941 |
| PEX1342 | 03/20/2001 | Email | Russek, E. | Benero, T. | Vol. 12, p. 3335 |
| PEX1352 | 03/23/2001 | Letter | Bowman, S. | Benero, T. | Vol. 2, p. 609 |
| PEX1361 | 03/29/2001 | Letter | Benero, T. | Bowman, S. | Vol. 3, p. 946 |
| PEX1362 | 03/29/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 949 |
| PEX1385 | 04/14/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 953 |
| JX79 | 04/16/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 907 |
| PEX0004.001 | 04/16/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 3, p. 911 |

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| PEX1390 | 04/16/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 961 |
| PEX1394 | 04/16/2001 | Email | Benero, T. | Maurer, H. | Vol. 12, p. 3339 |
| DX0568 | 04/17/2001 | | Mears W. | Russek, E. | Vol. 15, p. 4075 |
| PEX1398 | 04/23/2001 | Email | Russek, E. | McClenan, M. | Vol. 12, p. 3343 |
| PEX1402 | 04/23/2001 | Email | Russek, E. | McClenan, M. | Vol. 12, p. 3345 |
| PEX1405 | 04/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 819 |
| PEX1404 | 04/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 979 |
| PEX1409 | 04/25/2001 | Letter | McClenan, M. | Jefts, A. | Vol. 12, p. 3382 |
| PEX1413 | 04/26/2001 | Minutes | Mears, W. | Renda, O. | Vol. 12, p. 3346 |
| PEX1415 | 04/30/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 982 |
| PEX1419 | 05/01/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 985 |
| PEX1429 | 05/04/2001 | Survey | | | Vol. 3, p. 916 |
| JX81 | 05/17/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 917 |
| PEX1481 | 05/24/2001 | Agenda for Meeting | Renda Marine | COE-Galveston | Vol. 3, p. 824 |
| PEX1499 | 06/01/2001 | Letter | Cole, C. | Bowman, S. | Vol. 1, p. 275 |
| JX83 | 06/01/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 1008 |
| PEX0004.002 | 06/11/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 3, p. 911 |
| PEX1525 | 06/19/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 1184 |
| PEX1526 | 06/20/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 825 |
| JX86 | 08/09/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 927 |
| PEX1573 | 08/23/2001 | Email | Benero, T. | Smith, B. | Vol. 3, p. 929 |
| PEX1576 | 08/23/2001 | Email | Benero, T. | McClenan, M. | Vol. 13, p. 3398 |
| JX90 | 08/28/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 930 |
| JX20 | 12/12/2002 | DCAA Papers | DCAA | | Vol. 17, p. 4590 |
| JX21 | 12/12/2002 | DCAA Papers | DCAA | | Vol. 17, p. 4591 |

## ADMITTED EXHIBITS: OBSTRUCTIONS #2 (SECTION 9) CLAIM

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| PEX0951 | 08/08/2000 | Memo | Russek, E. | | Vol. 3, p. 934 |
| DX0542 | 01/24/2001 | | | | Vol. 16, p. 4469 |
| DX0542A | 01/24/2001 | | | | Vol. 16, p. 4469 |
| PEX1260 | 02/07/2001 | Email | Krueger, D. | Gorini, R. | Vol. 12, p. 3331 |
| JX76 | 03/07/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 1, p. 240 |
| PEX1317 | 03/09/2001 | Email | Benero, T. | Keys, D. | Vol. 12, p. 3333 |
| PEX1327 | 03/13/2001 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 246 |
| PEX1326 | 03/13/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 941 |
| PEX1342 | 03/20/2001 | Email | Russek, E. | Benero, T. | Vol. 12, p. 3335 |
| PEX1352 | 03/23/2001 | Letter | Bowman, S. | Benero, T. | Vol. 2, p. 609 |
| PEX1362 | 03/29/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 949 |
| PEX1361 | 03/29/2001 | Letter | Benero, T. | Bowman, S. | Vol. 3, p. 946 |
| PEX1385 | 04/14/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 953 |
| PEX1394 | 04/16/2001 | Email | Benero, T. | Maurer, H. | Vol. 12, p. 3339 |
| PEX1390 | 04/16/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 961 |
| DX0568 | 04/17/2001 | | Mears, W. | Russek, E. | Vol. 15, p. 4075 |
| PEX1402 | 04/23/2001 | Email | Russek, E. | McClenan, M. | Vol. 12, p. 3345 |
| PEX1398 | 04/23/2001 | Email | Russek, E. | McClenan, M. | Vol. 12, p. 3343 |
| PEX1405 | 04/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 819 |
| PEX1404 | 04/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 979 |
| PEX1413 | 04/26/2001 | Minutes | Mears, W. | Renda, O. | Vol. 12, p. 3346 |
| PEX1415 | 04/30/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 982 |
| PEX1419 | 05/01/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 985 |
| JX81 | 05/17/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 917 |
| PEX1481 | 05/24/2001 | Agenda for Meeting | Renda Marine | COE-Galveston | Vol. 3, p. 824 |
| JX83 | 06/01/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 1008 |
| PEX1499 | 06/01/2001 | Letter | Cole, C. | Bowman, S. | Vol. 1, p. 275 |
| PEX0005 | 06/14/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 4, p. 1027 |
| PEX1525 | 06/19/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 1184 |
| PEX1526 | 06/20/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 825 |
| JX20 | 12/12/2002 | DCAA Papers | DCAA | | Vol. 17, p. 4590 |

## ADMITTED EXHIBITS: SOUTH FERRY LANDING CLAIM

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| PEX0175 | 09/20/1995 | Permit | COE-Galveston | | Vol. 7, p. 1888 |
| PEX0262 | 10/07/1997 | Email | McManus, J. | Meyer, A. | Vol. 13, p. 3403 |
| PEX0299 | 12/01/1997 | Memo | McManus, J. | | Vol. 13, p. 3405 |
| PEX0317 | 01/15/1998 | Memo | McManus, J. | Unknown | Vol. 13, p. 3410 |
| PEX0342 | 03/23/1998 | Email | Meyer, A. | McManus, J. | Vol. 13, p. 3665 |
| PEX0691 | 01/06/2000 | Letter | Fisher, E. | McClenan, M. | Vol. 13, p. 3413 |
| DX0447 | 04/20/2000 | | Fisher, E. | McClenan, M. | Vol. 8, p. 2224 |
| PEX0838 | 04/20/2000 | Email | McClenan, M. | Uhrich, M. | Vol. 13, p. 3416 |
| PEX0840 | 04/20/2000 | Minutes | | Unknown | Vol. 13, p. 3419 |
| PEX0846 | 04/24/2000 | Email | McClenan, M. | Kohler, H. | Vol. 13, p. 3418 |
| JX51 | 05/03/2000 | Letter | Fisher, E. | Benero, T. | Vol. 3, p. 778 |
| PEX0857 | 05/03/2000 | Email | Meyer, A. | McClenan, M. | Vol. 13, p. 3423 |
| DX0456 | 05/05/2000 | | Fisher, E. | Meyer, A. | Vol. 8, p. 2291 |
| DX0458 | 05/08/2000 | | Hunt, T. | | Vol. 12, p. 3159 |
| JX53 | 05/30/2000 | Letter | Fisher, E. | McClenan, M. | Vol. 3, p. 848 |
| PEX0954 | 08/11/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 1036 |
| JX61 | 08/23/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 1038 |
| PEX0991 | 09/08/2000 | Email | Mears, W. | Jefts, A. | Vol. 15, p. 4061 |
| PEX0994 | 09/14/2000 | Memo | Mears, W. | Gorini, R. | Vol. 15, p. 4089 |
| PEX0997 | 09/18/2000 | Email | Mears, W. | Russek, E. | Vol. 12, p. 3217 |
| PEX1006 | 09/22/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 801 |
| JX69 | 11/15/2000 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 215 |
| PEX1158 | 12/13/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 1, p. 227 |
| PEX1175 | 12/20/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 752 |
| PEX1176 | 12/20/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 888 |
| PEX0007.001 | 01/10/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 4, p. 1059 |
| PEX1314 | 03/09/2001 | Letter | Benero, T. | Bowman, S. | Vol. 4, p. 1056 |
| PEX1315 | 03/09/2001 | Email | Benero, T. | Keys, D. | Vol. 12, p. 3379 |
| PEX1330 | 03/13/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 1057 |
| PEX1405 | 04/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 819 |
| PEX1420 | 05/02/2001 | Email | Mears, W. | Gorini, R. | Vol. 15, p. 4115 |
| PEX1481 | 05/24/2001 | Agenda for Meeting | Renda Marine | COE-Galveston | Vol. 3, p. 824 |
| PEX1526 | 06/20/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 825 |
| PEX0007.003 | 08/23/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 4, p. 1062 |
| PEX1751 | 07/24/2002 | Transcript | Cole, Curtis | Unknown | Vol. 5, p. 1206 |
| JX16 | 12/12/2002 | DCAA Papers | DCAA | | Vol. 17, p. 4584 |

## ADMITTED EXHIBITS: HL&P TOWER CLAIM

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| PEX0316 | 01/13/1998 | Email | Hasen, M. | Chelliah, D. | Vol. 17, p. 4752 |
| PEX0358 | 04/21/1998 | Email | Krueger, D. | Cutler, C. | Vol. 13, p. 3633 |
| JX31 | 01/27/1999 | HL&P | Lawhn, R. | | Vol. 13, p. 3622 |
| DX0369 | 03/30/1999 | Map | | | Vol. 13, p. 3628 |
| DX0373 | 04/13/1999 | | Bennett, B. | Lawhn, R. | Vol. 13, p. 3629 |
| PEX1023 | 10/16/2000 | Letter | Schoennagel, E. | Goodloe, B. | Vol. 4, p. 1068 |
| PEX1026 | 10/18/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 1067 |
| PEX1058 | 10/30/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 4, p. 1072 |
| JX65 | 10/31/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 1073 |
| JX69 | 11/15/2000 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 215 |
| PEX1158 | 12/13/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 1, p. 227 |
| PEX1175 | 12/20/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 752 |
| PEX1405 | 04/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 819 |
| PEX1409 | 04/25/2001 | Letter | McClenan, M. | Jefts, A. | Vol. 12, p. 3382 |
| PEX0002.001 | 05/16/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 4, p. 1076 |
| PEX1481 | 05/24/2001 | Agenda for Meeting | Renda Marine | COE-Galveston | Vol. 3, p. 824 |
| PEX1526 | 06/20/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 825 |
| PEX0002.002 | 08/09/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 4, p. 1077 |
| PEX1615 | 11/06/2001 | Letter | Benero, T. | Renda, O. | Vol. 1, p. 306 |
| JX18 | 12/12/2002 | DCAA Papers | DCAA | | Vol. 17, p. 4587 |
| PEX0016.531 | 04/11/2003 | Photograph | | | Vol. 5, p. 1346 |

## ADMITTED EXHIBITS: LEVEE REALIGNMENT CLAIM

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| PEX0926 | 07/28/2000 | Letter | Duke, Pat | Russek, E. | Vol. 4, p. 1079 |
| PEX0949 | 08/08/2000 | Memo | Russek, E. | File - COE | Vol. 12, p. 3303 |
| PEX0951 | 08/08/2000 | Memo | Russek E. | | Vol. 3, p. 934 |
| JX60 | 08/18/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 1081 |
| PEX0969 | 08/18/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 12, p. 3311 |
| PEX0999 | 09/18/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 12, p. 3312 |
| PEX1005 | 09/21/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 12, p. 3314 |
| PEX1006 | 09/22/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 801 |
| PEX1064 | 10/31/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 700 |
| DX0519 | 11/03/2000 | | McClenan, M. | Bowman, S. | Vol. 2, p. 660 |
| PEX1083 | 11/06/2000 | Letter | Benero, T. | Bowman, Steven | Vol. 1, p. 202 |
| PEX1084 | 11/06/2000 | Sign in sheet | | | Vol. 2, p. 649 |
| PEX1085 | 11/06/2000 | Agenda for Meeting | Renda Marine | | Vol. 2, p. 649 |
| JX69 | 11/15/2000 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 215 |
| PEX1158 | 12/13/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 1, p. 227 |
| PEX1175 | 12/20/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 752 |
| PEX1323 | 03/12/2001 | Letter | Benero, T. | Bowman, S. | Vol. 4, p. 1099 |
| PEX1326 | 03/13/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 941 |
| PEX1362 | 03/29/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 949 |
| PEX1384 | 04/13/2001 | Letter | Jefts, A. | McClenan, M. | Vol. 12, p. 3324 |
| PEX1405 | 04/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 819 |
| PEX1460 | 05/16/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 1113 |
| PEX0008 | 05/31/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 5, p. 1256 |
| PEX1526 | 06/20/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 825 |
| JX88 | 08/09/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 1119 |
| PEX1617 | 11/06/2001 | Letter | Benero, T. | Renda, O. | Vol. 1, p. 307 |
| JX22 | 12/12/2002 | DCAA Papers | DCAA | | Vol. 17, p. 4593 |

## ADMITTED EXHIBITS: LEVEE DIFFERING SITE CONDITION CLAIM

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| DX0304 | | Photograph | | | Vol. 14, p. 3951 |
| DX1070 | | Work papers | McCullough, R. | | Vol. 11, p. 2867 |
| DX1071 | | Work papers | McCullough, R. | | Vol. 11, p. 2867 |
| DX1072 | | Work papers | McCullough, R. | | Vol. 11, p. 2902 |
| DX1073 | | Work papers | McCullough, R. | | Vol. 11, p. 2974 |
| DX1074 | | Work papers | McCullough, R. | | Vol. 11, p. 2987 |
| DX1075 | | Work papers | McCullough, R. | | Vol. 11, p. 2994 |
| DX1076 | | Work papers | McCullough, R. | | Vol. 11, p. 2996 |
| DX1066 | 08/08/1996 | Contract Modification | Hopkins, W. | VanNorman, J. | Vol. 14, p. 3737 |
| DX1067 | 08/19/1996 | Contract Modification | Granger, C. | Monnell, M. | Vol. 14, p. 3740 |
| PEX0225 | 08/12/1997 | Chart | | | Vol. 17, p. 4718 |
| PEX0294; p.1 | 11/26/1997 | Email | Meyer, A. | Brotman, I. | Vol. 17, p. 4733 |
| PEX0322 | 02/02/1998 | Reports | HVJ Assoc. | | Vol. 7, p. 1919 |
| DX0319 | 02/02/1998 | | | | Vol. 16, p. 4498 |
| PEX0355 | 04/16/1998 | Email | Meyer, Alton H | Few, T. | Vol. 7, p. 1920 |
| JX03 | 07/07/1998 | Contract Modification | COE-Galveston | | Vol. 2, p. 529 |
| DX0356 | 12/01/1998 | | Herrera, D. | Russek, E. | Vol. 8, p. 2155 |
| DX0357; p. 9 | 12/03/1998 | | | | Vol. 8, p. 2158 |
| PEX0548 | 03/02/1999 | Email | Few, T. | McManus, J. | Vol. 12, p. 3203 |
| DX0307 | 04/18/1999 | | | | Vol. 14, p. 3951 |
| DX0305 | 04/18/1999 | | | | Vol. 14, p. 3951 |
| DX0306 | 04/18/1999 | | | | Vol. 14, p. 3951 |
| JX39 | 08/05/1999 | Letter | Herrera, D. | McClenan, M. | Vol. 12, p. 3191 |
| DX0403 | 10/12/1999 | | Hopkins, W. | Herrera, L. | Vol. 13, p. 3596 |
| DX1020 | 03/13/2000 | | Mears, W. | Russek, E. | Vol. 15, p. 4029 |
| PEX0817 | 04/10/2000 | Email | Jefts, A. | Walters, T. | Vol. 15, p. 3985 |
| DX0451 | 04/28/2000 | | Fisher, E. | Smith, B. | Vol. 7, p. 2065 |
| PEX0892 | 06/13/2000 | Email | Anderson, D. | Meyer, A. | Vol. 12, p. 3211 |
| DX0477 | 07/13/2000 | | Fisher, E. | Bowman, S. | Vol. 8, p. 2167 |
| JX59 | 08/03/2000 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 794 |
| JX60 | 08/18/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 1081 |
| PEX0994 | 09/14/2000 | Memo | Mears, W. | Gorini, R. | Vol. 15, p. 4089 |
| PEX0997 | 09/18/2000 | Email | Mears, W. | Russek, E. | Vol. 12, p. 3217 |
| PEX1006 | 09/22/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 801 |
| PEX1027 | 10/20/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 1, p. 207 |
| PEX1064 | 10/31/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 700 |
| PEX1070 | 11/02/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 1137 |
| DX0519 | 11/03/2000 | | McClenan, M. | Bowman, S. | Vol. 2, p. 660 |
| PEX1085 | 11/06/2000 | Agenda for Meeting | Renda Marine | | Vol. 2, p. 649 |

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| JX69 | 11/15/2000 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 215 |
| JX72 | 12/06/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 734 |
| PEX1158 | 12/13/2000 | Letter | McClenan, M. | Bowman, S. | Vol. 1, p. 227 |
| PEX1175 | 12/20/2000 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 752 |
| PEX1260 | 02/07/2001 | Email | Krueger, D. | Gorini, R. | Vol. 12, p. 3331 |
| PEX1267 | 02/08/2001 | Email | Few, T. | Keys, D. | Vol. 14, p. 3855 |
| PEX1285 | 03/01/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 1161 |
| PEX1319 | 03/09/2001 | Email | Watts, B. | Keys, D. | Vol. 12, p. 3251 |
| PEX1315 | 03/09/2001 | Email | Benero, T. | Keys, D. | Vol. 12, p. 3379 |
| PEX1323 | 03/12/2001 | Letter | Benero, T. | Bowman, S. | Vol. 4, p. 1099 |
| PEX1327 | 03/13/2001 | Letter | Bowman, S. | Benero, T. | Vol. 1, p. 246 |
| PEX1352 | 03/23/2001 | Letter | Bowman, S. | Benero, T. | Vol. 2, p. 609 |
| PEX1362 | 03/29/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 949 |
| PEX1405 | 04/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 819 |
| PEX1413 | 04/26/2001 | Minutes | Mears, W. | Renda, O. | Vol. 12, p. 3346 |
| PEX1415 | 04/30/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 982 |
| PEX1424 | 05/03/2001 | Email | McClenan, M. | Few, T. | Vol. 12, p. 3261 |
| PEX1432 | 05/06/2001 | Email | Few, T. | McClenan, M. | Vol. 12, p. 3263 |
| PEX1459 | 05/16/2001 | Email | McClenan, M. | Benero, T. | Vol. 12, p. 3234 |
| PEX1460 | 05/16/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 4, p. 1113 |
| JX81 | 05/17/2001 | Letter | Bowman, S. | McClenan, M. | Vol. 3, p. 917 |
| PEX1481 | 05/24/2001 | Agenda for Meeting | Renda Marine | COE-Galveston | Vol. 3, p. 824 |
| PEX1504 | 06/05/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 1173 |
| PEX1511 | 06/08/2001 | Email | Benero, T. | Keys, D. | Vol. 12, p. 3268 |
| PEX1525 | 06/19/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 1184 |
| PEX1526 | 06/20/2001 | Letter | Bowman, S. | Benero, T. | Vol. 3, p. 825 |
| PEX1551 | 07/24/2001 | Letter | Bowman, S. | Benero, T. | Vol. 4, p. 1182 |
| PEX0003.005 | 10/16/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 4, p. 1188 |
| PEX0003.004 | 10/16/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 4, p. 1188 |
| PEX0003.002 | 10/16/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 4, p. 1188 |
| PEX0003.001 | 10/16/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 4, p. 1188 |
| PEX0003.003 | 10/16/2001 | Certified Claim/REA | Renda Marine | COE-Galveston | Vol. 4, p. 1188 |
| PEX1619 | 11/07/2001 | Letter | Benero, T. | Renda, O. | Vol. 1, p. 309 |
| PEX1751 | 07/24/2002 | Transcript | Cole, C. | Unknown | Vol. 5, p. 1206 |
| PEX1794 | 12/02/2002 | Email | Ching, E. | McManus, J. | Vol. 12, p. 3289 |
| PEX1796 | 12/08/2002 | Memo | Hansen, J. | McClenan, M. | Vol. 12, p. 3292 |
| PEX1800 | 12/11/2002 | Email | Krueger, D. | McClenan, M. | Vol. 12, p. 3296 |
| JX23 | 12/12/2002 | DCAA Papers | DCAA | | Vol. 17, p. 4594 |
| PEX1868 | 07/12/2004 | Report | Geotest Engineering | COE-Galveston | Vol. 12, p. 3299 |

| Trial Ex. | Date | Document Type | Author | Recipient | Transcript Reference |
|---|---|---|---|---|---|
| DX1068 | 01/30/2005 | Reports | Hasen, M. | | Vol. 16, p. 4486 |
| DX1067A | 03/31/2005 | Drawing | Hrabovsky, L. | | Vol. 14, p. 3753 |
| DX1081 | 04/01/2005 | Drawing | Few, T. | | Vol. 15, p. 4256 |
| DX1080 | 04/01/2005 | Drawing | Few, T. | | Vol. 15, p. 4205 |
| DX1079 | 04/01/2005 | Drawing | Few, T. | | Vol. 15, p. 4199 |
| DX1082A | 04/04/2005 | Drawing | Hasen, M. | | Vol. 16, p. 4561 |
| DX1082B | 04/04/2005 | Drawing | Hasen, M. | | Vol. 16, p. 4561 |

## ADMITTED EXHIBITS: PHOTOGRAPHS BY ISSUE

| Issue | Exhibit No. | Transcript Reference |
|---|---|---|
| Affolter failed levees | PEX0016.561 | Vol. 5, p. 1397 |
| Affolter failed levees | PEX0016.562 | Vol. 7, p. 2051 |
| Affolter failed levees | PEX0016.563 | Vol. 7, p. 2053 |
| Affolter failed levees | PEX0016.569 | Vol. 7, p. 2055 |
| Affolter failed levees | PEX0016.571 | Vol. 7, p. 2055 |
| Affolter failed levees | PEX0016.575 | Vol. 7, p. 2058 |
| Affolter failed levees | PEX0016.576 | Vol. 7, p. 2060 |
| Affolter failed levees | PEX0016.577 | Vol. 7, p. 2062 |
| Brackish water | PEX0016.420 | Vol. 5, p. 1395 |
| Clay Recovery efforts | PEX0016.231 | Vol. 5, p. 1342 |
| Clay Recovery efforts | PEX0016.233 | Vol. 5, p. 1344 |
| Clay Recovery efforts | PEX0016.278 | Vol. 10, p. 2698 |
| Clay Recovery efforts | PEX0016.307 | Vol. 10, p. 2699 |
| Clay Recovery Efforts | PEX0016.319 | Vol. 5, p. 1377 |
| Clay Recovery Efforts | PEX0016.393 | Vol. 10, p. 2684 |
| Clayballs | PEX0016.141 | Vol. 5, p. 1325 |
| Containment Levee | PEX0016.180 | Vol. 2, p. 536 |
| Containment Levee | PEX0016.188 | Vol. 5, p. 1336 |
| Discharge control | PEX0016.133 | Vol. 2, p. 466 |
| Discharge from pipe | PEX0016.002 | Vol. 5, p. 1254 |
| Displaced Failure | PEX0016.357 | Vol. 5, p. 1380 |
| East Levee | PEX0016.604 | Vol. 5, p. 1402 |
| East Levee | PEX0018.004 | Vol. 2, p. 475 |
| East Levee | PEX0018.005 | Vol. 2, p. 481 |
| East Levee | PEX0018.016 | Vol. 2, p. 473 |
| East Levee | PEX0018.032 | Vol. 4, p. 1095 |
| East Levee | PEX0018.043 | Vol. 5, p. 1406 |
| East Levee | PEX0018.053 | Vol. 5, p. 1408 |

| **Issue** | **Exhibit No.** | **Transcript Reference** |
|---|---|---|
| East Levee | PEX0018.054 | Vol. 5, p. 1410 |
| East Levee | PEX0018.074 | Vol. 5, p. 1413 |
| East Levee | PEX0018.077 | Vol. 5, p. 1415 |
| East Levee | PEX0018.078 | Vol. 15, p. 4050 |
| Equipment | PEX0016.007 | Vol. 5, p. 1314 |
| Equipment | PEX0016.100 | Vol. 5, p. 1323 |
| Equipment | PEX0016.181 | Vol. 5, p. 1334 |
| Equipment | PEX0016.622 | Vol. 5, p. 1405 |
| Equipment | PEX0018.048 | Vol. 15, p. 4047 |
| Equipment | PEX0018.092 | Vol. 15, p. 4051 |
| Equipment | PEX0018.097 | Vol. 15, p. 4052 |
| Equipment | PEX0018.103 | Vol. 5, p. 1425 |
| Equipment | PEX0018.108 | Vol. 5, p. 1426 |
| Equipment | PEX0018.122 | Vol. 5, p. 1431 |
| HL&P Tower | PEX0016.098 | Vol. 5, p. 1321 |
| HL&P Tower | PEX0016.531 | Vol. 5, p. 1346 |
| Lack of clay | PEX0016.287 | Vol. 5, p. 1358 |
| Levee Failure | PEX0016.354 | Vol. 5, p. 1348 |
| Levee Failure | PEX0016.364 | Vol. 5, p. 1356 |
| Levee Failure | PEX0016.385 | Vol. 5, p. 1371 |
| Levee Failure | PEX0016.388 | Vol. 5, p. 1374 |
| Levee Failure | PEX0016.389 | Vol. 5, p. 1374 |
| Levee Realignment | PEX0016.178 | Vol. 5, p. 1330 |
| Levee repairs | PEX0018.068 | Vol. 5, p. 1411 |
| Mechanical Levee foundation | PEX0016.240 | Vol. 10, p. 2691 |
| Mechanical Levee foundation | PEX0016.241 | Vol. 10, p. 2693 |
| Millennium | PEX0016.582 | Vol. 2, p. 447 |
| Millennium | PEX0016.583 | Vol. 2, p. 451 |
| Millennium | PEX0016.585 | Vol. 2, p. 456 |

| Issue | Exhibit No. | Transcript Reference |
|---|---|---|
| Millennium | PEX0016.588 | Vol. 2, p. 464 |
| Mud wave | PEX0016.218 | Vol. 5, p. 1338 |
| Mud wave | PEX0016.254 | Vol. 10, p. 2695 |
| North levee | PEX0016.386 | Vol. 5, p. 1374 |
| North Levee | PEX0016.351 | Vol. 5, p. 1351 |
| North Levee | PEX0016.359 | Vol. 5, p. 1354 |
| North Levee | PEX0016.362 | Vol. 10, p. 2702 |
| North Levee | PEX0016.371 | Vol. 5, p. 1361 |
| North Levee | PEX0016.373 | Vol. 5, p. 1363 |
| North Levee | PEX0016.374 | Vol. 5, p. 1365 |
| North Levee | PEX0016.375 | Vol. 5, p. 1369 |
| North Levee | PEX0016.379 | Vol. 10, p. 2705 |
| Northeast levee corner | PEX0018.109 | Vol. 5, p. 1427 |
| Obstructions #1 | PEX0020.025 | Vol. 5, p. 1449 |
| Obstructions #2 (Section 9) | PEX0016.410 | Vol. 5, p. 1383 |
| Obstructions #2 (Section 9) | PEX0016.411 | Vol. 5, p. 1387 |
| Obstructions #2 (Section 9) | PEX0016.437 | Vol. 5, p. 1389 |
| Obstructions #2 (Section 9) | PEX0016.446 | Vol. 5, p. 1392 |
| Obstructions #2 (Section 9) | PEX0018.210 | Vol. 5, p. 1442 |
| Obstructions #2 (Section 9) | PEX0018.211 | Vol. 5, p. 1443 |
| Obstructions #2 (Section 9) | PEX0018.212 | Vol. 5, p. 1444 |
| Obstructions #2 (Section 9) | PEX0018.218 | Vol. 5, p. 1447 |
| Pipelines | PEX0016.004 | Vol. 5, p. 1310 |
| Pipelines | PEX0016.011; middle and bottom only | Vol. 5, p. 1319 |
| Pipelines | PEX0016.099 | Vol. 2, p. 471 |
| Pipelines | PEX0016.120 | Vol. 2, p. 468 |
| Pipelines | PEX0016.144 | Vol. 5, p. 1327 |
| Plugged pipe | PEX0018.099 | Vol. 5, p. 1423 |
| Soft ground | PEX0016.228 | Vol. 5, p. 1340 |

| Issue | Exhibit No. | Transcript Reference |
|---|---|---|
| Soft ground | PEX0016.253 | Vol. 10, p. 2688 |
| South Ferry Landing | PEX0018.180 | Vol. 5, p. 1438 |
| South Ferry Landing | PEX0018.205 | Vol. 5, p. 1440 |
| Stiff clay | PEX0016.392 | Vol. 10, p. 2685 |
| Unsuitable material | PEX0018.095 | Vol. 5, p. 1422 |
| West Levee | PEX0018.083 | Vol. 5, p. 1419 |
| West Levee | PEX0018.086 | Vol. 5, p. 1420 |
| West Levee | PEX0018.121 | Vol. 5, p. 1429 |
| West Levee | PEX0018.146 | Vol. 5, p. 1436 |
| West Levee | PEX0018.202 | Vol. 15, p. 4053 |