UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | § | |
| PLAINTIFF, | § | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| THE UNITED STATES | § | |
| DEFENDANT. | § | |

**REPLY BRIEF BY**
**PLAINTIFF, RENDA MARINE, INC.**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . -ii-

The Expert Testimony of William Connole . . . . . 1

The Government's Failure to Call Key Percipient Witnesses Warrants a Negative Inference. . . . . . 14

Applicable Law . . . . . 16

South Ferry Landing . . . . . 19

Flare Area . . . . . 26

Section 7 Clay . . . . . 28

HL&P Tower . . . . . 29

Sidecast Borrow Areas . . . . . 29

Renda's Levee Equipment . . . . . 31

Leon Hrabovsky . . . . . 33

Al Meyer . . . . . 35

Darrell Shobert . . . . . 36

Recovery of Consultant/Professional Costs . . . . . 37

Additional Booster Costs . . . . . 38

Equipment Rates . . . . . 38

CONCLUSION . . . . . 40

CERTIFICATE OF SERVICE . . . . . 42

**TABLE OF AUTHORITIES**

CASES

*Appeal of Rottau Electric Co.*,
1976 WL 2148 (A.S.B.C.A.), 76-2 BCA ¶12,001 (1976) . . . . . . . . . . . . . . . . . . . . . 17, 20

*Foster Construction C.A. v. United States*,
435 F.2d 873, 875 (Ct. Cl. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-19

*Kaiser Industries Corp. v. United States*,
169 Ct. Cl. 310, 324, 340 F.2d 322, 330 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC.,<br>PLAINTIFF, | §<br>§ | |
| | § | CASE NO. 02-306C |
| V. | § | |
| | § | (JUDGE HEWITT) |
| THE UNITED STATES<br>DEFENDANT. | §<br>§ | |

**REPLY BRIEF BY PLAINTIFF, RENDA MARINE, INC.**

Plaintiff, Renda Marine, Inc. ("Renda"), respectfully replies to the Post Trial Brief by Defendant, United States, as follows.

Since the Defendant primarily relied on the expert testimony of William Connole in defense of Renda's claims, much more so than its fact witnesses, Renda starts with Mr. Connole.

**The Expert Testimony of William Connole**

The Government tendered Mr. Connole as an expert in dredging, and, among other things, the means and methods of constructing levees. However, Mr. Connole admitted that he has had no formal courses in dredging and has never worked as a dredger. Trial Trans. at 5287. Mr. Connole admitted that he has never run a hydraulic cutter dredge. Trial Trans. at 5288. Mr. Connole made one visit to a hydraulic cutter dredge, sometime in 2003, and does not know how to run a dredge. Trial Trans. at 5288. Mr. Connole does not profess to be an expert leverman, and has never written any formal papers on dredging for publication. Trial Trans. at 5288. Other than being a registered professional engineer, Mr. Connole does not hold any other certifications. Trial Trans. at 5288.

Mr. Connole stated that the first project that he ever worked on as a consultant involving a hydraulic levee was in 2002. Trial Trans. at 5289. Mr. Connole admitted that he has never designed a hydraulic levee, and agrees that he is not an expert in the design of hydraulic levees. Mr. Connole

stated that he would not feel comfortable evaluating the design of a hydraulic levee. Trial Trans. at 5289.

Mr. Connole admitted that he does not know enough about dredges to be able to tell what the production rate would be for maintenance material versus a stiff clay new work material. Trial Trans. at 5291. Mr. Connole has never been on the Dredge Millennium. Trial Trans. at 5292. He does not consider himself to be an expert on cutter head dredges. Trial Trans. at 5292.

Mr. Connole does not consider himself to be a geotechnical expert, and does not know enough about soils to be able to determine their geological background. Trial Trans. at 5291.

Mr. Connole does not consider himself to be an expert on the reading of soil borings for marine dredging projects. Trial Trans. at 5293. He does agree, however, that something can happen between soil borings that would reflect a different condition than what was seen in the soil borings on either end. Trial Trans. at 5293. Mr. Connole admitted that he has found over the years that soils are variable between the borings. Mr. Connole agrees that a soil boring will give some information, but it may not reflect the actual conditions that the contractor is going to face other than right at the boring. Trial Trans. at 5293.

Mr. Connole has been to Lost Lake one time for a total of about three hours. Trial Trans. at 5293.

Under the circumstances, Mr. Connole clearly is not an expert in dredging, or in the evaluation of marine soil borings. Nevertheless, Mr. Connole passed opinions about dredging and marine soil borings, opinions which the Court should heavily discount.

For example, although Mr. Connole admitted that the Flare Area was out of the ship traffic, and was unique on the Project in this respect, Mr. Connole created his own measured mile in the

main ship channel, in the midst of ship traffic, and not in the Flare Area. Trial Trans. at 5270, 5313, and 5318. Mr. Connole did so, even while acknowledging that the Flare Area had the advantage that Renda could work relatively unimpeded from ships, and that there was more material available at any given spot for them to cut. Trial Trans. at 5313-14.

Joint Exhibit 41 (the Eddie Fisher letter of October 13, 1999, to Mr. McClenan) describes how the Flare Area is a favorable area for high production. Mr. Connole admitted that in preparing a measured mile for the Flare Area, it would be best to have the measured mile in the Flare Area, if there was a comparable period. Trial Trans. at 5314.

Will Sanford's email of February 22, 2001 (PX1283), concerning the creation of a measured mile, indicated that a reasonable measure of production rate does not necessarily have to be in the same area as the impacted area. It can be anywhere on the job, as long as it is similar material. Mr. Connole agreed with Mr. Sanford's interpretation. Trial Trans. at 5315.

Mr. Connole acknowledged that the Corps had looked at having a measured mile for the Flare Area claim some place other than in the Flare Area. Trial Trans. at 5315-16. However, in PX1303, the Corps rejected creating a measured mile for the Flare Area claim some place other than in the Flare Area. Mr. Sanford wrote to the effect that having the measured mile some place else other than the Flare Area was not equitable because the production of the channel dredging is impaired by down time for shipping traffic and obstructions located in the channel. Mr. Sanford noted that the Flare Area is outside the channel limits, and thus not subject to the same conditions. PX1303.

Mr. Connole took issue with Mr. Sanford's assessment. Trial Trans. at 5318. Mr. Connole took issue with the Corps agreeing that it was equitable to have the measured mile in the Flare Area.

Trial Trans. at 5318. Mr. Connole took issue with Mr. Sanford's cost estimate for the differing site conditions that Renda faced in the Flare Area. Trial Trans. at 5318-19.

Mr. Connole took this position even though Mr. Sanford appeared to Mr. Connole to be competent. Trial Trans. at 5316. Mr. Connole knew that it was part of Mr. Sanford's job to negotiate contractors' claims. Trial Trans. at 5316. Mr. Connole also knew that the Galveston District had called in Mr. Sanford from the Fort Worth District to help negotiate the Flare Area claim, among other Renda claims. Trial Trans. at 5317.

Mr. Connole also questioned Mr. Benero's competence in issuing the change order that paid Renda money in connection with the Flare Area. Trial Trans. at 5319.

Mr. Connole's assessment of the Flare Area was based on the character of material indications in the Inspection Reports of Dredging, and on Mr. Connole's determination that Renda's measured mile represented a first pass through the area. Trial Trans. at 5272. By "first pass," Mr. Connole intimated that Renda did not take a full depth cut during the measured mile.

However, the Inspection Report of Dredging for January 28, 2000 (JX09.141), the first day of Renda's measured mile for the Flare Area, indicated that Renda's dredging that day went from 25.0 feet to 48.0 feet, a depth which Mr. Connole admitted was full depth. Trial Trans. at 5274.

In assessing the character of material, Mr. Connole stated that he did not expect Renda to take periodic samples of material coming out of the dredge disposal pipeline, and that he has never seen any sort of manual or instructions or guidelines that the Corps provided to Renda about how to fill out the form concerning the character of the material. Trial Trans. at 5291. Mr. Connole acknowledged that he has never seen any sort of instruction manual about how to fill out the character of material forms. Mr. Connole admitted that he believes that the Corps probably did not

care if the character of material blanks were filled out on the inspection of dredging reports. Trial Trans. at 5291-92.

The character of material in the Inspection Report of Dredging for January 28, 2000 (JX09.141), did not match the character of material in the Report of Operations (JX12.119), for the same day. Mr. Connole admitted that there was nothing in the Corps' manual, in the plans and specifications, that would advise the contractor how to create the character of material percentages. Trial Trans. at 5275. Mr. Connole did not interview any of Renda's levermen about how the character of material percentages were created. Trial Trans. at 5276. Mr. Connole did not recall either Ben Goodloe's deposition or Steve Bowman's deposition about how the character of material numbers were filled in. Trial Trans. at 5276. Both Messrs. Goodloe and Bowman essentially testified at trial that the character of materials figures were meaningless as the proper percentages could not be determined. Trial Trans. at 2760-61 and 1531-34, respectively. Barry Smith testified that the character of materials percentage were "pretty iffy numbers." Trial Trans. at 1661 & 1666. In fact, no one at trial testified to the reliability of the character of materials percentages. No one with the Government even testified that they relied on the character of materials percentages. In fact, Mr. Connole testified that he believed that the Corps probably did not care if the character of materials blanks were filled out. Trial Trans. at 5292.

Further underscoring the lack of reliability of the character of material, the Report of Operations for October 17, 2000, (JX12.370), showed that the dredge was down all day, but nevertheless still listed a character of materials. Trial Trans. at 5352-53.

Mr. Connole made his Flare Area claim evaluation based in part on his assessment that boring 93-62 (JX05.021) had maintenance material on top. Trial Trans. at 5278. However, after

reviewing the closest cross section to boring 93-62 (see drawing C-10 (JX05.010)), and note 3 on drawing C-7 (JX05.007), concerning the dates of the surveys of the cross sections, Mr. Connole admitted that the cross section did not show a lot of maintenance material in the area of boring 93-62. Trial Trans. at 5280.

Mr. Connole assumed that the material in boring 93-62 was maintenance material due to the presence of hydrocarbons and the fact that the weight of the drill pipe alone caused the pipe to sink. Trial Trans. at 5281. However, Mr. Connole admitted that if the material were as soft as indicated, the weight of the pipe would cause the pipe to sink. Trial Trans. at 5282. Mr. Connole admitted that as shown in the soil boring, the material should be quite dredgeable, and that it would have a high dredgeability factor. Trial Trans. at 5282.

Concerning the presence of hydrocarbons, Mr. Connole admitted that boring 93-64 on drawing F-3 (JX05.021), indicated the presence of hydrocarbons, but its cross section (JX05.009) had very little if any maintenance material. Trial Trans. at 5284.

Concerning boring 3ST-3 (JX05.021), Mr. Connole admitted that the boring showed no hydrocarbons, although the cross section (JX05.010) indicated that it had six to eight feet of maintenance material. Trial Trans. at 5285-86.

Despite one boring having a lot of maintenance material and no hydrocarbons (3ST-3), and another boring having no maintenance material but indicating hydrocarbons (93-64), Mr. Connole was unwilling to admit that the presence of hydrocarbons was not a real good indication of whether or not the material was maintenance material. Trial Trans. at 5287.

Mr. Connole continued to rely on the character of material descriptions even though he had no idea how they were filled out and could not explain discrepancies between the Inspection Reports

of Dredging and the Reports of Operations. For example, the Inspection Report of Dredging for September 9, 1999 (JX09.004), shows that Renda dredged from 32.0 feet to 47.0 feet. Trial Trans. at 5295. According to the closest soil boring, 93-61, if Renda went from 32 feet down to 47 feet, Renda should have hit about 8 feet of silty sand. Trial Trans. at 5298. However, the material that Renda reported that day was 80% clay and 20% mud, which Mr. Connole admitted was not representative of what was shown in the boring. Trial Trans. at 5298-99.

As another example, in the Inspection Report of Dredging for September 14, 1999 (JX09.005), Renda again dredged from 32 feet down to 47 feet, and was still in the same ballpark as soil boring 93-61. Trial Trans. at 5301. Although the soil boring (93-61) showed that Renda would be dredging eight feet of silty sand, the first page of the Inspection Report of Dredging (JX09.005), lists the character of material as 80% clay and 20% mud, with no reference to sand at all. Trial Trans. at 5302. In fact, the entire month of October 1999 has a character of material listing of clay 80% and mud 20%, even though Plate 8 of HVJ's design report (PX322.0023) indicates that the reach from Station 480+00 to 500+00 (a reach which contains boring 93-61) has 30.1% sand, and Renda was primarily dredging in that reach in October. Trial Trans. at 5304-06. Mr. Connole admitted that Joint Exhibits 9.043, .044, and .045 did not indicate any sand in the character of material although the contractor was dredging in an area that should have had 30.1% sand. Trial Trans. at 5307-08.

The Inspection Report of Dredging for January 29, 2000 (JX09.142)(the second day of Renda's measured mile for the Flare Area), shows that Renda dredged full depth from 25.0 feet down to 48.0 feet. Trial Trans. at 5309. Mr. Connole admitted that the character of material

between the Inspection Report of Dredging (JX09.142) and the Report of Operations for the same day (JX12.120) did not match. Trial Trans. at 5309.

When Mr. Connole was analyzing the kind of material that Renda was dredging in the Flare Area, he relied on the Inspection Report of Dredging. Trial Trans. at 5310. However, Mr. Connole admitted that he did not know whether the Inspection Report of Dredging or the Report of Operations was correct. Trial Trans. at 5311. In fact, Mr. Connole did not know if either of the reports was correct. Trial Trans. at 5311.

The Inspection Report of Dredging for January 30, 2000 (JX09.143) (the third day of Renda's Flare Area measured mile), shows that the dredging went from 25.0 feet to 48.0 feet, a full depth cut. Trial Trans. at 5311-12. Again, the character of material is not consistent between the Inspection Report of Dredging (JX09.143) and the Report of Operations for the same day (JX12.121). Again, Mr. Connole did not know which report was correct. Trial Trans. at 5312. Mr. Connole did not know if either report was correct. Trial Trans. at 5312.

Mr. Connole admitted that sometimes a contractor's records are atrocious. Trial Trans. at 5320. As a matter of fact, Mr. Connole had a client where a Government auditor reviewed his client's records and declared that his client's records were atrocious. Trial Trans. at 5320-21. In the case of Circle, Inc., Engineering Board of Contract Appeals No. 6048, 1995 WL 128264, Mr. Connole testified as the claims consultant in the case. Trial Trans. at 5321-22. Based on record keeping that the Government auditor declared was the worst that he had ever encountered, Mr. Connole nevertheless testified to extensive damages to which he believed Circle was entitled. Trial Trans. at 5322-23.

Mr. Connole's practice is such that sometimes he takes a percentage stake in his client's claims when he presents them to the Government. Trial Trans. at 5324. Mr. Connole admitted that he has had a 5% stake in his client's recovery. Trial Trans. at 5324.

During his cross examination, Mr. Connole testified to his calculations for the hourly rates for Renda's equipment. The calculations are contained in Tab 100, of DX19/1200. Trial Trans. at 5324. After running through his calculations, Mr. Connole admitted that he improperly multiplied the shift adjustment factor against not only the facilities cost of money (FCCM) but also against the depreciation. Trial Trans. at 5332. The effect of the mistake gave Renda only 36% of the proper amount of the depreciation component for the hourly rates. Trial Trans. at 5333. Depreciation is by far the largest component in the hourly rate calculation. Allowing Renda only about one third of the depreciation significantly short changed Renda in Mr. Connole's rate calculations. Mr. Connole used the same formula for the rest of the attendant plant items on down through the spreadsheet. Trial Trans. at 5333. During redirect examination, Mr. Connole never corrected his mistakes or advised the Court what the appropriate rates should be.

Mr. Connole also miscalculated the standby rate for the marine attendant plant equipment. Trial Trans. at 5334-36. Mr. Connole testified that although the equipment was classed as marine attendant plant and he had criticized Renda for using Chapter 3 methodology in his report, he, himself, used Chapter 3 methodology to calculate the standby rate. Trial Trans. at 5336. Significantly, Mr. Connole used 112 hours (part of the Chapter 4 methodology for marine attendant plant equipment) in his calculations of hourly operating rates. Using 112 hours per week for the marine attendant plant would significantly reduce the hourly rate unless all of the Chapter 4

methodology calculation was employed. Again, Mr. Connole did not correct the mistake during his redirect testimony or advise the Court what the appropriate standby rates should be.

To calculate Renda's fuel costs, Mr. Connole had to adjust the fuel cost to reflect the change in price over time. To adjust the fuel cost rates, Mr. Connole used the Bureau of Labor and Statistics Index. Trial Trans. at 5337. Mr. Connole admitted that the Bureau of Labor and Statistics Index was an index. Trial Trans. at 5337. Mr. Connole acknowledged that the Consumer Price Index works off of a base year. Trial Trans. at 5337. Mr. Connole's report, Volume III, Tab 99, page 1195 of DX19, shows his calculation of, among other things, Renda's diesel costs. Trial Trans. at 5337. Page 1196 of his report (DX19/1196) has the index from the Bureau of Labor and Statistics concerning No. 2 diesel fuel. Trial Trans. at 5337-38.

Although the Bureau of Labor and Statistics Index lists the base year as 8200, Mr. Connole did not interpret it that way. Trial Trans. at 5338. Mr. Connole admitted that he instead took the numbers shown on the Bureau of Labor and Statistics Index as the actual fuel cost. Trial Trans. at 5338. The EP Manual, DX43, Appendix B at page 336 (DX43/336), lists the cost of diesel fuel per gallon for off road use at $0.74. Trial Trans. at 5338. The date of publication for that fuel cost is 30 June 1999. Trial Trans. at 5338. However, the Bureau of Labor and Statistics Index (DX19/1196) figure for June 1999 is 53.5, and rises to 110 for October 2000 (one of Renda's claim periods). Trial Trans. at 5338-39. If the Bureau of Labor and Statistics Index was an index, then the change in price from June 1999 to October 2000 would be 110 divided by 53.5 times whatever the base number was. Trial Trans. at 5339. Since Mr. Connole used the Bureau of Labor and Statistics Index figures as the actual fuel cost price, he never updated the base price of $0.74 per gallon from the 30 June 1999 EP Manual (DX43). Updating the 30 June 1999 EP Manual price of $0.74 per

gallon to October 2000 would properly reflect a price of 110/53.5 x $0.74 or $1.52 per gallon. Under the circumstances, Renda's use of $1.10 per gallon would be extremely conservative.

Mr. Connole's calculation of the fuel cost by taking the numbers listed in the Bureau of Labor and Statistics Index, adding them for the relevant period, and then dividing by the number of months, was simply wrong. Trial Trans. at 5340.

Since Mr. Connole miscalculated Renda's equipment hourly operating rates, and standby rates, and the fuel cost, the Court cannot use Mr. Connole's figures. The Court should use Rob McCullough's hourly rates, which were appropriately calculated.

Mr. Connole was not even-handed and was an overly zealous advocate for the Government's positions. In the course of his evaluating Renda's claims, Mr. Connole discovered that Renda had cheated or shorted itself of substantial amounts of money. Trial Trans. at 5341. For example, Mr. Connole discovered that Renda shorted itself approximately $300,000.00 in overhead. Trial Trans. at 5341. Mr. Connole buried the shortage in one of his work papers, and the error in the Government's favor does not appear in his report. Trial Trans. at 5341-42. Mr. Connole also noted that Renda cheated or shorted itself when Renda calculated its payroll on the various claims. When Mr. Barry Smith added the payroll, Mr. Smith did not include the first two rows. Trial Trans. at 5342. Mr. Connole did not mention that shortage in his report. Trial Trans. at 5342.

In evaluating Renda's repair costs for the Dredge Millennium, Mr. Connole disallowed costs if the invoice was not contemporaneous with the repair. In other words, if the repair part was purchased well before the repair or any time after, Mr. Connole disallowed the cost. However, Mr. Connole knew that Renda had on hand spare parts for the dredge. Trial Trans. at 5343. Mr. Connole admitted that if Renda required a repair, he would expect that Renda would use its

inventory of spare parts for the repairs. Trial Trans. at 5343. When Renda priced the repair, Renda would appropriately use the original purchase price for when it bought the spare part. Trial Trans. at 5343. Mr. Connole acknowledged that the original spare part purchase would occur before the repair became necessary. Trial Trans. at 5343. Mr. Connole admitted that if Renda had to use a spare part out of inventory, then Renda should be given credit for the cost of the spare part that Renda took out of inventory. Trial Trans. at 5344. Mr. Connole also admitted that if Renda took a spare part out of inventory, but did not have the invoice, and Renda had to order a new spare part to replace the one that Renda had, Renda should still be paid for the spare part that Renda had to use. Trial Trans. at 5345. Mr. Connole acknowledged that the invoice for something that Renda replaced as a spare part, necessarily would occur after the repairs occurred. Trial Trans. at 5345. Mr. Connole finally admitted that simply by looking at the date of the invoice and not knowing the particular use for the part, you may not be able to tell if it was a spare part or replacing a spare part. Trial Trans. at 5345.

Mr. Connole admitted that he did not investigate the particulars of the repairs to the Dredge Millennium. Trial Trans. at 5345. Mr. Connole did not talk to any of the vendors that Renda used for the repairs. Trial Trans. at 5345-46.

Under the circumstances, Mr. Connole's evaluation of Renda's dredge repairs is simply not credible.

In pricing Renda's claims, Mr. Connole declared that when Renda's equipment was damaged, the Government constructively suspended Renda's operations, and that Renda's equipment automatically went on standby. However, when shown page 104 of Joint Exhibit 1, the contract clause for suspension of work, Mr. Connole admitted that other than the change order where Renda

was directed to dredge private work at the Houston Fuel Oil Terminal, he was unaware of any other instance where the Contracting Officer actually ordered a suspension of the work. Trial Trans. at 5346.

Mr. Connole testified that the Government unreasonably delayed Renda in connection with the South Ferry Landing and the Flare Area. Trial Trans. at 5347. Mr. Connole testified that a 14 day delay by the Government was an unreasonable delay under the circumstances. Trial Trans. at 5347. Finally, concerning suspension, Mr. Connole acknowledged that there were requests for equitable adjustment submitted for each of Renda's claims. Trial Trans. at 5348. This becomes important since the suspension of work clause states that "no adjustment shall be made under this clause for any suspension, delay or interruption . . . for which an equitable adjustment is provided for, or excluded under any other term or condition of the contract." Trial Trans. at 5348. JX01.104.

Use of the EP Manual is only appropriate when actual cost data, which would support either ownership or operating costs for equipment, was not available. See DX43/8, ¶1-1; Trial Trans. at 5350-51. Similar language appeared in the contract, Joint Exhibit 2, at page 9, paragraph 7. Trial Trans. at 5351-52. Mr. Connole admitted that if the Government could determine both ownership and operating cost from the contractor's accounting records, then the EP Manual should not be used. Trial Trans. at 5352.

Concerning the Dredge Millennium, Mr. Connole acknowledged that there was an actual acquisition cost. Trial Trans. at 5348. Mr. Connole acknowledged that an actual betterments cost could be calculated for the Dredge Millennium. Trial Trans. at 5348. Mr. Connole acknowledged that an actual depreciation cost could be calculated for the Dredge Millennium. Trial Trans. at 5348. Mr. Connole knew that Renda had depreciated the Millennium for tax purposes over the course of

10 years. Trial Trans. at 5349. As a result, the depreciation that Renda claimed for tax purposes is a sum certain, and could be determined. Trial Trans. at 5349. Although Mr. Connole had seen Renda's repair invoices, he for some reason would not admit that adding the various repair invoices would provide the total repair costs. Trial Trans. at 5349-50. With all of these actual costs readily determinable for the Dredge Millennium and the booster barge, the contract and the EP Manual required that Renda use its actual costs. Renda has done so. The Government and Mr. Connole refused to do so.

Concerning additive items for the calculation of equipment rates, Mr. Connole listed zero in connection with the Dredge Millennium, even though Mr. Connole acknowledged that dredging rubble or trash, or hitting obstructions could cause wear to the dredge. Trial Trans. at 5353. He also admitted that there was sand on the Project. Trial Trans. at 5353. Nevertheless, as a zealous advocate, Mr. Connole determined that the additive item for trash and rubble and obstruction should be zero. Trial Trans. at 5353.

Mr. Connole's testimony was so partisan as to be incredible. After all, the Government was his biggest client for three years running. Trial Trans. at 5271-72.

**The Government's Failure to Call Key Percipient Witnesses Warrants a Negative Inference.**

The Government chose not to call percipient witnesses and instead relied on Mr. Connole. The identity of the principal percipient witnesses that the Government did not call is telling.

Defendant did not call as a witness Eric Russek, the Project Engineer. Trial Trans. at 3111-12. Mr. Russek was one of the only two Government personnel to have contact with the Project throughout the construction of the Project. (James "Tim" Few was the other.) Mr. Russek made regular visits to the Project. Trial Trans. at 3200-01, 3318. Mr. Russek and the Bay Area Office

were charged with overseeing Renda's work and the Upper Bayou contract. Trial Trans. at 3122 & 3834-35. Mr. Russek wrote many memoranda concerning his inspections of Renda's work. Mr. Russek initially undertook the Government's quality assurance for Renda's work. Trial Trans. at 3318-22.

Mr. Russek's role on the Project was so significant that his name was mentioned 348 times in the trial transcript.

Recognizing Mr. Russek's extensive involvement in the Project, Defendant had Mr. Russek at the court house waiting to testify for several days. Trial Trans. at 3067-68. However, it became apparent as the trial progressed and the evidence developed that Mr. Russek's testimony would be damaging to the Government.

For example, after Mr. Russek visited the Project on January 13, 2000, he wrote a memorandum which stated that: "In general, there has been continued improvement on this project, especially with regards to the hydraulic levee construction and dredge material placement." PX699.0002.

As another example, Mr. Russek attended the October 23, 2000, meeting where Leon Hrabovsky of the Joint Venture discussed the sidecast borrow areas. PX1064. Mr. Russek could have shed light on the discussions about the sidecast borrow areas, and Mr. Few's reaction to the disclosure.

As another example, Mr. Russek attended the August 7, 2000, meeting at Lost Lake to discuss realignment of the west levees. Mr. Russek could have shed light on Renda's interpretation of Mr. McClenan's oral direction and which if any of the draft letters (PX969, 999 or 1005) contained an accurate recap of Mr. McClenan's direction to Renda.

After the Government announced during trial that the Government was not going to call Mr. Russek as a witness (Trial Trans. at 4264), the Government objected to Renda's use of excerpts from Mr. Russek's deposition. Trial Trans. at 4566-67.

The Government's failure to call Mr. Russek as a witness should bear the negative inference that if called, Mr. Russek would not have testimony favorable to the Government.

The Government had listed Will Sanford as a witness, and had announced during the trial that the Government intended to call Mr. Sanford to testify. During the trial, Renda witnesses testified as to their dealings with Mr. Sanford, their negotiations of Renda's claims, and the template that was established for the presentation of Renda's claims. See, e.g., Trial Trans. at 618-623; 811; 1642; 1672; 1678-1680; 1685; 1753-54; 1765; 1772; 1835; 2017-19; 2509. Renda witnesses also testified to their dealings and discussions with Mr. Sanford concerning the length of depreciation period for the Dredge Millennium, and how Mr. Sanford had approved a depreciation period less than 25 years. Trial Trans. at 1754-55.

The Government's failure to call Mr. Sanford to testify should raise a negative inference that if called, Mr. Sanford would not have testimony favorable to the Government. Mr. Sanford's name appears 88 times in the trial transcript.

**Applicable Law**

The Government's recitation of applicable law is at best incomplete, and perhaps misleading. Case law applicable to the facts of this case follows.

Type I differing site conditions may arise from implied indications in the contract documents. The relevant legal inquiry in such cases is whether a reasonable bidder was justified in relying on "reasonably plain or positive" indications of the anticipated subsurface conditions, even if those

indications are not expressly stated. A "reasonably plain" indication means that the contract documents provide sufficient grounds to justify the bidder's expectations. "[I]t is not necessary that the 'indications' in the contract be explicit or specific; all that is required in that there be enough of an indication on the face of the contract documents for a bidder reasonably not to expect 'subsurface or latent physical conditions at the site differing materially from those indicated in this contract'." *Foster Construction C.A. v. United States*, 435 F.2d 873, 875 (Ct. Cl. 1970)(design features could very well lead a reasonable bidder to conclude that he would not meet the type of subsurface conditions he actually met during performance).

The failure to disclose a subsurface condition is, in effect, an indication that no such condition existed. *Appeal of Rottau Electric Co.*, 1976 WL 2148 (A.S.B.C.A.), 76-2 BCA ¶12,001 (1976).

Contractors are not bound to know that which only an expert could derive from bidding materials. *Kaiser Industries Corp. v. United States*, 169 Ct. Cl. 310, 324, 340 F.2d 322, 330 (1965). Moreover, they are not expected to conduct their own expensive tests. *Foster Construction C.A. v. United States*, 435 F.2d 873, 886 (1970). The contractor is not charged with knowledge of geological conditions not discoverable on a visual inspection of the site. 435 F.2d at 886-87.

The *Foster* court stated that the purpose of the changed conditions clause is to take at least some of the gamble on subsurface conditions out of bidding. *Id.* at 887. The court noted that bidders need not weigh the cost and ease of making their own borings against the risk of encountering an adverse subsurface, and they need not consider how large a contingency should be added to the bid to cover the risk. *Id.* The court observed that the bidders will have no windfalls and no disasters. *Id.* The court stated that the Government benefits from more accurate bidding, without inflation for

risks which may not eventuate. *Id*. The court noted that the Government pays for difficult subsurface work only when it is encountered and was not indicated in the logs. *Id*.

The *Foster* court cautioned against expansion of the site investigation clause:

> Faithful execution of the policy requires that the promise in the changed conditions clause not be frustrated by an expansive concept of the duty of bidders to investigate the site. That duty, if not carefully limited, could force bidders to rely on their own investigations lessen their reliance on logs in the contract and reintroduce the practice sought to be eradicated – the computation of bids on the basis of the bidders' own investigations, with contingency elements often substituting for investigation. The changed conditions clause "makes it clear that bidders are to compute their bids, not upon the basis of their own personal surveys or investigations, but upon the basis of what is indicated and shown in the specifications and on the drawings."

*Foster*, 435 F.2d at 887.

The *Foster* court noted the limitation of contract indications when they can be contradicted by simple inquiries:

> The contractor is unable to rely on contract indications at the subsurface only where relatively simple inquiries might have revealed contrary conditions. When, for instance, logs in the contract show no water, as in the instant case, he need not seek out experts who may tell him of the possibility of subsurface water.

*Id*. at 888.

The *Foster* Court noted the importance of soil borings: "Particular protection is given by the courts to the right of bidders to rely upon drill hole data in the contract, recognized to be the 'most reliable and the most specific indicator' of subsurface conditions."

*Id*.

The *Foster* court discounted attempts to disclaim the Government's responsibility for soil borings:

> Even unmistakable contract language in which the Government seeks to disclaim responsibility for drill hole data does not lessen the right of reliance. The decisions reject, as in conflict with the changed conditions clause, a "standard mandatory clause of broad application," the variety of such disclosures of responsibility – that the logs are not guaranteed, not representative, that the bidder is urged to draw his own conclusions.

*Id.*

**<u>South Ferry Landing</u>**

Contrary to the Government's indication in its brief (page 40, footnote 37), the contract documents do not show the location of the South Ferry Landing. In footnote 38 on that page, the Government defines "rubble." However, such definition does not appear in the contract documents.

Although the Government correctly notes that Renda's first written notice occurred by letter of April 28, 2000 (JX50), the Government had notice of the condition on April 20, 2000, and discussed Renda's having to shut down after hitting debris at the South Ferry Landing at the Project Coordination Meeting that day. PX840.0002. Renda waited for directions from the Government, losing time in the process. Mr. McClenan documented additional problems with concrete riprap in his email of April 24, 2000 (PX846).

While the Government did nothing to investigate the problem, or to direct Renda, Renda was faced with a threat of default termination. If Renda fell behind schedule, Renda faced a default termination. JX49. As Renda was getting no assistance or direction from the Government, Renda finally felt that it had no choice but to attempt to dredge the South Ferry Landing to clear Dredge Section 1 for acceptance by the Government. JX50. Renda faced a no-win situation - wait for direction from the Government (that never came) and fall further behind schedule, or attempt yet again to dredge by box cutting and over dredging but clearing the section.

The Government's lack of response or direction delayed Renda, and caused Renda to engage in busy work, but not much productive work, during the delay. Having to clear the South Ferry Landing with a cutterhead dredge was a difficult, and damaging undertaking. Indeed, the Corps later directed contractors to use a mechanical dredge, not a cutterhead dredge, to clear the North Ferry Landing. PX1751.0009.

The Government contends that Renda cannot prove a Type I differing site condition due to no affirmative representation that rubble or riprap would not be encountered. (Government Brief at 41). While it is true that the contract documents show nothing concerning the South Ferry Landing, the absence of obstructions in the dredge template is itself an indication that there are no obstructions. The *Rottau Electric* case instructs that the failure to disclose a subsurface condition is, in effect, an indication that no such condition exists. *Appeal of Rottau Electric Co*., 1976 WL 2148 (A.S.B.C.A.), 76-2 BCA ¶12,001 (1976).

Renda is not complaining about trash at the South Ferry Landing. No one at trial testified that they knew that there was rubble or riprap within the dredge template at the South Ferry Landing. See, e.g., Trial Trans. at 3674 (Al Meyer testimony). If the Government knew, the Government should have disclosed the knowledge in the contract documents. Trial Trans. at 3802-08 (Leon Hrabovsky testimony).

While it appears that over dredging occurred at the South Ferry Landing, such work was necessary to complete the dredging in that area. The Government recognized that box cutting is necessary to cut the side slopes. Trial Trans. at 3693 (Al Meyer testimony). Mr. Meyer testified that he expected some overcutting on the side slopes in the process of cutting the steps so that the contractor would ensure that the riser portion of the steps is outside the dredge template. Trial Trans.

at 3693. Indeed, box cutting (or stair stepping) is readily apparent in the left side of the cross section at 470+00 near the South Ferry Landing. JX15.015.0002.

Although the Government relies heavily on the dredging surveys, Mr. Bowman's testimony demonstrated that their accuracy is limited. Trial Trans. at 1452-61.

The record showed that dredging surveys had significant anomalies. For example, DX312C/19 and DX312C/640 are dredging surveys for the same cross section, 676+00, but taken on April 23 and February 27, 2000, respectively. The right side of the cross section had not been dredged, but the elevation is about two feet different. The same was true for comparisons of cross sections for 677+00 (DX312C/20 and DX312C/641) and 678+00 (DX312C/21 and DX312C/642). Trial Trans. at 1464-67 (Steve Bowman testimony).

The contract drawings, themselves, reveal similar anomalies. Notes 3 and 4 on Sheet C-7 (JX05.007) indicate that existing ground surveys were taken in February 1998, while after dredging surveys were taken in February 1995 or September 1996. Existing ground should match or be higher than the other dredge surveys, as maintenance material collects in the channel bottom. However, in numerous cross sections, the existing ground is well below the after dredge survey elevations. See, e.g., Station 608+00 (right side of cross section) on Sheet C-8 (JX05.008), Station 580+00 (right side of cross section), Station 576+00 (right side of cross section), Station 556+00 (left side of cross section) and Station 550+65.99 (left side of cross section) all on Sheet C-9 (JX05.009).

While the Government contends that Renda did not heed cautionary warnings in the specifications (Government Brief at 43-44), the facts reveal otherwise. Renda advised Mr. McClenan on April 20, 2000, that Renda had encountered debris. PX840.0002. The Government's failure to provide direction to Renda proximately led to the damage to the dredge.

The Government never did advise Renda how to use caution and still dredge the required areas. A similar instruction was provided by Mr. Benero in his direction to Renda to dredge Section 9. PX1361 ("you will not jeopardize damaging the Dredge Millennium"). Mr. McClenan testified he was not sure how Renda would dredge but not jeopardize damaging the Millennium. Trial Trans. at 3336.

The Government's footnote 43 (Government Brief at 44) refers to structures, and includes submerged shore protection as a "structure." However, one of the designers, Al Meyer, testified that when he described structures for the contractor not to disturb, he did not mean riprap. Trial Trans at 3682. Mr. Sanford's name appears 88 times in the trial testimony.

The Government relies on Mr. Lofgren concerning the cutting of side slopes at the South Ferry Landing. Government Brief at 44. However, Mr. Lofgren has never dredged in the Houston Ship Channel, or any where else in the Gulf Coast. Trial Trans. at 4435. Mr. Lofgren's domestic dredging experience has primarily been along the West Coast and in the Pacific. Trial Trans. at 4436. Mr. Lofgren has never dredged Beaumont Clay. Trial Trans. at 4436.

Mr. Lofgren admitted that if he was familiar with an area, he would perform less pre-bid investigation. Trial Trans. at 4443.

Mr. Lofgren acknowledged that when he visited the South Ferry Landing, te could not see whether there was riprap or rubble down in the channel. Trial Trans. at 4446. Mr. Lofgren admitted that he simply did not know if Renda ignored the warning about over dredging the slopes at the South Ferry Landing. Mr. Lofgren admitted that there could have been rubble and riprap shore protection down in the dredge template. Trial Trans. at 4448. Mr. Lofgren concluded that he could

not determine whether the rubble that Renda encountered was due to overdredging. Trial Trans. at 4451.

The Government complains about move-in and move-out days in Renda's claim. (Government Brief at 46-48). However, the record shows that Renda made several attempts to dredge at the South Ferry Landing using different approaches. JX50. Ideally, Renda would have made one move-in and one move-out to clear the South Ferry Landing. The rubble and riprap, and the Corps' lack of direction and assistance did not permit such efficiency. Obviously, the move-out on May 4, 2000, would not have been necessary if Renda had been able to dredge the South Ferry Landing during its April 2000 attempts.

As the Government notes on page 46 of its brief, The South Ferry Landing claim is based on measured mile damage model. To create the measured mile, Renda determined the average daily or hourly dredging production under conditions similar to those reasonably anticipated from the contract documents. Trial Trans. at 1653-1655. For the South Ferry Landing, Renda determined average dredging production in an area which did not contain rubble or riprap, the offending obstructions at issue. Renda then compared the average production from an un-impacted area to the average production in the impacted area to determine the extent of the impact or loss of production in the impacted area. Trial Trans. at 1671-1675.

Properly employing the measured mile damage model, Renda included all days where Renda was working in the vicinity of the South Ferry Landing to determine the appropriate rate of production in the impacted area. These days would necessarily include ones where the impact was slight or undetectable, resulting in higher dredging productions. Excluding such days would depress

the average production and negatively affect the Government. Conversely, including such days would increase the average production which benefits the Government.

The Government's attack on of the exact percentage of clay in Renda's measured mile lacks significance. Government Brief at 46. First, the stiffness of the clay is the important factor. Renda showed in the Flare Area that Renda could dredge upwards of 20,000 cubic yards per day of soft clay. See e.g. JX09.144, .182, and .183. Second, determining the percentage of clay is an inexact art. The daily reports are at best guesses. The soil borings were shown to be inaccurate. Challenging Renda's measured mile over a 20% difference in clay under these circumstances is speculative at best.

The Government challenges certain impacted days as being ones for "scheduled maintenance." Government Brief at 48. The Government use of the term intimates that "scheduled maintenance" is akin to routine maintenance, like changing an engine's oil at a regular interval. The Government relies on Quality Assurance reports that it prepared, and summaries that it prepared. (Although the Government also recognizes Mr. McCullough's spreadsheet, Mr. McCullough simply recapped the Government's quality assurance reports.) No percipient witness testified that the challenged down time was not due to repairs, but was for "scheduled maintenance." The Government did not show any schedule which listed the time period for maintenance. The timing determines whether the work was a repair or routine maintenance. For the South Ferry Landing, the need to replace cutter teeth, pump impeller, and pump liner was clearly caused by the dredging of rubble and riprap. True, while the dredge was down for those repairs, Renda repaired other problems. For example, while the dredge was down for cutterhead and pump problems on May 17, 2000, Renda repaired the spud winch drum. Had Renda not done so, the Government would have

criticized Renda for not taking advantage of the opportunity. (Renda's work on the spud winch continued into May 18, 2000, but Renda has not claimed that day concerning the South Ferry Landing.) No percipient witness testified at trial that the "other" repairs caused the downtime claimed, not the repairs due to the exposure to rubble and riprap. Significantly, no percipient witness testified that the spud winch drum repairs were necessary to keep the dredge in operation.

Importantly, Renda was under a threat of default termination. It makes no sense that Renda would on its own cease production for several days to undertake "scheduled maintenance" and risk being default terminated.

The Inspection Reports of Dredging show what happened during May 14-17, 2000:

| **Date of Report** | **Notes Appearing in the Report** | **Exhibit** |
|---|---|---|
| 5/14/2000 | "Upper Bayou Project down" | JX09.249 |
| 5/15/2000 | "Down for repairs to pump and dredge", "New teeth being put on dredge cutterhead, Installing a new shell, impellor [sic] and wear on ring on dredge" | JX09.250 |
| 5/16/2000 | "Repairs to Dredge", "New pump shell is being installed on dredge, New teeth are still being installed on dredge cutterhead" | JX09.251 |
| 5/17/2000 | "New pump is now finished on the dredge, Cutter teeth are not installed on dredge" | JX09.252 |

Renda's having to install new cutterhead teeth, and pump shell, impeller and wear ring are indicative of Renda's efforts to dredge rubble and riprap. Such repairs are not "scheduled maintenance" in the sense of routine maintenance. The Government is correct that after the damage was done, Renda did have to schedule the repairs.

On pages 48 and 49 of its brief, the Government discusses Mr. Connole's new measured mile. The dates for Mr. Connole's new measured mile are set out at DX19/1737 (Volume 5, Tab 22 of Mr. Connole's report). Inexplicably, when Mr. Connole calculates production rates, he excludes four of the listed measured mile days. Compare DX19/1737 with DX19/43 (Volume 1 of Mr. Connole's report). He also includes four sweeping days in his production rate calculations. The inclusion of so many sweeping severely skews the average production calculations (the day is counted, but the production is zero). Averaging the clay content when the production is zero is certainly speculative. On those days where the dredge was working in more than one location, Mr. Connole incorrectly splits the hours of operation based on advance instead of the actual hours identified on the Report of Operations, and labeled as "Move Dredge."

Mr. Connole's measured mile only extends 600 feet, while Renda's covers 1,900 feet. The additional distance for Renda's measured mile allows a larger sampling area. Renda's measured mile correctly isolated sweeping time for separate analysis so as not to skew production averages.

**<u>Flare Area</u>**

The Government criticizes Renda's pre-site investigation of the Flare Area. Government Brief at 55-56. The Government suggests that Renda should have used probes or taken soil borings to determine the stiffness of the subsurface materials in the Flare Area. First, the case law does not require any such investigation, and allows the bidders to rely on the soil borings. See the Applicable Law discussion, above. Second, there was no testimony from any percipient witness that there were an insufficient number of soil borings for the Project. In fact, Leon Hrabovsky testified that he would only take additional soil borings if he "was unfamiliar with the site and felt like there weren't sufficient borings in the plans that covered the area." Trial Trans. at 3727.

There was also no testimony from any one that Renda was not familiar with the site. In fact, Steve Bowman testified at length about various Renda personnel's familiarity with the Project area. Trial Trans. at 552; 1497-98. Indeed, the Government notes Eddie Fisher's familiarity with the Houston Ship Channel at pages 7-8 of its post trial brief. In fact, the Government's expert, Robert Lofgren, said that in his own dredging experience he did not undertake all of the steps outlined at paragraphs 1 through 13 of DX0015, page 11, if he is dredging in an area with which he is familiar. Trial Trans. at 4443. Mr. Lofgren also indicated that if Eddie Fisher had grown up in a family that had dredged all this type of area, then he may very well be aware of a lot of the things which would be material to Renda's pre-site investigation. Trial Trans. at 4443.

Probing would also have been problematic. The probe would have to be about 50 feet long to reach the bottom of the dredging template. There was no testimony about how strong one would have to be to push a probe that deep, or even if it was possible. Recall Renda's video of Dr. Mathewson pushing on about a ten foot rod, and having difficulty while probing a soft area at Lost Lake. PX1867A, Clip V75.

The Project involved dredging of about 3.9 miles of the Houston Ship Channel. Government Brief at 17. No one at trial testified as to when, where, and how often to probe. Mr. Bowman testified that for Renda to probe pre-bid would have been prohibitive. Trial Trans. at 776. Mr. Bowman testified that Renda had a bid success rate of maybe one in ten, and that conducting its own soil borings for every project would not have been feasible. Trial Trans. at 776-77.

Having each bidder conduct its own pre-bid soils investigation would increase the cost of bid preparation and ultimately the bid price, frustrating the very purpose of the differing site condition clause.

The Government again complains that Renda's daily reports do not mention impacts from the Flare Area's stiff clay on each day. Government Brief at 58. While that is certainly true, the Government missed the point of the measured mile damage model. To determine the average rate for dredging production in the impacted area, all days of dredging in the area should be reflected. If Renda excluded days when there appeared to be little or no impact, the exclusion would depress the average production rate to the Government's disadvantage. Including all days in the impacted period benefits the Government with days of significantly higher production. For example, one of the days included in the Flare Area impact period is February 20, 2000, since Renda was dredging in the Flare Area on that day. JX09.165. Renda's production that date was 20,060 cubic yards. Excluding that date would depress the average production rate in the Flare Area. Likewise, Renda included March 8, 9, and 10, 2000, since on these days Renda was dredging in the Flare Area. See JX09.182, .183, and .184, respectively. The production on those days was 23,865, 24,420, and 24,420 cubic yards, respectively. Excluding those dates would reduce the average production of Renda's tenure in the Flare Area.

Contrary to the Government's position, including days with high production in the impacted time period benefits the Government by narrowing the difference between the impacted production rate average and the measured mile production rate average.

**Section 7 Clay**

The government rejects the Section 7 Clay claim, arguing that Renda cannot prove a Type I differing site condition. Government Brief at 63.

Renda conducted an actual test in the field, not a theoretical laboratory experiment, and proved that the hardpan it encountered in Section 7 slowed Renda's production. Although the

material could have been tested much like the Flare Area, the Government chose not to, relying solely on inaccurate soil borings. The soil borings did not show the red hardpan, and instead disclosed blue-gray clay. See, e.g., boring 3ST-14 on JX05.020.

The hardpan that Renda encountered is the local bedrock in the Houston area. As Dr. Mathewson testified, the hardness would cause the cutterhead to chatter, and the material would tend to break or fracture, and not create clay balls. Trial Trans. at 1897.

**HL&P Tower**

Renda agrees with the Government that the HL&P Tower claim is not a Type I differing site condition claim. Government Brief at 65. The claim is actually one for interference or hindrance or delay. Government Brief at 66.

As noted in the Government's Brief at 67, HL&P originally planned to relocate its tower on the high east bank, and also to install timber dolphins. There was no dispute that HL&P actually constructed the new tower. The Government, however, makes much of a Letter of Permission and Statement of Findings, which allowed HL&P to abandon the old tower. The abandonment of the old tower is simply not at issue, and is irrelevant.

**Sidecast Borrow Areas**

The Government justifies its lack of information about the sidecast borrow areas in the bid solicitation by stating that the "sidecast borrow areas contain dredging material from past maintenance dredging jobs." Government Brief at 87. True, the material may be the same; however, the character of the material would be different. As HVJ noted in its design report, the surface material would dry out, dessicate, and form a hard crust. PX322.0012. However, the Corps kept robbing the sidecast borrow areas of its hard crust.

In its August 1996 report (PX195), HVJ noted that sidecast borrowing had occurred in 1992. PX195.0004. In 1996, HVJ reported the following surface conditions: "Very soft ground and/or ponded water extend from the toe of the perimeter dike approximately 100 feet into the disposal area along the north, west and east sides. Except for very soft ground around the perimeter of the dike, the interior of the disposal site was firm and presented no difficulties to the drilling equipment." PX195.0008.

However, the surface of the sidecast borrow areas never had a chance to dry out, dessicate and form a hard crust as later in 1996, the Corps commissioned more sidecast borrowing. DX1066 and DX1067. Trial Trans. at 3741 and 3862.

In addition, the Government never revealed the depth and width of the sidecast borrowing. Mr. Few had testified that on occasion, the Corps commissioned very deep sidecast borrowing to find suitable materials. Trial Trans. at 4207.

The drawings for the Project do not even hint at sidecast borrow areas, unlike DX1066 and DX1067. Instead, the drawings show a uniform foundation for the new levees. While Renda certainly expected that the new levees would displace soft foundation material, Renda had no idea that the Government had created a condition which did not account for differential settlement. PX1064. As a result, some of the levee rested on undisturbed berm, while the rest of the levee sunk into the sidecast borrow area. The sidecast borrow area caused the new levee to shear and settle differentially. Trial Trans. at 1907-1908; 1932 (Dr. Mathewson). Had the conditions been as depicted in the contract documents, the new levee would have stood as the portion did which rested on the undisturbed berm. Trial Trans. at 1948 (Dr. Mathewson).

The oversized sidecast borrow areas also caused another problem. They consumed an inordinate amount of suitable clay material, leaving Renda with insufficient material to construct the levees. PX1064.

The Government's argument misses the mark. The uneven foundation support caused the levees to shear and settle, and required that Renda repeatedly rebuild the levees. The fact that there was previously dredged material in the disposal area is not at issue. The existence of undisclosed sidecast borrow areas, which swallowed undue amounts of clay, and caused the new levee to settle differentially, is the differing site condition.

While it is true that Dr. Mathewson did not calculate stability, settlement, subsidence or displacement, Dr. Mathewson did not need to. He could see that the new levee had sheared and settled differentially. No calculations were needed. If a skater broke through the ice, no calculations are needed to determine that the skater was too heavy or the ice too thin. See Dr. Mathewson's drawings which shed light on this issue. PX1875.01 and PX1875.02. Trial Trans. at 1932.

While HVJ expected the hydraulically placed levee material to fill up the sidecast borrow areas, no one had determined the size of the sidecast borrow areas. As a result, no one knew how much material would be necessary to fill the sidecast borrow areas.

The Government can argue that mathematically or theoretically the design should have worked. The facts on the ground, however, show that the design was flawed, and simply could not have worked under the circumstances as they really existed.

**<u>Renda's Levee Equipment</u>**

The Government acknowledges that nowhere in Renda's bid estimate papers does the performance period of ten months appear for the hydraulic levees. Government Brief at 90. The

Government is correct. Renda only had 446 calendar days for the whole Project, and the mechanical levees had to be constructed first. 446 days is somewhat less than 15 months. The mechanical levee work took approximately six months, leaving Renda less than nine months to complete the hydraulic levees.

Simply because Renda assigned equipment to the Project, does not mean that the Government could direct the equipment to perform extra work at no additional charge to the Government. If a differing site condition caused Renda to have to perform extra work, or to stay on the Project for additional time, Renda is entitled to charge for the cost of the extra work or time. The Government has not argued that the equipment was not necessary or was needlessly assigned to the Project. In fact, the Government's principal complaint about Renda in both the Cure Notice (JX45) and Show Cause Notice (PX1083) was a lack of progress. The Government implicitly wanted more men and equipment, not less.

Mr. Rudy V. Renda testified at length about how the equipment was used to recover clay and rebuild failed levees. Trial Trans. at 2621-27. Mr. Bowman also testified as to the use of the equipment to overcome problems with the levees. Trial Trans. at 1638.

The Government complains that Renda did not have enough operators for every piece of equipment. Government Brief at 91. The Government ignores that fact that different equipment have different uses. For example, a carpenter will bring a hammer and a saw to work, but not use both at the same time. If the equipment was used during the day, it would be charged with operating hours. If the equipment was not used at all, Mr. McCullough charged standby for the equipment.

The fact that Renda had equipment listed in its bid is irrelevant as to whether Renda should be compensated for having to perform extra work. If Renda had equipment assigned to the project

as spares in case one broke down, it does not mean that the Government owes nothing for the use of the spares.

The Government also complains that Mr. McCullough did not know enough of the factual basis for the pipe backtracking claim. Government Brief at 93-94. The Government claims that Mr. Bowman did not testify concerning the daily reports for the back tracking days. Government Brief at 94. However, the Government ignores that Mr. Smith testified about the backtracking claim. Trial Trans. at 1820-21. Back tracking of pipe clearly occurred, and the Government should have queried the percipient witnesses if the Government had a question not already answered.

**Leon Hrabovsky**

Concerning the South Ferry Landing, Leon Hrabovsky testified that if shore protection existed at the Lynchburg Landing, it needed to be addressed in the design. Trial Trans. at 3802. Mr. Hrabovksy testified that if the contractor has to remove wood fenders or dolphins or riprap or that kind of work, there will normally be a line item in the bid schedule for that kind of work. Trial Trans. at 3805. Mr. Hrabovksy testified that if the specifications simply point out that there is other materials lying within the removal limit, that is too vague. He testified that it is better that the debris or whatever it is that needs to be removed be shown on the drawing or be described so the contractor can figure out what to expect. Trial Trans. at 3808. Mr. Hrabovksy testified that the Houston Ship Channel is so murky that you cannot see to the bottom, and may only be able to see two feet. He testified that if there is riprap near the toe of the channel, you are not going to be able to see it from the surface. He testified that if a contractor is going to be bidding in connection with an area that may possibly have riprap, the contractor is going to have to rely on what the drawings show and the specifications indicate. Trial Trans. at 3809. Finally, Mr. Hrabovksy testified that at the South Ferry

Landing, you cannot see if there is any broken up rubble or riprap that is down inside the dredge template. Trial Trans. at 3810.

Concerning the sidecast borrow areas, Mr. Hrabovksy testified that there is no indication in the drawings of a sidecast borrow area that pre-existed the drawings. He admitted that the new levee would cover up the sidecast borrow area even if it was 50 feet from the existing levee toe. Trial Trans. at 3847.

Mr. Hrabovksy acknowledged that since the hard crust under the crane mats was not removed, the contractor would face a situation where underneath the levee a portion of the foundation would be old crust, and a portion would be the newly excavated sidecast borrow area. Trial Trans. at 3848. Mr. Hrabovksy testified that if somebody were to be constructing a new hydraulic levee next to the existing levee, the berm area would be about 20 feet, plus or minus. Trial Trans. at 3863.

Mr. Hrabovksy testified that there was no requirement in the contract documents that the contractor build a training levee for the new hydraulic levees. He noted that if the material was soft and saturated, it would be difficult to pile up. Trial Trans. at 3869. Mr. Hrabovksy knew that Renda had trouble getting its main levee to stand up because the levee would sink into the soft foundation. He agreed that it would be difficult to get a training levee to a certain height because the training levee location would be even farther to the interior of Lost Lake. Trial Trans. at 3870.

Mr. Hrabovksy testified that under the contract for the Project, Renda's only obligation concerning the hydraulic levee construction was to place the material evenly along the length where the hydraulic levees were supposed to go. He noted that as long as Renda was doing that, the

Government had no ability to be able to force Renda to change Renda's conduct. Trial Trans. at 3875.

**Al Meyer**

Mr. Alton Meyer testified that when the North Ferry Landing was eliminated from the Project, Mr. Meyer anticipated that the debris problem with the ferry landings had been resolved. Mr. Meyer did not expect there to be any debris at the South Ferry Landing. He did not conduct the same sort of investigation of the South Ferry Landing as had been done for the North Ferry Landing. Trial Trans. at 3674.

Mr. Meyer agreed that there is no mention in the drawings, JX05.002, note 4, that there might be riprap inside the dredge template. When Mr. Meyer referenced structures for the contractor not to disturb he did not mean riprap. Trial Trans. at 3682.

Mr. Meyer understood that a contractor cutting the side slopes would use a box cutting technique, because the way the hydraulic cutterhead is set up, it does not do angles real well, and it does steps much better. He would expect that there is going to be some over cutting on the side slopes in the process of doing the steps so that the contractor can make sure that the riser portion of the step is outside the dredge template. Trial Trans. at 3693.

Typically, on projects where the Government expects that there will be fair amount of debris, Mr. Meyer testified that the Government will have a line item in the bid solicitation for debris removal. Trial Trans. at 3694. For example, for the Goat Island Project, there was a bid line item for debris removal, and Great Lakes got paid by the ton for removing debris. Trial Trans. at 3695. This would have included the remaining portion of Section 9 of the Upper Bayou Project.

Mr. Meyer testified that when the Corps widened the channel in the area of the South Ferry Landing, the channel extended closer to the South Ferry Landing. During the Corps' investigation, the Corps focused on surveying the north side, not on the south side. Trial Trans. at 3707-08.

**Darrell Shobert**

Mr. Shobert testified at trial that the DCAA has guidelines to follow when performing an audit, including being fair to the contractor, being objective, and being independent. Trial Trans. at 4620. Mr. Shobert then proceeded to testify, demonstrating how the DCAA was not fair, objective, or independent. In short, the DCAA rubber stamped the Corps' position on Renda's claims.

Mr. Shobert acknowledged that a technical analysis is important for a DCAA audit such as the ones in this case. Although the DCAA asked for technical assistance from the Corps in connection with the audit, the Corps did not provide the technical evaluation information requested. Trial Trans. at 4621-24. Mr. Shobert acknowledged that Gene Seiler handled the audit of Renda's equipment, and that Mr. Seiler did not have in depth knowledge about the equipment. Mr. Shobert admitted that Mr. Seiler relied primarily on the Corps for assistance. Trial Trans. at 4627.

Mr. Shobert admitted that the DCAA did not know whether or not it would be appropriate to exclude from a claim involving the dredge, the hydraulic levee-building equipment. Since the Corps instructed the DCAA to exclude the hydraulic levee-building equipment from the claims involving the dredge, the DCAA did so. Trial Trans. at 4638-39.

Other than the instruction provided by the Corps, Mr. Shobert did not have any knowledge about how many hours a day the dredging equipment should be charged. Trial Trans. at 4641.

Mr. Shobert admitted that he is not conversant enough with the EP Manual to know how the ownership factor for the calculations for equipment is calculated, or whether to include in the ownership factor betterments that occurred during the first year. Trial Trans. at 4644-45. Mr. Shobert did not determine for himself whether or not the Upper Bayou contract required the contractor to use actual costs if they were available, or the EP Manual if the actual costs were not available. Trial Trans. at 4645.

Mr. Shobert had not reviewed any of the claims that Mr. McCullough had prepared in connection with the litigation, or any of the reductions that Mr. McCullough had made for Renda's claims. Trial Trans. at 4650.

**Recovery of Consultant/Professional Costs**

This issue principally concerns the cost of Barry Smith's work on assembly and preparation of the various requests for equitable adjustment ("REA"). The REA's were not claims, but were prompts for change order negotiation. Several of the REA's were invited by the Government. See, e.g., PX1158. The cost of preparing the pricing information for a change order is allowable.

Mr. McCullough's report, at Tab 16, contains a specific allocation for Mr. Smith's time for allowable costs. Mr. McCullough did not include any time or costs for Mr. Smith after an extra cost issue became a claim.

Mr. Shobert admitted that the costs for a contractor's retention of a professional, like a construction consultant, are allowable for services in connection with responding to a Corps' request for a proposal. Trial Trans. at 4659-60. Mr. Shobert testified that a request for equitable adjustment is like a request for a proposal in connection with some extra work that the contractor has done. He

testified that if the contractor incurred costs in preparing the request for equitable adjustment by using a construction consultant, the costs would be allowable. Trial Trans. at 4661.

**Additional Booster Costs**

The Government contends that Renda intended from the beginning to use two booster pumps on the Project. Government Brief at 95. While that is true, Renda's claim is for having to bring on the second booster barge three months earlier than anticipated.

**Equipment Rates**

The Government incorrectly contends that "The record does not contain anything that shows the rates for any and all the equipment for which Renda is claiming." Government Brief at 98. The equipment rate calculation sheets were in fact submitted with each claim that Mr. Smith prepared. See, e.g., PX0001.001.0096-0104 & .0585-.0797. Mr. Smith had prepared separate rate sheets for each piece of equipment.

After Mr. Connole criticized Renda for not calculating the rates for marine attendant plant using Chapter 4 methodology, Mr. Smith recalculated those rates. Mr. McCullough furnished new equipment rate calculations to supplement the old ones that had already been furnished with the claims.

The Government contends that Darrell Shobert undertook a number of activities concerning Renda's equipment rates. Government Brief at 98. However, it was Gene Seiler, not Mr. Shobert, who evaluated Renda's equipment rates. Trial Trans. at 4621 & 4627. As Mr. Seiler did not testify, Mr. Shobert's testimony about Mr. Seiler must be discounted due to hearsay. Mr. Shobert admitted that since Mr. Seiler did not know how to perform the calculations required under the EP Manual

(DX43), Mr. Seiler prepared a request for technical assistance from the Corps. PX1724. Trial Trans. at 4623.

Mr. Shobert admitted that the DCAA was not conversant with performing the calculations required by the EP Manual. Trial Trans. at 4624. That was why the DCAA required assistance from the Corps. Trial Trans. at 4624. However, the Corps did not provide the technical assistance that the DCAA requested. Trial Trans. at 4624. PX1728.

Mr. Shobert admitted that Mr. Seiler did not have much in depth knowledge about construction equipment, and had to rely primarily on the Corps. Trial Trans. at 4627.

Mr. Shobert admitted that the DCAA basically got its marching orders from the Galveston District. Trial Trans. at 4629-30; 4637-38.

For example, aside from the Corps' instruction for the DCAA to exclude the hydraulic-levee building equipment from the claims associated with the dredge, he had no independent basis for doing so. Trial Trans. at 4639. As another example, aside from information provided by the Corps, he had no knowledge about how many hours a day the land-based equipment should be charged. Trial Trans. at 4641.

Mr. Shobert was not familiar with the plans or specifications for the Project. Trial Trans. at 4632-33. Mr. Shobert was not familiar with the use of a measured mile as a damage model. Trial Trans. at 4634.

Mr. James, a technical specialist with the DCAA, wrote in the DCAA work papers that there was nothing to preclude Renda from using [EP Manual] tables for most equipment and actual costs for the dredge equipment. JX21.0006.

Mr. Shobert had no involvement in determining whether or not these were actual costs for the Dredge Millennium. Trial Trans. at 4643. Mr. Shobert was not conversant enough with the EP Manual to know how the ownership factor for calculations for equipment governed by the EP Manual would be figured. Trial Trans. at 4644.

Contrary to the Government's assertion (Government Brief at 98), Mr. Shobert did not speak to Kim Callum concerning the depreciable life of the Dredge Millennium. In fact, Mr. Shobert did not even know if Kim Callum was a man or woman. Trial Trans. at 4653. Mr. Shobert's knowledge of the contract and the EP Manual was so lacking that he did not know whether Renda was required to use actual costs to calculate an equipment rate for the Millennium.

## CONCLUSION

The Government relied heavily on Mr. Connole to the exclusion of principal fact witnesses. Since Mr. Connole proved to be a highly partisan, overly zealous advocate for the Government, his testimony must be discounted. The testimony of the percipient witnesses largely was in agreement on many key points. No one knew that the South Ferry Landing had shore protection, and there was no reference of such in the contract documents. The Corps knew about the rubble and debris problem on April 20, 2000, but did nothing, leaving Renda to its own devices.

The Flare Area soil borings (93-62 and 93-63) showed soft to very soft clay, while Renda actually encountered stiff to very stiff clay.

No one knew before the contract about the obstructions that damaged Renda's dredge in Obstructions No. 1 claim.

No one knew before the contract (or even after the Joint Venture's sidescan sonar and magnetometer survey) that the mooring buoy was lurking in Section 9.

No one tested the Section 7 clay for stiffness or hardness, despite Renda's notice of a difference in material characteristics.

No one directly associated with the Project knew before hand that Renda's disposal pipeline would have to be moved to accommodate HL&P work at Lost Lake.

No one knew that the foundations at Lost Lake were going to be so soft that the mechanical levees could not be constructed as designed (e.g., berms were required for the training levees, and a new borrow pit for the South levee).

No one knew that the levee would stray so far from the existing levee that mud waves would intervene and threaten to top the existing levee.

No one knew the extent of the sidecast borrow areas, and how much suitable clay material would be swallowed during hydraulic levee construction. Much like the mechanical levees, no one knew the exact effect the soft foundations would have on the hydraulic levees. The sidecast borrow areas were not disclosed in the contract documents. The designers' statement that there were insufficient materials for the hydraulic levees does not appear in the contract documents. The designers' calculations as to estimated displacement and settlement do not appear in the contract documents.

These uncontested facts alone go a long way toward proving liability in favor of Renda.

Respectfully submitted,

QUILLING, SELANDER, CUMMISKEY & LOWNDS, P.C.

BY: s/Brian W. Erikson
Brian W. Erikson, TX Bar No. 06643800
Clark B. Will, P.C. TX Bar No. 21502500

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)

ATTORNEYS FOR RENDA MARINE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on the28th day of April, 2005, a true and correct copy of the Reply Brief by Plaintiff, Renda Marine, Inc., was served electronically through the CM/ECF system for the Court of Federal Claims.

s/Brian W. Erikson
Brian W. Erikson