IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S POST-TRIAL BRIEF

Pursuant to ¶ 6 of the Court's February 23, 2005 Order, defendant, the United States, respectfully submits the following reply to the "Post Trial Brief by Plaintiff, Renda Marine, Inc." filed on April 21, 2005:[1]

I. Flare Area Claim

A. Contract Representations

Renda states that "[t]he Flare Area claim arose when Renda encountered very stiff clay where the soil borings showed very soft clay." Pl. Br. 11. According to Renda, "[s]oil borings numbered 93-62 & 93-63 showed the presence of only very soft clay through the dredging template area." Pl. Br. 4 ("Proof Analysis Table," Comment 1). The only testimony cited by Renda for this contention is testimony by its geotechnical expert, Dr. Mathewson, with respect to boring log 93-62. See Tr. 1859-1863 (Mathewson).

[1] In this reply brief, "Pl. Br. ____" refers to the referenced page(s) of the "Post Trial Brief by Plaintiff, Renda Marine, Inc."filed on April 21, 2005, "JX ____" refers to the referenced joint trial exhibit, "PX ____" refers to the referenced plaintiff trial exhibit, "DX ____" refers to the referenced defendant trial exhibit, "Tr. ____ (____)" refers to the referenced page(s) of the trial transcript and (parenthetically) the last name of the witness, "Compl. ¶ ____" refers to the referenced paragraph(s) of the Complaint filed in this case on April 11, 2002, and "Stip. ¶ ____" refers to the referenced paragraph(s) of the "Stipulation of Facts" filed in this case on or about February 23, 2005.

We disagree that the contract documents indicated only very soft clay in the Flare Area above elevation -47' MLT. In addition to boring logs 93-62 and 93-63, the contract documents contain relevant logs of borings taken on the opposite side of the Channel from the Flare Area, i.e., 3ST-3, 3ST-4, and 3ST-6. See JX 5.021. Those logs show stiff clay at an elevation of about -35' MLT, which is 12 feet higher than the elevation of stiff clay shown in boring logs 93-62 and 93-63. See Tr. 5039-5042, 5046-5047 (Connole).

B. Reasonable Interpretation

Assuming for the sake of discussion that, in bidding the Upper Bayou Project, Renda relied upon the two boring logs in the Flare Area, i.e., logs 93-62 and 93-63, to predict the character of materials to be encountered in the Flare Area, without regard for information contained in other relevant boring logs, Renda did not act as a reasonably prudent contractor in interpreting the contract documents.

Renda relies upon testimony by Mr. Bowman and Dr. Mathewson concerning the Flare Area Claim to establish that Renda's interpretation of the contract documents was reasonable. See Pl. Br. 4 ("Proof Analysis Table," Comments 1, 3). Mr. Bowman's interpretation of what the contract indicated about the character of the material in the Flare Area was based primarily upon upon what boring log 93-62 supposedly showed. He testified that the top of elevation of boring log 93-63 is only at -45' MLT and that this log has only about "three feet of information" so that "you had to project from the one before, the 93-62, to really get a feel for what they considered in the area, which gave you a much higher or a much more informative opinion of what was there." Tr. 527.

The Flare Area in the Upper Bayou Project extended from Channel Sta. 520+00 to Sta. 550+65.99, a reach of approximately 3,500 feet. Boring 93-62 is located at Sta. 527+30, near the downstream end of the Flare Area. It is not reasonable to use this boring log, as Mr. Bowman testified he did, to predict the character of material to be encountered throughout the Flare Area, including locations as much as 3,000 feet upstream from where boring 93-62 was taken.[2]

In fact, Mr. Fisher could not have relied exclusively upon boring 93-62 or 93-63 to evaluate the character of the soils to be encountered throughout the Flare Area. In his stiff clay spreadsheet, Mr. Fisher estimated that, at Sta. 544+06, which is located in the part of the Flare Area that is in Section #6, stiff clay would be encountered at -38' MLT, not at the bottom of the dredging template (i.e., -47' MLT) as Renda claims. See JX 38 (column "Top of Stiff or Very Stiff Clay per Borings").

Dr. Mathewson testified that it was reasonable to rely upon the boring logs in the Flare Area (logs 93-62 and 93-63) to project the type of material to expect in the Flare Area without consideration of data contained in the contract logs of soil borings from the north bank of the Channel opposite the Flare Area because of the "highly variable" stratigraphy on the Texas Gulf Coast. Tr. 1865. That testimony, however, is not consistent with his deposition testimony in

---

[2] Mr. Bowman testified that one of the reasons he did not rely upon the borings on the north side of the Channel is because they were taken in the 1960s, 30 years prior to the Upper Bayou Project. Tr. 759. All the borings on the north bank across from the Flare Area have the prefix "3ST," which means that they were drilled in 1961 or 1963. Drawing F-4, Note 5 (JX 5.022). If Mr. Bowman did not rely upon the "3ST" borings, then what did he use to predict the character of the materials to be encountered *in the Channel* between Sta. 520+00 and Sta. 550+00? More, importantly, if Mr. Bowman did not believe that the "3ST" borings were reliable, on what basis did he assess soil conditions in other reaches of the Upper Bayou Project? Of the 64 boring logs contained in the contract documents, 46 are logs of "3ST" borings. See Drawings F-1 through F-4 (JX 5.019-JX 5.022).

this case. When, at his deposition, Dr. Mathewson was asked whether he would examine borings taken in the north bank across from the Flare Area to predict the nature of the materials to be encountered in the higher elevations of the south bank in the Flare Area, he testified that he would attempt to create a three-dimensional model of the soils with the data contained in the borings on the north side of the Channel as well as the two borings in the Flare Area. Tr. 1975-1976.

Moreover, because of the depths of the elevations at the tops of boring logs 93-62 and 93-63, it is not reasonable to rely exclusively upon boring logs 93-62 and 93-63 to evaluate the kind of material to be encountered in the Flare Area, particularly in the higher elevations of the side slope. Tr. 4411 (Lofgren); 5039 (Connole). The top of log 93-62 is approximately -33' MLT and the top of log 93-63 is about -44' MLT. Tr. 1974 (Mathewson). The borings in the Flare Area do not indicate anything about the character of soils in the Flare Area above elevation -33' MLT, in the case of boring 93-62, or above -45' MLT, in the case of boring log 93-63. Tr. 5037, 5038 (Connole). In addition to borings 93-62 and 93-63, a reasonably prudent contractor would consider the borings on the opposite side of the Channel from the Flare Area, including borings 3ST-3, 3ST-4, and 3ST-6, to predict the type of earth materials to be encountered in the Flare Area. Tr. 5039 (Connole); 4410-4411 (Lofgren).

C. Reasonable Reliance

In light of the fact that the contract documents contained only two soil borings that were in the Flare Area, a reasonable site investigation prior to bidding the Upper Bayou Project would have included additional testing of the materials in the Flare Area of the project, especially considering that, as Mr. Bowman noted, about 800,000 cubic yards of material or about one quarter of the estimated quantity of material to be dredged was in that area of the project. Under those

circumstances, it would have been reasonable for Renda to have taken a boat ride in the area to be dredged and probed the Flare Area with a rod or pipe to get an idea of where firm bottom was or to have taken additional soil borings in the Flare Area. See Tr. 3726-3727 (Hrabovsky). Mr. Bowman acknowledged that it is possible to determine the density of material from a barge or skiff by probing it with a rod. See Tr. 2256-2257.

Renda argues that it was reasonable to rely exclusively upon the two borings in the Flare Area to predict the type of soils present in the dredging template without conducting additional soils tests, citing testimony by Mr. Bowman that it would have been too expensive to perform such testing. Tr. 776. In fact, however, the reason that Renda did not perform additional soils tests during the pre-bid site investigation was because of Renda's desire to preserve its anonymity in the bidding process in order to increase its chances of a successful bid for the Upper Bayou Project, not because the costs of additional testing were prohibitive. According to Mr. Bowman, if Renda had taken soil borings or other soil tests "and spent a lot of time being very visible down there, obviously, we would have played our hand to the other contractors." Tr. 1503-1504.

Insofar as production estimates for the Flare Area are concerned, Renda cites testimony by Mr. Bowman that Renda expected to be able to pump 30,000 cubic yards of material per day. Pl. Br. 12. While Mr. Bowman testified that he anticipated 30,000 cubic yards of material per day or a minimum of 1,500 cubic yards of material per hour in the Flare Area, he added that he was "guessing because I don't have the worksheets." Tr. 522. That points up the problem with Renda's case for what it anticipated at the time of bidding the project about earth materials and production rates for the Upper Bayou Project. The worksheets that Renda prepared in connection with its bid estimate for the Upper Bayou Project, which contained that type of information, have

disappeared and the Court is left with little more than the admitted guesswork of Mr. Bowman, a witness whose trial testimony was contradicted in numerous respects by the testimony he gave at his deposition in this case. See Tr. 1475-1477; 1480-1482; 1493-1494; 1500-1501; 1503-1504; 1534-1535 (Bowman).

D. Renda's Measured Mile

Mr. Smith created the measured mile for the Flare Area Claim and Renda's damages expert, Mr. McCullough, relied upon that measured mile to calculate the damages sought by Renda in the Flare Area Claim. Tr. 1655 (Smith); 2832-2833 (McCullough).

The purpose of the measured mile method is to evaluate a contractor's efficiency – loss of productivity – in performing a part of the contract work that allegedly has been affected by some delaying event or condition.[3] The measured mile accomplishes that by determining the contractor's efficiency in performing identical or similar work elsewhere on the project or during another interval on the project that is unaffected by the delaying event or condition and using that production rate as a baseline by which to gauge the amount of time it would have taken the contractor to perform the work affected by the delaying event or condition. The loss of production attributable to the delaying event or condition is the difference between (a) the amount of time it would have taken to perform the work in question but for the delaying event or condition and (b) the amount of time actually expended by the contractor to perform that work.

[3] The Government's damages expert, William Connole, P.E., described the measured mile as "a method for comparing productivity between two work periods. One work period is affected by a change or differing site condition, and that's compared with another work period with similar environmental conditions that is unaffected by a change or a differing site condition." Tr. 4943.

Mr. Smith testified that, to select a measured mile for the Flare Area, he tried "to locate an area where the dredging that had occurred was as close to the material that they anticipated that they should have found in that particular area." Tr. 2069. Mr. Smith stated that, to identify days when the dredge was in material that he understood Renda anticipated in the Flare Area, he "started from the rate of production." Id. Mr. Smith further testified that he assumed "from the production numbers" that the material was "soft," but could not tell whether it was "a clay or a mud or a silt," acknowledging that the daily dredging reports do not reflect whether the material encountered was soft clay. Id., at 2073.

The problem with the measured mile used by Mr. Smith for the Flare Area Claim is that, instead of identifying dates upon which the *Millennium* was operating under conditions substantially similar to the conditions that Renda allegedly anticipated in the Flare Area, i.e., soft clays, and then determining the dredge's productivity in those conditions, Mr. Smith looked at production rates to identify days on which the dredge was operating in the soft clay condition allegedly anticipated in the Flare Area. Identifying days to include in a measured mile based upon production rates is flawed because that approach assumes the very thing the measured mile is supposed to test – the dredge's production in the soft clay allegedly anticipated by Renda in the Flare Area.

Moreover, even assuming for the sake of discussion that selecting days to be included a measured mile by reference to levels of production were an acceptable approach, which it is not, Mr. Smith's selection of the days included in the measured mile for the Flare Area Claim based upon high production rates would still be flawed because, as noted above, Mr. Smith admitted that he could not determine from production rates whether the *Millennium* was operating in clay, mud, or silt.

E. The Sanford Estimate

In its discussion of the Flare Area Claim, Renda refers to a cost estimate prepared by Mr. Will Sanford of the Corps and states that "Mr. Sanford's Government Estimate is attached to PX 155." Pl. Br. 18. Renda further states that "Mr. Sanford's Government Estimate indicates that the total additional costs were $4,111,778.00," citing "the last page of PX 155." Id. But PX 155 was not received in evidence at the trial. It is not part of the record in this case. The Court, thus, should disregard PX 155 and the factual proposition for which Renda relies upon that document.

F. Government Expert's Measured Mile

Renda asserts that, although Mr. Sanford at one point believed that a measured mile does not necessarily have to be located in the same area as the "impacted area," during negotiations upon the Flare Area Claim, he became convinced that a measured mile for the Flare Area Claim be located inside the Flare Area because, when dredging in the Channel, productivity is impaired by down time for ship traffic and obstructions, whereas the Flare Area is outside the Channel and not subject to those conditions. Pl. Br. 17-18 (citing PX 1303). Insofar as, by this statement, Renda implies that the measured mile for the Flare Area Claim identified by the Government's damages expert, Mr. Connole, is inappropriate because it is located in an area of the Upper Bayou Project that is in the Channel and outside the Flare Area, we disagree.

As Mr. Connole explained, in a dredging measured mile analysis, productivity is evaluated in terms of the quantity of material dredged per hour, a value that is derived by dividing the quantity of material dredged on a given day by the number of pumping hours for that day. Tr. 4970. The hourly production rate "takes into consideration the operation of the dredge, the time it's actually running, producing material." Id. The time that a dredge is down for ship traffic or

obstructions, thus, has no effect upon an hourly dredging production rate.

II. Section 7 Clay Claim

A. Material Difference

As to the element of material difference, Renda cites testimony by Dr. Mathewson and Mr. Bowman. See Pl. Br. 5 ("Proof Analysis Table"). Dr. Mathewson testified that encountering the alleged "hardpan" red clay would reduce the dredge's productivity because "[t]he cutterhead would probably bang or what I call chatter instead of excavating smoothly." Tr. 1897. On cross-examination, however, Dr. Mathewson admitted that he has never worked on a dredge in any capacity, does not have any experience with the design or fabrication of dredges, has never been qualified by a court or board as an expert with respect to the operations of a hydraulic cutterhead dredge, and has not reviewed the operating characteristics of the *Millennium*. Tr. 1953-1954, 1984. His understanding of what Renda encountered, moreover, is based upon statements by Mr. Oscar Renda or Mr. Smith. Id., at 1995. Dr. Mathewson did not ask to speak with the leverman who was on the *Millennium* during the period covered by the Section 7 Clay Claim. Id., at 2001.

Mr. Bowman testified that he had a telephone conversation with Mr. Benton Goodloe, Renda's Project Manager during the period covered by the Section 7 Clay Claim, and that Mr. Goodloe stated that the dredge had encountered "something hard on the north face" like "red rock" and that, as it entered the cut, the cutterhead was "chattering." Tr. 1232. The Government objected to the testimony of what Mr. Goodloe told Mr. Bowman upon the ground that it is hear-say. The Court ruled: "We'll look for something else for the proof of the material, but in terms of communication and why he took the actions he did, we'll allow it." Tr. 1234.

Mr. Goodloe was the last witness called by Renda to testify as part of its case-in-chief. Mr. Goodloe testified that the dredge "hit hard material" on the north side of Section #7" which reduced the dredge's production. Tr. 2762-2763. But he was not asked to describe the reaction of the cutterhead when it encountered the "hard" material. Nor did he testify that the cutterhead "chattered" when it came in contact with that material. See Tr. 2762-2764.

B. Renda's Measured Mile

For the Section 7 Clay Claim, Mr. Smith used the same measured mile that he selected for the Flare Area Claim. Tr. 2493 (Smith). Renda's damages expert, Mr. McCullough, relied upon that measured mile to calculate the damages sought by Renda in the Section 7 Clay Claim. Tr. 2833 (McCullough).

Renda states that "[t]he Section 7 Clay claim arose when Renda encountered hardpan or hard clay, when the soil borings showed stiff or very stiff clay." Pl. Br. 22.[4/] Mr. Smith testified that, in selecting the days included in the measured mile for the Flare Area Claim, he attempted, by reference to production levels, to identify days when the dredge was operating in *soft* material.

[4] In correspondence to the Corps, Renda stated that "the soil borings for the North reach of Section 7 clearly show gray and blue clays, *which although 'stiff' or 'hard'*, are relatively easy for the cutterhead to dredge through." PX 6.001.0003 (emphasis added). Renda's geotechnical expert, Dr. Mathewson, also acknowledged that boring logs 3ST-8W, 3ST-9W, 3ST-10W, 3ST-11W, 3ST-12W, 3ST-13W, 93-64, and 93-65, "all show either iron staining, or they show stiff gray clays." Tr. 1995-1996. Those borings show "mostly stiff and hard gray, or they have iron stains in them." Id., at 1997 (Mathewson); see also id., at 1998-1999 (boring 3ST–13W (see JX 5.020) shows hard or very stiff clay from -34' MLT to -50' MLT); id., at 1999-2000 (boring 3ST-14 (see JX 5.020) shows medium clay from -10' MLT to -20' MLT, dense sands from -20' MLT to -45' MLT, and stiff clay from -45' MLT to -50' MLT). Mr. Bowman agreed that, in the stiff clay spreadsheet prepared by Mr. Fisher for the Upper Bayou Project, Mr. Fisher estimated that 100 percent of the material to be dredged between Sta. 566+00 and Sta. 586+00 and at Sta. 602+00 and 608+00 would be stiff to very stiff clay. Tr. 2200-2201 (Bowman); DX 477; see also JX 28; JX 38 (earlier versions of Fisher stiff clay spreadsheet).

The measured mile used by Renda for the Flare Area Claim, therefore, is an inappropriate gauge of the dredge's performance in *stiff* clay, the type of materials anticipated by Renda in the area of the Upper Bayou Project (i.e., the north side of Section #7) that is the subject of the Section 7 Clay Claim. To properly evaluate lost productivity of the dredge in the area of the Project at issue in the Section 7 Clay Claim, the measured mile should model the dredge's performance in an area of the Project where the dredge was operating in *stiff* clay, not the dredge's performance in soft material, such as mud, silt, or a soft clay.

III. Obstructions #1 Claim

Renda states that "[t]he Obstructions No. 1 Claim arose from damage to and down time from collisions with unanticipated and unknown obstructions in the Houston Ship Channel" and that "[t]he principal obstructions included a stern swivel and Connex box," which, Renda notes, "the Government has conceded are Type II differing site conditions." Pl. Br. 25.[5] According to Renda, it "is not seeking the cost for dredging trash and debris," only "the cost of having to repair its dredging equipment, which resulted from collisions with unknown obstructions (other than trash and debris)." Id.[6]

---

[5] Type II differing site conditions are "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." See FAR 52.236-2, "Differing Site Conditions" (APR 1984) (Contract Section 00700, ¶ 60 (JX 1.0094)).

[6] For this proposition, Renda cites testimony by Mr. Bowman, the Renda official in charge of the Upper Bayou Project after July 2000. Mr. Bowman testified that, in connection with Renda's "claims for obstructions," he was not complaining about encountering "scrap, rope, wire cable, snags, and stumps – that kind of stuff." Tr. 843. Rather, he was "complaining about obstructions – or targets, as they're called – that were in the channel that we did not know about and wouldn't have known about," such as "40-foot connex box, links of pipe, a 30-inch [dredge] swivel . . . ." Id.

A. Liability

In addition to the Connex shipping container and the dredge stern swivel assembly, the obstructions of which Renda complains that are the subject of the Obstructions #1 Claim fall into two categories: (1) rubble or rip rap at the Oxy-Chemical Dock and (2) steel pipe or other steel objects. As discussed in the Government's initial post-trial brief, the rubble or rip rap encountered by the *Millennium* at the Oxy-Chemical Dock is not a Type I differing site condition for several reasons, not the least of which is that, in preparing the bid estimate for the Upper Bayou Project, Mr. Eddie Fisher, who was in charge of Renda's operations (including the Upper Bayou Project) until the end of July 2000, anticipated that the dredge would encounter rock and rip rap from shore protection projects. JX 98A, at 222.[7/] Similarly, in preparing the bid estimate for the Upper Bayou Project, Mr. Fisher anticipated that the dredge would encounter "metal debris" ("a lot" of which "is from dredge and barge work") and "large pieces of metal." Id.[8/]

B. Damages

Renda argues that the encounters with the objects that are the subject of the Obstructions #1 Claim discussed above damaged the "seals and ring gear in the cutterhead assembly," which

---

[7] The rubble or rip rap also is not a Type I differing site condition because, as discussed in our post-trial brief, (a) the contract for the Upper Bayou Project does not affirmatively indicate that rubble or rip rap would not be encountered at the Oxy-Chemical Dock and (b) Renda itself caused the rubble or rip rap to fall into the dredging prism by "overcutting at the lower elevations of the slope," PX 1176, thereby failing to heed the warning given by Specification § 02482.3.5.2 (JX 2.0118) when dredging in the area of the Oxy-Chemical Dock. See Tr. 3651-3652 (Meyer).

[8] The steel pipe also is not a Type I differing site condition because, as discussed in our post-trial brief, the contract for the Upper Bayou Project expressly identified "pipe" as "an obstructive material which may be encountered during dredging operations[.]" Specification § 02482.3.4.4.2 ("Debris") (JX 2.0117). Renda's reliance upon Specification §§ 1.11 and/or 1.11.1 (JX 2.0110), therefore, is misplaced.

had to be repaired. Pl. Br. 32. To recover for a Type I differing site condition, Renda must show that its claimed excess costs are "solely attributable to the materially different subsurface condition within the contract site." Weeks Dredging & Contracting, Inc. v. United States, 13 Cl. Ct. 193, 218 (1987), aff'd, 861 F.2d 728 (Fed. Cir. 1988); see also Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 94 (1989) (A contractor must demonstrate that the increased costs of performance "are attributable entirely to the materially different subsurface condition.").

Renda contends that *all* of the obstructions discussed above resulted in the damage to the *Millennium* for which it seeks compensation. Inasmuch as the Government is not liable for the encounters with the rubble/rip rap or the steel pipe, Renda has not demonstrated, and cannot demonstrate, that the two objects for which the Government has conceded liability – the Connex shipping container and the dredge stern swivel – were the sole cause of the damage to the cutterhead.

Renda asserts that, as a result of the damage to the dredge's cutterhead from encounters with the objects that are the subject of the Obstructions #1 Claim, the *Millennium* was down for a period of 31 days "[b]ecause some parts had to be obtained." Pl. Br. 32. As support for that contention, Renda cites testimony by Mr. Bowman. On direct examination, Mr. Bowman was examined about JX 76, a March 7, 2001 letter from Mr. Bowman to Mr. Mike McClenan of the Corps (the administrative contracting officer), in which Mr. Bowman wrote, in pertinent part:

> As you are also aware, on December 11, 2001, the dredge Millennium ceased dredging operations due to severe damage caused by hitting numerous obstructions and man-made erosion control material (concrete, riprap, etc.) near the Oxy-Chemical Dock Area. As a result, dredging operations were delayed approximately 31 days for dredge repairs (not including three days for partial repairs and shakeout) . . . .

PX 76.0002; see also Tr. 902-905. In response to the question "What was the damage that you were referring to [at PX 76.0002]," Mr. Bowman identified the cutterhead and stated that it took 31 days to repair the cutterhead because some of the parts "came from overseas." Tr. 904-905. On cross-examination, however, when asked whether on direct examination he had testified that it required 31 days to repair the cutterhead because the parts had to be obtained from overseas, Mr. Bowman seemingly contradicted himself:

> No. And we did have parts – and part of the cutterhead drive is an R&R gearbox. And yes, that was Italian made parts. But I do not remember specifically saying that the delay was caused by getting parts in.

Tr. 2266-2267. Mr. Bowman was then asked "Do you recall that the repairs to the cutterhead were completed by December 20, and that the cutterhead was installed on the Millennium on that date?," to which he responded: "I can't answer one way or the other. Sorry. I don't know the exact date." Id., at 2267.

Mr. Bowman's testimony, therefore, does not support Renda's contention that the dredge was out of service for 31 days during the period from December 11, 2000, to January 11, 2001, for repairs to the cutterhead. Renda's contention that the dredge was down for 31 days for that reason is refuted by the testimony of Mr. Christopher Babitzke, one of the inspectors provided by the Joint Venture for the Upper Bayou Project pursuant to the Supplemental Quality Assurance Agreement with the Corps. That testimony and those documents reflect, among other things, that the *Millennium* resumed operations on December 29, 2000, only to be taken out of service again on December 31, 2000, because of a broken main pump shaft. See Tr. 3505-3507; JX 11.130;

JX 11.131.[9]

C. Other Comment

In the section of its post-trial brief that is addressed to the Obstructions #1 Claim, Renda cites a January 31, 2001 letter from Mr. Bowman to Mr. McClenan "reporting on two additional differing site condition obstructions located in the Houston Ship Channel" allegedly encountered on January 27 and 28, 2001, that ostensibly interfered with Renda's dredging operations. Pl. Br. 31; see also PX 1221. These alleged encounters with obstructions are outside the damages window for the Obstructions #1 Claim, which extends from December 11, 2000, until about January 14, 2001. See Compl. ¶ 114.

IV. Obstructions #2 Claim

I. Liability

Renda states that "[t]he Obstructions No. 2 or Section 9 claim arose from Renda's having encountered obstructions, and excessive trash and debris in Dredge Section 9 of the Project." Pl. Br. 33. In his opening statement at the trial of this matter, Renda's counsel stated: "[I]t's important for the Corps to note that Renda's not complaining about having to remove trash. Renda is complaining about not being able to get to the dredged material, and when it came to Section 9, it's just simply an area that was just not suitable for cutterhead dredging." Tr. 48-49. During the course of the Upper Bayou Project, on April 14, 2001, Mr. Bowman wrote a letter to the contracting officer (Thomas Benero) in which he stated, relative to "excessive trash" in Section #9, that "the point at issue" is "the damage caused by excessive trash, NOT the decreased operating time

---

[9] Mr. Babitzke also testified, and his inspection reports reflect, that during December 20-28, 2000, the *Millennium* was undergoing repairs to the computer/electrical system, not the dredge's cutterhead. See Tr. 3493-3504; JX 11.123-JX 11.129.

due to trash." PX 1385.0002; see also Tr. 952-955 (Bowman).

As discussed in the Government's initial post-trial brief, to the extent that, in the Obstructions #2 Claim, Renda is asserting a claim for excessive trash, it cannot demonstrate a Type I differing site condition. The contract for the Upper Bayou Project does not contain an affirmative indication of the *quantity* of trash to be expected, only a description of the kind of trash or debris that Renda might encounter during dredging operations. Consequently, to the extent that Renda is contending that trash encountered in Section #9 was a contributing cause of the damage to the *Millennium* that is the subject of the Obstructions #2 Claim, then the claim fails because Renda cannot demonstrate that any other obstruction(s) encountered in Section #9, such as the mooring buoy, were the sole cause of the damage to the dredge.

Renda, moreover, has not demonstrated that the mooring buoy and chain are a Type I differing site condition. *First*, the contract for the Upper Bayou Project does not affirmatively indicate that Renda would not encounter a sunken mooring buoy or like object.[10/] The contract

---

[10] In support of its claim that the mooring buoy is a Type I differing site condition, Renda contends that the "Character of Materials" clause (Specification §§ 02482.1.11, 02482.1.11.1 (JX 2.0110)) "indicate that the contractor could reasonably expect to encounter scrap, rope, wire cable, snags and stumps, and affirmatively indicated that 'explorations, including core borings' had been made." Pl. Br. 8 ("Proof Analysis Table," Comment 1). Specification § 02482.1.11.1 merely sets forth a non-inclusive list of man-made materials that "may be encountered within the specified limits of required dredging and overdepth dredging." It does not imply that the contractor will not encounter other man-made materials in the dredging template that are not explicitly enumerated in that clause. Moreover, the purpose of the boring logs contained in the contract documents was to investigate *soil* conditions, not test for the presence of man-made materials, such as trash or debris. Thus, in D.W. Sandau Dredging, ENGBCA No. 5812, 96-1 BCA ¶ 28,064, the board rejected the contractor's contention that the contract indicated a lack of trash and debris because the boring logs did not indicate trash or debris, stating that "[i]t is not remarkable that the drilling of 11 bore holes, using small diameter tubes (4-inch diameter or smaller), excavated in a large dredging area (at least 390,000 square feet . . .) would not strike discrete items such as a single tire out of 52 or one of 4 shopping carts . . . ." Id., at 140,157-140,158.

does not say anything one way or the other about mooring buoys. *Second*, Renda has not demonstrated that the *Millennium*'s encounter with the mooring buoy was the sole cause of the damage to the dredge during the period covered by the Obstruction #2 Claim.[11/]

B. Damages

Renda states that the Obstructions #2 Claim "seeks to recover for the cost of repairs to the Dredge Millennium, and for down time and standby while the Corps unreasonably refused to release the Millennium from the Project and essentially held the dredge and Renda's equipment hostage." Pl. Br. 33. Renda has not shown, however, that if the Government is liable to it upon the Obstructions #2 Claim, Renda is entitled to be compensated for more than 14 days of down time for the dredge.

Renda's complaint alleges that "[r]epairs to Renda's dredge occurred between about April 16 and May 8, 2001." Compl. ¶ 133. Renda seeks compensation for down time to the *Millennium* due to the cutterhead gearbox repairs allegedly caused by the encounter with the mooring buoy, 80% of the day on April 16, 2001, 100% of the days during April 17, 2001, through May 7, 2001, and 50% of the day on May 8, 2001, a total of 22.3 days. Tr. 5153-5154 (Connole); DX 19/112.

---

[11] Renda's daily dredge report for April 16, 2001, states: "The cutter gearbox was damaged when a large mooring buoy was encountered." JX 9.586.0002. When asked at trial what the encounter with the mooring buoy did to the dredge, Mr. Goodloe testified: "[I]t didn't do it any good. *When you continually get these things like* chain, mooring buoys, it shortens the life of your seals and bearings and your drive." Tr. 2773 (Goodloe). That response implies that striking the mooring buoy was not the sole cause of the damage to the cutterhead gear box – that there were other encounters with obstructions that are not part of this claim and for which Renda has not established the Government is responsible.

As discussed in the Government's initial post-trial brief, at trial, Renda did not demonstrate, through the testimony of its damages expert, Mr. McCullough, or any other witness, that the *Millennium* was down for 22.3 days for repairs to the cutterhead gearbox. When asked how long he recalled the dredge being down for the cutterhead gearbox repairs, Renda's dredging superintendent, Mr. Goodloe, could not substantiate a period greater than 13 days for those repairs. See Tr. 2775-2776 (Goodloe).

Mr. Goodloe's testimony is consistent with the testimony of the Government's damages expert, Mr. Connole, and Mr. Hrabovsky. Mr. Connole determined that he could support 14 days of down time for the cutterhead gearbox repairs, based upon a document that he had reviewed that was prepared by Mr. Hrabovsky. Tr. 5158-5159 (Connole). Mr. Connole testified that he recalled that Mr. Hrabovsky had reported that the cutter tail shaft was installed on the *Millennium* on April 30, 2001. Id., at 5159; see also DX 19/110 & n.3. At trial, Mr. Hrabovsky confirmed in his testimony that, during a visit to the Upper Bayou Project on April 30, 2001, he visited the dredge and observed that the cutterhead tail shaft had been reinstalled and the dredge "appeared to be ready to go back to work." Tr. 3798 (Hrabovsky).

At trial, moreover, Renda did not offer or elicit any evidence tending to show that the Corps refused to release the *Millennium* from the Project or held the dredge and Renda's equipment "hostage," much less that any such conduct by the Corps could be attributed to a Type I differing site condition. To the contrary, Renda and the Government entered bilateral contract Modification P00026, effective on May 4, 2001, pursuant to which Renda agreed to suspend dredging on the Upper Bayou Project for a period of "at least 30 days but not exceeding 60 days" to allow Renda to perform a private dredging contract (the Houston Fuel Oil project). See JX

6.026.0003, at ¶ A. Modification P00026 contains a release which provides that "this adjustment constitutes compensation in full on behalf of the contractor . . . for all costs and markup directly or indirectly attributable to the change ordered, for all delays related thereto, and for performance of the change within the time frame stated." Id., at ¶ F.

C. Other Comments

(1) Renda asserts that, on August 7, 2000, at the meeting concerning the alignment of the West Levee, "[l]ong before Renda reached Section 9, Renda alerted the Corps to the prospects of that section containing an unreasonable amount of debris." Pl. Br. 33. How did Renda know in August 2000, before it began dredging in Section #9, that this reach of the Channel contained an unreasonable amount of debris? The statement suggests that Renda knew all along that this area contained a large amount of trash and that Renda anticipated this when it bid the Upper Bayou Project. That being so, it was unreasonable for Renda to wait for the Government to survey Section #9 and to begin dredging in that area without itself arranging for surveys, such as the sidescan and magnetometer surveys eventually performed by the Government. In that connection, the contract expressly required that, "[p]rior to dredging, the Contractor shall carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the Contractor deems suitable to locate any debris which may interfere with dredging." Specification § 02482.3.4.4.2 (JX 2.0117).

(2) In its post-trial brief, Renda discusses a March 13, 2001 letter from Mr. Bowman to the contracting officer (Benero), in which Mr. Bowman asserted, among other things, that the booster pump had been damaged by "inordinate amounts of trash[.]" See PX 1327. The record in this case contains no evidence of damage to a booster pump, let alone damage caused by trash.

(3) Renda contends that "Section 9 contained so much trash, debris, and obstructions, that dredging with a cutter head dredge was not practical." Pl. Br. 34. Renda further states that Mr. McClenan testified that the Corps had to have another contractor complete the plug between Sta. 650+00 and Sta. 658+00 and that, "as long as another contractor was coming back to complete the plug, they could do Section 9 with a bucket dredge." Id. Renda then states (parenthetically): "In fact, this is what happened. When the Corps solicited bids for the Mid Bayou/Goat Island Project, the Corps had the contractor remove the plug between Stations 650+00 and 658+00, and complete the remainder of Section 9." Id.

To the extent that Renda is suggesting that Great Lakes Dredging and Dock Co. (GLDD), the contractor that completed dredging the unfinished part of Section #9, performed that work with a bucket dredge, it is unsupported by the evidence. Mr. James Van Norman, GLDD's construction manager for the Mid-Bayou Project, testified that, as part of the Mid-Bayou Project, GLDD dredged the unfinished part of Section #9 with the Dredge *California*, a hydraulic cutter-head suction dredge. See Tr. 3528-3530.[12/]

V. South Ferry Landing Claim

A. Contract Representation

In support of its position that the contract for the Upper Bayou Project contained affirmative representations or indications that Renda would not encounter rubble or rip rap in the area of the South Ferry Landing, Renda asserts three things: (1) "[t]he drawing did not show debris or man made material extending into the dredging template;" (2) "[c]ross sections do not show any

[12] In any case, Renda is not seeking compensation in the Obstructions #2 Claim because of its inability to complete dredging Section #9.

rip rap or man made material extending into the dredge template and there is no warning such as at sta. 544+06.55 of any obstruction;" and (3) "Character of Materials: para. 1.11 and 1.11.1 indicate that the contractor could reasonably expect to encounter scrap, rope, wire cable, snags and stumps, and affirmatively indicated that 'explorations, including core borings' had been made." Pl. Br. 8 ("Proof Analysis Table," Comments 1, 2, 3).

As discussed in the Government's initial post-trial brief, a contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be. Comtrol, Inc. v. United States, 294 F.3d 1357, 1363 (Fed. Cir. 2002); H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed Cir. 1998). There must be "reasonably plain or positive indications in the bid information or contract documents that [the] subsurface conditions would be otherwise than as actually found in contract performance, or to view the other side of the coin, that there were such indications which induced reasonable reliance by the successful bidder that subsurface conditions would be more favorable than those encountered." Pacific Alaska Contractors, Inc. v. United States, 193 Ct. Cl. 850, 869, 436 F.2d 461, 469 (1971). A Type I differing site condition cannot be demonstrated, therefore, where "the plans and specifications do not 'show' or 'indicate' anything about the alleged unforeseen condition, i.e., if they say 'nothing one way or the other about [the subsurface condition].'" United Contractors v. United States, 177 Ct. Cl. 151, 161, 368 F.2d 585, 595 (1971) (quoting Ragonese v. United States, 128 Ct. Cl. 156, 159, 120 F.Supp. 768, 769 (1954)).

We do not agree that the parts of the contract documents cited by Renda identified above constitute, individually or together, an affirmative indication that there is no rubble or rip rap in the dredging prism in the area of the South Ferry Landing. *First*, as Alton Meyer, P.E., the Corps

official who prepared the channel design for the Upper Bayou Project, testified, "Drawings C-2 and C-3 [JX 5.002, JX 5.003] give the plan view of the channel and the alignment data that show the limits of dredging." Tr. 3647-3648. Those drawings are not intended to show trash or debris in the areas to be dredged under the Upper Bayou Project." Id., at 3648 (Meyer). Drawing C-6 (JX 5.006) shows the results of hydrographic surveys and some structures identified at the North Lynchburg Ferry Landing. Tr. 3653-3654 (Meyer). That drawing does not indicate anything one way or the other about conditions at the South Ferry Landing, the subject of Renda's claim.

*Second*, as Mr. Meyer testified, the cross sections of the Channel included in the contract plans (Drawings C-7 through C-13 (JX 5.007-JX 5.013)) are not intended to show rubble or rip rap in the dredging template. Tr. 3656-3657. The cross sections, which are generated from standard hydrographic surveys performed with a fathometer, "show the template of the new channel," the existing ground at the time of the surveys," and on several of them . . . some information that was taken from previous dredging." Id. (Meyer). The absence of any indication in the cross sections of rubble or rip rap, thus, could not constitute an indication that no such material is present.[13/]

*Third*, as discussed above, Specification § 02482.1.11.1 sets forth a non-inclusive list of man-made materials that "may be encountered within the specified limits of required dredging and overdepth dredging." This provision does not imply that other man-made materials not enumerated therein may not be found in the dredging template. The purpose of the boring logs contained in the contract documents was to investigate *soil* conditions, not to test for the presence of

---

[13] There is, moreover, no evidence that, in preparing Renda's bid for the Upper Bayou Project, Messrs. Fisher or Bowman interpreted any cross section included in the contract drawings in that manner.

man-made materials, such as trash or debris. See D.W. Sandau Dredging, ENGBCA No. 5812, 96-1 BCA ¶ 28,064, at 140,157-140,158.

B. Damages

Renda asserts that it dredged the South Ferry Landing Area and "damaged it pump and other equipment," but does not identify what equipment besides the pump was damaged. Pl. Br. 49. At trial, Mr. Bowman testified that the *Millennium* "ingested" rubble or rip rap, which "destroyed the internal [pump] liners." Tr. 1030. But he did not identify any other equipment that allegedly was damaged by dredging rubble or rip rap in the area of the South Ferry Landing.

C. Other Comments

(1) Renda states that Mr. McClenan "admitted that he knew that Renda had hit concrete riprap even before Renda formally turned in a notice of differing site condition." Pl. Br. 46. Mr. McClenan's knowledge, however, was not first-hand or based upon an independent investigation of the facts. Rather, Mr. McClenan's knowledge was based upon what had been reported to him by Renda. Immediately before the testimony cited by Renda, Mr. McClenan was asked "Now, you knew that Renda had hit concrete riprap at the South Ferry Landing even before Renda formally turned in a notice of differing site condition, didn't you, sir?" and Mr. McClenan responded: "They had reported that they hit riprap. Yes. I knew about that." Tr. 3417.

(2) Renda contends that, because Renda was under a "threat of default termination," it "had to do something about completing the South Ferry Landing if the Government would not provide direction." Pl. Br. 47-48. Renda offers this as an excuse for completing dredging at the South Ferry Landing without waiting for the Government to investigate. The Government, however, offered Renda the possibility of a partial acceptance of Section #1, which includes the area

of the South Ferry Landing, in order that the Government could investigate the alleged differing site condition. See Tr. 3658-3660; PX 857. Mr. Meyer testified that he discussed the proposal with Messrs. Fisher and Herrera of Renda who appeared receptive to it. Tr. 3660.

(3) Renda asserts that it "lost time while waiting for the Government to investigate the rubble and riprap" and that, "[w]hen the Government failed to respond in a timely manner, Renda notified Mr. McClenan that Renda would proceed with the dredging unless directed to stop." Pl. Br. 48-49. Renda does not cite any testimony or documentary evidence as support for these contentions and we are not aware of any such evidence.

VI. HL&P Tower Claim

A. Liability

Renda argues that "the issuance by the Corps of a permit to HL&P to erect and improve an electrical tower in the area where [Renda] was conducting operations in performance of the contract operated as a constructive change, entitling [Renda] to an equitable adjustment for costs and expenses incurred as a result of the constructive change." Pl. Br. 49. We disagree.

As discussed in the Government's initial post-trial brief, the permit issued by the Corps to HL&P did not address the construction of the new tower on land at Lost Lake of which Renda complains. Even if the permit issued by the Corps could be construed as extending to the new tower to be built on land at Lost Lake, which it plainly does not, that would not be of any help to Renda's argument because the permit provided that it did not authorize "interference with any existing or proposed Federal project," such as the Upper Bayou Project. See DX 373/5.

B. Damages

In its post-trial brief, Renda does not discuss the circumstances of the alleged incident with HL&P in July 2000, including the basis for that claim. The first mention made by Renda of the alleged July 2000 interference with its dredging operations was in an October 18, 2000 letter from Renda (Bowman) to the Corps (McClenan). See PX 1026 ("This is the second similar-type delay encountered as a result of interferences with HL&P at the Lost Lake Areas."). The first correspondence in which Renda described the alleged initial interference with any specificity was in the April 11, 2001 letter from Renda to the Corps transmitting the request for an equitable adjustment concerning the alleged interference by HL&P with Renda's dredging operations. See PX 2.001.0003.

C. Other Comments

(1) Renda asserts that "[t]he Corps knew or should have known that HL&P would be performing the work during the [Upper Bayou] Project since the Corps knew in advance of the Project that HL&P would have to replace one tower in the water with one on Lost Lake dry land." Pl. Br. 50. There is no basis in the record for this statement. As discussed in the Government's initial post-trial brief, Renda apparently relies upon an internal e-mail message dated April 21, 1998, from Dalton Krueger (Project Manager for the 45-Foot Project (Tr. 3101 (McClenan)), concerning power lines that cross the Houston Ship Channel. See PX 358. However, that e-mail does not reflect that, prior to the award of the Upper Bayou Project, the Corps was aware of any plan by HL&P to build a new tower on land at Lost Lake.[14]

---

[14] In the April 21, 1998 e-mail, Mr. Krueger states that, at a April 16, 1998 meeting between representatives of the Port of Houston Authority and the Corps, "it was agreed that all the lines which cross the HSC are in violation today and it would not make any difference if the widening

(2) Regarding the October 2000 incident with HL&P, Renda asserts that it "verbally informed the Corps, and later followed up with a letter, but received no guidance or direction from Mr. McClenan." Pl. Br. 51. In support of that statement, Renda cites trial testimony by Mr. Bowman. See Tr. 1070-1071. That testimony, however, is contradicted by Mr. Bowman's contemporaneous correspondence with the Corps about this matter. On October 18, 2000, Mr. Bowman sent a letter to Mr. McClenan in which Mr. Bowman advised that, on October 16 and 17, 2000, Renda had broken down its discharge pipeline and relocated it to accommodate HL&P's activities and stated: "[Renda] has not been able to give the Government adequate warning of these occurrences due to limited coordination time afforded by HL&P." See PX 1026.

(3) Renda asserts that "Mr. McClenan did know that there was a permit process going on to have HL&P empowered to put another tower out at Lost Lake." Pl. Br. 53. However, the trial record of Mr. McClenan's testimony reflects just the opposite:

> Q. And as a matter of fact there was a permit process going on to have HL&P empowered to go put a second – another tower out at Lost Lake. Right?
>
> A. I believe so.
>
> Q. That was something that you *didn't* know about.
>
> A. Correct.

Tr. 3426-3427 (McClenan) (emphasis added).

---

and deepening project was built." PX 358. "Therefore, the decision to get the lines in compliance with the Coast Guard regulations should be handled under the permit process and not the in connection with the HGNC project." Id.

VII. West Levee Realignment

Renda states that, "[f]ollowing the direction given on August 7, 2000, Renda moved a whole lot of material from the proper alignment shown in the plans so that the material would be against the existing levee." Pl. 56. Renda does not state what quantity of material was relocated and the trial record does not contain any evidence of the amount of material that was moved. The record does reflect, however, that Renda moved the material between August 7, 2000, the date of the meeting at the West Levee between representatives of Renda, the Corps, and the Joint Venture, and August 28, 2000. In that regard, Mr. Rudy V. Renda testified that approximately 1,600 linear feet of completed levee was "relocated" sometime during the three-week period from August 7, 2000, and August 28, 2000. Tr. 2611, 2613-2614 (discussing August 28, 2000 CQCR (JX 10.503)).

VIII. Lost Lake Levees Claim

Renda asserts that "[t]he Levee DSC Claim arose from an insufficient amount of suitable levee-building material from the contractually provided dredged areas in the Houston Ship Channel, unanticipated sidecast borrow areas which swallowed inordinate amounts of hydraulically-placed clay, foundations much softer than anticipated, an inability to construct the hydraulically-placed levees to the contract design template, and an inability to maintain the hydraulically-placed levees at the contract design elevation without failure." Pl. Br. 64. The alleged "inability" of Renda to construct the levees to the contract design template or to maintain the constructed levees at the contract design elevation without failure are the putative effects of the alleged "insufficient amount of suitable levee-building material," "unanticipated sidecast borrow areas," and/or "foundations much softer than anticipated."

A. Insufficient Suitable Levee-Building Materials

According to Renda, there was an insufficient quantity of suitable material available to construct the portion of the new perimeter levee at Lost Lake that was to be built by hydraulic placement method, i.e., with dredged fill material, which, Renda contends, is a Type I differing site condition. We disagree that there was an insufficient quantity of material with which to build the hydraulic levees (through no fault of Renda) and we address that claim below. But, even assuming for the sake of discussion that there were merit to the "insufficient quantity" claim, none of the damages claimed by Renda under the Lost Lake Levees Claim are tied to a Type I differing site condition based upon an "insufficient quantity" of levee-building material.

The March 2004 damages report prepared by Renda's damages expert, Mr. McCullough, does not quantify damages based upon an "insufficient quantity" of levee-building material. See PX 1863.0019-0024. Nor did Mr. McCullough address damages for that claim in his trial testimony. Mr. McCullough describes the Lost Lake Levees Claim as one for "extra costs for work and effort incurred to reconstruct levees damaged by subsidence of existing foundation materials, impacts to the dredging operation as a result, and standby time for equipment while awaiting an official release from the [Corps] to demobilize the project." PX 1863.0019.

None of the discrete damages items addressed by Mr. McCullough's report is linked to an insufficient quantity of levee-building material for the hydraulic levees. Claim Item #12a seeks compensation for alleged unplanned additional hydraulic levee crew and equipment needed to move "large amounts of displaced material" during the hydraulic placement operation and for extended performance of the hydraulic levee crew and equipment "when the dredge was delayed and the levee operation was forced into a standby mode." PX 1863.0021-0022. Claim Item #12b

seeks compensation for repairs to the East Levee, realignment of the completed portion of the West Levee in August 2000, and construction of the North Levee by mechanical methods with material allegedly "reclaimed" from side-cast borrow areas. PX 1863.0022. Claim Items #12c and #12d seek compensation for dredge down time while Renda backtracked pipeline to repair levees, pumped water to "flush" displacement material from the levee construction area, or waited for displaced material "to subside away from the levee construction area." PX 1863.0022-0023. Claim Item #12e seeks compensation for additional booster pump equipment allegedly required to pump hydraulic fill material longer distances "due to additional material requirements to construct the levees." PX 1863.0023. Claim Item #12f seeks compensation for standby time for the "dredge and dredge plant while awaiting official [Corps] release for the project." PX 1863.0023-0024.

The type of damages that would flow from an insufficient quantity of levee-building material are extra costs incurred by a contractor to obtain additional material with which to complete the hydraulic levees. But Renda was not required to mine material with the dredge to complete the levees.[15] In any event, Renda has not segregated and quantified in its damages calculation for the Lost Lake Levees Claim any damages attributable to having to mine or otherwise obtain extra material to complete the hydraulic levees.

---

[15] As noted above, Renda and the Corps entered bilateral contract Modification P00026, effective on May 4, 2001, pursuant to which Renda agreed to suspend dredging on the Upper Bayou Project for a period of "at least 30 days but not exceeding 60 days" to allow Renda to perform a private dredging contract (the Houston Fuel Oil project). See JX 6.026.0003, at ¶ A. That Modification contains a release which provides that "this adjustment constitutes compensation in full on behalf of the contractor . . . for all costs and markup directly or indirectly attributable to the change ordered, for all delays related thereto, and for performance of the change within the time frame stated." Id., at ¶ F.

Renda's argument that there was an insufficient quantity of levee-building material for the hydraulic levees is based upon the detailed design for the levees prepared by HVJ Associates (HVJ). Renda asserts that the HVJ design report indicates that 1.5 million cubic yards of material would be needed to construct the hydraulic levees (allowing for loss due to displacement of soft foundations), whereas the design report indicated that only 1.34 million cubic yards of material would be available from the required dredging prism in the Upper Bayou Project to build the levees. Pl. Br. 66.

The question, though, is not whether the quantity of available levee-building anticipated by the designer of the Lost Lake hydraulic levees was sufficient, but, rather, whether the actual available, as-built quantity of levee-building material was sufficient. In that regard, Renda cites a July 24, 2001 letter from it to the contracting officer (Benero) in which Renda asserted that it had "to date incorporated in excess of 2,000,000 cubic yards of levee quality building material into the levee system . . . ." Pl. Br. 94 (citing PX 1551.0001). If what Renda stated in this letter is accurate, that would seem to render the "insufficient quantity" claim moot. In that case, the only bases for a Type I differing site condition in the Lost Lake Levees Claim are the side-cast borrow areas and/or the excessively soft foundations arguments.

At any rate, we disagree that the HVJ design for the hydraulic levees did not provide for a sufficient quantity of levee-building material to complete the hydraulic levees at Lost Lake. Mr. Michael Hasen of HVJ, an expert in the design of levees for dredged material disposal sites who designed the Lost Lake levees, provided an estimate of the amount of suitable material for levee building available in the reach of the Channel dredged in the Upper Bayou Project. He calculated that the available quantity of levee-building material for the Upper Bayou Project is 1,789,986

cubic yards of material. Tr. 4547-4549; DX 1068/19; DX 1068/65-69. Mr. Hasen estimated that the amount of levee-building material required to build the hydraulic levees, including a quantity sufficient to displace the soft foundation material to a firm base, is 1,549,055 cubic yards. Tr. 4544. The available quantity of levee-building material, thus, exceeded the quantity required to construct the hydraulic levees by 240,000 cubic yards. Mr. Hasen's unrebutted estimates, thus, demonstrate that, as designed, the quantity of suitable levee-building material to be obtained from dredging was sufficient to build the hydraulic levees at Lost Lake.

Renda notes that HVJ concluded that an estimated 340,000 cubic yards of levee material may need to be obtained by mining for the Upper Bayou Project. Pl. Br. 65; see DX 319/13. As Mr. Hasen explained, however, at the time of the HVJ design report, he assumed that only stiff to hard clays were suitable for levee construction and he did not consider sand to be suitable for levee construction. Tr. 4531-4532; DX 317/7. When only the clays were considered, there was about 1.3 million cubic yards of levee-building material available for the Upper Bayou Project, which is about 200,000 less than the 1.5 million cubic yards of levee-building material that Mr. Hasen estimated was needed for the Upper Bayou Project. Tr. 4546. Mr. Hasen has since come to believe that the sands in the Houston area are suitable for levee-building because they are very fine-grained sands with a substantial amount of fines in them, which prevents water from seeping through the sand – the concern that Mr. Hasen had with the use of sands as a levee-building material. Id., at 4532-4533. Based upon his present view of sand as an acceptable levee-building material, Mr. Hasen estimated that the available quantity of levee-building material for the Upper Bayou Project is 1,789,986 cubic yards of material instead of the 1.34 million cubic yards of material reflected by the 1998 HVJ design report. Id., at 4546-4549.

Renda contends that the HVJ design violated the Corps' guidelines for the design and construction because the soil borings for the hydraulic levees do not extend to firm subsurface soils and "[t]he net result was that HVJ simply had to guess as to the foundation conditions underlaying the new hydraulic levee." Pl. Br. 77-78. As support for that argument, Renda cited a chart that Mr. Hasen "prepared" "which detailed seven borings which underlay the new hydraulic levee, none of which extended to firm subsurface soils, and all of which ended with a very soft character of material." Id.

Renda's argument misrepresents the HVJ design for the hydraulic levees. The chart of the seven borings to which Renda refers (PX 1876) was not "prepared" by Mr. Hasen. He did not select the borings that are the subject of PX 1876. Renda's counsel prepared the chart and selected the borings that are the subject of that exhibit. See Tr. 4677-4686. On redirect examination, Mr. Hasen testified that he did not use the borings reflected in PX 1876 for purposes of determining the extent of anticipated displacement. Tr. 4775. Rather, he used different borings taken at Lost Lake that went to firm bottom, e.g., the borings drilled by HVJ in 1996. Id., at 4775-4776. Mr. Hasen used one of the 1996 borings (96LL-2) during his direct examination, to illustrate how he estimated the amount of levee-building material needed to displace the soft foundation material. Id., at 4542-4544.

Renda did not properly manage the hydraulic fill placement operation. Renda did not build toe dikes parallel to the fill operation to train or guide material – sand in particular – as it was being placed in order to keep the material from running off into the interior of Lost Lake.

Tr. 3923-3924 (Mears).[16] Renda placed material hydraulically to +30' MLT instead of to +20' MLT, as the contract contemplated, which resulted in the placement of an excessive amount of material. Tr. 3918, 3919-3921 (Mears).[17] Nor did Renda maintain records of the hydraulic fill quantities being placed that would have enabled it to monitor the quantities being used to build the levees and make adjustments to the hydraulic fill operation where appropriate. See Tr. 4211-4218 (Few).

Renda argues that "there are no provisions in the contract documents concerning techniques for discharge control," implying that Renda was not require to employ techniques for discharge control. Pl. Br. 78. We disagree. The contract provided that Renda submit to the Corps a plan for the construction of the hydraulically-constructed levee, "including . . . techniques to minimize foundation displacements." Discharge control is related to foundation displacement: the greater the quantity of material placed hydraulically, the wider the base of the levee and the more displacement of material.

Renda seems to argue that it did not have to do a better job of capturing sand deposited from the dredge disposal pipeline. Pl. Br. 78. Renda states that the contract did not admonish it to "do all it could to capture sand" and that, moreover, "HVJ's design report, itself, says it is relying on stiff to very stiff clay to build the levees, not sand." Id.

---

[16] Mr. Mears testified that "[t]he sand was running what appeared to be 1,000 feet out into the site instead of being contained within the planned levee alignment." Tr. 3925.

[17] Mr. Mears testified: "The placing at that high of an elevation with the water velocity as it comes out of the pipe, the material has a tendency to run based on the height of fall, as well as the velocity of the water. So the higher you are, the further the material will run away from the pipe." Tr. 3918.

The contract for the Upper Bayou Project provided that "[m]aterial for the Hydraulically Constructed Levees shall be medium to hard clays and sands, as described in the Logs of Borings." Specification § 2.2.2.3 (JX 2.0102) (underscoring in original). The contract, thus, defined suitable materials for levee-building to include *sand* as well as medium to hard clays. Insofar as Renda disregarded the contract and did not use sand to construct the hydraulically-placed levees, it acted at its peril and can only fault itself for any shortfall in suitable levee-building material.

B. Softer-Than-Anticipated Foundations

Renda has not demonstrated a Type I differing site condition with respect to the hydraulic levees. The soft foundations for the hydraulic levees encountered by Renda, including displacement of the soft foundations resulting in "mud waves," are what the contract indicated. Drawing C-14, Note 10, describes the foundation for the new levees as "very soft to soft dredge material and sand placed in past dredging maintenance cycles" and states that "[i]t is anticipated that very soft to soft foundation material will be displaced by the new levee material." JX 5.014. This is underscored in the Government's responses to questions by potential bidders incorporated in Amendment No. 0001 to the Solicitation: "[T]he designers intend the new work material to be used to displace very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material." JX 3.0007.

Renda asserts that "Mr. Few, the Corps' geotechnical engineer for the [Upper Bayou] Project, envisioned that the new hydraulic levee would 'float' on the soft foundation materials." Pl. Br. 73. Assuming for the sake of argument that this is what Mr. Few contemplated, it is irrelevant. Mr. Few did not prepare the detailed design for the hydraulic levees. HVJ prepared the design for the levees and, as Mr. Hasen testified, that design is based upon the displacement

of the soft foundation to firm bottom at all locations of the hydraulic placement operation. Tr. 4543.

Renda argues that Affolter Contracting (Affolter), Renda's subcontractor for the Upper Bayou Project, "ran into similar problems with its mechanically constructed levees standing up due to the soft foundation conditions" and that the Government issued a change order "to resolve the problem Affolter was having with the soft foundations . . . ." Pl. Br. 81. The problems to which Renda is referring, however, do not relate to the new perimeter levees at Lost Lake. This refers to the "training levees" at the drop-outlet structures which were perpendicular to the existing perimeter levees and extended several hundred feet into the interior of Lost Lake where the foundation conditions were very poor.

Renda contends that Affolter, which also was a subcontractor to GLDD on the Mid-Bayou Project, "attempted to construct the west levee but was unsuccessful as it repeatedly failed." Pl. Br. 97. As Mr. Kenneth Affolter admitted, however, Affolter attempted to perform this work in the fall of 2003 when the conditions were "pretty wet," which adversely affected the levee construction. Tr. 1628.

Renda asserts that GLDD "hydraulically pumped a million or more yards of material on the north levee, without successfully completing the north levee." Pl. Br. 98. But GLDD was endeavoring to construct the North Levee to a design template with a height of +36' MLT, which would require a larger base and, consequently, substantially larger quantity of material, than the +30' MLT levee Renda was required to build. Tr. 3534-3535 (Van Norman); Tr. 1624 (Affolter). More significantly, GLDD was able to construct the North Levee to a height of no less than +30' MLT (the design height for the hydraulic levees that Renda was required by the contract for the

Upper Bayou Project contract to build) and, in some areas, as high as +36' MLT. Tr. 3534-3535 (Van Norman).

C. Side-Cast Borrow Areas

As discussed in the Government's initial post-trial brief, the side cast borrow areas do not constitute a Type I differing site condition. The side-cast borrow areas do not constitute a site condition that differed materially from what the contract documents indicated. The side-cast borrow areas contained dredged material from past maintenance dredging jobs, tr. 4209 (Few), which, as noted above, is precisely what the contract documents indicate the contractor should expect to find when it builds the hydraulic levees.

Renda asserts that Mr. Hrabovsky testified that, during the side-cast borrow operation, in placing the borrowed material on the toe of the existing levee, the material was soft enough that it tended to shift toward the drag line, which had the result of causing the existing levee to be less than 50 feet from the sidecast borrow area." Pl. Br. 74. We disagree. Mr. Hrabovsky did not testify that the side-cast borrow operation the sides of the existing levee increased in size, which, in effect, is what Renda contends he testified. Rather, he testified that, when the side-cast borrow operation was completed, the "stockpile" of excavated material placed on the interior toe of the existing levee "had run back almost to the [drag line] mats in places." Tr. 3862-3863.

Renda notes that Mr. Few testified that, on occasion, the Corps conducted "very deep sidecast borrowing to find suitable materials." Pl. Br. 74. While Mr. Few did testify to a "very deep excavation" having been done "at least once or twice," his testimony made clear that the excavation was not within 20 to 50 feet of the existing perimeter levee, contrary to what Renda implies. Rather, the deep excavation occurred at a location farther into the interior of Lost Lake,

inasmuch as the excavated material was "double-handled" or relayed by more than one piece of equipment. See Tr. 4207 (Few).

Renda contends that, as a result of the side-cast borrow areas, Renda experienced difficulty building the hydraulic levees from the very first day beginning with the material that was placed at approximate Levee Sta. 97+00. There are at least two problems with this assumption.

*First*, the side-cast borrow areas testified to by Mr. Hrabovsky created in 1996 by T.L. James (through its subcontractor, King Fisher Marine) did not run parallel to the inside of the entire existing perimeter at Lost Lake. Under the contract modification pursuant to which the side-cast borrow area was created, no ditching was required between Levee Sta. 86+88.1 and Levee Sta. 135+00. See DX 1067/3; Tr. 3740-3741. The area between those stations includes a portion of the area where Affolter built mechanical levees for the Upper Bayou Project (Sta. 135+00 to Sta. 97+00) and a portion of the area where Renda built hydraulic levees for the Upper Bayou Project (Sta. 97+00 to Sta. 86+88.1). Thus, the difficulties allegedly experienced by Renda in placing the hydraulic levee between Sta. 97+00 to Sta. 86+88.1 cannot be attributed to the presence of a side-cast borrow area. Conversely, if what Renda contends is correct, Affolter should have experienced on the portion of the South Levee where the side-cast borrow areas existed (i.e., from Sta. 160+00 to Sta. 136+00) the same kinds of difficulties that Renda complains of with respect to the North Levee that it tried to build by mechanical methods. But, as Kenneth Affolter testified, Affolter was able to build the South Levee as designed. See Tr. 1590-1591.

*Second*, Renda the first 500 feet of hydraulic levees constructed by Renda from Levee Sta. 97+00 and Sta. 92+00 was out of alignment, as noted in a October 12, 1999 letter from

William Hopkins, P.E., the first administrative contracting officer for the Upper Bayou Project, to Leo Herrera, Renda's Quality Control Coordinator. See DX 403; Tr. 3591-3593 (Herrera).[18] Renda can hardly claim extra costs associated with the placement of an out-of-alignment levee for which it acknowledged responsibility.[19]

What Renda's side-cast borrow argument comes down to is the flawed, untested, unsupported hypothesis of its expert, Dr. Mathewson, that the side-cast borrow areas resulted in differential settlement and levee shearing or cracking. Dr. Mathewson's suppositions are not supported by any calculations or tests. Tr. 2004. He did not perform side-slope stability, settlement, subsidence, or displacement analyses in connection with his opinion concerning the effect of the side-cast borrow areas upon the construction of the hydraulic levees. Id. In fact, Dr. Mathewson does not even know the dimensions of the side-cast borrow areas or whether they ran continuously along the footprint of the hydraulic levees. Id., at 2004-2005.

As the Government's expert, Mr. Hasen, testified, side-cast borrow areas were not a factor in the design for the hydraulic levees at Lost Lake: "They're relatively small features compared to the size of the embankments that we're designing, and the displacement would eliminate them. They'd be gone by the time the displacement was finished. So they just weren't relevant." Tr. 4552. Turning to Dr. Mathewson's drawings (PX 1875.02, PX 1875.02), Mr. Hasen testified that

---

[18] See also Tr. 3917 (Mears) ("starting approximately at Levee Station 97, looking toward . . . Station 89, instead of the placement being approximately parallel to the existing dikes, the placement was at some skewed angle out into the site from being parallel").

[19] The Hopkins letter also notified Renda that "[n]o survey stakes were observed ahead of the discharge pipe to guide the backhoe operator in the proper alignment of the levee." DX 403; see also Tr. 3918-3919 (Mears). Mr. Herrera testified that, upon receipt of the letter from Mr. Hopkins, Renda arranged for Affolter to perform the survey work for the hydraulic levee operation. See Tr. 3593-3596.

he did not agree with what they depicted for two reasons: the geometry of the levee was incorrect and the clay mat or crust "just isn't capable of supporting that weight of embankment in a floating condition." Tr. 4555-4556.

Mr. Hasen performed a calculation – unrebutted by Renda – which demonstrates that any clay mat or crust underneath the hydraulically-placed levee would not support the new levee but would be displaced when the hydraulically-placed levee-building material attains a height of five feet. Tr. 4558-4560; DX 1082-B. And once the displacement has been initiated by placement of the fill material, the crust will "be broken into pieces and it will form a kind of flat clay ball basically and go down with the rest of the clay balls into the muck." Tr. 4561.

D. Other Comment

Renda argues that, "[i]n sum, the hydraulic levees were not constructable as designed, and under the circumstances." Pl. Br. 98. This statement makes it appear that Renda is attempting to establish a defective specifications claim with respect to the part of the Lost Lake levees that the Contract required be constructed with hydraulically-placed material. In Comtrol, the Federal Circuit held that, "[a]lthough differing site conditions and defective specifications claims are distinct in theory, they collapse into a single claim . . . where the alleged defect in the specification is the failure to disclose the alleged differing site condition," which would appear to be the case with Renda's Lost Lake Levees Claim. 294 F.3d at 1362. In that circumstance, "[t]he claim will be governed by the specific differing site conditions clause and the cases under that clause." Id.[20/]

[20] Renda did not comply with the contract plans and specifications in that it attempted to construct the North Levee by mechanical methods, notwithstanding that the contract specified the hydraulically-placed fill construction method. Assuming for the sake of discussion that it

IX. Damages: Generally

In its post-trial brief, Renda does not attempt to explain or provide the Court with any sort of road map to its damages calculations. At the end of the discussion of each of its claims, Renda simply asserts, summarily, that the claimed amounts are reasonable and proper. For example, in the case of the Flare Area Claim, Renda states that Messrs. Smith and McCullough "testified that they had made various reductions to Renda's claim to reflect errors or concessions" and that "Mr. McCullough testified that after all deductions, offsets, and credits, $906,364.00 was owed to Renda as the reasonable and necessary cost of overcoming the unanticipated very stiff clay in the Flare Area." Pl. Br. 22. That hardly suffices to carry Renda's burden of proof with respect to damages.

To "receive an equitable adjustment from the Government, a contractor must show three necessary elements – liability, causation, and resultant injury." Servidone Construction Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991) (citing Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968 (1965)). The contractor "bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount will be more than mere speculation." Willems Industries, Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961), cert.

---

would be appropriate to apply defective specifications principles to the Lost Lake Levees Claim, Renda would be faced with the "difficult burden" of having to demonstrate that, had it complied with the plans and specifications, it would have experienced the same construction difficulties. See Al Johnson Construction Co. v. United States, 854 F.2d 467, 470 (Fed. Cir. 1988) (where contractor did not comply with contract specifications, it had the burden of demonstrating that "nonconformance to specifications had no logical relationship to the failure of the berm"); Tyger Construction Co. v. United States, 31 Fed. Cl. 177, 243 (1994) ("The implied warranty attached to design specifications only applies if the contractor complies with the specifications.").

denied, 370 U.S. 903 (1962).

X. Damages: Equipment Rates

As noted in the Government's initial post-trial brief, the issue of equipment rates spans all of the claims. A fundamental question remains as to what rates are being used by Renda in its claims as quantified by Mr. McCullough. Mr. Smith testified that he gave Mr. McCullough various adjustments that Mr. Smith has made to equipment rates he calculated. See Tr. 1710, 1760-1763, 1731. Mr. McCullough, however, did not testify that any of those rate adjustments are incorporated in any rates that Mr. McCullough used in his damages calculations, either in his March 2004 report (PX 1863) or in the damages revision offered at trial (PX 1863A). Nor did Mr. McCullough identify the particular equipment rates that he used in his damages calculations or demonstrate how he arrived at those rates, through an illustrative example or otherwise.

Mr. Smith initially calculated the rate for the dredge *Millennium* using the Construction Equipment Ownership and Operating Costs Schedule (Schedule) (DX 43), which generated a rate of $570 per hour. Tr. 2016; PX 1874.11. But then, he recalculated the rate several times, deviating from the Schedule, generating rates of $831.83 per hour (Tr. 1711; 1723), $740-$750 per hour (Tr. 1759), $800 and $772.50 per hour (Tr. 2018-2019), and $786.60 per hour (rate for fist half of 2000) (Tr. 2020-2022; 2511). There is no evidence that Mr. McCullough used any of those rates in any of his damages calculations.

Regarding fuel costs, Mr. Smith testified that, in earlier versions of the rate calculation for the *Millennium*, he used $1.10 per gallon, Tr. 2512-2513, which he testified was "based on our best guess of actual invoices." Tr. 1741-1742. However, Mr. Smith prepared an inventory of fuel cost invoices for the year 2000 that reflects an average cost of fuel of only $0.9117 per

gallon. See DX 1069; Tr. 2514 (Smith). Mr. Smith testified that he is not convinced that this inventory of fuel receipts is accurate simply because he could not find any additional receipts. Tr. 2514-2515.

The last equipment rate derived by Mr. Smith is $786.60, a six-month rate for the first half of calendar year 2000. For that rate, Mr. Smith testified he used the Bureau of Labor Standards (BLS) fuel index to generate a fuel cost rate for the *Millennium*, a rate that he admitted is not an actual cost and which is *higher* than the $1.10 per hour fuel rate used in earlier rate calculations for the dredge. Tr. 2515-2516, 2519.

XI. Extensions Of Time/Relief From Liquidated Damages

The contract, as awarded, required that Renda complete the Upper Bayou Project within 446 calendar days from its receipt of the Notice to Proceed (NTP). See Stip. ¶ 14; Specification § 00820.1 (JX 2.0014), as modified by Amendment No. 0001, at ¶ 1(b)(1) (JX 3.0002). Notice to Proceed (NTP) was given to Renda on November 16, 1998, and Renda acknowledged receipt of the NTP on November 19, 1998. Stip. ¶¶ 12, 13. During the course of the Upper Bayou Project, the contracting officer extended the contract completion date to June 28, 2000. See Modification No. P00023, at ¶ 14E (JX 23.0002).

Renda's claims in this case sought, in addition to monetary compensation, an extension of the contract completion date. See Compl. ¶¶ 38, 67, 81, 88, 97, 117, 142, 196. Towards the end of its complaint in this case, Renda asserts that, "[u]nder the circumstances, the Corps should release and/or waive any and all liquidated damages." Compl., at 28.

"When a contractor is seeking extensions of contract time, for changes and excusable delay, which will relieve it from the consequences of having failed to complete the work within

the time allowed for performance, it has the burden of establishing by a preponderance of the evidence not only the existence of an excusable delay but also the extent to which completion of the contract work as a whole was delayed thereby." R.P. Wallace, Inc. v. United States, 63 Fed. Cl. 402, 409 (2004) (quoting Morganti National, Inc. v. United States, 49 Fed. Cl. 110, 132-33 (2001), aff'd, 36 Fed. Appx. 452 (Fed. Cir. 2002)); see also Sauer Inc. v. Danzig, 224 F.3d 1340, 1347 (Fed. Cir. 2000) ("[A] party asserting that liquidated damages were improperly assessed bears the burden of showing the extent of the excusable delay to which it is entitled.").

At the trial of this matter, Renda did not attempt to demonstrate through any witness or exhibits evidence of either the extent of any excusable delay in the prosecution of the work or, more importantly, the extent to which completion of the contract work as a whole was delayed thereby. Renda's damages expert, Mr. McCullough did not address those issues in his testimony. His expert report, moreover, is addressed to the monetary relief to which Renda allegedly is entitled. It does not address the extent to which the completion of the Upper Bayou Project was delayed as a result of any of the alleged differing site conditions or the constructive change at issue in this case. See PX 1863; PX 1863A.

In its post-trial brief, Renda requests an award of monetary damages but does not request an extension of the time for completing the Upper Bayou Project. Pl. Br. 98. Renda, therefore, has not established that it is entitled to an extension of time for completing the contract or that Renda otherwise should be relieved from its failure to complete the work within the time allowed for performance, including the remission of any liquidated damages assessed by the Government.

CONCLUSION

For the foregoing reasons and the reason set forth in "Defendant's Post-Trial Brief" dated April 21, 2005, plaintiff has not proven that defendant is liable to plaintiff upon any its claims and the claims, therefore, should be dismissed. Assuming for the sake of argument that defendant is liable to plaintiff upon any of its claims, for the reasons set forth above and in our post-trial brief, the damages and time extensions requested by plaintiff have not been established and/or are overstated. The Court, therefore, should deny the damages and time extensions requested by plaintiff or reduce them accordingly.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

APRIL 28, 2005