No. 02-306C
(Judge Hewitt)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION
FOR RECONSIDERATION OF COURT'S APRIL 19, 2005 OPINION AND ORDER

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

JUNE 20, 2005

# TABLE OF CONTENTS

**Page (s)**

PRELIMINARY STATEMENT . . . . . . . . . 1

BACKGROUND . . . . . . . . . 3

I. Nature Of The Case . . . . . . . . . 3

II. Renda's Complaint . . . . . . . . . 3

III. The November 26, 2002 Contracting Officer's Decision . . . . . . . . . 4

IV. Renda's Motion For Trial Amendment . . . . . . . . . 5

ARGUMENT . . . . . . . . . 8

I. Renda's Motion, Under The Guise Of A Request For Reconsideration, Is An Improper Attempt To Have The Court Review The Validity Of A Contracting Officer's Final Decision That Renda Did Not Challenge By An Appeal To A Board Of Contract Appeals Or An Action In This Court . . . . . . . . . 8

II. Assuming For The Sake Of Argument That It Would Be Appropriate To Reach The Merits Of Renda's Challenge To The Validity Of The Contracting Officer's November 26, 2002 Decision, Renda's Motion Should Be Denied Because The Government Claims To Which The Contracting Officer's Decision Is Addressed Are Not The "Mirror Image" Of, Or The Same As, The Claims By Renda That Are The Subject Of The Complaint Filed By Renda In This Case . . . . . . . . . 9

A. The Hughes, Durable, And Sharman Decisions . . . . . . . . . 10

B. Post-Sharman Case Law . . . . . . . . . 13

C. The Government Claims To Which The November 26, 2002 Contracting Officer's Decision Is Addressed Are Not The "Mirror Image" Of, Or The Same As, The Claims By Renda That Are The Subject Of The Complaint In This Case . . . . . . . . . 18

CONCLUSION . . . . . . . . . 22

# TABLE OF AUTHORITIES

## CASES

Alaska Pulp Corp. v. United States,
34 Fed. Cl. 100 (1995) .......... 17, 18

Anderson Columbia Environmental, Inc. v. United States,
42 Fed. Cl. 880 (1999) .......... 7

Boeing Co. v. United States,
31 Fed. Cl. 289 (1994) .......... 17, 18, 20

Buse Timber & Sales, Inc. v. United States,
45 Fed. Cl. 258 (1999) .......... 18

Case, Inc. v. United States,
88 F.3d 1004 (Fed. Cir. 1996) .......... passim

Cincinnati Electronics Corp. v. United States,
32 Fed. Cl. 496 (1994) .......... 21

D.L. Braughler Co., Inc. v. West,
127 F.3d 1476 (Fed. Cir. 1997) .......... 6, 7, 9

Durable Metal Products, Inc. v. United States,
21 Cl. Ct. 41 (1990) .......... 10,11,12,13

England v. The Swanson Group, Inc.,
353 F.3d 1375 (Fed. Cir. 2004) .......... 6

Garrett v. General Electric Co.,
987 F.2d 747 (Fed. Cir. 1993) .......... 19

Hughes Aircraft Co. v. United States,
209 Ct. Cl. 446, 534 F.2d 889 (1976) .......... passim

James M. Ellett Construction Co., Inc. v. United States,
93 F.3d 1537 (Fed. Cir. 1996) .......... 7

Johnson Controls World Services, Inc. v. United States,
43 Fed. Cl. 506, appeal dismissed, 217 F.3d 853 (Fed. Cir. 1999) (Table) .......... 17, 18

## TABLE OF AUTHORITIES (CONT'D)

## CASES (CONT'D)

Joseph Morton Co., Inc. v. United States,
757 F.2d 1273 (Fed. Cir. 1987) .......... 17

McDonnell Douglas Corp. v. United States,
37 Fed. Cl. 285 (1997) .......... 18

Medina Construction, Ltd. v. United States,
43 Fed. Cl. 537 (1999) .......... 18

Orion Scientific Systems v. United States,
28 Fed. Cl. 669 (1993) .......... 7

Reflectone, Inc. v. Dalton,
60 F.3d 1572 (Fed. Cir. 1995) .......... 10, 19

Seaboard Lumber Co. v. United States,
903 F.2d 1560 (Fed. Cir. 1990), cert. denied, 499 U.S. 919 (1991) .......... 7

Sharman Co., Inc. v. United States,
2 F.3d 1564 (Fed. Cir. 1993) .......... passim

United Partition Systems, Inc. v. United States,
59 Fed. Cl. 627 (2004) .......... 9

United States v. Kasler Electric Co., Inc.,
123 F.3d 341 (6th Cir. 1997) .......... 7

United States v. Suntip Co.,
82 F.3d 1468 (9th Cir. 1996) .......... 7

Vanalco, Inc. v. United States,
48 Fed. Cl. 68 (2000) .......... 21

Widdoss v. Secretary of HHS,
989 F.2d 1170 (1993) .......... 7

## TABLE OF AUTHORITIES (CONT'D)

## STATUTES


United States Code:

28 U.S.C. § 516 .......... 17

28 U.S.C. §§ 516, 518 .......... 12, 14, 17, 18

28 U.S.C. §§ 516-20 (2000) .......... 10

28 U.S.C. §§ 516-20 .......... 10,12,13,15,17

41 U.S.C. § 605(a) (2000) .......... 6

41 U.S.C. § 605(b) (2000) .......... 7

41 U.S.C. § 605(b) ..........17

41 U.S.C. § 605(c)(5) (2000) .......... 6

41 U.S.C. § 605(c)(5) .......... 11,12

41 U.S.C. § 606 (2000) .......... 5

41 U.S.C. §§ 606, 609(a)(1),(3) (2000) .......... 2,5,8

Public Laws:

Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13) .......... 3


## REGULATIONS


Code of Federal Regulations:

48 C.F.R. § 33.201 ..........19


## MISCELLANEOUS


Court Rules:

RCFC 15(b) ..........6,7,8,9

# INDEX TO DEFENDANT'S APPENDIX

Page

Letter dated November 26, 2002, from Thomas Benero, Chief, Contracting Division, Galveston District, United States Army Corps of Engineers, to Oscar Renda, President, Renda Marine, Inc., re: Contract for Upper Bayou Project .............................. 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR RECONSIDERATION OF COURT'S APRIL 19, 2005 OPINION AND ORDER

PRELIMINARY STATEMENT

Pending before the Court is "Plaintiff's Motion Requesting the Court's Modification of its April 19, 2005 Opinion and Order," filed on June 1, 2005. In this motion, construed by the Court as a motion for reconsideration of its April 19, 2005 Opinion and Order,[1/] plaintiff, Renda Marine, Inc. (Renda) requests that the Court modify its April 19, 2005 Opinion and Order and "hold that the contracting officer's November 26, 2002 'final decision' . . . is a nullity to the extent the November letter addresses or is premised on denial of the certified claims included in Renda's Complaint filed in this Court on April 11, 2002." Pl. Mot. 1.[2/] Curiously, Renda states that "[t]he Court does not need to determine which portions of the November letter include certified claims within Renda's complaint," that it "only needs to correctly articulate the legal principle," and "if the scope of invalidity is not resolved through settlement it can be dealt with

---

[1] See June 6, 2005 Order, at 2.

[2] In this response to Renda's motion for reconsideration, "Pl. Mot. ____" refers to the referenced page(s) of "Plaintiff's Motion Requesting the Court's Modification of its April 19, 2005 Opinion and Order," dated June 1, 2005, and "Def. App. ____" refers to the referenced page(s) of the appendix to this response.

in later proceedings." Id.; see also id., at 6 ("Although Renda does not ask the Court to examine and determine the extent to which the November letter addresses Renda's claims, two examples follow that highlight the issue presented in [Renda's motion for reconsideration]."

Renda's motion should be denied for two reasons. First, it is an improper attempt, under the guise of a motion for reconsideration, to have the Court review the validity of the contracting officer's November 26, 2002 decision – something the Court previously declined to do when it denied Renda's untimely motion for leave to file an amended complaint that, among other things, challenged the validity of the contracting officer's decision. See July 30, 2004 Order denying Renda's motion for leave to amend its complaint. The predicament in which Renda finds itself, i.e., the lack of an opportunity to test the validity of the contracting officer's November 26, 2002 decision in either of the fora designated by the Contract Disputes Act (CDA), is one of Renda's own making. Renda neglected to bring a direct challenge to that decision either by an appeal to a board of contract appeals or by an action in this Court within the time prescribed by the CDA. See 41 U.S.C. §§ 606, 609(a)(1),(3) (2000).

Second, assuming for the sake of argument that it would be appropriate to reach the merits of Renda's challenge to the validity of the November 26, 2002 contracting officer's decision, the motion should be denied because the contracting officer's decision is not a decision upon the claims by Renda included in its complaint in this case. The Government claims addressed by the November 2002 contracting officer's decision are neither a "mirror image" of nor the same as the equitable adjustment claims based upon the differing site conditions clause that are the subject of Renda's complaint.

## BACKGROUND

### I. Nature Of The Case

This case involves claims governed by the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13), arising under or relating to Contract No. DACW64-99-C-0001 between plaintiff, Renda Marine, Inc., and the United States, acting through the Army Corps of Engineers, Galveston, Texas District, to dredge a reach of the Houston Ship Channel known as the Upper Bayou and to construct containment levees and other structures at the Lost Lake Placement Area, a disposal facility for dredged material owned and operated by the Port of Houston Authority. The scope of work under the contract is referred to in the complaint and other documents as the "Upper Bayou Project."

### II. Renda's Complaint

The complaint filed by Renda in this case sought a recovery of a total of $14,244,848, plus interest under the CDA upon eight claims under the differing site conditions clause contained in the contract for the Upper Bayou Project:

| Claim | Amount |
|---|---|
| South Ferry Landing Claim | $1,049,173 |
| Flare Area Claim | 1,607,855[3/] |
| HL&P Tower Claim | 170,863[4/] |

---

[3] For the Flare Area Claim, Renda sought to recover $1,607,855, which represents the difference between the amount of the claim presented to the contracting officer, i.e., $4,691,688, and the amount paid by the Government to Renda for that claim pursuant to unilateral contract Modification P00023, i.e., $3,083,833.

[4] At the pretrial conference, Renda conceded that it could not demonstrate a Type I differing site condition with respect to the actions of Houston Lighting & Power (HL&P). Instead, Renda contended that its HL&P Tower Claim is a claim for breach by the Government of the implied

(continued...)

| | |
|---|---|
| Section 7 Clay Claim | 1,083,779 |
| West Levee Realignment Claim | 789,600[5/] |
| Obstruction # 1 Claim | 2,126,083 |
| Obstruction # 2 Claim | 1,158,642 |
| Lost Lake Levees Claim | 6,258,853 |
| | $14,244,848 |

See Complaint, at 29.

III. The November 26, 2002 Contracting Officer's Decision

The complaint in this case was filed on April 11, 2002. The Government filed an answer to the complaint on July 25, 2002. Four months later, on November 26, 2002, the contracting officer for the Upper Bayou Project, issued a "final decision" to Renda upon Government claims (denominated "Counter Claims") against Renda relating to the Upper Bayou Project in the total amount of $11,860,016:

| | |
|---|---|
| Counter Claim No. 1: Dredging Section No. 9 .................................... | $2,067,000 |
| Counter Claim No. 2: Section 7 Clay Misplaced Material .................. | 571,000 |
| Counter Claim No. 3: Incomplete West Levee Realignment ................ | 108,000 |
| Counter Claim No. 4: Incomplete Non-Hydraulic North Levee ........... | 3,413,000 |
| Counter Claim No. 5: Recovery of Misplaced/Wasted Materials ......... | 5,465,000 |
| Counter Claim No. 6: Liquidated Damages ......................................... | 236,016 |
| | $11,860,016 |

Def. App. 1-4. The contracting officer demanded that Renda submit a payment to the Government in the amount of $11,860,000 and he notified Renda of its right to appeal his decision to the Armed Services Board of Contract Appeals within 90 days of Renda's receipt of the decision or,

4 (...continued)
duty not to do anything that will hinder or delay a contractor in its performance of a contract.

5 The March 2004 report by Renda's damages expert, Robert McCullough, as revised by Mr. McCullough at trial – and upon which Renda relies – does not treat the West Levee Realignment Claim as a separate claim, but "combines" it with the revised Lost Lake Levees Claim. See PX 1863.0015.

in lieu of an appeal to the board, to bring an action directly in the Court of Federal Claims within 12 months of its receipt of the decision. Def. App. 4-5.

It is undisputed that Renda did not appeal the contracting officer's November 26, 2002 decision to the board or file an action in the Court of Federal Claims with respect to that decision. On July 1, 2004, seventeen months after its acknowledged receipt of the contracting officer's November 26, 2002 decision, Renda filed a motion, pursuant to RCFC 15(a), to amend the complaint in this case by, among other things, adding a new count challenging the validity of the contracting officer's decision and, in the alternative, alleging that, the factual predicate for the decision was "incorrect," "arbitrary or capricious," or "not supported by the evidence." See proposed "First Amended Complaint," ¶¶ 228, 230, 231, at pp. 34, 35 of the appendix to Renda's motion to amend the complaint.

The Court denied Renda's untimely proposed amendment of the complaint. See July 30, 2004 Order. Among other things, the Court found Renda's "explanation for its belated challenge to the contracting officer's November 26, 2002 final decision . . . unpersuasive," noting that Renda "does not dispute either that it timely received the final decision or that it declined to exercise its appeal rights under the Contract Disputes Act, in particular, to appeal the decision to an agency board of contract appeals, 41 U.S.C. § 606 (2000), or to institute a proceeding in this court upon that claim, 41 U.S.C. § 609(a)(1),(3) (2000)." Id. at 7.

IV. Renda's Motion For Trial Amendment

On April 6, 2005, the day before the close of the trial in this case, Renda filed a "Motion for Trial Amendment," which the Court construed as a motion to amend the complaint pursuant

to RCFC 15(b).[6] See April 19, 2005 Opinion and Order, at 1-2. Renda contended that the issue of whether it was entitled to recover an alleged unpaid, earned contract balance of $399,840.85 upon the Upper Bayou Project contract had been tried by implied consent of the parties and that, therefore, under Rule 15(b), Renda should be permitted to amend its complaint to conform to the evidence presented at trial. In an apparent attempt to buttress the contract balance claim, the proposed amendment to the complaint contained language that alluded to and quoted from the contracting officer's November 26, 2002 decision: "On November 26, 2002, the Corps acknowledged in writing to Renda that 'at the present time the Government is withholding approximately $259,840.85 in retainage. In addition to this, we are withholding $236,016.00 in liquidated damages . . . .'" See proposed trial amendment, ¶ 200.

The Court denied Renda's Rule 15(b) motion to amend the complaint for lack of jurisdiction, holding that the motion sought to add a new claim to the litigation that Renda had not previously submitted to the contracting officer for a decision, as required by 41 U.S.C. § 605(a) (2000). See April 19, 2005 Opinion and Order, at 11-15. As the Court noted, see id. at 10, a court or board lacks jurisdiction to entertain a claim that is subject to the CDA unless the claim has been presented to the contracting officer and either the contracting officer renders a final decision upon the claim or the claim is "deemed denied" pursuant to 41 U.S.C. § 605(c)(5) (2000). See England v. The Swanson Group, Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004); D.L. Braughler

[6] Rule 15(b) provides, in pertinent part: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."

Co., Inc. v. West, 127 F.3d 1476, 1480 (Fed. Cir. 1997); James M. Ellett Construction Co., Inc. v. United States, 93 F.3d 1537, 1541-42 & n.3 (Fed. Cir. 1996).[7]

The Court also stated that "[i]t is not clear whether [Renda's] motion is, in part, another attempt to have the court review the November 2002 contracting officer's decision." April 19, 2005 Opinion and Order, at 15. The Court rejected any attempt by Renda to do so: "Rule 15(b) cannot be invoked to resurrect an otherwise time-barred claim and bring it within this court's jurisdiction. To the extent that [Renda's] motion seeks to amend its complaint to include a claim involving the November 2002 final decision, that request is DENIED for lack of jurisdiction." Id. And the Court stated that "[Renda's] motion seeks to add to its complaint a claim . . . that appears intended to effect an untimely appeal of a final and conclusive contracting officer's decision that is not reviewable by this court."[8]

---

[7] Rule 15(b), moreover, cannot confer subject-matter jurisdiction upon the Court of Federal Claims that does not otherwise exist. A Federal court, including this Court, cannot expand its jurisdiction by court rule. See Widdoss v. Secretary of HHS, 989 F.2d 1170, 1177-78 (1993); Anderson Columbia Environmental, Inc. v. United States, 42 Fed. Cl. 880, 885 (1999); Orion Scientific Systems v. United States, 28 Fed. Cl. 669, 671 (1993).

[8] The CDA provides that "[t]he contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter."). 41 U.S.C. § 605(b) (2000). Thus, "once the decision of the contracting officer becomes final on a government claim against the contractor, the merits of that decision cannot be judicially challenged." Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1562 (Fed. Cir. 1990), cert. denied, 499 U.S. 919 (1991); accord United States v. Kasler Electric Co., Inc., 123 F.3d 341, 343-44 (6th Cir. 1997); United States v. Suntip Co., 82 F.3d 1468, 1474-75 (9th Cir. 1996).

ARGUMENT

I. Renda's Motion, Under The Guise Of A Request For Reconsideration, Is An Improper Attempt To Have The Court Review The Validity Of A Contracting Officer's Final Decision That Renda Did Not Challenge By An Appeal To A Board Of Contract Appeals Or An Action In This Court.

The November 26, 2002 contracting officer's final decision informed Renda of its right to contest that decision either by an appeal to the Armed Services Board of Contract Appeals or by an action in the Court of Federal Claims. Renda did not avail itself of either option. Instead, it sought to bring the November 2002 contracting officer's decision before this Court through an untimely motion to file an amended complaint in the above-captioned action, which the Court denied for the reasons set forth in its July 30, 2004 Order, among which was Renda's omission to institute a timely suit upon the contracting officer's decision, i.e., within 12 months of its receipt of the decision as prescribed by the CDA. See 41 U.S.C. § 609(a)(1),(3) (2000).

The occasion for the Court's April 19, 2005 Opinion and Order was Renda's motion to amend the complaint pursuant to RCFC 15(b) through which Renda attempted raise a new claim for an alleged unpaid, earned contract balance. In *support* of that motion, Renda alluded to and quoted a portion of the November 2002 contracting officer's decision, which is consistent with and a tacit concession of the validity of that decision. In its motion for reconsideration, however, Renda *assails* the contracting officer's decision that it initially invoked to support the Rule 15(b) motion, asserting that the decision is a legal nullity and requesting that the Court modify its April 19, 2005 ruling upon the Rule 15(b) motion by declaring the decision to be a nullity.

Renda's present challenge to the validity of the November 2002 contracting officer's decision should be denied because it is an improper attempt, under the guise of a motion for

reconsideration, to have the Court review a decision that it did not appeal to a board or bring a direct action upon in this Court within the time prescribed by the CDA (or at any time for that matter). Moreover, the aspect of the Court's April 19, 2005 Opinion and Order to which Renda's reconsideration motion is addressed – i.e., the observation by the Court that the November 2002 contracting officer's decision is "'final and conclusive' and not reviewable by this court" – was not even necessary to the court's holding that it lacked jurisdiction to entertain the Rule 15(b) motion, inasmuch as that determination rested upon the fact that Renda had not presented a claim to the contracting officer for the alleged unpaid, earned contract balance. A ruling upon Renda's reconsideration motion that reached or addressed the merits of Renda's whipsaw contention that the November 2002 contracting officer's decision is a legal nullity, therefore, would amount to an advisory opinion.

II. Assuming For The Sake Of Argument That It Would Be Appropriate To Reach The Merits Of Renda's Challenge To The Validity Of The Contracting Officer's November 26, 2002 Decision, Renda's Motion Should Be Denied Because The Government Claims To Which The Contracting Officer's Decision Is Addressed Are Not The "Mirror Image" Of, Or The Same As, The Claims By Renda That Are The Subject Of The Complaint Filed By Renda In This Case.

It has been held that, in the case of a claim subject to the CDA, "[w]hen a contracting officer goes beyond the scope of his authority and issues a final decision that is jurisdictionally invalid, such a decision is treated as a legal nullity and, accordingly, does not affect a contractor's rights or obligations." United Partition Systems, Inc. v. United States, 59 Fed. Cl. 627, 637 (2004) (citing D.L. Braughler, 127 F.3d at 1480).

The linchpin of Renda's challenge to the validity of the contracting officer's November 26, 2002 decision is that the contracting officer lacked authority to issue the decision because it

"addresses or is premised on a denial of Renda's certified claims before this Court and involves the same operative facts." Pl. Mot. 2. According to Renda, "[t]he factual issues in both are whether Renda encountered differing site conditions that entitled it to an equitable adjustment for increased costs, profit, and increased time for performance for excusable delay." Id. Renda argues that the contracting officer's November 2002 decision "essentially denied the equitable adjustment for costs, profit, and time extensions for excusable delays being sought by Renda in the certified claims over which this Court has exclusive jurisdiction," id. at 2-3, and, consequently, "the November letter on those issues is a nullity." Id. at 3. The legal underpinning for Renda's argument is 28 U.S.C. §§ 516-20 (2000) and the decisions in Sharman Co., Inc. v. United States, 2 F.3d 1564 (Fed. Cir. 1993),[9/] Hughes Aircraft Co. v. United States, 209 Ct. Cl. 446, 534 F.2d 889 (1976), and Durable Metal Products, Inc. v. United States, 21 Cl. Ct. 41 (1990). Id. at 2, 5-6. Renda's reliance upon these authorities is misplaced.

A. The Hughes, Durable, And Sharman Decisions

In Hughes, a Government contracts case that pre-dated the CDA, the Court of Claims, citing 28 U.S.C. §§ 516-20,[10/] observed that, "unless otherwise provided by law, the Attorney General is charged by statute with exclusive and plenary power to supervise and conduct all litigation to which the [United States] is a party." 209 Ct. Cl. at 465, 534 F.2d at 901. The court

---

[9] Sharman was overruled in part by Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995) (en banc), upon grounds that are not implicated by Renda's motion for reconsideration.

[10] Section 516 of title 28, United States Code, provides that, "[e]xcept as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General." Section 518 of title 28, United States Code, provides that, "[e]xcept as otherwise authorized by law, the Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party . . . ."

stated that "[t]his power, because so broadly inclusive, must be narrowly construed," remarking that, "[i]n our view it is limited to the conduct of pending litigation against the Government, and does not encompass exclusive control of other matters which, albeit related, are not yet so pending." Id.

Durable involved a contract awarded by the Government to the plaintiff contractor to produce quantities of cylinder assemblies. 21 Cl.Ct. at 43. The contractor submitted a claim to the contracting officer. Id. at 44. When the contracting officer did not issue a decision upon the claim within the time prescribed by the CDA, the contractor treated the claim as deemed denied pursuant to 41 U.S.C. § 605(c)(5) and instituted an action upon the claim in the Court of Federal Claims. Id. A few months after the suit was filed, the contracting officer issued a final decision upon the contractor's claim that was the subject of the judicial proceeding, denying the claim for the most part, but finding that the contractor was entitled to an equitable adjustment for rework upon 1,300 units, without, however, deciding the amount of any damages due the contractor. Id. The contractor then presented a second claim to the Government which matched the parameters of liability that, in his decision, the contracting officer had conceded. Id. at 45.

The contractor in Durable subsequently requested that the court accept the finding contained in the contracting officer's final decision that the Government was liable to the contractor for rework upon 1,300 units, determine the amount of monetary damages due the contractor upon that finding, and order the Government to pay the contractor that amount. 21 Cl.Ct. at 43. The court denied the request, reasoning that, because the contracting officer's decision was not binding upon the court, it was not compelled to order the Government to determine and pay the contractor any amount of damages based upon the contracting officer's decision. Id. at 46. In the

course of its opinion, the Durable court, citing 28 U.S.C. §§ 516, 518 and the Hughes precedent, observed:

> [T]he Department of Justice attorneys in this case have the sole authority and control over the conduct of this action on behalf of [the Government]. Likewise, when the [contracting officer] fails to issue a decision within the statutorily prescribed time period and the contractor chooses to deem its claim denied, it may file suit in the United States Claims Court. In that event, under the CDA, the [contracting officer] is divested of his authority over [the contractor's] claim unless the Claims Court, in its discretion, concludes to stay the action and remand it to the contracting officer pursuant to 41 U.S.C. § 605(c)(5).

Id. (footnote omitted).

In Sharman, the Federal Circuit applied 28 U.S.C. §§ 516–20, as construed by Hughes, precedent in the context of a proceeding governed by the CDA. Sharman involved a contract between the plaintiff contractor and the Government for the manufacture of steel water tanks. 2 F.3d at 1566. The contractor repudiated the contract and the contracting officer issued a final decision terminating the contract for default. Id. The contractor then filed suit in the Claims Court seeking to have the default termination overturned and claiming entitlement, in quantum meruit, to all unliquidated progress payments. Id. at 1567. Several months after the litigation was instituted, the contracting officer issued a letter, purporting to be a final decision, seeking the return of the unliquidated progress payments, id., to which the contractor responded by filing an amended complaint challenging both the final decision terminating the contract for default and the subsequent final decision in which the contracting officer asserted a claim against the contractor for the return of the unliquidated progress payments. Id. at 1567-68. Shortly thereafter, the Government filed a counterclaim for the unliquidated progress payments. The Claims Court

sustained the default termination and entered a judgment for the Government upon the counter-claim for the unliquidated progress payments. Id.

On appeal, the Federal Circuit set aside the judgment for the Government upon the claim for the return of unliquidated progress payments: "Because this claim was effectively was put in litigation by [the contractor's] original complaint and because the contracting officer had not issued a final decision as to either the government claim or the contractor's mirror image claim before the original suit was filed, the Claims Court did not have jurisdiction over either claim." Sharman, 2 F.3d at 1573.

Sharman further held that, "[b]ecause the progress payment claim was the subject of litigation at the outset, the contracting officer had no authority to issue a final decision on the claim after the complaint was filed" and that the final decision letter, therefore, "was issued without authority and consequently is a nullity." 2 F.3d at 1572. The Federal Circuit opined that the Government claim for return of the unliquidated progress payments and the claim to all unliquidated progress payments contained in the contractor's original complaint were the same claim "because in each case the 'claim' alleges entitlement to the same money based on the same partial performance, only under a different legal label." Id. at 1571. Citing 28 U.S.C. §§ 516-20, Hughes, and Durable, the Federal Circuit reasoned that, "[o]nce a claim is in litigation, the Department of Justice gains exclusive authority to act in the pending litigation" and "[t]hat exclusive authority divests the contracting officer of his authority to issue a final decision on the claim." Id.

B. Post-Sharman Case Law

In Case, Inc. v. United States, 88 F.3d 1004 (Fed. Cir. 1996), another CDA proceeding, the Federal Circuit was again called upon to consider the rule, applied in Sharman, that once a

claim is in litigation, the Department of Justice gains exclusive authority – by virtue of 28 U.S.C. §§ 516, 518 – to act in the pending litigation and that, by the same token, the contracting officer is divested of authority to issue a final decision or otherwise act upon the claim. Case involved a contract for the supply of fire resistant coveralls. 88 F.3d at 1005. When the contractor failed to meet the delivery schedule, the contracting officer issued a final decision terminating the contract for default and, shortly thereafter, a second final decision seeking the repayment of unliquidated progress payments in the amount of $4,064,212.54 (later reduced to $2,806,448.43). Id. at 1006.

The contractor brought an action in the Claims Court in which it challenged the contracting officer's final decisions terminating the supply contract for default and demanding repayment of the unliquidated progress payments, alleging that it had experienced problems in performance as a result of defective specifications (Case, Inc. v. United States, 25 Cl.Ct. 379 (1992) (Case I)). Case, 88 F.3d at 1006. Thereafter, while Case I was pending, the contractor submitted a claim to the contracting officer in which it asserted that four problems, for which the Government allegedly was responsible, had delayed its performance of the contract. Id. at 1006. The contractor asserted that those problems delayed and disrupted its performance of the contract, causing it to incur additional expenses in labor, overhead, and related expenses. Id. at 1007. The contractor sought additional compensation in the amount of $1,745,707.55 plus lost profits, for a total recovery of $1,840,674.03. Id. After the contracting officer failed to issue a final decision upon the contractor's claim, the contractor instituted an action upon the claim in the Claims Court, challenging the contracting officer's deemed denial of its claim for an equitable adjustment and lost profits (Case, Inc. v. United States, No. 92-873 (Cl.Ct.) (Case II)). Id. at 1007.

The Government filed a motion for summary judgment in Case I, which the Claims Court granted. The Claims Court sustained the termination for default and it granted the Government's counterclaim for repayment of unliquidated progress payments, entering judgment for the Government for the full amount of its counterclaim. Case, 88 F.3d at 1007. The Government then sought to have Case II dismissed, arguing that the Claims Court lacked jurisdiction to entertain Case II because the prior filing of Case I had put the subject matter of Case II in litigation, which, the Government argued, divested the contracting officer authority to issue the final decision upon the contractor's claim that was the subject of Case II. Id. at 1008. The Claims Court dismissed Case II, invoking the doctrine of *res judicata*, without commenting upon the Government's jurisdictional argument. Id.

The contractor appealed both Case I and Case II and the Federal Circuit stayed consideration of Case II pending its resolution of the appeal in Case I. Case, 88 F.3d at 1008. The court of appeals affirmed the Claims Court's grant of summary judgment in Case I and then lifted the stay of the appeal in Case II. Id. The Government contended that Case II should have been dismissed for lack of jurisdiction because the contracting officer lacked the authority to issue a final decision upon the contractor claim that was the subject of Case II. The Government argued that, under 28 U.S.C. §§ 516-20, only the Department of Justice possessed the authority to act in Case II because the contractor claim in Case II was based upon the same specification defects alleged in Case I, which was pending when the contracting officer issued the final decision upon the contractor's equitable adjustment claim that was the subject of Case II. Id. at 1009. Consequently, the Government argued, the contracting officer's unauthorized final decision upon the contractor claim was invalid and, as such, could not serve as the basis for a CDA action. Id.

The Federal Circuit, however, disagreed. It concluded that the complaint in Case I did not divest the contracting officer of the authority to issue the final decision upon the contractor's claim that was the subject of Case II, holding that the contractor's claim in Case II was not the same as the Government's claims in Case I. Case, 88 F.3d at 1009-11.

The Case court distinguished Sharman on its facts: "In Sharman, both the contractor's initial claim asserting entitlement to progress payments and the government's subsequent counterclaim for the return of progress payments involved precisely 'the same money based on the same partial performance, only under a different label.'" 88 F.3d at 1010.[11/] The court found that, unlike the claims in Sharman, the Government claims in Case I were "separate and distinct" from the contractor's claim in Case II. Id. In Case I, the contractor challenged the termination for default and the Government's claim for unliquidated progress payments in the amount of $2,806,448.43 upon the grounds that the default termination was based upon an unreasonable delivery schedule and that the Government had waived the delivery schedule. Id. In Case II, by contrast, the contractor "asserted a claim for additional compensation – over and above the progress payments it had received and to which it claimed entitlement in Case I – based upon overly strict government inspection and alleged defective specifications for the coveralls." Id. "In short, the claim in Case II was not the 'mirror image' of the claim in Case I." Id.

In concluding that the claims in Case I and Case II were not the same claim, the court in Case emphasized: "That both Case I and Case II arose out of the same underlying set of facts and involved allegations of defective specifications does not alter the fact that the two cases involved

---

[11] The panel in Case also emphasized that Sharman "referred to the contractor's claim as being the 'mirror image' of the government's claim." 88 F.3d at 1010.

different claims." 88 F.3d at 1010. "Thus, [the contractor's] claim for an equitable adjustment and lost profits was not 'in litigation' for purposes of 28 U.S.C. § 516 when the contracting officer received the claim." Id. at 1011. The court further stated that, "[i]n reaching this conclusion, we are mindful of the admonition in [Hughes] that the statutory scheme granting the Department of Justice exclusive and plenary power to supervise and conduct all litigation to which the United States is a party . . . 'must be narrowly construed.'" Id.[12/]

Consistent with Case, the post-Sharman decisions of the Court of Federal Claims have stressed that, where an action has been instituted in court upon a claim, 28 U.S.C. §§ 516, 518 do not divest a contracting officer of the authority to issue a decision upon a second claim unless the claims assert entitlement to the same money. See Johnson Controls World Services, Inc. v. United States, 43 Fed. Cl. 506, 512 ("Two claims are the same if each alleges the same entitlement to the same amount based on the same triggering events, even if each is asserted under a different legal label."), appeal dismissed, 217 F.3d 853 (Fed. Cir. 1999) (Table); Alaska Pulp Corp. v. United States, 34 Fed. Cl. 100, 104 (1995) ("[T]his court has repeatedly drawn a distinction, for purposes of the 28 U.S.C. §§ 516-520 analysis, based on whether the two claims assert entitlement to the same money."); Boeing Co. v. United States, 31 Fed. Cl. 289, 292 (1994) ("The problem on which the court in Sharman focused was the identity between the complaint and the [contracting officer's] decision in terms of the precise quantum of relief sought.").[13/]

---

[12] The Case court highlighted the Federal Circuit's observation in Joseph Morton Co., Inc. v. United States, 757 F.2d 1273, 1281 (Fed. Cir. 1987), that, as used in 41 U.S.C. § 605(b), "claim" refers to "each claim under the CDA for money that is one part of a divisible case." 88 F.3d at 1010.

[13] The infrequent occasions upon which the Court of Federal Claims has found that claims are (continued...)

As the Federal Circuit made clear in Case, for purposes of the 28 U.S.C. §§ 516, 518 analysis, claims are not "mirror images" of the other unless they assert entitlement to the same money, even though they arise from the same set of underlying facts. Thus, "the mere overlap of legal and factual issues between that which is in court and that which is put in issue by a claim pending before the contracting officer does not implicate the statute." Buse Timber & Sales, Inc. v. United States, 45 Fed. Cl. 258, 266 (1999); accord McDonnell Douglas Corp. v. United States, 37 Fed. Cl. 285, 289 (1997) ("The fact that the two claims involve overlapping issues of law and fact is not determinative."); Alaska Pulp, 34 Fed. Cl. at 104 ("[S]imilarities between the allegations raised in [plaintiff's] complaint, which is the appeal of the government's breach claim, and [plaintiff's] monetary claims are not dispositive: 'an overlap of legal and factual issues between that which is in court and that which is put in issue by a claim pending before the [contracting officer] is not enough,'" quoting Boeing, 31 Fed. Cl. at 293).

C. The Government Claims To Which The November 26, 2002 Contracting Officer's Decision Is Addressed Are Not The "Mirror Image" Of, Or The Same As, The Claims By Renda That Are The Subject Of The Complaint In This Case.

The November 26, 2002 contracting officer's final decision states that it is a "counterclaim" under the contract for the Upper Bayou Project "for items determined to be deficient or incomplete or not in accordance with the contract specifications." Def. App. 1. The decision is

[13] (...continued)
"mirror images" of each other have involved situations where the claims assert entitlement to the same money. See Medina Construction, Ltd. v. United States, 43 Fed. Cl. 537, 552-53 (1999) (suit pending in Portugese Court involved "the very same causes of action and the same damages against the government" as the claim addressed by the subsequently-issued contracting officer's final decision); Johnson Controls, 43 Fed. Cl. at 512-14 (final decisions by different contracting officers issued before and after commencement of litigation sought refund of same surplus pension assets and demanded the same sum certain).

addressed to six monetary claims[14/] by the Government against Renda:

Claim #1: A claim for $2,067,000 based upon the alleged failure by Renda to complete Dredge section No. 9 (Def. App. 1-2).

Claim #2: A claim for $571,000 based upon the alleged misplacement by Renda at the Lost Lake Placement Area of material dredged from Dredge Section No. 7 (Def. App. 2).

Claim #3: A claim for $108,000 based upon the alleged failure of Renda to construct portions of the West levee at the Lost Lake Placement Area to the lines and grades specified by the contract (Def. App. 2-3).

Claim #4: A claim for $3,413,000 based upon the alleged failure of Renda to construct the North Levee at the Lost lake Placement Area to the lines and grades specified by the contract (Def. App. 3).

Claim #5: A claim for $5,465,000 for the recovery of dredged material at the Lost Lake Placement Area allegedly misplaced or wasted by Renda (Def. App. 3-4).

Claim #6: A claim for liquidated damages in the amount of $236,016 based upon the failure of Renda to complete the Upper Bayou Project within the time specified by the contract (as amended by contract modifications) (Def. App. 4).

The Government claims enumerated above addressed by the November 2002 contracting officer's decision are not the "mirror image" of Renda's equitable adjustment claims under the differing site conditions clause that are the subject of its complaint in this litigation. Unlike the contractor and Government claims for unliquidated progress payments at issue in Sharman, the

[14] As the Court noted in its April 19, 2005 Opinion and Order, at 10 n.6, the term "claim" is not defined in the CDA itself. To determine the meaning of that term, the courts have looked to the definition of "claim" supplied by the Federal Acquisition Regulations (FAR), the language of the contract in dispute, and the facts of the particular case. See Reflectone, 60 F.3d at 1575; Garrett v. General Electric Co., 987 F.2d 747, 749 (Fed. Cir. 1993). The FAR defines "claim," in relevant part, as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain . . . ." 48 C.F.R. § 33.201.

Government's claims and Renda's equitable adjustment claims, which are for different amounts, do not – in whole or in part – allege entitlement to the *same money* based upon the same performance, only under a different legal label. As the Federal Circuit's decision in Case and decisions of this Court construing and applying Sharman make abundantly clear, the fact that the Government's claims and Renda's claims may arise from the same set of underlying facts is not determinative of whether they should be deemed the same claim: "[A]n overlap of legal and factual issues between that which is in court and that which is put in issue by a claim pending before the [contracting officer] and is not enough." Boeing, 31 Fed.. Cl. at 293. For the claims to be deemed the same, they must allege entitlement to the *same money*.

Renda asserts that the November 2002 contracting officer's decision is a legal nullity because it allegedly addresses or is premised upon a denial of the claims by Renda that are the subject of its complaint in this case. We disagree. Other than to note by way of background, in the findings of fact appended to the November 2002 decision, that the contracting officer sent correspondence to Renda acknowledging his receipt of Renda's certified claims and to list those claims by amount, see Finding of Fact #24, Def. App. 8, the November 2002 contracting officer's decision does not discuss, evaluate, analyze, or purport to decide any of Renda's differing site conditions claims. The "Analysis" and "Final Decision" sections of the November 2002 decision are addressed solely to the Government claims described above. See Def. App. 1-5.

While factual or legal assumptions underlying the November 2002 contracting officer's decision upon the Government claims may be inconsistent with the factual or legal predicate for the differing site conditions claims that are the subject of Renda's judicial complaint, that does not transmute the decision into a final decision upon Renda's claims or render the Government

claims a "mirror image" of, or the same as, Renda's claims. Any such thought was dismissed in Cincinnati Electronics Corp. v. United States, 32 Fed. Cl. 496 (1994).

In Cincinnati, the contracting officer issued final decisions terminating a contract for default and demanding the return of progress payments made by the Government to the contractor. 32 Fed. Cl. at 499. The contractor instituted an action in court seeking relief from the allegedly improper default termination and Government claim for the return of the progress payments. Id. After the suit was filed, the contractor submitted a claim to the contracting officer seeking termination-for-convenience costs. Id. When the contracting officer declined to act upon the claim for termination costs, the contractor filed an amended complaint that added that claim to the pending law-suit. Id.

The Government then sought to have the termination costs claim dismissed from the litigation for lack of jurisdiction upon the ground that it and the claim seeking to set aside the default termination included in the contractor's original complaint were the same claim. The Government argued that the commencement of the litigation divested the contracting officer of the power to decide the termination costs claim, so that there could not have been a valid deemed denial of that claim – a necessary jurisdictional prerequisite.[15/] Cincinnati, 32 Fed. Cl. at 500.

The court in Cincinnati rejected the Government's jurisdictional objection, holding that "[a] claim for termination for convenience costs is not the same as a claim seeking to overturn a default termination." 32 Fed. Cl. at 502. And the court stated that "[t]his is so, even though the existence of a decision terminating a contractor for default *is dissonant with* the contractor's

---

[15] See, e.g., Case, 88 F.3d at 1009; Vanalco, Inc. v. United States, 48 Fed. Cl. 68, 76 (2000).

claim that it is entitled to termination for convenience costs." Id. (emphasis added).

The November 2002 contracting officer's final decision, therefore, is not rendered a legal nullity because of any factual or legal assumptions underlying that decision which may clash with the factual and legal predicate for the equitable adjustment claims based upon the differing site conditions clause that are the subject of Renda's judicial complaint. Sharman, as amplified by Case and subsequent decisions of this Court discussed above, compels the conclusion that the Government claims which are the subject of the November 2002 contracting officer's decision are not the "mirror image" of, or the same as, the equitable adjustment claims by Renda that are the subject of the complaint in this litigation. Consequently, the filing of the complaint in this case did not divest the contracting officer of the authority to issue the November 2002 final decision. Renda's motion for reconsideration of the Court's April 19, 2005 Opinion and Order, thus, is without merit.

CONCLUSION

For the foregoing reasons, plaintiff's motion for reconsideration of the Court's April 19, 2005 Opinion and Order should be denied.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

JUNE 20, 2005

# DEFENDANT'S APPENDIX

DEPARTMENT OF THE ARMY
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO
ATTENTION OF.

November 26, 2002

Contracting Division

Mr. Oscar Renda
Renda Marine, Inc.
522 Benson Lane
Roanoke, TX 76262

SUBJECT: Contract DACW64-99-C-0001
Houston/Galveston Ship Channel
Dredging Upper Bayou Project

Dear Mr. Renda:

This letter serves as a Contracting Officer counter-claim on Contract DACW64-99-C-0001, Houston/Galveston Ship Channel for items determined to be deficient or incomplete or not in accordance with the contract specifications.

On October 26, 1998, above referenced contract was awarded to Renda Marine, Inc., (RMI) in the amount of $12,526,100.00 to dredge approximately 3,483,700 cubic yards of material. Renda Marine was also responsible for building 381,300 cubic yards of mechanically constructed levees and building 13,700 lineal feet of hydraulically constructed levees. Contract completion was originally set at 18 February 2000 and through several modifications later revised to 28 June 2000. The Notice to Proceed was issued on 16 November 1998.

Each counter-claim is listed below with an explanation and dollar amount associated with each claim:

## FINDINGS OF FACT

I have attached my Findings of Fact and they are incorporated in this document.

## ANALYSIS

**a. Counter Claim No. 1: Dredging Section No. 9**

Modification CO-11, dated 18 September 2001, deleted the remainder of dredging for the project as stated in a Contracting Officer decision dated 01 June 2001.

The Government deleted the remainder of Section 9 under Modification P00028 dated 18 September 2001 due to your continued and protracted inability to accomplish the work in accordance with contract requirements. Your ineffective and inefficient hydraulic placement of material dredged from the channel resulted in wasting a large quantity of material inside the area instead of such being incorporated into the hydraulic levees. Deletion of the remainder of Section 9 put an end to any further damage to the area by the inefficient operation.

Approximately 135,000 cubic yards of "required dredging" remains to be removed within the channel template in Section 9 and will be removed by another contractor.

Modification P00029 dated 28 September 2001 decreased the total funded amount of the contract by $415,000.00, from $17,052,424.16 to $16,637,424.16. The $415,000.00 deduction is the result of the deletion of Section 9 on this contract.

Our estimate for completing this portion of the work is $2,067,000.00. This amount includes costs for mobilization, pipelines, two boosters and cost to dredge the remaining material from Section 9.

**b. Counter Claim No. 2: Sec. 7 Clay Misplaced Material**

On 20 October 2000, you submitted a letter alleging a differing site condition consisting of "Heavy Red Clay at North Side of Channel, Stations 565+00 to 580+00." The Government never considered this issue to have merit.

You encountered materials commensurate with what was reflected in the borings on the contract drawings, i.e., stiff clays. Hence, that material should have been incorporated into the hydraulic levees around Lost Lake Placement Area (LLPA) but you elected to stockpile such in lieu of what the contract required. The Government decided that it would be more prudent not to incur any further lost time due to inefficient levee construction methods exhibited by you at LLPA. This material is still in this location and will have to be recovered and used to rebuild the incomplete levees by another contractor.

The Government carefully considered your claim in this section, and as stated above, never considered it to have merit. Our estimated cost for excavating the misplaced material, placing it in trucks and hauling to the North Levee is $571,000.00.

**c. Counter Claim No. 3: Incomplete West Levee Realignment (Mechanical Portion Only)**

You failed to complete a significant portion of the west levee to the lines and grades in accordance with the contract specifications during the construction period.

The Government did not recommend that you relocate the completed portion of the levee between approximate levee stations 166+00 and 180+00, but only that work beyond station 180+00. This realignment was to improve the current site conditions and to assist you with your levee construction method. However, you made the decision to relocate this already completed portion of the levee.

In order to bring the levees to lines and grades as specified in the contract documents, the Government estimates it will cost $108,000.00 to complete the work. This work includes mobilization, cutting/hauling and filling material, bonds and contingency.

**d. Counter Claim No. 4: Incomplete, Non-Hydraulic North Levee**

Between approximate levee stations 15+00 to 40+00 you attempted to construct the North Levee mechanically instead of hydraulically displacing the soft foundation with dredged material as required by the construction contract. Consequently, the North Levee was never constructed to the lines and grades as required by the contract documents. You also failed to complete the North Levee to the lines and grades as specified by the contract documents. The contract clearly stipulates that the levees were to be placed hydraulically. This was a requirement so that the soft foundation material would be displaced during the hydraulic operations. Your ability to accomplish an effective and efficient hydraulic fill operation precluded such from occurring. It is apparent that your equipment and management of such were incapable of doing so.

It is noted in this area that you recovered misplaced material from the east side of the levee (one truckload at a time) to attempt to mechanically construct the North Levee. Again, the Government decided that it would be more prudent to delete the work and not incur any further lost time due to inefficient dredging or additional damages at LLPA.

Our estimated cost for another contractor completing the North Levee in accordance with the contract specifications is $3,413,000.00. This estimate includes mobilization of a large dredge capable of excavating new work material, pipelines and associated cost to dredge material from Sections 16-20 in the Mid-Bayou Reach.

**e. Counter Claim No. 5: Recovery of Misplaced/Wasted Material**

Again, due to your inefficiencies in your dredging operations, approximately 1.2 million cubic yards of suitable levee building material was wasted toward the interior of LLPA. A letter from the Bay Area Office, dated November 3, 2000, referenced an October 23, 2000 meeting that recommended continuing to reasonably recover the

misplaced and overplaced satisfactory material along the East Levee. Once again, the Government decided that it would be more prudent to cease any further Renda Marine recovery operations and delete the work and not incur any further lost time or additional damages at LLPA.

Subsequent to the Upper Bayou Contract, the Government contracted with a geotechnical consultant to take numerous soils borings at various locations within LLPA. The borings indicated that suitable levee building material had flowed to the interior approximately 1,000 feet from the levee toe on the east and west sides of LLPA. Also, the borings indicated that the suitable material varied in thickness from about 10 feet near the levee toe to about 1 foot at a distance of about 1,000 feet to the interior. As a result of this, the Government estimates that it will take at least 8 months for another contractor to recover this material and incorporate into the incomplete levees. This work is estimated to cost the Government $5,465,000.00.

**f. Counter Claim No. 6: Liquidated Damages**

At the present time the Government is withholding approximately $259,840.85 in retainage. In addition to this, we are withholding $236,016.00 in liquidated damages calculated by multiplying $528.00 per day multiplied by 447 days the Government estimates is beyond the contract completion date of 28 June 2000.

. To date the Government has refunded $252,000.00 to your company. The amount of $259,840.85 represents the balance remaining in retainage.

Total for all counter claims is summarized below:

| | |
|---|---|
| a. Dredging Section 9: | $2,067,000.00 |
| b. Sec. 7 Clay Misplaced Material: | 571,000.00 |
| c. Incomplete W. Levee Realign. (Mech. Portion Only) | 108,000.00 |
| d. Incomplete, Non-Hydraulic North Levee: | 3,413,000.00 |
| e. Recovery of Misplaced/ Wasted Material: | 5,465,000.00 |
| f. Liquidated Damages: | 236,016.00 |
| Total | $11,860,016.00 |

**FINAL DECISION**

Based upon the above stated facts, I hereby determine that Renda Marine, Inc., is indebted to the Government in the amount of $11,860,000.00 for the additional cost of correction of deficiencies under Contract DACW64-99-C-0001. I hereby direct Renda

Marine to submit a payment in the amount of $11,860,000.00 to me by Certified Check payable to "FAO USAED, Galveston."

Any amount not paid within 30 days from the date of this demand will bear simple interest from the date of this demand at the interest rate established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraph (b) of FAR 52.232-17, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

You may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed. The proposal for deferment should provide the information required in FAR 32.613 and should provide information regarding a proposed bond or other collateral as required.

This is a final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 7th Floor, 5109 Leesburg Pike, Falls Church, Virginia 22041-3204. If you decide to appeal, you must mail or other otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you received this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedures for claims of $50,000.00 or less or its accelerated procedures for claims of $100,000.00 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Thomas Benero

Thomas Benero
Chief, Contracting Division
Contracting Officer

CF: Brian W. Erikson, Attorney at Law
John Kosloske, Dept.of Justice
Mike McClenan, Bay Area Office

## FINDINGS OF FACT

1. Solicitation (IFB) DACW64-98-B-0004 for Dredging Upper Bayou (45 foot project) in Harris and Galveston Counties was issued 16 June 1998. The solicitation was amended one time

2. Amendment 0001 dated 7 July 1998 incorporated questions from prospective bidders and provided answers by the Galveston District Design Team.

3. Bids were opened on 17 July 1998.

4. Five bids were received, the lowest being $12,526,100.00.

5. The Government estimate was $13,607,400.00 or approximately 9% higher than the Renda Marine, Inc., (RMI) bid.

6. RMI submitted the lowest bid of $12,526,100.00. Award of the contract was made on 26 October 1998. The Notice to Proceed was issued on 16 November 1998.

7. A total of 30 modifications were issued under this contract. Some modifications were issued unilaterally by the Contracting Officer and some bilaterally after mutual agreement by both parties.

8. On 8 March 2000, a Cure Notice was issued to RMI for what the Government considered RMI's failure to demonstrate that they could achieve satisfactory execution of the project within the times required by its terms.

9. On 4 April 2000, RMI responded to the Cure Notice. In their response RMI provided a contract summary to date and a proposed completion date. This response also provided a proposed production rate of dredged material and utilization of a booster pump. Also included in this letter was a dredging plan for completion of the project.

10. On 16 April 2000, the Government and the local sponsor of the project, the Port of Houston Authority (PHA), met with RMI and their surety to discuss progress of work on the Upper Bayou Contract and RMI's response to the Cure Letter issued 8 March 2000.

11. As a result of the 16 April 2000 meeting, on 25 April 2000, RMI was presented a letter outlining 4 conditions they had to meet in order to avoid being Terminated for Default. These were:

a. Maintaining a monthly production rate as stated in the dredging plan for completion of the project must be met for each pay period;
b. Work must be in accordance with the contract drawings and specs;
c. All materials suitable for constructing levees are to be utilized for levee building, and;
d. RMI was to provide an update of quality control personnel and responsibilities for each work area.

12. On 11 July 2000, a letter was issued to RMI stating that the dredging quantity stated in each pay period appeared reasonable and attainable. However, there was still some concern that the quantities of lineal feet of hydraulic levee proposed to be constructed per pay period appeared to be excessive. RMI was asked to review the proposed quantities and revise as appropriate. RMI was also told the 4 conditions in the Government's 25 April 2000 letter still applied.

13. On 6 October 2000, the Government requested RMI to submit a proposal for removing and disposing the debris on the north side of the channel between approximate channel stations 530+00 and 554+00.

14. Modification P00019 dated 27 October 2000, directed RMI to remove and dispose of the debris on the north side of the channel between approximate channel stations 530+00 and 554+00. This mod also increased the contract amount by $66,000.00 and added 4 calendar days to the contract.

15. On 6 November 2000, a Show Cause Notice was issued to RMI for failure to demonstrate they could achieve satisfactory completion of the project within the times required by its terms. This Show Cause Notice reiterated the 4 conditions of the 25 April 2000 letter. However, RMI continued to demonstrate their inability to complete this project by a definite date.

16. On 15 November 2000, RMI responded to the Show Cause Notice. As a result of this, the Government submitted a letter to RMI on 13 December 2000 responding to the 17 issues summarized in their letter. RMI was asked to submit Requests for Equitable Adjustments (REA's) for issues numbered 3, 4, 9 and 10 within 15 calendar days of receipt of our letter. These four issues were the ones the Government considered to have merit.

17. On 21 December 2000, the Government submitted another letter to RMI requesting an REA for a new differing site condition consisting of unknown obstructions on the south side of the channel between stations 634+90 and 635+00 and station 637+57. This was the result of a letter describing a new differing site condition submitted by RMI on 13 December 2000.

18. On 7 March 2001, RMI made an alternative proposal for project delays due to differing site conditions. RMI suggested that they would complete its dredging work at the North Slope of Dredge Section No. 5 and 6 and then move the

discharge line at Jacinto Port. The Government was to remove the remainder of Dredge Section No. 9 from the contract.

19. On 13 March 2000, RMI submitted a letter proposing furnishing approximately 250,000 cubic yards of clay material from a private contract to LLPA for hydraulic levee construction. As a result of this, Modification P00026 was issued adding up to 60 calendar days to the contract.

20. Modification P00023, dated 14 March 2001, established a revised contract completion date of 28 June 2000. It also provided for payment to RMI in the amount of $3,083,833.00 for dredge work completed in the flare area of the Houston/Galveston Navigation Channel.

21. Modification P00026 dated 4 May 2001allowed up to 60 calendar days to complete dredging from private sources and hydraulically placing it into the new levee template at Lost Lake Placement Area (LLPA). The modification provided for additional time allowed of up to 60 calendar days.

22. On 27 August 2001, the Government issued a letter to RMI directing them to remove any remaining pipelines or appurtenant equipment belonging to RMI from the LLPA.

23. Modification P00028 dated 18 September 2001, deleted the remaining unfinished dredging on the north levees between stations 4+00 and 40+00 and the remaining levee construction from the contract.

24. On November 6 and 7, 2001, the Contracting Officer issued 6 letters to RMI acknowledging receipt of various certified claims submitted by RMI between January thru October 2001. Breakdown of claims and dollar amounts are as follows:

| **Claim** | **Dollar Amt.** |
|---|---|
| Dredging S. Ferry Landing | $1,049,173.00 |
| Dredging Flare Area Clay | 4,691,688.00 |
| Delays due to HL&P Trans. Tower | 170,863.00 |
| Dredging Sec. 7 Clay | 1,083,779.00 |
| Realignment of West Levee | 789,600.00 |
| Dredging obstructions No. 1 (Sec. 4-8) | 2,126,083.00 |
| Dredging obstructions No. 2 (Sec. 9) | 1,158,642.00 |
| Delays due to Hydraulic Levees at LLPA | 6,258,853.00 |
| Total | $17,328,892.00 |