*In the United States Court of Federal Claims*

No. 02-306 C
(E-Filed:  July 28, 2005)

_____ )
                                   )
                                   )
RENDA MARINE, INC.,                )
                                   )
                  Plaintiff,       ) Trial; Contract for Hydraulic Dredging and
                                   ) Hydraulic and Mechanical Levee
                                   ) Construction; Type I Differing Site
         v.                        ) Conditions
                                   )
THE UNITED STATES,                 )
                                   )
                  Defendant.       )
                                   )
_____ )

Brian W. Erikson, Dallas, TX, for plaintiff.  Clark B. Will, Dallas, TX, of counsel.

John E. Kosloske, with whom were Peter D. Keisler, Assistant Attorney General, and
David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States
Department of Justice, Washington, DC, for defendant.  P. Alex Petty, Galveston District,
United States Army Corps of Engineers, Galveston, TX, of counsel.

OPINION

HEWITT, Judge

        This case is before the court following trial on claims[1] by plaintiff Renda Marine,
Inc. (Renda, RMI or plaintiff) that it encountered six Type I differing site conditions,[2] one

_____

        [1]In this case the contracting officer did not timely issue a final decision on any of
plaintiff's claims.  See Compl. passim, ¶¶ 17, 48, 73, 83, 90, 100, 120, 147, 197.  Accordingly,
each claim before the court is "deemed to be a decision by the contracting officer denying the
claim."  41 U.S.C. § 605(c)(5) (2000).

        [2]Plaintiff asserts six Type I differing site conditions:  (1) the South Ferry Landing claim,
Compl. at 4-8, ¶¶ 19-52; (2) the Flare Area claim,  Compl. at 8-11, ¶¶ 53-74; (3) the Section 7
Clay claim, Compl. at 12-13, ¶¶ 84-90; (4) the Obstructions No. 2 claim, Compl. at 17-21, ¶¶
                                                                        (continued...)

Type II differing site condition,[3] and one constructive contract modification[4] during the course of its performance of Contract No. DACW64-99-C-0001, known as the Upper Bayou Project Contract (Upper Bayou Contract or Contract).  See Complaint (Compl.) ¶¶ 10-11, 20–31, 54–61, 75–79, 84–88, 91–95, 102–15, 122–37, 148–83.  The Upper Bayou Contract involved dredging a portion of the Houston-Galveston Navigation Channel (the Channel) and constructing perimeter levees and other structures at a disposal area known as Lost Lake to contain material to be dredged under the Contract and material to be later dredged under other contracts.  See generally Joint Exhibit (JX) 2 (Contract Specifications for Dredging Upper Bayou (Specs.)); JX 5 (Contract Plans and Drawings (Drawings)); see also Transcript of Trial (Tr.) at 3098:15–21, 3171:5–8 (C. Michael McClenan, Administrative Contracting Officer) (explaining that the levees were designed to contain material dredged under contracts issued for 50 years following the Upper Bayou Contract); cf. id. at 4150:18–25 (J. Timothy Few, civil engineer) (explaining that the designs of "all of the placement areas" in the 45-Foot Project were predicated on a "50-year dredge material management plan").  Plaintiff seeks $10,842,811 in damages.  Post-Trial Brief by Plaintiff, Renda Marine, Inc. (Pl.'s Br.) at 2, 98; cf. Tr. at 2456:10–11 (plaintiff's damages expert, Robert McCullough); Plaintiff's Exhibit (PX) 1863A (Summary of Plaintiff's Claims by Mr. McCullough) (Revised McCullough Rep.) at 1.

I.      Introduction

        Between February 28 and April 7, 2005, the court conducted nineteen days of trial, during which it heard the testimony of twenty-two live witnesses[5] and admitted more than

--------

[2](...continued)
121-147; (5) West Levee Realignment claim, Compl. at 13-14, ¶¶ 91-101; and (6) the Lost Lake Levees claim, Compl. at 21-28, ¶¶ 148-197.

        [3]Plaintiff asserts an Obstructions No. 1 claim alleging a Type II differing site condition. Compl. at 14-17, ¶¶ 102-120.

        [4]Plaintiff asserts an HL&P Tower Claim alleging a constructive contract modification. Compl. at 11-12, ¶¶ 75-83.

        [5]For convenient reference, the name and a description of each witness upon whose live testimony the court relies in this opinion follows:

        Kenneth Affolter is a project engineer with his family's business, Affolter Contracting. Tr. at 1584:15-23.  Renda hired Affolter "[as a subcontractor . . . on the Lost Lake project] . . . to build the mechanical levees in two or three locations and install a spillway."  Id. at 1586:15-21.

                                                                        (continued...)

---

[5](...continued)

Christopher Babitzke is a dredging superintendent with J.F. Brennan, a marine construction firm. Tr. at 3470:2-6 (Babitzke). He performed inspections on the Upper Bayou Project, id. at 3480:8-10 (Babitzke), and prepared written inspection reports, id. at 3480:25-3481:2 (Babitzke).

Thomas Benero, the "[C]hief of [the] [C]ontracting [Division] for the Army Corps of Engineers in Galveston, Texas," id. at 68:5–6 (Benero), was the contracting officer who awarded the Upper Bayou Contract to plaintiff, id. at 85:5–9 (Benero). Mr. Benero has held an unlimited contracting officer warrant since his arrival at the Galveston District office in April 1997. Id. at 72:14–17; 73:14–15 (Benero).

Bruce Bennett is the lead physical scientist for the Corps' Galveston District. Id. at 3614:24-3615:8 (Bennett). In that capacity, he leads the North Evaluation Unit of the Regulatory Branch of the Corps' Planning, Environmental and Regulatory Division. Id. at 3615:14–19 (Bennett). The mission of the Galveston District's regulatory branch is "[to] administer several regulatory laws. The main two are . . . Section 10 of the River and Harbor Act of 1899, and Section 404 of the Clean Water Act of 1977, the main two laws." Id. at 3616:20-25 (Bennett).

Steven Bowman, a construction scientist, id. at 325:7-8 (Bowman), began working with Renda in 1991, see id. at 326:12. He worked as a Project Manager, see id. 326:12- 329:24 (Bowman), and assumed the estimating duties, among other responsibilities, at Renda, id. at 330:3-7 (Bowman).

William Connole is a registered professional engineer and a twenty-two year employee of Franvel Corporation, a construction consulting firm. Id. at 4805:13-16, 4806:12-15 (Connole). He is primarily a construction consultant, id. at 4802:5-6 (Connole), and has consulted on "probably ten or more projects that involve dredging," id. at 4808:8-11 (Connole). The court qualified Mr. Connole as an expert for defendant in three areas: "[1] delay, disruption and damages claims; [2] . . . means and methods of levee construction generally; and [3] . . . the application of Corps of Engineers' Construction Equipment Ownership and Operating Expense Schedules." Id. at 4830:12-19.

James Few is a civil engineer in the Geotechnical and Structures Section of the Corps' Engineering Branch, see id. at 4133:10–19 (Few), where he "act[s] as a coordinator and designer for beneficial use of dredge[d] material and other navigation channel[-]associated contracts and projects in the Galveston District, primarily for the operations and maintenance portion of the mission," id. at 4134:3–7 (Few). Mr. Few was involved in developing the design for the hydraulic levees to be constructed under the Contract. See, e.g., id. at 4151:8–10; 4181:5–13 (Few).

(continued...)

---

[5](...continued)

Benton Goodloe works in the "dredging business," id. at 2746:16-18, assisting with job investigations and bidding work, id. at 2748:2-7 (Goodloe).  He is employed by Renda, id. at 2746:1-2, and also assists his wife with her dredging business, Goodloe Marine, id. at 2746:3-6 (Goodloe).

Michael Hasen is the Executive Vice President of HVJ Associates.  Id. at 4470:17 (Hasen).  HVJ Associates is a "civil engineering consulting firm, . . . specializ[ing] in geotechnical construction materials, environmental and pavement engineering."  Id. at 4471:7-9 (Hasen).  The court qualified Mr. Mr. Hasen, a geotechnical engineer by training, see id. at 4472:9 (Hasen), as an expert for defendant "on geotechnical engineering and in particular, on the design of levees or dykes for dredged material disposal sites," id. at 4485:14-16.

Darillo (Leo) Herrera is a construction representative with the Corps' Tulsa District.  See Tr. at 3540:17-3541:2, 3549:22-24 (Herrera).  From December 1998 until June 2000, id. at 3547:12, 3549:4-7, he worked for Renda as a project engineer and the quality control coordinator.  Id. at 3547:14-15 (Herrera).  As quality control coordinator for Renda, Mr. Herrera's duties included "document[ing] activities out on the job site" and "ensur[ing] that Renda Marine complied with its quality control plan submitted to the Corps."  Id. at 3547:18-24 (Herrera).

Leon Hrabovsky is an engineer employed with Gahagan & Bryant and Associates (GBA).  Id. at 3712:22-25 (Hrabovsky).  Among his responsibilities with GBA is an assignment "to work with a partner of ours, Turner Collie & Braden, as a joint venture . . . [on] a contract with the Port of Houston."  Id. at 3713:12-17 (Hrabovsky).  Mr. Hrabovsky worked as "a construction manager for the joint venture concerning the Houston Ship Channel."  Id. at 3713:19–21 (Hrabovsky).

Robert Lofgren, a civil engineer by training, id. at 4364:4-9, is an "independent engineering consultant," id. at 4362:9.  The court qualified Mr. Lofgren as defendant's expert "in hydraulic dredging, including the preparation of bid estimates for hydraulic dredging work and the operation of hydraulic dredges."  Id. at 4377:16-19.

Dr. Christopher Mathewson is a "professor of geology, specializing in engineering geology, [at] Texas A&M University, College Station, Texas."  Id. at 1849:13-15 (Dr. Mathewson).  Without objection from defendant, plaintiff tendered "Dr. Mathewson as an expert in geology and geotechnical engineering."  Id. at 1853:20-22.

C. Michael McClenan was the Administrative Contracting Officer for the Upper Bayou Project from the fall of 1999 until the end of the Contract period, id. at 3104:13–16 (McClenan), and held a contracting officer warrant that was limited to $100,000, id. at 3085:19–20 (McClenan).  From the time the Upper Bayou Contract was awarded in October 1998 until the

(continued...)

---

[5](...continued)

fall of 1999, Mr. McClenan was an Area Engineer for the Corps' Galveston District's Bay Area Office. Id. at 3082:20–21 (McClenan). In this capacity, he "oversaw [the Upper Bayou Contract] . . . [but] didn't have the authority to make any . . . changes to the [C]ontract." Id. at 3106:3–5 (McClenan). Mr. McClenan was assisted in the administration of the Contract by Eric Russek, a Project Engineer in the Bay Area Office. Id. at 3111:15–18 (McClenan). Mr. Russek "interact[ed] with the contractor on a daily basis. . . . He would make . . . frequent visits to the . . . construction site, and . . . observe . . . the actual construction work that was going on." Id. at 3111:22–3112:2 (McClenan). Mr. Russek prepared project correspondence for Mr. McClenan's signature, issued "non-funding" contract modifications, and processed and verified plaintiff's monthly pay applications. See id. at 3112:3–12 (McClenan). Although Mr. Russek was expected to testify at trial, see Def.'s Witness List at 1–2, ¶ 3 (listing Mr. Russek as a "[w]itness [w]hom [t]he [g]overnment [e]xpect[ed] [t]o [p]resent [a]t [t]rial); Post-Pretrial Conference Order at 7 (reflecting the parties' proposed trial schedule, which shows Mr. Russek testifying for 4 ½ hours), defendant decided not to call Mr. Russek as a witness during the presentation of its case. Tr. at 4264:17–18 (statement of defendant's counsel).

Robert McCullough, a certified cost engineer, Tr. at 2405:15–16 (McCullough) is the president of the construction consulting firm McCullough & Associates, id. at 2813:1–10 (McCullough). Mr. McCullough "prepare[s] . . . [and] review[s] claims primarily for contractors. . . . [He estimates that] 90 percent of [his] work is in claims analysis and claims preparation." Id. at 2408:12–17 (McCullough). Mr. McCullough prepared an Evaluation of Claims on plaintiff's behalf in this litigation, see generally PX 1863 (3/3/04 Evaluation of Claims by McCullough & Associates (McCullough Report)), amended by PX 1863A (revisions to McCullough Report presented at trial on 3/10/05), and was tendered as plaintiff's damages expert in this case. Tr. at 2410:3–4. The court found Mr. McCullough qualified to testify as an expert in the area of cost engineering. Id. at 2410:6–8.

Wendell Mears is an engineer with Gahagan & Bryant Associates (GBA), an engineering consulting firm that specializes in dredging and marine construction. Id. at 3890:1–12 (Mears). GBA is a member of the "Joint Venture" (JV), a business enterprise formed in the early 1990s "specifically . . . to work with the Port of Houston Authority and the [C]orps to . . . develop the recon level plan [to] . . . widen and deepen the Houston Ship Channel, [and] to carry it through to completion." Id. at 3905:10–14 (Mears).

Alton Meyer is a project engineer in the Corps' Galveston District. Id. at 3636:8-20 (Meyer). He "prepare[d] . . . drawings . . . for the Upper Bayou project that dealt with channel design." Id. at 3646:8-11 (Meyer).

Rudolph (Rudy) J. Renda is the vice president of Oscar Renda Contracting, Inc., and was the acting vice president of Renda from the time that the business was formed. Tr. at

(continued...)

five hundred exhibits into evidence.  In addition to the record amassed during trial, the court has reviewed deposition testimony from twelve witnesses,[6] see generally JX

_____

[5](...continued)
2570:24–25.

Rudy V. Renda[, Jr.] is the son of Rudy J. Renda and the "superintendent of the levee construction" on the Upper Bayou Project.  Id. at 2597:15-16, 2599:20-21 (R.V. Renda).

Barry Smith began working for Renda in July 2000 initially as a project administration consultant for the Upper Bayou Project.  Id. at 1642:15-17, 2107:24-2108:9.  He prepared plaintiff's REAs and certified claims in this matter.  Id. at 1645:5-13, 2110:20–2111:6 (Smith).

James Van Norman is the Construction Manager for Great Lakes Dredge & Dock Company (GLDD), id. at 3523:23-24, a dredging contractor, id. at 3534:19.  GLDD performed hydraulic levee construction at Lost Lake and dredging work as part of the Mid Bayou Project, the marine construction project that succeeded the Upper Bayou Project.  See id. at 3527:22-3528:25, 3530:15-19.

[6]The parties offered into evidence excerpts from depositions taken in this matter, as well as depositions taken by counsel in Renda Marine Inc. v. Dredging Supply Company, No. H-00-1721 (S.D. Tex.) (RMI v. DSC).  Although deposition excerpts were offered and received into evidence as joint exhibits, the parties agreed at trial that deposition testimony designated by defendant would be labeled with the letter "A," i.e., JX 100A, and deposition testimony designated by plaintiff would be designated with the letter "B," i.e., JX 100B.  The court utilizes these designations when citing deposition testimony in this opinion.  The court disregards deposition testimony of witnesses who appeared at trial except where used with the witness at trial.  See, e.g., United States v. Int'l Bus. Machs. Corp., 90 F.R.D. 377, 382 (S.D.N.Y. 1981) (expressing "disapprov[al] [of] the use of deposition testimony as substantive evidence when the deponent appears live").

For convenient reference, the name and a description of each deposition witness upon whose testimony the court relies in this opinion follows:

Eddie Fisher was the vice president of Renda Marine from its formation in 1988 until July 2000.  Mr. Fisher is the son of a dredging contractor.  See JX 98A (Fisher Dep.) at 17:21–18:12.  Since graduating from college in 1975, Mr. Fisher has been involved in most aspects of the dredging business, including manufacturing and repairing various dredges and cutterheads; serving as a deckhand, a leverman, and a project supervisor on various dredges; serving as vice president of the Gulf Coast division of a dredging company, which involved preparing and submitting bids for various government and private dredging contracts, including Corps contracts; and serving as superintendent of dredging operations for a marine construction

(continued...)

94A–JX 106B, and has had the opportunity to consider extensive post-trial briefing filed by the parties, see generally Pl.'s Br.; Defendant's Post-Trial Brief (Def.'s Br.); Reply Brief by Plaintiff, Renda Marine, Inc. (Pl.'s Reply); and Defendant's Reply to Plaintiff's Post-Trial Brief (Def.'s Reply).

The court found the testimony of all of the witnesses before it to be given earnestly and in good faith.  However, plaintiff's witness Mr. Bowman at times appeared so committed to establishing plaintiff's trial positions that his testimony was more than once at odds with deposition testimony that proved unhelpful to plaintiff's case at trial.  For example, in an effort to establish that plaintiff's pre-bid site investigation was both reasonable and through, Mr. Bowman testified at trial that plaintiff's pre-bid investigation of the Channel and the Lost Lake Placement Area lasted "two days and one night," Tr. at

---

[6](...continued)
company, which involved monitoring contract compliance.  See generally id. at 17–47.  Some of Mr. Fisher's dredging contracts involved levee construction and repair work.  See id. at 41:19–44:6.  Much of Mr. Fisher's experience was acquired in the Texas Gulf Coast region, see, e.g., id. at 18:19–19:9, and he had experience dredging in and preparing bids for work in the Houston Ship Channel, see, e.g, id. at 19:1–18; 33:1–34:7; 35:19–36:4, including the preparation of bids for work that was within the reach of the dredging work covered in the Upper Bayou Project, see id. at 47:21–48:18.  Although Mr. Fisher was expected to testify at trial, see Pl.'s Witness List at 3, ¶ 4 (listing Mr. Fisher as a witness whom plaintiff expected to present at trial); Post-Pretrial Conference Order at 6 (reflecting the parties' proposed trial schedule, which shows Mr. Fisher testifying for 3½ hours), plaintiff declined to call him as a witness during the presentation of its case, Tr. at 1581:13–16.

Johnny Rozsypal is the Chief of the Construction Branch for the Corps' Galveston District.  JX 105B (Rozsypal Dep.) at 7:15–17.  In this capacity, he "[o]versees the [D]istrict's construction program, which . . . include[s] both vertical construction and dredging."  Id. at 7:20–21.

Louis Saenz is a project engineer in the Corps' Galveston District.  See generally JX 106B (Saenz Dep.) at 5.  He is responsible for developing plans and specifications for dredging jobs.  Id.

Burson Warren is the equipment manager of Renda Marine, Inc.  See JX 100A (Warren Dep.) at 18:13.

William J. Wetta is the president of Dredging Supply Company, the company from which plaintiff purchased the dredge used to perform the Upper Bayou Contract.  See JX 103A (Wetta Dep.) at 4:10–13.

552:6–7 (Bowman).  During cross-examination, defendant's counsel reminded Mr. Bowman of his deposition testimony that the investigation lasted only "one afternoon and one evening."  Tr. at 1501:10–12 (Def.'s Counsel) (quoting JX 99A (Bowman Dep.) at 37:14–15).  When confronted with his deposition, Mr. Bowman did not contradict his earlier testimony and conceded that a significant portion of this brief investigation took place "after dark."  See generally id. at 1500:13–1501:20 (colloquy between Mr. Bowman and def.'s counsel).  Similarly, in an effort to discredit the representations in plaintiff's Inspection Reports of Dredging concerning the character of materials encountered by plaintiff's dredge, Mr. Bowman testified that "it would not be obvious," whether the material flowing through the dredge pipe consisted of sands, clay or other material.  See Tr. at 1533:18–1534:12 (colloquy between Bowman and def.'s counsel).  When confronted with his deposition testimony that "it was real obvious [to the person monitoring the discharge pipe] when we were in the good clays, and it was obvious when we were in the sands, and it was obvious when were in what you call the maintenance material, which was the silt and clay," id. at 1535:2–5 (Def.'s Counsel) (quoting JX 99A (Bowman Dep.) at 145:10–14), Mr. Bowman did not attempt to correct or explain his earlier statements.

Two of the major participants in the relevant events were not called as witnesses at trial.  Plaintiffs did not call as a witness Eddie Fisher, its former Vice President.  Defendant had taken the precaution of designating Mr. Fisher's deposition as a trial exhibit.  The court has found the deposition to be a useful resource with respect to plaintiff's preparation of its bid, an important aspect of a differing site condition claim.  Defendant did not call as a witness Erik Russek, Project Engineer with the Corps.  Plaintiff had not taken the precaution of designating Mr. Russek's deposition as a trial exhibit.  Plaintiff argues that defendant's failure to call Mr. Russek "warrants a negative inference."  Pl.'s Reply at 14.  The proof of a differing site conditions claim, however, is focused on the actions of the plaintiff.  The court does not see how the absence of a government witness could be deployed to assist plaintiff in carrying its burden of proof.

II.     Applicable Legal Standards

A.      Standard of Review

The "Disputes" clause in the Upper Bayou Contract, see generally JX 1 (Solicitation) at 91 (incorporating FAR § 52-233-1 ("Disputes") (Oct. 1995) as a standard clause), provides that disputes arising under the Contract are to be governed by the Contract Disputes Act of 1978 (CDA), as amended, see generally 41 U.S.C. §§ 601–613 (2000).  The CDA imposes two "jurisdictional prerequisites," which must be met before a contractor may pursue a claim in this court.  E.g., England v. The Swanson Group, Inc.,

353 F.3d 1375, 1379 (Fed. Cir. 2004); Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1578-79 (Fed. Cir. 1994); Sharman Co. v. United States, 2 F.3d 1564, 1568–69 (Fed. Cir. 1993), overruled in part on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995).  First, "[a]ll claims by a contractor against the government relating to a contract . . . [must] be in writing and . . . be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a).  Second, "[t]he contracting officer [must] issue [a final] decision[] in writing, and . . . furnish a copy of the decision to the contractor."[7]  Id.

A contractor that satisfies the jurisdictional prerequisites and is dissatisfied with the contracting officer's decision may appeal that decision to the Court of Federal Claims "within twelve months from the date of the receipt by the contractor of the decision." 41 U.S.C. § 609(a)(3).  "In [such] . . . proceedings . . . 'the facts, as well as the law, are decided de novo by the . . . court.'" Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 414 (1993) (quoting Seaboard Lumber Co. v. United States, 903 F.2d 1560, 1562 (Fed. Cir. 1990)) (final alteration in original); see also 41 U.S.C. § 609(a)(1), (3) (providing that, "in lieu of appealing the decision of a contracting officer . . . to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims," within twelve months, and that such a "claim . . . shall proceed de novo in accordance with the rules of the appropriate court").   "Th[e] court is not bound by either the findings of fact or the conclusions [of law] of the [contracting officer]." Lathan Co. v. United States, 20 Cl. Ct. 122, 125 (1990); accord 41 U.S.C. § 605(a) ("Specific findings of fact[,] . . . if made [by the contracting officer], shall not be binding in any subsequent proceeding."); see also Rice Co., 03-188-1 B.C.A. (CCH) (Ag. B.C.A. June 13, 2005) ("[D]e novo review precludes reliance on the presumed correctness of a [contracting officer's] . . . decision[,] and once an action is brought[,] . . . the parties start in court . . . with a clean slate.").

B.      Plaintiff's Burden

"[W]here an appeal is taken to a board or court, the contracting officer's award" of time or money under the differing site conditions clause "is not to be treated as if it were the unappealed determination of a lower tribunal which is owed special deference or acceptance on appeal." Assurance Co. v. United States, 813 F.2d 1202, 1206 (Fed. Cir. 1987); accord Mega Constr., 29 Fed. Cl. at 414 ("The administrative award of time or money . . . is not to be treated as if it were the unappealed determination of a lower court

---

[7]If the contractor's claim exceeds $100,000 and the contracting officer fails either to issue a decision or to notify the contractor that a decision is forthcoming, the contracting officer's inaction is "deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim." 41 U.S.C. § 605(c)(2), (5).

or a board of contract appeals that might be owed some sort of special deference on appeal."). Because "the findings of fact in th[e] [contracting officer's] decision are not binding on the parties . . . [or] entitled to any deference[,]" the contractor bears the burden of proving by preponderant evidence "the fundamental facts of liability and damages de novo." Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (citing Servidone Constr. Corp. v. United States, 931 F.2d 860, 861 (Fed. Cir. 1991), William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir. 1984), and Blinderman Constr. Co. v. United States, 695 F.2d 552, 559 (Fed. Cir. 1982)); see also id. at 1401 ("[W]hen the claim being asserted by the contractor is based upon alleged government-caused delay, the contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor."). Further, "a contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision. De novo review precludes reliance upon the presumed correctness of the [prior] decision." Id. (citing Renegotiation Bd. v. Bannercraft Clothing Co., 415 U.S. 1, 23 (1974)).

The Federal Circuit has made clear that this court's de novo review extends not only to "final" decisions issued by contracting officers in response to contractor claims, but also to "interim" decisions by contracting officers, such as contract modifications, issued in response to contractor claims:

> Congress made it clear in the CDA that any findings by a contracting officer in a final decision are not binding in any subsequent proceeding. Although, by its terms, the CDA only applies to contracting officers' final decisions, in light of the policies underlying the CDA, we see no basis for drawing a distinction between an interim and a final decision of a contracting officer. Apart from finality, the interim decision . . . is indistinguishable from a final decision.

England v. Sherman R. Smoot Corp., 388 F.3d 844, 856 (Fed. Cir. 2004). Because interim decisions are subject to the same de novo review as a contracting officer's final decisions, see id., a contractor who undertakes an appeal of an interim award of partial relief must relitigate the entire claim–not only the portion of that claim that was denied by the contracting officer, see Transamerica Ins. Corp. v. United States, 28 Fed. Cl. 418, 423 (1993) ("[P]laintiff asks the court to deem plaintiff's request denied only as to the amount of the equitable relief adjustment. The court cannot engage in such piecemeal analysis. The modification is a unitary document upon which plaintiff sued.") (footnote omitted); accord Rice Co., 03-188-1 B.C.A. ("[T]he parties start in court . . . with a clean slate.") (interpreting and applying Smoot). Thus, where a contracting officer has awarded partial relief to a contractor through modifications awarding extra compensation or performance

time, a contractor appealing the claim which gave rise to that modification does not raise a rebuttable presumption that the government was responsible for the circumstances that resulted in the relief previously granted by the contracting officer. See George Sollitt, 64 Fed. Cl. at 245 ("[T]he Federal Circuit interprets the CDA as removing any rebuttable presumption of validity for either interim or final . . . decisions by the contracting officer.") (citing Smoot, 388 F.3d at 854). It follows that, where a contracting officer has not timely issued a final decision on a contractor's certified claim, the effect of that "deemed denial," see 41 U.S.C. § 605(c)(2), (5), is to "negate the . . . existence" of a previously-issued contract modification. Transamerica, 28 Fed. Cl. at 423 n.4. Because "the modification [is] a nullity, . . . plaintiff would be forced to litigate entitlement to the entire equitable adjustment amount." Id.; see also Appeal of M.A. Mortenson Co., 94-31 A.S.B.C.A. (CCH) (June 27, 2005) ("An interim decision such as [a contract modification] does not bind the government on appeal.") (citing Smoot, 388 F.3d at 856).

C.    Defendant's Duties

Under each contract it enters, the government has implied duties of good faith and fair dealing. See e.g., Centex Corp. v. United States, 395 F.3d 1283, 1306 (Fed. Cir. 2005) (recognizing "an implied covenant . . . of good faith and fair dealing"); Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1340 (Fed. Cir. 2000) (among government's contractual obligations are the implied duties of good faith and fair dealing). As this court recently observed in Short Bros., PLC v. United States:

> The implied duties of good faith and fair dealing "must attach to a specific substantive obligation, mutually assented to by the parties." Alaska v. United States, 35 Fed. Cl. 685, 704 (1996), aff'd, 119 F.3d 16 (Fed. Cir. 1997) (Table). . . . [T]he implied duties of good faith and fair dealing "do[ ] not form the basis for wholly new contract terms, particularly terms which would be inconsistent with the express terms of the agreement." Jarvis v. United States, 43 Fed. Cl. 529, 534 (1999).

In order to prove a claim based on the Government's breach of its implied obligation of good faith and fair dealing, the contractor must rebut a "presumption of regularity . . . that public officers perform their duties correctly, fairly, in good faith and in accordance with law and governing regulations[.]" Schism v. United States, 316 F.3d 1259, 1302 (Fed. Cir. 2002). The presumption of good faith "is valid and binding unless 'well-nigh irrefragable proof rebuts or overcomes it.'" Id. (quoting Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 795 (Fed. Cir. 1993)); Torncello v. United States, 681 F.2d 756, 770 (Ct. Cl. 1982) (stating that "the

11

government, unlike private parties, is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary"). Plaintiff's burden is "intended to be very difficult," requiring clear and convincing proof that the Government specifically intended to injure plaintiff. Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002). For example, "'[s]ubterfuges and evasions violate the obligation of good faith.'" Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988) (quoting Restatement § 205 cmt. d).

The aspect of the covenant of good faith and fair dealing that calls for non-interference is sometimes referred to as a duty to cooperate. Compare Centex Corp., 395 F.3d at 1304 (stating that the covenant of good faith and fair dealing "imposes obligations . . . that include the duty not to interfere with the other party's performance"), with, e.g., Olympus Corp. v. United States, 98 F.3d 1314, 1318 (Fed. Cir. 1996) ("Interference by the government with a contractor's access to the work site may constitute a breach of the government's duty to cooperate."). A breach of the duty to cooperate is actually a breach of the covenant of good faith and fair dealing. See Malone, 849 F.2d at 1445 (citing Restatement § 241(e) for proposition that "lack of diligence and interference with or failure to cooperate in the other party's performance" violates obligation of good faith). Failure to cooperate can give rise to a claim for breach of contract, see Malone, 849 F.2d at 1445-46, but such a claim must be discussed in the particular circumstances of the case, see Milmark Servs., Inc. v. United States, 731 F.2d 855, 859-60 (Fed. Cir. 1984).

In terms of "hindering performance," the implied duty not to hinder performance prohibits the Government, as with any other party to a contract, from "doing anything to prevent performance thereof by the [contractor] or that will hinder or delay him in its performance." Lewis-Nicholson, Inc. v. United States, 213 Ct. Cl. 192, 550 F.2d 26, 32 (1977). "Not only must the Government not breach this implied provision, the Government 'must do whatever is necessary to enable the contractor to perform.'" Id. at 32. Thus, the Government can violate the duty to cooperate by causing a delay in the contractor's performance. Id.

No. 98-894 C, 2005 U.S. Claims LEXIS 160, at **356-59 (Fed. Cl. June 10, 2005).

The Court of Claims has long recognized that an "implied duty of cooperation and noninterference . . . is inherent in any contract." S. A. Healy Co. v. United States, 576

12

F.2d 299, 306 (Ct. Cl. 1978); see also Whittaker Elec. Sys. v. Dalton, 124 F.3d 1443, 1447 (Fed. Cir. 1997) (government has an implied duty to cooperate with a contractor during contract performance). Concomitant with those duties, the government has an implied obligation not to hinder a contractor in its performance of a government contract. C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1542 (Fed. Cir. 1993) ("The government must avoid actions that unreasonably cause delay or hindrance to contract performance."); Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988); Blackstone Consulting, Inc. v. United States, 65 Fed. Cl. 463, 471 (2005); PCL Constr. Servs., Inc. v. United States, 47 Fed. Cl. 745, 801 (2000) (pointing out that a contractor is "entitled to both an extension of time within which to perform[] and recovery of excess costs associated with [a] delay" only if the government is the sole cause of the delay) (internal quotation and citations omitted); Peter Kiewit Sons' Co. v. United States, 151 F. Supp. 726, 731 (Ct. Cl. 1957) (discussing government's implied duty not to willfully or negligently interfere with a contractor's performance). If a breach of these implied duties "causes harm to [a contractor], the government may be found liable for damages." Trinity River Lumber Co. v. United States, Nos. 02-943C, 02-944C, 2005 WL 1459442, at *15 (Fed. Cl. June 20, 2005) (discussing cases in which the court found that government-caused delay "by unreasonably prolonging timber contract suspensions or by unreasonably provoking the suspension of a contract" constituted a breach of the implied duties to cooperate and not to hinder).

D.      Elements of a Claim for Type I Differing Site Conditions

Six of the eight claims for which liability was litigated at trial allege that plaintiff encountered Type I differing site conditions during its performance of the Upper Bayou Contract.[8] See Transcript of Pretrial Conference (Pretrial Tr.) at 271:13–15 (statement by plaintiff's counsel that "[t]he H[]L[&]P Tower claim is really a changed condition"); Pl.'s Br. at 1 ("Renda's claims [with two exceptions] principally arose from type I differing site conditions."). The Differing Site Conditions clause, see JX 1 (Solicitation) at 94, upon which plaintiff bases its claims provides that a contractor is entitled to an

---

[8]At the pretrial conference in this matter, defendant conceded that two object encountered by plaintiff's dredge–a steel Conex shipping container and a dredge stern swivel assembly–constituted Type II differing site conditions, see Transcript of Pretrial Conference (Pretrial Tr.) at 290:18-291:7 (statement of defendant's counsel), and that only damages would be litigated at trial, see id. at 291:8-11 (colloquy between defendant's counsel and the court); Post Pretrial Order of Feb. 23, 2005 at 3, ¶ 8(a) ("The government conceded that the Conex shipping container and dredge stern swivel assembly, encountered by plaintiff's dredge . . . constitute Type II differing site conditions."). During the pretrial conference, plaintiff stated that, with one exception, the claims to be litigated at trial were "Type I differ[ing] site conditions." Id. at 271:13-15.

equitable adjustment of the contract price and/or the time required for performance for, inter alia, "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract,"[9] FAR § 52.236-2(a)(1) (footnote added).  The purpose of the clause is

> to shift the risk of adverse subsurface or latent physical conditions from the contractor, who normally bears such risk under a fixed-price contract, to the government . . . [and] to take at least some of the gamble on subsurface conditions out of bidding.  Bidders need not weigh the cost and ease of making their own borings against the risk of encountering an adverse subsurface, and they need not consider how large a contingency should be added to the bid to cover the risk.  They will have no windfalls and no disasters.  The government benefits from more accurate bidding, without inflation for risks which may not eventuate.  It pays for difficult subsurface work only when it is encountered and was not indicated in the logs.

Olympus Corp. v. United States, 98 F.3d 1314, 1316–17 (Fed. Cir. 1996) (citing, inter alia, Foster Constr. C.A. & Williams Bros. Co. v. United States, 435 F.2d 873, 887 (Ct. Cl. 1970)); see also H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1343 (Fed. Cir. 1998) ("The purpose of the Differing Site Conditions clause is to allow contractors to submit more accurate bids by eliminating the need for contractors to inflate their bids to account for contingencies that may not occur.").  However, the clause is not intended to "shift the risk of all unanticipated adverse site conditions from the contractor to the government. Rather, the government bears only those risks that encourage 'more accurate bidding.'" Olympus, 98 F.3d at 1317 (quoting Foster, 435 F.2d at 887).

To prevail on each of its Type I differing site conditions claims, plaintiff must prove, by preponderant evidence, not only that plaintiff notified the contracting officer of each alleged differing site condition, but also that plaintiff satisfies all six elements of a Type I differing site conditions claim for each alleged condition.

1.      The Notice Requirement

When proving that it encountered a Type I differing site condition, a contractor must establish as a threshold matter that it "promptly, and before the conditions are disturbed, g[a]ve a written notice to the Contracting Officer" of the alleged differing site

---

[9]The FAR defines Type II differing site conditions, also known as "changed conditions," as "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract."  FAR § 52.236-2(a)(2).

condition.  FAR § 52.236-2(a).  Notwithstanding the language in the FAR, the requirement that notice be "in writing," has been relaxed by the courts.  "[N]otice need not be in any particular form[.  It] may . . . be oral and given to the contracting officer's representative . . . [and] may even be waived if the court finds that defendant had actual or constructive notice of the conditions encountered."  Dawco Constr., Inc. v. United States, 18 Cl. Ct. 682, 693 (1989) (citations omitted), rev'd in part on other grounds, 930 F.2d 872 (Fed. Cir. 1991); see also Engineered Maint. Servs., Inc. v. United States, 55 Fed. Cl. 637, 641 (2003) ("[N]otice need not be in any particular form . . .  (despite the FAR requirement of a writing) so long as it is sufficient to generally inform the Government of the facts surrounding the claim.").

When proceeding on a theory that the government had actual or constructive notice of a differing site condition, the contractor "may recover if [it proves that] defendant [was] not prejudiced by the lack of [written or oral] notice."  Dawco, 18 Cl. Ct. at 693.  The government may defeat recovery by proving that "it was prejudiced or disadvantaged by plaintiff's failure to give notice," id., and may satisfy this burden by establishing that "the passage of time obscured the elements of proof or [that] defendant could have minimized the extra work and attendant costs had notice been given," id. (citing Schnip Bldg. Co. v. United States, 645 F.2d 950, 959 (Ct. Cl. 1981) ("[P]laintiff's[] failure to render the notice . . .  and its completion of the [contract work] prior to submitting its claim prevented the Government from ascertaining whether the . . . problems resulted from a subsurface condition that was unexpected or from [plaintiff's own] use of an improper . . . procedure . . . .  The lack of a timely notice was prejudicial to the Government because it effectively prevented any verification of [plaintiff's] claim and also the employment of alternate remedial procedures.") (internal quotations omitted)).

Regardless of the form of the notice, a plaintiff-contractor bears the burden of proving that the contracting officer was timely informed of the alleged differing site condition.  E.g., Schnip, 645 F.2d 950 at 953-59; Dawco, 18 Cl. Ct. at 693.  "[O]nce [such] notice is given it need not be given again when the same conditions recur on the site."  Dawco, 18 Cl. Ct. at 693 (citing Allied Contractors, Inc. v. United States, 277 F.2d 464, 466 (Ct. Cl. 1960) ("[The contractor] filed a written notice originally[,] and . . . [need] not . . . file an additional claim for excess cost every time a new rock [is] discovered.").

> 2.  The "Indispensable Elements" of a Type I Differing Site Condition Claim

In addition to making a threshold showing of timely and proper notice, a contractor seeking to "establish entitlement to an equitable adjustment by reason of a Type 1 differing site condition . . . must prove, by a preponderance of the evidence, 'that the

conditions indicated in the contract differ materially from those [the contractor] encounter[ed] during performance.'" H.B. Mac, 153 F.3d at 1345 (quoting in part Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1581 (Fed. Cir. 1987)) (quotations omitted); see also Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed. Cir. 2001) (same).  To determine whether plaintiff has met this burden, "the court must place itself into the shoes of a 'reasonable and prudent' contractor," P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 917 (Fed. Cir. 1984), "and ascertain whether the conditions actually encountered were reasonably unforeseeable on the basis of all the information available to the contractor at the time of bidding," Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 94 (1989).

When applying this standard, courts require that the contractor establish by preponderant evidence "six indispensable elements . . . for each [differing site condition] claim":  (1) that the contract affirmatively indicated subsurface conditions upon which the contractor's claims are based; (2) that the plaintiff acted as a reasonably prudent contractor in interpreting the contract documents; (3) that the contractor reasonably relied on the indications of subsurface conditions in the contract; (4) that the subsurface conditions actually encountered differed materially from subsurface conditions indicated in the contract; (5) that the subsurface conditions encountered were reasonably unforeseeable; and (6) that the contractor's claimed excess costs were solely attributable to the materially different subsurface conditions.  Weeks Dredging & Contracting Inc. v. United States, 13 Cl. Ct. 193, 218 (1987).  Thus, a contractor must prove more than a mere difference between the information in the bid documents and the conditions encountered at the contract site.  The reasonableness of the contractor's conduct prior to submission of its bid and during performance and the absence of a contributing or concurrent cause of the contractor's alleged damages must be proven as well.

a.     Contract Must Affirmatively Represent the Subsurface
Conditions

A contractor's eligibility for an equitable adjustment for a Type I differing site condition depends on the subsurface conditions indicated in the contract and other bid documents.  See Comtrol, Inc. v. United States, 294 F.3d 1357, 1363 (Fed. Cir. 2002) ("A contractor is not eligible for an equitable adjustment for a Type I differing site  condition unless the contract indicated what that condition would be."); Lathan Co. v. United States, 20 Cl. Ct. 122, 126 (1990) ("If the contract is silent on the conditions of the site, plaintiff has no Type I claim.") (citing Foster, 435 F.2d at 881).  The "bid information or contract documents" must include

reasonably plain or positive indications . . . that [the] subsurface conditions
would be otherwise than actually found in contract performance, or to view

the other side of the coin, that there were such indications which induced reasonable reliance by the successful bidder that subsurface conditions would be more favorable than those encountered.

Pac. Alaska Contractors, Inc. v. United States, 436 F.2d 461, 469 (Ct. Cl. 1971). Although a Type I differing site condition cannot exist where "the plans and specifications do not 'show' or 'indicate' anything about the alleged unforeseen condition, i.e., if they say 'nothing one way or the other about [the subsurface condition],'" United Contractors v. United States, 368 F.2d 585, 595 (Ct. Cl. 1966) (quoting Ragonese v. United States, 120 F. Supp. 768, 769 (Ct. Cl. 1954)); Neal & Co. v. United States, 36 Fed. Cl. 600, 617 (1996) ("[W]here the contract is silent, a claim cannot arise."); Weeks, 13 Cl. Ct. at 219 ("Where the contract contains no affirmative (positive or negative) representations of the subsurface conditions . . . the government has no liability."), "'contract "indication[s]" need not be explicit or specific' so long as they provide sufficient grounds by which the contractor can justify his 'expectation of latent conditions materially different from those encountered.'" Neal, 36 Fed. Cl. at 617 (quoting P.J. Maffei, 732 F.2d at 916); accord Foster, 435 F.2d at 875 ("[A]ll that is required is that there be enough of an indication on the face of the contract documents for a bidder reasonably not to expect 'subsurface or latent physical conditions at the site differing materially from those indicated in this contract.'").

What is "indicated" by contract documents "is a matter of contract interpretation and thus presents a question of law" to be decided by the court. P.J. Maffei, 732 F.2d at 916; accord Foster, 435 F.2d at 880 ("The issue of the indications in the contract is one of law for decision by the tribunal, not an issue of fact to be proven by a preponderance of expert testimony[.]"). To determine what is "indicated," a "proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents." Randa/Madison, 239 F.3d at 1274 (quoting P.J. Maffei, 732 F.2d at 917) (internal quotations omitted). The term "'[c]ontract documents' can be interpreted with considerable breadth to include not only the bidding documents ([i]nvitation for bids, drawings, specifications and other documents physically furnished to bidders)[,] but [also] documents and materials mentioned in the bidding documents," McCormick Constr. Co. v. United States, 18 Cl. Ct. 259, 263 (1989), aff'd 907 F.2d 159 (Fed. Cir. 1990) (Table), as well as minutes of pre-bid conferences and summaries of those minutes, if distributed to bidders, see Appeal of Goss Fire Prot., Inc., 97-1 B.C.A. (CCH) ¶ 28,853 (Dep't of Transp. B.C.A. Mar. 19, 1997).

      b.     Contractor's Interpretation of Contract Documents Must be Reasonable

17

It is not enough that the contract documents affirmatively indicated the subsurface conditions upon which the contractor's claims are based. A contractor "is presumed to have the general skills of a reasonable contractor," Neal, 36 Fed. Cl. at 620, and must have acted as a "reasonable contractor" or "reasonable bidder," when interpreting those documents and forming its bid. See P.J. Maffei, 732 F.2d at 917; Youngdale & Sons Constr. Co. v. United States, 27 Fed. Cl. 516, 533 (1993).

A contractor "'does not bear the burden of interpreting [the] contract [documents] correctly, only of interpreting [them] reasonably.'" Mega Constr., 29 Fed. Cl. at 457 (quoting Salem Eng'g & Constr. Corp. v. United States, 2 Cl. Ct. 803, 807 (1983) (citing Max Drill, Inc. v. United States, 427 F.2d 1233, 1245 (1970))). For example, the contractor "is bound to inquire into obvious omissions or inconsistencies in the contract documents, and a contractor's interpretation cannot be reasonable 'if the ambiguity is obvious'" Id. (quoting Jamsar, Inc. v. United States, 442 F.2d 930, 934 (1971), and citing Salem, 2 Cl. Ct. at 807). Where a contractor fails to seek clarification prior to bidding, the contractor assumes the risk of unexpected costs flowing from a patent defect in the contract. E.g., Delcon Constr. Corp. v. United States, 27 Fed Cl. 634, 638 (1993) ("Had [the contractor] inquired in writing or sought clarification from the contracting officer, this misunderstanding, and this litigation, could have been avoided."). This duty to inquire is particularly robust where, as here, the contract contains an "omissions and misdescriptions" clause. FAR § 252.236-7001(d) (Aug. 2000); see JX 2 (Specs.) at 4, ¶ 1(d). Such a clause "cautions bidders that information contained in the contract documents may not accurately depict encountered conditions," Conner Bros. Constr. Co. v. United States, No. 99-735 C, 2005 U.S. Claims LEXIS 159, at *62 (Fed. Cl. June 10, 2005), and "places the burden on the contractor to correctly [perform] 'manifestly necessary' work . . . despite omissions or mistakes in contract drawings," George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 302 (2005).

"Although not expected to anticipate the worst-case scenario, [a contractor] is responsible for evaluating the available information and reasonably extracting from such information subsurface conditions." Fru-Con Const. Corp. v. United States, 44 Fed. Cl. 298, 309 (1999); see, e.g., Neal, 36 Fed. Cl. at 621 ("A reasonable site inspection would have disclosed the presence of [subsurface water seepage,] and a reasonable . . . contractor would have understood its implications."). For a contractor's pre-bid interpretation to be "reasonable," the contractor is expected to have done more than merely read the bid documents and visit the contract site. A reasonable contractor is expected to draw upon previous experience in the industry and/or region. E.g., id. ("[W]ater seepage is a 'common [problem] in Alaska:' Plaintiff was an Alaska contractor, and it had done work before on Kodiak Island. There is even less reason, therefore, to treat the minimal contract indications as an indication to an experienced Alaskan contractor that there would be no subsurface water seepage.") (citation omitted)

18

(second alteration in original).  A reasonable contractor also may be held responsible for information revealed at the government's pre-bid conference for prospective bidders. E.g., In the Appeal of Twigg Corp., 92-2 B.C.A. (CCH) ¶ 25,011 (NASA B.C.A. Apr. 17, 1992).  Although a contractor's failure to attend a pre-bid conference is not presumptively unreasonable, see, e.g., Appeal of Goss Fire Prot., Inc., 97-1 B.C.A. (CCH) ¶ 28,853 (noting that the contractor's "failure to attend the prebid conference [is not by itself] an impediment to recovery, since it had no legal obligation to attend the conference."), a contractor that "decide[s] not to attend . . . thereby risk[s] that it w[ill] not receive or understand information that could be material to its bid," In the Appeal of Twigg Corp., 92-2 B.C.A. (CCH) ¶ 25,011.

Thus, a contractor's reasonable interpretation of the contract documents is undertaken not in a vacuum, but in conjunction with information that should be known by a reasonable contractor in the field and could be learned from carefully reading the contract documents and conducting a reasonable inspection of the site.  See Neal, 36 Fed. Cl. at 621.  "'It is a rule that a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition.  Where he knows or has opportunity to learn the facts, he is unable to prove . . . that he was misled by the contract.'"  Spirit Leveling, 19 Cl. Ct. at 95 (quoting Vann v. United States, 420 F.2d 968, 982 (Ct. Cl. 1970) and citing Stuyvesant, 11 Cl. Ct. at 859).  However, contractors are not expected to know that which only an expert could derive from those materials.  See Kaiser Indus. Corp. v. United States, 340 F.2d 322, 330 (Ct. Cl. 1965).  Nor are they charged with knowledge of geological conditions not discoverable during a visual inspection of the site.  See Foster, 435 F.2d at 887–88.  Further, a contractor is not required "to conduct [costly and perhaps impossible] geological or other technical investigations" to supplement the bid documents, Foster, 435 F.2d at 888, but will be held responsible for all "direct or indirect representations as to subsurface . . . conditions on the site."  Neal, 36 Fed. Cl. at 617.

Where the bid documents contain or refer bidders to boring logs, the contractor is "held to the standard of a reasonably prudent contractor in deciphering the meaning of such logs."  Youngdale, 27 Fed. Cl. at 534.  Renda avers that it is reasonable for a contractor to take at face value the representations contained in soil borings because borings are "'recognized to be the "most reliable and . . . most specific indicator" of subsurface conditions.'"  Pl.'s Reply at 18 (quoting Foster, 435 F.2d at 888 (quoting United Contractors, 368 F.2d at 598)).  The court agrees with plaintiff that soil borings are so recognized, but notes two limitations to plaintiff's contention.  First, the court notes that, under certain circumstances, a contractor's "reliance on the Corps'[] out-of-date borings, and [the contractor's] conclusion that those borings represented the conditions which [the contractor] would face years later, [would] not [be] reasonable and prudent," in the context of other information available to the contractor prior to its bid.  Hardwick

Bros. Co., II v. United States, 36 Fed. Cl. 347, 379 (1996), aff'd 168 F.3d 1322 (Table) (Fed. Cir. 1998), cert. denied, 526 U.S. 1111 (1999).[10]

Second, the court notes that the information conveyed by boring logs is quite limited.  Borings may properly be viewed as contract "indications relat[ing] to the character and nature of each of the anticipated subsurface materials . . . (i.e., sands, clays, fines, gravel, eutaw, etc.)," but may not reasonably be viewed as indications of "the specific quantity of each such material."  Weeks, 13 Cl. Ct. at 220. As the court in Weeks explained:

> [A] reasonable and prudent contractor would conclude, based on the contract boring logs, that the government was positively representing the overall character of the type of materials to be expected and, within certain reasonable limits, where such materials would be found within the contract area. . . .  It is not at all clear from the contract documents how [a] plaintiff [could]  vault[] from the clear and unambiguous language depicting only the character . . . of each material in the several boring logs, to a claim that the government was simultaneously warranting the approximate, if not the precise, quantum of each category of subsurface materials by those same

---

[10]Both the Court of Federal Claims and the Federal Circuit explained that a finding of unreasonableness under these circumstances could not be construed as a requirement that "a 'reasonable' contractor . . . perform its own detailed soil borings."  Hardwick, 168 F.3d 1322 at **3.  Rather, the trial court determined that "information provided to potential bidders by the Corps 'on balance gave sufficient notice to reasonably prudent bidders of poor subsurface conditions, including the possibility of . . . soft soils,' and thus was 'generally adequate . . . to warn [the contractor] of the operational problems it encountered.'"  Id. (quoting with added emphasis Hardwick, 36 Fed. Cl. at 400).  The Federal Circuit explained that,

> where the information about the site is obviously not current, as indicated by the testing dates accompanying the boring data provided, a reasonable contractor would consider verifying the information rather than assuming that the site conditions remained consistent with that data. . . . [M]ore extensive boring data might have helped, but . . . regardless, [the contractor] had no reason to be surprised by the . . . conditions it encountered based on the information it already had.  Because . . . an experienced . . . contractor [nonetheless] made this incorrect assumption, the court wondered if [the contractor] perhaps did not understand the data provided and suggested that, in such circumstances, a reasonable contractor would hire an expert to interpret the data.  The [trial] court did not, however, impose hiring an expert as a legal pre-bid requirement.

Id. at **3 (citations omitted).

20

<u>character descriptions</u>. . . . [T]he only clear and unambiguous <u>quantity</u> estimate we find contained in the contract is the <u>gross</u> estimated total quantity of <u>all</u> subsurface materials to be excavated in the aggregate.

. . . .

_____ Moreover, what each boring log indicate[s] . . . as to the <u>location</u> of the various materials . . . <u>between</u> the several logs and throughout the project area, is relatively even less precise.

<u>Id.</u> at 220-21; <u>accord</u> <u>Stuyvesant</u>, 834 F.2d at 1581 (noting that "[g]overnment estimates are not warranties," and finding that a contract "provision set[ting] forth the 'total estimated quantity of material necessary to be removed from the prescribed [area]' . . . do[es] not rise even to the level of [an] estimate[].").  Thus, a contractor's claim that subsurface conditions between borings differed in location and quantity from the contractor's pre-bid extrapolations of subsurface conditions from the boring logs does not provide a reasonable basis for a Type I differing site conditions claim.  <u>Weeks</u>, 13 Cl. Ct. at 221.  Though derived from the boring logs, such extrapolations are not themselves affirmative indications of the subsurface conditions, but rather "hospitable assumptions, which, while necessary for the bid to proceed, are nonetheless <u>entirely of the contractor's own making</u>."  <u>Id.</u>  Because boring extrapolations from Corps logs represent the contractor's "<u>perception</u> of what the government was representing to be the materials throughout the entire project site," <u>id.</u> at 222, rather than a contract representation, contractors may not rely on their own perceptions as a basis for a Type I differing site conditions claim.  a contractor who does so assumes the risk of miscalculation and error.  <u>See</u> <u>id.</u> at 219 ("[T]he assumption of a perceived fact which prove[s] erroneous . . . is [unfortunately] a risk for which only the contractor must assume responsibility."  <u>Id.</u> at 219.

In sum, "[a] [g]overnment contractor, regardless of its size, locality, or experience, is [obligated] to understand the complexities and consequences of its undertaking," <u>Tony Downs Foods Co. v. United States</u>, 530 F.2d 367, 374 (Ct. Cl. 1976), and "to study all aspects of the contract . . . before submitting its bid," <u>Wickham Contracting, Inc. v. United States</u>, 546 F.2d 395, 398 (Ct. Cl. 1976); <u>cf.</u> <u>Dale Ingram, Inc. v. United States</u>, 475 F.2d 1177, 1184 (Ct. Cl. 1973) ("[A] contractor who submits his bid without reading all of the specifications does so at his peril.").  If, under the circumstances, a contractor's bid "was beneath industry standards," or the "Corps'[] own reasonable estimate," a court may conclude that the "bid was unreasonably low and not that of a reasonably prudent contractor."  <u>Hardwick</u>, 36 Fed. Cl. at 379–80; <u>see also</u> <u>id.</u> at 380 ("[B]ased upon a detailed review of plaintiff's actions and assumptions regarding the Plans and the job site, which included its undue reliance upon the Corps' borings, its failure to review the field

21

books[,] . . . its superficial and inadequate investigation of local conditions, its failure to anticipate . . . the possibility of . . . severe weather conditions at the site and, in general, its misconstruction of the Plans, the court concludes that under all circumstances here present, plaintiff's bid was below industry standards.").

       c.     Contractor Must Reasonably Rely on Contract Indications of Subsurface Conditions

"[A] crucial element of . . . a differing site conditions claim . . . is reliance.  To prevail on a differing site conditions claim, the contractor must show reliance on the representations in the contract."  Comtrol, 294 F.3d at 1363–64 (citing H.B. Mac, 153 F.3d at 1345 ("[T]o establish entitlement to an equitable adjustment by reason of a Type I differing site condition: . . . [t]he contractor . . . must show that it reasonably relied upon its interpretation of the contract and contract-related documents.")(alterations in original)).  Similarly, "where a contractor seeks an equitable adjustment based on a theory of defective specifications, there can be no recovery unless the contractor was actually misled by the erroneous statements in the specifications.  There can be no recovery if there was no reliance."  Comtrol, 294 F.3d at 1363.  In either case, a contractor must prove that, when "interpreting the bid data . . . it [not only] examined the contract documents and reasonably interpreted them, but [also] . . . that it relied on its interpretation when calculating its bid."  Neal, 36 Fed Cl. at 617 (internal quotation and citation omitted).

Further, the contractor's reliance must be reasonable and undertaken in good faith. "A Type I differing site conditions claim is intended to compensate a contractor that, in good faith, relies upon the available information to its detriment."  Fru-Con, 43 Fed. Cl. at 321.  Conversely, the contractor may not "rely on contract indications of the subsurface only [if] relatively simple inquiries might have revealed contrary conditions."  Foster, 435 F.2d at 888.

       d.     There Must Be a Material Difference Between Indicated and Encountered Conditions

For a contractor's Type I differing site conditions claim to succeed, the subsurface conditions actually encountered by the contractor at the contract site must have differed materially from the subsurface conditions indicated by the contract documents for the same site area. Youngdale, 27 Fed. Cl. at 535.  Proof of a material difference requires "a comparison of the subsurface conditions, both estimated and actual, contained within the precise work site as defined in the parties' contract."  Weeks, 13 Cl. Ct. at 228 (emphasis omitted).

What conditions actually were encountered by the contractor is a question of fact. See Arundel Corp. v. United States, 515 F.2d 1116, 1123 (Ct. Cl. 1975). "Evidence as to a material difference most commonly illustrates that a larger amount of work than initially contemplated or that an alternative method of workmanship must be implemented in order to complete the contractual agreement." McCormick, 18 Cl. Ct. at 263. However, "[c]laims alleging differences in anticipated quantity of [subsurface] materials, rather than differences in the character and nature [of materials], do not constitute a typical differing site condition claim," Spirit Leveling, 19 Cl. Ct. at 94; accord Appeal of Gulf Coast Trailing Co., 96-1 B.C.A. (CCH) ¶ 28,217 (Eng'rs B.C.A. Feb 16, 1996) ("The contract contained a specific . . . representation that debris was a principal material to be dredged, and Gulf Coast should have anticipated significant quantities of debris. Nor did Gulf Coast establish that the quantity of debris it encountered was unusual or that the quantity dredged would not normally have been expected for this area.").

e.      Actual Subsurface Conditions Must Be Reasonably Unforeseeable

It is not enough that the contractor encountered subsurface conditions that differed materially from those represented in the contract documents—the actual subsurface conditions encountered must have been reasonably unforeseeable based upon all information available to the contractor at the time it prepared and submitted its bid. Stuyvesant, 834 F.2d at 1581; United Contractors, 368 F.2d at 594. "In essence, the underlying issue in a Type I claim is whether the contractor could reasonably have anticipated the conditions encountered from a knowledgeable interpretation of the contract documents, his inspection of the site, and his general experience of a contractor." Erikson-Shaver Contracting Corp. v. United States, 9 Cl. Ct. 302, 304 (1985).

Where, as here, a contract contains the standard "Site Investigation and Conditions Affecting the Work" clause, FAR § 52.236-3 (Apr. 1984), see JX 1 (Solicitation) at 95, which provides in relevant part that "[t]he Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost," id., the contractor is "charged with knowledge of the conditions that a pre-bid site visit would have revealed," H.B. Mac, 153 F.3d at 1346; accord Ambrose-Augusterfer Corp. v. United States, 394 F.2d 536, 546 (Ct. Cl. 1968) ("The settled rule in cases of this type is that a contractor is bound by what it would have discovered if it had adequately investigated the site."); S.S. Mullen, Inc. v. United States, 389 F.2d 390, 393 (1968) ("[T]here was a standard 'Site Investigation' article. As the contractor, so far as appears, made no actual site investigation[,] . . . it is bound by what it would have discovered if it had investigated."). However, "the duty to make an inspection of the site does not . . . put[] the contractor at peril to discover hidden subsurface conditions or those

23

beyond the limits of an inspection appropriate to the time available." Foster, 435 F.2d at 888.

f.      Contractor's Claimed Excess Costs Must be Solely Attributable to the Materially Different Subsurface Condition

Even if a contractor establishes the five elements discussed above, it cannot recover damages unless it proves by a preponderance of the evidence that its increased performance costs "were solely attributable to the materially different subsurface conditions." Dawco, 18 Cl. Ct. at 688 (citing P.J. Maffei, 732 F.2d at 916 (citations omitted)); see also Spirit Leveling, 19 Cl. Ct. at 94 ("[T]he contractor must demonstrate that the excess costs are attributed entirely to the materially different subsurface conditions."). For example, "expenses which a contractor would have been required to expend anyway had no [differing site condition] occurred are not recoverable as part of an equitable adjustment." Dale Ingram, 475 F.2d at 1185. Further, "[c]oncurrent causes of excess cost, such as costs resulting from the contractor's own mistakes," or the mistakes of others, "must be carefully distinguished by the court." John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 511 (3d ed. 1995) (citing Weeks, 13 Cl. Ct. at 193). The court "must be careful to focus only on those damages directly attributable to the alleged differing site condition, and not on those damages for which concurrent causes, stemming from the plaintiff's own making, are equally to blame." Weeks, 13 Cl. Ct. at 240.

Because the causation analysis pertains as much to a contractor's liability as it does to damages, causation cannot be proven merely by pointing to testimony by a damages expert or to statements in that expert's report. Rather, "[i]t is for the plaintiff to show, by probative evidence, which separate causes by the government result in which identifiable periods of delay, before it can be said that plaintiff has carried its burden with respect to causation." Weeks, 13 Cl. Ct. at 240. Without such a showing, plaintiff cannot recover.

III.    Background to the Claims

The court presents the following facts to put into context the Upper Bayou Contract and the circumstances that preceded the award of the Contract to plaintiff. Additional facts specific to each claim will be introduced as necessary in the sections that follow.

A.      The Upper Bayou Contract

The Upper Bayou Contract (Contract) was the second in a series of eight dredging contracts awarded by the United States Corps of Engineers, Galveston District (Corps,

24

government, or defendant).  See Tr. at 3092:18–20 (C. Michael McClenan, Administrative Contracting Officer for the Upper Bayou Project); Defendant's Exhibit (DX) 309 (map of the Channel identifying the reach of the channel to be dredged under each contract).  Referred to collectively as the "45-foot Project," Tr. at 3087:5–7 (McClenan), three objectives of the contracts were (1) to "provide[] for cheaper transportation[,] . . . allowing deeper dra[ught] vessels to use the channel" by widening the bottom of the Channel; (2) to "improve[] . . . safety" by increasing the channel's depth to -45 feet Mean Low Tide (MLT); and (3) to "provide[] environmental enhancement." Id. at 3087:15–19 (McClenan).  Consistent with these objectives, the Upper Bayou Contract involved dredging a reach of the Channel, placing the dredge spoils at the Lost Lake Placement Area disposal site (Lost Lake), and mechanically and hydraulically raising the levees containing the dredge spoils at Lost Lake to +30 feet MLT.  See generally JX 2 (Specs.).

On January 26, 1998, the Corps issued the pre-solicitation notice for the Upper Bayou Contract, see DX 19 (Connole Report) at 1207 (copy of pre-solicitation announcement posted on the Commerce Business Daily Online website, http://cbdnet.access.gpo.gov/).  The Corps issued the Solicitation for the Upper Bayou Contract on June 16, 1998.  See JX 1 (Solicitation) at 1.  On June 23, 1998, the Corps' design team hosted a pre-bid conference with prospective contractors to answer questions about the Contract plans and specifications.  See JX 3 (Am. 1 to Solicitation) at 4. Following the conference, Amendment 1 to the Solicitation was issued on July 7, 1998. Id. at 1.  Bids were due on July 17, 1998.  See id. at 2, ¶ 1.  The Contract required the contractor to complete performance "not later than 446 calendar days after the date of receipt by it of the Notice to Proceed."  Id. at 2, ¶ 1(b)(2) (amending JX 2 (Specs.) at 14, ¶ 1).

1.    Dredging Specifications

The Specifications required the contractor to dredge a 20,606.58-foot (approximately 3.9-mile) reach of the Channel between Station (Sta.) 470+00 and Sta. 684+06.58,[11] increasing the width of the Channel bottom and deepening the Channel to –47 feet MLT.  JX 2 (Specs.) at 107, ¶ 1.1.1).[12]  When excavating in the Channel, the

---

[11]No dredging was permitted between Sta. 650+00 and 658+00, near the upstream limit of the project.  See JX 2 (Specs.) at 107–08, ¶ 1.1.1.

[12]Mr. McClenan explained that, in addition to deepening the Channel to -45 feet MLT, the Contract Specifications "add[ed] another two f[eet] for what we call advanced maintenance, so that we can allow the channel to shoal up a little bit before we have to deepen it again, so [the
(continued...)

contractor was required "to provide . . . final side and end slopes" in the Channel's dredge template of three horizontal to one vertical (3H:1V). Id. at 118, ¶¶ 3.5.2, 3.5.4.

Under the Contract, "[t]he total amount of material removed and to be paid for [was] measured by the cubic yard in-place." Id. at 111, ¶ 1.13.1); cf. JX 1 (Solicitation) at 3 (Bidding Schedule, Item No. 0008) (providing that the contractor would be paid for dredging work by the cubic yard). This measurement was determined by comparing the volume of material recorded in before-dredging (BD) surveys of a given dredging prism with the volume of material recorded in after-dredging (AD) surveys of the same prism. See JX 2 (Specs.) at 111, ¶ 1.13.1. For purposes of accepting and paying for dredging work under the Contract, the reach of the Channel subject to the Contract was divided into nine sections. See id. at 114–15, ¶ 3.3); JX 5 (Contract Drawings (Drawings)) at 2–3 (Dredging Plans).

In addition to authorizing payment for material dredged to the required depth of -47 feet MLT, the Contract stated that it took into account "inaccuracies of the dredging process" by paying the contractor the contractual unit price for one foot of "allowable overdepth," defined as material excavated "below required depth." JX 2 (Specs.) at 117–18, ¶¶ 3.5.1, 3.5.4. However, "[m]aterial taken from beyond the limits" of the one-foot allowable overdepth would "be deducted from the total amount dredged as excessive overdepth dredging," and would not be paid for. Id. at 118, ¶ 3.5.3. Similarly, the Specifications cautioned that no additional compensation would be paid for material dredged outside the required side and end slopes. Id.; see also id. at 118, ¶ 3.5.2 ("Material actually removed from within limits as approved, to provide for final side and end slopes . . ., but not in excess of the amounts originally above these limiting side and end slopes will be estimated and paid for."). The Contract Drawings also contained a note stating that "[t]he Contractor shall be required to use caution when dredging the side slopes in the channel from Sta. 470+00 to Sta. 473+00, from Sta. 514+00 to Sta. 537+00, and from Sta. 610+00 to Sta. 625+00. See Specifications." JX 5 (Drawings) at 2, n.4. The referenced Specifications repeated this instruction and explained that

> [e]xcessive cutting outside the side slope lines and grades in these reaches
> of the Channel may cause damage to existing structures along the Channel.
> If the Contracting Officer determines that excessive cutting of the side

---

[12](...continued)
Contract] actually shows an extension of the [C]hannel that would go out to the 47-foot contour." Tr. at 3089:16–22; cf. JX 98A (Fisher Dep.) at 19:21–25 (explaining the concept of shoaling: "When you make an artificial channel, nature tries to return it to the state that it was previously, and material that is suspended or comes through runoff from drainage channels will sooner or later fill the channel to some degree or another.").

slopes in these reaches causes failure of existing structures, the Contractor shall be responsible for restoring the structures to their pre-dredging condition.  Therefore, the Contractor may consider shaping the top of the cut in these reaches by using the dredge cutter head or mechanical equipment.

JX 2 (Specs.) at 118, ¶ 3.5.2.

The Specifications provided some information concerning the soils and debris that might be encountered during dredging.  The "Character of Materials" clause stated that "[e]xplorations, including core borings, to determine the character of materials to be removed have been made by the Government."  Id. at 110, ¶ 1.11.  The results of the soil borings, which had been taken at various times between 1961 and 1997, were included with the Solicitation.  See generally JX 5 (Drawings) at 19–22 (Logs of Channel Borings); cf. id. at 23–27 (Logs of Lost Lake Borings).  However, the Contract Drawings contained a note advising the contractor that "dredging ha[d] occurred" after surveys of Lost Lake were taken in April and December of 1997, see id. at 14 n.2; accord JX 98A (Fisher Dep.) at 226:14–17 (stating that the Channel was "maintenance [dredged by the Corps] . . . every two years,"); Tr. at 846:11-14 (Bowman testifying that, at the time plaintiff prepared its bid, it understood that "all but . . . about 1700 or 1800 feet of the 22[,000 to] 23,000 feet of [the Channel] had been maintenance dredged within the last 3 years."), and the Specifications stated that "[t]he Contractor [was] . . . expected to examine the site of the work and make its own determination as to the character of the materials to be dredged."  JX 2 (Specs.) at 110, ¶ 1.11.

The "Character of Materials" clause advised that "[o]ther materials such as scrap, rope, wire cable, snags, and stumps may be encountered within the specified limits of required dredging and overdepth dredging.  No separa[t]e payment will be made for removal and placement of this debris."  Id. at 110, ¶ 1.11.1.  The Specifications contained guidelines for locating and handling debris:

Prior to dredging, the Contractor shall carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the Contractor deems suitable to locate any debris which may interfere with dredging. . . .  During the progress of the work, the Contractor shall not deposit worn out discharge pipe, wire rope, scrap metal, timbers, or other such rubbish or obstructive material in the Placement Areas, or along the banks of the navigable waters.  Such material, together with scrap, rope, wire cable, piles, pipe, or other obstructive material which may be encountered during the dredging operations, shall be placed by the Contractor at approved locations.

27

Id. at 117, ¶ 3.4.4.2.

"The total estimated quantity of [non-debris] material . . . to be removed from the required dredging prism, exclusive of allowable overdepth . . . [was] 3,105,500 cubic yards [in-]place measurement." Id. at 113, ¶ 3.1.1. According to the Specifications, there was a total estimated pay quantity of 3,483,700 cubic yards of material to be dredged, including allowable overdepth. Id. at 114–15, ¶ 3.3. In addition, the Specifications provided that "[m]isplaced [e]xcavated [m]aterial," defined as "[e]xcavated material that is deposited in places other than those designated or approved" would "not be paid for, and the Contractor may be required to remove such misplaced excavated material and deposit it where directed at [the] Contractor's expense." Id. at 116, ¶ 3.4.4.1.

2.      Levee Specifications

The Contract specified that material dredged from the Channel was to be transported by pipeline and placed at Lost Lake, a 670-acre disposal site for dredged material. See JX 2 (Specs.) at 61 (Attach. A), ¶ 1.1. Located at approximately Sta. 480+00, "[t]he [Lost Lake] Placement Area drains into the Upper Bayou of the Houston Ship Channel which flows into Galveston Bay." Id. at 61, ¶ 1.4. At the time the Contract was drafted, there was an existing containment levee around the approximately four-mile perimeter of Lost Lake. See JX 5 (Drawings) at 14. The Contract required a new perimeter levee to be constructed inside the existing levee using both mechanical[13] and hydraulic[14] construction methods, see id. at 14, nn. 8–9, and directed that the new levee would "be raised to a minimum crest elevation of +30 feet MLT, with crest width of at least 10 feet, and side slopes no steeper than 1V[ertical]:3H[orizontal]," id. at 14, n.7.

A note on the Contract Drawings advised prospective bidders that "[t]he foundation of the [entire] levee is very soft to soft dredged material, and sand placed in past dredging maintenance cycles.[15] It is anticipated that very soft to soft foundation

---

[13]Mechanical levee construction requires "excavat[ion of levee building materials] using draglines, backhoes, dozers . . . , transport[ation] to the levee site, and place[ment] in layers not exceeding 18 inches in thickness before compaction." JX 2 (Specs.) at 102, ¶ 3.1.1.

[14]Hydraulic levee construction requires that materials dredged be pumped to the levee construction site. JX 2 (Specs.) at 103, ¶¶ 3.1.2, 3.1.3.

[15]As Mr. Rozsypal explained, Lost Lake

is pretty strategic in its location along the Houston Ship Channel in that it's in a reach that we dredge relatively often and we have to have a place to put or place

(continued...)

28

material will be displaced by the new levee material." Id. at 14, n.10; cf. id. at 23–27 (Logs of Lost Lake Borings); accord id. at 17 (Section and Plan at New Drop-Outlet Structure) n.1 ("Construct levee section to a minimum elev[ation] +19 [feet] and place surcharge f[i]ll in order to displace the soft foundation.").  The relationship between the soft foundations and the design of the levees was apparently discussed several times during the pre-bid conference.  See generally JX 3 (Am. 1 of Solicitation) (publishing "[q]uestions by [p]rospective [b]idders and [a]nswers by the Galveston District Design Team" from the pre-bid conference).  For example, in response to the comment that "[e]xisting levees in hydraulic constructed levee reach should be raised prior to dredging in order to maintain the required 2-ft[.] of freeboard," id. at 6, the Corps responded:

> The designers believe a more flexible approach is possible, where the hydraulic dredging can occur to place material to raise the levees while containing the produced fines inside the existing placement area. This will be the most efficient way to displace the soft levee foundation material beneath the new levee alignment.

Id.  Similarly, in response to the question, "Why is the levee alignment so far from the perimeter where the foundation is crummy?  It makes it harder to build on weaker ground.  What's the purpose of leaving a hundred feet . . . on the outside where the base is the best?," id. at 7, the Corps replied:

---

[15](...continued)
that material and there is not a[nother] disposal area above Lost Lake for . . . some 30,000 feet.

> So, you have a significant volume of material that we . . . have to put somewhere.  So, again, it's there to receive material dredged from the Houston Ship Channel for a considerable reach.

JX 105B (Rozypal Dep.) at 27:16–28:7.  The reach of the Channel near Lost Lake was maintenance dredged "every two to three years," id. at 29:24, and the containment levees at Lost Lake were raised just as frequently, id. at 29:9.  According to Mr. Rozsypal, the levees were raised frequently "because we needed a higher levee.  Routinely on our maintenance dredging jobs, we would only go in and raise the levees enough to accommodate that job plus maybe one more.  And so, we would have to then come back and raise it again." Id. at 29:12-16.

The intent of the design is to use the new work material[16] to enhance the long term stability of the levees. For this reason, the designers intend the new work material to be used to displace the very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material.

Id. (footnote added).

> a.    Mechanical Levee Construction

The Specifications contained an "Order of Work" provision for "Retaining Levees," see JX 2 (Specs.) at 100, ¶ 1.4.3, providing that all mechanical levee construction was to be "fully complete . . . prior to beginning work on placement of the Hydraulically Constructed Levees," id. ¶ 1.4.3(1). This provision specified that the contractor was to construct a new drop-outlet structure[17] at the northeast corner of Lost Lake, modify the existing drop-outlet structure at the northwest corner of Lost Lake, and mechanically construct the portions of the levee located on the south side of Lost Lake and near both Drop-Outlet structures prior to placing the hydraulically-constructed part of the new perimeter levee (hydraulic levee) on the west, east and north sides of Lost Lake. Id.; see also JX 5 (Drawings) at 14 nn.8–9.

---

[16]"New work [or "virgin"] material . . . [is] earth [taken from] . . . areas that have never been excavated before." Tr. at 395:32–34 (Bowman). New work material is excavated during "new work dredging," defined as "the creation or alteration of an existing channel to a prescribed depth or width." JX 98A (Fisher Dep.) at 20:8–10. By contrast, "[m]aintenance dredging is the dredging of a channel that has previously been dredged to its authorized depth, and it's being dredged again to remove material that has shoaled in since the time it was dredged." Id. at 19:14–18; see also JX 103A (Wetta Dep.) at 43:1–5 ("Maintenance dredging is basically cleaning up an area that's been dredged before. It's not virgin dredging, so it would be removing silt and deposits that have happened after dredging has already taken place.").

[17]The drop-outlet structures, also known as spill boxes, Tr. at 3198:24–3199:31 (McClenan), "control the discharge of fluids [that accumulated in Lost Lake] back into the . . . San Jacinto River," id. at 500:19–20 (Bowman). A drop-outlet structure contains a "mechanism . . . for boarding up . . . which allows you to adjust the level of the water [in the placement area]. And you can control the discharge for water quality." Id. at 500:21–24 (Bowman). "Usually in a placement area, you'll have two out[let] structures . . . . If you're pumping [dredge spoils] in close to one, then you'd want to [close off that one and] drain from the other one, because you want all the [solid] material to settle before it goes out the spill box because you're supposed to put clear water back into the bay or the bayou." Id. at 3199:4–11 (McClenan).

The 6,900 feet of mechanically-constructed levee (mechanical levee) were to be built using material "obtained from . . . designated borrow areas" at Lost Lake.  JX 2 (Specs.) at 102, ¶ 3.1.1; see also JX 5 (Drawings) at 14 & n.8 (showing two borrow areas on the south side of Lost Lake).  This material was to "be excavated using draglines, backhoes, dozers, or other suitable equipment, [and] transported to the levee site."  JX 2 (Specs.) at 102, ¶ 3.1.1.  The mechanical levees were to be raised by layering 18-inch thick "lifts" of material prior to compaction by a "crawler-type tractor," id., except in areas having standing water or soft foundations, where "borrow materials [had to] be placed in a single lift (layer) as required to support hauling and compacting equipment," id. at 102–03, ¶ 3.1.1.  When mechanically constructing the sections of levee located near the new Drop-Outlet structure, the contractor was instructed to "[c]onstruct [the] levee section to a minimum elev[ation of] +19 [feet] and place surcharge f[i]ll in order to displace the soft foundation."  JX 5 (Drawings) at 17 n.1 (Section and Plan at New Drop-Outlet Structure).

The Contract anticipated that 381,300 cubic yards of fill material would be required to raise the 6,900 feet of mechanical levee to +30 feet MLT.  See JX 1 at 3 (Bidding Schedule Item No. 0002).  The total cubic yardage of material used by the contractor to construct the mechanical levees would be calculated by comparing pre- and post-construction "cross sections taken at the borrow area[s]" from which the fill was excavated.  JX 2 (Specs.) at 101, ¶ 1.5.1.  The Corps would pay for mechanical levee construction by the cubic yard excavated, at the unit price per cubic yard bid by the contractor.  Id. at 101, ¶ 1.6.1.

b.    Hydraulic Levee Construction

After the mechanical levees were completed, levees on the west, east and north sides of Lost Lake were to be raised by hydraulically placing "medium to hard clays and sands, as described on the Logs of Borings, . . . obtained from the required dredging."  Id. at 102, ¶ 2.2.1; see also id. at 103, ¶ 3.1.4 ("Suitable materials obtained from the required dredging shall be used for placement of the Hydraulically Constructed Levees.").  The Corps' levee design team believed that dredging would yield "sufficient new work material . . . to construct the levees hydraulically where indicated, even allowing for the soft foundations, without having to mine."  JX 3 (Am. 1 to Solicitation) at 5 (answering questions from the pre-bid conference).  Accordingly, the Contract provided that, "[i]f, upon completion of required dredging . . . sufficient suitable materials [were] not available to complete the Hydraulically Constructed Levees to the lines and grades specified, the Contractor [would] be required to complete the [h]ydraulic[] . . . [l]evees

31

with suitable materials obtained from mining below the Channel template."[18]  JX 2 (Specs.) at 103, ¶ 3.1.4.  According to the designers, "[a]n area for mining was established only in the event that the Contractor chose to place the material in such a way as to exhaust the available pay new work material before levee raising was complete."  JX 3 (Am. 1 to Solicitation) at 5.  However, mining would "not be measured for payment." JX 2 (Specs.) at 101, ¶ 1.5.3.

The Specifications set out a two-step process for constructing the hydraulic levees. First, before raising any portion of the hydraulic levee to the required height of +30 feet MLT, the contractor was to "place [the] [h]ydraulically [c]onstructed [l]evees . . . until the entire perimeter levee has been completed to Elevation +20 feet [MLT]."  JX 2 at 100 (Specs.), ¶ 1.4.3(2), as modified by JX 3 at 2 (Am. 1 to Solicitation), ¶ (1)(b)(9).[19]  To raise the hydraulic levee to +20 feet MLT, "[t]he Contractor [was required] evenly [to] distribute sufficient hydraulic material at all locations along the levee so that the final new levee section [could] be constructed to the minimum lines and grades."  JX 2 (Specs.) at 103, ¶ 3.1.2.

Second, after the entire hydraulic levee had been constructed to at least +20 feet MLT, the contractor was permitted to raise the levee to +30 feet MLT mechanically, by "excavat[ing] material from the adjacent existing levee" and using that material to shape the new levee to the lines and grades specified in the Contract.  Id. at 103, ¶ 3.1.2; cf. JX 3 (Am. 1 to Solicitation) at 2, ¶ 1(b)(10) ("The [c]ontractor shall not be permitted to grade the area outside the slope of the newly constructed levee until the entire perimeter levee has been completed to Elevation +20 feet MLT.")[20]; JX 2 (Specs.) at 103, ¶ 3.1.5

---

[18]The Contract Drawings noted that, if additional material was required to construct the levees, the contractor was to mine the Channel from Sta. 470+00 to Sta. 514+00.  See JX 5 (Drawings) at 3 (unnumbered note).

[19]As originally drafted, paragraph 1.4.3(2) stated:  "The Contractor shall place Hydraulically Constructed Levees . . . until the entire perimeter levee has been completed to the lines and grades shown."  JX 2 (Specs.) at 100, ¶ 1.4.3(2).  Amendment 1 to the Specifications, see generally JX 3, was issued on July 7, 1998—ten days before bids were due for the Upper Bayou Contract, see id. at 2, ¶ 1, and replaced the phrase "to the lines and grades shown," with the phrase, "to Elevation +20 feet Mean Low Tide (MLT)."  JX 3 at 2, ¶ 1(b)(9).

[20]As originally drafted, the Solicitation stated:  "Upon completion of the entire perimeter levee to the lines and grades shown, the Contractor shall be required to grade the area outside the slope of the newly constructed levee to drain away from the levee as shown."  JX 2 (Specs.) at 100, ¶1.4.3(3).  Amendment 1 of the Solicitation deleted this provision and replaced it with the following: "The Contractor shall not be permitted to grade the area outside the slope of the newly

(continued...)

("[M]aterial shall not be removed from the existing levee until the new levee crest exceeds Elevation +20 feet Mean Low Tide around the entire Placement Area."). "During the shaping process, the material shall be placed using the same lift thickness and compaction requirements as those required for the Mechanically Constructed Levees." Id. at 103, ¶ 3.1.2.

The hydraulic levee was to be measured and paid by the "linear foot of levee constructed to the minimum lines and grades shown" in the Drawings, based upon the unit price per linear foot bid by the contractor.  JX 2 (Specs.) at 101, ¶¶ 1.5.2, 1.6.2; see also JX 1 at 3 (Bidding Schedule Item No. 0006 ("Hydraulically Constructed Levees")). The Solicitation included drawings of fourteen levee cross-sections, see generally JX 5 (Drawings) at 15–16.  The Drawings each show a section of levee with a minimum height of +30 feet MLT, a minimum crest of ten feet and a minimum slope to drain ratio of 3H:1V.  Id.

3.    FAR Clauses

The Upper Bayou Contract contained a number of standard Federal Acquisition Regulation (FAR) clauses, see generally JX 1 at 5–131, including the "Disputes" clause, FAR 52.233-1 (Oct. 1995), see id. at 91; the "Differing Site Conditions" clause, FAR § 52.236-2 (Apr. 1984), see id. at 94; the "Site Investigation and Conditions Affecting the Work" clause, FAR § 52.236-3 (Apr. 1984), see id. at 95; the "Suspension of Work" clause, FAR § 52.242-14 (Apr. 1984), see id. at 104; and the "Changes" clause, FAR § 52.243-4 (Aug. 1987), see id. at 104–05.

The Contract also contained several "Special Clauses," see generally JX 2 (Specs.) at 3–12, including an "omissions and misdescriptions clause," see FAR 252.236-7001(d), which stated:

Omissions from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of work, but shall be performed as if fully and correctly set forth and described in the drawings and specifications.

JX 2 (Specs) at 4, ¶ 1(d).

_____

[20](...continued)
constructed levee until the entire perimeter levee has been completed to Elevation +20 feet MLT."  JX 3 at 2, ¶ 1(b)(10).

Also among the "Special Clauses" in the Contract was a "Physical Data" clause, see FAR § 52.236-4 (Apr. 1984), which provided that

> [d]ata and information furnished or referred to [in the Specifications] is for the Contractor's information.  The Government shall not be responsible for the interpretation of or conclusion drawn from the data or information by the Contractor.
>
> (a)      The indications of physical conditions on the drawings and in the specifications are the result of site investigations by surveys and subsurface borings.

JX 2 (Specs.) at 6, ¶ 2.[21]

      **B.**      **The Award of the Upper Bayou Contract**

---

[21]The Contract also included as a "Special Clause" the Corps' "Equipment Ownership and Operating Expense Schedule" clause, FAR § 52.231-5000 (Mar. 1995), which provided that, in the event of a successful claim by the contractor against the government, damages would be calculated as follows:

> Allowable cost for construction and marine plant and equipment in sound and workable condition owned or controlled and furnished by a contractor . . . shall be based on actual cost data for each piece of equipment or groups of similar serial and series for which the Government can determine both ownership and operating costs from the contractor's accounting records.  When both ownership and operating costs cannot be determined . . . from the contractor's accounting records, costs for that equipment shall be based upon the applicable provisions of EP 1110-1-8, Construction Equipment Ownership and Operating Expense Schedule, Region VI.  Working conditions shall be considered to be average for determining equipment rates using the schedule unless specified otherwise by the contracting officer.  For equipment not included in the schedule, rates for comparable pieces of equipment may be used or a rate may be developed using the formula provided in the schedule.

JX 2 (Specs.) at 9, ¶ 7(b).  This clause provided that "[f]or retroactive pricing, the schedule in effect at the time the work was performed shall apply."  Id.  The parties agree that the June 1999 version of the EP Manual, see generally DX 43, was in effect at the time the claims arose in this case.  See, e.g., Pl.'s Reply at 10 ("The date of publication for th[e] fuel cost [listed in the EP Manual] is 30 June 1999."); Def.'s Br. at 38 ("The . . . expense schedule in effect during Renda's performance of the [Contract] is the June 1999 version of [the] EP [Manual].").

1.      Renda Marine, Inc.

Plaintiff Renda Marine, Inc. is a marine dredging contractor.  Compl. at 2, ¶ 1.
Referred to as the "marine division" of Oscar Renda Contracting, Inc. (ORCI), see, e.g.,
JX 100A (Dep. of Burson Warren, Equipment Manager for RMI, in Renda Marine Inc. v.
Dredging Supply Company, No. H-00-1721 (S.D. Tex.) (RMI v. DSC)) (Warren DSC
Dep.), at 17:14–15; Renda was formed in May 1998, see Tr. at 1479:5–7 (Bowman), after
ORCI successfully completed a construction contract for the "White Rock Lake" project,
see, e.g., JX 98A (Fisher Dep.) at 55:1–5,[22] which involved "dredg[ing] sediment that had
accumulated in a lake . . . in the middle of Dallas, and pumping the material by slurry to a
placement area quite some distance away," id. at 55:2–5.

Prior to the White Rock Lake project, ORCI never had owned or operated a
hydraulic cutterhead suction dredge, which was the type of equipment required to perform
the White Rock Lake contract.  See JX 97A (Warren DSC Dep.) at 13:9–14:1.
Accordingly, ORCI subcontracted the hydraulic cutterhead dredging work to Soli-Flo, a
subsidiary of the Fluor Daniel construction company.  See JX 98A (Fisher Dep.) at
50:25–51:27.

During the performance of the White Rock lake contract, ORCI "purchased the
assets and contract obligations of Soli-Flo," id. at 57:2–3, and "completed the project
using the Dredge White Rock," id. at 57:20–21.  After ORCI purchased the assets of Soli-
Flo, Mr. Fisher, who had been Soli-Flo's "project manager for the White Rock Lake
project," id. at 51:20–21, assumed the role of project manager for ORCI's dredging
operations, "supervising all of the production of the dredge and most of the work with the
slurry transport system."  Id. at 57:24–58:10.

In the spring of 1998, see id. at 58:12-17, Mr. Fisher entered into discussions with
Rudy J. Renda and Steven Bowman "about plans for the Dredge White Rock and related
equipment following completion of the White Rock Lake project."  JX 98A (Fisher Dep.)
at 63:7–10.  During these discussions Messrs. Renda, Bowman and Fisher decided "to
form a marine group and bid and acquire[] several jobs in the South Texas area."  Tr. at
326:22–25 (Bowman).

Messrs. Fisher, Bowman and Rudy J. Renda served as vice presidents for Renda
Marine from its inception, and each was responsible for a different aspect of the business.
Eddie Fisher "ran the marine division."  Id. at 16:8–9.  Steve Bowman assumed

---

[22]The court assumes that the parties referred to this project by the name "White Rock
Lake" because the contract involved "dredging . . . an urban lake in Dallas.  See Tr. at 326:15–20
(Bowman).

responsibility for the daily administration of Renda's marine contracts the day after Mr. Fisher resigned in July 2000.  See Tr. at 1483:19–25 (Bowman).

"Eddie Fisher resigned from Renda Marine, Inc. on July 30, 2000."  Tr. at 1483:19–21 (Bowman).  During his deposition, Mr. Fisher acknowledged that he had "'resigned [his] position . . . as vice president of Renda Marine, Inc., due to differences in management philosophies with the owners and directors of the company.'" JX 98A (Fisher Dep.) at 347:25-348:3 (Fisher acknowledging statement of defendant's counsel) (quoting an email from Fisher to defendant's contracting officer).  When asked to explain these "differences," Mr. Fisher testified:

> The differences that I had that led me to resign were we had to choose when we were with Renda Marine of going down two directions.  The Corps was not welcoming us at all to the district and were fighting us tooth and nail on being able to settle even the littlest of claims, and we had to choose whether we were going to try to go attack—building alliances with other dredging contractors within the district that were already accepted by the Corps, or whether we were going to continue . . . fighting with claims and battles.
>
> I was pushing more of a position that we needed to build some alliances with other firms and try to get on the good side of the Corps because we weren't getting anywhere with the claims.  They were fighting us tooth and nail.  And I thought we were at a crossroads in the Upper Bayou Project, and it was kind of a point of no return where we would be doing claims forever.

Id. at 348:18–349:11.  When confronted with his deposition from the RMI v. DSC litigation, Mr. Fisher admitted that several disagreements with plaintiff's management concerned plaintiff's claims under the Upper Bayou Contract:

> Q:    I'm reading from your deposition in the litigation between Renda Marine and Dredging Supply Company . . . .  Question:  "Why did you leave Renda Marine?"
>
> Answer:  "I had some philosophical differences with management."
>
> Question:  "And what was that?"
>
> Answer:  "It was really two areas.  One of the areas is that I disagreed with how some of the issues with the Corps and the claims

were being pursued.  And another area was just management style and practice."

. . . .

Question:  " . . . .  What was the problem with the claims with the Corps?"

Answer:  "We had a large claim with the Bolivar Marsh job, which was, in my opinion, a very soundly based claim, and I proceeded with that and brought in consultants and we settled that—that issue. But I had disagreements primarily with Oscar Renda about some of the claims for the Upper Bayou Project."

Question:  "And what were those?"

Answer:  "They had to do with the type of material that was being pumped to the hydraulic levees.  Really a lot of issues, a lot of different issues."

Question:  "I'm afraid we're going to have to get into them.  Can you be a little more specific?"

Answer:  "It was—on the Upper Bayou Project, Oscar had wanted to file requests for equitable adjustments on some areas that I believed were contractual responsibilities, such as—"

Question:  "Under the primary contract?"

Answer:  "Under the primary contract.  And they had to do with . . . [t]he type of material that was available for building the levees, the amount of trash and debris that was in the cut were two of the specific items, and there were also issues at the mouth of the Colorado."

Q:     Do you recall being asked those questions and giving those responses at your deposition in the Dredging Supply Litigation?

A:     Yes.

Mr. Erikson:   Would you like to review your deposition?

A:      No.

Id. at 350:24–352:24.  Defendant's counsel pressed Mr. Fisher for the details of his disagreements with plaintiff's management concerning the Upper Bayou Contract.  Mr. Fisher testified that he could not remember the basis for the dispute concerning the hydraulically-placed levees, id. at 353:6–7, but did recall other specific disputes:

> I remember that one of the disagreements that I did have with Oscar [Renda] was about some of the trash, especially by the ferry landing, that I thought that that was minor and that we should probably try to negotiate our way out of that one.  And he wanted to include everything in it, and I wasn't in complete agreement with that.

Id. at 353:11–17.  When asked to clarify the phrase, "include everything in it," id. at 353:18–19, Mr. Fisher continued:

> Again, it was . . . a philosophical difference.  [Oscar Renda] perceived that the Corps was not going to be negotiable on any of these items and that we just needed to start building to include them in a claim, and I felt that we needed to work harder to try to get the Corps to make adjustments in change orders.

Id. at 353:20–354:1.

According to Mr. Fisher, when Renda was formed in May 1998, the three vice presidents pursued a two-pronged "business plan" for the new company:  First, Renda would continue to profit from its existing dredge, the White Rock, by bidding on "[s]pecialty[-]type contracts . . . similar to . . . the White Rock Lake project . . . where a portable dredge [like the White Rock] would be needed," id. at 68:15–18, as well as smaller "maintenance dredging contracts along the intercoastal waterway," id. at 69:2–3.  The second prong of Renda's business plan was to break into the lucrative maintenance dredging market because "[m]ost of the dredging [work] . . . that's [sponsored] . . . private[ly] and by the Corps of Engineers is maintenance dredging. . . .  So it would naturally fall that most of the [available contract] work would be maintenance work."  JX 98B (Fisher Dep.) at 69:14–18.

For years, Mr. Fisher had "watched all of the bids that came out of the Corps districts, especially Galveston, New Orleans, and Fort Worth," and he was aware that the Corps soon would be soliciting bids for the dredging contracts under the 45-Foot Project, including the Upper Bayou Contract.  See JX 98A (Fisher Dep.) at 70:7–13.  Mr. Fisher testified that, in his view, the 45-Foot Project offered a unique business opportunity for the new dredging concern:

What I had discussed with Steve Bowman and Rudy [Renda] was that I thought, with the widening and deepening of the Houston Ship Channel, that there would be a market for a dredge with a ladder pump to do maintenance dredging once Houston got to be 45 feet. . . .  And when it got deep into 45 feet, some of the conventional dredges would have a hard time providing the maintenance work at that depth.

DX 19 (Connole Rep.) at 1208 (2/1/2001 Fisher Dep. at 12:20–13:4)[23]; see also JX 98A (Fisher Dep.) at 356:23-357:7 (statement of defendant's counsel quoting same); id. at 358:1 (Fisher acknowledging the above-quoted testimony).  Mr. Fisher offered recommendations concerning the size and components required of an additional dredge for the performance of deep maintenance work, and became the dredge supplier's contact at Renda Marine . . . [to whom DSC] went to to answer all . . . questions."  See JX 103A (Wetta Dep.) at 29:19-23.

Mr. Fisher testified that, although one of plaintiff's early goals was provide maintenance dredging services to the Corps after the Channel was dredged to a depth of 45 feet, plaintiff did not plan to bid on the new work dredging contracts that would soon be solicited pursuant to the 45-Foot Project:  "I recognized [at the time] that [the Upper Bayou Project] was a very . . . difficult project[.] . . .  [I]t wasn't something that I had originally had in the business plan in my mind for us to do."  DX 19 (Connole Rep.) at 1233 (2/1/2001 Fisher Dep. at 18:7–9).  At some point, however, plaintiff modified both its business plan and the design for its new dredge, and decided to bid on the Upper Bayou Contract.

    2.      Plaintiff's Pre-Bid Site Investigation

The Upper Bayou Contract contained the standard "Site Investigation and Conditions Affecting the Work" clause, FAR § 52.236-3 (Apr. 1984).  See JX 1 at 95.  Messrs. Fisher and Bowman agree that a site investigation occurred before plaintiff submitted its bid, and that both of them participated in this investigation.  See JX 98A (Fisher Dep.) at 84:2–10 (colloquy between Fisher and defendant's counsel); Tr. at 550:25–551:12 (colloquy between Bowman and plaintiff's counsel).  However, there are

---

[23]This deposition excerpt was admitted into evidence without objection as an exhibit to the report of defendant's damages expert, Mr. Connole.  Tr. at 4838:16-19.  Although Mr. Connole's report does not indicate which litigation generated this deposition, Mr. Fisher acknowledged during his deposition in this case that the above-quoted testimony was given in "the deposition [Mr. Fisher] gave in the litigation between Renda Marine and Dredging Supply Company."  See generally JX 98A (Fisher Dep.) at 356:14-358:1 (colloquy between Fisher and defendant's counsel).

a number of discrepancies between Mr. Bowman's trial testimony and the deposition testimony provided by Mr. Fisher concerning the nature and scope of this investigation.

During his direct examination, Mr. Bowman testified that plaintiff conducted a thorough pre-bid site investigation, during which a number of individuals spent several days exploring the site.  Mr. Bowman explained that he was assisted in the site investigation by "[a] number of personnel that were working for us at that time . . . [who] had significant experience working in the [Houston] ship channel and working on Lost Lake.  Eddie Fisher, Kenneth Mahachek[24] . . . and a number of the dredge personnel with various contractors."  Tr. at 551:8–12 (Bowman).  Mr. Bowman testified that, of these individuals, Mr. Fisher was most involved with the investigation.  See id. at 551:22–24 (Bowman).  Mr. Bowman's testimony at trial is not consistent with the deposition testimony of Mr. Fisher positively identifying only Mr. Fisher and Mr. Bowman as present during the investigation.[25]  See JX 98A (Fisher Dep.)  at 84:7–10 (Fisher stating that "Steve Bowman and myself went to—I don't know if anybody else accompanied us or not.  But I know Steve and I . . . visited the Lost Lake Placement Area.").

That the pre-bid investigation was executed by Messrs. Fisher and Bowman alone—and not with assistance from "dredge personnel with various contractors"—is consistent with a concession made by Mr. Bowman during cross-examination at trial concerning plaintiff's strategy to maintain a low profile vis-a-vis other prospective bidders for the Upper Bayou Contract.  Tr. at 1503:18-1504:18 (colloquy between Bowman and defendant's counsel establishing plaintiff's belief that concealing its plans to bid on the Contract would provide plaintiff a tactical advantage).  Mr. Fisher confirmed that anonymity was part of plaintiff's bidding strategy.  When asked whether he had consulted with Affolter Contracting, the firm to which Renda subcontracted the mechanical levee work under the Contract, prior to submitting plaintiff's bid, Mr. Fisher testified that he did not believe that was the case:

> I know that we were trying not to tip our hand to the other dredging companies that . . . were bidding on the project.  So that[] . . . makes me think that we didn't talk to them beforehand because they work closely with all of the dredging contractors.  They do almost all of the levee work for the Galveston District.

---

[24]Mr. Mahachek was plaintiff's dredge captain at the time of the site investigation and during the early part of the contract period.  See Tr. at 551:15 (Bowman).

[25]See JX 98A (Fisher Dep.) at 98:23–99:14 (indicating that Bowman consulted with various Renda personnel, including Mahachek, when preparing bid estimates for the Upper Bayou Contract).

JX 98B (Fisher Dep.) at 101:13–19; cf. Tr. at 1501:25-1502:3 (Bowman) ("Eddie didn't feel like . . . going to the pre-bid [conference] was necessary because . . . any questions would be in writing and the response would . . . –he felt that anonymity would be reasonable.").

Plaintiff's pre-bid site investigation was not of long duration.  See JX 98A (Fisher Dep.) at 84:17–19, 104:20–24 (Fisher stating that he and Bowman spent "part of one day" at Lost Lake but that they "might have been in Houston more than one day").  Mr. Bowman testified during direct examination at trial that plaintiff's pre-bid investigation of the channel and the Lost Lake Placement Area lasted "two days and one night."  Tr. at 552:6–7.  When confronted during cross-examination with the statement in his deposition that his investigation of the Channel took place in the "late afternoon, early evening," however, Mr. Bowman revised his testimony and conceded that a significant portion of this investigation took place "after dark."  See generally id. at 1500:13–1501:20 (Bowman).

Mr. Bowman pointed out at trial that Mr. Fisher "had come down on several occasions investigating the site, and was very familiar with the various organizations . . . up and down the ship channel in this area. [He was] [a]lso very familiar with Lost Lake." Tr. at 552:2–5; cf. id. at 1500:12 (Bowman stating that he accompanied Fisher on "one of" Fisher's pre-bid investigations).  However, Mr. Fisher testified in his deposition that he "had looked at [the site] several times" prior to his employment with Renda, JX 98A (Fisher Dep.) at 86:14–21, but that he only made one site visit in conjunction with bidding on the Upper Bayou Contract, see id. at 84:7–13.

Messrs. Bowman and Fisher also offered somewhat inconsistent accounts of the nature and scope of their pre-bid investigation of both the reach of the Channel to be dredged under the Contract and of the Lost Lake Placement Area.  For example, Mr. Bowman testified that he and Mr. Fisher inspected the Channel by car, see Tr. at 1507:18–22 (Bowman), and did not explore by boat the reach of the Channel covered by the Contract, Tr. at 1507:23–1508:7 (Bowman).  However, Mr. Fisher testified that he and Mr. Bowman "went by boat up and down the reach of the channel that was to be dredged, and we looked at a lot of logistical placement for pipelines, for staging equipment, and that sort of thing."  JX 98A (Fisher Dep.) at 84:9–13; see also id. at 106:18 (Fisher stating that he and Bowman took a launch and traveled the "entire reach" of Channel to be dredged under the Contract).

Despite their inconsistent accounts of plaintiff's pre-bid inspection of the Channel, both Mr. Fisher and Mr. Bowman specifically recall inspecting the South Ferry Landing, located near the downstream limit of dredging, see JX 5 (Drawings) at 3, and taking the

ferry from the South Landing to the North Landing during their visit.  See Tr. at
1504:23–1505:16 (Bowman); JX 98A (Fisher Dep.) at 107:3–15.  Mr. Bowman testified
at trial that he probably viewed shore protection structures consisting of riprap[26] along the
shoreline of the South Ferry Landing, but could not discern any such material within the
dredging template "because it was under water."  Tr. at 1505:10–16 (colloquy between
Bowman and defendant's counsel).  Mr. Fisher testified that he "[did not] recall one way
or another" whether he viewed shore protection in the vicinity of the South Ferry
Landing, JX 98A (Fisher Dep.) at 107:5–15.

The descriptions by Messrs. Fisher and Bowman of the pre-bid site investigation
of Lost Lake are even less consistent than their descriptions of the pre-bid inspection of
the Channel.  Mr. Bowman testified that he and Mr. Fisher were not able to access the
Lost Lake Placement Area during the pre-bid period:

> [W]hen I came down, I had asked [Mr. Fisher] about bringing a skiff and
> going out to the island and doing some hands-on probing and looking at the
> interior of the levee.  But the site had been used for, apparently, a
> maintenance project just prior to this bidding and the entire interior of the
> Lost Lake was flooded.
> . . . .
>
> [I]t made it inaccessible.  Really, you couldn't see anything.[27]

Tr. at 552:23–553:7 (footnote added).  Mr. Bowman testified that he used binoculars to
conduct a visual inspection of Lost Lake, but did not personally visit the island.  See id. at
553:8–17 (colloquy between Bowman and plaintiff's counsel).

―――――――――――

[26]See also PX 846 (4/24/00 email from McClenan to various Corps personnel) (describing
riprap as "large blocks of broken concrete").

[27] When questioned by the court concerning whether "anyone asked [the Corps] any
questions about the fact that [Lost Lake] was flooded before you even started," Tr. at 553:24–25
(statement of the court), Mr. Bowman replied:

> Talking to [Mr. Fisher], which he knew the—each area has certain idiosyncrasies,
> and apparently, that was somewhat standard procedure . . . [I]t was known that we
> [would] de-cant and de-water [the site] prior to starting, but it just seemed like
> that was part of the rules for the road for the area, is how I took it.

Id. at 554:3–8.

However, Mr. Fisher testified that he and Mr. Bowman took a launch to Lost Lake, JX 98A (Fisher Dep.) at 105:6–8, and "walked the perimeter of where the entire levee was to be built" at Lost Lake, id. at 84:22–24; see also id. at 85:6–88:4 (describing this inspection in detail).  Mr. Fisher initially testified that "the time that we were limited on site at Lost Lake was a portion of one day," id. at 104:20–21, but later revised his testimony and explained that "[t]here weren't any formal requirements in the plans and specs . . . for obtaining permission [from the Corps] to visit the site," nor were there any limitations on the length of time that a prospective bidder could spend investigating the site, id. at 105:3–12 (colloquy between Fisher and defendant's counsel establishing that "there was nothing that prevented [plaintiff] from spending an entire day or more" at the site).

In contrast to Mr. Bowman's testimony that Lost Lake was entirely flooded, Mr. Fisher testified that the area was only partially flooded, and implied that this flooding was related to the defective spillbox that was to be repaired as part of the mechanical levee work under the Contract.  See id. at 85:6–13 (Fisher stating that one purpose of the Lost Lake inspection was to "look[] at what areas of the levee were currently flooded and submerged in water.  We were looking at the nature of the existing spillways which needed to be repaired as part of the project.").  Mr. Fisher recalled that "as you moved across the levee toward the spillway you observed less [consolidated soil material].  In fact, there was ponded water approximately halfway across, and you couldn't see the natural bottom of the levee at that time."  Id. at 87:25–88:4.

Despite their inconsistent testimony concerning plaintiff's site inspection of Lost Lake, Messrs. Bowman and Fisher agree that their only investigation of the soils at Lost Lake and in the Channel was visual.  Mr. Fisher testified that he and Mr. Bowman "were looking at the types of material that were in place to see how well it would support equipment," id. at 85:7–9, and that they did not draw "any particular conclusions of the type of soil" at Lost Lake, except that it appeared "suitable for supporting access of equipment and placement that was required to start the project," id. at 85:16–19.  When asked whether he had "form[ed] any conclusions at that point during that site inspection visit about the character of the materials on which the new levees were to be constructed," id. at 85:20–23 (question by defendant's counsel), Mr. Fisher replied, "The visual, what we could see from the surface, appeared to match some of the core borings that were provided in the plans and specs, although, as I recall, they were all fairly shallow, the borings we were looking at," id. at 85:24–86:3.

It appears that the brevity of Renda's site investigation was also related to its bidding strategy of maintaining low visibility vis-a-vis potential competitors for the Contract.  During cross-examination, Mr. Bowman initially attempted to deny that the decision to conduct a solely visual inspection of the soils in the Channel and at Lost Lake

was related to plaintiff's bidding strategy.  See Tr. at 1503:12–17 (Bowman).  However, when confronted with his deposition, Mr. Bowman did not attempt to challenge the accuracy of his earlier testimony.  See id. at 1503:18–1504:18 (Bowman).

### 3.    The Pre-Bid Conference for Potential Bidders

On June 23, 1998, the Corps' Galveston District Design Team hosted a meeting for prospective bidders on the Upper Bayou Contract.  See JX 3 (Am. 1 to Solicitation) at 4 (Questions by Prospective Bidders and Answers from the Galveston District Design Team).  Following this meeting, the Corps issued Amendment 1 to the Contract, which contained questions by prospective bidders concerning the Contract plans and specifications and the Corps' responses to those questions, see id. at 4–8, and also modified several Contract Specifications, see id. at 2–3, 13.  Although the questions and answers contained in Amendment 1 were offered into evidence at trial and discussed with several witnesses, neither party offered into evidence a copy of the transcript from the pre-bid conference.[28]  At least one deposition witness provided testimony describing discussions at the pre-bid conference about issues concerning the levee specifications that were not addressed in Amendment 1.  See JX 106 B (Dep. of Louis Saenz, Corps Project Engineer, Galveston Office) (Saenz Dep.) at 53:8–55:4.

Plaintiff did not attend the pre-bid conference, at least in part to maintain low visibility in the competition.  See Tr. at 1503:4–9 (Bowman explaining that a desire to conceal its bidding plans was "one reason" why plaintiff did not attend the pre-bid conference); JX 98A (Fisher Dep.) at 119:19–25 (stating that neither Fisher nor any other representative of Renda Marine attended the conference).  Nor did plaintiff submit questions to the contracting officer concerning the Contract prior to bidding.  JX 98A (Fisher Dep.) at 120:1–5.

### 4.    Plaintiff's Bid Estimate for the Upper Bayou Contract

Messrs. Bowman and Fisher jointly prepared plaintiff's bid for the Upper Bayou Contract.  See JX 24 (Bowman Letter), at 1 ("Eddie Fisher and myself were responsible for the estimate and bid."); JX 98A (Fisher Dep.) at 71:8–11 (similar testimony).  Mr.

---

[28]However, during Mr. Bowman's direct examination, plaintiff introduced into evidence a transcript from the pre-bid conference for the Mid-Bayou Contract, a successor to the Upper Bayou Contract.  See generally PX 1751.  Mr. Bowman noted that such transcripts are published by the government "[b]ecause it becomes part of the contract documents," Tr. at 1207:5–6, and to provide "additional information for the contractors prior to bidding the job," id. at 1207:9–10.

Fisher's "experience was almost exclusively limited to hydraulic dredging."[29]   JX 98A
(Fisher Dep.) at 72:6–7.   Prior to his employment with Renda, Mr. Fisher had served as
superintendent of dredging operations at King Fisher Marine Services, Inc., id. at
45:7–24, where his "duties [included] bidding, estimating, and supervising dredging
contracts," id. at 46:2–3.   Mr. Fisher testified that he had some experience preparing and
assisting with the preparation of bids for contracts involving levee maintenance work at
containment areas, id. at 41:19–24 (Fisher Dep.), had bid on "about half a dozen"
contracts involving the hydraulic placement of levees, and had prepared or assisted with
the preparation of "about 50" bids for contracts of similar size, scope, and nature to the
Upper Bayou Contract, id. at 120:6–15 (Fisher Dep.).

Mr. Bowman did not have extensive dredging experience.  Id. at 72:1–3 (Fisher
Dep.).   However, Mr. Bowman "had a much broader construction background [than Mr.
Fisher], which included a lot more general earth work and supervision of projects that
included some dredging."  Id. at 72:7–10.   Mr. Bowman testified that, prior to bidding on
the Upper Bayou Contract, he had amassed at least five years' experience preparing
estimates for contracts that were "very close" but not identical in scope to the Upper
Bayou Contract.   See generally Tr. at 329:17–331:11 (Bowman); cf. JX 98A (Fisher
Dep.) at 73:15–19 (stating that Bowman had more experience than Fisher in preparing
"earth work type calculations . . . [a]nd  [managing the] overall logistics of setting up a
large-scale project").

a.      Plaintiff's Bid Preparation Process

Messrs. Fisher and Bowman drew on their individual strengths when preparing the
bid for the Upper Bayou Contract.   See Tr. at 330:13–17 (Bowman) (stating that he had
prepared "on an average, ten [bids] a month . . . for eleven, twelve years").   Mr. Bowman
developed the calculations supporting parts of the bid addressed to mechanical excavation
and mechanical levee construction work.  JX 98A (Fisher Dep.) at 74:7–13 (colloquy
between Fisher and defendant's counsel).   Mr. Bowman relied upon Mr. Fisher, among
others, when preparing the parts of the bid addressing dredging and hydraulic levee

_____

[29]Mr. Fisher explained that his "strengths in the preparation of the bid," included

understanding the logistics of the [dredging] operation, the types of equipment[],
the locations . . . where equipment could be placed, where pipeline routes were
most effective, where booster pump locations would be . . ., production rates, fuel
logistics, everything to do more so with [a] marine type environment, working on
a navigable waterway.

JX 98A (Fisher Dep.) at 72:4–22.

construction work.  For these calculations, Mr. Bowman depended, in part, on Mr. Fisher's experiences with other dredging contracts.  See JX 98B (Fisher Dep.) at 73:1–7 (Fisher stating that Bowman relied on him for "[s]ome of the[se] calculations," but that they also consulted with "several dredge manufacturers . . . and were also working with a firm . . . specializ[ing] in specialty hydraulic slurry flow calculations" for this information).  When preparing the part of the bid addressing hydraulic levee construction, Mr. Bowman relied on Mr. Fisher's "experience in the placement of hydraulic levees . . . and [his experience determining] exactly what type of equipment would be needed to manage and place that material as it c[ame] out of the discharge pipe."  Id. at 74:2–7.

To estimate the dredging and hydraulic levee construction work under the Contract, Mr. Fisher utilized the Channel cross-sections, JX 5 (Drawings) at 7–13, the Channel boring logs, id. at 19–22, and the levee cross-sections, id. at 15–16, provided in the Contract plans.  Mr. Fisher also testified that he relied on the boring logs taken at the Lost Lake Placement Area, JX 5 (Drawings) at 23–27, when estimating the dredging and hydraulic levee construction work under the Contract.  See JX 98 (Fisher Dep.) at 112:19–24, but the court is not aware of any evidence illustrating Mr. Fisher's use of or reliance on the Lost Lake borings.  Mr. Fisher testified that the Channel cross-sections were used to calculate dredging production rates.

> They . . . showed what banks of new material were there to be dredged because of the existing templates that were laid in.  But they also showed in the template how much maintenance material also lay within the template, which is a factor of your production rates.  When you mix fine grain sediments with some of the clay material, it tends to pump better.

> So in areas where you don't have fines, your production rates would actually decrease . . . .  So it was important to note where there were fines and where there weren't.  And that also determined your unit price because it's very easy to pump the maintenance material and more difficult to dredge the clays, especially as they get stiffer.

JX 98A (Fisher Dep.) at 117:21–118:12.  Mr. Fisher explained that the channel cross-sections also were "[u]sed . . . to identify the volume of what we thought would be new work material versus maintenance material, and also the characteristics of . . . new work material in each section," id. at 127:17–20, specifically "[w]hether it was material that was . . . [not] suitable for building hydraulic levees, or whether it was more medium to stiff [clays] or possibly even sands," id. at 127:23–128:13 (Fisher Dep.).

In particular, Mr. Fisher first used the Channel borings to identify the types, quantities, and locations of different materials to be dredged as an aid in estimating

46

dredging production rates in the various reaches of the channel.  See id. at 113:3–10; Tr. 1489:24–1490:13 (Bowman).  Mr. Fisher then used the Channel borings to identify reaches of the channel containing sands and "medium to stiff clays that would be suitable for levee building," and to quantify the suitable material in those reaches; this information helped him determine the length of discharge pipeline required to transport suitable material to the locations at Lost Lake where hydraulic levees were to be constructed and to estimate the time needed to construct the hydraulic levees.  See id. at 114:10–19.

Although the Specifications stated that "medium to hard clays and sands" were "Satisfactory Material for the Hydraulically Constructed Levees," JX 2 (Specs.) at 102, ¶ 2.2.3, Mr. Fisher testified that the phrase

> [medium to hard clays] . . . would include stiff clays.  Hard clays . . . would be another way to say stiff clays. . . . [Although the terms "hard clays" and "stiff clays" are] [n]ot directly interchangeable, since [the Specifications] include[] medium to hard clays and sands [they are] talking about a mixture of material that will stay in place when building hydraulic levees.

JX 98A (Fisher Dep.) at 94:3–11.

Mr. Fisher described a process of extrapolation, in which he "tied the strata together over the borings to see how they would relatively project to intersect as you moved in between areas that didn't necessarily have borings."  Id. at 113:14–17.  Mr. Fisher explained that he "used [this process] as a tool," id. at 115:7, for projecting the locations and quantities of certain materials, but did not rely on extrapolations exclusively for such information:

> There were some areas where you would have a layer of stiff clay, and you would have a boring a couple hundred feet away, and when you tied those together they didn't really relate to any particular strata or elevation [of materials] maintaining in that area.  It would come and go kind of randomly.  And other times, you could line them up over several hundred feet and then make a real gentle curve that made logical sense that that's where the strata would be.
>
> . . . .
>
> [T]here were times where [extrapolation] was something useful, and there were times where it had no value at all.

JX 98B (Fisher Dep.) at 115:12–20, 117:1–3.

47

Mr. Fisher imported the estimates developed from the Channel borings into a "stiff clay percentages" spreadsheet, which identified by station number (1) the reaches of the channel where he expected to find stiff or very stiff clays, (2) the expected depth of the stiff or very stiff clays, and (3) the expected quantity of the stiff or very stiff clays.[30]  See, e.g., JX 28 (Stiff Clay Spreadsheet); Tr. at 577:16–19 (Bowman).  According to the Stiff Clay Spreadsheet, Mr. Fisher estimated that 1,051,671 cubic yards—twenty-eight percent of the 3,819,076 cubic yards of material to be dredged under the Contract—would be stiff or very stiff clay.  JX 28 at 2; see also Tr. at 2168:22–2170:7 (Bowman).  However, Mr. Fisher emphasized that the purpose of the spreadsheet "was not to calculate the exact number of cubic yards of stiff or very stiff clay.  It was used to identify the approximate reaches where the majority of the stiff or very stiff clay was so that we could locate boosters," and to predict plaintiff's rates of production when dredging various reaches of the channel.  JX 98B (Fisher Dep.) at 251:14–17.

Mr. Fisher testified that the information contained in the levee cross-sections was "very, very rough," id. at 118:16, but that he used this information in two ways:

> [The levee drawings] showed elevations of the existing levee, and also, of course, the distance around the perimeter . . . where we would have to lay pipe and move pipe, and what would be the shortest distance to be able to locate [the] pipe in order to build the levees in any particular location.

---

[30]JX 28 was printed on August 15, 1998—nearly one month after plaintiff submitted its bid.  See JX 98A (Fisher Dep.) at 134:13–21.  During his deposition, Mr. Fisher testified that he

> created a [stiff clay] spreadsheet before the bid, and there were different versions of it . . . after we found [out] we were [the] successful bidder where I was looking at things for different other reasons. [But] I don't know at exactly what point [the version of the spreadsheet contained in JX 28] was created.

Id. at 134:25–135:5; cf. Tr. at 577:16–578:2 (Bowman describing Fisher's pre-bid preparation of the spreadsheet).  The record in this case also contains stiff clay spreadsheets produced on July 7, 1999, JX 38, and July 13, 2000, DX 477 (7/13/00 letter from Fisher to Mahacek and Bowman) at 2–3.  These later-issued spreadsheets are identical to JX 28, except that JX 28 contains less descriptive column headings for the data.  Compare, e.g, JX 28 (Stiff Clay Spreadsheet) at 1, col. 2 ("Stiff or VS") with JX 38 at 1, col. 1 ("Top of Stiff or Very Stiff Clay As Per Borings").  Also, the August 15, 1998 version of the October 26, 1998 spreadsheet was created before the October 26, 1998 award of the Contract, JSF at 2, ¶ 11, the event after which, according to Mr. Fisher, he might have altered the spreadsheet from its pre-bid form. JX 98A (Fisher Dep.) at 134:25-135:5.  There is no indication in the record that  JX 28, although printed after bid submission, would not have reflected Mr. Fisher's pre-bid analysis.

48

Id. at 118:21–119:1.

Mr. Fisher testified that he also utilized "historical information from previous projects and what [he] could visually see at the placement area" to estimate the dredging and hydraulic levee work.  Id. at 122:2–4.  Mr. Fisher explained that there were "a couple of ways" to obtain information about the most recent work that had been contracted for and performed at a given site:  one could rely on information in a contractor's company files concerning previous bids submitted by the company,[31] "[o]r, independently, the Corps has records of [previous contracts], which is a little more cumbersome to obtain." See id. at 103:17–23.  Because plaintiff had performed only one maintenance dredging contract, and no new work dredging contract, prior to bidding on the Upper Bayou Contract, plaintiff had not yet developed an institutional record concerning the Houston Ship Channel or the Lost Lake Placement Area.  However, Mr. Mahachek, plaintiff's dredge captain, was familiar with the Upper Bayou Contract site, see id. at 104:7–13, and Mr. Fisher "believe[d]" the reach of the Channel covered by the Upper Bayou Contract was "maintenance [dredged] . . . every two years," id. at 226:15–16.

Consistent with plaintiff's desire to conceal its plans to bid on the Contract, Mr. Fisher turned to Mr. Mahachek, rather than to Corps files, for information concerning dredging and levee work that had previously been performed at the Upper Bayou Contract site.  See id. at 104:7–8.  Mr. Mahachek described to Mr. Fisher a previous maintenance dredging project that had taken place in certain reaches of the Channel, but Mr. Fisher stated that this work "wasn't quite as relevant, since [the Upper Bayou Contract] was a

---

[31]Mr. Fisher explained that when he worked for King Fisher Marine Services, Inc., "a lot of the jobs [for which he prepared bids] were repeat jobs . . . or were very similar to jobs that had been done before.  At the time I was working for the company[,] they had been in the business for 40, 50 years, and we had extensive files of production."  JX 98A (Fisher Dep.) at 49:22–50:1. Accordingly, as a King Fisher employee, Mr. Fisher would "research[] the production history from the past files," id. at 50:1–3, in lieu of conducting a pre-bid site investigation, id. at 49:18–20 (Fisher Dep.).

new work project and not exclusively a maintenance dredging project."[32]  Id. at
104:10–13.

        b.      Plaintiff's Assumptions Concerning the Contract

     After reviewing the Contract plans and specifications, inspecting the site and
speaking with Mr. Mahachek, Messrs. Fisher and Bowman formulated several
assumptions that informed the parts of their bid addressing the dredging and levee
construction work.  For example, Mr. Fisher anticipated non-pay overdepth dredging
quantities of as much as 25% of the contract bid quantity.  JX 98B (Fisher Dep.) at
237:5–22; cf. Tr. at 1500:3–6 (Bowman stating that he allowed for between 15 and 20
percent non-pay overdredging in the bid estimate).

     Mr. Fisher also made several assumptions concerning the materials he expected to
encounter while dredging the Channel.  For example, Mr. Fisher explained that "based on
historical [information], based on the borings, and based on . . . visual sightings at the
Lost Lake Placement Area," JX 98A (Fisher Dep.) at 122:25–123:2, he expected to
encounter stiff red clays, known as "Beaumont clay" somewhere in the Upper Bayou
Contract site.  See id. at 122:14–19, 22 ("Houston is known for having some red, stiff
clays.  And so that type of general knowledge of . . . [the] sand or clay to be present in the
area is just something associated with a project in a particular geographic location.").  Mr.
Fisher testified that

     Lost Lake had a mixture of materials.  But any time a new work project is
     done . . . especially a smaller project, the material is usually discharged
     immediately inside the perimeter of the levee, and there [are] some mounds
     that are usually left there and . . . you can visually see the type of material

---

[32]Mr. Fisher also spoke with his cousin, Randy Boyd, "who at the time worked for King
Fisher Marine Service, [and] was in charge of their levee construction department," JX 98A
(Fisher Dep.) at 108:2–4.  Initially, Mr. Boyd was interested in subcontracting the levee work
under the Contract.  However, "as it turned out, his company would not . . . provide a subquote to
us.  They . . . viewed Renda as competition and didn't want to possibly assist us in the project by
offering a subcontract price."  Id. at 108:13–18.  Although Messrs. Fisher and Boyd spoke "about
just generally the levees," id. at 108:22, Mr. Fisher "didn't ask [Mr. Boyd] any questions" about
the physical conditions at Lost Lake, and did not elicit any information concerning the site that
was useful in preparing the bid estimate for the Contract.  See id. at 109:1–16 (Fisher Dep.).  Nor
did Mr. Boyd provide any information about "the means and methods" of levee construction that
Mr. Fisher found useful in preparing the bid.  See id. at 110:2–25 (Fisher Dep.).  However, Mr.
Fisher testified that Mr. Boyd provided helpful information concerning which equipment would
be most useful for placing and shaping the hydraulic levees.  See id. at 112:3–12 (Fisher Dep.).

that was most recently dredged, if it's something that's stiff enough to stand up.

. . . .

[During the pre-bid site inspection,] [t]here was some red and yellow [stiff] clays that comprised most of what I'm calling the south wall [of the levees] adjacent to the channel.

Id. at 123:5–12, 16–18.  Although the sighting of stiff red clays during the pre-bid site inspection "confirmed [Mr. Fisher's expectations about] the types of materials that would be encountered" while dredging, id. at 123:22–23, the sighting did not confirm the precise reach of the Channel where this material was located.  See JX 98B (Fisher Dep.) at 124:13–18 (noting that "some of the historical knowledge and some of the visual knowledge of looking at the bank lines" helped him estimate the location of these materials, "[b]ut those were relatively minor factors . . . [because] most of the soils . . . to be dredged were 30 to 40 feet below surface.").  Mr. Fisher relied on his interpretation of the Channel borings, reflected in his Stiff Clay Spreadsheet, for this information.  Id. at 123:24–124:4 (Fisher Dep.).

Mr. Fisher also testified that, when preparing the bid estimate for the dredging work under the Contract, he anticipated that the dredge would encounter "typical types of trash [such as] metal debris, . . .—a lot of [which] is from dredge and barge work[—] . . . ropes, . . . cables, . . . large pieces of metal[,] . . . rock, . . . [and] ri[p]ra[p] from shore protection projects."  Id. at 222:19–24.  Mr. Fisher expected to find such debris in "[a]reas of new work that had not previously been dredged that were accessible at depths to vessels that could possibly discharge those types of debris," id. at 223:8–10, but did not anticipate a specific cubic yardage of such debris, see id. at 223:4–5.  According to Mr. Fisher, he took into account the anticipated trash and debris when estimating the dredging work by allowing for "more down time to remove and address trash problems" in the reaches of the Channel where greater quantities of trash were anticipated.  Id. at 224:1–5. Mr. Fisher identified "both banks" of the reach of the Channel between  Sta. 470+00 and Sta. 476+00 as areas that could contain trash:  "They are adjacent to the ferry landing, which is a vessel that's out all the time that . . . could possibly discard ropes and other debris which would cause problems, and also could be an area where some underwater support or landing could contain some debris.  So that was an area that was considered—that accounted for some lost time."  Id. at 224:14–24.[33]  However, Mr.

[33]According to Mr. Bowman's testimony at trial, Mr. Fisher's worksheets for the dredging part of the bid estimate, which were not produced at trial, allowed "downtime [for the dredge] for

(continued...)

Fisher did not expect to encounter a great deal of debris towards the upstream limits of dredging:

> Moving upstream, generally the anticipation of trash is less because the channel widening becomes less as you go upstream, and there is less new work bank, there is less bank that has not previously been dredged as part of the maintenance cycle, which I believe is every two years in this area of the Houston Ship Channel.  So anything that was in the template would have been encountered two years ago.
>
> So unless there would be a reason for a substantial amount of trash to occur in the two-year period, most of the [pre-bid] investigation was limited to the area outside of the existing template into the new work template, which wasn't that large as you moved upstream.

Id. at 226:11–25.

c.      Plaintiff's "Bid Estimate Recap"

Plaintiff's bid estimate process generated a series of documents that Mr. Bowman referred to as bid estimate "recap sheet[s]," see generally JX 24 (Bowman Letter) at 4–11; Tr. at 557:22–23 (Bowman).  The bid estimate recap is a series of handwritten grids addressing the costs of various bid items, including "general conditions," Tr. at 558:7–19 (Bowman); cf. JX 24 (Bowman Letter) at 4; "environmental protection plan," JX 24 (Bowman Letter) at 5; Tr. at 562:25–563:11 (Bowman), "drop outlet structure," JX 24 (Bowman Letter) at 6; Tr. at 564:16–565:4 (Bowman), "hydraulically constructed levees," JX 24 (Bowman Letter) at 7; Tr. at 566:6–8 (Bowman), "dredging," JX 24 (Bowman Letter) at 7; Tr. at 567:3–10; 1487:17–18 (Bowman), "pipelines," JX 24 (Bowman Letter) at 8; Tr. at 569:11–25 (Bowman), and "field costs," JX 24 (Bowman Letter) at 10; Tr. at 572:5–575:6 (colloquy among Bowman, plaintiff's counsel and the court).

The bid recap sheets, which were provided to the Corps, see JX 24 (Bowman Letter) (submitting plaintiff's bid recap sheets to defendant), were designed to show the costs of various bid items; they do not provide the data upon which those cost calculations

---

[33](...continued)
ship traffic.  And during that period, the cleaning of the cutterhead . . . would be scheduled."  Tr. at 1499:10–12 (Bowman), see also id. at 1499:20–21.  Mr. Bowman recalled that he and Mr. Fisher estimated the down time allowed for ship traffic at "around ten hours a day."  Id. at 1499:8–9.

were based.  Mr. Bowman testified that data supporting the entries in the bid estimate recap sheets were contained in separate worksheets prepared by Messrs. Fisher and Bowman.  See Tr. at 575:20–25 (Bowman).  Mr. Bowman indicated that these worksheets would reflect, for example, plaintiff's anticipated dredging production rates for various reaches of the Contract, such as the Flare Area.  Id. at 1491:9–13 (Bowman).

Although plaintiff's bid estimate recap sheets were introduced into evidence, plaintiff did not offer into evidence the detailed worksheets showing the basis for its calculations.  Mr. Bowman explained:  "I had copies of all of this.  And when I moved offices some of this stuff disappeared.  I have not seen the worksheets since we bid this thing.  But there is a lot of supporting documents of how these numbers were generated."  Id. at 575:23–576:3 (Bowman).  However, Mr. Fisher testified that he, not Mr. Bowman, "maintained the project files," JX 98A (Fisher Dep.) at 126:6–8, and that plaintiff probably did not retain most of these bid estimate worksheets:

Mr. Fisher:          [T]he way the process worked when I did a bid with [Mr. Bowman] was that he had the master sheet with his No. 2 pencil and his eraser, and he would write those down.  And the calculator sheet that went for about 40 feet down the hall was part of it.  I would have notes that I would do with a hand calculator to run personnel hours or different kinds of equipment rates.  Most of it was probably things we didn't keep, but that we used to support a particular line item in a bid as we were working through it.

Mr. Kosloske:       You said most of it—you didn't keep the supplemental worksheets?

Mr. Fisher:          I doubt that we kept most of them.

. . . .

Mr. Kosloske:       [After you moved offices,] [d]id you save any of the supplemental worksheets at all relating to the Upper Bayou bid?

Mr. Fisher:          I don't know.  I remember seeing the actual hand bid [recap] sheet that we did in pencil.  We tried to save these and copy those.  And I remember seeing copies of pieces of that.  But I don't remember per se seeing any of the supplemental sheets.

Id. at 125:15–127:3.  At the time Mr. Bowman created his bid recap, he anticipated that seventeen months would be required to complete the work under the Contract.  See Tr. at

559:9–19 (Bowman); JX 24 (Bowman Letter) at 4 (estimating project management costs for seventeen months).

### 5.    The Award of the Contract to Plaintiff

Renda and four other contractors submitted bids for the Upper Bayou Contract on July 17, 1998, approximately two months after Renda Marine was formed.  See JX 4 (Bid Abstracts), at 1; Joint Stipulation of Facts (JSF) at 2, ¶ 5.  Plaintiff's bid of $12,526,100 was the lowest bid that the Corps received for the Contract.  JX 4 (Bid Abstracts) at 1; JSF at 2, ¶¶ 6–7.  The Corps' Bid Abstracts, see generally JX 4, reveal that plaintiff's status as low bidder is largely, if not entirely, attributable to its bid on the dredging work included in the Contract.  Plaintiff valued the dredging work at $7,315,770, id. at 8—more than $3.5 million below the government's estimate, id. at 3, and slightly more than $4 million below the next lowest bidder's estimate for this aspect of the Contract, id. at 4.[34]

Following an unsuccessful protest by a disappointed bidder, JSF at 2, ¶¶ 8–10, defendant awarded the Upper Bayou Contract to Renda on October 26, 1998, id. at 2, ¶ 11; DX 349 (10/26/98 letter from Benero to Fisher accepting plaintiff's bid); Tr. at 320:3–6 (Benero).  "On or about November 16, 1998, Renda was given Notice to Proceed for the Upper Bayou Project."  JSF at 2, ¶¶ 11–12.  Plaintiff acknowledged receipt of the Notice to Proceed three days later.  Id. at 2, ¶ 13.

### C.    The Dredge "Millennium"

Plaintiff, as a new entrant into the hydraulic dredging industry, did not have a dredge that was capable of performing the Upper Bayou Contract when plaintiff prepared and submitted its bid, see JX 98A (Fisher Dep.) at 83:3–7.  However, plaintiff had been engaged in negotiations since its formation in 1998, see PX 428 (8/3/98 letter from Fisher and Bowman to Benero responding to a bid protest by Great Lakes Dredge & Dock Co.) (Fisher-Bowman Letter) at 19, with three dredge manufacturers— Krupp Vosta, see JX 98B (Fisher Dep.) at 74:21–25, Dredging Supply Company, Inc. (DSC), see id. at 77:13–16, and Ellicott, id. at 79:24—to purchase a dredge, which would be called the "Millennium."  Presumably because of his extensive dredging experience, Mr. Fisher was

---

[34]The court recognizes that prospective bidders might have allocated some dredging costs to the dredging-related bid items for Mobilization/Demobilization and Pipeline.  See JX 1 (Solicitation) at 3 (listing the bid items).  However, plaintiff's total bid on these dredging-related items was $2.8 million below the government's estimate, and $3.8 million below the estimate of the next-lowest bidder.  Compare JX 4 (Bid Abstracts) at 8 (plaintiff's bid) with id. at 3 (government estimate) and 4 (estimate of Great Lakes Dredge & Dock Co.).

responsible for the acquisition, design and construction of this dredge.  See JX 103A
(Wetta Dep.) at 29:19-21 (identifying Fisher as DSC's "contact at Renda Marine . . .
[whom DSC] went to to answer all our questions").  Plaintiff also employed as an
independent consultant Gary Gibbs, who "was involved in obtaining a lot of the Renda
supplied equipment[,] [provided] some basic direction on the dredge," JX 103A (Wetta
Dep.) at 29:25-30:3, and essentially served as plaintiff's "onsite representative" during
construction of the Millennium, id. at 30:7-9.

     1.    Design and Construction of the Millennium

     As initially envisioned, the Millennium was designed to be a portable dredge.  See
JX 103B (Dep. of William Wetta, president of DSC) (Wetta Dep.) at 27:7–9, which could
fill a niche dredging market by "effectively provid[ing] maintenance dredging at a 45-foot
depth and greater because it had a ladder pump," DX 19 (Connole Rep.) at 1208 (2/1/01
Fisher Dep. at 13:11–15).  However, after plaintiff bid on the Upper Bayou Contract,

> a lot of the specifications changed for the Dredge Millennium in order to be
> able to complete . . . smaller new work projects like the Upper Bayou
> Project, and essentially the price of the dredge escalated from 4 to 7½
> million [dollars] to compensate for the difference between just the basic
> maintenance dredge and one that can do a mixture of work.

JX 98A (Fisher Dep.) at 358:6–14; accord DX 19 (Connole Rep.) at 1208 (2/1/01 Fisher
Dep. at 1233:10–19) (colloquy between Fisher and counsel establishing that the
Millennium, as initially designed, was not appropriate for a new work dredging project
like the Upper Bayou Contract, and that plaintiff "made changes to the dredge after we
were low bidder on the [U]pper [B]ayou [P]roject in July [1998])"; PX 428 (Fisher-
Bowman Letter) at 19 (statement by plaintiff in response to bid protests by Great Lakes
Dredge & Dock Co. that "[t]he Dredge Millennium is designed to dredge virgin as well as
new maintenance material").

     On July 31, 1998—two weeks after submitting its bid for the Upper Bayou
Contract, cf. JSF at 2, ¶ 5—plaintiff placed an order with DSC to manufacture the
Millennium, a 24-inch suction cutterhead dredge with a ladder pump.[35]  See JX 103A

---

[35]"A cutterhead is a rotary device used to excavate material at the bottom of a waterway."
JX 103A (Wetta Dep.) at 18:14–16.  A 24" suction cutterhead dredge is a dredge equipped with a
cutterhead and a 24-inch pipe "in front of the dredge pump."  Id. at 46:16–17.  Mr. Wetta
explained that

(continued...)

(Wetta Dep.) at 83:16–84:6 .   Mr. Wetta explained that the specifications for the Millennium were created by both plaintiff and DSC:  "Some of the items were specifically spelled out by Renda Marine, and some of them were design features based on [Renda's choices] by DSC."   Id. at 86:7–10.   Renda's agreement with DSC provided that parts of the Millennium were to be built from scratch by DSC, while other parts would be provided by plaintiff and installed by DSC:

> [W]e installed the cutterhead,[36] the cutter drive,[37] the underwater dredge pump,[38] the underwater dredge pump drive system.[39]  We installed the main

---

[35](...continued)

[T]he number[] [of inches] refers to the size of the pipe in front of the dredge pump[,] . . . [w]hat we would call the suction . . . [or] [i]ntake [pipe]. . . .  A larger intake means that the velocity is lower, which means the dredge typically won't pick up as heavy a piece, but it allows it to pick up a wider area.  So [with] softer material, . . . it picks up a lot higher volume, whereas if you get into more compacted or heavy materials, the smaller diameter lets you pick up material because of its weight.

Id. at 46:16-47:25.

[36]Plaintiff selected a Vosta cutterhead, which was installed by DSC.  JX 103A (Wetta Dep.) at 18:24–19:2.  Mr. Wetta testified that DSC learned of plaintiff's decision to install a different cutterhead when it was instructed to "contact . . . Hagler Engineering . . . so we could give dimensions to them so that they could make sure that what we were going to put on would fit . . . their cutterhead.  So at that point we knew it was going to be a Vosta cutter."  JX 103B (Wetta Dep.) at 40:19–25.  Mr. Wetta emphasized that the Vosta "was not a cutter that [DSC was] familiar with," JX 103A (Wetta Dep.) at 38:8–11, and testified that DSC made an unsolicited recommendation that plaintiff use a different type of cutterhead "if they were going to encounter primarily stiff clays."  Id. at 39:6–8; cf. JX 103B (Wetta Dep.) at 102:21–103:2 (Wetta stating that "[the Millennium] had a very good cutter drive, but it wasn't a drive specifically designed to dig clay.  It was designed to dig a variety of different materials.  But there's not many 24 inch dredges that have the cutter drive that the Millennium has as far as capacity.").

[37]"The cutter drive would be anything that was required to make the cutter turn.  So it would include all the gear boxes, shafting, [and] motors."  JX 103A (Wetta Dep.) at 19:4–7.

[38]"The underwater dredge pump on the Millennium is the basic feed pump.  It picks up the material that's cut by the cutterhead and moves that material on through the pumpline to the booster pump or the back barge pump."  JX 103A (Wetta Dep.) at 20:14–18.

[39]The underwater dredge pump drive system, which was selected by DSC "based on the

(continued...)

generator[40] which was supplied by Renda.  We installed the auxiliary
generator[41] which was supplied by Renda.  We . . . installed the hauling
gear[42] which was supplied by Renda.  We installed the DC drives which
were supplied by [DSC].[43]  We erected the engine and closure, the crew
quarter[s] section, and the control cab, or lever room, for the dredge.  We
also assembled the frame that lifts the ladder.

Id. at 17:20–18:10 (Wetta) (footnotes added).  Mr. Wetta testified that the two generators
and hauling gear supplied by Renda were "used" parts.  See id. at 23:15–20, 25:6–8
(Wetta Dep.).  When asked to estimate the reasonable life expectancy for the dredge
Millennium, Mr. Wetta replied, "Fifty years, 20 to 50 years depending on how it's
maintained.  But there[] [are] dredges like it that are operating today that are 50 years
old."  Id. at 186:18–21.

Messrs. Fisher and Bowman represented to the Corps that the Millennium was
"designed specifically for the Houston Ship Channel and similar projects."  PX 428
(Fisher-Bowman Letter) at 19.  Although Mr. Wetta testified that the Millennium "was
designed for a brackish type water environment," JX 103A (Wetta Dep.) at 60:8–9, and
noted that "the Houston Ship Channel [is] brackish," id. at 60:20–21, he testified that
DSC was unaware that the Millennium was being constructed for immediate use in that
region: "[W]e were told by [Mr. Fisher] when we started [construction] . . . that [the]

---

[39](...continued)
horsepower laid out by Renda," was comprised of "a drive shaft, a gear box and a motor."  JX
103A (Wetta Dep.) at 20:19–22; 21:9–12 .

[40]"The main generator supplied all of the electrical power for all of the electrical functions
on the dredge to operate."  JX 103A (Wetta Dep.) at 21:22–24 .

[41]"The auxiliary generator supplies power when the main generator is not operating,
primarily for nondredging functions like lighting, air-conditioning, instrumentation, but not really
to operate the machine."  JX 103A (Wetta Dep.) at 22:14–18.  In the event of a main generator
failure, the auxiliary generator "would allow the dredge to get . . . out of the way.  It wouldn't
really allow it to operate.  But it would allow the ladder to come up very slow[ly] [so the dredge
could] . . . move out of traffic."  Id. at 23:2–5.

[42]"The hauling gear on the Millennium . . . allowed the dredge to swing from side to side
and to raise the ladder."  JX 103A (Wetta Dep.) at 24:4–6.  Also known as a "hoist," the hauling
gear essentially "is a series of winches."  Id. at 24:23–25:5 (Wetta Dep.).

[43]"DC Drives are electrical devices that convert AC power into a variable DC voltage so
that motor speeds can be varied."  JX 103A (Wetta Dep.) at 25:22–24.

dredge was going to be used for just general types of dredging all through the Texas, Louisiana, southern area of the United States, not for any—we weren't given any specific project." Id. at 59:9–14.  It is not clear from the record whether Mr. Fisher ever provided DSC with the plans and/or specifications for the Upper Bayou Contract.  Mr. Wetta testified that, "[t]o my knowledge no one at DSC even to this day was ever given a layout of what these jobs were going to be.  So we had no knowledge, and we still have no knowledge, of what the jobs really . . . entailed and how they were bid." Id. at 103:19–24; see also id. at 100:9 (Wetta) ("I didn't know what the job was.").  However, Mr. Fisher claimed in his deposition that "I know that we did provide information to [DSC].  But I don't know at what point it was, whether it was prebid or postbid." JX 98A (Fisher Dep.) at 82:17–20.

2.      Defendant's Pre-Award Investigation of Plaintiff

On August 20, 1998, Mr. Wetta accompanied Messrs. Fisher, Bowman, and other Renda personnel to a meeting with Corps personnel in connection with the Upper Bayou Contract.  See JX 103A (Wetta Dep.) at 99:6–23 (colloquy between Wetta and defendant's counsel); PX 449 (attendance roster from 8/20/98 meeting).  This meeting was scheduled as part of defendant's pre-award investigation of plaintiff.  See generally JX 104B (Dep. of Herbie Maurer, Chief of Operations, Corps of Engineers) (Maurer Dep.) at 56:11–13 ("We always do a pre-award investigation and it's generally on past history of the contractor.  In this case, we didn't have that past history for the contractor.").  According to Mr. Maurer, the Corps was "concerned . . . [that] we had a new—basically a new dredging contractor that was having a plant built and we were concerned if he could meet the performance measures." Id. at 57:25–58:3; cf. JX 103A (Wetta Dep.) at 100:1–5, 22–25 (Wetta stating that "[t]he purpose of the meeting as far as [DSC] being there . . . was to show that Renda legitimately had . . . a facility to get the dredge built that they were quoting a job for. . . . to basically show that Renda had . . . a dredge order in hand, that we had a dredge order in hand, that we were going to do something for Renda.")

Although "[n]o questions were really asked about the [capabilities of the] dredge at the meeting," JX 103A (Wetta Dep.) at 101:3–4, Mr. Maurer emphasized that the purpose of the meeting was not to dictate the dredge specifications to plaintiff:

[I]f the Corps required a 30-inch dredge . . . we would solicit that.  If we are . . . doing a hired plant, so to speak, it would be listed.  If we do not, then we would provide a production on most of our maintenance jobs.  And it would be the—the type of equipment basically that comes in is really the responsibility of the contractor in performance.  We just put performance measures in our contracts.

58

JX 104B (Maurer Dep.) at 57:10–17.  However, Mr. Maurer testified that one purpose of the pre-bid investigation was to "get[] reports on the progress [of the dredge]."  Id. at 59:11.  Accordingly, at the meeting, the Corps requested, and plaintiff provided, a completion date for the Millennium.  Tr. at 592:14–19 (Bowman).  At trial, plaintiff's counsel asked Mr. Bowman whether "the Corps of Engineers ask[ed] about when . . . the construction of the Millennium would be finished," Tr. at 592:14–16, and Mr. Bowman replied, "Yes," id. at 592:17.  Plaintiff's counsel then asked whether the Corps was "given an answer," id. at 592:18, and Mr. Bowman again replied, "Yes," id. at 592:19.  The record does not provide the date given.  Given the fact that the Contract proceeded, it appears that the response was satisfactory to the Corps.

Although the dredge specifications were not discussed in detail at the August 20 meeting, Mr. Maurer accompanied Messrs. Fisher and Gibbs "over to the site where the Millennium was being constructed" during the pre-award investigation.  JX 104B (Maurer Dep.) at 58:22–23.  Mr. Maurer testified that during this visit, Mr. Gibbs spoke enthusiastically about the capabilities of the Millennium:

> With the experience of Mr. Gibbs, we talked about some of the features that he was recommending . . . and some of the equipment he was putting in and so forth.  But there was no—no opinions of performance or anything at that point in time.  Mr. Gibbs at that time was—was quite—quite excited about some of the things that [the Millennium] was supposed to do.

Id. at 59:13–18.  Following the pre-bid investigation, defendant was "satisfied . . . [that] the dredge could perform the work in accordance with what the contractor had submitted. . . . [O]bviously, we awarded the contract."  Id. at 61:7–11 (Maurer Dep.).

### 3.    Delays in the Construction of the Millennium

At the time the July 31, 1998 agreement to construct the Millennium was ratified, see JX 103A (Wetta Dep.) at 83:22–84:6, the manufacture of the dredge was "on schedule based on [plaintiff's] equipment selection," id. at 92:16–17, to be completed and delivered to plaintiff by mid-December 1998, see JX 103A id. at 106:7–8.  Mr. Wetta testified that the July–December construction time-frame "just barely" allowed DSC sufficient lead time to order the parts necessary to complete the dredge, and that this construction schedule "would be very tight."  Id. at 93:9–20 (Wetta Dep.).

However, "[w]ithin several days," JX 103B (Wetta Dep.) at 46:1–2, following "that meeting at the Corps, [the design for the Millennium] was expanded significantly" at plaintiff's request, id. at 45:5–7.  Further, between November 27, 1998 and February 28, 1999 DSC experienced "a lot of . . . delays [in construction] . . . attributed to changes

in the dredge itself, changes in equipment, changes in engineering," which were "dictated by Renda." Id. 141:12–25 (Wetta Dep.); cf. JX 98A (Fisher Dep.) at 358:6–10 (Fisher stating that "once we decided to bid on the Upper Bayou Project, . . . a lot of the specifications changed for the Dredge Millennium in order to be able to complete . . . smaller new work projects like the Upper Bayou Project."); but see Tr. at 586:16–19 (Bowman stating that construction of the dredge "started in late October, which was headed into the holiday season and the rain season.  So it was significantly delayed getting . . . built, simply because of the conditions.").

Ultimately, "DSC did not meet th[e] schedule" because "[t]here were numerous changes made" in the specifications for the dredge "between what's shown [in the purchase order] and what was actually delivered."  Id. at 93:23–24, 94:3–5.  As to particularly long lead items involved in the delay, Mr. Wetta testified that "the longest lead items I would get would be 16 to 18 weeks.  And that would be on some of the . . . drive equipment, maybe a pump.  Engines and equipment like that we typically get faster than that."  JX 103B (Wetta Dep.) at 93:4–8.

The Millennium was not delivered to plaintiff until approximately April, 1999. JX 103A (Wetta Dep.) at  171:1–6.  Plaintiff did not begin its dredging work under the Upper Bayou Contract until September 13, 1999.  JX 98A (Fisher Dep.) at 320:20–24 (colloquy between Fisher and defendant's counsel).

4.     Mechanical Problems With The Millennium

Technical difficulties with the Millennium dogged plaintiff's performance of the Upper Bayou Contract.  E.g. PX 840 (4/20/00 Summary of Project Coordination Team Meeting, Houston-Galveston Navigation Channels (Team Meeting Summary)) at 2, ¶ b ("The production of the dredge [Millennium] has not improved and Renda now believes there is a problem with the design or construction of the dredge.").  Mr. Fisher  testified about a number of problems with the dredge that impeded plaintiff's performance of the Contract: "I recall that we had problems with both [the flow and density meters]."[44]  JX 98A (Fisher Dep.) at 327:24-25.  The Millennium's flow meter "had not been operating properly for some time," id. at 330:14-18 (Fisher Dep.), when, on March 18, 2000, Mr. Fisher sent a memorandum to the leverman and the chief engineer stating:  "I know we have been operating without the flow meter for a good while, but we are working to get it back on line ASAP.  Without the flow meter, we are constantly in danger of plugging the line and cannot maximize production," id. at 329:22-330:5 (Fisher Dep.) (quoting DX

---

[44]A flow meter "gives you the gallons per minute coming out of . . .  the pump discharge." JX 98A (Fisher Dep.) at 328:14-15.  A density meter "measures the density of the solids versus the water, and is capable . . . of calculating a production rate."  Id. at 328:18-21.

429 (3/18/00 memorandum from Fisher titled "Velocity Meter for Millennium") (internal quotations omitted).

Mr. Fisher also testified that the density meter "was [not] functioning a lot of the time, id. at 330:22-23, and that, "for part of the time on the [Upper Bayou] project," the Millennium was plagued/hindered by "plugged pipelines, and . . . a shortage of support equipment," id. at 331:7-15 (Fisher Dep.).  See also JX 98B (Fisher Dep.) at 330:1-9 ("[Building the Millennium] cost more than . . . anticipated and . . . funds were not available to buy some of the equipment for repairing [the] pipeline.").

D.    Administration of the Upper Bayou Contract

At the time the Upper Bayou Contract Solicitation issued, and throughout the Contract period, "the existing [Lost Lake] Placement Area [was] . . . maintained by the U.S. Army Corps of Engineers."  JX 2 (Specs.) at 61 (Attach. A), ¶ 2.1; cf. Tr. at 3098:10–12) (McClenan stating that "the Corps of Engineers operation and maintenance work maintains—you know, raises the levees and that" at Lost Lake).  At the same time, the Port of Houston Authority (PHA or Port), "the [s]tate . . . [entity] that was established to operate the port operations within Harris County, Texas," Tr. at 3905:17–20 (Mears), was responsible for the management and operations of the Port of Houston.  Id. at 3097:19–21 (colloquy between McClenan and defendant's counsel).  The PHA's oversight extended to disposal sites for dredged material, such as Lost Lake, which the PHA owns.  Id. at 3906:9–13 (colloquy between Mears and defendant's counsel).

In June 1998, the Corps and the PHA executed a "Project Cooperation Agreement" (PCA or Agreement) with respect to the 45-Foot Project.  See generally DX 327 (PCA). Under the Agreement, the PHA assumed responsibility for 25 percent of the Project's "total cost of construction of the general navigation features assigned to dredging to a depth in excess of 20 feet but not in excess of 45 feet," id. at 14, Art. II.G, including the cost of "[d]eepening and widening of the existing Bayou Reach," id. at 4, Art. II.B.3, and the "costs of contract dispute settlements or awards," id. at 5, Art. I.F.  Notwithstanding this cost-sharing arrangement, the Agreement specified that "the Government [had] the legal authority and responsibility for construction of the Project and operation and maintenance of the general navigation features," id. at 25, Art. V.D, and that "[i]n the exercise of their respective rights and obligations under this Agreement, the Government and [the PHA] each act in an independent capacity, and neither is to be considered the officer, agent, or employee of the other," id. at 33, Art. XII.A.  All construction contracts that were part of the 45-Foot Project, including the Upper Bayou Contract, were administered by the Corps' Galveston District's Bay Area Office.  Tr. at 3083:4–6 (McClenan).  Accordingly, "the Corps ha[d] full authority" over the contract site while it was "under contract to the Corps. . . ."   Id. at 3990:10–11 (Mears); cf. JSF at 1–2, ¶¶ 2–4

(acknowledging that the Solicitation "made no mention of" the PHA, the PCA, or the Joint Venture (JV), discussed infra).  However, "[o]nce the Corps contract vacate[d] the premises, then . . . the Port [would be] responsible for maintenance" of the site.  Id. at 3990:23–25 (Mears).

The Agreement provided for the establishment of a "Project Coordination Team" (PCT), composed of representatives of the PHA[45] and the Corps.  See generally DX 327 (Agreement) at 24, Art. V.  The PCT was to provide general oversight for the 45-Foot Project, "including but not necessarily limited to matters related to quality assurance; design; plans and specifications; scheduling; . . . contract awards, modifications or claims; contract costs; . . . [and the] final inspection of the entire Project."  Id. at 24, Art. V.C.  The PCT was permitted "to make recommendations . . . to the [Corps'] District Engineer on Project-related matters."  Id. at 25, Art. V.D.  However, the Corps, as the entity legally responsible for the project, had discretion to accept or reject, in whole or in part, the PCT's recommendations.  Id.

During plaintiff's performance of the Upper Bayou Contract, the Port was represented on the PCT by, in part, members of the "Joint Venture" (JV).  Tr. at 3910:3–5 (Mears).  The JV is a business enterprise that was formed in the early 1990s by two engineering consulting firms: Gahagan & Bryant Associates, which "specializ[es] in dredging and marine construction," id. at 3890:12 (Mears), and Turner, Collie & Bradon, Inc., "a traditional civil engineering firm" that performs a wide range of construction services, see id. at 3904:25–3905:3 (Mears).  The JV "was formed specifically . . . to work with the [PHA] and the [C]orps to not only develop the plan . . . [to] widen and deepen the Houston Ship Channel, but to carry it through until completion."  Id. at 3905:10–14 (Mears).  Accordingly, at the time the JV was formed, it entered into a contract with the PHA "to assist them in developing a plan [for the 45-Foot Project] that . . . met the environmental concerns of all agencies, and . . . could be authorized and [approved by Congress]," see id. at 3907:5–8, 11–13 (Mears).  Pursuant to that agreement, the JV "provided hydrographic surveys, geotechnical investigations, [and] worked with the [C]orps to develop the concepts that went into the authorizing documents [for the 45-Foot Project]," which "Congress authorized . . . for construction in 1996."  Id. at 3907:18–21 (Mears).

After the Corps and the Port executed the PCA, the JV worked with the Corps on the plans and specifications for each contract in the 45-Foot Project.  "[T]he [C]orps did the design for the ship channel itself.  The [J]oint [V]enture did the design for where the

---

[45]The Agreement provided that the PHA's representatives "[were] not required to be employees" of the PHA.  DX 327 (Agreement) at 24, Art. V.A.

dredge[d] material was placed." Id. at 3908:11–13 (Mears).  Additionally, for each contract in the 45-Foot Project, including the Upper Bayou Contract, see 3909:8–13 (Mears), designers from the JV and the Corps engaged in an

> Independent Technical Review [process], where . . . [the JV] would give [its] plans and specifications to the [C]orps for their internal review.  At the same time, [the Corps] would give [its plans and specifications to the JV].  And then at a point in the design process, those two packages would be combined to become one contract that would be bid through the [C]orps'[] bidding process.

> After the bidding process, [the JV] were also part of the [C]orps'[] quality assurance team, providing, due to the staff limitations for the [C]orps, . . . day-to-day inspection, kind of being the eyes and ears and completing [Q]uality [A]ssurance [R]eports for the Corps of Engineers.

Id. at 3908:16–3909:3 (Mears).

The JV provided quality assurance services to the Corps throughout plaintiff's performance of the Upper Bayou Contract.  See id. at 3909:4–7 (Mears).  Prior to April 2000, representatives from the JV visited Lost Lake "approximately once a month" to check Renda's progress under the Contract.  Id. at 3914:18–20 (Mears).  However, in April 2000, the JV began to provide quality assurances services to the Corps pursuant to a Supplemental Quality Assurance (SQA) agreement between the Corps and the PHA.  See generally JX 46 (proposed SQA agreement); Tr. at 3914:21–3915:1 (Mears).  Under the SQA agreement, "inspectors [were] on site four to five days a week for four to six hours" per day.  Tr. at 3915:9–11.  The JV oversaw the inspectors, who documented each inspection on a Corps Quality Assurance Report (QAR).  Id. at 3915:15–3916:3 (Mears).  The court heard testimony of Mr. Babitzke, a quality insurance inspector, and received numerous QARs into evidence.  See, e.g., JX 11.123-JX 11.131.  The court found the testimony of Mr. Babitzke to be straightforward and credible.

IV.  The Claims

A.  Plaintiff's "South Ferry Landing" Claim

In its South Ferry Landing claim, plaintiff seeks $839,657, PX 1863A (Revised McCullough Rep.) at 1, and an 18 calendar-day extension of contract time, Compl. at 6, ¶ 38, for damages allegedly sustained between April 7, 2000 and May 17, 2000, id. at 4-5, ¶¶ 23–31, when the Millennium encountered rubble and rip-rap between Sta. 470+00 and

Sta. 472+00, in the vicinity of the South side of the Lynchburg Ferry Landing (South Ferry Landing),[46] id. at 5, ¶¶ 24, 25.

      1.    Background

     On or about April 20, 2000, plaintiff notified the Corps that "the dredge Millennium ran into debris around the Lynchburg Ferry landing and shut down to clear the cutterhead."[47]  PX 840 (Team Meeting Summary) at 2, ¶ a (footnote added); see also PX 846 (4/24/00 email from McClenan to various Corps personnel) ("Renda Marine attempted to dredge the portion of the [C]hannel near the Lynchburg Ferry this past weekend.  They were unsuccessful in completing the work because they encountered so much concrete riprap (large blocks of broken concrete).  They will attempt it again in the next week or two.").  Mr. Fisher followed up with written notice of a "differing site condition" on April 28, 2000:

     This letter is notice of differing site conditions encountered at the south ferry landing in Section #1 on the south side of the channel between Stations 472+00 and 470+00.  We have attempted to dredge this small section on portions of five days thus far and have encountered what is apparently a subsurface man-made slope protection consisting of limestone rock.

     We understand that . . . the [Character of Materials Contract clause] addresses this issue.  This clause mentions . . . ["]materials such as scrap, rope, wire cable, snags and stumps may be encountered within the specified limits of the required dredging and overdepth dredging. . . ."

     Throughout the project, we have encountered normal debris which affects our running time.  We assessed that risk and those costs are accepted as normal debris that is to be encountered.  The expectation to remove rip rap shore protection is a differing site condition as per [the Contract]. . . .

---

    [46] The Lynchburg Ferry Landing itself is located at approximately Sta. 471+50.  See JX 5 (Drawings) at 6 (drawing of North Ferry Landing).

    [47]In its complaint, plaintiff alleges that "[o]n about October 8 and 9, 1999, . . . the Millennium[] hit obstructions . . . while dredging in the vicinity of Station 470+00 (South Ferry Landing)," and that it "orally notified the Corps of differing site conditions in the South Ferry Landing Area" that same day.  See Compl. at 4, ¶¶ 20–21.  Plaintiff did not offer any evidence at trial to establish these allegations, and it appears that the correct notice dates are those supported by the evidence at trial.

. . . .

As previously noted, we have attempted to dredge this area on five different occasions and progress has been extremely slow. We still have not completed this small stretch and are scheduled to move back into the area again this weekend. At this point the differing site condition has cost us portions of five days and this will increase as we move back into the area as we try to complete this section.

If you do not wish us to dredge this area, please notify us, otherwise we must continue to try to complete the area, as it is one of the last areas remaining to be dredged in Section #1 that we are trying to have ready for acceptance surveys next week.

JX 50 (4/28/00 Letter from Fisher to McClenan) at 1–2. "On or about December 13, 2000, [Mr. McClenan,] the Administrative Contracting Officer[,] denied entitlement for the differing site condition at the South Ferry Landing." JSF at 4, ¶ 33. Plaintiff submitted its certified claim, see generally PX 7 (South Ferry Landing Certified Claim) (SFL Cl.), "[o]n or about January 10, 2001." JSF at 4, ¶ 34.

The "Lost Time and Damages Analysis" in Plaintiff's certified claim for the South Ferry Landing, see generally PX 7 (SFL Cl.) at 7–13, identifies two categories of compensable injury. First, using a "measured mile" analysis,[48] plaintiff identifies damages on April 14, 21–23, 2000 and April 30–May 3, 2000 that it attributes to a loss of productivity caused by dredging rubble and rip-rap. See id. at 7. Plaintiff's certified claim also alleges that plaintiff is entitled to damages caused by "[d]redge repair & move-in/out days" on April 24–29, May 4, and May 14–17, 2000, when plaintiff removed its dredge for repairs and subsequently returned it to the site to finish dredging in Section 1. See id.

2.    Discussion

Plaintiff has not proven by preponderant evidence all six elements of a Type I differing site condition with respect to its South Ferry Landing claim. Whether or not

---

[48]A "measured mile" analysis "quantif[ies] what a contractor should have been able to do . . . in the performance of a particular piece of work . . . over a certain time " and compares "that should-have-been quantity . . . to the actual performance." Tr. at 1653:14-19 (Smith); see also id. at 1653:23-1654:1 (Smith) ("The good thing about the measured mile is that you don't abandon the bid [estimates], but essentially the measured mile takes into account the contractor's inefficiencies or efficiencies.").

there was an affirmative indication of an absence of rubble and riprap at the South Ferry Landing was sharply contested at trial.

Plaintiff points out that Contract Drawing 6, see JX 5 (Drawings) at 6 (North Ferry Landing) (N. Ferry Drawing), which represents conditions at the "North Lynchburg Ferry Landing," shows an abundance of rubble and riprap in the area.  Although the contracts did not contain a separate drawing of the South Ferry Landing, the dredging plan does not identify the South Ferry Landing or any rubble/riprap in the vicinity of Stas. 470+00 and 473+00.  See id. at 2 (Dredging Plan).  Plaintiff argues that "[w]hile it is true that the contract documents show nothing concerning the South Ferry Landing, the absence of obstructions in the dredge template is itself an indication that there are no obstructions.  The Rottau Electric case instructs that the failure to disclose a subsurface condition is, in effect, an indication that no such condition exists."  Pl.'s Reply at 20 (citing Appeal of Rottau Elec. Co., 76-2 B.C.A. (CCH) ¶12,001 (A.S.B.C.A. June 29, 1976) ("The site plan contained in the drawings showed where existing subsurface high temperature water lines intersected the specific areas in which [two manholes] . . . were to be located.  It failed, however, to disclose the existence of the adjacent concrete structures which also were directly in the path of the two new manholes to be constructed.  This failure to disclose was, in effect, an indication that no such structures existed, which indication was incorrect.").  Plaintiff cites no trial or circuit court decision for its proposition that defendant's failure to represent a subsurface condition is an affirmative indication that no such condition exists, nor has the court located any such decision.

Defendant argues simply that "the contract for the Upper Bayou Project does not affirmatively represent or indicate that rubble or rip rap would not be encountered in the dredging prism at [the South Ferry Landing].  The contract does not say anything one way or the other about rubble or rip rap within the dredging prism at the South Ferry Landing."  Def.'s Br. at 41.

There is a potentially colorable argument that the contract documents could be read to indicate an absence of rubble at the South Ferry Landing.  While the court cannot agree with plaintiff that one can infer an affirmative contract indication where the contract is silent on the conditions at the site, e.g., Comtrol, 294 F.3d at 1363 ("A contractor is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be."), the court must read the contract as a whole to determine whether the "contract 'indication[s]' . . . provide sufficient grounds by which the contractor can justify his 'expectation of latent conditions materially different from those encountered.'"  Neal, 36 Fed. Cl. at 617 (quoting P.J. Maffei, 732 F.2d at 916) (alteration in original); accord Foster, 435 F.2d at 875 ("[A]ll that is required is that there be enough of an indication on the face of the contract

66

documents for a bidder reasonably not to expect 'subsurface or latent physical conditions at the site differing materially from those indicated in this contract.'").

If Drawing No. 6, see JX 5 (Drawings) at 6 (N. Ferry Drawing), contained the only contract representation concerning rubble and riprap in the vicinity of the South Ferry Landing, the court might agree with plaintiff that defendant's failure to indicate similar structures on the south side was misleading.  However, the Contract also contained several provisions advising the contractor to use caution when dredging in the vicinity of the South Ferry Landing, see JX 2 (Specs.) at 118, ¶ 3.5.2; JX 5 (Drawings) at 2 n.4, and advising the contractor that overdredging in this region could "cause damage to existing structures along the Channel."  JX 2 (Specs.) at 118, ¶ 3.5.2.

The court need not resolve this issue because plaintiff did not demonstrate at trial that it encountered debris within the required dredging prism.  See Weeks, 13 Cl. Ct. at 228 ("[A]ny proof of actual conditions encountered, proffered by the [contractor] to establish a differing site condition, is . . . relevant only to the extent that it represents those conditions encountered.").  After plaintiff notified defendant of the alleged differing site condition at the South Ferry Landing, defendant investigated the claim.  See Tr. at 3154:20-3155:4 (colloquy between McClenan and defendant's counsel).  However, the results of the investigation were inconclusive:

> We sent a survey vessel to the area and made some [hydrographic] surveys, and looked at the surveys.  They were, I guess, only partially conclusive, [because] the dredge had already come in and dredged that area and left, so . . . they were inconclusive as far as showing us that there was any riprap at that location.

Id. at 3155:3–8 (McClenan).[49]

---

[49]The court notes a further deficiency in plaintiff's proof that it encountered rubble and riprap in the vicinity of the South Ferry Landing on each of the days specified in its claim. During its performance of the Contract, plaintiff submitted to the Corps Inspection Reports of Dredging (IRDs), see generally JX 9 (IRD for 9/10/99–4/29/01), which documented

> the vessel crew base, characteristics of what you're dredging, the weather, temperatures, rainfall . . . production, what attendant plants were there, meaning boats, barges, supply equipment[,] . . . fuels and commodities.  [The IRD] has a distribution of time [record], which includes operating or pumping time, non-effective working time[] chargeable . . . to work, and lost time not chargeable[] . . . . to work.

(continued...)

Even if plaintiff's allegations that it encountered rubble or riprap in the vicinity of South Ferry Landing were accurate, plaintiff admits that "it appears that over dredging occurred at the South Ferry Landing," Pl.'s Reply at 20, which dislodged the shore protection material from the adjacent bank and caused the material to enter the dredging prism. Robert Lofgren, defendant's hydraulic dredging expert, reviewed defendant's hydrographic survey of the South Ferry Landing area, see DX 458, and testified that a comparison of the "pre- and post-dredge Corps of Engineers' surveys that show that Renda Marine overdredged in that particular—throughout most of the job, but [in the

_____

[49](...continued)
Tr. at 595:24–596:8 (Bowman). Mr. Bowman testified that plaintiff filled out IRDs "daily" during plaintiff's performance of the Upper Bayou Contract, and kept the same information for its own records. Id. at 596:13-21(Bowman).

The court notes that only the IRDs for April 22 and 23, 2000, reflect that the dredge Millennium encountered "rock" or "rip rap" at the South Ferry Landing. See JX 9.227.0002 (4/22/00 IRD); JX 9.228.0002 (4/23/00 IRD). The IRDs for plaintiff's other claimed "lost productivity" days, i.e. April 14, 21, 30, and May 1–3, 2000, contain no such representation. See JX 9.219 (4/14/00 IRD), JX 9.226 (4/21/00 IRD), JX 9.235–.238 (4/30/00–5/3/00 IRDs).

Second, it appeared at trial that the Millennium was not operating in the area of the South Ferry Landing on April 30 and May 1, 2000. As the Government's damages expert, Mr. Connole, demonstrated, the Millennium was engaged in sweeping operations on the north side of the Channel on those dates. See generally Tr. at 4953, 4955-4966 (Connole) (discussing JX 9.230.0002, JX 13.127, JX 15.011.0002, JX 15.011.0003, JX 15.015.0002, JX 15.015.0003, JX 12.211, JX 12.212).

Also problematic is plaintiff's claim that it is entitled to compensation for "dredge repair and move-in/out" on April 24–29, 2000, May 4, and May 14–17, 2000. The evidence presented at trial indicates that the Millennium was not being moved in or out of the South Ferry Landing on these days, nor was it down for repairs related to the alleged rubble and riprap at the South Ferry Landing. Plaintiff's IRDs for these dates, see JX 9.229–9.234 (4/24/00–4/29/00 IRDs), state that the dredge was "sweeping" other parts of the Channel on these dates, accord Tr. at 4978: 15–19 (Connole explaining that "sweeping is clearing the channel of material that remains above the dredge prism, but generally they've already taken pay quantity credit for that material in a previous report, and so they don't report any material being removed that day."). Similarly, between May 14 and 17, 2000, the Millennium was down for scheduled maintenance, and could not have been moved in or out of the Channel on those days. See JX 11.023.0001 (5/19/00 Corps Quality Assurance Rep.) ("Dredge Millennium down for scheduled maintenance for past 5+ days[.] Once dredge is running again anticipate sweeping sections 2 & 3. Section 1 should be accepted soon[.]"); PX 1863 (McCullough Rep.) at 76 (summary of plaintiff's Daily Dredging Reports) (showing repair and scheduled maintenance on these days).

68

South Ferry Landing] by as much as 70 feet." Tr. at 4397:25–4398:3 (Lofgren). Mr. Lofgren explained that such excessive overdredging could have caused shore protection material on the bank outside the dredging template to fail and fall into the template:

> [The Contract Drawing], which [shows] the north side of the [Ferry Landing, which is outside the contract site], . . . shows a submerged rock groin, I will call it, located just approximately at the top of the slope line on that side. I think it's fair to assume that if there's a submerged rock run on that side, there's probably one on the other side. And they're liable to find that rock groin right on the top of the slope so any overexcavation is going to bring that rock down to you.

Id. at 4395:19–4396:2 (Lofgren); accord id. at 4395:17-19 (Lofgren opining "that . . . the contractor overdredged the silts, which might have caused some material to come into the channel from upon top.").

Although it is debatable whether Contract representations concerning conditions at the North Ferry Landing, see JX 5 (Drawings) at 6 (showing riprap at the North Ferry Landing), can be imputed to the South Ferry Landing, the Contract Specifications instructed plaintiff to "use caution when cutting the side slopes in the Channel from Station 470+00 to Station 473+00," JX 2 (Specs) at 118, ¶ 3.5.2; accord JX 5 (Drawings) at 2 n.4 (same)—the precise region near the South Ferry Landing where plaintiff allegedly encountered shore protection material, see JX 50 (4/28/00 Letter from Fisher to McClenan) at 1.[50] The Specifications further caution that "[e]xcessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel," and that "the Contractor may consider shaping the top of the cut in these reaches by using the dredge cutter head or mechanical equipment." JX 2 (Specs.) at 118, ¶ 3.5.2.

Plaintiff acknowledges that "the documents did warn the contractor to be 'careful,'" but insists that such a warning is without effect because the Contract "did not warn of what to be careful." Pl.'s Br. at 45. Plaintiff's argument is misplaced. By overdredging as much as 70 feet in this region, plaintiff did not heed the Contract terms.

---

[50]At a meeting between representatives of Renda, the Corps, and the JV to discuss plaintiff's South Ferry Landing Claim, Mr. Bowman initially claimed that the post-dredging surveys did not show any overdredging, see Tr. at 3785:17–20 (Leon Hrabovsky, Construction Manager for the JV), and then insisted that the caution against overdredging in the Specifications "was meant [only] for the north ferry landing and not the south ferry landing," id. at 3786:23–25 (Hrabovsky). There is no indication in the Contract plans and specifications that this provision is so limited, and the court finds such an interpretation to be unreasonable.

When asked how a reasonably prudent contractor would proceed in the vicinity of the South Ferry Landing, in light of the caution in paragraph 3.5.2, Mr. Lofgren opined that a "maximum [of] about six feet" of overcutting would be reasonable.  Tr. at 4399:23–4400:2 (Lofgren).  Even if Mr. Lofgren's estimate is overly cautious, plaintiff's excessive overdredging was not reasonable in light of the Contract's express caution against such activity.

Even if plaintiff had proven that it actually encountered rubble and riprap near the South Ferry Landing which was not shown in the contract documents, plaintiff failed to prove that such material would be reasonably unforeseeable to a reasonable contractor. At trial, defendant's damages expert, Mr. Connole, presented photographs of the South Ferry Landing taken in November 2003 that prominently show the presence of broken concrete shore protection.  See DX 19 (Connole Rep.) at 39, Figs. 4.1.1 and 4.1.2.  Mr. Connole testified to a conversation with Ferry personnel concerning this material:

> While I was at the South Ferry Landing, I observed the rubble along the shore from about Station 470 up to about 473, and I wanted to visit with somebody at the office to find out when that material was placed . . . on the south shoreline of the South Ferry Landing.  [I visited with David Starett, the superintendent of ferries], and he indicated that he'd been there 20 years, and the material had been placed there when he arrived.  I was concerned that it might have been changed from the time that Renda Marine had done their work.

Tr. at 4928:7–4929:3 (Connole).

Mr. Fisher could not "recall one way or another" whether he viewed shore protection in the vicinity of the South Ferry Landing, JX 98A (Fisher Dep.) at 107:5–15 (colloquy between Fisher and defendant's counsel).[51]  However, when preparing plaintiff's bid for the Upper Bayou Contract, he anticipated that the Millennium would encounter "common types" of debris, such as "rock, debris from—ri[p]ra[p] from shore protection projects."  JX 98A (Fisher Dep.) at 222:16–24 (colloquy between Fisher and defendant's counsel).  When questioned by defendant's counsel concerning the location of such obstacles, Mr. Fisher testified:

---

[51]Of course, plaintiff's visual site investigation conducted late in the day and in the evening does not appear to have been reasonably calculated to reveal information from the most obvious visual clues.

I guest starting at . . . what's called the downstream limit of the project, in the sections [of the Channel] between [Stas.] 470[+00] and 476[+00], both banks of that area would be considered areas that could contain trash. They are adjacent to the ferry landing, which is a vessel . . . [that] could possibly discard ropes and other debris . . . and also could be an area where some underwater support or landing could contain some debris. So that was an area that was considered [prior to bidding]—that accounted for some lost time.

Id. at 224:14–24. Because plaintiff specifically anticipated prior to bidding that the area near the South Ferry Landing could contain underwater support, which could include shore protection material, and because plaintiff factored into its bid "lost time" caused by encountering such material, plaintiff cannot prove that it was misled by an affirmative representation in the Contract drawings, see generally JX 5 (Drawings), or the Character of Materials clause, see JX 2 (Specs.) at 10, ¶ 1.11.1 ("Other material such as scrap, rope, wire cable, snags, and stumps may be encountered . . . . No separa[t]e payment will be made for removal and placement of this debris.").

> 3.    Conclusion

Because plaintiff failed to prove by preponderant evidence that (1) it encountered rubble or riprap at the South Ferry Landing; (2) that such material was reasonably unforeseeable; and (3) that it acted as a reasonable contractor when it disregarded the caution in the Contract Drawings and Specifications against overdredging in this region, plaintiff has not established that it encountered a Type I Differing Site Condition.

> B.    Plaintiff's "Flare Area"[52] Claim

In its Flare Area claim, plaintiff seeks $906,364, PX 1863A (Revised McCullough Rep.), and a 76 calendar-day extension of contract time, see Compl. at 10, ¶ 67, for lost productivity caused when plaintiff encountered stiff clays in the reach of the Channel between Stas. 520+00 and 550+00, id. at 8, ¶ 53; see generally JSF at 5-7, ¶¶ 40-63; PX 1.001 (Flare Area Certified Claim) (Flare Cl.)—a location where plaintiff claims that it had anticipated dredging soft clays.

> 1.    Background

---

[52]The width of the Channel flares out in this area "from 400 . . . to 600 feet" to allow ships easy passage. Tr. at 379:24-380:2 (Bowman); see also id. ("[T]hey widened the channel floor . . . [so that] a ship can pull in, and another [ship] can get by.").

In a letter to defendant dated March 30, 2000 Mr. Fisher provided notice to the Corps of the factual allegations underlying plaintiff's Flare Area Claim:

This letter is a request for additional contract days for work on the [Upper Bayou Project]. In a previous correspondence of January 5, 2000 we had responded to requests concerning production rates and the ability to meet the schedule.

At that time our dredge was entering the "flare" area of the project where the bulk of the material is located. We had planned for productions of near 25,000 cubic yards per day in most of the area.

Borings 93-62 and 93-63 show very soft materials to near the required dredging line at -47 [MLT]. Based on this information we estimated productions in the 25,000 cubic yard per day range in this area that contains approximately 900,000 cubic yards. Based on that production estimate the area should have been able to be dredged in 36 days.

Upon reaching the area, we encountered stiff clays at a much higher elevation than the -47 [MLT] as shown on the borings. At the downstream end of the flare, borings showed the stiff clay line to be at approximately -46 [MLT]. We encountered the clays at near -40 [MLT] and dredged the area to grade up to Station 534+00. From Station 534+00 upstream, the clay level continued to rise reaching as high as -10 [MLT] on the slopes and -15 [MLT] in the center of the flare area.

Our production estimates for soft muds were proven correct by production rates in excess of the 25,000 cubic yard per day when dredging very soft clays. During the period from January 29 to February 21 when making the first pass over this area, the dredge had production rates of 20,000 cubic yards eight days; in excess of 25,000 cubic yards four days and in excess of 30,000 cubic yards once.

During this period, however, as has been noted the productions were inconsistent. At a time when clays were not shown to be present at the depths being dredged, we did encounter stiff clays, which slowed production and also contributed to the plugged lines, which also hindered production.

>       We are requesting an additional 100 days for the difference in
> the production to dredge soft clays versus the time required to dredge
> stiff clays, and the associated down time caused by plugged lines
> caused by encountering stiff clays in areas where borings indicated
> soft clays.

DX 437 (3/30/00 Letter from Fisher to McClenan) at 1–2.

On February 14, 2001, plaintiff submitted a REA to the Corps, seeking $3,641,643 plus 76 calendar days for lost productivity, to include down time associated with plugged lines experienced by the Millennium while dredging in the Flare Area. See PX 1.0001 (Flare Cl.) at 129 (Flare REA Damages Summary); id. at 125 (2/14/01 Letter from Bowman to McClenan accompanying the REA). On or about March 7, 2001, plaintiff resubmitted its REA as a certified claim and adjusted its claimed damages. See Compl. at 10, ¶ 68. As amended, plaintiff's certified claim sought $4,691,688 in damages, PX 1.00.01 (Flare Cl.) at 3 (Damages Summary) and alleged a 104-day "impact period,"[53] which includes 81 "dredging days" and 23 "'lost' days for line plugs & move-in/out days." Id. at 4.

On March 14, 2001, Mr. Benero, the contracting officer, issued unilateral Contract Modification P00023. See JX 6.023 (Mod. P00023) at 1. Mr. Benero's "Statement of Change" in that modification provided:

> The Flare Area in subject contract, Station 520+00 to Station 550+00, was
> part of the overall dredging limits of the contract . . . . The contract
> drawings contain soil borings that show material in the flare area to be soft
> to very soft clay. However, upon commencement of dredging in this area
> the material encountered was stiff clay that caused the dredging contractor
> to lose production and take longer to complete the work. The Contracting
> Officer has determined that the contractor incurred a changed condition
> from that shown in the contract and therefore is entitled to be compensated
> for the additional work.

---

[53] The dates of plaintiff's claimed impact period are January 23–27, 2000; February 4–14, 2000; February 19–29, 2000; March 1–11, 2000; July 17–August 2, 2000; August 4–September 5, 2000; September 7–11, 2000, and September 19–29, 2000. See PX 1.001 (Flare Cl.) at 139–40; Tr. 2081:2–2083:23 (Barry Smith, the claims consultant who prepared plaintiff's REAs and certified claims in this matter).

Id. at 2, ¶ A.  Modification P00023 increased the contract price by an amount "[n]ot to [e]xceed $3,083,833.00" and extended the time for completing the Contract by 56 calendar days, from May 3, 2000, to June 28, 2000.  Id. at 2, ¶¶ D–E.  However, the modification provided that

> [t]he not-to-exceed price stated in this modification does not necessarily represent the Government's estimate of the cost of the work, but is merely an amount administratively obligated so payment can be made.  The final negotiated price for this modification may be less than the not-to-exceed price.  A supplemental agreement will be issued to definitize any time and pricing adjustments related to this change upon mutual agreement.

Id. at 2, ¶ G.  Defendant ultimately paid plaintiff the full not-to-exceed amount of $3,083,833 for the Flare Area REA.  JSF at 7, ¶ 60.

On or about August 9, 2001, plaintiff purportedly[54] submitted another certified claim to the contracting officer, see Compl. at 11, ¶ 72, seeking $1,607,855—the difference between the $4,691,688 total amount claimed by Renda under the Flare Area REA and the $3,083,833 that plaintiff received pursuant to Modification P00023.  Cf. PX 1863A (Revised McCullough Rep.) at 1 & n.** (showing that plaintiff's "[o]riginal REA submission" for the Flare Area Claim was $1,607,855 and explaining that this amount reflects the "[o]riginal REA amount ($4,691,688) less . . . [the] amount paid by USACE ($3,083,833)").  Plaintiff presently seeks $906,364 under its Flare Area claim.  See PX 1863A (Revised McCullough Rep.) at 1.

> 2.   Discussion

The court finds that plaintiff is not entitled to additional compensation under its Flare Area claim because it has not proven by preponderant evidence each of the six elements of a Type I differing site conditions claim.

> a.    Plaintiff's Interpretation of the Contract Documents was Not Reasonable

Plaintiff claims to have relied solely upon two boring logs located in the Flare Area—logs 93-62 and 93-63, see JX 5 (Drawings) at 21 (Logs of Borings)—to predict the

---

[54]Because neither the certification letter nor the Executive Summary from plaintiff's Flare Area claim are in evidence the court has no direct proof that plaintiff submitted its claim on August 9, 2001.  Defendant, however, did not challenge plaintiff's allegation.  Accordingly, the court views those facts as undisputed.

character of materials it would encounter in the Flare Area.  The court notes that these two boring logs are centrally located within the Flare area, see JX 5 (Drawings) at 3 (Dredging Plan), and understands why they would be the first borings that a contractor would examine to determine the character of soils in the vicinity.  In this case, however, borings 93-62 and 93-63 provide an incomplete account of the character of materials to be dredged in the Flare Area.

The top of boring 93-62 is approximately -33 feet MLT and the top of boring 93-63 is approximately -44 MLT.  JX 5 (Drawings) at 21 (Logs of Borings); PX 371 (Enlargements of Boring Logs) (Boring Enlargements) at 111–12; accord Tr. at 1974:11–19 (Dr. Mathewson, plaintiff's geotechnical expert).  According to Dr. Mathewson, "one would assume water [was located above the tops of these borings], but it also could be nonrecorded data."  Id. at 1975:22–23 (Dr. Mathewson).  Because neither boring provides any indication of the character of soils between -10 and at least - 33 Feet MLT, the court finds that plaintiff's use of these two borings and its failure to consider other nearby borings to predict the character of materials in the Flare Area was neither a reasonable nor prudent manner of interpreting the contract documents—especially where other borings in the vicinity provided a more complete picture of the soils to be dredged.  Cf. Tr. at 4410:11–4414:19 (Lofgren, defendant's expert in hydraulic dredging, including the preparation of bid estimates for hydraulic dredging work, opining that a reasonable contractor would not rely on borings 93-62 and 93-63 to the exclusion of other nearby boring logs, such as 3ST-4, 3ST-5, 3ST-6, 72-105 and 3ST-8W because 93-62 and 93-63 "start out a[t] a very deep elevation . . . so there's no dredging there anyhow.  And the primary material in there is very fine with hydrocarbons, which means that . . . it has been [much] deeper than this at one time or other and has filled in.").

The court notes that, boring logs 3ST-4, 3ST-5, and 3ST-6, although located on the opposite side of the Channel from the Flare Area, provide a more complete picture of the soils to be dredged in the vicinity of the Flare Area than 93-62 and 93-63.  The tops of each of these logs is located between 0 feet MLT and +10 Feet MLT.  JX 5 (Drawings) at 21; PX 371 (Boring Enlargements) at 33–36.  Each of these logs shows stiff or hard clay at approximately -35 feet MLT through at least -45 feet MLT.  Id.  These contract indications are consistent with the condition plaintiff encountered in the Flare Area.  See DX 437 (3/30/00 Letter from Fisher to McClenan) at 1 ("We encountered the [stiff] clays at near -40 [MLT].").  To the extent that plaintiff disregarded these borings logs entirely and decided to rely solely upon logs 93-62 and 93-63 to predict the character of materials to be dredged in the Flare Area, plaintiff did not act as a reasonably prudent contractor.[55]

---

[55]The court also notes that, in an October 13, 1999 letter to the Corps reporting on

(continued...)

b.      Stiff Clay in the Flare Area was Foreseeable

Plaintiff's asserted, both in its letter to the Corps, see DX 437 (3/30/00 Letter from Fisher to McClenan), and at trial, that only boring logs 93-62 and 93-63 were useful for predicting conditions in the Flare Area.  The court notes, however, that Mr. Fisher appears to have anticipated stiff clays in the Flare Area when preparing plaintiff's bid for the Upper Bayou Contract.  First, Mr. Fisher's "Stiff Clay Spreadsheet" indicates that he expected to encounter approximately 223,000 cubic yards of stiff or very stiff clay between Stas. 520+00 and 550+00, JX 28 (Stiff Clay Spreadsheet) at 7; JX 38 (same)—the precise area at issue in plaintiff's Flare Area claim, see PX 1.001 (Flare Cl.) at 2.

That Mr. Fisher expected to encounter stiff clay in the Flare area is underscored by a December 1988 submittal to the Corps which Mr. Fisher prepared to illustrate plaintiff's process for constructing the hydraulic levees.  See generally DX 356 (12/1/98 Construction Plan for Retaining Levees) (Retaining Levee Plan).  In conjunction with this submittal, Mr. Fisher prepared a color-coded chart, which superimposed a color-coded copy of a Contract Drawing of Dredge Sections 1–5, see JX 5 (Drawings) at 3, with a corresponding color-coded copy of the Contract Drawing of the Lost Lake Placement Area, see id. at 14.  See DX 356 (Retaining Levee Plan) at 6–8 (black and white copies); DX 357 (12/3/98 Agenda for Preparatory Meeting between plaintiff and defendant) (12/3/98 Agenda) at 9 (color-coded copy).  The purpose of this drawing was to show which part of hydraulic levees would be constructed from the suitable levee-building material (i.e., medium to hard clays) to be obtained from each Dredge Section, including the parts of Sections 4 and 5 located in the Flare Area.  See DX 357 (12/3/98 Agenda) at 9; accord Tr. at Tr. 3558:15–3559:10 (Darillo Herrera, plaintiff's project engineer and quality control coordinator for the Upper Bayou Contract, discussing plaintiff's use of this document to show the Corps locations in the Channel where plaintiff planned to obtain materials for constructing the hydraulic levees).

---

[55](...continued)
plaintiff's progress under the Contract and responding to the Corps' "concerns" that "[dredging] production in the northern half of Sections #1 and #2 [was] low," JX 41 (Letter from Fisher to McClenan) at 1, Mr. Fisher stated that he expected "productions to increase to more than 20,000 cubic yards per day" when plaintiff entered the Flare Area:  "After completing the north half of Section 3, we will dredge across to the flare portions of Sections 4, 5 and 6.  These areas . . . consist of very soft clays except for the section beginning in Section 6[iv]."  Id.  "Note iv," which appears at the end of this statement, reads, "See borings Nos. 93-62, 3ST-4, 3ST-5, and 93-63."  Id. at 2.  To the extent that plaintiff did rely on borings 3ST-4 and 3ST-5, which indicate that plaintiff would encounter stiff or hard clay between -35 feet MLT and -45 feet MLT, plaintiff's interpretation of those logs was not reasonable.

It appears to the court that, prior to its bid, plaintiff expected to encounter stiff clays in the Flare Area—and, in fact, relied on its estimates concerning the quantity of such materials when preparing its levee construction plan.  Accordingly, the court cannot conclude that the materials encountered by plaintiff in the Flare Area were reasonably unforeseeable.[56]

---

[56]Notwithstanding plaintiff's initial belief that it would encounter stiff clays in the Flare Area, the court notes that plaintiff expressed increased uncertainty concerning the materials it would encounter in the Flare Area after Contract performance was well underway.  For example, in a July 1999 letter to Mr. McClenan, Mr. Fisher appears to have revised his expectations concerning the materials to be encountered in the Flare Area:

> The construction of the hydraulic levees will be able to be judged more accurately after dredging begins in Sections #4 and #5.  These sections contain almost one million cubic yards of material, but very little that is classified as stiff or very stiff clay. If this soft to medium clay is able to be worked in the hydraulic levees, this phase of the project will be completed by the time the dredge completes Section #6. If very little of this material in this area is used, the hydraulic levee construction will continue throughout most of the project.

JX 36 (7/7/99 Letter from Fisher to McClenan) at 2 (providing a schedule to the Corps for the work remaining under the Contract).  One month later, during a preparatory meeting between plaintiff and the Corps concerning the construction of the hydraulicly-placed levees, Mr. Fisher commented to Corps personnel that

> based on his review of the core borings, there would be stiff clays present in the north side of sections #1 and 2.  However, the material in Sections #3, 4 and 5 was not able to be sufficiently identified by borings as material suitable for the construction of hydraulic levees.

JX 39 (8/05/99 Letter from Herrera to McClenan) at 1, ¶ 4.  When questioned by defendant's counsel concerning this comment, Mr. Herrera explained that he and Mr. Fisher "studied the borings and came up with that, and we relayed that to [Corps personnel] Eric Russek and Tim Few."  Tr. at  3584:4–6 (Herrera).

That Mr. Fisher revised his expectations of the conditions in the Flare Area after contract performance had commenced is not relevant to the court's analysis of plaintiff's differing site conditions claim.  While the conditions encountered by plaintiff in the Flare Area differed from Mr. Fisher's revised expectations, the site conditions appear to be consistent with Mr. Fisher's pre-bid expectations, as reflected in his Stiff Clay Spreadsheet and subsequent Retaining Levee Plan.

c.    Plaintiff Has Not Established that its Injury is Solely Attributable to the Actual Subsurface Conditions it Encountered

Plaintiff claims that the stiff clays it encountered in the Flare Area caused the Millennium to experienced plugged lines and slower productions.  See JX 1.001 (Flare Cl.) at 4 (Damages Analysis).  However, plaintiff failed to prove at trial that these injuries were "solely attributable" to the alleged differing site condition in the Flare Area.  See Weeks, 13 Cl. Ct. at 218.  For example, several witnesses testified at trial that plugged lines can occur when dredging in virtually any material.  E.g., Tr. at 2554:13–14 (Smith stating that "dredging in any material can result in a plugged line."); id. at 2782:17–25 (Goodloe stating that the lines on the Millennium were plugged "[m]ainly . . . due to trash.  And one of the other things that happens is when you're pumping a lot of debris, they'll be going through your pipeline, and at the ball joint connections a rock or cable or steel will hang up in one of the ball joint connections . . . and . . . that will plug your pipeline.  There's nothing you can do about that.").

The court notes that it is at least as likely that plaintiff's reduced productions and plugged lines were caused not by the stiff clay materials at the site, but by a malfunctioning flow meter or density meter on the Millennium.  A flow meter "basically gives you the gallons per minute coming out of, usually, the pump discharge."  It operates in conjunction with a density meter, "which measures the density of the solids versus the water," to calculate a production rate for a dredge.  JX 98A (Fisher Dep.) at 328:12–329:1.

In an internal memorandum dated March 18, 2000, from Mr. Fisher to Heraclio Lopez, "a leverman at the time," and Arturo Rodriguez, "who served as chief engineer and, for a short time, captain," JX 98 (Fisher Dep.) at 329:15–21, Mr. Fisher wrote:

I know we have been operating without the flow meter for a good while, but we are working to get it back on line ASAP.  Without the flow meter, we are constantly in danger of plugging the line and cannot maximize production.  I have included some info about its importance from reference books.

DX 429 (3/18/00 Memo titled "Velocity Meter for Millennium") at 1.  The materials appended to Mr. Fisher's memorandum explained that

Automatic slurry velocity control is so inexpensive relative to its operation, that it should be included on most hydraulic dredges.  This control has contributed to surprisingly large increases in production rate[s] . . . .  The control is simple.  As an example, a strap-on doppler velocity meter senses

78

the slurry velocity, sending a corrective signal to an engine throttle controller, functioning through an air-powered positioner.  This positions the throttle to adjust the pump speed up or down as required to keep the slurry velocity in the selected range for efficient transport of solids. With the all-important slurry velocity assured, the leverman is free to devote his time to other factors which affect production.

Id. at 4 (excerpt from Dredging In Practice 203–04).  When asked about this memorandum during his deposition, Mr. Fisher also testified that, while performing the Upper Bayou Contract, plaintiff's density meter "wasn't functioning a lot of the time when [he] was there."  Id. at 330:20–23.

Plaintiff failed to demonstrate at trial that its plugged pipelines were solely attributable to the stiff clays it allegedly encountered in the Flare Area.  Because it is likely that a "concurrent cause" caused or contributed to plaintiff's difficulties in the Flare Area, and because plaintiff has not separated "damages directly attributable to the alleged differing site condition . . . [from] those damages for which concurrent causes . . . are equally to blame," Weeks, 13 Cl. Ct. at 240, plaintiff has failed to prove by preponderant evidence that it was damaged by a differing site condition in the Flare Area.

> 3.    Damages

In its post-trial brief, defendant correctly argues that "The Government is not precluded by anything contained in Modification P00023 from litigating all aspects of the Flare Area Claim, including liability, causation, and damages."  Def.'s Br. at 52 (citing Smoot, 388 F.3d at 853-57).  The court agrees with defendant that the contracting officer's decision to modify the contract and ultimately award plaintiff $3,083,833, for "incurr[ing] a changed condition from that shown in the contract," see JX 6.023  (Mod. P00023) at 2, ¶¶ A, D, is not final and that plaintiff was required to "litigate entitlement to the entire equitable adjustment amount claimed, not just the difference between the amount Renda claimed and what it was paid."  Def.'s Br. at 53 (citing Transamerica Ins., 28 Fed. Cl. at 423 & n.4).

> C.    Plaintiff's "Section 7 Clay" Claim

In its Section 7 Clay claim, plaintiff seeks $944,099, see PX 1863A (Revised McCullough Rep.) At 1, and a 21 calendar-day extension of contract time, Compl. at 13, ¶ 88, for lost productivity allegedly suffered between October 2 and November 6, 2000, when plaintiff "encountered stiff clay material [in Dredge Section 7] between stations 561+00 and 609+00," id. at 12, ¶ 84; JSF at 8, ¶ 72.

1.      Background

In a letter dated October 20, 2000 Mr. Bowman notified defendant of the factual allegations underlying plaintiff's Section 7 Clay claim:

On October 5, 2000, while the Millennium was dredging on the North side of the [C]hannel at station no. 565+00 in Section 7, the dredge encountered hardpan, heavy red clay.  The dredge continued moving up station working in the clay through station 575+00.  At this time, the dredge moved to station 580+00 and began dredging toward station 575+00.  The dredge immediately encountered heavy red clay in this area.  The Differing Site Condition has affected production.  Further, it is [my] opinion that this heavy red clay may continue in Section 7 where none was anticipated.  RMI intends to request extra time and money for this condition.

PX 1027 (10/20/00 Letter from Bowman to McClenan) at 1.  The administrative contracting officer rejected this claim in a letter dated December 13, 2000:

The soil borings shown in the contract drawings pertaining to this area indicate stiff to very stiff clays and medium dense to dense sands.  Encountering these materials should be anticipated in various areas during dredging operations.  We do not consider this issue to have merit.

PX 1158 (12/13/00 Letter from McClenan to Bowman) at 3.

Plaintiff responded at length to defendant's denial on December 20, 2000:

On October 20, 2000, RMI reported to the Government that the dredge had encountered hardpan, heavy red clay . . . between station nos. 565+00 and 580+00 . . . .  The Contract Drawings show three soil borings in the area[:] . . . Nos. 93-65, 3ST-13W and 3ST-14.  An analysis of the soil borings shows that the majority of the material should have been soft to very soft light gray to gray silty or sandy clays, except small pockets (shown on only one boring) of stiff rusty-blue gray clays near the bottom of the dredging prism.  Instead, the dredge encountered red, hardpan clay throughout this area, but especially in the slopes. . . .

The Government directed that all clay material recovered from this area of Dredge Section 7 be placed on the new levees to "build foundations."  With the ever-present Government threat of termination hanging over the Contractor, RMI proceeded with dredging operations in

80

the area so as not to delay the Project.  Almost two months after RMI's notification, the Government has now decided that no merit exists, without ever visiting the area in question.  This "after-the-fact" analysis . . . is unreasonable and continues to hamper our efforts to substantiate changes.  The Government was afforded ample time to properly investigate . . . but . . . failed to examine the affected area or provide any direction.  Fortunately for RMI, the hard, red clay material has not been placed on the levee, and is available for Government review and analysis.[57] . . .  RMI will not relocate this material without a written directive from the Government.

. . . .  The Government has a duty to investigate these issues prior to the area(s) being disturbed.  RMI maintains the position that the Government has tacitly agreed that these types of issues have merit since, following notification by RMI, Government representatives refused or failed to inspect the area(s) prior to being disturbed, while demanding that work proceed without delay or face immediate termination.

---

[57]Mr. Bowman explained plaintiff's rationale for not placing the Section 7 clay on the levee:

I asked [Mr. Goodloe if he] . . . [w]ould . . . please dump off a representative sample of this material so we can get the Corps back out here to look at this.  Instead of putting it into the levee, which, if we [had] installed all this material on the levee, our argument that we had hit a differing site condition probably would not have been—we would have had no physical proof of that.

So we dumped a significant amount of material at, I believe, [Sta.] 118+00, or we had a bypass in the line.  And then the remainder of the material was put into the levees.

Tr. at 1233:3–13 (Bowman).  When questioned during cross-examination concerning the amount of clay that had been "stockpiled" by plaintiff, Mr. Bowman replied, "I didn't physically measure the area, but a couple of hundred feet by a couple of hundred feet potentially."  Id. at 2187:10–12 (Bowman).  Mr. Bowman later testified that, plaintiff ultimately "[h]auled 115 loads" of this "stiff to very stiff tan/red clay" when plaintiff relocated the stockpiled material to construct the North Levee.  Id. at 2360:23–2361:5 (Bowman).  Rudy V. Renda, son of Rudy J. Renda and "superintendent of the levee construction" on the Upper Bayou Project, id. at 2597:15-16, 2599:20-21 (R.V. Renda), also testified that a "vast quantity" of "good levee-building material" was relocated from approximately Sta. 120+00 to build foundations at the North Levee.  See id. at 2725:18–2727:10 (R.V. Renda).

81

> RMI disagrees with the Government's statement that this issue has no merit.  RMI intends to submit a Request for Equitable Adjustment for this work.

PX 1175 (12/20/00 Letter from Bowman to McClenan) at 4–5 (footnote added).

Approximately four months later, plaintiff submitted a "Request for Equitable Adjustment (REA) of the Contract Price for Differing Site Conditions encountered while dredging in Section 7 (between stations 561+20 and 609+00)[58] during the period between October 2, 2000 and November 6, 2000."  PX 6.001 (Section 7 REA) at 2 (4/16/01 Letter from Bowman to Benero) (footnote added).  Referencing its "detailed response" in Mr. Bowman's December 20, 2000 letter, plaintiff described the alleged differing site condition as follows:

> In short, RMI encountered hardpan, red clay, which we have explained in meetings and correspondence[] is very difficult to dredge through.  Conversely, the soil borings for the North reach of Section 7 clearly show gray and blue clays, which although "stiff" or "hard[,]"[] are relatively easy for the cutterhead to dredge through.  RMI anticipated having to dredge gray and blue clays, not hardpan, red clay, as intimated by the December 13, 2000 correspondence.

---

[58]When asked why plaintiff "expand[ed] the portion of the . . . [C]hannel in which this alleged differing site condition occurred . . . from . . . [Stations] 565 to 580 to the 561 to the 609," Tr. at 2194:7–11 (Bowman),  Mr. Bowman replied:

> From memory, I would assume that once we had analyzed the entire event it entailed [an extra] 400 feet on the low end and . . . another thousand or two feet on the upper end.  Again, I don't know exactly why 565 to 580 was listed [in the notice letter] and an expanded station was listed on the [REA].

> . . . .

> [T]he notice was—at this point this was not in an [REA] or a claim basis.  It was giving the Government an area to have them go look at this material.  This was a notice that the condition was present.  I would assume that once we had analyzed this that the actual exact station—you know, from 561[+]20 . . . [to] 609.  Again, I don't recall exactly what caused the expansion of this area, but I assume after we analyzed this it incorporated more area than we originally thought.

Id. at 2194:13–18, 2195:7–15 (Bowman).

. . . .

> Although the Government had previously denied merit for this issue in its December 13, 2000 correspondence, RMI does not believe that an adequate discussion and review of the issue has been performed.  Therefore, at this time, we do not wish to submit this REA as a claim, but reserve our rights to do so at a later date . . . .

Id. at 3.  Plaintiff resubmitted its REA as a certified claim on August 9, 2001.  See PX 6.002–.003 (Section 7 Clay Certified Claim) (Section 7 Cl.).

> 2.   Discussion

Notwithstanding defendant's alleged lack of responsiveness to plaintiff's Section 7 Clay claim,[59] plaintiff failed to prove by preponderant evidence at trial that the hard red clay it encountered in Section 7 constitutes a differing site condition. As a threshold matter, the court questions the sufficiency of plaintiff's notice to the government concerning this claim.  In its October 20, 2000 letter, Mr. Bowman provided plaintiff's first notice to defendant that it had encountered "hardpan, heavy red clay" two weeks earlier between Stas. 565+00 and 580+00.  PX 1027 (10/20/00 Letter from Bowman to McClenan) at 1; JSF at 8, ¶ 73 (describing this letter as plaintiff's notice to defendant); Compl. at 12, ¶ 84 (same).

Although Mr. Bowman's December 20, 2000 correspondence with defendant describes the condition in far greater detail than his initial notice, this second letter maintains that the alleged differing site condition was located between Stas. 565+00 and 585+00 and alleges that plaintiff encountered stiff red clay where it expected to encounter "soft to very soft light gray to gray silty or sandy clays, except small pockets (shown on only one boring) of stiff rusty-blue gray clays near the bottom of the dredging prism."  PX 1175 (12/20/00 Letter from Bowman to McClenan) at 4.  Based upon the allegations in plaintiff's notice and follow-up correspondence, defendant's response that stiff clays were to be expected in Section 7 based upon the representations in the boring logs was not unreasonable.

_____

[59]At the pretrial conference, plaintiff expressly stated that it was not alleging that the government acted in bad faith: "We don't have th[e] claim [that the government had specific intent to injure.]" Transcript of Pretrial Conference (Pretrial Tr.) at 128:11-16 (colloquy between plaintiff's counsel and the court).

Not until plaintiff submitted its REA six months following its initial notice did plaintiff provide the government with an overview of its Section 7 Clay differing site conditions claim: (1) that plaintiff encountered stiff red clays where it expected to encounter stiff gray clays, and (2) that this alleged condition spanned some two thousand feet more of the Channel than plaintiff first stated in its October 20, 2000 letter.[60]  See PX 6.001 (Section 7 REA) at 2.  Based upon the evidence presented at trial, it is far from clear that defendant was timely notified of the basis for plaintiff's differing site condition claim.

Even assuming that plaintiff's notice was timely and sufficient, plaintiff has not proven by preponderant evidence that the conditions plaintiff actually encountered in Section 7 were materially different from the conditions plaintiff expected to encounter when crafting its bid. As an initial matter, Mr. Fisher testified that "[b]ased on historical [experience], based on the borings, and based on . . . visual sightings at the Lost Lake Placement Area," JX 98A (Fisher Dep.) at 122:25–123:2, he expected to encounter stiff red clays, known as "Beaumont clay" somewhere in the Upper Bayou Contract site. See id. at 122:14–19, 22 ("Houston is known for having some red, stiff clays.  And so that type of general knowledge of . . . [the] sand or clay to be present in the area is just something that is associated with a project in a particular geographic location.").  In fact, Mr. Fisher noted that, during the pre-bid site investigation, he observed "some red and yellow [stiff] clays that comprised most of what I'm calling the south wall [of the levees] adjacent to the [C]hannel," id. at 123:16–18, and the location of these clays revealed that they were among the "most recently dredged" materials from the Channel, see id. at 123:5–12.

Both the boring logs in the Contract Drawings and Mr. Fisher's "Stiff Clay Spreadsheet" support Mr. Fisher's pre-bid expectations.  There are thirteen boring logs in the area covered by plaintiff's Section 7 Clay claim:  Borings 3ST-10W, 3ST-11W, 3ST-12W, 3ST-13W, 3ST-14, 3ST-16, 3ST-17, 3ST-18, 3ST-19, 72-106, 93-64 and 93-65. See JX 5 (Drawings) at 2–3 (Dredging Plan); cf. id. at 20–21 (Boring Logs); PX 371 (Boring Enlargements) at 40–49, 82, 113–14.  Many of these borings reflect stiff to very stiff clays of varying colors, including rust and red.  E.g., PX 371 (Boring Enlargements) at 42 (showing medium, stiff, very stiff and hard rust-colored clays in boring 3ST-12W); 43 (showing hard light gray and rust clays in boring 3ST-13W);  46 (showing medium gray clays and very stiff grey-rust clays in boring 3ST-16); 48 (showing very stiff tan and brown clays and hard red clays in Log 3ST-18); 49 (showing very stiff rust and grey clays and hard red clays in log 3ST-19); 82 (showing medium, very stiff and hard brown clays and very stiff gray clays in boring 72-106); 114 (showing very stiff gray clays in boring 93-65).  Indeed, Mr. Fisher's Stiff Clay Spreadsheet reveals that, prior to submitting its

---

[60]See supra note 67.

bid, plaintiff expected that 100% of the material to be dredged between Stas. 566+00 and 586+00, and between 602+00 and 614+00 would be stiff to very stiff clay.  JX 28 and JX 38 (Stiff Clay Spreadsheets).

Plaintiff appears to argue that there is a material difference between stiff <u>gray</u> clays, which it expected to dredge in Section 7, and the stiff <u>red</u> clay it encountered. Although plaintiff's geotechnical expert, Dr. Mathewson, stated that the "'red clays' [encountered in Section 7] have higher shear strength than . . . younger marine clays," PX 1861 (Mathewson Rep.) at 2, ¶ 3, plaintiff did not offer any evidence to explain how a difference in shear strength would impact plaintiff's ability to dredge stiff red clays.  <u>Cf.</u>, <u>e.g.</u>, Tr. at 2001:12–15 (colloquy between Dr. Mathewson and defendant's counsel establishing that Dr. Mathewson did not consult with the individual who served as leverman on the Millennium during the period covered by plaintiff's Section 7 Clay Claim).

The court notes that plaintiff's own records do not establish that plaintiff encountered red "hardpan" clay during the period covered by its Section 7 Clay claim. Although plaintiff's IRD forms identify "hardpan" as a specific material to be dredged, none of plaintiffs IRDs for the days in plaintiff's Section 7 Clay claim indicates that plaintiff's dredge encountered "hard red clay."  <u>See</u> JX 9.390–9.425 (10/2/00–11/6/00 IRDs).  Further, although plaintiff claims to have been impacted by hard red clay between October 2 and November 6, 2000, only the IRDs for October 18–25, 2000 indicate that plaintiff encountered "hard pan."  <u>See</u> JX 9.406–9.413 (10/18/00–10/25/00 IRDs).

3.     Conclusion

While there are some indications in the Contract of subsurface conditions in the Channel through the borings, those borings could not be relied on to indicate more than "the <u>overall character</u> of the <u>type</u> of materials to be expected," <u>Weeks</u>, 13 Cl. Ct. at 221, and could not, without more, support a Type I differing site conditions claim.  Even if the borings for Section 7 were thought to be such affirmative indications, plaintiff did not rely on an absence of stiff clays in its planning, JX 98A (Fisher Dep.) at 122:20-123:2 (Fisher agreeing that, "based on the borings," he "expect[ed] . . .[to]encounter red, stiff clays"), and in fact expected to encounter stiff red clays in Section 7, JX 28 and JX 38 (Stiff Clay Spreadsheets) at 2 (estimating the "[p]ercentage of Project with Stiff or V[ery Stiff Clays" as 0.28).  Plaintiff has not proven its Section 7 Clay claim on a theory of differing site conditions.

D.     Plaintiff's "Obstructions No. 1" Claim

85

In its "Obstructions No. 1" claim, plaintiff seeks $1,531,822, PX 1863A (Revised McCullough Rep.) at 1, and a 36 calendar-day extension of contract time, JSF at 11, ¶108, for damages allegedly sustained between October and December 2000 when the Millennium encountered trash and other debris in Dredge Section Nos. 7 and 8 of the Channel (Stas. 570+00 through 640+00), see generally Compl. at 14–17, ¶¶ 102–20; JSF at 10–12, ¶¶ 87–112. Notwithstanding plaintiff's reference in its complaint to "excessive . . . trash [which] slowed dredge production . . . [and] caused significant damage to the dredge," see Compl. at 15, ¶ 103, plaintiff makes clear in its Post-Trial Brief that it "is not seeking the cost for dredging trash and debris." Pl.'s Br. at 25. Rather, "Renda is seeking the cost of having to repair its dredging equipment, which resulted from collisions with unknown obstructions (other than trash and debris)." Id. (citing Tr. at 843:19–23 (Bowman stating that plaintiff "is complaining [not about trash, but] about obstructions . . . that were in the [C]hannel that we did not know about and wouldn't have known about . . . [such as a] 40-foot [C]onex box, l[engths] of pipe, [and] a 30-inch [dredge] swivel") ; cf. Tr. at 846:18–20 (Bowman stating that he "[c]ertainly did not have expectations that we would be hitting [C]onexes, swivel, pipelines, and other objects that were damaging to the dredge").

1.    Background

Plaintiff describes four alleged unanticipated obstructions, which it encountered within the dredge template in Sections 7 and 8. First, plaintiff alleges that it encountered "rubble or man[-]made riprap" while dredging "in the [s]outh slope of the Channel between station nos. 620+00 and 630+00, in the general vicinity of the Oxy-Chemical Dock."[61] PX 1176 (12/20/00 Letter from Bowman to McClenan) (citing JX 5 (Drawings) at 2) (footnote added); see also Compl. at 15-16, ¶ 109, JSF at 11, ¶ 101. Second, plaintiff alleges that it encountered steel pipe and other steel objects, which damaged its underwater cutterhead assembly so severely that "a major equipment failure" was "inevitable." JX 73 (12/13/00 Letter from Bowman to McClenan), at 1–2 (providing notice of "two newly discovered [steel] obstructions . . . [which] have damaged the dredge and are severely affecting the . . . Contract," and informing defendant that, "[a]s a result of encountering the latest obstruction, the dredge 'Millennium' severely damaged its underwater cutter head assembly and was forced to shut down operations early Monday morning, December 11th."); see also JX 63 (10/24/00 Letter from Bowman to McClenan) ("This letter is to notify you that while dredging the centerline area of the Channel this morning, at approximately station no. 575+00, the dredge discovered an

---

[61]"Oxy-Chem[ical] . . . was a plant . . . on the . . . [C]hannel. They had a barge dock adjacent to the [C]hannel." Tr. at 3650:5–7 (Alton Meyer, Corps Project Engineer for the Upper Bayou Contract).

obstruction, which we believe to be possibly a 50-foot section of steel pipe.  The dredge could not complete work in this area."); JX 71 (11/16/00 Letter from Bowman to McClenan) ("This letter is to notify you that while dredging the [s]outh side of the Channel . . . [at] approximate station no. 573+26[], the dredge struck an obstruction, which we believe to be possibly a 30 to 40 foot section of steel pipe at an approximate depth of -47 MLT.").

Plaintiff also alleges that it encountered a Conex shipping container, Compl. at 15, ¶ 104;  PX 1027 (10/20/00 Letter from Bowman to McClenan) at 2, and a dredge stern swivel assembly, Compl. at 15, ¶ 108.  At the pretrial conference in this matter, defendant conceded that these two objects constituted Type II differing site conditions,[62] see Pretrial Tr. at 290:18–291:7 (statement of defendant's counsel); Def.'s Br. at 76 ("The Government has conceded that the [Conex] shipping container and the dredge stern swivel assembly are Type II differing site conditions, and that only damages would be litigated at trial, see Pretrial Tr. at 291:8–11 (colloquy between defendant's counsel and the court); see also id. at 291:15-19 (colloquy between the court and counsel)("[It is] the understanding of . . . [p]laintiff[] [that only damages will be tried].").

2.	Plaintiff's Type I Differing Site Conditions Claim

a.	Rubble and Riprap

Plaintiff has not proven by preponderant evidence that the rubble or riprap it allegedly encountered near the Oxy-Chemical Dock constitutes a differing site condition. As a threshold matter, the Upper Bayou Contract does not affirmatively represent an absence of such material on the south bank of the Channel near the Oxy-Chemical Dock. Accord Lathan, 20 Cl. Ct. at 126 ("If the contract is silent on the conditions of the site, plaintiff has no Type I claim.") (citing Foster, 435 F.3d at 881).  "The [differing site conditions] clause cannot be invoked if the plans and specifications do not 'show' or 'indicate' anything about the alleged unforeseen condition, i.e., if they say 'nothing one way or the other about [the] subsurface [condition].'  If the contract is truly silent about [the] subsurface [condition], . . . there obviously can be nothing 'shown on the drawings or indicated in the specifications' from which the actual . . . conditions can 'materially' differ."  United Contractors, 368 F.2d at 595 (quoting Ragonese, 120 F. Supp. at 769) (footnote omitted).

---

[62]A "Type II differing site condition exists when the conditions at the site differ from those normally encountered."  Fru-Con, 43 Fed. Cl. at 321.

However, the contract documents expressly cautioned plaintiff to "use caution when cutting the side slopes in the Channel from . . . Station 610+00 to Station 625+00," in the vicinity of the Oxy-Chem dock, see JX 5 (Drawings) at 2 (showing the Oxy-Chem dock between approximately Stas. 610+00 and 630+00), and warned plaintiff that "[e]xcessive cutting outside the side slope lines and grades in these reaches of the Channel may cause damage to existing structures along the Channel," JX 2 (Specs.) at 118, ¶ 3.5.2; accord JX 5 (Drawing) at 2 n.4 (same).  The Contract advised the contractor to "consider shaping the top of the cut" in certain reaches of the Channel, including Stas. 610+00 through 625+00, "by using the dredge cutterhead or mechanical equipment."  JX 2 (Specs.) at 118, ¶ 3.5.2.

Alton Meyer, the Corps Project Engineer who prepared the Channel design and attendant dredging specifications for the Upper Bayou Contract, see Tr. at 3640:6–11 (Meyer), explained that it is common for dredging contractors to deliberately over-dredge a side slope by "cut[ting] below the pay template . . . so that the portion above the that pay template can fall in its place."  Id. at 3651:14, 18–20.  Mr. Meyer referred to this common practice as "box-cutting," id. at 3651:13–14, and explained that "[i]t's very common in the dredging industry, as opposed to having to walk the cutterhead up the side slope."  Id. at 3651:21–23.  Mr. Meyer testified that the Corps usually includes a paragraph in its dredging specifications that expressly permits box-cutting.  See id. at 3651:14–17, 23–25 ("We draw a side slope on the channel, and we say up there in the upper portion of that paragraph that if [the contractor] elects to dredge the channel by box-cutting, we'll allow that. . . .  That [provision] is very common.  It's in all of our specs.  We tell them on all their jobs, yes, we'll consider that; we'll allow it.").  Where, as in plaintiff's contract, the Corps includes a paragraph expressly prohibiting box-cutting, Mr. Meyer explained that "because of the proximity of the structures, we're trying to tell the contractor, [']We don't want you to boxcut in this reach.[']"  Id. at 3652:2–3.

When dredging on the south bank near the Oxy-Chemical Dock, plaintiff ignored the warning contained in paragraph 3.5.2 of the Specifications.  In its letter notifying defendant that it had encountered a differing site condition consisting of "rubble or man made riprap" near the Oxy-Chemical Dock, PX 1176 (12/20/00 Letter from Bowman to McClenan), plaintiff stated:

> RMI has attempted to complete dredging in this area twice with no success (note the attached RMI [after-dredging] survey[s] . . . which show the overcutting at the lower elevations of the slope attempting to unsuccesssfully dislodge riprap materials from the upper elevations of the slope).

Id. (emphasis added).

88

The contract documents affirmatively indicate that shore protection structures consisting of rubble and riprap would be present near the Oxy-Chemical Dock. By employing the very dredging practice that the Specifications advised against—"[e]xcessive[ly] cutting outside the side slope lines and grades," JX 2 (Specs) at 118, ¶ 3.5.2—plaintiff did not act as a reasonably prudent contractor. Further, when preparing the bid estimate for the Upper Bayou Project, Mr. Fisher anticipated that the Millennium would encounter "rock, . . . ri[p]ra[p] from shore protection projects," and other "common types" of obstructions. JX 98A (Fisher Dep.), at 222:22–24. Thus, the conditions encountered by the dredge at the Oxy-Chemical Dock, were not reasonably unforeseeable. Accordingly, plaintiff has failed to establish that the conditions at the Oxy-Chemical Dock constitute a differing site condition.

b.      Steel Pipe and Steel Objects

Nor has plaintiff proved by preponderant evidence that the pipe and other steel objects encountered by the dredge constitute a differing site condition. The Contract expressly identifies "pipe" as "an obstructive material which may be encountered during dredging operations." JX 2 (Specs.) at 117, ¶ 3.4.4.2. Further, when preparing plaintiff's bid estimate, Mr. Fisher anticipated that plaintiff's dredge would encounter "typical types of trash [such as] metal debris . . . a lot of [which] is from dredge and barge work," as well as "large pieces of metal." JX 98A (Fisher Dep.), at 222:19–22. Therefore, the pipe and other metal objects encountered by the dredge in the reach of the Houston Ship Channel covered by the Obstructions #1 Claim were not reasonably unforeseeable[63] (with the exception of the Conex shipping container and dredge stern swivel assembly, as noted above). Because such obstructions were both represented in the Contract documents, and foreseeable by the contractor, plaintiff cannot establish that the pipe and steel objects constitute a Type I differing site condition.

3.      Plaintiff's Type II Differing Site Conditions Claim

Although defendant "conceded that the [Conex] shipping container and the dredge stern swivel assembly are Type II differing site conditions," Def.'s Br. at 76, defendant's concession does not eliminate plaintiff's obligation to prove its damages by preponderant evidence at trial. Although plaintiff points to certain testimony from Mr. Bowman, and cites (without reference to specific pages) its certified claim and damages expert report, there are two problems with plaintiff's proof of damages. First, plaintiff has failed to

---

[63]Plaintiff points to PX1221, a copy of its January 31, 2001 letter notifying the Corps of "two additional Obstructions" that plaintiff "was not able to identify," as evidence that those obstructions were "reasonably unforeseeable," Pl.'s Br. at 6. The court finds plaintiff's conflation of the terms "[un]identif[iable]" and "unforeseeable" to be unpersuasive.

establish a causal nexus between its encounters with the Conex box or dredge stern swivel and its alleged injury.  Second, plaintiff has failed to identify which specific injury—or what portion of its claimed damages—should be attributed to those two objects.

a.      Plaintiff's Alleged Damages

Plaintiff's certified claim, see generally PX 4 (Obstructions No. 1 Certified Claim) (Obstructions No. 1 Cl.) at 14–17, identifies four injuries alleged to have occurred as a result of the Millennium's encounter with the various obstructions in sections 4–8, including the Conex shipping container and the dredge stern swivel assembly.  First, plaintiff claims that "as a result of the continual impacts in th[e] area" of the Oxy-Chemical dock, "the bearing seals for the underwater ladder pump were damaged, which required replacement beginning December 8, 2000."  PX 4 (Obstructions No. 1 Cl.) at 14. Second, plaintiff claims that, as a result of hitting various large obstructions, some of which were made of steel, "the dredge was shut down for major repairs to the cutterhead drive and the thrust bearing for the underwater pump."  Id. at 15.  Third, plaintiff avers that "[a]s a result of stresses suffered from impacting obstructions during October through December 2000, the main pump shaft on RMI's dredge broke, and the dredge was shut down for major repairs."  Id. at 16.  Although not referenced in its Certified Claim, plaintiff also appears to allege that its encounters with these Obstructions damaged the Millennium's computer and electrical systems.  See Tr. at 3520:1–5321:6 (Babitzke).

b.      Plaintiff's Proof of Damages

In his expert report, plaintiff's damages expert, Mr. McCullough, attempts to justify plaintiff's claimed costs in the aggregate and explains his method for calculating plaintiff's aggregate damages for these injuries.  See PX 1863 (McCullough Rep.) at 10–13.  However, Mr. McCullough does not explain any of these costs with particularity, nor does he discuss the specific damages alleged in plaintiff's Obstructions No. 1 claim. See id.  Further, the evidence presented at trial established neither a causal nexus between plaintiff's encounters with the Conex shipping container and dredge stern swivel assembly and plaintiff's specific damages, nor did it illustrate the degree to which portion of those obstructions were alleged to have caused plaintiff's injuries.

Plaintiff has not proven by preponderant evidence that the alleged damage to its underwater pump seals was caused by its encounters with the Conex box and dredge stern swivel assembly.  As a threshold matter, the court notes that plaintiff's certified claim attributes this damage to the alleged rubble and riprap in the vicinity of the Oxy-Chemical dock, and not to these larger obstructions.  See PX 4 (Obstructions No. 1 Cl.) at 14.  The evidence presented at trial also indicates that the damage to plaintiff's underwater pump seals was not caused by the Conex box or dredge stern swivel assembly.  When asked to

describe the effect that the various obstructions in the Obstructions No. 1 claim had on plaintiff's dredge, Benton Goodloe, plaintiff's dredging superintendent during the relevant period, testified that "continued hitting [of] these obstructions[] [caused] problems with the seals and the bearings . . . on the underwater gear box, on the cutter drive, which had to be repaired." Tr. at 2766:22–25 (Goodloe) (emphasis added). Although Mr. Goodloe's testimony might help to establish that numerous encounters with numerous objects damaged plaintiff's underwater pump seals and cutterhead gearbox, neither Mr. Goodloe nor any other witness established that the Conex shipping container and the dredge stern swivel assembly—the two items for which the government conceded liability—damaged this equipment.

Nor did any of the witnesses presented at trial, including Mr. Goodloe, establish a causal nexus between the alleged damage to the Millennium's computer/electrical system and its encounters with the Conex box and dredge stern swivel assembly. According to Christopher Babitzke, who inspected plaintiff's work on the Upper Bayou Contract pursuant to the Supplemental Quality Assurance agreement between the JV and the Corps, see Tr. at 3476:19–3480:24 (Babitzke), the Millennium was down for repairs to its computer/electrical system between December 12, 2000 and January 3, 2001. See Tr. 3484:6–3508:9 (Babitzke discussing JX 11.114–JX 11.131 (12/12/00–12/28/00 Supplemental Quality Assurance Reports (SQARs)). Although the dredge was functional on December 29, 2000, it again went down on December 31, 2000 due to a broken main pump shaft. Tr. at 3507:9–15 (Babitzke quoting JX 11.131 (1/3/01 SQAR)). During cross-examination, plaintiff's counsel and Mr. Babitzke had the following exchange:

Q:    Now, have you ever ever been in a situation where a dredge hit an underwater obstruction?

A:    Yes.

Q:    And can that cause a lot of problems for the dredge?

A:    Yes.

Q:    Can that cause problems to the electrical system?

A:    Not the ones I've been on.

Q:    Is it possible it could cause problems with the electrical system?

A:    No.

91

Tr. at 3520:9–19 (Babitzke).  Plaintiff failed to present any evidence to contradict or rebut Mr. Babitzke's testimony.

Nor has plaintiff established a causal nexus between its encounter with the Conex box and dredge stern swivel in October, 2000, see PX 1027 (10/20/00 Letter from Bowman to McClenan), at 2, and the failure of its main pump shaft on December 31, 2000, see JX 11.131 (1/3/01 SQAR)—two days after the dredge resumed operations following repairs to its electrical system.  In fact, Mr. Wetta testified that such a relationship is quite unlikely:

> Q:     What kind of condition or event could cause a shaft on the main
>        pump to fail?
>
> A:     A whole number of different conditions. It could have been a  bad
>        shaft, hanging clay in an impeller [vane], cavitation, any type of
>        obstruction that hung just in one [vane]. That's not an uncommon
>        occurrence.
>
> Q:     Could striking a large object with a cutter cause the shaft on the main
>        pump to fail?
>
> A:     Not striking it with the cutter.  I wouldn't see how it could, no.
>
> Mr. Leefe:     Cut it off just hitting it.
>
> A:     You'd have to blank the entire suction off.  If you did that, you
>        probably could.  You could cavitate it.

JX 103A (Wetta Dep.) at 185:9–22 (colloquy among Wetta, and counsel for defendant and counsel for Wetta).  Plaintiff did not present any testimony or other evidence to establish a causal nexus between its encounter with the Conex Box and dredge stern swivel assembly and its failed pump shaft.[64]

---

[64]According to its equipment manager Burson Warren, plaintiff obtained a new pump shaft from Mobile Pulley, the manufacturer of the failed pump shaft.  JX 100A (Warren Dep.) at 28:8–13.  Mr. Warren did not recall whether plaintiff returned the failed pump shaft to its manufacturer.  See id. at 29:9–11 ("I don't know what might have happened to it once it was removed.").  Nor did Mr. Warren know whether Renda shipped the broken shaft to Mobile Pulley or whether plaintiff had anyone perform a metallurgical analysis on the broken main pump shaft to determine why it failed.  See id. at 29:15–18 (Warren Dep.).

(continued...)

4.      Conclusion

Defendant's concession that the Conex shipping container and dredge stern swivel assembly constituted Type II differing site conditions does not obviate plaintiff's burden of proving by preponderant evidence the damages caused by hitting those obstructions. Because plaintiff failed to identify with any particularity the injuries caused by these objects, plaintiff is not entitled to recover on this claim.

E.      Plaintiff's "Obstructions No. 2" Claim

In its Obstructions No. 2 claim, plaintiff seeks $801,036, JX 1863A (Revised McCullough Rep.), and a 36 calendar-day extension of contract time, see Compl. at 20, ¶ 142, for lost productivity caused when plaintiff allegedly encountered various obstructions, trash and other debris while dredging in Section 9, id. at 18, ¶ 129; JSF at 12, ¶¶ 117–18, between Channel Stas. 660+00 and 685+00, PX 5 (Obstructions No. 2 REA) at 2.  According to plaintiff, "[t]he claim seeks to recover for the cost of repairs to the Dredge Millennium, and for downtime and standby while the Corps unreasonably refused to release the Millennium from the Project and essentially held the dredge and Renda's equipment hostage."  Pl.'s Br. at 33.

1.      Background

During a meeting with defendant on August 7, 2000 "to observe and verify the alignment of the levee centerline [of the west levee] . . . relative to the contract drawings," plaintiff "identified the flare in Section 9, between approximate stations 658+00 and 683+00 as a[n] . . . area containing debris beyond that described in the

--------

[64](...continued)
Defendant points out that plaintiff's failure to document this information is inconsistent with a policy implemented by plaintiff in October 2000 to develop an "equipment repair report" for equipment repaired during plaintiff's projects, including the Upper Bayou Project.  Def.'s Br. at 81 n.59 (citing DX 499 (10/03/00 Company Memorandum from Bowman and Warren to "All Renda Marine Inc. Employees")); see Tr. at 1537:4–1539:7 (Bowman).  The equipment repair report was to document the following:   (1) unit number; (2) parts number; (3) reason for breakage; (4) actions taken to repair; (5) time and place; (6) names of person(s) making repair; and (7) persons notified.  DX 499 (10/3/000 Company Memorandum) at 5.  Notwithstanding this policy, neither Mr. Warren nor Mr. Bowman recalled seeing or preparing any written repair reports for any failed parts or repairs to the Millennium during the Upper Bayou Project.  JX 100A (Warren Dep.) at 36:4–14; Tr. at 1540:6–1541:17 (Bowman) ("If there had been such a [repair] report [for damage to the Millennium], we would have expected to have seen it included as part of the claim documentation.").

[C]ontract." PX 951 (8/8/00 File Memorandum by Eric Russek discussing this meeting) (Russek File Memo) at 1–2; accord Pl.'s Br. at 33 ("Long before Renda reached Section 9, Renda alerted the Corps to the prospects of that section containing an unreasonable amount of debris."). Upon receiving this notice, defendant advised plaintiff that "[a] sidescan . . . . will be performed by the Corps to determine the magnitude of the debris." PX 951 (Russek File Memo) at 2.

The JV conducted sidescan and magnetometer surveys of Section 9 and provided the results of those surveys to defendant on January 24, 2001. See generally DX 542 (Survey Rep.); DX 542A (Survey Drawings); PX 1182 (Survey Drawings). The report makes the following observations concerning the reach of the Channel between Stas. 658+00 and 683+00—the subject of plaintiff's Obstructions No. 2 claim:

> Segment 3 (Sta. 655+00 to 685+00) corresponds to dredge section 9. . . . Although the contractor has not begun dredging in this era, evidence of previous dredge work was observed on the channel floor as weathered arcing striations . . . at the entrance channel to the berthing area to the north. Large debris fields consisting primarily of tires were observed throughout this area.

> Five significant targets were observed in the segment 3 sonar data. Two of these targets also caused deflections in the magnetic field indicating a ferric composition. Due to the lack of shadow in the side scan data, it can be determined that, with the exception of target #5, the other targets do not extend that far above the sea floor and therefore represent no hazard to present navigation. However, these targets may require further investigations prior to future dredging.

DX 542 (Survey Rep.) at 5–6. "Target #5," was identified as a "target[] which had a magnetic return," and was described as having a height of 1 foot, a radius of 4.5 feet and a ferrous composition. Id. at 6, T.1. Plaintiff received a copy of the survey report by January 31, 2001:

> RMI has received and reviewed the written portion of . . . [the] "Survey Report," for Section Nos. 7 through 9 . . . [and] would like to discuss this report . . . with you to determine the best course of action for removal or avoidance of all the identified obstructions. As we have seen, the obstructions have already caused significant damages to RMI's dredge and delays for Project Completion.

PX 1221 (1/31/01 Letter from Bowman to McClenan) at 2.

94

Plaintiff began dredging in Section 9 at Sta. 660+00 on February 9, 2001.  See JX 9.520 (2/9/01 IRD) at 2.  According to its IRDs, plaintiff continued dredging Section 9 for nine days without incident.  See JX 9.521–JX 9.529 (2/10/01–2/18/01 IRDs) (noting that between thirty minutes and 3 hours 50 minutes per day were spent "clearing [the] cutter or suction head").  Between February 19 and 26, 2001, the Millennium was "down" for minor repairs to its "Lufkin Gear,"  JX 9.530–9.536 (2/19/01–2/25/01 IRDs).  On February 26, 2001, plaintiff relocated the dredge from Section 9 and moved it downstream to Section 6, Sta. 548+10.  JX 9.537 (2/26/01 IRD); accord JX 5 (Drawings) at 3 (showing Section 6 at Stas. 540+00 to approximately 554+00).  The next day, the dredge was down with a plugged line.  JX 9.538 (2/27/01 IRD).  Between February 28, 2001 and April 3, 2001, the Millennium continued moving downstream through Sections 6 and 5.  See generally JX 9.539–9.573 (2/28/01–4/3/01 IRDs).  Plaintiff's IRDs for April 4 through 9, 2001 indicate that the dredge was down for "[m]iscellaneous" reasons, including the repair of a "[s]ub line."  See JX 9.574–9.579 (4/4/01–4/9/01 IRDs).

Although plaintiff's records indicate that plaintiff had not encountered any difficulties during its brief time in Section 9, plaintiff requested on March 7, 2001, that defendant "remove the remainder of Dredge Section No. 9 from the RMI contract and declare dredging work complete . . . [because] [t]he area is full of trash and obstructions, both identified and unknown as noted on the Government's Magnetometer Study, which will cause further delays to Project Completion."  JX 76 (3/7/01 Letter from Bowman to McClenan) at 2.  In a reply letter dated March 12, 2001, defendant instructed plaintiff to continue to place material hydraulically on the levees at Lost Lake.  See PX 1323 (3/12/01 Letter from Benero to Bowman), at 2.  Plaintiff responded by letter the next day:

> [O]n March 7, 2001, RMI transmitted a Proposal Letter . . . requesting that the remainder of Dredge Section 9 be removed from our Contract.  As identified in the JV Magnetometer Study . . . Dredge Section 9 contains an unreasonable quantity of trash, making the area unsuitable for further dredging by a hydraulic, cutterhead dredge.  Due to damages to the dredge and booster pump,[65] caused solely by the inordinate amount of trash, RMI does not intend on returning to this area. . . .  Therefore, in our opinion . . . our dredging will be complete when the work at the North Slope of Sections 5 and 6 is complete.  At that time, it is our intent to demobilize the dredge from this Project and pursue private work in the same area.

---

[65]Plaintiff did not point to any testimony or other evidence at trial supporting Mr. Bowman's contention that the booster pump was damaged during the period covered by plaintiff's Obstructions No. 2 claim.  Nor did plaintiff reassert this injury in its certified claim.

PX 1327 (3/13/01 Letter from Bowman to Benero) at 2.  Plaintiff then requested a "partial Termination for Convenience for Dredge Section 9 due to excessive trash or issuance of a modification to remove trash with a bucket dredge and then complete the remainder of the dredging with a hydraulic dredge."  Id. at 3.

Plaintiff and defendant met on March 22, 2001 to discuss "the current status and proposed work plan for completing the dredging for the Upper Bayou project."  PX 1361 (3/29/01 Letter from Benero to Bowman) at 1.  Regarding Section 9, defendant stated:

> At present, the Dredge Millennium is working on the north bank in Sections 5 and 6 and should be completed by March 25, 2001. . . .  After [that] . . . area is complete, you are directed to continue dredging in Section 9 until completion.
>
> You stated that there appears to be large debris fields based on the magnetometer and sidescan survey . . . and your initial attempt at dredging Section 9.  It is understood that you will not jeopardize damaging the Dredge Millennium by attempting to remove excess debris, trash or obstructions. . . .  [I]f the dredge encounters excessive debris, trash, or obstructions you [will] contact the Government for verification.  Upon verification . . . the Government reserves the rights to delete the remainder of work in Section 9 or to direct you to complete the work, which may require a bucket dredge to remove the debris.

Id.

The Millennium returned to Section 9, Sta. 660+00, on April 10, 2001.  JX 9.580 (4/10/01 IRD) at 2.  Dredging continued through April 15, 2001, see JX 9.581–9.585 (4/11/01–4/15/01 IRDs).  On April 14, 2001, plaintiff notified its contracting officer that excessive trash in Section 9 was hindering the Millennium's production:

> [T]his week, the Booster Barge pump was plugged by debris in the discharge line, and due to excessive trash and debris, the dredge was non-effective for eight hours on Wednesday, April 11[th] . . . and six hours on Thursday, April 12[th] . . . .  Additionally, the dredge struck another obstruction near Station 662+51 . . . at a depth of 45[]feet.  This unexpected obstruction was struck full force by the cutterhead assembly, which may have been seriously damaged.  An inspection of the cutterhead gearbox reveals that bearings and seals have been damaged and the gearbox is "growling," which may indicate future critical mechanical failure. . . .

. . . .

   As a result of the excessive trash and the damage caused by the obstruction, RMI contacted Mike McClenan, Area Engineer, on Thursday, April 12th and requested that the Government verify the conditions[,] . . . and all parties reviewed the trash cut out of the cutterhead and discussed the damage to the cutterhead gearbox.  Leon Hrabovsky [of the JV] stated that Section 9 is different from other dredging sections, i.e.[,] due to the amount of tires, wire rope, cable, trash and traffic, but that RMI should have anticipated the dredge would only be able to operate twelve hours per day in this area.

. . . .

   RMI anticipated that trash would be encountered in the Channel during dredging operations. . . .  However, the entire Project has posed significant trash problems for RMI . . . and the excessive trash in Section 9 is turning out to be a "trash pit" or "junkyard[,]"[] requiring extraordinary efforts to clear.  No reasonable dredging Contractor could have anticipated this quantity of debris.

PX 1385 (4/14/01 Letter from Bowman to Benero) at 1-2.  Plaintiff reiterated its request that defendant "delete the remainder of work from the Contract, or . . . [allow plaintiff to] proceed with the remaining work with a bucket dredge."  Id. at 4.

   Although plaintiff represented in its April 14, 2001 letter to defendant that a large object had damaged its cutterhead gearbox on April 12, plaintiff's records tell a slightly different story.  Not until April 14, 2001 do plaintiff's IRDs report that, "[d]ue to hitting hard objects in the cut, the cutter gearbox [wa]s damaged and will have to be repaired."  JX 9.584 (4/14/01 IRD) at 2.  On April 15, 2001, Renda continued dredging and reported that "[t]he dredge continue[d] to encounter large unknown objects which [could] not be dredged."  JX 9.585 (4/15/01 IRD) at 2.  Plaintiff's IRD for April 16, 2001 indicates that the "cutter gearbox was damaged when a large mooring buoy was encountered."  JX 9.586 (4/16/01 IRD) at 2.  Plaintiff's IRDs indicate that the dredge was down for repairs to its cutter gearbox through April 29, 2001.[66]  See JX 9.587–9.599 (4/17/02–4/29/01 IRDs).  Plaintiff notified defendant on April 16, 2001 that it had encountered the mooring buoy on the previous day, April 15, 2001:

---

[66]The date of the last IRD offered by the parties into evidence is April 29, 2001.

> Yesterday, the dredge again struck another obstruction[,] . . . [T]he obstruction is a 5' diameter by 15' long mooring buoy with anchor chain attached. . . . [W]e adamantly restate that this portion of the Channel is a junkyard and trash pit, strewn with scrap iron, 4" diameter wire cable and now a mooring buoy. . . . We expected minor amounts of trash, not scrap iron and trash/tires in quantities that are easily revealed on surveys. . . . We have now hit eight significant obstructions in Section 9 . . . and therefore[] request that the Government immediately issue a directive deleting this work from our Contract.

PX 1390 (4/16/01 Letter from Bowman to Benero) at 1-2.

On approximately May 4, 2001, defendant issued Contract Modification P00026, suspending dredging "for a period of at least 30 days, but not exceeding 60 days" to permit plaintiff to dredge "approximately 250,000 cubic yards of virgin material . . . from private sources, and hydraulically plac[e] it" on the levees at Lost Lake. JX 6.026 (Modification P00026) at 3, ¶ A. During the period when plaintiff was pursuing this private dredging work, plaintiff learned at a meeting with the government on May 24, 2001, that the contracting officer had decided to delete the remainder of plaintiff's dredging work from the contract. See JX 83 (6/1/01 Letter from Bowman to Benero) at 1; accord PX 1499 (6/1/01 Letter from Curtis Cole, Contracting Officer, to Bowman) at 2 ("As discussed in our May 24, 2001 meeting at the Corps of Engineers, . . . a Contracting Officer's Decision was made to delete the remaining portion of dredging Section 9 in your contract. . . . Hydrographic surveys . . . indicate that the dredging portion from Station 600+00 through the end of the project at 685+04.05 is acceptable with the inclusion of the deleted portion of Section 9.").

Plaintiff submitted an REA for its "Obstructions No. 2" claim on June 14, 2001, identifying "excessive trash" and the mooring buoy as differing site conditions. PX 5 (Obstructions No. 2 REA) at 3. Plaintiff resubmitted its REA as a certified claim on August 9, 2001. Compl. at 21, ¶ 145.

Defendant included the remainder of Section 9 in the "Mid-Bayou/Goat Island" Contract, a subsequent contract under the 45-foot project. See Def.'s Reply at 20. Great Lakes Dredging & Dock Company (GLDD) was awarded the Mid-Bayou/Goat Island Contract and successfully dredged the unfinished part of Section 9 with the Dredge California, a 30-inch hydraulic cutterhead suction dredge. See id.; Tr. at 3528:13–3530:7 (James Van Norman, construction manager for GLDD during the Mid-Bayou Contract).

    2.    Discussion

Plaintiff's Obstructions No. 2 claim seeks damages for two differing site conditions: "excessive trash," see JX 5 (Obstructions No. 2 REA) at 3, and the mooring buoy, see id. at 4.[67]   The court considers each claim in turn.

a.   Excessive Trash

Notwithstanding the difficulties plaintiff experienced in Section 9, the court cannot conclude, on the bases of the evidence presented at trial, that the "excessive trash" encountered by plaintiff in Section 9 constitutes a differing site condition.   First, the Contract affirmatively represents that the type of debris plaintiff encountered in Section 9 could be present at the site.   Paragraph 3.4.4.2 addresses "[d]ebris" and provides:

> Prior to dredging, the Contractor shall carefully inspect the entire area to be dredged, from estimated top of cut to top of cut, by whatever means the Contractor deems suitable to locate any debris which may interfere with dredging operations. . . .   [T]he Contractor shall not deposit worn out discharge pipe, wire rope, scrap metal, timbers, or other such rubbish or obstructive material in the Placement Areas. . . .   Such material, together with scrap, rope, wire cable, piles, pipe or other obstructive material, which may be encountered during the dredging operations, shall be placed by the Contractor at approved locations.

JX 2 (Specs) at 117, ¶ 3.4.4.2.

By contrast, the Contract makes no affirmative representation concerning the quantity of debris plaintiff would encounter during dredging.   In the absence of such a representation in the Contract, plaintiff cannot establish that encountering "excessive" debris constitutes a differing site condition.   Accord Weeks, 13 Cl. Ct. at 221 ("It is not at all clear from the contract documents how [a] plaintiff [could]  vault[] from the clear and unambiguous language depicting only the character . . . of . . . material . . . to a claim that the government was simultaneously warranting the approximate, if not the precise,

---

[67]In its brief, plaintiff argues that this "claim seeks to recover for the cost of repairs to the Dredge Millennium, and for downtime and standby while the Corps unreasonably refused to release the Millennium from the Project and essentially held the dredge and Renda's equipment hostage." Pl.'s Br. at 33.  As the court has already observed, supra n.60, plaintiff expressly declined to allege at the pretrial conference that defendant acted in bad faith.  See Pretrial Tr. at 128:11-16 (colloquy between plaintiff's counsel and the court establishing that plaintiff was not pleading that the government acted with "specific intent to injure").  Plaintiff must first prove the elements of liability under its Type I differing site condition theory before the court can properly consider plaintiff's claim for damages.

99

quantum of . . . materials. . . .  [T]he only clear and unambiguous <u>quantity</u> estimate we find contained in the contract is the <u>gross</u> estimated total quantity of <u>all</u> subsurface materials to be excavated in the aggregate."); <u>cf.</u> <u>Stuyvesant</u>, 834 F.2d at 1581 (noting that "[g]overnment estimates are not warranties," and finding that a contract "provision set[ting] forth the 'total estimated quantity of material necessary to be removed from the prescribed prism' . . . do[es] not rise even to the level of estimate[]. ").

Even if the contract had affirmatively represented not only the existence of debris at the contract site, but also the quantity of that debris, plaintiff still has not proven that it encountered a differing site condition because plaintiff did not act as a reasonably prudent contractor when investigating Section 9.  During his deposition, Mr. Fisher revealed that when preparing plaintiff's bid estimate for the dredging work he anticipated that the dredge would encounter "typical types of trash [such as] metal debris . . . —a lot of [which] is from dredge and barge work[—] . . . ropes, . . . cables, . . . [and] large pieces of metal."  JX 98A (Fisher Dep.) at 222:19–22.  Mr. Fisher explained that he expected "certain areas [to be] more prone to contain trash, and that when working in those areas there would be more down time to remove and address trash problems than there would be in other areas of the project."  <u>Id.</u> at 224:1–5.  Mr. Fisher reasoned that the areas that either were subject to increased traffic or consisted of new work material would contain more debris, and identified the area near the South Ferry Landing, <u>see id.</u> at 224:14–24; the area between stations 480 and 504, <u>see id.</u> at 225:5–14 (Fisher Dep.); the area between stations 504 and 524, <u>see id.</u> at 225:18–226:1; and the area between stations 524 and 550, <u>id.</u> at 226:2–10, as areas that might contain excess debris.

However, Mr. Fisher "generally . . . anticipat[ed] . . . less trash" towards the upstream limits of dredging, where Section 9 is located, because he believed that this reach of the Channel had been maintenance dredged within the previous two years.  <u>Id.</u> at 226:11–19.  Mr. Fisher admitted that, in reliance on this assumption, he curtailed his inspection of the upper reaches of the project:

> So unless there would be a reason for a substantial amount of trash to occur in the two-year period, <u>most of the [pre-bid] investigation was limited to the area outside of the existing template into the new work template, which wasn't that large as you moved upstream</u>.

<u>Id.</u> at 226:20–25 (emphasis added).  It appears that plaintiff did not inspect the area thoroughly and possibly not at all, an approach to pre-bid site investigation that would have been consistent with its efforts not to reveal to other contractors its plans to bid on the Contract.  Based on the evidence, the court cannot conclude that plaintiff acted as a reasonably prudent contractor prior to submitting its bid.  <u>Accord</u> <u>H.B. Mac</u>, 153 F.3d at 1345-46 (noting that where a contract contains the standard "Site Investigation and

Conditions Affecting the Work" clause, FAR § 52.236-3, the contractor is "charged with knowledge of the conditions that a pre-bid site visit would have revealed"); Ambrose-Augusterfer, 394 F.2d at 546 ("The settled rule in cases of this type is that a contractor is bound by what it would have discovered if it had adequately investigated the site.").

The court finds it puzzling that plaintiff began complaining to defendant of the debris in Section 9 on or about August 7, 2000, see PX 951(Russek File Memo) at 1–2—more than six months before plaintiff began dredging in Section 9. The court also finds its inexplicable that plaintiff reported to the Corps that its "initial attempt at dredging Section 9" between February 9 and 18, 2001 was hampered by "large debris fields," PX 1361 (3/29/01 Letter from Benero to Bowman) at 1, when none of plaintiff's IRDs for those dates reports such a problem, see JX 9.520–9.529 (reporting that plaintiff spent between 45 minutes and 7 hours per day "[c]learing pump and pump line" or "[c]learing cutter or suction head"). Moreover, the court is not persuaded by plaintiff's claim that this reach of the Channel could not be dredged hydraulically, see Pl.'s Br. at 34 ("Section 9 contained so much trash, debris, and obstructions, that dredging with a cutter head dredge was not practical."),—especially where there was uncontradicted evidence that a successor contractor completed the dredging work in Section 9 without incident using a hydraulic suction cutterhead dredge. Tr. at 3528:13-3530:7 (Van Norman).

b.    Mooring Buoy

Nor has defendant proven by preponderant evidence that the Mooring Buoy constitutes a Type I differing site condition. Although the court is not persuaded by defendant's suggestion that the Contract's failure to "say anything one way or the other about mooring buoys or the like," is dispositive of this claim, see Def.'s Br. at 83, the court agrees with defendant that plaintiff cannot establish that the mooring buoy was the sole proximate cause of plaintiff's injury. The mooring buoy was encountered on April 16, 2001, and appears in a photograph of trash, debris, and other materials taken that day. See PX 18.211. Plaintiff made no attempt at trial or in its certified claim to segregate the injuries allegedly incurred as a result of its encounter with the mooring buoy from those attributable to the other materials dredged that day. In fact, the evidence presented at trial undercuts plaintiff's argument that the injuries sustained by the Millennium were caused by its encounter with the mooring buoy.

When questioned by plaintiff's counsel concerning the effect on the Millennium of plaintiff's encounter with the mooring buoy, Mr. Goodloe, who "manage[d] the Upper Bayou Project [and] [t]ook over the dredging aspects of the job . . . in October 2000," Tr. at 2751:20–2752:4 (colloquy between Goodloe and plaintiff's counsel), testified: "[I]t didn't do it any good. When you continually get these things like chain, mooring buoys, it shortens the life of your seals and bearings and your drive." Id. at 2773:12–19 (colloquy

between Goodloe and plaintiff's counsel) (emphasis added).  As defendant notes, this "response implies that striking the mooring buoy was not the sole cause of the damage to the cutterhead gear box—that there were other encounters with obstructions that are not part of this claim and for which Renda has not established that the Government is responsible."  Def.'s Br. at 83.

Plaintiff's own records also undercut its argument that the Millennium's encounter with the mooring buoy was the sole cause of the damages claimed in plaintiff's Obstructions No. 2 claim.  Plaintiff reports in its April 16, 2001 IRD that "the cutter gearbox was damaged when a large mooring buoy was encountered."  JX 9.586 (4/16/01 IRD) at 2.  However, plaintiff also attributes this same injury to an encounter with a different "obstruction"—an obstruction that was neither identified in plaintiff's certified claim nor discussed during trial—which occurred several days <u>before</u> plaintiff's reported encounter with the mooring buoy.  In its April 14, 2001 letter to the Corps summarizing problems that plaintiff had encountered between April 11 and 13, 2001, Mr. Bowman wrote:

> Additionally, the dredge struck another obstruction near Station 662+51 . . . at a depth of 45[]feet.  This unexpected obstruction was struck full force by the cutterhead assembly, which may have been seriously damaged.  An inspection of the cutterhead gearbox reveals that bearings and seals have been damaged and the gearbox is 'growling,' which may indicate future critical mechanical failure.

PX 1385 (4/14/01 Letter from Bowman to Benero) at 2.  However, plaintiff's IRDs for this period, <u>see</u> JX 9.581–9.583 (4/11/01–4/13/01 IRDs), report that the Millennium was fully operational.  The IRD for April 14, 2001 indicates that the cutter gearbox was first damaged by "hitting hard [unidentified] objects in the cut."  PX 9.584 at 2.  While "[t]he dredge continue[d] to encounter large unknown objects which [could] not be dredged," PX 9.585 (4/15/01 IRD) at 2, it was not until April 16, 2001 that plaintiff's reports attribute any damage to the cutterhead assembly to the "mooring buoy [that] was encountered," JX 9.586 (4/16/01 IRD) at 2.  Because plaintiff has not reconciled its varying accounts concerning the precise cause of its injury, the court cannot conclude that the mooring buoy was the sole proximate cause of the damage.  <u>Accord</u> <u>Weeks</u>, 13 Cl. Ct. at 240 ("It is for the plaintiff to show, by probative evidence, <u>which</u> separate causes by the government result in <u>which</u> identifiable periods of delay, before it can be said that plaintiff has carried its burden with respect to causation.") (citing <u>William F. Klingensmith, Inc. v. United States</u>, 731 F.2d 805, 809 (Fed. Cir. 1984)).

Because the court finds that credible evidence, largely furnished by plaintiff, supports the conclusion that the injuries to the Millennium were cumulative, rather than

the result of a single encounter with the mooring buoy, plaintiff has not established a Type I differing site condition claim.

F.      Plaintiff's "West Levee Realignment" Claim

In its "West Levee Realignment" claim, plaintiff seeks compensation for costs associated with the relocation of a portion of hydraulically-constructed levee along the west side of Lost Lake, which defendant allegedly directed plaintiff to realign.  See JSF at 9, ¶¶ 81–83; Compl. at 13, ¶ 92.  In its certified claim, and again in its complaint, plaintiff sought "payment of $789,600 plus a 40 calendar[-]day extension of contract time," for this alleged differing site condition.  Compl. at 14, ¶ 97; PX 8 (Request for Equitable Adjustment for Levee Realignment) (W. Levee REA) at 6.  The Defense Contract Audit Agency (DCAA) reviewed plaintiff's West Levee Realignment claim and questioned plaintiff's claimed damages in their entirety because plaintiff had not provided "adequate support" for the claim.  See JX 22 (12/12/02 DCAA Audit) at 2 ("We questioned the entire claimed amount, due to RMI not providing adequate support for its claim."); id. at 4 ("We question [plaintiff's claimed amount for the realignment,] $789,600[,] in its entirety.  The price adjustment claim was not prepared in accordance with FAR [§]15 as required to provide the specific elements.").

In what appeared to the court to be an effort to mask or to minimize any problem with its proof of damages, plaintiff attempted to recast its "West Levee Realignment" claim by incorporating it into its Lost Lake Levees differing site condition claim.  See Pl.'s Pretrial Mem. at 17 ("To resolve the DCAA's concerns, Renda revised this claim to reflect actual cost, and incorporated it into the Lost Lake Levees Claim."); accord PX 1863 (McCullough Rep.) at 15 ("This levee-related claim item has been combined with Claim 12—Lost Lake Levees.").  However, the court cannot discern from Mr. McCullough's report that plaintiff revised this claim at all.  Although Mr. McCullough's report describes the West Levee realignment claim in the portion of his report dedicated to plaintiff's Lost Lake Levees claim, Mr. McCullough did not revise the amount of this claim.  See id. at 22 ("All mechanical levee claim items have been addressed in this claim item including the previously separate[] claim entitled 'West Levee Realignment Between Stations 166+00 to 215+00' ($789,600 total claim amount.)"); accord Pl.'s Br. at 64 (stating that plaintiff's claimed damages total $789,600 and that "[t]he levee realignment costs have since been incorporated in the larger Levee DSC claim.").

1.      Background

On or about July 28, 2000, plaintiff notified defendant of "an alleged problem with the centerline of the West Levee at the Lost Lake Placement Area."  JSF at 9, ¶ 79. Plaintiff described the problem as follows:

The centerline [of the new levee] is too far to the East of the existing old levee. The new levee placement will cause mud to be displaced to the West in a mud wave that will go over the old levee and into the Old River. As per our conversation it would seem that the proper thing to do would be to construct the new levee so that the toe of the new levee would be against the old levee, thus using the old levee as a berm to support the new levee and also keep the mud wave to the inside of the new levee and not push it over the old levee.

PX 926 (7/28/00 Letter from Pat Duke, RMI Quality Control Manager, to Eric Russek).[68]

On August 7, 2000 representatives of plaintiff (including Messrs. Bowman, Duke, Smith and R.V. Renda) and defendant (Messrs. McClenan, Russek and Few) met at Lost Lake "to observe and verify the alignment of the levee centerline in this area relative to the contract drawings." See PX 949 (8/8/00 Russek File Mem.) at 1, ¶ 1. At this time,

---

[68]The court has also considered whether this case might present a situation where "differing site conditions and defective specifications claims [although] distinct in theory . . . collapse into a single claim . . . where the alleged defect in the specification is the failure to disclose the alleged differing site condition." Comtrol, 294 F.3d at 1357. Here the specification as to the softness of the foundations of the levees, including the West Levee, appears to describe accurately the conditions encountered. Even if there might be a separate claim for a defective specification related to the location of the West Levee, it would appear that the design, if defective (location of the centerline of the new levee significantly at a distance eastward of the existing levee), was patently so. One of the questions posed by a prospective bidder at the Pre-Bid Conference, according to Amendment 1 of the Solicitation, JX 3, was, "Why is the levee alignment so far from the perimeter [levee] where the foundation is crummy? It makes it harder to build on weaker ground." Id. at 7; see also and compare JX 5 (Drawings) at 16 (Levee Cross Sections) (showing exterior toe of West Levee to be constructed under the Contract at Stas. 165+50 and 179.50 closely adjacent to interior toe of then existing West Levee) with id. at 14 (Lost Lake Placement Area Plan) (showing divergence of some 100 to 150 feet between centerlines of then existing West Levee and West Levee to be constructed under the Contract). The location of the West Levee to be constructed under the Contract would appear to involve "an obvious . . .inconsistency or discrepancy of significance–in other words, a patent defect." See E.L. Hamm Assocs., Inc. v. England, 379 F.3d 1334, 1339 (Fed. Cir. 2004)); see also Conner Bros., No. 99-735 C, 2005 U.S. Claims LEXIS 159, at *81 (barring a claimant from recovery for a defect in a specification of which the claimant "was aware . . . at the time of entering the contract" and requiring a contractor "faced with an obvious omission, inconsistency or discrepancy of significance . . . to bring the situation to the government's attention before bid submission if [the contractor] intended to subsequently resolve the issue in his own favor").

plaintiff had constructed approximately 1,600 feet of the West Levee.  See Tr. at 2611:3–9 (R.V. Renda).  On August 8, 2000, Mr. Russek documented the previous day's meeting in an internal Corps memorandum, which stated that

> a drawing of the levee centerline . . . supplied by Renda Marine's surveyor was reviewed with respect to the ongoing levee construction.  The surveyor's drawing supposedly contained the new levee centerline coordinates shown relative to the existing levee centerline coordinates.  According to the drawing, the new levee centerline showed to gradually depart from the existing levee centerline by over 73 feet at the northwest corner.  This condition was leading to the collection of poor material between the existing and new levees, resulting in mudwaves in advance of the new levee construction.

PX 949 (8/8/00 Russek File Mem.) at 1, ¶ 2.  To correct this problem, defendant determined that

> [t]he Contractor will be directed to forego use of the alignment shown in the [Contract] drawings . . . and place future material closer to the existing levee . . . .  Except for the change in the new levee centerline location, and the means by which it is to be laid out by the Contractor, the Contractor shall continue to comply with all other requirements in the specs and drawings.

Id. at 1–2, ¶ 2; accord PX 999 (9/18/00 draft letter from McClenan to Bowman) at 1 ("[Y]ou are directed to forego use of the alignment shown in the drawings . . . and place future material closer to the existing levee."); PX 1005 (9/21/00 draft letter from McClenan to Bowman) (same).  Plaintiff also documented the August 7, 2000 meeting in that day's Contractor Quality Control Report (CQCR).  See JX 10.482 (8/7/00 CQCR) at 3.  This record states:  "Eric R[ussek] and Mike [McClenan] came out and OK'd levee [change in alignment] shift to move [center line] of levee towards old levee to reduce loss of material."  Id. at 3; accord Tr. at 1793:2–21 (Smith discussing this exhibit); Tr. at 2607:22–2608:9 (R.V. Renda discussing this exhibit).

On August 18, 2000, plaintiff followed up with defendant concerning defendant's verbal instruction:

> At [the July 28, 2000] meeting, the Government verbally agreed to realign the levee such that the toe of the new levee would be against the existing, old levee.  At this time, we are awaiting written confirmation of our

instructions and changes to the drawings.  Please advise us of the status [of] this matter.

We also wish to notify you that, in our opinion, this constitutes a changed condition and/or differing site condition.  As soon as practicable, RMI will submit a Request for Equitable Adjustment for changing the alignment, which was performed through no fault of RMI.

JX 60 (8/18/00 Letter from Bowman to McClenan) at 1.  "Between about September 2000 and November 2000"—before the government responded to plaintiff's request for a contract modification—plaintiff realigned the entire West Levee between stations 166+00 and 188+00.  JSF at 9, ¶ 82; but see Tr. at 2611:10–2613:21 (R.V. Renda discussing the relocation of that same section of levee between August 7 and August 28, 2000).

On September 14, 2000, representatives of plaintiff (Messrs. Bowman, Duke and Smith), defendant (Messrs. McClenan and Russek) and the JV (Messrs. Mears and Baron) met to discuss plaintiff's progress on the Upper Bayou Contract.  See PX 997 (9/18/00 Email from Mears to Russek, McClenan and Smith including minutes from the meeting as an attachment) at 2.  Among the issues discussed at this meeting was the realignment of the West Levee.  According to the minutes from the meeting, it was determined that "RMI will . . . haul excess materials . . . to the unfinished portion of this reach."  Id. at 3.

On March 12, 2001, defendant confirmed in writing its directive concerning the West Levee:

With the status of construction as it presently is, it is now preferred that continued construction of the levee along the alignment shown in the drawings is no longer desirable.  Therefore, pursuant to Section 02223, Paragraph 1.4.5 Changes in Embankment Alignment,[69] you are hereby directed to continue with the revised alignment as previously instructed by the Bay Area Office.  You are to forego use of the alignment shown in the drawings . . . and place future material closer to the existing levee, based on the observed location of the outside edge of the graded top of the existing levee.

---

[69]A "General Provision" of the Levee Specifications in the Contract reserved the Contracting Officer's "right to make changes in the embankment alignment as may be found necessary before completion of the work.  If it becomes necessary, through no fault of the Contractor, to abandon a line or location on which work has been done, payment for material placed will be made as specified" in the Contract.  JX 2 (Specs.) at 100-01, ¶ 1.4.5.

PX 1323 (3/12/01 Letter from Benero to Bowman) at 1 (footnote added).

On approximately May 23, 2001, defendant issued Contract Modification P00027, see JX 6.0027, to

> formalize[] a field change between the Government and the contractor that occurred on or about August 7, 2000 wherein the contractor requested a realignment of the levee.  This change allows the contractor to complete the west levees of Lost Lake Placement Area . . . . with a different alignment than that shown in the contract drawings. . . . [P]ursuant to Section 02223, Paragraph 1.4.5 Changes in Embankment Alignment, you are to forego use of the alignment shown in the drawings . . . and place material between Station 182+00 and Station 215+00 closer to the existing levee.

Id. at 2, ¶ A.  Plaintiff submitted its REA for the West Levee Realignment claim on May 31, 2001.  See PX 8 (W. Levee REA) at 2, and resubmitted the REA as a certified claim on August 9, 2001, see JX 88 (8/9/01 Letter from Bowman to Benero) (W. Levee Cl.); accord PX 1617 (11/6/01 Letter from Benero to O. Renda) (acknowledging receipt of plaintiff's claim seeking " $789,600.00 and 40 days.")

2.    Discussion

The parties appear to agree that the August 7, 2000 meeting at Lost Lake resulted in a field change to the alignment of the West Levee, but there is disagreement as to the scope of the change.  There are only two items of contemporaneous documentary evidence concerning this meeting:  plaintiff's August 7, 2000 CQCR, see JX 10.482 (8/7/00 CQCR), and Mr. Russek's file memorandum dated the following day, see PX 949 (8/8/00 Russek File Mem.).

Mr. Russek's memorandum, which was not provided to plaintiff, states that defendant directed plaintiff "to forego use of the alignment shown in the [Contract] drawings . . . and place future material closer to the existing levee." Id. at 1, ¶ 2 (emphases added).  This language appears fairly to indicate  that defendant understood that it had directed plaintiff not to alter the alignment of the portion of the West Levee that plaintiff already had constructed, but rather to "forego" its previous construction path and realign the remaining stretch ("place future material") of the West Levee toward the existing levee.  Plaintiff's summary of the field change in its CQCR is less clear, and can be read either to mean that defendant instructed plaintiff to "shift" the alignment of the remaining West Levee toward the old levee, or that defendant instructed plaintiff to "move" the center line of the entire West Levee:  "Eric R[ussek] and Mike [McClenan]

107

came out and OK'd levee c/a [70] shift to move c/l[71] of levee towards old levee to reduce loss of material." JX 10.482 (8/7/00 CQCR) at 3 (footnotes added).

The testimony at trial concerning defendant's instruction to plaintiff was equally inconclusive.  Mr. McClenan testified that the directive at the August 7, 2000 meeting and the subsequent no-cost modification to the Contract came about because plaintiff

> [was] having problems with the alignment of the levee.  The plans called for the alignment of the levee to gradually diverge away from the existing levee, toward the interior of the placement area, and . . . they were having problems with soft materials . . . oozing out between the levee that was being constructed hydraulically and the existing levee, causing a mess, so to speak.
>
> . . . [W]hat we decided in the field was to allow them to, at that point, start moving the levee back just inside the existing levee, so that that bad material would ooze onto the inside and it wouldn't ooze out between the two levees and cause problems with construction.

Tr. at 3151:4–16 (McClenan).  When asked whether defendant "direct[ed] Renda Marine at the August 7 meeting to move or reposition any part of the west levee that had been previously constructed by Renda Marine," Mr. McClenan replied, "No," Id. at 3151:17–20 (McClenan), and explained that the purpose of Modification P00027 "was to help [plaintiff] . . . construct the levee and eliminate the problems they were having with the soft material oozing up between the two levees, id. at 3151:21–24 (McClenan).

Mr. Mears similarly testified that

> the contract documents required the contractor to build the finished new levee [with] a . . . set distance from the center line of the old levee and the center line of the new levee.  There was a prescribed distance between the two.
>
> The contractor had been having problems with constructing the new levee alignment out into the site.  So that center line was moved 33 feet. . . .  And

---

[70]The court understands "c/a" to be an abbreviation of the phrase "change in alignment."  See Tr. at 2608:6-7 (colloquy between R.V. Renda and plaintiff's counsel).

[71]The court understands "c/l" to be an abbreviation of the term "center line."  See Tr. at 2608:8-9 (colloquy between R.V. Renda and plaintiff's counsel).

what that did was it got it closer to the old levee alignment and a little bit of
a better foundation.

. . . .

The field change was to—from that point where we were at on that day, to
move the levee alignment from there until completion closer to the old
levee alignment.

Id. at 3936:16–3937:6 (Mears).  When asked whether Mr. McClenan had instructed
plaintiff "to reposition portions of the west levee that had been constructed to that point,"
Mr. Mears replied, "No."  Id. at 3937:7–10 (Mears).

On the other hand, Messrs. Bowman and Smith testified that the government stated
at the August 7, 2000 meeting that "'the intent of the new levee design was that the
outside toe of the hydraulically-constructed levee should tie into the inside top of the
slope of the existing levees.'"  See id. at 1084:11–19 (Bowman quoting PX 1006 (9/22/00
Letter from Bowman to McClenan) at 3); accord Tr. at 1794:19–20 (Smith stating that he
understood the intent of the specifications to be that "the new levee would be anchored to
the existing levee").  Based upon the foregoing account of defendant's statement at the
August 7, 2000 meeting, plaintiff acted on the assumption that defendant's instruction to
relocate the West Levee included was both prospective and retrospective.  See id. at
2611:13–16 (R.V. Renda stating that plaintiff "had to relocate the [1600 feet of the West
Levee] that we had already placed to help seal or cap the gap, if you will, between the old
levee and where the alignment of the new levee was designed to be placed.").

The only other witness to testify concerning the scope of defendant's directive at
the August 7, 2000 meeting was Mr. Mears, an engineer with the JV.  When asked at trial
whether defendant told plaintiff that defendant intended "to have the toe of the new levee
abut the existing levee along the west levees," Mr. Mears initially replied, "No" and then
answered, "I don't know."  Id. at 4058:5–13 (Mears).

The foregoing testimonial evidence is inconclusive as to the actual content of the
field directive.  Plaintiff's actions in relocating the existing portions of the West Levee
tend to support with some force plaintiff's view of the field instruction that relocation of
the existing West Levee was directed.  However, weighing against that conclusion is the
documented track record of plaintiff's acting unilaterally without coordinating with the
government, in particular in its decision to stockpile a "vast" amount of stiff red clay
dredged from Section 7, id. at 2725:15-2727:10 (R.V. Renda), rather than immediately
placing it on the levee, id. at 1233:3-12 (Bowman).

Even if plaintiff had established that its understanding of defendant's directive was correct, plaintiff did not present sufficient evidence at trial to demonstrate that the realignment of the West Levee was prompted by a differing site condition and was not, as Mr. McClenan asserted at trial, an accommodation to plaintiff.  Id. at 3151:21-24 (McClenan) ("[The purpose of Modification P00027] was to help [plaintiff] . . . eliminate the problems they were having with the soft material oozing up between the two levees.").

In a letter to defendant dated November 15, 2000, plaintiff declined to request a meeting to discuss a Show Cause Notice issued by defendant on November 6, 2000, see PX 1083 (Show Cause Notice); JX 69 (11/15/00 Letter from Bowman to Benero) at 4-5 ("At this time, RMI is not requesting a meeting regarding the 'Show Cause Notice.'  We believe our 'current' performance speaks for itself.").  Plaintiff then referred to the "Government directive to realign [the] levee near station 170+00 on [the] West side of Lost Lake," as one of numerous "Differing Site Conditions or Changed Conditions . . . which affect the design, construction and completion of the Project."  Id. at 3.

Defendant responded on December 13, 2000 and rejected plaintiff's allegation that the realignment of the West Levee was a changed condition:

> This verbal directive was issued to improve a worsening situation on the west levee, where the alignment of the newly[-]constructed levee was shifting to the interior of the saturated disposal area.  A previously placed shore pipeline had been positioned across the disposal area, effectively damming the discharge, precluding it from draining properly and saturating the work area.  This situation significantly aggravated problems with the upwelling of soft foundation materials between the hydraulically placed levee and the existing exterior levee.  The purpose of moving the new levee alignment toward the existing levee was to assist in resolving problems with the upwelling of soft material between the hydraulically placed levee and the existing exterior levee.  We do not consider this issue to have merit since the directive was issued to correct an improper construction method.

PX 1158 (12/13/00 Letter from McClenan to Bowman) at 2, ¶ 5.

Moreover, plaintiff failed to prove basic elements of a Type I differing site conditions claim.  Here, the contract affirmatively represented certain aspects of the subsurface at Lost Lake, in particular that "the foundation of the new levee is very soft to soft dredged material, and sand placed in past dredging maintenance cycles."  JX 5 (Drawings) at 14, n.10.  Having found that there are indications in the Contract, the court must determine whether the contractor's interpretation is reasonable and whether there

are material differences between the conditions indicated and those actually encountered and whether the conditions encountered were reasonably unforeseeable.  Here, there is no material difference that the court can discern between the conditions indicated and the conditions encountered.  In these circumstances, the conditions encountered could not be reasonably unforeseeable.  In addition to the conditions indicated in the Contract, there was testimony that, at the time of plaintiff's site visit, Lost Lake was inundated.  Tr. at 552:23-553:7 (Bowman stating that "the entire interior of the Lost Lake was flooded" at the time of his site visit).  Soft and wet conditions were not only foreseeable, they were both indicated and known to plaintiff.  Plaintiff has failed to support its claim for a differing site condition in its West Lake Levee Realignment claim.

G.      Plaintiff's "Lost Lake Levees" Claim

In its Lost Lake Levees claim, plaintiff seeks $5,660,479, see PX 1863A (Revised McCullough Rep.) at 1, plus a 397 calendar-day extension of time, JSF at 20, ¶ 196; Compl. at 28, ¶ 196, for differing site conditions allegedly encountered when constructing the hydraulically-placed levees at Lost Lake.

1.      Background

Plaintiff asserts that its lack of success when constructing the levees at Lost Lake is traceable to three differing site conditions.  First, plaintiff alleges that the levees would not stand due to the "highly unstable and exceedingly soft" foundation material at Lost Lake.  Compl. at 23, ¶ 160.  In a letter dated August 3, 2000, plaintiff notified defendant that

A Differing Site Condition has been identified in the Levee Area.  RMI has encountered very soft material in the levee area, which will not allow the construction of the levee in many areas.  This soft material, when compacted, causes a "mud wave[,]"[] resulting in significant production losses and time delays.  RMI intends to further investigate these conditions, request additional Contract Time for delays and request compensation for the production losses.

JX 59 (8/3/00 Letter from Bowman to Benero) at 2.

Second, plaintiff contends that the contract documents failed to disclose sidecast borrow areas, and that the sidecast borrow areas prevented plaintiff from constructing the hydraulic levees as designed.  Evidence at trial demonstrated that sidecast borrows are a well-known feature of containment levees:  "[L]evee raisings [by sidecast borrow] usually are accomplished by excavating dried dredge material from the interior of the site and

placing it on top of the existing levee." DX 1068 (Report of Defendant's Expert Witness Michael Hasen) (Hasen Rep.) at 4. A sidecast borrow area is formed "where a dragline essentially walks and borrows material from one place and places it adjacent, and then moves along and creates a borrow ditch of excavated material, and builds, usually, a levee adjacent to it or parallel to it." JX 98A (Fisher Dep.) at 44:1–5. A sidecast borrow area "essentially . . . is a ditch, a hole that parallels the existing levee that you're building, and is oftentimes either partially or totally filled with water when you're starting." JX 98B (Fisher Dep.) at 44:19–22.

Mr. Bowman recounted in a letter that he was told during an October 23, 2000 meeting with representatives of defendant and the JV that

> the existing levees were built up or added to using a crane with a dragline rig working off of mats, with the work taking place as late as 1996. The dragline, located inside the existing levee and sitting on crane mats, excavated material inside the existing levee location, creating a borrow pit or borrow area running continuously parallel to the existing levee. This borrow material was then used to build up or add to the existing levees. Although Tim Few . . . noted that a 50 feet minimum distance was specified and required by the Government to be maintained from the inside toe of the levee to the beginning of the borrow area, the JV seriously doubted that the 50 feet setback limit was closely monitored. The JV stated that they had discussed potential borrow area(s) problems with the Government prior to bidding the Project. The JV's hypothesis appears reliable since crane mats are typically 20 feet wide. The new shear line, located approximately 20 feet from the toe of the existing levee, corresponds with the general size of crane mats and what appears to be the leading edge of the existing borrow area.

PX 1064 (10/31/00 Letter from Bowman to McClenan) at 2. Plaintiff notified defendant of its position that the sidecast borrow areas constituted a "changed condition" on November 2, 2000. PX 1070 (11/2/00 Letter from Bowman to McClenan) at 2 ("RMI believes that the acknowledged existence of this borrow area(s) have contributed greatly to the lack of efficiency during new levee construction operations. The borrow areas are not shown in the Contract Documents and were not anticipated in the Bid by RMI and are a Changed Condition.").

Third, plaintiff argues that alleged defects in the design of the levees (in addition to soft conditions and the sidecast borrow areas) caused the levees to fail. However, plaintiff did not make a claim for defective design. See PX 3.001 (Lost Lake Placement Area Certified Claim) (Lost Lake Cl.) at 10 ("For this claim, only a Type I condition shall

be discussed.").[72]  In any case, plaintiff alleged that it experienced a shortage of suitable material to construct the hydraulic levees.  In a November 2, 2000 letter to defendant, Mr. Bowman wrote:

> During our telephone conversation on Tuesday, October 31, 2000, you asked if Renda . . . planned on completing the new levees hydraulically.  I told you that RMI would continue constructing the remaining new levees mechanically.  This is due primarily to the fact that the current dredging operations are not yielding any clay material for use in building the new levees, and frankly, building the new levees hydraulically to date, has not been successful. . . .  In this case, up to 700% of clay material is required to displace the soft foundation materials (far in excess of anyone's estimate), and we have reason to believe the reason for this low yield of clay material is that the contour of the stable foundation includes a parallel borrow area running adjacent to the new levee construction.  Further, the suggestion that a dredge pipe on the surface would "blast" or "blow out" soft foundation materials, to the depths and volumes that comprise these borrow area(s), is not physically reasonable.

PX 1070 (11/2/00 Letter from Bowman to McClenan) at 1.

---

[72]The court recognizes that a Type I differing site conditions claim may be "closely related" to a claim of defective specifications.  Comtrol, 294 F.3d at 1364.

> Although differing site conditions and defective specifications claims are distinct in theory, they collapse into a single claim under facts such as these, where the alleged defect in the specification is the failure to disclose the alleged differing site condition.  Where the differing site conditions claim and the defective specifications claim are so intertwined as to constitute a single claim, that claim will be governed by the specific differing site conditions clause and the cases under that clause.

Id. at 1362.

Here, however, if there is a defect in the specifications, it is difficult to discern how it could be closely related to the differing site condition of soft and wet materials that plaintiff has claimed.  Those conditions were clearly disclosed in the contract documents.  See, e.g., JX 5 (Drawings) at 14, n.10 ("The foundation of the new levee is very soft to soft dredged material, and sand placed in past dredging maintenance cycles.  It is anticipated that very soft to soft foundation material will be displaced by the new levee material.").

Plaintiff notified defendant one month later of its belief that "the voids being filled in the borrow areas have consumed the clay available for the Project . . . [and that] insufficient clay is available to complete the levees to the current design template."  JX 72 (12/6/00 Letter from Bowman to McClenan) at 2.  On October 16, 2001, plaintiff filed its certified claim for the Lost Lake Levees Differing Site Condition.  See generally PX 3.001–3.005 (Lost Lake Cl.).

      2.      Discussion

            a.      The Soft Foundations at Lost Lake are Not a Differing Site Condition

Plaintiff has not proven by preponderant evidence that the soft foundations it encountered at Lost Lake are a Type I differing site condition.  The phenomenon that plaintiff encountered, i.e., soft foundations that were displaced during the placement of the hydraulic levees, were expressly represented in the Contract plans and specifications.  For example, the Lost Lake site plan, see JX5 (Drawings) at 14, describes the foundation for the new levees as "very soft to soft dredge material, and sand placed in past dredging maintenance cycles" and "anticipate[s] that very soft to soft foundation material will be displaced by the new levee material."  Id. at 14, n.10; cf. id. at 17 (Section and Plan at New Drop-Outlet Structure), n.1 ("Construct levee section to a minimum elev[ation] of +19 [feet] and place surcharge f[i]ll in order to displace the soft foundation.").  This representation concerning the soft foundations is echoed in Amendment 1 to the Contract Specifications, see JX 3 (Am. 1 to Solicitation), which advises bidders that "the designers intend the new work material to be used to displace the very soft foundation material adjacent to the interior of the existing levees, and for the raised levee section to be constructed on this material," id. at 7 (emphasis added); accord id. at 6 (stating that constructing the levees hydraulically "will be the most efficient way to displace the soft levee foundation material beneath the new levee alignment.").

Because the Contract contained "reasonably plain or positive indications" that the subsurface conditions would be exactly what plaintiff encountered, plaintiff cannot establish that the soft foundations at Lost Lake constitute a Type I differing site condition.  Accord Pac. Alaska Contractors,, 436 F.2d at 469; Foster, 435 F.2d at 875.  Nor can plaintiff establish that the conditions it encountered at Lost Lake differed materially from those represented in the Contract documents.  Accord Youngdale, 27 Fed. Cl. at 535.

Even if the Contract representations concerning the soft foundations at Lost Lake were not so explicit, plaintiff's differing site conditions claim would fail because plaintiff did not act as a reasonably prudent contractor prior to submitting its bid.  Mr. Fisher admitted that plaintiff chose to spend only "a portion of one day" investigating Lost Lake.

JX 98B (Fisher Dep.) at 104:21.  Both Messrs. Bowman and Fisher admitted that the site was at least partly flooded during their brief visit, see id. at 87:18–88:4; Tr. at 552:23–553:7 (Bowman referring to the site as "inaccessible" due to flooding), and Mr. Fisher stated that the Lost Lake borings might have been too shallow to allow plaintiff to assess the conditions at Lost Lake, JX 98A (Fisher Dep.) at 85:24–86:3 ("The visual, what we could see from the surface [at Lost Lake], appeared to match some of the core borings that were provided in the plans and specs, although, as I recall, they were all fairly shallow, the borings that we were looking at.").

Notwithstanding these circumstances, Messrs. Fisher and Bowman did not extend their site investigation, nor did they conduct more than a cursory visual inspection of the site.  E.g., JX 98A (Fisher Dep.) at 85:6-13, 16–19.  The court does not believe that the plaintiff acted as a reasonably prudent contractor to determine the conditions at Lost Lake prior to making its bid.  Moreover, there is no evidence whatsoever that plaintiff relied on any representation in the Contract about the subsurface materials at Lost Lake that later proved to be erroneous.  In addition, some doubt is cast on plaintiff's claim that the levees could not be constructed as a result of soft foundations by the fact that after the Upper Bayou Project, GLDD and its subcontractor, Affolter Contracting, completed the levee construction at Lost Lake and hydraulically constructed North Levee to a height of no less than +30 feet  MLT and, in some areas, as high as +36 feet MLT.  See Tr. at 1623:13–1625:11 (Affolter); id. at 3533:22–3536:12 (Van Norman, Construction Manager for GLDD).

b.      The Sidecast Borrow Areas are Not a Differing Site Condition

Nor do the sidecast borrow areas constitute a differing site condition.  Although the Contract documents do not affirmatively show sidecast borrow ditches next to the existing levees, see JX 5 (Drawings) at 14, the sidecast borrow areas, to the extent that there were any, contained dredged material from past maintenance dredging jobs.  See Tr. at 4209:6–14 (Few).  This condition comports with the Contract representations concerning the conditions at Lost Lake.  See JX 5 (Drawings) at 14, n.10 ("The foundation of the levee is very soft to soft dredged material, and sand placed in past dredging maintenance cycles.") (emphasis added); accord id. at 23–27 (Logs of Lost Lake Borings).

Even if the presence of sidecast borrow areas were inconsistent with the contract representations, plaintiff has not established that a reasonably prudent contractor would find the existence of sidecast borrow areas "reasonably unforeseeable on the basis of all the information available . . . at the time of bidding."  Spirit Leveling, 19 Cl. Ct. at 94. The court notes that sidecast borrow was considered by both defendant and local dredging contractors to be "the standard excavation and levee construction procedure used in the

[Galveston] [D]istrict for small levee enlargements."  Tr. at 4202:6–8 (Few); accord id. at 1618:19–21 (colloquy between Affolter and defendant's counsel establishing that "side-cast borrow areas [are] common at dredge disposal areas like Lost Lake"); id. at 4516:6–10 (colloquy between Hasen and defendant's counsel establishing that "sidecast borrow areas [are] commonplace at disposal sites such as Lost Lake . . . [and that] when there's levee raising due to maintenance dredging, this is the way it's done.").  It also appears to have been common knowledge among dredging contractors—including Mr. Fisher—that the Channel was "maintenance [dredged by the Corps] . . . every two years," JX 98A (Fisher Dep.) at 226:15–16; accord Tr. at 846:11-14 (Bowman stating that, at the time he prepared plaintiff's bid, he understood that much "of [the Channel] had been maintenance dredged within the last 3 years.").  Accordingly, the court concludes that the existence of sidecast borrow areas near the Lost Lake Levees should have been reasonably foreseeable to a reasonably prudent dredging contractor.

Further, the court notes that—contrary to plaintiff's assertion—sidecast borrow areas were discussed during the prebid conference for the Upper Bayou Contract.  During his deposition, Louis Saenz, a Corps employee who "develop[s] plans and specs for dredging jobs," JX 106B (Saenz Dep.) at 5:17–18, testified:

A:   I remember [sidecast borrow areas] being discussed distinctly during the pre-bid conference.

Q:   Well, there's notes for the pre-bid conference.  Did you attend the pre-bid conference?

A:   I was there and I remember—I thought I remembered Rick Smith bringing it up.

Q:   Let me show you . . . the questions by prospective bidders and answers by the Galveston district . . . issued as Amendment No. 1.

     . . . .

Q:   Please look through those questions and answers and let me know if there's any discussion of borrow areas immediately adjacent to the perimeter levees, on the inside of the perimeter levees.

A:   (Witness reviews document.)

Q:     It looks like this may take some time.  Let me interrupt you and say
       this: If there was discussion about borrow areas, is that something
       that should have been put in Amendment No. 1 . . . ?

A:     I mean, I can't say whether it should have been put in there or not.
       But I was sitting right behind him, I think.  I was sitting right behind
       Rick Smith.  I don't know if you know Rick Smith but he can get
       quite vocal.

Q:     Who is he with?

A:     Rick Smith is probably with Great Lakes now. . . .  He was working
       for T.L. James at that time.  And Rick Smith, I believe, brought up
       the borrow situation, building over the old borrow pit.

Q:     . . . .  Question No. 6 says, "Why is the levee alignment so far from
       the perimeter where the foundation is crummy?"  Do you see this?

A:     Right.

Q:     Was that a Rick Smith question, or do you recall?

A:     Well, "crummy" sounds like the word he would use.  It could have
       been him, but I do remember somebody bringing it up.  I mean,
       I—you know, the—it wasn't—it was even brought up to me before
       the pre-bid conference.  You know, why are we putting this over an
       old borrow pit?  I said, well, you know, it will work if you
       hydraulically pump it.  It will work if you do that.  If you don't, it
       won't.

Id. at 53:8–55:4 (Saenz).  This testimony also tends to establish that the existence of
sidecast borrow areas at Lost Lake was commonly known among local dredging
contractors.  Although plaintiff's failure to attend the pre-bid conference is not
presumptively unreasonable because a contractor has "no legal obligation to attend," see,
e.g., Appeal of Goss, 97-1 B.C.A. (CCH) at ¶ 28,853, by choosing to remain anonymous
throughout the bidding process and by deciding not to attend the conference, plaintiff
"risked that it would not receive or understand information that could be material to its
bid," In the Appeal of Twigg, 92-2 B.C.A. (CCH) at ¶ 25,011.  In this case, however, the
risk appears a particularly imprudent one for plaintiff, a newcomer to the industry, to
assume.  Because sidecast borrow areas were not only foreseeable to reasonably prudent
dredging contractors at the time of bidding, but also appear to have been discussed during

the prebid conference, the court finds that plaintiff has failed to demonstrate that the sidecast borrow areas constitute a Type I differing site condition.

Moreover, even if sidecast borrow areas were unforeseeable, plaintiff did not demonstrate by a preponderance of the credible evidence that the sidecast borrow areas caused the shear failures it experienced.  The sidecast borrow area, which was constructed by T.L. James & Company in 1996 through its subcontractor, Kingfisher Marine, see Tr. at 3736:12-15 (Hrabovsky); DX 1067 (1996 Lost Lake Solicitation), ran parallel to the inside of the existing levee and resembled a shallow swale or pan about thirty-five feet wide and no deeper than four feet, see Tr. 3749:2–3752:23 (Hrabovsky).  The testimony indicated that the sidecast borrow area did not extend along the entire interior toe of the levees at Lost Lake.  See id. at 3740:24–3744:18 (Hrabovsky); accord DX 1067 (1996 Lost Lake Solicitation) at 3 (Sketch No. 1) (showing "no 'ditching' required" between Stas. 135+00 and 86+88.1).

The impact of the sidecast borrow areas on construction was addressed directly by the testimony of Mr. Hasen.  Mr. Hasen performed a calculation during trial —which plaintiff did not attempt to discredit—showing that any sidecast borrow area would be fully displaced when the hydraulically-placed levee-building material attained a height of five feet.  See Tr. at 4556:25–4560:21 (Hasen).  Mr. Hasen testified that the effect of this displacement would be that the crust covering the sidecast borrow area would "be broken into pieces and it will form a kind of a flat clay ball basically and go down with the rest of the clay balls into the muck."  Tr.  at  4561:1–8 (Hasen).  Plaintiff relies on Mr. Few, a government engineer, for the observation that the Corps on occasion commissioned "very deep" sidecast borrowing, Pl.'s Reply at 30 (citing Tr. at 4207[:6])), but did not prove any particulars about such work at Lost Lake that would allow the court to infer any impact on plaintiff's performance.  In fact, when asked at trial whether "side-cast borrow areas [were] a factor in the design of the . . . levees at Lost Lake," Mr. Few replied, "No."  Tr. at 4207:18-20 (Few).

        c.      The Alleged Shortage of Levee Building Material is Not a Type I Differing Site Condition

Plaintiff also failed to prove by preponderant evidence that there was insufficient material to construct the hydraulic levees at Lost Lake, and that this shortage constitutes a differing site condition.  As a threshold matter, the court notes that plaintiff has not established—or even alleged—that any of the damages it alleges in its Lost Lake Levees claim is "solely attributable" to an insufficient quantity of levee building material.  See Spirit Leveling, 19 Cl. Ct. at 94 ("[T]he contractor must demonstrate that the excess costs are attributable entirely to the materially different subsurface conditions.").

118

In fact, plaintiff does not allege that its compensable injuries are generally attributable to a shortage of suitable materials to construct the Lost Lake levees.  Plaintiff seeks as damages the "extra costs for work and effort incurred to reconstruct levees damaged by subsidence of existing foundation materials, impacts to the dredging operation as a result, and standby time for equipment while awaiting an official release from the [Corps] to demobilize the project."[73] PX 1863 (McCullough Rep.) at 19.

Even if plaintiff had attributed any of its claimed damages to the alleged insufficiency of clay, plaintiff has not established that the alleged shortage of material, and any impeding of its performance claimed to have resulted from a shortage, was not at least partly caused by plaintiff's own activities.  In order to recover for a differing site condition claim, plaintiff must show that its claimed excess costs were solely attributable

---

[73]Of the itemized damages items addressed by Mr. McCullough's report, only Claim Item 12E (dealing with "additional material requirements") (see fourth bullet, below) could conceivably be construed to relate to an insufficient quantity of levee-building material for the hydraulic levees:

- Claim Item #12A seeks compensation for alleged unplanned additional hydraulic levee crew and equipment needed to move "large amounts of displaced material" during the hydraulic placement operation, and for extended performance of the hydraulic levee crew and equipment "when the dredge was delayed and the levee operation was forced into a standby mode."  PX 1863 (McCullough Rep.) at 21–22.

- Claim Item #12B seeks compensation for repairs to the East Levee, realignment of the completed portion of the West Levee in August 2000, and construction of the North Levee by mechanical methods with material allegedly "reclaimed" from side-cast borrow areas.  Id. at 22.

- Claim Items #12C and #12D seek compensation for dredge down time while plaintiff backtracked pipeline to repair levees, pumped water to "flush" displacement material from the levee construction area, or waited for displaced material "to subside away from the levee construction area."  Id. at 22–23.

- Claim Item #12E seeks compensation for additional booster pump equipment allegedly required to pump hydraulic fill material longer distances "due to additional material requirements to construct the levees."  Id. at 23.

- Claim Item #12F seeks compensation for standby time for the "dredge and dredge plant while awaiting official [Corps] release from the project."  Id. at 23–24.

119

to the claimed differing condition.  See Spirit Leveling, 19 Cl. Ct. at 94.  Among the
factors contributing to a shortage of material the court must consider is the contractor's
decision to stockpile, in the phrase of Mr. Renda, a "vast" amount of stiff red clay
excavated from Section 7 of the Channel.  See Tr. at 2725:5-17 (R.V. Renda); see also Tr.
at 1233:6-12 (Bowman testifying regarding the decision to stockpile).  Other evidence
presented at trial also suggests that plaintiff's hydraulic levee construction methods were
less than efficient.  For example, Mr. Mears testified that plaintiff did not properly control
the discharge of hydraulic material from the dredge pipe, nor did plaintiff take proactive
measures to minimize the flow of this material into the interior of Lost Lake.  See id. at
3923:18–3925:20 (Mears) ("The sand was running what appeared to be 1,000 feet out
into the site instead of being contained within the planned levee alignment.").  Further,
plaintiff disregarded Contract Specifications and placed material hydraulically to +30 feet
MLT instead of to 20 feet MLT, which could have contributed to its loss of material.  See
id. at 3917:18–3921:21 (Mears); id. at 3918:15–19 (Mears) ("The placing at that high of
an elevation with the water velocity as it comes out of the pipe, the material has a
tendency to run based on the height of fall, as well as the velocity of the water. So the
higher you are, the further the material will run away from the pipe.").  Amendment 1 to
the Specifications states, "The Corps believes that there will be sufficient material to
construct the required levees, provided the contractor carefully manages . . . the discharge
pipe."  JX 3 (Am. 1 to Solicitation) at 7.  Because plaintiff's construction practices did
not comport with the contract requirements, plaintiff not only acted
unreasonably—plaintiff did not show that its claimed injury was not at least partly caused
by its own conduct.  Accord Weeks, 13 Cl. Ct. at 240 (stating that the court "must be
careful to focus only on those damages directly attributable to the alleged differing site
condition, and not on those damages for which concurrent causes, stemming from the
plaintiff's own making, are equally to blame.").  The court cannot conclude that plaintiff
has proven a Type I differing site condition based on a shortage of levee-building
material.

> H.     Plaintiff's Contract Interference and Superior Knowledge ("HL&P
>        Tower) Claim

Plaintiff alleges that "[o]n about July 16 and 17, 2000, Renda's dredging
operations were disrupted by Houston Lighting and Power ('HL&P') crews who were
installing a[n] . . . electrical tower in the vicinity of Lost Lake.  To accommodate the . . .
construction, Renda had to break down and relocate its discharge piping."  Compl. at 11,
¶ 75.  Plaintiff further alleges that "[b]etween about October 16 and 18, 2000, HL&P
caused a second disruption, which required another relocation of the discharge piping in
Lost Lake."  Id. at 11, ¶ 77.  Plaintiff's complaint states that "HL&P's work was not
shown or indicated in the Contract Documents[] and constituted a differing site
condition."  Id. at 11, ¶ 76.  As a result, plaintiff seeks $159,353 in "reasonable and

necessary costs for the [HL&P Tower] claim."  Pl.'s Br. at 53 (citing PX 1863A (McCullough Damages Summary) at 1.

        1.    Background

On October 18, 2000, Mr. Bowman sent a letter to the administrative contracting officer titled "Notification of Changed Condition—Interference with Contract Work by Other Contractor (Reliant Energy—HL&P),"  PX 1026 (10/18/00 Letter from Bowman to McClenan) (HL&P Notification), to notify the Corps of the July and October interruptions by HL&P:

> RMI was advised on October 16th by . . . HL&P . . .  that our dredge discharge pipe would have to be relocated to accommodate sheet pile work for HL&P's new tower location. . . .  RMI broke down the pipe and relocated it on October 16th and 17th.  As a result, dredging operations were halted and the pipeline relocated, which resulted in lost time and additional costs being incurred by RMI.

> This is the second similar-type delay encountered as a result of interferences with HL&P at the Lost Lake Area.  RMI has not been able to give the Government adequate warning of these occurrences due to limited coordination time afforded by HL&P.[74]  Since the delay(s) were neither caused by nor were they the responsibility of RMI, we will compile our costs and forward them to you for action.

Id. (footnote added).

---

[74]Plaintiff's own evidence on notice to the government is inconsistent and ambiguous.  At trial, Mr. Bowman testified that he informed the Corps of the second interruption before moving the pipeline.  Tr. at 1070:9–11 (Bowman).  Plaintiff points to this testimony in its post-trial brief and argues that "[Renda] verbally informed the Corps, and later followed it up with a letter, but received no guidance or direction from Mr. McClenan."  Pl.'s Br. at 51.  Mr. Bowman's testimony is undermined not only by the statement in his October 18 letter that plaintiff was not able to provide timely notice of the second interruption by HL&P, see PX 1026 (HL&P Notification) ("RMI [was] [un]able to give the Government adequate warning . . . due to limited coordination time afforded by HL&P."), but also by plaintiff's failure to notify defendant of the July disruption by HL&P before it sent the October 18 letter, see id. ("The is the second similar-type delay encountered as a result of [HL&P] interferences . . . at the Lost Lake Area.").

The parties then exchanged several letters.  See PX 1058 (10/30/00 Letter from McClenan to Bowman) ("[T]his is in response to your letter dated October 18, 2000 regarding . . . notice of a change in anticipation of submitting a request for an equitable adjustment due to relocation of dredge pipe caused by the relocation of an HL&P crossing tower. . . . [M]y initial evaluation of your letter indicates that the cost incurred for the pipeline relocation is not the responsibility of the government."); JX 69 (11/15/00 Letter from Bowman to Benero responding to 11/6/00 Show Cause Notice) at 3 (identifying the HL&P "changed condition" as one of may difficulties that delayed plaintiff's performance of the Contract).  On December 30, 2000, Mr. McClenan responded to plaintiff's claim that the relocation of the HL&P tower constituted a changed condition: "The contract drawings do not identify a 'new' or 'second' electrical transmission tower to be constructed at Lost Lake Placement Area.  HL&P failed to coordinate with the Government with respect to this tower.  We consider this issue to have merit."  PX 1158 (12/13/00 Letter from McClenan to Bowman responding to plaintiff's reply to the Show Cause notice) at 3.[75]

In his 12/13/00 letter, Mr. McClenan directed plaintiff to submit a Request for Equitable Adjustment (REA) for the HL&P Tower Claim "within 15 calendar days of receipt of this letter."  Id. at 6.  Plaintiff did not submit its REA until April 11, 2001, see PX 2.001 (HL&P REA) at 1.  After plaintiff and defendant failed to reach an agreement, plaintiff resubmitted its REA as a certified claim on August 9, 2001.  PX 2.002 (HL&P Certified Claim) at 1.

At the pretrial conference, plaintiff conceded that, notwithstanding its characterization of the HL&P Tower Claim as a "changed condition" claim in its REA, Certified Claim, and Complaint, plaintiff could not prove that the actions of HL&P constituted a changed condition:  "Obviously one of the essential requirements . . . [is] . . . that a . . . condition has to have existed prior to the time of the entry into the contract or the award of the contract. . . .  [T]his is a situation that arose during performance."  Pretrial Tr. at 273:18–25 (plaintiff's counsel).  Recognizing that "we are not [going forward] with this as a differing site conditions claim," id. at 273:25–274:1, plaintiff's counsel explored several alternate theories of recovery:

[This] really is a constructive change on the part of the government.

---

[75]Of course, Mr. McClenan's statement that the plaintiff's HL&P claim had "merit" is not binding on this court, which determines "the fundamental facts of liability and damages de novo."  E.g., Wilner, 24 F.3d at 1401.

> . . . because the government is the one that had the ability to either grant or
> restrict the issuance of permits to do work by third-party contractors . . .
> and the decision to award the permit, or allow [HL&P] to come in and do
> work in the area, which essentially was an impediment to access to the site,
> as well as restrictions to the performance of the work by the contractor after
> they had already mobilized. . . .
>
> . . . .
>
> It is an interference, hind[]rance, constructive change, because it was
> a restriction of access.  It was not something that was indicated as an
> activity that was to occur, or that the contractor should have considered
> would occur during the course of construction.  And the net result of the
> government's allowance of the permit was to create a restricted access
> situation, which was a change of conditions in terms of the contractor's
> access to the site.

Id. at 274:2–275:8 (plaintiff's counsel).  The court ordered plaintiff to file a memorandum
"discussing its theory that the government is under an obligation not to hinder a
contractor in situations analogous to that presented in plaintiff's 'HL&P Tower Claim.'"
Post-Pretrial Conference Order at 3-4, ¶ 9.

In its Memorandum Brief concerning the HL&P Tower Claim (Pl.'s HL&P Br.),
plaintiff advances two theories to prove defendant's liability.  First, plaintiff contends that
the Corps' issuance of a permit to HL&P for its activities at Lost Lake "hinder[ed]
[Renda] in its performance of the Contract, . . . [which] operated as a constructive change
to the Contract."  Pl.'s HL&P Br. at 2, ¶ 4.  Second, plaintiff argues "[a]dditionally or in
the alternative" that defendant withheld from bidders for the Upper Bayou Contract,
including plaintiff, "superior knowledge that the Corps had with regard to HL&P's lines,
and the impact that it would have on any contractor's performance of the Contract,
[which] should have been disclosed."  Id. at 2–3, ¶ 5.

2.      Discussion

a.      Plaintiff's Interference Claim

Plaintiff contends that defendant "had an affirmative duty to not undertake any
activity that would hinder [p]laintif['s] . . . performance of the Contract," and also "had
an affirmative duty to do whatever was necessary to enable [p]laintiff's performance."
Id. at 2, ¶ 4.  Plaintiff points out that, on February 1, 2001, "HL&P submitted an
Application for [a] Department of [the] Army [p]ermit to relocate [a] transmission tower

[located] in the water 350 feet to the east [of] Lost Lake,  Pl.'s Br. at 51 (citing JX 31 (Request for Permit)), and argues that "HL&P's construction activities undertaken pursuant to its permit[] interfered with [p]laintiff's activities at Lost Lake, causing [p]laintiff to move or disconnect its dredge disposal line, thereby causing delay and expense, Pl.'s HL&P Br. at 2, ¶ 3.  Plaintiff emphasizes that "[t]here was no mention of HL&P's work in the contract documents," Pl.'s Br. at 50, and argues that defendant's issuance of this permit effected "a constructive change to the Contract" for which plaintiff is entitled to recovery.  Id.; accord Pl.'s Br. at 49 (same).

Defendant agrees with plaintiff that "'[e]very contract contains an implied provision 'that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.'"  Def.'s Br. at 66 (quoting Lewis-Nicholson, Inc. v. United States, 550 F.2d 26, 32 (1977) (quoting George A. Fuller Co. v. United States, 69 F. Supp. 409, 411 (1947)) and citing Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000); Blackstone Consulting, Inc. v. United States, 65 Fed. Cl. 463, 471 (2005)).  Defendant concedes that the government may breach this duty by interfering with a contractor's access to a job site, but emphasizes that the government "is not responsible for the actions of third parties that impede a contractor's performance, absent a specific contractual provision that places the risk of such interference upon the [g]overnment."  Id. at 66–67 (citing Oman-Fischbach Int'l (JV) v. Pirie, 276 F.3d 1380, 1385 (Fed. Cir. 2002) and Olympus Corp. v. United States, 98 F.3d 1314, 1318 (Fed. Cir. 1996)).  Here, defendant contends the Corps did approve a request by HL&P for a permit to repair an existing tower located in the water to the east of Lost Lake.  However, defendant emphasizes that the Corps never issued a permit "authoriz[ing] HL&P to build the new transmission tower at Lost Lake that allegedly disrupted Renda's performance of the Upper Bayou Project."  Id. at 67.

At trial, Bruce Bennett, Leader of the North Evaluation Unit of the Regulatory Branch of the Corps' Planning, Environmental and Regulatory Division, Tr. at 3615:14–19, explained that section 10 of the River and Harbor Act of 1899, see generally 33 U.S.C. § 403 (2000), vests the Corps with authority to issue permits for "structures and work in navigable waters."  See Tr. at 3616:22–3617:14 (Bennett).  Mr. Bennett testified that, pursuant to this authority, he approved a request by HL&P, see JX 31 (Request for Permit), for a permit "to retain tower #20370 . . . at its present location [in the water approximately 350 feet east of Lost Lake], and to install three 19-pile timber dolphins to protect the tower foundation," see DX 373 (Letter of Permission) at 1.  The "Permit Conditions" provided that "[t]his permit does not authorize interference with any existing or proposed Federal project," id. at 5; see also Tr. at 3629:22–3630:20 (Bennett confirming this limitation on the HL&P permit).  When questioned about HL&P's request in its permit application to construct a new tower on land at Lost Lake, id. at 3629:10–13, Mr. Bennett explained that the Corps' authority under section 10 of the River and Harbor

Act of 1899 does not extend to structures built on land:  "Only work or structures in navigable waters . . . requires a permit."  Id. at 3629:15–17 (Bennett).

Defendant argues that,

> [c]ontrary to Renda's contention, the permit issued by the Corps to HL&P did not sanction the construction of the new transmission tower on land at Lost Lake. . . .  Even assuming for the sake of discussion that the permit could be construed as approving the construction of the new tower, the permit conditions expressly provided that the permit "does not authorize interference with any existing or proposed Federal project," e.g., the Upper Bayou Project.

Def.'s Br. at 69 (quoting DX 373 (Letter of Permission) at 5).  Because there is no provision in the Upper Bayou Contract "under which the [g]overnment assumed the risk of increased costs resulting from any acts of HL&P," defendant argues that "Renda's constructive change claim . . . lacks merit."  Id.

Notwithstanding the evidence presented at trial showing that the HL&P's activities at Lost Lake were not permitted by the Corps, plaintiff avers that "[t]he Corps knew or should have known . . . in advance of the Project" that HL&P was planning to construct a new tower on land at Lost Lake.  Pl.'s Br. at 50.  Plaintiff did not offer any evidence to support its "knew or should have known" theory, and the court is not aware of any.

"It is, of course, settled that absent fault or negligence or an unqualified warranty on the part of its representatives, the Government is not liable for damages resulting from the action of third parties."  Oman-Fischbach, 276 F.3d at 1385 (quotations and citations omitted).  "Unless the parties in unmistakable terms agreed to shift the risk of increased costs due to acts by [third parties] . . . no liability on the part of the [government] attaches from such acts."  Id. (citing Lenry, Inc. v. United States, 297 F.2d 550, 553 (1962); Fort Sill Assoc. v. United States, 183 Ct. Cl. 301, 309 (1968)).  Plaintiff has not identified any contractual provision under which defendant assumed the risk of increased costs resulting from any acts of third parties, such as HL&P.  Nor has plaintiff proved that the government "knew or should have known" prior to issuing the Upper Bayou Contract Solicitation that HL&P would construct a new transmission tower on land at Lost Lake.  For the foregoing reasons, the court cannot hold defendant liable for damages incurred by plaintiff as a result of HL&P's activities and plaintiff's interference claim must fail.

       b.      Plaintiff's Superior Knowledge Claim

In its HL&P brief, plaintiff also argued, for the first time, that the "superior knowledge" doctrine provides an alternate basis for recovery for this claim:

> [T]he superior knowledge that the Corps had with regard to HL&P's lines, and the impact it would have on any contractor's performance of the Contract, should have been disclosed. The Corps['] failure to disclose said information results in a contract breach. Since [p]laintiff could not have reasonably known about the HL&P matter and include[d] it in its bid process, [p]laintiff seeks damages for the costs and expenses incurred as a result of the Corps['] non-disclosure.

Id. at 2–3, ¶ 5. To support its "superior knowledge" claim, plaintiff points to an April 21, 1998 email from Dalton Krueger, the Project Manager for the 45-foot project,[76] see Tr. at 3101:19-24 (colloquy between McClenan and defendant's counsel), to several Corps employees concerning a meeting with "the Port of Houston Authority and numerous District people." PX 358 (4/21/98 Krueger Email). The email states:

> At th[e] meeting it was agreed that all the lines which cross the [Houston Ship Channel] are in violation today, and it would not make any difference if the widening and deepening project w[ere] built. There are also power lines upstream of the HGNC[77] project which appear to have a similar problem. Therefore, the decision to get the lines in compliance with the Coast Guard regulations should be handled under the permit process and not in connection with the HGNC.

Id. (footnote added). Relying on this email, which discusses the future relocation of power lines that crossed the Channel, plaintiff argues that it is entitled to damages and equitable relief because defendant possessed, and subsequently withheld, superior knowledge that a second transmission tower would be constructed at the Lost Lake Placement Area. See Pl.'s HL&P Br. at 1-2, ¶ 1.

      i.     Plaintiff's Superior Knowledge Claim is Jurisdictionally Barred

---

[76]Mr. Krueger did not testify at trial.

[77]Although the acronym "HGNC" was not clarified at trial, the court infers from the context of the email that HGNC refers to the Houston-Galveston Navigation Channel.

The court questions its jurisdiction to consider plaintiff's superior knowledge argument because plaintiff did not present this claim[78] to a contracting officer.[79]  41 U.S.C. § 605(a); England v. The Swanson Group, Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004) (discussing the jurisdictional prerequisites that a contractor must meet before proceeding in this court); see also Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1578 (Fed. Cir. 1994) (same); Sharman, 2 F.3d at 1568–69 (same).  "Absent a 'claim,' no [contracting officer's final] decision is possible and, thus, there is no basis for jurisdiction in this Court."  Def.'s Br. at 70 (citing Vanalco, Inc. v. United States, 48 Fed. Cl. 68, 76 (2000) ("In this case . . . there can be no final decision or "deemed denial" because there has been no claim submitted.").

In fact, after examining plaintiff's HL&P REA and Certified Claim, the court finds it difficult to discern that any claim was presented to the contracting officer concerning the HL&P tower.  Although both the REA and the Certified Claim purport to seek damages and equitable relief for "changed conditions" caused by the HL&P transmission tower delays, see PX 2.001 (HL&P REA) at 2; PX 2.002 (HL&P Certified Claim) at 2, neither document contains a written statement of the factual or legal underpinnings for this claim.  Compare PX 2.001 (HL&P REA) and PX 2.002 (HL&P Certified Claim) (consisting almost entirely of contractor records pertaining to damages and containing no discussion of claims) with PX 3.001 (Lost Lake Levees Certified Claim) at 6–175, and PX 5 (Obstructions No. 2 REA) at 6–22 ("Executive Overviews" of these claims).  Nor does plaintiff's HL&P Certified Claim present any other basis for relief to the contracting officer.  Construing the cover pages of plaintiff's REA and Certified Claim documents in conjunction with the plaintiff's brief written notice to the Corps concerning the second interference by HL&P, see PX 1026 (10/18/00 Letter from Bowman to McClenan) (quoted in its entirety supra), the court infers that, at most, plaintiff presented a claim to the contracting officer alleging a "changed condition."  The court recognizes that it

_____

[78]The term "claim" is not defined in the CDA; however, courts routinely look to the FAR to ascertain its meaning:

> Claim means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act.

48 C.F.R. § 2.101 (2004).

[79]Nor did plaintiff allege a "superior knowledge" claim in its complaint.

127

retains jurisdiction to review claims that "arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery," Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003), but plaintiff has neither argued nor proven that it is entitled to rely on a Scott Timber theory of jurisdiction.

ii.    Plaintiff's Superior Knowledge Claim Lacks Merit

Even if plaintiff's superior knowledge claim were not jurisdictionally barred, plaintiff failed to present sufficient evidence to prove the merits of this claim.  The "superior knowledge" doctrine imposes an implied affirmative duty upon a contracting agency "to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance."  Giesler v. United States, 232 F.3d 864, 876 (Fed. Cir. 2000).  "[T]he Government has an affirmative duty to disclose such knowledge.  It cannot remain silent with impunity."  Hardeman-Monier-Hutcherson v. United States, 458 F.2d 1364, 1371–72 (Ct. Cl. 1972).  Where a contractor claims that the government breached its duty to disclose, the contractor

> "must produce specific evidence that it  (1) undertook to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information."[80]

AT&T Communications, Inc. v. Perry, 296 F.3d 1307, 1312 (Fed. Cir. 2002) (footnote added) (quoting GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991)); see also Hercules Inc. v. United States, 24 F.3d 188, 196 (Fed. Cir. 1994) (discussing same evidentiary standards for superior knowledge claim); Petrochem Servs., Inc. v. United States, 837 F.2d 1076, 1078–79 (Fed. Cir. 1988) (same).

---

[80]To recover damages under the superior knowledge doctrine, a contractor also "must show that the nondisclosure . . . caused its additional . . . expenditures."  J.A. Jones Construction Co. v. United States, 390 F.2d 886, 893 (Ct. Cl. 1968).

128

When analyzing a claim that the government breached its duty to disclose superior knowledge, "[t]he court . . . must focus its inquiry on the government's knowledge at the time of contracting and its relationship to the contractor's lack of knowledge." L.W. Matteson, Inc. v. United States, 61 Fed. Cl. 296, 316 (2004); accord Max Jordan Bauunternehmung v. United States, 10 Cl. Ct. 672, 679 (1986) ("The government's liability for failure to provide information arises from a conscious omission to share superior knowledge it possesses in circumstances where it permits a contractor to pursue a course of action known to be defective."). As the Court of Claims explained:

> [T]he Government violates its contractual obligations if it permits the contractor to bid for a project and subsequently undertake a course of action in pursuance thereof which the Government knows to be defective, provided that the Government possesses knowledge which is vital to the successful completion of the contract, and provided further that it is unreasonable to expect the contractor to obtain that vital information from any other accessible source.

H. N. Bailey & Assocs. v. United States, 449 F.2d 376, 382–83 (Ct. Cl. 1971). Therefore, to prevail in its superior knowledge claim, plaintiff first must prove by preponderant evidence that defendant knew at the time of contracting that a new HL&P tower would be constructed at Lost Lake. Plaintiff has not met this burden.

Plaintiff relies on a single piece of evidence to support its superior knowledge claim: Mr. Krueger's email notifying Corps personnel of the decision to bring "all the [power] lines which cross the H[ouston] S[hip] C[hannel]" into "compliance with the Coast Guard Regulations . . . under the permit process." PX 358 (4/21/98 Krueger Email). Although this email was sent prior to the issuance of the Upper Bayou Contract solicitation, it does not discuss the construction of an additional transmission tower on land at Lost Lake. Plaintiff's complaint is about the construction of a transmission tower on land at Lost Lake. While this email might have some probative value if plaintiff were alleging that the government concealed superior knowledge concerning the relocation of HL&P's lines crossing the Channel, the email does not establish that, prior to the award of the Upper Bayou Contract, defendant was aware of any plans to construct a transmission tower on land at Lost Lake. Because plaintiff has not carried its burden to prove by a preponderance of the evidence that HL&P's construction activities on land at Lost Lake were approved by or even known to defendant, plaintiff's HL&P claim, if it were found to be within the jurisdiction of the court, must fail.

129

V.      Conclusion

Plaintiff has failed to prove by a preponderance of the credible evidence that it is entitled to recover on its claims.  This result is particularly harsh in this case because plaintiff received several equitable adjustments during contract performance to which, in the court's view, plaintiff was not entitled under the law governing the proof of Type I differing site conditions and the evidence adduced at trial.  Plaintiff's entitlement to those monies under its chosen theory of recovery was tried de novo in this court and plaintiff did not prevail.

The court believes that the evidence adduced at trial might support a claim of a breach of the implied duty of the government not to hinder a contractor's performance. For example, both the government's failure to respond timely to plaintiff's request for guidance about the West Levee realignment, and the government's failure, upon observing plaintiff's relocation of the levee, to correct what the government now claims is plaintiff's misunderstanding, appear on their face to be unreasonable.  The court would entertain a motion to deem a claim for a breach of the duty not to hinder to have been tried by consent and would consider as well a motion to schedule additional briefing, to be based entirely on the testimony and documentary evidence in the trial record, on that additional claim.  Any such motion shall be filed on or before September 1, 2005.

The court also considers the possibility that plaintiff may have failed to present certain claims under the contract.  If such an unpresented claim exists and is not time barred under 41 U.S.C. § 605(a) (2000), the court would entertain a request to stay proceedings pending the presentation of a claim or claims to the contracting officer for decision.

Finally, the court urges the parties to make renewed and vigorous efforts to settle their dispute on an agreed basis.

IT IS SO ORDERED.

s/Emily C. Hewitt
EMILY C. HEWITT
Judge