IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
Defendant. )

ORAL DEPOSITION

ERIC RUSSEK

January 14, 2004

ORAL DEPOSITION OF ERIC RUSSEK, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 14th day of January, 2004, from 9:59 a.m. to 5:08 p.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of the United States Corps of Engineers, 2000 Fort Point Road, 2nd Floor, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

RECEIVED

COPY

APPEARANCES

FOR THE PLAINTIFF:
Brian W. Erikson, Esq.
QUILLING, SELANDER, CUMMISKEY & LOWNDS
2001 Bryan Street, Suite 800
Dallas, Texas 75201
Telephone: 214-871-2100 - Fax: 214-871-2111

FOR THE DEFENDANT:
P. Alex Petty, Esq.
U.S. ARMY CORPS OF ENGINEERS, GALVESTON DISTRICT
2000 Fort Point Road
Galveston, Texas 77551
Telephone: 409-766-3191 - Fax: 409-766-3195

ALSO PRESENT:
Stacey Whitley, CSR
Oscar Renda
Barry L. Smith

INDEX

PAGE

ERIC RUSSEK
Examination by Mr. Erikson .................... 4
Signature Page ............................. 212
Court Reporter's Certificate ................. 214

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Quality Assurance Program, December, 1998 | 6 |
| 2 | 10-6-99 memorandum for files from Tim Few | 70 |
| 3 | 12-22-99 memorandum for files of Mr. Russek | 119 |
| 4 | 1-14-00 memorandum for files for Mr. Russek | 121 |
| 5 | 2-22-00 memorandum for files of Mr. Russek | 125 |
| 6 | Handwritten notes dated 10-30-97 | 170 |

ERIC RUSSEK,

having been first duly sworn, testified as follows:

EXAMINATION

Q. (BY MR. ERIKSON) Mr. Russek, could you state your full name for the record?

A. Yes. It's Eric Gerard Russek.

Q. Mr. Russek, my name is Brian Erikson; and I represent Renda Marine. You understand that, right?

A. Correct.

Q. Okay. If at any time during the course of this deposition I ask you a question and you didn't hear it, you didn't understand it, I wasn't comprehensible, will you agree to stop me and have me either repeat or rephrase the question?

A. Sure.

Q. If you answer the question, we're going to assume you understood it. Okay?

A. Okay.

Q. Mr. Russek, how long have you been with the Corps of Engineers?

A. Twenty years and 11 months.

Q. All right. Where did you go to -- you're an engineer, right?

A. Yes.

Q. Where did you go to engineering school?

A. Texas A&M University.

Q. When did you graduate?
A. I graduated in 1980 with a bachelors and '82 with a masters.
Q. And what was your bachelors in?
A. Civil engineering.
Q. What was your masters in?
A. Civil engineering.
Q. So, you went straight from Texas A&M to the Corps of Engineers?
A. Correct.
Q. And did you go straight to the Galveston district?
A. Yes.
Q. Now, I understand that you were the project engineer for the Upper Bayou project; is that correct?
A. That's correct.
Q. Now, when we talk about the Upper Bayou project, we're going to be referring to the project that's described in -- this is Rozsypal Exhibit No. 1. When we took the deposition of John Rozsypal, we identified the specifications for the dredging Upper Bayou project as Rozsypal Exhibit No. 1.
A. Okay.
Q. And dredging Upper Bayou drawings were identified as Rozsypal Exhibit No. 2.
A. Okay.

Q. So, when we talk about the Upper Bayou project, we're going to be talking about this project.

A. Okay.

Q. Now, as project engineer, what were you supposed to do?

A. My job was to perform contract administration, go out to the site, do some overview of the work that was ongoing, coordinate with the contractor, with his project engineer, project manager, do safety inspections, a variety of tasks.

Q. Do you remember seeing a quality assurance program document?

A. I believe, yes.

Q. Okay. Let me --

A. I know that one was done and I believe it had been updated once or twice during the project.

(Exhibit 1 marked)

Q. (BY MR. ERIKSON) The court reporter has marked for identification as Russek Exhibit No. 1, a quality assurance program dated December, 1998. Do you see that?

A. Uh-huh.

Q. By the way, I forgot to tell you, during the course of the deposition, I'm going to be asking you lots of questions and if you don't mind waiting for me to finish the question before you start your answer and then I'll wait for

you to finish your answer before I start the next question, it's easier on the court reporter. Okay?

A. Uh-huh.

Q. And secondly, she can't take down nods of the head or "uh-huh." So, you have to say "yes" or "no" or something audible.

A. Yes.

Q. Okay. And normal English speech isn't like that. So, I'll probably remind you a couple times during the course of the deposition and that's normal. Don't take any offense. All right?

A. Sure.

Q. Okay. So, Russek Exhibit 1 is the quality assurance program. Is this what was used during the course of the Upper Bayou project?

A. This is correct.

Q. Now, I see it was issued in December, 1998. Was there a previous one or is this an update or is this brand-new?

A. This is primary. I see the supplements were in the back, Page 15 and 16. I believe these are the ones that I was speaking of that were added to the initial document.

Q. Okay. Now, over on Page 4 -- and you notice down on the lower right-hand corner, there's a Bates stamp. It's just a sequential stamp to help us identify what the document is.

And this particular Bates stamp is RM-COE-15375. Do you see that?
A. Right.
Q. On Page 4, Item B is project engineer, right?
A. Correct.
Q. And so, that would list what it is you were supposed to do in connection with the Corps' quality assurance program, right?
A. Correct.
Q. Now, the way quality assurance and quality control worked was the contractor was supposed to do quality control and then the Corps, as the owner, was supposed to do quality assurance, right?
A. Correct.
Q. Now, is there anything listed under Item B that -- for you as project engineer that you didn't do or you couldn't do or for some reason didn't happen?
A. During the course of the project, we did request some additional assistance from the Joint Venture to perform quality assurance reports because they had a larger staff who was available to go out into the field and, you know, perform -- say, being the eyes and ears for us and do a little bit more vigilant review and site inspection, if you will, than what I was able to do as a project engineer.
Q. Okay. So, you delegated some of the on-site

observation. Is that what you're telling us?
A. Correct.
Q. Okay. Now, we know you prepared memoranda for records because I've seen some of those, right?
A. Correct.
Q. Now, what specifically were you supposed to do for the Upper Bayou project?
A. Really, you know, review the -- the daily reports submitted by the contractor and compare them to the reports that I would get from the Joint Venture. I would try to go out to the site weekly, if possible. Sometimes I couldn't do that and it would be once every two weeks. We would have coordination by telephone or in writing. Early on it was with Eddie Fisher and Lee Leo Herrera. We did -- there was a preconstruction conference and a preparatory meeting and just -- kind of just an overall review of the contractor's progress. I would review in-process pay estimates. We would coordinate hydrographic surveys for before dredging and after dredging.
Q. Now, were you assigned to the bay area office?
A. Correct.
Q. And that's where you are right now?
A. Yes.
Q. And throughout the course of this project, you were assigned to the bay area office?

A. Correct.
Q. Now, we know that Mr. McClenan ended up being the area engineer. Who was immediately Mr. McClenan's predecessor?
A. I believe that was Bill Hopkins.
Q. So, that's why he signed the first page --
A. Right.
Q. -- of Russek Exhibit No. 1?
A. Right.
Q. And it looks like Mr. Hopkins at one point was the administrative contracting officer?
A. He started out as that and then Mr. McClenan obtained his administrative contracting officer warrant after completing some courses.
Q. Do you know when that was?
A. It was in 1998.
Q. Now, did you have any involvement whatsoever with the Upper Bayou project prior to the time that it went out for bid?
A. No, I didn't.
Q. Okay. There was a preconstruction -- I'm sorry -- a pre-bid meeting. Did you attend the pre-bid meeting?
A. I did not attend the pre-bid meeting.
Q. When was the first time you ever saw the plans or the specification for the Upper Bayou project?

A. It was shortly before the preconstruction conference.

Q. Okay. So, that would be after the award of the contract to Renda Marine, right?

A. Correct.

Q. Okay. I think the award occurred some time around October, 1998. Is that about right?

A. I don't know. I know that there was a -- there was a protest and I'm -- I don't know the dates.

Q. Did you get involved in any way in the bid protest?

A. Not at all.

Q. So, after the dust settled from the bid protest and the contract was awarded to Renda Marine, then you got involved?

A. Then I got involved.

Q. Now, had you had any previous exposure to Lost Lake, the Lost Lake placement area?

A. I had gone out to the site -- it had been several years before when we had performed a -- I guess a levee raising project. It was probably in the mid Nineties.

Q. Now, Luis Saenz testified here last week and he testified about overseeing some levee raising projects out at Lost Lake. Is that a project that Mr. Saenz worked on, the one that you were involved with?

A. Yes. And I went out there as an observer.

Q. Okay. Did you have any actual job duties in connection with it?
A. No.
Q. You were just curious or something?
A. Yeah. I mean, it was a field trip and I was invited to attend to -- you know, just to see how the certain construction, you know, occurred and I took them up on it and I went strictly as an observer and had no job duties.
Q. Okay. Now, you said mid Nineties, right, that you went out there?
A. Yeah. I want to -- I can't give you an exact year.
Q. '95, '96, that time frame?
A. You know, I couldn't -- I couldn't pinpoint the exact year.
Q. Okay. What was the status of the project when you went out there. In other words, when you got out there, what did you see?
A. When it was just -- actually the first -- we met down at the office in Freeport before really any work started. That's when we had a preparatory meeting with Eddie Fisher and Leo Herrera and Tim Few and we discussed their plan of action.
Q. Let me stop you for a second because I probably wasn't clear about my question. In the mid Nineties when you were out there --
A. Okay.

Q. I'm talking about your first exposure to Lost Lake.

A. Right.

Q. In the mid Nineties when you were out there and you went out to the project on this field trip, tell me what the project looked like, whatever was going on, what you saw, what the status was, what they were doing with the levees.

A. There was a lot of excavation going on. The levees were being raised, I would say, anywhere from 2 to 4 feet. There was some trenching going on to try to drain Lost Lake through the spillbox. That was the main goal of that project was to raise the levees in order to provide more capacity within the interior to put more maintenance material in it.

Q. Okay. And that's generally the purpose of the Lost Lake placement center is to have some sort of repository, a placement area for maintenance material when the -- when dredges maintain the Houston Ship Channel; is that correct?

A. That's correct.

Q. Now, when you went out and you looked at the levee raising at the Lost Lake placement center in the mid Nineties, where were they getting the material from to raise the levees?

A. They were getting them from the interior of Lost Lake.

Q. Okay. Describe what that operation looked like. Did they have draglines or what construction and where were they actually getting the material from?

A. There were backhoes on mats. The backhoes would excavate -- of course, were sitting on mats that are pretty wide, 25 feet wide, give or take, two mats deep. And they would go to the interior and excavate and then place it on a truck and the truck would haul it and build up the levees. Or in some cases, when they were closer to the levee, the excavator would just dig, turn, and drop the material on to the levee.

Q. Now, how close were they digging to the levees, the existing levee?

A. It varied. In some cases, it was perhaps 20 to 25 feet. In other cases, it was 50 feet or 75 feet. So, it depended on where you were on the site.

Q. How deep were they digging when they were digging near the levees?

A. There again, that -- that depended on where they were in the site. But I would say anywhere from 3 to 5 feet in some areas. Say a bucket depth to perhaps two bucket depths.

Q. So, that would be 6 to 10 feet?

A. Six to 10 feet.

Q. Okay. Now, when they were digging the bucket depth or the double bucket depth, was that in the 25 to 50 feet area from the levee?

A. That was a little bit -- that was further out. That

was probably in the 50- to 75-foot range --

Q. Okay.

A. -- from the toe of the levee.

Q. Now, was Lost Lake at that time, when you were out there, was it -- did it have enough water in it that when they dug a bucket, whatever they dug into would immediately fill up with water?

A. It was -- it was pretty moist. You know, which was the reason for the mats because the foundation wasn't strong enough to support the backhoe, its weight as it sat. So, the contractor brought out mats and, you know, he would dig and, you know, depending on his first bucket grab, if the area did not fill up with water, maybe he would go back for a second grab. But it was -- you know, once he got -- once he broke the crust and he got into the -- into the noncrusted area, it would be wet.

Q. Where the ground was undisturbed, was it basically dry or did it look like you could walk on it?

A. It was heavily vegetated. Heavily vegetated. So, it was difficult, you know, to see if you really could walk on it very far out toward the center.

Q. Were they trying to avoid the vegetation when they were putting material on the levees or would they put material and vegetation on the levees?

A. The area that they were taking the soil from was

stripped of vegetation first.
Q. I got you. Okay. So, the other areas had vegetation?
A. Right. The interior.
Q. By how much were they trying to raise the levees? How many feet?
A. It varied from 2 to 4 feet. It wasn't very high. It wasn't a very large excavation -- I mean, raising.
Q. Okay. Now, were there any sort of surveys done on what the interior areas of Lost Lake looked like after that project was done? In other words, where there cross-section surveys?
A. Immediately after that project was done?
Q. Any time after to reflect what that project did to the interior of Lost Lake?
A. I don't know what was done immediately after that particular -- but there were surveys that were taken and shown in these drawings here.
Q. Okay. You're talking about Rozsypal Exhibit No. 2?
A. Rozsypal Exhibit No. 2.
Q. And incidentally, when we talk about this and that, the court reporter is preparing a record and "this and that" doesn't tell the reader what we're talking about. So, I'll probably stop you from time to time and mention a particular exhibit that you're pointing to or a page of the

exhibit you're pointing to or something like that. You understand?

A. I understand.

Q. And it's only for clarification purposes.

A. I understand.

Q. So, if I say something like that, don't get worried. It's just because I'm trying to keep the record straight.

Incidentally, did you ever sit for the professional engineers registration exam?

A. Yes.

Q. When did you sit for it?

A. That was back in 1981.

Q. Are you talking about the engineering and training exam?

A. Well, I took them -- back then you could take them one after the other.

Q. No kidding? You didn't have to have four years of experience?

A. No. But you couldn't get a license until you had four years of experience.

Q. Okay. So, you sat for both the exams in about 1981?

A. Yeah. I did the EIT, passed it. And then very -- the very next semester I sat in and did the P in P as it was called, professional in practice. Took that while I was in grad school and passed that. And then the last requirement

was getting the minimum of four years of experience before I could get a license.

Q. I want to back up a second. I think you said you came to the Corps of Engineers about 1982?

A. It was February of '83.

Q. February of '83. 2-83. And when you came to the Corps, what was your title?

A. I was a trainee. Engineer in training.

Q. All right. Were you assigned to a particular section or branch?

A. I had a --

Q. Or did you go through the training program?

A. I went through the training program. I was on a rotational training program that took me to various offices in the Corps.

Q. Okay. At some point in time did you settle in with one section or another?

A. I settled in with the structural section as a junior design engineer in -- that would be July of '83.

Q. Okay. How long did you stay in the structural section?

A. I stayed in there for three years.

Q. During your time in the structural section, did you ever have to design a levee?

A. At that time, we were working heavily in military

construction. So, it was vertical construction. It was concrete foundations, pilings, piers, steel framing, did a lot of that. We did some Tainer gate construction at Taylor's Bayou.

Q. How about a levee design? Did you do any levee design?

A. Very minimal levee design.

Q. During the course of your career, have you had to do levee design?

A. As far as, what, a geotechnical engineer, no.

Q. Well, Mr. Saenz who's not a geotechnical engineer told us that he had done levee design in his career and I'm just curious whether you had done it like Mr. Saenz maybe had.

A. What I would classify as levee design would not be to the caliber, say, of Mr. Few that you've already deposed.

Q. Incidentally, what did you do to prepare for this deposition today?

A. I reviewed a few documents.

Q. What did you review?

A. Some documents that Mr. Petty had provided for me.

MR. PETTY: Correspondence?

A. Correspondence, yes.

Q. (BY MR. ERIKSON) The documents that Mr. Petty provided, were they ones that were previously identified as exhibits in connection with earlier depositions?

A. Yes.

Q. Okay. I saw Mr. Petty shake his head. And that's just curious. I just wanted to know what you reviewed. Do you know if you reviewed anything that was not previously identified as an exhibit?

A. No.

MR. ERIKSON: Mr. Petty, did you show him documents that were not previously identified as an exhibit?

MR. PETTY: No. I did not.

MR. ERIKSON: In that case, I don't need to see them because I know what's been previously identified as an exhibit.

Q. (BY MR. ERIKSON) It sounds like you talked to Mr. Few; is that correct?

A. Yes.

Q. Did you talk to him about generally what his experience was like in the deposition?

A. Just in general, yes.

Q. Okay. Did you talk to anyone else who had been deposed?

A. I talked with Johnny Rozsypal.

Q. In your discussions with Mr. Few or Mr. Rozsypal, did you discuss the kinds of questions that they had been asked.

A. We talked very in general terms more about, you

know, length of time and the basic subject matter. No specific questions. Just kind of -- just a general subject matter.

Q. Well, you have the unfortunate situation today that the gentleman who was supposed to relieve you from the hot seat couldn't fly in. And so, we may have a full day with you.

A. I'm here.

Q. I appreciate that. Okay. You were in the structural section as a junior design engineer for three years. So, approximately 1986 you went and did something else. What did you go do?

A. I went into emergency management.

Q. So, when would that be? 1986?

A. That would be 1986. That would be November of '86.

Q. All right. Now, what did you do just very, very briefly in emergency management?

A. Emergency management is essentially preparation of Galveston district in case of a natural disaster such as a hurricane, tropical storm, floods. You know, developing plans of action, coordination with FEMA and various state, local, Federal agencies. And I did that for three years.

Q. Okay. So, some time 1989, you went on --

A. I went on into the general engineering section as a design engineer. And I worked on Sims Bayou.

Q. What kinds of things would you do for a project like Sims Bayou as a design engineer in the general engineering section?

A. Goodness, you do alignment layout, you go -- we went into the field a lot to mark planimetric features such as homes that may have to be bought out or, you know, removed as a result of the Federal project. We go look at bridges. We would mark the areas that needed to be excavated for the deepening and widening of Sims Bayou. And, of course, there would be your general correspondence and meetings with your local sponsors.

Q. Okay. Did Sims Bayou involve any levees?

A. Not levees -- not hydraulic levees.

Q. Any mechanically constructed levees?

A. There was some mechanically constructed levees, yes.

Q. Okay. We'll talk more about that in a little bit. So, how long were you in the general engineering section as the design engineer?

A. I was in there for two years.

Q. All right. So, approximately 1991 where did you go?

A. I went to Jacksonville district in Florida.

Q. And what did you do there?

A. And I went back into emergency management and I did very similar duties as what I had done here. We were very busy over there as things would be in Puerto Rico. There were

floods that damaged the island and we would go over there, send a task force and go review the damage and coordinate with the locals and take care of that. And then that was about the time Hurricane Andrew hit south Florida. So, I was very busy in that aspect dealing with FEMA and goodness, all the other Federal, state, local agencies.

Q. Okay. How long did you stay in the Jacksonville district?

A. I was there for a year. Got homesick, wanted to come back to Texas. And I came back and I went into project engineering section.

Q. So, about 1992?

A. Yes.

Q. Okay. What did you do in project engineering?

A. Project engineering I was assigned a variety of projects including the Sims Bayou project, Wallisville. And there it was -- you coordinated as project engineer -- engineering manager, you coordinated all the different design functions to develop plans and specifications for a project for bid.

Q. All right. When you would develop the plans and specifications to put together for a bid solicitation package, would you put in there anything and everything that the Corps would know about a particular project, all the soil borings and cross-sectional surveys, that kind of stuff?

A. That was always our ultimate goal, was to provide all the information that we could obtain through, you know, local sponsors, through our own subcontracts with boring contractors -- soil boring contractors. You know, just whatever information we could obtain.

Q. Why would you do that?

A. Just to make the plans and specs as -- as biddable as possible so that we could obtain, you know, some competitive bids from several contractors and, you know, so that they would have all the information as much as -- at their disposal, you know, to provide a good bid on several of the items that we would have in our bid abstract.

Q. Okay. Now, in Rozsypal Exhibit No. 2, if you turn over to Page C-14, you'll see that there's a number of soil borings that are indicated there, right?

A. Correct.

Q. And I think if you look on the legend, you'll see that there are soil borings that date back to 1963 and '64 and other years that are remote in time, right?

A. Correct.

Q. So, those are the sorts of things that you would look for and then indicate in your plans and specs?

A. Absolutely.

Q. Okay. Were you ever told not to include information about, say, borrow pits in any of the plans and specifications

that you put together for bidding purposes?

A. We were never instructed not to put any information, I mean, regardless to what it meant. You know, all the information that we would obtain, we would place on the drawings or have technicians place on the drawings or in the notes or in the specifications. You know, we may try to make it a little bit more clear and manipulate the information so it would be very clear so that there wouldn't -- it would not lead to questions or as minimal questions as we would have.

Q. While I'm talking about questions, you've been to pre-bid meetings in the past, right?

A. Correct.

Q. Did you happen to go to the pre-bid meeting for the Upper Bayou project?

A. Unfortunately not.

Q. Well, I don't know if you missed anything exciting but let me show you Amendment No. 1 to the bid solicitation for the Upper Bayou project. And if you turn over to Section 02223 and I guess it's Paragraph 1.5.3, there's a flag over on the right-hand side. Actually I'm probably jumping you ahead. So, let me see where you are --

A. I see this Page 2.

Q. Let me just skip that. Over on Page 4 of Amendment No. 1, there's a Paragraph No. 6. Do you see that?

A. Okay. Yes.

Q. And Paragraph No. 6 -- let me look over your shoulder for a second -- says, "Why is the levee alignment so far from the perimeter where the foundation is crummy? It makes it harder to build on weaker ground." And then it goes on from there, right?

A. Right.

Q. Now, have you ever had the task of having to prepare an answer to a question like that that was presented at a pre-bid meeting?

A. Yes.

Q. When you prepare the answers, do you try and give the bidders as much information as you have that's responsive to the question?

A. Sure.

Q. Is there any reason that you know of to hold back on providing information to a question like that?

A. I can't imagine that there would be any reason to hold information back.

Q. Now, I don't know if you've read Note No. 10 on Drawing C-14 lately but I think if you read it, it will point out that the foundations where the new levees are going to go are soft to very soft. Do you see that?

A. Soft to very soft dredge material and sand.

Q. Now, if the -- if you had information about why it is that the foundations were soft to very soft, if you were

answering a question like No. 6, would you provide that in your answer?

A. Yes. I would provide -- try to provide a dissertation as to why it's soft and also perhaps direct the contractor to any soil borings that may hold, you know, the answer in that particular area that would show what type of strata you're dealing with.

Q. Now, you understand for the Upper Bayou project that ultimately there was a bottom line price that each contractor was going to bid based on the bid solicitation materials, right?

A. Correct.

Q. And there were some unit prices but there were units for the unit prices and then it was all extended out and then there was one bottom line price that each bidder would bid and then the various bidders were compared against each other, right?

A. Correct.

Q. So, the more information you provide in connection with answers to questions or in the plans and specifications initially, then the more information the bidders will have in preparing their bids, right?

A. That's correct.

Q. And one of the reasons you want to provide as much information as possible is to remove uncertainty and take out

contingencies from peoples bids, right?

A. As much as possible.

Q. So, if it is a total unknown, they may have to put in a lot of contingencies. If you've given them some good information, then they'll say, "Okay, we can rely on this," right?

A. Yes. And if it's unknown, the answer should state this is an unknown quantity or factor or whatever.

Q. Now, it would be unfair if some of the bidders were given particular information about the project and others weren't, right?

A. Absolutely.

Q. And that's why an Amendment No. 1 comes out which has the questions plus the answers so all the bidders will be on the same footing, right?

A. That's the intent, yes.

Q. Okay. How long did you stay in the project engineering section?

A. Approximately six years, which would bring it up to '98. And from '98 to the present is where I've been in the bay area office.

Q. As a project engineer?

A. Yes.

Q. Now, is the Upper Bayou project the first project for which you were a project engineer?

A. In the bay area office, it was actually the second. I had done a dredging project over at Smith Point.

Q. What kind of a project was that?

A. That was -- that was dredging the Trinity River channel a little over a mile from Smith Point out toward the Houston Ship Channel. And it was developing a -- a bird habitat, if you will, with the dredged material.

Q. So, you're trying to create marsh land?

A. Since we were dredging mostly shell, shell hash, sand, and silt, it stood up and essentially built a small island.

Q. Okay. Now, prior to the Upper Bayou project, had you worked on any projects that had hydraulically placed levees?

A. No. I had not.

Q. Now, this Smith Point project -- is that what you call it, the Smith Point project?

A. Smith Point, yes.

Q. How tall was the island that you built?

A. The island, it was -- we started from semi-emergent ground at a low -- at low tide and we built it up, I would say, about 5 feet from about a minus two to a plus three.

Q. And the materials you were using were shells and --

A. That's what was there to be dredged.

Q. Okay. Shell makes pretty good building material,

right?

A. Sure.

Q. Consolidates well, right?

A. Yes.

Q. And is heavy enough that it will generally stay in place, right?

A. Absolutely.

Q. It's not like silts, which if you deposited those, those just sort of wash away, right?

A. Correct.

Q. Now, how did you get trained on how to build hydraulically constructed levees?

A. I went out to some other sites with some other project engineers, with some other geotechnical people and they essentially gave me a crash course, if you will, on the construction of hydraulic levees. And, you know, through lots of discussions with folks like Johnny Rozsypal and Tim Few and, you know, even some other contractors, I was quickly brought up to speed on some of the nuances of hydraulic levee construction.

Q. What by and large did you learn?

A. Well, I learned that when you build a hydraulic levee, the primary goal is essentially to fill that soft muck that's out there with this hydraulic material and what you want to do is force -- you know, force the good material into

its place until you get some sort of an equilibrium and you can start to construct a levee.

Q. Okay. So, in other words, you're going to have to displace the very soft materials until there is enough good material to use as a base to continue to construct the levee?

A. Correct. The displacement is the key factor.

Q. Okay. Now, if you wanted to, could you take some borings and determine just how deep the soft material was and just how much material would have to be displaced?

A. I would have to rely on my geotech folks to assist me with something like that and -- but yes, it could be determined.

Q. Okay. And if you did find out how much soft material would have to be displaced, then you could figure out how much good material it would take to displace the soft material, right?

A. Right. You have to figure out a gross in situ and then final shaping.

Q. Okay. What else did you learn? You said that was the primary goal.

A. Yeah. That was a primary goal. I learned some things about cutterheads and --

Q. What did you learn about cutterheads?

A. Cutterheads, horsepower required, you know, to cut various materials, silts, sands, clays. I understood about

pumping horsepower, how important that was for pumping various distances that the material would have to go from the channel to the site.

Q. And you got head losses all along the line?

A. Absolutely.

Q. The longer the line, the greater the head losses, the more horsepower you'll need, right?

A. Absolutely. And you may need a booster pump along the way.

Q. Back to horsepower required to cut the silts, the sands, and the clays. If you had a stiff clay, that would require more horsepower --

A. Absolutely.

Q. -- than if you had a soft clay, right?

A. Correct.

Q. And it takes more time to cut the stiff clay than the soft clay, right?

A. That's correct.

Q. Okay. Anything else you learned from your crash course on hydraulic constructing levees?

A. It's somewhat difficult work. Another very important item I learned was controlling the material. That if you don't try to contain your sands, your sand can run away from you and you can lose that integral building element for your hydraulic levee because ideally what you like, you know,

as the sand comes out of the pipe is it to run ahead and the clay balls that come through the pipe to pile on top of the sand. The sand gives you a nice cushion for clay to fall out on. And ideally you -- so, you like to create a trough, say, in which your sand can run ahead and then your clay balls can stack up to a certain elevation and then you add pipe and create a length of levee. And then at some later date after you have allowed this material to dry, then you can -- you can take some mechanical equipment and shape that levee and bring it up to a certain elevation that's required by your contract.

Q. What's the tallest levee that you've worked on prior to the Upper Bayou project?

A. I would say probably 8 to 10 feet. That was on Sims Bayou.

Q. And that one was mechanically constructed?

A. That was mechanically constructed.

Q. Who was the contractor for that?

A. Let's see. That was Lecon.

Q. Now, in the area where they mechanically constructed this 8- to 10-foot levee, how were the foundations where the levee was going?

A. Foundations were -- it was stratified sand and clays.

Q. So, it sounds like the foundation was pretty good?

A. It was fair to good.

Q. Okay. So, did Lecon have much trouble getting the 8 to 10 feet?

A. In some areas where we had some -- some very thick sand lenses and once they cut through the lenses, that sand became a little bit unstable and we did have some failures because the cap, the cap was clay and the clay helped stabilize the sand. And then once you remove that cap, the sand was able to run and then you lost a lot of your foundation capacity. So, that essentially had to be patched with other clay and then set and then you could come back up to your elevation.

Q. Okay. So, by the time the project was over, did Lecon get to the 8 to 10 feet throughout the project?

A. Yes. Yes.

Q. So, Lecon achieved whatever the design template --

A. Correct.

Q. -- was throughout?

A. Correct.

Q. Okay. Now, is there any way when you're hydraulically placing a levee you can make the sand run out ahead or you just take what you find?

A. From what I've seen on projects after this one, I've seen -- I've worked with other contractors and what they have done is build a small dike on the inside, say, like where the toe of the new levee will be and to create this trough so that

the sand can be contained and it can run out ahead and then the clay can fall out as clay balls and stack up and the equipment can sit there and it can keep pushing that clay and you keep running linearly. And then at some later time after it is dried sufficiently, then you can take some other equipment and bring it up another 3 or 4 feet to shape your levee, if necessary.

Q. Okay. Now you don't always have sand, right?

A. No. You have a variety of material.

Q. And when you were talking about the small dike, is that sometimes called a toe dike or a training levee?

A. Training levee. It has numerous -- I've even heard of potato row. It's just very -- various names for this interior dike.

Q. Okay. Now, on the Upper Bayou project, you saw Renda Marine try and build either a toe dike or a training levee around the -- near the -- where the new levee was supposed to go, right?

A. I saw -- that was -- that was more evident on the east side.

Q. Okay. And how did the training levee stand up in those soft foundations?

A. It was soft and it -- it was more like, well, for lack of a better word, potato row. It was kind of a little mound that was kind of stacked up to the interior. And there

were -- there were two backhoes that were trying to assist the material or to keep the material flowing in the direction of where the levee was supposed to be.

Q. Did it seem like Renda was performing in a reasonable fashion trying to do that?

A. It appeared reasonable at the time.

Q. All right. We'll get into some more of that later. Tell me about the additional contracts where you've seen hydraulic levees constructed.

A. I just finished Lower Bayou project. The contractor was Bean Stivison. And hydraulic levees were constructed at Spillman and Alexander Island.

Q. Hydraulic levees were built at Spillman Island and where?

A. And Alexander Island.

Q. All right. Let's talk about Spillman Island for a minute. How tall were the hydraulically constructed levees there?

A. They were -- they varied from 28 to 36 feet.

Q. Bean have any trouble constructing those levees?

A. For the most part, no. There -- there were some areas that the foundation was poor. And what -- essentially what they did there is that they essentially tried to find in the channel some stiffer clay material and would bring that material into that softer foundation to try and patch it, so

to speak.

Q. Now, on the Lower Bayou -- was the name of the project Lower Bayou?

A. Lower Bayou, yes.

Q. Lower Bayou or Low Bayou?

A. Lower as opposed to upper.

Q. Got you. On this Lower Bayou project, was there enough clay and other stiff material to be able to construct the levees at Spillman Island?

A. We ran a little short but it was not by a significant amount. We had complete closure of Spillman Island. In some areas, to a lower elevation than what was first shown on the plans and specs.

Q. How much lower?

A. Two feet.

Q. Now, did Bean end up getting paid a hundred percent of the line item for constructing the levees even though they didn't get to the full contract --

A. No, they didn't.

Q. -- height? How much less did they get paid?

A. It was a very small amount. I mean, they had done, I would say, 99 percent of their levees.

Q. So, did they get 99 percent of their money?

A. That's it.

Q. How are the foundations at Spillman Island where

these levees were going?

A. Some areas were extremely poor, very soft. Where -- Spillman Island is immediately adjacent to Barbours Cut and there had been some recent maintenance projects that had dumped some very fresh silty material into the south side, say, of Spillman Island. And the foundation over there was extremely poor. So, one of the main parameters of Lower Bayou was to fix that extremely poor south side of Spillman with some heavier -- with some sand and heavier clay on top of it so that we would not have this extremely poor foundation in the future for other maintenance cycles.

Q. Now, on the Lower Bayou, were they deepening and widening the channel?

A. Correct. It was part of the Houston-Galveston project.

Q. So, they were deepening and widening the Houston Ship Channel?

A. Yes.

Q. So, they were deepening and widening it to at least -- deepening it to at least 45 feet?

A. Correct.

Q. Plus the over depths?

A. Exactly.

Q. Now, was the requirement on the Lower Bayou project that Bean build some berms to help stabilize the levee, the

new levee?

A. Yes.

Q. Was that a pay item, the construction of berms?

A. No, it wasn't.

Q. Well, I guess it wasn't a pay item itself but if it was required in the specifications, then the contractor would have to figure that price in there, right?

A. Right. Exactly.

Q. And so that we bring this full circle, in the Upper Bayou project that we're here talking about, the design did not call for berms, right?

A. I don't believe so, no.

Q. And if you need to, you can look at the drawings. They're in front of you. You don't need to, right? You know that?

A. Right.

Q. Was there any sort of retention monitoring system set up for the dredged material that got placed at -- on the Lower Bayou project?

A. Yes.

Q. Let me ask you if it's something like -- I'm going to hand you what was previously marked during the deposition of Tim Few as Few Exhibit No. 18 and I've got some tabs here. By the way, have you seen the specification and project manual for the dredging Upper Bayou project, the one with invitation

number DACW64-00-B-0012? Do you know that project?
A. This is the -- these are the specifications that are -- should be here.
Q. Actually this is a 2000 project and this is '98 project. Do you see that in the number?
A. I see that.
Q. Do you know anything about this one, Few No. 18? Feel free to spend whatever time you need to look at it to figure out if you know what it is. And if you don't know what it is, then we'll take that from there.
A. This is an invitation. The reason I'm -- I'm a little confused is that this is the invitation for the Lower Bayou specification. This is not the Upper Bayou specification as stated on this title.
Q. So, that would be what --
A. Yeah. That's why when I saw this invitation I said that looks so very familiar and it was not -- this is not dredging Upper Bayou. This is dredging Lower Bayou. And Section 2482, the dredging section speaks about the Lower Bayou reach, Stations 0+00 to Station 280+00.
Q. Okay. So, this looks like what it is that Bean was supposed to do?
A. Exactly, right.
Q. Okay. Let's look and see what Bean was supposed to do. And we happen to have a blue tab here. And there's a

Section 02329, embankment construction. Do you see that?

A. I see that.

Q. I guess maybe this might be an earlier draft because there's --

A. Right.

Q. Looks like there's some writing and things that are supposed to go other places.

A. Exactly. This is definitely a draft.

Q. Maybe they got the name wrong on the first page.

A. Sure looks like it.

Q. Okay. But in here it sets out things that the contractor was supposed to do. Like, for example, the contractor on Page 02329-1, Paragraph 1.3.1.1, construction plan, contractor was supposed to submit a plan for the construction of mechanically constructed levees and the hydraulically constructed levees, right?

A. Correct.

Q. And then it lists various things that are supposed to be in that plan, correct?

A. Correct.

Q. And then over on Page 02329-2 there's a Paragraph 1.4, definitions, right?

A. Correct.

Q. And then over on the next page, Paragraph 1.4.5 is a net retention rate paragraph and a gross retention rate

paragraph, right?

A. Correct.

Q. Okay. Now, you'll agree that those retention rate paragraphs, they don't appear in the Upper Bayou project, right?

A. Without looking through the specs at that specific item, I can't say.

Q. I've got you turned over to, in Rozsypal Exhibit No. 1, Section 02482, dredging site work. And I think between that section and the next section -- the previous section, Section 02223, retaining levees has embankment construction in it, right?

A. Correct. These two paragraphs do not appear to appear in the Upper Bayou specifications.

Q. And when you say "these two paragraphs," you're talking about the --

A. The net retention rate paragraph and the gross retention rate paragraph.

Q. Which appear on Page 02329-3 of Few Exhibit No. 18?

A. Correct.

Q. Correct?

A. Correct.

Q. Okay. Now, over on Page 02329-6 of Few Exhibit No. 18, there's Paragraph 3.2, hydraulically constructed embankments. Do you see that?

A. Correct.

Q. And then there's a Paragraph 3.2.2, which is entitled initial placement. And if you look in Rozsypal Exhibit No. 1 -- the paragraph numbers are different but there's a hydraulically constructed levee section, which is 3.1.2, which talks about creation of the hydraulically constructed levees, right?

A. Correct.

Q. Now, would you agree that in Few Exhibit No. 18, there's a control of discharge paragraph that doesn't appear in Rozsypal Exhibit No. 1?

A. (Witness reviews document.) It does not appear to be in Rozsypal No. 1.

Q. Now, as a matter of fact, if you look at Paragraph 3.1.2, hydraulically constructed levees, in Rozsypal Exhibit No. 1, the very next paragraph is 3.1.3, misplaced materials. And there's a paragraph that's similar to that, that's Paragraph 3.2.4 on Page 02329-7 in Few Exhibit No. 18, right?

A. That's correct.

Q. And it looks like the control of discharge paragraph which immediately precedes that is after the information on how to construct the hydraulically constructed embankments in Few Exhibit No. 18, right?

A. That's correct.

Q. Okay. Now, if the Corps of Engineers wanted a control of discharge paragraph in Upper Bayou project, Rozsypal Exhibit No. 1, they could have inserted that either before the bid or after the bid by change order, right?

A. What you're showing there with the Lower Bayou exhibit, a lot of the information that we learn -- lessons learned, so to speak, from Upper Bayou were used to improve our specs for future jobs, if you will. So, yes. There -- there were some improvements, there were some changes made to the specifications. I know that for a fact. We did do a review and a lessons learned and we do that with -- subsequently with every contract to try to improve the specifications as much as possible. So, what you're seeing with the Lower Bayou specifications is that those are improvements that were done to the specifications to try and improve them.

Q. Okay. Now, do you think the changes that were made in the specifications we just looked at in Few Exhibit No. 18 were, in fact, improvements to the specification?

A. Yes, I do.

Q. Now, you understand that things like having to do retention monitoring costs the contractor money, right?

A. Unless he's got it built into his bid. I mean, I don't know. It would seem to me that some sort of monitoring would be understood just so that you have this fixed quantity

and you want to know how you're using it versus the length of levee that you're trying to build. Whether it's implied or not, I don't know. But this was -- this was some of the information that was gone over in the preparatory before the project really got started with Eddie Fisher and Leo Herrera. Tim Few had provided that method in which the contractor could monitor his retention rate versus the gross amount material that was taken out of the channel.

Q. All right. Let me show you Few Exhibit No. 18 and you still have Rozsypal Exhibit No. 1 open. If you look over on Page 02329-8 in Few Exhibit No. 18, there's a requirement for surveys and then somebody has written in red daily surveys, right?

A. Right.

Q. And that's Paragraph 3.5. And then it talks about under Paragraph 3.5.1, the contractor performing daily topographic surveys for submittal of the levees, right?

A. Correct.

Q. That wasn't required in the Upper Bayou project, right?

A. (Witness reviews document.) It does not appear to be spelled out specifically as in the exhibit Few 18 on Page 02329-8.

Q. Have you ever had to prepare a cost estimate for the Government?

A. Sure. Yes.
Q. And you understand how to prepare labor and materials sections for the cost estimate, right?
A. Correct.
Q. And then do takeoffs from the bid specs, right?
A. Correct.
Q. So, one of the line items to accomplish what is set out in Few Exhibit No. 18, the Lower Bayou project, would be you have to have some line item for daily surveys, right?
A. I would think, yes.
Q. So, obviously that would be an extra cost item for the contractor, right?
A. Unless it's -- you know, without knowing how the -- his bid takeoff was done, I don't know if he might have had some internal costs for something like that.
Q. If you were preparing the Government's estimate for Rozsypal Exhibit No. 1 and it didn't require daily surveys, then you wouldn't have a line item for daily surveys as a cost, right?
A. Sure.
Q. You're agreeing with me?
A. I agree.
Q. But you would have to with Few Exhibit No. 18 for the Lower Bayou project?
A. Yes.

Q. Likewise, on Page 02329-9, Paragraph 3.7 of Few Exhibit No. 18, under contractor quality control -- contractor is not spelled quite right.

A. Correct.

Q. There's a subparagraph, 3.7.1.2, retention rate spreadsheet. Do you see that?

A. Yes, I do.

Q. And that's something that the contractor would have to create on a periodic basis, right?

A. Correct.

Q. And obviously that would have some cost if somebody had -- you had to create some paperwork like a retention rate spreadsheet, right?

A. It would be minimal. It's something that the project engineer can do very easily. We're not talking substantial cost to keep up with something like that.

Q. Well, let's look at some of the items that go into the spreadsheet. You would to have the -- it wants columns for the cross-section station. That's not hard to figure out what it is, right?

A. Right.

Q. The neat line cross-section area. Now, you'll -- that's pretty easy to calculate --

A. Absolutely.

Q. -- what it's supposed to be, right?

A. Sure.
Q. Not what it actually is but what it is supposed to be is easy to calculate, right?
A. Sure.
Q. And then it goes to the actual cross-sectional area. That would be tied into those daily surveys, right?
A. Correct.
Q. So, somebody would have to perform the daily survey and then that information will be plugged in to whatever station you were talking about, right?
A. On a survey of some interval, whether it's daily, weekly, or whatever.
Q. And then it talks about an overplacement ratio. Do you know how to calculate that as you sit here?
A. Not off the top of my head.
Q. That would involve information from the dredge as to how much material was dredged, right?
A. Correct.
Q. Approximately how many cubic yards?
A. Right.
Q. And then it would require material from the discharge end to know where that material went, right?
A. Right.
Q. And so, it would take at least a person to figure that out on the discharge end, right?

A. Sure. That should be in your daily dredging log.

Q. So, it would involve some amount of cost and we're not going to sit and figure out how much right now, right?

A. Right.

Q. Okay. Now, you would agree that if the Government wanted this sort of thing that we've been talking about, Few Exhibit No. 18, to be done on the Upper Bayou project, it would require some sort of a contract modification, right?

A. To incorporate those specific items, yes.

Q. Okay. Now, why is it that retention monitoring is required? What purpose does it serve?

A. Well, the way I understand it is you want to balance, say, the material that you're taking out of the channel, that you're excavating, you're dredging and you want to determine or at least get a feel for how many yards per foot of levee that you're constructing so that you can -- you can -- you can determine how your material is going to play out for you. You know, first to see if you'll have enough and you can see how much you're actually retaining from what you're dredging and that way you can try to stay a step ahead to make sure you'll have enough to complete the levees if maybe not to the ultimate design elevation but all the way around to, say, a lower design -- lower elevation. And that's just -- it's just a tool just to try to keep up with your inventory of dirt, of your dredged material and to make sure

you are just going to have enough to go around.
Q. Okay. Now, I think you would probably agree that when the contractor is dredging, nobody is quite sure exactly how many cubic yards of suitable material the contractor is ultimately going to find, right?
A. That's correct.
Q. It's pretty much a guess on the part of those designers in the Corps of Engineers who were working on it, right?
A. And it's based on soil borings with the best information that we have.
Q. And it's based on soil borings that might be -- that might date from 1963 or even earlier?
A. Right. They could be from any dates. Yes.
Q. And it's based on a conditions which may no longer be the same. For example, there might be a large quantity of clay that the Government would expect to be in a certain area but there's a bunch of junk cars or other obstructions, you can't get to the clay, right?
A. Anything is possible out on the ship channel.
Q. As a matter of fact, that's things you've actually seen, right?
A. Absolutely.
Q. And in particular, you remember dredge Section No. 9 for the Upper Bayou project?