A. That's the end of the Upper Bayou project.

Q. Do you remember that being described by the Government as a varietal junkyard?

A. I don't know those particular words; but I know it was subjected to more trash and debris than, say, other sections of the project.

Q. And so, what ultimately happened is the Government told the contractor, you no longer have to continue to dredge in Section 9, correct?

A. That was a decision by our contracting officer to delete that portion -- the remaining portion of the dredging contract.

Q. And do you recall there was approximately 150,000 cubic yards of clay material that the Government had expected from that section?

A. I don't recall that number. I recall a number higher than that for Section 9.

Q. What number do you recall?

A. I recall a section -- an amount of around 300 some odd thousand cubic yards from Section 9 --

Q. And how much --

A. -- total.

Q. And how much did the contractor derive from Section 9?

A. I believe -- from what I recall, it was

approximately half.

Q. Half of that?

A. Yes.

Q. So, that would leave 150,000?

A. Yeah.

Q. Okay. So, it was 150,000 additional cubic yards that the Government had expected that the Government couldn't get because of all the obstructions and debris?

A. Exactly.

Q. Now, the purpose of the retention monitoring is so that the Government can figure out whether or not there's going to be enough materials, right?

A. The Government and the contractor working together to compare numbers, so to speak, and, you know -- because for one thing, Upper Bayou was essentially the first reach in the landlock region of the Houston Ship Channel to be done. So, what we were trying to do -- the Government was trying to do was to try to get a feel for an amount of material that we could expect, you know, the contract to retain from the in situ material in the channel to wind up on the levees essentially. And we periodically check that to make sure that, well, maybe we're going to run out. So, maybe we need to make an adjustment. Maybe we need not go up to 32 feet. Maybe we need to drop it to 28. That was the intention. Because we wanted to ring -- we wanted to completely ring Lost

Lake up to an elevation. We wanted to make best use of the available material that was in the channel to completely ring it. Now, if we didn't attain our ultimate elevation, fine. So be it. But we could -- we could ring it to a lower elevation. That would have been acceptable.

Q. So, what you really wanted was some level of containment within the placement area at Lost Lake?

A. Correct. A complete --

Q. It wouldn't do any good to have 30 feet through most of it but then have an open gap where it was at zero?

A. Correct.

Q. That's sort of like the weakest link in the chain is how far strong that chain is?

A. Sure.

Q. Okay. Now, if it turns out that there's not enough material to be able to bring the levees up to the designed height, what happens then?

A. Well, that's why it's -- the retention rate spreadsheet was so important to be doing that as you started and as was discussed in the preparatory, you know, to be doing that from the beginning so as you went along, you could refine it. You can adjust your percentages and, you know, say at the quarter point, okay, we're still looking -- we're still looking good. And you just keep after it and you keep looking at it because once you get it established, it's real easy to

maintain, your spreadsheet. So, you just maintain it and so you can try to keep up with your material.

Q. Now, do you recall letters coming in from Renda Marine on the Upper Bayou project advising that Renda Marine didn't think there was going to be enough clay to be able to finish the levees at Lost Lake? Do you recall that?

A. I recall several letters.

Q. And we'll look at some specifics a little bit later. But when those letters started coming in, what happened on the Corps side?

A. Well, I -- I would take the letter and I would make copies and I would share that with our geotechnical engineers first and foremost.

Q. Tim Few?

A. Tim Few. Just to get their input and to alert them that, hey, guys, we may have a problem here. And also to the Joint Venture who we had to work with and to see if -- you know, put some -- do you some number crunching to see if there was going to be a problem.

Q. Well, if the contractor wrote in and advised that the contractor thought there would be a problem, wouldn't you agree that the Corps should respond with either the Corps agrees there's going to be a problem or disagrees or something, right?

A. Sure.

Q. Because at some point in time, a decision has to be made as to what the heck you're going to do with the levees. Are you going to have them all be at 20 feet? Are you going to keep shooting for 30 feet, if there's the requirement, right?

A. Right.

Q. I'm going to place next to you the exhibits from the deposition of Tom Benero.

MR. ERIKSON: Did you bring your Benero exhibits back in?

MR. PETTY: Yes.

Q. (BY MR. ERIKSON) And I want you to turn to Tom Benero Exhibit No. 15. They're in order and I may have opened it too far. And Tom Benero Exhibit No. 15 should be a letter from Steve Bowman to Mr. McClenan dated September 22, 2000. Do you see that?

A. Correct.

Q. Now, Mr. McClenan was your boss as of September 22, 2000, right?

A. That's correct.

Q. You reported directly to Mr. McClenan?

A. Yes.

Q. And when a letter came in to Mr. McClenan, he invariably hand that letter to you for some sort of resolution, right?

A. Correct.
Q. Do you remember this letter, Benero Exhibit No. 15?
A. Yes. I've seen this letter.
Q. Now, the letter talks -- starts off talking about very stiff clay in the flare area, right?
A. Correct.
Q. And then there's a number of other subjects. If you go over to the third page, the very last paragraph on the third page Renda wrote that it's "Renda's opinion that sufficient dredged clay material will not be available to complete the levees to the final template elevation of +30 mean low tide." Do you see that?
A. Yes.
Q. Now, at that point in time, that must have raised some flags within the Corps of Engineers.
A. Correct.
Q. Did it?
A. Yes.
Q. Because if the contractor is saying that there's something wrong with the balance between material to be dredged and material available to construct the levees, then the Government has a problem if the Government ultimately wants levees to 30 feet mean low tide, right?
A. Correct.
Q. What happened inside the Government at that point?

A. Well, at that time, several -- I conferred with several people, including Tim Few, office of counsel, our contracting people and asked their advice on respond -- and the Joint Venture also. And, you know, asked them to please review this and confirm this comment.

Q. And what happened?

MR. PETTY: And I would object to any answer that goes into attorney-client privilege or attorney work product involving office of counsel.

Q. (BY MR. ERIKSON) Don't tell me what Dan Keys said or didn't say. But you can tell me what anybody else within the Government said or didn't say.

A. Okay. I know Tim Few looked at this and performed several weeks worth of calculations to see where the material was in relation to where it was estimated to be on the levee as did the Joint Venture. I mean, we did independent studies and then had several meetings thereafter, after we completed those studies and -- you know, to try to arrive at one particular answer. And I want to say that there was a response that was provided at a later time after all this was conducted.

Q. Well, you would agree that the contractor was entitled to a reasonably prompt response, right?

A. Sure.

Q. Now, this is a situation where you understand, since

you were involved with the pay estimates, that the contractor wasn't going to get paid for the hydraulically constructed levees until the hydraulically constructed levees were at the design template, right?

A. That's correct.

Q. So, if there isn't enough material to get to 30 feet mean low tide, then the contractor theoretically will never get paid for constructing the levee, right?

A. He would get -- it would be, say, at a prorated amount. If it wasn't 30, it would be at a lower -- an amount lower than that.

Q. So, you think the contractor should get paid something but maybe not a hundred percent?

A. Correct.

Q. Okay. Do you have any idea how much Renda Marine has been paid for the hydraulically constructed levees on Upper Bayou?

A. At this point, I don't remember.

Q. Did you ever get involved in determining some sort of prorated amount that Renda should get for the hydraulically constructed levees on Upper Bayou?

A. I was not directly involved with that because I believe that had gone into a contracting and office of counsel sort of discussion. I mean, I had some input; but as far as a final decision, I wasn't privy to that.

Q. What was your input?
A. Well, my input was that it should have been done on a volumetric basis and the percentages compared and then the cost, you know, summarily be -- you know, if they did 75 percent of the volume, they should be paid 75 percent of that levee section.
Q. Okay. When you say 75 percent of the volume, are you talking about 75 percent of the material placed or 75 percent of whatever Renda achieved of the neat line cross-sectional area?
A. Of the neat line cross-sectional area. Now, the dredging portion, they're getting paid for every cubic yard that's being dredged.
Q. Well, if it's within the design template plus allowable over depth?
A. Right. Right.
Q. Simply because they pumped an additional cubic yard onto the levees doesn't necessarily mean that they were going to get paid for that cubic yard, right?
A. If it's outside the template, that's correct.
Q. For example, they went and got material from the Houston Fuel Oil terminal, right?
A. Correct.
Q. Ballpark of one hundred fifty or 250,000 cubic yards, right?

A. Somewhere around there, yes.
Q. But Renda wasn't paid a penny for the dredging of that material by the Corps of Engineers, right?
A. By the Corps.
Q. Correct. So, you're agreeing with me?
A. I agree.
Q. Okay. Now, what was the Government's response to Renda's opinion that sufficient dredged material -- dredged clay material will not be available to complete the levees?
A. I don't -- I don't recall.
Q. What was your opinion at the time? Around September 22, 2000, or thereafter, what was your opinion?
A. My opinion was that okay, if we didn't have enough to reach 30, then perhaps we needed to relook at our template. Perhaps we needed to reduce the height, the footprint, the overall volume and then based on what was left in the job, you know, take what was left and then build that template and complete the levees. That was my opinion.
Q. Okay. Did you get outvoted or what happened?
A. I don't know.
Q. I think you'll agree that Renda was never formally instructed to build to a different elevation than 30 feet. You'll agree with that, right?
A. Well, without going through all the correspondence, I really can't agree with that a hundred percent because I

don't remember.

Q. That was my very next question. Do you remember any specifics that Renda was provided in terms of build to a certain elevation other than 30 feet on the Upper Bayou project?

A. I remember there were several discussions out in the field, especially on the west levee when the elevations -- when we had a very wide levee out there and there were several discussions amongst Tim Few, myself, Steve Bowman, Mike McClenan and we were all trying to help the situation by using whatever material was left to build -- the best use of the material and build the best levee that we could. There was several -- there were several meetings out on-site.

Q. Now, you understand that if there's going to be a change to the contract, there needs to be something in writing from the contracting officer and preferably a contract modification, right?

A. Correct.

Q. Did you ever see any contract modifications that instructed Renda or allowed Renda to build less than a 30-foot levee out at Lost Lake?

A. I remember developing such a vehicle. Now, I don't recall that modification ever going forward based on advice from office of counsel and contracting.

MR. PETTY: Again, I would object to any advice

from office of counsel.

Q. (BY MR. ERIKSON) I'm not going to ask you specifically what the advice was.

A. It was prepared but perhaps it was never initiated.

Q. Acted on?

A. Yeah.

Q. And what did your modification say, your proposed modification?

A. The proposal that I was coming up with was showing a reduced template, lower elevation to complete the rest of the project.

Q. And what was the reduced template? What was the height?

A. I want to say it was 26 feet, you know, one on three but it was, of course, a smaller footprint. Narrower at the top. Just -- you know, just so we could -- this was later on in the project. Just so we could complete the project.

Q. Okay. Now, when you prepared your modification, was it a no cost change or what was it? Cost to be determined later or how did you work it?

A. It was going to be a notice to proceed.

Q. Unilateral mod?

A. Uh-huh. Yes.

Q. The court reporter needs "yes's" and "no's."

A. Yes. I understand. Yes.

Q. And you understand that the contracting officer has that authority where the contracting officer can simply issue a unilateral modification and then the parties discuss what cost impact, if any, there is later, right?
A. Correct.
Q. If the contractor thinks that it's costing money, the contractor can submit a request for equitable adjustment --
A. Absolutely.
Q. -- or a claim or something, right?
A. Yes. Yes.
Q. Now, how soon after Benero Exhibit No. 15, the September 22, 2000 letter, did you prepare your modification?
A. I don't remember.
Q. Was it in 2000, or was it in 2001?
A. I would just be guessing. Because -- I'm very certain it was in 2001 because there was a substantial amount of discussion between the Joint Venture and our technical staff back and forth and it took several months.
Q. Okay. Now, you recall from actually being on the project that Renda would try and build training levees and I think you described them as potato rows, right?
A. Correct.
Q. And the material that Renda placed hydraulically would create mud waves, right?

A. Correct.
Q. And then the mud waves would swamp or overwhelm the potato rows, right?
A. Correct.
Q. And mud waves would be sent out a good distance from wherever the levees were trying to be created, right?
A. In fact, they would be almost where the potato rows were.
Q. Okay.
A. Maybe a little further.
Q. How far would these mud waves extend from where the material was being deposited to try and form the new levee?
A. It varied. But some cases they would be a hundred feet to the interior of the -- of the toe of the new levee and they would rise up about 8 feet, give or take a foot.
Q. And then sometimes the mud waves would extend toward the perimeter levee, right?
A. That's correct.
Q. And in some cases, there was worry that the mud waves may surmount or overwhelm the perimeter levee, right?
A. Correct.
Q. Now, the mud waves, that was a soft foundation that was trying to be displaced, right?
A. Right.
Q. In all the years that you've had constructing

levees, have you ever seen mud waves like that before?

A. Yes.

Q. What project?

A. On Lower Bayou again.

Q. Lower Bayou. Okay. And that was the Bean Stivison project?

A. Correct.

Q. Now, do you know if a net detention rate was figured for the Lower Bayou project?

A. Yes.

Q. What was that net retention rate?

A. That retention rate was -- it was around 40 percent.

Q. 40 percent?

A. Uh-huh.

Q. So, for every cubic yard put into the new levee, about 40 percent of that would be retained?

A. Correct.

Q. Wow. What is it that Bean did that allowed a retention that was that high?

A. It was, I guess, their construction and maintenance of their interior dike and the way that they had excavated, dredged the channel. They -- you know, they would locate the area that appeared to have the most sand and they would take that layer first and they would, you know, pump that, let the sand run and then they would cut into the hard clay and let

the clay balls stack up on top of the sand.

Q. Now, the -- you called it an interior dike, I think. Is that like a training levee?

A. Training levee, potato row. However you want to call it.

Q. Now, how high was the training levee that Bean constructed for Lower Bayou?

A. It would be anywhere from 8 to 12 feet and just set up with a marsh excavator. Nothing very neat but just enough material to stack up in order to create the trough in which to allow the sand to run.

Q. Where did Bean get the material to create the training levee on the Lower Bayou?

A. From within -- from within their placement areas.

Q. So, what kind of equipment did they use to create the training levee?

A. It was like -- it was a marsh excavator. It was a wide track with a small bucket and very wide pontoon-type tracks. And it would go out to the -- to the new toe and they would build this interior training levee, if you will, with the material from the inside of the placement area and they would take it and they would just plop it up there and as -- they would just build it up and just continue on.

Q. And when they placed the material from the interior area at Spillman Island, did it appear to stay as a training

levee?

A. They would have to work at it. Yeah. Some of it would sink out of sight. And in some areas -- I mean, it wasn't a complete interior dike all the way around because there were some areas that were impossible for them to put a dike.

Q. Okay. So, what happened on those areas where it was impossible to put a dike?

A. In those areas they pumped more clay. They pumped less sand that would escape and they would pump more clay to get the clay balls to sit up in front of them and then they take their dozers and push and then they would get around these areas where they didn't have an interior training levee back into the areas where they did.

Q. Now, on those areas where the training levees wouldn't stand up, was there anything that Bean was doing wrong that you saw?

A. No. I mean, it was just extremely poor material.

Q. If you got a poor foundation, it may be impossible to get a training levee to stand up?

A. Sure.

Q. Now, was Bean given designated areas where Bean was supposed to dredge in Lower Bayou?

A. Can you further define your question, please?

Q. What Bean was doing was they were dredging Houston

Ship Channel to the 45-foot depth plus allowable over draft, right?

A. Correct.

Q. They were probably widening it also, right?

A. Right.

Q. Were they given specific dredge sections where they were supposed to retrieve their material?

A. Yes. Yes.

Q. Now, the purpose of these projects as you understand them -- let's start with the Upper Bayou. The purpose of the Upper Bayou was to dredge the Houston Ship Channel and then you had material you could build levees around Lost Lake, right?

A. Correct.

Q. Which was more important, dredging the ship channel or building levees?

A. It's pretty equal in my book.

Q. Okay. You understand the name of the project is dredging Upper Bayou 45-foot depth, right?

A. Right.

Q. The name of the project doesn't say anything about Lost Lake, right?

A. Right.

Q. The name of the project doesn't say anything about building levees, right?

A. The name, yes.

Q. Now, I think, did you testify it took several weeks for these calculations to be done on the net retention rate for Upper Bayou after Renda provided notice that Renda thought there was an insufficient amount of clay?

A. Well, it went just -- it went beyond just the retention rate. I mean, there were -- there were slope stability analysis that were done on the levees that were built. There was hydrographic surveys that were taken to make -- to redefine how much material was left. And there was lots of geotechnical analyses that I -- I wasn't privy to that Tim Few and folks like him have performed and including Joint Venture to try to -- to determine how much -- what we could get done with the material that was left.

Q. Okay. Now, would you agree that the contractor should be involved in that process? In other words, the contractor should be part of the solution?

A. Sure.

Q. Would you know of any reason why the contractor -- the materials like you described, the hydrographic surveys and the net retention calculations, that sort of thing, should not be shared with the contractor?

A. I can't imagine why he wouldn't.

MR. ERIKSON: Why don't we break for lunch.

(Lunch recess)

(Exhibit 2 marked)

Q. (BY MR. ERIKSON) Mr. Russek, the court reporter has marked for identification as Russek Exhibit No. 2 a Tim Few memorandum for files dated 6 October, 1999. Do you see that?

A. Correct.

Q. Have you ever seen this before, either in this version or in final version?

A. Yes, I have.

Q. Okay. I just have a couple of questions for you --

A. Sure.

Q. -- from this. The first page under Paragraph No. 2, it talks about a reddish, tan and brown and some gray clays that appear to stack up well.

A. I see that.

Q. And it says they stacked up well to above elevation +32.

A. Yes.

Q. Does that comport with how you remember things?

A. Yes.

Q. Is that when the contractor was depositing the materials initially that could get -- the contractor could get the materials to stack up to +30 feet or more?

A. Yes.

Q. Now, the third sentence in Paragraph No. 2, it says, "This portion of the levee appeared to have displaced

considerable amount of foundation material, and appeared to have slumped since placement." Do you recall that happening, too?

A. I agree with the first part of the sentence, this portion of the levee appeared to have displaced a considerable amount of foundation material. That was true because it was a pretty good size mud wave out there. And appeared to have slumped since placement, I'm assuming that he's meaning the levee slumped since placement.

Q. Yes.

A. And which would -- which would indeed follow. I mean, it's kind of redundant.

Q. Yeah. If you are displacing the soft foundations, then your material is going to be dropping, right?

A. Right. Right.

Q. And that's kind of what the Corps was hoping would happen is that if you had a soft foundation, the good material would displace the soft foundation, you would end up with a mud wave, and end up with a more firm foundation, right?

A. Correct.

Q. And without the firm foundation, you weren't going to get materials stacked up 30 feet, right?

A. Right.

Q. It says -- it goes on to say, "The rest of the completed fill, which had been placed along a 60-75-foot

offset" and then inside parens it says, "(generally in accordance with the cross-sections) with relatively minor displacement." Do you see that?

A. Yes.

Q. When it says "the rest of the completed fill which had been placed," would that be mechanically or would that be hydraulically or do you know?

A. I don't know what he's referring to.

Q. And then he goes on a little later. He talks -- right in the middle of the paragraph, he talks about elevations appear to be at or above +32. Do you see that?

A. Right.

Q. You agree that the contractor achieved that height in places, right?

A. Correct. Yes. At that time, in October of '99.

Q. Below it, Mr. Few has written, "The contractor had two backhoes working at the discharge, one on mats moving behind the end of the discharge pipe and one on the existing levee exterior slope." Do you see that?

A. I saw that.

Q. Do you have any objection to that sort of activity by the contractor?

A. No.

Q. Did you have any objection to that sort of equipment being used by the contractor?

A. Not at all. Provided it was being safely used. I mean, that's the only objection I would have.

Q. Now, during the course of what you did on a daily basis, if you saw that the contractor was doing something that you took objection to, how did you note your objection?

A. Well, I mean, first if it was somewhat minor, I would talk to the QC manager, Leo Herrera. We would talk fairly frequently several times a week by phone or, you know, if things got serious enough, you know, document something in a memo or on an E-mail or something of that nature.

Q. Now, this Upper Bayou project, was this the first that you know of that the Galveston district engaged in where the Galveston district was ringing a displacement area?

A. A placement area?

Q. Right. I meant placement area. Sorry.

A. Yes.

Q. Okay. So, in other words, the Galveston district didn't have a reservoir of experience to build on when it came to designing and overseeing the construction of levees that ringed a placement area?

A. I wouldn't want to guess. I mean, I --

Q. You don't recall any?

A. I don't recall, no.

Q. Okay. Was this the first large scale use of hydraulic levee building that you recall the Galveston

district engaging in?

A. Yes.

Q. Now, the Upper Bayou project, was that designed as sort of a -- a test project so that subsequent -- you could learn lessons from Upper Bayou so you could improve the specifications for subsequent projects?

A. Well, I mean, that was not the initial -- that was not the intent. I mean, our intent was to build the project with the best information, the best knowledge that we had at the time. And it was based on -- you know, not only did we work on it but we also had an AE, a subcontractor work on it with us also. So, we tried to enlist other people who also had knowledge, maybe better knowledge than what we did to assist us, you know, with the development of the plans and specs.

Q. Are you talking about HVJ Associates?

A. HVJ.

Q. And HVJ Associates' name shows up on the plans for the Upper Bayou project, Rozsypal Exhibit No. 2, right?

A. Correct.

Q. Now, was it the intent that during the course of the Upper Bayou project if you learned things, that you would, then, use what you learned on subsequent projects?

A. Absolutely. That's -- that is our -- that's always been our goal regardless to what project it is. If we have --

we've done the same thing on Sims Bayou, which is a successive number of sections of a bayou. As we move from one section to another, to another contract, if we learn something of -- even minor importance, we want to incorporate that into our next set of plans and specs so that we make the plans and specs better or we don't make the same mistake again. So, I mean, it's an evolution of our plans and specs. And yes, we do try to get better.

Q. And this Upper Bayou project was the first in a series of bid solicitations where material dredged from deepening the Houston Ship Channel would be used to ring placement areas?

A. Correct.

Q. Now, Paragraph No. 3, down at the bottom of Russek Exhibit No. 2 the first page. Do you see that?

A. Correct. Yes.

Q. Where it has general assessment.

A. Yes.

Q. And then he wrote, "Hydraulic fill placement generally conforms to contract requirements for the following out of spec deficiencies."

First off, would you agree with what Mr. Few had written, that hydraulic fill placement generally conforms to contract requirements?

A. Yes. Yes.

Q. And then there were some deficiencies we'll talk about in a second.

A. Okay.

Q. Obviously if it's not being aligned in the right spot, then that would be a deficiency with the contract, right?

A. Correct.

Q. Now, during the course of the Upper Bayou project, do you recall that there was an area where the new levee, as per the design, moved farther away from the toe of the existing levee?

A. Yes, I do.

Q. And do you recall that presenting a problem?

A. Yes, it did. The area in which you're speaking is the southeastern corner of the placement area and that's what Mr. Few is alluding to here in Russek Exhibit No. 2, Paragraph 3A, the alignment, where the first 500 linear feet of the levee had gotten off line essentially by anywhere from 75 to a hundred feet. It had gotten shoved too far inside.

Q. Okay. So, if it was the east levee, it would be too far to the west?

A. Correct. Yes.

Q. And as you got further away from the perimeter levees, the foundation got softer and softer, would you agree?

A. Yes. Yes.

Q. Now, do you recall an incident where the contractor was actually building as per the design location for the levee but the existing levee was not as per where it was indicated on the drawings?

A. I don't recall a specific area, but that would not surprise me that it didn't occur.

Q. Now, do you recall an incident where in the southwest portion of Lost Lake, the distance between where the levee was designed to go and where the actual levee really was got farther and farther apart and the Corps asked the contractor to move the levee over so it was generally at the toe of the existing levee?

A. The way I recall that situation over there is the existing levee was as shown but the new levee diverted to the inside and got away from the existing levee at a distance, you know, varying from 30 feet out to maybe 75 feet. And that was per design. Now, when we got out to the site and we saw the mud waves coming up on both sides of the new levee and the fear of the mud wave overtopping the existing levee, that's when the decision was made to shove that -- to leave what was there -- leave what was there to that point but from a certain point on, bring that levee back in closer to the existing levee so that we're not getting out in all that soft foundation so we can make the most use of the material we have left.

Q. Okay. Now, how far did the contractor get on the proper line but how many feet was it until the Corps told the contractor to stop and move over the levee?

A. It was approximately 1600 feet that they were on the alignment that was as shown on the drawings at which -- you know, when we came out to the site, we did see the mud waves coming up on both sides. And at that time, it was -- it was decided that a better course of action was to bring that levee closer in to the existing levee that was to the outside to make better use of our material and to try to minimize the mud waves that were essentially squirting the soft material out on either side of the new levee.

Q. How far away was the existing levee at the point where the Corps instructed the contractor build over next to the existing levee?

A. I want to say I recall a dimension of about 70 feet.

Q. So, how was the contractor supposed to bridge that 70 feet? Were they supposed to make an immediate west turn with the levee so it joined up with the existing levee?

A. I don't remember exactly. But the intent was for it to be a general -- a gradual direction back toward the existing levee, not an immediate jog but a -- a slow, gradual turn back toward the existing levee to where the levees both matched up.

Q. Now, you learned through experience out at the Lost

Lake placement area that the new levee tended to stand up better if it was close to the existing levee, right?

A. Correct.

Q. If it was farther away from the existing levee, the foundations were softer and the levee tended to slump more, right?

A. Yes.

Q. And it tended to develop more mud waves, right?

A. Correct.

Q. Now, at certain points in time, the contractor was allowed to build the new levee right on top of the existing levee? Do you remember that?

A. Yes, I do.

Q. Matter of fact, your boss, Mr. McClenan, allowed that, right?

A. Correct. That was on the north side.

Q. And for how long did that last?

A. Timewise, I don't recall; but it lasted for about 900 feet, I can tell you -- 900 to a thousand feet.

Q. Did that seem to work better?

A. It worked better than what had been working.

Q. Okay. Now, prior to that point when the contractor was trying to build on the north side, the contractor had a lot of problems with the levee slumping into oblivion, right?

A. Yes. Because it was being constructed mechanically,

which you would expect -- I mean, it's the same principle as when you place material hydraulically, you're displacing. So, even when you place it mechanically, you're displacing it also. You're just doing it at a much slower rate.

If you think of a hydraulic dredge, the pipeline, you're displacing it with a fire hose. Think of it like that. Now, when you're building it mechanically and you're dumping with a truck, you're displacing it with like a teaspoon at a time rather than with a fire hose. So, you're still accomplishing the same thing. It's still -- you're still displacing but you're doing it at a much slower rate and the vibration of the equipment and the placement is still doing it and the failure is still there except you see the failure more readily because there's less material in the way. So, you'll see these cracks that just -- it will split. Sure, it drops 4 to 6 feet. Well, the same thing is happening over here on the hydraulic fill except you don't see it because there is so much volume of material coming out of the end of the pipe.

Q. Now, did the same amount of displacement of the soft materials occur whether it was occurring -- whether the materials were being placed hydraulically or mechanically, just different amount of time. Is that what you --

A. Well, you're displacing -- your rate of displacement mechanically is much slower because you're placing much less

material mechanically, so many truckloads per day. So, your volume is -- it's much less than the volume that's coming out of the dredge.

Q. Okay.

A. So, it's a relative thing.

Q. Okay. If you view what is coming out of the discharge pipe for -- from the dredge as being measured in cubic yards per minute or hours, something like that, that volume you're telling us is a lot greater coming from the dredge than it would be coming out of the back of a dump truck --

A. Sure.

Q. -- or from a backhoe bucket?

A. Right. Right.

Q. Okay. The amount of mud wave created or material, soft foundation displaced, did it end up being about the same whether the levees were built hydraulically or whether they were built mechanically? Now I understand it took more time to build it mechanically.

A. Right.

Q. But the total volume of what got displaced, was it the same, different, what?

A. When you displace it mechanically, you're not -- you're not placing the volume of water and soil that you are with placing it mechanically with a truck or a backhoe. I

mean, because a lot of -- some of your displacement also occurs with the volume of water that's being placed. And when you're placing it mechanically, you've essentially removed the water amount from that and you're essentially just placing soil. So, that displacement is much less than the displacement of the hydraulic material coming out of the pipe of the dredge.

Q. All right. So, let me make sure I understand what you're saying. You're saying if you compare the two methods, hydraulic placement of suitable material versus the mechanical placement of suitable material, would the hydraulic placement of suitable material end up with more soft foundation displaced versus what you had with the mechanical placement of the material?

A. Right. Right. And we want to get down to a foundation where we can start to build up at a fairly reasonable amount of time. You do it mechanically, it's going to take you much longer, the displacement may be as much but it will be over a much, much, much longer time.

Q. When you say "much longer," you're talking about years or --

A. Yes. Because you're talking -- a dredge can bring lot of cubic yards of material in a very fast time versus hauling a truckload at a time. And that's why I was trying bring up the relationship of a fire hose versus a teaspoon.

mean, that's kind of the way I see that as far as displacing.

Q. This is based on what you actually saw on the project?

A. This is what I actually saw.

Q. And this is also based on what you've actually seen on subsequent projects?

A. Yes.

Q. We didn't talk about all of them. We talked about Lower Bay.

A. Lower Bayou.

Q. Lower Bayou.

A. That's the one I can speak to specifically.

Q. Okay. By the way, before I forget, what other projects have you worked on since Upper Bayou? We talked about Lower Bayou at some length.

A. Yeah. I've done, let's see, Barbours Cut maintenance. Done that three times. Bayport, I've done that once.

Q. Bay, B-A-Y?

A. B-A-Y port. I've done that one once. Of course, I've done time here and there at Sims Bayou. I'm in the process right now of a levee raising project at House Track placement area. That's being done mechanically. And let's see. Over on the east side, I've done a couple of other smaller dredging projects over on the east side of the Trinity

Bay.

Q. Let me ask you about Barbours Cut for a second. Was there any hydraulic levee placed on that one?

A. Barbours Cut was a maintenance job that was recently done and all that material is silt. It's not good for levee construction. So, it was essentially just dumped into Spillman Island.

Q. Okay.

A. The only time we get into these levee raising projects is when we have a Houston-Galveston deepening and widening project where we have a substantial amount of clay. And the clay and the sand, the better material, the suitable material, we use that for the levees, you know, to bring the levees up so that we'll have many more years of capacity to put the maintenance material that we have to dredge on a cycle, some sort of a yearly or some sort of interval.

Q. Whatever happens to the silt that gets deposited in one of these placement areas? Is it ever excavated and then used for something or is it just allowed to consolidate over the years?

A. The silt is just allowed to consolidate because it's not good for anything.

Q. Okay.

A. It's, you know -- what they'll do after these -- after these placement areas are completed, there will be

trenching projects that will be awarded to try to dry the site and to consolidate the silt.

Q. Okay. We talked about Upper Bayou and the Lower Bayou as being widening and deepening projects in the Houston Ship Channel.

A. Correct.

Q. What other widening or deepening projects of the Houston Ship Channel are you aware of?

A. Oh, goodness. We -- starting at the mouth, we had the jetty and entrance channel.

Q. When did that occur?

A. That one was right around the same time as the award of Upper Bayou.

Q. What was the name of that project?

A. The jetty, J-E-T-T-Y, and entrance channel. That's at the -- where the Houston Ship Channel empties into the Gulf essentially.

Q. Were there any levees built hydraulically?

A. No.

Q. So, what happened to all that material?

A. That material was placed offshore. That was done by hopper dredge.

Q. All right. What's the next one up from that one?

A. The next one up from that one is Lower Bay. And Great Lakes performed that one. And there were marsh creation

sites or site at Bolivar. There were some geo-tubes and various other things.

Q. Now, did you have any involvement with Lower Bay?

A. No.

Q. Okay. What was the next one?

A. The next one up from that is Mid Bay, which is ongoing right now. Weeks Marine is doing that one.

Q. Now, for the Mid Bay project, are they using the new and improved specifications that we looked at with Few Exhibit No. 18?

A. They are probably even newer and more improved than the ones you've seen for Lower Bayou.

Q. But they've at least got what's in Lower Bayou in there?

A. I would assume so, yes.

Q. Okay.

A. There's another project engineer handling that job.

Q. Now, for Mid Bay, are they creating any hydraulic levees?

A. There are some levees that are being created hydraulically, yes.

Q. Do you know how many dollars for the Mid Bay project?

A. Mid Bay?

Q. What's the contract amount?

A. Right at 90 million.

Q. Wow.

A. Yeah. Big one.

Q. What all is involved with that? Is it just long or --

A. It's long. It's a lot of rock. There are other -- there are other boater cuts. There are other subchannels that are -- that tie into the Houston Ship Channel. I want to say there's over 20 million cubic yards to be dredged and a couple of maintenance cycles in Bayport. I forget how many thousand linear feet of rock is being placed at the placement areas that have the hydraulic levee placement out there. But that one is ongoing. And I believe they'll be finished with that one by mid this year, mid 2004.

Q. Now, the rock that's -- there's rock that has to be excavated from the bottom of the channel?

A. No. There's rock that has to be placed up there as erosion protection.

Q. Is there rock having to be excavated at the bottom of the channel?

A. No. It's brought in. It's brought in and placed along the perimeter -- along the channel to --

Q. Erosion protection?

A. Yeah. To prevent wave action, ship action, wave action. It's to protect the levee.

Q. Okay. Do you have any involvement with Mid Bay? Do you go out and visit it?
A. I've had minimal activity with that.
Q. Are they building hydraulic levees any place?
A. Yes.
Q. Where are they building hydraulic levees?
A. Placement Areas 14 and 15.
Q. They don't have names for those?
A. Don't have names for those.
Q. Now, Placement Areas 14 and 15, do they have the very soft foundations like at Lost Lake?
A. Very similar. It's -- in fact, they were somewhat unique because they were not enclosed. They were essentially like a horseshoe or U-shaped. So, they did not have a backside. There was no spillbox. So, what this particular project did, it enclosed the entire placement area and put in a -- constructed a spillbox so that it would be contained and it, too, over the years the levees will have to be increased for the future maintenance cycles.
Q. Did they have trouble creating those levees hydraulically?
A. I don't know the specifics since I had minimal involvement with it.
Q. Okay.
A. But its --

Q. What's after Mid Bay?
A. Mid Bay. Upper Bay.
Q. Upper Bay?
A. Upper bay.
Q. Okay. What was involved with Upper Bay?
A. Upper Bay was -- let's see. That one was a marsh creation and Atkinson Island levee construction out there and I don't know if that was -- yeah. That would have to be hydraulic. That was also hydraulic.
Q. What was the value of Upper Bay?
A. I don't recall.
Q. Is it a big project, small project?
A. It was -- it was in the 30, 35 million-dollar range.
Q. Who is doing Upper Bay?
A. That one is completed.
Q. Who was the contractor?
A. It was either Great Lakes or Weeks.
Q. What was Atkinson Island? Is that a placement area or is it --
A. Yes.
Q. Placement area?
A. Placement area. Placement area and a marsh on the backside.
Q. So, it's environmentally friendly?
A. Absolutely. We have to do that these days. And the

levees were built out in the water for the marsh.

Q. Okay. Soft foundations?

A. Yeah. No foundation pretty much.

Q. No foundation. They had trouble with those levees?

A. Yes.

Q. Do you know anything about the trouble they had?

A. I don't know the specifics. And that completes the bay reach. So, then we start with Lower Bayou, which we've discussed, the Bean Stivison project. That was the first one up from there. That one used, let's see -- that one excavated right at 10 million cubic yards. We built hydraulic levees at Spillman and Alexander Islands. And the value on that one was right around 33 million.

Q. Now, we didn't talk about Alexander Island. Is that a placement area?

A. Yes.

Q. Did that have very soft foundations?

A. Yes. In various spots.

Q. Now, Spillman Island, was that one of those islands where they had gone in right next to the existing levee and borrowed material and put it on the levee? Do you know anything about that?

A. In previous years. In fact, that's just about how all the placement areas are constructed. You know, to get your capacity when you don't have a large Houston-Galveston

project like we do have now, in order to enlarge your levees, you have to borrow material from the inside of the levee. After it is crusted and dried somewhat, you get your machine on a mat, you excavate and turn and you place your dirt and you construct your levee in that manner. And you only bring them up 2 to 4 feet at a time because that's about all it can handle at that time. Because then you're back into the soupy, silty poor foundation.

Q. Okay. Now, would it be -- is it standard practice for the Corps to go in and borrow the material immediately adjacent to the perimeter levee or to go --

A. When you say -- that's relative. I mean, because usually the -- there's an offset distance of at least 50 feet from the inside toe. There have been perhaps some areas less than that 50 feet. But we try to keep it at least 50 feet away from that inside toe.

Q. Okay.

A. And that is -- that's standard practice amongst this district.

Q. And you've seen that if you get -- if you start borrowing from less than 50 feet, then you start weakening the foundation for the existing levee, right?

A. Sure. Absolutely.

Q. And that's why you want to maintain that 50-foot gap?

A. Yes. Yes. Do you want to keep going upstream?

Q. Okay. What's the next one?

A. The next one is Mid Bayou. It's ongoing right now. Great Lakes has got that job. And that one involves reconstructing Goat Island with hydraulic levees. Goat Island originally -- became submerged over the past few decades and it is the intent of this project to rebuild Goat Island back to its somewhat original parameters.

Q. Is Goat Island a placement area?

A. It is for one time use.

Q. Is it going to be a bird nesting area?

A. It will be turned into a marsh.

Q. Marsh?

A. Yeah.

Q. So, another environmentally friendly thing?

A. Yes. Another environmentally friendly project.

Q. So, I assume with Goat Island, that's just a matter of the contractor goes out and deposits a bunch of material and doesn't have to build a levee?

A. He has to build his levees -- his perimeter levees first with the clay that's coming out of the channel because it is a deepening and widening section of the project and then his maintenance material is placed to the inside.

Q. So, that's why it's a one-time use maintenance?

A. Right. Right.

Q. Okay. And how many dollars for Mid Bayou?
A. I don't recall. But it's in the 30- to 40 million-dollar range.
Q. And when is Mid Bayou going to be completed?
A. I would say in another -- over another year. It will go on to 2005.
Q. Okay. All right. What's after Mid Bayou?
A. Upper Bayou.
Q. Then Upper Bayou?
A. Yeah.
Q. Is there anything above Upper Bayou?
A. Not under the Federal project there's not.
Q. Okay.
A. I mean, there's more Houston Ship Channel, yes. But it's not the new project depth. It's not the 45-foot project.
Q. So, it would be back at 40 feet?
A. Correct. And the narrower, the 400-foot wide channel.
Q. And so, under the Houston Ship Channel widening project, how much wider did they make it?
A. 530 feet was the minimum width. Some areas were much wider than that. There were some flares. There was a flare in Upper Bayou. So, it -- 530 was the minimum width of the new channel and the 45 plus the over depth.
Q. Okay. Now, typically on one of these projects that

we've been talking about, the widening and deepening, if the contractor runs into a differing site condition, the contractor generally provides notice of some sort, right?

A. True.

Q. And when the contractor provides notice, then the Government is supposed to respond in some way, right?

A. Should, yes.

Q. Typically how does the Government respond to a differing site condition notice?

A. Well, on something like that, we have a site visit and we have to include the Port and the Port consultants, Joint Venture, if you will, the Corps representatives, and the contractor just to get things started to see what the differing site condition -- just to try to get an on the site definition of what -- what's differing.

Q. Okay. Let me ask you a different question before I forget about it. Typically after a levee raising project has occurred where the Corps will go inside an existing placement area and borrow material near the levees, near the perimeter levees and put it on the levees, are there cross-sections typically done --

A. Yes.

Q. -- of what that area then looks like?

A. Yes.

Q. And that would include the borrow areas?

A. Yes.
Q. Where do those cross-sections end up? Who ends up with them? They go with the project file or they --
A. They are in the project file and after a certain amount of years, they're archived. You know, three years and then they're archived and they're put in records holding.
Q. Where is records holding?
A. We have a records holding here in the building and then once it gets beyond another certain amount of time, then it gets shipped off to somewhere.
Q. Okay.
A. It's like --
Q. I know there's a Federal government records retention --
A. There's a repository -- I want to say it's in the Dallas-Fort Worth area for this region.
Q. I was going to say there's a big one in Fort Worth.
A. Right.
Q. Okay.
A. It's like Section 51 or whatever it is.
MR. ERIKSON: Off the record a second.
(Discussion off the record)
Q. (BY MR. ERIKSON) Now, if there were cross-sections that showed existing levee and what the borrow areas looked like, you would agree that that would be important information

for a contractor, right?

A. Yes.

Q. You know, we looked at what you called the new and improved specifications for the Lower Bayou project.

A. Right. Right.

Q. And it set out a material retention scheme.

A. Right.

Q. Did the Corps think about implementing that at any time on the Upper Bayou project?

A. Yes. I believe that was Tim Few's idea. And whether his idea got shot down by whom, I don't know. Because when you're dealing with several entities who are providing information to the plans and specs, it might have been an oversight. It may -- they may not have thought much of it. I don't know. But yes. I got to credit Tim for coming up with it and I always thought it was a good idea.

Q. Was it something that was ever given to the contractor on the Upper Bayou project? In other words, do this material retention program?

A. That was one of the things that we discussed with Eddie Fisher and Leo Herrera at the preparatory meeting in Freeport. Tim had presented his retention plan and, you know, we were pretty much bringing out different ideas, discussing things openly. Eddie Fisher had provided a plan of -- color-coded scheme of what material from the channel was going

to go where on the placement area. So, he provided that to us and Tim provided him the retention scheme, retention plan scheme. So, there was a lot of ideas that were traded and discussed and just kind of like a brainstorming session, if you will.

Q. Was it ever formally issued to the contractor? In other words, was the contractor directed to follow or abide by some material retention plan?

A. Unless it was in the preparatory notes, that's probably where it would have been -- it would have surfaced.

Q. When you say "preparatory notes," you're talking about the preconstruction conference?

A. No. No. This was -- this was the -- like the first -- like a kickoff meeting just between the Corps and the contractor at the contractor's office in Freeport. And it's required by the specs, your initial phase of your -- of your plan on how you're going to do your dredging and your hydraulic levees. And it's really a method sort of meeting that you have. Contractor provides his information, how he's going to accomplish this and you have open discussion of that. And then, you know -- then each side states their concerns and potential problems, et cetera. And that -- that's after the precon. Okay. The precon is kind of more administrative stuff, how are you going to get paid, safety, yada, yada, and all this kind of stuff. But the preparatory is actually

hands-on how you're going to do what the plans and specs say you're going to do.

Q. Okay. Now, this preparatory conference, that's not designed to change the contract, is it?

A. No. No.

Q. It's just informational purpose?

A. It's information. It's information exchanged, you know, you've given us these set of plans and specs and this is how we intend to accomplish that.

Q. Okay. Now, what did Eddie Fisher tell you or what do you recall him saying about how Renda was going to construct the hydraulically placed levees?

A. Well, I mean, his -- he -- like I said, he provided this color-coded drawing which was essentially this drawing and then he had superimposed the channel and he had segmented the channel in different colors and the same thing with the placement area and showed how he was going to place the material at Lost Lake.

Q. And when you say "this drawing," you're talking about Drawing C-14?

A. C-14, correct.

Q. For the purposes of the record.

A. I understand. I understand.

Q. Okay. Did somebody ask or did Mr. Fisher say how he was going to place the hydraulically placed materials?

A. Well, I mean, he showed his sequencing. He showed how he was going to lay his pipe and he showed how he was going to accomplish section by section with floating line, with land line. He estimated how many cubic yards per day that they were -- that they would propose to place and essentially pretty much gave us like a schedule. You know, we're going to do this reach this month and this reach this month and so on and so forth.

Q. Were there any minutes kept for that meeting?

A. Yes. In fact, I believe Mr. Few wrote some and I believe Eddie Fisher wrote some.

Q. Okay. So, you attended and Mr. Few attended. Anybody else from the Corps that you recall?

A. Not that I recall.

Q. And then Mr. Fisher attended for Renda. Anybody else on Renda's side?

A. Leo Herrera.

Q. Okay. So, a four person meeting?

A. Yes.

Q. All right. Now, if Mr. Fisher had suggested something you took issue to, would you have written a letter or somebody with the Corps written a letter complaining about --

A. We would have raised it at that meeting. We would have -- and then it would have been documented in the minutes.

Q. If there would have been some sort of genuine dispute, Eddie Fisher wanted to do it using Method A and for whatever reason, the Corps didn't want Mr. Fisher to use Method A, would there have been a letter written?

A. It's been our premise not to tell the contractor how to do his job. That's --

Q. Let me ask you this: Did Mr. Fisher say anything that you recall that the Corps took issue with?

A. No, I don't. I don't recall that he said anything.

Q. Did Mr. Fisher talk about any means or methods that he was going to use to construct the hydraulically placed levees other than scheduling?

A. I mean, he spoke of the dredge. He spoke of the amount of lines that he would use, submerged lines, crossings that he would have to get permission from the Coast Guard to place. And then, of course, the equipment that would be used to shape the levees and to keep, you know, it pushing the material forward.

Q. Now, as construction progressed on the hydraulically placed levees, was Renda Marine doing it the way that Mr. Fisher had described?

A. They had started out that way. But then they had diverted from Mr. Fisher's original plan.

Q. Okay. How did it divert?

A. From what I recall, his plans showed that some of