the initial placement would be -- since they will be starting down here by Lynchberg Ferry, C-14 drawing reference, down here by Lynchberg Ferry, they would be pumping toward the farther side of the island, as I recall. Now, when things got started with the dredge coming later than what was anticipated, the -- it had been decided that the short pump would be -- that they would start with the east levee and go up to the spillbox. And we questioned that. Because it was such a short pump, we said, "Well, are you sure you don't want to go to the backside and get your -- while you're this close in the channel, bring it to the backside and as you move away, keep your lines about the same and then come back around this way." But he said no, we're going to do it this way. We said okay. You're the contractor. We'll proceed.

Q. Okay. Other than pumping to a different location, did the construction proceed basically as Mr. Fisher had envisioned and related to you, same kinds of equipment?

A. Yeah. Yeah. The equipment was the same. Of course, the dredge being the same. So, means and methods were about the same.

Q. Now, if you noticed that the contractor was doing something in violation of plans and specs, did you create notices of deficiency or -- aside from telling the contractor orally, what sort of record did you create?

A. We had -- see, this is when the Joint Venture began

to help us with the quality assurance reports. And those reports were shared with Mr. Herrera or Pat Duke or whomever the QC person was.

Q. When was it decided that the Joint Venture would have any quality assurance role?

A. I'm not sure. I mean, there is a project cooperation team -- that I'm not a part of -- that is made up of some Corps people, some Port people, and then the Port consultants. Okay. And they're kind of like an overview project team that tries to coordinate all the -- all these Houston-Galveston projects. It wasn't just this one. It's an ongoing team effort. And the major decisions, you know, whether there's a project change, if there's something that needs to -- anything that has to do with money goes through this project cooperation team. And they only meet once a month. So, that can slow down the process.

Q. Okay. When did you first become aware that the Joint Venture was going to have some role in the quality assurance tasks on the Upper Bayou project?

A. It was, I would say, probably about four or five months into the dredging portion of it. And I resisted it myself.

Q. You resisted it how, sir?

A. I resisted their involvement in the quality assurance portion of it. Because I felt that that was

something that it was better for the Corps to handle itself, whether we had to hire some -- you know, some quality control, quality assurance person, construction representative. I would have preferred to have done it that way. But however, it was decided, again, by this project cooperation team that the Joint Venture would assist in performing quality assurance for the Corps.

Q. Well, there ended up being a fair amount of animosity between the Government and the Joint Venturer over how this project was going to progress, wouldn't you agree?

A. I agree.

Q. And you've seen the Tim Few E-mails that call the Joint Venture backstabbing weasels. You've seen that?

A. I remember those words.

Q. Did you ever have a meeting where the Corps described the Joint Venture that way or words similar to that?

A. Meetings with the Joint Venture or --

Q. No. Meetings within the Corps.

A. Yes.

Q. And I understand from the Joint Venture people they had meetings where they described the Corps about the same way.

A. Sure. Yes. It's mutual.

Q. Mutual dislike for each other?

A. Sure.

Q. Did you ever hear anything personally from the Joint Venture where, you know, they expressed some sort of dislike or lack of professionalism toward the Corps?

A. Not directly from them. I mean, hearsay. I mean --

Q. Who did you hear it from?

A. I don't remember.

Q. What sorts of things did you hear?

A. Just that, you know, they accused us of letting contractors run amuck and, you know, not enforcing the plans and specs to the tee. And because we come from different philosophical backgrounds. I mean, the Corps has always tried to partner with the contractor, you know, and to go in the same direction. Whereas you get someone who is not with the Corps, private industry, Joint Venture types and, you know, their main thrust is that the contractor is out to screw the Government, plain and simple.

Q. So, you would agree that contractors bidding for, say, the Upper Bayou project would expect that there would be some sort of partnering relationship with the Government, right?

A. Yes.

Q. As a matter of fact, I think if you look in the project manual, it's probably something standard. They do talk about instituting a partnering relationship with the contractor, right?

A. Correct.

Q. Now, as part of partnering, one of the things that the sides should do is if they have an issue with the other side, they should let the other side know, right?

A. Right.

Q. Whether it's informally at a lower level in the field or a little more formally in writing so that the issue gets addressed, right?

A. Right.

Q. Another aspect of partnering is to respond to concerns the other side has raised, right?

A. Right.

Q. And you should respond in a reasonably prompt manner, right?

A. Sure. But it is in those writings, in those documents because it had to go through so many hands -- it had to go through the Port and the Port consultants and the Joint Venture -- that it made our letter writing campaign very arduous, very difficult to try to get things -- to try to get letters written out in a reasonable amount of time.

Q. How were the quality assurance deficiency notices from the Joint Venture transmitted to Renda Marine, if you know?

A. What I recall, I would get them. I would receive them.

Q. From the Joint Venture?
A. From the Joint Venture, the quality assurance reports.
Q. Who would submit them to you?
A. I would get them from various -- the inspectors that they -- the Joint Venture had.
Q. Leon Hrabovsky, Yogi Barron?
A. Yeah. They were the leads. They wouldn't necessarily go out in the field. They had other construction representative people who would drive the boats and visually observe or get up on the levee and take pictures or whatever. And then those guys would write a report and, I guess, transfer -- they would transfer it over to Leon, Yogi. And then they would finalize the report and then after a week or so of reports, they send a package to me and I would review them, keep copies and then I would share them with either Leo or Pat Duke.
Q. Okay. Would you do it by sending it by a telecopy or --
A. I would bring it myself. I would come out to the field myself.
Q. You would hand-deliver it?
A. I would hand-deliver it.
Q. Would you have some sort of transmittal letter on top of it?

A. Not necessarily.

Q. Would there be anything in your file that would indicate that you gave somebody with Renda Marine copies of the Joint Venture's quality --

A. There would be a handwritten note maybe on a Post-it note or something that this -- these amount of days were hand-delivered to whomever on this date.

Q. Okay. Did you have any sort of a daily log, daily diary?

A. Yeah. I created one on a spreadsheet that, you know, showed the dredging section and the levee section and the progress each day.

Q. Okay. Did you create anything that would list your concerns or your observations or things you did on a given day? Now, we have your -- a couple of your memoranda for records and we'll --

A. Right.

Q. We'll talk about that. But anything other than that that you prepared on a regular basis?

A. No. I mean, other than the spreadsheet that I -- I kept in -- I had a remarks column and I just kind of follow -- I would review the reports and I would make comments on the -- on each day of what occurred and if I went out in the field that day, I would make a note. But that -- I just kind of kept it on a spreadsheet of what was happening and that's how

I kept my notations.
Q. Now, you testified a little bit earlier about the project coordination team meetings. Do you remember?
A. Correct.
Q. And I think you said you weren't invited to those, right?
A. Well, I'm not at a level where I would be, let's put it that way.
Q. Okay. You also understand that Renda Marine wasn't invited to those?
A. Right.
Q. Don't you think it would have been a good idea to have you and Renda Marine involved in those so you can discuss the Upper Bayou project?
A. It would be -- it would be worthwhile. But as to this day, it still stands as it is. The contractor and the project engineer are still not a part of that project cooperation team --
Q. Okay.
A. -- for whatever reason.
Q. Well, are you aware of any change orders that might pay money to Renda Marine on the Upper Bayou project that the Joint Venture was in favor of?
A. In favor of? Those were few and far between.
Q. Was it your general impression of the Joint Venture,

that they didn't want to pay any more money on this project?

A. That's true.

Q. Now, I think there's at least a few instances where you agree Renda Marine would have been entitled to more money on the Upper Bayou project, right?

A. I agree.

Q. The flare area is one of them, right?

A. That was one.

Q. We'll talk about some more in a little while. Did you see some heated letters or memos from the Joint Venture when the Corps agreed to pay money to Renda Marine on the Upper Bayou project?

A. Yes, I did.

Q. Do you ever recall the Joint Venture requesting that the Corps simply instruct Renda Marine to do certain things and if Renda Marine complained about wanting money, Renda Marine can just file a claim at the end of the project? Do you remember anything like that?

A. I don't remember exactly in those words but very similar to what you're saying.

Q. And can you give me any specifics?

A. No, I can't. But what you're saying, the gist of it, the general -- your general statement is correct. I mean, I don't remember specifics but yes. In general, that's true.

Q. Let me see if I can help you a little bit, then. Do

you recall the Joint Venture wanted Renda just to -- to continue simply building foundations for levees out at Lost Lake and then at some future time, there would be a day of reckoning as to whether or not Renda would get paid?

A. That sounds pretty harsh. I don't -- I don't recall those -- I don't recall those words.

Q. Well, you understand -- and I'll show you a letter, it's either from Mr. McClenan or Mr. Benero, that instructed Renda to continue simply building foundations for the levees out at Lost Lake. Do you recall that letter?

A. Not specifically but --

Q. Do you recall Renda being given instructions like that during the course of the project?

A. Sure. Yes.

Q. Now, do you remember that Renda's concern and response to that sort of instructions was "How do we get paid," right?

A. Sure.

Q. Because, I mean, that was a legitimate concern on the part of Renda, right?

A. Correct.

Q. Because if they don't achieve the levee template, then theoretically they're not entitled to any money, right?

A. Right.

Q. And it may be that they can't achieve levee template

because there's an insufficient amount of material to build the levees, right?

A. Could be, yes.

Q. Or it could be that they can't get to levee template because the foundations are simply too soft and they're swallowing up the material that's getting placed there, right?

A. Could be that.

Q. Or it could be some other reasons, right?

A. There could be many reasons.

Q. But whatever the reason, unless Renda achieved the levee template, 30 feet above mean low tide, Renda wasn't entitled to any money as --

A. The Joint Venture was very adamant about all or nothing.

Q. So, in other words, the Joint Venture wanted Renda to achieve a 30-foot high levee or Renda get no money?

A. We were -- we were disagreeing and were saying no, let's at least prorate and do it on a volume or some sort of fraction and then pay accordingly to that. And that was something that was never agreed upon.

Q. And so, it never got resolved?

A. No.

Q. You're agreeing with me?

A. I agree.

Q. Okay. Now, prior to going from 40 feet to 45 feet

in the Houston Ship Channel, when was the previous deepening projects, if you recall?

A. I don't recall. It might have been 30 years or more.

Q. Okay. So, not since 1983 when you came to the Corps?

A. Right. Yeah. Right.

Q. Now, before it got to 40 feet, how deep was the channel? Do you recall?

A. From what I remember from reading in the history, it was 32 at the previous time before it hit 40. Thirty-two or 35. I forget. Somewhere around in there.

Q. Okay. So, some time prior to 1983 --

A. Absolutely. Yes. Yes. We're talking about in the Seventies or perhaps Sixties.

(Discussion off the record)

Q. (BY MR. ERIKSON) Now, you would agree that Renda didn't do the retention monitoring tasks that are set out in Few Exhibit No. 18, right? They didn't do the spreadsheet?

A. Well, I don't know if they never did it because I recall Eddie Fisher attempting to at least start that. In fact, I remember seeing some tabulations of his with some estimates of his own. I mean, but using that same Tim Few template with the retention. But following that -- and this was early on and I remember seeing -- I remember seeing that.

Q. Okay. Now, you would expect that the contractor would attempt to look at the amount of material to be dredged to see if it's going to be adequate to build the levees that are required, right?
A. Correct.
Q. And as soon as the contractor discovered that there might be an out of balance situation, you would expect the contractor to tell the Corps, right?
A. Right.
Q. Just like Mr. Bowman did in Benero Exhibit No. 15, the one we looked at this morning, right?
A. Yes.
Q. Turn back to Russek Exhibit No. 2. You got that in front of you some place?
A. Sure.
Q. Item B at the bottom of the first page talks about over-wash. It says, "Some minor over-wash or spillover was observed to have occurred previously during fill placement." Do you see that?
A. Yes.
Q. Then toward the tail end of that paragraph on Page 2, Mr. Few's written that "Paragraph 3.1.3, misplaced materials, requires control of backwash or construction of berm or dike to prevent spillover."
A. Yes. I see that.

Q. And as you understand the misplaced materials provision, if materials end up in the wrong place, the contractor could be required to move the materials to where they belonged, right?

A. Correct.

Q. And if they had to move them, that would be done mechanically, right?

A. However -- whatever means or methods he --

Q. He can't do it hydraulically any more, right?

A. Right.

Q. Other than mechanically, are you aware of any other ways?

A. That's it.

Q. So, they get out there with excavators and front-end loaders and trucks and bulldozers and that kind of stuff?

A. Sure.

Q. Now, Paragraph No. 4 on Page 2 is entitled placement technique?

A. I see.

Q. And it says, "Although the work generally conforms to specs, it appears some changes in the excavator equipment being used at the discharge would allow increased control of discharged clay balls, increasing levee production and retention rate." Do you see that?

A. I see that.

Q. And then he talks about, you know, how possibly that might occur, right?

A. Right.

Q. Now, as you understand Rozsypal Exhibit 1 and Rozsypal Exhibit No. 2, there isn't any definite requirement on the contractor to retain a certain percentage of the material placed hydraulically, right?

A. No, there's not.

Q. And there's no definition of how much material that escapes is too much, right?

A. I don't believe it's spelled out specifically, no.

Q. Now, you remember when Affolter Contracting was on --

A. Yes.

Q. -- the Lost Lake project?

A. Yes.

Q. And you remember that Affolter took care of the mechanically constructed levees, right?

A. Correct.

Q. And you remember Affolter had trouble with the mechanically constructed levees standing up, right?

A. I remember on -- in a couple of areas they had some problems, yes.

Q. And you remember Affolter got at least one change order to compensate Affolter for the trouble that Affolter was

having with the mechanically constructed levees, right?
A. That's correct.
Q. Now, is that one of those change orders that the Joint Venture complained about?
A. Yes.
Q. But the Corps felt it was fair and the Corps issued it, right?
A. Yes.
Q. Now, that was earlier on in the project, right?
A. Right.
Q. And after that time, the Joint Venture became more vocal about its concern about the issuance of change orders that gave money to the contractor, right?
A. Yes.
Q. Turn over to Page 3 of Russek Exhibit No. 2. At the top of the page, Paragraph No. 5, there's a current net retention rate paragraph. Do you see that?
A. I see that.
Q. And then down below, Mr. Few's written "net retention rate equals approximately 0.37"?
A. I see that.
Q. And so, that would be close to that 40 percent you talked about one of the other contractors achieving, right?
A. Right.
Q. And then Mr. Few's written below that that "the

required minimum average net retention rate to complete the required levees was 0.11"?

A. Right.

Q. And that would assume that the quantity of clay that Mr. Few figured would, in fact, be recovered by the contractor?

A. Yeah. In fact, that's the remaining in situ material --

Q. Right.

A. -- remaining on the project. So, from -- based on what he's saying here, 11 percent of the remaining material would be required to finish the levees.

Q. Well, it could be 11 percent of the whole project or it could be 11 percent of what's left, right?

A. Yeah. I mean, since it was only 65,000 cubic yards into the project out of 3.5 million cubic yards, that's how I read that.

Q. Okay. But if it turned out that the amount of clay recoverable in situ was not the amount that Mr. Few had calculated, then the net retention rate would have to go up --

A. Exactly.

Q. -- to affect the balance, right?

A. Right.

Q. Now, the next to the last paragraph on Page 3, Mr. Few wrote, "Although in future contracts, we intend to

include the above data as required reporting" -- and he's talking about net retention rate stuff. Do you see that?

A. Right.

Q. -- "it is not specified in this contract. Therefore, we must leave it to the contractor to decide how much of this reporting he feels he can do without incurring significant increase of costs or work difficulty," right?

A. Right.

Q. And that's fair, right?

A. Sure.

Q. You can't impose an obligation on the contractor without paying the contractor for it, right?

A. Absolutely. Right.

Q. Do you remember on the Lower Bay project where there were change orders issued in connection with the installation of the geo-tubes?

A. I knew about it. I mean, I didn't know the specifics but I do know that -- that there were some.

Q. Do you recall the Joint Venture having heartburn or complaining bitterly about the issuance of those change orders?

A. Yes. I did hear about their heartburn.

Q. Now, do you know Mr. Will Sanford?

A. Yes, I do.

Q. The Corps retained Mr. Sanford to help with the

contractor's requests for equitable adjustment on the Upper Bayou project, right?

A. Correct.

Q. And Mr. Will Sanford was also retained to help out on the contractor's request for equitable adjustment on the Lower Bay project, right?

A. Yes.

Q. What happened to Will Sanford? He sort of disappeared by the end of the project?

A. Will works for Fort Worth district.

Q. Right.

A. And I guess he had -- he had other duties that he needed to perform and he was just doing this because he had some slack time. And he was trying to help us out to do these -- this documentation and paperwork that was required.

Q. Okay. Now, when Will Sanford went away, did the Corps then retain George Strickler to look at the claims?

A. Yes.

Q. So, Mr. Strickler was kind of Mr. Sanford's replacement?

A. Right.

(Exhibit 3 marked)

Q. (BY MR. ERIKSON) The court reporter has marked for identification as Russek Exhibit No. 3 a memorandum for files that it appears you prepared on 22 December, 1999. Is this

your memorandum?

A. This is my memorandum.

Q. And you signed it on the second page?

A. Yes.

Q. Okay. Very first paragraph you've indicated that on 16 December, 1999, you went and visited the project, right?

A. Right.

Q. And you had some company, right?

A. Yes.

Q. Second sentence you say, "The first area visited was at Lost Lake placement area between Station 97+00 and Station 90+00 where misplaced dredge material was being moved to the correct levee alignment and shaped with two D-5 dozers to the required template. This area has drastically improved since the last inspection. A third D-5 was shaping the exterior slope of the levee near Station 70+00 +/-." Do you see that?

A. I see that.

Q. Now, if the contractor didn't put the levee material in the right place, then they were required or should move it to the right place?

A. Correct.

Q. And in this case, they were doing it mechanically, right?

A. Right.

Q. And you didn't have any concerns or objection to

them moving it mechanically, right?
A. Not at all.
Q. Now, this particular area, 97+00 down to 90+00 was a hydraulically placed levee section?
A. Correct.
Q. Turn to the second page, sir. Your Paragraph No. 6, first sentence says, "In general, there has been improvement on this project, especially with regards to the hydraulic levee construction and dredge material placement." Do you see that?
A. I see that.
Q. That was true when you wrote it, right?
A. Right.
Q. You still would agree with that now?
A. At the time I wrote it, I agree with it.
Q. No reason to change your mind now?
A. No.
(Exhibit 4 marked)
Q. (BY MR. ERIKSON) The court reporter has marked for identification as Russek Exhibit No. 4 a memorandum for files that you prepared on 14 January, 2000; is that correct?
A. That's correct.
Q. This is your memorandum for files?
A. Yes, it is.
Q. You signed it on the second page?

A. Yes.
Q. Now, before we get to this Exhibit No. 4, let me ask you a question. The Government would put out survey stakes where the contractor was supposed to build the levee, right?
A. Initially.
Q. Initially. And then after the contractor knocked them out, then the contractor had to replace them, right?
A. Right.
Q. And the Government expected that the contractor would follow those survey stakes, right?
A. Yes.
Q. Now, you recall in the southeast corner of Lost Lake there being a mistake in the surveying by the Government?
A. I remember -- I don't remember if the Government did that survey or who did the survey.
Q. Okay. But somebody either with the government or the Government retained to do the survey had an error, right?
A. Correct.
Q. And you recall that the contractor started building the levee in a wrong location and then had to move the material, right?
A. Right.
Q. That wouldn't have been a contractor misplaced problem, right?
A. If it was a Government placed alignment. And I

don't remember who placed the stakes there.

Q. Okay.

A. Whether it was -- now, if it was the Government's fault, then, yes.

Q. Kind of like the situation over on the west side where the Government decided at some point that the Government wanted the levee closer to the existing levee, right?

A. On the west side that was to alleviate a problem that was occurring.

Q. Right. And if it turns out that during the course of the project that it appears the design can't be accomplished commercially -- with commercial practicality, then the Government should change how the design is going to work, right?

A. Correct.

Q. And that's one instance where the Government did that?

A. Right.

Q. Where it just was not going to work out having the contractor build in no-man's-land where the foundations were so soft that the levee would just sink?

A. Correct.

Q. Russek Exhibit No. 4. It looks like you had a site visit on 13 January, 2000?

A. Correct.

Q. Now, every time you had a site visit, did you do one of these memorandum for files?
A. Not all the time.
Q. Most of the time?
A. Most of the time.
Q. More than half?
A. Yes.
Q. Okay. You indicate that the first -- looks --
A. Paragraph 1 they're still working on that area.
Q. In Russek Exhibit No. 3, in Paragraph No. 1, you wrote at the tail end of the paragraph that the area had drastically improved since the last inspection. And in Russek Exhibit No. 4, you wrote that the area has improved since the last inspection.
A. Uh-huh.
Q. Okay. So, they're making progress?
A. Making progress, sure. There was a lot of material to remove.
Q. Now, Paragraph No. 2, you wrote, "The pipeline discharge was at 54+50 +/- and the effluent consisted mostly of silt and shell hash, which is not conducive to hydraulic levee construction. As a result, the discharge was being diverted into the placement area adjacent to the northeast corner. Several more days of this type of material is anticipated." Do you see that?

A. I see that.
Q. The contractor was properly diverting material to the placement area as opposed to levee construction, right?
A. Correct.
Q. And if you saw that the contractor was placing silt and shell hash in the levee, you would have written something like that in your memo -- memorandum, right?
A. Right.
Q. Matter of fact, if you saw the contractor doing something that you thought was improper, you would have listed it in a memorandum like this, right?
A. Yes. In fact, I would have said something on site first and then written it down. So, yes.
Q. Now, these memorandum for files, did you give these to the contractor or just put them in your files?
A. I don't recall. Usually I shared them with Leo Herrera who is the QC.
Q. Okay. Paragraph No. 6 on the second page, it says, "In general, there has been continued improvement on this project especially with regard to the hydraulic levee construction in dredge material placement." Do you see that?
A. I see that.
Q. That was true when you wrote it, right?
A. That's true.
(Exhibit 5 marked)

Q. (BY MR. ERIKSON) The court reporter has marked for identification as Russek Exhibit No. 5 a memorandum for files from you dated February 22, 2000, right?

A. Right.

Q. And this reflects a site visit that you had on February 18, 2000, right?

A. Correct.

Q. In your third paragraph, about in the middle of the third paragraph, you say, "There were many questions from Mr. Bryant regarding the contractor's inefficiency. However, it was stated that the contractor may use any method to place material provided it does not conflict with the contract." Do you see that?

A. I see that.

Q. So, Mr. Bryant is Grady Bryant with the Joint Venture, right?

A. Correct.

Q. What were his questions or comments about the contractor's inefficiency? Do you recall?

A. I don't recall but in general he was -- he was taking issue with the method that the contractor was using to place the material.

Q. Do you recall what the method was at that point in time?

A. It was the method that the contractor had been using

to place the material hydraulically.

Q. The method that you had no objection to?

A. I had no objection to it and Mr. Few had no objection to it.

Q. Okay. You continue, "Mr. Bryant continued to be very critical of the efficiency such that Mr. Herrera asked if he was directing Renda Marine to change the placement method. During this exchange, Mr. Bryant was reminded that the contractor cannot be directed to change construction methods without an equitable adjustment." Do you see that?

A. Yes.

Q. Who told Mr. Bryant that?

A. I did.

Q. Okay. So, when it says Mr. Bryant was reminded, you told Mr. Bryant?

A. I reminded him, yeah. Yeah.

Q. What was Mr. Bryant's reaction to that?

A. He was taken aback by my statement. And I don't recall if he quickly shut up or not. But he was less vocal, let's say.

Q. Did you ever go out on the dredge MILLENNIUM?

A. Yes.

Q. Were you ever out there when they hit an obstruction?

A. I was not out there when they hit an obstruction,

no.

Q. Now, you notice -- you recall that Renda Marine provided notices of differing site condition when they hit submerged obstructions, right?

A. Yes. It was a dredge swivel, a concrete buoy, and a CONEX box.

Q. Among others?

A. Yeah. Among, you know, your garden variety trash.

Q. They hit some 50-foot long steel pipe and other things, right?

A. That was that dredge swivel, I believe. That's that big curved piece. It's about 3 or 4 feet in diameter, if I'm not mistaken.

Q. Benero Exhibit No. 2, is that the dredge swivel?

A. Yes.

Q. Did you ever see the cutterhead teeth marks on the dredge swivel?

A. No. I didn't examine it that closely. But I did see it pulled up on the shoreline there at Lost Lake. And it was -- it was a piece of equipment larger than this table and probably larger in diameter than the table is high. So, it's pretty substantial.

Q. Now, you would agree that there's no reference to the dredge swivel, what is shown in Benero Exhibit No. 2, in the plans or specs for the project, right?

A. No. No.
Q. You agree with that?
A. I agree.
Q. And if the contractor hits something like that, that would be a legitimate differing site condition?
MR. PETTY: Object to the form of the question. Go ahead and answer.
A. Please restate.
Q. (BY MR. ERIKSON) You would agree that if the contractor hit something like what's shown in Benero Exhibit No. 2, the dredge swivel, that would be a legitimate differing site condition, right?
A. It would not be noted on the plans and specs. But if this had been cast off from a ship or whatever after the project was started, we wouldn't have known about it. If it was buried in the soft material, hydrographic surveys wouldn't have picked it up. The only thing that would have picked this up is a magnetometer survey. So, nobody knew that it was there.
Q. Right. And one of the purposes for the differing site condition clause is to cover those things that neither party knows about, right?
A. That's one of the reasons, yes.
Q. Because if the Government knew that that dredge swivel was there, the Government should have told the

contractor, right?
A. And would have.
Q. Yeah. No reason not to tell the contractor, right?
A. Right.
Q. Because it's probably cheaper to tell them in advance than it is to fight over something the Government already knows about, right?
A. Yeah. There's -- I mean, there's no reason to withhold that.
Q. Okay. Now, you -- during the course of being project engineer for the Upper Bayou project, when Renda Marine hit obstructions like the dredge swivel shown in Benero Exhibit No. 2, you didn't expect that Renda would remove that at no cost to the Government, did you?
A. No.
Q. That would be -- Renda would be entitled to an equitable adjustment for something like that?
A. Yes. Some amount.
Q. And the same would be true for hitting the CONEX shipping container and the ship mooring buoy, right?
A. Yes.
Q. You recall that on about March 8, 2000, the contracting officer issued a cure notice to Renda Marine, right?
A. Yes. I remember.

Q. And then ultimately the contracting officer decided not to terminate Renda Marine for default, right?

A. I remember. Yes.

Q. Did you get involved in deciding one way or the other whether or not Renda should be terminated for default in connection with the March 8, 2000, cure notice?

A. I had provided some technical input based on my observations in the form of these memorandum for files. I provided where they were on the schedule. I provided basic data to the contracting officer and it was his decision based on the information that I provided to pursue what he did.

Q. Based on what you knew at the time, did you vote that the contractor should be terminated or the contractor should not be terminated? What was your position?

A. At that time I did not vote to terminate the contractor.

Q. So, it was your opinion the contractor should be allowed to proceed?

A. Proceed, yes.

Q. So, you agree with what Mr. Benero did? You agreed with what Mr. Benero did, allowing the contractor to proceed?

A. To proceed, yes.

Q. Okay. Now, November 6, 2000, there was a show cause notice that Mr. Benero issued. Do you recall that?

A. I recall that, yes.

Q. And thereafter, the contracting officer, again, decided to allow Renda Marine to proceed, right?

A. Right.

Q. And he didn't default terminate Renda Marine, right?

A. Right.

Q. At that point in time, did you have input into that decision making process?

A. I had less input that time than when I had the first time.

Q. Did you agree with what the contracting officer decided to do; namely, let Renda Marine proceed?

A. Yes.

Q. Did you feel at that point in time that Renda Marine should be default terminated?

A. No, I didn't.

Q. Okay. Why did you feel that Renda Marine should be allowed to proceed?

A. Well, I felt that in the best interest of the project and plus some of the changes that we had undertaken, especially on the west levee, I wanted to continue with the project in hopes that we could get through it. I just didn't want to stop it. I just wanted to continue it on and give the contractor the best opportunity to finish.

Q. Now, the changes you're talking about were the changes in the alignment of where the new levee was going to

go?

A. Correct. On the west side.

Q. So, instead of being out in the softer foundation, it was going to move closer to the existing levee?

A. Closer to the existing levee.

Q. Did you have any involvement in calculating what the appropriate liquidated damages rate should be for this contract?

A. No, I did not.

Q. Do you know who would have that involvement?

A. That would have come out of our construction branch, and I don't know who would have done it.

Q. Okay. Does the bay area office come up with those sorts of numbers for bay area office projects?

A. No, we do not. We have a separate construction branch office who does that.

THE REPORTER: May I change my paper?

MR. ERIKSON: Sure.

(Recess taken)

Q. (BY MR. ERIKSON) Now, do you remember at some point during the Upper Bay project Steve Bowman writing and complaining about the foundations just simply being too soft, that the levees couldn't be constructed mechanically? Do you remember that?

A. Yes, I do.

Q. When a letter like that came in, was there any sort of an investigation by the Government as to just how soft the foundations were or how much material had to be displaced or anything like that?

A. Well, there again, we relied on our soil borings and the data from that and our geotechnical people would go back and relook again at their analyses and make sure that they didn't have -- made a mistake. And I believe the frustrating part for Mr. Bowman was that he was used to building things mechanically and was not used to the displacement that was occurring out there, that we wanted to occur out there. So, he -- when he sees a displacement in a levee failure, he thought that was a failure. When in actuality, that's what the hydraulic -- that's what the hydraulic construction does. It fails the soft foundation so you can build that levee up. So, that was his -- that was his frustration. So, that's all I can say about it.

Q. Would you agree that there's some reasonable amount of material that should be placed in the new levee? For example, I'll represent to you that if you take the neat line of the levee template, it would require approximately 35 cubic yards per foot of levee?

A. Sure.

Q. Does that sound about right to you?

A. That sounds about right.

Q. Would you agree that there's some reasonable amount of material that the contractor would have to place in order to achieve a 35 cubic yard per foot neat line?
A. Sure. The gross amount.
Q. Right.
A. Yeah. Yeah.
Q. And whether it's twice as much or three times as much, there's some reasonable amount, right?
A. Right.
Q. Do you recall that Ira Brotman at one time had calculated 75 cubic yards?
A. I don't remember the exact number, but I know that he had done a calculation.
Q. Would that sound about right to you, 75 cubic yards?
A. Seventy-five neat line cubic yards?
Q. Well, 75 cubic yards that the contractor has to place to achieve the 35 cubic yard neat line.
A. See, I don't know if he's talking about in situ dredged material that is being placed or is he talking about material that has -- that has already been placed, the water has bled off, and now you're looking at a -- some sort of a settlement type of situation. Because there's two -- there's two different quantities here.
Q. We'll get back to that in just a second. Did you ever formulate any opinion as to how many yards the

contractors should reasonably be expected to place to achieve a 35 cubic yard neat line?

A. What I had looked at over the course of the project, I was expecting something on the order of about four to one.

Q. Okay.

A. So, 140 to 150 cubic yards of in situ material would yield your 35.

Q. Okay.

A. You know, in some areas maybe more, some areas maybe less, depending on the foundation.

Q. Okay. Now, if the contractor installed 140 or 150 cubic yards of material but it still wasn't enough, then --

A. See, that would have been a retention rate of about 25 percent.

Q. If the contractor was doing that --

A. That would have been reasonable. That would have been a reasonable amount to retain. Twenty-five was kind of on the lower end of being reasonable to retain. And we were -- we were shooting more for a third but, you know, we were trying to give ourselves a buffer between 25 percent and 33 percent, say.

Q. So, if the contractor would have installed or placed 140 or 150 cubic yards, that would have been a reasonable effort by the contractor trying to achieve a 35 cubic yard

neat line?

A. Sure.

MR. PETTY: Object to the form of the question.

Q. (BY MR. ERIKSON) Is that about what you expected during the course of the project?

A. That is about what I had estimated after -- you know, being a year plus into the project, based on what was being pumped out versus what was being retained.

Q. Now, if the foundations were softer than anybody anticipated, it might require more cubic yards. Am I right?

A. Sure. It could go up to 200, 250 cubic yards.

Q. Now, do you recall Renda reporting that Renda was having to place 700 cubic yards?

A. I do recall in one of Mr. Bowman's letters that number.

Q. And even at 700 cubic yards, Renda still wasn't able to get the levees to stand up because of soft foundations. Do you recall Mr. Bowman saying that?

A. Yes, I do.

Q. Do you have any reason to dispute what Mr. Bowman was saying?

A. I never did see where he got his 700 cubic yards from. So, I couldn't verify his number. And that was the -- that was the only thing I took issue with was that quantity. And I never could get him to share that piece of information

with me, where he was coming up with the 700 cubic yards.

Q. So, you can't vouch for it but you don't have enough information to dispute it?

A. Right.

Q. Okay. Did it ever become apparent to you during the course of the Upper Bayou project that the current design just wasn't going to work --

MR. PETTY: Object to the form of the question.

Q. (BY MR. ERIKSON) -- either due to insufficient clay materials or too soft foundations or some other reason like that?

THE WITNESS: Do I answer?

MR. PETTY: Yeah.

A. I guess I always felt like there was sufficient material that could have been recovered after it had been pumped there by mechanical means to shape the levees into perhaps a reduced elevation but all the way around. I did not necessarily agree with the sequence of how the placement area was divided and how -- and the sequencing of how the hydraulic levees were placed. But I mean, it was not my call to make -- to do that because that was up to the contractor to determine his sequencing.

Q. (BY MR. ERIKSON) It wouldn't make any difference to the levees themselves in what order they were constructed right?

A. No, it wouldn't have.
Q. The material wouldn't know any different?
A. No. It was -- it would have made -- it would have helped the dredge since the dredge was somewhat cutter limited for horsepower, you know, being 24-inch and had less horsepower. You know, if you would maintain your lines pretty consistent throughout the project -- instead of having a short line here and a really long line here at the end, if you would somehow compromise and make your line lengths about the same during the whole project, perhaps it could have been a little bit more efficient.
Q. Well, Renda never had problems with pumping all the way to the backside. They just brought in an additional booster; isn't that true?
A. That's true.
Q. So, when they needed to pump to the far reaches, they just added a booster and they could pump to the far reaches, right?
A. It was -- it was struggling. The dredge was struggling. The material, by the time it ran through 25,000 linear feet of pipeline, there wasn't much clay ball left. It had disintegrated down to a much smaller pea size almost in some cases.
Q. Is there anything in the specifications that talk about how long the line lengths can be, maximum amount?

A. There's nothing that states how long they can be. There's nothing that states how big the dredge has to be, horsepower, anything.

Q. Okay. Now, you understand that the length of the hydraulic levees as represented in the bid solicitation materials was 13,700 linear feet, right?

A. Correct.

Q. Since you're an engineer -- I think I can give you a calculator to help you out. An Engineering News Record calculator. Now, if you want some scratch paper, I'll give you some scratch paper, too. But if you've got 13,700 linear feet of levee that's required to be placed hydraulically. Assume that. Okay?

A. Okay.

Q. And also assume that the neat line is 35 cubic yards. So, if you multiply the two of those, it's going to give you the amount of cubic yardage required for all of the hydraulically placed levees in terms of what the neat line is, right?

A. Correct.

Q. So, go ahead and multiply.

A. Got it.

Q. And what is the figure you came up?

A. I came up with 479,500 cubic yards.

Q. Cubic yards. Okay. And we can just approximate

this. But at a two to one ratio, that would require approximately a little less than a million cubic yards, right?

A. Correct.

Q. And at three to one, it would be a little less than 1.5 cubic yards?

A. Right.

Q. And at a four to one, it would be 1,918,000 --

A. Just under 2 million.

Q. -- cubic yards, right?

A. Correct.

Q. Do you have any idea how much clay and other suitable materials the Corps of Engineers anticipated would be available from the channel?

A. No. I don't recall.

Q. Do you have any idea how much clay and other suitable materials the Corps of Engineers designers anticipated would actually be required to construct that 13,700 linear feet of levee?

A. I was not privy to the calculations.

Q. Do you know how much clay and other suitable materials Renda Marine actually pumped for placement on the hydraulically placed levees?

A. No. I have the numbers, but I would have to go back and figure it out.

Q. It was pretty close to 1.9 million cubic yards,

wasn't it?

A. I know they pumped a gross of over three and a half, and I do remember a percentage of close to 65 percent of suitable material.

Q. So, if you took three and a half million times 65 percent, what do you get?

A. 2.275 million.

Q. Okay. Does that sound about right to you as to how much Renda -- suitable materials Renda put out there?

A. In a ballpark, you know, quick calculation, that sounds reasonable.

Q. Okay. Now, do you remember -- we talked before we broke for lunch about at one point in time the Corps in general and Mr. McClenan, in particular, allowed Renda to build on top of the existing levee.

A. On the north side.

Q. And I think that occurred -- did you say 900 feet or 1600 feet?

A. It was about 900 to a thousand feet.

Q. Okay. How come that stopped? Why did the Corps tell Renda not to do that anymore?

A. I believe I recall that there -- that the Joint Venture had much to say about that.

Q. And what did the Joint Venture have to say?

A. They objected into allowing them -- allowing the

contractor to build on top of the levee. They wanted the -- the Joint Venture wanted the levee built in accordance with the drawings and the contract.

Q. Well, on that north side, that's where the foundations were the softest of all, wasn't it?

A. Correct.

Q. I mean, that's where it was hardest to build the new levee, right?

A. Right.

Q. Was the contractor having some success building on top of the existing levee?

A. Yes, there was.

Q. So, how come the Corps listened to the Joint Venture? I'm just trying to figure this out in my own mind.

A. I can't answer that. I don't know.

Q. 20/20 hindsight, do you think it would have been better if the contractor continued to build on top of the existing levee?

MR. PETTY: Object to the form of the question.

Q. (BY MR. ERIKSON) You're free to answer.

A. This is an opinion.

Q. Give me your opinion.

A. I would have liked to have seen Mr. McClenan be a little bit more adamant in allowing the north -- especially the north levee to continue to be constructed, the new levee

on top of the existing for that entire north reach.

Q. And you think the contractor and the Corps would have ended up with a better result?

A. Better than what resulted, yes.

Q. And it would have taken less material, right?

A. Absolutely.

Q. Because if you are building on top of the existing levee, then however big the existing levee gets subtracted out of the neat line, right?

A. Correct.

Q. And less material would have been lost to soft foundations, right?

A. True.

Q. So, Mr. Bowman's concerns about the lack of sufficient materials, clay to be able to build the levees would have been resolved in part by that, right?

A. Sure. I mean, the best response -- I guess, the best result would have been to hydraulically pump that north levee. Since that didn't occur, placing it mechanically on top of the existing levee was the second best alternative to hydraulically placing it.

Q. Okay. Now, you should have -- let me see here. The court reporter is going to hit you if you get these out of order. Here's the Few exhibits. If you don't mind keeping those together.

Turn to Tim Few Exhibit No. 3. And Tim Few Exhibit No. 3 is an E-mail from Mr. Few to Mr. Sutcliffe carbon copy to you, dated February 16, 1999, right?

A. Correct.

Q. And he talks about you and Mr. Few having gone to Lost Lake to look at the ongoing levee construction. Do you see that?

A. Correct.

Q. And in particular, some of the items of discussion involve the spillbox construction, right?

A. Right.

Q. Down at the tail bottom there's lessons learned and the first lesson is "When we put a spillbox in the interior of a disposal area containing deep soft dredge material, will need to look at 'mucking out' the foundation for the access dike, as well as the box location, then preloading to final grade throughout, to displace additional bad foundation material, and promote consolidation of the remaining material." Do you agree with that lesson learned?

A. Yes, I do.

Q. That that's a -- that's one resolution to the soft foundation problem, right?

A. In that particular area.

Q. Right.

A. Yeah.

Q. In actuality, that could have been done in any of the areas where the contractor was having soft foundation problems, right?

A. Well, it would be very difficult to muck out the entire perimeter of soft foundation on 21,000 linear feet of levee. That would not be economically feasible. But in certain areas where you're building a spillbox, I agree.

Q. Okay. Then Item No. 2 for lessons learned he indicates, "In the future, we should probably show the training dike template with 25- to 40-foot wide berms since this is usually required in these types of foundations in old disposal areas," right? Do you see that?

A. I see that.

Q. Now, the reason for a 25- to 40-foot wide berm is to accommodate the soft foundations, right?

A. That's correct.

Q. And the levee has a better chance of standing up if it has a 25- to 40-foot berm?

A. Correct.

Q. Right?

A. Right. A wider footprint.

Q. And then one thing that the berm does is it tends to be a counterweight over the soft foundation materials for the weight that the new levee is going to place on the soft foundation materials, right?

A. Correct.
Q. And that also tends to lend some structural stability to the new levee?
A. Correct.
Q. Now, talking about Affolter. Do you remember that Affolter, after Renda left the Upper Bayou project, came back as a subcontractor to Great Lakes and did some additional work on the levees at Lost Lake?
A. Yes. I'm aware.
Q. Have you been out to see the work that Affolter did?
A. No. I have not.
Q. Let me show you some photographs. These were taken on April 11, 2003. And I'll represent to you that they occur in areas where Affolter worked on the levees at Lost Lake. I'm going to show you Rozsypal Exhibit No. 11, Rozsypal Exhibit No. 12, Rozsypal Exhibit No. 13, and Rozsypal Exhibit No. 14. Do you see those?
A. Uh-huh.
Q. And you recognize Oscar Renda standing in Rozsypal Exhibit No. 12. He's standing in a crevice in the levee, right?
A. Right.
Q. Now, the pictures depicted in Rozsypal Exhibit Nos. 11, 12, 13, and 14 show a failed levee, right?
A. Yeah. It shows a -- yeah, some fissures and some

cracks and some sliding.

Q. And I'm going to show you Benero Exhibit No. 1. The top photograph also shows a failed levee, right?

A. Yes.

Q. And there happens to be a gentleman standing in a crevice kind of like what Mr. Renda is doing in Rozsypal Exhibit No. 12, right?

A. Sure.

Q. Were you aware that Affolter was going to go do work on the levees at Lost Lake after Renda Marine disappeared or finished with the project?

A. I wasn't aware until I heard that they were going to work as a sub for Great Lakes.

Q. Were you the project manager for any aspect of the additional work on the levees at Lost Lake?

A. No. Because this comes under the Mid Bayou contract.

Q. Okay. Who is the project engineer for that?

A. That's Dale Williams.

Q. Okay. Now, the Mid Bayou, is that a bay area office project?

A. Yes, it is.

Q. You said Dale Williams?

A. Yes.

Q. He works down the hall from you or in the same

office as you?

A. Yes. He's right down the same aisle as I am.

Q. Okay. All right. Turn to -- turn to Tim Few Exhibit No. 6. Now, Tim Few Exhibit No. 6 is another E-mail from Tim Few and the top one is to you, right?

A. Right.

Q. And apparently there was a lower one that mentions you, Ishaq Syed or something like that.

A. Yes. He was a geotechnical engineer at the time.

Q. Okay. The bottom E-mail says, "Eric Russek said that the designed training levee was continuously sinking into the soft foundation conditions and the contractor wanted to increase the levee base to 50 feet both sides of the centerline." Do you see that?

A. I see that.

Q. Mr. Syed, S-Y-E-D, accurately quoted you; is that correct?

A. That's correct.

Q. This was a training levee that was near the new spillbox?

A. Correct.

Q. Now, this training levee continuously sinking, what did you observe? How high did they build it, and how quickly did it sink?

A. Well, this was when Affolter was out there, they

were constructing.

Q. Right.

A. They were -- this was the south training levee, which they were having more problem with. They would try to bring it up to grade and then they would get off of it and then it would settle. It would displace the soft foundation.

Q. How quickly?

A. Within a week.

Q. And then how much would it settle?

A. It would settle anywhere from 2 to 4 feet. So, they would allow it to stabilize. They would watch it and, you know, make sure that it was okay to get on it again and then they would bring in more material and they would bring it up maybe a foot or 2 and then they let that sit and then see how far it would settle. So, eventually over a period of time after several iterations, they were able to get the levee up to about elevation 28.

Q. But that's only after they increased the levee base to 50 feet and did some other stuff?

A. After adding the berm.

Q. Okay. What I'm interested in is what did you see that prompted these changes in design? That the contractor would build and then it would sink and then build and sink? What?

A. Right. I mean, he was just spinning his wheels.