So, I brought this to the geotechnical folks' attention and said, "Guys, we need to do something here because, you know, this is not working. So, we need to do something a little bit different here so we can attain our elevation or do we accept a lower elevation?" So, I gave him the options. So, they came up with the 50-foot berms and, you know, placing the material in 1-foot lifts rather than 4-foot lifts and it worked.

Q. I think under the specifications for the mechanically constructed levees, it talks about placing new lifts in 18-inch lifts. Do you recall that?

A. I recall that. But for one particular reason, they tried to place these training levees right next to the spillbox. They tried to place it all at once and that didn't work.

Q. Maybe they were trying to overload the foundation --

A. Perhaps.

Q. -- and get it all out of the way at once.

A. Perhaps.

Q. Now, the addition of these berms, did that seem to help?

A. Yes, it did.

Q. Now, if Renda would have been instructed to construct berms along the levees, the perimeter levees that Renda was constructing, do you think that would have helped?

A. Quite possibly.
Q. So, how come Renda wasn't instructed to construct berms?
A. Well, perhaps we had material quantity situation where we didn't have the material to build the berms.
Q. I'm not asking you to guess. But do you know?
A. I don't know. I mean, that would be -- that would be an observation.
Q. Would that be a logical resolution to the problem, that just instruct Renda --
A. It's one logical resolution.
Q. Okay. Can you think of any other logical resolutions to the problems that Renda was having constructing the perimeter levees in the areas for the hydraulically constructed levees?
A. Perhaps moving the levees closer to the existing levees and building on top of more of the existing levees. You know, say, coming off of the existing levee and building to the inside may have been a solution.
Q. Do you remember at one point Mr. Bowman proposing that instead of a three to one slope, that he -- that Renda construct the levees on a two to one slope to stay out of the sidecast borrow areas?
A. I do recall that. However, the angle of repose of the material would not have allowed us to construct on such a

steep angle.
Q. But staying out of the sidecast borrow areas would have been a good idea, right?
A. If we didn't have enough material to displace that -- displace the muck that was in there, then perhaps that would have been another reasonable solution.
Q. Can you think of any other reasonable solutions?
A. Other than those two, you know, building closer on top of the levee --
Q. Now, both of those Renda asked to be able to do, right?
A. I don't recall. I mean, there was many, many pieces of correspondence from Mr. Bowman.
Q. You're right. There certainly was. Now, turn to your Benero stack.
A. Got it.
Q. And I want you to turn to Benero Exhibit No. 5. Now, Benero Exhibit No. 5 is a letter from Steve Bowman to your boss, Mr. McClenan, dated August 4, 2000. Do you see that?
A. I see that.
Q. And it's a request for acceptance of the hydraulically placed levee between Stations 97+00 and 40+00. Do you see that?
A. I see that.

Q. Now, you understand or you can appreciate that the contractor would want a fairly quick acceptance because that levee tends to sink everyday, right?

A. True.

Q. Now, when Mr. McClenan would get a letter like this, I assume he would give it to you, right?

A. Right.

Q. And then when you got a letter like this, what would you do with it?

A. I would go out and take a look at it -- at the levee and, you know, confirm. And, of course, with Mr. McClenan being the administrative contracting officer, he would have to sign the letter approving such a request.

Q. Was there ever any permission given to the contractor for the contractor to undertake its own surveys to show what the levee template looked like for acceptance by the Government?

A. I don't believe that permission was really needed.

Q. Well, was there ever any agreement with Renda Marine on the Upper Bayou project that Renda Marine could go undertake its own surveys of its levee construction and the Government would accept those surveys?

A. I don't recall that there was. However, I do recall that on more than one occasion on the dredging sections, the contractor's dredging sections were accepted -- this was

during the time of Eddie Fisher -- when perhaps we couldn't have gotten a crew out within a reasonable amount of time and we did accept the contractor's hydrographic surveys. So, the same -- by the same token, that could also go for the levees.

Q. Okay. Do you ever recall anybody telling Renda Marine that if Renda Marine would have got surveyors out there, the Government would have considered accepting those surveys?

A. I don't recall that. But that -- I would not have had an objection to that and I doubt Mr. McClenan would have either.

Q. Okay. Turn to Benero Exhibit No. 6. Benero Exhibit No. 6 is a letter from Mr. Bowman to Mr. McClenan dated August 18, 2000, still requesting acceptance of the levee from Station 40+00 to 97+00, right?

A. Right.

Q. So, apparently in the two weeks that passed since August 4th, it hadn't yet been accepted?

A. That's -- by the letters, that's what it appears.

Q. Turn to Benero Exhibit No. 8. Benero Exhibit No. 8 is a letter from Mr. Bowman to Mr. McClenan dated August 18, 2000. Do you see that?

A. I see that.

Q. One of the issues we talked about earlier today was realignment of the levee in the west Lost Lake placement area.

Do you recall that?
A. I recall.
Q. And this is the one where the levee just started going out in the middle of no-man's-land and the Government instructed Renda to build closer to the existing levee, right?
A. Correct.
Q. Now, in the first paragraph, Mr. Bowman notes that on July 28, 2000, Renda Marine notified you of levee alignment problems on the west side of the Lost Lake placement area. And then Mr. Bowman writes, "Following the specified levee alignment, mud waves were being formed which threatened to top the old levee. Renda personnel met with you, Eric Russek and Tim Few on August 7th at the placement area. At this meeting, the Government verbally agreed to realign the levee such that the toe of the new levee would be against the existing old levee." Do you see that?
A. I see that.
Q. Do you agree with Mr. Bowman's statements that that's what happened?
A. Yes.
Q. And that would work out for a more structurally sound new levee, right?
A. Requiring less material.
Q. And also requiring less material. You're agreeing with me, right?

A. Yes.
Q. Do you remember attending a meeting where you were there and Tim Few and Leon Hrabovsky and Yogi Barron and Steve Bowman and Barry Smith in about October, 2000, at the Galveston office where Mr. Hrabovsky voiced an opinion as to why it is the new levees wouldn't stand?
A. I remember the meeting, but I don't recall his statement.
Q. Do you remember Mr. Hrabovsky making a statement to the effect that the new levees wouldn't stand because of the old sidecast borrow areas?
A. Yeah. I do recall that.
Q. Now, do you recall that Mr. Bowman became concerned about these sidecast borrow areas at that time?
A. Concerned is very mild. He was very livid, let's put it that way.
Q. Now, was he livid because it appeared he didn't know anything about that before?
A. That's what it appeared.
Q. Do you recall Mr. Hrabovsky stating that Mr. Hrabovsky had discussed the sidecast borrow issue with Mr. Few prior to the award of the contract to Renda Marine?
A. Yes, I do.
Q. What did Mr. Hrabovsky say about that?
A. I don't recall specifically.

Q. But you recall that he made a statement like that?

A. But he did make a statement.

Q. Do you recall Mr. Hrabovsky stating at that meeting that Mr. Hrabovsky had been the project manager when T.L. James Dredging Company was creating those sidecast borrow areas?

A. Yes, I do.

Q. Do you recall Mr. Hrabovsky stating that at the time that T.L. James was creating those sidecast borrow areas that T.L. James probably didn't maintain a 50-foot gap between the borrow area and the existing levee?

A. I'm not familiar with the specifics; but I mean, considering the way he was speaking about it, I wouldn't doubt it.

Q. And you know from your own personal knowledge, I think you testified that you saw between 25 and 50 feet away from the existing --

A. Correct.

Q. -- toe was the borrow areas?

A. Correct.

Q. Now, back to Benero Exhibit No. 8. The tail end of the very first paragraph says, "At this time, we are awaiting written confirmation of our instructions and changes to the drawings. Please advise us of the status in this matter."

Do you understand that Renda was wishing

something formally from the Government to confirm that that's how the change was going to happen, right?

A. Yes. I understand.

Q. And you agree that it was a change to the drawings, right?

A. Yes. Yes.

Q. Now, at the bottom of the first page, Mr. Bowman talks about the soft foundations, right?

A. Right.

Q. And at the top of the second page, he writes, "Renda expected and planned for displacement of a reasonable amount of soft materials in its bid for the work. However, the contractor could not have anticipated the sheer magnitude of displaced material, which has caused mud waves and prevented the efficient and economic use of equipment and personnel placing good, available clay material." Do you see that?

A. I see that.

Q. When you saw this letter, did you consider writing back or preparing something for Mr. McClenan to write back to Renda to advise them of the sidecast borrow areas possibly being a cause for where all this good material was going?

A. Yes.

Q. And what happened? Did Mr. McClenan reject your suggestion?

A. No, he did not. However, since we had to coordinate

with the Joint Venture, they objected to much of what I had written.

Q. So, you wrote a draft letter that would have pointed out that problem with the sidecast borrow area?

A. Correct.

Q. And it got vetoed by the Joint Venture?

A. And eventually vetoed completely.

Q. It got what? First it got changed and then it got vetoed? What?

A. Sending the letter got vetoed.

Q. Okay. How quickly did you prepare -- do you generally prepare draft letters for Mr. McClenan?

A. Yes.

Q. When you get a letter like this one, this August 18, 2000 letter, how quickly do you prepare a draft response?

A. First off, I'll make copies of this and provide it to the usual people that I consulted with, get their opinion. And, you know, based on their information, I would take that and draft up a letter. And then Mr. McClenan would take this and would coordinate with the Joint Venture by either E-mail or meeting or whatever and have other discussions about it.

Q. Who were the usual suspects that you coordinated with?

A. Suspects --

Q. You said there was a usual group of people that when

you got a letter like this you coordinated with.

A. Tim Few, geotech, office of counsel, contracting, Mr. Benero, and Johnny Rozsypal.

Q. Okay. Why Johnny Rozsypal?

A. Johnny had -- has a lot of experience. I mean, he's done dredging all his career and he has a lot of knowledge of, you know, all the placement areas. And so, I relied on his expertise and experience.

Q. Okay. So, in your group, you didn't include the Joint Venture in the people you coordinated with?

A. No, I didn't.

Q. And then when you prepared it for Mr. McClenan, then he would involve the Joint Venture?

A. Correct.

Q. So, how quickly would you prepare a response after you did your coordination and collected the information you needed from your group?

A. I mean, it wouldn't take -- it would take maybe a week or so to get various information back from the people that I would coordinate directly. And, you know, it wouldn't take but a day or two to compile that information into a draft letter for Mr. McClenan's signature. But what took the longest time was coordination with the Joint Venture.

Q. Okay. So, in your draft response back to Mr. Bowman, you were going to tell Mr. Bowman about the

sidecast borrow areas, right?

A. We had -- I forget how it was worded but that was a paragraph that I had taken specifically from Tim Few from what he had written and I used it in its entirety. And he had explained perhaps the historical -- you know, how the levees were constructed and I don't know if he used borrow pits per se but, you know, he did explain that the material was used from within the placement area to construct the levees.

Q. Okay. So, that October, 2000, meeting where Mr. Hrabovsky was there and advised Mr. Bowman, that information could have gotten passed a few months earlier if you would have been allowed to have your version of a response to Benero Exhibit No. 8?

A. Correct.

Q. Did you ever understand any reason why the Joint Venture didn't want that information passed on to Renda Marine?

A. That particular information, I didn't -- I don't know why.

Q. Turn over to Benero Exhibit No. 12. By the way, before we get to there, would you like a break?

A. Yeah. Sure.

MR. ERIKSON: Let's take about five minutes.

(Recess taken)

Q. (BY MR. ERIKSON) All right. Benero Exhibit No. 12

is a letter from Steve Bowman to Mike McClenan dated August 23, 2000, concerning differing site condition, rubble at the south ferry landing. Do you see that?

A. I see that.

Q. Did you ever see the rubble at the south ferry landing that Mr. Bowman is complaining about?

A. I never saw it come out of the dredge pipe. Now, granted there -- in that particular area, there is erosion protection up on the shoreline. But that's a considerable distance away from the channel. So, that's all I can say about that. But as far as seeing rubble at the -- coming through the dredge pipeline and out at the placement area, no, I never saw any concrete, rubble, whatever you want to call it.

Q. You wouldn't expect that the contractor would be dredging up man-made shore protection, do you?

A. No.

Q. Because somebody might get kind of mad if they -- if the Government's contractor was removing their man-made shore protection, right?

A. Especially there at the state ferry.

Q. Because if there's -- if there's riprap or rubble there, it's there for a reason, to protect against erosion, right?

A. Right. Correct.

Q. With all those passing ships and the wave wash from the ships, it tends to erode the shore, right?

A. Correct.

Q. Now, as a general rule, the Government didn't want Renda Marine to remove the man-made shore protection, right?

A. Correct.

Q. If Renda encountered rubble or other man-made shore protection, the Government wanted Renda to leave it alone, right?

A. Right.

Q. But Renda wouldn't know it existed until Renda encountered it unless it was shown in the drawings or in the plans -- drawings or in the specifications, right?

A. Right.

Q. Did you know that there was rubble or other man-made shore protection at the south ferry landing prior to Renda encountering it?

A. No, I didn't.

Q. Now, Mr. McClenan, when he testified, said that he expected that if Renda ran into it, Renda would deposit the man-made rubble or shore protection on a dock or on the bank or some place to let the Government look at it. I'm just representing to you that's what he said.

A. Okay.

Q. Would you have expected that in a case where Renda

ran into rubble or other man-made shore protection, that Renda would gather it all and deposit it on a barge or on shore so the Government can look at it?

A. Well, that goes back to what I said earlier. I would have expected chunks of concrete or man-made rubble or something to be deposited in the placement area and to -- for us to take a look at. But not gather it up and put it on a barge but for it to have been deposited wherever the discharge pipe was at the time and have it just gathered in one particular area.

Q. Well, you -- you're assuming that the size of the rubble or other man-made shore protection is small enough that it's going to be able to fit through a 24-inch pipe, right?

A. Or it got chewed up.

Q. Or maybe it got chewed up.

A. Portions of it.

Q. When a subsurface obstruction like this is encountered by the contractor, isn't the Government supposed to hire a diver or do something to go check and see what's there?

A. I know some hydrographic surveys were taken to see if we could -- you know, to try to find this. And I'm not sure if we ever were successful to do that.

Q. Well, let me ask you this: If Renda encountered rubble at the south ferry landing and provided notice of it as

being a differing site condition and was delayed or its operations disrupted, would you consider that to be a differing site condition?

MR. PETTY: Objection to the form of the question. Go ahead.

A. Please repeat.

Q. (BY MR. ERIKSON) If Renda encountered rubble or other man-made shore protection at the south ferry landing and it disrupted or delayed Renda's operations and Renda provided the Government notice of that condition, would you expect that that would be a valid differing site condition?

MR. PETTY: Objection to the form of the question. Go ahead.

A. It could be construed as a differing site condition if it was not spelled out sufficiently in the plans or specs. Now, I know in the specs there is a paragraph that does caution the contractor that there is some rubble or erosion protection, however you want to call it, in a particular area which corresponds to the south ferry landing. However, you know, it's very generic. But there is a caution nevertheless. And unfortunately, the drawings do not detail the south ferry landing area sufficiently or show the erosion protection.

Q. (BY MR. ERIKSON) Actually the drawings don't show the south ferry landing at all, do they?

A. Well, I mean C-14 of Rozsypal No. 2, I mean, it does

show, you know, State Highway 134 coming up and the landing is right there. And this 470 to 472 is right here at the ferry. And here's the south ferry landing. Here's the north ferry landing.

Q. Now, where in the specifications does it caution the contractor at Station 472 or wherever it is that there's rubble at the south ferry landing?

A. It's in paragraph -- Rozsypal No. 1, Paragraph 3.5.2, that paragraph.

Q. Okay. It says, "The contractor shall be required to use caution when cutting the side slopes and the channel from Station 470+00 to Station 473+00." And you're saying that's this area here by the south ferry landing?

A. Correct.

Q. Okay. Does that say the north side or the south side?

A. It doesn't distinguish.

Q. Now, if you look in --

A. It says, "Excessive cutting outside the side slopes and grades in these reaches of the channel may cause damage to the existing structures along the channel."

Q. Now, if you look on Drawing C-3, it shows the area where the north and south ferry landings are, right?

A. Unfortunately the south ferry landing is cut off here by the text.

Q. But it shows where they should be?
A. Right. Right.
Q. And the south ferry landing is in Section 1?
A. Correct.
Q. Dredge Section 1, right?
A. Correct.
Q. And then there's a circle and it refers the reader to Drawing C-6, right --
A. Right.
Q. -- for a detail?
A. Right.
Q. And if you go to C-6, it's a blow up of that area?
A. Right.
Q. And it shows the north ferry landing?
A. Right.
Q. With a whole bunch of riprap and other soundings?
A. Right.
Q. Now, is there any indication that there's any rubble at the south ferry landing?
A. Not on Drawing C-6.
Q. But there is indication that there's rubble at the north ferry landing, right?
A. Correct.
Q. To turn Benero Exhibit 15, sir. Benero Exhibit 15 is a letter from Steve Bowman to Mr. McClenan dated

September 22, 2000. Do you see that?

A. I see that.

Q. And discusses a number of things including differing site condition issues, right?

A. Right.

Q. Now, over on the bottom of Page 2, it talks about the levee alignment problems on the west side, right?

A. Correct.

Q. It says generally located in the vicinity of Station 170+00?

A. Right.

Q. On Page 3 at the top, Mr. Bowman writes that "Renda's July 28, 2000 letter notified the Government of this changed condition." Then he writes, "As the levees on the west side of the placement area were being hydraulically constructed, it was noted by Renda field personnel that the levee alignment in the field did not correspond with the drawings. As a result, the newly constructed levee diverged from the existing levee to the point that displaced material between the levees threatened to 'top' the existing levee." First off, do you recall that happening?

A. Yes, I do.

Q. Okay. "At the request of Renda, the Government's geotechnical engineer and area engineer met with Renda personnel at the site on August 7, 2000, to discuss

discrepancies between the actual location of the existing levees from that shown on the drawings, apparent survey discrepancies, very soft and unstable levee foundation materials and material displacement problems between the new and existing levees."

Now, do you recall that as the old levee existed it was in a different location than that shown on the drawings and Renda was running into a problem as a result?

A. I don't recall the existing levee being in a different location. But I do -- I do know that the new levee diverged from the existing and was heading out toward the soft foundation to the interior of the placement area.

Q. The next sentence Mr. Bowman writes, "At this meeting, the Government verbally instructed Renda that the intent of the new levee design was that the outside toe of the hydraulically constructed levees should tie into the inside top of the slope of the existing levees, while specified levee slopes should be maintained." Now, is that true? Is that what the Government told Renda?

A. That's true. And that's where we wanted the contractor to -- where it had divulged, we wanted the contractor to start bringing the levee back in toward the existing levee.

Q. Turn to Benero Exhibit 18.

(Exhibit 6 marked)

Q. (BY MR. ERIKSON) Now, the court reporter has marked for identification as Russek No. 6 some handwritten notes. At the top it says "Lost Lake from HVJ" and it's dated October 30, 1997. And it has a Bates stamp REM12100. First off, have you ever seen that before?

A. No, I haven't.

Q. Is any of the handwriting on that yours?

A. No.

Q. Do you recognize any of the handwriting?

A. No, I don't.

Q. Do you know Ira Brotman's handwriting?

A. I don't recall because he's been gone for some time now.

Q. He's on the East Coast some place right now, right?

A. Yes.

Q. Okay. Back to Benero Exhibit 18. Do you see Benero Exhibit 18 is a letter from Mr. Bowman to Mr. McClenan dated October 18, 2000, with a carbon copy to you, right?

A. Correct.

Q. And this concerns a notice of changed conditions concerning the HL&P new tower, the second tower, right?

A. Correct.

Q. Now, when did you learn that HL&P was constructing a second tower out at Lost Lake?

A. When this letter showed up.

Q. Now, the -- you knew that there was one tower by HL&P that's shown on the drawings, right?

A. Right.

Q. And I guess it was a surprise to you that HL&P was going to construct a second tower out at Lost Lake, right?

A. There was no coordination between HL&P and the Corps.

Q. And if it was a surprise to you, you would expect it to be a surprise to the contractor, right?

A. Absolutely.

Q. Now, did you understand when you got Benero Exhibit No. 18 that Renda was going to have to move its discharge pipe?

A. Yes.

Q. Is that Renda's fault in any way, that Renda had to move its discharge pipe?

A. No.

Q. Now, Renda indicates that in an effort to avoid delays to the project, that Renda accommodated HL&P and moved Renda's discharge pipe. Do you understand that's what happened?

A. Right.

Q. Do you blame Renda in any way for doing that?

A. Not at all.

Q. Was that a faster, more expeditious resolution of

the situation?

A. Sure.

Q. If Renda had written to the Government to ask for permission to move its pipe, the Government would have had to coordinate with the Joint Venture, right?

A. Absolutely.

Q. And sometimes that takes months?

A. Yes.

Q. Could have made HL&P pretty mad by then, huh?

A. They would have gone and done their thing and been out of the way.

Q. Do you think Renda handled that situation appropriately?

A. I think that was fine.

Q. Turn to Benero Exhibit No. 19. Benero Exhibit No. 19 is a letter from Steve Bowman to Mike McClenan dated October 20, 2000. Do you see that?

A. Yes.

Q. And this letter concerns, among other things, the differing site condition for heavy red clay discovered in Section No. 7, right?

A. Right.

Q. Now, when this letter came in and Mr. McClenan gave you a copy, did you, then, launch an investigation of that heavy red clay?

A. Yeah.

Q. Did you go take soil borings?

A. We contracted to take three more soil borings.

Q. Now, this is not the flare area.

A. Excuse me. I'm sorry.

Q. The flare area in May of 2000 the Corps arranged for three additional soil borings?

A. Right. Right. This is on the north side of the channel. Yeah. I do remember consulting with our geotech folks, Tim Few again.

Q. Did you arrange for soil borings or anything to investigate this?

A. We didn't -- no. We didn't do any additional soil borings.

Q. Why not, sir?

A. I don't recall.

Q. Did you recommend that soil borings be done there?

A. I pretty much left that up to Tim Few, you know, for that decision because the soil boring contractor was through the geotechnical section.

Q. Now, you recall that the Government wrote back to Renda and disclaimed this Section 7 heavy red clay as a differing site condition. Do you recall that happening?

A. Yeah. I do recall.

Q. And then do you recall Renda depositing this

Section 7 heavy red clay at about Station 117 on the project?
A. Yes.
Q. Just piling it up there?
A. Uh-huh.
Q. And Mr. Bowman wrote a letter -- and we may see it in a minute -- where he said he's deposited the nonexistent heavy red clay for the Government to inspect?
A. I vaguely remember something like that, yes.
Q. Did the Government ever go do any tests, any analyses, any investigation whatsoever of the material that Mr. Bowman had piled up at about Station 117 so the Government could inspect it?
A. I know surveys were taken of the material.
Q. Surveys of the size?
A. Of the size.
Q. How about an investigation of the stiffness?
A. If that was done, I wasn't privy to that.
Q. Well, Mr. Bowman obviously wasn't complaining about the size of the stuff, right?
A. Right.
Q. He was complaining about the stiffness, right?
A. Yeah.
Q. Do you agree?
A. Yeah. In his letter, sure.
Q. Because the stiffer the material, the harder it is

to dig, right?

A. Sure.

Q. Now, over on the second page in the middle paragraph, there's a changed condition, failure of the Lost Lake levee between Station Nos. 40+00 and 15+00. Do you see that?

A. Right.

Q. Do you remember previously Renda had written trying to get acceptance of the levee from 97+00 down to 40+00?

A. Correct.

Q. And this is near that area but it's between 40+00 and 15+00.

A. Uh-huh.

Q. Now, Mr. Bowman writes that "Renda has been building the levee to an elevation of 25 feet for the past weeks on the north side. During this time, Renda has experienced minor failures (sinking or sagging) of the levee up to the 25-foot elevation, which have been repaired as required."

First off, that is something that you would expect to happen, right?

A. Right.

Q. There would be minor sinking or sagging?

A. Sure.

Q. And that's just something that's normal as the soft foundations are pushed out?

A. Correct.
Q. Creating mud waves?
A. Correct.
Q. Then he writes, "Levee failures began to increase in number and magnitude approximately two weeks ago as clay material was loaded above the 25-foot elevation. On Wednesday, October 18, 2000, the levee between Station Nos. 40+00 through 15+00 began failing catastrophically, sagging and dropping between 3 feet and 5 feet below the existing elevation. As of today, the levee continues to fail."
First off, when this letter came in, did you go out and investigate that situation?
A. Yes. Yes. We took a look.
Q. Did you verify what Mr. Bowman was writing about the condition of the levees?
A. Yes, we did. And since they were loading it -- loading the levee above the 25-foot elevation, this was expected. It's the same process that the levee goes through regardless to whether you load it mechanically or hydraulically. This is -- this is a lot more pronounced because you're loading it slowly. So, the failure seems much more catastrophic. But the same mechanism, the same failure mechanism occurs when you load a levee hydraulically.
Q. Okay. Now, this levee at this point in time was being built hydraulically, right?

A. No. This was being built mechanically.
Q. Mechanically?
A. Correct.
Q. Okay. I thought you testified before -- maybe I was mistaken but if you built it mechanically, you would expect less catastrophic failure --
A. Up to a point. Up to a point. You know, then it reaches -- then it reaches a certain elevation and it can vary from site to site. But once -- once a levee has reached its maximum support of that particular area, yes, it will fail, it will drop 3 to 5 feet. That's not uncommon.
Q. Okay. So, you're saying that's to be expected?
A. That's to be expected. It's just more pronounced, it's just more visible when you're doing it slowly mechanically versus with a dredge because of the sheer volume that you are putting.
Q. Okay. Did you write a letter back to or prepare a draft of a letter back to Mr. Bowman to say this is to be expected, this is normal, this is what is going to happen?
A. I recall a conference call with Mr. McClenan and Mr. Bowman and Mr. Few may have been there. But we told them that, you know, Paragraph No. 3, yes, expect this. You know, this -- and we tried to explain what I just said, you know, about the failure mechanism. You're -- you know, you're failing this levee slowly because you're building it

mechanically and not hydraulically.

Q. As that same paragraph continues or a little bit farther down in the paragraph, Mr. Bowman points out that Yogi Barron and Leon Hrabovsky had visited the site and that, quote, "The Joint Venture requested that Renda immediately notify the Government. Renda is continuing to build the levee from Station No. 15+00 through 0+00, located at the old overflow box. However, Renda has stopped work at the fail area of the levee awaiting instructions from the Government." Do you see that?

A. Yes.

Q. Now, you understood when you got this letter that Renda needed some instruction as to what to do, whether this is normal, unexpected conditions, just keep loading it, keep building it, keep doing what you're doing, or do something different, right?

A. Right.

Q. And the Joint Venture had basically requested or Mr. Bowman indicates that the Joint Venture had requested that Renda seek guidance from the Government, right?

A. Right.

Q. And that's to be expected. That's nothing out of the ordinary, right?

A. Right.

Q. So, you understand from this letter, Benero Exhibit

No. 19, that Renda was looking for instructions from the Government about what the heck to do with that failed area?

A. Right.

Q. Okay. Turn to Benero Exhibit No. 22. Benero Exhibit No. 22 is a letter from Steve Bowman to Mr. McClenan dated October 31, 2000, concerning a meeting held on October 23, 2000, right?

A. Correct.

Q. And you're noted in attendance at the meeting, right?

A. Right.

Q. And among other things, the things -- what was discussed was the catastrophic failure problem we just talked about in Benero Exhibit No. 19, right?

A. Correct.

Q. In the bottom paragraph on the first page of Benero Exhibit No. 22, Mr. Bowman writes, "The ensuing discussion centered mainly on the catastrophic failure of the new levee between Station Nos. 40+00 plus 15+00 on the north side of the Lost Lake area site." He gives some particulars about the failure and where the failure occurred.

Then over on the second page, Mr. Bowman writes, in the second paragraph, "During the meeting, the Joint Venture noted that the existing levees were built up or added to using a crane with a dragline rig working off of mats

with the work taking place as late as 1996." First off, do you agree with that?

A. Yeah. That corresponds to Mr. Hrabovsky's statement earlier.

Q. Matter of fact, it may have been Mr. Hrabovsky who was the Joint Venture person who did the noting, right?

A. I'm sure.

Q. The letter continues, "The dragline, located inside the existing levee and sitting on crane mats, excavated material inside the existing levee location creating a borrow pit or borrow area running continuously parallel to the existing levee." Do you recall Mr. Hrabovsky talking about that?

A. Yes, I do.

Q. And I think you observed that exact event when you went out to Lost Lake, right?

A. Yes.

Q. "This borrow area was then used to build up or add to the existing levees. Although Tim Few, P.E., noted that a 50 feet minimum distance was specified and required by the Government to be maintained from the inside toe of the levee to the beginning of the borrow area, the Joint Venture seriously doubted that the 50 feet setback limit was closely monitored. The Joint Venture stated that they had discussed potential borrow area problems with the Government prior to

bidding the project. The Joint Venture's hypothesis appears reliable since crane mats are typically 20 feet wide. The new shear line, located approximately 20 feet from the toe of the existing levee, corresponds with the general size of crane mats and what appears to be the leading edge of the existing borrow area." Do you see that?

A. Yes.

Q. Now, did you think about writing back to or preparing a letter back to Mr. Bowman about the borrow areas at this point in time?

A. Yes. In fact, I think this corresponds back to a previous exhibit where I had tried to prepare something but was vetoed.

Q. Okay. Did you now try to prepare something else or did it get vetoed again or what happened?

A. I don't think I -- no. I did not pursue anything else because I already knew what the answer was going to be.

Q. The answer was going to be a veto?

A. Exactly.

Q. You didn't expect that the Joint Venture was going to change its stripes?

A. No, not at all.

Q. Now, as we go through these documents, we're going to see again and again that Renda requested some direction and guidance about what the heck to do. They don't have enough

clay material to build levees, the levees they're trying to build are failing. Renda suggests doing certain things. Did you consider providing some guidance to Renda as to what they ought to do?

A. Yes, I did.

Q. Now, was that -- your thoughts about providing some guidance, was that, again, vetoed by the Joint Venture?

A. I mean, I did try and then when word got back that I had, then I was --

Q. Scolded?

A. Scolded is a good word.

Q. Scolded by whom?

A. Well, not from Mike McClenan but through Mike McClenan.

Q. So, who passed the scolding along to you?

A. Let's say certain people of the Joint Venture.

Q. Okay. So, the Joint Venture blew a fuse --

A. Absolutely.

Q. -- and lit up Mr. McClenan?

A. Yeah.

Q. And word got back to you that you needed to stop giving any guidance or direction to the contractor?

A. Yes.

Q. Why didn't the Joint Venture, near as you can tell, why didn't they want any guidance or direction going to the

contractor?

A. They wanted -- I mean, they thought that these plans and specs were it. They wanted the project built as shown and that's it.

Q. Do you agree that the project couldn't be built as shown?

A. There could have been some improvements in certain areas of the plans and specs.

Q. For example, with --

A. But going back to our partnering session, that -- the whole goal is when you have a problem, you try to first resolve it out in the field at the lowest level possible. And then if not there, then you step it up a level. And, you know, you try to avoid getting as many people involved in blowing the problem out of proportion. So, that was -- that was always my objective when I go out, was try to handle it at the field level. And then when that didn't work --

Q. And it didn't work because the Joint Venture vetoed that?

A. Right.

Q. Now, a lot of proposed resolutions could be done at no cost or minimal cost, right?

A. Sure.

Q. For example, if the contractor tells you that something just isn't working and you and the contractor put

your heads together and you can resolve it at a no cost or minimal cost change, right?

A. Absolutely. Right.

Q. I assume that you were an advocate for your position with Mr. McClenan; is that correct?

A. That's correct.

Q. Why wouldn't Mr. McClenan listen to you, as far as you know?

A. Mr. McClenan was being pressured from his boss.

Q. Who is Mr. McClenan's boss?

A. That would be Johnny Rozsypal. Who would -- who is on the project cooperation team and so is Mr. McClenan. And a lot of that pressure came from the Port as far as dollars. The Port didn't want to pay for anything above that set price. They wanted mods to be at a minimum, period. So, the pressure flowed downhill essentially.

Q. But you-all recognized going into this project that there were no guarantees that there was going to be sufficient materials to be able to accomplish what you wanted, right?

A. That's correct.

Q. It was -- Tim Few admitted to you that it was a guess as to whether or not there's going to be sufficient clay or other suitable materials to build the levees, right?

A. Yeah. Based on their estimates.

Q. But they didn't know whether their estimates were

going to be right or wrong; but if they were wrong, they were going to adjust during the course of the project?

A. I mean, their estimates were based on research that had been done in the past at other locations and adapted for this project. So, yes. We were on a learning curve. And, you know, this was the best that we had at the time.

Q. In the last paragraph on Page 2, Mr. Bowman wrote, "In order to correct the problems or at least diminish the affects of the levee failure, the Government recommended that Renda complete the levee up to a minimum elevation tying the remaining levees into both sides of the old drop outlet structure at the north side of the site." Do you see that?

A. Yes.

Q. And that's typically how the Government would resolve, in part, a problem like this, is that you tell the contractor construct it as high as you can and then we'll address it from there, right?

A. Right.

Q. Because the bottom line is you want to have a perimeter levee that's at least a certain number of feet high so you can contain material?

A. Correct.

Q. And then Mr. Bowman notes some changes that the Government requested. Do you see those, the three bullet points?

A. Yes.

Q. Do you agree that the Government had requested those changes?

A. The first bullet I'm not familiar with. The second bullet I agree with, and the third bullet I agree with.

Q. All right. The first bullet, you do agree that if the side slope were increased, that the footprint would then be less for the new levee?

A. Right. It would be steepened.

Q. And it would venture less into the borrow areas than the old method, right?

A. Right.

Q. So, that would be one possible resolution of the problem, right?

A. Possible. I would be concerned about the steepness.

Q. Okay.

A. And failures as a result thereof.

Q. Now, did you prepare any sort of response to this letter, draft response, other sort of response?

A. I don't remember.

Q. Do you remember coordinating with the Joint Venture about what the response should be?

A. Yes, I do. And their's would have been a very negative response.

Q. Even to the three bullet points that we talked about

to resolve the problem with the levee --

A. Perhaps with maybe the exception to those.

Q. Now, turn to Page No. 7 of Mr. Bowman's letter, Benero Exhibit No. 22. The first full paragraph on that page Mr. Bowman wrote, "Renda requests that the Government complete their requested ten-day evaluation and issue written direction" -- you see he's got "written direction" underlined and in bold, right?

A. Right.

Q. -- "no later than Friday, November 3, 2000, to confirm these design changes." Do you see that?

A. Yes.

Q. In the last paragraph, Mr. Bowman wrote, "Renda looks forward to a timely response by the Government. Renda reaffirms its intent to file a request for equitable adjustment." And then finally he follows with "If the information presented in this letter is incorrect or if we have misunderstood the Government's directives, Renda requests that you notify us immediately." Do you see that?

A. Yes.

Q. Now, that's a normal thing for a contractor to write, right?

A. Sure.

Q. And you've probably prepared letters that go to the contractor that say the same sort of thing, correct?

A. Right.

Q. If I've gotten something incorrect, please let me know, right?

A. Right.

Q. Do you recall writing back to Renda and advising that Renda had gotten something wrong in this letter?

A. No, I don't.

Q. Do you recall Mr. McClenan writing back or you preparing something for Mr. McClenan to write back to indicate that Renda got something wrong?

A. No, I don't.

Q. Turn to Benero No. 23. Benero 23 is a Steve Bowman letter to Mr. McClenan dated November 1, 2000. Do you see that?

A. Yes.

Q. And he, again, confirms some of the things that the Government had advised Renda, right?

A. Right.

Q. And among other things is the Government directed that the slope gradient of the new levee be changed from one vertical to three horizontal to one vertical to two horizontal to decrease the size of the new levee footprint?

A. Correct.

Q. And then if for some reason that wasn't the directive, then the Government would write back and indicate,

no, that's not it, right?
A. Right.
Q. And the last sentence in the first paragraph, Mr. Bowman is confirming a telephone conversation. He writes, "The Government was also reminded that in answer to the shear problems and the use of a dragline crane to recover lost clay material past the shear line was due by Friday, November 3, 2000." Do you see that?
A. Yes.
Q. So, I understand that Renda's looking for answers and then they're hopefully trying to get them by November 3, 2000, correct?
A. Correct.
Q. Now, at any -- around this time, October 31, November 1, around this time period, did you consider telling Renda that instead of the Government giving Renda answers, the Government was going to issue a show cause notice?
A. No.
Q. But you know that the Government, instead of giving answers, actually issued a show cause notice on November 6th, right?
A. Yes, I do.
Q. Turn to Benero Exhibit No. 24. And Benero Exhibit No. 24 is a letter from Mr. Bowman to Mr. McClenan dated November 2, 2000, that discusses realignment of the hydraulic

levee and the hydraulic levee template design change. Do you see that?

A. Right.

Q. First sentence Mr. Bowman writes, "During our telephone conversation on Tuesday, October 31, 2000 you asked if Renda planned on completing the new levees hydraulically. I told you that Renda would continue constructing the remaining new levees mechanically. This is due primarily to the fact that the current dredging operations are not yielding any clay for use in building the new levees and frankly, building the new levees hydraulically to date has not been successful."

Now, let's look at that for a second. Would you agree that as of around November 2, 2000, the dredging operation was not producing clay suitable for building new levees?

A. I don't remember but I do remember that the dredge was on a very long line, which would not be conducive for yielding any clay balls for levee building. I don't recall if a booster pump was in line at that time or not. So, his statement that the dredging operations are not yielding any clay material for use in building the new levees, I believe that because the dredge is on a long line.

Q. Now, if for some reason either you disputed or Mr. McClenan disputed the contents of Mr. Bowman's letter,

Benero Exhibit 24, you would write back and say, "What do you mean you're not producing any clay? There's a lot of clay," right?

A. Yeah.

Q. And then secondly, Mr. Bowman indicates that building the new levees hydraulically to date has not been successful. Would you agree with that statement?

A. I would totally agree with that because the east levee was built hydraulically and it was, I think, successful.

Q. Okay.

A. Portions of the west levee were built hydraulically and once the levee got pushed over to the existing levee, it became more successful.

Q. Now, in the middle of the first paragraph, Mr. Bowman quotes Mr. McClenan and Mr. Bowman writes, "You stated that the original intent of the specifications was that the discharge pipe would be moved ahead of new levee work, and the 'surge' would displace the soft foundation materials out of the way, allowing the clay material to be used for building up the new levees. Your statement incorrectly infers that building the new levees mechanically may cause or is causing problems during construction, which would not have occurred had the levees been constructed hydraulically."

Let's talk about that for a second. Okay?

A. Okay.

Q. Now, you agree that whether you construct it hydraulically or construct it mechanically, there's going to be soft foundation displacement?

A. Correct.

Q. And I think you've testified more than once that if you build it hydraulically, you're going to expect more soft foundation displacement because you've got quicker loading?

A. Right.

Q. And that if you construct it mechanically, you're going to have less foundation loading -- foundation displacement but it will take a longer time?

A. Correct.

Q. Okay. Now, by the way, the east levees, you recall that Renda deposited materials hydraulically but then had to mechanically build and rebuild the levees after they failed, right?

A. Yeah. And that's -- really in hydraulic levee construction, that's somewhat expected. I mean, you place -- you place the material hydraulically. You bring the bulk of the material there in a lump and then you shape it mechanically up to your dressed levee template and elevation. And sure, some failure is expected because your foundation is inconsistent throughout the entire placement area.

Q. Actually it's pretty consistently soft.

A. Well, yeah. But in some areas --

Q. It may not be quite as soft?

A. Right.

Q. Okay. But you would expect that as the foundation were shaped the first time to 30 feet, 32 feet, whatever it is, that there's going to be some settlement, some failure and the contractor is going to go back out and redo it?

A. Yeah. In some areas, that's true. That was true on Lower Bayou. That's true from what I understand from other project engineers on their projects.

Q. Is there any reasonable amount of times that the contractor is supposed to go out and rebuild the levee or is it just sort of a case by case basis?

A. It's a case by case thing. And in a case where -- if a reasonable effort has been -- has been undertaken and the levee won't set up, then it's time to walk away from it -- from that particular section and just let that load sit.

Q. Now, if the contractor has made a reasonable effort to construct the levee to the design template -- in other words, the contractor does just as much effort as would be reasonably required to achieve the design template for the levee -- why shouldn't the contractor get paid a hundred percent?

A. That's a contractual question that I don't know if I can answer.

Q. Okay.

A. I would have to consult with some other folks about that. But that is a good question.

Q. Well, don't you think it would be fair to pay the contractor a hundred percent if the contractor put in the reasonable amount of effort to bring the levee up to the desired template but for reasons beyond the contractor's control, it just couldn't happen?

A. If it was within, you know, a foot or 2, sure. I could understand that.

Q. Now, are you aware that the Joint Venture calculated that the hydraulic levee construction on the west levees was requiring in excess of 200 cubic yards per lineal foot to construct?

A. I seem to recall a number around there. That would not surprise me. I mean, that's still within the 150 to 250 cubic yards of in situ material to get your neat line template.

Q. Did you expect before this contract started that it would take between 150 and 250 cubic yards of suitable dredged material to be able to construct the 35 cubic yards per lineal foot neat line of levee?

A. I did not have a feel before the project started.

Q. If somebody within the Government had an idea or knew that that's what it was going to take, do you think they should have put that in the bid solicitation materials?

A. It would have been a help, especially in the pre-bid conference that was held to give, so to speak a range of what to expect based on their research or other projects or something. Just so -- just so you could keep an eye on the material that's coming from the channel and you can kind of have a handle on how much is going where, what kind of retention to expect and do we have enough material to complete it to this elevation or do we need to complete it to a lower elevation.

Q. Now, if during the pre-bid meeting -- and we've looked at the questions and answers to the pre-bid meeting --

A. Right.

Q. -- the contractor had been told please, be advised to expect that you're going to need between 150 and 250 cubic yards per lineal foot to be able to achieve the 35 cubic yard neat line, then the contractor could have factored that into the contractor's bid, right?

A. Sure.

Q. And then during the course of the project, if it took 150 or 250 cubic yards, then the contractor would have been forewarned, right?

A. Correct.

Q. And the Government could have pointed to the Amendment No. 1 and said, "You were on notice it was going to take between 150 and 250 cubic yards per lineal foot," right?

A. Correct.

Q. And that would have been fair to the contractors, right?

A. I think so.

Q. Turn to Benero Exhibit No. 24. Second page. Have we talked about this exhibit yet? Yeah, we certainly have. The second page of the exhibit, Mr. Bowman writes that Renda believes that the acknowledged existence of this borrow area have -- borrow areas have contributed greatly to the lack of efficiency during the -- during new levee construction operations. The borrow areas are not shown in the contract documents and were not anticipated in the bid by Renda and are a changed condition. Do you see that?

A. Yes.

Q. Now, first off, do you agree that the borrow areas have contributed to the requirement of extra material to be able to construct the hydraulically placed levees?

A. Well, considering that the borrow areas, as he's got stated here, are consistently around the entire placement area, when you place the dredged material hydraulically and you displace the soft material that's in these borrow pits, it is not as obvious as when it's done mechanically. Now, Affolter being there on site had constructed some of the first levees out at Lost Lake and they were a wonderful source of information.

Q. Now, you remember Affolter built on top of the existing levees?

A. Correct.

Q. Which is what Renda had asked to do but except for 900 feet or so wasn't allowed to do?

A. Right. But I guess my point is is that Renda's subcontractor, Affolter, has a very long history of what was out there. And if anybody could have answered any of these questions, it would have been the Affolters. Maybe even better so than some of our folks because they had been in the business for 40 or 50 years.

Q. Yeah. But do you know when Renda subcontracted with Affolter, whether it was before the bid or after?

A. I don't know.

Q. If Renda subcontracted with Affolter after the bid, then Affolter wouldn't have been much of a source of information before the bid, right?

A. True.

Q. Now, there's nothing in plans and specs that require that the bidders go consult Affolter and find out what Affolter knows about borrow pits out at -- the sidecast borrow areas out at Lost Lake, right?

A. I believe the only statement is that the -- it's recommended that the contractor make a site visit.

Q. Now, as of the beginning of this project, your first

involvement with it, the Lost Lake area, the placement area was full of water and recently placed maintenance material, right?

A. There was still a lot of residual material from the last maintenance cycle in there.

Q. So, if a contractor had gone out there to take a look at it, they would have seen basically a lake worth of stuff in Lost Lake, right?

A. Quite possibly. I don't remember what it looked like back then.

Q. Well, typically the way the placement areas look after a maintenance dredging cycle has occurred is the interior of the placement area is full of water and soupy gunk, right?

A. A lot of vegetation.

Q. I'm sorry?

A. And a lot of vegetation.

Q. And a lot of vegetation. A lot of vegetation where the roots are covered with water?

A. Yeah.

Q. Correct?

A. Sure.

Q. So, if a contractor wanted to, they would have to have a boat to go across the interior of the placement area and you couldn't walk, right?

A. Sure.
Q. You're agreeing with me?
A. Yes. And then there's also consulting key maps of the -- I guess of the project site at various times.
Q. Now, after a maintenance disposal event, the borrow areas are typically going to get filled up with maintenance materials, right?
A. Correct.
Q. And as a general rule, the maintenance materials are the soft silts that you don't want on your levee, right?
A. Right.
Q. So, if somebody is going to construct a levee on top of a borrow area, then the soft silts that got deposited during the maintenance cycle are going to have to be displaced, right?
A. Correct.
Q. Otherwise, your levee is not going to hold up, right?
A. Right.
Q. Okay. Benero Exhibit 24, middle of the second paragraph -- middle of the first paragraph on the second page Mr. Bowman wrote, "Renda is very concerned about these new levee problems and our ability to complete the construction as originally designed. We are expecting a response to these problems from the Government by Friday, November 3, 2000, in