order to avoid schedule delays and potential shutdown of new levee construction."

You can see that Renda is kind of begging for guidance, assistance, right?

A. Yes.

Q. And I guess the Government in conjunction with the Joint Venture decided not to give Renda guidance or assistance, right?

A. I don't recall it being that drastic but the show cause notice didn't help.

Q. And the show cause notice by and large complains about being behind schedule, right?

A. Right.

Q. And that's Benero Exhibit 25.

A. Right.

Q. Turn to Benero Exhibit No. 27. Benero Exhibit No. 27 is a Steve Bowman letter to Mr. McClenan dated December 6, 2000, discussing project status and updates. Do you see that?

A. Yes.

Q. The very first paragraph it refers to several telephone conversations that Mr. Bowman has had with you, right?

A. Right.

Q. Now, over on the second page, second paragraph

Mr. Bowman writes, "Renda again requests that any and all surveys and additional geotechnical information for the Lost Lake placement area be forwarded to us as discussed in October, 2000." Do you see that?
A. Right.
Q. Now, if Renda is trying to figure out a resolution to soft foundations, levees not standing up, whether or not there's enough clay, that's a reasonable thing for Renda to ask for, right?
A. Sure.
Q. The next paragraph Renda points out that Renda believes that insufficient clays are available to complete the levees to the current design template, right?
A. Right.
Q. So, again, Renda is asking for some input from the Government, right?
A. Right.
Q. Now, turn to Benero Exhibit No. 29. Benero Exhibit No. 29 is a response to Benero Exhibit No. 26, which concerns the show cause notice. And among other things, Paragraph No. 7 on Page 2 discusses the soft levee foundation issues?
A. Right.
Q. Now, you understand that Renda has been asking for some guidance, some direction, what the heck is Renda supposed to do. Does Paragraph No. 7, which discusses the soft levee

foundation issues give Renda any guidance about how to proceed with the project? Any specifics about what Renda should do to complete the levee construction?

A. As far as specific methodology, no, it does not.

Q. Turn to Rozsypal Exhibit No. 18. That's in the Rozsypal stack. That's over here. Rozsypal Exhibit No. 18 is an E-mail -- the top of it is an E-mail from Mr. Benero to Mr. McClenan, carbon copy to you, dated January 17, 2001. Do you see that?

A. Yes.

Q. And below that is an E-mail from Mr. McClenan to Wendell Mears, carbon copy to you, dated January 16, 2001, right?

A. Right.

Q. Now, Mr. McClenan wrote, "Eric and I called Renda and told them to place the material unsuitable for levee building within the discharge corridor as indicated in the plans and that when they encounter suitable material, they are to pump it to the northwest corner and continue hydraulic construction of the levees. Once this happens, based on what I'm hearing of yours and Johnny's evaluation of their pumping capabilities, they should self destruct." Do you see that?

A. Uh-huh.

Q. First off, Renda did not self destruct, right?

A. Right.

Q. And what is it that Mr. McClenan, if you know, was writing about Renda self destructing? What did he expect would happen, as far as you know?

A. I wouldn't want to give a guess.

Q. Okay.

A. I don't know.

Q. Turn to Benero Exhibit No. 33. Benero Exhibit No. 33 is a Steve Bowman letter to Mr. Benero dated March 1, 2001, carbon copy to Mr. McClenan. Do you see that?

A. Yes.

Q. And the very first paragraph Mr. Bowman writes, "Since August, 2000, Renda has attempted to make the Government and representatives from the Port of Houston Authority aware that sufficient quantities of clay material are not available to complete the Lost Lake levees specified in the contract documents." Do you see that?

A. Yes.

Q. And then he goes on to and cites some reasons why, in his opinion, there's insufficient amount of material, right?

A. Right.

Q. Then you recall that Renda had done some negotiations with the private owner, the Houston Fuel Oil terminal, to dredge their docks and facilities and supply that material to the Government project, right, to the Upper Bayou

project?

A. Correct.

Q. At the bottom of the page, Renda issues a proposal that Renda -- "After the completion of the dredging operations on Upper Bayou, Renda will continue to place suitable material on the uncompleted northwest levee section, building foundation in the unstable borrow areas and raising the new levee to an elevation of +25 feet, Renda's best guess is that the 250,000 cubic yards will construct an estimated 1,000 +/- feet of levee." Do you see that?

A. Yes.

Q. Now, did you understand that around this time Renda was asking for permission to go work on this private project because enough clay wasn't coming in from the remaining sections of the dredged area on the Upper Bayou project?

A. Yes. I understand.

Q. Do you also understand that it wasn't until a few months later that the Government finally said, okay, you can go do it? You understand that?

A. Yes, I do.

Q. Why did it take so long?

A. I don't know.

Q. Didn't it seem like a good idea to let Renda go off to a private project and pump clay back to the Upper Bayou project?

A. I was for it from the beginning.

Q. Isn't this like a win win situation? The Government wasn't going to have to pay anything for the additional clay coming in, right?

A. Correct.

Q. And they were getting, ballpark, 250,000 cubic yards of free clay essentially. Why did it take months?

A. I don't know. I can't answer that.

Q. Turn to Benero Exhibit No. 43. Benero Exhibit No. 43 is a Tom Benero E-mail to Herbie Maurer, Mike McClenan, numerous other people. You're shown as getting a carbon copy. It's dated April 16, 2001. Do you see that?

A. Yes.

Q. And it concerns the debris in dredge Section No. 9, right?

A. Right.

Q. And the essence of it is that Mr. Benero feels that enough is enough and he wants to cut Renda loose from having to dredge the remainder of dredge Section No. 9, right?

A. Correct.

Q. Now, how come Renda wasn't cut loose from dredge Section No. 9 for months after this E-mail from Mr. Benero?

A. I don't recall. I don't know. That would be a contracting question.

Q. Okay. Turn to Benero Exhibit No. 31, sir. Benero

Exhibit No. 31 is a Steve Bowman letter to Mr. McClenan dated December 20, 2000. And this concerns rubble discovered by the Oxy Chem docks. Do you remember the Oxy Chem dock situation?
A. Yes, I do.
Q. Do you remember this letter?
A. As I read it, I'm -- I'm familiar, yeah.
Q. And then it's got various hydrographic surveys attached?
A. Right.
Q. Okay. Now, these were hydrographic surveys that Renda undertook and you understand that they show on the left side, as you're looking at them, obstructions from rubble that extend into the dredge template?
A. I see a dredge -- I mean, a cut section along the template.
Q. Let me ask you real quick about the Oxy Chem differing site condition. What, if anything, did the Government do to go investigate this?
A. I know that there was a magnetometer survey that was done.
Q. It wasn't done for this area, right?
A. That's what I don't remember what area it was done in.
Q. Okay. Do you recall what was specifically done for this one or not?

A. No. I don't remember.
Q. Okay. Now, you see from the letter that Renda tried to get the dredge template cleared by undercutting the area where the rubble was to try and get the rubble to dislodge. Do you see that?
A. "Overcutting at the lower elevation of the slope attempting to unsuccessfully dislodge riprap material from the upper elevations of the slope."
Q. Do you understand what Renda was trying to do?
A. Yes.
Q. Any criticism, fault, blame Renda for trying to do that?
A. Just a concern of damaging the cutterhead by under or overcutting at the lower elevations to dislodge riprap because riprap falling on your cutterhead, that could do some damage.
Q. That would be a bad thing, right?
A. Yeah.
Q. But as long as that didn't happen, then any other criticism?
A. And I'm kind of -- I don't -- if this is erosion protection -- I guess my concern is, is this erosion protection for Oxy Chem, is the template in the correct location, is the alignment in the correct location?
Q. Those are things that the Government should go and

investigate, right?

A. Yeah. I agree.

Q. Okay. One last line of questions for you. We've seen numerous letters by Renda where they indicate that there's insufficient clay materials in Renda's mind and that as far as Renda is concerned, they can't get the levees to the 30-foot elevation either because the foundations are too unstable or there's just insufficient materials, right?

A. Right.

Q. What was Renda supposed to do at that point? As the project engineer, what was Renda supposed to do?

A. I mean, they requested the assistance. I was somewhat shackled in being able to respond to the requests.

Q. Shackled by your boss and the Joint Venture?

A. Correct. Not so much my boss.

Q. Your boss was shackled by the Joint Venture?

A. Yeah. And through him I was very limited in what I could provide.

Q. Renda is not blaming you. Renda just wants to know what the heck was it supposed to do?

A. Yeah. I understand.

Q. Any idea what Renda was supposed to do at that point?

A. I understand. 20/20 hindsight.

Q. So, other than the influence of the Joint Venture,

is there any reason why the Government didn't respond and tell Renda what to do?

A. Well, unfortunately the Joint Venture did have quite an impact on our responses and unfortunately so did the Port. If it would have just been a contract -- well, without the Joint Venture, I would say this would have ended a lot differently.

Q. And it would have ended with the Corps partnering with Renda to resolve these problems?

A. Correct.

Q. And the Corps and Renda would have worked to change the design so that the project could have been finished?

A. I think so. I think we could -- I think we could have worked through several -- all the issues. I think we could have developed together solutions, you know, all the levees and the stiff clay. You know, I don't know. I mean, it's --

Q. We'll leave it at that.

A. Okay.

MR. ERIKSON: At this point in time, we'll adjourn the deposition, reserving our rights to ask additional questions if we have any based on documents that may be produced from Corps electronic media. And subject to that, we'll pass the witness.

MR. PETTY: And we would reserve any questions

for a future time also but we do want to read and sign.

(Proceedings recessed at 5:08 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: ________________ DATE OF DEPOSITION: ____________

PAGE LINE CHANGE REASON

I, ERIC RUSSEK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

ERIC RUSSEK

THE STATE OF )
COUNTY OF )

Before me, , on this day personally appeared ERIC RUSSEK, known to me or proved to me on the oath of or through (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this day of , .

NOTARY PUBLIC IN AND FOR
THE STATE OF

My Commission Expires:

STATE OF TEXAS

COUNTY OF HARRIS

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF ERIC RUSSEK

January 14, 2004

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 27th day of January, 2004.

Stacey Whitley

Stacey Whitley, CSR
Texas CSR 3999 by Norma DeLaCruz
Expiration: 12/31/2005
ESQUIRE DEPOSITION SERVICES
Firm Registration No.: 03
3401 Louisiana, Suite 300
Houston, Texas 77002
713-524-4600

CHANGES AND SIGNATURE

WITNESS NAME: RUSSEK DATE OF DEPOSITION: 1/14/04

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 19 | 3 | CHANGE "TAINER" TO "TAINTER" | |
| 36 | 11 | CHANGE "BEAN STIVISON" TO "BEAN-STUYVESANT" | |
| 57 | 3 | CHANGE "RESPOND" TO "RESPONDING" | |
| 65 | 5 | CHANGE "STIVISON" TO "-STUYVESANT" | |
| 83 | 22 | CHANGE "HOUSE TRACK" TO "HOUSE-TRACT" | |
| 90 | 9 | CHANGE "STIVISON" TO "-STUYVESANT" | |
| 94 | 14 | DELETE "AN" | |
| 103 | 9 | CHANGE "JOINT VENTURER" TO "JOINT-VENTURE" | |
| 170 | 21 | CHANGE "DIVULGED" TO "DIVERGED" | |
| 192 | 8 | ADD "NOT" AFTER "WOULD" AND BEFORE "TOTALLY" | |

I, ERIC RUSSEK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Eric A Russek

ERIC RUSSEK

THE STATE OF TEXAS )
COUNTY OF GALVESTON )

Before me, Ruben R. Villagran, on this day personally appeared ERIC RUSSEK, known to me ~~or proved to me on the oath of ______ or through ______ (description of identity card or other document)~~ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this 31st day of MARCH, 2004.

Ruben R. Villagran
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

My Commission Expires:

RUBEN R. VILLAGRAN
Notary Public, State of Texas
My Commission Expires
January 02, 2005

STATE OF TEXAS

COUNTY OF HARRIS

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF ERIC RUSSEK

January 14, 2004

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 27th day of January, 2004.

Stacey Whitley

Stacey Whitley, CSR

Texas CSR 3999 by Norma DelaCruz

Expiration: 12/31/2005

ESQUIRE DEPOSITION SERVICES

Firm Registration No.: 03

3401 Louisiana, Suite 300

Houston, Texas 77002

713-524-4600