**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| RENDA MARINE, INC.,<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br>Defendant. | ) | No. 02-306C<br>(Judge Hewitt) |

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS CLAIMS RELATING TO THE GOVERNMENT'S BREACH OF THE IMPLIED DUTY TO COOPERATE**

Clarence T. Kipps, Jr.
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5701
(202) 626-5800 (Telephone)
(202) 628-0858 (Facsimile)

Counsel for Renda Marine, Inc.
Plaintiff

*Of Counsel*:
Mary Lou Soller
Lara A. Covington
Justin C. Miller
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, D.C. 20005
(202) 626-5800 (Telephone)
(202) 628-0858 (Facsimile)

# Table of Contents

Page

I. THE GOVERNMENT BREACHED ITS IMPLIED OBLIGATION TO COOPERATE WITH RENDA MARINE IN CONSTRUCTING THE WEST LEVEE ..... 2

A. Facts ..... 2

B. Argument ..... 7

II. RENDA MARINE IS ENTITLED TO RECOVER $738,923 ON ITS CLAIM FOR THE GOVERNMENT'S BREACH OF ITS IMPLIED DUTY TO COOPERATE WITH RENDA MARINE IN CONSTRUCTING THE WEST LEVEE ..... 9

CONCLUSION ..... 15

# **Table of Authorities**

Page

**Cases**

*Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35 (2001)........................................8

*Tecom, Inc. v. United States*, 66 Fed. Cl. 736 (2005) ..................................................................8

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| RENDA MARINE, INC., Plaintiff, | ) | |
| v. | ) | No. 02-306C (Judge Hewitt) |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS CLAIMS RELATING TO THE GOVERNMENT'S BREACH OF THE IMPLIED DUTY TO COOPERATE**

Plaintiff, Renda Marine, Inc. ("Renda Marine"), respectfully moves this Court to find that the Government is liable to it for damages in the amount of $738,923 caused by its breach of the implied duty to cooperate with Renda Marine under the contract both because the Government failed to respond timely to the company's request for guidance about the West Levee realignment and because the contracting officer failed, upon observing Renda Marine's relocation of the West Levee at Lost Lake, to correct what the Government now claims was Renda Marine's misunderstanding.

Although these issues were not specifically raised in Plaintiff's complaint, this Court found that they were tried by consent and are ripe for adjudication by this Court. *See* Order of December 19, 2005 at 2, 5; *see also* Order and Opinion of July 28, 2005 at 130.[1]

[1] As the Court noted when it first raised the issue: "The court believes that the evidence adduced at trial might support a claim of a breach of the implied duty of the government not to hinder a contractor's performance. For example, both the government's failure to respond timely to plaintiff's request for guidance about the West Levee realignment, and the government's failure, upon observing plaintiff's relocation of the levee, to correct what the government now claims is plaintiff's misunderstanding, appear on their face to be unreasonable." Opinion and Order of July 28, 2005 at 130. As demonstrated here, the Court's observations were correct.

# I. THE GOVERNMENT BREACHED ITS IMPLIED OBLIGATION TO COOPERATE WITH RENDA MARINE IN CONSTRUCTING THE WEST LEVEE

## A. Facts

The contract documents include both drawings and coordinates that use global positioning system ("GPS") information for the location of the hydraulic levees in the Lost Lake area. JX 5.014. Steven Bowman, a Renda Marine Vice President and Project Manager in charge of estimating and a number of other tasks, explained that when Renda Marine started this portion of the project it determined the placement of the new West Levee according to both the drawings and the coordinates in the contract documents.[2] Trial Tr. at 497. Although the construction drawings demonstrated that the Government intended the new levee to be built directly next to the old levee, the coordinates mandated the exact placement of the structure. *Id*. at 550.

As *per* the contract requirements, at the beginning of the construction of the West Levee, Renda Marine positioned the new levee directly next to the old levee. *Id.* However, following the coordinates caused the new levee to begin to veer away from the old structure as the construction progressed. *Id*. at 497, 546, 3307-09. As Mr. Bowman explained, the levee became "a levee to nowhere." *Id.* at 546. The increasing distance – or gap – between the old levee and the new levee resulted in construction problems because the new levee placement was causing

---

In November 2005, Renda Marine moved this Court for leave to brief three related issues related to the West Levee realignment. This Court granted that request on December 19, 2005. After a careful review of the record, Renda Marine has determined that the first listed issue (failure to timely address the misalignment of the West Levee at Lost Lake) is subsumed in the other two issues and is not separately addressed.

[2] At one point, the Joint Venture (and possibly some Government employees) appeared to dispute Renda Marine's position that it was constructing the West Levee in accordance with the contract specifications. As a result, they hired Survcon, an independent survey company, to review Renda Marine's work. Survcon verified that Renda Marine had built the levee precisely according to the coordinates provided to it by the Government. Trial Tr. at 550, 726. *See also id*. at 1094.

mud to be displaced in a "mud wave" (*i.e*. subgrade displacement) that was likely to go over the old levee and into the Old River.

In the early summer of 2000, Renda Marine personnel spoke to Eric Russek, the Army Corps of Engineers' Project Manager, about these problems and followed up the conversation in a letter to Mr. Russek on July 28, 2000. PX 926. In this letter, Mr. Bowman, for Renda Marine, explained how the new levee placement was causing subgrade displacement and suggested that this could be solved by allowing Renda Marine to construct the new levee so that its toe was against the old levee. *Id.* It stated that this construction would use the old levee as a berm to support the new levee and would keep the mud wave to the inside of the old levee. *Id*.

Because this issue was pressing, Mr. Bowman requested Government personnel to visit the site. Trial Tr. at 498. On August 7, 2000, Tim Few (a geotechnical expert who served as the Government's levee designer), Mike McClenan (the "area engineer" or administrative contracting officer), and Eric Russek met with Steve Bowman and five other representatives of Renda Marine at the West Levee. *Id*. at 545, 675-76, 3150. At that time, Renda Marine had already constructed 1,600 linear feet of this levee. *Id*. at 2611.

At the meeting, Mr. Few stated that it was the Government's design intent that the new levee was to be tied into the old levee, thereby preventing the trapping of soft displaced subgrade materials between the levees. PX 1175.0007-08. He recognized that realignment was necessary to correct an improper design. *Id.* No one at the meeting suggested that Renda Marine continue to construct the West Levee on its then-present course. As Mr. Bowman explained, at that meeting "we made a decision at that point and *were directed by the [Corps'] Galveston office to move the levee back adjacent to the old levee*." Trial Tr. at 498 (emphasis added).

At trial, Mr. McClenan confirmed that he attended this meeting and admitted that he provided oral direction there to Renda Marine to realign the West Levee. *Id*. at 3301-04. Thomas Benero, the contracting officer, further explained that such oral direction is a "field change agreement," which occurs when representatives of the Government and Renda Marine "go out to the site . . . then they agree among themselves to go ahead and make a change, and then they come back and they formalize it with a contract modification. So on the field, at the site is where these gentlemen agree to go ahead and make that particular change to the contract." *Id*. at 261-62.

At trial, the Government's representatives all recognized and agreed that, following oral instructions, the Government should give the contractor direction in writing. *Id*. at 3304. They also agreed that such written direction should be issued promptly. *Id*. at 3305. Indeed, Mr. McClenan testified that he tries to provide these instructions as quickly as resources permit. *Id.* Mr. McClenan recognized that, without something in writing, there might be a misunderstanding about what was said in the field. *Id*. at 3304.

Despite this universal recognition of the need for written direction, the Government did not timely provide it to Renda Marine. By August 18, 2000, Renda Marine still had not received any documentation of the Government's oral instructions. Thus, Mr. Bowman wrote to Mr. McClenan. JX 60. In that letter, Mr. Bowman reminded Mr. McClenan that the company had formally notified the Government of the levee alignment problems on July 28, 2000, and had met to discuss it with them on August 7, 2000. He clearly stated Renda Marine's understanding that the Government orally "agreed to realign the levee such that the toe of the new levee would be against the existing, old levee." Mr. Bowman also stated Renda Marine's position that the

realignment constituted a changed condition, for which Renda Marine would submit a request for equitable adjustment. JX 60.0001.

The Government did not respond to this letter. At trial, Mr. McClenan testified that if he disagreed with Mr. Bowman's position, he should have responded to him within a reasonable time. Trial Tr. at 3309. He did not do so.

Instead, Mr. McClenan failed to send any of three draft letters prepared for him by Mr. Russek – on August 18, 2000, September 18, 2000, and September 21, 2000 – to provide written direction to Renda Marine about the West Levee realignment. PX 969, 999, 1005; Trial Tr. at 3311-13. In the last draft, Mr. Russek included language that confirmed "the verbal direction you were provided during [the August 7, 2000] site visit, i.e., you are to forego use of the alignment shown in the contract drawings, and proceed along an alignment closer to, and paralleling, the existing levee." PX 1005.0001.

Because Renda Marine had received oral direction, field sketches, and dimensions to realign the West Levee – and because the company received no instructions to the contrary – the company began work pursuant to these directions. After the meeting, Renda Marine "broke, moved dredge line, moved over and started filling adjacent to the old levee and had a significant task of excavating the levee [it] had installed. . . . And with that directive, [the company] moved the levee back adjacent to the old levee. One, eliminating the problem of the topping and the displaced material and having soft material between the two levees." Trial Tr. at 498–99.

Because the new levee was intended to tie into the existing levee, Renda Marine needed to start work on the portion of the West Levee on which problems had already developed. Thus, the company began to move material to reposition the portion of the levee on which it had worked before August 7, 2000. As stipulated by the parties, work on this section of the levee

took place during September and October 2000. Joint Stipulation of Facts, ¶ 82. As Mr. Bowman testified, the company started work at the point where the new and existing levees

> actually adjoined at station 166 . . . we proceeded from that point and just relayed material over, and essentially as they spread, we just continued to relay material . . . And we were just relaying back and forth to where we finally, over a couple months' period, had actually just transferred material, swapped it.

Trial Tr. at 677. To reposition this levee, Renda Marine had to use extensive heavy equipment, including hydraulic excavators, dozers, and a marsh track backhoe. *Id.* at 2738. After it completed this section, the company then continued construction on the levee beyond the station where it had worked by August 7, 2000.

Throughout this period, representatives of the Government made regular site visits to Lost Lake. Indeed, Mr. McClenan testified that Mr. Russek visited the site weekly. *Id*. at 3310, 3318-19. He was also required to write up any problems with the contractor's performance. *Id.* No reports exist that discuss a problem with Renda Marine's realignment of the West Levee. At no time did Mr. Russek – or anyone from the Government – ever tell anyone at Renda Marine that they were not authorized to realign any portion of the West Levee.

Indeed, at no time did the Government provide alternative instructions as to how Renda Marine should tie the levees together. Mr. McClenan testified at trial that if the direction in the last draft letter prepared by Mr. Russek was correct (*i.e.*, if it was what he told Renda Marine on August 7, 2000), and if the company altered the alignment it had previously used, the company should have arguably moved material. *Id*. at 3313-14.

After Renda Marine received its oral direction from the Government, but before it had received any written documentation, the company exchanged letters with the Government and held several meetings to ensure that it had a clear understanding of what was expected of it. At no time did the Government inform Renda Marine that the company's understanding that it had

been instructed to realign the newly constructed levee was incorrect. For example, in addition to the letters discussed earlier, Mr. Bowman wrote to Mr. McClenan on September 22, 2000. In that letter, Mr. Bowman again noted that the Government had orally affirmed that its original intent had been that the outside toe of the hydraulically constructed levee should tie into the inside top of the slope of the existing levees, while specified levee slopes should be maintained. PX 1006.0003. The Government never challenged or refuted this statement. At trial, Mr. McClenan conceded that he would have responded to this letter if he disagreed with what Mr. Bowman had written. Trial Tr. at 3315. On October 31, 2000, Mr. Bowman wrote another letter to Mr. McClenan in which he stated that the Government had told him during the August 7, 2000 meeting that it was the Government's intent that the original drawings were to provide that the outside toe of the new levee tie into the inside top edge of the existing levee. PX 1064.0003. Again, the Government did not respond to Renda Marine's letter.

Finally on March 12, 2001, by way of a letter from Mr. Benero to Mr. Bowman, the Government confirmed that it had directed Renda Marine to realign the center of the new levee to fall closer to the existing levee between Station 166+00 and 176+00. PX 1323. A change order did not follow until May 23, 2001. JX 06.027 (change order no. 10).

**B. Argument**

The Government now argues that Renda Marine had no authority to realign the part of the West Levee on which the company began work before August 7, 2000. Although it does not quarrel with Renda Marine's realignment of the rest of the West Levee, the Government's position is that Renda Marine misunderstood its oral directions. Whether or not this is true, it is irrelevant. Renda Marine incurred substantial additional costs to realign the sections of the levee, which it had already built by August 7, 2000, and the Government has refused to

recognize these damages or compensate Renda Marine. The Government thus breached its implied duty to cooperate with Renda Marine in constructing the West Levee.

This implied duty to cooperate is part of every government contract. *See Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 58-59 (2001). The government breaches its implied duty to cooperate by failing to take essential action or otherwise cooperate with the contractor. *See Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 770 (2005); *Precision Pine,* 50 Fed. Cl. at 59 n.31. The duty to cooperate is assessed using a reasonableness standard. *See Tecom*, 66 Fed. Cl. at 770.

Here, the Government breached its implied duty to cooperate with Renda Marine in two ways. First, the Government acted unreasonably when it failed to provide Renda Marine with written direction with respect to realigning the West Levee. Despite its recognition of the need for written guidance, the Government gave Renda Marine only oral directions as to the realignment and then failed – or refused – to commit these to writing until after Renda Marine had essentially completed the work. The Government employees directly involved in this project have acknowledged that contractor's need to receive prompt written guidance in order to avoid the very circumstances in which Renda Marine now finds itself. The Government has provided no explanation, however, as to why such direction was not given. Indeed, Mr. Russek prepared three draft letters to be sent to Renda Marine providing such guidance, but none of them were ever sent. Renda Marine was thus forced to expend its resources to continually solicit the Government's concurrence with its understanding, but to no avail. In fact, it took the Government almost five months to finally confirm that it had directed Renda Marine to realign the new levee.

Second, the Government acted unreasonably by failing to give Renda Marine any guidance in the interim as to how it wanted the West Levee realigned – particularly if it disagreed with Renda Marine's clearly articulated understanding. Despite receiving confirmation in writing on at least three occasions (August 18, 2000, September 22, 2000, and October 31, 2000) of Renda Marine's understanding of the Government's oral direction, the Government failed to correct it.

Most importantly, the Government was able to observe Renda Marine working on the West Levee. Mr. Russek and others saw that Renda Marine was realigning the entire levee – not just the new portion of it. Yet, despite these observations, the Government did nothing to correct or stop Renda Marine. These actions (or more precisely, lack of actions) were unreasonable. If the Government is correct that Renda Marine misunderstood its directions, it had an obligation to inform the company. It did not do so. Instead, the Government acted unreasonably by observing Renda Marine realign the entire West Levee and then, after the fact, claiming that part of this realignment was contrary to the Government's direction – without doing what was necessary to correct the realignment.

The Government's unreasonable actions with respect to the West Levee realignment are a breach of its implied duty to cooperate with Renda Marine.

## II. RENDA MARINE IS ENTITLED TO RECOVER $738,923 ON ITS CLAIM FOR THE GOVERNMENT'S BREACH OF ITS IMPLIED DUTY TO COOPERATE WITH RENDA MARINE IN CONSTRUCTING THE WEST LEVEE

Line Item No. 2 in Renda Marine's competitively bid contract called for payment of a Unit Price of $4.60 per cubic yard ("pcy") for mechanically constructed levees. JX 1.0003.[3] Renda Marine mechanically constructed the realigned West Levee between Stations 166+00 and

---

[3] The cost of performing work is irrelevant when, as here, the contract provides a line item unit price for the work.

188+00 to an elevation of, on average, 28' MLT and requested its acceptance.[4] Renda Marine relocated at least 167,937 cubic yards of material that had been placed on the original West Levee alignment and used it in mechanically constructing the West Levee. Accordingly, at a minimum, Renda Marine is entitled to recover the contract line item unit price of $4.60 pcy for relocating this West Levee material. This produces a recovery of $772,510.

Renda Marine is also entitled to recover $0.10 pcy as a reasonable price for triple-handling the material. *Compare* JX 1.0003 *with* PX 8.0006. Renda Marine's subcontractor, Affolter Contracting, mechanically constructed the South Levee. Trial Tr. at 1612. Renda Marine was required to realign and relocate part of the South Levee and a training levee by Change Orders 1 and 2. PX 528.006, PX 558. Renda Marine was paid $381,170 for realigning and relocating 81,000 cubic yards of levee material at $4.70 pcy. PX 528.006.0003. Change Order 2 increased Renda Marine's $4.60 pcy unit price to $4.70 pcy for the work required by Change Order 1 because of the triple-handing of the material. *Id*. Renda Marine triple-handled the material relocated for use in constructing the realigned West Levee for Stations 166+00 and 188+00. JX 6.008; Trial Tr. at 46, 603, 1148. Accordingly, $4.70 pcy is a reasonable price for relocating and using this material to build the West Levee between Stations 166+00 and 188+00.

The reasonableness of this price is supported by Renda Marine's competitively bid unit price of $4.60 pcy. It is further supported by the competitively bid unit prices of the other bidders, which were as follows:

| | |
|---|---|
| T.L. James & Company, Inc. | $ 5.00 pcy |
| Bean Horizon Corporation | $ 4.80 pcy |
| Pine Bluffs Sand & Gravel Co. | $ 4.75 pcy |
| Great Lakes Dredge & Dock Co. | $ 4.33 pcy |

---

[4] It thereafter gradually failed.

The average price of the other bidders was $4.72 pcy. Accordingly, $4.70 pcy is a reasonable price for relocating and using this material to construct the West Levee between Stations 166+00 and 188+00. This produces a recovery of $838,923.

It has not been and cannot be disputed that at least 167,937 cubic yards of material was relocated. Renda Marine had constructed and the Government had paid for the West Levee built on the original alignment between Stations 166+00 and 188+00. On behalf of the Government, the Joint Venture had conducted quality assurance surveys on August 16, 2000 for the West Levee placed hydraulically by Renda Marine between Stations 166+00 and 183+00. PX 8.0044. By letter dated September 1, 2000, the Joint Venture informed the Government that Renda Marine had pumped (placed) 132,937 cubic yards of material for the neat line above grade on the original West Levee alignment between Stations 166+00 and 183+00.[5] *Id.* The Joint Venture surveys of 132,937 cubic yards and the $4.70 pcy reasonable price produces a recovery of $624,804.

Renda Marine also relocated approximately 35,000 cubic yards needed to mechanically construct the realigned West Levee between Stations 183+00 and 188+00. PX 8.0005-06. Because no Government survey was made to document it, the amount of material relocated to construct the West Levee between these stations is estimated.[6] The estimated 35,000 cubic yards was conservatively calculated by multiplying 500 linear feet (between Stations 183+00 and 188+00) by 70 cubic yards. The 70 cubic yards per linear foot is the historical minimum yardage required to construct the neat line for the levees with foundations. Because of variation in

---

[5] Renda Marine relocated a great deal more material than included in the Joint Venture neat line survey because it also excavated much of the foundation material and relocated and used it in the realigned West Levee and foundation. PX 8.0004-05.

[6] The REA proposed pricing and volumes that the Corps would recognize was reasonable so that prompt payment would be made because of its need for money to continue performance.

elevations, the cubic yards per linear foot varied from 35 to in excess of 40 cubic yards per linear foot for the neat line. Renda Marine used a multiple of two to provide for the foundation of the neat lines in bidding this contract and in estimating the 70 cubic yards per linear foot (with 35 cubic yards for the neat line and 35 cubic yards for the foundation). Ira Brotman, the Corps' design engineer, used 73.7 cubic yards per linear foot. PX 279. The HVJ Associates design report used 124 cubic yards per linear foot. PX 322.0010, 322.0014 (1,700,000 divided by 13,700 linear feet = 124 cubic yards per linear foot).

The application of the $4.70 pcy reasonable price to 35,000 cubic yards entitles Renda Marine to an additional $164,500, for a total recovery of $738,923 for the Government's breach of its implied duty to cooperate in constructing the West Levee.

**CONCLUSION**

For the foregoing reasons, judgment should be entered for Renda Marine in the amount of $738,923.

Respectfully submitted,

/s Clarence T. Kipps, Jr.
Clarence T. Kipps, Jr.
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5701
(202) 626-5800 (Telephone)
(202) 628-0858 (Facsimile)

Counsel for Renda Marine, Inc.
Plaintiff

*Of Counsel*:
Mary Lou Soller
Lara A. Covington
Justin C. Miller
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W., Suite 900
Washington, D.C. 20005
(202) 626-5800 (Telephone)
(202) 628-0858 (Facsimile)

Dated: January 13, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that I have this 13th day of January 2006 caused the foregoing "Plaintiff's Brief In Support Of Its Claims Relating To The Government's Breach Of The Implied Duty To Cooperate" to be served by the United States Court of Federal Claims ECF system upon the following:

David M. Cohen
John E. Kosloske
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street, N.W., Room 8012
Washington D.C. 20530
Telephone: (202) 307-0282

/s Clarence T. Kipps, Jr.
Clarence T. Kipps, Jr.