No. 02-306C
(Judge Hewitt)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S RESPONSE TO PLAINTIFF'S BRIEF IN SUPPORT OF ITS CLAIM THAT, WITH RESPECT TO THE REALIGNMENT OF THE WEST LEVEE, DEFENDANT BREACHED THE IMPLIED DUTY TO COOPERATE

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

<u>OF COUNSEL</u>:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

FEBRUARY 10, 2006

# TABLE OF CONTENTS

DEFENDANT'S RESPONSE TO PLAINTIFF'S BRIEF IN SUPPORT OF ITS CLAIM THAT, WITH RESPECT TO THE REALIGNMENT OF THE WEST LEVEE, DEFENDANT BREACHED THE IMPLIED DUTY TO COOPERATE. . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. West Levee Construction Prior To August 7, 2000 Lost Lake Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. August 7, 2000 Lost Lake Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. West Levee Construction After August 7, 2000 Lost Lake Meeting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV. Contract Modification P00027 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V. Stipulation ¶ 82 Should Be Disregarded Because It Is Contrary To Facts Established By The Evidence . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I. The Government's Conduct With Respect To The Realignment Of The West Levee Did Not Breach The Implied Duties To Cooperate And Not To Hinder Renda's Performance Of The Contract For The Upper Bayou Project . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A. The Implied Duties To Cooperate And Not To Hinder Performance Of Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B. The Government Did Not Breach The Implied Duty To Cooperate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C. The Government Did Not Breach The Implied Duty Not To Hinder Renda's Performance Of The Contract . . . . . . . . . . . . . . 24

# TABLE OF CONTENTS (CONT'D)

II. Assuming For The Sake Of Argument That The Government Breached Either The Implied Duty To Cooperate Or The Implied Duty Not To Hinder Renda's Performance Of The Contract, The Damages Claimed Are Overstated . . . . . 25

A. General Principles . . . . . 25

B. Renda's Original Damages Claim For The West Levee Realignment . . . . . 25

C. Renda's Revised Damages Claim For The West Levee Realignment . . . . . 27

D. Renda's Present Damages Claim For The West Levee Realignment . . . . . 28

E. The Contract Does Not Establish A Unit Price For Relocating The West Levee . . . . . 28

F. The Unit Price Established By The Contract For The Work Covered By Bid Item No. 0002 Is Not A Reasonable Index Of The Cost Of Relocating The West Levee . . . . . 30

G. There Is No Evidence That Renda Triple-Handled The Relocated Material . . . . . 31

H. Renda's Estimate Of The Volume Of Relocated West Levee Material Is Flawed . . . . . 33

(1) The Alleged Quantity Of Material Between Levee Sta. 166+00 And Sta. 183+00. . . . . . 33

(2) The Alleged Quantity Of Material Between Levee Sta. 183+00 And Sta. 188+00 . . . . . 35

I. If, As Alleged, The Government Breached Either The Implied Duty To Cooperate Or The Implied Duty Not To Hinder Renda's Performance Of The Contract, A Reasonable Award Of Damages For The Breach Would Be $73,800 . . . . . 37

**TABLE OF CONTENTS (CONT'D)**

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES

## CASES

Bluebonnet Savings Bank v. United States,
339 F.3d 1341 (Fed. Cir. 2003) .......................................................................... 25

Bromley Contracting Co., Inc. v. United States,
14 Cl.Ct. 69 (1987), aff'd, 861 F.2d 729 (Fed. Cir. 1988) (Table) ................................ 13

C. Sanchez and Son, Inc. v. United States,
6 F.3d 1539 (Fed. Cir. 1993) .......................................................................... 15

Cedar Lumber, Inc. v. United States,
5 Cl.Ct. 539 (1984) .......................................................................... 15,16

Charter Federal Savings Bank v. United States,
54 Fed. Cl. 120 (2002) .......................................................................... 15

Commerce International Co. v. United States,
167 Ct. Cl. 529, 338 F.2d 81 (1964) .......................................................................... 16

D.E.W., Inc., ASBCA No. 49735, 96-2 BCA ¶ 28,488 .......................................................... 13

Dillon, Read & Co., Inc. v. United States,
875 F.2d 293 (Fed. Cir. 1989) .......................................................................... 13

Earth Burners, Inc. v. United States,
43 Fed. Cl. 481 (1999) .......................................................................... 25

F.H. McGraw & Co. v. United States,
131 Ct. Cl. 501, 130 F.Supp. 394 (1955) .......................................................................... 17

George A. Fuller Co. v. United States,
108 Ct. Cl. 70, 69 F.Supp. 409 (1947) .......................................................................... 15

H.B. Zachry Co. v. United States,
170 Ct. Cl. 115, 344 F.2d 352 (1965) .......................................................................... 13

Hardie-Tynes Mfg. Co., ASBCA No. 20582, 76-2 BCA ¶ 11,972 ........................................... 16

Hardrives, Inc., IBCA No. 2319, 94-1 BCA ¶ 26,267 .......................................................... 16

## TABLE OF AUTHORITIES (CONT'D)

### CASES (CONT'D)

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. 2005) ........ 25

J.D. Hedin Construction Co., Inc. v. United States,
171 Ct. Cl. 70, 347 F.2d 235 (1965) ........ 25

Kaminer Construction Co. v. United States,
203 Ct. Cl. 182, 488 F.2d 980 (1973) ........ 13

LaSalle Tallman Bank v. United States,
317 F.3d 1363 (Fed. Cir. 2003) ........ 25

Loftin and Woodard, Inc. v. United States,
577 F.2d 1206 (5th Cir. 1978) ........ 13

Mech-Con Corp. v. West,
61 F.3d 883 (Fed. Cir. 1995) ........ 12

Northrop Grumman Corp. v. United States,
47 Fed. Cl. 20 (2000) ........ 16

O'Neill v. United States,
231 Ct. Cl. 823 (1982) ........ 15

PR Contractors, Inc. v. United States,
No. 03-30C (Fed. Cl., Jan. 20, 2006) ........ 36

Precision Pine & Timber, Inc. v. United States,
50 Fed. Cl. 35 (2001) ........ 16, 17

Renda Marine, Inc. v. United States,
66 Fed. Cl. 639 (2005) ........ 3

San Carlos Irrigation and Drainage District v. United States,
877 F.2d 957 (Fed. Cir. 1989) ........ 15

Scott Timber Co., Inc., IBCA No. 3771-97, 98-1 BCA ¶ 29,555 ........ 13

## TABLE OF AUTHORITIES (CONT'D)

### CASES (CONT'D)

Swift & Co. v. Hocking Valley Railway Co.,
243 U.S. 281 (1917) .......... 13

Tecom, Inc. v. United States,
66 Fed. Cl. 736 (2005) .......... 16, 17

Walter Dawgie Ski Corp. v. United States,
30 Fed. Cl. 115 (1993) .......... 16, 17

Willems Industries, Inc. v. United States,
155 Ct. Cl. 360, 295 F.2d 822 (1961), cert. denied, 370 U.S. 903 (1962) .......... 25

WRB Corp. v. United States,
183 Ct. Cl. 409 (1962) .......... 17

### STATUTES

41 U.S.C. § 611 .......... 2, 39

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S BRIEF IN SUPPORT OF ITS CLAIM THAT, WITH RESPECT TO THE REALIGNMENT OF THE WEST LEVEE, DEFENDANT BREACHED THE IMPLIED DUTY TO COOPERATE

PRELIMINARY STATEMENT

In its December 19, 2005 Order, the Court ordered briefing with respect to whether defendant, the United States, breached its implied duties to cooperate and not to hinder performance of the contract for the Upper Bayou Project because, according to plaintiff, Renda Marine, Inc. (Renda), "[t]he contracting officer failed to timely address the misalignment of the West Levee at Lost Lake[,] failed to respond timely to [Renda's] request for guidance about the realignment of this levee[,] and failed, upon observing [Renda's] relocation of the levee, to correct what the Government now claims was [Renda's] misunderstanding." See "Plaintiff's Motion to Deem Claims for the Government's Breach of Implied Duty to Have Been Tried by Consent," at 2. In the initial brief filed by Renda in response to the Court's December 19, 2005 Order, Renda states that it has "determined that the first listed issue (failure to timely address the misalignment of the West Levee at Lost Lake) is subsumed in the other two issues and is not separately addressed." Pl. Br. 2 n.1.[1/]

---

[1] Pl. Br. ____" refers to the referenced page(s) of "Plaintiff's Brief in Support of its Claims (continued...)

Renda contends that the Government breached its implied duty to cooperate with Renda by "failing" to provide Renda with "written direction with respect to realigning the West Levee" and by "failing to give Renda any guidance in the interim as to how it wanted the West Levee realigned – particularly if it disagreed with [Renda's] clearly articulated understanding." Pl. Br. 8, 9. For these alleged breaches of contract, Renda seeks to recover $738,923[2/] in compensation for the additional costs allegedly incurred by Renda to realign a completed portion of the West Levee closer to the existing levee on the west side of Lost Lake. Pl. Br. 1, 12.

For the reasons set forth below, Renda's claim based upon a breach of the implied duty to cooperate is without merit. Assuming for the sake of argument that the Government is liable to Renda upon that claim, the damages sought are overstated: Renda would in that event be entitled to recover no more than $73,800, plus interest pursuant to 41 U.S.C. § 611.[3/]

## FACTUAL BACKGROUND

### I. West Levee Construction Prior To August 7, 2000 Lost Lake Meeting

The contract for the Upper Bayou Project required that the perimeter levees on the east west, and north sides of the Lost Lake Placement Area (Lost Lake) were to be constructed by the

[1] (...continued)
Relating to the Government's Breach of the Implied Duty to Cooperate" dated January 13, 2006.

[2] Due to an arithmetical error in its damages calculation, the amount requested by Renda, i.e., $738,923, is understated by $50,381. Correcting for that error, the amount claimed is $789,304.

[3] In this brief, "JX ____" refers to the referenced joint trial exhibit; "PX ____" refers to the referenced plaintiff trial exhibit; "DX ____" refers to the referenced defendant trial exhibit; "Tr. ____ (____)" refers to the referenced page(s) and (parenthetically) lines of the transcript of the trial in this case; "Stip. ¶ ____" refers to the referenced paragraph(s) of the Stipulation of Facts" filed in this case on or about February 23, 2005; "CQC Report" means "Contractor Quality Control Report;" and "QA Report" means "Quality Assurance Report."

hydraulic placement of dredged fill materials,[4] except for areas of the perimeter levees near the new drop-outlet structure to be constructed in the northeast corner of Lost Lake and the existing drop-outlet structure to be modified in the northwest corner of Lost Lake, which were to be constructed mechanically. See Renda Marine, Inc. v. United States, 66 Fed. Cl. 639, 660-61 (2005). The perimeter levee along the west side of Lost Lake (the "West Levee") extended from Levee Sta. 166+00 to Sta. 215+00. See Drawing C-14 (Note 8) (JX 5.014); Drawing C-18 (5.018).

On April 11, 2000, Renda began pumping fill for the West Levee at Levee Sta. 166+50, which is near the southwest corner of Lost Lake, and proceeded northward along the west side of Lost Lake towards the northwest corner. Tr. 497(10-11) (Bowman); CQC Report (4/11/00) (JX 10.364.0002) ("Dredge begin [sic] discharge on CS 166+00.").[5]

The plans for the Upper Bayou Project "called for the alignment of the [West Levee] to gradually diverge away from the existing levee, toward the interior of the placement area . . . ." Tr. 3151(5-7) (McClenan); see also Tr. 497(17-19) (Bowman) (As the drawings specified, the West Levee "veered away from the old levee."). Material displaced by hydraulic fill – "muck" – became "trapped" between the existing or "old" perimeter levee and the new perimeter levee. Tr. 546(18-23) (Bowman); 1792(13-19) (Smith). Renda had constructed a temporary dike or "potato

---

[4] The new perimeter levees were to be constructed on an alignment to the inside of and roughly parallel with the alignment of the existing containment levee. See Drawing C-14, JX 5.014.

[5] Renda's daily construction reports indicate that Renda initially deposited material at Levee Sta. 188+82 on the west side of Lost Lake during March 12-28, 2000. See CQC Reports (3/12-28/00) (JX 10.334.0002–JX 10.350.0002). On March 28, 2000, the "discharge pipeline buckle [sic] in the middle of the spoil area and the pipeline was cut to borrow area #2 [South Levee at Levee Sta. 150+00] to keep on dredging." See CQC Report (3/28/00) (JX 10.350.0002). The broken line was repaired and Renda resumed pumping fill material at Levee Sta. 188+82 during April 3-10, 2000. See CQC Reports (4/3-10/00) (JX 10.356.0002–JX 10.363.0002).

roll"[6] on top of the existing levee to prevent the displaced material trapped between the existing and new perimeter levees from spilling over the existing levee. Tr. 499(19-20) (Bowman); 2600((14-19) (R.V. Renda). Renda's superintendent of levee construction, Mr. Rudy V. Renda, testified that the "mud wave" between the existing levee and the new levee was "on the brink" of spilling over the potato roll on the existing levee. Tr. 2609(20-25);[7] see also Stip. ¶ 78 ("During July 2000, Renda had difficulty constructing levees at [Lost Lake] near station 175+00.").

Renda first brought the difficulty that it was experiencing with displaced material trapped between the existing and new levees on the west side of Lost Lake to the attention of the Corps in late July 2000. The daily report for July 27, 2000, states: "Corps visited job site today, talked to them about center line on lievee [sic] running to the inside of the old levee. They agreed to go back and check the plans and let us know their thoughts on the situation." JX 10.471.0003. As of July 27, the hydraulic placement operation had reached Levee Sta. 180+33. CQC Report (7/27/00) ("Dump at station 180+33.") (JX 10.471.0002). ("Dump," as used in Renda's CQC

---

[6] As William Connole, P.E., who was qualified as an expert in "means and methods of levee construction generally" (see Tr. 4830(12-17)), testified, a "potato roll" is "an expedient berm that's put on top of an existing levee to retain – on the Mississippi [River], you'd say it would have been to retain flood waters. But here it was used to retain a mud wave that [Renda] was experiencing." Tr. 5172(1-5); see also Tr. 2600(19-24) (R.V. Renda) ("potato roll" is a "containment dike").

[7] Renda's CQC Reports for the July 24-August 7, 2000 period state that, among other things, Renda was "[w]orking on beefing up potato roll on levee ahead of dump." See JX 10.468.0002 to JX 10.482.0002. The CQC Report for August 8, 2000, states that Renda was "[k]eeping up potato roll levee, to keep material inside levee." JX 10.483.0002. The CQC Reports for August 10-14, 2000, state that Renda "[r]epaired potato roll levee to keep mud wave from breaking levee." JX 10.485.0002 to JX 10.489.0002. After August 14, 2000, Renda's daily reports do not reference any work upon the potato roll on the existing levee.

Reports, is the point at which dredged material is being discharged (pumped or placed) into Lost Lake. Tr. 2607(1-6) (R.V. Renda) ("Dump" is "the location of the discharge . . . ."))

The next day, July 28, 2000, Pat Duke, Renda's quality control manager,[8/] sent a letter to Eric Russek, the Corps's project engineer for the Upper Bayou Project, in which Mr. Duke stated:

> This letter is a follow up on our conversation about the levee on the West side of Lost Lake. The centerline is too far to the East of the existing old levee. The new levee placement will cause the mud to be displaced to the West in a mud wave that will go over the old levee and into the Old River. As per our conversation it would seem that the proper thing to do would be to construct the new levee so that the toe of the new levee would be against the old levee, thus using the old levee as a berm to support the new levee and also keep the mud wave to the inside of the new levee and not push it over the old levee.
>
> Please advise me of the possibility of moving the centerline to the West so we can tie in to the old levee.

PX 926; see also Stip. ¶ 79.

II. August 7, 2000 Lost Lake Meeting

On August 7, 2000, representatives of Renda and the Corps met at Lost Lake to evaluate the situation with the construction of the West Levee. The meeting took place near Levee Sta.

---

[8] Mr. Duke was Renda's quality control manager. Tr. 2600(8-13) (R.V. Renda). According to Barry Smith, the consultant who prepared Renda's claims relating to the Upper Bayou Project, Mr. Duke was an "office engineer." Tr. 1810(23-25)–1811(1-8). Renda's CQC Reports were "typed up" and signed by Mr. Duke. Id. The information contained in the CQC Reports, however, was provided by Renda field personnel such as, for example, Rudy V. Renda, Renda's superintendent of levee construction. Id. Rudy V. Renda filled out the CQC Reports and, for days when he was absent from Lost Lake, Glen Williams, the foreman who worked with the hydraulic fill operation at Lost Lake, would provide Rudy V. Renda with the information to be entered in the CQC Reports. Tr. 2600(1-6) (R.V. Renda); 2114(23-25), 2115(13-15) (Smith).

182+00. Tr. 2529(13-17) (Smith).[9/] The representatives of Renda at this meeting included Steve Bowman,[10/] Barry Smith, Pat Duke, and Rudy V. Renda; the Corps officials at the meeting were C. Michael "Mike" McClenan, Area Engineer for the Galveston District's Bay Area Office and the administrative contracting officer for the Upper Bayou Project, Eric Russek, and Tim Few, a geotechnical engineer in the Galveston District involved in the development of the design for the hydraulic levees to be constructed at Lost Lake.[11/] Tr. 498(6-12) (Bowman); 1793(22-25) (Smith); 2608(12-13) (R.V. Renda); 3150(7-14) (McClenan); 4238 (Few).

At the August 7, 2000 Lost Lake meeting, Mr. McClenan informed Renda that the Corps would allow Renda to construct the West Levee from that point, i.e., Levee Sta. 182+00, forward on an alignment that was closer to the existing perimeter levee. Tr. 3151(12-16) (McClenan) ("[S]o what we decided in the field was to allow [Renda] to, at that point, start moving the levee back just inside the existing levee, so that the bad material would ooze onto the inside and it

---

[9] Between July 28, 2000, and August 7, 2000, Renda's West Levee hydraulic fill operation advanced 230 feet from Levee Sta. 180+33 to Sta. 182+63. See JX 10.472.0003 ("Dump at station 180+33."); JX 10.473.0003 ("Dump at station 180+63"); JX 10.474.0003 ("Dump at station 180+63."); JX 10.475.0003 ("Dump at station 180+63."); JX 10.476.0003 ("Dump at station 181+63."); JX 10.477.0003 ("Dump at station 181+67."); JX 10.478.0003 ("Dump at station 181+67."); JX 10.479.0003 ("Dump at station 181+67."); JX 10.480.0003 ("Dump at station 181+67."); JX 10.481.0003 ("Dump at station 182+00."); JX 10.482.0003 ("Dump at station 182+63.").

[10] On July 30, 2000, Eddie Fisher, Renda's vice president in charge of day-to-day operations who had functioned as Renda's project manager for the Upper Bayou Project, resigned. Tr. 1483(19-21) (Bowman); JX 57. Mr. Bowman then took over the management of Renda's projects, including the Upper Bayou Project. Tr. 1483(22-25) (Bowman).

[11] Mr. Few, however, did not prepare the detailed design for the hydraulic levees reflected in Drawing C-14 (JX 05.14). The detailed design for the Lost Lake perimeter levees, including the hydraulic levees, was prepared for the Corps by HVJ Associates, an engineering firm specializing in, among other things, geotechnical construction materials. Tr. 4471(7-8), 4492(7-25)-4493(1-6), 4497(19-21) (Hasen); DX 319.

wouldn't ooze out between the two levees and cause problems with construction.");[12] Stip. ¶ 81 ("On August 7, 2000, representatives of the Corps and Renda met at the site and agreed to a revised levee alignment.").[13] "At that point," Mr. Bowman testified, Renda "broke, moved dredge line, moved over and started filling adjacent to the old levee . . . ." Tr. 498(18-20).

There is a conflict between the testimony of the Renda and the Corps personnel as to whether the Corps also directed Renda to relocate or reposition the previously-built part of the West Levee closer to the existing levee. Mr. Bowman testified that the Corps "had directed us at that time to excavate the muck between the two clay structures and clear it back to the existing disposal area, and then move the material that we had placed previously, by hydraulic methods, and mechanically construct the levee from [station] 166 to the station of 184-186, about 2,000 feet of levee." Tr. 675(22-25)-676(1-7).[14] Mr. McClenan, however, testified that, at the August

---

[12] Regarding the August 7, 2000 meeting, Mr. Few testified that it was "agreed in the field" that, "from the station that we observed" (i.e., Levee Sta. 182+00), "until we were able to run surveys and see if our alignment was correct or what was wrong, the contractor should proceed by measuring a specific distance from the existing levee rather than laying out the points that are – were given on the drawing, so as to assure that they would be the proper distance from the existing levee and that would accomplish the displacement of the soft material to the interior of the placement area, and not have it squeeze up right in the middle of the construction area." Tr. 4239(17-25)-4240(1-15).

[13] Renda asserts that Mr. Few "recognized that realignment [of the West Levee] was necessary to correct an improper design." Pl. Br. 3 (citing PX 1175.0007-08). In a December 13, 2000 letter to Renda, however, Mr. McClenan, the administrative contracting officer, wrote: "This verbal directive was issued to improve a worsening situation on the west levee, where the alignment of the newly constructed levee was shifting to the interior of the saturated disposal area. . . . The purpose of moving the new levee toward the existing levee was to assist in resolving problems with the upwelling of soft material between the hydraulically placed levee and the existing exterior levee. We no not consider [Renda's West Levee realignment claim] to have merit since the directive was issued to correct an improper construction method." PX 1158.0002.

[14] Rudy V. Renda testified that, "from [station] 166 to close to [station] 182, . . . we got
(continued...)

7, 2000 meeting, he did not direct Renda to move or reposition any part of the West Levee that Renda had previously constructed. Tr. 3151(17-20).[15/] Renda's CQC Report for August 7, 2000, did not make clear whether the Corps had approved a realignment of the part of the West Levee that remained to be constructed or whether the Corps also had approved the realignment or repositioning of the completed part of the West Levee as well. It simply states: "Eric R. & Mike M. came out and OK'd levee c/a shift to move c/l of levee towards old levee to reduce loss of material." JX 10.482.0003.[16/]

III. West Levee Construction After August 7, 2000 Lost Lake Meeting

Renda's levee construction superintendent, Rudy V. Renda, testified that, as of August 7, 2000, Renda had built approximately 1,600 feet of the West Levee from Levee Sta. 166+00 to Sta. 182+00. Tr. 2611(1-9). He further testified that Renda had to "relocate" the 1,600 feet of previously constructed West Levee closer to the existing perimeter levee "to help seal or cap the gap, if you will, between the old levee and where the alignment of the new levee was designed to be placed." Tr. 2611(10-16).

---

[14] (...continued)
direction to move the hydraulic levee over to the old levee. The reason why that was done . . . was to cap the mud from coming over." Tr. 2617(5-11).

[15] Mr. Few testified that construction of the part of the West Levee that remained to be built would "require" that Renda move "some" of the previously placed material "back closer" to the existing levee. Tr. 4240(8-10).

[16] "Eric R." and "Mike M." are references to Eric Russek and Mike McClenan. Tr. 2607(22-25)-2608(1-2) (R.V. Renda); 1793(10-14) (Smith). The notation "c/a" refers to "change in alignment." Tr. 2608(6-7) (R.V. Renda). The notation "c/l" refers to "center line." Tr. 1793(17-21) (Smith).

During the three-week period from August 7 to August 28, 2000, Renda's hydraulic fill operation on the West Levee advanced (on the modified alignment) from Levee Sta. 182+63 to Sta. 189+50.[17] CQC Report (8/7/00) ("Dump at station 182+63.") (JX 10.482.0003). During that same period, Renda also relocated the 1,600 feet of completed West Levee from Levee Sta. 166+00 to Sta. 182+00 closer to the existing levee. Renda's CQC Report for August 28, 2000 states: "Checking C/L to establish toe and shoulder stays to begin fine dressing sta 167+00-189+00." JX 10.503.0002. Rudy V. Renda explained this entry as follows: "So we have now relocated the alignment, based off of August 7 over to the old levee to cap the mud wave, using the old levee as the benchmark." Tr. 2614(6-9). He further testified that the "fine dressing" part of levee construction is "close to the finished product, or after the material's been relocated." Tr. 2614(14-17). "Fine dressing," Mr. Renda explained, is "trying to shape it to the grades illustrated and indicated on the prints." Tr. 2614(10-13).

Renda used hydraulic excavators (including a marsh track backhoe) and bulldozers to relocate the completed portion of the West Levee between Levee Sta. 166+00 and Sta. 182+63 to an alignment closer to the existing levee. Tr. 2738(7-23) (R.V. Renda); see also Tr. 2611(17-22) (R.V. Renda) ("Renda used "escavators [sic], dozers" to relocate completed part of West Levee.). Mr. Bowman testified that Renda began relocating the completed portion of the west levee at Levee Sta. 166+00. Tr. 677(10-11). He described the relocation operation as follows: "So what we did we proceeded from that point and just relayed material over, and essentially as

[17] See CQC Report (8/7/00) ("Dump at station 182+63.") (JX 10.482.0003); CQC Report (8/28/00) ("Dump at station 189+50.") (JX 10.503.0003); QA Report (8/27/00) ("Renda Marine discharge along west levee at around station 189+90.") (JX 11.046.0001).

they spread, we just continued to relay material. We had an excavator out in front pulling the soft material out and relaying it back into the existing disposal area." Tr. 677(13-17).[18]

Renda's daily construction reports indicate that the grading or shaping of the relocated West Levee occurred during August 28-September 11, 2000.[19] The report for September 11, 2000, states: "Levee work in 2 areas, Sta 168+00-193+00." JX 10.512.0002. The daily reports after September 11, 2000, do not refer to any levee work performed on the West Levee between Levee Sta. 166+00 and Sta. 182+63.

Two weeks later, on September 25, 2000, when Renda's *hydraulic* placement of the West Levee had advanced to Levee Sta. 194+70,[20] Renda folded up its hydraulic fill operation on the West Levee and moved the discharge point for dredged materials to Sta. 118+00/120+00[21] on the

---

[18] Mr. Bowman testified that the Corps "directed us to remove the muck between the two levees almost 100 feet apart, and mechanically move the levee back adjacent to the existing levee." Tr. 676(15-25). In response to the Court's question "By mechanically that means with front-end loaders and bulldozers," Mr. Bowman stated: "Front-end loaders and trucks." Tr. 677(1-6). Rudy V. Renda, however, testified that Renda attempted, but was unable, to move the West Levee with trucks. Tr. 2611(17-22).

[19] CQC Report (8/29/00) ("Continue work on fine dressing sta. 167+00.") (JX 10.504.0002); CQC Report (9/1/00) ("Levee grading, surveying, Sta 168+00-189+00.") (JX 10.507.0002); CQC Report (9/2/00) ("Levee grading, surveying, Sta 168+00-189+50.") (JX 10.507.0002); CQC Report (9/5/00) ("Continued drying clay cutting levee sta 168+00-191+00.") (JX 10.511.0002); CQC Report (9/6/00) ("Continued to roughcut levee sta 168+00-192+00.") (JX 10.512.0002); CQC Report (9/7/00) ("Continue levee work sta 168+00-152+50."); (JX 10.513.0002); and CQC Report (9/8/00) ("Continue grading levees. 168+00-152+00.") (JX 10.514.0002).

[20] See QA Report (9/25/00) (discharge point at Sta. 194+70) (JX 11.060.0001).

[21] In a March 21, 2001 letter from Thomas Benero, the contracting officer, to Mr. Bowman, Mr. Benero stated: "Please recall that verbal approval was provided to allow discharge of material at Station 118+00. This was considered a temporary relaxing of specifications to allow you short-term relief to address equipment problems with the understanding that any suitable material for levee building would be stockpiled, recovered, transported and used for levee construction in
(continued...)

South Levee,[22/] and began pumping dredged materials at that location on September 26, 2000.[23/] Renda continued to deposit dredged materials at the South Levee during October, November, and into December 2000.[24/]

IV. Contract Modification P00027

The administrative contracting officer's oral approval of a change in the alignment of the West Levee from Levee Sta. 182+00 forward was memorialized in a no-cost modification issued on May 23, 2001, which stated, in pertinent part:

> This formalizes a field change agreement between the Government and the contractor that occurred on or about August 7, 2000 wherein the contractor requested a realignment of the levee. This change allows the contractor to complete the west levees of Lost Lake Placement Area, Station 182+33 to Station 215+00 with a different alignment than that shown in the contract drawings. The alignment shown in the contract drawings between Station 166+00 and Station 182+33, as constructed prior to August 7, 2000, is acceptable. Therefore, pursuant to Section 02223, Paragraph 1.4.5 Changes in

[21] (...continued)
areas where levees were incomplete." PX 1323.0002.

[22] See QA Report (9/25/00) ("Preparations are being made to move discharge to approximately sta# 118+00, 550H and D6 dozers are shaping the area and Linkbelt 4300 excavator is assisting pipe welding and placement.") (JX 11.060.0001); CQC Report (9/25/00) ("moved discharge to sta 120+00") (JX 10.531.0003).

[23] See CQC Report (9/26/00) ("Discharging into borrow area @ 120+00.") (JX 10.532.0002); QA Report (9/26/00) ("Dredge Millennium is depositing material over the levee at approximately sta. 118+00. Depositing material in dike alignment ceased at 194+70.") (JX 11.061.0001).

[24] See CQC Report (11/6/00) ("Met with the Corps and J.V. people in Galveston today. Received verbal instruction to continue to pump mud and silt to station 120 until we hear different from the Corps.") (JX 10.573.0003); QA Report (12/8/00) (Dredge *Millennium* "discharging material over the levee at approximate sta. # 118+00.") (JX 11.111.0001).

> Embankment Alignment,[[25/]] you are to forego use of the alignment shown in the drawings (both on plan and cross sections), and place material between Station 182+00 and Station 215+00 closer to the existing levee, based on the observed location of the outside edge of the graded top of the existing levee, as shown in the attached sketch.

Modification P00027, JX 6.027.0002. Mr. McClenan confirmed that the purpose of the field change agreement memorialized in Modification P00027 was to "help" Renda with construction of the West Levee by eliminating the problems Renda was having "with the soft material oozing up between the two levees." Tr. 3151(21-24).

V. Stipulation ¶ 82 Should Be Disregarded Because It Is Contrary To Facts Established By The Evidence.

Renda contends that the portion of the West Levee that it relocated closer to the existing perimeter levee on the west side of Lost Lake as a result of the August 7, 2000 meeting discussed above "took place during September and October 2000," Pl. Br. 5-6, and that the relocated part of the West Levee extended from Levee Sta. 166+00 to Sta. 188+00. Pl. Br. 9-10. In support of those contentions, Renda apparently relies upon Stip. ¶ 82, which states: "Between about September 2000 and November 2000, Renda realigned the levee between stations 166+00 to 183+00 and 183+00 to 188+00." This stipulation should be disregarded because it is contrary to facts established by the evidence.

A court or a board may disregard a stipulation when it is "inadvertent, contrary to law, *contrary to fact*, or made without proper authority." Mech-Con Corp. v. West, 61 F.3d 883, 887

---

[25] Specification § 02223.1.4.5 (Changes in Embankment Alignment) provides: "The Contracting Officer reserves the right to make changes in the embankment alignment as may be found necessary before completion of the work. If it becomes necessary, through no fault of the Contractor, to abandon a line or location on which work has been done, payment for material placed will be made as specified below." JX 2.0100-JX 2.0101.

(Fed. Cir. 1995) (emphasis added) (quoting Kaminer Construction Corp. v. United States, 203 Ct. Cl. 182, 197, 488 F.2d 980, 988 (1973)).[26] Thus, for example, in D.E.W., Inc., ASBCA No. 49735, 96-2 BCA ¶ 28,488, the board released the Government from an erroneous stipulation as to the amount of liquidated damages withheld by the Government from a contractor, noting that "[i]t is well established that a party may be relieved of a stipulation if it is contrary to fact." Id. at 142,268; see also Swift & Co. v. Hocking Valley Railway Co., 243 U.S. 281, 288 (1917) (setting aside award of demurrage charges to railway carrier based upon erroneous stipulation that switch track upon which Swift's railway cars stood was "private track").

The stipulated facts that, "[b]etween about September 2000 and November 2000," Renda "realigned the levee between stations 166+00 to 183+00 and 183+00 to 188+00" are contradicted by the testimony elicited by Renda at trial from its superintendent of levee construction, Rudy V. Renda. He testified that, as of the August 7, 2000 Lost Lake meeting, Renda had built approximately 1,600 feet of the West Levee from Levee Sta. 166+00 to Sta. 182+00, Tr. 2611(1-9), and that, as of August 28, 2000, Renda had relocated this 1,600 feet of completed West Levee to the new alignment closer to the existing perimeter levee, with only "fine dressing," i.e., final grading

[26] Accord Dillon, Read & Co., Inc. v. United States, 875 F.2d 293, 300 (Fed. Cir. 1989) ("The trial court has a duty to reject stipulations that are demonstrably false."); H.B. Zachry Co. v. United States, 170 Ct. Cl. 115, 123, 344 F.2d 352, 357 (1965) ("A court may relieve a party of his stipulation if necessary to prevent an injustice, particularly where facts contrary to the stipulation are established by the evidence."); Bromley Contracting Co., Inc. v. United States, 14 Cl.Ct. 69, 74 (1987) ("[A] court or board may . . . reject a stipulation if it is contrary to the facts on the record."), aff'd, 861 F.2d 729 (Fed. Cir. 1988) (Table); see also Loftin and Woodard, Inc. v. United States, 577 F.2d 1206, 1232 (5th Cir. 1978) ("Simply stated, the district court was entitled to disregard the stipulation if to accept it would have been manifestly unjust or if the evidence contrary to the stipulation was substantial."); Scott Timber Co., Inc., IBCA No. 3771-97, 98-1 BCA ¶ 29,555, at 146,514 ("[B]oards of contract appeals, like the courts, have the power and the obligation to review proposed factual stipulations to ensure to the extent possible that they are not contrary to law or the record.").

or shaping of the relocated material, remaining to be done. Tr. 2614(6-9). As discussed above, Renda's daily CQC Reports indicate that the final grading or shaping of the relocated West Levee occurred during August 28-September 11, 2000. The reports after September 11, 2000, do not refer to any work performed on the West Levee between Levee Sta. 166+00 and Sta. 182+00.[27]

The West Levee between Levee Sta. 183+00 and Sta. 188+00 was placed hydraulically by Renda *after* the August 7, 2000 Lost Lake meeting, during August 10-18, 2000. See CQC Report (8/10/00) ("Dump @ station 183+93.") (JX 10.485.0002); CQC Report (8/18/00) ("Discharge point 188+00.") (JX 10.493.0002). The notion that, after the August 7, 2000 meeting, Renda continued to place any part of the West Levee along the original alignment called for by the contract Drawing C-14 so that it, too, had to be relocated, is inconsistent with the agreement reached by the Corps and Renda at the August 7, 2000 meeting (acknowledged by Messrs. McClenan and Bowman) to change the alignment of the West Levee from that point forward closer to the existing perimeter levee. It is also inconsistent with Mr. Bowman's testimony that, when Renda and the Corps agreed at the August 7, 2000 meeting that the alignment of the West Levee should be modified, "[a]t that point," Renda "broke, moved dredge line, moved over and started filling adjacent to the old levee . . . ." Tr. 498(18-20).

Therefore, to the extent that Stip. ¶ 82 states that Renda realigned the completed part of the West Levee "[b]etween about September 2000 and November 2000" and that the part of the

---

[27] After September 24, 2000, Renda was not even placing fill hydraulically on the West Levee. On September 25, 2000, Renda moved its point of discharge to a spot on the South Levee where it pumped dredged materials continuously from September 26, 2000, until December 2000. See CQC Report (11/6/00) ("Met with the Corps and J.V. people in Galveston today. Received verbal instruction to continue to pump mud and silt to station 120 until we hear different from the Corps.") (JX 10.573.0003); QA Report (12/8/00) (Dredge *Millennium* "discharging material over the levee at approximate sta. # 118+00.") (JX 11.111.0001).

West Levee that Renda relocated includes the reach from Levee Sta. 183+00 to Sta. 188+00, the stipulation is contrary to the evidence adduced at the trial of this case and should be disregarded.

## ARGUMENT

### I. The Government's Conduct With Respect To The Realignment Of The West Levee Did Not Breach The Implied Duties To Cooperate And Not To Hinder Renda's Performance Of The Contract For The Upper Bayou Project.

To recover for a breach of contract, Renda must establish: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); Charter Federal Savings Bank v. United States, 54 Fed. Cl. 120, 129 (2002). The Government does not dispute the validity of the contract for the Upper Bayou Project or that the implied duties to cooperate and not to hinder or unreasonably delay contract performance[28/] are part of this contract. However, we dispute that the Corps' conduct in respect of the realignment of the West Levee breached either of those implied duties and that, assuming for the sake of argument that a breach of contract occurred, Renda would be entitled to recover damages in the amount claimed.

---

[28] "In addition to the promise of positive performance under a contract, there is an implied obligation on both parties to cooperate and not to hinder the performance of the other party." Cedar Lumber, Inc. v. United States, 5 Cl. Ct. 539, 549 (1984); see also C. Sanchez and Son, Inc. v. United States, 6 F.3d 1539, 1542 (Fed. Cir. 1993) ("The government must avoid actions that unreasonably cause delay or hindrance to contract performance."); O'Neill v. United States, 231 Ct. Cl. 823, 824 (1982) (referring to the "longstanding rule in this court that every Government contract contains an implied provision whereby the parties agree not to hinder or unreasonably delay the other party's performance"); George A. Fuller Co. v. United States, 108 Ct. Cl. 70, 94, 69 F.Supp. 409, 411 (1947) (It is an implied condition of every contract that "neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.").

A. The Implied Duties To Cooperate And Not To Hinder Performance Of Contracts

The "implied duty to cooperate and the implied duty not to hinder performance of contracts (both being subspecies of the implied duty of good faith) are present in all government contracts." Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 58-59 (2001); accord Walter Dawgie Ski Corp. v. United States, 30 Fed. Cl. 115, 130 (1993) (The implied covenant of good faith and fair dealing "implicates the disparate aspects of the duty to cooperate and the duty not to hinder performance.").

Under the implied duty to cooperate, "the Government may not fail to cooperate reasonably with the contractor in the performance of a contract." Walter Dawgie, 30 Fed. Cl. at 130. "Breach of this duty generally implicates the reasonableness of the Government's acts or omissions." Id. The "nature and scope of this duty depends upon the facts and circumstances of the case." Accord Tecom, Inc. v. United States, 66 Fed. Cl. 736, 770 (2005) ("Breach of the duty to cooperate is assessed under a reasonableness standard, and depends upon 'the particular contract, its context, and its surrounding circumstances,'" quoting Commerce International Co. v. United States, 167 Ct. Cl. 529, 536, 338 F.2d 81, 86 (1964)). "Specifically, it is necessary to look to the magnitude of the failure to cooperate and the impact of that failure on [the contractor's] operations." Cedar Lumber, 5 Cl.Ct. at 550.

The "Government has been held to have breached the duty to cooperate when it has failed to timely respond to a contractor's request for information." Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 78 (2000) (citing Hardie-Tynes Mfg. Co., ASBCA No. 20582, 76-2 BCA ¶ 11,972, at 57,379). "A failure to provide assistance at the request of a contractor has amounted to a breach of the duty to cooperate." Id. (citing Hardrives, Inc., IBCA No. 2319, 94-1 BCA ¶

26,267, at 130,682); see also Precision Pine, 50 Fed. Cl. at 59 n.31 ("If the Government fails to take essential action, or when the Government's conduct during contract performance is unreasonable such as failing to help in a solution of a problem that has arisen in contract performance, it will be said to have breached its implied duty to cooperate with the performance of the contract.").

Under the implied duty not to hinder or unreasonably delay the performance of a contract, "the Government may not actively interfere in the performance of a contract by the contractor." Walter Dawgie, 30 Fed. Cl. at 130. Thus, "[i]f the Government takes an action that is wrongful, or otherwise engages in 'active interference,' it will be held to have breached the implied duty not to hinder performance of the contracts." Precision Pine, 50 Fed. Cl. at 59 n.31. Situations in which the Government has been held to have breached the implied duty not to hinder the performance of a contract include overzealous inspection of a contractor's work and untimely changes to contract specifications. See Tecom, 66 Fed. Cl. at 770 (citing WRB Corp. v. United States, 183 Ct. Cl. 409, 509 (1968); F.H. McGraw & Co. v. United States, 131 Ct. Cl. 501, 507-08, 130 F.Supp. 394, 397 (1955)).

B. The Government Did Not Breach The Implied Duty To Cooperate.

The Government did not breach the implied duty to cooperate in this case. In late July 2000, Renda asked the Corps for assistance with the difficulty that Renda was experiencing with displaced material trapped between the existing perimeter levee on the west side of Lost Lake and the new West Levee that Renda was constructing with hydraulically-placed fill (dredged materials). The Corps visited the work site in early August 2000 and, on the spot, approved a change in the alignment of the uncompleted part of the West Levee closer to the existing levee.

Renda argues that the Government breached the implied duty to cooperate by "fail[ing] to provide [Renda] with written direction with respect to realigning the West Levee." Pl. Br. 8. To begin, the contract for the Upper Bayou Contract did not expressly require that the Govern-ment provide Renda with a written directive regarding realignment of the West Levee. Specification § 02223.1.4.5, concerning "Changes in Embankment Alignment," provides that "[t]he Contracting Officer reserves the right to make changes in the embankment alignment as may be found neces-sary before completion of the work," but it does not state that any such changes will be provided to Renda in writing.

More importantly, Renda cannot demonstrate that it was harmed by the lack of any such written direction. Renda did not suspend construction of the West Levee following the August 7, 2000 Lost Lake meeting pending receipt of written confirmation by the Corps of its approval of the realignment of the West Levee. Rather, as Mr. Bowman acknowledged, upon the Corps' approval of the change of alignment at the August 7, 2000 Lost Lake meeting, Renda "broke, moved dredge line, moved over and started filling adjacent to the old levee . . . ." Tr. 498(18-20).[29/] Nor can it be said with any assuredness that, if the Corps had promptly provided Renda with written confirmation of the agreement to realign the West Levee reached in the field, Renda would have understood such written confirmation to mean that the Corps was agreeing only to a

[29] Renda's immediate implementation of the agreement to realign the West Levee is consistent with the recollection of Mr. McClenan, who testified that, when he "left the site" of the August 7, 2000 meeting at Lost Lake, he thought that "there was a clear understanding of the direction about [Renda] could start there and move the levee closer to the existing levee, so the toe of the new levee would abut the existing levee." Tr. 3309(25)-3310(1-5).

new alignment for the part of the West Levee that remained to be built as of the August 7, 2000 Lost Lake meeting, i.e., from Levee Sta. 182+00 to Sta. 215+00.[30]

Renda complains about the Corps' lack of response to the August 18, 2000 letter from Renda (Bowman) to the Corps (McClenan) in which Renda stated that, at the August 7, 2000 Lost Lake meeting, "the Government verbally agreed to realign the levee such that the toe of the new levee would be against the existing, old levee" and that Renda was "awaiting written confirmation of our instructions and changes in the drawings." JX 60. By August 18, 2000, however, Renda's hydraulic fill operation had advanced from where it was as of the August 7, 2000 meeting (i.e., Levee Sta. 182+33) to Levee Sta. 187+50. See CQC Reports for August 7 and 18, 2000, JX 10.482.0003 ("Dump at station 182+33."), JX 10.493.0002 ("Dump @ station #187+50."). Renda, moreover, continued to place fill hydraulically along the new alignment after August 18, 2000, without waiting for a response by the Corps to the "written confirmation" of "instructions and changes in the drawings" requested by Renda in its August 18 correspondence.[31]

---

[30] We acknowledge that Modification P00027 issued by the Corps in May 2001 with respect to the West Levee realignment unmistakably limited the scope of the field change agreed to at the August 7, 2000 Lost Lake meeting to that part of the West Levee which remained to be constructed from Levee Sta. 182+00 to Sta. 215+00 and that it expressly provided that "[t]he alignment shown in the contract drawings between Station 166+00 and Station 182+33, as constructed prior to August 7, 2000, is acceptable." See JX 6.027.0002. Modification P00027, however, must be viewed in context. It was issued after and in light of the fact of Renda's relocation of the previously-completed part of the West Levee. One cannot assume that, if the modification had been issued a day or two after the August 7, 2000 Lost Lake meeting, prior to Renda's relocation of the completed portion of the West Levee and without knowledge of Renda's intent to reposition that part of the West Levee, the modification would have been as explicit in characterizing the scope of the field change agreement as it was after and with knowledge of the relocation.

[31] Renda also complains that the Corps did not respond to its correspondence of September 22,
(continued...)

Renda argues that the Government breached the implied duty of cooperation "by failing to give [Renda] any guidance in the interim as to how it wanted the West Levee realigned – particularly if it disagreed with [Renda's] clearly articulated understanding." Pl. Br. 9. But Renda's understanding of the scope of the Corps' approval of the realignment of the West Levee was not "clearly articulated." During the August 7-September 11, 2000 period when Renda completed the realignment of the part of the West Levee it had constructed prior to August 7, 2000, there are only two documents created by Renda that address the agreement to realign the West Levee, neither of which plainly alerted the Corps that Renda would relocate the previously-constructed reach of the West Levee. The first is the CQC Report for August 7, 2000, which merely states that "Eric R. & Mike M. came out and OK'd levee c/a shift to move c/l of levee towards old levee to reduce loss of material." JX 10.482.0003. The second is Renda's August 18, 2000 letter to the Corps, which only stated that, at the August 7, 2000 Lost Lake meeting, "the Government verbally agreed to realign the levee such that the toe of the new levee would be against the existing, old levee." JX 60. Both statements could be viewed as comporting with the Corps' understanding of the scope of its agreement to permit Renda to realign the West Levee.

---

[31] (...continued)
2000, and October 31, 2000 (PX 1006, PX 1064), in which Renda again referenced the August 7, field change agreement. Pl. Br. 7. There is nothing in the record which indicates that Renda's progress was impeded in any way by the lack of a prompt response by the Corps to that correspondence. From August 18, 2000, to September 22, 2000, Renda's hydraulic placement operation on the West Levee advanced from Levee Sta. 187+50 to Sta. 194+00. CQC Report (8/18/00) ("Dump @ station #187+50.") (JX 10.493.0002); QA Report (9/22/00) ("Discharge pipeline was @ Station # 194+00 of the levee.") (JX 11.058.0001). Renda states that it was "forced to expend its resources to continually solicit the Government's concurrence with its understanding, but to no avail." Pl. Br. 8. Renda, however, does not attempt to quantify those alleged costs, much less seek compensation for them.

Renda further contends that, "[m]ost importantly, the Government was able to observe [Renda] working on the West Levee" and that, "despite these observations, the Government did nothing to correct or stop [Renda]." Pl. Br. 9. Renda argues that "the Government acted unreasonably by observing [Renda] realign the entire West Levee and then, after the fact, claiming that part of this realignment was contrary to the Government's direction – without doing what was necessary to correct the realignment." Id.

The trouble with this contention is that Renda has not pointed to anything in the record which establishes that in fact Mr. McClenan or any other responsible Corps official observed Renda's repositioning of the part of the West Levee that had been constructed prior to August 7, 2000. If anything, the record suggests that the Corps was *not* aware of it. Mr. McClenan testified that he "didn't know it was happening." Tr. 331(6-8).

Renda's daily construction reports reported when representatives of the Corps, such as Mr. McClenan or Mr. Russek, visited Lost Lake. E.g., CQC Reports for July 27 and August 7, 2000 (JX 10.471.0003, JX 10.482.0003). The first reference by a daily construction report to a visit by Corps officials to Lost Lake after August 7, 2000, appears in Renda's CQC Report for September 27, 2000, which is *after* Renda completed the relocation of the completed part of the West Levee and moved its hydraulic placement operation to the South Levee. See JX 10.533.0003 ("Corps on job site, Eric Russek, Mike McClenan. JV also out. Looked at clay recovery and hauling operations to North end. Schedule meeting with Corps for 10/3/00 at job site.").

The first unmistakable reference contained in Renda's daily construction reports to any work being performed upon the previously-completed portion of the West Levee from Levee Sta.

166+00 to Sta. 182+00 appears in the CQC Report for August 28, 2000, by which time, as Rudy V. Renda testified, that part of the West Levee had been relocated closer to the existing perimeter levee.[32] See JX 10.503.0003 ("Checking C/L to establish toe and shoulder stays to begin fine dressing sta 167+00-189+00.").[33] At that juncture, there was nothing that the Corps could have done to stop or correct Renda. The repositioning of the previously-completed part of the West Levee was a *fait accompli*.

In the August-September 2000 period, the Joint Venture monitored Renda's construction activities and submitting QA Reports to the Corps.[34] There are no QA Reports for August 4-21,

---

[32] The description of work contained in the CQC Reports for August 8-27, 2000, is not clear as to the work performed or the precise location of such work. The CQC Report for August 8, 2000 states: "Pushing material ahead of discharge point up against old levee base to force the mud wave towards inside of levee." JX 10.483.0002. Testifying about an identical entry in the 8/7/00 CQC Report (JX 10.482.0002), Rudy V. Renda explained that this is a reference to Renda's hydraulic fill operation on the West Levee: "When we were placing the dredge material hydraulically, it's just a methodology of trying to construct the levees hydraulically. In other words, trying to chase that ahead and keep it ahead of your working area so you could, in fact, construct these hydraulically." Tr. 2601(19-24). Other CQC Reports contain entries such as as "Worked material towards old levee to push mud wave towards inside levee" (e.g., JX 10.485.0002, JX 10.486.0002, JX 10.487.0002), "Moving material to push mud wave to center of dump" (JX 10.492.0002), and "Using dozers to push material against old levee slope" (JX 10.493.0002). The CQC Reports for August 22-27, 2000 only refer to the hydrualic fill operation: "Moving material from discharge point." See JX 10.497.0002–JX 10.502.0002.

[33] The CQC Report for August 28, 2000, was not signed by Renda's quality control manager, Pat Duke, until September 5, 2000, see JX 10.503.0003, which means that it would not have been delivered to the Corps any earlier than September 5, 2000.

[34] The Joint Venture began providing quality assurance services to the Corps in April 2000, pursuant to a Supplemental Quality Assurance (SQA) agreement between the Corps and the Port of Houston Authority. See JX 46; Tr. 3124-3131 (McClenan); 3914-3915 (Mears). The Joint Venture, in turn, entered a subcontract with the J. Simmons Group for, among other things, personnel to provide SQA inspection services. Tr. 3913 (Mears). The individuals who provided the SQA inspection services prepared a record of their inspections upon the Corps' standard-form "Quality Assurance Reports." Id., at 3915-3916.

2000. The QA Reports for August 22 and August 25, 2000, refer to levee-building activity between Levee Sta. 166+00 and Sta. 182+00. See JX 11.041.0001, JX 11.044.0001. But those QA Reports were not initialed by the inspector's supervisor (Wendell Mears) until August 25, 2002, see JX 11.041.0002, JX 11.044.0002, and there is no evidence in the record as to when they were forwarded to and received by the Corps. The QA Reports for August 26 and 27, 2000, similarly refer to work on the West Levee between Levee Sta. 166+00 and Sta. 182+00, see JX 11.046.0001, JX 11.047.0001, but they were not initialed by the inspector's supervisor until September 1, 2000, see JX 11.046.0002, JX 11.047.0002, and thus would not have been delivered to the Corps before that date.

Renda asserts, vaguely, that, "[t]hroughout this period," "representatives of the Government made regular site visits to Lost Lake," Pl. Br. 6, but does not identify who these individuals are or cite to any evidence in support of that contention. Renda further states that, "[i]ndeed, Mr. McClenan testified that Mr. Russek visited the site weekly." Pl. Br. 6. At trial, Renda's counsel asked Mr. McClenan "Now, Mr. Russek made numerous visits out to the project. Right?" and Mr. McClenan responded: "Eric? Yes. I *think* he went out *about* once a week." Tr. 3318(3-6) (emphasis added).[35] This testimony does not establish that Mr. Russek invariably visited Lost Lake every week of the Upper Bayou Project, much less that he visited Lost Lake during August 8-28, 2000, when Renda repositioned the previously-completed part of the West Levee – particularly in view of the absence of any mention in Renda's CQC Reports or the Joint Venture's QA Reports to any visit to Lost Lake by Mr. Russek (or any other Corps official) during that int-

[35] Renda's counsel then inquired "'Numerous' may be too strong a word. He made several visits. Right?," to which Mr. McClenan responded "Yes." Tr. 3318(7-9).

erval. Renda, therefore, has not demonstrated that the Government breached the implied duty to cooperate with respect to the realignment of the West Levee.

C. The Government Did Not Breach The Implied Duty Not To Hinder Renda's Performance Of The Contract.

The Government did not breach its implied duty not to hinder Renda's performance of the contract for the Upper Bayou Project and Renda does not suggest that it did. Regarding the West Levee, the Corps did not "actively interfere" with Renda's performance of its obligation under the contract to construct the West Levee. Even assuming for the sake of discussion that the contract required the Government to provide Renda with a written directive concerning any change in the alignment of a levee ordered by the contracting officer, which it did not, the failure of the contracting officer to do so in a timely manner with respect to the realignment of the West Levee did not delay or otherwise impede Renda's contractual performance.

As discussed above, upon the Corps' approval of the change of alignment at the August 7, 2000 Lost Lake meeting, Renda did not suspend its levee construction operations pending the receipt of a written directive from the Corps. Renda promptly moved the discharge pipe closer to the existing levee and resumed the hydraulic placement operation. Renda also repositioned the completed part of the West Levee without awaiting written confirmation by the Corps of the field change agreement reached at the August 7, 2000 Lost Lake meeting. Nor did the Corps require Renda to move the repositioned part of the West Levee back to its original alignment. The Government, therefore, did not breach its implied duty not to hinder or delay Renda's performance of the contract, i.e., Renda's construction of the West Levee.

II. Assuming For The Sake Of Argument That The Government Breached Either The Implied Duty To Cooperate Or The Implied Duty Not To Hinder Renda's Performance Of The Contract, The Damages Claimed Are Overstated.

A. General Principles

The remedy for a breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed. E.g., Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005); Bluebonnet Savings Bank v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003). The non-breaching party "is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred." LaSalle Tallman Bank v. United States, 317 F.3d 1363, 1371 (Fed. Cir. 2003). "As in all breach of contract cases, the proper measure of damages for [the Government's] breaches is the amount of [the contractor's] extra costs directly attributable to said breaches." J.D. Hedin Construction Co., Inc. v. United States, 171 Ct. Cl. 70, 108, 347 F.2d 235, 259 (1965); see also Earth Burners, Inc. v. United States, 43 Fed. Cl. 481, 482-83 n.1 (1999) (proper measure of equitable adjustment is "reasonable costs, including reasonable profit for the work performed"). Renda "bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount will be more than mere speculation." Willems Industries, Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961), cert. denied, 370 U.S. 903 (1962).

B. Renda's Original Damages Claim For The West Levee Realignment

Renda's certified claim submitted to the contracting officer on August 9, 2001, sought $789,600 as compensation for the cost of relocating the West Levee. Complaint ¶ 98; Answer

¶ 98. The claim amount ($789,600) is the product of an alleged volume of material relocated (168,000 cubic yards (CY)) times a unit price ($4.70/CY), calculated as follows:

Costs Associated With Levee Realignment And Relocation Work:

| | |
|---|---|
| Between Stations 166+00 and 183+00: | 133,000 CY @ $4.70/CY = $ 625,100 |
| Between Stations 183+00 and 188+50: | 35,000 CY @ $4.70/CY = $ 164,500 |
| Total Claimed: | $ 789,600 |

See Renda's May 31, 2001 "Request for Equitable Adjustment," PX 8.0006.

To price the West Levee Realignment Claim, Renda relied upon the unit price of $4.70 per cubic yard of material that was negotiated in Modification P00006 dated June 28, 1999, JX 6.006. Modification P00006 compensated Renda for additional work performed by its subcontractor, Affolter Contracting, Inc. (Affolter) "to realign the perimeter levee adjacent to the new drop-outlet structure, re-locate the south training levee from approximate Sta. 61+00 to Sta. 61+50, construct 50-foot wide berms on both sides of the two training levees, increase the length of the north training levee to tie-in to the north perimeter levee and extend the new drop-outlet structure walkway." Modification P00006, ¶ A, JX 6.006.0002.

The Defense Contract Audit Agency (DCAA) performed an audit of Renda's West Levee Realignment Claim. See DCAA Audit Report No. 3511-2003M17200010 dated December 12, 2002, JX 22. The DCAA audit report questioned the $789,600 claimed costs in their entirety because Renda had not provided "adequate support" for the claim. See JX 22.0002. Specifically, Renda "did not break out its labor, equipment and other direct costs or present them in a format that was auditable and traceable to the accounting books and records." JX 22.0005.

Renda contended that it was not required to produce evidence of its actual costs of realigning the part of the West Levee involved in this claim because of "a previous agreement with [the Government] regarding unit costs." "Plaintiff's Memorandum of Contentions of Fact and Law" filed on January 12, 2005, at 17. The Government disagreed, arguing that Modification P00006 did not purport to establish a unit price for earth-moving work under any subsequent contract modification or that might be the subject of a claim by Renda, such as the West Levee Realignment Claim. See "Defendant's Revised Memorandum of Contentions of Fact and Law" dated February 2, 2005, at 47.

C. Renda's Revised Damages Claim For The West Levee Realignment

Prior to trial, Renda altered its position regarding the pricing of the West Levee Realignment Claim, stating that, "[t]o resolve the DCAA's concerns, Renda revised this claim to reflect actual cost, and incorporated it into the Lost Lake Levees Claim (Claim 8)." "Plaintiff's Memorandum of Contentions of Fact and Law" filed on January 12, 2005, at 17. Renda's change of position is reflected in the March 3, 2004 Report of Robert McCullough, Jr., Renda's damages expert, (PX 1863). Mr. McCullough's March 2004 Report "combines" the West Levee Realignment Claim with the Lost Lake Levees Claim. See PX 1863.0015.

Renda's Lost Lake Levees claim consists of several damages items, one of which is Claim Item #12B – Mechanical Levees. For that item, Renda sought to recover $1,176,648.59. PX 1863A.008; Tr. 2449(8-10). At trial, Mr. McCullough testified that Item #12B contains his estimate of the costs incurred by Renda for its attempt to construct the North Levee mechanically with materials "reclaimed" from inside the East Levee, see Tr. 2446(5-14), 2448(17-25)-2449(1-5), and the costs incurred by Renda to relocate part of the West Levee. See Tr. 2449(11-19),

2453(22-25)-2456(1-5), 2875(16-19). Claim Item #12B, however, does not separately identify the costs estimated by Mr. McCullough for Renda to construct the North Levee mechanically and the costs allegedly incurred by Renda in relocating the West Levee.

D. Renda's Present Damages Claim For The West Levee Realignment

In its present damages claim for the West Levee realignment, Renda has reverted to an estimating method substantially similar to the method originally used by Renda to price the West Levee Realignment claim. The claimed amount ($789,304) is the product of an alleged volume of relocated material (167,937 CY) times a unit price ($4.70/CY), calculated as follows:

| | |
|---|---|
| Between Stations 166+00 and 183+00: | 132,937 CY @ $4.70/CY = $ 624,804 |
| Between Stations 183+00 and 188+00: | 35,000 CY @ $4.70/CY = $ 164,500 |
| Total Claimed: | $ 789,304 |

See Pl. Br. 9-12.

E. The Contract Does Not Establish A Unit Price For Relocating The West Levee.

As noted above, the revised damages estimate prepared by Renda's damages expert for mechanical levee construction work does not segregate costs associated with relocating the West Levee from costs attributable to Renda's effort to build the North Levee mechanically. Renda's response to this problem with the presentation of its actual costs for the relocation of the West Levee is that "[t]he cost of performing work is irrelevant when, as here, the contract provides a line item unit price for the work." Pl. Br. 9 n.3. We disagree.

The contract did not provide a line item unit price for the relocation of the West Levee. For the work covered by Item No. 0002, "Mechanically Constructed Levees," in the contract Bidding Schedule, Renda bid a unit price of $4.60/CY. JX 1.0003. The contract provided:

> Mechanically Constructed Levee (Levee Stations 97+00 to 166+00 and around the New and Existing Drop-outlet Structures) will be paid for at the contract unit price per cubic yard for "Mechanically Constructed Levees," measured as specified herein.

Specification § 02223.1.6.1, JX 2.0101 (underscoring in original).

Renda's West Levee claim, by contrast, involves the relocation of a hydraulically-placed levee between Levee Sta. 166+00 and (allegedly) Sta. 188+00. The work that is the subject of the West Levee claim, therefore, is not part of the work for which the contract established a unit price of $4.60 per cubic yard.

Even assuming for the sake of argument that the contract unit price applies to the earth-moving and grading work involved in the relocation of the West Levee, Renda has not demonstrated that, in performing that work, it complied with the contract requirement that the volume of material to which Bid Item No. 0002's unit price applies be "measured as specified" in the contract. In that regard, the contract provided that the "Mechanically Constructed Levee"

> shall be measured for payment by the cubic yard. The quantities shall be determined by the average end area method. The basis for the measurement will be cross sections taken at the borrow area. Cross sections shall be taken immediately before excavation, and again immediately after the required excavation to complete the Mechanically Constructed Levee has been completed.

Specification § 02223.1.5.1, JX 2.0101. There is no evidence in the record that Renda derived the volume of material to which it contends the Bid Item No. 0002 unit price of $4.60 per cubic yard applies from any measurements made in accordance with the requirements of Specification § 02223.1.5.1. Renda has not cited any testimony or identified any other evidence which demonstrates that it measured the material relocated at the West Levee in the manner specified by the contract.

F. The Unit Price Established By The Contract For The Work Covered By Bid Item No. 0002 Is Not A Reasonable Index Of The Cost Of Relocating The West Levee.

The unit price for the work covered by Bid Item No. 0002 is not a reasonable measure of the unit cost for the work involved in relocating the West Levee because the work to which Bid Item No. 0002 applies is qualitatively different from the work required to relocate the West Levee. Bid Item No. 0002 entailed mechanical construction of the South Levee (a reach of 6,900 feet from Levee Sta. 97+00 to Sta. 166+00), the part of the new perimeter levee between Levee Sta. 56+00 and 61+00 at the new drop-outlet structure (spill box) in the northeast corner of Lost Lake, the part of the new perimeter levee between Levee Sta. 4+00 and Sta. 215+00 at the existing drop-outlet structure in the northwest corner of Lost Lake, and training levees into the interior of Lost Lake perpendicular to the new and existing drop-outlet structures. See Drawing C-14 & Note 8, JX 5.014; Drawing C-18, JX 5.018; and Amendment No. 0001, ¶ 1(c)(1), Sketch SK-01, JX 3.0003, JX 3.0013.

To perform this work, Affolter, Renda's subcontractor for the mechanically-constructed levees, built a haul road around Lost Lake with material excavated from the designated borrow pits located inside the existing perimeter levee on the south side of Lost Lake. Tr. 1589(13-14), 1590(7-9) (Affolter). Affolter then excavated levee fill material from the designated borrow pits, loaded the fill material in dump trucks, hauled that material around the perimeter of Lost Lake in the trucks to the contractually-specified locations, placed, and graded (dressed) the material at those locations. Tr. 1590(4-20) (Affolter). The distance from designated Borrow Area No. 1 at Levee Sta. 120+00 around the east side of Lost Lake to the new spill box in the northeast corner at Levee Sta. 58+00 is about 6,000 feet and the distance from Borrow Area No. 2 at Levee

Sta. 150+00 around the west side of Lost Lake to the existing spill box in the northwest corner at Levee Sta. 215+00 is about 5,500 feet. The unit price for Bid Item No. 0002 was Renda's compensation for the costs of this "haul-and-fill" operation, plus a profit.

Relocation of the West Levee, by contrast, was not a haul-and-fill operation. That work involved shifting 1,600 feet of a previously-built levee that was roughly parallel to the existing perimeter levee a relatively short distance of about 100 feet[36/] towards the existing levee and grading that material again to the design template. This operation was accomplished entirely with hydraulic excavators and bulldozers.

The work covered by Bid Item No. 0002, thus, required a substantially greater and more costly effort than what was required to relocate the West Levee. Therefore, the unit price specified by the contract for the work covered by Bid Item No. 0002 is not a reasonable index of the cost of relocating the West Levee.

G. There Is No Evidence That Renda Triple-Handled The Relocated Material.

Renda contends that it "triple-handled the material relocated for use in constructing the realigned West Levee for Stations 166+00 and 188+00" and that it should receive compensation for that effort in the form of an additional $0.10 per cubic yard of material relocated, increasing the unit price sought by Renda for the relocated material from $4.60/CY to $4.70/CY. Pl. Br. 10. We do not agree.

There is no evidence that Renda triple-handled any of the material that was relocated in connection with the realignment of the West Levee. The evidence cited by Renda, i.e., JX 6.008,

---

[36] See Tr. 676(15-25) (Bowman) (At the August 7, 2000 Lost Lake meeting, the Corps "directed us [Renda] to remove the muck between the two levees *almost 100 feet apart*, and mechanically move the levee back adjacent to the existing levee." (emphasis added)).

Tr. 46, 603, 1148, does not establish that Renda triple-handled any material. JX 6.008 is a copy of Modification P00008 dated August 4, 1999, the purpose of which was to provide Renda "adequate compensation for the equipment used" by Renda (Affolter) "to triple-handle material at the new borrow area (Site No. 3) required to complete the perimeter and new training levees." See JX 6.008.0002.[37/] Page 46 of the trial transcript is a portion of the opening statement by Renda's counsel at the trial, which is not evidence and which, in any case, refers to that which Affolter was required to do, not what Renda had to do to relocate the West Levee. See Tr. 46(22-24) (Erikson). Page 603 of the trial transcript contains testimony by Mr. Bowman again referring to the triple-handling of material by Affolter at the new borrow area which is the subject of Modification P00008. See Tr. 603(21-25) (Bowman). Page 1148 of the trial transcript contains further testimony by Mr. Bowman addressed to the contract modifications that compensated Renda for additional work performed by its subcontractor Affolter, referencing triple-handling of material by Affolter, not what Renda was required to do to relocate the West Levee. See Tr. 1148(12-15) (Bowman).[38/] Renda, thus, has not demonstrated that it tripled-handled any of the material that it

---

[37] Kenneth Affolter, Affolter's project manager for the Upper Bayou Project, testified that Affolter "relayed" material from the new borrow area from the interior of Lost Lake "towards the perimeter dike" with a drag line that would "excavate the material and swing 180 degrees and throw it towards the levee. Once you make one pass, then you get behind it and throw it further towards the levee." Affolter had to perform this side-cast operation three times (triple-handle) in order to bring the material to trucks to be hauled and placed in the training levees at the spill boxes in the northeast and northwest corners of Lost Lake. See Tr. 1601(19-25)-1602 (1-9). Mr. Affolter testified that "the ground was stiff enough for a drag line on mats to mat across it, but the trucks could not run out there." Tr. 1600(20-22). "You couldn't haul it, but you could side-cast it." Tr. 1600(12).

[38] Renda asserts that it was "required to realign and relocate part of the South Levee and a training levee by Change Orders 1 and 2." Pl. Br. 10. The exhibits cited by Renda, PX 528.006 and PX 558, are not part of the record. See Notice filed April 26, 2005 (Cumulative Index of (continued...)

relocated at the West Levee. Accordingly, it should not receive any additional compensation on that account.

H. Renda's Estimate Of The Volume Of Relocated West Levee Material Is Flawed.

Renda asserts that "[i]t has not been and cannot be disputed that at least 167,937 cubic yards of material was relocated." Pl. Br. 11. We disagree. Renda has not presented any credible evidence that it relocated that volume of material.

(1) The Alleged Quantity Of Material Between Levee Sta. 166+00 And Sta. 183+00.

Renda contends that, in relocating the part of the West Levee between Levee Sta. 166+00 and Sta. 183+00, it moved 132,937 cubic yards of material. Pl. Br. 11. The only evidence cited by Renda in support of that assertion is a survey by the Joint Venture of the *hydraulically-placed* levee between Levee Sta. 166+00 and Sta. 183+00, calculations from which indicated that Renda had placed 132,937 cubic yards of material. See September 1, 2000 letter from the Joint Venture (Alan R. Jefts, P.E., Project Manager) to the Corps (Russek) appended to Renda's May 21, 2001 Request for Equitable Adjustment, PX 8.0014. Significantly, however, the Joint Venture survey did not purport to measure the quantity of material between Levee Sta. 166+00 and Sta. 183+00 that Renda subsequently repositioned or relocated closer to the existing perimeter levee.

To determine the quantity of material relocated by Renda between Levee Sta. 166+00 and Sta. 183+00, one needs to be able to calculate the volume of material in place before and after the

---

[38] (...continued)
Exhibits). At any rate, neither Change Order 1 (CO-1) nor Change Order 2 (CO-2) is concerned with a realignment of the South Levee. Those change orders, among other things, are addressed to the relocation of the "south training levee from approximate Sta. 61+00 to Sta. 61+50 . . . ." See Modification P00004, ¶ A, JX 6.004.0002; Modification P00008, ¶ A, JX 6.006.0002. Mr. Affolter testified that the South Levee was constructed "pretty well" "to design." Tr. 1590(21-25)-1591(1).

material was repositioned. To do that, it is necessary to survey (i.e., take cross sections of) the area from which the material was relocated before and after the relocation and to compare the quantity of material in place calculated from the before-relocation survey with the quantity of material in place calculated from the after-relocation survey. Here, Renda only has pointed to a survey taken by the Joint Venture before the relocation took place and the quantity of material calculated from that survey. Missing from Renda's proof is the critical *after*-relocation survey of the area between Levee Sta. 166+00 and Sta. 183+00 in which the hydraulically-placed levee was constructed. Without such evidence, Renda's claim that it repositioned all of the hydraulically-placed material between Levee Sta. 166+00 and Sta. 183+00 is rank speculation.

Presumably, Renda relocated a sufficient amount of material between Levee Sta. 166+00 and Sta. 183+00 to construct the West Levee between those stations to the design template, i.e., the neat line volume. In correspondence to the Corps, Renda stated that it had "calculated that approximately 33+/- cy of material per linear foot is required to meet the levee design template of +30 MLT." See letter dated October 31, 2000, from Renda (Bowman) to the Corps (McClenan) re: October 23, 2000 Project Meeting, PX 1064.0005.[39/] Assuming that Renda constructed the relocated West Levee to the design template, this would mean that Renda relocated at least 56,100 cubic yards of material between Levee Sta. 166+00 and Sta. 183+00 (1,700 linear feet *x* 33 cubic yards per linear foot = 56,100 cubic yards). But the suggestion that Renda moved any greater quantity of material than 56,100 cubic yards is, on the present record, pure speculation.

[39] See also letter dated September 22, 2000, from Renda (Bowman) to the Corps (McClenan) re: Differing Site Conditions Issues, etc., which stated that Renda "anticipate[s] that 66,000 cy (neat) of clay material is required to complete" the portion of the West Levee between Levee Sta. 195+00 and Sta. 215+00. PX 1006.0004. This equates to 33 cubic yards per linear foot of levee: 66,000 cubic yards ÷ 2,000 linear feet = 33 cubic yards per linear foot.

(2) The Alleged Quantity Of Material Between Levee Sta. 183+00 And Sta. 188+00.

Renda contends that it "also relocated approximately 35,000 cubic yards needed to mechanically construct the realigned West Levee between Stations 183+00 and 188+00." Pl. Br. 11. Again, we disagree.

Renda did not relocate a completed section of hydraulically-placed levee between Levee Sta. 183+00 and Sta. 188+00. That claim is contradicted by the testimony, discussed above, of Rudy V. Renda (Renda's levee construction superintendent) that Renda relocated 1,600 feet of previously-constructed levee between Levee Sta. 166+00 and Sta. 182+00, Tr. 2611(10-16), and the testimony of Steve Bowman (Renda's project manager) that, upon the Corps' approval of the change of alignment at the August 7, 2000 Lost Lake meeting, Renda "broke, moved dredge line, moved over and started filling adjacent to the old levee . . . ." Tr. 498(18-20).

The only evidentiary support cited by Renda for the contention that Renda relocated 500 feet of completed levee between Levee Sta. 183+00 and Sta. 188+00 is the following statement appearing in Renda's May 31, 2001 Request for Equitable Adjustment (REA):

> Stations 183+50 through 188+00:
> Although the [Joint Venture's] survey of August 16, 2000 did not extend beyond Station 183+67 22, [Renda] had also deposited foundation-building materials to an elevation of approximately 27' MLT, extending across at least a 200' base with a 100' top, and a 6:1 slope of repose, between Stations 183+50 and 188+00. This material placed after the August 16, 2000 [Joint Venture] survey, approximating 35,000 CY, was also relocated mechanically to the new location abutting the existing levees in accordance with Sketch SK-C010-01.[40/]

40 Sketch SK-C010-01 is an attachment to Modification P00027. See JX 6.027.0003.

PX 8.0005. At trial, however, Renda did not elicit testimony from any witnesses or adduce any other evidence to substantiate the assertions contained in the May 31, 2001 REA quoted above. Therefore, they should not be accepted as fact. As the Court observed in PR Contractors, Inc. v. United States, No. 03-30C (Fed. Cl., Jan. 20, 2006):

> Defendant raises several valid points about the weight to be given the content of the claim and the purpose for which the claim may be used. ***The Court will not accept unsubstantiated speculation as fact simply because it is contained within the four corners of the claim.*** A claim is precisely that–a request for relief that requires factual support and backup for the demands therein. In sum, ***the Court does not exclude the claim*** at this juncture, ***but will not accept statements in the claim as fact without further substantiation in the form of credible testimony or reliable documentation***.

Id., slip op. at 4 (emphases added).

The assertion in Renda's May 31, 2001 REA quoted above that, after August 16, 2000, Renda deposited dredged material between Levee Sta. 183+00 and Sta. 188+00 is contradicted by Renda's daily construction reports, which indicate that, *as of* August 16, 2000, the hydraulic fill operation had advanced to Levee Sta. 187+50, see CQC Report (8/16/00) (JX 10.491.0003) ("Dump @ station # 187+50."), and that, on August 14 and 15, 2000, the hydraulic fill operation reached and crossed a "clay mound" at Levee Sta. 187+00 that had been "pumped up in the past." See CQC Report (8/15/00) (JX 10.490.0003); CQC Report (8/16/00) (JX 10.491.0002).[41/] The assertion that this material was placed after August 16, 2000, is also inconsistent with the agreement to realign the West Levee reached at the August 7, 2000 Lost Lake meeting. If, as Renda

---

[41] A memorandum prepared by Eric Russek of the Corps the day after the August 7, 2000 Lost Lake meeting states: "The contractor previously attempted to place material for the hydraulically constructed levee, 200 feet on either side of station 188+00. The contractor is now within about 300 feet of tying into this material." PX 949.

has acknowledged, it understood as of the August 7, 2000 meeting that the remainder of the levee would be constructed on an alignment closer to the existing levee, it does not make any sense that, after August 7, 2000, Renda would have deposited any fill material along the original alignment specified by the contract.[42/]

There is, moreover, nothing in the record which establishes the size of the "clay mound" at Levee Sta. 187+00 mentioned in Renda's daily reports, either before or after any part of it allegedly was moved to the new alignment closer to the existing levee, much less that 35,000 cubic yards of that material was relocated. The record does not contain either a before or after survey of the "clay mound" at Levee Sta. 187+00 from which a calculation of whatever part of it may have been relocated could be made.

I. If, As Alleged, The Government Breached Either The Implied Duty To Cooperate Or The Implied Duty Not To Hinder Renda's Performance Of The Contract, A Reasonable Award Of Damages For The Breach Would Be $73,800.

As Renda notes in its brief, on August 16, 2000, the Joint Venture surveyed the hydraulically-placed West Levee between Levee Sta. 166+00 and Sta. 183+00. Pl. Br. 11; see also PX 8.0014. Renda, thus, did not relocate this part of the West Levee until after the survey was taken on August 16, 2000. Renda completed the relocation of this part of the West Levee during the 12-day period from August 17 to August 28, 2000; only final grading (fine dressing) remained to be done between Levee Sta. 167+00 and Sta. 189+00 as of August 28, 2000. See Tr. 2614(6-17) (R.V. Renda); CQC Report (8/28/00) (JX 10.503.0002). Final grading of that part of the West

---

[42] As noted above, Renda's daily construction reports indicate that, during March 12-28, 2000, and April 3-10, 2000, Renda discharged dredged material at Levee Sta. 188+82 on the west side of Lost Lake. See CQC Reports (3/12-28/00) (JX 10.334.0002–JX 10.350.0002); CQC Reports (4/3-10/00) (JX 10.356.0002–JX 10.363.0002).

Levee was completed during the 14-day period between August 28 and September 11, 2000. See CQC Reports (8/29-9/11/00) (JX 10.504.0002–JX 10.512.0002).

The Government's damages expert, William Connole, P.E., prepared an estimate for the effort to relocate the hydraulically-placed West Levee at issue here. Mr. Connole testified two bulldozers working 11 days (12 hours/day[43/]) would have been required to accomplish that work. Tr. 5173(23-25)-5174(1-3). Based upon those assumptions, Mr. Connole estimated the cost of this work to be $20,583, a figure that includes labor, equipment, overhead, profit, and bond. See Tr. 5176(1-14); Connole Report (1/30/04), DX 19/124. $20,583 ÷ 11 days = $1,872 per day.

Mr. Connole also estimated the cost of a hydraulic excavator as part of his analysis of Renda's "potato roll" work on the West Levee. Mr. Connole estimated that Renda would have accomplished that work over a period of 17 days (12 hours/day) with one excavator. Tr. 5172(6-16). Based upon those assumptions, Mr. Connole estimated the cost of this work to be $17,792, a figure that includes labor, equipment, overhead, profit, and bond. See Tr. 5172(17-25)-5173(1-3); Connole Report (1/30/04), DX 19/123. $17,792 ÷ 17 days = $1,047 per day. The daily rate for two excavators, therefore, would be $2,094 ($1,047 *x* 2 = $2,094).

Renda's levee construction superintendent testified that Renda used hydraulic excavators and bulldozers to relocate the completed portion of the West Levee between Levee Sta. 166+00 and Sta. 182+63. Tr. 2611(17-22), 2738(7-23). Renda would have used the bulldozers and excavators to reposition the new levee during the 12-day period from August 17 to August 28, 2000. However, only the bulldozers would have been needed to complete the final grading or shaping

[43] Renda's damages expert, Robert McCullough, testified that it was his understanding that mechanical levee operations were conducted during daylight hours, i.e., during the daylight shift. Tr. 2881(9-12).

of the relocated levee during the 14-day period from August 29 to September 11, 2000. Accordingly, the reasonable cost of relocating the previously-constructed part of the West Levee would be as follows:

| | | |
|---|---|---|
| 2 bulldozers (8/17-9/11/00): | 26 days *x* $1,872 per day = | $48,672 |
| 2 excavators (8/17-28/00): | 12 days *x* $2,094 per day = | $25,128 |
| | Total: | $73,800 |

Therefore, if, as alleged, the Government breached either the implied duty to cooperate or the implied duty not to hinder Renda's performance of the contract, a reasonable award of damages for the breach would be $73,800, plus interest pursuant to 41 U.S.C. § 611 from August 9, 2001.

CONCLUSION

For the foregoing reasons, defendant did not breach the implied duty to cooperate or the implied duty not to hinder plaintiff's performance of the contract with respect to the realignment of the West Levee. Assuming for the sake of argument that defendant breached either of those implied duties, the damages sought by plaintiff are overstated. A reasonable award of damages for the alleged breach of contract, i.e., the cost to relocate the previously-constructed part of the West Levee, would be $73,800, plus interest pursuant to 41 U.S.C. § 611 from August 9, 2001.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

FEBRUARY 10, 2006