No. 02-306C
(Judge Hewitt)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S SUR-REPLY TO PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS CLAIM THAT, WITH RESPECT TO THE REALIGNMENT OF THE WEST LEVEE, DEFENDANT BREACHED THE IMPLIED DUTY TO COOPERATE

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

<u>OF COUNSEL</u>:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

MARCH 2, 2006

# TABLE OF CONTENTS

DEFENDANT'S SUR-REPLY TO PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS CLAIM THAT, WITH RESPECT TO THE REALIGNMENT OF THE WEST LEVEE, DEFENDANT BREACHED THE IMPLIED DUTY TO COOPERATE . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. The Government Did Not Breach The Implied Duties To Cooperate And Not To Hinder Renda's Performance Of The Contract For The Upper Bayou Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Stipulation ¶ 82 Is Contrary To Facts Established By The Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. Renda Is Responsible For The Uncertainty Of Its Claimed Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV. The Contract Does Not Establish A Unit Price For Relocating The West Levee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

## CASES

Deloro Smelting and Refining Co. v. United States,
161 Ct. Cl. 489, 317 F.2d 382 (1963) .................................................................. 16

Firestone Tire & Rubber Co. v. United States,
195 Ct. Cl. 21, 444 F.2d 547 (1971) .................................................................. 16

Franconia Associates v. United States,
61 Fed. Cl. 718 (2004) ........................................................................................ 9

Franklin Co. v. United States,
180 Ct. Cl. 666, 381 F.2d 416 (1967) ................................................................ 16

Joseph Pickard's Sons Co. v. United States,
209 Ct. Cl. 643, 532 F.2d 739 (1976) ............................................................ 11, 12, 13

Mech-Con Corp. v. West,
61 F.3d 883 (Fed. Cir. 1995) ............................................................................. 4

Renda Marine, Inc. v. United States,
66 Fed. Cl. 639 (2005) ...................................................................................... 2, 5

Story Parchment Co. v. Patterson Parchment Paper Co.,
282 U.S. 555 (1931) ........................................................................................... 8

## STATUTES

41 U.S.C. § 611 ................................................................................................. 2, 17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-306C |
| v. | ) | |
| | ) | (Judge Hewitt) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S SUR-REPLY TO PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS CLAIM THAT, WITH RESPECT TO THE REALIGNMENT OF THE WEST LEVEE, DEFENDANT BREACHED THE IMPLIED DUTY TO COOPERATE

PRELIMINARY STATEMENT

In the reply by plaintiff, Renda Marine, Inc. (Renda) to the Government's response to Renda's initial brief upon its claim that the Government breached the implied duty to cooperate, Renda argues that "[t]he only reason why [Renda] relocated the West Levee was because the Corps told it to do so," "[t]he relocation of the materials used in the mechanical construction of the West Levee started in August and continued through November [2000]," and "[t]he amount of damages payable to [Renda] for relocating the West Levee is $789,304." Pl. Reply 1, 2.[1/] We disagree.[2/]

---

[1] "Pl. Reply ____" refers to the referenced page(s) of "Plaintiff's Reply Brief in Support of its Claims Relating to the Government's Breach of the Implied Duty to Cooperate" dated February 24, 2006.

[2] In this brief, "JX ____" refers to the referenced joint trial exhibit; "PX ____" refers to the referenced plaintiff trial exhibit; "Tr. ____ (____)" refers to the referenced page(s) and (parenthetically) lines of the transcript of the trial in this case; "Stip. ¶ ____" refers to the referenced paragraph(s) of the Stipulation of Facts" filed in this case on or about February 23, 2005; and "CQC Report" means "Contractor Quality Control Report."

The Government did not direct Renda to relocate the part of the West Levee from Levee Sta. 166+00 to 182+00 that, as of the August 7, 2000 Lost Lake meeting, Renda had constructed hydraulically with dredged fill material. Renda in fact repositioned that part of the West Levee closer to the existing levee on the west side of Lost Lake during August 17-28, 2000, and "fine dressed" that material to the design template during August 29-September 11, 2000. If the Court were to find that the Government breached the implied duty to cooperate with Renda in respect of the realignment of the West Levee, the damages sought by Renda are overstated: Renda in that event should not recover any more than $73,800, plus interest pursuant to 41 U.S.C. § 611 from August 9, 2001.[3/]

## ARGUMENT

### I. The Government Did Not Breach The Implied Duties To Cooperate And Not To Hinder Renda's Performance Of The Contract For The Upper Bayou Project.

In our response to Renda's initial brief upon its claim that the Government breached the implied duty to cooperate with respect to the realignment of the West Levee, we demonstrated that the Government did not breach either the implied duty to cooperate or the implied duty not to hinder Renda's performance of the contract for the Upper Bayou Project. See Def. Resp. 17-24.[4/] Renda's reply to the Government's response is basically a rehash of the argument made in its initial brief to which, except for one point, no additional response is warranted.

---

[3] Renda submitted a request for equitable adjustment (REA) for the West Levee realignment to the contracting officer on May 31, 2001, and resubmitted the REA as a certified claim to the contracting officer on August 9, 2001. See PX 8; JX 88; see also Renda Marine, Inc. v. United States, 66 Fed. Cl. 639, 707 (2005).

[4] "Def. Resp. ____" refers to the referenced page(s) of "Defendant's Response to Plaintiff's Brief in Support of its Claim that, With Respect to the Realignment of the West Levee, Defendant breached the Implied Duty to Cooperate," dated February 10, 2006.

Renda asserts that "[t]he government's argument that the Army Corps of Engineers was unaware of [Renda's] relocation of that portion of the West Levee that had been accepted and paid simply is not creditable" because, Renda "met regularly [with] Corps representatives from August through November 2000 to discuss what was being done and what needed to be done," citing Tr. 3310, 3311-19. Pl. Reply 3. This argument is flawed.

Renda has not pointed to anything in the record which establishes that, at any juncture between the August 7, 2000 Lost Lake meeting and August 28, 2000, by which time Renda had relocated the West Levee, the Government was aware that Renda intended to or in fact was repositioning the previously-constructed part of the West Levee. The testimony of the Corps administrative contracting officer, C. Michael McClenan, cited by Renda, i.e., Tr. 3310, 3311-19, does not support that proposition. Mr. McClenan testified that he "didn't know it was happening." Tr. 3310(8). While Mr. McClenan acknowledged that Eric Russek, the Corps' project engineer for the Upper Bayou Project, visited Lost Lake during the course of the Upper Bayou Project, see Tr. 3318(3-9), this does not establish that Mr. Russek visited Lost Lake during the August 7-28, 2000 interval or that any meetings between Renda and the Corps took place during that period, much less that Renda mentioned at any such meeting that it intended to or was in the process of repositioning the previously-constructed part of the West Levee.

II. Stipulation ¶ 82 Is Contrary To Facts Established By The Evidence.

Stip. ¶ 82 states: "Between about September 2000 and November 2000, Renda realigned the levee between stations 166+00 to 183+00 and 183+00 to 188+00." Renda argues that this stipulation "should be accepted as establishing the duration of [Renda's] rework on the realignment of the West Levee." Pl. Reply 7. But even Renda does not confine itself to the boundaries

of this stipulation: Renda contends (correctly) that "[t]he relocation of the materials used in the mechanical construction of the West Levee started in August [2000] . . . ." Pl. Reply 1.

As demonstrated in our response to Renda's initial brief, Stip. ¶ 82 should be disregarded because it is contrary to facts established by the evidence adduced at trial. Renda responds that "[t]his argument ignores the fact that the reason why parties stipulate is so the parties will *not* spend time or attention proving facts or establishing evidence on the stipulated point." Pl. Reply 7 (emphasis in original). This begs the question: Why, then, did Renda spend time at trial eliciting from its levee construction superintendent, Rudy V. Renda, testimony as to the period during which Renda repositioned the previously-built part of the West Levee? At trial, Renda's counsel showed Rudy V. Renda the daily report for August 28, 2000, and elicited from Mr. Renda testimony about entries in that report which establish that, as of August 28, 2000, Renda had relocated 1,600 feet of completed West Levee from Levee Sta. 166+00 to Sta. 182+00 with only "fine dressing," which is "close to the finished product," remaining to be done, contrary to Stip. ¶ 82. See Tr. 2614(6-17) (R.V. Renda). These facts, which contradict Stip. ¶ 82, are established by evidence adduced by Renda itself at trial.

Renda urges that "[l]ack of evidence addressing a stipulated fact cannot be used to nullify the stipulation, because the stipulation eliminated the need to prove the fact." Pl. Reply 5. This is not a case, however, where there is an absence of evidence in the record concerning a fact that is the subject of a stipulation.[5/] The period during which Renda relocated the completed section

[5] By contrast, see, e.g., Mech-Con Corp. v. West, 61 F.3d 883 (Fed. Cir. 1995) (overturning board finding that contractor failed to prove prerequisites for recovery of delay damages under Eichleay formula where such prerequisites were the subject of stipulated facts).

of the West Levee is addressed in testimony elicited by Renda from its levee construction superintendent, Rudy V. Renda, as well as in Renda's daily construction reports received in evidence.

Next, Renda argues that "[t]he Government has failed to show special considerations necessary to overcome Stipulation ¶ 82." Pl. Reply 6. Renda asserts that "[b]oth parties knew what the facts were at the time of stipulation" and that "[t]he government had the documents and deposed Rudy Renda, the witness whose testimony it now cites as contrary to the stipulation." Id. Renda is mistaken. The Government took the deposition of Rudy J. Renda (Oscar Renda's brother) before trial in this case. We did not depose Rudy V. Renda, the son of Rudy J. Renda[6/] and Renda's levee construction superintendent. The Government heard for the first time at trial Rudy V. Renda's testimony concerning the realignment of the previously-constructed part of the West Levee, including his explanation of related entries in Renda's daily construction report for August 28, 2000.

Citing the Court's "strict time limits on the presentation of proof,"[7/] Renda asserts that it "had no reason to explain why some information – such as the relocation efforts – was not routinely recorded in the CQC Reports." Pl. Reply 6. According to Renda, it "was more concerned with getting the job done that compiling records for a claim." Id. Renda has not pointed to anything in the record, however, which suggests that the work performed by Renda to relocate the

---

[6] See Tr. 2597(15-16) (R.V. Renda).

[7] The Court provided Renda and the Government with two weeks each to present their cases. If anything, Renda was the cause of any difficulties that it experienced with time management during the trial. For one thing, Renda expended a substantial amount of time (3-1/2 days) upon the direct examination of Steven Bowman, a witness who, the Court found, "at times appeared so committed to establishing plaintiff's trial positions that his testimony was more than once at odds with deposition testimony that proved unhelpful to plaintiff's case at trial." Renda Marine, 66 Fed. Cl. at 645.

West Levee was not routinely recorded in Renda's daily construction reports or that Renda was more concerned with getting the job done than compiling records for a claim. Renda had a contractual obligation to provide the Corps with daily reports of its construction activities that set forth, among other things, Renda's "[o]perating plant and equipment with hours worked, idle, or down for repair" and "[w]ork performed today, giving location, description, and by whom." Specifications § 01451.3.8(2),(3), JX 2.0088.

Next, Renda argues that the testimony of Rudy V. Renda "does not support repudiation of the stipulation," arguing that, "[b]ecause of the stipulation, [Renda] had no reason to ensure that Mr. Renda's testimony precisely stated the time period when all work was done to relocate the West Levee – to do so would have been a waste of time in light of the stipulation." Pl. Reply 6. Rudy V. Renda's testimony establishes that the major part of the effort to realign the West Levee, i.e., the repositioning of the previously-placed hydraulic levee from Levee Sta. 166+00 to Sta. 182+00, was completed by August 28, 2000, which is inconsistent with Stip. ¶ 82. As noted above, Mr. Renda also testified that, as of August 28, 2000, only "fine dressing," which is "close to the finished product," remained to be done. See Tr. 2614(6-17) (R.V. Renda). That testimony coupled with the absence of any reference in Renda's daily reports after September 11, 2000, to work by Renda upon the West Levee between Levee Sta. 166+00 and Sta. 182+00, also contradicts Stip. ¶ 82.

Renda asserts, without any supporting citation to the record, that, "[a]s the government well knows, the West Levee failed and required more mechanical relocation of material through November 2000 and indeed was not completed when the Corps instructed [Renda] to use remaining clay to build foundations." Pl. Reply 6-7. There is nothing in the record which suggests that,

after September 11, 2000, Renda performed any work upon the West Levee between Levee Sta. 166+00 and Sta. 182+00. What the record does reflect is that, beginning early September 2000,[8/] Renda embarked upon an unsuccessful attempt to construct the North Levee mechanically[9/] that continued through November 2000[10/] and into December 2000,[11/] and that, in March 2001, the contracting officer directed Renda "to uniformly place any available additional material, including the stockpiled material at levee Station 118+00 in the unfinished portion of the [West Levee] between approximate levee Stations 200+00 and 214+00." PX 1323.0002.

Stip. ¶ 82, therefore, should be disregarded because it is contrary to facts established by the evidence adduced at the trial of this case.

---

[8] See 9/5/00 CQC Report ("Began planning the hauling of material from sta. 95+00-97+00.") (JX 10.511.0002); 9/6/00 CQC Report ("Began cutting haul road to remove excess material behind sta 40+00-97+00." (JX 10.512.0002); 9/7/00 CQC Report ("Planned hauling out of excess clay from Sta 97+00.") (JX 10.513.0002); 9/10/00 CQC Report ("Hauling dirt mechanically, building levees, sta 37+00-36+00.") (JX 10.516.0002); 9/12/00 CQC Report ("Hauled an estimated 2300 cy of material up to sta 34+50.") (JX 10.518.0002).

[9] In a letter dated December 20, 2000, from Renda (Bowman) to the Corps (McClenan), Mr. Bowman stated: "[Renda] made the decision to mechanically haul material from the East side of the site to the North side of the site to complete the levee work. . . . [Renda] hauled and placed this material to construct levees at the North side." (PX 1175.0016); "In early September 2000, [Renda] began hauling satisfactory materials from the East side and kept a careful count of actual yards incorporated into this new levee reach. . . . By the middle of October 2000, the new levees between station nos. 40+00 and 15+00 had been completed to an elevation of 25 feet . . . ." (PX 1175.0020-0021).

[10] See 10/3/00 CQC Report ("Had a record day with 232 loads (5104 cyd)[.] Placed material in a variety of locations from 37+00-13+00[.]") (JX 10.539.0002); 10/30/00 CQC Report ("Hauled 25 loads up to Sta 10+90.") (JX 10.566.0002); 11/1/00 CQC Report ("Hauled 135 loads for the day up to Sta 8+50.") (JX 10.568.0002); 11/2/00 CQC Report ("Hauled 150 loads for the day up to Sta 7+50.") (JX 10.569.0002); 11/30/00 CQC Report ("Hauled 120 loads from the Southside of levee.") (JX 10.597.0002).

[11] See 12/20/00 CQC Report ("Build up temp levee Sta 214+00 to 198+00. Level up and dress clay levee Sta 4+00 to 10+00.") (JX 10.617.0002).

III. Renda Is Responsible For The Uncertainty Of Its Claimed Damages.

The damages sought by Renda are the product of a unit price times an alleged quantity of relocated material. In our response to Renda's initial brief, we demonstrated that the method used by Renda to calculate damages is inappropriate for two reasons. *First*, the proposed unit price is not a reasonable index of the cost of relocating the West Levee because it is a price for work under the contract that is qualitatively different from the work required to relocate the West Levee and is otherwise unsupported by the record. See Def. Resp. 30-33. *Second*, the alleged quantity of relocated material is speculative because it is not supported by before and after surveys of the borrow area from which the quantity of repositioned material accurately could have been calculated. See Def. Resp. 33-37.

Renda now contends that the Court should accept Renda's speculative damages calculation because "[t]he government's breach created some uncertainty on the amount of damages," citing precedent to the effect that, where the harm resulting from a breach of contract is of such a nature as to preclude ascertainment of the amount of damages with certainty, the injured party need only provide a reasonable basis upon which to estimate damages.[12/] Pl. Reply 8. But Renda has not demonstrated – and cannot demonstrate – that the Government's conduct is responsible for the unsubstantiated and speculative quality of its damages calculation. Moreover, even under that relaxed damages standard, assuming for the sake of argument it applied here, "a court will

---

[12] See, e.g., Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555, 563 (1931) (where harm committed "is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts").

not permit a plaintiff to recover . . . based on mere speculation or guess[.]" Franconia Associates v. United States, 61 Fed. Cl. 718, 753 (2004) (internal quotation marks omitted).

Renda states that "[t]he government's breach created some uncertainty on the amount of damages," Pl. Reply 8, without demonstrating a nexus between the supposed breach and Renda's inability to establish its damages with certainty. Renda merely asserts, baldly, that "[t]here is no precise way to measure the cubic yards of the relocated material because it could not measure the material before and after placement." Pl. Reply 2; see also id. at 9 ("There is no precise way to measure the cubic yards of the relocated material and therefore a reasonable estimate has to be made.").

The contract for the Upper Bayou Project required that for the work covered by Bid Item No. 0002, "Mechanically Constructed Levees," Renda would be compensated based upon a unit price applied to the quantity of levee fill material required to construct those levees "determined by the average end area method" and that the "basis for the measurement" would be cross sections "taken at the borrow area" "immediately before excavation, and again after the required excavation to complete the Mechanically Constructed Levees has been completed." Specifications § 02223.1.5.1, JX 2.0101. By executing the contract, Renda implicitly represented that it either was capable of performing the contractually-specified method for measuring the borrow material used to build the mechanical levees covered by Bid Item No. 0002 or could obtain the services of a firm with that expertise.[13/]

---

[13] Renda asserts that "[i]t is undisputed that the company was overrunning its costs and hoped to resolve this matter quickly to receive prompt payment." Pl. Reply 2. Renda does not cite to any evidence to support this assertion and we are not aware of anything, except that the Government does not dispute that Renda experienced a cost overrun on the Upper Bayou Project. At (continued...)

Renda, therefore, cannot reasonably suggest that it did not have the ability to perform a similar measurement with respect to the relocated West Levee material and it has not identified any testimony or other evidence in the record which establishes that such a measurement could not have been performed in the case of the repositioned West Levee material.[14/] Even if it were true that a precise measurement could not be made of the quantity of material repositioned by Renda during the realignment of the West Levee, that would not excuse the speculative nature of Renda's quantity estimate or explain Renda's failure to develop a unit price that reflects the cost of that work.

Insofar as Renda contends that the alleged Government breach of contract deprived it of the opportunity in August 2000 to make an accurate determination of the quantity of relocated material, the contention is without merit. In its August 18, 2000 correspondence to the contracting officer confirming the agreement to change the alignment of the West Levee reached at the August 7, 2000 Lost Lake meeting, Renda stated:

> We also wish to notify you that, in our opinion, this constitutes a changed condition and/or differing site condition. As soon as practicable, [Renda] will submit a Request for Equitable Adjustment for changing the alignment, which was performed through no fault of [Renda].

---

[13] (...continued)
any rate, Renda's assertion here hardly excuses its failure to properly survey and accurately determine the quantity of material that was repositioned when the alignment of the West Levee was changed.

[14] As Renda itself acknowledged in its initial brief, on August 16, 2000, the Joint Venture performed a survey of the part of the levee between Levee Sta. 166+00 and 183+00 that Renda had placed hydraulically and computed a quantity estimate from the survey results. See "Plaintiff's Brief in Support of its Claims Relating to the Government's Breach of the Implied Duty to Cooperate" dated January 13, 2006, at 11.

JX 60. Thus, before the relocation of any material at the West Levee,[15] Renda intended to make a claim against the against the Government for the cost of that work. It reasonably could – and should – have taken steps to survey the area from which the repositioned material was moved before and after the material was moved, in order to accurately measure the quantity of material that was relocated, if it wished to compute damages by multiplying the quantity of material relocated by a unit price.

By the same token, before any work to relocate the West Levee was performed, Renda had the opportunity to separately identify in its daily reports or other records the specific equipment (and equipment hours) used to relocate the West Levee,[16] from which Renda could have made an accurate demonstration of the direct costs associated with the realignment of the West Levee, including the calculation of a reasonable unit price for that work. The alleged breach of contract by the Government, therefore, did not preclude Renda from establishing damages with certainty.

The circumstances here are analogous to those in Joseph Pickard's Sons Co. v. United States, 209 Ct. Cl. 643, 532 F.2d 739 (1976). That case involved a contract to supply the Government with bundles of steel landing mat for aircraft. The landing mats produced by the plaintiff were shipped to Vietnam and put in service there. The mats had burrs and sharp edges that

---

[15] As discussed in the Government's response to Renda's initial brief, Renda did not begin to relocate the previously-constructed part of the West Levee until after the Joint Venture had completed its survey of that part of the West Levee on August 16, 2000. See Def. Resp. 37.

[16] More than a week elapsed between the August 7, 2000 Lost Lake meeting and the start of work upon relocating the previously-constructed part of the West Levee. Renda, thus, had ample time to develop and implement any record-keeping procedures that may have been necessary to keep track of the costs associated with the realignment of the West Levee.

resulted in excessive aircraft tire wear. The plaintiff's contract was modified to require a more exacting welding workmanship standard. See id., 209 Ct. Cl. at 645-46, 532 F.2d at 740-41.

The board of contract appeals in Joseph Pickard's agreed with the plaintiff that the more stringent welding requirements changed the contract's specifications in a manner that increased both the labor and material costs of welding and it awarded the plaintiff an equitable adjustment of $124,001.88 for those costs. The board, however, denied the plaintiff's claim that it was due an additional $851,418.54 to compensate it for decreased productivity (and resultant delay in contract completion) measured by the increase in end-product rejections that it contended were attributable to the supplementary welding requirements. The board concluded that the plaintiff's failure to adduce any direct evidence of increased costs resulting from delay attributable to the change order was inexcusable. Noting that the plaintiff had resisted the change order when first proposed, expressly forecasting that imposition of the revised welding standards would increase performance costs, and that the plaintiff had secured a three-week moratorium upon enforcement of the change order after its issuance in order to prepare for operations under it, the board found fatally defective the plaintiff's failure to assemble any evidence directly connecting decreased production inefficiency and consequent cost increases with differences between the original and supplementary welding standards. See id., 209 Ct. Cl. at 647-48, 532 F.2d at 741-42.

In the Court of Claims, the plaintiff attempted to justify "its general approximation of damages, not by undertaking to explain its inability to produce any evidence of actual damage from delay but by expansively invoking the maxim that where liability is established 'absolute certainty or precise mathematical accuracy' is not an invariable prerequisite to a damage award." Joseph Pickard's, 209 Ct. Cl. at 649, 532 F.2d at 742. The court disagreed, remarking that "the

inescapable fallacy in plaintiff's position on proof of damages is the presupposition that in a contract dispute the general requirement that the amount of a damage award be supported by direct proof of loss is displaced by a bare showing that the contract has definitely been breached." Id. The court explained that, "[w]hile it is true that a clear showing of liability is indispensable to a recovery, it is equally well-settled that the amount of the recovery can only be approximated in the format of a 'jury verdict' where the claimant can demonstrate a *justifiable* inability to substantiate the amount of his resultant injury by direct and specific proof . . . ." 209 Ct. Cl. at 649-50, 532 F.2d at 742 (emphasis added).

In upholding the board's denial of the plaintiff's claim for deceased productivity costs, the Court of Claims reiterated that "relaxation of the requirement that an injured party support his damage claim with definite and specific proof may be countenanced only where such proof is not reasonably available to him." Joseph Pickard's, 209 Ct. Cl. at 652, 532 F.2d at 744. The court noted that "the plaintiff has offered neither the Board nor this court any explanation, much less justification for its total failure to present direct proof of additional costs that resulted from delay stemming from the change order dealing with welding," and emphasized: "Certainly there was nothing inherent in the change order action, of which plaintiff had ample advance notice, that would realistically have prevented it from assembling such proof." Id.

Renda similarly has not offered the Court an explanation, much less justification, for its failure to present direct proof of additional costs that resulted from the realignment of the West Levee. There was nothing in the alleged Government breach of contract that prevented Renda from assembling such proof. Renda, not the Government, is responsible for the speculative and unsubstantiated quality of its damages calculation.

IV. The Contract Does Not Establish A Unit Price For Relocating The West Levee.

Renda asserts that "Line Item No. 2 of the contract provides for the payment of the Unit Price of $4.60 pcy for mechanically constructed levees" and that "[c]ontrary to the Government's argument, the contract does not limit the applicability of the unit price for mechanically constructed levees to those specifically identified in the contract at time of contract award." Pl. Reply 9. Renda also argues that, with respect to any mechanical levee construction not specifically identified in the contract at time of contract award, the unit price for mechanically constructed levees at Bid Item No. 0002 establishes only a floor, not a ceiling, for such work, as it must in order to justify the greater unit price of $4.70 per cubic yard of material that it seeks to recover upon the West Levee realignment claim. See Pl. Reply 2 ("The line item unit price of $4.60 pcy for mechanically constructing levees is the minimum contract price . . . .").

The contract does not provide that Renda will be compensated for any mechanical levee construction work beyond that expressly specified by the contract at the unit price for Bid Item No. 0002, much less that this unit price establishes a floor but not a ceiling upon the compensation for mechanical levee construction not specifically identified in the contract at time of award. For Bid Item No. 0002, "Mechanically Constructed Levees," the Bidding Schedule contained an estimate of 381,300 cubic yards of material. JX 1.0003. The scope of work contemplated by the contract for the "Mechanically Constructed Levees" under Bid Item No. 0002 is confined to specific locations at Lost Lake Placement Area described by the "Retaining Levees" specification, which provided that "[t]he Contractor shall fully complete placement of the Mechanically Constructed Levee between Stations 97+00 and 166+00; and at the areas for construction of the new Drop-outlet Structure and the modification of the existing Drop-outlet Structure as shown,

to the lines and grade specified." Specifications § 02223.1.4.3(1), JX 2.0100.[17/] With respect to "Payment," the "Retaining Levees" specification provided that "Mechanically Constructed Levee (Levee Stations 97+00 to 166+00 and around the New and Existing Drop-outlet Structures) will be paid for at the contract unit price per cubic yard for 'Mechanically Constructed Levees,' measured as specified herein." Specifications § 02223.1.6.1, JX 2.0101 (underscoring in original).[18/]

Renda's West Levee claim, by contrast, involves the relocation of a hydraulically-placed levee between Levee Sta. 166+00 and (allegedly) Sta. 188+00. That area is not part of the carefully delimited areas of Lost Lake to which the bid item for "Mechanically Constructed Levees" applies. The contract provided that the area between Levee Sta. 166+00 and 210+66, among others, were to be constructed with hydraulically-placed dredged fill materials for which Renda would be paid "at the contract unit price per linear foot for 'Hydraulically Constructed Levees,' measured as specified herein." Specifications § 1.6.2, JX 2.0101. Bid Item No. 0006, "Hydraulically Constructed Levees," established a unit price per linear foot for the construction of levees with hydraulic fill at the specific locations called out by the contract plans and specifications.[19/]

---

[17] See also Drawing C-14, Note 8 ("The Contractor is responsible for constructing the levee mechanically between stations 97+00 and 166+00 to the minimum template limits shown on Drawings C-15 and C-16, as well as at the areas indicated on Drawings C-17 and C-18 (existing and new drop-outlet structure locations), using material obtained from the borrow areas shown on the drawing."), JX 5.014.

[18] Regarding "Measurement," the "Retaining Levees" specification similarly provided that "Mechanically Constructed Levee (Levee Stations 97+00 to 166+00 and around the New and Existing Drop-outlet Structures) shall be measured for payment by the cubic yard." Specification § 02223.1.5.1, JX 2.0101 (underscoring in original).

[19] The costs of excavating and transporting the hydraulically-placed fill material to the levee alignment is subsumed in the unit price established by Bid Item No. 0008 for "Dredging" and the lump-sum price established by Bid Item No. 0009 for "Pipelines."

Apart from the lack of any support in the text of the contract for Renda's construction of Bid Item No. 0002, it does not make good business sense. "The Government is no more devoid of minimal business sense than contractors . . . ." Franklin Co. v. United States, 180 Ct. Cl. 666, 672, 381 F.2d 416, 419 (1967).[20/] That being so, why would the Corps enter a bargain for unspecified mechanically-constructed levees which establishes a minimum unit price for such work that protects the contractor from an underpayment but exposes the Government to the possibility of an overpayment? Renda could not reasonably have expected the Corps to bind itself to such an unfavorable arrangement. "The [Government] would not have accepted such a requirement and [Renda] would not have asked it to agree." Deloro Smelting and Refining Co. v. United States, 161 Ct. Cl. 489, 497, 317 Ct. Cl. 382, 387 (1963). Renda's construction of the unit price for Bid Item No. 0002 as applying to work not specifically identified in the contract at time of award and as establishing a minimum but not a maximum price for any such work is bereft of good business sense and it should be rejected.

CONCLUSION

For the foregoing reasons, and the reasons stated in "Defendant's Response to Plaintiff's Brief in Support of its Claim that, With Respect to the Realignment of the West Levee, Defendant Breached the Implied Duty to Cooperate" dated February 10, 2006, defendant did not breach the implied duty to cooperate or the implied duty not to hinder plaintiff's performance of the contract with respect to the realignment of the West Levee. Assuming for the sake of argument that

[20] Accord Firestone Tire & Rubber Co. v. United States, 195 Ct. Cl. 21, 30, 444 F.2d 547, 551 (1971) ("Both parties are presumed to be endowed with at least a modicum of business acumen. This presumption has especial attachment to the drafting party who must bear the risk of any contractual uncertainty, ambiguity or inequitable consequence." (citations omitted)).

defendant breached either of those implied duties, the damages sought by plaintiff are overstated. A reasonable award of damages for the alleged breach of contract would be $73,800, plus interest pursuant to 41 U.S.C. § 611 from August 9, 2001.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282
(fax) (202) 514-8624

Attorneys for Defendant

OF COUNSEL:

MR. P. ALEX PETTY
Assistant District Counsel
Office of Counsel
Galveston District
U.S. Army Corps of Engineers
Galveston, TX

MARCH 2, 2006