IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., Plaintiff, | ) | No. 02-306C |
| v. | ) | (Judge Hewitt) |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO MODIFY THE COURT'S APRIL 19, 2005 OPINION**

Plaintiff, Renda Marine Inc. ("Renda") respectfully moves the Court for leave to amend its Motion to Modify the Court's April 19, 2005 Opinion ("Motion to Modify") and to file the attached supplemental brief in support thereof. In its Motion to Modify, Renda asked the Court to hold, based on the *Sharman* case, that the November 26, 2002, letter of the contracting officer ("the CO's Letter") is a nullity to the extent that document addresses or is premised on denial of the certified claims included in Renda's Complaint filed in this Court on April 11, 2002. At the time it filed its Motion to Modify, Renda anticipated that the Court would rule that Renda was entitled to recover on the differing site conditions claims, and that Renda would be able to raise the merits of the *Sharman* issue when the Government asserted its claims as an offset.

However, in light of the views expressed by the Court at oral argument, and in light of the Court's July 28, 2005, denial of Renda's differing site conditions claims, Renda now requests that the Court decide the merits of whether the CO's Letter is a nullity, either because it was premised on the issues already the subject of litigation before this Court, or for one of the other reasons that a purported CO final decision is not accorded finality under section 605(b) of the Contract Disputes Act ("CDA").

Counsel for Renda has conferred with counsel for the United States and has been informed that the United States intends to file an opposition to this Motion.

Respectfully submitted,

/s Clarence T. Kipps, Jr.
Clarence T. Kipps, Jr.
MILLER & CHEVALIER CHARTERED
Suite 900
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5701
Tel: 202/626-5814
Fax: 202/628-0858

Counsel for Plaintiff Renda Marine, Inc.

Dated: April 7, 2006

CERTIFICATE OF SERVICE

I hereby certify that I have this 7th day of April 2006, caused the foregoing PLAINTIFF'S MOTION FOR LEAVE TO FILE A SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO MODIFY THE COURT'S APRIL 19, 2005 OPINION to be served by the United States Court of Federal Claims ECF system upon the following:

David M. Cohen
John E. Kosloske
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street, N.W., Room 8012
Washington D.C. 20530
Telephone: (202) 307-0282

/s Clarence T. Kipps, Jr.
Clarence T. Kipps, Jr.

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| RENDA MARINE, INC., Plaintiff, | ) | |
| v. | ) | No. 02-306C (Judge Hewitt) |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

## PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO MODIFY THE COURT'S APRIL 19, 2005 OPINION

During oral argument on July 14, 2005, the Court expressed concern over whether it had jurisdiction to consider Renda's Motion requesting that the Court modify its April 19, 2005 Opinion (the "Motion to Modify). In the Motion to Modify, Renda asked the Court to hold that the November 26, 2002, letter of the contracting officer ("the CO's Letter") (Exhibit 1) is a nullity to the extent it constituted the same claim already subject to litigation before the Court. At argument, the Court stated that it might not have jurisdiction to resolve whether the CO's Letter is a nullity, because of Renda's failure to appeal within the 12-month period specified in the CDA.

### A. Jurisdiction

Renda submits that this Court does have jurisdiction to resolve the question whether the CO's Letter is a nullity, and it asks the Court to do so. As set forth in Renda's Motion to Modify, the basis for Renda's request is that under the *Sharman* decision, the CO's Letter is a nullity because it asserts claims premised on issues already the subject of litigation before this Court. Necessarily, this Court is in the best position to resolve the question at hand, that is, whether the CO's Letter is premised on issues already the subject of litigation before this Court.

Moreover, the CO's Letter on its face shows that the Government knew its claims addressed claims that were already the subject of litigation in this Court - namely, the CO's Letter states that it "serves as a Contracting Officer counter-claim," and the six claims presented are each entitled "Counter Claims." *See* Exhibit 1 at 1-4. Further, by the enactment of the Contract Disputes Act ("CDA"), Congress intended that the Court of Federal Claims and the Federal Circuit constitute the Courts with the greatest expertise in government contract matters. It is only logical that this Court, not any other court, resolve a question about the finality of a CO's final decision.

### B. Merits

The courts have recognized that there are exceptions to the general rule set forth in section 605(b) of the CDA that a CO's final decision is accorded finality if not timely appealed. This Court should examine whether any of the following exceptions applies to excuse Renda's failure to appeal the CO's Letter within one year.

#### 1. Exceptions To the Finality Rule of Section 605(b) of the CDA

First, in *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002), the Federal Circuit considered whether duress imposed by a CO on a contractor could excuse the contractor's failure to timely appeal the CO's final decision. The Court stated: "If we were to conclude that the failure to timely file could have resulted from duress, however, a plausible argument could be made for the equitable tolling of the statutory period." *Id.* at 1238. On the facts before it, the Court concluded that Am-Pro had failed to create a genuine factual issue about duress and affirmed dismissal of the complaint.

Second, a CO's final decision that is procedurally defective cannot trigger the running of the one-year limitations period. *See Pathman Constr. Co. v. United States*, 817 F.2d 1573, 1578

(Fed. Cir. 1987) (finding CO's failure to issue a final decision was defective as a means of commencing the running of the limitations period under the "deemed denial" provision).

Third (as set forth in Renda's Motion to Modify), the Federal Circuit held in *Sharman* that a CO's final decision is "a nullity" if it is issued after the claim is subject to litigation in court. *Sharman Co. v. United States,* 2 F.3d 1564, 1571-72 (Fed. Cir. 1993), *overruled in other part by Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1579 (Fed. Cir. 1995). If the CO's decision is a nullity, it cannot be final and conclusive.

Fourth, the Supreme Court has recognized for more than a century that a government official's decision resolving a contract dispute is not accorded finality if that decision is based on "fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment…." *See United States v. Wunderlich,* 342 U.S. 98, 99-100 (1951) (citing *Kihlberg v. United States*, 97 U.S. 398, 402 (1878); *Sweeney v. United States*, 109 U.S. 618, 620 (1883); *Martinsburg & P.R. Co. v. March*, 114 U.S. 549, 553 (1885); and *Chicago, S .F. & C. R. Co. v. Price*, 138 U.S. 185, 195 (1891)). *See also United States v. Moorman*, 338 U.S. 457, 461 (1950).

Fifth, the courts have consistently recognized over the years that a CO's action is not valid if it was not the independent decision of the CO. *See generally Schlesinger v. United States*, 390 F.2d 702, 708-09 (Ct. Cl. 1968) (CO improperly influenced by pressure from Congressional Committee); *John A. Johnson Contracting Corp. v. United States*, 132 F. Supp. 698, 705 (Ct. Cl. 1955) (CO improperly terminated for irrelevant reason unrelated to performance); *Darwin Constr. Co. v. United States,* 811 F.2d 593, 596 (Fed. Cir. 1987) (CO improperly terminated for irrelevant reason unrelated to performance).

### 2. Application of Exceptions to Renda

The principal exception that applies to excuse Renda's failure to appeal the CO's Letter within one year is the third exception identified above, based on the *Sharman* case. To make its determination, this Court will need to compare the claims asserted in the CO's Letter with the claims and facts at issue in the litigation before the Court. Both Renda and the Government have provided the CO's Letter to this Court, but Renda again attaches this decision as Exhibit 1 for the Court to consider in making its determination. Renda respectfully requests that the Court permit further briefing on the comparison between the claims asserted in the CO's Letter with the claims and facts at issue in the litigation before the Court.

The fourth exception concerning "gross mistake" also applies to Renda. Renda believes there is significant evidence that the CO's Letter was issued as a result of gross mistake and that its failure to appeal within one year is therefore excused. For example, Counter Claim No. 1 in the CO's Letter seeks recovery of $2 million for work in Section 9 that Renda Marine did not complete. *See* Exhibit 1 at 1-2. But this is directly contrary to the CO's testimony in his deposition that:

> . . . Renda completed the majority of the contract with the exception of Section 9. We terminated a portion – we, the Government – a portion *for the convenience of the Government* on Section 9 and that was the end of the contract.

Benero Dep. at 57-58 (Exhibit 2) (emphasis added). In addition, all of the claims asserted in the CO's Letter are predicated on Renda being in default. Specifically, the CO's Letter seeks reprocurement costs, plus liquidated damages for default. *See* Exhibit 1 at 1-4. But this is incorrect – Renda was *not* terminated for default. Indeed, the CO testified at trial that: "The contractor was never – there was never any termination for default on this contract." Trial Tr. at 297-98 (Exhibit 3).

Finally, the fifth exception applies here as well. In light of the testimony of the CO that is contrary to some of the facts asserted in the CO's Letter, as well as the other factual errors in that letter, there is a serious question as to whether any of the claims asserted in the CO's Letter were actually the CO's decisions. Indeed, Mr. Russek, the Corps' Project Engineer, testified that the Joint Venture interfered with the administration of the contract, and that without this interference, the Army Corps of Engineers would have worked out "all the issues" – *i.e.*, the issues raised in this litigation and in the CO's letter. Russek Dep. at 102-05, 108-11, 116, 142-43, 158-62, 182-87, 209-10 (Exhibit 4). If the CO's Letter does not represent the decision of the contracting officer, it is invalid, under *Schlesinger* and *Darwin*.

**C. Process**

To develop the relevant facts, Renda will likely need to take additional discovery, and there will likely be the need for a further hearing before this Court. Most importantly, the Government withheld documents concerning the decision-making process of the CO's Final Decision on the ground of privilege. Those documents should be produced, to determine whether the CO's Letter was the decision of the CO, or whether it was rendered as a result of "fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment."

## CONCLUSION

For the above reasons, Renda requests that the Court decide the merits of whether the CO's Letter is a nullity, either because it was premised on issues already the subject of litigation before this Court, or for one of the other reasons that a purported CO final decision is not accorded finality under section 605(b) of the CDA.

Respectfully submitted,

/s Clarence T. Kipps, Jr.
Clarence T. Kipps, Jr.
MILLER & CHEVALIER CHARTERED
Suite 900
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5701
Tel: 202/626-5814
Fax: 202/628-0858

Counsel for Renda Marine, Inc.

Dated: April 7, 2006

DEPARTMENT OF THE ARMY
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO ATTENTION OF

November 26, 2002

Contracting Division

Mr. Oscar Renda
Renda Marine, Inc.
522 Benson Lane
Roanoke , TX 76262

SUBJECT: Contract DACW64-99-C-0001
Houston/Galveston Ship Channel
Dredging Upper Bayou Project

Dear Mr. Renda:

This letter serves as a Contracting Officer counter-claim on Contract DACW64-99-C-0001, Houston/Galveston Ship Channel for items determined to be deficient or incomplete or not in accordance with the contract specifications.

On October 26, 1998, above referenced contract was awarded to Renda Marine, Inc., (RMI) in the amount of $12,526,100.00 to dredge approximately 3,483,700 cubic yards of material. Renda Marine was also responsible for building 381,300 cubic yards of mechanically constructed levees and building 13,700 lineal feet of hydraulically constructed levees. Contract completion was originally set at 18 February 2000 and through several modifications later revised to 28 June 2000. The Notice to Proceed was issued on 16 November 1998.

Each counter-claim is listed below with an explanation and dollar amount associated with each claim:

## FINDINGS OF FACT

I have attached my Findings of Fact and they are incorporated in this document.

## ANALYSIS

**a. Counter Claim No. 1: Dredging Section No. 9**

Modification CO-11, dated 18 September 2001, deleted the remainder of dredging for the project as stated in a Contracting Officer decision dated 01 June 2001.

DEPOSITION EXHIBIT
11

The Government deleted the remainder of Section 9 under Modification P00028 dated 18 September 2001 due to your continued and protracted inability to accomplish the work in accordance with contract requirements. Your ineffective and inefficient hydraulic placement of material dredged from the channel resulted in wasting a large quantity of material inside the area instead of such being incorporated into the hydraulic levees. Deletion of the remainder of Section 9 put an end to any further damage to the area by the inefficient operation.

Approximately 135,000 cubic yards of "required dredging" remains to be removed within the channel template in Section 9 and will be removed by another contractor.

Modification P00029 dated 28 September 2001 decreased the total funded amount of the contract by $415,000.00, from $17,052,424.16 to $16,637,424.16. The $415,000.00 deduction is the result of the deletion of Section 9 on this contract.

Our estimate for completing this portion of the work is $2,067,000.00. This amount includes costs for mobilization, pipelines, two boosters and cost to dredge the remaining material from Section 9.

**b. Counter Claim No. 2: Sec. 7 Clay Misplaced Material**

On 20 October 2000, you submitted a letter alleging a differing site condition consisting of "Heavy Red Clay at North Side of Channel, Stations 565+00 to 580+00." The Government never considered this issue to have merit.

You encountered materials commensurate with what was reflected in the borings on the contract drawings, i.e., stiff clays. Hence, that material should have been incorporated into the hydraulic levees around Lost Lake Placement Area (LLPA) but you elected to stockpile such in lieu of what the contract required. The Government decided that it would be more prudent not to incur any further lost time due to inefficient levee construction methods exhibited by you at LLPA. This material is still in this location and will have to be recovered and used to rebuild the incomplete levees by another contractor.

The Government carefully considered your claim in this section, and as stated above, never considered it to have merit. Our estimated cost for excavating the misplaced material, placing it in trucks and hauling to the North Levee is $571,000.00.

**c. Counter Claim No. 3: Incomplete West Levee Realignment (Mechanical Portion Only)**

You failed to complete a significant portion of the west levee to the lines and grades in accordance with the contract specifications during the construction period.

The Government did not recommend that you relocate the completed portion of the levee between approximate levee stations 166+00 and 180+00, but only that work beyond station 180+00. This realignment was to improve the current site conditions and to assist you with your levee construction method. However, you made the decision to relocate this already completed portion of the levee.

In order to bring the levees to lines and grades as specified in the contract documents, the Government estimates it will cost $108,000.00 to complete the work. This work includes mobilization, cutting/hauling and filling material, bonds and contingency.

**d. Counter Claim No. 4: Incomplete, Non-Hydraulic North Levee**

Between approximate levee stations 15+00 to 40+00 you attempted to construct the North Levee mechanically instead of hydraulically displacing the soft foundation with dredged material as required by the construction contract. Consequently, the North Levee was never constructed to the lines and grades as required by the contract documents. You also failed to complete the North Levee to the lines and grades as specified by the contract documents. The contract clearly stipulates that the levees were to be placed hydraulically. This was a requirement so that the soft foundation material would be displaced during the hydraulic operations. Your ability to accomplish an effective and efficient hydraulic fill operation precluded such from occurring. It is apparent that your equipment and management of such were incapable of doing so.

It is noted in this area that you recovered misplaced material from the east side of the levee (one truckload at a time) to attempt to mechanically construct the North Levee. Again, the Government decided that it would be more prudent to delete the work and not incur any further lost time due to inefficient dredging or additional damages at LLPA.

Our estimated cost for another contractor completing the North Levee in accordance with the contract specifications is $3,413,000.00. This estimate includes mobilization of a large dredge capable of excavating new work material, pipelines and associated cost to dredge material from Sections 16-20 in the Mid-Bayou Reach.

**e. Counter Claim No. 5: Recovery of Misplaced/Wasted Material**

Again, due to your inefficiencies in your dredging operations, approximately 1.2 million cubic yards of suitable levee building material was wasted toward the interior of LLPA. A letter from the Bay Area Office, dated November 3, 2000, referenced an October 23, 2000 meeting that recommended continuing to reasonably recover the

misplaced and overplaced satisfactory material along the East Levee. Once again, the Government decided that it would be more prudent to cease any further Renda Marine recovery operations and delete the work and not incur any further lost time or additional damages at LLPA.

Subsequent to the Upper Bayou Contract, the Government contracted with a geotechnical consultant to take numerous soils borings at various locations within LLPA. The borings indicated that suitable levee building material had flowed to the interior approximately 1,000 feet from the levee toe on the east and west sides of LLPA. Also, the borings indicated that the suitable material varied in thickness from about 10 feet near the levee toe to about 1 foot at a distance of about 1,000 feet to the interior. As a result of this, the Government estimates that it will take at least 8 months for another contractor to recover this material and incorporate into the incomplete levees. This work is estimated to cost the Government $5,465,000.00.

**f. Counter Claim No. 6: Liquidated Damages**

At the present time the Government is withholding approximately $259,840.85 in retainage. In addition to this, we are withholding $236,016.00 in liquidated damages calculated by multiplying $528.00 per day multiplied by 447 days the Government estimates is beyond the contract completion date of 28 June 2000.

. To date the Government has refunded $252,000.00 to your company. The amount of $259,840.85 represents the balance remaining in retainage.

Total for all counter claims is summarized below:

| | |
|---|---|
| a. Dredging Section 9: | $2,067,000.00 |
| b. Sec. 7 Clay Misplaced Material: | 571,000.00 |
| c. Incomplete W. Levee Realign. (Mech. Portion Only) | 108,000.00 |
| d. Incomplete, Non-Hydraulic North Levee: | 3,413,000.00 |
| e. Recovery of Misplaced/ Wasted Material: | 5,465,000.00 |
| f. Liquidated Damages: | 236,016.00 |
| Total | $11,860,016.00 |

**<u>FINAL DECISION</u>**

Based upon the above stated facts, I hereby determine that Renda Marine, Inc., is indebted to the Government in the amount of $11,860,000.00 for the additional cost of correction of deficiencies under Contract DACW64-99-C-0001. I hereby direct Renda

Marine to submit a payment in the amount of $11,860,000.00 to me by Certified Check payable to "FAO USAED, Galveston."

Any amount not paid within 30 days from the date of this demand will bear simple interest from the date of this demand at the interest rate established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraph (b) of FAR 52.232-17, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

You may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed. The proposal for deferment should provide the information required in FAR 32.613 and should provide information regarding a proposed bond or other collateral as required.

This is a final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 7th Floor, 5109 Leesburg Pike, Falls Church, Virginia 22041-3204. If you decide to appeal, you must mail or other otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you received this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedures for claims of $50,000.00 or less or its accelerated procedures for claims of $100,000.00 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Thomas Benero

Thomas Benero
Chief, Contracting Division
Contracting Officer

CF: Brian W. Erikson, Attorney at Law
John Kosloske, Dept.of Justice
Mike McClenan, Bay Area Office

## FINDINGS OF FACT

1. Solicitation (IFB) DACW64-98-B-0004 for Dredging Upper Bayou (45 foot project) in Harris and Galveston Counties was issued 16 June 1998. The solicitation was amended one time

2. Amendment 0001 dated 7 July 1998 incorporated questions from prospective bidders and provided answers by the Galveston District Design Team.

3. Bids were opened on 17 July 1998.

4. Five bids were received, the lowest being $12,526,100.00.

5. The Government estimate was $13,607,400.00 or approximately 9% higher than the Renda Marine, Inc., (RMI) bid.

6. RMI submitted the lowest bid of $12,526,100.00. Award of the contract was made on 26 October 1998. The Notice to Proceed was issued on 16 November 1998.

7. A total of 30 modifications were issued under this contract. Some modifications were issued unilaterally by the Contracting Officer and some bilaterally after mutual agreement by both parties.

8. On 8 March 2000, a Cure Notice was issued to RMI for what the Government considered RMI's failure to demonstrate that they could achieve satisfactory execution of the project within the times required by its terms.

9. On 4 April 2000, RMI responded to the Cure Notice. In their response RMI provided a contract summary to date and a proposed completion date. This response also provided a proposed production rate of dredged material and utilization of a booster pump. Also included in this letter was a dredging plan for completion of the project.

10. On 16 April 2000, the Government and the local sponsor of the project, the Port of Houston Authority (PHA), met with RMI and their surety to discuss progress of work on the Upper Bayou Contract and RMI's response to the Cure Letter issued 8 March 2000.

11. As a result of the 16 April 2000 meeting, on 25 April 2000, RMI was presented a letter outlining 4 conditions they had to meet in order to avoid being Terminated for Default. These were:

a. Maintaining a monthly production rate as stated in the dredging plan for completion of the project must be met for each pay period;
b. Work must be in accordance with the contract drawings and specs;
c. All materials suitable for constructing levees are to be utilized for levee building, and;
d. RMI was to provide an update of quality control personnel and responsibilities for each work area.

12. On 11 July 2000, a letter was issued to RMI stating that the dredging quantity stated in each pay period appeared reasonable and attainable. However, there was still some concern that the quantities of lineal feet of hydraulic levee proposed to be constructed per pay period appeared to be excessive. RMI was asked to review the proposed quantities and revise as appropriate. RMI was also told the 4 conditions in the Government's 25 April 2000 letter still applied.

13. On 6 October 2000, the Government requested RMI to submit a proposal for removing and disposing the debris on the north side of the channel between approximate channel stations 530+00 and 554+00.

14. Modification P00019 dated 27 October 2000, directed RMI to remove and dispose of the debris on the north side of the channel between approximate channel stations 530+00 and 554+00. This mod also increased the contract amount by $66,000.00 and added 4 calendar days to the contract.

15. On 6 November 2000, a Show Cause Notice was issued to RMI for failure to demonstrate they could achieve satisfactory completion of the project within the times required by its terms. This Show Cause Notice reiterated the 4 conditions of the 25 April 2000 letter. However, RMI continued to demonstrate their inability to complete this project by a definite date.

16. On 15 November 2000, RMI responded to the Show Cause Notice. As a result of this, the Government submitted a letter to RMI on 13 December 2000 responding to the 17 issues summarized in their letter. RMI was asked to submit Requests for Equitable Adjustments (REA's) for issues numbered 3, 4, 9 and 10 within 15 calendar days of receipt of our letter. These four issues were the ones the Government considered to have merit.

17. On 21 December 2000, the Government submitted another letter to RMI requesting an REA for a new differing site condition consisting of unknown obstructions on the south side of the channel between stations 634+90 and 635+00 and station 637+57. This was the result of a letter describing a new differing site condition submitted by RMI on 13 December 2000.

18. On 7 March 2001, RMI made an alternative proposal for project delays due to differing site conditions. RMI suggested that they would complete its dredging work at the North Slope of Dredge Section No. 5 and 6 and then move the

discharge line at Jacinto Port. The Government was to remove the remainder of Dredge Section No. 9 from the contract.

19. On 13 March 2000, RMI submitted a letter proposing furnishing approximately 250,000 cubic yards of clay material from a private contract to LLPA for hydraulic levee construction. As a result of this, Modification P00026 was issued adding up to 60 calendar days to the contract.

20. Modification P00023, dated 14 March 2001, established a revised contract completion date of 28 June 2000. It also provided for payment to RMI in the amount of $3,083,833.00 for dredge work completed in the flare area of the Houston/Galveston Navigation Channel.

21. Modification P00026 dated 4 May 2001allowed up to 60 calendar days to complete dredging from private sources and hydraulically placing it into the new levee template at Lost Lake Placement Area (LLPA). The modification provided for additional time allowed of up to 60 calendar days.

22. On 27 August 2001, the Government issued a letter to RMI directing them to remove any remaining pipelines or appurtenant equipment belonging to RMI from the LLPA.

23. Modification P00028 dated 18 September 2001, deleted the remaining unfinished dredging on the north levees between stations 4+00 and 40+00 and the remaining levee construction from the contract.

24. On November 6 and 7, 2001, the Contracting Officer issued 6 letters to RMI acknowledging receipt of various certified claims submitted by RMI between January thru October 2001. Breakdown of claims and dollar amounts are as follows:

| **Claim** | **Dollar Amt.** |
|---|---|
| Dredging S. Ferry Landing | $1,049,173.00 |
| Dredging Flare Area Clay | 4,691,688.00 |
| Delays due to HL&P Trans. Tower | 170,863.00 |
| Dredging Sec. 7 Clay | 1,083,779.00 |
| Realignment of West Levee | 789,600.00 |
| Dredging obstructions No. 1 (Sec. 4-8) | 2,126,083.00 |
| Dredging obstructions No. 2 (Sec. 9) | 1,158,642.00 |
| Delays due to Hydraulic Levees at LLPA | 6,258,853.00 |
| Total | $17,328,892.00 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
Defendant. )

ORAL DEPOSITION

THOMAS BENERO

January 8, 2004

ORAL DEPOSITION OF THOMAS BENERO, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 8th day of January, 2004, from 9:02 a.m. to 5:06 p.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of the United States Corps of Engineers, 2000 Fort Point Road, 2nd Floor, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

COPY

feelings to me, engineers, the other engineers, the Joint Venture, that he favored terminating Renda Marine for default based on the progress of Renda Marine at that time on this contract.

Q. (BY MR. ERIKSON) Progress or lack thereof?

A. Or the lack of progress, yes.

Q. Now, Mr. Rozsypal apparently felt that there should be greater progress than there was, right?

A. Not only Mr. Rozsypal but also the Government and the Joint Venture and the Port of Houston.

Q. And by that time Renda had submitted notices of differing site condition and other notices of problems that Renda was having that Renda contended weren't Renda's fault, right?

A. That is correct. Yes.

Q. Now, ultimately Renda was not terminated for default, correct?

A. That is correct.

Q. What did the Government do ultimately with this project? What happened?

A. Ultimately?

Q. Yeah. What's the paperwork show? Dealing with Renda, what does the paperwork show? We're going to get into some of it. What does the paperwork show?

A. The paperwork shows that Renda completed the

majority of its contract with the exception of Section 9. We terminated a portion -- we, the Government -- a portion for the convenience of the Government on Section 9 and that was the end of the contract.

Q. Okay. Let's talk about Section 9 for a second. Section 9 had a number of obstacles that Renda was encountering, right?

A. Right.

Q. So, the Government terminated for convenience because of the obstacles, correct?

A. Not only because of the obstacles but also because of the condition that the Joint Venture, the Port of Houston, and the Government felt that Renda was not doing the kind of work, the quality of work that they wanted Renda to do in Section 9. And so, they came to us, me, the contracting officer, and asked that a termination for convenience notice be issued to Renda Marine and that we would subsequently readvertise and award that portion of the Section 9 that was not completed to another contractor.

Q. Now, as you understand a termination for convenience, what that does is it sort of liberates the contractor from having to perform that sort of work, right?

A. That is correct.

Q. So, the Government doesn't have to pay the contractor any more for doing work in that area and the

CHANGES AND SIGNATURE

WITNESS NAME: ______________ DATE OF DEPOSITION: ___________

PAGE LINE CHANGE REASON

16 4 "Ft. Meed," MD, to be changed to "Ft. Meade, MD."

45 10 Change the word "contacting" to "contract."

55 16 Change, "mistaken bid" to read, "mistake in bid."

101 17 Change the word, "contracts" to "contractors."

123 4 Change the word, "change" to "changed."

I, THOMAS BENERO, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Thomas Benero

THOMAS BENERO

THE STATE OF )

COUNTY OF )

Before me, RUBEN R. VILLAGRAN, on this day personally appeared THOMAS BENERO, known to me ~~or proved to me on the oath of~~ ~~or through~~ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/~~she~~ executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this 3rd day of MARCH, 2004.

Ruben R. Villagran

NOTARY PUBLIC IN AND FOR

THE STATE OF TEXAS

My Commission Expires:

RUBEN R. VILLAGRAN
Notary Public, State of Texas
My Commission Expires
January 02, 2005

STATE OF TEXAS
COUNTY OF HARRIS

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF THOMAS BENERO
January 8, 2004

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 22nd day of January, 2004.

Stacey Whitley by Norma DeLaCruz

Stacey Whitley, CSR
Texas CSR 3999
Expiration: 12/31/2005
ESQUIRE DEPOSITION SERVICES
Firm Registration No.: 03
3401 Louisiana, Suite 300
Houston, Texas 77002
713-524-4600

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
v. ) Docket No. 02-306C
UNITED STATES )
Defendant )

VOLUME I
Courtroom 11-D
Casey Federal Courthouse
515 Rusk
Houston, Texas
Monday,
February 28, 2005

The parties met, pursuant to the notice of the Judge, at 9:00 a.m.

BEFORE: HON. EMILY C. HEWITT
Judge

APPEARANCES:

For the Plaintiff:
BRIAN W. ERIKSON, ESQ.
CLARK B. WILL, ESQ.
TERRY SALAZAR, ESQ.
Quilling Selander Cummisky Lownds, PC
201 Bryan Street, Suite 1800
Dallas, Texas 75201

For the Defendant:
JOHN E. KOSLOSKE, ESQ.
USDOJ Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20005

Page 2

C O N T E N T S

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| Thomas Benero | 67 | 311 | 321 | | |
| | 169 | | | | |
| Steven Craig Bowman | 324 | | | | |

Page 3

E X H I B I T S

| PLAINTIFF'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| PX-1 | 123 | -- | FAR Part 43 |
| PX-2 | 197 | -- | FAR Part 49 |
| PX-0783 | 160 | 162 | Renda letter, 3/22/00 |
| PX-0798 | 162 | 173 | Renda letter, 4/4/00 |
| PX-0915 | 182 | 185 | COE letter to Fisher, 7/11/00 |
| PX-1027 | 203 | 207 | Renda letter, 10/20/02 |
| PX-1083 | 189 | 202 | 11/6/00 show-cause notice |
| PX-1158 | 216 | 227 | McClenan letter, 12/13/00 |
| PX-1178 | 228 | 229 | McClenan letter, 12/21/00 |
| PX-1327 | 241 | 246 | Renda letter, 3/13/01 |
| PX-1499 | 263 | 275 | Cole letter, 6/1/01 |
| PX-1547 | 276 | 279 | McClenan letter, 7/23/01 |
| PX-1583 | 279 | 282 | Benero letter, 8/27/01 |
| PX-1614 | 302 | 303 | Benero letter, 11/6/01 |
| PX-1615 | 303 | 306 | Benero letter, 11/6/01 |
| PX-1617 | 306 | 307 | Benero letter, 11/6/01 |
| PX-1619 | 308 | 309 | Benero letter, 11/7/01 |
| PX-1793 | 298 | w/drawn | Benero letter, 11/26/02 |

30

Page 4

E X H I B I T S

| DEFENDANT'S EXHIBITS: | IDENTIFIED | RECEIVED | DESCRIPTION |
|---|---|---|---|
| DX-309 | 332 | 332 | Plane view, Galveston Bay/Houston Ship Channel |
| DX-349 | 319 | 320 | Benero letter, 10/26/98 |
| DX-437 | 315 | 317 | Renda letter, 3/30/02 |

Page 297

some experience with termination actions. Correct?
A Uh-huh.
Q And we've talked a little bit about what the effect was or what the nature was of the termination action that occurred with the June 1, 2001, letter. Do you remember that?
A Yes.
Q Okay. And this modification essentially, in contract modification form, formalized what had occurred in your June 1 letter or in the June 1 letter of Curtis Cole and in your August 27 letter. Correct?
A Correct.
Q At the time that you issued change order number – or excuse me – modification P00028 that we've been talking about, that deleted the remainder of Section 9 of the dredging and the balance of the levee construction –
A Yes.
Q – did you consider that or did you issue it as a termination for default, partial termination for default?
A Oh, no.
Q You didn't.
A No.
Q So –
A The contractor was never – there was never any termination for default on this contract.

Page 298

Q There wasn't?
A There was not.
Q Okay. Well, let me ask you to turn then to Plaintiff's Exhibit 1793.
A 1793?
Q Yes, sir.
(The document referred to was marked for identification as Plaintiff's Exhibit PX-1793.)
BY MR. SALAZAR:
Q Mr. Benero, please count the number of pages. You should have an eight-page exhibit there as PX-1793.
A I do.
Q Okay. And this appears to be a letter dated November 26 of 2002 that on the fifth page of the – excuse me – on the fifth page of the exhibit bears your signature as the chief of contracting division, contracting officer.
THE COURT: Try to explain to me why we're actually looking at this letter.
MR. SALAZAR: Well, Your Honor –
THE COURT: When was this complaint filed?
MR. SALAZAR: This complaint was filed in April of –
MR. ERIKSON: April of 2002.
THE COURT: Now, this is an after-occurring

Page 299

event. Now, was this appealed to this Court?
MR. ERIKSON: There was no appeal. No, Your Honor.
THE COURT: I really need – why is this here?
MR. SALAZAR: Well, Your Honor –
THE COURT: Are you impeaching something he said? He told you something, and you're not – did he lie to you? I mean, why is this in here? We had a colloquy –
MR. SALAZAR: Yes, Your Honor. And –
THE COURT: – and there was a motion to amend –
MR. SALAZAR: Yes, Your Honor.
THE COURT: – on – would someone tell me in the Contract Disputes Act when it is you need to appeal the contracting officer's final decision?
MR. SALAZAR: It depends on who you want to appeal to. It's 90 days to the Board of Contract Appeals, and it's a year to the Court of Federal Claims.
THE COURT: Okay. Was it appealed to the Court of Federal Claims in a year?
MR. SALAZAR: There was no separate appeal action filed.
THE COURT: Was it appealed to the Contract Board in 90 days?
MR. SALAZAR: There was no appeal action filed.
THE COURT: So this is not really before me.

Page 300

MR. SALAZAR: Your Honor, the issue –
THE COURT: Has he said something he needs to be impeached on?
MR. SALAZAR: Your Honor, this is his decision that runs diametrically opposed with what he's already testified to, but we believe that the position that the other government witnesses are going to take later on during the presentation of the Government's case in chief will be inconsistent with what Mr. Benero has already testified about.
THE COURT: Okay. We have a pretrial conference ruling that this exhibit will come in for impeachment only. What has Mr. Benero said that needs to be impeached?
MR. SALAZAR: Well, Your Honor –
THE COURT: I mean, you are going to follow the pretrial hearing. You're going to follow the orders of this Court, and if you didn't appeal this, you're not appealing it here. I don't have jurisdiction of this, and he has not said something that you – I mean, you're not saying he lied.
MR. SALAZAR: No, Your Honor. I'm not –
THE COURT: Good. That's a start. So –
MR. SALAZAR: Your Honor –
THE COURT: So how do you impeach someone who hasn't lied or where you want to correct their testimony?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
Defendant. )

ORAL DEPOSITION

ERIC RUSSEK

January 14, 2004

ORAL DEPOSITION OF ERIC RUSSEK, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 14th day of January, 2004, from 9:59 a.m. to 5:08 p.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of the United States Corps of Engineers, 2000 Fort Point Road, 2nd Floor, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

COPY

to help us with the quality assurance reports. And those reports were shared with Mr. Herrera or Pat Duke or whomever the QC person was.

Q. When was it decided that the Joint Venture would have any quality assurance role?

A. I'm not sure. I mean, there is a project cooperation team -- that I'm not a part of -- that is made up of some Corps people, some Port people, and then the Port consultants. Okay. And they're kind of like an overview project team that tries to coordinate all the -- all these Houston-Galveston projects. It wasn't just this one. It's an ongoing team effort. And the major decisions, you know, whether there's a project change, if there's something that needs to -- anything that has to do with money goes through this project cooperation team. And they only meet once a month. So, that can slow down the process.

Q. Okay. When did you first become aware that the Joint Venture was going to have some role in the quality assurance tasks on the Upper Bayou project?

A. It was, I would say, probably about four or five months into the dredging portion of it. And I resisted it myself.

Q. You resisted it how, sir?

A. I resisted their involvement in the quality assurance portion of it. Because I felt that that was

something that it was better for the Corps to handle itself, whether we had to hire some -- you know, some quality control, quality assurance person, construction representative. I would have preferred to have done it that way. But however, it was decided, again, by this project cooperation team that the Joint Venture would assist in performing quality assurance for the Corps.

Q. Well, there ended up being a fair amount of animosity between the Government and the Joint Venturer over how this project was going to progress, wouldn't you agree?

A. I agree.

Q. And you've seen the Tim Few E-mails that call the Joint Venture backstabbing weasels. You've seen that?

A. I remember those words.

Q. Did you ever have a meeting where the Corps described the Joint Venture that way or words similar to that?

A. Meetings with the Joint Venture or --

Q. No. Meetings within the Corps.

A. Yes.

Q. And I understand from the Joint Venture people they had meetings where they described the Corps about the same way.

A. Sure. Yes. It's mutual.

Q. Mutual dislike for each other?

A. Sure.

Q. Did you ever hear anything personally from the Joint Venture where, you know, they expressed some sort of dislike or lack of professionalism toward the Corps?
A. Not directly from them. I mean, hearsay. I mean --
Q. Who did you hear it from?
A. I don't remember.
Q. What sorts of things did you hear?
A. Just that, you know, they accused us of letting contractors run amuck and, you know, not enforcing the plans and specs to the tee. And because we come from different philosophical backgrounds. I mean, the Corps has always tried to partner with the contractor, you know, and to go in the same direction. Whereas you get someone who is not with the Corps, private industry, Joint Venture types and, you know, their main thrust is that the contractor is out to screw the Government, plain and simple.
Q. So, you would agree that contractors bidding for, say, the Upper Bayou project would expect that there would be some sort of partnering relationship with the Government, right?
A. Yes.
Q. As a matter of fact, I think if you look in the project manual, it's probably something standard. They do talk about instituting a partnering relationship with the contractor, right?

A. Correct.

Q. Now, as part of partnering, one of the things that the sides should do is if they have an issue with the other side, they should let the other side know, right?

A. Right.

Q. Whether it's informally at a lower level in the field or a little more formally in writing so that the issue gets addressed, right?

A. Right.

Q. Another aspect of partnering is to respond to concerns the other side has raised, right?

A. Right.

Q. And you should respond in a reasonably prompt manner, right?

A. Sure. But it is in those writings, in those documents because it had to go through so many hands -- it had to go through the Port and the Port consultants and the Joint Venture -- that it made our letter writing campaign very arduous, very difficult to try to get things -- to try to get letters written out in a reasonable amount of time.

Q. How were the quality assurance deficiency notices from the Joint Venture transmitted to Renda Marine, if you know?

A. What I recall, I would get them. I would receive them.

I kept my notations.

Q. Now, you testified a little bit earlier about the project coordination team meetings. Do you remember?

A. Correct.

Q. And I think you said you weren't invited to those, right?

A. Well, I'm not at a level where I would be, let's put it that way.

Q. Okay. You also understand that Renda Marine wasn't invited to those?

A. Right.

Q. Don't you think it would have been a good idea to have you and Renda Marine involved in those so you can discuss the Upper Bayou project?

A. It would be -- it would be worthwhile. But as to this day, it still stands as it is. The contractor and the project engineer are still not a part of that project cooperation team --

Q. Okay.

A. -- for whatever reason.

Q. Well, are you aware of any change orders that might pay money to Renda Marine on the Upper Bayou project that the Joint Venture was in favor of?

A. In favor of? Those were few and far between.

Q. Was it your general impression of the Joint Venture,

that they didn't want to pay any more money on this project?

A. That's true.

Q. Now, I think there's at least a few instances where you agree Renda Marine would have been entitled to more money on the Upper Bayou project, right?

A. I agree.

Q. The flare area is one of them, right?

A. That was one.

Q. We'll talk about some more in a little while. Did you see some heated letters or memos from the Joint Venture when the Corps agreed to pay money to Renda Marine on the Upper Bayou project?

A. Yes, I did.

Q. Do you ever recall the Joint Venture requesting that the Corps simply instruct Renda Marine to do certain things and if Renda Marine complained about wanting money, Renda Marine can just file a claim at the end of the project? Do you remember anything like that?

A. I don't remember exactly in those words but very similar to what you're saying.

Q. And can you give me any specifics?

A. No, I can't. But what you're saying, the gist of it, the general -- your general statement is correct. I mean, I don't remember specifics but yes. In general, that's true.

Q. Let me see if I can help you a little bit, then. Do

you recall the Joint Venture wanted Renda just to -- to continue simply building foundations for levees out at Lost Lake and then at some future time, there would be a day of reckoning as to whether or not Renda would get paid?
A. That sounds pretty harsh. I don't -- I don't recall those -- I don't recall those words.
Q. Well, you understand -- and I'll show you a letter, it's either from Mr. McClenan or Mr. Benero, that instructed Renda to continue simply building foundations for the levees out at Lost Lake. Do you recall that letter?
A. Not specifically but --
Q. Do you recall Renda being given instructions like that during the course of the project?
A. Sure. Yes.
Q. Now, do you remember that Renda's concern and response to that sort of instructions was "How do we get paid," right?
A. Sure.
Q. Because, I mean, that was a legitimate concern on the part of Renda, right?
A. Correct.
Q. Because if they don't achieve the levee template, then theoretically they're not entitled to any money, right?
A. Right.
Q. And it may be that they can't achieve levee template

because there's an insufficient amount of material to build the levees, right?

A. Could be, yes.

Q. Or it could be that they can't get to levee template because the foundations are simply too soft and they're swallowing up the material that's getting placed there, right?

A. Could be that.

Q. Or it could be some other reasons, right?

A. There could be many reasons.

Q. But whatever the reason, unless Renda achieved the levee template, 30 feet above mean low tide, Renda wasn't entitled to any money as --

A. The Joint Venture was very adamant about all or nothing.

Q. So, in other words, the Joint Venture wanted Renda to achieve a 30-foot high levee or Renda get no money?

A. We were -- we were disagreeing and were saying no, let's at least prorate and do it on a volume or some sort of fraction and then pay accordingly to that. And that was something that was never agreed upon.

Q. And so, it never got resolved?

A. No.

Q. You're agreeing with me?

A. I agree.

Q. Okay. Now, prior to going from 40 feet to 45 feet

having with the mechanically constructed levees, right?
A. That's correct.
Q. Now, is that one of those change orders that the Joint Venture complained about?
A. Yes.
Q. But the Corps felt it was fair and the Corps issued it, right?
A. Yes.
Q. Now, that was earlier on in the project, right?
A. Right.
Q. And after that time, the Joint Venture became more vocal about its concern about the issuance of change orders that gave money to the contractor, right?
A. Yes.
Q. Turn over to Page 3 of Russek Exhibit No. 2. At the top of the page, Paragraph No. 5, there's a current net retention rate paragraph. Do you see that?
A. I see that.
Q. And then down below, Mr. Few's written "net retention rate equals approximately 0.37"?
A. I see that.
Q. And so, that would be close to that 40 percent you talked about one of the other contractors achieving, right?
A. Right.
Q. And then Mr. Few's written below that that "the

wasn't it?
A. I know they pumped a gross of over three and a half, and I do remember a percentage of close to 65 percent of suitable material.
Q. So, if you took three and a half million times 65 percent, what do you get?
A. 2.275 million.
Q. Okay. Does that sound about right to you as to how much Renda -- suitable materials Renda put out there?
A. In a ballpark, you know, quick calculation, that sounds reasonable.
Q. Okay. Now, do you remember -- we talked before we broke for lunch about at one point in time the Corps in general and Mr. McClenan, in particular, allowed Renda to build on top of the existing levee.
A. On the north side.
Q. And I think that occurred -- did you say 900 feet or 1600 feet?
A. It was about 900 to a thousand feet.
Q. Okay. How come that stopped? Why did the Corps tell Renda not to do that anymore?
A. I believe I recall that there -- that the Joint Venture had much to say about that.
Q. And what did the Joint Venture have to say?
A. They objected into allowing them -- allowing the

contractor to build on top of the levee. They wanted the -- the Joint Venture wanted the levee built in accordance with the drawings and the contract.

Q. Well, on that north side, that's where the foundations were the softest of all, wasn't it?

A. Correct.

Q. I mean, that's where it was hardest to build the new levee, right?

A. Right.

Q. Was the contractor having some success building on top of the existing levee?

A. Yes, there was.

Q. So, how come the Corps listened to the Joint Venture? I'm just trying to figure this out in my own mind.

A. I can't answer that. I don't know.

Q. 20/20 hindsight, do you think it would have been better if the contractor continued to build on top of the existing levee?

MR. PETTY: Object to the form of the question.

Q. (BY MR. ERIKSON) You're free to answer.

A. This is an opinion.

Q. Give me your opinion.

A. I would have liked to have seen Mr. McClenan be a little bit more adamant in allowing the north -- especially the north levee to continue to be constructed, the new levee

Q. But you recall that he made a statement like that?
A. But he did make a statement.
Q. Do you recall Mr. Hrabovsky stating at that meeting that Mr. Hrabovsky had been the project manager when T.L. James Dredging Company was creating those sidecast borrow areas?
A. Yes, I do.
Q. Do you recall Mr. Hrabovsky stating that at the time that T.L. James was creating those sidecast borrow areas that T.L. James probably didn't maintain a 50-foot gap between the borrow area and the existing levee?
A. I'm not familiar with the specifics; but I mean, considering the way he was speaking about it, I wouldn't doubt it.
Q. And you know from your own personal knowledge, I think you testified that you saw between 25 and 50 feet away from the existing --
A. Correct.
Q. -- toe was the borrow areas?
A. Correct.
Q. Now, back to Benero Exhibit No. 8. The tail end of the very first paragraph says, "At this time, we are awaiting written confirmation of our instructions and changes to the drawings. Please advise us of the status in this matter."
Do you understand that Renda was wishing

something formally from the Government to confirm that that's how the change was going to happen, right?

A. Yes. I understand.

Q. And you agree that it was a change to the drawings, right?

A. Yes. Yes.

Q. Now, at the bottom of the first page, Mr. Bowman talks about the soft foundations, right?

A. Right.

Q. And at the top of the second page, he writes, "Renda expected and planned for displacement of a reasonable amount of soft materials in its bid for the work. However, the contractor could not have anticipated the sheer magnitude of displaced material, which has caused mud waves and prevented the efficient and economic use of equipment and personnel placing good, available clay material." Do you see that?

A. I see that.

Q. When you saw this letter, did you consider writing back or preparing something for Mr. McClenan to write back to Renda to advise them of the sidecast borrow areas possibly being a cause for where all this good material was going?

A. Yes.

Q. And what happened? Did Mr. McClenan reject your suggestion?

A. No, he did not. However, since we had to coordinate

with the Joint Venture, they objected to much of what I had written.

Q. So, you wrote a draft letter that would have pointed out that problem with the sidecast borrow area?

A. Correct.

Q. And it got vetoed by the Joint Venture?

A. And eventually vetoed completely.

Q. It got what? First it got changed and then it got vetoed? What?

A. Sending the letter got vetoed.

Q. Okay. How quickly did you prepare -- do you generally prepare draft letters for Mr. McClenan?

A. Yes.

Q. When you get a letter like this one, this August 18, 2000 letter, how quickly do you prepare a draft response?

A. First off, I'll make copies of this and provide it to the usual people that I consulted with, get their opinion. And, you know, based on their information, I would take that and draft up a letter. And then Mr. McClenan would take this and would coordinate with the Joint Venture by either E-mail or meeting or whatever and have other discussions about it.

Q. Who were the usual suspects that you coordinated with?

A. Suspects --

Q. You said there was a usual group of people that when

you got a letter like this you coordinated with.
A. Tim Few, geotech, office of counsel, contracting, Mr. Benero, and Johnny Rozsypal.
Q. Okay. Why Johnny Rozsypal?
A. Johnny had -- has a lot of experience. I mean, he's done dredging all his career and he has a lot of knowledge of, you know, all the placement areas. And so, I relied on his expertise and experience.
Q. Okay. So, in your group, you didn't include the Joint Venture in the people you coordinated with?
A. No, I didn't.
Q. And then when you prepared it for Mr. McClenan, then he would involve the Joint Venture?
A. Correct.
Q. So, how quickly would you prepare a response after you did your coordination and collected the information you needed from your group?
A. I mean, it wouldn't take -- it would take maybe a week or so to get various information back from the people that I would coordinate directly. And, you know, it wouldn't take but a day or two to compile that information into a draft letter for Mr. McClenan's signature. But what took the longest time was coordination with the Joint Venture.
Q. Okay. So, in your draft response back to Mr. Bowman, you were going to tell Mr. Bowman about the

sidecast borrow areas, right?

A. We had -- I forget how it was worded but that was a paragraph that I had taken specifically from Tim Few from what he had written and I used it in its entirety. And he had explained perhaps the historical -- you know, how the levees were constructed and I don't know if he used borrow pits per se but, you know, he did explain that the material was used from within the placement area to construct the levees.

Q. Okay. So, that October, 2000, meeting where Mr. Hrabovsky was there and advised Mr. Bowman, that information could have gotten passed a few months earlier if you would have been allowed to have your version of a response to Benero Exhibit No. 8?

A. Correct.

Q. Did you ever understand any reason why the Joint Venture didn't want that information passed on to Renda Marine?

A. That particular information, I didn't -- I don't know why.

Q. Turn over to Benero Exhibit No. 12. By the way, before we get to there, would you like a break?

A. Yeah. Sure.

MR. ERIKSON: Let's take about five minutes.

(Recess taken)

Q. (BY MR. ERIKSON) All right. Benero Exhibit No. 12

bidding the project. The Joint Venture's hypothesis appears reliable since crane mats are typically 20 feet wide. The new shear line, located approximately 20 feet from the toe of the existing levee, corresponds with the general size of crane mats and what appears to be the leading edge of the existing borrow area." Do you see that?

A. Yes.

Q. Now, did you think about writing back to or preparing a letter back to Mr. Bowman about the borrow areas at this point in time?

A. Yes. In fact, I think this corresponds back to a previous exhibit where I had tried to prepare something but was vetoed.

Q. Okay. Did you now try to prepare something else or did it get vetoed again or what happened?

A. I don't think I -- no. I did not pursue anything else because I already knew what the answer was going to be.

Q. The answer was going to be a veto?

A. Exactly.

Q. You didn't expect that the Joint Venture was going to change its stripes?

A. No, not at all.

Q. Now, as we go through these documents, we're going to see again and again that Renda requested some direction and guidance about what the heck to do. They don't have enough

clay material to build levees, the levees they're trying to build are failing. Renda suggests doing certain things. Did you consider providing some guidance to Renda as to what they ought to do?
A. Yes, I did.
Q. Now, was that -- your thoughts about providing some guidance, was that, again, vetoed by the Joint Venture?
A. I mean, I did try and then when word got back that I had, then I was --
Q. Scolded?
A. Scolded is a good word.
Q. Scolded by whom?
A. Well, not from Mike McClenan but through Mike McClenan.
Q. So, who passed the scolding along to you?
A. Let's say certain people of the Joint Venture.
Q. Okay. So, the Joint Venture blew a fuse --
A. Absolutely.
Q. -- and lit up Mr. McClenan?
A. Yeah.
Q. And word got back to you that you needed to stop giving any guidance or direction to the contractor?
A. Yes.
Q. Why didn't the Joint Venture, near as you can tell, why didn't they want any guidance or direction going to the

contractor?

A. They wanted -- I mean, they thought that these plans and specs were it. They wanted the project built as shown and that's it.

Q. Do you agree that the project couldn't be built as shown?

A. There could have been some improvements in certain areas of the plans and specs.

Q. For example, with --

A. But going back to our partnering session, that -- the whole goal is when you have a problem, you try to first resolve it out in the field at the lowest level possible. And then if not there, then you step it up a level. And, you know, you try to avoid getting as many people involved in blowing the problem out of proportion. So, that was -- that was always my objective when I go out, was try to handle it at the field level. And then when that didn't work --

Q. And it didn't work because the Joint Venture vetoed that?

A. Right.

Q. Now, a lot of proposed resolutions could be done at no cost or minimal cost, right?

A. Sure.

Q. For example, if the contractor tells you that something just isn't working and you and the contractor put

your heads together and you can resolve it at a no cost or minimal cost change, right?

A. Absolutely. Right.

Q. I assume that you were an advocate for your position with Mr. McClenan; is that correct?

A. That's correct.

Q. Why wouldn't Mr. McClenan listen to you, as far as you know?

A. Mr. McClenan was being pressured from his boss.

Q. Who is Mr. McClenan's boss?

A. That would be Johnny Rozsypal. Who would -- who is on the project cooperation team and so is Mr. McClenan. And a lot of that pressure came from the Port as far as dollars. The Port didn't want to pay for anything above that set price. They wanted mods to be at a minimum, period. So, the pressure flowed downhill essentially.

Q. But you-all recognized going into this project that there were no guarantees that there was going to be sufficient materials to be able to accomplish what you wanted, right?

A. That's correct.

Q. It was -- Tim Few admitted to you that it was a guess as to whether or not there's going to be sufficient clay or other suitable materials to build the levees, right?

A. Yeah. Based on their estimates.

Q. But they didn't know whether their estimates were

going to be right or wrong; but if they were wrong, they were going to adjust during the course of the project?

A. I mean, their estimates were based on research that had been done in the past at other locations and adapted for this project. So, yes. We were on a learning curve. And, you know, this was the best that we had at the time.

Q. In the last paragraph on Page 2, Mr. Bowman wrote, "In order to correct the problems or at least diminish the affects of the levee failure, the Government recommended that Renda complete the levee up to a minimum elevation tying the remaining levees into both sides of the old drop outlet structure at the north side of the site." Do you see that?

A. Yes.

Q. And that's typically how the Government would resolve, in part, a problem like this, is that you tell the contractor construct it as high as you can and then we'll address it from there, right?

A. Right.

Q. Because the bottom line is you want to have a perimeter levee that's at least a certain number of feet high so you can contain material?

A. Correct.

Q. And then Mr. Bowman notes some changes that the Government requested. Do you see those, the three bullet points?

A. Yes.
Q. Do you agree that the Government had requested those changes?
A. The first bullet I'm not familiar with. The second bullet I agree with, and the third bullet I agree with.
Q. All right. The first bullet, you do agree that if the side slope were increased, that the footprint would then be less for the new levee?
A. Right. It would be steepened.
Q. And it would venture less into the borrow areas than the old method, right?
A. Right.
Q. So, that would be one possible resolution of the problem, right?
A. Possible. I would be concerned about the steepness.
Q. Okay.
A. And failures as a result thereof.
Q. Now, did you prepare any sort of response to this letter, draft response, other sort of response?
A. I don't remember.
Q. Do you remember coordinating with the Joint Venture about what the response should be?
A. Yes, I do. And their's would have been a very negative response.
Q. Even to the three bullet points that we talked about

investigate, right?

A. Yeah. I agree.

Q. Okay. One last line of questions for you. We've seen numerous letters by Renda where they indicate that there's insufficient clay materials in Renda's mind and that as far as Renda is concerned, they can't get the levees to the 30-foot elevation either because the foundations are too unstable or there's just insufficient materials, right?

A. Right.

Q. What was Renda supposed to do at that point? As the project engineer, what was Renda supposed to do?

A. I mean, they requested the assistance. I was somewhat shackled in being able to respond to the requests.

Q. Shackled by your boss and the Joint Venture?

A. Correct. Not so much my boss.

Q. Your boss was shackled by the Joint Venture?

A. Yeah. And through him I was very limited in what I could provide.

Q. Renda is not blaming you. Renda just wants to know what the heck was it supposed to do?

A. Yeah. I understand.

Q. Any idea what Renda was supposed to do at that point?

A. I understand. 20/20 hindsight.

Q. So, other than the influence of the Joint Venture,

is there any reason why the Government didn't respond and tell Renda what to do?

A. Well, unfortunately the Joint Venture did have quite an impact on our responses and unfortunately so did the Port. If it would have just been a contract -- well, without the Joint Venture, I would say this would have ended a lot differently.

Q. And it would have ended with the Corps partnering with Renda to resolve these problems?

A. Correct.

Q. And the Corps and Renda would have worked to change the design so that the project could have been finished?

A. I think so. I think we could -- I think we could have worked through several -- all the issues. I think we could have developed together solutions, you know, all the levees and the stiff clay. You know, I don't know. I mean, it's --

Q. We'll leave it at that.

A. Okay.

MR. ERIKSON: At this point in time, we'll adjourn the deposition, reserving our rights to ask additional questions if we have any based on documents that may be produced from Corps electronic media. And subject to that, we'll pass the witness.

MR. PETTY: And we would reserve any questions

CHANGES AND SIGNATURE

WITNESS NAME: RUSSEK DATE OF DEPOSITION: 1/14/04

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 19 | 3 | CHANGE "TAINER" TO "TAINTER" | |
| 36 | 11 | CHANGE "BEAN STIVISON" TO "BEAN-STUYVESANT" | |
| 57 | 3 | CHANGE "RESPOND" TO "RESPONDING" | |
| 65 | 5 | CHANGE "STIVISON" TO "-STUYVESANT" | |
| 83 | 22 | CHANGE "HOUSE TRACK" TO "HOUSE-TRACT" | |
| 90 | 9 | CHANGE "STIVISON" TO "-STUYVESANT" | |
| 94 | 14 | DELETE "AN" | |
| 103 | 9 | CHANGE "JOINT VENTURER" TO "JOINT-VENTURE" | |
| 170 | 21 | CHANGE "DIVULGED" TO "DIVERGED" | |
| 192 | 8 | ADD "NOT" AFTER "WOULD" AND BEFORE "TOTALLY" | |

I, ERIC RUSSEK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Eric H Russek

ERIC RUSSEK

THE STATE OF TEXAS )
COUNTY OF GALVESTON )

Before me, RUBEN R. Villagran, on this day personally appeared ERIC RUSSEK, known to me ~~or proved to me on the oath of ______________ or through ______ (description of identity card or other document)~~ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this 31st day of MARCH, 2004.

Ruben R. Villagran
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

My Commission Expires:

RUBEN R. VILLAGRAN
Notary Public, State of Texas
My Commission Expires
January 02, 2005

STATE OF TEXAS
COUNTY OF HARRIS

REPORTER'S CERTIFICATE
ORAL DEPOSITION OF ERIC RUSSEK
January 14, 2004

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 27th day of January, 2004.

Stacey Whitley

Stacey Whitley, CSR
Texas CSR 3999 by Norma DelaCruz
Expiration: 12/31/2005
ESQUIRE DEPOSITION SERVICES
Firm Registration No.: 03
3401 Louisiana, Suite 300
Houston, Texas 77002
713-524-4600