DEPARTMENT OF THE ARMY
GALVESTON DISTRICT, CORPS OF ENGINEERS
P.O. BOX 1229
GALVESTON, TEXAS 77553-1229

REPLY TO
ATTENTION OF

November 26, 2002

Contracting Division

Mr. Oscar Renda
Renda Marine, Inc.
522 Benson Lane
Roanoke , TX 76262

SUBJECT: Contract DACW64-99-C-0001
Houston/Galveston Ship Channel
Dredging Upper Bayou Project

Dear Mr. Renda:

This letter serves as a Contracting Officer counter-claim on Contract DACW64-99-C-0001, Houston/Galveston Ship Channel for items determined to be deficient or incomplete or not in accordance with the contract specifications.

On October 26, 1998, above referenced contract was awarded to Renda Marine, Inc., (RMI) in the amount of $12,526,100.00 to dredge approximately 3,483,700 cubic yards of material. Renda Marine was also responsible for building 381,300 cubic yards of mechanically constructed levees and building 13,700 lineal feet of hydraulically constructed levees. Contract completion was originally set at 18 February 2000 and through several modifications later revised to 28 June 2000. The Notice to Proceed was issued on 16 November 1998.

Each counter-claim is listed below with an explanation and dollar amount associated with each claim:

## FINDINGS OF FACT

I have attached my Findings of Fact and they are incorporated in this document.

## ANALYSIS

**a. Counter Claim No. 1: Dredging Section No. 9**

Modification CO-11, dated 18 September 2001, deleted the remainder of dredging for the project as stated in a Contracting Officer decision dated 01 June 2001.

DEPOSITION EXHIBIT
11

The Government deleted the remainder of Section 9 under Modification P00028 dated 18 September 2001 due to your continued and protracted inability to accomplish the work in accordance with contract requirements. Your ineffective and inefficient hydraulic placement of material dredged from the channel resulted in wasting a large quantity of material inside the area instead of such being incorporated into the hydraulic levees. Deletion of the remainder of Section 9 put an end to any further damage to the area by the inefficient operation.

Approximately 135,000 cubic yards of "required dredging" remains to be removed within the channel template in Section 9 and will be removed by another contractor.

Modification P00029 dated 28 September 2001 decreased the total funded amount of the contract by $415,000.00, from $17,052,424.16 to $16,637,424.16. The $415,000.00 deduction is the result of the deletion of Section 9 on this contract.

Our estimate for completing this portion of the work is $2,067,000.00. This amount includes costs for mobilization, pipelines, two boosters and cost to dredge the remaining material from Section 9.

**b. Counter Claim No. 2: Sec. 7 Clay Misplaced Material**

On 20 October 2000, you submitted a letter alleging a differing site condition consisting of "Heavy Red Clay at North Side of Channel, Stations 565+00 to 580+00." The Government never considered this issue to have merit.

You encountered materials commensurate with what was reflected in the borings on the contract drawings, i.e., stiff clays. Hence, that material should have been incorporated into the hydraulic levees around Lost Lake Placement Area (LLPA) but you elected to stockpile such in lieu of what the contract required. The Government decided that it would be more prudent not to incur any further lost time due to inefficient levee construction methods exhibited by you at LLPA. This material is still in this location and will have to be recovered and used to rebuild the incomplete levees by another contractor.

The Government carefully considered your claim in this section, and as stated above, never considered it to have merit. Our estimated cost for excavating the misplaced material, placing it in trucks and hauling to the North Levee is $571,000.00.

**c. Counter Claim No. 3: Incomplete West Levee Realignment (Mechanical Portion Only)**

You failed to complete a significant portion of the west levee to the lines and grades in accordance with the contract specifications during the construction period.

The Government did not recommend that you relocate the completed portion of the levee between approximate levee stations 166+00 and 180+00, but only that work beyond station 180+00. This realignment was to improve the current site conditions and to assist you with your levee construction method. However, you made the decision to relocate this already completed portion of the levee.

In order to bring the levees to lines and grades as specified in the contract documents, the Government estimates it will cost $108,000.00 to complete the work. This work includes mobilization, cutting/hauling and filling material, bonds and contingency.

**d. Counter Claim No. 4: Incomplete, Non-Hydraulic North Levee**

Between approximate levee stations 15+00 to 40+00 you attempted to construct the North Levee mechanically instead of hydraulically displacing the soft foundation with dredged material as required by the construction contract. Consequently, the North Levee was never constructed to the lines and grades as required by the contract documents. You also failed to complete the North Levee to the lines and grades as specified by the contract documents. The contract clearly stipulates that the levees were to be placed hydraulically. This was a requirement so that the soft foundation material would be displaced during the hydraulic operations. Your ability to accomplish an effective and efficient hydraulic fill operation precluded such from occurring. It is apparent that your equipment and management of such were incapable of doing so.

It is noted in this area that you recovered misplaced material from the east side of the levee (one truckload at a time) to attempt to mechanically construct the North Levee. Again, the Government decided that it would be more prudent to delete the work and not incur any further lost time due to inefficient dredging or additional damages at LLPA.

Our estimated cost for another contractor completing the North Levee in accordance with the contract specifications is $3,413,000.00. This estimate includes mobilization of a large dredge capable of excavating new work material, pipelines and associated cost to dredge material from Sections 16-20 in the Mid-Bayou Reach.

**e. Counter Claim No. 5: Recovery of Misplaced/Wasted Material**

Again, due to your inefficiencies in your dredging operations, approximately 1.2 million cubic yards of suitable levee building material was wasted toward the interior of LLPA. A letter from the Bay Area Office, dated November 3, 2000, referenced an October 23, 2000 meeting that recommended continuing to reasonably recover the

misplaced and overplaced satisfactory material along the East Levee. Once again, the Government decided that it would be more prudent to cease any further Renda Marine recovery operations and delete the work and not incur any further lost time or additional damages at LLPA.

Subsequent to the Upper Bayou Contract, the Government contracted with a geotechnical consultant to take numerous soils borings at various locations within LLPA. The borings indicated that suitable levee building material had flowed to the interior approximately 1,000 feet from the levee toe on the east and west sides of LLPA. Also, the borings indicated that the suitable material varied in thickness from about 10 feet near the levee toe to about 1 foot at a distance of about 1,000 feet to the interior. As a result of this, the Government estimates that it will take at least 8 months for another contractor to recover this material and incorporate into the incomplete levees. This work is estimated to cost the Government $5,465,000.00.

**f. Counter Claim No. 6: Liquidated Damages**

At the present time the Government is withholding approximately $259,840.85 in retainage. In addition to this, we are withholding $236,016.00 in liquidated damages calculated by multiplying $528.00 per day multiplied by 447 days the Government estimates is beyond the contract completion date of 28 June 2000.

. To date the Government has refunded $252,000.00 to your company. The amount of $259,840.85 represents the balance remaining in retainage.

Total for all counter claims is summarized below:

| | | |
|---|---|---|
| a. | Dredging Section 9: | $2,067,000.00 |
| b. | Sec. 7 Clay Misplaced Material: | 571,000.00 |
| c. | Incomplete W. Levee Realign. (Mech. Portion Only) | 108,000.00 |
| d. | Incomplete, Non-Hydraulic North Levee: | 3,413,000.00 |
| e. | Recovery of Misplaced/ Wasted Material: | 5,465,000.00 |
| f. | Liquidated Damages: | 236,016.00 |
| | Total | $11,860,016.00 |

**<u>FINAL DECISION</u>**

Based upon the above stated facts, I hereby determine that Renda Marine, Inc., is indebted to the Government in the amount of $11,860,000.00 for the additional cost of correction of deficiencies under Contract DACW64-99-C-0001. I hereby direct Renda



PEX1793_0004

Marine to submit a payment in the amount of $11,860,000.00 to me by Certified Check payable to "FAO USAED, Galveston."

Any amount not paid within 30 days from the date of this demand will bear simple interest from the date of this demand at the interest rate established by the Secretary of the Treasury as provided in Section 12 of the Contract Disputes Act of 1978 (Public Law 95-563), which is applicable to the period in which the amount becomes due, as provided in paragraph (b) of FAR 52.232-17, and then at the rate applicable for each six-month period as fixed by the Secretary until the amount is paid.

You may submit a proposal for deferment of collection if immediate payment is not practicable or if the amount is disputed. The proposal for deferment should provide the information required in FAR 32.613 and should provide information regarding a proposed bond or other collateral as required.

This is a final decision of the Contracting Officer. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 7th Floor, 5109 Leesburg Pike, Falls Church, Virginia 22041-3204. If you decide to appeal, you must mail or other otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you received this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended and identify the contract by number. The notice shall also include a copy of this decision. With regard to appeals to the Armed Services Board of Contract Appeals you may, solely at your election, proceed under the Board's small claims procedures for claims of $50,000.00 or less or its accelerated procedures for claims of $100,000.00 or less. In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Federal Claims (except as provided in the Contract Disputes Act, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Sincerely,

Thomas Benero

Thomas Benero
Chief, Contracting Division
Contracting Officer

CF: Brian W. Erikson, Attorney at Law
John Kosloske, Dept.of Justice
Mike McClenan, Bay Area Office

**FINDINGS OF FACT**

1. Solicitation (IFB) DACW64-98-B-0004 for Dredging Upper Bayou (45 foot project) in Harris and Galveston Counties was issued 16 June 1998. The solicitation was amended one time

2. Amendment 0001 dated 7 July 1998 incorporated questions from prospective bidders and provided answers by the Galveston District Design Team.

3. Bids were opened on 17 July 1998.

4. Five bids were received, the lowest being $12,526,100.00.

5. The Government estimate was $13,607,400.00 or approximately 9% higher than the Renda Marine, Inc., (RMI) bid.

6. RMI submitted the lowest bid of $12,526,100.00. Award of the contract was made on 26 October 1998. The Notice to Proceed was issued on 16 November 1998.

7. A total of 30 modifications were issued under this contract. Some modifications were issued unilaterally by the Contracting Officer and some bilaterally after mutual agreement by both parties.

8. On 8 March 2000, a Cure Notice was issued to RMI for what the Government considered RMI's failure to demonstrate that they could achieve satisfactory execution of the project within the times required by its terms.

9. On 4 April 2000, RMI responded to the Cure Notice. In their response RMI provided a contract summary to date and a proposed completion date. This response also provided a proposed production rate of dredged material and utilization of a booster pump. Also included in this letter was a dredging plan for completion of the project.

10. On 16 April 2000, the Government and the local sponsor of the project, the Port of Houston Authority (PHA), met with RMI and their surety to discuss progress of work on the Upper Bayou Contract and RMI's response to the Cure Letter issued 8 March 2000.

11. As a result of the 16 April 2000 meeting, on 25 April 2000, RMI was presented a letter outlining 4 conditions they had to meet in order to avoid being Terminated for Default. These were:

a. Maintaining a monthly production rate as stated in the dredging plan for completion of the project must be met for each pay period;
b. Work must be in accordance with the contract drawings and specs;
c. All materials suitable for constructing levees are to be utilized for levee building, and;
d. RMI was to provide an update of quality control personnel and responsibilities for each work area.

12. On 11 July 2000, a letter was issued to RMI stating that the dredging quantity stated in each pay period appeared reasonable and attainable. However, there was still some concern that the quantities of lineal feet of hydraulic levee proposed to be constructed per pay period appeared to be excessive. RMI was asked to review the proposed quantities and revise as appropriate. RMI was also told the 4 conditions in the Government's 25 April 2000 letter still applied.

13. On 6 October 2000, the Government requested RMI to submit a proposal for removing and disposing the debris on the north side of the channel between approximate channel stations 530+00 and 554+00.

14. Modification P00019 dated 27 October 2000, directed RMI to remove and dispose of the debris on the north side of the channel between approximate channel stations 530+00 and 554+00. This mod also increased the contract amount by $66,000.00 and added 4 calendar days to the contract.

15. On 6 November 2000, a Show Cause Notice was issued to RMI for failure to demonstrate they could achieve satisfactory completion of the project within the times required by its terms. This Show Cause Notice reiterated the 4 conditions of the 25 April 2000 letter. However, RMI continued to demonstrate their inability to complete this project by a definite date.

16. On 15 November 2000, RMI responded to the Show Cause Notice. As a result of this, the Government submitted a letter to RMI on 13 December 2000 responding to the 17 issues summarized in their letter. RMI was asked to submit Requests for Equitable Adjustments (REA's) for issues numbered 3, 4, 9 and 10 within 15 calendar days of receipt of our letter. These four issues were the ones the Government considered to have merit.

17. On 21 December 2000, the Government submitted another letter to RMI requesting an REA for a new differing site condition consisting of unknown obstructions on the south side of the channel between stations 634+90 and 635+00 and station 637+57. This was the result of a letter describing a new differing site condition submitted by RMI on 13 December 2000.

18. On 7 March 2001, RMI made an alternative proposal for project delays due to differing site conditions. RMI suggested that they would complete its dredging work at the North Slope of Dredge Section No. 5 and 6 and then move the

discharge line at Jacinto Port. The Government was to remove the remainder of Dredge Section No. 9 from the contract.

19. On 13 March 2000, RMI submitted a letter proposing furnishing approximately 250,000 cubic yards of clay material from a private contract to LLPA for hydraulic levee construction. As a result of this, Modification P00026 was issued adding up to 60 calendar days to the contract.

20. Modification P00023, dated 14 March 2001, established a revised contract completion date of 28 June 2000. It also provided for payment to RMI in the amount of $3,083,833.00 for dredge work completed in the flare area of the Houston/Galveston Navigation Channel.

21. Modification P00026 dated 4 May 2001allowed up to 60 calendar days to complete dredging from private sources and hydraulically placing it into the new levee template at Lost Lake Placement Area (LLPA). The modification provided for additional time allowed of up to 60 calendar days.

22. On 27 August 2001, the Government issued a letter to RMI directing them to remove any remaining pipelines or appurtenant equipment belonging to RMI from the LLPA.

23. Modification P00028 dated 18 September 2001, deleted the remaining unfinished dredging on the north levees between stations 4+00 and 40+00 and the remaining levee construction from the contract.

24. On November 6 and 7, 2001, the Contracting Officer issued 6 letters to RMI acknowledging receipt of various certified claims submitted by RMI between January thru October 2001. Breakdown of claims and dollar amounts are as follows:

| **Claim** | **Dollar Amt.** |
|---|---|
| Dredging S. Ferry Landing | $1,049,173.00 |
| Dredging Flare Area Clay | 4,691,688.00 |
| Delays due to HL&P Trans. Tower | 170,863.00 |
| Dredging Sec. 7 Clay | 1,083,779.00 |
| Realignment of West Levee | 789,600.00 |
| Dredging obstructions No. 1 (Sec. 4-8) | 2,126,083.00 |
| Dredging obstructions No. 2 (Sec. 9) | 1,158,642.00 |
| Delays due to Hydraulic Levees at LLPA | 6,258,853.00 |
| Total | $17,328,892.00 |



PEX1793_0008