IN THE UNITED STATES COURT OF FEDERAL CLAIMS

RENDA MARINE, INC., )
Plaintiff, )
)
vs. ) CASE NO. 02-306C
)
THE UNITED STATES, )
Defendant. )

ORAL DEPOSITION

ERIC RUSSEK

January 14, 2004

ORAL DEPOSITION OF ERIC RUSSEK, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 14th day of January, 2004, from 9:59 a.m. to 5:08 p.m., before Stacey Whitley, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of the United States Corps of Engineers, 2000 Fort Point Road, 2nd Floor, Galveston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

RECEIVED

COPY

to help us with the quality assurance reports. And those reports were shared with Mr. Herrera or Pat Duke or whomever the QC person was.

Q. When was it decided that the Joint Venture would have any quality assurance role?

A. I'm not sure. I mean, there is a project cooperation team -- that I'm not a part of -- that is made up of some Corps people, some Port people, and then the Port consultants. Okay. And they're kind of like an overview project team that tries to coordinate all the -- all these Houston-Galveston projects. It wasn't just this one. It's an ongoing team effort. And the major decisions, you know, whether there's a project change, if there's something that needs to -- anything that has to do with money goes through this project cooperation team. And they only meet once a month. So, that can slow down the process.

Q. Okay. When did you first become aware that the Joint Venture was going to have some role in the quality assurance tasks on the Upper Bayou project?

A. It was, I would say, probably about four or five months into the dredging portion of it. And I resisted it myself.

Q. You resisted it how, sir?

A. I resisted their involvement in the quality assurance portion of it. Because I felt that that was

something that it was better for the Corps to handle itself, whether we had to hire some -- you know, some quality control, quality assurance person, construction representative. I would have preferred to have done it that way. But however, it was decided, again, by this project cooperation team that the Joint Venture would assist in performing quality assurance for the Corps.

Q. Well, there ended up being a fair amount of animosity between the Government and the Joint Venturer over how this project was going to progress, wouldn't you agree?

A. I agree.

Q. And you've seen the Tim Few E-mails that call the Joint Venture backstabbing weasels. You've seen that?

A. I remember those words.

Q. Did you ever have a meeting where the Corps described the Joint Venture that way or words similar to that?

A. Meetings with the Joint Venture or --

Q. No. Meetings within the Corps.

A. Yes.

Q. And I understand from the Joint Venture people they had meetings where they described the Corps about the same way.

A. Sure. Yes. It's mutual.

Q. Mutual dislike for each other?

A. Sure.

Q. Did you ever hear anything personally from the Joint Venture where, you know, they expressed some sort of dislike or lack of professionalism toward the Corps?

A. Not directly from them. I mean, hearsay. I mean --

Q. Who did you hear it from?

A. I don't remember.

Q. What sorts of things did you hear?

A. Just that, you know, they accused us of letting contractors run amuck and, you know, not enforcing the plans and specs to the tee. And because we come from different philosophical backgrounds. I mean, the Corps has always tried to partner with the contractor, you know, and to go in the same direction. Whereas you get someone who is not with the Corps, private industry, Joint Venture types and, you know, their main thrust is that the contractor is out to screw the Government, plain and simple.

Q. So, you would agree that contractors bidding for, say, the Upper Bayou project would expect that there would be some sort of partnering relationship with the Government, right?

A. Yes.

Q. As a matter of fact, I think if you look in the project manual, it's probably something standard. They do talk about instituting a partnering relationship with the contractor, right?

A. Correct.

Q. Now, as part of partnering, one of the things that the sides should do is if they have an issue with the other side, they should let the other side know, right?

A. Right.

Q. Whether it's informally at a lower level in the field or a little more formally in writing so that the issue gets addressed, right?

A. Right.

Q. Another aspect of partnering is to respond to concerns the other side has raised, right?

A. Right.

Q. And you should respond in a reasonably prompt manner, right?

A. Sure. But it is in those writings, in those documents because it had to go through so many hands -- it had to go through the Port and the Port consultants and the Joint Venture -- that it made our letter writing campaign very arduous, very difficult to try to get things -- to try to get letters written out in a reasonable amount of time.

Q. How were the quality assurance deficiency notices from the Joint Venture transmitted to Renda Marine, if you know?

A. What I recall, I would get them. I would receive them.

I kept my notations.
Q. Now, you testified a little bit earlier about the project coordination team meetings. Do you remember?
A. Correct.
Q. And I think you said you weren't invited to those, right?
A. Well, I'm not at a level where I would be, let's put it that way.
Q. Okay. You also understand that Renda Marine wasn't invited to those?
A. Right.
Q. Don't you think it would have been a good idea to have you and Renda Marine involved in those so you can discuss the Upper Bayou project?
A. It would be -- it would be worthwhile. But as to this day, it still stands as it is. The contractor and the project engineer are still not a part of that project cooperation team --
Q. Okay.
A. -- for whatever reason.
Q. Well, are you aware of any change orders that might pay money to Renda Marine on the Upper Bayou project that the Joint Venture was in favor of?
A. In favor of? Those were few and far between.
Q. Was it your general impression of the Joint Venture,

that they didn't want to pay any more money on this project?

A. That's true.

Q. Now, I think there's at least a few instances where you agree Renda Marine would have been entitled to more money on the Upper Bayou project, right?

A. I agree.

Q. The flare area is one of them, right?

A. That was one.

Q. We'll talk about some more in a little while. Did you see some heated letters or memos from the Joint Venture when the Corps agreed to pay money to Renda Marine on the Upper Bayou project?

A. Yes, I did.

Q. Do you ever recall the Joint Venture requesting that the Corps simply instruct Renda Marine to do certain things and if Renda Marine complained about wanting money, Renda Marine can just file a claim at the end of the project? Do you remember anything like that?

A. I don't remember exactly in those words but very similar to what you're saying.

Q. And can you give me any specifics?

A. No, I can't. But what you're saying, the gist of it, the general -- your general statement is correct. I mean, I don't remember specifics but yes. In general, that's true.

Q. Let me see if I can help you a little bit, then. Do

you recall the Joint Venture wanted Renda just to -- to continue simply building foundations for levees out at Lost Lake and then at some future time, there would be a day of reckoning as to whether or not Renda would get paid?

A. That sounds pretty harsh. I don't -- I don't recall those -- I don't recall those words.

Q. Well, you understand -- and I'll show you a letter, it's either from Mr. McClenan or Mr. Benero, that instructed Renda to continue simply building foundations for the levees out at Lost Lake. Do you recall that letter?

A. Not specifically but --

Q. Do you recall Renda being given instructions like that during the course of the project?

A. Sure. Yes.

Q. Now, do you remember that Renda's concern and response to that sort of instructions was "How do we get paid," right?

A. Sure.

Q. Because, I mean, that was a legitimate concern on the part of Renda, right?

A. Correct.

Q. Because if they don't achieve the levee template, then theoretically they're not entitled to any money, right?

A. Right.

Q. And it may be that they can't achieve levee template

because there's an insufficient amount of material to build the levees, right?

A. Could be, yes.

Q. Or it could be that they can't get to levee template because the foundations are simply too soft and they're swallowing up the material that's getting placed there, right?

A. Could be that.

Q. Or it could be some other reasons, right?

A. There could be many reasons.

Q. But whatever the reason, unless Renda achieved the levee template, 30 feet above mean low tide, Renda wasn't entitled to any money as --

A. The Joint Venture was very adamant about all or nothing.

Q. So, in other words, the Joint Venture wanted Renda to achieve a 30-foot high levee or Renda get no money?

A. We were -- we were disagreeing and were saying no, let's at least prorate and do it on a volume or some sort of fraction and then pay accordingly to that. And that was something that was never agreed upon.

Q. And so, it never got resolved?

A. No.

Q. You're agreeing with me?

A. I agree.

Q. Okay. Now, prior to going from 40 feet to 45 feet

having with the mechanically constructed levees, right?
A. That's correct.
Q. Now, is that one of those change orders that the Joint Venture complained about?
A. Yes.
Q. But the Corps felt it was fair and the Corps issued it, right?
A. Yes.
Q. Now, that was earlier on in the project, right?
A. Right.
Q. And after that time, the Joint Venture became more vocal about its concern about the issuance of change orders that gave money to the contractor, right?
A. Yes.
Q. Turn over to Page 3 of Russek Exhibit No. 2. At the top of the page, Paragraph No. 5, there's a current net retention rate paragraph. Do you see that?
A. I see that.
Q. And then down below, Mr. Few's written "net retention rate equals approximately 0.37"?
A. I see that.
Q. And so, that would be close to that 40 percent you talked about one of the other contractors achieving, right?
A. Right.
Q. And then Mr. Few's written below that that "the

wasn't it?
A. I know they pumped a gross of over three and a half, and I do remember a percentage of close to 65 percent of suitable material.
Q. So, if you took three and a half million times 65 percent, what do you get?
A. 2.275 million.
Q. Okay. Does that sound about right to you as to how much Renda -- suitable materials Renda put out there?
A. In a ballpark, you know, quick calculation, that sounds reasonable.
Q. Okay. Now, do you remember -- we talked before we broke for lunch about at one point in time the Corps in general and Mr. McClenan, in particular, allowed Renda to build on top of the existing levee.
A. On the north side.
Q. And I think that occurred -- did you say 900 feet or 1600 feet?
A. It was about 900 to a thousand feet.
Q. Okay. How come that stopped? Why did the Corps tell Renda not to do that anymore?
A. I believe I recall that there -- that the Joint Venture had much to say about that.
Q. And what did the Joint Venture have to say?
A. They objected into allowing them -- allowing the

contractor to build on top of the levee. They wanted the -- the Joint Venture wanted the levee built in accordance with the drawings and the contract.

Q. Well, on that north side, that's where the foundations were the softest of all, wasn't it?

A. Correct.

Q. I mean, that's where it was hardest to build the new levee, right?

A. Right.

Q. Was the contractor having some success building on top of the existing levee?

A. Yes, there was.

Q. So, how come the Corps listened to the Joint Venture? I'm just trying to figure this out in my own mind.

A. I can't answer that. I don't know.

Q. 20/20 hindsight, do you think it would have been better if the contractor continued to build on top of the existing levee?

MR. PETTY: Object to the form of the question.

Q. (BY MR. ERIKSON) You're free to answer.

A. This is an opinion.

Q. Give me your opinion.

A. I would have liked to have seen Mr. McClenan be a little bit more adamant in allowing the north -- especially the north levee to continue to be constructed, the new levee

Q. But you recall that he made a statement like that?
A. But he did make a statement.
Q. Do you recall Mr. Hrabovsky stating at that meeting that Mr. Hrabovsky had been the project manager when T.L. James Dredging Company was creating those sidecast borrow areas?
A. Yes, I do.
Q. Do you recall Mr. Hrabovsky stating that at the time that T.L. James was creating those sidecast borrow areas that T.L. James probably didn't maintain a 50-foot gap between the borrow area and the existing levee?
A. I'm not familiar with the specifics; but I mean, considering the way he was speaking about it, I wouldn't doubt it.
Q. And you know from your own personal knowledge, I think you testified that you saw between 25 and 50 feet away from the existing --
A. Correct.
Q. -- toe was the borrow areas?
A. Correct.
Q. Now, back to Benero Exhibit No. 8. The tail end of the very first paragraph says, "At this time, we are awaiting written confirmation of our instructions and changes to the drawings. Please advise us of the status in this matter."
Do you understand that Renda was wishing

something formally from the Government to confirm that that's how the change was going to happen, right?

A. Yes. I understand.

Q. And you agree that it was a change to the drawings, right?

A. Yes. Yes.

Q. Now, at the bottom of the first page, Mr. Bowman talks about the soft foundations, right?

A. Right.

Q. And at the top of the second page, he writes, "Renda expected and planned for displacement of a reasonable amount of soft materials in its bid for the work. However, the contractor could not have anticipated the sheer magnitude of displaced material, which has caused mud waves and prevented the efficient and economic use of equipment and personnel placing good, available clay material." Do you see that?

A. I see that.

Q. When you saw this letter, did you consider writing back or preparing something for Mr. McClenan to write back to Renda to advise them of the sidecast borrow areas possibly being a cause for where all this good material was going?

A. Yes.

Q. And what happened? Did Mr. McClenan reject your suggestion?

A. No, he did not. However, since we had to coordinate

with the Joint Venture, they objected to much of what I had written.

Q. So, you wrote a draft letter that would have pointed out that problem with the sidecast borrow area?

A. Correct.

Q. And it got vetoed by the Joint Venture?

A. And eventually vetoed completely.

Q. It got what? First it got changed and then it got vetoed? What?

A. Sending the letter got vetoed.

Q. Okay. How quickly did you prepare -- do you generally prepare draft letters for Mr. McClenan?

A. Yes.

Q. When you get a letter like this one, this August 18, 2000 letter, how quickly do you prepare a draft response?

A. First off, I'll make copies of this and provide it to the usual people that I consulted with, get their opinion. And, you know, based on their information, I would take that and draft up a letter. And then Mr. McClenan would take this and would coordinate with the Joint Venture by either E-mail or meeting or whatever and have other discussions about it.

Q. Who were the usual suspects that you coordinated with?

A. Suspects --

Q. You said there was a usual group of people that when

you got a letter like this you coordinated with.

A. Tim Few, geotech, office of counsel, contracting, Mr. Benero, and Johnny Rozsypal.

Q. Okay. Why Johnny Rozsypal?

A. Johnny had -- has a lot of experience. I mean, he's done dredging all his career and he has a lot of knowledge of, you know, all the placement areas. And so, I relied on his expertise and experience.

Q. Okay. So, in your group, you didn't include the Joint Venture in the people you coordinated with?

A. No, I didn't.

Q. And then when you prepared it for Mr. McClenan, then he would involve the Joint Venture?

A. Correct.

Q. So, how quickly would you prepare a response after you did your coordination and collected the information you needed from your group?

A. I mean, it wouldn't take -- it would take maybe a week or so to get various information back from the people that I would coordinate directly. And, you know, it wouldn't take but a day or two to compile that information into a draft letter for Mr. McClenan's signature. But what took the longest time was coordination with the Joint Venture.

Q. Okay. So, in your draft response back to Mr. Bowman, you were going to tell Mr. Bowman about the

sidecast borrow areas, right?

A. We had -- I forget how it was worded but that was a paragraph that I had taken specifically from Tim Few from what he had written and I used it in its entirety. And he had explained perhaps the historical -- you know, how the levees were constructed and I don't know if he used borrow pits per se but, you know, he did explain that the material was used from within the placement area to construct the levees.

Q. Okay. So, that October, 2000, meeting where Mr. Hrabovsky was there and advised Mr. Bowman, that information could have gotten passed a few months earlier if you would have been allowed to have your version of a response to Benero Exhibit No. 8?

A. Correct.

Q. Did you ever understand any reason why the Joint Venture didn't want that information passed on to Renda Marine?

A. That particular information, I didn't -- I don't know why.

Q. Turn over to Benero Exhibit No. 12. By the way, before we get to there, would you like a break?

A. Yeah. Sure.

MR. ERIKSON: Let's take about five minutes.

(Recess taken)

Q. (BY MR. ERIKSON) All right. Benero Exhibit No. 12

bidding the project. The Joint Venture's hypothesis appears reliable since crane mats are typically 20 feet wide. The new shear line, located approximately 20 feet from the toe of the existing levee, corresponds with the general size of crane mats and what appears to be the leading edge of the existing borrow area." Do you see that?

A. Yes.

Q. Now, did you think about writing back to or preparing a letter back to Mr. Bowman about the borrow areas at this point in time?

A. Yes. In fact, I think this corresponds back to a previous exhibit where I had tried to prepare something but was vetoed.

Q. Okay. Did you now try to prepare something else or did it get vetoed again or what happened?

A. I don't think I -- no. I did not pursue anything else because I already knew what the answer was going to be.

Q. The answer was going to be a veto?

A. Exactly.

Q. You didn't expect that the Joint Venture was going to change its stripes?

A. No, not at all.

Q. Now, as we go through these documents, we're going to see again and again that Renda requested some direction and guidance about what the heck to do. They don't have enough

clay material to build levees, the levees they're trying to build are failing. Renda suggests doing certain things. Did you consider providing some guidance to Renda as to what they ought to do?

A. Yes, I did.

Q. Now, was that -- your thoughts about providing some guidance, was that, again, vetoed by the Joint Venture?

A. I mean, I did try and then when word got back that I had, then I was --

Q. Scolded?

A. Scolded is a good word.

Q. Scolded by whom?

A. Well, not from Mike McClenan but through Mike McClenan.

Q. So, who passed the scolding along to you?

A. Let's say certain people of the Joint Venture.

Q. Okay. So, the Joint Venture blew a fuse --

A. Absolutely.

Q. -- and lit up Mr. McClenan?

A. Yeah.

Q. And word got back to you that you needed to stop giving any guidance or direction to the contractor?

A. Yes.

Q. Why didn't the Joint Venture, near as you can tell, why didn't they want any guidance or direction going to the

contractor?

A. They wanted -- I mean, they thought that these plans and specs were it. They wanted the project built as shown and that's it.

Q. Do you agree that the project couldn't be built as shown?

A. There could have been some improvements in certain areas of the plans and specs.

Q. For example, with --

A. But going back to our partnering session, that -- the whole goal is when you have a problem, you try to first resolve it out in the field at the lowest level possible. And then if not there, then you step it up a level. And, you know, you try to avoid getting as many people involved in blowing the problem out of proportion. So, that was -- that was always my objective when I go out, was try to handle it at the field level. And then when that didn't work --

Q. And it didn't work because the Joint Venture vetoed that?

A. Right.

Q. Now, a lot of proposed resolutions could be done at no cost or minimal cost, right?

A. Sure.

Q. For example, if the contractor tells you that something just isn't working and you and the contractor put

your heads together and you can resolve it at a no cost or minimal cost change, right?

A. Absolutely. Right.

Q. I assume that you were an advocate for your position with Mr. McClenan; is that correct?

A. That's correct.

Q. Why wouldn't Mr. McClenan listen to you, as far as you know?

A. Mr. McClenan was being pressured from his boss.

Q. Who is Mr. McClenan's boss?

A. That would be Johnny Rozsypal. Who would -- who is on the project cooperation team and so is Mr. McClenan. And a lot of that pressure came from the Port as far as dollars. The Port didn't want to pay for anything above that set price. They wanted mods to be at a minimum, period. So, the pressure flowed downhill essentially.

Q. But you-all recognized going into this project that there were no guarantees that there was going to be sufficient materials to be able to accomplish what you wanted, right?

A. That's correct.

Q. It was -- Tim Few admitted to you that it was a guess as to whether or not there's going to be sufficient clay or other suitable materials to build the levees, right?

A. Yeah. Based on their estimates.

Q. But they didn't know whether their estimates were

going to be right or wrong; but if they were wrong, they were going to adjust during the course of the project?

A. I mean, their estimates were based on research that had been done in the past at other locations and adapted for this project. So, yes. We were on a learning curve. And, you know, this was the best that we had at the time.

Q. In the last paragraph on Page 2, Mr. Bowman wrote, "In order to correct the problems or at least diminish the affects of the levee failure, the Government recommended that Renda complete the levee up to a minimum elevation tying the remaining levees into both sides of the old drop outlet structure at the north side of the site." Do you see that?

A. Yes.

Q. And that's typically how the Government would resolve, in part, a problem like this, is that you tell the contractor construct it as high as you can and then we'll address it from there, right?

A. Right.

Q. Because the bottom line is you want to have a perimeter levee that's at least a certain number of feet high so you can contain material?

A. Correct.

Q. And then Mr. Bowman notes some changes that the Government requested. Do you see those, the three bullet points?

A. Yes.

Q. Do you agree that the Government had requested those changes?

A. The first bullet I'm not familiar with. The second bullet I agree with, and the third bullet I agree with.

Q. All right. The first bullet, you do agree that if the side slope were increased, that the footprint would then be less for the new levee?

A. Right. It would be steepened.

Q. And it would venture less into the borrow areas than the old method, right?

A. Right.

Q. So, that would be one possible resolution of the problem, right?

A. Possible. I would be concerned about the steepness.

Q. Okay.

A. And failures as a result thereof.

Q. Now, did you prepare any sort of response to this letter, draft response, other sort of response?

A. I don't remember.

Q. Do you remember coordinating with the Joint Venture about what the response should be?

A. Yes, I do. And their's would have been a very negative response.

Q. Even to the three bullet points that we talked about

investigate, right?

A. Yeah. I agree.

Q. Okay. One last line of questions for you. We've seen numerous letters by Renda where they indicate that there's insufficient clay materials in Renda's mind and that as far as Renda is concerned, they can't get the levees to the 30-foot elevation either because the foundations are too unstable or there's just insufficient materials, right?

A. Right.

Q. What was Renda supposed to do at that point? As the project engineer, what was Renda supposed to do?

A. I mean, they requested the assistance. I was somewhat shackled in being able to respond to the requests.

Q. Shackled by your boss and the Joint Venture?

A. Correct. Not so much my boss.

Q. Your boss was shackled by the Joint Venture?

A. Yeah. And through him I was very limited in what I could provide.

Q. Renda is not blaming you. Renda just wants to know what the heck was it supposed to do?

A. Yeah. I understand.

Q. Any idea what Renda was supposed to do at that point?

A. I understand. 20/20 hindsight.

Q. So, other than the influence of the Joint Venture,

is there any reason why the Government didn't respond and tell Renda what to do?

A. Well, unfortunately the Joint Venture did have quite an impact on our responses and unfortunately so did the Port. If it would have just been a contract -- well, without the Joint Venture, I would say this would have ended a lot differently.

Q. And it would have ended with the Corps partnering with Renda to resolve these problems?

A. Correct.

Q. And the Corps and Renda would have worked to change the design so that the project could have been finished?

A. I think so. I think we could -- I think we could have worked through several -- all the issues. I think we could have developed together solutions, you know, all the levees and the stiff clay. You know, I don't know. I mean, it's --

Q. We'll leave it at that.

A. Okay.

MR. ERIKSON: At this point in time, we'll adjourn the deposition, reserving our rights to ask additional questions if we have any based on documents that may be produced from Corps electronic media. And subject to that, we'll pass the witness.

MR. PETTY: And we would reserve any questions

CHANGES AND SIGNATURE

WITNESS NAME: RUSSEK DATE OF DEPOSITION: 1/14/04

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 19 | 3 | CHANGE "TAINER" TO "TAINTER" | |
| 36 | 11 | CHANGE "BEAN STIVISON" TO "BEAN-STUYVESANT" | |
| 57 | 3 | CHANGE "RESPOND" TO "RESPONDING" | |
| 65 | 5 | CHANGE "STIVISON" TO "-STUYVESANT" | |
| 83 | 22 | CHANGE "HOUSE TRACK" TO "HOUSE-TRACT" | |
| 90 | 9 | CHANGE "STIVISON" TO "-STUYVESANT" | |
| 94 | 14 | DELETE "AN" | |
| 103 | 9 | CHANGE "JOINT VENTURER" TO "JOINT-VENTURE | |
| 170 | 21 | CHANGE "DIVULGED" TO "DIVERGED" | |
| 192 | 8 | ADD "NOT" AFTER "WOULD" AND BEFORE "TOTALLY" | |

I, ERIC RUSSEK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

Eric A Russek

ERIC RUSSEK

THE STATE OF TEXAS )
COUNTY OF GALVESTON )

Before me, RUBEN R. Villagran, on this day personally appeared ERIC RUSSEK, known to me ~~or proved to me on the oath of ____________ or through ____ (description of identity card or other document)~~ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office on this 31st day of MARCH, 2004.

Ruben R. Villagran
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

My Commission Expires:

RUBEN R. VILLAGRAN
Notary Public, State of Texas
My Commission Expires
January 02, 2005

STATE OF TEXAS

COUNTY OF HARRIS

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF ERIC RUSSEK

January 14, 2004

I, the undersigned Certified Shorthand Reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, related to, nor employed by any parties to the action in which this testimony is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto or financially interested in the action.

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the 27th day of January, 2004.

Stacey Whitley

Stacey Whitley, CSR

Texas CSR 3999 by Norma DelaCruz

Expiration: 12/31/2005

ESQUIRE DEPOSITION SERVICES

Firm Registration No.: 03

3401 Louisiana, Suite 300

Houston, Texas 77002

713-524-4600