# In the United States Court of Federal Claims

No. 02-306 C

(E-Filed: June 29, 2006)

| | |
|---|---|
| RENDA MARINE, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Post-Trial Proceedings; Whether a Claim Was Tried By Consent; Whether a Claim That the Government Breached Its Duty to Cooperate (Cooperation Claim) Is Within the Jurisdiction of the of the Court Where Not Specifically Submitted to the Contracting Officer; Whether Different Operative Facts and/or Different Legal Theories Underlie a Cooperation Claim and a Differing Site Condition Claim |

Clarence T. Kipps, Jr., Washington, DC, for plaintiff. Mary Lou Soller, Lara A. Covington and Justin C. Miller, Washington, DC, of counsel.

John E. Kosloske, with whom were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. P. Alex Petty, Office of Counsel, Galveston District, United States Army Corps of Engineers, Galveston, TX, of counsel.

## OPINION

HEWITT, Judge

This case is before the court following the pertinent procedural history described below:

Between February 28 and April 7, 2005, the court conducted a trial of nineteen days on claims by plaintiff, Renda Marine, Inc. (Renda), that it encountered six Type I

differing site conditions, one Type II differing site condition, and one constructive contract modification during the course of its performance of Contract No. DACW64-99-C-0001, known as the Upper Bayou Project Contract (Upper Bayou Contract or Contract). See Renda Marine, Inc. v. United States (Renda II), 66 Fed. Cl. 639, 642-44 (2005). On July 28, 2005 the court issued an Opinion denying plaintiff's claims (Trial Opinion), finding that plaintiff "failed to prove by a preponderance of the credible evidence that it is entitled to recover on its claims." Id. at 721. The court noted that

> [t]his result is particularly harsh in this case because plaintiff received several equitable adjustments during contract performance to which, in the court's view, plaintiff was not entitled under the law governing the proof of Type I differing site conditions and the evidence adduced at trial. Plaintiff's entitlement to those monies under its chosen theory of recovery was tried de novo in this court and plaintiff did not prevail.

Id. Because of the extensive record and lengthy trial in this case and the "particularly harsh" result to plaintiff, id., the court provided two suggestions: First, the court noted that

> the evidence adduced at trial might support a claim of a breach of the implied duty of the government not to hinder a contractor's performance. For example, both the government's failure to respond timely to plaintiff's request for guidance about the West Levee realignment, and the government's failure, upon observing plaintiff's relocation of the levee, to correct what the government now claims is plaintiff's misunderstanding, appear on their face to be unreasonable. The court would entertain a motion to deem a claim for a breach of the duty not to hinder to have been tried by consent[1] and would consider as well a motion to schedule additional

---

[1]Rule 15(b) of the Rules of the Court of Federal Claims (RCFC) states, in pertinent part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

RCFC 15(b) (2006).

> briefing, to be based entirely on the testimony and documentary evidence in the trial record, on that additional claim.

Id. at 721-22 (footnote added). Second, the court considered

> the possibility that plaintiff may have failed to present certain claims under the contract. If such an unpresented claim exists and is not time barred under 41 U.S.C. § 605(a) (2000),[2] the court would entertain a request to stay proceedings pending the presentation of a claim or claims to the contracting officer for decision.

Id. at 722 (footnote added). Upon further consideration and for the following reasons, the court now concludes that neither of its suggestions has been helpful to the resolution of the case.

I. The Possibility That the Court Stay Proceedings Pending the Presentation of Additional Claims Under the Contract to the Contracting Officer for Decision

The second suggestion made by the court in its Trial Opinion led plaintiff to file a motion to stay proceedings on October 4, 2005 (Mot. to Stay or Motion to Stay). After receiving responsive briefing on plaintiff's Motion to Stay, the court found that "[a]llowing the proposed stay would run the risk of confusing and intermingling the records of separate proceedings on separate claims and infusing records to be subsequently created in a new claim into the already-settled and carefully established record in this case." Order of Oct. 26, 2005 at 3. Under such circumstances, although the court "acknowledge[d] that 'Renda's motion to stay proceedings pending the presentation of a claim or claims to the contracting officer for decision is expressly authorized by the [c]ourt's [Trial Opinion],'" id. at 3 n.2 (quoting Plaintiff's Reply to Defendant's Response to Plaintiff's Motion To Stay Proceedings at 1) (alterations added), the court determined "that further delay is unwarranted and that proceeding to enter judgment on the already-settled record in this case is the proper course of action at this time," id. at 4 n.2. Accordingly, the court denied plaintiff's Motion to Stay. Id. at 4.

II. Whether the Evidence Adduced at Trial May Support a Claim Agreed by the Parties to Have Been Tried by Consent That the Government Breached its Implied Duty to Cooperate or Not to Hinder

---

[2]Section 605(a) of the Contract Disputes Act, 41 U.S.C. §§ 601-612 (2000) (CDA), states: "Each claim by a contractor against the government relating to a contract . . . shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 605(a) (2000).

The first suggestion made by the court in its Trial Opinion led plaintiff to file, on November 15, 2005, Plaintiff's Motion to Deem Claims for the Government's Breach of Implied Duty to Have Been Tried By Consent. On December 19, 2005, the court ordered briefing

> on whether defendant breached its implied duty to cooperate and its implied duty not to hinder performance of the contract because:
>
> > [t]he contracting officer failed to timely address the misalignment of the West Levee at Lost Lake; failed to respond timely to Renda Marine's request for guidance about the realignment of this levee; and failed, upon observing Renda Marine's relocation of the levee, to correct what the Government now claims was Renda Marine's misunderstanding.

Order of Dec. 19, 2005 at 4-5 (quotation omitted).

Further to the court's order for briefing, presently before the court are Plaintiff's Brief in Support of Its Claims Relating to the Government's Breach of the Implied Duty to Cooperate (Pl.'s Br. or Brief); Defendant's Response to Plaintiff's Brief in Support of its Claim That, With Respect to the Realignment of the West Levee, Defendant Breached the Implied Duty to Cooperate (Def.'s Resp. or Response); Plaintiff's Reply Brief in Support of Its Claims Relating to the Government's Breach of the Implied Duty to Cooperate (Pl.'s Reply or Reply); and Defendant's Sur-Reply to Plaintiff's Reply Brief in Support of Its Claim That, With Respect to the Realignment of the West Levee, Defendant Breached the Implied Duty to Cooperate (Def.'s Sur-Reply or Sur-Reply). For the following reasons, the court finds that it lacks jurisdiction to consider the merits of plaintiff's claim that the government breached its implied duty to cooperate;[3] the court therefore DECLINES to consider the merits of plaintiff's claim.

---

[3]Plaintiff does not appear to claim that the government breached its implied duty not to hinder – as distinguished from its implied duty to cooperate – in its briefing. See Pl.'s Br. passim; Pl.'s Reply passim. Accordingly, the court deems such a claim to have been waived. See Precision Pine & Timber, Inc. v. United States, 50 Fed. Cl. 35, 59 n.31 (2001) ("The implied duties to cooperate and not to hinder are two separate, albeit related, implied duties.").

A. Background[4]

The Upper Bayou Contract required, inter alia, construction of a levee along the west side of Lost Lake (the West Levee) extending from Levee Station (Sta.) 166+00 to Sta. 215+00. See Def.'s Resp. at 2-3; Pl.'s Br. at 2. On or about July 28, 2000, plaintiff notified defendant of "an alleged problem with the centerline of the West Levee at the Lost Lake Placement Area." Joint Stipulation of Facts (JSF) ¶ 79. Plaintiff described the problem as follows:

> The centerline [of the new levee] is too far to the East of the existing old levee. The new levee placement will cause mud to be displaced to the West in a mud wave that will go over the old levee and into the Old River. As per our conversation it would seem that the proper thing to do would be to construct the new levee so that the toe of the new levee would be against the old levee, thus using the old levee as a berm to support the new levee and also keep the mud wave to the inside of the new levee and not push it over the old levee.

[Plaintiff's Exhibit (PX)] 926 (letter of July 28, 2000 from Pat Duke, Quality Control Manager, Renda, to Eric Russek, Project Engineer, Army Corps of Engineers).[5]

On August 7, 2000 representatives of plaintiff and defendant met at Lost Lake "to observe and verify the alignment of the levee centerline in this area relative to the contract drawings." See PX 949 (Russek File Mem. of Aug. 8, 2000) at 1, ¶ 1. At this time, plaintiff had constructed approximately 1,600 feet of the West Levee, from approximately Sta. 166+00 to Sta. 182+33. See Trial Transcript (Tr.) at 2611:3-9 (R.V. Renda); Joint Exhibit (JX) 6.027 (Contract Modification P00027) at 2, ¶ A ("The alignment shown in the contract drawings between Station 166+00 and 182+33, as constructed prior to August 7, 2000, is acceptable."); JX 10.485 (Contractor Quality Control Report (CQCR) of Aug. 10, 2000) at 2 ("Dump @ station 183+93"); Def.'s Resp. at 15. On August 8, 2000, Mr. Russek, a Project Engineer with the Army Corps of

---

[4]Facts pertinent to plaintiff's claim that the government breached its implied duty to cooperate are more fully described in Part IV.F.1 of the court's Trial Opinion. See Renda II, 66 Fed. Cl. at 705-07.

[5]For convenient reference, the name and a description of each witness whose live testimony the court heard at trial and who is referenced in this opinion appear in note 5 to the Trial Opinion. See Renda II, 66 Fed. Cl. at 644 n.5.

Engineers in Galveston, Texas, documented the previous day's meeting in an internal Corps memorandum, which stated that

> a drawing of the levee centerline . . . supplied by Renda Marine's surveyor was reviewed with respect to the ongoing levee construction. The surveyor's drawing supposedly contained the new levee centerline coordinates shown relative to the existing levee centerline coordinates. According to the drawing, the new levee centerline showed to gradually depart from the existing levee centerline by over 73 feet at the northwest corner. This condition was leading to the collection of poor material between the existing and new levees, resulting in mudwaves in advance of the new levee construction.

PX 949 (Russek File Mem. of Aug. 8, 2000) at 1, ¶ 2. To correct this problem, defendant determined that

> [t]he Contractor will be directed to forego use of the alignment shown in the [Contract] drawings . . . and place future material closer to the existing levee . . . . Except for the change in the new levee centerline location, and the means by which it is to be laid out by the Contractor, the Contractor shall continue to comply with all other requirements in the specs and drawings.

Id. at 1-2, ¶ 2; accord PX 969 (draft letter of Aug. 18, 2000 from C. Michael McClenan, Administrative Contracting Officer for the Upper Bayou Project, to Steven Bowman, Project Manager, Renda) at 1 ("[Y]ou are directed to forego use of the alignment shown in the drawings . . . and place future material closer to the existing levee . . . ."); PX 999 (draft letter of Sept. 18, 2000 from Mr. McClenan to Mr. Bowman) (same); PX 1005 (draft letter of Aug. 21, 2000 from Mr. McClenan to Mr. Bowman) (same); Tr. at 3151:12-16 (McClenan) ("[W]hat we decided in the field was to allow [Renda] to, at that point, start moving the levee back just inside the existing levee, so that bad material would ooze onto the inside and it wouldn't ooze out between the two levees and cause problems with construction."); see also Renda II, 66 Fed. Cl. at 706. Plaintiff also documented the August 7, 2000 meeting in that day's CQCR. See JX 10.482 (CQCR of Aug. 7, 2000) at 3. This record states: "Eric R[ussek] and Mike M[cClenan] came out and OK'd levee [change in alignment] shift to move [center line] of levee towards old levee to reduce loss of material." Id.; accord id. at 1793:2-21 (Smith); id. at 2607:22-2608:9 (R.V. Renda). "At that point, [Renda] broke, moved dredge line, moved over and started filling adjacent to the old levee . . . ." Tr. at 498:18-19 (Bowman).

On August 18, 2000, plaintiff followed up with defendant concerning defendant's oral instruction at the August 7 meeting:

> At th[e] meeting, the Government verbally agreed to realign the levee such that the toe of the new levee would be against the existing, old levee. At this time, we are awaiting written confirmation of our instructions and changes to the drawings. Please advise us of [the] status [of] this matter.
>
> We also wish to notify you that, in our opinion, this constitutes a changed condition and/or differing site condition. As soon as practicable, [Renda] will submit a Request for Equitable Adjustment for changing the alignment, which was performed through no fault of [Renda].

JX 60 (letter of Aug. 18, 2000 from Mr. Bowman to Mr. McClenan) at 1. Despite plaintiff's indication that it was "awaiting written confirmation of [its] instructions and changes to the drawings," id., "[t]he Government did not respond to this letter," Pl.'s Br. at 5.

There is conflicting evidence and testimony as to whether, at the August 7 meeting, the Corps directed Renda to relocate or reposition the already-built portions of the West Levee closer to the existing levee, or whether the Corps merely directed Renda to relocate or reposition the part of the West Levee that remained to be constructed. In the court's Trial Opinion, the court discussed this conflicting evidence and testimony at length:

> There are only two items of contemporaneous documentary evidence concerning this meeting: plaintiff's August 7, 2000 CQCR, see JX 10.482 (8/7/00 CQCR), and Mr. Russek's file memorandum dated the following day, see PX 949 (8/8/00 Russek File Mem.).
>
> Mr. Russek's memorandum, which was not provided to plaintiff, states that defendant directed plaintiff "to forego use of the alignment shown in the [Contract] drawings . . . and place future material closer to the existing levee." Id. at 1, ¶ 2 (emphases added). This language appears fairly to indicate that defendant understood that it had directed plaintiff not to alter the alignment of the portion of the West Levee that plaintiff already had constructed, but rather to "forego" its previous construction path and realign the remaining stretch ("place future material") of the West Levee toward the existing levee. Plaintiff's summary of the field change in its CQCR is less clear, and can be read either to mean that defendant instructed

plaintiff to "shift" the alignment of the remaining West Levee toward the old levee, or that defendant instructed plaintiff to "move" the center line of the entire West Levee . . . .

The testimony at trial concerning defendant's instruction to plaintiff was equally inconclusive. Mr. McClenan testified that the directive at the August 7, 2000 meeting and the subsequent no-cost modification to the Contract came about because plaintiff

> [was] having problems with the alignment of the levee. The plans called for the alignment of the levee to gradually diverge away from the existing levee, toward the interior of the placement area, and . . . they were having problems with soft materials . . . oozing out between the levee that was being constructed hydraulically and the existing levee, causing a mess, so to speak.
>
> . . . [W]hat we decided in the field was to allow them to, at that point, start moving the levee back just inside the existing levee, so that that bad material would ooze onto the inside and it wouldn't ooze out between the two levees and cause problems with construction.

Tr. at 3151:4-16 (McClenan). When asked whether defendant "directed Renda Marine at the August 7 meeting to move or reposition any part of the west levee that had been previously constructed by Renda Marine," Mr. McClenan replied, "No," id. at 3151:17-20 (McClenan), and explained that the purpose of Modification P00027 "was to help [plaintiff] . . . construct the levee and eliminate the problems they were having with the soft material oozing up between the two levees," id. at 3151:21-24 (McClenan).

Mr. Mears similarly testified that

> the contract documents required the contractor to build the finished new levee [with] a . . . set distance from the center line of the old levee and the center line of the new levee. There was a prescribed distance between the two.
>
> The contractor had been having problems with constructing the new levee alignment out into the site. So that center line

> was moved 33 feet. . . . And what that did was it got it closer to the old levee alignment and a little bit of a better foundation.
>
> . . . .
>
> The field change was to–from that point where we were at on that day, to move the levee alignment from there until completion closer to the old levee alignment.

Id. at 3936:16-3937:6 (Mears). When asked whether Mr. McClenan had instructed plaintiff "to reposition portions of the west levee that had been constructed to that point," Mr. Mears replied, "No." Id. at 3937:7-10 (Mears).

On the other hand, Messrs. Bowman and Smith testified that the government stated at the August 7, 2000 meeting that "'the intent of the new levee design was that the outside toe of the hydraulically-constructed levee should tie into the inside top of the slope of the existing levees.'" See id. at 1084:11-19 (Bowman quoting PX 1006 (9/22/00 Letter from Bowman to McClenan) at 3); accord Tr. at 1794:19-20 (Smith stating that he understood the intent of the specifications to be that "the new levee would be anchored to the existing levee"). Based upon the foregoing account of defendant's statement at the August 7, 2000 meeting, plaintiff acted on the assumption that defendant's instruction to relocate the West Levee . . . was both prospective and retrospective. See id. at 2611:13-16 (R.V. Renda stating that plaintiff "had to relocate the [1600 feet of the West Levee] that we had already placed to help seal or cap the gap, if you will, between the old levee and where the alignment of the new levee was designed to be placed.").

The only other witness to testify concerning the scope of defendant's directive at the August 7, 2000 meeting was Mr. Mears, an engineer with the [Joint Venture]. When asked at trial whether defendant told plaintiff that defendant intended "to have the toe of the new levee abut the existing levee along the west levees," Mr. Mears initially replied, "No" and then answered, "I don't know." Id. at 4058:5-13 (Mears).

Renda II, 66 Fed. Cl. at 707-09.

The foregoing led the court to determine that the

> evidence is inconclusive as to the actual content of the field directive. Plaintiff's actions in relocating the existing portions of the West Levee tend to support with some force plaintiff's view of the field instruction that relocation of the existing West Levee was directed. However, weighing against that conclusion is the documented track record of plaintiff's acting unilaterally without coordinating with the government, in particular in its decision to stockpile a "vast" amount of stiff red clay dredged from Section 7, [Tr.] at 2725:15-2727:10 (R.V. Renda), rather than immediately placing it on the levee, id. at 1233:3-12 (Bowman).

Id. at 709.

The record also contained ambiguity as to exactly when plaintiff relocated the already-constructed portions of the West Levee. Compare JSF ¶ 82 ("Between about September 2000 and November 2000, Renda realigned the levee between stations 166+00 to 183+00 and 183+00 to 188+00.") with Tr. at 2613:18-2614:17 (R.V. Renda, stating that, as of August 28, 2000, "we ha[d] . . . relocated the alignment, based off of [the] August 7 [meeting,] over to the old levee to cap the mud wave, using the old levee as a benchmark," and that, at that time, "fine dressing," i.e., "relocating the material and trying to shape it to the grades illustrated and indicated on the prints," was beginning, which occurs "close [in time] to the finished product, or after the material's been relocated"); see also Def.'s Resp. at 14 (noting that the CQCRs "after September 11, 2000, do not refer to any work performed on the West Levee between Levee Sta. 166+00 and Sta. 182+00"); Renda II, 66 Fed. Cl. at 707 (noting this discrepancy).[6] Under either party's version of events, it is undisputed that it was not until March 12, 2001 that defendant confirmed in writing its directive concerning the West Levee:

> With the status of construction as it presently is, it is now preferred that continued construction of the levee along the alignment shown in the drawings is no longer desirable. Therefore, pursuant to Section 02223,

[6]Defendant argues that the joint stipulation made by the parties in ¶ 82 of their JSF "is contrary to the evidence adduced at the trial of this case and should be disregarded." Def.'s Resp. at 14-15. Because the court does not rule on the merits in this opinion, the court does not address defendant's argument.

> Paragraph[] 1.4.5 Changes in Embankment Alignment,[7] you are hereby directed to continue with the revised alignment as previously instructed by the Bay Area Office. You are to forego use of the alignment shown in the drawings . . . and place future material closer to the existing levee, based on the observed location of the outside edge of the graded top of the existing levee.

PX 1323 (letter of Mar. 12, 2001 from Thomas Benero, Chief of the Contracting Division for the Army Corps of Engineers in Galveston, Texas, to Mr. Bowman) at 1 (footnote added).

On approximately May 23, 2001, defendant issued Contract Modification P00027, see JX 6.027, to

> formalize[] a field change agreement between the Government and the contractor that occurred on or about August 7, 2000 wherein the contractor requested a realignment of the levee. This change allows the contractor to complete the west levees of Lost Lake Placement Area, Station 182+33 to Station 215+00 with a different alignment than that shown in the contract drawings. The alignment shown in the contract drawings between Station 166+00 and 182+33, as constructed prior to August 7, 2000, is acceptable. Therefore, pursuant to Section 02223, Paragraph[] 1.4.5 Changes in Embankment Alignment, you are to forego use of the alignment shown in the drawings . . . and place material between Station 182+00 and Station 215+00 closer to the existing levee . . . .

Id. at 2, ¶ A (emphasis added). Because defendant allegedly did not anticipate or agree to plaintiff's realignment of the already-constructed portions of the West Levee after the August 7, 2000 meeting, see id., – and allegedly was not even aware that such realignment occurred until after it had been completed, see Def.'s Resp. at 21-22 – the costs associated with plaintiff's realignment were not compensated by defendant, see Pl.'s Br. at 7-8.

---

[7] A "General Provision" of the Levee Specifications in the Contract reserved the Contracting Officer's (CO)'s "right to make changes in the embankment alignment as may be found necessary before completion of the work. If it becomes necessary, through no fault of the Contractor, to abandon a line or location on which work has been done, payment for material placed will be made as specified" in the Contract. JX 2 (Specs.) at 100-01, ¶ 1.4.5.

Accordingly, on May 31, 2001, plaintiff submitted a Request for Equitable Adjustment (REA) for the West Levee realignment claim, see PX 8 (W. Levee REA) at 3-6, and resubmitted the REA as a certified claim on August 9, 2001, see JX 88 (letter of Aug. 9, 2001 from Mr. Bowman to Mr. Benero) (W. Levee Cl.); accord PX 1617 (letter of Nov. 6, 2001 from Mr. Benero to Mr. O. Renda) (acknowledging receipt of plaintiff's claim for "$789,600.00 and 40 days"). Plaintiff's REA claim stated that "[o]n July 28, 2000 [Renda] notified the Government of a Changed/Differing Site Condition, which required immediate attention by the Government." PX 8 (W. Levee REA) at 5. Plaintiff alleged in the REA that, "[a]t the time of the [August 7, 2000] realignment directive and for several months thereafter, [Renda] has requested that the Government provide . . . survey information. However, to date, the Government has refused to validate the survey discrepancies alleged by [Renda]." Id. at 5-6. Plaintiff claimed that "[Renda] was required to expend significant effort in order to achieve the results as directed by the Government at the August 7, 2000 Meeting," and requested "in the strongest terms possible that payment for this work, based on an approved Unit Price, be transmitted with no further delays." Id. at 6. The contracting officer (CO) did not issue a final decision on plaintiff's claim for an equitable adjustment with respect to the West Levee realignment. See Complaint (Compl.) ¶ 100. Accordingly, under the Contract Disputes Act, 41 U.S.C. §§ 601-612 (2000) (CDA), the CO is deemed to have made a decision denying plaintiff's claim. See 41 U.S.C. § 605(c)(5). At trial, the court found that plaintiff had failed to support a differing site condition claim with respect to the realignment of the West Levee by a preponderance of the credible evidence. Renda II, 66 Fed. Cl. at 721.

Plaintiff's claim presently before the court and agreed by the parties to have been tried by consent, see Defendant's Response to Plaintiff's Motion to Deem Claims for the Government's Breach of Implied Duty to Have Been Tried by Consent (Def.'s Consent Resp.) at 2 n.4 ("The Government agrees that the [c]ourt should establish a schedule for additional briefing . . . with respect to Renda's additional claim [that the Government breached its implied duties] concerning realignment of the West Levee."), states that defendant "breached its implied duty to cooperate with Renda Marine in two ways," Pl.'s Br. at 8.

> First, the Government acted unreasonably when it failed to provide Renda Marine with written direction with respect to realigning the West Levee. Despite its recognition of the need for written guidance, the Government gave Renda Marine only oral directions as to the realignment and then failed – or refused – to commit these to writing until after Renda Marine had essentially completed the work. . . . Renda Marine was thus forced to expend its resources to continually solicit the Government's concurrence with its understanding, but to no avail.

> Second, the Government acted unreasonably by failing to give Renda Marine any guidance in the interim as to how it wanted the West Levee realigned – particularly if it disagreed with Renda Marine's clearly articulated understanding. Despite receiving confirmation in writing . . . of Renda Marine's understanding of the Government's oral direction, the Government failed to correct it.

Id. at 8-9.

B. Jurisdiction

Upon comparison of the above-described REA and the claim presently before the court that the government breached its implied duty to cooperate, and after examination of the briefing before the court and the record in this case, the court has become aware of a significant issue of jurisdiction not argued by the parties.[8] "A court may and should raise the question of its jurisdiction sua sponte at any time it appears in doubt." Arctic Corner, Inc. v. United States, 845 F.2d 999, 1000 (Fed. Cir. 1988); see also Metabolite Labs, Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir. 2004) ("Subject matter jurisdiction is an inquiry that this court must raise sua sponte, even where, as here, neither party has raised this issue.").

1. Jurisdiction Over Claims Deemed to Have Been Tried by Consent

As the court has explained in another aspect of this case,

---

[8]The parties appeared to recognize – as did the court – that the court would not have jurisdiction to hear additional claims not submitted to the CO and not tried by consent in this court. See Mot. to Stay at 1 ("Plaintiff . . . submits this Motion requesting the [c]ourt to stay proceedings in order to allow Renda to present previously unpresented claims to the contracting officer."); Defendant's Response to Plaintiff's Motion to Stay Proceedings at 7 (noting that the court does not have authority to act upon a claim governed by the CDA and not submitted to the contracting officer, "including any claims that Renda has or may have relating to the contract for the Upper Bayou Project"); Renda II, 66 Fed. Cl. at 722 (stating that the court "would entertain a request to stay proceedings" while additional claims not previously submitted to the CO were presented to the CO for decision). However, neither party raised the issue of whether the court may not have jurisdiction over plaintiff's claim that the government breached its implied duty to cooperate even if the parties agreed that such a claim was tried by consent in this court. Nor has the court identified any authority addressing precisely this issue.

> [a]lthough "Rule 15(b) is to be 'liberally construed'" to ensure that controversies are properly tried on the merits, John R. Sand & Gravel Co. v. United States, 62 Fed. Cl. 556, 568 (2004) (quoting Tucker v. United States, 8 Cl. Ct. 575, 586 (1985)), the application of the rule is limited in several important respects.
>
> Most notably, this court cannot try–by implied consent or otherwise–a claim over which the court lacks jurisdiction. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter spring[s] from the nature and limits of the judicial power of the United States and is inflexible and without exception.") (quotations and citation omitted). Because "[s]ubject-matter jurisdiction . . . is . . . a statutory requirement[,] . . . no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, consent of the parties is irrelevant" where jurisdiction does not exist in the first place. Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982); see also In re Alappat, 33 F.3d 1526, 1530 (Fed. Cir. 1994) ("[J]urisdiction cannot be conferred on this court by waiver or acquiescence [by a party]."); Jeppesen Sanderson, Inc. v. United States, 19 Cl. Ct. 233, 237 (1990) ("[N]either actions of the parties nor of other courts can confer jurisdiction on this court where it does not otherwise exist."). Nor can the jurisdiction of this court be expanded by the creation or invocation of this court's procedural rules. E.g., United States v. Sherwood, 312 U.S. 584, 589-90 (1941) ("An authority conferred upon a court to make rules of procedure for the exercise of its jurisdiction is not an authority to enlarge that jurisdiction."). Accordingly, Rule 15(b) cannot be invoked by either party to confer jurisdiction over claims that are otherwise beyond the purview of this court. AAAA Enters. v. United States, 10 Cl. Ct. 191, 194 (1986) ("This court cannot endow itself with jurisdiction through exercise of its discretion to allow amendments.").

Renda Marine, Inc. v. United States (Renda I), 65 Fed. Cl. 152, 158 (2005).

2. Jurisdiction Under the Tucker Act and the CDA

The parties do not appear to dispute that plaintiff's claim that the government breached its implied duty to cooperate has been tried by consent, see Def.'s Consent Resp. at 2 n.4 ("The Government agrees that the [c]ourt should establish a schedule for additional briefing . . . with respect to Renda's additional claim [that the Government breached its implied duties] concerning realignment of the West Levee.").

Notwithstanding the absence of dispute, the court finds that it is without jurisdiction to rule on this claim and therefore that it was in error to have invited briefing on this claim.

The United States Court of Federal Claims is a court of "limited jurisdiction." United States v. King, 395 U.S. 1, 3 (1969). The Tucker Act, 28 U.S.C. § 1491 (2000), vests this court with jurisdiction over certain claims against the United States; however, the Tucker Act does not itself create substantive rights enforceable against the sovereign. United States v. Testan, 424 U.S. 392, 398 (1976); Khan v. United States, 201 F.3d 1375, 1377 (Fed. Cir. 2000). The Tucker Act sets out this court's CDA jurisdiction as follows: "The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the [CDA] . . . on which a decision of the contracting officer has been issued under [section 605 of the CDA]." 28 U.S.C. § 1491(a)(2).

Section 605(a) of the CDA requires that "[a]ll claims by a contractor against the government relating to a contract . . . be in writing and . . . be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). Where the amount of a claim exceeds $100,000, the claim must be certified by the contractor. § 605(c)(1). Section 605 also requires "[t]he contracting officer [to] issue his decisions in writing, and . . . [to] furnish a copy of the decision to the contractor." § 605(a). If the CO fails to issue a decision upon the contractor's claim within the statutory time period, the CDA provides that the contracting officer is deemed to have made a decision denying the claim. § 605(c)(5). The Federal Circuit has interpreted section 605 to impose two distinct prerequisites to this court's jurisdiction over disputes between contractors and the government: the contractor must have submitted a "claim"[9] to a contracting officer, and the contracting officer must have issued a "final decision" concerning that claim. See, e.g., England v. Swanson

---

[9]The term "claim" is not defined in the CDA; however, courts routinely look to the Federal Acquisition Regulation to ascertain its meaning:

> Claim means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. However, a written demand or written assertion by the contractor seeking the payment of money exceeding $100,000 is not a claim under the Contract Disputes Act of 1978 until certified as required by the Act.

48 C.F.R. § 2.101 (2005); see, e.g., Remediation Constructors, Inc. v. United States, 68 Fed. Cl. 162, 165 n.7 (2005) (using 48 C.F.R. § 2.101 to define "claim" under the CDA); ATK Thiokol, Inc. v. United States, 68 Fed. Cl. 612, 626 n.12 (2005) (same).

Group, Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004); Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1578 (Fed. Cir. 1994). A party must establish both jurisdictional prerequisites to proceed in this court. E.g., Alliant Techsys. Inc. v. United States, 178 F.3d 1260, 1264 (Fed. Cir. 1999) ("[T]he CDA grants jurisdiction to the Court of Federal Claims . . . over a contractor's request for relief only when the appeal or action is based on a qualifying claim filed by the contractor and a final decision by the contracting officer.").

3. Plaintiff's Claims

Plaintiff claims that "[t]he Government's unreasonable actions with respect to the West Levee realignment are a breach of its implied duty to cooperate with Renda Marine." Pl.'s Br. at 9. The implied duty to cooperate is encompassed within the duty of good faith and fair dealing implied in every government contract. See Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988) ("'[S]ubterfuges and evasions violate the obligation of good faith,' as does lack of diligence and interference with or failure to cooperate in the other party's performance." (quoting Restatement (Second) of Contracts § 205 cmt. d (1981))); Tecom, Inc. v. United States, 66 Fed. Cl. 736, 769 (2005) (stating that the implied duty to cooperate appears to be an aspect of "the overarching duty of good faith and fair dealing"); Precision Pine & Timber v. United States, 50 Fed. Cl. 35, 58-59 (2001) ("[T]he implied duty to cooperate and the implied duty not to hinder performance of contracts (both being subspecies of the implied duty of good faith) are present in all government contracts."); Walter Dawgie Ski Corp. v. United States, 30 Fed. Cl. 115, 130 (1993) ("Specifically, . . . th[e] singular duty [of good faith] implicates the disparate aspects of the duty to cooperate and the duty not to hinder performance."); see also Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000) ("Every contract, as an aspect of the duty of good faith and fair dealing, imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'" (quoting Luria Bros. & Co. v. United States, 369 F.2d 701, 708 (Ct. Cl. 1966))). The government's violation of the implied duty to cooperate can amount to a material breach of contract. See Malone, 849 F.2d at 1445.

In this case, however, plaintiff's claim regarding the West Levee that was before the CO was a REA based on a "[c]hanged/[d]iffering [s]ite [c]ondition" discovered while performing work on the West Levee. PX 8 (W. Levee REA) at 5; see also JX 88 (W. Levee Cl.) at 1 (certifying that "[Renda] submitted a REA for Changed Conditions at the Lost Lake Area due to the Government's directive for Levee Realignment Between Stations 166+00 to 215+00"); Plaintiff's Motion Requesting Modification of its April 19, 2005 Opinion and Order at 7 ("The realignment of the west levee referred to by the contracting officer is based on the differing site conditions and related increased costs and

damages presented in Renda's west levee realignment claim. . . . Renda presented a request for equitable adjustment for this differing site condition to the government on May 31, 2001." (citing PX 8 (W. Levee REA))); Renda II, 66 Fed. Cl. at 642 n.2 (identifying plaintiff's theory of recovery for its West Levee realignment claim as a "Type I differing site condition[]" claim).[10] The Differing Site Conditions clause in the Solicitation, JX 1 (Solicitation) at 94, provides that a contractor is entitled to an equitable adjustment of the contract price and/or the time required for performance for, inter alia, "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract," id.; 48 C.F.R. § 52.236-2(a)(1) (2005). The purpose of the clause is "to shift the risk of adverse subsurface or latent physical conditions from the contractor, who normally bears such risk under a fixed-price contract, to the government." Olympus Corp. v. United States, 98 F.3d 1314, 1316 (Fed. Cir. 1996). As stated by the court's predecessor:

---

[10]Plaintiff's REA with respect to the West Levee realignment submitted to the CO does not state specifically that it is a "Differing Site Condition" claim, nor does it mention that it is based on the Differing Site Conditions clause in the Solicitation. See PX 8 (W. Levee REA) passim. However, plaintiff's claim certification submitted to the CO did state that plaintiff had "submitted a REA for Changed Conditions," JX 88 (W. Levee Cl.) at 1, and plaintiff's REA describes the fact that it notified the government of the "Changed/Differing Site Condition" at the West Levee, PX 8 (W. Levee REA) at 6. Moreover, plaintiff clarified its intentions with respect to the West Levee realignment claim by choosing the "Type I Differing Site Condition" theory of recovery at trial. See Renda Marine, Inc.'s Memorandum of Contentions of Fact & Law at 17 ("Renda revised [its West Levee realignment] claim to reflect actual cost, and incorporated it into the Lost Lake Levees Claim (Claim 8)[, a differing site condition claim]"); Order of Feb. 23, 2005 (Post-PreTrial Order) at 3, ¶ 8 ("During the pretrial conference, the parties further clarified the issues to be tried as follows: . . . With [one] exception . . . , each of plaintiff's claims alleges a Type I differing site condition."); Renda II, 66 Fed. Cl. at 642 n.2 (identifying plaintiff's theory of recovery for its West Levee realignment claim as a "Type I differing site condition[]" claim). After trial, plaintiff identified its West Levee realignment claim submitted to the CO as "a request for equitable adjustment for this differing site condition." Plaintiff's Motion Requesting Modification of its April 19, 2005 Opinion and Order at 7 (citing PX 8 (W. Levee REA)). Based on the foregoing, plaintiff's claim for an equitable adjustment submitted to the CO appears to the court to resemble most closely a differing site condition claim and, accordingly, the court analyzes it as such. However, even if plaintiff's claim submitted to the CO can be interpreted as a REA based on another, similar claim (e.g., a defective specifications claim), the court's analysis and conclusion in this opinion are not affected. As described below, see infra Parts II.B.4.a and b, the critical features absent from plaintiff's REA – necessitating a finding of lack of jurisdiction over plaintiff's claim that the government breached its implied duty to cooperate – are underlying operative facts and claimed theories of recovery identical or similar to those associated with a claim for breach of the implied duty to cooperate.

> The purpose of the changed conditions clause is thus to take at least some of the gamble on subsurface conditions out of bidding. Bidders need not weigh the cost and ease of making their own borings against the risk of encountering an adverse subsurface, and they need not consider how large a contingency should be added to the bid to cover the risk. They will have no windfalls and no disasters. The Government benefits from more accurate bidding, without inflation for risks which may not eventuate. It pays for difficult subsurface work only when it is encountered and was not indicated in the logs.

Foster Constr. C.A. & Williams Bros. Co. v. United States, 435 F.2d 873, 887 (Ct. Cl. 1970); see also H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1343 (Fed. Cir. 1998) ("The purpose of the Differing Site Conditions clause is to allow contractors to submit more accurate bids by eliminating the need for contractors to inflate their bids to account for contingencies that may not occur."). However, the clause is not intended to "shift the risk of all unanticipated adverse site conditions from the contractor to the government. Rather, the government bears only those risks that encourage 'more accurate bidding.'" Olympus, 98 F.3d at 1317 (quoting Foster, 435 F.2d at 887).

4. Comparison of Plaintiff's West Levee Realignment Claim Brought Before the Contracting Officer and Plaintiff's Claim that the Government Breached Its Implied Duty to Cooperate

This court has identified three considerations that should be made in order to determine whether it has jurisdiction over a claim arising under the CDA:

> the court should consider whether [(1)] the claim is based on the same common or related set of operative facts brought before the CO, [(2)] the legal theory underlying the claim remains the same as presented to the CO, and [(3)] the complaint requests the same relief as requested from the CO.

Manuel Bros., Inc. v. United States, 55 Fed. Cl. 8, 33 (2002), aff'd, 95 Fed. Appx. 344 (Fed. Cir. 2004) (unpublished table decision); see also Johnson Controls World Servs., Inc. v. United States, 43 Fed. Cl. 589, 594 (1999) ("[F]or the purpose of determining whether a claim presented to the contracting officer is the same as that before the court, the[ relevant] cases addressed whether such claim is based on the same underlying theory, seeks the same relief, and arises from the same operative facts."). The court now considers each of these in turn.

a. Whether Plaintiff's Claim that the Government Breached Its Implied Duty to Cooperate Is Based on the Same Set of Operative Facts as Those Before the Contracting Officer

"Operative facts are the essential facts that give rise to a cause of action." Kiewit Constr. Co. v. United States, 56 Fed. Cl. 414, 420 (2003). As explained by this court in Kiewit,

> [t]he operative facts supporting a Type I differing site conditions claim filed pursuant to a standard Differing Site Conditions clause include (1) whether conditions indicated in the contract at issue differed materially from conditions encountered by the contractor during performance of the contract; (2) whether conditions actually encountered by the contractor were reasonably unforeseeable based upon all information available to the contractor during the contract bidding; and (3) whether the contractor reasonably relied upon its interpretation of the contract, and was thus damaged from the material variation between expected and encountered conditions.

Id. at 420 (citing HB Mac, 153 F.3d at 1345). Accordingly, the operative facts necessary to support a differing site condition, as analyzed in this case by the court in its Trial Opinion, focus on whether "the contract affirmatively represented certain aspects of the subsurface at Lost Lake," Renda II, 66 Fed. Cl. at 709, "whether the contractor's interpretation is reasonable[,] whether there are material differences between the conditions indicated and those actually encountered[,] and whether the conditions encountered were reasonably unforeseeable," id. at 710.

By contrast, a claim that the government breached its implied duty to cooperate requires analysis of whether, "[w]hen some government action is essential for the contractor to perform[,] . . . the government wrongfully fails or refuses to take that action." Ryco Constr., Inc. v. United States, 55 Fed. Cl. 184, 192 (2002); see also Tecom, 66 Fed. Cl. at 770 ("Breaches of the implied duty to cooperate have been found when a contracting officer responded to a contractor's requests in an evasive or untimely manner . . . ." (citing Malone, 849 F.2d at 1445-46 and Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 78 (2000))); Renda II, 66 Fed. Cl. at 649 ("[T]he Government 'must do whatever is necessary to enable the contractor to perform.' Thus, the Government can violate the duty to cooperate by causing a delay in the contractor's performance." (quoting Lewis-Nicholson, Inc. v. United States, 550 F.2d 26, 32 (Ct. Cl. 1977))). "Actions that hinder or delay a contractor's performance must be found unreasonable for the government to be found liable." CEMS, Inc. v. United States, 59

Fed. Cl. 168, 195 (2003). Accordingly, the operative facts necessary to support a claim that the government breached its implied duty to cooperate focus on whether the plaintiff's performance was thwarted or frustrated to its detriment by some unreasonable government action or inaction.

It appears to the court, then, that plaintiff's Type I differing site conditions claim for an equitable adjustment regarding the West Levee realignment submitted to the CO, and its claim that the government breached its implied duty to cooperate, rely upon different operative facts. See Kiewit, 56 Fed. Cl. at 421 ("[T]he Court lacks subject matter jurisdiction over Count I because Kiewit never submitted a defective specifications claim to the Contracting Officer, and because the operative facts supporting the certified claim do not also support a defective specifications claim."). The operative facts necessary to support a differing site conditions claim for equitable adjustment do not also support a claim that the government breached its implied duty to cooperate. However, it potentially could be argued that plaintiff's REA with respect to the West Levee realignment stated sufficient "operative facts" to allege a claim for breach of the implied duty to cooperate. See PX 8 (W. Levee REA) at 5-6 ("At the time of the [August 7, 2000] realignment directive and for several months thereafter, [Renda] has requested that the Government provide . . . survey information. However, to date, the Government has refused to validate the survey discrepancies alleged by [Renda]."); id. at 6 ("[Renda] performed the levee realignment and relocation work ten months ago. Significant costs were incurred and thus have imposed an unreasonable burden upon this Small Business Contractor, awaiting a reasonable response from the Government."); see also Placeway Constr. Corp. v. United States, 920 F.2d 903, 908 (Fed. Cir. 1990) ("The court should have determined whether one or more claims existed, regardless of the form in which they were presented to the CO; the court should have decided this question based on whether all claims presented to the CO arose from a common or related set of operative facts."). Accordingly, the court does not rely on the operative facts analysis alone in determining that the court lacks jurisdiction over plaintiff's claim that the government breached its implied duty to cooperate.

b. Whether Plaintiff's Claim that the Government Breached Its Implied Duty to Cooperate Is Based on the Same Legal Theory as Plaintiff's REA Before the Contracting Officer

In Reliance Insurance Co. v. United States, the United States Court of Appeals for the Federal Circuit examined the nature of a claim for equitable adjustment brought before the CO as contrasted with claims "that the Government breached the contract or its duty of good faith" before the court. 931 F.2d 863, 866 (Fed. Cir. 1991). The court noted that "Reliance only submitted to the contracting officer claims for equitable adjustment to

the contract. Reliance did not submit to the contracting officer a clear and unequivocal claim that the [Veteran's Administration (VA)] breached the contract or its duty of good faith." Id. Accordingly, because "Reliance did not satisfy 41 U.S.C. § 605(a)[]" and "the Government has not waived its sovereign immunity with respect to any breach claims," the Federal Circuit held that "[t]he Claims Court and this court lack jurisdiction to consider these claims." Id.; see also City of Tacoma, Dep't of Pub. Utils. v. United States, 31 F.3d 1130, 1134-35 (Fed. Cir. 1994) (finding the plaintiff's attempt to invalidate the contract based on the termination clause not reviewable because, in the plaintiff's certified claim to the contracting officer, the plaintiff did not challenge the validity of the termination clause).

In Scott Timber Co. v. United States, the Federal Circuit reviewed whether the plaintiff's claim submitted to the CO under the CDA alleging that the United States Forest Service's prolonged suspension of their contracts constituted a breach of contract, 333 F.3d 1358, 1362 (Fed. Cir. 2003), provided a proper and adequate jurisdictional basis for certain other breach of contract claims in the Court of Federal Claims, id. at 1365. The court explained:

> An action brought before the Court of Federal Claims under the CDA must be "based on the same claim previously presented to and denied by the contracting officer." Cerberonics, Inc. v. United States, 13 Cl. Ct. 415, 417 (1987); 41 U.S.C. § 605(a)[]. This standard, however, does not require [rigid] adherence to the exact language or structure of the original administrative CDA claim. The Court of Federal Claims correctly found that it had jurisdiction over Scott's claims in this case, because they arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery. This court "know[s] of no requirement in the [CDA] that a 'claim' must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987). In this case, Scott gave the CO clear notice of a purported breach of contract based on the prolonged and allegedly unauthorized suspensions. Moreover Scott sought from the CO the same remedy sought from the trial court, namely consequential damages for the alleged breach. Scott may have posed slightly different legal theories for the breach, but Scott's claim is essentially the same as presented to the CO. Thus, Scott's claims in this case would not "subvert the statutory purpose of requiring contractors first

> to submit their claims to the [CO]" to allow the CO to receive and pass judgment on the contractor's entire claim. Croman [Corp.] v. United States, 44 Fed. Cl. 796, 801-02 (1999).

Id. at 1365-66 (first, second and last alterations added) (citations omitted); see also ThermoCor, Inc. v. United States, 35 Fed. Cl. 480, 489-90 (1996) (finding that the court had jurisdiction over plaintiff's claim because "[p]laintiff merely 'augments the legal theories underlying its claim. But it does not change the essence of that claim . . . .'" (quoting Cerberonics, 13 Cl. Ct. at 419)).

At first glance, it appears that the Reliance and Scott Timber may contradict one another. Reliance can be read to require that, in order for this court or the Federal Circuit to have jurisdiction over a "claim," the claim must be submitted "clear[ly] and unequivocal[ly]" to the CO. 931 F.2d at 866. On the other hand, Scott Timber requires only that a "claim" provide the CO with "'adequate notice of the basis and amount of the claim,'" 333 F.3d at 1365 (quoting Contract Cleaning Maint., 811 F.2d at 592), and allows for "slightly different legal theories" from those submitted to the CO to be asserted in this court, id. at 1366.

Reliance and Scott Timber can be readily distinguished from one another, however, based on the difference in degree in those cases between the legal theories underlying the claims submitted to the COs and the legal theories underlying the claims filed in this court. In Scott Timber, both the claim submitted to the CO and the claims before the court were breach of contract claims, and the court noted, significantly, that "Scott gave the CO clear notice of a purported breach of contract," 333 F.3d at 1365, and that "Scott sought from the CO the same remedy sought from the trial court, namely consequential damages for the alleged breach," id. at 1366. Although "slightly different legal theories" were permitted to be maintained in this court, they were nevertheless "slightly different legal theories for the breach," id. at 1366 (emphasis added), and not entirely distinct legal theories unannounced to the CO and never raised by the plaintiff with the CO, see id. By contrast, in Reliance, the court specifically noted that, just as with the plaintiff in this case, "Reliance only submitted to the contracting officer claims for equitable adjustment to the contract. Reliance did not submit to the contracting officer a . . . claim that the VA breached the contract or its duty of good faith." 931 F.2d at 866. Absent the same – or at least a similar – underlying legal theory for relief submitted to the CO, the court in Reliance declined to extend its jurisdiction as if a "claim" for breach of contract or breach of the duty of good faith had been raised before the CO under 41 U.S.C. § 605(a). See id. ("[T]he Government has not waived its sovereign immunity with respect to any breach claims.") (emphasis added).

This court has also previously identified this distinction in analyzing its jurisdiction over a party's claim under the CDA. See, e.g., Manuel Bros., 55 Fed. Cl. at 34 ("Because the plaintiff's claim to the CO and its complaint allege a breach of contract, . . . this court has jurisdiction to consider the plaintiff's claim that the defendant breached the contract by withholding superior knowledge of the clay soils at the project site. The plaintiff . . . has merely augmented or changed the nomenclature of its claim that the defendant breached the contract . . . ."); Solar Turbines, Inc. v. United States, 26 Cl. Ct. 1249, 1260 n.9 (1992) (finding jurisdiction because, "while additional facts have been presented, the essential basis of the Claims Court action is the same as the claim presented to the contracting officer . . . . Plaintiff has consistently alleged that the Navy breached its contractual obligations."); Johnson Controls, 43 Fed. Cl. at 595 (dismissing a claim because "[i]t is evident in this case that the claim in litigation does not 'merely augment[] the legal theories,' that were the subject of the contracting officer's decision" (quoting ThermoCor, 35 Fed. Cl. at 490)).

The court concludes that plaintiff's differing site condition claim for an equitable adjustment regarding the West Levee realignment submitted to the CO, and its claim that the government breached its implied duty to cooperate, rely upon sufficiently distinct legal theories to defeat the court's jurisdiction over the latter claim. Here, as in Reliance, plaintiff "only submitted to the contracting officer claims for equitable adjustment to the contract," and "did not submit to the contracting officer a clear and unequivocal claim that [defendant] breached the contract or its duty of good faith." 931 F.2d at 866; accord Johnson Controls, 43 Fed. Cl. at 595. When plaintiff submitted its REA, the CO was not put on notice of a breach of contract claim or a claim for breach of the duty of good faith, both of which are implicated in a claim for the breach of the implied duty to cooperate.[11] A differing site condition claim is not a "slightly different legal theor[y]" from a claim that the government has breached its implied duty to cooperate under the contract. See Reliance, 931 F.2d at 866; cf. Scott Timber, 333 F.3d at 1366. Each claim involves entirely distinct requisite elements of proof, determinations of law, potential defenses and/or counterclaims, and underlying policy rationales. Accordingly, plaintiff has not satisfied 41 U.S.C. § 605(a) and the government has not waived its sovereign immunity to be sued for a breach of its implied duty to cooperate.

c. Whether Plaintiff's Claim That the Government Breached Its Implied Duty to Cooperate Requests the Same Relief as Requested From the Contracting Officer

[11] As noted above, see supra note 10, this conclusion can be made irrespective of whether plaintiff's claim for equitable adjustment submitted to the CO was specifically a differing site condition claim or another, similar "claim."

Although the total amounts are slightly different, plaintiff's Type I differing site conditions claim for an equitable adjustment regarding the West Levee realignment submitted to the CO, and its claim that the government breached its implied duty to cooperate, request essentially the same relief. Compare PX 8 (W. Levee REA) at 5 (claiming $789,600 for "the work directly related to relocation of material necessary for realignment of the levees") with Pl.'s Reply at 7, 9 (claiming $789,304 "for the work to relocate the West Levee in accordance with the oral directive"). However, the court finds that this is the only prong in the three-part analysis under Manuel Bros., 55 Fed. Cl. at 33, that plaintiff has satisfied.

## III. Conclusion

For the foregoing reasons, the court finds that it lacks jurisdiction to consider the merits of plaintiff's claim that the government breached its implied duty to cooperate and therefore DECLINES to consider it.[12]

IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Judge

---

[12]The rationale for denying plaintiff's Motion to Stay described in Part I of this opinion applies with equal force to the court's decision not to stay the case here while plaintiff submits any potential claims that the government breached its implied duty to cooperate to the CO. After issuing this opinion, the only outstanding items before the court are Plaintiff's Motion Requesting the Court's Modification of Its April 19, 2005 Opinion and Order, and Plaintiff's Motion for Leave to File a Supplemental Brief in Support of Its Motion to Modify the Court's April 19, 2005 Opinion, filed on June 1, 2005 and April 7, 2006, respectively. The court expects to rule on these outstanding motions in the near future and then to "proceed[] to enter judgment on the already-settled record in this case." Order of Oct. 26, 2005 at 4 n.2.